**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |

-------------------------------------------------------------

### AFFIDAVIT OF JAMES WHITLINGER, CHIEF FINANCIAL OFFICER OF RESIDENTIAL CAPITAL, LLC, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, James Whitlinger, being duly sworn, depose and say:

1.      I am the Chief Financial Officer of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"). I have held this position since May 2011. I joined ResCap in 1992, and before becoming its Chief Financial Officer, I served in a number of positions, including Chief Accounting Officer for a significant subsidiary of ResCap, Senior Vice President of mergers and acquisitions and Executive Director of Finance. I am also Chief Financial Officer for the Mortgage Operations of Ally Financial, Inc. ("AFI," f/k/a GMAC Inc.),[1] which is not a debtor in these Chapter 11 cases. I am a director of ResCap and of GMAC Mortgage, LLC ("GMAC Mortgage") and Residential Funding Company LLC ("RFC"), each of which is a subsidiary of ResCap and Debtors. In my role as Chief Financial Officer of ResCap, I am responsible for financial oversight, analysis, controls, accounting, reporting and business

---

[1] AFI is the parent company of the intermediate non-debtor company that owns 100% of ResCap's equity, GMAC Mortgage Group, LLC.

planning for the mortgage-related operations of the Debtors and their non-Debtor subsidiaries, but not for Ally Bank and any Canadian mortgage-related operations.  Board member I am authorized to submit this Affidavit in support of the Debtors' Chapter 11 petitions and the first day pleadings described herein.[2]

2.        In my capacity as Chief Financial Officer, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records.  I submit this Affidavit (the "Affidavit") on the Debtors' behalf in conjunction with their petitions and in support of the various motions and applications for orders filed with the Court contemporaneously herewith (collectively, the "First Day Pleadings").  Except as otherwise indicated, all statements in this Affidavit are based upon my personal knowledge; information supplied or verified by personnel in departments within the various business units of the Debtors and/or AFI; my review of the Debtors' books and records as well as other relevant documents; my discussions with other members of the Debtors' management team; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' operations, financial condition and history.  In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees or consultants, I have relied upon these employees and consultants accurately recording, preparing, collecting, or verifying any such documentation and other information.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

---

[2] Unless otherwise defined, capitalized terms used herein have the meanings ascribed to them in the relevant First Day Pleadings (defined below).

ny-1011800

3.      Part I of this Affidavit provides an overview of the Debtors' businesses and operations.  Part II describes the Debtors' assets and capital structure.  Part III of the Affidavit describes the developments that led to the Debtors' filing for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Finally, Part IV sets forth the relevant facts in support of the First Day Pleadings.

## I.      THE DEBTORS' BUSINESSES AND OPERATIONS

### A.      The Chapter 11 Cases

4.      ResCap maintains its headquarters at its New York office located at 1177 Avenue of the Americas, New York, New York 10036.  The New York office has served as the primary office for the senior executives and core management team of the largest operating Debtors – ResCap, Residential Funding Company LLC ("RFC") and GMAC Mortgage, LLC. These core operating Debtors share certain management personnel and senior officers, including their President, Steven Abreu.  I serve as the CFO for each of these three operating Debtors, while Tom Marano serves as CEO of ResCap.  In addition, the Board of Directors of ResCap holds its regular (and often special) meetings in New York City.  Moreover, one of RFC's largest unencumbered assets consists of a $250 million cash account maintained in New York City.

5.      Contemporaneously with the filing of this Affidavit today (the "Petition Date"), each of the Debtors has filed a voluntary petition commencing a case in this Court under Chapter 11 of the Bankruptcy Code.  The Debtors will continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.[3]

---

[3] As described under Part I, Section C of this Affidavit, ResCap and all but two of its domestic subsidiaries have filed Chapter 11 petitions.

6.     The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank (f/k/a GMAC Bank), and other third parties.  As of March 31, 2012, the Debtors were servicing over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately $374 billion.  To preserve and realize the value of these assets and achieve the goals of these Chapter 11 cases, the Debtors developed and are prepared to implement a strategy that provides maximum value to the Debtors' estates.

7.     The Debtors have negotiated and entered into two separate asset purchase agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder ("Purchaser") for the sale of their mortgage loan origination and servicing businesses (the "Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of the Debtors' "legacy" portfolio consisting mainly of mortgage loans and other residual financial assets (the "Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").  The Debtors intend to implement a comprehensive reorganization by consummating the Asset Sales through a plan of reorganization consistent with the terms of  one or more plan support agreements with AFI and certain of their key secured and unsecured creditor constituents (the "Plan Support Agreements").[4]

8.     Pursuant to the Plan Support Agreements, a plan and disclosure statement consistent with the Plan Support Agreement(s) will be filed within 30 days, which will effectuate a global settlement with AFI and other creditor constituencies that provides the estate with substantial value.  In furtherance of their reorganization strategy, and contemporaneous with the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to,

---

[4]

among other things, establish auction and sale procedures for both Asset Sales, and for approval

to consummate the Asset Sales under a Plan.  In the unlikely event, however, that the Debtors do

not obtain confirmation of the Plan by the dates set forth in the Plan Support Agreements, then

the Sale Motion allows the Debtors to pursue an alternative course of action and immediately

move forward with the Asset Sales under Bankruptcy Code section 363(b) and outside of a plan.

### B.    Summary

9.        The Debtors are collectively the fifth largest servicer of residential

mortgage loans in the United States, servicing approximately $374 billion of domestic[5]

residential mortgage loans and working with more than 2.4 million homeowners across the

United States as of March 31, 2012.  Only Bank of America, NA, J.P. Morgan Chase Bank NA,

Wells Fargo Bank, NA and CitiMortgage, Inc. service more mortgage loans than the Debtors.

GMAC Mortgage has been a leader in refinancings and loan modifications to ease the mortgage

debt burden on homeowners.  Since 2008, GMAC Mortgage has executed over 784,000 default

workouts for borrowers.  In the most recent assessment by the U.S. Department of the Treasury

(the "Treasury") of compliance with its "Making Home Affordable" program, GMAC Mortgage

has been and continues to be a leading performer in virtually all the established benchmarks for

program compliance.[6]  GMAC Mortgage is a leading participant in HAMP (Home Affordable

Modification Program), which is sponsored by the Treasury and the U.S. Department of Housing

and Urban Development ("HUD").  GMAC Mortgage has effected more than 40,400 permanent

HAMP modifications to date, which is an implied conversion rate of trial modifications to active

---

[5] Unless otherwise specified, all information regarding Debtors' mortgage loans refers only to domestic operations.

[6] See "Making Home Affordable – Program Performance Report Through March 2012," available at
http://www.treasury.gov/initiatives/financial-stability/results/MHA-
Reports/Documents/Feb%202012%20MHA%20Report%20FINAL.pdf

permanent loan modifications of 59%, one of the highest in the industry.  GMAC Mortgage also

has consistently received three "stars" pursuant to the Servicer Total Achievement and Rewards

(STAR) Program sponsored by Fannie Mae.[7]

10.    The Debtors are also a leading residential real estate finance company.  As

of the Petition Date,[8] the Debtors and their non-debtor affiliates, including Ally Bank, are

collectively the tenth largest originator of residential mortgage loans in the United States.  On

December 1, 2011, GMAC Mortgage was the first major originator of loans to roll out the

Treasury's HARP 2.0 (the updated Home Affordable Refinance Program), which removes

certain refinancing restrictions, thereby increasing the number of existing mortgage loans eligible

for refinancing in the current mortgage environment.  GMAC Mortgage has effected more than

63,000 HARP and HARP 2.0 refinancings to date.

11.    GMAC Mortgage estimates that from May 1, 2012 through December 31,

2012, through HARP, HARP 2.0, HAMP and other loan modification programs, including its

own direct mail outreach program, it will be able to help more than 116,000[9] borrowers stay in

their homes by lowering monthly mortgage payments and/or interest rates, further stabilizing the

housing market and overall economic recovery.

12.    More than five years ago, as the residential real estate market collapsed

throughout the country, leading the United States into its current economic circumstances, the

Debtors, together with AFI, began taking numerous steps to survive and to continue to offer

---

[7]  The STAR program, announced in February 2011, measures the performance of servicers with an emphasis on
foreclosure prevention.  Fannie Mae was formerly known as the Federal National Mortgage Association.

[8] As used herein, unless otherwise indicated, financial information as of the "Petition Date" means as of the close of
business on April 30, 2012.

[9] This excludes any loan modifications pursuant to the DOJ/AG Settlement (as defined herein).  See paragraph 89 *et
seq*.

6

affordable mortgage loans to homeowners and mortgage servicing to public and private

investors.  Those steps, which are described in more detail in Part III, Section A, have included

debt restructurings, asset sales, downsizings and capital contributions from AFI.  Those steps are

no longer sufficient, and the Debtors now find that they must file for relief under Chapter 11.

13.    The purpose of these Chapter 11 cases is to facilitate an orderly sale of

substantially all of the Debtors' assets and an orderly wind-down and sale of the Debtors'

remaining assets.  During these Chapter 11 cases, the Debtors will continue to offer loan

modifications to thousands of borrowers, to originate new mortgage loans to allow individuals to

purchase homes or refinance their existing mortgage loans, and to service millions of mortgage

loans.  The Debtors believe that orderly asset sales in Chapter 11 are the best way to: (a)

maximize the value of the Debtors' assets for the benefit of creditors; (b) preserve the Debtors'

servicing business on a going concern basis for sale (in whole or in part), thus preserving jobs,

providing the best possible outcome for the more than 2.4 million consumers whose loans are

serviced by the Debtors and for the investors, including pension fund and money fund managers

and insurance companies, in securitization pools that own loans serviced by the Debtors; (c)

avoid disruption in the fragile housing market recovery; and (d) provide a vehicle for distributing

the proceeds of the Asset Sales to creditors pursuant to the priority scheme under the Bankruptcy

Code.

### C.    Debtors' Businesses

#### (1)    Overview

14.    As of March 31, 2012, the Debtors were servicing over 2.4 million

domestic loans with an aggregate UPB of approximately $374 billion.  Approximately 68% of

the mortgage loans (by unpaid principal balance, or "UPB") serviced by the Debtors are owned,

insured or guaranteed by the federal government sponsored or owned entities, Fannie Mae,

7

Freddie Mac and Ginnie Mae.[10]  In addition, prior to the Petition Date, the Debtors and their non-debtor affiliates, including Ally Bank, were collectively the tenth largest originator of residential mortgage loans in the United States, producing approximately $56.3 billion and $8.6 billion in loan origination volume during the year ended December 31, 2011 and the three months ended March 31, 2012, respectively.  For the year ended December 31, 2011 and the three months ended March 31, 2012, approximately 99% and 99%, respectively (by number of mortgage loans), of the mortgage loans originated or purchased by the Debtors were sold to Fannie Mae and Freddie Mac or guaranteed by Ginnie Mae.  GMAC Mortgage is an industry leader among peers on loan quality as measured by Fannie Mae.

15.     The Debtors are affiliated with Ally Bank, which is an indirect wholly owned subsidiary of AFI.  **Ally Bank is <u>not</u> a Debtor in these Chapter 11 cases**.  Ally Bank is a commercial state non-member bank chartered under the laws of the State of Utah.  The Debtors broker mortgage loans to Ally Bank and subservice substantially all of the mortgage loans owned by Ally Bank or for which Ally Bank retains the mortgage servicing rights (as described herein).  Ally Bank's other mortgage operations consist of providing (i) collateralized lines of credit to mortgage originators other than the Debtors ("warehouse lending"), (ii) correspondent funding origination whereby Ally Bank purchases closed mortgage loans from other mortgage

---

[10] Freddie Mac was formerly known as the Federal Home Loan Mortgage Corporation and Ginnie Mae is the Government National Mortgage Association.  Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress and are referred to herein as the "Government Associations."  Fannie Mae and Freddie Mac securitize or buy mortgage loans originated by mortgage lenders, enabling the lenders to replenish their funds so that they can make additional loans to other homeowners.  Ginnie Mae is a federal corporation within HUD, a federal agency, that guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS") backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA") or the U.S. Department of Agriculture ("USDA").

originators,[11] (iii) wholesale funding origination, whereby Ally Bank originates loans brokered to it by mortgage brokers other than GMAC Mortgage, and (iv) collateral document custodial services to the Debtors and others.  Until April 30, 2012, except for its held-for-investment ("HFI") mortgage loan portfolio, Ally Bank sold all of its Fannie Mae, Freddie Mac or Ginnie Mae eligible originated mortgage loans and other such mortgage loans that it purchased through GMAC Mortgage.  Effective May 1, 2012, Ally Bank began selling loans directly to Fannie Mae and Freddie Mac.  As a result, Ally Bank, rather than GMAC Mortgage, currently sells loans directly to Fannie Mae and Freddie Mac for inclusion in their securitization trusts.  GMAC Mortgage continues to broker mortgage loans to Ally Bank, to originate Ginnie Mae eligible mortgage loans pursuant to an amended and restated master mortgage loan purchase and sale agreement between Ally Bank and GMAC Mortgage, dated May 1, 2012, and to securitize mortgage loans guaranteed by Ginnie Mae.

16.    The Debtors, together with their non-debtor subsidiaries, manage their businesses in two business lines: (i) the ongoing Origination and Servicing business and (ii) the Legacy Portfolio and Other operations,[12] the latter of which is being wound down.

### (2)    Origination and Servicing

17.    The principal activities of the Debtors' Origination and Servicing business are: (a) brokering, originating, purchasing, selling and securitizing residential mortgage loans throughout the United States for the Debtors and Ally Bank; and (b) servicing residential

---

[11] In November 2011, AFI announced that Ally Bank was reducing its focus on the correspondent mortgage channel. See also paragraph 80 of this Affidavit.

[12] AFI, which files periodic and other reports with the Securities and Exchange Commission, reports its results of operations on a line of business basis in five operating segments, two of which are "Mortgage – Origination and Servicing Operations" and "Mortgage – Legacy Portfolio and Other Operations."

9

mortgage loans throughout the United States for the Debtors, Ally Bank and other investors in residential mortgage loan and mortgage-backed securities ("MBS").

### (a)    Loan Brokerage and Origination

18.    GMAC Mortgage, under the GMAC Mortgage brand, brokers and originates mortgage loans through a consumer lending business that consists of internet and telephone-based call center operations and, to a lesser extent, a retail network of loan officers who have direct contact with consumers, including through referrals from builders, realtors, and other third parties.  GMAC Mortgage brokers its loan production in 47 states to Ally Bank.[13] Ally Bank underwrites and originates loans based on loan application packages submitted by GMAC Mortgage in accordance with applicable regulatory and industry standards.  In recent years, substantially all of the Debtors' loan production has consisted of conforming loans (that is, loans that meet the required guidelines of Fannie Mae, Freddie Mac or Ginnie Mae, as applicable) and a limited number of prime nonconforming jumbo mortgage loans.

19.    In the years ended December 31, 2010 and 2011 and the three months ended March 31, 2012, the Debtors brokered $7.4 billion, $7.3 billion and $3.6 billion, respectively, of mortgage loans to Ally Bank.  During the same periods, Debtors purchased $66.3 billion, $56.7 billion and $9.9 billion, respectively, of mortgage loans from Ally Bank.

20.    Prior to 2008, the Debtors' origination activities also consisted of home equity mortgage loans, which allow borrowers to make draws from time to time subject to certain requirements.

### (b)    Loan Sales and Securitizations

---

[13] GMAC Mortgage does not originate loans in Hawaii.  Ally Bank does not have the licenses to originate mortgage loans in Nevada and Ohio, in which states, GMAC Mortgage originates and funds mortgage loans directly.

21.     A fundamental part of the Debtors' business strategy consists of securitizing or selling substantially all of the mortgage loans they purchase or originate.

22.     The Debtors through their capital markets function participate in the securitization programs of Fannie Mae, Freddie Mac and Ginnie Mae.  Until April 30, 2012, the Debtors purchased the loans they brokered to Ally Bank and other eligible loans from Ally Bank and, together with mortgage loans originated by the Debtors in Nevada and Ohio, either sold the mortgage loans to Fannie Mae and Freddie Mac for each of them to deposit into securitizations trusts or pooled and deposited Ginnie Mae-guaranteed mortgage loans into securitization trusts and sponsored the issuance of MBS or certificates by such trusts.[14]  Unlike Fannie Mae and Freddie Mac, Ginnie Mae does not buy mortgage loans or issue MBS, but instead provides guarantees of MBS with respect to loans (mainly loans insured by the FHA or guaranteed by the VA or USDA) that have been pooled and securitized by approved issuers such as the Debtors. The applicable GSE or Ginnie Mae guarantees that it will supplement amounts received by the relevant GA Securitization Trust as required in order to permit timely payments of principal and interest on the MBS or certificates.  As of the Petition Date, the Debtors continue to (i) originate loans in Nevada and Ohio, and subsequently sell the Fannie Mae and Freddie Mac eligible loans to Ally Bank, (ii) broker loans to Ally Bank in 47 states, and (iii) purchase loans from Ally Bank that are eligible to be pooled and guaranteed by Ginnie Mae.

---

[14] For purposes of this Affidavit, "GA Securitization Trusts" means securitization trusts holding Fannie Mae- or Freddie Mac–owned mortgage loans and securitization trusts in which the mortgage loans are guaranteed by Ginnie Mae.

23.     The securities issued by GA Securitization Trusts and PLS Trusts[15] are

owned by a broad range of investors, including pension funds, money market funds, mutual

funds, banks, insurance companies, governmental bodies and other public and private entities.

24.     **All securitization trusts sponsored by the Debtors are distinct legal**

**entities and are not included in the Debtors' Chapter 11 cases**.

(c)     **Loan Servicing**

25.     Since 2008, mortgage loan servicing has been the Debtors' main source of

ongoing revenue.  Mortgage servicing rights ("MSRs") consist of either primary or master

servicing rights.  The Debtors generally retain the MSRs with respect to mortgage loans they

have purchased from Ally Bank and sold into Ginnie Mae-guaranteed securitizations.  Ally Bank

retains the MSRS for mortgage loans the Debtors originate or broker to Ally Bank for sale to

Fannie Mae or Freddie Mac.  The Debtors service the mortgage loans for the MSRs they own

and for MSRs owned by Ally Bank and other parties.

26.     Primary servicing rights are rights to service mortgage loans.  As a

primary servicer, the Debtors collect and remit mortgage loan payments, respond to borrower

inquiries, account for and apply principal and interest, hold custodial and escrow funds for

payment of property taxes and insurance premiums, provide ancillary products, counsel or

otherwise work with delinquent borrowers[16] (including helping borrowers modify their loans in

accordance with federal programs and public policy intended to assist homeowners' efforts to

---

[15] Since the collapse of the mortgage loan industry in 2007, the Debtors have not been active sponsors of private label securitizations.  In a private label securitization ("PLS"), the Debtors pooled together non-conforming mortgage loans in their own names ("private label") and conveyed the pool of loans to a newly formed securitization trust (a "PLS Trust").  The PLS Trust raised cash to purchase the mortgage loans from the Debtors by issuing MBS to investors.  The MBS entitle their holders to receive the principal (including prepayments) and interest collected on the mortgage loans in the PLS Trust.

[16] For purposes of this Affidavit, delinquent mortgage loans are those that are delinquent in payment for thirty days or more, including those for which foreclosure is pending.

remain in their homes in the face of the recession and housing market collapse), supervise

foreclosures and property dispositions and generally administer the mortgage loans consistent

with contractual undertakings and business practices.

27.    As primary servicer, the Debtors are typically obligated to make various

types of advances.  With respect to loans in foreclosure, the servicer is typically obligated to

advance all reasonable, customary, and necessary costs and expenses (including reasonable legal

fees) incurred in the performance of its servicing obligations, which may include, without

limitation: (a) fees and expenses to various servicing vendors, including but not limited to,

property inspectors and maintenance contractors; (b) fees and expenses associated with

enforcement or judicial proceedings, including foreclosures, bankruptcy, eviction, or litigation

actions; (c) costs and expenses associated with the management, maintenance, and liquidation of

property that has been foreclosed upon; and (d) costs to preserve foreclosed property prior to

liquidation (collectively, "Corporate Advances").  The Debtors carry these Corporate Advances

until the property can be liquidated.  The Advances are then reimbursed from the sale proceeds

or if the loan is brought current, to the extent proceeds are insufficient to reimburse the

Corporate Advances, the Servicer can be reimbursed from claims to the applicable GSE, Ginnie

Mae or PLS Trust, subject to certain limitations.

28.    In addition to Corporate Advances, from time to time, to the extent funds

available from the Debtors' custodial accounts are insufficient to cover required remittances to

investors, the Debtors, as primary servicer, may be required to advance funds to investors or

other third parties with respect to MBS and mortgage-related asset backed securities and whole-

loan packages in order to cover delinquent principal and interest payments on the related pool of

mortgage loans ("P&I Advances") and taxes, insurance premiums, and other charges against

property securing the loans ("T&I Advances" and, together with the P&I Advances and the Corporate Advances, the "Advances").

29.     The Debtors are required to use their own funds to pay the Advances. Moreover, when a loan becomes delinquent, in most cases, the Debtors must continue making P&I Advances until they are determined to be nonrecoverable from the related loans.  At that time, the Debtors may stop making P&I Advances, although they are required to continue to make the T&I Advances and Corporate Advances in order to protect the lien on the property. Advances are generally reimbursable to the Debtors on a priority basis, either from amounts paid by the borrower or from the proceeds of insurance policies or the liquidation of the related loan or, under certain circumstances, from pool collections if such reimbursement is insufficient. Advances constitute the single largest use of the Debtors' cash.

30.     Although most Advances are reimbursable, the primary servicer is responsible for any loss in excess of the guarantee on an FHA-insured, VA- or USDA-guaranteed mortgage loan.  The primary servicer also may incur losses for other reasons, such as costs of services exceeding expense caps or allowable amounts set forth in servicing agreements, making certain interest payments, penalties for failure to comply with required foreclosure timelines, costs related to restarting suspended foreclosures and assuming losses relating to Fannie Mae loans if the loss resulted from a rescinded mortgage insurance policy.

31.     As part of their servicing operations, the Debtors also contract with third party owners of MSRs to act as subservicers.  As subservicers, the Debtors perform the responsibilities of a primary servicer and receive a fee from the primary servicer for such services but do not own the corresponding MSRs.

14

32.    In master servicing, the Debtors service the MBS, mortgage-related asset-backed securities and whole-loan packages owned by investors.[17]  In this capacity, the Debtors interact with investors, not homeowners.  When the Debtors act as master servicer, they collect mortgage loan payments from primary servicers or subservicers and distribute those funds to the investors.  Master servicers also work with third parties that perform functions for securitization trusts, such as mortgage insurance providers, interest rate swap providers, bond insurance providers and rating agencies.  Additional key services provided by master servicers include advancing principal and interest on REO properties,[18] and performing claims administration, oversight of primary servicers and subservicers, loss mitigation, bond administration, cash flow waterfall calculations, investor reporting, tax reporting compliance, and other contractual and oversight functions.  In most cases, master servicers must make Advances to the extent the primary servicer does not make such advances.  Master servicing advances are priority cash flows in the event of a default by the underlying borrower, thus making their collection reasonably assured. In most cases, unless there is a determination that the Advances will be nonrecoverable, the master servicer is also required to make P&I Advances until such time as the loan is liquidated or the related REO is disposed of, and the Advances are reimbursed from the proceeds thereof.

33.    In many cases, the Debtors (through separate legal entities) act as both the primary and master servicer.  However, in certain cases, the Debtors also service loans that have been purchased and subsequently sold through a securitization trust or whole-loan sale in which

---

[17] The Debtors' master servicing operations also perform an immaterial amount of bond administration services related to automobile securitizations and master servicing related to a small number of fee-based servicing clients.

[18] Properties that have been foreclosed upon that remain on Debtors' balance sheet until sold to a third party are referred to as "real estate owned" or "REO."

the originator of the loans retained the primary servicing rights and the Debtors retained the

master servicing rights.

34.    The Debtors receive a fee based on the UPB of the mortgage pool or, in

some cases, for each loan serviced.  These servicing fees are typically paid from the monthly

payments made by the borrowers on the loans or if the Debtors act as a subservicer, they may bill

the subservicing clients.  In addition, the Debtors may receive other remuneration for loan

servicing, including borrower-contracted fees such as late charge fees, assignment transfer fees,

insufficient funds check charges, assumption fees, loss mitigation fees and other incidental fees

and charges.  As described above, the Debtors are generally required to continue making

Advances as part of their servicing (or subservicing) obligations, unless such amounts are

determined to be nonrecoverable from the related loans; however, in many cases, the Debtors'

right to servicing fees with respect to delinquent mortgage loans may be subordinate to other

obligations of the securitization trusts with respect to such loans.  In addition, when borrowers

repay their loans prior to the end of an interest period, generally the Debtors are responsible for

covering the interest payment with respect to such loans for the full interest period.

35.    As of March 31, 2012, the Debtors acted as the primary servicer for

approximately 1.5 million loans having an aggregate UPB of approximately $197 billion.  In

addition, as of March 31, 2012, the Debtors acted as subservicer for over 847,000 loans having

an aggregate UPB of approximately $169 billion, including mortgage loans for which Ally Bank

retains the MSRs and whole loans owned by Ally Bank.  The Debtors are the master servicer for

approximately 439,000 loans having an aggregate UPB of approximately $58.7 billion as of

March 31, 2012, including loans having an aggregate UPB of $7.8 billion for which the Debtors

are the master servicer but not the primary servicer.

16

36.     The Debtors' master servicing operations work with 925 mortgage loan

securitization trusts.  As of March 31, 2012, these securitization trusts have an aggregate UPB of

$102.6 billion.

37.     As part of the Debtors' master servicing, Executive Trustee Services,

LLC, ETS of Washington, Inc. and ETS of Virginia, Inc. (collectively, "ETS"), act as

foreclosure trustees with respect to certain loans in states that allow for non-judicial

foreclosures—specifically, California, Arizona, Texas, Washington, and until recently, Nevada

and Virginia.  ETS also provides recovery operations, which consist of debt collection in

circumstances where the servicer elects not to pursue foreclosure.

### (d)     Certain Collateralized Borrowings

38.     As noted above, Advances constitute the single largest use of the Debtors'

cash.  In order to meet their liquidity needs to fund Advances, in addition to the Debtors' credit

facilities (described in Part II, Section B), the Debtors maintain a nonrecourse servicing advance

facility to fund Advances for specified PLS Trusts secured by the receivables relating to those

Advances.  Under the servicing advance facility (the "GSAP Facility"), the Debtors sell the right

to collect repayment of Advances (the "Servicing Advance Receivables") through a two-step

transaction to a Cayman Islands special purpose entity, GMAC Mortgage Servicer Advance

Funding Company Ltd. (the "GSAP Issuer"), which is not a Debtor in these Chapter 11

proceedings.  The GSAP Issuer, in turn, may issue to investors term notes and/or variable

funding notes secured by the Servicing Advance Receivables.  The amount of Servicing Advance

Receivables securing notes issued under the GSAP Facility fluctuates depending on the volume

of Advances required to be made by the Debtors under the servicing agreements and the sale of

the related Servicing Advance Receivables to the GSAP Issuer.  On March 13, 2012, the GSAP

Issuer issued the Series 2012-1 VFN variable funding note (the "2012 VFN Note") with a

maximum balance of $800 million. Approximately $712 million of the maximum balance was used to repay the outstanding term notes and variable funding note then outstanding. In the ordinary course, the 2012 VFN Note will begin amortizing in March 2013 and mature on March 12, 2020. As of the Petition Date, there are no other outstanding notes under the GSAP Facility.[19]

39.    The Debtors also established a nonrecourse funding facility to assist in the financing of certain home equity mortgage loans. The Debtors formed a special purpose entity, GMACM Home Equity Notes 2004 Variable Funding Trust (the "GMEN Issuer"), which is not a Debtor in these Chapter 11 proceedings. The GMEN Issuer issued variable funding notes (the "GMEN Notes") collateralized by home equity loans and revolving lines of credit. Under this facility, the Debtors sold certain home equity mortgage loans in a two-step transaction to the GMEN Issuer, which, in turn, issued the GMEN Notes. Under the mortgage sale agreement, the GMEN Issuer purchased the initial loan balances on the home equity mortgage loans and any additional balances up to the commencement of the amortization period for such loans. The maturity date of the GMEN Notes is February 25, 2031. As of March 31, 2012, the principal amount due to holders of the GMEN Notes was $127.3 million. No further draws on this facility are permitted.

### (3)    Legacy Portfolio and Other

40.    Debtors' legacy portfolios principally consist of the remaining mortgage loan assets from their historical non-conforming domestic residential mortgage loan origination and securitization activities (referred to in this Affidavit as "Domestic Non-core"), the Debtors'

---

[19] The GSAP Issuer is a bankruptcy remote special purpose entity. However, the Debtors' filings under the Bankruptcy Code are a default under the GSAP Facility, which would have caused the Notes to begin rapid amortization absent the refinancing of such facility through the Barclays DIP Facility (as defined in paragraph 194). See paragraph 198.

remaining international operations, and the Debtors' captive mortgage reinsurance operation.
The legacy portfolios are being wound down through opportunistic asset sales, workouts or other strategic disposition transactions.

### (a)      Domestic Non-core Mortgage Loan Portfolio

41.      The Domestic Non-core mortgage loan portfolio activities primarily consist of loss mitigation and sales of mortgage loan assets (which are serviced by either the Debtors or third party subservicers).  The mortgage loans consist primarily of mortgage loans repurchased by Debtors pursuant to representation and warranty obligations, distressed mortgage loans, loans contributed to the Debtors by AFI in 2009, and mortgage loans originated prior to January 1, 2009 of types that are no longer being offered by the Debtors or that were not securitizable.  As of March 31, 2012, the aggregate carrying value of these mortgage loans was $2.1 billion and their UPB was $5.2 billion.

### (b)      International Operations

42.      The Debtors' international business operates through international, non-Debtor subsidiaries, all of which are being wound down. Effective May 11, 2012, ResCap sold the entity that conducted operations in Mexico.  At March 31, 2012, the carrying value of its total assets was approximately $401 million but it had negative stockholder's equity of $18.3 million. In connection with this sale, holders of notes issued by the Mexican subsidiary and guaranteed by ResCap and certain other Debtors approved the release of such guaranties.  In addition, RFC owns interests in the cash flow from certain mortgage loans on properties in Canada, which loans are held by a Canadian subsidiary.  The carrying value of those interests at March 31, 2012 was $1.4 million.

(c)    **Other**

43.    Prior to 2009, certain Debtors also provided loans, made private equity investments or participated in joint ventures in connection with residential housing development and construction.  As of March 31, 2012, any remaining value of these Debtors' assets has been impaired.

44.    Cap Re of Vermont, LLC ("Cap Re") operated the Debtors' captive reinsurance business **and is <u>not</u> a debtor in these Chapter 11 cases**.  Cap Re ceased insuring new business in 2008, and its operations are being wound down.  As of March 31, 2012, the carrying value of its assets was approximately $123.5 million.

45.    In the ordinary course of the Debtors' loan servicing business, the Debtors institute foreclosure procedures when mortgagors fail to honor their loan commitments.  Once the foreclosures are complete, for GSE-related and Ginnie Mae-guaranteed mortgage loans, the GSE or applicable government agency, as the case may be, takes title to and possession of the relevant properties.  For PLS mortgage loans, if the investor requires it, the Debtors undertake to sell the properties foreclosed upon.  At March 31, 2012, the Debtors held for their own benefit and for the benefit of securitization investors approximately 137 and 2191 housing units, respectively, that are REO and are ready to be sold (the related loans had an aggregate UPB of approximately $85.9 million).

D.    **Organizational Structure**

46.    The Debtors are wholly owned, indirect domestic subsidiaries of AFI.

47.    As of the Petition Date, the Debtors consist of 51 separate entities organized and located in the United States.  ResCap also has 13 wholly owned indirect subsidiaries organized under the laws of various international jurisdictions.  All of the direct and indirect domestic subsidiaries of ResCap except for Cap Re and Phoenix Residential Securities,

LLC are Debtors in this case.  Attached hereto as **Exhibit 1** is a list of the Debtors that have filed

for Chapter 11 relief on the Petition Date.  Attached hereto as **Exhibit 2** is a summary

organizational chart.  In all cases, this information excludes the securitization trusts, which are

not Debtors.

## II.    DEBTORS' ASSETS AND CAPITAL STRUCTURE

### A.    The Debtors' Assets

48.    As of March 31, 2012, the carrying value of the Debtors' assets totaled

approximately $15.7 billion.  The principal assets owned by the Debtors are its mortgage

origination, capital markets and servicing platforms, Servicing Advance Receivables, held-for-

sale ("HFS") mortgage loans, HFI mortgage loans, MSRs, claims with respect to government-

insured loans (included within Debtors' accounts receivable) and derivative assets.

### (1)    Platforms

49.    The principal components of the Debtors' origination, capital markets and

servicing platforms are its employees and the software used to run the operations.

50.    The Debtors' origination platform consists of a direct call center, a retail

network and an operations fulfillment center.  In March 2012, the call center and retail network

brokered or originated approximately $1.5 billion in mortgage loans, which equaled

approximately 7,100 transactions closed by the operations fulfillment center.  As of the Petition

Date, there were approximately 598 employees working within the origination platform.

51.    The Debtors' capital markets platform is used to price, hedge and

distribute mortgage loans as well as to transact interest rate and foreign currency swaps, futures,

forwards, options, swaptions, and agency to-be-announced securities ("TBAs") in connection

with their risk management activities.  As of the Petition Date, there were approximately 113

employees working within the capital markets platform.

52.     The Debtors' fully integrated servicing platform addresses the primary servicing, master servicing, foreclosure trustee, recovery and special servicing needs of its customers.  As of the Petition Date, there were approximately 2,150 employees working within the servicing platform.

(a)     Primary servicing includes customer service, loan administration, loss mitigation (including loan modifications, deed-in-lieu transactions and short sales) and default administration.  Primary servicing uses the Fiserv loan servicing platform, which is able to integrate multiple brands and products.  On a monthly basis, primary servicing manages 6.6 million inbound and outbound customer phone calls, 2.3 million customer account statements and $8.45 billion of investor remittances.

(b)     Master servicing oversees approximately 38 servicers and provides bond administration services.

(c)     Special servicing addresses those loans that require additional "high touch" capability for managing loss mitigation and collections, and also manages REO liquidation.

(d)     ETS acts as a foreclosure trustee in five states and also has a recovery operation.

### (2)     Servicing Advance Receivables

53.     As described in Part I, Section C, the Debtors are required to make Advances pursuant to servicing agreements.  The Debtors have a contractual right to be reimbursed for these Advances.  Servicing Advance Receivables are generally collected from the payments received by the Debtors from the borrowers or from liquidation or other disposition proceeds.  As of March 31, 2012, the Debtors' Servicing Advance Receivables totaled approximately $2.1 billion (net of a $43.5 million allowance for uncollectible Advances).

22

### (3)    Mortgage Loans

54.    The Debtors' domestic HFS mortgage loans (*i.e.* those not sold or securitized) had an aggregate carrying value of approximately $4.3 billion as of March 31, 2012. The HFS portfolio consisted of first lien mortgage loans with a carrying value of $3.6 billion, which includes mortgage loans that are subject to the Debtors' conditional repurchase options of $2.3 billion in Ginnie Mae-guaranteed securitizations and $99.3 million in PLS Trusts, and home equity loans with a carrying value of $712.5 million.

55.    The Debtors' HFI consumer finance receivables and loan portfolio ("HFI Portfolio") had an aggregate carrying value of approximately $996.6 million as of March 31, 2012 (before allowance for loan losses).  The HFI Portfolio primarily consists of non-economic PLS assets required to be recognized by the Debtors under generally accepted accounting principles in the United States of America ("GAAP").  The corresponding liabilities are recognized on the Debtors' financial statements as collateralized borrowings in securitization trusts as a component of total borrowings.  The Debtors' economic exposure to the net assets of these PLS is limited to their retained interests in such PLS Trusts and the related MSRs.  The balance of the Debtors' HFI Portfolio represents home equity mortgage loans financed through the use of a special purpose entity.[20]  At March 31, 2012, the carrying value of the retained interests and MSRs of the HFI Portfolio was $12.5 and $2.0 million, respectively.  These PLS assets were transferred to special purpose entities as part of the Debtors' legacy non-conforming securitization activities.

---

[20] See paragraph 23.

### (4)    Mortgage Servicing Rights

56.    As described in Part I, Section C, the Debtors' MSRs are rights the Debtors either retained upon a sale of loans or purchased from other industry participants.  The Debtors collect a fee (often calculated as a percentage of the UPB of the serviced loans) in connection with servicing mortgage loans.  The carrying value of the Debtors' MSRs as of March 31, 2012 was $1.25 billion.

### (5)    Other Assets

57.    The Debtors hold $612.5 million of unrestricted cash and $275.5 million of restricted cash as of the Petition Date.

58.    The Debtors also own other assets with a carrying value at March 31, 2012 of $1.2 billion (exclusive of assets relating to the Debtors' derivative activities), consisting of:

(a)    Accounts receivable including a net loan insurance guarantee receivable that represents mortgage loans in foreclosure for which a guarantee from Ginnie Mae exists (net of a reserve for uncollectible guaranteed receivables) of $875 million and other various accounts receivable aggregating $231.6 million;

(b)    Net property and equipment and foreclosed assets, including REO, aggregating $107.0 million; and

(c)    Trading securities, consisting of MBS or mortgage-related asset-backed securities (including senior and subordinated interests), interest-only, principal-only or residual interests, which may be investment grade, non-investment grade, or unrated securities, aggregated $32.3 million.

24

B.     **The Debtors' Liabilities**

59.     The Debtors are borrowers under credit facilities and also maintain collateralized nonrecourse borrowing facilities for securitization trusts.[21]  The Debtors also are the issuer of $2.1 billion of secured and $972.2 million of unsecured publicly traded U.S. dollar, Euro and U.K. Sterling-denominated notes.  A chart that itemizes these facilities and notes, and the outstanding principal balances of each, is attached hereto as **Exhibit 3**.

(1)     **AFI Senior Secured Credit Facility**

60.     On December 30, 2009, Debtors RFC and GMAC Mortgage, as borrowers, ResCap as guarantor, Debtors Passive Asset Transactions, LLC ("PATI"), and RFC Asset Holdings II, LLC ("RAHI"), as obligors,[22] entered into a loan agreement with AFI, as agent and lender (as amended from time to time, the "AFI Senior Secured Credit Facility"), amending and restating in its entirety a previous loan agreement entered into on June 4, 2008.[23] The AFI Senior Secured Credit Facility originally was a revolving loan facility but the outstanding amount was converted into a term loan in connection with the December 2009 amendment and restatement.  The borrowers, however, are permitted to use certain accounts securing the AFI Senior Secured Credit Facility as revolving accounts to make advances under certain securitizations and whole loans that are not funded under the GSAP Facility.  The

---

[21] See Notes 38 and 39.

[22] Other Debtors that are obligors under the AFI Senior Secured Credit Facility are Residential Mortgage Real Estate Holdings, LLC, Residential Funding Real Estate Holdings, LLC, Homecomings Financial Services, LLC, Home Connects Lending Services, LLC, GMACR Mortgage, LLC, Ditech, LLC, Residential Consumer Services, LLC, GMAC Mortgage USA Corporation, Residential Funding Mortgage securities I, Inc., RFC Asset Management, LLC, RFC SFJV-2002, LLC and DOA Properties IX (Lots-Other), LLC.

[23] Other Debtors that are guarantors under the AFI Senior Secured Credit Facility are Homecomings Financial, LLC, GMAC-RFC Holding Company, LLC and GMAC Residential Holding Company, LLC; additional pledgor-Debtors under the AFI Senior Secured Credit Facility are GMAC Model Home Finance I, LLC, DOA Holding Properties, LLC and RFC Construction Funding, LLC.

outstanding principal amount under the AFI Senior Secured Credit Facility as of the Petition

Date is approximately $747 million.  The AFI Senior Secured Credit Facility is secured by a first

priority lien for the benefit of AFI on substantially all of the assets of the Debtors, with certain

exclusions such as Ginnie Mae MSRs and related assets and certain of the assets that secure the

other secured debt facilities.[24]  The assets that secure the AFI Senior Secured Credit Facility also

secure, on a junior basis, the Junior Secured Notes (as defined below).

### (2)    AFI LOC

61.    On December 30, 2009, Debtors RFC and GMAC Mortgage and certain of

the other Debtors, as borrowers, ResCap, as a guarantor,[25] and AFI, as agent and lender, also

entered into a $1.1 billion amended and restated secured loan agreement (as amended from time

to time, the "AFI LOC") in order to consolidate under one agreement the terms and provisions of

two secured credit agreements with AFI, entered into on November 20, 2008, and June 1, 2009,

respectively, as well as the loans made under those agreements.  On December 23, 2010, the

parties added a $500 million unsecured swingline loan facility to the AFI LOC, which was

available if there was no remaining borrowing capacity under the AFI LOC.  No amounts were

ever borrowed under the swingline loan facility and it was terminated in April 2012.  The

outstanding principal amount under the AFI LOC as of the Petition Date is approximately $380

million.  The AFI LOC provides funds to the Debtors, generally limited to unused capacity,

---

[24] "Excluded Assets" includes, among other items, "(c) any asset, including any account, note, contract, lease, financing arrangement, general intangible, equity investment, interests in joint ventures or other agreement to the extent that the grant of a security interest therein would violate applicable Requirements of Law, result in the invalidation thereof or provide any party thereto with a right of termination or default with respect thereto or with respect to any Bilateral Facility to which such asset is subject as of the Closing Date (in each case, after giving effect to applicable provisions of the UCC and other applicable Requirements of Law and principles of equity)." Generally, the assets that are collateral for the other secured debt facilities described in this Affidavit are not collateral for the indebtedness under the AFI Senior Secured Credit Facility.

[25] Certain of the other Debtors are also guarantors, together with ResCap, under the AFI LOC.

when the Debtors' unrestricted liquidity is below $300 million.  The AFI LOC is secured by assets of the Debtors, including, without limitation, certain mortgage loans secured by properties located in the United States; certain notes and related agreements issued by third parties that are held by PATI and RFC; certain equity interests of special purpose vehicles (including a pledge by RFC of 100% of the equity of Equity Investment I, LLC; a pledge by PATI of 100% of the equity of PATI Real Estate Holdings, LLC, and a pledge by RAHI of 100% of the equity of RAHI Real Estate Holdings, LLC); certain MSRs; and certain Freddie Mac-related Advances. From time to time, in order to maintain the borrowing base under the AFI LOC as mortgage loans are repaid, the Debtors post additional domestic and FHA/VA/USDA loans and certain Advances as collateral.  The obligations under the AFI LOC and certain derivative agreements with AFI (or its subsidiaries) are cross-collateralized for the benefit of AFI.  The available amount and the borrowing base of the AFI LOC are both reduced by the amount of any collateral posted or delivered by AFI to the borrowers or ResCap pursuant to such derivative agreements.

### (3)    Loans Against Mortgage Servicing Rights

62.    The Debtors own MSRs with a carrying value as of March 31, 2012 of approximately $1.3 billion.  GMAC Mortgage is a borrower, and ResCap is the guarantor, under a revolving facility with Citibank N.A. ("Citibank," and such facility, the "Citibank MSR Facility") consisting until March 30, 2012, of a $300 million committed line with an additional $250 million of uncommitted capacity, secured by MSRs for mortgage loans in Freddie Mac and Fannie Mae securitization pools.  The Citibank MSR Facility, originally scheduled to terminate on March 30, 2012, was extended to the earlier of (i) two days prior to the maturity of the AFI Senior Secured Credit Facility and the AFI LOC or (ii) May 30, 2012. As part of the extension, the Citibank MSR Facility is no longer revolving and the Debtors repaid $124 million of the

outstanding principal.  The outstanding amount under the Citibank MSR Facility as of the Petition Date is $152 million.

### (4)      Funding of Certain Fannie Mae Servicing Advances

63.      Pursuant to a Term Sheet, dated August 1, 2010, amended and restated as of January 18, 2011 and further amended and restated on August 1, 2011, Fannie Mae provides GMAC Mortgage with early partial reimbursement of certain required Fannie Mae servicing advances.  In turn, Fannie Mae recoups such early reimbursement amounts from future final reimbursements to, and other recoveries by, GMAC Mortgage in respect of certain servicing advances.  The total commitment under this facility is $125 million, of which $40.3 million was outstanding as of the Petition Date.  This facility terminates on August 1, 2012.

### (5)      BMMZ Repurchase Facility

64.      From time to time, the Debtors have entered into secured financing facilities pursuant to which they sell assets under repurchase agreements and agree to repurchase the assets at a later date.  In December 2011, repurchase agreements with third parties matured in accordance with their terms and the Debtors entered into a repurchase agreement, dated December 21, 2011, on substantially the same terms with BMMZ Holdings LLC, an indirect, wholly owned subsidiary of AFI ("BMMZ"), with a current facility amount of $250 million (the "BMMZ Repo Facility").  The BMMZ Repo Facility is secured by the assets being sold pursuant to the repurchase agreements.  The total amount outstanding under the BMMZ Repo Facility as of the Petition Date was approximately $250 million.[26]

---

[26] The BMMZ Facility is structured as a derivative repurchase agreement and, as such, will unwind, notwithstanding the Chapter 11 filing because of exceptions to the automatic stay, if not refinanced by the proposed debtor in possession financing.  The Debtors are refinancing the BMMZ Repo Facility through the DIP Facility.  See paragraph 198.

### (6)    Junior Secured Notes

65.    In June 2008, the Debtors closed private debt tender and exchange offers for a portion of their then outstanding public unsecured notes.  ResCap issued approximately $5.7 billion of new senior and junior secured notes consisting of 8.5% senior secured notes due 2010 (the "Senior Secured Notes") and 9.625% junior secured notes due 2015 (the "Junior Secured Notes" and collectively with the Senior Secured Notes, the "Secured Notes"), in exchange for approximately $8.6 billion of its then outstanding unsecured notes.

66.    On May 15, 2010, the then outstanding Senior Secured Notes were repaid at maturity.

67.    As of the Petition Date, the outstanding principal amount of Junior Secured Notes was approximately $2.1 billion.  The Junior Secured Notes are guaranteed by substantially all of the Debtors and the obligations under the Junior Secured Notes are secured by second priority liens on the same assets that secure the AFI Senior Secured Credit Facility.  The Junior Secured Notes are repayable in three equal tranches of $707 million in May of 2013, 2014 and 2015.

### (7)    Unsecured Notes

68.    As of March 31, 2012, ResCap had outstanding senior unsecured notes consisting of $673.3 million of U.S. dollar denominated notes maturing between June 2012 and June 2015, $131.2 million euro denominated notes maturing in May 2012 and $167.7 million U.K. sterling denominated notes maturing between May 2013 and July 2014.[27]   These senior unsecured notes had guarantees from ResCap and certain of its Debtors subsidiaries that were

---

[27] As of March 31, 2012, a non-Debtor international subsidiary of ResCap also had outstanding medium-term unsecured notes consisting of approximately $140.4 million of peso-denominated notes maturing in June 2012, which were guaranteed by ResCap and certain of its Debtor subsidiaries.  Effective May 11, 2012, this entity was sold and release of the guarantees was approved by the noteholders.

removed in the June 2008 debt tender and exchange offers referred to above and are solely the

obligations of ResCap itself.

### (8)    Financial Covenants

69.    The AFI Senior Secured Credit Facility, the AFI LOC, the Citi MSR

Facility, the Fannie Mae Master Agreement and the BMMZ Repurchase Facility[28] all impose

financial covenants on the Debtors.  ResCap and GMAC Mortgage (under certain facilities) are

required to maintain (either as a covenant or as a condition precedent to any loan) Consolidated

Tangible Net Worth (as defined in the applicable debt facilities) of at least $250 million as of the

last business day of the month and to maintain unrestricted liquidity and consolidated liquidity of

at least $250 million on a daily basis.

70.    Under its obligations to Ginnie Mae, GMAC Mortgage must maintain

Adjusted Net Worth (as defined) of $500 million.

71.    Freddie Mac and certain states require the Debtors to satisfy financial

covenants but at lower thresholds.  In addition, certain facilities and regulators require GMAC

Mortgage and certain other Debtors to have at least $1 of net worth calculated in accordance with

GAAP or to meet specified adjusted net worth standards.

### (9)    Other Liabilities

72.    The Debtors also have other liabilities, including mortgage loan

repurchase obligations, buyout obligations under their agreements with Ginnie Mae, HELOC

draw funding obligations, and potential obligations and expenses under outstanding litigation

matters, which are discussed elsewhere in this Affidavit.

---

[28] The GSAP Facility has a similar $250 million Consolidated Tangible Net Worth covenant.  See paragraph 38.

C.      **Hedging Arrangements**

73.      The Debtors transact interest rate and foreign currency swaps, futures,

forwards, options, swaptions, and agency TBAs in connection with their risk management

activities.[29]  These arrangements are with both AFI and third parties. The primary objective for

executing these financial instruments is to mitigate the Debtors' economic exposure to future

events that are outside their control. These financial instruments are utilized principally to

manage market risk and cash flow volatility associated with HFS mortgage loans, Ginnie Mae

pipeline loans and MSRs.  The Debtors post significant collateral for the benefit of their hedge

counterparties.  As of the Petition Date, the Debtors have $19.1 million of derivative assets with

a corresponding offsetting liability of $5.6 million, resulting in a net asset balance of $13.6

million.

74.      As discussed below, market volatility has adversely affected the Debtors'

ability to hedge their risk exposure.  With the filing of these Chapter 11 cases, most of these

hedging arrangements are expected to be unwound.

III.      **THE FILING OF THE CHAPTER 11 CASES**

A.      **Events Leading to the Filing of the Chapter 11 Cases**

(1)      **Summary**

75.      The Debtors are filing these Chapter 11 cases for a number of reasons,

many of which can be traced back to the continuing adverse economic climate, particularly in the

residential mortgage industry.  From time to time since 2009, ResCap or AFI has considered a

---

[29] Until April 30, 2012, certain of the Debtors were counterparty to fair value swaps with Ally Bank that effectively transferred to the Debtors the exposure to changes in fair value of specified pools of Ally Bank's HFS mortgage loans and interest rate lock commitments. In addition, GMAC Mortgage was a counterparty to a swap agreement with Ally Bank that effectively transferred to GMAC Mortgage substantially all of the economic return of a specified portfolio of MSRs owned by Ally Bank in exchange for a variable payment by GMAC Mortgage based on a fixed spread to LIBOR. Those swaps and certain derivative agreements with third parties were terminated on April 30, 2012.

ny-1011800

sale of the Debtors' operations as an entirety or in significant parts, whether through a sale of

assets or a sale of ResCap's equity, but to my knowledge, in their view, the consideration offered

was insufficient, particularly in light of potential buyers' unwillingness to assume most of the

Debtors' liabilities.

76.     Starting in 2007, the mortgage and capital markets experienced severe

stress due to credit concerns and housing market contractions, which have led to record declines

in home values and a continuing glut of homes available for sale and those in foreclosure.  At the

same time, the overall economy suffered its worst recession since the Great Depression, with the

unemployment rate reaching 10.0% in October 2009 and declining fitfully to 8.5% in December

2011 and 8.1% in April 2012.  Throughout the past five years, homeowners have had difficulty

paying their mortgages, refinancing their mortgages (despite record low interest rates), selling

their homes or buying new homes.  As both loan delinquencies and regulation increased, the

costs of servicing mortgage loans also increased.  Although the Debtors have continued to honor

their servicing obligations, it has become financially challenging to continue servicing mortgage

loans because the Debtors have had virtually no ability to access the capital markets to

restructure their indebtedness or to obtain working capital.

77.     Since 2007, the Debtors' management has explored various strategic

alternatives and taken aggressive actions in an attempt to reduce risk, reduce leverage, streamline

the Debtors' cost structure and maximize the value of the Debtors' assets.  In order to streamline

their operations and eliminate businesses that were not income-producing, the Debtors also

began selling assets in 2007, including (a) selling non-core assets to AFI or its affiliates, (b)

selling non-core assets in the marketplace, (c) downsizing operations and implementing

significant cost reductions, (d) restructuring liabilities, and (e) obtaining new loans and capital

contributions from AFI.  A detailed timeline of these actions is attached as **Exhibit 7** hereto and

summarized below.  From January 1, 2008 through March 31, 2012, the Debtors sold

approximately $790.5 million of Domestic Non-core mortgage loan assets, including $3.9 billion

of UPB of mortgage loans, and substantially eliminated their international operations.  Over the

same period, the Debtors' workforce decreased by 63% from approximately 10,900 to 4,031

employees, and the use of independent contractors substantially declined.   In addition, since

January 1, 2007, AFI has made capital contributions of approximately $10.3 billion to ResCap.

78.    Before the economic downturn, ResCap had total consolidated equity of

$7.6 billion at December 31, 2006.  By March 31, 2012, total consolidated equity had declined to

$399.3 million.

79.    Other factors leading the Debtors to determine to file these Chapter 11

cases include the following (described in greater detail in the following numbered paragraphs):

- the magnitude of the Debtors' potential liability for representations and

    warranties the Debtors have made related to mortgage loans sold by them,

    particularly from 2004 through 2008, and the significant time and defense

    costs in respect of litigation claims alleged with respect to such mortgage

    loans and sales, despite the substantial defenses that Debtors have and their

    belief that they can succeed on the merits of such litigations;

- the Debtors' overwhelming debt burden, including the principal and final

    maturity payments on the Junior Secured Notes, the near-term principal

    payments on the senior unsecured notes, and the near-term maturities of the

    credit facilities; and

33

- the continuing volatility in the interest rate markets, which affects the Debtors' ability to hedge the value of their MSRs and to comply with the financial covenants in their credit facilities and other agreements.

80.     In addition, while the Debtors remain heavily dependent on AFI for funding and capital support, AFI has stated that there can be no assurance that AFI or its affiliates will continue any such support or that AFI will choose to execute any further strategic transactions with respect to the Debtors or that any transactions undertaken will be successful.  In particular, AFI is not willing to extend the termination dates of the various credit facilities with the Debtors beyond May 14, 2012.  In a call with investors in April 2012, Michael Carpenter, Chief Executive Officer of AFI, stated "It is the contingent liabilities on the capital structure of ResCap that are dragging the whole company down and we have to separate ourselves from those issues."[30]  Mr. Carpenter has also stated that repaying the U.S. taxpayer is more important than supporting the mortgage origination and servicing operations of AFI's subsidiaries:  "My objective is to protect the value of Ally and to support the auto franchise, which is why the government bailed us out."[31]

81.     For all the foregoing reasons, the Debtors do not expect to be able to satisfy their obligations as they come due.

---

[30] "Earnings conference call," held on April 26, 2012 (quoted in *The Wall Street Journal*, April 27, 2012, available at http://online.wsj.com/article/SB10001424052702304811304577370552327820814.html?KEYWORDS=ally+financial.

[31] "Earnings conference call," held on February 2, 2012 (quoted in *The Wall Street Journal*, February 21, 2012, available at http://online.wsj.com/article/BT-CO-20120221-712857.html?mod=WSJ_Banking_middleHeadlines).

(2)     **A Brief History**

82.     The Debtors had net losses of $5.6 billion and $4.5 billion in the years ended December 31, 2008 and 2009, respectively.  Adverse market conditions also resulted in a significant decline in the fair value of the Debtors' assets, particularly the MSRs and other mortgage loan assets. Without capital contributions from AFI,[32] the Debtors would have breached their Consolidated Tangible Net Worth covenant on a number of occasions.

83.     Beginning in 2007, the Debtors began to receive historically unprecedented large numbers of loan repurchase requests due to alleged breaches of representations and warranties or early payment defaults.  Typically, when the Debtors sell loans through whole-loan sales or securitizations (guaranteed by the Government Associations or sold to private investors), they are required to make customary representations and warranties about the loans to the purchaser or securitization trust.[33]  The Debtors' whole-loan sale agreements generally require them to repurchase or substitute loans if they breach a representation or warranty given to the loan purchaser or investor.  In addition, they may be required to repurchase loans as a result of borrower fraud or if a payment default occurs on a mortgage loan shortly after its origination.  Likewise, the Debtors are required to repurchase loans if they breach a representation or warranty in connection with their securitizations.  Initially, the Debtors experienced an increase in repurchase obligations relating to representation and warranty claims

---

[32] Capital contributions by AFI totaled approximately $2.7 billion in 2007, $3.3 billion in 2008, and $4.0 billion in 2009.

[33] The specific representations and warranties vary among the different transaction types and associated agreements, but typically relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, the ability to deliver required documentation and compliance with applicable laws.

in respect of loans primarily sold to GA Securitization Trusts.  In 2008 and 2009, the Debtors'

repurchases in respect of representation and warranty claims aggregated $820 million.

84.     The Debtors believed that 2010 would mark a turnaround for themselves

and the economy.  In order to continue originating mortgage loans in the only available liquid

markets and maintain their origination and servicing platforms, the Debtors entered into

settlement agreements with Fannie Mae[34] and Freddie Mac[35] with respect to a substantial portion

of their respective representation and warranty claims.  Despite aggregate settlement payments of

$786.5 million (in respect of underlying mortgage loans with aggregate UPB of $377.3 billion),

the Debtors still achieved net income of $575.1 million in 2010.

85.     Beginning in 2010, however, the Debtors began to contend with additional

matters.  Non-GSE and Ginnie Mae representation and warranty claims continued to increase

and there was also a significant increase in litigations and claims filed, or threatened, against the

Debtors in respect of the PLS Trusts that they had sponsored prior to 2008.  Further, in the latter

half of 2010, the "robo-signing" allegations relating to foreclosure documentation began to affect

---

[34] In December 2010, the Debtors entered into a settlement agreement with Fannie Mae under which the Debtors made a one-time payment to Fannie Mae for the release of any repurchase obligations, including any claims in respect of PLS Trusts in which Fannie Mae is an investor, related to most of the mortgage loans the Debtors sold to Fannie Mae prior to June 30, 2010.  The Debtors continue to be responsible for other contractual obligations with Fannie Mae including all indemnification obligations that may arise in connection with the servicing of the mortgages.  The agreement does not cover any violation of servicing obligations related to any failure to comply with any requirements of law applicable to foreclosing on property serving as collateral for any applicable mortgage loan and does not release any of the Debtors' obligations with respect to loans where Ally Bank is the owner of the MSR.

[35] In March 2010, the Debtors entered into a settlement agreement with Freddie Mac under which the Debtors made a one-time payment to Freddie Mac for the release of any repurchase obligations relating to most of the mortgage loans sold to Freddie Mac prior to January 1, 2009.  The agreement does not cover any violation of servicing obligations related to any failure to comply with any requirements of law applicable to the foreclosing on property serving as collateral for any applicable mortgage and does not release any of our obligations with respect to loans where Ally Bank is the owner of the MSR.  It also does not release any claims in respect of PLS Trusts in which Freddie Mac is an investor.  In September 2011, the Federal Housing Finance Authority ("FHFA") as conservator for Freddie Mac, filed a complaint against certain of the debtors, AFI and certain unaffiliated underwriters in connection with Freddie Mac's investments in the Debtors' PLS Trusts.

the entire mortgage loan industry, including the Debtors.  Starting in October 2010,

representatives of federal and state governments, including the United States Department of

Justice ("DOJ"), the Securities and Exchange Commission ("SEC") and all 50 states attorneys

general and other state law enforcement authorities began investigating the procedures followed

by mortgage servicing companies and banks, including ResCap and GMAC Mortgage, in

connection with mortgage foreclosure home sales and evictions (the "DOJ/AG Investigation").

There were also a number of separate state law investigations and enforcement actions.

86.     In 2011, ResCap had a consolidated net loss of $845.1 million[36] primarily

due to continuing economic uncertainty, interest rate volatility and the adverse effects on the

valuation of MSRs arising from market speculation regarding potential government–required

mortgage loan refinancing programs.  In addition, the Debtors continued to lack liquidity and

capital and the market began to perceive that AFI's support for the Debtors was weakening, thus

increasing the Debtors' hedging costs and putting severe constraints on Ally Bank's ability and

desire to create and maintain MSRs in amounts consistent with historical levels.  In November

2011, AFI announced that Ally Bank was reducing its focus on the correspondent mortgage

channel with the intended goal of reducing AFI's exposure to MSR asset volatility over time and

better positioning AFI to comply with "Basel III's" Tier 1 capital requirements.  Further, in 2011

and the first quarter of 2012, the Debtors paid more than $110 million in settlement payments,

fines, penalties and costs and expenses related to the DOJ/AG Settlement, while representation

and warranty claims and PLS Trust litigations continued to increase.

---

[36] This consolidated net loss is after taking into effect aggregate capital contributions as of December 31, 2011 by
AFI of $109.4 million through forgiveness of indebtedness under the AFI LOC.

87.    On April 13, 2011, as a result of an examination conducted by the Board of Governors of the Federal Reserve System ("FRB") and the Federal Deposit Insurance Company (the "FDIC"), ResCap and GMAC Mortgage, together with AFI and Ally Bank, entered into a Consent Order with the FRB and the FDIC (the "Consent Order"). The Consent Order required ResCap and GMAC Mortgage to make improvements to various aspects of their residential mortgage loan servicing business and to undertake a risk assessment of their mortgage servicing operations. Substantially all of the requirements under the Consent Order have now been implemented. The Consent Order also requires the Debtors to conduct a review of certain past residential mortgage foreclosure actions and remediate any financial harm to borrowers resulting from errors or misrepresentations of the Debtors that the review uncovers. Among other things, the Consent Order requires the parties to perform an extensive review of past foreclosure proceedings with respect to loans serviced by the Debtors with the assistance of an independent consultant, and to prepare and submit a detailed report regarding the results of that review. The Debtors estimate that the performance of this review may cost as much as $180 million. The Debtors intend to comply with and adhere to the terms of the Consent Order to the best of their abilities.

88.    In January 2012, prior to closing their 2011 financial statements, the Debtors determined to record a charge of approximately $207 million in the fourth quarter of 2011 for penalties expected to be imposed in connection with the Consent Order and DOJ/AG Investigation. In order for the Debtors to record that charge and to cure the resulting breach of their Consolidated Tangible Net Worth covenant as of December 31, 2011, AFI made a capital contribution to ResCap of $196.5 million as of January 30, 2012 by means of forgiveness of indebtedness under the AFI LOC.

89.     On February 9, 2012, AFI, ResCap, and certain other of the Debtors, along with the four largest servicers of mortgage loans in the United States,[37] reached an agreement in principle with the federal government, 49 state attorneys general, and 48 state banking departments with respect to the DOJ/AG Investigation (the "DOJ/AG Settlement").[38]  The DOJ/AG Settlement generally resolves potential claims of the government parties arising out of origination and servicing activities and foreclosure matters, subject to certain exceptions. Pursuant to the DOJ/AG Settlement, in February 2012, ResCap paid approximately $110.0 million to a trustee, who is to distribute all such settlement funds to federal and state governments. In addition, AFI, ResCap and the other Debtors committed to provide a minimum of $200 million towards borrower relief, which includes loan modifications such as principal reductions, rate modifications and refinancing for borrowers that meet certain requirements, and to participate in certain other programs.  The DOJ/AG Settlement provides incentives for borrower relief provided by the Debtors within the first twelve months, and all borrower relief obligations must be satisfied by March 12, 2015.  As of March 31, 2012, no loan modifications have been completed.  The Debtors are currently in the process of soliciting eligible borrowers and expect modifications to begin in the second quarter of 2012.  The Debtors are also required to review foreclosures in which a service member eligible under the Servicemembers Civil Relief Act (SCRA) and any similar state law is known to have been a borrower and remediate all monetary damages.  The Debtors have not yet determined the size of the SCRA file review or analyzed the potential violations that may be alleged.  The cost of any file review and any

---

[37] See paragraph 9.

[38] The DOJ/AG Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia on March 12, 2012 and in relevant state courts.  In addition, AFI, ResCap and the Debtors separately reached an independent settlement with the attorney general of Oklahoma, who did not participate in the DOJ/AG Settlement.

remediation resulting from such review could be substantial.  In addition to the foregoing, AFI and the Debtors will be required to implement new specified servicing standards.  Compliance with the obligations under the DOJ/AG Settlement will be subject to oversight by an independent monitor, who will have authority to impose additional penalties and fines for noncompliance.

90.    On February 9, 2012, AFI and ResCap agreed with the FRB on a civil money penalty ("CMP") of $207 million related to the same activities that were the subject of the DOJ/AG Settlement.  This amount will be reduced dollar-for-dollar in connection with satisfaction of the federal portion of the required monetary payment and the borrower relief obligations included within the DOJ/AG Settlement, as well as participation in other similar programs approved by the FRB.  Additional future penalties related to the CMP may be imposed if the Debtors are unable to satisfy the borrower relief requirements of the DOJ/AG Settlement within two years.

91.    While ResCap had $110.4 million of consolidated net income for the three months ended March 31, 2012, there is no assurance that the Debtors will be able to generate net income for the entirety of 2012.

92.    In order to comply with certain regulatory requirements, effective May, 9, 2012, AFI entered into (i) an agreement whereby EPRE, LLC, a Debtor, transferred to AFI a 51% ownership interest in its owned real property located in Eden Prairie, Minnesota and (ii) an assignment whereby GMAC Mortgage assigned a 51% leasehold interest in its leased real property located in Lewisville, Texas.  These agreements also provide that EPRE shall repurchase the transferred ownership interest and GMAC Mortgage shall have the assigned leased interest reassigned for the leased property at any time from and after the closing of the Platform Sale but in no event later than December 31, 2014.  As a condition to the repurchase

40

and reassignment, EPRE and GMAC Mortgage are required to provide AFI for a period of at

least 12 months, with an option to extend such time period for an additional 12 months at AFI's

option, with the right to possession of that portion of the space occupied by AFI as of May 9,

2012, and certain services with respect to such space, subject to agreement of the Purchaser in

the Platform Sale to pay rent in proportion to the space occupied and other customary terms.

### (3)    Economic Conditions

93.    The continuing adverse economic conditions and their history over the

past nearly five years, particularly in the housing and mortgage markets, are well known and

briefly summarized above.  Some of the specific consequences to the Debtors are summarized

below.

94.    <u>Reduction in Ability to Obtain Financing</u>.  The Debtors rely heavily on

various funding sources to support the significant cash requirements of their operations.  In order

to obtain short-term funding, the Debtors pledge certain of their assets under debt facilities and

repurchase arrangements.  Typically, the amount advanced under these arrangements is a

function of the fair value of the asset being pledged.  Accordingly, as their assets lost value

beginning in 2007, the Debtors' ability to obtain funding was reduced.  In many cases, the

lenders required the Debtors to apply excess cash to reduce the lenders' overall commitment.

Since January 1, 2008, the Debtors have lost $12.8 billion of committed financing capacity and

$8.8 billion of uncommitted capacity has not been replaced.  Moreover, because the ability to sell

or obtain long-term financing for assets is a function of the perceived market value of those

assets, the continuing adverse conditions in the residential mortgage loan market have restricted

the Debtors' alternatives, including their ability to finance assets in the secondary markets.

Furthermore, since 2008, because of these adverse conditions and lenders' concerns about the

Debtors' financial condition, most of the Debtors' debt facilities have maturities of no more than

41

one year, which requires the Debtors to negotiate extensions on more onerous pricing terms and on a nearly continuous basis, adversely affecting Debtors' ability to manage their operations and financial condition.

95.    <u>Reduction in Loan Production</u>.  As with other mortgage lenders, the Debtors' profitability and operational stability have been adversely affected by a significant reduction in loan production.  Overall non-GSE/Ginnie Mae mortgage loan production declined from $625 billion in 2005 to $0 in 2011.  In the second half of 2007, the Debtors eliminated their domestic non-prime loan production.  In 2008, the Debtors' prime conforming production significantly declined as a result of tighter credit standards and the Debtors' closure of its wholesale channels and retail branches.  The decrease in loan production was reflective of the Debtors' inability to sell or otherwise fund their loan production in the secondary markets, and further negatively impacted their ability to generate income and cash flow.  In the last quarter of 2008, the Debtors ceased substantially all loan originations through mortgage brokers and became primarily a broker to Ally Bank.  This change in production model adversely affected the Debtors' economics of production, because brokering has a smaller profit margin.

96.    For the past five years, virtually all of the Debtors' mortgage loan production has been for GA Securitization Trusts as other exit channels remain substantially closed.  Since 2007, the Debtors have brokered or originated only $200.3 million of mortgage loans that are not eligible to be sold to Fannie Mae or Freddie Mac or guaranteed by Ginnie Mae.  By 2009, the Debtors' domestic loan production had declined by over 66% from its peak in 2006.  Starting in 2010, the Debtors' loan production began to increase, primarily due to the low interest rate environment, but remains significantly below peak production periods.

97.     Beginning in November 2011, as described above, Ally Bank has reduced its focus on its correspondent mortgage lending channel, which represented approximately 80% of Ally Bank's 2011 mortgage loan originations.  In 2011, the Debtors purchased 98% of their total originations and purchases of consumer mortgage loans from Ally Bank, but that level of mortgage loan purchases from Ally Bank is expected to decline significantly in future periods.

98.     <u>Market Volatility and Other Market Conditions Caused Decreases in Value of Assets</u>.  MSRs are generally subject to loss in value when mortgage rates decline. Declining mortgage rates generally result in an increase in refinancing activity, which increases prepayments and results in a decline in the value of MSRs.  Further, valuations of HFS mortgage loans, retained interests and other assets and liabilities that the Debtors record at fair value may continue to deteriorate if there continues to be weakness in housing prices or increased severity of delinquencies and defaults of mortgage loans.  A continuing significant decrease in the fair value of the Debtors' MSRs or other assets would adversely affect the ability of the Debtors to satisfy the financial covenant in their debt instruments relating to Consolidated Tangible Net Worth, described above.

99.     <u>Difficulty in Hedging</u>.  The Debtors pursue various hedging strategies to mitigate their economic exposure to changes in the fair value of their assets and liabilities from future events that are outside their control. These financial instruments are utilized principally to manage market risk and cash flow volatility associated with HFS mortgage loans and MSRs. While the Debtors' hedge performance can be favorable, marketplace volatility makes it significantly more difficult for the Debtors to operate, satisfy their financial covenants and plan for future events.  The Debtors' hedging strategies have not been able to eliminate fully the volatility caused by the fluctuations in the marketplace, resulting in larger spreads between the

Debtors' servicing assets and the derivative instruments the Debtors use to manage the interest

rate risks associated with these assets.  As interest rates change, the Debtors may need to repay

or deliver cash as credit support for these arrangements.  If the amount the Debtors must repay or

deliver is substantial, the Debtors may not be able to pay such amounts as required.  For these

reasons, the Debtors do not intend to engage in any hedging activities after the Petition Date

except with respect to origination and brokering of Ginnie Mae-eligible mortgage loans.

### (4)    Representation and Warranty Claims and Litigation Costs and Expenses

100.    <u>Representation and Warranty Claims</u>.  As described above, since 2007, the

Debtors have faced substantial and continuing increases in repurchase requests due to alleged

breaches of representations and warranties or early payment defaults.  From January 1, 2008

through March 31, 2012, the Debtors have repurchased mortgage loans or otherwise made

payments with respect to representation and warranty claims of approximately $2.8 billion.  At

March 31, 2012, the Debtors' aggregate reserve in respect of representation and warranty

liabilities was $810.8 million.  This estimated loss reserve is primarily based on an internal

model that considers current and historic repurchase request volume, rescission rates on claims

and severity of loss on repurchase or indemnification, among other factors. Adjustments to the

reserve are also made based on consideration of other qualitative factors including ongoing

dialogue and experience with counterparties.

101.    <u>Monoline Insurer Representation and Warranty Litigations</u>.  The Debtors

are currently defendants in 14 cases in which monoline insurance companies, which provided

financial guaranty insurance for certain tranches of the MBS issued by the Debtors' PLS Trusts,

have alleged that certain of the Debtors breached their contractual representations and warranties

relating to the characteristics of the mortgage loans contained in certain MBS offerings insured

44

by the applicable insurer.  The insurers further allege that the defendant Debtors failed to follow certain remedy procedures set forth in the contracts and improperly serviced the mortgage loans. The insurers allege both breach of contract and fraud.  The Debtors believe they have substantial defenses to such claims and that they can win on the merits, but resolving such litigation will take substantial time and expense.

102.    <u>Securities Litigation</u>.  The Debtors are currently defendants in 19 cases relating to various PLS Trusts having aggregate UPB of $9.3 billion.[39]  The plaintiffs in all cases have alleged that the various defendant Debtors made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to MBS offerings. The alleged misstatements and omissions typically concern underwriting standards for the mortgage loans held by the PLS Trusts.  The plaintiffs claim that such misstatements and omissions constitute violations of state and/or federal securities law and common law including negligent misrepresentation and fraud.  The plaintiffs seek monetary damages and rescission.

103.    The Debtors currently estimate that their reasonably possible losses over time related to litigation matters and potential repurchase obligations and related claims described above could be between $0 and $4 billion in excess of existing accruals.  This estimated range is based on significant judgment and numerous assumptions that are subject to change, and which could be material.

---

[39] In certain of these cases, current and former officers and employees of the Debtors are also named defendants. A list of these cases is attached to this Affidavit as **<u>Exhibit 5</u>**.

(5)    **Repayment of Secured and Unsecured Notes**

104.    Repayment of Junior Secured Notes and Unsecured Notes.  The Debtors will be required to repay principal of, and to pay interest on, its Junior Secured Notes and Unsecured Notes of $489.0 million, $1.45 billion, $931 million and $858.0 million in the years ended December 31, 2012, 2013, 2014 and 2015, respectively.[40]  Based on the Debtors' current operations and projected business operations over that same period, it is unlikely that the Debtors will have sufficient funds to pay such principal plus interest when due or that they will have sufficient additional assets available to secure new or expanded debt facilities that will provide the necessary funds to make such payments.

B.    **Objectives of the Chapter 11 Filing**

105.    The purpose of these Chapter 11 cases is to facilitate an orderly sale of the Debtors' most valuable assets, settle the Debtors' claims with their parent AFI, resolve the Debtors' legacy liabilities and complete an orderly wind-down of their remaining assets.

106.    After an extensive analysis by management and outside professionals, the Debtors determined that it is not feasible to maintain their assets for any extended period of time in Chapter 11.  Therefore, these Chapter 11 cases are intended to facilitate ResCap's sale of substantially all of its assets through a plan process.

107.    As part of the first step in this process, the Debtors agreed to sell their mortgage origination and servicing businesses to Nationstar Mortgage LLC, and their legacy portfolio, consisting mainly of mortgage loans and other residual financial assets, to AFI. Together, the Asset Sales are expected to generate approximately $4 billion in proceeds.

---

[40] **Exhibit 6** hereto sets forth the annual principal and interest expense for the Debtors' secured and unsecured notes.

108.     As part of the second phase of the plan process, the Debtors obtained

support for a restructuring plan premised upon the sales described above from AFI,[41] and from

holders of ResCap's junior secured notes holding approximately 37% of the outstanding notes.

Besides for obtaining the support of a key creditor constituency, the settlement with the junior

secured noteholders also has the benefit of reducing the estate's interest obligations by $350

million.[42]   ResCap also obtained support from, and entered into a settlement agreement with,

institutional investors in residential mortgage-backed securities issued by ResCap's affiliates.  At

present, institutional investors holding more than 25% of at least one class in each of 293

securitizations have agreed to support the reorganization.[43]   These 290 securitizations have an

aggregate original principal balance of approximately $164 billion.  As a total of 290

securitizations, with an aggregate original principal balance of approximately $221 billion,

remain outstanding, it is clear that the ResCap reorganization has broad support among

institutional investors.  If approved by the Bankruptcy Court, the institutional investor settlement

would result in ResCap making an irrevocable offer to settle with trusts, and trusts accepting the

deal would be granted a maximum Allowed Claim of $8.7 billion, which they would share with

monoline representation and warranty claims.

109.     Accordingly, I believe that immediately commencing an orderly asset sale

and plan process is the best way to preserve the Debtors' origination and servicing businesses on

a going concern basis for sale (in whole or in part) and to maximize the value of the Debtors'

assets for the benefit of creditors.  A sale/plan process will allow for a final resolution of

---

[41] A copy of the Plan Support Agreement with AFI is attached hereto as **Exhibit 8**.

[42] A copy of the Plan Support Agreement with certain junior secured noteholders is attached hereto as **Exhibit 9**.

[43] A copy of the Plan Support Agreement and RMBS Trust Settlement Agreement is attached hereto as **Exhibits 10-A and 10-B**.

ny-1011800

significant issues among a myriad of parties-in-interest by the end of the calendar year, resulting

in a material distribution of the sale and settlement proceeds.

110.    Moreover, the contemplated sale/plan process will preserve their

employees' jobs, provide the best possible outcome for the more than 2.4 million consumers

whose loans are serviced by the Debtors and for the many investors in securitizations that own

loans serviced by the Debtors, and avoid disrupting the fragile housing market recovery.

111.    Ultimately, the confirmation order will grant final approval of the Plan,

the sale and the settlements, all in form and substance satisfactory to the Debtors and their

creditors.

## IV.    FACTS IN SUPPORT OF FIRST DAY PLEADINGS

112.    Concurrently with the filing of their Chapter 11 petitions, the Debtors are

seeking orders approving the First Day Pleadings (collectively, the "First Day Orders").  The

Debtors request that each of the First Day Orders be entered, as each constitutes an integral

element in maximizing the value of these estates for the benefit of all parties in interest.  A list of

the First Day Motions is attached hereto as **Exhibit 4**.[44]

113.    In connection with the preparation of these bankruptcy cases, I reviewed

those First Day Motions and First Day Orders that are described herein (including the exhibits

thereto), and the facts set forth therein are true and correct to the best of my knowledge,

information and belief based upon the information supplied or verified by various employees of

the Debtors.  As set forth more fully below, I believe that the entry of First Day Orders granting

---

[44] In this Part IV, capitalized terms not otherwise defined herein shall have the meanings set forth in the First Day
Motions.

ny-1011800

the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates.

### A.    Administrative Motions

114.    The Debtors filed five "administrative" motions: (i) to jointly administer the bankruptcy cases; (ii) to retain Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent; (iii) to extend the deadline by which the Debtors must file certain schedules and statements by 33 days; (iv) to file a consolidated list of creditors; and (v) to establish case management procedures, as noted in items 1, 2, 3, 4 and 5 on **Exhibit 4** hereto.  The Debtors' attorneys explained to me the customary practice in this regard in other Chapter 11 business reorganization cases and the rationale for these motions.

### (1)    DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY RULE 1015 AUTHORIZING JOINT ADMINISTRATION OF THE DEBTORS' CHAPTER 11 CASES

115.    In particular, I understand that the Debtors are requesting that their Chapter 11 cases be jointly administered only for procedural purposes.  The Debtors consist of 51 entities, all of which are subsidiaries or affiliates of one another.  As set forth above, ResCap is the direct or indirect parent of each of the Debtors.  I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings that otherwise would need to be filed in each separate case absent joint administration.  Accordingly, the joint administration will save considerable time and expense for the Debtors and other parties in interest.  Further, joint administration will protect parties in interest by ensuring that parties in each of the Debtors' respective Chapter 11 cases will be apprised of the various matters before the Court in these cases.

> **(2)    APPLICATION FOR ORDER APPOINTING KURTZMAN CARSON CONSULTANTS, LLC AS CLAIMS AND NOTICING AGENT FOR THE DEBTORS PURSUANT TO 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), S.D.N.Y. LBR 5075-1 AND GENERAL ORDER M-409**

116.    The Debtors also seek authority to retain KCC as claims and noticing agent in their Chapter 11 cases.  I understand that such appointment is required by the rules of this Court.  Moreover, such relief is prudent in light of the tens of thousands of creditors, potential creditors, and parties in interest to whom certain notices will be sent and from whom proofs of claims will be received.  Accordingly, I believe that the most effective and efficient manner by which to give notice and provide solicitation services in these cases is to engage KCC, an independent third party with significant experience in this role, to act as an agent of the Court.

> **(3)    DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTION 521 AND BANKRUPTCY RULE 1007(c) EXTENDING TIME FOR FILING SCHEDULES AND STATEMENTS**

117.    The Debtors also seek to extend the deadline to file schedules and statements of financial affairs to June 30, 2012, such date that is forty-seven (47) days from the Petition Date (a thirty-three (33) day extension beyond that already provided by the rules of this Court).  Given the size and complexity of the Debtors' businesses, as well as the number of creditors in these Chapter 11 cases, I understand that the Debtors will not be in a position to accurately complete their schedules and statements within the deadline allowed for by the Bankruptcy Rules and Local Rules.  To prepare the schedules and statements, the Debtors and their advisors must gather, review, and assemble information from the Debtors' books, records, and documents related to tens of thousands of transactions.  This will require substantial time and effort on the part of the Debtors' employees and advisors.  Such an effort may detract the

Debtors from focusing on their planned asset sales – the means by which creditors will realize value in these Chapter 11 cases. Thus, I believe that the requested extension is necessary to ensure that the Debtors focus on their bankruptcy goals while providing ample time for them to prepare their schedules and statements.

> **(4)** **DEBTORS' MOTION FOR AN ORDER (I) WAIVING THE REQUIREMENT THAT EACH DEBTOR FILE A LIST OF CREDITORS, (II) AUTHORIZING THE DEBTORS TO FILE A CONSOLIDATED LIST OF THE FIFTY LARGEST UNSECURED CREDITORS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES AND (IV) APPROVING PUBLICATION NOTICE TO BORROWERS**

118.    The Debtors seek a waiver of the requirement to file a list of creditors and equity security holders for each debtor. With the assistance of KCC, the Debtors will prepare a consolidated list of creditors and list of equity security holders. The Debtors have thousands of creditors. I believe that requiring each of the Debtors to file a separate list of the top twenty creditors in each of their respective cases would impose an unnecessary burden on the United States Trustee without providing any benefit. Therefore, the Debtors seek authority to file a single consolidated list of the fifty largest unsecured creditors in these cases, which will facilitate the efficient and orderly administration of these cases.

119.    In addition, the Debtors seek approval of the proposed form providing notice of the commencement of these Chapter 11 cases and the meeting of creditors to be held pursuant to Bankruptcy Code section 341 (the "Notice of Commencement") and the authority to have KCC mail the Notice of Commencement to creditors. In addition to the mailing of the Notice of Commencement, the Debtors propose to publish the Notice of Commencement once in the National Editions of the *Wall Street Journal* and *USA Today*, concurrently with the mailing of the Commencement Notice. In addition, the Debtors request authority to provide notice of

pleadings and hearings to all of the homeowners by publication. I believe that such relief is not

only appropriate under the circumstances, but necessary for the efficient and orderly

administration of these cases.

> **(5)** **DEBTORS' MOTION FOR ENTRY OF AN ORDER UNDER BANKRUPTCY CODE SECTIONS 102(1), 105(a) AND 105(d), BANKRUPTCY RULES 1015(c), 2002(m) AND 9007 AND LOCAL BANKRUPTCY RULE 2002-2 ESTABLISHING CERTAIN NOTICE, CASE MANAGEMENT AND ADMINISTRATIVE PROCEDURES**

120.    Given the size and scope of these cases, the Debtors filed a motion to

implement Case Management Procedures that will facilitate service of the Court Papers and will

be less burdensome and costly than serving such pleadings on every potentially interested party,

which, in turn, will maximize the efficiency and orderly administration of these Chapter 11

cases, while at the same time ensuring that appropriate notice is provided, particularly to parties

who have expressed an interest in these cases and those directly affected by a request for relief.

**B.**    **Motions to Continue Certain Banking and Business Practices**

> **(1)** **DEBTORS' MOTION FOR ENTRY OF ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 345, 363, 364, AND 503(b)(1) AUTHORIZING (I) CONTINUED USE OF EXISTING CASH MANAGEMENT PRACTICES, (II) CONTINUED USE OF EXISTING BANK ACCOUNTS, CHECKS, AND BUSINESS FORMS, (III) INTERIM WAIVER OF INVESTMENT AND DEPOSIT REQUIREMENTS OF BANKRUPTCY CODE SECTION 345, AND (IV) CONTINUATION OF INTERCOMPANY TRANSACTIONS AND GRANTING ADMINISTRATIVE EXPENSE STATUS TO INTERCOMPANY CLAIMS**

121.    As noted in item 6 on **Exhibit 4**, the Debtors filed a motion to not only

continue use of their existing bank accounts, checks, business forms, ordinary course cash

management and banking practices, and their prepetition practices with respect to intercompany

transactions, but to also implement modifications to the system in order to segregate proceeds of

their lenders' respective collateral hereto.  Moreover, the motion seeks an extension of time to

comply with the investment and deposit requirements imposed by the Bankruptcy Code.  In that

regard, the Debtors' cash management practices are ordinary course, customary and essential

business practices, and their use of the cash management system is similar to cash management

systems employed by other large businesses in the mortgage lending and servicing industry.  The

cash management system enables the Debtors to more efficiently operate their businesses while,

at the same time, maximizing the investment income available from cash resources they

generate.  It allows cash receipts to be efficiently invested and managed to yield the highest

returns consistent with the investment objectives of safety and liquidity.

122.    Through the highly integrated cash management system, the Debtors

operate centralized disbursement accounts by which they are able to track the amounts paid to

and from each affiliated participant in the system.  In addition, the cash management system

enables the Debtors to track receipts related to their mortgage loan servicing platform with

respect to moneys that are paid to the Debtors as servicer for mortgage loans that the Debtors do

not own.

123.    It is my understanding that as a condition to providing the Debtors with

access to postpetition financing, the Debtors' lenders requested that accounts that held proceeds

of their collateral be kept separate and apart from the Debtors' operating accounts and the cash

collateral of the Debtors' other secured lenders.  Accordingly, with the consent of its prepetition

secured lenders and the DIP lenders, the Debtors have established distinct concentration accounts

that segregate the proceeds of the lenders' respective collateral pools and ensures that the

lenders' collateral is not commingled improperly in the Debtors' operating accounts.

124.    I believe that requiring the Debtors to adopt new cash management practices at this early and critical stage would be expensive, impose unnecessary administrative burdens, and cause undue and significant disruption.  Accordingly, the Debtors' request to maintain and continue to use the existing cash management system during the pendency of these Chapter 11 cases, subject to such reasonable changes as the Debtors may deem necessary or appropriate, is essential to the Debtors' business operations.

125.    Furthermore, I understand that the Debtors request authority to maintain the Debtors' existing bank accounts, checks, and business forms.  As of the Petition Date, the Debtors maintained approximately 3,514 bank accounts.  I believe that all of the bank accounts are in financially stable banking institutions insured by the FDIC (up to an applicable limit per Debtor per financial institution).  The bank accounts form part of the cash management system that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course.  Accordingly, in order to avoid delays in payments to administrative creditors, to ensure that the Debtors' transition into Chapter 11 is as smooth as possible, and to facilitate a successful outcome to these cases, the Debtors should be authorized to maintain and use their existing bank accounts.  Moreover, requiring the Debtors to alter the use of numerous business forms, including but not limited to checks and banking forms, would, I believe, cause unnecessary expenses to the Debtors' estates.

126.    The Debtors also desire to continue to use their investment guidelines to obtain the best available returns consistent with safety and liquidity.  I believe that the Debtors' investment practices are conservative and ensures that the funds therein will maximize return in the most risk adverse manner possible.

127.     Lastly, the Debtors seek authority to continue undertaking ordinary course intercompany transactions.  In the normal operation of their business, the Debtors maintain business relationships that involve transactions with each other.  There are numerous intercompany claims that reflect intercompany receivables and payments made to each other in the ordinary course of the Debtors' business.

### C.     Payment of Employee and Payroll Obligations and Certain Taxes

> **DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 363, 507(a) AND 1107 AND BANKRUPTCY RULE 6003 AUTHORIZING DEBTORS TO PAY PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS AND CONTINUE RELATED PROGRAMS**

128.     The Debtors also filed a motion seeking authority to continue paying various employee obligations, as set forth in item 7 on **<u>Exhibit 4</u>** hereto, which I believe is critical to the Debtors' estates.  The Debtors rely on the use of centralized human resource systems administered by AFI across AFI's business lines.  In general, the Debtors' bi-weekly payroll is paid out of corporate bank accounts maintained by AFI, with the Debtors reimbursing AFI through inter-company cash transfers.  The Debtors seek authorization, but not direction, to reimburse AFI through inter-company transfers for the outstanding amounts owed as of the Petition Date for accrued and unpaid wages, salaries and commissions, including amounts that AFI, on behalf of the Debtors, is required by law to withhold from employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes as well as all amounts owed to independent contractors as of the Petition Date.

129.     Specifically, as of the Petition Date, the Debtors employ approximately 3,625 employees, of whom approximately 3,575 are full-time employees and approximately 50 are part-time employees.  There are also approximately 280 employees who earn wages

primarily in the form of commissions. The Debtors also retain, through AFI who has contracted

with temporary staffing firms, approximately 375 contractors for various corporate functions.

130.    To minimize the personal hardship that the employees will suffer, and to

the extent there are any prepetition employee compensation obligations due as of the Petition

Date, and to maintain employee morale during this critical time, I believe it is important for the

Debtors to:  (i) reimburse AFI for all accrued and unpaid prepetition wages, salary, commissions

and variable pay obligations to employees and all amounts due to Contractors that accrued

prepetition; (ii) continue the Debtors' various non-working day policies, employee benefit plans,

and programs; (iii) reimburse employees for all approved prepetition expenses the employees

incurred on behalf of the Debtors; and (iv) reimburse AFI for all related prepetition withholdings

and payroll-related taxes. The Debtors are also seeking to continue to honor severance

obligations. In particular, the Debtors are seeking approval to honor and pay all severance and

retention obligations owed to a small number of non-insider employees who entered into

prepetition severance/retention agreements with the Debtors where the agreed upon termination

dates happen to fall after the Petition Date.

131.    I have been informed that there are presently no employees who are owed

in excess of $11,725 for wages, salaries, commissions and variable pay as of the Petition Date.

Thus, my understanding is that the overwhelming majority of all of the Debtors' employees may

have a priority claim with respect to all of their accrued but unpaid prepetition wages, salaries,

commissions and variable pay, a claim that I am told is granted priority over most other

unsecured claims pursuant to the Bankruptcy Code.

132.    I believe that the Debtors must continue to honor and reimburse AFI for

the outstanding amounts owed as of the date of this Affidavit for accrued and unpaid wages and

56

salaries, including amounts that the Debtors are required by law to withhold from employee

payroll checks in respect of federal, state, and local income taxes, garnishment contributions,

social security, and Medicare taxes.  I believe that if such reimbursement payments are not made,

it will breed uncertainty and have a negative impact on employee morale, leading employees to

terminate their employment with the Debtors, causing significant disruption to the Debtors'

operations, at a time when, quite frankly, the need for a well-motivated workforce is most

critical.  For the same reasons, the Debtors should be permitted to honor and continue the various

other employee benefits and programs in the ordinary course of the Debtors' business.

     **D.**     **Motions for Payment of Other Critical Business Expenditures**

     133.     The Debtors also filed motions seeking authority to:  (i) make critical

business expenditures on account of prepetition taxes and regulatory fees, and (ii) honor various

customer practices, as set forth in items 8 and 9 on **Exhibit 4** hereto.

     **(1)**     **DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY
CODE SECTIONS 105(a), 363, 506(a), 507(a)(8), 541 AND 1129 AND
BANKRUPTCY RULE 6003 AUTHORIZING
PAYMENT OF PREPETITION TAXES AND REGULATORY
FEES**

     134.     In the ordinary course of their business, the Debtors incur tax obligations

to federal, state, and local governments, as well as regulatory fee obligations.  My understanding

is that as of the Petition Date the Debtors are substantially current in the payment of assessed and

undisputed taxes and fees, but certain taxes and regulatory fees attributable to the pre-petition

period are not yet due.  I believe that the prepetition tax and fee obligations intended to be paid

are estimated at $1,250,000.  Of this amount, (i) approximately $1,005,000 relates to taxes, and

(ii) approximately $245,000 relates to regulatory fees.

     135.     Additionally, the Debtors seek to reimburse AFI for payments of taxes and

regulatory fees that AFI pays on the Debtors' behalf.  AFI pays for some of the Debtors' taxes

and regulatory fees by credit card and the Debtors' reimburse AFI for those payments bi-weekly, in the average amount of $70,000, in the ordinary course of business. The Debtors also seek to reimburse AFI for payment of income taxes that it makes on the Debtors' behalf. The Debtors anticipate that next payment to AFI will be in the amount of approximately $3,000,000.

136.    With respect to item 8 on **Exhibit 4**, I believe that payment and reimbursement of these taxes and regulatory fee obligations is necessary for several reasons. First, payment is necessary to sustain business operations. My understanding is that nonpayment or delayed payment of such obligations may subject the Debtors to efforts by governmental entities to revoke the Debtors' licenses and other privileges. Second, I believe that if such obligations are not timely paid, the Debtors may be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues such as what priority these obligations should be afforded, whether they arose prepetition or postpetition, and to what extent penalties, interest, attorneys' fees, and costs accrue on such obligations. Third, it is my understanding that payment of such taxes and fees is necessary to avoid assessment of personal liability against the Debtors' officers and directors.

> **(2)    DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 507 AND 541 AND BANKRUPTCY RULE 6003 AUTHORIZING DEBTORS TO HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS**

137.    With respect to item 9 on **Exhibit 4**, I understand that it is essential for the Debtors to ensure continued satisfactory customer relations. In order to do so, the Debtors must honor certain payments on account of customer programs. Before the Petition Date, the Debtors offered and/or sold to their mortgage customers certain services and financial products that the Debtors did not themselves provide, such as a credit monitoring service provided by a third party company and a variety of products related to homeownership, among other services and

products.  The customer paid the Debtors a fee and/or deposit for the service, and the Debtors

then transferred the service payment to the third party service provider (the "Services Payment

Conduit Program").  It is my understanding that, in each case, the Debtors served only as a

conduit for the payment for third party services.

138.    I have been informed that honoring the Services Payment Conduit

Program does not require the Debtors to utilize any property of the estates.  I also understand that

the Debtors' failure to pass along the payments may give rise to countless claims against the

Debtors' estates by participants in the program and the third party service providers.

Accordingly, I believe that in order to avoid unnecessary expenses to deal with customer claims

related to this customer program, it is in the best interest of the Debtors' estates and their

creditors to honor all prepetition obligations arising under the Services Payment Conduit

Program.

## E.    Operational Motions

139.    The Debtors also filed six operational motions and a related motion to seal

as set forth in items 10 through 16 on **Exhibit 4** hereto.  With respect to each of these items, I

believe that in order to maximize the Debtors' value for all stakeholders, the Debtors need to

preserve their ability to operate certain functions of their business in the ordinary course pending

the sale of their business lines and assets to the Purchaser (as defined in paragraph [6] hereof).

The Debtors' failure to maintain their current origination and servicing operations or to comply

with certain outstanding obligations relating to those operations pursuant to existing agreements

could seriously undermine the value of their enterprise, thus jeopardizing the value of the

Debtors' assets for all stakeholders.

## Continuation of Origination Activities

ny-1011800

      (1)     **DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105(a), 363, 364, 503(b), 1107(a), AND 1108 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO (I) PROCESS AND WHERE APPLICABLE FUND PREPETITION MORTGAGE LOAN COMMITMENTS, (II) CONTINUE BROKERAGE, ORIGINATION AND SALE ACTIVITIES RELATED TO LOAN SECURITIZATION, (III) CONTINUE TO PERFORM, AND INCUR POSTPETITION SECURED INDEBTEDNESS, UNDER THE MORTGAGE LOAN PURCHASE AND SALE AGREEMENT WITH ALLY BANK AND RELATED AGREEMENTS, (IV) PAY CERTAIN PREPETITION AMOUNTS DUE TO CRITICAL ORIGINATION VENDORS, AND (V) CONTINUE HONORING MORTGAGE LOAN REPURCHASE OBLIGATIONS ARISING IN CONNECTION WITH LOAN SALES AND SERVICING, EACH IN THE ORDINARY COURSE OF BUSINESS**

140.    I understand that, by item 10 on **<u>Exhibit 4</u>**, the Debtors seek authority to process, and where applicable, fund prepetition mortgage loan commitments, continue origination activities (including direct origination and brokering of completed loan applications) and sale activities related to the ultimate securitization of mortgage loans, continue to perform under the Purchase and Sale Agreement (defined below) with Ally Bank and the related Master Forward Agreement (defined below) with AIM, incur secured indebtedness under those agreements and the Pledge and Security Agreement (defined below) with certain non-Debtor affiliates, and grant such parties superpriority administrative claims in relation to the foregoing, pay certain amounts due to critical vendors providing origination services that accrued prior to the Petition Date, and continue honoring certain mortgage loan repurchase and other related obligations arising in connection with the sale and servicing of mortgage loans, each in the ordinary course of business.

141.    The Debtors conduct retail marketing activities via a traditional retail network and internet and telephone-based call center operations in every state except Hawaii.

ny-1011800

Through these operations, the Debtors procure prospective borrowers, assist them in completing

mortgage loan applications to Ally Bank's specifications, and develop additional borrower and

property-specific information necessary for underwriting.  In 47 states, the Debtors, acting in

their capacities as licensed mortgage brokers, broker mortgage loan applications and supporting

materials to Ally Bank in exchange for a broker fee paid by Ally Bank.  Ally Bank then

underwrites, originates, and funds loans based on the materials submitted by the Debtors.

142.    The Debtors are not responsible for funding the loans that they broker for

Ally Bank.  However, due to particular licensing issues, the Debtors are not permitted to broker

loans to Ally Bank that are secured by property in Nevada and Ohio.  Therefore, the Debtors

originate and fund residential mortgage loans in only those two states.  The Debtors originate and

fund on average $23.9 million and $10.8 million per month, respectively, of mortgage loans in

Nevada and Ohio.

143.    Until April 30, 2012, except for its HFI mortgage loan portfolio, Ally

Bank sold all of its Fannie Mae, Freddie Mac or Ginnie Mae eligible originated mortgage loans

and other such mortgage loans that it purchased through GMAC Mortgage because Ally Bank

was not an active direct seller to the Governmental Associations.  Effective May 1, 2012, Ally

Bank began selling loans directly to Fannie Mae and Freddie Mac.  As a result, Ally Bank, rather

than GMAC Mortgage, currently sells loans directly to Fannie Mae and Freddie Mac for

inclusion in their securitization trusts although the Debtors will continue to function in their

capacities as broker for Ally Bank or, potentially, other lenders for these loans.  In connection

with loans brokered to Ally Bank, the Debtors receive a per loan brokerage fee in an amount that

is subject to periodic resets based on prevailing market conditions.  As of the Petition Date, the

Debtors were receiving a brokerage fee of between 175 and 200 basis points per loan.

144.    With respect to Ginnie Mae Loans not funded by the Debtors (i.e., loans in states other than in Ohio and Nevada), the Debtors will continue to purchase loans from Ally Bank for resale to Ginnie Mae securitization trusts pursuant to that certain Amended and Restated Master Mortgage Loan Purchase and Sale Agreement, dated as of May 1, 2012, between GMAC Mortgage and Ally Bank (the "Purchase and Sale Agreement").  In connection with its role as a broker for loans sold to Ginnie Mae securitization pools, the Debtors will receive from Ally Bank a brokers' fee of between 175 and 200 basis points per loan as of the Petition Date, subject to periodic resets based on prevailing market conditions.  The Debtors will also receive the gain on the sale of those loans while creating valuable mortgage servicing rights, or "MSRs," for the benefit of the Debtors' estates.

145.    With respect to loans in Nevada and Ohio, I understand that the Debtors will continue to fund those loans postpetition, and will either deliver such loans directly to Ginnie Mae securitization pools or sell such loans to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac.  In connection with those activities, the Debtors will receive origination fees from the borrowers and will retain any gain on the sale of those loans.  In addition, the Debtors will retain servicing rights with respect to such loans.

146.    The Debtors typically approve applications for residential mortgage loans no later than between ninety (90) and one hundred and twenty (120) days before the loans are actually funded, subject in some cases to extension.  Thus, as of the Petition Date, there were a number of residential mortgage loans in the Debtors' pipeline (a) for which the Debtors had received residential mortgage loan applications that were still being processed but had yet to be underwritten or approved, or (b) that the Debtors approved prior to the Petition Date, but had not yet funded because the loans were still being processed (collectively, the "Pipeline Loan

Obligations"). I believe that the Debtors should be authorized to honor the Pipeline Loan

Obligations in the ordinary course of their businesses because such relief will help to alleviate

the concerns of the Governmental Associations, as well as the Debtors' other counterparties,

customers, and regulators, regarding the impact of the Debtors' bankruptcy on their ability to

process the Pipeline Loan Obligations. Indeed, I understand that the failure to meet existing

Pipeline Loan Obligations could subject the Debtors to actions by state regulatory authorities and

possibly the revocation of their servicing licenses. Thus, I believe that continued compliance

with state regulations to the maximum extent possible is critical to the preservation of the

Debtors' licenses to operate their origination and servicing platforms.

147.    I further understand that, in connection with its correspondent lending

operations, Ally Bank purchases certain Ginnie Mae Loans originated by USAA Federal Savings

Bank (the "USAA Loans"), which it in turn sells to GMAC Mortgage for delivery to Ginnie Mae

securitization trusts under the Purchase and Sale Agreement. GMAC Mortgage purchases the

USAA Loans from Ally Bank on credit, and grants Ally Bank a first priority lien on such loans,

and on the proceeds from their sale, pursuant to that certain Pledge and Security Agreement

dated as of April 25, 2012 (the "Pledge and Security Agreement") by and among GMAC

Mortgage, ResCap, and non-Debtor affiliates Ally Bank, Ally Financial Inc., GMAC Mortgage

Group, LLC and AIM (collectively, the "Ally Secured Parties"). Also pursuant to the Pledge and

Security Agreement, GMAC Mortgage has granted to Ally Bank a first priority lien in any

outstanding Ginnie Mae Loans that are included in the Debtors' prepetition Pipeline Loan

Obligations (the "Ginnie Pipeline Loans"), and in the proceeds from their sale. In each case, the

amounts due to Ally Bank for these Ginnie Mae Loans are repaid with the proceeds received by

the Debtors from the sale of the MBS underlying the Ginnie Mae Loans. The Debtors receive

those proceeds after Ginnie Mae has certified the pool of loans and the securities have been

delivered to an affiliate of Ally Bank, AIM who in turn sells interests in the securities to third

party investors, a process that takes approximately thirty (30) days from start to finish.

148.    As an additional safeguard for the Debtors' obligations under the Purchase

and Sale Agreement, Ally Bank has requested, and the Debtors have agreed, subject to

Bankruptcy Court approval, to grant Ally Bank superpriority administrative claims, senior to all

other administrative expense claims, except superpriority claims granted to the Debtors' post-

petition lenders, with respect to any and all claims of the Ally Secured Parties against GMAC

Mortgage arising under the Purchase and Sale Agreement (the "Ginnie Mae Purchase Claims"),

including claims arising from GMAC Mortgage's failure to pay Ally Bank the purchase price for

any mortgage loan purchased by GMAC Mortgage under the Purchase and Sale Agreement.

Ally Bank shall have recourse only to the proceeds of the mortgage loans purchased by GMAC

Mortgage from Ally Bank under the Purchase and Sale Agreement with respect to its

superpriority claims under that agreement.

149.    I understand that Ally Bank is subject to a certain amount of risk with

respect to the Ginnie Mae Loans it originates prior to their sale to the Debtors.  Specifically, as

noted above, Ally Bank is not a Ginnie Mae-approved issuer.  Therefore, if the Debtors elect not

to purchase Ginnie Mae Loans from Ally Bank, Ally Bank will have to find a Ginnie Mae-

approved third party issuer to purchase the loans for pooling and delivery to a Ginnie Mae

guaranteed securitization trust.  A third party purchaser would be purchasing the loans on the

open market, likely at a discount, exposing Ally Bank to losses.

150.     In order to induce Ally Bank to continue originating Ginnie Mae Loans for

sale to Ginnie Mae guaranteed securitization trusts, I believe it is necessary and appropriate to

grant superpriority status to Ally Bank for the Ginnie Mae Purchase Claims.

151.     The purchase of Ginnie Mae MBS from GMAC Mortgage by its non-

Debtor affiliate AIM for further sale to the market is governed a Master Forward Securities

Forward Agreement, dated April 30, 2012, between GMAC Mortgage and AIM (the "Master

Forward Agreement").  Pursuant to the Master Forward Agreement and in accordance with the

Debtors' prepetition activities and standard industry practices, the Debtors enter into individual

forward sale contracts of MBS, primarily Governmental Association "to-be-announced"

securities ("TBAs"), with AIM.  In a TBA transaction, on the "trade day," the parties agree to a

sale price for the delivery of a specified volume of Governmental Association MBS that satisfy

certain parameters at a specified future date (referred to as the "settlement day"), but the

particular MBS that will be delivered to AIM on the settlement day are not yet identified.

Following the trade day, the Debtors pool Ginnie Mae Loans meeting the criteria under the TBA.

At the same time the Debtors deliver the loans to Ginnie Mae's custodian for securitization, the

Debtors instruct Ginnie Mae to deliver the resulting MBS to AIM, which delivery occurs prior to

the settlement day.  AIM then pays the Debtors the agreed upon price on the settlement day,

typically out of proceeds from AIM's sale of the MBS to investors.

152.     With respect to each of the transactions entered into under the Master

Forward Agreement, each party may be required to post cash collateral with the counterparty, in

which the counterparty will obtain a security interest.  In addition, GMAC Mortgage is required

to post $10 million in initial margin collateral with AIM to secure its obligations to AIM under

the Master Forward Agreement.

153.    I believe the Debtors should be authorized to continue to perform under the Master Forward Agreement because it is the most efficient mechanism for generating MBS proceeds from the Ginnie Mae Loans purchased by the Debtors from Ally Bank.  It enables the Debtors to earn gains on sale and at the same time, generates a substantial volume of MBS for which the Debtors provide servicing.

154.    In order to induce AIM to enter into these hedges on behalf of the Debtors, AIM has also requested, and the Debtors have agreed, subject to Bankruptcy Court approval, to grant AIM superpriority administrative claims, senior to all other administrative expense claims, pursuant to Bankruptcy Code section 364(c)(1) with respect to any and all claims of AIM against GMAC Mortgage arising under the Master Forward Agreement (the "Ginnie Mae Hedging Claims" and, together with the Ginnie Mae Purchase Claims, the "Ginnie Mae Loss Claims"), which claims pursuant to section 364(c)(1) except superpriority claims granted to the Debtors' post-petition lenders, as well as a lien pursuant to Bankruptcy Code section 364(c)(2) with respect to any cash collateral posted by GMAC Mortgage in connection with transactions entered into under the Master Forward Agreement.  AIM shall have recourse only to the proceeds of any collateral pledged by GMAC Mortgage to AIM under the Master Forward Agreement.

155.    I believe the Debtors should be authorized to continue to perform under the Purchase and Sale Agreement and the Pledge and Security Agreement, in part, because the likelihood of Ginnie Mae Loss Claims is minimal.  The Debtors are incentivized to purchase eligible Ginnie Mae Loans originated by Ally Bank because the Debtors receive brokers' fees and valuable MSRs (including the ability to charge servicing fees) in connection with their securitization of Ginnie Mae Loans.  As a result, I believe that it is unlikely that any Ginnie Mae Purchase Claims will arise.  Additionally, the Debtors transacted various hedging transactions,

including Governmental Association TBAs, in connection with their risk management activities prepetition.  I believe that the impact of continuing those activities, including the likelihood that Ginnie Mae Hedging Claims will arise, is very limited.  Furthermore, inducing Ally Bank to continue originating Ginnie Mae Loans will help to ensure that the value of the Debtors' servicing and origination platforms is preserved.

156.     In connection with their origination activities, the Debtors typically utilize various third party vendors and professionals to provide services supporting the Debtors' origination functions because employing vendors who specialize in various origination functions is more cost-effective than performing such services in-house.  I believe that it is critical that the Debtors be authorized to utilize the services of certain third party vendors listed in the specific categories of identified in the motion in order to maintain their origination platform and preserve its value pending the sale to Nationstar.  I understand that the Debtors carefully reviewed the lists of third party origination vendors they employ and identified a number of vendors who, in addition to providing critical services, would also be prohibitively difficult, disruptive, and/or expensive to replace, and who might well discontinue providing services to the Debtors if they are not paid on account of their prepetition claims.  Accordingly, I believe that prompt payment of these vendors, including payment of any outstanding prepetition fees, is necessary to ensure that the Debtors can continue to perform their origination functions seamlessly and with minimal disruption.

157.     Further, I believe that the Debtors should also be authorized to honor certain other obligations related to existing securitization arrangements.  Specifically, in connection with the sale of loans to Fannie Mae, Freddie Mac, or securitization trusts guaranteed by Ginnie Mae and the servicing of such loans by the Debtors, the Debtors provided certain

67

representations, warranties, and covenants concerning the mortgage loans relating to such items

as lien status or mortgage insurance coverage.  In the event that any such representation,

warranty, or covenant is breached and such breach materially and adversely affects the interests

of third-party investors, the Debtors are required to repurchase the affected loan from the

securitization trust or to pay "make-whole" payments to the Governmental Associations in lieu

of repurchases.  The Debtors have similar obligations with respect to certain of the Non-GA

Loans.

158.    The Debtors also make certain representations and warranties regarding

their performance of servicing and may be required to repurchase loans in the event they breach

those servicing representations and warranties, to pay penalties in connection with "servicer

error" claims made by the counterparties to the subservicing agreements, or to pay penalties in

the event they fail to meet required deadlines with respect to foreclosure and sale activities.

159.    In addition, the Debtors are required to repurchase certain mortgage loans

from Ginnie Mae when certain delinquency thresholds in connection with loans sold to Ginnie

Mae guaranteed securitization trusts are met.

160.    I believe that the continuation of the benefits associated with such

securitization agreements entered into prepetition with respect to the GA Securitization Trusts

(the "GA Securitization Agreements") is important to the Debtors' efforts to sell their business as

a going concern.  In my opinion, if the Debtors do not continue to honor their obligations under

the GA Securitization Agreements, including repurchase obligations and similar commitments,

the Debtors may, among other things, face actions to terminate their contractual rights under

such agreements which, if successful, would be potentially catastrophic to the value of the

Debtors' servicing platform.  Further, the Governmental Associations could likewise prevent

Nationstar from servicing such loans following the closing of the Servicing Sale.

Ginnie Mae has requested, and the Debtors, subject to Bankruptcy Court approval, have agreed

to provide to Ginnie Mae an administrative expense claim under section 503(b) of the

Bankruptcy Code for any and all postpetition claims of Ginnie Mae arising under, or pursuant to,

the purchase of the Ginnie Mae Loans, including, without limitation, repurchase, indemnity,

credit enhancement, recourse liability, make-whole payments, or other remedies provided by the

Ginnie Mae MBS Guide or other applicable GA Purchase Documents.  I believe this relief is

necessary in order to induce Ginnie Mae to continue purchasing loans after the Petition Date,

which activity is vital to the Debtors' loan origination and servicing platforms.

**Continuation of Servicing Activities**

(2)    **DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105(a), 361, 362, 363, 1107(a), AND 1108 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO CONTINUE IN THE ORDINARY COURSE OF BUSINESS (A) SERVICING GOVERNMENTAL ASSOCIATION LOANS AND (B) FORECLOSURE ACTIVITIES RELATED TO CERTAIN REAL ESTATE OWNED BY FANNIE MAE, FREDDIE MAC, AND GINNIE MAE; (II) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION AMOUNTS DUE TO CRITICAL SERVICING VENDORS AND FORECLOSURE PROFESSIONALS; (III) GRANTING LIMITED STAY RELIEF TO ENABLE BORROWERS TO ASSERT RELATED COUNTER-CLAIMS IN FORECLOSURE AND EVICTION PROCEEDINGS; (IV) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL UNDER THE FANNIE MAE EAF FACILITY; AND (V) GRANTING RELATED RELIEF**

(3)    **DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105(a), 362, 363, 1107(a) AND 1108 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO CONTINUE IN THE ORDINARY COURSE**

69

**OF BUSINESS (A) SERVICING NON-GOVERNMENTAL
ASSOCIATION LOANS, AND (B) SALE ACTIVITIES
RELATED TO CERTAIN LOANS IN FORECLOSURE AND
REAL ESTATE OWNED PROPERTY, AND (II) GRANTING
LIMITED STAY RELIEF TO ENABLE BORROWERS TO
ASSERT RELATED COUNTER-CLAIMS IN
FORECLOSURE AND EVICTION PROCEEDINGS**

161.     I also understand that, by items 11 and 12 on **Exhibit 4**, the Debtors seek

authority to honor existing obligations in connection with the servicing of mortgage loans, to

conduct foreclosure activities related to mortgage loans and sale activities related to certain "real

estate owned," whether owned or serviced by the Debtors, and to continue to employ and pay

third party vendors and foreclosure professionals providing servicing support (including, with

respect to critical vendors, payment of prepetition amounts).  The Debtors also seek a grant of

limited stay relief to enable borrowers or their tenants, as applicable, to assert related counter-

claims in foreclosure and eviction proceedings.  Additionally, in connection with their servicing

of GA Loans, the Debtors seek authority to use cash collateral under the Fannie Mae EAF

Facility (defined below), to provide to Fannie Mae and Freddie Mac certain enhanced reporting

and adequate assurance of performance regarding their servicing of those Governmental

Associations' respective loans, and to transfer Freddie Mac loans to a back up servicer if certain

performance metrics are not satisfied.

162.     As stated earlier, the Debtors sell most of the mortgage loans they

originate or purchase.  However, the Debtors generally retain the rights to service these loans.  It

is my understanding that the Debtors intend to continue servicing the GA Securitization Trusts in

the ordinary course of business.  The Debtors also intend to continue servicing the Non-GA

Securitization Trusts and loans held by third party investors in non-securitized loan pools in the

ordinary course of business.  To preserve the value of the Debtors' servicing platform as a

marketable asset for the ultimate benefit of creditors, I believe that it is in the estates' best

interests to continue servicing mortgage loans in the ordinary course of business.  This includes

honoring certain servicing advance obligations with respect to the GA Securitization Trusts and,

at the Debtors' sole discretion, with respect to the Non-GA Securitization Trusts and loans held

by private investors.

163.     I believe that continuing to honor the servicing obligations is important for

several reasons.  Among other things, if the Debtors stop honoring the servicing obligations with

respect to the GA Securitization Trusts, including the payment of Advances, there is a risk that

actions could be undertaken to terminate their rights as servicer which, if successful, would result

in the loss of future servicing fees.  In addition, I believe that in order to maintain borrower

confidence in the Debtors' ability to continue to provide services and financing to borrowers, the

Debtors must honor their agreements and be able to reassure borrowers that the Debtors will

continue to make certain payments on their behalf throughout the bankruptcy cases.  Further, I

believe that continuing the Debtors' servicing activities will promote the stabilization of the

housing market while minimizing any adverse effects on existing securitizations for which the

Debtors function as servicers.

164.     Significantly, the Advances made by the Debtors with respect to both GA

Loans and Non-GA Loans are generally reimbursable, and, for the most part, represent only

temporary expenditures that generate receivables.  Furthermore, I understand that, as part of the

sale to Purchaser, Purchaser is buying both the Debtors' MSRs and assuming the Debtors'

subservicing arrangements, as well as the then-outstanding receivables on account of Advances.

Accordingly, the Debtors will recoup certain postpetition Advances made directly from proceeds

of the Platform Sale to Purchaser.

165.    As part of their servicing activities, the Debtors typically utilize various

third party vendors and professionals to provide services supporting the Debtors' servicing

functions.  Some of these vendors are paid directly by the Debtors, which expenses are part of

the Debtors' corporate overhead.  Other vendors are paid by the Debtors, but payment of those

fees is reimbursed, either from investors upon submission of a claim by the Debtors, by

borrowers upon receipt of borrower payments, or from insurance proceeds.  In each case, the

Debtors require the continued services of third party vendors in order to maintain their servicing

platform and preserve its value pending the sale to Nationstar.  Replacing these vendors would

be difficult if not impossible, highly disruptive, and cost-prohibitive.  Moreover, the Debtors

have developed relationships with these vendors that have allowed the Debtors to negotiate

favorable pricing, credit terms, and priority scheduling.  Failure to timely honor the prepetition

obligations to these vendors would seriously jeopardize these relationships and, in all likelihood,

would impair the Debtors' ability to preserve the value of their loan servicing business.  The

Debtors carefully reviewed the lists of third party origination vendors they employ and identified

a select number of vendors who, in addition to providing critical services, would also be

prohibitively difficult, disruptive, and/or expensive to replace, and who might well discontinue

providing services to the Debtors if they are not paid on account of their prepetition claims.

Accordingly, I believe that prompt payment of these vendors, including payment of any

outstanding prepetition fees, is necessary to ensure that the Debtors can continue to perform their

servicing functions seamlessly and with minimal disruption.

166.    The Debtors have also committed to maintain servicing functions under

recent settlements with the U.S. government and various state officials.  I believe that

maintaining the Debtors' servicing functions in accordance with these government mandates will

help assuage borrower concerns regarding the status of their mortgage obligations, assure current and future loan applicants that their mortgage loans will be properly administered, and assure investors that their investments (and related collateral) will be properly managed. Moreover, the failure to comply with these settlements could result, among other things, in the imposition of significant monetary penalties and fines.

167.    In their capacity as servicers of mortgage loans, the Debtors may institute foreclosure procedures when mortgagors fail to remit the requisite payments pursuant to the terms of their mortgages or otherwise honor their loan commitments. Once these properties are foreclosed upon (to the extent they are not sold directly to a third party at a foreclosure sale), they are referred to herein as "real estate owned" or "REO."

168.    The Debtors do not own the GA REO and are not responsible for the marketing or sale of GA REO, although they remain responsible for maintaining the GA REO pending its sale. With respect to the Non-GA REO, the Debtors currently hold approximately 4,180 housing units that have been foreclosed upon and are ready to be sold, with an aggregate unpaid principal balance of $523 million. The Debtors estimate that there are approximately 1,100 contracts pending for the sale of Non-GA REO, with approximately 1,000 sales scheduled to close on or before June 30, 2012. The Debtors estimate that sale proceeds from Non-GA REOs during May and June 2012 will be approximately $130 million. I believe it is important that the Debtors be authorized to continue to conduct servicing and foreclosure activities with respect to foreclosed loans and REO, and to sell foreclosed Non-GA Loans and REO in the ordinary course of business. These activities are part of the Debtors' contractual servicing duties and are the mechanism by which the Debtors recover Advances made with respect to foreclosed loans. In addition, Fannie Mae and Freddie Mac require servicers to pay penalties if they fail to

73

meet contractual foreclosure timelines.  Therefore, failure to continue foreclosure activities may

result in Advances not being reimbursed and penalties being assessed against the Debtors.

169.    At the closing of a sale of a foreclosed Non-GA Loan or REO, the Debtors

are generally required to deliver marketable and insurable title to the purchaser of the property.

My understanding is that solely because the Debtors have commenced these Chapter 11 cases,

certain title insurance companies, escrow agents, or other third parties may refuse to insure, pass

clear title to the purchasers, or otherwise facilitate the sale absent an order from the Court

confirming the Debtors' authority to sell the property in the ordinary course of business.  Such a

refusal to proceed with the closings would significantly impair the Debtors' ability to conduct

business operations.  Accordingly, the Debtors need to confirm their authority to deliver

marketable title to foreclosed Non-GA Loans and REO in the ordinary course of business and to

continue funding any Corporate Advances and submitting claims to be reimbursed by the

investor.

170.    In their capacity as servicer, the Debtors currently are party to

approximately 31,400 foreclosure proceedings.  It is my understanding that it is not uncommon

for borrowers to raise defenses and related counter-claims against the Debtors in order to

preserve their interest in the underlying property.  In addition, the Debtors may be required to

bring eviction proceedings against borrowers or their tenants residing in properties subject to

FHA guaranteed Ginnie Mae Loans or Non-GA Loans upon which the Debtors have foreclosed.

The counter-claims asserted by borrowers are or may be subject to the automatic stay under

Bankruptcy Code section 362(a).  I believe that requiring each of those borrowers to obtain stay

relief to assert counter-claims related to the subject matter of the foreclosure complaint will add

an unnecessary degree of complexity, costs and delay to the foreclosure process.  Therefore,

74

limited stay relief should be provided to borrowers to enable them to assert related counter-

claims in foreclosure proceedings.

171.   Fannie Mae provides GMAC Mortgage with early partial reimbursement

of T&I Advances and Corporate Advances made by GMAC Mortgage with respect to Fannie

Mae Loans (the "Fannie Mae EAF Facility").  Fannie Mae pays the early reimbursements into a

collection account (the "EAF Collection Account") in which Fannie Mae holds a first priority

lien, and the Debtors are permitted to use funds from the account only to make additional

Advances on Fannie Mae Loans.  In turn, Fannie Mae recoups the early reimbursement amounts

it pays under the Fannie Mae EAF Facility from future final reimbursements to, and other

recoveries by, GMAC Mortgage in respect of certain Advances subject to the Fannie Mae EAF

Facility.  I understand that Fannie Mae has agreed to permit the Debtors to continue to use the

funds held in the EAF Collection Account as of the Petition Date, which constitute Fannie Mae's

cash collateral, in return for certain adequate protection, and pursuant to certain terms and

conditions, which I believe to be fair and reasonable.  If the Debtors are unable to use the Fannie

Mae EAF Facility, their liquidity will be reduced during these Chapter 11 cases, and their ability

to continue to fund Advances on GA Loans may be impaired.

172.   During the ordinary course of the Debtors' servicing operations, the

Debtors are required under the GA Guides to provide the Governmental Associations with access

to information relating to the servicing of GA Loans.  It is my understanding that the Debtors

have agreed to provide Freddie Mac and Fannie Mae with certain enhanced reporting with

respect to the Debtors' servicing of the relevant GA Loans, and with certain assurances regarding

the Debtors' ability to service the Fannie Mae loans and Freddie Mac loans during the course of

these Chapter 11 cases.  The form of these assurances was negotiated at arms' length and with

the assistance of independent counsel, and I believe they are fair and reasonable. The Debtors

have also agreed to transfer servicing postpetition to one or more third-party servicers designated

by Freddie Mac with respect to certain Freddie Mac Loans, if the Debtors fail to satisfy one or

more performance metrics (the "Metrics"), and to use reasonable best efforts to facilitate the

engagement of a hot back up servicer for Freddie Mac Loans by, among other things, providing

access to technology and systems support, in order to complete that process on or before July 31,

2012.

173.    The Debtors have every intention of maintaining their servicing operations

in accordance with the standards and requirements set forth in the GA Guides, GA Servicing

Agreements, and other related documents. It is therefore my belief that providing the

Governmental Associations with the requested assurances is reasonable and appropriate, and will

not be unduly burdensome. Moreover, the Platform Sale is conditioned upon the Debtors'

continued servicing in the ordinary course, as is the Debtors' DIP financing. Accordingly, I

believe that it is essential that the Debtors be authorized to provide the requested

accommodations to Fannie Mae and Freddie Mac.

> **(4)    DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY
> CODE SECTIONS 105(a) AND 107(b) AND BANKRUPTCY
> RULE 9018 (I) AUTHORIZING THE DEBTORS TO FILE
> UNDER SEAL CONFIDENTIAL EXHIBIT TO THE
> GOVERNMENTAL ASSOCIATION SERVICING MOTION
> AND (II) LIMITING NOTICE THEREOF**

174.    With respect to item 13 on **Exhibit 4**, I understand that it is necessary for

the Debtors to file under seal Exhibit D (the "Metrics Exhibit") to the Debtors' Motion for

Interim and Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the

Bankruptcy Code (i) Authorizing the Debtors to Continue in the Ordinary Course of Business

(A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to

76

Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (ii) Authorizing the

Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure

Professionals; (iii) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-

Claims in Foreclosure and Eviction Proceedings; (iv) Authorizing the Debtors to Use Cash

Collateral Under the Fannie Mae EAF Facility; and (v) Granting Related Relief.  It is my

understanding that the Metrics Exhibit contains the business metrics that need to be satisfied by

the Debtors after the Petition Date in connection with the servicing of Freddie Mac mortgage

loans.

        175.    I have been informed that the business metrics set forth in the Metrics

Exhibit contain highly sensitive and proprietary confidential terms as well as other information

regarding Freddie Mac's business operations and the relationship between the Debtors and

Freddie Mac.  I have further been informed that such information, if it were to be publically

disclosed, would be damaging to both Freddie Mac and the Debtors.  In addition, it is my

understanding that the motion provides for the Debtors to submit a copy of the Metrics Exhibit

(a) to the Office of the United States Trustee for the Southern District of New York on a

confidential basis and (b) to any other party as may be ordered by the Court or agreed to by the

Debtors and Freddie Mac under appropriate confidentiality agreements (collectively, the

"Limited Notice Parties").  Therefore, in order to protect the confidential information contained

in the Metrics Exhibit, I believe that the Debtors should be authorized to file the Metrics Exhibit

under seal and limit service thereof to the Limited Notice Parties.

ny-1011800

(5)    **DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363
AUTHORIZING THE DEBTORS TO CONTINUE TO
PERFORM UNDER THE ALLY BANK SERVICING
AGREEMENT IN THE ORDINARY COURSE OF
BUSINESS**

176.    With respect to item 14 on **Exhibit 4**, the Debtors seek authorization to

continue to perform under an Amended and Restated Servicing Agreement, dated as of May 11,

2012 (the "Servicing Agreement"), between GMAC Mortgage and Ally Bank.  Under the

Servicing Agreement, GMAC Mortgage will continue to provide servicing for MSRs held by

Ally Bank.  Ally Bank's mortgage servicing rights ("MSRs") were comprised of approximately

690,000 mortgage loans with an aggregate unpaid principal balance of $140.8 billion, and

GMAC Mortgage has been servicing these loans since 2001 under the predecessor agreement to

the Servicing Agreement.  The servicing of Ally Bank's MSRs is a critical component of the

Debtors' mortgage loan servicing business.  The Servicing Agreement was entered into

following a competitive bidding process for the servicing of the Ally Bank MSRs that conducted

at the direction of the FDIC, and contains certain provision in order to comply with requirements

under the FRB Order and DOJ/AG Settlement.

177.    The Servicing Agreement was negotiated at arms' length over an extended

period of time by senior personnel from Ally Bank and GMAC Mortgage with the assistance of

independent counsel to each of the parties.  It provides for lower fee rates than under the prior

servicing agreement, which will terminate in August 2012.  I understand, however, that the

Debtors will receive more compensation in total by providing subservicing under the Servicing

Agreement through the anticipated termination date of December 31, 2012 than if they were to

provide servicing only through August under the higher rates provided for in the Prior Servicing

Agreement.

78

178.    If the Debtors are not authorized to continue performing subservicing

activities for Ally Bank, thereby generating subservicing fees, there will be immediate disruption

of the Debtors' operations which would, in all likelihood, significantly diminish the value of the

Debtors' estates and impede the Debtors' ability to consummate any going concern sale with a

buyer.  Thus, I believe it is essential to the Debtors' day-to-day operations and their business

model that Ally Bank and its affiliates are able to continue to rely upon and have the benefits of

the services historically performed by GMAC Mortgage.

179.    Ally Bank has requested, and the Debtors have agreed, subject to Court

approval, that it be granted relief from the automatic stay to permit Ally Bank to provide the 120-

day notice required by the Servicing Agreement to terminate the Servicing Agreement with

respect to up to 3,000 loans.  Ally Bank has further requested, and the Debtors have agreed, that

the Debtors will not move to reject or modify the Servicing Agreement within the first ninety

(90) days following the Petition Date, without Ally Bank's consent.  I believe that this relief is

reasonable under the circumstances.

**(6)    DEBTORS' MOTION FOR AUTHORITY TO PROVIDE
NOTICE TO BORROWERS THAT THE DEBTORS WILL
SUSPEND FUNDING DRAWS UNDER [CERTAIN] HOME
EQUITY LINES OF CREDIT**

180.    With respect to item 15 on **<u>Exhibit 4</u>**, I believe that proper exercise of the

Debtors' business judgment requires the Debtors to suspend all future draws under certain

HELOCs.  Accordingly, the Debtors seek authority to provide notice to borrowers under the

HELOCs that the Debtors will no longer fund the borrowers' draw requests under such lines as

of a date certain.

181.    HELOCs operate similarly to revolving lines of credit secured by second

lien mortgages on residential real property.  It is my understanding that almost every HELOC has

a "draw period," followed by a "repayment period."  During the draw period, so long as a default does not exist under the HELOC and other specified conditions have not occurred, the borrower under the HELOC is permitted to borrow up to the credit limit and thereafter re-borrow principal amounts previously repaid.  Once the draw period ends, the ability to re-borrow terminates, and the HELOC becomes a closed-end, amortizing loan.

   182. Debtors fund draws for a large number of HELOCS in their roles as owner or seller.  The Debtor is either obligated to fund draws as the owner of the on-balance-sheet loans or pursuant to provisions in loan sale agreements between the Debtors and third parties in which the Debtors, as sellers, retain the obligation to fund future draws by borrowers with respect to sales to securitization trusts or third party investors.  For sales to securitization trusts, the securitization documents provide that the trusts do not have the direct future draws under the HELOCs; however, the securitization documents provide a mechanism whereby the trusts use funds collected from payments made by borrowers to purchase additional draw balances that are advanced by the seller from the time immediately after the HELOCs are sold to the trust until the occurrence of an "amortization event."  At such time, the trust will no longer purchase additional draw balances, and the seller must fund draws from this point forward until borrowers no longer make draws or the HELOCs are outside their draw period, which by the terms of the loan agreement is often longer than the "revolving period" specified in the securitization documents. The large potential cash exposure and the uncertain length of time that the Debtors" funds would remain unavailable create liquidity concerns for the estate without adding any incremental value to the estate.  Therefore, funding future draws for HELOCs that the Debtors have sold is not feasible.

183.     The Debtors also subservice HELOCs for which the MSR is owned by a third party or service HELOC whole loans owned by third parties.  The servicing agreements pursuant to which Debtors service these HELOCs obligate the Debtors, as servicers, to advance monies to fund the HELOCs in the event that there is not sufficient cash available in collection accounts or until reimbursed by the applicable funding party pursuant to the servicing agreement.  Although there is large potential cash exposure, funding future draws for the HELOCs owned by third parties does not require the same amount of available cash as funding the Debtor-owned HELOCs or those sold to third parties where the Debtors contractually retained the obligation to fund draws because the exposure is limited to a short time period, from one business day in most instances up to a few months in some, except in a few circumstances that extend the exposure to one month.  In addition, maintaining the servicing relationships with these third parties creates value for the Debtors' estate because the related servicing agreements are being sold to the Purchaser.  For these reasons, the Debtors intend to continue funding draws for these HELOCs to the extent cash is available to do so.

184.     The Debtors also are obligated to fund certain HELOC draws not because they initially owned or sold the loan; rather, by virtue of the terms of specific classes of securities retained or acquired by Debtors in specific securitizations that currently are in their amortization period.  Specifically, under the terms of the applicable indenture, the Debtors, as holders of a certain class of securities, are obligated to fund draws during such period and risk all losses associated with that funding obligation.  Although the potential cash exposure is not large, the length of time that the Debtors' funds would remain unavailable is uncertain.  Because the Debtors risk all losses associated with the funding obligation, funding future draws for HELOCs

in these third party securitization trusts creates liquidity concerns for the Debtors' estate without adding any value to the estate.

185.    In the past, the Debtors had the ability to draw upon the GMACM Home Equity Notes 2004 Variable Funding trust to finance home equity line draws; however, the Debtors have no further ability to borrow under this facility, which is currently amortizing.  It is my understanding that the Debtors project their net forecasted cash needs for HELOC advances would total over $85.3 million for the next twelve months.

186.    Accordingly, the Debtors have determined, in the exercise of their business judgment, that they effectively have no choice but to immediately suspend the funding of draws for certain subsets of HELOCs.  The Debtors cannot take a chance that their HELOC customers will draw over $2 billion on their available lines.  As debtors in possession, the Debtors must make every effort to preserve their cash and limit burdensome obligations under the HELOCs that do not provide a material benefit to the estate, especially when the Debtors' liquidity and post-petition funding could not support such substantial monetary demands.

(7)    **DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B) AUTHORIZING RESIDENTIAL CAPITAL, LLC TO ENTER INTO A SHARED SERVICES AGREEMENT WITH ALLY FINANCIAL INC. TO CONTINUE THE RECEIPT AND PROVISION OF SHARED SERVICES NECESSARY FOR THE CONTINUED OPERATION OF THE DEBTORS' BUSINESS**

187.    With respect to item 16 on **Exhibit 4**, the Debtors are seeking Court approval for ResCap to enter into a shared services agreement with AFI (the "Shared Services Agreement").  I understand that prepetition, and for many years, the Debtors, on the one hand, and certain non-debtor affiliates, on the other, including AFI, provided various financial,

operational and administrative services to each other, which the Debtors seek to continue

postpetition pursuant to the Shared Services Agreement.

188.    The services that the Debtors seek to continue providing and/or receiving

during these Chapter 11 cases include, among other things: (i) information technology services;

(ii) employee benefits administration and other human resources functions; (iii) accounting, tax

and internal audit services; (iv) treasury and collateral management; (v) risk management

functions; (vi) supply chain management, including procurement of goods and services from

third parties; (vii) government and regulatory relations and compliance services; (viii) facilities

management services; (ix) marketing services; and (x) capital markets services relating to

managing the value of certain of the Debtors' loan servicing rights.  I understand that the Debtors

are seeking the Court's authority to allow ResCap to enter into the Shared Services Agreement

with AFI so that these services can be continued postpetition to avoid any interruption to the

Debtors' business and allow for a smooth transition to operating a debtor in possession and then

to a sale.

189.    The Shared Services Agreement will confer substantial benefits upon the

Debtors during the Chapter 11 cases by ensuring that (i) the Debtors obtain and pay for only

those services that are necessary during their Chapter 11 cases; (ii) the services that are being

provided between ResCap and AFI are specifically indentified; and (iii) ResCap may reduce or

terminate the receipt of services at any time, including, without limitation, following the closing

of a sale of substantially all of the Debtors' assets.[45]

---

[45] Although the Shared Services Agreement covers services historically provided by the Debtors and certain non-debtor AFI affiliates, only ResCap and AFI are parties to the Shared Services Agreement.  I understand each party is required under the Shared Services Agreement to work with its respective subsidiaries and affiliates to ensure that all of the required Shared Services are provided.

190.    As discussed in Part I.C above, the mortgage loan origination, servicing

and related securitization operations of AFI are an integrated business involving the Debtors and

Ally Bank.  I understand that the services covered by the Shared Services Agreement are

common among enterprises similar to those of the Debtors and their non-debtor affiliates,

especially given the integrated nature of their businesses, because these arrangements eliminate

redundant functions, reduce costs and allow for the realization of operational synergies.  In

addition, I believe that the services to be provided and received by the Debtors are performed in

the ordinary course of the Debtors' business.

191.    It is my understanding that the Shared Services Agreement was negotiated

at arm's length, and that the amount of services to be received by the Debtors pursuant to the

Shared Services Agreement has been scaled back from prepetition levels to reflect only those

services that the Debtors believe are necessary during their Chapter 11 cases and will provide a

material benefit to the estates.  On May 13, 2012, ResCap's board of directors approved

ResCap's entry into the Shared Services Agreement.

192.    I believe that it is in the best interest of the Debtors' estates and their

creditors to enter into the Shared Services Agreement to ensure that the Debtors receive all

services necessary to run their businesses through and following a sale.  Given the type and

volume of services received by the Debtors, it would be highly impracticable for the Debtors to

duplicate these services through other sources.  I believe that even if they could do so, shifting to

outside service providers would likely require significant expenditures to customize the

suppliers' services to address the Debtors' particularized needs.  Further, the Debtors' employees

are already experiencing disruption in their day-to-day operations.  I believe sourcing these

services to new third party providers would only amplify the disruption and add additional layers of unnecessary complexity to the ability of employees to complete their daily tasks.

193.    It is my belief that if the Debtors are not authorized to continue receiving all of the services pursuant to the Shared Services Agreement, there will be immediate and widespread disruption of the Debtors' operations.  In my view, discontinuing any of the shared services would, in all likelihood, significantly diminish the value of the Debtors' estates, which could impede the Debtors' ability to consummate any going concern sale with a buyer. Accordingly, to ensure that the Debtors' Chapter 11 transition is as smooth as possible, and to preserve, enhance and maximize the value of the Debtors' estates, ResCap should be authorized to enter into the Shared Services Agreement with AFI to continue the provision and receipt of shared services among the Debtors and their non-debtor affiliates.

## F.    Financing Motions.

194.    The Debtors filed three financing and cash collateral motions, as set forth in items 17 through 19 on **Exhibit 4** hereto.  Although the motions are presented individually and relate to separately identifiable collateral, in my opinion they must be considered and granted together as an integrated whole for the Debtors to be able to continue operating their businesses seamlessly and without interruption pending the Asset Sales.

195.    By these motions, the Debtors seek authority to obtain postpetition financing on a secured, superpriority basis from (i) Barclays Bank PLC ("Barclays"), as Administrative Agent on behalf of a syndicate of lenders (collectively, the "DIP Lenders"), and the related facility, the "Barclays DIP Facility") and (ii) AFI in the form of postpetition draw(s) under the AFI LOC (the "AFI DIP Facility" and together with the Barclays DIP Facility, the "DIP Facilities").  In addition, the Debtors intend to use cash collateral (as that term is defined in Bankruptcy Code Section 363(a), "Cash Collateral") to pay expenses of operating their

85

business, as described below.  AFI, the holders of the Junior Secured Notes (the "Junior

Noteholders"), and Citibank each have consented to the use of their Cash Collateral.

196.    I believe that to preserve the value of the Debtors' businesses as a going

concern and maximize the value of the estates, the Debtors need the liquidity provided by the

DIP Facilities to continue to fund the servicing advance obligations in connection with certain

of their servicing related assets and to satisfy other obligations in order to maintain the value of

their assets pending a sale.  Further, the Debtors' use of Cash Collateral generated by their

existing debt facilities, each to support expenses related to their respective collateral pools, is

necessary to maintain the value of the collateral pending a sale or other disposition thereof.[46]  I

believe that the Debtors will adequately protect the security interests of each of AFI, the Junior

Noteholders, and Citibank by granting them replacement liens and superpriority claims.

197.    In light of the limited funds available to the Debtors post filing, in my

opinion, authorization and approval of the three financing motions on an interim and final basis

is in the best interests of the Debtors' estates and creditors.

---

[46] A copy of the Debtors' consolidated 20-week cash flows is attached hereto as **Exhibit 11**.

ny-1011800

**(1)   DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(3), 364(d)(1) AND 364(e) AND BANKRUPTCY RULES 4001 AND 6004 (I) AUTHORIZING THE DEBTORS TO (A) ENTER INTO AND PERFORM UNDER RECEIVABLES PURCHASE AGREEMENTS AND MORTGAGE LOAN PURCHASE AND CONTRIBUTION AGREEMENTS RELATING TO INITIAL RECEIVABLES AND MORTGAGE LOANS AND RECEIVABLES POOLING AGREEMENTS RELATING TO ADDITIONAL RECEIVABLES, AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c), AND (III) GRANTING RELATED RELIEF**

198.   By this motion (the "Barclays DIP Motion"), the Debtors seek authority to enter into a superpriority secured credit facility with the DIP Lenders comprised of revolving and term loans with a total commitment of $1,450,000,000 for a period of up to eighteen (18) months (the "DIP Facility").   Of this amount, the DIP Lenders will provide:

(i) revolving loans in an aggregate principal amount up to $200,000,000 with an interest rate of LIBOR + 4.00% per annum (the "Revolving Loans") and

(ii) term loans in (a) an aggregate principal amount up to $1,050,000,000 with an interest rate of LIBOR + 4.00%, and (b) an aggregate principal amount up to $200,000,000 with an interest rate of LIBOR + 6.00%, each with a LIBOR floor of 1.25% per annum (the "Term Loans", and together with the Revolving Loans, the "Barclays Loans").[47]

199.   The Debtors intend to use the proceeds of the Barclays Loans to (i) refinance the GSAP Facility and the BMMZ Repo Facility through the purchase of the Initial Purchased Assets (as defined in the DIP Credit Agreement), (iii) fund general corporate and working capital requirements, including the acquisition of the Additional Purchased Assets (as defined in the DIP Credit Agreement), (iv) pay interest, fees and expenses payable under

---

[47] Availability of the funds is subject to a borrowing base, as described in greater detail in the Barclays DIP Motion.

ny-1011800

the Barclays DIP Facility, and (v) pay certain costs of administration of the Chapter 11 Cases in

accordance with the DIP budget.

200.    The Debtors engaged financial advisors and investment bankers to assist

them in obtaining a postpetition financing arrangement on the best possible terms.  Following a

marketing process in which the Debtors and their advisors discussed and negotiated proposed

financing terms with the Debtors' prepetition lenders and a limited number of third parties, the

Debtors determined that the Barclays DIP Facility provided terms and conditions that are fair,

reasonable and appropriate in the circumstances presented.

201.    Despite our best efforts, the Debtors could not obtain postpetition

financing of the type and magnitude required for these Chapter 11 cases on an unsecured or

junior secured basis.  Thus, the Debtors propose to grant the DIP Lenders senior security

interests on the collateral that currently secures the GSAP Facility and the BMMZ Repo

Facility, and junior security interests on the collateral that currently secures the AFI LOC and

the Citibank MSR Facility (the "Barclays DIP Liens").  The Debtors also propose to grant the

DIP Lenders superpriority administrative expense claims, subject to a carveout.  The DIP

Lenders will not be taking any liens on the primary unencumbered assets of the Debtors or liens

on causes of action under Chapter 5 of the Bankruptcy Code (or the proceeds of such causes of

action).

202.    The availability under the Barclays DIP Facility is critical to enable the

Debtors to continue operating in the ordinary course of business, which includes their loan

servicing operations that are necessary to preserve the value of their servicing platform for the

ultimate benefit of all creditors and other parties in interest pending the closing of the Asset

Sales.  Due to the nature of the refinanced facilities, the Debtors do not believe that they would

have had access to any of the Cash Collateral under these facilities while in bankruptcy and

would have lost a primary source of liquidity that they need in order to operate their businesses.

Further, the Debtors intend to use the Barclays Loans to purchase the Purchased Assets from

the existing owners of such assets to the newly formed Debtor-Borrowers (the "Purchase

Transactions").  The Purchase Transactions will bring substantial assets into the Debtors'

estates, which otherwise may not have been available to the Debtors, and will enable the

Debtors to access incremental liquidity that is essential to the Debtors' ongoing business

operations pending the Asset Sales.  Thus, I believe that the liquidity provided by the Barclays

DIP Facility, together with the AFI DIP Facility and proposed use of Cash Collateral, will

enable the Debtors to preserve and enhance the enterprise value for the benefit of the Debtors'

stakeholders.

      **(2)**    **DEBTORS MOTION FOR ORDER UNDER BANKRUPTCY
CODE SECTIONS 105(a) AND 107(b) AND BANKRUPTCY
RULE 9018 AUTHORIZING THE FILING UNDER SEAL
OF CERTAIN PROPOSED DEBTOR IN POSSESSION
FINANCING FEE LETTERS**

203.    With respect to item 20 on **<u>Exhibit 4</u>**, I understand that it is necessary for

the Debtors to file under seal certain fee letters (the "Fee Letters"), by and among certain of the

Debtors and Barclays Bank PLC ("Barclays").  I have been informed that the Fee Letters were

executed in relation to the proposed debtor in possession financing facility (the "Barclays DIP

Facility").  I have been further informed that the Fee Letters contain closely-guarded

proprietary and commercial information that is sensitive to the Debtors and Barclays, and for

that reason the Debtors have agreed to keep the specific terms of the Fee Letters confidential.

204.    It is my understanding that public disclosure of the information in the

Fee Letters could potentially harm Barclays' business and impair its ability to effectively

market and syndicate DIP financing facilities.  It is my further understanding that if the flex

terms of the Barclays DIP Facility were to be publically disclosed, then the Barclays DIP

Facility is more likely to be flexed, which may increase the costs to the Debtors' estates.  I have

been informed that the estimated aggregate amount of fees and expenses payable by the

Debtors in connection with the Barclays DIP Facility has been made a matter of public record

through disclosure in the Debtors' motion for approval of the Barclays DIP Facility.  In

addition, I have been informed that the motion provides that the Debtors will submit a copy of

the Fee Letters to the Office of the United States Trustee for the Southern District of New York

on a confidential basis and, upon request, to counsel and financial advisors to any statutory

committee appointed in these cases on a confidential and "professionals' eyes only" basis.

Therefore, in order to protect the confidential information contained in the Fee Letters, I

believe that the Debtors should be authorized to file the Fee Letters under seal.

(3) **DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 507(b) AND BANKRUPTCY RULES 4001 AND 6004: (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) AUTHORIZING THE USE OF CASH COLLATERAL AND RELATED RELIEF, (III) GRANTING ADEQUATE PROTECTION AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) and 4001(c), AND (V) GRANTING RELATED RELIEF (DEBTOR IN POSSESSION FINANCING AND ALLY FINANCIAL INC. AND JUNIOR SECURED NOTEHOLDERS CASH COLLATERAL**

205.    By this motion (the "AFI DIP Motion"), the Debtors seek authority to (i)

enter into a postpetition financing facility pursuant to which the Debtors are permitted to make

postpetition draw(s) under the AFI LOC in an amount up to $150,000,000 (which amount may

be increased to $220,000,000 subject to agreement between the Debtors and AFI), with an

interest rate of LIBOR + 4.00% per annum (with a LIBOR floor of 1.25% per annum), and

(ii) use the Cash Collateral of (a) AFI under the AFI LOC, (b) AFI under the AFI Senior

Secured Credit Facility, and (c) the Junior Noteholders under the Junior Secured Notes.

206.    **Postpetition Extension of Credit**.  The postpetition extensions of credit

under the AFI LOC may be used solely to fund repurchases of Ginnie Mae Loans (as defined in

the AFI DIP Motion) to the extent necessary in order to (i) continue making repurchases of

whole loans from Ginnie Mae Trusts (as defined in the AFI DIP Motion) in order to avoid

GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18

of the Ginnie Mae Guide, (ii) effect foreclosures, conveyances or other normal course loss

mitigation activities of the related properties in connection with the submission of HUD Claims

(as defined in the AFI DIP Motion), and (iii) allow for trial modifications under programs

implemented by the Debtors for which the related loans and borrowers are qualified.  No

proceeds may be used to fund the purchase of whole loans for any other purpose, including for

non-compliance with eligibility representations, lack of insurance or guaranty, or for title

defects.

207.    In exchange for these postpetition draws under the AFI LOC, the

Debtors propose to grant AFI, in its capacity as lender under the AFI DIP Facility, (i) a senior

security interest on the repurchased whole loans, (ii) a priming lien on all other assets securing

the AFI LOC, and (iii) superpriority administrative expense claims in an amount equal to the

principal and interest on the postpetition draws that are junior to the superpriority

administrative expense claims granted to the DIP Lenders, but senior to all other superpriority

claims.

208.   **Use of Cash Collateral**.  The Debtors intend to use the Cash Collateral

securing each of the AFI Senior Secured Credit Facility, the AFI LOC, and the Junior Secured

Notes to fund only the cash needs related to the operations (including an allocated portion of

the costs to administer the Bankruptcy Cases based on the asset values within each collateral

pool) and assets of each of the respective collateral pools.  Each of AFI and the Junior Secured

Noteholders will be adequately protected for the use of Cash Collateral.

209.   As discussed above, the AFI LOC is secured by various assets of the

Debtors, including certain mortgage loans secured by properties located in the United States,

certain notes and related agreements issued by third parties, certain equity interests of special

purpose vehicles, certain mortgage servicing rights, and certain Freddie Mac servicing

advances.  In its capacity as lender under the AFI LOC, AFI will receive (i) adequate protection

liens (the "Adequate Protection Liens") on all of the collateral securing the AFI LOC, and (ii)

adequate protection payments (the "Adequate Protection Payments") in the form of payment of

interest at the non-default rate under the AFI LOC.  To the extent the Adequate Protection

Liens are insufficient to provide adequate protection, AFI will receive superpriority

administrative expense claims to the extent of any diminution in value of the collateral.

210.   The AFI Senior Secured Credit Facility is secured by a first priority lien

for the benefit of AFI on substantially all of the Debtors' assets other than certain excluded

assets, such as the Ginnie Mae MSRs and certain of the assets that secure the other secured debt

facilities described in this Affidavit under specified circumstances.  In its capacity as lender

under the AFI Senior Secured Credit Facility, AFI will receive (i) Adequate Protection Liens

on (a) all of the collateral securing the AFI Senior Secured Credit Facility, (b) all of the

collateral securing the AFI LOC, which are junior to the liens granted to AFI under the AFI

92

LOC and the Barclays DIP Liens, and (c) the equity interests of GMACM Borrower, LLC and

RFC Borrower, LLC, each a Debtor in the Chapter 11 Cases and borrowers under the Barclays

DIP Facility (the "Barclays DIP Borrowers"), and (ii) Adequate Protection Payments in the

form of payment of interest at the non-default rate under the AFI Senior Secured Credit

Facility.  Further, to the extent the Adequate Protection Liens are insufficient to provide

adequate protection, AFI will receive superpriority administrative expense claims to the extent

of any diminution in value of the collateral.

211.    The Junior Secured Notes are secured by the same assets that secure the

AFI Senior Secured Credit Facility.  The Junior Noteholders will receive (i) Adequate

Protection Liens on (a) all of the collateral securing the AFI Senior Secured Credit Facility,

which are junior to the liens granted to AFI under the AFI Senior Secured Credit Facility and

existing liens granted to the Junior Noteholders, (b) all of the collateral securing the AFI LOC,

which are junior to all existing liens and Adequate Protection Liens granted to AFI (on both the

AFI LOC and the AFI Senior Secured Credit Facility), and the DIP Liens, and (c) the equity

interests of the Barclays DIP Borrowers, and (ii) Adequate Protection Payments in the form of

payment of fees of the professionals of the Ad Hoc Committee of Junior Noteholders.  To the

extent the Adequate Protection Liens are insufficient to provide adequate protection, the Junior

Noteholders will receive superpriority administrative expense claims, junior to AFI's

superpriority administrative expense claims, to the extent of any diminution in value of the

collateral.

ny-1011800

(4)     **DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361,
362, 363, AND 507(b) AND BANKRUPTCY RULE 4001(B):
(I) AUTHORIZING THE USE OF CASH COLLATERAL
AND RELATED RELIEF, (II) GRANTING ADEQUATE
PROTECTION AND (III) SCHEDULING A FINAL
HEARING (CITIBANK, N.A. CASH COLLATERAL)**

212.     By this motion, the Debtors seek authority to use the Cash Collateral of

Citibank under the Citibank MSR Facility to fund only the cash needs related to the operations

(including funding advances and loan repurchases the Debtors are obligated to make in

accordance with their servicing agreements with Fannie Mae and Freddie Mac,  which

servicing rights secure the Citibank MSR Facility, as well as an allocated portion of the costs to

administer the Bankruptcy Cases based on the value of Citibank's collateral relative to the

value of the Debtors' other assets) and assets of the Citibank MSR Facility collateral pool.

Citibank will be adequately protected for this use of Cash Collateral.

213.     As discussed above, the Citibank MSR Facility is secured by MSRs for

mortgage loans in Freddie Mac and Fannie Mae Securitization Trusts.  Citibank will receive (i)

Adequate Protection Liens on all of the collateral securing the Citibank MSR Facility, which

are senior to the DIP Liens, (ii) Adequate Protection Payments in the form of payment of

interest at the non-default rate under the Citibank MSR Facility and all fees and expenses

payable to Citibank under the Agreement, and (iii) the Debtors will seek authority under any

order approving the sale of Citibanks's collateral to provide for the repayment of loans under

the Citibank MSR Facility with the proceeds of such collateral from the sale.  To the extent the

Adequate Protection Liens are insufficient to provide adequate protection, Citibank will receive

superpriority administrative expense claims to the extent of any diminution in value of the

collateral.

G.      **Sale Motion**

> **DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f),
> AND (m), 365 AND 1123, AND FED R. BANKR. P. 2002, 6004, 6006,
> and 9014 FOR ORDERS: (A)(I) AUTHORIZING AND APPROVING
> SALE PROCEDURES, INCLUDING BREAK-UP FEE AND
> EXPENSE REIMBURSEMENT; (II) SCHEDULING BID
> DEADLINE AND SALE HEARING; (III) APPROVING FORM
> AND MANNER OF NOTICE THEREOF; AND (IV) GRANTING
> RELATED RELIEF AND (B)(I) AUTHORIZING THE SALE OF
> CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
> ENCUMBRANCES, AND OTHER INTERESTS; (II)
> AUTHORIZING AND APPROVING ASSET PURCHASE
> AGREEMENTS THERETO; (III) APPROVING THE
> ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
> CONTRACTS AND UNEXPIRED LEASES RELATED THERETO;
> AND (IV) GRANTING RELATED RELIEF**

214.    The Debtors filed the Sale Motion on the Petition Date, but are not asking

the Court for relief on the first day of these Chapter 11 Cases.

215.    The Debtors are seeking approval to consummate the sales of certain of

the Debtors assets under a Plan.  In the unlikely event, however, that the Debtors do not obtain

confirmation of the Plan by the dates set forth in the Plan Support Agreement(s), the Sale Motion

allows the Debtors to pursue an alternative course of action and immediately move forward with

the Sales under section 363(b) of the Bankruptcy Code.

216.    The Sale Motion requests approval of two separate sale transactions and

seeks entry of three orders to be considered at two separate hearings.  The first order requests

(i) bankruptcy court authorization and approval of certain proposed procedures with respect to

two proposed sales (the "Sale Transactions" or "the Sales") by certain of the Debtors of (a) the

Purchased Assets (as such term is defined in the Asset Purchase Agreement by and between

Nationstar Mortgage LLC and certain of the Debtors (the "Nationstar APA")); and (b) the

Purchased Assets (as such term is defined in the Asset Purchase Agreement by and AFI and

BMMZ and certain of the Debtors (the "AFI APA," together with Nationstar APA, the "APAs");

(ii) setting objection deadlines and bidding deadlines with respect to the Sales; an auction of the

Purchased Assets (the "Auction"), and hearing for approval of the Sale Transactions (the "Sale

Hearing"); (iii) approving the form and manner of notices for (a) the Auction and (b) the Sale

Hearing; and (iv) the assumption and assignment of certain executory contracts and unexpired

leases in connection with the sale of the Purchased Assets pursuant to the Nationstar APA.  The

second and third orders, among other things, request bankruptcy court authorization and approval

of (i)(a) a form sale approval order authorizing the sale pursuant to the Nationstar APA free and

clear of liens, claims, encumbrances, and other interests except Permitted Liens (as defined in the

Nationstar APA) and (b) assumption and assignment of certain executory contracts and

unexpired leases, and (ii) a form sale approval order authorizing the sale pursuant to the Ally

APA free and clear of liens, claims, encumbrances, and other interests except Permitted Liens (as

defined in the AFI APA)

217.    It is my understanding that the Sale Transactions are the result of

significant efforts by numerous parties, including the Debtors and their professionals, Nationstar

Mortgage LLC, AFI and various governmental agencies.  The Sales will create significant value

for the Debtors and provide for the continuation of the Debtors' origination and servicing

business.

218.    by August 2011, ResCap was focused on (i) concerns regarding its

liquidity and inability to satisfy its (or its subsidiaries') tangible net worth and liquidity

covenants under credit facilities and agreements with Fannie Mae, Freddie Mac, and Ginnie

Mae; (ii) looming expirations of credit facilities, unsecured note maturities and interest

payments; (iii) the magnitude of the Debtors' potential liability for representations and

warranties the Debtors made related to mortgage loans sold by them, and the significant time and

defense costs in respect of litigation claims alleged with respect to such mortgage loans and

sales; (iv) the continuing volatility in the interest rate markets, which affects the Debtors' ability

to hedge the value of their MSRs and to comply with the financial covenants in their credit

facilities and other agreements; and (v) continued uncertainty over the future of ResCap and how

such uncertainty could negatively impact business performance.  During this period, ResCap

continued reviewing its strategic alternatives and began to contemplate a sale of its business

operations and a potential filing under Chapter 11.

219.    In October 2011, ResCap interviewed f potential investment advisors and

retained Centerview Partners LLC ("Centerview").  Between October 2011 and January 2012,

ResCap and its advisors, led by Centerview, began preparing for a potential auction of ResCap's

business.  In August 2011, as part of the Debtors' continuing review of its strategic alternatives,

the Debtors began to contemplate a broader range of options, including a potential Chapter 11

filing.

220.    Over several months, Centerview evaluated a broad range of strategic

alternatives, conducted extensive due diligence on the Debtors' assets and operations, including

frequent on-site meetings and constant dialogue with the Debtors' senior management team and

personnel in servicing, origination, risk, accounting, and the Debtors' other functional groups,

and evaluated in-court transaction alternatives.  Centerview worked with the Debtors to develop

an understanding of the value embedded in the assets individually and as part of the broader

platform, and constructed a variety of presentation materials for both the Debtors and their Board

of Directors that illustrated the highlights of and challenges associated with marketing the

Purchased Assets in various combinations.

97

221.     On or about January 23, 2012, Centerview launched a targeted marketing process for the Debtors' assets. On or about February 13, 2012, Centerview received three preliminary indications of interest, including one from Nationstar.  A majority of Nationstar is owned by investment funds managed by affiliates of Fortress Investment Group, LLC (collectively, the public company and its affiliates and funds managed by such affiliates, "Fortress").  On February 17, 2012, after careful evaluation of the assets contemplated to be purchased under each of the three bids, the associated bid values and the contingencies associated with each bid, Centerview, the Debtors, and their other advisors determined that proceeding with two of the three bidders was most prudent.  After the Debtors elected to proceed with two bidders, Centerview approached each with a detailed request for supplemental information.

222.     After receipt of the requested information from the bidders, the value of Nationstar's initial bid compared to the other bid, and an analysis of the assets Nationstar proposed to acquire compared to other bidders, the Debtors and their professionals, determined, in their business judgment, to negotiate exclusively with Nationstar.  Nationstar's offer was the highest and best offer for the Debtors' business as a whole and represented the value maximizing proposal for a number of reasons, including: (i) Nationstar's offer was the highest bid for the largest portion of the Debtors' assets and operations; (ii) Nationstar represented an ideal bidder because it is a strategic purchaser with a recent track record of purchasing mortgage assets, with access to Fortress as a funding source; (iii) Nationstar holds substantially all the mortgage operations licenses necessary to run the Purchased Assets; (iv) Nationstar offered the largest "equity" amount with the smallest debt financing requirements and contingencies; (v) Nationstar has strong relationships with Fannie Mae, Freddie Mac and Ginnie Mae; and (vi) Nationstar's

98

working knowledge of the Debtors, its operations and management from involvement in

previous sales processes, assisted in an expedited diligence process.

223.    The Debtors and Centerview concluded that working exclusively with one

bidder would increase the likelihood that the Debtors would be able to consummate a transaction

in a limited amount of time due to looming maturities and debt service obligations.  In addition,

the Debtors believed that the successful negotiation of a purchase agreement would require the

involvement and support of Fannie Mae, Freddie Mac, Ginnie Mae, and U.S. Treasury, among

others, each of whom were likely to engage with a single third-party bidder.

224.    Upon selection of Nationstar as the exclusive bidder, the Debtors and

Centerview facilitated extensive due diligence for Nationstar and Fortress over a 12-week time

period.  Nationstar and Fortress were provided access to over 1.2 million pages of electronic

diligence materials and additional presentation materials describing the Debtors' operations and

assets.

225.    In order to facilitate a sale of the Debtors' platform in full and protect

against any erosion in value of the Debtors' assets and operations, the Debtors and their advisors

negotiated extensively with AFI and its affiliates to allow the Debtors to originate mortgage

loans in the months leading up to the Petition Date and subsequently during the Chapter 11

cases.  The Debtors comprehensively reorganized the manner in which the Debtors and AFI

originate and sell mortgage loans to preserve the value of the origination platform and the

attractiveness of the Debtors' assets to a potential buyer.

226.    Between March 2, 2012 and May [14], 2012, the Debtors, together with

Centerview and its other advisers, negotiated the terms of the Nationstar APA and Nationstar

completed its analysis of the Debtors' business.  The parties and their advisors also engaged in

extensive discussions with various government entities in respect of the proposed agreement and plans for maintaining the Debtors' origination and servicing operations as a going concern throughout the Debtors' Chapter 11 cases and upon sale to the successful bidder.

227.    Concurrently with the sale process and starting in February 2012, the Debtors, AFI, and their respective advisers began discussing a potential settlement of all claims and disputes the Debtors might have against AFI (the "Settlement Agreement"), and a process to develop a comprehensive plan of reorganization for the Debtors (in contrast to a sale under section 363 of the Bankruptcy Code).  As part of these settlement discussions, AFI offered to purchase the Debtors' "legacy" whole loan portfolio as well as certain "trading securities and other financial assets" for a purchase price, based on such assets at December 31, 2011, of approximately $1.6 billion, provided that the Sale is consummated in connection with confirmation of a Chapter 11 plan incorporating the terms of the Settlement Agreement with AFI, and approximately $1.4 billion if such Sale occurs pursuant to section 363 of the Bankruptcy Code.  This offer was approximately $200 million higher than the next highest bid. As a result, ResCap and its advisers determined it was in the Debtors' best interest to negotiate a sale of these assets to AFI.

## V.    CONCLUSION

Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the Debtors request that the relief sought in the First Day Orders be approved.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: May 14, 2012

RESIDENTIAL CAPITAL, LLC, et al.,
Debtors and Debtors in Possession

*/s/ James Whitlinger*
James Whitlinger
Chief Financial Officer

101