# EXHIBIT 9

## PLAN SUPPORT AGREEMENT

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

This PLAN SUPPORT AGREEMENT (together with all exhibits attached hereto, the "Agreement") is made and entered into as of May 13, 2012, by and among:

(a) Residential Capital, LLC ("ResCap") and certain of its direct and indirect subsidiaries[1] (collectively, the "Debtors");

(b) Ally Financial Inc. ("AFI"), on behalf of its direct and indirect subsidiaries and affiliates, excluding ResCap and its subsidiaries, and in its role as lender under that certain Amended and Restated Credit Agreement, dated December 30, 2009, and as secured party under the Amended and Restated First Priority Pledge and Security Agreement and Irrevocable Proxy (collectively, the "AFI Revolver"), and as lender under that certain Amended and Restated Loan Agreement, dated December 30, 2009, and as secured party under the Amended and Restated Pledge and Security Agreement and Irrevocable Proxy dated December 30, 2009 (collectively, the "AFI LOC");

(c) the undersigned holders of notes (each, a "Consenting Holder", solely in its capacity as a holder of such notes, as of the date hereof for the amounts set forth

---

[1] The Debtors are: Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

on the applicable signature page, and collectively, the "<u>Consenting Holders</u>") issued under that certain Indenture, dated June 6, 2008, among ResCap, certain guarantors and U.S. Bank National Association, as trustee (collectively, with certain related agreements, the "<u>Indenture</u>"); and

(d)     certain of the Consenting Holders are part of an ad hoc group of holders of the notes issued under the Indenture that has engaged Houlihan Lokey as their financial advisors and White & Case LLP as their legal advisors (the "<u>Ad Hoc Group</u>").

AFI, the Consenting Holders and the Debtors are defined collectively as the "<u>Parties</u>."

## RECITALS

**WHEREAS**, each of the Debtors is contemplating filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

**WHEREAS**, AFI holds claims, as defined in section 101(5) of the Bankruptcy Code, against the Debtors arising under the AFI Revolver and the AFI LOC (each, an "<u>AFI Secured Claim</u>");

**WHEREAS**, each Consenting Holder is a holder of a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors based upon the junior secured notes issued under the Indenture (each, a "<u>Junior Note Claim</u>");

**WHEREAS**, the AFI Revolver and the Junior Notes Claims are secured by certain of the Debtors assets, as described in the Amended and Restated First Priority Pledge and Security Agreement and the Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "<u>Joint Collateral</u>");

**WHEREAS**, the Consenting Holders have asserted that they may hold claims, as defined in section 101(5) of the Bankruptcy Code, against AFI directly;

**WHEREAS**, the Debtors, the Consenting Holders, and AFI have engaged in arm's-length, good faith negotiations regarding the restructuring of the Debtors and a resolution of all claims and disputes between them and have agreed upon a term sheet, as set forth in **Exhibit A** attached hereto (the "<u>Plan Term Sheet</u>"), for a chapter 11 plan of reorganization (the "<u>Plan</u>") that incorporates a settlement between the Debtors and AFI, as set forth in the Plan Term Sheet (the "<u>Ally Settlement Agreement</u>") and an intercreditor settlement between AFI and the Consenting

Holders, as set forth herein and embodied in the Plan Term Sheet, which the Debtors will pursue after they commence their chapter 11 cases;[2]

**WHEREAS**, in accordance with the terms of this Agreement, the Parties have agreed to work together to facilitate confirmation and consummation of the Plan and the transactions contemplated in relation thereto (collectively, the "Restructuring"); and

**NOW, THEREFORE**, in consideration of the foregoing and the premises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**Section 1.** __The Restructuring.__

(a)    The Restructuring will be implemented pursuant to cases commenced by the Debtors under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases") in accordance with this Agreement.

(b)    On or prior to May 13, 2012, the Debtors shall file voluntary petitions commencing the Chapter 11 Cases in the Bankruptcy Court (the date of such filings, the "Petition Date").

(c)    The Restructuring will involve, among other things, a sale of certain of the Debtors' assets, which are collateral of AFI and the Junior Note Claims, under either (i) an asset purchase agreement between the Debtors and Nationstar Mortgage LLC, or pursuant to such other higher or better offer as may be selected by the Debtors in accordance with bidding procedures approved by the Bankruptcy Court, or (ii) an asset purchase agreement between the Debtors and AFI, or pursuant to such other or higher or better offer as may be selected by the Debtors in accordance with bidding procedures approved by the Bankruptcy Court (the "HFS Sale," and together with the Nationstar Sale, the "ResCap Asset Sale").

(d)    The Debtors will seek approval of the ResCap Asset Sale under the Plan; provided, if the Plan is not approved by the Bankruptcy Court, the Debtors, in accordance with the terms and conditions set forth in this Agreement, may seek approval of the ResCap Asset Sale under section 363 of the Bankruptcy Code (the "Section 363 Sale").

---

[2]    For the avoidance of doubt, as used herein, the term "Plan" means a chapter 11 plan of reorganization that contains the same terms set forth in, and is otherwise consistent with, the Plan Term Sheet and this Agreement. In the event of any inconsistencies with the terms and conditions of this Agreement and the Plan Term Sheet, the terms and conditions of the Plan Term Sheet shall control. Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan Term Sheet and the Ally Settlement Agreement.

**Section 2.**       **The Debtors' Obligations Under this Agreement.**

**2.1**     **Implementation of the Restructuring.**

As long as this Agreement has not been terminated, the Debtors agree to:

(a)     use good faith efforts to effectuate and consummate the Restructuring contemplated by the Plan Term Sheet in accordance with the deadlines and conditions specified in the milestones set forth on <u>Exhibit B</u> attached hereto (the "<u>Milestones</u>");

(b)     stipulate, in the cash collateral order attached hereto as **<u>Exhibit C</u>** (the "<u>Cash Collateral Order</u>"), to the validity of the liens securing the Junior Note Claims and the Debtors' post-petition financing, and the validity and enforceability of that certain Intercreditor Agreement dated June 6, 2008 (as may be amended from time to time, the "<u>Intercreditor Agreement</u>"), subject to the terms of this Agreement, subject to the Bankruptcy Court entering final orders approving the Debtors' post-petition debtor-in-possession financing facilities (the "<u>DIP Facilities</u>") and to a period of 75 days after entry of the interim Cash Collateral Order to challenge such stipulation;

(c)     subject to the Bankruptcy Court's approval, grant adequate protection for the Junior Note Claims as set forth in the Cash Collateral Order;

(d)     file a motion in the Bankruptcy Court within 30 days after the Petition Date for approval of this Agreement and use their commercially reasonable efforts to obtain an order from the Bankruptcy Court approving such motion at the hearing to approve the Disclosure Statement;

(e)     obtain any and all required regulatory approvals and material third-party approvals for the Restructuring; and

(f)     take any and all reasonably necessary actions in furtherance of the Restructuring.

**2.2**     **Representations and Warranties of the Debtors.**

(a)     None of the materials and information provided by or on behalf of the Debtors to AFI and the Consenting Holders in connection with the Restructuring, when read or considered together, contains any untrue statement of a material fact or omits to state a known material fact necessary in order to prevent the statements made therein from being materially misleading.

(b)     All assets identified as Petition Date Collateral are and will remain until the proceeds thereof are distributed subject to valid perfected (i) first priority liens in favor of Wells Fargo as collateral agent for the benefit the lenders under the AFI Revolver and (ii) second priority liens in favor of Wells Fargo as collateral agent for the benefit of the holders of notes issued under the Indenture.  "<u>Petition Date</u>

4

Collateral" means each of the items of collateral identified on Schedule 1 (the "Collateral Report") and any proceeds of such collateral.

(c)      The amounts set forth in the Collateral Report have been calculated based on information derived from the Debtors' books and records and the values of any asset included in the calculations to determine such amounts, in each case, have been made in good faith.

**2.3      Additional Covenants of the Debtors.**

(a)      The Debtors shall:

   a.   promptly notify the Consenting Holders in writing upon becoming aware

      i.   that any representation is not true and correct at any time;

      ii.  of any fact or circumstances that materially alters the amounts set forth in the Collateral Report;

      iii. the existence of a Termination Event; or

      iv.  any challenge to the validity or priority of, or seeking to avoid, the liens on any asset included in the Petition Date Collateral, proceeds thereof or any Replacement Collateral.

   b.   subject to the approval of the Cash Collateral Order, reimburse or pay, as the case may be, as allowed administrative expenses pursuant to Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code promptly upon invoice the documented out-of-pocket costs and expenses reasonably incurred by the Ad Hoc Group, so long as the members of the Ad Hoc Group are Consenting Holders obligated under this Agreement to support the Plan and have not breached such obligation, in connection with the negotiation and implementation of this Agreement and the enforcement and protection of any rights not otherwise inconsistent with this Agreement, including White & Case LLP as counsel to the Ad Hoc Group and Houlihan Lokey as financial advisors to the Ad Hoc Group pursuant to the terms of the Houlihan Lokey engagement letter. Except as otherwise provided for in the Cash Collateral Order, the Ad Hoc Group shall not submit any invoices for post-petition fees and expenses to the Debtors until the Bankruptcy Court has approved this Agreement.

(b)   The Debtors shall not file any motion relating to approval of, or any motion to modify or amend (1) the use of cash collateral, (2) cash management procedures, (3) the DIP Agreement or (4) this Agreement, unless in each case the form and substance of the proposed order and/or modification is reasonably acceptable to the Consenting Holders.

**2.4      The Debtors' Fiduciary Obligations.**

Notwithstanding anything contained in this Agreement to the contrary, following the good faith determination by the Debtors and their respective Boards of Directors that a binding proposal for a chapter 11 plan or other restructuring transaction that is not consistent with the Plan Term Sheet (an "Alternative Restructuring") constitutes a binding proposal that is reasonably likely to be more favorable to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties than the Restructuring, and receipt of approval by the Boards of Directors to pursue such Alternative Restructuring, the Debtors may immediately terminate their obligations under this Agreement (and AFI and the Consenting Holders shall have similar termination rights as set forth in Section 7.1(i)) by written notice to counsel for AFI and the Consenting Holders and all obligations of AFI, the Consenting Holders and their obligees under this Agreement shall be terminated immediately; provided that termination shall not impair any of AFI's obligations under a certain Shared Services Agreement, by and between the Debtors and AFI, to be approved by the Bankruptcy Court.

**Section 3.**     **AFI's Obligations Under this Agreement.**

**3.1**     **Support of Restructuring.**

As long as this Agreement has not been terminated, AFI agrees to:

(a)     support the Debtors' efforts to pursue the Restructuring contemplated by the Plan Term Sheet;

(b)     support the relief requested in each of the pleadings filed in the Chapter 11 Cases on the Petition Date (the "First Day Pleadings");

(c)     support entry of the Cash Collateral Order;

(d)     support entry of the Disclosure Statement Order to permit solicitation of the Plan;

(e)     support approval of the DIP Facilities;

(f)     vote to accept the Plan, provided, that (i) the Bankruptcy Court has entered the Disclosure Statement Order, (ii) AFI has been properly solicited pursuant to section 1125 of the Bankruptcy Code, (iii) the material terms of the Plan and the Disclosure Statement are consistent with the terms of the Plan Term Sheet and incorporate the terms of the Ally Settlement Agreement, and (iv) the Plan and the Disclosure Statement are reasonably satisfactory to AFI;

(g)     support confirmation of the Plan and approval of the Ally Settlement Agreement incorporated therein;

(h)     support the prompt payment of the proceeds of the ResCap Asset Sale and any other assets and cash on hand that represent Joint Collateral or proceeds thereof to the Consenting Holders; and

(i)     support the ResCap Asset Sale pursuant to the Milestones.

**3.2    Transfer of Claims.**

AFI hereby agrees, for so long as this Agreement shall remain in effect, not to sell, assign, transfer, pledge, hypothecate or otherwise dispose of, directly or indirectly, any of the AFI Secured Claims or any right related thereto and including any voting rights associated with such AFI Secured Claims.

**3.3    Further Acquisition of Claims.**

This Agreement shall in no way be construed to preclude AFI or any of its affiliates (as defined in section 101(2) of the Bankruptcy Code) from acquiring additional claims following its execution of the Agreement.   AFI further agrees that it will not knowingly create any subsidiary or affiliate for the sole purpose of acquiring any claims against or interests in any of the Debtors without causing such affiliate to become a Party hereto prior to such acquisition.

**3.4    Representations and Warranties of AFI.**

(a)    AFI represents that, as of the date hereof:

(1)    it is the legal and beneficial owner of the AFI Secured Claims subject to this Agreement; and

(2)    it has full power to vote, dispose of, and compromise the AFI Secured Claims.

**Section 4.    <u>The Consenting Holders' Obligations Under this Agreement.</u>**

**4.1    Support of Restructuring.**

As long as this Agreement has not been terminated, each of the Consenting Holders agrees to:

(a)    support the Debtors' efforts to pursue the Restructuring contemplated by the Plan Term Sheet;

(b)    support entry of the Cash Collateral Order, approval of the DIP Facilities and the relief requested by the Debtors in the First Day Pleadings;

(c)    not contest the validity and enforceability of the Intercreditor Agreement, subject to the terms of this Agreement;

(d)    support entry of the Disclosure Statement Order to permit solicitation of the Plan;

(e)    permit all disclosures in the Disclosure Statement and any filings by the Debtors with any regulatory agency to which the Debtors may be subject, of the contents of this Agreement, including the aggregate amount and nature of Junior Note Claims and other claims or interests held against any of the Debtors by the Consenting Holders;

(f)     vote to accept the Plan, <u>provided</u>, that (i) the Bankruptcy Court has entered the Disclosure Statement Order, (ii) the Consenting Holder has been properly solicited pursuant to section 1125 of the Bankruptcy Code, (iii) the material terms of the Plan and the Disclosure Statement are consistent with the terms of the Plan Term Sheet, and (iv) the Plan and the Disclosure Statement are reasonably satisfactory to the Consenting Holders; and

(g)     support confirmation of the Plan, including the Debtor releases and third-party releases of AFI and its non-Debtor affiliates incorporated in the Plan.

**4.2     Transfer of Claims.**

Each Consenting Holder shall not (a) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Consenting Holder's interest in the applicable Junior Note Claim in whole or in part, or (b) grant any proxies, deposit any of such Consenting Holder's interests in the applicable Junior Note Claim into a voting trust, or enter into a voting agreement with respect to any such interest (collectively, the actions described in clauses (a) and (b), the "<u>Transfer</u>"), unless such Transfer is to another Consenting Holder party to this Agreement or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Debtors a transferee acknowledgment substantially in the form attached hereto as **<u>Exhibit D</u>** (the "<u>Transferee Acknowledgment</u>").   With respect to Junior Note Claims held by the relevant transferee upon consummation of a Transfer, such transferee is deemed to make all of the representations and warranties of a Consenting Holder set forth in Section 4.4 of this Agreement. Upon compliance with the foregoing, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.   Any Transfer made in violation of this Section 4.2 shall be deemed null and void and of no force or effect, regardless of any prior notice provided to the Debtors or AFI, and shall not create any obligation or liability of the Debtors or AFI to the purported transferee (it being understood that the putative transferor shall continue to be bound by the terms and conditions set forth in this Agreement).   In no event shall this Agreement impose on the Consenting Holders an obligation to disclose the price for which any Consenting Holder has disposed of any Junior Note Claim.   Notwithstanding the foregoing, a Qualified Marketmaker that acquires any of the Junior Note Claims subject to this Agreement with the purpose and intent of acting as a Qualified Marketmaker for such Claims shall not be required to execute a joinder to this Agreement or otherwise agree to be bound by the terms and conditions set forth herein if such Qualified Marketmaker sells or assigns such Junior Note Claims within ten (10) Business Days of its acquisition and the purchaser or assignee of such Junior Note Claims from the Qualified Marketmaker is a Consenting Holder that is party to this Agreement or any other entity that first agrees in an enforceable writing to be bound by the terms of this Agreement by executing and delivering to the Plan Proponents a joinder to this Agreement substantially in the form attached hereto as Exhibit A or such alternative form agreed to by the Debtors, but shall agree to be so bound (and shall be deemed to have so agreed) if such conditions are not satisfied. For the purposes of this Section 4.2, a "Qualified Marketmaker" means an entity that holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers

into long and short positions in claims against the Debtors), in its capacity as a deal or market maker in claims against the Debtors.

**4.3    Further Acquisition of Claims.**

This Agreement shall in no way be construed to preclude the Consenting Holders or any of their affiliates (as defined in section 101(2) of the Bankruptcy Code) from acquiring additional claims, including participating in the DIP Financing, following their execution of the Agreement; provided, that any additional Junior Note Claims acquired by the Consenting Holders shall automatically be deemed to be subject to the terms of this Agreement. Upon the written request of the Debtors, each Consenting Holder shall, in writing and within five (5) business days, provide an accurate and current list of all Junior Note Claims that it holds at that time, subject to any applicable confidentiality restrictions and applicable law. The Consenting Holders further agree that they will not knowingly create any subsidiary or affiliate for the sole purpose of acquiring any claims against or interests in any of the Debtors without causing such affiliate to become a Party hereto prior to such acquisition. In no event shall this Agreement impose on any Consenting Holder an obligation to disclose the price paid for any claims.

**4.4    Representation of the Consenting Holders' Holdings.**

Each of the Consenting Holders represents that, as of the date hereof:

(a)    it is (i) the legal owner, or the investment advisor to the legal owner, of the Junior Note Claims subject to this Agreement or (ii) the sole owner, or the investment advisor to the sole owner, of the Junior Note Claims subject to this Agreement; and

(b)    it has full power to vote, dispose of, and compromise its Junior Note Claims.

**Section 5.    AFI Intercreditor Settlement with Consenting Holders.**

As long as a Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived in writing in accordance with the terms hereof, the Parties agree to the following terms in this Section 5.

**5.1    Distribution of Proceeds from Joint Collateral.**

Notwithstanding the Intercreditor Agreement, the proceeds from Joint Collateral (the "Collateral Proceeds") shall be distributed to AFI on account of the AFI Secured Claims arising under the AFI Revolver and the holders of Junior Note Claims, whether under, and in accordance with the terms and conditions of, the Plan or otherwise, in the following sequence:

(a)    AFI will receive first payment of Collateral Proceeds in the amount of $400 million plus post-petition interest accrued during the Chapter 11 Cases on account of $400 million;

(b)    the holders of Junior Note Claims will receive on a pro rata basis the next $1 billion;

9

(c)    (i) holders of Junior Note Claims will receive on a pro rata basis 81% of the Collateral Proceeds in excess of the amounts distributed under clauses (a) and (b) and (ii) AFI will receive 19% of the Collateral Proceeds in excess of the amounts distributed under clauses (a) and (b) until the Junior Note Claims have been paid in full;

(d)    AFI shall receive 100% of the remaining Collateral Proceeds up to the full amount of the AFI Secured Claims for the AFI Revolver plus all interest accrued ("Deferred Interest") during the Chapter 11 Cases on account of the AFI Secured Claims arising under or in connection with the AFI Revolver to the extent such interest has not been paid in accordance with Section 5.1(a) above.

**5.2**    **Distributions on Account of Deficiency Claims**

(a)    To the extent that the Collateral Proceeds are insufficient to pay the AFI Revolver and the Junior Note Claims in full as set forth in Section 5.1 above, AFI and the holders of Junior Note Claims will divide the distributions under the Plan that are made on account of deficiency claims in connection with the AFI Revolver and the Junior Note Claims (together, the "Deficiency Distributions") such that Deficiency Distributions are made in the following sequence:

(b)    To (i) holders of Junior Note Claims on a pro rata basis 81% of the Deficiency Distributions and (ii) AFI 19% of the Deficiency Distributions until the Junior Note Claims have been paid in full;

(c)    To AFI, 100% of the Deficiency Distributions on account of any AFI Secured Claims plus the full amount of Deferred Interest.

**5.3**    **Agreement Regarding Payments.**

(a)    In the event that, notwithstanding the foregoing, any Collateral Proceeds or Deficiency Distributions shall be received by any Party other than in accordance with the waterfall described in Sections 5.1 and 5.2 above, such amounts shall be received and held in trust for and shall be paid over to the Party or Parties to whom payment should have been made in accordance with Section 5.1 and/or 5.2, as applicable. The Debtors shall cooperate with AFI and the Consenting Holders in making payments in a manner that reflects the agreement in Sections 5.1 and 5.2, and the Debtors, AFI and the Consenting Holders shall agree on a protocol to make such payments efficient and minimize the need for payments among AFI and the holders of Junior Note Claims pursuant to the pay-over provisions described in the preceding sentence. To the extent that a Party's claims are not allowed or otherwise subordinated by final non-appealable order of the Bankruptcy Court, Collateral Proceeds and Deficiency Distributions shall be distributed as if the party affected by the unallowed claim or subordination received cash in accordance with the above distribution.

(b)     The Plan or any order approving the distribution of Collateral Proceeds or Deficiency Distributions in accordance with this Section 5 shall provide for procedures that prohibit any holder of Junior Note Claims that objects in its capacity as a holder of Junior Note Claims, to this Agreement, or the enforceability of this Agreement, asserts claims against the Debtors (other than Junior Note Claims or claims arising our of the enforcement of this Agreement, the Plan or rights in connection with the Chapter 11 Cases) or files pleadings in the Chapter 11 cases inconsistent with this Agreement, or asserts in its capacity as a holder of Junior Note Claims any claims against Ally inconsistent with this Agreement from receiving any distributions in accordance with this Section 5.

**5.4     Conditional Waiver of Interest on Joint Collateral**

(a)     So long as the Interest Waiver Condition remains satisfied, the Consenting Holders waive any and all rights to any interest on account of their Junior Note Claims that may be due and owing after the Petition Date through and including December 31, 2012. After that date, notwithstanding the satisfaction of the Interest Waiver Condition, the Consenting Holders may seek a determination from the Bankruptcy Court that the holders of the Junior Note Claims are entitled to receive post-petition interest accruing from and after January 1, 2013. The "Interest Waiver Condition" means a condition that is satisfied so long as each of the following is true:

(i)     no unsecured creditor of any Debtor receives post-petition interest on any unsecured claim against any Debtor,

(ii)     no Termination Event has occurred; and

(iii)     either

a.  the Plan has gone effective on the same terms, and consistent with, the Plan Term Sheet on or prior to December 31, 2012 or

b.  both (x) the ResCap Asset Sale has been consummated on or prior to December 31, 2012 and (y) the Plan has gone effective on the same terms, and consistent with, the Plan Term Sheet on or prior to March 31, 2013.

**5.5     Right to Payment in Connection with a Section 363 Sale**

In the event of a Section 363 Sale, the Debtors shall seek in the order approving such sale authority to pay the holders of Junior Note Claims on account of the secured portion of their Junior Note Claims in accordance with the terms set forth in this Agreement in advance of confirmation of a plan of reorganization. Notwithstanding anything to the contrary herein, this Agreement shall not terminate solely as a consequence of the Bankruptcy Court failing to approve such relief.

**5.6**    **Reservation of Rights.**

The Consenting Holders, the Debtors and AFI preserve all of their rights with respect to whether a diminution in value has occurred that would entitle the Junior Note Claims to recover from sources other than the Joint Collateral as adequate protection on account of the Debtors' use of Joint Collateral and obtaining debtor-in-possession financing including to refinance the Master Repurchase Agreement, dated December 21, 2011 and the Master Guarantee, dated December 21, 2011 (collectively, the "Pre-Petition Ally Repo Facility") and the financing facility under (i) the Fourth Amended and Restated Indenture, dated March 15, 2011 (the "Base Indenture"), as amended by Amendment No. 1, dated March 13, 2012, (ii) the Series 2012-VF1 Indenture Supplement, dated March 13, 2012 (together with the Base Indenture, as amended or supplemented prior to the date hereof, the "Pre-Petition GSAP Indenture"), (iii) the VFN Purchase Agreement, dated March 13, 2012, (the "VFN Purchase Agreement") and (iv) the Series 2012-VF1 Notes and all other notes issued pursuant to the Pre-Petition GSAP Indenture, as amended or supplemented prior the date hereof (collectively with the Pre-Petition GSAP Indenture and the VFN Purchase Agreement, the "Pre-Petition GSAP Facility"). The Consenting Holders consent to deferring any such adequate protection argument, if made, until the earlier of the effective date of the Plan or December 31, 2012, provided that ResCap shall reserve and not distribute assets equal to any amounts in dispute until a final adjudication on the merits or consensual resolution.  The Consenting Holders further preserve the right to make a claim for an equitable lien on the collateral securing the AFI LOC after December 31, 2012, provided, further that if the Plan has gone effective on or before December 31, 2012, the Consenting Holders shall irrevocably waive any such right and instruct U.S. Bank National Association, as trustee (the "Trustee"), not to pursue any such claims.  Notwithstanding anything to the contrary herein, the Consenting Holders shall not take any action adverse to AFI (i) if the Section 363 Sale is consummated by January 1, 2013, and (ii) in making any such equitable lien arguments.

Notwithstanding the foregoing, in the event this Agreement is terminated pursuant to Section 7 hereof, no statement, agreement, acknowledgement, finding or other provision herein shall be or shall be deemed to be a stipulation or admission by any Party or have any effect on any claims, causes of action or defenses of any Party.

**5.7 Trust Oversight Committee.**

Upon consummation of the Plan, the Debtors shall establish a committee of three individuals selected by each of (1) the Debtors, (2) the official committee of unsecured creditors, and (3) the Ad Hoc Group.  The committee shall be responsible for oversight over the liquidation trust created pursuant to the Plan, including the liquidation of any unsold assets of the Debtors, pursuant to the terms of an agreement to be negotiated in good faith by the parties' thererto.  In the event the Section 363 Sale is consummated, the parties shall negotiate in good faith to reach an agreement regarding oversight over the preservation and liquidation of remaining unsold Joint Collateral pending consummation of a Plan.

**Section 6.**    **Mutual Obligations of the Parties Under this Agreement.**

As long as a Termination Event has not occurred or has occurred but has been duly waived in accordance with the terms hereof, each of the Parties agrees that it:

(a)    shall negotiate in good faith the Definitive Documents (as defined in the Plan Term Sheet), including the Plan and a disclosure statement describing the Plan (the "Disclosure Statement"), both of which shall contain the same terms set forth in, and be consistent with, the Plan Term Sheet and the Ally Settlement Agreement and shall otherwise be in form and substance reasonably acceptable to AFI, the Consenting Holders, and the Debtors.

(b)    shall not directly or indirectly seek, solicit, support, or vote in favor of any Alternative Restructuring that could reasonably be expected to prevent, delay, or impede the Restructuring contemplated by the Plan Term Sheet or that is inconsistent with this Agreement, unless the Debtors, AFI and the Consenting Holders have agreed, in writing, to pursue an Alternative Restructuring;

(c)    shall not directly nor indirectly (a) engage in, continue, or otherwise participate in any negotiations regarding any Alternative Restructuring, (b) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any Alternative Restructuring or (c) withhold, withdraw, qualify, or modify its approval or recommendation of this Agreement, the Plan Term Sheet, the Plan, or the Restructuring;

(d)    shall not encourage any other entity to object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with the Restructuring; or

(e)    shall not take any action that is inconsistent with this Agreement, the Plan Term Sheet, the Ally Settlement Agreement, or the Plan, or that would obstruct or delay approval of the Disclosure Statement or confirmation and consummation of the Plan.

**Section 7.    Termination.**

**7.1    Termination Events.**

The term "Termination Event," wherever used in this Agreement, means any of the following events (whatever the reason for such Termination Event and whether it is voluntary or involuntary):

(a)    any Party has breached any representation or other material provision of this Agreement and any such breach has not been duly waived by the non-breaching Party or cured in accordance with the terms set forth in Section 7.2;

(b)    any material modification is made to the Plan Term Sheet or the Plan that is not in form and substance satisfactory to AFI, the Consenting Holders and the Debtors;

(c)    any of the Definitive Documents (as defined in the Plan Term Sheet), including the Plan, is filed with the Bankruptcy Court by the Debtors and is inconsistent with the Plan Term Sheet in any material respects, unless otherwise acceptable to AFI and the Consenting Holders;

(d)     the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing (i) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in sub-clauses (3) and (4) of section 1106(a) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(e)     the obligations of the Debtors under any of the DIP Facilities is accelerated;

(f)     any of the Chapter 11 Cases is dismissed;

(g)     a termination of the Ally Settlement Agreement has occurred;

(h)     the Debtors publicly announce their intention not to support the Restructuring or provide written notice to AFI and/or the Consenting Holders of their intention to do so;

(i)     the Debtors' Boards of Directors approve an Alternative Restructuring or the Debtors execute a letter of intent (or similar document) indicating their intention to pursue an Alternative Restructuring;

(j)     holders of Junior Note Claims holding at least an aggregate of 25% in principal amount of the Junior Note Claims have not executed this Agreement and become Consenting Holders as of the Petition Date;

(k)     holders of Junior Note Claims holding at least an aggregate of 50% in principal amount of the Junior Note Claims have not executed this Agreement and become Consenting Holders as of the date of the Bankruptcy Court hearing on the Disclosure Statement;

(l)     the Debtors seek, prior to entry of the order approving the Disclosure Statement, entry of an order (i) approving any settlement of any contingent or disputed liability, or (ii) allocating the proceeds to be paid pursuant to the Ally Settlement Agreement, in a manner which materially and adversely affects the recoveries of the Consenting Holders;

(m)     any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable;

(n)     the Bankruptcy Court does not approve an asset purchase agreement in connection with the ResCap Asset Sale;

(o)     the Debtors fail to comply with the deadlines and conditions set forth in the Milestones;

(p)     a Party has obtained standing and commenced an action to challenge the validity or priority of, or effort to avoid, the liens on any asset or assets comprising a material portion of the Petition Date Collateral and such challenge has not been

dismissed or otherwise resolved to the satisfaction of the Consenting Holders as of the date which is 10 days prior to the date that the Consenting Holders are required to vote for or against the Plan;

(q)     the reduction in the book value of Petition Date Collateral due to the successful challenge of the validity of the liens on such Petition Date Collateral or a determination that any asset or assets that were designated by a Debtor as being Petition Date Collateral do not constitute Joint Collateral in an aggregate amount (taking into account additional Joint Collateral that was not specified as Petition Date Collateral) for all such assets that exceeds one hundred million dollars ($100,000,000), based on the Debtors' book value as of February 29, 2012; and

(r)     the Consenting Holders acting reasonably determine that any Definitive Document (as defined in the Plan Term Sheet) attached as an exhibit to the Plan Term Sheet is materially inconsistent with the terms of this Agreement as notified in writing by the Consenting Holders within five Business Days of the first date upon which such Definitive Document was first delivered to counsel to the Ad Hoc Group.

The foregoing Termination Events are intended solely for the benefit of the Debtors, AFI and the Consenting Holders; provided, that AFI, any Consenting Holder or a Debtor may not seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions.

**7.2     Termination Event Procedures.**

Upon the occurrence of a Termination Event, any party seeking to terminate shall provide written notice of such Termination Event to the other Parties specifying the clause hereof pursuant to which such termination is made (such notice, the "Termination Notice"), and, unless no later than five (5) business days after the date of such Termination Notice the occurrence of the Termination Event specified therein is waived in writing by the Party or Parties providing the Termination Notice.   Notwithstanding the foregoing, if a Termination Event as specified in clauses (d), (e), (f), (h) or (m) of Section 7.1 hereof occurs, this Agreement shall automatically terminate without further action by any Party.   In the event the Agreement is terminated, the Parties shall not have any continuing liability or obligation under the Agreement and each Party shall have all the rights and remedies available to it under applicable law; provided, that no such termination shall modify any provision which by its express terms survives the termination of this Agreement.   Notwithstanding any termination of this Agreement, all payments made hereunder shall survive termination and shall be final and irrevocable, and any other agreements existing among the Parties prior to the date hereof shall be deemed null and void to the extent such agreements provide any Party a right to the payments made hereunder.

The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder (the "Automatic Stay") in connection with giving any such notice (and agree not to object to any non-breaching Party seeking to lift the Automatic Stay in connection with giving any such notice, if necessary).   Any such termination (or partial termination) of the Agreement shall not restrict the Parties' rights and remedies for any breach of

15

the Agreement by any Party, including, but not limited to, the reservation of rights set forth in
Section 9 hereof.

**7.3    Mutual Consent to Termination.**

In addition to the Termination Events set forth in Section 7.1 hereof, this Agreement shall
be terminable immediately upon the mutual written agreement of all of the Parties to terminate
this Agreement.

**7.4    Termination As a Result of the Effective Date.**

On the effective date of the Plan, the Plan shall supersede and replace this Agreement.

**Section 8.    <u>Mutual Representations, Warranties, and Covenants.</u>**

Each Party makes the following representations, warranties, and covenants to each of the
other Parties, each of which are continuing representations, warranties, and covenants:

**8.1    Good Faith.**

The Parties agree to negotiate in good faith all of the documents and transactions
described in the Plan Term Sheet and in this Agreement.

**8.2    Enforceability.**

Subject to Section 11.6 of this Agreement and any provisions of the Bankruptcy Code,
this Agreement is a legal, valid, and binding obligation, enforceable against the Debtors, AFI and
the Consenting Holders in accordance with its terms, except as enforcement may be limited by
applicable laws relating to or limiting creditors' rights generally or by equitable principles
relating to enforceability.

**8.3    No Consent or Approval.**

Except as expressly provided in this Agreement or as required by the Bankruptcy Code,
no consent or approval is required by any other entity in order for it to carry out the provisions of
this Agreement.

**8.4    Power and Authority.**

The Parties are duly organized, validly existing, and in good standing under the laws of
their jurisdictions of organization and the Parties have all requisite corporate, partnership, or
limited liability company power and authority to enter into this Agreement and to carry out the
transactions contemplated by, and perform its respective obligations under, this Agreement and
the Plan Term Sheet.

**8.5    Authorization.**

The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, or limited liability company action on its part.

**8.6    Governmental Consents.**

Subject to the provisions of Section 11.6 of the Agreement, the execution, delivery, and performance by the Parties of this Agreement does not and shall not require any registration or filing with or consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body, except such filings as may be necessary and/or required under the federal securities laws or as necessary for the approval of a disclosure statement and confirmation of the Plan by the Bankruptcy Court.

**8.7    No Conflicts.**

The execution, delivery, and performance of this Agreement does not and shall not: (a) violate any provision of law, rule, or regulations applicable to it or, in the case of the Debtors, any of its subsidiaries; (b) violate its certificate of incorporation, bylaws (or other formation documents in the case of a limited liability company) or, in the case of the Debtors, those of any of its subsidiaries; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or, in the case of the Debtors, any of its subsidiaries is a party.

**Section 9.    <u>No Waiver of Participation and Preservation of Rights.</u>**

This Agreement and the Plan Term Sheet include a proposed settlement among the Parties with respect to the AFI Secured Claims, the Junior Note Claims, and other disputes. Except as expressly provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair, or restrict the ability of AFI or the Consenting Holders to protect and preserve their rights, remedies, and interests, including their claims against any of the Debtors, any liens or security interests they may have in any assets of any of the Debtors, or their full participation in the Chapter 11 Cases.  Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan Term Sheet are not consummated as provided herein, if a Termination Event occurs or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies and interests.

**Section 10.    <u>Acknowledgement.</u>**

THIS AGREEMENT, THE PLAN TERM SHEET, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES.  EACH PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.    THE DEBTORS WILL NOT SOLICIT

ACCEPTANCES OF THE PLAN FROM AFI AND THE CONSENTING HOLDERS UNTIL AFI AND THE CONSENTING HOLDERS HAVE BEEN PROVIDED WITH COPIES OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.    EACH PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR.

**Section 11.    Miscellaneous Terms.**

**11.1    Effectiveness of Agreement; Binding Obligation; Assignment.**

(a)    **Effectiveness of Agreement**.    This Agreement shall be effective only upon the satisfaction of all of the following conditions, in addition to any other conditions to the effectiveness of this Agreement set forth herein:

(1)    execution of this Agreement by ResCap before the Petition Date;

(2)    execution of this Agreement by AFI before the Petition Date;

(3)    payment before the Petition Date of all invoiced fees and expenses of White & Case LLP and Houlihan Lokey;

(4)    execution of this Agreement before the Petition Date by Consenting Holders who hold in the aggregate at least 25% of the principal amount of Junior Note Claims; and

(5)    execution of this Agreement as of the date of the Bankruptcy Court hearing on the Disclosure Statement by Consenting Holders who hold in the aggregate at least 50% of the principal amount of Junior Note Claims.

(b)    **Binding Obligation.**    Subject to the provisions of the Bankruptcy Code, this Agreement is a legally valid and binding obligation of the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in the Chapter 11 Cases, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, successors, assigns, heirs, executors, administrators, and representatives.    Nothing in this Agreement, express or implied, shall give to any entity, other than the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, successors, assigns, heirs, executors, administrators, and representatives, any benefit or any legal or equitable right, remedy or claim under this Agreement.

(c)    **Assignment.**    Except as provided herein, rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity.

**11.2    Further Assurances.**

The Parties agree to execute or cause to be executed and deliver or cause to be delivered all such agreements, instruments and documents and take or cause to be taken all such further actions as the Parties may reasonably deem necessary from time to time to carry out the intent and purpose of this Agreement and to consummate the transactions contemplated hereby and thereby, whether the same occurs before or after the date of this Agreement.

**11.3    Headings.**

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

**11.4    Governing Law.**

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.

Further, by its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Agreement, provided, that upon commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

**11.5    Complete Agreement, Interpretation, Voting and Modification.**

(a)    **Complete Agreement.**  This Agreement and the Plan Term Sheet constitutes the complete agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between or among the Parties with respect thereto.

(b)    **Interpretation.**  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner.  There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

(c)    **Voting.**  Notwithstanding anything to the contrary in this Agreement, in any circumstance where a provision of this Agreement requires the approval, consent, satisfaction, agreement or any similar right of the Consenting Holders, such requirement shall been satisfied or determined by the affirmative vote of a simple majority by amount of the Junior Note Claims then held and voted by the members of the Ad Hoc Group that are Consenting Holders.

19

(d)    **Modification of Restructuring Agreements.**  This Agreement and the Plan
Term Sheet may only be modified, altered, amended, or supplemented by an
agreement in writing signed by the Debtors, AFI, and the Consenting Holders.

**11.6    Execution.**

This Agreement may be executed and delivered (by facsimile or otherwise) in any
number of identical counterparts, each of which, when executed and delivered, shall be deemed
an original and all of which together shall constitute the same agreement.  Except as expressly
provided in this Agreement, each individual executing this Agreement on behalf of a Party has
been duly authorized and empowered to execute and deliver this Agreement on behalf of said
Party.

**11.7    Specific Performance.**

Each Party acknowledges that the other Party would be irreparably damaged if this
Agreement were not performed in accordance with its specific terms or were otherwise breached.
Accordingly, each Party's sole remedy shall be to seek an injunction or injunctions to prevent
breaches of the provisions of this Agreement and to enforce specifically the terms of this
Agreement.

**11.8    Settlement Discussions.**

This Agreement and the Restructuring are part of a proposed settlement among the
Parties with respect to the AFI Secured Claims and other disputes and the plan treatment of the
Junior Note Claims.  Nothing herein shall be deemed an admission of any kind.  To the extent
provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this
Agreement and all negotiations relating thereto shall not be admissible into evidence in any
proceeding other than a proceeding to enforce the terms of this Agreement.

**11.9    Consideration.**

The Debtors, the Consenting Holders, and AFI hereby acknowledge that no
consideration, other than that specifically described herein and in the Plan Term Sheet shall be
due or paid to AFI or the Consenting Holders for their agreement to support confirmation of the
Plan in accordance with the terms and conditions of this Agreement, other than the Debtors'
agreement to use commercially reasonable efforts to obtain approval of the Disclosure Statement
and to seek confirmation of the Plan in accordance with the terms and conditions of the Plan
Term Sheet.

**11.10    Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if sent by
facsimile, courier, or by registered or certified mail (return receipt requested) to the following
addresses (or at such other addresses or facsimile numbers as shall be specified by like notice):

(a)    if to the Debtors, to: Residential Capital, LLC, 1100 Virginia Drive, Fort
Washington, PA 19034; Attn: Tammy Hamzehpour; with copies to: Morrison &

Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104, Attn: Larren Nashelsky, Gary Lee and Todd Goren;

(b)     if to AFI to: Ally Financial, Inc., 200 Renaissance Center, Detroit, MI 48265; Attn: William Solomon; with copies to: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Richard M. Cieri, Ray C. Schrock, and Stephen E. Hessler; and

(c)     if to the Consenting Holders, by facsimile to the facsimile number set forth on the applicable signature page, with copies to: White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036; Attn: Gerard Uzzi and David Thatch.

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

**11.11    Certain Indenture Matters.**

This Agreement shall constitute a direction to the Trustee under the Indenture to take all actions (if any) possible, necessary or desirable to implement this Agreement and the Trustee may conclusively rely upon this Agreement, as entered into by the Consenting Holders, in respect of any action taken, suffered or omitted by it in reliance upon this Agreement.

**11.12    Indemnification and Exculpation.**

Subject to the Bankruptcy Court approving this Agreement, the Debtors shall, jointly and severally, indemnify and hold harmless the Trustee and its directors, officers and employees (collectively, the "Indemnified Parties"), from and against any and all losses, liabilities, damages, judgments, reasonable costs and expenses (including reasonable attorney's fees and expenses) incurred in connection with defending itself or themselves against any claim or action or liability arising in connection with the exercise or performance of any of their duties or obligations hereunder (including as contemplated by Section 11.11) or any other agreement (including, but not limited to, the Definitive Documents) contemplated hereby, except to the extent that a court of competent jurisdiction shall find that the losses, liabilities, damages, judgments, costs or expenses are attributable to the willful misconduct, gross negligence or bad faith of the Indemnified Parties. Neither the Trustee, nor any Consenting Holder, shall be liable for monetary or other damages to the Debtors, any holder of any note issued under the Indenture, or any creditor of any Debtor arising out of the negotiation, execution and/or performance of this Agreement.

*        *        *        *        *

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

**RESIDENTIAL CAPITAL, LLC, on behalf of itself and its Debtor subsidiaries**

By:  _____

Name:  _____

Its:  _____

Dated: _____, 2012

**ALLY FINANCIAL INC., on behalf of its subsidiaries and affiliates, excluding the Debtors**

By: _____
Name: _____
Its: _____
Telephone: _____
Facsimile: _____

Dated: _____, 2012

**CONSENTING HOLDER**

By: _____
Name: _____
Its: _____
Telephone: _____
Facsimile: _____

Principal Amount of Junior Note Claims held by
Consenting Holder:

$ _____

Description and aggregate amount of any additional
claims against the Debtors other than Junior Note
Claims:

$ _____
Description: _____

# **EXHIBIT A**

## **PLAN TERM SHEET**

## EXHIBIT B

## MILESTONES

## MILESTONES

The Debtors' failure to comply with the following milestones (the "Milestones") will result in a Termination Event under Section 7 of this Agreement:

1)      The Debtors shall have commenced the Chapter 11 Cases on or before May 15, 2012;

2)      On or before May 18, 2012, the Debtors shall have obtained entry of orders of the Bankruptcy Court on an interim basis approving the DIP Agreement that are in form, scope, and substance satisfactory to AFI and the Consenting Holders;

3)      On or before May 18, 2012, the Debtors shall have obtained entry of the Cash Collateral Order and the Cash Management Order by the Bankruptcy Court, on an interim basis, in form, scope, and substance satisfactory to AFI and the Consenting Holders;

4)      On or before June 15, 2012, the Debtors shall have filed a motion seeking the Bankruptcy Court's approval of this Agreement, in form, scope, and substance satisfactory to AFI and the Consenting Holders;

5)      On or before June 15, 2012, the Debtors shall have filed with the Bankruptcy Court the Plan, Disclosure Statement, a motion to approve the Disclosure Statement, and a motion to approve solicitation procedures in relation to the Plan and Disclosure Statement, in each case in form, scope and substance satisfactory to AFI and the Consenting Holders;

6)      On or before May 18, 2012, the Debtors shall have filed with the Bankruptcy Court a motion to approve their proposed bidding procedures with respect to the ResCap Asset Sale, which bidding procedures will propose a timeline for the asset sale consistent with the terms of the Plan Term Sheet and provide for the ResCap Asset Sale to be approved in conjunction with the Plan;

7)      On or before 50 days following the Petition Date, the Debtors shall have obtained entry of the Bankruptcy Court of a final Cash Collateral Order and a final order approving the DIP Agreement, in each case in form, scope and substance satisfactory to AFI and the Consenting Holders;

8)      On or before 90 days following the Petition Date, the Bankruptcy Court shall have entered (a) an order approving the Disclosure Statement, (b) an order approving solicitation procedures in relation to the Plan and Disclosure Statement, (c) an order approving the Debtors' proposed bidding procedures related to the ResCap Asset Sale and (d) an order approving this Agreement, in each case in form, scope and substance satisfactory to AFI and the Consenting Holders;

9)      On or before December 31, 2012, either (a) the Plan has been confirmed by the Bankruptcy Court and the effective date of the Plan has occurred or (b) if the Plan has not been confirmed by the Bankruptcy Court, the ResCap Asset Sale has been approved by an order of the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code.

## EXHIBIT C

## CASH COLLATERAL ORDER

## EXHIBIT D

**TRANSFEREE ACKNOWLEDGEMENT**

## TRANSFEREE ACKNOWLEDGEMENT

This joinder (this "Joinder") to the Plan Support Agreement, dated as of May ___, 2012 (the "Agreement"), by and among (i) Residential Capital, LLC ("ResCap") and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), (ii) Ally Financial Inc., and (iii) [Transferor's name] ("Transferor") and certain other holders of Junior Note Claims against the Debtors (each, a "Consenting Holder" and collectively, the "Consenting Holders"), is executed and delivered by [_____] (the "Joining Party") as of [_____], 2012. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.     *Agreement to be Bound*.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Holder" and a "Party" for all purposes under the Agreement.

2.     *Representations and Warranties*.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is either the legal holder or sole beneficial owner of the Junior Note Claim of the Transferor, and (b) makes the representations and warranties set forth in Section 4 of the Agreement to each other Party.

3.     *Governing Law*.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.     *Notice*.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:
[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

      Name:

      Title:

Principal Amount of Junior Note Claims acquired by Joining Party:

$ _____

<u>**Annex I**</u>

**Plan Support Agreement**

# SCHEDULE 1

## Collateral Report