MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:     (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------

|   |   |   |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |

--------------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO**
**11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)**
**AND 364(e) AND BANKRUPTCY RULES 4001 AND 6004 (I) AUTHORIZING THE**
**DEBTORS TO (A) ENTER INTO AND PERFORM  UNDER RECEIVABLES**
**PURCHASE AGREEMENTS AND MORTGAGE LOAN PURCHASE AND**
**CONTRIBUTION AGREEMENTS RELATING TO INITIAL RECEIVABLES AND**
**MORTGAGE LOANS AND RECEIVABLES POOLING AGREEMENTS RELATING**
**TO ADDITIONAL RECEIVABLES, AND (B) OBTAIN POSTPETITION FINANCING**
**ON A SECURED, SUPERPRIORITY BASIS, (II) SCHEDULING A FINAL HEARING**
**PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c), AND (III) GRANTING**
**<u>RELATED RELIEF</u>**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"**Debtors**")[1] hereby move this Court (the "**Motion**")[2] pursuant to sections 105, 362, 363(b)(1),

----

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
(Footnote continues on next page.)

363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of Chapter 11 of title 11 of

the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 4001-2 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

Southern District of New York ("**Local Rules**"), for entry of an interim order substantially in the

form annexed hereto as <u>Exhibit A</u>, (the "**Interim Order**") and a final order (the "**Final Order**",

and together with the Interim Order, the "**DIP Orders**")[3] (i) authorizing (a) GMAC Mortgage,

LLC ("**GMAC Mortgage**"), Residential Funding Company, LLC ("**RFC**"), GMACM Borrower

LLC (the "**GMACM Borrower**") and RFC Borrower LLC (the "**RFC Borrower**" and, together

with the GMACM Borrower, the "**Borrowers**"), to enter into and perform under receivables

purchase agreements, mortgage loan purchase and contribution agreements, and receivables

pooling agreements relating to certain rights to reimbursement for servicer advances and certain

mortgage loans, and (b) the Debtors to enter into a Superpriority Debtor-in-Possession Credit and

Guaranty Agreement, substantially in the form attached hereto as <u>Exhibit B</u> (the "**DIP Credit**

**Agreement**"), and related documents (collectively, and including all exhibits thereto, the

"**Credit Documents**") to obtain postpetition financing on a secured superpriority basis,

(ii) scheduling a final hearing  (the "**Final Hearing**") pursuant to Bankruptcy Rules 4001(b) and

4001(c), and (iii) granting related relief.  In support of the Motion, the Debtors rely upon and

incorporate by reference the Affidavit of James Whitlinger, Chief Financial Officer of

Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, filed with

---

(Footnote continued from previous page.)

    requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

[3]    A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing (as defined
below).

the Court concurrently herewith (the "**Whitlinger Affidavit**") and the Declaration of Marc D.

Puntus in Support of the Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§

105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and

Bankruptcy Rules 4001 and 6004 (I) Authorizing the Debtors to (A) Enter into and Perform

Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution

Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling

Agreements Relating to Additional Receivables, and (B) Obtain Postpetition Financing on a

Secured, Superpriority Basis, (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules

4001(b) and 4001(c), and (III) Granting Related Relief (the "**Puntus Declaration**").  In further

support of the Motion, the Debtors, by and through their undersigned counsel, respectfully

represent:[4]

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief requested herein are

sections 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and

364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule

4001-2.

## PRELIMINARY STATEMENT

3.      The DIP Facility (as defined below) is critical to the Debtors' ability to

continue to operate.  The Debtors intend to sell their mortgage loan origination and loan

---

[4]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Whitlinger
Affidavit or in the proposed Interim Order, as applicable.

servicing businesses in these Chapter 11 cases, and the Debtors expect that such sale will yield a

significant return for the benefit of the Debtors' estates and creditors.  As described in more

detail below and in the Whitlinger Affidavit and the Puntus Declaration, selling the Debtors'

servicing and origination platform requires that the Debtors continue operating their businesses

in the ordinary course until a sale or sales can be consummated.  To do so, the Debtors require

liquidity in order to meet their obligations as servicers.  Without debtor in possession financing,

the Debtors will be unable to fund the servicing advances required in connection with their

servicing assets and operations, including principal and interest, taxes and insurance and other

contractually required costs.  Servicing advances comprise the largest use of cash, by far, for the

Debtors.  The DIP Facility provides the Debtors with this liquidity, which will preserve

substantial value for the Debtors' estates.  Accordingly, the Debtors request entry of interim and

final orders authorizing them to obtain postpetition financing so that they can maintain the

mortgage loan origination and servicing businesses and preserve the value of their assets pending

one or more sales of their businesses.

    4.  The Debtors operate in a highly regulated business in which they service

over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately

$374 billion, which are held by private investors or included in securitization trusts.  The holders

of these loans, and the purchasers of the mortgage-backed securities issued by the securitization

trusts, are comprised of a broad range of investors, such as pension funds, banks, insurance

companies, governmental bodies and other public and private entities.  These investors depend

on the performance of the Debtors, as servicer, to ensure the recovery of their investments.

    5.  The Debtors engaged financial advisors and investment bankers to assist

them in obtaining a postpetition financing arrangement on the best possible terms.  Following a

marketing process in which the Debtors and their advisors discussed and negotiated proposed financing terms with certain of the Debtors' prepetition lenders and certain third parties, the Debtors determined that the DIP Facility provided terms and conditions that are fair, reasonable and appropriate in the circumstances presented.

6.    The Debtors seek authority to enter into the DIP Credit Agreement and obtain financing in the total aggregate amount of $1,450,000,000, in the form of (i) a revolving facility in the amount of $200,000,000 with an interest rate of LIBOR + 4.00% per annum (the "**Revolver**"), (ii) a term loan in the amount of $1,050,000,000 with an interest rate of LIBOR + 4.00% per annum (the "**Term A-1 Loan**"), and (iii) a term loan in the amount of $200,000,000 with an interest rate of LIBOR + 6.00% per annum (the "**Term A-2 Loan**," and together with the Term A-1 Loan, the "**Term Loans**" and the Revolver together with the Term Loans the "**DIP Facility**").[5]

7.    In order for the Borrowers to obtain the assets necessary to secure these borrowings, the Debtors are also seeking authorization for the Borrowers to acquire (i) the right to reimbursement for certain servicer advances which are currently serving as the collateral securing the GSAP Facility (as defined below) and (ii) certain mortgage loans that are currently the subject of the BMMZ Repo Facility (as defined below).  These transactions will allow the Debtors to repay, or cause to be repaid, the GSAP Facility and the BMMZ Repo Facility (together, the "**Refinanced Indebtedness**") through the purchases of the collateral securing those facilities as of the Petition Date.  As described in more detail below, due to the nature of the facilities that will be refinanced, the Debtors do not believe that they would have access to any of the cash collateral under these facilities while in Chapter 11, absent refinancing.  Thus, if

---

[5]    The Term Loans each have a LIBOR floor of 1.25%.

ny-1011900

these facilities are not refinanced, the Debtors will lose a primary source of liquidity that they

need in order to operate their businesses.  In addition, the DIP Credit Agreement contemplates

advance rates greater than those available under the facilities that will be refinanced.  Thus, by

consummating the purchase transactions and entering into the Credit Documents, the Debtors

will not only obtain access to assets that would otherwise be unavailable to them, but also obtain

access to additional liquidity required to run their businesses and bridge their operations to a sale

transaction.

8.      This additional liquidity is required to allow the Debtors to continue

operating their mortgage loan servicing business in the ordinary course, which will instill public

confidence in the Debtors' capabilities to continue functioning as a servicer, notwithstanding the

commencement of these Chapter 11 cases.  If the Debtors are unable to demonstrate sufficient

liquidity, including amounts required to fund servicing advances, borrowers under the mortgage

loans that the Debtors service and the market in general will likely experience confusion and

uncertainty.  Those borrowers may refuse to make payments to the Debtors, impairing the

Debtors' ability to continue meeting their ongoing payment obligations (e.g., making payment

advances required under certain circumstances for the benefit of investors and paying certain

securitization fees) and the Debtors' future ability to collect on these loans.  It is essential that the

Debtors remain vigilant to ensure that borrowers continue making payments on their loans (e.g.,

by sending out bills and ensuring the collection and proper distribution of funds received).  If the

Debtors' ability to do so is impaired, there is a real risk that delinquencies and defaults will

materially increase, resulting in a material degradation in the value of the Debtors' assets and

operations.

9.    Moreover, if the Debtors do not continue to honor their ordinary course servicing commitments for mortgage loans owned, insured or guaranteed by the federal government sponsored entities Fannie Mae and Freddie Mac, or by Ginnie Mae (the "**Agency Loans**"),[6] they face the possible termination of their Agency Loan servicing rights by such entities, which would result in the loss of future servicing fees, with a concomitant tremendous (and potentially catastrophic) loss to their estates.  The Debtors would risk incurring penalties under recent settlements with the federal government and various state agencies, pursuant to which the Debtors agreed, among other things, to certain heightened servicing requirements with respect to the Agency Loans.

10.    To secure the DIP Obligations, the Debtors will grant Barclays Bank PLC ("**Barclays**"), as collateral agent under the DIP Credit Agreement (in such capacity, the "**Collateral Agent**") for the benefit of the DIP Lenders and the agents and other holders of obligations under the DIP Credit Agreement (the "**Secured Parties**"), (i) first priority liens on the Debtors' assets that secured the GSAP Facility and BMMZ Repurchase Facility; (ii) second priority liens on prepetition and postpetition assets that secure the AFI LOC and the Citibank MSR Facility; and (iii) superpriority administrative expense claims.  The DIP Lenders will not be granted any liens on the primary unencumbered assets of the Debtors or liens on causes of action under Chapter 5 of the Bankruptcy Code (or the proceeds of such causes of action).

---

[6]    As used herein, "Fannie Mae" means the Federal National Mortgage Association and Freddie Mac means the Federal Home Loan Mortgage Corporation.  As used herein, "**Ginnie Mae**" means the Government National Mortgage Association.  Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress and are referred to herein as the "**GSEs**."  Fannie Mae and Freddie Mac securitize or buy mortgage loans originated by mortgage lenders, enabling them to replenish their funds so that they can make loans to other homeowners.  Ginnie Mae is a federal agency that guarantees investors the timely payment of principal and interest on mortgage-backed securities backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("**FHA**") or guaranteed by the Department of Veterans Affairs ("**VA**").

11.     For the reasons set forth above, the Debtors believe that the terms of the

DIP Facility are reasonable and the amount of the DIP Facility is necessary to support the

Debtors' operations and restructuring activities throughout the cases.  Further, as described in

greater detail below, the Debtors and the DIP Lenders negotiated the Credit Documents in good

faith and at arms' length, and the Debtors' entry into the Credit Documents is an exercise of their

sound business judgment.  The availability under the DIP Facility will enable the Debtors to

continue operating in the ordinary course of business, which includes their loan servicing

operations that are necessary to preserve the value of their servicing platform for the ultimate

benefit of all creditors and other parties in interest pending the closing of the sales of these

assets.

## RELIEF REQUESTED

12.     By this Motion, the Debtors respectfully request that the Court grant the

following relief as provided in the DIP Orders:

(a)     authorization for the Borrowers to obtain, and be jointly and
severally obligated with each of the Debtors (in such capacity, the
"**Guarantors**") in respect of, postpetition secured superpriority
financing, in an aggregate principal amount up to $1,450,000,000 (the
availability of which shall be subject to the terms and conditions set
forth in the Credit Documents), to be provided by Barclays, acting as
Administrative Agent (in such capacity, the "**Administrative Agent**")
for a syndicate of financial institutions (together with Barclays, the
"**DIP Lenders**") and the DIP Lenders;

(b)     authorization for the Debtors to execute and enter into the DIP Credit
Agreement and the other Credit Documents and to perform such other and
further acts as may be required in connection with the Credit Documents;

(c)     authorization for the Debtors to repay, or cause the repayment of, the
Refinanced Indebtedness;

(d)     the grant to the DIP Lenders, subject to the Carve Out (as defined below),
of superpriority administrative expense claims with priority over all other
administrative expenses pursuant to section 364(c)(1) of the Bankruptcy
Code with respect to all the DIP Obligations;

8

(e)     the grant of valid, binding, continuing, enforceable, fully-perfected first priority security interests to the DIP Lenders, subject only to the Carve Out, under Bankruptcy Code section 364(c)(2) in the First Lien Collateral (as defined below) not subject to valid, perfected and non-avoidable liens or security interests and liens as of the Petition Date, including all of the property of the Borrowers and the Borrowers' REO Subsidiaries;

(f)     the grant of valid, binding, continuing, enforceable, fully-perfected first priority priming liens to the DIP Lenders, subject only to the Carve Out, under Bankruptcy Code section 364(d) in all First Lien Collateral subject to any valid, perfected and non-avoidable liens or security interests as of the Petition Date, including all of the property of the Borrowers and the Borrowers' REO Subsidiaries;

(g)     the grant of valid, binding, continuing, enforceable, fully-perfected security interests in the Junior Lien Collateral (as defined below) and priming lien on the Junior Lien Collateral, each to the DIP Lenders under Bankruptcy Code sections 364(c)(3) and 364(d), of the priority described below;

(h)     authorization for the Borrowers, GMAC Mortgage and RFC to enter into and perform under Receivables Purchase Agreements, Receivables Pooling Agreements, and Mortgage Loan Purchase and Contribution Agreements (each as defined below) pursuant to which (i) on the Closing Date, the GSAP Transferor shall sell and convey the Initial Purchased Assets (as defined below) to GMAC Mortgage and RFC, (ii) upon receipt on the Closing Date, GMAC Mortgage and RFC shall sell and convey the Initial Purchased Assets to the Borrowers, and (iii) following the Closing Date, GMAC Mortgage and RFC shall sell and convey the Additional Purchased Assets (as defined below) to the Borrowers, each free and clear of any liens, interests or other encumbrances that predate the Petition Date;

(i)     approval of certain indemnification obligations by GMAC Mortgage, RFC and the Borrowers with respect to the GSAP Transferor (as defined below) as seller under the Receivables Purchase Agreements, and by GMAC Mortgage and RFC of the Borrowers with respect to mortgage loans the Borrowers purchase from GMAC Mortgage and RFC under Mortgage Loan Purchase and Contribution Agreements;

(j)     subject only to, and effective upon entry of, the Final Order, the waiver of the Debtors' right to surcharge the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(k)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of the Interim Order, which would authorize the Borrowers to obtain postpetition

secured superpriority financing in an aggregate principal amount of: (i) $1,050,000,000 under the Term A-1 Loan; and (ii) $200,000,000 under the Term A-2 Loan to, collectively: (a) finance the purchase of the Initial Purchased Assets (b) repay, or cause the repayment of, the Refinanced Indebtedness, (c) fund general corporate purposes of the Debtors, including the acquisition of Additional Purchased Assets, arising out of the operation of the Debtors' businesses, working capital and allowed administrative expenses incurred during the Cases, (d) pay interest, fees and expenses payable under the DIP Facility, and (e) pay costs of administration of the Cases in a manner consistent with the requirements of the Bankruptcy Code, in each case, in accordance with the Approved DIP Budget[7] (as defined in the DIP Credit Agreement); and

(l)     that this Court schedule the Final Hearing within 30 days of the entry of the Interim Order to consider entry of the Final Order.

## CONCISE SUMMARY OF THE DIP FINANCING TERMS[8]

13.     In accordance with Bankruptcy Rules 4001(c) and (d), the following summarizes the significant terms of the DIP Credit Agreement, the other Credit Documents and Interim Order. Included in this summary is a description of each of the provisions required to be highlighted by Local Bankruptcy Rule 4001-2.[9] The Debtors believe that the following provisions of the DIP Credit Agreement and Interim Order are justified and necessary in the context and circumstances of these cases:

| Lenders: | Barclays and a syndicate of lenders selected by Barclays reasonably acceptable to the Debtors. **Agreement Preamble; Interim Order Introduction (4).** |
| --- | --- |

---

[7]     The Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing.

[8]     The descriptions of the terms of the proposed Interim Order provided in this Motion are intended only as summaries. In the event of any inconsistency between the descriptions set forth herein and the terms of the Interim Order, the terms of the Interim Order shall govern. **Local Rule 4001-2 requires the Debtors to highlight certain provisions in the motion in any proposed cash collateral order. Sections that must be highlighted for the Court are in bold and are marked with an asterisk.**

[9]     This summary of the DIP Credit Agreement is provided for the benefit of the Court and other parties in interest. A copy of the DIP Credit Agreement is attached hereto as Exhibit B and incorporated herein by reference. To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. Capitalized terms used in this summary but not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement.

ny-1011900

| | |
|---|---|
| Borrowers: | (1) GMACM Borrower, a wholly-owned subsidiary of GMAC Mortgage;  and<br><br>(2) RFC Borrower, a wholly-owned subsidiary of RFC.<br>**Agreement Preamble; Interim Order Introduction (1).** |
| Guarantors: | Residential Capital, LLC ("**ResCap**"), each of the other Debtors and certain other existing and future material domestic wholly-owned subsidiaries of ResCap.<br>**Agreement Preamble; Interim Order Introduction (4).** |
| Type of Facility and Availability: | Total Availability: $1,450,000,000<br><br>   Revolver: $200,000,000<br>   Term A-1 Loan: $1,050,000,000<br>   Term A-2 Loan: $200,000,000<br><br>(collectively, the "**DIP Loans**").  $1.25 billion of the Term Loans and $0 of the Revolver will be available upon entry of the Interim Order.  **Agreement Appendix A; Interim Order Introduction (4), (9).** |
| Maturity Date: | The loans mature on the date that is the earliest of: (i) 18 months from the closing date of the DIP Facility, (ii) 45 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 45-day period, (iii) substantial consummation of a plan of reorganization for any Debtor, and (iv) the date on which maturity is accelerated and the commitments are terminated as a result of an Event of Default.  **Agreement § 1.01 ("Termination Date").** |
| Interest Rate: | Revolver: LIBOR + 4.00% per annum<br><br>Term A-1 Loan: LIBOR + 4.00%, with a LIBOR floor of 1.25%, per annum<br><br>Term A-2 Loan: LIBOR + 6.00%, with a LIBOR floor of 1.25%, per annum<br><br>After the occurrence of an Event of Default, interest on all loans and other amounts outstanding increase by 2.00% per annum and will be payable on demand.  **Agreement § 1.01 ("Applicable Margin"); § 2.10.** |
| Fees: | Unused Line Fees: An amount equal to the product of (i) 0.75% per annum and (ii) the undrawn portion of the Revolver during the immediately preceding month, payable monthly in arrears.<br><br>Administrative Agent Fee: $150,000 per annum, payable in advance (annually the first year, semi-annually thereafter).<br><br>Collateral Agency Fee: $250,000 per annum, payable in advance (annually the first year, semi-annually thereafter).<br><br>Other fees provided for in the confidential Fee Letters (as defined in the DIP Credit Agreement), in an aggregate amount of approximately $52 million, net of credits, of which $18.75 million was paid prior to the Petition Date.  Contemporaneously herewith, the Debtors filed a motion for approval to file the Fee Letters under seal.  **Agreement § 2.11.** |
| Collateral: | First Priority Liens: (a)(i) a first priority priming security interest in and lien upon all Borrowers' present and after-acquired property, including, without limitation, all Initial Purchased Assets, Additional Receivables and interests therein, and all proceeds and products of each of the foregoing;<br><br>(b)(i) a first priority priming security interest in and lien upon all present and after-acquired property of GMACM REO LLC and RFC REO LLC (together, the "**Borrowers' REO Subsidiaries**");<br><br>(c)(i) a first priority priming security interest in and lien upon all right, title and interest of ResCap in a newly created Concentration Account (as defined in the DIP Credit Agreement), which account shall initially be in the name of Residential Capital, LLC established at JPMorgan Chase Bank, N.A., and all funds from time to time held or deposited in the Concentration Account as well as all proceeds thereof; and<br><br>(d)(i) a first priority security interest in and lien upon the Debtors' present and after-acquired rights to all cash deposits, rights under escrow agreements or other security or credit enhancements provided by or on behalf of a purchaser under any Sale Agreement, including, without limitation, |

ny-1011900

the Debtors' rights under the Nationstar Sale Agreement (as defined in the DIP Credit Agreement) to retain the Cash Deposit (as defined in the Nationstar Sale Agreement), and the Debtors' right, title and interest in, under and to the Deposit Escrow Agreement (as defined in the Nationstar Sale Agreement), including, without limitation, the right to receive and retain the Cash Deposit thereunder; (collectively, together with the property identified in (a), (b), (c) above, the "**First Lien Collateral**");

<u>Junior Liens</u>: (a)(i) a security interest in and lien upon all of the Debtors' present and after-acquired property, together with all proceeds and products thereof, that constitutes, or hereafter becomes, the collateral purporting to secure the obligations under the AFI LOC, including but not limited to the Repurchased Loans (as defined in the AFI DIP Order[10]), the HUD Claims (as defined in the AFI DIP Order) and the property in which AFI is granted a lien or security interest after the Petition Date as described in clauses (1) and (4) below, (the "**LOC Junior Lien Collateral**"), which security interests and liens are junior only to (1) the AFI DIP Liens (as defined in the AFI DIP Order); (2) liens and security interests granted to AFI in the LOC Junior Lien Collateral (for the avoidance of doubt, not including any liens that arise after, or were not perfected prior to, the Petition Date, or to liens that arise after the Petition Date but purport to relate back to periods prior to the Petition Date), (3) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (4) any replacement liens granted as adequate protection to AFI to the extent of and to secure any diminution in value of its security interests and liens arising before the Petition Date in the LOC Junior Lien Collateral, in any of the Debtors' property existing on the Petition Date, or acquired thereafter, in the case of (1), (2), (3) and (4) above, securing aggregate obligations under the Ally Line of Credit in an amount not to exceed $600,000,000; and (ii) a valid, binding, continuing, enforceable, fully-perfected priority priming lien on all such property to the extent that such property is subject to any liens or security interests as of the Petition Date other than those described in clauses (1), (2), (3) or (4) of the preceding clause of this sub-paragraph; and

(b)(i) a security interest in and lien upon all right, title and interest in all present and after-acquired property of GMACM that constitutes, or hereafter becomes, the collateral purporting to secure the obligations under the MSR Facility, including property in which Citibank, in its capacity as secured lender under the MSR Facility, is granted a lien or security interest after the Petition Date as described in clause (4) below, (the "**MSR Junior Lien Collateral**" and, together with the LOC Junior Lien Collateral, the "**Junior Lien Collateral**"), which security interests and liens are junior only to

(1) all rights, powers, and prerogatives of Freddie Mac under and in connection with the Freddie Mac Contracts (as defined in the DIP Credit Agreement) and Fannie Mae under and in connection with the Fannie Mae Contracts (as defined in the DIP Credit Agreement);;

(2) liens and security interests granted to Citibank in the MSR Junior Lien Collateral (the "**Citibank Liens**") (for the avoidance of doubt, with respect to (1) and (2), not including any liens that arise after, or were not perfected prior to, the Petition Date, or to liens that arise after the Petition Date but purport to relate back to periods prior to the Petition Date),

(3) valid and non-avoidable liens that are in existence immediately prior to the Petition Date that are (A) senior to the Citibank Liens or (B) perfected subsequent to the Petition Date as permitted

---

[10]    The "**AFI DIP Order**" means either (a) the *Interim Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Adequate Protection Parties and (IV) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing* or (b) the *Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Adequate Protection Parties and (IV) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing*, as applicable.

ny-1011900

|  | |
|---|---|
| | by section 546(b) of the Bankruptcy Code, and |
| | (4) any replacement liens granted as adequate protection to Citibank or any holders of liens senior to Citibank after the Petition Date to the extent of and to secure any diminution in value of its security interests and liens arising before the Petition Date in the MSR Junior Lien Collateral, in any of the Debtors' property existing on the Petition Date, or acquired thereafter; and |
| | (ii) a valid, binding, continuing, enforceable, fully-perfected priority priming lien on all such property to the extent that such property is subject to any liens or security interests as of the Petition Date other than those described in clauses (1), (2), (3) or (4) of the preceding clause of this sub-paragraph. **Security Agreements, Article 2; Interim Order ¶ 11.** |
| | <u>Superpriority Administrative Expense Claims</u>:  The DIP Facility will receive superpriority administrative expense claims, subject only to the Carve Out. Notwithstanding the foregoing, the Superpriority Claims are junior to: |
| | (a) AFI's rights, as lender under the AFI DIP Loan (as defined in the AFI DIP Order), in the AFI DIP Loan Collateral, and all proceeds and other consideration received upon the sale, exchange, transfer or other disposition thereof; |
| | (b) Ally Bank's rights in the Collateral (as defined in that certain Pledge and Security Agreement dated as of April 25, 2012); and |
| | (c) Ally Investment Management LLC's rights in the Collateral (as defined in that certain Master Forward Securities Forward Transaction Agreement, dated April 30, 2012). **Agreement § 2.25(a); Interim Order ¶ 10.** |
| Borrowing Base | The Revolver and Term A-1 Loans shall be provided subject to availability under the Borrowing Base, calculated on a weekly basis as follows: |
| | (a) up to an amount equal to the lesser of (i) 90% of the Book Value of Eligible Receivables of the Borrowers and (ii) the A-1 Revolver Trigger Advance Rate of the Book Value of Eligible Receivables of the Borrowers; plus |
| | (b) up to 50% of the Market Value of Eligible Mortgage Loans or any "real estate owned" ("**REO**") resulting from a foreclosure related to any Eligible Mortgage Loan of the Borrowers; plus |
| | (c) 100% of the aggregate amount of cash on deposit in the Borrower Accounts and the Concentration Account; minus |
| | (d) applicable reserves established by the Administrative Agent in its good faith and in the exercise of commercially reasonable (from the perspective of a secured asset-based lender) business judgment and a reserve for the Carve Out. |
| | The Term A-2 Loans shall be provided subject to availability under the Collateral Amount, calculated on a weekly basis as follows: |
| | (a) up to an amount equal to the lesser of (i) 95% of the Book Value of Eligible Receivables of the Borrowers and (ii) the A-2 Trigger Advance Rate of the Book Value of Eligible Receivables of the Borrowers; plus |
| | (b) up to 75% of the Market Value of Eligible Mortgage Loans or any REO resulting from a foreclosure related to any Eligible Mortgage Loan of the Borrowers; plus |
| | (c) 100% of the aggregate amount of cash and cash equivalents on deposit in the Borrower Accounts and the Concentration Account; minus |
| | (d) applicable reserves established by the Administrative Agent in its good faith and in the exercise of commercially reasonable (from the perspective of a secured asset-based lender) business judgment and a reserve for the Carve Out.  **Agreement §§ 2.01, 2.02.** |

| | |
|---|---|
| Carve Out | The Carve Out[11] includes: (i) all fees and expenses in an aggregate amount of up to $25,000,000 incurred by retained professionals in the Chapter 11 Cases following delivery of notice of an Event of Default, (ii) allowed unpaid professional fees and disbursements incurred prior to the delivery of the notice, (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court, and (iv) fees and expenses up to $500,000 incurred by a trustee under section 726(b) of the Bankruptcy Code. |
| | The Carve Out shall not include professional fees and disbursements incurred in connection with (a) any challenge to the validity, perfection, priority, extent or enforceability of the Loans and the other DIP Obligations under the DIP Facility, or the liens on or security interests securing the DIP Obligations, (b) any investigation or assertion of any other claims or causes of action against any DIP Lender, the Administrative Agent, the Collateral Agent or any other holder of any DIP Obligations, (c) any challenge to the validity, perfection, priority, extent or enforceability of the Existing GSAP Facility, or the liens on or security interests securing the Existing GSAP Facility (but may be used by professionals for any official committee to investigate such matters in an amount not to exceed $100,000), or (d) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of any Agent or any DIP Lender as set forth herein and in the definitive loan documents for the DIP Facility, or which results in the occurrence of an Event of Default (collectively, the "**Challenges**").  **Agreement § 1.01 ("Carve Out"), § 2.25; Interim Order ¶ 10.** |
| Purchase Transactions | Borrowers' Entry into Additional Agreements. |
| | Pursuant to section 363(b)(1) of the Bankruptcy Code, the Borrowers, GMAC Mortgage and RFC shall enter into and perform their obligations under |
| | (a) the GMACM Receivables Purchase Agreement and the RFC Receivables Purchase Agreement (each as defined in the DIP Credit Agreement, and collectively, the "**Receivables Purchase Agreements**"), |
| | (b) the GMACM Receivables Pooling Agreement and the RFC Receivables Pooling Agreement (each as defined in the DIP Credit Agreement, and collectively, the "**Receivables Pooling Agreements**"), and |
| | (c) the GMACM Mortgage Loan Purchase and Contribution Agreement and the RFC Mortgage Loan Purchase and Contribution Agreement (each as defined in the DIP Credit Agreement, and collectively, the "**Mortgage Loan Purchase and Contribution Agreements**").  Copies of the Mortgage Loan Purchase and Contribution Agreements are attached hereto as Exhibit C. |
| | Transfer of Receivables from GMAC Mortgage and RFC to the Borrowers. |
| | On the Closing Date (as defined in the DIP Credit Agreement), the GSAP Transferor shall sell and assign all of its right, title and interest in the servicing advance receivables owned by it that currently serve as collateral for the notes issued under the GSAP Facility (the "**Initial Receivables**") to the Borrowers in accordance with the terms of the Receivables Purchase Agreements. |
| | From and after the Closing Date, GMAC Mortgage and RFC shall sell and contribute all the Eligible Receivables they generate in their capacities as master servicers or servicers (the "**Additional Receivables**"), directly to the Borrowers pursuant to the Receivables Pooling Agreements. |

---

[11]   The Carve Out is not intended to be addition to the AFI DIP Carve Out.  Allocation of the $25 million Carve Out monies between the Barclays DIP Collateral and the AFI DIP Collateral shall be determined by the Court, after notice and a hearing, upon motion brought by any of the Debtors, the Administrative Agent or Ally.

| | |
|---|---|
| | Transfer of Mortgage Loans from GMAC Mortgage and RFC to the Borrowers. |
| | On the Closing Date, GMAC Mortgage and RFC shall enter into a two-step transaction, whereby, first, BMMZ sells the mortgage loans owned by it to GMAC Mortgage and RFC in accordance with the terms of the BMMZ Repo Facility, and second, GMAC Mortgage and RFC sell and contribute those mortgage loans that were previously the subject of the BMMZ Repo Facility (the "**Initial Mortgage Loans**", and together with the Initial Receivables, the "**Initial Purchased Assets**") to the GMACM Borrower and the RFC Borrower, respectively, each pursuant to the various Mortgage Loan Purchase and Contribution Agreements. |
| | The transactions described in this section shall be referred to herein as the "**Purchase Transactions**."  **Agreement §3.01; Interim Order ¶ 7.** |
| Termination/Events of Default | Customary events of default, plus it shall be an Event of Default if: |
| | (a) (i) any Credit Party (as defined in the DIP Credit Agreement) (x) seeks to, or supports or fails to oppose any other person's motion or pleading to, disallow or subordinate the claims of any DIP Lender or challenge the DIP Liens or (y) oppose a motion by any DIP Lender or any Agent to confirm its claims or DIP Liens, or (ii) in any case of the foregoing, the Bankruptcy Court enters a final order granting such relief; or |
| | (b) the Bankruptcy Court enters an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to permit foreclosure on any Collateral of any of the Credit Parties with a value in excess of $5,000,000, either individually or in the aggregate, except as otherwise agreed to in writing by Administrative Agent in its sole discretion; |
| | (c) the Debtors do not meet either of the Sale Order Milestone (February 15, 2013) or Sale Closing Milestone (April 15, 2013); or |
| | (d) a Change of Control occurs by which (i) any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act), other than the Investors, the U.S. Department of the Treasury, the GM Trusts, or any purchaser of the beneficial interest of General Motors in the GM Trusts acquires a majority of the Capital Stock of ResCap having the right to vote for election of directors of ResCap under ordinary circumstances; (ii) AFI ceases to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of ResCap; (iii) ResCap ceases to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of any Borrower or any Guarantor Subsidiary (except for certain permitted transactions); (iv) GMACM fails to directly own and control 100% of the aggregate issued and outstanding Capital Stock of GMACM Borrower; (v) RFC fails to directly own and control 100% of the aggregate issued and outstanding Capital Stock of RFC Borrower; (vi) the applicable Borrower fails to directly own and control 100% of the aggregate issued and outstanding Capital Stock of its Borrower's REO Subsidiary; or (vii) the majority of the seats (other than vacant seats) on the board of directors of any Primary Credit Party cease to be occupied by persons who either (x) were members of the board of directors of such Primary Credit Party on the closing date or (ii) were nominated for election by the board of directors of such Primary Credit Party, a majority of whom were directors on the closing date or whose election or nomination or appointment for election was previously approved by a majority of such directors or by the Investors, as applicable. |
| | **Agreement Article 8.** |
| Affirmative and Negative Covenants | Customary negative and affirmative covenants.<br>**Agreement Articles 5 and 6.** |
| Financial Covenants | (a) The Borrowers and Guarantors shall be required to perform against the Budget, subject to aggregate variances on receipts and disbursements (excluding servicing advances) of 20% measured every four (4) calendar weeks; |
| | (b) The Borrowers shall at all times maintain minimum liquidity of $50,000,000 in the aggregate; and |
| | (c) The minimum liquidity of ResCap, on a consolidated basis with its subsidiaries (including the |

| | |
|---|---|
| | Borrowers), shall not be (i) less than $250,000,000 in the aggregate for four (4) consecutive business days or (ii) less than $75,000,000 in the aggregate at any time. **Agreement § 6.07.** |
| <u>Use of Proceeds</u> | Proceeds of the DIP Loans shall be used (i) finance the purchase of the Initial Purchased Assets through the refinancing of the GSAP Facility and the BMMZ Repo Facility, (ii) fund general corporate purposes of the Debtors, including the acquisition of Additional Purchased Assets, arising out of the operation of the Debtors' businesses, working capital and allowed administrative expenses incurred during the Cases, (iii) to pay interest, fees and expenses payable under the DIP Facility and orders authorizing the Debtors' use of cash collateral, and (v) to pay costs of administration of the Chapter 11 Cases in a manner consistent with the requirements of the Bankruptcy Code, in each case, in accordance with the Budget. <br><br> The Budget will provide that up to $40,000,000 of the proceeds of the Term Loans shall be transferred on the closing date to an unrestricted account of ResCap to be used for general corporate purposes, including to fund servicing advances that will not be included in the Borrowing Base; *provided* that in no event shall ResCap use such proceeds to make payments on prepetition debt. No proceeds of the DIP Loans, the Collateral, or the Carve Out shall be used in connection with the Challenges. **Agreement §§ 2.06, 6.16; Interim Order Introduction (9).** |
| <u>Waiver of Automatic Stay</u> | Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent and the Collateral Agent shall have customary remedies, including, upon seven (7) days' written notice, relief from the automatic stay without further order of or application to the Bankruptcy Court to permit the Collateral Agent to realize on all other Collateral and to exercise any and all remedies under the loan documents and, subject to any intercreditor agreements with respect to junior lien collateral, to set off or seize amounts in any bank accounts that are a part of the Collateral that are maintained with or under the control of the Collateral Agent, the Administrative Agent or any DIP Lender. <br><br> In addition, upon the occurrence and during the continuation of an Event of Default, the Collateral Agent, without notice, may exercise its remedies under the control agreements with respect to certain of the Debtors' accounts subject to a control agreement to which the Collateral Agent is a party at the direction of the Administrative Agent to block withdrawals by the Borrowers, *provided*, that the Collateral Agent must provide seven (7) days' written notice before application of any amounts in such accounts to the DIP Obligations. **Agreement § 8.01; Interim Order ¶ 13.** |
| <u>Indemnification</u> | As provided in the Credit Documents, the Debtors shall, jointly and severally, indemnify the Administrative Agent, the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any actual or prospective claim, proceeding, investigation, or litigation relating to the DIP Facility, except to the extent resulting from gross negligence or willful misconduct of the Administrative Agent or the DIP Lenders, as determined by a final and non-appealable judgment of a court of competent jurisdiction. <br><br> As provided in the Receivables Purchase Agreements, the Borrowers, GMAC Mortgage and RFC shall indemnify the GSAP Transferor for any claims, costs and/or expenses associated with, or arising in connection with, the transactions contemplated under the Receivables Purchase Agreements, the GSAP Facility, or otherwise relating to the Chapter 11 cases. <br><br> As provided in the Mortgage Loan Purchase and Contribution Agreements, GMAC Mortgage and RFC shall indemnify the GMACM Borrower and the RFC Borrower, respectively, with respect to the mortgage loans transferred pursuant to such agreements. **Agreement § 12.03; Interim Order ¶ 9.** |
| <u>Debtors' Stipulation</u> | The Debtors stipulate that: <br><br> (a)  Prior to the Petition Date, GMACM and RFC made servicer advances pursuant to Designated Servicing Agreements for mortgage loans serviced under those Designated Servicing Agreements.  Under the GSAP Facility, the GSAP Transferor purchased – in true sales and absolute conveyances – GMACM's and RFC's rights to reimbursement of such servicer advances (such reimbursement rights, along with any other rights of GMACM or RFC to |

| | reimbursement of servicer advances made pursuant to Designated Servicing Agreements, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, are referred to herein as "Receivables"). To fund its purchases, the GSAP Transferor issued notes secured by Receivables under the GSAP Facility. As of the Petition Date, the GSAP Facility was secured with collateral (both Receivables and restricted cash) with a book value of $870 million and the GSAP Transferor was indebted and liable to the GSAP Indenture Trustee and the GSAP Facility noteholders under the GSAP Facility, without defense, recoupment, counterclaim or offset of any kind, in the aggregate principal amount of not less than $662 million, pursuant to and in accordance with the terms of the GSAP Facility plus, interest at the non-default rate thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the GSAP Facility), charges, indemnity obligations and other obligations incurred in connection therewith as provided in the GSAP Facility (the "GSAP Facility Debt").

(b) The GSAP Facility Debt is secured by valid, binding, perfected, enforceable, first priority liens and security interests upon the GSAP Transferor's assets and property, including Receivables and all property related thereto, which liens and security interests are not subject to avoidance (whether arising pursuant to sections 542 through 553 of the Bankruptcy Code, or otherwise), recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and secure, among other things, the GSAP Transferor's indemnity obligations to the GSAP Administrative Agent.

(c) Subject to the Challenge Period, the Debtors release and discharge all claims and causes of action of every kind and nature existing prior to the Petition Date against the GSAP Transferor, the GSAP Indenture Trustee, the GSAP Administrative Agent, all holders of notes issued pursuant to the GSAP Indenture, as well as affiliates, agents, officers, directors, employees and attorneys of each of the foregoing, each in their capacities as such (collectively, the "**Released Parties**"), and all claims and causes of action of every kind and nature existing prior to the Petition Date, in connection with or related to all rights and other property heretofor conveyed to any of the Released Parties, pursuant to, and in connection with, the GSAP Facility, whether arising at law or at equity, including, without limitation, any claims for recharacterization, subordination, substantive consolidation, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code with respect to the GSAP Facility and the transactions thereunder.

(d) The Pre-Petition Ally Repo Facility. Prior to the Petition Date, ResCap, GMACM, and RFC were parties to the Pre-Petition Ally Repo Facility. As of March 31, 2012, the book value of the mortgage loans subject to the Pre-Petition Ally Repo Facility was approximately $377 million, and as of the Petition Date, the amount of the outstanding repurchase obligations thereunder was approximately $250 million. **Interim Order ¶ 4.** |
| Effect of Debtors' Stipulations | The Debtors' stipulations shall be binding on all parties in interest, including, without limitation, any Committee, unless, and solely to the extent that, any party in interest files an objection challenging such stipulations or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against the Released Parties no later than the later of (i) sixty (60) days after the formation of the official committee of unsecured creditors in the Chapter 11 cases and (ii) seventy-five (75) days after the Petition Date. |
| Section 506(c) Waiver | Subject to entry of the Final Order, no costs or expenses of administration shall be surcharged or otherwise imposed against the DIP Lenders' collateral under section 506(c) of the Bankruptcy Code or otherwise. **Agreement § 3.01; Interim Order ¶ 14.** |
| No Liens on Avoidance Actions | The DIP Lenders are not being granted a lien on causes of action under Chapter 5 of the Bankruptcy Code. |

17

**BACKGROUND**

14.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a
voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors
are managing and operating their businesses as debtors in possession pursuant to Bankruptcy
Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has
been appointed in these Chapter 11 cases.

15.      The Debtors' primary and most valuable business operations consist of
servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank
(f/k/a GMAC Bank), and other third parties.  As of March 31, 2012, the Debtors were servicing
over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately
$374 billion.  To preserve and realize the value of these assets and achieve the goals of these
Chapter 11 cases, the Debtors developed and are prepared to implement a strategy that provides
maximum value to the Debtors' estates.

16.      The Debtors negotiated and entered into two separate asset purchase
agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder
("**Nationstar**") for the sale of their mortgage loan origination and servicing businesses (the
"**Platform Sale**"), and the second, with AFI as the proposed stalking horse bidder for the sale of
their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the
"**Legacy Sale**" and collectively with the Platform Sale, the "**Asset Sales**").

17.      In furtherance of their restructuring strategy, and contemporaneous with
the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to,
among other things, establish auction and sale procedures for the Asset Sales,[12] and for approval

---

[12]  *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m) and 365 and 1123, and Fed R. Bankr. P.*
(Footnote continues on next page.)

to consummate the Asset Sales under a plan.  If, however, the Debtors do not

obtain confirmation of a plan, the Sale Motion allows the Debtors to pursue an alternative course

of action and immediately move forward with the Asset Sales under Bankruptcy Code section

363(b) and outside of a plan.

18.    A more detailed description of the Debtors, including their business

operations, their capital and debt structure, and the events leading to the filing of these

bankruptcy cases, is below and set forth in the Whitlinger Affidavit.

## II.    Overview of the Debtors' Businesses

19.    The Debtors are a leading residential real estate finance company

indirectly owned by non-debtor AFI.  As of the Petition Date,[13] the Debtors and their non-debtor

affiliates, including Ally Bank, are collectively the tenth largest originator and fifth largest

servicer of residential mortgage loans in the United States.  The Debtors, together with their non-

debtor subsidiaries, manage the mortgage-related businesses in two business lines: (i) the

ongoing Origination and Servicing business and (ii) the Legacy Portfolio and Other operations,

which are being wound down.

## B.    Origination and Servicing

20.    The principal activities of the Debtors' Origination and Servicing are:

(a) brokering, originating, purchasing, selling and securitizing residential mortgage loans

_____

(Footnote continued from previous page.)

*2002, 6004,6006 and 9014 for Ordes: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up*
*Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and*
*Manner of Notice Thereof; and (IV ) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets*
*Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset*
*Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts*
*and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion").

[13]    As used herein, unless otherwise indicated, financial information as of the "Petition Date" means as of the close
of business on April 30, 2012.

throughout the United States for the Debtors and their non-debtor affiliate, Ally Bank; and

(b) servicing residential mortgage loans throughout the United States for the Debtors, Ally Bank

and other investors in residential mortgage loan and mortgage-backed securities ("**MBS**").

21.    GMAC Mortgage, under the GMAC Mortgage brand, brokers and

originates mortgage loans through a consumer lending business that consists of internet and

telephone-based call center operations and, to a lesser extent, a retail network of loan officers

who have direct contact with consumers, including through referrals from builders, realtors, and

other third parties.  GMAC Mortgage brokers its loan production in 47 states to Ally Bank.[14]

Ally Bank underwrites and originates loans based on loan application packages submitted by

GMAC Mortgage in accordance with applicable regulatory and industry standards.  In recent

years, substantially all of the Debtors' loan production has consisted of conforming loans (that is,

loans that meet the required guidelines of Fannie Mae, Freddie Mac or Ginnie Mae, as

applicable) and a limited number of prime nonconforming jumbo mortgage loans.

22.    In the years ended December 31, 2010 and 2011 and the three months

ended March 31, 2012, the Debtors brokered $7.4 billion, $7.3 billion and $3.6 billion,

respectively, of mortgage loans to Ally Bank.  During the same periods, Debtors purchased $66.3

billion, $56.7 billion and $9.9 billion, respectively, of mortgage loans from Ally Bank.

23.    A fundamental part of the Debtors' business strategy consists of

securitizing or selling substantially all of the mortgage loans they purchase or originate.  As

described in greater detail in the Whitlinger Affidavit, the Debtors participate in the

securitization programs of Fannie Mae, Freddie Mac and Ginnie Mae.  The Debtors also pool

---

[14]    GMAC Mortgage does not originate loans in Hawaii.  Ally Bank does not have the licenses to originate
mortgage loans in Nevada and Ohio, in which states, GMAC Mortgage originates and funds mortgage loans
directly.

together non-conforming mortgage loans in their own names ("private label") and convey the

pool of loans to newly formed private label securitization trusts.[15]  In each case, the

securitization trust issues securities to a broad range of investors, including pension funds,

money market funds, mutual funds, banks, insurance companies, governmental bodies and other

public and private entities.

24.    Since 2008, mortgage loan servicing has been the Debtors' primary source

of ongoing revenue.  The Debtors hold "mortgage servicing rights" (referred to as "**MSRs**") that

consist of primary, master, or sub-servicing rights.   As a primary servicer, the Debtors, among

other things, collect and remit mortgage loan payments, respond to borrower inquiries, account

for and apply principal and interest, hold custodial and escrow funds for payment of property

taxes and insurance premiums, provide ancillary products, counsel or otherwise work with

delinquent borrowers, supervise foreclosures and property dispositions, make advances of

required principal, interest, and certain "property protection" costs with respect to delinquent and

defaulted mortgage loans and the real estate that the trust or owner acquires as the result of a

foreclosure of the loan (the "**Advances**"), and generally administer the loans consistent with their

contractual undertakings and business practices.  When the Debtors act as master servicer, they

collect mortgage loan payments from primary servicers or sub-servicers and distribute those

funds to investors and to other transaction parties in mortgage-backed and mortgage-related

asset-backed securities and whole-loan packages.[16]  Finally, as a sub-servicer, the Debtors

---

[15]    Since the decline in the mortgage industry beginning in 2007, the Debtors have sold mortgage loans into only
two private label securitizations.

[16]    In addition, for Agency Securitizations, they provide certain key services, including advancing required
principal and interest and other expenses with respect to mortgage loans (to the extent the primary servicer does
not make such advances), claims administration, oversight of primary servicers and sub-servicers, loss
mitigation, investor reporting, and other contractual functions.

perform functions similar to the primary servicing functions described above pursuant to contractual arrangements with other servicers.  The Debtors receive a fee based on the unpaid principal balance ("**UPB**") of the mortgage pool, or in some cases, for each loan serviced.  In addition, the Debtors may receive other remuneration for loan servicing, including interest earned on custodial accounts where mortgage payments are held pending remittance to investors, as well as borrower-contracted fees, such as late charge fees, assignment transfer fees, and other incidental fees and charges.

25.    As of March 31, 2012, the Debtors acted as the primary servicer for approximately 1.5 million loans having an aggregate UPB of approximately $197 billion.  In addition, as of March 31, 2012, the Debtors acted as subservicer for over 847,000 loans having an aggregate UPB of approximately $169 billion, including mortgage loans for which Ally Bank retains the MSRs and whole loans owned by Ally Bank.  The Debtors are the master servicer for approximately 439,000 loans having an aggregate UPB of approximately $58.7 billion as of March 31, 2012, including loans having an aggregate UPB of $7.8 billion for which the Debtors are the master servicer but not the primary servicer.

**C.    Legacy Portfolio and Other**

26.    Debtors' legacy portfolios principally consist of the remaining mortgage loan assets from their historical non-conforming domestic residential mortgage loan origination and securitization activities (referred to as "**Domestic Non-core**"), the Debtors' remaining international operations, and the Debtors' captive mortgage reinsurance operation.  The legacy portfolios are being wound down through opportunistic asset sales, workouts or other strategic disposition transactions.

22

**III.      Events Leading Up to These Chapter 11 Cases**

27.      The Debtors are filing these Chapter 11 cases for a number of reasons, many of which can be traced back to the continuing adverse economic climate, particularly in the residential mortgage industry.  Starting in 2007, the mortgage and capital markets experienced severe stress due to credit concerns and housing market contractions, which have led to record declines in home values and a continuing glut of homes available for sale.  At the same time and substantially as a result of such contractions, the overall economy suffered its worst recession since the Great Depression.  Throughout the past five years, homeowners have had difficulty paying their mortgages, refinancing their mortgages (despite record low interest rates), selling their homes or buying new homes.  As loan delinquencies increased, the costs of servicing mortgage loans also increased, and although Debtors have continued to honor their servicing obligations, it has become financially challenging to continue servicing their mortgage loans.

28.      Since 2007, the Debtors' management has undertaken various strategic alternatives and aggressive actions in an attempt to reduce risk, reduce leverage, streamline the Debtors' cost structure, and maximize the value of the Debtors' assets, all of which are discussed in more detail in the Whitlinger Affidavit.  In order to streamline their operations and eliminate businesses that were not income-producing, the Debtors also began selling assets in 2007, including (a) selling non-core assets to AFI or affiliates of Cerberus Capital Management, which was and is an equity owner of AFI, (b) selling non-core assets in the marketplace, (c) downsizing their operations and implementing significant cost reductions, (d) restructuring their liabilities, and (e) obtaining new loans and equity infusions from AFI.  From January 1, 2008 through March 31, 2012, the Debtors sold approximately $790.5 million of Domestic Non-core mortgage loan assets, including $3.9 billion of UPB of mortgage loans, and substantially eliminated their international operations.  Over the same period, the Debtors' workforce decreased by 63% from

23

approximately 10,900 to 4,031 employees, and the use of independent contractors substantially

declined.   In addition, since January 1, 2007, AFI has made capital contributions of

approximately $10.3 billion to ResCap.  Still, the Debtors do not expect to be able to pay their

obligations as they come due.

29.    The purpose of these Chapter 11 cases is to facilitate an orderly sale of the

Debtors' most valuable assets and an orderly wind-down of Debtors' remaining assets.  As

discussed above, the Debtors are seeking authority to sell a substantial portion of their assets,

including their mortgage loan origination and loan servicing businesses and certain portions of

their Legacy Portfolio (defined below), to Purchaser  and AFI.  The Debtors believe that

immediately commencing an orderly asset sale process in Chapter 11 is the best way to

(a) maximize the value of the Debtors' assets for the benefit of creditors, (b) preserve the

Debtors' servicing business on a going concern basis for sale (in whole or in part), thus

preserving jobs, providing the best possible outcome for the more than 2.4 million consumers

whose loans are serviced by the Debtors and for the many investors, including pension fund and

other money managers, (c) avoid disruption in the fragile housing market recovery, and

(d) provide a vehicle for distributing the proceeds of the Debtors' Asset Sales to creditors

pursuant to the priority scheme under the Bankruptcy Code.

30.    Further, the Debtors are optimistic that the sale of the servicing platform

will yield a significant return for the benefit of the Debtors' estates and creditors.  As described

in greater detail in the Sale Motion, Purchaser requires, as a condition to closing, that the Debtors

maintain their servicing and mortgage origination operations until the sale is consummated.

Accordingly, the Debtors request entry of interim and final orders authorizing them to obtain

postpetition financing on a secured, superpriority basis so that they can maintain the servicing

business and preserve the value of their assets pending one or more Asset Sales.

## IV.    Overview of the Debtors' Prepetition Debt

31.    Certain of the Debtors are borrowers, guarantors and/or obligors under

credit facilities and also maintain collateralized nonrecourse borrowing facilities for

securitization trusts.[17]  Certain of the Debtors also are the issuer of $2.1 billion of secured and

$972.2 million of unsecured publicly traded U.S. dollar, Euro and U.K. Sterling-denominated

notes.

## A.    AFI Senior Secured Credit Facility

32.    On December 30, 2009, Debtors Residential Funding Company, LLC

("**RFC**") and GMAC Mortgage, as borrowers, and Debtors ResCap, Passive Asset Transactions,

LLC ("**PATI**"), and RFC Asset Holdings II, LLC ("**RAHI**"), as guarantors, entered into a loan

agreement with AFI, as agent and lender (as amended from time to time, the "**AFI Senior**

**Secured Credit Facility**") amending and restating in its entirety the original loan agreement

entered into on June 4, 2008.[18]  The AFI Senior Secured Credit Facility originally was a

revolving loan facility, but the outstanding amount was converted into a term loan in connection

with the amendment and restatement.  The borrowers, however, are permitted to use certain

accounts securing the AFI Senior Secured Credit Facility as revolving accounts to make

advances under certain securitizations that are not funded under the GSAP Facility (described

---

[17]    As required by New York State for licensing purposes, Debtors also have a $1 million line of credit with
Citibank, N.A.

[18]    Other Debtors that are guarantors under the AFI Senior Secured Credit Facility are Homecomings Financial,
LLC, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company, LLC and Executive
Trustee Services, LLC; additional pledgor-Debtors under the AFI Senior Secured Credit Facility are GMAC
Model Home Finance I, LLC, Developers of Hidden Springs, LLC, DOA Holding Properties, LLC, Equity
Investment IV, LLC and RFC Construction Funding, LLC.

below).   The outstanding principal amount under the AFI Senior Secured Credit Facility as of

the Petition Date is approximately $747 million.  The AFI Senior Secured Credit Facility is

secured by a first priority lien for the benefit of AFI on substantially all of the assets of the

Debtors with certain exclusions, such as the Ginnie Mae MSRs and related assets, as well as

certain of the assets that secure the other secured debt facilities.   The assets that secure the AFI

Senior Secured Credit Facility also secure the Junior Secured Notes (as defined below).

**B.    AFI LOC**

33.    On December 30, 2009, Debtors RFC and GMAC Mortgage, as

borrowers, Debtors ResCap, PATI and RAHI, as guarantors, and AFI, as agent and lender, also

entered into a $1.1 billion amended and restated secured loan agreement (as amended from time

to time, the "**AFI LOC**") in order to consolidate under one agreement the terms and provisions

of two secured credit agreements with AFI, entered into on November 20, 2008, and June 1,

2009, respectively, as well as the loans made under those agreements.  Certain other Debtors are

also guarantors under the AFI LOC.[19]  On December 23, 2010, the parties added a $500 million

unsecured swingline loan facility to the AFI LOC, which could be used only if there was no

remaining borrowing capacity under the AFI LOC.  No amounts were ever borrowed under the

swingline loan facility and it was terminated in April 2012.  The outstanding principal amount

under the AFI LOC as of Petition Date was approximately $380 million.  The AFI LOC provides

funds to the Debtors, generally limited to unused capacity, when the Debtors' unrestricted

liquidity is less than $300 million.  The AFI LOC is secured by assets of the Debtors, including,

without limitation: certain mortgage loans secured by properties located in the United States;

---

[19]    The other Debtors that are guarantors, together with ResCap, under the AFI LOC are GMAC-RFC Holding
Company, LLC, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC and Equity
Investment I, LLC.

certain notes and related agreements issued by third parties that are held by PATI and RFC; certain equity interests of special purpose vehicles (including a pledge by RFC of 100% of the equity of Equity Investment I, LLC; a pledge by PATI of 100% of the equity of PATI Real Estate Holdings, LLC, and a pledge by RAHI of 100% of the equity of RAHI Real Estate Holdings, LLC); certain MSRs; and certain Freddie Mac servicing advances.  From time to time, in order to maintain the borrowing base under the AFI LOC as mortgage loans are repaid, the Debtors post certain domestic loans and Advances as collateral.  The obligations under the AFI LOC and certain derivative agreements with AFI (or its subsidiaries) are cross-collateralized for the benefit of AFI.  The available amount and the borrowing base of the AFI LOC are both reduced by the amount of any collateral posted or delivered by AFI to the borrowers or ResCap pursuant to such derivative agreements.

## C.    Junior Secured Notes

34.    In June 2008, the Debtors closed private debt tender and exchange offers for a portion of their then outstanding public unsecured notes.  ResCap issued approximately $5.7 billion of new senior and junior secured notes consisting of 8.5% senior secured notes due 2010 (the "**Senior Secured Notes**") and 9.625% junior secured notes due 2015 (the "**Junior Secured Notes**" and collectively with the Senior Secured Notes, the "**Secured Notes**"), in exchange for approximately $8.6 billion of its then outstanding unsecured notes.

35.    On May 15, 2010, the then outstanding Senior Secured Notes were repaid at maturity.

36.    As of the Petition Date, the outstanding principal amount of Junior Secured Notes was approximately $2.1 billion.  The Junior Secured Notes are secured by second priority liens on the same assets that secure the AFI Senior Secured Credit Facility.  The Junior

Secured Notes are repayable in three equal tranches of $707 million in May of 2013, 2014 and 2015.

**D.      Loans Against Mortgage Servicing Rights**

37.      GMAC Mortgage is a borrower and ResCap is a guarantor under a revolving facility with Citibank N.A. ("**Citibank**," and such facility, the "**Citibank MSR Facility**") consisting, until March 30, 2012, of a $300 million committed line of credit with an additional $250 million of uncommitted capacity, secured by MSRs for mortgage loans in Freddie Mac and Fannie Mae securitization pools.[20]  The Citibank MSR Facility, originally scheduled to terminate on March 30, 2012, was extended to the earlier of (i) two days prior to the maturity of the AFI Senior Secured Credit Facility and the AFI LOC or (ii) May 30, 2012.  As part of the extension, the Citibank MSR Facility is no longer revolving and the Debtors repaid $124 million of the outstanding principal.  The outstanding amount under the Citibank MSR Facility as of the Petition Date is approximately $152 million.

**E.      Funding of Non-Agency Servicing Advances**

38.      The Debtors, much like other mortgage loan servicers, are required to make Advances on behalf of borrowers that are delinquent or in default on their loan obligations. These Advances are repaid from the Debtors' collections on principal, interest, tax, and insurance payments made by the mortgage borrowers (assuming the borrowers cure their defaults).  Alternatively, the Debtors recover such Advances following the foreclosure sales of the properties securing the defaulted mortgage loans.  The Debtors make the Advances monthly, and such Advances constitute the single largest use of the Debtors' cash.  The right to collect

---

[20]    The Debtors own Freddie Mac and Fannie Mae MSRs with a carrying value as of March 31, 2012 of approximately $641 million.

repayment of Advances (the "**Servicing Advance Receivables**") in turn are a significant asset of the Debtors.

39.     As noted above, Advances constitute the single largest use of the Debtors' cash.  In order to meet their liquidity needs to fund Advances, in addition to the Debtors' credit facilities, the Debtors maintain a nonrecourse servicing advance facility to fund Advances for specified PLS Trusts secured by the receivables relating to those Advances.  Under the servicing advance facility (the "**GSAP Facility**"), the Debtors sell the right to collect repayment of Advances (the "**Servicing Advance Receivables**") through a two-step transaction to a Cayman Islands special purpose entity, GMAC Mortgage Servicer Advance Funding Company Ltd. (the "**GSAP Issuer**"), which is not a Debtor in these Chapter 11 proceedings.  The GSAP Issuer, in turn, may issue to investors term notes and/or variable funding notes secured by the Servicing Advance Receivables.  The amount of Servicing Advance Receivables securing notes issued under the GSAP Facility fluctuates depending on the volume of Advances required to be made by the Debtors under the servicing agreements and the sale of the related Servicing Advance Receivables to the GSAP Issuer.  On March 13, 2012, the GSAP Issuer issued the Series 2012-1 VFN variable funding note (the "**2012 VFN Note**") with a maximum balance of $800 million. Approximately $712 million of the maximum balance was used to repay the outstanding term notes and variable funding note then outstanding.  In the ordinary course, the 2012 VFN Note will begin amortizing in March 2013 and mature on March 12, 2020.  As of the Petition Date, there are no other outstanding notes under the GSAP Facility.[21]

---

[21]    The GSAP Issuer is a bankruptcy remote special purpose entity. However, the Debtors' filings under the Bankruptcy Code are a default under the GSAP Facility, which would have caused the Notes to begin rapid amortization absent the refinancing of such facility through the Barclays DIP Facility (as defined in paragraph 194).  See paragraph 198.

ny-1011900

40.    As described in more detail above, the Borrowers will acquire the receivables that currently secure the GSAP Facility (i.e., the Initial Receivables) in the Initial Purchase Transactions.

**F.    Funding of Certain Fannie Mae Servicing Advances**

41.    Pursuant to a Term Sheet, dated August 1, 2010, amended and restated as of January 18, 2011 and further amended and restated on August 1, 2011, Fannie Mae provides GMAC Mortgage with early partial reimbursement of certain required Fannie Mae servicing advances (the "**FNMA EAF Facility**").  In turn, Fannie Mae recoups such early reimbursement amounts from future final reimbursements to, and other recoveries by, GMAC Mortgage in respect of certain servicing advances.  The total commitment under this facility is $125 million, of which $40.3 million was outstanding as of the Petition Date.  This facility terminates on August 1, 2012.

**G.    BMMZ Repurchase Facility**

42.    From time to time, the Debtors have entered into secured financing facilities pursuant to which they sell assets under repurchase agreements and agree to repurchase the assets at a later date.  In December 2011, repurchase agreements with third parties matured in accordance with their terms and the Debtors entered into a repurchase agreement, dated December 21, 2011, on substantially the same terms with BMMZ Holdings LLC, an indirect, wholly owned subsidiary of AFI ("**BMMZ**"), with a current facility amount of $250 million (the "**BMMZ Repo Facility**").  The BMMZ Repo Facility is secured by the assets being sold pursuant to the repurchase agreements.  The total amount outstanding under the BMMZ Repo Facility as of the Petition Date was approximately $250 million.

43.    As described in more detail above, the Borrowers will acquire the mortgage loans that currently secure the BMMZ Repo Facility (i.e., the Initial Mortgage Loans) in the Initial Purchase Transactions.

## H.    HELOC Facility

44.    The Debtors also established a nonrecourse funding facility to assist in the financing of certain home equity mortgage loans. The Debtors formed a special purpose entity, GMACM Home Equity Notes 2004 Variable Funding Trust (the "**GMEN Issuer**"), which is not a Debtor in these Chapter 11 proceedings.  The GMEN Issuer issued variable funding notes (the "**GMEN Notes**") collateralized by home equity loans and revolving lines of credit.  Under this facility, the Debtors sold certain home equity mortgage loans in a two-step transaction to the GMEN Issuer, which, in turn, issued the GMEN Notes.  Under the mortgage sale agreement, the GMEN Issuer purchased the initial loan balances on the home equity mortgage loans and any additional balances up to the commencement of the amortization period for such loans.  The maturity date of the GMEN Notes is February 25, 2031.  As of March 31, 2012, the principal amount due to holders of the GMEN Notes was $127.3 million.  No further draws on this facility are permitted.

## I.    Unsecured Notes

45.    As of March 31, 2012, ResCap had outstanding senior unsecured notes consisting of $673.3 million of U.S. dollar denominated notes maturing between June 2012 and June 2015, $131.2 million euro denominated notes maturing in May 2012 and $167.7 million U.K. sterling denominated notes maturing between May 2013 and July 2014.[22]   These senior

---

[22]    As of March 31, 2012, a non-Debtor international subsidiary of ResCap also had outstanding medium-term unsecured notes consisting of approximately $140.4 million of peso-denominated notes maturing in June 2012, which were guaranteed by ResCap and certain of its Debtor subsidiaries.  Effective May 11, 2012, this entity was sold and release of the guarantees was approved by the noteholders.

unsecured notes had guarantees from ResCap and certain of its Debtors subsidiaries that were

removed in the June 2008 debt tender and exchange offers referred to above and are solely the

obligations of ResCap itself.

**V.      The Debtors' Marketing Efforts to Obtain Postpetition Financing**

46.      In October 2011, the Debtors engaged Centerview Partners LLC

("**Centerview**") as their investment banker in connection with their restructuring efforts.

Centerview's mandate includes assisting the Debtors with, among other things, obtaining debt

financing, including debtor in possession financing.

47.      To continue to operate their business in the ordinary course while in

Chapter 11, the Debtors determined that liquidity in the form of debtor in possession financing

was essential.  The Debtors' need for such financing was and is particularly acute because, prior

to the Petition Date, the primary facility used to finance and fund servicing advances (the GSAP

Facility), with approximately $662 million outstanding as of the Petition Date, is structured as an

off-shore, bankruptcy remote, special purpose financing, which will, as a result of the Chapter 11

filing, go into "rapid amortization" if not "refinanced" by the DIP Facility.  Barclays is the

counterparty under the GSAP Facility.  Similarly, the Debtors' BMMZ Repurchase Facility, with

approximately $250 million outstanding as of the Petition Date, is structured as a derivative

repurchase agreement and, as such, will unwind, notwithstanding the Chapter 11 filing because

of exceptions to the automatic stay, if not refinanced by the proposed debtor in possession

financing.  BMMZ Holdings LLC, an indirect, wholly-owned subsidiary of AFI, the Debtors'

parent and prepetition lender, is the counterparty under the BMMZ Repurchase Facility.

48.      In the light of the foregoing, in January 2012, the Debtors, with the

assistance of Centerview (as well as FTI Consulting, Inc., who prepared debtor in possession

budgets and forecasts), commenced a marketing process to obtain the requisite debtor in

possession financing for these Chapter 11 cases.  As part of that process, the Debtors approached several potential lenders, including AFI, Barclays, other prepetition providers of debt capital to the Debtors and certain third party lenders with experience in financing mortgage origination and servicing businesses and providing debtor in possession financings of the magnitude required in these Chapter 11 cases (collectively, the "**Potential Lenders**").

49.     The Debtors ran a robust, careful, and well-documented process to obtain the best financing available to support their operations and restructuring activities throughout the Chapter 11 cases.  After engaging in extensive discussions and negotiations with the Potential Lenders, including diligence initiatives, structuring discussions, collateral discussions and the negotiation of potential financing terms and conditions, the Debtors ultimately determined to enter into the DIP Facility with Barclays.  The Debtors believe that the terms of the DIP Facility with Barclays, including structure, collateral required to be pledged, principal amount, pricing and fee structure, are more favorable to the Debtors than what could have been achieved with any of the other Potential Lenders.

50.     As the Chapter 11 filing date approached, the Debtors determined that the DIP Facility would be insufficient to cover the Debtors' second largest expense—repurchases of certain whole loans that were sold into securitization trusts guaranteed by Ginnie Mae (the "**Ginnie Buybacks**").  These repurchases were funded prior to the Petition Date by draws under the AFI LOC.  Thus, the Debtors requested and negotiated to obtain additional postpetition financing from AFI, their parent and prepetition lender under the AFI Senior Secured Credit Facility and the AFI LOC, in the form of postpetition draws under the AFI LOC (the "**AFI DIP Facility,**"[23] and together with the DIP Facility, the "**DIP Facilities**").

---

[23]   See *Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363,*
(Footnote continues on next page.)

51.     The Debtors believe that the availability under the DIP Facilities will enable them to continue operating in the ordinary course of business, including their loan servicing operations that are necessary to preserve the value of their servicing platform, for the ultimate benefit of their stakeholders pending the closing of the Asset Sales.  At the same time, pending the closing of one or more sales, the Debtors will continue to earn loan servicing fees and other fees from these operations prior to the closing of the Asset Sales.

## APPLICABLE AUTHORITY

52.     For the reasons set forth herein, the Debtors have an immediate need for adequate postpetition financing to continue operating their servicing business in the ordinary course and preserve the value of their assets pending the Asset Sales.  As discussed above, the Debtors believe that an orderly asset sale process in Chapter 11 is the best way to maximize the value of the Debtors' assets.

53.     Given the liens and interests of the prepetition lenders on the vast majority of the Debtors' assets, the Debtors were unable to obtain adequate unsecured credit allowable as an unsecured claim or superpriority administrative expense.  The DIP Facility proposed by the Debtors reflects the most favorable terms on which lenders were willing to offer financing.  The Debtors believe that the DIP Facility will allow them to continue their operations in the ordinary course, maintain prudent cash balances, and meet their liquidity needs through the closing of the planned Asset Sales.  The proceeds of the DIP Facility will be used to consummate the Purchase Transactions, which will result in the repayment of the GSAP Facility and BMMZ Repo Facility,

---

(Footnote continued from previous page.)

*and 507(b) and Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate Protection and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief (Debtor in Possession Financing and Ally Financial Inc. and Junior Secured Noteholders Cash Collateral).*

34

operate the Debtors' servicing and origination businesses pending the Asset Sales, fund

restructuring costs, and satisfy working capital requirements.  The Debtors believe that the terms

of the Credit Documents are fair and reasonable, reflect the Debtors' exercise of prudent

business judgment consistent with their fiduciary duties.

## VI.    The DIP Facility Should Be Approved

## J.    The DIP Facility Is Necessary to Preserve the Assets of the Debtors' Estates and Is in the Best Interests of Creditors

54.    Unless this Court authorizes the debtor in possession financing, the

Debtors will be unable to fund the day-to-day operating expenses of their businesses, including,

without limitation:  (i) significant funds needed to provide for servicing advances required to be

made by the Debtors pursuant to their servicing agreements (one of the Debtors' core assets),

certain agreements entered into with various state and federal governmental agencies and the

proposed asset purchase agreements relating to the Asset Sales; (ii) funds required to "refinance"

amounts outstanding under the GSAP Facility and the BMMZ Repo Facility; (iii) wages to

employees necessary to sustain the going concern value of the Debtors' assets pending

consummation of the Asset Sales; and (iv) funds required to satisfy other general corporate and

working capital requirements and fund the administrative costs of the Chapter 11 cases.

55.    Indeed, absent sufficient funds to support the Debtors' servicing and

origination operations (e.g., making advances and ensuring collection and proper distributions of

funds), the value of the Debtors' assets and operations will quickly erode and their ability to

consummate the Asset Sales will be jeopardized, to the detriment of the Debtors' estates and

stakeholders.  See In re Farmland Indus., Inc., 294 B.R. 855, 885 (Bankr. W.D. Mo. 2003)

(approving postpetition financing that "gives the Debtors sufficient time to market and sell

several of their major assets so as to pay down the debt to the DIP Lenders and then reorganize

around their remaining core assets. Without the continued financing, the Debtors would likely be forced into a Chapter 7 or 11 liquidation, to the detriment of all creditors…").

56.    Upon entry of the Interim Order, the DIP Facility will provide access to $1.25 billion in liquidity (and an aggregate amount of $1.45 billion upon entry of the Final Order), which the Debtors and their advisors have determined is sufficient and necessary to allow the Debtors to maintain their operations pending the Asset Sales in these Chapter 11 cases.

57.    Thus, the Debtors submit that the DIP Facility is in the best interest of the Debtors' estates, creditors, borrowers whose mortgage loans are being serviced by the Debtors, investors, and all other stakeholders, and therefore the Debtors should be granted the relief requested herein.

## K.    The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

58.    Section 364 of the Bankruptcy Code allows a debtor to obtain (a) unsecured credit in the ordinary course of business, (b) unsecured credit outside the ordinary course of business, (c) credit with specialized priority or with certain security interests, and (d) secured credit by granting a senior or *pari passu* lien on already encumbered property.  In other words, section 364 is "structured with an escalating series of inducements . . .." that may be offered to attract postpetition financing.  Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs., Inc.), 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d Cir. 1989).

59.    Accordingly, if a debtor cannot obtain postpetition financing on an unsecured basis under sections 364(a) and (b), the bankruptcy court may authorize a debtor to obtain postpetition financing on a superpriority administrative expense basis pursuant to section 364(c), secured by a senior lien on unencumbered property or secured by a junior lien on

encumbered property.  See 11 U.S.C. § 364(c); In re 495 Cent. Park Ave. Corp., 136 B.R. 626,

630 (Bankr. S.D.N.Y 1992) ("If [a] debtor cannot obtain credit as an administrative expense, it

may acquire a loan that is either unsecured but senior to all administrative expense claims,

secured by a lien on property that is not secured, or secured by a junior lien on property already

secured [under section 364(c)].");  Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575,

582-83 (S.D.N.Y. 2001) ("Section 364 of the Code empowers the bankruptcy court to allow new

debts to take priority over other administrative expenses.");  In re Garland Corp., 6 B.R. 456, 461

(B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a

hearing, upon showing that unsecured credit unobtainable).

60.    Courts consider various factors in determining whether a debtor may

obtain postpetition financing under section 364(c) of the Bankruptcy Code, including whether

(i) the debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is

necessary to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable

and adequate given the circumstances of the debtor-borrower and the proposed lender, (iv) entry

into the financing constitutes an exercise of the debtor's sound and reasonable business

judgment, and (v) the financing was negotiated in good faith and at arm's-length between the

debtor and the lender. See In re Farmland Indus., Inc., 294 B.R. at 879-81; Transcript of Record

at 733, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009),

Docket No. 3740 (citing Farmland factors); In re Mid-State Raceway, Inc., 323 B.R. 40, 60

(Bankr. N.D.N.Y. 2005) (citing Farmland factors).  See also In re Aqua Assocs., 123 B.R. 192,

195-96 (Bankr. E.D. Pa. 1991) (applying factors 1-3).

61.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a

debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor

on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n

(In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek

credit from every possible lender before concluding that such credit is unavailable." Id.; Pearl-

Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. at 584 (superpriority administrative

expenses authorized where debtor could not obtain credit otherwise).  When few lenders are

likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic

and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In

re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs.

Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also In re Ames Dep't

Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding

that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it

approached four lending institutions, was rejected by two, and selected the most favorable of the

two offers it received).

> **(a)     The Debtors are Unable to Obtain Credit on More Favorable
> Terms**

62.     The Debtors have been unable to procure sufficient financing (i) in the

form of unsecured credit allowable under sections 364(a) or (b) of the Bankruptcy Code, or

(ii) solely in exchange for the grant of a superpriority administrative expense claim pursuant to

section 364(c) of the Bankruptcy Code.

63.     Due to the liens and security interests granted under the Debtors' various

prepetition credit facilities and outstanding junior secured notes, the Debtors were unable to

procure sufficient debtor in possession financing in the form of unsecured credit, solely in

exchange for the grant of a administrative expense or superpriority administrative expense claim

or on a junior lien basis.  None of Barclays, AFI or the other Potential Lenders was willing to

commit to postpetition financing on these terms.  Notably, the proposals obtained from the

Potential Lenders other than Barclays required that the Debtors agree to grant first priority

"priming" liens on the AFI LOC as well as liens on the Debtors' currently unencumbered assets

with a book value of approximately $775 million as of the Petition Date, including $250 million

in unencumbered cash maintained by the Debtors.  As reflected in the DIP Facility, Barclays was

willing to provide the necessary debtor in possession financing without "priming" the Ally LOC,

without encumbering the Debtors' currently unencumbered assets and without taking liens on

causes of action under Chapter 5 of the Bankruptcy Code.

        64.     Based on the foregoing, the Debtors believe that they would not have been

able to obtain debtor in possession financing on more favorable terms from other sources.  See,

e.g., Bray v. Shenandoah Fed. Savs. & Loan Ass'n, 789 F.2d at 1088 (Section 364 "imposes no

duty to seek credit from every possible lender before concluding that such credit is

unavailable."); In re YL W. 87th Holdings I LLC, 423 B.R. at 421, 441 n. 44 (Bankr. S.D.N.Y.

2010) (noting that courts require only a showing of "reasonable effort" to obtain credit

otherwise); In re 495 Central Park Ave. Corp., 136 B.R. at 631 (debtor testified to numerous

failed attempts to procure financing from various sources, explaining that "most banks lend

money only in return for a senior secured position.").

        65.     The Debtors have succeeded in securing both a fully committed term

financing and revolver that meet their needs to continue their operations and preserve and

maximize the value of their estates.  The Court should therefore authorize the Debtors to grant

the liens in the Collateral to the Collateral Agent for the benefit of the Secured Parties and grant

superpriority administrative expense status for any obligations arising under the Credit

Documents pursuant to section 364(c) of the Bankruptcy Code.

**(b)    The Terms of the Credit Documents are Fair, Reasonable and Appropriate**

66.    The terms and conditions of the Credit Documents are fair, reasonable and appropriate in the circumstances presented, and were negotiated by the parties in good faith and at arm's length.

67.    The DIP Lenders have required that the Debtors grant the DIP Liens and Superpriority Claims upon the terms and conditions set forth in the Interim Order and the Credit Documents.  The DIP Liens and Superpriority Claims will be subject to the Carve Out, which includes up to $25,000,000 in professional fees accruing following an event of default plus amounts payable to the United States Trustee.  Such carve outs generally "preserve the adversary system" by ensuring that the committees and the debtor's estate are adequately assisted by counsel.  See In re Ames Dep't Stores, Inc., 115 B.R. at 38 (noting that courts generally "insist on a carve out" for professional fees, and that "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  Additionally, the Carve Out protects against administrative insolvency during the course of the cases by ensuring that assets remain for the payment of United States Trustee fees and professional fees of the Debtors and the official committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.  The DIP Facility provides the Debtors with the liquidity they need to operate their businesses during these Chapter 11 cases, which will preserve the value of their assets pending the Asset Sales.  After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.

68.    Bankruptcy courts routinely defer to a debtor's business judgment in considering whether to approve the debtor's request to obtain postpetition financing.  See e.g., In

re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y.

June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request

for financing does not 'leverage the bankruptcy process' and unfairly cede control of the

reorganization to one party in interest."); In re Ames Dep't Stores, Inc., 115 B.R. at 40 (The

court should defer to debtor's "reasonable business judgment . . . so long as the financing

agreement does not . . . leverage the bankruptcy process . . ." and its purpose is to benefit the

estate rather than another party-in-interest.).

        69.     The Debtors exercised their reasonable business judgment in determining

that the DIP Facility is the best financing option available under the present circumstances, and

the Debtors have satisfied the legal requirements to incur the DIP Obligations on the terms and

conditions set forth in the Credit Documents.  The Debtors believe that the Credit Documents

contain terms that are fair, reasonable and in the best interests of the Debtors and their estates.

Accordingly, the Debtors respectfully submit that they should be authorized to enter into the

Credit Documents and obtain access to the DIP Facility from the DIP Lenders on the terms

described herein.

**VII.**    **The Use of the DIP Loans to Refinance the Refinanced Facilities Through the
Purchase Transactions Should be Approved**

        70.     In order for the Borrowers to obtain sufficient assets to collateralize the

DIP Facility, the Debtors propose that the Borrowers use a portion of the borrowings under the

Term Loans to acquire (i) the Initial Receivables from the non-debtor GSAP Transferor, which is

the borrower under the GSAP Facility and (ii) the Initial Mortgage Loans from GMAC Mortgage

and RFC (after re-acquisition of such assets by GMAC Mortgage and RFC from BMMZ), each

free and clear of any liens, interests or other encumbrances that predate the Petition Date (such

transactions, the "**Initial Purchase Transactions**").  The Initial Purchase Transactions will have

the effect of unwinding the GSAP Facility (approximately $662 million outstanding) and the

BMMZ Repo Facility (approximately $250 million outstanding).[24]    Accordingly, the secured

parties under those facilities will release any liens in the Initial Receivables and the Initial

Mortgage Loans that currently serve as collateral for those facilities.  As described in more detail

herein, the Initial Purchased Assets[25] will serve as first-lien collateral to secure the DIP Facility.

71.    As a condition to providing the Debtors with financing that is secured by

some, but not all, of the Debtors' assets, the Administrative Agent required that the Debtors

segregate the First Lien Collateral securing the DIP Facility from the collateral that secures the

Debtors' prepetition facilities.  To implement this request, the Debtors created special purpose

entities to serve as Borrowers under the DIP Facility (which entities filed Chapter 11 petitions in

these cases), and the Borrowers, GMAC Mortgage and RFC hereby seek authority to enter into

and consummate the Purchase Transactions, which include both purchases of the Initial

Purchased Assets and Additional Purchased Assets (i.e., the servicing advance receivables

generated and the mortgage loans originated or acquired after the Closing Date).

72.    The Purchase Transactions will bring substantial assets into the Debtors'

estates, which otherwise would not be available to the Debtors.  Further, the Purchase

Transactions will enable the Borrowers to access incremental liquidity that is essential to the

Debtors' ongoing business operations pending the Asset Sales and will preserve and enhance the

enterprise value for the benefit of the Debtors' stakeholders.  In addition, absent consummation

of the Initial Purchase Transactions, the Debtors would lose access to the Initial Purchased

---

[24]    Under the BMMZ Repo Facility, the Debtors have sold assets under repurchase agreements and agreed to
repurchase those assets at a later date.  Thus, to "refinance" the BMMZ Repo Facility, the Debtors must
repurchase the assets from BMMZ.

[25]    Together the Initial Receivables and the Initial Mortgage Loans constitute the Initial Purchased Assets, as
defined above.

Assets and the ability to pledge them as collateral.  Compelling reasons exist to approve such refinancings.

73.     First, as discussed above, the GSAP Facility involves a non-debtor, off-shore, special purpose borrower.  Certain servicing advance reimbursement rights are sold and contributed to the GSAP Borrower, which, in turn, pledges those receivables to a Lender.  As such, absent refinancing with DIP Facility proceeds, and as a result of the Debtors' Chapter 11 filings, the GSAP Facility would go into "rapid amortization," causing substantially all of the amounts recovered on the Servicing Advance Receivables sold to the GSAP Borrower to automatically pay down the amounts outstanding under the GSAP Facility.  This would severely constrain the Debtors' liquidity, and leave the Debtors without any means to finance a substantial portion of their servicing advance obligations.  Second, the GSAP Facility is meaningfully oversecured.  As of the Petition Date, the GSAP Facility had approximately $662 million outstanding and was secured with collateral (advances and restricted cash) with a book value of approximately $870 million.  Absent refinancing with proceeds of the DIP Facility, such excess book collateral value (approximately $208 million) would almost certainly dissipate and potentially disappear as the GSAP Facility amortized and wound down, to the detriment of the Debtors' estates.  Third, the terms of the DIP Facility are actually more favorable than those under the GSAP Facility from a borrowing base perspective.  Specifically, advance rates on Servicing Advance Receivables under the GSAP Facility were approximately 70% as of March 31, 2012, while marginal advance rates on the same collateral under the DIP Facility are increased to 90% to 95%.

74.     Refinancing of the BMMZ Repurchase Facility with proceeds of the DIP Facility is compelling for similar reasons as set forth above with respect to the GSAP Facility.

First, the BMMZ Repurchase Facility is structured as a derivative repurchase agreement, pursuant to which BMMZ is actually the owner of the assets, and the Debtors have contracted for the right to repurchase those assets at an agreed upon price.  Absent the refinancing of this facility, notwithstanding the Chapter 11 filing, BMMZ could take immediate action to terminate the repurchase agreement and sell the underlying mortgage loans to third parties, likely impairing, and potentially eliminating the Debtors' interests therein.  Second, as with the GSAP Facility, there is meaningful excess value in the BMMZ Repurchase Facility.  Specifically, as of the Petition Date, the facility had $250 million outstanding but was associated with underlying assets, in the form of a portion of the Debtors' loan book, with a book value of approximately $473 million, equating to $223 million in excess book value that will be preserved by virtue of the DIP Financing.  The repurchased assets support a substantial portion of the Borrowing Base under the DIP Facility.  The Debtors will be afforded a 75% advance rate on this collateral under the DIP Facility as compared to a floating advance rate under the BMMZ Repurchase Facility that was approximately 60% as of March 31, 2012, providing the Debtors with greater liquidity than could otherwise have been obtained.

75.    In summary, for the reasons described above, it is necessary for the Debtors to refinance these facilities with the DIP Facility, immediately, in order to operate their businesses.  The administrative agent and indenture trustee for the GSAP Facility, and BMMZ, as lender under the BMMZ Repo Facility, each have consented to the repayment of all of the outstanding debt under such facilities and will release the collateral thereunder pursuant to the applicable facility documents.

76.    The Purchase Transactions are a critical element of the DIP Facility and the Debtors' overall restructuring.

**L.      The Purchase Transactions are Within the Sound Business Judgment of the Debtors and Should Be Approved**

77.      Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate..." 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's purchased assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to buy or sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 466 (2d Cir. 2007); Comm. of Equity Sec. Holders v. Lionel Corp. (In re The Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  When a debtor decides to sell property out of the ordinary course of business, courts apply a strong presumption that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company.'"  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 349 (2d Cir. 1993).

78.      Here, absent the Purchase Transactions, the Debtors would not have sufficient collateral to secure the DIP Facility.  Accordingly, the newly formed Debtor-Borrowers have agreed to purchase the Purchased Assets from the GSAP Transferor, GMAC Mortgage and RFC (following the unwinding of the GSAP and the BMMZ Repo Facility).  The Debtors submit that the Purchase Transactions have been effectuated in good faith and the terms of the Purchase Transactions are fair and reasonable, reflect the Debtors' exercise of prudent

45

business judgment consistent with their fiduciary duties and constitute "reasonably equivalent value" and "fair consideration" to the Borrowers within the meaning of such terms under section 548 of the Bankruptcy Code and under applicable non-bankruptcy law.

79.    The availability under the DIP Facility is critical to enable the Debtors to continue operating in the ordinary course of business, which includes their loan servicing operations that are necessary to preserve the value of their servicing platform for the ultimate benefit of all creditors and other parties in interest pending the closing of the Asset Sales.  Thus, the Debtors submit that ample business justification exists for them to enter into the Purchase Transactions.

80.    Accordingly, the Debtors seek authorization to consummate the Purchase Transactions and enter into related agreements contemplated therein, and approval of the Asset Indemnification Obligations contained in the Purchase Agreements.

## M.    The Purchase Transactions Should be Free and Clear of All Liens, Claims, and Encumbrances Under Section 363(f) of the Bankruptcy Code

81.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f).  See also Abir v. Stern, No. 09-cv-2872, 2010 WL 1170060, at *2 (E.D.N.Y. Mar. 22, 2010) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of [section] 363(f) have been met.")

(quoting In re The Dundee Equity Corp., No. 89-B-10233, 1992 WL 53743, at *4 (Bankr.

S.D.N.Y. Mar. 6, 1992)).  Approval of a proposed sale of assets free and clear of interests

requires only that one of the five requirements be satisfied with respect to each such interest.  In

re Borders Group, Inc., 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011).

82.    The administrative agent and indenture trustee for the GSAP Facility, and

BMMZ, as buyer under the BMMZ Repo Facility, each have consented to the repayment of all of

the outstanding debt under those facilities and will release the collateral thereunder pursuant to

the applicable facility documents.  Accordingly, the Debtors have satisfied the second

requirement, if not others as well, and the approval of the Purchase Transactions free and clear of

all adverse interests is warranted.

## VIII.    The Borrowers are Entitled to the Protections Under Section 363(m) of the Bankruptcy Code

83.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's

interest in property purchased from a debtor notwithstanding the fact that a sale conducted under

section 363(b) may later be reversed or modified on appeal. Specifically, section 363(m) states

that:

> The reversal or modification on appeal of an authorization under [section 363(b)]
> … does not affect the validity of a sale … to an entity that purchased … such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) not only fosters the policy of affording finality to the

judgment of the bankruptcy court, but also gives finality to those orders and judgments upon

which third parties rely.  Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.), No. 92-cv-7054,

1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Pa., Inc., 788

F.2d 143, 147 (3d Cir. 1986)); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y.

1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by

the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").  Although the Bankruptcy Code does not define "good faith," in Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997), the United States Court of Appeals for the Second Circuit held that:

> The "good faith" component of the test under § 363(m) speaks to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

111 F.3d at 276 (quoting In re Rock Indust. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)) (internal quotations omitted).

84.     The Debtors submit that the Purchase Transactions have been effectuated in good faith and the terms of the Purchase Transactions are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Accordingly, the Borrowers should be provided with the benefit and protection of 363(m) of the Bankruptcy Code, such that if any of the provisions of the Purchase Agreement are later modified, vacated, stayed or terminated by subsequent order of this or any other Court, the DIP Lenders will be fully protected with respect to any amounts previously disbursed.  In addition, in order to protect the DIP Lenders' interests in the Purchased Assets, the Administrative Agent should be entitled to derivatively assert any and all rights of the Borrowers.

## IX.    The Refinancing of the Debtors' Prepetition Debt Should Be Approved

85.     As discussed above, the Debtors had several secured financing facilities outstanding as of the Petition Date, and substantially all of their assets were encumbered thereby.

After carefully considering the potential concerns of creditors that may be expressed in

connection with the DIP Facility, the terms of the proposed refinancing and the scope and

validity of the prepetition lenders' secured claims (and any associated causes of action), the

Debtors believe that refinancing the GSAP Facility and the BMMZ Repo Facility is in the best

interests of the Debtors' estates and is necessary to collateralize the DIP Financing.   Notably,

each of the refinanced facilities will unwind if not refinanced and each is meaningfully

oversecured.

86.    Refinancings of prepetition debt have been approved at first day hearings

in this district. See, e.g., In re Eastman Kodak Co., Case 12-10202 (Bankr. S.D.N.Y. Jan. 20,

2012) (interim order) (Docket No. 54); In re Borders Grp., Inc., Case 11-10614 (Bankr. S.D.N.Y.

Feb. 17, 2011) (interim order) (Docket No. 69); In re The Great Atl. & Pac. Tea Co., Case 10-

24549 (Bankr. S.D.N.Y. Dec. 13, 2010) (interim order) (Docket No. 43); In re Uno Rest.

Holdings Corp., Case 10-10209 (MF) (Bankr. S.D.N.Y. Jan. 20, 2010) (interim order) (Docket

No. 40); In re Lyondell Chem. Co., Case 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009)

(interim order) (Docket No. 79).

## X.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders and Honor the Obligations Under the Commitment Letter

87.    As described above, the Debtors have agreed, subject to Court approval, to

pay certain fees described in the Credit Documents and reasonable costs and expenses to the

Administrative Agent, the Collateral Agent, the Lead Arranger, and the DIP Lenders, including

without limitation, fees and expenses of the professionals retained by the Administrative Agent

and the DIP Lenders, as provided for in the Credit Documents without the necessity of filing

retention applications or fee applications.  Specifically, the Debtors seek authority to pay an

aggregate amount of approximately $52 million in fees and expenses to Barclays in connection

49

with the closing of the DIP Facility, of which approximately $18.75 million was paid prior to the

Petition Date as part of Barclays's delivery of a binding commitment to provide the DIP Facility.

88.    These fees and other obligations under the Credit Documents were

negotiated in good faith and at arms' length and represent the most favorable terms to the

Debtors on which the DIP Lenders would agree to make the DIP Facility available. The Debtors

considered the fees described above when determining in their sound business judgment that the

Credit Documents constituted the best terms on which the Debtors could obtain the postpetition

financing necessary to continue their operations pending one or more sales of the assets and

prosecute their Chapter 11 cases, and that paying these fees in order to obtain the DIP Facility is

in the best interests of the Debtors' estates, creditors, and other parties in interest.

89.    Courts routinely authorize debtors to pay fees similar to those the Debtors

propose to pay, where the associated financing is, in the debtor's business judgment, beneficial

to the debtors' estates. See, e.g., In re Hostess Brands, Inc., No. 12-22052 (Bankr. S.D.N.Y.

Feb. 3, 2012) (Docket No. 254) (approving annual administration fee of $500,000 and funding

premium of 3%); In re Gen. Mar. Corp., No. 11-15285 (Bankr. S.D.N.Y. Dec. 15, 2011) (Docket

No. 141) (approving an up-front 1.50% facility fee); In re Borders Grp., Inc, No. 11-10614

(Bankr. S.D.N.Y. Mar. 16, 2011) (Docket No. 404) (approving underwriting fee of $2,250,000,

closing fee of $7,760,000, structuring fee of $4.5 million, plus fees related to annual

administration and collateral monitoring); In re Terrestar Networks Inc., No. 10-15446 (Bankr.

S.D.N.Y. Nov. 18, 2010) (Docket No.181) (approving 3% upfront fee); In re Lear Corp., No. 09-

14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (Docket No. 282) (approving 5.0% up front fee and a

1.0% exit/conversion fee); In re Gen. Growth Props., Inc., No. 09-11977 (Bankr. S.D.N.Y. May

14, 2009) (Docket No. 527) (approving 3.75% exit fee); In re Aleris Int'l Inc., No. 09-10478

(Bankr. D. Del. Mar. 18, 2009) (Docket No. 299) (approving 3.5% exit fee and 3.5% front-end

net adjustment against each lender's initial commitment); In re Tronox Inc., No. 09-10156

(Bankr. S.D.N.Y. Feb. 6, 2009) (Docket No. 148) (approving an up-front 3% facility fee); In re

Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009) (Docket No. 1002)

(approving exit fee of 3%). Accordingly, the Court should authorize the Debtors to pay the fees

provided under the Credit Documents in connection with entering into those agreements.

## XI.    Support for Modification of Automatic Stay

90.    As set forth more fully in the proposed Interim Order, the DIP Credit

Agreement contemplates a modification of the automatic stay established pursuant to section 362

of the Bankruptcy Code to permit the DIP Lenders, in their sole discretion, to take certain actions

permitted or required under the DIP Documents and to enforce certain remedies against the DIP

Collateral without having to obtain any further order of this Court.  The Interim Order further

provides that, prior to the exercise of certain enforcement or liquidation remedies against the DIP

Collateral, the DIP Lenders shall be required to give seven (7) days' written notice to each of

counsel for the Debtors and counsel for the official committee of unsecured creditors and the

United States Trustee, as provided for in the Credit Documents.

91.    The Debtors submit that stay modification provisions such as these are

ordinary and usual features of postpetition financing facilities and, in the Debtors' business

judgment, are reasonable under the present circumstances.  See e.g., In re Eastman Kodak Co.,

No. 12-10202 (Bankr. S.D.N.Y. Jan. 20, 2012) (interim order) (Docket No. 54); In re Hostess

Brands Inc., No. 12-22052 (Bankr. S.D.N.Y. Jan. 12, 2012) (interim order) (Docket No. 63); In

re Gen. Mar. Corp., No. 11-15285 (Bankr. S.D.N.Y. Nov. 18, 2011) (interim order) (Docket

No. 32); In re The Great Atl. & Pac. Tea Co., No. 10-24549 (Bankr. S.D.N.Y. Dec. 13, 2010)

(interim order) (Docket No. 43); In re Boston Generating, LLC, No. 10-14419 (Bankr. S.D.N.Y.

Aug. 20, 2010) (interim order) (Docket No. 56); In re Lear Corp., No. 09-14326 (Bankr.

S.D.N.Y. July 7, 2009) (interim order) (Docket No. 59); In re Gen. Growth Props. Inc., No. 09-

11977 (Bankr. S.D.N.Y. Apr. 17, 2009) (interim order) (Docket No. 44).  Accordingly, the

Debtors respectfully request that the Court authorize the modification of the automatic stay in

accordance with the terms set forth in the DIP Orders and the Credit Documents.

## XII.    The DIP Lenders are Entitled to the Protections Under Section 364(e) of the Bankruptcy Code

92.    Section 364(e) of the Bankruptcy Code, which protects a good faith

lender's right to collect on loans extended to a debtor and its right in any lien securing those

loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed

or modified on appeal, was designed to "encourage lenders to extend credit to debtors by

eliminating the risk that any lien securing the loan will be modified on appeal."  Keltic Fin.

Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st

Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493

(11th Cir. 1992)).  See also White Rose Food v. General Trading (In re Clinton St. Food Corp.,

170 B.R. 216, 220 (S.D.N.Y. 1994) (Section 364(e) "overcome[s] parties' reluctance to lend to a

bankrupt firm . . ."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.), 155 B.R.

271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good-faith lenders

to rely upon conditions at the time they extend credit and to encourage lenders to lend to

bankruptcy entities.").

93.    The Debtors believe that the terms and conditions of the DIP Facility are

fair and reasonable and are the best possible terms on which the Debtors could obtain

postpetition financing.  Further, the terms and conditions of the Credit Documents were

negotiated in good faith and at arm's length with all parties represented by experienced counsel.

52

Accordingly, the DIP Lenders should be provided with the benefit and protection of section

364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later

modified, vacated, stayed, or terminated by subsequent order of this or any other Court, the DIP

Lenders will be fully protected with respect to any amounts previously disbursed.

**XIII.    The Debtors Should be Authorized to Obtain Postpetition Financing Secured by Priming Liens**

94.    If the incentives available under Section 364(c) are insufficient to attract

post-petition financing, a bankruptcy court may authorize post-petition credit under Section

364(d) secured by a senior or *pari passu* lien on encumbered property (i.e., a "priming" lien)

without consent from the affected lienholders if (i) the debtor cannot otherwise obtain credit and

(ii) the interests of the existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1);

In re 495 Cent. Park Ave. Corp., 136 B.R. at 630-31; In re Aqua Assocs., 123 B.R. 192, 196

(Bankr. E.D. Pa. 1991).

95.    Here, as discussed above, the Credit Documents satisfy each of these

factors.  The Debtors approached several institutions to serve as potential financing sources,

conducted arm's- length negotiations with each of them, and ultimately determined that the DIP

Lenders offered the best available option for obtaining postpetition financing.  In fact, the

Debtors requested but were unable to obtain postpetition financing of the type and size needed

without the inclusion of limited priming liens in the collateral package.

96.    The Debtors submit that the parties, if any, subject to the DIP Lenders'

priming liens are adequately protected.  A debtor may obtain postpetition credit that is "secured

by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor,

among other things, provides "adequate protection" to those parties whose liens are primed.  See

11 U.S.C. § 364(d)(1)(B).  Adequate protection is evaluated on a case-by-case basis and may be

provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. See, e.g., In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case…") (citation and quotation omitted); In re Realty Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).

97.    Here, given the limited nature of the priming requested, the Debtors do not believe that any existing creditors are harmed by such priming or, if they suffer any harm, they will be adequately protected.  The Debtors do not propose to prime through the DIP Facility any of their existing prepetition secured lenders.  The Debtors seek three limited forms of priming. First, the Debtors seek authority to grant the priming liens on all of the Borrowers' present and after-acquired property ***solely to the extent*** that is subject to any valid, perfected and non-avoidable liens or security interests as of the Petition Date that are not being terminated as a result of the repayment of the GSAP Facility and the BMMZ Repo Facility and the Purchase Transactions.  Because the liens securing these assets are being released in connection with the refinancing of such facilities and the Debtors seek to sell such assets to the Borrowers free and clear of all liens, no such liens should exist.

98.    Second, the Debtors seek authority to grant priming liens on the newly created ResCap Concentration Account, which contained no funds and was not subject to a bank account control agreement prior to the Petition Date.  Thus, any purported lien on the account

was not validly perfected and would have been of no value, therefore, no creditors are harmed by such priming and no adequate protection should be required.

99.    Third, the Junior Secured Noteholders have indicated to the Debtors that they believe they may hold an equitable lien on the assets securing the AFI LOC. To the extent such lien exists, the Debtors submit that such equitable lien was not a valid, perfected and non-avoidable lien or security interests as of the Petition Date and therefore section 364(d)(1) does not apply. Further, even if section 364(d)(1) were to apply, the Debtors are providing the Junior Secured Noteholders with adequate protection in connection with the Debtors' use of their cash collateral, and such adequate protection would sufficiently cover any alleged interest in the collateral securing the AFI LOC. Finally, the Ad Hoc Committee of Junior Noteholders has consented to the proposed adequate protection package for the Junior Noteholders.[26]

100.    Accordingly, the Debtors believe that the adequate protection proposed herein and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of Sections 363(c) and 364(d) of the Bankruptcy Code.

## XIV.    Interim Approval Should Be Granted

101.    Bankruptcy Rule 4001(c) provides that:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

---

[26]    See Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 507(b) and Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate Protection and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief (Debtor in Possession Financing and Ally Financial Inc. and Junior Secured Noteholders Cash Collateral).

Fed. R. Bankr. P. 4001(c)(2).  Similarly, to the extent the Debtors are seeking authority to sell,

use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003

provides that the Court may only grant immediate relief to the extent it is necessary to avoid

immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).

102.    Generally, courts find "immediate and irreparable harm" exists where loss

of the business threatens ability to reorganize.  See In re Ames Dep't Stores, Inc., 115 B.R. at 36

n.2.  Approval of the DIP Facility on an interim basis under Rule 4001(c)(2) is left to the

discretion of the court as informed by the facts of each case.  In examining requests for interim

relief under this rule, courts apply the same business judgment standard applicable to other

business decisions, and a debtor should be entitled to borrow those amounts that it believes

prudent in the operation of its business.  See e.g., In re Trans World Airlines, Inc., 163 B.R. at

974; In re Ames Dep't Stores, Inc., 115 B.R. at 40; Evergreen Int'l Airlines Inc. v. Pan Am Corp.

(In re Pan Am Corp.), No. 91-8319, 1992 WL 154200, at *6 (S.D.N.Y. June 18, 1992) (noting

that there is no limit to the amount of funding that the court can approve on an interim basis).

After the 14-day period, the request for financing is not limited to those amounts necessary to

prevent the destruction of the debtor's business, and the debtor is entitled to borrow those

amounts that it believes are prudent to the operation of its business.  In re Ames Dep't Stores,

Inc., 115 B.R. at 36.

103.    The Debtors seek expedited approval of the relief requested in this Motion

in light of the immediate and irreparable harm that the Debtors' estates will incur unless they

obtain the financing necessary to sustain their businesses.  Indeed, the Debtors anticipate

accessing the DIP Facility as soon as practicable after the Interim Order is entered in order to

fund servicing advances required to be made by the Debtors pursuant to their servicing

ny-1011900

agreements, as well as other expenses necessary to preserve and maximize the value of the

Debtors' assets during the crucial first days of their reorganization efforts and the pendency of

the Debtors' Chapter 11 cases.  Within the first week of these Chapter 11 cases, the Debtors will

owe approximately $450 million for servicing advance obligations, which will need to be

funded, in part, by the DIP Facility.  In fact, over $318 million of these servicing advance

obligations relate to the mortgage loans securing the GSAP Facility, and due to the nature of the

GSAP Facility, as discussed above, the Debtors would be unable to make any of these advances

absent refinancing or entry into the DIP Credit Documents.

104.    Absent sufficient funds to support the Debtors' servicing business, the

Debtors' assets will quickly erode to the detriment of the Debtors' estates, the borrowers of the

mortgage loans, and investors.  For the reasons set forth above, the Debtors submit that

immediate access to $1.25 billion under the DIP Facility is necessary to preserve the value of the

Debtors' estates for the benefit of their creditors and other parties-in-interest.

105.    Courts in this jurisdiction have granted similar relief in other Chapter 11

cases.  See, e.g., In re Eastman Kodak Co., No. 12-10202 (Bankr. S.D.N.Y. Jan. 20, 2012)

(Docket No. 54) (order approving postpetition financing on an interim basis); In re Hostess

Brands Inc., No. 12-22052 (Bankr. S.D.N.Y. Jan. 12, 2012) (Docket No. 63) (same), In re Gen.

Mar. Corp., No. 11-15285 (Bankr. S.D.N.Y. Nov. 18, 2011) (Docket No. 32) (same); In re The

Great Atl. & Pac. Tea Co., No. 10-24549 (Bankr. S.D.N.Y. Dec. 13, 2010) (Docket No. 43)

(same); In re Boston Generating, LLC, No. 10-14419 (Bankr. S.D.N.Y. Aug. 20, 2010) (Docket

No. 56) (same); In re Chemtura Corp., No. 09-11233 (Bankr. S.D.N.Y. Mar. 20, 2009) (Docket

No. 58) (same); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (Docket No.

46) (same); <u>In re Lyondell Chem. Co.</u>, No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (Docket

No. 79) (same).

## XV.    Request for Immediate Relief and Waiver of Stay

106.    Bankruptcy Rule 6003 generally precludes the Court from authorizing

certain relief until twenty-one days after the petition is filed, except to the extent necessary to

prevent "immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that

Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the

interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to

the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief

requested in this Motion be entered on an interim basis.

107.    To successfully implement the foregoing, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy

Rule 6004(h).

108.    Therefore, the Debtors request that this Court (i) conduct an expedited

hearing on this Motion, (ii) grant the relief sought in this Motion on an interim basis and enter

the Interim Order, (iii) schedule the Final Hearing on this Motion, and (iv) establish notice and

objection procedures in respect thereof in accordance with Bankruptcy Rule 4001(c).

## NOTICE

109.    50.    Notice of this Motion will be given to the following parties, or in

lieu thereof, to their counsel: (a) the Office of the United States Trustee for the Southern District

of New York; (b) the office of the United States Attorney General; (c) the office of the New

York Attorney General; (d) the office of the United States Attorney for the Southern District of

New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g)

each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture

trustees for the Debtors' outstanding notes issuances; (i) the Administrative Agent and its counsel; (j) the Collateral Agent; (k) Barclays Bank PLC, as the Administrative Agent under the Barclays DIP Facility; (l) The Bank of New York Mellon, as indenture trustee under the GSAP Facility; (m) Ally Financial, Inc. and its counsel, Kirkland & Ellis LLP; (n) Ally Bank and its counsel, Kirkland & Ellis LLP; (o) Citibank, N.A. as secured lender under the MSR Facility; (p) U.S. Bank National Association, as trustee for the Prepetition Junior Secured Notes (q) Wells Fargo Bank, N.A., as collateral agent for the Prepetition Junior Secured Notes, as collateral agent for the Prepetition Ally Revolver, and as collateral control agent under the Intercreditor Agreement, dated as June 6, 2008; (r) BMMZ, as buyer under the Pre-Petition Ally Repo Facility; (s) Fannie Mae; (t) Freddie Mac; (u) Ginnie Mae; (v) servicers and sub-servicers under the Designated Servicing Agreements and the Specified Servicing Agreements (each term as defined in the DIP Credit Agreement); (w) the MBS Trustees (as defined in the DIP Credit Agreement); (x) Nationstar Mortgage LLC and its counsel; and (y) the parties included on the Debtors' list of fifty (50) largest unsecured creditors (collectively, the "**Initial Notice Parties**").

110.    Within two (2) days after entry of the Interim Order, the Debtors propose to serve a copy of the Motion and the Interim Order upon the Initial Notice Parties.  The Debtors request that the Court schedule the Final Hearing on the Motion for a date that is as soon as practicable, but in no event later than forty-five (45) days following the entry of the Interim Order, and establish the date prior to the Final Hearing for parties to file objections to the Motion.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the DIP

Orders granting (a) the relief requested herein and (b) such other relief as is appropriate under the

circumstances.

Dated:  May 14, 2012
        New York, New York


                                        /s/    Larren M. Nashelsky
                                        Larren M. Nashelsky
                                        Gary S. Lee
                                        Todd M. Goren
                                        MORRISON & FOERSTER LLP
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        Telephone: (212) 468-8000
                                        Facsimile: (212) 468-7900

                                        *Proposed Counsel for the Debtors and
                                        Debtors in Possession*