# EXHIBIT C

<u>Execution Version</u>

GMACM MORTGAGE LOAN PURCHASE AND CONTRIBUTION AGREEMENT

by and between

GMAC MORTGAGE, LLC

(Seller)

and

GMACM BORROWER LLC

(Purchaser)

Dated as of May 15, 2012

# TABLE OF CONTENTS

                                                                                Page

Section 1.      Definitions...........................................................................................................2
Section 2.      Sale and Contribution of Mortgage Loans................................................................5
Section 3.      GMACM's Acknowledgment and Consent to Assignment ....................................6
Section 4.      Representations, Warranties and Certain Covenants ...............................................6
Section 5.      Notice of Breach ......................................................................................................9
Section 6.      Termination...............................................................................................................9
Section 7.      General Covenants of GMACM ..............................................................................9
Section 8.      Intent of Parties......................................................................................................10
Section 9.      Indemnity ...............................................................................................................11
Section 10.     Miscellaneous ........................................................................................................11

Attachment A  ELIGIBLE MORTGAGE LOAN SCHEDULE

Attachment B  INELIGIBLE MORTGAGE LOAN SCHEDULE

i

## MORTGAGE LOAN PURCHASE AND CONTRIBUTION AGREEMENT

This MORTGAGE LOAN PURCHASE AND CONTRIBUTION AGREEMENT (as may be amended, modified or supplemented from time to time, this "Agreement") is made as of May 15, 2012, by and between GMACM BORROWER LLC, a Delaware limited liability company and special purpose entity, wholly owned subsidiary of GMACM and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (the "GMACM Purchaser"), and GMAC MORTGAGE, LLC, a Delaware limited liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (together with any successors and assignees permitted hereunder, "GMACM").

## RECITALS

A.   On May 14, 2012, GMACM and Residential Funding Company, LLC, a Delaware limited liability company ("RFC"), filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B.   Pursuant to a Master Repurchase Agreement (the "Master Repurchase Agreement"), dated as of December 21, 2011, by and among BMMZ Holdings LLC, as buyer ("BMMZ"), GMACM, as seller and servicer, RFC, as seller, and Residential Capital, LLC, a Delaware limited liability company, as guarantor ("ResCap"), the parties entered into repurchase transactions in which RFC and GMACM transferred to BMMZ certain eligible mortgage loans, against the transfer of funds by BMMZ, with a simultaneous agreement by BMMZ to transfer to RFC or GMACM, as applicable, such eligible mortgage loans at a date certain, against the transfer of funds by RFC or GMACM, as applicable.  Pursuant to the terms of the Master Repurchase Agreement, GMACM has repurchased the mortgage loans GMACM transferred to BMMZ and wishes to sell and contribute such loans to the GMACM Purchaser hereunder.

C.   The GMACM Purchaser, as a borrower, and GMACM, as a guarantor, administrator, originator, receivables custodian, servicer and GMACM servicer, are entering into the Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated of even date herewith (as such agreement may be amended, modified, restated or supplemented from time to time, the "Credit Agreement"), together with RFC Borrower LLC, as a borrower, ResCap, RFC and certain subsidiaries of ResCap, as guarantors, RFC, as administrator, originator, receivables custodian and servicer, the Lenders party thereto, Barclays Bank PLC, as administrative agent for the Secured Parties (together with its successors and assigns in such capacity, the "Administrative Agent"), Barclays Bank PLC, as Collateral Agent, and the other Persons party thereto from time to time.

D.      As a condition precedent to the Lenders entering into the Credit Agreement, the Required Documents relating to each Mortgage Loan must be delivered to and held by the Custodian for the benefit of the Collateral Agent and the Secured Parties until the security interest and Lien in such Mortgage Loan is released in accordance with the terms of the Collateral Documents.

E.      Pursuant to the Custodial Agreement, the Custodian has agreed to act as custodian/bailee for hire for the Collateral Agent with respect to the Mortgage Loans.

F.      Pursuant to the Borrowers Security Agreement, the GMACM Purchaser will pledge the Transferred Assets it purchases hereunder and all of its rights related to such Transferred Assets to the Collateral Agent for the benefit of the Secured Parties to secure the repayments of the Obligations under the Credit Documents.

G.      GMACM hereby wishes to sell and contribute to the GMACM Purchaser, and the GMACM Purchaser hereby wishes to acquire from GMACM certain Mortgage Loans and related assets owned by GMACM on the Closing Date.

H.      The execution, delivery and performance of this Agreement and the sale and contribution of the Mortgage Loans and related assets by GMACM to the GMACM Purchaser have been authorized and approved by the Interim Financing Order and, upon the entry thereof, the Final Financing Order.

I.      To supplement the Orders without in any way diminishing or limiting the effect of the Orders or the approval of such sale and assignment thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such sale and contribution.

## AGREEMENT

NOW, THEREFORE, in consideration of the above premises and of the mutual promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.    Definitions**.

This Agreement is entered into pursuant to the terms and conditions of the Credit Agreement.  Any capitalized term used but not defined herein shall have the meaning given to it in the Credit Agreement.

"Administrative Agent" has the meaning assigned to such term in the Recitals.

"Agreement" has the meaning assigned to such term in the Recitals.

"BMMZ" has the meaning assigned to such term in the Recitals.

"Borrowers Security Agreement" means the Debtor-in-Possession Security Agreement, dated as of the Closing Date, among the Borrowers, the Borrowers' REO Subsidiaries and the

2

Collateral Agent, as the same may be hereafter amended, amended and restated, supplemented or modified from time to time in accordance with the terms thereof and the terms of the Credit Agreement.

"Case" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which the GMACM Purchaser or GMACM, as applicable, is the debtor and the debtor-in-possession.

"Collateral Agent" means Barclays Bank PLC, as Collateral Agent under the Credit Agreement, together with its successors and assigns in such capacity.

"Conveyance" has the meaning assigned to such term in Section 2(a) of this Agreement.

"Conveyance Date" means the date of this Agreement.

"Credit Agreement" has the meaning assigned to such term in the Recitals.

"Custodial Agreement" means the Custodial Agreement, dated as of the date hereof, by and among the GMACM Purchaser, RFC Borrower LLC, the Collateral Agent and the Custodian, providing for the custody of Mortgage Files relating to the Mortgage Loans, as the same may be hereafter amended, amended and restated, supplemented and modified from time to time in accordance with the terms thereof and the terms of the Credit Agreement.

"Custodian" means Wells Fargo Bank, National Association or such other Person as may be appointed from time to time pursuant to the Custodial Agreement and who is reasonably acceptable to the Administrative Agent.

"Fannie Mae" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"Freddie Mac" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"GMACM Purchaser" has the meaning assigned to such term in the Recitals.

"GMACM" has the meaning assigned to such term in the Recitals.

"HELOC" means a home equity revolving line of credit secured by a mortgage, deed of trust or other instrument creating a second lien on the related Mortgaged Property, which lien secures the related line of credit.

"Ineligible Mortgage Loan" means a Mortgage Loan which does not constitute an Eligible Mortgage Loan under the Credit Agreement.

"Lien" means (a) any lien (statutory or other), mortgage, deed of trust, pledge, hypothecation, preference, participation interest, assignment, deposit arrangement, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing) and any option, trust or other preferential arrangement having the practical effect of

3

any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), and (c) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities; *provided*, *however*, that the lien created in favor of the Collateral Agent for the benefit of the Secured Parties under the Borrowers Security Agreement shall not be deemed to constitute a Lien for the purposes of this Agreement.

"Losses" has the meaning assigned to such term in Section 9 of this Agreement.

"Master Repurchase Agreement" has the meaning assigned to such term in the Recitals.

"Mortgage" means the mortgage, deed of trust or other instrument creating a lien on an estate in fee simple interest (including a leasehold estate) in real property securing a Mortgage Note.

"Mortgage Files" has the meaning assigned to such term in the Custodial Agreement.

"Mortgage Loan" means a first lien mortgage loan or second lien mortgage loan (including without limitation, an Adjustable Rate Mortgage Loan, HELOC or an Option ARM Mortgage Loan), which Custodian has been instructed to hold for the Collateral Agent pursuant to the Custodial Agreement, and which Mortgage Loan includes, without limitation, (i) a Mortgage Note, the related Mortgage and all other mortgage loan documents, (ii) all right, title and interest of GMACM in and to the Mortgaged Property covered by such Mortgage and (iii) with respect to each Servicing Retained Mortgage Loan, the related Servicing Rights.

"Mortgage Loan Schedules" means the schedule of Eligible Mortgage Loans, attached hereto at Attachment A, together with the schedule of Ineligible Mortgage Loans, attached hereto as Attachment B.

"Mortgagor" means the obligor or obligors on a Mortgage Note, including any Person who has assumed or guaranteed the obligations of the obligor thereunder.

"Mortgage Note" means either (i) an original promissory note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan or (ii) a copy of a promissory note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan accompanied by a duly executed lost note affidavit (containing customary indemnities).

"Option ARM Mortgage Loan" means an Adjustable Rate Mortgage Loan in respect of which the related Mortgage Note provides the Mortgagor with multiple monthly payment options.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"Purchase Price" has the meaning assigned to such term in Section 2(c) of this Agreement.

"Required Documents" has the meaning assigned to such term in the Custodial Agreement.

"ResCap" has the meaning assigned to such term in the Recitals.

"RFC" has the meaning assigned to such term in the Recitals.

"Servicing Retained Mortgage Loans" means those certain Mortgage Loans sold or proposed to be sold by GMACM to GMACM Purchaser which are serviced by GMACM.

"Servicing Rights" means contractual, possessory or other rights of GMACM to administer or service any Mortgage Loans (or to possess any Records relating thereto) including: (i) the rights to service the Mortgage Loans; (ii) the right to receive compensation (whether direct or indirect) for such servicing, including the right to receive and retain the related servicing fee and all other fees with respect to such Mortgage Loans; and (iii) all rights, powers and privileges incidental to the foregoing, together with all Records relating thereto.

"Transferred Assets" has the meaning assigned to such term in Section 2(a) of this Agreement.

**Section 2.    Sale and Contribution of Mortgage Loans**.

(a)    GMACM hereby sells, contributes, assigns, transfers, sets over and otherwise conveys to the GMACM Purchaser, and the GMACM Purchaser acquires from GMACM without recourse except as expressly provided in Section 5 and Section 9 hereof, all of its right, title and interest, whether now owned or hereafter acquired, wherever located, in, to and under the Mortgage Loans listed on the Mortgage Loan Schedules, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein, including all rights, claims or actions GMACM may have under any related servicing agreement, subservicing agreement or custodial agreement and all related accounts, and all proceeds (including "proceeds" as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions) (collectively, the "Transferred Assets") free and clear of all Liens. The actions described in this Section 2(a) shall collectively be referred to herein as the "Conveyance."

(b)    GMACM shall deliver or cause to be delivered to the Custodian all documents required to be delivered pursuant to Section 2 of the Custodial Agreement for each Mortgage Loan.

(c)    On the Conveyance Date, in consideration of the Conveyance to the GMACM Purchaser of the Transferred Assets, upon the terms and subject to the conditions set forth in this Agreement, the GMACM Purchaser has agreed to pay and deliver to GMACM or its designee aggregate consideration equal in value to the fair market value of such Transferred Asset, comprised of (x) a cash purchase price in an amount agreed between GMACM and the GMACM Purchaser plus (y) an increase in the capital contribution of GMACM in the GMACM Purchaser equal to the excess of the fair market value of such Transferred Asset over the cash purchase price paid therefore (the "Purchase Price"). The Conveyance shall occur immediately following the purchase, pursuant to the terms of the Master Repurchase Agreement, by GMACM

5

of the Mortgage Loans GMACM previously transferred to BMMZ, and the Conveyance shall take effect upon receipt of the Purchase Price by GMACM.

(d)      GMACM shall, at its own expense, on or prior to the date hereof, indicate in its books and records (including its computer files) that the Transferred Assets being transferred hereunder have been sold and contributed to the GMACM Purchaser in accordance with this Agreement.  GMACM shall not alter the indication referenced in this paragraph with respect to any Transferred Asset during the term of this Agreement and for so long as any Obligations remain outstanding under the Credit Documents or any Commitments under the Credit Agreement are in effect.  If a third party, including a potential purchaser of Mortgage Loans, should inquire, GMACM will promptly indicate that the Mortgage Loans have been sold, assigned and contributed and will claim no ownership interest therein.

(e)      GMACM agrees that all Transferred Assets transferred to the GMACM Purchaser hereunder shall comply with all the representations and warranties set forth in this Agreement.

**Section 3.    GMACM's Acknowledgment and Consent to Assignment**.

GMACM hereby acknowledges and consents to the grant set forth in the Borrowers Security Agreement and the Orders by the GMACM Purchaser to the Collateral Agent, for the benefit of the Secured Parties, of a First Priority Lien, upon and security interest in, the rights of the GMACM Purchaser under this Agreement, including, without limitation, the right to enforce the obligations of GMACM hereunder. GMACM acknowledges that each of the GMACM Purchaser and the Collateral Agent, for the benefit of the Secured Parties, shall be a third party beneficiary in respect of the representations, warranties, covenants, rights and benefits arising hereunder that are subject to such grant by the GMACM Purchaser.

GMACM hereby irrevocably constitutes and appoints the GMACM Purchaser and the Collateral Agent and any officer or agent thereof (and all other Persons designated by the Collateral Agent), with full power of substitution, as GMACM's true and lawful attorney-in-fact (and agent-in-fact) with full irrevocable power and authority in the place and stead of GMACM and in the name of GMACM or in its own name, from time to time in the GMACM Purchaser's or the Collateral Agent's discretion, as applicable, for the purpose of carrying out the terms of this Agreement, to, upon authorization by the Bankruptcy Court, take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created under the Borrowers Security Agreement and the Orders are released.  The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Transferred Assets and the interests of the Secured Parties and shall not impose any duty upon it to exercise any such powers.

**Section 4.    Representations, Warranties and Certain Covenants**.

GMACM hereby makes the following representations and warranties for the benefit of the GMACM Purchaser and its assignees, on which the GMACM Purchaser is relying in

accepting the Transferred Assets, executing this Agreement and performing its obligations hereunder.  The representations and warranties in this Section 4 are made as of the Conveyance Date.  Such representations and warranties shall survive the execution and delivery of this Agreement and the transfer, sale, contribution and assignment of any Transferred Asset to the GMACM Purchaser hereunder and are as follows:

(a)     General Representations, Warranties and Covenants of GMACM.

(1)     *Organization and Good Standing*. GMACM is an entity duly formed, validly existing and in good standing under the laws of the State of Delaware and is or will be in compliance with the laws of each state in which any Mortgaged Property underlying or securing any Mortgage Loan is located to the extent necessary to ensure the enforceability of each Mortgage Loan.

(2)     *Power and Authority; Binding Obligation*. Subject to entry of the Interim Financing Order, GMACM has the power and authority to make, execute, deliver and perform its obligations under this Agreement and all of the transactions contemplated under this Agreement and each Credit Document, and has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement; subject to entry of the Interim Financing Order, this Agreement constitutes a legal, valid and binding obligation of GMACM, enforceable against GMACM in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity) or by public policy with respect to indemnification under applicable securities laws.

(3)     *No Violation*. Subject to entry of the Interim Financing Order, the execution and delivery of this Agreement by GMACM and its performance and compliance with the terms of this Agreement will not violate (A) GMACM's organizational documents or (B) constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which GMACM is a party or which may be applicable to GMACM or any of its assets or (C) violate any statute, ordinance or law or any rule, regulation, order, writ, injunction or decree of any court or of any public, governmental or regulatory body, agency or authority applicable to GMACM or its properties.

(4)     *No Proceedings*.  Except for the commencement of the Cases, no litigation before any court, tribunal or governmental body is currently pending, nor to the knowledge of GMACM is threatened against GMACM, nor is there any such litigation currently pending, nor to the knowledge of GMACM threatened against GMACM with respect to this Agreement or any of the Transferred Assets that should reasonably be expected to result in a material adverse effect on the transactions contemplated by this Agreement.

7

(5)      *No Consents Required*.  Subject to entry of the Interim Financing Order, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by GMACM of or compliance by GMACM with this Agreement, the sale and contribution of the Transferred Assets or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained and are in full force and effect as of the date hereof.

(6)      *Information*.  No written statement, report or other document furnished or to be furnished pursuant to this Agreement contains or will contain any statement that is or will be inaccurate or misleading in any material respect. There are no facts relating to and known by GMACM which when taken as a whole may impair the ability of GMACM to perform its obligations under this Agreement or any other Credit Document, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of GMACM pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(7)      *Default*.  Except to the extent resulting from the commencement of its Case, GMACM is not in default with respect to any material contract, default under which should reasonably be expected to have a material adverse effect on GMACM's ability to perform its obligations under this Agreement, or with respect to any order of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the transactions contemplated hereunder, and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such contract, or with respect to any such order of any court, administrative agency, arbitrator or governmental body.

(8)      *Fannie and Freddie Approved*. GMACM is an approved seller/servicer of residential mortgage loans for Fannie Mae and Freddie Mac, and GMACM is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae and Freddie Mac and, except to the extent resulting from the commencement of its Case, no event has occurred which would make GMACM unable to comply with eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac.

(b)      Representations, Warranties and Covenants Concerning the Mortgage Loans.

(1)      GMACM represents and warrants that each Mortgage Loan designated as an Eligible Mortgage Loan on Attachment A hereto is an Eligible Mortgage Loan as of the Conveyance Date.

(2)      GMACM covenants and agrees from the date hereof to the date this Agreement is terminated, that it shall perform all covenants in Articles V and VI of the Credit Agreement to the extent such covenants relate to the Transferred Assets.

8

(c)    Survival. It is understood and agreed that this Section 4 shall survive Conveyance of the Transferred Assets to the GMACM Purchaser.

**Section 5.    Notice of Breach**.

(a)    GMACM shall inform the GMACM Purchaser and the Collateral Agent promptly, in writing, upon the discovery that any of GMACM's representations, warranties or covenants in Section 4 above that pertain to a Mortgage Loan were breached or untrue as of the Conveyance Date.  The breach of any representation, warranty or covenant shall not be waived by the GMACM Purchaser under any circumstances without the prior written consent of the Collateral Agent.

(b)    The GMACM Purchaser hereby designates the Collateral Agent as its designee for purposes of this Section 5 and any other notice required under this Agreement.

(c)    Survival. It is understood and agreed that this Section 5 shall survive the Conveyance of the Transferred Assets to the GMACM Purchaser.

**Section 6.    Termination**.

This Agreement (a) shall continue and may not be terminated until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated and (b) may be terminated at any time thereafter by either party upon written notice to the other party.

**Section 7.    General Covenants of GMACM**.

GMACM covenants and agrees that from the date of this Agreement until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated:

(a)    *Legal Existence*.  GMACM shall do or cause to be done all things necessary on its part to preserve and keep in full force and effect its legal existence, and to maintain each of its licenses, approvals, registrations and qualifications in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such licenses, approvals, registrations or qualifications, except for failures to maintain any such licenses, approvals, registrations or qualifications which, individually or in the aggregate, would not have a material adverse effect on the ability of GMACM or the GMACM Purchaser to perform its obligations hereunder or under any of the other Credit Documents.

(b)    *Compliance With Laws*.  GMACM shall comply in all material respects with all laws, rules, regulations and orders of any governmental authority applicable to its operation, the noncompliance with which would have a material adverse effect on the ability of GMACM or the GMACM Purchaser to perform their obligations hereunder or under any of the other Credit Documents.

(c)    *Taxes*.  GMACM shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon GMACM or upon its income and profits, or upon

any of its property or any part thereof, before the same shall become in default if the failure to pay such taxes should reasonably be expected to have a material adverse effect on the value of the Transferred Assets or on GMACM's ability to perform its obligations under this Agreement; provided that GMACM shall not be required to pay and discharge any such tax, assessment, charge or levy so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.  GMACM shall have set aside on its books adequate reserves with respect to any such tax, assessment, charge or levy so contested, for so long as the failure to pay any such tax, assessment, charge or levy would not have a material adverse effect on the ability of GMACM to perform its obligations hereunder.

(d)    *Separate Identity*.  GMACM hereby covenants and agrees to take all actions necessary to maintain the GMACM Purchaser's status as a separate legal entity. GMACM shall conduct its business solely in its own name and all written and oral communications of GMACM shall be made solely in the name of GMACM.  GMACM views the GMACM Purchaser as a separate legal entity.

(e)    *No Liens, Etc. Against Transferred Assets*.  GMACM hereby covenants that it will not sell, pledge, assign or transfer the Transferred Assets to any other Person, or grant, create, incur or assume any Lien on any of the Transferred Assets, or any interest therein. GMACM shall notify the GMACM Purchaser and the Collateral Agent and their designees of the existence of any Lien (other than as provided herein) on any Transferred Asset immediately upon discovery thereof; and GMACM shall defend the right, title and interest of the GMACM Purchaser and the Collateral Agent and their assignees in, to and under the Transferred Assets against all claims of third parties claiming through or under GMACM; *provided*, *however*, that nothing in this Section 7 shall be deemed to apply to any Liens for municipal or other local taxes and other governmental charges if such taxes or governmental charges shall not at the time be due and payable or if GMACM shall currently be contesting the validity thereof in good faith by appropriate proceedings to the extent the same would not constitute an Event of Default under the Credit Agreement.   GMACM shall take all actions as may be necessary to ensure that the ownership of the Mortgage Loans is conveyed to the GMACM Purchaser pursuant to this Agreement.

(f)    *Keeping of Records and Books of Account*.  GMACM shall maintain accurate, complete and correct documents, books, records and other information which is reasonably necessary for the collection of all Transferred Assets (including, without limitation, records adequate to permit the prompt identification of each new Mortgage Loan and all collections of, and adjustments to, each existing Mortgage Loan).

(g)    *Taking of Necessary Actions*. GMACM shall perform all actions necessary to sell, contribute and absolutely assign the Transferred Assets to the GMACM Purchaser and its assigns, including the Collateral Agent, including, without limitation, any necessary notifications to other parties.

### Section 8.    Intent of Parties.

The parties hereto intend that the Conveyance hereunder shall constitute an absolute sale and contribution, conveying good title free and clear of any liens, claims, encumbrances or rights

of others, from GMACM to the GMACM Purchaser.  It is the intention of the parties hereto that the arrangements with respect to the Transferred Assets shall constitute a sale and contribution of such Transferred Assets and not a loan, including for accounting purposes.

**Section 9.   Indemnity**.

GMACM agrees to indemnify the GMACM Purchaser against and hold the GMACM Purchaser harmless from any and all liabilities, losses, claims, damages, judgments and reasonable costs and expenses actually incurred by the GMACM Purchaser (including reasonable attorneys' fees and expenses) (collectively, "Losses") arising in connection with, or relating to, the Master Repurchase Agreement and this Agreement; provided, that such indemnity shall not be available to the extent that such Losses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the GMACM Purchaser.

**Section 10.   Miscellaneous**.

(a)    *Amendment*. This Agreement may not be amended except by an instrument in writing signed by GMACM and the GMACM Purchaser.  In addition, this Agreement constitutes a Credit Document and, so long as the Credit Agreement remains in effect, this Agreement may not be amended except in accordance with Section 12.05 of the Credit Agreement.

(b)    *Binding Nature; Assignment*. The covenants, agreements, rights and obligations contained in this Agreement shall be binding upon the successors and assigns of GMACM and shall inure to the benefit of the successors and assigns of the GMACM Purchaser, and all Persons claiming by, through or under the GMACM Purchaser.

(c)    *Entire Agreement*. This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

(d)    *Severability of Provisions*. If any provision in or obligation under this Agreement is held to be illegal, invalid or unenforceable in any jurisdiction, (a) the legality, validity and enforceability of the remaining provisions in or obligations under this Agreement, or of such provision in or obligation under this Agreement in any other jurisdiction, shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(e)    *Governing Law*. **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR**

**TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

(f)     *Jurisdiction; Etc.*

(1)     <u>Jurisdiction</u>.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AGAINST ANY OTHER PARTY HERETO, IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS RELATING HERETO, IN A FORUM OTHER THAN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(2)     <u>Waiver of Venue</u>.     Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in Section 10(f)(1). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(3)     <u>Service of Process</u>.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10(l).  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

(g)     ***Waiver of Jury Trial***.  **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED**

**HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

(h)     *Counterparts*. This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart. Any counterpart hereof signed by a party against whom enforcement of this Agreement is sought shall be admissible into evidence as an original hereof to prove the contents thereof.

(i)     *Indulgences; No Waivers*. Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or future exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(j)     *Headings Not to Affect Interpretation*. The headings contained in this Agreement are for convenience of reference only, and they shall not be used in the interpretation hereof.

(k)     *Benefits of Agreement*. Nothing in this Agreement, express or implied, shall give to any Person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement; provided, that the Collateral Agent, acting for the benefit of the Secured Parties, and the Administrative Agent shall be express third-party beneficiaries of this Agreement.

(l)     *Notices*.     Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any party, addressed to it at its address set forth in the Credit Agreement, or at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.

(m)     *Inconsistency*.     In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in the Credit Agreement and/or the Orders, the terms and provisions of the Credit Agreement and/or the Orders shall supersede and control the terms and provisions of this Agreement.

(n)     *Expenses*.     Without limiting any party's obligations under the Credit Documents, the Interim Financing Order or the Final Financing Order, the parties hereto agree to promptly pay or reimburse all out-of-pocket costs and expenses incurred by Collateral Agent

13

(including the fees, charges and disbursements of any counsel for Collateral Agent) (a) in connection with the enforcement or protection of any rights and remedies under this Agreement, including all such costs and expenses incurred during any legal proceeding, including the Cases and any other proceeding under any Debtor Relief Law, (b) in connection with protecting the Transferred Assets and (c) creating, perfecting, maintaining and enforcing the Collateral Agent's Liens on the Transferred Assets under the Borrowers Security Agreement and the Orders.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**GMAC MORTGAGE, LLC**, as Seller

By: _____

Name:

Title:

**GMACM BORROWER LLC**, as
Purchaser

By: _____
    Name:
    Title:

Acknowledged and Agreed:

**BARCLAYS BANK PLC**, as Collateral Agent

By: _____
    Name:
    Title:

<u>Attachment A</u>

ELIGIBLE MORTGAGE LOANS

[Please see attached]

<u>Attachment B</u>

INELIGIBLE MORTGAGE LOANS


None

Execution Version

GMACM RECEIVABLES POOLING AND PURCHASE AGREEMENT

by and between

GMAC MORTGAGE, LLC

(Originator and Servicer)

and

GMACM BORROWER LLC

(GMACM Purchaser)

Dated as of May 15, 2012

# TABLE OF CONTENTS

**Page**

Section 1.    Definitions. .......................................................................................................... 2
Section 2.    Transfer and Assignment of Receivables. .......................................................... 3
Section 3.    Originator's Acknowledgment and Consent to Assignment. .............................. 3
Section 4.    Representations, Warranties and Certain Covenants of Originator. ................... 4
Section 5.    Notice of Breach of Representations and Warranties. ........................................ 7
Section 6.    Termination.......................................................................................................... 7
Section 7.    General Covenants of Originator. ....................................................................... 7
Section 8.    Intent of Parties.................................................................................................. 8
Section 9.    Miscellaneous. .................................................................................................... 8

Attachment A    Designated Servicing Agreement Schedule

Attachment B    Schedule of Receivables

Attachment C    Form of MBS Trustee Notice

## GMACM RECEIVABLES POOLING AND PURCHASE AGREEMENT

This GMACM RECEIVABLES POOLING AND PURCHASE AGREEMENT (this "Agreement")
is made as of May 15, 2012, by and between GMAC MORTGAGE, LLC, a Delaware limited liability company and
a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (together with any
successors, "GMACM" or the "Servicer" or the "Originator") and GMACM BORROWER LLC, a Delaware limited
liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code
(together with any successors, the "GMACM Purchaser").

## RECITALS

(A)    The GMACM Purchaser is a special purpose company wholly owned by GMACM.  Pursuant to
certain pooling and servicing agreements, sale and servicing agreements, servicing agreements, subservicing
agreements or similar agreements (each a "Servicing Agreement"), GMACM services pools of mortgage loans,
including revolving home equity lines of credit (collectively, "Loans") for and on behalf of various MBS Trusts.
Certain of the Servicing Agreements will be designated as described herein for inclusion under this Agreement.

(B)    Pursuant to each Designated Servicing Agreement, GMACM, as servicer (in such capacity, the
"Servicer") will make certain Advances from time to time for the benefit of the related MBS Trust.  Upon making
each Advance, the Servicer becomes the beneficiary of a contractual right to be reimbursed for such Advance in
accordance with the terms of the related Servicing Agreement.  GMACM, in its capacity as originator of the right to
be reimbursed for Advances is referred to herein as the "Originator."

(C)    On May 14, 2012, GMACM and Residential Funding Company, LLC filed voluntary petitions
with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have
continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and
1108 of the Bankruptcy Code;

(D)    The GMACM Purchaser, as a borrower, and GMACM, as a guarantor, administrator, originator,
receivables custodian and servicer, are entering into the Superpriority Debtor-in-Possession Credit and Guaranty
Agreement, dated of even date herewith (as such agreement may be amended, modified, restated or supplemented
from time to time, the "Credit Agreement"), together with RFC Borrower LLC, as a borrower, Residential Capital,
LLC, GMACM and certain subsidiaries of Residential Capital, LLC, as guarantors, GMACM, as administrator,
originator, receivables custodian, servicer and GMACM servicer, the Lenders party thereto, Barclays Bank PLC, as
administrative agent (the "Administrative Agent") and as collateral agent (the "Collateral Agent"), and the other
Persons party thereto from time to time.

(E)    Pursuant to the Borrowers Security Agreement (as defined herein), the GMACM Purchaser will
pledge the Receivables it purchases hereunder and all of its rights related to such Receivables to the Collateral Agent
for the benefit of the Secured Parties to secure the repayment of the Obligations under the Credit Documents.

(F)    The execution, delivery and performance of this Agreement and the sale and assignment of the
Receivables by the Originator to the GMACM Purchaser have been authorized and approved by the Interim
Financing Order and, upon the entry thereof, the Final Financing Order.

(G)    To supplement the Orders without in any way diminishing or limiting the effect of the Orders or
the approval of such sale and assignment thereunder, the parties hereto desire to more fully set forth their respective
rights in connection with such sale and assignment.

## AGREEMENT

NOW, THEREFORE, in consideration of the above premises and of the mutual promises
hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### Section 1.        Definitions.

This Agreement is entered into pursuant to the terms and conditions of the Credit Agreement. Any capitalized term used but not defined herein shall have the meaning given to it in the Credit Agreement.

"<u>Administrative Agent</u>" has the meaning assigned to that term in the Recitals.

"<u>Agreement</u>" has the meaning assigned to that term in the Recitals.

"<u>Borrowers Security Agreement</u>" means the Pledge and Security Agreement, dated as of May 15, 2012 among the GMACM Purchaser, RFC Borrower LLC and the Collateral Agent, as the same may be hereafter amended and supplemented from time to time.

"<u>Case</u>" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which the GMACM Purchaser or the Originator, as applicable, is the debtor and the debtor-in-possession.

"<u>Collateral Agent</u>" has the meaning assigned to that term in the Recitals.

"<u>Credit Agreement</u>" has the meaning assigned to that term in the Recitals.

"<u>Designated Servicing Agreement Schedule</u>" has the meaning assigned to such term in Section 2(b) of this Agreement.

"<u>Designated Servicing Agreements</u>" means the Servicing Agreements listed on the Designated Servicing Agreement Schedule.

"<u>GMACM</u>" has the meaning assigned to that term in the Recitals.

"<u>GMACM Purchaser</u>" has the meaning assigned to that term in the Recitals.

"<u>Lien</u>" means (a) any lien (statutory or other), mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, right of set-off or recoupment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, title retention agreement, or any financing lease having substantially the same economic effect as any of the foregoing), and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities; provided, however, that the lien created in favor of the Collateral Agent for the benefit of the Secured Parties under the Borrowers Security Agreement shall not be deemed to constitute a Lien.

"<u>Originator</u>" has the meaning assigned to that term in the Recitals.

"<u>Receivables</u>" means contractual rights to reimbursement pursuant to the terms of Designated Servicing Agreements for Advances made by the Originator as Servicer pursuant to such Designated Servicing Agreements from time to time on and after the date of this Agreement, which Advances have not previously been reimbursed, including all rights of the Servicer to enforce payment of each such obligation under the related Designated Servicing Agreement.

"<u>Sale Date</u>" means the date on which any Receivable is sold, assigned, transferred, conveyed and contributed by the Originator to the GMACM Purchaser pursuant to the terms of this Agreement.

"<u>Schedule of Receivables</u>" means the schedule attached hereto as Attachment B.

"<u>Servicer</u>" has the meaning assigned to that term in the Recitals.

"<u>Servicing Agreement</u>" has the meaning assigned to that term in the Recitals.

2

"Transferred Assets" has the meaning assigned to that term in Section 2(a) of this Agreement.

**Section 2.**          **Transfer and Assignment of Receivables.**

(a)          Commencing on the date hereof and ending on the Receivables Sale Termination Date, the Originator shall sell, assign, transfer, set over and otherwise convey and contribute to the GMACM Purchaser, and the GMACM Purchaser shall acquire from the Originator without recourse all of its right, title and interest, whether now owned or hereafter acquired, in, to and under (1) the Receivables existing on the related Sale Date, and (2) all monies due or to become due and all amounts received or receivable with respect to each such Receivable and all proceeds (including "proceeds" as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions (collectively, the "Transferred Assets").  Until the Receivables Sale Termination Date, the Originator shall continue, automatically and without any further action on its part, to sell to the GMACM Purchaser, the Transferred Assets with respect to any Servicing Agreement that is a Designated Servicing Agreement, and the GMACM Purchaser shall accept such Transferred Assets.

In consideration of the sale, assignment, transfer, set-over and conveyance and contribution to the GMACM Purchaser of the Transferred Assets from time to time upon the terms and subject to the conditions set forth in this Agreement, the GMACM Purchaser agrees to pay and deliver to the Originator or its designee (it being understood that no cash purchase price will be paid for a Receivable until at least 24 hours after its creation) aggregate consideration equal in value to the fair market value of such Receivable, comprised of (i) in the case of the Eligible Receivables, (x) a cash purchase price in an amount agreed upon between the Originator and the GMACM Purchaser plus (y) an increase in the capital contribution of the Originator in the GMACM Purchaser equal to the excess of the fair market value of such Receivable over the cash purchase price paid therefore, and (ii) in the case of Receivables that do not qualify as Eligible Receivables, an increase in the capital contribution of the Originator in the GMAMC Purchaser equal to the fair market value of such Receivable.  The limited liability company membership interests of the GMACM Purchaser that were previously issued to the Originator in connection with the formation of the GMACM Purchaser represent all of the economic interest in the GMACM Purchaser (subject to the GMACM Purchaser's obligations under the Credit Agreement and the other Credit Documents).

(b)          The Designated Servicing Agreements under which the Receivables being transferred under this Agreement will be originated are listed on Attachment A hereto, which is referred to herein as the "Designated Servicing Agreement Schedule."

(c)          The Originator shall, at its own expense, on or prior to the date hereof, indicate in its books and records (including its computer files) that the Receivables and the related Transferred Assets being transferred hereunder have been sold to the GMACM Purchaser in accordance with this Agreement.  The Originator shall not alter the indication referenced in this paragraph with respect to any Designated Servicing Agreement during the term of this Agreement and for so long as any Obligations remain outstanding under the Credit Documents or any Commitments under the Credit Agreement are in effect.  If a third party, including a potential purchaser of Receivables, should inquire, the Originator will promptly indicate that the Receivables have been sold, assigned and contributed and will claim no ownership interest therein.

(d)          The Originator agrees to deliver a Schedule of Receivables on each Sale Date which indicates whether such Receivable is an Eligible Receivable that complies with all of the representations and warranties set forth in Section 4(b) of this Agreement, or whether such Receivable does not qualify as an Eligible Receivable.

**Section 3.**          **Originator's Acknowledgment and Consent to Assignment.**

The Originator hereby acknowledges that the GMACM Purchaser is granting to the Collateral Agent, for the benefit of the Secured Parties, a First Priority Lien upon, and security interest in, the rights of the GMACM Purchaser under this Agreement, including, without limitation, the right to enforce the obligations of the Originator hereunder (including the Originator's rights with respect to the Transferred Assets which are being assigned to the GMACM Purchaser pursuant to this Agreement).  The Originator hereby consents to such grant by the GMACM Purchaser to the Collateral Agent pursuant to the Borrowers Security Agreement and the Orders.  The Originator acknowledges that each of the Administrative Agent and the Collateral Agent, for the benefit of the

3

Secured Parties, shall be a third party beneficiary in respect of the representations, warranties, covenants, rights and benefits arising hereunder that are subject to such grant by the GMACM Purchaser.

The Originator hereby irrevocably constitutes and appoints the GMACM Purchaser and the Collateral Agent and any officer or agent thereof (and all other Persons designated by the Collateral Agent), with full power of substitution, as the Originator's true and lawful attorney-in-fact (and agent-in-fact) with full irrevocable power and authority in the place and stead of the Originator and in the name of the Originator or in its own name, from time to time in the GMACM Purchaser's or the Collateral Agent's discretion, as applicable, for the purpose of carrying out the terms of this Agreement, to, upon authorization by the Bankruptcy Court, take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement, including to enforce the Originator's rights to or collect under the Receivables. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created under the Borrowers Security Agreement and the Orders are released. The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Transferred Assets and the interests of the Secured Parties and shall not impose any duty upon it to exercise any such powers.

**Section 4.      Representations, Warranties and Certain Covenants of Originator.**

The Originator hereby makes the following representations and warranties for the benefit of the GMACM Purchaser and its assignees, on which the GMACM Purchaser is relying in accepting Receivables on each Sale Date and executing this Agreement. The representations and warranties in clause (a) of this Section 4 are made as of the date of this Agreement and as of each Sale Date. The representations and warranties in clause (b) of this Section 4 are made as to each Receivable that is designated as an Eligible Receivable on the Schedule of Receivables and such representations and warranties are made on and as of the applicable Sale Date for each such Eligible Receivable. The Originator does not make any representations herein with respect to the Receivables that are not designated as being Eligible Receivables on the Schedule of Receivables. The representations and warranties in clause (a) of this Section 4 shall survive the transfer, sale, assignment and contribution of any Receivables to the GMACM Purchaser and the representations and warranties in clause (b) of this Section 4 survive the transfer, sale, assignment and contribution of any Eligible Receivables to the RFC Purchaser, and are as follows:

(a)      General Representations, Warranties and Covenants of the Originator.

(1)      *Organization and Good Standing.* The Originator is an entity duly organized, validly existing and in good standing under the laws of the State of Delaware and is or will be in compliance with the laws of each state in which any mortgaged property underlying or securing any Loan is located to the extent necessary to ensure the enforceability of each Loan serviced under a Designated Servicing Agreement.

(2)      *Power and Authority; Binding Obligation.* Subject to entry of the Interim Financing Order. the Originator has the power and authority to make, execute, deliver and perform its obligations under this Agreement and all of the transactions contemplated under this Agreement and each Credit Document, and has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement; subject to entry of the Interim Financing Order, this Agreement constitutes a legal, valid and binding obligation of the Originator, enforceable against the Originator in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity) or by public policy with respect to indemnification under applicable securities laws.

(3)      *No Violation.* Subject to entry of the Interim Financing Order, the execution and delivery of this Agreement by the Originator and its performance and compliance with the terms of this Agreement will not violate (A) the Originator's organizational documents or (B) constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the

4

Originator is a party or which may be applicable to the Originator or any of its assets or (C) violate any statute, ordinance or law or any rule, regulation, order, writ, injunction or decree of any court or of any public, governmental or regulatory body, agency or authority applicable to the Originator or its properties.

(4)     *No Proceedings*.   Except for the commencement of the Cases, no litigation before any court, tribunal or governmental body is currently pending, nor to the knowledge of the Originator is threatened against the Originator, nor is there any such litigation currently pending, nor to the knowledge of the Originator threatened against the Originator with respect to this Agreement that should reasonably be expected to result in a material adverse effect on the transactions contemplated by this Agreement.

(5)     *No Consents Required*.   Subject to entry of the Interim Financing Order, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Originator of or compliance by the Originator with this Agreement, the sale of the Transferred Assets or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained and are in full force and effect as of the date hereof.

(6)     *Information*.   No written statement, report or other document furnished or to be furnished pursuant to this Agreement contains or will contain any statement that is or will be inaccurate or misleading in any material respect. There are no facts relating to and known by the Originator which when taken as a whole may impair the ability of the Originator to perform its obligations under this Agreement or any other Credit Document, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of the Originator pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(7)     *Default*.   Except to the extent resulting from the commencement of its Case, the Originator is not in default with respect to any material contract, default under which should reasonably be expected to have a material adverse effect on the Originator's ability to perform its obligations under this Agreement, or with respect to any order of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the transactions contemplated hereunder, and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such contract, or with respect to any such order of any court, administrative agency, arbitrator or governmental body, nor is GMACM, as Servicer, in default, nor has GMACM, as Servicer, received any notice of termination as Servicer under any Designated Servicing Agreement.

(8)     *Fannie and Freddie Approved*.   The Originator is an approved seller/servicer of residential mortgage loans for Fannie Mae and Freddie Mac, and the Originator is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae and Freddie Mac and except to the extent resulting from the commencement of its Case, no event has occurred which would make the Originator unable to comply with eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac.

(b)     Representations; Warranties and Covenants Concerning the Eligible Receivables.

(1)     *Eligible Receivables*.   Each Receivable that is designated on the Schedule of Receivables as an Eligible Receivable is payable in United States dollars and has been created pursuant to a Designated Servicing Agreement that is an Eligible Servicing Agreement, in accordance with the terms of such Designated Servicing Agreement and with the customary procedures and in the ordinary course of business of the Servicer and is being sold, assigned, transferred, conveyed and contributed by the Originator to the GMACM Purchaser pursuant to this Agreement. Each Eligible Receivable arises from an Advance for which the Originator is entitled to reimbursement pursuant to a Designated Servicing Agreement.

(2)     *Assignment Permitted under Servicing Agreements*.   The rights to reimbursement for the Advances under each Designated Servicing Agreement were eligible for assignment

5

and such assignment did not, and will not, violate the terms or require any consent under the related Designated Servicing Agreement or any other document or agreement to which the Originator is a party or to which its assets or properties are subject.

(3)     *Schedule of Receivables*.   The information set forth in the Schedule of Receivables attached as Attachment B hereto is true and correct with respect to the Eligible Receivables being transferred on the applicable Sale Date.

(4)     *Title to Receivables*.   Immediately prior to the transfer and assignment to the GMACM Purchaser as contemplated hereunder, the Originator had good and marketable title to each Eligible Receivable, free and clear of all Liens and rights of others.

(5)     *No Impairment of GMACM Purchaser's Rights*.   Neither the Originator nor any other Person has taken any action that, or failed to take any action the omission of which, would materially impair the rights of the GMACM Purchaser and its assignees with respect to the Eligible Receivables, or on the collectibility of such Eligible Receivables.

(6)     *No Defenses*.   Each Eligible Receivable represents valid entitlement to be paid, has not been repaid in whole or in part or been compromised, adjusted, extended, satisfied, subordinated, rescinded, waived, amended or modified, and is not subject to compromise, adjustment, extension, satisfaction, subordination, rescission, set-off, counterclaim, defense, waiver, amendment or modification by any Person.

(7)     *No Government Receivables*. No Eligible Receivable is due from the United States of America or any state or from any agency, department or instrumentality of the United States of America or any state.

(8)     *No Pending Proceedings*. There are no proceedings pending, or, to the best of the Originator's knowledge, threatened, wherein any governmental agency has (A) alleged that any Eligible Receivable is illegal or unenforceable, (B) asserted the invalidity of any Eligible Receivable or (C) sought any determination or ruling that might adversely affect the payment or enforceability of any Eligible Receivable.

(9)     *Originator's Reporting Obligations*.   With respect to each Eligible Receivable, the Originator is not aware of any respect in which the Originator may be unable to perform its reporting obligations as set forth herein.

(10)     *UCC Classification*.   No Eligible Receivable is secured by "real property" or "fixtures" or evidenced by an "instrument" under and as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions.  The Eligible Receivables constitute "general intangibles" or "accounts" within the meaning of the applicable Uniform Commercial Code in effect from time to time in the relevant jurisdiction.

(11)     *Enforceability; Compliance with Laws*.   Each Eligible Receivable is enforceable in accordance with its terms set forth in the related Designated Servicing Agreement.  Each Advance with respect to an Eligible Receivable, when made, complied with all applicable laws, including those relating to consumer protection, is valid and enforceable and is not subject to any set-off, counterclaim or other defense to payment by the Obligor, the related MBS Trust, MBS Trustee or any other Person.

(12)     *No Consent Required*.   Each Eligible Receivable is assignable by the Originator and their successors and assigns, without the consent of any other Person (except any such consent that has been obtained and is in full force and effect as of the date hereof).

6

(13)    *No Conflicting Assignment*.  Other than the ownership interest transferred to the GMACM Purchaser and its assignees pursuant to this Agreement, the Originator has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Eligible Receivables.

(14)    *Ownership of Eligible Receivables*.  Each Eligible Receivable created under the Designated Servicing Agreements set forth in the Designated Servicing Agreements Schedule is owned by the Originator.

**Section 5.    Notice of Breach of Representations and Warranties.**

The Originator shall inform the GMACM Purchaser and the Collateral Agent promptly, in writing, upon the discovery of any of the Originator's representations and warranties in Section 4 above that pertain to an Eligible Receivable were breached or untrue as of the applicable Sale Date.  The breach of any representation and warranty shall not be waived by the GMACM Purchaser under any circumstances without the prior written consent of the Collateral Agent.  The GMACM Purchaser hereby designates the Collateral Agent as its designee for purposes of this Section 5 and any other notice required under this Agreement.

**Section 6.    Termination.**

This Agreement (a) shall continue and may not be terminated until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated and (b) may be terminated at any time thereafter by either party upon written notice to the other party.

**Section 7.    General Covenants of Originator.**

The Originator covenants and agrees that from the date of this Agreement until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated:

(a)    *Legal Existence*.  The Originator shall do or cause to be done all things necessary on its part to preserve and keep in full force and effect its legal existence, and to maintain each of its licenses, approvals, registrations and qualifications in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such licenses, approvals, registrations or qualifications, except for failures to maintain any such licenses, approvals, registrations or qualifications which, individually or in the aggregate, would not have a material adverse effect on the ability of the Originator or the GMACM Purchaser to perform its obligations hereunder or under any of the other Credit Documents.

(b)    *Compliance With Laws*.  The Originator shall comply in all material respects with all laws, rules, regulations and orders of any governmental authority applicable to its operation, the noncompliance with which would have a material adverse effect on the ability of the Originator or the GMACM Purchaser to perform their obligations hereunder or under any of the other Credit Documents.

(c)    *Taxes*.  The Originator shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon the Originator or upon its income and profits, or upon any of its property or any part thereof, before the same shall become in default, if the failure to pay such taxes should reasonably be expected to have a material adverse effect on the value of the Receivables or on the Originator's ability to perform its obligations under this Agreement; *provided* that the Originator shall not be required to pay and discharge any such tax, assessment, charge or levy so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.  The Originator shall have set aside on its books adequate reserves with respect to any such tax, assessment, charge or levy so contested, or so long as the failure to pay any such tax, assessment, charge or levy would not have a material adverse effect on the ability of the Originator to perform its obligations hereunder or the Servicer's ability to perform its obligations under the Designated Servicing Agreements.

(d)    *Separate Identity*.  The Originator hereby covenants and agrees to take all actions necessary to maintain the GMACM Purchaser's status as a separate legal entity.  The Originator shall conduct its

business solely in its own name and all written and oral communications of the Originator shall be made solely in the name of the Originator. The Originator views the GMACM Purchaser as a separate legal entity.

(e)     *No Liens, Etc. Against Transferred Assets.*  The Originator hereby covenants that it will not sell, pledge, assign or transfer to any other Person, or grant, create, incur or assume any Lien on any of the Receivables, or any interest therein. The Originator shall notify the GMACM Purchaser and the Collateral Agent and their designees of the existence of any Lien (other than as provided above) on any Receivable immediately upon discovery thereof; and the Originator shall defend the right, title and interest of the GMACM Purchaser and the Collateral Agent and their assignees in, to and under the Receivables against all claims of third parties claiming through or under the Originator; *provided, however*, that nothing in this Section 7 shall be deemed to apply to any Liens for municipal or other local taxes and other governmental charges if such taxes or governmental charges shall not at the time be due and payable or if the Originator shall currently be contesting the validity thereof in good faith by appropriate proceedings to the extent the same would not constitute an Event of Default under the Credit Agreement. The Originator shall take all actions as may be necessary to ensure that the ownership of the Receivables is conveyed to the GMACM Purchaser pursuant to this Agreement.

(f)     *Keeping of Records and Books of Account.*  The Originator shall maintain accurate, complete and correct documents, books, records and other information which is reasonably necessary for the collection of all Receivables (including, without limitation, records adequate to permit the prompt identification of each new Receivable and all collections of, and adjustments to, each existing Receivable).

(g)     *Taking of Necessary Actions.*  The Originator shall perform all actions necessary to sell, contribute and absolutely assign the Receivables and other Transferred Assets to the GMACM Purchaser and its assigns, including the Collateral Agent, including, without limitation, any necessary notifications of the transfers occurring hereunder to any parties. The Originator shall deliver, prior to, or promptly following, the date of this Agreement, a notice substantially in the form attached hereto as <u>Attachment C</u> to the applicable MBS Trustee for each of the Designated Servicing Agreements.

**Section 8.      Intent of Parties.**

The parties hereto intend that the conveyance of the Originator's right, title and interest in and to the Transferred Assets shall constitute an absolute sale, conveying good title free and clear of any liens, claims, encumbrances or rights of others, from the Originator to the GMACM Purchaser. It is the intention of the parties hereto that the arrangements with respect to the Transferred Assets shall constitute a purchase and sale of such Transferred Assets and not a loan, including for accounting purposes.

**Section 9.      Miscellaneous.**

(a)     *Amendment.*  This Agreement may not be amended except by an instrument in writing signed by the Originator and the GMACM Purchaser. In addition, this Agreement constitutes a Credit Document and, so long as the Credit Agreement remains in effect, this Agreement may not be amended except in accordance with Section 12.05 of the Credit Agreement.

(b)     *Binding Nature; Assignment.*  The covenants, agreements, rights and obligations contained in this Agreement shall be binding upon the successors and assigns of GMACM (in any capacity hereunder, including as the Servicer and the Originator) and shall inure to the benefit of the successors and assigns of the GMACM Purchaser, and all persons claiming by, through or under the GMACM Purchaser.

(c)     *Entire Agreement.*  This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

(d)    *Severability of Provisions.*  If any provision in or obligation under this Agreement is held to be illegal, invalid or unenforceable in any jurisdiction, (a) the legality, validity and enforceability of the remaining provisions in or obligations under this Agreement, or of such provision in or obligation under this Agreement in any other jurisdiction, shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(e)    *Governing Law.*  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

(f)    *Jurisdiction; Etc.*

(1)    <u>Jurisdiction</u>.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AGAINST ANY OTHER PARTY HERETO, IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS RELATING HERETO, IN A FORUM OTHER THAN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(2)    <u>Waiver of Venue</u>.  Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in Section 10(f)(1).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(3)    <u>Service of Process</u>.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10(l).  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

**(g)    <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY**

**HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

(h)     *Counterparts*.  This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.  Any counterpart hereof signed by a party against whom enforcement of this Agreement is sought shall be admissible into evidence as an original hereof to prove the contents thereof.

(i)     *Indulgences; No Waivers*.  Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or future exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(j)     *Headings Not to Affect Interpretation*.  The headings contained in this Agreement are for convenience of reference only, and they shall not be used in the interpretation hereof.

(k)     *Benefits of Agreement*.  Nothing in this Agreement, express or implied, shall give to any Person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement; provided, that the Collateral Agent, acting for the benefit of the Secured Parties, and the Administrative Agent shall be express third-party beneficiaries of this Agreement.

(l)     *Notices*.  Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any party, addressed to it at its address set forth in the Credit Agreement, or at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.

(m)     *Inconsistency*.  In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in the Credit Agreement and/or the Orders, the terms and provisions of the Credit Agreement and/or the Orders shall supersede and control the terms and provisions of this Agreement.

(n)     *Expenses*.  Without limiting any party's obligations under the Credit Documents, the Interim Financing Order or the Final Financing Order, the parties hereto agree to promptly pay or reimburse all out-of-pocket costs and expenses incurred by Collateral Agent (including the fees, charges and disbursements of any counsel for Collateral Agent) (a) in connection with the enforcement or protection of any rights and remedies under this Agreement, including all such costs and expenses incurred during any legal proceeding, including the Cases and any other proceeding under any Debtor Relief Law, (b) in connection with protecting the Transferred Assets and (c) creating, perfecting, maintaining and enforcing the Collateral Agent's Liens on the Transferred Assets under the Borrowers Security Agreement and the Orders.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of date first above written.

**GMAC MORTGAGE, LLC**, as Originator and Servicer

By: _____

Name:

Title:

**GMACM BORROWER LLC**, as GMACM
Purchaser

By: _____
    Name:
    Title:

**DESIGNATED SERVICING AGREEMENTS**

| Deal Name | Servicing Agreement |
|---|---|
| GMACM 2004-J6 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated December 30, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J6 |
| GMACM 2005-AR3 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and Deutsche Bank National Trust Company as Trustee, dated May 26, 2005, GMACM Mortgage Pass-Through Certificates, Series 2005-AR3 |
| GMACM 2005-AR4 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and Deutsche Bank National Trust Company as Trustee, dated June 28, 2005, GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 |
| GMACM 2005-AR5 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and Deutsche Bank National Trust Company as Trustee, dated August 17, 2005, GMACM Mortgage Pass-Through Certificates, Series 2005-AR5 |
| GMACM 2005-AR6 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and Deutsche Bank National Trust Company as Trustee, dated October 27, 2005, GMACM Mortgage Pass-Through Certificates, Series 2005-AR6 |
| [GMACM 2004-HLTV1] | [Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Loan Trust 2004-HLTV1, as Issuer, and JPMorgan Chase Bank, as Indenture Trustee, dated September 29, 2004] |
| GMACM 2004-HE5 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2004-HE5, as Issuer, and Wells Fargo Bank, N.A., as Indenture Trustee, dated November 30, 2004, GMACM Home Equity Loan-Backed Certificates, Series 2004-HE5 |
| GMACM 2005-HE1 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2005-HE1, as Issuer, and Wells Fargo Bank, N.A. as Indenture Trustee, dated March 29, 2005 |
| GMACM 2005-HE2 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2005-HE2, as Issuer, and Wells Fargo Bank, N.A. as Indenture Trustee, dated June 29, 2005 |
| GMACM 2006-HE1 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2006-HE1, as Issuer, and JPMorgan Chase Bank, National Association, as Indenture Trustee, dated March 30, 2006 |

| | |
|---|---|
| | (amended September 23, 2008) |
| GMACM 2006-HE2 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2006-HE2, as Issuer, and JPMorgan Chase Bank, National Association, as Indenture Trustee, dated June 29, 2006 (amended September 23, 2008) |
| GMACM 2007-HE3 | Servicing Agreement among GMAC Mortgage, LLC as Servicer, GMACM Home Equity Loan Trust 2007-HE3, as Issuer, and The Bank of New York Trust Company, N.A, as Indenture Trustee, dated October 26, 2007 |
| GMACM 2004-J2 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank as Trustee, dated May 17, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J2 |
| GMACM 2004-J3 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank as Trustee, dated June 15, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J3 |
| GMACM 2004-J4 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank as Trustee, dated August 17, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J4 |
| GMACM 2004-GH1 | Servicing Agreement among GMACM Mortgage Loan Trust 2004-GH1 as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank, N.A. as Indenture Trustee, dated November 22, 2004, GMACM Mortgage Loan-Backed Term Notes, Series 2004-GH1 |
| GMACM 2004-J5 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated November 22, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J5 |

<u>Attachment B to</u>
<u>RFC Receivables Pooling and Purchase Agreement</u>

**SCHEDULE OF RECEIVABLES**

Attachment C to<br>RFC Receivables Pooling and Purchase Agreement

**FORM OF MBS TRUSTEE NOTICE**

RESIDENTIAL FUNDING COMPANY, LLC

[DATE]

[          ], as Trustee

_____
Attention: Structured Finance/_____

**NOTICE OF ASSIGNMENT OF ADVANCE REIMBURSEMENT RIGHTS**

This is intended as notification, as contemplated by UCC § 9-404(a)(2), that Residential Funding Company, LLC ("**RFC**") has sold, assigned, conveyed, transferred and contributed to RFC BORROWER LLC, a Delaware limited liability company (the "**RFC Purchaser**"), all of RFC's present and future rights to reimbursement for all servicer advances, including, but not limited to, advances for any applicable monthly principal and/or interest, taxes and insurance, home equity lines of credit draws, and foreclosure and liquidation and related expenses (the "**Advance Reimbursement Rights**") made by RFC on or after May 15, 2012 (the "**Transfer Date**"), in its capacity as Servicer of mortgage loans in any pool that is subject to the servicing agreement(s) described on the attached Schedule 1 (the "**Servicing Agreement(s)**") pursuant to a Receivables Purchase and Pooling Agreement, dated as of the Transfer Date, between the RFC Purchaser and RFC. These Advance Reimbursement Rights have been further pledged by the RFC Purchaser to Barclays Bank PLC, as Collateral Agent under a certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of May 15, 2012 (the "**Credit Agreement**"), by and among the RFC Purchaser, GMACM Borrower LLC, Residential Capital, LLC ("**ResCap**"), GMAC Mortgage, LLC ("**GMACM**"), RFC, and certain Subsidiaries of ResCap, as Guarantors, GMACM and RFC, as Administrators, Originators, Receivables Custodians and Servicers, GMACM, as GMACM Servicer, the Lenders party thereto from time to time, Barclays Bank PLC, as Administrative Agent and Collateral Agent for the Secured Parties, and the other persons party thereto from time to time.

In addition, RFC previously sold, assigned, conveyed, transferred and contributed its Advance Reimbursement Rights under the Servicing Agreements specified on Schedule 1 hereto to GSAP Servicer Advance, LLC, a Delaware limited liability company (the "**GSAP Intermediate Transferor**") and such Advance Reimbursement Rights were subsequently sold, assigned, conveyed, transferred and contributed by the GSAP Intermediate Transferor to GMAC Mortgage Servicer Advance Funding Company Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "**GSAP Transferor**"). The GSAP Transferor pledged such Advance Reimbursement Rights to The Bank of New York Mellon, as Indenture Trustee under a Fourth Amended and Restated Indenture, dated as of March 15, 2011, among the Issuer, The Bank of New York Mellon, as Indenture Trustee, Calculation Agent and Paying Agent, GMACM, as an Administrator and as a Servicer, and RFC, as an Administrator and as a Servicer, as further amended by Amendment No. 1 and the 2012-VF1 supplement under which Barclays Bank PLC acted as an administrative agent, dated as of March 13, 2012 (the "**GSAP Indenture**"). You are hereby notified that on or prior to the date hereof, the GSAP Indenture has been terminated, all notes issued pursuant thereto have been paid in full, and all liens granted in favor of the Indenture Trustee in connection therewith have been released.

In addition, this is intended as notification, as contemplated by UCC § 9-404(a)(2), that the GSAP Transferor has sold, assigned, conveyed and transferred all Advance Reimbursement Rights originated under the Servicing Agreements prior to the Transfer Date (as defined above), which are all of the Advance Reimbursement Rights owned by it, to the RFC Purchaser pursuant to a Receivables Purchase Agreement, dated as of the Transfer Date, among the RFC Purchaser, RFC and the GSAP Transferor. These Advance Reimbursement Rights have also been further pledged by the RFC Purchaser to Barclays Bank PLC, as Collateral Agent under the Credit Agreement.

Sincerely yours,


RESIDENTIAL FUNDING COMPANY, LLC


By: _____
       Name:
       Title:


RFC BORROWER LLC


By: _____
       Name:
       Title:

<u>Execution Version</u>

GMACM RECEIVABLES PURCHASE AGREEMENT

by and among

GMAC MORTGAGE, LLC

(Originator and Servicer),


GMACM BORROWER LLC

(GMACM Purchaser)


and


GMAC MORTGAGE SERVICER
ADVANCE FUNDING COMPANY LTD.

(GSAP Transferor)


Dated as of May 15, 2012

# TABLE OF CONTENTS

Page

Section 1.      Definitions. ................................................................................................ 2
Section 2.      Transfer and Assignment of Receivables. ............................................... 5
Section 3.      Originator's Acknowledgment and Consent to Assignment. .................. 6
Section 4.      Representations, Warranties and Certain Covenants. .............................. 6
Section 5.      Notice of  Breach of Representations and Warranties. ........................... 11
Section 6.      Termination. ............................................................................................. 11
Section 7.      General Covenants of Originator. ............................................................ 11
Section 8.      Intent of Parties. ...................................................................................... 12
Section 9.      Indemnity. ................................................................................................ 12
Section 10.     Miscellaneous. ......................................................................................... 13


Attachment A    Designated Servicing Agreement Schedule


Attachment B    Eligible Receivables Schedule

# GMACM RECEIVABLES PURCHASE AGREEMENT

This RECEIVABLES PURCHASE AGREEMENT (this "Agreement") is made as of May 15, 2012, by and among GMAC MORTGAGE SERVICER ADVANCE FUNDING COMPANY LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "GSAP Transferor"), GMACM BORROWER LLC, a Delaware limited liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (the "GMACM Purchaser"), and GMAC MORTGAGE, LLC, a Delaware limited liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (together with any successors, "GMACM" or the "Originator" or the "Servicer").

## RECITALS

A.      The GMACM Purchaser is a special purpose company wholly owned by GMACM.  Pursuant to certain pooling and servicing agreements, sale and servicing agreements, servicing agreements, subservicing agreements or similar agreements (each a "Servicing Agreement"), GMACM services pools of mortgage loans, including revolving home equity lines of credit (collectively, "Mortgage Loans") for and on behalf of various MBS Trusts.  Certain of the Servicing Agreements will be designated as described herein for inclusion under this Agreement.

B.      Pursuant to each Designated Servicing Agreement, GMACM, as servicer (in such capacity, the "Servicer"), has made certain Advances from time to time for the benefit of the related MBS Trust.  Upon making each Advance, the Servicer became the beneficiary of a contractual right to be reimbursed for such Advance in accordance with the terms of the related Servicing Agreement.  GMACM, in its capacity as originator of the right to be reimbursed for Advances (in such capacity, the "Originator"), sold, assigned, transferred, conveyed and contributed to GMACR Mortgage Products, LLC, a Delaware limited liability company (the "GSAP Intermediate Transferor"), all its right, title and interest in, and its rights to, the Receivables (as defined herein) originated under the Designated Servicing Agreements pursuant to the terms of a Receivables Sale Agreement, dated as of June 30, 2004, between the GSAP Intermediate Transferor and GMACM (as amended by Amendment No. 1 thereto, dated August 1, 2006, and as further amended by Amendment No. 1 thereto, dated as of March 6, 2008 (the "Original GMACM Receivables Sale Agreement"), as subsequently amended and restated by the First Amended and Restated Receivables Sale Agreement entered into as of April 15, 2010 by the GSAP Intermediate Transferor and GMACM (the "Amended and Restated GMACM Receivables Sale Agreement" and, together with the Original GMACM Receivables Sale Agreement, the "GMACM Receivables Sale Agreement").  The GSAP Intermediate Transferor contemporaneously entered into a Receivables Pooling Agreement, dated as of June 30, 2004 (as amended by Amendment No. 1, dated as of March 6, 2008, the "Original GMACM Receivables Pooling Agreement"), as subsequently amended and restated by the First Amended and Restated Receivables Pooling Agreement entered into as of April 15, 2010 (the "Amended and Restated GMACM Receivables Pooling Agreement" and, together with the Original GMACM Receivables Pooling Agreement, the "GMACM Receivables Pooling Agreement").pursuant to which it sold, assigned, transferred, conveyed and contributed to the GSAP Transferor all Receivables acquired by the GSAP Intermediate Transferor from GMACM, immediately upon the GSAP Intermediate Transferor's acquisition of such Receivables pursuant to the GMACM Receivables Sale Agreement.

C.      The GSAP Transferor, as issuer, GMACM, as an administrator on behalf of the GSAP Transferor and as servicer under various Designated Servicing Agreements, Residential Funding Company, LLC ("RFC"), as an administrator and as a servicer, and The Bank of New York Mellon, as indenture trustee, calculation agent and paying agent, also entered into a Fourth Amended and Restated Indenture, dated as of March 15, 2011, amending and restating a Third Amended and Restated Indenture, dated as of April 15, 2010, amending and restating a Second Amended and Restated Indenture, dated as of March 6, 2008, amending and restating a First Amended and Restated Indenture, dated as of March 18, 2005, which had previously amended and restated that certain Indenture dated as of

June 30, 2004 (as so amended and restated and, as further amended by Amendment No. 1 and the 2012-VF1 supplement under which Barclays Bank PLC acted as an administrative agent (the "GSAP Administrative Agent"), dated as of March 13, 2012, the "GSAP Indenture"), pursuant to which the GMAC Mortgage Servicer Advance Receivables Backed Notes (the "GSAP Indenture Notes") were issued. The GSAP Indenture Notes issued pursuant to the GSAP Indenture were collateralized by the Receivables and related property and certain monies in respect thereof acquired from time to time by the GSAP Transferor. The outstanding GSAP Indenture Notes are being paid in full with the proceeds received by the GSAP Transferor under this Agreement and under a Receivables Purchase Agreement, dated of even date herewith, into which the GSAP Transferor is entering with RFC and RFC Borrower LLC. The GSAP Indenture is being discharged.

D.    On May 14, 2012, RFC and GMACM filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

E.    The GMACM Purchaser, as a borrower, and GMACM, as a guarantor, administrator, originator, receivables custodian and servicer, are entering into the Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated of even date herewith (as such agreement may be amended, modified, restated or supplemented from time to time, the "Credit Agreement"), together with RFC Borrower LLC, as a borrower, Residential Capital, LLC, GMACM and certain subsidiaries of Residential Capital, LLC, as guarantors, GMACM, as administrator, originator, receivables custodian, servicer and GMACM servicer, the Lenders party thereto, Barclays Bank PLC, as administrative agent, (the "Administrative Agent") and as collateral agent (the "Collateral Agent"), and the other Persons party thereto from time to time.

F.    Pursuant to the Borrowers Security Agreement (as defined herein), the GMACM Purchaser will pledge the Receivables it purchases hereunder and all of its rights related to such Receivables to the Collateral Agent for the benefit of the Secured Parties to secure the repayments of the Obligations under the Credit Documents.

G.    The execution, delivery and performance of this Agreement and the sale and assignment of the Receivables by the GSAP Transferor to the GMACM Purchaser have been authorized and approved by the Interim Financing Order and, upon the entry thereof, the Final Financing Order.

H.    To supplement the Orders without in any way diminishing or limiting the effect of the Orders or the approval of such sale and assignment thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such sale and assignment.

**AGREEMENT**

NOW, THEREFORE, in consideration of the above premises and of the mutual promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.    Definitions.**

This Agreement is entered into pursuant to the terms and conditions of the Credit Agreement. Any capitalized term used but not defined herein shall have the meaning given to it in the Credit Agreement.

"<u>Administrative Agent</u>" has the meaning assigned to that term in the Recitals.

"<u>Agreement</u>" has the meaning assigned to that term in the Recitals.

"<u>Amended and Restated GMACM Receivables Pooling Agreement</u>" has the meaning assigned to that term in the Recitals.

"<u>Amended and Restated GMACM Receivables Sale Agreement</u>" has the meaning assigned to that term in the Recitals.

"<u>Borrowers Security Agreement</u>" means the Pledge and Security Agreement, dated as of May 15, 2012 among the GMACM Purchaser, RFC Borrower LLC and the Collateral Agent, as the same may be hereafter amended and supplemented from time to time.

"<u>Case</u>" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which the RFC Purchaser or the Originator, as applicable, is the debtor and the debtor-in-possession.

"<u>Collateral Agent</u>" has the meaning assigned to that term in the Recitals.

"<u>Credit Agreement</u>" has the meaning assigned to that term in the Recitals.

"<u>Designated Servicing Agreement Schedule</u>" has the meaning assigned to such term in Section 2(b) of this Agreement.

"<u>Designated Servicing Agreements</u>" means the Servicing Agreements listed on the Designated Servicing Agreement Schedule.

"<u>GMACM</u>" has the meaning assigned to that term in the Recitals.

"<u>GMACM Purchaser</u>" has the meaning assigned to that term in the Recitals.

"<u>GMACM Receivables Pooling Agreement</u>" has the meaning assigned to that term in the Recitals.

"<u>GMACM Receivables Sale Agreement</u>" has the meaning assigned to that term in the Recitals.

"<u>GSAP Administrative Agent</u>" has the meaning assigned to that term in the Recitals.

"<u>GSAP Indenture</u>" has the meaning assigned to that term in the Recitals.

"GSAP Indenture Notes" has the meaning assigned to that term in the Recitals.

"GSAP Indenture Trustee" has the meaning assigned to that term in the Recitals.

"GSAP Intermediate Transferor" has the meaning assigned to that term in the Recitals.

"Lien" means (a) any lien (statutory or other), mortgage, deed of trust, pledge, hypothecation, preference, participation interest, assignment, deposit arrangement, right of set-off or recoupment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities; *provided, however,* that the lien created in favor of the Collateral Agent for the benefit of the Secured Parties under the Borrowers Security Agreement shall not be deemed to constitute a Lien for the purposes of this Agreement.

"Losses" has the meaning assigned to that term in Section 9 of this Agreement.

"Original GMACM Receivables Pooling Agreement" has the meaning assigned to that term in the Recitals.

"Original GMACM Receivables Sale Agreement" has the meaning assigned to that term in the Recitals.

"Originator" has the meaning assigned to that term in the Recitals.

"Purchase Price" has the meaning assigned to that term in Section 2(a) of this Agreement.

"Receivables" means contractual rights to reimbursement pursuant to the terms of Designated Servicing Agreements for Advances made by the Originator as Servicer pursuant to such Designated Servicing Agreements, which Advances have not previously been reimbursed, including all rights of the Servicer to enforce payment of each such obligation under the related Designated Servicing Agreement, which contractual rights to reimbursement have been sold and contributed to the GSAP Transferor prior to the date of this Agreement.

"RFC" has the meaning assigned to that term in the Recitals.

"Servicer" has the meaning assigned to that term in the Recitals.

"Servicing Agreement" has the meaning assigned to that term in the Recitals.

"Transferred Assets" has the meaning assigned to that term in Section 2(a) of this Agreement.

4

Section 2.    **Transfer and Assignment of Receivables.**

(a)    The GSAP Transferor hereby sells, assigns, transfers, sets over and otherwise conveys to the GMACM Purchaser, and the GMACM Purchaser acquires from the GSAP Transferor without recourse except as expressly provided in Section 9 hereof, all of its right, title and interest in, to and under the Receivables existing on the date hereof which were originated under any Designated Servicing Agreement listed on Attachment A hereto, and, all monies due or to become due and all amounts received or receivable with respect to each such Receivable and all proceeds (including "proceeds" as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions (collectively, the "Transferred Assets").

In consideration of the sale, assignment, transfer, set-over and conveyance to the GMACM Purchaser of the Transferred Assets, upon the terms and subject to the conditions set forth in this Agreement, the GMACM Purchaser has agreed to pay and deliver to the GSAP Transferor consideration equal to $[                    ] (the "Purchase Price") representing the fair market value of the Receivables held by the GSAP Transferor and the amount of cash held by GSAP Transferor, reduced by the amount by which the value of such assets exceeds the obligations of the GSAP Transferor, which excess shall be paid as directed by GMACM and RFC as described in Section 2(e) below.

(b)    The Designated Servicing Agreements under which the Receivables being transferred under this Agreement were originated are listed on Attachment A hereto, which is referred to herein as the "Designated Servicing Agreement Schedule."

(c)    The Originator shall, at its own expense, on or prior to the date hereof, indicate in its books and records (including its computer files) that the Receivables and the related Transferred Assets being transferred hereunder have been sold to the GMACM Purchaser in accordance with this Agreement. The Originator shall not alter the indication referenced in this paragraph with respect to any Designated Servicing Agreement during the term of this Agreement and for so long as any Obligations remain outstanding under the Credit Documents or any Commitments under the Credit Agreement are in effect. If a third party, including a potential purchaser of Receivables, should inquire, the Originator will promptly indicate that the Receivables have been sold, assigned and contributed and will claim no ownership interest therein.

(d)    Each of the Originator and the GSAP Transferor agrees that all Transferred Assets transferred to the GMACM Purchaser hereunder shall comply with all the representations and warranties set forth in this Agreement; provided, that, if any Receivable transferred hereunder fails to comply with any of the representations and warranties specified in Section 4(c), then the Originator shall deliver to the GMACM Purchaser a separate schedule specifying each Receivable which does not qualify as an Eligible Receivable.

(e)    (e)    PATI A, LLC, a Delaware limited liability company and an indirect subsidiary of GMACM, represents that, as of the date hereof, it owns 100% of the Class A-1 Preference Shares of the GSAP Transferor. RAHI A, LLC, a Delaware limited liability company and an indirect subsidiary of RFC, represents that, as of the date hereof, it owns 100% of the Class A-2 Preference Shares of the GSAP Transferor. Each of PATI A, LLC and RAHI A, LLC hereby acknowledges and consents to the transactions contemplated in this Agreement, including the purchase of the Transferred Assets by the GMACM Purchaser in exchange for the Purchase Price. Each of PATI A, LLC and RAHI A, LLC, and their respective parents GMACM and RFC, hereby further acknowledges and consents to the fact that the GSAP Transferor will not be receiving a payment reflecting the benefit of any amount by which the value of the assets of the GSAP Transferor exceeds the GSAP Transferor's debts and obligations. PATI A, LLC and RAHI A, LLC had planned to distribute any such excess value to GMACM and RFC, respectively. GMACM and RFC have requested PATI A, LLC and RAHI A, LLC instead to waive any requirement that GSAP Transferor receive such payment, because the excess value will instead be used as directed by GMACM and RFC. Accordingly, each of PATI A, LLC, RAHI A, LLC, GMACM and RFC

acknowledges and consents to the fact that the entire amount of the Purchase Price received by the GSAP Transferor hereunder shall be applied to pay the aggregate outstanding balance of the GSAP Indenture Notes and any other amounts which the GSAP Transferor is required to pay in order to satisfy and discharge the GSAP Indenture, and that, as a result, the Class A-1 Preference Shares and the Class A-2 Preference Shares shall not receive any distributions in connection with the sale of the Transferred Assets.

Section 3.        **Originator's Acknowledgment and Consent to Assignment.**

The Originator hereby acknowledges that the GSAP Transferor has sold to the GMACM Purchaser, and that the GMACM Purchaser is granting to the Collateral Agent, for the benefit of the Secured Parties, a First Priority Lien upon, and security interest in, the rights of the GMACM Purchaser under this Agreement, including, without limitation, the right to enforce the obligations of the Originator hereunder (including the Originator's rights with respect to the Transferred Assets which are being assigned to the GMACM Purchaser pursuant to this Agreement). The Originator hereby consents to such grant by the GMACM Purchaser to the Collateral Agent pursuant to the Borrowers Security Agreement and the Orders. The Originator acknowledges that each of the Administrative Agent and the Collateral Agent, for the benefit of the Secured Parties, shall be a third party beneficiary in respect of the representations, warranties, covenants, rights and benefits arising hereunder that are subject to such grant by the GMACM Purchaser.

The Originator hereby irrevocably constitutes and appoints the GMACM Purchaser and the Collateral Agent and any officer or agent thereof (and all other Persons designated by the Collateral Agent), with full power of substitution, as the Originator's true and lawful attorney-in-fact (and agent-in-fact) with full irrevocable power and authority in the place and stead of the Originator and in the name of the Originator or in its own name, from time to time in the GMACM Purchaser's or the Collateral Agent's discretion, as applicable, for the purpose of carrying out the terms of this Agreement, to, upon authorization by the Bankruptcy Court, take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement, including to enforce the Originator's rights to or collect under the Receivables. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created under the Borrowers Security Agreement and the Orders are released. The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Transferred Assets and the interests of the Secured Parties and shall not impose any duty upon it to exercise any such powers.

Section 4.        **Representations, Warranties and Certain Covenants.**

The Originator and with regard to clause (a) of this Section 4, the GSAP Transferor, hereby make the following representations and warranties for the benefit of the GMACM Purchaser and its assignees, on which the GMACM Purchaser is relying in accepting the Receivables, executing this Agreement and performing its obligations hereunder. The representations and warranties in this Section 4 are made as of the date of this Agreement. Such representations and warranties shall survive the execution and delivery of this Agreement and the transfer, sale and assignment of any Receivables to the GMACM Purchaser hereunder and are as follows:

(a)        General Representations, Warranties and Covenants of the GSAP Transferor.

(1)        *Organization and Good Standing*.  The GSAP Transferor is an entity duly organized, validly existing and in good standing under the laws of the Cayman Islands.

6

(2)    *Power and Authority; Binding Obligation*.  The GSAP Transferor has the power and authority to make, execute, deliver and perform its obligations under this Agreement and all of the transactions contemplated under this Agreement and each Credit Document, and has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement; this Agreement constitutes a legal, valid and binding obligation of the GSAP Transferor, enforceable against the GSAP Transferor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity) or by public policy with respect to indemnification under applicable securities laws.

(3)    *No Violation*.  The execution and delivery of this Agreement by the GSAP Transferor and its performance and compliance with the terms of this Agreement will not violate (A) the GSAP Transferor's organizational documents or (B) constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the GSAP Transferor is a party or which may be applicable to the GSAP Transferor or any of its assets or (C) violate any statute, ordinance or law or any rule, regulation, order, writ, injunction or decree of any court or of any public, governmental or regulatory body, agency or authority applicable to the GSAP Transferor or its properties.

(4)    *No Proceedings*.  No litigation before any court, tribunal or governmental body is currently pending, nor to the knowledge of the GSAP Transferor is threatened against the GSAP Transferor, nor is there any such litigation currently pending, nor to the knowledge of the GSAP Transferor threatened against the GSAP Transferor with respect to this Agreement or any of the Transferred Assets that should reasonably be expected to result in a material adverse effect on the transactions contemplated by this Agreement.

(5)    *No Consents Required*.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the GSAP Transferor of or compliance by the GSAP Transferor with this Agreement, the sale of the Transferred Assets or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained and are in full force and effect as of the date hereof.

(6)    *Information*.  No written statement, report or other document furnished or to be furnished pursuant to this Agreement contains or will contain any statement that is or will be inaccurate or misleading in any material respect.  There are no facts relating to and known by the GSAP Transferor which when taken as a whole may impair the ability of the GSAP Transferor to perform its obligations under this Agreement or any other Credit Document, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of the GSAP Transferor pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(7)    *Default*.  The GSAP Transferor is not in default with respect to any material contract, default under which should reasonably be expected to have a material adverse effect on the GSAP Transferor's ability to perform its obligations under this Agreement, or with respect to any order of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the transactions contemplated hereunder, and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such contract, or with respect to any such order of any court, administrative agency, arbitrator or governmental body.

7

(b)    <u>General Representations, Warranties and Covenants of the Originator</u>.


(1)    *Organization and Good Standing*.  The Originator is an entity duly formed, validly existing and in good standing under the laws of the State of Delaware and is or will be in compliance with the laws of each state in which any mortgaged property underlying or securing any Mortgage Loan is located to the extent necessary to ensure the enforceability of each Mortgage Loan serviced under a Designated Servicing Agreement.


(2)    *Power and Authority; Binding Obligation*.  Subject to entry of the Interim Financing Order, the Originator has the power and authority to make, execute, deliver and perform its obligations under this Agreement and all of the transactions contemplated under this Agreement and each Credit Document, and has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement; subject to entry of the Interim Financing Order, this Agreement constitutes a legal, valid and binding obligation of the Originator, enforceable against the Originator in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity) or by public policy with respect to indemnification under applicable securities laws.


(3)    *No Violation*. Subject to entry of the Interim Financing Order, the execution and delivery of this Agreement by the Originator and its performance and compliance with the terms of this Agreement will not violate (A) the Originator's organizational documents or (B) constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the Originator is a party or which may be applicable to the Originator or any of its assets or (C) violate any statute, ordinance or law or any rule, regulation, order, writ, injunction or decree of any court or of any public, governmental or regulatory body, agency or authority applicable to the Originator or its properties.


(4)    *No Proceedings*.  Except for the commencement of the Cases, no litigation before any court, tribunal or governmental body is currently pending, nor to the knowledge of the Originator is threatened against the Originator, nor is there any such litigation currently pending, nor to the knowledge of the Originator threatened against the Originator with respect to this Agreement that should reasonably be expected to result in a material adverse effect on the transactions contemplated by this Agreement.


(5)    *No Consents Required*.  Subject to entry of the Interim Financing Order, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Originator of or compliance by the Originator with this Agreement, the sale of the Transferred Assets or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained and are in full force and effect as of the date hereof.


(6)    *Information*.  No written statement, report or other document furnished or to be furnished pursuant to this Agreement contains or will contain any statement that is or will be inaccurate or misleading in any material respect. There are no facts relating to and known by the Originator which when taken as a whole may impair the ability of the Originator to perform its obligations under this Agreement or any other Credit Document, which have not been disclosed herein or in the certificates and other documents

8

furnished by or on behalf of the Originator pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(7)    *Default*.  Except to the extent resulting from the commencement of its Case, the Originator is not in default with respect to any material contract, default under which should reasonably be expected to have a material adverse effect on the Originator's ability to perform its obligations under this Agreement, or with respect to any order of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the transactions contemplated hereunder, and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such contract, or with respect to any such order of any court, administrative agency, arbitrator or governmental body, nor is GMACM, as Servicer, in default, nor has GMACM, as Servicer, received any notice of termination as Servicer under any Designated Servicing Agreement.

(8)    *Fannie and Freddie Approved*.  The Originator is an approved seller/servicer of residential mortgage loans for Fannie Mae and Freddie Mac, and the Originator is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae and Freddie Mac and, except to the extent resulting from the commencement of its Case, no event has occurred which would make the Originator unable to comply with eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac.

(c)    Representations; Warranties and Covenants of the Originator Concerning the Receivables.

(1)    *Eligible Receivables*. Each Receivable is an Eligible Receivable that is payable in United States dollars and has been created pursuant to a Designated Servicing Agreement that is an Eligible Servicing Agreement, in accordance with the terms of such Designated Servicing Agreement and with the customary procedures and in the ordinary course of business of the Servicer and has been sold, assigned, transferred, conveyed and contributed by the Originator to the GSAP Intermediate Transferor pursuant to the GMACM Receivables Sale Agreement and sold, assigned, transferred, conveyed and contributed by the GSAP Intermediate Transferor to the GSAP Transferor pursuant to the GMACM Receivables Pooling Agreement.  Each Receivable arises from an Advance for which the Originator is entitled to reimbursement pursuant to a Designated Servicing Agreement.

(2)    *Assignment Permitted under Servicing Agreements*. The rights to reimbursement for the Advances under each Designated Servicing Agreement were eligible for assignment and such assignment did not, and will not, violate the terms or require any consent under the related Designated Servicing Agreement or any other document or agreement to which the Originator is a party or to which its assets or properties are subject.

(3)    *Schedule of Receivables*.  The information set forth in the Eligible Receivables Schedule attached as Attachment B hereto is true and correct with respect to any Receivables as of the date hereof.

(4)    *Title to Receivables*.  Immediately prior to the transfer and assignment to the GMACM Purchaser as contemplated hereunder, the GSAP Transferor had good and marketable title to each Receivable, free and clear of all Liens and rights of others.

(5)    *No Impairment of GMACM Purchaser's Rights*.    None of the Originator, the GSAP Intermediate Transferor, the GSAP Transferor or any other Person has taken any action that, or failed to take any action the omission of which, would materially impair the rights of the GMACM Purchaser and its assignees with respect to such Receivables, or on the collectibility of such Receivables.

(6)    *No Defenses*.    Each Receivable represents valid entitlement to be paid, has not been repaid in whole or in part or been compromised, adjusted, extended, satisfied, subordinated, rescinded, waived, amended or modified, and is not subject to compromise, adjustment, extension, satisfaction, subordination, rescission, set-off, counterclaim, defense, waiver, amendment or modification by any Person.

(7)    *No Government Receivables*.    No Receivable is due from the United States of America or any state or from any agency, department or instrumentality of the United States of America or any state.

(8)    *No Pending Proceedings*. There are no proceedings pending, or, to the best of the Originator's knowledge, threatened, wherein any governmental agency has (A) alleged that any Receivable is illegal or unenforceable, (B) asserted the invalidity of any Receivable or (C) sought any determination or ruling that might adversely affect the payment or enforceability of any Receivable.

(9)    *Originator's Reporting Obligations*. With respect to each Receivable, the Originator is not aware of any respect in which the Originator may be unable to perform its reporting obligations as set forth herein.

(10)    *UCC Classification*. No Receivable is secured by "real property" or "fixtures" or evidenced by an "instrument" under and as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions. The Receivables constitute "general intangibles" or "accounts" within the meaning of the applicable Uniform Commercial Code in effect from time to time in the relevant jurisdiction.

(11)    *Enforceability; Compliance with Laws*. Each Receivable is enforceable in accordance with its terms set forth in the related Designated Servicing Agreement. Each Advance, when made, complied with all applicable laws, including those relating to consumer protection, is valid and enforceable and is not subject to any set-off, counterclaim or other defense to payment by the Obligor, the related MBS Trust, MBS Trustee or any other Person.

(12)    *No Consent Required*. Each Receivable is assignable by the GSAP Transferor and its successors and assigns, without the consent of any other Person (except any such consent that has been obtained and is in full force and effect as of the date hereof).

(13)    *No Conflicting Assignment*.    Other than the ownership interest transferred to the GMACM Purchaser and its assignees pursuant to this Agreement, the GSAP Transferor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Receivables other than to secure the obligations under the GSAP Indenture and the GSAP Indenture Notes, which Lien is being released substantially concurrently with the repayment in full of the GSAP Indenture Notes using the proceeds of the Purchase Price and other proceeds of the initial borrowings under the Credit Agreement.

(14)    *Ownership of Receivables*. Each Receivable created under the Designated Servicing Agreements set forth in the Designated Servicing Agreements Schedule is owned by the GSAP Transferor.

**Section 5.    Notice of  Breach of Representations and Warranties.**

The Originator shall inform the GMACM Purchaser and the Collateral Agent promptly, in writing, upon the discovery that any of the Originator's or the GSAP Transferor's representations and warranties in Section 4 above that pertain to a Receivable were breached or untrue as of the date of this Agreement.  The breach of any representation and warranty shall not be waived by the GMACM Purchaser under any circumstances without the prior written consent of the Collateral Agent.  The GMACM Purchaser hereby designates the Collateral Agent as its designee for purposes of this Section 5 and any other notice required under this Agreement.

**Section 6.    Termination.**

This Agreement (a) shall continue and may not be terminated until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated and (b) may be terminated at any time thereafter by either party upon written notice to the other party.

**Section 7.    General Covenants of Originator.**

The Originator covenants and agrees that from the date of this Agreement until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated:

(a)    *Legal Existence*.  The Originator shall do or cause to be done all things necessary on its part to preserve and keep in full force and effect its legal existence, and to maintain each of its licenses, approvals, registrations and qualifications in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such licenses, approvals, registrations or qualifications, except for failures to maintain any such licenses, approvals, registrations or qualifications which, individually or in the aggregate, would not have a material adverse effect on the ability of the Originator or the GMACM Purchaser to perform its obligations hereunder or under any of the other Credit Documents.

(b)    *Compliance With Laws*.  The Originator shall comply in all material respects with all laws, rules, regulations and orders of any governmental authority applicable to its operation, the noncompliance with which would have a material adverse effect on the ability of the Originator or the GMACM Purchaser to perform their obligations hereunder or under any of the other Credit Documents.

(c)    *Taxes*.  The Originator shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon the Originator or upon its income and profits, or upon any of its property or any part thereof, before the same shall become in default, if the failure to pay such taxes should reasonably be expected to have a material adverse effect on the value of the Receivables or on the Originator's ability to perform its obligations under this Agreement; provided that the Originator shall not be required to pay and discharge any such tax, assessment, charge or levy so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.  The Originator shall have set aside on its books adequate reserves with respect to any such tax, assessment, charge or levy so contested, or so long as the failure to pay any such tax, assessment, charge or levy

11

would not have a material adverse effect on the ability of the Originator to perform its obligations hereunder or the Servicer's ability to perform its obligations under the Designated Servicing Agreements.

(d)    *Separate Identity*.  The Originator hereby covenants and agrees to take all actions necessary to maintain the GMACM Purchaser's status as a separate legal entity.  The Originator shall conduct its business solely in its own name and all written and oral communications of the Originator shall be made solely in the name of the Originator.  The Originator views the GMACM Purchaser as a separate legal entity.

(e)    *No Liens, Etc. Against Transferred Assets*. The Originator hereby covenants that it will not sell, pledge, assign or transfer to any other Person, or grant, create, incur or assume any Lien on any of the Receivables, or any interest therein.  The Originator shall notify the GMACM Purchaser and the Collateral Agent and their designees of the existence of any Lien (other than as provided above) on any Receivable immediately upon discovery thereof; and the Originator shall defend the right, title and interest of the GMACM Purchaser and the Collateral Agent and their assignees in, to and under the Receivables against all claims of third parties claiming through or under the Originator; *provided*, *however*, that nothing in this Section 7 shall be deemed to apply to any Liens for municipal or other local taxes and other governmental charges if such taxes or governmental charges shall not at the time be due and payable or if the Originator shall currently be contesting the validity thereof in good faith by appropriate proceedings to the extent the same would not constitute an Event of Default under the Credit Agreement.  The Originator shall take all actions, and shall cause the GSAP Transferor to take all actions, as may be necessary to ensure that the ownership of the Receivables is conveyed to the GMACM Purchaser pursuant to this Agreement.

(f)    *Keeping of Records and Books of Account*. The Originator shall maintain accurate, complete and correct documents, books, records and other information which is reasonably necessary for the collection of all Receivables (including, without limitation, records adequate to permit the prompt identification of each new Receivable and all collections of, and adjustments to, each existing Receivable).

(g)    *Taking of Necessary Actions*. The Originator and the GSAP Transferor shall perform all actions necessary to sell, contribute and absolutely assign the Receivables and other Transferred Assets to the GMACM Purchaser and its assigns, including the Collateral Agent, including, without limitation, any necessary notifications to the MBS Trustees or other parties.

**Section 8.    Intent of Parties.**

The parties hereto intend that the conveyance of the GSAP Transferor's right, title and interest in and to the Transferred Assets shall constitute an absolute sale, conveying good title free and clear of any liens, claims, encumbrances or rights of others, from the GSAP Transferor to the GMACM Purchaser.  It is the intention of the parties hereto that the arrangements with respect to the Transferred Assets shall constitute a purchase and sale of such Transferred Assets and not a loan, including for accounting purposes.

**Section 9.    Indemnity.**

Each of GMACM and the GMACM Purchaser, jointly and severally, agrees to indemnify the GSAP Transferor, the GSAP Indenture Trustee and the GSAP Administrative Agent against and hold each of them harmless from any and all liabilities, losses, claims, damages, judgments and reasonable costs and expenses actually incurred by any of them (including reasonable attorneys' fees and expenses) (collectively, "Losses") arising in connection with, or relating to, the GSAP Indenture, the GMACM Receivables Sale Agreement, the GMACM

Receivables Pooling Agreement, this Agreement or otherwise relating to the Cases; provided, that such indemnity shall not, as to any indemnitee, be available to the extent that such Losses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee.

**Section 10.    Miscellaneous.**

(a)    *Amendment*. This Agreement may not be amended except by an instrument in writing signed by the Originator and the GMACM Purchaser.  In addition, this Agreement constitutes a Credit Document and, so long as the Credit Agreement remains in effect, this Agreement may not be amended except in accordance with Section 12.05 of the Credit Agreement.

(b)    *Binding Nature; Assignment*. The covenants, agreements, rights and obligations contained in this Agreement shall be binding upon the successors and assigns of GMACM (in any capacity hereunder, including as the Servicer and the Originator) and the GSAP Transferor and shall inure to the benefit of the successors and assigns of the GMACM Purchaser, and all persons claiming by, through or under the GMACM Purchaser.

(c)    *Entire Agreement*. This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

(d)    *Severability of Provisions*. If any provision in or obligation under this Agreement is held to be illegal, invalid or unenforceable in any jurisdiction, (a) the legality, validity and enforceability of the remaining provisions in or obligations under this Agreement, or of such provision in or obligation under this Agreement in any other jurisdiction, shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(e)    *Governing Law*. **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

(f)    *Jurisdiction; Etc.*

(1)    Jurisdiction.    EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AGAINST ANY OTHER PARTY HERETO, IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS RELATING HERETO,

13

IN A FORUM OTHER THAN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(2)     Waiver of Venue.  Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in Section 10(f)(1).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(3)     Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10(l).  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

**(g)     *Waiver of Jury Trial*.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

(h)     *Counterparts*.  This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.  Any counterpart hereof signed by a party against whom enforcement of this Agreement is sought shall be admissible into evidence as an original hereof to prove the contents thereof.

(i)     *Indulgences; No Waivers*.  Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or future exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(j)        *Headings Not to Affect Interpretation.* The headings contained in this Agreement are for convenience of reference only, and they shall not be used in the interpretation hereof.

(k)        *Benefits of Agreement.* Nothing in this Agreement, express or implied, shall give to any Person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement; provided, that the Collateral Agent acting for the benefit of the Secured Parties and the Administrative Agent shall be express third-party beneficiaries of this Agreement and the GSAP Indenture Trustee shall be an express third-party beneficiary of Section 9 of this Agreement.

(l)        *Notices.* Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any party, addressed to it at its address set forth in the Credit Agreement, or at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.

(m)        *Inconsistency.* In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in the Credit Agreement and/or the Orders, the terms and provisions of the Credit Agreement and/or the Orders shall supersede and control the terms and provisions of this Agreement.

(n)        *Expenses.* Without limiting any party's obligations under the Credit Documents, the Interim Financing Order or the Final Financing Order, the parties hereto agree to promptly pay or reimburse all out-of-pocket costs and expenses incurred by Collateral Agent (including the fees, charges and disbursements of any counsel for Collateral Agent) (a) in connection with the enforcement or protection of any rights and remedies under this Agreement, including all such costs and expenses incurred during any legal proceeding, including the Cases and any other proceeding under any Debtor Relief Law, (b) in connection with protecting the Transferred Assets and (c) creating, perfecting, maintaining and enforcing the Collateral Agent's Liens on the Transferred Assets under the Borrowers Security Agreement and the Orders.

(o)        *Limited Recourse.* The parties hereto acknowledge and agree that recourse against the GSAP Transferor for the performance of any obligations it may have hereunder or for any related claims are limited to the property pledged by the GSAP Transferor under the GSAP Indenture and that, following realization of such property and application of the proceeds thereof in accordance with the terms of the GSAP Indenture, all claims in respect of this Agreement against the GSAP Transferor shall be extinguished and shall not thereafter revive.

[*Signature Page Follows*]

15

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**GMAC MORTGAGE, LLC**, as Originator and Servicer

By: _____
       Name:
       Title:

**GMACM BORROWER LLC**, as GMACM Purchaser

By: _____
      Name:
      Title:

**GMAC MORTGAGE SERVICER ADVANCE FUNDING
COMPANY LTD.,** as GSAP Transferor


By: _____
      Name:
      Title:

**Acknowledged by:**

**PATI A, LLC**

By: _____
      Name:
      Title:

**Acknowledged by:**

**RAHI A, LLC**

By: _____

    Name:

    Title:

Attachment A to
GMACM Receivables Purchase Agreement

**DESIGNATED SERVICING AGREEMENTS**

| Deal Name | Servicing Agreement |
|---|---|
| GMACM 2004-J6 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated December 30, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J6 |
| GMACM 2005-AR3 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and Deutsche Bank National Trust Company as Trustee, dated May 26, 2005, GMACM Mortgage Pass-Through Certificates, Series 2005-AR3 |
| GMACM 2005-AR4 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and Deutsche Bank National Trust Company as Trustee, dated June 28, 2005, GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 |
| GMACM 2005-AR5 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and Deutsche Bank National Trust Company as Trustee, dated August 17, 2005, GMACM Mortgage Pass-Through Certificates, Series 2005-AR5 |
| GMACM 2005-AR6 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and Deutsche Bank National Trust Company as Trustee, dated October 27, 2005, GMACM Mortgage Pass-Through Certificates, Series 2005-AR6 |
| [GMACM 2004-HLTV1] | [Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Loan Trust 2004-HLTV1, as Issuer, and JPMorgan Chase Bank, as Indenture Trustee, dated September 29, 2004] |
| GMACM 2004-HE5 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2004-HE5, as Issuer, and Wells Fargo Bank, N.A., as Indenture Trustee, dated November 30, 2004, GMACM Home Equity Loan-Backed Certificates, Series 2004-HE5 |
| GMACM 2005-HE1 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2005-HE1, as Issuer, and Wells Fargo Bank, N.A. as Indenture Trustee, dated March 29, 2005 |
| GMACM 2005-HE2 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2005-HE2, as Issuer, and Wells Fargo Bank, N.A. as Indenture Trustee, dated June 29, 2005 |
| GMACM 2006-HE1 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2006-HE1, as Issuer, and JPMorgan Chase Bank, National Association, as Indenture Trustee, dated March 30, 2006 |

| | |
|---|---|
| | (amended September 23, 2008) |
| GMACM 2006-HE2 | Servicing Agreement among GMAC Mortgage Corporation as Servicer, GMACM Home Equity Loan Trust 2006-HE2, as Issuer, and JPMorgan Chase Bank, National Association, as Indenture Trustee, dated June 29, 2006 (amended September 23, 2008) |
| GMACM 2007-HE3 | Servicing Agreement among GMAC Mortgage, LLC as Servicer, GMACM Home Equity Loan Trust 2007-HE3, as Issuer, and The Bank of New York Trust Company, N.A, as Indenture Trustee, dated October 26, 2007 |
| GMACM 2004-J2 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank as Trustee, dated May 17, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J2 |
| GMACM 2004-J3 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank as Trustee, dated June 15, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J3 |
| GMACM 2004-J4 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank as Trustee, dated August 17, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J4 |
| GMACM 2004-GH1 | Servicing Agreement among GMACM Mortgage Loan Trust 2004-GH1 as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank, N.A. as Indenture Trustee, dated November 22, 2004, GMACM Mortgage Loan-Backed Term Notes, Series 2004-GH1 |
| GMACM 2004-J5 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Company, GMAC Mortgage Corporation as Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated November 22, 2004, GMACM Mortgage Pass-Through Certificates, Series 2004-J5 |

<u>Attachment B to</u>
<u>GMACM Receivables Purchase Agreement</u>

**<u>Eligible Receivables Schedule</u>**

[Please see attached]

<u>Execution Version</u>

RFC MORTGAGE LOAN PURCHASE AND CONTRIBUTION AGREEMENT

by and between

RESIDENTIAL FUNDING COMPANY, LLC

(Seller)

and

RFC BORROWER LLC

(Purchaser)

Dated as of May 15, 2012

# TABLE OF CONTENTS

Page

Section 1.     Definitions..........................................................................................................2
Section 2.     Sale and Contribution of Mortgage Loans............................................................5
Section 3.     RFC's Acknowledgment and Consent to Assignment ...........................................6
Section 4.     Representations, Warranties and Certain Covenants ..............................................6
Section 5.     Notice of Breach ....................................................................................................8
Section 6.     Termination............................................................................................................9
Section 7.     General Covenants of RFC ....................................................................................9
Section 8.     Intent of Parties....................................................................................................10
Section 9.     Indemnity .............................................................................................................10
Section 10.    Miscellaneous ......................................................................................................11

Attachment A  ELIGIBLE MORTGAGE LOAN SCHEDULE

Attachment B  INELIGIBLE MORTGAGE LOAN SCHEDULE

## MORTGAGE LOAN PURCHASE AND CONTRIBUTION AGREEMENT

This MORTGAGE LOAN PURCHASE AND CONTRIBUTION AGREEMENT (as may be amended, modified or supplemented from time to time, this "Agreement") is made as of May 15, 2012, by and between RFC BORROWER LLC, a Delaware limited liability company and special purpose entity, wholly owned subsidiary of RFC and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (the "RFC Purchaser"), and RESIDENTIAL FUNDING COMPANY, LLC, a Delaware limited liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (together with any successors and assignees permitted hereunder, "RFC").

## RECITALS

A.      On May 14, 2012, RFC and GMAC Mortgage, LLC, a Delaware limited liability company ("GMACM"), filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B.      Pursuant to a Master Repurchase Agreement (the "Master Repurchase Agreement"), dated as of December 21, 2011, by and among BMMZ Holdings LLC, as buyer ("BMMZ"), GMACM, as seller and servicer, RFC, as seller, and Residential Capital, LLC, a Delaware limited liability company, as guarantor ("ResCap"), the parties entered into repurchase transactions in which RFC and GMACM transferred to BMMZ certain eligible mortgage loans, against the transfer of funds by BMMZ, with a simultaneous agreement by BMMZ to transfer to RFC or GMACM, as applicable, such eligible mortgage loans at a date certain, against the transfer of funds by RFC or GMACM, as applicable.  Pursuant to the terms of the Master Repurchase Agreement, RFC has repurchased the mortgage loans RFC transferred to BMMZ and wishes to sell and contribute such loans to the RFC Purchaser hereunder.

C.      The RFC Purchaser, as a borrower, and RFC, as a guarantor, administrator, originator, receivables custodian and servicer, are entering into the Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated of even date herewith (as such agreement may be amended, modified, restated or supplemented from time to time, the "Credit Agreement"), together with GMACM Borrower LLC, as a borrower, ResCap, GMACM and certain subsidiaries of ResCap, as guarantors, GMACM, as administrator, originator, receivables custodian, servicer and GMACM servicer, the Lenders party thereto, Barclays Bank PLC, as administrative agent for the Secured Parties (together with its successors and assigns in such capacity, the "Administrative Agent"), Barclays Bank PLC, as Collateral Agent, and the other Persons party thereto from time to time.

D.      As a condition precedent to the Lenders entering into the Credit Agreement, the Required Documents relating to each Mortgage Loan must be delivered to and held by the Custodian for the benefit of the Collateral Agent and the Secured Parties until the security interest and Lien in such Mortgage Loan is released in accordance with the terms of the Collateral Documents.

E.      Pursuant to the Custodial Agreement, the Custodian has agreed to act as custodian/bailee for hire for the Collateral Agent with respect to the Mortgage Loans.

F.      Pursuant to the Borrowers Security Agreement, the RFC Purchaser will pledge the Transferred Assets it purchases hereunder and all of its rights related to such Transferred Assets to the Collateral Agent for the benefit of the Secured Parties to secure the repayments of the Obligations under the Credit Documents.

G.      RFC hereby wishes to sell and contribute to the RFC Purchaser, and the RFC Purchaser hereby wishes to acquire from RFC certain Mortgage Loans and related assets owned by RFC on the Closing Date.

H.      The execution, delivery and performance of this Agreement and the sale and contribution of the Mortgage Loans and related assets by RFC to the RFC Purchaser have been authorized and approved by the Interim Financing Order and, upon the entry thereof, the Final Financing Order.

I.      To supplement the Orders without in any way diminishing or limiting the effect of the Orders or the approval of such sale and assignment thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such sale and contribution.

## AGREEMENT

NOW, THEREFORE, in consideration of the above premises and of the mutual promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.    Definitions**.

This Agreement is entered into pursuant to the terms and conditions of the Credit Agreement.  Any capitalized term used but not defined herein shall have the meaning given to it in the Credit Agreement.

"Administrative Agent" has the meaning assigned to such term in the Recitals.

"Agreement" has the meaning assigned to such term in the Recitals.

"BMMZ" has the meaning assigned to such term in the Recitals.

"Borrowers Security Agreement" means the Debtor-in-Possession Security Agreement, dated as of the Closing Date, among the Borrowers, the Borrowers' REO Subsidiaries and the Collateral Agent, as the same may be hereafter amended, amended and restated, supplemented or modified from time to time in accordance with the terms thereof and the terms of the Credit Agreement.

"Case" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which the RFC Purchaser or RFC, as applicable, is the debtor and the debtor-in-possession.

2

"Collateral Agent" means Barclays Bank PLC, as Collateral Agent under the Credit Agreement, together with its successors and assigns in such capacity.

"Conveyance" has the meaning assigned to such term in Section 2(a) of this Agreement.

"Conveyance Date" means the date of this Agreement.

"Credit Agreement" has the meaning assigned to such term in the Recitals.

"Custodial Agreement" means the Custodial Agreement, dated as of the date hereof, by and among the RFC Purchaser, GMACM Borrower LLC, the Collateral Agent and the Custodian, providing for the custody of Mortgage Files relating to the Mortgage Loans, as the same may be hereafter amended, amended and restated, supplemented and modified from time to time in accordance with the terms thereof and the terms of the Credit Agreement.

"Custodian" means Wells Fargo Bank, National Association or such other Person as may be appointed from time to time pursuant to the Custodial Agreement and who is reasonably acceptable to the Administrative Agent.

"Fannie Mae" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"Freddie Mac" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"GMACM" has the meaning assigned to such term in the Recitals.

"HELOC" means a home equity revolving line of credit secured by a mortgage, deed of trust or other instrument creating a second lien on the related Mortgaged Property, which lien secures the related line of credit.

"Ineligible Mortgage Loan" means a Mortgage Loan which does not constitute an Eligible Mortgage Loan under the Credit Agreement.

"Lien" means (a) any lien (statutory or other), mortgage, deed of trust, pledge, hypothecation, preference, participation interest, assignment, deposit arrangement, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), and (c) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities; *provided*, *however*, that the lien created in favor of the Collateral Agent for the benefit of the Secured Parties under the Borrowers Security Agreement shall not be deemed to constitute a Lien for the purposes of this Agreement.

"Losses" has the meaning assigned to such term in Section 9 of this Agreement.

"Master Repurchase Agreement" has the meaning assigned to such term in the Recitals.

"Mortgage" means the mortgage, deed of trust or other instrument creating a lien on an estate in fee simple interest (including a leasehold estate) in real property securing a Mortgage Note.

"Mortgage Files" has the meaning assigned to such term in the Custodial Agreement.

"Mortgage Loan" means a first lien mortgage loan or second lien mortgage loan (including without limitation, an Adjustable Rate Mortgage Loan, HELOC or an Option ARM Mortgage Loan), which Custodian has been instructed to hold for the Collateral Agent pursuant to the Custodial Agreement, and which Mortgage Loan includes, without limitation, (i) a Mortgage Note, the related Mortgage and all other mortgage loan documents, (ii) all right, title and interest of RFC in and to the Mortgaged Property covered by such Mortgage and (iii) with respect to each Servicing Retained Mortgage Loan, the related Servicing Rights.

"Mortgage Loan Schedules" means the schedule of Eligible Mortgage Loans, attached hereto at Attachment A, together with the schedule of Ineligible Mortgage Loans, attached hereto as Attachment B.

"Mortgagor" means the obligor or obligors on a Mortgage Note, including any Person who has assumed or guaranteed the obligations of the obligor thereunder.

"Mortgage Note" means either (i) an original promissory note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan or (ii) a copy of a promissory note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan accompanied by a duly executed lost note affidavit (containing customary indemnities).

"Option ARM Mortgage Loan" means an Adjustable Rate Mortgage Loan in respect of which the related Mortgage Note provides the Mortgagor with multiple monthly payment options.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"Purchase Price" has the meaning assigned to such term in Section 2(c) of this Agreement.

"Required Documents"  has the meaning assigned to such term in the Custodial Agreement.

"ResCap" has the meaning assigned to such term in the Recitals.

"RFC" has the meaning assigned to such term in the Recitals.

"RFC Purchaser" has the meaning assigned to such term in the Recitals.

4

"Servicing Retained Mortgage Loans" means those certain Mortgage Loans sold or proposed to be sold by RFC to RFC Purchaser which are serviced by RFC.

"Servicing Rights" means contractual, possessory or other rights of RFC to administer or service any Mortgage Loans (or to possess any Records relating thereto) including: (i) the rights to service the Mortgage Loans; (ii) the right to receive compensation (whether direct or indirect) for such servicing, including the right to receive and retain the related servicing fee and all other fees with respect to such Mortgage Loans; and (iii) all rights, powers and privileges incidental to the foregoing, together with all Records relating thereto.

"Transferred Assets" has the meaning assigned to such term in Section 2(a) of this Agreement.

### Section 2.    Sale and Contribution of Mortgage Loans.

(a)    RFC hereby sells, contributes, assigns, transfers, sets over and otherwise conveys to the RFC Purchaser, and the RFC Purchaser acquires from RFC without recourse except as expressly provided in Section 5 and Section 9 hereof, all of its right, title and interest, whether now owned or hereafter acquired, wherever located, in, to and under the Mortgage Loans listed on the Mortgage Loan Schedules, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein, including all rights, claims or actions RFC may have under any related servicing agreement, subservicing agreement or custodial agreement and all related accounts, and all proceeds (including "proceeds" as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions) (collectively, the "Transferred Assets") free and clear of all Liens.  The actions described in this Section 2(a) shall collectively be referred to herein as the "Conveyance."

(b)    RFC shall deliver or cause to be delivered to the Custodian all documents required to be delivered pursuant to Section 2 of the Custodial Agreement for each Mortgage Loan.

(c)    On the Conveyance Date, in consideration of the Conveyance to the RFC Purchaser of the Transferred Assets, upon the terms and subject to the conditions set forth in this Agreement, the RFC Purchaser has agreed to pay and deliver to RFC or its designee aggregate consideration equal in value to the fair market value of such Transferred Asset, comprised of (x) a cash purchase price in an amount agreed between RFC and the RFC Purchaser plus (y) an increase in the capital contribution of RFC in the RFC Purchaser equal to the excess of the fair market value of such Transferred Asset over the cash purchase price paid therefore (the "Purchase Price").  The Conveyance shall occur immediately following the purchase, pursuant to the terms of the Master Repurchase Agreement, by RFC of the Mortgage Loans RFC previously transferred to BMMZ, and the Conveyance shall take effect upon receipt of the Purchase Price by RFC.

(d)    RFC shall, at its own expense, on or prior to the date hereof, indicate in its books and records (including its computer files) that the Transferred Assets being transferred hereunder have been sold and contributed to the RFC Purchaser in accordance with this Agreement.  RFC shall not alter the indication referenced in this paragraph with respect to any

Transferred Asset during the term of this Agreement and for so long as any Obligations remain outstanding under the Credit Documents or any Commitments under the Credit Agreement are in effect. If a third party, including a potential purchaser of Mortgage Loans, should inquire, RFC will promptly indicate that the Mortgage Loans have been sold, assigned and contributed and will claim no ownership interest therein.

(e)    RFC agrees that all Transferred Assets transferred to the RFC Purchaser hereunder shall comply with all the representations and warranties set forth in this Agreement.

**Section 3.    RFC's Acknowledgment and Consent to Assignment**.

RFC hereby acknowledges and consents to the grant set forth in the Borrowers Security Agreement and the Orders by the RFC Purchaser to the Collateral Agent, for the benefit of the Secured Parties, of a First Priority Lien, upon and security interest in, the rights of the RFC Purchaser under this Agreement, including, without limitation, the right to enforce the obligations of RFC hereunder. RFC acknowledges that each of the RFC Purchaser and the Collateral Agent, for the benefit of the Secured Parties, shall be a third party beneficiary in respect of the representations, warranties, covenants, rights and benefits arising hereunder that are subject to such grant by the RFC Purchaser.

RFC hereby irrevocably constitutes and appoints the RFC Purchaser and the Collateral Agent and any officer or agent thereof (and all other Persons designated by the Collateral Agent), with full power of substitution, as RFC 's true and lawful attorney-in-fact (and agent-in-fact) with full irrevocable power and authority in the place and stead of RFC and in the name of RFC or in its own name, from time to time in the RFC Purchaser's or the Collateral Agent's discretion, as applicable, for the purpose of carrying out the terms of this Agreement, to, upon authorization by the Bankruptcy Court, take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created under the Borrowers Security Agreement and the Orders are released. The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Transferred Assets and the interests of the Secured Parties and shall not impose any duty upon it to exercise any such powers.

**Section 4.    Representations, Warranties and Certain Covenants**.

RFC hereby makes the following representations and warranties for the benefit of the RFC Purchaser and its assignees, on which the RFC Purchaser is relying in accepting the Transferred Assets, executing this Agreement and performing its obligations hereunder. The representations and warranties in this Section 4 are made as of the Conveyance Date. Such representations and warranties shall survive the execution and delivery of this Agreement and the transfer, sale, contribution and assignment of any Transferred Asset to the RFC Purchaser hereunder and are as follows:

(a)    <u>General Representations, Warranties and Covenants of RFC</u>.

(1)       *Organization and Good Standing*. RFC is an entity duly formed, validly existing and in good standing under the laws of the State of Delaware and is or will be in compliance with the laws of each state in which any Mortgaged Property underlying or securing any Mortgage Loan is located to the extent necessary to ensure the enforceability of each Mortgage Loan.

(2)       *Power and Authority; Binding Obligation*. Subject to entry of the Interim Financing Order, RFC has the power and authority to make, execute, deliver and perform its obligations under this Agreement and all of the transactions contemplated under this Agreement and each Credit Document, and has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement; subject to entry of the Interim Financing Order, this Agreement constitutes a legal, valid and binding obligation of RFC, enforceable against RFC in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity) or by public policy with respect to indemnification under applicable securities laws.

(3)       *No Violation*. Subject to entry of the Interim Financing Order, the execution and delivery of this Agreement by RFC and its performance and compliance with the terms of this Agreement will not violate (A) RFC's organizational documents or (B) constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which RFC is a party or which may be applicable to RFC or any of its assets or (C) violate any statute, ordinance or law or any rule, regulation, order, writ, injunction or decree of any court or of any public, governmental or regulatory body, agency or authority applicable to RFC or its properties.

(4)       *No Proceedings*.  Except for the commencement of the Cases, no litigation before any court, tribunal or governmental body is currently pending, nor to the knowledge of RFC is threatened against RFC, nor is there any such litigation currently pending, nor to the knowledge of RFC threatened against RFC with respect to this Agreement or any of the Transferred Assets that should reasonably be expected to result in a material adverse effect on the transactions contemplated by this Agreement.

(5)       *No Consents Required*.  Subject to entry of the Interim Financing Order, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by RFC of or compliance by RFC with this Agreement, the sale and contribution of the Transferred Assets or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained and are in full force and effect as of the date hereof.

(6)       *Information*.  No written statement, report or other document furnished or to be furnished pursuant to this Agreement contains or will contain any

7

statement that is or will be inaccurate or misleading in any material respect. There are no facts relating to and known by RFC which when taken as a whole may impair the ability of RFC to perform its obligations under this Agreement or any other Credit Document, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of RFC pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(7)      *Default*.  Except to the extent resulting from the commencement of its Case, RFC is not in default with respect to any material contract, default under which should reasonably be expected to have a material adverse effect on RFC's ability to perform its obligations under this Agreement, or with respect to any order of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the transactions contemplated hereunder, and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such contract, or with respect to any such order of any court, administrative agency, arbitrator or governmental body.

(8)      *Fannie and Freddie Approved*. RFC is an approved seller/servicer of residential mortgage loans for Fannie Mae and Freddie Mac, and RFC is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae and Freddie Mac and, except to the extent resulting from the commencement of its Case, no event has occurred which would make RFC unable to comply with eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac.

(b)      <u>Representations, Warranties and Covenants Concerning the Mortgage Loans</u>.

(1)      RFC represents and warrants that each Mortgage Loan designated as an Eligible Mortgage Loan on Attachment A hereto is an Eligible Mortgage Loan as of the Conveyance Date.

(2)      RFC covenants and agrees from the date hereof to the date this Agreement is terminated, that it shall perform all covenants in Articles V and VI of the Credit Agreement to the extent such covenants relate to the Transferred Assets.

(c)      <u>Survival</u>. It is understood and agreed that this Section 4 shall survive Conveyance of the Transferred Assets to the RFC Purchaser.

**Section 5.    Notice of Breach**.

(a)      RFC shall inform the RFC Purchaser and the Collateral Agent promptly, in writing, upon the discovery that any of RFC's representations, warranties or covenants in Section 4 above that pertain to a Mortgage Loan were breached or untrue as of the Conveyance Date.  The breach of any representation, warranty or covenant shall not be waived by the RFC Purchaser under any circumstances without the prior written consent of the Collateral Agent.

(b)      The RFC Purchaser hereby designates the Collateral Agent as its designee for purposes of this Section 5 and any other notice required under this Agreement.

8

(c)    <u>Survival</u>. It is understood and agreed that this Section 5 shall survive the Conveyance of the Transferred Assets to the RFC Purchaser.

**Section 6.    Termination**.

This Agreement (a) shall continue and may not be terminated until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated and (b) may be terminated at any time thereafter by either party upon written notice to the other party.

**Section 7.    General Covenants of RFC**.

RFC covenants and agrees that from the date of this Agreement until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated:

(a)    *Legal Existence*.  RFC shall do or cause to be done all things necessary on its part to preserve and keep in full force and effect its legal existence, and to maintain each of its licenses, approvals, registrations and qualifications in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such licenses, approvals, registrations or qualifications, except for failures to maintain any such licenses, approvals, registrations or qualifications which, individually or in the aggregate, would not have a material adverse effect on the ability of RFC or the RFC Purchaser to perform its obligations hereunder or under any of the other Credit Documents.

(b)    *Compliance With Laws*.  RFC shall comply in all material respects with all laws, rules, regulations and orders of any governmental authority applicable to its operation, the noncompliance with which would have a material adverse effect on the ability of RFC or the RFC Purchaser to perform their obligations hereunder or under any of the other Credit Documents.

(c)    *Taxes*.    RFC shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon RFC or upon its income and profits, or upon any of its property or any part thereof, before the same shall become in default if the failure to pay such taxes should reasonably be expected to have a material adverse effect on the value of the Transferred Assets or on RFC's ability to perform its obligations under this Agreement; provided that RFC shall not be required to pay and discharge any such tax, assessment, charge or levy so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings. RFC shall have set aside on its books adequate reserves with respect to any such tax, assessment, charge or levy so contested, for so long as the failure to pay any such tax, assessment, charge or levy would not have a material adverse effect on the ability of RFC to perform its obligations hereunder.

(d)    *Separate Identity*.  RFC hereby covenants and agrees to take all actions necessary to maintain the RFC Purchaser's status as a separate legal entity. RFC shall conduct its business solely in its own name and all written and oral communications of RFC shall be made solely in the name of RFC.  RFC views the RFC Purchaser as a separate legal entity.

(e)    *No Liens, Etc. Against Transferred Assets*. RFC hereby covenants that it will not sell, pledge, assign or transfer the Transferred Assets to any other Person, or grant, create, incur or assume any Lien on any of the Transferred Assets, or any interest therein. RFC shall notify the RFC Purchaser and the Collateral Agent and their designees of the existence of any Lien (other than as provided herein) on any Transferred Asset immediately upon discovery thereof; and RFC shall defend the right, title and interest of the RFC Purchaser and the Collateral Agent and their assignees in, to and under the Transferred Assets against all claims of third parties claiming through or under RFC; *provided*, *however*, that nothing in this Section 7 shall be deemed to apply to any Liens for municipal or other local taxes and other governmental charges if such taxes or governmental charges shall not at the time be due and payable or if RFC shall currently be contesting the validity thereof in good faith by appropriate proceedings to the extent the same would not constitute an Event of Default under the Credit Agreement. RFC shall take all actions as may be necessary to ensure that the ownership of the Mortgage Loans is conveyed to the RFC Purchaser pursuant to this Agreement.

(f)    *Keeping of Records and Books of Account*. RFC shall maintain accurate, complete and correct documents, books, records and other information which is reasonably necessary for the collection of all Transferred Assets (including, without limitation, records adequate to permit the prompt identification of each new Mortgage Loan and all collections of, and adjustments to, each existing Mortgage Loan).

(g)    *Taking of Necessary Actions*. RFC shall perform all actions necessary to sell, contribute and absolutely assign the Transferred Assets to the RFC Purchaser and its assigns, including the Collateral Agent, including, without limitation, any necessary notifications to other parties.

### Section 8.    Intent of Parties.

The parties hereto intend that the Conveyance hereunder shall constitute an absolute sale and contribution, conveying good title free and clear of any liens, claims, encumbrances or rights of others, from RFC to the RFC Purchaser. It is the intention of the parties hereto that the arrangements with respect to the Transferred Assets shall constitute a sale and contribution of such Transferred Assets and not a loan, including for accounting purposes.

### Section 9.    Indemnity.

RFC agrees to indemnify the RFC Purchaser against and hold the RFC Purchaser harmless from any and all liabilities, losses, claims, damages, judgments and reasonable costs and expenses actually incurred by the RFC Purchaser (including reasonable attorneys' fees and expenses) (collectively, "Losses") arising in connection with, or relating to, the Master Repurchase Agreement and this Agreement; provided, that such indemnity shall not be available to the extent that such Losses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the RFC Purchaser.

10

**Section 10.  Miscellaneous**.

(a)  *Amendment*. This Agreement may not be amended except by an instrument in writing signed by RFC and the RFC Purchaser.  In addition, this Agreement constitutes a Credit Document and, so long as the Credit Agreement remains in effect, this Agreement may not be amended except in accordance with Section 12.05 of the Credit Agreement.

(b)  *Binding Nature; Assignment*. The covenants, agreements, rights and obligations contained in this Agreement shall be binding upon the successors and assigns of RFC and shall inure to the benefit of the successors and assigns of the RFC Purchaser, and all Persons claiming by, through or under the RFC Purchaser.

(c)  *Entire Agreement*. This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

(d)  *Severability of Provisions*. If any provision in or obligation under this Agreement is held to be illegal, invalid or unenforceable in any jurisdiction, (a) the legality, validity and enforceability of the remaining provisions in or obligations under this Agreement, or of such provision in or obligation under this Agreement in any other jurisdiction, shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(e)  *Governing Law*. **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

(f)  *Jurisdiction; Etc*.

(1)  Jurisdiction.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AGAINST ANY OTHER PARTY HERETO, IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS RELATING HERETO, IN A FORUM

11

OTHER THAN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(2)    <u>Waiver of Venue</u>.    Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in Section 10(f)(1).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(3)    <u>Service of Process</u>.    Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10(l).  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

(g)    *Waiver of Jury Trial*.    **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

(h)    *Counterparts*.    This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart. Any counterpart hereof signed by a party against whom enforcement of this Agreement is sought shall be admissible into evidence as an original hereof to prove the contents thereof.

(i)       *Indulgences; No Waivers*. Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or future exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(j)       *Headings Not to Affect Interpretation*. The headings contained in this Agreement are for convenience of reference only, and they shall not be used in the interpretation hereof.

(k)       *Benefits of Agreement*. Nothing in this Agreement, express or implied, shall give to any Person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement; provided, that the Collateral Agent, acting for the benefit of the Secured Parties, and the Administrative Agent shall be express third-party beneficiaries of this Agreement.

(l)       *Notices*.    Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any party, addressed to it at its address set forth in the Credit Agreement, or at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.

(m)      *Inconsistency*.    In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in the Credit Agreement and/or the Orders, the terms and provisions of the Credit Agreement and/or the Orders shall supersede and control the terms and provisions of this Agreement.

(n)       *Expenses*.    Without limiting any party's obligations under the Credit Documents, the Interim Financing Order or the Final Financing Order, the parties hereto agree to promptly pay or reimburse all out-of-pocket costs and expenses incurred by Collateral Agent (including the fees, charges and disbursements of any counsel for Collateral Agent) (a) in connection with the enforcement or protection of any rights and remedies under this Agreement, including all such costs and expenses incurred during any legal proceeding, including the Cases and any other proceeding under any Debtor Relief Law, (b) in connection with protecting the Transferred Assets and (c) creating, perfecting, maintaining and enforcing the Collateral Agent's Liens on the Transferred Assets under the Borrowers Security Agreement and the Orders

[*Signature Page Follows*]

13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**RESIDENTIAL FUNDING COMPANY, LLC**, as Seller

By: _____

Name:

Title:

**RFC BORROWER LLC**, as Purchaser

By: _____
    Name:
    Title:

Acknowledged and Agreed:

**BARCLAYS BANK PLC**, as Collateral Agent

By: _____
    Name:
    Title:

<u>Attachment A</u>

ELIGIBLE MORTGAGE LOANS

[Please see attached]

## Attachment B

INELIGIBLE MORTGAGE LOANS

None

<u>Execution Version</u>

RFC RECEIVABLES POOLING AND PURCHASE AGREEMENT

by and between

RESIDENTIAL FUNDING COMPANY, LLC

(Originator and Servicer)

and

RFC BORROWER LLC

(RFC Purchaser)

Dated as of May 15, 2012

# TABLE OF CONTENTS

**Page**

Section 1.        Definitions..................................................................................................................2
Section 2.        Transfer and Assignment of Receivables.........................................................................3
Section 3.        Originator's Acknowledgment and Consent to Assignment............................................3
Section 4.        Representations, Warranties and Certain Covenants of Originator...................................4
Section 5.        Notice of Breach of Representations and Warranties.......................................................7
Section 6.        Termination....................................................................................................................7
Section 7.        General Covenants of Originator. ....................................................................................7
Section 8.        Intent of Parties. ...........................................................................................................8
Section 9.        Miscellaneous. ..............................................................................................................8

Attachment A    Designated Servicing Agreement Schedule

Attachment B    Schedule of Receivables

Attachment C    Form of MBS Trustee Notice

## RFC RECEIVABLES POOLING AND PURCHASE AGREEMENT

This RFC RECEIVABLES POOLING AND PURCHASE AGREEMENT (this "Agreement") is made as of May 15, 2012, by and between RESIDENTIAL FUNDING COMPANY, LLC, a Delaware limited liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (together with any successors, "RFC" or the "Servicer" or the "Originator") and RFC BORROWER LLC, a Delaware limited liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (together with any successors, the "RFC Purchaser").

## RECITALS

(A)    The RFC Purchaser is a special purpose company wholly owned by RFC.  Pursuant to certain pooling and servicing agreements, sale and servicing agreements, servicing agreements, subservicing agreements or similar agreements (each a "Servicing Agreement"), RFC services pools of mortgage loans, including revolving home equity lines of credit (collectively, "Loans") for and on behalf of various MBS Trusts.  Certain of the Servicing Agreements will be designated as described herein for inclusion under this Agreement.

(B)    Pursuant to each Designated Servicing Agreement, RFC, as servicer (in such capacity, the "Servicer") will make certain Advances from time to time for the benefit of the related MBS Trust.  Upon making each Advance, the Servicer becomes the beneficiary of a contractual right to be reimbursed for such Advance in accordance with the terms of the related Servicing Agreement.  RFC, in its capacity as originator of the right to be reimbursed for Advances is referred to herein as the "Originator."

(C)    On May 14, 2012, RFC and GMAC Mortgage, LLC filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

(D)    The RFC Purchaser, as a borrower, and RFC, as a guarantor, administrator, originator, receivables custodian and servicer, are entering into the Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated of even date herewith (as such agreement may be amended, modified, restated or supplemented from time to time, the "Credit Agreement"), together with GMACM Borrower LLC, as a borrower, Residential Capital, LLC, GMAC Mortgage, LLC and certain subsidiaries of Residential Capital, LLC, as guarantors, GMAC Mortgage, LLC, as administrator, originator, receivables custodian, servicer and GMACM servicer, the Lenders party thereto, Barclays Bank PLC, as administrative agent (the "Administrative Agent") and as collateral agent (the "Collateral Agent"), and the other Persons party thereto from time to time.

(E)    Pursuant to the Borrowers Security Agreement (as defined herein), the RFC Purchaser will pledge the Receivables it purchases hereunder and all of its rights related to such Receivables to the Collateral Agent for the benefit of the Secured Parties to secure the repayment of the Obligations under the Credit Documents.

(F)    The execution, delivery and performance of this Agreement and the sale and assignment of the Receivables by the Originator to the RFC Purchaser have been authorized and approved by the Interim Financing Order and, upon the entry thereof, the Final Financing Order.

(G)    To supplement the Orders without in any way diminishing or limiting the effect of the Orders or the approval of such sale and assignment thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such sale and assignment.

## AGREEMENT

NOW, THEREFORE, in consideration of the above premises and of the mutual promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### Section 1.        Definitions.

This Agreement is entered into pursuant to the terms and conditions of the Credit Agreement. Any capitalized term used but not defined herein shall have the meaning given to it in the Credit Agreement.

"Administrative Agent" has the meaning assigned to that term in the Recitals.

"Agreement" has the meaning assigned to that term in the Recitals.

"Borrowers Security Agreement" means the Pledge and Security Agreement, dated as of May 15, 2012 among the RFC Purchaser, GMACM Borrower LLC and the Collateral Agent, as the same may be hereafter amended and supplemented from time to time.

"Case" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which the RFC Purchaser or the Originator, as applicable, is the debtor and the debtor-in-possession.

"Collateral Agent" has the meaning assigned to that term in the Recitals.

"Credit Agreement" has the meaning assigned to that term in the Recitals.

"Designated Servicing Agreement Schedule" has the meaning assigned to such term in Section 2(b) of this Agreement.

"Designated Servicing Agreements" means the Servicing Agreements listed on the Designated Servicing Agreement Schedule.

"Lien" means (a) any lien (statutory or other), mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, right of set-off or recoupment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, title retention agreement, or any financing lease having substantially the same economic effect as any of the foregoing), and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities; *provided*, *however*, that the lien created in favor of the Collateral Agent for the benefit of the Secured Parties under the Borrowers Security Agreement shall not be deemed to constitute a Lien.

"Originator" has the meaning assigned to that term in the Recitals.

"Receivables" means contractual rights to reimbursement pursuant to the terms of Designated Servicing Agreements for Advances made by the Originator as Servicer pursuant to such Designated Servicing Agreements from time to time on and after the date of this Agreement, which Advances have not previously been reimbursed, including all rights of the Servicer to enforce payment of each such obligation under the related Designated Servicing Agreement.

"RFC" has the meaning assigned to that term in the Recitals.

"RFC Purchaser" has the meaning assigned to that term in the Recitals.

"Sale Date" means the date on which any Receivable is sold, assigned, transferred, conveyed and contributed by the Originator to the RFC Purchaser pursuant to the terms of this Agreement.

"Schedule of Receivables" means the schedule attached hereto as Attachment B.

"Servicer" has the meaning assigned to that term in the Recitals.

"Servicing Agreement" has the meaning assigned to that term in the Recitals.

2

"Transferred Assets" has the meaning assigned to that term in Section 2(a) of this Agreement.

**Section 2.        Transfer and Assignment of Receivables.**

(a)        Commencing on the date hereof and ending on the Receivables Sale Termination Date, the Originator shall sell, assign, transfer, set over and otherwise convey and contribute to the RFC Purchaser, and the RFC Purchaser shall acquire from the Originator without recourse all of its right, title and interest, whether now owned or hereafter acquired, in, to and under (1) the Receivables existing on the related Sale Date, and (2) all monies due or to become due and all amounts received or receivable with respect to each such Receivable and all proceeds (including "proceeds" as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions (collectively, the "Transferred Assets").  Until the Receivables Sale Termination Date, the Originator shall continue, automatically and without any further action on its part, to sell to the RFC Purchaser, the Transferred Assets with respect to any Servicing Agreement that is a Designated Servicing Agreement, and the RFC Purchaser shall accept such Transferred Assets.

In consideration of the sale, assignment, transfer, set-over and conveyance and contribution to the RFC Purchaser of the Transferred Assets from time to time upon the terms and subject to the conditions set forth in this Agreement, the RFC Purchaser agrees to pay and deliver to the Originator or its designee (it being understood that no cash purchase price will be paid for a Receivable until at least 24 hours after its creation) aggregate consideration equal in value to the fair market value of such Receivable, comprised of (i) in the case of Eligible Receivables, (x) a cash purchase price in an amount agreed upon between the Originator and the RFC Purchaser plus (y) an increase in the capital contribution of the Originator in the RFC Purchaser equal to the excess of the fair market value of such Receivable over the cash purchase price paid therefor, and (ii) in the case of Receivables that do not qualify as Eligible Receivables, an increase in the capital contribution of the Originator in the RFC Purchaser equal to the fair market value of such Receivable.  The limited liability company membership interests of the RFC Purchaser that were previously issued to the Originator in connection with the formation of the RFC Purchaser represent all of the economic interest in the RFC Purchaser (subject to the RFC Purchaser's obligations under the Credit Agreement and the other Credit Documents).

(b)        The Designated Servicing Agreements under which the Receivables being transferred under this Agreement will be originated are listed on Attachment A hereto, which is referred to herein as the "Designated Servicing Agreement Schedule."

(c)        The Originator shall, at its own expense, on or prior to the date hereof, indicate in its books and records (including its computer files) that the Receivables and the related Transferred Assets being transferred hereunder have been sold to the RFC Purchaser in accordance with this Agreement.  The Originator shall not alter the indication referenced in this paragraph with respect to any Designated Servicing Agreement during the term of this Agreement and for so long as any Obligations remain outstanding under the Credit Documents or any Commitments under the Credit Agreement are in effect.  If a third party, including a potential purchaser of Receivables, should inquire, the Originator will promptly indicate that the Receivables have been sold, assigned and contributed and will claim no ownership interest therein.

(d)        The Originator agrees to deliver a Schedule of Receivables on each Sale Date which indicates whether such Receivable is an Eligible Receivable that complies with all of the representations and warranties set forth in Section 4(b) of this Agreement, or whether such Receivable does not qualify as an Eligible Receivable.

**Section 3.        Originator's Acknowledgment and Consent to Assignment.**

The Originator hereby acknowledges that the RFC Purchaser is granting to the Collateral Agent, for the benefit of the Secured Parties, a First Priority Lien upon, and security interest in, the rights of the RFC Purchaser under this Agreement, including, without limitation, the right to enforce the obligations of the Originator hereunder (including the Originator's rights with respect to the Transferred Assets which are being assigned to the RFC Purchaser pursuant to this Agreement).  The Originator hereby consents to such grant by the RFC Purchaser to the Collateral Agent pursuant to the Borrowers Security Agreement and the Orders.  The Originator acknowledges that each of the Administrative Agent and the Collateral Agent, for the benefit of the Secured Parties, shall be a third

party beneficiary in respect of the representations, warranties, covenants, rights and benefits arising hereunder that are subject to such grant by the RFC Purchaser.

The Originator hereby irrevocably constitutes and appoints the RFC Purchaser and the Collateral Agent and any officer or agent thereof (and all other Persons designated by the Collateral Agent), with full power of substitution, as the Originator's true and lawful attorney-in-fact (and agent-in-fact) with full irrevocable power and authority in the place and stead of the Originator and in the name of the Originator or in its own name, from time to time in the RFC Purchaser's or the Collateral Agent's discretion, as applicable, for the purpose of carrying out the terms of this Agreement, to, upon authorization by the Bankruptcy Court, take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement, including to enforce the Originator's rights to or collect under the Receivables.    All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created under the Borrowers Security Agreement and the Orders are released.   The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Transferred Assets and the interests of the Secured Parties and shall not impose any duty upon it to exercise any such powers.

**Section 4.        Representations, Warranties and Certain Covenants of Originator.**

The Originator hereby makes the following representations and warranties for the benefit of the RFC Purchaser and its assignees, on which the RFC Purchaser is relying in accepting Receivables on each Sale Date and executing this Agreement.  The representations and warranties in clause (a) of this Section 4 are made as of the date of this Agreement and as of each Sale Date.  The representations and warranties in clause (b) of this Section 4 are made as to each Receivable that is designated as an Eligible Receivable on the Schedule of Receivables and such representations and warranties are made on and as of the applicable Sale Date for each such Eligible Receivable.  The Originator does not make any representations herein with respect to the Receivables that are not designated as being Eligible Receivables on the Schedule of Receivables.  The representations and warranties in clause (a) of this Section 4 shall survive the transfer, sale, assignment and contribution of any Receivables to the RFC Purchaser and the representations and warranties in clause (b) of this Section 4 survive the transfer, sale, assignment and contribution of any Eligible Receivables to the RFC Purchaser, and are as follows:

(a)        General Representations, Warranties and Covenants of the Originator.

(1)        *Organization and Good Standing*. The Originator is an entity duly organized, validly existing and in good standing under the laws of the State of Delaware and is or will be in compliance with the laws of each state in which any mortgaged property underlying or securing any Loan is located to the extent necessary to ensure the enforceability of each Loan serviced under a Designated Servicing Agreement.

(2)        *Power and Authority; Binding Obligation*. Subject to entry of the Interim Financing Order. the Originator has the power and authority to make, execute, deliver and perform its obligations under this Agreement and all of the transactions contemplated under this Agreement and each Credit Document, and has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement; subject to entry of the Interim Financing Order, this Agreement constitutes a legal, valid and binding obligation of the Originator, enforceable against the Originator in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity) or by public policy with respect to indemnification under applicable securities laws.

(3)        *No Violation*.  Subject to entry of the Interim Financing Order, the execution and delivery of this Agreement by the Originator and its performance and compliance with the terms of this Agreement will not violate (A) the Originator's organizational documents or (B) constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the

Originator is a party or which may be applicable to the Originator or any of its assets or (C) violate any statute, ordinance or law or any rule, regulation, order, writ, injunction or decree of any court or of any public, governmental or regulatory body, agency or authority applicable to the Originator or its properties.

(4)        *No Proceedings*.   Except for the commencement of the Cases, no litigation before any court, tribunal or governmental body is currently pending, nor to the knowledge of the Originator is threatened against the Originator, nor is there any such litigation currently pending, nor to the knowledge of the Originator threatened against the Originator with respect to this Agreement that should reasonably be expected to result in a material adverse effect on the transactions contemplated by this Agreement.

(5)        *No Consents Required*.   Subject to entry of the Interim Financing Order, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Originator of or compliance by the Originator with this Agreement, the sale of the Transferred Assets or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained and are in full force and effect as of the date hereof.

(6)        *Information*.   No written statement, report or other document furnished or to be furnished pursuant to this Agreement contains or will contain any statement that is or will be inaccurate or misleading in any material respect. There are no facts relating to and known by the Originator which when taken as a whole may impair the ability of the Originator to perform its obligations under this Agreement or any other Credit Document, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of the Originator pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(7)        *Default*.   Except to the extent resulting from the commencement of its Case, the Originator is not in default with respect to any material contract, default under which should reasonably be expected to have a material adverse effect on the Originator's ability to perform its obligations under this Agreement, or with respect to any order of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the transactions contemplated hereunder, and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such contract, or with respect to any such order of any court, administrative agency, arbitrator or governmental body, nor is RFC, as Servicer, in default, nor has RFC, as Servicer, received any notice of termination as Servicer under any Designated Servicing Agreement.

(8)        *Fannie and Freddie Approved*.  The Originator is an approved seller/servicer of residential mortgage loans for Fannie Mae and Freddie Mac, and the Originator is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae and Freddie Mac and except to the extent resulting from the commencement of its Case, no event has occurred which would make the Originator unable to comply with eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac.

(b)        Representations; Warranties and Covenants Concerning the Eligible Receivables.

(1)        *Eligible Receivables*.   Each Receivable that is designated on the Schedule of Receivables as an Eligible Receivable is payable in United States dollars and has been created pursuant to a Designated Servicing Agreement that is an Eligible Servicing Agreement, in accordance with the terms of such Designated Servicing Agreement and with the customary procedures and in the ordinary course of business of the Servicer and is being sold, assigned, transferred, conveyed and contributed by the Originator to the RFC Purchaser pursuant to this Agreement.  Each Eligible Receivable arises from an Advance for which the Originator is entitled to reimbursement pursuant to a Designated Servicing Agreement.

(2)        *Assignment Permitted under Servicing Agreements*.   The rights to reimbursement for the Advances under each Designated Servicing Agreement were eligible for assignment

and such assignment did not, and will not, violate the terms or require any consent under the related Designated Servicing Agreement or any other document or agreement to which the Originator is a party or to which its assets or properties are subject.

(3)     *Schedule of Receivables*. The information set forth in the Schedule of Receivables attached as Attachment B hereto is true and correct with respect to the Eligible Receivables being transferred on the applicable Sale Date.

(4)     *Title to Receivables*.  Immediately prior to the transfer and assignment to the RFC Purchaser as contemplated hereunder, the Originator had good and marketable title to each Eligible Receivable, free and clear of all Liens and rights of others.

(5)     *No Impairment of RFC Purchaser's Rights*.  Neither the Originator nor any other Person has taken any action that, or failed to take any action the omission of which, would materially impair the rights of the RFC Purchaser and its assignees with respect to the Eligible Receivables, or on the collectibility of such Eligible Receivables.

(6)     *No Defenses*.  Each Eligible Receivable represents valid entitlement to be paid, has not been repaid in whole or in part or been compromised, adjusted, extended, satisfied, subordinated, rescinded, waived, amended or modified, and is not subject to compromise, adjustment, extension, satisfaction, subordination, rescission, set-off, counterclaim, defense, waiver, amendment or modification by any Person.

(7)     *No Government Receivables*. No Eligible Receivable is due from the United States of America or any state or from any agency, department or instrumentality of the United States of America or any state.

(8)     *No Pending Proceedings*. There are no proceedings pending, or, to the best of the Originator's knowledge, threatened, wherein any governmental agency has (A) alleged that any Eligible Receivable is illegal or unenforceable, (B) asserted the invalidity of any Eligible Receivable or (C) sought any determination or ruling that might adversely affect the payment or enforceability of any Eligible Receivable.

(9)     *Originator's Reporting Obligations*. With respect to each Eligible Receivable, the Originator is not aware of any respect in which the Originator may be unable to perform its reporting obligations as set forth herein.

(10)    *UCC Classification*. No Eligible Receivable is secured by "real property" or "fixtures" or evidenced by an "instrument" under and as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions.  The Eligible Receivables constitute "general intangibles" or "accounts" within the meaning of the applicable Uniform Commercial Code in effect from time to time in the relevant jurisdiction.

(11)    *Enforceability; Compliance with Laws*. Each Eligible Receivable is enforceable in accordance with its terms set forth in the related Designated Servicing Agreement. Each Advance with respect to an Eligible Receivable, when made, complied with all applicable laws, including those relating to consumer protection, is valid and enforceable and is not subject to any set-off, counterclaim or other defense to payment by the Obligor, the related MBS Trust, MBS Trustee or any other Person.

(12)    *No Consent Required*. Each Eligible Receivable is assignable by the Originator and their successors and assigns, without the consent of any other Person (except any such consent that has been obtained and is in full force and effect as of the date hereof).

(13)    *No Conflicting Assignment*.  Other than the ownership interest transferred to the RFC Purchaser and its assignees pursuant to this Agreement, the Originator has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed  any of the Eligible Receivables.

(14)    *Ownership of Eligible Receivables*. Each Eligible Receivable created under the Designated Servicing Agreements set forth in the Designated Servicing Agreements Schedule is owned by the Originator.

**Section 5.          Notice of Breach of Representations and Warranties.**

The Originator shall inform the RFC Purchaser and the Collateral Agent promptly, in writing, upon the discovery of any of the Originator's representations and warranties in Section 4 above that pertain to an Eligible Receivable were breached or untrue as of the applicable Sale Date.  The breach of any representation and warranty shall not be waived by the RFC Purchaser under any circumstances without the prior written consent of the Collateral Agent.  The RFC Purchaser hereby designates the Collateral Agent as its designee for purposes of this Section 5 and any other notice required under this Agreement.

**Section 6.          Termination.**

This Agreement (a) shall continue and may not be terminated until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated and (b) may be terminated at any time thereafter by either party upon written notice to the other party.

**Section 7.          General Covenants of Originator.**

The Originator covenants and agrees that from the date of this Agreement until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated:

(a)    *Legal Existence*.  The Originator shall do or cause to be done all things necessary on its part to preserve and keep in full force and effect its legal existence, and to maintain each of its licenses, approvals, registrations and qualifications in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such licenses, approvals, registrations or qualifications, except for failures to maintain any such licenses, approvals, registrations or qualifications which, individually or in the aggregate, would not have a material adverse effect on the ability of the Originator or the RFC Purchaser to perform its obligations hereunder or under any of the other Credit Documents.

(b)    *Compliance With Laws*.  The Originator shall comply in all material respects with all laws, rules, regulations and orders of any governmental authority applicable to its operation, the noncompliance with which would have a material adverse effect on the ability of the Originator or the RFC Purchaser to perform their obligations hereunder or under any of the other Credit Documents.

(c)    *Taxes*.  The Originator shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon the Originator or upon its income and profits, or upon any of its property or any part thereof, before the same shall become in default, if the failure to pay such taxes should reasonably be expected to have a material adverse effect on the value of the Receivables or on the Originator's ability to perform its obligations under this Agreement; *provided* that the Originator shall not be required to pay and discharge any such tax, assessment, charge or levy so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.  The Originator shall have set aside on its books adequate reserves with respect to any such tax, assessment, charge or levy so contested, or so long as the failure to pay any such tax, assessment, charge or levy would not have a material adverse effect on the ability of the Originator to perform its obligations hereunder or the Servicer's ability to perform its obligations under the Designated Servicing Agreements.

(d)    *Separate Identity*.  The Originator hereby covenants and agrees to take all actions necessary to maintain the RFC Purchaser's status as a separate legal entity.  The Originator shall conduct its business

7

solely in its own name and all written and oral communications of the Originator shall be made solely in the name of the Originator.  The Originator views the RFC Purchaser as a separate legal entity.

(e)     *No Liens, Etc. Against Transferred Assets*.  The Originator hereby covenants that it will not sell, pledge, assign or transfer to any other Person, or grant, create, incur or assume any Lien on any of the Receivables, or any interest therein.  The Originator shall notify the RFC Purchaser and the Collateral Agent and their designees of the existence of any Lien (other than as provided above) on any Receivable immediately upon discovery thereof; and the Originator shall defend the right, title and interest of the RFC Purchaser and the Collateral Agent and their assignees in, to and under the Receivables against all claims of third parties claiming through or under the Originator; *provided*, *however*, that nothing in this Section 7 shall be deemed to apply to any Liens for municipal or other local taxes and other governmental charges if such taxes or governmental charges shall not at the time be due and payable or if the Originator shall currently be contesting the validity thereof in good faith by appropriate proceedings to the extent the same would not constitute an Event of Default under the Credit Agreement. The Originator shall take all actions as may be necessary to ensure that the ownership of the Receivables is conveyed to the RFC Purchaser pursuant to this Agreement.

(f)     *Keeping of Records and Books of Account*.  The Originator shall maintain accurate, complete and correct documents, books, records and other information which is reasonably necessary for the collection of all Receivables (including, without limitation, records adequate to permit the prompt identification of each new Receivable and all collections of, and adjustments to, each existing Receivable).

(g)     *Taking of Necessary Actions*.  The Originator shall perform all actions necessary to sell, contribute and absolutely assign the Receivables and other Transferred Assets to the RFC Purchaser and its assigns, including the Collateral Agent, including, without limitation, any necessary notifications of the transfers occurring hereunder to any parties.  The Originator shall deliver, prior to, or promptly following, the date of this Agreement, a notice substantially in the form attached hereto as <u>Attachment C</u> to the applicable MBS Trustee for each of the Designated Servicing Agreements.

> **Section 8.     Intent of Parties.**

The parties hereto intend that the conveyance of the Originator's right, title and interest in and to the Transferred Assets shall constitute an absolute sale, conveying good title free and clear of any liens, claims, encumbrances or rights of others, from the Originator to the RFC Purchaser.  It is the intention of the parties hereto that the arrangements with respect to the Transferred Assets shall constitute a purchase and sale of such Transferred Assets and not a loan, including for accounting purposes.

> **Section 9.     Miscellaneous.**

(a)     *Amendment*.  This Agreement may not be amended except by an instrument in writing signed by the Originator and the RFC Purchaser.  In addition, this Agreement constitutes a Credit Document and, so long as the Credit Agreement remains in effect, this Agreement may not be amended except in accordance with Section 12.05 of the Credit Agreement.

(b)     *Binding Nature; Assignment*.  The covenants, agreements, rights and obligations contained in this Agreement shall be binding upon the successors and assigns of RFC (in any capacity hereunder, including as the Servicer and the Originator) and shall inure to the benefit of the successors and assigns of the RFC Purchaser, and all persons claiming by, through or under the RFC Purchaser.

(c)     *Entire Agreement*.  This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

(d)    *Severability of Provisions*.  If any provision in or obligation under this Agreement is held to be illegal, invalid or unenforceable in any jurisdiction, (a) the legality, validity and enforceability of the remaining provisions in or obligations under this Agreement, or of such provision in or obligation under this Agreement in any other jurisdiction, shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(e)    *Governing Law*.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

(f)    *Jurisdiction; Etc.*

(1)    Jurisdiction.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AGAINST ANY OTHER PARTY HERETO, IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS RELATING HERETO, IN A FORUM OTHER THAN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(2)    Waiver of Venue.  Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in Section 10(f)(1).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(3)    Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10(l).  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

(g)    **Waiver of Jury Trial**.  **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER**

9

**PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

(h)      *Counterparts*.  This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.  Any counterpart hereof signed by a party against whom enforcement of this Agreement is sought shall be admissible into evidence as an original hereof to prove the contents thereof.

(i)      *Indulgences; No Waivers*.  Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or future exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(j)      *Headings Not to Affect Interpretation*.  The headings contained in this Agreement are for convenience of reference only, and they shall not be used in the interpretation hereof.

(k)      *Benefits of Agreement*.  Nothing in this Agreement, express or implied, shall give to any Person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement; *provided*, that the Collateral Agent, acting for the benefit of the Secured Parties, and the Administrative Agent shall be express third-party beneficiaries of this Agreement.

(l)      *Notices*.  Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any party, addressed to it at its address set forth in the Credit Agreement, or at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.

(m)      *Inconsistency*.  In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in the Credit Agreement and/or the Orders, the terms and provisions of the Credit Agreement and/or the Orders shall supersede and control the terms and provisions of this Agreement.

(n)      *Expenses*.  Without limiting any party's obligations under the Credit Documents, the Interim Financing Order or the Final Financing Order, the parties hereto agree to promptly pay or reimburse all out-of-pocket costs and expenses incurred by Collateral Agent (including the fees, charges and disbursements of any counsel for Collateral Agent) (a) in connection with the enforcement or protection of any rights and remedies under this Agreement, including all such costs and expenses incurred during any legal proceeding, including the Cases and any other proceeding under any Debtor Relief Law, (b) in connection with protecting the Transferred Assets and (c) creating, perfecting, maintaining and enforcing the Collateral Agent's Liens on the Transferred Assets under the Borrowers Security Agreement and the Orders.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of date first above written.

**RESIDENTIAL FUNDING COMPANY, LLC**, as
Originator and Servicer

By: _____

    Name:
    Title:

**RFC BORROWER LLC**, as RFC Purchaser

By: _____
     Name:
     Title:

## DESIGNATED SERVICING AGREEMENTS

| Deal Name | Servicing Agreement |
|---|---|
| RALI 2007-QA1 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA1 |
| RALI 2007-QA2 | Series Supplement dated February 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA2 |
| RALI 2007-QA3 | Series Supplement dated April 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA3 |
| RALI 2007-QA4 | Series Supplement dated May 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated May 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA4 |
| RALI 2007-QA5 | Series Supplement dated August 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA5 |
| RALI 2007-QS1 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1 |
| RASC 2004-KS10 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of October 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS10 |
| RASC 2004-KS11 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of November 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS11 |

| | |
|---|---|
| RASC 2004-KS12 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated as of December 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS12 |
| RASC 2004-KS6 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of June 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS6 |
| RASC 2004-KS7 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of July 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS7 |
| RASC 2004-KS8 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of August 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS8 |
| RASC 2004-KS9 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of September1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS9 |
| RALI 2007-QS10 | Series Supplement dated August 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS10 |
| RALI 2007-QS11 | Series Supplement dated September 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS11 |
| RALI 2007-QS2 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC asMaster Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS2 |
| RALI 2004-QA2 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated April 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA2 |
| RALI 2004-QA3 | Series Supplement dated August 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA3 |

| | |
|---|---|
| RALI 2004-QA4 | Series Supplement dated September 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated September 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA4 |
| RALI 2004-QA5 | Series Supplement dated November 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA5 |
| RALI 2004-QA6 | Series Supplement dated December 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA6 |
| RALI 2004-QS10 | Series Supplement dated July 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated April 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS10 |
| RALI 2004-QS12 | Series Supplement dated September 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS12 |
| RALI 2004-QS13 | Series Supplement dated September 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS13 |
| RALI 2004-QS14 | Series Supplement dated October 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS14 |
| RALI 2004-QS15 | Series Supplement dated November 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS15 |
| RALI 2004-QS16 | Series Supplement dated December 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS16 |

| | |
|---|---|
| RALI 2004-QS8 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated April 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS8 |
| RALI 2004-QS9 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated April 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS |
| RAMP 2004-RS10 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated October 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS10 |
| RAMP 2004-RS11 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated November 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS11 |
| RAMP 2004-RS12 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated December 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS12 |
| RAMP 2004-RS6 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated June 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS6 |
| RAMP 2004-RS8 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS8 |
| RAMP 2004-RS9 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated September 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS9 |
| RAMP 2004-RZ2 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated June 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RZ2 |
| RAMP 2004-RZ3 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated December 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RZ4 |
| RAMP 2004-RZ4 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated September 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RZ3 |

| | |
|---|---|
| RFMSI 2004-S6 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated June 1, 2004, Mortgage Pass-Through Certificates, Series 2004-S6 |
| RFMSI 2004-S8 | Series Supplement dated September 1, 2004 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2004, Mortgage Pass-Through Certificates, Series 2004-S8 |
| RFMSI 2004-S9 | Series Supplement dated December 1, 2004 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2004, Mortgage Pass-Through Certificates, Series 2004-S9 |
| RFMSI 2004-SA1 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated June 1, 2004, Mortgage Pass-Through Certificates, Series 2004-SA1 |
| RAMP 2004-SL2 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated June 1, 2004, Mortgage-Backed Pass-Through Certificates, Series 2004-SL2 |
| RAMP 2004-SL3 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated September 1, 2004, Mortgage-Backed Pass-Through Certificates, Series 2004-SL3 |
| RAMP 2004-SL4 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2004, Mortgage-Backed Pass-Through Certificates, Series 2004-SL4 |
| RALI 2007-QS3 | Series Supplement dated February 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS3 |
| RALI 2007-QS4 | Series Supplement dated March 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4 |
| RALI 2007-QS5 | Series Supplement dated March 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS5 |

| | |
|---|---|
| RALI 2007-QS6 | Series Supplement dated April 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6 |
| RALI 2007-QS7 | Series Supplement dated May 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated May 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS7 |
| RASC 2005-AHL1 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-AHL1 |
| RASC 2005-AHL2 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated October 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-AHL2 |
| RASC 2005-AHL3 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-AHL3 |
| RAMP 2005-EFC1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC1 |
| RAMP 2005-EFC2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC2 |
| RAMP 2005-EFC3 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated August 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC3 |
| RAMP 2005-EFC4 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC4 |
| RAMP 2005-EFC5 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated October1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC5 |
| RAMP 2005-EFC6 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2005, Mortgage Asset- |

Backed Pass-Through Certificates, Series 2005-EFC6

RAMP 2005-EFC7    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC7

RASC 2005-KS1    Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated as of January 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS1

RASC 2005-KS10    Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated as of October 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS10

RASC 2005-KS11    Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated as of November 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS11

RALI 2007-QS8    Series Supplement dated As Of June 1, 2007 to Pooling And Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated As Of June 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS8

RALI 2007-QS9    Series Supplement dated As Of July 1, 2007 to Pooling And Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated As Of July 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS9

RASC 2005-KS12    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS12

RASC 2005-KS2    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS2

RASC 2005-KS3    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated March 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS3

RASC 2005-KS4    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated April 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS4

RASC 2005-KS5 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS5

RASC 2005-KS6 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS6

RASC 2005-KS7 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS7

RASC 2005-KS8 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated August 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS8

RASC 2005-KS9 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS9

RAMP 2005-NC1 — Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-NC1

RALI 2005-QA1 — Series Supplement dated January 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA1

RALI 2005-QA10 — Series Supplement dated September 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA10

RALI 2005-QA11 — Series Supplement dated October 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA11

RALI 2005-QA12 — Series Supplement dated November 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA12

RALI 2005-QA13 Series Supplement dated December 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA13

RALI 2005-QA2 Series Supplement dated February 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA2

RALI 2005-QA3 Series Supplement dated March 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA3

RALI 2005-QA4 Series Supplement dated April 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA4

RALI 2005-QA5 Series Supplement dated April 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA5

RALI 2005-QA6 Series Supplement dated May 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA6

RALI 2005-QA7 Series Supplement dated June 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA7

RALI 2005-QA8 Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA8

RALI 2005-QA9 Series Supplement dated August 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA9

RALI 2005-QS1     Series Supplement dated January 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS1

RALI 2005-QS10     Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS10

RALI 2005-QS11     Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS11

RALI 2005-QS12     Series Supplement dated August 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS12

RALI 2005-QS13     Series Supplement dated September 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS13

RALI 2005-QS14     Series Supplement dated September 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS14

RALI 2005-QS15     Series Supplement dated October 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS15

RALI 2005-QS16     Series Supplement dated November 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS16

RALI 2005-QS17     Series Supplement dated December 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS17

| | |
|---|---|
| RALI 2005-QS2 | Series Supplement dated February 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS2 |
| RALI 2005-QS3 | Series Supplement dated March 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS3 |
| RALI 2005-QS4 | Series Supplement dated April 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS4 |
| RALI 2005-QS5 | Series Supplement dated April 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS5 |
| RALI 2005-QS6 | Series Supplement dated May 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS6 |
| RALI 2005-QS7 | Series Supplement dated June 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS7 |
| RALI 2005-QS8 | Series Supplement dated June 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS8 |
| RALI 2005-QS9 | Series Supplement dated June 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS9 |
| RAMP 2005-RS1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank National Association as Trustee, dated January 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS1 |
| RAMP 2005-RS2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and |

JPMorgan Chase Bank, N.A as Trustee, dated February 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS2

RAMP 2005-RS3    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A as Trustee, dated March 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS3

RAMP 2005-RS4    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated April 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS4

RAMP 2005-RS5    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated May 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS5

RAMP 2005-RS6    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated June 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS6

RAMP 2005-RS7    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated July 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS7

RAMP 2005-RS8    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated September 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS8

RAMP 2005-RS9    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated November 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS9

RAMP 2005-RZ1    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated March 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RZ1

RAMP 2005-RZ2    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated July 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RZ2

RAMP 2005-RZ3    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated September 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RZ3

RAMP 2005-RZ4    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and

|  | JPMorgan Chase Bank, N.A. as Trustee, dated November 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RZ4 |
|---|---|
| RFMSI 2005-S1 | Series Supplement dated February 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2004, Mortgage Pass-Through Certificates, Series 2005-S1 |
| RFMSI 2005-S2 | Series Supplement dated March 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2004, Mortgage Pass-Through Certificates, Series 2005-S2 |
| RFMSI 2005-S4 | Series Supplement dated May 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S4 |
| RFMSI 2005-S5 | Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S5 |
| RAMP 2007-RS1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and Lasalle Bank National Association as Trustee And Supplemental Interest Trust Trustee, dated February 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-RS1 |
| RFMSI 2005-S6 | Series Supplement dated August 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S6 |
| RFMSI 2005-S7 | Series Supplement dated November 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S7 |
| RFMSI 2005-S8 | Series Supplement dated November 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S8 |
| RFMSI 2005-S9 | Series Supplement dated December 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S9 |
| RFMSI 2005-SA1 | Series Supplement dated February 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2004, Mortgage Pass-Through Certificates, Series |

2005-SA1

| | |
|---|---|
| RFMSI 2005-SA2 | Series Supplement dated May 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-SA2 |
| RFMSI 2005-SA3 | Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-SA3 |
| RFMSI 2005-SA4 | Series Supplement dated August 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-SA4 |
| RFMSI 2005-SA5 | Series Supplement dated October 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-SA5 |
| RAMP 2005-SL1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2005, Mortgage Backed Pass-Through Certificates, Series 2005-SL1 |
| RAMP 2005-SL2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated June 1, 2005, Mortgage Backed Pass-Through Certificates, Series 2005-SL2 |
| RAMP 2007-RS2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and LaSalle Bank National Association as Trustee and Supplemental Interest Trust Trustee, dated April 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-RS2 |
| RAMP 2007-RZ1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and LaSalle Bank National Association as Trustee and Supplemental Interest Trust Trustee, dated February 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-RZ1 |
| RFMSI 2007-S1 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2007-S1 |
| RFMSI 2007-S2 | Series Supplement dated February 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series |

2007-S2

| | |
|---|---|
| RFMSI 2007-S3 | Series Supplement dated March 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2007-S3 |
| RFMSI 2007-S4 | Series Supplement dated April 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated April 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S4 |
| RFMSI 2007-S5 | Series Supplement dated May 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated April 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S5 |
| RFMSI 2007-S6 | Series Supplement dated June 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S6 |
| RFMSI 2007-S7 | Series Supplement dated July 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S7 |
| RFMSI 2007-S8 | Series Supplement dated August 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S8 |
| RFMSI 2007-SA1 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2007-SA1 |
| RFMSI 2007-SA2 | Series Supplement dated March 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2007-SA2 |
| RFMSI 2007-SA3 | Series Supplement dated June 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated April 1, 2007, Mortgage Pass-Through Certificates, Series 2007-SA3 |
| RAMP 2006-EFC1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Asset- |

Backed Pass-Through Certificates, Series 2006-EFC1

RAMP 2006-EFC2 — Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EFC2

RASC 2006-KS1 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS1

RASC 2006-KS2 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS2

RASC 2006-KS3 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated March 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS3

RASC 2006-KS4 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS4

RASC 2006-KS5 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS5

RASC 2006-KS6 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS6

RASC 2006-KS7 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated August 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS7

RASC 2006-KS8 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS8

RASC 2006-KS9 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated October 27, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS9

RAMP 2006-NC1    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-NC1

RAMP 2006-NC2    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-NC2

RAMP 2006-NC3    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-NC3

RALI 2006-QA1    Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and the trustee named in the applicable Series Supplement as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA1

RALI 2006-QA10    Series Supplement dated November 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated November 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA10

RALI 2006-QA11    Series Supplement dated December 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated November 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA11

RALI 2006-QA2    Series Supplement dated February 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA2

RALI 2006-QA3    Series Supplement dated April 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA3

RALI 2006-QA4    Series Supplement dated May 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA4

RALI 2006-QA5    Series Supplement dated June 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-

QA5

RALI 2006-QA6    Series Supplement dated July 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA6

RALI 2006-QA7    Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA7

RALI 2006-QA8    Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA8

RALI 2006-QA9    Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated October 30, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA9

RALI 2006-QS1    Series Supplement dated January 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS1

RALI 2006-QS10    Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS10

RALI 2006-QS11    Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS11

RALI 2006-QS12    Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS12

RALI 2006-QS13    Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates,

Series 2006-QS13

RALI 2006-QS14    Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated October 30, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS14

RALI 2006-QS15    Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated October 30, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS15

RALI 2006-QS16    Series Supplement dated November 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated November 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS16

RALI 2006-QS17    Series Supplement dated December 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS17

RALI 2006-QS18    Series Supplement dated December 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18

RALI 2006-QS2    Series Supplement dated February 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS2

RALI 2006-QS3    Series Supplement dated March 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS3

RALI 2006-QS4    Series Supplement dated April 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS4

RALI 2006-QS5    Series Supplement dated May 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-

QS5

| | |
|---|---|
| RALI 2006-QS6 | Series Supplement dated June 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS6 |
| RALI 2006-QS7 | Series Supplement dated June 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS7 |
| RALI 2006-QS8 | Series Supplement dated July 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS8 |
| RALI 2006-QS9 | Series Supplement dated July 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS9 |
| RAMP 2006-RS1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS1 |
| RAMP 2006-RS2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS2 |
| RAMP 2006-RS3 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated April 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS3 |
| RAMP 2006-RS4 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated June 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS4 |
| RAMP 2006-RS5 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated August 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS5 |
| RAMP 2006-RS6 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee and Supplement Interest Trust Trustee, dated October 30, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series |

2006-RS6

| | |
|---|---|
| RAMP 2006-RZ1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ1 |
| RAMP 2006-RZ2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated April 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ2 |
| RAMP 2006-RZ3 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated July 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ3 |
| RAMP 2006-RZ4 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated September 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ4 |
| RAMP 2006-RZ5 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ5 |
| RFMSI 2006-S1 | Series Supplement dated January 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S1 |
| RFMSI 2006-S10 | Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated October 30, 2006, Mortgage Pass-Through Certificates, Series 2006-S10 |
| RFMSI 2006-S11 | Series Supplement dated November 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S11 |
| RFMSI 2006-S12 | Series Supplement dated December 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S11 |
| RFMSI 2006-S2 | Series Supplement dated February 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006- |

S2

| | |
|---|---|
| RFMSI 2006-S3 | Series Supplement dated March 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S3 |
| RFMSI 2006-S4 | Series Supplement dated April 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S4 |
| RFMSI 2006-S5 | Series Supplement dated June 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S5 |
| RFMSI 2006-S6 | Series Supplement dated July 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S6 |
| RFMSI 2006-S7 | Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S7 |
| RFMSI 2006-S8 | Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S8 |
| RFMSI 2006-S9 | Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S9 |
| RFMSI 2006-SA1 | Series Supplement dated January 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-SA1 |
| RFMSI 2006-SA3 | Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Mortgage Pass-Through Certificates, Series 2006-SA3 |
| RFMSI 2006-SA4 | Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated October 30, 2006, Mortgage Pass-Through Certificates, Series |

2006-SA4

| | |
|---|---|
| RASC 2007-EMX1 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1 |
| RASC 2007-KS1 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS1 |
| RASC 2007-KS2 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS2 |
| RASC 2007-KS3 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated March 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS3 |
| RASC 2007-KS4 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and LaSalle Bank National Association as Trustee, dated April 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS4 |

Attachment B to
RFC Receivables Pooling and Purchase Agreement

**SCHEDULE OF RECEIVABLES**

Attachment C to
RFC Receivables Pooling and Purchase Agreement

**FORM OF MBS TRUSTEE NOTICE**

RESIDENTIAL FUNDING COMPANY, LLC

[DATE]

[          ], as Trustee

_____
Attention: Structured Finance/_____

**NOTICE OF ASSIGNMENT OF ADVANCE REIMBURSEMENT RIGHTS**

This is intended as notification, as contemplated by UCC § 9-404(a)(2), that Residential Funding Company, LLC ("RFC") has sold, assigned, conveyed, transferred and contributed to RFC BORROWER LLC, a Delaware limited liability company (the "RFC Purchaser"), all of RFC's present and future rights to reimbursement for all servicer advances, including, but not limited to, advances for any applicable monthly principal and/or interest, taxes and insurance, home equity lines of credit draws, and foreclosure and liquidation and related expenses (the "Advance Reimbursement Rights") made by RFC on or after May 15, 2012 (the "Transfer Date"), in its capacity as Servicer of mortgage loans in any pool that is subject to the servicing agreement(s) described on the attached Schedule 1 (the "Servicing Agreement(s)") pursuant to a Receivables Purchase and Pooling Agreement, dated as of the Transfer Date, between the RFC Purchaser and RFC. These Advance Reimbursement Rights have been further pledged by the RFC Purchaser to Barclays Bank PLC, as Collateral Agent under a certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of May 15, 2012 (the "Credit Agreement"), by and among the RFC Purchaser, GMACM Borrower LLC, Residential Capital, LLC ("ResCap"), GMAC Mortgage, LLC ("GMACM"), RFC, and certain Subsidiaries of ResCap, as Guarantors, GMACM and RFC, as Administrators, Originators, Receivables Custodians and Servicers, GMACM, as GMACM Servicer, the Lenders party thereto from time to time, Barclays Bank PLC, as Administrative Agent and Collateral Agent for the Secured Parties, and the other persons party thereto from time to time.

In addition, RFC previously sold, assigned, conveyed, transferred and contributed its Advance Reimbursement Rights under the Servicing Agreements specified on Schedule 1 hereto to GSAP Servicer Advance, LLC, a Delaware limited liability company (the "GSAP Intermediate Transferor") and such Advance Reimbursement Rights were subsequently sold, assigned, conveyed, transferred and contributed by the GSAP Intermediate Transferor to GMAC Mortgage Servicer Advance Funding Company Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "GSAP Transferor"). The GSAP Transferor pledged such Advance Reimbursement Rights to The Bank of New York Mellon, as Indenture Trustee under a Fourth Amended and Restated Indenture, dated as of March 15, 2011, among the Bank, The Bank of New York Mellon, as Indenture Trustee, Calculation Agent and Paying Agent, GMACM, as an Administrator and as a Servicer, and RFC, as an Administrator and as a Servicer, as further amended by Amendment No. 1 and the 2012-VF1 supplement under which Barclays Bank PLC acted as an administrative agent, dated as of March 13, 2012 (the "GSAP Indenture"). You are hereby notified that on or prior to the date hereof, the GSAP Indenture has been terminated, all notes issued pursuant thereto have been paid in full, and all liens granted in favor of the Indenture Trustee in connection therewith have been released.

In addition, this is intended as notification, as contemplated by UCC § 9-404(a)(2), that the GSAP Transferor has sold, assigned, conveyed and transferred all Advance Reimbursement Rights originated under the Servicing Agreements prior to the Transfer Date (as defined above), which are all of the Advance Reimbursement Rights owned by it, to the RFC Purchaser pursuant to a Receivables Purchase Agreement, dated as of the Transfer Date, among the RFC Purchaser, RFC and the GSAP Transferor. These Advance Reimbursement Rights have also been further pledged by the RFC Purchaser to Barclays Bank PLC, as Collateral Agent under the Credit Agreement.

Attachment C-1

Sincerely yours,


RESIDENTIAL FUNDING COMPANY, LLC


By: _____
    Name:
    Title:


RFC BORROWER LLC


By: _____
    Name:
    Title:

<u>Execution Version</u>

RFC RECEIVABLES PURCHASE AGREEMENT

by and among

RESIDENTIAL FUNDING COMPANY, LLC

(Originator and Servicer),

RFC BORROWER LLC

(RFC Purchaser)

and

GMAC MORTGAGE SERVICER
ADVANCE FUNDING COMPANY LTD.

(GSAP Transferor)

Dated as of May 15, 2012

# TABLE OF CONTENTS

<u>Page</u>

Section 1.    Definitions. ........................................................................................................ 2
Section 2.    Transfer and Assignment of Receivables. ........................................................... 4
Section 3.    Originator's Acknowledgment and Consent to Assignment. ............................... 5
Section 4.    Representations, Warranties and Certain Covenants. .......................................... 6
Section 5.    Notice of Breach of Representations and Warranties. ....................................... 10
Section 6.    Termination.......................................................................................................... 11
Section 7.    General Covenants of Originator. .................................................................... 11
Section 8.    Intent of Parties.................................................................................................. 12
Section 9.    Indemnity............................................................................................................ 12
Section 10.   Miscellaneous. .................................................................................................. 12


Attachment A    Designated Servicing Agreement Schedule


Attachment B    Eligible Receivables Schedule

i

# RFC RECEIVABLES PURCHASE AGREEMENT

This RECEIVABLES PURCHASE AGREEMENT (this "Agreement") is made as of May 15, 2012, by and among GMAC MORTGAGE SERVICER ADVANCE FUNDING COMPANY LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "GSAP Transferor"), RFC BORROWER LLC, a Delaware limited liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (the "RFC Purchaser"), and RESIDENTIAL FUNDING COMPANY, LLC, a Delaware limited liability company and a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code (together with any successors, "RFC" or the "Originator" or the "Servicer").

## RECITALS

A.    The RFC Purchaser is a special purpose company wholly owned by RFC.  Pursuant to certain pooling and servicing agreements, sale and servicing agreements, servicing agreements, subservicing agreements or similar agreements (each a "Servicing Agreement"), RFC services pools of mortgage loans, including revolving home equity lines of credit (collectively, "Mortgage Loans") for and on behalf of various MBS Trusts.  Certain of the Servicing Agreements will be designated as described herein for inclusion under this Agreement.

B.    Pursuant to each Designated Servicing Agreement, RFC, as servicer (in such capacity, the "Servicer"), has made certain Advances from time to time for the benefit of the related MBS Trust.  Upon making each Advance, the Servicer became the beneficiary of a contractual right to be reimbursed for such Advance in accordance with the terms of the related Servicing Agreement.  RFC, in its capacity as originator of the right to be reimbursed for Advances (in such capacity, the "Originator"), sold, assigned, transferred, conveyed and contributed to RFC – GSAP Servicer Advance, LLC, a Delaware limited liability company (the "GSAP Intermediate Transferor"), all its right, title and interest in, and its rights to, the Receivables (as defined herein) originated under the Designated Servicing Agreements pursuant to the terms of a Receivables Sale Agreement, dated as of March 6, 2008, between the GSAP Intermediate Transferor and RFC (the "Original RFC Receivables Sale Agreement"), as subsequently amended and restated by the First Amended and Restated Receivables Sale Agreement entered into as of April 15, 2010 by the GSAP Intermediate Transferor and RFC (the "Amended and Restated RFC Receivables Sale Agreement" and, together with the Original RFC Receivables Sale Agreement, the "RFC Receivables Sale Agreement").  The GSAP Intermediate Transferor contemporaneously entered into a Receivables Pooling Agreement, dated as of April 15, 2010 (the "RFC Receivables Pooling Agreement"), pursuant to which it sold, assigned, transferred, conveyed and contributed to the GSAP Transferor all Receivables acquired by the GSAP Intermediate Transferor from RFC, immediately upon the GSAP Intermediate Transferor's acquisition of such Receivables pursuant to the RFC Receivables Sale Agreement.

C.    The GSAP Transferor, as issuer, RFC, as an administrator on behalf of the GSAP Transferor and as servicer under various Designated Servicing Agreements, GMAC Mortgage, LLC, as an administrator and as a servicer ("GMACM"), and The Bank of New York Mellon, as indenture trustee, calculation agent and paying agent, also entered into a Fourth Amended and Restated Indenture, dated as of March 15, 2011, amending and restating a Third Amended and Restated Indenture, dated as of April 15, 2010, amending and restating a Second Amended and Restated Indenture, dated as of March 6, 2008, amending and restating a First Amended and Restated Indenture, dated as of March 18, 2005, which had previously amended and restated that certain Indenture dated as of June 30, 2004 (as so amended and restated and, as further amended by Amendment No. 1 and the 2012-VF1 supplement under which Barclays Bank PLC acted as an administrative agent (the "GSAP Administrative Agent"), dated as of March 13, 2012, the "GSAP Indenture"), pursuant to which the GMAC Mortgage Servicer Advance Receivables Backed Notes (the "GSAP Indenture Notes") were issued.  The GSAP Indenture Notes issued pursuant to the GSAP Indenture were collateralized by the Receivables and related property and certain monies in respect thereof acquired from time to time by the GSAP Transferor.  The outstanding GSAP Indenture Notes are being paid in full with the

proceeds received by the GSAP Transferor under this Agreement and under a Receivables Purchase Agreement, dated of even date herewith, into which the GSAP Transferor is entering with GMACM and GMACM Borrower LLC.  The GSAP Indenture is being discharged.

D.       On May 14, 2012, RFC and GMACM filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

E.       The RFC Purchaser, as a borrower, and RFC, as a guarantor, administrator, originator, receivables custodian and servicer, are entering into the Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated of even date herewith (as such agreement may be amended, modified, restated or supplemented from time to time, the "Credit Agreement"), together with GMACM Borrower LLC, as a borrower, Residential Capital, LLC, GMAC Mortgage, LLC and certain subsidiaries of Residential Capital, LLC, as guarantors, GMAC Mortgage, LLC, as administrator, originator, receivables custodian, servicer and GMACM servicer, the Lenders party thereto, Barclays Bank PLC, as administrative agent (the "Administrative Agent"), and as collateral agent (the "Collateral Agent"), and the other Persons party thereto from time to time.

F.       Pursuant to the Borrowers Security Agreement (as defined herein), the RFC Purchaser will pledge the Receivables it purchases hereunder and all of its rights related to such Receivables to the Collateral Agent for the benefit of the Secured Parties to secure the repayments of the Obligations under the Credit Documents.

G.       The execution, delivery and performance of this Agreement and the sale and assignment of the Receivables by the GSAP Transferor to the RFC Purchaser have been authorized and approved by the Interim Financing Order and, upon the entry thereof, the Final Financing Order.

H.       To supplement the Orders without in any way diminishing or limiting the effect of the Orders or the approval of such sale and assignment thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such sale and assignment.

**AGREEMENT**

NOW, THEREFORE, in consideration of the above premises and of the mutual promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.        Definitions.**

This Agreement is entered into pursuant to the terms and conditions of the Credit Agreement.   Any capitalized term used but not defined herein shall have the meaning given to it in the Credit Agreement.

"Administrative Agent" has the meaning assigned to that term in the Recitals.

"Agreement" has the meaning assigned to that term in the Recitals.

2

"Amended and Restated RFC Receivables Sale Agreement" has the meaning assigned to that term in the Recitals.

"Borrowers Security Agreement" means the Pledge and Security Agreement, dated as of May 15, 2012 among the RFC Purchaser, GMACM Borrower LLC and the Collateral Agent, as the same may be hereafter amended and supplemented from time to time.

"Case" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which the RFC Purchaser or the Originator, as applicable, is the debtor and the debtor-in-possession.

"Collateral Agent" has the meaning assigned to that term in the Recitals.

"Credit Agreement" has the meaning assigned to that term in the Recitals.

"Designated Servicing Agreement Schedule" has the meaning assigned to such term in Section 2(b) of this Agreement.

"Designated Servicing Agreements" means the Servicing Agreements listed on the Designated Servicing Agreement Schedule.

"GMACM" has the meaning assigned to that term in the Recitals.

"GSAP Administrative Agent" has the meaning assigned to that term in the Recitals.

"GSAP Indenture" has the meaning assigned to that term in the Recitals.

"GSAP Indenture Notes" has the meaning assigned to that term in the Recitals.

"GSAP Indenture Trustee" has the meaning assigned to that term in the Recitals.

"GSAP Intermediate Transferor" has the meaning assigned to that term in the Recitals.

"Lien" means (a) any lien (statutory or other), mortgage, deed of trust, pledge, hypothecation, preference, participation interest, assignment, deposit arrangement, right of set-off or recoupment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities; *provided*, *however*, that the lien created in favor of the Collateral Agent for the benefit of the Secured Parties under the Borrowers Security Agreement shall not be deemed to constitute a Lien for the purposes of this Agreement.

3

"Losses" has the meaning assigned to that term in Section 9 of this Agreement.

"Original RFC Receivables Sale Agreement" has the meaning assigned to that term in the Recitals.

"Originator" has the meaning assigned to that term in the Recitals.

"Purchase Price" has the meaning assigned to that term in Section 2(a) of this Agreement.

"Receivables" means contractual rights to reimbursement pursuant to the terms of Designated Servicing Agreements for Advances made by the Originator as Servicer pursuant to such Designated Servicing Agreements, which Advances have not previously been reimbursed, including all rights of the Servicer to enforce payment of each such obligation under the related Designated Servicing Agreement, which contractual rights to reimbursement have been sold and contributed to the GSAP Transferor prior to the date of this Agreement.

"RFC" has the meaning assigned to that term in the Recitals.

"RFC Purchaser" has the meaning assigned to that term in the Recitals.

"RFC Receivables Pooling Agreement" has the meaning assigned to that term in the Recitals.

"RFC Receivables Sale Agreement" has the meaning assigned to that term in the Recitals.

"Servicer" has the meaning assigned to that term in the Recitals.

"Servicing Agreement" has the meaning assigned to that term in the Recitals.

"Transferred Assets" has the meaning assigned to that term in Section 2(a) of this Agreement.

**Section 2.    Transfer and Assignment of Receivables.**

(a)    The GSAP Transferor hereby sells, assigns, transfers, sets over and otherwise conveys to the RFC Purchaser, and the RFC Purchaser acquires from the GSAP Transferor without recourse except as expressly provided in Section 9 hereof, all of its right, title and interest in, to and under the Receivables existing on the date hereof which were originated under any Designated Servicing Agreement listed on Attachment A hereto, and, all monies due or to become due and all amounts received or receivable with respect to each such Receivable and all proceeds (including "proceeds" as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions (collectively, the "Transferred Assets").

In consideration of the sale, assignment, transfer, set-over and conveyance to the RFC Purchaser of the Transferred Assets, upon the terms and subject to the conditions set forth in this Agreement, the RFC Purchaser has agreed to pay and deliver to the GSAP Transferor consideration equal to $[                    ] (the "Purchase Price")

4

representing the fair market value of the Receivables held by the GSAP Transferor and the amount of cash held by GSAP Transferor, reduced by the amount by which the value of such assets exceeds the obligations of the GSAP Transferor, which excess shall be paid as directed by GMACM and RFC as described in Section 2(e) below.

(b)    The Designated Servicing Agreements under which the Receivables being transferred under this Agreement were originated are listed on <u>Attachment A</u> hereto, which is referred to herein as the "<u>Designated Servicing Agreement Schedule</u>."

(c)    The Originator shall, at its own expense, on or prior to the date hereof, indicate in its books and records (including its computer files) that the Receivables and the related Transferred Assets being transferred hereunder have been sold to the RFC Purchaser in accordance with this Agreement.  The Originator shall not alter the indication referenced in this paragraph with respect to any Designated Servicing Agreement during the term of this Agreement and for so long as any Obligations remain outstanding under the Credit Documents or any Commitments under the Credit Agreement are in effect.  If a third party, including a potential purchaser of Receivables, should inquire, the Originator will promptly indicate that the Receivables have been sold, assigned and contributed and will claim no ownership interest therein.

(d)    Each of the Originator and the GSAP Transferor agrees that all Transferred Assets transferred to the RFC Purchaser hereunder shall comply with all the representations and warranties set forth in this Agreement; provided, that, if any Receivable transferred hereunder fails to comply with any of the representations and warranties specified in Section 4(c), then the Originator shall deliver to the RFC Purchaser a separate schedule specifying each Receivable which does not qualify as an Eligible Receivable.

(e)    PATI A, LLC, a Delaware limited liability company and an indirect subsidiary of GMACM, represents that, as of the date hereof, it owns 100% of the Class A-1 Preference Shares of the GSAP Transferor.  RAHI A, LLC, a Delaware limited liability company and an indirect subsidiary of RFC, represents that, as of the date hereof, it owns 100% of the Class A-2 Preference Shares of the GSAP Transferor.  Each of PATI A, LLC and RAHI A, LLC hereby acknowledges and consents to the transactions contemplated in this Agreement, including the purchase of the Transferred Assets by the RFC Purchaser in exchange for the Purchase Price.  Each of PATI A, LLC and RAHI A, LLC, and their respective parents GMACM and RFC, hereby further acknowledges and consents to the fact that the GSAP Transferor will not be receiving a payment reflecting the benefit of any amount by which the value of the assets of the GSAP Transferor exceeds the GSAP Transferor's debts and obligations.  PATI A, LLC and RAHI A, LLC had planned to distribute any such excess value to GMACM and RFC, respectively.  GMACM and RFC have requested PATI A, LLC and RAHI A, LLC instead to waive any requirement that GSAP Transferor receive such payment, because the excess value will instead be used as directed by GMACM and RFC.  Accordingly, each of PATI A, LLC, RAHI A, LLC, GMACM and RFC acknowledges and consents to the fact that the entire amount of the Purchase Price received by the GSAP Transferor hereunder shall be applied to pay the aggregate outstanding balance of the GSAP Indenture Notes and any other amounts which the GSAP Transferor is required to pay in order to satisfy and discharge the GSAP Indenture, and that, as a result, the Class A-1 Preference Shares and the Class A-2 Preference Shares shall not receive any distributions in connection with the sale of the Transferred Assets.

**Section 3.    Originator's Acknowledgment and Consent to Assignment.**

The Originator hereby acknowledges that the GSAP Transferor has sold to the RFC Purchaser, and that the RFC Purchaser is granting to the Collateral Agent, for the benefit of the Secured Parties, a First Priority Lien upon, and security interest in, the rights of the RFC Purchaser under this Agreement, including, without limitation, the right to enforce the obligations of the Originator hereunder (including the Originator's rights with respect to the Transferred Assets which are being assigned to the RFC Purchaser pursuant to this Agreement).  The Originator

hereby consents to such grant by the RFC Purchaser to the Collateral Agent pursuant to the Borrowers Security Agreement and the Orders. The Originator acknowledges that each of the Administrative Agent and the Collateral Agent, for the benefit of the Secured Parties, shall be a third party beneficiary in respect of the representations, warranties, covenants, rights and benefits arising hereunder that are subject to such grant by the RFC Purchaser.

The Originator hereby irrevocably constitutes and appoints the RFC Purchaser and the Collateral Agent and any officer or agent thereof (and all other Persons designated by the Collateral Agent), with full power of substitution, as the Originator's true and lawful attorney-in-fact (and agent-in-fact) with full irrevocable power and authority in the place and stead of the Originator and in the name of the Originator or in its own name, from time to time in the RFC Purchaser's or the Collateral Agent's discretion, as applicable, for the purpose of carrying out the terms of this Agreement, to, upon authorization by the Bankruptcy Court, take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement, including to enforce the Originator's rights to or collect under the Receivables. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created under the Borrowers Security Agreement and the Orders are released. The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Transferred Assets and the interests of the Secured Parties and shall not impose any duty upon it to exercise any such powers.

### Section 4.        Representations, Warranties and Certain Covenants.

The Originator and, with regard to clause (a) of this Section 4, the GSAP Transferor, hereby make the following representations and warranties for the benefit of the RFC Purchaser and its assignees, on which the RFC Purchaser is relying in accepting the Receivables, executing this Agreement and performing its obligations hereunder. The representations and warranties in this Section 4 are made as of the date of this Agreement. Such representations and warranties shall survive the execution and delivery of this Agreement and the transfer, sale and assignment of any Receivables to the RFC Purchaser hereunder, and are as follows:

(a)        General Representations, Warranties and Covenants of the GSAP Transferor.

(1)        *Organization and Good Standing*. The GSAP Transferor is an entity duly organized, validly existing and in good standing under the laws of the Cayman Islands.

(2)        *Power and Authority; Binding Obligation*. The GSAP Transferor has the power and authority to make, execute, deliver and perform its obligations under this Agreement and all of the transactions contemplated under this Agreement and each Credit Document, and has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement; this Agreement constitutes a legal, valid and binding obligation of the GSAP Transferor, enforceable against the GSAP Transferor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity) or by public policy with respect to indemnification under applicable securities laws.

(3)        *No Violation*. The execution and delivery of this Agreement by the GSAP Transferor and its performance and compliance with the terms of this Agreement will not violate (A) the GSAP Transferor's organizational documents or (B) constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach

of, any material contract, agreement or other instrument to which the GSAP Transferor is a party or which may be applicable to the GSAP Transferor or any of its assets or (C) violate any statute, ordinance or law or any rule, regulation, order, writ, injunction or decree of any court or of any public, governmental or regulatory body, agency or authority applicable to the GSAP Transferor or its properties.

(4)    *No Proceedings*.  No litigation before any court, tribunal or governmental body is currently pending, nor to the knowledge of the GSAP Transferor is threatened against the GSAP Transferor, nor is there any such litigation currently pending, nor to the knowledge of the GSAP Transferor threatened against the GSAP Transferor with respect to this Agreement or any of the Transferred Assets that should reasonably be expected to result in a material adverse effect on the transactions contemplated by this Agreement.

(5)    *No Consents Required*.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the GSAP Transferor of or compliance by the GSAP Transferor with this Agreement, the sale of the Transferred Assets or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained and are in full force and effect as of the date hereof.

(6)    *Information*.  No written statement, report or other document furnished or to be furnished pursuant to this Agreement contains or will contain any statement that is or will be inaccurate or misleading in any material respect.  There are no facts relating to and known by the GSAP Transferor which when taken as a whole may impair the ability of the GSAP Transferor to perform its obligations under this Agreement or any other Credit Document, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of the GSAP Transferor pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(7)    *Default*.  The GSAP Transferor is not in default with respect to any material contract, default under which should reasonably be expected to have a material adverse effect on the GSAP Transferor's ability to perform its obligations under this Agreement, or with respect to any order of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the transactions contemplated hereunder, and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such contract, or with respect to any such order of any court, administrative agency, arbitrator or governmental body.

(b)    <u>General Representations, Warranties and Covenants of the Originator</u>.

(1)    *Organization and Good Standing*.  The Originator is an entity duly formed, validly existing and in good standing under the laws of the State of Delaware and is or will be in compliance with the laws of each state in which any mortgaged property underlying or securing any Mortgage Loan is located to the extent necessary to ensure the enforceability of each Mortgage Loan serviced under a Designated Servicing Agreement.

(2)    *Power and Authority; Binding Obligation*.  Subject to entry of the Interim Financing Order, the Originator has the power and authority to make, execute, deliver and perform its obligations under this Agreement and all of the transactions contemplated under this Agreement and each Credit Document, and has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement; subject to entry of the Interim Financing Order, this Agreement constitutes

a legal, valid and binding obligation of the Originator, enforceable against the Originator in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity) or by public policy with respect to indemnification under applicable securities laws.

(3)    *No Violation*.  Subject to entry of the Interim Financing Order, the execution and delivery of this Agreement by the Originator and its performance and compliance with the terms of this Agreement will not violate (A) the Originator's organizational documents or (B) constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the Originator is a party or which may be applicable to the Originator or any of its assets or (C) violate any statute, ordinance or law or any rule, regulation, order, writ, injunction or decree of any court or of any public, governmental or regulatory body, agency or authority applicable to the Originator or its properties.

(4)    *No Proceedings*.  Except for the commencement of the Cases, no litigation before any court, tribunal or governmental body is currently pending, nor to the knowledge of the Originator is threatened against the Originator, nor is there any such litigation currently pending, nor to the knowledge of the Originator threatened against the Originator with respect to this Agreement that should reasonably be expected to result in a material adverse effect on the transactions contemplated by this Agreement.

(5)    *No Consents Required*.  Subject to entry of the Interim Financing Order, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Originator of or compliance by the Originator with this Agreement, the sale of the Transferred Assets or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained and are in full force and effect as of the date hereof.

(6)    *Information*.  No written statement, report or other document furnished or to be furnished pursuant to this Agreement contains or will contain any statement that is or will be inaccurate or misleading in any material respect. There are no facts relating to and known by the Originator which when taken as a whole may impair the ability of the Originator to perform its obligations under this Agreement or any other Credit Document, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of the Originator pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(7)    *Default*.  Except to the extent resulting from the commencement of its Case, the Originator is not in default with respect to any material contract, default under which should reasonably be expected to have a material adverse effect on the Originator's ability to perform its obligations under this Agreement, or with respect to any order of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the transactions contemplated hereunder, and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such contract, or with respect to any such order of any court, administrative agency, arbitrator or governmental body, nor is RFC, as Servicer, in default, nor has RFC, as Servicer, received any notice of termination as Servicer under any Designated Servicing Agreement.

8

(8)    *Fannie and Freddie Approved*. The Originator is an approved seller/servicer of residential mortgage loans for Fannie Mae and Freddie Mac, and the Originator is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae and Freddie Mac and, except to the extent resulting from the commencement of its Case, no event has occurred which would make the Originator unable to comply with eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac.

(c)    <u>Representations; Warranties and Covenants of the Originator Concerning the Receivables</u>.

(1)    *Eligible Receivables*. Each Receivable is an Eligible Receivable that is payable in United States dollars and has been created pursuant to a Designated Servicing Agreement that is an Eligible Servicing Agreement, in accordance with the terms of such Designated Servicing Agreement and with the customary procedures and in the ordinary course of business of the Servicer and has been sold, assigned, transferred, conveyed and contributed by the Originator to the GSAP Intermediate Transferor pursuant to the RFC Receivables Sale Agreement and sold, assigned, transferred, conveyed and contributed by the GSAP Intermediate Transferor to the GSAP Transferor pursuant to the RFC Receivables Pooling Agreement. Each Receivable arises from an Advance for which the Originator is entitled to reimbursement pursuant to a Designated Servicing Agreement.

(2)    *Assignment Permitted under Servicing Agreements*. The rights to reimbursement for the Advances under each Designated Servicing Agreement were eligible for assignment and such assignment did not, and will not, violate the terms or require any consent under the related Designated Servicing Agreement or any other document or agreement to which the Originator is a party or to which its assets or properties are subject.

(3)    *Schedule of Receivables*. The information set forth in the Eligible Receivables Schedule attached as Attachment B hereto is true and correct with respect to any Receivables as of the date hereof.

(4)    *Title to Receivables*. Immediately prior to the transfer and assignment to the RFC Purchaser as contemplated hereunder, the GSAP Transferor had good and marketable title to each Receivable, free and clear of all Liens and rights of others.

(5)    *No Impairment of RFC Purchaser's Rights*. None of the Originator, the GSAP Intermediate Transferor, the GSAP Transferor or any other Person has taken any action that, or failed to take any action the omission of which, would materially impair the rights of the RFC Purchaser and its assignees with respect to such Receivables, or on the collectibility of such Receivables.

(6)    *No Defenses*. Each Receivable represents valid entitlement to be paid, has not been repaid in whole or in part or been compromised, adjusted, extended, satisfied, subordinated, rescinded, waived, amended or modified, and is not subject to compromise, adjustment, extension, satisfaction, subordination, rescission, set-off, counterclaim, defense, waiver, amendment or modification by any Person.

(7)    *No Government Receivables*. No Receivable is due from the United States of America or any state or from any agency, department or instrumentality of the United States of America or any state.

9

(8)      *No Pending Proceedings*. There are no proceedings pending, or, to the best of the Originator's knowledge, threatened, wherein any governmental agency has (A) alleged that any Receivable is illegal or unenforceable, (B) asserted the invalidity of any Receivable or (C) sought any determination or ruling that might adversely affect the payment or enforceability of any Receivable.

(9)      *Originator's Reporting Obligations*. With respect to each Receivable, the Originator is not aware of any respect in which the Originator may be unable to perform its reporting obligations as set forth herein.

(10)      *UCC Classification*. No Receivable is secured by "real property" or "fixtures" or evidenced by an "instrument" under and as defined in the Uniform Commercial Code in effect from time to time in all relevant jurisdictions. The Receivables constitute "general intangibles" or "accounts" within the meaning of the applicable Uniform Commercial Code in effect from time to time in the relevant jurisdiction.

(11)      *Enforceability; Compliance with Laws*. Each Receivable is enforceable in accordance with its terms set forth in the related Designated Servicing Agreement. Each Advance, when made, complied with all applicable laws, including those relating to consumer protection, is valid and enforceable and is not subject to any set-off, counterclaim or other defense to payment by the Obligor, the related MBS Trust, MBS Trustee or any other Person.

(12)      *No Consent Required*. Each Receivable is assignable by the GSAP Transferor and its successors and assigns, without the consent of any other Person (except any such consent that has been obtained and is in full force and effect as of the date hereof).

(13)      *No Conflicting Assignment*.  Other than the ownership interest transferred to the RFC Purchaser and its assignees pursuant to this Agreement, the GSAP Transferor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Receivables, other than to secure the obligations under the GSAP Indenture and the GSAP Indenture Notes, which Lien is being released substantially concurrently with the repayment in full of the GSAP Indenture Notes using the proceeds of the Purchase Price and other proceeds of the initial borrowings under the Credit Agreement.

(14)      *Ownership of Receivables*. Each Receivable created under the Designated Servicing Agreements set forth in the Designated Servicing Agreements Schedule is owned by the GSAP Transferor.

**Section 5.      Notice of Breach of Representations and Warranties.**

The Originator shall inform the RFC Purchaser and the Collateral Agent promptly, in writing, upon the discovery that any of the Originator's or the GSAP Transferor's representations and warranties in Section 4 above that pertain to a Receivable were breached or untrue as of the date of this Agreement.  The breach of any representation and warranty shall not be waived by the RFC Purchaser under any circumstances without the prior written consent of the Collateral Agent.  The RFC Purchaser hereby designates the Collateral Agent as its designee for purposes of this Section 5 and any other notice required under this Agreement.

**Section 6.**        **Termination.**

This Agreement (a) shall continue and may not be terminated until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated and (b) may be terminated at any time thereafter by either party upon written notice to the other party.

**Section 7.**        **General Covenants of Originator.**

The Originator covenants and agrees that from the date of this Agreement until all Obligations under the Credit Documents have been paid in full and all Commitments under the Credit Agreement have been terminated:

(a)        *Legal Existence*.  The Originator shall do or cause to be done all things necessary on its part to preserve and keep in full force and effect its legal existence, and to maintain each of its licenses, approvals, registrations and qualifications in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such licenses, approvals, registrations or qualifications, except for failures to maintain any such licenses, approvals, registrations or qualifications which, individually or in the aggregate, would not have a material adverse effect on the ability of the Originator or the RFC Purchaser to perform its obligations hereunder or under any of the other Credit Documents.

(b)        *Compliance With Laws*.  The Originator shall comply in all material respects with all laws, rules, regulations and orders of any governmental authority applicable to its operation, the noncompliance with which would have a material adverse effect on the ability of the Originator or the RFC Purchaser to perform their obligations hereunder or under any of the other Credit Documents.

(c)        *Taxes*.  The Originator shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon the Originator or upon its income and profits, or upon any of its property or any part thereof, before the same shall become in default, if the failure to pay such taxes should reasonably be expected to have a material adverse effect on the value of the Receivables or on the Originator's ability to perform its obligations under this Agreement; provided that the Originator shall not be required to pay and discharge any such tax, assessment, charge or levy so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.  The Originator shall have set aside on its books adequate reserves with respect to any such tax, assessment, charge or levy so contested, or so long as the failure to pay any such tax, assessment, charge or levy would not have a material adverse effect on the ability of the Originator to perform its obligations hereunder or the Servicer's ability to perform its obligations under the Designated Servicing Agreements.

(d)        *Separate Identity*.  The Originator hereby covenants and agrees to take all actions necessary to maintain the RFC Purchaser's status as a separate legal entity.  The Originator shall conduct its business solely in its own name and all written and oral communications of the Originator shall be made solely in the name of the Originator.  The Originator views the RFC Purchaser as a separate legal entity.

(e)        *No Liens, Etc. Against Transferred Assets*. The Originator hereby covenants that it will not sell, pledge, assign or transfer to any other Person, or grant, create, incur or assume any Lien on any of the Receivables, or any interest therein.  The Originator shall notify the RFC Purchaser and the Collateral Agent and their designees of the existence of any Lien (other than as provided above) on any Receivable immediately upon discovery thereof; and the Originator shall defend the right, title and interest of the RFC Purchaser and the Collateral Agent and their assignees in, to and under the Receivables against all claims of third parties claiming through or under the Originator; *provided*, *however*, that nothing in this Section 7 shall be deemed to apply to any Liens for

11

municipal or other local taxes and other governmental charges if such taxes or governmental charges shall not at the time be due and payable or if the Originator shall currently be contesting the validity thereof in good faith by appropriate proceedings to the extent the same would not constitute an Event of Default under the Credit Agreement. The Originator shall take all actions, and shall cause the GSAP Transferor to take all actions, as may be necessary to ensure that the ownership of the Receivables is conveyed to the RFC Purchaser pursuant to this Agreement.

(f)      *Keeping of Records and Books of Account*. The Originator shall maintain accurate, complete and correct documents, books, records and other information which is reasonably necessary for the collection of all Receivables (including, without limitation, records adequate to permit the prompt identification of each new Receivable and all collections of, and adjustments to, each existing Receivable).

(g)      *Taking of Necessary Actions*. The Originator and the GSAP Transferor shall perform all actions necessary to sell, contribute and absolutely assign the Receivables and other Transferred Assets to the RFC Purchaser and its assigns, including the Collateral Agent, including, without limitation, any necessary notifications to the MBS Trustees or other parties.

**Section 8.      Intent of Parties.**

The parties hereto intend that the conveyance of the GSAP Transferor's right, title and interest in and to the Transferred Assets shall constitute an absolute sale, conveying good title free and clear of any liens, claims, encumbrances or rights of others, from the GSAP Transferor to the RFC Purchaser.  It is the intention of the parties hereto that the arrangements with respect to the Transferred Assets shall constitute a purchase and sale of such Transferred Assets and not a loan, including for accounting purposes.

**Section 9.      Indemnity.**

Each of RFC and the RFC Purchaser, jointly and severally, agrees to indemnify the GSAP Transferor, the GSAP Indenture Trustee and the GSAP Administrative Agent against, and hold each of them harmless from, any and all liabilities, losses, claims, damages, judgments and reasonable costs and expenses actually incurred by any of them (including reasonable attorneys' fees and expenses) (collectively, "Losses") arising in connection with, or relating to, the GSAP Indenture, the RFC Receivables Sale Agreement, the RFC Receivables Pooling Agreement, this Agreement or otherwise relating to the Cases; provided, that such indemnity shall not, as to any indemnitee, be available to the extent that such Losses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee.

**Section 10.      Miscellaneous.**

(a)      *Amendment*. This Agreement may not be amended except by an instrument in writing signed by the Originator and the RFC Purchaser.  In addition, this Agreement constitutes a Credit Document and, so long as the Credit Agreement remains in effect, this Agreement may not be amended except in accordance with Section 12.05 of the Credit Agreement.

(b)      *Binding Nature; Assignment*. The covenants, agreements, rights and obligations contained in this Agreement shall be binding upon the successors and assigns of RFC (in any capacity hereunder, including as the Servicer and the Originator) and the GSAP Transferor and shall inure to the benefit of the successors and assigns of the RFC Purchaser, and all persons claiming by, through or under the RFC Purchaser.

(c)    *Entire Agreement*. This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

(d)    *Severability of Provisions*. If any provision in or obligation under this Agreement is held to be illegal, invalid or unenforceable in any jurisdiction, (a) the legality, validity and enforceability of the remaining provisions in or obligations under this Agreement, or of such provision in or obligation under this Agreement in any other jurisdiction, shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(e)    *Governing Law*. **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

(f)    *Jurisdiction; Etc.*

(1)    Jurisdiction.    EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AGAINST ANY OTHER PARTY HERETO, IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS RELATING HERETO, IN A FORUM OTHER THAN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(2)    Waiver of Venue. Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in Section 10(f)(1).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

13

(3)     Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10(l).  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

**(g)     *Waiver of Jury Trial.*  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

(h)     *Counterparts*. This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart. Any counterpart hereof signed by a party against whom enforcement of this Agreement is sought shall be admissible into evidence as an original hereof to prove the contents thereof.

(i)     *Indulgences; No Waivers*. Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or future exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(j)     *Headings Not to Affect Interpretation*. The headings contained in this Agreement are for convenience of reference only, and they shall not be used in the interpretation hereof.

(k)     *Benefits of Agreement*. Nothing in this Agreement, express or implied, shall give to any Person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement; provided, that the Collateral Agent, acting for the benefit of the Secured Parties, and the Administrative Agent shall be express third-party beneficiaries of this Agreement and the GSAP Indenture Trustee shall be an express third-party beneficiary of Section 9 of this Agreement.

(l)     *Notices*.  Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any party, addressed to it at its address set forth in the Credit Agreement, or at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.

(m)     *Inconsistency*.  In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in the Credit Agreement and/or the Orders, the terms and provisions of the Credit Agreement and/or the Orders shall supersede and control the terms and provisions of this Agreement.

(n)    *Expenses.*    Without limiting any party's obligations under the Credit Documents, the Interim Financing Order or the Final Financing Order, the parties hereto agree to promptly pay or reimburse all out-of-pocket costs and expenses incurred by Collateral Agent (including the fees, charges and disbursements of any counsel for Collateral Agent) (a) in connection with the enforcement or protection of any rights and remedies under this Agreement, including all such costs and expenses incurred during any legal proceeding, including the Cases and any other proceeding under any Debtor Relief Law, (b) in connection with protecting the Transferred Assets and (c) creating, perfecting, maintaining and enforcing the Collateral Agent's Liens on the Transferred Assets under the Borrowers Security Agreement and the Orders.

(o)    *Limited Recourse.*    The parties hereto acknowledge and agree that recourse against the GSAP Transferor for the performance of any obligations it may have hereunder or for any related claims are limited to the property pledged by the GSAP Transferor under the GSAP Indenture and that, following realization of such property and application of the proceeds thereof in accordance with the terms of the GSAP Indenture, all claims in respect of this Agreement against the GSAP Transferor shall be extinguished and shall not thereafter revive.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**RESIDENTIAL FUNDING COMPANY, LLC**, as Originator and Servicer

By: _____

Name:

Title:

**RFC BORROWER LLC**, as RFC Purchaser


By: _____
        Name:
        Title:

**GMAC MORTGAGE SERVICER ADVANCE FUNDING COMPANY LTD.**, as GSAP Transferor

By: _____

     Name:

     Title:

**Acknowledged by:**

**PATI A, LLC**

By: _____
    Name:
    Title:

**Acknowledged by:**

**RAHI A, LLC**

By: _____
    Name:
    Title:

Attachment A to
RFC Receivables Purchase Agreement

### DESIGNATED SERVICING AGREEMENTS

| Deal Name | Servicing Agreement |
|---|---|
| RALI 2007-QA1 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA1 |
| RALI 2007-QA2 | Series Supplement dated February 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA2 |
| RALI 2007-QA3 | Series Supplement dated April 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA3 |
| RALI 2007-QA4 | Series Supplement dated May 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated May 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA4 |
| RALI 2007-QA5 | Series Supplement dated August 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA5 |
| RALI 2007-QS1 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1 |
| RASC 2004-KS10 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of October 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS10 |
| RASC 2004-KS11 | Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of November 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS11 |

Attachment A-1

RASC 2004-KS12     Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated as of December 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS12

RASC 2004-KS6     Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of June 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS6

RASC 2004-KS7     Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of July 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS7

RASC 2004-KS8     Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of August 1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS8

RASC 2004-KS9     Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated as of September1, 2004, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS9

RALI 2007-QS10     Series Supplement dated August 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS10

RALI 2007-QS11     Series Supplement dated September 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS11

RALI 2007-QS2     Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC asMaster Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS2

RALI 2004-QA2     Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated April 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA2

RALI 2004-QA3     Series Supplement dated August 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA3

RALI 2004-QA4 | Series Supplement dated September 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated September 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA4

RALI 2004-QA5 | Series Supplement dated November 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA5

RALI 2004-QA6 | Series Supplement dated December 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QA6

RALI 2004-QS10 | Series Supplement dated July 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated April 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS10

RALI 2004-QS12 | Series Supplement dated September 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS12

RALI 2004-QS13 | Series Supplement dated September 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS13

RALI 2004-QS14 | Series Supplement dated October 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS14

RALI 2004-QS15 | Series Supplement dated November 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS15

RALI 2004-QS16 | Series Supplement dated December 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS16

| | |
|---|---|
| RALI 2004-QS8 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated April 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS8 |
| RALI 2004-QS9 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation, as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated April 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS |
| RAMP 2004-RS10 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated October 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS10 |
| RAMP 2004-RS11 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated November 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS11 |
| RAMP 2004-RS12 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated December 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS12 |
| RAMP 2004-RS6 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated June 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS6 |
| RAMP 2004-RS8 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS8 |
| RAMP 2004-RS9 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated September 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RS9 |
| RAMP 2004-RZ2 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated June 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RZ2 |
| RAMP 2004-RZ3 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated December 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RZ4 |
| RAMP 2004-RZ4 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated September 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RZ3 |

| | |
|---|---|
| RFMSI 2004-S6 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated June 1, 2004, Mortgage Pass-Through Certificates, Series 2004-S6 |
| RFMSI 2004-S8 | Series Supplement dated September 1, 2004 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2004, Mortgage Pass-Through Certificates, Series 2004-S8 |
| RFMSI 2004-S9 | Series Supplement dated December 1, 2004 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2004, Mortgage Pass-Through Certificates, Series 2004-S9 |
| RFMSI 2004-SA1 | Series Supplement dated June 1, 2004 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank as Trustee, dated June 1, 2004, Mortgage Pass-Through Certificates, Series 2004-SA1 |
| RAMP 2004-SL2 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated June 1, 2004, Mortgage-Backed Pass-Through Certificates, Series 2004-SL2 |
| RAMP 2004-SL3 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated September 1, 2004, Mortgage-Backed Pass-Through Certificates, Series 2004-SL3 |
| RAMP 2004-SL4 | Pooling and Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2004, Mortgage-Backed Pass-Through Certificates, Series 2004-SL4 |
| RALI 2007-QS3 | Series Supplement dated February 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS3 |
| RALI 2007-QS4 | Series Supplement dated March 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4 |
| RALI 2007-QS5 | Series Supplement dated March 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS5 |

RALI 2007-QS6 — Series Supplement dated April 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6

RALI 2007-QS7 — Series Supplement dated May 1, 2007 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated May 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS7

RASC 2005-AHL1 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-AHL1

RASC 2005-AHL2 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated October 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-AHL2

RASC 2005-AHL3 — Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-AHL3

RAMP 2005-EFC1 — Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC1

RAMP 2005-EFC2 — Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC2

RAMP 2005-EFC3 — Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated August 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC3

RAMP 2005-EFC4 — Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC4

RAMP 2005-EFC5 — Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated October1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC5

RAMP 2005-EFC6 — Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2005, Mortgage Asset-

Backed Pass-Through Certificates, Series 2005-EFC6

RAMP 2005-EFC7     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC7

RASC 2005-KS1     Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated as of January 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS1

RASC 2005-KS10     Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated as of October 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS10

RASC 2005-KS11     Pooling and Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated as of November 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS11

RALI 2007-QS8     Series Supplement dated As Of June 1, 2007 to Pooling And Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated As Of June 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS8

RALI 2007-QS9     Series Supplement dated As Of July 1, 2007 to Pooling And Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated As Of July 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS9

RASC 2005-KS12     Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS12

RASC 2005-KS2     Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS2

RASC 2005-KS3     Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated March 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS3

RASC 2005-KS4     Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated April 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS4

RASC 2005-KS5 Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS5

RASC 2005-KS6 Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS6

RASC 2005-KS7 Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS7

RASC 2005-KS8 Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated August 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS8

RASC 2005-KS9 Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2005, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS9

RAMP 2005-NC1 Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-NC1

RALI 2005-QA1 Series Supplement dated January 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA1

RALI 2005-QA10 Series Supplement dated September 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA10

RALI 2005-QA11 Series Supplement dated October 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA11

RALI 2005-QA12 Series Supplement dated November 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA12

| | |
|---|---|
| RALI 2005-QA13 | Series Supplement dated December 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA13 |
| RALI 2005-QA2 | Series Supplement dated February 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA2 |
| RALI 2005-QA3 | Series Supplement dated March 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA3 |
| RALI 2005-QA4 | Series Supplement dated April 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA4 |
| RALI 2005-QA5 | Series Supplement dated April 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA5 |
| RALI 2005-QA6 | Series Supplement dated May 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA6 |
| RALI 2005-QA7 | Series Supplement dated June 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA7 |
| RALI 2005-QA8 | Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA8 |
| RALI 2005-QA9 | Series Supplement dated August 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA9 |

| | |
|---|---|
| RALI 2005-QS1 | Series Supplement dated January 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS1 |
| RALI 2005-QS10 | Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS10 |
| RALI 2005-QS11 | Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS11 |
| RALI 2005-QS12 | Series Supplement dated August 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS12 |
| RALI 2005-QS13 | Series Supplement dated September 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS13 |
| RALI 2005-QS14 | Series Supplement dated September 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS14 |
| RALI 2005-QS15 | Series Supplement dated October 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS15 |
| RALI 2005-QS16 | Series Supplement dated November 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS16 |
| RALI 2005-QS17 | Series Supplement dated December 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS17 |

| | |
|---|---|
| RALI 2005-QS2 | Series Supplement dated February 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS2 |
| RALI 2005-QS3 | Series Supplement dated March 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS3 |
| RALI 2005-QS4 | Series Supplement dated April 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS4 |
| RALI 2005-QS5 | Series Supplement dated April 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS5 |
| RALI 2005-QS6 | Series Supplement dated May 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS6 |
| RALI 2005-QS7 | Series Supplement dated June 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS7 |
| RALI 2005-QS8 | Series Supplement dated June 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS8 |
| RALI 2005-QS9 | Series Supplement dated June 1, 2005 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated August 1, 2004, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QS9 |
| RAMP 2005-RS1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank National Association as Trustee, dated January 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS1 |
| RAMP 2005-RS2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and |

JPMorgan Chase Bank, N.A as Trustee, dated February 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS2

RAMP 2005-RS3     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A as Trustee, dated March 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS3

RAMP 2005-RS4     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated April 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS4

RAMP 2005-RS5     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated May 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS5

RAMP 2005-RS6     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated June 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS6

RAMP 2005-RS7     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated July 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS7

RAMP 2005-RS8     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated September 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS8

RAMP 2005-RS9     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated November 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS9

RAMP 2005-RZ1     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated March 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RZ1

RAMP 2005-RZ2     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated July 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RZ2

RAMP 2005-RZ3     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank, N.A. as Trustee, dated September 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RZ3

RAMP 2005-RZ4     Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and

|  | JPMorgan Chase Bank, N.A. as Trustee, dated November 1, 2005, Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RZ4 |
|---|---|
| RFMSI 2005-S1 | Series Supplement dated February 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2004, Mortgage Pass-Through Certificates, Series 2005-S1 |
| RFMSI 2005-S2 | Series Supplement dated March 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2004, Mortgage Pass-Through Certificates, Series 2005-S2 |
| RFMSI 2005-S4 | Series Supplement dated May 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S4 |
| RFMSI 2005-S5 | Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S5 |
| RAMP 2007-RS1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and Lasalle Bank National Association as Trustee And Supplemental Interest Trust Trustee, dated February 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-RS1 |
| RFMSI 2005-S6 | Series Supplement dated August 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S6 |
| RFMSI 2005-S7 | Series Supplement dated November 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S7 |
| RFMSI 2005-S8 | Series Supplement dated November 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S8 |
| RFMSI 2005-S9 | Series Supplement dated December 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-S9 |
| RFMSI 2005-SA1 | Series Supplement dated February 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated December 1, 2004, Mortgage Pass-Through Certificates, Series |

2005-SA1

| | |
|---|---|
| RFMSI 2005-SA2 | Series Supplement dated May 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-SA2 |
| RFMSI 2005-SA3 | Series Supplement dated July 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-SA3 |
| RFMSI 2005-SA4 | Series Supplement dated August 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-SA4 |
| RFMSI 2005-SA5 | Series Supplement dated October 1, 2005 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2005, Mortgage Pass-Through Certificates, Series 2005-SA5 |
| RAMP 2005-SL1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2005, Mortgage Backed Pass-Through Certificates, Series 2005-SL1 |
| RAMP 2005-SL2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated June 1, 2005, Mortgage Backed Pass-Through Certificates, Series 2005-SL2 |
| RAMP 2007-RS2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and LaSalle Bank National Association as Trustee and Supplemental Interest Trust Trustee, dated April 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-RS2 |
| RAMP 2007-RZ1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and LaSalle Bank National Association as Trustee and Supplemental Interest Trust Trustee, dated February 1, 2007, Mortgage Asset-Backed Pass-Through Certificates, Series 2007-RZ1 |
| RFMSI 2007-S1 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2007-S1 |
| RFMSI 2007-S2 | Series Supplement dated February 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series |

2007-S2

| | |
|---|---|
| RFMSI 2007-S3 | Series Supplement dated March 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2007-S3 |
| RFMSI 2007-S4 | Series Supplement dated April 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated April 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S4 |
| RFMSI 2007-S5 | Series Supplement dated May 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated April 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S5 |
| RFMSI 2007-S6 | Series Supplement dated June 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S6 |
| RFMSI 2007-S7 | Series Supplement dated July 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S7 |
| RFMSI 2007-S8 | Series Supplement dated August 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2007, Mortgage Pass-Through Certificates, Series 2007-S8 |
| RFMSI 2007-SA1 | Series Supplement dated January 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2007-SA1 |
| RFMSI 2007-SA2 | Series Supplement dated March 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2007-SA2 |
| RFMSI 2007-SA3 | Series Supplement dated June 1, 2007 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated April 1, 2007, Mortgage Pass-Through Certificates, Series 2007-SA3 |
| RAMP 2006-EFC1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EFC1 |

Attachment A-15

RAMP 2006-EFC2    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EFC2

RASC 2006-KS1    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS1

RASC 2006-KS2    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS2

RASC 2006-KS3    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated March 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS3

RASC 2006-KS4    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated May 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS4

RASC 2006-KS5    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS5

RASC 2006-KS6    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated July 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS6

RASC 2006-KS7    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated August 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS7

RASC 2006-KS8    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS8

RASC 2006-KS9    Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated October 27, 2006, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS9

RAMP 2006-NC1    Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-NC1

| | |
|---|---|
| RAMP 2006-NC2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-NC2 |
| RAMP 2006-NC3 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-NC3 |
| RALI 2006-QA1 | Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and the trustee named in the applicable Series Supplement as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA1 |
| RALI 2006-QA10 | Series Supplement dated November 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated November 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA10 |
| RALI 2006-QA11 | Series Supplement dated December 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated November 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA11 |
| RALI 2006-QA2 | Series Supplement dated February 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA2 |
| RALI 2006-QA3 | Series Supplement dated April 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA3 |
| RALI 2006-QA4 | Series Supplement dated May 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA4 |
| RALI 2006-QA5 | Series Supplement dated June 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA5 |
| RALI 2006-QA6 | Series Supplement dated July 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006- |

QA6

| | |
|---|---|
| RALI 2006-QA7 | Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA7 |
| RALI 2006-QA8 | Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA8 |
| RALI 2006-QA9 | Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated October 30, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA9 |
| RALI 2006-QS1 | Series Supplement dated January 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS1 |
| RALI 2006-QS10 | Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS10 |
| RALI 2006-QS11 | Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS11 |
| RALI 2006-QS12 | Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS12 |
| RALI 2006-QS13 | Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS13 |
| RALI 2006-QS14 | Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated October 30, 2006, Mortgage Asset-Backed Pass-Through |

Certificates, Series 2006-QS14

RALI 2006-QS15    Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated October 30, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS15

RALI 2006-QS16    Series Supplement dated November 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated November 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS16

RALI 2006-QS17    Series Supplement dated December 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS17

RALI 2006-QS18    Series Supplement dated December 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated December 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18

RALI 2006-QS2    Series Supplement dated February 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS2

RALI 2006-QS3    Series Supplement dated March 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS3

RALI 2006-QS4    Series Supplement dated April 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS4

RALI 2006-QS5    Series Supplement dated May 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS5

RALI 2006-QS6    Series Supplement dated June 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-

QS6

RALI 2006-QS7 | Series Supplement dated June 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS7

RALI 2006-QS8 | Series Supplement dated July 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS8

RALI 2006-QS9 | Series Supplement dated July 1, 2006 to Pooling and Servicing Agreement among Residential Accredit Loans, Inc. as Company, Residential Funding Corporation as Master Servicer, and Deutsche Bank Trust Company Americas as Trustee, dated March 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS9

RAMP 2006-RS1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated January 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS1

RAMP 2006-RS2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS2

RAMP 2006-RS3 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated April 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS3

RAMP 2006-RS4 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated June 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS4

RAMP 2006-RS5 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated August 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS5

RAMP 2006-RS6 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee and Supplement Interest Trust Trustee, dated October 30, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS6

RAMP 2006-RZ1 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated February 1, 2006, Mortgage Asset-

|  | Backed Pass-Through Certificates, Series 2006-RZ1 |
|---|---|
| RAMP 2006-RZ2 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated April 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ2 |
| RAMP 2006-RZ3 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated July 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ3 |
| RAMP 2006-RZ4 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Corporation as Master Servicer, and JPMorgan Chase Bank N.A. as Trustee, dated September 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ4 |
| RAMP 2006-RZ5 | Pooling And Servicing Agreement among Residential Asset Mortgage Products, Inc. as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2006, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ5 |
| RFMSI 2006-S1 | Series Supplement dated January 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S1 |
| RFMSI 2006-S10 | Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated October 30, 2006, Mortgage Pass-Through Certificates, Series 2006-S10 |
| RFMSI 2006-S11 | Series Supplement dated November 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S11 |
| RFMSI 2006-S12 | Series Supplement dated December 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated November 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S11 |
| RFMSI 2006-S2 | Series Supplement dated February 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S2 |
| RFMSI 2006-S3 | Series Supplement dated March 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as |

|  |  |
|---|---|
|  | Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S3 |
| RFMSI 2006-S4 | Series Supplement dated April 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S4 |
| RFMSI 2006-S5 | Series Supplement dated June 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S5 |
| RFMSI 2006-S6 | Series Supplement dated July 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S6 |
| RFMSI 2006-S7 | Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S7 |
| RFMSI 2006-S8 | Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S8 |
| RFMSI 2006-S9 | Series Supplement dated September 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated September 1, 2006, Mortgage Pass-Through Certificates, Series 2006-S9 |
| RFMSI 2006-SA1 | Series Supplement dated January 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2006, Mortgage Pass-Through Certificates, Series 2006-SA1 |
| RFMSI 2006-SA3 | Series Supplement dated August 1, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Corporation as Master Servicer, and U.S. Bank National Association as Trustee, dated June 1, 2006, Mortgage Pass-Through Certificates, Series 2006-SA3 |
| RFMSI 2006-SA4 | Series Supplement dated October 30, 2006 to Pooling and Servicing Agreement among Residential Funding Mortgage Securities I, Inc. as Company, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated October 30, 2006, Mortgage Pass-Through Certificates, Series 2006-SA4 |
| RASC 2007-EMX1 | Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2007, Home Equity |

Attachment A-22

Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1

RASC 2007-KS1     Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated January 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS1

RASC 2007-KS2     Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated February 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS2

RASC 2007-KS3     Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and U.S. Bank National Association as Trustee, dated March 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS3

RASC 2007-KS4     Pooling And Servicing Agreement among Residential Asset Securities Corporation as Depositor, Residential Funding Company, LLC as Master Servicer, and LaSalle Bank National Association as Trustee, dated April 1, 2007, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS4

<u>Attachment B to</u>
<u>RFC Receivables Purchase Agreement</u>

**Eligible Receivables Schedule**

[Please see attached]