MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |

-------------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT
TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 507(b) AND
BANKRUPTCY RULE 4001(B): (I) AUTHORIZING THE USE OF CASH
COLLATERAL AND RELATED RELIEF, (II) GRANTING ADEQUATE
PROTECTION AND (III) SCHEDULING A FINAL HEARING**

**(CITIBANK, N.A. CASH COLLATERAL)**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors")[1] hereby move this Court (the "Motion")[2] pursuant to sections 105, 361, 362, 363, and

507(b) of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rule

4001(b) of Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the Southern District of New York (the "Local Rules"), for entry of an interim order

(substantially in the form annexed hereto as Exhibit A, the "Interim Order") and a final order

(the "Final Order", and together with the Interim Order, the "Cash Collateral Orders")[3]

(i) authorizing the use of Citibank's cash collateral (the "MSR Cash Collateral")[4] and related

relief, (ii) granting adequate protection to Citibank, N.A. ("Citibank"), and (iii) scheduling a final

hearing regarding the same.[5]  In support of the Motion, the Debtors rely upon and incorporate by

reference the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC,

in Support of Chapter 11 Petitions and First Day Pleadings, filed with the Court concurrently

herewith (the "Whitlinger Affidavit").  In further support of the Motion, the Debtors, by and

through their undersigned counsel, respectfully represent:

**JURISDICTION**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and

this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates

for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 507(b),

Bankruptcy Rule 4001(b) and Local Rule 4001-2.

---

[3]      A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing (as defined below).

[4]      As used herein, "MSR Cash Collateral" means the cash collateral (as defined in section 363(a) of the Bankruptcy Code) of Citibank, N.A under the Citibank MSR Facility (as defined herein).

[5]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Whitlinger Affidavit or in the proposed Interim Order.

## PRELIMINARY STATEMENT

2.      The Debtors operate in a highly regulated business in which they service over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion, which are held by private investors or included in securitization trusts.  The holders of these loans, and the purchasers of the mortgage-backed securities ("MBS") issued by the securitization trusts, are comprised of a broad range of investors, such as pension funds, banks, insurance companies, governmental bodies and other public and private entities.  These investors depend on the performance of the Debtors, as servicer, to ensure the recovery of their investments.  The Debtors intend to sell their mortgage loan origination and loan servicing businesses in these Chapter 11 cases, and the Debtors expect that such sale will yield a significant return for the benefit of the Debtors' estates and creditors.  The Debtors' largest cash need, by far, is to fund the servicing advances required under the servicing agreements.  Accordingly, the Debtors request use of the MSR Cash Collateral so that they can maintain the servicing business and preserve the value of their assets pending one or more sales of their businesses.

3.      The MSR Cash Collateral will be used, among other things, to fund only the cash needs related to the operations (including funding advances and loan repurchases the Debtors are obligated to make in accordance with their servicing agreements with Fannie Mae and Freddie Mac, which servicing rights secure the Citibank MSR Facility, as well as an allocated portion of the costs to administer the Bankruptcy Cases based on the value of the Prepetition MSR Collateral relative to the value of the Debtors' other assets) and assets of the Citibank MSR Facility collateral pool.

4.      In exchange for the use of the MSR Cash Collateral, Citibank will receive (i) the MSR Adequate Protection Liens, (ii) superpriority administrative expense claims, (iii) the

ny-1039734

Adequate Protection Payments, and (iv) the Debtors will seek authority under any order approving the sale of MSR Collateral to repay the loans under the Citibank MSR Facility with the proceeds of such collateral received by the Debtors from such sale, subject to the interests (collectively, the "Agency Interests") of Freddie Mac and Fannie Mae as set forth in (a) the Prepetition MSR Agreement, (b) the Federal Home Loan Mortgage Corporation Acknowledgement Agreement among Freddie Mac, GMAC Mortgage and Citibank, N.A. dated March 12, 2009, and (c) the Acknowledgement Agreement (Single Secured Party) among Citibank, N.A., GMAC Mortgage and Fannie Mae dated September 7, 2007.

5.      It is critical that the Debtors have access to the MSR Cash Collateral within the first week of the cases so they can continue operating their mortgage loan servicing business in the ordinary course, which will instill public confidence in the Debtors' capabilities to continue functioning as a servicer, notwithstanding the commencement of these Chapter 11 cases. If the Debtors are unable to demonstrate sufficient liquidity, borrowers and the market could experience confusion and uncertainty. Borrowers may refuse to make payments to the Debtors, thus impairing the Debtors' ability to continue meeting their ongoing payment obligations (e.g., making payment advances required under certain circumstances for the benefit of investors and paying certain securitization fees) and the Debtors' future capacity to collect on these loans. Similarly, it is essential that the Debtors remain vigilant to ensure that borrowers continue making payments on their loans (e.g., by sending out bills and ensuring the collection and proper distribution of funds received). If the Debtors' ability to do so is impaired, there is a real risk that delinquencies and defaults may materially increase to the ultimate detriment of the Debtors' estates.

ny-1039734

6.      Further, if the Debtors do not continue to honor their ordinary course servicing commitments for mortgage loans which are owned, insured or guaranteed by the federal government sponsored entities Fannie Mae and Freddie Mac, or by the corporation Ginnie Mae (the "Agency Loans"),[6] they face the possible termination of their Agency Loan servicing rights, which, if successful, would result in the loss of future servicing fees, with a concomitant tremendous (and potentially catastrophic) loss to their estates.  The Debtors also may incur penalties under recent settlements with the federal government and various state agencies, pursuant to which the Debtors agreed to, among other things, certain heightened servicing requirements with respect to the Agency Loans.

7.      Accordingly, the Debtors believe that the terms governing the proposed use of the MSR Cash Collateral are reasonable, and the use of the MSR Cash Collateral is necessary to support the Debtors' operations and restructuring activities throughout the Chapter 11 cases for the ultimate benefit of all creditors and other parties in interest pending the closing of the sales of the Debtors' assets.

**BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 CONCISE STATEMENT[7]**

8.      It is critical that the Debtors have access to the MSR Cash Collateral during these Chapter 11 cases.  This is the first time a debtor has tried to sell an operating servicing and origination platform in bankruptcy.  The use of the MSR Cash Collateral will

---

[6]      As used herein, Ginnie Mae is a federal agency that guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS") backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA").

[7]      The descriptions of the terms of the proposed Interim Order provided in this Motion are intended only as summaries. In the event of any inconsistency between the descriptions set forth herein and the terms of the Interim Order, the terms of the Interim Order shall govern. **Local Rule 4001-2 requires the Debtors to highlight certain provisions in the motion in any proposed cash collateral order. Sections that must be highlighted for the Court are in bold and are marked with an asterisk.**

5

provide the Debtors with the liquidity to achieve this result, which will create substantial value

for the Debtors' estates.

9.      In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2,

below is a summary of the terms of the proposed use of the MSR Cash Collateral:

| | |
|---|---|
| **Use of the MSR Cash Collateral** | The Debtors shall use the MSR Cash Collateral to pay expenses of operating their business. The MSR Cash Collateral securing the revolving facility with Citibank (the "Citibank MSR Facility")[8] shall be used to fund only the cash needs related to the operations (including funding advances and loan repurchases the Debtors are obligated to make in accordance with their servicing agreements with Fannie Mae and Freddie Mac,[9] which servicing rights (the "Servicing Rights") secure the Citibank MSR Facility, as well as an allocated portion of the costs to administer the Bankruptcy Cases based on the value of the Prepetition MSR Collateral (as defined below) relative to the value of the Debtors' other assets) and assets of the Citibank MSR Facility collateral pool. |
| | The Debtors shall segregate the MSR Cash Collateral and deposit it into a new concentration account at JP Morgan Chase Bank, N.A. ("JPM") that is subject to a deposit account control agreement between JPM, Citibank and GMAC Mortgage (the "MSR Concentration Account").   **Interim Order ¶ 3.** |
| **Termination Date** | In the absence of further order of the Bankruptcy Court, the Debtors shall no longer be authorized pursuant to the Cash Collateral Orders to use the MSR Cash Collateral without the consent of Citibank after the earliest to occur of: (i) the date that is 18 months from the closing date of the DIP Facility, (ii) 45 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 45-day period, (iii) the effective date of a Chapter 11 plan for any Debtor with assets exceeding $10 million, and (iv) the date on which maturity of the DIP Facility is accelerated pursuant to the DIP Credit Agreement (as defined in the DIP Motion) as a result of an event of default. **Interim Order ¶ 3.** |

---

[8]      "Citibank MSR Facility" means that certain Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified, including pursuant to Amendment Number Ten, dated March 30, 2012, pursuant to which Citibank agreed, among other things, to the extension of the Loan Repayment Date (as defined in the Amended and Restated Loan and Security Agreement) to May 30, 2012, the "Prepetition MSR Agreement" and, together with all other loan and security documents related to, referenced in or executed in connection with the Prepetition MSR Agreements, the "Prepetition MSR Credit Documents"), among GMAC Mortgage, LLC ("GMAC Mortgage"), as Borrower, Residential Capital LLC, as Guarantor, and Citibank, as Lender.

[9]      As used herein, "Fannie Mae" means the Federal National Mortgage Association, "Freddie Mac" means the Federal Home Loan Mortgage Corporation and "Ginnie Mae" means the Government National Mortgage Association.  Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress and are referred to herein as the "GSEs."  Fannie Mae and Freddie Mac securitize or buy mortgage loans originated by mortgage lenders, enabling the lenders to replenish their funds so that they can make loans to other homeowners.

| **Adequate Protection** | Citibank, in its capacity as lender under the Citibank MSR Facility, shall receive the following: |
|---|---|

(a) additional and replacement continuing, valid, binding, enforceable, non-avoidable, and automatically perfected security interests and liens (the "MSR Adequate Protection Liens") on any and all presently owned and hereafter acquired assets of the Debtors and their estates that do or would (absent the commencement of the Cases) constitute Prepetition MSR Collateral under the Prepetition MSR Credit Documents, including but not limited to all cash in the MSR Concentration Account (such assets, together with the Prepetition MSR Collateral, the "MSR Collateral"), which shall be senior to the liens (the "DIP Liens") granted to the DIP Lenders under the DIP Facility (each as defined below) and shall not be made subject to or *pari passu* with any lien or security interest granted in these Chapter 11 cases;

(b) to the extent the MSR Adequate Protection Liens are insufficient to provide adequate protection, superpriority administrative expense claims which (i) shall be junior to the superpriority administrative expense claims granted to the Debtors' proposed providers of debtor in possession financing and the Carve Out,[10] and (ii) may be *pari passu* with the superpriority administrative expense claims granted to any parties that provide the Debtors' with use of cash collateral  (collectively, the "Permitted Superpriority Claims");

(c) adequate protection payments (the "Adequate Protection Payments") consisting of: (i) payments of interest on the Prepetition MSR Obligations at the non-default rate set forth in the Prepetition MSR Agreement, (ii) any fees of Citibank, including professionals' fees, pursuant to the Prepetition MSR Agreement payable at the times specified in the Prepetition MSR Agreement; and (iii) ongoing payment of the reasonable fees, costs and expenses of Citibank, including, without limitation, the payment of the reasonable fees and expenses of legal and other professionals retained by Citibank; and

(d) the Debtors shall seek authority under any order approving the sale of MSR Collateral to repay the loans under the Citibank MSR Facility with the proceeds of such collateral received by the Debtors from such sale, subject to the Agency Interests (as defined below). **Interim Order ¶¶ 4-6.**

| **Reporting** | Reporting shall mean (i) the monthly servicing tapes required under the MSR Prepetition Agreement, (ii) on a bi-weekly basis, variance reports on actual vs. projected cash flows of the operations with respect to the MSR Collateral (with updated budgets[11] provided every |
|---|---|

---

[10]    The Carveout includes: (i) all fees and expenses in an aggregate amount of up to $25,000,000 incurred by professionals of the Debtors and the official committee of unsecured creditors appointed in the Chapter 11 cases following delivery of notice of an event of default under the DIP Facility, (ii) allowed unpaid professional fees and disbursements incurred prior to the delivery of the notice, (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court, and (iv) fees and expenses up to $500,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.  The Carveout generally does not include professional fees and disbursements incurred in connection with challenges against the DIP Lenders (but may be used by professionals for any official committee to investigate certain matters in an amount not to exceed $100,000).

[11]    The Debtors believe that the budget will be adequate, considering all available assets, to pay all administrative expenses due and accruing during the period covered by the financing or the budget.  The Debtors' variance reports are for informational purposes only, and the Debtors' failure to meet any variance obligation shall not be considered a default or breach of the Debtors' obligations described herein.

ny-1039734

four (4) weeks), (iii) monthly collateral reports and such other monthly, quarterly, or annual financial reports, each consistent with those provided under any postpetition financing facilities, (iv) notice of any changes in tier rating of GMAC Mortgage by Freddie Mac or Fannie Mae, and (v) a copy of each monthly report filed by the Debtors in these Chapter 11 cases as required by the Court, the U.S. Trustee or applicable law.  **Interim Order ¶ 10.**

| | |
|---|---|
| **Events of Default** | The occurrence of any of the following events, unless waived by Citibank, shall constitute an event of default: |

(i) an event of default is declared under the DIP Facility;

(ii) failure to satisfy the reporting requirements under the Interim or Final Order, as applicable, that continues unremedied for a period of five (5) business days after the date it was due;

(iii) any failure to perform or observe any term, covenant or agreement under the Interim or Final Order, as applicable, that is not otherwise specified as an Event of Default and that remains unremedied for fifteen (15) business days;

(iv) any event of default, early amortization event, termination event or other similar event (other than as a result of the commencement of the Chapter 11 cases) shall occur under any material document or agreement that relates to the Prepetition MSR Agreement or the MSR Collateral and such event could reasonably be expected to be materially adverse to the rights and interests of Citibank;

(v) any liens, claims and other interests created by the Cash Collateral Orders shall cease to be valid, perfected and enforceable and of the same priority purported to be created thereby or any of the Debtors or their subsidiaries shall challenge in any action the validity, perfection, enforceability or priority thereof;

(vi) dismissal of any of the Chapter 11 cases with assets exceeding $10 million (or any of the Debtors or their affiliates seeking or supporting such dismissal) or conversion of any of the Chapter 11 cases with assets exceeding $10 million to a case under chapter 7 of the Bankruptcy Code (or any of the Debtors or their affiliates seeking or supporting such conversion);

(vii) appointment of a trustee (or comparable person) or a responsible officer or examiner with expanded powers in any of the Chapter 11 cases with assets exceeding $10 million (or any of the Debtors or their affiliates seeking or supporting such appointment);

(viii) entry of an order granting relief from the automatic stay as to MSR Collateral with a value in excess of $10 million (or any of the Debtors or their affiliates seeking or supporting such relief) (i) to allow any creditor to execute upon or enforce a lien on or security interest in any MSR Collateral, or (ii) with respect to any lien of or the granting of any lien on any MSR Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

(ix) a court shall enter an order amending, supplementing, staying, vacating, reversing or otherwise modifying the Interim or Final Order, as applicable except as otherwise agreed to in writing by Citibank, or the Cash Collateral Orders shall cease to be in full force and effect; *provided* that no event of default shall occur to the extent that any such amendment, supplement or other modification is made in compliance with the Cash Collateral Orders and is not adverse to Citibank, in the reasonable judgment of Citibank;

(x) entry of a Bankruptcy Court order granting any superpriority claim (or claim of equivalent status) that is senior to or *pari passu* with the claims of Citibank or any lien or security interest that is senior to or *pari passu* with the liens and security interests securing the Citibank MSR Facility, except for the Permitted Superpriority Claims;

(xi) entry of an order authorizing recovery from the MSR Collateral for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than as may be provided in the Cash Collateral Orders, or certain de minimis amounts;

(xii) upon written notice from Citibank, any material misrepresentation of a material fact made after the Petition Date by any of the Debtors or their agents to Citibank or its agents about the financial condition of the Debtors, or any of them, the nature, extent, location or quality of any MSR Collateral, or the disposition or use of any MSR Collateral, including the MSR Cash Collateral;

(xiii) the sale after the Petition Date of any portion of the MSR Collateral except pursuant to an order that provides for the repayment of the Prepetition MSR Obligations from the proceeds of such sale, subject to the Agency Interests; and

(xiv) upon written notice from Citibank, the material failure to make Adequate Protection Payments or other payments to Citibank when due, subject to a cure period of five (5) days. **Interim Order ¶ 12.**

**Debtors' Stipulations**    The Debtors stipulate that:

(a)  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition MSR Agreement was not less than $152 million (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition MSR Credit Documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorney's fees, related expenses and disbursements), reimbursement obligations, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof to the extent and as provided for in the Prepetition MSR Credit Documents, including all "Obligations" as described in the Prepetition MSR Agreement, the "Prepetition MSR Obligations").  Subject to any Challenges within the Challenge Period, in light of the Prepetition MSR Obligations and the value of the MSR Prepetition Collateral with respect thereto, Citibank is oversecured and, accordingly, is entitled to interest and fees with respect to the Prepetition MSR Obligations in accordance with the Prepetition MSR Credit Documents.

(b) As more fully set forth in the Prepetition MSR Credit Documents, prior to the Petition Date, the Debtors granted security interests in and liens on, among other things, all of the Debtors' existing and after acquired Servicing Rights, to the full extent of the Debtors' interest therein and regardless of where located, whether or not yet accrued, earned, due or payable, as well as all other present and future rights and interests of GMAC Mortgage in such Servicing Rights, all contracts with Fannie Mae and Freddie Mac relating to the Servicing Rights, and all monies due or to become due with respect to and all proceeds of the Servicing Rights and related collateral (collectively, the "Prepetition MSR Collateral") to Citibank (the "Prepetition MSR Liens").

(c) Subject to any Challenges within the Challenge Period, each of the Debtors acknowledges and agrees that: (a) as of the Petition Date, the Prepetition MSR Liens on the

Prepetition MSR Collateral were valid, binding, enforceable, non-avoidable and properly perfected; (b) the Prepetition MSR Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (c) other than the Agency Interests (as defined below), to the extent set forth in the Agency Acknowledgement Agreements (as defined below), no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition MSR Liens or Prepetition MSR Obligations exist; (d) no portion of the Prepetition MSR Liens or Prepetition MSR Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under the Bankruptcy Code, against Citibank or its affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to its loans to the Debtors under the Prepetition MSR Credit Documents.

(d) As of the Petition Date, the Prepetition MSR Liens were senior in priority over any and all other liens on the Prepetition MSR Collateral, subject only to the interests (collectively, the "Agency Interests") of Freddie Mac and Fannie Mae as set forth in (a) the Prepetition MSR Agreement, (b) the Federal Home Loan Mortgage Corporation Acknowledgement Agreement among Freddie Mac, GMAC Mortgage and Citibank, N.A. dated March 12, 2009 (the "Freddie Mac Acknowledgement Agreement"), and (c) the Acknowledgement Agreement (Single Secured Party) among Citibank, N.A., GMAC Mortgage and Fannie Mae dated September 7, 2007 (the "Fannie Mae Acknowledgement Agreement" and, together with the Freddie Mac Acknowledgement Agreement, the "Agency Acknowledgement Agreements").

(e) Each Debtor represents that all of the Debtors' cash proceeds of the Servicing Rights and related collateral, including but not limited to all cash on deposit in that certain "Collection Account," as defined in the Prepetition MSR Agreement and the MSR Collateral Account (as defined herein), constitutes the MSR Cash Collateral. **Interim Order ¶ G.**

| | |
|---|---|
| **Determination of the Validity, Enforceability, and Amount of the Claims and Liens of Citibank** | The Interim Order contains acknowledgements as to the validity, enforceability and amount of Citibank's claims and that the liens securing the Citibank MSR Facility (the "Stipulated Claims and Liens") are properly perfected, valid, enforceable and non-avoidable, *provided*, however, that any party shall have seventy-five (75) days from entry of the Interim Order (the "Challenge Period") to commence a challenge (each, a "Challenge") to the amount and validity of the Stipulated Claims and Liens.  **Interim Order ¶ G.** |
| **Section 506(c) Waiver** | Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 cases at any time shall be charged against Citibank or any of its claims or the MSR Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of Citibank, and no such consent shall be implied from any other action, inaction, or acquiescence by Citibank. **Interim Order ¶ 18.** |
| **Reservation of Rights** | Citibank's consent to the use of the MSR Cash Collateral shall be without prejudice to Citibank seeking additional adequate protection in the event that of a diminution of the value of the MSR Collateral, or if circumstances otherwise warrant.  **Interim Order ¶ 21.** |

ny-1039734

| | |
|---|---|
| **Waiver of Automatic Stay** | Upon the occurrence and during the continuation of an event of default under the DIP Facility, (i) Citibank shall have customary remedies, including, upon seven (7) days' written notice, relief from the automatic stay without further order of or application to the Bankruptcy Court to permit Citibank exercise its to rights and remedies as set forth in the Prepetition MSR Documents or under applicable law (including the right to setoff monies of the Debtors in accounts maintained with Citibank and delivery of a shifting control notice with respect to the MSR Collateral Account (as defined in the Prepetition MSR Documents)). **Interim Order ¶ 13.** |

## BACKGROUND

10.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has been appointed in these Chapter 11 cases.

11.    A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

12.    The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank (f/k/a GMAC Bank), and other third parties.  As of March 31, 2012, the Debtors were servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374 billion.  To preserve and realize the value of these assets and achieve the goals of these Chapter 11 cases, the Debtors developed and are prepared to implement a strategy that provides maximum value to the Debtors' estates.

13.    The Debtors negotiated and entered into two separate asset purchase agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder

("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the

"Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of

their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the

"Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

14.    In furtherance of their restructuring strategy, and contemporaneous with

the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to,

among other things, establish auction and sale procedures for the Asset Sales,[12] and for approval

to consummate the Asset Sales under a plan.  If, however, the Debtors do not

obtain confirmation of a plan, the Sale Motion allows the Debtors to pursue an alternative course

of action and immediately move forward with the Asset Sales under Bankruptcy Code section

363(b) and outside of a plan.

## I.    Overview of the Debtors' Businesses

15.    The Debtors are a leading residential real estate finance company

indirectly owned by AFI, which is not a Debtor in these Chapter 11 proceedings.  As of the

Petition Date, the Debtors and their non-debtor affiliates, including Ally Bank, are collectively

the tenth largest originator and fifth largest servicer of residential mortgage loans in the United

States.  The Debtors, together with their non-debtor subsidiaries, manage the mortgage-related

businesses in two business lines: (i) the ongoing Origination and Servicing business and (ii) the

Legacy Portfolio and Other operations, which are being wound down.

---

[12] *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m) and 365 and 1123 and Fed R. Bankr. P. 2002, 6004, and 6006 and 9014 for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV ) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion").

### A.    Origination and Servicing

16.    The principal activities of the Debtors' Origination and Servicing are: (a) brokering, originating, purchasing, selling and securitizing residential mortgage loans throughout the United States for the Debtors and their non-debtor affiliate, Ally Bank; and (b) servicing residential mortgage loans throughout the United States for the Debtors, Ally Bank and other investors in residential mortgage loan and mortgage-backed securities ("MBS").

17.    GMAC Mortgage, under the GMAC Mortgage brand, brokers and originates mortgage loans through a consumer lending business that consists of internet and telephone-based call center operations and, to a lesser extent, a retail network of loan officers who have direct contact with consumers, including through referrals from builders, realtors, and other third parties.  GMAC Mortgage brokers its loan production in 47 states to Ally Bank.[13] Ally Bank underwrites and originates loans based on loan application packages submitted by GMAC Mortgage in accordance with applicable regulatory and industry standards.  In recent years, substantially all of the Debtors' loan production has consisted of conforming loans (that is, loans that meet the required guidelines of Fannie Mae, Freddie Mac or Ginnie Mae, as applicable) and a limited number of prime nonconforming jumbo mortgage loans.

18.    In the years ended December 31, 2010 and 2011 and the three months ended March 31, 2012, the Debtors brokered $7.4 billion, $7.3 billion and $3.6 billion, respectively, of mortgage loans to Ally Bank.  During the same periods, Debtors purchased $66.3 billion, $56.7 billion and $9.9 billion, respectively, of mortgage loans from Ally Bank.

---

[13] GMAC Mortgage does not originate loans in Hawaii.  Ally Bank does not have the licenses to originate mortgage loans in Nevada and Ohio, in which states, GMAC Mortgage originates and funds mortgage loans directly.

19.     A fundamental part of the Debtors' business strategy consists of securitizing or selling substantially all of the mortgage loans they purchase or originate.  As described in greater detail in the Whitlinger Affidavit, the Debtors participate in the securitization programs of Fannie Mae, Freddie Mac and Ginnie Mae.  The Debtors also pool together non-conforming mortgage loans in their own names ("private label") and convey the pool of loans to newly formed private label securitization trusts.[14]  In each case, the securitization trust issues securities to a broad range of investors, including pension funds, money market funds, mutual funds, banks, insurance companies, governmental bodies and other public and private entities.

20.     Since 2008, mortgage loan servicing has been the Debtors' primary source of ongoing revenue.  The Debtors hold "mortgage servicing rights" (referred to as "**MSRs**") that consist of primary, master, or sub-servicing rights.  As a primary servicer, the Debtors, among other things, collect and remit mortgage loan payments, respond to borrower inquiries, account for and apply principal and interest, hold custodial and escrow funds for payment of property taxes and insurance premiums, provide ancillary products, counsel or otherwise work with delinquent borrowers, supervise foreclosures and property dispositions, make advances of required principal, interest, and certain "property protection" costs with respect to delinquent and defaulted mortgage loans and the real estate that the trust or owner acquires as the result of a foreclosure of the loan (the "**Advances**"), and generally administer the loans consistent with their contractual undertakings and business practices.  When the Debtors act as master servicer, they collect mortgage loan payments from primary servicers or sub-servicers and distribute those

---

[14]     Since the decline in the mortgage industry beginning in 2007, the Debtors have sold mortgage loans into only two private label securitizations.

funds to investors and to other transaction parties in mortgage-backed and mortgage-related asset-backed securities and whole-loan packages.[15]  Finally, as a sub-servicer, the Debtors perform functions similar to the primary servicing functions described above pursuant to contractual arrangements with other servicers.  The Debtors receive a fee based on the unpaid principal balance ("**UPB**") of the mortgage pool, or in some cases, for each loan serviced.  In addition, the Debtors may receive other remuneration for loan servicing, including interest earned on custodial accounts where mortgage payments are held pending remittance to investors, as well as borrower-contracted fees, such as late charge fees, assignment transfer fees, and other incidental fees and charges.

21.   As of March 31, 2012, the Debtors acted as the primary servicer for approximately 1.5 million loans having an aggregate UPB of approximately $197 billion.  In addition, as of March 31, 2012, the Debtors acted as subservicer for over 847,000 loans having an aggregate UPB of approximately $169 billion, including mortgage loans for which Ally Bank retains the MSRs and whole loans owned by Ally Bank.  The Debtors are the master servicer for approximately 439,000 loans having an aggregate UPB of approximately $58.7 billion as of March 31, 2012, including loans having an aggregate UPB of $7.8 billion for which the Debtors are the master servicer but not the primary servicer.

### B.   Legacy Portfolio and Other

22.   The Debtors' legacy portfolios principally consist of the remaining mortgage loan assets from their historical non-conforming domestic residential mortgage loan origination and securitization activities, the Debtors' remaining international operations, and the

---

[15]   In addition, for Agency Securitizations, they provide certain key services, including advancing required principal and interest and other expenses with respect to mortgage loans (to the extent the primary servicer does not make such advances), claims administration, oversight of primary servicers and sub-servicers, loss mitigation, investor reporting, and other contractual functions.

ny-1039734

Debtors' captive mortgage reinsurance operation. The legacy portfolios are being wound down through opportunistic asset sales, workouts, or other strategic disposition transactions.

## II.    Overview of the Certain of the Debtors' Prepetition Debt

23.    The Debtors are borrowers under credit facilities and also maintain collateralized nonrecourse borrowing facilities for securitization trusts.[16] The Debtors also are the issuer of $2.1 billion of secured and $972.2 million of unsecured publicly traded U.S. dollar, Euro and U.K. Sterling-denominated notes.

24.    The Debtors are party to a revolving facility with Citibank, referred to herein as the Citibank MSR Facility. The Debtors own MSRs with a carrying value as of March 31, 2012 of approximately $1.3 billion. GMAC Mortgage is a borrower, and ResCap is the guarantor, under the Citibank MSR Facility, consisting until March 30, 2012, of a $300 million committed line with an additional $250 million of uncommitted capacity secured by MSRs for mortgage loans in Fannie Mae and Freddie Mac securitization pools. The Citibank MSR Facility, originally scheduled to terminate on March 30, 2012, was extended to the earlier of (i) two days prior to the maturity of the AFI Senior Secured Credit Facility[17] and the AFI LOC[18]

---

[16]    As required by New York State for licensing purposes, Debtors also have a $1 million line of credit with Citibank.

[17]    On December 30, 2009, Debtors Residential Funding Company, LLC ("RFC") and GMAC Mortgage, as borrowers, and Debtors ResCap, Passive Asset Transactions, LLC ("PATI"), and RFC Asset Holdings II, LLC ("RAHI"), as guarantors, entered into a loan agreement with AFI, as agent and lender (as amended from time to time, the "AFI Senior Secured Credit Facility"), amending and restating in its entirety the original loan agreement entered into on June 4, 2008. The AFI Senior Secured Credit Facility terminates on May 14, 2012, and the outstanding principal amount as of the Petition Date is approximately $747 million. The AFI Senior Secured Credit Facility is described in greater detail in the Whitlinger Affidavit.

[18]    On December 30, 2009, Debtors RFC and GMAC Mortgage, as borrowers, Debtors ResCap, PATI and RAHI and certain other Debtors, as guarantors, and AFI, as agent and lender, also entered into a $1.1 billion amended and restated secured loan agreement (as amended from time to time, the "AFI LOC") in order to consolidate under one agreement the terms and provisions of two secured credit agreements with AFI. AFI LOC terminates on May 14, 2012. The outstanding principal amount under the AFI LOC as of Petition Date was approximately $380 million. The AFI LOC provides funds to the Debtors, generally limited to unused capacity, when the Debtors' unrestricted liquidity is less than $300 million. The AFI

(Footnote continues on next page.)

or (ii) May 30, 2012. As part of the extension, the Citibank MSR Facility is no longer revolving

and the Debtors repaid $124 million of the outstanding principal.  The outstanding principal

amount of all loans under the Citibank MSR Facility as of the Petition Date is $152 million.

### III.    Cash Needs Post-Filing

25.    The Debtors seek to continue their operations, including the origination,

servicing, and sale of mortgage loans, in the ordinary course pending the closing of the Asset

Sales.  The Debtors are optimistic that the sale of the servicing platform will yield a significant

return for the benefit of their estates and creditors.  As described in greater detail in the Sale

Motion, Purchaser requires, as a condition to closing, that the Debtors maintain their servicing

operations until the sale is consummated.  Thus, the use of the MSR Cash Collateral is necessary

to preserve the value of their servicing platform for the ultimate benefit of their stakeholders

pending the closing of the sale of these assets to Purchaser.  At the same time, the Debtors will

continue to earn loan servicing fees and other fees in the ordinary course of business.

26.    Further, the Debtors seek to use the MSR Cash Collateral to maintain their

mortgage loan servicing business in the ordinary course to instill confidence in their capabilities

to continue functioning as a servicer, notwithstanding the commencement of these Chapter 11

cases.  If the Debtors are unable to demonstrate sufficient liquidity, borrowers and the market

could experience confusion and uncertainty.  Borrowers may refuse to make payments to the

Debtors, thus impairing the Debtors' ability to continue meeting their ongoing payment

obligations (e.g., making payment advances required under certain circumstances for the benefit

of investors and paying certain securitization fees) and the Debtors' future capacity to collect on

_____

(Footnote continued from previous page.)

LOC is described in greater detail in the Whitlinger Affidavit.

these loans.  Similarly, it is essential that the Debtors remain vigilant to ensure that borrowers
continue making payments on their loans (e.g., by sending out bills and ensuring the collection
and proper distribution of funds received).  If the Debtors' ability to do so is impaired, there is a
real risk that delinquencies and defaults may materially increase to the ultimate detriment of the
Debtors' estates.

27.    Further, if the Debtors do not continue to honor their ordinary course
servicing commitments for mortgage loans which are owned, insured or guaranteed by the
federal government sponsored entities Fannie Mae and Freddie Mac, or by the corporation
Ginnie Mae (the "Agency Loans"), they face the possible termination of their Agency Loan
servicing rights, which, if successful, would result in the loss of future servicing fees, with a
concomitant tremendous (and potentially catastrophic) loss to their estates.  The Debtors also
may incur penalties under recent settlements with the federal government and various state
agencies, pursuant to which the Debtors agreed to, among other things, certain heightened
servicing requirements with respect to the Agency Loans.

28.    In addition, Citibank and the Debtors have negotiated at arm's length and
in good faith regarding the Debtors' use of the MSR Cash Collateral, and Citibank has consented
to the use of the MSR Cash Collateral as described herein.

29.    Accordingly, the relief herein requested is in the best interests of the
Debtors' estates and amply warranted under the circumstances.

## RELIEF REQUESTED

30.    This Motion is one of three related motions that collectively seek authority
for the Debtors to obtain financing and utilize the cash collateral of certain secured lenders, each
of whose claims is secured by its own separate set of cash-generating collateral.

Contemporaneously herewith, the Debtors have also filed (i) a separate motion[19] to (a) obtain

postpetition financing from AFI in the form of postpetition draw(s) under the AFI LOC, and

(b) utilize the cash collateral of AFI and the Junior Noteholders with respect to the assets

securing the AFI LOC, the AFI Senior Secured Credit Facility, and the Junior Secured Notes,[20]

and (ii) a separate motion (the "DIP Motion")[21] to obtain postpetition financing (the "DIP

Facility") on a senior secured, superpriority basis from Barclays Bank PLC ("Barclays"), as

Administrative Agent on behalf of a syndicate of lenders (collectively, the "DIP Lenders").

While the motions and orders are separate, each relating to separately identifiable collateral, they

are being presented in tandem and must be granted together as an integrated whole for the

Debtors to be able to continue operating their businesses seamlessly and without interruption

pending one or more sales of their business lines and assets.

        31.     The Debtors request that, to the extent necessary, the relief sought by this

Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases.  The

Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's entry

---

[19]    <u>See</u> *Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 507(b) and Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate Protection and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief (Debtor in Possession Financing and Ally Financial Inc. and Junior Secured Noteholders Cash Collateral)*

[20]    As of the Petition Date, the outstanding principal amount of the 9.625% junior secured notes due 2015 (the "Junior Secured Notes", and the holders thereof, the "Junior Noteholders") was approximately $2.1 billion. The Junior Secured Notes are described in greater detail in the Whitlinger Affidavit.

[21]    <u>See</u> *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (a) Enter Into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (b) Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, (II) Scheduling a Final Hearing, and (III) Granting Related Relief.*

of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the

Chapter 11 cases of the Debtors.

<strong>APPLICABLE AUTHORITY</strong>

**I.      The Use of the MSR Cash Collateral is Necessary**

32.      Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not

use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the

provisions of this section." 11 U.S.C. § 363(c)(2).

33.      It is essential that the Debtors obtain authority to use the MSR Cash

Collateral to fund the day-to-day operating expenses of their businesses.  Indeed, absent

sufficient funds to support the Debtors' servicing business, the value of that asset will quickly

erode and the Debtors' ability to service loans will be greatly jeopardized to the detriment of the

Debtors' estates, as well as borrowers of and investors in the mortgage loans.

34.      Citibank has consented to the Debtors' continued use of the MSR Cash

Collateral pursuant to the terms of the Interim Order and Final Order.  Thus, the Court has

authority to enter such orders pursuant to section 363(c)(2) of the Bankruptcy Code.

35.      Accordingly, authorization to use the MSR Cash Collateral is in the best

interests of the Debtors' estates and creditors.

**II.     The Interests of Citibank are Adequately Protected**

36.      Pursuant to sections 361 and 363(e) of the Bankruptcy Code, Citibank is

entitled to adequate protection of its interest in the MSR Cash Collateral for, and equal in amount

to, the aggregate diminution in the value of its security interests in the MSR Cash Collateral as a

result of the Debtors' use, sale or lease of the MSR Cash Collateral.  See 11 U.S.C. § 363(e) ("on

request of an entity that has an interest in property used, sold, or leased, or proposed to be used,

sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition

such use, sale, or lease as is necessary to provide adequate protection of such interest.").

        37.      What constitutes adequate protection is determined on a case-by-case

basis.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate

protection is a fact-specific inquiry . . . left to the vagaries of each case") (quotation omitted); In

re Realty Sw. Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992).  Although the Bankruptcy

Code does not define the term "adequate protection," it provides a non-exhaustive list of types of

adequate protection, including "other relief' resulting in the "indubitable equivalent" of the

secured creditor's interest in such property.  See 11 U.S.C. § 361.  Specifically, section 361 of

the Bankruptcy Code provides the following non-exclusive examples of what may constitute

adequate protection:

        (1)      requiring the trustee to make a cash payment or periodic
cash payments to such entity, to the extent that the . . . use . . . under
section 363 . . . results in a decrease in the value of such entity's interest in
such property;

        (2)      providing to such entity an additional or replacement lien to
the extent that such . . . use . . . results in a decrease in the value of such
entity's interest in such property; or

        (3)      granting such other relief . . . as will result in the realization
by such entity of the indubitable equivalent of such entity's interest in
such property.

11 U.S.C. § 361.  Essentially, the Bankruptcy Code intends "adequate protection" to shield a

secured creditor from diminution in the value of its interest in the particular collateral during the

period of use by the debtor.  See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr.

S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor

from diminution in value of its interest during the Chapter 11 case); Save Power Ltd. v. Pursuit

Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.), 193 B.R. 713, 716 (Bankr. D. Del.

1996) (holding creditor adequately protected if no diminution in value of collateral).

38.     Here, the Debtors believe that Citibank is adequately protected in several ways in connection with the Debtors' proposed use of the MSR Cash Collateral.  First, Citibank will be granted replacement liens and additional liens related to the use of its MSR Cash Collateral.  Second, Citibank will be adequately protected by the superpriority administrative expense claims granted by the Debtors.  Third, Citibank will receive Adequate Protection Payments consisting of current interest paid at the non-default rate, as well as payments of all fees and expenses, each to the extent permitted by the applicable loan documents.  Fourth, the Debtors have agreed to seek authority to use the proceeds from any sale of Prepetition MSR Collateral to repay the loans under the Citibank MSR Facility, subject to the Agency Interests.  Fifth, the MSR Cash Collateral will be used only to fund the Debtors' operations related to Citibank's collateral pool, including the payment of servicing Advances and related fees or the repurchases of loans related to the Prepetition MSR Collateral (plus an allocated portion of administrative expenses).

39.     Moreover, the Debtors believe that the sale of the servicing platform will yield a significant return for their estates.  In fact, the Debtors have already received an offer from Purchaser to buy their mortgage loan origination and loan servicing businesses (including the Prepetition MSR Collateral).  As a condition to closing, Purchaser requires that the Debtors maintain their servicing operations until the sale is consummated.  If the underlying mortgage loans could not be serviced, however, there could be a precipitous decline in the value of the Prepetition MSR Collateral.  The Court's authorization of the use of the MSR Cash Collateral, therefore, will protect Citibank's security interests by preserving the value of its collateral.  See In re Salem Plaza Assocs., 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured

creditor was adequately protected when cash collateral was used to pay necessary operating

expenses); In re Pursuit Athletic Footwear, 193 B.R. at 717-18 (holding that a showing that the

debtors could operate profitably postpetition demonstrated adequate protection); In re Mullen,

172 B.R. 473, 478 (Bankr. D. Mass. 1994) ("If the rents were not used to pay for management,

taxes and maintenance of the properties, the value of [the secured lender's] mortgage interest

would rapidly decline."); In re 495 Cent. Park Ave. Corp., 136 B.R. at 631 (holding that a

prepetition secured creditor was adequately protected because "the value of the debtor's property

[would] increase as a result of the renovations funded by the proposed financing."); In re

Constable Plaza Assocs., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (observing that debtor's use

of rents to maintain and operate property "will serve to preserve or enhance the value of the

building which, in turn, will protect the collateral covered by [the secured lender's] mortgage.");

Hartigan v. Pine Lake Vill. Apartment Co. (In re Pine Lake Vill. Apartment Co.), 16 B.R. 750,

756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's

collateral . . . clearly ensures that the plaintiff-mortgagee's investment is adequately protected.").

          40.     Additionally, the Debtors believe that Citibank is adequately protected

through the existence of a substantial equity cushion in its collateral.  The Debtors have

borrowed approximately $152 million under the Citibank MSR Facility, and the Purchaser has

allocated approximately $362.6 million of its purchase price to the Prepetition MSR Collateral.

Thus, the Citibank MSR Facility likely is over-secured by approximately $210.6 million.  It is

highly unlikely that Citibank will harmed by any diminution of the value of the Prepetition MSR

Collateral by the Debtors' use thereof.  As several courts have held, the presence of an equity

cushion in encumbered collateral is itself a form of adequate protection.  See In re Realty Sw.

Assocs., 140 B.R. at 366-67 (holding that creditor was adequately protected pursuant to

Bankruptcy Code section 363(e) because of substantial equity cushion); <u>In re Am. Consol.</u>

<u>Transp. Cos.</u>, No. 09-B-26062, 2010 Bankr. LEXIS 3144, *11 (Bankr. N.D. Il. Sept. 10, 2010)

(finding adequate protection where there was a substantial equity cushion in the debtors'

property, including the debtors' real estate, buses, inventory, and cash); <u>In re Dynaco Corp.</u>, 162

B.R. 389, 398 (Bankr. D.N.H. 1993). <u>See also</u> <u>Capital Commc'ns Fed. Credit Union v. Boodrow</u>

<u>(In re Boodrow)</u>, 126 F.3d 43, 53 (2d Cir. 1997) ("[I]n determining whether a creditor's interest

in a debtor's property is adequately protected, most courts engage in an analysis of the property's

'equity cushion.'") (citation and internal quotation marks omitted)); <u>In re New Era Co.</u>, 125 B.R.

725, 728 (S.D.N.Y. 1991) ("[I]t is clear that one way to assure [adequate] protection is to have an

`equity cushion.'").

   41. The Debtors submit that the terms and conditions of adequate protection

set forth in the Interim Order and Final Order are, taken as a whole, fair and reasonable under the

circumstances, reflect the Debtors' reasonable exercise of business judgment consistent with their

fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  For

the foregoing reasons, the Debtors' requested use of the MSR Cash Collateral and the protections

provided to Citibank are reasonable, appropriate, and sufficient to satisfy the legal standard of

"adequate protection."

## III. Support for Modification of the Automatic Stay

   42. As set forth more fully in the proposed Interim Order, the Debtors propose

to grant Citibank limited relief from the automatic stay established pursuant to section 362 of the

Bankruptcy Code to permit Citibank, in its sole discretion, to take certain actions permitted or

required under the applicable loan documents and to enforce certain remedies against the

Prepetition MSR Collateral without having to obtain any further order of this Court.  The Interim

Order further provides that, prior to the exercise of any enforcement or liquidation remedies,

Citibank shall be required to give seven (7) days' written notice to each of (i) counsel for the

Debtors, (ii) counsel for the Creditors' Committee, (iii) Freddie Mac, and its counsel, (iv) Fannie

Mae, and its counsel, and (v) the United States Trustee.

43.     The Debtors submit that stay modification provisions such as these are

ordinary and usual features of adequate protection and, in the Debtors' business judgment, are

reasonable under the present circumstances.  Courts in this jurisdiction have granted similar

relief on an interim basis in other Chapter 11 cases.  See e.g., In re Last Mile, Inc., Case No. 11-

14769 (SHL) (Bankr. S.D.N.Y. Apr. 19, 2012) (Docket No. 134); In re Innkeepers USA Trust,

Case No. 10-13800 (SCC) (Bankr. S.D.N.Y. July 20, 2010) (Docket No. 54); In re BearingPoint,

Inc., Case No. 09-10691 (REG) (Bankr. S.D.N.Y. Feb. 19, 2009) (Docket No. 37); In re DBSD

North America, Inc., Case No. 09-13061 (REG) (Bankr. S.D.N.Y. May 22, 2009) (Docket No.

41); In re Extended Stay, Case No. 09-13764 (JMP) (Bankr. S.D.N.Y. June 29, 2009) (Docket

No. 110).

## IV.    Interim Approval Should be Granted

44.     Bankruptcy Rule 4001(b)(2) provides that:

> The court may commence a final hearing on a motion for authorization to
> use cash collateral no earlier than 14 days after service of the motion. If
> the motion so requests, the court may conduct a preliminary hearing
> before such 14 day period expires, but the court may authorize the use of
> only that amount of cash collateral only as is necessary to avoid immediate
> and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2).  Similarly, to the extent the Debtors are seeking authority to sell,

use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003

provides that the Court may only grant immediate relief to the extent it is necessary to avoid

immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).

ny-1039734

45.        Generally, courts find "immediate and irreparable harm" exists where loss

of the business threatens ability to reorganize.  See In re Ames Dep't Stores, Inc., 115 B.R. 34,

36 n.2 (Bankr. S.D.N.Y. 1990).  Approval of the use of cash collateral on an interim basis under

Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case.  In

examining requests for interim relief under this rule, courts apply the same business judgment

standard applicable to other business decisions, and a debtor should be entitled to borrow those

amounts that it believes prudent in the operation of its business.  See e.g., In re Eastman Kodak

Co., Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012) (Docket No. 54); In re Hostess

Brands, Inc., Case No. 12-22052 (RDD) (Bankr S.D.N.Y. Jan. 12, 2012) (Docket No. 63); In re

General Maritime Corp., Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Nov. 18, 2011) (Docket

No. 32); In re MF Global Holdings Ltd., Case No. 11-15059 (MG) (Bankr. S.D.N.Y. Nov. 2,

2011) (Docket No. 24); In re Borders Group, Inc. Case No. 11-10614 (MG) (Bankr. S.D.N.Y.

Feb. 17, 2011) (Docket No. 69); In re The Great Atlantic & Pacific Tea Co., Case No. 10-24549

(RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (Docket No. 43).

46.        The Debtors seek expedited approval of the relief requested in this Motion

in light of the immediate and irreparable harm that the Debtors' estates will incur unless they

obtain the liquidity necessary to sustain their businesses.  Absent sufficient liquidity to support

the Debtors' servicing business, the Debtors' assets will quickly erode to the detriment of the

Debtors' estates, the borrowers of the mortgage loans, and investors.  For the reasons set forth

above, the Debtors submit that the use of the MSR Cash Collateral is necessary to preserve the

value of the Debtors' estates for the benefit of their creditors and other parties-in-interest.

47.        Courts in this jurisdiction have granted similar relief in other Chapter 11

cases.  See, e.g., In re Eastman Kodak Co., Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20,

2012) (Docket No. 54) (order approving use of cash collateral on an interim basis); In re Hostess

Brands Inc., Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2012) (Docket No. 63)

(same), In re General Maritime Corp., Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Nov. 18,

2011) (Docket No. 32) (same); In re MF Global Holdings Ltd., Case No. 11-15059 (MG) (Bankr.

S.D.N.Y. Nov. 2, 2011) (Docket No. 24) (same); In re The Great Atlantic & Pacific Tea Co., No.

10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (Docket No. 43) (same); In re Boston

Generating, LLC, Case No. 10-14419 (SCC) (Bankr. S.D.N.Y. Aug. 20, 2010) (Docket No. 56)

(same); In re Chemtura Corp., Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Mar. 20, 2009)

(Docket No. 58) (same); In re Lyondell Chem. Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y.

Jan. 8, 2009) (Docket No. 79) (same).

## V.    Request for Immediate Relief and Waiver of Stay

48.    Bankruptcy Rule 6003 generally precludes the Court from authorizing

certain relief until twenty-one days after the petition is filed, except to the extent necessary to

prevent "immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that

Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the

interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to

the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief

requested in this Motion be entered on an interim basis.

49.    To successfully implement the foregoing, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy

Rule 6004(h).

50.    Therefore, the Debtors request that this Court (i) conduct an expedited

hearing on this Motion, (ii) grant the relief sought in this Motion on an interim basis and enter

the Interim Order, (iii) schedule the Final Hearing on this Motion, and (iv) establish notice and

objection procedures in respect thereof in accordance with Bankruptcy Rule 4001(c).

## NOTICE

51.    Notice of this Motion will be given to the following parties, or in lieu

thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of

New York; (b) the office of the United States Attorney General; (c) the office of the New York

Attorney General; (d) the office of the United States Attorney for the Southern District of New

York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of

the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees

for the Debtors' outstanding notes issuances; (i) the Administrative Agent and its counsel; (j) the

Collateral Agent; (k) Barclays Bank PLC ("Barclays"), as the Administrative Agent under the

Barclays DIP Facility; (l) The Bank of New York Mellon, as indenture trustee under the Pre-

Petition GSAP Facility; (m) Ally Financial, Inc. and its counsel, Kirkland & Ellis LLP; (n) Ally

Bank and its counsel, Kirkland & Ellis LLP; (o) Citibank, N.A. as secured lender under the MSR

Facility; (p) U.S. Bank National Association, as trustee for the Prepetition Junior Secured Notes

(q) Wells Fargo Bank, N.A., as collateral agent for the Prepetition Junior Secured Notes, as

collateral agent for the Prepetition Ally Revolver, and as collateral control agent under the

Intercreditor Agreement, dated as June 6, 2008; (r) BMMZ, as buyer under the Pre-Petition Ally

Repo Facility; (s) Fannie Mae; (t) Freddie Mac; (u) Ginnie Mae; (v) servicers and sub-servicers

under the Designated Servicing Agreements and the Specified Servicing Agreements (each term

as defined in the DIP Credit Agreement); (w) the MBS Trustees (as defined in the DIP Credit

Agreement); (x) Nationstar Mortgage LLC and its counsel; and (y) the parties included on the

Debtors' list of fifty (50) largest unsecured creditors (collectively, the "Initial Notice Parties").

52.    Within two (2) days after entry of the Interim Order, the Debtors propose

to serve a copy of the Motion and the Interim Order upon the Initial Notice Parties.  The Debtors

request that the Court schedule the Final Hearing on the Motion for a date that is as soon as

practicable, but in no event later than forty-five (45) days following the entry of the Interim

Order, and establish the date prior to the Final Hearing for parties to file objections to the

Motion.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an

interim order substantially in the form attached hereto as <u>Exhibit A</u>, granting certain of the relief

sought herein immediately; (ii) enter a final order granting the relief sought herein on a final

basis; and (iii) grant such other and further relief to the Debtors as the Court may deem just and

proper.

Dated:  May 14, 2012
      New York, New York

*/s/*    Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

# **EXHIBIT A**

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------- x
In re                                              :
                                                   :    Chapter 11
                                                   :
RESIDENTIAL CAPITAL, LLC, et al.,                  :    Case No. 12-_____
                                                   :
              Debtors.                             :    (Jointly Administered)
                                                   :
-------------------------------------------------------------- x
```

## INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING

Upon the motion, dated May 14, 2012 (the "**Motion**")[1] of Residential Capital, LLC and its direct and indirect subsidiaries, each as a debtor and debtor in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, with any successor case, the "**Cases**") pursuant to sections 105, 361, 362, 363 and 507 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Bankruptcy Rules of the Southern District of New York, seeking entry of an interim order (this "**Interim Order**"):

(i)    authorizing the Debtors' use of "cash collateral" (as defined in section 363(a) of the Bankruptcy Code) of Citibank (as defined herein) (the "**MSR Cash Collateral**");

(ii)    providing adequate protection to Citibank and for any diminution in value of its interest in the Prepetition MSR Collateral (as defined herein), including the MSR Cash Collateral;

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed in the Motion.

(iii)    vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and

provisions of this Interim Order; and

(iv)    scheduling a final hearing (the "**Final Hearing**") to consider the relief

requested in the Motion and the entry of a Final Order (as defined herein), and approving

the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the Affidavit of James Whitlinger, Chief

Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day

Pleadings, sworn to on May 14, 2012, the exhibits attached thereto, and the evidence submitted

or adduced and the arguments of counsel made at the interim hearing held on May __, 2012 (the

"**Interim Hearing**"); and after due deliberation and consideration, and for good and sufficient

cause appearing therefor;

## THE COURT HEREBY FINDS THAT[2]:

A.    _Petition Date_:  On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed

a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the Southern District of New York (the "**Court**") commencing these Cases.

B.    _Debtors in Possession_.  The Debtors are continuing in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.    _Jurisdiction and Venue_.  This Court has jurisdiction, pursuant to 28 U.S.C.

§§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate.

NYDOCS03/948309.6
ny-1040177

Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue

for the Cases appears proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    _Statutory Committee_.  As of the date hereof, the United States Trustee (the "**U.S.**

**Trustee**") has not yet appointed an official committee of unsecured creditors in these Cases

pursuant to section 1102 of the Bankruptcy Code (a "**Statutory Committee**").

E.    _Notice._  Notice of the Interim Hearing and the relief requested in the Motion was

given on the Petition Date by electronic mail, facsimile and/or overnight delivery to (i) the 50

largest unsecured creditors of the Debtors on a consolidated basis; (ii) the Administrative Agent

under the DIP Facility; (iii) the Collateral Agent under the DIP Facility; (iv) the DIP Lenders (as

defined in the Motion); (v) the Prepetition Finance Parties;[3] (vi) Ally Financial Inc.; (vii) Ally

Bank; (viii) Citibank, N.A., as secured lender under the Prepetition MSR Facility (as defined

below); (ix) U.S. Bank National Association, as trustee for the Junior Secured Notes;[4]  (x) Wells

Fargo Bank, N.A., as collateral agent for the Junior Secured Notes, as collateral agent for the

Ally Senior Secured Credit Facility,[5]  and as collateral control agent under the Intercreditor

Agreement;[6] (xi) BMMZ Holdings LLC, as buyer under the BMMZ Repo Facility; (xii) Fannie

Mae (a/k/a The Federal National Mortgage Association); (xiii) Freddie Mac (a/k/a The Federal

---

[3]     "**Prepetition Finance Parties**" means The Bank of New York Mellon, as indenture trustee under the Prepetition GSAP Facility (as defined in the DIP Credit Agreement) and Barclays, as administrative agent under the Prepetition GSAP Facility.

[4]     "**Junior Secured Notes**" means the 9.625% Junior Secured Guaranteed Notes due 2015 issued by ResCap pursuant to the Prepetition Junior Secured Indenture, in an initial aggregate face amount of $4,010,280,000, as amended or supplemented prior to the date hereof.  "**Prepetition Junior Secured Indenture**" means the Indenture, dated as of June 6, 2008, among ResCap, as issuer, the Subsidiaries of ResCap party thereto as guarantors, and U.S. Bank National Association, as trustee, as amended or supplemented prior to the date hereof.

[5]     The "**AFI Senior Secured Credit Facility**" means the credit facility under (a) the Amended and Restated Loan Agreement, dated as of December 30, 2009, by and among RFC, GMACM, ResCap, certain other affiliates of ResCap, Wells Fargo Bank, N.A., and GMAC Inc., as amended or supplemented prior to the date hereof, and related documents, as amended or supplemented prior to the date hereof.

[6]     The "**Intercreditor Agreement**" means the Intercreditor Agreement, dated as of June 6, 2008, relating to the Junior Secured Notes and the AFI Senior Secured Credit Facility.

3

Home Loan Mortgage Corporation); (xiv) Ginnie Mae (a/k/a the Government National Mortgage

Association); (xv) the GSAP Transferor (as defined below); (xvi) the servicers and sub-servicers

under the Designated Servicing Agreements and the Specified Servicing Agreements (each term

as defined in the DIP Credit Agreement); (xvii) the MBS Trustees (as defined in the DIP Credit

Agreement); (xviii) Nationstar Mortgage LLC and its counsel; and (xix) the U.S. Trustee

(collectively, the "**Initial Notice Parties**").  Such notice constitutes good and sufficient notice of

the Motion and the Interim Hearing under the circumstances in accordance with Bankruptcy

Rules 4001(b), 4001(c), the Local Bankruptcy Rules and section 102(1) of the Bankruptcy Code,

as required by sections 363(c), 363(e), 364(c) and 364(d) of the Bankruptcy Code in light of the

emergency nature of the relief requested in the Motion.

F.     *The Prepetition MSR Facility*.  Pursuant to that certain Amended and Restated

Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or

otherwise modified, including pursuant to Amendment Number Ten, dated March 30, 2012,

pursuant to which Citibank agreed, among other things, to the extension of the Loan Repayment

Date (as defined in the Amended and Restated Loan and Security Agreement) to May 30, 2012,

the "**Prepetition MSR Agreement**" and, together with all other loan and security documents

related to, referenced in or executed in connection with the Prepetition MSR Agreements, the

"**Prepetition MSR Credit Documents**"), among GMAC Mortgage, LLC ("**GMAC**

**Mortgage**"), as Borrower, Residential Capital LLC, as Guarantor, and Citibank, N.A., as Lender

("**Citibank**"), Citibank provided a credit facility to GMAC Mortgage (the "**Prepetition MSR**

**Facility**").  The Prepetition MSR Facility provided the Debtors with financing to provide

funding for the origination or acquisition of certain mortgage loan servicing rights (as defined in

the Prepetition MSR Agreement, the "**Servicing Rights**").  GMAC Mortgage's obligations under

the Prepetition MSR Facility are guaranteed by Residential Capital, LLC, a Debtor in these Cases.

G.      *Debtors' Stipulations Regarding the Prepetition MSR Facility*.  Without prejudice to the rights of parties in interest as set forth in Paragraph 16 herein, the Debtors admit, stipulate and agree to, and with, the following with respect to the Prepetition MSR Facility (collectively, the "**Debtors' Stipulations**"):

(i)      *Prepetition MSR Obligations*.  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition MSR Agreement was not less than $152 million (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition MSR Credit Documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorney's fees, related expenses and disbursements), reimbursement obligations, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof to the extent and as provided for in the Prepetition MSR Credit Documents, including all "Obligations" as described in the Prepetition MSR Agreement, the "**Prepetition MSR Obligations**").  Subject to Paragraph 16, in light of the Prepetition MSR Obligations and the value of the MSR Prepetition Collateral with respect thereto, Citibank is oversecured and, accordingly, is entitled to interest and fees with respect to the Prepetition MSR Obligations in accordance with the Prepetition MSR Credit Documents.

(ii)      *Prepetition MSR Liens and Prepetition MSR Collateral*.  As more fully set forth in the Prepetition MSR Credit Documents, prior to the Petition Date, the Debtors granted security interests in and liens on, among other things, all of the Debtors' existing and after acquired Servicing Rights, to the full extent of the Debtors' interest therein and regardless of

5

where located, whether or not yet accrued, earned, due or payable, as well as all other present

and future rights and interests of GMAC Mortgage in such Servicing Rights, all contracts with

Fannie Mae and Freddie Mac relating to the Servicing Rights, and all monies due or to become

due with respect to and all proceeds of the Servicing Rights and related collateral (collectively,

the "**Prepetition MSR Collateral**") to Citibank (the "**Prepetition MSR Liens**").

(iii)    *Validity and Perfection of Prepetition MSR Liens and Prepetition MSR*

*Obligations*.  Subject to the provisions of Paragraph 16 of this Interim Order, each of the Debtors

acknowledges and agrees that: (a) as of the Petition Date, the Prepetition MSR Liens on the

Prepetition MSR Collateral were valid, binding, enforceable, non-avoidable and properly

perfected; (b) the Prepetition MSR Obligations constitute legal, valid, binding, and non-

avoidable obligations of the Debtors; (c) other than the Agency Interests (as defined herein), to

the extent set forth in the Agency Acknowledgement Agreements (as defined herein), no offsets,

challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the

Prepetition MSR Liens or Prepetition MSR Obligations exist; (d) no portion of the Prepetition

MSR Liens or Prepetition MSR Obligations is subject to any challenge or defense including,

without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination

(whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy

law; and (e) the Debtors and their estates have no claims, objections, challenges, causes of

actions, and/or choses in action, including without limitation, avoidance claims under the

Bankruptcy Code, against Citibank or its affiliates, agents, attorneys, advisors, professionals,

officers, directors and employees arising out of, based upon or related to its loans to the Debtors

under the Prepetition MSR Credit Documents.

6

(iv)    *Priority of Prepetition MSR Liens*.  As of the Petition Date, the Prepetition

MSR Liens were senior in priority over any and all other liens on the Prepetition MSR

Collateral, subject only to the interests (collectively, the "**Agency Interests**") of Freddie Mac

and Fannie Mae as set forth in (a) the Prepetition MSR Agreement, (b) the Federal Home Loan

Mortgage Corporation Acknowledgement Agreement among Freddie Mac, GMAC Mortgage

and Citibank, N.A. dated March 12, 2009 (the "**Freddie Mac Acknowledgement Agreement**"),

and (c) the Acknowledgement Agreement (Single Secured Party) among Citibank, N.A., GMAC

Mortgage and Fannie Mae dated September 7, 2007 (the "**Fannie Mae Acknowledgement**

**Agreement**" and, together with the Freddie Mac Acknowledgement Agreement, the "**Agency**

**Acknowledgement Agreements**").

(v)    *Cash Collateral*.  Each Debtor represents that all of the Debtors' cash

proceeds of the Servicing Rights and related collateral, including but not limited to all cash on

deposit in that certain "Collection Account," as defined in the Prepetition MSR Agreement and

the MSR Collateral Account (as defined herein), constitutes the MSR Cash Collateral of

Citibank.

H.    *Adequate Protection*.  Citibank is entitled to receive adequate protection to the

extent of any diminution in value of its interests in the Prepetition MSR Collateral, including the

MSR Cash Collateral, resulting from the use of MSR Cash Collateral without the continued

maintenance of the Borrowing Base (as defined in the Prepetition MSR Agreement) in

accordance with the terms of the Prepetition MSR Agreement. as a result of the imposition of the

automatic stay pursuant to sections 362 of the Bankruptcy Code.  Pursuant to sections 361, 363,

and 507(b) of the Bankruptcy Code, as adequate protection, (a) Citibank will receive (i) the MSR

Adequate Protection Liens (as defined below); (ii) the Adequate Protection Superpriority Claim

7

(as defined below); and (iii) the Adequate Protection Payments (as defined below) and (b) the

Debtors agree that they will seek authority in any order approving the sale of the Prepetition

MSR Collateral to provide that the net proceeds of such sale shall be applied by the Debtors to

repay the Obligations under the Prepetition MSR Credit Documents, provided the Agency

Interests (as defined herein) are satisfied through such sale (together with the MSR Adequate

Protection Liens, the Adequate Protection Superpriority Claim and the Adequate Protection

Payments, the "**Adequate Protection**").  Notwithstanding the foregoing, if the Prepetition MSR

Obligations are determined by this Court to be undersecured, interest payments and payment of

fees permitted hereunder may be recharacterized and recredited to the principal balance of such

Prepetition MSR Obligations pursuant to further order entered by this Court.

I.   *Necessity of Relief Requested*.  The ability of the Debtors to finance their

operations requires, in addition to the Debtors' proposed DIP Facility and use of the Ally Cash

Collateral and Junior Secured Notes Cash Collateral, the use of MSR Cash Collateral, absent

which immediate and irreparable harm will result to the Debtors, their estates and creditors.  In

the absence of the use of MSR Cash Collateral, the continued operation of the Debtors'

businesses would not be possible and serious and irreparable harm to the Debtors, their estates

and their creditors would occur.  The relief requested in the Motion therefore is necessary for the

continued operation of the Debtors' businesses and the preservation of their property.  Citibank

and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of

MSR Cash Collateral as set forth herein to fund the continued operation of the Debtors'

businesses during the Specified Period (as defined below).  Entry of this Interim Order is in the

best interests of the Debtors and their estates.

J.      *Final Hearing*.  At the Final Hearing, the Debtors will seek final approval of the relief requested in the Motion pursuant to a proposed final order (the "**Final Order**"), which shall be in form and substance acceptable to Citibank, notice of which Final Hearing and Final Order will be provided in accordance with this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Motion Granted.  The Motion is granted on an interim basis as set forth herein, and the use of MSR Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.      Objections Overruled.  All objections to the Motion to the extent not withdrawn or resolved are overruled.

3.      Authorization to Use MSR Cash Collateral.  Subject to the terms and conditions of the Cash Collateral Orders, the Debtors are authorized to use the MSR Cash Collateral for the period (the "**Specified Period**") from the Petition Date through the date that is the earliest to occur of (a) the expiration of the Remedies Notice Period, (b) forty-five (45) days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 45-day period, (c) the date on which maturity of the DIP Facility is accelerated pursuant to the DIP Loan Agreement as a result of an event of default thereunder, (d) the effective date of a Chapter 11 plan for any Debtor with assets exceeding $10 million, or (e) subject to entry of the Final Order, the date that is eighteen (18) months from the closing date of the DIP Facility.  The MSR Cash Collateral may be used during the Specified Period solely (x) to fund the cash needs related to the operations and assets of the assets that comprise the Prepetition MSR Collateral, including

9

funding advances or repurchase obligations owed by the Debtors with respect to such Prepetition

MSR Collateral, and (y) to fund (an allocated portion of the Debtors' costs of administering these

Cases based on the value of the Prepetition MSR Collateral relative to the value of the Debtors'

other assets in accordance with the budget previously approved by Citibank, a copy of which is

attached hereto as **Exhibit A** (as may be amended as provided herein, the "**Budget**").

4.      MSR Adequate Protection Liens.

(a)      *MSR Adequate Protection Liens.*  As adequate protection of the interests

of Citibank, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are

authorized to grant, and upon entry of this Interim Order shall be deemed to have granted

additional and replacement continuing valid, binding, enforceable, non-avoidable, and

automatically perfected post-petition security interests in and liens on (the "**MSR Adequate**

**Protection Liens**") any and all presently owned and hereafter acquired assets of the Debtors and

their estates that do or would (absent the commencement of the Cases) constitute Prepetition

MSR Collateral under the Prepetition MSR Credit Documents, including but not limited to all

cash in the MSR Concentration Account (as defined herein) (such assets, together with the

Prepetition MSR Collateral, the "**MSR Collateral**").

(b)      *Priority of MSR Adequate Protection Liens.*

(i)      The MSR Adequate Protection Liens shall be senior to all other

security interests in, liens on, or claims against any of the MSR Collateral, subject only to

the Agency Interests.

(ii)      The MSR Adequate Protection Liens shall be enforceable against

the Debtors, their estates and any successors thereto, including without limitation, any

trustee or other estate representative appointed in the Cases, or any case under chapter 7

10

of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "**Successor Cases**").  Except as provided herein, the MSR Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and the MSR Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases.  The MSR Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code, and no lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Prepetition MSR Liens or the MSR Adequate Protection Liens.

5.       Adequate Protection Superpriority Claim.

(a)       *Adequate Protection Superpriority Claim.*  As further adequate protection of the interests of Citibank in the MSR Prepetition Collateral against any Diminution in Value of such interests in the Prepetition MSR Collateral, Citibank hereby is granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "**Adequate Protection Superpriority Claim**").

(b)       *Priority of the Adequate Protection Superpriority Claim.*  The Adequate Protection Superpriority Claim shall have priority over all administrative expenses and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds

11

specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a),

507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy

Code, except the Adequate Protection Superpriority Claim (i) shall be junior to the superpriority

administrative expense claims granted to the Debtors' proposed providers of debtor in possession

financing and the Carve Out (as defined herein), and (ii) may be *pari passu* with the

superpriority administrative expense claims granted to any parties that provide the Debtors with

use of cash collateral (collectively, the "**Permitted Superpriority Claims**").

   6. <u>Adequate Protection Payments and Protections</u>.

   (a) *Adequate Protection Payments*.  As further adequate protection, each

Debtor is authorized and directed to provide adequate protection payments to Citibank (the

"**Adequate Protection Payments**"), in the form of: (i) payments of interest on the Prepetition

MSR Obligations at the non-default rate set forth in the Prepetition MSR Agreement, (ii) any

fees of Citibank pursuant to the Prepetition MSR Agreement payable at the times specified in the

Prepetition MSR Agreement; and (iii) ongoing payment of the reasonable fees, costs and

expenses of Citibank, including, without limitation, the payment of the reasonable fees and

expenses of legal and other professionals retained by Citibank in accordance with Paragraph 11

hereof.

   (b) The Debtors shall seek authority from the Court pursuant to any order

approving the sale, transfer, lease, encumbrance or other disposition of any portion of the MSR

Collateral prior to payment in full of the Prepetition MSR Obligations to repay the loans under

the Prepetition MSR Facility with the proceeds of such disposition, provided the Agency

Interests are satisfied through such sale.

NYDOCS03/948309.6
ny-1040177

7.      <u>MSR Concentration Account</u>.  As a condition to the authorization to use MSR

Cash Collateral, the Debtors shall segregate the MSR Cash Collateral from the Debtors' other

cash by depositing the MSR Cash Collateral into a newly formed separate concentration account

(the "**MSR Concentration Account**") at JP Morgan Chase Bank, N.A. ("**JPM**"), and subject to

a deposit account control agreement entered into among JPM, the GMAC Mortgage, and

Citibank.

8.      <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy

Code section 362(a) is modified as necessary to effectuate all of the terms and provisions of this

Interim Order, including, without limitation, to: (a) permit the Debtors to grant the MSR

Adequate Protection Liens and Adequate Protection Superpriority Claim; (b) permit the Debtors

to perform such acts as Citibank may request in its reasonable discretion to assure the perfection

and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and

obligations to Citibank under this Interim Order; (d) permit the Debtors to open the MSR

Concentration Account, as necessary and execute a deposit account control agreement with

respect thereto without further order of this Court; and (e) authorize the Debtors to pay, and

Citibank to retain and apply payments made in accordance with the terms of this Interim Order;

<u>provided</u>, <u>however</u>, that any stay of relief with respect to the exercise of remedies shall be in

accordance with Paragraph 13 below or as otherwise ordered by this Court.

9.      <u>Perfection of MSR Adequate Protection Liens</u>.  This Interim Order shall be

sufficient and conclusive evidence of the validity, perfection, and priority of the MSR Adequate

Protection Liens and the liens on the MSR Cash Collateral Account without the necessity of

filing or recording any financing statement, mortgage, notice, or other instrument or document

which may otherwise be required under the law or regulation of any jurisdiction or the taking of

13

any other action (including, for the avoidance of doubt, entering into any deposit account control

agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the MSR

Adequate Protection Liens and the liens on the MSR Cash Collateral Account, or to entitle

Citibank to the priorities granted herein.  Notwithstanding the foregoing, Citibank is authorized

to file, as it deems necessary or advisable, such financing statements, notices of liens and other

instruments or documents to perfect in accordance with applicable non-bankruptcy law or to

otherwise evidence the applicable MSR Adequate Protection Liens, liens on the MSR Cash

Collateral Account, and all such financing statements, notices and other documents shall be

deemed to have been filed or recorded as of the Petition Date; provided, however, that no such

filing or recordation shall be necessary or required in order to create, evidence or perfect the

MSR Adequate Protection Liens including the liens on the MSR Cash Collateral Account.  The

Debtors are authorized and directed to execute and deliver promptly upon demand to Citibank all

such financing statements, notices, instruments and other documents as Citibank may reasonably

request.  Citibank, in its sole discretion, may file a copy of this Interim Order as a financing

statement or notice with any filing or recording office or with any registry of deeds or similar

office, in addition to or in lieu of such financing statements, notices of lien, instrument, or similar

document.

        10.    <u>Additional Covenants of the Debtors</u>.  The Debtors shall:

        (a)    Remit all MSR Cash Collateral, as and when received, for deposit to the

MSR Concentration Account to be used in accordance with this Interim Order, the Budget and

the Cash Management Order (as defined herein);

        (b)    Provide to Citibank (i) monthly servicing tapes required under the MSR

Prepetition Agreement; (ii) on a bi-weekly basis, variance reports on actual versus projected cash

flows of the operations with respect to the MSR Collateral; (iii) every four weeks, updated

Budgets; (iv) monthly collateral reports and such other monthly, quarterly or annual financial

reports as the Debtor is required to provide pursuant to the DIP Facility; and (v) notice of any

changes in tier rating of GMAC Mortgage by Freddie Mac or Fannie Mae.

(c)      Serve Citibank and its counsel, and counsel to any Statutory Committee,

with a copy of each monthly report filed by the Debtors in these Cases as required by the Court,

the U.S. Trustee or applicable law.

11.    Payment of Professional Fees.  Professionals for Citibank shall not be required to

comply with the U.S. Trustee fee guidelines for the payment of fees and expenses, but each

professional shall provide detailed fee and expense statements (redacted if necessary for

privilege) to the U.S. Trustee, counsel for any Statutory Committee, counsel for the DIP Lender,

and counsel for the Debtors.  To the extent that the Debtors, U.S. Trustee, Statutory Committee,

or the DIP Lender has an objection to the fees and expenses of any such professional, they shall

so advise the professional.  If any such objection is raised and not resolved and/or withdrawn

within five (5) business days after receipt of the fee or expense statement (or such later date as

the objecting party and the professional shall agree), the parties shall submit any dispute to this

Court for adjudication.

12.    Events of Default.  The occurrence of any of the following events, unless waived

in writing by Citibank, shall constitute an event of default (collectively, the "**Events of

Default**"):

(a)      the occurrence and continuance of an event of default under the DIP

Facility (as defined in the Motion);

NYDOCS03/948309.6
ny-1040177

(b)        the failure to obtain a Final Order within forty-five (45) days after the

Petition Date;

(c)        the failure of the Debtors to provide any report or certificate due under

Paragraph 10 that continues unremedied for a period of five (5) business days after the date that

such report or certificate was due;

(d)        any event of default, early amortization event, termination event or other

similar event (other than as a result of the commencement of the Cases) shall occur under any

material document or agreement that relates to the Prepetition MSR Agreement or the MSR

Collateral and such event could reasonably be expected to be materially adverse to the rights and

interests of Citibank;

(e)        any liens, claims and other interests created by this Interim Order shall

cease to be valid, perfected and enforceable and of the same priority purported to be created

hereby or any of the Debtors or their subsidiaries shall challenge in any action the validity,

perfection, enforceability or priority thereof;

(f)        dismissal of the Case of any Debtor with assets exceeding $10 million (or

any of the Debtors or their affiliates seeking or supporting such any such dismissal) or

conversion of the Case of any Debtor with assets exceeding $10 million to a case under chapter 7

of the Bankruptcy Code (or any of the Debtors or their affiliates seeking or supporting any such

conversion);

(g)        appointment of a trustee (or such other comparable responsible person) or

a responsible officer or examiner with expanded powers in the Case of any Debtor with assets

exceeding $10 million (or any of the Debtors or their affiliates seeking or supporting any such

appointment);

16

(h)       entry of an order granting relief from the automatic stay as to the MSR

Collateral with a value in excess of $10 million (or any of the Debtors or their affiliates seeking

or supporting any such relief) (i) to allow any creditor to execute upon or enforce a lien on or

security interest in any MSR Collateral, or (ii) with respect to any lien of or the granting of any

lien on any MSR Collateral to any state or local environmental or regulatory agency or authority,

which in either case would have a material adverse effect on the business, operations, property,

assets, or condition, financial or otherwise, of the Debtors;

(i)       entry an order amending, supplementing, staying, vacating, reversing or

otherwise modifying this Interim Order except as otherwise agreed to in writing by Citibank, or

this Interim Order shall cease to be in full force and effect;

(j)       entry of an order granting any superpriority claim (or claim of equivalent

status) that is senior to or *pari passu* with the claims of Citibank or any lien or security interest

that is senior to or *pari passu* with the liens and security interests securing the Prepetition MSR

Facility, except for the Permitted Superpriority Claims, which superpriority claims may be senior

or *pari passu* with the Adequate Protection Superpriority Claim as provided in paragraph 5(b);

(k)       entry of an order authorizing recovery from the MSR Collateral for any

cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or

otherwise, other than as may be provided in this Interim Order.

(l)       upon written notice from Citibank, any material misrepresentation of a

material fact made after the Petition Date by any of the Debtors or their agents to Citibank or its

agents about the financial condition of the Debtors, or any of them, the nature, extent, location or

quality of any MSR Collateral, or the disposition or use of any MSR Collateral, including MSR

Cash Collateral;

17

(m)      the sale after the Petition Date of any portion of the MSR Collateral except pursuant to an order that provides for the repayment of the Prepetition MSR Obligations from the proceeds of such sale, provided the Agency Interests are satisfied through such sale;

(n)      upon written notice from Citibank, the material failure to make Adequate Protection Payments or other payments to Citibank when due, subject to a cure period of five (5) days; and

(o)      the failure by the Debtors to perform or observe in any respect any terms, provisions, conditions, covenants, agreements or obligations under this Interim Order that is not otherwise specified as an Event of Default and that remains unremedied for fifteen (15) business days; provided, however, that a variance from the Budget shall not be deemed an Event of Default hereunder;

13.      Rights and Remedies Upon Event of Default.  Upon the occurrence of an Event of Default and at any time thereafter during the continuance thereof, with seven (7) days' prior written notice (an "**Enforcement Notice**") of any such occurrence, in each case given to (i) the Debtors and their counsel, (ii) counsel to the Adminstrative Agent and Collateral Agent under the DIP Facility, (iii) counsel to any Statutory Committee, (iv) the U.S. Trustee, (v) counsel to Ally, (vi) counsel to the Junior Secured Notes, (vii) Freddie Mac, and its counsel, and (viii) Fannie Mae, and its counsel, Citibank shall be entitled to exercise Citibank's rights and remedies as set forth in the Prepetition MSR Documents or under applicable law (including the right to setoff monies of the Debtors in accounts maintained with Citibank and delivery of a shifting control notice with respect to the MSR Collateral Account).  Any Enforcement Notice shall also be filed with the Court.  This Interim Order shall not prejudice the rights of any party in interest to oppose the exercise of Citibank's remedies; *provided* that the only issue that may be raised by

18

any party in opposition thereto shall be whether an Event of Default has in fact occurred and is

continuing, and the Debtors hereby waive their right to seek any relief, whether under section

105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or

delay the exercise or benefit of, the rights and remedies of Citibank under the Prepetition MSR

Documents or this Interim Order.  Upon the expiration of the seven (7) day period (the

"**Remedies Notice Period**"), in the absence of a determination by the Court that an Event of

Default has not occurred or is not continuing, Citibank shall be entitled to pursue all remedies

under the Prepetition MSR Documents or applicable law without further order of the Court, and

the automatic stay is hereby deemed modified to permit the pursuit of such remedies.

14.     Carve Out.  As used in this Interim Order, the "**Carve Out**" means the Carve Out

as defined in any order of the Court approving the DIP Facilities provided by Barclays Bank

PLC and Ally Financial Inc..  Notwithstanding anything to the contrary herein, the Carve Out

shall be junior in priority to the Prepetition MSR Liens and the MSR Adequate Protection Liens.

No payment of any Carve Out amount shall reduce any Prepetition MSR Obligations.

15.     Limitations on the Use of MSR Cash Collateral.  The MSR Cash Collateral may

not be used in connection with or to finance in any way any action, suit, arbitration, proceeding,

application, motion or other litigation of any type (a) adverse to the interests of Citibank, or its

rights and remedies under the Prepetition MSR Credit Documents or this Interim Order,

including, without limitation, for the payment of any services rendered by the professionals

retained by the Debtors or any Statutory Committee in connection with the assertion of or joinder

in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other

contested matter, the purpose of which is to seek, or the result of which would be to obtain, any

order, judgment, determination, declaration or similar relief adverse to the interests of Citibank,

19

or their rights and remedies under the Prepetition MSR Credit Documents or this Interim Order,

(b) invalidating, setting aside, recharacterizing, avoiding or subordinating, in whole or in part,

the Prepetition MSR Obligations, (c) objecting to or challenging in any way the claims, liens, or

interests (including interests in the MSR Collateral) held by or for the benefit of Citibank;

(d) asserting, commencing or prosecuting any claims or causes of action whatsoever, including,

without limitation, any actions under chapter 5 of the Bankruptcy Code, against Citibank; (e)

prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity,

extent, amount, perfection, priority, characterization or enforceability of any of the Prepetition

MSR Obligations or Prepetition MSR Liens or any other rights or interests of Citibank; or

(f) preventing, hindering or otherwise delaying the exercise by Citibank of any rights and

remedies granted under this Interim Order; provided that such restrictions shall not prohibit any

investigation by any Statutory Committee of any of the foregoing.

16.     <u>Reservation of Certain Statutory Committee and Third Party Rights and Bar of</u>

<u>Challenges and Claims</u>.  Nothing in this Interim Order shall prejudice the rights of a Statutory

Committee to seek to avoid, object to or otherwise challenge the findings or Debtors'

Stipulations regarding (a) the validity, extent, priority, or perfection of the mortgages, security

interests, and liens of Citibank; or (b) the validity, allowability, priority, fully secured status or

amount of the Prepetition MSR Obligations.  Subject to the entry of a Final Order, any Statutory

Committee, if appointed, must commence, as appropriate, a contested matter or adversary

proceeding raising such claim, objection, defense, or other challenge, including, without

limitation, any claim against Citibank in the nature of a setoff, counterclaim or defense to the

applicable Prepetition MSR Obligations (each, a "**Challenge**") within seventy-five (75) calendar

days after entry of the Interim Order subject to further extension by written agreement between

20

the parties (in each case, a "**Challenge Period**" and the date of expiration of each Challenge

Period being a "**Challenge Period Termination Date**").  Upon the expiration of the Challenge

Period Termination Date, without the filing of a challenge (or if any such challenge is filed and

overruled):  (x) any and all such Challenges by any party (including, without limitation, the

Statutory Committee, any chapter 11 trustee, examiner or other estate representative appointed or

elected in these Cases, and any chapter 7 trustee, examiner or other estate representative

appointed or elected in any Successor Case) shall be deemed to be forever waived, released and

barred, and (y) all of the Debtors' Stipulations, waivers, releases, affirmations and other

stipulations as to the priority, extent, and validity as to Citibank's claims, liens, and interests

shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy

estates and all creditors, holders of interests, and other parties in interest in these Cases and any

successor cases.

17.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim

Order does not create any rights for the benefit of any third party, creditor, equity holder or any

direct, indirect, or incidental beneficiary.

18.    <u>Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or expenses of

administration which have been or may be incurred in the Cases at any time shall be charged

against Citibank or its claims or the MSR Collateral pursuant to sections 105 or 506(c) of the

Bankruptcy Code, or otherwise, without the prior express written consent of Citibank, and no

such consent shall be implied, directly or indirectly, from any other action, inaction, or

acquiescence by Citibank.

19.    <u>No Marshaling/Applications of Proceeds</u>.  Upon entry of the Final Order,

Citibank shall not be subject to the equitable doctrine of "marshaling" or any other similar

doctrine with respect to any of the Prepetition MSR Collateral, as the case may be, and proceeds shall be received and applied in accordance with this Interim Order notwithstanding any other agreement or provision to the contrary.

20.    <u>Section 552(b)</u>.  Upon entry of the Final Order, Citibank shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to Citibank with respect to proceeds, product, offspring or profits of any of the Prepetition MSR Collateral.

21.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) Citibank's right to seek any other or supplemental relief in respect of any Debtor, including the right to seek additional adequate protection (without prejudice to the Debtors' or any other person's right to object to or otherwise oppose such additional adequate protection); (b) any of the rights of Citibank under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of Citibank are preserved, including Citibank's rights under section 507(b) of the Bankruptcy Code.

22.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of Citibank to seek relief or otherwise exercise its rights and remedies under this Interim Order, the Prepetition MSR Credit

Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of Citibank.

23.    <u>Proofs of Claim</u>.    Upon entry of the Final Order, Citibank will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein, and the Debtors' Stipulations in Paragraph G herein shall be deemed to constitute a timely filed proof of claim for Citibank.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, Citibank is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any claim allowed herein.

24.    <u>Good Faith</u>.    Citibank has acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith.

25.    <u>Reservation of Rights</u>.    Nothing in this Order shall discharge, release, or otherwise preclude any setoff or recoupment right of the United States of America, its agencies, departments, or agents.  Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

23

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates (excluding

ResCap and its subsidiaries).

26.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry by this Court

(notwithstanding any applicable law or rule to the contrary), the terms and provisions of this

Interim Order shall become valid and binding upon and inure to the benefit of the Debtors,

Citibank, all other creditors of any of the Debtors, any Statutory Committee or any other Court

appointed committee appointed in any of the Cases, and all other parties in interest and their

respective successors and assigns, including any trustee or other fiduciary hereafter appointed in

any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.  In the

event of any inconsistency between the provisions of this Interim Order and the Prepetition MSR

Credit Documents or any other order (including any "first-day" order), the provisions of this

Interim Order shall govern and control.  Any payments to be made under any order (including

any "first-day" order) shall be made in accordance with this Interim Order.

27.    <u>No Modification of Interim Order</u>.  Subject to Paragraph 15, the Debtors

irrevocably waive any right to seek any amendment, modification or extension of this Interim

Order without the prior written consent of Citibank, and no such consent shall be implied by any

other action, inaction or acquiescence of Citibank.  In the event any or all of the provisions of

this Interim Order are hereafter modified, amended or vacated by a subsequent order of this

Court or any other court, such modification, amendment or vacatur shall not affect the validity,

perfection, priority, allowability, enforceability or non-avoidability of any advances previously

made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or

claims granted to Citibank hereunder arising prior to the effective date of any such modification,

amendment or vacatur of this Interim Order shall be governed in all respects by the original

24

provisions of this Interim Order, including entitlement to all rights, remedies, privileges and

benefits granted herein.

28.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant

hereto shall survive entry of any order that may be entered: (a) confirming any plan of

reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of

the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; (d) discharging

any Debtor; or (e) pursuant to which this Court abstains from hearing any of the Cases or

Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens,

security interests and other protections granted to Citibank pursuant to this Interim Order,

notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases,

or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as

provided by this Interim Order until all Prepetition MSR Obligations have been indefeasibly paid

in full in cash, notwithstanding the expiration of the Specified Period or any earlier termination

of the Debtors' authorization to use MSR Cash Collateral.

29.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order is

scheduled for _____, 2012 at _____.m. (Eastern Time) before the Honorable

_____, United States Bankruptcy Judge, at the United States Bankruptcy Court for the

Southern District of New York.  The Debtors shall promptly mail copies of this Order (which

shall constitute adequate notice of the Final Hearing, including without limitation, notice that the

Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the

Bankruptcy Code) to the parties having been given notice of the Interim Hearing, and to any

other party that has filed a request for notices with this Court and to any Statutory Committee

after the same has been appointed, or to counsel to any Committee, after the same shall have

25

been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall

serve and file written objections; which objections shall be served upon (a) Morrison & Foerster

LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Larren M. Nashelsky

(LNashelsky@mofo.com) and Todd M. Goren (TGoren@mofo.com), attorneys for the Debtors;

(b) Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036

(Attention: Kenneth S. Ziman (Ken.Ziman@skadden.com) and Jonathan Hofer

(Jonathan.Hofer@skadden.com)), attorneys for Barclays Bank PLC, as Administrative Agent; (c)

counsel to Citibank, attn: Fredric Sosnick and Susan A. Fennessey, Shearman & Sterling LLP,

599 Lexington Avenue, New York, NY 10022; and (d) the Office of the United States Trustee

for the Southern District of New York, and shall be filed with the Clerk of the United States

Bankruptcy Court, Southern District of New York, 33 Whitehall Street, 21st Floor New York,

New York 10004 (Attention: Tracy Hope Davis; Brian S. Masumoto; and Linda Riffkin) in each

case to allow actual receipt by the foregoing no later than _____, 2012 at _____,

prevailing Eastern time (with any replies filed by _____, 2012 at _____ ).

30.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be

enforceable immediately upon execution hereof.

31.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce

this Interim Order according to its terms.

Dated: _____, 2012
          New York, New York


_____
The Honorable _____
United States Bankruptcy Judge

NYDOCS03/948309.6
ny-1040177

## Exhibit A

**Budget**

Weekly Cash Flow Projections - Citi MSR

| ($ millions) | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CITI MSR CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | |
| 1 FNMA / FHLMC Net Repurchases | $ (0.8) | $ (0.8) | $ (0.9) | $ (0.9) | $ (0.6) | $ (0.9) | $ (0.9) | $ (0.9) | $ (1.1) | $ (1.1) | $ (1.1) | $ (1.0) | $ (1.0) | $ (1.0) | $ (1.0) | $ (1.0) | $ (0.9) | $ (1.2) | $ (1.2) | $ (1.4) | $ (19.4) |
| 2 Servicing / Ancillary Fees | 4.0 | 2.6 | 5.4 | 3.9 | 4.8 | 2.7 | 4.0 | 5.6 | 3.8 | 3.9 | 2.6 | 6.7 | 3.8 | 3.9 | 2.3 | 2.9 | 5.5 | 3.7 | 3.8 | 4.2 | 80.0 |
| 3 Interest | - | - | (1.1) | - | - | - | - | (1.1) | - | - | - | (1.1) | - | - | - | - | (1.1) | - | - | - | (4.6) |
| 4 Operating Expenses / Professional Fees | (1.4) | (2.8) | (1.0) | (2.8) | (2.4) | (2.8) | (1.3) | (2.4) | (1.2) | (5.0) | (1.2) | (2.6) | (1.2) | (5.2) | (1.2) | (2.5) | (1.1) | (5.7) | (1.4) | (2.7) | (47.9) |
| 5 **Net Cash Flow** | **1.8** | **(1.0)** | **2.3** | **0.3** | **1.8** | **(0.9)** | **1.8** | **1.2** | **1.5** | **(2.2)** | **0.3** | **2.0** | **1.6** | **(2.3)** | **0.2** | **(0.6)** | **2.3** | **(3.1)** | **1.3** | **0.0** | **8.2** |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | |
| 6 Beginning Cash Balance | - | 1.8 | 0.8 | 3.1 | 3.4 | 5.2 | 4.3 | 6.1 | 7.3 | 8.8 | 6.5 | 6.8 | 8.8 | 10.4 | 8.2 | 8.4 | 7.7 | 10.0 | 6.9 | 8.2 | - |
| 7 Net Cash Flow | 1.8 | (1.0) | 2.3 | 0.3 | 1.8 | (0.9) | 1.8 | 1.2 | 1.5 | (2.2) | 0.3 | 2.0 | 1.6 | (2.3) | 0.2 | (0.6) | 2.3 | (3.1) | 1.3 | 0.0 | 8.2 |
| 8 **Ending Cash Balance** | **1.8** | **0.8** | **3.1** | **3.4** | **5.2** | **4.3** | **6.1** | **7.3** | **8.8** | **6.5** | **6.8** | **8.8** | **10.4** | **8.2** | **8.4** | **7.7** | **10.0** | **6.9** | **8.2** | **8.2** | **8.2** |