MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------------
|                                        | )  |                              |
| In re:                                 | )  | Case No. 12-                 |
|                                        | )  |                              |
| RESIDENTIAL CAPITAL, LLC, et al.,      | )  | Chapter 11                   |
|                                        | )  |                              |
|                       Debtors.         | )  | Joint Administration Pending |
|                                        | )  |                              |
----------------------------------------------------------------------------

**DECLARATION OF MARC D. PUNTUS IN SUPPORT OF THE
DEBTORS' MOTIONS FOR INTERIM AND FINAL ORDERS AUTHORIZING
THE DEBTORS TO ENTER INTO THE BARCLAYS DIP FACILITY AND
<u>THE AFI DIP FACILITY</u>**

I, Marc D. Puntus, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of

perjury:

    1.    I am a Partner and co-head of the Restructuring Group at Centerview

Partners LLC ("Centerview"), investment banker to Residential Capital LLC ("ResCap") and the

other above-captioned debtors and debtors in possession (collectively the "Debtors").[1]  I submit

this declaration in support of (i) the *Debtors' Motion for Interim and Final Orders Pursuant to*

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on
       Exhibit 1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors
       may file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such
       entities.

ny-1030911

*11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing the Debtors to (A) Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (III) Granting Related Relief* (the "Barclays DIP Motion"),[2] and (ii) the *Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 507(b) and Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate Protection and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief (Debtor in Possession Financing and Ally Financial Inc. and Junior Secured Noteholders Cash Collateral)* (the "AFI DIP Motion", and together with the Barclays DIP Motion, the "DIP Motions") filed by the Debtors on May 14, 2012 (the "Petition Date").

**Qualifications**

2. I have over 18 years of experience advising corporations and other constituents on restructuring transactions. I also have considerable experience with mergers, acquisitions and financing transactions. I have prepared various valuation reports and testified as a fact and expert witness on numerous occasions, including in connection with debtor-in-possession and Chapter 11 exit financings. Since October 18, 2011, my partner, Samuel Greene, and I have been the primary contacts at Centerview responsible for day-to-day discussions with

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

the Debtors relating to general restructuring advice, financing efforts and the Asset Sales (as defined below).

3.  Established in 2006, Centerview is a leading investment banking boutique providing financial advisory services, including M&A and restructuring advice, across a broad range of industries, including financial institutions. Centerview serves a diverse set of clients around the world from its offices in New York, Los Angeles, San Francisco and London. Centerview's Restructuring Group was founded in 2011, and its professionals have extensive experience advising debtors, lenders, committees and acquirors in complex financial restructurings, both out-of-court and in Chapter 11 proceedings.

4.  I joined Centerview in 2011 as a Partner and co-head and co-founder of the Restructuring Group. Prior to joining Centerview, I was a Managing Director at Miller Buckfire & Co., where I was a founding member and partner for more than ten years. Prior to Miller Buckfire, I was a member of the financial restructuring group at Dresdner Kleinwort Wasserstein, and prior to that, a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP., a leading global law firm. I have extensive experience in advising troubled companies and their stakeholders. My experience includes a wide range of advisory assignments, including mergers, acquisitions, financings and restructurings, for both public and private companies. My company-side experience includes representing Acterna, Anchor Danly, Autocam, Best Products, BroderBros., Bruno's Supermarkets, Conversent Communications, CNL Hotels & Resorts, CTC Communications, Dura Automotive, EaglePicher, Edison Brothers, Gate Gourmet, Greatwide Logistics Services, Independence Air, Isola Group, Itronix, Keystone Automotive, Magna Entertainment Corp., Mashantucket Pequot Tribal Nation/Foxwoods, MicroWarehouse, OSI Restaurants Partners, Pegasus Satellite

ny-1030911

Communications, Pegasus Broadcast, PlayPower, Progressive Moulded Products, PSINet, Reichhold, SI Corporation, Sunbeam, Women First Healthcare and Vonage Corporation.  I have also represented acquirors, secured lenders and committees in transactions involving, among other companies, AT&T Latin America, DS Waters, EaglePicher, Fairpoint Communications, First Wave Marine, Global Broadcasting, Grove Crane, Heilig-Meyers, Ion Media Networks, Ionica PLC, Lehman Brothers, Mariner Post-Acute Network, The Pittsburgh Penguins, RDM Sports Group, Rockefeller Center Properties, Safety Components, Shared Technologies, SLI Inc., The Wiz and XO Communications.

        5.        Samuel Greene joined Centerview in June 2011 as a Partner and co-head and co-founder of the Restructuring Group.  Prior to joining Centerview, Mr. Greene was a Partner at Miller Buckfire & Co., which he joined in 2002 as an original member.  Mr. Greene was also a member of the financial restructuring group of Wasserstein Perella & Co., which he joined in 1997.  He has extensive experience representing companies, creditors and other constituents in complex restructuring, M&A and financing transactions across a wide range of industries.  Selected company-side experience includes representing Bedford Fair, Bruno's Supermarkets, Calpine Corporation, CMS Energy, Colo.com, Cygnus Business Media, Favorite Brand International, F&W Media, Laidlaw, MagnaChip Semiconductor, McLeod USA, Oakwood Homes, PG&E, Polymer Group, Port Townsend Paper, Stallion Oilfield Services, TECO Energy, The Dialog Corporation, United Australia/Pacific and U.S. Office Products.  Mr. Greene also represented creditor and equity constituencies in various transactions, including CDX Gas, Dow Corning Corporation, Extended Stay Hotels, Hilex Polymer, Kerzner Resorts, Mirant Corporation and Station Casinos.

4

6. Since October 2011, Centerview's ResCap "Core Team" of seven professionals, including me, has been diligently working on ResCap. The team includes me, Samuel Greene, Stephen Crawford, Karn Chopra, Dan Dunay, Ryan Kielty and Ben Weingarten.

7. Since Centerview's engagement by the Debtors in October 2011, the Core Team has worked closely with the Debtors' management, financial staff and other professionals as part of the Debtors' restructuring efforts; analyzed the Debtors' liquidity and projected cash flows; reviewed and analyzed potential debtor-in-possession financing arrangements; fully acquainted ourselves with the Debtors' business, operations, properties and finances; and assisted the Debtors in connection with preparations for commencement of these cases, including detailed and significant work relating to the proposed DIP Facilities.

8. Accordingly, I, along with other members of the Core Team at Centerview, have developed substantial knowledge regarding the Debtors that allows us to provide an assessment of, and demonstrate the need for, the proposed DIP Facilities.

9. Given Centerview's and my background and expertise, I am qualified to provide the testimony referred to herein.

**The Debtors' Need for Postpetition Financing**

10. It is critical that the Debtors have access to the loans under the DIP Facilities so they can continue operating their mortgage loan servicing and origination businesses in the ordinary course. Unless this Court authorizes the debtor-in-possession financing, the Debtors will be unable to fund the day-to-day operating expenses of their businesses, including, without limitation: (i) significant funds needed to provide for servicing advances required to be made by the Debtors pursuant to their servicing agreements (one of the Debtors' core assets), certain agreements entered into with various state and federal governmental agencies and the proposed asset purchase agreements relating to the Asset Sales; (ii) funds required to "refinance"

amounts outstanding under the GSAP Facility (described herein) and the BMMZ Repurchase Facility (described herein); (iii) wages to employees necessary to sustain the going concern value of the Debtors' assets pending consummation of the Asset Sales; and (iv) funds required to satisfy other general corporate and working capital requirements and fund the administrative costs of the Chapter 11 cases.  Absent sufficient funds to support the Debtors' servicing and origination operations, the value of the Debtors' assets and operations will quickly erode and their ability to consummate the Asset Sales will be jeopardized, to the detriment of the Debtors' estates and stakeholders.

11. The purpose of these Chapter 11 cases is to facilitate an orderly sale of the Debtors' most valuable assets and an orderly wind-down of Debtors' remaining assets.  The Debtors have negotiated and entered into two separate asset purchase agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder ("Nationstar"), for the sale of their mortgage loan origination and servicing businesses (the "Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the "Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").  Nationstar requires, as a condition to closing, that the Debtors maintain their servicing and mortgage origination operations until the sale is consummated.  Without debtor-in-possession financing, the Debtors will be unable to fund the servicing advances required in connection with their servicing assets and operations, including principal and interest, taxes and insurance and other contractually required costs.  Servicing advances comprise the largest use of cash, by far, for these Debtors.

12. If the Debtors are unable to demonstrate sufficient liquidity, including amounts required to fund servicing advances, borrowers under the mortgage loans that the

6

Debtors service and the market in general will likely experience confusion and uncertainty. Those borrowers may refuse to make payments to the Debtors, impairing the Debtors' ability to continue meeting their ongoing payment obligations (e.g., making payment advances required under certain circumstances for the benefit of investors and paying certain securitization fees) and the Debtors' future ability to collect on these loans. It is essential that the Debtors remain vigilant to ensure that borrowers continue making payments on their loans (e.g., by sending out bills and ensuring the collection and proper distribution of funds received). If the Debtors' ability to do so is impaired, there is a real risk that delinquencies and defaults will materially increase, resulting in a material degradation in the value of the Debtors' assets and operations.

13. Moreover, if the Debtors do not continue to honor their ordinary course servicing commitments for mortgage loans owned, insured or guaranteed by the federal government sponsored entities Fannie Mae and Freddie Mac, or by Ginnie Mae (the "Agency Loans"),[3] they face the possible termination of their Agency Loan servicing rights by such entities, which would result in the loss of future servicing fees, with a concomitant tremendous (and potentially catastrophic) loss to their estates. The Debtors would also risk incurring penalties under recent settlements with the federal government and various state agencies, pursuant to which the Debtors agreed, among other things, to certain heightened servicing requirements with respect to the Agency Loans.

---

[3] As used herein, "Fannie Mae" means the Federal National Mortgage Association, "Freddie Mac" means the Federal Home Loan Mortgage Corporation and "Ginnie Mae" means the Government National Mortgage Association. Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress and are referred to herein as the "GSEs." Fannie Mae and Freddie Mac securitize or buy mortgage loans originated by mortgage lenders, enabling them to replenish their funds so that they can make loans to other homeowners. Ginnie Mae is a federal agency that guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS") backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA").

ny-1030911

**The DIP Financing Process**

14.     In October 2011, the Debtors engaged Centerview as their investment banker in connection with their restructuring efforts. Centerview's mandate includes assisting the Debtors with, among other things, obtaining debt financing, including debtor-in-possession financing.

15.     To continue to operate their business in the ordinary course while in Chapter 11, the Debtors determined that liquidity in the form of debtor-in-possession financing was essential. The Debtors' need for such financing was and is particularly acute because, prior to the Petition Date, the primary facility used to finance and fund servicing advances (the GSAP Facility), with approximately $662 million outstanding as of the Petition Date, is structured as an off-shore, bankruptcy remote, special purpose financing, which will, as a result of the Chapter 11 filing, go into "rapid amortization" if not "refinanced" by the Barclays DIP Facility. Barclays Bank PLC ("Barclays") is the counterparty under the GSAP Facility. Similarly, the Debtors' BMMZ Repurchase Facility, with approximately $250 million outstanding as of the Petition Date, is structured as a derivative repurchase agreement and, as such, will unwind, notwithstanding the Chapter 11 filing because of exceptions to the automatic stay, if not refinanced by the proposed debtor-in-possession financing. BMMZ Holdings LLC, an indirect, wholly-owned subsidiary of Ally Financial, Inc. ("AFI"), the Debtors' parent and prepetition lender, is the counterparty under the BMMZ Repurchase Facility.

16.     In the light of the foregoing, in January 2012, the Debtors, with the assistance of Centerview (as well as FTI Consulting, Inc. ("FTI"), who prepared debtor-in-possession budgets and forecasts), commenced a marketing process to obtain the requisite debtor-in-possession financing for these Chapter 11 cases. As part of that process, the Debtors approached several potential lenders, including AFI, Barclays, other prepetition providers of debt

8

ny-1030911

capital to the Debtors and certain third party lenders with experience in financing mortgage origination and servicing businesses and providing debtor-in-possession financings of the magnitude required in these Chapter 11 cases (collectively, the "Potential Lenders").

17. After engaging in extensive discussions and negotiations with the Potential Lenders, including diligence initiatives, structuring discussions, collateral discussions and the negotiation of potential financing terms and conditions, the Debtors ultimately determined to enter into the Barclays DIP Facility. It is my judgment that the terms of the Barclays DIP Facility, including its structure, collateral required to be pledged, principal amount, pricing and fee structure, are more favorable to the Debtors than what could have been achieved with any of the other Potential Lenders.

18. The need for the AFI DIP Facility arose as the chapter 11 filing date approached and the Debtors determined that the Barclays DIP Facility would be insufficient to cover the Debtors' second largest expense—repurchases of certain whole loans that were sold into securitization trusts guaranteed by Ginnie Mae ("Ginnie Buybacks"). These repurchases were funded prior to the Petition Date by draws under the AFI LOC. Thus, the Debtors requested and negotiated to obtain additional post petition financing from AFI, their parent and prepetition lender under the AFI Senior Secured Credit Facility and the AFI LOC, in the form of postpetition draws under the AFI LOC (i.e., the AFI DIP Facility).

**Negotiation of the DIP Facilities**

19. As described above, the Debtors entered into preliminary negotiations with Barclays in January 2012. Over the course of the following months, the Debtors, Barclays, and their respective advisors engaged in extensive diligence and negotiations regarding the terms and structure of the Barclays DIP Facility. The parties exchanged various term sheets, held many in person meetings and participated in numerous telephone calls regarding these issues and

9

related documentation. Ultimately, these negotiations, which were conducted in good faith and at arms' length, culminated in the execution of a Commitment Letter for the Barclays DIP Facility, dated as of April 9, 2012, and thereafter a definitive credit agreement for the Barclays DIP Facility, a copy of which is appended to the Barclays DIP Motion.

20.     Beginning in April 2012, the Debtors engaged in discussions with AFI regarding funding the Ginnie Buybacks prior to and during these Chapter 11 cases. Such discussions eventually morphed into negotiations regarding the terms and structure of the AFI DIP Facility. The Debtors and AFI and their respective professionals participated in numerous meetings and telephone calls regarding these issues and related documentation. Ultimately, AFI agreed to allow the Debtors to draw on the AFI LOC postpetition in an amount up to $150 million, which amount may be increased to $220 million subject to agreement between the Debtors and AFI, to fund the Ginnie Buybacks.

**A.     Security Interests and Superpriority Administrative Expense Claims**

21.     Due to the liens and security interests granted under the Debtors' various prepetition credit facilities and outstanding junior secured notes, the Debtors were unable to procure sufficient debtor-in-possession financing in the form of unsecured credit, solely in exchange for the grant of a administrative expense or superpriority administrative expense claim or on a junior lien basis. None of Barclays, AFI or the other Potential Lenders was willing to commit to postpetition financing on these terms.

**(a)     Barclays DIP Facility**

22.     Notably, the proposals obtained from the Potential Lenders other than Barclays required that the Debtors agree to grant first priority "priming" liens on the AFI LOC as well as liens on the Debtors' currently unencumbered assets with a book value of approximately $775 million as of the Petition Date, including $250 million in unencumbered cash maintained

10

by the Debtors. As reflected in the Barclays DIP Facility, Barclays was willing to provide the necessary debtor-in-possession financing without "priming" the AFI LOC, without encumbering the Debtors' currently unencumbered assets and without taking liens on causes of action under Chapter 5 of the Bankruptcy Code.

23. The Barclays DIP Facility grants Barclays, as Collateral Agent, for the benefit of the Secured Parties (as defined in the DIP Credit Agreement), (i) first priority liens on the Debtors' assets that secured the GSAP Facility and BMMZ Repurchase Facility; (ii) second priority liens on prepetition and postpetition assets that secure the AFI LOC and the Citi MSR Facility; and (iii) superpriority administrative expense claims. The security interests and administrative expense claims will be subject to a carve-out for professional fees plus amounts payable to the United States Trustee.

**(b)    AFI DIP Facility**

24. Following extensive negotiations between AFI and the Debtors, the parties agreed that AFI, in its capacity as AFI Lender under the AFI DIP Facility, would be permitted to prime itself, AFI, in its capacity as lender under the AFI LOC. In addition, AFI in its capacity as lender under the AFI LOC has consented to the adequate protection package proposed in the Interim Order, without encumbering the Debtors' currently unencumbered assets and without taking liens on causes of action under Chapter 5 of the Bankruptcy Code.

25. The AFI DIP Facility grants AFI first priority liens on the repurchased whole loans and HUD Claims from the securitization trusts guaranteed by Ginnie Mae, and a priming lien on all collateral pledged prepetition to secure the AFI LOC. AFI will also receive: (i) superpriority administrative expense claims with respect to the repurchased whole loans, which are senior to the superpriority administrative expense claims of the Barclays DIP Lenders solely as to the proceed of such loans, and (ii) superpriority administrative expense claims in an

amount equal to the principal and interest on the draws made under AFI DIP Facility, which are junior to the superpriority administrative expense claims of the Barclays DIP Lenders. The security interests and administrative expense claims will be subject to a carve-out for professional fees plus amounts payable to the United States Trustee.

**B.      Rationale for Refinancing the GSAP Facility and the BMMZ Repurchase Facility**

26.     As discussed above and in the Barclays DIP Motion, the Barclays DIP Facility proposes to "refinance" the prepetition GSAP Facility (approximately $662 million outstanding) and the prepetition BMMZ Repurchase Facility (approximately $250 million outstanding). Compelling reasons exist to approve such refinancings.

27.     First, as described in the Barclays DIP Motion and above, the GSAP Facility involves a non-debtor, off-shore, special purpose borrower. Certain servicing advance reimbursement rights are sold and contributed to the GSAP Borrower, which, in turn, pledges those receivables to a Lender. As such, absent refinancing with Barclays DIP Facility proceeds, as a result of the Debtors' Chapter 11 filings, the GSAP Facility would go into "rapid amortization," causing substantially all of the amounts recovered on the Servicing Advance Receivables sold to the GSAP Borrower to automatically pay down the amounts outstanding under the GSAP Facility. This would severely constrain the Debtors' liquidity, and leave the Debtors without any means to finance a substantial portion of their servicing advance obligations.

28.     Second, the GSAP Facility is meaningfully oversecured. As of the Petition Date, the GSAP Facility had approximately $662 million outstanding and was secured with collateral (advances and restricted cash) with a book value of approximately $870 million. Absent refinancing with proceeds of the Barclays DIP Facility, such excess book collateral value (approximately $208 million) would almost certainly dissipate and potentially disappear as the

ny-1030911

GSAP Facility amortized and wound down, to the detriment of the Debtors' estates. Third, the terms of the Barclays DIP Facility are actually more favorable than those under the GSAP Facility from a borrowing base perspective. Specifically, advance rates on Servicing Advance Receivables under the GSAP Facility were approximately 70% as of March 31, 2012, while marginal advance rates on the same collateral under the Barclays DIP Facility are increased to 90-95%.

29. Refinancing of the BMMZ Repurchase Facility with proceeds of the Barclays DIP Facility is compelling for similar reasons as set forth above with respect to the GSAP Facility. First, the BMMZ Repurchase Facility is structured as a derivative repurchase agreement, pursuant to which BMMZ is actually the owner of the assets, and the Debtors have contracted for the right to repurchase those assets at an agreed upon price. Absent the refinancing of this facility, notwithstanding the Chapter 11 filing, BMMZ could take immediate action to terminate the repurchase agreement and sell the underlying mortgage loans to third parties, likely impairing, and potentially eliminating, the Debtors' interests therein. Second, as with the GSAP Facility, there is meaningful excess value in the BMMZ Repurchase Facility. Specifically, as of the Petition Date, the facility had $250 million outstanding but was associated with underlying assets, in the form of a portion of the Debtors' loan book, with a book value of approximately $473 million, equating to $223 million in excess book value that will be preserved by virtue of the Barclays DIP Financing. The repurchased assets support a substantial portion of the Borrowing Base under the Barclays DIP Facility. The Debtors will be afforded a 75% advance rate on this collateral under the Barclays DIP Facility as compared to a floating advance rate under the BMMZ Repurchase Facility that was approximately 60% as of March 31, 2012, providing the Debtors with greater liquidity than could otherwise have been obtained.

ny-1030911

30. In summary, for the reasons described above, it is necessary for the Debtors to refinance these facilities with the Barclays DIP Facility, immediately, in order to operate their businesses. The administrative agent and indenture trustee for the GSAP Facility, and BMMZ, as lender under the BMMZ Repo Facility, each has consented to the repayment of all of the outstanding debt under such facilities and will release the collateral thereunder pursuant to the applicable facility documents.

C. **Use of Proceeds of the Barclays DIP Facility to Purchase the Initial Purchased Assets and the Additional Purchased Assets Free and Clear of Liens, Claims and Encumbrances**

31. The Debtors propose to use the proceeds of the Barclays DIP Facility to Purchase the Initial Purchased Assets and the Additional Purchased Assets free and clear of all liens, claims and encumbrances.

32. The Debtors seek authority to enter into the Purchase Transactions for two primary reasons. First, the purchase of the Initial Purchased Assets, which will in effect result in the refinancing of the GSAP Facility and the BMMZ Repo Facility, is necessary for the Borrowers to obtain sufficient assets to collateralize the Barclays DIP Facility. Second, as a condition to providing the Debtors with a financing that is secured by some, but not all, of the Debtors' assets, the Administrative Agent required that the Debtors segregate the primary collateral securing the Barclays DIP Facility from the collateral that secures the Debtors' prepetition facilities. To implement this request, the Debtors created special purpose entities to serve as Borrowers under the Barclays DIP Facility (which entities filed Chapter 11 petitions in these cases), and, pursuant to the Barclays DIP Motion, the Borrowers, GMAC Mortgage and RFC seek authority to enter into the Purchase Agreements and consummate the Purchase Transactions. As described above, the Purchase Transactions will bring substantial assets into the Debtors' estates, which otherwise would not be available to the Debtors, and will enable the

Borrowers to access incremental liquidity that is essential to the Debtors' ongoing business operations and to preserve value for the benefit of the Debtors' stakeholders.

33. Absent the Purchase Transactions, the Debtors would not have sufficient collateral to secure the Barclays DIP Facility. Accordingly, the newly formed Debtor-Borrowers have agreed to purchase the Purchased Assets on the terms set forth in the Purchase Agreements from the GSAP Transferor, GMAC Mortgage and RFC (following the unwinding of the BMMZ Repo Facility). In my view, the terms of Barclays DIP Facility, including the Purchase Transactions, are fair and reasonable and reflect the Debtors' exercise of prudent business judgment. Due to the Debtors' need for liquidity to continue operating their businesses in the ordinary course, ample business justification exists for the Debtors to enter into the Purchase Transactions.

### Arms' Length Negotiations

34. The terms and conditions of the DIP Facilities are fair, reasonable and appropriate in the circumstances presented, and were negotiated by the parties in good faith and at arms' length, with all parties represented by experienced counsel. Accordingly, I believe the Debtors' entry into the DIP Facilities is an exercise of their sound business judgment.

### DIP Lenders' Fees

35. The Debtors have agreed, subject to Court approval, to pay certain fees described in the Barclays DIP Facility Credit Documents and reasonable costs and expenses to the Administrative Agent, the Collateral Agent, the Lead Arranger and the DIP Lenders, including without limitation, fees and expenses of the professionals retained by the Administrative Agent and the DIP Lenders, as provided for in the Credit Documents without the necessity of filing retention applications or fee applications. These fees and other obligations under the Credit Documents were negotiated in good faith and at arms' length and represent the

most favorable terms to the Debtors on which the DIP Lenders would agree to make the Barclays DIP Facility available. The Debtors considered the fees when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the financing necessary to continue their operations and prosecute their Chapter 11 cases, and that paying these fees in order to obtain the Barclays DIP Facility is in the best interests of the Debtors' estates, creditors and other parties in interest.

### Benefit to the Debtors and Their Estates

36. The Debtors ran a robust, careful and well-documented process to obtain the best financing available to support their operations and restructuring activities throughout the Chapter 11cases.  The DIP Facilities reflects the most favorable terms on which lenders were willing to offer financing, and the Debtors have satisfied the legal requirements to incur the DIP obligations on the terms and conditions set forth in the DIP credit documents.  The Debtors believe that the proposed DIP Facilities will allow them to continue their operations in the ordinary course, including meeting their repurchase obligations, maintain prudent cash balances and satisfy their liquidity needs during the pendency of the Chapter 11 cases.

37. Upon entry of the Interim Order, (i) the Barclays DIP Facility will provide access to $1.25 billion in liquidity (and an aggregate amount of $1.45 billion upon entry of the Final Order), and (ii) the AFI DIP Facility will provide access to up to $85 million in liquidity, which the Debtors and their advisors have determined together is sufficient and necessary to allow the Debtors to maintain their operations.

38. In addition to funds required to refinance the GSAP Facility and the BMMZ Repurchase Facility, the Debtors anticipate accessing the Barclays DIP Facility immediately after the Interim Order is entered in order to fund servicing advances required to be made by the Debtors pursuant to their servicing agreements, as well as other expenses necessary

16

to preserve and maximize the value of the Debtors' assets during the crucial first days of their reorganization efforts. Specifically, during the first week of these Chapter 11 cases, the Debtors will owe approximately $350 million for servicing advance obligations, which will need to be funded by the Barclays DIP Facility. Absent sufficient funds to support the Debtors' servicing business, the Debtors' assets will quickly erode to the detriment of the Debtors' estates, the borrowers of the mortgage loans, and investors. For these reasons, immediate access to $1.25 billion under the Barclays DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of their creditors and other parties-in-interest.

### Filing the Fee Letters Under Seal

39. In connection with the Barclays DIP Facility, certain of the Debtors and Barclays executed certain fee letters (the "Fee Letters"). The Debtors submit that the Fee Letters contain closely-guarded proprietary and commercial information that is sensitive to Barclays and the Debtors. The Debtors further submit that disclosure of the Fee Letters would violate the Debtors' agreement with Barclays.

40. It is important that Barclays' method for calculating fees and the contents of the Fee Letters remain confidential. Specifically, disclosing the market flex terms of the Fee Letters puts great pressure on Barclays' ability to effectively market and syndicate the Barclays DIP Facility to the marketplace and could increase the cost of the Barclays DIP Facility to the Debtors' estates.

41. Barclays, and the finance industry in general, customarily considers this information highly sensitive and confidential. Such information is rarely disclosed to the public or made available to competitor financial institutions. Given the investment banking and lending industries' highly competitive nature, it is of the utmost importance that the terms and pricing

17

details set forth in the Fee Letters be kept confidential so that Barclays' competitors may not use the information contained therein to gain an unfair, strategic advantage over Barclays in the marketplace.  Disclosure of the Fee Letters would essentially place a ceiling on the fees Barclays or its affiliates could charge in future transactions.

42. Additionally, it is imperative that the Debtors, particularly at this early stage in their Chapter 11 cases, be able to assure counterparties with whom they contract that the confidential and proprietary terms contained in any such contracts will remain confidential, so as not to further weaken the Debtors' bargaining position.  The Debtors also submit that providing the Fee Letters to the United States Trustee on a strictly confidential basis and, upon request, to Committee Professionals on a strictly confidential and "professionals' eyes only" basis will subject the Fee Letters to sufficient scrutiny on the merits, while at the same time minimizing any impact on the Debtors' or Barclays' ongoing business objectives.  In addition, the Debtors have disclosed in the DIP Motion the aggregate fees payable of approximately $52 million, net of credits, of which $18.75 million was paid prior to the Petition Date.  In an effort to protect the confidential information contained in the Fee Letters, I believe that the Debtors should be authorized to file the Fee Letters under seal.

43. Based on the foregoing, I believe that the DIP Facilities address the Debtors' working capital and liquidity needs on the best terms available, will enable the Debtors to preserve their value as a going concern and should be approved in all respects.

Dated:  May 14, 2012
      New York, New York

                                                                   */s/*    Marc D. Puntus
                                                                    Marc D. Puntus

ny-1030911