MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Proposed Counsel for the Debtors And
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- )
In re:                                              )    Case No. 12-
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,     )    Chapter 11
                                                    )
                                  Debtors.      )    Joint Administration Pending
-------------------------------------------------------------------- )

**DEBTORS' MOTION SEEKING AUTHORITY TO PROVIDE NOTICE TO
BORROWERS THAT THE DEBTORS WILL SUSPEND
FUNDING DRAWS UNDER CERTAIN HOME EQUITY LINES OF CREDIT**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move for entry of an order pursuant to section 105 of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 2002(m) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Debtors to provide notice to

borrowers under certain home equity lines of credit that the Debtors will no longer fund any

borrower's draw requests under such lines (the "Motion").[2]  In support of this Motion, the

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit
1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may file
Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the
relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

Debtors rely upon and incorporate by reference the Affidavit of James Whitlinger, Chief

Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day

Pleadings, filed with the Court concurrently herewith (the "Whitlinger Affidavit").  In further

support of the Motion, the Debtors, by and through their undersigned counsel, respectfully

represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for

the relief requested herein are Bankruptcy Code section 105(a) and Rule 2002(m) of the

Bankruptcy Rules.

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors

are managing and operating their businesses as debtors in possession pursuant to Bankruptcy

Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has

been appointed in these Chapter 11 cases.

3.      The Debtors are a leading residential real estate finance company

indirectly owned by Ally Financial Inc., which is not a Debtor.  The Debtors and their non-

debtor affiliates operate the fifth largest servicing business and the tenth largest mortgage

origination business in the United States.  A more detailed description of the Debtors, including

their business operations, their capital and debt structure, and the events leading to the filing of

these bankruptcy cases, is set forth in the Whitlinger Affidavit.

**RELIEF REQUESTED**

4.      By this Motion, the Debtors seek entry of an order substantially in the form attached hereto as <u>Exhibit A</u> authorizing the Debtors to provide notice to borrowers whose home equity loans are contained within the pools set forth in <u>Exhibits C-1 to C-5</u> (described in greater detail herein), that the Debtors will suspend the funding of any borrower's draw requests under such home equity loans.

5.      The Debtors request that, to the extent necessary, the relief sought by this Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases. The Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's entry of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the Chapter 11 cases of the Debtors.

**APPLICABLE AUTHORITY**

6.      The relief sought in this Motion is very limited.  Specifically, in order to apprise borrowers under the HELOC agreements identified in the exhibits to the Motion of the Debtors' inability to honor any further HELOC draw requests due to its restricted liquidity in these Chapter 11 cases, the Debtors request authority to send notices to each such HELOC borrower substantially in the form of the notice attached as <u>Exhibit B</u> (the "Notice").

**A.      Overview of Home Equity Lines**

7.      Prior to the filing of their bankruptcy cases, the Debtors were in the business of, among other things, originating, purchasing, servicing and selling home equity lines of credit and related mortgages (collectively, "HELOCs").  HELOCs operate as revolving lines of credit typically secured by second lien mortgages on residential real property.  Almost every HELOC has a "draw period," followed by a "repayment period."  During the draw period, so

ny-1011893

long as a default does not exist under the HELOC agreement and other specified conditions have

not occurred, the borrower under the HELOC agreement is permitted to borrow up to the credit

limit and thereafter re-borrow principal amounts previously repaid. Once the draw period ends,

the ability to re-borrow terminates, and the HELOC becomes a closed-end loan.

8.      A significant portion of the HELOCs that the Debtors originated or

purchased prior to the Petition Date were bundled together in pools and thereafter sold to

securitization trusts formed to acquire and own the HELOCs. The securitization trusts issued

securities to investors in the form of trust certificates or notes, and the securities are secured by,

and are repaid from the stream of payments made under, the HELOCs. The securitization trusts

use the proceeds of the securities to acquire the HELOCs from the Debtors. The Debtors also

hold HELOCs in their loan portfolio.

9.      The Debtors also retained the right to service HELOCs that they sold to

Debtor-sponsored securitization trusts, certain third-party sponsored securitization trusts, and

private investors. The Debtors' servicing obligations are embodied in separate servicing

agreements with each Debtor-sponsored trust, and in sale and servicing agreements or separate

servicing agreements with a third-party entity. As servicer, the Debtors are responsible for,

among other things, collecting payments and issuing billing statements to the HELOC borrowers,

and as consideration for their services, the Debtors are entitled to a monthly servicing fee, which

they collect out of repayments made by HELOC borrowers.

10.      When Debtors sell HELOCs but retain the servicing rights for those

HELOCs, accounting rules permit the Debtors to record a financial asset known as a "mortgage

servicing right," or "MSR," on their balance sheet representing the capitalized present value of

the future stream of servicing fee payments. HELOC MSRs are valuable assets of the Debtors,

which have been pledged to AFI to secure loans made by AFI to the Debtors.  In addition, the

Debtors have entered into servicing agreements, sale and servicing agreements, and other similar

subservicing agreements that allow the Debtors to service HELOCs sold to third-party

securitization trusts, held by third parties as whole loans, or held by Debtors as whole loans in

their "held-for-investment" portfolio.

11.     As a general matter, the Debtors' obligation to fund draws under the

HELOCs are contained in securitization documents, loan purchase agreements, and servicing

agreements, as applicable.  The Debtors fund draws in their roles as (i) owner or seller of the

HELOCs, (ii) servicer or subservicer of the HELOCs, or in some instances, (iii) as a security

holder within a securitization.  The Debtors' obligations to fund draws, the capacity in which

they must do so, and how they are repaid may change over the lifespan of the HELOCs,

depending on whether an "amortization event" has occurred.  An "amortization event" may

begin on a specified date or may arise upon the occurrence of certain events of default under the

applicable agreement.  This is described in more detail below.

### HELOCs in Securitization Trusts

12.     Prepetition agreements documenting the Debtors' sale of HELOCs to

securitization trusts generally provide that the Debtors, as sellers, retain the obligation to fund

future draw requests by borrowers.  Consistent with the HELOC sale agreements, the

securitization documents provide that the trusts do not have the direct obligation to fund any

future draw requests under the HELOCs; however, the securitization documents provide a

mechanism whereby the trusts use funds collected from payments made by borrowers to

purchase additional draw balances that are advanced by the seller from the time immediately

after the HELOCs are sold to the trust until the occurrence of an "amortization event."  At such

time, the trust will no longer purchase additional draw balances, and the seller must fund draws

from this point forward until borrowers no longer make draws or the HELOCs are outside their

draw period, which by the terms of the loan agreement is often longer than the "revolving

period" specified in the securitization documents.  Likewise, generally the securitization

documents do not obligate the Debtors, as servicer, to fund future draws by borrowers.

However, some securitization documents obligate the Debtors, as holder of a certain class of

securities, to fund draws once an "amortization event" occurs or an "amortization period" begins.

13.    As of March 31, 2012, the Debtors had pooled and sold HELOCs into

twenty-four (24) separate Debtor-sponsored securitization trusts with securities currently

outstanding.  The Debtors, as sellers of the HELOCs into these securitization trusts, retained the

obligation to fund these HELOCs pursuant to the terms of the applicable loan purchase

agreement.  The Debtors also perform servicing functions for these securitization trusts.  Draws

for nine (9) of the securitization trusts are currently funded by the Debtors, as sellers, until there

is sufficient cash available from principal and interest payments made by borrowers for the

issuers of these securitization trusts to purchase those additional balances from the Debtors.

Depending on the payment performance of the borrowers, the purchase of additional balances

could happen as soon as one business day after, or as late as several months after, the Debtors

fund the draws.  An amortization event has occurred in fifteen (15) of these Debtor-sponsored

securitization trusts, which requires the Debtors, as sellers, to fund draws long-term because

neither the loan purchase agreement nor servicing agreement permit the issuers of these

securitization trusts to purchase additional balances once an "amortization event" has occurred.

The twenty-four (24) Debtor-sponsored securitization trusts described above collectively have

outstanding principal balances of approximately $1.6 billion.

14.     A list of each of the twenty-four (24) Debtor-sponsored HELOC trusts that

the Debtors currently service and the related non-debtor counterparty for each securitization trust

is attached hereto as <u>Exhibit C-1</u>.  As of March 31, 2012, the Debtors' potential commitment

exposure (amounts borrowers could request the Debtors to fund) under these trusts, by virtue of

the Debtors having sold the loans into the securitization trusts, is approximately $665 million.

The large potential cash exposure and the uncertain length of time that the Debtors' funds would

remain unavailable create liquidity concerns for the estates without adding any incremental value

to the estates.  Therefore, funding future draws for HELOCs in these Debtor-sponsored

securitization trusts is not feasible.

15.     The Debtors previously pooled HELOC loans into nine (9) additional

Debtor-sponsored HELOC trusts, but they no longer service those trusts because their servicing

rights were terminated by the securitization bond insurer.  However, the Debtors, in their

capacity as sellers, remain obligated to fund HELOC draws for these securitization trusts.  All of

the notes issued by the securitization trusts are in amortization periods; however, individual

borrower's lines of credit included in the securitization trusts are still in their draw periods, and

therefore, there remains an ongoing obligation to fund borrowers' draw requests.  A list of each

of the nine (9) HELOC trusts and the related non-debtor counterparty is attached hereto as

<u>Exhibit C-2</u>.  As of March 31, 2012, the Debtors' potential commitment exposure (amounts

borrowers could request the Debtors to fund) is approximately $192 million for these particular

HELOCs.  The large potential cash exposure, the poor pool performance that caused the

securitization bond insurers to terminate servicing, and the uncertain length of time that the

Debtors' funds would remain unavailable collectively create liquidity concerns for the Debtors'

estates without adding any value to the estates.  Therefore, funding future draws for HELOCs in these Debtor-sponsored securitization trusts is not feasible.

16.     Finally, the Debtors also are contractually obligated to fund certain HELOC draws because they own certain classes of securities in specific securitizations that currently are in their amortization period.  Under the terms of the applicable indenture, the Debtors, as holders of such securities, have the sole obligation to fund draws during such period and risk all losses associated with that funding obligation.  The Debtors currently have this obligation for two third-party sponsored securitization trusts.  A list of those third-party-sponsored HELOC trusts where the Debtors' funding obligation derives from their role as security holder, and the related non-debtor counterparty is attached hereto as Exhibit C-3.  As of March 31, 2012, the Debtors' potential commitment exposure, for these third-party sponsored securitization trusts is approximately $2.0 million.  Although the potential cash exposure is not large, the length of time that the Debtors' funds would remain unavailable is uncertain.  Because the Debtors risk all losses associated with the funding obligation, funding future draws for HELOCs in these third-party securitization trusts creates liquidity concerns for the Debtors' estates without adding any value to the estates.

*HELOCs Maintained by the Debtors on their Balance Sheet*

17.     The Debtors also maintain a held-for-investment portfolio of HELOCs on their consolidated balance sheet with an outstanding principal balance of approximately $151.2 million, which is derived from either purchases from Ally Bank, origination by the Debtors prior to the financial crisis, purchases from other sellers, or repurchases out of securitization trusts as a result of a breach or breaches of loan-level representations and warranties made in the loan purchase agreement.  As the owner of, or lender for, these HELOCs, the Debtors have the

ny-1011893

obligation to fund draws for the held-for-investment HELOCs.  A list of HELOC pools

maintained in the Debtors' held-for-investment portfolio is attached hereto as Exhibit C-4.  As of

March 31, 2012, the Debtors' potential commitment exposure (amounts borrowers could request

the Debtors to fund) is approximately $705.5 million.  The large potential cash exposure and the

uncertain length of time that the Debtors' funds would remain unavailable create liquidity

concerns for the estates without adding any incremental value to the estates.  Therefore, funding

future draws for HELOCs on the Debtors' consolidated balance sheet is not feasible.  The

funding exposure creates liquidity concerns for the Debtors' estates without adding additional

value to the estates.

### HELOCs Serviced for Ally Bank

18.    GMAC Mortgage, LLC ("GMACM"), in its role as servicer, has the

obligation to advance funds for draws for HELOC loans originated and retained by Ally Bank in

its held-for-investment portfolio pursuant to the Servicing Agreement between GMAC Bank

(now known as Ally Bank) and GMACM, dated August 21, 2001 and related amendments (the

"Servicing Agreement").  However, going forward, Ally Bank will be advancing the necessary

funding of draws to BNY Mellon instead of having GMACM advance the funds for the draws

requested by the individual borrowers.  Ally Bank will not be seeking a claim against the

Debtors' estates on account of its funding of the draws for the HELOCs in its own portfolio.

### Servicing of Third-Party HELOCs

19.    The Debtors also subservice HELOCs for which the MSR is owned by a

third party or service HELOC whole loans owned by third parties.  The servicing agreements

pursuant to which Debtors service these HELOCs obligate the Debtors, as servicers, to advance

monies to fund the HELOCs similar to the obligations in the Servicing Agreement with Ally

Bank described above.  A list of the applicable servicing and subservicing agreements is attached

hereto as Exhibit C-5.  As of March 31, 2012, the Debtors' potential commitment exposure

(amounts borrowers could request the Debtors to fund) is approximately $100.5 million.  This

large potential cash exposure creates liquidity concerns for the Debtors' estates without adding

any incremental value to the estates.  Therefore, funding future draws for HELOCs that the

Debtors subservice is not feasible.

**B.      Overview of HELOC Trust Amortization**

20.      During the five-year period after a trust's acquisition of HELOCs and

issuance of securities, which is referred to for purposes of the securitization as the "revolving

period," a portion of the payments made by borrowers on their HELOCs is utilized to make

payments on the securities issued by the trusts, and a portion of such payments may be made

available to the Debtors in connection with the funding of additional draw requests made by

HELOC borrowers.

21.      However, at the conclusion of the revolving period, all payments by

borrowers under the HELOCs must be used to pay down the principal and interest on the notes

issued by the trusts.  Thus, at the conclusion of the revolving period, no payments by borrowers

may be used by the Debtors to fund new draw requests by other borrowers.  To the contrary,

after the revolving period, the Debtors are obligated to fund a properly submitted draw request

under the HELOCs out of their own funds.

22.      Moreover, the revolving period can be cut short, thereby causing the notes

issued by a trust to go into "early amortization" or "rapid amortization."  Early or rapid

amortization may be triggered by any number of things, including by a downgrade of a surety for

the securities, claims made by holders of the notes on the insurance policies issued by such

sureties, or bankruptcy or insolvency of the Debtors. It also can be triggered when the delinquency or losses exceed certain thresholds. Such events are often referred to as "amortization events," "early amortization events," or "rapid amortization events."

23. The revolving period for 24 HELOC trusts sponsored by the Debtors ended prior to the Petition Date. Accordingly, all payments of principal and interest by HELOC borrowers under such trusts are being used to pay down the securities; none of such payments is available to the Debtors to honor new HELOC draw requests. As a consequence, the Debtors, as sellers, are the only source of funding for future HELOC advances in respect of these trusts (which the Debtors may advance from their own funds or from borrowings through third-party funding facilities).

**C.    Reasons Debtors Decided to Stop Funding Future Draws**

24. Prior to the Petition Date, the Debtors continued to honor HELOC draw requests out of their own funds with respect to those trusts as to which the revolving period had ended. However, the Debtors closely managed this process to reduce their exposure and to minimize future draw requests.[3] Notwithstanding these efforts, the costs to the Debtors of continuing to do so has become, in the Debtors' business judgment, unsustainable for several reasons.

25. First, after the revolving period for the Debtor-sponsored securitization trusts, the Debtors and the securitization trusts must share pro rata repayments of principal and

---

[3]    As a part of these prepetition efforts, the Debtors had previously terminated or suspended funding advances to certain HELOC borrowers pursuant to guidelines provided in federal regulations (the "Suspended Borrowers"). See 12 C.F.R. 226.5b(f)(2), (3)(vi). In particular, the Debtors had terminated draws on accounts that had suffered a payment default and had suspended draws on accounts: (i) for which there was a decline in the value of the equity in the property securing the loan, and (ii) for which the Debtors reasonably believed a borrower would be unable to meet repayment obligations because of a material change in the borrower's financial circumstances.

ny-1011893

interest made by HELOC borrowers.  In particular, a portion of each repayment of principal and interest is paid to the trust on account of HELOC draws funded during the revolving period, with such amounts utilized solely to pay down the balances on the securities; the balance is repaid to the Debtors on account of HELOC draws funded by them after the conclusion of the revolving period.  As a consequence, the Debtors receive a fraction of every dollar that borrowers repay on the HELOCs, which in turn represents only a fraction of every dollar of draws that the Debtors have funded after the revolving period.  For other securitization trusts where the Debtors have funding obligations, similar funding problems exist because Debtors rely on repayments of principal and interest made by HELOC borrowers to reimburse themselves for funding draws.

26.    Second, there is virtually no end in sight to this growing cash outlay.  In the past, the Debtors had the ability to draw upon the GMACM Home Equity Notes 2004 Variable Funding trust to finance home equity line draws; however, the Debtors have no further ability to borrow under this facility, which is currently amortizing.  Accordingly, as of February 29, 2012, the Debtors projected that their net forecasted cash needs for HELOC advances would total over $85 million for the following twelve months.  However, Debtors do not know what impact this bankruptcy proceeding will have on borrowers' draw and payment behavior, and the Debtors must consider the possibility that borrowers will seek to draw on available lines rather than seek new lines from another lender.  The Debtors cannot risk borrowers drawing on the maximum availability, which currently exceeds $2 billion.

27.    Third, and perhaps most significantly, the Debtors commenced these Chapter 11 cases with a modest amount of unencumbered cash.  As fiduciaries for the estates, the Debtors must evaluate how best to utilize their funds in order to return significant value to these

12

estates.  Moreover, most of the Debtors' cash constitutes the cash collateral of various secured lenders.

28.    The Debtors are not the only mortgage originator and servicer to come to the conclusion that the prudent course of action is to suspend the funding of the HELOCs identified in <u>Exhibits C-1</u> to <u>C-5</u> and notify the HELOC borrowers that the Debtors would no longer be funding draws on outstanding home equity lines of credit.  <u>See</u>, <u>e.g.</u>, <u>In re American Home Mortgage Holdings, Inc.</u>, Case No. 07-11047 (CSS) (Bankr. D. Del. Jan. 8, 2008) (Docket No. 2632) (approving successor servicer's motion to deliver notice to borrowers that debtors would not be funding future HELOC draws).

29.    Accordingly, based upon the facts described above, the Debtors have determined, in the exercise of their business judgment, that they effectively have no choice but to immediately suspend the funding of HELOC draws.  The Debtors cannot take a chance that HELOC customers will draw $2 billion on their available lines.  As debtors in possession, the Debtors must make every effort to preserve their cash and limit burdensome obligations under the HELOCs that do not provide a material benefit to their estates, especially when the Debtors' liquidity and post-petition funding could not support such substantial monetary demands. Notwithstanding the Debtors' decision to suspend funding HELOC draws, the Debtors will continue to explore possible alternative funding arrangements with their counterparties that shift the funding obligation to a non-debtor third party.

30.    The Debtors intend to continue acting as servicer under the HELOC securitization trust documents and applicable servicing or subservicing agreements.  As noted above, the mortgage servicing rights and related fee income are valuable assets of the Debtors'

estates.  The Debtors therefore will continue their servicing obligations pending their efforts to

sell the HELOC servicing business, including the HELOC MSRs.

**D.        Proposed Form of Borrower Notice**

31.    The Notice is necessary, and immediate relief is required, because

HELOC borrowers may be relying on their HELOCs and incurring obligations based upon that

reliance.  The Debtors believe that the notice they are requesting will help prevent the specified

HELOC borrowers from incurring additional obligations.

32.    Moreover, the HELOC borrowers may assert that they are contingent

creditors under the Bankruptcy Code and as such, are entitled to notice of the bankruptcy filing

and the bar date, among other things.  Therefore, the Notice requested by the Debtors would not

only help prevent the incurrence of liabilities by the HELOC borrowers, but would also reduce

any potential claims against the Debtors' estates as a result of the HELOC borrowers' reliance on

their ability to obtain draws under the HELOCs.

33.    The relief requested by this Motion is consistent with applicable

provisions of the Bankruptcy Code.  Specifically, Rule 2002(m) of the Bankruptcy Rules

provides that the Court "may from time to time enter orders designating the matters in respect to

which, the entity to whom, and the form and manner in which notices shall be sent except as

otherwise provided by these rules."  Fed. R. Bankr. P. 2002 (m).  Moreover, section 105(a) of the

Bankruptcy Code vests in this Court the power to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §105(a).

34.    The purpose of section 105(a) of the Bankruptcy Code is "to assure the

bankruptcy courts power to take whatever action is appropriate or necessary in aid of the

exercise of their jurisdiction."  See 2 Collier on Bankruptcy, ¶ 105.01 at 105-6 (Alan N. Resnick

et al., ids., 15th ed. rev. 1999).  Federal regulations governing HELOCs require lenders to send

notice to a HELOC borrower if the lender suspends the borrower's right to draw funds or reduces

the borrower's credit limit.  Federal regulations governing HELOCs also require lenders to send

notice to a HELOC borrower if there is a significant "change in terms" in the HELOC.

35.    In fact, the Notice is consistent with the form of HELOC borrower notice

previously approved by the bankruptcy court in In re American Home Mortgage.  See, e.g., In re

American Home Mortgage Holdings, Inc., Case No. 07-11047 (CSS), (Bankr. D. Del. Jan. 8,

2008) (Docket No. 2632).

36.    Based upon the foregoing discussion, the Debtors assert that the entry of

an order authorizing the Debtors to notify the HELOC borrowers of the status of their HELOCs

is appropriate, necessary and consistent with the Bankruptcy Code and Bankruptcy Rule 2002.

Indeed, as noted above, similar relief was granted in another HELOC servicer's Chapter 11 case.

See, e.g., In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D.

Del. Jan. 8, 2008).

37.    Bankruptcy Rule 6003 generally precludes the Court from authorizing

certain relief until twenty-one days after the petition is filed, except to the extent necessary to

prevent "immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  The Debtors submit that, for

the reasons set forth above, the relief requested in this Motion is necessary to avoid immediate

and irreparable harm and, accordingly, Bankruptcy Rule 6003 has been satisfied.

38.    The Debtors further submit that the relief requested is necessary to avoid

immediate and irreparable harm to the Debtors, and that it is essential that HELOC borrowers be

notified as promptly as possible that future draws on HELOCs will not be honored so that they

can plan accordingly.  To the extent applicable, and the Debtors do not believe that it is, the

Debtors submit that Bankruptcy Rule 6003 has been satisfied.  Similarly, to successfully implement this noticing process, the Debtors seek a waiver of the notice requirements, to the extent they are applicable, under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

## NOTICE

39.    Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for the Debtors' outstanding notes issuances; (i) the equity security holder; (j) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing; (k) HELOC counterparties identified in Exhibits C-1 to C-5; and (l) the parties included on the Debtors' list of fifty (50) largest unsecured creditors.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter an Order,

substantially in the form annexed hereto as <u>Exhibit A</u>, granting the relief requested in the

Motion; and (ii) grant such other and further relief as the Court may deem just and proper.

Dated:  May 14, 2012
      New York, New York

                    */s/    Larren M. Nashelsky*
                    Larren M. Nashelsky
                    Gary S. Lee
                    Lorenzo Marinuzzi
                    MORRISON & FOERSTER LLP
                    1290 Avenue of the Americas
                    New York, New York 10104
                    Telephone: (212) 468-8000
                    Facsimile: (212) 468-7900

                    *Proposed Counsel for the Debtors and*
                    *Debtors in Possession*

# **EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------- )
　　　　　　　　　　　　　　　　　　　　　　　 )
In re:　　　　　　　　　　　　　　　　　　　　 )　　Case No. 12-
　　　　　　　　　　　　　　　　　　　　　　　 )
RESIDENTIAL CAPITAL, LLC, et al.,　　　　　　 )　　Chapter 11
　　　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　Debtors.　　　 )　　Jointly Administered
　　　　　　　　　　　　　　　　　　　　　　　 )
------------------------------------------------------------------------- )

### ORDER AUTHORIZING THE DEBTORS TO PROVIDE NOTICE TO BORROWERS THAT THE DEBTORS WILL SUSPEND FUNDING DRAWS UNDER CERTAIN HOME EQUITY LINES OF CREDIT

Upon the motion (the "Motion")[1] of the Debtors for an order under Bankruptcy Code section 105 and Bankruptcy Rule 2002(m) authorizing the Debtors to provide notice to borrowers under certain home equity lines of credit ("HELOCs") that the Debtors will suspend funding any home equity borrowers' draw requests under such lines; and upon the Whitlinger Affidavit; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. §157(b); and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon; and sufficient cause appearing therefor, it is hereby:

### ORDERED, ADJUDGED, AND DECREED THAT:

---

[1]　　Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief granted herein may refer to http://www.kccllc.net/rescap for additional information.

1.    The Motion is GRANTED as set forth herein.

2.    The Debtors are authorized to send the notice substantially in the form attached as <u>Exhibit B</u> to the Motion to each HELOC borrower advising the borrowers of the Debtors' inability to honor any further HELOC advances on the loans and trusts identified on <u>Exhibits C-1</u> to <u>C-5</u> to the Motion.

3.    GMAC Mortgage will continue to honor draws on certain HELOC loans originated and retained by Ally Bank in its held-for-investment portfolio pursuant to the Servicing Agreement between GMAC Bank (now known as Ally Bank) and GMAC Mortgage, dated August 21, 2001 and related amendments (the "Servicing Agreement") with funding provided by Ally Bank that sent to the Bank Of New York Mellon account to fund Ally Bank customers' HELOC draws. Ally Bank shall not seek a claim against the Debtors' estates for funding these advances.

4.    Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) AFI and Ally Bank and their respective subsidiaries and affiliates (excluding ResCap and its subsidiaries).

5.    Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

2

6.      The relief granted by this Order shall apply to any affiliated future debtor (a "Future Debtor") in these jointly-administered cases.  An affiliated debtor shall be deemed to be a Future Debtor upon the Court's entry of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the Chapter 11 cases of the Debtors.

7.      This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated:          _____, 2012
                New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------
                                        )
In re:                                  )        Case No. 12-
                                        )
RESIDENTIAL CAPITAL, LLC, et al.,       )        Chapter 11
                                        )
                        Debtors.        )        Jointly Administered
-----------------------------------------------------------
                                        )

<u>**IMPORTANT INFORMATION REGARDING YOUR HOME EQUITY LINE OF CREDIT**</u>

1.      On _____, 2012 (the "Petition Date"), Residential Capital, LLC ("ResCap") and certain of its affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.      On _____, 2012, the U.S. Bankruptcy Court for the Southern District of New York approved the Debtors' request to issue this notice to you.

3.      You are receiving this notice because you are currently a borrower under a home equity line of credit mortgage loan ("HELOC") with the Debtors. Prior to the Petition Date, the Debtors have been responsible for advancing draws on your HELOC.

4.      <u>**Effective as of the Petition Date, the Debtors will no longer fund any draws on your HELOC.  Therefore, you will no longer be able to borrow any funds that may have otherwise been available under your HELOC. Please be further advised that, if you have any pending draw requests under your HELOC, such requests will not be honored.**</u>

5.      Please note that if you previously received a notice from the Debtors suspending your credit line availability, any reinstatement rights or process contained in that prior suspension notice are no longer available.

6.      **Please remember that your existing loan balance remains outstanding and must be repaid in accordance with the terms of your HELOC agreement.  You should continue to send your HELOC payments in the same manner and to the same address as you did before receiving this notice.**

7.      If you have any questions regarding this notice or the status of your HELOC, please contact the ResCap HELOC Call Center, at (888) 926-3480 or your servicer at the number provided with your HELOC information.  Additional information regarding ResCap's restructuring can be found online at http://www.kccllc.net/rescap.

Dated:          New York, New York
                _____, 2012

## EXHIBIT C-1

| HELOC Trust | Non-Debtor Counterparty | Available Credit as of 3/31/12 |
|---|---|---|
| GMACM Home Equity Notes 2004 Variable Funding Trust | Wells Fargo Bank, N.A. as Indenture Trustee | $78,902,005 |
| GMACM Home Equity Loan Trust 2000-HE2 | Norwest Bank Minnesota, National Association as Indenture Trustee | $6,747,678 |
| GMACM Home Equity Loan Trust 2000-HE4 | Wells Fargo Bank Minnesota, N.A. as Indenture Trustee | $6,320,928 |
| GMACM Home Equity Loan Trust 2001-HE2 | Bank One National Association as Indenture Trustee | $15,076,966 |
| GMACM Home Equity Loan Trust 2001-HE3 | Bank One National Association as Indenture Trustee | $15,127,716 |
| GMACM Home Equity Loan Trust 2002-HE1 | Wells Fargo Bank Minnesota, N.A. as Indenture Trustee | $33,224,912 |
| GMACM Home Equity Loan Trust 2002-HE3 | Wells Fargo Bank Minnesota, N.A. as Indenture Trustee | $73,953,754 |
| GMACM Home Equity Loan Trust 2003-HE1 | Wells Fargo Bank Minnesota, N.A. as Indenture Trustee | $82,044,103 |
| GMACM Home Equity Loan Trust 2004-HE1 | Wells Fargo Bank, N.A. as Indenture Trustee | $152,573,861 |
| GMACM Home Equity Loan Trust 2005-HE1 | Wells Fargo Bank, N.A. as Indenture Trustee | $83,794,343 |
| GMACM Home Equity Loan Trust 2006-HE1 | JPMorgan Chase Bank, National Association as Indenture Trustee | $66,171,920 |
| Home Equity Loan Trust 2005-HSA1 | JPMorgan Chase Bank, N.A. as Indenture Trustee | $459,210 |
| Home Equity Loan Trust 2005-HS1 | JPMorgan Chase Bank, N.A. as Indenture Trustee | $3,821,539 |
| Home Equity Loan Trust 2005-HS2 | JPMorgan Chase Bank, N.A. as Indenture Trustee | $2,270,717 |
| Home Equity Loan Trust 2006-HSA2 | JPMorgan Chase Bank, N.A. as Indenture Trustee | $439,577 |
| Home Equity Loan Trust 2001-HS3 | The Chase Manhattan Bank, as Indenture Trustee | $761,249 |
| Home Equity Loan Trust 2003-HS4 | JPMorgan Chase Bank, N.A. as Indenture Trustee | $7,565,209 |

| | | |
|---|---|---|
| Home Equity Loan Trust 2003-HS3 | JPMorgan Chase Bank, N.A. as Indenture Trustee | $8,089,449 |
| Home Equity Loan Trust 2004-HS2 | JPMorgan Chase Bank as Indenture Trustee | $4,468,726 |
| Home Equity Loan Trust 2002-HS3 | JPMorgan Chase Bank as Indenture Trustee | $3,622,520 |
| Home Equity Loan Trust 2003-HS1 | JPMorgan Chase Bank as Indenture Trustee | $3,390,522 |
| Home Equity Loan Trust 2003-HS2 | JPMorgan Chase Bank as Indenture Trustee | $7,270,560 |
| Home Equity Loan Trust 2004-HS1 | JPMorgan Chase Bank as Indenture Trustee | $3,910,962 |
| Home Equity Loan Trust 2004-HS3 | JPMorgan Chase Bank as Indenture Trustee | $5,247,264 |
| **TOTAL** | | **$665,255,690** |

# EXHIBIT C-2

| HELOC Trust | Non-Debtor Counterparty | Available Credit as of 3/31/12 |
|---|---|---|
| GMACM Home Equity Loan Trust 2004-HE3 | Wells Fargo Bank, N.A. as Indenture Trustee | |
| GMACM Home Equity Loan Trust 2004-HE4 | Wells Fargo Bank, N.A. as Indenture Trustee | |
| GMACM Home Equity Loan Trust 2005-HE3 | Wells Fargo Bank, N.A. as Indenture Trustee | |
| GMACM Home Equity Loan Trust 2006-HE4 | JPMorgan Chase Bank, National Association as Indenture Trustee | |
| Home Equity Loan Trust 2006-HSA3 | JPMorgan Chase Bank, N.A. as Indenture Trustee | |
| Home Equity Loan Trust 2006-HSA4 | JPMorgan Chase Bank, N.A. as Indenture Trustee | |
| Home Equity Loan Trust 2006-HSA4 | JPMorgan Chase Bank, N.A. as Indenture Trustee | |
| Home Equity Loan Trust 2007-HSA1 | LaSalle Bank National Association as Indenture Trustee | |
| Home Equity Loan Trust 2007-HSA3 | LaSalle Bank National Association as Indenture Trustee | |
| **TOTAL** | | **$192,000,000** |

## EXHIBIT C-3

| HELOC Trust | Non-Debtor Counterparty | Available Credit as of 3/31/12 |
| --- | --- | --- |
| GMACM Home Equity Loan Trust 2006-HE1 | JPMorgan Chase Bank, National Association as Indenture Trustee | $921,124 |
| GSR Trust 2007-HEL1 | GS Mortgage Securities Corp. as Depositor, Deutsche Bank National Trust Company as Indenture Trustee, and Goldman Sachs Mortgage Company as Sponsor | $1,112,784 |
| **TOTAL** | | **$2,033,908** |

# EXHIBIT C-4

| Debtor Balance Sheet Portfolio | Available Credit as of 3/31/12 |
|---|---|
| GMAC MORTGAGE | $657,654,060 |
| GMAC MORTGAGE | $0 |
| GMAC MORTGAGE | $0 |
| GMAC MORTGAGE | $0 |
| GMACM - BMMZ REPO | $148,274 |
| GMAC MORTGAGE | $7,939,686 |
| GMACM - BMMZ REPO | $0 |
| RFC-PIA | $0 |
| RFC-PIA | $37,734,179 |
| RFC-PIA | $0 |
| RFC-PIA | $0 |
| RFC-PIA | $0 |
| RFC - BMMZ REPO | $351,750 |
| RFC - BMMZ REPO | $0 |
| RFC-PIA | $1,621,436 |
| RFC-PIA | $0 |
| RFC - BMMZ REPO | $93,544 |
| **TOTAL** | **$705,542,929** |

# EXHIBIT C-5

| HELOC | Servicing Agreement | Available Credit as of 3/31/12 |
|---|---|---|
| Suntrust Asset Funding, LLC | Servicing Agreement between Suntrust Asset Funding, LLC as Owner and GMAC Mortgage, LLC as Servicer, dated January 26, 2007 | $14,641,535 |
| First Union National Bank | Servicing Agreement between First Union National Bank and GMAC Mortgage Corporation, dated July 8, 1999 | $5,886,855 |
| Macquarie Mortgages USA Inc. (MMUSA) | Subservicing Agreement between Macquarie Mortgages USA Inc. (MMUSA) and GMAC Mortgage Corporation as Subservicer, dated September 1, 2006 | $28,826,987 |
| Macquarie Mortgages USA Inc. (MMUSA) | Subservicing Agreement between Macquarie Mortgages USA Inc. (MMUSA) and GMAC Mortgage Corporation as Subservicer, dated September 1, 2006 | $1,928,377 |
| Macquarie Mortgages USA Inc. (MMUSA) | Subservicing Agreement between Macquarie Mortgages USA Inc. (MMUSA) and GMAC Mortgage Corporation as Subservicer, dated September 1, 2006 | $7,237,110 |
| Macquarie Mortgages USA Inc. (MMUSA) | Subservicing Agreement between Macquarie Mortgages USA Inc. (MMUSA) and GMAC Mortgage Corporation as Subservicer, dated September 1, 2006 | $5,896,902 |
| Macquarie Mortgages USA Inc. (MMUSA) | Subservicing Agreement between Macquarie Mortgages USA Inc. (MMUSA) and GMAC Mortgage Corporation as Subservicer, dated September 1, 2006 | $673,203 |
| Macquarie Mortgages USA Inc. (MMUSA) | Sale and Servicing Agreement between Financial Asset Securities Corp. as Depositor, Macquarie Mortgages USA Inc. as Seller, Macquarie Mortgage Funding Trust 2007-1 as Issuing Entity, The Bank of New York as Indenture Trustee, The Bank of New York Trust Company, N.A. as Custodian and Macquarie Bank Limited, Asset-Backed Notes, Series 2007-1 | $21,845,296 |

| | | |
|---|---|---|
| | Amended and Restated Side Servicing Agreement by Macquarie Mortgages USA Inc. (MMUSA as owner of servicing rights) and GMAC Mortgage, LLC as Servicer, dated February 1, 2010 | |
| Lehman Brothers Bank, FSB | Flow Servicing Agreement between Lehman Brothers Bank, FSB as Purchaser and GMAC Mortgage Corporation as Servicer, dated July 2006, Conventional Fixed and Adjustable Rate Residential Mortgage Loans | $0 |
| Atlanta Internet Bank | Sale and Servicing Agreement by Atlanta Internet Bank as Purchaser and Residential Funding Corporation as Company, dated April 24, 1998 | $821,253 |
| Old Kent Bank | Sale and Servicing Agreement between Old Kent Bank as Purchaser and Residential Funding Corporation as Company, dated June 23, 200, Home Equity Revolving Credit Line Loans, Series 2000 HWH-6 | $291,713 |
| Treasury Bank, N.A. | Sale and Servicing Agreement between Treasury Bank, N.A. as Purchaser and Residential Funding Corporation as Company, dated January 31, 2005, Home Equity Lines of Credit | $6,027,812 |
| Texas Asset Acquisition Corporation | Sale and Servicing Agreement between Texas Asset Acquisition Corporation as Purchaser and Residential Funding Corporation as Company, dated June 30, 1995, Home Equity Revolving Credit Line Loans, Series 1995-HWH1 | $0 |
| Monogram Home Equity Corporation | Sale and Servicing Agreement between Monogram Home Equity Corporation as Purchaser and Residential Funding Corporation as Company, dated September 28, 1995, Home Equity Revolving Credit Line Loans, Series 1995-HWH2 | $0 |

| | | |
|---|---|---|
| Monogram Home Equity Corporation | Sale and Servicing Agreement between Monogram Home Equity Corporation as Purchaser and Residential Funding Corporation as Company, dated December 7, 1995, Home Equity Revolving Credit Line Loans, Series 1995-HWH3 | $0 |
| Texas Asset Acquisition Corporation | Sale and Servicing Agreement between Texas Asset Acquisition Corporation as Purchaser and Residential Funding Corporation as Company, dated December 28, 1995, Home Equity Revolving Credit Line Loans, Series 1995-HWH4 | $0 |
| Old Kent Bank | Amended Sale and Servicing Agreement between Old Kent Bank as Purchaser and Residential Funding Corporation as Company, dated May 1, 2000, Home Equity Revolving Credit Line Loans, Series 2000-HWH3 | $374,456 |
| Citizens Bank, N.A. | Sale and Servicing Agreement between Citizens Bank, N.A. as Initial Owner and Residential Funding Corporation as Company, dated June 29, 1995, Home Equity Revolving Credit Line Loans, Series 2005-HWH11 | $4,818,226 |
| Summit Bank | Sale and Servicing Agreement between Summit Bank as Purchaser and Residential Funding Corporation as Company, dated August 19, 1998, Home Equity Revolving Credit Line Loans, Series 1998-HWH5 | $925,303 |
| Lehman Brothers Bank, FSB | Flow Servicing Agreement between Lehman Brothers Bank, FSB as Purchaser and GMAC Mortgage Corporation as Servicer, dated July 2006, Conventional Fixed and Adjustable Rate Residential Mortgage Loans | $243,473 |
| US BANK, N.A. | | $581,361 |
| DEUTSCHE BANK NATIONAL TRUST CO | | $5,647,573 |
| US BANK, N.A. | | $31,016 |
| US BANK, N.A. | | $699,918 |
| US BANK, N.A. | | $1,619,089 |
| US BANK, N.A. | | $0 |
| **TOTAL** | | **$100,438,500** |