MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |

-------------------------------------------------------------

**CORRECTED DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS**
**PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 507(b) AND**
**BANKRUPTCY RULES 4001 AND 6004: (I) AUTHORIZING THE DEBTORS TO**
**OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS,**
**(II) AUTHORIZING THE USE OF CASH COLLATERAL AND RELATED RELIEF,**
**(III) GRANTING ADEQUATE PROTECTION AND (IV) SCHEDULING A FINAL**
**HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) and 4001(c), AND**
**<u>(V) GRANTING RELATED RELIEF</u>**

**(DEBTOR-IN-POSSESSION FINANCING AND ALLY FINANCIAL INC.**
**AND JUNIOR SECURED NOTEHOLDERS CASH COLLATERAL)**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors")[1] hereby move this Court (the "Motion")[2] pursuant to sections 105, 361, 362, 363, and

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below). Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis. As used herein, the term "Debtors" includes any such entities.

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

507(b) of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001

and 6004 of Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule

4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the Southern District of New York ("Local Rules"), for entry of an interim order

(substantially in the form annexed hereto as <u>Exhibit A</u>, the "Interim Order") and a final order

(the "Final Order", and together with the Interim Order, the "DIP/CC Orders")[3] (i) authorizing

the Debtors to obtain postpetition financing on a secured, superpriority basis (the "AFI DIP

Facility"), (ii) authorizing the use of Cash Collateral[4] and related relief, (ii) granting adequate

protection to Ally Financial Inc. ("AFI") and the holders of the 9.625% Junior Secured Notes

Due 2015 (the "Junior Secured Noteholders"), and (iii) scheduling a final hearing regarding the

same.[5]  In support of the Motion, the Debtors rely upon and incorporate by reference the

Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of

Chapter 11 Petitions and First Day Pleadings, filed with the Court concurrently herewith (the

"Whitlinger Affidavit").  In further support of the Motion, the Debtors, by and through their

undersigned counsel, respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and

---

[3]   A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing (as defined
     below).

[4]   "<u>Cash Collateral</u>" means the cash collateral (as defined in section 363(a) of the Bankruptcy Code) of (i) AFI
     under the AFI Senior Secured Credit Facility (as defined herein), (ii) AFI under the AFI LOC (as defined herein),
     and (iii) the Junior Secured Noteholders under the Junior Secured Notes (as defined herein).

[5]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Whitlinger
     Affidavit or in the proposed Interim Order.

this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates

for the relief requested herein are Bankruptcy Code sections 361, 362, 363, and 507(b),

Bankruptcy Rules 4001 and 6004, and Local Rule 4001-2.

### PRELIMINARY STATEMENT

2.        The Debtors operate in a highly regulated business in which they service

over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately

$374.2 billion, which are held by private investors or included in securitization trusts. The

holders of these loans, and the purchasers of the mortgage-backed securities ("MBS") issued by

the securitization trusts, are comprised of a broad range of investors, such as pension funds,

banks, insurance companies, governmental bodies and other public and private entities. These

investors depend on the performance of the Debtors, as servicer, to ensure the recovery of their

investments. The Debtors intend to sell their mortgage loan origination and loan servicing

businesses in these Chapter 11 cases, and the Debtors expect that such sale will yield a

significant return for the benefit of the Debtors' estates and creditors.

3.        By this motion, the Debtors request authority to (i) enter into a

postpetition financing facility with AFI in an aggregate principal amount not to exceed $150

million, no more than $85 million of which will be available upon the entry of the Interim Order

and the balance of which will be available upon the entry of the Final Order, provided that up to

an additional $65 million in postpetition draws may be made available to the AFI LOC

Borrowers under the AFI LOC (each as defined below) if the AFI LOC Borrowers and AFI agree

upon written mutually satisfactory terms for such incremental $70 million before the Final

Hearing, solely to fund certain repurchases (as described herein) of mortgage loans (the "Ginnie

Mae Loans") that were previously sold into securitization trusts guaranteed by Ginnie Mae[6] (the

"Ginnie Mae Trusts"), and (ii) to use the Cash Collateral of AFI and the Junior Secured

Noteholders (the "Adequate Protection Parties") on the terms set forth herein.[7]

4.    The Debtors are seeking authority to enter into the AFI DIP Facility, the

proceeds of which will be used to (i) continue making repurchases of whole loans from Ginnie

Mae Trusts in order to avoid GMAC Mortgage (as defined below) being in violation of

delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide,[8] (ii) effect

foreclosures, conveyances or other normal course loss mitigation activities of the related

properties in connection with the submission of HUD Claims, and (iii) to allow for trial

modifications under programs implemented by the Debtors for which the related loans and

borrowers are qualified (the "Ginnie Mae Obligations").[9]

5.    It is imperative that the Debtors obtain financing to meet their Ginnie Mae

Obligations because, pursuant to the documents related to the sale of mortgage loans to Ginnie

---

[6]    As used herein, Ginnie Mae is a federal agency that guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS") backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA").

[7]    Contemporaneously herewith, the Debtors have filed a motion (the "Barclays DIP Motion") seeking authority to enter into a secured superpriority postpetition financing facility (the "Barclays DIP Facility") with Barclays Bank PLC ("Barclays") as Administrative Agent (in such capacity, the "Administrative Agent") for a syndicate of financial institutions (together with Barclays, the "Barclays DIP Lenders").  See *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (a) Enter Into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (b) Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, (II) Scheduling a Final Hearing, and (III) Granting Related Relief.*

[8]    The Ginnie Mae MBS Guide is available at http://www.ginniemae.gov/guide/guidtoc.asp, as may be amended from time to time.

[9]    No proceeds of the AFI DIP Loans may be used to repurchase whole loans for any other purpose, including without limitation, for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects.

ny-1021268

Mae Trusts, if the Ginnie Mae Loans collectively exceed the delinquency rate specified by

Ginnie Mae, the Debtors are obligated to repurchase a group of Ginnie Mae Loans sufficient to

decrease the delinquency rate below the specified level.  Amounts paid by the Debtors to

repurchase Ginnie Mae Loans from the Ginnie Mae Trusts are in substantial part reimbursable to

the Debtors, as each of these mortgage loans are either partially insured by the FHA or partially

guaranteed by the VA.  As an alternative to submitting a claim to HUD for reimbursement by the

FHA or VA in connection with repurchased Ginnie Mae loans, the Debtors may also modify the

repurchased loan and resell it into a Ginnie Mae Trust, sell it to a third party, or retain it in a

Debtor-owned portfolio.  In 2011, the Debtors were obligated to, and did in fact, repurchase

4,721 mortgage loans with an aggregate value of approximately $745 million from Ginnie Mae

securitization trusts in connection with delinquency thresholds, the majority of which have been

subsequently reimbursed by the FHA and VA.

6.      In addition, the Debtors seek authority to use the Cash Collateral of AFI

and the Junior Secured Noteholders to, among other things, fund only the cash needs related to

the operations (including an allocated portion of the costs to administer the Bankruptcy Cases

based on the asset values within each collateral pool) and assets of each of the respective

collateral pools.  Each of AFI and the Junior Secured Noteholders has consented to the use of

their Cash Collateral on the terms described herein.

7.      In exchange for the use of the Cash Collateral, AFI and the Junior Secured

Noteholders will receive (i) the Adequate Protection Liens and superpriority administrative

expense claims, and (ii) the Adequate Protection Payments (each as defined below).

8.      It is critical that the Debtors have access to the AFI DIP Facility and Cash

Collateral within the first week of the cases so they can continue operating their mortgage loan

servicing business in the ordinary course, which will instill public confidence in the Debtors'

capabilities to continue functioning as a servicer, notwithstanding the commencement of these

Chapter 11 cases.  If the Debtors are unable to demonstrate sufficient liquidity, borrowers and

the market could experience confusion and uncertainty.  Borrowers may refuse to make

payments to the Debtors, thus impairing the Debtors' ability to continue meeting their ongoing

payment obligations (e.g., making payment advances required under certain circumstances for

the benefit of investors and paying certain securitization fees) and the Debtors' future capacity to

collect on these loans.  Similarly, it is essential that the Debtors remain vigilant to ensure that

borrowers continue making payments on their loans (e.g., by sending out bills and ensuring the

collection and proper distribution of funds received).  If the Debtors' ability to do so is impaired,

there is a real risk that delinquencies and defaults may materially increase to the ultimate

detriment of the Debtors' estates.

        9.      Further, if the Debtors do not continue to honor their ordinary course

servicing commitments for mortgage loans which are owned, insured or guaranteed by the

federal government sponsored entities Fannie Mae and Freddie Mac, or by the corporation

Ginnie Mae (the "Agency Loans"), they face the possible termination of their Agency Loan

servicing rights, which, if successful, would result in the loss of future servicing fees, with a

concomitant tremendous (and potentially catastrophic) loss to their estates.  The Debtors also

may incur penalties under recent settlements with the federal government and various state

agencies, pursuant to which the Debtors agreed to, among other things, certain heightened

servicing requirements with respect to the Agency Loans.

        10.     Accordingly, the Debtors believe that the terms governing the proposed

AFI DIP Facility and use of the Cash Collateral are reasonable and necessary to support the

Debtors' operations and restructuring activities throughout the Chapter 11 cases for the ultimate

benefit of all creditors and other parties in interest pending the closing of the sales of the

Debtors' assets.

### BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 CONCISE STATEMENTS[10]

11.    In accordance with Bankruptcy Rules 4001(b), (c) and (d), the following

summarizes the significant terms of the AFI DIP Facility, the Eighth Amendment to the

Amended and Restated Loan Agreement (Line of Credit Agreement), to be entered into by the

parties, the principal terms of which are included on the term sheet annexed hereto as <u>Exhibit B</u>

(the "AFI LOC Amendment"), and the Interim Order.  Included in this summary is a description

of each of the provisions required to be highlighted by Local Bankruptcy Rule 4001-2.  The

Debtors believe that the following terms of the AFI DIP Facility, the AFI LOC Amendment, and

the Interim Order are justified and necessary in the context and circumstances of these cases:

| | |
|---|---|
| <u>**Lenders**</u> | AFI **Term Sheet (LOC); Int. Order (Preamble) Introduction.** |
| <u>**Borrowers**</u> | GMAC Mortgage, LLC ("GMAC Mortgage") and Residential Funding Company, LLC **Term Sheet (LOC); Int. Order (Preamble)** |
| <u>**Guarantors**</u> | Residential Capital, LLC ("ResCap")  **Int. Order (Preamble)** |
| <u>**Commitment**</u> | AFI will honor postpetition draw requests under the AFI LOC (collectively, the "AFI DIP Loans"), subject to entry of the DIP/CC Orders, in an aggregate amount not to exceed $150 million, no more than $85 million of which will be available upon entry of the Interim Order and the balance of which will be available upon the entry of the Final Order, provided that up to an additional $70 million in postpetition draws may be made available to the Borrowers under the AFI LOC if the Borrowers and AFI agree upon written mutually satisfactory terms for such incremental $70 million before the Final Hearing (the "Commitment Amount"). **Term Sheet (Commitment); Int. Order IV, ¶ 5(a)** |

---

[10]    The descriptions of the terms of the proposed Interim Order provided in this Motion are intended only as summaries. In the event of any inconsistency between the descriptions set forth herein and the terms of the Interim Order, the terms of the Interim Order shall govern. **Local Rule 4001-2 requires the Debtors to highlight certain provisions in the motion in any proposed cash collateral order. Sections that must be highlighted for the Court are in bold and are marked with an asterisk.**

| | |
|---|---|
| **Draw Requests** | AFI agrees to make loans on a non-revolving basis in such aggregate amounts as requested by the Debtors up to the Commitment Amount. **Term Sheet (Draw Requests); Int. Order ¶ 5.** |
| **Interest Rate** | Interest will accrue postpetition on amounts drawn under AFI DIP Facility at the rate of LIBOR + 4.00%, with a LIBOR floor of 1.25%. After the occurrence of an Event of Default, interest on all loans and other amounts outstanding increase by 2.00% per annum. **Term Sheet (Interest)** |
| **Fees and Expenses** | Fees and expenses of counsel to AFI in connection with the AFI DIP Facility shall be payable by GMAC Mortgage. **Term Sheet (Fees and Expenses)** |
| **Termination** | To be determined. **Term Shee**t (Available Period) |
| **Use of Proceeds** | The proceeds of the AFI DIP Loan may only be used, in a manner consistent with past practices, to fund:<br><br>(a) the repurchase of whole loans from Ginnie Mae pools in order to avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide,<br><br>(b) to effect foreclosures, conveyances or other normal course loss mitigation activities of the related properties in connection with the submission of HUD Claims, and<br><br>(c) to allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified. **Term Sheet (Use of Proceeds); Int. Order ¶ 9.**<br><br>For the avoidance of doubt, no proceeds may be used to repurchase whole loans for any other purpose, including without limitation, for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects. **Int. Order ¶ 9.** |
| **Carve Out** | The Carve Out includes: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, and (ii) at any time after the first business day after the occurrence and during the continuance of a Termination Event hereunder, and delivery of notice thereof to the U.S. Trustee and each of the lead counsel for the Debtors (the "Carve Out Notice"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms whose retention is approved pursuant to sections 327 and 1103 of the Bankruptcy Code after the Business Day following delivery of the Carve Out Notice and allowed by this Court, in an aggregate amount not exceeding $25 million (the "Carve Out Cap") (plus all unpaid Professional Fees allowed by this Court at any time that were incurred on or prior to the Business Day following delivery of the Carve Out Notice, whether paid or unpaid); provided further that (A) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Adequate Protection Parties, (B) so long as no event of default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by this Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (C) nothing in this Interim Order shall impair the right of any party to object to any such fees or expenses to be paid by the Debtors' estates. **Int. Order ¶ 14(g**<br><br>The Carve Out is intended to mirror the Barclays' Carve Out (and not be in addition to). Allocation of the $25 million Carve Out monies between the Barclays' DIP collateral and |

ny-1021268

AFI Collateral TBD.  **Int. Order ¶ 14(g).**

| | |
|---|---|
| **Collateral** | <u>First Priority Priming Liens</u>: on the repurchased whole loans and HUD Claims funded with the AFI DIP Loans (the "Postpetition Collateral"), and on all collateral pledged prepetition to secure the AFI LOC (the "Prepetition Collateral").  **Term Sheet (Collateral); Int. Order ¶ 14.** |

<u>Superpriority Administrative Expense Claims</u>: the AFI DIP Lender will receive:

(a) superpriority administrative expense claims with respect to the repurchased whole loans, which are senior to the superpriority administrative expense claims of the Barclays DIP Lenders, and

(b) superpriority administrative expense claims in an amount equal to the principal and interest on the draws made under AFI DIP Facility, which are junior to the superpriority administrative expense claims of the Barclays DIP Lenders, except to the extent of claims to the above-described collateral and any proceeds or other amounts received in connection with the collection, sale or other disposition of such collateral. **Term Sheet (Collateral); Int. Order ¶ 14.**

The "**Barclays DIP Lenders**" mean the lenders under the $1,450,000,000 Secured Debtor-in-Possession Credit Agreement, agented by Barclays Bank PLC, and provided to the debtors in connection with the Cases (the "**Barclays DIP Facility**").

| | |
|---|---|
| **Affirmative and Negative Covenants** | Customary affirmative and negative covenants. **Term Sheet (Affirmative Covenants and Negative Covenants); Int. Order ¶ 16** |
| **Events of Default** | Customary events of default. |
| **Waiver of Automatic Stay** | The Debtors grant a waiver of the automatic stay to the extent necessary to permit the AFI DIP Lender to exercise all rights and remedies under the AFI DIP Loan, and, to: |

(a) cease making any extensions of credit or loans or advances to the Debtors; (b) declare all AFI DIP Obligations to be immediately due and payable without presentment, demand, protest or notice; (c) exercise any and all remedies available to it under the AFI DIP Loan; or (d) take any other actions or exercise any other rights or remedies permitted under the DIP/CC Orders, the AFI DIP Loan, or applicable law to realize upon the AFI DIP Loan Collateral and/or effect the repayment and satisfaction of the DIP Obligations; <u>subject to</u> the AFI DIP Lender providing seven (7) days written notice to the U.S. Trustee, counsel to the Debtors ,counsel to any Committee and counsel to the Administrative Agent and Collateral Agent under the Barclays DIP Facility, prior to exercising any enforcement rights or remedies in respect of the Collateral, other than with respect to the placement of administrative holds on any other deposit accounts or securities accounts.  **Int. Order ¶ 19**.

All rights of the AFI DIP Lender and Adequate Protection Parties are subject to paragraphs 13[(e)-(g)] of the Barclays DIP Order.  **Int. Order ¶ 19.**

| | |
|---|---|
| **Section 506(c) Waiver** | Subject to entry of the Final Order, no costs or expenses of administration shall be surcharged or otherwise imposed against the DIP Lenders' collateral under section 506(c) of the Bankruptcy Code or otherwise. **Int. Order ¶ 20.** |

| | |
|---|---|
| **Section 522 Waiver** | The parties on whose behalf the Borrowers are making servicer advances hereby waive any and all rights of setoff or recoupment against the Debtors and AFI to the extent such advances are directly funded by Cash Collateral.  Int. Order ¶29 |
| | Upon entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code is deemed waived with respect to the Prepetition Collateral. **Int. Order III,¶ 16** |
| **No Liens on Avoidance Actions** | The AFI Lender is not being granted a lien on causes of action under Chapter 5 of the Bankruptcy Code (or a lien on the proceeds thereof). |

12.     In accordance with Bankruptcy Rules 4001(b), (c) and (d), the following summarizes the significant terms of the Debtors' proposed use of Cash Collateral and the Interim Order.  Included in this summary is a description of each of the provisions required to be highlighted by Local Bankruptcy Rule 4001-2.  The Debtors believe that the following terms of the Debtors' proposed use of Cash Collateral and the Interim Order are justified and necessary in the context and circumstances of these cases:

| | |
|---|---|
| **Use of Cash Collateral** | The Debtors shall use Cash Collateral to pay expenses of operating their business.  The Cash Collateral securing each of the AFI Senior Secured Credit Facility/Junior Notes and the AFI LOC, respectively, shall be used to fund only the cash needs related to the operations (including an allocated portion of the costs to administer the Bankruptcy Cases based on the asset values within each collateral pool) and assets of each of the respective collateral pools, as set forth in the Approved DIP Budget. **Int. Order ¶¶ 9, .28.** |
| **Termination Date** | The Debtors' right to use Prepetition Collateral, including Cash Collateral, pursuant to the Interim Order shall automatically terminate without further notice or order of the Court (x) on the effective date of a Plan for any Debtor or (y) upon written notice to the Debtors after the occurrence and during the continuance of a Termination Events (as set forth below) beyond any applicable grace period (unless waived by the Adequate Protection Parties). . **Int. Order ¶ 18.** |
| **Adequate Protection** | (i) AFI, in its capacity as lender under the AFI LOC shall receive: |
| | (a) additional and replacement continuing, valid, binding, enforceable, non-avoidable, and automatically perfected security interests and liens (the "Adequate Protection Liens"), on all of the collateral securing the AFI LOC, which shall be (i) senior to the (A) existing liens granted to the AFI Lender under the AFI LOC, (B) junior liens in the AFI LOC Collateral granted under paragraph 11 of the Barclays DIP Order to secure the obligations under the Barclays DIP Facility  under the Debtors' postpetition debtor-in-possession financing facility ("Barclays DIP Facility"), (C) Adequate Protection Liens granted to the AFI Lender in its capacity as AFI Revolver Lender, and (D) Adequate Protection Liens granted to the Junior Secured Parties, and (ii) junior to the Carve Out and the AFI DIP Liens;; |
| | (b) to the extent the Adequate Protection Liens are insufficient to provide adequate protection, superpriority administrative expense claims that are (i) junior to the |

10

superpriority administrative expense claims granted to the Barclays DIP Lenders under the Barclays DIP Facility and the AFI DIP Loan superpriority administrative expense claims, (ii) *pari passu* with the superpriority administrative expense claims granted to Citibank, and (iii) senior to the superpriority administrative expense claims granted to the Junior Secured Noteholders; and

(c) adequate protection payments (the "Adequate Protection Payments") consisting of current interest paid at the non-default rate set forth in the Amended and Restated Loan Agreement governing the AFI LOC.

(ii) AFI, in its capacity as lender under the AFI Senior Secured Credit Facility shall receive:

(a) Adequate Protection Liens on

(1) all of the collateral securing the AFI Senior Secured Credit Facility, which shall be (i) junior only to the existing liens granted to AFI under the AFI Senior Secured Credit Facility, and (ii) senior to (x) the existing liens granted to the Junior Secured Noteholders, and (y) Adequate Protection Liens granted to the Junior Secured Noteholders;

(2) all of the collateral securing the AFI LOC, which shall be (i) junior to the (w) existing liens granted to AFI under the AFI LOC, (x) Adequate Protection Liens granted to AFI in its capacity as lender under the AFI LOC, (y) liens granted under paragraph 11 of the Barclays DIP Order to secure the obligations under the Barclays DIP Facility the "Barclays DIP Liens"), and (z) DIP Liens, and (ii) senior to the Adequate Protection Liens granted to the Junior Secured Noteholders on the collateral securing the AFI LOC as set forth below;

(3) the equity interests of GMACM Borrower LLC and RFC Borrower LLC, each a debtor in these Chapter 11 cases and borrower under the Barclays DIP Facility which shall be senior to the Adequate Protection Liens granted to the Junior Secured Parties on the equity of the DIP Borrowers; and

(b) superpriority claims that are (x) senior to the superpriority claims granted to the Junior Secured Noteholders and (y) pari passu with the superpriority claims granted to Citibank and the AFI Lender on account of the AFI LOC (but senior to the claims referred to in this clause (y) to the extent relating to Cash Collateral that is used to fund GNMA Buyouts);

(c) Adequate Protection Payments consisting of accrued and unpaid prepetition interest as well as current postpetition payments of interest at the non-default rate set forth in the AFI Revolver (the foregoing to include all unpaid prepetition interest) calculated based on the AFI Revolver balance of $400 million; provided that if that certain Plan Support Agreement between AFI, certain Junior Secured Noteholders, and the Debtors (the "Junior Notes PSA") is terminated pursuant to its terms, the AFI Lenders shall be entitled to payment of interest on the full amount outstanding under the AFI Revolver, including all accrued and unpaid interest thereon.

The sum of the obligations under the (x) AFI DIP Loan, (y) the AFI LOC Loan and (z) the Adequate Protection Obligations in respect of the AFI LOC Loan that shall be senior to the Barclays DIP Liens in the AFI LOC Collateral granted in paragraph 11 of the Barclays DIP Order, in the aggregate, shall not exceed $600 million.

(iii) The Junior Secured Noteholders shall receive:

(a) Adequate Protection Liens on

(1) all of the collateral securing the AFI Senior Secured Credit Facility, which shall be junior to the (i) existing liens granted to AFI under the AFI Senior Secured

11

Credit Facility, (ii) Adequate Protection Liens granted to AFI in its capacity as lender under the AFI Senior Secured Credit Facility, and (iii) existing liens granted to the Junior Secured Noteholders;

(2) additional Adequate Protection Liens on (1) all of the collateral securing the AFI LOC, which shall be junior to (i) all existing liens and Adequate Protection Liens granted to AFI (on both the AFI LOC and the AFI Senior Secured Credit Facility), and (ii) the DIP Liens; and

(3) the equity interests of GMACM Borrower LLC and RFC Borrower LLC, each a debtor in these Chapter 11 cases and borrower under the Barclays DIP Facility.

(b) to the extent the Adequate Protection Liens are insufficient to provide adequate protection, superpriority administrative expense claims that are junior to the superpriority administrative expense claims granted to the DIP Lenders under the Barclays DIP Facility and the superpriority administrative expense claims granted to AFI; and

(c) Adequate Protection Payments consisting of payment of fees and expenses of the Trustee and the professionals of the Ad Hoc Committee of Junior Noteholders. **Int. Order ¶ 14.**

|  |  |
|---|---|
| **Termination Events** | Customary events of default, plus:<br><br>(a) the Debtors seek to reject under section 365 of the Bankruptcy Code, or otherwise, either the Master Servicing Agreement (1st Lien Mortgages Servicing Released) dated as of April 16, 2006 and amended as of June 1, 2007 between Residential Funding Company, LLC (f/k/a Residential Funding Corporation) and Ally Bank (f/k/a GMAC Bank) or the Master Servicing Agreement (1st Lien Mortgages Servicing Retained) dated as of August 15, 2005 and amended as of March 31, 2006 between Residential Funding Company, LLC (f/k/a Residential Funding Corporation) and Ally Bank (f/k/a GMAC Bank);<br><br>(b) failure to perform or remain current on all of the Consent Obligations (as defined in the Interim Order);<br><br>(c) failure to obtain entry of the *Interim Order Pursuant to Sections 105(A)and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business* in form and substance satisfactory to the AFI Lender within five (5) days of the Petition Date; and<br><br>(d) entry of a Bankruptcy Court order granting any superpriority claim (or claim of equivalent status) that is senior to or pari passu with the claims of the Adequate Protection Parties or any lien or security interest that is senior to or *pari passu* with the liens and security interests securing the AFI Senior Secured Credit Facility, the AFI LOC, or the Junior Secured Notes, except as provided herein.  **Int. Order ¶ 18.** |
| **Section 506(c) Waiver** | Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the Adequate Protection Parties or any of their respective claims or the Cash Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Adequate Protection Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders; *provided*, however, that in the event that any Ally Settlement is not approved by the Bankruptcy Court, the Debtors reserve the right to charge costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases against AFI's collateral. **Int. Order ¶ 20.** |
| **Waiver of Automatic Stay** | The Debtors grant the Adequate Protection Parties a waiver of the automatic stay to the extent necessary to permit the Adequate Protection Parties to, immediately upon the occurrence and during the continuation of a Termination Event, and issuance of the |

ny-1021268

Termination Notice (each as defined in the Interim Order), terminate the right of the loan parties to use Prepetition Collateral, including Cash Collateral.

In no event shall the Adequate Protection Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral. The delay or failure of the Adequate Protection Parties to exercise rights and remedies under the Prepetition Obligations or the Interim Order shall not constitute a waiver of their respective rights, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the Prepetition Obligations.

The AFI DIP Lender may exercise all rights and remedies under the AFI DIP Loan, and, to the extent provided for in the AFI DIP Loan, to take any or all of the following actions without further order of or application to this Court: (a) cease to make any extensions of credit or loans or advances to the Debtors; (b) declare all AFI DIP Obligations to be immediately due and payable without presentment, demand, protest or notice; (c) the AFI DIP Lender shall exercise any and all remedies available to it under the AFI DIP Loan; (d) take any other actions or exercise any other rights or remedies permitted under this Order, the AFI DIP Loan, or applicable law to realize upon the AFI DIP Loan Collateral and/or effect the repayment and satisfaction of the DIP Obligations; subject to the AFI DIP Lender providing seven (7) days written notice (by facsimile, telecopy, electronic mail or otherwise) to the U.S. Trustee, counsel to the Debtors ,counsel to any Committee and counsel to the Administrative Agent and Collateral Agent under the Barclays DIP Facility, prior to exercising any enforcement rights or remedies in respect of the Collateral (other than the rights described in clauses (a) and (b) above (to the extent they might be deemed remedies in respect of the Collateral) and other than with respect to the placement of administrative holds on any other deposit accounts or securities accounts). **Int. Order ¶ 19.**

**Debtors' Stipulations**

The Debtors stipulate that:

(a) as of the Petition Date, the aggregate principal amount outstanding (i) under the AFI Senior Secured Credit Facility was at least $749,000,000, (ii) under the AFI LOC was at least $380 million, and (iii) under the Junior Secured Notes was at least $2,120,452,000, in each case plus accrued and unpaid interest thereon, reimbursement obligations in respect thereof and fees and expenses (including fees and expenses of the Junior Secured Noteholders' attorneys and financial advisors) and other obligations incurred in connection therewith (collectively, the "Prepetition Obligations");

(c) the Junior Secured Notes constitute legal, valid and binding obligations of the Loan Parties, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);

(d) no portion of the Junior Secured Notes is subject to avoidance, recharacterization, recovery, subordination, setoff, or counterclaim pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(e) the Debtors have granted liens and security interests to the AFI Lender pursuant to and in connection with the AFI LOC, including the liens and security interests in

(x) certain of the accounts described in the *Amended Interim Order (A) Authorizing, But Not Directing, the Debtors to Continue Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Continued Investment of Excess Funds in Investment Accounts and (D) Authorizing Continued Intercompany Arrangements and Historical Practices,* which was entered by this Court on May 14, 2012 (the "Interim Cash Management Order"), and

(y) in the other personal and real property constituting "Collateral" under, and as defined in, the AFI LOC (the "AFI LOC Collateral"), and such liens and security

interests are presently subject and subordinate only to (A) the Carve Out, (B) certain liens and security interests granted to secure the adequate protection obligations, and (C) certain liens and security interests granted to secure the AFI DIP Loan;

(f) the Debtors have granted liens and security interests to the AFI Lender pursuant to and in connection with the AFI Senior Secured Credit Facility, including the liens and security interests in certain of the accounts described in the Interim Cash Management Order, and in the other personal and real property constituting "Collateral" under, and as defined in, the AFI Senior Secured Credit Facility (together with the AFI LOC Collateral, collectively, the "AFI Lender Collateral"), and such liens and security interests are presently subject and subordinate only to (A) the Carve Out, as defined in paragraph 14(g) of the Interim Order, and (B) certain liens and security interests granted to secure the Adequate Protection Obligations (as defined in paragraph 14 of the Interim Order);

(g) the liens and security interests granted to the Junior Secured Noteholders pursuant to and in connection with Junior Secured Notes are valid, binding, perfected, and enforceable first priority liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the Junior Secured Notes (together with the AFI Lender Collateral, the "Prepetition Collateral") and (i) were granted to, or for the benefit of, the Junior Secured Noteholders for fair consideration and reasonably equivalent value; (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non bankruptcy law and (iii) are subject and subordinate only to (A) the liens and security interests granted to the AFI Lender under the AFI Senior Secured Credit Facility, all subject to the terms and conditions of the Intercreditor Agreement, dated as of June 6, 2008 (as amended, the "Intercreditor Agreement" and, together with the instruments and agreement evidencing or providing for the issuance of the Prepetition Obligations, the "Existing Agreements"), (B) the Carve Out, and (C) the liens and security interests granted to secure the adequate protection obligations; and

(h) the Collateral securing the Junior Secured Notes includes, among others, the categories of assets set forth on <u>Exhibit A</u> to the Interim Order;

(i) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Junior Secured Notes exist, and no portion of the Junior Secured Notes or any payments made to any or all of the Junior Secured Noteholders are subject to avoidance, recharacterization, recovery, subordination, attach, recoupment, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, except for the priming contemplated under the Interim Order;

(j) there are no claims, defenses, or causes of action against the Junior Secured Noteholders with respect to the Junior Secured Notes (the "Junior Secured Noteholders Claims");

(k) subject to the reservation of rights set forth in paragraph 25 of the Interim Order, each Debtor and its estate shall be deemed to have forever waived, discharged and released each of the Junior Secured Noteholders of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment, or other offset rights, whether arising at law or in equity, relating to and/or otherwise in connection with the Junior Secured Notes and the Junior Secured Notes Liens, or the debtor creditor relationship between the Junior Secured Noteholders and the Debtors, including, without limitation, (x) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law, and (y) any right or basis to challenge or object to the amount, validity or enforceability of the Junior Secured Notes, or the validity, enforceability, priority or non-avoidability of the Junior Secured Notes Liens securing the Junior Secured Notes;

(l) the Adequate Protection Parties retain, and have not waived or otherwise prejudiced, any of their rights, claims, defenses or counterclaims at law or in equity with respect to the

Debtors or any other person or governmental unit (each such term as defined in the Bankruptcy Code); and

(m) the AFI LOC Borrowers will continue to fund GNMA Buyouts with the proceeds of the AFI DIP Loan on a postpetition basis and with Cash Collateral (as hereinafter defined) under the AFI Senior Secured Credit Facility and submit HUD Claims in the ordinary course of business.

The Debtors make no stipulation regarding the extent or validity of AFI's claims and liens. **Int. Order ¶ 3.**

**Effect of Debtors' Stipulations on Third Parties**

The stipulations, admissions, and releases contained in the Interim Order shall be binding on all parties in interest, including any Committee, unless, and solely to the extent that, any party in interest files an objection to the Interim Order challenging such stipulations, admissions, releases, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against the Junior Secured Noteholders (an "Objection"), in each case no later than seventy-five (75) days after entry of the Interim Order. **Int. Order ¶ 26.**

## BACKGROUND

13.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee, examiner or statutory creditors' committee has been appointed in these Chapter 11 cases.

14.    A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is below and set forth in the Whitlinger Affidavit.

15.    The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank, and other third parties. As of March 31, 2012, the Debtors were servicing over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion. To preserve and realize the value of these assets and achieve the goals of these Chapter 11 cases, the Debtors developed and are prepared to implement a strategy that provides maximum value to the Debtors' estates.

ny-1021268

16.     The Debtors negotiated and entered into two separate asset purchase agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder ("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the "Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the "Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

17.     In furtherance of their restructuring strategy, and contemporaneous with the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to, among other things, establish auction and sale procedures for the Asset Sales,[11] and for approval to consummate the Asset Sales under a plan.  If, however, the Debtors do not obtain confirmation of a plan by deadlines to be determined, then the Sale Motion allows the Debtors to pursue an alternative course of action and immediately move forward with the Asset Sales under Bankruptcy Code section 363(b) and outside of a plan.

## I.    Overview of the Debtors' Businesses

18.     The Debtors are a leading residential real estate finance company indirectly owned by non-debtor AFI.  Prior to the Petition Date, the Debtors, together with their non-debtor affiliates and foreign subsidiaries, were collectively the tenth largest originator and fifth largest servicer of residential mortgage loans in the United States.  The Debtors, together with their non-debtor subsidiaries, manage the mortgage-related businesses in two business lines:

---

[11]    *Debtors' Motion Pursuant to 11 U.S.C.  §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion").

ny-1021268

(i) the ongoing Origination and Servicing business and (ii) the Legacy Portfolio and Other

operations, which are being wound down.

### A.       Origination and Servicing

19.       The principal activities of the Debtors' Origination and Servicing are:

(a) brokering, originating, purchasing, selling and securitizing residential mortgage loans

throughout the United States for the Debtors and their non-debtor affiliate, Ally Bank (f/k/a

GMAC Bank); and (b) servicing residential mortgage loans.

20.       The Debtors, principally GMAC Mortgage LLC ("GMAC Mortgage"),

broker and originate mortgage loans through a consumer lending business that consists of

internet and telephone-based call center operations operated under the GMAC Mortgage brand.

Through these operations, the Debtors broker, and to a lesser extent originate, loans through a

retail network of loan officers who have direct contact with consumers, including through

referrals from builders, realtors, and other third parties.  GMAC Mortgage brokers substantially

all of its loan production to Ally Bank, which underwrites and originates the loans.  In the years

ended December 31, 2010 and 2011 and the three months ended March 31, 2012, the Debtors

brokered $7.4 billion, $7.3 billion and $3.6 billion, respectively, of mortgage loans to Ally Bank.

During the same periods, Debtors purchased $66.3 billion, $56.7 billion and $9.9 billion,

respectively, of mortgage loans from Ally Bank.

21.       A fundamental part of the Debtors' business strategy consists of

securitizing or selling substantially all of the mortgage loans they purchase or originate.  As

described in greater detail in the Whitlinger Affidavit, the Debtors participate in the

securitization programs of Fannie Mae, Freddie Mac and Ginnie Mae.[12]  The Debtors also pool

---

[12]     As used herein, "<u>Fannie Mae</u>" means the Federal National Mortgage Association, "<u>Freddie Mac</u>" means the
(Footnote continues on next page.)

together non-conforming mortgage loans in their own names ("private label") and convey the

pool of loans to newly formed private label securitization trusts.[13]  In each case, the

securitization trust issues securities to a broad range of investors, including pension funds,

money market funds, mutual funds, banks, insurance companies, governmental bodies and other

public and private entities.

           22.    Since 2008, mortgage loan servicing has been the Debtors' primary source

of ongoing revenue.  The Debtors hold "mortgage servicing rights" (referred to as "MSRs") that

consist of primary, master, or sub- servicing rights.  As a primary servicer, the Debtors, among

other things, collect and remit mortgage loan payments, respond to borrower inquiries, account

for and apply principal and interest, hold custodial and escrow funds for payment of property

taxes and insurance premiums, provide ancillary products, counsel or otherwise work with

delinquent borrowers, supervise foreclosures and property dispositions, make advances of

required principal, interest, and certain "property protection" costs with respect to delinquent and

defaulted mortgage loans and the real estate that the trust or owner acquires as the result of a

foreclosure of the loan (the "Advances"), and generally administer the loans consistent with their

contractual undertakings and business practices.  When the Debtors act as master servicer, they

collect mortgage loan payments from primary servicers or sub-servicers and distribute those

funds to investors and to other transaction parties in mortgage-backed and mortgage-related

---

(Footnote continued from previous page.)

    Federal Home Loan Mortgage Corporation and "Ginnie Mae" means the Government National Mortgage
    Association.  Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress and
    are referred to herein as the "GSEs."  Fannie Mae and Freddie Mac securitize or buy mortgage loans originated
    by mortgage lenders, enabling them to replenish their funds so that they can make loans to other homeowners.

[13]    Since the decline in the mortgage industry beginning in 2007, the Debtors have sold mortgage loans into only
    two private label securitizations.

ny-1021268

asset-backed securities and whole-loan packages.[14]    Finally, as a sub-servicer, the Debtors

perform functions similar to the primary servicing functions described above pursuant to

contractual arrangements with other servicers.  The Debtors receive a fee based on the unpaid

principal balance ("UPB") of the mortgage pool, or in some cases, for each loan serviced.  In

addition, the Debtors may receive other remuneration for loan servicing, including interest

earned on custodial accounts where mortgage payments are held pending remittance to investors,

as well as borrower-contracted fees, such as late charge fees, assignment transfer fees, and other

incidental fees and charges.

23.    As of March 31, 2012, the Debtors acted as the primary servicer for

approximately 1.5 million loans having an aggregate UPB of approximately $197 billion.  In

addition, as of March 31, 2012, the Debtors acted as subservicer for over 847,000 loans having

an aggregate UPB of approximately $169 billion, including mortgage loans for which Ally Bank

retains the MSRs and whole loans owned by Ally Bank.  The Debtors are the master servicer for

approximately 439,000 loans having an aggregate UPB of approximately $58.7 billion as of

March 31, 2012, including loans having an aggregate UPB of $7.8 billion for which the Debtors

are the master servicer but not the primary servicer.

**B.    Legacy Portfolio and Other**

24.    The Debtors' Legacy Portfolio and Other business principally consists of

the remaining mortgage loan assets from the historical non-conforming domestic residential

mortgage loan origination and securitization activities, the Debtors' remaining international

operations, and the Debtors' captive mortgage reinsurance portfolio.  The legacy portfolios are

---

[14]    In addition, for Agency Securitizations, the Debtors provide certain key services, including advancing required principal and interest and other expenses with respect to mortgage loans (to the extent the primary servicer does not make such Advances), claims administration, oversight of primary servicers and sub-servicers, loss mitigation, investor reporting, and other contractual functions.

being run off through opportunistic asset sales, workouts, or other strategic disposition

transactions.

## II.    Overview of the Certain of the Debtors' Prepetition Debt

25.    Certain of the Debtors are borrowers, guarantors and/or obligors under

credit facilities and also maintain collateralized nonrecourse borrowing facilities for

securitization trusts.[15]  Certain of the Debtors also are the issuer of $2.3 billion of secured and

$968 million of unsecured publicly traded U.S. dollar, Euro and U.K. Sterling-denominated

notes.

### A.    AFI Senior Secured Credit Facility

26.    On December 30, 2009, Debtors Residential Funding Company, LLC

("RFC") and GMAC Mortgage, as borrowers, and Debtors ResCap, Passive Asset Transactions,

LLC ("PATI"), and RFC Asset Holdings II, LLC ("RAHI"), as guarantors, entered into a loan

agreement with AFI, as agent and lender (as amended from time to time, the "AFI Senior

Secured Credit Facility") amending and restating in its entirety the original loan agreement

entered into on June 4, 2008.[16]  The AFI Senior Secured Credit Facility originally was a

revolving loan facility, but the outstanding amount was converted into a term loan in connection

with the amendment and restatement.  The borrowers, however, are permitted to use certain

accounts securing the AFI Senior Secured Credit Facility as revolving accounts to make

Advances under certain securitizations that are not funded by other facilities.   The AFI Senior

---

[15]    As required by New York State for licensing purposes, Debtors also have a $1 million line of credit with Citibank, N.A. ("Citibank")

[16]    Other Debtors that are guarantors under the AFI Senior Secured Credit Facility are Homecomings Financial, LLC, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company, LLC and Executive Trustee Services, LLC; additional pledgor-Debtors under the AFI Senior Secured Credit Facility are GMAC Model Home Finance I, LLC, Developers of Hidden Springs, LLC, DOA Holding Properties, LLC, Equity Investment IV, LLC and RFC Construction Funding, LLC.

Secured Credit Facility terminates on May 14, 2012, and the outstanding principal amount as of

the Petition Date is approximately $747 million.  The AFI Senior Secured Credit Facility is

secured by a first priority lien for the benefit of AFI on substantially all of the assets of the

Debtors with certain exclusions, such as the Ginnie Mae MSRs and related assets, as well as

certain of the assets that secure the other secured debt facilities.   The assets that secure the AFI

Senior Secured Credit Facility also secure the Junior Secured Notes.

**B.      AFI LOC**

27.      On December 30, 2009, Debtors RFC and GMAC Mortgage, as

borrowers, Debtors ResCap, PATI and RAHI, as guarantors, and AFI, as agent and lender, also

entered into the $1.1 billion AFI LOC in order to consolidate under one agreement the terms and

provisions of two secured credit agreements with AFI, entered into on November 20, 2008, and

June 1, 2009, respectively, as well as the loans made under those agreements.  Certain other

Debtors are also guarantors under the AFI LOC.[17]  On December 23, 2010, the parties added a

$500 million unsecured swingline loan facility to the AFI LOC, which could be used only if

there was no remaining borrowing capacity under the AFI LOC.  No amounts were ever

borrowed under the swingline loan facility and it was terminated in April 2012.  The AFI LOC

terminates on May 14, 2012.  The outstanding principal amount under the AFI LOC as of

Petition Date was approximately $380 million.  The AFI LOC provides funds to the Debtors,

generally limited to unused capacity, when the Debtors' unrestricted liquidity is less than $300

million.  The AFI LOC is secured by assets of the Debtors, including, without limitation: certain

mortgage loans secured by properties located in the United States; certain notes and related

---

[17]    The other Debtors that are guarantors, together with ResCap, under the AFI LOC are GMAC-RFC Holding
Company, LLC, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC and Equity
Investment I, LLC.

ny-1021268

agreements issued by third parties that are held by PATI and RFC; certain equity interests of special purpose vehicles (including a pledge by RFC of 100% of the equity of Equity Investment I, LLC; a pledge by PATI of 100% of the equity of PATI Real Estate Holdings, LLC, and a pledge by RAHI of 100% of the equity of RAHI Real Estate Holdings, LLC); certain MSRs; and certain Freddie Mac servicing Advances. Prior to the Petition Date, the available amount and the borrowing base of the AFI LOC were both reduced by the amount of any collateral posted or delivered by AFI to the borrowers or ResCap pursuant to certain derivative transaction agreements with AFI (if any). The obligations under the AFI LOC and certain derivative agreements with AFI are cross-collateralized for the benefit of AFI. From time to time, in order to maintain the borrowing base under the AFI LOC as mortgage loans are repaid, the Debtors post additional loans and certain servicer Advances as collateral.

### C.    Junior Secured Notes

28.    In June 2008, the Debtors closed private debt tender and exchange offers for a portion of their then outstanding public unsecured notes. ResCap issued approximately $5.7 billion of new senior and junior secured notes consisting of 8.5% senior secured notes due 2010 (the "Senior Secured Notes") and the Junior Secured Notes (together with the Senior Secured Notes, the "Secured Notes"), in exchange for approximately $8.6 billion of its then outstanding unsecured notes.

29.    On May 15, 2010, the then outstanding Senior Secured Notes were repaid at maturity.

30.    As of the Petition Date, the outstanding principal amount of Junior Secured Notes was approximately $2.3 billion. The Junior Secured Notes are secured by second priority liens on the same assets that secure the AFI Senior Secured Credit Facility. The Junior

Secured Notes are repayable in three equal tranches of $707 million in May of 2013, 2014 and 2015.

### III.    The Debtors' Cash Needs Post-Filing

31.    It is critical that the Debtors have access to the AFI DIP Facility so that they can meet their Ginnie Mae Obligations.  Failure to do so could result in the possible termination of the Debtors' Ginnie Mae servicing rights, which would result in the loss of future servicing fees, with a corresponding catastrophic loss to the Debtors' estates.  To continue to operate their business in the ordinary course while in Chapter 11, the Debtors determined that liquidity in the form of debtor-in-possession financing was essential.

32.    As the chapter 11 filing date approached, the Debtors determined that the Barclays DIP Facility would be insufficient to cover the Debtors' second largest expense— repurchases of Ginnie Mae Loans.  These repurchases were funded prior to the Petition Date by draws under the AFI LOC.  Thus, the Debtors requested additional post petition financing from AFI, their parent and prepetition lender under the AFI Senior Secured Credit Facility and the AFI LOC, in the form of postpetition draws under the AFI LOC.

33.    Beginning in April 2012, the Debtors engaged in discussions with AFI regarding the repurchases of Ginnie Mae Loans.  Those discussions eventually morphed into negotiations regarding the terms and structure of the AFI DIP Facility.  The parties exchanged various term sheets and participated in numerous telephone calls regarding these issues and related documentation.  Ultimately, AFI agreed to allow the Debtors to draw on the AFI LOC postpetition in an amount up to $220 million to fund the repurchases of Ginnie Mae Loans.  These negotiations, which were conducted in good faith and at arms' length, culminated in the agreement to enter into the Term Sheet.

34.      The Debtors believe that the availability under the AFI DIP Facility,
combined with the use of AFI's and the Junior Secured Noteholders' Cash Collateral, will enable
them to continue operating in the ordinary course of business, including their loan servicing
operations that are necessary to preserve the value of their servicing platform, for the ultimate
benefit of their stakeholders pending the closing of the Asset Sales.

## RELIEF REQUESTED

35.      This Motion is one of three related motions that collectively seek authority
for the Debtors to obtain financing and utilize the cash collateral of certain secured lenders, each
of whose claims is secured by its own separate set of cash-generating collateral.
Contemporaneously herewith, the Debtors have also filed (i) a separate motion to utilize the cash
collateral of Citibank with respect to a separate pool of assets securing a separate prepetition
facility with GMAC Mortgage, as borrower, and ResCap, as guarantor, and (ii) the Barclays DIP
Motion to enter into the Barclays DIP Facility.  While the motions and orders are separate, each
relating to separately identifiable collateral, they are being presented in tandem and must be
granted together as an integrated whole for the Debtors to be able to continue operating their
businesses seamlessly and without interruption pending one or more sales of their business lines
and assets.

36.      The Debtors request that, to the extent necessary, the relief sought by this
Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases.  The
Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's entry
of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the
Chapter 11 cases of the Debtors.

## APPLICABLE AUTHORITY

**I.      The AFI DIP Facility Should Be Approved**

**A.      The AFI DIP Facility Is Necessary to Preserve the Assets of the Debtors' Estates and Is in the Best Interests of Creditors**

37.      The reasons supporting the Debtors' need to obtain debtor-in-possession financing is compelling.  As discussed above, the Debtors require additional financing to continue honoring in their sole discretion the Ginnie Mae Obligations.   Indeed, if the Debtors do not continue to honor their repurchase obligations, the Debtors may face actions to terminate their right to continue servicing Ginnie Mae Loans, as the applicable agreements with Ginnie Mae generally permit it to terminate a servicer at will.  Further, Ginnie Mae could likewise prevent Nationstar (or such other successful bidder) from servicing such loans following the closing of the platform sale.  Such a result would be potentially disastrous to the value of the Debtors' servicing platform and the estates in general.   For these reasons, the Debtors believe it is essential that they be authorized to continue to honor all of their repurchase obligations with respect to the Ginnie Mae Loans in the ordinary course of business.

38.      Indeed, absent sufficient funds to meet the Ginnie Mae obligations, the value of the Debtors' assets and operations will quickly erode and their ability to consummate the Asset Sales will be jeopardized, to the detriment of the Debtors' estates and stakeholders. See In re Farmland Indus., Inc., 294 B.R. 855, 885 (Bankr. W.D. Mo. 2003) (approving postpetition financing that "gives the Debtors sufficient time to market and sell several of their major assets so as to pay down the debt to the DIP Lenders and then reorganize around their remaining core assets. Without the continued financing, the Debtors would likely be forced into a Chapter 7 or 11 liquidation, to the detriment of all creditors…").

39.     Upon entry of the Interim Order, the AFI DIP Facility will provide access to $85,000,000, which the Debtors and their advisors have determined is sufficient and necessary to allow the Debtors to meet their repurchase obligations during the next thirty (30) days.  Thus, the Debtors submit that the AFI DIP Facility is in the best interest of the Debtors' estates, creditors, borrowers whose mortgage loans are being serviced by the Debtors, investors, and all other stakeholders, and therefore the Debtors should be granted the relief requested herein.

**B.     The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

40.     Section 364 of the Bankruptcy Code allows a debtor to obtain (a) unsecured credit in the ordinary course of business, (b) unsecured credit outside the ordinary course of business, (c) credit with specialized priority or with certain security interests, and (d) secured credit by granting a senior or *pari passu* lien on already encumbered property.  In other words, section 364 is "structured with an escalating series of inducements . . . ." that may be offered to attract postpetition financing.  Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs., Inc.), 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d Cir. 1989).

41.     Accordingly, if a debtor cannot obtain postpetition financing on an unsecured basis under sections 364(a) and (b), the bankruptcy court may authorize a debtor to obtain postpetition financing on a superpriority administrative expense basis pursuant to section 364(c), secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  See 11 U.S.C. § 364(c); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y 1992) ("If [a] debtor cannot obtain credit as an administrative expense, it may acquire a loan that is either unsecured but senior to all administrative expense claims, secured by a lien on property that is not secured, or secured by a junior lien on property already

secured [under section 364(c)]."); Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575,

582-83 (S.D.N.Y. 2001) ("Section 364 of the Code empowers the bankruptcy court to allow new

debts to take priority over other administrative expenses."); In re Garland Corp., 6 B.R. 456, 461

(B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a

hearing, upon showing that unsecured credit unobtainable).

42.      Courts consider various factors in determining whether a debtor may

obtain postpetition financing under section 364(c) of the Bankruptcy Code, including whether

(i) the debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is

necessary to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable

and adequate given the circumstances of the debtor-borrower and the proposed lender, (iv) entry

into the financing constitutes an exercise of the debtor's sound and reasonable business

judgment, and (v) the financing was negotiated in good faith and at arm's-length between the

debtor and the lender.  See In re Farmland Indus., Inc., 294 B.R. at 879-81; Transcript of Record

at 733, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009),

Docket No. 3740 (citing Farmland factors); In re Mid-State Raceway, Inc., 323 B.R. 40, 60

(Bankr. N.D.N.Y. 2005) (citing Farmland factors).  See also In re Aqua Assocs., 123 B.R. 192,

195-96 (Bankr. E.D. Pa. 1991) (applying factors 1-3).

43.      To satisfy the requirements of section 364(c) of the Bankruptcy Code, a

debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor

on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n

(In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek

credit from every possible lender before concluding that such credit is unavailable." Id.; Pearl-

Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. at 584 (superpriority administrative

expenses authorized where debtor could not obtain credit otherwise).  When few lenders are

likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic

and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In

re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs.

Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also In re Ames Dep't

Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding

that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it

approached four lending institutions, was rejected by two, and selected the most favorable of the

two offers it received).

> (i)    **The Debtors are Unable to Obtain Credit on More Favorable
> Terms**

44.    The Debtors have been unable to procure sufficient financing (i) in the

form of unsecured credit allowable under sections 364(a) or (b) of the Bankruptcy Code, or

(ii) solely in exchange for the grant of a superpriority administrative expense claim pursuant to

section 364(c) of the Bankruptcy Code.

45.    Due to the liens and security interests granted under the Debtors' various

prepetition credit facilities and outstanding junior secured notes, the Debtors were unable to

procure sufficient debtor-in-possession financing in the form of unsecured credit, solely in

exchange for the grant of a administrative expense or superpriority administrative expense claim

or on a junior lien basis.  Specifically, none of AFI, Barclays nor any of the other Potential

Lenders was willing to commit to postpetition financing on these terms.  As reflected in the AFI

LOC Amendment, AFI was willing to provide the necessary debtor-in-possession financing

without encumbering any of the Debtors' prepetition assets (other than the assets already

encumbered by AFI under the AFI LOC) and without taking liens on causes of action under Chapter 5 of the Bankruptcy Code.

46.     Based on the foregoing, the Debtors believe that they would not have been able to obtain debtor-in-possession financing on more favorable terms from other sources.  See, e.g., Bray v. Shenandoah Fed. Savs. & Loan Ass'n, 789 F.2d at 1088 (Section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); In re YL W. 87th Holdings I LLC, 423 B.R. at 421, 441 n. 44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable effort" to obtain credit otherwise); In re 495 Central Park Ave. Corp., 136 B.R. at 631 (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position.").

47.     Accordingly, the Court should therefore authorize the Debtors to grant the AFI DIP Liens and AFI Superpriority Claims requested herein pursuant to section 364(c) of the Bankruptcy Code.

(i)     **The Terms of the Credit Documents are Fair, Reasonable and Appropriate**

48.     The terms and conditions of the AFI LOC Amendment are fair, reasonable and appropriate in the circumstances presented, and were negotiated by the parties in good faith and at arm's length.

49.     The AFI Lender has required that the Debtors grant the DIP Liens and Superpriority Claims upon the terms and conditions set forth in the Interim Order and the AFI LOC Amendment.  The AFI Liens and AFI Superpriority Claims will be subject to the Carve Out, which includes up to $25,000,000 in professional fees accruing following an event of default plus amounts payable to the United States Trustee (subject to allocation among the

Barclays DIP Facility).  Such carve outs generally "preserve the adversary system" by ensuring

that the committees and the debtor's estate are adequately assisted by counsel.  See In re Ames

Dep't Stores, Inc., 115 B.R. at 38 (noting that courts generally "insist on a carve out" for

professional fees, and that "[a]bsent such protection, the collective rights and expectations of all

parties-in-interest are sorely prejudiced.").  The AFI DIP Facility provides the Debtors with the

liquidity they need to continue meeting their repurchase obligations as required by the Ginnie

Mae Guide, which will preserve the value of their assets pending the Asset Sales.  After thorough

analysis by the Debtors and their advisors, they have concluded that the terms of the AFI DIP

Facility are reasonable and appropriate under the circumstances.

    50.  Bankruptcy courts routinely defer to a debtor's business judgment in

considering whether to approve the debtor's request to obtain postpetition financing.  See e.g., In

re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y.

June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request

for financing does not 'leverage the bankruptcy process' and unfairly cede control of the

reorganization to one party in interest."); In re Ames Dep't Stores, Inc., 115 B.R. at 40 (The

court should defer to debtor's "reasonable business judgment . . . so long as the financing

agreement does not . . . leverage the bankruptcy process . . ."  and its purpose is to benefit the

estate rather than another party-in-interest.).

    51.  The Debtors exercised their reasonable business judgment in determining

that the AFI DIP Facility is the best financing option available under the present circumstances,

and the Debtors have satisfied the legal requirements to incur the AFI DIP Obligations on the

terms and conditions set forth in the AFI LOC Amendment.  The interest rates under the AFI

DIP Facility are the same as those under the Term A-1 Loans provided under the Barclays DIP

Facility. The Debtors are not paying any fees to AFI in connection with the AFI DIP Facility, and the only priming liens proposed are ones on which AFI is priming itself. The AFI DIP Facility is essentially funding the purchase of new collateral because the Debtors will use the AFI DIP Loans to purchase the Ginnie Mae Loans, which serve as the new collateral securing the AFI DIP Facility. The Debtors believe that the AFI LOC Amendment contains terms that are fair, reasonable and in the best interests of the Debtors and their estates. Accordingly, the Debtors respectfully submit that they should be authorized to enter into the AFI LOC Amendment and obtain access to the AFI DIP Facility from the AFI Lender on the terms described herein.

## II.    The AFI DIP Lender is Entitled to the Protections Under Section 364(e) of the Bankruptcy Code

52.    Section 364(e) of the Bankruptcy Code, which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal." Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493 (11th Cir. 1992)). See also White Rose Food v. General Trading (In re Clinton St. Food Corp., 170 B.R. 216, 220 (S.D.N.Y. 1994) (Section 364(e) "overcome[s] parties' reluctance to lend to a bankrupt firm . . ."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.), 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

53.     The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable and are the best possible terms on which the Debtors could obtain postpetition financing.  The AFI DIP Loan has been negotiated in good faith and at arm's length among the Debtors and the AFI DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the AFI DIP Loan, including (i) all future draws remitted to the AFI LOC Borrowers pursuant to the AFI DIP Loan, and (ii) any other AFI DIP Obligations, shall be deemed to have been extended by the AFI DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

54.     Accordingly, AFI should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code with respect to the AFI DIP Facility, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed, or terminated by subsequent order of this or any other Court, AFI will be fully protected with respect to any amounts previously disbursed.

## III.    The Debtors Should be Authorized to Obtain Postpetition Financing Secured by Priming Liens

55.     If the incentives available under Section 364(c) are insufficient to attract post-petition financing, a bankruptcy court may authorize post-petition credit under Section 364(d) secured by a senior or *pari passu* lien on encumbered property (i.e., a "priming" lien) without consent from the affected lienholders if (i) the debtor cannot otherwise obtain credit and (ii) the interests of the existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1);

32

In re 495 Cent. Park Ave. Corp., 136 B.R. at 630-31; In re Aqua Assocs., 123 B.R. 192, 196
(Bankr. E.D. Pa. 1991).

56.    While it is true that, in this case, the Debtors cannot obtain credit without
priming liens and the interests of the primed lienholders are adequately protected, it is important
to note first and foremost that AFI, in its capacity as AFI Lender under the AFI DIP Facility, is
priming itself, AFI, in its capacity as lender under the AFI LOC.  In addition, AFI in its capacity
as lender under the AFI LOC has consented to the adequate protection package proposed herein.

**IV.    The Use of Cash Collateral is Necessary**

57.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not
use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or
(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the
provisions of this section." 11 U.S.C. § 363(c)(2).

58.    It is essential that the Debtors obtain authority to use Cash Collateral to
fund their day-to-day operating expenses, including payments to remaining employees and other
expenses necessary to preserve and maximize the value of the Debtors' servicing business and
other assets pending one or more sales.  In particular, the Debtors must use Cash Collateral to
fund servicing Advances that are required to be made by the Debtors pursuant to the related
servicing agreements.  Indeed, absent sufficient funds to support the Debtors' servicing business,
the value of that asset will quickly erode.  Accordingly, authorization to use Cash Collateral is in
the best interests of the Debtors' estates and creditors.

59.    In addition, the Adequate Protection Parties have consented to the
Debtors' continued use of Cash Collateral pursuant to the terms of the DIP/CC Orders.  Thus, the
Court has authority to enter such orders pursuant to section 363(c)(2) of the Bankruptcy Code.

60.    Furthermore, as described in greater detail below, the urgent need for the use of Cash Collateral pending the final hearing is critical.  The Debtors have an immediate need to obtain the financing available under the AFI DIP Loan in order to permit the orderly continuation of the operation of their businesses, including continuing to meet the Ginnie Mae Obligations to ensure their compliance with the GNMA Mae Guide and maintain their current issuer status.  The Debtors and their estates will suffer irreparable harm if such use is not immediately authorized.  The Debtors submit that the terms and conditions set forth in the Interim Order are, taken as a whole, fair and reasonable under the circumstances, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

## V.    The Interests of the Adequate Protection Parties are Adequately Protected

61.    Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Adequate Protection Parties are entitled to adequate protection of their interests in the Cash Collateral for, and equal in amount to, the aggregate diminution in the value of such parties' security interests in the Cash Collateral as a result of the Debtors' use, sale or lease of Cash Collateral.  See 11 U.S.C. § 363(e) ("on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.").

62.    What constitutes adequate protection is determined on a case-by-case basis.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . .") (citation and quotation omitted); In re Realty Southwest Assoc., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992).  Although the Bankruptcy Code does not define the term "adequate protection," it provides a non-

exhaustive list of types of adequate protection, including "other relief" resulting in the

"indubitable equivalent" of the secured creditor's interest in such property.  See 11 U.S.C. § 361.

Specifically, section 361 of the Bankruptcy Code provides the following non-exclusive examples

of what may constitute adequate protection:

> (1)    requiring the trustee to make a cash payment or periodic
> cash payments to such entity, to the extent that the . . . use . . . under
> section 363 . . . results in a decrease in the value of such entity's interest in
> such property;

> (2)    providing to such entity an additional or replacement lien to
> the extent that such . . . use . . . results in a decrease in the value of such
> entity's interest in such property; or

> (3)    granting such other relief . . . as will result in the realization
> by such entity of the indubitable equivalent of such entity's interest in
> such property.

11 U.S.C. § 361.  Essentially, the Bankruptcy Code intends "adequate protection" to shield a

secured creditor from diminution in the value of its interest in the particular collateral during the

period of use by the debtor.  See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631

(Bankr. S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured

creditor from diminution in value of its interest during the Chapter 11 case); Save Power Ltd. v.

Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.), 193 B.R. 713, 716 (Bankr.

D. Del. 1996) (holding creditor adequately protected if no diminution in value of collateral).

63.    Here, the Debtors believe that the Adequate Protection Parties are

adequately protected in several ways in connection with the Debtors' proposed use of Cash

Collateral.  First, the Adequate Protection Parties will be granted replacement liens and

additional liens related to the use of their Cash Collateral.  Second, the Adequate Protection

Parties will be adequately protected by the superpriority administrative expense claims granted

by the Debtors.  Third, AFI will receive Adequate Protection Payments consisting of current

interest paid at the non-default rate set forth in the applicable loan documents, and the Junior

Secured Noteholders will receive the payment of their advisors' fees and expenses.

64.    The proposed use of Cash Collateral also will preserve or enhance the

value of the Adequate Protection Parties' collateral, thereby providing adequate protection to the

Adequate Protection Parties.  As set forth above, the Cash Collateral will be used only to fund

the Debtors' operations related to their respective collateral pools, including the payment of

servicing Advances and related fees.  By continuing to originate and service mortgage loans that

serve as collateral under the AFI Senior Secured Credit Facility, the AFI LOC, and the Junior

Secured Notes, the value of those mortgage loans will be preserved.

65.    Moreover, the Debtors believe that the sale of the servicing platform will

yield a significant return for their estates.  In fact, the Debtors have already entered into an asset

purchase agreement with Nationstar to buy their mortgage loan origination and loan servicing

businesses in connection with a plan of reorganization and/or in accordance with bidding and

auction procedures and subject to higher or better bids, as described above.  As a condition to

closing, Nationstar requires that the Debtors maintain their servicing operations until the sale is

consummated.  If the underlying mortgage loans could not be serviced, however, there would be

a precipitous decline in the value of the Adequate Protection Parties' collateral.  The Court's

authorization of the use of Cash Collateral, therefore, will protect the Adequate Protection

Parties' security interests by preserving the value of their collateral.  See In re Salem Plaza

Assoc., 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was

adequately protected when cash collateral was used to pay necessary operating expenses);In re

Pursuit Athletic Footwear, 193 B.R. at 717-18 (holding that a showing that the debtors could

operate profitably postpetition demonstrated adequate protection); In re 495 Cent. Park Ave.

Corp., 136 B.R. at 631 (holding that a prepetition secured creditor was adequately protected

because "the value of the debtor's property [would] increase as a result of the renovations funded

by the proposed financing"); In re Constable Plaza Assocs., 125 B.R. 98, 105 (Bankr. S.D.N.Y.

1991) (observing that debtor's use of rents to maintain and operate property "will serve to

preserve or enhance the value of the building which, in turn, will protect the collateral covered

by [the secured lender's] mortgage."); In re Pine Lake Vill. Apartment Co., 16 B.R. 750, 756

(Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's collateral

. . . clearly ensures that the plaintiff-mortgagee's investment is adequately protected.").

          66.        Additionally, the Debtors believe that AFI, in its capacity as lender under

the AFI LOC, will be adequately protected through the existence of a substantial equity cushion

in its collateral. After giving effect to the AFI DIP Facility, the Debtors will have borrowed up

to $530 million under the AFI LOC, which amounts are secured by collateral valued at

approximately $1.6 billion, plus the value attributable to the Ginnie Mae Loans repurchased

using the AFI DIP Loans. It is highly unlikely that AFI will harmed by any diminution of the

value of the AFI LOC Cash Collateral by the Debtors' use thereof. As several courts have held,

the presence of an equity cushion in encumbered collateral is itself a form of adequate protection.

See In re Realty Southwest Assoc., 140 B.R. 360, 366-67 (Bankr. S.D.N.Y. 1992) (holding that

creditor was adequately protected pursuant to Bankruptcy Code section 363(e) because of

substantial equity cushion); In re Am. Consol. Transp. Cos., No. 09 B 26062 2010 Bankr. LEXIS

3144 at *11-12 (Bankr. N.D. Il. Sept. 10, 2010) (finding adequate protection where there was a

substantial equity cushion in the debtors' property, including the debtors' real estate, buses,

inventory, and cash); In re Dynaco Corp., 162 B.R. 389, 398 (Bankr. D. N.H. 1993). See also

Capital Commc'ns. Fed. Credit Union v. Boodrow (In re Boodrow), 126 F.3d 43, 53 (2d Cir.

1997) ("[I]n determining whether a creditor's interest in a debtor's property is adequately

protected, most courts engage in an analysis of the property's 'equity cushion.'") (citation and

internal quotation marks omitted)); In re New Era Co., 125 B.R. 725, 728 (S.D.N.Y. 1991) ("[I]t

is clear that one way to assure [adequate] protection is to have an `equity cushion.'").

       67.     The Debtors also believe that AFI, in its capacity as lender under the AFI

Senior Secured Credit Facility, and the Junior Secured Noteholders are adequately protected

under the terms of the Interim Order.  When viewed as a whole, the AFI Senior Secured Credit

Facility and the Junior Secured Notes are undersecured.  To protect against any diminution in the

value of the collateral underlying these facilities, the Debtors have granted Adequate Protection

Liens on (i) the AFI Senior Secured Credit Facility collateral, (ii) the AFI LOC collateral, and

(iii) the equity interests of GMACM Borrower LLC and RFC Borrower LLC, each a debtor in

these Chapter 11 cases and borrower under the Barclays DIP Facility.  The prepetition liens of

the AFI Senior Secured Credit Facility and the Junior Secured Notes covered a substantial

majority of the Debtors' assets, and included equity pledges of the preferred shareholders of the

GSAP Transferor and a lien on the Debtors' residual value under the BMMZ Repo Facility.

Once the BMMZ Repo Facility is refinanced by the Barclays DIP Facility, AFI and the Junior

Secured Noteholders could potentially lose the value of their "equity" interests in BMMZ and the

GSAP Transferor.  Accordingly, the Debtors agreed to give AFI and the Junior Secured

Noteholders equity pledges of the borrowers under the Barclays DIP Facility, which will

essentially preserve any interests they may have had with respect to the facilities being

refinanced by the Barclays DIP Facility.

ny-1021268

68.    For the foregoing reasons, the Debtors' requested use of Cash Collateral and the protections provided to the Adequate Protection Parties are reasonable, appropriate, and sufficient to satisfy the legal standard of "adequate protection."

## VI.    Support for Modification of the Automatic Stay

69.    As set forth more fully in the proposed Interim Order, the Debtors propose to grant (i) AFI in its capacity as AFI Lender under the AFI DIP Facility, and (ii) AFI in its capacity as lender under the prepetition AFI LOC and AFI Senior Secured Credit Facility limited relief from the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit AFI, in its sole discretion, to take certain actions permitted or required under the applicable loan documents and to enforce certain remedies against the collateral securing the AFI Senior Secured Credit Facility and the AFI LOC without having to obtain any further order of this Court.  The Interim Order further provides that, prior to the exercise of any enforcement or liquidation remedies, AFI shall be required to give seven (7) days' written notice to each of counsel for the Debtors and counsel for the Creditors' Committee and the United States Trustee.

70.    The Debtors submit that stay modification provisions such as these are ordinary and usual features of adequate protection and, in the Debtors' business judgment, are reasonable under the present circumstances.

71.    The Debtors submit that stay modification provisions such as these are ordinary and usual features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  See e.g., In re Eastman Kodak Co., No. 12-10202 (Bankr. S.D.N.Y. Jan. 20, 2012) (interim order) (Docket No. 54); In re Hostess Brands Inc., No. 12-22052 (Bankr. S.D.N.Y. Jan. 12, 2012) (interim order) (Docket No. 63); In re Gen. Mar. Corp., No. 11-15285 (Bankr. S.D.N.Y. Nov. 18, 2011) (interim order) (Docket No. 32); In re The Great Atl. & Pac. Tea Co., No. 10-24549 (Bankr. S.D.N.Y. Dec. 13, 2010)

(interim order) (Docket No. 43); In re Boston Generating, LLC, No. 10-14419 (Bankr. S.D.N.Y.

Aug. 20, 2010) (interim order) (Docket No. 56); In re Lear Corp., No. 09-14326 (Bankr.

S.D.N.Y. July 7, 2009) (interim order) (Docket No. 59); In re Gen. Growth Props. Inc., No. 09-

11977 (Bankr. S.D.N.Y. Apr. 17, 2009) (interim order) (Docket No. 44).  Accordingly, the

Debtors respectfully request that the Court authorize the modification of the automatic stay in

accordance with the terms set forth in the DIP/CC Orders and the AFI LOC Amendment.

## VII.    Interim Approval Should be Granted

72.    Bankruptcy Rule 4001(b)(2) provides that:

> The court may commence a final hearing on a motion for authority to
> obtain credit no earlier than 14 days after service of the motion. If the
> motion so requests, the court may conduct a hearing before such 14 day
> period expires, but the court may authorize the obtaining of credit only to
> the extent necessary to avoid immediate and irreparable harm to the estate
> pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2).  Similarly, to the extent the Debtors are seeking authority to sell,

use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003

provides that the Court may only grant immediate relief to the extent it is necessary to avoid

immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).

73.    Generally, courts find "immediate and irreparable harm" exists where loss

of the business threatens ability to reorganize.  See In re Ames Dep't Stores, Inc., 115 B.R. at 36

n.2.  Approval of the use of cash collateral on an interim basis under Rule 4001(c)(2) is left to

the discretion of the court as informed by the facts of each case.  In examining requests for

interim relief under this rule, courts apply the same business judgment standard applicable to

other business decisions, and a debtor should be entitled to borrow those amounts that it believes

prudent in the operation of its business.  See e.g., In re Eastman Kodak Co., No. 12-10202

(ALG) (Bankr. S.D.N.Y. Jan. 20, 2012) (Docket No. 54); In re Hostess Brands, Inc., No. 12-

22052 (RDD) (Bankr S.D.N.Y. Jan. 12, 2012) (Docket No. 63); <u>In re Gen. Mar. Corp.</u>, No. 11-15285 (MG) (Bankr. S.D.N.Y. Nov. 18, 2011) (Docket No. 32); <u>In re MF Global Holdings Ltd.</u>, No. 11-15059 (MG) (Bankr. S.D.N.Y. Nov. 2, 2011) (Docket No. 24); <u>In re Borders Group, Inc.</u> No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 17, 2011) (Docket No. 69); <u>In re The Great Atl. & Pac. Tea Co.</u>, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (Docket No. 43).

74.      The Debtors seek expedited approval of the relief requested in this Motion in light of the immediate and irreparable harm that the Debtors' estates will incur unless they obtain the liquidity necessary to sustain their businesses.  Indeed, the Debtors anticipate that they will need to use the funds provided by the AFI DIP Facility and the Cash Collateral as soon as practicable after the Interim Order is entered in order to fund their operations, including the payment of servicing Advances on the mortgage loans that secure the AFI Senior Secured Credit Facility, the AFI LOC, and the Junior Secured Notes, and to pay other expenses related to the operations of the respective collateral pools necessary to preserve and maximize the value of the Debtors' assets during the crucial first days of their reorganization efforts and the pendency of the Debtors' Chapter 11 cases.  Indeed, absent sufficient liquidity to support the Debtors' servicing business, the Debtors' assets will quickly erode to the detriment of the Debtors' estates, the borrowers of the mortgage loans, and investors.  For the reasons set forth above, the Debtors submit that immediate access to the AFI DIP Facility and the use of Cash Collateral is necessary to preserve the value of the Debtors' estates for the benefit of their creditors and other parties-in-interest.

75.      Courts in this jurisdiction have granted similar relief in other Chapter 11 cases.  <u>See, e.g.</u>, <u>In re Eastman Kodak Co.</u>, No. 12-10202 (Bankr. S.D.N.Y. Jan. 20, 2012) (Docket No. 54) (order approving use of cash collateral on an interim basis); <u>In re Hostess</u>

Brands Inc., No. 12-22052 (Bankr. S.D.N.Y. Jan. 12, 2012) (Docket No. 63) (same), In re

General Maritime Corp., No. 11-15285 (Bankr. S.D.N.Y. Nov. 18, 2011) (Docket No. 32)

(same); In re MF Global Holdings Ltd., No. 11-15059 (MG) (Bankr. S.D.N.Y. Nov. 2, 2011)

(Docket No. 24) (same); In re The Great Atl. & Pac. Tea Co., No. 10-24549 (Bankr. S.D.N.Y.

Dec. 13, 2010) (Docket No. 43) (same); In re Boston Generating., LLC, No. 10-14410 (Bankr.

S.D.N.Y. Aug. 20, 2010) (Docket No. 56) (same); In re Chemtura Corp., No. 09-11233 (Bankr.

S.D.N.Y. March 20, 2009) (Docket No. 58) (same); In re Lyondell Chem. Co., No. 09-10023

(Bankr. S.D.N.Y. Jan. 8, 2009) (Docket No. 79) (same).

## VIII.    Request for Immediate Relief and Waiver of Stay

76.    Bankruptcy Rule 6003 generally precludes the Court from authorizing

certain relief until twenty-one days after the petition is filed, except to the extent necessary to

prevent "immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that

Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the

interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to

the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief

requested in this Motion be entered on an interim basis.

77.    To successfully implement the foregoing, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy

Rule 6004(h).

78.    Therefore, the Debtors request that this Court (i) conduct an expedited

hearing on this Motion, (ii) grant the relief sought in this Motion on an interim basis and enter

the Interim Order, (iii) schedule the Final Hearing on this Motion, and (iv) establish notice and

objection procedures in respect thereof in accordance with Bankruptcy Rule 4001(c).

## NOTICE

79.    Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for the Debtors' outstanding notes issuances; (i) the Administrative Agent and its counsel; (j) the Collateral Agent; (k) Barclays Bank PLC ("Barclays"), as the Administrative Agent under the Barclays DIP Facility; (l) The Bank of New York Mellon, as indenture trustee under the Pre-Petition GSAP Facility; (m) Ally Financial Inc. and its counsel, Kirkland & Ellis LLP; (n) Ally Bank and its counsel, Kirkland & Ellis LLP; (o) Citibank, N.A. as secured lender under the MSR Facility; (p) U.S. Bank National Association, as trustee for the Prepetition Junior Secured Notes (q) Wells Fargo Bank, N.A., as collateral agent for the Prepetition Junior Secured Notes, as collateral agent for the Ally Senior Secured Credit Facility, and as collateral control agent under the Intercreditor Agreement, dated as June 6, 2008; (r) BMMZ, as buyer under the Pre-Petition Ally Repo Facility; (s) Fannie Mae; (t) Freddie Mac; (u) Ginnie Mae; (v) servicers and sub-servicers under the Designated Servicing Agreements and the Specified Servicing Agreements (each term as defined in the Cash Collateral Orders); (w) the MBS Trustees (as defined in the DIP Credit Agreement); (x) Nationstar Mortgage LLC and its counsel; and (y) the parties included on the Debtors' list of fifty (50) largest unsecured creditors (collectively, the "Initial Notice Parties").

80.    Within two (2) days after entry of the Interim Order, the Debtors propose

to serve a copy of the Motion and the Interim Order upon the Initial Notice Parties.  The Debtors

request that the Court schedule the Final Hearing on the Motion for a date that is as soon as

practicable, but in no event later than forty-five (45) days following the entry of the Interim

Order, and establish the date prior to the Final Hearing for parties to file objections to the

Motion.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an

interim order substantially in the form attached hereto as <u>Exhibit A</u>, granting certain of the relief

sought herein immediately; (ii) enter a final order granting the relief sought herein on a final

basis; and (iii) grant such other and further relief to the Debtors as the Court may deem just and

proper.

Dated:  May 14, 2012
        New York, New York

*/s/*    Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

# **EXHIBIT A TO THE MOTION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 12- |
| | ) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,[1] | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**INTERIM ORDER UNDER**
**SECTIONS 105, 361, 362, 363, AND 364 OF THE BANKRUPTCY**
**CODE AND BANKRUPTCY RULES 2002, 4001, 6004, AND 9014 (I)**
**AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING**
**ON A SECURED SUPERPRIORITY BASIS, (II) AUTHORIZING THE DEBTORS**
**TO USE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION**
**TO ADEQUATE PROTECTION PARTIES AND (IV) PRESCRIBING THE FORM**
**AND MANNER OF NOTICE AND SETTING TIME FOR THE FINAL HEARING**

Upon the motion, dated May ___, 2012, (the "***Motion***") [2] of the above-captioned debtors

and debtors in possession (collectively, the "***Debtors***") filed in these chapter 11 cases (the

"***Chapter 11 Cases***")[3] for entry of interim and final orders under sections 105, 361, 362, 363(c),

and 364 of title 11 of the United States Code (the "***Bankruptcy Code***"), and Rules 2002, 4001,

---

[1]    The Debtors are:  Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Motion.

[3]    These Chapter 11 Cases were commenced on May ___, 2012 (the "***Petition Date***").

K&E 22457667

6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),
seeking:

(I)    authorization for

(a) GMAC Mortgage, LLC and Residential Funding Company, LLC
(collectively, the "**Borrowers**") to use Cash Collateral and all other Prepetition
Collateral (each as defined below) pursuant to sections 361, 362 and 363 of the
Bankruptcy Code, as set forth herein;

(b) the Debtors to provide adequate protection to Ally Financial Inc.
("**AFI**")

(x) as lender under the Amended and Restated Credit Agreement,
dated as of December 30, 2009 (as amended, supplemented or otherwise
modified, the "**AFI Revolver Loan**"), among the Borrowers, Residential
Capital, LLC, GMAC Residential Holding Company, LLC,  GMAC-RFC
Holding Company, LLC, and Homecomings Financial, LLC (together
with certain other affiliates of the Borrowers as guarantors or obligors,
collectively, the "**AFI Revolver Guarantors**"), AFI as initial lender (the
"**AFI Revolver Lender**") and agent for the AFI Revolver Lender, and
Wells Fargo Bank, N.A., as First Priority Collateral Agent, and

(y) as secured party under the Amended and Restated First Priority
Pledge and Security Agreement and Irrevocable Proxy dated as of
December 30, 2009 (as amended, supplemented or otherwise modified, the
"**AFI Revolver Security Agreement**," and together with the AFI Revolver
Loan, collectively, the "**AFI Revolver**"), among the Borrowers, the AFI

Revolver Guarantors and certain other affiliates of the Borrowers, the AFI

Revolver Lender, as agent for the AFI Revolver Lender, and Wells Fargo

Bank, N.A. as First Priority Collateral Agent and Collateral Control

Agent;

(c) the Debtors to provide adequate protection to AFI

(x) as lender under the Amended and Restated Loan Agreement,

dated as of December 30, 2009 (as amended, supplemented or otherwise

modified, the "**AFI LOC Loan**"), by and among GMAC Mortgage, LLC

and Residential Funding Company, LLC, as borrowers (in such capacity,

the "**AFI LOC Borrowers**"), Residential Capital, LLC, RFC Asset

Holdings II, LLC, Passive Asset Transactions, LLC, GMAC Residential

Holding Company, LLC, GMAC-RFC Holding Company, LLC,

Homecomings Financial, LLC, and Equity Investment I, LLC as

guarantors (the "**AFI LOC Guarantors**"), AFI as lender (the "**AFI LOC

Lender**" and, together with the AFI Revolver Lender, collectively, the

"**AFI Lender**") and agent for the AFI LOC Lender, and

(y) as a secured party under the Amended and Restated Pledge and

Security Agreement and Irrevocable Proxy (as amended, supplemented or

otherwise modified, the "**AFI LOC Security Agreement**," and together

with the AFI LOC Loan, collectively, the "**AFI LOC**"), dated as of

December 30, 2009, among the Borrowers and the AFI LOC Guarantors,

and the AFI LOC Lender, GMAC Investment Management, LLC, as

secured parties; and

3

(d) the Debtors to provide adequate protection to the holders (the "*Junior Secured Noteholders*") of the 9.625% Junior Secured Guaranteed Notes due 2015 (the "*Junior Secured Notes*") issued under that certain Indenture (the "*Indenture*" and, together with the Junior Secured Notes, the Security Documents (as defined in the Indenture) and all other documents executed in connection therewith, the "*Junior Secured Notes Documents*") dated as of June 6, 2008, among Residential Capital, LLC, as issuer, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, GMAC Mortgage, LLC, Residential Funding Company, LLC, and Homecoming Financial, LLC as guarantors (the "*Junior Secured Notes Guarantors*" and, together with the AFI Revolver Guarantors and the AFI LOC Guarantors, the "*Guarantors*"), and U.S. Bank National Association, as trustee (the "*Trustee*") for the benefit of the Junior Secured Noteholders; (ii) the Trustee, as trustee under the Indenture; and (iii) Wells Fargo Bank, N.A., as collateral agent under the Junior Secured Note Documents (the "*Collateral Agent*" and, together with the Junior Secured Parties and the Trustee, the "*Junior Secured Parties*").  All obligations of the Debtors arising under the Junior Secured Notes Documents shall collectively be referred to herein as the "*Junior Secured Notes Obligations*";

(II)     authorization for the Debtors' waiver and release of any right to surcharge against the Prepetition Collateral (hereinafter defined) and the AFI DIP Loan Collateral (hereinafter defined) pursuant to section 506(c) of the Bankruptcy Code, as set forth herein;

(III)     authorization for the Debtors' waiver and release of any right to seek a court order invalidating or otherwise voiding AFI Lender's and the Junior Secured Parties'

security interests in their respective collateral pursuant to section 552(b)(1) of the Bankruptcy Code, as set forth herein;

(IV)    authorization for the AFI LOC Borrowers to request postpetition draws under the AFI LOC in an aggregate principal amount not to exceed $150 million, no more than $85 million of which will be available upon the entry of the Interim Order (as hereinafter defined) and the balance of which will be available upon the entry of the Final Order (as hereinafter defined), *provided* that up to an additional $70 million in postpetition draws may be made available to the AFI LOC Borrowers under the AFI LOC if the AFI LOC Borrowers and AFI agree upon written mutually satisfactory terms for such incremental $70 million before the Final Hearing, *provided further* that the aggregate amount of AFI LOC prepetition and postpetition draws (plus any unpaid, interest, expenses or other costs payable thereunder) may not exceed $600 million (the "*AFI DIP Loan*") pursuant to the terms of the Eighth Amendment to the AFI LOC (the "*AFI LOC Amendment*"), the principal terms of which are included on the term sheet that is attached the Motion as **Exhibit A**, and the terms of the Interim Order and Final Order (as hereinafter defined); and

(V)    authorization for the AFI LOC Borrowers to execute the AFI LOC Amendment, and perform such other and further acts as may be required in connection with the AFI LOC Amendment and the AFI LOC;

(VI)    the grant of superpriority administrative expense claims to the AFI Lender in its capacity as the lender under the AFI DIP Loan (in such capacity, the "*AFI DIP Lender*");

(VII)    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "*Interim Hearing*") for this Court to consider entry of the interim order (the "*Interim Order*") in substantially the form annexed to the Motion authorizing the Borrowers (collectively, the

"**Loan Parties**") to (a) use Cash Collateral and granting adequate protection to AFI Lender and the Junior Secured Parties (collectively, as applicable, the "**Adequate Protection Parties**"), and (b) to obtain postpetition secured superpriority financing under the AFI DIP Loan to fund, in a manner consistent with past practices, the repurchase of whole loans from Ginnie Mae pools in order to (i) avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (ii) effect foreclosures, conveyances or other normal course loss mitigation activities with respect to the related properties in connection with the submission of HUD Claims (as hereinafter defined), and (iii) allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified, in each case, pursuant to the terms of the Interim Order and the Final Order;

(VIII) to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "**Final Hearing**") for this Court to consider entry of the final order (the "**Final Order**") in substantially the form annexed to the Motion authorizing the Loan Parties on a final basis to use Cash Collateral and obtain the AFI DIP Loan, and providing such additional relief on a final basis as set forth therein.

**WHEREAS**, the Interim Hearing was held by this Court on _____, 2012 at _:___ _.m.

**NOW THEREFORE**, upon the record established at the Interim Hearing, and all objections to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court, and after due deliberation and consideration, and sufficient cause appearing therefor;

6

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.     *Jurisdiction.*  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     *Notice.*  Notice of the Motion, the relief requested therein and the Interim Hearing was given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the Administrative Agent and its counsel; (h) the Collateral Agent; (i) Barclays Bank PLC ("***Barclays***"), as the Administrative Agent under the Barclays DIP Facility; (j) The Bank of New York Mellon, as indenture trustee under the Pre-Petition GSAP Facility; (k) Barclays Bank PLC, as administrative agent under the Pre-Petition GSAP Facility; (l) Ally Financial, Inc. and its counsel, Kirkland & Ellis LLP; (m) Ally Bank and its counsel, Kirkland & Ellis LLP; (n) Citibank, N.A. as secured lender under the MSR Facility; (o) U.S. Bank National Association, as Trustee for the Junior Secured Notes, and its counsel, Kelley Drye & Warren LLP, as collateral agent for the Prepetition Junior Secured Notes, as collateral agent for the Prepetition Ally Revolver, and as collateral control agent under the Intercreditor Agreement, dated as June 6, 2008; (q) BMMZ, as buyer under the Pre-Petition Ally Repo Facility; (r) Fannie Mae; (s) Freddie Mac; (t) Ginnie Mae; (u) servicers and sub-servicers under the Designated Servicing Agreements and the Specified Servicing Agreements (each term as defined in the DIP Credit Agreement); (v) the MBS Trustees (as defined in the DIP Credit Agreement); (x) Nationstar Mortgage LLC and its counsel; and (y) the parties included on the

7

K&E 22457667

Debtors' list of fifty (50) largest unsecured creditors (collectively, the "**Notice Parties**").  The Court finds that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

3.    *Debtors' Stipulations.*  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraph 28 below), the Debtors admit, stipulate and agree that:

(a)    the Debtors' proposed chapter 11 plan (the "**Plan**") incorporates a settlement between AFI and the Debtors of all claims held by AFI and Ally Bank (together with their subsidiaries and affiliates, excluding Residential Capital, LLC and its subsidiaries, "**Ally**") against the Debtors, and of all claims held by the Debtors against Ally, as set forth in the Settlement and Plan Sponsor Agreement dated as of May 14, 2012 (the "**Ally Settlement Agreement**"), and the Debtors have agreed to use commercially reasonable efforts to seek this Court's approval of the Plan (and the Ally Settlement Agreement, whether under the Plan or otherwise);

(b)    As of the Petition Date, the aggregate principal amount outstanding (i) under the AFI Revolver was at least $749,000,000, (ii) under the AFI LOC was at least $380,000,000, and (iii) under the Junior Secured Notes Documents was at least $2,120,452,000, in each case plus accrued and unpaid interest thereon, reimbursement obligations in respect thereof and additional fees and expenses and other amounts now or hereafter due under the Junior Secured Notes Documents (including any fees and expenses of the Junior Secured Parties' attorneys and financial advisors that are chargeable or reimbursable under the Junior Secured Notes Documents) and other obligations incurred in connection therewith (collectively, the "**Prepetition Obligations**");

(c)    the Junior Secured Notes Obligations constitute legal, valid and binding obligations of the Loan Parties, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);

(d)    no portion of the Junior Secured Notes is subject to avoidance, recharacterization, recovery, subordination, setoff, or counterclaim pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(e)    the Debtors have granted liens and security interests to the AFI Lender pursuant to and in connection with the AFI LOC, including the liens and security interests in

(x) certain of the accounts described in the *Amended Interim Order (A) Authorizing, But Not Directing, the Debtors to Continue Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Continued Investment of Excess Funds in Investment Accounts and (D) Authorizing Continued Intercompany Arrangements and Historical Practices*, which was entered by this Court on _____, 2012 [Docket No. ___] (the "**Interim Cash Management Order**"), and

(y) in the other personal and real property constituting "Collateral" under, and as defined in, the AFI LOC (the "**AFI LOC Collateral**"), and such liens and security interests are presently subject and subordinate only to (A) the Carve Out, as defined in paragraph 14(g), (B) certain liens and security interests granted to secure the Adequate Protection Obligations (as defined in paragraph 14 below), and (C) certain liens and security interests granted to secure the AFI DIP Loan;

(f)    the Debtors have granted liens and security interests to the AFI Lender pursuant to and in connection with the AFI Revolver, including the liens and security interests in

certain of the accounts described in the Interim Cash Management Order, and in the other personal and real property constituting "Collateral" under, and as defined in, the AFI Revolver (the "*AFI Revolver Collateral*," and together with the AFI LOC Collateral, collectively, the "*AFI Lender Collateral*"), and such liens and security interests are presently subject and subordinate only to (A) the Carve Out, as defined in paragraph 14(g), and (B) certain liens and security interests granted to secure the Adequate Protection Obligations (as defined in paragraph 14 below);

(g)    the liens and security interests granted to the Junior Secured Parties pursuant to the Junior Secured Notes Documents and in connection with Junior Secured Notes (the "*Junior Secured Notes Liens*") are valid, binding, perfected, and enforceable first priority liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the Junior Secured Notes Documents (together with the AFI Lender Collateral, the "*Prepetition Collateral*") and (i) were granted to, or for the benefit of, the Junior Secured Parties for fair consideration and reasonably equivalent value; (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iii) are subject and subordinate only to (A) the liens and security interests granted to the AFI Lender under the AFI Revolver, all subject to the terms and conditions of the Intercreditor Agreement, dated as of June 6, 2008 (as amended, the "*Intercreditor Agreement*" and, together with the instruments and agreement evidencing or providing for the issuance of the Prepetition Obligations, the "*Existing Agreements*"), (B) the Carve Out, and (C) the liens and security interests granted to secure the Adequate Protection Obligations (as defined in paragraph 14 below); and

(h)      the Collateral securing the Junior Secured Notes Obligations includes, among others, the categories of assets set forth on **Exhibit A** hereto;

(i)      no setoffs, recoupments, offsets, defenses or counterclaims to any of the Junior Secured Notes Obligations exist, and no portion of the Junior Secured Notes Obligations or any payments made to any or all of the Junior Secured Parties are subject to avoidance, recharacterization, recovery, subordination, attach, recoupment, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, except for the priming contemplated herein;

(j)      there are no claims, defenses, or causes of action against the Junior Secured Parties with respect to the Junior Secured Notes Documents (the "*Junior Secured Parties Claims*");

(k)      subject to the reservation of rights set forth in paragraph 25 below, each Debtor and its estate shall be deemed to have forever waived, discharged and released each of the Junior Secured Parties in their respective capacities as such and their respective affiliates, members, managers, equity security holders, agents, attorneys, financial advisors, consultants, officers, directors, and employees of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment, or other offset rights, whether arising at law or in equity, relating to and/or otherwise in connection with the Junior Secured Notes Obligations and the Junior Secured Notes Liens, or the debtor creditor relationship between the Junior Secured Parties and the Debtors, including, without limitation, (x) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law, and (y) any right or basis to challenge or object to the amount,

11

validity or enforceability of the Junior Secured Notes Obligations, or the validity, enforceability, priority or non-avoidability of the Junior Secured Notes Liens securing the Junior Secured Notes Obligations;

(l)        the Adequate Protection Parties retain, and have not waived or otherwise prejudiced, any of their rights, claims, defenses or counterclaims at law or in equity with respect to the Debtors or any other Person or Governmental Unit (each such term as defined in the Bankruptcy Code); and

(m)        prior to the Petition Date, the AFI LOC Borrowers funded the repurchase of whole loans (the "**_Repurchased Loans_**") from Ginnie Mae pools in order (i) to avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (ii) to effect foreclosures, conveyances or other normal course loss mitigation activities of the related properties in connection with the submission of HUD Claims (as defined below), and (iii) to allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified (collectively, the "**_GNMA Buyouts_**"), and for additional reasons determined at the Debtors' discretion.  Following the GNMA Buyouts, the AFI LOC Borrowers submit a claim to the Secretary of the U.S. Department of Housing and Urban Development (such a claim, a "**_HUD Claim_**") for payments of amounts related to the Repurchased Loans insured by the Federal Housing Administration (the "**_FHA_**") or guaranteed by the U.S. Department of Veterans Affairs ("**_VA_**"), as applicable.  Following a period of review and processing of a HUD Claim, it is typically converted to cash that is remitted to the AFI LOC Borrowers.  The AFI LOC Borrowers will continue to fund GNMA Buyouts with the proceeds of the AFI DIP Loan on a postpetition basis and with Cash Collateral (as hereinafter defined) under the AFI Revolver Loan and submit HUD Claims in the ordinary course of business.

12

4.      *Certain Findings Regarding the Use of Cash Collateral and the AFI DIP Loan.*

(a)      Good cause has been shown for entry of this Interim Order.  The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the use of Cash Collateral.  The use of Cash Collateral, will, therefore, help preserve the going concern value of the Debtors and their estates and will enhance the prospects for successful Chapter 11 Cases.

(b)      The Debtors have an immediate need to obtain the financing available under the AFI DIP Loan in order to permit the orderly continuation of the operation of their businesses, including the continued funding of GNMA Buyouts to ensure their compliance with the GNMA Mae Guide and maintain their current issuer status.  The Debtors' access to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)      The Debtors are unable to obtain financing on more favorable terms from sources other than the AFI DIP Lender under the AFI DIP Loan.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the AFI DIP Lender, subject to the Carve Out (as defined below) as provided for herein, the AFI DIP Liens (as defined below) and the AFI Superpriority Claims (as defined below) upon the terms and conditions set forth in this Interim Order and in the AFI DIP Loan.

(d)      The terms of the AFI DIP Loan are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(e)    The AFI DIP Loan has been negotiated in good faith and at arm's length among the Debtors and the AFI DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the AFI DIP Loan, including (i) all future draws remitted to the AFI LOC Borrowers pursuant to the AFI DIP Loan, and (ii) any other obligations under the AFI DIP Loan (clauses (i) and (ii) collectively, the "**AFI DIP Obligations**"), shall be deemed to have been extended by the AFI DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)    Based on the record established in the Court at the Interim Hearing, the terms of the Debtors' use of Cash Collateral appear to be fair and reasonable, and reflect the Debtors' and their respective managers' and directors' exercise of prudent business judgment consistent with their fiduciary duties.  Entry of this Interim Order is in the best interests of the Debtors' estates and creditors.

(g)    The terms of the use of the Cash Collateral have been the subject of extensive negotiations conducted in good faith and at arm's-length among the Debtors and the Adequate Protection Parties, and the Adequate Protection Parties are found to have acted in "good faith" in connection with the negotiation and entry of this Interim Order, and are entitled to the protections provided to good faith lenders under section 364(e) of the Bankruptcy Code.

(h)    The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the AFI DIP

14

K&E 22457667

Loan in accordance with this Interim Order is therefore in the best interest of the Debtors' estates.

5.    *Authorization for the AFI LOC Amendment and for Continued Borrowings Under the AFI LOC*.

(a)    The Debtors are hereby authorized and directed to continue to perform under the AFI LOC. Further, the AFI LOC Borrowers are hereby authorized to execute the AFI LOC Amendment. Each of the AFI LOC Borrowers is hereby authorized to borrow money pursuant to the AFI DIP Loan, and the AFI DIP Loan Guarantors (as defined in the AFI LOC Amendment) are hereby authorized to unconditionally guaranty (on a joint and several basis) such borrowings and the AFI LOC Borrowers' joint and several obligations with respect to such borrowings up to an aggregate principal or face amount not to exceed $150 million, no more than $__ of which will be available upon the entry of this Interim Order and the balance of which will be available upon the entry of the Final Order, *provided* that up to an additional $70 million in postpetition draws may be made available to the AFI LOC Borrowers under the AFI LOC if the AFI LOC Borrowers and AFI agree upon written mutually satisfactory terms for such incremental $70 million before the Final Hearing, *provided further* that the aggregate amount of AFI LOC prepetition and postpetition draws (plus any unpaid, interest, expenses or other costs payable thereunder) authorized under the Final Order may not exceed $600 million.

(b)

(i)    the execution, delivery and performance of the AFI LOC Amendment;

(ii)      the performance of all other acts required under or in connection with the AFI DIP Loan pursuant to the AFI LOC, as amended by the AFI LOC Amendment (including the indemnity provisions contained therein).

(c)      Upon execution and delivery of the AFI LOC Amendment, the AFI DIP Loan shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms and this Order.  No obligation, payment, transfer or grant of security under the AFI DIP Loan or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      *AFI DIP Loan Liens*.  As security for the AFI DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the AFI Lender, the following security interests and liens are hereby granted to the AFI Lender (all tangible and intangible property, whether real or personal, identified in clauses (a) and (b) below being collectively referred to as the "***AFI DIP Loan Collateral***"); all such liens and security interests granted to the AFI Lender pursuant to this Interim Order, the "***AFI DIP Liens***", subject and subordinate only to the payment of the Carve Out:

(a)      Pursuant to sections 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien upon all right, title and interest in all Repurchased Loans (including the related mortgage notes, mortgage, or

any assignments of mortgage) and HUD Claims funded with the proceeds of the AFI DIP Loan, together with all proceeds, products, and supporting obligations with respect thereto; and

(b)      Pursuant to sections 364(d) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, whether tangible or intangible, whether real or personal, together with all proceeds and products thereof, that constitutes the AFI LOC Collateral (other than the property described in (a) of this paragraph).

7.      *Superpriority Claims.*

(a)      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the AFI DIP Obligations shall constitute allowed claims against each of the Debtors (without the need to file a proof of claim) with priority over any and all administrative expenses, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under section 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order, to the extent therein approved), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, including any superpriority claims granted as adequate protection in favor of the Debtors' pre-petition secured lenders or other secured parties in the Cases (the "***Superpriority Claims***"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claims shall be subject only to the Carve Out to the extent specifically provided for herein and shall be junior to the "Superpriority Claims" granted in respect of the obligations under the Barclays DIP Facility (as defined hereinafter) pursuant to

17

section 364(c)(1) of the Bankruptcy Code (the "**Barclays 364(c)(1) Claims**") as provided in paragraph 11 of the Barclays DIP Order;[4] *provided*, that the Barclays 364(c)(1) Claims are junior to the AFI Lender's rights in the AFI DIP Loan Collateral and all proceeds and other consideration received upon the sale, exchange, transfer or other disposition thereof.

    8.    *Perfection of the AFI DIP Liens.*

    (a)    The AFI DIP Lender is hereby authorized, but not required, to file or record financing statements, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted hereunder. Whether or not the AFI DIP Lender shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Order.

    (b)    A certified copy of this Interim Order may, in the discretion of the AFI DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices

---

[4]    The "**Barclays DIP Order**" means either the *Interim Order Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing Debtors (A) to Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) to Obtain Post-Petition Financing on a Secured Superpriority Basis, (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and (III) Granting Related Relief* or the *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing Debtors (A) to Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) to Obtain Post-Petition Financing on a Secured Superpriority Basis, (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and (III) Granting Related Relief*, as applicable.

ny- 1040970K&E 22457667

are hereby authorized and directed to accept such certified copy of this Interim Order for filing and recording. For the avoidance of doubt, the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the AFI Lender, and the Secured Parties to take all actions, as applicable, referenced in this paragraph 8.

9.     *Use of AFI DIP Loan Proceeds.*  The proceeds of the AFI DIP Loan shall be used solely to fund GNMA Buyouts to the extent necessary in order to (a) avoid Debtor GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (b) effect foreclosures, conveyances or other normal course loss mitigation activities of the related properties in connection with the submission of HUD Claims, and (c) allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified. For the avoidance of doubt, no proceeds may be used to fund the purchase of whole loans for any other purpose, including for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects, or for any other purpose other than as identified in the first sentence of this paragraph.

10.     *Conditions Precedent to AFI DIP Loan Draws.*  Notwithstanding the terms of the AFI DIP Loan, the AFI LOC Borrowers shall not be permitted to draw under the AFI DIP Loan unless the following conditions are satisfied:

(a)     the Debtors shall have performed and shall be current on all of their obligations required under (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon

K&E 22457667

Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with Ally (collectively, the "**Consent Obligations**");

(b)    the Bankruptcy Court shall have entered the *Interim Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business* in form and substance satisfactory to the AFI Lender;

(c)    the Bankruptcy Court shall have entered the Interim Cash Management Order in form and substance reasonably satisfactory to the AFI Lender; and

(d)    the Debtors shall use good faith efforts to comply with all requirements attendant to their position as subsidiaries of a Bank Holding Company;

(e)    no Termination Event (as hereinafter defined) shall have occurred and be continuing.

11.    *Cash Collateral.*    The Debtors' cash and cash equivalents on deposit or maintained in any account or accounts by the Debtors that is subject to a security interest in favor of the AFI Lender or the Junior Secured Parties and cash and cash equivalents generated by the collection of accounts receivable, sale of inventory or other disposition of the Prepetition Collateral constitutes proceeds of the Prepetition Collateral and, therefore, are and shall be deemed to be cash collateral of the Adequate Protection Parties within the meaning of section 363(a) of the Bankruptcy Code for the purposes hereof and under the terms hereof (collectively, and together with all cash and cash equivalents otherwise constituting Prepetition Collateral and the AFI DIP Loan Collateral, the "**Cash Collateral**").

12.    *Reporting.*    The Debtors have delivered to the Adequate Protection Parties a 20-week forecast of anticipated cash receipts and disbursements for such period (the "**Initial 20-**

K&E 22457667

*Week Forecast*"), a copy of which is attached hereto as **Exhibit B**.  In lieu of the reporting

requirements set forth in the documents underlying the Prepetition Obligations, the Debtors shall

deliver to the Adequate Protection Parties: (i) beginning on the first Monday immediately

following five (5) weeks after the Petition Date (or if the Petition Date is a Monday, beginning

five (5) weeks after the Closing Date), as soon as available, but not later than 1:00 p.m. (New

York City time) on the sixth (6th) business day following each four-week period ended six (6)

business days prior to such date, an updated 20-week forecast (an "*Updated Forecast*") for the

following 20-week period (each such subsequent forecast delivered after the Initial 20-Week

Forecast shall be, for the period of its applicability, referred to herein as the "*Forecast*") that is in

form satisfactory to the AFI Lender; (ii) beginning on the first Monday immediately following

three (3) weeks after the Petition Date (or if the Petition Date is a Monday, beginning three (3)

weeks after the Petition Date), as soon as available, but not later than 1:00 p.m. (New York City

time) on the sixth (6th) business day following the two-week period ended six (6) business days

prior to such date, a bi-weekly variance report for each prior two (2) week period setting forth,

for such two-week period (x) actual results noting therein aggregate variances from amounts set

forth for the two-week period in the relevant Forecast, (y) with respect to the AFI LOC, a report,

in form and detail satisfactory to the AFI Lender, of all deposits into and withdrawals from the

concentration account established and maintained pursuant to the AFI LOC, and (z) with respect

to the AFI Revolver, a report, in form and detail satisfactory to the AFI Lender, of all deposits

into and withdrawals from the concentration account established and maintained pursuant to the

AFI Revolver; provided that on any date on which an Updated Forecast is provided, the variance

report shall set forth actual results against the amounts projected in the relevant Forecast for the

prior four-week period; and (iii) no later than the fifteenth (15) business day of each calendar

month, a collateral report that reflects updated values as of the end of the prior calendar month (each such revised report, for the period of its applicability, to be referred to herein as the "***Collateral Report***"). Thereafter, promptly following request by either AFI Lender or the Trustee, the Debtors shall make themselves reasonably available to discuss such Forecast and the details thereof.

13.     *Authorization of Use of Cash Collateral.*   Subject to the terms hereof, including all reservations of rights herein, the Loan Parties are authorized to use Cash Collateral during the period from the Petition Date through and including the Termination Date (as defined in paragraph 18 below) solely for the purposes detailed within the Initial 20-Week Forecast and each subsequent Forecast and, in the case of the AFI Revolver Loan Cash Collateral, to fund GNMA Buyouts, subject to the restriction on the use thereof for such purpose set forth in the first sentence of paragraph 9.   Each Forecast will be subject to the written approval of the AFI Lender, which shall use reasonable efforts to deliver its approval, or non-approval, as the case may be, to the Debtors within two business days of the receipt of the Forecast.   The Debtors are enjoined and prohibited from using Cash Collateral and other Prepetition Collateral at any time, except as set forth in this Interim Order.

14.     *Adequate Protection.*   Subject to the provisions of paragraph 26 hereof, the Adequate Protection Parties are entitled, pursuant to sections 362, 363(c)(2), and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Collateral to the extent of their interests therein, including any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of any Prepetition Collateral, including Cash Collateral, the priming of the AFI Lenders' liens on the AFI LOC Collateral by

22

the Carve Out and AFI DIP Loan, and the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, if any, the "*Adequate Protection Obligations*"). As adequate protection, the Adequate Protection Parties are granted the following:

(a)     The AFI Lender, in its capacity as AFI LOC Lender, shall receive:

(i)     as security for the Adequate Protection Obligations, effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the AFI Lender of any collateral, additional and replacement continuing, valid, binding, enforceable, non-avoidable and automatically perfected security interests and liens on all of the collateral securing the AFI LOC (the "*Adequate Protection Liens*").   The Adequate Protection Liens shall not be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code.   The Adequate Protection Liens shall be (i) senior to the (A) existing liens granted to the AFI Lender under the AFI LOC, (B) junior liens in the AFI LOC Collateral granted under paragraph 11 of the Barclays DIP Order to secure the obligations under the Barclays DIP Facility under the Debtors' postpetition debtor-in-possession financing facility ("*Barclays DIP Facility*"), (C) Adequate Protection Liens granted to the AFI Lender in its capacity as AFI Revolver Lender, and (D) Adequate Protection Liens granted to the Junior Secured Parties, and (ii) junior to the Carve Out and the AFI DIP Liens;

(ii)    superpriority administrative expense claims as and to the extent provided in section 507(b) of the Bankruptcy Code with priority in payment over any and all unsecured claims and administrative expense claims, now existing or after arising, of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including sections 326, 328, 330, 331, 503(b), 506(c) and 726 of the Bankruptcy Code   (a "**507(b) Claim**"), which 507(b) Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, and shall at all times be senior to the rights of the Loan Parties, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code subject and subordinate only to the Carve Out and that shall be (x) senior to the 507(b) Claims granted to the Junior Secured Parties, and (y) *pari passu* with the 507(b) Claims granted to Citibank, N.A. and the AFI Lender on account of the AFI Revolver; and

(iii)    adequate protection payments ("**Adequate Protection Payments**") consisting of accrued and unpaid prepetition interest as well as current postpetition payments of interest at the non-default rate set forth in the AFI LOC (the foregoing to include all unpaid prepetition interest)

(b)    AFI Lender, in its capacity as the AFI Revolver Lender, shall receive:

(i)    Adequate Protection Liens on all of the collateral securing the AFI Revolver and on the Repurchased Loans on the repurchase of which is funded through the use of AFI Revolver Loan Cash Collateral, which shall be (x) junior only to the existing liens granted to the AFI Revolver Lender under the AFI

Revolver, and (y) senior to (A) the existing liens granted to the Junior Secured Parties, and (B) Adequate Protection Liens granted to the Junior Secured Parties;

(ii)    additional Adequate Protection Liens on all of the collateral securing the AFI LOC, which shall be (x) junior to the (A) existing liens granted to the AFI Lender under the AFI LOC, (B) Adequate Protection Liens granted to the AFI LOC Lender, (C) the liens granted under paragraph 11 of the Barclays DIP Order to secure the obligations under the Barclays DIP Facility (the "**Barclays DIP Liens**") and (D) the AFI DIP Liens, and (y) senior to the Adequate Protection Liens granted to the Junior Secured Parties on the collateral securing the AFI LOC as set forth below;

(iii)    507(b) Claims that are (x) senior to the 507(b) Claims granted to the Junior Secured Parties and (y) *pari passu* with the 507(b) Claims granted to Citibank and the AFI Lender on account of the AFI LOC (but senior to the claims referred to in this clause (y) to the extent relating to Cash Collateral that is used to fund GNMA Buyouts); and

(iv)    Additional Adequate Protection Liens on all of the equity of GMACM Borrower, LLC and RFC Borrower, LLC (the "**Barclays DIP Borrowers**"), which shall be senior to the Adequate Protection Liens granted to the Junior Secured Parties on the equity of the DIP Borrowers;

(v)    Adequate Protection Payments consisting of accrued and unpaid prepetition interest as well as current postpetition payments of interest at the non-default rate set forth in the AFI Revolver (the foregoing to include all unpaid prepetition interest) calculated based on the AFI Revolver balance of $400

million; provided that if that certain Plan Support Agreement between AFI, certain Junior Secured Noteholders, and the Debtors (the "***Junior Notes PSA***") is terminated pursuant to its terms, the AFI Lenders shall be entitled to payment of interest on the full amount outstanding under the AFI Revolver, including all accrued and unpaid interest thereon; and

(c)      the Junior Secured Parties shall receive:

(i)      Adequate Protection Liens on all of the collateral securing the AFI Revolver, which shall be junior to the (x) existing liens granted to the AFI Lender under the AFI Revolver, (y) Adequate Protection Liens granted to the AFI Lender in its capacity as AFI Revolver Lender and (z) existing liens granted to the Junior Secured Parties, *provided*, that the enforcement of the Adequate Protection Liens shall be subject to, in all respects, the Intercreditor Agreement and paragraph 21 below;

(ii)      additional Adequate Protection Liens on all of the collateral securing the AFI LOC, which shall be junior to (x) all existing liens and Adequate Protection Liens granted to the AFI Lender (on both the AFI LOC and the AFI Revolver), (y) the Barclays DIP Liens and (z) the AFI DIP Liens;

(iii)      additional Adequate Protection Liens on all of the equity interests of the DIP Borrowers, which shall be junior to the Adequate Protection Liens granted to the AFI Revolver Lender on the equity of the DIP Borrowers;

(iv)      to the extent the Adequate Protection Liens are insufficient to provide adequate protection, 507(b) Claims that are junior to the 507(b) Claims granted to the DIP Lenders under the DIP Facility and all 507(b) Claims granted

to the AFI Revolver Lender but *pari passu* with any and all other 507(b) Claims; and

(v)      The Debtors shall promptly pay the reasonable fees and expenses of (i) the Trustee (including the reasonable fees and expenses of Kelley Drye & Warren LLP), and (ii) that certain Ad Hoc Committee of Holders of Junior Secured Notes represented by White & Case LLP (including the reasonable fees and expenses of White & Case LLP and Houlihan Lokey); *provided* that none of such fees and expenses as adequate protection payments hereunder shall be subject to further approval by the Court or the United States Trustee Guidelines, but such professional shall provide copies of summary invoices and statements (subject in all respects to applicable privilege or work product doctrines) to the official committee of unsecured creditors appointed in the Cases (the "***Committee***") and the U.S. Trustee, and the Debtors shall promptly pay all reasonable fees and expenses not subject to objection of the U.S. Trustee within ten business days after the receipt of such invoices.  No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, however, that the Court shall have jurisdiction to determine any dispute concerning such invoices, *provided*, *further*, however, that nothing shall prejudice the rights of any party to seek to recharacterize any such payments, upon motion and further order of the Court, as payments of principal under the Junior Secured Notes.

(d)      Notwithstanding anything to the contrary in this Order, the sum of the obligations under the (x) AFI DIP Loan, (y) the AFI LOC Loan and (z) the Adequate Protection

Obligations in respect of the AFI LOC Loan that shall be senior to the Barclays DIP Liens in the AFI LOC Collateral granted in paragraph 11 of the Barclays DIP Order, in the aggregate, shall not exceed $600,000,000.

(e)    All 507(b) claims granted herein are junior and subordinate to all administrative expense claims granted priority under section 364(c)(1) of the Bankruptcy Code whether under this order, the Barclays DIP Order, or otherwise.

(f)    All reasonable, documented fees, and expenses incurred or accrued by the AFI Lender, including reasonable documented fees and expenses of counsel, shall accrue during the Chapter 11 Cases and be waived by AFI Lender subject to confirmation of the Plan that is in accordance with the terms of the Ally Settlement Agreement.    In the event that a Plan incorporating the Ally Settlement Agreement in accordance with the terms thereof is confirmed, AFI Lenders reserves all rights to assert claims against the Debtors' estates for payment of all such fees and expenses.    In the event that a Plan incorporating the Ally Settlement Agreement in accordance with the terms thereof is not confirmed, the Debtors shall pay all of the AFI Lenders such fees and expenses.

(g)    For purposes hereof, the "***Carve Out***"[5] shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, and (ii) at any time after the first business day after the occurrence and during the continuance of a Termination Event hereunder, and delivery of notice thereof to the U.S. Trustee and each of the lead counsel for the Debtors (the "***Carve Out Notice***"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of accrued and

---

[5]    The Carve Out is intended to mirror the Barclays' Carve Out (and not be in addition to).  Allocation of the $25 million Carve Out monies between the Barclays' DIP collateral and AFI Collateral TBD.

unpaid professional fees, costs and expenses (collectively, the "***Professional Fees***") incurred by persons or firms whose retention is approved pursuant to sections 327 and 1103 of the Bankruptcy Code after the Business Day following delivery of the Carve Out Notice and allowed by this Court, in an aggregate amount not exceeding $25 million (the "***Carve Out Cap***") (plus all unpaid Professional Fees allowed by this Court at any time that were incurred on or prior to the Business Day following delivery of the Carve Out Notice, whether paid or unpaid); provided further that (A) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Adequate Protection Parties, (B) so long as no event of default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by this Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (C) nothing in this Interim Order shall impair the right of any party to object to any such fees or expenses to be paid by the Debtors' estates.

15.     *Replacement Liens*.  Pursuant to section 363(e) and (f) of the Bankruptcy Code or otherwise, the AFI Revolver Lender shall receive first priority replacement liens and the Junior Secured Parties shall receive second priority replacement liens (collectively, the "***Replacement Liens***"), junior only to the Replacement Liens granted to the AFI Revolver Lender, on all of the equity of the DIP Borrowers as adequate protection for the transfer of the Initial Purchased Assets (as defined in the Barclays DIP Order).

16.     *Additional Adequate Protection.*

(a)     <u>Covenants</u>:  As additional adequate protection:

(i)     the Debtors shall maintain (x) their cash management system and (y) the treatment of any and all claims on account of postpetition distributions and

transfers by the Loan Parties to any Affiliated Debtor (the "***Priority Intercompany Claim***"), in each case, in a manner consistent with such arrangements and treatment described in the Interim Cash Management Order, without further modification thereto;

(ii)    the Debtors shall use good faith efforts to be in compliance with all requirements attendant to their position as subsidiaries of a Bank Holding Company;

(iii)    the Debtors shall continue to perform and remain current with, and require that all of the Debtors continue to perform and remain current with, all of their obligations under the Consent Obligations;

(iv)    the Debtors shall comply with the terms of the Amended and Restated Servicing Agreement by and between Ally Bank, as Owner, and GMAC Mortgage, LLC, as Servicer, dated as of May [__], 2012;

(v)    the Debtors shall comply with the terms of the *Interim Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business*, which was entered by this Court on _____, 2012 [Docket No. ___], and the *Final Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business*;

(vi)    the Debtors shall use the AFI DIP Loan proceeds to fund only the GNMA Buyouts; and

(vii)    the Debtors shall perform and comply with all obligations under the Ally Settlement in accordance with the terms thereof.

(b)    <u>Reporting</u>:  As further adequate protection hereunder, the Debtors shall comply with the reporting requirements set forth in paragraph 12 (the "**Reporting Requirements**").  Further, the Adequate Protection Parties shall receive copies of all reports provided to the DIP Lenders pursuant to the DIP Facility and the DIP order.

(c)    <u>Section 552 Waiver</u>.  Upon entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code is deemed waived with respect to the Prepetition Collateral.

17.    *Exercise of Rights and Remedies against Deposit Accounts*.  Notwithstanding anything to the contrary contained in any instrument or agreement to which the Loan Parties, or any Loan Party, are party or subject, or in any order entered by this Court, no Person (as defined by the Bankruptcy Code) that holds or has lien or other security interest on any demand deposit or other accounts of a Loan Party may exercise any rights or remedies against any such account (including by way of set off), whether pursuant to an account control agreement or otherwise, without first providing seven days written notice (by facsimile electronic mail, overnight mail or hand delivery) to the U.S. Trustee, counsel to the Debtors, counsel to any statutory committee appointed in the Debtors' chapter 11 cases, counsel for the AFI Lender, counsel to the Junior Secured Notes, counsel for Citibank, N.A. and counsel for Barclays (the "Account Notice Parties").  The AFI Lender hereby acknowledges and stipulates that its liens on any demand deposit or other account, whether such lien arises under a prepetition control agreement or under this Order, attach only to the proceeds of its collateral, and such liens do not attach to amounts on deposit in any such account to the extent such amount constitutes the proceeds of any other

Person's collateral or property that was unencumbered prior to its being deposited in such an account.  In the event any Person asserts the occurrence and continuance of a default or an event of default and the right to exercise remedies with respect to such an account, the Debtors within three days will prepare and serve on the Account Notice Parties a detailed accounting of each Person's interest in the amounts on deposit in such account.  All parties rights to review and object to such accounting are hereby preserved.  Each Account Notice Party shall serve on the others a notice of objections with respect to such accounting within 5 days following service thereof. Any unresolved disputes with the Debtors' accounting shall be determined by this Court at a hearing to be held on not less than 15 days written notice to the Account Notice Parties.  All amounts in dispute shall remain on deposit in such account pending Court order.  No commingling of amounts on deposit in any such account shall in any way adversely affect, detract from, or otherwise impair the perfection of any Person's lien on such proceeds.

18.    *Termination.*  The Loan Parties' right to use Prepetition Collateral, including Cash Collateral, pursuant to this Interim Order shall automatically terminate (the date of any such termination, the "***Termination Date***") without further notice or order of the court (x) on the effective date of a Plan for any Debtor or (y) upon written notice (the "***Termination Notice***") to the Loan Parties (with a copy to counsel for the official committee of unsecured creditors (the "***Creditors' Committee***" and the Administrative Agent and the Collateral Agent under the Barclays DIP Facility), if appointed in the Chapter 11 Cases, and the United States Trustee) after the occurrence and during the continuance of any of the following events (unless waived by the Adequate Protection Parties, "***Termination Events***") beyond any applicable grace period set forth below:

(a)     the occurrence and continuance of an event of default under the Barclays DIP Facility, or if the Barclays DIP Facility has been paid in full, an event, condition or occurrence that would have been event of default under the Barclays DIP Facility;

(b)     the occurrence and continuance of an event of default under the AFI DIP Loan;

(c)     the Debtors seek to reject under section 365 of the Bankruptcy Code, or otherwise, either the Master Servicing Agreement (1st Lien Mortgages Servicing Released) dated as of April 16, 2006 and amended as of June 1, 2007 between Residential Funding Company, LLC (f/k/a Residential Funding Corporation) and Ally Bank (f/k/a GMAC Bank) or the Master Servicing Agreement (1st Lien Mortgages Servicing Retained) dated as of August 15, 2005 and amended as of March 31, 2006 between Residential Funding Company, LLC (f/k/a Residential Funding Corporation) and Ally Bank (f/k/a GMAC Bank);

(d)     failure to perform or remain current on all of the Consent Obligations;

(e)     failure to obtain entry of the *Interim Order Pursuant to Sections 105(A)and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business* in form and substance satisfactory to the AFI Lender within five days of the Petition Date;

(f)     failure to satisfy the Reporting Requirements that continues unremedied for a period of five (5) business days after the date of such failure;

(g)     failure of the Loan Parties to comply with any other covenant or agreement specified in this Interim Order that continues unremedied for a period of five (5) business days after the date of such failure;

(h)      any event of default, early amortization event, termination event or other similar event (other than as a result of the commencement of the Chapter 11 Cases) shall occur under any material document or agreement that relates to the Prepetition Collateral and such event could reasonably be expected to be materially adverse to the rights and interests of the Adequate Protection Parties, as applicable;

(i)      any event of default, early amortization event, termination event or other similar event (other than as a result of the commencement of the Chapter 11 Cases) shall occur under any material document or agreement that relates to the Prepetition Collateral and such event could reasonably be expected to be materially adverse to the rights and interests of the Adequate Protection Parties, as applicable;

(j)      any of the material Chapter 11 Cases shall be dismissed or converted to a chapter 7 case; or a chapter 11 trustee with plenary powers, a responsible officer or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the material Chapter 11 Cases;

(k)      appointment of a trustee (or comparable person) or a responsible officer or examiner with expanded powers in any of the material Chapter 11 Cases (or any of the Debtors or their affiliates seeking or supporting such appointment);

(l)      this Court shall enter an order granting relief from the automatic stay as to any Prepetition Collateral which has an aggregate value in excess of $25 million and such order shall not, at any time, be subject to stay pending appeal;

(m)      a court shall enter an order amending, supplementing, staying, vacating or otherwise modifying the Cash Collateral Orders except as otherwise agreed to in writing by the

Adequate Protection Parties, or the Cash Collateral Orders shall cease to be in full force and effect; provided that no event of default shall occur to the extent that any such amendment, supplement or other modification is made in compliance with the Cash Collateral Orders and is not adverse, in the reasonable judgment of the Adequate Protection Parties, as applicable;

(n)      entry of a Bankruptcy Court order granting any superpriority claim (or claim of equivalent status) that is senior to or *pari passu* with the claims of the Adequate Protection Parties or any lien or security interest that is senior to or *pari passu* with the liens and security interests securing the AFI Revolver, the AFI LOC, or the Junior Secured Notes, except as provided herein;

(o)      entry of an order authorizing recovery from Prepetition Collateral, including Cash Collateral, for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than as may be provided in the Cash Collateral Orders, or certain *de minimis* amounts as may be agreed to by the Adequate Protection Parties;

(p)      any judgment in excess of $10 million as to any postpetition obligation not covered by insurance shall be rendered against the Debtors and the enforcement thereof shall not effectively be stayed at all times; or there shall be rendered against the Debtors a non-monetary judgment with respect to a postpetition event which has or could reasonably be expected to have a material adverse effect on the property, business or condition (financial or otherwise) of the Debtors taken as a whole or the ability of the Debtors to perform their obligations under this Interim Order; or

(q)      any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition

ny- 1040970K&E 22457667

indebtedness or payables (including reclamation claims) other than payments authorized by the Court.

The Loan Parties shall, within two business days of an occurrence of a Termination Event, provide the corresponding Termination Notice to the parties set forth above.

19.    *Remedies After Termination Event.*

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit

(i)    the Adequate Protection Parties to, immediately upon the occurrence and during the continuation of a Termination Event, and issuance of a the Termination Notice, terminate the right of the Loan Parties to use Prepetition Collateral, including Cash Collateral;

(ii)    In no event shall the Adequate Protection Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral.  The delay or failure of the Adequate Protection Parties to exercise rights and remedies under the Prepetition Obligations or this Interim Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the Prepetition Obligations; and

(iii)    the AFI DIP Lender to exercise all rights and remedies under the AFI DIP Loan, and, to the extent provided for in the AFI DIP Loan, to take any or all of the following actions without further order of or application to this Court: (a) cease to make any extensions of credit or loans or advances to the Debtors; (b) declare all AFI DIP Obligations to be immediately due and payable without

36

presentment, demand, protest or notice; (c) the AFI DIP Lender shall exercise any

and all remedies available to it under the AFI DIP Loan; (d) take any other actions

or exercise any other rights or remedies permitted under this Order, the AFI DIP

Loan, or applicable law to realize upon the AFI DIP Loan Collateral and/or effect

the repayment and satisfaction of the DIP Obligations; subject to the AFI DIP

Lender providing seven (7) days written notice (by facsimile, telecopy, electronic

mail or otherwise) to the U.S. Trustee, counsel to the Debtors ,counsel to any

Committee and counsel to the Administrative Agent and Collateral Agent under

the Barclays DIP Facility, prior to exercising any enforcement rights or remedies

in respect of the Collateral (other than the rights described in clauses (a) and (b)

above (to the extent they might be deemed remedies in respect of the Collateral)

and other than with respect to the placement of administrative holds on any other

deposit accounts or securities accounts).  All rights of the AFI DIP Lender and

Adequate Protection Parties are subject to paragraphs 13 (e)-(g) of the Barclays

DIP Order.

(b)    In any hearing regarding any exercise of rights or remedies by the AFI

Lender, the only issue that may be raised by the Debtors and any party in interest shall be

whether, in fact, a Termination Event has occurred and is continuing, and neither the Debtors nor

any party in interest shall be entitled to seek relief, including under section 105 of the

Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and

remedies of the AFI DIP Lender set forth in this Order or the AFI DIP Loan.  In no event shall

the AFI DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine

with respect to the AFI DIP Loan Collateral.

(c)      Subject to the provisions of the Junior Notes PSA or further order of the

Court, following the occurrence of an event of default under the Prepetition Obligations, the

Junior Secured Parties may not exercise any rights or remedies under the Junior Secured Notes

Documents or this Interim Order unless and until all the indebtedness of the AFI Lender

attributable to the AFI Revolver, including the Adequate Protection Liens, 507(b) Claims, and

Adequate Protection Payments granted to the AFI Lender on account the AFI Revolver pursuant

to the terms of this Interim Order (collectively, the "*AFI Revolver Payable*"), has been paid in

full in cash and all commitments under the AFI Revolver and AFI Revolver Payable have been

terminated or an amount sufficient to satisfy the AFI Revolver Payable has been escrowed by the

Debtors (calculated in accordance with the Junior Notes PSA to the extent then in effect).  If,

prior to the payment in full in cash of all of the AFI Revolver Payable and all commitments

under the AFI Revolver and AFI Revolver Payable having been terminated, the Junior Secured

Parties or any other party holding a claim junior to the AFI Revolver Payable receive(s) any

Prepetition Collateral or proceeds thereof, such Prepetition Collateral or proceeds thereof shall

be considered to be held in trust for the benefit of the AFI Revolver Lender and shall be

immediately payable to the AFI Revolver Lender.  For the avoidance of doubt, other than the use

of the Carve Out in accordance with the terms of this Interim Order, the Loan Parties may not

use the Prepetition Collateral or Cash Collateral to challenge in any manner the claims and liens

of the Adequate Protection Parties.

20.      *Limitation On Charging Expenses Against Prepetition Collateral and AFI DIP

Loan Collateral.*  Subject only to, and effective upon entry of, the Final Order, and only to the

extend provided for therein, except to the extent of the Carve Out, no expenses of administration

of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation

38

in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral and AFI DIP Loan Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Adequate Protection Parties or AFI DIP Lender, as applicable and no such consent shall be implied from any other action, inaction, or acquiescence by the Adequate Protection Parties or AFI DIP Lender, as applicable.

21.    *Reservation Of Rights Of The Adequate Protection Parties.*    The Adequate Protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties.  Notwithstanding any other provision hereof, the grant of Adequate Protection to the Adequate Protection Parties pursuant hereto is without prejudice to the right of the Adequate Protection Parties to seek modification of the grant of Adequate Protection provided hereby so as to provide different or additional Adequate Protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.  Nothing herein shall be deemed to waive, modify or otherwise impair the rights of the Adequate Protection Parties under the Existing Agreements, and the Adequate Protection Parties expressly reserve all rights and remedies that the Adequate Protection Parties now or may in the future have under the Existing Agreements and/or applicable law in connection with all defaults and events of default.  Except as expressly provided herein, nothing contained in this Interim Order (including the authorization to use any Prepetition Collateral, including Cash Collateral) shall have the effect of, or shall be construed as having the effect of, amending or waiving any covenant, term or provision of the Existing Agreements, or any rights or remedies of the Adequate Protection Parties thereunder, including any right to argue that failure to strictly comply with any such covenant, term or provision during the course of the Chapter 11 Cases or

that any use of Prepetition Collateral, including Cash Collateral, permitted or contemplated hereby constitutes a default or event of default that is not subject to cure under section 1124 of the Bankruptcy Code or otherwise despite any consent or agreement contained herein.

22.    *Reservation Of Rights Of The Debtors.*    The foregoing Adequate Protection provisions contained in this Interim Order shall be without prejudice to the rights of the Debtors to object to the Adequate Protection Parties' request for any other, further or additional Adequate Protection.    Nothing in this Interim Order shall be deemed to waive, modify or otherwise impair the respective rights of the Debtors under the Existing Agreements, and the Debtors expressly reserve all rights and remedies that each has now or may in the future have under the Existing Agreements and/or applicable law (subject to paragraphs 3 and 25).

23.    *Reservation of Rights of the Junior Secured Parties.*    The Junior Secured Parties hereby reserve their rights to assert arguments that the adequate protection provided hereunder is insufficient on account of diminution in value of the AFI Revolver Collateral resulting from the Barclays DIP Loan; *provided*, that the Junior Secured Parties shall not assert any such arguments, if at all, prior to January 1, 2013, with such date subject to extension solely at the discretion of the Junior Secured Parties, and that the assertion of such arguments may in no way adversely affect Ally.

24.    *Perfection Of Adequate Protection Liens.*    The Adequate Protection Parties are authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over or take any other action in order to validate and perfect the liens and security interests granted to it hereunder.    Whether or not the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages,

40

notices of lien or similar instruments, take possession of or control over or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the Petition Date.

25.    *Preservation Of Rights Granted Under The Interim Order.*

(a)    Except as permitted in this Interim Order, no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order to the Adequate Protection Parties shall be granted or allowed while any portion of the Adequate Protection Obligations remain outstanding, and Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Loan Parties' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Except as otherwise provided for herein, no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the AFI DIP Lender shall be granted or allowed while any portion of the AFI DIP Loan or the commitments thereunder or the DIP Obligations remain outstanding, and the AFI DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise (other than the Carve Out and as expressly provided in this Order).

(c)    Unless all AFI DIP Obligations shall have been indefeasibly paid in full, the Debtors shall not seek (i) any modifications or extensions of this Order without the prior

written consent of the AFI DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the AFI DIP Lender, or (ii) an order converting or dismissing any of the Chapter 11 Cases.  If an order dismissing any of the Chapter 11 Cases under section 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims and AFI DIP Liens granted to the AFI DIP Lender pursuant to this Interim Order shall continue in full force and effect, shall maintain their priorities as provided in this Interim Order and shall, notwithstanding such dismissal, remain binding on all parties in interest until all AFI DIP Obligations shall have been indefeasibly paid in full in cash and the commitments under the AFI DIP Loan have been terminated in accordance with the AFI DIP Loan and (ii) this Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claims and AFI DIP Liens.

(d)    If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the 507(b) Claims, the other administrative claims granted pursuant to this Interim Order and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Adequate Protection Obligations shall have been paid and satisfied in full (and that such 507(b) Claims, the other administrative claims granted pursuant to this Interim Order and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) above.

ny- 1040970K&E 22457667

(e)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Adequate Protection Parties of the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the Adequate Protection Liens.  Notwithstanding any such reversal, stay, modification or vacatur, any use of Prepetition Collateral, including Cash Collateral, or any Adequate Protection Obligations incurred by the Loan Parties hereunder, as the case may be, prior to the actual receipt of written notice by the Adequate Protection Parties of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the Adequate Protection Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in this Interim Order with respect to all uses of Prepetition Collateral, including Cash Collateral, and all Adequate Protection Obligations.

(f)    If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt by the AFI Lender of written notice of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of the AFI DIP Liens and Superpriority Claims authorized or created hereby or pursuant to the AFI DIP Loan with respect to any DIP Obligations.  Notwithstanding any such reversal, stay, modification or vacation, the DIP Obligations incurred by the Debtors pursuant to the AFI DIP Loan, prior to the actual receipt by the AFI DIP Lender of written notice of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the AFI DIP Lender shall be entitled to all the

43

rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the AFI DIP Loan.

(g)     The Adequate Protection Payments shall not be subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance in the Chapter 11 Cases or any subsequent chapter 7 case.

(h)     Except as expressly provided in this Interim Order or in the Prepetition Obligations, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the Adequate Protection Parties granted by the provisions of this Interim Order and the Prepetition Obligations shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order confirming a Plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Adequate Protection Obligations.  The terms and provisions of this Interim Order and the Prepetition Obligations shall continue in the Chapter 11 Cases, in any successor cases, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens, the 507(b) Claims, the other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the Adequate Protection Parties granted by the provisions of this Interim Order and the Prepetition Obligations shall continue in full force and effect until all Adequate Protection Obligations are indefeasibly paid in full in cash.  Notwithstanding anything contained in this paragraph, nothing in this Interim Order shall (i) limit the Debtors' rights, if any, with respect to unimpairment of the Debtors' prepetition debt or (ii) be deemed to modify the Prepetition Obligations.

(i)       Except as expressly provided in this Interim Order or in the AFI DIP

Loan, the AFI DIP Liens, the Superpriority Claims and all other rights and remedies of the AFI

DIP Lender granted by the provisions of this Interim Order and the AFI DIP Loan shall survive,

and shall not be modified, impaired or discharged by (i) the entry of an order converting any of

the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the

Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other

act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the

Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have

waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this

Interim Order and the AFI DIP Loan shall continue in these Chapter 11 Cases, in any successor

cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7

cases under the Bankruptcy Code, and the AFI DIP Liens, the Superpriority Claims and all other

rights and remedies of the AFI DIP Lender granted by the provisions of this Interim Order and

the AFI DIP Loan shall continue in full force and effect until the DIP Obligations are

indefeasibly paid in full.

26.       *Effect Of Stipulations On Third Parties.*  The stipulations, admissions, and

releases contained in paragraph 3(b)-3(h) of this Order, shall be binding on the Debtors upon

entry of this Interim Order, subject to the terms of paragraph 3, effective as of the Petition Date.

The stipulations, admissions, and releases contained in paragraph 3(b)-3(h) of this Order, shall be

binding on all parties in interest, including any Committee, unless, and solely to the extent that,

any party in interest files an objection to this Interim Order challenging such stipulations,

admissions, releases, or otherwise asserting any claims or causes of action on behalf of the

Debtors' estates against the Junior Secured Parties (an "**Objection**"), in each case no later than

the later of seventy-five (75) days after entry of this Interim Order.  If no such Objection is timely filed then, without further order of this Court, all of the stipulations, admissions and releases set forth in paragraph 3 shall be binding on all parties in interest in the Chapter 11 Cases and shall not be subject to challenge or modification in any respect.  If such an Objection is timely filed, the stipulations, admissions and releases shall nonetheless remain binding on all parties in interest and shall be preclusive except to the extent that any such stipulations, admissions and releases are expressly challenged pursuant to such timely filed Objection, and there is an order sustaining such Objection.  Notwithstanding anything to the contrary, if the Junior Notes PSA is terminated, the stipulation contained in paragraph 3(g)(ii)(A) or this Interim Order shall not be binding on the Junior Secured Notes.

27.    *Reservation of Rights.*  Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, the Consent Obligations.

28.    *Limitation On Use Of Prepetition Collateral and Proceeds of AFI DIP Loan.*  The Loan Parties shall use the proceeds of the Prepetition Collateral, including Cash Collateral, and the proceeds of the AFI DIP Loan solely as provided in this Interim Order.  Notwithstanding anything herein or in any other order of this Court to the contrary, no Prepetition Collateral, including Cash Collateral, or the proceeds thereof, or the proceeds of the AFI DIP Loan, or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Prepetition Obligations, or to any of the liens or claims granted under this Interim Order or the Prepetition Obligations, (b) assert any claims and defenses or any other causes of action against the AFI Lender or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors,

(c) prevent, hinder or otherwise delay the AFI Lender's assertion, enforcement or realization on the Prepetition Collateral in accordance with the Prepetition Obligations or this Interim Order, (d) seek to modify any of the rights granted to the AFI Lender hereunder or under the Prepetition Obligations, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted hereunder; *provided*, that without duplication of the limitations on the use of the Carve Out, up to $100,000 in the aggregate of such proceeds may be used to pay allowed fees and expenses of professionals to any Court-appointed committee to investigate (but not initiate or prosecute any claims with respect to) any Ally Debt Claims or Junior Secured Parties Claims.

29.    *Waiver of Setoff and Recoupment Rights*.    The parties on whose behalf the Borrowers are making servicer advances hereby waive any and all rights of setoff or recoupment against the Debtors and AFI to the extent such advances are directly funded by Cash Collateral.

30.    *Notice to MBS Trustees Regarding Advance Facility and Debtors' Status as an Advancing Person/Advancing Counterparty*.    The Debtors shall serve this Interim Order and the notice of the Final Hearing on all MBS trustees or other persons for which it is servicing mortgage loans.    Service of this Interim Order in accordance with the preceding sentence shall constitute notice and payment direction by the Debtors as the master servicer and servicer to each MBS trustee  or other person for which it is servicing mortgage loans (other than the GSEs) to pay, or cause to be paid, all collections with respect to, and all other proceeds of, receivables to the applicable Debtor, as the party to whom the master servicer's or servicer's advance reimbursement rights have been sold, assigned and/or pledged, and each MBS trustee shall pay, or cause to be paid, all collections with respect to, and all other proceeds of, receivables to the

applicable Debtor, as the party to whom the master servicer's or servicer's advance reimbursement rights have been sold, assigned and/or pledged (as such party may be otherwise defined) as so provided.

31.    *Waiver of Claims and Causes of Action.*  Without prejudice to the rights of any other party, the Debtors waive any and all claims and causes of action against the AFI Lender and its respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors related to this Interim Order or the negotiation of the terms thereof.

32.    *Binding Effect; Successors and Assigns.*  Subject to paragraph 26, the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including the Adequate Protection Parties, the Creditors' Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Adequate Protection Parties and the Debtors and their respective successors and assigns, *provided*, that, except to the extent expressly set forth in this Interim Order, the Adequate Protection Parties shall have no obligation to permit the use of Prepetition Collateral, including Cash Collateral, or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

33.    *Limitation of Liability.*  Subject to entry of the Final Order, solely in connection with permitting the use of Prepetition Collateral, including Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order or the Prepetition Obligations, the Adequate Protection Parties shall not be deemed, from and after the Petition

48

Date, to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Adequate Protection Parties any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

34. *No Impact on Certain Contracts/ Transactions.* No rights of any entity under sections 555, 556, 559, 560 and 561 of the Bankruptcy Code shall be affected by the entry of this Interim Order as to any contract or transaction of the kind listed in such sections of the Bankruptcy Code.

35. *Effectiveness.* This Interim Order shall take effect immediately upon entry and shall constitute findings of fact and conclusions of law. This Interim Order is effective *nunc pro tunc* as of the Petition Date.

36. *Final Hearing Notice.* The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties that received notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any committee after the same has been appointed, or committee counsel, if the same shall have been appointed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served upon (a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104, Attn: Larren Nashelsky, Gary Lee and Todd Goren; (b) counsel for Ally Bank, Kirkland

49

& Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Richard M. Cieri, Ray

C. Schrock, and Stephen E. Hessler; (c) counsel to U.S. Bank National Association, Kelley Drye

& Warren LLP, 101 Park Avenue, New York, New York 10178, Attn: Eric R. Wilson and

Benjamin D. Feder; (d) counsel to the Ad Hoc Group of Junior Secured Notes, White & Case

LLP, 1155 Avenue of the Americas, New York, New York, 10036, Attn.:  Gerard Uzzi and

Harrison Denman; (e) the Office of the United States Trustee for the Southern District of New

York at 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.:  Tracy Hope Davis,

Linda Riffkin and Brian S. Masumoto; (f) the Debtors' postpetition lenders; and (g) counsel to

any official statutory committee appointed in these cases and shall be filed with the Clerk of the

United States Bankruptcy Court, Southern District of New York, in each case to allow actual

receipt by the foregoing no later than _____ __, 2012 at _:__ _.m. prevailing Eastern time

(with any replies filed by _____ __, 2012 at _:__ _.m.).

     37.    *Objections Overruled.*  Any objection that has not been withdrawn or resolved is,

to the extent not resolved, hereby overruled.

Dated:   _____ __, 2012
       New York, New York

                      _____

                    UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT A**

($ in millions)

| | Ally Revolver | Blanket | Ally LOC | Citi MSR | DIP GSAP | DIP BMMZ Repo | Fannie EAF | Unpledged | Subtotal | Mexico | Canada | Other Int'l | CapRe | Exclude | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | | | |
| 1 Cash and Cash Equivalents | $ 69 | $ 174 | $ - | $ - | $ 91 | $ - | $ - | $ 252 | $ 586 | $ 88 | $ 22 | $ 10 | $ 0 | $ - | $ 706 |
| 2 | | | | | | | | | | | | | - | | |
| 3 **Mortgage Loans Held For Sale** | | | | | | | | | | | | | - | | |
| 4 Pipeline | - | 15 | 22 | - | - | - | - | - | 37 | - | - | - | - | | 37 |
| 5 1st Lien | 107 | 31 | 397 | - | - | 225 | - | - | 760 | - | - | - | - | | 760 |
| 6 2nd Lien | 225 | 5 | 109 | - | - | 157 | - | - | 497 | - | - | - | - | | 497 |
| 7 HELOCs | - | 90 | 142 | - | - | - | - | - | 232 | - | - | - | - | | 232 |
| 8 Reverse Mortgages/ Silent 2nds | 11 | - | 0 | - | - | - | - | - | 11 | - | - | - | - | | 11 |
| 9 Contingent Repurchase Option | - | 0 | - | - | - | - | - | - | 0 | - | - | - | - | | 0 |
| 10 GNMA Loans | 36 | 124 | 189 | - | - | - | - | - | 350 | - | - | - | - | | 350 |
| 11 Foreign | 42 | 0 | - | - | - | - | - | - | 42 | 5 | 0 | - | - | | 47 |
| 12 | | | | | | | | | | | | | - | | |
| 13 Repo and foreclosed assets | 5 | 15 | 11 | - | - | - | - | - | 32 | 3 | - | 0 | - | | 35 |
| 14 | | | | | | | | | | | | | - | | |
| 15 **Finance Receivables & Lns Net** | - | (0) | - | - | - | - | - | - | (0) | 27 | 1 | (0) | - | | 28 |
| 16 | | | | | | | | | | | | | - | | |
| 17 **Mortgage Servicing Rights** | | | | | | | | | | | | | - | | |
| 18 FNMA MSR | - | - | - | 422 | - | - | - | - | 422 | - | - | - | - | | 422 |
| 19 FLHMC MSR | - | - | - | 180 | - | - | - | - | 180 | - | - | - | - | | 180 |
| 20 GNMA MSR | - | - | - | - | - | - | - | 393 | 393 | - | - | - | - | | 393 |
| 21 PLS MSR | - | 1 | 178 | - | - | - | - | - | 179 | - | - | - | - | | 179 |
| 22 Master Servicing MSR | - | - | 28 | - | - | - | - | - | 28 | - | - | - | - | | 28 |
| 23 | | | | | | | | | | | | | - | | |
| 24 **Servicer Advance** | | | | | | | | | | | | | - | | |
| 25 FNMA SA | 6 | 10 | - | - | - | - | 144 | - | 161 | - | - | - | - | | 161 |
| 26 FLHMC SA | 2 | 1 | 79 | - | - | - | - | - | 83 | - | - | - | - | | 83 |
| 27 GNMA SA | - | - | - | - | - | - | - | 108 | 108 | - | - | - | - | | 108 |
| 28 PLS SA | 612 | 0 | - | - | 792 | - | - | - | 1,403 | - | - | - | - | | 1,403 |
| 29 Master Servicing SA | 31 | (0) | - | - | 178 | - | - | - | 208 | - | - | - | - | | 208 |
| 30 Other SA | 120 | - | - | - | - | - | - | - | 120 | - | 0 | - | - | | 120 |
| 31 | | | | | | | | | | | | | - | | |
| 32 **Accounts Receivable** | | | | | | | | | | | | | - | | |
| 33 Govt Claims | 29 | 329 | 466 | - | - | - | - | - | 824 | - | - | - | - | | 824 |
| 34 Other | 3 | 31 | 36 | 36 | - | 4 | - | 19 | 129 | 0 | 0 | - | 3 | 30 | 162 |
| 35 | | | | | | | | | | | | | - | | |
| 36 **Other** | | | | | | | | | | | | | - | | |
| 37 Trading Securities | 29 | 25 | 42 | - | - | - | - | - | 96 | - | - | - | - | | 96 |
| 38 Oth Assts-Rstrctd cash & Eqv(1) | - | 211 | - | - | - | - | - | - | 211 | 0 | 0 | - | 123 | | 334 |
| 39 Other Assets(2) | - | 62 | - | - | - | - | - | - | 62 | 5 | 1 | 0 | 0 | - | 68 |
| 40 **Total Assets** | **1,329** | **1,126** | **1,699** | **638** | **1,060** | **387** | **144** | **772** | **7,154** | **128** | **25** | **10** | **126** | **30** | **7,474** |
| 41 **Other Excluded** | | | | | | | | | | | | | | | |
| 42 Derivative Assets | - | - | - | - | - | - | - | - | - | - | - | - | | 3,967 | 3,967 |
| 43 Derivative collateral placed | - | - | - | - | - | - | - | - | - | - | - | - | | 1,163 | 1,163 |
| 44 Intercompany Loans Rec | - | - | 2 | - | - | - | - | - | 2 | - | - | - | | 3,457 | 3,459 |
| 45 Subsidiary Inv | - | - | - | - | - | - | - | - | - | - | - | - | | - | - |
| 46 Receivables from Affiliates | - | - | - | - | - | - | - | - | - | - | - | - | | - | - |
| 47 | | | | | | | | | | | | | | | |
| 48 **Total Assets with Excluded Assets** | **1,329** | **1,126** | **1,701** | **638** | **1,060** | **387** | **144** | **772** | **7,156** | **128** | **25** | **10** | **126** | **8,617** | **16,063** |

(1) Of the $211MM in restricted cash, approximately $75M was subsequently returned to the company, and the LOC was paid down by the same amount.

(2) Includes $45M of PP&E, $8.7M of pre-paids, $5M of non derivative collateral posted, and $3.5M of unamortized debt issuance cost.

# **EXHIBIT B**

**Weekly Cash Flow Projections - Ally Line of Credit**

| ($ millions) | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALLY LINE OF CREDIT CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | |
| 1 GNMA Net Repurchases | $ 9.7 | $ (0.5) | $ (2.1) | $ (2.5) | $ 0.4 | $ 24.0 | $ (2.5) | $ (6.3) | $ 0.8 | $ 22.6 | $ 2.5 | $ (44.8) | $ 1.2 | $ (2.1) | $ 27.6 | $ (2.1) | $ (44.0) | $ 1.3 | $ 22.8 | $ 3.0 | $ 8.8 |
| 2 Net Servicer Advances | (8.8) | 1.4 | 1.2 | 1.7 | 1.7 | (8.4) | 1.7 | 2.8 | 3.4 | (8.7) | 3.4 | 1.9 | 0.9 | (9.2) | 0.9 | 3.4 | 4.3 | 3.5 | (5.3) | 4.7 | (6.0) |
| 3 P&I / Residual / REO / HELOC Collections | 2.5 | 6.6 | 3.5 | 4.3 | 3.7 | 1.9 | 8.2 | 5.4 | 3.5 | 3.0 | 7.3 | 6.0 | 3.8 | 3.6 | 6.8 | 2.7 | 6.3 | 3.5 | 2.8 | 8.1 | 93.4 |
| 4 Servicing / Ancillary Fees | 4.8 | 3.2 | 6.5 | 10.1 | 5.8 | 3.3 | 4.8 | 12.1 | 4.6 | 4.7 | 3.1 | 13.4 | 4.6 | 4.8 | 2.8 | 3.5 | 11.8 | 4.5 | 4.7 | 5.1 | 118.3 |
| 5 Interest | - | - | (1.0) | - | - | - | - | (1.2) | - | - | - | (1.5) | - | - | - | - | (1.7) | - | - | - | (5.4) |
| 6 Operating Expenses / Professional Fees | (3.4) | (6.9) | (2.6) | (7.2) | (6.1) | (7.2) | (3.5) | (6.5) | (3.3) | (13.6) | (3.3) | (7.0) | (3.2) | (14.4) | (3.2) | (7.0) | (3.0) | (15.8) | (3.8) | (7.6) | (128.8) |
| 7 **Net Cash Flow** | **4.7** | **3.7** | **5.5** | **6.3** | **5.5** | **13.6** | **8.7** | **6.2** | **9.0** | **8.0** | **13.0** | **(32.0)** | **7.2** | **(17.4)** | **34.9** | **(2.0)** | **(27.2)** | **(2.1)** | **21.2** | **13.3** | **80.2** |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | |
| 8 Beginning Cash Balance | - | 4.7 | 8.5 | 14.0 | 20.3 | 25.8 | 39.4 | 48.1 | 54.3 | 63.3 | 71.3 | 84.3 | 52.2 | 59.5 | 42.1 | 77.0 | 75.1 | 47.9 | 45.8 | 66.9 | - |
| 9 Net Cash Flow | 4.7 | 3.7 | 5.5 | 6.3 | 5.5 | 13.6 | 8.7 | 6.2 | 9.0 | 8.0 | 13.0 | (32.0) | 7.2 | (17.4) | 34.9 | (2.0) | (27.2) | (2.1) | 21.2 | 13.3 | 80.2 |
| 10 **Ending Cash Balance** | **4.7** | **8.5** | **14.0** | **20.3** | **25.8** | **39.4** | **48.1** | **54.3** | **63.3** | **71.3** | **84.3** | **52.2** | **59.5** | **42.1** | **77.0** | **75.1** | **47.9** | **45.8** | **66.9** | **80.2** | **80.2** |

**Weekly Cash Flow Projections - Ally Revolver**

| ($ millions) | | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALLY REVOLVER CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | | |
| 1 | Origination Activity | $ 87.7 | $ 1.2 | $ - | $ 9.8 | $ 25.7 | $ 6.7 | $ - | $ 12.9 | $ 0.7 | $ 5.6 | $ 1.1 | $ 12.4 | $ - | $ - | $ - | $ 17.1 | $ - | $ - | $ - | $ - | $ 181.0 |
| 2 | GNMA Net Repurchases | 9.7 | (0.5) | (2.1) | (2.5) | 0.4 | 24.0 | (2.5) | (19.0) | 0.8 | 22.6 | 2.5 | (40.5) | 1.2 | (2.1) | 27.6 | (2.1) | (41.8) | 1.4 | 22.8 | 3.0 | 2.8 |
| 3 | Net Servicer Advances | (95.3) | (35.1) | 32.8 | 44.2 | (91.0) | (30.8) | 44.2 | 39.0 | 48.8 | (161.4) | 48.8 | 41.3 | 36.3 | (98.9) | (38.7) | 36.3 | 46.2 | 57.8 | (124.9) | 60.1 | (140.7) |
| 4 | P&I / Residual / REO / HELOC Collections | 2.2 | 3.9 | 3.0 | 3.5 | 3.4 | 2.0 | 5.5 | 4.4 | 2.9 | 2.6 | 4.6 | 4.9 | 3.2 | 3.1 | 4.2 | 2.4 | 4.9 | 3.0 | 2.4 | 5.2 | 71.2 |
| 5 | Interest | - | - | (2.0) | - | - | - | - | (2.0) | - | - | - | (2.0) | - | - | - | - | (2.1) | - | - | - | (8.1) |
| 6 | Operating Expenses / Professional Fees | (4.8) | (9.7) | (3.6) | (9.8) | (8.3) | (9.8) | (4.7) | (8.6) | (4.4) | (17.9) | (4.4) | (9.4) | (4.3) | (19.3) | (4.3) | (9.4) | (4.0) | (20.9) | (5.0) | (10.1) | (172.6) |
| 7 | **Net Cash Flow** | **(0.6)** | **(40.1)** | **28.0** | **45.1** | **(69.8)** | **(7.9)** | **42.5** | **26.7** | **48.9** | **(148.6)** | **52.5** | **6.6** | **36.4** | **(117.2)** | **(11.2)** | **27.2** | **20.4** | **41.2** | **(104.7)** | **58.3** | **(66.4)** |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | | |
| 8 | Beginning Cash Balance | 206.5 | 206.0 | 165.9 | 193.9 | 239.0 | 169.2 | 161.3 | 203.8 | 230.5 | 279.3 | 130.7 | 183.3 | 189.8 | 226.2 | 109.0 | 97.8 | 125.0 | 145.3 | 186.5 | 81.8 | 206.5 |
| 9 | Net Cash Flow | (0.6) | (40.1) | 28.0 | 45.1 | (69.8) | (7.9) | 42.5 | 26.7 | 48.9 | (148.6) | 52.5 | 6.6 | 36.4 | (117.2) | (11.2) | 27.2 | 20.4 | 41.2 | (104.7) | 58.3 | (66.4) |
| 10 | **Ending Cash Balance** | **206.0** | **165.9** | **193.9** | **239.0** | **169.2** | **161.3** | **203.8** | **230.5** | **279.3** | **130.7** | **183.3** | **189.8** | **226.2** | **109.0** | **97.8** | **125.0** | **145.3** | **186.5** | **81.8** | **140.1** | **140.1** |

**Weekly Cash Flow Projections - Ally DIP**

| ($ millions) | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALLY DIP CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | |
| 1   GNMA Net Repurchases | $    - | $    - | $    - | $  (84.7) | $   0.2 | $   0.2 | $   0.2 | $  (63.3) | $   0.4 | $   0.4 | $   0.4 | $  (3.8) | $   0.5 | $   0.5 | $   0.5 | $   0.5 | $  (1.7) | $   0.5 | $   0.5 | $   0.5 | $  (148.1) |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | |
| 2   Beginning Cash Balance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 3   Net Cash Flow | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4   **Ending Cash Balance** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **ALLY DIP FACILITY ACTIVITY** | | | | | | | | | | | | | | | | | | | | | |
| 5   Beginning DIP Balance | - | - | - | - | 84.7 | 84.5 | 84.2 | 84.0 | 147.3 | 146.9 | 146.5 | 146.0 | 149.8 | 149.4 | 148.9 | 148.4 | 148.0 | 149.7 | 149.1 | 148.6 | - |
| 6   Net Cash Flow | - | - | - | 84.7 | (0.2) | (0.2) | (0.2) | 63.3 | (0.4) | (0.4) | (0.4) | 3.8 | (0.5) | (0.5) | (0.5) | (0.5) | 1.7 | (0.5) | (0.5) | (0.5) | 148.1 |
| 7   **Ending DIP Balance** | **-** | **-** | **-** | **84.7** | **84.5** | **84.2** | **84.0** | **147.3** | **146.9** | **146.5** | **146.0** | **149.8** | **149.4** | **148.9** | **148.4** | **148.0** | **149.7** | **149.1** | **148.6** | **148.1** | **148.1** |

# EXHIBIT B TO THE MOTION

This preliminary, non-binding term sheet (this "**Term Sheet**") is confidential and its contents or existence may not be distributed, disclosed or discussed with any other party.  This Term Sheet shall be governed by Rule 408 of the Federal Rules of Evidence and any and all similar and applicable rules and statutory provisions governing the non-admissibility of settlement discussions.

This Term Sheet is provided as a basis for discussion, and summarizes the terms and provisions of any definitive documentation that is being or will be provided in connection with the proposed transaction described herein.  To the extent of any discrepancy between this Term Sheet and such definitive documentation, the terms and provisions of such definitive documentation will control.

| | |
|---|---|
| **ALLY FINANCIAL INC.** **POST-PETITION DRAWS UNDER LINE OF CREDIT** | |
| *LOC:* | That certain Amended and Restated Loan Agreement, dated as of December 30, 2009, by and among Residential Capital, LLC, GMAC Mortgage, LLC, Residential Funding Company, LLC, Passive Asset Transactions, LLC, RFC Asset Holdings II, LLC, Equity Investment I, LLC and GMAC Inc. (now known as Ally Financial, Inc. "**AFI**"), as amended by the First Amendment, dated as of April 30, 2010, as further amended by the Second Amendment, dated as of May 14, 2010, as further amended by the Third Amendment, dated as of August 31, 2010, as further amended by the Fourth Amendment, dated as of December 23, 2010, as further amended by the Fifth Amendment, dated as of April 18, 2011, as further amended by the Sixth Amendment, dated as of May 27, 2011, as further amended by the Seventh Amendment, dated as of April 10, 2012 (as further amended or supplemented, the "**LOC**"), including, without limitation, the other Facility Documents (as defined in the LOC) (each as amended or supplemented). |
| *Commitment:* | Notwithstanding the commencement of cases under the United States Bankruptcy Code (the "**Cases**") by one or more borrowers under the LOC, AFI will permit postpetition draws to be requested under the LOC, and will honor such draw requests, subject to entry by the Bankruptcy Court of a DIP order or orders approving the postpetition extension of credit pursuant to the terms hereof, in an aggregate amount not to exceed $150,000,000 (such commitment, the "**Buyout Funding Commitment**"). |
| *Availability Period:* | Subject to satisfaction of the conditions precedent referred to herein, the Buyout Funding Commitment will be available between [●], 2012 and [●], 2013. |
| *Draw Requests:* | Subject to the Amendment described below, as provided for the in the LOC. |
| *Use of Proceeds:* | The postpetition extensions of credit under the Buyout Funding Commitment may only be used, in a manner consistent with past practices, to fund (A) the repurchase of whole loans from Ginnie Mae pools in order to avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (B) to effect foreclosures and conveyances of the related properties in connection with the submission of HUD Claims, and (C) to allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified.  For the avoidance of doubt, no proceeds may be used to repurchase whole loans for any other purpose, including without limitation, for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects. |

1

| | |
|---|---|
| ***Cash Collateral:*** | The postpetition credit extended under the Buyout Funding Commitment will be included in a cash collateral and DIP order that permits use of LOC cash collateral during the pendency of the Cases, subject to the terms of such order. |
| ***Collateral:*** | Perfected first lien on the repurchased whole loans in addition to all other collateral pledged prepetition to secure the LOC, and a superpriority administrative claim with respect to the repurchased whole loans senior to the superpriority administrative claim of the Barclays DIP Lenders, together with a superpriority administrative claim in an amount equal to the principal and interest on the draws made under the Buyout Funding Commitment junior to the superpriority administrative claim of the Barclays DIP Lenders, except with respect to the Lenders' rights in the repurchased loans and proceeds thereof.  The "**Barclays DIP Lenders**" mean the lenders under the $1,450,000,000 Secured Debtor-in-Possession Credit Agreement, agented by Barclays Bank PLC, and provided to the debtors in connection with the Cases (the "**Barclays DIP Facility**"). |
| ***Conditions*** | 1. Entry of a DIP order, in form and substance satisfactory to AFI, permitting the postpetition credit extensions under the Buyout Funding Commitment, granting perfected first priority liens in the whole loans repurchased with the proceeds of such postpetition credit extensions, extending the pre-petition liens on collateral under the LOC to secure the postpetition credit extensions under the Buyout Funding Commitment, granting the administrative claims described above under "Collateral", permitting the execution, delivery and performance of the Amendment described below, and otherwise granting the protections customarily afforded to lenders under debtor-in-possession credit facilities (collectively, the "**AFI DIP Order(s)**"). <br><br> 2. Execution, delivery and performance by the parties to the LOC, and approval by the Court in the AFI DIP Order(s), of an eighth amendment to the LOC (the "**Amendment**"), in form and substance satisfactory to AFI, to restrict the use of proceeds for the purposes described above, modify the conditions precedent under the LOC to permit the Buyout Funding Commitment to be effected, to modify the prepayment and repayment provisions of the LOC as described below, to add events of default and conditions to borrowing congruent with those in the Barclays DIP Facility and customary for lenders under debtor-in-possession credit facilities, and to make the technical and conforming edits necessary to accommodate the Buyout Funding Commitment. <br><br> 3. After giving effect to the Amendment, all conditions precedent to the funding of advances under the LOC shall apply in respect of draw requests under the Buyout Funding Commitment. <br><br> 4. All collateral eligibility requirements under the LOC shall apply in respect of the loans purchased with the proceeds of the Buyout Funding Commitment. |
| ***Interest:*** | Interest will accrue postpetition on amounts drawn under the Buyout Funding Commitment at the rate of LIBOR + 400bps, with a LIBOR Floor of 1.25%. Interest will be payable monthly on the last day of each applicable interest period, and on the maturity or earlier repayment of advances under the Buyout Funding Commitment.  Customary breakage costs, consistent with the Barclays DIP Facility, will be payable if applicable. |

701676189.8 10488637

| | |
|---|---|
| *Prepayment:* | As provided for in the LOC.  Amounts voluntarily prepaid under the Buyout Funding Commitment may not be reborrowed. |
| *Repayment:* | As provided for in the Amendment, mandatory repayment of all obligations will be due upon the earliest of (i) contemplated sale(s) of the Debtors' assets, (ii) the effectiveness of a plan of reorganization, (iii) a stated maturity date consistent with the maturity of the A-1 term loan under the Barclays DIP Facility, and (iv) the occurrence of an event of default, provided that in any event all outstanding obligations shall be repaid in full contemporaneously with the repayment of the Barclays DIP Facility.  The Amendment will deem repayments to be made first to indebtedness drawn under the Buyout Funding Commitment, and second to the pre-petition indebtedness under the LOC. |
| *Representations and Warranties:* | After giving effect to the Amendment, as provided for in the LOC. |
| *Affirmative Covenants:* | After giving effect to the Amendment, as provided for in the LOC. |
| *Negative Covenants:* | After giving effect to the Amendment, as provided for in the LOC. |
| *Events of Default:* | After giving effect to the Amendment, as provided for in the LOC. |
| *Governing Law:* | New York and the Bankruptcy Code. |
| *Fees and Expenses:* | All fees and expenses of counsel to AFI in connection with the Buyout Funding Commitment shall be payable by GMAC Mortgage. |

701676189.8 10488637