MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
|  |  )  |  |
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |
---------------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER BANKRUPTCY
CODE SECTIONS 105(a), 363(b), 507(a), 1107 AND 1108 AND BANKRUPTCY RULE
6003 (I) AUTHORIZING BUT NOT DIRECTING DEBTORS TO (A) PAY AND HONOR
PREPETITION WAGES, COMPENSATION, EMPLOYEE EXPENSE
AND EMPLOYEE BENEFIT OBLIGATIONS; AND (B) MAINTAIN AND CONTINUE
EMPLOYEE COMPENSATION AND BENEFIT PROGRAMS; AND (II) DIRECTING
BANKS TO HONOR PREPETITION CHECKS AND TRANSFER REQUESTS FOR
PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move for entry of interim and final orders (the "Motion"), under sections

105, 363(b), 507(a), 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code")

and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

(i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, compensation,

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes such entities.

employee expenses and employee benefit obligations under employee benefit programs and

associated taxes and administration fees;  and (b) continue the payment of wages, compensation

and employee expenses, employee benefit obligations under employee benefit programs, and

associated taxes and administration fees accruing postpetition in the ordinary course;

(ii) directing all banks to honor checks and transfer requests for payment of approved employee

obligations; and (iii) scheduling a final hearing (the "Final Hearing") to consider entry of a final

order with respect to the relief requested herein.[2]  In support of the Motion, the Debtors rely

upon and incorporate by reference the Affidavit of James Whitlinger, Chief Financial Officer of

Residential Capital, LLC ("ResCap"), in Support of Chapter 11 Petitions and First Day Pleadings,

filed with the Court concurrently herewith (the "Whitlinger Affidavit").  In further support of the

Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for

the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 507(a), 1107 and 1108;

Bankruptcy Rule 6003; and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District

of New York.

## BACKGROUND

2.       On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors

---

[2]      Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

are managing and operating their businesses as debtors in possession pursuant to Bankruptcy

Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has

been appointed in these Chapter 11 cases.

3.    The Debtors are a leading residential real estate finance company

indirectly owned by Ally Financial Inc. ("AFI"), which is not a Debtor.  The Debtors and their

non-debtor affiliates operate the fifth largest servicing business and the tenth largest mortgage

origination business in the United States.  A more detailed description of the Debtors, including

their business operations, their capital and debt structure, and the events leading to the filing of

these bankruptcy cases, is set forth in the Whitlinger Affidavit.

4.    The Debtors' primary and most valuable business operations consist of

servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank, and

other third parties.  As of March 31, 2012, the Debtors were servicing over 2.4 million domestic

mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion.  To

preserve and realize the value of these assets and achieve the goals of these Chapter 11 cases, the

Debtors developed and are prepared to implement a strategy that provides maximum value to the

Debtors' estates.

5.    The Debtors negotiated and entered into two separate asset purchase

agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder

("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the

"Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of

their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the

"Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

6.    In furtherance of their restructuring strategy, and contemporaneous with the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to, among other things, establish auction and sale procedures for the Asset Sales,[3] and for approval to consummate the Asset Sales under a plan.  If, however, the Debtors do not obtain confirmation of a plan by deadlines to be determined, then the Sale Motion allows the Debtors to pursue an alternative course of action and immediately move forward with the Asset Sales under Bankruptcy Code section 363(b) and outside of a plan.

## RELIEF REQUESTED

7.    By this Motion, the Debtors seek entry of interim and final orders (the "Interim Order" and "Final Order," respectively), under Bankruptcy Code sections 105(a), 363(b), 507(a), 1107 and 1108 and Bankruptcy Rule 6003:

(a) authorizing, but not directing, the Debtors, in accordance with their current employment policies and practices, to:

(i) (A) pay and/or honor, as applicable, prepetition obligations owed to current and former employees of the Debtors (collectively, the "Employees"), contractors (the "Contractors") and members of the board of directors (the "Directors"), including accrued and unpaid prepetition wages, salaries, commissions, variable pay, bonuses and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, "Prepetition Compensation Obligations");

(B) reimburse Employees, Contractors and Directors for prepetition expenses incurred by such Employees, Contractors and Directors on behalf of the Debtors (the "Prepetition Non-Compensation Obligations");

---

[3]    Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the "Sale Motion").

(C) honor all prepetition obligations to or on behalf of Employees for Benefit Plans, Retirement and Savings Plans and Other Benefits (each as defined herein below) and workers' compensation obligations (collectively, the "Prepetition Benefit Obligations"); and

(D) direct the payment of all related prepetition payroll withholding obligations and payroll-related taxes to the appropriate parties (the "Prepetition Withholding Obligations," together, with the Prepetition Compensation Obligations, the Prepetition Non-Compensation Obligations and the Prepetition Benefit Obligations," the "Prepetition Employee Obligations"); and

(ii) continue to honor obligations and/or make necessary payments under the Debtors' employee compensation programs and benefit plans (and to pay all fees and costs in connection therewith) arising postpetition except as otherwise set forth herein, the most significant of which are described below; and

(iii) modify, change or discontinue any of the plans, policies and procedures associated with or giving rise to the compensation or benefit plans described below, and to implement new plans, policies or procedures related thereto in the ordinary course of business during these Chapter 11 cases in the Debtors' sole discretion without the need for further Court approval; and

(b)      authorizing and directing the Debtors' banks to receive, process, honor and pay all of the Debtors' prepetition checks and honor transfer requests on account of any of the Prepetition Employee Obligations;

(c)      prohibiting the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations; and

(d)      authorizing the Debtors, if applicable, to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

8.      The Debtors request that, to the extent necessary, the relief requested by this Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases. The Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's

entry of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the Chapter 11 cases of the Debtors.

9.       As described below, many of the compensation, benefit and variable pay programs provided by the Debtors to their Employees and Contractors are sponsored by and/or administered through and/or directly funded by AFI.  In general, most payments to Employees for wages and compensation and third party benefit providers for Employee benefit obligations are made directly by AFI.  The Debtors reimburse AFI for substantially all amounts paid by AFI to Employees and to third party benefit providers on behalf of the Debtors through direct cash transfers to AFI in the normal course of business ("Direct Costs").

10.       The Debtors also reimburse AFI for their allocated pro rata share of the costs relating to the administration of Employee benefits and compensation ("Indirect Costs").[4] This payment for this allocation is generally done on a monthly basis for the prior month.  The Debtors' reimbursement to AFI for the postpetition Indirect Costs will generally be governed by the Shared Services Agreement.  Out of an abundance of caution, where noted, by this Motion the Debtors are seeking authority, but not direction, to reimburse AFI for certain Indirect Costs, as necessary and to the extent such reimbursement requirements are not otherwise covered by the

---

[4]      As discussed below, the payment of third party administrator fees is a direct obligation of AFI for which the Debtors reimburse AFI through a monthly allocation charge.  Simultaneously with the filing of this Motion, the Debtors have filed a motion (the "Shared Services Motion") to approve the Shared Services Agreement between ResCap and AFI.  The Shared Services Agreement governs the provision of necessary services between the Debtors and AFI and their respective affiliates as well as the parties' financial obligations thereunder.  The Shared Services Motion requests authority for the Debtors to honor all of their obligations under the Shared Services Agreement.  The Shared Services Agreement covers, among other services, human resource services relating to benefits administration, payroll and other related matters.  By the Shared Services Motion, the Debtors are seeking authority to pay AFI for the services provided to the Debtors for certain services as described in more detail therein. Out of an abundance of caution, by this Motion, where noted, the Debtors are seeking authority to satisfy certain obligations that may otherwise be covered by the Shared Services Motion. The costs to the Debtors and their specific reimbursement obligations under the Shared Services Agreement is governed by the Shared Services Agreement and described in the Shared Services Motion.

ny-1011823

Shared Services Agreement, in order to avoid any disruptions relating to the provision of

compensation, non-compensation and other benefits to Employees.

## I.    COMPENSATION OBLIGATIONS – WAGES, SALARIES, VARIABLE PAY AND BOARD OF DIRECTORS' FEES

### A.    Wages and Salaries

11.    As of April 30, 2012, the Debtors employ approximately 3,625 Employees,

of whom approximately 3,575 are full time Employees (the "Full-time Employees"),[5] and

approximately 50 are part time Employees (the "Part-time Employees").[6]  There are

approximately 280 Employees who earn wages primarily in the form of commissions (the

"Commission Status Employees").[7]  In addition to ordinary wage, and salary obligations, in the

ordinary course of the Debtors' businesses, the Debtors incur obligations to certain Employees

for compensation and benefits under several programs defined and discussed below, including

Variable Pay Plans.

12.    Salaried Full-Time Employees are paid every other Friday, one week in

arrears for their bi-weekly share of their annual salary.  Full-Time Employees that are

compensated on an hourly wage basis are also paid one week in arrears for their regular and

overtime hours (i.e., they are paid every other Friday for work through and including the

previous Sunday).  Part-Time Employees are compensated on an hourly wage basis one week in

arrears every other Friday according to the time recorded for work through and including the

previous Sunday.  Commission Status Employees generally are paid a commission draw every

---

[5]    Full-time Employees work at least 40 hours per week.

[6]    Part-time Employees work less than 40 hours per week.  Part-time Employees who work 20-39 hours per week (the "Benefit Eligible Part-time Employees") are eligible for most of the Debtors' benefit programs.

[7]    Commission Status Employees are eligible for certain benefits based on their individual job descriptions. Certain Commission Status Employees receive the same benefit package as Full-time Employees (the "Commission Benefit Employees").

ny-1011823

other Friday, and are paid commissions on a bi-weekly, monthly or quarterly basis.  Details

regarding the Commission Variable Pay (as defined below) are set forth below.

13.    Hourly Full and Part-time Employees, whose regularly scheduled work

days fall on an observed holiday and who work on such holiday are paid 1.5 times their normal

hourly rate (the "Holiday Pay") plus the regular hourly rate.  Holiday Pay is paid one pay period

in arrears.

14.    The average monthly gross payroll for Employees for the trailing 13 pay

cycles was approximately $20.5 million. The Debtors rely on the use of centralized systems

administered by AFI across AFI's business lines for payment of Employee-related obligations.

The Debtors' payroll is funded and paid by AFI through AFI bank accounts, and then reimbursed

through direct cash transfers from the Debtors to AFI.  The Debtors estimate that as of the

Petition Date there are no accrued but unpaid obligations related to gross payroll owed to

Employees.  Out of an abundance of caution, the Debtors seek the authority, but not the direction,

to pay to AFI any residual unpaid prepetition obligations related to Employee payroll to the

extent the Debtors determine there are any.

15.    In addition to their Employees, the Debtors retain approximately 375

independent contractors (the "Contractors")for various business functions.  Substantially all

Contractors are either retained through (a) AFI who has contracted with Kelly Vendor

Management Solutions ("KVMS") for the provision of such services or (b) Tata America

International Corporation ("Tata") for technology related support.  The Debtors pay KVMS and

Tata directly for Contractors provided to the Debtors, based on approved invoices received from

KVMS or Tata.  The Debtors' average monthly payment for Contractors is approximately $2.15

8

million.  The Debtors estimate that as of the Petition Date there are no accrued but unpaid

obligations related to Contractors.

### B.    Variable Pay

16.    Variable pay is one component of total Employee compensation.

Employees generally receive variable pay in the form of cash or AFI restricted stock depending

upon which of the numerous variable pay plans (collectively, the "Variable Pay Plans") the

individual Employee participates.  Specifically, the Debtors have established two commission-

based Variable Pay Plans, five production-based Variable Pay Plans and two discretionary

Variable Pay Plans.  All Employees are eligible to receive variable pay with approximately 825

Employees receiving Commission Variable Pay or Production Variable Pay (as defined below).

### 1.    Commission Variable Pay

17.    The Debtors have established two Variable Pay Plans for Commission

Status Employees.  Commission Status Employees generally do not receive any base salary and

compensation is therefore exclusively in the form of cash commissions earned upon funding of a

loan ("Commission Variable Pay").

a.    <u>Mortgage – Consumer Lending</u> [8]

The Debtors' Direct Consumer Lending group consists of approximately
165 loan agents and 9 sales managers, with variable pay awarded based
on funded loan volume during each period.  Variable pay provides 100
percent of each loan agent's compensation and is targeted to provide 66

---

[8]    Prior to the Petition Date, with the exception of mortgage loans originated by the Debtors in Nevada and Ohio,
the Debtors ceased funding mortgage loans.  The vast majority of the Debtors' activities in connection with loan
origination efforts involve brokering loans with the Debtors' non-debtor affiliate Ally Bank.
Contemporaneously with the filing of this Motion, the Debtors have filed a motion seeking an order from the
Bankruptcy Court authorizing the Debtors to (I) Process And Where Applicable Fund Prepetition Mortgage
Loan Commitments, (II) Continue Brokerage, Origination And Sale Activities Related To Loan Securitization,
(III) Continue To Perform Under The Mortgage Loan Purchase And Sale Agreement With Ally Bank And
Related Agreements, (IV) Pay Certain Prepetition Amounts Due To Critical Origination Vendors, And (V)
Continue Honoring Mortgage Loan Repurchase Obligations Arising In Connection With Loan Sales And
Servicing, each in the ordinary course of the Debtors' business.

9

percent of managers' compensation. Awards are subject to adjustment based on quality and customer service metrics.

Loan agents are also eligible to receive chargeable and recoverable draws, and may be eligible for forgivable draws. Payments are made on a monthly/quarterly basis for the prior month/quarter.  As of the Petition Date, the Debtors believe that there is no unpaid variable pay related to the Direct Consumer Lending Variable Pay Plan.

b.  <u>Mortgage - Retail Origination</u>

The approximately 108 loan officers, 7 sales managers, 17 area sales managers, 8 regional directors, and loan officer assistants in the Debtors' Retail Consumer Origination group participate in a Variable Pay Plan based upon the total value of loans funded during a given month, adjusted based on quality measurements.  Variable pay provides 100 percent of loan officer and sales manager compensation, with area sales managers and regional directors receiving 50 to 60 percent of their compensation from variable pay.

Loan officers and sales managers are also eligible to receive draws, a portion of which may be forgivable (<u>i.e.</u>, not recoverable by the Debtors other than against future commissions) and a portion of which is chargeable and recoverable. Payments are made on a monthly/quarterly basis for the prior month/quarter.  As of the Petition Date, the Debtors believe that there is no unpaid variable pay related to the Retail Origination Variable Pay Plan.

18.  As of the Petition Date, the Debtors believe there are no unpaid obligations for Commission Variable Pay.

19.  Commissions are funded in the same manner as the Debtors' weekly payroll.  AFI funds all payments of Commissions to Employees, and the Debtors then reimburse AFI through a direct cash transfer.

**2.  Production Variable Pay**

20.  Eligible Employees receive production-based variable pay based on meeting certain monthly, quarterly and annual production targets (collectively, the "Production Variable Pay").  Production Variable Pay may include a discretionary portion that is paid to certain Employees that have consistently exceeded production targets.

10

a.  Mortgage – Consumer Lending Operations

Approximately 18 loan closers, 15 funders, 119 processors, 12 team managers and 2 directors of operations in the Consumer Lending Operations group are entitled to receive variable pay targeted at 10 to 30 percent of each Employee's total compensation.  Variable payments are calculated based on the total number of loans closed or an "equivalent unit,"[9] subject to quality and customer service adjustments and achievement of minimum equivalent unit targets.  Payments are made on a monthly/quarterly basis for the prior month/quarter.  As of the Petition Date, the Debtors believe that there is no unpaid variable pay related to the Consumer Lending Operations Variable Pay Plan.

b.  Mortgage Servicing - Real Estate Owned ("REO")[10]

Approximately 25 asset managers and 6 supervisors in the Debtors' business group earn variable pay based on several factors, including turnover ratio of assets sold for the month; ratio of the actual selling price versus market value as determined by valuation department and total number of REO days on sold assets, subject to quality and efficiency goals determined by an independent quality management group.  Variable compensation for REO Employees is targeted to comprise 40 percent of their total compensation. Payments are made on a monthly basis for the prior month.  As of the Petition Date, the Debtors believe that there is no unpaid variable pay related to the REO Variable Pay Plan.

c.  Mortgage Servicing - Loss Mitigation

Approximately 191 specialists in the Debtors' Loss Mitigation group participate in a Variable Pay Plan targeted to provide 24 to 33 percent of each Employee's total compensation.  The variable pay plan pool is funded if the specialists meet certain production goals for servicing and resolution of past due mortgage loan payments weighted by delinquency and severity that are adjusted based on quality and efficiency scores for the unit.  Payments are made on a monthly basis for the prior month.  As of the Petition Date, the Debtors believe that there is no unpaid variable pay related to the Loss Mitigation Variable Pay Plan.

---

[9]  The number of "equivalent units" earned by an employee depends on the task undertaken.  Different tasks are awarded predetermined numbers of "equivalent units" based upon the effort and time required to undertake the particular task.

[10]  REO is property owned by a lender acquired at a foreclosure auction.  The Debtors hold REO on account of mortgage loans they own, and service REO for third-parties in connection with their loan servicing operations.

d.    Collections

The 99 specialists and 11 supervisors in the Debtors' Collections group are eligible for a Variable Pay Plan intended to provide 29 to 31 percent of each Employee's total compensation.  The available variable pay pool is based on factors such as completing workouts that mitigate losses and maintaining acceptable quality standards.  Payments are made on a monthly basis for the prior month.  As of the Petition Date, the Debtors believe that there is no unpaid variable pay related to the Collections Variable Pay Plan.

e.    Loan Recovery

The Variable Pay Plan covering the 10 specialists, 8 senior specialists, and 3 team leaders in the Debtors' Loan Recovery group is intended to provide each Employee with between 23 to 35 percent of her or his total compensation.  Specialists and senior specialists receive awards based on execution of revenue generating short-sales and settlements, which offset previously incurred losses on charged-off assets, with team leaders receiving awards based upon the performance of their team members. Payments are made on a monthly basis for the prior month.  As of the Petition Date, the Debtors estimate that there is no unpaid variable pay related to the Loan Recovery Variable Pay Plan.

21.    As of the Petition Date, the Debtors believe there are no unpaid obligations under the Production Variable Pay.

22.    Production Variable Pay is funded in the same manner as the Debtors' weekly payroll.  AFI funds all payments to Employees, and the Debtors then reimburse AFI through a direct cash transfer.

**3.    Discretionary Variable Pay**

23.    For all Employees not eligible to receive Commission Variable Pay or Production Variable Pay, a portion of their annual compensation is in the form of variable pay awarded based on company, unit and individual performance targets established by management and approved by the Debtors' compensation committee (the "Discretionary Variable Pay"). Discretionary Variable Pay is generally paid in cash, with certain Employees receiving a portion of Discretionary Variable Pay in restricted AFI stock.  Eligible Employees receive Discretionary

12

Variable Pay through participation in the Ally Financial Inc. Long-Term Equity Compensation

Plan (the "AFI LTECIP") and the Residential Capital, LLC Annual Plan (the "ResCap AIP"),

the ResCap Reward and Recognition Program and the Sign-on Bonus Program (collectively, the

"Discretionary Variable Pay Plans").

### a.    Equity Variable Pay

24.    Seventy-two Employees have previously received awards under the AFI

LTECIP.  It is undetermined whether future awards will be granted to these Employees.  The

AFI LTECIP awards are in the form of restricted stock grants in AFI common stock generally

awarded by AFI in the first quarter of each year.  The AFI LTECIP is generally designed to

motivate employees of AFI and its subsidiaries, including the Debtors, by providing for deferred

compensation that is based on AFI's growth, profitability and success, including appreciation in

its common stock.

25.    As a result of AFI having received support under the federal government's

troubled assets relief program ("TARP"), the Debtors (as indirect wholly-owned subsidiaries)

must follow the TARP rules that govern compensation.  The AFI LTECIP is intended to be

compliant with Title VII of the American Recovery and Reinvestment Act of 2009 and TARP

and the regulations thereunder for the awarding of restricted stock under a long-term equity plan.

Since 2009, the compensation for those Employees that fall within AFI's top 25 highly-

compensated employees must have their total compensation reviewed and approved by the

special paymaster appointed by the United States Treasury (the "Special Paymaster").[11]  The

Special Paymaster must also approve the compensation structure for those Employees that fall

within AFI's 75 next most highly-compensated employees and Employees that receive total cash

---

[11]    In addition, the Special Paymaster must approve all cash salaries that exceed $500,000 per annum. Three senior leadership Employees fall within AFI's top 25 highly-compensated employees.

compensation above a certain threshold.[12]  The pay structure that has been approved by the

Special Paymaster requires 50 percent of Discretionary Variable Pay to be in the form of equity

that must be deferred for three years.  Furthermore, of the 50 percent of Discretionary Variable

Pay that is payable in cash, 50 percent must be deferred for one year (i.e., 25 percent of overall

Discretionary Variable Pay).[13]

26.      AFI LTECIP awards for Employees are determined by the Debtors'

management and approved by AFI and the Special Paymaster where appropriate.  AFI LTECIP

awards are memorialized in a letter to the Employee (the "Award Letter"), which the Employee

must sign in order to be an AFI LTECIP participant.   The Award Letter details the amount of the

award and the vesting schedule.[14]  Payment of vested awards is based on the appraised value of

AFI common stock at the time of payment.

27.      Prior to the Petition Date, the Debtors typically reimbursed AFI for the

amount of the AFI LTECIP award when paid to an Employee.[15]  The Debtors do not anticipate

making any payments on account of any prepetition awards under the AFI LTECIP during 2012.

**b.      Cash Variable Pay**

28.      Historically, the Debtors participated in the Ally Financial Inc. Annual

Incentive Plan (the "AFI AIP").  As of March 8, 2012, Debtor ResCap adopted the ResCap AIP

---

[12]   Nine Employees fall within AFI's 75 next most highly-compensated employees.

[13]   As a bank holding company, Ally is subject to supervision, examination and regulation by the Board of
       Governors of the Federal Reserve System.  Accordingly, the Federal Reserve has pay-review authority of all
       employees at a regulated entity whose activities expose the organization to material amounts of risk.

[14]   In connection with any sale of the Debtors' business during the Chapter 11 proceeding, Employee awards under
       the AFI LTECIP may vest as a result of their termination by the Debtors as a result of such sale.  As of the
       Petition Date, the value of all AFI LTECIP awards to Employees that would vest upon a sale, and be paid on a
       deferred basis, is approximately $17.6 million.

[15]   The Debtors may have contingent liability to AFI for AFI LTECIP awards granted to Employees prior to the
       Petition Date that have not vested on or before the Petition Date; however, the Debtors reserve all rights as to
       the validity of such obligation.

effective on and after January 1, 2012.  The ResCap AIP adopts substantially all of the terms of

the AFI AIP and is consistent with the AFI AIP.  Under the AFI AIP, the Debtors reimbursed

AFI though direct cash transfers for all awards paid by AFI to Employees thereunder.  The

practical effect of the adoption of the ResCap AIP is for the most part administrative.  ResCap is

now offering the ResCap AIP directly to Employees rather than having AFI sponsor the AFI AIP

with the Debtors having the corresponding obligation to reimburse AFI for all payments made

thereunder.  ResCap will be responsible for the administration of and obligations relating to the

ResCap AIP.

29.    The ResCap AIP, like the AFI AIP, is designed to tie a portion of an

eligible Employees' to annual established by management and approved by the compensation

committee.  The total size of the ResCap AIP award pools are subject to approval by the

Debtors' independent Directors.  If awarded, ResCap AIP award payments are made during the

first quarter of each year based on performance for the prior year and considered on a corporate,

business unit, function and individual bases, with the earliest payments being in 2013. The

Debtors do not anticipate making any payments under the ResCap AIP during 2012.

30.    The Debtors have no obligations to Employees under the AFI AIP.

**C.    Other Compensation**

31.    Eligible Employees are provided additional forms of compensation

("Other Compensation") and is generally subject to management approval and a provided on a

case-by-case basis.

**1.    Recruiting Bonuses**

32.    Eleven Employees are eligible to receive recruiting bonuses for the hiring

of loan officers.  The recruiting bonuses average approximately $3,000 per loan officer hired by

the Debtors.  The Debtors have established a target for each recruiter to hire three new loan

15

officers per month.  Bonus payments are made with gross payroll.  As of the Petition Date, the

Debtors estimate that there are no unpaid recruiting bonuses.

### 2.    Spot Bonus Program

33.    All Employees, except the top 25 most highly compensated employees,

are eligible to receive "spot" bonuses.

34.    The ResCap Reward and Recognition Program recognize Employees who

for their contribution to the Debtors' business goals.  Winners receive an "on-the-spot" cash

payment of $100.  On average, 14 Employees are recognized on a monthly basis.  In addition,

Employees recognized by management or their colleagues for going above and beyond

expectations in their service of internal or external customers are eligible to receive spot bonuses

ranging from $100 to $20,000.  "Above and beyond" bonuses average $1,200 per award, with

the significant majority of bonuses (92 percent) totaling less than $3,000.  Only 3 percent of all

"above and beyond" awards have been for amounts greater than $5,000 and no awards have

exceeded $10,000.  Upon management approval of the awards, bonus payments are paid in the

next bi-weekly payroll.

35.    The Debtors have no prepetition obligations due to Employees under the

ResCap Reward and Recognition Program.

### 3.    Sign-On Bonus Program

36.    The Debtors also provide bonuses to certain new recruits to provide for a

prospective employee to join the company.  For these Employees, the sign-on bonus is typically

tied to performance criteria specified at the time of their hiring.  Sign-on bonuses may be paid

immediately, monthly or quarterly, but are fully paid no later than one-year after an Employee

commences employment.

37.     The Debtors have no prepetition obligations due to Employees for prepetition signing bonuses.

38.     Pursuant to this Motion, the Debtors seek the authorization, but not direction, to (i) reimburse AFI through direct cash transfers for all accrued and unpaid amounts owed to Employees as of the Petition Date for wages and salaries, including amounts that the Debtors or their agents are required by law to withhold from Employee payroll checks in respect of federal, state and local income taxes, garnishment, contributions, social security and Medicare taxes, (ii) pay KVMS and Tata for any payments owed for Contractors as of the Petition Date (iii) continue to pay KVMS and Tata for Contractors as such payment obligations are incurred in the ordinary course on and after the Petition Date; (iv) continue the Variable Pay Plans, including Employee participation in the AFI LTECIP and the ResCap AIP as approved by the Special Paymaster to be in compliance with the TARP regulations; (v) continue their Other Compensation programs in the ordinary course, and (vi) continue to reimburse AFI for these payments in the ordinary course as such Compensation Obligations are incurred on and after the Petition Date; provided however, that the relief sought herein shall not be deemed to constitute an assumption of a contract with any of the Debtors' officers.

**D.      Board Of Directors' Fees**

39.     The Debtors' current Employees who serve as directors receive no additional compensation for their service on the ResCap Board of Directors.  The Debtors pay four (4) non-Employees compensation as members of the ResCap Board of Directors (the "Directors") base compensation for a director is $180,000 per year.

40.     Directors who are on a committee receive an additional $10,000 per year, and directors who chair a committee receive an additional $20,000 per year.  Directors are also paid $1,500 for each board and committee meeting during a calendar year.  As of the Petition

17

Date, the Debtors believe that there are no outstanding amounts owed to the four (4) non-

Employee Directors on account of their work for the Debtors during the prepetition period.

41.      By this Motion, out of an abundance of caution, the Debtors request

authority, but not direction, to pay accrued and unpaid amounts owed to the Directors as of the

Petition Date and to continue their historical director compensation practices in the ordinary

course of their businesses; provided however, no relief being sought herein shall be deemed an

assumption of any contract with a director.

## II.      NON-COMPENSATION OBLIGATIONS: PAID TIME OFF, HOLIDAY, SICK BANK, AND LEAVE POLICIES AND SEVERANCE BENEFITS

### A.      Paid Time Off, Holiday, Sick Bank, Leave Time and Overtime Pay

42.      The Debtors offer their Full-time Employees, Benefit Eligible Part-time

Employees, and Commission Benefit Employees other forms of compensation, including paid

time off ("PTO"), Holiday Time, Sick Bank Time, Leave Time and overtime pay (collectively,

the "Other Compensation Obligations").  These forms of compensation are usual and customary

and the Debtors' ability to continue to honor them is essential in order for the Debtors to retain

qualified employees to operate their businesses.

43.      PTO.  Certain current Employees earn PTO, which is intended to be used

for vacations, illness, and personal business and is generally based on an Employee's length of

service with the company.  Full-time Employees are permitted to carryover unused PTO until the

Employee reaches a "cap" equal to 150 percent of the Employee's annual accrual rate.  PTO is

calculated as follows:

18

| Length of Service[16] | PTO Days[17] |
|---|---|
| < 3 years | 20 days |
| 3 years to <5 years | 23 days |
| 5 years to <10 years | 25 days |
| 10 years to <15 years | 27 days |
| 15 years to < 25 years | 30 days |
| 25+ years | 35 days |

PTO is also provided as a benefit to Benefit Eligible Part-time Employees, but is pro-rated based on the number of hours worked per week. As of April 26, 2012, PTO accruals totaled approximately $10.35 million representing an average of approximately $3,140.00 per eligible Employee. PTO is not a cash expenditure, but rather a tool utilized by the Debtors to track the estimated non-cash cost of the PTO benefit. Employees can however cash out their accrued, but unused, PTO upon termination. The Debtors believe prepetition cash obligations for PTO termination cash outs related to employees that have received notifications of termination for dates subsequent to the Petition Date is approximately $60,250.

44.    Holiday Time. Holiday time is provided to current Full-time Employees for various nationally observed holidays (the "Holiday Time"). Holiday Time is also provided to current Benefit Eligible Part-time Employees, but is pro-rated based on the number of hours worked per week. Holiday Time is provided to qualifying Employees starting with an Employee's first year of service.

---

[16]    Employees of the Debtors with at least 20 years of service on or before December 31, 2008 were grandfathered into the 25 year schedule.

[17]    Certain Employees negotiated additional PTO accruals upon hire.

ny-1011823

45.    <u>Sick Bank</u>.  Some current Employees have sick bank time (the "Sick Bank

Time") accrued under previous time off policies that are no longer offered.  Sick Bank Time can

only be used in conjunction with approved disabilities or the Family Medical Leave Act.  Sick

Bank Time is not paid out upon termination.  The Debtors seek authority, but not direction, to

continue honoring their Sick Bank Time obligations that accrued as of January 1, 2009.

46.    <u>Leave Policies</u>.  All current Employees may be eligible for leaves of

absence ("Leave Time"), either pursuant to company policy or applicable law.  Current

Employees are eligible for paid leaves of absence for jury duty, bereavement upon the death of

certain qualifying family members, and disability leave (as described below).  In certain

instances, these current Employees may also take unpaid personal leaves of absence for a variety

of reasons.  The Debtors believe that the estimated value of accrued and unpaid Leave Time as of

the Petition Date for any Employees that are currently on leaves of absence is <u>de minimis</u>.

**B.    Severance**

47.    Historically, the Debtors' Full-time Employees, Benefit Eligible Part-time

Employees and Commission Status Employees participated in the Ally Financial Inc. Severance

Plan (the "AFI Severance Plan").  Under the AFI Severance Plan, the Debtors would reimburse

AFI for payments made by AFI to the Debtors' former employees.

48.    Effective March 8, 2012, AFI discontinued the Debtors' Employees

participation in the AFI Severance Plan. On March 8, 2012, the Debtors adopted the Residential

Capital, LLC Severance Plan (the "ResCap Severance Plan").  The ResCap Severance Plan is

substantially the same as the AFI Severance Plan and reflects that the Debtors are directly

obligated for the administration of and payments made under the ResCap Severance Plan instead

of AFI.  The ResCap Severance Plan benefits include cash payments, outplacement services as

well as certain other benefits depending on the Employee's benefit level, payable upon a

qualified termination of employment.  Eligible Employees who do not participate in the AFI

LTECIP participate in the ResCap Severance Plan at benefit level I (see definition below) and

those Employees that participate in the AFI LTECIP participate in the ResCap Severance Plan at

benefit level II.  ResCap Severance Plan benefits are not paid unless and until the Employee

signs and does not revoke a general release of claims against the Debtors.  In addition,

Employees are obligated to comply with certain non-solicitation (benefit level II participants,

defined below), confidentiality, non-disparagement, cooperation and the return of company

property provisions.

   49. <u>Benefit Level I Participants</u>.  Benefit Level I Participants are eligible for

cash payments which range from 4 weeks to 35 weeks base salary and outplacement service.

The specific amount for an individual payment varies, based on length of service and the

Employee's level of responsibility within the Debtors' organization.

   50. <u>Benefit Level II Participants</u>.  Benefit Level II Participants are eligible for

cash payments which range from 26 weeks to 52 weeks base salary and outplacement service.

The specific amount for an individual payment varies, based on length of service and the

Employee's level of responsibility within the Debtors' organization.

   51. Pursuant to the ResCap Severance Plan, ResCap enters into agreements

with employees that are terminated to memorialize the terms of the severance payments, the

releases in favor of the employer and other details relating to the termination of employment.

ResCap has entered into agreements with 15 Employees whose employment will be terminated

effective as of various dates ranging from June 2012 to December 2012.  These Employees are

employed with the Debtors' Risk, Finance, Accounting and Treasury Departments.  Severance

payments are made in a lump sum and are generally included in the former employee's final payroll check following termination.

52.    As of the Petition Date, the Debtors are obligated to pay $180,778 in severance under the 15 pre-petition termination agreements the Debtors entered into with Employees who are currently employed, but whose employment will end postpetition. Notwithstanding that these severance payments are a primary obligation of ResCap, these amounts will be paid by AFI through the normal bi-weekly payroll process, and the Debtors will reimburse AFI through a direct cash transfer in the ordinary course.  The Debtors anticipate that they will make approximately $75,000 in severance reimbursement payments to AFI over the next 30 days.

53.    The Debtors anticipate that their current Employees will be entitled to use any accrued but unused PTO, Sick Bank Time, Holiday Time or Leave Time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.[18]

54.    By this Motion, the Debtors seek authority, but not direction, to (a) honor in the ordinary course of business all accrued prepetition obligations for PTO, Sick Time, Holiday Time, Sick Bank Time and Leave Time, except as otherwise set forth herein; (b) continue, honor and pay Employee for accrued severance obligations under the ResCap Severance Plan; (c) reimburse AFI for severance obligations to be paid to 15 Employees under prepetition termination/retention agreements; and (d) continue their historical policies, practices and procedures relating to these benefits in the ordinary course during the pendency of the

---

[18]    As noted above, accrued PTO is paid out upon termination.

Chapter 11 cases for benefits accruing on and after the Petition Date; <u>provided</u>, <u>however</u>, that

any payments made to insiders would violate section 503(c) of the Bankruptcy Code.

## III. NON-COMPENSATION OBLIGATIONS – EXPENSE REIMBURSEMENT AND RELOCATION BENEFITS

### A. Expense Reimbursement

55. The Debtors routinely reimburse Employees and Contractors for certain expenses incurred within the scope of their work on behalf of the Debtors, including expenses for travel, lodging, ground transportation, meals, supplies and miscellaneous business expenses (collectively, the "Business Expenses"). Business Expenses are paid by Employees and Contractors with either (i) an AFI corporate credit card issued by PNC Bank (a "Corporate Credit Card") or (ii) cash or a personal credit card.

56. The vast majority of the Business Expenses are incurred through the use of the Corporate Credit Card. Under this program, the Employees submit all valid expenses charged on the Corporate Credit Card for approval online. The Debtors approve expense reports submitted by the Employees on a daily basis. AFI pays the Corporate Credit Card issuer directly when billed and the Debtors reimburse AFI for these payments bi-weekly. On average, the Debtors reimburse AFI approximately $312,500 on a bi-weekly basis.

57. All approved Business Expenses paid by Employees or Contractors using cash or personal credit cards are paid directly to Employees and Contractors in the same manner as payroll. As a result, certain Employees and Contractors may have not yet been reimbursed for Business Expenses incurred prepetition, including expenses for automobile usage. Business Expenses paid to Employees, excluding Contractors, totals approximately $30,250 each bi-weekly payroll period.

58.     As of the Petition Date, the Debtors had no prepetition Business Expense obligations outstanding in their systems.  The Debtors cannot estimate the amount of Business Expenses outstanding as of the Petition Date because not all Employees and Contractors have submitted expense reports covering prepetition expenditures, but the Debtors believe unpaid reimbursable prepetition Business Expenses should not exceed $700,000.  The Debtors seek authority, but not direction, to (i) reimburse AFI for all approved Business Expenses accrued prior to the Petition date for which AFI has, or will, reimburse Employees in the ordinary course of business and (ii) to honor and satisfy all approved prepetition Business Expenses as and when expense reports are submitted by Employees after the Petition Date in the ordinary course of the Debtors' business.

## B.     Relocation Benefits

59.     Historically, AFI paid certain Employees for the cost of relocating to spur desirable candidates to accept positions with the Debtors (the "Relocation Expenses").  The Employee would submit request for relocation expenses which includes back up and proof of payment.  Upon approval from the Debtor, AFI would reimburse the Employee in accordance with the bi-weekly payroll cycle.  The Debtors would then reimburse AFI for all Relocation Expenses paid by AFI to Employees.  As of March 8, 2012, the Debtors adopted a relocation benefit program (the "Relocation Program") for its Employees AFI informed that AFI was no longer offering relocation benefits to Employees.  As of the Petition Date, there is one Employee eligible for relocation expense reimbursement.  The Debtors believe there are no outstanding obligations related to Relocation Benefits as of the Petition Date.  The Debtors expect that

24

Relocation Expenses for this Employee will be incurred postpetition.  The Debtors believe these expenses are incurred in the ordinary course of their business.[19]

60.     By this Motion, the Debtors seek authority, but not direction, to pay all prepetition Expense Reimbursement and Relocation Expense obligations, except as otherwise set forth herein, and to continue the Relocation Program in the ordinary course and reimburse AFI through direct cash payments for Relocation Expenses paid by AFI through the bi-weekly payroll, as such obligations become due postpetition in the ordinary course.

## IV.    BENEFIT OBLIGATIONS

### A.    Employee Benefit Plans

61.     The Debtors Full-Time Employees and Benefit Eligible Part-Time Employees may participate in various benefits, described below, through the AFI Financial Inc. Welfare Benefit Plan, including but not limited to Medical Plans, a Prescription Drug Plan, a Dental Plan, a Vision Plan, Flex Benefits, an employee assistance plan ("EAP") and Life and Disability Coverage (each as defined herein below and, collectively referred to as the "Benefit Plans").  The Benefit Plans are self-insured plans funded by AFI or third-party administrators contracted by AFI.

62.     The Debtors make a direct bi-weekly cash payment to AFI, equivalent to 11.75% of their base payroll expense, for the estimated costs of certain Benefit Plans for their Employees (the "Estimated Employer Benefits Cost Payment"), which is based on claims payment experience.[20]  The costs of the Medical Plans, Prescription Drug Plan, the Dental Plan,

---

[19]    In addition to reimbursing individual Employees for their actual out-of-pocket expenditures, the Debtors also directly pay certain relocation-related vendors, including shipping companies, realtors and relocation agents for Relocation Expenses.

[20]    AFI uses a third-party provider, AonHewitt, to administer its self-insured benefits programs.  As part of its monthly payments under the Shared Services Agreement, ResCap will pay AFI for the use of these services.  As

*(cont'd)*

the EAP, Life and Disability Coverage are covered by the Estimated Employer Benefits Cost

Payment and premium deductions from Employees gross wages for certain benefits as described

below (together, the "Estimated Benefits Cost Payments").   AFI tracks the Estimated Benefits

Cost Payments against the actual claims paid under the Benefit Plans, plus an estimated reserve

for claims that were incurred but not paid.  When there is a significant difference between the

Estimated Benefits Cost Payments and the actual costs, a true-up payment is made by AFI or the

Debtors at least once a year for the difference between the Estimated Benefits Cost Payments

and the actual costs.  Administering benefits in this way is cost-effective for the Debtors and the

most efficient use of the Debtors' resources.  It would be cost prohibitive for the Debtors to

change the way they administer and pay for the Benefit Plans at this time.

63.    Medical Plans.  The Debtors, through AFI, provide a number of Full-time

Employees, Commission Benefit Employees, Benefit Eligible Part-Time Employees, COBRA

participants, and their dependents with medical benefits pursuant to several different medical

plan options available under the Benefit Plans (collectively, the "Medical Plans") through

Anthem Blue Cross Blue Shield, ACS|Mellon and CIGNA International (collectively, the

"Medical Plan Providers"), offering varying levels of coverage.

64.    Approximately 2,870 current Employees in addition to COBRA

participants and their respective dependants participate in and are covered under the Medical

Plans.  The cost of the Medical Plans is borne primarily by the Debtors, but participating

Employees also contribute to the Medical Plans through payroll deductions.  Employee

contributions are deducted from bi-weekly paychecks to pay for that month's coverage.  COBRA

_____
*(cont'd from previous page)*
a general matter, the Debtors are seeking to reimburse AFI for the Estimated Employer Benefits Cost Payment
as part of the relief requested in the Shared Services Motion.

ny-1011823

participants make premium payments for continuing coverage under the Medical Plans directly to AFI.  The Debtors' estimated cost for the Medical Plans is covered by the Estimated Employer Benefits Cost Payment.[21]

65.    Prescription Drug Plan.  Prescription drug coverage (the "Prescription Drug Plan") is provided through pharmacies participating in the Express Scripts Pharmacy Network.  Prescription drug costs depend on the whether the prescribed medicine is on the approved list and whether eligible Employees use a retail or mail order network or non-network provider.  The Debtors' estimated cost for the Prescription Drug Plans is covered by the Estimated Employer Benefits Cost Payment.

66.    Dental Plan.  The Debtors offer Full-time Employees, Benefit Eligible Part-time Employees, Commission Benefit Employees, COBRA participants and their dependents dental benefits (the "Dental Plan") through Delta Dental of Minnesota.  The cost of the Dental Plan is primarily borne by the Debtors, but participating Employees contribute to the Dental Plan through payroll deductions.  Employee contributions are deducted from bi-weekly paychecks to pay for that month's coverage.  The Debtors' estimated cost for the Dental Plan is covered by the Estimated Employer Benefits Cost Payment.

67.    Employee Assistance Program.  The Debtors offer their current Employees and their family members counseling services to help resolve personal issues under the EAP through Life Matters.  The cost to the Debtors for the EAP is covered by the Estimated Employer Benefits Cost Payment.

---

[21]    The most prevalent Plan is the Anthem Blue Cross Blue Shield self-insured plan option with no stop loss coverage.  Most medical plan participants are covered by the self-insured plan.  This makes it difficult to predict actual expenses based on claims experience.

ny-1011823

68.    <u>Life, Short-Term Disability and Long-Term Disability Insurance</u>.  Certain

Employees also have the option to purchase, and in some cases the Debtors provide, voluntary

life, accidental death and dismemberment, short-term disability, long-term disability and

supplemental long-term disability insurance (collectively, the "Life and Disability Coverage")

under the Ally Financial Inc. Welfare Benefit Plan.

69.    <u>Life Insurance</u>.  The Debtors make available to all Full-time Employees,

Benefit Eligible Part-time Employees, and Commission Benefit Employees basic life insurance,

which includes coverage for accidental death and dismemberment ("Basic Life and AD&D

Insurance") through Minnesota Life.  For Full-time Employees and Benefit Eligible Part-time

Employees, basic life insurance is at a rate of two (2) times such Employee's annual base salary

(as reflected in the Employee's payroll record) with a maximum of $2,000,000 of coverage.  For

Commission Benefit Employees, basic life insurance is provided in the amount of $100,000 or

$160,000.

70.    The Basic Life and AD&D Insurance benefits are paid for 100 percent by

employer contributions.  Eligible Employees may also elect to purchase supplemental life

insurance ("Supplemental Life Insurance") for themselves and their dependants. The

Supplemental Life Insurance premiums are deducted from Employees bi-weekly paycheck and

remitted by AFI to the insurance provider. The Debtors' costs for Basic Life and AD&D

Insurance are covered by the Estimated Employer Benefits Cost Payment.

71.    <u>Disability Coverage</u>.  The Debtors, through AFI, also provide certain

Employees with short and long-term disability coverage in the event that they are unable to work

for an extended period due to illness or injury.  Benefits are paid through payroll and

administered by The Hartford Life and Accident Insurance Company.  The short and long-term

disability coverage provides continuous income replacement in the event of sudden income loss due to disability.

72.     For Full-time Employees and Benefit Eligible Part-time Employees, the short-term disability program (the "Short-Term Disability Program") pays a percentage of the Employee's base pay, dependant on such Employee's years of service.  Under the Short-Term Disability Program, income replacement begins after seven calendar days of disability, and provides up to a maximum benefit of 25 weeks (including the seven day waiting period).  The Short-Term Disability Program provides Commission Benefit Employees with coverage based on the Employee's income plus commission, or a set benefit rate depending on when the Employee was hired, but is capped at $100,000-150,000.  The Short-Term Disability Program is self-funded by the Debtors.  AFI make salary continuation payments to eligible Employees through the bi-weekly payroll process and is reimbursed by the Debtors as part of the reimbursement of Compensation Obligations.

73.     Under the long-term disability program (the "Long-Term Disability Program"); income replacement begins after 180 days of disability.  The Long-Term Disability Program offers Full-time Employees and Benefit Eligible Part-time Employees a 60 percent income replacement in the event of disability due to a covered sickness or accident, up to a maximum monthly benefit of $10,000.  Commission Benefit Employees may obtain coverage under the Long-Term Disability Program as well, with premiums and benefits based on the Employee's income plus commission, or a set benefit rate depending on when the Employee was hired.  AFI provides 60 percent salary continuation payments to eligible Employees.

74.     As noted, the Debtors self-fund the Short Term Disability Program.  The Debtors' fund the Long-Term Disability Program through the premiums included in the

Estimated Employer Benefits Cost Payment.  As of the Petition Date, the Debtors estimate that

there are no prepetition obligations related to the Short-Term Disability Program.

76. By this Motion, in order to ensure that the Debtors can continue to provide

the full spectrum of Employee Benefits to the Employees, the Debtors seek authority, but not

direction, to continue to make cash payments to AFI for any obligations under the Short-Term

Disability Program and the Estimated Employer Benefits Cost Payment, including payments that

may relate to a prepetition period.

## V.   WORKERS' COMPENSATION AND PERSONAL UMBRELLA LIABILITY INSURANCE

### A.    Workers' Compensation

76. The Debtors participate in AFI's global workers compensation program.

AFI purchases workers compensation insurance coverage for all subsidiaries, including the

Debtors, in 46 of the 50 states they operate in on an annual basis to the extent obligated by state

law (the "Workers' Compensation Program").  The Debtors participate in workers compensation

programs provided by the states of Ohio, Wyoming, North Dakota and Washington.  The current

AFI policy, placed through Chartis Insurance is for $2 million and includes a $1 million

deductible.  AFI negotiates premiums on an annual basis based on total headcount by

location.   The renewal date for the current policy is September 2012.

77. Operationally, an employee will notify his/ her supervisor of an injury

event.  The supervisor is responsible for notifying Sedgwick Claims Management Services, Inc.

of the claim.  Cases are audited on a monthly basis by AFI.  There are currently 47 open cases

across the organization.

78. Currently AFI allocates charges to the Debtors for total global insurance

costs, including the Workers' Compensation Program.  AFI will charge the Debtors

ny-1011823

approximately 37 percent of AFI's total cost for Workers' Compensation Program premiums on a monthly basis as part of the global insurance allocation under the Shared Services Agreement. The total annual cost for all insurance plans is approximately $15 million.

### B.    Personal Umbrella Liability Insurance

79.    Executive level personal umbrella liability insurance ("PULI") is provided on a blanket basis to every employee in the "Level I" Severance band. The PULI policy is $5 million. In the event an Employee covered under the PULI leaves or is terminated, the policy continues to cover the former Employee through the renewal date of the policy. There currently are 47 individuals receiving benefits under the PULI plan. The premium per employee is approximately $420 per month. AFI will charge the Debtors for PULI premiums on a monthly basis as part of the global insurance allocation under the Shared Services Agreement.

## VI.    RETIREMENT AND SAVINGS PLANS

80.    The Debtors, through AFI, offer various retirement and savings plans, including but not limited to a 401(k) Plan and a Pension Plan (each as defined herein below and collectively referred to as the "Retirement and Savings Plans").

### A.    Defined Contribution Plan.

81.    The Debtors, through AFI, offer certain Employees a defined contribution retirement plan through which they can accumulate savings for their future. Eligible Employees participate in a 401(k) plan sponsored by AFI, the AFI Financial Inc. Retirement Savings Plan (the "401(k) Plan"). Employees may contribute up to 90 percent of their pre-tax compensation through the 401(k) Plan, up to federal deferral and contribution limits. Full-time Employees and Benefit Eligible Part-time Employees are eligible to participate in the 401(k) Plan.

82.    Employees who participate in the 401(k) Plan are eligible to receive from the Debtors a dollar for dollar matching contribution up to 6 percent of the Employee's eligible

compensation per pay period.  Eligibility for the company matching contribution occurs after one

year of service and vesting is immediate.  The Debtors matching contribution is paid to AFI for

each pay period at the time the Debtors reimburse AFI for payroll expenses.

83.     Even if Employees do not choose to contribute, the Debtors pay a 2

percent retirement contribution per pay period (the "Company Retirement Contribution") for the

benefit of eligible Employees.  Additionally, AFI may make a 2 percent discretionary

contribution (the "Company Discretionary Contribution") to each Employee's account based on

AFI's business performance.  The Company Retirement Contribution and Company

Discretionary Contribution include a three year cliff vesting schedule, under which Employees

do not vest in any of the contributions until they have reached three years of service and then

become fully vested immediately thereafter.

84.     AonHewitt acts as the 401(k) Plan's recordkeeper.   The trustee is State

Street Bank & Trust Company.  AFI makes bi-weekly payments to the Trustee which includes

participating Employees' contributions, employer contributions and Employee loan repayments.

The Debtors reimburse AFI through a direct cash payment on a bi-weekly basis for its portion of

the employer contributions. As of the Petition Date, the Debtors believe that they have no

outstanding obligations related to the Company Retirement Contribution.

### B.     Employees' Retirement Plan for GMAC Mortgage Group LLC.

85.     The Debtors participate in the Employees' Retirement Plan for GMAC

Mortgage Group LLC ("Pension Plan"), a defined benefit pension plan.  Benefit accruals for all

eligible participants were frozen as of December 31, 2006, and remains frozen as of the Petition

Date.  However, approximately 7,680 retirees and current Employees of the Debtors have earned

an accrued benefit in the Pension Plan.  The Pension Plan is sponsored by GMAC Mortgage

Group LLC, with assets actively managed by Promark Global Advisors.  State Street Bank &

Trust Company is the trustee of the Pension Plan and Towers Watson is the recordkeeper.  As of

the Petition Date, the Debtors have no funding obligations under the Pension Plan and do not

anticipate making any funding payments during the pendency of the Chapter 11 cases.

86.    By this Motion, the Debtors seek authority, but not direction, to pay all

amounts owed as of the Petition Date and to continue postpetition to administer the Retirement

and Savings Plans including, but not limited to, paying benefits due, making contributions, and

continuing to engage the necessary administrators, and satisfy the costs of administering the

Retirement and Savings Plans to the extent not covered by the Shared Services Motion.

## VII.    OTHER BENEFITS

87.    The Debtors also offer several other benefits to eligible Employees

including, but not limited to, Tuition Reimbursement, Adoption Assistance, Dependant Life

Insurance, Vision Plan, Flex Spending Accounts, Commuter Benefit Program (each as defined

herein below), and certain third party service offerings (collectively, the "Other Benefits").  Of

the Other Benefits, the Debtors only bear the costs for the Tuition Reimbursement and the

Adoption Assistance benefits.  For the Debtor-funded Other Benefits, the Debtors reimburse AFI

for the cost on a bi-weekly basis in the same manner as the gross payroll.  As described below,

the remaining Other Benefits are funded by Employees and administered through AFI, for which

third party administration costs are allocated to the Debtors by AFI, the reimbursement of which

will be covered in the Shared Services Agreement filed contemporaneously herewith.

### A.    Debtor-Funded Other Benefits.

88.    <u>Tuition Reimbursement</u>.  In an effort to contribute to Employees' career

development, the Debtors, through AFI offer Full-Time Employees, Benefit Eligible Part-Time

Employees who are scheduled to work at least 32 hours per week and Commission Benefit

Employees tuition reimbursement up to a maximum of $6,400 per year for eligible expenses

33

related to either undergraduate or graduate courses (the "Tuition Reimbursement").  Historically,

the Tuition Reimbursement benefit costs the Debtors approximately $625,000 per annum.  Based

on historical figures, over the next thirty (30) days, the Debtors expect reimbursement payments

to AFI to total approximately $100,000 for Tuition Reimbursement obligations incurred prior to

the Petition Date on behalf of Employees.  However, this is only an estimate because the Debtors

have yet to receive approved reimbursement requests from eligible Employees.

89.    Adoption Assistance.  The Debtors, through AFI offer adoption assistance

(the "Adoption Benefits") to eligible Employees with a maximum reimbursement of $5,000 per

child.  Eligible Adoption Benefits expenses include court costs, attorney fees and transportation

costs to bring the child home. As of the Petition Date, the Debtors believe there are no unpaid

Adoption Assistance benefit obligations.

**B.    Employee Funded Other Benefits**

90.    Dependent Life Insurance.  Eligible Employees may purchase

Spouse/Same-Gender Domestic Partner Life Insurance and/or Child Life Insurance for their

eligible dependents.  Employees purchasing such coverage with post-tax dollars through

automatic payroll deduction.   Therefore, the Debtors have no obligations with respect to

premiums paid by Employees for this benefit.

91.    Vision Plan.  The Debtors offer Full-time Employees, Benefit Eligible

Part-time Employees, and Commission Benefit Employees, COBRA participants and their

dependants vision benefits (the "Vision Plan") through Vision Service Plan Insurance Company.

The cost of the Vision Plan is borne exclusively by the participant with no cost, other than the

administrative costs, incurred by the Debtors.  Employee contributions are deducted from bi-

weekly paychecks to pay for that month's coverage.

34

92.    <u>Flexible Spending Accounts</u>.  In addition, the Debtors offer current

Employees and COBRA participants the use of flexible spending accounts for various medical

claims not otherwise covered or payable by the Medical Plans and eligible dependent care

expenses.  The flexible spending benefits (the "Flex Benefits") include a Healthcare Spending

Account and a separate Flexible Spending Accounts.  Eligible Employees may elect which of the

Flex Benefits they wish to utilize.  Flex Benefits are administered by AonHewitt and

ACS|Mellon.  The Debtors, through AFI, incur administrative fees to AonHewitt and

ACS|Mellon for bundled services including Flex Benefits administration, payment of which is

included as part of the Shared Services Agreement.

93.    <u>Commuter Benefit Program</u>.  All active Benefit Eligible Employees who

travel to work using public transportation – such as trains, subways, ferries, or vanpools, and/or

pay for parking related to their commute to and from work, can pay for these expenses with pre-

tax dollars up to the limits established by the Internal Revenue Service.  The Commuter Benefit

Program is administered through automatic payroll deduction from gross wages by AFI.

Because deductions are made by AFI at the time wages are paid to Employee, the Debtors

estimate that there are no prepetition obligations withheld and owed on behalf of Employees.

The Commuter Benefit Program is administered by AonHewitt on behalf of AFI.

94.    <u>Third-Party Services</u>.  All Employees (and their dependents) covered by

the Minnesota Life Basic Life and AD&D Program are offered (a) travel assistance, (b) will

preparation and legal services and (c) beneficiary financial counseling at no cost to the Employee

or their dependent. The Debtors incur no costs for the provision of these services to their

Employees.

95.     By this Motion, the Debtors seek authority to make direct reimbursement payment to AFI, to the extent necessary, on account of prepetition Debtors-funded Other Benefits and continue the Other Benefit programs for Employees in the ordinary courses of the Debtors' businesses.

## VIII.   WITHHOLDING OBLIGATIONS

96.     AFI, on behalf of the Debtors, routinely withholds from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholding include (a) social security, FICA, federal and state income taxes ("Payroll Taxes"); (b) Employee contributions for health plans, disability, and additional life insurance; (c) Employee contributions to Retirement and Savings Plans; (d) legally ordered deductions such as wage garnishments and tax levies; (e) voluntary charitable contributions; (f) health care, flexible spending account, health savings account contributions and other Employee funded benefits; (g) other voluntary savings; and (h) other miscellaneous deductions (collectively, with the Payroll Taxes, the "Employee Deductions").  The Debtors believe that the Debtors and AFI have the authority to direct such funds to the appropriate parties in the ordinary course of business, but, out of an abundance of caution, request authority from the Court to remit all Employee Deductions to the appropriate parties and to continue to direct such Employee Deductions postpetition in the ordinary course of the Debtors' business.

## IX.   MODIFICATION TO COMPENSATION POLICIES AND BENEFIT PLANS

97.     The Debtors also seek Court approval to modify, change or discontinue any of the plans, policies and procedures associated with or giving rise to the compensation or benefit plans described above, and to implement new plans, policies or procedures related thereto in the ordinary course of business during these Chapter 11 cases in the Debtors' sole discretion

without the need for further Court approval to the extent such relief is consistent with section
503(c) of the Bankruptcy Code.

## X.   DIRECTION TO BANKS

98.   Finally, the Debtors seek an order authorizing and directing the Debtors'
banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers
on account of any Prepetition Employee Obligations, and prohibiting the Debtors' banks from
placing any holds on, or attempting to reverse, any automatic transfers to any account of an
Employee or other party for Prepetition Employee Obligations, if necessary.  The Debtors also
seek an order authorizing them to issue new postpetition checks or effect new postpetition fund
transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or
fund transfer requests that may be dishonored or rejected.  As noted above, most of the Debtors'
employee-related obligation are paid or offered to Employees by AFI.  The Debtors believe that,
if any, there are minimal direct pre-petition payment obligations to Employees that would
implicate the Debtors' bank accounts; however, the Debtors seek this relief out of an abundance
of caution and to ensure that the Debtors can continue to make the required payments to AFI
discussed above.

99.   Bankruptcy Rule 6003 generally precludes the Court from authorizing
certain relief until twenty-one days after the petition is filed, except to the extent necessary to
prevent "immediate and irreparable harm." Fed, R. Bankr. P. 6003.  The Debtors submit that
Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the
interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to
the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief
requested in this Motion be entered on an interim basis.

100.    To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

## APPLICABLE AUTHORITY

### A.    The Proposed Payments Should Be Authorized Under Bankruptcy Code Section 507

101.    Bankruptcy Code sections 507(a)(4) and 507(a)(5) require that certain claims for prepetition wages, salaries, variable pay, vacation, sick leave and employee benefit contributions be accorded priority in payment in an amount not to exceed $11,725 for each employee.  The Debtors believe that they have reimbursed AFI for all Prepetition Employee Obligations, other than certain deferred Variable Pay as required by the TARP regulations. Because of the number of Employees working for the Debtors, and because some amounts are unknown pending submission of reimbursement claims, the Debtors do not know the exact amount due each Employee for the prepetition period.  However, the overwhelming majority of Employees are owed amounts under the aggregate cap of $11,725 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Accordingly, granting the relief requested will not adversely affect the Debtors' other unsecured creditors.

102.    Likewise, section 507(a)(5) of the Bankruptcy Code grants administrative expense priority for the costs of administering employee benefits programs.  See Alleghany Int'l, Inc. v. Metro. Life Ins. Co., 145 B.R. 820, 822-23 (W.D. Pa. 1992) (explaining, under then section 507(a)(4) (now 507(a)(5)) that "[i]t would be useless to prioritize expenses for contributions to an employee benefit plan and not prioritize the expenses necessary to administer those plans.").  Courts in this and other districts routinely approve payment of prepetition benefit and payroll administrator claims in bankruptcy cases.  See, e.g., In re Hostess Brands, Inc., No.

12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 27, 2012) (Docket No. 194); In re Blockbuster Inc., No.

10-14997 (BRL) (Bankr. S.D.N.Y. Oct. 21, 2010) (Docket No. 354).  Accordingly, to the extent

the Debtors have any unpaid obligations related to the Estimated Employer Benefits Cost

Payment, which the Debtors believe is not the case, the Court should authorize the Debtors to

pay such amounts.

103.    To the extent that the aggregate amounts owed to the Employees and AFI

for the Estimated Employer Benefits Cost Payment exceeds the section 507(a) cap, payment of

the Prepetition Employee Obligations in such higher amounts is nonetheless justified in this case.

An insubstantial number of Employees may have claims that exceed the $11,725 cap, after

accounting for all Prepetition Employee Obligations.  The amount by which these claims exceed

the statutory cap, however, would be de minimis in relation to the Debtors' bi-weekly gross

payroll and to the value to the Debtors of honoring all Prepetition Employee Obligations in the

ordinary course.  Moreover, the continued and dedicated service of Employees is critical to the

Debtors' restructuring efforts and the realization of the value of the Debtors' estates.

**B.**    **The Proposed Payments Are Appropriate Under Bankruptcy Code
Sections 363 and 105(a).**

104.    Although the Debtors believe that all prepetition claims exceeding

$11,725 have arisen in the ordinary course of the business and are reasonable in relation to the

value of the services rendered, payment of these claims is also appropriate under sections 363(b)

and 105(a).  Bankruptcy Code section 363 empowers bankruptcy courts to authorize a Chapter

11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of

business.  See 11 U.S.C. § 363.  In order to obtain approval for the use of estate assets outside

the ordinary course of business, the debtor must articulate a valid business justification for the

39

requested use.  See, e.g., In re Boston Generating, LLC, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010).

105.    The business judgment rule is satisfied where "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); In re Quigley Co., 437 B.R. 102, 156-57 (Bankr. S.D.N.Y. 2010).  Indeed "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." In re Quigley Co., 437 B.R. at 157 (quoting In re Integrated Res., Inc., 147 B.R. at 656).  "Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id.

106.    Preservation and protection of a debtor's business in order to ultimately sell the business as a going concern, while retaining their currently working employees and maintaining positive employee morale provides a sufficient business justification for authorization to pay prepetition wages even if outside the ordinary course of business. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

107.    The Debtors have entered into an asset purchase agreement (the "APA") with Nationstar as the stalking-horse bidder.  Under the APA, Nationstar has agreed to purchase the substantially all of the Debtors' assets, including the mortgage servicing operations, servicing advances, whole loans, intellectual property and certain other assets.  The continued services of the Employees are critical to the maintenance of the Debtors' operations pending the closing of the proposed sale and transitioning of the business to Nationstar.  Any delay in paying

Prepetition Employee Obligations or any discontinuation of the Debtors' prepetition

compensation and benefits programs will negatively impact the Debtors' relationships with the

Employees, have an adverse impact on the Employees' morale, and would likely precipitate the

loss of key personnel.  Having a motivated and incentivized work force is absolutely critical to

the Debtors' ability to achieve the objectives of these Chapter 11 cases, including the

consummation of the sale and realization of the maximum value for the benefit of the Debtors'

estates and its creditors.  The Debtors simply cannot risk the potential damage that is likely to

occur if payment of the Prepetition Employee Obligations is delayed in light of the relatively

small amounts at issue.

   108. Likewise, the Court is empowered to approve payment of certain

prepetition claims, including the Prepetition Employee Obligations, under Bankruptcy Code

section 105 and the "doctrine of necessity."  Bankruptcy Code section 105 authorizes this Court

to "issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy

Code.  11 U.S.C. § 105.  For the reasons set forth herein, and in light of the critical need for the

Debtors to preserve the going concern value of their businesses, through, among other things,

preservation of the Debtors' workforce and its morale, payment of the wages and benefits as

requested herein is proper in accordance with Bankruptcy Code section 105.

   109. The well-settled doctrine of necessity also permits a bankruptcy court to

authorize payment of certain prepetition claims prior to the completion of the reorganization

process where the payment of such claims is necessary to the reorganization.  <u>See, e.g.</u> <u>In re</u>

<u>Ionosphere Clubs, Inc.</u>, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (doctrine of necessity

"recognizes the existence of the judicial power to authorize a debtor in a reorganization case to

pay pre-petition claims where such payment is essential to the continued operation of the

debtor")[22]; see also Mich. Bureau of Workers' Disability Comp. v. Chateaugay (In re Chateaugay

Corp.), 80 B.R. 279, 285-87 (S.D.N.Y. 1987) (bankruptcy court did not abuse discretion when

utilizing equitable powers to pay prepetition debts); In re Just for Feet, Inc., 242 B.R. 821, 826

(D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain

prepetition claims, the doctrine of necessity should be invoked to permit payment); In re NVR

L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a

pre-petition obligation when essential to the continued operation of the debtor."); In re Eagle-

Picher Indus., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-

petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious

threat to the Chapter 11 process.").

    110.    The doctrine of necessity is a widely accepted component of modern

bankruptcy jurisprudence.  The Court should approve payment of the Prepetition Employee

Obligations under the doctrine of necessity to avoid a precipitous decline in the value of the

Debtors' businesses.  See Just For Feet, 242 B.R. at 826 (approving payment of key inventory

suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to

deliver new inventory on eve of debtor's key sales season); see also In re Chemtura Corp., No.

09-11233 (REG) (Bankr. S.D.N.Y. Apr. 13, 2009) (Docket No. 176) (approving payment to

supplier on account of prepetition claims because it was "necessary to avoid immediate and

---

[22]    The Court's power to use the doctrine of necessity in Chapter 11 cases derives from the Court's inherent equity
powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to
carry out the provisions of this title."  11 U.S.C. § 105(a).  The United States Supreme Court first articulated the
doctrine of necessity over a century ago, in Miltenberger v. Logansport Ry., 106 U.S. 286 (1882), when it
affirmed an authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed
to employees, vendors and suppliers, among others, when such payments were necessary to preserve the
railroad receivership property and the integrity of the business in receivership.  See id. at 309-14.  Applicability
of the doctrine was long ago extended beyond railroad cases.  See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir.
1945).

irreparable harm to the Debtors and their estates"); <u>In re General Motors Corp.</u>, No. 09-50026

(REG) (Bankr. S.D.N.Y. 2009) (Docket No. 175) (approving same); <u>In re Blockbuster Inc.</u>, No.

10-14997 (BRL) (Bankr. S.D.N.Y. Sept. 27, 2010) (Docket No. 89) (same); <u>In re Columbia Gas</u>

<u>Sys., Inc.</u>, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994); <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174,

175 (Bankr. S.D.N.Y. 1989).

111.    As discussed above, the Employees are critical to the Debtors'

reorganization effort, and without payment of the Prepetition Employee Obligations and

continuation of the Debtors' compensation and benefit programs, the Debtors face a potentially

devastating decline in employee morale and exodus in search of more stable employment.

Accordingly, it is absolutely necessary to pay the Prepetition Employee Obligations and continue

prepetition compensation and benefit practices if the Debtors expect to succeed with their

reorganization efforts.

112.    For the foregoing reasons, the Debtors submit that the relief sought by this

motion is based upon a sound exercise of their business judgment and absolutely necessary to the

continued viability of the Debtors' businesses and their continued operations.  Accordingly, the

Court should grant the requested relief under Bankruptcy Code sections 363 and 105(a) and the

doctrine of necessity.

**C.    The Debtors Should Be Authorized To Pay The Prepetition Employee
Obligations Under Bankruptcy Code Sections 1107(a) And 1108.**

113.    The Debtors, operating their businesses as debtors in possession under

Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s]

and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity

owners." <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the

duties of a Chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

114.    Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.  The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . ." Id.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

115.    Payment of the Prepetition Employee Obligations meets each element of the CoServ court's standard.  As described above, the Employees likely maintain priority claims against the Debtors for the Prepetition Employee Obligations.  In addition, any failure by the Debtors to pay the Prepetition Employee Obligations would negatively impact the morale of Employees at a critical time for the Debtors and their businesses.  In short, the potential harm and economic disadvantage that would stem from the failure to pay the Prepetition Employee Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid.

116.    With respect to the Employees, the Debtors have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of the Prepetition Employee Obligations.  Therefore, the Debtors can only

meet their fiduciary duties as debtors in possession under Bankruptcy Code sections 1107(a) and

1108 by payment of the Prepetition Employee Obligations.

> **D.**      **The Payment of Certain Prepetition Employee Obligations is Appropriate Under Bankruptcy Code Sections 507 And 541.**

117.      Further, payment of the Employer Taxes and the other Employee

Withholdings will not prejudice the Debtors' estates because such withholdings are held in trust

for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates

under Bankruptcy Code section 541.  See Begier v. IRS, 496 U.S. 53, 58-59 (1990).  The 2005

amendments to the Bankruptcy Code amended sections 541(b) to explicitly remove from

property of the estate "any amount withheld by an employer from the wages of employees for

payment as contributions to certain ERISA qualified, tax-deferred annuities and health insurance

plans."  See 11. U.S.C. § 541(b)(7)(A).  Further, many, if not all, of the Employer Taxes are

entitled to priority under Bankruptcy Code section 507(a)(8).  In addition, AFI is the party that is

holding such amounts in trust, not the Debtors, until payment to the appropriate parties.

118.      Accordingly, and out of an abundance of caution, the Debtors seek

authority to direct AFI to continue making these payments to the appropriate payee under

Bankruptcy Code sections 541(b)(7)(A) and 541(d) because doing so will not impair the interests

of the Debtors' other unsecured creditors.  Moreover, as discussed above, these payments are

critical to the retention and morale of the Debtors' workforce and add value to the estates

because an unplanned reduction in Employee retention or productivity could have disastrous

effects on recoveries to unsecured creditors.

> **E.**      **The Debtors Seek A Waiver of the Automatic Stay As It Applies to Workers' Compensation Claims**

119.      Section 362(a) of the Bankruptcy Code operates to stay:

the commencement or continuation, including the issuance or employment of
process of a judicial, administrative, or other action or proceeding against the
debtor that was or could have been commenced before the commencement of the
case under this title, or to receive a claim against the debtor that arose before the
commencement of the case under this title…

11 U.S.C. § 362(a)(1). Section 362, however, permits a debtor or other parties in interest

to request modification or termination of the automatic stay for "cause." Id. at § 362(d)(1).

120.    The Debtors seek authorization, under section 362(d) of the Bankruptcy

Code, to permit Employees to proceed with their workers' compensation claims in the

appropriate administrative or judicial forum.  The Debtors believe cause exists to modify the stay

because Employees could otherwise experience disproportionate financial hardship.

### F.    The Court Should Grant Interim Relief Pursuant to Bankruptcy Rule 6003.

121.    Bankruptcy Rule 6003 provides:

Except to the extent that relief is necessary to avoid immediate and irreparable
harm, the court shall not, within 21 days after the filing of the petition, issue an
order granting the following: . . . (b) a motion to use, sell, lease, or otherwise
incur an obligation regarding property of the estate, including a motion to pay all
or part of a claim that arose before the filing of the petition, but not a motion
under Rule 4001.

Fed. R. Bankr. P. 6003.

122.    Interim relief is appropriate, pursuant to Bankruptcy Rule 6003 to "avoid

immediate and irreparable harm."  In re First NLC Fin. Servs., LLC, NO. 08-10632, 2008 Bankr.

LEXIS 1466 at *4 (Bankr. S.D. Fla. Jan. 28, 2008) (holding that Rule 6003 permits entry of

retention orders on an interim basis to avoid irreparable harm).  The threat of irreparable harm

exists where failure to obtain the requested relief would result in swift diminution in the value of

a debtor's estate or its prospect of reorganizing.  See In re Ames Dep't Stores, Inc., 115 B.R. 34,

36 n.2 (Bankr. S.D.N.Y. 1990) (citing Semmes Motors, Inc. v. Ford Motor Corp., 429 F.2d 1197,

1205 (2d Cir. 1970)).  To the extent that the requirements of Bankruptcy Rule 6003 are

applicable to the relief requested in the Motion, the Debtors submit that for the reasons already

set forth herein, the relief requested in this Motion is necessary to avoid immediate and

irreparable harm to employee morale, the Debtors' ability to continue maintain operations in the

ordinary course and, ultimately, the Debtors' ability to reorganize and maximize the value of

their estates for the benefit of all stakeholders.

123.    Numerous courts, including this Court, have permitted the postpetition

payment of prepetition wage and benefit obligations on the first day or in the early stages of

other Chapter 11 bankruptcy cases.  See, e.g., In re Eastman Kodak Co., No. 12-10202 (ALG)

(Bankr. S.D.N.Y. Jan. 20, 2012) (Docket No. 55); In re Hostess Brands, Inc., No. 12-22052

(RDD) (Bankr. S.D.N.Y. Jan. 13, 2012) (Docket No. 77); In re Sbarro, Inc., No. 11-11527 (SCC)

(Bankr. S.D.N.Y. Apr. 5, 2011) (Docket No. 46); In re Borders Group, Inc., No. 11-10614 (MG)

(Bankr. S.D.N.Y. Feb. 17, 2011) (Docket No. 83); In re Loehmann's Holdings, Inc., No. 10-

16077 (REG) (Bankr. S.D.N.Y. Nov. 15, 2010) (Docket No. 29); In re Metro-Goldwyn-Mayer

Studios Inc., No. 10-15774 (SMB) (Bankr. S.D.N.Y. Nov. 8, 2010) (Docket No.71); In re

TerreStar Networks Inc., No. 10-15446 (SHL) (Bankr. S.D.N.Y. Oct. 20, 2010) (Docket No. 34);

In re Blockbuster, Inc., No. 10-14997 (BRL) (Bankr. S.D.N.Y. Sept. 23, 2010) (Docket No. 46);

In re Saint Vincent's Catholic Medical Centers of New York, No. 10-11963 (CGM) (Bankr.

S.D.N.Y. Apr. 15, 2010) (Docket No. 29); In re Chiyoda America, Inc., No. 09-15059 (AJG)

(Bankr. S.D.N.Y. Aug. 25, 2009) (Docket No. 30); In re Charter Commc'ns Inc., No. 09-11435

(JMP) (Bankr. S.D.N.Y. Mar. 30, 2009) (Docket No. 70).

124.    Accordingly, the Court should allow the payment of the Prepetition

Employee Obligations as requested herein.

ny-1011823

125.    As a precaution, the proposed Order provides that the relief granted

therein shall not constitute or be deemed an assumption of any of the employment and service

agreements to which the Debtors are a party or any of the Debtors' employee benefit policies,

plans, programs, practices and procedures under Bankruptcy Code section 365(a).

126.    To the extent Bankruptcy Rule 6004 is applicable to the relief requested

herein, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and

the fourteen-day stay under Bankruptcy Rule 6004(h).

127.    Accordingly, for all of the foregoing reasons, the Debtors submit that

cause exists for granting the relief requested herein.

### NOTICE

128.    Notice of this Motion will be given to the following parties, or in lieu

thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of

New York; (b) the office of the United States Attorney General; (c) the office of the New York

Attorney General; (d) the office of the United States Attorney for the Southern District of New

York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of

the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees

for the Debtors' outstanding notes issuances; (i) Ally Financial Inc. and its counsel, Kirkland &

Ellis, LLP; (j) to the administrative agent for the Debtors' proposed providers of debtor in

possession financing and its counsel, Skadden, Arps, Slate, Meagher & Flom LLP; (k) Nationstar

Mortgage LLC and its counsel; (l) the parties included on the Debtors' list of fifty (50) largest

unsecured creditors and (m) Tata America International Corporation (collectively, the "Initial

Notice Parties").

129.    Within two (2) days after entry of an interim order, the Debtors propose to serve a copy of the Motion and the interim order upon the Initial Notice Parties.

130.    Any objections to the relief requested in the Motion must be filed with the Clerk of the Bankruptcy Court and served upon and received by: (a) proposed counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Larren M. Nashelsky, Gary S. Lee, and Lorenzo Marinuzzi); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Tracy Hope Davis, Linda A. Riffkin and Brian S. Masumoto); (c) counsel for Ally Financial Inc., Kirkland & Ellis, LLP, Citigroup Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard Cieri); (d) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman (Ken.Ziman@skadden.com) and Jonathan H. Hofer (jhofer@skadden.com)); (e) counsel for any statutory committee appointed in the Debtors' cases; and (f) Tata America International Corporation, Attn: General Counsel, 101 Park Avenue, 26th Floor, New York, NY 10178.  If no objections are filed to the Motion, the Court may enter the order without further notice or hearing.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an

interim order substantially in the form attached hereto as <u>Exhibit A</u>, granting certain of the relief

sought herein immediately; (ii) enter a final order substantially in the form attached hereto as

<u>Exhibit B</u>, granting the relief sought herein on a final basis; and (ii) grant such other and further

relief to the debtors as the Court may deem just and proper.

Dated:  May 14, 2012
       New York, New York

 

*/s/* Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

ny-1011823

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

-----------------------------------------------------------------------

**INTERIM ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 363(b), 507(a),
1107 AND 1108 AND BANKRUPTCY RULE 6003 (I) AUTHORIZING BUT NOT
DIRECTING DEBTORS TO (A) PAY AND HONOR PREPETITION WAGES,
COMPENSATION, EMPLOYEE EXPENSE AND EMPLOYEE BENEFIT
OBLIGATIONS; AND (B) MAINTAIN AND CONTINUE EMPLOYEE
COMPENSATION AND BENEFIT PROGRAMS; AND (II) DIRECTING BANKS TO
HONOR PREPETION CHECKS AND TRANSFER REQUESTS FOR PAYMENT OF
PREPETITION EMPLOYEE OBLIGATIONS**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its affiliates,

as debtors and debtors in possession (collectively, the "Debtors") for entry of an interim and final

orders, under Bankruptcy Code sections 105(a), 363(b), 507(a), 1107 and 1108 and Bankruptcy

Rule 6003 (i) authorizing, but not directing, the Debtors to (a) pay and honor prepetition wages,

compensation, employee expense and employee benefit obligations; and (b) maintain and

continue employee compensation and benefit programs, and (ii) directing banks to honor

prepetition checks and transfer requests for payment of prepetition employee obligations; and

upon the Whitlinger Affidavit; and it appearing that this Court has jurisdiction to consider the

Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these Chapter 11

cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it

appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b);

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
granted herein may refer to http://www.kccllc.net/rescap for additional information.

and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon; and sufficient cause appearing therefore, it is hereby

### ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Motion is GRANTED on an interim basis, as set forth herein.

2.     The Final Hearing, if required, to consider the Motion and proposed final order is scheduled for _____ __, 2012 at __:__ __.m. (prevailing Eastern Time) before the Court. Any objections or responses to the Motion must be filed with the Clerk of the Bankruptcy Court and served upon and received by: (a) proposed counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Larren M. Nashelsky, Gary S. Lee, and Lorenzo Marinuzzi); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Tracy Hope Davis, Linda A. Riffkin and Brian S. Masumoto); (c) counsel for Ally Financial Inc., Kirkland & Ellis, LLP, Citigroup Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard Cieri); (d) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman (Ken.Ziman@skadden.com) and Jonathan H. Hofer (jhofer@skadden.com)); (e) counsel for any statutory committee appointed in the Debtors' cases and (f) Tata America International Corporation, Attn: General Counsel, 101 Park Avenue, 26th Floor, New York, NY 10178, on or before _____, 2012 at 4:00 p.m. prevailing EST.  If

2

no objections are filed to the Motion, the Court may enter the proposed final order without

further notice or hearing.

3.    Nothing herein shall be deemed to authorize the payment of any amounts

or the incurrence of any obligation that would violate section 503(c) of the Bankruptcy Code.

4.    The Debtors are authorized, but not directed, to pay, honor, direct and

reimburse, as applicable, all Prepetition Employee Obligations, to the extent requested in the

Motion, including reimbursement of AFI for any costs that AFI has paid or will pay on account

of the Prepetition Employee Obligations; provided, however, that any payments on account of

Prepetition Employee Obligations shall not exceed $11,725 to any single Employee or

Contractor prior to entry of a Final Order.

5.    Notwithstanding the foregoing, the $11,725 cap shall not apply to those

commissions that do not become due until postpetition.

6.    The Debtors are authorized, but not directed, to continue to honor their

obligations, including any prepetition obligations, to Employees for Business Expenses and

Relocation Expenses in accordance with the Debtors' stated policies and prepetition practices.

7.    The Debtors are authorized, but not directed, to continue postpetition to

honor all practices, procedures, plans and policies related to compensation and benefits programs

for their Employees, Directors and Contractors to the extent requested in the Motion, including

procedures related to reimbursement of AFI for costs associated with the compensation and

benefits programs.

8.    The Debtors and any applicable third parties are authorized to continue to

allocate and distribute Employee Deductions to the appropriate third-party recipients or taxing

authorities in accordance with the Debtors' stated policies and prepetition practices.

ny-1015017

9.      Pursuant to Section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay provided by Bankruptcy Code section 362(a) pertains solely to claims under the Workers' Compensation Program.

10.     The Debtors' banks shall be and hereby are authorized and directed to receive, process, honor, and pay any and all prepetition and postpetition checks and fund transfers evidencing payments made under this Interim Order or any other order of this Court, whether presented prior to or after the commencement of these cases, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.  Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks or fund transfers are issued or authorized to be paid pursuant to this Interim Order without any duty of further inquiry and without liability for following the Debtors' instructions.

11.     The Debtors' banks are prohibited from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee, Contractor or other party for Prepetition Employee Obligations.  The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

12.     Nothing in the Motion or this Interim Order or the relief granted (including any actions taken or payments made by the Debtors pursuant to the relief) shall (a) be

4

construed as a request for authority to assume any executory contract under Bankruptcy Code

section 365; (b) be deemed an assumption of any contract with any of the Debtors' officers or

directors; (c) waive, affect or impair any of the Debtors' rights, claims or defenses, including, but

not limited to, those arising from Bankruptcy Code section 365, other applicable law and any

agreement; (d) grant third-party beneficiary status or bestow any additional rights on any third-

party; or (e) be otherwise enforceable by any third-party.

13.     Nothing in the Motion, this Interim Order, the Bankruptcy Code or the

relief granted shall prohibit or otherwise restrict AFI from continuing or making payments on

account of any compensation and benefit programs covering the Debtors' Employees,

Contractors or Directors.

14.     The Debtors are authorized, but not directed, to modify, change and

discontinue any of the policies, plans, programs, practices, and procedures associated with

compensation and benefits programs for their Employees and Contractors and to implement new

plans, policies, practices and procedures related thereto in the ordinary course of business during

these Chapter 11 cases in their sole discretion without the need for further Court approval.

15.     Notwithstanding anything herein to the contrary, this Order shall not

modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order

of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit

Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with AFI

5

and Ally Bank and their respective subsidiaries and affiliates (excluding ResCap and its subsidiaries).

16.     The Debtors shall serve a copy of the Motion and this Interim Order by United States mail, first class postage, on (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable, (h) each of the indenture trustees for the Debtors' outstanding notes issuances; (i) the equity security holder; (j) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing; (k) the parties included on the Debtors' list of fifty (50) largest unsecured creditors; (l) counsel for AFI and (k) Tata America International Corporation, on or before _____, 2012.

17.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

18.     The requirements set forth in Local Rule 9013-1(b) are satisfied by the contents of the Motion.

19.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

20.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Interim Order shall be effective and enforceable immediately upon entry hereof.

21.     Authorizations given to the Debtors in this Interim Order empower but do not direct the Debtors to effectuate the payments specified herein.

22.     The Debtors are authorized to take all actions necessary to effectuate the

relief granted pursuant to this Interim Order in accordance with the Motion.

23.     The relief granted by this order shall apply to any Future Debtor in these

jointly-administered cases.

24.     This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Interim Order.


Dated:          New York, New York
                _____, 2012



                                                _____
                                                UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---------------------------------------------------------------

**FINAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 363(b), 507(a), 1107
AND 1108 AND BANKRUPTCY RULE 6003 (I) AUTHORIZING BUT NOT
DIRECTING DEBTORS TO (A) PAY AND HONOR PREPETITION WAGES,
COMPENSATION, EMPLOYEE EXPENSE AND EMPLOYEE BENEFIT
OBLIGATIONS; AND (B) MAINTAIN AND CONTINUE EMPLOYEE
COMPENSATION AND BENEFIT PROGRAMS; AND (II) DIRECTING BANKS TO
HONOR PREPETION CHECKS AND TRANSFER REQUESTS FOR PAYMENT OF
PREPETITION EMPLOYEE OBLIGATIONS**

Upon the motion (the "Motion")[1] of  Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of interim

and final orders under Bankruptcy Code sections 105(a), 363(b), 507(a), 1107 and 1108 and

Bankruptcy Rule 6003 (i) authorizing, but not directing, the Debtors to (a) pay and honor

prepetition wages, compensation, employee expense and employee benefit obligations; and

(b) maintain and continue employee compensation and benefit programs, and (ii) directing banks

to honor prepetition checks and transfer requests for payment of prepetition employee

obligations; and upon the Whitlinger Affidavit; and the Court having entered an interim order

(the "Interim Order") on May __, 2012 granting the Motion on an interim basis; and it appearing

that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334;

and it appearing that venue of these Chapter 11 cases and the Motion in this district is proper

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the
relief granted herein may refer to http://www.kccllc.net/rescap for additional information.

pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this proceeding on the Motion is a

core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been

given; and it appearing that no other or further notice need be provided; and upon the record of

the Final Hearing; and it appearing that the relief requested by the Motion is in the best interests

of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation

thereon; and sufficient cause appearing therefore, it is hereby

## ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Nothing herein shall be deemed to authorize the payment of any amounts

or the incurrence of any obligation that would violate section 503(c) of the Bankruptcy Code.

3.      The Debtors are authorized, but not directed, to pay, honor, direct, and

reimburse, as applicable, all Prepetition Employee Obligations, to the extent requested in the

Motion, including reimbursement of AFI for any costs that AFI has paid or will pay on account

of the Prepetition Employee Obligations.

4.      The Debtors are authorized, but not directed, to continue to honor their

obligations, including any prepetition obligations, to Employees for Business Expenses and

Relocation Expenses in accordance with the Debtors' stated policies and prepetition practices.

5.      The Debtors are authorized, but not directed, to continue postpetition to

honor all practices, procedures, plans and policies related to compensation and benefits programs

for their Employees, Directors and Contractors, to the extent requested in the Motion, including

procedures related to reimbursement of AFI for costs associated with the compensation and

benefits programs.

ny-1011826

6.      The Debtors and any applicable third parties are authorized to continue to allocate and distribute Employee Deductions to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

7.      Pursuant to Section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay provided by Bankruptcy Code section 362(a) pertains solely to claims under the Workers' Compensation Program.

8.      The Debtors' banks shall be and hereby are authorized and directed to receive, process, honor and pay any and all prepetition and postpetition checks and fund transfers evidencing payments made under this Final Order or any other order of this Court, whether presented prior to or after the commencement of these cases, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.  Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks or fund transfers are issued or authorized to be paid pursuant to this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

9.      The Debtors' banks are prohibited from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee, Contractor or other party for Prepetition Employee Obligations.  The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account

of the Prepetition Employee Obligations authorized by this Final Order to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

10.     Nothing in the Motion or this Final Order or the relief granted (including any actions taken or payments made by the Debtors pursuant to the relief) shall (a) be construed as a request for or granting of authority to assume any executory contract under Bankruptcy Code section 365; (b) be deemed an assumption of any contract with any of the Debtors' officers or directors; (c) waive, affect or impair any of the Debtors' rights, claims or defenses, including, but not limited to, those arising from Bankruptcy Code section 365, other applicable law and any agreement; (d) grant third-party beneficiary status or bestow any additional rights on any third-party; or (e) be otherwise enforceable by any third-party.

11.     Nothing in the Motion, this Final Order, the Bankruptcy Code or the relief granted shall prohibit or otherwise restrict AFI from continuing or making payments on account of any compensation and benefit programs covering the Debtors' Employees, Directors or Contractors.

12.     The Debtors are authorized, but not directed, to modify, change and discontinue any of the policies, plans, programs, practices, and procedures associated with compensation and benefits programs for their Employees and Contractors and to implement new plans, policies, practices and procedures related thereto in the ordinary course of business during these Chapter 11 cases in their sole discretion without the need for further Court approval.

13.     Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

4

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order

of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit

Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with AFI

and Ally Bank and their respective subsidiaries and affiliates (excluding ResCap and its

subsidiaries).

14.     The requirements of Local Rule 9013-1(b) are satisfied by the contents of

the Motion.

15.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

16.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this

Final Order shall be effective and enforceable immediately upon entry hereof.

17.     Authorizations given to the Debtors in this Final Order empower but do

not direct the Debtors to effectuate the payments specified herein.

18.     The Debtors are authorized and empowered to take all actions necessary to

implement the relief granted in this Final Order in accordance with the Motion.

19.     The relief granted by this order shall apply to any Future Debtor in these

jointly-administered cases.

20.     This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Final Order.

Dated:        New York, New York
              _____, 2012


_____
UNITED STATES BANKRUPTCY JUDGE