MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12- |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

-----------------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105(a),
363, 364, 503(b), AND 1108 OF THE BANKRUPTCY CODE AUTHORIZING
THE DEBTORS TO (I) PROCESS AND WHERE APPLICABLE FUND PREPETITION
MORTGAGE LOAN COMMITMENTS, (II) CONTINUE BROKERAGE,
ORIGINATION AND SALE ACTIVITIES RELATED TO LOAN SECURITIZATION,
(III) CONTINUE TO PERFORM, AND INCUR POSTPETITION SECURED
INDEBTEDNESS, UNDER THE MORTGAGE LOAN PURCHASE AND SALE
AGREEMENT WITH ALLY BANK AND RELATED AGREEMENTS, (IV) PAY
CERTAIN PREPETITION AMOUNTS DUE TO CRITICAL ORIGINATION VENDORS,
AND (V) CONTINUE HONORING MORTGAGE LOAN REPURCHASE
OBLIGATIONS ARISING IN CONNECTION WITH LOAN SALES AND SERVICING,
<u>EACH IN THE ORDINARY COURSE OF BUSINESS</u>**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move for entry of interim and final orders, under sections 105(a), 362,

363, 364, 503(b), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on <u>Exhibit 1</u> to the Whitlinger Affidavit (defined below). Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis. As used herein, the term "Debtors" includes any such entities.

Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),
authorizing the Debtors to (i) process and where applicable fund prepetition mortgage loan
commitments; (ii) continue origination activities (including direct origination and brokering of
completed loan applications) and sale activities related to the ultimate securitization of mortgage
loans; (iii) continue to perform under the Purchase and Sale Agreement (defined below) with
Ally Bank and the related Master Forward Agreement (defined below) with Ally Investment
Management LLC ("AIM"), incur secured indebtedness under those agreements and the Pledge
and Security Agreement (defined below) with certain non-Debtor affiliates, and grant such
parties superpriority administrative claims in relation to the foregoing; (iv) pay certain amounts
due to critical vendors providing origination services that accrued prior to the Petition Date; and
(v) continue honoring certain mortgage loan repurchase and other related obligations, including,
without limitation, indemnification obligations, arising in connection with the sale and servicing
of loans, each in the ordinary course of business (the "Motion").[2]  In support of the Motion, the
Debtors rely upon and incorporate by reference the Affidavit of James Whitlinger, Chief
Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day
Pleadings, filed with the Court concurrently herewith (the "Whitlinger Affidavit").  In further
support of the Motion, the Debtors, by and through their undersigned counsel, respectfully
represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157
and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

---

[2]      Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the
relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

ny-1011860

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 362, 363, 364, 503(b), 1107(a), and 1108. Relief is warranted under Bankruptcy Rule 6003.

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee, examiner or statutory creditors' committee has been appointed in these Chapter 11 cases.

3.      The Debtors are a leading residential real estate finance company indirectly owned by Ally Financial Inc. ("AFI"), which is not a Debtor. The Debtors and their non-debtor affiliates operate the fifth largest mortgage loan servicing business and the tenth largest residential mortgage loan origination business in the United States. A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

## PRELIMINARY STATEMENT

4.      The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank, and other third parties. As of March 31, 2012, the Debtors were servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion. The Debtors and their non-debtor affiliates, including Ally Bank, produced approximately $56.3 billion in loan origination volume during the year ended December 31, 2011, and $8.6 billion

3

during the three months ended March 31, 2012.  To preserve and realize the value of these assets

and achieve the goals of these Chapter 11 cases, the Debtors developed and are prepared to

implement a strategy that provides maximum value to the Debtors' estates.

5.       The Debtors negotiated and entered into two separate asset purchase

agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder

("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the

"Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of

their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the

"Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

6.       In furtherance of their restructuring strategy, and contemporaneous with

the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to,

among other things, establish auction and sale procedures for the Asset Sales,[3] and for approval

to consummate the Asset Sales under a plan.  If, however, the Debtors do not obtain

confirmation of a plan by deadlines to be determined, then the Sale Motion allows the Debtors to

pursue an alternative course of action and immediately move forward with the Asset Sales under

Bankruptcy Code section 363(b) and outside of a plan.

7.       The Debtors' loan origination line of business (including the subsequent

sale of loans for securitization) goes hand in hand with their servicing platform because those

activities create servicing inventory.  Thus, the continuation of the Debtors' loan origination and

---

[3]    See *Debtors' Motion Pursuant to 11 U.S.C.  §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief.*

4

loan sale line of business is essential to maintaining and enhancing the Debtors' enterprise value,

and, for this very reason, Nationstar has conditioned its offer on the Debtors' ability to maintain

these operations.

8.      While the Debtors are undoubtedly in the somewhat unique, yet fortunate,

position of seeking authority to continue origination and related activities, the relief requested is

by no means extraordinary as the Debtors in practical effect seek authority to continue to do

business as usual pending the closing of the Asset Sales, allowing for a seamless transition

through Chapter 11.  In addition, because the Debtors (together with their non-Debtor affiliates)

are a significant originator and servicer of residential mortgage loans nationally, the relief

requested will promote the stabilization of the housing market while minimizing any adverse

effects on existing securitizations for which the Debtors function as servicers.  As will be

explained in more detail below, the relief requested is in the best interests of the Debtors' estates

and amply warranted under the circumstances.

## RELIEF REQUESTED

### I.      Summary Of Relief Requested

9.      By this Motion, the Debtors seek relief pursuant to Bankruptcy Code

sections 105, 362, 363, 364, 503(b), 1107(a), and 1108 authorizing the Debtors to continue

operations in the ordinary course as follows:

> i.   retail marketing of mortgage loan products, including collection and
>      processing of mortgage loan applications, and brokering of mortgage loan
>      applications to Ally Bank;
>
> ii.  the funding of mortgage loans originated by the Debtors in Ohio and
>      Nevada, including those applications and loans that, as of the Petition
>      Date, have yet to be underwritten, approved and/or funded;

5

   iii. the sale of mortgage loans originated by the Debtors in Ohio and Nevada directly to securitization trusts guaranteed by Ginnie Mae[4] for securitization or to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac, and, pursuant to the Purchase and Sale Agreement with Ally Bank, the purchase of mortgage loans from Ally Bank and subsequent sale to securitization trusts guaranteed by Ginnie Mae, in each case including:[5]

     (a) making any representation, warranty, covenant or guaranty in respect of such loans;

     (b) continuing to pay fees to Ginnie Mae in the ordinary course of business; and

     (c) granting Ginnie Mae an administrative expense claim in respect of any loan transferred to a Ginnie Mae securitization trust subsequent to the Petition Date in connection with any claims arising under, or in connection with, such loans;

   iv. continuing to perform all other obligations under the Purchase and Sale Agreement with Ally Bank and Master Forward Agreement with non-Debtor affiliate AIM, including, in connection therewith:

     (a) the grant by GMAC Mortgage, LLC ("GMAC Mortgage") of first priority liens to certain non-Debtor affiliates in loans purchased pursuant to the Purchase and Sale Agreement and the proceeds from the sale thereof as security for (x) GMAC Mortgage's obligations under and pursuant to the Purchase and Sale Agreement, pursuant to Bankruptcy Code section 364(c)(2) and in accordance with the related Pledge and Security Agreement and (y) the transactions to be entered into under the Master Forward Agreement;

---

[4] As used herein, "Fannie Mae" means the Federal National Mortgage Association, "Freddie Mac" means the Federal Home Loan Mortgage Corporation, and "Ginnie Mae" means the Government National Mortgage Association. Collectively, they are referred to herein as the "Governmental Associations." Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling them to replenish their funds so that they can make additional loans to other homeowners. Ginnie Mae is a federal corporation within the Department of Housing and Urban Development, a federal agency, that guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS") backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA") or the U.S. Department of Agriculture ("USDA").

[5] As discussed in detail below, Fannie Mae and Freddie Mac buy and securitize mortgage loans directly, whereas Ginnie Mae does not buy or securitize loans, but instead guarantees mortgage-backed securities issued by "Issuers" who then hold the mortgage servicing rights or "MSRs" for the underlying mortgage loans and administer the securities (referred to herein as "Ginnie Mae securitization trusts"). The Debtor is an approved Ginnie Mae Issuer.

ny-1011860

    (b)   the grant by GMAC Mortgage to Ally Bank of superpriority administrative claims, with recourse only to the proceeds of Ally Bank's collateral and junior to the Barclays 364(c)(1) Claims (defined below), with respect to any and all claims of Ally Bank against GMAC Mortgage under the Purchase and Sale Agreement including those arising from GMAC Mortgage's failure to pay Ally Bank the purchase price for any loans purchased pursuant to the Purchase and Sale Agreement; and a similar grant to AIM of superpriority administrative claims, with recourse only to the proceeds of the collateral pledged under the Master Forward Agreement and junior to the Barclays 364(c)(1) Claims, with respect to GMAC Mortgage's obligations under the Master Forward Agreement; and

    (c)   using assets of the estate in order to satisfy its obligations thereunder.

   v.  utilizing third party vendors to provide origination support services (including, with respect to critical vendors, payment of prepetition amounts due and owing);

  vi.  in their sole discretion, the repurchase of mortgage loans from the Governmental Associations pursuant to certain representation and warranty obligations incurred in connection with the sale of loans to, or the servicing of loans for, the Governmental Associations (or the payment of "make-whole" or similar amounts in lieu of repurchase), or upon exceeding certain delinquency thresholds in connection with loans sold to Ginnie Mae guaranteed securitization trusts, as applicable;[6] and

  vii.  in their sole discretion, the repurchase of mortgage loans as required pursuant to certain representation and warranty obligations incurred in connection with the sale of loans to, or servicing of loans for, private investors and "private label" securitization trusts (or the payment of "make-whole" or similar amounts in lieu of repurchase).

   10.    The Debtors submit that any action to be taken pursuant to the relief sought herein would be subject to available funding and the terms of any debtor in possession financing and cash collateral orders entered in these Chapter 11 proceedings.

---

[6]    Fannie Mae asserts that the Debtors' servicing obligations and selling obligations under their contracts with Fannie Mae are intertwined and inseparable, absent some specific agreement by Fannie Mae to the contrary. The Debtors reserve all rights with respect to this issue.

ny-1011860

11.     The Debtors request that, to the extent necessary, the relief sought by this

Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases.  The

Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's entry

of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the

Chapter 11 cases of the Debtors.

**II.      Authority To Continue Mortgage Loan Retail, Brokerage, Origination, Sale, And Securitization Activities**

**A.      Overview of Mortgage Loan Retail, Brokerage, Origination, Sale And Securitization Activities**

12.     Historically, a key piece of the Debtors' business has been the extension

of secured credit through the origination of residential mortgage loans and the facilitation of the

origination of residential mortgage loans by their non-debtor affiliate, Ally Bank.  With the

limited exception of a small volume of mortgage loans made in the states of Ohio and Nevada,

the Debtors no longer fund mortgage loans; however, primarily through the provision of

brokerage services, the Debtors are still actively involved in the origination of residential

mortgage loans, and continue to purchase loans for resale to Ginnie Mae securitization trusts or

other third parties.  The Debtors request authority to continue to perform these activities, subject

to certain modifications, as described in further detail below.

**1.      Mortgage Loan Retail Activities**

13.     The Debtors' origination platform consists of a direct call center, a

traditional retail network, and an operations fulfillment center.  In April 2010, the Debtors

launched a traditional consumer retail network in which loan officers work directly with

consumers to take mortgage loan applications.  In addition, the Debtors, principally GMAC

8

Mortgage[7], broker (in forty-seven states) and directly originate and fund (in two states) mortgage loans through a consumer lending business that consists of internet and telephone-based call center operations operated under the GMAC Mortgage brand.  Through these operations, the Debtors originate loans in forty-nine states (excluding Hawaii) through direct contact with consumers, including through referrals from builders, realtors, and other third parties.

### 2.    Mortgage Loan Origination Activities

14.    Through the retail marketing activities described above, the Debtors procure prospective borrowers, assist them in completing mortgage loan applications to Ally Bank's specifications, and develop additional information necessary for underwriting regarding the prospective borrower and the property to be mortgaged.  In forty-seven states, the Debtors, acting in their capacities as licensed mortgage brokers, broker mortgage loan applications and supporting materials (collectively, "loan application packages") to Ally Bank in exchange for a broker fee paid by Ally Bank.  Ally Bank then underwrites, originates, and funds loans based on the loan application packages.  The Debtors are not responsible for funding the loans that they broker for Ally Bank.  However, due to particular licensing issues, the Debtors are not permitted to broker loans secured by property in Nevada and Ohio to Ally Bank.  Therefore, the Debtors originate and fund residential mortgage loans in only these two states.  The Debtors originate and fund on average $23.9 million and $10.8 million per month, respectively, of mortgage loans in Nevada and Ohio.  Immediately after origination, loans originated in Nevada and Ohio are sold to Ally Bank as part of Ally Bank's "correspondent" loan business or, once certain transaction

---

[7]    Historically, Debtor Residential Funding Company, LLC ("RFC") also performed certain origination and securitization-related activities.  RFC was no longer actively involved in these activities prior to the Petition Date.

amount thresholds under applicable banking regulations have been reached, directly to Fannie

Mae, Freddie Mac, and Ginnie Mae securitization trusts.

15.    Since the fourth quarter of 2008, the Debtors have brokered substantially

all of their loan production to Ally Bank.  Substantially all of the Debtors' loan production has

consisted of conforming loans (that is, loans that meet the requirements of the applicable

Governmental Associations) and a limited number of nonconforming loans including jumbo

prime mortgage loans,[8] that are held for investment by Ally Bank, or that are sold to third parties

as whole loans.  In the years ended December 31, 2010 and 2011, the Debtors (excluding Ally

Bank and other non-Debtor affiliates) brokered $7.36 billion and $7.29 billion, respectively, of

mortgage loans, all of which were brokered to Ally Bank.  During the three months ended March

31, 2012, the Debtors (excluding Ally Bank and other non-Debtor affiliates) brokered an

additional $3.59 billion of mortgage loans to Ally Bank.

### 3.    Purchase And Resale Of Mortgage Loans For Securitization or Investment

#### (a)    Prepetition Loan Sales And Securitization Activities

16.    Prior to the Petition Date, the Debtors, principally GMAC Mortgage,

purchased mortgage loans from Ally Bank (including loans brokered or sold by the Debtors to

Ally Bank, as well as loans brokered or sold to Ally Bank by third parties) and sold those loans

to Fannie Mae or Freddie Mac for transfer by those entities into securitization trusts sponsored

by the applicable Governmental Association, or directly to securitization trusts guaranteed by

Ginnie Mae.[9]  The majority of these purchase and resale activities were conducted pursuant to a

---

[8]    Jumbo prime mortgage loans are loans made to borrowers with good credit histories, but the amounts of which
exceed the Fannie Mae and Freddie Mac limits of $417,000 generally or, in some high-cost areas, $729,750.

[9]    The Debtors also sold loans to securitization trusts guaranteed by the following state and local housing agencies:
California Housing Finance Agency; City Of Northampton; Connecticut Housing Finance Authority;

*(cont'd)*

10

master mortgage loan purchase and sale agreement (the "MMLPSA") between Ally Bank and
GMAC Mortgage.  Mortgage loans sold to Fannie Mae, Freddie Mac, or Ginnie Mae guaranteed
securitization trusts are referred to herein collectively as "GA Loans," and the related trusts,
collectively, as the "GA Securitization Trusts."  For the year ended December 31, 2011,
approximately 99.2% (by loan count) of the mortgage loans purchased by the Debtors from Ally
Bank for securitization were sold to Fannie Mae and Freddie Mac for transfer into Governmental
Association-sponsored securitization trusts that issue mortgage-backed securities ("MBS"), and
most of the remaining loans were included in pools sold to securitization trusts issuing MBS
guaranteed by Ginnie Mae.

17.    In securitizations of GA Loans, the Debtors sold mortgage loans to Fannie
Mae or Freddie Mac, who then pool loans together, deposit the mortgage loans into a GA
Securitization Trust, and sponsor the issuance of MBS by the GA Securitization Trust.  Ginnie
Mae does not buy mortgage loans or issue MBS itself, but instead provides guarantees of MBS
with respect to loans that meet Ginnie Mae's securitization requirements (mainly consisting of
loans insured by the FHA or guaranteed by the VA or the USDA), and that have been pooled and
securitized by approved issuers (the "Ginnie Mae Loans").  The applicable Governmental
Association guarantees to the GA Securitization Trust that it will supplement amounts received
by the trust as required to permit timely payments of principal and interest on the related MBS.
The MBS created through this process are initially issued by the applicable Governmental
Association (or with respect to Ginnie Mae, by the securitization trust) to or for the account of

---

*(cont'd from previous page)*
        Minneapolis Comm Devel. Agency 2; Neighborhood Housing Services; North Dakota Housing Finance Agency;
        Philadelphia Neighborhood Housing; San Diego Housing Commission; State of Oregon Housing; and Texas
        Veterans Land Board.  However, for purposes of this Motion, such loans are treated as "private label" loans, as
        discussed in further detail below.

11

GMAC Mortgage as payment for the mortgage loans underlying the MBS.  Currently, GMAC

Mortgage directs Fannie Mae, Freddie Mac or the Ginnie Mae securitization trusts, as applicable,

to deliver the MBS to an affiliate of Ally Bank who in turn sells (for GMAC Mortgage's account)

the MBS to third party investors (the "Certificate Owners").  This Governmental Association

issued or guaranteed MBS entitles the Certificate Owners to specified cash flows generated from

the securitized loans.  These interests are usually represented by notes or certificates with various

interest rates and are supported by the payments on the loans acquired by the GA Securitization

Trusts.

18.     The securitization trusts into which loans are pooled are created and

serviced pursuant to pooling and servicing agreements, trust agreement, and related

securitization documents (collectively, the "Securitization Agreements").  The Securitization

Agreements govern, inter alia, the establishment of the securitization trusts, the transfer of loans

into such trusts, and the creation and sale of pass-through and/or mortgage-backed securities with

respect to such trusts.  Although the Debtors historically sold most of the residential mortgage

loans that they acquired from Ally Bank to Fannie Mae, Freddie Mac, or Ginnie Mae-backed

securitization trusts, the Debtors generally retained the rights to service these loans.  By separate

motions filed contemporaneously herewith, the Debtors are also seeking authority to continue to

operate their loan servicing businesses in the ordinary course.[10]

---

[10]    The continuation of the Debtors' servicing activities with respect to Non-GA Securitization Trusts is addressed
in *Debtors' Motion For Interim And Final Orders Under Sections 105(a), 362, 363, 1107(a), And 1108 Of The
Bankruptcy Code (I) Authorizing The Debtors To Continue In The Ordinary Course Of Business (A) Servicing
Non-GA Loans And (B) Sale Activities Related To Certain Loans In Foreclosure And Real Estate Owned
Property; And (II) Granting Limited Stay Relief To Enable Borrowers To Assert Related Counter-Claims In
Foreclosure and Eviction Proceedings*.  The continuation of the Debtors' servicing activities with respect to the
GA Securitization Trusts is addressed in the *Debtors' Motion For Interim And Final Orders Under Sections
105(a), 361, 362, 363, 1107(a), And 1108 Of The Bankruptcy Code (I) Authorizing The Debtors To Continue In
The Ordinary Course Of Business (A) Servicing Governmental Association Loans And (B) Foreclosure
Activities Related To Certain Real Estate Owned By Fannie Mae, Freddie Mac, And Ginnie Mae;*

*(cont'd)*

12

19.     Historically, the Debtors also sold mortgage loans to trusts that issued so-called "private label" securities.  Due to a change in market conditions, with very limited exceptions, the Debtors no longer sell mortgage loans to "private label" securitization trusts; however, the Debtors continue to service the mortgage loans in these trusts.  The Debtors also pooled and sold loans that were not securitized to third party investors.  Loans sold to "private label" securitization trusts or to third party investors as described above are referred to herein collectively as "Non-GA Loans," and the related trusts, collectively as the "Non-GA Securitization Trusts."

20.     In each instance, Ally Bank provided the original funding for the underlying mortgage loans or acquired them from other lenders, and the Debtors' role was limited to that of facilitating the origination and securitization of mortgage loans.  Pursuant to the MMLPSA between the Debtors and Ally, the Debtors purchased the GA Loans from Ally Bank for subsequent sale in connection with Governmental Association securitizations.  Prepetition, the Debtors, rather than Ally Bank, were required to be the seller for all GA Loans because of certain licensing requirements imposed by the Governmental Associations.

(b)     **Postpetition Loan Sales And Securitization Activities**

21.     Shortly before the Petition Date, Ally Bank obtained the requisite approvals allowing it to sell loans directly to Fannie Mae and Freddie Mac.  As a result, on and after the Petition Date, Ally Bank, rather than the Debtors, will be selling loans directly to Fannie Mae and Freddie Mac for inclusion in GA Securitization Trusts, although the Debtors will

_____
*(cont'd from previous page)*
*(II) Authorizing The Debtors To Pay Certain Prepetition Amounts Due To Critical Servicing Vendors And Foreclosure Professionals; (III) Granting Limited Stay Relief To Enable Borrowers To Assert Related Counter-Claims In Foreclosure And Eviction Proceedings; (IV) Authorizing The Debtors To Use Cash Collateral Under the Fannie Mae EAF Facility And (V) Granting Related Relief.*

continue to function in their capacities as broker for Ally or, potentially, other lenders for these loans.  In connection with loans brokered to Ally Bank, the Debtors will receive a per loan brokerage fee in an amount that is subject to periodic resets based on prevailing market conditions.  As of the Petition Date, the Debtors were receiving a brokerage fee of between 175 and 200 basis points per loan.

22.     With respect to loans in Ohio and Nevada, the Debtors will continue to fund those loans, and will sell such loans directly to Ginnie Mae securitization pools or to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac.  In connection with those activities, the Debtors will receive origination fees from the borrowers and will retain any gain on the sale of those loans.  In addition, the Debtors will retain servicing rights with respect to such loans.

23.     On May 1, 2012, the MMLPSA was amended and restated (as amended and restated, the "Purchase and Sale Agreement"), a copy of which is annexed hereto as Exhibit C.  Pursuant to the Purchase and Sale Agreement, with respect to Ginnie Mae Loans not funded by the Debtors (i.e., loans in states other than in Ohio and Nevada), the Debtors will continue to purchase loans from Ally Bank for resale to Ginnie Mae securitization trusts.  In connection with its role as a broker for loans sold to Ginnie Mae securitization pools, the Debtors will receive from Ally Bank a brokers' fee of between 175 and 200 basis points per loan as of the Petition Date, subject to periodic resets based on prevailing market conditions.  The Debtors will also receive the gain on the sale of those loans while creating valuable mortgage servicing rights, or "MSRs," for the benefit of the Debtors' estates.  The book value of the Debtors' Ginnie Mae MSRs as of March 31, 2012 was approximately $402.8 million.

14

### 4. Participation In Government-Sponsored Loan Refinancing Programs

24.     Keeping borrowers in their homes has become one of the most important objectives of the Debtors in recent years.  GMAC Mortgage participates in a number of loan refinancing programs, including the U.S. Treasury's HARP 2.0 (Home Affordable Refinance Program), which removes certain refinancing restrictions, thereby increasing the number of existing mortgage loans available for refinancing in the current mortgage environment.  On December 1, 2011, GMAC Mortgage was the first major originator of loans to roll out a program under HARP 2.0.  GMAC Mortgage estimates that in 2012 through HARP 2.0 and other loan refinancing programs, it will be able to help over 116,000 borrowers stay in their homes by lowering their monthly mortgage payments, further stabilizing the housing market, minimizing the adverse effects on investors in their securitizations, and contributing to the overall economic recovery.

### B. Authority To Honor Prepetition Pipeline Loan Obligations

25.     The Debtors typically approve applications for residential mortgage loans no later than between ninety (90) and one hundred and twenty (120) days before the loans are actually funded, subject in some cases to extension.  Thus, as of the Petition Date, there were a number of residential mortgage loans in the Debtors' pipeline (a) for which the Debtors had received residential mortgage loan applications that were still being processed but had yet to be underwritten or approved, or (b) that the Debtors approved prior to the Petition Date, but had not yet funded because the loans were still being processed (collectively, the "Pipeline Loan Obligations").[11]  As of the Petition Date, the Debtors had outstanding Pipeline Loan Obligations

---

[11]     In this Motion, the Debtors are not seeking to continue funding or to transfer any commitments with respect to home equity lines of credit (the "HELOC Loan Commitments").  The Debtors have made the business judgment

*(cont'd)*

ny-1011860

that they were required to fund directly (solely with respect to loans secured by property in Ohio and Nevada) in the approximate amount of $66.4 million.[12] Moreover, as of the Petition Date, the Debtors had received approximately 20,520 applications seeking loans in the approximate amount of $4.04 billion with respect to Pipeline Loan Obligations relating to property in the other forty-seven states in which the Debtors conduct origination activities. The Debtors request authorization from this Court to honor the Pipeline Loan Obligations in the ordinary course of their businesses.

26.    The relief requested herein is necessary to alleviate the concerns of the Governmental Associations, as well as the Debtors' other counterparties, customers, and regulators, regarding the impact of the Debtors' bankruptcy on their ability to process the Pipeline Loan Obligations. Indeed, the Debtors' industry is highly regulated, and the failure to meet existing Pipeline Loan Obligations could subject the Debtors to actions by state regulatory authorities and possibly the revocation of their servicing licenses.[13] Thus, continued compliance with state regulations to the maximum extent possible is critical to the preservation of the Debtors' licenses to operate their origination and servicing platforms. In turn, meeting these obligations and maintaining their licenses will, in tandem with the other relief being requested by the Debtors, preserve the going concern value of the Debtors' businesses. As noted, in

_____

(cont'd from previous page)

    to cease honoring substantially all draws requested under HELOC Loan Commitments, which is the subject of a separate motion.

[12]  This amount represents the gross amount of Pipeline Loan Obligations to be funded directly by the Debtors. Typically, however, the Debtors only approve approximately 87% of loan applications received. Moreover, the amount of actual commitments ultimately funded with respect to approved loan applications is approximately 30% lower than the commitment amounts due to the fact that some borrowers decide, for various reasons, that they no longer need financing. Accordingly, as of the Petition Date, the net amount of Pipeline Loan Obligations that the Debtors expect they will have to fund is approximately $46.4 million.

[13]  In Mortgage Lenders Network USA, Inc., Case No. 07-10146 (PJW) (Bankr. D. Del.), for example, various state departments issued cease and desist orders, ordering the debtor to obtain replacement funding for loan commitments that they failed to fund.

connection with the Platform Sale, Nationstar is requiring that the Debtors continue their

activities with respect to loan origination and otherwise maintain the origination business

through the closing of the sale.  Furthermore, to maintain the Debtors' ongoing and day-to-day

relationships with the Governmental Associations, securitization trustees, and borrowers, it is

essential that the Debtors be able to fund their direct Pipeline Loan Obligations, which will

ultimately be sold to Ginnie Mae securitization trusts or to Ally Bank for subsequent sale to

Fannie Mae or Freddie Mac, except for a small number of loans that will be held for investment

by Ally Bank.  Interruption of these activities would not only inconvenience MBS investors and

result in a significant loss of goodwill, but would also undermine the value of the estate assets

that the Debtors are seeking to sell to Nationstar, almost certainly reducing recoveries for

creditors.

> ### C.    Authority To Refund Fees Associated With Pipeline Loan Obligations

27.    As part of the loan origination process, the Debtors reserve the right to

charge prospective borrowers for certain fees and expenses, including, without limitation, credit

investigation fees and deposits towards loan closing costs (collectively, the "Loan Fees").  Under

limited circumstances, the Debtors collect certain Loan Fees in advance of funding the

borrower's loan by either collecting funds directly from the borrower or by charging the

borrower's credit card.  As of the Petition Date, the Debtors do not believe that they are holding

any advance-paid Loan Fees related to Pipeline Loan Obligations.  However, to the extent the

Debtors hold any such Loan Fees in their accounts, and to the extent that a Pipeline Loan

Obligation is not ultimately approved or funded, for whatever reason, the Debtors seek authority

17

to refund any such Loan Fees to the related borrower in their sole discretion.[14]

### D.    Authority To Continue Origination Activities

28.    As described above, through their capacities as brokers and their relationship with Ally Bank, the Debtors secure borrowers and process applications for conforming loans for GA securitizations, including, with respect to Ginnie Mae securitizations, FHA and VA insured and conforming loans.  In addition, the Debtors broker a smaller number of loans to Ally Bank, including jumbo prime mortgage loans, that Ally Bank holds for investment and does not securitize, and may also engage in other origination-related activities such as the sale of whole loans to third parties.  In exchange for providing brokerage services to Ally Bank, the Debtors receive a per loan brokerage fee in an amount that is subject to periodic resets based on prevailing market conditions.  As of the Petition Date, the Debtors were receiving a brokerage fee of between 175 and 200 basis points per loan.  Based on recent performance, the Debtors estimate that, at current volumes and based on the current brokerage fees, they will receive approximately $28 million per month in brokerage fees for brokering loans to Ally Bank during the pendency of these Chapter 11 cases.

29.    Concurrent with these activities, the Debtors also request authority to continue to directly originate and fund loans in Nevada and Ohio for sale to Ginnie Mae securitization trusts or to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac.  Taken together, this relief will allow the Debtors to continue their nearly nationwide brokerage and

---

[14]    The Debtors submit that to the extent any Loan Fees must be returned directly to a borrower, authority for such repayment could be granted, in addition to the authority cited in this Motion, under section 507(a)(7) of the Bankruptcy Code (providing for priority of a claim "to the extent of $2,425 . . . arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.").

ny-1011860

direct origination platform.  In addition, the Debtors' brokerage and direct origination activities

generate a significant portion of the loans for which the Debtors provide servicing.

**III.    Authority To Continue (A) Purchase And Resale Of Ally Bank Originated
Mortgage Loans To Ginnie Mae Securitization Pools And Related Grant Of
Security Interests And Administrative Priority Claims To Ally Bank Pursuant To
The Purchase And Sale Agreement and Pledge And Security Agreement, And
(B) Sale Of Debtor-Originated Mortgage Loans To Ally Bank And Ginnie Mae
Securitization Pools**

**A.    Authority To Perform Under The Purchase And Sale Agreement, The Pledge
And Security Agreement, And The Master Forward Agreement**

30.    As described above, the Debtors facilitated the securitization of mortgage

loans for Ally Bank by purchasing loans and selling them to Fannie Mae, Freddie Mac, and

Ginnie Mae securitization trusts.  Postpetition, the Debtors expect to continue those activities

solely with respect to Ginnie Mae Loans pursuant to the Purchase and Sale Agreement.  The

actual purchase and resale of Ginnie Mae Loans by the Debtors is necessary because Ally Bank

is not a Ginnie Mae approved issuer.  The Debtors will purchase certain Ginnie Mae Loans from

Ally Bank for cash.

31.    In addition, in connection with its correspondent lending operations, Ally

Bank purchases certain Ginnie Mae Loans originated by USAA Federal Savings Bank (the

"USAA Loans"), which it in turn sells to GMAC Mortgage for resale to Ginnie Mae

securitization trusts under the Purchase and Sale Agreement.  Pursuant to the Purchase and Sale

Agreement, GMAC Mortgage purchases the USAA Loans from Ally Bank on credit, and grants

Ally Bank a first priority lien on such loans, and on the proceeds from their sale, pursuant to that

certain Pledge and Security Agreement dated as of April 25, 2012 (the "Pledge and Security

Agreement"), (a copy of which is annexed hereto as <u>Exhibit D</u>), by and among GMAC Mortgage,

ResCap, and non-Debtor affiliates Ally Bank, Ally Financial Inc., GMAC Mortgage Group, LLC

and AIM (collectively, the "Ally Secured Parties").[15]  Also pursuant to the Pledge and Security

Agreement, GMAC Mortgage has granted to Ally Bank a first priority lien in any outstanding

Ginnie Mae Loans that are included in the Debtors' prepetition Pipeline Loan Obligations (the

"Ginnie Pipeline Loans"), and in the proceeds from their sale.  In each case, the amounts due to

Ally Bank for these Ginnie Mae Loans are repaid with the proceeds received by the Debtors

from the sale of the MBS underlying the Ginnie Mae Loans.  The Debtors receive those proceeds

after Ginnie Mae has certified the pool of loans and the securities have been delivered to an

affiliate of Ally Bank, AIM which in turn sells interests in the securities to third party investors,

a process that takes approximately thirty (30) days from start to finish.[16]

        32.     The Debtors request authority to continue performing under the Purchase

and Sale Agreement in the ordinary course, including, in connection therewith, authority to use

assets of the estate in order to satisfy their obligations thereunder, and to incur secured

indebtedness with respect to the purchase of the USAA Loans, the Ginnie Pipeline Loans and the

other Ginnie Mae Loans in accordance with the terms and conditions of the Pledge and Security

Agreement pursuant to Bankruptcy Code section 364(c)(2).[17]

        33.     As an additional safeguard for the Debtors' obligations under the Purchase

and Sale Agreement, Ally Bank has requested, and the Debtors have agreed, subject to

Bankruptcy Court approval, to grant Ally Bank superpriority administrative claims pursuant to

---

[15]   Under the Pledge and Security Agreement, among other collateral, GMAC Mortgage has granted to the secured
parties a security interest in the mortgage loans purchased by GMAC Mortgage under the Purchase and Sale
Agreement for which GMAC does not pay the full purchase price and all MBS related to such mortgage loans;
provided that to the extent GMAC subsequently pays the purchase price in full, such mortgage loans no longer
constitute collateral.

[16]   The purchase of Ginnie Mae MBS from GMAC Mortgage by AIM for further sale to the market is governed by
the Master Forward Agreement, discussed in greater detail below.

[17]   The Debtors are not seeking authority to assume the Purchase and Sale Agreement herein, and expressly reserve
all rights with respect to any decision to assume or reject the Purchase and Sale Agreement.

Bankruptcy Code section 364(c)(1), that are senior to all other administrative expense claims

except the Barclays 364(c)(1) Claims to the extent set forth below with respect to any and all

claims of the Ally Secured Parties against GMAC Mortgage arising under the Purchase and Sale

Agreement (the "Ginnie Mae Purchase Claims"), including claims arising from GMAC

Mortgage's failure to pay Ally Bank the purchase price for any mortgage loan purchased by

GMAC Mortgage under the Purchase and Sale Agreement.  The superpriority claims granted to

the Ally Secured Parties on account of the Ginnie Mae Purchase Claims shall have recourse only

to the Collateral (as defined in the Pledge and Security Agreement) and all proceeds and other

consideration received upon the sale, exchange, transfer or other disposition thereof and shall

otherwise constitute ordinary administrative claims under section 503(b) of the Bankruptcy Code

(the "Ally Secured Parties Recourse Claims").  The Ally Secured Parties Recourse Claims shall

be junior to the claims granted in respect of the obligations under the DIP Facilities (as defined

in the Barclays DIP Order)[18] pursuant to section 364(c)(1) of the Bankruptcy Code (the

"Barclays 364(c)(1) Claims") as provided in paragraph 10 of the Barclays DIP Order, except that

the Barclays 364(c)(1) Claims shall be junior to the Ally Secured Parties to the extent of any

rights in the Collateral (as defined in the Pledge and Security Agreement) and all proceeds and

other consideration received upon the sale, exchange, transfer or other disposition thereof.

        34.     The Debtors believe the grant of superpriority status to the Ginnie Mae

Purchase Claims is warranted under the circumstances.  By way of example, Ally Bank is subject

---

[18]   The "Barclays DIP Order" means either the interim or final orders granted pursuant to the *Debtors' Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And Bankruptcy Rules 4001 And 6004 (I) Authorizing Debtors (A) To Enter Into And Perform Under Receivables Purchase Agreements And Mortgage Loan Purchase And Contribution Agreements Relating To Initial Receivables And Mortgage Loans And Receivables Pooling Agreements Relating To Additional Receivables, And (B) To Obtain Post-Petition Financing On A Secured Superpriority Basis, (II) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(B) And (C) And (III) Granting Related Relief*, as applicable.

to a certain amount of risk with respect to the Ginnie Mae Loans it originates prior to their sale to

the Debtors.  Specifically, as noted above, Ally Bank is not a Ginnie Mae approved issuer.

Therefore, if the Debtors elect not to purchase Ginnie Mae Loans from Ally Bank, Ally Bank

will have to find a Ginnie Mae-approved third party issuer to purchase the loans for pooling and

delivery to a Ginnie Mae guaranteed securitization trust.  Such a third party purchaser would be

purchasing the loans on the open market, likely at a discount, exposing Ally Bank to losses.

       35.     The purchase of Ginnie Mae MBS from GMAC Mortgage by its non-

Debtor affiliate AIM for further sale to the market is governed by a Master Forward Securities

Forward Agreement, dated April 30, 2012, between GMAC Mortgage and AIM (the "Master

Forward Agreement," a copy of which, together with supporting annexes, is annexed hereto as

Exhibit E).  Pursuant to the Master Forward Agreement and in accordance with the Debtors'

prepetition activities and standard industry practices, the Debtors enter into individual forward

sale contracts of MBS, primarily Governmental Association "to-be-announced" securities

("TBAs"), with AIM.  Each forward sale contract constitutes a "transaction" under the Master

Forward Agreement.  In a TBA transaction, on the "trade day," the parties agree to a sale price

for the delivery of a specified volume of Governmental Association MBS that satisfy certain

parameters at a specified future date (referred to as the "settlement day"), but the particular MBS

that will be delivered to AIM on the settlement day are not yet identified.  Following the trade

day, the Debtors pool Ginnie Mae Loans meeting the criteria under the TBA.  At the same time

the Debtors deliver the loans to Ginnie Mae's custodian for securitization, the Debtors instruct

Ginnie Mae to deliver the resulting MBS to AIM, which delivery occurs prior to the settlement

day.  AIM then pays the Debtors the agreed upon price on the settlement day, typically out of

proceeds from AIM's sale of the MBS to investors.

22

36.    With respect to each of the transactions entered into under the Master

Forward Agreement, each party may be required to post cash collateral with the counterparty, in

which the counterparty will obtain a security interest.  In addition, GMAC Mortgage is required

to post $10 million in initial margin collateral with AIM to secure its obligations to AIM under

the Master Forward Agreement.

37.    The Master Forward Agreement is the most efficient mechanism for

generating MBS proceeds from the Ginnie Mae Loans purchased by the Debtors from Ally Bank

from which the Debtors earn gains on sale and at the same time, generates a substantial volume

of MBS for which the Debtors provide servicing.  Accordingly, the Debtors believe it is in the

best interests of the Debtors' estates to continue performing under the Master Forward

Agreement, including providing collateral to the extent required by the terms of the Master

Forward Agreement for the transactions entered into thereunder.

38.    In order to induce AIM to enter into these hedges on behalf of the Debtors,

AIM has also requested, and the Debtors have agreed, subject to Bankruptcy Court approval, to

grant AIM superpriority administrative claims pursuant to Bankruptcy Code section 364(c)(1),

that are senior to all other administrative expense claims except the Barclays 364(c)(1) Claims to

the extent set forth below with respect to any and all claims of AIM against GMAC Mortgage

arising under the Master Forward Agreement (the "Ginnie Mae Hedging Claims" and, together

with the Ginnie Mae Purchase Claims, the "Ginnie Mae Loss Claims").  The superpriority claims

granted to AIM on account of the Ginnie Mae Hedging Claims shall have recourse only to the

Collateral (as defined in the Master Forward Agreement) and all proceeds and other

consideration received upon the sale, exchange, transfer or other disposition thereof, and shall

otherwise constitute ordinary administrative claims under section 503(b) of the Bankruptcy Code

23

(the "AIM Recourse Claims").  The AIM Recourse Claims shall be junior to the Barclays

364(c)(1) Claims, except that the Barclays 364(c)(1) Claims shall be junior to AIM's rights in the

Collateral (as defined in the Master Forward Agreement) and all proceeds and other

consideration received upon the sale, exchange, transfer or other disposition thereof.

39.    Each of the Sale and Purchase Agreement, Pledge and Security Agreement

and Master Forward Agreement were negotiated in good faith and at arm's length.  In certain

respects those agreements were crafted to accommodate these Chapter 11 cases.  For example,

although each of the Sale and Purchase Agreement and Master Forward Agreement are

terminable by either party on advance notice[19], the parties have agreed that Ally Bank (in the

case of the Sale and Purchase Agreement) and AIM (in the case of the Master Forward

Agreement) cannot seek to exercise such right for 150 days following the Petition Date.  In

exchange, and subject to Court approval, the Debtors have agreed that the automatic stay would

be modified to permit those counterparties to exercise their termination rights following the

initial 150 day period.  Similarly, under both agreements, each counterparty must give five (5)

business days advance notice, with such notice to be filed with the Court, to terminate the

applicable agreement for a cause as consequence of the occurrence of an enumerated event of

default.

40.    Because the Debtors receive brokers' fees and valuable MSRs (including

the ability to charge servicing fees) in connection with their securitization of Ginnie Mae Loans,

the Debtors are incentivized to purchase eligible Ginnie Mae Loans originated by Ally Bank.  As

a result, the Debtors believe that it is unlikely that any Ginnie Mae Purchase Claims will arise.

---

[19]    The Sale and Purchase Agreement provides that either party may terminate the agreement on thirty (30) days
advance notice, and the Master Forward Agreement provides that either party may terminate the agreement
upon written notice.

Additionally, the Debtors transacted various hedging transactions, including Governmental Association TBAs, in connection with their risk management activities prepetition. The Debtors believe that the impact of continuing those activities, including the likelihood that Ginnie Mae Hedging Claims will arise, is very limited. Furthermore, inducing Ally Bank to continue originating Ginnie Mae Loans will help to ensure that the value of the Debtors' servicing and origination platforms is preserved, thereby directly benefitting the Debtors' estates. Accordingly, the Debtors' submit that the grant of the limited administrative superpriority to any Ginnie Mae Purchase Claims and any Ginnie Mae Hedging Claims, as well as the grant of liens under the Pledge and Security Agreement and Master Forward Agreement, is both warranted and necessary and should be approved.

### B.    Authority To Sell Debtor-Originated Mortgage Loans To Ally Bank And Ginnie Mae Securitization Pools

41.    Additionally, the Debtors request authority to sell mortgage loans they fund in Ohio and Nevada directly to Ginnie Mae securitization trusts or to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac. For the reasons discussed below, the Debtors request authority to continue these business activities in connection with the Governmental Association securitizations, and to conduct other origination and securitization-related activities in the ordinary course, including, without limitation, the purchase of loans from third parties for resale to Ginnie Mae securitization trusts and the sale of whole loans to third parties.

### C.    Payment Of GA Securitization Fees And Ginnie Mae Commitment Fees

42.    In connection with the sale of loans to the GA Securitization Trusts, the Debtors are required to pay certain guarantee fees to the Governmental Associations for the guarantee by the applicable entity of timely payment to investors (the "GA Securitization Fees"). GA Securitization Fees are due to Fannie Mae on the 7th day of the month following the delivery

25

of the securities to AIM for sale to third party investors.  GA Securitization Fees are due to

Freddie Mac upon delivery of the securities to an affiliate of Ally Bank for sale to third party

investors.  GA Securitization Fees are due to Ginnie Mae on the 10th and 19th day of each

month.  The GA Securitization Fees are paid by the Debtors but are partially covered by profits

made when the securities are sold to third party investors, as described above.

    43.  In addition, the Debtors also pay a commitment fee to Ginnie Mae each

time they request authority (referred to as "commitment authority") to pool mortgages into

Ginnie Mae-guaranteed MBS (the "Ginnie Mae Commitment Fees").  The Ginnie Mae

Commitment Fees are paid in advance, typically on a quarterly basis.  For example, in March

2012, the Debtors paid Ginnie Mae Commitment Fees totaling approximately $400,300 with

respect to mortgage loans expected to be delivered to Ginnie Mae securitization pools during

March, April, and May of 2012.  By this Motion, the Debtors seek authority to satisfy all GA

Securitization Fees incurred prior to the Petition Date in the ordinary course of their businesses.

The Debtors estimate that no GA Securitization Fees were outstanding as of the Petition.  The

Debtors also seek authority to continue to pay applicable postpetition GA Securitization Fees and

Ginnie Mae Commitment Fees in connection with the postpetition transfer of loans to the Ginnie

Mae securitization trusts.  The Debtors anticipate that, at current volumes, following the Petition

Date, they will pay approximately $60,000 to $65,000 in GA Securitization Fees per month.

## IV.  Employment And Payment Of Third Party Origination Vendors

    44.  In connection with the origination activities described above, the Debtors

typically utilize various third party vendors and professionals to provide services supporting the

Debtors' origination operations.  These vendors provide a variety of services, including, but not

limited to, the following general categories:

ny-1011860

(a) <u>Critical Daily Operations Support</u>:  The Debtors rely on key third party vendors to
(i) provide critical systems and support tools to manage a pipeline of over 20,000 loan
applications and 25,000 mortgage leads, (ii) maintain applications that are necessary for the
timely management, hedging, and trading of core and non-core assets, (iii) manage closing
events, provide title insurance policies, and perform property appraisals critical to the
underwriting review and loan decision process (appraisals are required on most of the 8,000 to
9,000 monthly mortgage applications), and (iv) provide consumer credit information.

(b) <u>Business Process Outsourcing</u>:  The Debtors outsource approximately 50% of their
mortgage loan processing tasks to companies that are necessary to perform critical functions
such as lead generation, loan set-up, underwriting, processing, closing, and post-closing
functions.  Outsourcing these functions is more cost-effective and operationally efficient than if
the Debtors were to perform such activities in-house.  At this time, the Debtors do not have the
capability to bring these functions in-house.  If these key vendors were to stop providing these
services, it could cause irreparable harm to the Debtors.

(c) <u>Legal and Compliance Advisory</u>:  The Debtors utilize third party services and tools to
maintain compliance with state and federal regulations supporting fees, loan products, and
licensing.  Without this support, the Debtors risk violating those regulations and incurring
resulting penalties, which may include significant fines.

(d) <u>Customer Communication and Documentation</u>:  The Debtors rely on third party
services to package and securely deliver loan documents to borrowers.  Without this single-
source solution, the Debtors would be at risk for significant penalties and fines associated with
their failure to comply with the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, <u>et</u>
<u>seq</u>., often referred to as RESPA.

27

45.     The Debtors rely on these third party vendors to perform a substantial portion of their origination functions because employing these specialized vendors is more cost-effective than performing such activities in-house.  Replacing these vendors would be difficult, disruptive, and cost-prohibitive.  Moreover, the Debtors have developed relationships with these vendors that have allowed the Debtors to negotiate favorable pricing, credit terms, and priority scheduling.  Failure to timely honor the prepetition obligations to these vendors would seriously jeopardize these relationships.  Any interruption of the services provided by these critical vendors for even a short period of time would impair the Debtors' loan servicing operations and, in all likelihood, the value of their loan origination business.  Such parties may refuse to continue providing services to the Debtors postpetition or may impose unfavorable terms, including cash in advance, security, or restricting of trade credit.

46.     Accordingly, by this Motion, the Debtors request authorization, but not direction, to continue to employ and pay, in their sole discretion, the third party origination vendors (the "Critical Origination Vendors") that the Debtors determine must be paid in order to continue receiving the vital products and/or services provided by those vendors, including amounts accrued prior to the Petition Date.  As of the Petition Date, the Debtors estimate that the outstanding prepetition obligations related to the Critical Origination Vendors total approximately $3.32 million, on account of which the Debtors expect to make payments of approximately $2.21 million in the first thirty (30) days of these bankruptcy cases, subject to Court approval.[20]

47.     The Debtors propose to condition payment of the prepetition claims of Critical Origination Vendors on the agreement of individual Critical Origination Vendors to

---

[20]    These amounts include expenses incurred with respect to both GA Loans and Non-GA Loans.

ny-1011860

continue supplying products and/or services to the Debtors pursuant to the parties' normal and customary trade terms, practices, and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowance, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs) under which such Critical Origination Vendors provided products and/or services to the Debtors prior to the Petition Date (the "Customary Trade Terms"), or pursuant to such other trade practices and programs that are favorable to the Debtors.  The Debtors reserve the right to negotiate new trade terms with any Critical Origination Vendor as a condition to payment of any prepetition claim.  In the event a Critical Origination Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of full or partial payment on its prepetition claim, the Debtors hereby seek authority, in their sole discretion and without further order of the Court, (i) to declare that payments made to the Critical Origination Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Origination Vendor without further action by any person or entity; and (ii) to recover or seek disgorgement of any full or partial payment made to the Critical Origination Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Origination Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.

ny-1011860

48.    The Debtors also seek an order authorizing the Debtors and their banks to honor such expenses and any prepetition wire transfers that were made in the ordinary course of the Debtors' origination business, and to re-issue any checks that may have been returned.[21]

## V.    Authority To Honor Repurchase And Related Obligations Incurred In Connection With Sale and Servicing Of Loans And Grant Of Administrative Priority Claims To Ginnie Mae In Connection With Postpetition Claims

49.    The Debtors provide certain representations, warranties, and covenants in connection with the sale of their mortgage loans to Fannie Mae, Freddie Mac, and Ginnie Mae securitization trusts, relating to items including, but not limited to, rights, title and interest in the mortgage, mortgage eligibility requirements, completeness and accuracy of mortgage loan data, compliance with underwriting standards, lien status, and mortgage insurance coverage.  In the event that any such representation, warranty, or covenant is breached and such breach materially and adversely affects the interests of the Governmental Associations, the Debtors may be required to repurchase or substitute the affected loan from the GA Securitization Trust or to pay "make-whole" payments to the Governmental Associations in lieu of repurchases.  The Debtors have similar obligations with respect to certain of the Non-GA Loans.

50.    In addition, pursuant to the servicing agreements between the Debtors, on one hand, and the Governmental Associations, on the other hand, as well as under the Debtors' servicing and subservicing agreements with other clients, the Debtors make certain representations and warranties regarding their performance of servicing.  The Debtors also may

---

[21]    Similar relief has also been requested in the *Debtors' Motion For Order Under Bankruptcy Code Sections 105(a), 345, 363, 364, And 503(b)(1) And Bankruptcy Rules 6003 And 6004 Authorizing (I) Continued Use Of Cash Management Services And Practices, As Modified, (II) Continued Use Of Existing Bank Accounts, Checks, And Business Forms, (III) Interim Waiver Of The Investment And Deposit Requirements Of Bankruptcy Code Section 345, (IV) Debtors To Honor Specified Outstanding Prepetition Payment Obligations, And (V) Continuation Of Intercompany Transactions, Including Intercompany Transactions With Future Debtors, And Granting Administrative Expense Status To Intercompany Claims*, filed concurrently with this Motion.

ny-1011860

be required to repurchase loans in the event they breach those servicing representations and warranties, to pay penalties in connection with "servicer error" claims made by the counterparties to the subservicing agreements, or to pay penalties in the event they fail to meet required deadlines with respect to foreclosure and sale activities.  With respect to Ginnie Mae Loans, the Debtors may also incur repurchase obligations in connection with loan modifications, foreclosures, and short sales.  In each case, these servicing-related obligations for which the Debtors are liable are deducted from the same accounts as the sale-related obligations described above.  Accordingly, by this Motion, the Debtors request authority to honor in their sole discretion all repurchase and related obligations with respect to the Governmental Associations, as well as with respect to the Non-GA Loans, whether related to the initial sale of loans or the subsequent servicing of such loans.

51.     In December 2010, the Debtors entered into settlement agreements with Fannie Mae and Freddie Mac (the "2010 Settlement Agreements"), pursuant to which the Debtors settled most of the repurchase liabilities that accrued prior to the settlements.  Since that time, the quality of loans pooled and sold into the GA Securitization Trusts has substantially increased, and the number of mortgage loans subject to repurchase by the Debtors has significantly decreased.  In 2011, the Debtors were obligated to, and did in fact, repurchase 1,647 mortgage loans with an aggregate value of approximately $349 million from GA Securitization Trusts in connection with their sale representations and warranty obligations.  The Debtors hereby request authority to continue to honor all obligations under the 2010 Settlement Agreements.

52.     In addition, pursuant to the documents related to the sale of mortgage loans to Ginnie Mae securitization trusts, if the pooled mortgage loans in a Ginnie Mae

31

securitization trust collectively exceed the delinquency rate specified by Ginnie Mae, the Debtors

are obligated to repurchase a group of mortgage loans sufficient to decrease the delinquency rate

below the specified level.  Amounts paid by the Debtors to repurchase mortgage loans from the

GA Securitization Trusts guaranteed by Ginnie Mae are in substantial part reimbursable to the

Debtors, as each of these mortgage loans are either partially insured by the FHA or partially

guaranteed by the VA.  As an alternative to submitting a claim to HUD for reimbursement by the

FHA or VA in connection with repurchased Ginnie Mae Loans, the Debtors may also modify the

repurchased loan and resell it into a Ginnie Mae guaranteed securitization trust, sell it to a third

party, or retain it in a Debtor-owned portfolio.  In 2011, the Debtors were obligated to, and did in

fact, repurchase 4,721 mortgage loans with an aggregate value of approximately $745 million

from Ginnie Mae securitization trusts in connection with delinquency thresholds, and have been

subsequently reimbursed by the FHA and VA for a majority of those loans.

     53.    The Debtors request authorization to continue honoring in their sole

discretion their mortgage loan repurchase obligations (or, in their sole discretion, to pay "make-

whole" payments in lieu of repurchase), in accordance with their applicable representations and

warranty obligations in the ordinary course of business, including those loan repurchase

obligations that arose prepetition and all postpetition obligations.[22]  Indeed, if the Debtors do not

continue to honor their repurchase obligations, the Debtors may face actions to terminate their

right to continue servicing GA Loans, as the applicable agreements with the Governmental

Associations generally permit them to terminate a servicer at will.  Further, the Governmental

Associations could likewise prevent Nationstar from servicing such loans following the closing

---

[22]    The Debtors are not required, and are not seeking authority, to repurchase any loans that are sold to Fannie Mae
or Freddie Mac directly by Ally Bank.

of the Platform Sale. Such a result would be potentially catastrophic to the value of the Debtors' servicing platform and the estates in general.[23] In addition, Fannie Mae and Freddie Mac impose penalties for delays in honoring repurchase obligations, which would continue to accrue postpetition. For these reasons, the Debtors believe it is essential that they be authorized to continue to honor all of their repurchase obligations with respect to the GA Loans in the ordinary course of business. The Debtors also request authorization to continue to resell modified Ginnie Mae Loans to Ginnie Mae guaranteed securitization trusts or to submit claims to HUD for reimbursement by the FHA or VA for repurchased Ginnie Mae Loans, in accordance with their prepetition practices.

54. To the extent that the automatic stay of Bankruptcy Code section 362(a) would apply to requests by the Governmental Associations that the Debtors repurchase GA Loans, the Debtors further request that the Court modify the automatic stay to the limited extent necessary to allow the Governmental Associations to submit repurchase or repurchase-related requests to the Debtors. Such requests may include, without limitation, requests for indemnity, credit enhancement, recourse liability, make-whole payments, or other remedies provided by the GA Guides,[24] and any other documents related to the sale of mortgage loans to Fannie Mae, Freddie Mac or Ginnie Mae securitization trusts (collectively, the "GA Purchase Documents"). However, the automatic stay, to the extent applicable, will remain in effect with respect to any effort by the Governmental Associations to enforce or collect on any such request.

---

[23] In addition, most Non-GA Servicing Agreements require servicers to be licensed by Fannie Mae and/or Freddie Mac, so the loss of servicing rights with respect to the Governmental Associations could cause counter-parties to Non-GA Servicing Agreements to seek the cancellation of those agreements as well.

[24] As used herein, "GA Guides" refers collectively to the Freddie Mac Single-Family Seller/Servicer Guide, available at http://www.freddiemac.com/sell/guide/, the Fannie Mae Single Family Selling Guide, available at https://www.efanniemae.com/sf/guides/ssg/sg/pdf/sel022812.pdf, and the Ginnie Mae MBS Guide, available at http://www.ginniemae.gov/guide/guidtoc.asp, in each case as may be amended from time to time.

33

55.    As described, the Debtors' agreements with the Governmental

Associations create certain contingent rights on the part of the Governmental Associations and

other third parties with respect to the GA Loans (e.g., to assert claims if purchased GA Loans

were not in conformity with applicable representations and warranties).  In order to induce

Ginnie Mae to continue purchasing loans after the Petition Date, which the Debtors submit is

vital to their loan origination and servicing platforms, Ginnie Mae has requested, and the Debtors,

subject to Bankruptcy Court approval, have agreed to provide to Ginnie Mae an administrative

expense claim under section 503(b) of the Bankruptcy Code for any and all postpetition claims

of Ginnie Mae arising under, or pursuant to, the purchase of the Ginnie Mae Loans, including,

without limitation, repurchase, indemnity, credit enhancement, recourse liability, make-whole

payments, or other remedies provided by the Ginnie Mae MBS Guide or other applicable GA

Purchase Documents.

56.    The Debtors also request that any order entered by the Court approving the

relief requested in this Motion also provide that all payments by the Debtors to the Governmental

Associations, including, without limitation, repurchase, indemnity, credit enhancement, recourse

liability, make-whole payments, shall be made free and clear of any lien, security interest, or

other interest of any party, including, without limitation, any prepetition or postpetition lender.

## VI.    Request For Immediate Relief And Waiver Of Stay

57.    Bankruptcy Rule 6003 generally precludes the Court from authorizing

certain relief until twenty-one days after the petition is filed, except to the extent necessary to

prevent "immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that

Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the

interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to

34

the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief

requested in this Motion be entered on an interim basis.

58.    To successfully implement the foregoing, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy

Rule 6004(h).

**VII.    The Relief Requested Will Benefit The Debtors' Estates**

59.    The Debtors' continuation of their mortgage loan retail, brokerage, and

origination activities, and their purchase and resale of Ginnie Mae Loans pursuant to the

Purchase and Sale Agreement and Pledge and Security Agreement (or, solely with respect to

loans they originate in Ohio and Nevada, their sale directly to Ginnie Mae or to Ally Bank for

subsequent resale to Fannie Mae or Freddie Mac) is essential to the Debtors' efforts to

consummate the contemplated sale of its core platform and, as demonstrated herein, is simply a

continuation of the Debtors' prepetition operations.  As noted, Nationstar has conditioned the

Platform Sale on the continuation of these processes as well as related servicing functions.

Moreover, continuing this line of business will benefit the Debtors' estates because, among other

reasons, the Debtors earn brokerage and origination fees in connection with the brokering and

funding of loans, and earn servicing fees for the GA Loans in connection with the securitizations,

as well as on loans held for investment by Ally Bank.  With respect to the substantial majority of

the loans for which the Debtors only serve as brokers, the credit risk exposures associated with

the loans are not borne by the Debtors.  The relief requested will also contribute to assuring the

Governmental Associations, borrowers, current and future loan applicants, and investors that the

Debtors are fully prepared and authorized to process and administer mortgage loan applications

and the resulting mortgage loans.  The Debtors believe that such brokering, origination, and sale

35

activities should be approved by the Court pursuant to sections 105(a), 363(c), 364, 503, 1107,

and 1108 of the Bankruptcy Code.

## APPLICABLE AUTHORITY

I.    **The Debtors Should Be Authorized To Continue To Honor Existing Pipeline Loan
      Obligations And Continue Loan Brokering, Origination And Sale Activities,
      Including Performing Under The Purchase And Sale Agreement And Pledge And
      Security Agreement, Paying Certain Prepetition Amounts To Critical Origination
      Vendors, And Honoring Repurchase Obligations, In The Ordinary Course Of Their
      Business**

        60.    The relief requested in this Motion falls squarely within the ordinary

course of the Debtors' business within the meaning of Bankruptcy Code sections 363(c)(1),

1107(a) and 1108.  Section 1107(a) and 1108 of the Bankruptcy Code authorize a debtor in

possession to continue to operate its business.  11 U.S.C. §§ 1107(a), 1108.  In addition,

Bankruptcy Code section 363(c), in relevant part, provides:

> If the business of the debtor is authorized to be operated under
> section 721, 1108, 1203, 1204 or 1304 of this title and unless the
> court orders otherwise, the trustee may enter into transactions,
> including the sale or lease of property of the estate, in the ordinary
> course of business, without notice or a hearing, and may use
> property of the estate in the ordinary course of business without
> notice or a hearing.

11 U.S.C. § 363(c)(1).  The Debtors seek to have their customary practices associated with the

brokering and origination of mortgage loans, and the purchase and resale of mortgage loans for

purposes of securitization authorized as ordinary course activities on a going forward basis.  The

Debtors must ensure that they will be able to continue operating their business as a whole

postpetition, in the ordinary course, to preserve the value of their estates.

        61.    The ordinary course of business standard was intended to allow a debtor in

possession the flexibility required to run its business and respond quickly to changes in the

business environment.  Moore v. Brewer (In re HMH Motor Servs., Inc.), 259 B.R. 440, 448-49

36

ny-1011860

(Bankr. S.D. Ga. 2000). A debtor in possession, thus, may use, sell or lease property of the estate without need for prior court approval if the transaction is in the ordinary course. Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate property do not require a prior hearing); Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 394 (S.D.N.Y. 1983) (holding that where a debtor in possession is merely exercising the privileges of his status, there is no general right to notice and hearing concerning particular transactions conducted in the ordinary course of the business).

62.    Courts broadly interpret the term ordinary course. Gassen v. Universal Bldg. Materials, Inc. (In re Berkley Multi-Units, Inc.), 88 B.R 394, 396 (Bankr. M.D. Fla. 1988). In determining whether a transaction is in the ordinary course of business under Bankruptcy Code section 363, the courts apply a two-pronged test: (1) the objective horizontal test, and (2) the subjective vertical test. See Med. Malpractice Ins. Ass'n. v. Hirsch (In re Lavigne), 114 F.3d 379, 384-85 (2d Cir. 1997); see also In re Dana Corp., 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006) (and cases cited therein); In re The Leslie Fay Cos.,168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994). The horizontal test is a factual analysis as to whether the transaction in question is of the sort commonly undertaken by companies in that industry. In re Lavigne, 114 F.3d at 385. That is, the horizontal test focuses on whether the transaction is usual or abnormal for the industry. The vertical test, which is also called the creditor's expectation test, is an analysis conducted from the perspective of a hypothetical creditor and analyzes whether the transaction subjects the creditor to economic risks of a nature different from those it accepted when it decided to extend credit. Id. (internal quotations omitted); In re The Leslie Fay Cos.,168 B.R. at 304. In making

this determination, courts look to the debtor's pre-petition business practices and conduct and compare them to the debtor's postpetition conduct.  In re The Leslie Fay Cos.,168 B.R. at 304.

63.     Here, all of the activities for which the Debtors seek authority to continue satisfy both the horizontal and vertical tests.  The horizontal test is easily met.  It is without question that each of the foregoing activities represents an essential component in continuing the Debtors' business so as to maximize its value.  Likewise, a hypothetical creditor should expect that the Debtors would continue the various functions described in this Motion in connection with their core businesses, particularly where, as here, the Debtors are seeking to preserve going concern value.  Granting the relief requested herein would not subject creditors to economic risks that would not have been contemplated by them.  Therefore, the vertical test is also satisfied. See Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d 700, 705 (9th Cir. 1988) (debtor's renewal and execution of leases satisfied vertical test because debtor routinely entered into leases prior to bankruptcy); In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (debtor's employment of lobbyists satisfied both vertical and horizontal tests because debtor had been retaining lobbyists for many years and because it was common practice of other major companies to do so).

## II.     The Requested Relief Is Necessary To Provide Comfort To Third Parties That The Debtors' Role In Facilitating Origination And Securitization Activities Will Not Be Disrupted

64.     As set forth above, the Debtors facilitate the origination and securitization of Ginnie Mae Loans.  The Debtors' role, although limited in most cases to that of an intermediary, is nonetheless necessary because they, and not Ally Bank, hold the necessary licenses to conduct such activities.  The relief requested herein is necessary to alleviate the concerns of the Governmental Associations, as well as the Debtors' other counterparties, customers, and regulators regarding the impact of the Debtors' bankruptcy on these activities,

38

and is being sought at the express request of the Governmental Associations.  Similar relief was

granted in the bankruptcy case of <u>Capmark Financial Group Inc.</u>, Case No. 09-13684 (CSS)

(Bankr. D. Del. Nov. 24, 2009) (ECF No. 343).

### III.    The Requested Relief Is Warranted Under The Doctrine Of Necessity

65.    Under Bankruptcy Code section 105, this Court "may issue any order . . .

that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C.

§ 105(a).  Such relief is necessary to allow the Debtors to preserve, enhance and maximize the

value of the estates.  The relief requested is essential to preserve the Debtors as a going concern

and, thus, serves the rehabilitative purposes of the Bankruptcy Code as authorized pursuant to

Bankruptcy Code section 105(a).  Further, the relief requested herein is necessary to alleviate the

concerns of the Governmental Associations, as well as the Debtors' other counterparties,

customers, and regulators regarding the impact of the Debtors' bankruptcy on the Debtors'

origination-related activities, and is being sought at the express request of the Governmental

Associations.

66.    To the extent the relief requested herein contemplates payment of

prepetition claims, including the payment to Critical Origination Vendors of amounts accrued

prior to the Petition Date, such relief is also supported by the doctrine of necessity.  The doctrine

of necessity is a well-settled principle that permits a bankruptcy court to authorize payment of

certain prepetition claims before the completion of the Chapter 11 case where the payment of

such claims is necessary to the restructuring efforts.  <u>See</u> <u>In re C.A.F. Bindery, Inc.</u>, 199 B.R.

828, 835 (Bankr. S.D.N.Y. 1996) ("[T]he 'doctrine of necessity' . . . permits the bankruptcy

court to authorize the payment of prepetition claims prior to confirmation.  To invoke the rule,

however, the debtor must show that the payment is 'critical to the debtor's reorganization."

(citing <u>In re Fin. News Network, Inc.</u>, 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991)); <u>In re</u>

39

Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (doctrine of necessity

"recognizes the existence of the judicial power to authorize a debtor in a reorganization case to

pay pre-petition claims where such payment is essential to the continued operation of the

debtor"); see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where

the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of

necessity should be invoked to permit payment); Mich. Bureau of Workers' Disability Comp. v.

Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-87 (S.D.N.Y. 1987) (bankruptcy

court did not abuse discretion when utilizing equitable powers to pay prepetition debts); In re

NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment

of a pre-petition obligation when essential to the continued operation of the debtor."); In re

Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment

of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a

serious threat to the Chapter 11 process.").

        67.     As set forth above, the Critical Origination Vendors provide services that

are vital to the day-to-day operations of the Debtors' loan servicing business and cannot be

transitioned without severe disruption.  The Debtors' inability to pay the Critical Origination

Vendors on account of obligations incurred prior to the Petition Date would, in the Debtors'

business judgment, result in the Critical Origination Vendors refusing to provide products or

services to the Debtors postpetition.  Any refusal by the Critical Origination Vendors to provide

products or perform key services would have immediate and severe adverse repercussions,

including, but not limited to, jeopardizing or impairing the value of the loan origination business,

thereby reducing recoveries for stakeholders.  Accordingly, the Debtors believe that paying the

Critical Origination Vendors on account of obligations incurred prior to the Petition Date is both

appropriate and necessary.

**IV.    The Grant Of Administrative Priority Claims To Ginnie Mae In Connection With
The Sale Of Ginnie Mae Loans Is Warranted And Necessary**

68.    The Debtors request authority pursuant to section 503(b)(1)(a) of the

Bankruptcy Code to grant administrative priority to Ginnie Mae under section 503(b) of the

Bankruptcy Code for any and all postpetition claims of Ginnie Mae in connection with the

purchase of Ginnie Mae Loans by Ginnie Mae securitization trusts.

69.    Pursuant to Bankruptcy Code section 503(b)(1)(A), after notice and a

hearing, "the actual, necessary costs and expenses of preserving the estate" shall be allowed as

administrative expenses.  11 U.S.C. § 503(b)(1)(A).  To establish an administrative claim under

Bankruptcy Code section 503(b), there must be (1) a postpetition transaction between the

claimant and the estate, and (2) a benefit to the estate.  See, e.g., In re AppliedTheory Corp., 312

B.R. 225, 238 (Bankr. S.D.N.Y. 2004); In re Adelphia Bus. Solutions, Inc., 296 B.R. 656, 662

(Bankr. S.D.N.Y. 2003); In re R.H. Macy & Co., 170 B.R. 69, 76 (Bankr. S.D.N.Y. 1994); In re

Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 889

(Bankr. S.D.N.Y. 1993); In re CIS Corp., 142 B.R. 640, 643 (S.D.N.Y. 1992); In re New York

Trap Rock Corp., 137 B.R. 568, 572 (Bankr. S.D.N.Y. 1992); In re Drexel Burnham Lambert

Group Inc., 134 B.R. 482, 487-88 (Bankr. S.D.N.Y. 1991); In re Chateaugay Corp., 102 B.R.

335, 353 (Bankr. S.D.N.Y. 1989).  "The administrative expense priority 'furthers the goal of

rehabilitation by encouraging third parties to supply goods and services on credit to the

estate . . . .'" Adelphia Bus. Solutions, Inc., 296 B.R. at 663 (citation omitted).

70.    As set forth above, the Debtors' contracts governing mortgage origination

and sales create certain contingent rights on the part of the Governmental Associations with

41

respect to the purchased loans.  In order to induce Ginnie Mae securitization trusts to purchase

loans postpetition, the Debtors respectfully request that the Court grant Ginnie Mae an

administrative expense claim under section 503(b) of the Bankruptcy Code for any and all

postpetition claims of Ginnie Mae arising under, or pursuant to, the purchase of the Ginnie Mae

Loans, including, without limitation, repurchase, indemnity, credit enhancement, recourse

liability, make-whole payments, or other remedies provided by the Ginnie Mae MBS Guide or

other applicable GA Purchase Documents.  The Debtors submit that such relief is vital to

preserve the value of their loan origination and servicing platforms, and that any claim or

expense the estate may in fact incur in connection with the purchase by Ginnie Mae

securitization trusts of such loans is an actual and necessary expense of preserving the value of

the estates.

71.    To be clear, by this Motion the Debtors are not requesting authority at this

time to assume any executory contracts or to provide adequate protection pursuant to Bankruptcy

Code section 365; any such relief shall be sought in a separate motion.  The acceptance by the

Governmental Associations of the relief herein shall not be deemed to constitute a waiver of such

rights or consent by the Governmental Associations of the assumption and assignment of the GA

Servicing Agreements.

**V.    The Incurring Of Superpriority Secured Indebtedness In Connection With The
Purchase Of Ginnie Mae Loans From Ally Bank Pursuant To The Purchase And
Sale Agreement And Pledge And Security Agreement And Under The Master
Forward Agreement Should Be Authorized Pursuant To Bankruptcy Code Section
364(c)**

72.    The Debtors request authority pursuant to section 364(c)(2) of the

Bankruptcy Code to grant first priority liens to (i) the Ally Secured Parties with respect to

GMAC Mortgage's obligations under the Purchase and Sale Agreement in accordance with the

Pledge and Security Agreement and (ii) AIM under the Master Forward Agreement, with respect

42

to the collateral pledged thereunder.  The Debtors also request authority pursuant to section

364(c)(1) of the Bankruptcy Code to grant superpriority administrative claims senior to all other

administrative claims, other than the Barclays 364(c)(1) Claims, with respect to Ally Bank's

Ginnie Mae Purchase Claims and AIM's Ginnie Mae Hedging Claims.  In each case, such

superpriority claims would be limited to the proceeds of the collateral pledged under the Pledge

and Security Agreement and the Master Forward Agreement.

    73.  Section 364(c) of the Bankruptcy Code allows a debtor to obtain credit

with specialized priority or with certain security interests if it is unable obtain postpetition

financing on an unsecured basis.  <u>See</u> 11 U.S.C. § 364(c); <u>In re 495 Cent. Park Ave. Corp.</u>, 136

B.R. 626, 630 (Bankr. S.D.N.Y 1992) ("If [a] debtor cannot obtain credit as an administrative

expense, it may acquire a loan that is either unsecured but senior to all administrative expense

claims, secured by a lien on property that is not secured, or secured by a junior lien on property

already secured [under section 364(c)]."); <u>Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.</u>, (266

B.R. 575, 582-83 (S.D.N.Y. 2001) ("Section 364 of the Code empowers the bankruptcy court to

allow new debts to take priority over other administrative expenses."); <u>In re Garland Corp.</u>, 6

B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after

notice and a hearing, upon showing that unsecured credit unobtainable).

    74.  Courts consider various factors in determining whether a debtor may

obtain postpetition financing under section 364(c) of the Bankruptcy Code, including whether

(i) the debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is

necessary to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable

and adequate given the circumstances of the debtor-borrower and the proposed lender, (iv) entry

into the financing constitutes an exercise of the debtor's sound and reasonable business judgment,

and (v) the financing was negotiated in good faith and at an arm's-length between the debtor and

the lender.  See In re Farmland Indus., Inc., 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003);

Transcript of Record at 733, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y.

Feb. 27, 2009) (citing Farmland factors); In re Mid-State Raceway, Inc., 323 B.R. 40, 60 (Bankr.

N.D.N.Y. 2005) (citing Farmland factors).  See also In re Aqua Assocs., 123 B.R. 192, 195-96

(Bankr. E.D. Pa. 1991) (applying factors 1-3).  Bankruptcy courts routinely defer to a debtor's

business judgment in considering whether to approve the debtor's request to obtain postpetition

financing.  See e.g., In re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649, at

*14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business

judgment "so long as a request for financing does not 'leverage the bankruptcy process' and

unfairly cede control of the reorganization to one party in interest."); In re Ames Dep't Stores,

Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (The court should defer to debtor's "reasonable

business judgment . . . so long as the financing agreement does not . . . leverage the bankruptcy

process" and its purpose is to benefit the estate rather than another party-in-interest.); Trans

World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974

(Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based

facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the

circumstances and in the best interests of [the debtor] and its creditors.").

        75.    In light of the nature of the credit being provided to the Debtors in

connection with the proposed security interests (i.e., the temporary extension of credit for

purposes of channeling Ginnie Mae Loans originated by Ally Bank into securitization trusts), it

is highly unlikely that any other lender would be able and willing to extend the necessary credit.

As such, "it would be unrealistic and unnecessary" to require the Debtors "to conduct such an

exhaustive search for financing" on an unsecured basis.  In re Sky Valley, Inc., 100 B.R. 107,

113 (Bankr. N.D. Ga. 1988).

76.    Moreover, the transactions to be undertaken pursuant to the Sale and

Purchase Agreement, the Pledge and Security Agreement and the Master Forward Agreement are

necessary to ensure the continued securitization of Ginnie Mae Loans, which, as explained above,

forms a key component of the Debtors' servicing platform.  The relief requested will contribute

to preserving the value of the Debtors' loan origination and loan servicing platforms and create

value for unsecured creditors through the creation of new unencumbered Ginnie Mae MSRs.

The terms and conditions of the Sale and Purchase Agreement, the Pledge and Security

Agreement and the Master Forward Agreement are fair, reasonable and appropriate in the

circumstances presented, and as described above, were negotiated by the parties in good faith

and at arm's length.  Accordingly, the Debtors exercised their reasonable business judgment in

determining that the Sale and Purchase Agreement, the Pledge and Security Agreement and

Master Forward Agreement represent the best financing option available under the present

circumstances, and the Debtors have satisfied the legal requirements to incur the obligations on

the terms and conditions set forth therein.

## VI.    Similar Relief Has Been Granted In Other Cases

77.    The relief requested by the Debtors has been routinely granted as a matter

of course in numerous Chapter 11 cases of other mortgage lenders.  See, e.g., In re Capmark

Financial Group Inc., Case No. 09-13684 (CSS) (Bankr. D. Del. Nov. 24, 2009) (Docket No. 343)

(authorizing debtors to continue operation of their loan origination, securitization, correspondent

lending, and sale businesses, and granting the Governmental Associations an administrative

expense claim in connection with loans transferred after the petition date); In re New Century

TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 26, 2007) (Docket No. 404)

45

(authorizing Debtors to transfer any pipeline loans); In re Mortgage Lenders Network USA, Inc.,

Case No. 07-10146 (PJW) (Bankr. D. Del. Feb. 7, 2007) (Docket No. 38) (authorizing debtors to,

among other things, sell loans that had closed and been funded and honor loan commitments

upon which the debtors closed prepetition but were unable to fund); In re The Finova Group Inc.,

Case No. 01-00697 (PJW) (Bankr. D. Del. Mar. 7, 2001) (Docket No. 16) (authorizing debtors to

honor, renew, increase and/or fund prepetition commitments and continue business practices

including making of new loans); In re United Cos. Fin. Corp., Case No. 99-00451 (RB) (Bankr.

D. Del. Mar. 5, 1999) (Docket No. 54) (authorizing debtors to honor prepetition commitments to

fund borrower loans).

### SCOPE OF MOTION

78.    This Motion does not cover all aspects of the Debtors' businesses.

Whether or not a business activity is described in this Motion, and whether or not the Debtors

seek a comfort order with respect to the continuation of such activity, if the activity is one that

the Debtors conduct in the ordinary course of business, the Debtors intend to continue to conduct

such activity after the Petition Date pursuant to the authority granted to them by Bankruptcy

Code section 363(c).

79.    Nothing herein limits the rights of the Debtors to conduct their business

and manage their assets in the ordinary course without prior court approval.  Nothing herein is

intended to constitute a request to assume any contract or agreement under Bankruptcy Code

section 365.  The Debtors are in the process of reviewing all underlying agreements and reserve

all of their rights under such agreements, applicable law and under the Bankruptcy Code with

respect thereto.

46

# NOTICE

80.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for the Debtors' outstanding notes issuances; (i) Ally Financial Inc. and its counsel; (j) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing; (k) Nationstar Mortgage LLC and its counsel; (l) the parties included on the Debtors' list of fifty (50) largest unsecured creditors; (m) each of the Governmental Associations and their counsel; (n) HUD; (o) counsel for the United States of America; and (p) the FDIC (collectively, the "Initial Notice Parties").  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

81.     Within two (2) days after entry of an interim order, the Debtors propose to serve a copy of the Motion and the interim order upon the Initial Notice Parties.  The Debtors request that the Court schedule the final hearing on the Motion for a date that is as soon as practicable, but in no event later than forty-five (45) days following the entry of the interim order, and establish the date prior to the final hearing for parties to file objections to the Motion.

82.     Any objections to the relief requested in the Motion must be filed with the Clerk of the Bankruptcy Court and served upon and received by: (a) proposed counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Larren M. Nashelsky, Gary Lee, Lorenzo Marinuzzi); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004

(Attn:  Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) counsel for Ally Financial Inc., Kirkland & Ellis, LLP, Citigroup Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M. Cieri, Ray C. Schrock, and Stephen E. Hessler) (d) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman and Jonathan H. Hofer); (e) counsel for any statutory committee appointed in the Debtors' cases; (f) counsel for the United States of America and Ginnie Mae, U.S. Department of Justice, Civil Division, 1100 L Street NW, Room 10018, Washington, D.C. 20005 (Attn: Glenn D. Gillett) and United States Attorney's Office for the Southern District of New York, Civil Division, 86 Chambers Street, 3rd Floor, New York City, NY 10007 (Attn: Joseph Cordaro); (g) counsel for Fannie Mae, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166 (Attn: David Neier, Desiree M. Ripo and Alan Moskowitz); and (h) counsel for Freddie Mac, McKool Smith, 600 Travis St., Suite 7000, Houston, Texas 77002 (Attn: Paul D. Moak), before the date of the final hearing as scheduled by the Court.  If no objections to the Motion are filed, the Court may enter the final order without further notice or hearing.


**[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]**

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an

interim order substantially in the form attached hereto as <u>Exhibit A</u>, granting certain of the relief

sought herein immediately; (ii) enter a final order substantially in the form attached hereto as

<u>Exhibit B</u>, granting the relief sought herein on a final basis; and (iii) grant such other and further

relief to the Debtors as the Court may deem just and proper.


Dated:  May 14, 2012
      New York, New York

<div style="margin-left:40%">

<u>/s/    Larren M. Nashelsky        </u>
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

</div>

49

ny-1011860

# **EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

-------------------------------------------------------------------

**INTERIM ORDER UNDER SECTIONS 105(a), 363, 364, 503(b), 1107(a),**
**AND 1108 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS**
**TO (I) PROCESS AND WHERE APPLICABLE FUND PREPETITION MORTGAGE**
**LOAN COMMITMENTS, (II) CONTINUE BROKERAGE, ORIGINATION**
**AND SALE ACTIVITIES RELATED TO LOAN SECURITIZATION,**
**(III) CONTINUE TO PERFORM, AND INCUR POSTPETITION SECURED**
**INDEBTEDNESS, UNDER THE MORTGAGE LOAN PURCHASE AND SALE**
**AGREEMENT WITH ALLY BANK AND RELATED AGREEMENTS,**
**(IV) PAY CERTAIN PREPETITION AMOUNTS DUE TO CRITICAL**
**ORIGINATION VENDORS, AND (V) CONTINUE HONORING MORTGAGE**
**LOAN REPURCHASE OBLIGATIONS ARISING IN CONNECTION WITH LOAN**
**SALES AND SERVICING, EACH IN THE ORDINARY COURSE OF BUSINESS**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of interim

and final orders, under Bankruptcy Code sections 105(a), 362, 363, 364, 503(b), 1107(a), and

1108 and Bankruptcy Rule 6003, authorizing the Debtors to (i) process and where applicable

fund prepetition mortgage loan commitments; (ii) continue origination activities (including direct

origination and brokering of completed loan applications) and sale activities related to the

ultimate securitization of mortgage loans; (iii) continue to perform under the Purchase and Sale

Agreement with Ally Bank and the related Master Forward Agreement  with Ally Investment

Management LLC ("AIM"), incur secured indebtedness under those agreements and the Pledge

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
granted herein may refer to http://www.kccllc.net/rescap for additional information.

and Security Agreement with non-Debtor affiliates Ally Bank, Ally Financial Inc., GMAC

Mortgage Group, LLC and AIM (collectively, the "Ally Secured Parties"), and grant such parties

superpriority administrative claims in relation to the foregoing; (iv) pay certain amounts due to

critical vendors providing origination services that accrued prior to the Petition Date; and

(v) continue honoring certain mortgage loan repurchase and other related obligations arising in

connection with the sale and servicing of loans, each in the ordinary course of business; and

upon the Whitlinger Affidavit; and it appearing that this Court has jurisdiction to consider the

Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these Chapter 11

cases and the Motion in this district is proper pursuant to 28 U.S.C §§ 1408 and 1409; and it

appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C.

§ 157(b); and sufficient notice of the Motion having been given under the particular

circumstances; and it appearing that no other or further notice need be provided; and it appearing

that the relief requested by the Motion is in the best interests of the Debtors' estates, their

creditors, and other parties in interest; and after due deliberation thereon; and sufficient cause

appearing therefor, it is hereby

## ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED on an interim basis, as set forth herein.

Mortgage Loan Retail, Brokerage, and Origination Activities

2.      Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, the

Debtors are authorized to continue their mortgage loan brokering and origination operations in

the ordinary course, including, but not limited to, the following:

(a)      conducting retail marketing of mortgage loan products, including collection and
         processing of mortgage loan applications, and brokering of mortgage loan
         applications to Ally Bank, including loan applications that were received prior to

the Petition Date and are being processed by the Debtors (the "Prepetition Application Obligations"); and

(b)     funding mortgage loans originated by the Debtors in Ohio and Nevada, including any applications and loans that, as of the Petition Date, have not yet been underwritten, approved or funded (the "Prepetition Funding Obligations" and collectively with the "Prepetition Application Obligations", the "Pipeline Loan Obligations").

3.      To the extent that a Pipeline Loan Obligation is not ultimately approved or funded, for whatever reason, the Debtors are authorized, in their sole discretion, to refund any Loan Fees held in their accounts to the related borrower.

<u>Mortgage Loan Purchase, Sale, and Securitization-Related Activities and</u>
<u>Grant of Postpetition Liens and Superpriority Claims to the Ally Secured Parties</u>

4.      Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, the Debtors are authorized to continue their operations related to the purchase, sale, and securitization of mortgage loans in the ordinary course, including, but not limited to, the following:

(a)     purchasing mortgage loans from Ally Bank and subsequently selling such loans to securitization trusts guaranteed by Ginnie Mae pursuant to the Purchase and Sale Agreement, the Pledge and Security Agreement, and the Master Forward Agreement; and

(b)     selling mortgage loans originated by the Debtors in Ohio and Nevada directly to securitization trusts guaranteed by Ginnie Mae for securitization or to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac.

5.      Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, GMAC Mortgage is authorized to continue to perform all of its obligations under the Purchase and Sale Agreement in accordance with the terms of the Purchase and Sale Agreement and this Interim Order.

6.      Ally Bank is granted limited relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code solely to the extent necessary to permit Ally Bank to:

ny-1008492

(a) beginning 150 days after the Petition Date, send a 30-day notice terminating the Purchase and

Sale Agreement without cause pursuant to Section 6.1 of the Purchase and Sale Agreement

without further order of the Court; and (b) terminate the Purchase and Sale Agreement for cause

pursuant to Section 6.2 of the Purchase and Sale Agreement without further order of the Court;

provided, that Ally Bank shall give five (5) business days' advance notice of termination for

cause to GMAC Mortgage and file such notice with the Court when such notice is given.

7.      GMAC Mortgage is authorized to incur secured indebtedness pursuant to

section 364(c)(2) of the Bankruptcy Code in accordance with the terms of the Purchase and Sale

Agreement and the Pledge and Security Agreement.

8.      Pursuant to sections 364(c)(1) and (2) of the Bankruptcy Code, any and all

claims of Ally Bank against GMAC Mortgage under the Purchase and Sale Agreement,

including claims arising from GMAC Mortgage's breach of the Purchase and Sale Agreement as

a result of its failure to pay Ally Bank the Purchase Price (as defined in the Purchase and Sale

Agreement ) for any mortgage loan purchased under the Purchase and Sale Agreement (the

"Mortgage Loans") and any claims of the other Ally Secured Parties under the Specified

Documents (as defined in the Pledge and Security Agreement), (a) shall be secured by a fully

perfected first priority lien on all Collateral (as defined in the Pledge and Security Agreement),

including the Mortgage Loans and the proceeds thereof, which lien shall be senior to all other

liens and claims, including the liens of any debtor-in-possession lender, and secured claims, and

(b) are superpriority claims which shall have priority over any and all unsecured claims and

administrative expense claims, other than the Barclays 364(c)(1) Claims (defined below) to the

extent provided below.  The superpriority claims granted to the Ally Secured Parties in this

Interim Order shall be junior to the claims granted in respect of the obligations under the DIP

4

Facilities (as defined in the Barclays DIP Order) pursuant to section 364(c)(1) of the Bankruptcy

Code (the "Barclays 364(c)(1) Claims") as provided in paragraph 10 of the Barclays DIP Order;

except that the Barclays 364(c)(1) Claims shall be junior to (x) the Ally Secured Parties' rights in

the Collateral (as defined in the Pledge and Security Agreement) and all proceeds and other

consideration received upon the sale, exchange, transfer or other disposition thereof and (y) the

Ally Secured Parties Recourse Claims (defined below).  The superpriority claims granted to the

Ally Secured Parties pursuant to this paragraph 8 shall have recourse only to the Collateral (as

defined in the Pledge and Security Agreement) and all proceeds and other consideration received

upon the sale, exchange, transfer or other disposition thereof and shall otherwise constitute

ordinary administrative claims under section 503(b) of the Bankruptcy Code (the "Ally Secured

Parties Recourse Claims").

       9.     Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, GMAC

Mortgage is authorized to continue to perform all of its obligations under the Master Forward

Agreement in the ordinary course in accordance with the terms of the Master Forward

Agreement and this Interim Order.  Pursuant to section 364(c)(2) of the Bankruptcy Code,

GMAC Mortgage is authorized to pledge to AIM the cash collateral required under the Master

Forward Agreement as may be required from time to time.

       10.     AIM is granted limited relief from the automatic stay under section 362 of

the Bankruptcy Code solely to the extent necessary to permit AIM to (a)  send the notice of

termination of the Master Forward Agreement without cause pursuant to Section 12 of the

Master Forward Agreement without further order of the Court beginning 150 days after the

Petition Date, and (b) terminate the Master Forward Agreement for cause pursuant to Section 7

of the Master Forward Agreement without further order of the Court; <u>provided</u>, that AIM shall

give five (5) business days' advance notice of termination for cause to GMAC Mortgage and file

such notice with the Court when such notice is given.

11.     Pursuant to section 364(c)(1) and (2) of the Bankruptcy Code, any claims

of AIM against GMAC Mortgage arising under the Master Forward Agreement (a) shall be

secured by a fully perfected first priority lien on all Collateral (as defined in the Master Forward

Agreement), which lien shall be senior to all other liens and claims, including the liens of any

debtor-in-possession lender, and secured claims, and (b) are superpriority claims which shall

have priority over any and all unsecured claims and administrative expense claims, other than the

Barclays 364(c)(1) Claims to the extent provided below.  The superpriority claims granted to

AIM in this Interim Order shall be junior to the Barclays 364(c)(1) Claims, except that the

Barclays 364(c)(1) Claims shall be junior to (x) AIM's rights in the Collateral (as defined in the

Master Forward Agreement) and all proceeds and other consideration received upon the sale,

exchange, transfer or other disposition thereof and (y) the AIM Recourse Claims (as defined

below).  The superpriority claims granted to AIM pursuant to this paragraph 11 shall have

recourse only to the Collateral (as defined in the Master Forward Agreement) and all proceeds

and other consideration received upon the sale, exchange, transfer or other disposition thereof

and shall otherwise constitute ordinary administrative claims under section 503(b) of the

Bankruptcy Code (the "AIM Recourse Claims").

12.     Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, the

Debtors are authorized to purchase mortgage loans from third parties for resale to the Ginnie

Mae securitization trusts and to purchase whole loans for resale to third parties.

13.     Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, the

Debtors are authorized, but not directed, to pay any applicable GA Securitization Fees or Ginnie

Mae Commitment Fees.

14.     The liens granted to the Ally Secured Parties pursuant to this Interim

Order shall be perfected by operation of law immediately upon entry of this Interim Order by the

Court.  None of the Ally Secured Parties shall be required to take any action in order to validate

and to perfect the liens granted pursuant to this Interim Order.

Critical Origination Vendors

15.     Pursuant to section 105(a) of the Bankruptcy Code, the Debtors are

authorized, but not directed, in the reasonable exercise of their business judgment, to pay some

or all of the prepetition claims of Critical Origination Vendors, upon such terms and in the

manner provided in this Interim Order and the Motion; provided, that payments to Critical

Origination Vendors on account of prepetition claims shall not exceed $2,210,000 during the

first thirty (30) days following the Petition Date.

16.     If a Critical Origination Vendor refuses to supply products and/or services

to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties)

following receipt of payment on its prepetition claim, then the Debtors may, in their sole

discretion and without further order of the Court:

(a)     declare that any payments made to the Critical Origination Vendor on account of
such claim be deemed to have been in payment of then-outstanding (or
subsequently accruing) postpetition claims of the Critical Origination Vendor
without further order of the Court or action by any person or entity; and

(b)     take actions to recover or seek disgorgement of any payment made to the Critical
Origination Vendor on account of its prepetition claim to the extent that the
payments exceeded the postpetition claims of the Critical Origination Vendor,
without giving effect to any rights of setoff, recoupment, claims, provision for
payment of reclamation or trust fund claims, or other defense.

7

Under any such circumstances, such Critical Origination Vendor shall immediately repay to the

Debtors any payment made to it on account of its Critical Origination Vendor claims to the

extent that such payments exceed the postpetition claims of the Critical Origination Vendor,

without giving effect to any rights of setoff, recoupment, claims, provision for payment of

reclamation or trust fund claims, or other defense.

17.    Nothing herein shall:

(a)    constitute a waiver of the Debtors' rights to seek damages, disgorgement or other appropriate remedies against any breaching Critical Origination Vendor;

(b)    be construed to waive, limit, or in any way affect, the Debtors' ability to dispute a claim of a Critical Origination Vendor;

(c)    be deemed an admission to the validity of the underlying obligation, including any payment made pursuant to this Interim Order;

(d)    be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Origination Vendor; or

(e)    be deemed to require the Debtors to make any of the payments to Critical Origination Vendors authorized herein.

18.    Notwithstanding entry of this Interim Order, the Debtors' rights to enforce

the automatic stay provisions of section 362 of the Bankruptcy Code with respect to any creditor

who demands payment of its prepetition claims as a condition to doing business with the Debtors

postpetition are preserved.

19.    The banks and other financial institutions at which the Debtors maintain

their disbursement accounts are authorized and directed at the Debtors' direction, to receive,

process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic

fund transfers requested or to be requested by the Debtors in respect of the claims of Critical

Origination Vendors.

20.      The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of the claims of Critical Origination Vendors to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

Repurchase and Related Obligations

21.      Pursuant to sections 105(a), 363(c)(1), 1107 and 1108 of the Bankruptcy Code, the Debtors are authorized, but not directed, to honor in their sole and absolute discretion all mortgage loan repurchase or repurchase-related obligations (or, in their sole discretion, to pay "make-whole" payments in lieu of repurchase), in accordance with their applicable representations and warranty obligations, arising in the ordinary course of business in connection with:  (a) their sale of GA Loans to Fannie Mae, Freddie Mac or Ginnie Mae securitization trusts; and (b) their sale of Non-GA Loans, in each case without regard to whether such obligations arose prepetition or postpetition; provided, that nothing herein shall be construed to limit, or in any way affect, the Debtors' ability to dispute or contest the validity or amounts of such claims or obligations.

22.      Pursuant to sections 105(a), 363(c)(1), 1107 and 1108 of the Bankruptcy Code, the Debtors are authorized, but not required, in their sole and absolute discretion:

(a)      to honor all mortgage loan repurchase or related obligations in accordance with their applicable representations and warranty obligations, arising in the ordinary course of business in connection with:

(i)      their servicing of the GA Loans, in accordance with the applicable GA Guides, GA Servicing Agreements, and related documents; and

(ii)     their servicing and subservicing agreements with other clients;

(b)      to satisfy prepetition penalties incurred in connection with "servicer error" claims made by counterparties to the Debtors' subservicing agreements;

9

(c)     to satisfy prepetition penalties in the event the Debtors fail to meet required
deadlines with respect to foreclosure and sale activities for GA Loans; and

(d)     with respect to Ginnie Mae Loans, to honor repurchase obligations in connection
with loan modifications, foreclosures, and short sales;

provided, that nothing herein shall be construed to limit, waive, or in any way affect, the

Debtors' ability to dispute or contest the validity or amounts of such claims or obligations.

23.     Pursuant to sections 105(a) of the Bankruptcy Code, the Debtors are

authorized to resell modified Ginnie Mae Loans to Ginnie Mae guaranteed securitization trusts

or to submit claims to HUD for reimbursement by the FHA or VA, as applicable, with respect to

repurchased Ginnie Mae Loans in accordance with their prepetition practices.

24.     To the extent that the automatic stay of Bankruptcy Code section 362(a)

applies to requests by the Governmental Associations that the Debtors repurchase GA Loans, the

automatic stay is hereby modified pursuant to section 362(d)(1) of the Bankruptcy Code, to the

limited extent necessary, to allow the Governmental Associations to submit repurchase or

repurchase-related requests to the Debtors, including, without limitation, requests for indemnity,

credit enhancement, recourse liability, make-whole payments, or other remedies provided by the

GA Guides and GA Purchase Documents; provided, however, that such requests are limited to

such requests and remedies as may be made in the ordinary course; provided, further, that the

automatic stay, to the extent applicable will remain in effect with respect to any effort by the

Governmental Associations to enforce or collect on any such request.

25.     Any undisputed, noncontingent and liquidated postpetition claims of

Ginnie Mae arising under, or pursuant to, the Debtors' sale of the Ginnie Mae Loans, including,

without limitation, repurchase, indemnity, credit enhancement, recourse liability, make-whole

payments, or other remedies provided by the Ginnie Mae MBS Guide or other applicable GA

Purchase Documents, shall be granted administrative expense priority pursuant to section 503(b)

of the Bankruptcy Code.

26.     For the avoidance of doubt, all payments by the Debtors to the

Governmental Associations, including, without limitation, repurchase, make-whole and

indemnity payments, shall be made free and clear of any lien, security interest, or other interest

of any party, including, without limitation, any prepetition or postpetition lender.

<u>Other Relief</u>

27.     The Debtors are authorized and empowered to take all actions and execute

such documents as may be necessary or appropriate to carry out the relief granted herein.

28.     Nothing herein shall be deemed to limit the rights of the Debtors to

operate their business in the ordinary course, and no subsequent order shall be required to

confirm such rights.

29.     Notwithstanding the relief granted herein and any actions taken hereunder,

nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any

contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their

non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or

otherwise.

30.     Notwithstanding anything to the contrary in this Interim Order, any action

to be taken pursuant to the relief authorized in this Interim Order is subject to the terms of any

cash collateral order or debtor in possession financing order entered in these chapter 11

proceedings.  All amounts authorized to be paid pursuant to this Interim Order are subject to the

limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit

Agreement).  To the extent that there is any inconsistency between the terms of this Interim

ny-1008492

Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

31.     Nothing in this Interim Order shall discharge, release, or otherwise preclude any setoff or recoupment right of the United States of America, its agencies, departments, or agents.

32.     Notwithstanding anything herein to the contrary, this Interim Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012 and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates (excluding ResCap and its subsidiaries).

33.     The Debtors shall serve a copy of the Motion and this Interim Order by United States mail, first class postage, on (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for the Debtors' outstanding notes issuances; (i) Ally Financial, Inc. and its counsel; (j) counsel to the administrative agent for the Debtors' proposed providers of debtor

ny-1008492

in possession financing; (k) Nationstar Mortgage LLC and its counsel; (l) the parties included on

the Debtors' list of fifty (50) largest unsecured creditors; (m) each of the Governmental

Associations and their counsel; (n) HUD; (o) counsel for the United States of America, and

(p) the FDIC, on or before _____, 2012.

34.     The Final Hearing, if required, to consider the Motion and proposed final

order is scheduled for _____ __, 2012 at __:__ __.m. (prevailing Eastern Time) before the Court.

Any objections or responses to the Motion must be filed with the Clerk of the Bankruptcy Court

and served upon and received by: (a) proposed counsel for the Debtors, Morrison & Foerster

LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Larren M. Nashelsky, Gary S.

Lee, and Lorenzo Marinuzzi); (b) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Tracy Hope

Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) counsel for Ally Financial Inc., Kirkland

& Ellis, LLP, Citigroup Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M.

Cieri, Ray C. Schrock, and Stephen E. Hessler); (d) counsel to the administrative agent for the

Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher &

Flom LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman and

Jonathan H. Hofer); (e) counsel for any statutory committee appointed in the Debtors' cases,

(f) counsel for the United States of America and Ginnie Mae, U.S. Department of Justice, Civil

Division, 1100 L Street NW, Room 10018, Washington, D.C. 20005 (Attn: Glenn D. Gillett) and

United States Attorney's Office for the Southern District of New York, Civil Division, 86

Chambers Street. 3rd Floor, New York City, NY 10007 (Attn: Joseph Cordaro); (g) counsel for

Fannie Mae, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166 (Attn: David

Neier); and (h) counsel for Freddie Mac, McKool Smith, 600 Travis St., Suite 7000, Houston,

Texas 77002 (Attn: Paul D. Moak), on or before _____, 2012 at 4:00 p.m. prevailing EST.  If

no objections are filed to the Motion, the Court may enter the proposed final order without

further notice or hearing.

35.    The Court finds and determines that the requirements of Bankruptcy Rule

6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable

harm.

36.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

37.    Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this

Interim Order shall be effective and enforceable immediately upon entry hereof.

38.    The relief granted by this Interim Order shall apply to any Future Debtor

in these jointly-administered cases.

39.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Interim Order.

Dated:                           , 2012
           New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

ny-1008492

**<u>EXHIBIT B</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

------------------------------------------------------------

<div align="center">

**FINAL ORDER UNDER SECTIONS 105(a), 363, 364, 503(b), 1107(a),
AND 1108 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS
TO (I) PROCESS AND WHERE APPLICABLE FUND PREPETITION MORTGAGE
LOAN COMMITMENTS, (II) CONTINUE BROKERAGE, ORIGINATION
AND SALE ACTIVITIES RELATED TO LOAN SECURITIZATION,
(III) CONTINUE TO PERFORM, AND INCUR POSTPETITION SECURED
INDEBTEDNESS, UNDER THE MORTGAGE LOAN PURCHASE AND SALE
AGREEMENT WITH ALLY BANK AND RELATED AGREEMENTS,
(IV) PAY CERTAIN PREPETITION AMOUNTS DUE TO CRITICAL
ORIGINATION VENDORS, AND (V) CONTINUE HONORING MORTGAGE
LOAN REPURCHASE OBLIGATIONS ARISING IN CONNECTION WITH LOAN
<u>SALES AND SERVICING, EACH IN THE ORDINARY COURSE OF BUSINESS</u>**

</div>

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of interim

and final orders, under Bankruptcy Code sections 105(a), 362, 363, 364, 503(b), 1107(a), and

1108 and Bankruptcy Rule 6003, authorizing the Debtors to (i) process and where applicable

fund prepetition mortgage loan commitments; (ii) continue origination activities (including direct

origination and brokering of completed loan applications) and sale activities related to the

ultimate securitization of mortgage loans; (iii) continue to perform under the Purchase and Sale

Agreement with Ally Bank and the related Master Forward Agreement with Ally Investment

Management LLC ("AIM"), incur secured indebtedness under those agreements and the Pledge

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
      Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
      granted herein may refer to http://www.kccllc.net/rescap for additional information.

and Security Agreement with non-Debtor affiliates Ally Bank, Ally Financial Inc., GMAC

Mortgage Group, LLC and AIM (collectively, the "Ally Secured Parties"), and grant such parties

superpriority administrative claims in relation to the foregoing; (iv) pay certain amounts due to

critical vendors providing origination services that accrued prior to the Petition Date; and

(v) continue honoring certain mortgage loan repurchase and other related obligations arising in

connection with the sale and servicing of loans, each in the ordinary course of business; and the

Court having considered the Whitlinger Affidavit; and the Court having entered an interim order

on May __, 2012 granting the Motion on an interim basis; and it appearing that this Court has

jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that

venue of these Chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C

§§ 1408 and 1409; and it appearing that this proceeding on the Motion is a core proceeding

pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been given; and it

appearing that no other or further notice need be provided; and upon the record of the Final

Hearing; and it appearing that the relief requested by the Motion is in the best interests of the

Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon;

and sufficient cause appearing therefor, it is hereby

### ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED, as set forth herein.

<u>Mortgage Loan Retail, Brokerage, and Origination Activities</u>

2.    Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, the Debtors

are authorized to continue their mortgage loan brokering and origination operations in the

ordinary course, including, but not limited to, the following:

    (a)    conducting retail marketing of mortgage loan products, including collection and
           processing of mortgage loan applications, and brokering of mortgage loan

applications to Ally Bank, including loan applications that were received prior to the Petition Date and are being processed by the Debtors (the "Prepetition Application Obligations"); and

(b)    funding mortgage loans originated by the Debtors in Ohio and Nevada, including any applications and loans that, as of the Petition Date, have not yet been underwritten, approved or funded (the "Prepetition Funding Obligations"  and collectively with the "Prepetition Application Obligations", the "Pipeline Loan Obligations").

3.    To the extent that a Pipeline Loan Obligation is not ultimately approved or

funded, for whatever reason, the Debtors are authorized, in their sole discretion, to refund any

Loan Fees held in their accounts to the related borrower.

<u>Mortgage Loan Purchase, Sale, and Securitization-Related Activities and</u>
<u>Grant of Postpetition Liens and Superpriority Claims to the Ally Secured Parties</u>

4.    Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, the Debtors

are authorized to continue their operations related to the purchase, sale, and securitization of

mortgage loans in the ordinary course, including, but not limited to, the following:

(a)    purchasing mortgage loans from Ally Bank and subsequently selling such loans to securitization trusts guaranteed by Ginnie Mae pursuant to the Purchase and Sale Agreement, the Pledge and Security Agreement, and the Master Forward Agreement ; and

(b)    selling mortgage loans originated by the Debtors in Ohio and Nevada directly to securitization trusts guaranteed by Ginnie Mae for securitization or to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac.

5.    Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, GMAC

Mortgage is authorized to continue to perform all of its obligations under the Purchase and Sale

Agreement in accordance with the terms of the Purchase and Sale Agreement and this Final

Order.

6.    Ally Bank is granted limited relief from the automatic stay under section

362(d)(1) of the Bankruptcy Code solely to the extent necessary to permit Ally Bank to:

(a) beginning 150 days after the Petition Date, send a 30-day notice terminating the Purchase and

Sale Agreement without cause pursuant to Section 6.1 of the Purchase and Sale Agreement

without further order of the Court; and (b) terminate the Purchase and Sale Agreement for cause

pursuant to Section 6.2 of the Purchase and Sale Agreement without further order of the Court;

provided, that Ally Bank shall give five (5) business days' advance notice of termination for

cause to GMAC Mortgage and file such notice with the Court when such notice is given.

7.      GMAC Mortgage is authorized to incur secured indebtedness pursuant to section

364(c)(2) of the Bankruptcy Code in accordance with the terms of the Purchase and Sale

Agreement and the Pledge and Security Agreement.

8.      Pursuant to sections 364(c)(1) and (2) of the Bankruptcy Code, any and all claims

of Ally Bank against GMAC Mortgage under the Purchase and Sale Agreement, including

claims arising from GMAC Mortgage's breach of the Purchase and Sale Agreement as a result of

its failure to pay Ally Bank the Purchase Price (as defined in the Purchase and Sale Agreement )

for any mortgage loan purchased under the Purchase and Sale Agreement (the "Mortgage

Loans") and any claims of the other Ally Secured Parties under the Specified Documents (as

defined in the Pledge and Security Agreement), (a) shall be secured by a fully perfected first

priority lien on all Collateral (as defined in the Pledge and Security Agreement), including the

Mortgage Loans and the proceeds thereof, which lien shall be senior to all other liens and claims,

including the liens of any debtor-in-possession lender, and secured claims, and (b) are

superpriority claims which shall have priority over any and all unsecured claims and

administrative expense claims, other than the Barclays 364(c)(1) Claims (defined below) to the

extent provided below.  The superpriority claims granted to the Ally Secured Parties in this Final

Order shall be junior to the claims granted in respect of the obligations under the DIP Facilities

(as defined in the Barclays DIP Order) pursuant to section 364(c)(1) of the Bankruptcy Code (the

"Barclays 364(c)(1) Claims") as provided in paragraph 10 of the Barclays DIP Order; except that

the Barclays 364(c)(1) Claims shall be junior to (x) the Ally Secured Parties' rights in the

Collateral (as defined in the Pledge and Security Agreement) and all proceeds and other

consideration received upon the sale, exchange, transfer or other disposition thereof and (y) the

Ally Secured Parties Recourse Claims (defined below).  The superpriority claims granted to the

Ally Secured Parties pursuant to this paragraph 8 shall have recourse only to the Collateral (as

defined in the Pledge and Security Agreement) and all proceeds and other consideration received

upon the sale, exchange, transfer or other disposition thereof and shall otherwise constitute

ordinary administrative claims under section 503(b) of the Bankruptcy Code (the "Ally Secured

Parties Recourse Claims").

9.    Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, GMAC

Mortgage is authorized to continue to perform all of its obligations under the Master Forward

Agreement  in the ordinary course in accordance with the terms of the Master Forward

Agreement  and this Final Order.  Pursuant to section 364(c)(2) of the Bankruptcy Code, GMAC

Mortgage is authorized to pledge to AIM the cash collateral required under the Master Forward

Agreement  as may be required from time to time.

10.    AIM is granted limited relief from the automatic stay under section 362 of the

Bankruptcy Code solely to the extent necessary to permit AIM to (a)  send the notice of

termination of the Master Forward Agreement  without cause pursuant to Section 12 of the

Master Forward Agreement  without further order of the Court beginning 150 days after the

Petition Date, and (b) terminate the Master Forward Agreement  for cause pursuant to Section 7

of the Master Forward Agreement  without further order of the Court; provided, that AIM shall

give five (5) business days' advance notice of termination for cause to GMAC Mortgage and file

such notice with the Court when such notice is given.

11.     Pursuant to section 364(c)(1) and (2) of the Bankruptcy Code, any claims of AIM

against GMAC Mortgage arising under the Master Forward Agreement (a) shall be secured by a

fully perfected first priority lien on all Collateral (as defined in the Master Forward Agreement),

which lien shall be senior to all other liens and claims, including the liens of any debtor-in-

possession lender, and secured claims, and (b) are superpriority claims which shall have priority

over any and all unsecured claims and administrative expense claims, other than the Barclays

364(c)(1) Claims to the extent provided below.  The superpriority claims granted to AIM in this

Final Order shall be junior to the Barclays 364(c)(1) Claims, except that the Barclays 364(c)(1)

Claims shall be junior to (x) AIM's rights in the Collateral (as defined in the Master Forward

Agreement) and all proceeds and other consideration received upon the sale, exchange, transfer

or other disposition thereof and (y) the AIM Recourse Claims (as defined below).  The

superpriority claims granted to AIM pursuant to this paragraph 11 shall have recourse only to the

Collateral (as defined in the Master Forward Agreement) and all proceeds and other

consideration received upon the sale, exchange, transfer or other disposition thereof and shall

otherwise constitute ordinary administrative claims under section 503(b) of the Bankruptcy Code

(the "AIM Recourse Claims").

12.     Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, the Debtors

are authorized to purchase mortgage loans from third parties for resale to Ginnie Mae

securitization trusts and to purchase whole loans for resale to third parties.

6

13.     Pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code, the Debtors are authorized, but not directed, to pay any applicable GA Securitization Fees or Ginnie Mae Commitment Fees.

14.     The liens granted to the Ally Secured Parties pursuant to this Final Order shall be perfected by operation of law immediately upon entry of this Final Order by the Court.  None of the Ally Secured Parties shall be required to take any action in order to validate and to perfect the liens granted pursuant to this Final Order.

Critical Origination Vendors

15.     Pursuant to section 105(a) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of Critical Origination Vendors, upon such terms and in the manner provided in this Final Order and the Motion.

16.     If a Critical Origination Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its prepetition claim, then the Debtors may, in their sole discretion and without further order of the Court:

(c)     declare that any payments made to the Critical Origination Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Origination Vendor without further order of the Court or action by any person or entity; and

(d)     take actions to recover or seek disgorgement of any payment made to the Critical Origination Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Origination Vendor, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

Under any such circumstances, such Critical Origination Vendor shall immediately repay to the Debtors any payment made to it on account of its Critical Origination Vendor claims to the

ny-1008490

extent that such payments exceed the postpetition claims of the Critical Origination Vendor,

without giving effect to any rights of setoff, recoupment, claims, provision for payment of

reclamation or trust fund claims, or other defense.

17.     Nothing herein shall:

(e)     constitute a waiver of the Debtors' rights to seek damages, disgorgement or other
appropriate remedies against any breaching Critical Origination Vendor;

(f)     be construed to waive, limit, or in any way affect, the Debtors' ability to dispute a
claim of a Critical Origination Vendor;

(g)     be deemed an admission to the validity of the underlying obligation, including
any payment made pursuant to this Final Order;

(h)     be deemed to constitute an assumption or rejection of any executory contract or
prepetition or postpetition agreement between the Debtors and a Critical
Origination Vendor; or

(i)     be deemed to require the Debtors to make any of the payments to Critical
Origination Vendors authorized herein.

18.     Notwithstanding entry of this Final Order, the Debtors' rights to enforce the

automatic stay provisions of section 362 of the Bankruptcy Code with respect to any creditor

who demands payment of its prepetition claims as a condition to doing business with the Debtors

postpetition are preserved.

19.     The banks and other financial institutions at which the Debtors maintain their

disbursement accounts are authorized and directed at the Debtors' direction, to receive, process,

honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund

transfers requested or to be requested by the Debtors in respect of the claims of Critical

Origination Vendors.

20.     The Debtors are authorized, but not directed, to issue new postpetition checks, or

effect new electronic fund transfers, on account of the claims of Critical Origination Vendors to

8

replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored

or rejected as a result of the commencement of the Debtors' chapter 11 cases.

<u>Repurchase and Related Obligations</u>

21.      Pursuant to sections 105(a), 363(c)(1), 1107 and 1108 of the Bankruptcy Code,

the Debtors are authorized, but not directed, to honor in their sole and absolute discretion all

mortgage loan repurchase or repurchase-related obligations (or, in their sole discretion, to pay

"make-whole" payments in lieu of repurchase), in accordance with their applicable

representations and warranty obligations, arising in the ordinary course of business in connection

with:  (a) their sale of GA Loans to Fannie Mae, Freddie Mac or Ginnie Mae securitization

trusts; and (b) their sale of Non-GA Loans, in each case without regard to whether such

obligations arose prepetition or postpetition; <u>provided</u>, that nothing herein shall be construed to

limit, or in any way affect, the Debtors' ability to dispute or contest the validity or amounts of

such claims or obligations.

22.      Pursuant to sections 105(a), 363(c)(1), 1107 and 1108 of the Bankruptcy Code,

the Debtors are authorized, but not required, in their sole and absolute discretion:

(j)      to honor all mortgage loan repurchase or related obligations in accordance with their applicable representations and warranty obligations, arising in the ordinary course of business in connection with:

(k)      their servicing of the GA Loans, in accordance with the applicable GA Guides, GA Servicing Agreements, and related documents; and

(l)      their servicing and subservicing agreements with other clients;

(m)      to satisfy prepetition penalties incurred in connection with "servicer error" claims made by counterparties to the Debtors' subservicing agreements;

(n)      to satisfy prepetition penalties in the event the Debtors fail to meet required deadlines with respect to foreclosure and sale activities for GA Loans; and

(o)      with respect to Ginnie Mae Loans, to honor repurchase obligations in connection with loan modifications, foreclosures, and short sales;

provided, that nothing herein shall be construed to limit, waive, or in any way affect, the

Debtors' ability to dispute or contest the validity or amounts of such claims or obligations.

23.      Pursuant to sections 105(a) of the Bankruptcy Code, the Debtors are authorized to

resell modified Ginnie Mae Loans to Ginnie Mae guaranteed securitization trusts or to submit

claims to HUD for reimbursement bys the FHA or VA, as applicable, with respect to

repurchased Ginnie Mae Loans in accordance with their prepetition practices.

24.      To the extent that the automatic stay of Bankruptcy Code section 362(a) applies to

requests by the Governmental Associations that the Debtors repurchase GA Loans, the automatic

stay is hereby modified pursuant to section 362(d)(1) of the Bankruptcy Code, to the limited

extent necessary, to allow the Governmental Associations to submit repurchase or repurchase-

related requests to the Debtors, including, without limitation, requests for indemnity, credit

enhancement, recourse liability, make-whole payments, or other remedies provided by the GA

Guides and GA Purchase Documents; provided, however, that such requests are limited to such

requests and remedies as may be made in the ordinary course; provided, however, that the

Debtors' right to contest any such request shall be preserved, and the automatic stay will remain

in effect with respect to any effort by the Governmental Associations to enforce or collect on any

such request.

25.      Any undisputed, noncontingent and liquidated postpetition claims of Ginnie Mae

arising under, or pursuant to, the Debtors' sale of the Ginnie Mae Loans, including, without

limitation, repurchase, indemnity, credit enhancement, recourse liability, make-whole payments,

or other remedies provided by the Ginnie Mae MBS Guide or other applicable GA Purchase

Documents, shall be granted administrative expense priority pursuant to section 503(b) of the

Bankruptcy Code.

26.      For the avoidance of doubt, all payments by the Debtors to the Governmental

Associations, including, without limitation, repurchase, make-whole and indemnity payments,

shall be made free and clear of any lien, security interest, or other interest of any party,

including, without limitation, any prepetition or postpetition lender.

Other Relief

27.      The Debtors are authorized and empowered to take all actions and execute such

documents as may be necessary or appropriate to carry out the relief granted herein.

28.      Nothing herein shall be deemed to limit the rights of the Debtors to operate their

business in the ordinary course, and no subsequent order shall be required to confirm such rights.

29.      Notwithstanding the relief granted herein and any actions taken hereunder,

nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any

contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their

non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or

otherwise.

30.      Notwithstanding anything to the contrary in this Final Order, any action to be

taken pursuant to the relief authorized in this Final Order is subject to the terms of any cash

collateral order or debtor in possession financing order entered in these chapter 11 proceedings.

All amounts authorized to be paid pursuant to this order are subject to the limitations and

restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement).  To

the extent that there is any inconsistency between the terms of this Final Order and the terms of

any order relating to postpetition financing or cash collateral, the terms of the orders relating to

postpetition financing or cash collateral shall govern.

11

31.     Nothing in this Final Order shall discharge, release, or otherwise preclude any setoff or recoupment right of the United States of America, its agencies, departments, or agents.

32.     Notwithstanding anything herein to the contrary, this Final Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012 and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates (excluding ResCap and its subsidiaries).

33.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

34.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

35.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Final Order shall be effective and enforceable immediately upon entry hereof.

36.     The relief granted by this Final Order shall apply to any Future Debtor in these jointly-administered cases.

37.     This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Final Order.

ny-1008490

Dated:                         , 2012
            New York, New York


                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT C</u>**

**Execution Version**

**AMENDED AND RESTATED MASTER MORTGAGE LOAN PURCHASE AND SALE AGREEMENT**

**FHA, USDA and VA Residential Mortgage Loans**

**between**

**ALLY BANK**

**"Seller"**

**and**

**GMAC MORTGAGE, LLC**

**"Purchaser"**

**May 1, 2012**

**AMENDED AND RESTATED MASTER MORTGAGE LOAN PURCHASE
AND SALE AGREEMENT**

(FHA, USDA and VA Residential Mortgage Loans Flow Delivery)

**AMENDED AND RESTATED MASTER MORTGAGE LOAN PURCHASE AND
SALE AGREEMENT** (this "Agreement"), dated **May 1, 2012**, by and between ALLY BANK,
a Utah bank, with its principal office at 6985 Union Park Center, Suite 435, Midvale, Utah 84047
("Seller"), and GMAC MORTGAGE, LLC, a Delaware limited liability company, with offices at
1100 Virginia Drive, Fort Washington, Pennsylvania 19034 ("Purchaser").

## RECITALS

1.      Seller is engaged in, inter alia, the origination, purchase and sale of Mortgage
Loans (as hereinafter defined);

2.      Seller desires to sell, from time to time, and Purchaser desires to purchase, from
time to time, all right, title, and interest in and to certain Mortgage Loans in accordance with the
terms and conditions of this Agreement. This Agreement shall apply to every sale transaction
and transfer between Purchaser and Seller with respect to Mortgage Loans, except as otherwise
agreed by the parties; and

3.      Under Federal Reserve System Regulation W (12 CFR §223.1 et. seq.), Seller and
Purchaser are affiliates of each other.  Seller and Purchaser intend that this Agreement comply
with requirements of Sections 23A and 23B of the Federal Reserve Act (12 USC §221 et. seq.)
and with implementing federal regulations.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and for
other good and valuable consideration the receipt and sufficiency of which are hereby
acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

### Definitions

All words or phrases defined in this Article I (except as herein otherwise expressly
provided or unless the context otherwise requires) shall, for the purposes of this Agreement, have
the respective meanings specified in this Article.

**1.1      Adjusted Carrying Value** means, with respect to any Mortgage Loan and any
date of determination, the adjusted carrying value of such Mortgage Loan on Seller's books on
such date calculated by Seller to be the unpaid principal balance of such Mortgage Loan on such
date, plus any premium at origination and any servicing released premium, minus any discount at
origination, and without consideration of any fair value adjustment, to the extent the Mortgage
Loan is subject to a fair value election, or LOCOM adjustment to the extent the Mortgage Loan
is not subject to a fair value election.

1

**1.2**    **Affiliate** means, with respect to any party hereto, any person or entity which controls, is controlled by, or is under common control with, such party.

**1.3**    **Agreement** means this Amended and Restated Master Mortgage Loan Purchase and Sale Agreement and all exhibits, schedules, amendments and supplements attached hereto, and any written amendments or modifications hereto signed by both Seller and Purchaser.

**1.4**    **Applicable Law** means (a) all federal, state and local legal and regulatory requirements (including statutes, rules regulations and ordinances) applicable to Seller, (b) all other requirements and guidelines of the FDIC, The Utah Department of Financial Institutions, and any other governmental body or officer having jurisdiction over Seller, (c) all judicial and administrative judgments, orders, stipulations, awards, writs and injunctions applicable to Seller and (d) Seller's Affiliate Transaction Policy, as it may be amended from time to time.

**1.5**    **Approval Order** means an order of the United States Bankruptcy Court presiding over Purchaser's case under Chapter 11 of the Bankruptcy Code, in form and substance acceptable to Seller, (a) authorizing Purchaser to operate under this Agreement in the ordinary course and effectuate the transactions as contemplated hereby; (b) granting Seller relief from the automatic stay to permit (i) Seller to send the 30-day notice of termination of this Agreement without cause pursuant to Section 6.1 of this Agreement without further order of the court beginning 150 days after Purchaser files a petition for relief under the Bankruptcy Code, and (ii) Seller to terminate this Agreement for cause pursuant to Section 6.2 of this Agreement without further order of the court, provided that Seller give 5 Business Days' advance notice of termination for cause to Purchaser and file such notice with the court when such notice is given; and (c) authorizing Purchaser to incur secured indebtedness pursuant to section 364 of the Bankruptcy Code in accordance with the terms of this Agreement and the Pipeline Security Agreement and providing, among other things, that any and all claims of Seller against Purchaser under this Agreement, including claims arising from Purchaser's breach of this Agreement as a result of its failure to pay Seller the Purchase Price for any Mortgage Loan purchased under this Agreement, (i) are secured by a fully perfected first priority lien on all Collateral, as defined in the Pipeline Security Agreement, including the Mortgage Loans and the proceeds thereof, which lien shall be senior to all other liens and claims, including the liens of any debtor-in-possession lender, and secured claims, and (ii) are superpriority claims solely as to the proceeds of the Collateral, as defined in the Pipeline Security Agreement, including the Mortgage Loans, which shall have priority over any and all unsecured claims and administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code, including claims of any debtor-in-possession lender.

**1.6**    **Assignment of Mortgage** means an assignment of all of Seller's right, title and interest in and to a Mortgage, in a form acceptable to Purchaser, to be executed by Seller in connection with each Mortgage Loan purchased hereunder in the event such Mortgage Loan is not registered on the MERS® System.

**1.7**    **Bankruptcy Code** means Title 11 of the United States Code (11 U.S.C. § 101, et seq.), as amended, modified or replaced from time to time.

**1.8**     **Broker** means to refer Mortgage Loans to Seller for underwriting and closing in the name of Seller.

**1.9**     **Business Day** means a day of the week other than Saturday, Sunday, or a day which is a legal holiday or a bank holiday in the Commonwealth of Pennsylvania or the State of Utah.

**1.10**    **Closing Date** means (i) with respect to any Ginnie Mae Mortgage Loan, the Ginnie Mae Closing Date, (ii) with respect to any Pipeline Mortgage Loan, the Pipeline Closing Date, and (iii) with respect to any USAA Mortgage Loan, the USAA Closing Date.

**1.11**    **Confirmation** means a written confirmation letter delivered by Seller to Purchaser which shall provide, with respect to a purchase of Mortgage Loans hereunder, a Mortgage Loan Schedule, the Purchase Price to be paid by Purchaser for each Mortgage Loan to be purchased, additional terms and conditions pertaining to the purchase of Mortgage Loans, the scheduled Closing Date and the scheduled Transfer Date.  A form of Confirmation is attached hereto as Exhibit A.

**1.12**    **FDIC** means the Federal Deposit Insurance Corporation.

**1.13**    **FHA** means the Federal Housing Administration, or any successor organization thereto.

**1.14**    **Ginnie Mae** means the Government National Mortgage Association, a corporate body organized under the laws of the United States, or any successor organization thereto.

**1.15**    **Ginnie Mae Closing Date** means, with respect to each purchase of Ginnie Mae Mortgage Loans hereunder, the Transfer Date, which will be the close of business on the second (2nd) Business Day after the delivery of the related Confirmation and date on which the applicable Purchase Price shall be paid, all as specified in such Confirmation. Notwithstanding the foregoing, if any Ginnie Mae Closing Date would, in accordance with the immediately preceding sentence, occur prior to Purchaser filing a petition for relief under the Bankruptcy Code and therefore Purchaser does not at that time have access to either debtor-in-possession (DIP) financing or unencumbered funds, such Ginnie Mae Closing Date shall be the Business Day on which Purchaser or Ally Investment Management LLC receives the proceeds of its sale of the related Ginnie Mae mortgage backed security.

**1.16**    **Ginnie Mae Mortgage Loan** means an individual mortgage loan (other than a USAA Mortgage Loan) which is secured by an interest in residential (1 to 4 family) real estate, that, in each case, (a) is subject to a purchase commitment under this Agreement, (b) is insured or guaranteed by the FHA, the USDA or the VA, and (c) is intended by Seller to be endorsed by Purchaser for inclusion in a pool of mortgage loans backing a Ginnie Mae security.

**1.17**    **Locked Commitment** means a rate-lock or rate commitment by Seller to hold a certain interest rate for a borrower for a period of time while such borrower's Mortgage Loan application is being processed.  For the sake of clarity, a Locked Commitment only includes rate-locks or rate commitments of Mortgage Loans that are intended by Seller to be endorsed by Purchaser for inclusion in a pool of mortgage loans backing a Ginnie Mae security.

3

**1.18    MERS** means Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

**1.19    MERS® System** means the system of recording transfers of Mortgages electronically maintained by MERS.

**1.20    Mortgage** means a valid and enforceable mortgage, deed of trust, or other security instrument creating a first or second lien, as applicable, upon described real property improved by a one-to-four family dwelling which secures a Mortgage Note.

**1.21    Mortgage File** means the Mortgage Loan Documents, records and other items pertaining to a particular Mortgage Loan.  Except to the extent required by Applicable Law, the Mortgage File may be retained in microfilm, microfiche, optical storage or magnetic media in lieu of hard copy.

**1.22    Mortgage Loan** means a Ginnie Mae Mortgage Loan, a Pipeline Mortgage Loan or a USAA Mortgage Loan.

**1.23    Mortgage Loan Documents** means the Mortgage Notes, Mortgages and all accompanying instruments, insurance policies, if applicable, evidence of compliance with Applicable Law, and other writings that document, evidence or relate to the Mortgage Loans purchased hereunder which include, without limitation, all documents required to be delivered by Seller to Purchaser pursuant to the terms of this Agreement and the related Confirmation.

**1.24    Mortgage Loan Schedule** means a list of Mortgage Loans to be purchased by Purchaser, as may be supplemented or amended from time to time, and which is attached as an Exhibit to the Confirmation.

**1.25    Mortgage Note** means a written promise by a Mortgagor to pay a sum of money at a stated interest rate during a specified term that evidences a Mortgage Loan.

**1.26    Mortgaged Property** means the real property and any improvements subject to a Mortgage, constituting security for repayment of the debt evidenced by the related Mortgage Note.

**1.27    Mortgagor** means the Mortgagor on a Mortgage Note.

**1.28    Pipeline Closing Date** means, with respect to each purchase of Pipeline Mortgage Loans hereunder, the date on which the applicable Purchase Price shall be paid, which, with respect to each Pipeline Mortgage Loan, shall be the Business Day on which Purchaser or Ally Investment Management LLC receives the proceeds of its sale of the related Ginnie Mae mortgage backed security.

**1.29    Pipeline Mortgage Loan** means a Ginnie Mae Mortgage Loan, a USAA Mortgage Loan or a Locked Commitment, in each case, existing as of April 30, 2012.

**1.30    Pipeline Security Agreement** means the Pledge and Security Agreement, dated as of April 25, 2012, by and among Purchaser, Residential Capital, LLC, Ally Financial Inc.,

4

GMAC Mortgage Group, LLC, Seller and Ally Investment Management LLC, as the same shall be amended and supplemented from time to time in accordance with its terms.

**1.31    Purchase Price** means, with respect to any Mortgage Loan, the Adjusted Carrying Value of such Mortgage Loan as of the date such Mortgage Loan is funded, <u>plus</u> interest accrued on such Mortgage Loan from the date of funding through Closing Date, broker fees and Underwriting Fees and <u>minus</u> prepaid interest on such Mortgage Loan payable to Purchaser.

**1.32    Transfer Date** means the date Seller delivers the endorsed Mortgage Note to Purchaser as specified in the related Confirmation.

**1.33    Underwriting Fee** means the fee, payable by Purchaser to Seller monthly within 3 Business Days of presentment by Seller to Purchaser of an invoice therefor, equal to the product obtained by multiplying (i) the Underwriting Fee Rate <u>times</u> (ii) the aggregate balance of Mortgage Loans underwritten by Seller in the preceding calendar month.

**1.34    Underwriting Fee Rate** means a rate mutually agreed by Seller and Purchaser, as such rate may be amended from time to time with the mutual consent of Seller and Purchaser. The Underwriting Fee Rate on the date hereof is 27 basis points (0.27%).

**1.35    USAA** means USAA Federal Savings Bank, a Texas-based indirect subsidiary of United Services Automobile Association, an inter-insurance exchange established pursuant to the Texas Insurance Code.

**1.36    USAA Mortgage Loan** means an individual mortgage loan, which is secured by an interest in residential (1 to 4 family) real estate, that, in each case, (a) is subject to a purchase commitment under this Agreement, (b) is insured or guaranteed by the FHA, the USDA or the VA, (c) was purchased by Seller from USAA pursuant to the correspondent agreement between Seller and USAA, dated as of August 14, 2007, and (d) is intended by Seller to be transferred to Purchaser on the understanding that Purchaser intends to endorse such mortgage loan for inclusion of such mortgage loan in a pool of mortgage loans backing a Ginnie Mae security.

**1.37    USAA Closing Date** means, with respect to each purchase of USAA Mortgage Loans hereunder, the date on which the applicable Purchase Price shall be paid, which, with respect to each USAA Mortgage Loan, shall be the Business Day on which Purchaser or Ally Investment Management LLC receives the proceeds of its sale of the related Ginnie Mae mortgage backed security.

**1.38    USDA** means the United States Department of Agriculture, or any successor organization thereto.

**1.39    VA** means the Department of Veteran's Affairs, or any successor organization thereto.

**1.40    Wire Transfer** means (a) a bank wire transfer of immediately available funds or (b) an ACH transaction resulting in availability of funds on the same date as would have been the case had a bank wire transfer of immediately available funds been employed.

701376054 12355006

## ARTICLE II

### Sale and Delivery of Mortgage Loans

**2.1**    **Commitment**.    Seller hereby confirms its agreement to sell, and Purchaser confirms its agreement to purchase, on a non-recourse basis (subject to the terms of this Agreement), from time to time during the term of this Agreement, on a mandatory delivery basis, (i) any and all Ginnie Mae Mortgage Loans Brokered to Seller by Purchaser pursuant to the terms of the client agreement between Seller and Purchaser, dated November 29, 2011, (ii) any and all Pipeline Mortgage Loans originated or acquired by Seller and (iii) any and all USAA Mortgage Loans originated or acquired by Seller.   For the sake of clarity, if Seller funds a Mortgage Loan with the intention that such Mortgage Loan be endorsed for inclusion in a pool of mortgage loans backing a Ginnie Mae security, the commitment by Purchaser to purchase such Mortgage Loan is not dependent upon the inclusion of such Mortgage Loan in a pool of mortgage loans backing a Ginnie Mae security. Mortgage Loans will be sold by Seller at the applicable Purchase Price as whole loans, subject to the terms and conditions of this Agreement. Mortgage Loans will be sold on a servicing-released basis.   This commitment extends to all Pipeline Mortgage Loans existing as of April 30, 2012, which otherwise would have been subject to the Master Mortgage Loan Purchase and Sale Agreement, dated as of July 1, 2008 between Seller and Purchaser before giving effect to this amendment and restatement.

**2.2**    **Offer and Acceptance**.

(a)    Seller shall provide Purchaser with access to loan-level information relating to Seller's inventory of Mortgage Loans.   Such access will be provided solely for the purposes of facilitating Purchaser's evaluation of mortgage loans for purchase by Purchaser hereunder. Access will be provided subject to Applicable Law and regulations pertaining to consumer privacy, including without limitation, the Gramm-Leach-Bliley Act.

(b)    With respect to Mortgage Loans from time to time during the term of this Agreement, Purchaser shall notify Seller of Purchaser's intent to purchase Mortgage Loans pursuant to the commitment set forth in Section 2.1 of this Agreement.   Such notice shall be accompanied by a proposed Mortgage Loan Schedule and Confirmation.   Seller may consent to the consummation of the transaction by electronic acceptance of the Confirmation in accordance with the requirement of Section 2.2(c) of this Agreement.

(c)    Notwithstanding anything contained in Section 7.4 of this Agreement, it is understood and agreed that (i) Purchaser may transmit notices, proposed Mortgage Loan Schedules and Confirmations to Seller by e-mail to the attention of Seller's designated Mortgage Loan Operations Officer, and (ii) Seller may transmit its acceptance of any Confirmation by e-mail to the attention of Purchaser's designated Capital Markets Trading Officer.

**2.3**    **Closing**.

(a)    As a condition precedent to the purchase of any Mortgage Loan under this Agreement, Seller's credit exposure to Purchaser under this Agreement must (prior to, and after giving effect to any purchase) be fully collateralized by cash provided by GMAC Mortgage

6

Group, LLC, an indirect parent of Purchaser, which funds are borrowed by GMAC Mortgage Group, LLC from Ally Financial Inc.

(b)     As an additional condition precedent to the sale and purchase of any Mortgage Loan under this Agreement and the financing provided by Seller in connection therewith, all of Seller's obligations to perform under this Agreement shall be subject to and conditioned upon (i) the lien granted by Purchaser under the Pipeline Agreement being in full force and effect, (ii) in the event that Purchaser files a petition for relief under the Bankruptcy Code, Purchaser having obtained court approval and entry of the Approval Order on an interim and final basis within the time periods specified in Section 6.2(f) of this Agreement, which orders shall not have been appealed, stayed, reversed or otherwise rendered ineffective, and (iii) there existing no cause for termination under Section 6.2 of this Agreement.  For the avoidance of doubt, no Transfer Date shall occur under this Agreement after Purchaser has commenced a case under the Bankruptcy Code unless and until the Approval Order has been entered on an interim basis in accordance with this Section.

(c)     Prior to each Transfer Date, Purchaser shall prepare a final Mortgage Loan Schedule detailing the Mortgage Loans to be purchased on the Transfer Date which shall be attached to the Confirmation.

(d)     On each Transfer Date hereunder, subject to, and upon the terms and conditions of, this Agreement, Seller shall sell, transfer, assign, convey and deliver to Purchaser on a servicing-released basis and Purchaser shall purchase, all right, title and interest in and to the related Mortgage Loans.

(e)     On each Closing Date, Purchaser shall deposit funds in an amount equal to the related Purchase Price by Wire Transfer, (i) in accordance with the terms of any bailee letter delivered to Purchaser by Seller, (ii) in the absence of any such bailee letter, to a bank account to be designated in writing by Seller, or (iii) as otherwise agreed upon in writing by the parties.

(f)     On each Transfer Date, title to the related Mortgage Loans, Mortgage Loan Documents, and all rights, benefits, collateral, payments, recoveries, proceeds and obligations arising from or in connection with the related Mortgage Loans shall vest in Purchaser.

Notwithstanding the foregoing in Section 2.3(e) and Section 2.3(f), the portion of the related Purchase Price that represents broker fees (after netting against broker fees owed by Seller to Purchaser pursuant to the client agreement) and Underwriting Fees for the related Mortgage Loans will not be paid on the related Closing Date, but will paid monthly within 3 Business Days of presentment of an invoice therefor to Purchaser by Seller.

**2.4**     **Computation; Adjustment**.  It is understood and agreed that:

(a)     All wiring instructions and Purchase Price information necessary to effect payment of the Purchase Price shall be provided to Purchaser at least one Business Day prior to the date of payment.

(b)     If the principal balance of any of the Mortgage Loans used in computing the payment of the Purchase Price shall be found to be incorrectly computed, the Purchase Price

shall be promptly and appropriately adjusted and payment promptly made by the appropriate party to the other party.

**2.5    Post-Closing Representations, Warranties and Agreements**.

(a)    On the Transfer Date, Seller will deliver to Purchaser for each Mortgage Loan, the original Mortgage Note endorsed, "Pay to the order of _____, without recourse" and signed in the name of Seller by an authorized officer of Seller.  In the event the original Mortgage Note is lost, misplaced, or destroyed, Seller shall take such action as may be required to cure as provided in the Ginnie Mae MBS Guide.  The Mortgage Note shall include originals of all prior and intervening endorsements as may be necessary to show a complete chain of endorsements.

(b)    Seller represents and warrants to Purchaser that each Mortgage Loan sold to Purchaser pursuant to this Agreement is eligible and insurable by the FHA, the VA or the USDA, and will remain eligible and insurable by the FHA, the USDA or the VA for purposes of Ginnie Mae pool certification until the issuance of a valid and binding mortgage insurance certificate or guaranty, as applicable.

(c)    If any Mortgage Loan sold to Purchaser hereunder is determined to be ineligible or uninsurable by the FHA, the USDA or the VA for purposes of Ginnie Mae pool certification, Seller agrees to repurchase such Mortgage Loan from Purchaser at its original Purchase Price, plus interest accrued and unpaid from the Closing Date, minus any principal payments received since the Closing Date, within 5 days of receipt of a notice of defect from Purchaser (which notice shall describe such defect in reasonable detail); provided that, for any Mortgage Loan that is determined to be ineligible or uninsurable for purposes of Ginnie Mae pool certification because of a defect that is capable of being cured, Seller shall have 10 days from receipt of such notice to cure such defect prior to being required to repurchase such Mortgage Loan. Notwithstanding the foregoing, Seller shall have no obligation to repurchase any Mortgage Loan that is determined to be ineligible or uninsurable by the FHA, the USDA or the VA for purposes of Ginnie Mae pool certification if such condition results from or arises out of actions or inactions of Purchaser after the related Transfer Date.

## ARTICLE III

### General Representations and Warranties of Seller

As an inducement to Purchaser to enter into this Agreement, Seller represents and warrants as follows, as of each Closing Date:

**3.1    Due Organization and Good Standing**.  Seller is a Utah bank duly organized, validly existing and in good standing under the laws of the State of Utah during the time of its activities with respect to the Mortgage Loans.

**3.2    Authority and Capacity**.  Seller has all requisite power, authority and capacity to enter into this Agreement and to perform the obligations required of it hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action.  This Agreement constitutes

701376054 12355006

the valid and legally binding agreement of Seller enforceable in accordance with its terms, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance.

**3.3**    **Effective Agreement**.    The execution, delivery and performance of this Agreement by Seller, its compliance with the terms hereof and consummation of the transactions contemplated hereby (assuming receipt of the various consents required pursuant to this Agreement) will not violate, conflict with, result in a breach of, constitute a default under, be prohibited by or require any additional approval under its organizational documents, or any instrument or agreement to which it is a party or by which it is bound or which affects the Mortgage Loan, or under Applicable Law.

**3.4**    **Compliance with Contracts and Regulations**.    Prior to each Closing Date, Seller will have complied with all material obligations under all contracts to which it was a party, and under Applicable Law, to the extent that such obligations might affect any of the Mortgage Loans being purchased by Purchaser hereunder.  Seller has done and Seller will do, no act or thing which may adversely affect the Mortgage Loans.

**3.5**    **Sale Treatment**.    The sale of each Mortgage Loan shall be reflected on Seller's balance sheet and other financial statements as a sale of assets by Seller.  Seller will not take any action or omit to take any action which would cause the transfer of the Mortgage Loans to Purchaser to be treated as anything other than a sale to Purchaser of all of Seller's right, title and interest in and to each Mortgage Loan.

**3.6**    **Litigation; Compliance with Laws**.    There is no litigation, proceeding or governmental investigation pending, or any order, injunction or decree outstanding which might materially affect any of the Mortgage Loans.  Additionally, there is no litigation, proceeding or governmental investigation existing or pending or, to the knowledge of Seller threatened, or any order, injunction or decree outstanding against or relating to Seller, that has not been disclosed by Seller to Purchaser or its counsel in writing prior to the execution of this Agreement, which could have a material adverse effect upon the Mortgage Loans, nor does Seller know of any basis for any such litigation, proceeding, or governmental investigation.  Seller has not violated any applicable law, regulation, ordinance, order, injunction or decree, or any other requirement of any governmental body or court, which may materially affect any of the Mortgage Loans or the Servicing.

**3.7**    **Compliance**.    The sale, transfer, assignment and conveyance of the Mortgage Loans by Seller to Purchaser pursuant to this Agreement does not and shall not violate Applicable Law or the terms of any license held by Seller.

## ARTICLE IV

## Representations and Warranties of Purchaser

As an inducement to Seller to enter into this Agreement, Purchaser represents and warrants as follows, as of each Closing Date:

9

**4.1**    <u>**Due Organization and Good Standing**</u> Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. To the extent required by Applicable Law, Purchaser is properly licensed and qualified to transact business in all appropriate jurisdictions.

**4.2**    <u>**Authority and Capacity**</u>.  Purchaser has all requisite corporate power, authority and capacity to enter into this Agreement and to perform the obligations required of it hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary corporate action.  This Agreement constitutes the valid and legally binding agreement of Purchaser enforceable in accordance with its terms, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance.

**4.3**    <u>**Effective Agreement**</u>.    The execution, delivery and performance of this Agreement by Purchaser, its compliance with the terms hereof and the consummation of the transactions contemplated hereby will not violate, conflict with, result in a breach of, constitute a default under, be prohibited by or require any additional approval under its certificate of incorporation, bylaws, or any instrument or agreement to which it is a party or by which it is bound.

**4.4**    <u>**Litigation**</u>.  Except as described on Schedule I hereto, there is no action, suit or proceeding or investigation pending, or to Purchaser's knowledge, threatened, against Purchaser that, if determined adversely to Purchaser, would adversely affect the sale of the Mortgage Loans, the execution, delivery or enforceability of this Agreement.

**4.5**    <u>**Consent**</u>.    With the exception of such approval or authorization as may be required by the Bankruptcy Court in the event Purchaser files a petition for relief under the Bankruptcy Code, no consent, approval, authorization or order of any court or governmental authority is required for the execution and delivery of this Agreement by Purchaser or for the performance by Purchaser of its obligations hereunder, other than such consent, approval, authorization or order as has been or will be obtained prior to each Closing Date.

**4.6**    <u>**Agency Approval**</u>.  Purchaser is (i) a mortgagee approved by the Secretary of the U.S. Department of Housing and Urban Development pursuant to Section 203 of the National Housing Act and (ii) an approved issuer by Ginnie Mae.

**ARTICLE V**

**Remedies**

**5.1**    <u>**Indemnification by Seller**</u>.

(a)    Seller shall indemnify and hold Purchaser harmless from and shall reimburse Purchaser for any losses, damages, deficiencies, claims, causes of action or expenses of any nature (including reasonable attorneys' fees and expenses) incurred by Purchaser and arising after the Closing Date which result from (i) any material breach of any representation, warranty or covenant made by Seller under this Agreement, (ii) termination or revocation of the FHA, the

10

USDA or the VA insurance pertaining to a Mortgage Loan or resale or put of any Mortgage Loan to Purchaser based on any defect or deficiency in such insurance, in each case, prior to Ginnie Mae pool certification or (iii) the rescission of any Mortgage Loan prior to Ginnie Mae pool certification.  Notwithstanding any provision herein, the foregoing indemnification is not intended to cover and Seller shall not be liable for any losses related to VA "no-bid" procedures; *provided* that this limitation shall not affect Seller's indemnification obligations with respect to breaches of representations and warranties not related to VA "no-bid" procedures.

      **5.2**    **Indemnification by Purchaser**.  Purchaser shall indemnify and hold Seller harmless from and shall reimburse Seller for any losses, damages, deficiencies, claims, causes of action or expenses of any nature (including reasonable attorneys' fees and expenses) incurred by Seller and arising after the Closing Date which result from any material breach of any representation, warranty or covenant made by Purchaser under this Agreement.

      **5.3**    **Notice of Claim**.  If any action is brought against any person entitled to indemnification pursuant to Section 5.1 or Section 5.2 (a "Claimant") in respect of a claim under Section 5.1 or Section 5.2, as applicable (an "Indemnifiable Claim"), the Claimant shall promptly notify Purchaser or Seller, as the case may be, in writing of the institution of such action (but the failure so to notify shall not relieve Seller or Purchaser, as the case may be (the "Indemnifying Party") from any liability the Indemnifying Party may have except to the extent such failure materially prejudices the Indemnifying Party).  Unless otherwise agreed to by Seller or Purchaser, as the case may be, the Indemnifying Party shall assume and direct the defense of such action, including the employment of counsel, and all fees, costs and expenses incurred in connection with defending or settling the Indemnifiable Claim shall be borne solely by the Indemnifying Party; *provided*, however, that such counsel shall be satisfactory to the Claimant in the exercise of its reasonable judgment and that the Indemnifying Party shall not compromise any claim without the prior written consent of the Claimant, which consent shall not be unreasonably withheld.  If the Indemnifying Party shall undertake to compromise or defend any such asserted liability, it shall promptly notify the Claimant of its intention to do so, and the Claimant agrees to cooperate fully with the Indemnifying Party and its counsel in the compromise of, defense against, any such asserted liability.  Notwithstanding an election by the Indemnifying Party to assume the defense of such action or proceeding, the Claimant shall have the right to employ separate counsel and to participate in the defense of such action or proceeding, and the Indemnifying Party shall bear the reasonable fees, costs and expenses of such separate counsel (and shall pay such fees, costs and expenses at least quarterly), if (a) the use of counsel chosen by the Indemnifying Party to represent the Claimant would present such counsel with a conflict of interest; (b) the defendants in, or targets of, any such action or proceeding include both a Claimant and the Indemnifying Party, and the Claimant shall have reasonably concluded that there may be legal defenses available to it or to other Claimants which are different from or additional to those available to the Indemnifying Party (in which case the Indemnifying Party shall not have the right to direct the defense of such action or proceeding on behalf of the Claimant); or (c) the Indemnifying Party shall authorize the Claimant to employ separate counsel at the expense of the Indemnifying Party.  All costs and expenses incurred in connection with a Claimant's cooperation shall be borne by the Indemnifying Party.  In any event, the Claimant shall have the right at its own expense to participate in the defense of such asserted liability.

**5.4**    **Limitation of Liability**.  In no event will either Purchaser or Seller be liable to the other party to this Agreement for incidental or consequential damages, including, without limitation, loss of profit or loss of business or business opportunity, regardless of the form of action whether in contract, tort or otherwise.

## ARTICLE VI

### Termination

**6.1**    **Termination without Cause**.  Seller or Purchaser may terminate this Agreement without cause on 30 days prior written notice (such notice in compliance with Section 7.4 below) to the other party.  This Agreement shall also terminate without cause on the date that is the earlier of (i) December 31, 2012 or (ii) the date on which Purchaser has in place all authorities, systems and procedures necessary to originate residential mortgage loans to be endorsed and included in pools of mortgage loans backing Ginnie Mae securities; *provided* that if such date is not a Business Day, then on the immediately succeeding Business Day.  Following the effective date of any such termination without cause, Purchaser will purchase (i) Mortgage Loans subject to the terms and conditions of any outstanding Confirmation issued prior to such effective date (including Mortgage Loan commitments made by Seller but not yet funded) and (ii) Mortgage Loans that are subject to Locked Commitments issued prior to such effective date.

**6.2**    **Termination for Cause**.  Notwithstanding anything to the contrary contained herein, either Seller or Purchaser (as applicable, the "Terminating Party") shall have the right to immediately terminate this Agreement for cause.  For purposes of this Section 6.2, "cause" shall include any of the following:

(a)    the other party's breach of any of the representations, warranties and/or covenants contained in this Agreement that has not been cured within 10 Business Days of receipt of notice of such breach;

(b)    institution of any receivership or conservatorship with respect to Seller, including without limitation receivership or conservatorship imposed by the FDIC;

(c)    termination of the other party's status as an approved FHA mortgagee;

(d)    Purchaser's commencement of a case under the Bankruptcy Code, provided, however, that Seller agrees that cause shall not exist under this subsection 6.2(d) if the Approval Order is entered within the time periods specified in subsection 6.2(f) below;

(e)    Seller's termination for cause of any client agreement between Purchaser and Seller;

(f)    (1) the lien granted by Purchaser under the Pipeline Security Agreement ceases to be in full force and effect or Purchaser shall contest in any manner such effectiveness, validity, binding nature or enforceability; provided; however no such default shall exist during the period during which Purchaser shall seek entry of the Approval Order on an interim basis as permitted below, (2) Seller, Ally Investment Management LLC or Ally Financial Inc. does not, or ceases to, hold a valid lien on any of the Collateral under and as defined in the Pipeline Security

12

Agreement, or such lien shall cease to be a perfected first priority lien pursuant to Section 364 of the Bankruptcy Code against Purchaser, or Purchaser shall so allege in any pleading filed in any court, provided; however no such default shall exist during the period during which Purchaser shall seek entry of the Approval Order on an interim basis as permitted below, (3) an order with respect to Purchaser shall be entered by a court appointing, or Purchaser shall file an application for an order seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, (4) an order with respect to Purchaser shall be entered by a court converting any case relating to Purchaser to a case under Chapter 7 of the Bankruptcy Code, (5) a "default" or "event of default", however defined, under any post-petition financing arrangement to which Purchaser is a borrower party to the extent such default is not cured or otherwise waived by the post-petition lender or agent, as applicable, (6) Purchaser fails to (i) within two Business Days of filing a petition for relief under the Bankruptcy Code, obtain entry of the Approval Order on an interim basis, or (ii) within 50 days of filing a petition for relief under the Bankruptcy Code, obtain entry of the Approval Order on a final basis; or (7) a default occurs under the provisions of the Approval Order with respect to the terms set forth in Section 1.5 of this Agreement or the Approval Order is at any time appealed, stayed, reversed or otherwise rendered ineffective; and/or

(g)  the Master Securities Forward Transaction Agreement, dated as of April 30, 2012, between Ally Investment Management LLC and Purchaser shall be terminated with or without cause by Ally Investment Management LLC, and a replacement arrangement (including replacement collateral and security arrangements) satisfactory to Seller is not effective within three (3) Business Days of such termination.

**6.3    Effect of Termination**.  Upon termination of this Agreement under Section 6.2 above, the Terminating Party shall have no further obligation to purchase or sell Mortgage Loans hereunder, as the case may be, and this Agreement shall be null and void and have no further force and effect except for those provisions identified in Section 7.3 of this Agreement, which provisions shall survive any such termination and continue in effect thereafter.

## ARTICLE VII

### Miscellaneous

**7.1    Costs and Expenses**.    Except as specifically provided to the contrary in this Agreement, Purchaser and Seller shall each bear its own accounting, legal and related costs and expenses in connection with the negotiation and preparation of this Agreement and the performance by each of Purchaser and Seller of its respective obligations arising under this Agreement.

**7.2    Confidentiality of Information**.  Seller and Purchaser and their Affiliates shall, and shall cause their respective directors, officers, employees and authorized representatives to, hold in strict confidence and not use or disclose to any other party except their respective Affiliates without the prior written consent of the other party all information concerning customers or proprietary business procedures, fees or prices, policies or plans of the other party

13

or any of its affiliates received by them from the other party in connection with the transactions contemplated hereby.

7.3    **Survival**.  Each party hereto covenants and agrees that the representations and warranties, covenants, obligations and agreements contained in Section 2.5 and Articles III through V of this Agreement shall survive the execution hereof, and the Closing Date, and any inspection, investigation, or determination made by, or on behalf of, either party, and expiration or termination of this Agreement, for a period of two (2) years from the applicable Closing Date.

7.4    **Notices**.  All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, sent by overnight courier, or mailed by certified mail, return receipt requested, postage prepaid, or transmitted by facsimile and confirmed by a similar mailed writing:

(a)    If to Purchaser, to:

GMAC Mortgage, LLC
1100 Virginia Drive
Ft. Washington, PA  19034
Attention: Chief Financial Officer

with a copy to:

GMAC Mortgage, LLC
1100 Virginia Drive
Ft. Washington, PA  19034
Attention: General Counsel

(b)    If to Seller, to:

Ally Bank
6985 Union Park Center, Suite 435
Midvale, Utah 84047
Attention: Chief Financial Officer

with a copy to:

Ally Bank
1100 Virginia Drive
Ft. Washington, PA  19034
Attention: Office of the General Counsel

or to such other address as Purchaser or Seller shall have specified in writing to the other.

7.5    **Governing Law**.  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES HEREUNDER SHALL BE DETERMINED IN

14

ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

**7.6** **Jurisdiction and Venue**.  Purchaser and Seller mutually agree that any legal cause of action arising out of a dispute concerning this Agreement or the enforceability of any part thereof shall be subject to the jurisdiction of the United States District Court in and for the Southern District of New York.

**7.7** **Integration**.  This Agreement constitutes a final and complete integration of the Agreement of the parties respecting the subject matter hereof, thereby superseding all previous oral or written agreements.  There are no contemporaneous oral agreements.

**7.8** **Modification**.  This Agreement may not be changed orally but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, or discharge is sought.  Subject to the foregoing, any of the terms or conditions of this Agreement may be waived or modified at any time by the party entitled to the benefit thereof, but no such waiver, express or implied, shall affect or impair the right of the waiving party to require observance, performance, or satisfaction of either (1) the same term or condition as it applies on a subsequent or previous occasion or (2) any other term or condition hereof.

**7.9** **Third Party Beneficiaries**.  This Agreement is intended for the benefit of the parties hereto only.  There shall be no third party beneficiaries hereof.

**7.10** **Construction**.  In construing the words of this Agreement, plural constructions shall include the singular, and singular constructions shall include the plural.  The words "herein", "hereof", and other similar compounds of the word "here" shall mean and refer to this entire Agreement, not to any particular provision, section, or subsection of it.

**7.11** **Captions**.  Paragraph captions in this Agreement are for ease of reference only and shall be given no substantive or restrictive meaning or significance whatsoever.

**7.12** **Counterparts**.  This Agreement may be executed in two counterparts, each of which shall be an original regardless of whether all parties sign the same document.  Regardless of the number of counterparts, they shall constitute only one agreement.  It shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart.

**7.13** **Attorneys' Fees**.  If any action of law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees from the other party.  Such fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose.  Such fees shall be in addition to any other relief that may be awarded.

**7.14** **Binding Effect and Assignment**.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.  Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto and their successors and assigns, any rights, obligations, remedies or liabilities.  No party may, or shall have the power to, assign this Agreement without the prior written consent of the other.

**7.15    Incorporation of Exhibits**.  All Exhibits and Schedules attached hereto shall be incorporated herein and shall be understood to be a part hereof as though included in the body of this Agreement.

**7.16    Amendment and Restatement**.  This Agreement amends and restates in its entirety the Master Mortgage Loan Purchase and Sale Agreement, dated as of July 1, 2008, between Purchaser, as purchaser, and Seller, as seller.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

701376054 12355006

**IN WITNESS WHEREOF,** each of the undersigned parties to this Amended and Restated Master Mortgage Loan Purchase and Sale Agreement has caused this Amended and Restated Master Mortgage Loan Purchase and Sale Agreement to be duly executed in its corporate name by one of its duly authorized officers, all as of the date first above written.

**PURCHASER:**

GMAC MORTGAGE, LLC

By: _____

Name:  JAMES WHITLINGER

Title: CFO - GMAC Mortgage, LLC

**SELLER:**

ALLY BANK

By: _____

Name: JAMES N. YOUNG

Title: Chief Financial Executive

701376054 12355006

Schedule I

Litigation

NONE

Schedule I

**Exhibit "A"**

**FORM OF CONFIRMATION**

Mortgage Loan Schedule:

Purchase Price to be paid by Purchaser:

Terms and conditions:

Scheduled Closing Date:

Scheduled Transfer Date:

**EXHIBIT D**

**EXECUTION VERSION**

PLEDGE AND SECURITY AGREEMENT

dated as of

April 25, 2012

among

GMAC MORTGAGE, LLC
as Grantor,

RESIDENTIAL CAPITAL, LLC

and

ALLY FINANCIAL INC
GMAC MORTGAGE GROUP, LLC
ALLY BANK, and
ALLY INVESTMENT MANAGEMENT LLC
as Secured Parties

# TABLE OF CONTENTS

**Page**

1.    Definitions ................................................................................................................... 2

2.    Grant of Security Interest by Grantor ...................................................................... 4

3.    Representations and Warranties ................................................................................ 6

4.    Grantor Remains Liable; Nature of Security Interest; Subrogation, etc ................ 7

5.    Release ......................................................................................................................... 9

6.    Agreements of the Grantor ...................................................................................... 10

7.    Agreement as to Investment Property ..................................................................... 12

8.    Defaults and Events of Default; Remedies .............................................................. 13

9.    Limitation on Duty in Respect of Collateral .......................................................... 15

10.    Appointment of Agent; Special Provisions Relating to AFI .................................. 16

11.    Agency for Collateral ............................................................................................... 19

12.    Legal Opinions .......................................................................................................... 19

13.    General ....................................................................................................................... 19

## PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (this "<u>Agreement</u>") dated as of April 25, 2012, is among GMAC Mortgage, LLC, a Delaware limited liability company ("<u>GMACM</u>" or the "<u>Grantor</u>"), Residential Capital, LLC, a Delaware limited liability company ("<u>ResCap</u>"), GMAC Mortgage Group, LLC, a Delaware limited liability company ("<u>Mortgage Group</u>"), Ally Bank, a Utah industrial bank ("<u>Ally Bank</u>"), Ally Investment Management LLC, a Delaware limited liability company ("<u>AIM</u>"), and Ally Financial Inc. ("<u>AFI</u>" or the "<u>Agent</u>" and, together with AIM, Ally Bank and Mortgage Group, each a "<u>Secured Party</u>," and together, the "<u>Secured Parties</u>").

## W I T N E S S E T H:

WHEREAS, Ally Bank and GMACM are party to that certain Master Mortgage Loan Purchase and Sale Agreement, dated as of July 1, 2008 (as supplemented, restated or otherwise modified from time to time, the "<u>MLPA</u>"), pursuant to which Ally Bank sells mortgage loans to GMACM;

WHEREAS, the MLPA requires that GMACM pay the purchase price for mortgage loans sold by Ally Bank to GMACM on the Closing Date (as defined in the MLPA), unless otherwise agreed to by Ally Bank and GMACM;

WHEREAS, pursuant to the MLPA, from time to time, Ally Bank endorses mortgage loans to GMACM (and GMACM further endorses such mortgage loans to one or more GSEs) prior to the date on which GMACM pays the purchase price to Ally Bank for such mortgage loans;

WHEREAS, AFI and Mortgage Group have informed GMACM and ResCap that the credit exposure of Ally Bank to GMACM as a result of the foregoing is currently collateralized by cash provided by Mortgage Group, which funds are provided to Mortgage Group by AFI and, as a result, Mortgage Group and AFI have credit exposure to the extent that GMACM does not ultimately pay the purchase price in cash to Ally Bank for mortgage loans sold by Ally Bank to GMACM pursuant to the MLPA;

WHEREAS, the mortgage servicing rights associated with New Mortgage Loans (as defined below) are retained by Ally Bank before and after sale and delivery of such mortgage loans to the applicable GSE (as defined below), except for New Mortgage Loans that are insured or guaranteed by the Federal Housing Administration or the Department of Veteran's Affairs, which related mortgage servicing rights are sold by Ally Bank to GMACM under the MLPA;

WHEREAS, AFI, Mortgage Group, GMACM and ResCap entered into that certain letter agreement, dated December 5, 2011 (the "<u>Letter Agreement</u>"), pursuant to which, *inter alia*, GMACM agreed, as a contemporaneous exchange of new value for those mortgage loans sold by Ally Bank to GMACM pursuant to the MLPA on and after such date, to grant a security interest in New Mortgage Loans and New MBS (each as defined therein) to Ally Bank and Mortgage Group as security for the credit exposure to GMACM;

WHEREAS, GMACM intends to enter into hedging arrangements with AIM from time to time relating to the New MBS pursuant to the MFSTA (as defined below), and AIM intends to enter

into contemporaneous hedging arrangements with third parties which reflect the transactions executed by GMACM with AIM;

WHEREAS, pursuant to the Letter Agreement, ResCap and GMACM agreed, *inter alia*, to sign a separate stand-alone agreement covering the obligations set forth in Section A of the Letter Agreement and containing customary terms and conditions, and the parties wish to more fully document and define the agreements contained in the Letter Agreement by entry into this Agreement; and

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, and intending to be legally bound, the parties hereto agree as follows:

1.      Definitions.  When used herein and unless the context otherwise requires, (a) unless otherwise defined herein, the capitalized terms Account, Account Debtor, Certificated Security, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Contract, Deposit Account, Document, Electronic Chattel Paper, Equipment, Financial Assets, Fixture, General Intangibles, Goods, Health Care Insurance Receivables, Instrument, Inventory, Investment Property, Letter-of-Credit Rights, Money, Payment Intangibles, Proceeds, Security, Security Entitlement, Securities Account, Supporting Obligations and Uncertificated Security have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below); (b) all references herein to Articles, Sections, Exhibits and Schedules herein shall refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement as the same may be amended, supplemented, restated or otherwise modified from time to time; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

Agent means AFI, in its capacity as agent for the Secured Parties under this Agreement.

AFI means Ally Financial Inc., a Delaware corporation.

Business Day means any day other than (a) a Saturday or Sunday; or (b) a day on which banking institutions in the States of New York, Minnesota or Pennsylvania are required or authorized by law to be closed.

Collateral means all property and rights of the Grantor in which a security interest is granted pursuant to the provisions of this Agreement, including without limitation Section 2.

Controlled Account means one or more deposit accounts opened in the name of AIM, Ally Bank or AFI, and used for the receipt and distribution of funds from the settlement of sales of New MBS.

Default means (i) any Event of Default or (ii) any event that, with the giving of notice or lapse of time, or both, would become an Event of Default.

Event of Default means any "event of default" under a Specified Agreement (however such event is defined or described, and after giving effect to any applicable requirements for notice and after the expiration of any applicable grace periods set forth in such Specified Agreement) where the defaulting party is GMACM or ResCap, or, if no such event is described or provided for in any Specified Agreement, a breach by GMACM or ResCap of its material obligations under such

Specified Document not being cured after written notice describing the default and requiring the same to be cured, and providing a reasonable period (not less than five (5) Business Days) in which to effect such cure.

Fannie Mae means Fannie Mae, also known as The Federal National Mortgage Association, or any successor thereto.

Freddie Mac means Freddie Mac, also known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

Ginnie Mae means The Government National Mortgage Association (also known as Ginnie Mae), or any successor thereto.

Grantor is defined in the preamble.

GSE means each of Fannie Mae, Freddie Mac and Ginnie Mae.

GSE Consent Arrangements means, with respect to each GSE, that such GSE has (i) consented to delivery of New Mortgage Loans to it under an agreed form of bailee letter or other retention of title arrangement acceptable to such GSE and to the document custodian for the related New Mortgage Loans, (ii) consented to any modifications to the certifications and deliveries by the document custodian for the related New Mortgage Loans required to be made by such document custodian to such GSE, (iii) consented to the form of any Form UCC-1 financing statement (as amended by any Form UCC-3) on file or to be filed by the Secured Parties and naming the Grantor as debtor and referring to the New Mortgage Loans in the collateral description therein, and (iv) executed an agreement or otherwise consented, to the reasonable satisfaction of the Secured Parties, to the Secured Parties maintaining their security interest in the related New Mortgage Loans following endorsement of such New Mortgage Loans to the related GSE.

Lien means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in or any filing of or agreement to give any financing statement under the UCC of any jurisdiction.

MLPA is defined in the recitals.

Mortgage Loan means any mortgage loan sold to GMACM pursuant to the MLPA, and includes any collateral, insurance, guaranty or other credit support arrangement related thereto.

MSFTA means that certain Master Securities Forward Transaction Agreement, dated as of March 18, 2009, by and between AIM and GMACM, as such agreement may be amended or supplemented from time to time.

MSR Loan Agreement means the Amended and Restated Loan and Security Agreement dated as of June 30, 2010, as amended through the date hereof, by and between GMAC Mortgage, LLC and Citibank, N.A., as the same may be extended (but not otherwise amended, waived or supplemented) from time to time.

3

New MBS means all mortgage-backed securities delivered by a GSE to the order of GMACM after December 5, 2011 (or, with respect to Obligations owed to AIM or AFI, on or after the date of this Agreement), to the extent related to New Mortgage Loans.

New Mortgage Loan means each Mortgage Loan that is sold by Ally Bank to GMACM pursuant to the MLPA after December 5, 2011 (or, with respect to Obligations owed to AIM or AFI, on or after the date of this Agreement) and for which GMACM is not paying the full purchase price in cash simultaneously with the endorsement by Ally Bank of such Mortgage Loan to GMACM, provided that, if GMACM shall pay such purchase price in cash subsequent to such endorsement, the related Mortgage Loan shall thereafter cease to be a New Mortgage Loan.

Obligations means, with respect to the Grantor or ResCap, the obligations, indebtedness, fees, expenses (including, without limitation, attorneys' fees and expenses) and liabilities of such Person related to GMACM's acquisition of New Mortgage Loans and subsequent disposition thereof under any Specified Document, now existing or hereafter arising, whether monetary or otherwise, matured or unmatured, direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, and any interest accruing thereon (including any interest that accrues after the commencement of any proceeding by or against GMACM, ResCap or any other Person under any bankruptcy, insolvency, liquidation, moratorium, receivership, reorganization or other debtor relief law) and all attorneys' fees and other expenses incurred in the collection or enforcement thereof.

Permitted Liens means (a) Liens arising under this Agreement and (b) Liens permitted under any Specified Document.

Person means any individual, corporation, estate, partnership, limited liability company, limited liability partnership, joint venture, association, joint-stock company, business trust, trust, unincorporated organization, government or any agency or political subdivision thereof, or other entity of a similar nature.

Pledged Property means all New MBS and all other securities, all assignments of any amounts due or to become due, all other instruments which are now being or have previously been delivered by the Grantor to the Agent or any other Secured Party or any other agent, custodian, designee or bailee of the Secured Parties, or may from time to time hereafter be delivered by the Grantor to the Agent or any other Secured Party or an agent, custodian, designee or bailee of the Agent or any other Secured Party, for the purpose of being pledged under this Agreement or any other Specified Document.

Requirements of Law means, with respect to any Person or any of its property, the certificate of incorporation or articles of association and by-laws, limited liability company agreement, operating agreement, certificate of limited partnership, limited partnership agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of any arbitrator or governmental authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether Federal, state or local (including, without limitation, usury laws, the Federal Truth in Lending Act and retail installment sales acts).

4

*Pipeline Security Agreement*

Secured Parties is defined in the Recitals.

Secured Transactions means all transactions with respect to New Mortgage Loans and New MBS contemplated by the Specified Documents.

Specified Documents means (i) the Letter Agreement to the extent that the same is not superseded by this Agreement, (ii) the MLPA, (iii) the MSFTA as it applies to transactions relating to New MBS, but not as to any other transactions and not under any cross-collateralization or netting provisions (except for cross-collateralization or netting among transactions related to New MBS), and (iv) this Agreement.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

2.    Grant of Security Interest by Grantor.  As security for the prompt payment in full in cash and performance of the Obligations, the Grantor hereby confirms and restates, for the benefit the Secured Parties, its grant of continuing security interest in, all of the Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all New Mortgage Loans, including all related servicing rights (to the extent owned by the Grantor and not retained by or transferred to Ally Bank), and all assets, rights or property related thereto;

(b)    all New MBS, including all assets, rights or property related thereto;

(c)    all payments and rights, in each case if and to the extent evidencing or specifically related to the New Mortgage Loans or the New MBS;

(d)    to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or specifically related to the New Mortgage Loans and New MBS;

(e)    all books, records, writings, data bases, information and other property if and to the extent specifically relating to or evidencing the New Mortgage Loans or the New MBS, including, but not limited to, mortgage files or servicing records and all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or specifically related to the New Mortgage Loans;

(f)    to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the New Mortgage Loans and New MBS; and

*Pipeline Security Agreement*

(g)    all Proceeds, products, rents, issues, profits and returns of and from, and all distributions on any of the foregoing (including, in the case of the New Mortgage Loans, all New MBS);

provided that:

(i)    with respect to delivery of New Mortgage Loans to a GSE:

(A)    until the GSE Consent Arrangements are in effect, the grants in clause (a) and (c) through (g) above as such grants relate to New Mortgage Loans (but not any New MBS or other Proceeds) is and shall be automatically released with respect to any New Mortgage Loan at the time that such New Mortgage Loan is endorsed to the related GSE and GMACM's document custodian certifies to such GSE in accordance with its usual procedures that such New Mortgage Loan is held by such document custodian free and clear of liens (however such certification is expressed), and

(B)    on and from the time that the GSE Consent Arrangements are in effect with respect to a particular GSE, the grants in clauses (a) and (c) through (g) above shall thereafter be deemed to have been made, and given effect to, subject to the terms of such GSE Consent Arrangements;

(ii)    to the extent that Ally Bank, as document custodian for GMACM with respect to New Mortgage Loans, has released or is deemed by any custodial agreement, custodial undertaking, GSE requirement (whether or not forming part of the published guides and procedures of the GSEs) or other binding arrangement affecting Ally Bank, to have released, or is or is deemed to be prohibited from asserting its security interest in the New Mortgage Loans that it holds, the grant in clause (a) above shall remain in full force and effect as between Ally Bank and the Grantor (subject to this Agreement, including, without limitation, sub-clause (i) above, and any applicable GSE Consent Arrangement), or, if such force and effect cannot be maintained, shall remain in full force and effect as between the other Secured Parties and the Grantor (subject to this Agreement) and the other Secured Parties shall hold the same for the further benefit of Ally Bank in proportion to the Obligations owed to it;

(iii)    with respect to any New Mortgage Loan released from the grants described in this Section 2 upon sale and delivery to a GSE, the Secured Parties will have no right, title or interest in any (A) related servicing rights retained by the Grantor in such mortgage loans after such sale and delivery to the GSE, (B) in any corresponding interest in the Grantor's agreements with the GSE relating to such mortgage loans, or in any books and records, including computer disks and other records or physical or virtual data or information, related to the foregoing, or (C) rights and claims pledged by the Grantor pursuant to the MSR Loan Agreement (other than any rights or claims that may be pledged by the Grantor pursuant to any amendment to the MSR Loan Agreement after the date hereof which amendment effects more than an extension of the maturity of such agreement, to the extent such rights and claims were not pledged pursuant to the MSR Loan Agreement prior to such amendment); and

(iv)    for the avoidance of doubt, the security interest created pursuant to the Letter Agreement and this Agreement shall not extend to any debt obligation owed or guaranteed by

ResCap and/or its subsidiaries (including the Grantor) to any Secured Party as of the date of the Letter Agreement (i.e., any antecedent debt obligation outstanding prior to the date of the Letter Agreement).

Nothing herein shall release or otherwise impair any security interest granted under any of the other Specified Documents, each of which will remain in full force and effect (i) in the case of security interests granted under the Letter Agreement, under the terms of this Agreement, and (ii) in the case of security interests granted under any other Specified Document, under the terms of such Specified Document.

3.      <u>Representations and Warranties</u>.

(a)      The Grantor represents and warrants that:

(i)      no financing statement (other than any UCC financing statements which may have been filed on behalf of the Secured Parties, or in connection with Permitted Liens) covering any of the Collateral is or will be on file in any public office, unless the same shall have been released with respect to the Collateral;

(ii)      (A) the Grantor is and will be the lawful owner of all Collateral in which it has rights, free of all Liens and claims whatsoever, other than the security interest hereunder and Permitted Liens, with full power and authority to execute and deliver this Agreement and perform the Grantor's obligations hereunder, and to subject the Collateral to the security interest hereunder, and (B) none of the Collateral of the Grantor is subject to any Liens other than Permitted Liens;

(iii)      all information with respect to the Collateral set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by the Grantor to a Secured Party is and will be true and correct in all material respects as of the date specified therein (or, if no date is so specified, as of the date furnished);

(iv)      the Grantor's true legal name as registered in the jurisdiction in which the Grantor is organized or incorporated, jurisdiction of organization or incorporation, federal employer identification number, organizational identification number, if any, as designated by the state of its organization, formation or incorporation, chief executive office and principal place of business are as set forth on <u>Schedule I</u> hereto (and the Grantor has not maintained its chief executive office and principal place of business at any other location at any time after January 1, 2007 except as otherwise disclosed in writing to the Agent);

(v)      each other location where the Grantor maintains a place of business is set forth on <u>Schedule II</u> hereto or as otherwise disclosed in writing to the Agent;

(vi)      except as disclosed on <u>Schedule III</u> hereto, the Grantor is not now known and during the five years preceding the date hereof has not previously been known by any trade name;

(vii)      except as disclosed on <u>Schedule III</u> hereto, during the five years preceding the date hereof the Grantor has not been known by any legal name different from the one set

7

forth on the signature page of this Agreement nor has the Grantor been the subject of any merger or other corporate reorganization;

(viii)   the Grantor is a limited liability company and is duly organized, validly existing and in good standing under the laws of the State of Delaware;

(ix)    the execution and delivery of this Agreement, the grant of the security interest and other rights granted herein and the performance by the Grantor of its obligations hereunder are within the Grantor's limited liability company powers, have been duly authorized by all necessary limited liability company action, have received all necessary governmental approvals (if any shall be required), and do not and will not contravene or conflict with any provision of law or of the charter or by-laws or other organizational documents of the Grantor or any judgment, order or decree, which is binding upon the Grantor and will not cause a breach, default or event of default under of any agreement, indenture, instrument or other document to which the Grantor is a party;

(x)    this Agreement is a legal, valid and binding obligation of the Grantor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law);

(xi)    the Grantor has not performed any act which might prevent the Agent or any other Secured Party from enforcing the terms of this Agreement or which could limit any such enforcement;

(xii)    no Collateral is in the possession of any Person (other than the Grantor or a custodian, securities intermediary or account bank appointed by the Grantor) asserting any claim thereto or security interest therein (other than Permitted Liens); and

(xiii)    the Letter Agreement created, and this Agreement creates, a valid security interest in the Collateral, securing the payment of the Obligations (other than, in the case of the Letter Agreement, Obligations arising in connection with the MSFTA), and all filings and other actions necessary to perfect and protect such security interest under the UCC have been duly taken, and except to the extent provided for in the GSE Consent Arrangements, as applicable, such security interest shall be prior to all other security interests covering the Collateral (except for Permitted Liens).

4.    <u>Grantor Remains Liable; Nature of Security Interest; Subrogation, etc.</u>

(a)    Anything herein to the contrary notwithstanding, (i) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein, and will perform all of its duties and obligations under such contracts and agreements to the same extent as if this Agreement had not been executed, (ii) the exercise by the Agent or any other Secured Party of any of its rights hereunder shall not release the Grantor from any of its duties or obligations under any such contracts or agreements included in the Collateral, and (iii) neither the Agent nor any other Secured Party shall have any obligation or liability under any contracts or agreements included in

*Pipeline Security Agreement*

the Collateral by reason of this Agreement, nor shall the Agent nor any other Secured Party be obligated by reason of this Agreement to perform any of the obligations or duties of the Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder, except to the extent otherwise provided for in the GSE Consent Arrangements.

(b)    This Agreement shall in all respects be a continuing, absolute, unconditional and irrevocable grant of security interest to the Secured Parties and shall remain in full force and effect until all Obligations have been paid in full in cash and all Secured Transactions have terminated. All rights of the Secured Parties and the security interests granted hereunder, and all obligations of the Grantor hereunder, shall, in each case, be absolute, unconditional and irrevocable irrespective of (i) any lack of validity, legality or enforceability of any Specified Document, (ii) any change in the time, manner or place of payment of, or in any other term of, all or any part of the Obligations, or any other extension, compromise or renewal of any Obligations, (iii) any amendment to, rescission, waiver, or other modification of, or any consent to or departure from, any of the terms of any Specified Document, or (iv) any addition or substitution of any Collateral, or any surrender or non-perfection of the Secured Parties' security interest in any Collateral; provided that nothing in this clause (iv) shall limit the effectiveness of any release of such security interest effected in accordance with the terms hereof.

(c)    Until one year and one day after all Obligations have been paid in full in cash and all Secured Transactions under the Specified Documents have terminated, each of ResCap and the Grantor hereby irrevocably waives any claim or other rights which it may now or hereafter acquire against the other that arise from the existence, payment, performance or enforcement of their respective obligations under this Agreement or any other Specified Document, including any right of subrogation, reimbursement, exoneration or indemnification, any right to participate in any claim or remedy of the Agent or any other Secured Party against the other or any Collateral which the Agent or any other Secured Party now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including the right to take or receive from the other, directly or indirectly, in cash or other property or by set-off or in any manner, payment or security on account of such claim or other rights.  If any amount shall be paid to either of ResCap or the Grantor in violation of the preceding sentence and the Obligations shall not have been indefeasibly paid in full in cash or all Secured Transactions have not been terminated, then such amount shall be deemed to have been paid to such Person for the benefit of, and held in trust for the Secured Parties, and shall forthwith be paid to the Agent for the benefit of the Secured Parties to be credited and applied upon the Obligations, whether matured or unmatured.  Each of ResCap and the Grantor acknowledges that it will receive direct and indirect benefits from the transactions contemplated by the Specified Documents and that the waiver set forth in this Section 4(c) is knowingly made in contemplation of such benefits.

(d)    Except as otherwise provided in any Specified Agreement, if any Secured Party may, under applicable Requirements of Law, proceed to realize its benefits under this Agreement or any Specified Documents giving any Secured Party a lien upon any Collateral, either by judicial foreclosure or by non-judicial sale or enforcement, such Secured Party may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Agreement.  If, in the exercise of any of its rights and remedies, any Secured Party shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against the Grantor, ResCap or any other Person, whether because of any applicable Requirements

9

*Pipeline Security Agreement*

of Law pertaining to "election of remedies" or the like, each of the Grantor and ResCap hereby consents to such action by such Secured Party and waives any claim based upon such action, even if such action by such Secured Party shall result in a full or partial loss of any rights of subrogation that such Person might otherwise have had but for such action by such Secured Party.

     5.   <u>Release</u>.  (a) Subject to <u>clause (b)</u> below, until all of the Obligations have been paid in full in cash and all Secured Transactions under the Specified Documents have been terminated, the Secured Parties may release Collateral from the security interest granted to the Secured Parties pursuant to this Agreement or any other agreement in their sole discretion.  The Secured Parties acknowledge and agree that the terms of the grant of the security interest herein, including as a result of the operation of any GSE Consent Arrangements, may result in the release of Collateral from the security interest granted hereunder, separately from the provisions of this <u>Section 5</u>.

     (b)    To the extent that New MBS is delivered to, or held to the order of AIM, AIM shall be deemed to be acting on behalf of the Grantor and the Secured Parties as their interests may appear, and shall perform such functions subject to this Agreement.  AIM (and, with respect to clause (i) below, GMACM is hereby irrevocably authorized by each of the other parties hereto:

     (i)    to execute transactions with GMACM under the MSFTA at any time and from time to time with respect to the New MBS notwithstanding the collateral security interests of the other Secured Parties in such New MBS, and contemporaneously therewith, as original principal or by assignment, to enter into (and subsequently to terminate, pair off or otherwise manage in the ordinary course of business with the intention that AIM maintain an overall neutral position with respect to the New MBS) hedging or derivative transactions with third parties with respect to New MBS notwithstanding the interests of GMACM in the related New Mortgage Loans or such New MBS, the grant of the security interest herein and all rights and obligations arising under this Agreement or any other Specified Agreement, and whether or not any or all of the foregoing shall constitute rehypothecation of the New MBS, <u>provided</u> <u>that</u> all such transactions (whether under the MSFTA or with third parties), to extent the same require delivery of some or all of the New MBS, shall be executed and performed in a manner consistent with the requirements of this <u>Section 5(b)</u>;

     (ii)    to deliver New MBS from time to time, free and clear of the Lien of this Agreement and any other Specified Agreement (all of which Liens shall be deemed to have been automatically released upon delivery of the New MBS by AIM in accordance herewith) on a delivery-versus-payment basis consistent with market convention for settlement of "to be announced" or specified pool securities forward contracts, in settlement of such transactions as AIM may from time to time execute with its counterparties (other than GMACM), <u>provided that</u> the proceeds of such settlements are delivered directly to a Controlled Account for further application in accordance with this Agreement;

     (iii)    to receive into such Controlled Account any and all funds delivered by counterparties purchasing New MBS, to give valid and binding receipts and acknowledgments relating to such receipts of funds, to engage in such corrective or reconciliation activities as may from time to time be necessary or appropriate in the sole discretion of AIM or as directed by the Agent in order to better account for funds received or to be received by it in connection with the sale or delivery of New MBS; and

                       *Pipeline Security Agreement*

(iv)      to pay out of the Controlled Account any and all available funds credited thereto to such Persons as it such have been instructed in writing (for which purpose email or another form of permanently-recorded electronic messaging shall be deemed sufficient) by the Agent to direct payment, including without limitation, (I)(A) to Ally Bank, in satisfaction of any amounts owed by GMACM under the MLPA with respect to the New Mortgage Loans with respect to which the related New MBS the subject of such sale or delivery was created, and (B) to GMACM, in satisfaction of the net amount owed to GMACM, if any, after deemed delivery of the New MBS to AIM in settlement of transactions under the MSFTA relating to the New MBS, or (II) solely to Ally Bank, provided that such sweep is performed in conjunction with a reconciliation process whereby Ally Bank will remit to GMACM on behalf of AIM such amounts as Ally Bank may be instructed in writing (for which purpose email or another form of permanently-recorded electronic messaging shall be deemed sufficient) by the Agent, as are owed to GMACM by AIM as net amount(s) owed to GMACM, if any, after deemed delivery of the New MBS to AIM in settlement of transactions under the MSFTA relating to the New MBS.  For the avoidance of doubt, if the cash proceeds of sales of the New MBS are insufficient to satisfy all amounts then due and owed by GMACM under the MLPA with respect to the New Mortgage Loans with respect to which the related New MBS the subject of such sale was created, such amounts shall nevertheless continue to be owed under the MLPA and GMACM shall remit such amounts in immediately available funds to Ally Bank on the day of such sale.

The Agent agrees to provide the instructions described in the foregoing clauses (iii) and (iv) in accordance with the Specified Documents promptly upon receipt of the requisite information from the loan accounting group (or the functional replacement thereof) whose responsibility it is to generate the applicable reports, or to delegate to one or more officers within such group the authority to provide such written directions on its behalf.

(c)      Except as set forth in clause (b) above, upon any release pursuant to this Section 5, the Secured Parties will, at the Grantor's request and expense, deliver to the Grantor, without any representations, warranties or recourse of any kind whatsoever, any such released Collateral held by the Secured Parties hereunder, and execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such release.

6.      Agreements of the Grantor.  (a) The Grantor:

(i)      will execute and/or deliver such financing statements and other documents (and pay the cost of filing or recording the same in all public offices reasonably determined to be appropriate by the Agent) and do such other acts and things (including, without limitation, delivery to any Person nominated by the Agent, of any Instruments and Certificated Securities which constitute Collateral), all as the Agent may from time to time reasonably request, to establish and maintain a valid perfected security interest in the Collateral (free of all other Liens, other than Permitted Liens) to secure the payment of the Obligations;

(ii)      will keep all its records regarding Collateral at, and will not maintain any place of business at any location other than, its address(es) shown on Schedules I and II

hereto or at such other addresses of which the Grantor shall have given the Agent not less than 30 days' prior written notice;

(iii)    will not change its state of formation and will not change its name, identity, entity form or its organizational identification number for the state of its formation, in each case such that any financing statement filed to perfect the Secured Parties' interests under this Agreement would become seriously misleading, unless the Grantor shall have given the Agent not less than 30 days' prior notice of such change (provided that this Section 6(a)(iii) shall not be deemed authorize any change or transaction prohibited under the Specified Documents) and shall have taken or will timely take all action necessary to maintain continued perfection and priority of the security interest created hereunder following such change;

(iv)    to the extent practicable, will keep its records concerning the Collateral in such a manner as will enable the Agent or its designees to determine at any time the status of the Collateral, and the identity of the Collateral as being separate and apart from any other property of the Grantor (whether or not the same shall be subject to a Lien other than the Lien arising under this Agreement);

(v)    to the extent practicable, will furnish the Agent or its designees such information as is available to the Grantor concerning the Grantor and the Collateral as the Agent or its designees may from time to time reasonably request in order to preserve or protect their interests in the Collateral;

(vi)    will permit the Agent or its designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice if a Default has occurred and is continuing) to inspect, audit and make copies of and extracts from all records and all other papers in the possession of the Grantor pertaining to the Collateral, and will, upon request of the Agent or its designees during the existence of a Default and to the extent practicable, deliver to the Agent or its designees all of such records and papers;

(vii)    will not sell, lease or assign any Collateral except as permitted hereunder, or create or permit to exist any Lien on any Collateral other than Permitted Liens;

(viii)    will keep all of the Collateral in the United States;

(ix)    acknowledges and agrees that it is not authorized to file any financing statement in favor of the Secured Parties without the prior written consent of the Agent and that it will not do so without the prior written consent of the Agent, subject to the Grantor's rights under Section 9-509(d)(2) of the UCC;

(x)    upon the reasonable request of the Agent, will facilitate the realization of the Collateral and the exercise of all powers, authorities and discretions vested by this Agreement in the Agent; and

(xi)    shall in particular promptly execute all transfers, conveyances, assignments, assurances which the Agent may reasonably request in order to preserve or protect the interest of the Secured Parties in the Collateral.

Any expenses reasonably incurred in protecting, preserving or maintaining any Collateral shall be borne by the Grantor.  Notwithstanding the foregoing, except as otherwise provided herein or in any Specified Document, none of the Secured Parties shall have any obligation or liability regarding the Collateral or any proceeds thereof by reason of, or arising out of, this Agreement.

(b)    The Grantor agrees that it will give Fannie Mae (or any other applicable GSE) written direction that the cash proceeds of any sales of New Mortgage Loans to such GSE:

(i)    for which such GSE remits such cash proceeds directly upon sale; or

(ii)    under the Fannie Mae ASAP program (or any similar program at another GSE) after settlement of the associated forward transaction;

shall be paid without setoff, recoupment or other reduction directly to a Controlled Account, including, without limitation, by requiring that related contractual arrangements contain a provision unconditionally requiring the foregoing.  All funds so paid into such Controlled Account shall disbursed in the same manner as funds deposited following the sale of New MBS, subject to and as set forth in Section 5(b).  The Secured Parties acknowledge that if the Agent instructs the Grantor to change the Controlled Account to which such proceeds are directed, the associated GSE may not direct funds to such new account until the wiring instructions have been implemented in accordance with such GSE's usual practices.

7.    Agreement as to Investment Property.  Except as otherwise provided pursuant to Section 11:

(a)    All certificates or Instruments, if any, evidencing or constituting Collateral, including any Pledged Property, shall be delivered to and held by AIM (on behalf of the Secured Parties pursuant to the provisions of this Agreement), shall be in suitable form for transfer by delivery, and shall be accompanied by all necessary endorsements or instruments of transfer or assignment, duly executed in blank.

(b)    To the extent any of the Collateral constitutes a "certificated security" (as defined in Section 8-102(a)(4) of the UCC), the Grantor shall take such other actions as necessary to grant "control" (as defined in Section 8-106 of the UCC) to AIM (on behalf of the Secured Parties pursuant to the provisions of this Agreement) over such Collateral.

(c)    To the extent any of its Collateral constitutes an "uncertificated security" (as defined in Section 8-102(a)(18) of the UCC), the Grantor shall take and cause the appropriate Person (including any issuer, entitlement holder or securities intermediary thereof) to take all actions necessary to grant "control" (as defined in Section 8-106 of the UCC) to AIM (on behalf of the Secured Parties pursuant to the provisions of this Agreement) over such Collateral including, without limitation, causing delivery of such Collateral or causing the issuer of such Collateral, as appropriate, to agree to comply with the instructions originated by AIM (on behalf of the Secured

13

Parties pursuant to the provisions of this Agreement) without further consent by the registered owner thereof;

(d)    To the extent any of its Collateral constitutes a "security entitlement" or a "securities account" (as such terms are defined in Sections 8-102(a)(17) and 8-501(a), respectively, of the UCC), the Grantor shall take and cause the appropriate Person (including any securities intermediary thereof) to take all actions necessary to grant "control" (as defined in Section 8-106 of the UCC) to AIM (on behalf of the Secured Parties pursuant to the provisions of this Agreement) over such Collateral including, without limitation, causing to be delivered to the Agent an agreement, in form and substance satisfactory to the Agent, executed by the securities intermediary thereof whereby such securities intermediary agrees (i) that it will comply with entitlement orders originated by AIM (on behalf of the Secured Parties pursuant to the provisions of this Agreement) without further consent by the Grantor or any other Person with respect to all such Collateral, (ii) to subordinate any security interest it may have in and to all such Collateral to the security interest of the Secured Parties therein, and (iii) that it will not agree with any Person other than AIM (on behalf of the Secured Parties pursuant to the provisions of this Agreement) in any manner that would grant such Person "control" over any such Collateral without the Agent's prior written consent.

(e)    The Grantor agrees following the occurrence and during the continuance of any Event of Default, promptly upon receipt thereof by the Grantor and without any request therefor by AIM or Agent, to deliver (properly endorsed where required hereby or requested by AIM or the Agent) to AIM (on behalf of the Secured Parties pursuant to the provisions of this Agreement) or the Agent all interest, all principal, all other cash payments, and all proceeds of the Collateral, all of which shall be held by AIM (on behalf of the Secured Parties pursuant to the provisions of this Agreement) or the Agent, as applicable, as additional Collateral for use in accordance with Section 8(f).

(f)    All Collateral constituting interest, principal, cash payments, and proceeds, which may at any time and from time to time be held by the Grantor but which the Grantor is then obligated to deliver to the Agent, shall, until delivery to the Agent, be held by the Grantor separate and apart from its other property in trust for the Secured Parties.

8.    <u>Defaults and Events of Default; Remedies</u>.

(a)    The Grantor hereby irrevocably appoints the Agent as its attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time, upon the occurrence and during the continuance of an Event of Default, to take any action and to execute any instrument which the Agent may request to create, perfect or enforce the security interest provided for in this Agreement, including (A) to direct any party liable for any payment under any Collateral to make payment of any and all moneys due or to become due to thereunder directly to the Agent or its designees, (B) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (C) to receive, endorse, and collect any drafts or other Collateral in connection with <u>clauses (A)</u> or <u>(B)</u> above, (D) to file any claims or take any action or institute any proceedings which the Agent may request for the collection of any of the Collateral or otherwise to enforce the rights of the Secured Parties with respect to any of the Collateral, and (E) to perform the affirmative obligations of the Grantor thereunder;

*Pipeline Security Agreement*

**THE GRANTOR HEREBY ACKNOWLEDGES, CONSENTS AND AGREES THAT THE POWER OF ATTORNEY GRANTED PURSUANT TO THIS SECTION 8 IS IRREVOCABLE AND COUPLED WITH AN INTEREST AND SHALL BE EFFECTIVE UNTIL ALL OBLIGATIONS HAVE BEEN IRREVOCABLY PAID IN FULL IN CASH AND ALL SECURED TRANSACTIONS HAVE TERMINATED.**

(b)     If an Event of Default shall have occurred and be continuing, in addition to its rights in the foregoing clause (a) and without limiting the generality of such clause, the Agent may exercise from time to time, for itself or on behalf of the other Secured Parties, any rights and remedies available to the Secured Parties under the UCC, under any other applicable Requirements of Law and in the clauses (c) through (g) set forth below in this Section 8.

(c)     Notice of the intended disposition of any Collateral may be given by first-class mail, hand-delivery (through a delivery service or otherwise), facsimile or e-mail, and shall be deemed to have been "sent" upon deposit in the U.S. mails with adequate postage properly affixed, upon delivery to an express delivery service, upon the electronic submission through telephonic services or, if by facsimile transmission, when sent against mechanical confirmation of successful transmission, as applicable.  The Grantor agrees that any disposition of Collateral pursuant to a transaction that is a hedge of a Secured Transaction may be made without additional notice to the Grantor, provided that the Grantor shall have previously been provided details of the hedging transaction for such Secured Transaction.

(d)     The Grantor hereby agrees and acknowledges that a commercially reasonable disposition (i) made in the usual manner on any recognized market, (ii) at the price current in any recognized market at the time of disposition, or (iii) in conformity with reasonable commercial practices among dealers in the type of property subject to the disposition shall, in each case, be deemed commercially reasonable.  The Grantor further agrees and acknowledges that any disposition of Collateral pursuant to a transaction that is a hedge of a Secured Transaction shall be deemed to be commercially reasonable.

(e)     Any cash proceeds of any disposition by the Agent or its designees of any of the Collateral shall be applied, *first*, to payment of the Secured Parties' expenses in connection with the Collateral, including its disposition, and including without limitation, attorneys' fees and legal expenses, and *thereafter* to the payment of any and all of the Obligations in such order of application as the Agent (on behalf of the Secured Parties) may from time to time direct, and *finally* any surplus will be paid to the Grantor or as a court of competent jurisdiction shall direct.  Neither the Agent nor any other Secured Party need apply or pay over for application noncash proceeds of collection and enforcement unless (i) the failure to do so would be commercially unreasonable, and (ii) the Grantor has provided the Agent with a written demand to apply or pay over such noncash proceeds on such basis.  To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Agent or any other Secured Party arising out of the exercise by the Agent of any rights hereunder.

(f)     If any Event of Default has occurred and is continuing, the Agent or its designees may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to the Secured Parties, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) and also may,

without notice except as specified below, (or, if notice cannot be waived under the UCC, as required to be provided by the UCC) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of their offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as they may deem commercially reasonable.  The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' prior notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  Neither the Agent nor any of its designees shall be obligated to make any sale of Collateral regardless of notice of sale having been given, and any such Person may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(g)    If any Event of Default has occurred and is continuing, the Agent may transfer all or any part of the Collateral into the name of one or more of the Secured Parties, with or without disclosing that such Collateral is subject to the lien and security interest hereunder, notify the parties obligated on any of the Collateral to make payment to the Agent or its designees of any amount due or to become due thereunder, enforce collection of any of the Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, endorse any checks, drafts, or other writings in the Grantor's name to allow collection of the Collateral, take control of any proceeds of the Collateral, and execute (in the name, place and stead of the Grantor) endorsements, assignments, transfer powers and other instruments of conveyance or transfer with respect to all or any of the Collateral.

(h)    The Grantor agrees that in any sale of any of the Collateral whenever an Event of Default shall have occurred and be continuing, the Agent and its designees is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable Requirements of Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any governmental regulatory authority or official, and the Grantor further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall any such Person be liable nor accountable to the Grantor for any discount allowed by the reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.  The Agent may sell the Collateral without giving any warranties or representations as to the Collateral.  The Agent may disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

9.    <u>Limitation on Duty in Respect of Collateral</u>.  Beyond the exercise of reasonable care in the custody and preservation thereof, no Secured Party will have any duty as to any Collateral in its possession or control or in the possession or control of any sub-agent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto.  Each Secured Party will be deemed to have exercised reasonable care in the custody and

*Pipeline Security Agreement*

preservation of the Collateral in its respective possession or control if such Collateral is accorded treatment substantially equal to that which it accords its own property, and will not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of any act or omission of any sub-agent or bailee selected by such Secured Party in good faith, or by reason of any act or omission by such Secured Party, except to the extent that such liability arises from such Secured Party's gross negligence or willful misconduct.

To the extent that applicable law imposes duties on the Secured Parties to exercise remedies in a commercially reasonable manner, the Grantor acknowledges and agrees that (a) the Secured Parties and their designees shall have no obligation to (i) incur expenses reasonably deemed by them to be significant in order to prepare Collateral for disposition, (ii) obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) remove Liens on or any adverse claims against Collateral, (iv) advertise dispositions of Collateral through publications or media of general circulation, or media or publications directed toward the type of Collateral being disposed of, except in the case of a public disposition, (v) contact other Persons, whether or not in the same business as the Grantor, for expressions of interest in acquiring all or any portion of the Collateral, (vi) obtain the services of brokers, investment bankers, consultants and other professionals to assist in the collection or disposition of any of the Collateral, or (vii) provide disposition warranties, including, without limitation, any warranties of title, and that any sale or disposition of Collateral shall be conducted in a commercially reasonable manner if such Collateral (i) is disposed of in wholesale rather than retail markets, (ii) is delivered into one or more transactions executed by one or more Secured Parties or their affiliates, whether such transactions are executed before or after the occurrence of an Event of Default, or (iii) to the extent permitted by Article 9 of the UCC, is retained by one or more Secured Parties provided that credit therefor is given equivalent to the fair market value of the Collateral so retained.  Nothing contained in this Section shall be construed to grant any right to the Grantor or to impose any duties on the Secured Parties that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section.

10.    <u>Appointment of Agent; Special Provisions Relating to AFI</u>.  Each Secured Party hereby appoints the Agent and its successors as its representative to perform the duties assigned to the Agent hereunder, subject to the terms hereof (including without limitation <u>Sections 8</u> and <u>9</u> and this <u>Section 10</u>).  In addition, each Secured Party hereby authorizes the Agent to act as its agent and designee, to take such action on its behalf under the provisions of this Agreement and to exercise such powers and perform such duties as are delegated to the Agent hereunder.  Without limitation of the foregoing, the Agent shall be granted the following rights, powers, obligations and duties under this Agreement, notwithstanding anything herein to the contrary:

(a)    [RESERVED].

(b)    The Agent may execute any of its duties under this Agreement or any other Specified Document by or through agents, experts or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible for the negligence or misconduct of any agents, experts or attorneys-in-fact selected by it in good faith.

*Pipeline Security Agreement*

(c)    Beyond the exercise of reasonable care in the custody thereof and except as otherwise specifically stated in this Agreement or any other Specified Document, AFI shall have no duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or as to preservation of rights against prior parties or any other rights pertaining thereto.

(d)    The Agent shall be authorized to but shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or monitoring or maintaining the perfection of any security interest in the Collateral.  It is expressly agreed, to the maximum extent permitted by applicable law, that the Agent shall have no responsibility for (i) taking any necessary steps to preserve rights against any Person with respect to any Collateral or (ii) taking any action to protect against any diminution in value of the Collateral, but, in each case (A) subject to the requirement that the Agent may not act or omit to take any action if such act or omission would constitute gross negligence, bad faith or willful misconduct and (B) the Agent may do so and all expenses reasonably incurred in connection therewith shall be part of the Obligations.

(e)    The Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Agent in good faith, except to the extent of the Agent's gross negligence or willful misconduct.

(f)    The Agent shall not be responsible for, nor incur any liability with respect to, (i) the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the security interest in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part under this Agreement or any other Specified Document, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Agent, (ii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iii) the validity of the title of the Grantor to the Collateral, (iv) insuring the Collateral or (v) the payment of taxes, charges or assessments upon the Collateral or otherwise as to the maintenance of the Collateral.

(g)    Notwithstanding anything in this Agreement or any other Specified Document to the contrary, (i) in no event shall the Agent or any officer, director, employee, representative or agent of the Agent be liable under or in connection with this Agreement or any other Specified Document for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits or loss of opportunity, whether or not foreseeable, even if the Agent or such officer, director, employee, representative or agent has been advised of the possibility thereof and regardless of the form of action in which such damages are sought; and (ii) the Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the Specified Documents to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such Specified Document.  In no event shall the Agent be obligated to invest any amounts received by it hereunder.

18

(h)     The Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any note, writing, resolution, request, direction, certificate, notice, consent, affidavit, letter, cablegram, telegram, telecopy, email, telex or teletype message, statement, order or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and/or upon advice and/or statements of legal counsel, independent accountants and other experts selected by the Agent and need not investigate any fact or matter stated in any such document. Any such statement of legal counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in accordance therewith.

(i)     Notwithstanding that the Agent is appointed by and acting for and at the direction of the Secured Parties, the Grantor will pay upon demand to the Agent the amount of any and all reasonable fees and out-of-pocket expenses, including the reasonable fees and expenses of its counsel, that the Agent may incur in connection with (i) filing fees or other external costs (other than outside counsel fees) associated with the administration of this Agreement and the Specified Documents to which it is a party, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement (whether through negotiations, legal proceedings or otherwise) of any of the rights of the Agent or the other Secured Parties hereunder or under the Specified Documents or (iv) the failure by the Grantor to perform or observe any of the provisions hereof or of any of the Specified Documents. The provisions of this Section shall survive the termination of this Agreement and resignation or removal of the Agent. The expenses of the Agent incurred in connection with actions undertaken as provided in this Section 10 shall be payable by the Grantor to the Agent upon demand therefor (which demand shall be accompanied by an appropriate invoice).

(j)     The Grantor agrees to indemnify each of the Agent and its officers, directors, employees, agents or attorneys-in-fact (collectively, the "Indemnified Parties") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorneys' fees and expenses) or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against any Indemnified Party in any way relating to or arising out of this Agreement or the Specified Documents; provided that the Grantor shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent that any of the foregoing result from any such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction beyond all applicable appeals.

(k)     Neither the Agent, any other Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on the Agent hereunder are solely to protect the Agent and the Secured Parties' interests in the Collateral and shall not impose any duty upon the Agent to exercise any such powers. The Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its

19

*Pipeline Security Agreement*

officers, directors, employees or agents shall be responsible to the Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

(l)     Pursuant to any applicable law, the Grantor authorizes the Agent without obligation to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of the Grantor in such form and in such offices as the Agent determines appropriate to perfect the security interests of the Agent under this Agreement. The Grantor hereby ratifies and authorizes the filing by the Agent of any financing statement with respect to the Collateral made prior to the date hereof. Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, in no event shall the Agent have any duty or obligation to monitor the perfection, continuation of perfection or the sufficiency or validity of any security interest in or related to the Collateral or to prepare or file any Uniform Commercial Code financing statement or continuation statement.

(m)     Any corporation into which the Agent may be merged, or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Agent shall be a party, shall become a party to this Agreement without the execution or filing of any paper or any further act on the part of the parties hereto.

11.     Agency for Collateral.  Each of the Secured Parties hereby appoints AIM as its agent to hold any New MBS, and AIM hereby accepts such appointment. Each of the parties hereto acknowledges and agrees that AIM shall hold any such Collateral in its possession for the benefit of the Secured Parties and the Grantor as their interests may appear. Each of the parties hereto acknowledges and agrees that to the extent that it shall hold or dispose of any Collateral, AIM shall be entitled to the benefit of the terms of Sections 10(b) through (l) inclusive as though AIM were "the Agent" as named therein, and the same had been set forth in full below. The Grantor's obligation under the Letter Agreement to deliver New MBS to AIM shall be satisfied when the applicable GSE credits the related New MBS to the Controlled Account nominated for such purpose by AIM.

12.     Legal Opinions.  The Grantor hereby agrees to deliver, on the date hereof, such opinions of counsel as are requested by the Secured Parties, in form and substance satisfactory to the Secured Parties.

13.     General.

(a)     The Grantor agrees that a carbon, photographic or other reproduction of this Agreement is sufficient as a financing statement.

(b)     All notices hereunder shall be in writing (including facsimile transmission or e-mail) and shall be sent to the applicable address shown on Schedule IV hereto, or to such other address as such party may, by written notice received by the other parties, have designated as its address for such purpose. Notices sent by facsimile transmission or e-mail shall be deemed to have been given when sent against mechanical confirmation of successful transmission; notices sent by mail shall be deemed to have been given three Business Days after the date when sent by registered or certified mail, postage prepaid; and

20

notices sent by hand delivery or overnight courier shall be deemed to have been given when received.

(c)    The Grantor agrees to pay all fees and expenses, including reasonable attorneys' fees, paid or incurred by each of the Secured Parties in enforcing this Agreement against the Grantor, and all such fees and expenses shall constitute Obligations.

(d)    No delay on the part of any Secured Party in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Secured Party of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

(e)    This Agreement shall remain in full force and effect until all Obligations have been paid in full in cash and all Secured Transactions have terminated.  If at any time all or any part of any payment theretofore applied by any Secured Party to any of the Obligations is or must be rescinded or returned by such Secured Party for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Grantor), such Obligations shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by such Secured Party, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Obligations, all as though such application by such Secured Party had not been made.

(f)    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Requirements of Law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Consistent with the foregoing, and notwithstanding any other provision of this Agreement to the contrary, in the event that any action or proceeding is brought in whatever form and in whatever forum seeking to invalidate the Grantor's obligations under this Agreement under any fraudulent conveyance, fraudulent transfer theory, or similar avoidance theory, whether under state or federal law, the Grantor, automatically and without any further action being required of the Grantor or any Secured Party, shall be liable under this Agreement only for an amount equal to the maximum amount of liability that could have been incurred under applicable law by the Grantor under any pledge to secure the Obligations (or any portion thereof) at the time of the execution and delivery of this Agreement (or, if such date is determined not to be the appropriate date for determining the enforceability of the Grantor's obligations hereunder for fraudulent conveyance or transfer (or similar avoidance) purposes, on the date determined to be so appropriate) without rendering such a hypothetical pledge voidable under applicable Requirements of Law relating to fraudulent conveyance, fraudulent transfer, or any other grounds for avoidance (such highest amount determined hereunder being the "Maximum Amount"), and not for any greater amount, as if the stated amount of this Agreement had instead been the Maximum Amount.  This paragraph is intended solely to preserve the rights of the Secured Parties under this Agreement to the maximum extent not subject to avoidance under applicable Requirements of Law, and neither the Grantor nor any other person or entity shall have any right or claim under this

21

Section with respect to the limitation described in this Agreement, except to the extent necessary so that the obligations of the Grantor under this Agreement shall not be rendered voidable under applicable Requirements of Law.

(g)     This Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon the Grantor and its successors, transferees and assigns, and (ii) inure, together with the rights and remedies of the Secured Parties hereunder, to the benefit of each Secured Party and its respective successors, transferees and assigns.  The Grantor may not assign (unless otherwise permitted under the terms of the Specified Documents) any of its obligations hereunder without the prior written consent of the Secured Parties.

(h)     This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.  This Agreement represents the entire agreement of the parties as to its subject matter.  To the extent that any inconsistency shall exist between this Agreement and the Letter Agreement, this Agreement shall prevail, but in all other respects the Letter Agreement shall continue in full force and effect in accordance with its terms.  Except as expressly set forth herein, nothing in this Agreement shall affect or limit any other agreement that exists between any two or more of the parties.  At any time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the other parties a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery.  Immediately upon such execution and delivery (and without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

(i)     **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).**

(j)     EACH PARTY HEREBY REPRESENTS AND WARRANTS THAT IT HAS NO RIGHT TO IMMUNITY FROM THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT OR FROM EXECUTION OF ANY JUDGMENT OR FROM THE EXECUTION OR ENFORCEMENT THEREIN OF ANY ARBITRATION DECISION IN RESPECT OF ANY SUIT, ACTION, PROCEEDING OR ANY OTHER MATTER ARISING OUT OF OR RELATING TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND TO THE EXTENT THAT ANY PARTY IS OR BECOMES ENTITLED TO ANY SUCH IMMUNITY WITH RESPECT TO THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT, AND TO THE EXTENT PERMITTED BY LAW, IT DOES HEREBY AND WILL IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO PLEAD OR CLAIM ANY SUCH IMMUNITY

22

WITH RESPECT TO ITS OBLIGATIONS OR ANY OTHER MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(k)     EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES.  THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.

(l)     EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(m)     This Agreement may only be amended, waived or otherwise modified by written agreement among the parties.

(n)     The parties intend and acknowledge that this Agreement (to the extent that it relates to Secured Transactions) is a "master netting agreement" as that term is defined in Section 101(38A)(A) of the Bankruptcy Code, and that this Agreement and each Secured Transaction is a "securities contract" as that term is defined in Section 741(7)(A)(i) of the Bankruptcy Code.  It is understood and agreed that any party's right to cause the termination, liquidation or acceleration of, or to offset net termination values, payment amounts or other transfer obligations arising under or in connection with this Agreement or any Secured Transaction is in each case a contractual right to cause the termination, liquidation, or acceleration of, or to offset net termination values, payment amounts or other transfer obligations arising under or in connection with this Agreement or any Secured Transaction hereunder as described in Sections 555 and 561 of the Bankruptcy Code.  The parties further intend and agree that the totality of the security interest granted, and the representations and covenants of the parties under the Specified Documents, together

*Pipeline Security Agreement*

represent a contemporaneous exchange of new value for each sale of the related New Mortgage Loans and New MBS.

(o)    ResCap agrees that it shall cause the Grantor to observe each of the Grantor's covenants as set forth herein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

700897433 10488637                                          *Pipeline Security Agreement*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

GMAC MORTGAGE, LLC,
as Grantor

By: _____
Name: _____
Title: _____

RESIDENTIAL CAPITAL, LLC

By: _____
Name: _____
Title: _____

*Pipeline Security Agreement*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

GMAC MORTGAGE, LLC,
as Grantor

By:_____
Name:
Title:

RESIDENTIAL CAPITAL, LLC

By:_____
Name: Jim Whitlinger
Title: CFO, ResCap

ALLY FINANCIAL INC.
as a Secured Party and as the Agent

By: _____
Name:  JAMES G MACKEY
Title:  Chief Financial Officer

ALLY BANK,
as a Secured Party

By: _____
Name:
Title:

GMAC MORTGAGE GROUP, LLC,
as a Secured Party

By: _____
Name:
Title:

ALLY INVESTMENT MANAGEMENT LLC,
as a Secured Party

By: _____
Name:
Title:

S-2

*Pipeline Security Agreement*

ALLY FINANCIAL INC.
as a Secured Party and as the Agent


By:_____
Name:
Title:


ALLY BANK,
as a Secured Party


By:____*Craig S Evans*_____
Name:    *Craig S Evans*
Title:    *Senior Vice President*

GMAC MORTGAGE GROUP, LLC,
as a Secured Party


By:_____
Name:
Title:


ALLY INVESTMENT MANAGEMENT LLC,
as a Secured Party


By:_____
Name:
Title:

700897433 10488637

*Pipeline Security Agreement*

ALLY FINANCIAL INC.
as a Secured Party and as the Agent


By:_____
Name:
Title:


ALLY BANK,
as a Secured Party


By:_____
Name:
Title:


GMAC MORTGAGE GROUP, LLC,
as a Secured Party


By: _Musall Br_____
Name: Matthew Brennan
Title: Ally Financial Balance Sheet Management Executive


ALLY INVESTMENT MANAGEMENT LLC,
as a Secured Party


By:_____
Name:
Title:

S-2

*Pipeline Security Agreement*

ALLY FINANCIAL INC.
as a Secured Party and as the Agent


By:_____
Name:
Title:


ALLY BANK,
as a Secured Party


By:_____
Name:
Title:


GMAC MORTGAGE GROUP, LLC,
as a Secured Party


By:_____
Name:
Title:


ALLY INVESTMENT MANAGEMENT LLC,
as a Secured Party


By:_____   3/28/12
Name: Jonathan Centuring
Title: Chief Investment Officer

*Pipeline Security Agreement*

**SCHEDULE I**

**GRANTOR INFORMATION**

**GMAC MORTGAGE, LLC**

Jurisdiction of Formation:  Delaware
FEIN:  23-1694840
State organization ID number:  4143873
Chief Executive Office/Principal place of business:
1100 Virginia Drive
Fort Washington, PA  19034-3200

## SCHEDULE II

## ADDITIONAL PLACES OF BUSINESS

None.

*Pipeline Security Agreement*

**SCHEDULE III**

**TRADE NAMES; PRIOR LEGAL NAMES; MERGERS**

1.    <u>Trade Names; Prior Legal Names</u>

**GMAC MORTGAGE, LLC**

Prior Names:   GMAC Mortgage Corporation

2.    <u>Mergers</u>

**GMAC MORTGAGE, LLC**

On October 25, 2006, GMAC Mortgage, LLC merged with GMAC Mortgage Corporation.

*Pipeline Security Agreement*

## SCHEDULE IV

## NOTICE INFORMATION

<u>GMAC MORTGAGE:</u>

GMAC Mortgage, LLC
c/o Residential Funding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: Jerry.Lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Tammy Hamzehpour, General Counsel
Phone:  (952) 857-6415
Fax:  (866) 572-7524
Email: Tammy.Hamzehpour@gmacrescap.com

<u>RESCAP:</u>

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Tammy Hamzehpour, General Counsel
Phone:  (952) 857-6415
Fax:  (866) 572-7524
Email: Tammy.Hamzehpour@gmacrescap.com

AFI:

Ally Financial Inc.
16th Floor
440 South Church Street
Charlotte NC 28202
Attn: Jeffrey Brown, Corporate Treasurer
Phone: (704) 540-6133
Fax: (704) 540-6549
Email: jb@ally.com

With a copy to:

William B. Solomon, VP and General Counsel
Phone: (313) 656-6128
Fax: (313) 656-6124
Email: william.b.solomon@ally.com

GMAC MORTGAGE GROUP, LLC

GMAC Mortgage Group, LL
200 Renaissance Center
Detroit, MI 48265
Attn:  William B. Solomon
Phone: (313) 656-6128
Fax: (313) 656-6124
Email: william.b.solomon@ally.com

ALLY BANK

Ally Bank
6985 Union Park Center
Midvale, UT  84047
Attn: Chief Financial Officer

With a copy to:

Ally Financial Inc.
Attn: William B. Solomon, VP and General Counsel
Phone: (313) 656-6128
Fax: (313) 656-6124
Email: william.b.solomon@ally.com

ALLY INVESTMENT MANAGEMENT LLC

Ally Investment Management LLC
1185 Avenue of the Americas
New York, NY  10036
Attn: Christopher Wright
Phone: 646-781-2557
Fax: 646-781-2569
Email: christopher.wright@ally.com

With a copy to:

Ally Financial Inc.
Attn: William B. Solomon, VP and General Counsel
Phone: (313) 656-6128
Fax: (313) 656-6124
Email: william.b.solomon@ally.com

**EXHIBIT E**

# Master Securities Forward Transaction Agreement

Dated as of **April 30, 2012**

Between: **ALLY INVESTMENT MANAGEMENT LLC**

and **GMAC MORTGAGE, LLC**

## 1. Applicability

From time to time the parties hereto may enter into transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as may be set forth in Annex I hereto ("Securities"), including pursuant to when-issued, TBA, dollar roll and other transactions that result or may result in the delayed delivery of Securities. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto, and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election; (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days; (iii) the making by such party of a general assignment for the benefit of creditors; or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Business Day", any day on which the Federal Reserve Bank of New York and the government securities markets are open for business, or such other day as may be specified by the parties in Annex I hereto;

(c)  "Buyer", the party purchasing the Securities;

(d)  "Collateral", the meaning specified in Paragraph 4 hereof;

(e)  "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f)  "Forward Collateral", the meaning specified in an annex hereto;

(g)  "Prime Rate", the prime rate of U.S. commercial banks as published in *The Wall Street Journal* (or, if more than one such rate is published, the average of such rates);

(h)  "Seller", the party selling the Securities;

(i)  "Settlement Date", the date agreed upon by the parties for the payment of funds and the delivery of the Securities; and

(j)  "Trade Date", the date on which the parties enter into a Transaction.

## 3.  Initiation and Confirmation

(a)  An agreement to enter into a Transaction may be made orally or in writing at the initiation of either party and shall be legally binding from the moment such agreement is made.

(b)  Upon agreeing to enter into a Transaction hereunder, one or both parties, as shall be agreed, shall promptly deliver to the other party a confirmation, in writing or as otherwise agreed and in accordance with market practice, of each Transaction (a "Confirmation"). The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between the parties with respect to the Transaction to which the Confirmation relates, unless with respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

## 4.  Security Interest

Any party obligated to provide Forward Collateral pursuant to an annex hereto ("Pledgor") here-by grants to the other party ("Pledgee") a continuing first security interest in and right of setoff against all Forward Collateral and all other securities, money and other property, and all proceeds of any of the foregoing, now or hereafter delivered by or on behalf of Pledgor to Pledgee, held or carried by Pledgee for the account of Pledgor or due from Pledgee to Pledgor (collectively, the "Collateral"), as security for the payment and performance by Pledgor of all obligations of Pledgor to Pledgee under this Agreement (the "Secured Obligations"). Pledgee shall be entitled to repledge or assign any and all Collateral to secure loans or other extensions of credit to Pledgee or other of its obligations, which obligations may be in amounts greater than, and may extend for periods of time longer than, the periods during which Pledgee is entitled to Collateral as security for the obligations of Pledgor; *provided, however,* that no such transaction shall relieve Pledgee of its obligations to transfer Collateral to Pledgor pursuant to Paragraph 7 of this Agreement or any annex hereto.

**5. Payment and Transfer; Market Practice**

(a) Unless otherwise mutually agreed, each Transaction shall be settled on a delivery-versus-pay-
ment basis and payment shall be made in immediately available funds to Seller or upon
Seller's order. None of Seller's property interest in the Securities shall pass to Buyer until such
delivery and payment are made. Transfers of funds and Securities shall be made to such
accounts as the parties shall agree with respect to a Transaction. All Securities transferred by
one party hereto to the other party (i) shall be in suitable form for transfer or shall be accom-
panied by duly executed instruments of transfer or assignment in blank and such other docu-
mentation as the party receiving possession may reasonably request, (ii) shall be transferred
on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other
method mutually acceptable to Seller and Buyer.

(b) Each party will comply with, and this Agreement and each Transaction is subject to, includ-
ing with regard to settlement, the market practice for the type of Transaction involved,
including provisions of the *Uniform Practices for the Clearance and Settlement of Mortgage-
Backed Securities and Other Related Securities* applicable to transactions in certain securities
between members of the The Bond Market Association (the "Association"), as currently in
effect, or successor provisions thereto (the "Uniform Practices"), regardless of whether both
parties are members of the Association, to the extent that such market practice (including the
*Uniform Practices*) does not conflict with the terms of this Agreement or any Confirmation
for any Transaction.

**6. Representations**

Each party represents and warrants to the other that (i) it is duly authorized to execute and deliver
this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations
hereunder and has taken all necessary action to authorize such execution, delivery and performance;
(ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex
hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed
principal); (iii) the person signing this Agreement on its behalf is duly authorized to do so on its
behalf (or on behalf of any such disclosed principal); (iv) it has obtained all authorizations of any
governmental body required in connection with this Agreement and the Transactions hereunder and
such authorizations are in full force and effect; and (v) the execution, delivery and performance of
this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or
rule applicable to it or any agreement by which it is bound or by which any of its assets are affected.
On the Trade Date for any Transaction each party shall be deemed to repeat all of the foregoing rep-
resentations made by it.

**7. Events of Default**

In the event that (i) either party fails to make on the Settlement Date of any Transaction any pay-
ment of funds or any delivery of Securities required pursuant to such Transaction; (ii) an Act of
Insolvency occurs with respect to either party; (iii) any representation made by either party shall
have been incorrect or untrue in any material respect when made or repeated or deemed to have
been made or repeated; or (iv) either party shall admit to the other its inability to, or its intention
not to, perform its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and without prior notice to the defaulting party; (i) cancel and otherwise liquidate and close out any and all Transactions, whereupon the defaulting party shall be liable to the nondefaulting party for any resulting loss, damage, cost and expense; (ii) set off any obligation, including any obligation with respect to securities, money or other property, of the nondefaulting party to the defaulting party against any of the defaulting party's obligations to the nondefaulting party hereunder; (iii) (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all noncash Collateral and apply the proceeds thereof and the amount of any cash Collateral to the Secured Obligations or (B) in its sole discretion elect, in lieu of selling all or a portion of such noncash Collateral, to give the defaulting party credit for such noncash Collateral in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source; and (iv) take any other action necessary or appropriate to protect and enforce its rights and preserve the benefits of its bargain under this Agreement and any Transaction. The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of its option to declare an Event of Default as promptly as practicable.

(b) Any Collateral held by the defaulting party, together with any income thereon and proceeds thereof, shall be immediately transferred by the defaulting party to the nondefaulting party. The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), and without prior notice to the defaulting party; (i) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any securities Collateral that is not delivered by the defaulting party to the nondefaulting party as required hereunder; or (ii) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source, whereupon the defaulting party shall be liable for the price of such Replacement Securities together with the amount of any cash Collateral not delivered by the defaulting party to the nondefaulting party as required hereunder.

(c) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default; (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default; and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(d) To the extent permitted by applicable law, the defaulting party shall be liable to the nondefaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party; or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the defaulting party to the nondefaulting party under this Paragraph 7(d) shall be at a rate equal to the Prime Rate.

(e) Unless otherwise provided in Annex I, the parties acknowledge and agree that (i) securities included in the Collateral are instruments traded in a recognized market; (ii) in the absence of a generally recognized source for prices or bid or offer quotations for any such securities Collateral or any Securities, the nondefaulting party may establish the source therefor in its sole discretion; and (iii) all prices, bids and offers shall be determined together with accrued principal and/or interest thereon (except to the extent contrary to market practice with respect to the relevant securities).

(f) The nondefaulting party shall have all of the rights and remedies provided to a secured party under the New York Uniform Commercial Code and, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

## 8. Single Agreement

The parties acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of the parties agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder; (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder; and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any such Transaction hereunder, and the obligations to make such payments, deliveries and other transfers may be applied against each other and netted.

## 9. Risk of Loss

The risk of loss of engaging in when-issued, TBA, dollar roll and other transactions that result or may result in the delayed delivery of securities can be substantial. Each party should carefully consider when such transactions are suitable for its financial condition, its investment objectives and any legal or regulatory restrictions placed upon it and whether the party has the operational resources in place to monitor the associated risks and contractual obligations over the term of the Transaction. A primary risk of such transactions is that the market value of the securities on the Settlement Date or at any time during the term of the Transaction could vary substantially from the price at which such securities are purchased or sold due to such factors as market-price fluctuations and interest-rate movements occurring between the Trade Date and the Settlement Date. A second risk is that on the Settlement Date one party to such a transaction may be unable to perform, resulting in substantial loss, including the possible loss of any Collateral held by the defaulting party. A third risk is that a party may from time to time take proprietary positions and/or make a market in securities identical or economically related to Transactions entered into with the other party. A party may also undertake proprietary activities, including hedging transactions related to the initiation or termination of a Transaction, that may adversely affect the market price, rate, index or other market factors underlying a Transaction and consequently the value of the Transaction. Finally, another risk relates to the requirements that may be imposed under an annex hereto that Forward Collateral be deposited at the Trade Date or periodically thereafter as the markets move against a party's position. A party's inability to meet a demand for such Forward Collateral, at times on short notice, may result in closing out of Transactions and losses to that party. This brief statement does not disclose all of the risks and other material con-

siderations of such transactions. Accordingly, before engaging in Transactions, each party should consult its own business, legal, tax and accounting advisers with respect to the proposed Transaction and examine the contractual arrangements contained herein carefully to determine all risks and whether the Transaction is appropriate for that party. Each party agrees that the other party is not acting as a fiduciary or an advisor for it in respect of this Agreement or any Transaction.

## 10. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 11. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for when-issued, TBA, dollar roll and other transactions that result or may result in the delayed delivery of Securities. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 12. Nonassignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transaction shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 12 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 7 hereof.

## 13. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflicts of law principles thereof.

## 14. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto.

15. **Use of Employee Plan Assets**

If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

16. **Intent**

(a) The parties recognize that each Transaction is a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended.

(b) It is understood that either party's right to cancel Transactions hereunder or to exercise any other remedies pursuant to Paragraph 7 hereof is a contractual right to liquidate such Transaction as described in Section 555 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as that term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in the FDIA and any rules, orders or policy statements thereunder.

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation," respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

[Name of Party] ALLY INVESTMENT MANAGEMENT LLC          [Name of Party] GMAC MORTGAGE, LLC

By: _____          By: _____

Title: SEVP – Finance & Planning          Title: CFO GMAC Mortgage LLC

Date: 05/01/2012          Date: 5/1/2012

# Annex I

# Supplemental Terms and Conditions

This Annex I forms a part of the Master Securities Forward Transaction Agreement dated as of April 30, 2012 (the "Agreement") between **Ally Investment Management LLC** ("AIM") and **GMAC Mortgage, LLC** ("GMAC Mortgage"). Capitalized terms used but not defined in this Annex I shall have the meaning ascribed to them in the Agreement.

1.    **Other Applicable Annexes.** In addition to this Annex I and Annex II, the following Annexes and any Schedules thereto shall form part of the Agreement and shall be applicable thereunder:

Annex III (Mark-to-Market Provisions).

2.    **Definitions**. The following shall be added to Paragraph 2 of the Agreement at the end thereof:

"(k) "Federal Funds Rate", for any day, the Federal Funds (Effective) rate published in N.Y. Federal Reserve Statistical Release H.15(519) (or any successor publication) for that day; provided that if, for any reason, such rate should be unavailable the Interest Rate shall be such rate as the In-the-Money Party shall reasonably determine.

"(l) "Flow Agreement" means that certain Amended and Restated Master Mortgage Loan Purchase and Sale Agreement, dated as of April 30, 2012, by and between GMAC Mortgage and Ally Bank, as the same shall be amended and supplemented from time to time in accordance with its terms.

"(m) "Pipeline Security Agreement" means that certain Pledge and Security Agreement, dated as of April 25, 2012, by and among GMAC Mortgage, Residential Capital, LLC, Ally Financial Inc., GMAC Mortgage Group, LLC, Ally Bank and AIM, as the same shall be amended and supplemented from time to time in accordance with its terms.

"Any terms defined in the Flow Agreement and/or the Pipeline Security Agreement and not otherwise defined in this Agreement, shall have the same meaning where used in this Agreement as is given to such term in the Flow Agreement or the Pipeline Security Agreement, as applicable."

3.    **Settlement Date Mechanics**. Notwithstanding the provisions of Paragraph 5 and the Uniform Practices, the parties agree that:

(a)    The Securities will be New MBS for purposes of the Pipeline Security Agreement, this Agreement will be deemed to be the MSFTA for purposes of the Pipeline Security Agreement, and accordingly the Securities will be directed by GMAC Mortgage to be delivered by Ginnie Mae directly to AIM no later than the Settlement Date.

(b)    On each Settlement Date, settlement shall be initiated by GMAC Mortgage being deemed to have delivered the Securities the subject of the related Transaction(s) to AIM without substantially contemporaneous transfer of payment, and that all of GMAC Mortgage's right, title and interest in the Securities shall pass to AIM

immediately upon such deemed delivery, free and clear of any lien or right of redemption. AIM will proceed to settle expeditiously its hedge transaction(s) for the related Transaction(s), and upon receipt of funds from its counterparty, will complete settlement of the Transaction by transfer of immediately-available funds to GMAC Mortgage, net of amounts owed by GMAC Mortgage to Ally Bank and otherwise required to be delivered to Ally Bank in accordance with the Pipeline Security Agreement. GMAC Mortgage agrees that AIM's obligation is to transfer settlement funds in accordance with the foregoing by the later of (x) the close of business on the Settlement Date, and (y) four (4) hours after completion of settlement by AIM with its hedge counterparty, regardless of whether such four (4) hour period expires on a day other than the Settlement Date. For purposes of the foregoing, such four (4) hour period shall only run while the Fedwire system is available for funds transfers between participants, and settlement with AIM's hedge counterparty shall be treated as "completed" if a Fedwire reference number shall have been delivered by the counterparty to AIM.

4.  **Additional Representations**. Paragraph 6 shall be amended as follows:

The word "and" shall be deleted before "(v)" in the ninth line and the following new language shall be inserted after clause (v) therein as follows:

"; (vi) it is acting for its own account, and has made its own independent decisions (x) to enter into this Agreement and each Transaction and (y) as to whether this Agreement and each Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any advice, counsel, or representation of the other party as investment advice or as a recommendation to enter into this Agreement or any Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to expected results of a Transaction;

(vii) it is capable of assessing the merits of (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks (economic and otherwise) of each Transaction. It is also capable of assuming, and assumes, the risk of each Transaction;

(viii) the other party is not acting as a fiduciary for or an adviser to it in respect of any Transaction; and

(ix) it is entering into this Agreement and each Transaction as a principal and not as an agent of any person or entity."

5.  **Events of Default**.

(A)     The introductory paragraph to Paragraph 7 shall be amended as follows:

(i)     The words "subject to Paragraph 5 as amended by Annex I," shall be added immediately before the word "either" in the first line.

(ii)    The word "or" shall be deleted before "(iv)" in the fifth line and the following new language shall be inserted after the word "hereunder" in the sixth line:

"; (v) any of the following shall occur: (1) GMAC Mortgage shall cease to be an approved FHA mortgagee or an approved issuer by Ginnie Mae, (2) any termination for cause by Ally Bank of any client agreement between Ally Bank and GMAC Mortgage, or (3) the Flow Agreement shall be terminated, with or without cause, by Ally Bank, or (vi) any of the following shall occur: (1) the lien granted by GMAC Mortgage under the Pipeline Security Agreement ceases to be in full force and effect or GMAC Mortgage shall contest in any manner such effectiveness, validity, binding nature or enforceability; provided; however no such default shall exist during the period during which GMAC Mortgage shall seek entry of the Approval Order on an interim basis as permitted in the Flow Agreement, (2) AIM, Ally Bank or Ally Financial Inc. does not, or ceases to, hold a valid lien on any of the Collateral under and as defined in the Pipeline Security Agreement, or such lien shall cease to be a perfected first priority lien pursuant to Section 364 of the Bankruptcy Code against GMAC Mortgage, or GMAC Mortgage shall so allege in any pleading filed in any court, provided; however no such default shall exist during the period during which GMAC Mortgage shall seek entry of the Approval Order on an interim basis as permitted in the Flow Agreement, (3) an order with respect to GMAC Mortgage shall be entered by a court appointing, or GMAC Mortgage shall file an application for an order seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, (4) an order with respect to GMAC Mortgage shall be entered by a court converting any case relating to GMAC Mortgage to a case under Chapter 7 of the Bankruptcy Code, (5) a "default" or "event of default", however defined, under any post-petition financing arrangement to which GMAC Mortgage is a borrower party to the extent such default is not cured or otherwise waived by the post-petition lender or agent, as applicable, (6) GMAC Mortgage fails to obtain interim and final entry of the Approval Order in accordance with the time periods set forth in the Flow Agreement; or (7) a default occurs under the provisions of the Approval Order with respect to the terms set forth in Section 1.5 of the Flow Agreement or the Approval Order is at any time appealed, stayed, reversed or otherwise rendered ineffective."

(B)    The words "(which option shall be deemed to have been exercised immediately upon the occurrence of any Act of Insolvency)" shall be deleted from clauses (a) and (b) of Paragraph 7 of the Agreement, and replaced with "(which Event of Default, if applicable to GMAC Mortgage, shall not exist under this Agreement, including, without limitation, Paragraph 16(b) as it relates to such event, if the Approval Order both (x) specifically permits GMAC Mortgage to operate under this Agreement and to perform the Transactions entered into hereunder, secures for the benefit of AIM the obligations of GMAC Mortgage under this Agreement with the same priority liens and claims as are applicable in respect of the Flow Agreement, and grants AIM relief from the automatic stay (i) to terminate the Agreement without cause pursuant to Paragraph 12(a) of the Agreement without further order of the court beginning 150 days after GMAC Mortgage files a petition for relief under the Bankruptcy Code and (ii) to terminate Transactions hereunder based upon an Event of Default pursuant to this Paragraph 7 without further order of the court, provided that AIM give 5 Business Days' advance notice of such termination for cause to GMAC Mortgage and file such notice with the court when such

notice is given, and (y) is entered within the time periods specified in the Flow Agreement)".

(C)    There shall be added a new sentence to Paragraph 7 of the Agreement, under clause (f) thereof, as follows:

"No failure or delay by the nondefaulting party in the exercise of any of its rights or remedies referred to in this Paragraph 7, and no partial exercise of any such rights or remedies, shall operate to preclude the nondefaulting party from exercising any of its other rights and remedies hereunder, or from later exercising any such rights or remedies."

(D)    GMAC Mortgage agrees and acknowledges that nothing in clause (B) above shall commit or obligate AIM to execute Transactions under the Agreement.

6.    **Interest on Defaulted Amounts**.  The words "Prime Rate" that appear at the end of Paragraph 7(d) to the Agreement are hereby deleted and replaced by the words "Federal Funds Rate."

7.    **Documents to be Delivered.**  Each party shall deliver the following documents to the other party when and as applicable:

| Party Required to Deliver Documents | Document | Date by which to be Delivered |
|---|---|---|
| AIM and GMAC Mortgage | A duly executed United States Internal Revenue Service Form W-9, W-8ECI, W-8BEN, W-8IMY (or any of the respective successor forms thereto), as applicable, that establishes a basis for exemption from or reduction in any withholding or other tax. | (i) Upon execution of the Agreement or (ii) upon reasonable request by the other party |
| GMAC Mortgage | Certified copy of resolution of Board of Managers of GMAC Mortgage or of its relevant committee, authorizing GMAC Mortgage to enter into Agreement and each Transaction entered into under Agreement, and incumbency certificate. | Promptly following reasonable demand of other party. |

8.      **Mark-to-Market Provision.**

(a)      In no event shall the failure of either party to request the transfer of any Forward Collateral pursuant to any Annex to the Agreement be deemed to have any impact on the value of any Forward Collateral, whether pursuant to such Annex or in the exercise of remedies pursuant to Paragraph 7 of the Agreement.

(b)      Each payment or transfer made pursuant to Section 2 of Annex III shall be a "margin payment" as defined in Section 741(5) and 761(15) of Title 11 of the United States Code, or any successor provision(s) thereto.

9.      **No Default or Event of Default**.  For the purposes of Paragraph 7 of the Agreement, and unless otherwise provided for in the confirmation for any Transaction, no default or Event of Default shall occur for a failure to pay an amount due or to deliver Securities, in each case in accordance with the terms of the Agreement, unless the obligated party fails to pay such amount or to deliver such Securities within one (1) Business Day of a written notice from the other party requiring that such amount be paid or such Securities be delivered, together with (in the case of Securities) all interest, yield, dividends and other amounts paid to the holder of such securities by the issuer thereof from the date such Securities should have been delivered to the non-defaulting party to the date of delivery thereof.  The notice described in the preceding sentence shall be deemed effective (a) if sent by facsimile transmission, on the date that such transmission is received by the defaulting party (it being agreed that the burden of proving receipt will be met by a transmission report generated by the sender's facsimile machine), (b) if sent by electronic messaging system, on the date the electronic message is received, and (c) if in writing and delivered in person or by courier, on the date it is delivered.

10.      **Forward Contracts**.  Paragraph 16 of the Agreement is amended to add the following new subparagraph:

"(e) The parties recognize and intend that each Transaction is, and shall constitute, a "forward contract" (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable) and a "securities contract", as those terms are defined in Section 212 of FIRREA, and that this Agreement constitutes a "master agreement" as that term is used in such Section "

11.      **Restriction on Liens**.  GMAC Mortgage hereby agrees that it shall not grant any lien or security interest in its rights under this Agreement or in the Securities or the proceeds thereof, other than (i) the lien created pursuant to this Agreement and the Pipeline Security Agreement, and (ii) any lien for taxes or assessments or other governmental charges or levies not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such taxes are owed or the third party obligated to pay such taxes and for which adequate reserves are being maintained, to the extent required by generally accepted accounting principles, and such proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such lien).

12.      **Submission to Jurisdiction**.    EACH    PARTY    IRREVOCABLY    AND UNCONDITIONALLY (i) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, AND ANY APPELLATE

COURT FROM THAT COURT, SOLELY FOR THE PURPOSE OF ANY SUIT, ACTION OR PROCEEDING BROUGHT TO ENFORCE ITS OBLIGATIONS UNDER THE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED UNDER THE AGREEMENT OR RELATING IN ANY WAY TO THE AGREEMENT, AND (ii) WAIVES TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF ITS PLACE OF RESIDENCE OR DOMICILE.

13.     **Waiver of Jury Trial**.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT THAT IT MAY HAVE TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.     **Damages.**  UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE FOR PUNITIVE DAMAGES IN ANY WAY RELATED TO THIS AGREEMENT AND EXCEPT AS PROVIDED IN PARAGRAPH 7(c) OF THE AGREEMENT, UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGES SUFFERED OR INCURRED BY THE OTHER, OR ANY OTHER PARTY, IN EACH CASE ARISING UNDER THIS AGREEMENT, REGARDLESS OF WHETHER SUCH DAMAGES COULD HAVE BEEN FORESEEN OR PREVENTED.

15.     **Integral Transactions**.  GMAC Mortgage agrees that each Transaction individually, all Transactions together, and the Agreement generally, constitute an integral line of business for Ally Financial Inc. and its applicable subsidiaries that is predicated on the continuing sale of Mortgage Loans under the Flow Agreement and the continuing applicability of the Pipeline Security Agreement for any sales of Mortgage Loans thereunder that are not settled in cash on endorsement of the related Mortgage Note. GMAC Mortgage further agrees and acknowledges that, accordingly, the Agreement, the Flow Agreement and the Pipeline Security Agreement will be treated by it as an integral series of contractual arrangements that are intended to operate in conjunction with each other.

16.     **Effectiveness**.   Notwithstanding anything to the contrary in the Agreement, the Agreement shall be effective automatically and without further effect, from the earlier of (a) 12.01 a.m. (New York City time) on May 1, 2012, and (b) the occurrence of any Act of Insolvency of GMAC Mortgage.

[signature pages follow]

IN WITNESS WHEREOF, the undersigned have caused this Annex to the Agreement to be executed as of the day and year first above written.

| ALLY INVESTMENT MANAGEMENT LLC | GMAC MORTGAGE, LLC |
|---|---|
| By: _____ <br> Name: JEFFREY J. BROWN <br> Title: SEVP - Finance & Planning | By: _____ <br> Name: JAMES WHITLINGER <br> Title: CFO - GMAC Mortgage, LLC |

**Annex II**

**Names and Addresses for Communication Between the Parties**

**ALLY INVESTMENT MANAGEMENT LLC**

Address for notices or communications to Ally Investment Management LLC (for all purposes):

Address:      Ally Investment Management LLC
                    1177 Avenue of the Americas
                    16th Floor
                    New York, NY  10036
                    Attn: Christopher Wright
                    Phone: 646-781-2557
                    Fax: 646-781-2569
                    Email: ally-operations@ally.com

                    With a copy to:

                    Ally Financial Inc.
                    Attn: William B. Solomon, VP and General Counsel
                    Phone: (313) 656-6128
                    Fax: (313) 656-6124
                    Email: william.b.solomon@ally.com

Address for Collateral Management:

Address:      Ally Investment Management LLC
                    1177 Avenue of the Americas, 16th Floor
                    New York, NY  10036
                    Group Email: collateral.management@ally.com

**GMAC MORTGAGE, LLC**

Address for all notices to GMAC Mortgage, LLC:

Address:        GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA  19034
Attention: Treasury Operations Settlements
Telephone No.:  (215) 682-1210
Email:  gmactreasuryoperations@ally.com

With a copy to:

Address:        GMAC Mortgage, LLC
1100 Virginia Drive
Mail Code 190-FTW-L95
Fort Washington, PA  19034
Attention: Office of the General Counsel
Facsimile No.:  (866) 340-7662
Telephone No.:  (215) 682-1307
Email:  tammy.hamzehpour@ally.com

Address for Collateral Management:

Address:        GMAC Mortgage, LLC
C/O Ally Financial Inc.
1177 Avenue of the Americas, 16th Floor
New York, NY  10036
Group Email: collateral.management@ally.com

701596051 10488637          Annex II-2

## Annex III

## Mark-to-Market Provisions

This Annex III forms a part of the Master Securities Forward Transaction Agreement dated as of April 30, 2012 (the "Agreement") between **Ally Investment Management LLC** ("AIM") and **GMAC Mortgage, LLC** ("GMAC Mortgage"). Capitalized terms used but not defined in this Annex I shall have the meaning ascribed to them in the Agreement.

1.      **Definitions.** For purposes of the Agreement and this Annex III, the following terms shall have the following meanings:

(a)      "Forward Exposure", the amount of loss a party would incur upon canceling a Transaction and entering into a replacement transaction, determined in accordance with market practice or as otherwise agreed by the parties;

(b)      "Initial Margin Amount", with respect to AIM, means $0, and with respect to GMAC Mortgage, unless otherwise stated in the confirmation for a Transaction, means an amount equal to $10,000,000.

(c)      "Minimum Transfer Amount", $250,000 or such other specified dollar amount for a Transaction or Transactions agreed to by the parties (which amount shall be agreed to by the parties prior to entering into any such Transactions).

(d)      "Net Forward Exposure", the aggregate amount of a party's Forward Exposure to the other party under all Transactions hereunder reduced by the aggregate amount of any Forward Exposure of the other party to such party under all Transactions hereunder;

(e)      "Net Unsecured Forward Exposure", a party's Net Forward Exposure reduced by the amount of any Forward Collateral transferred to such party (and not returned) pursuant to Paragraph 2 of this Annex III; and

(f)      "Threshold", with respect to AIM, means $25,000,000, and with respect to GMAC Mortgage, means $0.

2.      **Margin Maintenance.**

(a)      If at any time a party (the "In-the-Money Party") shall have a Net Unsecured Forward Exposure to the other party (the "Out-of-the-Money Party") under one or more Transactions that exceeds the Threshold for the Out-of-the-Money Party, the In-the-Money Party may by notice to the Out-of-the-Money Party require the Out-of-the-Money Party to transfer to the In-the-Money Party cash collateral (together with any income thereon and proceeds thereof, "Forward Collateral") sufficient to eliminate such Net Unsecured Forward Exposure. The Out-of-the-Money Party may by notice to the In-the-Money Party require the In-the-Money Party to transfer to the Out-of-the-Money Party Forward Collateral in an amount that exceeds the In-the-Money Party's Net Forward Exposure ("Excess Forward Collateral Amount").

(b)      The parties agree, with respect to any or all Transactions hereunder, that the respective rights of the parties under subparagraph (a) of this Paragraph may be exercised only where the amount to be transferred in respect of a Net Unsecured Forward Exposure or Excess Forward Collateral Amount, as the case may be, exceeds the Minimum Transfer Amount.

(c)      The parties agree, with respect to any or all Transactions hereunder, that the respective rights of the parties under subparagraph (a) of this Paragraph to require the elimination of a Net Unsecured Forward Exposure or Excess Forward Collateral Amount, as the case may be, may be exercised whenever such a Net Unsecured Forward Exposure or Excess Forward Collateral Amount exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under the Agreement).

(d)      The parties may agree, with respect to any or all Transactions hereunder, that (i) one party shall transfer to the other party Forward Collateral in an amount equal to a specified dollar amount or other specified threshold no later than a deadline agreed to by the parties in the relevant Confirmation, in Annex I to the Agreement or otherwise on the Trade Date for such Transaction or (ii) one party shall not be required to make any transfer otherwise required to be made under this Paragraph if, after giving effect to such transfer, the amount of the Forward Collateral held by such party would be less than a specified dollar amount or other specified threshold (which amount or threshold shall be agreed to by the parties prior to entering into any such Transaction).

(e)      Unless otherwise agreed by the parties, if any notice is to be given by one party to the other under subparagraph (a) of this Paragraph, such notice shall be delivered by 11:00 a.m. (New York City time) on a Business Day.  If such notice is so delivered by 11:00 a.m. (New York City time) on any Business Day, the party receiving such notice shall transfer Forward Collateral as provided in such subparagraph no later than 11:00 a.m. (New York City time) (in the case of a posting by GMAC Mortgage) or 1:00 p.m. (New York City time) (in the case of a posting by AIM) on the next following Business Day.

(f)      Unless otherwise agreed by the parties, AIM may give notice by 3:00 p.m. (New York City time) on any Business Day to GMAC Mortgage that an incremental Initial Margin Amount is required in respect of a Transaction.  If such notice is so delivered by 3:00 p.m. (New York City time) on any Business Day, GMAC Mortgage shall transfer such incremental Initial Margin Amount to AIM no later than 11:00 a.m. (New York City time) on the next following Business Day.

(g)      Upon the occurrence of the Settlement Date for any Transaction and the performance by the parties of their respective obligations to transfer cash on such date, (A) the incremental Initial Margin Amount, if any, previously delivered by GMAC Mortgage in respect of such Transaction, pursuant to a request by AIM made under clause (f) above, and (B) any Forward Collateral in respect of such Transaction, together with any income thereon and proceeds thereof, shall be transferred by the party holding such portion of the Initial Margin Amount or Forward Collateral to the other party; *provided, however,* that neither party shall be required to transfer such Initial Margin Amount or Forward Collateral to the other if such transfer would result in the creation of a Net Unsecured Forward Exposure.

(h)      A pledgor of Forward Collateral may not substitute Forward Collateral.

(i)      Transfers of cash Forward Collateral or Initial Margin Amount shall be made in the same manner as the transfer of cash under Paragraph 5 of the Agreement.

**3.      Events of Default.**  In addition to the Events of Default set forth in Paragraph 7 of the Agreement, it shall be an additional "Event of Default" if either party fails, after one Business Day's notice, to perform any covenant or obligation required to be performed by it under any provision of this Annex III.

**4.**    **No Waivers, Etc.**    Without limitation of the provisions of Paragraph 14 of the Agreement, the failure to give a notice pursuant to subparagraph (a) through (f) of Paragraph 2 of this Annex III will not constitute a waiver of any right to do so at a later date.