MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------
                                                    )
In re:                                              )    Case No. 12-
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )    Chapter 11
                                                    )
                                       Debtors.     )    Joint Administration Pending
                                                    )
-------------------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER**
**SECTIONS 105(a), 362, 363, 1107(a) AND 1108 OF THE BANKRUPTCY CODE**
**(I) AUTHORIZING THE DEBTORS TO CONTINUE IN THE ORDINARY COURSE**
**OF BUSINESS (A) SERVICING NON-GOVERNMENTAL ASSOCIATION LOANS,**
**AND (B) SALE ACTIVITIES RELATED TO CERTAIN LOANS IN FORECLOSURE**
**AND REAL ESTATE OWNED PROPERTY, AND (II) GRANTING LIMITED STAY**
**RELIEF TO ENABLE BORROWERS TO ASSERT RELATED COUNTER-CLAIMS**
**IN FORECLOSURE AND EVICTION PROCEEDINGS**

              The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move (the "Motion")[2] for entry of interim and final orders, under sections

105(a), 362, 363, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code")

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on
       Exhibit 1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may
       file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
       requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

(i) authorizing, but not directing, the Debtors to continue in the ordinary course of business

(a) servicing Non-GA Loans (defined below), and (b) sale activities related to certain loans in

foreclosure and real estate owned property, including authorizing the sale of such property free

and clear of liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code,

and (ii) granting limited stay relief to enable borrowers or other tenants, as applicable, to assert

related counter-claims in foreclosure and eviction proceedings.  In support of the Motion, the

Debtors rely upon and incorporate by reference the Affidavit of James Whitlinger, Chief

Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day

Pleadings, filed with the Court concurrently herewith (the "Whitlinger Affidavit").  In further

support of the Motion, the Debtors, by and through their undersigned counsel, respectfully

represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for

the relief requested herein are Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108.

Relief is warranted under Bankruptcy Rule 6003.

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are

managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code

sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has been

appointed in these Chapter 11 cases.

2

3.      The Debtors are a leading residential real estate finance company indirectly owned by Ally Financial Inc. ("AFI"), which is not a Debtor.  The Debtors and their non-debtor affiliates operate the fifth largest mortgage loan servicing business and the tenth largest residential mortgage loan origination business in the United States.  A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

## PRELIMINARY STATEMENT

4.      The Debtors' primary and most valuable business operations consist of servicing mortgage loans, including loans originated by the Debtors, Ally Bank, and other third parties.  As of March 31, 2011, the Debtors were servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion, approximately 17% of which are held by private investors or included in securitization trusts for "private label" securitization pools (as described in greater detail below, the "Non-GA Loans").  The holders of Non-GA Loans, including the purchasers of securities issued by private label securitization trusts, are comprised of a broad range of investors, such as pension funds, banks, insurance companies, governmental bodies and other public and private entities.  These investors depend on the performance of the servicer to ensure the recovery of their investments.  To preserve and realize the value of these assets and achieve the goals of these Chapter 11 cases, the Debtors developed and are prepared to implement a strategy that provides maximum value to the Debtors' estates.

5.      The Debtors negotiated and entered into two separate asset purchase agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder ("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the

3

"Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of

their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the

"Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

6.      In furtherance of their restructuring strategy, and contemporaneous with

the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to,

among other things, establish auction and sale procedures for the Asset Sales,[3] and for approval

to consummate the Asset Sales under a plan.  If, however, the Debtors do not obtain

confirmation of a plan by deadlines to be determined, then the Sale Motion allows the Debtors to

pursue an alternative course of action and immediately move forward with the Asset Sales under

Bankruptcy Code section 363(b) and outside of a plan.

7.      As described in greater detail in the Sale Motion, Nationstar requires, as a

condition to closing, that the Debtors maintain their servicing operations at current volume and

quality standards until the sale is consummated.  Accordingly, the Debtors seek to continue

servicing the Non-GA Loans in the ordinary course to preserve the value of their servicing

platform for the ultimate benefit of their stakeholders pending the closing of the Platform Sale.

As explained below, integral to this relief is obtaining authority for the Debtors to meet certain

prepetition obligations, and to honor certain postpetition obligations essential to their loan

servicing operations without interruption.  At the same time, pending the closing of the Platform

Sale, the Debtors will continue to earn loan servicing fees and other fees.

---

[3]    See *Debtors' Motion Pursuant to 11 U.S.C.  §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion").

8.    The Debtors are also seeking authority to obtain postpetition financing on a senior secured, superpriority basis, all as more fully set forth in a separate motion filed contemporaneously with the commencement of these Chapter 11 cases (the "DIP Financing Motion").[4]  It is a condition to the DIP Credit Agreement (as defined in the DIP Financing Motion) that the Debtors continue to perform their servicing activities in the ordinary course of business.

9.    Maintaining their mortgage loan servicing business in the ordinary course will instill confidence in the Debtors' capabilities to continue functioning as a servicer, notwithstanding the commencement of these Chapter 11 cases.  However, if the Debtors are unable to demonstrate this, borrowers and the market will experience confusion and uncertainty. Borrowers may refuse to make payments to the Debtors, thus impairing the Debtors' ability to continue meeting ongoing payment obligations with respect to Non-GA Loans (e.g., making payment advances required under certain circumstances for the benefit of investors) and their future capacity to collect on these loans.  Similarly, it is essential that the Debtors remain vigilant to ensure that borrowers continue making payments on their loans (e.g., by sending out bills and ensuring the collection and proper distribution of funds received).  If the Debtors' ability to do so is impaired, there is a real risk that delinquencies and defaults may materially increase to the ultimate detriment of the Debtors' estates.

---

[4]    See *Debtors' Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And Bankruptcy Rules 4001 And 6004 (I) Authorizing The Debtors To (A) Enter Into And Perform Under Receivables Purchase Agreements And Mortgage Loan Purchase And Contribution Agreements Relating To Initial Receivables And Mortgage Loans And Receivables Pooling Agreements Relating To Additional Receivables, And (B) Obtain Postpetition Financing On A Secured, Superpriority Basis, (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(b) and 4001(c), And (III) Granting Related Relief.*

5

10.    In addition, the Debtors own subordinated, equity or equity-like interests in certain jumbo and home equity securitizations.  If the Debtors' ability to fully honor their servicing obligations to investors is compromised, their interests in these securitizations may experience a decrease in value.

11.    Further, if the Debtors do not continue to honor their ordinary course servicing commitments to investors with respect to the Non-GA Loans, the Debtors may incur compensatory fees, repurchase demands, and penalties under recent settlements with the federal government and various state agencies, pursuant to which the Debtors agreed to, among other things, certain heightened servicing requirements with respect to the Non-GA Loans. Interruptions in the Debtors' servicing activities may also result in increased borrower delinquency rates and a corresponding decrease in the value of mortgage servicing rights held by the Debtors.  In addition, because the Platform Sale contemplates the Debtors' assumption and assignment of their mortgage loan servicing agreements to Nationstar, it is essential that the Debtors be authorized to continue to meet their obligations thereunder prior to assumption and assignment.

12.    In light of the sheer volume of residential mortgage loans serviced by the Debtor nation-wide, the relief requested will contribute to the stabilization of the housing market, while minimizing disruption to existing mortgage loan securitizations.  As explained in detail below, the relief requested is in the best interests of the Debtors' estates and amply warranted under the circumstances.

## RELIEF REQUESTED

### I.    Summary Of Relief Requested

13.    By this Motion, the Debtors seek relief pursuant to Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108 to operate all components of their businesses

6

integral to servicing Non-GA Loans in the ordinary course pending the closing of the Platform

Sale. Specifically, the Debtors respectfully request that the Court enter Interim and Final Orders

(i) authorizing, but not directing, them to continue in the ordinary course (a) servicing Non-GA

Loans, and (b) sale activities related to certain Non-GA Loans in foreclosure and real estate

owned property (including authorizing the sale of such property free and clear of liens, claims,

and encumbrances pursuant to section 363(f) of the Bankruptcy Code), and (ii) granting limited

stay relief to enable borrowers or other tenants, as applicable, to assert counter-claims in

foreclosure and eviction proceedings that are related to the subject matter of the underlying

foreclosure or eviction complaint. The Debtors propose that any action to be taken pursuant to

the relief sought herein would be subject to their sole discretion, available funding, and the terms

of any debtor in possession financing and cash collateral orders entered in these Chapter 11

proceedings.

    14.  The Debtors request that, to the extent necessary, the relief sought by this

Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases. The

Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's entry

of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the

Chapter 11 cases of the Debtors.

**II.  Authority To Honor Certain Existing Obligations
   In Connection With Servicing Non-GA Loans**

   **A.  Overview Of Mortgage Loan Securitization Process**

    15.  Loan servicing is an integral part of the Debtors' business operations. As

described below, the Debtors also play a significant role in generating a substantial portion of the

mortgage loans they service.

7

16.     Prior to the Petition Date, the Debtors, principally GMAC Mortgage, LLC ("GMAC Mortgage"), purchased mortgage loans from Ally Bank (including loans brokered or sold by the Debtors to Ally Bank, as well as loans brokered or sold to Ally Bank by third parties) or directly from third parties and sold those loans to Fannie Mae, Freddie Mac[5] or securitization trusts guaranteed by Ginnie Mae[6] (collectively, the "GA Loans").  In addition, prior to the Petition Date, the Debtors originated or acquired and sold mortgage loans to private investors and securitization trusts for so-called "private label" securitization pools, which are referred to herein collectively as the "Non-GA Securitization Trusts."[7]  The Non-GA Securitization Trusts are not guaranteed by the Governmental Associations.  Due to a change in market conditions arising as a result of the financial crisis, with very limited exceptions, GMAC Mortgage no longer sells mortgage loans to Non-GA Securitization Trusts.  However, GMAC Mortgage continues to hold the servicing rights with respect to certain existing Non-GA Securitization Trusts, and continues to service those mortgage loans.

17.     In the Debtor-sponsored private label securitizations, the Debtors pooled loans together and conveyed the pooled mortgage loans to one of their wholly-owned special

---

[5]    As used herein, "Fannie Mae" means the Federal National Mortgage Association, and "Freddie Mac" means the Federal Home Loan Mortgage Corporation.  Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress that securitize or buy mortgage loans originated by mortgage lenders, enabling them to replenish their funds so that they can make additional loans to other homeowners.

[6]    As used herein, "Ginnie Mae" means the Government National Mortgage Association.  Ginnie Mae is a federal corporation within the Department of Housing and Urban Development ("HUD"), a federal agency, that guarantees investors the timely payment of principal and interest on securities backed by federally insured or guaranteed mortgage loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA") or the Department of Agriculture ("USDA").  Fannie Mae, Freddie Mac, and Ginnie Mae are collectively referred to herein as the "Governmental Associations."

[7]    The Debtors also sold loans to securitization trusts guaranteed by the following state and local housing agencies: California Housing Finance Agency; City Of Northampton; Connecticut Housing Finance Authority; Minneapolis Comm Devel. Agency 2; Neighborhood Housing Services; North Dakota Housing Finance Agency; Philadelphia Neighborhood Housing; San Diego Housing Commission; State of Oregon Housing, and; Texas Veterans Land Board.  For purposes of this Motion, such loans are treated as Non-GA Loans.

8

purpose entities, which then sold the mortgage loans to the Debtor-sponsored Non-GA

Securitization Trusts.  In some cases, the Debtors also acquired servicing rights with respect to

third parties' Non-GA Securitization Trusts.  The Non-GA Securitization Trusts issued

mortgage-backed securities ("MBS"), which they in turn sold to third-party investors (the

"Certificate Owners").  The Certificate Owners' interests are usually represented by notes or

certificates with various interest rates and are supported by the payments on the specified cash

flows generated from the securitized mortgage loans that were acquired by the Non-GA

Securitization Trusts.[8]

### B.    Servicing Rights With Respect To Non-GA Loans

18.    Although the Debtors and Ally Bank sell most of the residential mortgage

loans they originate, the Debtors generally retain the rights to service the Non-GA Loans that are

ultimately sold into the Non-GA Securitization Trusts.  This right is referred to as a "mortgage

servicing right," or "MSR."  The Debtors also perform servicing for pools of non-securitized

Non-GA Loans that are held by private investors.

### C.    Overview Of Servicing Functions

19.    The Debtors, primarily GMAC Mortgage and Residential Funding

Company, LLC ("RFC"), hold MSRs consisting of primary and master servicing rights.  The

Debtors also perform subservicing with respect to MSRs held by other parties.

---

[8]    Certain of the Debtors' other obligations relating to, among other things, the pooling of loans, their transfer to
the GA Securitization Trusts, and the repurchase of such loans are addressed separately in the Debtors' motion
to continue origination and securitization activities in the ordinary course of business.  See *Debtors' Motion For
Interim And Final Orders Under Sections 105(a), 363, 364, 503(b), 1107(a), And 1108 Of The Bankruptcy
Code Authorizing The Debtors To (I) Process And Where Applicable Fund Prepetition Mortgage Loan
Commitments, (II) Continue Brokerage, Origination And Sale Activities Related to Loan Securitization,
(III) Continue To Perform, And Incur Postpetition Secured Indebtedness, Under the Mortgage Loan Purchase
And Sale Agreement With Ally Bank And Related Agreements, (IV) Pay Certain Prepetition Amounts Due To
Critical Origination Vendors, And (V) Continue Honoring Mortgage Loan Repurchase Obligations Arising In
Connection With Loan Sales and Servicing, Each In the Ordinary Course Of Business* (the "Origination
Motion").

20.     Primary servicing rights represent the Debtors' contractual right to service certain mortgage loans originated or owned by third parties or the Debtors, or loans sold to the Debtors on either a "servicing-retained" basis (with respect to loans for which the Debtors act as master servicer) or a "servicing-released" basis (with respect to loans for which the Debtors generally do not act as master servicer), as well as primary servicing rights they purchase from other mortgage industry participants.  As a primary servicer, the Debtors collect and remit mortgage loan payments, respond to borrower inquiries, account for principal and interest, hold custodial and escrow funds for payment of property taxes, insurance premiums, and ancillary products, counsel or otherwise work with delinquent borrowers (including, but not limited to, granting borrowers leniency under certain circumstances and structuring loan modifications and repayment plans for certain borrowers), supervise foreclosures and property dispositions, make advances of required principal, interest, and certain "property protection" costs with respect to delinquent mortgage loans, report and remit payments due to investors, and generally administer the loans consistent with their contractual undertakings and business practices (the "Primary Servicing Functions").  As part of the Primary Servicing Functions, Executive Trustee Services, LLC and ETS of Washington Inc. (collectively "ETS"), wholly owned subsidiaries of GMAC Mortgage and Debtors herein, act as foreclosure trustees with respect to certain loans in states that allow for non-judicial foreclosures—specifically, California, Arizona, Texas, Washington, and until recently, Nevada and Virginia.  ETS also includes a recovery division, which conducts debt collection activities with respect to certain defaulted loans for which the Debtors have elected not to foreclose.[9]

---

[9]     If debt collections are unsuccessful, ETS may also sell the underlying mortgage notes on behalf of the owners, which may be the Debtors or other investors or clients.

ny-1016207

21.     Master servicing rights, on the other hand, represent the Debtors' right to service mortgage-backed and mortgage-related asset-backed securities and whole-loan packages purchased from sellers on a "servicing-retained" basis and sold to investors.  When the Debtors act as master servicer, they collect mortgage loan payments from primary servicers or subservicers and distribute those funds to investors and to other transaction parties in mortgage-backed and mortgage-related asset-backed securities and whole-loan packages.  Moreover, for Non-GA Securitizations, they provide certain key services, including advancing required principal and interest and other expenses with respect to mortgage loans (to the extent the primary servicer does not make such advances), loan accounting, claims administration, oversight of primary servicers and subservicers, loss mitigation, bond administration, cash flow waterfall calculations, investor reporting, tax reporting compliance and other contractual functions (the "Master Servicing Functions").

22.     As a subservicer, the Debtors perform servicing functions similar to the Primary Servicing Functions and Master Servicing Functions pursuant to contractual arrangements with third parties who hold MSRs or mortgage loans, such as the agreement with Ally Bank (the "Subservicing Functions" and, together with the Primary Servicing Functions and the Master Servicing Functions, the "Servicing Functions").  In addition, in connection with the Subservicing Functions, from time to time, the Debtors enter into new subservicing contracts, modify existing subservicing contracts, and pay fees in connection with "servicer error" claims submitted by contract counterparties.[10]  As part of the subservicing functions, ETS also performs fee-based foreclosure trustee and recovery services for certain loans.

---

[10]     The Debtors have requested authority to continue the payment of servicer error claims pursuant to the Origination Motion.

ny-1016207

23.     In the ordinary course of their business, the Debtors routinely enter into various types of servicing agreements, including without limitation, pooling and servicing agreements, interim servicing agreements, mortgage loan sale and servicing agreements, subservicing agreements, servicing guides, and related documents (collectively, the "Non-GA Servicing Agreements").  These Non-GA Servicing Agreements set forth various rights and obligations of the Debtors with respect to the performance of the Servicing Functions.[11]

24.     By performing the Servicing Functions consistent with the terms of the Non-GA Servicing Agreements, the Debtors typically earn loan servicing fees equal to a specified percentage of the outstanding principal balance of the loans being serviced and may also be entitled to other forms of servicing compensation, such as late payment fees, prepayment penalties, modification fees, and other similar fees.  When acting as subservicer, however, the Debtors typically receive a monthly fee per loan.  The Debtors' servicing compensation may also include interest income, or the "float," earned on collections that are deposited in various custodial accounts between their receipt and distribution of the funds to investors (the fees described in this paragraph are hereinafter collectively referred to as the "Servicing Fees").  The Servicing Fees are typically collected from the monthly payments made by the borrowers on the loans.  ETS trustee fees are earned on foreclosure sales and ETS recovery fees are earned as a percentage of collections.

---

[11]     Pursuant to the Non-GA Servicing Agreements, the Debtors make certain representations and warranties regarding their performance of the Servicing Functions.  In the event they breach those representations and warranties, they may be required to repurchase certain Non-GA Loans.  Although such repurchase obligations are incurred in connection with the Debtors' servicing functions, the Debtors have requested authority to honor those obligations in their sole discretion in the Debtors' Origination Motion, supra, footnote 8.

ny-1016207

D.     **Payment Of Advances**

25.     In connection with the Servicing Functions itemized above, the servicer is typically obligated to pay all reasonable, customary, and necessary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations with respect to loans in foreclosure, which may include, without limitation:

(a)     fees and expenses to various servicing vendors, including but not limited to, property inspectors and maintenance contractors;

(b)     fees and expenses associated with enforcement or judicial proceedings, including foreclosures, bankruptcy, eviction, or litigation actions;

(c)     costs and expenses associated with the management, maintenance, and liquidation of property that has been foreclosed upon; and

(d)     costs to preserve foreclosed property prior to liquidation (items (a) – (d) are referred to herein collectively as the "Corporate Advances").

The Debtors submit claims to the investors or owners of the loans for reimbursement of the Corporate Advances after the properties have been liquidated.  As of March 31, 2012, the Debtors held receivables totaling approximately $278.1 million on account of Corporate Advances made with respect to Non-GA Loans.  The Debtors typically recover substantially all of the Corporate Advances.  The Debtors expect to make Corporate Advances in connection with the Non-GA Loans in the average amount of approximately $75 million per month.[12]

26.     Additionally, from time to time, to the extent funds available from the Debtors' custodial accounts are insufficient to cover required remittances, the Debtors are

---

[12]    These amounts are reflected in the budget attached to the proposed interim order submitted in connection with the DIP Financing Motion and the budgets required to be submitted in accordance with the *Debtors' Motion For Interim And Final Orders Pursuant To Bankruptcy Code Sections 105, 361, 363, And 507(b) And Bankruptcy Rule 4001(b): (I) Authorizing The Use Of Cash Collateral And Related Relief, (II) Granting Adequate Protection And (III) Scheduling A Final Hearing* and the *Debtors' Motion For Interim And Final Orders Pursuant To Bankruptcy Code Sections 105, 361, 362, 363, And 507(b) And Bankruptcy Rule 4001(b): (I) Authorizing The Use Of Cash Collateral And Related Relief, (II) Granting Adequate Protection And (III) Scheduling A Final Hearing*, each filed contemporaneously with this Motion (collectively, the "Budgets").

13

required under the Non-GA Servicing Agreements to advance funds to investors or third parties in mortgage-backed and mortgage-related asset-backed securities and whole-loan packages to cover delinquent principal and interest payments on the related pool of mortgage loans (the "P&I Advances") and taxes and insurance premiums (the "T&I Advances", and, together with the P&I Advances and the Corporate Advances, the "Advances").

27.    When a loan becomes delinquent, the Debtors must continue making Advances (except where the Debtors determine that future Advances will be non-recoverable from the related loans, in which case the Debtors may stop making P&I Advances (although they may still be required to make T&I Advances and Corporate Advances).  T&I Advances and P&I Advances are generally reimbursable to the Debtors on a priority basis from amounts paid by the borrower, the proceeds of insurance policies or the liquidation of the related loan (whether through foreclosure or upon repurchase of the loan from the securitization pool).  As of March 31, 2012, the Debtors held receivables totaling approximately $579.7 million on account of T&I Advances made with respect to Non-GA Loans and approximately $890.6 million on account of P&I Advances made with respect to Non-GA Loans.  The Debtors expect to make P&I Advances and T&I Advances in connection with the Non-GA Loans in the average monthly amount of $650 million and $125 million, respectively.[13]

28.    Advances paid by the Debtors, primarily GMAC Mortgage, with respect to the Non-GA Loans are handled in a similar manner to those paid with respect to GA Loans, except that, in connection with loans for which RFC holds the MSRs, in the event that the Debtors determine that future Advances will be non-recoverable, RFC reimburses GMAC

---

[13]    These amounts are reflected in the Budgets.  The projected Advance amounts take into account volatility based on, among other things, seasonality in borrower delinquencies and potential disruptions in borrower payments due to the filing of the Debtors' bankruptcy cases.

14

Mortgage for any outstanding Advances immediately following such determination and holds the receivables on account of such Advances.  RFC then has the right to recover such Advances upon the ultimate disposition of the loan.

29.    In connection with the Platform Sale, Nationstar is buying the Debtors' MSRs, as well as the then-outstanding receivables on account of Advances made with respect to the Non-GA Loans.  Nationstar is also assuming the Debtors' subservicing arrangements. Accordingly, the Debtors will recoup certain Advances they will make subsequent to the Petition Date from the proceeds of the sale to Nationstar.

**E.    Deferment, Forbearance, And Loan Modification Arrangements**

30.    From time to time, the Debtors, in their capacity as servicer, may agree to enter into a forbearance, modification, or deferment arrangement with a borrower (any such arrangement, the "Deferment and Forbearance Arrangement").  The policies and practices regarding Deferment and Forbearance Arrangements are designed to manage borrower relationships, maximize collections, and avoid foreclosure (or repossession of collateral, as applicable) if reasonably possible.  By entering into Deferment and Forbearance Arrangements, the Debtors provide a delinquent borrower (or in limited circumstances a current borrower if a default of his or her loan is reasonably judged to be imminent) certain relief or a work-out to repay defaulted amounts.  Such relief or work-outs include, without limitation, agreements for the borrower to repay past due amounts over time in addition to the regularly scheduled payment, forgiveness of past due amounts, and/or interest rate reductions or term extensions.  The Debtors' reason for entering into such agreements is not only to preserve costs associated with foreclosures, but also to pursue a policy of assisting borrowers to retain homeownership when there is a commitment from the borrower and a financial ability to pay on the loan.

15

31.     The Debtors also participate in a number of loan modification programs, including as a leading participating servicer in the Home Affordable Modification Program (the "HAMP"), which is coordinated through Fannie Mae and sponsored by the U.S. Treasury Department.  Due to the requirements of the applicable Non-GA Servicing Agreements, the servicing activities of the Debtors must comply with HAMP, and in return, the Debtors receive success fees for various activities under HAMP.  In the most recent assessment by the U.S. Treasury, GMAC Mortgage met all but one of the established benchmarks for HAMP program compliance, a level of performance matched by only one of the other five largest mortgage servicers.[14]  GMAC Mortgage is a leading HAMP participant with over 40,400 active permanent HAMP modifications, which is an implied conversion rate of trial loan modifications to active permanent loan modifications of 59%, one of the highest in the industry.[15]  These programs benefit borrowers by enabling them to modify the terms of their loans so that they can afford to make continued payments, and benefit the Debtors by preserving the value of the servicing rights on those loans, which would otherwise potentially go into default or foreclosure.

**F.     FRB Consent Order And DOJ/AG Settlement**

32.     In addition to preserving and enhancing the value of their businesses, the Debtors have committed to maintain Servicing Functions under recent settlements with the U.S. government and several state officials.

---

[14]    See "January 2012 Making Home Affordable Report and Servicer Assessments for Fourth Quarter 2011," available at http://www.treasury.gov/initiatives/financial-stability/results/MHA-Reports/Documents/Feb%202012%20MHA%20Report%20FINAL.pdf.

[15]    In addition, the Debtors originate loans under the U.S. Treasury's HARP 2.0 (Home Affordable Refinance Program), which removes certain refinancing restrictions, thereby increasing the number of existing mortgage loans available for refinancing in the current mortgage environment.

16

33.     As a result of an examination conducted by the Federal Reserve Board

(the "FRB") and the Federal Deposit Insurance Company (the "FDIC"), on April 13, 2011,

Debtors Residential Capital, LLC ("ResCap") and GMAC Mortgage, and non-debtor affiliates

AFI and Ally Bank entered into a Consent Order with the FRB and the FDIC (the "Consent

Order").  Pursuant to the Consent Order, the Debtors are responsible for making improvements

to various aspects of their residential mortgage loan servicing business, including, among other

things, compliance programs, internal audit, communications with borrowers, vendor

management, management information systems, employee training, and oversight by the boards

of directors of ResCap and GMAC Mortgage.  Among other things, the Consent Order requires

the parties to perform an extensive review of past foreclosure proceedings with respect to loans

serviced by the Debtors with the assistance of an independent consultant, and to prepare and

submit a detailed report regarding the results of that review.  The Debtors estimate that the

performance of this review may cost as much as $180 million.  The Debtors intend to comply

with and adhere to the terms of the Consent Order to the best of their abilities.

34.     In addition, on February 9, 2012, ResCap, certain other Debtors, and AFI,

along with several other banks and mortgage servicers, reached an agreement in principle (the

"DOJ/AG Settlement") with the federal government, 49 state attorneys general, and 48 state

banking departments.  The DOJ/AG Settlement resulted from various investigations related to

the procedures followed by mortgage servicing companies and banks, including ResCap and

GMAC Mortgage, in connection with mortgage foreclosure home sales and evictions.[16]

---

[16]    AFI, ResCap and the Debtors separately reached an independent settlement with Oklahoma, which did not
participate in the DOJ/AG Settlement.

35.     A final agreement with respect to the DOJ/AG Settlement was filed as a
Consent Judgment in the United States District Court for the District of Columbia on March 12,
2012.  The Consent Judgment was approved by that court on April 4, 2012 and entered on
April 5, 2012.  Compliance with the DOJ/AG Settlement will be overseen by a court-appointed
monitor.

36.     In addition to certain fixed payments of approximately $110 million made
prior to the Petition Date, ResCap and the other Debtors committed to provide a minimum of
approximately $200 million towards borrower relief with respect to Non-GA Loans owned by
Ally Bank.  This commitment for borrower relief includes loan modifications, such as principal
reductions, rate modifications and refinancing for borrowers that meet certain requirements, and
participation in certain other programs.  The Debtors currently expect that Non-GA Loans
totaling approximately $523 million of unpaid principal balance will be modified in connection
with these programs, although the actual amount of modified loans could be significantly
different.  The DOJ/AG Settlement provides incentives for borrower relief that is provided
within the first twelve months; all consumer obligations must be met by March 1, 2015, and are
enforceable through September 1, 2015.  On February 9, 2012, AFI and ResCap also agreed with
the FRB on a civil money penalty of $207 million related to the same activities that were the
subject of the DOJ/AG Settlement, which amount will be reduced dollar-for-dollar in connection
with satisfaction of the required monetary payment and borrower relief obligations included
within the DOJ/AG Settlement, as well as through participation in other similar programs
approved by the FRB.

37.     Under the DOJ/AG Settlement, the Debtors are required to continue their
mortgage loan servicing activities.  In connection therewith, the Debtors are to implement new

18

servicing standards relating to matters such as foreclosure and bankruptcy information and

documentation, oversight, loss mitigation, limitations on fees, and related procedural matters.

Compliance with these obligations will be overseen by an independent monitor, who will have

authority to impose additional significant monetary penalties and fines if the Debtors fail to

continue their servicing activities, meet established timelines, or implement required servicing

standards.  The Debtors are also required to undertake a review of their foreclosure practices

pursuant to the DOJ/AG Settlement, which is being performed with the assistance of outside

counsel.

38.     The Debtors are fully committed to complying with and adhering to the

terms of the Consent Order and the DOJ/AG Settlement to the best of their abilities, and the

Debtors and their estates will benefit from these activities.  For the avoidance of doubt, the

Debtors request express authority to take such actions and make such disbursements that are

required in order to comply with the Consent Order and the DOJ/AG Settlement, including, but

not limited to, the review of past foreclosure proceedings and preparation of reports regarding

the findings of that review, with the assistance of Pricewaterhouse Coopers LLP and outside

counsel as independent consultants.  Maintenance of Servicing Functions in accordance with

these government mandates will help assuage borrower concerns regarding the status of their

mortgage obligations, assure current and future loan applicants that their mortgage loans will be

properly administered, and assure investors that their investments (and related collateral) will be

properly managed.

### G.     Summary Of Relief Requested Concerning Servicing Functions

39.     The Debtors' failure to maintain their current loan servicing operations for

Non-GA Loans or satisfy in their discretion certain outstanding obligations related to this

segment of their businesses could seriously undermine the value of their enterprises and

jeopardize the contemplated sale to Nationstar.  Similarly, the relief requested will contribute to

the stability of the housing market and minimize adverse effects on existing mortgage loan

securitizations for which the Debtors function as servicer.  Finally, under the credit documents

relating to proposed debtor in possession financing, the Debtors are required to comply with

certain Non-GA Servicing Agreements.  Accordingly, the Debtors request authorization to

continue honoring, in their sole discretion and subject to available funding, certain of their

Servicing Functions in the ordinary course of business pursuant to the Non-GA Servicing

Agreements, whether arising prepetition or postpetition, including without limitation:

(a) honoring certain obligations arising under the Non-GA Servicing Agreements, including

without limitation collecting all Servicing Fees owed thereunder; (b) honoring obligations related

to certain of the Advances; (c)  entering into loan modifications and Deferment and Forbearance

Arrangements as they deem appropriate; and (d) honoring their obligations under the Consent

Order and the DOJ/AG Settlement in connection with the Servicing Functions to the best of their

abilities.  For the avoidance of doubt, the Debtors will continue to honor all servicing obligations

and obligations related to Advances to the extent required by the credit documents relating to

proposed debtor in possession financing.

### III.    Authority To Continue Servicing, Foreclosure, And Property Sale Activities Related To Real Estate Owned

#### A.    Ordinary Course Sale Of Non-GA Loans In Foreclosure And REO

40.    As the servicers of mortgage loans, the Debtors institute foreclosure

procedures on Non-GA Loans when mortgagors fail to remit the requisite payments pursuant to

the terms of their mortgages or otherwise honor their loan commitments.  These procedures may

include foreclosure sales of the properties (the "Non-GA Foreclosure Sales").  Once these

properties are foreclosed upon (to the extent they are not sold directly to a third party at a Non-

GA Foreclosure Sales), the Debtors undertake to sell the properties foreclosed upon in their

capacity as servicer on behalf of the investor with respect to the vast majority of Non-GA Loans.

The Debtors also perform such foreclosure and sale activities with respect to properties they own

in their capacity as owner.  Once these properties are foreclosed upon, they are referred to herein

as "real estate owned" or "REO."[17]

        41.     Following the foreclosure of loans owned by the Debtors or Non-GA

Loans serviced by the Debtors, the Debtors market and sell the vast majority of REO themselves,

often with the assistance of a real estate broker.  Where the Non-GA Loans are owned by third

parties (and the Debtors have serviced the loans), the Debtors remit the net proceeds of any sale

to the appropriate parties in accordance with the relevant Non-GA Servicing Agreement and

submit a claim for repayment of outstanding Advances to the applicable investor.  As of March

31, 2012, the Debtors estimate that they currently hold approximately 4,180 housing units that

have been foreclosed upon under Non-GA Loans ("Non-GA REO") and are ready to be sold,

with an aggregate unpaid principal balance of approximately $523 million.  The Debtors estimate

that there are approximately 1,100 contracts pending for the sale of Non-GA REO, with

approximately 1,000 sales scheduled to close on or before June 30, 2012.  The Debtors estimate

that sale proceeds from Non-GA REOs during May and June 2012 will be approximately $130

million.

        42.     At the closing of a Non-GA Foreclosure Sale or a sale of REO, the

Debtors are generally required to deliver marketable and insurable title to the purchaser of the

property.  However, solely because the Debtors have commenced these Chapter 11 cases, certain

---

[17]    Generally, after a property of foreclosed upon, the title vests in the owner of the loan and the owner, in turn,
markets and sells the property itself.  In some instances, however, the servicing agreements provide that the
servicer is responsible for marketing and selling the property on behalf of the owner.

title insurance companies, escrow agents, or other third parties may refuse to insure, pass clear

title to the purchasers of property owned by the Debtors or sold in their capacity as servicer, or

otherwise facilitate the sale absent an order from the Court confirming the Debtors' authority to

sell the property (whether in their capacity as owner or servicer) in the ordinary course of

business. Their hesitancy or outright refusal to proceed with the closings would significantly

impair these expected revenues from these sales and disrupt the Debtors' operations.

43.    Thus, notwithstanding that the Non-GA Foreclosure Sales and sales of

REO take place in the ordinary course, it is essential that the Debtors be able to provide the title

insurance companies, escrow agents, and other third parties with the comfort that they may seek

so that marketable and insurable title can pass to the purchasers of such properties and the sales

can otherwise close without disruption. Accordingly, the Debtors seek the authority to conduct

Non-GA Foreclosure Sales and sales of REO, whether owned by the Debtors or on behalf of

third parties in the Debtors' capacity as servicer, without further order of the Court. If the

Debtors are unable to sell the sell these properties because of the refusal of third parties to close

(or conditionally close) without an order of the Court granting the requested relief, the Debtors

will incur significant administrative costs in connection with preservation of the REO that would

have otherwise been sold. Moreover, the value of such properties becomes more uncertain the

longer they remain on the market. Therefore, delaying the sale of the foreclosed Non-GA Loans

and REO could lead to a reduction of the purchase price of these properties.

44.    Lastly, any refusal by third parties to close on the Non-GA Foreclosure

Sales and REO sales not only impairs the Debtors' business operations, but also may adversely

affect the purchasers of the properties to the extent there are outstanding contracts on these

properties. In certain cases, for example, purchasers of the REO have presumably scheduled

22

their respective closings to coincide with the sale of their existing home or some other event

necessitating the purchase of the REO.  By not closing on the scheduled date because of a

requirement to obtain court approval of such sale, the purchasers of the REO may be forced to

make other arrangements, including deciding not to proceed with the purchase of the REO.

Requiring the Debtors to seek Court approval for each Non-GA Foreclosure Sale and REO sale

will only increase administrative costs, delay closings, significantly disrupt the Debtors' business

operations, and adversely affect the purchase of the underlying properties.

**B.     Payment Of Fees Associated With Servicing Of Non-GA Loans In
Foreclosure And REO**

45.     Following the foreclosure of Non-GA Loans owned by the Debtors and

certain of the Non-GA Loans serviced by the Debtors, the Debtors remain responsible for

managing and maintaining the vast majority of Non-GA REO pending a sale.  Accordingly, the

Debtors seek authority to continue making Advances—and to fund prepetition amounts owed—

with respect to the REO and, in their sole discretion, the Non-GA Loans in foreclosure.

Specifically, the Debtors seek the authority to pay P&I Advances on delinquent Non-GA Loans

until title is conveyed pursuant to a foreclosure sale or through REO liquidation, as may be

required by the applicable Non-GA Servicing Agreement.

46.     The Debtors also request authority to continue making T&I Advances, and

to make Corporate Advances consisting of utility payments, and payments to various vendors

related to the management and maintenance of the properties.  For example, when the Debtors

foreclose on a property, the utility services are placed in the name of the listing broker of that

property.  Upon the property's ultimate disposition, the listing broker seeks reimbursement for

the interim utility charges from the Debtors.  Other common expenses covered by Corporate

Advances include regular property inspections, payment of homeowner association and

23

management fees, lawn care, repairs and other basic property maintenance. These T&I

Advances and Corporate Advances are necessary to preserve the value of the REO pending a

sale of the asset, and to the extent the Debtors are acting as servicer, generally are required by the

Non-GA Servicing Agreements.

47.    In addition, the Debtors seek authority to continue making Corporate

Advances related to (i) foreclosure professionals that assist with the foreclosure-related

proceedings of the various properties (i.e., attorneys, appraisers, field service companies, realtors,

title companies, and other professionals engaged in connection with property foreclosures), and

(ii) real estate brokers that market and sell the REO following foreclosure. Foreclosure attorneys

are typically paid on a pre-approved, per service basis. Inspection companies charge a flat fee

per inspection. Field service companies are compensated based on a fee structure that has been

pre-approved by mortgage investors. Realtors receive a capped percentage from the proceeds of

a successful property sale.

48.    In February and March 2012, the Debtors made Corporate Advances in

connection with the Non-GA REO in the approximate amounts of $13.5 million and $15.4,

respectively. The Debtors request authority to make Corporate Advances related to Non-GA

REO included within the overall Corporate Advances provided for under the Budgets in amounts

consistent with historical levels. Where the Debtors are paying the Corporate Advances in their

capacity as servicer under the Non-GA Servicing Agreements, upon the sale of REO, the Debtors

will be reimbursed for any amounts incurred with respect to these Corporate Advances from the

sale proceeds before the funds are distributed to the appropriate parties. Thus, certain of these

fees are not ultimately chargeable to the Debtors. Moreover, the Debtors request authority to

24

remit the sale proceeds to the appropriate parties in accordance with the relevant Non-GA

Servicing Agreement.

49.     Moreover, the Debtors request authority to remit the net proceeds of sale

of a foreclosed Non-GA Loan or REO to the appropriate parties in accordance with the relevant

Non-GA Servicing Agreement, and to refund overpayments to purchasers, as appropriate.

Proceeds from third party foreclosure sales are deposited into a clearing account.  Upon

conveyance of the property to a purchaser, the Debtors submit a claim for repayment of

outstanding Advances to the applicable investor.  The Debtors may also be required to refund

overpayments to buyers in connection with post-sale cost adjustments.  The remaining proceeds

are then distributed to the appropriate parties.

### C.     Limited Relief From The Automatic Stay To Allow Borrowers Or Other Tenants To Raise Related Counter-Claims In Foreclosure And Eviction Proceedings

50.     In their capacity as servicer, the Debtors currently are party to

approximately 31,400 foreclosure proceedings.  It is not uncommon for borrowers to raise

defenses and related counter-claims against the Debtors in order to preserve their interests in the

property underlying the Non-GA Loans.  In addition, the Debtors may be required to bring

eviction proceedings against borrowers or their tenants residing in properties subject to Non-GA

Loans upon which the Debtors have foreclosed.  The related counter-claims asserted by

borrowers in foreclosure actions or by tenants in eviction actions, whether commenced prior to,

on, or after the Petition Date, are or may be subject to the automatic stay under Bankruptcy Code

section 362(a).  The Debtors respectfully submit that requiring each of those parties to obtain

stay relief to assert counter-claims related to the subject matter of the foreclosure or eviction

complaint, as applicable, will add an unnecessary degree of complexity, costs and delay to the

foreclosure process.  Accordingly, the Debtors hereby request that the Court enter a standing

order modifying the automatic stay solely for the purposes of allowing (a) borrowers to assert

and prosecute counter-claims related to the subject matter of the foreclosure complaint in

connection with foreclosure proceedings, and (b) tenants to assert and prosecute counter-claims

related to the subject matter of the eviction complaint in connection with eviction proceedings, in

each case excluding claims against the Debtors related to the origination or securitization of the

borrowers' mortgage loans.  However, absent further affirmative relief from this Court, under no

circumstances shall such parties be entitled to enforce against, recoup, setoff or collect any

judgment or award related to any such counter-claim.  The Debtors reserve the right in their sole

discretion to determine whether any such defense or counterclaim falls within the exception to

the automatic stay described herein.

> **D.     Monthly Operating Reports Regarding Debtor-Owned
> Non-GA Foreclosure Sales, And REO Sales**

51.     In connection with their obligations to prepare and file monthly operating

reports in accordance with Operating Guidelines and Reporting Requirements for Debtors in

Possession and Trustees (revised Feb. 18, 2011) promulgated by the Office of the United States

Trustee for Region 2, the Debtors will disclose, in summary format, all Debtor-owned REO sales

and Non-GA Foreclosure Sales of Debtor-owned property closed subsequent to the Petition Date

and the associated costs, to the extent allocable.

> **E.     Summary Of Relief Requested Concerning
> Non-GA Loans In Foreclosure And REO**

52.     The Debtors seek, with respect to the Non-GA Loans and REO, authority

to (a) continue selling, in their capacities as the owners and servicers of mortgage loans, the Non-

GA Loans in foreclosure and REO on an "as is where is" basis and without any representation

and warranties except for title, in their ordinary course of business in their discretion and subject

to their business judgment, and to sell the Non-GA Loans in foreclosure and REO free and clear

of any and all liens and encumbrances, (b) continue paying foreclosure professionals' and

brokers' fees, as applicable, in the ordinary course of business in connection with the Non-GA

Foreclosure Sales and REO sales, (c) continue the funding of Corporate Advances related to the

Non-GA Loans in foreclosure and REO and submit claims for reimbursement of Advances

following the closing of Non-GA Foreclosure Sales and REO sales in accordance with the

relevant Non-GA Servicing Agreements, (d) refund overpayments to purchasers of Non-GA

Foreclosure Sales and REO sales and distribute the balance of the sale proceeds in accordance

with the relevant Non-GA Servicing Agreements, and (e) provide limited stay relief to enable

borrowers or their tenants to assert counter-claims in foreclosure or eviction proceedings related

to the subject matter of the foreclosure or eviction complaint.

## IV.     Request For Immediate Relief And Waiver Of Stay

53.     Bankruptcy Rule 6003 generally precludes the Court from authorizing

certain relief until twenty-one days after the petition is filed, except to the extent necessary to

prevent "immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that

Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the

interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to

the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief

requested in this Motion be entered on an interim basis.

54.     To successfully implement the foregoing, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy

Rule 6004(h).

## APPLICABLE AUTHORITY

I.    **The Court Should Authorize The Debtors To Continue
Servicing Non-GA Loans In The Ordinary Course Of
Business Pursuant To Section 363 Of The Bankruptcy Code**

55.    The relief requested in this Motion relates solely to the continued ordinary

course conduct of the Debtors' business within the meaning of section 363(c)(1) of the

Bankruptcy Code.  Nonetheless, the relief requested herein is essential to provide comfort to

those doing business with the Debtors.  Section 363(c) of the Bankruptcy Code authorizes a

debtor in possession to use, sell, or lease property of the estate in the ordinary course of its

business.  <u>See</u> 11 U.S.C. § 363(c).  Section 363(c) of the Bankruptcy Code, in relevant part,

provides:

> If the business of the debtor is authorized to be operated under
> section 721, 1108, 1203, 1204 or 1304 of this title and unless the
> court orders otherwise, the trustee may enter into transactions,
> including the sale or lease of property of the estate, in the ordinary
> course of business, without notice or a hearing, and may use
> property of the estate in the ordinary course of business without
> notice or a hearing.

11 U.S.C. § 363(c)(1).

56.    The ordinary course of business standard was intended to allow a debtor in

possession the flexibility required to run its business and respond quickly to changes in the

business environment.  <u>Moore v. Brewer (In re HMH Motor Servs., Inc.)</u>, 259 B.R. 440, 448-49

(Bankr. S.D. Ga. 2000).  A debtor in possession, thus, may use, sell or lease property of the

estate without need for prior court approval if the transaction is in the ordinary course.  <u>Comm.

of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville

Corp.)</u>, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate

property do not require a prior hearing); <u>Armstrong World Indus. v. James A. Phillips, Inc. (In re

James A. Phillips, Inc.)</u>, 29 B.R. 391, 394 (S.D.N.Y. 1983) (holding that where a debtor in

28

possession is merely exercising the privileges of his status, there is no general right to notice and

hearing concerning particular transactions conducted in the ordinary course of the business).

57.    Courts broadly interpret the term ordinary course.  <u>Gassen v. Universal</u>

<u>Bldg. Materials, Inc. (In re Berkley Multi-Units, Inc.)</u>, 88 B.R 394, 396 (Bankr. M.D. Fla. 1988).

In determining whether a transaction is in the ordinary course of business under Bankruptcy

Code section 363, the courts apply a two-pronged test: (1) the objective horizontal test, and (2)

the subjective vertical test.  <u>See</u> <u>Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)</u>, 114 F.3d

379, 384-85 (2d Cir. 1997); <u>see also</u> <u>In re Dana Corp.</u>, 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006)

(and cases cited therein); <u>In re The Leslie Fay Cos.</u>, 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).

The horizontal test is a factual analysis as to whether the transaction in question is of the sort

commonly undertaken by companies in that industry.  <u>In re Lavigne</u>, 114 F.3d at 385.  That is,

the horizontal test focuses on whether the transaction is usual or abnormal for the industry.  The

vertical test, which is also called the creditor's expectation test, is an analysis conducted from the

perspective of a hypothetical creditor and analyzes whether the transaction subjects the creditor

to an economic risk of a nature different from those it accepted when it decided to extend credit.

<u>Id.</u> (internal quotations omitted); <u>In re The Leslie Fay Cos.</u>, 168 B.R. at 304.  In making this

determination, courts look to the debtor's pre-petition business practices and conduct and

compare them to the debtor's postpetition conduct.  <u>In re The Leslie Fay Cos.</u>, 168 B.R. at 304.

58.    Here, all of the activities for which the Debtors seek authority to continue

satisfy both the horizontal and vertical tests.  The horizontal test is easily met.  Each of the

foregoing activities represents an essential component in continuing the Debtors' business as it

was conducted prior to the Petition Date.  These services are typically performed by similarly

situated mortgage loan servicers in the mortgage lending and securitization industries.  Likewise,

29

a hypothetical creditor should expect that the Debtors, in their capacity as loan servicer, would be parties to various agreements that require them to engage in the various activities described in this Motion.  Granting the relief requested herein would not subject creditors to economic risks that would not have been contemplated by them.  Therefore, the vertical test is also satisfied. See Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d 700, 705 (9th Cir. 1988) (debtor's renewal and execution of leases satisfied vertical test because debtor routinely entered into leases prior to bankruptcy); In re Johns-Manville Corp., 60 B.R. at 616 (debtor's employment of lobbyists satisfied both vertical and horizontal tests because debtor had been retaining lobbyists for many years and because it was common practice of other major companies to do so).

59.    Relief similar to that requested by the Debtors has been routinely granted as a matter of course in numerous Chapter 11 cases of other mortgage lenders.  See, e.g., In re Thornburg Mortg., Inc., No. 09-17787 (Bankr. D. Md. May 6, 2009) (Docket No. 49) (granting the debtors authority to continue servicing loans and performing its loan auditing and fulfillment services business in the ordinary course of business); In re Am. Home Mortg. Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) (Docket No. 358) (granting the debtors authority to, among other things, sell REO owned in the ordinary course free and clear of any and all liens and encumbrances and to continue funding servicing advances); (authorizing the debtors to sell loans owned by the debtors and honor existing obligations and incur new obligations in the ordinary course of business in connection with the servicing of loans); In re Aegis Mortg. Corp., Case No. 07-11119 (BLS) (Bankr. D. Del. August 15, 2007) (Docket No. 35) (authorizing the debtors to sell certain loans owned by the debtors, continue performing under existing subservicing agreements, and enter into new subservicing agreements); In re Mortg.

30

<u>Lenders Network USA, Inc.</u>, Case No. 07-10146 (PJW) (Bankr. D. Del. Feb. 7, 2007) (Docket No. 38) (authorizing debtors to sell loans that had closed and been funded, honor loan commitments upon which the debtors closed prepetition but were unable to fund, and honor existing obligations and incur new obligations in the ordinary course of business in connection with the servicing of loans); <u>In re The Finova Group Inc.</u>, Case No. 01-00697 (PJW) (Bankr. D. Del. Mar. 7, 2001) (Docket No. 16) (authorizing debtors to honor, renew, increase and/or fund prepetition commitments, honor prepetition or post petition servicing and payment obligations, continue business practices including making of new loans, continuing ordinary course intercompany loans and authorizing banks to honor prepetition checks and other forms of payment); <u>In re United Cos. Fin. Corp.</u>, Case No. 99-00451 (RB) (Bankr. D. Del. Mar. 5, 1999) (Docket No. 54) (authorizing debtors to honor prepetition commitments to fund borrower loans, honor existing obligations in connection with servicing existing loans, honor existing obligations in connection with securitization of loans and sell loans in the ordinary course of business, and directing banks to honor loan disbursement checks and wire transfers); <u>In re Cityscape Fin. Corp.</u>, No. 98-22569 (ASH) (Bankr. S.D.N.Y. Jan. 25, 1999) (Docket No. 221) (granting the debtors authority to, among other things, sell loan portfolios in the ordinary course of business).

## II.     The Court Should Authorize The Debtors To Sell Non-GA REO "Free And Clear" Of Liens Pursuant To Section 363 Of The Bankruptcy Code

60.     Section 363(f) of the Bankruptcy Code provides that a debtor in possession:

> "may sell property . . . free and clear of any interest in such property of an entity other than the estate, only if
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction of such interest.

11 U.S.C. §363(f).

61.     At closing for the Non-GA Foreclosure Sales and REO sales, the Debtors are required to deliver marketable and insurable title free and clear of encumbrances.  To convey marketable and insurable title to the prospective buyers at closing, the Debtors request authority to sell the Non-GA Loans in foreclosure and REO (whether owned by the Debtors or by investors for whom the Debtors act as servicer) free and clear of any lien, claim or encumbrance. To the extent that any lien, claim or encumbrance exists on the property that is the subject of a Non-GA Foreclosure Sale or REO sale, it shall attach to the proceeds realized from the sale of such property.  The Debtors submit that the attachment of any such lien or encumbrance to the proceeds of a Non-GA Foreclosure Sale or REO sale, as applicable, will adequately protect any such interest in the property.  See, e.g., In re Bearingpoint, Inc., No. 09-10691, 2009 Bankr. LEXIS 5051, at *14 (Bankr. S.D.N.Y. Nov. 9, 2009) (authorizing free and clear sale of assets pursuant to section 363(f) where parties with interests in the assets were adequately protected by having their interests attach to the net proceeds ultimately attributable to the assets against or in which such interests were asserted); In re Gen. Motors Corp., 09-50026, 2009 Bankr. LEXIS 5565, at *25 (Bankr. S.D.N.Y. July 5, 2009) (same); In re Steve & Barry's Manhattan LLC, No. 08-12579, 2008 Bankr. LEXIS 4348, at *21 (Bankr. S.D.N.Y. Aug. 22, 2008) (same).  The relief requested herein has been granted by other courts in a similar context.  See e.g., In re Am. Home Mortg. Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) (Docket No.

32

358) (confirming the debtors' authority to sell real estate owned or serviced by the debtors free and clear of liens and encumbrances in the ordinary course).  Accordingly, the Debtors request that the Non-GA Foreclosure Sales and REO sales in the ordinary course of business free and clear of all claims and encumbrances be authorized.

### III.    The Court May Rely On The "Necessity Of Payment" Doctrine And Its General Equitable Powers To Grant The Motion

62.    Under section 105 of the Bankruptcy Code, this Court "may issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a).  The Debtors, operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  See also In re J. M. Fields, Inc., 8 B.R. 638, 642 (Bankr. S.D.N.Y. 1981) ("[A] debtor-in-possession owes a duty to preserve and protect his property for [creditors'] benefit.").

63.    Implicit in the duties of a Chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." CoServ, L.L.C., 273 B.R. at 497.  See also In re Jennifer Convertibles, Inc., No. 10-13779, 2010 Bankr. LEXIS 6068 (Bankr. S.D.N.Y. July 29, 2010) (authorizing relief where, among other things, it would enable the debtors "to preserve and realize the value of the Debtors' remaining operations on a going concern basis and avoid any decline and further devaluation of the Debtors' business. . . ."); In re Gen. Motors Corp., 2009 Bankr. LEXIS 5565, at *12 (authorizing relief where the court found it was necessary to preserve the viability of the debtors' businesses as going concerns).

33

64.     The relief requested herein is necessary to allow the Debtors to preserve, enhance and maximize the value of the estates, thereby fulfilling their fiduciary duties imposed by the Bankruptcy Code.  Specifically, the Debtors are contractually obligated to perform the servicing and related activities (including the payment of Advances and other fees due prepetition) that they are seeking authority to continue to perform under this Motion.  If the Debtors fail to perform these obligations, (i) the Debtors would be in breach of their obligations under the Non-GA Servicing Agreements, which could result in the termination of the Debtors as servicer for the applicable Non-GA Loans and/or Non-GA REO, (ii) the Debtors would no longer earn Servicing Fees with respect to the applicable Non-GA Loans and/or Non-GA REO, and (iii) the value of the Debtors' assets would decrease, notwithstanding the Debtors' efforts to preserve value in advance of the Platform Sale.  The harm and economic disadvantage that would stem from the Debtors' failure to perform these obligations is grossly disproportionate to the amount of the prepetition claims that would have to be paid.  Moreover, any Advances incurred by the Debtors are reimbursable from the sale proceeds before the funds are distributed to the appropriate parties.  Thus, these fees are not ultimately chargeable to the Debtors.  In addition, Nationstar will be buying the Debtors' outstanding Advances with respect to the Non-GA Loans, further limiting the impact of making postpetition Advances on the estates.  Finally, as noted above, the Debtors are required to continue their mortgage loan servicing activities under the terms of the DOJ/AG Settlement, and may incur penalties if they fail to do so.

65.     For the reasons set forth above, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by continuing to perform in the ordinary course paying the Advances.  Accordingly, the relief requested herein is essential to preserve the Debtors as a going concern and, thus, serves the

34

rehabilitative purposes of the Bankruptcy Code as authorized pursuant to Bankruptcy Code

section 105(a).

66.    To the extent the relief requested herein contemplates payment of

prepetition claims, such relief is also supported by the doctrine of necessity.  The doctrine of

necessity is a well-settled principle that permits a bankruptcy court to authorize payment of

certain prepetition claims before the completion of the Chapter 11 case where the payment of

such claims is necessary to the restructuring efforts.  See In re C.A.F. Bindery, 199 B.R. 828,

835 (Bankr. S.D.N.Y. 1996) ("[T]he 'doctrine of necessity' . . . permits the bankruptcy court to

authorize the payment of prepetition claims prior to confirmation.  To invoke the rule, however,

the debtor must show that the payment is 'critical to the debtor's reorganization." (citing In re

Fin. News Network, Inc., 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991)); In re Ionosphere Clubs,

Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (doctrine of necessity "recognizes the existence

of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims

where such payment is essential to the continued operation of the debtor"); see also In re Just for

Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive"

absent payment of certain prepetition claims, the doctrine of necessity should be invoked to

permit payment); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re

Chateaugay Corp.), 80 B.R. 279, 285-87 (S.D.N.Y. 1987) (bankruptcy court did not abuse

discretion when utilizing equitable powers to pay prepetition debts); In re NVR L.P., 147 B.R.

126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition

obligation when essential to the continued operation of the debtor."); In re Eagle-Picher Indus.,

Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition

unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to

the Chapter 11 process.").

**IV.    The Court Should Grant Limited Stay Relief Pursuant To
Section 362(d)(1) Of The Bankruptcy Code**

67.    With respect to the foreclosure of REO, the Debtors request that the Court

modify the automatic stay pursuant to section 362(d)(1) to permit borrowers to raise counter-

claims related to the subject matter of the foreclosure complaint against the Debtors during the

foreclosure proceedings.  The Debtors also request that the Court grant such relief with respect to

tenants against whom the Debtors have brought eviction actions.  The Bankruptcy Code provides

the Court may grant stay relief "for cause, including the lack of adequate protection of an interest

in property of such party in interest[.]" 11 U.S.C. §362(d)(1).  As discussed above, the Debtors

respectfully submit that it is in the best interests of their estates and borrowers to permit

borrowers or other tenants to raise applicable defenses and related counter-claims in their related

foreclosure or eviction proceedings.  The Debtors believe that limited stay relief for this purpose

will allow for an efficient and fair mortgage foreclosure process preserving both the interests of

the Debtors' estates and borrowers.

**V.    The Requested Relief Is Necessary To Avoid Immediate And Irreparable Harm**

68.    The Debtors further submit that, because the relief requested is necessary

to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein,

Bankruptcy Rule 6003 has been satisfied.  Bankruptcy Rule 6003 provides that the relief

requested in this Motion may be granted if the "relief is necessary to avoid immediate and

irreparable harm."  For the reasons set forth herein, the Debtors submit that their immediate

ability to continue their loan servicing operations in the ordinary course of business, including

disposing of some of their property, honoring certain outstanding obligations, and making

36

ny-1016207

payments on certain prepetition obligations are indispensable to prevent the immediate and irreparable disruption of their businesses.

## SCOPE OF MOTION

69.    This Motion does not cover all aspects of the Debtors' businesses. Whether or not a business activity is described in this Motion, and whether or not the Debtors seek a comfort order with respect to the continuation of such activity, if the activity is one that the Debtors conduct in the ordinary course of business, the Debtors intend to continue to conduct such activity after the Petition Date pursuant to the authority granted to them by Bankruptcy Code section 363(c).

70.    Nothing herein limits the rights of the Debtors to conduct their business and manage their assets in the ordinary course without prior court approval.  Nothing herein is intended to constitute a request to assume any contract or agreement under Bankruptcy Code section 365; nor is anything herein intended to constitute a request to create any rights in favor of, or to enhance the status of any claim held by, any entity.  The Debtors are in the process of reviewing all underlying agreements and reserve all of their rights under such agreements, applicable law and under the Bankruptcy Code with respect thereto.

## NOTICE

71.    Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees

37

for the Debtors' outstanding notes issuances; (i) Ally Financial Inc. and its counsel; (j) counsel to

the administrative agent for the Debtors' proposed providers of debtor in possession financing;

(k) Nationstar Mortgage LLC and its counsel; (k) the parties included on the Debtors' list of fifty

(50) largest unsecured creditors; and (l) the Non-GA Securitization Trusts (collectively, the

"Initial Notice Parties").  The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

72.    Within two (2) days after entry of an interim order, the Debtors propose to

serve a copy of the Motion and the interim order upon the Initial Notice Parties.  The Debtors

request that the Court schedule the final hearing on the Motion for a date that is as soon as

practicable, but in no event later than forty-five (45) days following the entry of the interim order,

and establish the date prior to the final hearing for parties to file objections to the Motion.

73.    Any objections to the relief requested in the Motion must be filed with the

Clerk of the Bankruptcy Court and served upon and received by: (a) proposed counsel for the

Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn:

Larren M. Nashelsky, Gary Lee, Lorenzo Marinuzzi); (b) the Office of the United States Trustee

for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004

(Attn:  Tracy Hope Davis and Brian S. Masumoto); (c) counsel for Ally Financial Inc., Kirkland

& Ellis, LLP, Citigroup Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M.

Cieri, Ray C. Schrock, and Stephen E. Hessler) (d) counsel to the administrative agent for the

Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher &

Flom LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman and

Jonathan H. Hofer); and (e) counsel for any statutory committee appointed in the Debtors' cases,

on or before the date of the final hearing as scheduled by the Court.  If no objections are filed to

the Motion, the Court may enter the final order without further notice or hearing.


**[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]**

ny-1016207

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an

interim order substantially in the form attached hereto as <u>Exhibit A</u>, granting certain of the relief

sought herein immediately; (ii) enter a final order substantially in the form attached hereto as

<u>Exhibit B</u>, granting the relief sought herein on a final basis; and (iii) grant such other and further

relief to the Debtors as the Court may deem just and proper.

Dated:  May 14, 2012
        New York, New York

*/s/*    Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

40

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- )
                                                                     )
In re:                                                               )    Case No. 12-
                                                                     )
RESIDENTIAL CAPITAL, LLC, et al.,                                    )    Chapter 11
                                                                     )
                                         Debtors.                    )    Jointly Administered
                                                                     )
-------------------------------------------------------------------- )

**INTERIM ORDER UNDER SECTIONS 105(a), 362, 363, 1107(a) AND 1108
OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO
CONTINUE IN THE ORDINARY COURSE OF BUSINESS (A) SERVICING
NON-GOVERNMENTAL ASSOCIATION LOANS, AND (B) SALE ACTIVITIES
RELATED TO CERTAIN LOANS IN FORECLOSURE AND REAL ESTATE OWNED
PROPERTY, AND (II) GRANTING LIMITED STAY RELIEF TO ENABLE
BORROWERS TO ASSERT RELATED COUNTER-CLAIMS IN
FORECLOSURE AND EVICTION PROCEEDINGS**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of interim

and final orders, under Bankruptcy Code sections 105(a), 362, 363, 1107(a), and 1108 and

Bankruptcy Rule 6003, (i) authorizing, but not directing, the Debtors to continue in the ordinary

course of business (a) servicing Non-GA Loans, and (b) sale activities related to certain loans in

foreclosure and real estate owned property, including authorizing the sale of such property free

and clear of liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code,

and (ii) granting limited stay relief to enable borrowers or their tenants, as applicable, to assert

related counter-claims in foreclosure and eviction proceedings; and upon the Whitlinger

Affidavit; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
       Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
       granted herein may refer to http://www.kccllc.net/rescap for additional information.

U.S.C. §§ 157 and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in

this district is proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this

proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient

notice of the Motion having been given under the particular circumstances; and it appearing that

no other or further notice need be provided; and it appearing that the relief requested by the

Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest;

and after due deliberation thereon; and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED on an interim basis, as set forth herein.

Servicing of Non-GA Loans

2.      The Debtors are authorized, but not directed, in their sole discretion and

subject to available funding, to continue servicing Non-GA Loans in the ordinary course,

including, but not limited to:

(a)    performing the Servicing Functions and honoring all obligations arising under the
       Non-GA Servicing Agreements;

(b)    making all Advances related to the Non-GA Loans in accordance with the
       applicable Non-GA Servicing Agreement; and

(c)    entering into loan modifications and Deferment and Forbearance Arrangements,
       including participating in HAMP.

3.      The Debtors are authorized to honor their obligations under the Consent

Order and the DOJ/AG Settlement in connection with the Servicing Functions, and to use estate

assets and take such actions as, in their reasonable business judgment, are necessary to comply

with and adhere to the terms of the Consent Order and the DOJ/AG Settlement.  The Debtors are

further authorized to implement new servicing standards and procedures and to perform reviews

2

of their past foreclosure proceedings and reports regarding the results of such reviews, in each

case as may be required to comply with the Consent Order and the DOJ/AG Settlement.

4.      Nothing set forth in this Interim Order or in the Motion shall alter the

Debtors' obligations under the Consent Order and the DOJ/AG Settlement.

Non-GA Loans in Foreclosure and REO

5.      The Debtors are authorized, but not directed, in their sole and absolute

discretion and subject to available funding, to continue servicing Non-GA Loans in foreclosure

and REO in the ordinary course, including, but not limited to:

(a)     selling Non-GA Loans in foreclosure and REO free and clear of any and all liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code);

(b)     paying foreclosure professionals' and brokers' fees, as applicable, in the ordinary course of business in connection with respect to the Non-GA Foreclosure Sales and REO sales;

(c)     making Advances related to the Non-GA Loans in foreclosure and REO in accordance with the relevant loan servicing agreements or other governing documents;

(d)     distributing proceeds from the sale of Non-GA Loans in foreclosure and REO in accordance with the relevant loan servicing agreements or other governing documents; and

(e)     refunding overpayments to purchasers of Non-GA Loans in foreclosure and REO, as appropriate.

6.      To the extent that any lien, claim or encumbrance exists on the Non-GA

Loans in foreclosure or REO, as applicable, such lien, claim or encumbrance shall attach to the

proceeds of the sale in the order of priority and with the same validity, force and effect that such

lien, claim or encumbrance may have against the Non-GA Loans in foreclosure or REO at the

time of the sale.

ny-1016747

7.      Nothing herein shall be construed to limit, or in any way affect, the Debtors' ability to dispute any foreclosure professionals' and brokers' fees that may be requested.

8.      Nothing herein shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement with any foreclosure professional or broker, or to require the Debtors to make any of the payments to any foreclosure professional or broker authorized herein.

9.      The Debtors shall file monthly operating reports disclosing, in summary format, all Debtor-owned REO sales and Non-GA Foreclosure Sales of Debtor-owned property closed subsequent to the Petition Date and the associated costs, to the extent allocable.

Limited Borrower Relief from Automatic Stay

10.      The stay imposed by section 362(a) of the Bankruptcy Code is hereby modified solely to enable (a) borrowers to assert and prosecute counter-claims related to the subject matter of the foreclosure complaint in connection with foreclosure proceedings, and (b) tenants to assert and prosecute counter-claims related to the subject matter of the eviction complaint in connection with eviction proceedings for which the underlying property is the subject of a foreclosure proceeding or has been foreclosed upon, in each case excluding claims against the Debtors related to the origination or securitization of the borrowers' mortgage loans; provided, that absent further order of the Court, under no circumstances shall a borrower be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any such counter-claim.  The Debtors shall retain the right to determine, in their sole discretion, whether any such counter-claim or defense falls within the exception to the automatic stay provided for under this paragraph 10.

ny-1016747

Other Relief

11.     The Debtors are authorized and empowered to take all actions and execute

such documents as may be necessary or appropriate to carry out the relief granted herein.

12.     Nothing herein shall be deemed to limit the rights of the Debtors to

operate their business in the ordinary course, and no subsequent order shall be required to

confirm such rights.

13.     Notwithstanding the relief granted herein and any actions taken hereunder,

nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any

contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their

non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or

otherwise.

14.     Notwithstanding anything to the contrary in this Interim Order, any action

to be taken pursuant to the relief authorized in this Interim Order is subject to the terms of any

cash collateral order or debtor in possession financing order entered in these chapter 11

proceedings.  All amounts authorized to be paid pursuant to this Interim Order are subject to the

limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit

Agreement).  To the extent that there is any inconsistency between the terms of this Interim

Order and the terms of any order relating to postpetition financing or cash collateral, the terms of

the orders relating to postpetition financing or cash collateral shall govern.

15.     Notwithstanding anything herein to the contrary, this Interim Order shall

not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the

Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and

among Ally Financial Inc., Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors

ny-1016747

of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent

judgment entered by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012 and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates (excluding

ResCap and its subsidiaries).

16.    The Debtors shall serve a copy of the Motion and this Interim Order by

United States mail, first class postage, on  (a) the Office of the United States Trustee for the

Southern District of New York; (b) the office of the United States Attorney General; (c) the

office of the New York Attorney General; (d) the office of the United States Attorney for the

Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange

Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each

of the indenture trustees for the Debtors' outstanding notes issuances; (i) Ally Financial Inc. and

its counsel; (j) counsel to the administrative agent for the Debtors' proposed providers of debtor

in possession financing; (k) Nationstar Mortgage LLC and its counsel; (k) the parties included on

the Debtors' list of fifty (50) largest unsecured creditors; and (l) the Non-GA Securitization

Trusts, on or before _____, 2012.

17.    The Final Hearing, if required, to consider the Motion and proposed final

order is scheduled for _____ __, 2012 at __:__ __.m. (prevailing Eastern Time) before the Court.

Any objections or responses to the Motion must be filed with the Clerk of the Bankruptcy Court

and served upon and received by: (a) proposed counsel for the Debtors, Morrison & Foerster

LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Larren M. Nashelsky, Gary

Lee, Lorenzo Marinuzzi); (b) the Office of the United States Trustee for the Southern District of

6

New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn:  Tracy Hope Davis and

Brian S. Masumoto); (c) counsel for Ally Financial Inc., Kirkland & Ellis, LLP, Citigroup

Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M. Cieri, Ray C. Schrock,

and Stephen E. Hessler) (d) counsel to the administrative agent for the Debtors' proposed

providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4

Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman and Jonathan H.

Hofer); and (e) counsel for any statutory committee appointed in the Debtors' cases, on or before

_____, 2012 at 4:00 p.m. prevailing EST.  If no objections are filed to the Motion, the Court

may enter the proposed final order without further notice or hearing.

18.    The Court finds and determines that the requirements of Bankruptcy Rule

6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable

harm.

19.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

20.    Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this

Interim Order shall be effective and enforceable immediately upon entry hereof.

21.    The relief granted by this Interim Order shall apply to any Future Debtor

in these jointly-administered cases.

22.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Interim Order.

Dated:                              , 2012
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------  )
                                                                         )
In re:                                                                   )    Case No. 12-
                                                                         )
RESIDENTIAL CAPITAL, LLC, et al.,                                        )    Chapter 11
                                                                         )
                                    Debtors.                             )    Jointly Administered
                                                                         )
-----------------------------------------------------------------------  )

### FINAL ORDER UNDER SECTIONS 105(a), 362, 363, 1107(a) AND 1108 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO CONTINUE IN THE ORDINARY COURSE OF BUSINESS (A) SERVICING NON-GOVERNMENTAL ASSOCIATION LOANS, AND (B) SALE ACTIVITIES RELATED TO CERTAIN LOANS IN FORECLOSURE AND REAL ESTATE OWNED PROPERTY, AND (II) GRANTING LIMITED STAY RELIEF TO ENABLE BORROWERS TO ASSERT RELATED COUNTER-CLAIMS IN FORECLOSURE AND EVICTION PROCEEDINGS

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of interim and final orders, under Bankruptcy Code sections 105(a), 362, 363, 1107(a), and 1108 and Bankruptcy Rule 6003, (i) authorizing, but not directing, the Debtors to continue in the ordinary course of business (a) servicing Non-GA Loans, and (b) sale activities related to certain loans in foreclosure and real estate owned property, including authorizing the sale of such property free and clear of liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and (ii) granting limited stay relief to enable borrowers or their tenants, as applicable, to assert related counter-claims in foreclosure and eviction proceedings; and the Court having considered the Whitlinger Affidavit; and the Court having entered an interim order (the "Interim Order") on May __, 2012 granting the Motion on an interim basis; and it appearing that this Court has

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief granted herein may refer to http://www.kccllc.net/rescap for additional information.

jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that

venue of these Chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C

§§ 1408 and 1409; and it appearing that this proceeding on the Motion is a core proceeding

pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been given; and it

appearing that no other or further notice need be provided; and upon the record of the Final

Hearing; and it appearing that the relief requested by the Motion is in the best interests of the

Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon;

and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED, as set forth herein.

<u>Servicing of Non-GA Loans</u>

2.      The Debtors are authorized, but not directed, in their sole discretion and

subject to available funding, to continue servicing Non-GA Loans in the ordinary course,

including, but not limited to:

(a)     performing the Servicing Functions and honoring all obligations arising under the Non-GA Servicing Agreements;

(b)     making all Advances related to the Non-GA Loans in accordance with the applicable Non-GA Servicing Agreement; and

(c)     entering into loan modifications and Deferment and Forbearance Arrangements, including participating in HAMP.

3.      The Debtors are authorized to honor their obligations under the Consent

Order and the DOJ/AG Settlement in connection with the Servicing Functions, and to use estate

assets and take such actions as, in their reasonable business judgment, are necessary to comply

with and adhere to the terms of the Consent Order and the DOJ/AG Settlement.  The Debtors are

further authorized to implement new servicing standards and procedures and to perform reviews

of their past foreclosure proceedings and reports regarding the results of such reviews, in each

case as may be required to comply with the Consent Order and the DOJ/AG Settlement.

Non-GA Loans in Foreclosure and REO

4.      The Debtors are authorized, but not directed, in their sole and absolute

discretion and subject to available funding, to continue servicing Non-GA Loans in foreclosure

and REO in the ordinary course, including, but not limited to:

(a)      selling Non-GA Loans in foreclosure and REO free and clear of any and all liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code);

(b)      paying foreclosure professionals' and brokers' fees, as applicable, in the ordinary course of business in connection with respect to the Non-GA Foreclosure Sales and REO sales;

(c)      making Advances related to the Non-GA Loans in foreclosure and REO in accordance with the relevant loan servicing agreements or other governing documents;

(d)      distributing proceeds from the sale of Non-GA Loans in foreclosure and REO in accordance with the relevant loan servicing agreements or other governing documents; and

(e)      refunding overpayments to purchasers of Non-GA Loans in foreclosure and REO, as appropriate.

5.      To the extent that any lien, claim or encumbrance exists on the Non-GA

Loans in foreclosure or REO, as applicable, such lien, claim or encumbrance shall attach to the

proceeds of the sale in the order of priority and with the same validity, force and effect that such

lien, claim or encumbrance may have against the Non-GA Loans in foreclosure or REO at the

time of the sale.

6.      Nothing herein shall be construed to limit, or in any way affect, the

Debtors' ability to dispute any foreclosure professionals' and brokers' fees that may be

requested.

7.      Nothing herein shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement with any foreclosure professional or broker, or to require the Debtors to make any of the payments to any foreclosure professional or broker authorized herein.

8.      The Debtors shall file monthly operating reports disclosing, in summary format, all Debtor-owned REO sales and Non-GA Foreclosure Sales of Debtor-owned property closed subsequent to the Petition Date and the associated costs, to the extent allocable.

Limited Borrower Relief from Automatic Stay

9.      The stay imposed by section 362(a) of the Bankruptcy Code is hereby modified solely to enable (a) borrowers to assert and prosecute counter-claims related to the subject matter of the foreclosure complaint in connection with foreclosure proceedings, and (b) tenants to assert and prosecute counter-claims related to the subject matter of the eviction complaint in connection with eviction proceedings for which the underlying property is the subject of a foreclosure proceeding or has been foreclosed upon, in each case excluding claims against the Debtors related to the origination or securitization of the borrowers' mortgage loans; provided, that absent further order of the Court, under no circumstances shall a borrower be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any such counter-claim.  The Debtors shall retain the right to determine, in their sole discretion, whether any such counter-claim or defense falls within the exception to the automatic stay provided for under this paragraph 9.

Other Relief

10.      The Debtors are authorized and empowered to take all actions and execute such documents as may be necessary or appropriate to carry out the relief granted herein.

4

ny-1016748

11.     Nothing herein shall be deemed to limit the rights of the Debtors to operate their business in the ordinary course, and no subsequent order shall be required to confirm such rights.

12.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

13.     Notwithstanding anything to the contrary in this Final Order, any action to be taken pursuant to the relief authorized in this Final Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings. All amounts authorized to be paid pursuant to this Final Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement).  To the extent that there is any inconsistency between the terms of this Final Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

14.     Notwithstanding anything herein to the contrary, this Final Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

ny-1016748

Federal Deposit Insurance Act, as amended, dated February 10, 2012 and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates (excluding

ResCap and its subsidiaries).

15.    The Court finds and determines that the requirements of Bankruptcy Rule

6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable

harm.

16.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

17.    Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this

Final Order shall be effective and enforceable immediately upon entry hereof.

18.    The relief granted by this Final Order shall apply to any Future Debtor in

these jointly-administered cases.

19.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Final Order.

Dated:                          , 2012
         New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

ny-1016748