Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |

---------------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER
BANKRUPTCY CODE SECTIONS 105(a) AND 363 AUTHORIZING
THE DEBTORS TO CONTINUE TO PERFORM UNDER THE ALLY BANK
<u>SERVICING AGREEMENT IN THE ORDINARY COURSE OF BUSINESS</u>**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move for entry of interim and final orders, under sections 105(a) and

363(c) of title 11 of the United States Code (the "Bankruptcy Code") authorizing GMAC

Mortgage, LLC ("GMAC Mortgage") to continue to perform under the Servicing Agreement

(defined below), by and between GMAC Mortgage and its non-Debtor affiliate, Ally Bank, in

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on
<u>Exhibit 1</u> to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may
file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

the ordinary course of the Debtors' businesses (the "Motion").[2]  In support of the Motion, the

Debtors rely upon and incorporate by reference the Affidavit of James Whitlinger, Chief

Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day

Pleadings, filed with the Court concurrently herewith (the "Whitlinger Affidavit").  In further

support of the Motion, the Debtors, by and through their undersigned counsel, respectfully

represent:

**JURISDICTION**

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

relief requested herein are Bankruptcy Code sections 105(a), 362, and 363(c).

**BACKGROUND**

2.    On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors

are managing and operating their businesses as debtors in possession pursuant to Bankruptcy

Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has

been appointed in these Chapter 11 cases.

3.    The Debtors are a leading residential real estate finance company

indirectly owned by Ally Financial Inc. ("AFI"), which is not a Debtor.  The Debtors and their

non-debtor affiliates operate the fifth largest mortgage servicing business and the tenth largest

residential mortgage loan origination business in the United States.  A more detailed description

---

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief

*(cont'd)*

of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

4.    The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank, and other third parties.  As of March 31, 2012, the Debtors were servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion.  To preserve and realize the value of these assets and achieve the goals of these Chapter 11 cases, the Debtors developed and are prepared to implement a strategy that provides maximum value to the Debtors' estates.

5.    The Debtors negotiated and entered into two separate asset purchase agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder ("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the "Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the "Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

6.    In furtherance of their restructuring strategy, and contemporaneous with the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to, among other things, establish auction and sale procedures for the Asset Sales,[3] and for approval

_____
*(cont'd from previous page)*

requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

[3]    See *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving*

*(cont'd)*

to consummate the Asset Sales under a plan.  If, however, the Debtors do not obtain

confirmation of a plan by deadlines to be determined, then the Sale Motion allows the Debtors to

pursue an alternative course of action and immediately move forward with the Asset Sales under

Bankruptcy Code section 363(b) and outside of a plan.

## PRELIMINARY STATEMENT

7.      As described below, in connection with mortgage loans it originates or

purchases, Ally Bank frequently retains the right to service these loans.  As of March 31, 2012,

the Ally Bank mortgage servicing rights ("MSRs") were comprised of approximately 690,000

mortgage loans with an aggregate unpaid principal balance of $140.8 billion.  GMAC Mortgage

has been servicing these loans pursuant to a servicing agreement, dated as of August 21, 2001,

between GMAC Mortgage and Ally Bank.  Prior to the Petition Date, GMAC Mortgage and Ally

Bank amended and restated the servicing agreement pursuant to an Amended and Restated

Servicing Agreement, dated as of May 11, 2012 (the "Servicing Agreement").[4]  The Servicing

Agreement only becomes effective upon approval by this Court and will replace the current

agreement between the parties.  The Servicing Agreement (including its predecessor agreement)

is a critical component of the Debtors' mortgage loan servicing business.

8.      As described in greater detail in the Sale Motion, the Purchaser requires,

as a condition to the closing of the Platform Sale, that the Debtors operate their businesses in the

_____

*(cont'd from previous page)*

*Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory
Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion").

[4]      A copy of the Servicing Agreement is attached hereto as <u>Exhibit C</u>.  Because of their voluminous nature, the
exhibits to the Servicing Agreement have not been included but will be made available upon request and subject
to the execution of appropriate non-disclosure agreements.

ordinary course and use commercially reasonable efforts to preserve the value of their business

enterprise.  To comply with these conditions and preserve the value of their loan servicing

platform, the Debtors must avoid significant disruptions to their operations during this critical

postpetition period.  Accordingly, the Debtors seek authority for GMAC Mortgage to continue to

perform under the Servicing Agreement with Ally Bank to ensure that the value of the Debtors'

subservicing platform is preserved.  As explained in detail below, the relief requested is in the

best interests of the Debtors' estates and amply warranted under the circumstances.

## RELIEF REQUESTED

9.    By this Motion, the Debtors seek entry of interim and final orders pursuant

to Bankruptcy Code sections 105(a), 362, and 363(c):  (a) authorizing GMAC Mortgage to

provide services to Ally Bank in accordance with the Servicing Agreement, a copy of which is

attached hereto as Exhibit C; and (b) granting Ally Bank additional relief, including, among

other things, (i) limited relief from the automatic stay of Bankruptcy Code section 362(a) to

permit Ally Bank to provide the 120-day notice required by the Servicing Agreement in order to

terminate the Servicing Agreement with respect to no more than 3,000 Mortgage Loans (defined

below) in the aggregate; (ii) relief from the automatic stay of Bankruptcy Code section 362(a) to

permit Ally Bank to, ninety (90) days after the Petition Date, provide the 120-day notice required

by the Servicing Agreement to terminate the Servicing Agreement without cause; and

(iii) limiting the authority of the Debtors to terminate, move to reject or modify the Servicing

Agreement without Ally Bank's consent within ninety (90) days of the Petition Date.

10.    The Debtors request that, to the extent necessary, the relief sought by this

Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases.  The

Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's entry

of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the

Chapter 11 cases of the Debtors.

**A.    FRB Consent Order And DOJ/AG Settlement**

11.    As a result of an examination conducted by the Federal Reserve Board

(the "FRB") and the Federal Deposit Insurance Company (the "FDIC"), on April 13, 2011,

Debtors Residential Capital, LLC ("ResCap") and GMAC Mortgage, and non-debtor affiliates

AFI and Ally Bank entered into a Consent Order with the FRB and the FDIC (the "Consent

Order").  Pursuant to the Consent Order, the Debtors are responsible for making improvements

to various aspects of their residential mortgage loan servicing business, including, among other

things, compliance programs, internal audit, communications with borrowers, vendor

management, management information systems, employee training, and oversight by the boards

of directors of ResCap and GMAC Mortgage.

12.    In addition, on February 9, 2012, ResCap, certain other Debtors, and AFI,

along with several other banks and mortgage servicers, reached an agreement in principle (the

"DOJ/AG Settlement") with the federal government, 49 state attorneys general, and 48 state

banking departments.  The DOJ/AG Settlement resulted from various investigations related to

the procedures followed by mortgage servicing companies and banks, including ResCap and

GMAC Mortgage, in connection with mortgage foreclosure home sales and evictions.[5]

13.    A final agreement with respect to the DOJ/AG Settlement was filed as a

Consent Judgment in the United States District Court for the District of Columbia on March 12,

2012.  The Consent Judgment was approved by that court on April 4, 2012 and entered on

---

[5]    AFI, ResCap and the Debtors separately reached an independent settlement with Oklahoma, which did not
participate in the DOJ/AG Settlement.

April 5, 2012.  Compliance with the DOJ/AG Settlement will be overseen by a court-appointed

monitor.

14.      In addition to certain fixed payments of approximately $110 million made

prior to the Petition Date, ResCap and the other Debtors committed to provide a minimum of

approximately $200 million towards borrower relief with respect to mortgage loans that were not

originated in connection with Ginnie Mae,[6] Freddie Mac or Fannie Mae[7] securitization programs

(collectively, the "Non-GA Loans") and that are owned by Ally Bank.  This commitment for

borrower relief includes loan modifications, such as principal reductions, rate modifications and

refinancing for borrowers that meet certain requirements, and participation in certain other

programs.  The Debtors currently expect that Non-GA Loans with an unpaid principal balance of

approximately $523 million will be modified in connection with these programs, although the

actual amount of modified loans could be significantly different.  The DOJ/AG Settlement

provides incentives for borrower relief that is provided within the first twelve months; all

consumer obligations must be met by March 1, 2015, and are enforceable through September 1,

2015.  On February 9, 2012, AFI and ResCap also agreed with the FRB on a civil money penalty

of $207 million related to the same activities that were the subject of the DOJ/AG Settlement,

---

[6]    As used herein, "Ginnie Mae" means the Government National Mortgage Association.  Ginnie Mae is a federal
corporation within the Department of Housing and Urban Development ("HUD"), a federal agency, that
guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS")
backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration
("FHA") or guaranteed by the Department of Veterans Affairs ("VA") or the Department of Agriculture
("USDA").

[7]    As used herein, "Fannie Mae" means the Federal National Mortgage Association, and "Freddie Mac" means the
Federal Home Loan Mortgage Corporation.  Fannie Mae and Freddie Mac are government-sponsored
enterprises chartered by Congress that securitize or buy mortgage loans originated by mortgage lenders,
enabling them to replenish their funds so that they can make additional loans to other homeowners.
Collectively, Fannie Mae, Freddie Mac, and Ginnie Mae are referred to herein as the "Governmental
Associations."

which amount will be reduced dollar-for-dollar in connection with satisfaction of the required monetary payment and borrower relief obligations included within the DOJ/AG Settlement, as well as through participation in other similar programs approved by the FRB.

15.     Under the DOJ/AG Settlement, the Debtors are required to continue their mortgage loan servicing activities.  In connection therewith, the Debtors are to implement new servicing standards relating to matters such as foreclosure and bankruptcy information and documentation, oversight, loss mitigation, limitations on fees, and related procedural matters. Compliance with these obligations will be overseen by an independent monitor, who will have authority to impose additional significant monetary penalties and fines if the Debtors fail to continue their servicing activities, meet established timelines, or implement required servicing standards.

**B.      The Debtors' Subservicing Activities**

16.     In connection with their mortgage loan origination activities, the Debtors, in their capacities as licensed mortgage brokers, broker loan applications and supporting materials with Ally Bank across a 47 state platform.  Ally Bank then underwrites, originates and funds loans based on the loan application packages.  Ally Bank also acquires loans from other parties as part of its correspondent loan business.  The substantial majority of these loans are pooled and securitized as MBS guaranteed by Fannie Mae, Freddie Mac, or Ginnie Mae (collectively, the "GA Loans") for which the Debtors typically act as loan servicers, including as subservicer for MSRs held by Ally Bank.

17.     As a subservicer, the Debtors perform servicing functions pursuant to contractual arrangements with third parties who hold mortgage servicing rights or mortgage loans, such as the Servicing Agreement with Ally Bank.  Those subservicing functions include collecting and remitting mortgage loan payments, responding to borrower inquiries, accounting

for principal and interest, holding custodial and escrow funds for payment of property taxes,

insurance premiums, and ancillary products, counsel or otherwise working with delinquent

borrowers (including, but not limited to, granting borrowers leniency under certain

circumstances and structuring loan modifications and repayment plans for certain borrowers),

supervising foreclosures and property dispositions, making advances of required principal,

interest, and certain "property protection" costs with respect to delinquent mortgage loans,

reporting and remitting payments due to investors, and generally administering the loans

consistent with their contractual undertakings and business practices.

## C.       The Prior Servicing Agreement

18.       Prior to the Petition Date, GMAC Mortgage and certain of its affiliates

performed subservicing activities for Ally Bank pursuant to a servicing agreement between the

parties dated as of August 21, 2001 (the "Prior Servicing Agreement").

19.       The Prior Servicing Agreement renewed automatically every year unless

either party terminated it on 120 days' advance notice.  The Debtors were advised that the FDIC

would not permit Ally Bank to renew the Prior Servicing Agreement upon its stated expiration

on August 21, 2012, and instead required Ally Bank to solicit bids for the contractual right to

provide subservicing for Ally Bank.[8]  Following a competitive selection process, GMAC

Mortgage was selected as the winning bidder although it was not the lowest bidder.  GMAC

---

[8]    The FDIC is an independent agency charged with maintaining stability and public confidence in the nation's
       financial system by insuring deposits, examining and supervising financial institutions for safety and soundness
       and consumer protection, and managing receiverships.  If the FDIC determines that a financial institution has
       significant deficiencies or has failed to comply with an informal enforcement action, the FDIC is empowered to,
       among other things, issue a cease-and-desist order against the institution or against an individual associated with
       the institution, such as an officer or director.  The FDIC may also assess a fine, remove an officer or director
       from office and permanently bar him or her from the banking industry.

Mortgage was chosen in large part to avoid the disruption of having to move Ally Bank's entire portfolio of MSRs to a new third party provider.

20.    Ally Bank provided notice of termination of the Prior Servicing Agreement on April 19, 2012. Accordingly, the Prior Servicing Agreement will expire pursuant to its terms on August 21, 2012.

## D.    The Servicing Agreement

21.    GMAC Mortgage and Ally Bank entered into the Servicing Agreement on May 11, 2012, which amends and restates the Prior Servicing Agreement. By its terms, the Servicing Agreement will become effective only upon the entry of an order of the Court authorizing the Debtors to operate under the Servicing Agreement. The Servicing Agreement has been amended to incorporate certain requirements under the Consent Order and DOJ/AG Settlement.[9]

22.    The following are the salient terms of the Servicing Agreement:[10]

Term            The initial term of the Servicing Agreement begins on the date the Servicing Agreement is approved by the Bankruptcy Court (the "Effective

---

[9]    The Debtors have requested authority to take such actions and make such disbursements required in order to comply with the Consent Order and the DOJ/AG Settlement pursuant to the *Debtors' Motion For Interim And Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), And 1108 Of The Bankruptcy Code (I) Authorizing The Debtors To Continue In The Ordinary Course Of Business (A) Servicing Governmental Association Loans And (B) Foreclosure Activities Related To Certain Real Estate Owned By Fannie Mae, Freddie Mac, And Ginnie Mae; (II) Authorizing The Debtors To Pay Certain Prepetition Amounts Due To Critical Servicing Vendors And Foreclosure Professionals; (III) Granting Limited Stay Relief To Enable Borrowers To Assert Related Counter-Claims In Foreclosure Proceedings; (IV) Authorizing The Debtors To Use Cash Collateral Under the Fannie Mae EAF Facility And (V) Granting Related Relief*, and the *Debtors' Motion For Interim And Final Orders Under Sections 105(a), 362, 363, 1107(a), And 1108 Of The Bankruptcy Code (I) Authorizing The Debtors To Continue In The Ordinary Course Of Business (A) Servicing Non-GA Loans And (B) Sale Activities Related To Certain Loans In Foreclosure And Real Estate Owned Property; And (II) Granting Limited Stay Relief To Enable Borrowers To Assert Related Counter-Claims In Foreclosure And Eviction Proceedings*, each filed contemporaneously with this Motion.

[10]    Capitalized terms used in the summary and not otherwise defined shall have the meaning ascribed to them in the Servicing Agreement. The contents of this summary are qualified in their entirety by the terms of the Servicing Agreement. In the event of a conflict between this summary and the Servicing Agreement, the Servicing Agreement shall govern.

Date")[11] and continues through the one (1) year anniversary of the Effective Date unless terminated sooner by mutual agreement or otherwise in accordance with the terms of the Servicing Agreement.

Notwithstanding the date upon which the Servicing Agreement was executed or the date of the occurrence of the Effective Date, the Servicing Agreement shall be considered a pre-Petition Date executory contract under section 365 of the Bankruptcy Code and subject to assumption or rejection as set forth therein.

<u>Services</u>

From and after the Effective Date, GMAC Mortgage will service and administer each mortgage loan conforming to specified eligibility criteria and that is subject to the Servicing Agreement, including GA Loans, Non-GA Loans and loans issued under home equity lines of credit (each, a "Mortgage Loan") and each mortgaged property acquired by GMAC Mortgage on behalf of Ally Bank through foreclosure or by deed in lieu of foreclosure ("REO Property"), including, without limitation, handling all mortgagor inquiries and correspondence, payments and payoff funds, and similar matters, as set forth in the Servicing Agreement.

<u>Compensation</u>

Servicing fees in accordance with the Pricing Exhibit, attached as <u>Exhibit 1</u> to the Servicing Agreement.

In addition, Ally Bank will pay Owner Expenses and any other fees as mutually agreed, and will reimburse GMAC Mortgage for Servicing Advances and Advances paid by GMAC Mortgage in accordance with the Servicing Agreement, each payable within no more than ten (10) business days from receipt of a bill from GMAC Mortgage, to the extent such amount cannot be deducted from any Custodial Accounts or deducted from any remittance due to Ally Bank.

<u>Events of Default</u>

Ally Bank "Owner Events of Default" include, but are not limited to, the following:

(a) any failure by Ally Bank to remit to GMAC Mortgage any payment required to be made under the terms of the Servicing Agreement that continues un-remedied for a period of three (3) business days

_____

*(cont'd from previous page)*

[11]    Notwithstanding that the Prior Servicing Agreement does not expire until August 21, 2012, the proposed Effective Date of the Servicing Agreement is the date on which the Court enters an order authorizing the Debtors to perform under the Servicing Agreement; however, by this Motion, the Debtors seek to immediately perform under the Servicing Agreement upon the entry of an interim order and subject to a final hearing.

after receiving notice of such failure; and

(b) the failure by Ally Bank to observe or perform in any material respect any other obligation under the Servicing Agreement that continues un-remedied for a period of sixty (60) days after receiving notice of such failure, subject to extension of the cure period with GMAC Mortgage's consent.

GMAC Mortgage "Servicer Events of Default" include, but are not limited to, the following:

(a) any failure by GMAC Mortgage to remit to Ally Bank any payment required to be made under the terms of the Servicing Agreement that continues un-remedied for a period of three (3) business days after receiving notice of such failure;

(b) the failure by GMAC Mortgage to observe or perform in any material respect any other obligation under the Servicing Agreement that continues un-remedied for a period of sixty (60) days after receiving notice of such failure, subject to extension of the cure period with Ally Bank's consent;

(c) GMAC Mortgage consents to the appointment of a conservator, receiver or liquidator, or a court order authorizing the appointment of a conservator, receiver or liquidator is entered and remains in force for a period of sixty (60) days;

(d) GMAC Mortgage files for bankruptcy and the Servicing Agreement is not approved by this Court on an interim basis within five (5) days;

(e) GMAC Mortgage fails to maintain its license to do business or service residential mortgage loans in any jurisdiction where the Mortgaged Properties are located, which failure continues un-remedied for a period of sixty (60) after GMAC Mortgage receives notice of such failure and such failure has a material and adverse effect on GMAC Mortgage's ability to perform its obligations under the Servicing Agreement;

(f) GMAC Mortgage fails to observe or perform in any material respect, as determined by the FRB, the FDIC, or the Monitor, any of the obligations of GMAC Mortgage set forth in the Consent Order or the DOJ/AG Settlement, which continues un-remedied for a period of sixty (60) days after GMAC Mortgage receives notice of such failure from FRB or FDIC, requiring the same to be remedied, subject to extension of the cure period with Ally Bank's consent;

and

> (g) GMAC Mortgage fails to maintain its status as an approved GA servicer of GA Loans, which continues un-remedied for a period of sixty (60) days after GMAC Mortgage receives notice of such failure from the applicable Governmental Association; provided, that if the applicable GA notifies GMAC Mortgage that its failure to maintain its status cannot be cured within the cure period, no cure period will apply.

<u>Termination</u>    The Servicing Agreement may be terminated in accordance with, but not limited to, the following provisions:

> (a) Ally Bank may terminate, at its sole option, the Servicing Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause, upon one hundred twenty (120) days advance written notice to GMAC Mortgage. If the count of active Mortgage Loans serviced under the Servicing Agreement falls to less than fifty (50) for a period of sixty (60) consecutive days, the Servicing Agreement shall be deemed to have been terminated without cause by Ally Bank, subject to GMAC Mortgage's consent. GMAC Mortgage shall be entitled to receive the Deboarding Fee and the Loan Termination Fee for any termination under this provision.

> (b) GMAC Mortgage may terminate, at its sole option, the Servicing Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause, upon one hundred twenty (120) days advance written notice to Ally Bank. GMAC Mortgage shall not be entitled to receive any fees for a termination under this provision.

> (c) Ally Bank may terminate, at its sole option, the Servicing Agreement with respect to some or all of the Mortgage Loans or REO Property if an Owner Event of Default occurs upon one hundred twenty (120) days advance written notice to GMAC Mortgage. GMAC Mortgage shall be entitled to receive the Deboarding Fee and the Loan Termination Fee for any termination under this provision.

23.    Ally Bank has requested, and the Debtors have agreed, subject to Court approval, that from and after ninety (90) days from the Petition Date, Ally Bank be granted limited relief from the automatic stay, solely to the extent required to provide the 120-day notice

prior to termination of the Servicing Agreement, as required by the Servicing Agreement.[12]  As

noted above, Ally Bank has also requested, subject to Court approval, that it be granted relief

from the automatic stay to permit Ally Bank to provide the 120 day notice required by the

Servicing Agreement to terminate the Servicing Agreement with respect to up to 3,000 loans.

Ally Bank shall be required to seek further relief from the Court to the extent it seeks to

terminate the Servicing Agreement pursuant to any other provision of the Servicing Agreement.

Ally Bank has further requested, and the Debtors have also agreed, that the Debtors will not

move to reject or modify the Servicing Agreement within the first ninety (90) days following the

Petition Date, unless Ally Bank in its sole discretion provides written consent to such

termination.  The Debtors will provide 120 days' prior notice before obtaining any hearing to

consider rejection of the Servicing Agreement, such that the earliest date a hearing could occur is

210 days following the Petition Date.  Finally, the proposed orders include certain additional

events, the occurrence of which would permit Ally Bank to terminate the Servicing Agreement

for cause.[13]  The Debtors submit that such relief is reasonable under the circumstances, and is a

material component of the consideration the Debtors agreed to provide to Ally Bank.

24.     For the avoidance of doubt, by seeking the authority to perform under the

Servicing Agreement, the Debtors are seeking the authority to perform for Ally Bank such

---

[12]   The proposed order agreed to by the parties provides that the Court may hold a hearing before the Termination Date (as such term is defined in the Servicing Agreement); <u>provided</u>, that the sole issue to be decided by the Court shall be whether Ally Bank complied with the termination notice requirements of the Servicing Agreement.

[13]   Such events include, among others, (a) entry by the Court of an order appointing a trustee or an examiner with expanded powers, (b) acceleration of the obligations due under the Debtors' debtor-in-possession credit facility, (c) conversion of any of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (d) the final order approving this Motion not being entered within fifty (50) days of the Petition Date, or (e) the interim order or the final order having been stayed, reversed or otherwise rendered ineffective;

further subservicing activities, as and if necessary in the ordinary course of business, without the need for further order of this Court.

**E.      Entry Into The Servicing Agreement Is An Exercise Of The Debtors' Reasonable Business Judgment**

25.      The mortgage loan origination, servicing and related securitization operations of AFI are an integrated business involving the Debtors and Ally Bank.  The Debtors are seeking the Court's authority to allow ResCap to continue to perform under the Servicing Agreement with Ally Bank so that these services can be continued postpetition to allow for a smooth transition to operating as a debtor in possession, and facilitate the contemplated the Platform Sale.

26.      GMAC Mortgage will receive compensation for its services under the Servicing Agreement in the form of monthly servicing charges and other fees.  The anticipated aggregated monthly fees that will be generated for services provided by GMAC Mortgage to Ally Bank pursuant to the Servicing Agreement are approximately $5.3 million.  The Debtors anticipate that under the Servicing Agreement they will maintain profit margins with respect to their servicing of Ally Bank MSRs in accordance with historical results.  The Debtors are not seeking to pay any prepetition claims through or pursuant to the Servicing Agreement.

27.      The Servicing Agreement provides for lower fee rates than under the Prior Servicing Agreement; however, the Debtors will receive more compensation in total by providing subservicing under the Servicing Agreement through the anticipated termination date of December 31, 2012, rather than only through August under the higher rates provided for in the Prior Servicing Agreement.  Thus it is in the best interest of the Debtors' estates to preserve the right to service the Ally Bank MSRs through their continue performance under the Servicing Agreement.

28.     The Servicing Agreement was negotiated at arms' length over an extended period of time by senior personnel from Ally Bank and GMAC Mortgage with the assistance of independent counsel to each of the parties.

**F.     The Urgent Need For The Servicing Agreement**

29.     As noted above, the effectiveness of the Servicing Agreement is conditioned on the entry of interim and final orders of this Court approving the agreement, substantially in the forms attached hereto as Exhibits A and B.  If the Servicing Agreement is not approved, the Debtors will be forced to begin making arrangements to transfer servicing for approximately 690,000 loans to another servicer by August, which will cause substantial disruption to the Debtors' estates.

30.     Specifically, as described above, the Debtors' and Ally Bank's loan origination and securitization businesses are integrated.  If the Debtors are not authorized to continue performing subservicing activities for Ally Bank, thereby generating subservicing fees, there will be immediate disruption of the Debtors' operations which would, in all likelihood, significantly diminish the value of the Debtors' estates and impede the Debtors' ability to consummate any going concern sale with a buyer.  Thus, it is essential to the Debtors' day-to-day operations and their business model that Ally Bank and its affiliates are able to continue to rely upon and have the benefits of the services historically performed by GMAC Mortgage.  Any material disruption to Ally Bank's operations caused by GMAC Mortgage's failure to provide services would necessarily disrupt the Debtors' operations to the detriment of the Debtors and their creditors.

## APPLICABLE AUTHORITY

**A.    The Servicing Agreement Has A Sound Business Purpose And The Debtors Should Be Authorized To Continue Their Performance Thereunder Pursuant To Sections 363(c)(1) And 105(a) Of The Bankruptcy Code**

31.    The relief requested in this Motion relates solely to the continued ordinary course conduct of the Debtors' business within the meaning of section 363(c)(1) of the Bankruptcy Code.  Nonetheless, the relief requested herein is essential to provide comfort to those doing business with the Debtors.  Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business.  See 11 U.S.C. § 363(c).  Section 363(c) of the Bankruptcy Code, in relevant part, provides:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing. . . .

11 U.S.C. § 363(c)(1).

32.    The ordinary course of business standard was intended to allow a debtor in possession the flexibility required to run its business and respond quickly to changes in the business environment.  Moore v. Brewer (In re HMH Motor Servs., Inc.), 259 B.R. 440, 448-49 (Bankr. S.D. Ga. 2000).  A debtor in possession, thus, may use, sell or lease property of the estate without need for prior court approval if the transaction is in the ordinary course.  Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate property do not require a prior hearing); Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 394 (S.D.N.Y. 1983) (holding that where a debtor in

possession is merely exercising the privileges of his status, there is no general right to notice and

hearing concerning particular transactions conducted in the ordinary course of the business).

33.    Courts broadly interpret the term ordinary course.  Gassen v. Universal

Bldg. Materials, Inc. (In re Berkley Multi-Units, Inc.), 88 B.R 394, 396 (Bankr. M.D. Fla. 1988).

In determining whether a transaction is in the ordinary course of business under Bankruptcy

Code section 363, the courts apply a two-pronged test: (1) the objective horizontal test, and (2)

the subjective vertical test.  See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d

379, 384-85 (2d Cir. 1997); see also In re Dana Corp., 358 B.R. 567, 580 (Bankr. S.D.N.Y.

2006) (and cases cited therein); In re The Leslie Fay Cos.,168 B.R. 294, 304 (Bankr. S.D.N.Y.

1994).  The horizontal test is a factual analysis as to whether the transaction in question is of the

sort commonly undertaken by companies in that industry.  In re Lavigne, 114 F.3d at 385.  That

is, the horizontal test focuses on whether the transaction is usual or abnormal for the industry.

The vertical test, which is also called the creditor's expectation test, is an analysis conducted

from the perspective of a hypothetical creditor and analyzes whether the transaction subjects the

creditor to an economic risk of a nature different from those it accepted when it decided to

extend credit.  Id.; In re The Leslie Fay Cos.,168 B.R. at 304.  In making this determination,

courts look to the debtor's pre-petition business practices and conduct and compare them to the

debtor's postpetition conduct.  In re The Leslie Fay Cos.,168 B.R. at 304.

34.    Here, the activities for which the Debtors seek authority to continue satisfy

both the horizontal and vertical tests.  The horizontal test is easily met.  The continuation of the

Debtors' subservicing activities with respect to MSRs and mortgage loans held by Ally Bank

represents an essential component in continuing the Debtors' business as it was conducted prior

to the Petition Date.  These services are typically performed by similarly situated mortgage loan

servicers in the mortgage lending and securitization industries.  Likewise, a hypothetical creditor

should expect that the Debtors, in their capacity as loan servicer, would be parties to various

agreements that require them to engage in the various activities described in this Motion.

Granting the relief requested herein would not subject creditors to economic risks that would not

have been contemplated by them.  Therefore, the vertical test is also satisfied.  See Burlington N.

R.R. Co. v. Dant & Russell (In re Dant & Russell, Inc.), 853 F.2d 700, 705 (9th Cir. 1988)

(debtor's renewal and execution of leases satisfied vertical test because debtor routinely entered

into leases prior to bankruptcy); In re Johns-Manville Corp., 60 B.R. at 616 (debtor's

employment of lobbyists satisfied both vertical and horizontal tests because debtor had been

retaining lobbyists for many years and because it was common practice of other major

companies to do so).

        35.        Additionally, under Bankruptcy Code section 105(a), this Court "may

issue any order "[t]hat is necessary or appropriate to carry out the provisions of" the Bankruptcy

Code.  11 U.S.C. § 105(a).  Courts in this Circuit have consistently held that a debtor may use,

sell or lease property of the estate where a sound business purpose justifies such actions.

Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.), 600 F.3d 231, 248 n.8 (2d

Cir. 2010); Comm. of Equity Sec. Holders v. Lionel Corp. (In re The Lionel Corp.); 722 F.2d

1063, 1070 (2d Cir. 1983); In re Borders Group, Inc., 453 B.R. 459, 473 (Bankr. S.D.N.Y.

2011); In re Boston Generating, LLC, 440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010).  Specifically,

once a debtor articulates a valid business justification for a particular form of relief, the court

reviews the debtor's request under the "business judgment rule."  "The business judgment rule

'is a presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van

Gorkom, 488 A.2d 858, 872 (Del. 1985)); In re Quigley Co., 437 B.R. 102, 156-57 (Bankr.

S.D.N.Y. 2010). "Courts are loath to interfere with corporate decisions absent a showing of bad

faith, self-interest, or gross negligence." In re Quigley Co., 437 B.R. at 157 (quoting In re

Integrated Res., Inc., 147 B.R. at 656). Consequently, a debtor's business decision "should be

approved by the court unless it is shown to be so manifestly unreasonable that it could not be

based upon sound business judgment, but only on bad faith, or whim or caprice." In re Aerovox,

Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal quotations omitted); cf. In re Global

Grossing Ltd., 295 B.R. 726, 742 (Bankr. S.D.N.Y. 2003).

36. The decision to continue providing services under the Servicing

Agreement is in the sound business judgment of the Debtors because it ensures that the Debtors

will be able to maintain their subservicing operations with Ally Bank. In tandem with the other

relief requested by the Debtors, the relief requested herein will permit the Debtors to maintain

the value of their servicing platform and facilitate the Platform Sale.

37. As discussed above, the Servicing Agreement was negotiated at arms'

length and the nature of services to be provided by the Debtors pursuant to the Servicing

Agreement are consistent with those provided prior to the Petition Date. Likewise, the Debtors

submit that the pricing terms in the Servicing Agreement were heavily negotiated and reasonably

calculated

38. In light the foregoing, the Debtors submit that they have demonstrated

more than a sound business justification to continue to perform under the Servicing Agreement

and request authorization, pursuant to Bankruptcy Code section 363(c)(1), to continue

performing thereunder.  Allowing the Debtors to provide services under the Servicing
Agreement without interruption is absolutely necessary to preserve, enhance and maximize the
value of the Debtors' estates and is in the best interests of the Debtors, their creditors, and all
other parties in interest.  Accordingly, the Debtors submit that continuing to perform under the
Servicing Agreement and consenting to the limited relief from the automatic stay pursuant to
section 362 of the Bankruptcy Code as set forth above represents an exercise of their sound
business judgment.

**B.    Request For Immediate Relief And Waiver Of Stay**

     39.    Bankruptcy Rule 6003 generally precludes the Court from authorizing
certain relief until twenty-one days after the petition is filed, except to the extent necessary to
prevent "immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  The Debtors submit that
Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the
interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to
the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief
requested in this Motion be entered on an interim basis.

     40.    To successfully implement the foregoing, the Debtors seek a waiver of the
notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy
Rule 6004(h).

**SCOPE OF MOTION**

     41.    This Motion is limited to the Servicing Agreement between GMAC
Mortgage and Ally Bank and the associated services provided by GMAC Mortgage to Ally Bank
thereunder.  The Motion does not cover all aspects of the Debtors' transactions with Ally Bank
or other affiliates.  Other ordinary course agreements and payment arrangements exist between
and among the Debtors and their non-debtor affiliates, including, without limitation, those that

are disclosed in publicly available filings with the Securities and Exchange Commission and

other regulatory bodies.  Whether or not a particular transaction with an affiliate is described in

the Servicing Agreement or this Motion, and whether or not the Debtors seek an order with

respect to the continuation of such transaction, the Debtors intend to continue ordinary course

transactions with affiliates after the Petition Date pursuant to the authority granted to them by

Bankruptcy Code section 363(c).  By this Motion, the Debtors do not believe that any of the

relief sought herein limits their right to conduct other transactions with Debtor and non-debtor

affiliates in the ordinary course of business without prior Court approval.  By this motion, the

Debtors are not seeking to assume the Servicing Agreement under Bankruptcy Code section 365

and the Debtors expressly reserve all rights to seek to assume or reject the Servicing Agreement

consistent with the provisions of the interim and final orders.

### NOTICE

42.    Notice of this Motion will be given to the following parties, or in lieu

thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of

New York; (b) the office of the United States Attorney General; (c) the office of the New York

Attorney General; (d) the office of the United States Attorney for the Southern District of New

York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of

the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees

for the Debtors' outstanding notes issuances; (i) Ally Financial, Inc. and its counsel; (j) Barclays

Bank PLC and its counsel; (k) Nationstar Mortgage LLC and its counsel; and (l) the parties

included on the Debtors' list of fifty (50) largest unsecured creditors (collectively, the "Initial

Notice Parties").  The Debtors submit that, in view of the facts and circumstances, such notice is

sufficient and no other or further notice need be provided.

43.     Within two (2) days after entry of an interim order, the Debtors propose to serve a copy of the Motion and the interim order upon the Initial Notice Parties.  The Debtors request that the Court schedule the final hearing on the Motion for a date that is as soon as practicable, but in no event later than forty-five (45) days following the entry of the interim order, and establish the date prior to the final hearing for parties to file objections to the Motion.

44.     Any objections to the relief requested in the Motion must be filed with the Clerk of the Bankruptcy Court and served upon and received by: (a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104 (Attn: Larren Nashelsky, Gary Lee, and Todd Goren); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the office of the United States Attorney General; (d) the office of the New York Attorney General; (e) the office of the United States Attorney for the Southern District of New York; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) each of the Debtors' prepetition lenders, or their agents, if applicable; (i) each of the indenture trustees for the Debtors' outstanding notes issuances; (j) counsel for Ally Financial Inc., Kirkland & Ellis, LLP, Citigroup Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M. Cieri, Ray C. Schrock, and Stephen E. Hessler); (k) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman (Ken.Ziman@skadden.com) and Jonathan H. Hofer (jhofer@skadden.com)); (l) Nationstar Mortgage LLC and its counsel; and (m) the parties included on the Debtors' list of fifty (50) largest unsecured creditors, before the date of

the final hearing as scheduled by the Court.  If no objections are filed to the Motion, the Court

may enter the order without further notice or hearing.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an

interim order substantially in the form attached hereto as <u>Exhibit A</u>, granting certain of the relief

sought herein immediately; (ii) enter a final order substantially in the form attached hereto as

<u>Exhibit B</u>, granting the relief sought herein on a final basis; and (iii) grant such other and further

relief to the Debtors as the Court may deem just and proper.

Dated:  May 14, 2012
   New York, New York

           <u>*/s/*   Larren M. Nashelsky</u>
           Larren M. Nashelsky
           Gary S. Lee
           Norman S. Rosenbaum
           MORRISON & FOERSTER LLP
           1290 Avenue of the Americas
           New York, New York 10104
           Telephone: (212) 468-8000
           Facsimile: (212) 468-7900

           *Proposed Counsel for the Debtors and*
           *Debtors in Possession*

## Exhibit A

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Case No. 12-_____ (___) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### INTERIM ORDER PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO CONTINUE TO PERFORM UNDER THE ALLY BANK SERVICING AGREEMENT IN THE ORDINARY COURSE OF BUSINESS

Upon the motion (the "Motion") of Residential Capital, LLC ("ResCap") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") authorizing the Debtors to continue to perform under the Servicing Agreement pursuant to the terms of this Order (the "Order")[1]; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion will benefit the Debtors' estates, their creditors and all other parties in interest; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and upon the arguments and testimony presented at the hearing before the Court, and any objections to the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

Motion having been withdrawn, resolved, or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is **ORDERED** that:

1.      The Motion is granted on an interim basis to the extent provided herein.

2.      The Debtors are authorized and directed to continue to perform under the terms of the Servicing Agreement pursuant to sections 105(a) and 363(c) of the Bankruptcy Code until the Servicing Agreement is terminated under its own terms or pursuant to the terms of this Order, or the Debtors have obtained a Court order rejecting the Agreement in accordance with the provisions set forth herein.

3.      From and after (a) the Petition Date, Ally Bank shall be granted limited relief from the automatic stay solely to the extent required to provide the 120-day notice required pursuant to Section 11.01(b) of the Servicing Agreement to terminate the Servicing Agreement with respect to no more than 3,000 Mortgage Loans (as defined in the Servicing Agreement) in the aggregate; and (b) 90 days after the Petition Date, Ally Bank shall be granted limited relief from the automatic stay solely to the extent required to provide the 120-day notice required pursuant to Section 11.01(b) of the Servicing Agreement; provided, that (i) Ally Bank shall file the notice of termination contemplated in Section 11.01(b) of the Servicing Agreement with the Court no later than five business days after providing it to the Debtors, should the Debtors object to Ally Bank invoking the termination rights under Section 11.01(b) of the Servicing Agreement, the Court may hold a hearing before the Termination Date (as such term is defined in the Servicing Agreement); provided, that the sole issue to be decided by the Court shall be whether Ally Bank complied with the notice requirements set forth in Section 11.01(b), as modified herein, and (ii) Ally Bank shall be required to seek further relief from the Court to the extent it

3

seeks to terminate the Servicing Agreement pursuant to any other provision of the Servicing Agreement.

4.      Notwithstanding the date upon which the Servicing Agreement was executed or the date of the occurrence of the "Effective Date" as such term is defined in the Servicing Agreement, the Servicing Agreement shall be considered a pre-Petition Date executory contract under Bankruptcy Code section 365 and subject to assumption or rejection as further set forth herein.

5.      Notwithstanding any provision in the Servicing Agreement, the Debtors may not terminate or otherwise move to reject or modify the Servicing Agreement in the first 90 days following the Petition Date, unless Ally Bank in its sole discretion provides written consent to such termination.

6.      Notwithstanding any provision in the Servicing Agreement or this Order to the contrary, Ally Bank may immediately terminate the Servicing Agreement without further relief from the Court upon (a) entry by the Court of an order appointing a trustee or an examiner with expanded powers, (b) acceleration of the obligations due under the Debtors' debtor-in-possession credit facility, (c) conversion of any of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (d) the failure of the final order attached to the Motion as Exhibit B (the "Final Order") to be entered by the Court within fifty (50) days of the Petition Date, or (e) either this Order or the Final Order having been stayed, reversed or otherwise rendered ineffective; provided, that if Ally Bank terminates the Servicing Agreement pursuant to this paragraph 6, notwithstanding any provision in the Servicing Agreement to the contrary, the Debtors shall not be entitled to any Loan Termination Fees (as such term is defined in the Servicing Agreement).

4

7.      In the event that Ally Bank properly invokes the termination rights set forth in

Section 11.01(b) of the Servicing Agreement or as set forth in this Order, the Debtors shall take

all reasonable actions in accordance with the Servicing Agreement to allow Ally Bank to move

the servicing at Ally Bank's direction as provided for under the Servicing Agreement, and Ally

Bank may take all reasonable actions necessary to allow Ally Bank to terminate the Servicing

Agreement and provide for the orderly transfer of servicing to a new servicing provider without

seeking further relief.

8.      Notwithstanding any provision in the Servicing Agreement, the Bankruptcy Code,

or other orders of this Court to the contrary, the Debtors shall be required to provide 120-days

prior written notice to Ally Bank and to the Notice Parties (as defined below) before obtaining

any hearing before the Court where the Court considers relief seeking rejection or modification

of the Servicing Agreement pursuant to section 365 of the Bankruptcy Code or otherwise.  For

the avoidance of doubt, the earliest date such a hearing could occur is 210 days following the

Petition Date.

9.      Notwithstanding any provision in the Servicing Agreement or the Bankruptcy

Code, including under section 365 of the Bankruptcy Code, to the contrary, the Debtors may,

without the consent of Ally Bank, assign the Servicing Agreement only to an Eligible Servicer

(as such term is defined in the Servicing Agreement) as to whom Ally Bank's engagement as a

subservicer under the Servicing Agreement for the Agency Loans (as such term is defined in the

Servicing Agreement) has been approved by the applicable Agencies (as such term is defined in

the Servicing Agreement).

10.     Notwithstanding any provision in the Servicing Agreement to the contrary, if the

servicing provided for under the Servicing Agreement is transferred pursuant to the confirmation

5

of chapter 11 plan(s) or sale of substantially all of the Debtors' assets in these chapter 11 cases, the Debtors shall not be entitled to any Deboarding Fees or Loan Termination Fees (each as defined in the Servicing Agreement).

11.     Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012 and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates (excluding ResCap and its subsidiaries).

12.     Any objections or responses to entry of the proposed final order shall be filed on or before _____, 2012 at __:__ a.m./p.m. (Eastern Time) (the "Objection Deadline") and served on the following parties:  (a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104 (Attn:  Larren Nashelsky, Gary Lee, and Todd Goren); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn:  Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the office of the United States Attorney General; (d) the office of the New York Attorney General; (e) the office of the United States Attorney for the Southern District of New York; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) each of the Debtors' prepetition lenders, or their agents, if applicable; (i) each

6

of the indenture trustees for the Debtors' outstanding notes issuances; (j) counsel for Ally Financial Inc., Kirkland & Ellis, LLP, Citigroup Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M. Cieri, Ray C. Schrock, and Stephen E. Hessler); (k) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman (Ken.Ziman@skadden.com) and Jonathan H. Hofer (jhofer@skadden.com)); (l) Nationstar Mortgage LLC and its counsel; and (m) the parties included on the Debtors' list of fifty (50) largest unsecured creditors (collectively, the "Notice Parties").

13.     If an objection is timely filed and served so as to be received on or before the Objection Deadline, such objection shall be set for hearing on _____, 2012 at __:__ a.m./p.m. (Eastern Time) (the "Final Hearing").  This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an objection.

14.     In the event that no objection to the Motion or this Order is timely filed and served, then the Court shall enter the final order attached to the Motion as <u>Exhibit B</u> without need for the Final Hearing and without further notice to any party.

15.     The relief granted herein shall be binding upon any chapter 11 trustee appointed in these chapter 11 cases and upon any chapter 7 trustee appointed in the event of a subsequent conversion of these chapter 11 cases to cases under chapter 7.

16.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

*[Remainder of page intentionally left blank.]*

17.     The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

New York, New York
Date: _____, 2012                    _____

                                                      Honorable _____
                                                      United States Bankruptcy Judge

## **Exhibit B**

**Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Case No. 12-_____ (___) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### FINAL ORDER PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO CONTINUE TO PERFORM UNDER THE ALLY BANK SERVICING AGREEMENT IN THE ORDINARY COURSE OF BUSINESS

Upon the motion (the "Motion") of Residential Capital, LLC ("ResCap") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") authorizing the Debtors to continue to perform under the Servicing Agreement pursuant to the terms of this Order (the "Order")[1]; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion will benefit the Debtors' estates, their creditors and all other parties in interest; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and upon the arguments and testimony presented at the hearing before the Court, and any objections to the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

Motion having been withdrawn, resolved, or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is **ORDERED** that:

1.      The Motion is granted on a final basis to the extent provided herein.

2.      The Debtors are authorized and directed to continue to perform under the terms of the Servicing Agreement pursuant to sections 105(a) and 363(c) of the Bankruptcy Code until the Servicing Agreement is terminated under its own terms or pursuant to the terms of this Order, or the Debtors have obtained a Court order rejecting the Agreement in accordance with the provisions set forth herein.

3.      From and after (a) the Petition Date, Ally Bank shall be granted limited relief from the automatic stay solely to the extent required to provide the 120-day notice required pursuant to Section 11.01(b) of the Servicing Agreement to terminate the Servicing Agreement with respect to no more than 3,000 Mortgage Loans (as defined in the Servicing Agreement) in the aggregate; and (b) 90 days after the Petition Date, Ally Bank shall be granted limited relief from the automatic stay solely to the extent required to provide the 120-day notice required pursuant to Section 11.01(b) of the Servicing Agreement; provided, that (i) Ally Bank shall file the notice of termination contemplated in Section 11.01(b) of the Servicing Agreement with the Court no later than five business days after providing it to the Debtors, should the Debtors object to Ally Bank invoking the termination rights under Section 11.01(b) of the Servicing Agreement, the Court may hold a hearing before the Termination Date (as such term is defined in the Servicing Agreement); provided, that the sole issue to be decided by the Court shall be whether Ally Bank complied with the notice requirements set forth in Section 11.01(b), as modified herein, and (ii) Ally Bank shall be required to seek further relief from the Court to the extent it

2

seeks to terminate the Servicing Agreement pursuant to any other provision of the Servicing Agreement.

4.     Notwithstanding the date upon which the Servicing Agreement was executed or the date of the occurrence of the "Effective Date" as such term is defined in the Servicing Agreement, the Servicing Agreement shall be considered a pre-Petition Date executory contract under Bankruptcy Code section 365 and subject to assumption or rejection as further set forth herein.

5.     Notwithstanding any provision in the Servicing Agreement, the Debtors may not terminate or otherwise move to reject or modify the Servicing Agreement in the first 90 days following the Petition Date, unless Ally Bank in its sole discretion provides written consent to such termination.

6.     Notwithstanding any provision in the Servicing Agreement or this Order to the contrary, Ally Bank may immediately terminate the Servicing Agreement without further relief from the Court upon (a) entry by the Court of an order appointing a trustee or an examiner with expanded powers, (b) acceleration of the obligations due under the Debtors' debtor-in-possession credit facility, (c) conversion of any of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (d) this Order having been stayed, reversed or otherwise rendered ineffective; provided, that if Ally Bank terminates the Servicing Agreement pursuant to this paragraph 6, notwithstanding any provision in the Servicing Agreement to the contrary, the Debtors shall not be entitled to any Loan Termination Fees (as such term is defined in the Servicing Agreement).

7.     In the event that Ally Bank properly invokes the termination rights set forth in Section 11.01(b) of the Servicing Agreement or as set forth in this Order, the Debtors shall take

ny-1025404

all reasonable actions in accordance with the Servicing Agreement to allow Ally Bank to move the servicing at Ally Bank's direction as provided for under the Servicing Agreement, and Ally Bank may take all reasonable actions necessary to allow Ally Bank to terminate the Servicing Agreement and provide for the orderly transfer of servicing to a new servicing provider without seeking further relief.

8.    Notwithstanding any provision in the Servicing Agreement, the Bankruptcy Code, or other orders of this Court to the contrary, the Debtors shall be required to provide 120-days prior written notice to Ally Bank and to the Notice Parties before obtaining any hearing before the Court where the Court considers relief seeking rejection or modification of the Servicing Agreement pursuant to section 365 of the Bankruptcy Code or otherwise.  For the avoidance of doubt, the earliest date such a hearing could occur is 210 days following the Petition Date.

9.    Notwithstanding any provision in the Servicing Agreement or the Bankruptcy Code, including under section 365 of the Bankruptcy Code, to the contrary, the Debtors may, without the consent of Ally Bank, assign the Servicing Agreement only to an Eligible Servicer (as such term is defined in the Servicing Agreement) as to whom Ally Bank's engagement as a subservicer under the Servicing Agreement for the Agency Loans (as such term is defined in the Servicing Agreement) has been approved by the applicable Agencies (as such term is defined in the Servicing Agreement).

10.    Notwithstanding any provision in the Servicing Agreement to the contrary, if the servicing provided for under the Servicing Agreement is transferred pursuant to the confirmation of chapter 11 plan(s) or sale of substantially all of the Debtors' assets in these chapter 11 cases, the Debtors shall not be entitled to any Deboarding Fees or Loan Termination Fees (each as defined in the Servicing Agreement).

4

11.    Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012 and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates (excluding ResCap and its subsidiaries).

12.    The relief granted herein shall be binding upon any chapter 11 trustee appointed in these chapter 11 cases and upon any chapter 7 trustee appointed in the event of a subsequent conversion of these chapter 11 cases to cases under chapter 7.

13.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

14.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Date: _____, 2012

_____
Honorable _____
United States Bankruptcy Judge

**EXHIBIT C**

FINAL EXECUTION COPY

## AMENDED AND RESTATED SERVICING AGREEMENT
by and between


ALLY BANK
Owner


and


GMAC MORTGAGE, LLC
Servicer


Dated as of May 11, 2012

AMENDED AND RESTATED SERVICING AGREEMENT
BY AND BETWEEN ALLY BANK AND GMAC MORTGAGE, LLC                    MAY 11, 2012

## ARTICLE I. DEFINITIONS ................................................................................ 2

SECTION 1.01.   DEFINITIONS. ...............................................................................2
SECTION 1.02.   CONSTRUCTION ...........................................................................12

## ARTICLE II. SERVICING........................................................................................ 13

SECTION 2.01.   SERVICER TO ACT AS SERVICER. ................................................13
SECTION 2.02.   LIQUIDATION OF MORTGAGE LOANS ...........................................18
SECTION 2.03.   COLLECTION OF MORTGAGE LOAN PAYMENTS ...........................19
SECTION 2.04.   ESTABLISHMENT OF AND DEPOSITS TO CUSTODIAL ACCOUNT .......20
SECTION 2.05.   PERMITTED WITHDRAWALS FROM CUSTODIAL ACCOUNT ...............21
SECTION 2.06.   ESTABLISHMENT OF AND DEPOSITS TO ESCROW ACCOUNT............22
SECTION 2.07.   PERMITTED WITHDRAWALS FROM ESCROW ACCOUNT .....................23
SECTION 2.08.   PAYMENT OF ESCROW ITEMS AND OTHER CHARGES ......................24
SECTION 2.09.   ESTABLISHMENT AND PROTECTION OF ACCOUNTS...........................25
SECTION 2.10.   MAINTENANCE OF HAZARD AND FLOOD INSURANCE .......................25
SECTION 2.11.   MAINTENANCE OF BLANKET HAZARD INSURANCE COVERAGE .........27
SECTION 2.12.   MAINTENANCE OF FIDELITY BOND AND ERRORS AND OMISSIONS INSURANCE ..........27
SECTION 2.13.   INSPECTIONS.................................................................................27
SECTION 2.14.   RESTORATION OF MORTGAGED PROPERTY.......................................27
SECTION 2.15.   TITLE, MANAGEMENT AND DISPOSITION OF REO PROPERTY .............28
SECTION 2.16.   SERVICING ADVANCES WITH RESPECT TO REO PROPERTY ..............28
SECTION 2.17.   NOTIFICATION OF ADJUSTMENTS ...................................................29
SECTION 2.18.   MAINTENANCE OF PMI POLICIES ...................................................29
SECTION 2.19.   SERVICING CHANGES.....................................................................30
SECTION 2.20.   PREPAYMENT CHARGES .................................................................31
SECTION 2.21.   CREDIT REPORTING .......................................................................31
SECTION 2.22.   SAFEGUARDING CUSTOMER INFORMATION ......................................31

## ARTICLE III. REMITTANCES AND STATEMENTS ................................................ 32

SECTION 3.01.   REMITTANCES FOR MORTGAGE LOANS THAT ARE NOT HELOC LOANS.......32
SECTION 3.02.   REMITTANCES FOR HELOC LOANS3.................................................32
SECTION 3.03.   REMITTANCE FOR AGENCY LOANS ..................................................33
SECTION 3.04.   RECONCILIATION OF SERVICING ADVANCES .....................................33
SECTION 3.05.   STATEMENTS TO OWNER ................................................................34
SECTION 3.06.   INTERNAL REVENUE SERVICE REPORTS ...........................................34
SECTION 3.07.   NO PRINCIPAL & INTEREST ADVANCES ...........................................34
SECTION 3.08.   ODD DUE DATES ..........................................................................35

## ARTICLE IV. ADDITIONAL SERVICING PROCEDURES............................................ 35

SECTION 4.01.   TRANSFERS OF MORTGAGED PROPERTY ...........................................35
SECTION 4.02.   SATISFACTION OF MORTGAGES UPON PAYMENT IN FULL .................36
SECTION 4.03.   SERVICING COMPENSATION AND OWNER EXPENSES ..........................36
SECTION 4.04.   POSSESSION OF MORTGAGE FILES ...................................................37
SECTION 4.05.   RIGHT TO EXAMINE SERVICER RECORDS; COOPERATION WITH OWNER'S CONSENT ORDER
INITIATIVES AND ESTABLISHMENT OF SERVICE LEVELS ..............................................37
SECTION 4.06.   LOSSES AND EXPENSES ..................................................................38
SECTION 4.07.   REPURCHASE REQUESTS .................................................................39

## ARTICLE V. COMPLIANCE AND CONFIDENTIALITY  INTELLECTUAL
PROPERTY........................................................................................................... 39

SECTION 5.01.   ANNUAL STATEMENT AS TO COMPLIANCE ......................................39
SECTION 5.02.   ANNUAL INDEPENDENT PUBLIC ACCOUNTANTS' SERVICING REPORT..........40
SECTION 5.03.   COMPLIANCE WITH GRAMM-LEACH BLILEY ACT OF 1999 .................40

ii

SECTION 5.04.    DATA SECURITY; BREACH OF SECURITY .......................................................40
SECTION 5.05.    CONFIDENTIALITY OF INFORMATION ...........................................................40
SECTION 5.06.    INTELLECTUAL PROPERTY ...........................................................................43
SECTION 5.07.    COMPLIANCE WITH MERS ...........................................................................43
SECTION 5.08.    ELIGIBLE SERVICER .....................................................................................43

**ARTICLE VI. REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER**
................................................................................................................................. **43**

SECTION 6.01.    ORGANIZATION AND GOOD STANDING ..........................................................44
SECTION 6.02.    ORDINARY COURSE OF BUSINESS ..................................................................44
SECTION 6.03.    NO VIOLATIONS ...........................................................................................44
SECTION 6.04.    ABILITY TO PERFORM ...................................................................................44
SECTION 6.05.    LITIGATION ..................................................................................................44
SECTION 6.06.    NO CONSENT REQUIRED ...............................................................................45
SECTION 6.07.    OWNERSHIP ..................................................................................................45
SECTION 6.08.    ACCURACY ...................................................................................................45
SECTION 6.09.    NO HIGH COST LOANS ..................................................................................45
SECTION 6.10.    COMPLIANCE WITH LAW ...............................................................................45
SECTION 6.11.    DISCLAIMER .................................................................................................45

**ARTICLE VII. REPRESENTATIONS AND WARRANTIES OF SERVICER.................. 45**

SECTION 7.01.    ORGANIZATION AND GOOD STANDING ..........................................................46
SECTION 7.02.    ORDINARY COURSE OF BUSINESS ..................................................................46
SECTION 7.03.    NO VIOLATION .............................................................................................46
SECTION 7.04.    ABILITY TO PERFORM ...................................................................................46
SECTION 7.05.    ABILITY TO SERVICE ....................................................................................46
SECTION 7.06.    LITIGATION ..................................................................................................47
SECTION 7.07.    NO CONSENT REQUIRED ...............................................................................47
SECTION 7.08.    ARMS LENGTH TERMS ..................................................................................47
SECTION 7.09.    COMPLIANCE WITH LAW ...............................................................................47
SECTION 7.10.    ELIGIBLE SERVICER .....................................................................................47
SECTION 7.11.    MERS .........................................................................................................47
SECTION 7.12.    DISCLAIMER .................................................................................................48

**ARTICLE VIII. OWNER DEFAULT ........................................................................ 48**

SECTION 8.01.    OWNER EVENTS OF DEFAULT. ......................................................................48

**ARTICLE IX. SERVICER DEFAULT ....................................................................... 49**

SECTION 9.01.    SERVICER EVENTS OF DEFAULT ...................................................................49

**ARTICLE X. INDEMNIFICATION AND ASSIGNMENT ........................................... 51**

SECTION 10.01.    INDEMNIFICATION .......................................................................................51
SECTION 10.02.    LIMITATION ON LIABILITY OF SERVICER AND OTHERS ..................................54
SECTION 10.03.    OPERATION OF INDEMNITIES ........................................................................54
SECTION 10.04.    LIMITATION ON ASSIGNMENT BY THE SERVICER ...........................................54
SECTION 10.05.    ASSIGNMENT BY OWNER ..............................................................................55
SECTION 10.06.    CORPORATE EXISTENCE; MERGER OR CONSOLIDATION OF THE SERVICER ................55
SECTION 10.07.    COOPERATION OF SERVICER WITH AN AGENCY TRANSFER ..............................55
SECTION 10.08.    RECONSTITUTION .........................................................................................57

**ARTICLE XI. TERMINATION ................................................................................ 58**

SECTION 11.01.    TERMINATION ..............................................................................................58
SECTION 11.02.    TRANSFER PROCEDURES ..............................................................................60

## ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................. 61

SECTION 12.01.    NOTICES.................................................................................................61
SECTION 12.02.    WAIVERS ................................................................................................63
SECTION 12.03.    ENTIRE AGREEMENT; AMENDMENT .......................................................63
SECTION 12.04.    COUNTERPARTS; BINDING EFFECT ........................................................63
SECTION 12.05.    NO-HIRE ................................................................................................63
SECTION 12.06.    HEADINGS ..............................................................................................64
SECTION 12.07.    GOVERNING LAW ....................................................................................64
SECTION 12.08.    RELATIONSHIP OF PARTIES ...................................................................64
SECTION 12.09.    SEVERABILITY OF PROVISIONS...............................................................64
SECTION 12.10.    RECORDATION OF ASSIGNMENTS OF MORTGAGE......................................64
SECTION 12.11.    EXHIBITS ................................................................................................64
SECTION 12.12.    FINANCIALS ............................................................................................65
SECTION 12.13.    NO SOLICITATION ..................................................................................65
SECTION 12.14.    FORCE MAJEURE ....................................................................................65
SECTION 12.15.    WAIVER OF TRIAL BY JURY ...................................................................66
SECTION 12.16.    LIMITATION OF DAMAGES......................................................................66
SECTION 12.17.    SURVIVAL ...............................................................................................66

## EXHIBITS

EXHIBIT 1        PRICING EXHIBIT
EXHIBIT 2        MORTGAGE LOAN DOCUMENTS
EXHIBIT 3        ELIGIBILITY CRITERIA
EXHIBIT 4 A      LOSS MITIGATION AND SERVICING DELEGATED AUTHORITY MATRIX (FOR PORTFOLIO LOANS
                 A/K/A STANDARD MATRIX)
EXHIBIT 4 B      LOSS MITIGATION AND SERVICING DELEGATED AUTHORITY MATRIX (RELATING TO THE
                 SETTLEMENT AGREEMENT - A/K/A AG MENU)
EXHIBIT 5        FORM OF TRANSFER INSTRUCTIONS
EXHIBIT 6        LIST OF VENDORS AND SERVICE PROVIDERS
EXHIBIT 7        ADDITIONAL TERMS AND CONDITIONS, INCLUDING ATTACHMENT 1: CONSUMER  COMPLIANCE
EXHIBIT 8        SERVICER LITIGATION AND COMPLIANCE MATTERS
EXHIBIT 9        CONTINUATION ORDER
EXHIBIT 10        FORM OF MONTHLY REPORT

iv

# AMENDED AND RESTATED SERVICING AGREEMENT

This Amended and Restated Servicing Agreement ("Agreement") is entered into as of May 7, 2012, (but is effective as of the Effective Date defined below) by and among GMAC MORTGAGE, LLC, a Delaware limited liability company (the "Servicer") and ALLY BANK, a Utah Bank (the "Owner").  The Servicer and the Owner may be referred to herein as a "Party" or collectively as the "Parties.

WHEREAS, the Owner has purchased or originated and expects in the future to purchase or originate residential, first lien mortgage loans, closed–end subordinate lien mortgage loans and home equity lines of credit and/or the related servicing rights; and

WHEREAS, the Servicer regularly services such mortgage loans and lines of credit and has agreed to service the mortgage loans that become subject to this Agreement and the Parties desire to provide the terms and conditions of such servicing by the Servicer; and

WHEREAS, the Servicer currently services mortgage loans on behalf of the Owner and such mortgage loans shall be serviced pursuant to the terms of this Agreement as of the Effective Date; and

WHEREAS, the Owner is an affiliate of the Servicer and a Utah state chartered bank;

WHEREAS, the Parties entered into a Servicing Agreement, dated as of August 21, 2001, as amended by the four Amendments to Servicing Agreement, dated and effective as of July 1, 2004, April 1, 2005, June 1, 2007 and September 1, 2007 (collectively, the "Original Agreement"), and wish to comply with requirements of Sections 23A and 23B of the Federal Reserve Act (12 USC §221 et. seq.) and with implementing federal regulations, and therefore are further amending and restating the Original Agreement as set forth herein and such Original Agreement is hereby superseded and replaced as of the Effective Date, except as otherwise provided for herein;

WHEREAS, the Servicer, Ally Financial Inc. and Residential Capital, LLC ("ResCap") have entered into the Consent Order, the FRB Order and the Settlement Agreement (each as defined below);

WHEREAS, in connection with the Consent Order, the FRB Order and the Settlement Agreement, the Servicer, Ally Financial Inc., ResCap and the Owner have agreed that the Servicing Agreement be amended to reflect certain revisions to their terms.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

# ARTICLE I.
## DEFINITIONS

Section 1.01.   Definitions.

The following terms are defined as follows:

Accepted Servicing Practices:  With respect to any Portfolio Loan or related REO Property, servicing practices that are in accordance with (i)  the National Mortgage Servicing Standards as agreed to pursuant to the Settlement Agreement and Sections 5, 6, 9, 10 and 11 of the Consent Order, (ii) the provisions of the applicable Mortgage and related Mortgage Note, (iii) the Fannie Mae Guides, and (iv) to the extent not inconsistent with the foregoing, those mortgage servicing practices of mortgage lending institutions which service mortgage loans of the same type as such Portfolio Loan in the jurisdiction where the related Mortgaged Property is located, exercising a reasonable standard of care in performing those practices.  With respect to any Agency Loan or related REO Property, servicing practices that are in accordance with (i)  the National Mortgage Servicing Standards as agreed to pursuant to the Settlement Agreement and Sections 5, 6, 9, 10 and 11 of the Consent Order, (ii) the provisions of the applicable Mortgage and related Mortgage Note, (iii) the applicable Agency Guide, and (iv) to the extent not inconsistent with the foregoing, those mortgage servicing practices of mortgage lending institutions which service mortgage loans of the same type as such Agency Loan in the jurisdiction where the related Mortgaged Property is located, exercising a reasonable standard of care in performing those practices.

Adjustable Rate Mortgage Loan:  Any Mortgage Loan with respect to which the related Mortgage Note contains a provision whereby the Mortgage Interest Rate is subject to change from time to time in accordance with the terms of such Mortgage Note.

Advances:  The Monthly Payment (or portion thereof) required to be remitted to an Agency according to the Agency Guide.

Affiliate:  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agreement:  This Amended and Restated Servicing Agreement, as the same may be amended, modified or supplemented from time to time pursuant to the applicable provisions hereof.

Agency:  Any of Fannie Mae, Freddie Mac or Ginnie Mae.

Agency Guide:  The respective Fannie Mae Guide, Freddie Mac Guide or Ginnie Mae Guide.

Agency Transfer:  The sale or transfer by Owner of some or all of the Portfolio Loans to Fannie Mae under its Cash Purchase Program (Special Servicing Option) or its MBS Swap Program (Special Servicing Option) or to Freddie Mac under its Freddie Mac Cash Program or Gold PC Program, or to Ginnie Mae.

Agency Loans:  Any Mortgage Loan sold to an Agency.

Ancillary Income:  All income derived from the Mortgage Loans and REO Properties actually collected by the Servicer in connection with the servicing the Mortgage Loans, including late charges, non-sufficient funds fees, ACH fees, Agency incentive fees and loss mitigation fees, assumption fees, amounts associated with marketing special products, if any, to the Mortgagors, interest or other benefits earned in connection with funds on deposit in the Custodial Accounts and Escrow Accounts, and all other incidental fees and charges with respect to a Mortgage Loan or REO Property, but excluding any servicing fees from any Agency. The Ancillary Income shall be allocated between the Owner and the Servicer as set forth on the Pricing Exhibit.

Applicable Law:  (a) All federal, state or local laws or regulations applicable to any Mortgage Loan, any Mortgaged Property, any REO Property or the Servicer's activities under this Agreement and (b) all judicial and administrative judgments, orders, stipulations, settlement agreements, awards, writs, and injunctions, in each case to the extent applicable to the Servicer's activities under this Agreement.

Applicable Requirements:  All other requirements and guidelines of the FDIC, the Utah Department of Financial Institutions, and any other governmental body or officer having jurisdiction over the Owner, and all judicial and administrative judgments, orders, stipulations, awards, writs, and injunctions applicable to the Owner, to the extent the foregoing requirements are in effect on the date of this Agreement, and subject to Section 2.19 hereof, any additional requirements (to the extent not also applicable to the Servicer) which the Owner requests the Servicer to comply with subsequent to the Effective Date of the Agreement.

Assignment of Mortgage:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer or sale of the Mortgage.

Automated Clearing House (ACH):  An electronic funds transfer network that enables participating financial institutions to distribute electronic credit and debit entries to bank accounts and to settle such entries.

Bankruptcy Code:  Title 11 of the United States Code.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions are authorized to be closed for business in the States of California, Iowa or Texas, or the Commonwealth of Pennsylvania.

Condemnation Proceeds:  All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Consent Order:  The Consent Order dated as of April 13, 2011 and entered into by the FDIC, the Board of Governors of the Federal Reserve System, Ally Financial Inc., the Owner, ResCap and the Servicer.

Continuation Order:  The order attached hereto as Exhibit 9.

Credit Line Increase:  An increase in the maximum available principal balance with respect to a HELOC Loan.

Credit Line Increase Fee:  With respect to each HELOC Loan, the credit line increase fee shown on the Pricing Exhibit.

Custodial Account:  The separate account or accounts created and maintained pursuant to Section 2.04.

Custodian:  The custodian of the Mortgage Loan Documents as specified under any related custodial agreement between the Owner and its custodian.

Daily HELOC Report:  The daily report to be provided by Servicer to Owner in connection with the HELOC Loans, as described in Section 3.02.

Deboarding Fee:  With respect to each Mortgage Loan and REO Property, the deboarding fee set forth in the Pricing Exhibit.

Default:  A Mortgage Loan shall be considered in default when one Monthly Payment is due and unpaid as of the last day of the calendar month in which the monthly payment was due.

Determination Date:  The last Business Day of the month prior to the related Invoice Date.

Due Date:  The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Effective Date:  This Agreement shall not be effective until (i) in the event of any decree or order of a court, agency, or supervisory authority having jurisdiction for the appointment of a conservator or receiver in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, having been entered against the Servicer, or if the Servicer files a voluntary petition for relief under title 11 of the United States Code (collectively, an "Insolvency Event"), on or before August 15, 2012, this Agreement shall become effective upon the entry of an order, in the form attached as Exhibit 9 (or another order

containing substantially similar provisions), by the United States Bankruptcy Court for the Southern District of New York on an interim basis within 5 days of an Insolvency Event; or (ii) if an Insolvency Event does not occur on or before August 15, 2012, this Agreement shall become effective and the Effective Date shall be deemed to have occurred on such date.

Eligible Investments:  With respect to any accounts established with respect to the Agency Loans, those investments deemed eligible pursuant to the applicable Agency Guide, and with respect to any accounts established with respect to the Portfolio Loans, those investments deemed eligible pursuant to the Fannie Guides.

Eligible Servicer:  An entity that (a) is an approved servicer by the Agencies, with the power and authority to service the Mortgage Loans in accordance with the guidelines of the Agencies, and is in good standing with the Agencies, (b) is a mortgagee approved by the Secretary of HUD pursuant to Section 203 of the National Housing Act, (c) is licensed, qualified and in good standing pursuant to the terms of Section 7.01 herein, (d) has the insurance required to be maintained pursuant to the terms of Section 2.12 herein, and (e) is an eligible HAMP servicer in good standing and has signed a Servicer Participation Agreement that is in effect.

Eligibility Criteria:  The eligibility criteria for residential mortgage loans and home equity lines of credit to be delivered by Owner and serviced by Servicer under this Agreement attached as Exhibit 3.

Escrow Account:  The separate account or accounts created and maintained pursuant to Section 2.06.

Escrow Payment:  With respect to any Mortgage Loan, the amounts constituting real estate taxes, mortgage insurance premiums, fire and hazard insurance premiums, and any other payments required to be escrowed by the Mortgagor with the mortgagee or Servicer pursuant to the Mortgage or any other document.

Extended Transfer Period:  As defined in Section 11.01 herein.

Fannie Mae:  Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

Fannie Mae Guides:  The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto.

FDIC:  Federal Deposit Insurance Corporation.

FHA:  The Federal Housing Administration, or any successor thereto.

Fitch:  Fitch, Inc., or any successor thereto.

Flood Act:  The Flood Disaster Protection Act of 1973, as amended.

Forbearance:  Shall have the meaning set forth in Section 2.01(l).

FRB Order:  The Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, dated February 10, 2012, and entered into by the Board of Governors of the Federal Reserve System, Ally Financial Inc., ResCap, and the Servicer.

Freddie Mac:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

Freddie Mac Guide:  The Single-Family Seller/Servicer Guide.

Ginnie Mae:  The Government National Mortgage Association or any successor thereto.

Ginnie Mae Guide:  The Ginnie Mae MBS Guide.

HELOC Loan:  Any revolving line of credit, secured by a lien on a one to four family residential real property, whether or not said line of credit has a loan balance.

HOEPA Loan:  A Mortgage Loan subject to the Home Ownership and Equity Protection Act of 1994 ("HOEPA").

HUD:  U.S. Department of Housing and Urban Development or any successor thereto.

Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interest Rate Adjustment Date:  With respect to each Adjustable Rate Mortgage Loan, the date specified in the related Mortgage Note and the New Loan Data File, on which the Mortgage Interest Rate is adjusted.

Invoice Date:  The seventh Business Day of the month following the Determination Date.

Key Leadership Employees:  With respect to the Servicer, Key Leadership Employees shall mean the direct reports of the servicing executive and their respective direct reports.  With respect to the Owner, Key Leadership Employees shall mean the direct reports of the mortgage executive.

Liability:  Shall have the meaning set forth in Section 10.01 hereof.

LIBOR Rate:  The three month London Inter-Bank Offered Rate as published in the Wall Street Journal (northeast edition).

Liquidation Proceeds:  Cash received in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

Loan Termination Fee:  With respect to each Mortgage Loan, the termination fee set forth in the Pricing Exhibit, calculated as of the date of notice of termination.  For the avoidance of doubt, the Servicer shall not be entitled to a Loan Termination Fee upon a Mortgage Loan payment in full.

Loss Mitigation and Servicing Delegated Authority Matrix:  (a)  the Loss Mitigation and Servicing Delegated Authority Matrix attached as Exhibit 4A and applicable only to the Portfolio Loans.  Exhibit 4A may also be referred to as the "Standard Matrix," and (b) the Loss Mitigation and Servicing Delegated Authority Matrix attached as Exhibit 4B reflecting certain programs contemplated under the Settlement Agreement and that may be applied to those Portfolio Loans that meet the criteria for "soft dollar" credit under the Settlement Agreement, in the Servicer's sole discretion, but subject to Section 10.01(e) and (f) hereof.  Exhibit 4B may also be referred to as the "AG Menu Items."

LPMI Policy:  A PMI policy pursuant to which the related premium is either (1) to be paid by the servicer of the related Mortgage Loan from payments of interest made by the Mortgagor in an amount as is set forth in the related New Loan Data File, or (2) to be paid by the Owner.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the state of Delaware, or any successor thereto.

MERS Designated Mortgage Loan:  A Mortgage Loan that is registered with MERS.

MERS Procedures Manual:  The MERS procedures manual promulgated by MERS, as it may be amended, supplemented or otherwise modified from time to time.

MERS System:  MERS mortgage electronic registry system, as more particularly described in the MERS Procedures Manual.

Monthly Payment:  The monthly payment of principal and interest due on a Mortgage Loan under the applicable Mortgage Loan Documents.

Monthly Report:  The form of monthly report, substantially in the form set forth in Exhibit 10, to be provided by Servicer to Owner in connection with each remittance.

Moody's:  Moody's Investors Service, Inc., and any successor thereto.

Mortgage:  The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first or subordinate lien, as applicable, on an unsubordinated estate in fee

simple in real property securing the Mortgage Note; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the mortgage, deed of trust or other instrument securing the Mortgage Note may secure and create a first or subordinate lien, as applicable, upon a leasehold estate of the Mortgagor.

Mortgage File:  Copies of the documents pertaining to a particular Mortgage Loan or REO Property referred to as the Mortgage File, listed in Exhibit 2 annexed hereto to the extent received by the Servicer from the Owner, prior servicer, sub-servicer or originator, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate:  The annual rate of interest borne on a Mortgage Note with respect to each Mortgage Loan including any changes resulting from any amendment, modification, forbearance, application of the Servicemembers Civil Relief Act of 2003 or any court order.

Mortgage Loan:  An individual mortgage loan conforming to the Eligibility Criteria and which is subject to this Agreement, including the Agency Loans and Portfolio Loans including any HELOC Loan.

Mortgage Loan Documents:  The documents pertaining to a particular Mortgage Loan or REO Property referred to as the Mortgage File in Exhibit 2 attached hereto pertaining to any Mortgage Loan.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property:  The real property (or leasehold estate, if applicable) located in one of the fifty states, certain territories of the United States (subject to the Eligibility Criteria) or the District of Columbia, securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor:  The obligor on a Mortgage Note.

Mortgagor Check:  A check intended to be used by a Mortgagor as a means for drawing down funds on a HELOC Loan.

National Mortgage Servicing Standards:  Those certain servicing standards established under the Settlement Agreement.

New Loan Data File:  With respect to each Mortgage Loan to be serviced, hereunder, the data file, if any, produced by Owner or the prior servicer pursuant to the Transfer Instructions, which is used to enable Servicer to set up each Mortgage Loan on its loan servicing system.

Non-recoverable Advance:  Any Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property which, in the good faith judgment of

the Servicer, will not or, in the case of a proposed advance, may not, be ultimately recoverable from related Insurance Proceeds, Liquidation Proceeds or otherwise from such Mortgage Loan or REO Property.  The determination by the Servicer that it has made a Non-recoverable Advance shall be evidenced by an officer's certificate of Servicer delivered to the Owner.

Original Agreement:  As defined in the recitals hereto.

Owner Event of Default:  Any one of the conditions or circumstances enumerated in Section 8.01.

Owner Income:  That portion of Ancillary Income flows listed on the Pricing Exhibit which is payable to the Owner.

Owner Expense:  "Out-of-pocket" costs to third parties incurred by the Servicer in servicing the Mortgage Loans and REO Properties in accordance with this Agreement that are not reimbursable by the Mortgagor or from Liquidation Proceeds or from any other Person (including any applicable Agency) and that are to be paid by the Owner.  Owner Expenses may include, but are not limited to, the cost of (a) Mortgagor counseling fees payable to a third party to the extent required of the Servicer by the applicable Agency with respect to an Agency Loan or by Applicable Requirements or by Applicable Law, (b) any Mortgage Loan assignment, recording, trustee, endorsement or release fee including recordation of powers of attorney and any MERS charges, (c) tax penalties related to a Mortgaged Property as a result of a prior servicer or originator not paying taxes when due, (d) flood tracking contracts, (e) tax service contracts, (f) tax certifications performed to research past due tax amounts, (g) LPMI premiums, (h) attorneys' fees and costs not chargeable to the Mortgagor, (i) funds to repurchase Agency Loans from the applicable Agency, (j) funds to buy out a superior lien, (k) environmental clean up costs, (l) costs from the sale of REO Properties or charged-off assets, (m) any interest on escrows owed to Mortgagors or (n) any other fees or amounts contained in this Agreement, including, but not limited to, Section 4.06, required to be processed or incurred by Servicer and not otherwise reimbursed.  All such expenses are subject to change from time-to-time.

Pass-Through Transfer:  The sale or transfer, other than Agency Transfers, of some or all of the Mortgage Loans by the Owner to a trust to be formed as part of a publicly issued or privately placed mortgage-backed securities transaction.

Person:  Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

PMI Policy:  A policy of primary mortgage guaranty insurance issued by an insurer in connection with any Mortgage Loan.

Portfolio Loan:  Any Mortgage Loan, including any HELOC Loan, that is not an Agency Loan.

Pricing Exhibit:  The pricing exhibit attached hereto as Exhibit 1.

Principal Prepayment:  Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date (including any charge or premium thereon) and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Program Form:  Any form of worksheet, checklist, summary, log, transmittal, request, order, report or other written form and any written document, instrument, statement, notice, request, authorization or communication, including, without limitation, customer billing forms and customer correspondence, utilized in connection with the servicing of the Mortgage Loans.

Qualified Depository:  A depository (i) the accounts of which are insured by the FDIC, or any successor thereto and (ii) with respect to Custodial Accounts (a) which can provide electronic detailed statements, (b) has the ability to use the Webseries application, (c) which has the ability to handle cut-off scenarios throughout any given month and (d) maintains demand deposit accounts.

Rating Agency:  Any of Fitch, Moody's or Standard & Poor's.

Reconstitution:  Any Pass-Through Transfer or Whole Loan Transfer.

Reconstitution Agreement:  Any agreement involving any Reconstitution.

Reconstitution Date:  Each date on which any or all of the Mortgage Loans being serviced by the Servicer pursuant to this Agreement shall be reconstituted as part of a Reconstitution.

Recourse Obligation:  means, with respect to any Mortgage Loan, any obligation or liability (actual or contingent), as applicable, for loss of principal incurred in connection with the foreclosure or other disposition of, or other realization or attempt to realize upon the collateral securing such Mortgage Loan, or any repurchase obligation in connection with a Mortgage Loan.

Remittance Date:  For Portfolio Loans, each Business Day, and for Agency Loans, as provided in the applicable Agency Guide.

REO Property:  A Mortgaged Property acquired by the Servicer on behalf of the Owner through foreclosure or by deed in lieu of foreclosure.

Repurchase Request:  A request to repurchase a Mortgage Loan.

Repurchase Request Fee:  With respect to each Repurchase Request processed by Servicer pursuant to Section 4.07 hereof, the fee shown on the Pricing Exhibit.

Servicer Employees:  As defined in Section 2.12 hereof.

**Servicer Event of Default**:  Any one of the conditions or circumstances enumerated in Section 9.01.

**Servicer Participation Agreement**:  A party's Commitment to Purchase Financial Instrument and Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008, entered into between such party and Fannie Mae, together with the related financial instrument and all other instruments, certifications or addenda appurtenant thereto or required thereunder, in each case as amended from time to time.

**Servicer Recovery Costs**:  The costs of any necessary (1) Mortgagor credit reports, (2) asset searches or bankruptcy searches, (3) asset valuations, or (4) Mortgagor skip tracing, in each case which costs shall be borne by the Servicer.

**Servicing Advances**:  All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred (i) in the performance by the Servicer of its servicing obligations pursuant to this Agreement including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any fees relating to any enforcement or judicial proceedings, including but not limited to proof of claim charges, not related to foreclosures, (c) foreclosure actions, (d) property inspections, (e) property valuations including broker price opinions, appraisals, or automated values, (f) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage, (g) taxes, assessments, water rates, sewer rents and other charges which are or may become a lien upon the Mortgaged Property, (h) insurance premiums, including PMI insurance premiums, (i) any amounts owed to Servicer as a result of a scheduled balance transfer to a successor servicer, (j) any amounts paid by a prior servicer and assumed by Servicer on the applicable Transfer Date and (k) such other costs designated in this Agreement as a Servicing Advance.

**Servicing Compensation**:  With respect to each Mortgage Loan and REO Property, the amounts Owner shall pay to the Servicer, (a) as set forth on the Pricing Exhibit, or (b) for any specially requested services by Owner.

**Servicing Fee**:  With respect to each Mortgage Loan and REO Property, the amounts Owner shall pay to the Servicer,  and that portion of Ancillary Income due Servicer, each as set forth on the Pricing Exhibit.

**Servicing File**:  The origination documents and copies of the Mortgage Loan Documents, to the extent provided to the Servicer and servicing information pertaining to a Mortgage Loan.

**Servicing Rights**:  Any and all of the following:  (a) any and all rights to service and administer, or direct the servicing or administration, of the Mortgage Loans; (b) any payments to or monies received by the Servicer for servicing the Mortgage Loans; (c) any Ancillary Income associated with the Mortgage Loans; (d) all agreements or documents creating,

defining or evidencing any such servicing rights and all rights of the Servicer thereunder; (e) any and all rights to and in the Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected by the Servicer with respect thereto; (f) all accounts and other rights to payment related to any of the property described in this paragraph; and (g) any and all servicing files, servicing documents, servicing records, or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans.

Settlement Agreement:  Collectively, that certain joint State-Federal foreclosure settlement, publicly announced on February 9, 2012,  by the Department of Justice and the Attorneys General of certain 49 States, as to which Ally Financial Inc., ResCap and the Servicer have entered into a final Consent Judgment, including all Exhibits thereto,  all of which was filed with the U.S. District Court for the District of Columbia on March 12, 2012.

Standard & Poor's:  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies Inc., and any successor thereto.

Termination Date:  Shall have the meaning set forth in Section 11.01 hereof.

Transfer Out Date:  Shall have the meaning set forth in Section 11.02 hereof.

Transfer Date:  With respect to each Mortgage Loan and REO Property, the date Servicer physically assumes its obligations of servicing pursuant to this Agreement.

Transfer Instructions:  The standard form of transfer instructions used by the Servicer and provided to Owner or any prior servicer in connection with any given transfer of Mortgage Loans, REO Properties or HELOC Loans for servicing by the Servicer under this Agreement, as modified by Servicer from time to time.  The current form of the Mortgage Loan (excluding HELOC Loan) Transfer Instructions is attached hereto as Exhibit 5A, the current form of the HELOC Loan Transfer Instructions is attached hereto as Exhibit 5B and the current form of Recovery Transfer Instructions is attached hereto as Exhibit 5C.

VA:  The United States Department of Veterans Affairs, or any successor thereto.

VA No-Bid Instruction:  an instruction given by the VA that the VA will not accept conveyance of the REO Property resulting from the foreclosure of a VA guaranteed Mortgage Loan or when the VA pays all or part of the difference between the net sale proceeds and the total indebtedness on a VA guaranteed loan following the private sale of the property where the proceeds are insufficient to fully payoff the existing Mortgage.

Whole Loan Transfer:  Any sale or transfer, other than Agency Transfers, of some or all of the Mortgage Loans by the Owner to a third party, which sale or transfer is not a Pass-Through Transfer.

Section 1.02.   Construction

As of the Effective Date hereof, this Agreement will supersede and replace the Original Agreement, and any Mortgage Loan serviced by Servicer under the Original Agreement as of the Effective Date of this Agreement shall now be subject to this Agreement; provided, however, that (1) the Parties will remain bound by any continuing obligations thereunder relating to mortgage loans not becoming subject to this Agreement (such as previously paid off or liquidated mortgage loans), which obligations shall survive the termination of the aforementioned agreement(s), and (2) for any claim by Owner against Servicer arising prior to the Effective Date hereof (whether under indemnification, breach of contract or otherwise), such claim shall be subject to Section 8.2 of the Original Agreement, which Section 8.2 shall likewise survive termination of the aforementioned Original Agreement.

# ARTICLE II.
## SERVICING

Section 2.01.    Servicer to Act as Servicer.

(a)      From and after the date of this Agreement and the applicable Transfer Date (provided that all information required hereunder from Owner or any prior servicer has been provided to Servicer by such Transfer Date), the Servicer, as an independent contractor, shall service and administer each Mortgage Loan and each REO Property, including, without limitation, handling all Mortgagor inquiries and correspondence, payments and payoff funds, and similar matters, and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable, consistent with the terms of this Agreement, Applicable Law, Applicable Requirements, Accepted Servicing Practices and the Loss Mitigation and Servicing Delegated Authority Matrix.  In particular, the Servicer shall not make any Advances or Servicing Advances other than in accordance with Accepted Servicing Practices.  The Servicer shall perform such servicing in its own name unless otherwise provided in this Agreement or required by Applicable Law or Applicable Requirements.  The Owner shall not interfere with or itself attempt to perform the duties and activities of the Servicer hereunder (except as otherwise provided in the Loss Mitigation and Servicing Delegated Authority Matrix), and Owner shall refer to Servicer any Mortgagor inquiries or correspondence, payments or payoff funds, or similar matters within the Servicer's responsibilities hereunder that Owner may receive; provided, however, that the Owner may in the case of an uncured Event of Default or in the event of termination of this Agreement perform such duties described in this sentence.  All Mortgage Loans and REO Properties transferred to Servicer hereunder after the Effective Date shall conform to the Eligibility Criteria and shall be documented on those Mortgage Loan Documents that have been approved by Servicer.  If Owner wishes the Servicer to assume the servicing of additional Mortgage Loans or REO Properties after the Effective Date that do not meet the Eligibility Criteria or that are not documented on approved Mortgage Loan Documents, such request shall be subject to the Parties' agreement on a new Pricing Exhibit covering such additional Mortgage Loans and REO Properties.  Without the written consent of Servicer, which shall not be unreasonably withheld, Owner shall not deliver any Mortgage Loan regarding which any Mortgagor is a party to litigation, including class action litigation, (but excluding litigation constituting routine foreclosure actions and bankruptcy filings which may be delivered by the Owner) against the Owner, any prior servicer, any Person connected with the origination of such

Mortgage Loan, or other litigation related to or arising from such Mortgage Loan.  In addition, the Servicer shall be entitled to conclusively rely on any directions given to it by or taking authority from Owner or its agents.

(b)      In connection with any bulk transfers of Mortgage Loans occurring after the date of this Agreement, the Servicer may require a reasonable due diligence review satisfactory to Servicer to be completed and reported to Servicer prior to the Transfer Date for certain types of Mortgage Loans and REO Properties.  Such due diligence may be completed by the Servicer or contracted directly by the Servicer with a third party provider.  The Servicer shall work with the Owner to ensure the due diligence process is appropriately defined and scheduled.  The Owner shall cooperate in and is responsible for all costs associated with the due diligence process. Servicer may also use information gathered during any due diligence review of Mortgage Loans and REO Properties to enable Servicer to begin servicing the Mortgage Loans and REO Properties in accordance with this Agreement as promptly as possible following the applicable Transfer Date.

(c)      Owner shall provide or cause to be provided by the applicable prior servicer, in accordance with and if applicable and required by the Transfer Instructions, the New Loan Data File and any related Servicing File for each Mortgage Loan and REO Property to be serviced by the Servicer under this Agreement.  For newly originated Mortgage Loans being transferred prior to the first Due Date of the Mortgage Loan, the Servicer must receive this information no later than five (5) Business Days before Servicer is to begin servicing such Mortgage Loan.  For all other Mortgage Loans and REO Properties, the Servicer must receive this information no later than two (2) Business Days following the Transfer Date.  Owner shall notify Servicer within two (2) Business Days, in writing, of any changes in the information contained in the New Loan Data File.  Owner agrees to provide Servicer, within two (2) Business Days after Servicer's request, copies of the Mortgage Note, the Mortgage or any other documents with respect to a Mortgage Loan that Servicer deems reasonably necessary in connection with its performance of the servicing of said Mortgage Loan or REO Property.  Owner agrees to, and shall use commercially reasonable efforts to cause any prior servicer to, comply with the Transfer Instructions.  Owner is responsible for ensuring that all advances made by any prior servicer are communicated to Servicer within three (3) Business Days following the Transfer Date so as to enable Servicer to meet Mortgagor notification requirements of Applicable Law; if the foregoing timeframe is not met, Servicer shall have no obligation to board or collect any such prior servicer advances. Owner is responsible for reconciling and funding all prior servicer advances directly with the prior servicer; Servicer will reasonably cooperate and assist in the reconciliation process but Servicer will not advance any of its own funds to reimburse the prior servicer or Owner for such amounts.

(d)      Owner hereby agrees that the Servicer shall net the costs or expenses incurred to transfer tax service contracts and flood service contracts or to obtain contracts that are not existing or transferable to the Servicer, in the amounts indicated on the Pricing Exhibit, which amounts can change from time to time, from amounts payable to the Owner.

(e)      Owner acknowledges that Servicer's obligations pursuant to Section 2.08 and this Section 2.01 are contingent upon the existence of life of loan tax and flood service contracts on a

per Mortgage Loan or REO Property basis.  To the extent, Servicer has not received evidence of the existence of contracts that are acceptable to Servicer, as specified below, the Servicer shall obtain such contracts.  Owner acknowledges that Servicer will use the vendors or service providers set forth on Exhibit 6, which may be changed by Servicer in its reasonable judgment with notice to the Owner.

(f)      For newly originated Mortgage Loans being transferred prior to the first due date of the Mortgage Loan, Owner is responsible to ensure that any items included in Escrow Payments that are due within 60 days following the closing date of the Mortgage Loan, are paid. For all other Mortgage Loans, Owner is responsible to ensure that any items included in Escrow Payments that are due within thirty (30) days following the Transfer Date are paid prior to transfer to Servicer.  Owner is responsible for any loss of discount, tax penalties or lapses in hazard or flood coverage due to non-payment of such amounts prior to the Transfer Date.

(g)      In servicing and administering the Mortgage Loans and REO Properties, the Servicer shall comply in all material respects with Applicable Law and employ Accepted Servicing Practices except and to the extent that such practices conflict with the requirements of this Agreement.  The Servicer shall retain adequate personnel to service and administer the Mortgage Loans and REO Properties.

(h)      In connection with any subordinate lien Portfolio Loan that succeeds to a superior lien position as a result of payment in full of the related superior lien mortgage loan, the Servicer may subordinate such subordinate lien Portfolio Loan in accordance with the Loss Mitigation and Servicing Delegated Authority Matrix and Accepted Servicing Practices.

(i)      In connection with the HELOC Loans, the Servicer will, upon Owner's request, provide Mortgagor Checks to the Mortgagors and shall be reimbursed by Owner for all out of pocket expenses associated with providing such checks.  The Servicer will verify the availability of funds prior to authorizing payment of Mortgagor Checks.  The Mortgagor will also be able to access available funds by calling Servicer, via a toll free number.  For each request made by a Mortgagor via the toll free number, such Mortgagor will be sent a wire request form and given instructions on where the form is to be sent once completed.  Servicer will review the form and verify funds availability and funds will be wire transferred to the account designated by such Mortgagor requesting funds.  Pursuant to the Loss Mitigation and Servicing Delegated Authority Matrix, Servicer will not issue payment of a Mortgagor Check and will not wire funds in response to a wire request form if Servicer has knowledge that the Mortgagor is not eligible to draw funds from his or her HELOC Loan because draw privileges have been suspended or terminated.  If Servicer pays a Mortgagor Check or wires funds to a Mortgagor when Servicer had knowledge that the Mortgagor was not eligible to draw funds from his or her HELOC Loan, Servicer shall be responsible for such payment or wire of funds.  Notwithstanding the Loss Mitigation and Servicing Delegated Authority Matrix, the Servicer will, at the Owner's express written direction, subject to Applicable Law, suspend or terminate the right of a Mortgagor to make draws under a HELOC Loan.

(j)      Pursuant to the Loss Mitigation and Servicing Delegated Authority Matrix the Servicer will process all Credit Line Increase requests received on a HELOC Loan in compliance with the Mortgage Loan Documents and Accepted Servicing Practices.

(k)      The Servicer's computer system shall clearly reflect the Owner's ownership of each Mortgage Loan and REO Property.  The Servicer shall release from its custody the contents of any Mortgage File retained by it only in accordance with this Agreement or at the written direction of the Owner.

(l)      In the event that any Mortgage is in Default or, in the judgment of the Servicer, such a Default is reasonably foreseeable, the Servicer, subject to the Loss Mitigation Delegated Authority Matrix and consistent with Applicable Law and Accepted Servicing Practices, may waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Interest Rate, forgive the payment of principal or interest, or waive, in whole or in part, a prepayment charge), accept payment from the related Mortgagor of an amount less than the principal balance in final satisfaction of such Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor (any and all such waivers, modifications, payment plans, variances, forgiveness of principal or interest, postponements, or indulgences collectively referred to herein as "Forbearance").  The Servicer's analysis supporting any Forbearance and the conclusion that any Forbearance meets the standards of this section, shall be appropriately reflected in the Servicer's records.

(m)      The Servicer shall, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Owner, all instruments and documents necessary to carry out its servicing and administrative duties under this Agreement including but not limited to instruments in connection with foreclosures; satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties.  The Owner shall furnish the Servicer with any powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

(n)      With respect to the performance of any service to be performed by the Servicer hereunder, including, without limitation, the obtaining of credit report data, the provision of field or other inspections, the provision of title-related services, and the sale or management of REO properties, the Servicer may obtain such services from an Affiliate in accordance with Accepted Servicing Practices and Section 10.04 (b) of this Agreement.

(o)      With respect to any Portfolio Loan in Default, if the Servicer determines that (x) no significant net recovery is possible through foreclosure proceedings or other liquidation of the related Mortgage Property or (y) the potential net recoveries are anticipated to be an amount, determined by the Servicer in its reasonable discretion, that is insufficient to warrant proceeding through foreclosure or other liquidation of the related Mortgaged Property, the Servicer may, subject to the Loss Mitigation and Servicing Delegated Authority Matrix, forego foreclosing and treat such Portfolio Loan as a charge off.  The Servicer will provide Owner with written notice of such charge offs.  Servicer has no obligation to foreclose upon a charged off Portfolio Loan;

16

however, Servicer shall continue to attempt to collect the Portfolio Loan as set forth below. Owner agrees to pay Servicer the "Recovery Collection" fee specified in the Pricing Exhibit for amounts collected subsequent to charge off.

(p)      Servicer shall use all reasonable methods to collect the amounts due under each charged off Portfolio Loan.  The Owner recognizes that not all amounts due under each charged off Portfolio Loan may be collectable, due to inadequate collateral value, Mortgagor inability or unwillingness to pay, or otherwise.  Servicer shall use such methods, consistent with this Agreement, which in Servicer's reasonable judgment will maximize the recovery under the charged off Portfolio Loan.  The Servicer shall pay all items constituting Servicer Recovery Costs, without reimbursement therefore from Owner.  The Servicer shall be under no obligation to make any Servicing Advance in connection with a charged off Portfolio Loan, including advances to protect the lien status of such charged off Portfolio Loan, but to the extent Servicer does so it shall be reimbursed as provided herein.  The Servicer shall have no obligation to attempt to collect on any charged off Portfolio Loan via institution of litigation against the Mortgagor, whether via suit on the Portfolio Loan or otherwise.

(q)      In the event the Servicer is unable to collect in full or in part from the Mortgagor on a charged off Portfolio Loan within a reasonable period of time following the date of charge off (determined by Servicer in its reasonable discretion), Servicer may, on behalf of Owner and with the prior written consent of Owner, sell such charged off Portfolio Loan or the Mortgage Note servicing released to a third party, either individually or as part of a bulk package of charged off mortgage loans.  In furtherance of any such sale, Owner agrees and hereby authorizes Servicer, subject to Applicable Law, to disclose information related to the charged off Portfolio Loans and make available for inspection the collateral documents (to the extent those documents are in Servicer's possession), to prospective purchasers of the charged off Portfolio Loans conducting a due diligence examination.  Servicer shall obtain a non-disclosure agreement from any such prospective purchaser prior to releasing any information.  Any such sale shall be evidenced by a purchase and sale agreement which shall be entered into between Servicer (on behalf of Owner) and the purchaser of such assets.  Servicer shall negotiate such agreement on behalf of Owner and Owner agrees to cooperate in such negotiation and if necessary execute such agreement in a timely manner to accomplish such sale.  Any out of pocket expenses incurred by Servicer in connection with such a sale of charged off Portfolio Loans or associated Mortgage Notes shall be deemed a Servicing Advance.  Proceeds from any such sale shall be treated as a recovery on the Portfolio Loan(s), subject to Servicer's right to receive the Recovery Collection Fee and recover any related Servicing Advances and Non-recoverable Advances as contemplated in this Agreement.  The Servicer shall not be entitled to receive the Deboarding Fee or  the  Loan Termination Fee for any transfer under this Section 2.01(q).

(r)      At the expiration of six months from the date of charge off, unless (1) the charged off Portfolio Loan is in a paying status or negotiations with the Mortgagor are pending to resolve the delinquency, or (2) the charged off Portfolio Loan is in the process of being sold servicing released to a third party, Servicer may cease active collections efforts and either (i) at Owner's request, transfer the Portfolio Loan servicing released to Owner or its designee pursuant to Section 11.02, or (ii) if Owner does not request such transfer or timely respond to Servicer's transfer request, satisfy the lien securing such Portfolio Loan and remove such Portfolio Loan

from Servicer's servicing system.  The Servicer shall have no further obligation to service such Portfolio Loan.  The Servicer shall not be entitled to receive the Loan Termination Fee for any transfer under this Section 2.01(r) and shall not be entitled to receive any Deboarding Fee for any transfer under Section 2.0(r)(ii).

(s)        The Servicer, as permitted by Applicable Law, will continue to service a Portfolio Loan in recovery regarding which the Mortgagor files bankruptcy.  Upon notice of a bankruptcy filing, the Owner agrees to pay the Servicer for any out of pocket costs incurred by Servicer including the cost for filing any proof of claim, which shall be treated as a Servicing Advance.  In addition, the Owner agrees to pay the Servicer a monthly fee as shown on the Pricing Exhibit while the Portfolio Loan remains in bankruptcy.

(t)        Owner agrees to reimburse Servicer for any costs or expenses associated with any Assignment of Mortgage, MERS transfer or any other assignment or endorsement costs incurred by Servicer for the Mortgage Loans or REO Properties in accordance with Section 4.03(b).

(u)        For all Agency Loans, the Servicer shall service, report and remit in compliance with the applicable Agency Guide as allowed or required by its role as "subservicer" on behalf of Owner; Owner retains the role and responsibility as "Issuer" and "Servicer" as defined by the Ginnie Mae Guide and as "Seller" and "Servicer" as defined by the Fannie Mae Guide or Freddie Mac Guide, as applicable.

(v)        By the 5th Business Day of each month, the Servicer will provide a list of all consumer complaints received during the prior month to the Owner that related to the Mortgage Loans.

Section 2.02.    Liquidation of Mortgage Loans

(a)        In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 2.01 is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as is consistent with Applicable Law and Accepted Servicing Practices.  In the event that any payment due under any Mortgage Loan is not postponed pursuant to Section 2.01 and remains delinquent for a period of 90 days or any other default continues for a period of 90 days beyond the expiration of any grace or cure period (or such other period as is required by Applicable Law in the jurisdiction where the related Mortgaged Property is located) , and further provided that such Mortgage Loan has not been charged off pursuant to Section 2.01(o), the Servicer shall refer the Mortgage Loan for foreclosure.  The Servicer shall take such foreclosure actions in the name of the Owner.  In connection with any such foreclosure, the Servicer shall make all necessary and proper Servicing Advances, provided, however, that the Servicer shall not be required to expend any funds in connection with any foreclosure or towards the restoration or preservation of any Mortgaged Property, unless it shall determine that such expense is beneficial to the Owner or will be recoverable by it either through Liquidation Proceeds (respecting which the Servicer shall have priority for purposes of reimbursing itself for any related un-reimbursed Servicing Advances and Non-recoverable Advances, unpaid Servicing Compensation, and any other

unpaid expenses due under this Agreement) or through Condemnation Proceeds or Insurance Proceeds (respecting which it shall have similar priority).

(b)      In connection with a foreclosure, in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, the Servicer shall cause the Mortgaged Property to be inspected by a qualified environmental inspector at the Owner's expense.  Upon completion of the inspection, the Servicer shall promptly provide the Owner with a written report of the environmental inspection.

(c)      Notwithstanding anything to the contrary contained herein, after reviewing the environmental inspection report, the Owner shall determine how the Servicer shall proceed with respect to the Mortgaged Property; provided, that Servicer may determine in its sole discretion that it will not proceed with a foreclosure or acceptance of a deed in lieu of foreclosure with respect to a Mortgaged Property that has been determined to be contaminated by hazardous or toxic substances or wastes and with respect to which Servicer would be expected to take title in its own name.  In the event (a) the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes and (b) the Owner directs the Servicer to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Servicer shall be reimbursed for all reasonable costs associated with any related environmental clean up costs, as applicable, from the related Liquidation Proceeds, or if the Liquidation Proceeds are insufficient to fully reimburse the Servicer, the Servicer shall be entitled to be reimbursed from amounts due the Owner in Sections 3.01, 3.02 or 3.03.

(d)      In the event the Owner directs the Servicer not to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, or the Servicer is otherwise not proceeding to liquidation as a result of environmental contamination, the Servicer shall be entitled to be reimbursed for any related un-reimbursed Servicing Advances and Non-recoverable Advances and any other amounts from amounts due Owner pursuant to Sections 3.01, 3.02 or 3.03.  The Servicer shall release such Mortgage Loan or REO Property within fifteen (15) days of such determination following the procedures in Section 11.02 after which Servicer will have no further servicing obligation with regard to such Mortgaged Loan or REO Property.

Section 2.03.   Collection of Mortgage Loan Payments

The Servicer shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take reasonable care in ascertaining and estimating Escrow Payments, to the extent applicable, and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the extent that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.  In connection with any Mortgage Loan that is in Default or regarding which the Servicer believes Default is reasonably foreseeable, the Servicer may, in accordance with Accepted Servicing Practices and Section 12.13 of this Agreement, recommend or counsel the Mortgagor to refinance their Mortgage Loan. Notwithstanding the confidentiality provisions of this Agreement, the Servicer may (with any required Mortgagor consent) use Confidential Information relative to the Mortgagor's Mortgage Loan in connection with any such refinance.

Section 2.04.    Establishment of and Deposits to Custodial Account

(a)    The Servicer shall segregate and hold all funds collected and received pursuant to the Portfolio Loans and REO Properties separate and apart from any of its own funds and general assets, to the extent the Servicer is not otherwise permitted to retain such funds under the terms of this Agreement, and shall establish one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "GMAC Mortgage, LLC, in trust for Ally Bank re: Fixed and Adjustable Rate Residential Mortgage Loans" (the "non-HELOC Custodial Account") and "GMAC Mortgage, LLC, in trust for Ally Bank re: Home Equity Lines of Credit" (the "HELOC Custodial Account"), or such other title as is mutually agreed upon and directed in writing by Owner.  The Custodial Accounts shall be established pursuant to Section 2.09.  Any funds deposited in the Custodial Accounts shall at all times be fully insured to the full extent permitted under Applicable Law.

The Servicer shall deposit in the corresponding Custodial Account no more than two (2) Business Days following receipt thereof (unless otherwise noted), the following collections received by the Servicer or payments to be made by the Servicer, in connection with the Portfolio Loans and REO Properties, after the applicable Transfer Date:

(i)    all collections of principal, including all Principal Prepayments;

(ii)    all collections of interest;

(iii)    all Liquidation Proceeds (which shall be deposited as soon as practical after the expenses of such sale are paid and the Servicer has reimbursed itself for any related un-reimbursed Servicing Advances, unpaid Servicing Compensation, and un-reimbursed Owner Expenses);

(iv)    net cash flow, if any, from the REO Property, which shall equal the revenues from such REO Property net of expenses and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses;

(v)    all Insurance Proceeds,  required to be deposited pursuant to Section 2.10, other than proceeds to be held in a suspense account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vi)    all Condemnation Proceeds which are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vii)    any amount required to be deposited in the Custodial Account pursuant to Section 2.09 (losses on Eligible Investments), or Section 3.01(interest on late remittances);

(viii)    any amounts required to be deposited by the Servicer pursuant to Section 2.11 in connection with the deductible clause in any blanket hazard insurance policy;

(ix)    any amounts received by the Servicer under a PMI Policy or an LPMI Policy (which shall be deposited as soon as practical after Servicer has reimbursed itself for any related un-reimbursed Servicing Advances, unpaid Servicing Compensation, and un-reimbursed Owner Expenses); and

(x)    any other amount specifically required to be deposited in the Custodial Account pursuant to this Agreement.

The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, unless otherwise provided herein, payments consisting of Servicing Compensation, reimbursement of Owner Expenses, or Ancillary Income due the Servicer pursuant to this Agreement and the Pricing Exhibit need not be deposited by the Servicer into the Custodial Account and may be retained by Servicer.

(b)    The Servicer shall segregate and hold all funds collected and received in connection with the Agency Loans separate and apart from any of its own funds and general assets, to the extent the Servicer is not otherwise permitted to retain such funds under the terms of this Agreement, and shall establish Custodial Accounts in accordance with the applicable Agency Guide and Section 2.09. The Servicer shall deposit in the corresponding Agency Custodial Accounts the applicable collections received by the Servicer in accordance with the Agency Guide.

(c)    Any interest paid on funds deposited in the Custodial Accounts by the depository institution or any other non-interest benefits shall constitute Ancillary Income and shall accrue to the benefit of the Servicer unless otherwise set forth in the Pricing Exhibit.

Section 2.05.    Permitted Withdrawals From Custodial Account

(a)    The Servicer shall be entitled to withdraw funds from the Custodial Accounts for the following purposes; provided, however, that withdrawals from the Custodial Accounts relating to the Agency Loans shall be made only in accordance with the applicable Agency Guide:

(i)    to make payments to the Owner in the amounts and in the manner provided in Section 3.01 and Section 3.02;

(ii)    to pay to itself any accrued but unpaid Servicing Compensation and reimburse itself for Owner Expenses (to the extent the Servicer has not retained the Servicing Compensation and reimbursement of Owner Expenses) in the manner provided in Section 4.03. The Servicer's right to payment or reimbursement pursuant to this section shall be prior to the rights of the Owner;

(iii)    to reimburse itself for un-reimbursed Servicing Advances (except to the extent already reimbursed pursuant to any other provision of this Agreement). The Servicer's right to reimbursement pursuant to this section shall be prior to the rights of the Owner;

(iv)    to reimburse itself for any un-reimbursed Non-recoverable Advances made by the Servicer in accordance with this Agreement.  The Servicer's right to reimbursement pursuant to this section shall be prior to the rights of the Owner;

(v)    to invest funds in Eligible Investments in accordance with Section 2.09;

(vi)    to withdraw funds deposited in error;

(vii)    to withdraw funds necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance and the fees of any managing agent acting on behalf of the Servicer;

(viii)    to pay itself any interest earned on funds deposited in the Custodial Account which constitute Ancillary Income and to pay the Owner any interest earned on funds deposited in the Custodial Account which are set forth in the Pricing Exhibit as Owner Income (all such interest to be withdrawn no later than each Remittance Date), to the extent such interest is earned and deposited in such Custodial Account;

(ix)    to pay itself any amounts that are owed by Owner under this Agreement and that remain unpaid;

(x)    to pay for any LPMI Policy premiums;

(xi)    to transfer funds to another Qualified Depository in accordance with Section 2.09 hereof; and

(xii)    to clear and terminate the Custodial Account upon the termination of this Agreement.

Section 2.06.    Establishment of and Deposits to Escrow Account

(a)    The Servicer shall segregate and hold all funds collected and received pursuant to a Portfolio Loan constituting Escrow Payments separate and apart from any of its own funds and general assets in one or more Escrow Accounts, in the form of non-interest-bearing money market or demand accounts, titled, "GMAC Mortgage, LLC, in trust for Owners of Residential Fixed and Adjustable Rate Mortgage Loans, and various Mortgagors," or such other title as is mutually agreed upon and directed in writing by Owner.  The Escrow Accounts shall be established pursuant to Section 2.09.

(b)      The Servicer shall deposit in the Escrow Account or Accounts no more than two (2) Business Days following receipt thereof the following amounts received in connection with the Portfolio Loans:

(i)      all Escrow Payments collected for the purpose of effecting timely payment of any such items as required under the terms of this Agreement along with any refunds received in connection with Escrow Payment items;

(ii)      all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property; and

(iii)      buydown funds and other amounts held is suspense prior to application to the Mortgage Loan or REO Property.

(c)      The Servicer shall segregate and hold all funds collected and received pursuant to the Agency Loans separate and apart from any of its own funds and general assets and shall establish Escrow Accounts in accordance with the applicable Agency Guide and Section 2.09. The Servicer shall deposit in the corresponding Agency Escrow Accounts the applicable collections received by the Servicer related to Agency Loans in accordance with the applicable Agency Guide.

(d)      Any benefit related to the funds held in the Escrow Accounts shall constitute Ancillary Income and shall accrue to the benefit of the Servicer unless otherwise set forth in the Pricing Exhibit.

Section 2.07.   Permitted Withdrawals From Escrow Account

(a)      The Servicer shall be entitled to withdrawal funds from the Escrow Accounts for the following purposes; provided, however, that withdrawals from the Escrow Accounts relating to the Agency Loans shall be made only in accordance with the applicable Agency Guide:

(i)      to effect timely payments of real estate taxes, assessments, mortgage insurance premiums, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Mortgage Loan;

(ii)      to reimburse itself for any Servicing Advance constituting Escrow Payments made by the Servicer pursuant to this Agreement with respect to a related Mortgage Loan (except to the extent already reimbursed pursuant to any other provision of this Agreement), but only from amounts received on the related Mortgage Loan which represent late collections of Escrow Payments thereunder;

(iii)      to refund to any Mortgagor any funds found to be in excess of the amounts required or permitted under the terms of the related Mortgage Loan or Applicable Law;

(iv)    to transfer funds to the Custodial Account for application to reduce the principal balance of the Mortgage Loan in accordance with the terms of the related Mortgage and Mortgage Note or as specifically authorized by the Mortgagor;

(v)    to pay to itself as Ancillary Income or pay the Owner as Owner Income in accordance with this Agreement and the Pricing Exhibit, or pay any Mortgagor to the extent required by Applicable Law, any interest paid on the funds deposited in the Escrow Account to the extent such interest is earned and deposited in such Escrow Account;

(vi)    to restore or repair the Mortgaged Property in accordance with Section 2.15;

(vii)    to withdraw funds deposited in error; and

(viii)    to clear and terminate the Escrow Account on the termination of this Agreement.

Section 2.08.    <u>Payment of Escrow Items and Other Charges</u>

With respect to each first lien Mortgage Loan that provides for Escrow Payments, the Servicer shall maintain accurate records reflecting the status of real estate taxes and other charges which are or may become a lien upon the Mortgaged Property, and the status of hazard and flood insurance coverage, and shall obtain, from time to time, all bills for the payment of such charges that are part of Escrow Payments (including renewal premiums) and shall effect payment thereof prior to the applicable loss of discount, penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage.  The Servicer assumes full responsibility for the timely payment of all such bills and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments.

With respect to each first lien Mortgage Loan that does not provide for Escrow Payments, the Servicer shall monitor to ensure that any payments for real estate taxes and other charges which are or may become a lien upon the Mortgaged Property, and payments for mortgage insurance premiums or fire, flood and hazard insurance premiums are made by the Mortgagor.  The Servicer shall make Servicing Advances to effect such payments, if possible, within the time period required to avoid additional penalties and interest, and no later than the time required to avoid the loss of the related Mortgaged Property by foreclosure from a tax or other lien.  Servicer will charge the Mortgagor for such penalties and interest associated with such past due amounts paid by Servicer in connection with the Mortgaged Property.  Servicer may, at Servicer's discretion and in accordance with Accepted Servicing Practices, establish an Escrow Account for any Mortgagor that fails to pay real estate taxes, flood or hazard insurance on the Mortgaged property in a timely manner.

Notwithstanding the foregoing, if the Servicer determines that such Servicing Advance for Escrow Payments may be a Non-recoverable Advance, the Servicer shall have no obligation to make such Servicing Advance.

With respect to each second lien Mortgage Loan, the Servicer shall not be required to collect any Escrow Payments and shall not be responsible for monitoring or payment of any taxes, flood or hazard insurance, or other amounts constituting Escrow Payments.

Section 2.09.   Establishment and Protection of Accounts

(a)      Any Custodial Accounts relating to the Portfolio Loans will initially be accounts established and held by the Servicer on deposit with a Qualified Depository approved in writing by the Owner.  The Servicer shall promptly transfer the Custodial Accounts relating to the Portfolio Loans to a different Qualified Depository (including, if applicable, the Owner or its Affiliates) from time to time as directed in writing by the Owner.

(b)      Any Escrow Accounts relating to the Mortgage Loans will initially be accounts established and held by the Servicer on deposit with the Owner.  The Servicer shall promptly transfer the Escrow Accounts relating to the Portfolio Loans to a different Qualified Depository from time to time as directed in writing by the Owner, subject, with respect to Escrow Accounts for Agency Loans, to compliance with the applicable Agency Guide or waiver therefrom.

(c)      Any Custodial Accounts relating to the Agency Loans will initially be accounts established and held by the Servicer on deposit with a Qualified Depository approved by the Owner and in compliance with the applicable Agency Guide or pursuant to waivers thereof.  The Servicer shall, subject to compliance with the applicable Agency Guide or a waiver thereof, promptly transfer the Custodial Accounts relating to the Agency Loans to a different Qualified Depository (including, if applicable, the Owner or its Affiliates) from time to time as directed in writing by the Owner.

(d)      All suspense and clearing accounts in which funds relating to the Mortgage Loans are deposited shall be owned by the Servicer and shall be established with a Qualified Depository, in a manner which shall provide maximum available insurance thereunder.

Section 2.10.   Maintenance of Hazard and Flood Insurance

The Servicer shall cause to be maintained for each first lien Mortgage Loan, hazard insurance such that all buildings upon the Mortgaged Property are insured by a generally acceptable insurer acceptable under the applicable Agency Guide or, with respect to the Portfolio Loans, the Fannie Mae Guides against loss by fire, hazards of extended coverage and such other hazards as are required to be insured pursuant to the such Agency Guide, in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such first lien Mortgage Loan or (ii) the outstanding principal balance of the first lien Mortgage Loan provided that such amount represents at least 80% of the insurable value of the Mortgaged Property.  If a Mortgaged Property is not covered by hazard insurance or is covered in an amount

less than the amount required, the Servicer shall notify the related Mortgagor in accordance with Accepted Servicing Practices that the Mortgagor must obtain such insurance coverage, and if said Mortgagor fails to obtain the required insurance coverage after such notification, the Servicer shall force place insurance on the Mortgagor's behalf in accordance with Applicable Law and within the time permitted by Accepted Servicing Practices.

The Servicer shall cause to be maintained  for each first lien Mortgage Loan secured by a Mortgaged Property located in a flood zone (where flood insurance is available, and where the originator or prior servicer maintained, such flood insurance) ), a flood insurance policy with an insurance carrier acceptable under the applicable Agency Guide or, with respect to the Portfolio Loans, the Fannie Mae Guides in an amount representing coverage not less than the lesser of (i) the aggregate unpaid principal balance of the Mortgage Loan, (ii) maximum amount of insurance which is available under the Flood Act , and (iii) the full replacement value of the improvements which are part of such Mortgaged Property.  If a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Act, the Servicer shall notify the related Mortgagor in accordance with Accepted Servicing Practices that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage after such notification, the Servicer shall force place flood insurance on the Mortgagor's behalf in accordance with Applicable Law and within the time permitted by Accepted Servicing Practices.

All policies required hereunder shall name the Servicer and its successors and assigns as a mortgagee and loss payee and shall be endorsed with non contributory standard or New York mortgagee clauses which shall provide for at least 30 days prior written notice of any cancellation, reduction in amount or material change in coverage.

The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting a insurance carrier or agent, provided, however, that the Servicer shall not accept any insurance policies from insurance companies unless such companies are acceptable under the applicable Agency Guide or, with respect to the Portfolio Loans, the Fannie Mae Guides and are licensed to do business in the jurisdiction in which the Mortgaged Property is located.  The Servicer shall determine that such policies provide sufficient coverage in amounts as required pursuant to such Agency Guide.

Any amounts collected by the Servicer under any such policies (other than amounts to be deposited in a suspense account and applied to the restoration or repair of the related Mortgaged Property, or to be released to the Mortgagor, in accordance with the Servicer's normal servicing procedures as specified in Section 2.14) shall be deposited in the Custodial Account pursuant to Section 2.04, subject to withdrawal pursuant to Section 2.05.

With respect to each subordinate lien Mortgage Loan, including HELOC Loans, the Servicer shall obtain and maintain the blanket hazard insurance and flood policy described in Section 2.11.

Section 2.11.    Maintenance of Blanket Hazard Insurance Coverage

In the event that the Servicer shall obtain and maintain a blanket policy insuring against losses arising from fire, hazards and flood covered under extended coverage on all of the Mortgage Loans and HELOC Loans, then, to the extent such policy complies with all of the requirements of Section 2.10 relating to hazard insurance, the Servicer shall conclusively be deemed to have satisfied its obligations as set forth in Section 2.10 to maintain such hazard and flood insurance.  Any amounts collected by the Servicer under any such blanket policy relating to a Mortgage Loan shall be deposited in the Custodial Account pursuant to Section 2.04, subject to withdrawal pursuant to Section 2.05.  Such policy may contain a deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property an individual policy complying with Section 2.10, and there shall have been a loss which would have been covered by such individual policy, the Servicer shall deposit in the applicable Custodial Account  the amount not otherwise payable under the blanket policy because of such deductible clause, such amount to be deposited from the Servicer's funds, without reimbursement therefore.

Section 2.12.    Maintenance of Fidelity Bond and Errors and Omissions Insurance

The Servicer shall maintain with responsible companies, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds, money, documents or papers relating to the Mortgage Loans ("Servicer Employees").  Any such fidelity bond and errors and omissions insurance policy shall be in the form of the mortgage banker's blanket bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Servicer Employees.  No provision of this Section 2.12 requiring such fidelity bond and errors and omissions insurance policy shall relieve the Servicer from its duties and obligations as set forth in this Agreement.  The Servicer shall maintain minimum coverage amounts under any such fidelity bond and errors and omissions insurance policy that satisfies the Agency Guides. The Servicer shall provide proof of such coverage upon written request by Owner.

Section 2.13.    Inspections

Regarding Mortgage Loans in a first lien position, the Servicer shall perform inspections of the Mortgaged Property as required by Accepted Servicing Practices.  Regarding subordinate lien Mortgage Loans, the Servicer shall have no obligation to perform inspections. The cost of any inspections performed by the Servicer shall be considered a Servicing Advance.

Section 2.14.    Restoration of Mortgaged Property

(a)    With respect to Portfolio Loans, the Servicer need not obtain the approval of the Owner prior to releasing to the Mortgagor any Insurance Proceeds to be applied to the restoration or repair of the Mortgaged Property or any Condemnation Proceeds, if such release is in accordance with Accepted Servicing Practices; provided, however, that in connection with any

release of Insurance Proceeds in excess of the levels set forth in the Fannie Mae Guide, the Servicer shall comply with the following conditions:

> (i)      the Servicer shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

> (ii)     the Servicer shall take all steps necessary to preserve the priority of the lien of the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens; and

> (iii)    pending repairs or restoration, the Servicer shall place the Insurance Proceeds in a suspense account.

Section 2.15.    Title, Management and Disposition of REO Property

(a)      In the event that title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall, subject to Section 2.02, be taken in the name directed by the Owner.

(b)      The Servicer, either itself or through an agent selected by the Servicer, shall manage, protect and market for sale each REO Property for the Owner for the purpose of securing its prompt disposition and sale.  The disposition of REO Property shall be carried out by the Servicer at such price, and upon such terms and conditions, as the Servicer deems to be in the best interests of the Owner, in accordance with the terms of the Loss Mitigation and Servicing Delegated Authority Matrix.

(c)      The Servicer shall use commercially reasonable efforts to dispose of each REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless the Servicer determines that a longer period is necessary for the orderly liquidation of such REO Property.

(d)      The Servicer shall maintain on each REO Property fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Act, flood insurance.

(e)      The net proceeds of sale of any REO Property shall be remitted to the Owner as soon as practical after the expenses of such sale are paid and the Servicer has reimbursed itself for any related un-reimbursed Servicing Advances and unpaid Servicing Fees.

Section 2.16.    Servicing Advances with Respect to REO Property

The Servicer shall make a Servicing Advance for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance and the fees of any managing agent acting on behalf of the Servicer.  The Servicer shall make distributions on each Remittance Date to the Owner of the available net cash flow, if

any, from the REO Property, which shall equal the revenues from such REO Property net of expenses, unreimbursed Servicing Advances and Non-recoverable Advances and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses.

Section 2.17.   Notification of Adjustments

With respect to each Adjustable Rate Mortgage Loan, the Servicer shall adjust the Mortgage Interest Rate on the related Interest Rate Adjustment Date in compliance with the requirements of the related Mortgage Note and Applicable Law.  The Servicer shall deliver any and all notices required under Applicable Law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate and the Monthly Payment adjustments.  The Servicer shall promptly upon written request thereof, deliver to the Owner any applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. In connection with any Forbearance entered into pursuant to Section 2.01(i), the Servicer may waive any interest rate or Monthly Payment adjustments.

Section 2.18.   Maintenance of PMI Policies

(a)     With respect to each Mortgage Loan subject to a PMI Policy or LPMI Policy on the related Transfer Date and subject to the PMI or LPMI insurer's ability to rescind coverage under such PMI Policy or LPMI Policy for origination defects or prior servicer error, the Servicer shall maintain or cause the Mortgagor to maintain (to the extent that the Mortgage Loan requires the Mortgagor to maintain such insurance) in full force and effect such PMI Policy or LPMI Policy, and shall pay or shall cause the Mortgagor to pay their Escrow Payments relating thereto, on a timely basis.  The Servicer shall have no obligation with respect to a PMI Policy or LPMI Policy that has been rescinded for origination defects, prior servicer error, or any other grounds not directly related to actions or inactions of Servicer.  In connection with any assumption or substitution agreements entered into or to be entered into with respect to a Mortgage Loan, the Servicer shall promptly notify the insurer under the related PMI Policy or LPMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such PMI Policy or LPMI Policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under such PMI Policy or LPMI Policy.

(b)     The Servicer shall comply with all provisions of Applicable Law relating to the cancellation of, or collection of premiums with respect to, PMI Policies, including, but not limited to, the provisions of the Homeowners Protection Act of 1998, and all regulations promulgated thereunder, as amended from time to time.  The Servicer shall be obligated to make premium payments with respect to PMI Policies required to be maintained by the Mortgagor, if the Mortgagor is required but fails to pay any Escrow Payments, which shall be paid from the Escrow Account and shall be recoverable by the Servicer as a Servicing Advance.

(c)     The Servicer shall bill the Owner for any premiums advanced by Servicer for the LPMI Policy pursuant to Section 3.04.

(d)      With respect to each Mortgage Loan covered by a PMI Policy or LPMI Policy, the Servicer shall take all such actions on behalf of the Owner as are necessary to service, maintain and administer the related Mortgage Loan in accordance with such policy and to enforce the rights under such policy.  Except as expressly set forth herein, the Servicer shall have full authority on behalf of the Owner to do anything it deems appropriate or desirable in connection with the servicing, maintenance and administration of such policy; provided that the Servicer shall not take any action with respect to such Mortgage Loan which would result in non-coverage under such LPMI Policy or PMI Policy of any loss which, but for actions of the Servicer, would have been covered thereunder.  With respect to requests from any PMI or LPMI insurers, (i) the Servicer shall not, without the express written direction of the Owner, provide any origination information from the Servicing File or Mortgage File to such insurers and (ii) the Servicer shall cooperate with the PMI Policy or LPMI Policy insurers in accordance with Accepted Servicing Practices and provide reasonable evidence and information in the possession of the Servicer relating to servicing activities to which the Servicer has access with respect to the related Mortgage Loan.

(e)      The Servicer agrees to prepare and present, on behalf of itself and the Owner, claims to the insurer under any PMI Policy or LPMI Policy in a timely fashion in accordance with the terms of such PMI Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any PMI Policy or LPMI Policy respecting a defaulted Mortgage Loan.  Any amounts collected by the Servicer under any PMI Policy or LPMI Policy shall be remitted to the Owner.

(f)      The Servicer shall obtain and maintain all necessary approvals with the primary mortgage insurance carriers as may be necessary to submit premiums and process claims.

Section 2.19.   Servicing Changes

(a)      If, following the date of this Agreement, Owner shall propose to (i) amend, supplement, discontinue or introduce any Program Form; and/or (ii) alter, amend or supplement the servicing activities including any change to the Loss Mitigation and Servicing Delegated Authority Matrix (any such amendment, supplement, discontinuation, introduction or other alteration being herein referred to as a "Servicing Change"), the Owner shall provide written notice of each such proposed Servicing Change to the Servicer by providing (a) a specimen of each Program Form proposed to be amended, supplemented or introduced, in the form in which it is proposed to be amended, supplemented or introduced; and/or (b) a written description of each proposed amendment, supplement or other alteration to the servicing activities, which description shall in each case be sufficiently clear, comprehensive and detailed to provide a reasonable basis for the training of individuals who would be required to follow the procedures described thereby (such written notice, as accompanied by the items described in clauses (a) and (b), is referred to herein as a "Servicing Change Proposal").

(b)      Upon receipt of a Servicing Change Proposal, the Servicer shall deliver a written response either (i) accepting such Servicing Change Proposal, in which case the Servicing Change shall become effective on the date that Servicer, in its reasonable discretion, is able to implement the Servicing Change, or (ii) reject such Servicing Change Proposal, which rejection

shall include the reasons for such rejection set forth in reasonable detail.  No Servicing Change shall become effective unless and until all terms, including the cost thereof, are agreed upon in writing by both Parties.

(c)      If following the date of this Agreement, the aggregate number of Mortgage Loans removed or transferred by the Owner exceeds 120,000 Mortgage Loans  and either (i) the percentage of loans in Default exceed any of the respective triggers as provided in the Pricing Exhibit or (ii) the Agency Loans as a percentage of all Mortgage Loans serviced under this Agreement exceeds the respective trigger provided in the Pricing Exhibit, the Servicer may provide a Servicing Change Proposal to the Owner with respect to any proposed increase in the pricing payable by the Owner hereunder in an amount requested by the Servicer upon sixty (60) days advance written notice to the Owner.  If the Owner has not agreed to such Servicing Change Proposal at the end of sixty (60) days after receipt of such Servicing Change Proposal, then the increased costs set forth therein will automatically take effect; provided, however, if the Owner does not agree to pay such increased costs, the Owner may exercise its rights under Section 11.01(b)hereof and will pay the Servicer any costs related thereto, including without limitation those fees listed on the Pricing Exhibit.

Section 2.20.   <u>Prepayment Charges</u>

The Servicer shall not waive any applicable prepayment charge with respect to any Mortgage Loan that prepays during the term of the prepayment charge.  If the Servicer fails to collect the applicable prepayment charge upon any prepayment of any Mortgage Loan, the Servicer shall pay the Owner an amount equal to the prepayment charge not collected.  Notwithstanding the foregoing, the Servicer may waive a prepayment charge without paying the Owner the amount of the prepayment charge if (i) the Mortgage Loan is in Default or default is reasonably foreseeable and such waiver would maximize recovery of total proceeds taking into account the value of such prepayment charge and the other amounts due on the related Mortgage Loan or (ii) the collection of the prepayment charge would be in violation of Applicable Law.

Section 2.21.   <u>Credit Reporting</u>

For each Mortgage Loan, the Servicer shall, on a monthly basis, accurately and fully furnish, in accordance with Applicable Law, accurate and complete information (e.g., favorable and unfavorable) on the Mortgagors to each of the following credit repositories: Equifax Credit Information Services, Inc., Trans Union, LLC and Experian Information Solution, Inc.

Section 2.22.   <u>Safeguarding Customer Information</u>

The Servicer has implemented and will maintain security measures designed to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information published in final form on February 1, 2001, 66 Fed. Reg. 8616, and the rules promulgated thereunder, as amended from time to time.

# ARTICLE III.
## REMITTANCES AND STATEMENTS

Section 3.01.    Remittances for Mortgage Loans that are not HELOC Loans

On each Remittance Date, the Servicer shall remit for each Portfolio Loan that is not a HELOC Loan and for each REO Property by wire transfer of immediately available funds to the Owner all amounts deposited in the applicable Custodial Account as of the close of business on each related Remittance Date and any related Ancillary Income.

With respect to any remittance not made to Owner on the Remittance Date on which such remittance was required to be made, the Servicer shall, if such remittance has not already been made when written notice of such nonpayment is provided from Owner to Servicer, pay to the Owner interest on any such late payment at an annual rate equal to the LIBOR Rate, adjusted as of the date of each change, but in no event greater than the maximum amount permitted by law.  Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the Business Day on which notice of such non-payment was given by Owner and ending with the Business Day on which such payment is made, both inclusive.  Such interest shall be remitted within three (3) Business Days from the date such payment was made.  The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Servicer Event of Default.

Section 3.02.    Remittances for HELOC Loans3

(a)    The Servicer shall on each Business Day determine the amount of all HELOC Draws made on account of the HELOC Loans on the preceding Business Day and notify the Owner of such amount in the Daily HELOC Report.

(b)    Each Remittance Date, the Servicer shall remit for each HELOC Loan by wire transfer of immediately available funds to the Owner all amounts deposited in the applicable Custodial Account as of the close of Business on each Remittance Date and any related Owner Income, net of HELOC Draws not previously reimbursed.

(c)    To the extent the amount owed to the Servicer pursuant to Section 3.02(b) exceeds the remittance amount or the available funds in the Custodial Account, the Servicer shall one Business Day prior will notify the Owner of such amount owed to the Servicer and the Owner will be required to reimburse the Servicer on the related Remittance Date.

(d)    If such payment is not made by the Owner when due pursuant to Section 3.02 (c), in addition to any other rights or remedies available to Servicer under this Agreement, including but not limited to the right of the Servicer to collect interest on such late payment pursuant to Section 4.03, the amount payable to Servicer may be deducted from the Custodial Account or from any subsequent remittance due Owner.

Section 3.03.    Remittance for Agency Loans

The Owner shall remit to Servicer, or ensure the Agency Custodial Account has sufficient funds for, all Monthly Payments due to the applicable Agency, on the date such funds are due to the applicable Agency.  The Servicer shall provide one (1) Business Day prior written notice to the Owner of any amounts due to the applicable Agency.  The Servicer requires any funds due to the Agency be in the Custodial Account on the day prior to the date such funds are due to be remitted to the Agency or deducted from the Agency Custodial Account.  This includes but is not limited to Monthly Payments, interest shortfalls on payoffs, guaranty fees, buyout amounts and Repurchase Requests.

On each Remittance Date the Servicer shall also remit for each Agency Loan by wire transfer of immediately available funds, all amounts required to be remitted to the Owner pursuant to this Agreement, including any related Ancillary Income, as of the related Remittance Date.  This amount shall include any Agency servicing fees collected by the Servicer and due the Owner net of amounts due Servicer  pursuant to Section 4.03.

Section 3.04.    Reconciliation of Servicing Advances

With respect to all Mortgage Loans and REO Properties, Servicer shall maintain a corporate account to daily reconcile the amount of unreimbursed Servicing Advances and Servicing Advances recovered.  The Servicer shall, on the related Remittance Date, determine all amounts representing Servicing Advances recovered and unreimbursed Servicing Advances on account of the Mortgage Loans and REO Properties.  To the extent that the aggregate Servicing Advances recovered exceed the unreimbursed Servicing Advances, Servicer shall remit such difference to Owner by wire transfer of immediately available funds on the related Remittance Date.  To the extent that the aggregate amount of unreimbursed Servicing Advances exceed the Servicing Advances recovered, (a) Servicer shall notify Owner of such difference in the Servicing Advance report which shall be provided on the Remittance Date and (b) the Servicer shall net such amount from the remittance due to the Owner or withdraw such amount from the Custodial Account related to the Portfolio Loans, provided, however, if the remittance is not sufficient  to allow the Servicer to net the full amount of the Servicing Advances and the Servicer cannot deduct the amount from the Custodial Account the Owner shall, by wire transfer, remit to Servicer such amount within one (1)Business Day of receipt by Owner of such notice.

If such payment is not made by the Owner when due pursuant to this Section 3.04, in addition to any other rights or remedies available to Servicer under this Agreement, including but not limited to the right of the Servicer to collect interest on such late payment pursuant to Section 4.03, the amount payable to Servicer may be deducted from the Custodial Account or from any subsequent remittance due Owner.  For the avoidance of doubt, the Servicer acknowledges that once such notice has been issued, the amount referenced in such notice may not be netted from any remittance made to the Owner or withdrawn from the Custodial Account, unless the Owner fails to reimburse the Servicer pursuant to this Section 3.04.

On each Invoice Date, the Servicer shall provide the owner with a summary in its Monthly Report of Servicing Advances.

Section 3.05.   Statements to Owner

(a)      Not later than each Invoice Date, the Servicer shall furnish to the Owner a Monthly Report for the Mortgage Loans, in electronic medium mutually acceptable to the Parties.

(b)      No later than the Invoice Date of each month, the Servicer shall provide the Owner with a billing statement for amounts owed to Servicer under the terms of this Agreement (which billing statement shall include both the amounts payable to the Servicer under the Agreement, the amounts already received by the Servicer pursuant to the Agreement, and any remaining amount owed to the Servicer).

(c)      During the term of this Agreement, in addition to the reports specifically required under this Agreement, the Servicer shall also furnish to the Owner such other periodic, special, or other reports or information as shall be reasonably requested by the Owner to the extent such reports or information are readily accessible to the Servicer without any more than nominal expense or effort.  Upon request of the Owner, the Servicer shall provide copies of any reports Servicer transmits to the Agencies.  Upon the reasonable request of the Owner, the Servicer shall provide customary backup with respect to any requested advances.  To the extent any such report not otherwise provided for herein and requiring more than nominal expense or effort is reasonably requested by Owner, Servicer shall have no obligation to provide such report until Servicer and Owner agree on the additional compensation to be paid Servicer for such report using the Servicing Change process outlined in Section 2.19.

Section 3.06.   Internal Revenue Service Reports

(a)      The Servicer shall mail, on or before the dates required by Applicable Law, U.S. Internal Revenue Service ("IRS") Form No. 1099 to all parties entitled to receive interest on Escrow Accounts, where applicable, as well as IRS Form No. 1098 to each Mortgagor.  The Servicer shall timely file all required reporting relating to the Mortgage Loans with the IRS, including, for all periods after the applicable Transfer Date.  In addition, the Servicer shall provide the Owner with such information concerning the Mortgage Loans which is reasonably available to the Servicer and which is necessary for the Owner to prepare its federal income tax return as the Owner may reasonably request from time to time.

(b)      Following the foreclosure sale or abandonment of any Mortgaged Property, the Servicer shall report such foreclosure or abandonment to the U.S. Internal Revenue Service as required by Applicable Law.

Section 3.07.   No Principal & Interest Advances

The Servicer will service the Portfolio Loans on an "actual/actual" basis and the Servicer shall have no obligation to advance principal or interest payments not collected from

Mortgagors.  With respect to Agency Loans, Advances and other amounts due the applicable Agency shall be funded by the Owner pursuant to Section 3.03.

Section 3.08.   Odd Due Dates

Any Mortgage Loan other than a HELOC Loan, which has a scheduled Due Date on a day other than the first day of each month shall, for the purposes of this Agreement, be considered due on the first day of the month following the month in which that payment is due. For example, a Mortgage Loan with a scheduled payment due on August 15 shall be considered to have a Due Date of September 1 for the purposes of this Agreement, including investor reports and remittance, and for calculating the length of payment Default on such Mortgage Loan.

# ARTICLE IV.
## ADDITIONAL SERVICING PROCEDURES

Section 4.01.   Transfers of Mortgaged Property

(a)      The Servicer shall be required to enforce any "due-on-sale" provision contained in any Mortgage or Mortgage Note.  When the Mortgaged Property has been conveyed by the Mortgagor without repayment in full of the related Mortgage Loan, the Servicer shall, to the extent it has knowledge of such conveyance, exercise its right to accelerate the maturity of such Mortgage Loan under the applicable "due-on-sale" clause, provided, however, that the Servicer shall not exercise such right if prohibited by Applicable Law from doing so.

(b)      If the Servicer reasonably believes it is unable under Applicable Law to enforce a "due-on-sale" clause, the Servicer, shall, to the extent permitted by Applicable Law, enter into (i) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (ii) in the event the Servicer is unable under Applicable Law to require that the original Mortgagor remain liable under the Mortgage Note and the Servicer has the prior consent of the PMI Policy or LPMI Policy provider, a substitution of liability agreement with the purchaser of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the purchaser of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note.  In connection with any such assumption, the Mortgage Interest Rate, the term of the Mortgage Loan and the outstanding principal amount of the Mortgage Loan shall not be changed.

(c)      To the extent that any Mortgage Loan is assumable, the Servicer shall inquire diligently into the creditworthiness of the proposed transferee, and shall follow Accepted Servicing Practices including but not limited to conducting a review of the credit and financial capacity of the transferee, and may approve the assumption if it believes the transferee is capable of performing the mortgage obligations.  If the credit of the proposed transferee does not satisfy the relevant underwriting criteria and the transfer of ownership actually occurs, the Servicer shall, to the extent permitted by the Mortgage, Mortgage Note and Applicable Law, accelerate the maturity of the Mortgage Loan.

(d)     Any assumption fee collected by the Servicer for entering into an assumption agreement shall be retained by the Servicer as additional servicing compensation.

Section 4.02.    Satisfaction of Mortgages Upon Payment in Full

Upon the payment in full of any Mortgage Loan, or if a HELOC Loan, the receipt of written notification from the Mortgagor to satisfy their HELOC Loan (provided that no amounts due on such HELOC Loan),  the Servicer shall notify the Owner in the Monthly Report, and may request the release of any Mortgage Loan Documents from the Owner or Custodian. The Servicer shall satisfy the lien of record securing any such paid in full Mortgage Loan within the applicable time limit required by Applicable Law; provided that the Owner or its Custodian has provided, or caused to be provided, all necessary documents requested by the Servicer.

Section 4.03.    Servicing Compensation and Owner Expenses

As consideration for servicing the Mortgage Loans pursuant to this Agreement, the Servicer shall be entitled to net from remittances made to the Owner or withdraw from the Custodial Account on the Invoice Date the applicable Servicing Compensation from payments on the Mortgage Loans or to withdraw the applicable Servicing Compensation with respect to each Mortgage Loan from the Custodial Account pursuant to Section 2.05 hereof.  In addition to the Servicing Compensation, the Owner also agrees to pay Owner Expenses and (when applicable) any other fees as mutually agreed; if not otherwise withdrawn from the Custodial Account pursuant to this Agreement.

To the extent any amounts due the Servicer per the Pricing Exhibit or this Agreement, including but not limited to Servicing Compensation, Owner Expenses, Servicing Advances, and Advances, cannot be deducted from any Custodial Accounts or deducted from any remittance due Owner, the Servicer shall bill the Owner.  The Owner agrees to pay all such bills within 10 Business Days from receipt, unless a shorter period of time is provided elsewhere in this Agreement for Owner to make a particular payment.  For the avoidance of doubt, the Servicer acknowledges that once such notice has been issued, the amount referenced in such notice may not be netted from any remittance made to the Owner or withdrawn from the Custodial Account, unless the Owner fails to reimburse the Servicer pursuant to this Section 4.03.

If such amounts are not paid when required, the Owner shall, if such amounts have not already been paid when written notice of such non-payment is provided from Servicer to Owner, pay to the Servicer interest on any such late payment at an annual rate equal to the LIBOR Rate, adjusted as of the date of each change, but in no event greater than the maximum amount permitted by law.  Such interest shall be paid by Owner with the payment to which such interest relates, or withdrawn by Servicer from the Custodial Account with the withdrawal to which such interest relates, and shall cover the period commencing with the Business Day on which notice of such non-payment was given by Servicer and ending with the Business Day on which such payment is made by Owner or withdrawn by Servicer, both inclusive.  The payment by the Owner of any such interest shall not be deemed an extension of time for payment or a waiver of any Owner Event of Default.

Section 4.04.    Possession of Mortgage Files

(a)        To the extent that the Servicer is in possession of any originals of any Mortgage Documents, such original documents shall be held in trust by the Servicer for the benefit of the Owner as the owner thereof.  The Servicing File shall be held in trust by the Servicer for the benefit of the Owner as the owner thereof.  The possession of the Mortgage File and the Servicing File by the Servicer is at the will of the Owner for the sole purpose of servicing the related Mortgage Loan, pursuant to this Agreement, and such retention and possession by the Servicer is in its capacity as Servicer only and at the election of the Owner; provided, however, that Servicer may keep copies of any records it deems necessary for compliance with any state or federal record retention requirements or as it deems advisable for use in defending any litigation, action or claim.  The Servicer shall release the contents of any Mortgage File or Servicing File only in accordance with written instructions from the Owner, unless such release is required as incidental to the Servicer's servicing of the Mortgage Loans pursuant to this Agreement.

(b)        The Servicer shall be responsible for maintaining, and shall maintain, the Servicing File for each Mortgage Loan which shall clearly reflect the ownership of each Mortgage Loan by the Owner.  To the extent that original documents (other than the Mortgage Loan Documents) are not required for purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Servicer may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including but not limited to, optical imaging techniques so long as the Servicer complies with Accepted Servicing Practices.

(c)        In addition, the Servicer shall, upon request by the Owner, transmit back-up tapes in an electronic format containing information, in the Servicer's control, relating to the Mortgage Loans to the Owner or the Owner's back-up servicer(s) on such schedule as is requested by the Owner and subject to Section 2.19 hereof, the Servicer shall provide such reasonable assistance in connection with transmitting and reconciling the related loan tape and information with the back-up servicer(s) as the Owner may request.  Such reconciliation shall take place no more than once per month and shall be limited to reconciling loan counts, the aggregate unpaid principal balance of the mortgage loans and the aggregate escrow and corporate advance balances of the mortgage loans.  The Owner shall reimburse Servicer for such out of pocket costs and pay the fee set forth on the Pricing Exhibit.  The Servicer will cooperate with the Owner and its designee to develop required contingency measures in the event of merger, acquisition, change of control, or bankruptcy/reorganization of the Servicer.  To the extent the Owner's requirements change, the Servicer's obligations with respect to this clause (c) are subject to Section 2.19 herein.

Section 4.05.    Right to Examine Servicer Records; Cooperation with Owner's Consent
                          Order Initiatives and Establishment of Service Levels

        The Owner and its agents and regulators shall have the right to examine and audit, with reasonable frequency and upon reasonable advance written notice, any and all of the books, records, or other information of the Servicer, whether held by the Servicer or by another on its

behalf, with respect to or concerning this Agreement or the Mortgage Loans, during normal business hours or as otherwise agreed to by the Servicer.  If Servicer incurs any out of pocket costs associated with any such examine, audit or review, Owner shall reimburse Servicer for such costs.

The Servicer will use commercially reasonable efforts in accordance with Accepted Servicing Practices, to cooperate with the Owner with respect to the Owner's mortgage servicing oversight program pursuant to the Owner's obligations under the Consent Order.  In addition to Section 3.05 (c), the Owner may ask Servicer to produce additional reports or data files so that the Owner may monitor the Mortgage Loans in accordance with the Consent Order. Exhibit 7 attached hereto sets forth the agreed upon procedures with respect to the Owner's Third Party Vendor Management process established between the Owner and the Servicer.  Upon request of Owner, as may be reasonably required, the Parties agree to work together to establish and document service levels relating to certain of the servicing activities being performed by Servicer under this Agreement.  Any such service levels shall be mutually agreed upon by Owner and Servicer.  The foregoing paragraph is subject to Section 2.19.

Section 4.06.    Losses and Expenses

(a)      Except as may otherwise be expressly provided in this Agreement, Owner shall remain responsible, as between Owner and Servicer, for losses related to Owner's investment in the Servicing Rights or, as applicable, the Mortgage Loans as distinct from (and which shall not include) costs and expenses related to the performance of the servicing duties delegated to Servicer hereunder, for which Servicer shall be responsible.  Losses of the type referred to above for which Owner shall remain responsible include, but are not limited to:  investor repurchase demands, earthquake losses or other such special hazard losses not covered by the insurance required to be maintained under this Agreement, litigation losses, fraud, foreclosure losses, REO Property losses, Recourse Obligations, prepayment interest shortfall, Agency penalties, VA No-Bid Instruction, VA partial guaranties, FHA partial claims payments, shortages in the reimbursements amounts for fees paid by Servicer on FHA and VA Mortgage Loans and losses resulting from application of the Servicemembers Civil Relief Act of 2003.

(b)      In addition to Servicing Advances and Owner Expenses regarding which the Servicer is entitled to reimbursement hereunder, Owner shall reimburse Servicer for expenses incurred in connection with the performance by Servicer at the request of Owner of any activity that is not specifically required to be performed by Servicer under this Agreement and is not reasonably ancillary to any specific obligation of Servicer under this Agreement.  Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incurred in connection with the preparation of and performance under this Agreement, including, without limitation, its own legal fees and expenses of preparing and delivering the notices, documents, reports, accountings and any other information required of it hereunder.  Owner shall be solely responsible for all custodial fees (including related shipping costs) of Owner's document Custodian, if any.

(c)      In the event that Servicer determines it is in the Owner's best interest to cure a default under or pay off a superior lien mortgage loan related to a subordinate lien Mortgage

Loan, Servicer shall notify Owner of the amount needed to effectuate such a cure or pay off. Owner agrees to remit such funds to Servicer within the time period specified by Servicer if Owner wishes to preserve the subordinate lien Mortgage Loan being serviced by Servicer.  If Servicer does not receive the required funds within the time periods specified, Servicer will not cure or pay off such superior lien mortgage loan.

Section 4.07.   Repurchase Requests

(a)       In the event Servicer receives a Repurchase Request directly from an Agency, investor or any other Person, Servicer shall provide notice to the Owner as soon as reasonable practicable, but no later than five (5) Business Days and Servicer agrees to provide Owner with reasonably requested information relating to such request.  Owner shall respond in a timely manner directly to the Person making such repurchase request.

(b)       In the event the Owner requests the seller or the originator of the Mortgage Loan to repurchase such Mortgage Loan and/or the Servicing Right to such Mortgage Loan, Servicer agrees to cooperate with Owner to provide Owner with reasonably requested information relating to such request.

(c)       If the Mortgage Loan is to be repurchased, Servicer shall calculate, on behalf of Owner, amounts required to repurchase the Mortgage Loan.  In the event of a repurchase by the seller or originator at Owner's request with transfer of servicing to another servicer, Owner shall immediately reimburse Servicer a) for any funds owed to or advanced by Servicer; and b) for any outstanding funds due Servicer according to Section 11.02 of this Agreement.  The Servicer shall not be entitled to receive the Deboarding Fee or the Loan Termination Fee with respect to any repurchases.

(d)       Owner agrees to pay Servicer the Repurchase Request Fee for each Repurchase Request processed by Servicer pursuant to this Section 4.07.

# ARTICLE V.
## COMPLIANCE AND CONFIDENTIALITY  INTELLECTUAL PROPERTY

Section 5.01.   Annual Statement as to Compliance

The Servicer shall deliver to the Owner, on or before March 31st each year beginning March 31, 2013, an officer's certificate, stating that (i) a review of the activities of the Servicer during the preceding calendar year and of performance under this Agreement has been made under such officer's supervision, and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof and the action being taken by the Servicer to cure such default.

In the event a default that with passage of time or failure to cure would constitute a Servicer Event of Default comes to the attention of an officer of the Servicer prior to the requirement to deliver the annual statement of compliance set forth above, the Servicer shall provide written notice of such default, as soon as it is reasonably practicable, as well as the nature and status thereof and the action taken or to be taken by the Servicer to correct such default.

Section 5.02.    Annual Independent Public Accountants' Servicing Report

On or before March 31st of each year beginning March 31, 2013, the Servicer, at its expense, shall either (a) cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Owner to the effect that such firm has examined certain documents and records for the preceding fiscal year (or during the period from the date of commencement of such Servicer's duties hereunder until the end of such preceding fiscal year in the case of the first such certificate), and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Servicer's overall servicing operations have been conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers except for such exceptions that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report, in which case such exceptions shall be set forth in such statement, or (b) furnish to Owner the Servicer's assessment of Servicer's compliance with the servicing criteria set forth in Section 1122(d) of Securities and Exchange Commission Regulation AB (17 C.F.R. Section 229.1122(d)), which assessment shall be attested to by a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants.  If pursuant to generally accepted accounting principles or accepted mortgage industry practice, material changes to the requirements of this Section 5.02 become necessary or desirable in the reasonable good faith judgment of either Party, the Parties agree to negotiate in good faith to modify the requirements of this Section 5.02.

Section 5.03.    Compliance with Gramm-Leach Bliley Act of 1999

With respect to each Mortgage Loan and the related Mortgagor, each party shall as required comply with Title V of the Gramm-Leach-Bliley Act and all applicable regulations promulgated thereunder, and shall provide all notices required of such party thereunder.

Section 5.04.    Data Security; Breach of Security

The Servicer shall comply with its Privacy and Information Security policies and programs.  In addition, no later than two Business Days after becoming aware of any breaches in security, the Servicer shall furnish to the Owner information with respect to any such breaches in security, including from any unauthorized intrusion.

Section 5.05.    Confidentiality of Information

(a)    The Servicer and the Owner each agree that any information and documents that are furnished for the purposes of performing under this Agreement or that are produced or are otherwise furnished to or come to the attention of either Party in connection herewith are confidential and proprietary and shall be used only for the purposes of carrying out such Party's obligations under this Agreement.  This information includes the terms of this Agreement, technical specifications and operating manuals, information concerning current, future, or proposed products and services and combinations of products and services; product and services descriptions; financial information; information related to mergers or acquisitions; passwords and security procedures; computer programs, loan servicing systems, software, and software documentation; customer and/or prospective client lists, mortgage loan files or Servicing Files, and all other information relating in any way to the borrower and/or prospective borrower; printouts; records; policies, practices and procedures; and any or all other information, data or materials relating to the business, trade secrets and technology of either Party, its customers, clients, employees, business affairs and Affiliates (all of the foregoing collectively referred to as "Confidential Information").  Without limiting the foregoing, any non-public, personally identifiable information about the Owner's consumers or Mortgagors ("Customer Information") is the Confidential Information of the Owner.

(b)    As between the Parties, the Party disclosing Confidential Information to the other Party retains all right, title and interest in and to its Confidential Information, regardless of whether provided by or on behalf of the disclosing Party or generated by the receiving Party.  At no time during or after the term of this Agreement shall the receiving Party have, and the receiving Party hereby waives, any interest in or statutory or common law lien, claim or encumbrance on the Confidential Information of the disclosing Party.  Neither Party shall sell, rent, lease, encumber, pledge or, except as permitted by this Agreement or Applicable Law, transfer, the other Party's Confidential Information.  In connection with the exercise of rights and the performance of obligations pursuant to this Agreement, the Parties may exchange and have access to each other's Confidential Information.  Confidential Information of the disclosing Party shall be used by the receiving Party solely in the performance of its obligations or the exercise of its rights pursuant to this Agreement.  Each Party receiving Confidential Information from the other Party under this Agreement agrees that any Confidential Information provided by the other Party shall be kept strictly confidential and shall not be disclosed in any manner whatsoever, in whole or in part, to any employee, agent, consultant or third party (each a "Representative" and, collectively, the "Representatives"), except (i) as may be necessary to perform its obligations or exercise its rights pursuant to this Agreement, including, without limitation, for the management, use and administration of the services performed pursuant to and in accordance with this Agreement, (ii) as may be agreed upon in writing by the disclosing Party prior to disclosure, or (iii) as otherwise required by Applicable Law or judicial, regulatory or administrative process.  Each Party will use its commercially reasonable efforts to ensure that its Representatives to whom Confidential Information is disclosed take such action as shall be necessary or advisable to preserve and protect the confidentiality of Confidential Information.  Each of the Servicer and the Owner assumes full responsibility for the acts and omissions of the persons and entities to which it discloses or that obtains from such Party the other Party's Confidential Information, as if such acts or omissions were those of the Servicer or the Owner, respectively.  The receiving Party shall not duplicate, copy or reproduce, in tangible or electronic form, including, without limitation, by means of photocopying, transcribing of voice recording or electronic imaging,

delivery or process, Confidential Information except in the ordinary course of business for the performance of its obligations or the exercise of its rights pursuant to this Agreement, for its own required recordkeeping and retention purposes, and as may be required by Applicable Law or judicial, regulatory or administrative purposes.  Notwithstanding the terms of this Section, and for the purpose of clarity, any and all reports, data feeds and other deliverables created as part of or pursuant to the services performed pursuant to this Agreement, to the extent incorporating the Customer Information and other Confidential Information of the Owner shall be the Confidential Information of the Owner.  Unless otherwise expressly stated in a signed writing, the Owner shall have the right to disclose all reports and data feeds and other deliverables to third parties to exercise fully its rights to such deliverables, subject to this Section and so long as such reports, data feeds or other deliverables do not include any Servicer Confidential Information.

(c)     Each Party shall maintain the Confidential Information of the other in confidence using the same care and discretion to avoid disclosure of Confidential Information as it uses to protect its own confidential information that it does not want disclosed, but in no event less than a reasonable standard of care.

(d)     The obligations imposed under this Agreement shall not apply to Confidential Information that is (a) made public by the Party whose Confidential Information is disclosed, (b) generally available to the public other than by a breach of this Agreement by the receiving Party, its employees or agents, or (c) rightfully received from a third person having the legal right to disclose the Confidential Information free of any obligation of confidence, nor shall the section be deemed to prohibit any disclosure by a Party that is necessary or appropriate in such Party's work with legal counsel, accountants, auditors or as required by law.  In the event that the receiving Party, or any of such Party's agents or employees, becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil or criminal investigative demand or similar process) to disclose any Confidential Information of the disclosing Party, such receiving Party shall, provided it is not legally prohibited from doing so, provide prompt prior notice to the disclosing Party so that it may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, the receiving Party will furnish only that portion of the Confidential Information which in the judgment of its counsel is legally required and will exercise reasonable efforts to obtain assurances that confidential treatment will be accorded the Confidential Information.

(e)     Each Party acknowledges and agrees that any breach or threatened breach of any of the provisions of this section by the other Party may result in immediate and irreparable harm and that any remedies at law in such event will be inadequate.  The Parties agree that such breaches, whether threatened or actual, will give the disclosing Party the right to obtain injunctive relief to restrain such disclosure or use.  This right shall, however, be in addition to and not in lieu of any other remedies at law or in equity.

Upon termination of this Agreement, all copies of the Confidential Information will either be destroyed or returned to the disclosing Party immediately upon such Party's request.  Each Party agrees that it will not retain any copy, summary or extract of the Confidential Information or any related work papers on any storage medium whatsoever, except as may be legally required for records retention compliance purposes.  Notwithstanding anything

to the contrary contained herein, neither Party shall be required to purge information from computer system back-up tapes or comparable back-up medium, and Servicer shall in no event have any obligation hereunder to destroy Servicing Files or any documents related thereto.

(f)    No later than two Business Days after becoming aware of any unauthorized disclosure of Confidential Information, the Servicer shall furnish to the Owner information with respect to any such unauthorized disclosure of Confidential Information, including from any unauthorized intrusion.

Section 5.06.   Intellectual Property

(a)    Each party shall be the sole owner of all intellectual property rights and code, script, software programs and other tangible embodiments of such intellectual property rights owned by it as of the Effective Date or developed by it during the term of this Agreement unless otherwise agreed in writing by the Parties.  Each Party reserves all rights except as expressly set forth in this Agreement.  Without limiting the foregoing, the Parties acknowledge and agree that any disclosure of Confidential Information and, in the case of the Owner, Customer Information, will in no way be construed to be an assignment, transfer or conveyance of title to or ownership rights in such Confidential Information or Customer Information.

(b)    Subject to the terms of this Agreement, Owner grants to Servicer a royalty free, nontransferable, revocable, nonexclusive license during the term of this Agreement in the United States to access and use the (i) Customer Information; and (ii) Owner Materials, in the case of (i) and (ii), solely to the extent necessary and for the sole purpose of performing the services in accordance with this Agreement.  Servicer shall not access or use the Customer Information for any additional purpose, except as may be necessary to comply with this Agreement, Applicable Law or respond to governmental or regulatory inquiries.  Except for the foregoing license, Owner retains all right, title and interest in and to the Customer Information and Owner Materials.  "Owner Materials" means all text, forms, scripts, photographs, graphics, trademarks, service marks, design marks and domain names, and other content provided to Servicer by Owner for the purpose of performing the services pursuant to this Agreement.

Section 5.07.   Compliance with MERS

The Servicer shall comply with all rules and procedures of MERS in connection with the servicing of MERS Designated Mortgage Loans for so long as such Mortgage Loans are registered with MERS.

Section 5.08.   Eligible Servicer

Servicer covenants and agrees, at all times, to be an Eligible Servicer.

# ARTICLE VI.
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER

As of the date of this Agreement (or such other date if set forth below), the Owner warrants and represents to, and covenants and agrees with, the Servicer as follows:

Section 6.01.   Organization and Good Standing

The Owner is a state chartered bank duly organized, validly existing and in good standing under the laws of the State of Utah and is licensed, qualified and in good standing in each state where a Mortgaged Property is located to the extent necessary to perform its obligations under this Agreement.  The Owner has the power and authority to make, execute, deliver and perform this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement.  When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Owner enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

Section 6.02.   Ordinary Course of Business

The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Owner.

Section 6.03.   No Violations

The execution, delivery and performance of this Agreement by the Owner, its compliance with the terms hereof and the performance of the functions contemplated hereby will not violate, conflict with, result in a breach of, give rise to any right of termination, cancellation or acceleration, or constitute a default in any material respect under any provision of (i) any existing law or regulation or any order or decree of any court applicable to the Owner, except for violations that will not adversely affect the Owner's ability to perform its obligations under this Agreement, or constitute a material breach of(ii) any mortgage, indenture, contract or other agreement to which the Owner is a party or by which the Owner may be bound.

Section 6.04.   Ability to Perform

The Owner does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

Section 6.05.   Litigation

No litigation or administrative proceeding before any court, tribunal or governmental body is currently pending or to the knowledge of the Owner threatened, against the Owner or with respect to this Agreement, which if adversely determined would have a material adverse effect on the transactions contemplated by this Agreement.

Section 6.06.    No Consent Required

        The Owner is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except (a) for the written non-objection of the FDIC, which is required for certain agreements between the Owner and its Affiliates, as applicable, and (b) such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of the Owner to perform all obligations hereunder.

Section 6.07.    Ownership

        As of the related Transfer Date, with respect to each Portfolio Loan, Owner is the owner of all right, title, and interest in and to the Mortgage Loan and the Servicing Rights.  As of the related Transfer Date, with respect to each Agency Loan, Owner is the owner of all right, title, and interest in and to the Servicing Rights.  Each Mortgage Loan is a valid and collectible obligation of the respective Mortgagor.

Section 6.08.    Accuracy

        The information provided in any New Loan Data File, except to the extent such information was provided by Servicer, is true, complete and correct in all material respects as of the related Transfer Date.

Section 6.09.    No High Cost Loans

        To Owner's knowledge, no Mortgage Loan is a HOEPA Loan or subject to any similar law or regulation addressing high cost or predatory lending.

Section 6.10.    Compliance with Law

        The Owner has complied with and has not violated, any law, ordinance, request, regulation, rules or orders applicable to its business or properties, the violation of which reasonably could be expected to materially and adversely affect the operation or financial condition of the Owner.

Section 6.11.    Disclaimer

        Except as set forth in this Article VI, the Owner hereby disclaims all representations and warranties, implied or otherwise, including without limitation, implied warranties of fitness for a particular purpose and merchantability.

# ARTICLE VII.
## REPRESENTATIONS AND WARRANTIES OF SERVICER

As of the date of this Agreement, the Servicer warrants and represents to, and covenants and agrees with, the Owner as follows:

Section 7.01.   Organization and Good Standing

The Servicer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Servicer, and in any event the Servicer is in compliance with the laws of any such state to the extent necessary to perform its obligations in accordance with the terms of this Agreement.  The Servicer has the power and authority to make, execute, deliver and perform this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement.  When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Servicer enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

Section 7.02.   Ordinary Course of Business

The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Servicer.

Section 7.03.   No Violation

The execution, delivery and performance of this Agreement by the Servicer , its compliance with the terms hereof and the performance of the functions contemplated hereby will not violate, conflict with, result in a breach of, give rise to any right of termination, cancellation or acceleration, or constitute a default in any material respect under any provision of (i) any existing law or regulation or any order or decree of any court applicable to the Servicer, except for violations that will not adversely affect in any material way the Servicer's ability to perform its obligations under this Agreement, (ii) the certificate of formation of the Servicer, or (iii) any mortgage, indenture, contract or other agreement to which the Servicer is a party or by which the Servicer may be bound.

Section 7.04.   Ability to Perform

The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

Section 7.05.   Ability to Service

The Servicer has the facilities, procedures, and experienced personnel necessary for the servicing of mortgage loans of the same type as the Mortgage Loans.  The Servicer is in

good standing to enforce and service mortgage loans in the jurisdiction wherein the Mortgaged Properties are located.

Section 7.06.    <u>Litigation</u>

Except as set forth on Exhibit 8 hereof,  there is no litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending or to the knowledge of the Servicer threatened, against the Servicer or with respect to this Agreement, which if adversely determined would have a material adverse effect on the transactions contemplated by this Agreement.

Section 7.07.    <u>No Consent Required</u>

The Servicer is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance or enforceability of this Agreement, except such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of the Servicer to perform all obligations hereunder.

Section 7.08.    <u>Arms Length Terms</u>

The terms of this Agreement are no less favorable to Owner than those which would be offered by Servicer to, or would apply to, a third party which is not affiliated with Servicer, in accordance with Section 23B of the Federal Reserve Act, and the implementing regulations.

Section 7.09.    <u>Compliance with Law</u>

Except as set forth on Exhibit 8 hereto, the Servicer has complied with and has not violated, any law, ordinance, request, regulation, rules or orders applicable to its business or properties, the violation of which reasonably could be expected to materially and adversely affect the operation or financial condition of the Service.

Section 7.10.    <u>Eligible Servicer</u>

The Servicer is an Eligible Servicer.

Section 7.11.    <u>MERS</u>

The Servicer is a member of MERS in good standing, and has complied in all material respects with the rules and procedures of MERS in connection with the servicing of any MERS Designated Mortgage Loans for as long as such Mortgage Loans are registered with MERS.

Section 7.12.   Disclaimer

Exception as set forth in this Article VII, the Servicer hereby disclaims all representations and warranties, implied or otherwise, including without limitation, implied warranties of fitness for a particular purpose and merchantability.

On each anniversary date of the Effective Date, the Servicer shall reaffirm the representations and warranties set forth in sections 7.06 and 7.09 and shall provide the Owner with an update or changes to Exhibit 8 relating to these specific representations and warranties.

# ARTICLE VIII.
## OWNER DEFAULT

Section 8.01.   Owner Events of Default.

(a)      The following shall constitute an Owner Event of Default under this Agreement:

(i)      any failure by the Owner to remit to the Servicer any payment required to be made under the terms of this Agreement which continues un-remedied for a period of three (3) Business Days after the date upon which notice of such failure, requiring the same to be remedied, shall have been given to the Owner by the Servicer; or

(ii)      the failure by the Owner duly to observe or perform in any material respect any other of the obligations of the Owner set forth in this Agreement which continues un-remedied for a period of sixty (60) days after the date on which notice of such failure, requiring the same to be remedied, shall have been given to the Owner by the Servicer; provided, however, that in the case of a failure that cannot be cured within sixty (60)days, the cure period shall be extended if the Owner can demonstrate to the reasonable satisfaction of the Servicer that the failure can be cured and the Owner is diligently pursuing remedial action; or

(iii)      a decree or order of a court, agency or supervisory authority having jurisdiction for the appointment of a conservator, receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Owner and such decree or order shall have remained in force un-discharged or un-stayed for a period of sixty (60) days; or

(iv)      the Owner shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Owner or relating to all or substantially all of its property; or

(v)    the Owner shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

(b)    In each and every such case, so long as an Owner Event of Default shall not have been remedied, in addition to whatever rights the Servicer may have at law or equity to damages, including injunctive relief and specific performance, the Servicer, by notice in writing to the Owner, may terminate this Agreement in accordance with Section 11.01.

(c)    Upon receipt by the Owner of such written notice, Owner shall cooperate with Servicer to transfer the servicing to the successor appointed pursuant to Section 11.02.  The Servicer agrees to reasonably cooperate with the Owner and such successor in transferring the servicing hereunder, as described in Section 11.02, and shall place in such successor's possession all Mortgage Files and Servicing Files, and do or accomplish all other acts or things reasonably necessary or appropriate to effect the transfer of such successor servicer.

# ARTICLE IX.
## SERVICER DEFAULT

Section 9.01.  <u>Servicer Events of Default</u>

(a)    The following shall constitute a Servicer Event of Default under this Agreement on the part of the Servicer:

(i)    any failure by the Servicer to remit payments on any Remittance Date required to be made under the terms of this Agreement which continues unremedied for a period of three (3) Business Days after the date upon which notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner; or

(ii)    the failure by the Servicer duly to observe or perform in any material respect any other of the obligations of the Servicer set forth in this Agreement which continues un-remedied for a period of sixty (60) days after the date on which notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner and; provided, however, that in the case of a failure that cannot be cured within sixty (60) days, the cure period shall be extended if the Servicer can demonstrate to the reasonable satisfaction of the Owner that the failure can be cured and the Servicer is diligently pursuing remedial action; or

(iii)    a decree or order of a court, agency or supervisory authority having jurisdiction for the appointment of a conservator, receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall

have been entered against the Servicer and such decree or order shall have remained in force un-discharged or un-stayed for a period of sixty (60) days; or

(iv)    the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of its property; or

(v)    the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi)    the Servicer fails to maintain its license to do business or service residential mortgage loans in any jurisdiction where the Mortgaged Properties are located which failure continues un-remedied for a period of sixty (60) days after Servicer receiving actual notice of such failure and such failure has a material and adverse effect on the Servicer's ability to perform its obligations under the Agreement; or

(vii)    the failure by the Servicer to duly to observe or perform in any material respect, as determined by the Federal Reserve Board, the FDIC, or the monitor appointed by the Department of Justice and Attorneys General of certain states pursuant to the Settlement Agreement, any of the obligations of the Servicer set forth in (A) the Consent Order, (B) the FRB Order or (C) the Settlement Agreement; which continues un-remedied for a period of sixty (60) days after the date on which notice of such failure from the Federal Reserve Board or FDIC or the monitor, respectively, requiring the same to be remedied, shall have been given to the Servicer by the Owner; provided, however, that in the case of a failure that cannot be cured within sixty (60) days, the cure period shall be extended if the Servicer can demonstrate to the reasonable satisfaction of the Owner that the failure can be cured and the Servicer is diligently pursuing remedial action; or

(viii)    the failure by the Servicer to maintain its status as an approved Agency servicer of Agency Loans hereunder which continues un-remedied for a period of sixty (60) days after the date on which Servicer receives notice from the applicable Agency; provided, however, that in the case of such failure cannot be cured within sixty (60) days, the cure period shall be extended if the Servicer can demonstrate to the reasonable satisfaction of the applicable Agency and the Owner that the failure can be cured and the Servicer is diligently pursuing remedial action; provided, further, however, in the event the applicable Agency notifies the Servicer that its failure to maintain its status cannot be cured with the cure period, the Servicer shall not be entitled to the cure period set forth in this clause (viii).

(b)      In each and every such case, so long as a Servicer Event of Default shall not have been remedied, in addition to whatever rights the Owner may have at law or equity to damages, including injunctive relief and specific performance, the Owner, by notice in writing to the Servicer, may terminate all the rights and obligations of the Servicer under this Agreement in accordance with Section 11.01.

(c)      Upon receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor(s) appointed pursuant to Section 11.02.  The Servicer agrees to reasonably cooperate with the Owner and such successor(s) in effecting the termination of the Servicer's responsibilities and rights hereunder, as described in Section 11.02, and shall place in such successor's possession all Mortgage Files and Servicing Files, and do or accomplish all other acts or things reasonably necessary or appropriate to effect the purposes of such notice of termination.

# ARTICLE X.
## INDEMNIFICATION AND ASSIGNMENT

Section 10.01. <u>Indemnification</u>

(a)      The Owner shall defend and indemnify the Servicer, its employees, officers, Affiliates, agents and representatives (the "Servicer Indemnified Parties"), against any and all assessments, judgments, claims, liabilities, losses, costs, damages or expenses whatsoever (including, without limitation, reasonable attorneys' fees, expenses and disbursements in connection with any third party action, suit or proceeding and any such reasonable attorneys' fees, expenses and disbursements incurred in enforcing any right of indemnification) (collectively, the "Liability"), Servicer Indemnified Parties may sustain arising from:

(i)       the Servicer taking any action, or refraining from taking any action, in conformity with the express written direction of the Owner or this Agreement;

(ii)      any breach by the Owner of any of the terms of this Agreement;

(iii)     the failure of the Owner or any trustee or Custodian in possession of original Mortgage Loan Documents to provide to the Servicer the originals of any Mortgage Loan Documents within a reasonable amount of time after a request for such documents has been received in order to allow the Servicer sufficient time to process satisfactions, payoffs and releases;

(iv)     any act or omission to act of any Person, including but not limited to the originator of the Mortgage Loan (except if the Servicer or Homecomings Financial was the originator) or any prior servicer (except if the Servicer was the prior servicer), prior to the Transfer Date, including, without limitation, any data integrity issue (and any costs of correcting such issue);

(v)    perpetuating the acts or omissions of prior servicers (except if the Servicer was the prior servicer), unless (A) the Servicer has actual knowledge that perpetuating such act or omission will result in Liability to the Servicer, (B) the Servicer knowingly acts or fails to act and such act or failure to act, as a singular event, not in combination with any other act or omission of any prior servicer(s), results in Liability to the Servicer, or (C) the acts or omissions are based on a mistaken or false conception of the law that is obvious and significant and the Servicer, over a period of time, in more than a single instance, continues in its course of servicing to perpetuate such acts or omissions;

(vi)    the Owner's or a prior servicer's (except if the Servicer was the prior servicer) failure to comply with the Transfer Instructions;

(vii)    advances, if any, initially assumed by the Servicer that ultimately are not recoverable from the Mortgagor or other proceeds;

(viii)    a Mortgage Loan which violates the Eligibility Criteria applicable to such Mortgage Loan;

(ix)    the infringement or misappropriation of third party intellectual property rights arising from the Servicer's use of the unmodified Owner Materials in accordance with this Agreement;

(x)    any claims by a purchaser or prospective purchaser of a Mortgage Loan or group of Mortgage Loans, including relating to any note sale agreement;

(xi)    any VA No Bid Instruction and for any interest curtailment associated with standard servicing of the FHA or the VA Mortgage Loans and timeline variances relating to referral to the attorney, foreclosure initiation or conveyance to HUD; and

(xii)    any Environmental Liability.

(b)    The term "Environmental Liability" shall mean any Liability arising out of the existence of environmentally hazardous materials on any Mortgaged Property, including, without limitation, (a) any liability under or on account of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as the same may be amended from time to time, and/or any other federal or state environmental laws, and specifically including, without limitation, any liability relating to asbestos and asbestos containing materials, polychlorinated biphenyls, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory", "usable work in process" or similar classification which would, if classified as unusable, be included in the foregoing definition, including the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained subsequent to the date hereof, and (c) liability with respect to any other matter affecting the Mortgaged Property within the jurisdiction of the federal Environmental Protection Agency or state environmental regulatory agencies pursuant to any

state laws, and in the regulations adopted pursuant to any of said laws; provided, however, that the indemnity for Environmental Liability shall not be effective with respect to any liability caused by the Servicer that would otherwise be imposed by reason of the Servicer's willful misfeasance or bad faith in the performance of or failure to perform its duties hereunder.

(c)    The Owner shall not be required to indemnify, or otherwise be liable to, the Servicer Indemnified Parties, however, for any Liability which the Servicer is required to indemnify for pursuant to Section 10.01(d) below.  The Servicer shall not be required to indemnify, or otherwise be liable to, the Owner Indemnified Parties for any Liability which the Owner is required to indemnify for pursuant to Section 10.01(a) above.

(d)    Except as provided in Section 4.06, the Servicer shall defend and indemnify the Owner, its employees, officers, Affiliates, agents and representatives (the "Owner Indemnified Parties") against any and all Liability sustained by the Owner Indemnified Parties arising from (i) the failure of the Servicer to perform its duties under this Agreement, (ii) the Owner taking any action or refraining from taking any action in conformity with the express written direction of the Servicer, (iii) the Servicer's breach of the terms of this Agreement, or (iv) the infringement or misappropriation of third party intellectual property rights in connection with the performance of this Agreement by Servicer or others acting on its behalf.  For the avoidance of doubt, (i) any such obligation of Servicer relating to a Liability arising prior to the Effective Date hereof shall be (as provided in Section 1.02 hereof) subject to Section 8.02 of the Original Agreement, which Section 8.02 shall survive as to any such prior existing Liability and (ii) notwithstanding any provisions relating to the non-solicitation of mortgagors pertaining to Mortgage Loans owned by the Owner which were serviced by the Servicer in any prior agreement, the Owner and the Servicer hereby agree that the Servicer shall have no liability to the Owner in the event any such solicitations may have occurred prior to the Effective Date.

(e)    In addition, the Servicer shall indemnify the Owner for losses suffered by the Owner as a result of any action taken in accordance with the AG Menu Items attached hereto as Exhibit 4-B; provided, that the Servicer shall not be required to indemnify the Owner for any losses in connection with any such action that also would have been permitted under the terms of the Standard Matrix.  The Servicer shall make such required indemnification payments pursuant to the calculations provided in the AG Menu Items promptly (but in no event later than two Business Days) after the last day of each calendar month for all activities undertaken in such calendar month.  To the extent required by applicable banking law or regulations, the Servicer will collateralize the forgoing indemnification obligations with security satisfactory to the Owner.

(f)    In no case shall the Servicer evaluate additional Portfolio Loans for actions pursuant to the AG Menu Items in the month following the month in which indemnification payments to the Owner pursuant to subsection (e) above exceed $75,000,000 in the aggregate.  Notwithstanding the above, any loans that have been solicited for such AG Menu Items prior to such month shall be eligible for the AG Menu Items.  If the Servicer desires to perform modifications or other loss mitigation activities resulting in indemnification payments to the Owner in excess of an aggregate amount of $75,000,000, then the Owner and the Servicer will agree to discuss the terms on which such additional loss mitigation activities could proceed.

(g)      As provided in Section 12.17 hereof, the foregoing indemnification obligations of Owner and Servicer shall survive termination of this Agreement or removal of some or all of the Mortgage Loans from the coverage of this Agreement, including removal due to an Agency Transfer.

Section 10.02. Limitation on Liability of Servicer and Others

Notwithstanding Section 10.01, the Servicer Indemnified Parties shall not incur any liability to the Owner for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Servicer Indemnified Parties against any breaches of representations or warranties made herein, or failure to perform its obligations in compliance with the standard of care set forth in this Agreement.  The Servicer does not guarantee or warrant the collectability, in whole or in part, of any Mortgage Loan or REO Property or the results of the resolution or ultimate disposition of any Mortgage Loan or REO Property.  The Servicer Indemnified Parties may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.  The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability; provided, however, that the Servicer may undertake any such action which it may deem necessary or desirable in respect to this Agreement, consistent with Applicable Law and Accepted Servicing Practices and the rights and duties of the Parties hereto.  In such event, the Servicer shall be entitled to reimbursement from the Owner of the reasonable legal expenses and costs of such action.

Section 10.03. Operation of Indemnities

If any Person has made any indemnity payments to any other Person pursuant to this Article X and such other Person thereafter collects any of such amounts from others, such other Person will repay such amounts collected, together with any interest collected thereon.  The provisions of this Article X shall survive any termination of this Agreement, the liquidation of any Mortgage Loan, or the transfer or assignment by the Owner to another Person of any Mortgage Loan or REO Property or any interest in any Mortgage Loan or REO Property.

Section 10.04. Limitation on Assignment by the Servicer

(a)      The Servicer shall not assign this Agreement or delegate its duties hereunder or any portion thereof; provided however, that Servicer may assign this Agreement with the prior written consent of the Owner to an Eligible Servicer as to whom the Owner's engagement as a subservicer hereunder for the Agency Loans has been approved by the applicable Agencies; and provided further, however, that such Eligible Servicer shall execute and deliver to the Owner a mutually agreeable assignment and assumption agreement.

(b)      Notwithstanding the foregoing, the Servicer or, as applicable, its Affiliates may also, without the consent of the Owner, subject to the terms of this Agreement, retain third party

contractors (including the entities listed on Exhibit 6) to perform certain discrete servicing and loan administration functions, including without limitation, hazard insurance administration, tax payment and administration, flood certification and administration, collection services, REO services and similar functions; provided, that the retention of such contractors by Servicer or its Affiliate shall not limit the obligation of the Servicer to service the Mortgage Loans and REO Properties pursuant to the terms and conditions of this Agreement.

Section 10.05. <u>Assignment by Owner</u>

The Owner shall have the right to assign this Agreement with respect to some or all of the Mortgage Loans, and designate any Person to exercise the rights of the Owner hereunder; provided that (a) Owner and such Person execute an assignment and assumption agreement whereby such Person assumes all of the Owner's obligations under this Agreement, including the obligation to pay all fees, and such agreement is delivered to the Servicer and (b) the Owner provides the Servicer with written notice of the assignment sixty (60) days prior to the effective date of such assignment.

Upon such assignment of rights and assumption of obligations, the assignee or designee shall accede to the rights and obligations hereunder of the Owner with respect to such Mortgage Loans and the Owner as assignor shall be released from all obligations hereunder with respect to such Mortgage Loans from and after the date of such assignment and assumption (except that the provisions described in Section 12.17 hereof shall survive such transfer). All references to the Owner in this Agreement shall be deemed to include its permitted assignee or designee.

Section 10.06. <u>Corporate Existence; Merger or Consolidation of the Servicer</u>

The Servicer shall keep in full effect its existence, rights and franchises as a corporation, and shall obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement or any of the Mortgage Loans and to perform its duties under this Agreement. Any Person into which the Servicer may be merged or consolidated, or any entity resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person that acquires the servicing business or all or substantially all of the assets of the Servicer, shall be a permitted successor or assignee, as the case may be of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the Parties hereto, anything herein to the contrary notwithstanding; provided, that the Owner shall have consented to the foregoing and such Person is an Eligible Servicer as to whom the Owner's engagement as a subservicer hereunder for the Agency Loans has been approved by the applicable Agencies. The Servicer will use commercially reasonable efforts to require any such Person to accept the assignment and/or assumption of this Agreement in its entirety, provided, however, that the successor or surviving Person shall be an Eligible Servicer.

Section 10.07. <u>Cooperation of Servicer with an Agency Transfer</u>

(a)      The Servicer and the Owner agree that with respect to some or all of the Portfolio Loans, the Owner may effect Agency Transfers.

(b)      The Servicer and the Owner acknowledge and agree that the Servicer is not obligated hereunder to act as servicer in any Agency Transfer and the Owner is not obligated hereunder to offer the Servicer the opportunity to act as servicer in an Agency Transfer.

(c)      The Servicer shall reasonably cooperate with the Owner in connection with any Agency Transfer contemplated by the Owner pursuant to this Section 10.07, provided, however, that under no circumstances and in no event shall such Agency Transfer materially increase the Servicer's liabilities or obligations beyond those liabilities and obligations contained in this Agreement, or decrease the Servicer's profitability from that provided for herein, except as otherwise specifically set forth in this Section 10.07.

(d)      In connection with any Agency Transfer in which the Servicer shall act as the servicer, the Owner shall notify the Servicer of such Agency Transfer and provide a preliminary loan list at least twenty (20) Business Days prior to the closing date of such Agency Transfer. Owner shall provide Servicer with a complete and final list of loans related to any Agency Transfer at least five (5) Business Days prior to the scheduled closing date of the Agency Transfer.  In addition, any Portfolio Loans regarding which Owner wishes to affect an Agency Transfer must be transferred to Servicer and live on Servicer's servicing system at least five (5) Business Days prior to the month end prior to the first reporting period.

(e)      Owner agrees to deliver any agreement or other documents related to the Agency Transfer to the Servicer at least five (5) Business Days prior to the closing date for an Agency Transfer.  The Servicer shall have no liability to Owner and no obligation to cooperate with Owner if Owner fails to provide such notice or deliver such documents in a timely manner.  If any Agency Transfer involves the establishment of a new Custodial Account or new Escrow Account, the Owner shall provide information on the naming of the accounts no less than fifteen (15) Business Days in advance of the Agency Transfer's closing date.

(f)      Any Agency Transfer may, in the Owner's discretion, and subject to the Servicer's right to negotiate the same, contain contractual provisions not set forth in this Agreement, including, but not limited to, (i) representations and warranties of the Servicer conforming in all material respects to the representations and warranties in this Agreement and (ii) such provisions with regard to servicing responsibilities, investor reporting, segregation and deposit of principal and interest payments, custody of the Portfolio Loans, and other provisions that conform to secondary market standards for mortgage-backed securities backed by mortgage loans similar to the Portfolio Loans.  Notwithstanding any other terms of this Agreement, Servicer shall be under no obligation to (i) advance delinquent scheduled payments of principal and interest or (ii) pay compensating interest for prepayment interest shortfalls or (iii) use its own funds for Servicing Advances, unless satisfactory arrangements have been agreed to by Servicer and Owner for Servicer to be reimbursed for such amounts.  The Servicer's refusal to execute any agreement or related documents may be based on any provision which materially (a) increases the liability or obligations of the Servicer and/or (b) affects Servicer's profitability from that contemplated in this Agreement.

(g)      For any Portfolio Loans included in an Agency Transfer, it is understood and agreed that certain portions of this Agreement may not be applicable as the Servicer will be responsible for servicing the Mortgage Loans in compliance with the applicable Fannie Mae Guides, the Freddie Mac Guides, or the Ginnie Mae Guides.  The Servicer does not service or participate in all of the Fannie Mae, Freddie Mac or Ginnie Mae programs or products including but not limited to bond programs and negotiated waivers.  The Servicer may require an amendment to this Agreement and/or a new Pricing Exhibit for Agency Transfers.

Section 10.08. <u>Reconstitution</u>

The Owner and the Servicer agree that with respect to some or all of the Mortgage Loans, the Owner, at its sole option, may effect Whole Loan Transfers or Pass-Through Transfers, retaining the Servicer as the servicer thereof or subservicer if a master servicer is employed, or as applicable the "seller/servicer."  Such a transfer may be effected through the execution of either an assignment, assumption and recognition agreement with respect to this Agreement or a replacement agreement at which point the Portfolio Mortgage Loans transferred shall cease to be covered by this Agreement; provided, however, that, in the event that any Portfolio Mortgage Loan transferred pursuant to this Section 10.08 is rejected by the transferee, the Servicer shall continue to service such rejected Portfolio Mortgage Loan on behalf of the Owner in accordance with the terms and provisions of this Agreement.

The Servicer shall cooperate with the Owner in connection with each Whole Loan Transfer or Pass-Through Transfer in accordance with this Section 10.08.  In connection therewith the Servicer shall:

(a)      execute a Reconstitution Agreement reasonably acceptable to the Servicer that restates, as of the Reconstitution Date, all representations and warranties made by Servicer pursuant to Article VII of this Agreement, subject to modification based on events arising after the date hereof;

(b)      cooperate with Owner with respect to reasonable requests that have been made by Owner by prior notice and, if Servicer is required to be a party to any of the Reconstitution Agreements, execute any Reconstitution Agreement, subject to the provisions of this Section 10.08, within a reasonable period of time, but in no event shall any prior notice and request to execute a Reconstitution Agreement be made to Servicer less than thirty (30) days prior to the date such Reconstitution Agreement is to be executed.  Unless otherwise agreed to by the Servicer and pursuant to Section 2.19 hereof, in no event shall a Reconstitution Agreement impose any additional obligations or liabilities on Servicer other than as are set forth in this Agreement; provided, however, that it is understood that a Reconstitution Agreement may contain (i) industry standard language regarding Servicer's duties under Regulation AB or (ii) language regarding Servicer servicing into a Pass-Through Transfer, and Servicer shall reasonably cooperate with such;

(c)      provide to the Owner, as of a recent date prior to the Reconstitution, any and all available information and appropriate verification of information which may be reasonably

available to Servicer, whether through letters of its auditors and counsel or otherwise, as Owner shall reasonably request as to the Servicer and the related Mortgage Loans and/or REO Properties and that is customary information for a Reconstitution;

(d)        provide to the Owner any and all information with respect to the Servicer, its servicing portfolio or the Mortgage Loans and/or REO Properties and appropriate verification of information reasonably requested by the Owner;

(e)        indemnify the Owner for any material misstatements contained in the information provided above which is contained in any securities offering documents pertaining to any such Reconstitution;

(f)        the Owner shall indemnify the Servicer for losses related to material misstatements with respect to information contained in any securities offering documents pertaining to any such Reconstitution that was not provided by the Servicer or its agents;

(g)        With respect to each Whole Loan Transfer or Pass-Through Transfer, Owner shall pay all of Servicer's reasonable out of pocket costs incurred in connection with the transfer of the Portfolio Mortgage Loans relating thereto;

All Mortgage Loans not sold or transferred pursuant to Whole Loan Transfers or Pass-Through Transfers shall remain subject to this Agreement and shall continue to be serviced in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.  In the event the Servicer does not remain the servicer of the Mortgage Loans, the Servicer shall be entitled to the Deboarding Fee and the Loan Termination Fee.

# ARTICLE XI.
## TERMINATION

Section 11.01. <u>Termination</u>

(a)        This Agreement shall continue in full force and effect for an original term (the "Original Term") of one (1) year from the Effective Date, unless terminated sooner by mutual agreement or otherwise in accordance with this Agreement.  The Owner shall not be required to pay any Loan Termination Fee upon the expiration of the Original Term. In addition, the Owner shall not be required to pay a Deboarding Fee for any Mortgage Loan upon expiration of the Original Term unless the servicing of such Mortgage Loan is transferred to a third party upon such expiration.

(b)        The Owner may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause, upon  one hundred twenty (120) days advance written notice to Servicer.  If the count of active Mortgage Loans serviced under this agreement falls to less than fifty (50) for a period of sixty (60) consecutive days, this Agreement shall be deemed to have been terminated without cause by the Owner, subject to Servicer's consent, at Servicer's sole discretion, in writing to Owner.  The Servicer shall be

entitled to receive the Deboarding Fee and the Loan Termination Fee for any termination under this Section 11.01(b).  For the avoidance of doubt, notwithstanding the foregoing, the Servicer shall not be entitled to receive (A) the Loan Termination Fee if (i) the Servicer shall continue servicing in an Agency Transfer, Whole Loan Transfer or Pass-Through Transfer or (ii) the Mortgage Loans are transferred pursuant to Sections 2.01(q) or (r) or (B) the Deboarding Fee if (i) the Servicer shall continue servicing in an Agency Transfer, Whole Loan Transfer or Pass-Through Transfer or (ii) the Mortgage Loans are transferred pursuant to Sections 2.01(q) or (r)(ii).

(c)      Servicer may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause, upon one hundred twenty (120) days advance written notice to the Owner.  The Servicer shall not be entitled to receive the Deboarding Fee, and the Loan Termination Fee for any termination under this Section 11.01(c).

(d)      The Servicer may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, with cause, upon  one hundred twenty (120) days advance written notice to Owner.  For purposes of this subsection, "cause" shall mean an Owner Event of Default.  The Servicer shall be entitled to receive the Deboarding Fee and the Loan Termination Fee for any termination under this Section 11.01(d).

(e)      The Owner may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, with cause, which termination shall be effective on Transfer Out Date.  For purposes of this subsection, "cause" shall mean Servicer Event of Default.  The Servicer shall not be entitled to receive the Deboarding Fee or the Loan Termination Fee for any termination under this Section 11.01(e).

(f)      The Servicer may terminate this Agreement upon the determination that its duties hereunder are no longer permissible under Applicable Law and such incapacity cannot be cured by the Servicer.  Any such determination permitting the resignation of the Servicer shall be evidenced by an opinion of counsel to such effect delivered to the Owner.  The Servicer shall not be entitled to receive the Loan Termination Fee for any termination under this Section 11.01(f).

(g)      The Owner may terminate this Agreement if any banking regulator with jurisdiction over the Owner requires the Owner to terminate its obligations under this Agreement.  So long as such termination is solely pursuant to this Section 11.01(g), such termination shall be considered a termination without cause by the Owner and the Servicer shall be entitled to receive the Deboarding Fee and the Loan Termination Fee.

(h)      Any notice given by the Owner or Servicer to terminate servicing of the Mortgage Loans shall specify a termination date (the "Termination Date"), provided each Party has received the required notice specified herein.  Notwithstanding the foregoing, the Owner may extend the term of this Servicing Agreement after the Termination Date, by providing the Servicer with notice of such request, which period shall be an additional one hundred twenty days (120) (the "Extended Transfer Period).

(i)      If the Owner does not designate a successor servicer and transfer out the servicing of the Mortgage Loans and REO Properties by the end of the Extended Transfer Period, Servicer shall be entitled to the following additional remedies (in addition in all other rights and remedies to which Servicer is entitled under this Agreement or in law or equity):

(i)      The Servicer shall not be required to make any remittances normally required on any Remittance Date after the Extended Transfer Period until such time Owner has transferred out the servicing of the Mortgage Loans and REO Properties.  Such amounts shall remain in the Custodial Account pursuant to Section 2.04.  For the avoidance of doubt, the Servicer shall have no obligation to pay Owner interest on such amounts.

(ii)      The Owner shall pay the Servicer the following additional fees calculated as of the applicable Determination Date, in addition to the fees on the Pricing Exhibit, for each Mortgage Loan and REO Property for each additional month beyond the end of the Extended Transfer Period, the Servicer must service the Mortgage Loans and REO Properties: (x) First month beyond the Extended Transfer Period: $5 per Mortgage Loan and REO Property, (y) Second month beyond the Extended Transfer Period: $10 per Mortgage Loan and REO Property, and (z) Third and each additional month thereafter beyond the Extended Transfer Period: $20 per Mortgage Loan and REO Property, with a minimum of $50,000 in the aggregate due and payable in each such third month and each month thereafter.

Section 11.02. <u>Transfer Procedures</u>

(a)      In the event this Agreement is terminated in whole or in part, the Servicer agrees to reasonably cooperate with the Owner and with any party or parties designated as the successor servicer(s) in transferring the servicing to such successor servicer(s) in accordance with Accepted Servicing Practices, including sending the transferor's notice of transfer of servicing or "goodbye letter" in accordance with the requirements of Applicable Law.  Owner agrees to cooperate with Servicer to provide any required information necessary to complete an orderly servicing transfer.

(b)      Within five (5) Business days following the date upon which servicing is transferred from the Servicer to any successor servicer(s) (the "Transfer Out Date"), the Servicer shall deliver to the successor servicer(s) any and all Mortgage Files and Servicing Files in the possession of the Servicer.  The Servicer shall provide the successor servicer(s) with the net funds held in the Escrow Account and suspense funds related to the Mortgage Loans within two (2) Business Days following the Transfer Out Date.

(c)      If Servicer is named as the mortgagee of record, Servicer shall prepare certain documents which are necessary to effect the transfer of servicing from Servicer, including but not limited to the transfer and endorsement or assignment of the related Mortgage Loans and related documents at Owner's request and expense.  The Servicer, at the Owner's expense, shall cause MERS to designate on the MERS system the Owner or its designee as the beneficial holder

with respect to such Mortgage Loan.  All other out-of-pocket expenses incurred in connection with any such transfer shall be borne by Owner, except in the case of termination of this Agreement without cause by Servicer pursuant to Section 11.01(c) or termination with cause by Owner pursuant to Section 11.01(e), in which cases such other out-of-pocket costs shall be borne by Servicer.  In addition, in the event of termination of this Agreement without cause by Servicer pursuant to Section 11.01(c) or termination with cause by Owner pursuant to Section 11.01(e), no Deboarding Fee or Loan Termination Fee will be payable by Owner.

(d)    On the Transfer Out Date, the Servicer shall be entitled to be reimbursed for all actual and estimated un-reimbursed Servicing Advances, Non-recoverable Advances, Owner Expenses, unpaid Servicing Fees and any other amounts owed to Servicer under this Agreement, including, if applicable, the Deboarding Fee and the Loan Termination Fee.  Such amount will be paid to the Servicer in advance of the Transfer Out Date.  Any funds related to the transferred Mortgage Loans held by Servicer in the Custodial Account after reimbursement to Servicer of the foregoing amounts will be remitted to Owner on the next Remittance Date following the Transfer Out Date.  In addition, the Owner shall cause the Servicer to be reimbursed within fifteen (15) Business Days of request for any for any trailing expenses representing Servicing Advances and Owner Expenses for which invoices are received by the Servicer after the Transfer Out Date.

(e)    Servicer agrees to cooperate with Owner on the transfer out of REO Properties.  Owner agrees to pay the Servicer's cost to cancel the title preparation (currently $350 per REO Property) and the cost to dismiss the closing agent (currently $100 per REO Property).  Such costs are subject to change.  In addition, Owner agrees to reimburse Servicer for any costs associated with the preparation of any deeds.

(f)    Except as otherwise provided in this Agreement, on the related Transfer Out Date for each related Mortgage Loan, this Agreement, except for the provisions described in Section 12.17 hereof which shall survive the related Transfer Out Date, shall terminate with respect to such Mortgage Loan.  For the avoidance of doubt, as provided in Section 12.17 hereof, the obligation of the Owner to pay any applicable Deboarding Fee and Loan Termination Fee, and out-of- pocket transfer expenses shall survive removal of some or all of the Mortgage Loans from the coverage of this Agreement, including removal upon a reconstitution where the Servicer does not continue to act as the Servicer of the removed Mortgage Loans.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

Section 12.01. <u>Notices</u>

All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon the mailing thereof, sent by registered or certified mail, return receipt requested, or nationally recognized overnight delivery service:

(a)    If to Owner to:

Ally Bank
6985 Union Park Center
Midvale, Utah 84047
Attention:  CFO

With a Copy to:

Ally Bank
1100 Virginia Drive
Fort Washington, PA 19034
Attention:  Chief Counsel

With a Copy to:

Ally Bank
440 South Church Street
Charlotte, NC 28202
Attention:  Mortgage Executive

With a Copy to:

Ally Bank
8400 Normandale Lake Boulevard
Minneapolis, MN  55437
Attention:  Chief Financial Executive

With a Copy to:

Ally Bank
6985 Union Park Center
Midvale, UT 84047
Attention:  Chief Compliance Officer

(b)    If to Servicer to:

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention:  Chief Servicing Officer

With a Copy to:

GMAC Mortgage, LLC
3451 Hammond Ave.

Waterloo, IA 50702-5345
Attention:  General Manager

With a Copy to:

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention:  General Counsel

Section 12.02. Waivers

The Servicer or the Owner may, by written notice to the other, waive compliance with any of the terms, conditions or covenants required to be complied with by the other hereunder; and waive or modify performance of any of the obligations of the other hereunder. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

Section 12.03. Entire Agreement; Amendment

This Agreement, including all documents and exhibits incorporated by reference herein, constitutes the entire agreement between the Parties with respect to servicing of the Mortgage Loans.  This Agreement may be amended and any provision hereof waived, but, only in writing signed by the Party against whom enforcement of such amendment or waiver is sought.

Section 12.04. Counterparts; Binding Effect

This Agreement may be executed in one or more counterparts and by the different Parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement.  This Agreement shall inure to the benefit of and be binding upon the Servicer and the Owner and their respective permitted successors and assigns.

Section 12.05. No-Hire

During the term of this Agreement and for a period of 12 months following any termination of this Agreement, neither Party shall solicit for hire Key Leadership Employees of the other Party unless mutually agreed.  It is acknowledged that advertising positions generally available to the public, such as positions posted online, advertised in newspapers, or similarly made available to the general public, shall not constitute solicitation for purposes of the foregoing.

Additionally, during the term of this Agreement and for a period of 12 months following any termination of this Agreement, Owner shall not solicit for hire all or substantially all of any team or functional group of employees of Servicer, including, but not limited to, any collections or loss mitigation team assigned to service the Mortgage Loans under this Agreement

unless agreed to by the parties.  It is acknowledged that advertising positions generally available to the public, such as positions posted online, advertised in newspapers, or similarly made available to the general public, shall not constitute solicitation for purposes of the foregoing.

Section 12.06. <u>Headings</u>

Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

Section 12.07. <u>Governing Law</u>

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

Section 12.08. <u>Relationship of Parties</u>

Nothing contained herein shall be deemed or construed to create a partnership or joint venture between the Parties.  The duties and responsibilities of the Servicer shall be rendered by it as an independent contractor and not as an agent of the Owner.  The Servicer shall have full control of all of its acts, doings, and proceedings relating to or required in connection with the discharge of its duties and responsibilities under this Agreement.  The Servicer and the Owner understand and agree that this Agreement is intended to establish and set forth the terms of an arms-length business relationship between the Parties which is at least favorable to the Owner as would be likely to exist between unaffiliated parties.

Section 12.09. <u>Severability of Provisions</u>

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remainder of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 12.10. <u>Recordation of Assignments of Mortgage</u>

If Assignments of Mortgage are required to be recorded, such recordation shall be effected by the Owner, the Owner's designee or the Servicer pursuant to its obligations under this Agreement at the Owner's expense.

Section 12.11. <u>Exhibits</u>

The exhibits to this Agreement are hereby incorporated and made a part hereof and are integral parts of this Agreement.  If there are any discrepancies between the Agreement and any of the exhibits, the Agreement shall prevail.

Section 12.12. <u>Financials</u>

Without limiting the Servicer's obligations in Exhibit 7, Section 4, the Servicer shall deliver to the Owner, on or before March 31st each year beginning March 31, 2013 (or within 60 days of the end of Servicer's fiscal year, if Servicer's fiscal year does not correspond to the calendar year), audited financial statements of Servicer covering the year ended the previous December 31 (or such other period constituting Servicer's fiscal year).

The Owner shall deliver to the Servicer, on or before March 31st each year beginning March 31, 2013 (or within 60 days of the end of Owner's fiscal year, if Owner's fiscal year does not correspond to the calendar year), audited financial statements of Owner covering the year ended the previous December 31 (or such other period constituting Owner's fiscal year).

Section 12.13. <u>No Solicitation</u>

From and after the Effective Date, the Servicer shall not, nor shall it take any action, to solicit the Mortgagors for purposes of prepayment or refinance of the Mortgage Loans, without the written consent of the Owner, except as otherwise provided in Section 2.03. The Owner hereby agrees that the Servicer's actions pursuant to the AG Menu Items and in accordance with Sections 10.01 (e) and (f) shall not be deemed a solicitation.

Nothing in this Section 12.13 shall prohibit the Servicer from generalized advertising not targeted exclusively to the Mortgagors, including on its website, monthly account statements, or VRU (voice response unit), mortgage leads purchased from third parties, recorded communications, or otherwise engaging in a program directed to the general public at large to encourage or recommend mortgage loan products and other products and services provided by the Servicer or an Affiliate, or from taking applications for refinance from Mortgagors as a result thereof. In addition, the Servicer shall be entitled to solicit borrowers for products that enhance or benefit the value of the Mortgage Loans for the Owner or pertain directly to the servicing of loans; provided, however, that the Servicer shall not offer (a) any products relating to deposits, insurance or lending or (b) any products that compete directly with Owner's or Owner's Affiliates' products, except as otherwise provided above. The Servicer is hereby permitted to utilize statement inserts which are in compliance with the foregoing and is entitled to retain any income derived from these products. To the extent (a) the Owner takes actions pursuant to and in accordance with that certain Client Contract between the Owner and the Servicer dated as of November 29, 2011 or (b) the Owner and the Servicer enter into a separate written arrangement or agreement after the date hereof which conflicts with this Section 12.13, the Servicer shall have no liability to the Owner for any actions taken in accordance with such written arrangement or agreement that would otherwise constitute a breach of this Agreement.

Section 12.14. <u>Force Majeure</u>

A Party will not be responsible for delays or failures in performance of its obligations under this Agreement resulting from acts beyond its reasonable control such as acts of God, strikes, riots, acts of war, terrorism, earthquakes or other similar events. A Party

excused from performance pursuant to this section shall exercise reasonable efforts to continue to perform its obligations hereunder and shall thereafter continue with reasonable due diligence and good faith to remedy its inability to so perform, except that nothing herein shall obligate either Party to settle a strike or labor dispute when it does not wish to do so.

Section 12.15. <u>Waiver of Trial by Jury</u>

THE SERVICER AND THE OWNER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.16. <u>Limitation of Damages</u>

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PARTIES AGREE THAT NEITHER OWNER OR SERVICER SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, WHETHER IN CONTRACT, TORT OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE; PROVIDED, HOWEVER, THAT SUCH LIMITATION SHALL NOT BE APPLICABLE WITH RESPECT TO INDEMNIFICATION OBLIGATIONS FOR THIRD PARTY CLAIMS MADE AGAINST A PARTY.

Section 12.17. <u>Survival</u>

In addition to any provisions in this Agreement, which by their express terms shall survive termination, the following provisions shall survive termination of this Agreement or removal of some or all of the loans from the coverage of this Agreement due transfer to a successor servicer or reconstitution, or otherwise: Sections 4.03 (Servicing Compensation), 4.06 (Losses and Expenses), 5.05 (Confidentiality of Information), 11.01 (Termination), 11.02 (Transfer Procedures), 10.01 (Indemnification), 10.02 (Limitation on Liability of Servicer and Others), 10.03 (Operation of Indemnities), 10.07 (Agency Transfers), Article VI (Representations, Warranties and Covenants of Owner), Article VII (Representations, Warranties and Covenants of Servicer), 11.02 (Transfer Procedures), Sections 12.01 (Notices), 12.02 (Waivers), 12.03 (Entire Agreement; Amendment), 12.04 (Counterparts; Binding Effect), 12.05 (No-Hire), 12.06 (Headings), 12.07 (Governing Law), 12.08 (Relationship of Parties), 12.09 (Severability of Provisions), 12.13 (No Solicitation), 12.14 (Force Majeure), 12.15 (Waiver of Trial by Jury), 12.16 (Limitation of Damages) and this Section 12.17 (Survival).

[SIGNATURES APPEAR ON NEXT PAGE]

AMENDED AND RESTATED SERVICING AGREEMENT
BY AND BETWEEN ALLY BANK AND GMAC MORTGAGE, LLC                                MAY 11, 2012

IN WITNESS WHEREOF, the Parties have caused their names to be signed to this Amended and Restated Servicing Agreement by their respective officers thereunto duly authorized as of the date first above written.

ALLY BANK
(Owner)

By:      _____

Name:    _____

Title:   _____


GMAC MORTGAGE, LLC
(Servicer)

By:      _____

Name:    _____

Title:   _____

67

IN WITNESS WHEREOF, the Parties have caused their names to be signed to this Amended and Restated Servicing Agreement by their respective officers thereunto duly authorized as of the date first above written.

ALLY BANK
(Owner)

By: _____

Name: _____

Title: _____

GMAC MORTGAGE, LLC
(Servicer)

By: _____

Name: Joseph A. Pensabene

Title: EVP, Chief Servicing Officer

67