MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:   (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |

-------------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105(a),
361, 362, 363, 1107(a), AND 1108 OF THE BANKRUPTCY CODE (I) AUTHORIZING
THE DEBTORS TO CONTINUE IN THE ORDINARY COURSE OF BUSINESS
(A) SERVICING GOVERNMENTAL ASSOCIATION LOANS AND
(B) FORECLOSURE ACTIVITIES RELATED TO CERTAIN REAL ESTATE OWNED
BY FANNIE MAE, FREDDIE MAC, AND GINNIE MAE; (II) AUTHORIZING THE
DEBTORS TO PAY CERTAIN PREPETITION AMOUNTS DUE TO CRITICAL
SERVICING VENDORS AND FORECLOSURE PROFESSIONALS; (III) GRANTING
LIMITED STAY RELIEF TO ENABLE BORROWERS TO ASSERT RELATED
COUNTER-CLAIMS IN FORECLOSURE AND EVICTION PROCEEDINGS;
(IV) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL UNDER THE
FANNIE MAE EAF FACILITY; AND (V) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move (the "Motion")[2] for entry of interim and final orders, under sections

---

[1]   The names of the Debtors in these cases and their respective tax identification numbers are identified on
Exhibit 1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may
file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

105(a), 361, 362, 363, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

(i) authorizing the Debtors to continue in the ordinary course of business (a) servicing the GA

Loans (defined below); and (b) foreclosure activities related to certain real estate owned by

Ginnie Mae,[3] Fannie Mae or Freddie Mac[4] (together, the "Governmental Associations");

(ii) authorizing the Debtors to pay certain prepetition amounts due to critical servicing vendors

and foreclosure professionals; (iii) granting limited stay relief to enable borrowers or their

tenants, as applicable, to assert related counter-claims in foreclosure and eviction proceedings;

(iv) authorizing the Debtors to use cash collateral under the Fannie Mae EAF Facility (defined

below); and (v) granting related relief.  In support of the Motion, the Debtors rely upon and

incorporate by reference the Affidavit of James Whitlinger, Chief Financial Officer of

Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, filed with

the Court concurrently herewith (the "Whitlinger Affidavit").  In further support of the Motion,

the Debtors, by and through their undersigned counsel, respectfully represent:

_____

*(cont'd from previous page)*

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the
      relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

[3]    As used herein, "Ginnie Mae" means the Government National Mortgage Association.  Ginnie Mae is a federal
      corporation within the Department of Housing and Urban Development ("HUD"), a federal agency, that
      guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS")
      backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration
      ("FHA") or guaranteed by the Department of Veterans Affairs ("VA") or the Department of Agriculture
      ("USDA").

[4]    As used herein, "Fannie Mae" means the Federal National Mortgage Association, and "Freddie Mac" means the
      Federal Home Loan Mortgage Corporation.  Fannie Mae and Freddie Mac are government-sponsored
      enterprises chartered by Congress that securitize or buy mortgage loans originated by mortgage lenders,
      enabling them to replenish their funds so that they can make additional loans to other homeowners.

ny-1011869

## JURISDICTION

1.        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, 1107(a) and 1108. Relief is warranted under Bankruptcy Rule 6003.

## BACKGROUND

2.        On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has been appointed in these Chapter 11 cases.

3.        The Debtors are a leading residential real estate finance company indirectly owned by Ally Financial Inc. ("AFI"), which is not a Debtor.  The Debtors and their non-debtor affiliates operate the fifth largest mortgage loan servicing business and the tenth largest residential mortgage loan origination business in the United States.  A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

## PRELIMINARY STATEMENT

4.        The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank, and other third parties.  As of March 31, 2012, the Debtors were servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion,

approximately 68% of which are owned, insured or guaranteed by the Governmental

Associations (as described in greater detail below, the "GA Loans").  The mortgage backed

securities ("MBS") issued or guaranteed by the Governmental Associations are owned by a

broad range of investors, including pension funds, banks, insurance companies, governmental

bodies and other public and private entities.  The MBS issuers depend on the performance of the

servicer to ensure timely payment of amounts owed under the securities.  To preserve and realize

the value of these assets and achieve the goals of these Chapter 11 cases, the Debtors developed

and are prepared to implement a strategy that provides maximum value to the Debtors' estates.

5.       The Debtors negotiated and entered into two separate asset purchase

agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder

("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the

"Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of

their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the

"Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

6.       In furtherance of their restructuring strategy, and contemporaneous with

the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to,

among other things, establish auction and sale procedures for the Asset Sales,[5] and for approval

to consummate the Asset Sales under a plan.  If, however, the Debtors do not obtain

confirmation of a plan by deadlines to be determined, then the Sale Motion allows the Debtors to

---

[5]    See *Debtors' Motion Pursuant to 11 U.S.C.  §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P.
2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-
Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form
and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain
Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving
Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory
Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion").

4

pursue an alternative course of action and immediately move forward with the Asset Sales under

Bankruptcy Code section 363(b) and outside of a plan.

7.      As described in greater detail in the Sale Motion, Nationstar requires, as a

condition to closing, that the Debtors maintain their servicing operations at current volume and

quality standards until the sale is consummated.  Accordingly, the Debtors seek to continue

servicing the GA Loans in the ordinary course to preserve the value of their servicing platform

for the ultimate benefit of their stakeholders pending the closing of the Platform Sale.  As

explained below, integral to this relief is obtaining authority for the Debtors to meet certain

prepetition obligations, and to honor certain postpetition obligations essential to their loan

servicing operations without interruption.  At the same time, pending the closing of the Platform

Sale, the Debtors will continue to earn loan servicing fees and other fees.

8.      The Debtors are also seeking authority to obtain postpetition financing on

a senior secured, superpriority basis, all as more fully set forth in a separate motion filed

contemporaneously with the commencement of these Chapter 11 cases (the "DIP Financing

Motion").[6]  It is a condition to the DIP Credit Agreement (as defined in the DIP Financing

Motion) that the Debtors continue to perform their servicing activities in the ordinary course of

business.

9.      Maintaining their mortgage loan servicing business in the ordinary course

will instill confidence in the Debtors' capabilities to continue functioning as a servicer,

---

[6]  See *Debtors' Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f),
363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And Bankruptcy Rules 4001 And 6004
(I) Authorizing The Debtors To (A) Enter Into And Perform Under Receivables Purchase Agreements And
Mortgage Loan Purchase And Contribution Agreements Relating To Initial Receivables And Mortgage Loans
And Receivables Pooling Agreements Relating To Additional Receivables, And (B) Obtain Postpetition
Financing On A Secured, Superpriority Basis, (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules
4001(b) and 4001(c), And (III) Granting Related Relief.*

notwithstanding the commencement of these Chapter 11 cases.  However, if the Debtors are

unable to demonstrate this, borrowers and the market will experience confusion and uncertainty.

Borrowers may refuse to make payments to the Debtors, thus impairing the Debtors' ability to

continue meeting their ongoing payment obligations with respect to GA Loans (e.g., making

payment advances required under certain circumstances for the benefit of investors and paying

certain securitization fees to the Governmental Associations) and their future capacity to collect

on these loans.  Similarly, it is essential that the Debtors remain vigilant to ensure that borrowers

continue making payments on their loans (e.g., by sending out bills and ensuring the collection

and proper distribution of funds received).  If the Debtors' ability to do so is impaired, there is a

real risk that delinquencies and defaults may materially increase to the ultimate detriment of the

Debtors' estates.

10.     If the Debtors do not continue to honor their ordinary course servicing

commitments to the Governmental Associations with respect to the GA Loans, they face the

possible termination of their GA Loan servicing rights,[7] which, if successful, would result in the

loss of future servicing fees, with a concomitant tremendous (and potentially catastrophic) loss to

their estates.  Further, the Debtors may incur compensatory fees, repurchase claims, and other

obligations under the GA selling and servicing contracts and may incur compensatory fees,

repurchase claims, and penalties under recent settlements with the federal government and

various state agencies, pursuant to which the Debtors agreed to, among other things, certain

heightened servicing requirements with respect to the GA Loans.  In addition, because the

Platform Sale contemplates the Debtors' assumption and assignment of their mortgage loan

---

[7]     As discussed in greater detail below, the Governmental Associations can arguably terminate the GA Servicing
Agreements virtually at will.

servicing agreements to Nationstar, it is essential that the Debtors be authorized to continue to meet their obligations thereunder prior to assumption and assignment.

11.     In light of the sheer volume of residential mortgage loans serviced by the Debtor nation-wide, the relief requested will contribute to the stabilization of the housing market, while minimizing disruption to existing and future mortgage loan securitizations.  As explained in detail below, the relief requested is in the best interests of the Debtors' estates and amply warranted under the circumstances.

## RELIEF REQUESTED

## I.     Summary Of Relief Requested

12.     By this Motion, the Debtors seek relief pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, 1107(a) and 1108 to operate all components of their businesses integral to servicing GA Loans in the ordinary course pending the closing of the Platform Sale. Specifically, the Debtors respectfully request that the Court enter Interim and Final Orders (i) authorizing them to continue in the ordinary course (a) servicing GA Loans, including making certain payments related to prepetition obligations; (b) foreclosure activities related to certain real estate owned by Ginnie Mae, Fannie Mae or Freddie Mac, including satisfying certain related prepetition obligations, (ii) authorizing them to pay certain prepetition amounts due to critical servicing vendors and other third parties in connection with mortgage servicing and foreclosures, (iii) granting limited stay relief to enable borrowers or their tenants, as applicable, to assert counter-claims in foreclosure and eviction proceedings that are related to the subject matter of the underlying foreclosure or eviction complaint; (iv) authorizing the Debtors' use of cash collateral under the Fannie Mae EAF Facility, including furnishing adequate protection in connection therewith; and (v) granting related relief.  The Debtors propose that any action to be

7

taken pursuant to the relief sought herein would be subject to available funding, and the terms of

any debtor in possession financing and cash collateral orders entered in these Chapter 11

proceedings.

13.     The Debtors request that, to the extent necessary, the relief sought by this

Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases.  The

Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's entry

of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the

Chapter 11 cases of the Debtors.

## II.    Authority To Honor Certain Existing Obligations
In Connection With Servicing GA Loans

### A.    Overview Of Mortgage Loan Securitization Process

14.     Loan servicing is an integral part of the Debtors' business operations.  As

described below, the Debtors also play a significant role in generating a substantial portion of the

mortgage loan pools they service through securitization-related activities.

Prepetition Loan Securitization Activities

15.     Prior to the Petition Date, the Debtors, principally GMAC Mortgage, LLC

("GMAC Mortgage"), purchased mortgage loans from Ally Bank (including loans brokered or

sold by the Debtors to Ally Bank, as well as loans brokered or sold to Ally Bank by third parties)

or directly from third parties and sold those loans to Fannie Mae, Freddie Mac or securitization

trusts guaranteed by Ginnie Mae.[8]  Loans sold to Freddie Mac or Fannie Mae are referred to

---

[8]    The Debtors also sold loans to securitization trusts guaranteed by the following state and local housing agencies:
California Housing Finance Agency; City Of Northampton; Connecticut Housing Finance Authority;
Minneapolis Community Development Agency 2; Neighborhood Housing Services; North Dakota Housing
Finance Agency; Philadelphia Neighborhood Housing; San Diego Housing Commission; State of Oregon
Housing, and; Texas Veterans Land Board.  However, for purposes of this Motion, such loans are treated as
"private label" loans, see footnote 9, infra.

ny-1011869

herein respectively as "Freddie Mac Loans" and "Fannie Mae Loans," and Loans sold to Ginnie

Mae are referred to herein as "Ginnie Mae Loans."  The related trusts that issue the MBS are

referred to herein collectively as the "GA Securitization Trusts."[9]

16.     In these Governmental Association securitizations, Fannie Mae or Freddie

Mac purchase mortgage loans and then pool the loans together, deposit the mortgage loans into a

GA Securitization Trust, and sponsor the issuance of MBS by the GA Securitization Trust.

Ginnie Mae does not buy mortgage loans or issue MBS itself, but instead guarantees MBS with

respect to loans (consisting mainly of loans insured by the FHA or guaranteed by the VA or

USDA) that have been pooled and securitized by approved issuers.  The applicable

Governmental Association guarantees to the GA Securitization Trust that it will supplement

amounts received by the trust as required to permit timely payments of principal and interest on

the certificates.  The securities are delivered to an affiliate of Ally Bank who in turn sells

interests in the securities to third party investors (the "Certificate Owners"), which entitle the

Certificate Owners to specified cash flows generated from the securitized loans.  These interests

are usually represented by notes or certificates with various interest rates and are supported by

the payments on the loans acquired by the GA Securitization Trusts.

17.     With the exception of loans they originated in Ohio and Nevada, Ally

Bank provided the original funding for the underlying mortgage loans or acquired them from

---

[9]     Historically, the Debtors also sold mortgage loans to private investors and trusts comprised of so-called "private
label" securities.  Due to a change in market conditions, GMAC Mortgage and Ally Bank no longer sell
mortgage loans to private investors or "private label" securitization trusts, however, the Debtors continue to
service these mortgage loans.  The continuation of the Debtors' servicing activities with respect to "private
label" securities is addressed in a separate motion.  See *Debtors' Motion For Interim And Final Orders Under
Sections 105(a), 362, 363, 1107(a), And 1108 Of The Bankruptcy Code (I) Authorizing The Debtors To
Continue In The Ordinary Course Of Business (A) Servicing Non-GA Loans And (B) Sale Activities Related To
Certain Loans In Foreclosure And Real Estate Owned Property; And (II) Granting Limited Stay Relief To
Enable Borrowers To Assert Related Counter-Claims In Foreclosure And Eviction Proceedings* (the "Non-GA
Servicing Motion").

other lenders, and the Debtors' role was limited to that of facilitating the origination and securitization of mortgage loans. The Debtors brokered the loans initially, for which they were paid fees, and subsequently facilitated the sale and securitization of mortgage loans funded or acquired by Ally Bank by purchasing these loans from Ally Bank for resale to and securitization by a GA Securitization Trust.

Postpetition Loan Securitization Activities

18.    As described above, prior to the Petition Date, the Debtors served as a seller for all GA Loans because of certain lender approval requirements imposed by each of the Governmental Associations. Shortly before the Petition Date, Ally Bank obtained the requisite approvals allowing it to sell loans directly to Fannie Mae and Freddie Mac. As a result, on and after the Petition Date, Ally Bank, rather than the Debtors, will be selling loans directly into the Fannie Mae and Freddie Mac securitization pools, and the Debtors will function solely in their capacities as broker and subservicer for these loans. For Ginnie Mae, the Debtors intend to continue the mortgage loan securitization process in the manner this business was conducted prior to the Petition Date. The Debtors will continue to be a direct seller of Ginnie Mae Loans and will continue their loan origination activities in Ohio and Nevada.[10]

---

[10]    Certain of the Debtors' other obligations relating to, among other things, the pooling of loans, their transfer to the GA Securitization Trusts, and the repurchase of such loans are addressed separately in the Debtors' motion to continue origination and securitization activities in the ordinary course of business. See *Debtors' Motion For Interim And Final Orders Under Sections 105(a), 363, 364, 503(b), 1107(a), And 1108 Of The Bankruptcy Code Authorizing The Debtors To (I) Process And Where Applicable Fund Prepetition Mortgage Loan Commitments, (II) Continue Brokerage, Origination And Sale Activities Related to Loan Securitization, (III) Continue To Perform, And Incur Postpetition Secured Indebtedness, Under the Mortgage Loan Purchase And Sale Agreement With Ally Bank And Related Agreements, (IV) Pay Certain Prepetition Amounts Due To Critical Origination Vendors, And (V) Continue Honoring Mortgage Loan Repurchase Obligations Arising In Connection With Loan Sales And Servicing, Each In the Ordinary Course Of Business* (the "Origination Motion"). Fannie Mae asserts that the servicing obligations and selling obligations under the Fannie Mae Contract (defined below) are intertwined and inseparable, absent some specific agreement by Fannie Mae to the contrary. The Debtors reserve all rights with respect to this issue.

B.        **Servicing Rights With Respect To GA Loans**

19.      Although the Debtors and Ally Bank sell most of the residential mortgage loans they originate, the Debtors and Ally Bank generally retain the rights to service these loans. This right is referred to as a "mortgage servicing right," or "MSR." The Debtors retain MSRs and service the loans they originate in Nevada and Ohio, as well as loans originated by Ally Bank that are sold by the Debtors to Ginnie Mae pools. Ally Bank retains the MSRs on loans it originates for the Fannie Mae and Freddie Mac securitizations, but Ally Bank has entered into an arrangement with the Debtors to service those loans on Ally's behalf, and in this capacity, the Debtors function as a subservicer.

20.      GMAC Mortgage is qualified to service the mortgage loans pooled in the GA Securitization Trusts because it is approved as a seller/servicer by Fannie Mae and Freddie Mac and as an issuer by Ginnie Mae. All qualified servicers, subservicers, and servicing agents of GA Loans must comply with the servicing terms and procedures set forth by the Governmental Associations in the GA Servicing Agreements, which incorporate by reference the applicable Governmental Association servicing guides, as may be updated or supplemented from time to time (collectively, the "GA Guides").[11] The GA Guides generally provide that the Governmental Associations can terminate licensed servicers and approved issuers at will or for cause. Thus, if the Debtors do not continue to honor their servicing obligations with respect to the GA Securitization Trusts in the ordinary course of their business, the Governmental Associations may argue that they have the right to unilaterally terminate the Debtors' servicing rights, which would result in the loss of future servicing fees and at the same time significantly

---

[11]     The Fannie Mae Single Family Servicing Guide (the "Fannie Mae Guide") is available at https://www.efanniemae.com/sf/guides/ssg/svcgpdf.jsp. The Freddie Mac Single-Family Seller/Servicer Guide (the "Freddie Mac Guide") is available at http://www.freddiemac.com/sell/guide/. The Ginnie Mae MBS Guide (the "Ginnie Mae Guide") is available at http://www.ginniemae.gov/guide/guidtoc.asp.

11

impair and diminish the value of the Debtors' mortgage loan servicing platform.  Even if the

Governmental Associations did not have the right to unilaterally terminate the Debtors' servicing

rights as a result of the Debtors' bankruptcy filings, Nationstar would not purchase such rights

from the Debtors if the Debtors do not continue to honor their servicing obligations.

21.    GMAC Mortgage, Ally Bank, and Freddie Mac are parties to a Master

Agreement dated as of July 22, 2011 (the "Freddie Mac Master Agreement"), which governs,

among other things, GMAC Mortgage's sale and servicing of Freddie Mac Loans.  The Freddie

Mac Master Agreement specifically incorporates, and supplements, the Freddie Mac Guide.  In

connection with GMAC Mortgage's prepetition sales of Freddie Mac Loans, the Freddie Mac

Master Agreement, the Freddie Mac Guide, and the applicable Purchase Documents (as defined

in the Freddie Mac Guide and referred to in this Motion as the "Freddie Mac Purchase

Documents") provided for and required the Debtors to convey to Freddie Mac one hundred

percent of their right, title and interests in and to the Freddie Mac Loans.  Accordingly, the

Debtors do not retain any ownership interest in the Freddie Mac Loans.  Through this Motion,

the Debtors intend to comply with, and adhere to, their obligations, representations, covenants,

and warranties to Freddie Mac as set forth in the Freddie Mac Master Agreement, the Freddie

Mac Guide, and other Freddie Mac Purchase Documents through the closing of the Asset Sales,

subject to further Court approval to the extent required.

22.    GMAC Mortgage and Fannie Mae are parties to a Mortgage Selling and

Servicing Contract dated as of August 9, 2006, as subsequently may be amended, which

incorporates the provisions of the Fannie Mae Selling and Servicing Guides and any Master

Contracts or pool purchase contracts that Fannie Mae and GMAC Mortgage have entered into

(collectively, each as amended from time to time, the "Fannie Mae Contract").  The Fannie Mae

12

Contract governs, among other things, GMAC Mortgage's sale and servicing of Fannie Mae

Loans.  In connection with GMAC Mortgage's prepetition sales of Fannie Mae Loans, the

Fannie Mae Contract provided for and required the Debtors to convey to Fannie Mae one

hundred percent of their right, title and interests in and to the Fannie Mae Loans.  Accordingly,

the Debtors do not retain any ownership interest in the Fannie Mae Loans.   The Debtors are also

required as part of both their selling and servicing obligations to honor all repurchase and make

whole claims when there are findings of breaches of selling representations and warranties.  The

Debtors intend to comply with, and adhere to, their obligations, representations, covenants, and

warranties to Fannie Mae as set forth in the Fannie Mae Contract through the closing of the

Asset Sales, subject to Court approval to the extent required.

### C.    Overview Of Servicing Functions

23.    The Debtors, primarily GMAC Mortgage and Residential Funding

Company, LLC ("RFC"), hold MSRs consisting of primary and master servicing rights.  The

Debtors also perform subservicing with respect to MSRs held by other parties.

24.    Primary servicing rights represent the Debtors' contractual right to service

certain mortgage loans originated or owned by third parties or the Debtors, or loans sold to the

Debtors on a "servicing-released" basis, as well as primary servicing rights they purchase from

other mortgage industry participants.  As a primary servicer, the Debtors collect and remit

mortgage loan payments, respond to borrower inquiries, account for principal and interest, hold

custodial and escrow funds for payment of property taxes, insurance premiums, and ancillary

products, counsel or otherwise work with delinquent borrowers (including, but not limited to,

granting borrowers leniency under certain circumstances and structuring loan modifications and

repayment plans for certain borrowers), supervise foreclosures and property dispositions, make

advances of required principal, interest, and certain "property protection" costs with respect to

delinquent mortgage loans, report and remit payments due to investors, and generally administer the loans consistent with their contractual undertakings and business practices (the "Primary Servicing Functions"). As part of the Primary Servicing Functions, Executive Trustee Services, LLC and ETS of Washington Inc. (collectively "ETS"), wholly owned subsidiaries of GMAC Mortgage and Debtors herein, act as foreclosure trustees with respect to certain loans in states that allow for non-judicial foreclosures—specifically, California, Arizona, Texas, Washington, and until recently, Nevada and Virginia. ETS also includes a recovery division, which conducts debt collection activities with respect to certain defaulted loans for which the Debtors have elected not to foreclose.

25.    Master servicing rights, on the other hand, represent the Debtors' right to service mortgage-backed and mortgage-related asset-backed securities and whole-loan packages purchased from sellers on a "servicing-retained" basis and sold to investors. When the Debtors act as master servicer, they collect mortgage loan payments from primary servicers or subservicers and distribute those funds to investors and to other transaction parties in mortgage-backed and mortgage-related asset-backed securities and whole-loan packages. Moreover, for GA Securitizations, they provide certain key services, including advancing required principal and interest and other expenses with respect to mortgage loans (to the extent the primary servicer does not make such advances), loan accounting, claims administration, oversight of primary servicers and subservicers, loss mitigation, investor reporting, and other contractual functions (the "Master Servicing Functions").

26.    As a subservicer, the Debtors perform servicing functions similar to the Primary Servicing Functions and Master Servicing Functions pursuant to contractual arrangements with third parties who hold MSRs or mortgage loans, such as their agreement with

14

Ally Bank (the "Subservicing Functions" and, together with the Primary Servicing Functions and

the Master Servicing Functions, the "Servicing Functions").  In addition, in connection with the

Subservicing Functions, from time to time, the Debtors enter into new subservicing contracts,

modify existing subservicing contracts, and pay fees in connection with "servicer error" claims

submitted by contract counterparties.  As part of the subservicing functions, ETS also performs

foreclosure trustee and recovery services for certain Fannie Mae loans.

27.    The Debtors have entered into servicing agreements with the

Governmental Associations to service GA Loans, which incorporate the applicable GA Guides

by reference (collectively, the "GA Servicing Agreements").  These GA Servicing Agreements

set forth various rights and obligations of the Debtors with respect to the performance of the

Servicing Functions.[12]

28.    By performing the Servicing Functions consistent with the terms of the

GA Servicing Agreements, the Debtors typically earn loan servicing fees equal to a specified

percentage of the outstanding principal balance of the loans being serviced and may also be

entitled to other forms of servicing compensation, such as late payment fees, prepayment

penalties, modification fees, and other similar fees.  When acting as subservicer, however, the

Debtors typically receive a monthly fee per loan.  The Debtors' servicing compensation may also

include interest income, or the "float," earned on collections that are deposited in various

---

[12]    Pursuant to the GA Servicing Agreements, as well as under their servicing and subservicing agreements with
other clients, the Debtors make certain representations and warranties regarding their performance of the
Servicing Functions.  The Debtors may be required to repurchase loans in the event they breach those servicing
representations and warranties, or to pay penalties in connection with "servicer error" claims made by the
counterparties.  Although such repurchase obligations are incurred in connection with the Debtors' Servicing
Functions, the Debtors have requested authority to honor those obligations in the Debtors' Origination Motion.
As previously noted, Fannie Mae asserts that the servicing obligations and selling obligations under the Fannie
Mae Contract are intertwined and inseparable, absent some specific agreement by Fannie Mae to the contrary.
The Debtors reserve all rights with respect to this issue.

custodial accounts between their receipt and distribution of the funds to investors (the fees

described in this paragraph are hereinafter collectively referred to as the "Servicing Fees").  The

Servicing Fees are typically collected from the monthly payments made by the borrowers on the

loans.  ETS trustee fees are earned on foreclosure sales and ETS recovery fees are earned as a

percentage of collections.

29.    The Debtors also perform Servicing Functions for loans that are not held

in GA Securitization Trusts (collectively, the "Non-GA Loans").  The Debtors have requested

authority to continue servicing the Non-GA Loans pursuant to the Non-GA Servicing Motion,

filed contemporaneously herewith.[13]

### D.    Payment Of Advances

30.    In connection with the Servicing Functions itemized above, the servicer is

typically obligated to pay all reasonable, customary, and necessary costs and expenses (including

reasonable legal fees) incurred in the performance of its servicing obligations with respect to

loans in foreclosure, which may include, without limitation:

(a)    fees and expenses to various servicing vendors, including but not limited to, property inspectors and maintenance contractors;

(b)    fees and expenses associated with enforcement or judicial proceedings, including foreclosures, bankruptcy, eviction, or litigation actions;

(c)    costs and expenses associated with the management, maintenance, and liquidation of property that has been foreclosed upon; and

(d)    costs to preserve foreclosed property prior to liquidation (items (a) – (d) are referred to herein collectively as the "Corporate Advances").

The Debtors submit claims to the Governmental Associations for reimbursement of the

Corporate Advances after the properties have been liquidated.  As of March 31, 2012, the

---

[13]    See footnote 9, supra.

16

Debtors held receivables totaling approximately $92.1 million on account of Corporate Advances made with respect to GA Loans.  The Debtors typically recover substantially all of the Corporate Advances.  The Debtors expect to make Corporate Advances in connection with the GA Loans in the average amount of approximately $25 million per month.[14]

31.      Additionally, from time to time, to the extent funds available from the Debtors' custodial accounts are insufficient to cover required remittances, the Debtors are required under the GA Servicing Agreements to advance funds to investors or third parties in mortgage-backed and mortgage-related asset-backed securities and whole-loan packages to cover delinquent principal and interest payments on the related pool of mortgage loans (the "P&I Advances") and taxes and insurance premiums (the "T&I Advances", and, together with the P&I Advances and the Corporate Advances, the "Advances").

32.      When a loan becomes delinquent, the Debtors must continue making Advances, except where the Debtors determine that future Advances will be non-recoverable from the related loans, in which case the Debtors may stop making P&I Advances (although they are still required to make T&I Advances and Corporate Advances).  T&I Advances and P&I Advances are generally reimbursable to the Debtors on a priority basis from amounts paid by the borrower, the proceeds of insurance policies or the liquidation of the related loan (whether through foreclosure or upon repurchase of the loan from the securitization pool).  As of March 31, 2012, the Debtors held receivables totaling approximately $283.3 million on account

---

[14]    These amounts are reflected in the budget attached to the proposed interim order submitted in connection with the DIP Financing Motion and the budgets required to be submitted in accordance with the *Debtors' Motion For Interim And Final Orders Pursuant To Bankruptcy Code Sections 105, 361, 363, And 507(b) And Bankruptcy Rule 4001(b): (I) Authorizing The Use Of Cash Collateral And Related Relief, (II) Granting Adequate Protection And (III) Scheduling A Final Hearing* and the *Debtors' Motion For Interim And Final Orders Pursuant To Bankruptcy Code Sections 105, 361, 362, 363, And 507(b) And Bankruptcy Rule 4001(b): (I) Authorizing The Use Of Cash Collateral And Related Relief, (II) Granting Adequate Protection And (III) Scheduling A Final Hearing*, each filed contemporaneously with this Motion (collectively, the "Budgets").

of T&I Advances made with respect to GA Loans and approximately $36.7 million on account of P&I Advances made with respect to GA Loans. The Debtors expect to make P&I Advances and T&I Advances in connection with the GA Loans in the average monthly amount of $100 million and $50 million, respectively.[15]

33.    In connection with the Platform Sale, Nationstar is buying the Debtors' MSRs, as well as the then-outstanding receivables on account of Advances made with respect to the GA Loans. Nationstar is also assuming the Debtors' subservicing arrangements. Accordingly, the Debtors will recoup certain Advances they will make subsequent to the Petition Date from the proceeds of the sale to Nationstar.

### E.    Deferment, Forbearance, And Loan Modification Arrangements

34.    From time to time, the Debtors, in their capacity as servicer, may agree to enter into a forbearance, modification, or deferment arrangement with a borrower (any such arrangement, the "Deferment and Forbearance Arrangement"). The policies and practices regarding Deferment and Forbearance Arrangements are designed to manage borrower relationships, maximize collections, and avoid foreclosure (or repossession of collateral, as applicable) if reasonably possible. By entering into Deferment and Forbearance Arrangements, the Debtors provide a delinquent borrower (or in limited circumstances, a current borrower if a default of his or her loan is reasonably judged to be imminent) certain relief or a work-out to repay defaulted amounts. Such relief or work-outs include, without limitation, agreements for the borrower to repay past due amounts over time in addition to the regularly scheduled payments, forgiveness of past due amounts, and/or interest rate reductions or term extensions.

---

[15]    These amounts are reflected in the Budgets. The projected Advance amounts take into account volatility based on, among other things, seasonality in borrower delinquencies and potential disruptions in borrower payments due to the filing of the Debtors' bankruptcy cases.

ny-1011869

The Debtors' reason for entering into such agreements is not only to preserve costs associated
with foreclosures, but also to pursue a policy of assisting borrowers to retain homeownership
when there is a commitment from the borrower and a financial ability to pay on the loan.

35.    The Debtors also participate in a number of loan modification programs,
including as a leading participating servicer in the Home Affordable Modification Program
("HAMP"), which is coordinated through Fannie Mae and sponsored by the U.S. Treasury
Department.  Due to the requirements of the applicable GA Servicing Agreements, the servicing
activities of the Debtors must comply with HAMP, and in return, the Debtors receive success
fees for various activities under HAMP.  In the most recent assessment by the U.S. Treasury,
GMAC Mortgage met all but one of the established benchmarks for HAMP program compliance,
a level of performance matched by only one of the other five largest mortgage servicers.[16]
GMAC Mortgage is a leading HAMP participant with over 40,400 active HAMP modifications,
which is an implied conversion rate of trial loan modifications to permanent loan modifications
of approximately 59%, one of the highest in the industry.[17]  These programs benefit borrowers
by enabling them to modify the terms of their loans so that they can afford to make continued
payments, and benefit the Debtors by preserving the value of the servicing rights on those loans,
which would otherwise potentially go into default or foreclosure.

---

[16]    See "January 2012 Making Home Affordable Report and Servicer Assessments for Fourth Quarter 2011,"
available at http://www.treasury.gov/initiatives/financial-stability/results/MHA-
Reports/Documents/Feb%202012%20MHA%20Report%20FINAL.pdf.

[17]    In addition, the Debtors originate loans under the U.S. Treasury's HARP 2.0 (Home Affordable Refinance
Program), which removes certain refinancing restrictions, thereby increasing the number of existing mortgage
loans available for refinancing in the current mortgage environment.

### F.    FRB Consent Order And DOJ/AG Settlement

36.    In addition to preserving and enhancing the value of their businesses, the

Debtors have committed to maintain Servicing Functions under recent settlements with the U.S.

government and several state officials.

37.    As a result of an examination conducted by the Federal Reserve Board

(the "FRB") and the Federal Deposit Insurance Company (the "FDIC"), on April 13, 2011,

Debtors Residential Capital, LLC ("ResCap") and GMAC Mortgage, and non-debtor affiliates

AFI and Ally Bank entered into a Consent Order with the FRB and the FDIC (the "Consent

Order").  Pursuant to the Consent Order, the Debtors are responsible for making improvements

to various aspects of their residential mortgage loan servicing business, including, among other

things, compliance programs, internal audit, communications with borrowers, vendor

management, management information systems, employee training, and oversight by the boards

of directors of ResCap and GMAC Mortgage.  Among other things, the Consent Order requires

the parties to perform an extensive review of past foreclosure proceedings with respect to loans

serviced by the Debtors with the assistance of an independent consultant, and to prepare and

submit a detailed report regarding the results of that review.  The Debtors estimate that the

performance of this review may cost as much as $180 million.  The Debtors intend to comply

with and adhere to the terms of the Consent Order to the best of their abilities.

38.    In addition, on February 9, 2012, ResCap, certain other Debtors, and AFI,

along with several other banks and mortgage servicers, reached an agreement in principle (the

"DOJ/AG Settlement") with the federal government, 49 state attorneys general, and 48 state

banking departments.  The DOJ/AG Settlement resulted from various investigations related to

20

the procedures followed by mortgage servicing companies and banks, including ResCap and

GMAC Mortgage, in connection with mortgage foreclosure home sales and evictions.[18]

39.    A final agreement with respect to the DOJ/AG Settlement was filed as a

Consent Judgment in the United States District Court for the District of Columbia on March 12,

2012. The Consent Judgment was approved by that court on April 4, 2012 and entered on

April 5, 2012. Compliance with the DOJ/AG Settlement will be overseen by a court-appointed

monitor.

40.    In addition to certain fixed payments of approximately $110 million made

prior to the Petition Date, ResCap and the other Debtors committed to provide a minimum of

approximately $200 million towards borrower relief with respect to Non-GA Loans owned by

Ally Bank. This commitment for borrower relief includes loan modifications, such as principal

reductions, rate modifications and refinancing for borrowers that meet certain requirements, and

participation in certain other programs. The Debtors currently expect that Non-GA Loans

totaling approximately $523 million of unpaid principal balance will be modified in connection

with these programs, although the actual amount of modified loans could be significantly

different. The DOJ/AG Settlement provides incentives for borrower relief that is provided

within the first twelve months; all consumer obligations must be met by March 1, 2015, and are

enforceable through September 1, 2015. On February 9, 2012, AFI and ResCap also agreed with

the FRB on a civil money penalty of $207 million related to the same activities that were the

subject of the DOJ/AG Settlement, which amount will be reduced dollar-for-dollar in connection

with satisfaction of the required monetary payment and borrower relief obligations included

---

[18]    AFI, ResCap and the Debtors separately reached an independent settlement with Oklahoma, which did not
participate in the DOJ/AG Settlement.

within the DOJ/AG Settlement, as well as through participation in other similar programs approved by the FRB.

41.    Under the DOJ/AG Settlement, the Debtors are required to continue their mortgage loan servicing activities.  In connection therewith, the Debtors are to implement new servicing standards relating to matters such as foreclosure and bankruptcy information and documentation, oversight, loss mitigation, limitations on fees, and related procedural matters. Compliance with these obligations will be overseen by an independent monitor, who will have authority to impose additional significant monetary penalties and fines if the Debtors fail to continue their servicing activities, meet established timelines, or implement required servicing standards.  The Debtors are also required to undertake a review of their foreclosure practices pursuant to the DOJ/AG Settlement, which is being performed with the assistance of outside counsel.

42.    The Debtors are fully committed to complying with and adhering to the terms of the Consent Order and the DOJ/AG Settlement to the best of their abilities and the Debtors and their estates will benefit from these activities.  For the avoidance of doubt, the Debtors request express authority to take such actions and make such disbursements that are required in order to comply with the Consent Order and the DOJ/AG Settlement, including, but not limited to, the review of past foreclosure proceedings and preparation of reports regarding the findings of that review, with the assistance of Pricewaterhouse Coopers LLP and outside counsel as independent consultants.  Maintenance of Servicing Functions in accordance with these government mandates will help assuage borrower concerns regarding the status of their mortgage obligations, assure current and future loan applicants that their mortgage loans will be

22

properly administered, and assure investors that their investments (and related collateral) will be properly managed.

### G.    Summary Of Relief Requested Concerning Servicing Functions

43.    The Debtors' failure to maintain their current loan servicing operations for GA Loans or comply with certain outstanding obligations related to this segment of their businesses, could seriously undermine the value of their enterprises and jeopardize the Platform Sale.  Similarly, the relief requested will contribute to the stability of the housing market and minimize adverse effects on existing mortgage loan securitizations for which the Debtors function as servicer.  Accordingly, the Debtors request authorization to continue honoring, subject to available funding, all of their Servicing Functions in the ordinary course of business pursuant to the GA Servicing Agreements, whether arising prepetition or postpetition, including without limitation:  (a) honoring all obligations arising under the GA Servicing Agreements, including, without limitation, collecting all Servicing Fees owed thereunder; (b) honoring obligations related to the Advances; (c) entering into loan modifications and Deferment and Forbearance Arrangements as they deem appropriate; and (d) honoring their obligations under the Consent Order and the DOJ/AG Settlement in connection with the Servicing Functions to the best of their abilities.  For the avoidance of doubt, the Debtors will continue to honor all servicing obligations and obligations related to Advances to the extent required by the credit documents relating to proposed debtor in possession financing.

### III.    Authority To Continue Servicing And Foreclosure Activities Related To GA Real Estate Owned

#### A.    Ordinary Course Servicing of GA Loans In Foreclosure And GA REO

44.    In their capacity as servicers of mortgage loans, the Debtors may institute foreclosure procedures on GA Loans when mortgagors fail to remit the requisite payments

23

pursuant to the terms of their mortgages or otherwise honor their loan commitments. Once these properties are foreclosed upon (to the extent they are not sold directly to a third party at a foreclosure sale), they are referred to herein as GA "real estate owned" or "GA REO."[19]

45.    Generally, after property is foreclosed upon, the title vests in the owner of the loan and the owner, in turn, markets and sells the property itself. The Debtors do not own the GA REO and are not responsible for the marketing or sale of GA REO or for making P&I Advances on GA REO. Following the foreclosure of a GA Loan, however, the Debtors remain responsible under the GA Guides for, among other things, maintaining the GA REO pending the Governmental Association's sale of the GA REO, including, without limitation, paying applicable taxes, insurance, home owners' association fees, and property maintenance expenses.

46.    In some circumstances, the Debtors, in their role as servicers, conduct foreclosure sales in their own names, rather than in the name of the owner of the loan. As a consequence, immediately following foreclosure, title to GA REO is occasionally held in the name of the Debtors, even though ownership of, and equitable title to, the GA REO are vested in the applicable Governmental Association as the owner of the GA Loan. On such occasions, in order to reflect actual ownership, the Debtors subsequently transfer or assign the deed relating to the GA REO to the true owner.

47.    The Debtors seek authorization to continue operating the GA REO business in the ordinary course, including conducting foreclosures of GA REO property and, to the extent necessary, transferring or assigning deeds relating to GA REO to Fannie Mae, Freddie Mac, or Ginnie Mae, as applicable, as owner of the REO.

---

[19]    The term REO may be used to refer to real estate (a) owned by the Debtors, or (b) owned by investors for whom the Debtors act as servicer.

B.    **Payment Of Fees Associated With Servicing Of GA Loans
In Foreclosure And GA REO**

48.    The Debtors seek authority to continue making Advances—and to fund

prepetition amounts owed—with respect to GA Loans in foreclosure and the GA REO for which

the Debtors act as servicer for the underlying loan.  Specifically, the Debtors request authority to

continue making P&I Advances on Ginnie Mae Loans until they are liquidated from the loan

pool via a foreclosure sale or conveyance of the loan to HUD, on Freddie Mac loans until they

are referred to foreclosure, and on Fannie Mae Loans until they are removed from the loan pool,

in each case as required pursuant to the applicable GA Servicing Agreement.

49.    The Debtors also request authority to continue making T&I Advances, and

to make Corporate Advances consisting of utility payments, and payments to various vendors

related to the management and maintenance of the properties.  For example, when the Debtors

foreclose on a property, the utility services are placed in the name of the listing broker of that

property.  Upon the property's ultimate disposition, the listing broker seeks reimbursement for

the interim utility charges from the Debtors.  Other common expenses covered by Corporate

Advances include regular property inspections, payment of homeowner association and

management fees, lawn care, repairs and other basic property maintenance.  These T&I

Advances and Corporate Advances are necessary to preserve the value of the GA REO pending a

sale of the asset and are also required pursuant to the GA Guides.

50.    In addition, the Debtors seek authority to continue making Corporate

Advances—and, solely with respect to Critical Servicing Vendors (defined below), to fund

prepetition amounts owed—related to amounts due in connection with foreclosure proceedings,

including the payment of professionals that assist with the property foreclosure-related

proceedings, such as attorneys, appraisers, field service companies, realtors, title companies, and

25

other professionals engaged in connection with property foreclosures. Foreclosure attorneys are typically paid on a pre-approved, per service basis. Inspection companies charge a flat fee per inspection. Field service companies are compensated based on a fee structure that has been pre-approved by mortgage investors. Realtors receive a capped percentage from the proceeds of a successful property sale. The Debtors are generally reimbursed for fees related to these professionals upon a sale of the property.

51.     In February and March 2012, the Debtors made Corporate Advances in connection with the GA REO in the approximate amounts of $19,200 and $2,500, respectively. The Debtors request authority to make Corporate Advances related to GA REO included within the overall Corporate Advances provided for under the Budgets in amounts consistent with historical levels. Although the Debtors are required to pay these Corporate Advances under the GA Servicing Agreements, the Debtors will be reimbursed upon the sale of GA REO for any amounts incurred with respect to these Corporate Advances from the sale proceeds before the funds are distributed to the appropriate parties. Thus, these fees are not ultimately chargeable to the Debtors.

52.     Pursuant to the GA Guides, the Debtors are required to meet certain deadlines in connection with foreclosure proceedings. If the foreclosure of a GA Loan exceeds the time allotted under the GA Guides, Fannie Mae or Freddie Mac, as applicable, may assess a penalty against the Debtors (a "Foreclosure Timeline Penalty"). In February and March 2012, Foreclosure Timeline Penalties were assessed against the Debtors of $1.38 million and $1.53 million, respectively. As part of their general servicing obligations pursuant to the GA Servicing Agreements, the Debtors request authority to pay any Foreclosure Timeline Penalties assessed against them.

26

ny-1011869

53.    Moreover, the Debtors request authority to remit the net proceeds of sale of a foreclosed GA Loan or GA REO to the appropriate parties in accordance with the relevant GA Servicing Agreement.  Proceeds from third party foreclosure sales are deposited into a GMAC Mortgage clearing account.  Upon conveyance of the property to a purchaser, the Debtors submit a claim for repayment of outstanding Advances to Ginnie Mae, Fannie Mae, or Freddie Mac, as applicable.  As of March 31, 2012, the Debtors estimate that they currently service approximately 370 GA REO properties that are sold but not yet conveyed, with an aggregate unpaid principal balance of approximately $59.6 million.

**C.    Summary Of Relief Requested Concerning GA Loans
In Foreclosure And GA REO**

54.    The Debtors seek, with respect to GA Loans in foreclosure and the GA REO, authority to:  (a) continue the Servicing Functions; (b) continue paying foreclosure professionals' and brokers' fees, as applicable, in the ordinary course of business; (c) continue the funding of Advances in accordance with the relevant GA Servicing Agreements; (d) distribute the balance of the proceeds from the sale of a foreclosed GA Loan or GA REO to the appropriate parties in accordance with the relevant GA Servicing Agreement; and (e) where applicable, transfer or assign deeds relating to GA REO to Fannie Mae, Freddie Mac, or Ginnie Mae, as applicable, as owner of the REO.

**IV.    Employment And Payment Of Third Party Vendors**

55.    In connection with the Servicing Functions described above, the Debtors typically utilize various third party vendors and professionals to provide services supporting the Debtors' Servicing Functions.  These vendors provide a variety of services that are critical to sustaining the Debtors' day-to-day servicing operations, including, but not limited to, the following general categories:

27

(a) <u>Critical General Support Services</u>:  The Debtors rely on third party vendors to (i) maintain the technology used to perform their loan servicing processes, (ii) operate call routing technology, which is used to route approximately one million customer calls per month and to direct workflow to service loans, (iii) perform collections and processing of customer payments, thus ensuring that large scale collections and processing of borrower payments remain timely, (iv) manage loan records, by facilitating rapid and efficient access to huge volumes of information (for example, over 250 million record images are stored in the Debtors' database, with 3.4 million new images being added to the database monthly) with respect to foreclosures, lien releases, and loss mitigation activities, among others, (v) provide title services, including performing title searches necessary to validate property ownership for recordation purposes, and (vi) maintain customer correspondence, by coordinating over 2.2 million mailings to customers each month regarding payments, legal and regulatory notifications, and loss mitigation and foreclosure communications.

(b) <u>Business Process Outsourcing</u>:  The Debtors outsource approximately 50% of their Servicing Functions to companies that are able to provide technology, labor, and expertise on a much more cost-effective basis than if the Debtors were to perform such activities in-house.  Provision of services by these companies is a critical component of the cost-structure for the Debtors' servicing business.

(c) <u>Escrow Services</u>:  The Debtors utilize third party escrow service providers who assist with the processing, calculation, and collection of escrow payments, including taxes, mortgage insurance and other types of hazard insurance, as required pursuant to the

28

Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, et seq., often referred to as

RESPA.

(d) Consumer Relief and Loss Mitigation:  The Debtors employ third party

community relationship managers, who work with borrowers to avoid foreclosure and

implement loss mitigation procedures, as required pursuant to applicable regulations and

the Consent Order.  The Debtors also rely on third party professionals to assist them in

connection with borrower bankruptcies, collection activities for delinquent loans, loan

foreclosures, evictions, and closing services that cannot be completed in-house and are

vital to the Debtors' servicing operations related to defaulted loans.

(e) Property Preservation and Maintenance:  The Debtors employ various

foreclosure and property preservation professionals, including attorneys, appraisers, field

service companies, realtors, and title companies, to conduct foreclosures and manage and

market residential properties foreclosed upon by the Debtors.  The performance of these

activities by the Debtors is required under the Debtors' Servicing Agreements, and helps

to preserve property values and maximize proceeds received from the sale of real estate

(which, among other things, are used to reimburse the Debtors for their Advances).  Most

of these vendors are paid directly from the proceeds of sale.  These expenses constitute

Corporate Advances and are reimbursable by the investor.

56.    Expenses for vendors included in categories (a) through (d) listed above

are paid directly by the Debtors, which expenses are part of the Debtors' corporate overhead.

Vendors included in category (e) are paid by the Debtors, but those fees are subject to

reimbursement, thereby creating a receivable payable to the Debtors.  Under the applicable GA

Servicing Agreements, many of these expenses are satisfied out of amounts that have been

29

remitted by the borrowers and deposited in segregated custodial accounts maintained by the

Debtors.  Other pass-through expenses are reimbursed by investors upon submission of a claim

for payment by the Debtors.  In addition, under certain circumstances, these pass-through

expenses may be reimbursed out of insurance proceeds.

57.     The Debtors rely on these third party vendors to perform a substantial

portion of their servicing functions for a number of reasons.  In some cases, employing these

specialized vendors is more cost-effective and efficient than performing such activities in-house.

In other cases, the Debtors are simply unable to replicate these services in-house.  In either case,

replacing these vendors would be difficult if not impossible, highly disruptive, and cost-

prohibitive.  Moreover, the Debtors have developed relationships with these vendors that have

allowed the Debtors to negotiate favorable pricing, credit terms, and priority scheduling.  Failure

to timely honor the prepetition obligations to these vendors would seriously jeopardize these

relationships.  Any interruption of the services provided by these critical vendors for even a short

period of time would impair the Debtors' loan servicing operations and, in all likelihood, the

value of their loan servicing business.  Such parties may refuse to continue providing services to

the Debtors postpetition or may impose unfavorable terms, including cash in advance, security,

or restricting of trade credit.

58.     Accordingly, by this Motion, the Debtors request authorization, but not

direction, to continue to employ and pay, in their sole discretion, the third party servicing

vendors (the "Critical Servicing Vendors") that the Debtors determine must be paid in order to

continue receiving the vital products and/or services provided by those vendors, including the

satisfaction of amounts accrued prior to the Petition Date.  By this Motion, the Debtors are

seeking authority to pay the Critical Servicing Vendors with respect to all loans for which the

Debtors provide servicing, not just the GA Loans.

59.     As of the Petition Date, the Debtors estimate that the outstanding

prepetition obligations related to the Critical Servicing Vendors total approximately $15.97

million, on account of which the Debtors expect to make payments of approximately $10.82

million in the first thirty (30) days of these bankruptcy cases, subject to Court approval.  The

Debtors estimate that the outstanding prepetition obligations related to the Critical Servicing

Vendors on a pass-through basis (i.e., for services for which the Debtors expect that they will be

repaid) included in those amounts total approximately $1.2 million, on account of which the

Debtors expect to make payments of approximately $790,000 in the first thirty (30) days of these

bankruptcy cases.[20]

60.     The Debtors propose to condition payment of the prepetition claims of

Critical Servicing Vendors on the agreement of individual Critical Servicing Vendors to continue

supplying products and/or services to the Debtors pursuant to the parties' normal and customary

trade terms, practices, and programs (including, but not limited to, credit limits, pricing, cash

discounts, timing of payments, allowance, rebates, coupon reconciliation, normal product mix

and availability and other applicable terms and programs) under which such Critical Servicing

Vendors provided products and/or services to the Debtors prior to the Petition Date (the

"Customary Trade Terms"), or pursuant to such other trade practices and programs that are

favorable to the Debtors.  The Debtors reserve the right to negotiate new trade terms with any

Critical Servicing Vendor as a condition to payment of any prepetition claim.

---

[20]    These amounts include expenses incurred with respect to both GA Loans and Non-GA Loans.

61.     In the event a Critical Servicing Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or on such other terms as are agreed by the parties) following receipt of any full or partial payment on a prepetition claim, the Debtors hereby seek authority, in their sole discretion and without further order of the Court, (i) to declare that payments made to the Critical Servicing Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Servicing Vendor without further action by any person or entity; and (ii) to recover or seek disgorgement of any payment made to the Critical Servicing Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Servicing Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.

62.     The Debtors also seek an order authorizing the Debtors and their banks to honor such expenses and any prepetition wire transfers that were made in the ordinary course of the Debtors' servicing business, and to re-issue any checks that may have been returned.[21]

## V.     Limited Relief From The Automatic Stay To Allow Borrowers Or Their Tenants To Raise Related Counter-Claims In Foreclosure And Eviction Proceedings

63.     In their capacity as servicer, the Debtors currently are party to approximately 31,400 foreclosure proceedings.  During foreclosure proceedings, borrowers may seek to raise certain defenses and related counter-claims against the Debtors in order to preserve their interest in the GA REO.  In addition, the Debtors may be required to bring eviction

---

[21]    Similar relief has also been requested in the *Debtors' Motion For Order Under Bankruptcy Code Sections 105(A), 345, 363, 364, And 503(B)(1) Authorizing (I) Continued Use Of Existing Cash Management Practices, (II) Continued Use Of Existing Bank Accounts, Checks, And Business Forms, (III) Interim Waiver Of The Investment And Deposit Requirements Of Bankruptcy Code Section 345, (IV) Debtors To Honor Specified Outstanding Prepetition Payment Obligations, And (V) Continuation Of Intercompany Transactions, Including Intercompany Transactions With Future Debtors, And Granting Administrative Expense Status To Intercompany Claims*, filed contemporaneously with this Motion.

proceedings against borrowers or their tenants residing in properties subject to FHA guaranteed

Ginnie Mae Loans upon which the Debtors have foreclosed.  The related counter-claims asserted

by borrowers in foreclosure actions or by tenants in eviction actions, whether commenced prior

to, on, or after the Petition Date, are or may be subject to the automatic stay under Bankruptcy

Code section 362(a).  The Debtors respectfully submit that requiring each of those parties to

obtain stay relief to assert counter-claims related to the subject matter of the foreclosure or

complaint, as applicable, will add an unnecessary degree of complexity, costs and delay to the

foreclosure process.  Accordingly, the Debtors hereby request that the Court enter a standing

order modifying the automatic stay solely for the purposes of allowing (a) borrowers to assert

and prosecute counter-claims related to the subject matter of the foreclosure complaint in

connection with foreclosure proceedings, and (b) tenants to assert and prosecute counter-claims

related to the subject matter of the eviction complaint in connection with eviction proceedings

for which the underlying property is the subject of a foreclosure proceeding or has been

foreclosed upon, in each case excluding claims against the Debtors related to the origination or

securitization of the borrowers' mortgage loans.  However, absent further affirmative relief from

this Court, under no circumstances shall such parties be entitled to enforce against, recoup, setoff

or collect any judgment or award related to any such counter-claim.  The Debtors reserve the

right in their sole discretion to determine whether any such defense or counterclaim falls within

the exception to the automatic stay described herein.

**VI.    Consensual Use Of Cash Collateral Under The Fannie Mae EAF Facility**

64.    Pursuant to an Early Advance Funding Mechanism Term Sheet, dated

August 1, 2010, as amended and restated on January 18, 2011, and August 1, 2011, Fannie Mae

provides GMAC Mortgage with early partial reimbursement of T&I Advances and Corporate

Advances made by GMAC Mortgage with respect to Fannie Mae Loans (the "Fannie Mae EAF

33

Facility"). Fannie Mae pays the early reimbursements into a collection account (the "EAF

Collection Account") in which Fannie Mae holds a first priority lien, and the Debtors are

permitted to use funds from the account only to make additional Advances on Fannie Mae Loans.

In turn, Fannie Mae recoups the early reimbursement amounts it pays under the Fannie Mae EAF

Facility from future final reimbursements to, and other recoveries by, GMAC Mortgage in

respect of certain Advances subject to the Fannie Mae EAF Facility. The total commitment

under the Fannie Mae EAF Facility is $125 million, of which $40.4 million was outstanding as

of May 4, 2012.

65.     As described above, the Debtors' obligations to make Advances are

significant and, although Advances are generally subject to reimbursement, they may remain

outstanding for extended periods of time. The Fannie Mae EAF Facility provides the Debtors

with additional liquidity by accelerating payment on certain of their outstanding Advances.

66.     Fannie Mae has agreed to permit the Debtors to continue to use the funds

held in the EAF Collection Account as of the Petition Date, which constitute Fannie Mae's cash

collateral, in return for certain adequate protection, and pursuant to the terms and conditions set

forth in Exhibit C, attached hereto (the "EAF Terms"). The EAF Terms generally provide as

follows:

(a)     use of the EAF Facility in accordance with its terms and in accordance with the
        terms set forth in Exhibit C;

(b)     valid, enforceable, unavoidable, and fully perfected replacement liens and security
        interests in the EAF Collection Account senior to all security interests in, liens on,
        or claims against any of the EAF Collection Account;

(c)     in accordance with sections 503 and 507 of the Bankruptcy Code, with respect to
        any diminution of the value of the interest of Fannie Mae in the Fannie Mae
        Collection Account, allowed superpriority administrative expense claims with
        priority over any and all administrative expense claims and unsecured claims
        against the Debtors and their estates, now existing or hereafter arising, with the
        exception of any priority administrative expense claims granted to any lender of

34

debtor in possession financing (or such lender's agent) or other party extending postpetition secured credit in these Chapter 11 cases; and

(d)    waiver of any surcharge claim under section 506(c) of the Bankruptcy Code or otherwise, including, without limitation, any claim under the equitable doctrine of marshaling or any similar doctrine, for any costs and expenses incurred in connection with the preservation, protection or enhancement of the Fannie Mae Collection Account.

The EAF Terms were negotiated at arms' length and with the assistance of independent counsel.

67.    If the Debtors are unable to use the Fannie Mae EAF Facility, their liquidity will be reduced during these Chapter 11 cases, and their ability to continue to fund Advances on GA Loans may be impaired.  Accordingly, the Debtors request authority to utilize Fannie Mae's cash collateral under the Fannie Mae EAF Facility in accordance with the EAF Terms.  The Debtors believe that the EAF Terms are fair and reasonable, and that use of Fannie Mae's cash collateral under the Fannie Mae EAF Facility is in the best interests of the Debtors' estates.

## VII.    Grant Of Related Relief, Including Authorizing Compliance With Enhanced Reporting Requirements And Provision Of Adequate Assurance

### A.    Enhanced Reporting Requirements

68.    During the ordinary course of the Debtors' servicing operations, the Debtors are required under the GA Guides to provide the Governmental Associations with access to information relating to the servicing of GA Loans.  The Debtors intend to provide the Governmental Associations with continued access to servicing information postpetition and have specifically agreed to provide Freddie Mac and Fannie Mae with reasonable access to the Debtors' books, records, and accounts including, without limitation:

(a)    information relating to the Freddie Mac Loans and Fannie Mae Loans, respectively;

(b)    monthly custodial account reconciliations via tapes, delivered to Freddie Mac on or before the fifth (5th) day of the month immediately following the reconciliation

35

period, and to Fannie Mae on or before the fifteenth (15th) day of the month immediately following the reconciliation period, of all P&I and T&I accounts relating to Freddie Mac Loans and Fannie Mae Loans;

(c)     monthly reports, delivered to Freddie Mac and Fannie Mae, respectively, on or before the fifteenth (15th) day of each month, disclosing the Debtors' employee attrition, identifying departing employees by name, position, and principle duties;

(d)     monthly reports, delivered to Freddie Mac and Fannie Mae, respectively, on or before the fifth (5th) business day of each month, disclosing the Debtors' compliance or non-compliance with all foreclosure-related timelines required by the Freddie Mac Guide and Fannie Mae Contract; and

(e)     until such time as a "hot back-up" servicer is in place with respect to Freddie Mac Loans as described below, a daily data tape providing enhanced servicing information requested by Freddie Mac and Fannie Mae, respectively.

To facilitate access to information, the Debtors have also agreed to provide Freddie Mac and Fannie Mae personnel with physical, on-site access to the Debtors' offices and records during all business hours.

### B.     Transfers Of Non-Performing Freddie Mac Loans

69.     The Debtors have agreed to cooperate with Freddie Mac in connection with its engagement of a hot back-up servicer for purposes of servicing the Freddie Mac Loans in the event the Debtors are unable to adequately service those loans or servicing of the loans is otherwise transferred during the Debtors' bankruptcy cases.  A "hot back-up" servicer is a servicer approved by the applicable Governmental Association that is prepared to take over servicing functions on specified notice.  The Debtors have agreed to use reasonable best efforts to facilitate the engagement of a hot back up servicer for Freddie Mac Loans by, among other things, providing access to technology and systems support, in order to complete that process on or before July 31, 2012.  Further, the Debtors have agreed to provide the back-up servicer with access to data relating to the Freddie Mac Loans, including, without limitation, daily and monthly data tapes of transactions relating to the loans.

36

70.    In the ordinary course of business, prior to the Petition Date, the Debtors may have been required by Freddie Mac, pursuant to contractual terms of business, to transfer to other servicers the servicing relating to Freddie Mac Loans that failed to meet negotiated servicing standards or benchmarks.  The Debtors have agreed to transfer servicing postpetition to one or more third-party servicers designated by Freddie Mac with respect to Freddie Mac Loans, if the Debtors fail to satisfy one or more performance metrics (the "Metrics"), which are identified in Exhibit D attached hereto and filed under seal.  In response to one or more written notices (each, a "Transfer Notice") by Freddie Mac notifying the Debtors that they have failed to satisfy the Metrics, the Debtors shall transfer, within thirty (30) days from receipt of the applicable Transfer Notice, the servicing of the Freddie Mac Loans identified in the Transfer Notice to one or more servicers designated by Freddie Mac, in its sole discretion.  The Debtors have agreed to execute and transfer all documents and files requested by Freddie Mac to complete the servicing transfer.  With respect to any Freddie Mac Loan transferred for failure to satisfy the Metrics, the Debtors' servicing rights shall be considered terminated "with cause" within the meaning of the Freddie Mac Guide.

## C.    Adequate Assurance Of Future Performance

71.    The Debtors service approximately 950,000 Fannie Mae Loans, with an aggregate unpaid principal balance of $153.2 billion.  Fannie Mae Loans comprise approximately 60% of the Debtors' GA Loan servicing portfolio.  The Debtors service approximately 370,000 Freddie Mac Loans, with an aggregate unpaid principal balance of $59.8 billion.  Freddie Mac Loans comprise approximately 23% of the Debtors' GA Loan servicing portfolio.  Fannie Mae and Freddie Mac have each requested, and the Debtors have agreed, subject to Court approval, to provide certain assurances regarding the Debtors' ability to service the Fannie Mae Loans and Freddie Mac Loans during the course of these Chapter 11 cases, as set

37

forth in Exhibits E and F, attached hereto, given Fannie Mae's and Freddie Mac's respective interests in those loans. The form of these assurances was negotiated at arms' length and with the assistance of independent counsel, and the Debtors believe they are fair and reasonable. In addition, as set forth herein, the Platform Sale is conditioned upon the Debtors' continued servicing in the ordinary course, as is the Debtors' DIP financing. Thus, the Debtors submit that it is essential that they be authorized to provide such adequate assurance to Fannie Mae and Freddie Mac. The Debtors have every intention of maintaining their servicing operations in accordance with the standards and requirements set forth in the GA Guides, GA Servicing Agreements, and other related documents.

72.     The Debtors request that any order entered by the Court approving the relief requested in this Motion also provide that all payments by the Debtors to the Governmental Associations (including, without limitation, payments of principal and interest, Advances, foreclosure timeline compensatory fees, post-claim reimbursements, and other servicing-related fees and claims) shall be made free and clear of any lien, security interest, or other interest of any party, including, without limitation, any prepetition or postpetition lenders.

73.     To the extent that the automatic stay under Bankruptcy Code section 362(a) applies to requests by the Governmental Associations that the Debtors honor their servicing-related commitments and obligations, the Debtors request that the Court modify the automatic stay to the limited extent necessary to allow the Governmental Associations to make servicing-related requests to the Debtors. Such requests may include, without limitation, requests for payment of principal and interest, Advances, foreclosure timeline compensatory fees, post-claim reimbursements, and other servicing-related fees and claims, in each case to the extent provided under the relevant GA Guide, GA Servicing Agreement, or other related documents. However,

38

to the extent the automatic stay is applicable, the Governmental Associations may not proceed to take any enforcement actions against the Debtors, or property of their estates with respect to such requests, including the collection thereof, without further order of the Court, except with respect to a transfer of servicing of Freddie Mac Loans as provided in paragraph 70.

## VIII.    Request For Immediate Relief And Waiver Of Stay

74.    Bankruptcy Rule 6003 generally precludes the Court from authorizing certain relief until twenty-one days after the petition is filed, except to the extent necessary to prevent "immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief requested in this Motion be entered on an interim basis.

75.    To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

## APPLICABLE AUTHORITY

## I.    The Court Should Authorize The Debtors To Continue Servicing GA Loans In The Ordinary Course Of Business Pursuant To Section 363 Of The Bankruptcy Code

76.    The relief requested in this Motion relates solely to the continued ordinary course conduct of the Debtors' business within the meaning of section 363(c)(1) of the Bankruptcy Code.  Nonetheless, the relief requested herein is essential to provide comfort to those doing business with the Debtors.  Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its

ny-1011869

business.  See 11 U.S.C. § 363(c).  Section 363(c) of the Bankruptcy Code, in relevant part,

provides:

> If the business of the debtor is authorized to be operated under
> section 721, 1108, 1203, 1204 or 1304 of this title and unless the
> court orders otherwise, the trustee may enter into transactions,
> including the sale or lease of property of the estate, in the ordinary
> course of business, without notice or a hearing, and may use
> property of the estate in the ordinary course of business without
> notice or a hearing.

11 U.S.C. § 363(c)(1).

77.    The ordinary course of business standard was intended to allow a debtor in

possession the flexibility required to run its business and respond quickly to changes in the

business environment.  Moore v. Brewer (In re HMH Motor Servs., Inc.), 259 B.R. 440, 448-49

(Bankr. S.D. Ga. 2000).  A debtor in possession, thus, may use, sell or lease property of the

estate without need for prior court approval if the transaction is in the ordinary course.  Comm.

of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville

Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate

property do not require a prior hearing); Armstrong World Indus. v. James A. Phillips, Inc. (In re

James A. Phillips, Inc.), 29 B.R. 391, 394 (S.D.N.Y. 1983) (holding that where a debtor in

possession is merely exercising the privileges of his status, there is no general right to notice and

hearing concerning particular transactions conducted in the ordinary course of the business).

78.    Courts broadly interpret the term ordinary course.  Gassen v. Universal

Bldg. Materials, Inc. (In re Berkley Multi-Units, Inc.), 88 B.R 394, 396 (Bankr. M.D. Fla. 1988).

In determining whether a transaction is in the ordinary course of business under Bankruptcy

Code section 363, the courts apply a two-pronged test: (1) the objective horizontal test, and (2)

the subjective vertical test.  See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d

379, 384-85 (2d Cir. 1997); see also In re Dana Corp., 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006)

40

(and cases cited therein); In re The Leslie Fay Cos., 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).

The horizontal test is a factual analysis as to whether the transaction in question is of the sort

commonly undertaken by companies in that industry.  In re Lavigne, 114 F.3d at 385.  That is,

the horizontal test focuses on whether the transaction is usual or abnormal for the industry.  The

vertical test, which is also called the creditor's expectation test, is an analysis conducted from the

perspective of a hypothetical creditor and analyzes whether the transaction subjects the creditor

to an economic risk of a nature different from those it accepted when it decided to extend credit.

Id. (internal quotations omitted); In re The Leslie Fay Cos., 168 B.R. at 304.  In making this

determination, courts look to the debtor's pre-petition business practices and conduct and

compare them to the debtor's postpetition conduct.  In re The Leslie Fay Cos., 168 B.R. at 304.

79.    Here, all of the activities for which the Debtors seek authority to continue

satisfy both the horizontal and vertical tests.  The horizontal test is easily met.  Each of the

foregoing activities represents an essential component in continuing the Debtors' business as it

was conducted prior to the Petition Date.  These services are typically performed by similarly

situated mortgage loan servicers in the mortgage lending and securitization industries.  Likewise,

a hypothetical creditor should expect that the Debtors, in their capacity as loan servicer, would

be parties to various agreements that require them to engage in the various activities and incur

the financial obligations described in this Motion.  Granting the relief requested herein would not

subject creditors to economic risks that would not have been contemplated by them.  Therefore,

the vertical test is also satisfied.  See Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant

& Russell, Inc.), 853 F.2d 700, 705 (9th Cir. 1988) (debtor's renewal and execution of leases

satisfied vertical test because debtor routinely entered into leases prior to bankruptcy); In re

Johns-Manville Corp., 60 B.R. at 616 (debtor's employment of lobbyists satisfied both vertical

41

and horizontal tests because debtor had been retaining lobbyists for many years and because it

was common practice of other major companies to do so).

80.    Relief similar to that requested by the Debtors has been routinely granted

as a matter of course in numerous Chapter 11 cases of other mortgage lenders.  See, e.g., In re

Thornburg Mortg., Inc., No. 09-17787 (Bankr. D. Md. May 6, 2009) (Docket No. 49) (granting

the debtors authority to continue servicing loans and performing its loan auditing and fulfillment

services business in the ordinary course of business); In re Am. Home Mortg. Holdings, Inc.,

Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) (Docket No. 358) (granting the

debtors authority to, among other things, sell REO owned in the ordinary course free and clear of

any and all liens and encumbrances and to continue funding servicing advances); (authorizing

the debtors to sell loans owned by the debtors and honor existing obligations and incur new

obligations in the ordinary course of business in connection with the servicing of loans); In re

Aegis Mortg. Corp., Case No. 07-11119 (BLS) (Bankr. D. Del. August 15, 2007) (Docket No. 35)

(authorizing the debtors to sell certain loans owned by the debtors, continue performing under

existing subservicing agreements, and enter into new subservicing agreements); In re Mortg.

Lenders Network USA, Inc., Case No. 07-10146 (PJW) (Bankr. D. Del. Feb. 7, 2007) (Docket

No. 38) (authorizing debtors to sell loans that had closed and been funded, honor loan

commitments upon which the debtors closed prepetition but were unable to fund, and honor

existing obligations and incur new obligations in the ordinary course of business in connection

with the servicing of loans); In re The Finova Group Inc., Case No. 01-00697 (PJW) (Bankr. D.

Del. Mar. 7, 2001) (Docket No. 16) (authorizing debtors to honor, renew, increase and/or fund

prepetition commitments, honor prepetition or post petition servicing and payment obligations,

continue business practices including making of new loans, continuing ordinary course

intercompany loans and authorizing banks to honor prepetition checks and other forms of

payment); In re United Cos. Fin. Corp., Case No. 99-00451 (RB) (Bankr. D. Del. Mar. 5, 1999)

(Docket No. 54) (authorizing debtors to honor prepetition commitments to fund borrower loans,

honor existing obligations in connection with servicing existing loans, honor existing obligations

in connection with securitization of loans and sell loans in the ordinary course of business, and

directing banks to honor loan disbursement checks and wire transfers); In re Cityscape Fin. Corp.,

No. 98-22569 (ASH) (Bankr. S.D.N.Y. Jan. 25, 1999) (Docket No. 221) (granting the debtors

authority to, among other things, sell loan portfolios in the ordinary course of business).

## II.    The Court May Rely On The "Necessity Of Payment" Doctrine And Its General Equitable Powers To Grant The Motion

81.    Under section 105 of the Bankruptcy Code, this Court "may issue any

order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

11 U.S.C. § 105(a).  The Debtors, operating their business as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy

estate and operating the business for the benefit of its creditors and (if the value justifies) equity

owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  See also In re J. M.

Fields, Inc., 8 B.R. 638, 642 (Bankr. S.D.N.Y. 1981) ("[A] debtor-in-possession owes a duty to

preserve and protect his property for [creditors'] benefit.").

82.    Implicit in the duties of a Chapter 11 debtor in possession is the duty "to

protect and preserve the estate, including an operating business's going-concern value." CoServ,

L.L.C., 273 B.R. at 497.  See also In re Jennifer Convertibles, Inc., No. 10-13779, 2010 Bankr.

LEXIS 6068 (Bankr. S.D.N.Y. July 29, 2010) (authorizing relief where, among other things, it

would enable the debtors "to preserve and realize the value of the Debtors' remaining operations

on a going concern basis and avoid any decline and further devaluation of the Debtors'

43

business. . . ."); <u>In re Gen. Motors Corp.</u>, No. 09-50026, 2009 Bankr. LEXIS 5565, at *12 (Bankr.

S.D.N.Y. July 5, 2009) (authorizing relief where the court found it was necessary to preserve the

viability of the debtors' businesses as going concerns).

83.    The relief requested herein is necessary to allow the Debtors to preserve,

enhance and maximize the value of the estates, thereby fulfilling their fiduciary duties under the

Bankruptcy Code.  Specifically, the Debtors are contractually obligated to perform the servicing

and related activities (including the payment of Advances and other fees due prepetition) that

they are seeking authority to continue to perform under this Motion.  If the Debtors fail to

perform these obligations, (i) the Debtors would be in breach of their obligations under the GA

Servicing Agreements and the GA Guides, which could result in the assessment of compensatory

fees, the assertion of repurchase demands, and the potential for termination of the Debtors as

servicer for the GA Loans and/or GA REO because the GA Servicing Agreements are terminable

at will, (ii) the Debtors would no longer earn Servicing Fees with respect to the GA Loans and/or

GA REO, and (iii) the value of the Debtors' assets would decrease, notwithstanding the Debtors'

efforts to preserve value in advance of the Platform Sale.  The harm and economic disadvantage

that would stem from the Debtors' failure to perform these obligations is grossly

disproportionate to the amount of the prepetition claims that would have to be paid.  Moreover,

any Advances incurred by the Debtors are reimbursable from borrower payments or, with respect

to Corporate Advances, from sale of the REO.  Thus, these fees are not ultimately chargeable to

the Debtors.  In addition, Nationstar will be buying the Debtors' outstanding Advances with

respect to the GA Loans, further limiting the impact of making postpetition Advances on the

estates.  Finally, as noted above, the Debtors are required to continue their mortgage loan

servicing activities under the terms of the DOJ/AG Settlement, and may incur penalties if they

fail to do so.

84.     For the reasons set forth above, the Debtors can only meet their fiduciary

duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by

continuing to perform in the ordinary course by paying the Advances.  Accordingly, the relief

requested herein is essential to preserve the Debtors as a going concern and, thus, serves the

rehabilitative purposes of the Bankruptcy Code as authorized pursuant to Bankruptcy Code

section 105(a).

85.     To the extent the relief requested herein contemplates payment to Critical

Servicing Vendors of amounts accrued prior to the Petition Date, such relief is also supported by

the doctrine of necessity.  The doctrine of necessity is a well-settled principle that permits a

bankruptcy court to authorize payment of certain prepetition claims before the completion of the

Chapter 11 case where the payment of such claims is necessary to the restructuring efforts.  See

In re C.A.F. Bindery, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996) ("[T]he 'doctrine of

necessity' . . . permits the bankruptcy court to authorize the payment of prepetition claims prior

to confirmation.  To invoke the rule, however, the debtor must show that the payment is 'critical

to the debtor's reorganization." (citing In re Fin. News Network, Inc., 134 B.R. 732, 736 (Bankr.

S.D.N.Y. 1991)); In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989)

(doctrine of necessity "recognizes the existence of the judicial power to authorize a debtor in a

reorganization case to pay pre-petition claims where such payment is essential to the continued

operation of the debtor"); see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999)

(stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the

doctrine of necessity should be invoked to permit payment); Mich. Bureau of Workers'

Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-87 (S.D.N.Y.

1987) (bankruptcy court did not abuse discretion when utilizing equitable powers to pay

prepetition debts); In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can

permit pre-plan payment of a pre-petition obligation when essential to the continued operation of

the debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991)

("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment

is necessary to avert a serious threat to the Chapter 11 process.").  As set forth above, the Critical

Servicing Vendors provide services that are vital to the day-to-day operations of the Debtors'

loan servicing business and cannot be transitioned without severe disruption.  The Debtors'

inability to pay the Critical Servicing Vendors on account of obligations incurred prior to the

Petition Date would, in the Debtors' business judgment, result in the Critical Servicing Vendors

refusing to provide products or services to the Debtors postpetition.  Any refusal by the Critical

Servicing Vendors to provide products or perform key services would have immediate and

severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of

the loan servicing business, thereby reducing recoveries for stakeholders.  Accordingly, the

Debtors believe that paying the Critical Servicing Vendors on account of obligations incurred

prior to the Petition Date is both appropriate and necessary.

III.     **The Court Should Grant Limited Stay Relief Pursuant To
Section 362(d)(1) Of The Bankruptcy Code**

86.     With respect to the foreclosure of REO, the Debtors request that the Court

modify the automatic stay pursuant to section 362(d)(1) to permit borrowers to raise related

defenses and counter-claims against the Debtors during the foreclosure proceedings.  The

Debtors also request that the Court grant such relief with respect to tenants against whom the

Debtors have brought eviction actions.  The Bankruptcy Code provides the Court may grant stay

46

relief "for cause, including the lack of adequate protection of an interest in property of such party

in interest[.]" 11 U.S.C. §362(d)(1). As discussed above, the Debtors respectfully submit that it

is in the best interests of their estates and borrowers to permit borrowers or their tenants to raise

applicable defenses and related counter-claims in their related foreclosure or eviction

proceedings. The Debtors believe that limited stay relief for this purpose will allow for an

efficient and fair mortgage foreclosure process preserving both the interests of the Debtors'

estates and borrowers.

**IV.    Consensual Use Of Cash Collateral Under The Fannie Mae EAF Facility**

87.    Sections 363(c)(2) and (4) of the Bankruptcy Code mandate, automatically

and without the request of any party in interest, provision of adequate protection with respect to

"cash collateral," as defined in section 363(a) of the Bankruptcy Code. Specifically, section

363(c)(2) of the Bankruptcy Code provides that a debtor may only use cash collateral if the

debtor first obtains consent of the secured creditor, or establishes to the court's satisfaction that

the secured creditor is adequately protected. See 11 U.S.C. § 363(c)(2); In re Megan-Racine

Assocs., 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996).

88.    Here, the Debtors seek to use Fannie Mae's cash collateral with the

consent of Fannie Mae on the terms and conditions set forth in Exhibit C, which the Debtors

believe are fair and reasonable and should be approved.

**V.    Adequate Protection And Adequate Assurance Of Future Performance**

89.    The basic purpose of adequate protection is to preserve the status quo and

to assure a creditor party that its position will not be impaired during the bankruptcy case. See,

e.g., United States v. Smithfield Estates, Inc. (In re Smithfield Estates, Inc.), 48 B.R. 910, 914

(Bankr. D.R.I. 1985); In re Roe Excavating, Inc., 52 B.R. 439, 440 (Bankr. S.D. Ohio 1984).

The Bankruptcy Code permits a debtor's continued operation and use of the estate's property

during the ordinary course of business, subject to the qualification that it not be at the expense of

passing the risk of loss or dissipation to the value on to creditors.  See 11 U.S.C. § 363(e); United

States v. Whiting Pools, Inc., 462 U.S. 198, 204 (1983).

90.    Fannie Mae and Freddie Mac assert that they are entitled to adequate

protection of their respective interests in the Fannie Mae Loans and Freddie Mac Loans that are

being serviced by the Debtors pursuant to the GA Servicing Agreements if the Debtors are to be

allowed to continue to service the Fannie Mae Loans and Freddie Mac Loans during the

pendency of these Chapter 11 cases.  Bankruptcy Code section 363(e) provides, in pertinent part:

> [A]t any time, on request of an entity that has an interest in
> property used . . . the court, with or without a hearing, shall
> prohibit or condition such use . . . as is necessary to provide
> adequate protection of such interest . . .

11 U.S.C. §363(e).  Section 363(e) requires a debtor benefiting from the use of a contract to

provide adequate assurance to its counterparty until its agreement is either assumed or rejected.

See Memphis-Shelby Cnty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),

783 F.2d 1283, 1287 (5th Cir. 1986) (adequate protection provided to creditors by Chapter 11 is

generally considered interim relief).

91.    Courts have routinely held that providing adequate protection is

mandatory.  As described by one bankruptcy court:

> Section 363(e) is not permissive or discretionary - it states that the
> "shall" grant the relief specified, at any time, on request. . .  If
> adequate protection cannot be offered, such use, sales or lease of
> the collateral must be prohibited.

Metromedia Fiber Networks Servcs. V. Lexent, Inc. (In re Metromedia Fiber Network, Inc.), 290

B.R. 487, 491 (Bankr. S.D.N.Y. 2003) (quotations omitted).  Accord Institutional Creditors of

Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.), 780 F.2d 1223, 1226

(5th Cir. 1986) (Section 363(e) provides that, on the request of an entity having an interest in

48

property used or proposed to be used, "the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest.") (quotations omitted); Perez v. Peake, 373 B.R. 468, 482 (S.D. Tex. 2007) (creditors often use section 363(e) to impose on debtor the duty to provide adequate protection of an interest in property the debtor proposes to use during the bankruptcy case); In re DeSardi, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) ("The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests." (citations omitted)).

92.     The Debtors submit that the proposed terms for adequate protection and adequate assurance of future performance set forth in Exhibits E and F are fair and reasonable and should be approved.  To be clear, by this Motion the Debtors are not requesting authority at this time to assume any executory contracts or to provide adequate protection pursuant to Bankruptcy Code section 365; any such relief shall be sought in a separate motion.  Moreover, Nationstar has requested various modifications of the GA Servicing Agreements between the Debtors and the Governmental Associations, which have not yet been agreed to by the Governmental Associations.  The rights of the Governmental Associations with respect to any such modifications are not affected by the relief requested in this Motion, and the acceptance by the Governmental Associations of the adequate protection and related relief herein shall not be deemed to constitute a waiver of such rights or consent by the Governmental Associations of the assumption and assignment of the GA Servicing Agreements.

## VI.    The Requested Relief Is Necessary To Avoid Immediate And Irreparable Harm

93.     The Debtors further submit that, because the relief requested is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.  Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and

49

irreparable harm." For the reasons set forth herein, the Debtors submit that their immediate

ability to continue their loan servicing operations in the ordinary course of business, including

honoring certain outstanding obligations, and making payments on certain prepetition obligations

are indispensable to prevent the immediate and irreparable disruption of their businesses.

## SCOPE OF MOTION

94.     This Motion does not cover all aspects of the Debtors' businesses.

Whether or not a business activity is described in this Motion, and whether or not the Debtors

seek a comfort order with respect to the continuation of such activity, if the activity is one that

the Debtors conduct in the ordinary course of business, the Debtors intend to continue to conduct

such activity after the Petition Date pursuant to the authority granted to them by Bankruptcy

Code section 363(c).

95.     Nothing herein limits the rights of the Debtors to conduct their business

and manage their assets in the ordinary course without prior court approval. Nothing herein is

intended to constitute a request to assume any contract or agreement under Bankruptcy Code

section 365. The Debtors are in the process of reviewing all underlying agreements and reserve

all of their rights under such agreements, applicable law and under the Bankruptcy Code with

respect thereto.

## NOTICE

96.     Notice of this Motion will be given to the following parties, or in lieu

thereof, to their counsel: (a) the Office of the United States Trustee for the Southern District of

New York; (b) the office of the United States Attorney General; (c) the office of the New York

Attorney General; (d) the office of the United States Attorney for the Southern District of New

York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of

the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees

for the Debtors' outstanding notes issuances; (i) Ally Financial Inc. and its counsel; (j) counsel to

the administrative agent for the Debtors' proposed providers of debtor in possession financing;

(k) Nationstar Mortgage LLC and its counsel; (l) the parties included on the Debtors' list of fifty

(50) largest unsecured creditors; (m) each of the Governmental Associations and their counsel;

(n) counsel for the United States of America; and (o) the trustees for each of the GA

Securitization Trusts (collectively, the "Initial Notice Parties").  The Debtors submit that, in view

of the facts and circumstances, such notice is sufficient and no other or further notice need be

provided.

   97.  Within two (2) days after entry of an interim order, the Debtors propose to

serve a copy of the Motion and the interim order upon the Initial Notice Parties.  The Debtors

request that the Court schedule the final hearing on the Motion for a date that is as soon as

practicable, but in no event later than forty-five (45) days following the entry of the interim order,

and establish the date prior to the final hearing for parties to file objections to the Motion.

   98.  Any objections to the relief requested in the Motion must be filed with the

Clerk of the Bankruptcy Court and served upon and received by: (a) proposed counsel for the

Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn:

Larren M. Nashelsky, Gary Lee, Lorenzo Marinuzzi); (b) the Office of the United States Trustee

for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004

(Attn:  Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) counsel for Ally

Financial Inc., Kirkland & Ellis, LLP, Citigroup Center, 601 Lexington Avenue, New York, NY

10022 (Attn: Richard M. Cieri, Ray C. Schrock, and Stephen E. Hessler) (d) counsel to the

administrative agent for the Debtors' proposed providers of debtor in possession financing,

Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036

(Attention: Kenneth S. Ziman and Jonathan H. Hofer); (e) counsel for any statutory committee appointed in the Debtors' cases; (f) counsel for the United States of America and Ginnie Mae, U.S. Department of Justice, Civil Division, 1100 L Street NW, Room 10018, Washington, D.C. 20005 (Attn: Glenn D. Gillett) and United States Attorney's Office for the Southern District of New York, Civil Division, 86 Chambers Street. 3rd Floor, New York City, NY 10007 (Attn: Joseph Cordaro); (g) counsel for Fannie Mae, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166 (Attn: David Neier, Desiree M. Ripo and Alan Moskowitz); and (h) counsel for Freddie Mac, McKool Smith, 600 Travis St., Suite 7000, Houston, Texas 77002 (Attn: Paul D. Moak), before the date of the final hearing as scheduled by the Court.  If no objections to the Motion are filed, the Court may enter the final order without further notice or hearing.


**[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]**

ny-1011869

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an interim order substantially in the form attached hereto as <u>Exhibit A</u>, granting certain of the relief sought herein immediately; (ii) enter a final order substantially in the form attached hereto as <u>Exhibit B</u>, granting the relief sought herein on a final basis; and (iii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated:  May 14, 2012
       New York, New York

*/s/*    Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

ny-1011869

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- )
                                                                           )
In re:                                                                     )    Case No. 12-12020 (MG)
                                                                           )
RESIDENTIAL CAPITAL, LLC, et al.,                                          )    Chapter 11
                                                                           )
                                          Debtors.                         )    Jointly Administered
                                                                           )
-------------------------------------------------------------------------- )

**INTERIM ORDER UNDER SECTIONS 105(a), 361, 362, 363, 1107(a),
AND 1108 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS
TO CONTINUE IN THE ORDINARY COURSE OF BUSINESS (A) SERVICING
GOVERNMENTAL ASSOCIATION LOANS AND (B) FORECLOSURE ACTIVITIES
RELATED TO CERTAIN REAL ESTATE OWNED BY FANNIE MAE, FREDDIE MAC,
AND GINNIE MAE; (II) AUTHORIZING THE DEBTORS TO PAY CERTAIN
PREPETITION AMOUNTS DUE TO CRITICAL SERVICING VENDORS AND
FORECLOSURE PROFESSIONALS; (III) GRANTING LIMITED STAY RELIEF
TO ENABLE BORROWERS TO ASSERT RELATED COUNTER-CLAIMS IN
FORECLOSURE AND EVICTION PROCEEDINGS; (IV) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL UNDER THE FANNIE MAE EAF
FACILITY; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of interim

and final orders, under Bankruptcy Code sections 105(a), 361, 362, 363, 1107(a) and 1108 and

Bankruptcy Rule 6003, (i) authorizing the Debtors to continue in the ordinary course of business

(a) servicing the GA Loans; and (b) foreclosure activities related to certain real estate owned by

the Governmental Associations; (ii) authorizing the Debtors to pay certain prepetition amounts

due to critical servicing vendors and foreclosure professionals; (iii) granting limited stay relief to

enable borrowers or their tenants, as applicable, to assert related counter-claims in foreclosure

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief granted herein may refer to http://www.kccllc.net/rescap for additional information.

and eviction proceedings; (iv) authorizing the Debtors to use cash collateral under the Fannie

Mae EAF Facility; and (v) granting related relief; and upon the Whitlinger Affidavit; and it

appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this proceeding on the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion

having been given under the particular circumstances; and it appearing that no other or further

notice need be provided; and it appearing that the relief requested by the Motion is in the best

interests of the Debtors' estates, their creditors, and other parties in interest; and after due

deliberation thereon; and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED on an interim basis, as set forth herein.

Servicing of GA Loans

2.      The Debtors are authorized, but not directed, in their sole discretion and

subject to available funding, to continue servicing GA Loans in the ordinary course, including,

but not limited to:

(a)    performing the Servicing Functions and honoring all obligations arising under the
        GA Servicing Agreements;

(b)    making all Advances related to the GA Loans in accordance with the applicable
        GA Guides and GA Servicing Agreements; and

(c)    entering into loan modifications and Deferment and Forbearance Arrangements,
        including participating in HAMP.

3.      The Debtors are authorized to honor their obligations under the Consent

Order and the DOJ/AG Settlement in connection with the Servicing Functions, and to use estate

assets and take such actions as, in their reasonable business judgment, are necessary to comply

with and adhere to the terms of the Consent Order and the DOJ/AG Settlement. The Debtors are

further authorized to implement new servicing standards and procedures and to perform reviews

of their past foreclosure proceedings and reports regarding the results of such reviews, in each

case as may be required to comply with the Consent Order and the DOJ/AG Settlement.

4.      Nothing set forth in this Interim Order or in the Motion shall alter the

Debtors' obligations under the Consent Order and the DOJ/AG Settlement.

GA Loans in Foreclosure and GA REO

5.      The Debtors are authorized, but not directed, in their sole and absolute

discretion and subject to available funding, to continue servicing GA Loans in foreclosure and

GA REO in the ordinary course, including, but not limited to:

(a)     performing the Servicing Functions for GA Loans in foreclosure and GA REO in
        accordance with the applicable GA Servicing Agreements or other governing
        documents;

(b)     conducting foreclosures of GA REO property and, to the extent necessary,
        transferring or assigning deeds relating to GA REO to the applicable
        Governmental Association, as owner of the REO;

(c)     paying foreclosure professionals' and brokers' fees, as applicable, in the ordinary
        course of business;

(d)     paying Advances related to the GA Loans in foreclosure and GA REO in
        accordance with the relevant GA Servicing Agreements;

(e)     satisfying any Foreclosure Timeline Penalties assessed against the Debtors; and

(f)     remitting the proceeds from the sale of GA Loans in foreclosure and GA REO in
        accordance with the relevant GA Servicing Agreements or other governing
        documents.

6.      Nothing herein shall be construed to limit, or in any way affect, the

Debtors' ability to dispute any foreclosure professionals' and brokers' fees or Foreclosure

Timeline Penalties that may be assessed against them.

3

7.        Nothing herein shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement with any foreclosure professional or broker, or to require the Debtors to make any of the payments to any foreclosure professional or broker authorized herein.

Critical Servicing Vendors

8.        Pursuant to section 105(a) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of Critical Servicing Vendors, upon such terms and in the manner provided in this Interim Order and the Motion; provided, that payments to Critical Servicing Vendors on account of prepetition claims shall not exceed $7,310,000 during the first thirty (30) days following the Petition Date.

9.        If a Critical Servicing Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its prepetition claim, then the Debtors may, in their sole discretion and without further order of the Court:

(a)    declare that payments made to the Critical Servicing Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Servicing Vendor without further order of the Court or action by any person or entity; and

(b)    take actions to recover or seek disgorgement of any payment made to the Critical Servicing Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Servicing Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.

Under any such circumstances, such Critical Servicing Vendor shall immediately repay to the Debtors any payment made to it on account of its Critical Servicing Vendor claims to the extent that such payments exceed the postpetition claims of the Critical Servicing Vendor, without

4

giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund

claims, or other defense.

        10.      Nothing herein shall:

(a)      constitute a waiver of the Debtors' rights to seek damages, disgorgement or other appropriate remedies against any breaching Critical Servicing Vendor;

(b)      be construed to waive, limit, or in any way affect, the Debtors' ability to dispute a claim of a Critical Servicing Vendor;

(c)      be deemed an admission to the validity of the underlying obligation, including any payment made pursuant to this Interim Order;

(d)      be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Servicing Vendor; or

(e)      be deemed to require the Debtors to make any of the payments to Critical Servicing Vendors authorized herein.

        11.      Notwithstanding entry of this Interim Order, the Debtors' rights to enforce

the automatic stay provisions of section 362 of the Bankruptcy Code with respect to any creditor

who demands payment of its prepetition claims as a condition to doing business with the Debtors

postpetition are preserved.

        12.      The banks and other financial institutions at which the Debtors maintain

their disbursement accounts are authorized and directed at the Debtors' direction, to receive,

process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic

fund transfers requested or to be requested by the Debtors in respect of the claims of Critical

Servicing Vendors.

        13.      The Debtors are authorized, but not directed, to issue new postpetition

checks, or effect new electronic fund transfers, on account of the claims of Critical Servicing

Vendors to replace any prepetition checks or electronic fund transfer requests that may be lost or

dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

Limited Borrower Relief from Automatic Stay

14.      The stay imposed by section 362(a) of the Bankruptcy Code is hereby

modified solely to enable (a) borrowers to assert and prosecute counter-claims related to the

subject matter of the foreclosure complaint in connection with foreclosure proceedings, and

(b) tenants to assert and prosecute counter-claims related to the subject matter of the eviction

complaint in connection with eviction proceedings for which the underlying property is the

subject of a foreclosure proceeding or has been foreclosed upon, in each case excluding claims

against the Debtors related to the origination or securitization of the borrowers' mortgage loans;

provided, that absent further order of the Court, under no circumstances shall a borrower be

entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award

related to any such counter-claim.  The Debtors shall retain the right to determine, in their sole

discretion, whether any such counter-claim or defense falls within the exception to the automatic

stay provided for under this paragraph 14.

Use of Cash Collateral Under Fannie Mae EAF Facility

15.      Pursuant to section 363(c)(2) and (4) of the Bankruptcy Code, the Debtors

are authorized to use the funds held in the EAF Collection Account as of the Petition Date, which

constitute Fannie Mae's cash collateral (the "Fannie Mae Cash Collateral"), subject to the

provision by the Debtors of adequate protection pursuant to the EAF Terms set forth in Exhibit C

to the Motion.

16.      In accordance with the EAF Terms and pursuant to section 363(e) of the

Bankruptcy Code, Fannie Mae shall be granted replacement liens and security interests in the

EAF Collection Account (the "Fannie Mae Replacement Liens"), which shall be senior to all

security interests in, liens on, or claims against any of the EAF Collection Account.  The Fannie

ny-1008480

Mae Replacement Liens granted pursuant to this Interim Order shall be perfected by operation of law immediately upon entry of this Interim Order by the Court and Fannie Mae shall not be required to take any action in order to validate and to perfect the liens granted pursuant to this Interim Order.

17.     Any undisputed, noncontingent and liquidated postpetition claims of Fannie Mae with respect to any diminution of the value of the interest of Fannie Mae in the Fannie Mae Collection Account, shall be granted administrative expense superpriority pursuant to sections 503 and 507 of the Bankruptcy Code, with priority over any and all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, with the exception of any priority administrative expense claims granted to any lender of debtor in possession financing (or such lender's agent) or other party extending postpetition secured credit in these Chapter 11 cases.

18.     No expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Fannie Mae Cash Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of Fannie Mae.

Senior Priority of Interests with Respect to the Freddie Mac
Purchase Documents, Fannie Mae Contract Documents and Ginnie Mae

19.     *The Freddie Mac Senior Interests.*  Notwithstanding anything to the contrary herein or in any other order, the Debtors acknowledge and agree that any security interest granted in the Freddie Mac mortgage servicing rights is subject and subordinate in  all respects to all rights, powers, and prerogatives of the senior priority interests of Freddie Mac pursuant to the Freddie Mac Purchase Documents (as defined in the Freddie Mac Guide).  The

ny-1008480

Debtors further acknowledge and agree that, notwithstanding anything herein to the contrary or in any other order, no secured party has any claim or entitlement as a secured creditor against Freddie Mac, and Freddie Mac has no duty or obligation to any secured party, except as otherwise expressly agreed to in writing by Freddie Mac.

20.    *The Fannie Mae Senior Interests.*  Notwithstanding anything to the contrary herein or in any other order, the Debtors acknowledge and agree that any security interest granted in the Fannie Mae mortgage servicing rights is subject and subordinate in  all respects to all rights, powers, and prerogatives of the senior priority interests of Fannie Mae pursuant to that certain Mortgage Selling and Servicing Contract, dated as of August 9, 2006, which incorporates the provisions of the Fannie Mae Selling and Servicing Guides and any Master Contracts or pool purchase contracts that Fannie Mae and GMAC Mortgage have entered into, as each such document may be amended, supplemented or otherwise modified from time to time.  The Debtors further acknowledge and agree that, notwithstanding anything herein to the contrary or in any other order, no secured party has any claim or entitlement as a secured creditor against Fannie Mae, and Fannie Mae has no duty or obligation to any secured party, except as otherwise expressly agreed to in writing by Fannie Mae.

21.    *The Ginnie Mae Senior Interests.*  Notwithstanding anything to the contrary herein or in any other order, the Debtors acknowledge and agree that any security interest granted in the Ginnie Mae mortgage servicing rights is subject and subordinate in  all respects to all rights, powers, and prerogatives of the senior priority interests of Ginnie Mae. The Debtors further acknowledge and agree that, notwithstanding anything herein to the contrary or in any other order, no secured party has any claim or entitlement as a secured creditor against

8

Ginnie Mae, and Ginnie Mae has no duty or obligation to any secured party, except as otherwise

expressly agreed to in writing by Ginnie Mae.

Enhanced Reporting Requirements, Transfer of Servicing, and Provision of Adequate Assurance

22.    The Debtors are directed and empowered to provide the Governmental

Associations with reasonable access to the Debtors' books, records, and accounts in accordance

with the applicable GA Guides including, without limitation, to provide Freddie Mac and Fannie

Mae personnel with physical, on-site access to the Debtors' offices and records during all

business hours, and to provide Fannie Mae and Freddie Mac with reasonable access to:

(a)    information relating to the Freddie Mac Loans and Fannie Mae Loans, respectively;

(b)    monthly custodial account reconciliations via tapes, delivered to Freddie Mac on or before the fifth (5th) day of the month immediately following the reconciliation period, and to Fannie Mae on or before the fifteenth (15th) day of the month immediately following the reconciliation period, of all P&I and T&I accounts relating to Freddie Mac Loans and Fannie Mae Loans;

(c)    monthly reports, delivered to Freddie Mac and Fannie Mae, respectively, on or before the fifteenth (15th) day of each month, disclosing the Debtors' employee attrition, identifying departing employees by name, position, and principle duties;

(d)    monthly reports, delivered to Freddie Mac and Fannie Mae, respectively, on or before the fifth (5th) business day of each month, disclosing the Debtors' compliance or non-compliance with all foreclosure-related timelines required by the Freddie Mac Guide and Fannie Mae Contract; and

(e)    until such time as a "hot back-up" servicer is in place with respect to Freddie Mac Loans as described below, a daily data tape providing enhanced servicing information requested by Freddie Mac and Fannie Mae, respectively.

23.    The Debtors are directed and empowered to use reasonable best efforts to

assist Freddie Mac to engage a "hot back-up" servicer for purposes of servicing the Freddie Mac

Loans in the event the Debtors are unable to adequately service those loans or servicing of the

loans is otherwise transferred during the Debtors' bankruptcy cases by, among other things,

providing access to data, technology and systems support, in order to complete the engagement

of a hot back up servicer on or before July 31, 2012.

24.     The Debtors are authorized and required, without further order of the

Court, to transfer servicing to one or more third-party servicers designated by Freddie Mac with

respect to Freddie Mac Loans, if the Debtors fail to satisfy one or more of the Metrics set forth in

Exhibit D to the Motion.  The Debtors shall transfer servicing within thirty (30) days of the

receipt of a Transfer Notice and shall execute and transfer all documents and files requested by

Freddie Mac to complete the servicing transfer.  With respect to any Freddie Mac Loan

transferred for failure to satisfy the Metrics, the Debtors' servicing rights shall be considered

terminated with cause within the meaning of the Freddie Mac Guide.  The Debtors shall file any

Transfer Notice with the Court.

25.     Pursuant to section 363(e) of the Bankruptcy Code, the Debtors are

authorized to provide to Fannie Mae and Freddie Mac adequate assurance of future performance

under the applicable GA Servicing Agreements on the terms and conditions set forth in

Exhibits E and F to the Motion; provided, that nothing herein, including the provision of such

adequate assurance, shall be deemed to constitute an assumption or rejection of any executory

contract or prepetition or postpetition agreement between the Debtors and Fannie Mae or Freddie

Mac, as applicable.  The acceptance by the Governmental Associations of the adequate

protection and related relief granted pursuant to this Interim Order shall not be deemed to

constitute consent by the Governmental Associations of the assumption and assignment of the

GA Servicing Agreements.

26.     For the avoidance of doubt, all payments by the Debtors to the

Governmental Associations (including, without limitation, payments of principal and interest,

Advances, foreclosure timeline compensatory fees, post-claim reimbursements, and other

servicing-related fees and claims) shall be made free and clear of any lien, security interest, or

other interest of any party, including, without limitation, any prepetition or postpetition lenders.

27.    To the extent that the automatic stay under Bankruptcy Code section

362(a) applies to requests by the Fannie Mae and Freddie Mac that the Debtors honor their

servicing-related commitments and obligations, the automatic stay is hereby modified to the

limited extent necessary to allow the Fannie Mae and Freddie Mac to make servicing-related

requests to the Debtors, including, without limitation, requests for payment of principal and

interest, Advances, foreclosure timeline compensatory fees, post-claim reimbursements, and

other servicing-related fees and claims, in each case to the extent provided under the relevant GA

Guide, GA Servicing Agreement, or other related documents; provided, however, that to the

extent the automatic stay is applicable, the Fannie Mae and Freddie Mac may not proceed to take

any enforcement actions against the Debtors, or property of their estates with respect to such

requests, including the collection thereof, without further order of the Court, except with respect

to a transfer of servicing for Freddie Mac Loans arising from the Debtors' failure to satisfy the

Metrics, pursuant to paragraph 21 of this Interim Order.

Other Relief

28.    The Debtors are authorized and empowered to take all actions and execute

such documents as may be necessary or appropriate to carry out the relief granted herein.

29.    Nothing herein shall be deemed to limit the rights of the Debtors to

operate their business in the ordinary course, and no subsequent order shall be required to

confirm such rights.

30.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

31.     Notwithstanding anything to the contrary in this Interim Order, any action to be taken pursuant to the relief authorized in this Interim Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings.  All amounts authorized to be paid pursuant to this Interim Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement).  To the extent that there is any inconsistency between the terms of this Interim Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

32.     Notwithstanding anything herein to the contrary, this Interim Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012 and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

12

33.    Nothing in this Interim Order shall discharge, release, or otherwise preclude any setoff or recoupment right of the United States of America, its agencies, departments, or agents.

34.    The Debtors shall serve a copy of the Motion and this Interim Order by United States mail, first class postage, on (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for the Debtors' outstanding notes issuances; (i) Ally Financial Inc. and its counsel; (j) counsel to the administrative agent for the Debtors' proposed providers of debtor in possession financing; (k) Nationstar Mortgage LLC and its counsel; (l) the parties included on the Debtors' list of fifty (50) largest unsecured creditors; (m) each of the Governmental Associations and their counsel; (n) counsel for the United States of America; and (o) the trustees for each of the GA Securitization Trusts, on or before _____, 2012.

35.    The Final Hearing, if required, to consider the Motion and proposed final order is scheduled for _____ __, 2012 at __:__ __.m. (prevailing Eastern Time) before the Court. Any objections or responses to the Motion must be filed with the Clerk of the Bankruptcy Court and served upon and received by: (a) proposed counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Larren M. Nashelsky, Gary Lee, Lorenzo Marinuzzi); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn:  Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) counsel for Ally Financial Inc., Kirkland & Ellis,

13

LLP, Citigroup Center, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M. Cieri,

Ray C. Schrock, and Stephen E. Hessler) (d) counsel to the administrative agent for the Debtors'

proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom

LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman and Jonathan

H. Hofer); (e) counsel for any statutory committee appointed in the Debtors' cases; (f) counsel

for the United States of America and Ginnie Mae, U.S. Department of Justice, Civil Division,

1100 L Street NW, Room 10018, Washington, D.C. 20005 (Attn: Glenn D. Gillett) and United

States Attorney's Office for the Southern District of New York, Civil Division, 86 Chambers

Street. 3rd Floor, New York City, NY 10007 (Attn: Joseph Cordaro); (g) counsel for Fannie

Mae, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166 (Attn: David Neier,

Desiree M. Ripo and Alan Moskowitz); and (h) counsel for Freddie Mac, McKool Smith, 600

Travis St., Suite 7000, Houston, Texas 77002 (Attn: Paul D. Moak), on or before _____,

2012 at 4:00 p.m. prevailing EST.  If no objections are filed to the Motion, the Court may enter

the proposed final order without further notice or hearing.

36.     The Court finds and determines that the requirements of Bankruptcy Rule

6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable

harm.

37.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

38.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this

Interim Order shall be effective and enforceable immediately upon entry hereof.

39.     The relief granted by this Interim Order shall apply to any Future Debtor

in these jointly-administered cases.

40.     This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Interim Order.


Dated:                          , 2012
              New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

-------------------------------------------------------------------

**FINAL ORDER UNDER SECTIONS 105(a), 361, 362, 363, 1107(a),**
**AND 1108 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS**
**TO CONTINUE IN THE ORDINARY COURSE OF BUSINESS (A) SERVICING**
**GOVERNMENTAL ASSOCIATION LOANS AND (B) FORECLOSURE ACTIVITIES**
**RELATED TO CERTAIN REAL ESTATE OWNED BY FANNIE MAE, FREDDIE MAC,**
**AND GINNIE MAE; (II) AUTHORIZING THE DEBTORS TO PAY CERTAIN**
**PREPETITION AMOUNTS DUE TO CRITICAL SERVICING VENDORS AND**
**FORECLOSURE PROFESSIONALS; (III) GRANTING LIMITED STAY RELIEF**
**TO ENABLE BORROWERS TO ASSERT RELATED COUNTER-CLAIMS IN**
**FORECLOSURE AND EVICTION PROCEEDINGS; (IV) AUTHORIZING THE**
**DEBTORS TO USE CASH COLLATERAL UNDER THE FANNIE MAE EAF**
**FACILITY; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of interim

and final orders, under Bankruptcy Code sections 105(a), 361, 362, 363, 1107(a) and 1108 and

Bankruptcy Rule 6003, (i) authorizing the Debtors to continue in the ordinary course of business

(a) servicing the GA Loans; and (b) foreclosure activities related to certain real estate owned by

the Governmental Associations; (ii) authorizing the Debtors to pay certain prepetition amounts

due to critical servicing vendors and foreclosure professionals; (iii) granting limited stay relief to

enable borrowers or their tenants, as applicable, to assert related counter-claims in foreclosure

and eviction proceedings; (iv) authorizing the Debtors to use cash collateral under the Fannie

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
granted herein may refer to http://www.kccllc.net/rescap for additional information.

Mae EAF Facility; and (v) granting related relief; and the Court having considered the

Whitlinger Affidavit; and the Court having entered an interim order on May __, 2012 granting

the Motion on an interim basis; and it appearing that this Court has jurisdiction to consider the

Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these Chapter 11

cases and the Motion in this district is proper pursuant to 28 U.S.C §§ 1408 and 1409; and it

appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C.

§ 157(b); and sufficient notice of the Motion having been given; and it appearing that no other or

further notice need be provided; and upon the record of the Final Hearing; and it appearing that

the relief requested by the Motion is in the best interests of the Debtors' estates, their creditors,

and other parties in interest; and after due deliberation thereon; and sufficient cause appearing

therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED, as set forth herein.

<u>Servicing of GA Loans</u>

2.      The Debtors are authorized, but not directed, in their sole discretion and

subject to available funding, to continue servicing GA Loans in the ordinary course, including,

but not limited to:

     (a)     performing the Servicing Functions and honoring all obligations arising under the
            GA Servicing Agreements;

     (b)     making all Advances related to the GA Loans in accordance with the applicable
            GA Guides and GA Servicing Agreements; and

     (c)     entering into loan modifications and Deferment and Forbearance Arrangements,
            including participating in HAMP.

3.      The Debtors are authorized to honor their obligations under the Consent

Order and the DOJ/AG Settlement in connection with the Servicing Functions, and to use estate

assets and take such actions as, in their reasonable business judgment, are necessary to comply

with and adhere to the terms of the Consent Order and the DOJ/AG Settlement.  The Debtors are

further authorized to implement new servicing standards and procedures and to perform reviews

of their past foreclosure proceedings and reports regarding the results of such reviews, in each

case as may be required to comply with the Consent Order and the DOJ/AG Settlement.

GA Loans in Foreclosure and GA REO

4.      The Debtors are authorized, but not directed, in their sole and absolute

discretion and subject to available funding, to continue servicing GA Loans in foreclosure and

GA REO in the ordinary course, including, but not limited to:

(a)     performing the Servicing Functions for GA Loans in foreclosure and GA REO in
        accordance with the applicable GA Servicing Agreements or other governing
        documents;

(b)     conducting foreclosures of GA REO property and, to the extent necessary,
        transferring or assigning deeds relating to GA REO to the applicable
        Governmental Association, as owner of the REO;

(c)     paying foreclosure professionals' and brokers' fees, as applicable, in the ordinary
        course of business;

(d)     paying Advances related to the GA Loans in foreclosure and GA REO in
        accordance with the relevant GA Servicing Agreements;

(e)     satisfying any Foreclosure Timeline Penalties assessed against the Debtors; and

(f)     remitting the proceeds from the sale of GA Loans in foreclosure and GA REO in
        accordance with the relevant GA Servicing Agreements or other governing
        documents.

5.      Nothing herein shall be construed to limit, or in any way affect, the

Debtors' ability to dispute any foreclosure professionals' and brokers' fees or Foreclosure

Timeline Penalties that may be assessed against them.

6.      Nothing herein shall be deemed to constitute an assumption or rejection of

any executory contract or prepetition or postpetition agreement with any foreclosure professional

3

or broker, or to require the Debtors to make any of the payments to any foreclosure professional or broker authorized herein.

<u>Critical Servicing Vendors</u>

7.      Pursuant to section 105(a) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of Critical Servicing Vendors, upon such terms and in the manner provided in this Final Order and the Motion.

8.      If a Critical Servicing Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its prepetition claim, then the Debtors may, in their sole discretion and without further order of the Court:

(g)     declare that payments made to the Critical Servicing Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Servicing Vendor without further order of the Court or action by any person or entity; and

(h)     take actions to recover or seek disgorgement of any payment made to the Critical Servicing Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Servicing Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.

Under any such circumstances, such Critical Servicing Vendor shall immediately repay to the Debtors any payment made to it on account of its Critical Servicing Vendor claims to the extent that such payments exceed the postpetition claims of the Critical Servicing Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.

9.      Nothing herein shall:

(a)     constitute a waiver of the Debtors' rights to seek damages, disgorgement or other appropriate remedies against any breaching Critical Servicing Vendor;

4

(b)     be construed to waive, limit, or in any way affect, the Debtors' ability to dispute a claim of a Critical Servicing Vendor;

(c)     be deemed an admission to the validity of the underlying obligation, including any payment made pursuant to this Final Order;

(d)     be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Servicing Vendor; or

(e)     be deemed to require the Debtors to make any of the payments to Critical Servicing Vendors authorized herein.

10.     Notwithstanding entry of this Final Order, the Debtors' rights to enforce the automatic stay provisions of section 362 of the Bankruptcy Code with respect to any creditor who demands payment of its prepetition claims as a condition to doing business with the Debtors postpetition are preserved.

11.     The banks and other financial institutions at which the Debtors maintain their disbursement accounts are authorized and directed at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors in respect of the claims of Critical Servicing Vendors.

12.     The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of the claims of Critical Servicing Vendors to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

Limited Borrower Relief from Automatic Stay

13.     The stay imposed by section 362(a) of the Bankruptcy Code is hereby modified solely to enable (a) borrowers to assert and prosecute counter-claims related to the subject matter of the foreclosure complaint in connection with foreclosure proceedings, and

ny-1008484

(b) tenants to assert and prosecute counter-claims related to the subject matter of the eviction complaint in connection with eviction proceedings for which the underlying property is the subject of a foreclosure proceeding or has been foreclosed upon, in each case excluding claims against the Debtors related to the origination or securitization of the borrowers' mortgage loans; provided, that absent further order of the Court, under no circumstances shall a borrower be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any such counter-claim.  The Debtors shall retain the right to determine, in their sole discretion, whether any such counter-claim or defense falls within the exception to the automatic stay provided for under this paragraph 13.

Use of Cash Collateral Under Fannie Mae EAF Facility

14.    Pursuant to section 363(c)(2) and (4) of the Bankruptcy Code, the Debtors are authorized to use the funds held in the EAF Collection Account as of the Petition Date, which constitute Fannie Mae's cash collateral (the "Fannie Mae Cash Collateral"), subject to the provision by the Debtors of adequate protection pursuant to the EAF Terms set forth in Exhibit C to the Motion.

15.    In accordance with the EAF Terms and pursuant to section 363(e) of the Bankruptcy Code, Fannie Mae shall be granted replacement liens and security interests in the EAF Collection Account (the "Fannie Mae Replacement Liens"), which shall be senior to all security interests in, liens on, or claims against any of the EAF Collection Account.  The Fannie Mae Replacement Liens granted pursuant to this Final Order shall be perfected by operation of law immediately upon entry of this Final Order by the Court and Fannie Mae shall not be required to take any action in order to validate and to perfect the liens granted pursuant to this Final Order.

6

16.     Any undisputed, noncontingent and liquidated postpetition claims of Fannie Mae with respect to any diminution of the value of the interest of Fannie Mae in the Fannie Mae Collection Account, shall be granted administrative expense superpriority pursuant to sections 503 and 507 of the Bankruptcy Code, with priority over any and all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, with the exception of any priority administrative expense claims granted to any lender of debtor in possession financing (or such lender's agent) or other party extending postpetition secured credit in these Chapter 11 cases.

17.     No expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Fannie Mae Cash Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of Fannie Mae.

Senior Priority of Interests with Respect to the Freddie Mac
Purchase Documents, Fannie Mae Contract Documents and Ginnie Mae

18.     *The Freddie Mac Senior Interests.*  Notwithstanding anything to the contrary herein or in any other order, the Debtors acknowledge and agree that any security interest granted in the Freddie Mac mortgage servicing rights is subject and subordinate in all respects to all rights, powers, and prerogatives of the senior priority interests of Freddie Mac pursuant to the Freddie Mac Purchase Documents (as defined in the Freddie Mac Guide).  The Debtors further acknowledge and agree that, notwithstanding anything herein to the contrary or in any other order, no secured party has any claim or entitlement as a secured creditor against Freddie Mac, and Freddie Mac has no duty or obligation to any secured party, except as otherwise expressly agreed to in writing by Freddie Mac.

7

19.    *The Fannie Mae Senior Interests.*  Notwithstanding anything to the contrary herein or in any other order, the Debtors acknowledge and agree that any security interest granted in the Fannie Mae mortgage servicing rights is subject and subordinate in all respects to all rights, powers, and prerogatives of the senior priority interests of Fannie Mae pursuant to that certain Mortgage Selling and Servicing Contract, dated as of August 9, 2006, which incorporates the provisions of the Fannie Mae Selling and Servicing Guides and any Master Contracts or pool purchase contracts that Fannie Mae and GMAC Mortgage have entered into, as each such document may be amended, supplemented or otherwise modified from time to time (collectively, the "Fannie Mae Contract Documents").  The Debtors further acknowledge and agree that, notwithstanding anything herein to the contrary or in any other order, no secured party has any claim or entitlement as a secured creditor against Fannie Mae, and Fannie Mae has no duty or obligation to any secured party, except as otherwise expressly agreed to in writing by Fannie Mae.

20.    *The Ginnie Mae Senior Interests.*  Notwithstanding anything to the contrary herein or in any other order, the Debtors acknowledge and agree that any security interest granted in the Ginnie Mae mortgage servicing rights is subject and subordinate in all respects to all rights, powers, and prerogatives of the senior priority interests of Ginnie Mae. The Debtors further acknowledge and agree that, notwithstanding anything herein to the contrary or in any other order, no secured party has any claim or entitlement as a secured creditor against Ginnie Mae, and Ginnie Mae has no duty or obligation to any secured party, except as otherwise expressly agreed to in writing by Ginnie Mae.

8

Enhanced Reporting Requirements, Transfer of Servicing, and Provision of Adequate Assurance

21.    The Debtors are directed and empowered to provide the Governmental Associations with reasonable access to the Debtors' books, records, and accounts in accordance with the applicable GA Guides including, without limitation, to provide Freddie Mac and Fannie Mae personnel with physical, on-site access to the Debtors' offices and records during all business hours, and to provide Fannie Mae and Freddie Mac with reasonable access to:

(a)    information relating to the Freddie Mac Loans and Fannie Mae Loans, respectively;

(b)    monthly custodial account reconciliations via tapes, delivered to Freddie Mac on or before the fifth (5th) day of the month immediately following the reconciliation period, and to Fannie Mae on or before the fifteenth (15th) day of the month immediately following the reconciliation period, of all P&I and T&I accounts relating to Freddie Mac Loans and Fannie Mae Loans;

(c)    monthly reports, delivered to Freddie Mac and Fannie Mae, respectively, on or before the fifteenth (15th) day of each month, disclosing the Debtors' employee attrition, identifying departing employees by name, position, and principle duties;

(d)    monthly reports, delivered to Freddie Mac and Fannie Mae, respectively, on or before the fifth (5th) business day of each month, disclosing the Debtors' compliance or non-compliance with all foreclosure-related timelines required by the Freddie Mac Guide and Fannie Mae Contract; and

(e)    until such time as a "hot back-up" servicer is in place with respect to Freddie Mac Loans as described below, a daily data tape providing enhanced servicing information requested by Freddie Mac and Fannie Mae, respectively.

22.    The Debtors are directed and empowered to use reasonable best efforts to assist Freddie Mac to engage a "hot back-up" servicer for purposes of servicing the Freddie Mac Loans in the event the Debtors are unable to adequately service those loans or servicing of the loans is otherwise transferred during the Debtors' bankruptcy cases by, among other things, providing access to data, technology and systems support, in order to complete the engagement of a hot back up servicer on or before July 31, 2012.

23.     The Debtors are authorized and required, without further order of the Court, to transfer servicing to one or more third-party servicers designated by Freddie Mac with respect to Freddie Mac Loans, if the Debtors fail to satisfy one or more of the Metrics set forth in Exhibit D to the Motion.  The Debtors shall transfer servicing within thirty (30) days of the receipt of a Transfer Notice and shall execute and transfer all documents and files requested by Freddie Mac to complete the servicing transfer.  With respect to any Freddie Mac Loan transferred for failure to satisfy the Metrics, the Debtors' servicing rights shall be considered terminated with cause within the meaning of the Freddie Mac Guide.  The Debtors shall file any Transfer Notice with the Court.

24.     Pursuant to section 363(e) of the Bankruptcy Code, the Debtors are authorized to provide to Fannie Mae and Freddie Mac adequate assurance of future performance under the applicable GA Servicing Agreements on the terms and conditions set forth in Exhibits E and F to the Motion; provided, that nothing herein, including the provision of such adequate assurance, shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and Fannie Mae or Freddie Mac, as applicable.  The acceptance by the Governmental Associations of the adequate protection and related relief granted pursuant to this Final Order shall not be deemed to constitute consent by the Governmental Associations of the assumption and assignment of the GA Servicing Agreements.

25.     For the avoidance of doubt, all payments by the Debtors to the Governmental Associations (including, without limitation, payments of principal and interest, Advances, foreclosure timeline compensatory fees, post-claim reimbursements, and other

ny-1008484

servicing-related fees and claims) shall be made free and clear of any lien, security interest, or

other interest of any party, including, without limitation, any prepetition or postpetition lenders.

26.    To the extent that the automatic stay under Bankruptcy Code section

362(a) applies to requests by Fannie Mae and Freddie Mac that the Debtors honor their

servicing-related commitments and obligations, the automatic stay is hereby modified to the

limited extent necessary to allow the Fannie Mae and Freddie Mac to make servicing-related

requests to the Debtors, including, without limitation, requests for payment of principal and

interest, make repurchase requests, Advances, foreclosure timeline compensatory fees, post-

claim reimbursements, and other servicing-related fees and claims, in each case to the extent

provided under the relevant GA Guide, GA Servicing Agreement, or other related documents for

Fannie Mae and Freddie Mac; provided, however, that to the extent the automatic stay is

applicable, Fannie Mae and Freddie Mac may not proceed to take any enforcement actions

against the Debtors, or property of their estates with respect to such requests, including the

collection thereof, without further order of the Court, except with respect to a transfer of

servicing for Freddie Mac Loans arising from the Debtors' failure to satisfy the Metrics, pursuant

to paragraph 20 of this Final Order.

Other Relief

27.    The Debtors are authorized and empowered to take all actions and execute

such documents as may be necessary or appropriate to carry out the relief granted herein.

28.    Nothing herein shall be deemed to limit the rights of the Debtors to

operate their business in the ordinary course, and no subsequent order shall be required to

confirm such rights.

ny-1008484

29.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

30.     Notwithstanding anything to the contrary in this Final Order, any action to be taken pursuant to the relief authorized in this Final Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings. All amounts authorized to be paid pursuant to this Final Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement).  To the extent that there is any inconsistency between the terms of this Final Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

31.     Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012 and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

12

32.     Nothing in this Final Order shall discharge, release, or otherwise preclude any setoff or recoupment right of the United States of America, its agencies, departments, or agents.

33.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

34.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

35.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Final Order shall be effective and enforceable immediately upon entry hereof.

36.     The relief granted by this Final Order shall apply to any Future Debtor in these jointly-administered cases.

37.     This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Final Order.


Dated:                          , 2012
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

ny-1008484

**<u>EXHIBIT C</u>**

**Residential Capital, LLC**

**Fannie Mae Early Advance Funding**

Agreed terms regarding Early Advance Funding ("EAF") pursuant to the Amended and Restated as of January 18, 2011 (the "EAF Facility") between Debtor GMAC Mortgage L.L.C. ("GMAC Mortgage") and Federal National Mortgage Association ("Fannie Mae") in connection with the Debtors operating their servicing business in the ordinary course during the Chapter 11 Cases and to preserve the value of their assets pending one or more sales of their business.[1]

| | |
|---|---|
| **Continuation of the EAF Facility During the Chapter 11 Cases** | Following the commencement of the Chapter 11 Cases (the "Petition Date") and through the earlier of (i) consummation of a sale of all or substantially all of the Eligible Advances, and (ii) the effective date of the Debtors' plan of reorganization (collectively, the "Termination Date"), the Debtors shall honor the terms of the EAF Facility, subject to the modifications set forth herein. |
| **EAF Facility Maximum Amount** | The Early Reimbursement Amount Limit for the EAF Facility shall continue to be a maximum outstanding amount of $125 million. |
| **Fannie Mae's Setoff and Recoupment Rights** | The automatic stay shall be modified to the extent necessary to permit Fannie Mae's setoff and recoupment rights to continue unimpaired following the Petition Date.  The Debtors agree and acknowledge that the EAF Facility is an integral part of the Master Agreement and that Fannie Mae has valid setoff and recoupment rights with respect to all of the Debtors' obligations arising under the Master Agreement, including, without limitation, the EAF Facility.  Accordingly, Fannie Mae shall continue to have unimpaired setoff and recoupment rights against both Collection Accounts (defined below) and all Fannie Mae collections, Advances and reimbursements received by the Debtors (i) from Fannie Mae, (ii)  from Fannie Mae mortgagors, or (iii) as liquidation proceeds or other recoveries with respect to certain Fannie Mae Eligible Advances (in the aggregate, the "Collections"). |
| **EAF Payments** | Fannie Mae shall continue making periodic early partial reimbursement payments of Eligible Advances and the Debtors shall continue to make all deposits into the Collection Accounts. |
| **Modifications to EAF** | • The combined funding for T&I Escrow Advances and Corporate Servicing Advances shall be limited to a maximum outstanding amount of $61 million.<br><br>• Reimbursement by Fannie Mae of P&I Delinquency Advances shall be limited to only the 5% amount that GMAC Mortgage has actually advanced.  Fannie Mae will no longer reimburse 100% of the P&I Delinquency Advances amount, since GMAC Mortgage has only actually advanced 5% of P&I Delinquency Advances.<br><br>• Following the Petition Date, the definition of "P&I Delinquency |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to those terms in the EAF Facility.

Advances" in the EAF Facility shall be revised to only include foreclosure buyouts. Delinquent SS P&I payments shall not be eligible.

- There shall be non-material operational reasonable adjustments and modifications to the EAF Facility following the Petition Date and continuing as necessary until the Termination Date, including with respect establishment of accounts, payments, settlements, incentives and reconciliations, each in Fannie Mae's sole discretion.

**Reporting**

Reporting requirements under the EAF Facility shall continue uninterrupted. Reasonable modifications in reporting requirements to be determined by Fannie Mae in its sole discretion.

**EAF Account and Security Interest**

The Debtors shall continue to deposit all Collections into custodial trust accounts for the benefit of Fannie Mae or Fannie Mae controlled accounts (collectively, the "Collection Accounts").

Fannie Mae shall receive a grant of adequate protection and as part of such grant shall have:

- A first priority perfected security interest in all funds in Collections and Collection Accounts superior to the rights of any creditor, including, without limitation, any creditor providing postpetition financing or use of cash collateral;

- Valid, enforceable, unavoidable, and fully perfected replacement

---

[2] The "Barclays DIP Order" means either the *Interim Order Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing Debtors (A) to Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) to Obtain Post-Petition Financing on a Secured Superpriority Basis, (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and (III) Granting Related Relief* or the *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing Debtors (A) to Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) to Obtain Post-Petition Financing on a Secured Superpriority Basis, (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and (III) Granting Related Relief*, as applicable.

[3] The "Ally DIP Order" means either (a) the *Interim Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Adequate Protection Parties and (IV) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing* or (b) the *Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Adequate Protection Parties and (IV) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing*, as applicable.

ny-1040871

liens and security interests in the senior to all security interests in, liens on, or claims against any of the Collections and Collection Accounts;

- Pursuant to sections 503 and 507 of the Bankruptcy Code, with respect to any diminution of the value of the interest of Fannie Mae in its collateral, allowed superpriority administrative expense claims, subject and subordinate only to (i) DIP Liens granted to the DIP Agent, (ii) the "Superpriority Claims" granted in respect of the obligations under the DIP Facility, as provided in paragraph 10 of the Barclays DIP Order[2], and (iii) the "Superpriority Claims" granted in respect of the obligations under the Ally DIP Loan, as provided in paragraph 7 of the Ally DIP Order[3]; and

- waiver of any surcharge claim under section 506(c) of the Bankruptcy Code or otherwise, including, without limitation, any claim under the equitable doctrine of marshaling or any similar doctrine, for any costs and expenses incurred in connection with the preservation, protection or enhancement of the Collection Accounts.

Fannie Mae may seek additional adequate protection or to seek modification to its grant of adequate protection provided herein so as to provide different or additional adequate protection, without prejudice to the right of the Debtors or any other party in interest to contest any such addition or modification to adequate protection.

| | |
|---|---|
| **Termination of EAF Facility** | Upon the Termination Date, (i) all Advances must be acquired by any purchaser of the servicing business or by any reorganized Debtor entity engaged in the servicing business; (ii) GMAC Mortgage shall pay to Fannie Mae all amounts outstanding under the EAF Facility; and (iii) the EAF arrangement shall terminate. |

**EXHIBIT D**

**To Be Filed Under Seal**

**<u>EXHIBIT E</u>**

**Fannie Mae**
**Adequate Assurance of Future Performance[1]**

- Regular access of Fannie Mae staff to GMAC Mortgage facilities to provide oversight on GMAC Mortgage's performance of its servicing duties.

- GMAC Mortgage shall at all times maintain its servicing performance to the standards set forth in the Fannie Mae Contract and to the following supplemental standards:

  - GMAC Mortgage must maintain a quarterly STAR score exceeding 75;

  - No STAR overall operational assessment can result in a rating of "red";

  - Any formal servicing compliance review, including, but not limited to SQRR (f/k/a LARC) and LMQC, must not return an overall risk rating of 'high', and GMAC Mortgage must submit and comply with all related Action Plans timely;

  - GMAC Mortgage will be drafted 50% of billed compensatory fees on the due date, and must submit compensatory fee and servicing repurchase documentation, as well as pay the balance of compensatory fees, within prescribed timelines;

  - GMAC Mortgage must use best efforts to reduce the net population of seriously delinquent loans, as measured by ensuring that performance continues to exceed the comp rate;

  - GMAC Mortgage shall at all times maintain staffing in servicing functions at levels consistent with pre-filing staffing levels and commensurate with portfolio, including maintaining staffing within each of the separate specific departments;

  - GMAC Mortgage shall provide notice to Fannie Mae of departures of management and other loss of personnel and shall provide a retention plan for servicing employees to prevent departures during the bankruptcy proceedings;

  - GMAC Mortgage shall provide all reporting and other servicing information as reasonably requested by Fannie Mae, including such additional reports that may be requested as needed, as currently permitted under the Fannie Mae Contract;

---

[1]    Capitalized terms used and not otherwise defined in the Motion shall have the meanings ascribed to such terms in the Fannie Mae Guide.

- GMAC Mortgage will confer and consult with Fannie Mae in good faith with respect to the implementation of any new programs/directives, and policy changes, including upcoming HAMP/loss-mitigation changes, to the extent such changes are required by Fannie Mae to be implemented by large servicers generally, and will use commercially reasonable efforts to comply with such changes, notwithstanding possible additional costs to implement those changes; and

- GMAC Mortgage will keep Fannie Mae apprised of its ongoing compliance efforts, and shall be entitled to apply for and obtain any extensions as it deems appropriate.  As with other lenders, Fannie Mae will acknowledge, but not approve, extension requests and will not assert a breach based solely on such non-compliance for up to 90 days of non-compliance, but Fannie Mae reserves the right to assess compensatory fees related thereto.

- GMAC Mortgage shall commit to continuation of regularly scheduled engagements with Fannie Mae, such as the monthly Account Performance Reviews at current participation level, including GMAC Mortgage senior management.

- GMAC Mortgage shall maintain response times to file requests (for both origination and servicing files) timely (within 30 days) as is current practice and GMAC Mortgage shall comply with Fannie Mae timelines for appeal letters, identifying "impasse loans", and for supplying missing docs as well as timely addressing aged repurchase issues.

- GMAC Mortgage shall post funds to meet margin requirements as may be necessary.

**<u>EXHIBIT F</u>**

**Freddie Mac**
**Adequate Assurance of Future Performance**

GMAC Mortgage shall at all times maintain its servicing performance consistent with the standards set forth in the Freddie Mac Guide and the Freddie Mac Purchase Documents and with the following supplemental standards (nothing herein is intended, however, to waive or release any of GMAC Mortgage's current obligations under the Freddie Mac Guide or the Freddie Mac Purchase Documents):

- In connection with any operation assessment by Freddie Mac's Counterparty Operations Risk Evaluation group ("CORE"), GMAC Mortgage must maintain an operational assessment that is above "critical" or "major" for each finding in connection with such assessment.  If there is a finding by CORE of "critical," "major" or "other" for any matter that is within the scope of any CORE review, GMAC Mortgage must remediate and address each such finding;

- GMAC Mortgage must (i) pay 50% of all billed and outstanding compensatory fees no later than ten (10) calendar days after the due date for such fees, irrespective of the pendency of any appeal, and (ii) submit compensatory fee and servicing repurchase documentation, as well as pay the balance of compensatory fees, within prescribed timelines;

- GMAC Mortgage shall at all times maintain staffing in servicing functions at levels consistent with pre-filing staffing levels and requirements under the Freddie Mac Guide and the Freddie Mac Purchase Documents (appropriately taking into account, however, changes affecting the servicing portfolio generally, such as increases or decreases in the level of loan delinquencies), including maintaining staffing within each of the separate specific departments;

- GMAC Mortgage shall provide notice to Freddie Mac of departures of GMAC Mortgage management and other loss of GMAC Mortgage personnel and shall provide (or continue in place, as applicable) a retention plan for servicing employees to prevent departures during the bankruptcy proceedings;

- GMAC Mortgage shall provide all reporting and other servicing information as reasonably requested by Freddie Mac, including (without limitation) fraud reports and such additional reports that may be requested by Freddie Mac, in accordance with the Freddie Mac Guide and the Freddie Mac Purchase Documents;

- GMAC Mortgage will confer and consult with Freddie Mac in good faith with respect to the implementation of any new programs/directives, and policy changes, including (without limitation) upcoming HAMP/loss-mitigation changes, to the extent such changes are required by Freddie Mac to be implemented by all servicers generally, and GMAC Mortgage will (i) comply with such changes if compliance is required pursuant to applicable law or regulation, or if noncompliance would itself constitute grounds for termination of GMAC

Mortgage as a seller/servicer under the Freddie Mac Purchase Documents, and
(ii) use commercially reasonable efforts to comply with such changes in all other
cases, notwithstanding possible additional costs to implement those changes;

- GMAC Mortgage will keep Freddie Mac apprised of its ongoing compliance
  efforts, and shall be entitled to apply for any applicable extensions, which
  extensions will not be withheld solely on the basis of GMAC Mortgage's
  bankruptcy proceedings;

- GMAC Mortgage shall continue (post-filing) its regularly scheduled meetings and
  engagements with Freddie Mac, including (without limitation) monthly executive
  meetings and any and all reviews relating to the servicing of the Freddie Mac
  servicing portfolio; and

- GMAC Mortgage shall maintain response times to file requests (for both
  origination and servicing files) timely (within 30 days), as is current practice, and
  GMAC Mortgage shall comply with Freddie Mac timelines for appeal letters, and
  for supplying missing documents, as well as timely addressing aged repurchase
  issues.