MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), AND (m), 365 AND
1123, AND FED R. BANKR. P. 2002, 6004, 6006, and 9014 FOR ORDERS: (A)(I)
AUTHORIZING AND APPROVING SALE PROCEDURES, INCLUDING BREAK-UP
FEE AND EXPENSE REIMBURSEMENT; (II) SCHEDULING BID DEADLINE AND
SALE HEARING; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF;
AND (IV) GRANTING RELATED RELIEF AND (B)(I) AUTHORIZING THE SALE OF
CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
OTHER INTERESTS; (II) AUTHORIZING AND APPROVING ASSET PURCHASE
AGREEMENTS THERETO; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED
THERETO; AND (IV) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors")[1] hereby move this Court (the "Motion")[2] for approval of two sale transactions

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1
to the Whitlinger Affidavit (defined below).

pursuant to sections 105(a), 363, 365, 503, 507, and 1123 of Title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and entry of three orders to be considered at two hearings:[3]

(A) The first order, substantially in the form annexed to the Motion as Exhibit A (the "Sale Procedures Order"), pursuant to 11 U.S.C. §§ 105(a), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9007, 9008, and 9014 requesting approval of the following sales procedures (the "Sale Procedures Relief"),

(i) authorizing and approving procedures (the "Sale Procedures"), with respect to two proposed sales pursuant to Bankruptcy Code section 363(b) and 1123(a)(5)(B) (the "Sale Transactions" or the "Sales") by certain of the Debtors of:

(a) the Purchased Assets (as such term is defined in the Asset Purchase Agreement by and between Nationstar Mortgage LLC ("Nationstar")[4] and certain of the Debtors (the "Nationstar APA"),[5] annexed hereto as Exhibit B)) including approval of the Break-Up Fee and the Expense Reimbursement as allowed administrative expenses with priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code (as such terms are defined below); and

---

(Footnote continued from previous page.)

[2] Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

[3] See In re Matter of Adoption of Amended Guidelines for the Conduct of Assets Sales (General Order Amending M-331 (M-383)) (Bankr. S.D.N.Y. Nov. 18, 2009) (the "Sale Guidelines").

[4] As discussed below, a majority of Nationstar is owned by investment funds managed by affiliates of Fortress Investment Group, LLC.

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Nationstar APA or the AFI APA (defined below), as applicable.

(b) the Purchased Assets (as such term is defined in the Asset Purchase Agreement by and between Ally Financial Inc. ("AFI") the Debtors' non-debtor indirect parent, and BMMZ Holdings LLC ("BMMZ") an indirect, wholly owned subsidiary of AFI, and certain of the Debtors (the "AFI APA," together with the Nationstar APA, the "APAs"), annexed hereto as <u>Exhibit C</u>));

(ii) scheduling a Bid Deadline, an auction, and a hearing to consider approval of the Sale Transactions (the "Sale Hearing")  (which hearing may be one to confirm a reorganization plan) and setting objection and bidding deadlines with respect to the Sale Transactions;

(iii) approving the form and manner for an auction for the Purchased Assets that are the subject of the APAs (the "Auction") and the form of Notice of Auction and the Sale Hearing, as described in the form of Notice of Auction and Sale Hearing, annexed to the Sale Procedures Order as <u>Exhibit A-2</u>;

(iv) approving the form and manner for the Assumption and Assignment Procedures (as defined below) and the Notice of Assumption and Assignment Procedures, annexed hereto as <u>Exhibit F</u> and annexed to the Sale Procedures Order as <u>Exhibit A-3</u>; and

(v) granting related relief; and

(B) The second and third orders (which may be incorporated into a confirmation order), subject to the terms of the Sale Procedures Order and the entry of orders substantially in the form annexed hereto as <u>Exhibit D</u> and <u>Exhibit E</u> (the "Nationstar Sale Approval Order" and the "AFI

Sale Approval Order," together the "Sale Approval Orders"), pursuant to 11 U.S.C. §§ 105(a), 363(b), (f), and (m) and Fed. R. Bankr. P. 6004 and 6006,[6]

(i) authorizing the Sales, pursuant to:

(a)     the Nationstar APA among the Sellers (as defined in the Nationstar APA) and  Nationstar, as a stalking-horse bidder, free and clear of liens, claims, encumbrances, and other interests; and

(b)     the AFI APA among the Sellers (as defined in the AFI APA), and AFI and BMMZ, as stalking-horse bidder, free and clear of liens, claims, encumbrances, and other interests; and

(ii) authorizing and approving the respective APAs thereto;

(iii) approving the assumption and assignment of executory contracts and unexpired leases (the "Assumed Contracts") and cure amounts in connection with the Nationstar APA, as described in the proposed Notice of Assumption and Assignment, annexed hereto as Exhibit F; and

(iv) granting related relief.

In support of this Motion, the Debtors rely on (i) the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC in Support of the Chapter 11 Petitions and First Day Pleadings (the "Whitlinger Affidavit"), pursuant to Local Bankruptcy Rule 1007-2; (ii) the Declaration of Samuel M. Greene in Support of the Proposed Sale of the Debtors' Assets (the "Greene Declaration"); and (iii) the Declaration of Tammy Hamzehpour in Support of the Proposed Sale of the Nationstar Purchased Assets Without a Privacy Ombudsman

---

[6] To the extent that the terms of any agreement regarding the Sales require modification of the proposed Sale Approval Orders, the Debtors will provide notice of the modified proposed Sale Approval Orders to this Court and interested parties in advance of the Sale Hearing.

(the "Hamzehpour Declaration").[7]   In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363, 365, 503, 507, and 1123 as supplemented by Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Bankruptcy Rules.

## PRELIMINARY STATEMENT

2.        This Motion requests approval of two separate sale transactions, which combined are projected to yield approximately $3.9 billion of cash for the Debtors' estates. Specifically, the Debtors are selling their mortgage origination and servicing platform (effectively comprising the entirety of the Debtors' operating business), including certain financial assets to Nationstar and legacy loan portfolio to AFI.  These Sales represent the Debtors' primary and most valuable assets.

3.        The Debtors' mortgage origination and servicing platform is one of the largest in the United States.  These operations consist of servicing mortgage loans for investors and homeowners, including loans originated by the Debtors, non-debtor Ally Bank, and other third-party lenders.  Due to the size, volatility, and critical nature of the Debtors' platform to the functioning of the U.S. mortgage market, the Debtors have carefully constructed a strategy to maximize value to the Debtors' estates and avoid any material disruption to the servicing of millions of residential mortgages.

---

[7] The Hamzehpour Declaration will be filed subsequent to the filing of this Motion.

dc-667294

4.      Ultimately, the Debtors intend to implement a comprehensive reorganization by consummating the Sales through a plan of reorganization.  If, however, the Debtors do not obtain confirmation by a specific date, this Motion will allow the Debtors to pursue an alternative course of action and immediately move forward with the Sales under Bankruptcy Code section 363(b).[8]

5.      The Sales are the result of significant efforts by numerous parties, including the Debtors, AFI, Nationstar, and their respective professionals, to implement a reorganization of the Debtors with the goal of preserving and maximizing the value of their estates—a goal that the Debtors have been pursuing since the collapse of the housing and mortgage loan industries beginning in 2007.  In structuring the Sales, the Debtors worked with a wide range of governmental constituencies, including (i) Fannie Mae, Freddie Mac, and Ginnie Mae;[9] and (ii) the U.S. Treasury.  By any measure, the regulatory complexity, size, and nature of the Sales are almost unprecedented, and the Debtors are hopeful that they will continue to have the support of these governmental constituencies.

6.      The terms of the Sales are contained in the Nationstar APA and the AFI APA, which the Debtors negotiated and executed prior to the filing of these Chapter 11 cases. The APAs are generally summarized as follows:

---

[8] In either case, the proposed Sale Procedures shall govern the sale of the assets that are the subject of the APAs. Likewise, the terms of the proposed Sale Approval Orders shall apply in any sale pursuant to a Chapter 11 plan; however, in any case the terms of the Sale Approval Order may be incorporated into the confirmation order.

[9] As used herein, "Fannie Mae" means the Federal National Mortgage Association, "Freddie Mac" means the Federal Home Loan Mortgage Corporation, and "Ginnie Mae" means the Government National Mortgage Association.  Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling them to replenish their funds so that they can make loans to other homeowners.  Ginnie Mae is a federal corporation within the Department of Housing and Urban Development, a federal agency, that guarantees investors the timely payment of principal and interest on mortgage-backed securities backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA") or the U.S. Department of Agriculture ("USDA").

- ***Nationstar APA.*** Nationstar is the proposed stalking horse bidder for the sale of the Debtors' mortgage loan origination and servicing platform (the "Servicing Platform"). The Purchased Assets under the Nationstar APA (the "Nationstar Purchased Assets") also include mortgage servicing rights and servicer advances belonging to Ginnie Mae (the "Ginnie Mae MSRs"). Pursuant to the Nationstar APA, a Qualified Bidder can elect to bid on the Ginnie Mae MSRs independently or as part of their bid for all of the Nationstar Purchased Assets. As detailed below, the purchase price for the Nationstar Purchased Assets is approximately $2.3 billion,[10] of which approximately $200 million relates to the Ginnie Mae MSRs (in each case calculated as of February 29, 2012).[11]

- ***AFI APA.*** AFI is the proposed stalking horse bidder for the sale of the Debtors' legacy portfolio, which (as detailed below) consists mainly of mortgage loans and other residual financial assets (the "Legacy Portfolio Sale"). In consideration for the sale of the Purchased Assets under the AFI APA (the "AFI Purchased Assets") to BMMZ, Sellers will receive approximately $1.6 billion if the sale is consummated pursuant to a Chapter 11 plan of the Debtors, subject to adjustment. If the sale is consummated pursuant to a section 363 sale outside of a Chapter 11 plan, Sellers will receive approximately $1.4 billion, subject to adjustment.

7.  This dual APA structure allows for certain combinations of sale transactions, ensuring that the Debtors will receive the highest or best value for the assets. A Qualified Bidder may bid on the Nationstar Purchased Assets and/or the AFI Purchased Assets (together with the Nationstar Purchased Assets, the "Purchased Assets"). Alternatively, a Qualified Bidder may bid solely on the Ginnie Mae MSRs, or the Ginnie Mae MSRs and the AFI Purchased Assets.

8.  The purpose of this Motion is to obtain the necessary relief to facilitate orderly sales of the Debtors' most valuable assets. As set forth above, the Debtors contemplate and expect that the Sales will be consummated under a plan. The Debtors believe that orderly asset sales in conjunction with a plan are the best way to (i) maximize the value of the Debtors'

---

[10] All purchase price figures contained in this Motion are net of assumed liabilities, where applicable.

[11] The actual purchase price will be calculated as of Closing in accordance with the terms of the Nationstar APA and will vary from that set forth in this Motion.

assets for the benefit of creditors; (ii) preserve the Debtors' servicing business on a going concern basis for sale, thus preserving jobs, providing the best possible outcome for the more than 2.4 million homeowners whose loans are serviced by the Debtors and for the investors in securitization pools that own loans serviced by the Debtors; (iii) avoid disruption in the fragile housing market recovery; and (iv) provide a vehicle for distributing the proceeds of the Debtors' asset sales to creditors pursuant to the priority scheme under the Bankruptcy Code.

9.     The result of the Sales will be the continuation of the Debtors' origination and servicing business.  Should, for example, Nationstar emerge as the Successful Bidder[12] for the Nationstar Purchased Assets in any auction, Nationstar will become an industry leader in the mortgage servicing and origination industry, capable of servicing the full spectrum of mortgage products, including primary servicing, special servicing, and master servicing, without the burden of certain of the Debtors' prepetition liabilities.

10.     Because of the significant funding needed to maintain the servicing business, the Debtors' very limited access to capital, and the ongoing concerns of various federal and state regulatory authorities, the Debtors believe that it is imperative to move forward with the sale process quickly.  In addition, approval is critical to compliance with the Debtors' postpetition financing arrangements.  The Debtors therefore request that the relief requested herein be expeditiously approved.

11.     The Debtors' ability to obtain approval of, and consummate, the Sales at this juncture is critical to maintaining the confidence of the Debtors' employees, the millions of residential mortgage borrowers whose loans are serviced by the Debtors, the many investors who

---

[12] For purposes of this Motion, the term "Successful Bidder" shall include each of Nationstar and AFI, respectively, in the event there is no auction of the Nationstar Purchased Assets and/or the AFI Purchased Assets, respectively.

dc-667294

rely on the Debtors for servicing the securitizations in which they have invested, and Fannie

Mae, Freddie Mac, and Ginnie Mae, who are essential parties in the mortgage loan industry.

Any undue delay in consummating the Sales will in all likelihood negatively affect asset values

and impair the progress of the Debtors' reorganization.

## BACKGROUND

12.     On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors

are managing and operating their businesses as debtors in possession pursuant to Bankruptcy

Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has

been appointed in these Chapter 11 cases.

13.     As of the Petition Date, the Debtors and their non-debtor affiliates operate

one of the largest mortgage origination and servicing businesses in the United States.  A more

detailed description of the Debtors, including their business operations, their capital and debt

structure, and the events leading to the filing of these bankruptcy cases, is set forth in the

Whitlinger Affidavit.

**A.      Business Operations**

14.     The Debtors, together with their non-debtor subsidiaries, manage their

businesses in two business lines: (i) the ongoing Origination and Servicing business and (ii) the

Legacy Portfolio and Other operations,[13] the latter which is being wound down and sold pursuant

to the terms of the AFI APA, as described below.

---

[13] AFI, which files periodic and other reports with the Securities and Exchange Commission, reports its results of operations on a line of business basis in five operating segments, two of which are "Mortgage – Origination and Servicing Operations" and "Mortgage – Legacy Portfolio and Other Operations."

15.    <u>Origination and Servicing</u>.  The principal activities of the Debtors'
Origination and Servicing business are: (a) brokering, originating, purchasing, selling and
securitizing residential mortgage loans throughout the United States; and (b) servicing residential
mortgage loans throughout the United States for the Debtors, Ally Bank, and other investors in
residential mortgage loan and mortgage-backed securities ("MBS").

16.    Under the Debtors' loan brokerage and origination function, GMAC
Mortgage, under the GMAC Mortgage brand, brokers and originates mortgage loans through a
consumer lending business that consists of internet and telephone-based call center operations
and, to a lesser extent, a retail network of loan officers who have direct contact with consumers,
including through referrals from builders, realtors, and other third parties.  GMAC Mortgage
brokers its loan production in 47 states to Ally Bank.[14]  Ally Bank underwrites and originates
loans based on loan application packages submitted by GMAC Mortgage in accordance with
applicable regulatory and industry standards.  In recent years, substantially all of the Debtors'
loan production has consisted of loans that meet the required guidelines of Fannie Mae, Freddie
Mac, or Ginnie Mae, as applicable, and a limited number of prime nonconforming jumbo
mortgage loans.

17.    In the years ended December 31, 2010 and 2011 and the three months
ended March 31, 2012, the Debtors brokered $7.4 billion, $7.3 billion and $3.6 billion,
respectively, of mortgage loans to Ally Bank.  During the same periods, the Debtors purchased
$66.3 billion, $56.7 billion and $9.7 billion, respectively, of mortgage loans from Ally Bank.
Over this entire period, the Debtors originated an aggregate of $454.7 million of mortgage loans.

---

[14] GMAC Mortgage does not originate loans in Hawaii.  Ally Bank does not have the licenses to originate mortgage loans in Nevada and Ohio, in which states, GMAC Mortgage originates and funds mortgage loans directly.

Prior to 2008, the Debtors' loan production also consisted of home equity mortgage loans, which allow borrowers to make draws from time to time subject to certain requirements.

18.     In addition, a fundamental part of the Debtors' business strategy in connection with its loan brokerage and origination function consists of securitizing or selling substantially all of the mortgage loans they purchase or originate.  The Debtors, through their capital markets function, participate in the securitization programs of Fannie Mae, Freddie Mac, and Ginnie Mae.  Until April 30, 2012, the Debtors purchased the loans they brokered to Ally Bank and other eligible loans from Ally Bank and, together with mortgage loans originated by the Debtors in Nevada and Ohio, and either sold the mortgage loans to Fannie Mae and Freddie Mac, who in turn pool and deposit such loans into securitizations trusts or pooled and deposited such mortgage loans into securitization trusts backed by Ginnie Mae guaranties.  Unlike Fannie Mae and Freddie Mac, Ginnie Mae does not buy mortgage loans or issue MBS, but instead provides guarantees of MBS with respect to loans (mainly loans insured by the FHA or guaranteed by the VA or USDA) that have been pooled and securitized by approved issuers such as the Debtors.  The applicable GSE or Ginnie Mae guarantees that it will supplement amounts received by the relevant securitization trust (referred to herein collectively as, "Agency Securitization Trusts") as required in order to permit timely payments of principal and interest on the MBS or underlying certificates.

19.     In addition, prior to the Petition Date, the Debtors originated or acquired and sold mortgage loans to private investors and securitization trusts for so-called "private label" securitization pools, which are referred to herein collectively as the "Non-Agency Securitization Trusts."[15]  The Non-Agency Securitization Trusts are not guaranteed by the GSEs.  Due to a

---

[15] The Debtors also sold loans to securitization trusts guaranteed by the following state and local housing agencies:
(Footnote continues on next page.)

dc-667294

change in market conditions arising as a result of the financial crisis, with very limited exceptions, GMAC Mortgage no longer sells mortgage loans to Non-Agency Securitization Trusts.  However, GMAC Mortgage continues to hold the servicing rights with respect to certain existing Non-Agency Securitization Trusts, and continues to service those mortgage loans.

20.     As of the Petition Date, the Debtors continue to (i) originate loans in Nevada and Ohio, selling the Fannie Mae and Freddie Mac eligible loans to Ally Bank, (ii) broker loans to Ally Bank in 47 states, and (iii) purchase loans from Ally Bank that are eligible to be pooled into Agency Securitization Trusts guaranteed by Ginnie Mae along with loans originated by the Debtors in Nevada and Ohio.

21.     The securities issued by Agency Securitization Trusts and Non-Agency Securitization Trusts are owned by a broad range of investors, including pension funds, money market funds, mutual funds, banks, insurance companies, governmental bodies and other public and private entities.  All securitization trusts sponsored by the Debtors are distinct legal entities and are not included in the Debtors' Chapter 11 cases.

22.     The Debtors' residential mortgage loan servicing function has since 2008 been the Debtors' main source of ongoing revenue.  Mortgage servicing rights consist of either primary or master servicing rights.  The Debtors retain the MSRs with respect to mortgage loans they have originated and sold, as well as for mortgage loans purchased from Ally Bank and sold into Ginnie Mae-guaranteed securitizations.  Often, third parties and Ally Bank retain the MSRs

---

(Footnote continued from previous page.)

California Housing Finance Agency; City Of Northampton; Connecticut Housing Finance Authority; Minneapolis Comm. Devel. Agency 2; Neighborhood Housing Services; North Dakota Housing Finance Agency; Philadelphia Neighborhood Housing; San Diego Housing Commission; State of Oregon Housing; and Texas Veterans Land Board.

dc-667294

with respect to the mortgage loans they originate and engage the Debtors to service those loans in their capacities as subservicers.

23.    Primary servicing rights are the Debtors' contractual right to service mortgage loans.  As a primary servicer, the Debtors collect and remit mortgage loan payments, respond to borrower inquiries, account for and apply principal and interest, hold custodial and escrow funds for payment of property taxes and insurance premiums, provide ancillary products, counsel or otherwise work with delinquent borrowers (including helping borrowers modify their loans in accordance with federal programs and public policy intended to assist homeowners' efforts to remain in their homes in the face of the recession and housing market collapse), supervise foreclosures and property dispositions, remit payments due to investors and generally administer the mortgage loans consistent with contractual undertakings and business practices.

24.    As primary servicer, the Debtors are typically obligated to make various types of advances.  With respect to loans in foreclosure, the servicer is typically obligated to advance all reasonable, customary, and necessary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations, which may include, without limitation: (i) fees and expenses to various servicing vendors, including but not limited to, property inspectors and maintenance contractors; (ii) fees and expenses associated with enforcement or judicial proceedings, including foreclosures, bankruptcy, eviction, or litigation actions; (iii) costs and expenses associated with the management, maintenance, and liquidation of property that has been foreclosed upon; and (iv) costs to preserve foreclosed property prior to liquidation (collectively, "Corporate Advances").  The Debtors carry these Corporate Advances until the property can be liquidated.  After the underlying property is liquidated, the Debtors submit claims for reimbursement of the Corporate Advances.

dc-667294

25.     In addition to Corporate Advances, from time to time, to the extent funds available from the Debtors' custodial accounts are insufficient to cover required remittances to investors, the Debtors, as primary servicer, may be required to advance funds to investors or other third parties with respect to MBS and mortgage-related asset backed securities and whole-loan packages in order to cover delinquent principal and interest payments on the related pool of mortgage loans ("P&I Advances") and taxes, insurance premiums, and other charges against property securing the loans ("T&I Advances" and, together with the P&I Advances and the Corporate Advances, the "Advances").

26.     The Debtors are required to use their own funds to pay the Advances. Moreover, when a loan becomes delinquent, the Debtors must continue making P&I Advances until they are determined to be nonrecoverable from the related loans.  At that time, the Debtors may stop making P&I Advances, although they are required to continue to make the T&I Advances and Corporate Advances in order to protect the lien on the property.  The P&I and T&I Advances are generally reimbursable to the Debtors on a priority basis, either from amounts paid by the borrower or from the proceeds of insurance policies or the liquidation of the related loan. Advances constitute the single largest use of the Debtors' cash.

27.     Although most Advances are reimbursable, the primary servicer is responsible for any loss in excess of the guarantee on an FHA-insured or VA- or USDA-guaranteed mortgage loan.  The primary servicer also may incur losses for other reasons, such as costs of services exceeding expense caps or allowable amounts set forth in servicing agreements, making certain interest payments, penalties for failure to comply with required foreclosure timelines.  Costs related to restarting suspended foreclosures and assuming losses relating to Fannie Mae loans if the loss resulted from a rescinded mortgage insurance policy.

28.     The Debtors contract with third party owners of MSRs to act as subservicers.  As subservicers, the Debtors perform the responsibilities of a primary servicer and receive a fee from the primary servicer for such services but do not own the corresponding MSRs.  A subservicer generally has the same operational responsibilities as a primary servicer including the obligation to make Advances.

29.     In master servicing, the Debtors service the MBS, mortgage-related asset-backed securities or whole-loan packages owned by investors.  In this capacity, the Debtors interact with investors, not homeowners.  When the Debtors act as master servicer, they collect mortgage loan payments from primary servicers or subservicers and distribute those funds to the investors.  Master servicers also work with third parties that perform functions for securitization trusts, such as mortgage insurance providers, interest rate swap providers, bond insurance providers and rating agencies.  Additional key services provided by master servicers include advancing principal and interest on REO properties,[16] and performing claims administration, oversight of primary servicers and subservicers, loss mitigation, bond administration, cash flow waterfall calculations, investor reporting, tax reporting compliance, and other contractual and oversight functions.  In most cases, master servicers must make Advances to the extent the primary servicer does not make such advances.  Master servicing advances are priority cash flows in the event of a default by the underlying borrower, thus making their collection reasonably assured. In most cases, unless there is a determination that the Advances will be nonrecoverable, the master servicer is also required to make P&I Advances until such time as the

---

[16] Properties that have been foreclosed upon that remain on Debtors' balance sheet until sold to a third party are referred to as "real estate owned" or "REO."

loan is liquidated or the related REO is disposed of, and the Advances are reimbursed from the proceeds thereof.

30.     In many cases, the Debtors (through separate legal entities) act as both the primary and master servicer.  However, in certain cases, the Debtors also service loans that have been purchased and subsequently sold through a securitization trust or whole-loan sale in which the originator of the loans retained the primary servicing rights and the Debtors retained the master servicing rights.

31.     The Debtors receive a fee based on the unpaid principle balance ("UPB") of the mortgage pool or, in some cases, for each loan serviced.  These servicing fees are typically paid from the monthly payments made by the borrowers on the loans or if the Debtors act as a subservicer, they may bill the subservicing clients.  In addition, the Debtors may receive other remuneration for loan servicing, including borrower-contracted fees such as late charge fees, assignment transfer fees, insufficient funds check charges and assumption fees, loss mitigation incentive fees and other incidental fees and charges.  When acting as a subservicer, the Debtors typically receive a monthly per-loan fee.  As described above, the Debtors are generally required to continue making Advances as part of their servicing (or subservicing) obligations, unless such amounts are determined to be nonrecoverable from the related loans; however, in many cases, the Debtors' right to servicing fees with respect to delinquent mortgage loans may be subordinate to other obligations of the securitization trusts with respect to such loans.  In addition, when borrowers repay their loans prior to the end of an interest period, the Debtors are responsible for covering the interest payment with respect to such loans for the full interest period.

32.     As of March 31, 2012, the Debtors acted as the primary servicer for approximately 1.52 million loans having an aggregate UPB of approximately $2.0 billion.  In

addition, as of March 31, 2012, the Debtors acted as subservicer for over 847,000 loans having

an aggregate UPB of approximately $1.7 billion, including mortgage loans for which Ally Bank

retains the MSRs and whole loans owned by Ally Bank.  The Debtors are the master servicer for

approximately 439,000 loans having an aggregate UPB of approximately $58.7 billion as of

March 31, 2012, including loans having an aggregate UPB of $7.8 billion for which the Debtors

are the master servicer but not the primary servicer.

33.    The Debtors' master servicing operations work with 925 mortgage loan

securitization trusts.  As of March 31, 2012, these securitization trusts have an aggregate UPB of

$102.6 billion.

34.    Legacy Portfolio and Other.  The Debtors' legacy portfolios principally

consist of the remaining mortgage loan assets from their historical non-conforming domestic

residential mortgage loan origination and securitization activities (the "Domestic Non-core"), the

Debtors' remaining international operations, and the Debtors' captive mortgage reinsurance

operation.  The legacy portfolios are being wound down through opportunistic asset sales,

workouts or other strategic disposition transactions, including by virtue of the AFI APA, as

described below.

35.    First, the Domestic Non-core mortgage loan portfolio activities primarily

consist of loss mitigation and sales of mortgage loan assets (which are serviced by either the

Debtors or third party subservicers).  The mortgage loans consist primarily of mortgage loans

repurchased by Debtors pursuant to representation and warranty obligations, distressed mortgage

loans, loans contributed to the Debtors by AFI in 2009, and mortgage loans originated prior to

January 1, 2009 of types that are no longer being offered by the Debtors or that were not

securitizable.  As of March 31, 2012, the aggregate carrying value of these mortgage loans was $2.1 billion and their UPB was $5.2 billion.

36.     Second, the Debtors' international business operates through international, non-Debtor subsidiaries, all of which are being wound down.  In Mexico, which is currently the Debtors' only significant international operation, at March 31, 2012, the carrying value of its total assets was approximately $401.0 million but it had negative stockholder's equity of $18.3 million.  In addition, Residential Funding Company, LLC ("RFC"), a Debtor, owns interests in the cash flow from certain loans on properties in Canada, which loans are held by a Canadian-organized subsidiary.  The carrying value of those interests at March 31, 2012 was $1.6 million.

## B.     Prepetition Marketing and Sale Efforts

37.     As described in the Whitlinger Affidavit, by August 2011, ResCap was focused on (i) concerns regarding its  liquidity and inability to satisfy its (or its subsidiaries') tangible net worth and liquidity covenants under credit facilities and agreements with Fannie Mae, Freddie Mac, and Ginnie Mae; (ii) looming expirations of credit facilities, unsecured note maturities and interest payments; (iii) the magnitude of the Debtors' potential liability for representations and warranties the Debtors made related to mortgage loans sold by them, and the significant time and defense costs in respect of litigation claims alleged with respect to such mortgage loans and sales; (iv) the continuing volatility in the interest rate markets, which affects the Debtors' ability to hedge the value of their MSRs and to comply with the financial covenants in their credit facilities and other agreements; and (v) continued uncertainty over the future of ResCap and how such uncertainty could negatively impact business performance.  During this period, ResCap continued reviewing its strategic alternatives and began to contemplate a sale of its business operations and a potential filing under Chapter 11.

38.     As detailed more fully in the Greene Declaration, in August 2011, as part of the Debtors' continuing review of its strategic alternatives, the Debtors began to contemplate a broader range of options, including a potential Chapter 11 filing.

39.     In October 2011, ResCap interviewed potential investment advisors and retained Centerview Partners LLC ("Centerview").  Between October 2011 and January 2012, ResCap and its advisors, led by Centerview, began preparing for a potential auction of ResCap's business.

40.     Over several months, Centerview evaluated a broad range of strategic alternatives, conducted extensive due diligence on the Debtors' assets and operations, including frequent on-site meetings and constant dialogue with the Debtors' senior management team and personnel in servicing, origination, risk, accounting, and the Debtors' other functional groups, and evaluated in-court transaction alternatives.  Centerview worked with the Debtors to develop an understanding of the value embedded in the assets individually and as part of the broader platform, and constructed a variety of presentation materials for both the Debtors and their Board of Directors that illustrated the highlights of and challenges associated with marketing the Purchased Assets in various combinations. (Greene Decl. ¶ 20)

41.     On or about January 23, 2012, Centerview launched a targeted marketing process for the Debtors' assets. On or about February 13, 2012, Centerview received three preliminary indications of interest, including one from Nationstar.  A majority of Nationstar is owned by investment funds managed by affiliates of Fortress Investment Group, LLC (collectively, the public company and its affiliates and funds managed by such affiliates, "Fortress").  (Greene Decl. ¶ 23)  On February 17, 2012, after careful evaluation of the assets contemplated to be purchased under each of the three bids, the associated bid values and the

contingencies associated with each bid, Centerview, the Debtors, and their other advisors

determined that proceeding with two of the three bidders was most prudent.  After the Debtors

elected to proceed with two bidders, Centerview approached each with a detailed request for

supplemental information.  (Greene Decl. ¶ 26)

42.    After receipt of the requested information from the bidders, the value of

Nationstar's initial bid compared to the other bid, and an analysis of the assets Nationstar

proposed to acquire compared to other bidders, the Debtors and their professionals, determined,

in their business judgment, to negotiate exclusively with Nationstar.  Nationstar's offer was the

highest and best offer for the Debtors' business as a whole and represented the value maximizing

proposal for a number of reasons, including: (i) Nationstar's offer was the highest bid for the

largest portion of the Debtors' assets and operations; (ii) Nationstar represented an ideal bidder

because it is a strategic purchaser with a recent track record of purchasing mortgage assets, with

access to Fortress as a funding source; (iii) Nationstar holds substantially all the mortgage

operations licenses necessary to run the Purchased Assets; (iv) Nationstar offered the largest

"equity" amount with the smallest debt financing requirements and contingencies; (v) Nationstar

has strong relationships with Fannie Mae, Freddie Mac and Ginnie Mae; and (vi) Nationstar's

working knowledge of the Debtors, its operations and management from involvement in

previous sales processes, assisted in an expedited diligence process.  (Greene Decl. ¶ 27)

43.    The Debtors and Centerview concluded that working exclusively with one

bidder would increase the likelihood that the Debtors would be able to consummate a transaction

in a limited amount of time due to looming maturities and debt service obligations.  In addition,

the Debtors believed that the successful negotiation of a purchase agreement would require the

involvement and support of Fannie Mae, Freddie Mac, Ginnie Mae, and U.S. Treasury, among others, each of whom were likely to engage with a single third-party bidder. (Greene Decl. ¶ 28)

44.    Upon selection of Nationstar as the exclusive bidder, the Debtors and Centerview facilitated extensive due diligence for Nationstar and Fortress over a 12-week time period. Nationstar and Fortress were provided access to over 1.2 million pages of electronic diligence materials and additional presentation materials describing the Debtors' operations and assets. (Greene Decl. ¶ 29)

45.    In order to facilitate a sale of the Debtors' platform in full and protect against any erosion in value of the Debtors' assets and operations, the Debtors and their advisors negotiated extensively with AFI and its affiliates to allow the Debtors to originate mortgage loans in the months leading up to the Petition Date and subsequently during the Chapter 11 cases. The Debtors comprehensively reorganized the manner in which the Debtors and AFI originate and sell mortgage loans to preserve the value of the origination platform and the attractiveness of the Debtors' assets to a potential buyer. (Greene Decl. ¶ 30)

46.    Between March 2, 2012 and May 13, 2012, the Debtors, together with Centerview and its other advisers, negotiated the terms of the Nationstar APA and Nationstar completed its analysis of the Debtors' business. The parties and their advisors also engaged in extensive discussions with various government entities in respect of the proposed agreement and plans for maintaining the Debtors' origination and servicing operations as a going concern throughout the Debtors' Chapter 11 cases and upon sale to the successful bidder. (Greene Decl. ¶ 33)

47.    Concurrently with the sale process and starting in February 2012, the Debtors, AFI, and their respective advisers began discussing a potential settlement of all claims

and disputes the Debtors might have against AFI (the "Settlement Agreement"), and a process to develop a comprehensive plan of reorganization for the Debtors (in contrast to a sale under section 363 of the Bankruptcy Code). As part of these settlement discussions, AFI offered to purchase the Debtors' "legacy" whole loan portfolio as well as certain "trading securities and other financial assets" for a purchase price, based on such assets at December 31, 2011, of approximately $1.6 billion, provided that the Sale is consummated in connection with confirmation of a Chapter 11 plan incorporating the terms of the Settlement Agreement with AFI, and approximately $1.4 billion if such Sale occurs pursuant to section 363 of the Bankruptcy Code. This offer was approximately $200 million higher than the next highest bid. As a result, ResCap and its advisers determined it was in the Debtors' best interest to negotiate a sale of these assets to AFI. (Greene Decl. ¶ 34)

## THE APAs AND THEIR EXTRAORDINARY PROVISIONS

### A.    The Nationstar APA

48.    After significant negotiations, on May 13, 2012, the Nationstar APA was executed and delivered by the parties. From the start of the sales process, the Debtors and their advisors spent significant time with the government entities with which the Debtors conduct business, including but not limited to Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Finance Agency, and the United Services Automobile Association in an effort to obtain their support for a transaction. In order to garner the support of such organizations, the Debtors and their advisors engaged in constant dialogue, consisting of multiple weekly update strategy calls with certain GSEs and frequent update calls with other government-related organizations, in-person management presentations and substantive discussions, including with Nationstar. Obtaining government support was viewed as paramount by both the Debtor and its advisors to consummating a value-maximizing sale of the Debtors' assets and operations.

49.    Pursuant to the Nationstar APA, Nationstar agreed to acquire the

Nationstar Purchased Assets.  Pertinent terms of the Nationstar APA are summarized and

attached hereto as Exhibit B-1.[17]

50.    Generally, the Nationstar Purchased Assets include the Debtors' Servicing

Platform, including the Ginnie Mae MSRs.  Subject to a higher bid, the Ginnie Mae MSRs may

be sold separately from the remainder of the Nationstar Purchased Assets.

51.    Extraordinary Provisions.  The Nationstar APA contains the following

terms, conditions and provisions, which may be considered "Extraordinary Provisions" under the

Sale Guidelines:

- **Good Faith Deposit.**  In light of the extensive prepetition negotiations culminating in the Nationstar APA and Nationstar's deposit in the amount of $72 million in connection with its execution of the Nationstar APA (the "Nationstar Deposit"), the Debtors request that Nationstar be excused from submitting an additional deposit.  The Debtors request that the Nationstar Deposit be deemed Nationstar's Good Faith Deposit (as defined in the Sale Procedures) for all purposes under the Sale Procedures.

- **Record Retention.**  The Debtors confirm they will retain, or have reasonable access to, their books and records to enable them to administer their bankruptcy cases.

- **Successor Liability**.  In light of the significant consideration provided to the estates, except for the Assumed Liabilities expressly set forth in the Nationstar APA, the Debtors request a finding that neither Nationstar, nor any of its successors, assigns, nor any affiliates shall have any successor liability.  In addition to the aforementioned estate consideration provided by Nationstar, Nationstar and the Debtors have developed a far reaching notice protocol—as detailed in ¶ 57 below—which will apprise all interested parties of the proposed successor liability provisions in the Nationstar Sale Approval Order.  In addition, the Debtors will be publishing the Notice of Auction and Sale Hearing in the global edition of *The Wall Street Journal*, the national edition of *The New York Times*, and on the website of the Debtors' proposed claims and noticing agent Kurtzman Carson Consultants, LLC at http://www.kccllc.net..  The Notice of Auction and Sale Hearing apprises parties that the sale to Nationstar will be free and clear of all

---

[17]  The description of the terms of the Nationstar APA provided herein is intended as a summary only.  To the extent that the description provided in this Motion differs in any respects from the terms of the Nationstar APA, the terms of the Nationstar APA shall govern.  Capitalized terms used in this paragraph that are not otherwise defined herein shall have the meanings ascribed to them in the Nationstar APA.

dc-667294

claims, liabilities, interests, liens, obligations and encumbrances, including those that are based upon, without limitation, any successor or transferee theory of liability. Accordingly, the Debtors submit that no further notice concerning this provision need be provided and that good cause exists for the approval of the Nationstar Sale Approval Order's successor liability findings.

- **Relief from Bankruptcy Rule 6004(h).** For the reasons discussed below, the Debtors request relief from the 14-day stay imposed by Bankruptcy Rule 6004(h). The Debtors submit that such relief is necessary and supported by legitimate business reasons because the value of the Debtors' businesses would rapidly decline in value if the transactions subject of the Nationstar APA are not promptly consummated.

**B.    The AFI APA**

52.    After significant negotiations, certain of the Debtors, AFI, and BMMZ entered into the AFI APA, whereby BMMZ agreed to acquire the AFI Purchased Assets pursuant to the terms of the AFI APA. Pertinent terms of the AFI APA and the Legacy Portfolio Sale are summarized and attached hereto as Exhibit C-1.[18]

53.    Generally, the AFI Purchased Assets consist mainly of first and second lien mortgage loans, home equity lines of credit, and other residual financial assets. Subject to a higher bid, the AFI Purchased Assets may be sold separately or together with the Nationstar Purchased Assets.

54.    Extraordinary Provisions. The AFI APA contains the following terms, conditions and provisions, which may be considered "Extraordinary Provisions" under the Sale Guidelines:

- **Sale to Insider.** The AFI APA proposes a sale to BMMZ, an insider of the Debtors, guaranteed with respect to payment by AFI. Extensive measures have been taken to ensure the fairness of the sale process and the proposed Sale pursuant to the AFI APA. In negotiating the AFI APA, AFI sought to conform its APA with that of the Nationstar

---

[18]  The description of the terms of the AFI APA provided herein is intended as a summary only. To the extent that the description provided in this Motion differs in any respects from the terms of the AFI APA, the terms of the AFI APA shall govern. Capitalized terms used in this paragraph that are not otherwise defined herein shall have the meanings ascribed to them in the AFI APA.

APA, to the extent applicable.  As with the Nationstar APA, the AFI APA does not contain special treatment for ResCap, ResCap's estate, AFI, or their respective affiliates and insiders.  The AFI APA specifically provides for overbids, as set forth in section 7.1, ensuring that ResCap will realize the highest or best price for the AFI Purchased Assets. In addition, AFI will not receive a break-up fee or expense reimbursement.  Both the AFI and Nationstar APAs were unanimously approved by ResCap's Board of Directors, which consists of a majority of independent directors.  In approving the AFI APA, ResCap itself and the independent members of its board of directors consulted with separate legal counsel, who do not represent AFI or any of its subsidiaries or affiliates (other than the Debtors).

- **Good Faith Deposit.**  Sellers request that AFI be excused from submitting a good faith deposit required of Qualified Bidders in light of the extensive prepetition negotiations culminating in the AFI APA, and in light of AFI's irrevocable, absolute, and unconditional guarantee (as described in section 10.15 of the AFI APA) to Sellers of the prompt and full payment by BMMZ's of all of BMMZ's monetary obligations under the AFI APA and any Ancillary Agreements as and when payment is due and payable in accordance with the terms under the AFI APA.

- **Successor Liability.**  In light of the significant consideration provided to the estates, except for the Assumed Liabilities expressly set forth in the AFI APA, the Debtors request a finding that neither AFI, nor any of its successors, assigns, nor any affiliates shall have any successor liability.  In addition to the aforementioned estate consideration provided by AFI, AFI and the Debtors have developed a far reaching notice protocol—as detailed in ¶ 57 below—which will apprise all interested parties of the proposed successor liability provisions in the AFI Sale Approval Order.  In addition, the Debtors will be publishing the Notice of Auction and Sale Hearing in the global edition of *The Wall Street Journal*, the national edition of *The New York Times*, and on the website of the Debtors' proposed claims and noticing agent Kurtzman Carson Consultants, LLC at http://www.kccllc.net.  The Notice of Auction and Sale Hearing apprises parties that the sale to AFI will be free and clear of all claims, liabilities, interests, liens, obligations and encumbrances, including those that are based upon, without limitation, any successor or transferee theory of liability.  Accordingly, the Debtors submit that no further notice concerning this provision need be provided and that good cause exists for the approval of the AFI Sale Approval Order's successor liability findings.

- **Relief from Bankruptcy Rule 6004(h).**  For the reasons discussed below, the Debtors request relief from the 14-day stay imposed by Bankruptcy Rule 6004(h).  The Debtors submit that such relief is necessary and supported by legitimate business reasons because the value of the Debtors' businesses would rapidly decline in value if the transactions subject of the AFI APA are not promptly consummated.

## DESCRIPTION OF PROPOSED SALE PROCEDURES

55.     The Debtors believe that the best interests of their estates are preserved by conducting a public Auction to identify the highest or otherwise best offer for their assets to be sold pursuant to the Sales.  Accordingly, the Debtors seek this Court's approval of the following Sale Procedures, which are also attached as Exhibit A-1 to the proposed Sale Procedures Order.[19]

56.     The Debtors reserve the right to seek approval of the Sales through separate asset purchase agreements with different purchasers in the event that the combination of such sales are determined by the Debtors, in their sole discretion, to obtain the highest value for the assets.  As described above, this multiple asset purchase agreement structure may include, for example, a separate auction process for the Ginnie Mae MSRs currently subject of the Nationstar Purchased Assets, as detailed in Exhibit B.

57.     The Sale Procedures contemplate an Auction process pursuant to which bids for the Nationstar and AFI Purchased Assets will be subject to higher or better offers, whether pursuant to a Chapter 11 plan or a section 363 sale.  As described below and more fully in the Sale Procedures, only Qualified Bidders that timely submit Qualified Bids may be eligible to participate in the Auction.[20]  The Auction will be conducted as a closed auction, open only to Qualified Bidders, due to the sensitive nature of the assets being sold.

58.     The Sale Procedures provide, in relevant part, as follows:

---

[19] To the extent the description of the Sale Procedures set forth herein differs from those set forth in Exhibit A-1 to the Sale Procedures Orders, the terms of Exhibit A-1 to the Sale Procedures Order shall control.

[20] The Sale Procedures define a Qualified Bidder as a Potential Bidder whose Financials (or the Financials of its equity holder(s), if applicable) demonstrate the financial capability to consummate the Sale(s), whose bid meets all of the Bid Requirements described in the Sale Procedures, and who the Debtors, in their discretion, after consultation with any creditors' committee appointed in these Chapter 11 cases, determine is likely to consummate the Sale(s), if selected as the Successful Bidder, after taking into account all relevant legal, regulatory, and business considerations.  Notwithstanding anything herein to the contrary, Nationstar and AFI shall each be deemed a Qualified Bidder.

dc-667294

(a)   **Notice**:   Not later than ten days after the entry of the Sale Procedures Order, the Debtors will serve copies of the Notice of Auction and Sale Hearing, the Sale Procedures, and the Sale Procedures Order on the following parties (a) by overnight, postage prepaid to: (i) the Office of the United States Trustee for the Southern District of New York, (ii)  the attorneys for the U.S. Treasury, (iii) the attorneys for ResCap's prepetition secured credit facilities, (iv) the attorneys for the agent under the Debtors' prepetition amended and restated secured revolving credit agreement, (v) the attorneys for the statutory committee of unsecured creditors appointed in the Debtors' Chapter 11 cases (the "Creditors' Committee") (if no statutory committee of unsecured creditors has been appointed, the holders of the fifty largest unsecured claims against the Debtors on a consolidated basis), (vi) the attorneys for the ad hoc bondholders' committee, (vii) the attorneys for the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association, (viii) any party who, in the past year, expressed in writing to the Debtors an interest in the Purchased Assets and who the Debtors and their representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transaction contemplated in the APA, (ix) each non-debtor counterparty to the Assumed Contracts, any known third party beneficiaries to such Assumed Contracts, all trustees, certificateholders, investors, rating agencies, mortgage insurers and any parties to any pooling and servicing agreements, assignment, assumption and recognition agreements, Servicing Agreements, subservicing agreements or similar agreements; (x) all parties who are known to have asserted or believed by Debtors to hold any lien, claim, encumbrance, or interest in or on the Purchased Assets, (xi) the Securities and Exchange Commission, (xii) the Internal Revenue Service, (xiii) all applicable state attorneys' general, and local authorities, (xiv) all applicable state and local taxing authorities, (xv) the Federal Trade Commission, (xvi) the United States Department of Justice, (xvii) the United States Attorney's Office, (xviii) the office of the New York Attorney General; and (xix) all entities that requested notice in these Chapter 11 cases under Bankruptcy Rule 2002

Three days after entry of the Sale Procedures Order or as soon as practicable thereafter, pursuant to Bankruptcy Rule 2002(l), the Debtors propose that the Notice of Auction and Sale Hearing be published (i) once in the (a) global edition of *The Wall Street Journal* and (b) the national edition of *The New York Times*; and (ii) on the website of the Debtors' proposed claims and noticing agent, Kurtzman Carson Consultants, at http://kccllc.com/rescap, which methods shall be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

(b) **Access to Information**:   To obtain due diligence access or additional information regarding the Purchased Assets or the Sellers, a Qualified Bidder must provide the Debtors with a written nonbinding expression of interest (the "Expression of Interest") regarding (i) the Qualified Bidder's proposed Sale

Transaction; (ii) the purchase price range; and (iii) the structure and financing of the Sale Transaction. The Debtors, in their business judgment, will determine whether a Qualified Bidder that has submitted an Expression of Interest is reasonably likely to make a bona fide offer (a "Qualifying Expression of Interest"). The Debtors will notify each party that submits an Expression of Interest as to whether such party has made a Qualifying Expression of Interest within 5 business days of the Debtors' receipt of the Qualifying Expression of Interest. Such Qualified Bidder will be afforded reasonable due diligence, including access to information concerning the Purchased Assets subject of the relevant APA(s) from a confidential electronic data room (the "Data Room"). All reasonable requests for additional information and due diligence access from Qualified Bidders who make a Qualifying Expression of Interest shall be posted in the Data Room. The Debtors will promptly give Nationstar (in the case of the Nationstar Purchased Assets) and AFI (in the case of the AFI Purchased Assets) any confidential memoranda containing information and financial data and any other relevant materials or information that Nationstar or AFI, as applicable, may reasonably request with respect to the Purchased Assets subject of the relevant APA and access to all due diligence provided to any other Qualified Bidder. Availability of additional due diligence to a Qualified Bidder who has made a Qualifying Expression of Interest will cease after the Bid Deadline. The Debtors and their advisors shall be entitled to due diligence from a Qualified Bidder, upon execution of a confidentiality agreement that is reasonably satisfactory to the Debtors. Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors.

(c)    **Qualified Bid**. Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver to the parties set forth in the Sale Procedures each of the following, which shall be referred to collectively as a "Qualified Bid Package": (i) one written copy of its bid (a "Bid Proposal"); (ii) a copy of such bidder's proposed APA(s) that has been marked to show amendments and modifications to the Nationstar APA and/or the AFI APA, as applicable, including price and terms (including a separate bid for the Ginnie Mae MSRs, if applicable), and with respect to which the Qualified Bidder agrees to be bound (each a "Marked Agreement"); and (iii) a list of executory contracts and leases that the Qualified Bidder intends to assume (the "Proposed Assumption Contracts" and together with a Bid Proposal and a Marked Agreement(s), a "Bid Package"). A bid must be a written irrevocable offer from a Qualified Bidder (i) stating that the Qualified Bidder offers to consummate the Sale Transaction(s) pursuant to the Marked Agreement(s); (ii) confirming that the offer shall remain open until the closing of the Sale Transactions to the Successful Bidders; (iii) enclosing a copy of the Marked Agreement(s); and (A) in the case of the Nationstar APA, including a certified or bank check, or wire transfer, in the amount of $72 million (of which $6,076,799 applies to the Ginnie MSRs) to be held in escrow as a "Good-Faith Deposit"; (B) in the case of the AFI APA including a certified or bank check, or wire transfer, in the amount of $25 million to be held in escrow as a Good-Faith Deposit.

dc-667294

A Qualified Bidder may submit Bid Proposals and Bid Packages either for both of the Nationstar Purchased Assets or the AFI Purchased Assets; provided, however, that a Qualified Bidder that bids on both the Nationstar Purchased Assets and the AFI Purchased Assets must provide separate Bid Proposals for the Nationstar Assets and the AFI Purchased Assets.  As noted herein, the Debtors will consider Qualified Bids for all of the Nationstar Purchased Assets or for only the Ginnie Mae MSRs; provided that to the extent a Qualified Bidder seeks to bid only on the Ginnie Mae MSRs, such bid must also be provided separately.  Under no other circumstances may a Qualified Bidder submit separate bids for any portion of the Nationstar Purchased Assets (other than in respect of the Ginnie Mae MSRs) or the AFI Purchased Assets. Only bulk bids for these assets will be deemed Qualified Bids provided the other requirements are met.

(d)  **Bid Deadline.**  The deadline for submitting a Qualified Bid Package by a Qualified Bidder shall be September 14, 2012 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").  Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver written copies of its bid to: (i) Residential Capital, LLC, 1100 Virginia Drive, Fort Washington, Pennsylvania 19034, Attn: Mr. Thomas Marano (tom.marano@gmacfs.com) and Tammy Hamzehpour, Esq. (tammy.hamzehpour@ally.com); (ii)  Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104; Attn:  Larren M. Nashelsky, Esq. (lnashelsky@mofo.com), Gary S. Lee, Esq. (glee@mofo.com), proposed counsel to the Debtors; (iii) Centerview Partners, 31 West 52nd street, 22nd floor, New York, New York 10019; Attn: Samuel M. Greene (sgreene@centerviewpartners.com) and Marc Puntus (mpuntus@centerviewpartners.com), proposed financial advisors to the Debtors, and (iv) counsel to the statutory committee of unsecured creditors in these Chapter 11 cases (the "Creditors' Committee"), when appointed.

(e)  **Auction**.  If one or more Bid Packages are received from Qualified Bidder(s) by the Bid Deadline in addition to Nationstar's Qualified Bid or AFI's Qualified Bid, the Auction will take place on September 25, 2012 at 10:00 a.m. (prevailing Eastern Time) at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, 39th Floor, New York, New York 10104, or such other place and time as the Debtors shall notify all Qualified Bidders, the Creditors' Committee, and the DIP Lenders.  Unless otherwise determined by the Debtors, only the Debtors, Nationstar (in the case of the Nationstar APA), AFI (in the case of the AFI APA), a representative of each of any official creditors' committee and any Qualified Bidder (and the legal and financial advisors to each of the foregoing) will be entitled to attend the Auction, and only Nationstar (in the case of the Nationstar APA), AFI (in the case of the AFI APA), and Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(f)  **Auction Procedures.**  Bidding at the Auction will begin with the initial bid selected and announced by the Debtors (the "Starting Bid") and continue, in

one or more rounds of bidding. With respect to the assets subject of the Nationstar APA (including the Ginnie Mae MSRs), the initial minimum bid increment at the Auction shall be $25 million, and cannot be reduced or increased without the consent of Nationstar. To the extent applicable, and only for the Ginnie Mae MSRs, the initial minimum bid increment at the Auction shall be $2 million, and cannot be reduced or increased without the consent of Nationstar. With respect to the assets subject of the AFI APA, the initial minimum bid increment at the Auction shall be $15 million, and cannot be reduced or increased without the consent of AFI. Thereafter, in each circumstance, minimum bid increments at the Auction shall be determined by the Debtors in their discretion. For purposes of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Nationstar), the Debtors will give Nationstar a credit equal to the Break-Up Fee. No additional bids may be considered after the Auction is closed.

If (i) no Qualified Bids with respect to the Nationstar Purchased Assets are timely received, or (ii) the Debtors only timely receive Qualified Bids for the Ginnie Mae MSRs and do not timely receive a Qualified Bid for the remaining Nationstar Purchased Assets other than Nationstar's Qualified Bid, the Debtors shall not conduct the Auction with respect to such Nationstar Purchased Assets for which no Qualified Bids were received (other than Nationstar's Qualified Bid) and instead shall seek approval of the relevant Nationstar Purchased Assets pursuant to the provisions of the Nationstar APA at the Sale Hearing.

(g)     **Acceptance of the Sale**. Following any Auction, the Debtors, in their sole discretion, in consultation with any official creditors' committee, shall determine the highest and best bid (the "Successful Bid") and the bidder with respect thereto, the ("Successful Bidder") in connection with each of the APAs. The next highest bidder after the Successful Bidder shall be deemed the ("Next-Highest Bidder"). The Next-Highest Bidder shall be required to hold open its bid until the earlier of (i) the closing of the sale to the Successful Bidder, and (ii) the Confirmation Hearing (the "Back-Up Bid Release Date"). The Debtors shall present to the Bankruptcy Court at the Sale Hearing or the Confirmation Hearing, as applicable, the Successful Bid. At the Sale Hearing or the Confirmation Hearing, as applicable, certain findings will be sought from the Bankruptcy Court, including that (i) the Successful Bidder was selected in accordance with the Sale Procedures, and (ii) consummation of the Sales as contemplated by the Successful Bid will provide the highest or otherwise best result and is in the best interests of the Sellers and their estates in these Chapter 11 cases.

(h)     **Return of Good Faith Deposit**. All Good Faith Deposits will be non-refundable if the Qualified Bidder is selected as the Successful Bidder and fails to consummate the Sale Transaction (other than as a result of a breach by the respective Sellers under the APAs) and refundable if it is not selected as the Successful Bidder (other than as a result of its own breach).

Except as otherwise provided in this paragraph with respect to the Successful Bidder and the Next-Highest Bidder, the Good Faith Deposits of all Qualified Bidders required to submit such a deposit under the Sale Procedures shall be returned upon or within two (2) business days after entry of the Sale Order. The Good Faith Deposit of the Successful Bidder shall be held until the closing of the Sale Transaction and applied in accordance with the Successful Bid. The Good Faith Deposit of the Next-Highest Bidder shall be retained in escrow until the Back-Up Bid Release Date and returned to the Next-Highest Bidder within two (2) business days of such date. Until the return of the Good Faith Deposit in accordance with the above, the Debtors shall hold such deposits in an interest-bearing escrow account. If the closing does not occur, the disposition of Good Faith Deposits shall be as provided in the Successful Bid and Next-Highest Bidder Bid, as applicable. The Nationstar APA (including any escrow agreement entered into in connection therewith) shall apply in all respect to the application or return of the Good Faith Deposit of Nationstar and the provisions of this paragraph shall not apply.

(i)      **Break-Up Fee**. Only with respect to the Nationstar APA, if Nationstar's bid is not the Successful Bid, Nationstar shall be entitled to receive a break-up fee in the amount of $72 million (of which 8.44% is allocable to the Ginnie Mae MSRs and 91.56% is allocable to the remaining Nationstar Purchased Assets) under the terms set forth in the Nationstar APA, without the need for any application, motion, or further order of this Court (the "Break-Up Fee"), plus reimbursement of Nationstar's actual, reasonable, out-of-pocket expenses incurred in connection with transactions contemplated by the APA, not to exceed $10 million (the "Expense Reimbursement"). This Motion seeks approval of the Break-Up Fee and Expense Reimbursement, and seeks to have these expenses deemed administrative expenses under sections 503(b) and 507 of the Bankruptcy Code.

59.      Subject to this Court's calendar, the Debtors seek to have the Sale Hearing scheduled for a date during the week of October 15, 2012, or such other date before October 31, 2012 that the Court conducts the Confirmation Hearing.

## DESCRIPTION OF PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES

60.      The assumption and assignment of the Assumed Contracts are part and parcel of the Sale Transaction with Nationstar. Accordingly, the Debtors seek this Court's approval of the Assumption and Assignment Notice and related procedures. Each non-debtor counterparty to the Assumed Contracts, any known third party beneficiaries to such Assumed Contracts, all trustees, certificateholders, investors, rating agencies, mortgage insurers and any

parties to any pooling and servicing agreements, assignment, assumption and recognition agreements, Servicing Agreements, subservicing agreements or similar agreements (collectively, the "Interested Contract Parties") shall receive the Assumption and Assignment Notice.  The Assumption and Assignment notice shall apprise Interested Contract Parties of the following:

- the Debtors' estimate of the Cure Amount associated with each such contract;

- that Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations relating to the pre-closing period under any Assumed Contract, whether such claims or obligations are known, unknown, fixed, contingent, unliquidated or liquidated at the time of the Closing, including, without limitation, any claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification claims or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date.  Any parties holding such claims or obligations will be required to respond to the Debtors' cure notice if they disagree with the amounts set forth therein;

- The deadline for objecting to approval of any Cure Amounts, the severing of any multi-agreement document (as described below) and/or the assumption by the Debtors and assignment to Nationstar of an Assumed Contract, shall be **August 30, 2012, at 5:00 p.m.** (Eastern Time) (the "Contract Objection Deadline"), *provided*, *however*, that in the event the Sale Procedures result in a Successful Bidder other than Nationstar, the deadline for objecting to the sale of the Purchased Assets to such Successful Bidder shall be at the Sale Hearing;

- Any objection that challenges a Cure Amount, or otherwise asserts that there exist outstanding defaults under an Assumed Contract, must set forth with specificity the Cure Amount being claimed by the objecting party or the nature of the asserted default, as applicable, and must include appropriate documentation in support thereof satisfactory to the Debtors and Nationstar.  If no objection to the Cure Amount or the proposed assumption and assignment of an Assumed Contract is timely filed and served, the pertinent Debtor may assume and assign the Assumed Contract to Nationstar (or, alternatively, to the Successful Bidder for the applicable

Purchased Assets), and the Cure Amount set forth in the
Assumption and Assignment Notice shall be binding for all
purposes in such Debtor's Chapter 11 cases; and

- The Nationstar Sale Approval Order will generally provide
that, in cases where a Servicing Agreement is contained within
the same writing as an agreement related to origination or loan
sales, that the Debtors intend to assume and assign to
Nationstar only the Servicing Agreement and that the
origination agreements and/or loan sale documents will be
severed from the multi-agreement document pursuant to the
Sale Order. Further, the Sale Order will generally require that
no delay or failure of performance by the Debtors under or in
respect to any origination agreement will (i) affect any right of
Nationstar under any Servicing Agreement or (ii) permit, result
in or give rise to any setoff, delay, deferral, defense,
recoupment, claim, counterclaim, default or other impairment
of the rights of Nationstar under any Servicing Agreement.[21]

## APPLICABLE AUTHORITY

61.    The Debtors have filed a Memorandum of Law in Support of this Motion

(the "Memorandum of Law") that discusses more fully the authority for requested relief. As

detailed in the Memorandum of Law, if a valid business justification exists, the applicable

principle of law embeds the debtor's decision to sell property out of the ordinary course of

business with a strong presumption that "'in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was

taken in the best interests of the company.'"  Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992). A sale

under section 363 of the Bankruptcy Code should be approved if the court is satisfied that the

debtor has exercised sound business judgment; adequate and reasonable notice of the sale has

---

[21] See  DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.), 402 B.R.
87 (Bankr. D. Del. 2009) (holding that mortgage servicing rights included in the same document as other
commitments are severable from loan sale commitments).

been provided to interested parties; the purchase price is fair; and the purchaser is proceeding in

"good faith."

**A.      The Sales Are Within the Sound Business Judgment of the Debtors and Should be
Approved**

62.      Section 1123(a)(5)(B) of the Bankruptcy Code provides that

"Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate

mean for the plan's implementation, such as . . . transfer of all or any part of the property of the

estate to one or more entities, whether organized before or after the confirmation of such plan . .

." 11 U.S.C. § 1123(a)(5)(B).  In addition, section 363(b)(1) of the Bankruptcy Code provides,

in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is

appropriate for a court to authorize the sale or disposition of a debtor's purchased assets prior to

confirmation of a plan.  However, courts in this Circuit and others have required that the decision

to sell Purchased Assets outside the ordinary course of business be based upon the sound

business judgment of the debtors.  See Motorola, Inc. v. Official Comm. of Unsecured Creditors

(In re Iridium Operating LLC), 478 F.3d 452, 466 (2d Cir. 2007); In re Lionel Corp., 722 F.2d at

1063.

63.      The "sound business judgment" test requires a debtor to establish three

elements in order to justify the sale or lease of property outside the ordinary course of business,

namely, (a) that adequate and reasonable notice has been provided to interested persons, (b) that

the debtors have obtained a fair and reasonable price, and (c) that the purchaser is proceeding in

"good faith."  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d

1063, 1070 (2d Cir. 1983).  The Debtors submit that the decision to proceed with the Sales of the

Purchased Assets and the Sale Procedures related thereto are based upon their sound business judgment and should be approved.

64.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's Purchased Assets.  See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

65.    The Debtors submit that ample business justification exists to sell the Purchased Assets under the APAs to the Successful Bidders (or Next Highest Bidders) pursuant to the Sale Procedures.  For the reasons identified more fully above, the Debtors believe that it is essential to sell the Purchased Assets, and that those Sales be consummated as part of the plan confirmation process or, to the extent a Chapter 11 plan is not confirmed, by October 31, 2012, then as promptly as practicable thereafter in order to preserve the viability of the businesses to which the Purchased Assets relate as a going concern.  The Debtors also believe that a targeted sale process involving potential end users of the Purchased Assets is most likely to achieve the highest and best price for the Purchased Assets.

66.    **Adequate and Reasonable Notice.**  The notice described herein and the Sale Procedures is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets. Accordingly, the proposed Sales satisfy the notice requirement.  Further, a reasonable opportunity to object or be heard with respect to the Sale Procedures, Cure Amounts, and ultimately the Sales will be afforded to all interested persons, including the Notice Parties.

67.    **Fair and Reasonable Price.**  Moreover, the Sale Procedures are designed to maximize the value received for the Purchased Assets.  The process proposed by the Debtors allows for a timely auction process while also providing bidders and consultants with ample time and information to conduct due diligence and submit a Qualified Bid.  The Sale Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price.  The Debtors are subjecting the value of the Purchased Assets to market testing and permitting prospective purchasers to bid on the Purchased Assets.  The proposed Sales will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Sale Procedures.  Courts frequently approve the implementation of competitive bidding procedures to facilitate an asset sale outside of the ordinary course of business as a means to ensure that such sale will generate the highest return for a debtor's estate.  See In re Fin. News Networks, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991).

68.    Further, Nationstar's involvement will ensure that the Sale of the Purchased Assets subject of the Nationstar APA will yield the highest possible bid by encouraging bidding.  The payment of the Break-Up Fee and Expense Reimbursement is within the Debtors' business judgment.  Bankruptcy courts have approved incentives similar to the

Break-Up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing; (ii) the break-up fee does not hamper bidding; and (iii) the amount of the break-up fee is reasonable.  See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R 650 at 656-57 (S.D.N.Y. 1992).  Accord In re Metaldyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009).  The Break-Up Fee meets each of these requirements.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable.

69.     **Good Faith**.  The Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 277 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders").

70.     When evaluating sales to insiders, courts in this circuit and others have considered whether the sale involved full disclosure to the court and to the parties involved in the proceeding.  In re Betty Owens Schools, Inc., 1997 WL 188127, at *11 (S.D.N.Y. April 16, 1997) ("[A ]debtor-in-possession who proposes a sale of all of its assets to an insider must fully disclose the relationship between the buyer and seller."); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (where court was "hard pressed" to find bad faith when challenged relationship between bidder and debtor "was fully disclosed to the Bankruptcy Court").

71.      Despite AFI's status as the Debtors' indirect parent an hence an "insider," the sale of the Purchased Assets subject of the AFI APA, under applicable heightened scrutiny, is still in "good faith."  See In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ("[S]ales to fiduciaries in chapter 11 cases are not *per se* prohibited, but [they] are necessarily subjected to heightened scrutiny.") (quoting C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.), 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988)).

72.      AFI has fully disclosed its status as an "insider" and the Sale Notice will provide parties in interest with adequate and reasonable notice of the Sale and the relationship between the Debtors and AFI.

73.      The AFI APA has been negotiated by ResCap and its advisers and AFI and its advisers at arm's-length.  Except where the specific requirements of the assets being purchased required different terms, the terms of the AFI APA are substantially similar or more favorable to the Debtors than the Nationstar APA.  The AFI APA was negotiated in a process that also approximates arm's length despite ResCap being a wholly owned subsidiary of AFI. ResCap and the independent members of its board of directors each have separate legal counsel, who do not represent AFI or any of its subsidiaries or affiliates (other than the Debtors).  In negotiating its APA, AFI sought to conform its APA with that of the Nationstar APA, to the extent applicable.  As with the Nationstar APA, the AFI APA does not contain special treatment for ResCap, ResCap's estate, AFI, or their respective affiliates and insiders and it specifically provides for overbids, ensuring that ResCap will realize the highest or best price for the AFI Purchased Assets.  In addition, AFI will not receive a break-up fee or expense reimbursement. The Nationstar APA and the AFI APA were unanimously approved by the ResCap Board of Directors.

74.     As further discussed below, the "good faith" prong of the <u>Lionel</u> standard

is also satisfied here.

**B.      The Sales Are Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code**

75.     The Debtors request that the Court find that the Successful Bidders (or

Next Highest Bidders) (each as defined in the Sale Procedures) are entitled to the protections of a

good faith purchaser under section 363(m) of the Bankruptcy Code.

76.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) ... of this section of a sale . . . of property does not
> affect the validity of a sale ... under such authorization to an entity
> that purchased . . . such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

77.     As required by section 363(m) of the Bankruptcy Code, the Sale

Procedures have been proposed in good faith and provide for both the Debtors and the potential

purchaser to act in good faith in negotiating the Sales and the assignment of the Assumed

Contracts (as defined below) in the case of the Nationstar APA.

78.     Although the Bankruptcy Code does not define "good faith purchaser," the

Second Circuit, construing section 363(m) of the Bankruptcy Code, has explained that "[g]ood

faith of a purchaser is shown by the integrity of his conduct during the course of the sale

proceedings; where there is a lack of such integrity, a good faith finding may not be made.  A

purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the

trustee, or an attempt to take grossly unfair advantage of other bidders.'"  <u>Licensing by Paolo,</u>

<u>Inc. v. Sinatra (In re Gucci)</u>, 126 F.3d 380, 390 (2d Cir. 1997) (quoting <u>In re Rock Indus. Mach.</u>

Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).  Here, the sale of the Purchased Assets is in good

faith.  There is no evidence of fraud or collusion in the terms of the Sales.  To the contrary, as

discussed herein, and as will be further demonstrated at the Sale Hearing, the APAs represent the

culmination of a solicitation and negotiation process in which all parties will have the benefit of

sophisticated counsel and financial advisors.

79.    Here, all negotiations have been and will continue to be conducted at an

arm's-length, on a good-faith basis.  With respect to the potential bidders, the Sale Procedures

are designed to ensure that no party is able to exert undue influence over the process.  Under the

circumstances, the Successful Bidders (or Next-Highest Bidders) should be afforded the

protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

Furthermore, the Sale Procedures are designed to prevent the Debtors or the Successful Bidders

(or Next-Highest Bidders) from engaging in any conduct that would, cause or permit the APAs,

or the Sales of the Purchased Assets to the Successful Bidders (or Next-Highest Bidders)

pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

80.    All creditors and parties in interest will receive notice of the Sales and will

be provided with an opportunity to be heard.  Additionally, all counterparties to Assumed

Contracts will be provided notice of assumption and assignment and an opportunity to be heard.

The Debtors submit that such notice is adequate for entry of the Sale Approval Orders and

satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy

Code.

**C.    The Sales Should Be Free and Clear of Liens, Claims, and Encumbrances Because
the Sales Satisfy the Requirements of Section 363(f) of the Bankruptcy Code**

81.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may

sell all or any part of its property free and clear of any and all liens, claims or interests in such

property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party

asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the

purchase price for the property is greater than the aggregate amount of all liens on the property;

(iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or

interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for

such interest.  11 U.S.C. § 363(f).  See also Abir v. Stern, 2010 WL 1170060 (E.D.N.Y. March

22, 2010) ("Section 363(f) is in the disjunctive, such that the sale of the interest concerned may

occur if any one of the conditions of [section] 363(f) have been met") (quoting In re Dundee

Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992)).  Approval of a proposed

sale of assets free and clear of interests requires only that one of the five requirements be

satisfied with respect to each such interest.  In re Borders Grp, Inc., 453 B.R. 477, 483 (Bankr.

S.D.N.Y. 2011).  Because the Debtors expect that they will satisfy the second and fifth of these

requirements, if not others as well, approving the sale of the Purchased Assets free and clear of

all adverse interests is warranted.

**D.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should
Be Approved**

82.    To facilitate and effect the Sale Transactions and the Nationstar APA, the

Debtors seek authority to assume and assign various executory contracts and unexpired leases

related to the Nationstar APA (as may be identified by separate notice prior to the Sale Hearing,

the "Notice of Assumption and Assignment," annexed hereto as Exhibit F) to the Successful

Bidders (or the Next Highest Bidders) to the extent required by such Successful Bidder (or Next

Highest Bidder).

83.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or

assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy

Court, provided that the defaults under such contracts and leases are cured and adequate

assurance of future performance is provided.  A debtor's decision to assume or reject an

executory contract or unexpired lease must only satisfy the "business judgment rule" and will not

be subject to review unless such decision is clearly an unreasonable exercise of such judgment.

See In re Old Carco LLC, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009) ("Moreover, the business

judgment standard as applied to a bankrupt's decision to reject an executory contract because of

perceived business advantage requires that the decision be accepted by courts unless it is shown

that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankruptcy

retained business discretion") (internal quotations omitted).

84.     The meaning of "adequate assurance of future performance" depends on

the facts and circumstances of each case, but should be given "practical, pragmatic construction."

See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr.

D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  See In re Bygaph Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate

assurance of future performance present when the prospective assignee of a lease from the

debtors has the financial resources and has expressed a willingness to devote sufficient funding

to the business in order to give it a strong likelihood of succeeding; "chief determinant of

adequate assurance of future performance is whether rent will be paid").

85.     The Successful Bidders (or the Next Highest Bidders) under the Nationstar

APA may wish to take assignment of certain executory contracts and unexpired leases related to

the Debtors' business (the "Assumed Contracts").  To the extent Assumed Contracts are

identified, the Debtors believe that they can and will demonstrate that all requirements for

assumption and/or assignment of the Assumed Contracts will be satisfied at the Sale Hearing.
The Debtors, as required by the Sale Procedures, will evaluate the financial wherewithal of all
potential bidders before qualifying such bidders to bid for the Business.  Further, for the reasons
stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe
that selling the Debtors' business and assuming and assigning to the Successful Bidders (or the
Next Highest Bidders) the Assumed Contracts would be in the best interests of their estates.

        86.      Moreover, the Debtors will provide to all parties to the Assumed Contracts
an opportunity to be heard.  The Debtors will maintain a schedule of Executory Contracts and
Leases that Nationstar has designated as Assumed Contracts.  Following the designation of an
Executory Contract or Lease as an Assumed Contract, the Debtors will provide an Assumption
and Assignment Notice to each non-debtor counterparty to the Assumed Contracts (including the
Servicing Agreements) and all trustees that are parties to the Pooling and Servicing Agreements,
substantially in the form annexed hereto as Exhibit F and annexed to the Sale Procedures Order
as Exhibit A-3, setting forth (i) the proposed Cure Amount, if any and (ii) the procedures for
objecting to the proposed assumption and assignment of the Assumed Contract and the proposed
Cure Amount, if any.  Each non-debtor party to an Assumed Contract will receive notice as soon
as reasonably practicable to object to such assignment and/or cure amount.  Additionally, all
investors, to the extent known by the Sellers, will be provided with notice of the terms of the
proposed assumption and assignment of the relevant Assumed Contracts.

87.      Thus, the Debtors respectfully submit that by the conclusion of the Sale

Hearing, assumption and assignment of the Assumed Contracts should be approved.

**E.      Sufficient "Cause" Exists for Denying Credit Bidding to Qualified Bidders
Regarding the Nationstar Purchased Assets**

88.      Section 363(k) of the Bankruptcy Code permits secured lenders holding

"allowed claims" to credit bid and offset their claim against the purchase price of the property

sold if they are the successful bidder—unless the Court, "for cause," orders otherwise.[22]  The

Bankruptcy Code does not define "cause" under section 363(k).  "Cause" is "intended to be a

flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis."  In

re NJ Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J.

June 29, 2006); cf. In re Theroux, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) (noting there is no

absolute entitlement to credit bid.)  Credit bidding may be denied in the interest of any policy

advanced by the Bankruptcy Code, such as to ensure the success of the reorganization, or to

foster a competitive bidding environment.  3 COLLIER ON BANKRUPTCY ¶ 363.09[1] (Alan N.

Resnick & Henry J. Sommer eds., 16th ed.).

89.      Here, sufficient "cause" exists to exclude otherwise Qualified Bidders

from credit bidding, as specifically provided under the "Bid Requirements" and related "Bid

Proposal" provisions of the Sale Procedures.  First, in order for the Debtors to maximize value to

their estates, the Debtors seek approval of sale procedures that are designed to result in the

highest or best value for the Purchased Assets.  To that end, the Sale Procedures permit Qualified

Bidders to bid on various combinations of Purchased Assets pursuant to two asset purchase

---

[22] "At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. 363(k).

agreements, as described above.  The Debtors' capital structure is highly complex, and the

Nationstar Purchased Assets are subject to liens under five of the Debtors' credit facilities,

including the DIP Facility (as defined in the Financing Motions), AFI Senior Secured Facility,

AFI LOC, Citi MSR Facility, and the Junior Secured Notes.  As a result, allowing a bidder to

credit bid in these circumstances would introduce needless complexity into any auction process

and complicate the Debtors' ability to assess competing bids.

90.    Second, denying Qualified Bidders the opportunity to credit bid in these

unique circumstances is likely to be uncontroversial as the possibility for credit bidding is at best

remote.  AFI, the largest secured creditor in these Chapter 11 Cases, is theoretically the entity in

the best position to credit bid, and they have expressly agreed to waive such right.  Assuming

any junior lienholder had standing to credit bid, such lienholder would only have the opportunity

to credit bid if it satisfied any senior debt in full in cash — an unlikely scenario.  For these

reasons, "cause" exists to prohibit credit bidding on these facts as a means of furthering a robust

and fair auction process.

### F.    Anti-Assignment Provisions in the Assumed Contracts Should Be Deemed Unenforceable

91.    To assist in the assumption, assignment, and sale of the Assumed

Contracts, the Sale Approval Order with respect to the Nationstar APA should provide that

certain anti-assignment provisions shall not restrict, limit, or prohibit, the assumption,

assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable

anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

92.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign

executory contracts and Leases free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or
> unexpired lease of the debtor, or in applicable law, that prohibits,

> restricts, or conditions the assignment of such contract or lease, the
> trustee may assign such contract or lease under paragraph (2) of
> this subsection.

11 U.S.C. § 365(f)(1).

93.    Section 365(f) prohibits three distinct types of anti-assignment provisions

that are not enforceable in the context of assignments effected under section 365 of the

Bankruptcy Code:  (i) provisions that "prohibit" the assignment of an executory contract or

unexpired lease are unenforceable; (ii) provisions that seek to "restrict" the ability of a debtor to

assume and assign an executory contract or unexpired lease are not given effect; and

(iii) provisions that "condition" the ability of a debtor to assume and assign an executory contract

or unexpired lease are unenforceable.

94.    Section 365(f)(1), by operation of law, invalidates provisions that prohibit,

restrict, or condition assignment of an executory contract or unexpired lease.  See, e.g., Coleman

Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F.3d 904, 910-11 (9th Cir.

1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here

to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the

purposes of section 365").

95.    Section 365(f)(3) goes beyond the scope of section 365(f)(1) by

prohibiting enforcement of any clause creating a right to modify or terminate the contract or

lease upon a proposed assumption or assignment thereof.  11 U.S.C. § 365(f)(3).  See, e.g., In re

Jamesway Corp., 201 BR 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of

any lease clause creating right to terminate lease because it is being assumed or assigned, thereby

indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-

assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).  Many

courts have recognized that provisions that have the effect of restricting assignments cannot be

enforced.  See In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting

Section 365(f), courts and commentators alike have construed the terms to not only render

unenforceable lease provisions which prohibit assignment outright, but also lease provisions that

are so restrictive that they constitute de facto anti-assignment provisions."), aff'd, 209 F.3d 291

(3d Cir.), cert. denied, 531 U.S. 873 (2000).  Similarly, in In re Mr. Grocer, Inc., the court noted

that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code
> establishes that the court does retain some discretion in
> determining that lease provisions, which are not themselves *ipso
> facto* anti-assignment clauses, may still be refused enforcement in
> a bankruptcy context in which there is no substantial economic
> detriment to the landlord shown, and in which enforcement would
> preclude the bankruptcy estate from realizing the intrinsic value of
> its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).  Consequently, any anti-assignment provisions should

not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and

should be deemed and found to be unenforceable anti-assignment provisions within the meaning

of section 365(f) of the Bankruptcy Code.

**G.     No Consumer Privacy Ombudsperson Is Required**

96.     Section 363(b)(1) of the Bankruptcy Code states that if a debtor is selling

personally identifiable information ("PII") in bankruptcy and the debtor has a privacy policy in

place that limits the transfer of PII to unaffiliated parties, then a debtor must either (i) comply

with its privacy policies in connection with the sale, or (ii) a consumer privacy ombudsman must

be appointed.  11 U.S.C. § 363(b)(1).

97.     Separately, the Gramm-Leach-Bliley Act (the "GLBA"), as implemented

by rules made by the Consumer Financial Protection Bureau, requires that a financial institution

deliver to any individual with whom it has a "customer relationship," an annual notice describing

its practices with respect to the disclosure of PII to nonaffiliated third parties.  See 12 C.F.R.

1016.5.  The GLBA prohibits financial institutions from disclosing PII to non-affiliated third

parties, except as provided in their privacy notice.  See 12 C.F.R. 1016.10.  The GLBA,

however, specifically permits a financial institution to disclose PII to unaffiliated third parties

"[i]n connection with a proposed or actual sale, merger, transfer, or exchange of all or a portion

of a business or operating unit if the disclosure of [PII] concerns solely consumers of such

business or unit."  12 C.F.R. 1016.15(a)(6).  In this regard, the GLBA specifically permits the

disclosure of customer PII as part of the sale of a going concern.

        98.     Section 2.13 of the Nationstar APA notes that the sale, if any, of customer

lists, customer data and other consumer privacy information pursuant to the Nationstar APA is

subject to and shall conform to the recommendations of any consumer privacy ombudsperson

that may be appointed pursuant to section 332 of the Bankruptcy Code (the "Consumer Privacy

Ombudsperson").  As set forth in further detail in the Hamzehpour Declaration, the Debtors

maintain that in connection with the sale of the Purchased Assets pursuant to the Nationstar

APA, including the sale of Mortgage Loans and MSRs, the Debtors will be able to comply with

existing privacy policies in connection with the Sales.  The Debtors also maintain that the

disclosure of PII pursuant to the Nationstar APA will comply with the GLBA and the terms of

the privacy notices delivered by the Debtors to mortgage borrowers.  In turn, the Debtors believe

that borrower data can be disclosed in connection with the sale pursuant to the Nationstar APA

without the need for a Consumer Privacy Ombudsman.

## H.    Relief from the Fourteen-Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

        99.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless

the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the

expiration of 14 days after the entry of the order, unless the court orders otherwise." The

Debtors request that the Sale Procedures Order and the Sale Approval Orders be effective

immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and

6006(d) be waived.

100.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide

sufficient time for an objecting party to appeal before an order can be implemented. See

Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy

Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court

should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on

Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale

or other transaction to close immediately "where there has been no objection to the procedure."

10 COLLIER ON BANKRUPTCY ¶ 6004.11 (Alan N. Resnick & Henry J. Sommers eds., 16th ed.).

Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party

informs the court of its intent to appeal, the stay may be reduced to the amount of time actually

necessary to file such appeal. Id.

101.    The Debtors hereby request that the Court waive the fourteen-day stay

period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

102.    No trustee or examiner has been appointed in these Chapter 11 cases.

Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel:

(i) the Office of the United States Trustee for the Southern District of New York; (ii) the office

of the United States Attorney General; (iii) the office of the New York Attorney General; (iv) the

office of the United States Attorney for the Southern District of New York; (v) the Internal

Revenue Service; (vi) the Securities and Exchange Commission; (vii) each of the Debtors'

prepetition lenders, or their agents, if applicable; (viii) each of the indenture trustees for the

Debtors' outstanding notes issuances; (ix) AFI and its counsel; (x) the administrative agent for

the Debtors' proposed providers of debtor in possession financing and its counsel; (xi) Nationstar

Mortgage LLC and its counsel; and (xii) the parties included on the Debtors' list of fifty (50)

largest unsecured creditors.

103.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

dc-667294

## CONCLUSION

WHEREFORE the Debtors respectfully request that this Court (i) enter the

proposed Sale Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>; (ii) enter

the proposed Sale Approval Orders, substantially in the forms attached hereto as <u>Exhibits D and

E</u>; and (iii) grant such other and further relief as this Court deems just and proper.

Dated:  May 14, 2012
       New York, New York


/s/ Larren M. Nashelsky_____
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

dc-667294