MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | Chapter 11 |
| Debtors. | Jointly Administered |

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), AND (m), 365, 503, 507 AND 1123, AND FED R. BANKR. P. 2002, 6004, 6006, 9007, 9008, AND 9014 FOR ORDERS: (A)(I) AUTHORIZING AND APPROVING SALE PROCEDURES, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (II) SCHEDULING BID DEADLINE AND SALE HEARING; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF AND (B)(I) AUTHORIZING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENTS THERETO; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

# TABLE OF CONTENTS

**Page**

I.      THE SALE TRANSACTIONS ARE AN EXERCISE OF SOUND BUSINESS
        JUDGMENT AND SHOULD BE APPROVED ..................................................................... 2

        A.      The Sale Transactions Are the Only Alternative to Preserve Value and
                Finance the Debtors' Operations ......................................................................... 13

        B.      The Sale Transactions Are Also Justified Because They Avoid the Dire
                Consequences of a Liquidation ........................................................................... 13

        C.      The Debtors Have Satisfied All of the Other Section 363(b) Factors .................. 14

        D.      No Appointment of a Privacy Ombudsperson Is Required .................................. 18

II.     THE SALE TRANSACTIONS ARE ENTITLED TO THE PROTECTIONS
        PROVIDED BY SECTION 363(M) OF THE BANKRUPTCY CODE ......................... 19

III.    THE SALE TRANSACTIONS SHOULD BE APPROVED FREE AND CLEAR
        OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS ............. 21

IV.     THE SALE TRANSACTIONS ARE NOT A SUB ROSA PLAN ................................... 24

V.      THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
        CONTRACTS AND UNEXPIRED LEASES ARE NECESSARY TO
        EFFECTUATE THE SALE TRANSACTIONS ............................................................ 27

VI.     ANTI-ASSIGNMENT PROVISIONS IN CERTAIN OF THE ASSUMED
        CONTRACTS SHOULD NOT RESTRICT, LIMIT, OR PROHIBIT THE
        ASSUMPTION, ASSIGNMENT, AND SALE UNDER SECTION 365(F) .................. 31

VI.     THE COURT SHOULD WAIVE OR REDUCE THE PERIODS REQUIRED BY
        BANKRUPTCY RULES 6004(H) AND 6006(D) ......................................................... 31

# TABLE OF AUTHORITIES

**Page**

CASES

390 Park Avenue Assocs. v. Park Avenue Garage LLC (In re Park Avenue Garage, LLC),
   403 F. App'x. 555 (2d Cir. 2010) ............................................................... 28

410 Park Ave. Assocs. v. American Banknote Corp. (In re American Banknote Corp.),
   No. 99 B 11577, 2000 WL815910 (S.D.N.Y June 22, 2000) ................................. 20

Abel v. Shugrue (In re Ionosphere Clubs, Inc.),
   184 B.R. 648 (S.D.N.Y. 1995) .................................................................. 25

Abir v. Stern,
   No. 09 Civ. 2872, 2010 WL 1170060 (E.D.N.Y. March 22, 2010) ......................... 21

Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.),
   56 B.R. 186 (Bankr. N.D. Ga. 1986), aff'd, 805 F.2d 1515 (11th Cir. 1986)................. 23, 24

Aronson v. Lewis,
   473 A.2d 805 (Del. 1984)........................................................................ 6

Baker v. Latham Sparrowbush Assocs.,
   72 F.3d 246 (2d Cir. 1995) ..................................................................... 15

C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)
   92 B.R. 87 (Bankr. S.D.N.Y. 1988) ........................................................... 12

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),
   103 B.R. 524 (Bankr. D.N.J. 1989)............................................................ 29

Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),
   94 B.R. 343 (E.D. Pa. 1988) ................................................................... 22

Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K. Corp.),
   127 F.3d 904, 910 (9th Cir. 1997).............................................................. 31

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
   722 F.2d 1063 (2d Cir. 1983)............................................................ 4, 5, 7, 14, 27

Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.
(In re Johns-Manville Corp.),
   60 B.R. 612 (Bankr. S.D.N.Y. 1986) .......................................................... 5

# TABLE OF AUTHORITIES
## (continued)

Page

COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.),
524 F.3d 373 (2d Cir. 2008) ........................................................... 27

Dev. Co. of Am. V. Adamson Co. Inc. (In re Adamson Co. Inc),
159 F.3d 896 (4th Cir. 1998) ......................................................... 20

DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg.
Holdings, Inc.), 402 B.R. 87 (Bankr. D. Del. 2009) ............................... 31

Fla. Dep't of Revenue v. Piccadilly Cafeteria, Inc.,
554 U.S. 33 (2008) .................................................................. 3, 8

Futuresource LLC v. Reuters Ltd.,
312 F.3d 281 (7th Cir. 2002) ......................................................... 22

Hargrave v. Township of Pemberton (In re Tabone, Inc.),
175 B.R. 855 (Bankr. D.N.J. 1994) ................................................... 23

HSBC Bank USA Nat. Ass'n v. Calpine Corp. (In re Calpine Corp.),
No. 07 Civ. 3088 (GBD), 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) ............... 5

In re 995 Fifth Ave. Assoc., L.P.),
96 B.R. 24 (Bankr. S.D.N.Y 1989) .................................................... 10

In re Andy Frain Servs., Inc.,
798 F.2d 1113 (7th Cir. 1986) ......................................................... 8

In re Bidermann Indus. U.S.A., Inc.,
203 B.R. 547 (Bankr. S.D.N.Y 1997) .................................................. 12

In re Borders Group, Inc.,
453 B.R. 477 (Bankr. S.D.N.Y. 2011) ............................................... 4, 22

In re Boston Generating, LLC,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) ................................................. 14

In re Bygaph, Inc.,
56 B.R. 596 (Bankr. S.D.N.Y. 1986) .................................................. 30

In re Child World, Inc.,
142 B.R. 87 (Bankr. S.D.N.Y. 1992) .................................................. 28

In re Chrysler LLC,
576 F.3d 108 (2d Cir.), judgment vacated as moot, 175 L. Ed. 2d 614 (2009), appeal
dismissed, 592 F.3d 370 (2d Cir. 2010) ............................................... 7

# TABLE OF AUTHORITIES
### (continued)

**Page**

In re Chrysler LLC,
   405 B.R. 84 (Bankr. S.D.N.Y. 2009) ....................................................................... 23

In re Condere Corp.,
   228 B.R. 615 (Bankr. S.D. Miss. 1998) ................................................................... 25

In re Decora Indus., Inc.,
   No. 00-4459, 2002 WL 32332749 (D. Del. May 20, 2002).................................... 14

In re Del. & Hudson Ry. Co.,
   124 B.R. 169 (D. Del. 1991) .................................................................................... 14

In re Drexel Burnham Lambert Group, Inc.,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................................. 1, 2

In re Drexel Burnham Lambert Group, Inc.,
   960 F.2d 285 (2d Cir. 1992).................................................................................... 26

In re Drexel Burnham Lambert Group Inc.,
   995 F.2d 1138 (2d Cir. 1993) ................................................................................. 15

In re Dundee Equity Corp.,
   No. 89-B-10233, 1992 WL 53743 (Bankr. S.D.N.Y. Mar. 6, 1992) ................ 21, 22

In re Enron Corp.,
   No. 01-16034 (AJG), 2003 WL 21755006 (Bankr. S.D.N.Y. July 28, 2003) ........ 22

In re Fleming Cos.,
   499 F.3d 300 (3d Cir. 2007).................................................................................... 29

In re General Motors Corp.,
   407 B.R. 463 (Bankr. S.D.N.Y. 2009) .............................................................. 14, 25

In re Global Crossing Ltd.,
   295 B.R. 726 (Bankr. S.D.N.Y. 2003) ...................................................................... 4

In re Global Serv. Group, LLC,
   316 B.R. 451 (Bankr. S.D.N.Y. 2004) ...................................................................... 2

In re GSC, Inc.,
   453 B.R. 132 (Bankr. S.D.N.Y. 2011) ......................................................... 5, 22, 25

In re Hupp Indus., Inc.,
   140 B.R. 191 100 B.R. 670 (Bankr. N.D. Ohio 1992) ........................................... 10

iv

# TABLE OF AUTHORITIES
### (continued)

Page

In re Ionosphere Clubs, Inc.,
  100 B.R. 670 (Bankr. S.D.N.Y. 1989) ................................................................. 5, 28

In re Ionosphere Clubs, Inc.,
  98 B.R. 174 (Bankr. S.D.N.Y. 1989) ....................................................................... 2

In re Jamesway Corp.,
201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996) ................................................................. 32

In re Lehigh Valley Prof'l Sports Clubs, Inc.,
  No. 00-11296, 2000 WL 567905 (Bankr. E.D. Pa. May 5, 2000) ......................... 25

In re Lehman Bros. Holdings, Inc.,
  415 B.R. 77 (S.D.N.Y. 2009) .................................................................................... 7

In re Lion Capital Group,
  49 B.R. 163 (Bankr. S.D.N.Y. 1985) ...................................................................... 26

In re M. Fine Lumber Co.,
  383 B.R. 565 (Bankr. E.D.N.Y. 2008) .................................................................... 30

In re Marvel Entm't Group, Inc.,
  222 B.R. 243 (D. Del. 1998) ................................................................................... 25

In re Motors Liquidations Co.,
  No. 09-50026, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ............................................. 7

In re Naron & Wagner, Chartered,
  88 B.R. 85 (Bankr. D. Md. 1988) ........................................................................... 26

In re Natco Indus., Inc.,
  54 B.R. 436 (Bankr. S.D.N.Y. 1985) ...................................................................... 29

In re Old Carco LLC,
  406 B.R. 180 (Bankr. S.D.N.Y. 2009) .................................................................... 28

In re Quigley Co.,
  437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...................................................................... 5

In re Refco, Inc.,
  Case No. 05-60006 (Bankr. S.D.N.Y. Nov. 14, 2005) ............................................. 7

In re Rickel Home Ctrs., Inc.,
240 B.R. 826, 831 (D. Del. 1998) ........................................................................... 32

## TABLE OF AUTHORITIES
### (continued)

Page

In re Rock Indus. Mach. Corp.,
   572 F.2d 1195 (7th Cir. 1978) ............................................................................. 18

In re Sasson Jeans, Inc.
   96 B.R. 608 (S.D.N.Y. 1998) ............................................................................... 12

In re Spa Chakra,
   No. 09-17260, 2010 WL 779270 (Bankr. S.D.N.Y. March 5, 2010) ...................... 2

In re Sire Plan, Inc.,
   332 F.2d 497 (2d Cir. 1964) .................................................................................. 8

In re Smart World Tech. LLC,
   423 F.3d 166 (2d Cir. 2005) ................................................................................ 21

In re Steve & Barry's Manhattan LLC,
   Case. No. 08-12579 (Bankr. S.D.N.Y. Aug. 22, 2008) ........................................ 7

In re Tempo Tech. Corp.,
   202 B.R. 363 (D. Del. 1996) ............................................................................... 17

In re Trans World Airlines, Inc.,
   No. 01-00056, 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001) ..................... 8, 9, 24, 25, 27

In re Trans World Airlines, Inc.,
   322 F.3d 283 (3d Cir. 2003) ............................................................................... 23

In re Vitanza,
   No. 98-19611, 1998 WL 808629 (Bankr. E.D. Pa. Nov. 13, 1998) ...................... 30

In re White Motor Corp.,
   75 B.R. 944 (Bankr. N.D. Ohio 1987) ................................................................. 21

In re WorldCom, Inc.,
   No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .................... 2

Int'l Creditors of Cont'l Air Lines v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),
   780 F.2d 1223 (5th Cir. 1986) ............................................................................. 26

Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.),
   111 F.3d 269 (2d Cir. 1997) ........................................................................... 12, 18

## TABLE OF AUTHORITIES
### (continued)

Page

Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,
  141 F.3d 490 (3d Cir. 1998) ................................................................... 20

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
  126 F.3d 380 (2d Cir. 1997) ............................................................... 6, 18

Morrissey v. Brewer,
  408 U.S. 471 (1972) ............................................................................. 14

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),
  478 F.3d 452 (2d Cir. 2007) .................................................................... 4

Mullane v. Cent. Hanover Bank & Trust Co.,
  339 U.S. 306 (1950) ........................................................................ 14, 15

NLRB v. Bildisco & Bildisco,
  465 U.S. 513 (1984) .......................................................................... 1, 2

Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),
  78 F.3d 18 (2d Cir. 1996) ....................................................................... 28

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.
  (In re Integrated Res., Inc.),
  147 B.R. 650 (S.D.N.Y. 1992) ...................................................... 5, 6, 10, 11

Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.
  (In re Chateaugay Corp.),
  973 F.2d 141 (2d Cir. 1992) .................................................................... 4

Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun
  Elec. Power Coop, Inc.),
  119 F.3d 349 (5th Cir. 1997) ................................................................... 25

Official Unsecured Creditors' Comm. v. Stern (In a SPM Mfg. Corp.),
  984 F.2d 1305 (1st Cir. 1993) .................................................................. 25

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures),
  4 F.3d 1095 (2d Cir. 1993) ..................................................................... 28

Paramount Commc'ns, Inc. v. QVC Network Inc.,
  637 A.2d 34 (Del. 1994) .......................................................................... 6

PBGC v. Braniff Airways Inc. (In re Braniff Airways, Inc.),
  700 F.2d 935 (5th Cir.), reh'g denied, 705 F.2d 450 (5th Cir. 1983) ..................... 26

# TABLE OF AUTHORITIES
### (continued)

Page

Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Schools, Inc.),
No. 96 Civ. 3576, 1997 WL 188127 (S.D.N.Y April 16, 1997) ....................................... 12, 14

Reading Co. v. Brown,
391 U.S. 471 (1968) ................................................................................................................. 2

Ready v. Rice,
No. L 05-Civ. 3358, 2006 WL 4550188 (D. Md. Sept. 26, 2006) ........................................... 8

Richmond Leasing Co. v. Capital Bank, N.A.,
762 F.2d 1303 (5th Cir. 1985) .............................................................................................. 28

Roselink Investors LLC v. Shenkman,
386 F.Supp. 2d 209 (S.D.N.Y. 2004) ..................................................................................... 6

Rubinstein v. Alaska Pac. Consortium (In re New English Fish Co.),
19 B.R. 323 (Bankr. W.D. Wash. 1982) ................................................................................ 23

Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.),
872 F.2d 36 (3d Cir. 1989) .................................................................................................... 28

Sinclair Oil Corp. v. Levine,
280 A.2d 717 (Del.1971) ......................................................................................................... 6

Smith v. Van Gorkin,
488 A.2d 858 (Del.1971) ......................................................................................................... 5

Sulmeyer v. Karbach Enters., (In re Exennium, Inc.),
715 F.2d 1404 (9th Cir. 1993) ................................................................................................. 5

WBQ P'ship v. Commonwealth of Va. Dept. of Med. Assistance Servs. (In re WBQ
P'ship),
189 B.R. 97 (Bankr. E.D. Va. 1995) ...................................................................................... 18

# TABLE OF AUTHORITIES
### (continued)

Page

STATUTES

11 U.S.C.
§ 101 ................................................................................................................. 18
§ 105 ................................................................................................................... 1
§ 332 ................................................................................................................. 18
§ 363 ........................................................................................................... passim
§ 365 ........................................................................................................... passim
§ 503 ................................................................................................................... 9
§ 507 ................................................................................................................... 9
§ 1107(a) ............................................................................................................ 4
§ 1123 ................................................................................................................. 1


OTHER AUTHORITIES

7 COLLIER ON BANKRUPTCY ¶ 1100.01(Alan N. Resnick & Henry J. Sommer eds.,
     16th ed.) ....................................................................................................... 3, 14

Fed. R. Bankr. P. 2002 ......................................................................................... 1, 16

Fed. R. Bankr. P. 2003 ............................................................................................. 16

Fed. R. Bankr. P. 6004 ..................................................................................... 1, 4, 30

Fed. R. Bankr. P. 6006 ................................................................................ 1, 7, 30, 31

Fed. R. Bankr. P. 9014 ............................................................................................ 1, 7

H.R. Rep. No. 95-595, reprinted in, 1978 U.S.C.C.A.N. 5963 ....................................... 3

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, submit this Memorandum of Law in Support of the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m) 365, and 1123, and Fed R. Bankr. P. 2002, 6004, 6006, and 9014 (filed contemporaneously herewith, the "Sale Motion")[1] for entry of two orders to be considered at two hearings, as described more fully in the Sale Motion.

## PRELIMINARY STATEMENT

1.       The Debtors' decision to enter into the Sale Transactions represents an exercise of sound business judgment—the overriding consideration under section 363(b). Absent approval of the Sale Transactions, either under a Chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code, the Debtors will likely be forced to liquidate, yielding only a fraction of the value that the Purchased Assets have as a going concern.  Chapter 11— including section 363(b)—is designed, and repeatedly has been applied, to avoid this result. As noted in In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992), the "'fundamental purpose of reorganization is to prevent [the] debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.'" Id. at 760 (quoting NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)).

2.       The Sale Transactions provide a genuine opportunity for the Debtors to maximize value for all of their stakeholders.  For the reasons stated herein and in the Sale Motion, the Debtors request that this Court expeditiously approve the Sale Transactions.

---

[1]   Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the Sale Motion, the Whitlinger Affidavit filed contemporaneously with the Sale Motion, the Nationstar APA, and the AFI APA. Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief granted herein may refer to http://www.kccllc.net/rescap for additional information.

**STATEMENT OF FACTS**

3.      The Debtors refer this Court to, and expressly incorporate herein, the factual background set forth in (i) the Sale Motion; (ii) the Whitlinger Affidavit; (iii) the Greene Declaration; and (iv) the Hamzehpour Declaration.

**ARGUMENT**

**I.      THE SALE TRANSACTIONS ARE AN EXERCISE OF SOUND BUSINESS JUDGMENT AND SHOULD BE APPROVED**

4.      Avoidance of liquidation and preservation of going concern value, and the preservation of a business, jobs, and correlated interests, should be the objectives of any bankruptcy case.  See In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 759-60 (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)).  See also Reading Co. v. Brown, 391 U.S. 471, 475 (1968) ("[T]he words 'preserving the estate' include the larger objective . . . of operating the debtor's business with a view to rehabilitating it."); In re Spa Chakra, No. 09-17260, 2010 WL 779270 at *3 (Bankr. S.D.N.Y. March 5, 2010) ("[T]he sale of a going concern [pursuant to section 363] often fulfills the fundamental purpose of reorganization . . . .") (internal quotation marks omitted); In re Global Serv. Group LLC, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004) ("[C]hapter 11 is based on the accepted notion that a business is worth more to everyone alive than dead.") (citations omitted); In re WorldCom, Inc., No. 02-13533, 2003 WL 23861928, at *51 (Bankr. S.D.N.Y. Oct. 31, 2003) (same); In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) ("[T]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor.").

5.      The Sale Transactions will achieve the objectives of enhancing value

and preserving one of the nation's largest loan origination and servicing businesses, thereby

avoiding liquidation and, thus, comporting with the essential purpose of Chapter 11:

> The purpose of a business reorganization case, unlike a liquidation
> case, is to restructure a business's finances so that it may continue
> to operate, provide its employees with jobs, pay its creditors, and
> produce a return for its stockholders. *The premise of a business
> reorganization is that assets that are used for production in the
> industry for which they were designed are more valuable than
> those same assets sold for scrap.* Often, the return on assets that a
> business can produce is inadequate to compensate those who have
> invested in the business. Cash flow problems may develop, and
> require creditors of the business, both trade creditors and long-term
> lenders, to wait for payment of their claims. If the business can
> extend or reduce its debts, it often can be returned to a viable state.
> *It is more economically efficient to reorganize than to liquidate,
> because it preserves jobs and assets.*

H.R. Rep. No. 95-595, at 220, reprinted in, 1978 U.S.C.C.A.N. 5963, 6179 (emphasis added);

see also 7 COLLIER ON BANKRUPTCY ¶ 1100.01 (Alan N. Resnick & Henry J. Sommer eds.,16th

ed.) ("Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue

to operate and to reorganize its business rather than simply to liquidate a troubled business.

Continued operation may enable the debtor to preserve any positive difference between the going

concern value of the business and the liquidation value. Moreover, continued operation can save

the jobs of employees, the tax base of communities, and generally reduce the upheaval that can

result from termination of a business.").

6.      Against this backdrop, the authority for the Sale Transactions, which

enables the Debtors to sell certain assets as a going concern, rather than simply liquidating

them, is clear in the Bankruptcy Code and under the cases. See e.g., Fla. Dep't of Revenue v.

Piccadilly Cafeterias, Inc., 554 U.S. 33 n.2 (2008) (recognizing that debtors often sell

"substantially all [their] assets as a going concern" and then "submit[] for confirmation a plan

3

of liquidation . . . providing for the distribution of the proceeds resulting from the sale").

Specifically, section 363(b) authorizes a debtor to sell assets other than in the ordinary course

of business by providing, in relevant part, that "[t]he trustee, after notice and a hearing, may

use, sell or lease, other than in the ordinary course of business, property of the estate."

11 U.S.C. § 363(b)(1); see also 11 U.S.C. § 1107(a) (providing that debtors in possession have

"all the rights. . . of a trustee"); Fed. R. Bankr. P. 6004(f)(1) (providing that "[a]ll sales not in

the ordinary course of business may be by private sale or by public auction").

       7.         Although section 363(b) states the general principle that debtors in

possession may sell property of the estate outside of the ordinary course of business, section

363(b) does not set forth a standard for determining when it is appropriate for a court, in an

exercise of its sound discretion, to authorize such a sale or other disposition of a debtor's

assets.  Courts in the Second Circuit (and elsewhere) have required that the decision to sell

assets outside the ordinary course of business be based on the sound business judgment of the

debtor.  See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating

LLC), 478 F.3d 452, 466 (2d Cir. 2007) (holding that an asset sale under section 363(b) "is

permissible if the 'judge determining the . . . application expressly find[s] from the evidence

presented before [him or her] at the hearing [that there is] a good business reason to grant such

an application'") (quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),

722 F.2d 1063, 1071 (2d Cir. 1983)); Official Comm. of Unsecured Creditors of LTV

Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir.

1992) (same); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same);

In re Borders Group, Inc., 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011) (same); HSBC Bank

USA, Nat'l Ass'n v. Calpine Corp., No. 07 Civ. 3088 (GBD), 2010 WL 3835200, at *10

(S.D.N.Y. Sept. 15, 2010) (same); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (same); see also In re Lionel, 722 F.2d at 1069, 1071 (holding that, in considering a section 363(b) motion, "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," but must simply find a "good business reason" supporting the proposed transaction).

8.      Nor will courts second-guess a reasonably founded business judgment in the context of section 363(b).  As Judge Lifland stated in Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612 (Bankr. S.D.N.Y. 1986), "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Id. at 616.  See also In re GSC, Inc., 453 B.R. 132 (Bankr. S.D.N.Y. 2011) ("Courts give deference to the debtor as long as there is a reasonable basis for its business decision.") (internal quotations omitted).  When a valid business justification exists, the law vests the debtor's decision to sell or otherwise dispose of assets outside the ordinary course of business with a strong presumption that the debtor's management and directors, in approving the sale or other disposition, "'acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the Debtors.'"  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); In re Quigley Co., Inc., 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010); see also In re Integrated Res., 147 B.R. at 656 (holding that the Delaware business judgment rule has "vitality by analogy" in Chapter 11, especially where the debtor is a

Delaware corporation) (quotations omitted).  The burden of rebutting this presumption falls to

parties opposing the proposed exercise of a debtor's business judgment.  See In re Integrated

Res., 147 B.R. at 656 (citing Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)).  And that

burden is heavy indeed, for the business judgment rule defers to a board decision that can be

"attributed to any rational business purpose."  See Roselink Investors, LLC v. Shenkman, 386

F.Supp. 2d 209, 220 (S.D.N.Y. 2004) (quoting Paramount Commc'ns, Inc. v. QVC Network

Inc., 637 A.2d 34, 45 (Del. 1994)); see also Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720

(Del. 1971) ("A court under such circumstances will not substitute its own notions of what is or

is not sound business judgment.").  Here, the Debtors' exercise of business judgment is without

question in the best interests of the Debtors' estates.

## 1.    Proposed Timing

9.    Just as the decision to engage in a sale or other disposition at all is, in the

end, a business judgment, so, too, is the decision regarding the timing of that transaction.  See,

e.g., Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997)

(holding that an early sale is permissible "if a good business reason exists to support it")

(citation omitted).  Indeed, circumstances often exist where, and the courts repeatedly have

upheld debtors' business judgments that, such a transaction in the earliest days of a Chapter 11

case is necessary (and especially, as here, critical) to the ultimate success of the reorganized

business.  For example, courts frequently approve sales, in a wide range of businesses, where

the debtor's assets—and future prospects—are rapidly deteriorating.  In fact, courts in this

Circuit, on a number of occasions, have approved the sale or transfer of all or substantially all

of a debtor's assets in the very early stages of a Chapter 11 case.  See, e.g., Order

(I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase

Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (II) Authorizing

Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in

Connection with the Sale; and (III) Granting Related Relief, In re Motors Liquidations Co.,

Case No. 09-50026, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (approving sale of assets 34 days

after filing); In re Chrysler LLC, 576 F.3d 108 (2d Cir.), judgment vacated as moot, 175 L. Ed.

2d 614 (2009), appeal dismissed, 592 F.3d 370 (2d Cir. 2010) (approving sale of substantially

all of debtors' assets 32 days after filing); Bay Harbour Mgmt. v. Lehman Bros. Holdings Inc.

(In re Lehman Bros. Holdings Inc.), 415 B.R. 77, 86 (S.D.N.Y. 2009) (affirming bankruptcy

court's approval of sale of debtors' investment banking business three days after the filing of

sale motion); see also Order Pursuant to Section 105(a), 363 and 365 of the Bankruptcy Code

and Bankruptcy Rules 6004, 6006 and 9014 (i) Authorizing the Sale of Substantially all of the

Debtors' Assets, Free and Clear of Liens, Claims, Encumbrances and Other Interests;

(ii) Approving Asset Purchase Agreement; (iii) Authorizing the Assumption and Assignment

of Certain Executory Contracts and Unexpired Leases; (iv) Authorizing the Conduct of Store

Closing Sales; (v) Approving Agency Agreements; and (vi) Granting Related Relief,  In re

Steve & Barry's Manhattan LLC, Case. No. 08-12579 (Bankr. S.D.N.Y. Aug. 22, 2008)

(approving sale of debtors' entire retail business 45 days after filing); Order Authorizing the

Debtors to Sell the Regulated Commodities Futures Merchant Business and the Assumption

and Assignment of Certain Related Executory Contracts and Unexpired Leases, In re Refco,

Inc., Case No. 05-60006 (Bankr. S.D.N.Y. Nov. 14, 2005) (approving sale of regulated

commodities futures merchant bank 28 days after commencement of bankruptcy case).

      10.      Moreover, the Second Circuit has stressed that "perishability" of assets

is not the *sine qua non* for approval.  See In re Lionel, 722 F.2d at 1070 (specifically approving

the decision in In re Sire Plan, Inc., 332 F.2d 497, 499 (2d Cir. 1964)).  In In re Sire, the

debtors' sale of their principal asset—a partially completed hotel—was approved because,

according to the Second Circuit in Lionel, "a good business opportunity was presently

available, so long as the parties could act quickly."  In re Lionel, 722 F.2d at 1069.  *A fortiori*,

approval is appropriate where perishability *and* timing are substantial factors.  See, e.g., In re

Andy Frain Servs., Inc., 798 F.2d 1113, 1128 (7th Cir. 1986) (affirming sale order with respect

to substantially all of the debtor's assets where lower court, "under very difficult

circumstances, showed great concern for salvaging [the debtor] and protecting the jobs of its

numerous employees"); Ready v. Rice, No. L 05-Civ. 3358, 2006 WL 4550188, at *3 (D. Md.

Sept. 26, 2006) (the "fast deteriorating condition" of the debtor's property "called for a prompt

sale"); In re Trans World Airlines, Inc., No. 01-00056, 2001 WL 1820326, at *14 (Bankr. D.

Del. Apr. 2, 2001) ("Given TWA's precarious financial history, . . . a rejection or denial of the

Sale Motion would have resulted in an immediate and precipitous decline in the financial

affairs of TWA with a very high probability, if not certainty, of liquidation"); see also

Piccadilly, 544 U.S. at 57 ("[O]ne major reason why a transfer may take place before rather

than after a plan is confirmed is that the preconfirmation bankruptcy process takes time. . . .

And a firm (or its assets) may have more value (say, as a going concern) where a sale takes

place quickly. . . .  Thus, an immediate sale can often make more revenue available to creditors

or for reorganization of the remaining assets.") (Breyer, J., dissenting).

       11.      The public (and not merely the debtor's) interest in avoiding the

enormous impact of the failure of a major corporation also has been appropriately taken into

account not only by the boards of directors of Chapter 11 debtors, but also by courts

considering whether to approve proposed sale transactions.  As the court observed in In re

Trans World Airlines:

> [T]here is a substantial public interest in preserving the value of
> TWA as a going concern and facilitating a smooth sale of
> substantially all of TWA's assets to American.  This includes the
> preservation of jobs for TWA's 20,000 employees, the economic
> benefits the continued presence of a major air carrier brings to the
> St. Louis region, and preserving consumer confidence in purchased
> TWA tickets American will assume under the sale.  I also believe
> the Sale Order implements the public interest that favors an
> organized rehabilitation . . . of a financially distressed corporation
> which lies at the core of chapter 11.  I conclude that the alternative
> to the Sale Order in this case is a free-fall chapter 11 leading to a
> liquidation with the subsequent substantial disruption of diverse
> economic relationships and likelihood of material adverse harm to
> a very broad spectrum of creditor constituencies.

2001 WL 1820326, at *14.

## 2.    Break-Up Fee and Expense Reimbursement

12.    Nationstar and its advisors have made a substantial investment of time

and incurred substantial expenses in connection with the negotiation and the execution of the

Nationstar APA, and likely will continue to expend considerable time, energy, and resources

pursuing the purchase of the Nationstar Purchased Assets.  In light of the time, effort, and

resources expended to facilitate such a transaction, and the benefit that the Debtors' estates

received through Nationstar's submission of a stalking horse bid offer, the Debtors have agreed

to pay Nationstar the Break-Up Fee of $72 million with respect to all the Nationstar Purchased

Assets 8.44% of which is allocable to the Ginnie Mae MSRs with the remaining 91.56%

allocable to the remaining Nationstar Purchased Assets, plus reimbursement of Nationstar's

actual, reasonable out-of-pocket expenses incurred in pursuit of the transaction subject of the

Nationstar APA under the terms set forth in the Nationstar APA.  The Break-Up Fee and

Expense Reimbursement shall be treated as an administrative expense with priority pursuant to

9

sections 503(b) and 507(a)(2) of the Bankruptcy Code.  Under the Nationstar APA, the Break-Up Fee and Expense Reimbursement is made in consideration for Nationstar serving as the "'stalking-horse" bidder and agreeing to effect the purchase of the Nationstar Purchased Assets and assumption of the Assumed Liabilities.

13.     Establishing the Break-Up Fee and Expense Reimbursement is a sound exercise of the Debtors' business judgment as the Break-Up Fee will enhance the Debtors' ability to maximize the value of the Nationstar Purchased Assets for the benefit of its creditors. Nationstar's participation as stalking-horse bidder will ensure that the Sale Transaction realizes the most value for the Nationstar Purchased Assets.

14.     Break-up fees and expense reimbursements are a normal and, in many cases, necessary components of significant sales conducted under section 363 of the Bankruptcy Code: "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation ha[s] a duty to encourage bidding, breakup fees can be necessary to discharge [such] duties to maximize values." In re Integrated Res., Inc., 147 B.R. at 659-60.  Specifically, "break-up fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted).  Accord In re Integrated Res., Inc., 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

15.    Bankruptcy courts have approved payments similar to the Break-Up Fee and Expense Reimbursement under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing, (ii) the break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable.  In re Integrated Res., Inc., 147 B.R. at 656-57.

16.    The requested Break-Up Fee and Expense Reimbursement was negotiated by the parties in good faith and at arm's length, primarily through counsel.  With respect to encouraging competitive bidding, the Debtors have been seeking to sell the Nationstar Purchased Assets as a going concern for months, including through negotiations with various parties and brokers.  The Sale Procedures and the APAs are designed to maximize the value paid for the Nationstar Purchased Assets by subjecting the value of the Purchased Assets to market testing and permitting prospective purchasers to bid on the Purchased Assets, and allowing for termination of the Nationstar APA between the Debtors and the Nationstar, or the AFI APA between the Debtors and AFI and BMMZ, in the event of a Competing Transaction.

17.    Should the Sale Transaction pursuant to the Nationstar APA yield an Auction with a higher bid than Nationstar's bid, then it will be because of, and not in spite of, Nationstar's bid.  The requested Break-Up Fee and Expense Reimbursement—which is a condition of the Nationstar APA—therefore will necessarily encourage bidding and will ensure that only serious interested purchasers participate at the Auction.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Nationstar Purchased Assets will be fair and reasonable.

### 3. Good Faith Sale to Insider

18. When evaluating sales to insiders, the Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders").

19. Courts in this circuit and others have considered whether the sale involved full disclosure to the court and to the parties involved in the proceeding.  Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Schools, Inc.), No. 96 Civ. 3576, 1997 WL 188127, at *4 (S.D.N.Y. April 16, 1997) ("[A ]debtor-in-possession who proposes a sale of all of its assets to an insider must fully disclose the relationship between the buyer and seller."); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (where court was "hard pressed" to find bad faith when challenged relationship between bidder and debtor "was fully disclosed to the Bankruptcy Court").

20. Despite AFI's status as an "insider," the sale of the AFI Purchased Assets, under applicable heightened scrutiny, is still in "good faith."  See In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ("sales to fiduciaries in chapter 11 cases are not per se prohibited, but [they] are necessarily subjected to heightened scrutiny.") (quoting C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.), 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988)).

21.     The AFI APA was negotiated at arm's length in good faith.  In negotiating its APA, AFI sought to conform its APA to that of the Nationstar APA.  Both the Nationstar APA and the AFI APA were unanimously approved by the Debtors' Board of Directors, which is composed of a majority of independent directors.  The AFI APA does not contain special treatment for the Debtors, the Debtors' estates, AFI, BMMZ, or their respective affiliates and insiders, and it specifically provides for overbids, as set forth in Section 7.1

A.      **The Sale Transactions Are the Only Alternative to Preserve Value and Finance the Debtors' Operations**

22.     As discussed above and at length in the Sale Motion, the Whitlinger Affidavit, and the Greene Declaration, given the Debtors' current financial posture, the Debtors are unable to continue operating their businesses absent the Sale Transactions.

23.     The Sale Transactions are the *only* alternative to a liquidation, and the only means of enabling the sale of the Purchased Assets and continuing the Debtors' operations as part of an immediately viable going concern.

B.      **The Sale Transactions Are Also Justified Because They Avoid the Dire Consequences of a Liquidation**

24.     The Sale Transactions are critical to the Debtors' ability to curb increasing revenue erosion and maintain vital integrated relationships with various regulatory agencies, including the GSEs and Ginnie Mae, existing and potential customers, investors, and current and former employees.  For example, a protracted bankruptcy process, among other things, would (i) put at risk the near-term liquidation of one of the nation's largest loan servicing and origination businesses; and (ii) minimize the value of the Purchased Assets, which would have significant economic consequences, not only to the Debtors' customers and employees, but also to the entire mortgage servicing industry.

dc-667354

25.      The Sale Transactions, pursuant to which the Successful Bidders would continue to operate the Debtors' business free of any taint of bankruptcy (in exchange for consideration to the Debtors), is intended to address the foregoing concerns.  In particular, the Sale Transactions maximize the value of the Debtors' businesses for the benefit of all of the Debtors' economic stakeholders.

### C.      The Debtors Have Satisfied All of the Other Section 363(b) Factors

26.      Given the Debtors' sound business justification for the proposed sale, the inquiry turns to whether: (i) adequate and reasonable notice of the sale has been provided to interested parties; (ii) the purchase price is fair and reasonable; and (iii) the sale has been proposed in good faith.  See In re Lionel, 722 F.2d at 1070;  In re Boston Generating, LLC, 440 B.R. 302, 330 (citing In re Gen. Motors Corp., 407 B.R. 463, 493-94, (Bankr. S.D.N.Y. 2009)); In re Betty Owens, 1997 WL 188127, at *4; accord In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *3 (D. Del. May 20, 2002).  See also 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("[T]o obtain approval in a chapter 11 case before confirmation of a plan of a sale of substantially all of the assets of the estate, the trustee must show a sound business reason, that there has been adequate and reasonable notice and that the sale has been proposed in good faith.  These factors are considered to assure that the interests of all parties in interest are protected and that the sale is not for an illegitimate purpose.").  These factors are all satisfied here.

27.      As to the adequacy of notice, the U.S. Supreme Court has repeatedly emphasized the flexibility of the due process requirement.  See Morrissey v. Brewer, 408 U.S. 471, 481 (1972) ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular

situation demands.").  An "elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); see also Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 254 (2d Cir. 1995) ("If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended."); In re Drexel Burnham Lambert Grp. Inc., 995 F.2d 1138, 1144 (2d Cir. 1993) ("[T]he Due Process Clause requires the best notice practical under the circumstances . . . .").  Constitutional requirements of due process will have been satisfied if notice was given with "due regard for the practicalities and peculiarities of the case."  Mullane, 339 U.S. at 314-15.

28.    No trustee or examiner been appointed in these Chapter 11 cases. Accordingly, pursuant to the Debtors' proposed notice procedures, the Debtors intend to serve notice of the Sale Motion, and an opportunity to be heard with respect to the same, on:

- the Office of the United States Trustee for the Southern District of New York;

- the attorneys for the U.S. Treasury;

- the attorneys for ResCap's prepetition secured credit facilities;

- the attorneys for the agent under the Debtors' prepetition amended and restated secured revolving credit agreement;

- the attorneys for the statutory committee of unsecured creditors appointed in the Debtors' Chapter 11 cases (the "Creditors' Committee") (if no statutory committee of unsecured creditors has been appointed, the holders of the fifty largest unsecured claims against the Debtors on a consolidated basis);

- the attorneys for the ad hoc bondholders' committee;

- the attorneys for the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association,

- any party who, in the past year, expressed in writing to the Debtors an interest in the Purchased Assets and who the Debtors and their representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transaction contemplated in the APA;

- each non-debtor counterparty to the Assumed Contracts, any known third party beneficiaries to such Assumed Contracts, all trustees, certificateholders, investors, rating agencies, mortgage insurers and any parties to any pooling and servicing agreements, assignment, assumption and recognition agreements, Servicing Agreements, subservicing agreements or similar agreements;

- all parties who are known to have asserted or believed by Debtors to hold any lien, claim, encumbrance, or interest in or on the Purchased Assets;

- the Securities and Exchange Commission

- the Internal Revenue Service

- all applicable state attorneys' general, and local authorities

- all applicable state and local taxing authorities

- the Federal Trade Commission,

- the United States Department of Justice

- the United States Attorney's Office

- the office of the New York Attorney General, and

- all entities that requested notice in these Chapter 11 cases under Bankruptcy Rule 2002.

29.     In addition, the Debtors propose, pursuant to Bankruptcy Rules 2003(d) and 2002(l), that publication notice with respect to the Sale Motion be effected in the global edition of the *Wall Street Journal* and the national edition of the *New York Times*, as well as on the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants, at http://www.kccllc.net/rescap.  The Debtors submit that no other or further notice need be given, particularly given the publicity that, for months, has surrounded, among other things, the Debtors' financial challenges and the Debtors' consideration of its strategic options—not to

mention the publicity attendant to the commencement of the Debtors' Chapter 11 cases.[2]  In

fact, given such publicity, the Debtors also submit that their proposed Sale Procedures that

govern the submission of any competing offers based on the APAs are also appropriate and,

under the circumstances, will enable the Debtors to realize the maximum value from the sales

of the Purchased Assets.

30.    Further, the Debtors seek to have the Sale Hearing scheduled for a date

during the week of October 15, 2012, or such other date before October 31, 2012 that the Court

holds the confirmation hearing on the Debtors' Chapter 11 plan.

31.    As to the sufficiency of the purchase price under the APAs, the Sale

Procedures will enable the Debtors to realize the greatest value for the Purchased Assets.  See,

e.g., In re Tempo Tech. Corp., 202 B.R. 363, 370 (D. Del. 1996) (dismissing appeal from

bankruptcy court's approval of sale of substantially all of Chapter 11 debtor's assets and

holding that "[w]ithout a sizable pool of potential buyers, with only one buyer willing to

negotiate terms of a purchase, and the [d]ebtor's severe cash flow predicament, the bankruptcy

court did not err when it approved the sale," which it agreed was negotiated in good faith;

"combined with the [d]ebtor's cash crunch, the lack of other companies engaged in th[e]

industry weighed heavily in justifying an expeditious sale . . . as a going concern.").

32.    Finally, the sale of the Purchased Assets is in good faith.  In the Second

Circuit, "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course

---

[2] See Dakin Campbell, Ally Gets Treasury Nod for ResCap as U.S. Seeks Repayment, BLOOMBERG (May 8, 2012), http://bloomberg.com; Dakin Campbell and Jeffrey McCracken, Ally Financial's ResCap is Said to Discuss Buyout with Fortress Investment, BLOOMBERG (March 9, 2012), http://bloomberg.com; Josh Kosman and MarkDeCambre, Fortress in Talks to Buy Ally Bank's ResCap Mortgage Unit, NEW YORK POST (March 9, 2012), http://nypost.com; Jeffrey McCracken, Dakin Campbell and Zachary R. Mider, Ally's ResCap Said to Seek Buyers for Prearranged Bankruptcy, BLOOMBERG (Feb. 8, 2012), http://bloomberg.com; Shira Ovide, ResCap Possible Bankruptcy: By the Numbers, WALL STREET JOURNAL (DEAL JOURNAL) (November 8, 2011), http://blogs.wsj.com/deals/2011/11/08/rescap-possible-bankruptcy-by-the-numbers/?blog_id=6&post_id=35459.

of the sale proceedings; where there is lack of such integrity, a good faith finding may not be made." The Sale Transactions are the result of arm's length, good faith negotiations by and between the Debtors and Nationstar, and the Debtors and AFI. Greene Declaration ¶ 39. Moreover, the Debtors, despite significant efforts, have been unable to identify any viable alternative to the Sale Transactions, either inside or outside of Chapter 11, and therefore made the reasonable business judgment to negotiate the APAs and sell the Purchased Assets. The APAs are also the "product of an arm's length transaction," WBQ P'ship v. Commonwealth of Va. Dept. of Med. Assistance Servs.(In re WBQ P'ship), 189 B.R. 97, 102, 103 (Bankr. E.D. Va. 1995), that encompassed negotiated concessions from AFI and Nationstar. See also In re Gucci, 126 F.3d at 390 (holding that good faith is destroyed by "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders'"—but not by "hard bargaining" by the purchaser) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)); In re Colony Hill Assocs., 111 F.3d at 276 (same).

### D.    No Appointment of a Privacy Ombudsperson Is Required

33.    Under section 363(b)(1) of the Bankruptcy Code, if the sale of consumer information containing "personally identifiable information" (as defined in Bankruptcy Code section 101(41A)) relating to individual persons does not comply with the Debtors' consumer privacy policy, a consumer privacy ombudsperson should be appointed in accordance with section 332 of the Bankruptcy Code. 11 U.S.C. § 363(b)(1)(B). The Debtors have provided certain privacy policies to consumers that govern the disclosure of "personally identifiable information" to unaffiliated third parties. As detailed in the Hamzehpour Declaration, the Debtors' disclosure of personally identifiable information pursuant to the Sale Transactions is in compliance with the Gramm-Leach-Bliley Act and is consistent with the privacy notices

delivered by the Debtors to mortgage borrowers.  For these reasons, and the reasons set forth in

the Hamzehpour Declaration, no consumer privacy ombudsperson is necessary under section

363(b)(1) of the Bankruptcy Code.  See In re New Century TRS Holdings, Inc., Case No. 07-

10416 (KJC), Transcript of Hearing Held on April 12, 2007; 32:8-33:8 (no privacy

ombudsman appointed as transfer of information was in compliance with privacy policy and

disclosure was in connection with sale of loans); In re Am. Home Mortg. Holdings, Inc., Case

No. 07-11047 (CSS), Transcript of Hearing Held on August 20, 2007; pp. 3:20-5:15.

II.    **THE SALE TRANSACTIONS ARE ENTITLED TO THE PROTECTIONS
       PROVIDED BY SECTION 363(m) OF THE BANKRUPTCY CODE**

34.    The Successful Bidders (or Next-Highest Bidders) are acting in good

faith and are entitled to the benefits and protections provided by section 363(m) of the

Bankruptcy Code in connection with the Sales.

Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) ... of this section of a sale . . . of property does not
> affect the validity of a sale ... under such authorization to an entity
> that purchased . . . such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code thus protects the purchaser of

assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that the purchaser will

lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

35.    Courts in this circuit and others have indicated that section 363(m) of the

Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under

Bankruptcy Code section 365.  The assignment of an unexpired lease is a "use, sale, or lease of

property" governed by section 363 of the Bankruptcy Code and entitled to the protections of

363(m).  See 410 Park Ave. Assocs., L.P. v. Am. Banknote Corp. (In re Am. Banknote Corp.),

No. 99 B 11577, 2000 WL 815910, at *2 (S.D.N.Y. June 22, 2000) (quoting Krebs Chrysler-

Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 498 (3d Cir. 1998).  See also Dev. Co. of

Am. v. Adamson Co. Inc. (In re Adamson Co. Inc.), 159 F.3d 896 (4th Cir. 1998); Sulmeyer v.

Karbach Enters., (In re Exennium, Inc.) 715 F.2d 1401 (9th Cir. 1993).  In Krebs, the Court

considered "whether assignments of [certain automobile dealership] franchises under section

365 are also sales of estate property subject to section 363(m)."  Id. at 497.  Despite the

absence of an explicit reference to assignments of executory contracts under Section 365 of the

Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code

protected an assignment of a debtor's interest in certain automobile franchise agreements

pursuant to an auction sale.  141 F.3d at 498.  Similarly, in In re American Banknote Corp., the

district court affirmed the bankruptcy court's finding that the assignee of a lease was entitled to

the good faith protections of section 363(m) of the Bankruptcy Code, as the unexpired lease

was property of the estate assignable under section 363, and not restricted by the mechanics of

the sale provisions of section 365.  2000 WL 815910, at *2

   36. Like the franchise agreements protected in Krebs and the lease protected

in In re American Banknote Corp., the Assumed Contracts are executory contracts that may be

assumed and assigned pursuant to section 365 of the Bankruptcy Code.  In light of In re

American Banknote Corp. and Krebs, section 363(m) applies to protect the Successful Bidders

(or Next-Highest Bidders) with respect to the Assumed Contracts.

   37. Because the terms and provisions of the Nationstar APA were negotiated

by the Sellers and Nationstar at arm's length, without collusion, and in good faith, and the

terms and provisions of the AFI APA were negotiated by the Sellers and AFI at arm's length,

without collusion, and in good faith, the Successful Bidders (or Next-Highest Bidders) are

entitled to the protections of 363(m).

### III.    THE SALE TRANSACTIONS SHOULD BE APPROVED FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS

38.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell

property of the estate under section 363(b) "free and clear of any interest in such property of an

entity other than the estate" if any one of the following conditions is satisfied:[3]

- applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See In re Smart World Techs., LLC, 423 F.3d 166, 169 n.3 (2d Cir. 2005);

In re Borders Grp Inc., 453 B.R. at 483; Abir v. Stern, No. 09 Civ. 2872, 2010 WL 1170060, at *

169, n. 2 (E.D.N.Y. March 22, 2010) ("Section 363 permits sales of assets free and clear of

claims and interests.  It thus allows purchasers . . . to acquire assets [from a debtor] without any

Debtors' liabilities."); ("Section 363(f) is in the disjunctive, such that the sale of the interest

concerned may occur if any one of the conditions of § 363(f) have been met.") (quoting In re

---

[3] Likewise, section 1123(a)(5)(D) provides for the sale of assets under a chapter 11 plan free of any liens and interests.

Dundee Equity Corp., No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992)).[4]

39.    Pursuant to the Sale Motion, the Debtors request that this Court authorize the Sale Transactions free and clear of all liens, claims, encumbrances, and other interests, other than the liabilities expressly assumed by the Purchasers, as set forth in the Nationstar APA (the "Assumed Liabilities").  The Sale Transactions will satisfy section 363(f) because any entities holding an interest in the Purchased Assets will have received notice and have been afforded a sufficient opportunity to object to the requested relief.  Any such entity that does not object should be deemed to have consented.  As the Seventh Circuit explained in Futuresource LLC v. Reuters Ltd., 312 F.3d 281 (7th Cir. 2002):

> It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.

Id. at 285-86 (internal citations omitted) (emphasis in original); see also In re GSC, Inc., 453 B.R. 132, 183 (Bankr. S.D.N.Y. 2011) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)); In re Enron Corp., No. 01-16034 (AJG), 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (same); In re Borders Grp, Inc., 453 B.R. at 484 (citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (failure to object to sale free and clear of liens, claims, and encumbrances satisfies

---

[4] In addition, section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to "issue any order . . . that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a); and that authority, separate and apart from section 363(f), extends to the approval of asset sales free and clear of all claims and liabilities.  See, e.g., In re White Motor Corp., 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (holding that the court's power to approve a sale free and clear of tort claims originated from section 105(a), rather than section 363(f), subject only to the limits on the court's power to discharge claims under section 1141).

dc-667354

section 363(f)(2)); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858

(Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims, and encumbrances

satisfies section 363(f)(2)).  As such, to the extent that no party holding a lien, claim,

encumbrance, or other interest objects to the relief requested in the Sale Approval Orders, the

sale of the Purchased Assets free and clear of all such interests, except for any expressly assumed

liabilities, satisfies section 363(f)(2).

　　　　　40.　　Moreover, to the extent a specific lien, claim, encumbrance, or other

interest does not satisfy the consent requirement of section 363(f)(2), such lien, claim,

encumbrance, or other interest satisfies one or more of the other conditions set forth in section

363(f) and will be adequately protected by attachment to the net proceeds of the sale, or

interest will be adequately protected by attachment to the net proceeds of the sale, subject to

any claims and defenses the Debtors may possess with respect thereto.  For example, each of

the parties holding liens on the Purchased Assets could be compelled to accept a monetary

satisfaction of such interests, satisfying sections 363(f)(5).

　　　　　41.　　In addition, the Purchased Assets may be sold free and clear of all

successor liability claims.  Notwithstanding reference to the conveyance free and clear of "any

interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's

assets free and clear of successor liability claims, as well.  See, e.g., In re Trans World

Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f)

barred successor liability claims for employment discrimination and rights under travel

voucher program); see also In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) (sale

of assets pursuant to section 363(f) extinguished any potential state successor or transferee

liability claims); Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186,

189-90 (Bankr. N.D. Ga. 1986) (sale pursuant to section 363(f) barred successor liability for product defects claims), aff'd, 805 F.2d 1515 (11th Cir. 1986); Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.), 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations).

42.    Accordingly, the Purchased Assets should be transferred to the Purchasers free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, and other than the Assumed Liabilities, with such interests to be transferred and to attach to the net sale proceeds from the Purchased Assets or satisfied as may be agreed upon by the parties.

## IV.    THE SALE TRANSACTIONS ARE NOT A *SUB ROSA* PLAN

43.    Although it is contemplated that the Sale Transactions will be approved in connection with a Chapter 11 plan, the APAs neither dictate the terms of a plan of reorganization nor restructure the rights of creditors.  In the unlikely event that the Debtors are unable to confirm a Chapter 11 plan by the dates set forth in the Plan Support Agreements(s) and the Debtors seek approval of the Sales under section 363 of the Bankruptcy Code, courts have made clear that a section 363(b) sale transaction is not objectionable as a *sub rosa* plan based on the fact that the purchaser is to assume some but not all of the debtor's liability, or because some creditors may benefit disproportionately compared with others whose claims are not being assumed by the purchaser.  See, e.g., In re Chrysler LLC, 405 B.R. at 71-73, aff'd, No. 09-2311-bk, 2009 WL 2382766 (2d Cir. Jun. 5, 2009), temporary stay vacated and further stay denied, 129 S.Ct. 2275 (Jun. 9, 2009); In re Trans World Airlines, Inc., 2001 WL 1820326, at *11 (Bankr. D. Del. Apr. 2, 2001).  As explained in In re Trans World Airlines:

[N]othing in section 363 suggests that disparate treatment of creditors, such as is likely to occur here, disqualifies a transaction from court approval. The purpose of a section 363(b) sale is to transform assets . . . into cash in an effort to maximize value. *Distribution of the value generated in accordance with section 1129 and other priority provisions occurs and is intended to occur subsequent to the sale.*

*    *    *

The treatment of creditors in a section 363(b) context is dictated by the fair market value of those assets of the debtor that the purchaser in its business judgment elects to purchase. A purchaser cannot be told to assume liabilities that do not benefit its purchase objective. *Thus, the disparate treatment of creditors occurs as a consequence of the sale transaction itself and is not an attempt by the debtor to circumvent the distribution scheme of the Code.*

Id. (emphasis added).

44.    Courts in this and other jurisdictions have long considered whether a preconfirmation sale transaction constitutes a *sub rosa* plan of reorganization, and have suggested various factors that aid in that determination—but *none* of those factors exist here. See, e.g., In re GSC, Inc., 453 B.R. at 179 (where aspects of transaction seek to allocate distribution of proceeds or dictate terms of plan); Abel v. Shugrue (In re Ionosphere Clubs, Inc.), 184 B.R. 648, 654 & n.6 (S.D.N.Y. 1995) (same); Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop, Inc.), 119 F.3d 349, 354 (5th Cir. 1997) (settlement disposing of all claims; restriction upon creditors' right to vote; disposition of virtually all assets); Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1317 (1st Cir. 1993) (agreement to vote for particular plan); In re Lehigh Valley Prof'l Sports Clubs, Inc., No. 00-11296, 2000 WL 567905, at *6 (Bankr. E.D. Pa. May 5, 2000) (transactions or agreements fixing terms of plan by securing court's imprimatur on preconfirmation motions without protections afforded creditors through confirmation process); In re Marvel Entm't Grp, Inc., 222 B.R. 243, 251 (D. Del. 1998) (all

dc-667354

parties must be given opportunity to litigate details of reorganization plan); In re Condere

Corp., 228 B.R. 615, 626-29 (Bankr. S.D. Miss. 1998) (term sheet dictating allocation of sale

proceeds among secured and priority claimants; requirement of creditors to cast votes for or

dictate terms of any plan; deal contingent upon concessions by creditors; and requirement of

waiver of claims by independent creditors).  See also In re General Motors Corp., 407 B.R. at

495-96 (holding that a transaction was not a *sub rosa* plan where it did not "dictate the terms of

the ensuing plan or constrain parties in exercising their confirmation rights" or "seek to

allocate or dictate the distribution of sale proceeds among different classes of creditors" but

merely "brings in value").

      45.      Accordingly, while the Debtors recognize that a sale of assets may not

be approved where such sale dictates the terms of a plan of reorganization, thereby denying

creditors the procedural protections of the plan process, see Inst. Creditors of Cont'l Air Lines

v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.), 780 F.2d 1223, 1227-28 (5th Cir. 1986);

PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 939 (5th Cir.),

reh'g denied, 705 F.2d 450 (5th Cir. 1983), that is not what the Debtors propose.  Rather, the

APAs provide for a sale: the Debtors will sell and assign assets; and the Purchasers, in

exchange, will provide consideration consisting of cash and assumption of liabilities and stock.

Such consideration unquestionably is the highest and best available, and of far more value than

the Debtors' refusing to sell and simply liquidating.

      46.      The Sale Transactions are solely geared towards maximizing value for

the benefit of creditors and in no way affect creditors' full protections under the Bankruptcy

Code to assert their claims and participate in the Sale Procedures Hearing or in the proposed

plan process.  See In re Naron & Wagner, Chartered, 88 B.R. 85, 88 (Bankr. D. Md. 1988)

(holding that the "sale proposed here is not a sub rosa plan because it seeks only to liquidate assets, and the sale will not restructure [the] rights of creditors"); cf. In re Lion Capital Grp, 49 B.R. 163, 177 (Bankr. S.D.N.Y. 1985) (settlement agreement did not dictate terms of plan of reorganization where it "frees up assets for an estate and permits formulation of a plan"). See also In re Drexel Burnham Lambert Grp, Inc., 960 F.2d 285, 293 (2d Cir. 1992) (emphasizing the discretion vested in the court in approving a transaction outside of, but that paves the way for, a plan of reorganization and, thus, "is unquestionably an essential element of [the] ultimate reorganization"); In re Lionel, 722 F.2d at 1071 (noting that a debtor may take action, despite an allegation that the action deprives a party in interest of essential protections under Chapter 11 (i.e., the safeguards of disclosure, voting, acceptance, and confirmation), if there is an articulated business justification); accord In re Trans World Airlines, 2001 WL 1820326, at *12 ("It is true, of course, that TWA is converting a group of volatile assets into cash. It may also be true that the value generated is not enough for a dividend to certain groups of unsecured creditors. It does not follow, however, that the sale itself dictates the terms of TWA's future Chapter 11 plan. The value generated through the Court approved auction process reflects the market value of TWA's assets and the conversion of the assets into cash is the contemplated result under § 363(b).").

## V.   THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES ARE NECESSARY TO EFFECTUATE THE NATIONSTAR SALE TRANSACTION

47.     As stated above, to facilitate and effect the sale of the Purchased Assets under the Nationstar APA, the Debtors also seek authority to assume and assign certain contracts and unexpired leases (the "Assumed Contracts"). Section 365 of the Bankruptcy Code allows the debtor to maximize the value of its estate by assuming and assigning executory contracts and unexpired leases that benefit the estate and by rejecting those that do

not.  11 U.S.C. § 365(a); see COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.), 524 F.3d 373, 382 (2d Cir. 2008).  Section 365 authorizes the proposed assumptions and assignments, provided that any defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  See 11 U.S.C. § 365(f)(2).

48.    The "business judgment" test is the standard applied by courts in determining whether an executory contract or unexpired lease should be assumed.  See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993); 390 Park Ave Assocs. v. Park Ave Garage LLC (In re Park Ave Garage, LLC), 403 F. App'x. 555, 557 (2d Cir. 2010); In re Old Carco LLC, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").  Thus, the assumption of a contract under section 365 should be approved if the court finds that the debtor has exercised its sound business judgment in determining that such assumption is in the best interests of its estate.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. at 673.

49.    Section 365(b) requires that a debtor in possession meet certain requirements to assume an executory contract or unexpired lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

dc-667354

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).[5]  The Notice of Assumption and Assignment sets forth the cure amounts the

Debtors believe are required to be paid—pursuant to section 365 in connection with the

assumption and cure of the Assumed Contracts ("Cure Amounts"), which the parties to such

contracts will have ample opportunity to contest.

50.    Moreover, pursuant to section 365(f)(2), a debtor in possession may

assign an executory contract or unexpired lease of nonresidential property if:

(A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a

"practical, pragmatic construction" based on "the facts of the proposed assumption."  In re

Fleming Cos., 499 F.3d 300, 307 (3d Cir. 2007); Carlisle Homes, Inc. v. Azzari (In re Carlisle

---

[5] This section does not apply to a default that is a breach of a provision relating to:

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

(Footnote continues on next page.)

29

Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) ("Although no single solution will satisfy

every case, the required assurance will fall considerably short of an absolute guarantee of

performance."); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean absolute assurance that debtor will

thrive and pay rent).

51.    Adequate assurance may be given by demonstrating, among other

things, the assignee's financial health and experience in managing the type of enterprise or

property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986)

(adequate assurance of future performance present when prospective assignee of a lease from

debtor has financial resources and has expressed a willingness to devote sufficient funding to

business in order to give it strong likelihood of succeeding; chief determinant of adequate

assurance is whether rent will be paid); see also In re M. Fine Lumber Co., Inc., 383 B.R. 565

572 (Bankr. E.D.N.Y. 2008); In re Vitanza, No. 98-19611, 1998 WL 808629, *26 (Bankr. E.D.

Pa. Nov. 13 1998) ("The test is not one of guaranty but simply whether it appears that the rent

will be paid and other lease obligations met").

52.    The Debtors will present facts at the Sale Hearing that demonstrate the

financial credibility, willingness, and ability of Nationstar or any other Successful Bidder to

perform under the Assumed Contracts.  The Sale Hearing thus will provide the Court and other

interested parties the opportunity to evaluate the ability of Nationstar or any other Successful

Bidder to provide adequate assurance of future performance under the Assumed Contracts, as

required by section 365(b)(1)(C).

---

(Footnote continued from previous page.)

Id. at § 365(b)(2).

53.     In addition, the severing of the "Other Agreements" has been approved

in circumstances very similar to those before this Court.  See <u>DB Structured Prods. v. Am.</u>

<u>Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.)</u>, 402 B.R. 87 (Bankr. D.

Del. 2009) (holding that mortgage servicing rights included in the same document as other

commitments are severable from loan sale commitments).[6]

## VI.   ANTI-ASSIGNMENT PROVISIONS IN CERTAIN OF THE ASSUMED CONTRACTS SHOULD NOT RESTRICT, LIMIT, OR PROHIBIT THE ASSUMPTION, ASSIGNMENT, AND SALE UNDER SECTION 365(f).

54.     Pursuant to the Sale Motion, the Debtors also request that the Sale

Approval Order provide that anti-assignment provisions in certain of the Assumed Contracts

shall not restrict, limit, or prohibit the assumption, assignment, and sale of such contracts

within the meaning of section 365(f).  See 11 U.S.C. § 365(f)(1); see also <u>Coleman Oil Co.,</u>

<u>Inc. v. Circle K Corp. (In re Circle K. Corp.)</u>, 127 F.3d 904, 910-11 (9th Cir. 1997) ("[N]o

principle of bankruptcy or contract law precludes us from permitting the Debtors here to

extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the

purposes of section 365.").  In addition, section 365(f)(3) further prohibits the enforcement of

any clause creating a right to modify or terminate the contract or lease upon a proposed

assumption or assignment thereof.  See <u>In re Jamesway Corp.</u>, 201 B.R. 73, 78 (Bankr.

---

[6] The proposed Sale Approval Order defines "Other Agreements" as means any right, obligation, representation, covenant or agreement (i) contained in an a Servicing Agreement that is not related to (a) collections with respect to, or the administration or servicing or subservicing or master servicing of, or reporting in respect of, Mortgage Loans, (b) servicing fees or ancillary income, (c) the disbursement of collections with respect to Mortgage Loans, (d) the making of delinquency advances and servicing advances in connection with the servicing or subservicing or master servicing of Mortgage Loans, (e) payment of expenses associated with the administration, servicing or subservicing or master servicing of Mortgage Loans, (f) the limitation on liability of, and indemnification in favor of, the servicer, subservicer or master servicer thereunder, or (g) representations, warranties and covenants running in favor of the servicer, subservicer or master servicer thereunder, or (ii) that relates to mortgage loan origination, or the sale of mortgage loans, in all cases regardless of whether such Other Agreement arises from, or is memorialized in, the same writing as a Servicing Agreement.

S.D.N.Y. 1996); see also In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions"), aff'd, 209 F.3d 291 (3d Cir.), cert. denied, 531 U.S. 873 (2000).

## VII.    THE COURT SHOULD WAIVE OR REDUCE THE PERIODS REQUIRED BY BANKRUPTCY RULES 6004(h) AND 6006(d)

55.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order.  See Fed. R. Bankr. P. 6004(h). Along these same lines, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 14 days, unless the Court orders otherwise.  See Fed. R. Bankr. P. 6006(d).

56.    To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Purchased Assets, it is critical that the Debtors consummate the Sale Transactions.  Accordingly, the Debtors request that the Court waive the 14-day stay periods under Rules 6004(h) and 6006(d).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

dc-667354

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Sale Motion, the Sale

Transactions should be approved.

Dated:  May 14, 2012
      New York, New York

/s/ Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

dc-667354