**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, et al., ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

**DECLARATION OF SAMUEL M. GREENE**
**IN SUPPORT OF THE PROPOSED SALE OF DEBTORS' ASSETS**

I, Samuel M. Greene, make this Declaration under 28 U.S.C. § 1746 and state:

1.  I am a Partner and co-head of the restructuring group of Centerview Partners LLC ("Centerview"), investment banker to Residential Capital LLC ("ResCap")[1] and the other above-captioned debtors and debtors in possession (collectively the "Debtors"). I submit this Declaration in support of the proposed sales (the "Sales") which may be effectuated in connection with a Chapter 11 plan of reorganization or sale under section 363 of the Bankruptcy Code of (i) certain of the Debtors' assets (the "Nationstar Purchased Assets") to Nationstar Mortgage LLC and its affiliates (collectively, "Nationstar")[2] pursuant to an asset purchase agreement dated May 13, 2012 (the "Nationstar APA"), all as more fully described in the Motion and (ii) certain of the Debtors' whole loans, trading securities and certain other financial assets (collectively, the "AFI Purchased Assets") to BMMZ Holdings LLC, a wholly

---

[1] Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b),(f), and (m), 365 and 1123, and Fed R. Bankr. P. 2002, 6005, and 6006 for Orders (A)(I) Authorizing and Approving Sale Procedures Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief] (the "Motion") or the Whitlinger Affidavit, as defined in the Motion.

[2] As used in this Declaration and solely for purposes thereof, Nationstar includes Fortress Investment Group LLC and its affiliates.

ny-1014128

owned indirect subsidiary of Ally Financial Inc., the parent of the Debtors ("AFI"),[3] pursuant to an asset purchase agreement dated May 13, 2012 (the "AFI APA," together with the Nationstar APA, the "APAs"), all as more fully described in the Motion.

2.  Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, and my personal knowledge and experience. If I were called upon to testify, I could and would testify to each of the facts set forth below.

## QUALIFICATIONS OF DECLARANT AND CENTERVIEW

3.  I have over 14 years of experience advising corporations and other constituents on restructuring transactions. I also have considerable experience with mergers, acquisitions and financings. I have prepared various valuation reports and testified as a fact witness on numerous occasions. Since October 18, 2011, my partner, Marc Puntus, and I have been the primary persons at Centerview responsible for day-to-day discussions with the Debtors relating to general restructuring advice, financing efforts, and the Sales.

4.  Established in 2006, Centerview is a leading investment banking boutique providing financial advisory services, including M&A and restructuring advice, across a broad range of industries including financial institutions. Centerview serves a diverse set of clients around the world from its offices in New York, Los Angeles, San Francisco, and London. Centerview's Restructuring Group was founded in 2011, and its professionals have extensive experience advising debtors, lenders, committees and acquirors in complex financial restructurings, both in out-of-court and Chapter 11 proceedings.

---

[3] For purposes of the Declaration, AFI will be treated as the purchaser of the AFI Purchased Assets.

5. I joined Centerview in June 2011 as a Partner, co-head, and co-founder of the Restructuring Group. Prior to joining Centerview, I was a Partner at Miller Buckfire & Co., which I joined in 2002 as an original member. I was also a member of the financial restructuring group of Wasserstein Perella & Co., which I joined in 1997. I have extensive experience representing companies, creditors and other constituents in complex restructuring, M&A and financing transactions across a wide range of industries. Selected company-side experience includes representing Bedford Fair, Bruno's Supermarkets, Calpine Corporation, CMS Energy, Colo.com, Cygnus Business Media, Favorite Brand International, F&W Media, Laidlaw, MagnaChip Semiconductor, McLeod USA, Oakwood Homes, PG&E, Polymer Group, Port Townsend Paper, Stallion Oilfield Services, TECO Energy, The Dialog Corporation, United Australia/Pacific and U.S. Office Products. I have also represented creditor and equity constituencies in various transactions including CDX Gas, Dow Corning Corporation, Extended Stay Hotels, Hilex Polymer, Kerzner Resorts, Mirant Corporation and Station Casinos.

6. Marc Puntus joined Centerview in 2011 as a Partner and co-head and co-founder of the Restructuring Group. Prior to joining Centerview, Mr. Puntus was at Miller Buckfire & Co., of which he was a founding member and partner for more than ten years. Prior to Miller Buckfire, Mr. Puntus was a member of the financial restructuring group at Dresdner Kleinwort Wasserstein, and prior to that, a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP, a leading global law firm. Mr. Puntus has extensive experience in advising troubled companies and their stakeholders. His experience includes a wide range of advisory assignments including mergers, acquisitions, financings and restructurings with both public and private companies. Mr. Puntus's company-side experience includes representing Acterna, Anchor Danly, Autocam Corporation, Best Products,

BroderBros., Bruno's Supermarkets, Conversent Communications, CNL Hotels & Resorts, CTC Communications, Dura Automotive Systems, EaglePicher, Edison Brothers, Gate Gourmet, Greatwide Logistics Services, Inc., Independence Air, Isola Group, Itronix, Keystone Automotive, Magna Entertainment Corp., the Mashantucket Pequot Tribal Nation/Foxwoods, MicroWarehouse, OSI Restaurants Partners, Pegasus Satellite Communications and Pegasus Broadcast, PlayPower, Progressive Moulded Products, PSINet, Reichold, SI Corp, Sunbeam, Women First Healthcare, and Vonage Corporation. He has also represented acquirors, secured lenders and committees in transactions involving, among other companies, AT&T Latin America, DS Waters, EaglePicher, Fairpoint Communications, First Wave Marine, Global Broadcasting, Grove Crane, Heilig-Meyers, Ion Media Networks, Ionica PLC, Lehman Brothers, Mariner Post-Acute Network, The Pittsburgh Penguins, RDM Sports Group, Rockefeller Center Properties, Safety Components, Shared Technologies, SLI Inc., The Wiz and XO Communications.

7. Since October 2011, Centerview's ResCap "Core Team" of seven professionals, including me, has been diligently working on ResCap. The team includes me, Marc Puntus, Stephen Crawford, Karn Chopra, Dan Dunay, Ryan Kielty, and Ben Weingarten.

8. Since Centerview's engagement by the Debtors in October 2011, the Core Team has worked closely with the Debtors' management, financial staff, and other professionals as part of the Debtors' restructuring efforts; analyzed the Debtors' liquidity and projected cash flows; reviewed and analyzed potential debtor-in-possession financing arrangements; fully acquainted ourselves with the Debtors' business, operations, properties and finances; and assisted the Debtors in connection with preparations for commencement of these cases, including detailed and significant work relating to the Sales.

4

ny-1014128

9. Accordingly, I, along with other members of the Core Team at Centerview, have developed substantial knowledge regarding the Debtors that allows us to provide an assessment of the proposed Sales and the relative benefits and risks associated with the proposed Sales.

10. Given Centerview's and my background and expertise, I am qualified to provide the testimony referred to herein.

## INFORMATION CONSIDERED

11. In preparing this Declaration and in addition to the information referenced herein, I have reviewed and considered, among other materials and documents, the APAs, Motion, Sale Procedures Order, internal non-public financial and operating data concerning the Debtors furnished to us by the management of the Debtors and information publicly available about the Debtors and AFI, the Debtors' indirect parent entity.

## PROPOSED SALES

12. Centerview has worked closely with the Debtors in the development of a sale process intended to maximize value for the Debtors' key stakeholders. As described more specifically in the APAs and the Motion, the Sales will create significant value for the Debtors and provide for the continuation of the Debtors' origination and servicing business. Contemporaneous with the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to, among other things, establish auction and sale procedures for the Sales, and for approval to consummate the Sales under a Plan. In the unlikely event, however, that the Debtors do not obtain confirmation of the Plan by the dates set forth in the Plan Support Agreement(s), the Sale Motion allows the Debtors to pursue an alternative course of action and immediately move forward with the Sales under section 363(b) of the Bankruptcy Code.

13. There were a variety of considerations in the decision to pursue the Sales, including:

(i) concerns about the Debtors' liquidity and inability to satisfy its (or its subsidiaries') tangible net worth and liquidity covenants under their credit facilities and certain other agreements;

(ii) looming credit facility expirations, and substantial unsecured note maturities and interest payments, aggregating approximately $1.8 billion in the 30 days following the Petition Date;

(iii) the magnitude of the Debtors' potential liability for representations and warranties the Debtors have made related to mortgage loans sold by them, particularly from 2004 through 2008, and the significant time and defense costs in respect of litigation claims alleged with respect to such mortgage loans and sales;

(iv) the continuing volatility in the interest rate markets, which affects the Debtors' ability to hedge the value of their MSRs and to comply with the financial covenants in their credit facilities and other agreements; and

(v) continued uncertainty over the future of the Debtors and how such uncertainty could negatively impact business performance, particularly in light of the public statements by AFI regarding its unwillingness to continue to support the Debtors and actions taken by AFI to separate itself from the Debtors.

## The Debtors' Pre-Petition Marketing and Sale Efforts

14. It is my understanding that from time to time since 2009, the Debtors and/or AFI have considered a sale of the Debtors' operations, in its entirety or in significant parts, whether through a sale of assets or a sale of the Debtors' equity. To my knowledge, in the Debtors or AFI's view, the purchase prices that were indicated by potential buyers were insufficient, particularly because potential buyers required that AFI provide a complete

6

indemnity to the buyers for all of the Debtors' contingent litigation liabilities (which AFI was unwilling to do).

15. To my knowledge, the most recent sale effort prior to the current sale process occurred in late 2010 when AFI retained Goldman Sachs & Co. and Citibank to seek potential purchasers of AFI's Mortgage Operations. That process did not result in a satisfactory offer.

16. In August 2011, as part of the Debtors' continuing review of its strategic alternatives, the Debtors began to contemplate a broader range of options including a potential Chapter 11 filing. In October 2011, the Debtors interviewed six potential investment advisors and retained Centerview.

17. Initially, Centerview assisted the Debtors in evaluating a broad range of strategic alternatives including continuing to pursue the status quo, an out-of-court sale transaction involving a new money investment consummated through a "spin" of certain assets into a "NewCo" and multiple variations of potential in-court restructuring alternatives. Centerview's evaluation of each such alternative included a comprehensive evaluation of (i) the market landscape, (ii) the Debtors' assets, (iii) the capital necessary to obtain and manage such assets on a go-forward basis and (iv) the relative attractiveness of each out-of-court transaction as compared to a Chapter 11 proceeding.

18. Centerview began by analyzing the dynamics of the Debtors' most recent sale process in 2010. By examining previous bidder interest and requirements, Centerview gained insight into the relative attractiveness of each of the Debtors' assets and how combining certain assets could significantly influence bidder appetite. In addition to evaluating the Debtors' prior sale processes, Centerview conducted extensive due diligence on the Debtors' assets and

7

operations, including frequent on-site meetings and constant dialogue with the Debtors' senior management team and personnel in servicing, origination, risk, accounting, and the Debtors' other functional groups. Indeed, the complexity of both the Debtors' business model and the Debtors' operational relationship with its parent AFI required Centerview to spend significant time with the Debtors before Centerview could begin to develop a set of value maximizing strategic alternatives, with a defined sequence and timeline to execution.

19. From November 2011 through mid-January 2012, the Debtors and Centerview contemplated a number of potential out-of-court recapitalization and/or spinoff alternatives, and attempted to negotiate an out-of-court transaction with a third party. The Debtors and their advisors worked with the third party to develop detailed financial projections under various business structures, and assisted the third party in conducting due diligence on the business. In connection therewith, Centerview developed various presentations highlighting the pros and cons of an out-of-court transaction for parties including the Debtors, AFI and the third party. The Debtors, Centerview and the Debtors' other advisors worked diligently to find an out-of-court solution for the Debtors. One significant challenge to an out-of-court transaction was the amount of capital the third party required to consummate a transaction out-of-court and assume the Debtors' debt obligations and contingent liabilities. The Debtors and their advisors approached AFI as the most likely and motivated source for the requisite financing. Ultimately, the financing from AFI was not obtained and no formal bid was made by the third party.

20. In late December 2011, with significant impending March and April 2012 debt maturities, the Debtors and Centerview shifted their focus to evaluating in-court transaction alternatives; specifically, an in-court sale of a substantial portion of the Debtors' assets and operations. In working to develop a value-maximizing future business structure, Centerview

worked with the Debtors to develop an understanding of the value embedded in the assets individually and as part of the broader platform, and constructed a variety of presentation materials for both the Debtors and their Board of Directors illustrating the highlights of and challenges associated with marketing the Debtors assets in various combinations. These presentations were both quantitative and qualitative in nature, including analysis of the financial impact on profitability, capital requirements and affect on potential bidder interest of marketing assets as a whole, in groups, or individually. These presentations also covered the practical difficulties associated with these options both from an operational and regulatory perspective.

21.    On or about January 23, 2012, Centerview launched a targeted marketing process for the Debtors' assets. Prior to approaching the market, Centerview assisted the Debtors in assembling a targeted list of potential bidders, taking into consideration firms that had expressed interest in the Debtors in the past, firms that had been recently acquisitive and/or already participating in the mortgage servicing and origination industry, firms that had the financial wherewithal and sophistication to acquire and properly capitalize an operation like that of the Debtors, and firms that were familiar with the Debtors and their operations—which was important given the timeframe allotted to consummate a transaction.

22.    After developing a focused list of potential bidders, Centerview contacted five potential bidders and negotiated non-disclosure agreements with each potential bidder. Based on the results of Centerview's asset combination analyses, conclusions reached from prior processes, initial market feedback, and continuous dialogue with the Debtors' management, Centerview assisted the Debtors in preparing a confidential information memorandum predicated on a revised business structure that management believed would be attractive to third-party buyers and maximize value for the Debtors' estates. When distributing the confidential

9

information memorandum, Centerview, at the direction of the Debtors, encouraged buyers to be flexible with their proposals and made clear that the Debtors would consider bids for any and all asset combinations, including bids on individual assets. Contemporaneous with distributing the confidential information memorandum, Centerview, at the Debtors' direction, also opened a data room to facilitate bidder due diligence. After allowing potential bidders approximately one week to review the confidential information memorandum and data room contents, the Debtors held multi-day management presentations with three of the five potential bidders.[4] In addition to presenting the business plan as described in the confidential information memorandum, potential bidders were also afforded the opportunity to evaluate Ally Bank's business lending operations as a potential bolt-on to the business plan described by the confidential information memorandum.

23. On or about February 13, 2012, Centerview received three preliminary indications of interest, including one from Nationstar. A majority of Nationstar is owned by investment funds managed by affiliates of Fortress Investment Group, LLC (collectively, the public company and its affiliates and funds managed by such affiliates, "Fortress").

24. Nationstar and one other bidder indicated their interest in participating as a stalking horse bidder for a substantial portion of the Debtors' assets and operations. The third bidder expressed an interest in buying a limited group of financial assets.

25. During this time, an additional five potential bidders contacted Centerview or, to my knowledge, the Debtors, and expressed an interest in participating in a sale process. Given the need to reach an agreement relatively quickly, the complexity of the assets and extensive due diligence required, combined with the fact that these potential bidders would have

---

[4] Two bidders decided not to pursue an acquisition after signing the non-disclosure agreement and receiving the confidential information memorandum.

an opportunity to compete in an auction process during the Debtors' Chapter 11 cases, these additional potential bidder opportunities were not explored further.

26. On February 17, 2012, after careful evaluation of the assets contemplated to be purchased under each of the three bids, the associated bid values and the contingencies associated with each bid, Centerview, the Debtors, and their other advisors determined that proceeding with two of the three bidders was most prudent. After the Debtors elected to proceed with two bidders, Centerview approached each with a detailed request for supplemental information. The supplemental information request and the resulting discussions Centerview and the Debtors had with each bidder were used to obtain further clarity on the following issues: (i) which assets would be purchased and which assets would remain in the estate, (ii) how the purchase price would be allocated among the purchased assets; (iii) licensing issues; (iv) financing contingencies; and (v) how other factors might affect purchase price and desired transaction structure. In order to receive detailed and definitive answers to the information requests, bidders were granted additional information through the electronic data room and participated in additional information sessions with Debtors' management.

27. After receipt of the requested information from the bidders, the Debtors and their professionals compared the bids and determined, in their business judgment, to negotiate exclusively with Nationstar. Nationstar's offer was the highest and best offer for the Debtors' business as a whole and represented the most value maximizing proposal for the following reasons:

 (i) Nationstar's offer was the highest bid for the largest portion of the Debtors' assets and operations;

 (ii) Nationstar represented an ideal bidder because it is a strategic purchaser with a recent track record of purchasing mortgage assets, with access to Fortress as a funding source;

    (iii)    Nationstar holds substantially all the mortgage operations licenses necessary to run the Purchased Assets;

    (iv)    Nationstar offered the largest "equity" amount with the smallest debt financing requirements and contingencies;

    (v)    Nationstar has strong relationships with Fannie Mae, Freddie Mac and Ginnie Mae; and

    (vi)    Nationstar's working knowledge of the Debtors, its operations and management from involvement in previous sales processes, assisted in an expedited diligence process.

28.    The Debtors and Centerview concluded that working exclusively with one bidder would increase the likelihood that the Debtors would be able to consummate a transaction in a limited amount of time due to the previously mentioned looming maturities and debt service obligations. In addition, the Debtors believed that the successful negotiation of a purchase agreement would require the involvement and support of Fannie Mae, Freddie Mac, Ginnie Mae, and the U.S. Treasury, among others, each of whom were likely to engage with a single third-party bidder.

29.    Upon selection of Nationstar as the exclusive bidder, the Debtors and Centerview facilitated extensive due diligence for Nationstar and Fortress over a 12-week time period. Nationstar and Fortress were provided access to over 1.2 million pages of electronic diligence materials and additional presentation materials describing the Debtors' operations and assets. The Debtors and Centerview arranged for Nationstar, Fortress, their advisors and lenders to have daily telephone conversations to address their due diligence questions and over 80 hours of on-site, in person diligence meetings conducted in the Debtors' offices in New York, NY, Fort

Washington, PA, and Dallas, TX. Indeed, diligence sessions, calls and meetings were continuous in the months leading up to the Chapter 11 filing.

30. In order to facilitate a sale of the Debtors' platform in full and protect against any erosion in value of the Debtors' assets and operations, the Debtors and their advisors negotiated extensively with AFI and its affiliates to allow the Debtors to originate mortgage loans in the months leading up to the petition date and subsequently during the Chapter 11 cases. In fact, the Debtors comprehensively reorganized the manner in which the Debtors and AFI originate and sell mortgage loans to preserve the value of the origination platform and the attractiveness of the Debtors' assets to a potential buyer.

31. The Debtors also negotiated the terms of a shared services agreement with AFI to ensure that the Debtors' servicing and origination platforms could operate without interruption and ultimately transition smoothly to a potential buyer. These efforts were integral to preserving the value inherent in the platform for the benefit of all stakeholders.

32. In addition to negotiating a restructuring of the Debtors' mortgage origination process and shared and transition services agreements, the Debtors and their advisors solicited financing from AFI to support the Nationstar bid. While financing was also an element of significant negotiation, no financing is being provided by AFI in connection with the Nationstar APA.

33. On or about March 2, 2012, at the Debtors' direction, Centerview distributed a draft asset purchase agreement to Nationstar. Between March 2, 2012 and May 13, 2012, the Debtors, together with Centerview and its other advisers, negotiated the terms of the Nationstar APA and Nationstar completed its analysis of the Debtors' business. The parties and their advisors also engaged in extensive discussions with various government entities in respect

13

of the proposed agreement and plans for maintaining the Debtors' origination and servicing operations as a going concern throughout the Debtors' Chapter 11 cases and upon sale to the successful bidder.

34. Concurrently with the sale process and starting in February 2012, the Debtors, AFI, and their respective advisers began discussing a potential settlement of all claims and disputes the Debtors might have against AFI (the "Settlement Agreement"), and a process to develop a comprehensive plan of reorganization for the Debtors (in contrast to a sale under section 363 of the Bankruptcy Code). As part of these settlement discussions, AFI offered to purchase the Debtors' "legacy" whole loan portfolio as well as certain "trading securities and other financial assets" for a purchase price, based on such assets at December 31, 2011, of approximately $1.6 billion. This offer was approximately $200 million higher than the next highest bid. As a result, ResCap and its advisers determined it was in the Debtors' best interest to negotiate a sale of these assets to AFI. On April 29, 2012, AFI delivered a draft asset purchase agreement for the AFI Purchased Assets that was based on the then draft of the Nationstar APA.

35. On May 13, 2012, both APAs were executed and delivered by the parties, and immediately prior to the filing of the Debtors' Chapter 11 cases, the Debtors and AFI signed the Settlement Agreement.

36. It bears significant note that from the start of the sales process, the Debtors and their advisors spent significant time with the government entities with which the Debtors conduct business, including but not limited to Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Finance Agency, and the United Services Automobile Association ("USAA") in an effort to obtain their support for a transaction. In order to garner the support of such

14

ny-1014128

organizations, the Debtors and their advisors engaged in constant dialogue, consisting of multiple weekly update strategy calls with certain GSEs and frequent update calls with other government-related organizations, in-person management presentations and substantive discussions, including with Nationstar and Fortress. Obtaining government support was viewed as paramount by both the Debtor and its advisors to consummating a value-maximizing sale of the Debtors' assets and operations.

### The APAs

37. It is my opinion that the Nationstar APA was negotiated at arm's length as part of good faith negotiations. The Nationstar APA does not contain special treatment for the Debtors, the Debtors' estates, Nationstar, or their respective affiliates and insiders. The Nationstar APA specifically provides for overbids, as set forth in Section 7.1, ensuring that the Debtors will realize the highest or best price for the Purchased Assets. In addition, because the Debtors and Centerview believe that a separate auction of the Ginnie Mae MSRs and related Servicing Advances to be acquired by Nationstar might result in a higher or better price for such assets, the Debtors persuaded Nationstar to agree to proposed Sale Procedures that will permit potential purchasers to bid on both the entire Nationstar Purchased Assets, and separately, the Ginnie Mae MSRs and related Servicing Advances.

38. It is also my opinion that the AFI APA was negotiated at arm's length in good faith despite the Debtors being a wholly owned subsidiary of AFI. The Debtors have a Board of Directors with a majority of independent directors. The Debtors and the independent members of the Board of Directors each have separate legal counsel, who do not represent AFI or any of its subsidiaries or affiliates. As with the Nationstar APA, the AFI APA does not contain special treatment for the Debtors, the Debtors' estates, AFI, or their respective affiliates and insiders, and it specifically provides for overbids, as set forth in Section 7.1, ensuring that

the Debtors will realize the highest or best price for the AFI Purchased Assets. Both the Nationstar APA and the AFI APA were unanimously approved by the Debtors' Board of Directors.

### The Sale Procedures

39. It is my opinion the Sale Procedures will allow the Debtors to obtain the maximum recovery for their creditors. The Sale Procedures contemplate well-advertised sales and Auctions of the Nationstar Purchased Assets, including a separate auction of the Ginnie Mae MSRs and related Servicing Advances, and AFI Purchased Assets. The Auctions will allow for a bidding process involving some or all of the parties that originally expressed interest in purchasing the Debtors' assets, as well as parties that did not participate in the pre-Chapter 11 marketing process. I believe that the Sale Procedures will serve to maximize the value that the Debtors will recover on account of the Sales.

40. It is my opinion that Nationstar's Break-Up Fee is fair, reasonable and necessary to induce Nationstar to serve as the stalking-horse bidder for the Nationstar Purchased Assets. The AFI APA does not include a break-up fee.

41. The proposed Sale Procedures and the submission of stalking-horse bids by both Nationstar and AFI ensure that the highest or best prices will be realized for the Nationstar Purchased Assets and the AFI Purchased Assets, respectively. The proposed Sale Procedures will also allow the Debtors to seek approval of the Sales through separate APAs with different purchasers, if necessary, to maximize value. The Notice of Auction and Sale Hearing will provide appropriate encouragement for overbids for these assets. Further, the Notice of Auction and Sale Hearing ensure that the terms of the Sales will be fully disclosed to creditors and other potential bidders.

42. The integrity of the bidding process is maintained as each Qualified Bidder is required to confirm that it has not engaged in any undisclosed group bidding or any collusion with respect to the bidding or the sale.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

ny-1014128

43. I declare, under penalty of perjury, that the foregoing is true and correct, to the best of my knowledge.

Executed this May 14, 2012                     /s/ Samuel M. Greene
                                                Samuel M. Greene

ny-1014128