**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors.[1] | Jointly Administered<br>**Related to Docket No.: 13** |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363(b)(1), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND BANKRUPTCY RULES 4001 AND 6004 (I) AUTHORIZING DEBTORS (A) TO ENTER INTO AND PERFORM UNDER RECEIVABLES PURCHASE AGREEMENTS AND MORTGAGE LOAN PURCHASE AND CONTRIBUTION AGREEMENTS RELATING TO INITIAL RECEIVABLES AND MORTGAGE LOANS AND RECEIVABLES POOLING AGREEMENTS RELATING TO ADDITIONAL RECEIVABLES, AND (B) TO OBTAIN POST-PETITION FINANCING ON A SECURED SUPERPRIORITY BASIS, (II) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c) AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**"), dated May 14, 2012, of Residential Capital, LLC

("**ResCap**") and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the

"**Debtors**"), in the above-captioned chapter 11 cases (the "**Cases**") pursuant to sections 105, 362,

363(b)(1), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United

---

[1]   The Debtors in these chapter 11 cases are Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), requesting, among other things:

(1)    authorization for the GMACM Borrower LLC (the "**GMACM Borrower**") and RFC Borrower LLC (the "**RFC Borrower**" and, together with the GMACM Borrower, the "**Borrowers**") to enter into and perform under receivables purchase agreements and mortgage loan purchase and contribution agreements and use proceeds of the loans made under the Term Facilities (as defined below) to acquire the rights to reimbursement for servicer advances previously financed through the Pre-Petition GSAP Facility (as defined below) and mortgage loans that, as of the Petition Date (as defined below), were the subject of the Pre-Petition Ally Repo Facility (as defined below) (such rights to reimbursement and mortgage loans, the "**Initial Purchased Assets**"), free and clear of any liens, interests or other encumbrances that predate the Petition Date and for GMAC Mortgage, LLC ("**GMACM**") and Residential Funding Company, LLC ("**RFC**") to enter into and perform under receivables purchase agreements and mortgage loan purchase and contribution agreements and to sell and convey mortgage loans that, as of the Petition Date, were the subject of the Pre-Petition Ally Repo Facility to the Borrowers;

(2)    authorization for the Borrowers, GMACM and RFC to enter into and perform under receivables pooling agreements and mortgage loan purchase and contribution agreements to purchase or sell, as applicable, Additional Receivables (as defined below);

(3)     approval of certain indemnification obligations by GMACM, RFC and the Borrowers (each as defined below) with respect to the GSAP Transferor, the GSAP Administrative Agent and the GSAP Indenture Trustee (each as defined below), as seller under receivables purchase agreements, and by GMACM and RFC of the Borrowers with respect to mortgage loans the Borrowers purchase from GMACM and RFC under mortgage loan purchase and contribution agreements;

(4)     authorization for the Borrowers to obtain, and be jointly and severally obligated in respect of, post-petition secured superpriority financing, in an aggregate principal amount up to $1,450,000,000 (the availability of which shall be subject to the terms and conditions set forth in the Credit Documents (as defined in the DIP Credit Agreement and including any exhibits thereto)), to be provided by Barclays Bank PLC ("**Barclays**"), acting as Administrative Agent (in such capacity, the "**Administrative Agent**") for a syndicate of financial institutions (together with Barclays, the "**DIP Lenders**") to be arranged by Barclays (in such capacity, the "**Lead Arranger**"), and the DIP Lenders, and for all of the other Debtors (collectively, the "**Debtor Guarantors**") to guaranty all of the Borrowers' obligations under such post-petition financing;

(5)     authorization for the Debtors to execute and enter into a Superpriority Debtor-in-Possession Credit and Guaranty Agreement (the "**DIP Credit Agreement**"), substantially in the form filed as Exhibit C to the Motion, and the other Credit Documents and to perform such other and further acts as may be required in connection with the Credit Documents;

3

(6)    authorization for the Debtors to repay, or cause the repayment of, the Pre-Petition Refinanced Indebtedness (as defined below);

(7)    the grant of superpriority administrative expense claims to the DIP Lenders;

(8)    subject only to, and effective upon entry of, a final order granting such relief and such other relief as provided herein and in such final order (the "**Final Order**"), the waiver of the Debtors' right to surcharge the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(9)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "**Interim Order**") to obtain post-petition secured superpriority financing in an aggregate principal amount:  (i) up to $150,000,000 under the revolving loan facility (the "**Revolving Facility**"); (ii) up to $1,050,000,000 under the A-1 term loan facility (the "**Term A-1 Facility**"); and (iii) up to $200,000,000 under the A-2 term loan facility (the "**Term A-2 Facility**" and, together with the Term A-1 Facility, the "**Term Facilities**"; the Term Facilities together with the Revolving Facility, the "**DIP Facilities**") to, collectively:  (a) finance the purchase of the Initial Purchased Assets (b) to repay, or cause the repayment of, the Pre-Petition Refinanced Indebtedness, (c) fund general corporate purposes of the Debtors, including the acquisition of Additional Receivables, arising out of the operation of the Debtors' businesses, working capital and allowed administrative expenses incurred during the Cases, (d) pay interest, fees and expenses payable under the DIP Facilities, (e)

4

make adequate protection payments, to the extent approved by the Bankruptcy

Court, for the use of cash collateral, and (f) pay costs of administration of the

Cases in a manner consistent with the requirements of the Bankruptcy Code, in

each case, in accordance with the Approved DIP Budget (as defined in the DIP

Credit Agreement); and

(10)    that this Court schedule a final hearing (the "**Final Hearing**") to be

held within 30 days of the entry of the Interim Order to consider entry of the Final

Order;

and due and appropriate notice of the Motion, the relief requested therein and the Interim

Hearing having been served by the Debtors on the fifty (50) largest unsecured creditors of the

Debtors on a consolidated basis; the Administrative Agent; the Collateral Agent; the DIP

Lenders; the Pre-Petition Finance Parties;[2] Ally Financial Inc. ("**Ally**"); Ally Bank; Citibank,

N.A. ("**Citibank**"), as secured lender under the MSR Facility (as defined below); U.S. Bank

National Association, as trustee for the Prepetition Junior Secured Notes;[3] Wells Fargo Bank,

N.A., as collateral agent for the Prepetition Junior Secured Notes, as collateral agent for the

Prepetition Ally Revolver,[4] and as collateral control agent under the Intercreditor Agreement[5];

---

[2]    "**Pre-Petition Finance Parties**" means The Bank of New York Mellon, as indenture trustee (the "**GSAP Indenture Trustee**") under the Pre-Petition GSAP Facility (as defined below) and Barclays, as administrative agent under the Pre-Petition GSAP Facility in such capacity, the "**GSAP Administrative Agent**").

[3]    "**Prepetition Junior Secured Notes**" means the 9.625% Junior Secured Guaranteed Notes due 2015 issued by ResCap pursuant to the Prepetition Junior Secured Indenture, in an initial aggregate face amount of $4,010,280,000, as amended or supplemented prior to the date hereof.  "**Prepetition Junior Secured Indenture**" means the Indenture, dated as of June 6, 2008, among ResCap, as issuer, the Subsidiaries of ResCap party thereto as guarantors, and U.S. Bank National Association, as trustee, as amended or supplemented prior to the date hereof.

[4]    The "**Prepetition Ally Revolver**" means the credit facility under (a) the Amended and Restated Loan Agreement, dated as of December 30, 2009, by and among RFC, GMACM, ResCap, certain other affiliates of ResCap, Wells Fargo Bank, N.A., and GMAC Inc., as amended or supplemented prior to the date hereof (the "**Prepetition Ally Revolving Credit Agreement**"), and (b) the other Facility Documents (as defined in the Prepetition Ally Revolving Credit Agreement), as amended or supplemented prior to the date hereof.

BMMZ Holdings LLC, as buyer under the Pre-Petition Ally Repo Facility; Fannie Mae (f/k/a

The Federal National Mortgage Association); Freddie Mac (f/k/a The Federal Home Loan

Mortgage Corporation); the Government National Mortgage Association; the GSAP Transferor

(as defined below); the servicers and sub-servicers under the Designated Servicing Agreements

and the Specified Servicing Agreements (each term as defined in the DIP Credit Agreement); the

MBS Trustees (as defined in the DIP Credit Agreement); Nationstar Mortgage LLC; Ally

Investment Management LLC, as secured hedging counterparty, the office of the United States

Attorney General, the office of the New York Attorney General, the office of the United States

Attorney for the Southern District of New York, the Internal Revenue Service, the Securities and

Exchange Commission, and the Office of the United States Trustee for the Southern District of

New York (the "**U.S. Trustee**") (collectively, the "**Notice Parties**"), and upon the record of the

Interim Hearing held by this Court on May 14, 2012; and upon the arguments of counsel at the

Interim Hearing; and the Court having considered any objections to the relief sought herein; and

after due deliberation and consideration and sufficient cause appearing therefore,

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion, and the

parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Notice of the Motion, the relief requested therein and the Interim Hearing

was served by the Debtors on the Notice Parties.  The interim relief granted herein is necessary

to avoid immediate and irreparable harm to the Debtors and their estates pending the Final

---

*(cont'd from previous page)*
[5]    The "**Intercreditor Agreement**" means the Intercreditor Agreement, dated as of June 6, 2008, relating to the
Prepetition Junior Secured Notes and the Prepetition Ally Revolver.

Hearing. Under the circumstances, the request for interim relief granted herein and the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(b) and (c), Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York, and no further notice of the relief sought at the Interim Hearing is necessary or required.

3.    *Effectiveness.* This Order shall constitute findings of fact and conclusions of law. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Order.

4.    *Debtors' Stipulations.* Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraphs 17 and 22 below, the Debtors admit, stipulate and agree that:

(a)    *The Pre-Petition GSAP Facility.* Prior to the filing of the Debtors' chapter 11 petitions (the "**Petition Date**"), GMACM and RFC made servicer advances pursuant to Designated Servicing Agreements for mortgage loans serviced under those Designated Servicing Agreements. Under the Pre-Petition GSAP Facility,[6] the GSAP

---

[6]    The "**Pre-Petition GSAP Facility**" means the financing facility under (i) the Fourth Amended and Restated Indenture, dated as of March 15, 2011 (the "**Base Indenture**"), as amended by Amendment No. 1, dated as of March 13, 2012, among the GSAP Transferor, as issuer, GMACM, as an administrator and a servicer, RFC, as an administrator and a servicer, and The Bank of New York Mellon, as indenture trustee, calculation agent and paying agent, as amended or supplemented prior the date hereof, (ii) the Series 2012-VF1 Indenture Supplement, dated as of March 13, 2012 (together with the Base Indenture, as amended or supplemented prior to the date hereof, the "**Pre-Petition GSAP Indenture**"), by and among the GSAP Transferor, as issuer, GMACM, as an administrator and servicer, RFC, as an administrator and servicer, The Bank of New York Mellon, as indenture trustee, calculation agent and paying agent, and Barclays, as administrative agent, (iii) the VFN Purchase Agreement, dated as of March 13, 2012, by and among the GSAP Transferor, GMACM, as an originator, RFC,

*(cont'd)*

Transferor purchased – in true sales and absolute conveyances – GMACM's and RFC's rights to reimbursement of such servicer advances (such reimbursement rights, along with any other rights of GMACM or RFC to reimbursement of servicer advances made pursuant to Designated Servicing Agreements, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, are referred to herein as "**Receivables**").  To fund its purchases, the GSAP Transferor issued notes secured by Receivables under the Pre-Petition GSAP Facility.  As of the Petition Date, the GSAP Facility was secured with collateral (both Receivables and restricted cash) with a book value of $870 million and the GSAP Transferor was indebted and liable to the GSAP Indenture Trustee and the Pre-Petition GSAP Facility noteholders under the Pre-Petition GSAP Facility, without defense, recoupment, counterclaim or offset of any kind, in the aggregate principal amount of not less than $662 million, pursuant to and in accordance with the terms of the Pre-Petition GSAP Facility plus, interest at the non-default rate thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Pre-Petition GSAP Facility), charges, indemnity obligations and other obligations incurred in connection therewith as provided in the Pre-Petition GSAP Facility (the "**Pre-Petition GSAP Facility Debt**").

(b)    *The Pre-Petition GSAP Facility Collateral*.  The Pre-Petition GSAP Facility Debt is secured by valid, binding, perfected, enforceable, first priority liens and

---

*(cont'd from previous page)*

as an originator, GMACR Mortgage Products, LLC, as a seller, RFC-GSAP Servicer Advance, LLC, as a seller, and Barclays, as administrative agent and purchaser relating to the GMAC Mortgage Servicer Advance Funding Company Ltd., GMAC Mortgage Advance Receivables-Backed Notes, Series 2012-VF1 (the "**Series 2012-VF1 Notes**") issued pursuant to the Pre-Petition GSAP Indenture, as amended or supplemented prior the date hereof, and (iv) the Series 2012-VF1 Notes and all other notes issued pursuant to the Pre-Petition GSAP Indenture, as amended or supplemented prior the date hereof.  The "**GSAP Transferor**" means GMAC Mortgage Servicer Advance Funding Company Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands.

security interests upon the GSAP Transferor's assets and property, including Receivables and all property related thereto, which liens and security interests are not subject to avoidance (whether arising pursuant to sections 542 through 553 of the Bankruptcy Code, or otherwise), recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and secure, among other things, the GSAP Transferor's indemnity obligations to the GSAP Administrative Agent.

(c)     *Release*.  Subject to paragraph 17, the Debtors release and discharge all claims and causes of action of every kind and nature existing prior to the Petition Date against the GSAP Transferor, the GSAP Indenture Trustee, the GSAP Administrative Agent, all holders of notes issued pursuant to the Pre-Petition GSAP Indenture, as well as affiliates, agents, officers, directors, employees and attorneys of each of the foregoing, each in their capacities as such (collectively, the "**Released Parties**"), and all claims and causes of action of every kind and nature existing prior to the Petition Date, in connection with or related to all rights and other property heretofor conveyed to any of the Released Parties, pursuant to, and in connection with, the Pre-Petition GSAP Facility, whether arising at law or at equity, including, without limitation, any claims for recharacterization, subordination, substantive consolidation, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code with respect to the Pre-Petition GSAP Facility and the transactions thereunder.

(d)     *The Pre-Petition Ally Repo Facility*.  Prior to the Petition Date, ResCap, GMACM, and RFC were parties to the Pre-Petition Ally Repo Facility.[7]  As of

---

[7]     The "**Pre-Petition Ally Repo Facility**" means the repurchase facility under (i) the Master Repurchase Agreement, dated as of December 21, 2011, by and among BMMZ Holdings LLC, ResCap, GMACM and RFC;

*(cont'd)*

9

March 31, 2012, the book value of the mortgage loans subject to the Pre-Petition Ally

Repo Facility was approximately $377 million, and as of the Petition Date, the amount of

the outstanding repurchase obligations thereunder was approximately $250 million.

(e)     Ally admits, stipulates and agrees that the mortgage loans that were,

as of the Petition Date, the subject of the Pre-Petition Ally Repo Facility, are transferred

from BMMZ to GMACM and RFC, as applicable, free and clear of all liens, claims and

encumbrances.  The Debtors admit, stipulate and agree that such mortgage loans are

transferred to the GMACM Borrower and the RFC Borrower, as applicable, free and clear

of all liens, claims and encumbrances.

5.     *Findings Regarding the Purchase Transactions.*

(a)     The purchases of the Initial Purchased Assets provide a basis for the

Debtors to access incremental liquidity essential to operate their businesses and preserve

and enhance enterprise value for the benefit of their stakeholders.  As structured, the

proposed DIP Facilities contemplate advance rates on Receivables of 90% to 95%, as

compared to approximately 70% under the Pre-Petition GSAP Facility, and advance rates

on mortgage loans of 75% as compared to a floating advance rate of approximately 60%

under the Pre-Petition Ally Repo Facility (as of March 31, 2012).  Without the Initial

Purchased Assets transactions, the Debtors would not have sufficient assets to obtain

financing required to run their businesses and bridge their operations to a sale transaction.

(b)     The Purchase Transactions have been undertaken as a critical

element to the structure of the DIP Facilities and the Debtors' overall restructuring.  The

_____
*(cont'd from previous page)*
and (ii) the Master Guarantee, dated as of December 21, 2011, by ResCap and BMMZ Holdings LLC, each as
further amended or supplemented prior to the date hereof.

Borrowers shall be entitled to the protections of section 363(m) of the Bankruptcy Code.

The Administrative Agent shall be entitled, derivatively, to assert any and all of the rights

of the Borrowers.

6.      *Findings Regarding the DIP Facilities*.

(a)      Good cause has been shown for approval of the DIP Facilities and

entry of this Order.

(b)      The Debtors have an immediate need to obtain the financing

available under the DIP Facilities in order to permit, among other things, the orderly

continuation of the operation of their businesses, including:  to provide funding for

GMACM and RFC to continue to make certain advances on account of mortgage loans

serviced on behalf of third parties that GMACM and RFC are required to make as master

servicers or servicers under the Designated Servicing Agreements; to fund the purchase of

the Initial Purchased Assets and the addition of Additional Receivables; to satisfy other

general corporate and working capital requirements and fund administrative costs of the

Cases; and to pay such other amounts in accordance with the Credit Documents.  The

Debtors' access to sufficient working capital and liquidity through the incurrence of new

indebtedness for borrowed money is vital to the preservation and maintenance of the going

concern values of the Debtors, their performance of their obligations under the Original

Sale Agreements (as defined in the DIP Credit Agreement) and to a successful

reorganization of the Debtors.

(c)      The Debtors are unable to obtain financing on more favorable terms

from sources other than the DIP Lenders under the Credit Documents and are unable to

obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy

Code as an administrative expense.  The Debtors are also unable to obtain secured credit

allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code

without (i) the Debtors granting to Barclays, as collateral agent under the DIP Facilities (in

such capacity, the "**Collateral Agent**") for the benefit of the Secured Parties (as defined in

the DIP Credit Agreement), and the DIP Lenders, subject to the Carve Out (as defined

below) as provided for herein, the DIP Liens (as defined below) and the Superpriority

Claims (as defined below) upon the terms and conditions set forth in this Order and in the

Credit Documents and (ii) the Debtors repaying all outstanding indebtedness (the "**Pre-**

**Petition Refinanced Indebtedness**") under the Pre-Petition GSAP Facility and the Pre-

Petition Ally Repo Facility (collectively, the "**Pre-Petition Refinanced Facilities**") in full

immediately following entry of this Order from the proceeds of borrowings under the Term

Facilities, such repayment being a requirement of the DIP Facilities.

(d)     The terms of the DIP Facilities are fair and reasonable, reflect the

Debtors' exercise of prudent business judgment consistent with their fiduciary duties and

constitute "reasonably equivalent value" and "fair consideration" within the meaning of

such terms under section 548 of the Bankruptcy Code and under applicable non-

bankruptcy law.

(e)     The DIP Facilities have been negotiated in good faith and at arm's

length among the Debtors, the Administrative Agent, and the DIP Lenders, and all of the

Debtors' obligations and indebtedness arising under, in respect of or in connection with the

DIP Credit Agreement or any of the other Credit Documents, including without limitation,

all loans (the "**Loans**") made to the Debtors pursuant to the DIP Credit Agreement

(collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the

Administrative Agent and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)    The Debtors have requested entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Absent granting the relief set forth in this Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facilities in accordance with this Order and the Credit Documents is therefore in the best interest of the Debtors' estates.

7.    *Authorization of the Purchase Transactions*.

(a)    Pursuant to section 363(b)(1) of the Bankruptcy Code, the GMACM Borrower, GMACM, the RFC Borrower, and RFC are hereby authorized to enter into and perform their obligations under (i) the GMACM Receivables Purchase Agreement and the RFC Receivables Purchase Agreement (each as defined in the DIP Credit Agreement, and collectively, the "**Receivables Purchase Agreements**"), (ii) the GMACM Receivables Pooling and Purchase Agreement and the RFC Receivables Pooling and Purchase Agreement (each as defined in the DIP Credit Agreement, and collectively, the "**Receivables Pooling Agreements**"), and (iii) the GMACM Mortgage Loan Purchase and Contribution Agreement and the RFC Mortgage Loan Purchase and Contribution Agreement (each as defined in the DIP Credit Agreement, and collectively, the "**Mortgage Loan Purchase and Contribution Agreements**"), in each case, to the extent party thereto.

13

(b)     On the Closing Date (as defined in the DIP Credit Agreement), the GSAP Transferor shall sell and assign all of its right, title and interest in the Receivables owned by it (the "**Initial Receivables**") to the Borrowers in accordance with the terms of the Receivables Purchase Agreements.  From and after the Closing Date, GMACM and RFC shall sell and contribute all the Receivables they generate in their capacities as master servicers or servicers under the various Designated Servicing Agreements (the "**Additional Receivables**"), directly to the GMACM Borrower and the RFC Borrower, respectively, pursuant to the Receivables Pooling Agreements.

(c)     On the Closing Date, (i) GMACM shall sell and contribute the mortgage loans owned by GMACM that were previously the subject of the Pre-Petition Ally Repo Facility to the GMACM Borrower, and (ii) RFC shall sell and contribute the mortgage loans owned by RFC that were previously the subject of the Pre-Petition Ally Repo Facility to the RFC Borrower, pursuant to the Mortgage Loan Purchase and Contribution Agreements.  The transactions described in subparagraphs (a) through (c) of this paragraph shall be referred to collectively as the "**Purchase Transactions**."

(d)     Pursuant to section 363(b)(1) of the Bankruptcy Code, each Additional Receivable sold or contributed by GMACM or RFC to the applicable Borrower pursuant to the applicable Receivables Pooling Agreement or Mortgage Loan Purchase and Contribution Agreement shall be transferred by GMACM and RFC, as applicable.

(e)     In connection with the repurchase by GMACM and RFC of the mortgage loans from BMMZ that were, as of the Petition Date, the subject of the Pre-Petition Ally Repo Facility, and the payment to BMMZ of the purchase price thereunder, BMMZ has represented and warranted that such mortgage loans are transferred free and

14

clear of all liens, claims and encumbrances.  In extending Loans for the purpose of effecting such repurchase and in making subsequent advances under the DIP Facilities in reliance on the Borrowers' clear title to such mortgage loans, the Administrative Agent and the DIP Lenders are relying on such representations by BMMZ.  Ally hereby agrees to indemnify the Administrative Agent and the DIP Lenders for any losses incurred as a result of the breach of such representations.  This indemnity shall remain in full force and effect until the earlier of (i) repayment in full of the DIP Obligations and the termination of the commitments under the DIP Facilities and (ii) the date on which a court of competent jurisdiction renders a final non-appealable order that the transfers of the whole loans from BMMZ to GMACM and RFC and from GMACM and RFC to the Borrowers are free and clear of all liens, claims and encumbrances (which order the Debtors intend to seek at the Final Hearing).

(f)      As provided in the Receivables Purchase Agreements, the Borrowers, GMACM and RFC, shall indemnify the GSAP Transferor, the GSAP Administrative Agent and the GSAP Indenture Trustee for any claims, costs and/or expenses associated with, or arising in connection with, the transactions contemplated under the Receivables Purchase Agreements, the Pre-Petition GSAP Facility, or otherwise relating to the Cases.  As provided in the Mortgage Loan Purchase and Contribution Agreements, GMACM and RFC shall indemnify the GMACM Borrower and the RFC Borrower, respectively, with respect to the mortgage loans transferred pursuant to such agreements (the indemnification obligations described in this sub-paragraph (f), collectively the "**Asset Indemnification Obligations**").

(g)    Upon consummation of the Purchase Transactions, all agreements, indentures, notes, instruments, certificates, side letters, fee letters and other documents evidencing or giving rise to the Pre-Petition GSAP Facility and the Pre-Petition Ally Repo Facility shall be deemed paid in full and canceled, and the obligations of, and all liens and security interests granted by, the obligors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged.

(h)    The Debtors are hereby authorized to perform all other acts required under or in connection with the Receivables Purchase Agreements, the Receivables Pooling Agreements and the Mortgage Loan Purchase and Contribution Agreements, including the Asset Indemnification Obligations.

(i)    Each Borrower is a separate and distinct legal entity from each of the GSAP Transferor, GMACM and RFC and each of the other Debtors.  The DIP Lenders are extending credit to the Borrowers in reliance upon the separateness of each Borrower and the fact that neither of the Borrowers shall be subject to consolidation into the GSAP Transferor or any of the estates of GMACM, RFC or any other Debtor (in any such case, whether through the doctrine of substantive consolidation, veil piercing, alter ego or any similar remedy).

8.    *Authorization of the Credit Documents*

(a)    The Debtors are hereby authorized to enter into the Credit Documents and the Credit Documents are hereby approved.  Each of the Borrowers is hereby authorized to borrow money pursuant to the DIP Credit Agreement, and the Debtor Guarantors are hereby authorized to unconditionally guaranty such borrowings (on a joint and several basis) and the Borrowers' joint and several obligations with respect to such

borrowings up to an aggregate principal or face amount of $1,250,000,000 (plus interest, fees, costs and other expenses and amounts provided for in the Credit Documents) on an interim basis, in accordance with the terms of this Order and the Credit Documents, which shall be used for all purposes permitted under the Credit Documents, including, without limitation, to acquire the Initial Purchased Assets and the Additional Receivables; to refinance the Pre-Petition Refinanced Indebtedness, as provided herein; to provide working capital for the Borrowers and the Debtor Guarantors; to transfer, on the Closing Date, up to $40,000,000 of the proceeds of the Term Loans (as defined in DIP Credit Agreement) to an account of GMACM to be used for general corporate purposes in accordance with the Credit Documents, including to fund servicing advances that will not be included in the Borrowing Base (as defined in the DIP Credit Agreement); and to pay interest, fees and expenses, in each case in accordance with this Order, the Credit Documents and the Approved DIP Budget.

(b)      Immediately following the entry of this Order and upon the closing of the DIP Facilities, the Debtors shall use the proceeds from the Term Facilities in accordance with the Credit Documents and this Interim Order to consummate the Purchase Transactions and acquire the Initial Purchased Assets, the proceeds of which shall be used to repay in full the Pre-Petition Refinanced Indebtedness then outstanding.  Upon such repayment, the existing liens securing the Pre-Petition Refinanced Facilities shall be irrevocably released and terminated.

(c)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or

recordation of security agreements, mortgages and financing statements), and to pay all

fees, that may be reasonably required or necessary for the Debtors' performance of their

obligations under the DIP Facilities, including, without limitation:

(i)      the execution, delivery and performance of the Credit Documents;

(ii)      the execution, delivery and performance of one or more

amendments to the Credit Documents, without further approval of this Court, to,

(a) at any time, add additional financial institutions and other lenders as DIP

Lenders or reallocate the commitments under the Credit Documents among such

lenders, (b) at any time up to 120 days following the Closing Date, if and to the

extent the Lead Arranger, or any of its affiliates, determines, in its discretion,

(x) effect amendments that are reasonably necessary or advisable to facilitate a

"successful syndication," as contemplated by the Facility Fee Letter (as defined in

the DIP Credit Agreement) entered into in connection with the DIP Facilities, or

(y) effect amendments because a "successful syndication" is not likely to be

achieved by the end of such 120-day period, in each case, with any such

amendment being deemed effective as of the Closing Date, (c) effect amendments

as are otherwise contemplated by any separate letter agreement entered into in

connection with the DIP Facilities, or (d) at any time, make any ministerial

amendments;

(iii)      formation by the Borrowers of the Delaware statutory trusts, as

required by the DIP Credit Agreement;

(iv)      the non-refundable payment to the Administrative Agent, the

Collateral Agent, the Lead Arranger and the DIP Lenders, as the case may be, of

the fees referred to in the Credit Documents and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable fees and expenses of the professionals, consultants, sub-agents and independent contractors retained by the Administrative Agent, the Collateral Agent and the DIP Lenders, as provided for in the Credit Documents without the necessity of filing retention applications or fee applications; and

(v)    the performance of all other acts required under or in connection with the Credit Documents.

(d)    Upon execution and delivery of the Credit Documents, the Credit Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms and this Order.  No obligation, payment, transfer or grant of security under the Credit Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

9.    *Indemnity.*  The indemnity provisions of the Credit Documents are hereby approved.  As provided in the Credit Documents, the Debtors shall, jointly and severally, indemnify and hold harmless the Administrative Agent, the Collateral Agent, the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, sub-agents, advisors, consultants and independent contractors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any actual or prospective claim, proceeding, investigation, or litigation, or the preparation of any defense with respect thereto,

19

arising out of or relating to the Credit Documents or the transactions contemplated by the DIP

Facilities, except to the extent resulting from gross negligence or willful misconduct of the

Administrative Agent, the Collateral Agent or the DIP Lenders, as determined by a final and

non-appealable judgment of a court of competent jurisdiction.

       10.    *Superpriority Claims*.

       (a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP

Obligations shall constitute allowed claims against each of the Debtors (without the need

to file a proof of claim) with priority over any and all administrative expenses, and all

other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever,

including, without limitation, all administrative expenses of the kind specified in sections

503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses

or other claims arising under section 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of

the Final Order, to the extent therein approved), 507(a), 507(b), 546, 726, 1113 or 1114 of

the Bankruptcy Code, including, without limitation, any superpriority claims granted as

adequate protection in favor of the Debtors' pre-petition secured lenders or other secured

parties in the Cases (the "**Superpriority Claims**"), whether or not such expenses or claims

may become secured by a judgment lien or other non-consensual lien, levy or attachment,

which allowed claims shall be payable from and have recourse to all pre- and post-petition

property of the Debtors and all proceeds thereof, subject only to the Carve Out to the

extent specifically provided for herein.  Notwithstanding the foregoing, the Superpriority

Claims are junior to:

(i)      Ally's rights, as lender under the AFI DIP Loan (as defined in the Ally DIP Order[8]), in the AFI DIP Loan Collateral, as provided in paragraph 7 of the Ally DIP Order, and all proceeds and other consideration received upon the sale, exchange, transfer or other disposition thereof;

(ii)      The Allied Secured Parties' (as defined in the Origination Order) rights in the Collateral (as defined in that certain Pledge and Security Agreement dated as of April 25, 2012) and all proceeds and other consideration received upon the sale, exchange, transfer or other disposition thereof, as provided in paragraph 8 of the Origination Order[9]; and

(iii)      Ally Investment Management LLC's rights in the Collateral (as defined in that certain Master Forward Securities Forward Agreement, dated April 30, 2012) and all proceeds and other consideration received upon the sale,

---

[8]    The "**Ally DIP Order**" means either (a) the *Interim Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Adequate Protection Parties and (IV) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing* or (b) the *Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Adequate Protection Parties and (IV) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing*, as applicable.

[9]    The "**Origination Order**" means either (a) the *Interim Order Under Sections 105(a), 363, 364, 503(b), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to (I) Process and Where Applicable Fund Prepetition Mortgage Loan Commitments, (II) Continue Brokerage, Origination and Sale Activities Related to Loan Securitization, (III) Continue to Perform, and Incur Postpetition Secured Indebtedness, Under the Mortgage Loan Purchase and Sale Agreement with Ally Bank and Related Agreements, (IV) Pay Certain Prepetition Amounts Due to Critical Origination Vendors, and (V) Continue Honoring Mortgage Loan Repurchase Obligations Arising in Connection with Loan Sales and Servicing, Each in the Ordinary Course of Business* or (b) *Final Interim Order Under Sections 105(a), 363, 364, 503(b), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to (I) Process and Where Applicable Fund Prepetition Mortgage Loan Commitments, (II) Continue Brokerage, Origination and Sale Activities Related to Loan Securitization, (III) Continue to Perform, and Incur Postpetition Secured Indebtedness, Under the Mortgage Loan Purchase and Sale Agreement with Ally Bank and Related Agreements, (IV) Pay Certain Prepetition Amounts Due to Critical Origination Vendors, and (V) Continue Honoring Mortgage Loan Repurchase Obligations Arising in Connection with Loan Sales and Servicing, Each in the Ordinary Course of Business*, as applicable.

exchange, transfer or other disposition thereof, as provided in paragraph 11 of the

Origination Order.

(b)    For purposes hereof, the "**Carve Out**"[10] shall mean (i) all fees

required to be paid to the Clerk of the United States Bankruptcy Court, Southern District of

New York and to the U.S. Trustee under section 1930(a) of title 28 of the United States

Code and interest thereon, (ii) any and all allowed and unpaid claims of professionals

whose retention is approved by this Court during the Cases pursuant to sections 327 or

1103 of the Bankruptcy Code for unpaid fees and expenses incurred (x) prior to the

occurrence of an Event of Default (as defined in the DIP Credit Agreement) and (y) at any

time after the occurrence and during the continuance of an Event of Default in an

aggregate amount not to exceed $25,000,000 (the "**Carve Out Cap**"), which shall be used

to pay fees and expenses incurred by the professionals retained in the Cases and

reimbursement of out-of-pocket expenses of the members of any official committee

appointed in the Cases (any such committee, a "**Committee**"), and (iii) all reasonable fees

and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to

exceed $500,000.  Any payments of the allowed professional fees incurred after an Event

of Default shall reduce the amount of the Carve Out by the amount of any such payment.

The Carve Out shall not include, apply to, or be available for any fees or expenses incurred

by any party in connection with (1) any challenge to the validity, perfection, priority,

extent or enforceability of the Loans and the other DIP Obligations under the DIP

Facilities, or the DIP Liens on any Collateral or security interests securing the DIP

---

[10]    The Carve Out is not intended to be addition to the Ally DIP Carve Out.  Allocation of the $25 million Carve
Out monies between the Barclays DIP Collateral and the AFI DIP Collateral shall be determined by the Court,
after notice and a hearing, upon motion brought by any of the Debtors, the Administrative Agent or Ally.

Obligations, (2) any investigation or assertion of any other claims or causes of action

against any DIP Lender, the Administrative Agent or any other holder of any DIP

Obligations, (3) any challenge to the validity, perfection, priority, extent or enforceability

of the Pre-Petition GSAP Facility, or the liens on the trust estate and collateral under the

Pre-Petition GSAP Facility or other security interests securing the Pre-Petition GSAP

Facility or any other matter in connection with the Pre-Petition GSAP Facility (but may be

used by professionals for any Committee to investigate such matters in an amount not to

exceed $100,000), or (4) any act which has the effect of materially or adversely modifying

or compromising the rights and remedies of the Administrative Agent, the Collateral Agent

or any DIP Lender or which results in the occurrence of an Event of Default, unless

otherwise agreed in writing by Administrative Agent in its sole discretion.  The Carve Out

Cap shall neither be reduced nor increased by the amount of compensation or

reimbursement of allowed fees and/or expenses incurred, awarded or paid prior to the

occurrence of an Event of Default in respect of which the Carve Out is invoked, and

nothing herein shall be construed to impair the ability of any party to object to the fees,

expenses, reimbursement or compensation described in this definition.

11.    *DIP Liens.*  As security for the DIP Obligations, effective and perfected upon the

date of this Order and without the necessity of the execution, recordation or filings of mortgages,

security agreements, control agreements, pledge agreements, financing statements or other

similar documents, or the possession or control by the Collateral Agent of, or over, any

Collateral, the following security interests and liens are hereby granted to the Collateral Agent

for the benefit of the Secured Parties (all tangible and intangible property, whether real or

personal, identified in clauses (a), (b), (c), (d), (e) and (f) below being collectively referred to as

23

the "**Collateral**"); all such liens and security interests granted to the Collateral Agent for the

benefit of the Secured Parties pursuant to this Order, the "**DIP Liens**", subject and subordinate

only to the payment of the Carve Out and, in the case of the Junior Lien Collateral, any claim

secured by a senior lien therein; *provided, however*, that the Collateral shall not include the

Debtors' claims and causes of action under sections 544, 545, 547, 548 and 550 (but not to the

extent of any recoveries under section 549 of the Bankruptcy Code) of the Bankruptcy Code or

the proceeds thereof:

(a)      *Borrower Liens*.  Pursuant to sections 364(c)(2) and 364(d) of the

Bankruptcy Code, (i) a valid, binding, continuing, enforceable, fully-perfected first priority

senior security interest in and lien upon all property of the Borrowers, whether existing on

the Petition Date or thereafter arising, coming into existence or acquired, whether tangible

or intangible, whether real or personal, that (1) is not subject to valid, perfected and non-

avoidable liens or security interests as of the Petition Date or (2) becomes unencumbered

and is no longer subject to any lien or security interest as a result of the repayment of the

Pre-Petition Refinanced Indebtedness with the proceeds of the loans made pursuant to the

DIP Facilities, including, without limitation, all Initial Purchased Assets, Additional

Receivables and interests therein, servicing rights related to each GMACM Serviced

Mortgage Loan (as defined in the DIP Credit Agreement), cash, general intangibles,

accounts, equipment, goods, inventory, fixtures, documents, instruments, chattel paper,

letters of credit and letters of credit rights, investment property, commercial tort claims,

money, deposit accounts (including the Borrower Accounts and the Collection Account (as

defined in the DIP Credit Agreement)), supporting obligations (each of foregoing terms as

defined in the Uniform Commercial Code as in effect from time to time in the State of

New York (the "**UCC**")), all books and records relating to the foregoing, and all other

personal and real property of the Borrowers, whether tangible or intangible, and all

proceeds (as defined in the UCC) and products of each of the foregoing, and (ii) a valid,

binding, continuing, enforceable, fully-perfected first priority priming lien on all such

property to the extent that such property is subject to any valid, perfected and non-

avoidable liens or security interests as of the Petition Date that are not being terminated as

a result of the repayment of Pre-Petition Refinanced Indebtedness;

(b)        *Borrowers' REO Subsidiaries Liens*.  Pursuant to sections 364(c)(2)

and 364(d) of the Bankruptcy Code, (i) a valid, binding, continuing, enforceable, fully-

perfected first priority senior security interest in and lien upon all property of GMACM

REO LLC and RFC REO LLC (together, the "**Borrowers' REO Subsidiaries**"), whether

existing on the Petition Date or thereafter arising, coming into existence or acquired,

whether tangible or intangible, whether real or personal, that (1) is not subject to valid,

perfected and non-avoidable liens or security interests as of the Petition Date or (2)

becomes unencumbered and is no longer subject to any lien or security interest as a result

of the repayment of the Pre-Petition Refinanced Indebtedness with the proceeds of the

loans made pursuant to the DIP Facilities, including, without limitation, all REO Property

(as defined in the DIP Credit Agreement) and interests therein, general intangibles,

accounts, equipment, goods, inventory, fixtures, documents, instruments, chattel paper,

letters of credit and letters of credit rights, investment property, commercial tort claims,

money, deposit accounts, supporting obligations (each of foregoing terms as defined in the

UCC), all books and records relating to the foregoing, and all other personal and real

property of the Borrowers' REO Subsidiaries, whether tangible or intangible, and all

proceeds (as defined in the UCC) and products of each of the foregoing; and (ii) a valid, binding, continuing, enforceable, fully-perfected first priority priming lien on all such property to the extent that such property is subject to any valid, perfected and non-avoidable liens or security interests as of the Petition Date that are not being terminated as a result of the repayment of Pre-Petition Refinanced Indebtedness;

(c)      *ResCap Lien.*   Pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code, (i) a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all right, title and interest of ResCap in the Concentration Account (as defined in the DIP Credit Agreement), which account shall initially be account no. 796682938 in the name of Residential Capital, LLC established at JPMorgan Chase Bank, N.A., and all funds from time to time held or deposited in the Concentration Account as well as all proceeds, products, additions, income, substitutions, replacements, rents and profits of or in respect of any of the foregoing, to the extent such property is not subject to valid, perfected and non-avoidable liens or security interests as of the Petition Date and (ii) a valid, binding, continuing, enforceable, fully-perfected priming lien on all such property to the extent that such property is subject to any valid, perfected and non-avoidable liens or security interests as of the Petition Date;

(d)      *Liens in Debtors' Rights under the Nationstar APA, the Deposit Escrow Agreement and APA Deposit Account.*   Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon the Debtors' rights to all cash deposits, rights under escrow agreements or other security or credit enhancements provided by or on behalf of a purchaser under any Sale Agreement (as defined in the DIP Credit Agreement), whether

now existing or hereafter arising, including, without limitation, the Debtors' rights under

the Nationstar Sale Agreement (as defined in the DIP Credit Agreement) to retain the Cash

Deposit (as defined in the Nationstar Sale Agreement), and the Debtors' right, title and

interest in, under and to the Deposit Escrow Agreement (as defined in the Nationstar Sale

Agreement), including, without limitation, the right to receive and retain the Cash Deposit

thereunder (collectively, together with the property identified in (a), (b), (c) above, the

"**First Lien Collateral**");

(e)        *Ally LOC Collateral Lien.*  Pursuant to sections 364(c)(3) and 364(d)

of the Bankruptcy Code, (i) a valid, binding, continuing, enforceable, fully-perfected

security interest in and lien upon all property of the Debtors, whether existing on the

Petition Date or thereafter arising, coming into existence or acquired, whether tangible or

intangible, whether real or personal, together with all proceeds and products thereof, that

constitutes, or hereafter becomes, the collateral purporting to secure the obligations under

the Ally Line of Credit,[11] including but not limited to the Repurchased Loans (as defined in

the Ally DIP Order), the HUD Claims (as defined in the Ally DIP Order) and the property

in which Ally, in its individual capacity as well as its capacities as Lender Agent and

Omnibus Agent under the Ally Line of Credit, is granted a lien or security interest after the

Petition Date as described in clauses (1) and (4) below, (the "**LOC Junior Lien**

**Collateral**"), which security interests and liens in favor of the Collateral Agent are junior

---

[11]    The " **Ally Line of Credit**" means the line of credit facility under the (i) the Amended and Restated Loan
Agreement, dated as of December 30, 2009, by and among the LOC Grantors (as defined below), and GMAC
Inc., as amended, supplemented or otherwise modified from time to time (the " **Ally LOC Agreement**") and (ii)
the other "Facility Documents" as that term is used in the Ally LOC Agreement, as amended or supplemented
prior to the date hereof.  The "**LOC Grantors**" means, collectively, ResCap, GMACM, RFC, Passive Asset
Transactions, LLC, RFC Asset Holdings II, LLC, and Equity Investment I, LLC, each a Delaware limited
liability company.

27

only to (1) the AFI DIP Liens (as defined in the Ally DIP Order); (2) liens and security interests granted to Ally, in its individual capacity as well as in its capacities as Lender Agent and Omnibus Agent under the Ally Line of Credit, in the LOC Junior Lien Collateral (for the avoidance of doubt, not including any liens that arise after, or were not perfected prior to, the Petition Date, or to liens that arise after the Petition Date but purport to relate back to periods prior to the Petition Date), (3) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (4) any replacement liens granted as adequate protection to Ally after the Petition Date to the extent of and to secure any diminution in value of its security interests and liens arising before the Petition Date in the LOC Junior Lien Collateral, in any of the Debtors' property existing on the Petition Date, or acquired thereafter, in the case of (1), (2), (3) and (4) above, securing aggregate obligations under the Ally Line of Credit in an amount not to exceed $600,000,000; and (ii) a valid, binding, continuing, enforceable, fully-perfected priority priming lien on all such property to the extent that such property is subject to any liens or security interests as of the Petition Date other than those described in clauses (1), (2), (3) or (4) of the preceding clause of this sub-paragraph; and

(f)      *GMACM MSR Lien*.  Pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, (i) a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all right, title and interest in all property of GMACM, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, whether tangible or intangible, whether real or personal, together with all proceeds and products thereof, that constitutes, or hereafter becomes, the collateral purporting to secure

the obligations under the MSR Facility,[12] including property in which Citibank, in its

capacity as secured lender under the MSR Facility, is granted a lien or security interest

after the Petition Date as described in clause (4) below, (the "**MSR Junior Lien**

**Collateral**" and, together with the LOC Junior Lien Collateral, the "**Junior Lien**

**Collateral**"), which security interests and liens in favor of the Collateral Agent are junior

only to (1) all rights, powers, and prerogatives of Freddie Mac under and in connection

with the Freddie Mac Purchase Documents (as defined in the Freddie Mac Guide) and

Fannie Mae under and in connection with the Fannie Mae Contract,[13] Freddie Mac's and

Fannie Mae's rights to setoff and recoupment with respect to the Junior Lien Collateral (to

the extent of Fannie Mae and Freddie Mac's interests in such Collateral); payment of (A)

Freddie Mac's claims arising from the Debtors' obligations to Freddie Mac, including,

without limitation, servicing transfer costs and (B) Fannie Mae's claims arising from the

Debtors' obligations to Fannie Mae, including, without limitation, servicing transfer costs;

and any other valid, perfected and non-avoidable security interests or liens of Fannie Mae

and/or Freddie Mac in existence as of the Petition Date against such property (collectively,

the rights and interests described in sub-clause (1) of this paragraph the "**Agency**

**Interests**", which such interests are expressly recognized by the Debtors); (2) liens and

---

[12]   The "**MSR Facility**" means the credit facility provided pursuant to (i) the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010, by and among GMACM, ResCap and Citibank, as amended or supplemented or otherwise modified from time to time (the "**MSR Loan Agreement**") and (ii) the other "Facility Documents" as that term is used in the MSR Loan Agreement, as amended or supplemented prior to the date hereof.

[13]   The "**Fannie Mae Contract**" means that certain Mortgage Selling and Servicing Contract, dated as of August 9, 2006, which incorporates the provisions of the Fannie Mae Selling and Servicing Guides and any Master Contracts or pool purchase contracts that Fannie Mae and GMAC Mortgage have entered into, as same have been and may be amended, supplemented or otherwise modified from time to time.

security interests granted to Citibank in the MSR Junior Lien Collateral (the "**Citibank Liens**") (for the avoidance of doubt, with respect to (1) and (2), not including any liens that arise after, or were not perfected prior to, the Petition Date, or to liens that arise after the Petition Date but purport to relate back to periods prior to the Petition Date), (3) valid and non-avoidable liens that are in existence immediately prior to the Petition Date that are (A) senior to the Citibank Liens or (B) perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (4) any replacement liens granted as adequate protection to Citibank or any holders of liens senior to Citibank after the Petition Date to the extent of and to secure any diminution in value of its security interests and liens arising before the Petition Date in the MSR Junior Lien Collateral, in any of the Debtors' property existing on the Petition Date, or acquired thereafter; and (ii) a valid, binding, continuing, enforceable, fully-perfected priority priming lien on all such property to the extent that such property is subject to any liens or security interests as of the Petition Date other than those described in clauses (1), (2), (3) or (4) of the preceding clause of this sub-paragraph.

(g)      Ally acknowledges and agrees that none of the security interests and liens arising before the Petition Date securing any obligations under the Prepetition Ally Revolver attach to any of the First Lien Collateral or the Junior Lien Collateral described herein.  Ally, in its individual capacity, as well as its capacities as Lender Agent and Omnibus Agent under the Ally Line of Credit, acknowledges and agrees that none of the security interests and liens arising before the Petition Date securing any obligations under the Ally Line of Credit attach to any of the First Lien Collateral or MSR Junior Lien Collateral described herein.  Citibank, as secured lender under the MSR Facility,

acknowledges and agrees that none of the security interests and liens arising before the

Petition Date securing any obligations under the MSR Facility attach to any of the First

Lien Collateral and the LOC Junior Lien Collateral described herein.  Any lien or other

equitable interest in any of the First Lien Collateral or the Junior Lien Collateral

purportedly securing the pre-Petition Date Junior Secured Note obligations is subordinate

and junior to the liens and security interests in such Collateral securing the DIP

Obligations.  For the avoidance of doubt, nothing in this Order or the Credit Documents

shall discharge, release, or otherwise preclude any setoff or recoupment right of the United

States of America, its agencies, departments, or agents, in the Junior Lien Collateral.

(h)    Except as expressly provided herein with respect to the Junior Lien

Collateral, the DIP Liens granted hereunder do not attach to any Agency Interests of

Fannie Mae, including, without limitation, any Agency Interests relating to the EAF

Facility or the EAF Collateral (as each such term is defined in the DIP Credit Agreement).

(i)    Fannie Mae acknowledges and agrees that none of the Agency

Interests, including, without limitation, any Agency Interests relating to the EAF Facility

or the EAF Collateral, attach to any of the First Lien Collateral.

(j)    For so long as any of the DIP Obligations remain outstanding, (i)

there shall be no liens on the First Lien Collateral, other than the liens granted to the

Collateral Agent for the benefit of the Secured Parties; and (ii) the Ally Line of Credit

obligations shall not exceed $600,000,000.

(k)    Except as set forth in sub-paragraphs (e) and (f) of this paragraph,

any liens granted as adequate protection to any secured party, including but not limited to

(i) Ally as a secured lender under the Prepetition Ally Revolver and (ii) Wells Fargo Bank,

N.A., as collateral agent for the holders of the Prepetition Junior Secured Notes, are junior and subordinate to the DIP Liens in the Collateral granted to the Collateral Agent, for the benefit of the Secured Parties pursuant to this Order.

12.    *Proceeds of Collateral.*

(a)    All proceeds of the GMACM Borrower's and the RFC Borrower's Receivables and Mortgage Loans and all proceeds of the REO Property of the Borrowers' REO Subsidiaries of any kind which are now or shall hereafter come into the possession or control of any Debtor (including, without limitation, ResCap, or any Debtor servicer), or to which any Debtor is now or shall become entitled under the Credit Documents, shall be promptly deposited into the Borrower Accounts (as defined in the DIP Credit Agreement) upon which the Collateral Agent shall have first priority liens pursuant to this Order, and such collections and proceeds shall remain subject to the DIP Liens and shall be treated in accordance with this Order and the Credit Documents.  As more fully described in the DIP Credit Agreement, funds on deposit in the Borrower Accounts may be swept from time to time to the Concentration Account, subject to the Collateral Agent's first priority perfected DIP Liens.  Each time funds in the Borrower Accounts are swept to the Concentration Account, ResCap shall become obligated (i) to the GMACM Borrower in the amount swept into the Concentration Account from the GMACM Borrower Accounts (as defined in the DIP Credit Agreement) and (ii) to the RFC Borrower in the amount swept into the Concentration Account from the RFC Borrower Accounts (as defined in the DIP Credit Agreement).  Such intercompany indebtedness shall be payable by ResCap upon demand by the applicable Borrower or, upon the occurrence of an Event of Default under the DIP Credit Agreement (such term as defined therein), by the Collateral Agent.  Subject to the

provisions of this Order, all financial institutions in which (i) the Borrower Accounts,

(ii) the Concentration Account, (iii) the Collection Account (as defined in the DIP Credit

Agreement), or (iv) any other deposit accounts, lockboxes, blocked accounts or other

accounts of any of the Debtors holding the proceeds of any of the First Lien Collateral are

located are hereby authorized and directed to comply with any request of the Collateral

Agent to turn over to the Collateral Agent all funds therein without setoff, recoupment or

deduction of any kind.

(b)      All proceeds of LOC Junior Lien Collateral of any kind which are

now or shall hereafter come into the possession or control of any Debtor, or to which any

Debtor shall become entitled under the Credit Documents, shall be promptly deposited in

the LOC Accounts (as defined in the Credit Documents), with all liens and security

interests in such LOC Accounts and amounts on deposit therein having the priorities set

forth in paragraph 11 above.

13.    *Protection of DIP Lenders' Rights*.  The automatic stay provisions of section 362

of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the

need for any further order of the Court:

(a)      to permit the Administrative Agent to make Protective Advances (as

defined in the DIP Credit Agreement) upon the terms and subject to the conditions set forth

in the DIP Credit Agreement; and

(b)      to permit the Administrative Agent and/or Collateral Agent to

exercise, upon the occurrence of any Event of Default under the Credit Documents, all

rights and remedies under the Credit Documents, and, to the extent provided for in the

Credit Documents, to take any or all of the following actions without further order of or

application to this Court:  (i) cease to make any extensions of credit or loans or advances to

the Debtors and declare the DIP Lenders' commitments under the DIP Facilities terminated;

(ii) declare all DIP Obligations to be immediately due and payable without presentment,

demand, protest or notice; (iii) to provide any Activation Notice (as defined in the DIP

Credit Agreement); (iv) direct the Collateral Agent to (and the Collateral Agent shall)

exercise its remedies under any Deposit Account Control Agreements (as defined in the

DIP Credit Agreement) to block withdrawals from the Borrower Accounts, the Collection

Account and the Concentration Account; (v) set off and apply immediately any and all

amounts in accounts maintained by any Debtor with the Administrative Agent, Collateral

Agent or any DIP Lender against the DIP Obligations; and (vi) take any other actions or

exercise any other rights or remedies permitted under this Order, the Credit Documents, or

applicable law to realize upon the Collateral and/or effect the repayment and satisfaction of

the DIP Obligations; subject to the Administrative Agent and/or the Collateral Agent

providing seven (7) days written notice (by facsimile, telecopy, electronic mail or

otherwise) to the U.S. Trustee, counsel to the Debtors and counsel to any Committee prior

to exercising any enforcement rights or remedies in respect of the Collateral (other than the

rights described in clauses (i), (ii), (iii) and (iv) above (to the extent they might be deemed

remedies in respect of the Collateral) and other than with respect to the placement of

administrative holds on any other deposit accounts or securities accounts).

      (c)      In any hearing regarding any exercise of rights or remedies by the

Administrative Agent and/or the Collateral Agent, the only issue that may be raised by the

Debtors and any party in interest shall be whether, in fact, an Event of Default under the

Credit Documents has occurred and is continuing, and neither the Debtors nor any party in

interest shall be entitled to seek relief, including, without limitation, under section 105 of

the Bankruptcy Code, to the extent such relief would in any way impair or restrict the

rights and remedies of the Administrative Agent, the Collateral Agent or the DIP Lenders

set forth in this Order or the Credit Documents.  In no event shall the Administrative Agent,

the Collateral Agent or the DIP Lenders be subject to the equitable doctrine of

"marshaling" or any similar doctrine with respect to the Collateral.

(d)       The Pre-Petition Finance Parties shall deliver or cause to be

delivered, at the Debtors' cost and expense (for which the Pre-Petition Finance Parties shall

be reimbursed upon submission to the Debtors of invoices or billing statements without

any need for Court approval), any termination statements, releases or other documents

necessary to effectuate and/or evidence the release and termination of the Pre-Petition

Finance Parties' liens on or security interests in any portion of the Initial Purchased Assets.

(e)       Until the payment in full of the DIP Obligations and the termination

of the Revolving Commitments (as defined in the DIP Credit Agreement), the Collateral

Agent shall have the exclusive right to enforce and exercise rights and remedies in respect

of the LOC Junior Lien Collateral including, without limitation, the right to direct or

provide direction or orders to Ally or any custodian, depository bank or securities

intermediary and Ally shall (to the extent not subject to any stay) refrain from taking any

such actions or any other enforcement actions or exercising any rights and remedies or

otherwise interfering with the Collateral Agent's enforcement actions or exercise of rights;

*provided* that the first $600,000,000 of the proceeds of the LOC Junior Lien Collateral

shall be deposited into a cash collateral account that is an LOC Account for the benefit of

Ally pending further order of this Court, *provided* that the Collateral Agent shall retain its

liens in such account in the same priority described in paragraph 11(e); *provided*, *further*, that any proceeds of the LOC Junior Lien Collateral in excess of $600,000,000 shall be applied by the Collateral Agent to satisfaction of the DIP Obligations, in accordance with the DIP Credit Agreement.

(f)    Until the payment in full of the DIP Obligations and the termination of the Revolving Commitments, any party other than the Collateral Agent that has or obtains a lien or security interest in the LOC Junior Lien Collateral shall not exercise any rights or remedies with respect to the LOC Junior Lien Collateral.

(g)    Notwithstanding paragraphs 13(e) and (f) above, Ally shall be permitted to enforce its rights and exercise its remedies against the LOC Junior Lien Collateral during any period in which (i) Ally is not subject to any stay prohibiting the same and (ii) (x) the Collateral Agent is subject to a stay from enforcing its rights and exercising its remedies (both individually and on behalf of the Secured Parties) or (y) the Collateral Agent shall have failed to enforce its rights or exercise its remedies for twenty (20) days following the seven (7) day notice period referenced in paragraph 13(b) above (or any longer period imposed by the Court).  Ally shall provide the Collateral Agent and Administrative Agent not less than seven (7) days notice of its intent to enforce rights or exercise remedies against the LOC Junior Lien Collateral.

14.    *Limitation on Charging Expenses Against Collateral*.  Subject only to, and effective upon entry of, the Final Order and only to the extent provided for therein, except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code and the cost of preservation or disposition of the Collateral, shall be charged

against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or

any similar principle of law, without the prior written consent of the Administrative Agent, and

no such consent shall be implied from any other action, inaction, or acquiescence by the

Administrative Agent, the Collateral Agent or the DIP Lenders.  The Debtors (for themselves

and their estates) hereby irrevocably waive and relinquish any rights they may have under

section 506(c) of the Bankruptcy Code with respect to the Collateral.

      15.    *Perfection of DIP Liens*.

      (a)    The Administrative Agent and the Collateral Agent, on behalf of the

Secured Parties, are each hereby authorized, but not required, to file or record financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar

instruments in any jurisdiction, or take possession of or control over, or take any other

action in order to validate and perfect the liens and security interests granted hereunder.

Whether or not the Administrative Agent or the Collateral Agent, on behalf of the Secured

Parties shall, in its sole discretion, choose to file such financing statements, trademark

filings, copyright filings, mortgages, notices of lien or similar instruments, or take

possession of or control over, or otherwise confirm perfection of the liens and security

interests granted hereunder, such liens and security interests shall be deemed valid,

perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or

subordination, at the time and on the date of entry of this Order.  Without limitation of the

foregoing, the Collateral Agent on behalf of the Secured Parties shall have a perfected lien

upon and security interest of the same relative priority or priorities set forth in paragraphs

11(e) and 11(f) in all bank accounts in which any cash constituting Junior Lien Collateral

is deposited, without any need for entering into any control agreement.

(b)      A certified copy of this Order may, in the discretion of the Administrative Agent or the Collateral Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.  For the avoidance of doubt, the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Administrative Agent, the Collateral Agent, and the Secured Parties to take all actions, as applicable, referenced in this paragraph 15.

16.      *Preservation of Rights Granted Under this Order*.

(a)      Except as otherwise provided for herein (including as to the Junior Lien Collateral and the collateral for the Prepetition Ally Revolver), no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the Collateral Agent, the Administrative Agent and/or the DIP Lenders shall be granted or allowed while any portion of the DIP Facilities (or any refinancing thereof) or the commitments thereunder or the DIP Obligations remain outstanding, and the DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise other than the Carve Out and as expressly provided in this Order with respect to the Junior Lien Collateral.

(b)      Unless all DIP Obligations shall have been indefeasibly paid in full, the Debtors shall not seek (i) any modifications or extensions of this Order without the prior written consent of the Administrative Agent, and no such consent shall be implied by

any other action, inaction or acquiescence by the Administrative Agent, or (ii) an order

converting or dismissing any of the Cases.  If an order dismissing any of the Cases under

section 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order

shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the

Superpriority Claims and DIP Liens granted to the Administrative Agent, the Collateral

Agent and the DIP Lenders pursuant to this Order shall continue in full force and effect,

shall maintain their priorities as provided in this Order and shall, notwithstanding such

dismissal, remain binding on all parties in interest until all DIP Obligations shall have been

indefeasibly paid in full in cash and the commitments under the DIP Facilities have been

terminated in accordance with the Credit Documents and (ii) this Court shall retain

jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the

Superpriority Claims and DIP Liens.

(c)      If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect

(i) the validity of any DIP Obligations incurred prior to the actual receipt by the

Administrative Agent of written notice of the effective date of such reversal, stay,

modification or vacation or (ii) the validity or enforceability of the DIP Liens and

Superpriority Claims authorized or created hereby or pursuant to the Credit Documents

with respect to any DIP Obligations.  Notwithstanding any such reversal, stay,

modification or vacation, the DIP Obligations incurred by the Debtors pursuant to the

Credit Documents, prior to the actual receipt by the Administrative Agent of written notice

of the effective date of such reversal, stay, modification or vacation shall be governed in all

respects by the original provisions of this Order, and the Administrative Agent, the DIP

Lenders, and the other Secured Parties, shall be entitled to all the rights, remedies,

privileges and benefits granted in section 364(e) of the Bankruptcy Code (including,

without limitation, in respect of any payments received in connection with the refinancing

of the Pre-Petition Refinanced Facilities), this Order and pursuant to the Credit Documents.

(d)    If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect

the validity of any purchases of Receivables or Mortgage Loans by the Borrowers pursuant

to the Receivables Purchase Agreements, the Receivables Pooling Agreements or the

Mortgage Loan Purchase and Contribution Agreements or related obligations incurred

under such agreements, if such purchases and obligations were effected or incurred, as

applicable, prior to the actual receipt by the Administrative Agent of written notice of the

effective date of such reversal, stay, modification or vacation.  Notwithstanding any such

reversal, stay, modification or vacation, purchases of Receivables or Mortgage Loans by

the Borrowers pursuant to the Receivables Purchase Agreements, the Receivables Pooling

Agreements and the Mortgage Loan Purchase and Contribution Agreements and related

obligations incurred under such agreements, if such purchases and obligations were

effected or incurred, as applicable, prior to the actual receipt by the Administrative Agent

of written notice of the effective date of such reversal, stay, modification or vacation, shall

be governed in all respects by the original provisions of this Order, and the Borrowers and

the Administrative Agent shall be entitled to all the rights, remedies, privileges and

benefits granted in section 363(m) of the Bankruptcy Code, this Order and pursuant to the

Receivables Purchase Agreements, the Receivables Pooling Agreements and the Mortgage

Loan Purchase and Contribution Agreements.

(e)       Except as expressly permitted by section 6.08(d) of the DIP Credit

Agreement with respect to up to $25 million of First Lien Collateral, no order providing

for the sale of any First Lien Collateral under section 363 or any other provision of the

Bankruptcy Code shall be entered by this Court unless in connection with and concurrently

with the consummation of such sale, the proceeds of such sale are used to satisfy the DIP

Obligations in full in cash.

(f)       Except as expressly provided in this Order or in the Credit

Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of

the Administrative Agent and the DIP Lenders granted by the provisions of this Order and

the Credit Documents shall survive, and shall not be modified, impaired or discharged by

(i) the entry of an order converting any of the Cases to a case under chapter 7 of the

Bankruptcy Code, dismissing any of the Cases, terminating the joint administration of

these Cases or by any other act or omission, (ii) the entry of an order approving the sale of

any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent

permitted by the Credit Documents) or (iii) the entry of an order confirming a plan of

reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy

Code, the Debtors have waived any discharge as to any remaining DIP Obligations.  The

terms and provisions of this Order and the Credit Documents shall continue in these Cases,

in any successor cases if these Cases cease to be jointly administered, or in any

superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the

Superpriority Claims and all other rights and remedies of the Administrative Agent and the

DIP Lenders granted by the provisions of this Order and the Credit Documents shall

continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

41

17.     *Effect of Stipulations on Third Parties*.  The stipulations, admissions, and releases

contained in paragraph 4(a)-(c) and 4(e) (and not 4(d)) of this Order, shall be binding on the

Debtors upon entry of this Interim Order, effective as of the Petition Date.  The stipulations,

admissions, and releases contained in paragraph 4(a)-(c) and 4(e) (and not 4(d)) of this Order,

shall be binding on all parties in interest, including, without limitation, any Committee, unless,

and solely to the extent that, any party in interest files an objection to this Order challenging such

stipulations, admissions, releases, or otherwise asserting any claims or causes of action on behalf

of the Debtors' estates against the Released Parties (an "**Objection**"), in each case no later than

seventy-five (75) days after the Petition Date.  If no such Objection is timely filed then, without

further order of this Court, all of the stipulations, admissions and releases set forth in paragraph 4

shall be binding on all parties in interest in the Cases and shall not be subject to challenge or

modification in any respect.  If such an Objection is timely filed, the stipulations, admissions and

releases shall nonetheless remain binding on all parties in interest and shall be preclusive except

to the extent that any such stipulations, admissions and releases are expressly challenged

pursuant to such timely filed Objection, and there is an order sustaining such Objection.

18.     *Limitation on Use of Financing Proceeds and Collateral*.  Notwithstanding

anything herein or in any other order by this Court to the contrary, no portion of the Loans, shall

be used in connection with the investigation, initiation or prosecution of any claims against the

Administrative Agent or any DIP Lender or other holder of DIP Obligations under the Credit

Documents or against any noteholder, agent, trustee or other holder of obligations under the Pre-

Petition GSAP Facility and/or the DIP Facilities; *provided* that, without duplication of the

limitations on the use of the Carve Out, up to $100,000 in the aggregate of such proceeds may be

used to pay allowed fees and expenses of professionals to any Committee to investigate (but not

initiate or prosecute any claims with respect to) any Prepetition Refinanced Indebtedness (as

defined in the DIP Credit Agreement).  No portion of any Loan shall be used (i) to make any

Prepetition Payment (as defined in the DIP Credit Agreement) except as permitted under the DIP

Credit Agreement, and then only in accordance with the Approved DIP Budget, (ii) for any act

which has the effect of materially or adversely modifying or compromising the rights and

remedies of any Agent or DIP Lender as set forth herein and in the other Credit Documents, or

which results in the occurrence of an Event of Default, or (iii) in any manner that causes or might

cause such a Loan to violate Regulation T, Regulation U or Regulation X of the Board of

Governors of the Federal Reserve System of the United States or any other regulation thereof or

to violate the Securities Exchange Act of 1934.  No portion of any Loans or the proceeds of any

Collateral, including cash collateral, shall be used for any purpose other than as provided for in

the Approved DIP Budget.

19.     *Notice to MBS Trustees Regarding Advance Facility and Borrowers' Status as an
Advancing Person/Advancing Counterparty.*  The DIP Facilities shall constitute an "Advance

Facility" as described in each Designated Servicing Agreement giving rise to Receivables, and

the applicable Borrower shall constitute an "Advancing Person," an "Advance Facility

Counterparty", or the party to whom the master servicer's or servicer's advance reimbursement

rights have been sold, assigned and/or pledged (as such party may be otherwise defined), for

purposes thereof.  The Debtors shall serve this Order and Notice of the Final Hearing on all MBS

Trustees and other identified persons to be noticed under the applicable provisions of the

Designated Servicing Agreements.  Service of this Order in accordance with the preceding

sentence shall constitute notice and payment direction under such Designated Servicing

Agreements by the master servicer and servicer to each MBS Trustee to pay, or cause to be paid,

all collections with respect to, and all other proceeds of, Receivables to the applicable Borrower,

as an Advancing Person, Advance Facility Counterparty, or the party to whom the master

servicer's or servicer's advance reimbursement rights have been sold, assigned and/or pledged (as

such party may be otherwise defined), as provided in such Designated Servicing Agreements,

and each MBS Trustee shall pay, or cause to be paid, all collections with respect to, and all other

proceeds of, Receivables to the applicable Borrower, as an Advancing Person, Advance Facility

Counterparty or the party to whom the master servicer's or servicer's advance reimbursement

rights have been sold, assigned and/or pledged (as such party may be otherwise defined) as so

provided.  **Applicable payment instructions are the same as the instructions in effect prior**

**to the Petition Date: GMACM and RFC, while acting as master servicer or servicer under**

**the Designated Servicing Agreements, shall cause such payments to be made on behalf of**

**the MBS Trustees and any advance reimbursement to be remitted to the applicable**

**Borrower**.  Upon service of this Order, as provided in this paragraph, each MBS Trustee shall be

deemed to have recognized the separate and distinct interests of the applicable Borrower in such

Receivables and the proceeds thereof as agreed in and required pursuant to the terms of the

Designated Servicing Agreements, and the lien of the Collateral Agent on such Receivables and

proceeds.

20.     *Notice to Third-Party Servicers of Transfer of Specified Mortgage Loans to the*

*Borrowers and Grant of Liens to Collateral Agent in Specified Mortgage Loans.*  The Debtors

shall serve this Order and notice of the Final Hearing on all non-Debtor servicers of the Specified

Mortgage Loans (as defined in the DIP Credit Agreement).  Such service shall constitute notice

under the Specified Servicing Agreements by GMACM or RFC, as applicable, to the third-party

servicers of the transfer of the Specified Mortgage Loans to the applicable Borrowers; the grant

44

of liens on such Specified Mortgage Loans and the related servicing rights as set forth in

paragraph 11(a) of this Order to the Collateral Agent for the benefit of the Secured Parties.  Upon

service of this Order, as provided in this paragraph, each third-party servicer (a) shall be deemed

to have acknowledged the Borrowers' respective ownership of the Specified Mortgage Loans; the

lien of the Collateral Agent on such Specified Mortgage Loans, and the related servicing rights

and the proceeds thereof; and (b) is hereby directed, in the event of the Collateral Agent's

exercise of remedies in accordance with the Credit Documents and this Order, to take direction

exclusively from the Collateral Agent with respect to (x) the Specified Mortgage Loans or any

proceeds thereof and (y) the Specified Servicing Agreements.

21.    *Order Governs.*  In the event of any inconsistency between the provisions of this

Order and the Credit Documents, the provisions of this Order shall govern.

22.    *Binding Effect; Successors and Assigns.*  Except as expressly provided herein, the

Credit Documents and the provisions of this Order, including all findings herein, shall be binding

upon all parties in interest in these Cases, including, without limitation, the Administrative Agent,

the Collateral Agent, the DIP Lenders, the Pre-Petition Finance Parties, any Committee and the

Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee

hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit

of the Administrative Agent, the DIP Lenders, the Pre-Petition Finance Parties and the Debtors

and their respective successors and assigns; provided, however, that the Administrative Agent

and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or

similar responsible person appointed for the estates of the Debtors.  In determining to make any

loan under the DIP Credit Agreement or in exercising any rights or remedies as and when

permitted pursuant to this Order or the Credit Documents, the Administrative Agent and the DIP

45

Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a

"responsible person" or "owner or operator" with respect to the operation or management of the

Debtors, so long as the DIP Lenders' actions do not constitute, within the meaning of 42 U.S.C.

§ 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility

owned or operated by a Debtor, or cause the status of responsible person or managing agent to

exist under applicable law (as such terms, or any similar terms, are used in the United States

Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et

seq., as amended, or any similar federal or state statute).  Nothing in this Order or the Credit

Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).  Further, nothing in this Order

providing for the release of non-Debtors or injunction of actions against non-Debtors shall apply

to (a) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies

and liabilities of the United States and any agency thereof, (b) any claims, debts, obligations,

rights, suits, damages, actions, causes of action, remedies, and liabilities of any State or any

agency of any State, under state or federal environmental laws, or (c) any criminal liability under

the laws of the United States.  Notwithstanding anything herein to the contrary, this Order shall

not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the

Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and

among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

23.     *Future Debtors.*  Upon notice to the parties and no objection having been

interposed, an affiliated debtor shall be deemed to be a "Future Debtor" upon the Court's entry

of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the

Chapter 11 cases of the Debtors.  Upon notice to the parties and no objection having been

interposed, the relief granted by this Order shall apply to the Future Debtor in these jointly-

administered cases.

24.     *Final Hearing*.  The Final Hearing is scheduled for June 12**,** 2012 at 10 a.m.

before this Court.  The Debtors shall promptly mail copies of this Order (which shall constitute

adequate notice of the Final Hearing, including without limitation, notice that the Debtors will

seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy

Code) to the parties having been given notice of the Interim Hearing, and to any other party that

has filed a request for notices with this Court and to any Committee after the same has been

appointed, or to counsel to any Committee, after the same shall have been appointed.  Any party

in interest objecting to the relief sought at the Final Hearing shall serve and file written

objections; which objections shall be served upon (a) Morrison & Foerster LLP, 1290 Avenue of

the Americas, New York, NY 10104 (Attention: Larren M. Nashelsky (LNashelsky@mofo.com)

and Todd M. Goren (TGoren@mofo.com), attorneys for the Debtors; (b) Skadden, Arps, Slate,

Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attention: Kenneth S.

Ziman (Ken.Ziman@skadden.com) and Jonathan H. Hofer (jhofer@skadden.com)), attorneys for

Barclays Bank PLC, as Administrative Agent; (c) Kirkland & Ellis LLP, 601 Lexington Avenue,

New York, New York 10022 (Attention: Richard M. Cieri (richard.cieri@kirkland.com), Ray C.

Schrock (ray.schrock@kirkland.com), and Stephen E. Hessler (stephen.hessler@kirkland.com)),

attorneys for Ally Financial Inc.; and (d) the Office of the United States Trustee for the Southern

District of New York, and shall be filed with the Clerk of the United States Bankruptcy Court,

Southern District of New York, 33 Whitehall Street, 21st Floor New York, New York 10004,  in

each case to allow actual receipt by the foregoing no later than June 5, 2012 at 4 p.m., prevailing

Eastern time.


Dated: May 15, 2012
      New York, New York


                                    _____*s/ James M. Peck*_____
                                    Honorable James M. Peck
                                    United States Bankruptcy Judge