# EXHIBIT B

## SUPERPRIORITY DEBTOR-IN-POSSESSION

## CREDIT AND GUARANTY AGREEMENT

dated as of May ~~15,~~16, 2012

among

### GMACM BORROWER LLC,
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as a Borrower,

### RFC BORROWER LLC,
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as a Borrower,

### RESIDENTIAL CAPITAL, LLC,
### GMAC MORTGAGE, LLC,
### RESIDENTIAL FUNDING COMPANY, LLC and
### CERTAIN SUBSIDIARIES OF RESIDENTIAL CAPITAL, LLC,
each a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as Guarantors,

### GMAC MORTGAGE, LLC and
### RESIDENTIAL FUNDING COMPANY, LLC,
as Administrators, Originators, Receivables Custodians and Servicers,

### GMAC MORTGAGE, LLC,
as GMACM Servicer,

### THE LENDERS PARTY HERETO,

### BARCLAYS BANK PLC,
as Administrative Agent,

### BARCLAYS BANK PLC,
as Collateral Agent,

### BARCLAYS BANK PLC,
as Syndication Agent and as Documentation Agent,

and

### BARCLAYS BANK PLC,
as Bookrunner and Lead Arranger for the Credit Facilities

---

$200,000,000 Superpriority Debtor-in-Possession Revolving Facility

$1,050,000,000 Superpriority Debtor-in-Possession Term A-1 Facility

$200,000,000 Superpriority Debtor-in-Possession Term A-2 Facility

---

## TABLE OF CONTENTS

PAGE

**ARTICLE I DEFINITIONS AND INTERPRETATION** ...................................**2**
 Section 1.01  Definitions........................................................................2
 Section 1.02  Accounting Terms..........................................................62
 Section 1.03  Interpretation, Etc. .....................................................~~63~~62
**ARTICLE II LOANS** .................................................................................~~64~~63
 Section 2.01  Term Loans .................................................................~~64~~63
 Section 2.02  Revolving Loans ............................................................64
 Section 2.03  ~~Intentionally Omitted~~............................................~~66~~[Reserved] 65
 Section 2.04  ~~Intentionally Omitted~~ ...........................................~~66~~[Reserved] 65
 Section 2.05  Pro Rata Shares; Availability of Funds.................................~~66~~65
 Section 2.06  Use of Proceeds...............................................................66
 Section 2.07  Evidence of Debt; Register; Lenders' Books and Records; Notes.............................................................................67
 Section 2.08  Interest on Loans .........................................................~~68~~67
 Section 2.09  Conversion/Continuation ..................................................69
 Section 2.10  Default Interest............................................................~~70~~69
 Section 2.11  Fees................................................................................70
 Section 2.12  Protective Advances.........................................................70
 Section 2.13  Voluntary Prepayments/Commitment Reductions .......................71
 Section 2.14  Mandatory Prepayments ..................................................72
 Section 2.15  Application of Prepayments...............................................73
 Section 2.16  General Provisions Regarding Payments.............................73
 Section 2.17  Ratable Sharing.............................................................~~75~~74
 Section 2.18  Making or Maintaining Eurodollar Rate Loans ...........................75
 Section 2.19  Increased Costs; Capital Adequacy ......................................77
 Section 2.20  Taxes: Withholding, Etc. .................................................78
 Section 2.21  Obligation to Mitigate.....................................................~~82~~81
 Section 2.22  Defaulting Lenders..........................................................82
 Section 2.23  Removal or Replacement of a Lender ...................................~~83~~82
 Section 2.24  Determination of Borrowing Base and Collateral Amount ..........83
 Section 2.25  Priority and Liens Applicable to Credit Parties ...........................86
 Section 2.26  Payment of Obligations...................................................87
 Section 2.27  No Discharge; Survival of Claims.....................................87
**ARTICLE III CONDITIONS PRECEDENT** ...............................................**88**
 Section 3.01  Closing Date....................................................................88
 Section 3.02  Conditions to Revolver Post-Closing Availability Date...............93
 Section 3.03  Conditions to Each Credit Date .........................................~~94~~93
 Section 3.04  Conditions to Each Withdrawal Date .................................95
**ARTICLE IV REPRESENTATIONS AND WARRANTIES** ...............................**97**
 Section 4.01  Organization; Requisite Power and Authority; Qualification........97
 Section 4.02  Capital Stock and Ownership.............................................97
 Section 4.03  Due Authorization............................................................98
 Section 4.04  No Conflict.....................................................................98

i

Section 4.05    Governmental and Other Consents ...............................................98
Section 4.06    Binding Obligation.........................................................~~98~~99
Section 4.07    Financial Statements ..............................................................99
Section 4.08    Projections..........................................................................99
Section 4.09    Approved DIP Budget ............................................................99
Section 4.10    No Material Adverse Effect .....................................................99
Section 4.11    Insurance.............................................................................99
Section 4.12    Adverse Proceedings, Etc. .................................................~~99~~100
Section 4.13    Payment of Taxes ................................................................100
Section 4.14    Properties ..........................................................................100
Section 4.15    Environmental Matters.........................................................101
Section 4.16    No Defaults ........................................................................101
Section 4.17    Material Contracts ...........................................................~~101~~102
Section 4.18    Governmental Regulation .....................................................102
Section 4.19    Margin Stock.......................................................................102
Section 4.20    Employee Matters ...............................................................102
Section 4.21    Employee Benefit Plans....................................................~~102~~103
Section 4.22    Specified Permitted Indebtedness Documents and
                Underlying Documents.........................................................103
Section 4.23    Compliance with Statutes, Etc. .............................................103
Section 4.24    Accuracy of First Lien Collateral Schedules .....................~~103~~104
Section 4.25    Disclosure ..........................................................................104
Section 4.26    Patriot Act ..........................................................................104
Section 4.27    Location of Books and Records ........................................~~104~~105
Section 4.28    Accuracy of Borrowing Base and Collateral Amount ..........~~104~~105
Section 4.29    Post-Audit Asset Dispositions .........................................~~104~~105
Section 4.30    Collateral Documents...........................................................105
Section 4.31    ResCap ..........................................................................~~105~~106
Section 4.32    Borrowers.......................................................................~~105~~106
Section 4.33    Adverse Actions..................................................................106
Section 4.34    The Orders .........................................................................106
Section 4.35    Cash Collateral and Other Orders..........................................106
Section 4.36    Provision of Information ..................................................~~106~~107
Section 4.37    MERS.................................................................................107
Section 4.38    GMACM Serviced /Specified Mortgage Loans .........................107
Section 4.39    Mortgage Loan Level Representations and Warranties...............107
Section 4.40    Administrators' and Servicers' Additional Representation
                and Warranty.....................................................................107
Section 4.41    Servicers and Subservicers ..................................................107
**ARTICLE V AFFIRMATIVE COVENANTS........................................................108**
Section 5.01    Financial Statements and Other Reports....................................108
Section 5.02    Approved DIP Budget ..........................................................116
Section 5.03    Existence ............................................................................117
Section 5.04    Payment of Taxes ................................................................117
Section 5.05    Maintenance of Properties ....................................................118
Section 5.06    Insurance............................................................................118

ii

Section 5.07        Maintaining Records; Access to Properties and Inspections;
                    Lender Discussions .................................................. ~~118~~119
Section 5.08        Compliance with Credit Documents ............................................. 119
Section 5.09        Compliance with Laws ................................................................ 119
Section 5.10        Environmental ............................................................................. 120
Section 5.11        Subsidiaries ................................................................................. 120
Section 5.12        Security Interests; Further Assurances........................................ 120
Section 5.13        Non-Consolidation ................................................................ ~~121~~120
Section 5.14        Information Regarding Collateral .......................................... ~~121~~120
Section 5.15        LOC Junior Lien Collateral ................................................... ~~122~~120
Section 5.16        Credit Rating .......................................................................... ~~122~~120
Section 5.17        Final Financing Order ............................................................ ~~122~~120
Section 5.18        Advisory Firm ........................................................................ ~~122~~120
Section 5.19        Servicing ................................................................................. ~~122~~120
Section 5.20        Receivables ............................................................................. ~~123~~120
Section 5.21        Obligations and Contractual Exercise of Rights and
                    Remedies................................................................................. ~~123~~120
Section 5.22        Custodial Procedures ............................................................. ~~124~~120
Section 5.23        REO Property ......................................................................... ~~124~~120
Section 5.24        Mortgage Loan Level Representations and Warranties.......... ~~124~~120
Section 5.25        MERS....................................................................................... ~~124~~120
Section 5.26        Servicing of GMACM Serviced Mortgage Loans ................. ~~124~~120
Section 5.27        Corporate Separateness of Borrowers; Related Matters and
                    Covenants................................................................................ ~~125~~120
Section 5.28        Corporate Separateness of the Borrowers' REO
                    Subsidiaries; Related Matters and Covenants ........................ ~~125~~120
Section 5.29        Amendments to Servicing Agreements ................................... ~~125~~120
Section 5.30        Notice of Security Interest in Receivables............................. ~~126~~120
Section 5.31        Acquisition of Residual Interests .......................................... ~~126~~120
Section 5.32        Compliance with Designated Servicing Agreements ............ ~~126~~120
Section 5.33        Payment of Fees and Administrative Expenses..................... ~~126~~120
Section 5.34        Reimbursement of Non-Recoverable Advances.................... ~~126~~120
Section 5.35        MBS Trust Collection Accounts............................................ ~~126~~120
Section 5.36        Verification Agent Duties with respect to MBS Trust
                    Accounts ................................................................................. ~~126~~120
Section 5.37        Broker's Price Opinions ........................................................ ~~126~~120
Section 5.38        Senior Management ............................................................... ~~127~~120
Section 5.39        Obligations Regarding Sale Process ...................................... ~~127~~120
Section 5.40        Servicer Acknowledgment and Instruction Letters............... ~~127~~120
Section 5.41        Borrowing Base and Collateral Amount Certificate
                    Variances................................................................................. ~~127~~120
Section 5.42        Notification of MBS Trustees................................................ ~~127~~120
Section 5.43        Collections; Blocked Accounts.............................................. ~~128~~120
Section 5.44        Delaware Statutory Trusts..................................................... ~~128~~120
**ARTICLE VI NEGATIVE COVENANTS** ..................................................... ~~128~~**120**
Section 6.01        Indebtedness.......................................................................... ~~128~~120

Section 6.02      Liens...........................................................................129120
Section 6.03      No Further Negative Pledges ............................................132120
Section 6.04      Restricted Junior Payments ..............................................132120
Section 6.05      Restrictions on Subsidiary Distributions ...........................132120
Section 6.06      Investments ......................................................................132120
Section 6.07      Financial Covenants ........................................................134120
Section 6.08      Fundamental Changes; Disposition of Assets; Acquisitions .134120
Section 6.09      Disposal Of Subsidiary Interests ......................................135120
Section 6.10      Mortgage Loan Servicing Fees .........................................136120
Section 6.11      Transactions with Shareholders and Affiliates ...................136120
Section 6.12      Conduct of Business .........................................................136120
Section 6.13      Permitted Activities of ResCap..........................................136120
Section 6.14      Amendments or Waivers of Certain Agreements ..................136120
Section 6.15      Fiscal Year .......................................................................137120
Section 6.16      Use of Proceeds................................................................137120
Section 6.17      Other Superpriority Claims ...............................................137120
Section 6.18      Servicing Practices ...........................................................137120
Section 6.19      Dispositions of LOC Junior Lien Collateral .........................138120
Section 6.20      Amendment to MSFTA ....................................................138120
**ARTICLE VII GUARANTY** ..............................................................**138120**
Section 7.01      Guaranty of the Obligations..............................................138120
Section 7.02      Contribution by Guarantors ..............................................139120
Section 7.03      Payment by Guarantors ....................................................139120
Section 7.04      Liability of Guarantors Absolute .......................................140120
Section 7.05      Waivers by Guarantors .....................................................141120
Section 7.06      Guarantors' Rights of Subrogation, Contribution, Etc. ..........142120
Section 7.07      Subordination of Other Obligations...................................143120
Section 7.08      Continuing Guaranty.........................................................143120
Section 7.09      Authority of Guarantors or Borrowers ...............................143120
Section 7.10      Financial Condition of Borrowers .....................................143120
Section 7.11      Discharge of Guaranty Upon Sale of Guarantor...................144120
Section 7.12      Taxes................................................................................144120
Section 7.13      Assignments ....................................................................144120
Section 7.14      Reinstatement...................................................................144120
**ARTICLE VIII EVENTS OF DEFAULT** ...........................................**144120**
Section 8.01      Events of Default ..............................................................144120
Section 8.02      Application of Funds.........................................................151120
**ARTICLE IX CASH MANAGEMENT; COLLECTIONS**...................**153120**
Section 9.01      Accounts; Cash Management ............................................153120
Section 9.02      Daily Deposits of Receivables Proceeds............................155120
Section 9.03      Restoration of Amounts Held for Future Distribution...........156120
**ARTICLE X AGENTS** .......................................................................**156120**
Section 10.01     Appointment and Authorization of Agents..........................156120
Section 10.02     Rights as a Lender ............................................................157120
Section 10.03     Exculpatory Provisions ....................................................157120
Section 10.04     Reliance by Agents ..........................................................158120

iv

Section 10.05   Delegation of Duties ................................................ ~~158~~120
Section 10.06   Indemnification of Agents ....................................... ~~159~~120
Section 10.07   Resignation or Removal of Administrative Agent and
                Collateral Agent ..................................................... ~~159~~120
Section 10.08   Non-Reliance on Agents and Other Lenders ............. ~~161~~120
Section 10.09   Administrative Agent May File Proofs of Claim ........ ~~161~~120
Section 10.10   Collateral Documents and Guaranty ........................ ~~162~~120
**ARTICLE XI RECEIVABLES CUSTODIAN; VERIFICATION AGENT** ............ ~~162~~**120**
Section 11.01   Receivable Files ..................................................... ~~162~~120
Section 11.02   Duties of Receivables Custodian with Respect to the
                Receivables Files .................................................... ~~163~~120
Section 11.03   Removal and Replacement of Verification Agent ...... ~~164~~120
**ARTICLE XII MISCELLANEOUS** ............................................................ ~~164~~**120**
Section 12.01   Notices ................................................................... ~~164~~120
Section 12.02   Expenses ................................................................ ~~167~~120
Section 12.03   Indemnity ............................................................... ~~167~~120
Section 12.04   Set Off ................................................................... ~~170~~120
Section 12.05   Amendments and Waivers ....................................... ~~170~~120
Section 12.06   Successors and Assigns; Participations ..................... ~~174~~120
Section 12.07   Independence of Covenants ..................................... ~~178~~120
Section 12.08   Survival of Representations, Warranties and Agreements .... ~~178~~120
Section 12.09   No Waiver; Remedies Cumulative ........................... ~~179~~120
Section 12.10   Marshalling; Payments Set Aside ............................. ~~179~~120
Section 12.11   Severability ............................................................ ~~179~~120
Section 12.12   Obligations Several; Independent Nature of Lenders' Rights ~~180~~120
Section 12.13   Headings ................................................................ ~~180~~120
Section 12.14   Applicable Law ...................................................... ~~180~~120
Section 12.15   Jurisdiction; Etc .................................................... ~~180~~120
Section 12.16   **Waiver of Jury Trial** ............................................. ~~181~~120
Section 12.17   Confidentiality ....................................................... ~~181~~120
Section 12.18   Usury Savings Clause ............................................. ~~182~~120
Section 12.19   Counterparts ........................................................... ~~183~~120
Section 12.20   Effectiveness .......................................................... ~~183~~120
Section 12.21   Patriot Act ............................................................. ~~183~~120
Section 12.22   Electronic Execution of Assignments ...................... ~~183~~120
Section 12.23   No Fiduciary Duty .................................................. ~~183~~120
Section 12.24   Borrowers' Obligations .......................................... ~~184~~120
Section 12.25   Inconsistency .......................................................... ~~188~~120
Section 12.26   Liability of Administrator; Indemnities .................... ~~188~~120

~~1743354.19~~1743354.22 New York Server 7A - MSW

## SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT, dated as of May 15,16, 2012, is entered into by and among GMACM BORROWER LLC, a Delaware limited liability company and special purpose entity, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as a borrower ("**GMACM Borrower**"), RFC BORROWER LLC, a Delaware limited liability company and special purpose entity, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as a borrower ("**RFC Borrower**," and together with GMACM Borrower, "**Borrowers**," and each, a "**Borrower**"), RESIDENTIAL CAPITAL, LLC, a Delaware limited liability company ("**ResCap**"), GMAC MORTGAGE, LLC, a Delaware limited liability company ("**GMACM**"), RESIDENTIAL FUNDING COMPANY, LLC, a Delaware limited liability company ("**RFC**"), and CERTAIN SUBSIDIARIES OF RESCAP, each a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as Guarantors, GMACM and RFC, as Administrators, Originators, Receivables Custodians and Servicers, GMACM, as GMACM Servicer, the Lenders party hereto from time to time, BARCLAYS BANK PLC ("**Barclays**"), as administrative agent for the Secured Parties (together with its successors and assigns in such capacity, "**Administrative Agent**"), BARCLAYS, as collateral agent for the Secured Parties (together with its successors and assigns in such capacity, "**Collateral Agent**"), and BARCLAYS, as syndication agent (together with its successors and assigns in such capacity, "**Syndication Agent**").

### RECITALS:

WHEREAS, capitalized terms used in the preamble hereto and in these Recitals shall have the respective meanings set forth for such terms in Section 1.01;

WHEREAS, on May 14, 2012 (the "**Petition Date**"), the Credit Parties filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrowers have requested that the Lenders provide a revolving credit facility and term loan facilities, and the Lenders are willing to do so on the terms and conditions set forth herein; and

WHEREAS, the respective priorities of the Facilities with respect to the Collateral shall be as set forth in the Interim Financing Order and the Final Financing Order, in each case upon entry thereof by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

(e)    The agreement shall fully disclose the identity of the proposed purchaser(s) and, if applicable, the proposed investors therein.

(f)    The agreement, and in the event there is more than one Replacement Sale Agreement and/or Overbid Sale Agreement, such Replacement and/or Overbid Sale Agreements collectively, shall provide for payment in full in Cash of the Obligations and termination of the Commitments on the closing date of the sale(s).

"**Acceptable Reorganization Plan**" means a Reorganization Plan that (a) authorizes and implements the sale transactions contemplated under the Sale Agreements, (b) provides for the termination of the Commitments and the payment in full in Cash of the Obligations under the Credit Documents (other than contingent indemnification obligations not yet due and payable) on the effective date of such Reorganization Plan and (c) provides (i) for releases and exculpations reasonably acceptable to Administrative Agent (which, for the avoidance of doubt, will extend to the Credit Facilities and the Prepetition GSAP Facility) and (ii) that the Obligations shall not be discharged pursuant to the terms of such Reorganization Plan or the Confirmation Order.

"**Accepted Servicing Practices**" means with respect to any Mortgage Loan, REO Property, Serviced Loan and owned real property resulting from the foreclosure of a Serviced Loan, those mortgage servicing practices that are in accordance with the applicable Guidelines and consistent with past practices, in all the foregoing cases, subject to the following exceptions: (a) servicing practices may be modified to conform to the applicable Guidelines, other than conforming to modifications made to the GMAC-RFC Servicer Guide, (b) as otherwise expressly consented to by Administrative Agent, and (c) to the extent that complying with any such practice as to any Serviced Loan or owned real property resulting from the foreclosure of a Serviced Loan would cause the related Servicer to violate any provision of the related Designated Servicing Agreement.

"**Account Bank**" means the Borrower Account Bank, Collection Account Bank or Concentration Account Bank, as applicable.

"**Activation Notice**" as defined in Section 9.01(e̶c)(i̶i̶i).

"**Activation Period**" means the period on and after the date that an Activation Notice has been received.

"**Activation Trigger Event**" means, at any time, Revolver Excess Availability shall be less than $25,000,000 for a period of three (3) consecutive Business Days.

"**Additional Receivables**" means all Receivables created on or after the Closing Date under the Designated Servicing Agreements that are sold, transferred and contributed by the Originators to the Borrowers pursuant to the Receivables Pooling and Purchase Agreements, as described in Section 2(a) of each such Receivables Pooling and Purchase Agreement. For the avoidance of doubt, the Additional Receivables to be funded on any Credit Date or Withdrawal Date shall be identified in the annexes (and, in the aggregate, in the schedules) to the applicable Borrowing Base and Collateral Amount Certificate delivered with respect to such Credit Date or Withdrawal Date.

3

"**Ally Line of Credit**" means the credit facility under (a) the Prepetition Ally LOC Agreement, as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof (as so amended or supplemented, the "**Ally LOC Agreement**"), (b) the Prepetition Ally LOC Security Agreements, as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof (as so amended or supplemented, collectively, the "**Ally LOC Security Agreements**") and (c) the other Facility Documents (as defined in the Ally LOC Agreement), as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof.

"**Ally LOC Agreement**" as defined in the definition of "Ally Line of Credit."

"**Ally LOC DIP Amendment**" as defined in Section 3.01(o).

"**Ally LOC Security Agreements**" as defined in the definition of "Ally Line of Credit."

"**Ally Sale Agreement**" means the asset purchase agreement between ResCap, GMACM and RFC and Ally Financial Inc. and BMMZ Holdings LLC, in the form attached to the Sale Motion, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, as such agreement may be amended, supplemented and/or modified from time to time as permitted by Section 5.39.

"**Ally Superpriority Claim**" means, collectively, (a) AFI's rights, as lender under the AFI DIP Loan (as defined in the AFI/Junior Secured Notes Order ), in the AFI DIP Loan Collateral, as provided in paragraph [7] of the AFI/Junior Secured Notes Order; (b) Ally Bank's rights in the Collateral (as defined in the Master Purchase Pipeline Security Agreement), as provided in paragraph [8] of the Origination Order; and (c) Ally Investment Management LLC's rights in the Collateral (as defined in that certain MSFTA), as provided in paragraph [11] of the Origination Order.

"**Alternate Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted Eurodollar Rate for a three (3) month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that, for the avoidance of doubt, the Adjusted Eurodollar Rate for any day shall be based on the rate appearing on Reuters Page LIBOR01 (or on any successor or substitute page) at approximately 11:00 a.m. London time on such day (without any rounding). Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Eurodollar Rate, respectively; provided that the Alternate Base Rate for purposes of interest rate determinations with respect to the Term Loans shall at no time be less than 2.25% per annum.

"**Amounts Held for Future Distribution**" as defined in Section 9.03.

board; (b) with respect to a partnership, the Board of Directors of the general partner of the partnership; (c) with respect to a limited liability company, the manager, managing member or members, board of managers or any controlling committee or board of directors of such company or the sole member or the managing member thereof; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"**Book Value**" means, as of any date of determination, with respect to any Eligible Receivable, the Receivable Balance of such Eligible Receivable (any Charged-Off Receivable Balance being considered to have a Book Value of zero).

"**Borrower Account Bank**" as defined in Section 9.01(a).

"**Borrower Accounts**" as defined in Section 9.01(a).

"**Borrower Materials**" as defined in Section 12.01(d).

"**Borrowers**" as defined in the preamble hereto.

"**Borrower's Case**" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which one of the Borrowers is the debtor and the debtor-in-possession.

"**Borrower's REO Subsidiary**" means (a) with respect to GMACM Borrower, GMACM REO Subsidiary, and (b) with respect to RFC Borrower, RFC REO Subsidiary; "**Borrowers' REO Subsidiaries**" means, collectively, GMACM REO Subsidiary and RFC REO Subsidiary.

"**Borrowers Security Agreement**" means the Debtor-in-Possession Security Agreement, substantially in the form of Exhibit W, dated as of the Closing Date, among Borrowers, the Borrowers' REO Subsidiaries and Collateral Agent, as the same may be hereafter amended, amended and restated, supplemented or  modified from time to time in accordance with the terms hereof and thereof.

"**Borrowing Base**" means at any time, an amount equal to the sum of, without duplication:

~~(g)~~ (a) (i) the sum of (x) the Market Value of Eligible Mortgage Loans plus (y) the Appraised Value of Eligible REO Property, multiplied by (ii) an advance rate of 50%, plus

(b) ~~(h)~~ the Book Value of Eligible Receivables multiplied by the lesser of (i) an advance rate of 90% or (ii) the A-1/Revolver Trigger Advance Rate, plus

(c) ~~(i)~~ 100% of the aggregate amount of Cash and Cash Equivalents on deposit in the Borrower Accounts and the Concentration Account (or, following the receipt of an Activation Notice but prior to the commencement of a Dominion Period, 100% of the aggregate amount of Cash and Cash Equivalents on deposit in the Collection Account), minus

10

(d)    (i) (i) the Carve Out Reserves and (ii) effective immediately upon notification thereof to Borrowers by Administrative Agent, any other Reserves established from time to time in accordance with the provisions set forth in the definition of "Reserves."

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base and Collateral Amount Certificate theretofor delivered to Collateral Agent and Administrative Agent with such adjustments as Collateral Agent deems appropriate in its Permitted Discretion to assure that the Borrowing Base is calculated in accordance with the terms of this Agreement.

"**Borrowing Base and Collateral Amount Certificate**" means a certificate from the Primary Credit Parties, to be executed and delivered by the Chief Financial Officer, Treasurer or, to the extent expressly permitted hereunder or otherwise in the sole discretion of Collateral Agent, Assistant Treasurer or any Senior Treasury Services Officer of each Primary Credit Party, substantially in the form of, and containing the information prescribed by, Exhibit I, delivered to Administrative Agent and Collateral Agent and setting forth the Primary Credit Parties' calculations of the Borrowing Base and the Collateral Amount.

"**Borrowing Base Shortfall**" as defined in Section 2.14(b).

"**Broker's Price Opinion**" means, with respect to a Mortgaged Property or REO Property, a broker's price opinion (a) prepared by a duly licensed real estate broker (i) who has no interest, direct or indirect, in the related Mortgaged Property or REO Property or in either Borrower or any Affiliate of either Borrower and (ii) whose compensation is not affected by the results of the broker's price opinion and (b) containing a valuation which indicates the expected proceeds for a sale of the related Mortgaged Property or REO Property and includes certain assumptions, including those as to the condition of the interior of the applicable Mortgaged Property or REO Property and marketing time.

"**Business Day**" means (a) any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (b) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "Business Day" means any day that is a Business Day described in clause (a) and that is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of such Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

1743354.19 1743354.22 New York Server 7A - MSW

(a)      any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act), other than the Investors, the U.S. Department of the Treasury, the GM Trusts, or any purchaser of the beneficial interest of General Motors in the GM Trusts, shall acquire ownership, directly or indirectly, beneficially or of record, in the aggregate, Capital Stock representing a majority of the Capital Stock of ResCap having the right to vote for election of directors (or the equivalent thereof) of ResCap under ordinary circumstances;

(b)      AFI shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of ResCap;

(c)      ResCap shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of any Borrower or any Guarantor Subsidiary (except, in the case of any Guarantor Subsidiary (other than any Restricted Entity) pursuant to a transaction permitted under Section 6.08 or 6.09);

(d)      GMACM shall fail to directly own and control 100% of the aggregate issued and outstanding Capital Stock of GMACM Borrower;

(e)      RFC shall fail to directly own and control 100% of the aggregate issued and outstanding Capital Stock of RFC Borrower;

(f)      the applicable Borrower shall fail to directly own and control 100% of the aggregate issued and outstanding Capital Stock of its Borrower's REO Subsidiary; or

(g)      the majority of the seats (other than vacant seats) on the Board of Directors (or similar governing body) of any Primary Credit Party cease to be occupied by Persons who either (i) were members of the Board of Directors (or similar governing body) of such Primary Credit Party on the Closing Date or (ii) were nominated for election by the Board of Directors (or similar governing body) of such Primary Credit Party, a majority of whom were directors on the Closing Date or whose election or nomination or appointment for election was previously approved by a majority of such directors or by the Investors, as applicable.

"**Charged-Off Receivable Balance**" means any portion of the Receivable Balance of any Receivable which has not been paid in full following application of the liquidation proceeds or the last collection in respect of the related Serviced Loan, and any portion of a Receivable's Receivable Balance which the related Servicer determines it will not recover, pursuant to its customary practices in place on the date of this Agreement.

"**Class**" (a) when used with respect to Lenders, refers to whether such Lenders are Term A-1 Lenders, Term A-2 Lenders or Revolving Lenders, (b) when used with respect to Commitments, refers to whether such Commitments are Term A-1 Commitments, Term A-2 Commitments or Revolving Commitments and (c) when used with respect to Loans, refers to whether such Loans are Term A-1 Loans, Term A-2 Loans, Revolving Loans or Protective Advances.

"**Closing Date**" means May 15,16, 2012.

14

the failure to make any required contribution to a Multiemployer Plan; (c) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA); (e) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (f) the withdrawal by ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two (2) or more contributing sponsors or the termination of any such Pension Plan resulting in liability to ResCap, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (g) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the imposition of liability on ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (i) the withdrawal of ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, that it has been determined to be in "endangered" or "critical" status within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (j) the occurrence of an act or omission which could give rise to the imposition on ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines, penalties, taxes or or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (k) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; or (l) receipt from the IRS of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code.

"**Eurodollar Rate**" means for any Interest Period with respect to a Eurodollar Rate Loan, the rate appearing on Reuters Page LIBOR01 (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m. (London time), two (2) Business Days prior to the commencement of such Interest Period, as the rate for Dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "Eurodollar Rate" with respect to such Eurodollar Rate Loan for such Interest Period shall be the rate at which Dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of Administrative Agent in immediately available funds in the London interbank

24

(e)    if such Mortgage Loan has been modified, in respect of which the Custodian is not in possession of an original Mortgage Note and the applicable modification agreements;

(f)    in respect of which such Mortgage Loan is a first lien Mortgage Loan that is Delinquent for more than 120 days unless a new Broker's Price Opinion has been received;

(g)    in respect of which such Mortgage Loan is a second lien Mortgage Loan or HELOC and such Mortgage Loan is Delinquent; or

(h)    if such Mortgage Loan is a second lien Mortgage Loan, a HELOC or a Delinquent Mortgage Loan and the Redemption Balance of such Mortgage Loan, when added to the aggregate Redemption Balance of all other second lien Mortgage Loans, HELOCs and Delinquent Mortgage Loans then constituting Eligible Mortgage Loans included in the First Lien Collateral (without double counting), exceeds 35% of the aggregate Redemption Balance for all Eligible Mortgage Loans included in the First Lien Collateral in Administrative Agent's sole determination.

For the avoidance of doubt, the Market Value for any Mortgage Loan shall never exceed the Redemption Value of such Mortgage Loan after taking into account any principal reductions, principal forgiveness or any other value reduction mandated by any Government Modification Program.

Notwithstanding anything to the contrary set forth in this definition, if Collateral Agent shall determine in good faith that any determination of Market Value by Valuation Agent shall have been unreasonable, the Market Value shall be as determined by AdministrativeCollateral Agent otherwise in accordance with the parameters set forth above.

"**Master Purchase Agreement**" means the Amended and Restated Master Mortgage Loan Purchase and Sale Agreement (FHA, USDA and VA Residential Mortgage Loans), dated as of May 1, 2012, between Ally Bank, as seller, and GMACM, as purchaser, as the same may be hereafter amended, amended and restated, supplemented or modified from time to time in accordance with the terms hereof and thereof.

"**Master Purchase Documents**" means, collectively, (a) the Master Purchase Agreement and (b) the Master Purchase Pipeline Security Agreement.

"**Master Purchase Pipeline Security Agreement**" means the Pledge and Security Agreement, dated as of April 25, 2012, by and among Ally Bank, ResCap, AFI, GMAC Mortgage Group, LLC, GMACM and Ally Investment Management LLC, as the same may be hereafter amended, amended and restated, supplemented or modified from time to time in accordance with the terms hereof and thereof.

"**Material Adverse Effect**" means a material adverse effect on and/or a material adverse development with respect to (a) the business, assets, properties, operations, liabilities or condition (financial or otherwise) of (i) either Borrower, (ii) any Servicer or Administrator or (iii) the Credit Parties, taken as a whole, in any such case, other than as a result of those events

"**RCRA**" as defined in Section 4.15.

"**Real Estate Asset**" means, at any time of determination, any fee interest then owned by any Credit Party in any real property.

"**Receivable**" means the contractual right to reimbursement, pursuant to the terms of a Designated Servicing Agreement, for an Advance made by an Originator as Servicer pursuant to such Designated Servicing Agreement, which Advance has not previously been reimbursed, including all rights of the Servicer to enforce payment of such obligation under the related Designated Servicing Agreement. For the avoidance of doubt, any right to reimbursement created upon the funding of an Advance at any time with respect to an MBS Trust or Serviced Loan with respect to which (a) neither GMACM nor RFC acts at such time as Servicer or (b) any other Person acts at such time as a master servicer, servicer or subservicer, shall not constitute a Receivable.

"**Receivable Balance**" means, as of any date of determination and with respect to any Receivable, the outstanding amount of such Receivable; provided, however that any Receivable related to a Serviced Loan that is a HELOC will be deemed to have a Receivable Balance of zero.

"**Receivable File**" as defined in Section 11.01(a).

"**Receivables Custodian**" as defined in Section 11.01(a).

"**Receivables Pooling and Purchase Agreement**" means either the GMACM Receivables Pooling and Purchase Agreement or the RFC Receivables Pooling and Purchase Agreement, as the context may require.

"**Receivables Proceeds**" means, for any date, all Collections received or collected on the Serviced Loans by GMACM or RFC, as Servicer, or withdrawn by or at the direction of the Servicer from the MBS Trust Collection Accounts for each of the MBS Trusts, or, as applicable, remitted by the related MBS Trustee to the Servicer, pursuant to each of the related Designated Servicing Agreements on such date.

"**Receivables Purchase Agreement**" means either the GMACM Receivables Purchase Agreement or the RFC Receivables Purchase Agreement, as the context may require.

"**Recipient**" means, as applicable, (a) Administrative Agent and (b) any Lender.

"**Records**" means all instruments, agreements and other books, records, reports and data generated by other media for the storage of information maintained by the Borrowers, any of their respective Affiliates or agents, or their servicer or custodian with respect to a Mortgage Loan. Records shall include the Mortgage File, the Servicing Records, the credit file and any other instruments necessary to document or service a Mortgage Loan, including, without limitation, the complete payment and modification history of each Eligible Mortgage Loan.

"**Redemption Balance**" means, as of any date of determination and with respect to any Mortgage Loan, the outstanding principal amount of such Mortgage Loan.

Administrative Agent from Lenders to be credited to the account of the applicable Borrower at the Principal Office designated by Administrative Agent or such other account as may be designated in writing to Administrative Agent by the applicable Borrower with reasonable promptness on the applicable Credit Date.

Section 2.03    ~~Intentionally Omitted~~[Reserved].

Section 2.04    ~~Intentionally Omitted~~[Reserved].

Section 2.05    Pro Rata Shares; Availability of Funds.

(a)    Pro Rata Shares. All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b)    Availability of Funds. Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Borrowers a corresponding amount on such Credit Date. If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation. If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Borrowers and Borrowers shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for ABR Loans. Nothing in this Section 2.05(b) shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrower may have against any Lender as a result of any default by such Lender hereunder.

Section 2.06    Use of Proceeds. The proceeds of the Loans will be used, in each case in accordance with the Approved DIP Budget, (a) on the Closing Date, to repay in full the indebtedness outstanding as of the commencement of the Cases under the Prepetition Refinanced Facilities and to pay the fees, costs and expenses incurred or payable by ResCap and its Subsidiaries in connection with the Credit Documents and the Transactions and (b) for general corporate purposes of ResCap and its Subsidiaries, including the acquisition of Receivables and Mortgage Loans, working capital, allowed administrative expenses incurred during the Cases or such expenses as have otherwise been approved by the Bankruptcy Court and for the purposes

Borrowing Base Shortfall; _provided_ that the Borrowers shall be required to terminate the Revolving Commitments in full prior to prepaying any Term A-1 Loans as required hereunder.

(c)    In the event that (i) the Aggregate Credit Exposure exceeds (ii) the Collateral Amount (the excess of clause (i) over clause (ii), a "**Collateral Amount Shortfall**"), Borrowers shall, within one (1) Business Day, (x) deposit Cash or Cash Equivalents into the Borrower Accounts in an aggregate amount equal to such ~~Borrowing Base~~Collateral Amount Shortfall and/or (y) without penalty or premium but subject to Section 2.18(c) (in accordance with Section 8.02), _first_, prepay Protective Advances until paid in full, _second_, prepay Revolving Loans until paid in full, _third_, prepay the Term A-1 Loans until paid in full, and _fourth_, prepay the Term A-2 Loans until paid in full, in an amount equal to such Collateral Amount Shortfall; _provided_ that the Borrowers shall be required to terminate the Revolving Commitments in full prior to prepaying any Term A-1 Loans or Term A-2 Loans as required hereunder.

(d)    In the event that any Net Proceeds are received by or on behalf of a Credit Party or any of its Subsidiaries in respect of a Prepayment Event, such Credit Party shall, or shall cause its Subsidiaries to, without penalty or premium but subject to Section 2.18(c), within one (1) Business Day first, prepay Protective Advances until paid in full, second, prepay Revolving Loans until paid in full, third, prepay the Term A-1 Loans until paid in full, and fourth, prepay the Term A-2 Loans until paid in full, in an aggregate amount equal to such Net Proceeds; _provided_ that the Borrowers shall be required to terminate the Revolving Commitments in full prior to prepaying any Term A-1 Loans or Term A-2 Loans as required hereunder; _provided_, _further_, that any Indebtedness secured by a Lien on any Junior Lien Collateral that is the subject of a Prepayment Event and is senior to the Liens of the Secured Parties has been repaid in full (or Net Proceeds in an amount necessary to repay such Indebtedness have been set aside for the benefit of the holder of such Indebtedness).

Section 2.15    Application of Prepayments

(a)    Application of Voluntary Prepayments of Revolving Loans.  Any prepayment of any Loan pursuant to Section 2.13(a) shall be applied as specified by Borrowers in the applicable notice of prepayment; _provided_, in the event Borrowers fail to specify the Revolving Loans to which any such prepayment shall be applied, such prepayment shall be applied as follows (without reduction of the Revolving Commitments): _first_, to repay outstanding Protective Advances to the full extent thereof; and _second_, to repay outstanding Revolving Loans to the full extent thereof.

(b)    Application of Prepayments of Loans to ABR Loans and Eurodollar Rate Loans.  Any prepayment of any Loan of any Class shall be applied first to ABR Loans of such Class to the full extent thereof before application to Eurodollar Rate Loans of such Class, in each case in a manner that minimizes the amount of any payments required to be made by Borrowers pursuant to Section 2.18(c).

Section 2.16    General Provisions Regarding Payments.

(a)    All payments by Borrowers of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim,

the related Receivables Pooling and Purchase Agreement with respect to such Receivable are true and correct in all material respects, and no breach of covenant of RFC or GMACM, as applicable, or the related Borrower exists with respect to such Receivables under this Agreement, or under the related Receivables Purchase Agreement or the related Receivables Pooling and Purchase Agreement;

(vii)    as of the date such Receivable was sold and/or contributed by the GSAP Transferor under the related Receivables Purchase Agreement or by GMACM or RFC, as applicable, the related Receivables Pooling and Purchase Agreement, none of RFC, GMACM or the GSAP Transferor had (1) taken any action that would impair the right, title and interest of the Secured Parties therein, or (2) failed to take any action that was necessary to avoid impairing the Secured Parties' right, title or interest therein;

(viii)    the Advance related to such Receivable has been fully funded by the related Servicer using its own funds and/or Amounts Held for Future Distribution (to the extent permitted under the related Designated Servicing Agreement);

(ix)    as of the date such Receivable was funded, the Advance Ratio for the related Designated Servicing Agreement determined as of the end of the most recently concluded calendar month was less than 1%; provided that this clause (ix) shall not apply to Receivables sold and/or contributed by the GSAP Transferor to the Borrowers on the Closing Date;

(x)    as of the end of the most recently concluded calendar month, (A) the Advance to Pool Balance Ratio for the related Designated Servicing Agreement was less than 33.33% and (B) the unpaid principal balance of Serviced Loans serviced under such related Designated Servicing Agreement was at least $8,000,000 and at least 50 Serviced Loans were being serviced under such Designated Servicing Agreement;

(xi)    as of the ~~first Business Day of the calendar month of such date of determination,~~date such Receivable was funded, the aggregate Receivable Balances of all Eligible Receivables arising under the related Designated Servicing Agreement determined as of the end of the most recently concluded calendar month does not exceed 15% of the aggregate Receivable Balance of all Eligible Receivables in respect of all Designated Servicing Agreements; and

(xii)    no Servicer Termination Event shall have occurred with respect to the Designated Servicing Agreement related to such Receivable (except any Servicer Termination Event caused solely by the failure of a collateral performance test under such Designated Servicing Agreement, in respect of which the related Servicer has not received a notice of termination from one or more parties authorized to terminate the Servicer under such Designated Servicing Agreement).

85

(k)     Administrative Agent shall have received a Borrowing Base and Collateral Amount Certificate as of a date as recent as reasonably practicable (but in no event more than seven (7) Business Days prior to the most recent Saturday prior to the Closing Date) with all supporting documentation required in connection therewith (as described in the form of Borrowing Base and Collateral Amount Certificate attached as Exhibit I), duly executed and delivered by the Chief Financial Officer or Treasurer of each Primary Credit Party, which Borrowing Base and Collateral Amount Certificate shall include, without limitation, a pro forma calculation of the Borrowing Base and Collateral Amount after giving effect to the amounts to be borrowed on the Closing Date;

(l)     substantially concurrently with the initial borrowings of the Term Loans, repayment in full of all obligations under the Prepetition Refinanced Facilities, termination of the commitments thereunder and release of all Liens granted thereunder shall have occurred (with such prepayment in full, termination and release being evidenced by payoff letters and other termination documents reasonably acceptable to Administrative Agent ~~or, if such letters are not available, and~~ appropriate provisions in the Interim Financing Order confirming such terminations and releases), which repayment shall be made with the initial borrowings of Term Loans;

(m)     Credit Parties shall be in compliance with all applicable requirements of Regulations U, T and X of the Board;

(n)     not later than four (4) Business Days following the commencement of the Cases, entry of an interim order approving the Credit Documents in form and substance satisfactory to Administrative Agent in its sole discretion (as the same may be hereafter amended, supplemented or modified from time to time in accordance with the terms hereof, the "**Interim Financing Order**") (it being understood and agreed that an order in the form of Exhibit N shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which Interim Financing Order shall (i) have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, (ii) authorize the extensions of credit in respect of the Revolving Facility and the Term Facilities, each in the amounts and on the terms set forth herein, (iii) grant the Superpriority Claim status and other Collateral and Liens referred to herein and in the other Credit Documents, including without limitation, a junior Lien on the Junior Lien Collateral, (iv) approve the payment by the Borrowers of the fees provided for herein, (v) approve the repayment in full of the Prepetition Refinanced Facilities from the proceeds of the Term Loans and the release of all Liens securing the Prepetition Refinanced Facilities, (vi~~) provide that (A) the sales of the Receivables from the GSAP Transferor under the Prepetition GSAP Facility to the Borrowers, (B) the sales of Additional Receivables from GMACM and RFC to the Borrowers, as applicable, and (C) the sales of the Mortgage Loans from GMACM and RFC to the Borrowers, as applicable, shall, in all of the foregoing cases, be true sales and/or contributions and constitute absolute and unconditional, non-avoidable transfers of all right, title and interest in the subject property, (vii~~) provide that each Borrower is a separate and distinct legal entity from the GSAP Transferor, GMACM and RFC, and that the Lenders are extending credit in reliance upon the separateness of each Borrower ~~and true sale and/or contribution of the Receivables and the Mortgage Loans to the Borrowers,~~ and that the Borrowers shall not be subject to consolidation into the estate of the GSAP Transferor, GMACM, RFC or any other Debtor (in any such case, whether through the

90

doctrine of substantive consolidation, veil piercing or any similar remedy), (~~viii~~vii) provide for
the waiver of section 506(c) of the Bankruptcy Code by the Debtors as to the Collateral, and
(~~ix~~viii) not have been (~~x~~A) stayed, vacated or reversed, or (~~y~~B) amended or modified except as
otherwise agreed to in writing by Administrative Agent in its sole discretion;

(o)    entry of one or more orders, in form and substance satisfactory to
Administrative Agent in its sole discretion, (i) authorizing the Debtors to use the cash collateral
of AFI and the holders of the Prepetition Junior Secured Notes under the Prepetition Ally
Revolver and granting adequate protection in respect thereof and (ii) approving and authorizing
the Debtors to enter into an amendment to the Prepetition Ally Line of Credit providing for up to
$150,000,000 of debtor-in-possession financing (the "**Ally LOC DIP Amendment**") and to use
the cash collateral of AFI under the Ally Line of Credit and granting adequate protection in
respect thereof (as the same may be hereafter amended, supplemented or modified from time to
time in accordance with the terms hereof, collectively, the "**AFI/Junior Secured Notes Order**")
(it being understood and agreed that an order in the form of Exhibit O shall, if entered by the
Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which AFI/Junior
Secured Notes Order (i) shall have been entered on such prior notice to such parties as may be
satisfactory to Administrative Agent in its sole discretion, and (ii) shall not have been (~~x~~A)
stayed, vacated or reversed, or (~~y~~B) amended or modified except as otherwise agreed to in
writing by Administrative Agent in its sole discretion;

(p)    entry of one or more orders, in form and substance satisfactory to
Administrative Agent in its sole discretion, authorizing the Debtors to use the EAF Facility and
granting adequate protection (as the same may be hereafter amended, supplemented or modified
from time to time in accordance with the terms hereof, collectively, the "**EAF Order**") (it being
understood and agreed that an order in the form of Exhibit P shall, if entered by the Bankruptcy
Court, be deemed to be acceptable to Administrative Agent), which EAF Order (i) shall have
been entered on such prior notice to such parties as may be satisfactory to Administrative Agent
in its sole discretion, and (ii) shall not have been (~~x~~A) stayed, vacated or reversed, or (~~y~~B)
amended or modified except as otherwise agreed to in writing by Administrative Agent in its
sole discretion;

(q)    entry of one or more orders, in form and substance satisfactory to
Administrative Agent in its sole discretion, approving and authorizing the Debtors to either (i)
enter into a debtor-in-possession financing facility refinancing the Prepetition MSR Facility, or
(ii) use the cash collateral of Citibank, N.A. under the Prepetition MSR Facility and granting
adequate protection (as the same may be hereafter amended, supplemented or modified from
time to time in accordance with the terms hereof, collectively, the "**MSR Order**") (it being
understood and agreed that an order in the form of Exhibit Q shall, if entered by the Bankruptcy
Court, be deemed to be acceptable to Administrative Agent), which MSR Order (x) shall have
been entered on such prior notice to such parties as may be satisfactory to Administrative Agent
in its sole discretion, and (y) shall not have been (A) stayed, vacated or reversed, or (B) amended
or modified except as otherwise agreed to in writing by Administrative Agent in its sole
discretion;

(r)    the Credit Parties shall have entered into the Ally Sale Agreement
and the Nationstar Sale Agreement, and the Credit Parties shall have filed with the Bankruptcy

Court a motion in form and substance reasonably acceptable to Administrative Agent (the "**Sale Motion**") seeking entry of orders by the Bankruptcy Court, respectively, approving (i) the Original Sale Agreement and (ii) bidding procedures, which bidding procedures shall be in form and substance reasonably satisfactory to Administrative Agent (as the same may be hereafter amended, supplemented or modified from time to time in accordance with the terms hereof, the "**Sale Procedures Order**") in connection with the sales contemplated thereby;

(s)    the Credit Parties shall be in pro forma compliance with the Borrowing Base, the Collateral Amount and the financial covenants set forth in Section 6.07 (after giving effect to the amounts to be borrowed and the use of proceeds on the Closing Date);

(t)    the Eligible Receivables and Eligible Mortgage Loans and other assets comprising First Lien Collateral shall have been identified in reasonable detail to Administrative Agent on Schedule 4.24, in form and substance reasonably satisfactory to Administrative Agent, and Administrative Agent shall be satisfied that all such Eligible Receivables and Eligible Mortgage Loans and other assets comprising First Lien Collateral are subject to no Liens other than Liens described in clause (a) of the definition of "Permitted Collateral Liens";

(u)    since April 9, 2012, there shall not have occurred any change, development, circumstance or event that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect;

(v)    no Default or Event of Default, both immediately prior to and giving effect to the Credit Extensions on the Closing Date, shall, in each case, have occurred under any of the Credit Documents;

(w)    Administrative Agent shall have received the results of satisfactory lien searches (including, without limitation, the results of satisfactory tax lien searches) showing the absence of any Liens on any of the Collateral other than Liens expressly permitted by Section 6.02 or Liens to be terminated or discharged on the Closing Date;

(x)    Administrative Agent shall have received evidence of Servicing Practices of the Servicers and servicing practices of GMACM Servicer that are reasonably satisfactory to Administrative Agent;

(y)    ~~Intentionally omitted;~~ [Reserved];

(z)    Borrowers shall have provided to Administrative Agent a written description of all servicing and subservicing fees relating to the Mortgage Loan portfolio of the Borrowers, which description shall be in form and substance reasonably satisfactory to Administrative Agent;

(aa)    the Credit Parties shall have used commercially reasonable efforts to obtain the MSR GSE Consents;

92

(bb)    the Credit Parties shall have established the Blocked Accounts and shall have delivered a duly authorized and executed Deposit Account Control Agreement with respect to each Blocked Account satisfying the criteria set forth in Section 9.01(d);

(cc)    GMACM Servicer shall deliver to the Agents the Servicer's Tape with respect to the GMACM Serviced Mortgage Loans; including those fields reasonably requested by Administrative Agent;

(dd)    entry of one or more orders, in form and substance reasonably satisfactory to Administrative Agent in its sole discretion, approving the origination and purchases and sales by the Credit Parties of certain mortgage loans and activities authorized in such order related to such originations or purchases (as the same may be hereafter amended, supplemented or modified from time to time in accordance with the terms hereof, collectively, the "**Origination Order**") (it being understood and agreed that an order in the form of Exhibit R shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which Origination Order (i) shall have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, and (ii) shall not have been (x) stayed, vacated or reversed, or (y) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion; and

(ee)    Administrative Agent shall have received a certificate, signed by a Senior Officer of each Primary Credit Party, on the Closing Date, confirming compliance (other than, as applicable, with respect to the satisfaction of any Agent) with the conditions set forth in Sections 3.01(a), (b), (c), (d), (g), (l), (m), (n), (o), (p), (q), (r), (s), (t), (u), (v), (w), (aa) and (bb) and Sections 3.03(c), (d), (e) and (g).

Section 3.02    Conditions to Revolver Post-Closing Availability Date.  The obligation of any Revolving Lender to make a Credit Extension under the Revolving Facility is subject to the satisfaction, or waiver in accordance with Section 12.05, of the following conditions precedent (the date upon which all such conditions shall be satisfied or waived, the "**Revolver Post-Closing Availability Date**"):

(a)    the Closing Date shall have occurred;

(b)    a final order approving the Credit Documents, in form and substance satisfactory to Administrative Agent in its sole discretion (as the same may be hereafter amended, supplemented or modified from time to time in accordance with the terms hereof, the "**Final Financing Order**") (it being understood that an order in the form of Exhibit N (with such changes that are, in Administrative Agent's sole discretion, customarily applicable to a final order or indicated in the Commitment Letter) shall if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), (i) shall have been entered by the Bankruptcy Court and shall be in full force and effect and (ii) shall not have been (iA) vacated, reversed, or stayed, or (iiB) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(c)    all of the "second day" orders entered by the Bankruptcy Court (and if any such orders shall not have been entered by the Bankruptcy Court, the form of such

93

borrowing), and (vii) such other calculations as required by the Borrowing Base and Collateral Amount Certificate; provided that if the first Business Day for which complete end-of-day information is available is three (3) Business Days prior to the requested Credit Date, any amounts in clauses (i) through (vii) above to be reported or calculated as of the Business Day that is two (2) Business Days prior to the requested Credit Date shall instead be reported or calculated as of such third (3rd) Business Day prior to the requested Credit Date, and any updates or pro forma calculations under clauses (iv) and (v) above shall be reported for each of the Business Days that is two (2) Business Days prior and one (1) Business Day prior to the requested Credit Date; provided, further that the form of Borrowing Base and Collateral Amount Certificate and the date of the foregoing calculations may be modified by agreement of the Borrowers and the Administrative Agent;

(c)    after giving effect to such Credit Extension and use of proceeds, (i) the Total Utilization of Revolving Commitments and the aggregate outstanding principal amount of Protective Advances shall not exceed the Revolving Commitments; (ii) the sum of the Aggregate Revolving/Term A-1 Credit Exposure and the aggregate outstanding principal amount of Protective Advances shall not exceed the Borrowing Base; and (iii) the sum of the Aggregate Credit Exposure and the aggregate outstanding principal amount of Protective Advances shall not exceed an amount equal to the lesser of (x) the Collateral Amount and (y) the aggregate principal amount of Loans authorized by the Interim Financing Order or the Final Financing Order, as applicable;

(d)    as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects subject to such qualification;

(e)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension and application of the proceeds thereof that would constitute an Event of Default or a Default;

(f)    not later than forty-five (45) days after the entry of the Interim Financing Order, the Bankruptcy Court shall have entered the Final Financing Order in form and substance satisfactory to Administrative Agent in its sole discretion; and

(g)    the Interim Financing Order or the Final Financing Order, as the case may be, shall be in full force and effect, and shall not have been (i) vacated, reversed, or stayed, or (ii) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion.

Section 3.04    Conditions to Each Withdrawal Date.  The right of ResCap or any Borrower to make a withdrawal of any funds from the Concentration Account or any Borrower Account (or, following the receipt of an Activation Notice but prior to the commencement of a

1743354.19 1743354.22 New York Server 7A - MSW

Dominion Period, the Collection Account) in accordance with Article IX is subject to satisfaction or waiver in accordance with Section 12.05, of the following conditions precedent:

(a)    Administrative Agent shall have received a fully executed and delivered Withdrawal Notice in accordance with the applicable requirements set forth in Article IX;

(b)    other than with respect to withdrawals and disbursements made on the Closing Date, which, for the avoidance of doubt, shall be subject to the delivery of a Borrowing Base and Collateral Amount Certificate pursuant to Section 3.01(k), Collateral Agent shall have received, no later than 11:00 a.m. (New York City time) on the proposed Withdrawal Date, a Borrowing Base and Collateral Amount Certificate, with all supporting documentation required in connection therewith (as provided in the form of Borrowing Base and Collateral Amount Certificate attached as Exhibit I), duly executed and delivered by the Chief Financial Officer, Treasurer, Assistant Treasurer or any Senior Treasury Services Officer of each Primary Credit Party, which certificate shall include (i) Cash and Cash Equivalent balances in the Borrower Accounts, the Concentration Account and the Collection Account as of end of the Business Day that is two (2) Business Days prior to the Withdrawal Date, (ii) a calculation of the Book Value of Eligible Receivables as of the end of the Business Day that is two (2) Business Days prior to the Withdrawal Date, (iii) a calculation of the Market Value of Eligible Mortgage Loans and the Appraised Value of Eligible REO Property as of the date of the most recent Borrowing Base and Collateral Amount Certificate provided to Collateral Agent pursuant to Section 5.01(f), updated to reflect any Eligible Mortgage Loans that have been added, liquidated or paid off as of end of the Business Day that is two (2) Business Days prior to the Withdrawal Date, (iv) a calculation of the Borrowing Base and the Collateral Amount  reflecting the calculations described in clauses (i), (ii) and (iii) of this Section 3.04(b), (v) a pro forma calculation of the Borrowing Base and the Collateral Amount after giving effect to the proposed withdrawal on the Withdrawal Date and use of funds (for the avoidance of doubt calculations under this clause (v) shall give pro forma effect to any Eligible Receivables to be created by the use of proceeds from the proposed withdrawal), and (vi) such other calculations as required by the Borrowing Base and Collateral Amount Certificate; provided that if the first Business Day for which complete end-of-day information is available is two (2) Business Days  prior to the requested Withdrawal Date, any amounts in clauses (i) through (vi) above to be reported or calculated as of the Business Day immediately preceding the requested Withdrawal Date shall instead be reported or calculated as of such second (2nd ) Business Day prior to the requested Withdrawal Date and, in addition to the calculations described in clauses (i) through (v) above, the Borrowing Base and Collateral Amount Certificate shall include a pro forma calculation of the Borrowing Base and the Collateral Amount reflecting the calculations described in clauses (i), (ii) and (iii) of this Section 3.04(b) and giving effect to any borrowings of Loans, withdrawals of funds from any Blocked Account, and the use of proceeds of such borrowings and funds withdrawn made or expected to be made on the Business Day that is one (1) day prior to the requested Withdrawal Date; provided, further that the form of Borrowing Base and Collateral Amount Certificate and the date of the foregoing calculations may be modified by agreement of the Borrowers and the Administrative Agent;

(c)    after giving effect to such withdrawal of funds and use of funds, (i) the Total Utilization of Revolving Commitments and the aggregate outstanding principal amount

(aaa)    Compliance with Interagency Guidance.  Each Eligible Mortgage Loan that is a "nontraditional mortgage loan" within the meaning of the Interagency Guidance on Nontraditional Mortgage Product Risks, 71 FR 58609 (October 4, 2006), and that has a residential loan application date on or after September 13, 2007 (or, if such date cannot be determined, an origination date on or after October 1, 2007), complies in all respects with such guidance, including any interpretations, applications or implementation plans with respect thereto that have been communicated and/or agreed to by an institution's regulator, regardless of whether the Eligible Mortgage Loan's originator or seller is subject to such guidance;

(bbb)    Compliance with Subprime Statement.  No Eligible Mortgage Loan that is an Adjustable Rate Mortgage Loan and that has a residential loan application date on or after September 13, 2007, is subject to the Interagency Statement on Subprime Mortgage Lending, 72 FR 37569 (July 10, 2007) as defined by Fannie Mae in the Lender Letter 03-07 (August 15, 2007) or by Freddie Mac in Freddie Mac Single Family Advisory (September 7, 2007) and Freddie Mac Bulletin 2007-4);

(ccc)    Georgia.  No Mortgage Loan was originated in the state of Georgia between October 1, 2002 and March 6, 2003;

(ddd)    ~~Payments Current.  Except as disclosed in the most recently delivered Mortgage Schedule, other than any Mortgage Loan that is Delinquent, no payment required under the Mortgage Loan is thirty (30) days or more delinquent.  With respect to Delinquent Mortgage Loans no payment required under the Mortgage Loan is sixty (60) days or more delinquent;~~[Reserved].

(eee)    No Defense to Insurance Coverage.  The Primary Credit Parties have caused or will cause to be performed any and all acts required to preserve the rights and remedies of Collateral Agent in any insurance policies applicable to the Mortgage Loans including, without limitation, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of Collateral Agent.  No action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed on or prior to the Closing Date (whether or not known to the Primary Credit Parties on or prior to such date) which has resulted or will result in an exclusion from, denial of, or defense to coverage under any applicable, special hazard insurance policy, primary mortgage guarantee insurance policy or bankruptcy bond (including, without limitation, any exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence, or fraud of the Primary Credit Parties, the related Mortgagor or any party involved in the application for such coverage, including the appraisal, plans and specifications and other exhibits or documents submitted therewith to the insurer under such insurance policy, or for any other reason under such coverage, but not including the failure of such insurer to pay by reason of such insurer's breach of such insurance policy or such insurer's financial inability to pay;

(fff)    Credit Information.  As to each consumer report (as defined in the Fair Credit Reporting Act, Public Law 91-508) or other credit information furnished by the Primary Credit Parties to Administrative Agent, that each Primary Credit Party has full right and