1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020(MG)

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              May 14, 2012

19              4:03 PM

20

21  B E F O R E:

22  HON. JAMES M. PECK (FOR HON. MARTIN GLENN)

23  U.S. BANKRUPTCY JUDGE

24

25

1

2    Debtors' Motion For Order Under Bankruptcy Rule 1015

3    Authorizing Joint Administration Of The Debtors' Chapter 11

4    Cases.

5

6    Debtors' Motion For Order Under Bankruptcy Code Sections

7    105(A), 345, 363, 364, And 503(B)(1) And Bankruptcy Rules 6003

8    And 6004 Authorizing (I) Continued Use Of Cash Management

9    Services And Practices, (II) Continued Use Of Existing Bank

10   Accounts, Checks, And Business Forms, (III) Implementation Of

11   Modified Cash Management Procedures, (IV) Interim Waiver Of The

12   Investment And Deposit Requirements Of Bankruptcy Code Section

13   345, (V) Debtors To Honor Specified Outstanding Prepetition

14   Payment Obligations, (VI) Continuation Of Intercompany

15   Transactions, Including Intercompany Transactions With Future

16   Debtors, And Granting Administrative Expense Status To

17   Intercompany Claims, And (VII) Scheduling A Final Hearing On

18   The Relief Requested.

19

20   Debtors' Motion For Entry Of Interim And Final Orders Pursuant

21   To Bankruptcy Code Sections 361, 363, And 507(b) And Bankruptcy

22   Rule 4001(b): (I) Authorizing The Use Of Cash Collateral And

23   Related Relief, (II) Granting Adequate Protection And (III)

24   Scheduling A Final Hearing (Citibank Cash Collateral).

25

1

2    Debtors' Motion For Interim And Final Orders Pursuant To

3    Bankruptcy Code Sections 105, 361, 363, And 507(b) And

4    Bankruptcy Rule 4001(b): (I) Authorizing The Use Of Cash

5    Collateral And Related Relief, (II) Granting Adequate

6    Protection And (III) Scheduling A Final Hearing (AFI/Secured

7    Notes Cash Collateral).

8

9    Debtors' Motion For Interim And Final Orders Pursuant To

10   11 U.S.C. Sections 105, 362, 363(b)(1), 363(f), 363(m),

11   364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And

12   Bankruptcy Rules 4001 And 6004 (I) Authorizing The Debtors To

13   (A) Enter Into And Perform Under Receivables Purchase

14   Agreements And Mortgage Loan Purchase And Contribution

15   Agreements Relating To Initial Receivables And Mortgage Loans

16   And Receivables Pooling Agreements Relating To Additional

17   Receivables, And (B) Obtaining Post-petition Financing On A

18   Secured, Superpriority Basis, (II) Scheduling A Final Hearing

19   Pursuant To Bankruptcy Rules 4001(b) and 4001(c), And (III)

20   Granting Related Relief.

21

22   Debtors' Motion For Order Under Bankruptcy Code Sections

23   105(a) And 107(b) And Bankruptcy Rule 9018 (I) Authorizing

24   The Debtors To File Under Seal Confidential Exhibit To The

25   Servicing Motion And (II) Limiting Notice Thereof.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:   Penina Wolicki and Clara Rubin

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

```
 1

 2    A P P E A R A N C E S :

 3    MORRISON & FOERSTER LLP

 4          Attorneys for Debtors

 5          1290 Avenue of the Americas

 6          New York, NY 10104

 7

 8    BY:   GARY S. LEE, ESQ.

 9          LARREN M. NASHELSKY, ESQ.

10          LORENZO MARINUZZI, ESQ.

11          TODD M. GOREN, ESQ.

12

13

14    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

15          Attorneys for Debtors

16          101 Park Avenue

17          New York, NY 10178

18

19    BY:   MARYANN GALLAGHER, ESQ.

20          STEVEN J. REISMAN, ESQ.

21

22

23

24

25
```

```
 1

 2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 3         Attorneys for Barclays Bank PLC,

 4          Proposed DIP Administrative Agent

 5         Four Times Square

 6         New York, NY 10036

 7

 8    BY:   KENNETH S. ZIMAN, ESQ.

 9          JAMIE B. BARON, ESQ. (TELEPHONICALLY)

10          JONATHAN H. HOFER, ESQ. (TELEPHONICALLY)

11

12

13    MCKOOL SMITH

14         Attorneys for Freddie Mac

15         600 Travis Street

16         Suite 7000

17         Houston, TX 77002

18

19    BY:   PAUL MOAK, ESQ.

20

21

22

23

24

25
```

```
 1

 2   MCKOOL SMITH

 3        Attorneys for Freddie Mac

 4        One Bryant Park

 5        47th Floor

 6        New York, NY 10036

 7

 8   BY:   MICHAEL R. CARNEY, ESQ.

 9

10

11   WINSTON & STRAWN LLP

12        Attorneys for Wells Fargo

13        200 Park Avenue

14        New York, NY 10166

15

16   BY:   JAMES DONNELL, ESQ.

17

18

19   WINSTON & STRAWN LLP

20        Attorneys for Fannie Mae

21        200 Park Avenue

22        New York, NY 10166

23

24   BY:   CAREY D. SCHREIBER, ESQ.

25        DAVID NEIER, ESQ.
```

```
 1

 2    CADWALADER, WICKERSHAM & TAFT LLP

 3          Attorneys for MBIA Insurance Co.

 4          Dashwood House

 5          69 Old Broad Street

 6          London, England EC2M 1QS

 7

 8    BY:   GREGORY M. PETRICK, ESQ.

 9

10

11    ROPES & GRAY LLP

12          Attorneys for Ad Hoc Institutional Investors Group

13          800 Boylston Street

14          Boston, MA 02199

15

16    BY:   D. ROSS MARTIN, ESQ.

17

18

19    ROPES & GRAY LLP

20          Attorneys for RMBS Holders

21          1211 Avenue of the Americas

22          New York, NY 10036

23

24    BY:   KEITH H. WOFFORD, ESQ.

25          DARREN AZMAN, ESQ. (TELEPHONICALLY)
```

```
 1

 2   MORRISON COHEN LLP

 3        Attorneys for Independent Directors of Residential

 4          Capital

 5        909 Third Avenue

 6        New York, NY 10022

 7

 8   BY:   JOSEPH T. MOLDOVAN, ESQ.

 9        DAVID A. PIEDRA, ESQ.

10        MICHAEL CONNOLLY, ESQ.

11

12

13   GIBBS & BRUNS LLP

14        Attorneys for Ad Hoc Institutional Investors Group

15        1100 Louisiana Street

16        Suite 5300

17        Houston, TX 77002

18

19   BY:   KATHY PATRICK, ESQ.

20

21

22

23

24

25
```

```
 1

 2    HUNTON & WILLIAMS LLP

 3          Attorneys for Barclays Bank PLC as

 4            Administrative Agent and Noteholder

 5          200 Park Avenue

 6          New York, NY 10166

 7

 8    BY:   PETER S. PARTEE, ESQ.

 9

10

11    CARTER LEDYARD & MILBURN LLP

12          Attorneys for Talcott Franklin, P.C.

13          2 Wall Street

14          New York, NY 10005

15

16    BY:   JAMES GADSDEN, ESQ.

17

18

19    KIRKLAND & ELLIS LLP

20          Attorneys for Ally Financial & Ally Bank

21          601 Lexington Avenue

22          New York, NY 10022

23

24    BY:   STEPHEN E. HESSLER, ESQ.

25          RAY C. SCHROCK, ESQ.
```

```
 1

 2    SHEARMAN & STERLING LLP

 3          Attorneys for Citibank, N.A.

 4          599 Lexington Avenue

 5          New York, NY 10022

 6

 7    BY:   SUSAN A. FENNESSEY, ESQ.

 8          FREDRIC SOSNICK, ESQ.

 9

10

11    KELLEY DRYE & WARREN LLP

12          Attorneys for U.S. Bank

13          101 Park Avenue

14          New York, NY 10178

15

16    BY:   JASON R. ADAMS, ESQ.

17          BENJAMIN D. FEDER

18

19

20    UNITED STATES DEPARTMENT OF JUSTICE

21          Civil Division

22          950 Pennsylvania Avenue

23          Washington, DC 20530

24

25    BY:   GLENN GILLETT, ESQ.
```

```
 1

 2   WHITE & CASE LLP

 3        Attorneys for Ad Hoc Group of Junior Secured Noteholders

 4        1155 Avenue of the Americas

 5        New York, NY 10036

 6

 7   BY:   GERARD UZZI, ESQ.

 8        J. CHRISTOPHER SHORE, ESQ.

 9        HARRISON DENMAN, ESQ.

10

11

12   UNITED STATES DEPARTMENT OF JUSTICE

13        U.S. Attorney's Office

14        86 Chambers Street

15        3rd Floor

16        New York, NY 10007

17

18   BY:   JOSEPH N. CORDARO, AUSA

19

20

21

22

23

24

25
```

```
 1

 2   UNITED STATES DEPARTMENT OF JUSTICE

 3         Office of the U.S. Trustee

 4         33 Whitehall Street

 5         21st Floor

 6         New York, NY 10004

 7

 8   BY:   TRACY HOPE DAVIS, ESQ.

 9         BRIAN S. MASUMOTO, ESQ.

10

11

12   SIDLEY AUSTIN

13         Attorneys for Nationstar Mortgage

14         1 South Dearborn Street

15         Chicago, IL 60603

16

17   BY:   JESSICA BOELTER, ESQ. (TELEPHONICALLY)

18         BRETT MYRICK, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25
```

```
 1

 2   CHADBOURNE & PARKE, LLP

 3        Attorneys for Chadbourne & Parke

 4        30 Rockefeller Plaza

 5        New York, NY 10112

 6

 7   BY:   MARC B. ROITMAN, ESQ. (TELEPHONICALLY)

 8

 9

10   BARNES & THORNBURG LLP

11        Attorneys for USAA

12        1000 N. West Street

13        Suite 1200

14        Wilmington, DE 19801

15

16   BY:   DAVID M. POWLEN, ESQ. (TELEPHONICALLY)

17

18

19   BARNES & THORNBURG LLP

20        Attorneys for USAA

21        225 South Sixth Street

22        Suite 2800

23        Minneapolis, MN 55402

24

25   BY:   STEPHANIE M. SEIDL, ESQ. (TELEPHONICALLY)
```

```
 1

 2   MILBANK, TWEED, HADLEY & MCCLOY, LLP

 3        Attorneys for Milbank, Tweed, Hadley & McCloy

 4        601 South Figueroa Street

 5        30th Floor

 6        Los Angeles, CA 90017

 7

 8   BY:   MARK SHINDERMAN, ESQ. (TELEPHONICALLY)

 9         GREGORY BRAY, ESQ. (TELEPHONICALLY)

10

11

12   MILLER JOHNSON, PLC

13        Attorneys for Creditor/Investor

14        250 Monroe Avenue NW

15        Suite 800

16        Grand Rapids, MI 49503

17

18   BY:   THOMAS SARB, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25
```

```
 1

 2   ALSO PRESENT:  (TELEPHONICALLY)

 3        JEFFREY ANAPOLSKY, T. Rowe Price

 4        JENNIFER H. ANDERSON, Farallon Capital Management

 5        GEORGE BRICKFIELD, The Seaport Group

 6        STEVEN H. CHURCH, Bloomberg LLP

 7        EPHRAIM DIAMOND, DK Partners

 8        DAVID DUNN, Arrowgrass Capital Partners

 9        JEFF FORLIZZI, Silver Point Capital

10        HARSH KONDAPALLI, UBS Securities LLC

11        JOSEPH KRONSBERG, Cyrus Capital Partners, LP

12        KENNETH MAIMAN, Appaloosa Management

13        SCOTT MATES, Blackstone

14        JOHN O'MEARA, Morgan Stanley

15        AMIT P. PATEL, Avenue Capital

16        DENNIS A. PRIETO, Aurelius Capital Management, LP

17        ANDREW REBACK, Credit Suisse

18        BILL J. SCHWARTZ, CitiGroup

19        MARC SCHWARTZ, Taconic Capital

20        MITCHELL SOCKETT, King Street Capital Management

21        KEVIN J. STARKE, CRT Capital Group, LLC

22        USMAN WAHEED, P. Schoenfeld Asset Management

23        DI WU, Varde Partners, Inc.

24

25
```

RESIDENTIAL CAPITAL, LLC, ET AL.

1                     P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Good afternoon.

3          MR. NASHELSKY:  Good afternoon, Your Honor.  Larren

4    Nashelsky from Morrison & Foerster, proposed counsel to the

5    debtors, Residential Capital, LLC and certain subsidiaries

6    which filed petitions for relief this morning.

7          First I wanted to thank Your Honor for taking the time

8    on an emergency basis to step in for Judge Glenn.  We really

9    appreciate it.  We need this critical relief, and we thank the

10   Court for its time.

11         With me today from ResCap is James Whitlinger, the

12   CFO.  He was the affiant in the first-day petition.  Mr.

13   Whitlinger is right there in the courtroom.

14         THE COURT:  I read your very long submission.

15         MR. NASHELSKY:  It's very detailed.

16         Also with me, Your Honor, are two of my partners, Todd

17   Goren and Gary Lee, who will be handling some of the first-day

18   motions today and tomorrow.

19         THE COURT:  Okay.

20         MR. NASHELSKY:  I wanted to apologize in advance for

21   having to have a tag-team approach, but I think it's important

22   for everybody to recognize that in the last -- with this

23   filing, there were fifty-one debtors, eighteen first-day

24   motions, two DIP requests requesting borrowings over a billion

25   and a half dollars on a final basis, two use of cash collateral

RESIDENTIAL CAPITAL, LLC, ET AL.

1    orders, two asset purchase agreements negotiated and signed

2    with a combined purchase price of almost four billion dollars,

3    and three plan support agreements that I will discuss in more

4    detail tomorrow.

5        Since Your Honor has granted us an emergency motion

6    (sic), I had a lot more remarks, but I'm going to spare the

7    Court, unless the Court would like more, and just go into the

8    motions.  Either way, I can do more, Your Honor, but I know

9    it's an emergency hearing and Your Honor is stepping in.

10       THE COURT:  I don't need to have you say anything

11   other than what I've read in the submissions.  But I also

12   recognize that this is a public hearing and it's the beginning

13   of a process that you probably would like to characterize in

14   the best possible way for the audience that's here.

15       MR. NASHELSKY:  That's great, Your Honor.  Then I --

16       THE COURT:  So you have that opportunity if you wish

17   to take it.

18       MR. NASHELSKY:  I do, Your Honor.  Thank you.  But I

19   just wanted to make it clear the we didn't want to indulge

20   (sic) on your time any more than we are.

21       THE COURT:  That's fine.  You've already indulged in

22   my whole day in getting ready for this.  So a few more

23   minutes --

24       MR. NASHELSKY:  I will apologize many times --

25       THE COURT:  -- a few more minutes won't be a problem.

RESIDENTIAL CAPITAL, LLC, ET AL.

1       MR. NASHELSKY:  Great.  So the debtors are one of the

2   largest mortgage companies in the United States.  They're

3   indirectly wholly owned subsidiaries of Ally Financial Inc.,

4   which I'll call Ally or AFI.  AFI is a bank holding company

5   that is regulated by the Federal Reserve.  None of Ally

6   Financial, Ally Bank or other direct Ally Financial

7   subsidiaries are debtors in these cases.  The only debtors are

8   Residential Capital, LLC and its subsidiaries.

9       Ally is almost seventy-four percent owned by the U.S.

10  Department of Treasury as a result of monies it borrowed from

11  Treasury under TARP.  Said differently, Your Honor, the debtors

12  are indirectly owned in large part, almost seventy-five

13  percent, by the United States government.

14      Although not debtors in these proceedings, Ally

15  Financial and Ally Bank have entered into a number of

16  agreements that will be discussed in more detail over the next

17  two days that will support the debtors' operations in these

18  Chapter 11 proceedings and through a sale of assets to buyers.

19      The debtors have two main lines of business:  mortgage

20  loan servicing and mortgage loan origination; and the wind-down

21  of its legacy portfolio.  The debtors operate those business

22  through two primary operating subsidiaries:  GMAC Mortgage,

23  LLC, and Residential Funding Company, LLC.

24      With respect to the servicing business, this is the

25  debtors' primary and most valuable asset.  It's a business

RESIDENTIAL CAPITAL, LLC, ET AL.

1    operation consisting of servicing mortgage loans for investors,

2    including loans originated by the debtors themselves, Ally Bank

3    and other third parties.  As of March 31st, 2012, the debtors

4    were servicing over 2.4 million mortgage loans with an

5    aggregate unpaid principal balance of approximately 374 billion

6    dollars.

7         The debtors are the fifth largest servicer of

8    mortgages in the United States.  Only Bank of America, Chase,

9    Wells Fargo and Citi service more mortgages than the debtors.

10   Servicing is critical to our borrowers.  It consists of

11   collecting and remitting mortgage loan payments, responding to

12   borrower increase, accounting for principal and interest,

13   holding custodial and escrow funds for payment of property

14   taxes and insurance, counseling or otherwise working with

15   delinquent borrowers, including granting borrower leniency and

16   certain loan modification or repayment plans for borrowers,

17   supervising foreclosure and property dispositions, making

18   advances of required principal and interest and certain

19   property protection costs with respect to delinquent mortgages,

20   and reporting and remitting payments due to investors under

21   securitizations.

22        As everybody knows, Your Honor, the housing market has

23   suffered dramatically since 2008.  One of the responses to that

24   crisis was the implementation of enhanced servicing standards.

25   These were standards that were pushed by the regulators and

RESIDENTIAL CAPITAL, LLC, ET AL.

1    adopted by the debtors, which allow for more required

2    refinancings and modifications of borrowers' mortgage loans.

3    The debtors have been a leader in those refinancings and

4    modifications, including under government-sponsored programs

5    such as Home Affordable Modification Program, known as HAMP,

6    and Home Affordable Refinance Program, known as HARP.  The

7    debtors intend to remain a leader in mortgage loan

8    modifications during these Chapter 11 cases.

9            The servicing business is not inexpensive, and

10   servicing advances are the single largest use of the debtors'

11   cash during these cases.  That will be the bulk of what we will

12   request in the DIP that Mr. Goren will describe a little later.

13           The other part of the mortgage loan business is the

14   origination side.  The debtors are also one of the leading

15   originators of mortgages; brokering, originating, purchasing,

16   selling and securitizing mortgages.  Prior to the petition

17   date, the debtors purchased mortgage loans, and together with

18   mortgage loans they originated in Nevada and Ohio, either sold

19   those loans to Fannie Mae and Freddie Mac, for the GSEs to

20   deposit them into securitizations, or they deposited them into

21   Ginnie Mae guaranteed mortgage loans, which were sponsored by

22   the issuance of MBS or trust certificates.

23           Post-petition, the debtors intend to continue to

24   originate loans in Nevada and Ohio, selling those loans which

25   will be Fannie Mae- and Freddie Mac-eligible loans to Ally

RESIDENTIAL CAPITAL, LLC, ET AL.

1    Bank, its nondebtor affiliate.  It will also broker loans to

2    Ally Bank in forty-seven states.  For those wanting to do the

3    math, Alaska we do not do any mortgage loans in, the other

4    forty-nine, we do -- sorry, take that back.  Hawaii, we do not

5    do any in.  The other forty-nine, we are licensed in all forty-

6    nine, but currently, we broker loans solely in forty-seven of

7    them.

8         I apologize.  My team has arrived a little late, Your

9    Honor, but I will continue.

10        The other part of the debtors' assets is the legacy

11   portfolio.  These are principally assets that remain from

12   nonconforming residential loans the debtors did in years past

13   and other residual interests.  The legacy portfolios are being

14   wound down and will be sold during these cases.

15        The primary liabilities of the debtors, Your Honor,

16   are borrowings under a number of credit facilities.  And maybe

17   that chart will come up so people can see, but I'll just

18   briefly go through them.  Your Honor, there are two facilities

19   with AFI, the nondebtor parent.

20        Thank you.  That might help people see a little bit.

21   Probably can't read it, but --

22        THE COURT:  Nobody can really see that.

23        MR. NASHELSKY:  Nobody can read it.  Then I'll

24   describe them.  There's an AFI senior secured credit facility

25   that's approximately 748 million dollars outstanding.  It

RESIDENTIAL CAPITAL, LLC, ET AL.

1    matures today.  And it's secured by a number of whole loans,

2    nonagency loans, servicing advances and other assets.

3              THE COURT:  Do you have another copy --

4              MR. NASHELSKY:  I do.

5              THE COURT:  -- of that, that I can just see on the

6    bench?

7              MR. NASHELSKY:  Yes.  Can I approach, Your Honor?

8              THE COURT:  Please.  Thank you.

9              MR. NASHELSKY:  The second secured facility the

10   debtors have is what they call a line of credit with Ally

11   Financial, as well.  This had approximately 380 million dollars

12   outstanding as of the petition date.  It also matured today.

13   And it was secured -- or is secured by whole loans, nonagency

14   mortgage service rights and other assets.

15             The third secured facility the debtors have is a

16   facility with Citibank.  It's an MSR facility.  MSR are

17   mortgage servicing rights.  These are the stream of payments

18   the debtors will receive for servicing pools of mortgages.  It

19   has approximately 152 million outstanding, and also matured

20   prior -- just prior to the -- sorry, matured today.  That

21   facility is secured by GSE mortgage servicing rights.  The GSEs

22   we refer to them colloquially; more accurately, it's Fannie

23   Mae, Freddie Mac or more GSEs, and then Ginnie Mae.

24             There is also another servicing advance facility with

25   Fannie Mae.  It has about forty-eight million outstanding.  And

RESIDENTIAL CAPITAL, LLC, ET AL.

1    that is secured by Fannie Mae servicing advances.

2         The two that are in purple in the middle, Your Honor,

3    of your chart, are the two facilities we propose to refinance

4    with the DIP.  It is a repo facility with BMMZ.  BMMZ is

5    another nondebtor affiliate/subsidiary of Ally Financial.  It

6    has approximately 250 million outstanding under the repo

7    facility.  And it is made up -- its collateral is made up of

8    whole loans.

9         The other facility that we propose to replace with the

10   DIP is what we refer to as the GSAP facility.  This is a

11   facility that's about 660 million outstanding.  And it is

12   secured by nonagency servicing advances.  Nonagency servicing

13   advances are not the GSEs but advances we make and we are owed

14   money in repayment of those advances, and those repayments

15   secure that facility.  We'll go a little bit more -- Mr. Goren

16   will go into those facilities a bit more with the DIP.

17        The remaining secured facility is a junior secured

18   note facility, approximately 2.1 billion dollars of principal.

19   It has a second lien on the collateral that the Ally senior

20   secured facility has a first lien on.  Those were the whole

21   loans, nonagency servicing advances and other assets.

22        Finally, there are a number of unsecured -- senior

23   unsecured notes, approximately a billion dollars -- just short

24   of a billion dollars.  Those are unsecured, Your Honor.  And

25   those are, unlike most of our other obligations, reside solely

RESIDENTIAL CAPITAL, LLC, ET AL.

1    at the parent, Residential Capital, LLC, and are not guaranteed

2    by any of the subsidiaries.

3         The debtors are also parties to a number of lawsuits

4    and contingent liabilities alleging liability from loans the

5    debtors originated and sold over the past number of years.  The

6    three big categories of those liabilities are representation

7    and warranty -- rep and warranty liability.  And we face

8    substantial and continuing rep and warranty requests due to

9    alleged breaches of rep and warranty or early payment defaults.

10   Between 2008 and 2012 we repurchased mortgage loans or

11   otherwise made payments with respect to those claims of 2.8

12   billion dollars.

13        There are also monoline insurance -- I'm sorry --

14   monoline insurer representation and warranty litigations.

15   There are about fifteen cases that the debtors have with

16   monoline insurance companies.  And in those cases, the

17   monolines are alleging that the debtors breached their rep and

18   warranties.

19        Finally, the debtors are defendants in approximately

20   nineteen securities case.  And those cases allege that the

21   debtors made misrepresentations or omissions in registration

22   statements and prospectus.

23        Why do we find ourselves here, Your Honor?  The

24   circumstances leading to this filing, there are a number of

25   reasons, but many of which can be traced back to the continuing

RESIDENTIAL CAPITAL, LLC, ET AL.

1    adverse economic climate, particularly in the residential

2    mortgage industry.  Starting in 2007, we saw record declines in

3    home values and a continuing glut of homes available for sale

4    and those in foreclosure.  Throughout the past five years,

5    homeowners have had difficulty paying their mortgages,

6    refinancing their mortgages, this despite record low interest

7    rates.  It is also very difficult to sell homes or buy homes in

8    this environment.

9          As both loan delinquencies and regulation costs

10   increased, the cost of servicing mortgage loans also increased.

11   Although the debtors have continued to honor their servicing

12   obligations, it's become financially challenging to do so,

13   especially while having limited access to the capital markets.

14   These liquidity problems existed despite Ally Financial having

15   made capital contributions of approximately 10.3 billion

16   dollars to ResCap since 2007.

17         As I just noted, Your Honor, there's been a

18   significant changing regulatory landscape.  And I think we'll

19   talk about this a little bit more tomorrow with some of the

20   motions, but as a result of this crisis, there were numerous

21   government agencies investigating mortgage service companies.

22   There are three meaningful settlements or orders that come out

23   of those investigations.

24         On April 13th, 2011, as a result of an examination by

25   the Federal Reserve and the FDIC, ResCap and GMAC Mortgage and

RESIDENTIAL CAPITAL, LLC, ET AL.

1    certain nondebtor affiliates entered into a consent order.  The

2    consent order requires ResCap and GMAC Mortgage to make

3    improvements to various aspects of their residential mortgage

4    loan servicing business and to undertake a risk assessment of

5    their mortgage servicing operations.  Substantially all the

6    requirements under the consent order have now been implemented.

7         The consent order also requires the debtors to conduct

8    a review of past residential mortgage foreclosure actions and

9    remediate any financial harm to borrowers that result from

10   errors or misrepresentations that the debtors uncovered in

11   those reviews.  The file review is underway and will continue

12   post-petition.

13        On February 9th, 2012, AFI, ResCap and certain other

14   debtors, along with the four largest servicers of mortgage

15   loans in the United States, reached an agreement in principle

16   with the federal government, forty-nine State Attorneys

17   General, and forty-eight state banking departments, with

18   respect to a DOJ/AG investigation.  The DOJ/AG settlement

19   resolves most potential claims of the government parties

20   arising out of origination and servicing matters and

21   foreclosure matters.

22        Pursuant to the DOJ/AG settlement, in February 2012,

23   the debtors paid approximately 110 million dollars to a trustee

24   who is distribute those settlement funds to federal and state

25   governments.  In addition, the debtors committed to provide a

RESIDENTIAL CAPITAL, LLC, ET AL.

1    minimum of 200 million additional dollars towards borrower

2    relief which would come in the form of loan modifications,

3    principal reductions, rate modifications and refinancings.

4        The DOJ/AG settlement provides incentives for borrower

5    relief provided by the debtor within the first twelve months.

6    And all borrower relief must be satisfied by 2015.  The debtors

7    are well underway with satisfying those requirements.

8    Compliance with the obligations of the DOJ/AG settlement will

9    be subject to oversight by an independent monitor who will have

10   authority to impose additional penalties and fines for

11   noncompliance.

12       Lastly, on February 9th, 2012, AFI and ResCap agreed

13   with the Federal Reserve Board on a civil money penalty of 207

14   million dollars related to the same activities that were the

15   subject of the DOJ/AG settlement.  This 207 million dollar

16   amount will be reduced, dollar for dollar, in connection with

17   the satisfaction of the federal portion of the DOJ/AG

18   settlement.  Additional future penalties related to the civil

19   money penalty may be imposed if we do not satisfy those

20   requirements.

21       With that regulatory backdrop, much of the first-day

22   relief being requested today and tomorrow is to permit the

23   debtors to continue to operate their businesses within this

24   regulatory landscape and to sell their assets in an orderly

25   fashion for almost four billion dollars under their stalking-

RESIDENTIAL CAPITAL, LLC, ET AL.

1   horse bids, and to benefit creditors.  To do that, it's

2   critical that the debtors have the ability to comply with the

3   various obligations under these regulatory provisions.  Not

4   surprisingly, no buyer wants to buy our assets if we haven't

5   continued to comply with those provisions; and we intend to.

6        It's mission critical, Your Honor, that in complying

7   with all of the additional requirements I just described, the

8   debtors maintain their entire workforce.  These regulations

9   require significantly more man and woman hours to satisfy

10  enhanced servicing standards.  The servicing business is very

11  competitive right now, and the debtors cannot afford to lose

12  any of their employees if they have any hope of continuing to

13  fulfill these regulatory obligations.

14       We are also -- excuse me, Your Honor.  We were part of

15  the problem, Your Honor.  We are trying very hard to be part of

16  the solution.  Complying with these regulatory obligations is a

17  critical part of that solution, a solution that will be

18  continued by the buyer after the sale.

19       So that there were no surprises and that we had

20  support from our regulators prior to filing, the debtors had

21  numerous discussions with a variety of regulators prior to the

22  filing, including the monitor that I described earlier from the

23  DOJ/AG settlement and the Office of Mortgage Settlement

24  Oversight, the Consumer Financial Protection Bureau, the

25  Department of Justice and Executive Office of the United States

RESIDENTIAL CAPITAL, LLC, ET AL.

1    Trustees, the Conference of State Bank Supervisors, AG

2    Monitoring Executive Committee, the New York State Department

3    of Financial Services, and the Oklahoma Attorney General's

4    Office and Banking Department.  There are many more calls set

5    up starting today through the end of the week and beyond.  The

6    debtors understand the importance of these regulatory issues,

7    and they will continue to comply.

8         The debtors would like to use Chapter 11, and

9    specifically a Chapter 11 plan here, to facilitate an orderly

10   sale of their most valuable assets, the origination and

11   servicing platform I described earlier, and their legacy

12   portfolio.  They would then wind down and sell any remaining

13   assets and resolve their legacy liabilities.  The debtors

14   believe that a rapid sale process during this calendar year

15   will reduce the risk of disruption and dissipation of value

16   with originating and servicing mortgage loans in a bankruptcy.

17        By doing this, Your Honor, the debtors hope to provide

18   the best possible outcome for the more than 2.4 million

19   customers whose loans they service and for the many investors

20   in securitizations that own loans serviced by the debtors.

21   They hope to avoid disrupting the fragile housing market

22   recovery and preserve their employees' jobs.

23        The key pieces of this restructuring effort are the

24   DIP financing, which we will discuss in a moment; the asset

25   sales, which include a sale of the platform and assets to

RESIDENTIAL CAPITAL, LLC, ET AL.

1   Nationstar; and a sale of the legacy portfolio to Ally

2   Financial.  The Nationstar sale is for a purchase price of

3   approximately 2.4 billion dollars -- sorry, almost 2.4 billion

4   dollars; and the Ally sale is for a purchase price of

5   approximately 1.6 billion.  Together the sales are generating

6   almost 4 billion dollars of value for the estates.

7        The third piece of this restructuring effort includes

8   settlements we've reached just before bankruptcy with Ally

9   Financial; with the holders of approximately 781 million

10  dollars of our junior secured bonds, which is approximately

11  thirty-seven percent of those bond issuance; and with a group

12  of institutional investors in residential mortgage-backed

13  securities issued by ResCap's affiliates.  And those investors

14  hold more than twenty-five percent of at least one class in 290

15  deals out of 392 total deals we did, with an original principal

16  balance of 164 billion that they hold -- sorry, of those deals,

17  compared to a total original principal balance of 392 deals we

18  did of 221.

19       So significant holdings in approximately seventy-five

20  percent, whether you go by dollar amount or number of deals,

21  are supporting the plan that the debtors are moving forward

22  with.

23       With respect to the asset sales, Your Honor; at the

24  beginning of the year, the debtors' investment banker,

25  Centerview Partners, launched a targeted marketing process for

RESIDENTIAL CAPITAL, LLC, ET AL.

1    the debtors' assets.  Five potential bidders were contacted,

2    and we negotiated NDAs with each of them.  These were bidders

3    that had previously shown interest in the debtors' assets and

4    had the economic wherewithal to complete transactions of this

5    size.

6         The buyers were encouraged to be flexible with their

7    proposals, and that the debtors would consider bids for any and

8    all asset combinations, including bids on individual assets.

9    The debtors received three preliminary bids of interest,

10   including one from Nationstar, a portfolio company of Fortress.

11   Nationstar and one other bidder indicated their interest in

12   participating as a stalking-horse bidder for a substantial

13   portion of the debtors' assets and operations.  The third

14   bidder expressed an interest in buying a limited group of

15   financial assets.

16        The debtors elected to proceed with the two bidders.

17   And after further bids were received, Nationstar's offer was

18   subsequently the highest and the best offer for the debtors'

19   business.  Nationstar is paying almost 2.4 billion for the

20   mortgage loan origination and servicing platform and related

21   assets.

22        As to these sales, both sales are subject to higher

23   and better offers as part of an auction process that hopefully

24   will be established in the coming weeks.  We anticipate the

25   process will give potential buyers approximately three months

RESIDENTIAL CAPITAL, LLC, ET AL.

1    to prepare bids to bid on these assets.  We would hope to have

2    an auction in mid-September.  And to that end, we have filed a

3    motion seeking a hearing in mid-June for approval of sale

4    procedures.

5            It should be noted, Your Honor, that from the start of

6    the sales process, the debtors and their advisors have spent

7    significant times with a variety of government entities,

8    including Fannie Mae, Freddie Mac, Ginnie Mae and FHFA.  In

9    order to garner the support of such organizations, the debtors

10   engaged in constant dialog, consisting of multiple weekly

11   update calls, frequent in-person meetings, and in-person

12   management presentations, where the debtors were, and they were

13   also joined by Nationstar.

14           Part of what these government entities would like to

15   know, Your Honor, is to be comfortable that Nationstar, as the

16   acquirer of such a large portfolio, can continue to service

17   them at the levels the debtors have.  Obtaining government

18   support is viewed as paramount by the debtors in consummating a

19   value-maximizing sale of assets and operations.  Although we

20   don't have complete sign-off from those entities today on all

21   the terms of the sale, they have generally indicated their

22   support for the process and what the debtors are seeking to do

23   in selling their assets to Nationstar.

24           Your Honor, the final piece of the debtors' plan that

25   I want to briefly summarize were the three plan support

RESIDENTIAL CAPITAL, LLC, ET AL.

1    agreements I noted earlier.  Back in the fall, it became

2    apparent that the debtors' best chance of restructuring

3    involved significant financial support from its parent, Ally

4    Financial.  It similarly became apparent that further support

5    in connection with a comprehensive restructuring would require

6    the debtors to provide releases to Ally Financial.  Nothing

7    comes for free, Your Honor.

8          And to determine whether such a settlement would be

9    appropriate, and whether releases would be appropriate under

10   the circumstances, the debtors undertook an investigation of

11   potential claims against Ally.  To make the process completely

12   independent, the debtors appointed two new independent members

13   to the ResCap board who had no prior involvement with either

14   ResCap or Ally, and created a subcommittee of those two

15   independent board members with sole responsibility for the

16   investigation.

17         THE COURT:  When did this occur?

18         MR. NASHELSKY:  The investigation started in end of

19   November, early December, Your Honor, and continued through

20   February, and then negotiations, probably, for the last two

21   months, culminating on a settlement in the last -- actually

22   signed up this morning.

23         THE COURT:  Okay.  I don't need to know the details of

24   what you just described.  I'm sure it will be the subject of

25   some close analysis during the case.

RESIDENTIAL CAPITAL, LLC, ET AL.

1        MR. NASHELSKY:  Yes.  I am sure, Your Honor.

2        Morrison & Foerster worked closely with counsel for

3    the independent directors, Morrison Cohen, in undertaking this

4    investigation.  A settlement was ultimately reached which was

5    unanimously approved by the special committee of the ResCap

6    board.  The settlement includes the following key contributions

7    by Ally to ResCap.

8        THE COURT:  When you say "unanimously approved by the

9    special committee", that means the two independent directors?

10       MR. NASHELSKY:  The two members.  And then endorsed by

11   the full board.

12       Ally will pay the debtors 750 million dollars in cash.

13   Ally will act as a stalking-horse bidder on the legacy loan

14   portfolio I described earlier, for a price that is 200 million

15   dollars higher than Nationstar was willing to pay for those

16   same assets; hence we have the bifurcated sale process now.

17       Ally will also support ResCap's continued origination

18   of loans in bankruptcy.  As far as we can tell, Your Honor,

19   originating loans while in bankruptcy has never been done

20   before.  And with Ally's support, we hope to complete that.

21       Continuing origination is critical.  Not only is

22   Nationstar requiring the debtors to continue to originate

23   during the cases, but origination is estimated to yield

24   approximately a hundred million dollars in net profit to the

25   debtors between today and the closing of the sale to

RESIDENTIAL CAPITAL, LLC, ET AL.

1   Nationstar.

2        As will be discussed in more detail below, Ally is

3   also providing a DIP loan to allow the debtors to continue to

4   make required Ginnie Mae buybacks.  Finally, Ally is providing

5   essential service to the debtors during the Chapter 11 cases to

6   allow the debtors to operate as a going concern through the

7   sale to Nationstar and any subsequent wind down.

8        Based on those contributions that the debtors valued

9   well in excess of a billion dollars, and which also allowed the

10   debtors to propose a plan that implements the sales to

11   Nationstar and Ally, the independent directors concluded that

12   the truly unusual circumstances justified a settlement that

13   includes third-party releases.

14        I want to be clear, none of the relief being sought

15   today or tomorrow limits in any way third parties' rights with

16   respect to challenging the settlement, third-party releases, or

17   anything else.  Those issues are for another day.  We just

18   wanted to give the Court and the parties an overview of what

19   the settlement entails.

20        THE COURT:  I have one question about process.  And

21   it's probably premature, but I'm going to ask it anyway.  To

22   the extent that there is a competitive process that is being

23   undertaken here, starting with June sale procedures to be

24   approved and a September auction, if one were to assume

25   hypothetically a robust competition for the assets that are the

RESIDENTIAL CAPITAL, LLC, ET AL.

1    subject of Ally's stalking-horse bid of 1.6 billion dollars,

2    how does the company independently assess that, given what

3    appears to be a conflict within the corporate structure, since

4    Ally is benefitted by this transaction by reason of the

5    releases?  It almost seems to be inviting a Chapter 11 trustee

6    or some independent fiduciary to be involved in assessing this.

7            And my question is, to what extent has any

8    consideration been given pre-filing to how that aspect of the

9    case will be managed?

10           MR. NASHELSKY:  We've given significant thought, Your

11   Honor.  We believe that with the investigation we've done, and

12   with the a creditors' committee who will be shortly appointed,

13   we believe we can have a robust process that looks at the

14   investigation, looks at the materials, looks at the facts, and

15   determines whether the board's judgment was reasonable, given

16   the circumstances.

17           On the bid you just noted, Ally Financial is

18   completely exposed to being overbid on that bid.  They do

19   not -- they're not locking up those assets.  I attributed a 200

20   million dollar value between the Fortress bid and the Ally bid.

21   That's the value today based on having a 200 million dollar

22   higher bid than we have.  That value may not be there come the

23   end of the case if they get overbid, and we'd have to have a

24   different discussion about what that value would be.

25           THE COURT:  But the decider will be the debtor-in-

RESIDENTIAL CAPITAL, LLC, ET AL.

1    possession with the advice and consent and oversight of the

2    creditors' committee, assuming one is appointed here.

3         MR. NASHELSKY:  And the ability of creditors to object

4    in a process before the Court.

5         THE COURT:  Okay.  I'm just raising what to me seems

6    to be a potential issue down the road.  But we don't need to

7    address it today.

8         MR. NASHELSKY:  Fair enough, Your Honor.  We recognize

9    it is.  But I think it's important to note that in addition to

10   Ally, the debtors began discussions with advisors representing

11   an ad hoc group of the junior secured bonds.  Those are the

12   bondholders that hold the second lien position on the

13   collateral that the AFI senior secured credit facility has a

14   first lien.  That ad hoc group included holders of

15   approximately forty percent of the junior secured bonds and is

16   represented by White & Case and Houlihan Lokey.

17        After execution of an NDA, the debtors gave those

18   advisors access to a data room containing a significant amount

19   of information about the debtors, their capital structure and

20   operations.  After a few months of diligence and meetings with

21   the debtors and their advisors, we began to discuss a potential

22   settlement.

23        The settlement discussions focused on the junior

24   secured bonds' support of a plan which includes the asset sales

25   I described earlier and an intercreditor settlement of

RESIDENTIAL CAPITAL, LLC, ET AL.

1    potential claims between the junior secured bonds and Ally,

2    with respect to the collateral they share and the positions on

3    that collateral.

4         After months of negotiations among the advisors, the

5    committee -- the ad hoc committee -- sorry, the advisors to the

6    ad hoc committee, Ally and the debtors, the junior secured

7    bondholder advisors believed the settlement was at a point

8    where they needed to have holders of their bonds become

9    restricted to make the ultimate determination about a

10   settlement.  After becoming restricted, the parties finalized a

11   settlement that is embodied in the plan support agreement among

12   the debtors, Ally and those holders who are signatories

13   thereto.

14        The primary terms of the plan support agreement

15   include the junior secured bonds' support of the plan, the

16   first day motions, the DIP facilities and the use of cash

17   collateral; the junior secured bonds waive any potential right

18   to post-petition interest till the end of the year; and they

19   waive the right to pursue any claim for an equitable lien they

20   may have on the Ally LOC assets -- that's the second facility

21   on the chart -- if the plan is confirmed by 12/31.

22        Ally has agreed to modify its intercreditor agreement

23   with the junior secured bonds, such that Ally only gets the

24   first 400 million of those bonds instead of the 748 they're

25   currently listed as being entitled to.  The next billion they

RESIDENTIAL CAPITAL, LLC, ET AL.

1   share -- sorry, JSBs get the next billion.  And then they share

2   eighty-one percent to the junior secured bonds and nineteen

3   percent to Ally after that.

4         Another benefit to the estate is through this

5   intercreditor settlement agreement, the debtors are only paying

6   interest on 400 million of an Ally revolver as opposed to the

7   full 750, if we can confirm a plan that approves that

8   settlement.

9         Finally, Your Honor, we reached a settlement with our

10  parent; we reached a settlement with bondholders; but we also

11  thought it very important to reach a settlement with contingent

12  claimants that held many of the claims I described earlier.

13  And what the debtors have achieved is a settlement in support

14  with a very large group of contingent creditors who have claims

15  arising from the debtors' sale of mortgage loans.

16        Those creditors are represented by Kathy Patrick of

17  Gibbs & Bruns.  Ms. Patrick recently represented similar

18  clients with similar claims against Bank of America.  Ms.

19  Patrick's clients are some of the largest investors and

20  investment management -- excuse me -- investors and investment

21  managers in the world.  Specifically here, they are

22  institutional investors in residential mortgage-backed

23  securities issued by ResCap's affiliates.  At present, those

24  institutional investors hold more than twenty-five percent of

25  at least one class in 290 securitizations; and they have agreed

RESIDENTIAL CAPITAL, LLC, ET AL.

 1   to support the debtors' restructuring.

 2        I won't go through much detail on the settlement

 3   today, Your Honor.  It's obviously not up to today and will be

 4   the subject of a future hearing.  But the essence of the

 5   settlement is that Ms. Patrick's clients have agreed to

 6   recommend that the trustees for RMBS cap the trust claims

 7   against the debtors at 8.7 billion for all claims held by the

 8   trust that arise from PSAs and the other related trust

 9   documents.  As you can imagine, when dealing with complex

10   securitizations, trusts, and certificates, the settlement is

11   much more complicated than the simplified version I just gave

12   you.

13        Part and parcel with the settlement is a plan support

14   agreement under which Ms. Patrick's clients will support the

15   debtors' efforts in various aspects of the restructuring,

16   including prosecution of the first- and second-day motions, and

17   approval of a disclosure statement and plan that materially

18   conform to the plan term sheet.  They will also direct the

19   trustees of relevant trusts to accept the settlement agreement

20   and support the same aspects of the bankruptcy case as the

21   claimants themselves.

22        To come full circle, Your Honor, the debtors believe

23   that in one of the most complicated bankruptcies in recent

24   memory, including the continuation of the operations of a

25   financial services company during a bankruptcy, the elements of

RESIDENTIAL CAPITAL, LLC, ET AL.

1    a successful Chapter 11 case are taking shape.  The debtors

2    hope to move quickly through Chapter 11 for the sake of their

3    business, their creditors, their employees, their customer, and

4    the fragile U.S. housing recovery.

5           Your Honor, thank you for your indulgence on letting

6    me give some background to the Court and to the parties today.

7    Unless the Court has any questions, I was going to turn the

8    podium over to Mr. Marinuzzi and Mr. Goren to go through

9    today's first-day motions.

10          THE COURT:  I do have one question that relates to the

11   timeline for getting all this done.  I noticed that the

12   maturity date for purposes of the DIP financing, which we're

13   going to be getting into, is eighteen months, but the plan that

14   you outline calls for, perhaps optimistically, an exit before

15   the end of the year.  Is there any consequence to the debtor in

16   respect of its financing, its plan support arrangements, its

17   post-petition operations or otherwise, if the timeline

18   associated with the sale process and completing the plan

19   process associated therewith, should be prolonged?

20          MR. NASHELSKY:  Currently, all those agreements

21   require milestones and deadlines.  The buyer is requiring them.

22   The DIP lender is requiring them.  And the counterparties to

23   our plan support agreements are requiring them.  So the short

24   answer is, Judge, yes there is significant consequence if we

25   can't achieve a sale -- well, if we can't achieve plan

RESIDENTIAL CAPITAL, LLC, ET AL.

1   confirmation by the end of October, or a sale of the assets --

2   sorry, a sale order for the assets by the middle of November;

3   or if we achieve confirmation, if we can't go effective before

4   the middle of December.  We'd have to close those sales.

5        So what we've done is, we've entered into these plan

6   support agreements; we're proposing a plan; and we believe

7   that's where the highest and best value is.  But we have not

8   done it in a way that this can't be closed outside of a plan

9   process.  These asset purchase agreements are designed that if

10  a plan isn't confirmed by a certain date or if it doesn't go

11  effective by a certain date, then separate sale orders will be

12  entered and those assets will be sold.

13       So while we are optimistic that we can get a plan that

14  has a lot of support, we've not put all our eggs in that

15  basket, Your Honor.  There are sales that will be done either

16  way.

17       THE COURT:  And will you be endeavoring to garner

18  support from others who are part of the same constituency that

19  signed plan support agreements, but who are not yet on board?

20       MR. NASHELSKY:  Absolutely, Your Honor.  We are -- we

21  have been in active discussions, and quite frankly, with

22  signature pages coming in, some of the numbers I gave you for

23  both Ms. Patrick's groups and the junior secured bondholders

24  are probably increased either since I left my office or since

25  this hearing started.  But we have also reached out and had

RESIDENTIAL CAPITAL, LLC, ET AL.

1    pre-petition discussions with the monolines, other contingent

2    holders similar to Ms. Patrick's clients, and other significant

3    holders of the junior secured bonds and the senior unsecured

4    bonds that I described.

5        So we believe we've been talking to just about

6    everybody, and we absolutely want to continue to talk to

7    everybody, because we understand that this is -- there's a lot

8    to be done here.  And if we can't get everybody comfortable

9    that this is the best deal, then we're going to have a problem,

10   and we may end up ending up just selling the assets, losing a

11   bunch of the value we're getting out of the variety of these

12   settlements, and having to then have a prolonged plan and claim

13   dispute thereafter.

14       But we're optimistic that we can push forward and see

15   if we can get increased support for our plan.

16       THE COURT:  All right.  Thank you.

17       MR. NASHELSKY:  Thank you, Your Honor.  With that, I'd

18   turn it over to Mr. Marinuzzi to briefly go through -- he's

19   going to do joint admin, and then Mr. Goren is going to handle

20   the financing motions.

21       MR. MARINUZZI:  Good afternoon, Your Honor.  For the

22   record, Lorenzo Marinuzzi, Morrison & Foerster.  Your Honor,

23   when we determined which motions we wanted to proceed with

24   today, with the Court's indulgence, versus tomorrow, we wanted

25   to minimize the number of motions that the Court had to hear

RESIDENTIAL CAPITAL, LLC, ET AL.

1    tonight.  And of the administrative motions that were

2    originally scheduled for the first-day hearing, we limited it

3    to the joint administration motion.

4         It's a standard, pro forma joint administration

5    motion.  We'd like to have the lead caption be "Residential

6    Capital, LLC, 12-12020".  Unless Your Honor has any questions,

7    it's --

8         THE COURT:  I have no questions.  But I'll check to

9    see if the U.S. Trustee has any comments.

10        MS. DAVIS:  Good afternoon, Your Honor.  Tracy Hope

11   Davis, United States Trustee.  Our office spent a considerable

12   amount of time speaking with the parties about the draft first-

13   day orders.  But as time would have it, we did not get a chance

14   to really fully digest the black-lined copies.

15        We have some comments that I would like my colleague

16   Mr. Masumoto to fully articulate to Your Honor, perhaps order

17   by order or motion by motion; but I wanted to just let the

18   Court know and let the parties know that the U.S. Trustee is

19   doing its best to appoint a creditors' committee as soon as

20   possible.  I have an organizational meeting scheduled for March

21   (sic) 16th at --

22        THE COURT:  It must be May.

23        MS. DAVIS:  Oh, pardon me.  It's the M's.  May 16th at

24   10:30 at the Hilton New York.  And that'll be posted on our web

25   site.  And the hope is that we'll have a committee appointed as

RESIDENTIAL CAPITAL, LLC, ET AL.

1    soon as possible.

2         I'll defer to Mr. Masumoto as to the remainder of our

3    issues.  Thank you.

4         THE COURT:  Okay.  Thank you.  Mr. Masumoto, any

5    comments with regard to joint administration?

6         MR. MASUMOTO:  Your Honor, we had discussions with

7    counsel, and I believe they agreed to certain modifications.

8    One thing that was not contained in the original version of the

9    order provided for separate disbursements by the individual

10   debtors.  I believe the order did not specifically address

11   whether or not the debtor would be seeking to file consolidated

12   statements; but I'll leave that decision up to the debtor.

13        So we did ask that at least we have a chance to see

14   the order before it's submitted to the Court.

15        MR. MARINUZZI:  Your Honor, we don't have any issues.

16   We're going to submit consolidated monthly operating reports,

17   but we'll break down disbursements by debtor entity.  And we'll

18   add that to the order for clarification.

19        THE COURT:  Okay.  Just for housekeeping purposes, if

20   that order can be put in shape to enter as we speak,

21   literally --

22        MR. MARINUZZI:  It can.  We'll do that.

23        THE COURT:  -- one of Judge Glenn's law clerks could

24   take it down to his courtroom deputy and we could have the

25   order entered, making it easier to enter subsequent orders both

RESIDENTIAL CAPITAL, LLC, ET AL.

1    today and tomorrow.

2            MR. MARINUZZI:  Will do, Your Honor.  Thank you.

3            THE COURT:  So if someone has access to a computer, I

4    encourage that the changes be made now.

5            MR. MARINUZZI:  We'll do that.  Thank you, Your Honor.

6            THE COURT:  So this is the tag team that I was warned

7    about.

8            MR. GOREN:  Yes, Your Honor.  Thank you.

9            MR. NASHELSKY:  This was the tag team you were warned

10   about.

11           MR. GOREN:  I will be handling everything else,

12   though, today, so no more tag teaming.

13           THE COURT:  Okay.

14           MR. NASHELSKY:  Your Honor, the tag team seemed a lot

15   better when there were a lot more motions and it wasn't one

16   motion at a time.  But we apologize.

17           THE COURT:  No problem.

18           MR. GOREN:  Thank you, Your Honor.  Todd Goren,

19   Morrison & Foerster, proposed counsel for Residential Capital,

20   LLC and its subsidiaries.  I'll be presenting four motions

21   today, all relating to the debtors' finances and all critical

22   to the debtors' ability to operate in these Chapter 11 cases.

23           In support of this relief, we rely on the affidavit of

24   James Whitlinger, chief financial officer of the debtors, and

25   Marc Puntus of Centerview Partners, the company's investment

RESIDENTIAL CAPITAL, LLC, ET AL.

1   banker.  We would ask that both declarations be accepted into

2   evidence for purposes of today's hearing.  Both Mr. Whitlinger

3   and Mr. Puntus are in court and available to the extent anyone

4   has any questions.

5          THE COURT:  Does anyone object to the request that I

6   receive in evidence the affidavit of Mr. Whitlinger and the

7   declaration of Mr. Puntus?

8          There's no objection.  They're admitted.

9      (Affidavit of Mr. Whitlinger was hereby received into

10  evidence as Debtors' Exhibit, as of this date.)

11     (Declaration of Mr. Puntus was hereby received into

12  evidence as Debtors' Exhibit, as of this date.)

13         MR. GOREN:  Thank you, Your Honor.

14         The four motions I'll be discussing today are the

15  debtors' motion to use a modified cash management system; their

16  motion to seek a 1.45 billion dollar debtor-in-possession

17  financing facility, syndicated by Barclays as administrative

18  agent and collateral agent; and authority to enter into another

19  debtor-in-possession financing facility of potentially up to

20  220 million dollars with Ally Financial; and to use the cash

21  collateral of Ally Financial and the junior secured bonds.  And

22  finally, we'll be seeking authority to use the cash collateral

23  of Citibank in connection with the debtors' MSR mortgage

24  servicing rights facility.

25         I'll start with cash management, if that's acceptable

RESIDENTIAL CAPITAL, LLC, ET AL.

1    to Your Honor?

2         THE COURT:  That's fine.

3         MR. GOREN:  Okay.  The debtors' primary business lines

4    are servicing and originating mortgage loans.  As servicer, the

5    debtors are responsible for managing and disbursing significant

6    sums of money on a regular basis, and often are required to

7    make significant advances from their accounts to cover

8    shortfalls in payments made by borrowers.  These advances are

9    the debtors' single biggest cash use, and they amount to

10   hundreds of millions of dollars a month.

11        These advances represent shortfalls in principal

12   payments on loans or tax payments to authorities.  So to the

13   extent a borrower fails to make the payments, the debtor is

14   obligated under its various servicing agreements, typically to

15   make those payments on the borrower's behalf, subject to

16   reimbursement down the road.

17        The debtors require immediate access to funds in order

18   to afford -- because they cannot afford any delay in making the

19   distributions required of them as servicer without severely

20   jeopardizing their operations and thus the value to be realized

21   from the estate from the planned sale to Nationstar.

22        As I'll get into a little bit later, the debtors

23   currently hold over 220 million dollars in an unencumbered

24   account.  And I consider it a minor miracle that it's managed

25   to stay unencumbered through the debtors' distress over the

RESIDENTIAL CAPITAL, LLC, ET AL.

1    years and will remain unencumbered through these bankruptcy

2    cases.  But unfortunately, that 250 million dollars will not

3    get us very far during this case.  And so we need access to all

4    of the cash in our system as quickly as possible.

5         If the debtors do not obtain permission from this

6    Court to use their cash management system and access these

7    funds, checks will begin to bounce by noon tomorrow, which

8    would be most uncharacteristic of one of the top servicers in

9    the country and would severely jeopardize the debtors'

10   reputation in the industry.

11        The debtors' primary -- the primary debtor that does

12   servicing is GMAC Mortgage, LLC, which will sometimes be

13   referred to as GMAC-M or GMAC Mortgage.  And if they were to

14   bounce checks, it would not only cause reputational damage, it

15   would cause severe economic harm to the investors in the

16   various securitization trusts that the debtors manage.

17        The debtors are not seeking to satisfy any pre-

18   petition debts or make any extraordinary payments by this

19   motion.  Rather, the debtors are simply asking the Court to

20   allow them to continue using their cash management system, as

21   modified to account for the various changes that the debtors

22   have implemented during this case, which I'll get into now.

23        As my colleague Mr. Nashelsky went through, the

24   debtors have a very complex capital structure.  And there

25   are -- substantially all their assets are liened up except for

RESIDENTIAL CAPITAL, LLC, ET AL.

1    an unencumbered cash count that I mentioned and advances and

2    mortgage servicing rights with respect to Ginnie Mae.  But the

3    rest of their assets are all liened up, and -- but by various

4    different facilities in different amounts.

5            As we started to get closer to the bankruptcy case, it

6    became clear that it would be difficult to ensure the adequate

7    protection of our various secured lenders, and in fact, our DIP

8    lender required, because they weren't taking a lien on all of

9    our assets, that the funds that they were advancing stayed in a

10   closed loop.  So what we've done for purposes of this case is

11   modify our cash management system to create various islands of

12   the different buckets of collateral within our estate.  We've

13   created concentration accounts at the top of each island, so

14   that money will flow through, go to pay the expenses of each

15   island, along with an allocated portion of administrative

16   expenses, and then sit in the concentration account to be used

17   for that purpose.

18           The relief requested in this motion goes hand-in-hand

19   with our next three motions, our financing and cash collateral

20   motions, as it will help us ensure that we adequately protect

21   the interests of our secured creditors.

22           THE COURT:  Let me just ask you a very simplistic

23   question.  Are you proposing that these motions be heard

24   seriatim or are you proposing that they be heard and considered

25   as one cluster of related motions?

RESIDENTIAL CAPITAL, LLC, ET AL.

1          MR. GOREN:  They're separate motions, but they really

2      are dependent on each other.  Both the AFI DIP/cash collateral

3      motion and the Barclays DIP motion require entry of the cash

4      collateral order.  So the cash collateral order -- sorry, cash

5      management order is a predicate, I think to our ability to get

6      the next three motions.  The next three are certainly

7      interrelated.  We need access to all of our cash collateral

8      right away, and we need access to -- as I'll get into -- a

9      significant amount of DIP financing right away.  But I don't

10     know that they're intertwined in the same way.

11         THE COURT:  Well, Mr. Whitlinger's affidavit suggested

12     that they were a package.  All I'm really asking is whether

13     you're seeking what amounts to an order first on cash

14     management with whatever comments are to be made on that, and

15     then sequentially going into each of the others, or are we, in

16     effect, doing this all at once?  It's a very simple --

17         MR. GOREN:  Okay.

18         THE COURT:  -- question of how we're proceeding.

19         MR. GOREN:  I would say sequentially.

20         THE COURT:  Okay.

21         MR. GOREN:  I would like to get cash management done

22     first, because that's, right now, the most important thing to

23     make sure money can flow as necessary.

24         THE COURT:  All right.  At least speaking for myself,

25     I consider the modification of cash management procedures as

RESIDENTIAL CAPITAL, LLC, ET AL.

1   part of a cash management motion to be an unusual feature of

2   this motion.  In the ordinary course of large Chapter 11 cases

3   that I'm familiar with, debtors' counsel shows up and says it

4   would just be too hard to change existing cash management

5   procedures, and so we want them to be validated on the first

6   day.

7        You're doing something very different.  You're seeking

8   to change it on the first day.  And even Mr. Nashelsky is

9   nodding in agreement that what I'm saying is something that

10  you've probably thought about.  So it seems to me that for

11  first-day purposes, you may need to have a somewhat heightened

12  standard for telling me why we should be changing existing cash

13  management other than the lenders insist on it.

14       MR. GOREN:  It wasn't merely that the lenders insisted

15  on it, Your Honor.  There are -- as we began to plan for

16  Chapter 11, we realized that there are significant expenses

17  that flow through the estate.  And if we didn't -- and the

18  debtors, prior to the petition date, ran through -- ran as an

19  integrated company.  And if they didn't develop an ability to

20  track and manage how the various cash spend applied to each

21  facility, it would be difficult, if not impossible, to assure

22  that we were adequately protecting the interests of our

23  lenders.

24       So we embarked on that process before we had committed

25  financing from anyone, before we had a single conversation with

                    RESIDENTIAL CAPITAL, LLC, ET AL.

1    any of our lenders about what the cash management system might

2    be like in this case; because it was our independent view that

3    it would be difficult for us to ensure the adequate protection

4    of our lenders without implementing this procedure.

5         And the procedure really is solely intended to ensure

6    the protection of our various lenders and creditors to make --

7    and that includes the estate as a whole, because we needed to

8    make sure that to the extent unencumbered cash was used, and

9    since we have a significant amount of it, that it benefitted

10   the estate and didn't go to the benefit of various lenders.  So

11   the cash management system -- the modified cash management

12   system that we're proposing, we believe is beneficial to all

13   the estate's creditors.

14        THE COURT:  I'm going to ask Mr. Masumoto if he has

15   any issues with regard to what's being proposed; and then I'm

16   going to ask if anybody else has any issues.

17        MR. MASUMOTO:  Your Honor we have some issues with

18   respect to the overall procedure.  One component of the request

19   in the order is that they have ninety days to come into

20   compliance.  As Your Honor knows, typically the request is

21   thirty days.  Ninety days in this case, where things are moving

22   so rapidly, from our standpoint, is a problem.  I believe --

23   I'm not sure if it was mentioned -- I believe it was mentioned

24   in the 1007 of Mr. Whitlinger, but there are over 3,500

25   accounts.  And as the debtor, I think has articulated, they

RESIDENTIAL CAPITAL, LLC, ET AL.

1    open and close these accounts perhaps on a daily basis.  From

2    the standpoint of the materials that were submitted, although

3    they had a list, I believe it may have included the 3,500

4    accounts, there was no indications of the amounts that were in

5    the account.

6          In addition, as Your Honor may have gathered by

7    reading the material, certain funds don't even belong to the

8    debtor.  They serve as a conduit for certain payments.  So it's

9    not clear to what extent the funds that the debtor is handling

10   or maintaining control over are even part of the estate.

11         So there are a number of issues that have arisen.

12   Leaving the issues as to whether or not they're going to

13   request a waiver of the 345 requirements for ninety days, from

14   our standpoint is much too long and certainly not the

15   acceptable practice.  We would request that the Court enter an

16   order that conforms to a typical period, which is thirty days,

17   which will certainly give enough time for the creditors, also,

18   to get on board to analyze the system and to determine whether

19   or not any variation or waivers of 345 will be granted.

20         The investment practice also is rather unusual,

21   because they -- frankly, Your Honor, I had some difficulty

22   understanding it.  But rather than actual investment practices,

23   they get certain credits against their fees, because of the

24   nature of the way in which they maintain the accounts.  And all

25   of these -- whether or not that complies with 345 or not, are

RESIDENTIAL CAPITAL, LLC, ET AL.

1    discussions that we have to have with the debtor.  But as

2    mentioned, we also, from a technical standpoint, have to

3    evaluate whether or not -- what portions of the over 3,500

4    accounts are either FDIC-protected or in nonauthorized

5    depositories that are exposed.

6         THE COURT:  So are you objecting principally to the

7    period of time for bringing these accounts into compliance with

8    345?

9         MR. MASUMOTO:  At this point, yes.  Your Honor, as to

10   the separate -- the newly developed system of creating separate

11   islands to protect various collateral, from our standpoint, at

12   the first day, we don't have any objection to that particular

13   practice.

14        THE COURT:  Okay.  So you're not objecting to the part

15   of this which is actually the most exceptional?

16        MR. MASUMOTO:  Which is -- yes, which is the new part

17   of it.  But we are concerned about the mechanics of the

18   individual accounts that will be part of the system.

19        THE COURT:  Okay.  Fine.  For purposes of the first

20   day of the case, it's obvious that authority has to be given to

21   allow the company to continue to operate in accordance with the

22   cash management procedures that have been in place to be

23   modified in a manner that satisfies the requirements of the

24   debtor-in-possession financing, to be considered in a moment.

25        I'm going to approve the facility -- the use of cash

RESIDENTIAL CAPITAL, LLC, ET AL.

1  on an interim basis.  Some people are getting up -- apparently

2  I'm doing this too soon.  Or they want to reserve rights or

3  something like that.

4       MR. GOREN:  We do have one objection to this motion,

5  actually, Your Honor --

6       THE COURT:  Okay.  So it must be --

7       MR. GOREN:  -- which I saw.

8       THE COURT:  -- it must be that somebody wants to

9  reserve rights.  Let's do that.

10      MR. MOAK:  Your Honor, Paul Moak, M-O-A-K, with McKool

11  Smith on behalf of Freddie Mac.  As Mr. Nashelsky indicated

12  earlier, the debtors service loans that are owned by Freddie

13  Mac, and that includes receiving from borrowers monthly

14  principal, interest, taxes, and insurance payments, and then

15  remitting the principal and interest to Freddie Mac, to whom

16  it's owed.

17      As U.S. Trustee's counsel said earlier, in essence,

18  the debtors serve a conduit function with regard to that.  We

19  have been assured by the debtors, and in fact there's a motion

20  to be heard tomorrow, that they will continue, post-petition to

21  operate their servicing platform in the same manner they did

22  pre-petition.  It's unclear to us whether the modifications

23  they've requested in this motion would impact the way that

24  Freddie Mac's monies are collected and then distributed.  We

25  don't think that's the intention.

RESIDENTIAL CAPITAL, LLC, ET AL.

1          But for example, there was discussion with regard to

2    collection accounts, concentration accounts, that I think you

3    heard Mr. Goren speak of, and again, we think that that's money

4    that is not ours, but it's not entirely clear.  And so to the

5    extent that any of the collections of principal and interest or

6    taxes or insurance related to Freddie Mac loans are being

7    impacted by the modification of the cash collateral (sic)

8    system, we object to that, or would at least like some

9    additional clarity with regard to that.

10         Also, Your Honor, we just had one particular objection

11    with regard to paragraph 7 of the order.  It says that "the

12    debtors are authorized to continue to deduct amounts from the

13    custodial accounts," which I again understand to be accounts in

14    which principal and interest are maintained on behalf of

15    Freddie Mac and others, "for the repayment of the Advances,"

16    capital A, Advances.  Well, first of all, I don't think capital

17    A "Advances" is defined in the motion, so we're not certain

18    exactly what that means.  But --

19         THE COURT:  It's defined in the affidavit supporting

20    the motion submitted by Mr. Whitlinger.

21         MR. MOAK:  Okay.  To the extent that that includes

22    corporate advances, Your Honor, we oppose that, because it

23    would be inconsistent with the Freddie Mac guide and the

24    purchase documents.  So we think that paragraph 7 should be

25    revised to reflect that the debtors are authorized, to the

RESIDENTIAL CAPITAL, LLC, ET AL.

1    extent permitted by the Freddie Mac purchase documents, the

2    governing documents, the guide, to do so, that they continue to

3    operate as they have pre-petition.

4         Your Honor, I think that's the extent of my comments.

5    If my understanding is inconsistent with the debtors'

6    intention, as I mentioned, we'd object to the modification of

7    the cash management system.

8         THE COURT:  Okay.  Why don't we take these one at a

9    time.  Can you provide some assurances right now to Freddie

10   Mac?  I assume that you have no intention of doing anything

11   that's at odds with the requirements of their governing

12   documents.

13        MR. GOREN:  That is exactly right, Your Honor.  While

14   we were -- while Freddie Mac's counsel was speaking, Mr. Moak,

15   I conferred with Mr. Whitlinger and the treasurer, Joe Rollin

16   (ph.), and they both confirmed to me that Freddie Mac's flow

17   money will be in exactly in accordance with the documents, and

18   there's no intention to --

19        THE COURT:  And you are prepared to include some

20   language in paragraph 7 as requested by counsel for Freddie

21   Mac?

22        MR. GOREN:  That is not a problem, Your Honor.

23        THE COURT:  Okay.  Fine.

24        MR. NEIER:  Good afternoon, Your Honor.  David Neier

25   on behalf of Fannie Mae.  And it's exactly the same issue.

RESIDENTIAL CAPITAL, LLC, ET AL.

1    That's why I arose to speak immediately after Mr. Moak, with

2    respect to Fannie Mae.  So if we could have the same assurances

3    in the same place, that'll be fine.

4          THE COURT:  I bet you're going to get the same

5    assurances right now.

6          MR. NEIER:  Thank you.

7          MR. GOREN:  Same assurances and we will include them

8    in the same portion of the order.

9          THE COURT:  Fine.  Anybody else who needs similar

10   assurances?

11         MR. DONNELL:  Good morning, Your Honor.  Jim Donnell

12   of Winston & Strawn.  We need to get some different assurances.

13   We filed a written objection.  I'd like to pass a copy up to

14   the bench.

15         THE COURT:  Is this on behalf of Wells Fargo?

16         MR. DONNELL:  Yes.

17         THE COURT:  I've read it.

18         MR. DONNELL:  Okay.  So again, our client has --

19   provides bank accounts under -- a series of bank accounts under

20   a deposit agreement originally with Wachovia Bank.  And there

21   probably is in excess of thirty million dollars currently in

22   those accounts.

23         We have limited objections to the cash management

24   order, really of two different types.  The first type are what

25   I would call technical or what I hope are noncontroversial

RESIDENTIAL CAPITAL, LLC, ET AL.

1    changes.  In the pleading that we filed I actually provided a

2    black-line copy of the debtors' cash management order with the

3    changes that we would seek there.  And if it made sense, I

4    could just walk through that and the debtor could respond.

5          THE COURT:  Apparently, it makes the most sense to

6    walk through that with debtors' counsel as opposed to walking

7    through it with me.

8          MR. DONNELL:  We've provided it to them on multiple

9    occasions, including over the weekend.  But those are

10   objections that we have that we feel that need to be made in

11   order for the cash management order to comply with the existing

12   deposit agreements.

13         And then sort of a second objection is --

14         THE COURT:  Let me understand.  What is it about the

15   cash management order in its present form that's in any way

16   inconsistent with the governing documents for your deposit

17   agreement?

18         MR. DONNELL:  Well, first of all, Your Honor, the -- I

19   guess there are a lot of unknowns here.  We've got references

20   in the document to the effect that the credit agreement -- the

21   DIP credit agreement or other orders would basically trump the

22   provisions.  And I think we've got -- we're seeking

23   clarification that we can still deal with the debtors as our

24   customer.  The document has language to the effect that we're

25   supposed to authorize -- be authorized to treat custodial

RESIDENTIAL CAPITAL, LLC, ET AL.

1    accounts as custodial accounts.  I really do think these are --

2    should be noncontroversial changes.

3            We're looking for the debtor to provide stop payments

4    on the items that it does not want us to pay, because

5    physically, it's very difficult for us to distinguish what

6    transfers the debtor has approved versus what they have not

7    approved and what the Court has approved.  So as a pre-

8    condition to opening those accounts, they would be required to

9    put a stop payment on it.  That's the sort of things we're

10   looking for.  I don't know if Your Honor -- if you want to go

11   through them one by one?

12           THE COURT:  I sure don't.

13           MR. DONNELL:  Okay.

14           THE COURT:  I think that you should work this out with

15   debtors' counsel, and if you can't -- I must tell you, I've

16   been through a lot of these, and this is one of the few times

17   that I've encountered an objection such as this.  In the

18   ordinary course of cash management orders that are sought on

19   the first day, the goal is to not interfere with existing

20   arrangements.  And one of the things I guess I'm missing, and

21   I'm going to look for some assurances from debtors' counsel, to

22   what extent does this first-day cash management order seek in

23   any way to alter existing arrangements with respect to the

24   accounts that are the subject of this objection.  Because if

25   the answer is not at all, we don't have to deal with any of

RESIDENTIAL CAPITAL, LLC, ET AL.

1    this.  If the answer is just a little, I want to know in what

2    respect there's any change in existing practice.  So that's a

3    question for debtors' counsel.

4         And to the extent this is controversial, you're going

5    to need to take a break and talk it through.

6         MR. DONNELL:  That's fine.  And, Your Honor, we would

7    be satisfied with a statement in the order that says nothing in

8    this order changes our deposit agreement.

9         MR. GOREN:  Your Honor, the order already says that.

10   Paragraph 4 of the order, "The transfer of funds by and among

11   the debtors and their affiliates are made in accordance with

12   the terms and conditions, and do not impair any parties' rights

13   under any servicing agreements, deposit agreements or other

14   similar document."

15        THE COURT:  Sounds like it covers it to me.

16        MR. DONNELL:  Okay.  Well, perhaps he added -- it

17   doesn't say "deposit agreements" last night at midnight, so I

18   might have missed that addition.

19        MR. GOREN:  That was one of the changes he had asked

20   for --

21        MR. DONNELL:  Okay.

22        MR. GOREN:  -- that was added at their request.

23        MR. DONNELL:  I apologize.  I did not realize that

24   that change had been made.

25        Your Honor, it's my understanding -- could I address a

RESIDENTIAL CAPITAL, LLC, ET AL.

1    second issue now?  The second issue is our need to protect and

2    preserve our security interest.  So through this deposit

3    agreement, we have a security interest in the deposit accounts

4    and all the funds in the deposit accounts as well as

5    contractual subordination rights that give my client priority

6    over the claims of Ally Financial.  Now, I'm happy to address

7    those in the context of the Ally Financial financing motion

8    and -- if that's more appropriate.

9         THE COURT:  It probably is more appropriate.

10        MR. DONNELL:  Okay.

11        THE COURT:  Let's deal with it there.

12        MR. DONNELL:  Thank you.

13        THE COURT:  And you might as well stay close to the

14   front of the room, because I think you're going to be coming up

15   again.

16        Is there anyone else who wants to be heard at this

17   point?

18        MR. CORDARO:  Good afternoon, Your Honor.  Joseph

19   Cordaro, Assistant United States Attorney from the Southern

20   District of New York, on behalf of the United States.  And I

21   just have a few very brief remarks, and I just think that this

22   is a time to make them, given one of the Court's previous

23   comments.

24        Your Honor, the government is supportive of the

25   debtors' efforts.  As Mr. Nashelsky pointed out, the debtors

RESIDENTIAL CAPITAL, LLC, ET AL.

1    have been working with a number of government entities over the

2    past several months.  And our overarching goal is to ensure

3    that servicing functions are not deteriorating during this

4    process and thereby putting borrowers at risk.

5         Just with respect to the cash management motion, it's

6    our understanding that the proposed order is designed in part

7    to allow the custodial accounts to continue their operations

8    uninterrupted.  And I think that was a theme of one of Your

9    Honor's statements before that caused me to right at this

10   moment.  And it is our understanding that the order does that.

11   But if our understanding is incorrect, of course, we would like

12   clarification from the debtors.

13        And I will only say at this point that we look forward

14   to further productive conversations with the debtors and other

15   interested parties in this matter, as the process unfolds.

16        THE COURT:  Okay.

17        MR. CORDARO:  Thank you.

18        MR. GOREN:  We can again, assure the government that

19   the intention is for the custodial accounts to continue to

20   function as they have so that the investors and borrowers are

21   not affected by this bankruptcy.

22        THE COURT:  Maybe we need to revisit, just for a

23   moment, in what respect anything is changing.  Because to the

24   extent that everything is proceeding post-petition in the same

25   manner as pre-petition, one would think that nobody would be

RESIDENTIAL CAPITAL, LLC, ET AL.

1   raising to object to anything.  And this is a very unusual

2   motion to fetch objections of this sort.

3         So can you provide some assurances, not only to me,

4   but to those who have some concerns about this, as to what, if

5   anything, is changing in order to accommodate the requirements

6   of the DIP lenders?

7         MR. GOREN:  I think that probably the easiest way to

8   explain it is that it's changing at the top of each island.

9   The money comes into our accounts the same way it always has.

10  It flows through custodial accounts off to investors, to the

11  agencies, in essentially the same way it always has.  It's the

12  fees and servicing advance receivables and other profits of the

13  business that come in that are just -- are being segregated in

14  a different way than it was pre-petition.

15        THE COURT:  But the flow of funds as it relates to --

16  I'll use a traditional term -- waterfall -- that may not be the

17  right term -- the way you divide up the money, that's going to

18  be the same?

19        MR. GOREN:  Yes, Your Honor.

20        THE COURT:  And all rights of all parties will be

21  unaffected by this, except the rights of the debtor-in-

22  possession lenders, that are getting some extra protection in

23  the form of being able to track their cash?

24        MR. GOREN:  That's right.  And that goes along with

25  the other secured lenders, that process.  It just enables us,

RESIDENTIAL CAPITAL, LLC, ET AL.

1    for other secured lenders, to track their cash as well.

2        THE COURT:  Okay.  I just -- in saying that in a

3    simplified way, I don't want to change the meaning of what's

4    really happening here.  Have I said it in a way that you can

5    endorse or would you make modifications to it?

6        MR. GOREN:  No, we can endorse what you said, Your

7    Honor.

8        THE COURT:  Fine.  On the basis of the colloquy that

9    we've had, I'll return to what I was saying about twenty-five

10   minutes ago.  And this cash management motion is approved.  But

11   it is approved subject to all of the comments that have been

12   made in the interval, and the various assurances that have been

13   provided by debtors' counsel.

14       Let's move on to the next one.

15       MR. GOREN:  Thank you, You Honor.  If it's acceptable,

16   I'd like to skip to number 6 on the agenda, the Barclays DIP,

17   because I think that sets the stage a little bit better for the

18   next two motions.  We're seeking approval today on an interim

19   basis of a 1.5 billion dollar debtor-in-possession credit

20   financing facility led by Barclays.  The facility is comprised

21   of a 1.05 billion dollar A-1 term loan with an interest rate of

22   LIBOR plus 400, and a 200 million dollar A-2 term loan with an

23   interest rate of LIBOR plus 600, and a 200 million dollar

24   revolver with an interest rate of LIBOR plus 400, all with a

25   LIBOR floor of 1.25.

RESIDENTIAL CAPITAL, LLC, ET AL.

1       The facility has an eighteen-month maturity, but does

2   contain various sale milestones which are well past the sale

3   milestones that are contained in our various sale agreements,

4   but would require us to have a sale order by February 15th and

5   an exit or a consummation of the sale by April 15th.

6       We're seeking authority to day to borrow the entire

7   term loan portion of the loan, which is 1.25 billion dollars.

8   We recognize that borrowing 1.25 billion dollars on the first

9   day of a case is a bit unusual, but this case presents

10  compelling reasons as to why such a large initial borrowing is

11  necessary.  I'll get to those reasons in a bit, but I'd first

12  like to explain what this DIP is not.

13      As I mentioned earlier, despite the debtors'

14  exceedingly complex capital structure and its numerous secured

15  credit facilities, the debtor has retained significant

16  unencumbered assets in the form of advances and servicing

17  rights on Ginnie Mae loans and a 250 million dollar exempt cash

18  account.  The DIP did not encumber those assets nor does it

19  encumber causes of action under Chapter 5.  However, as a

20  result of our success in keeping our unencumbered assets

21  unencumbered, the only realistic possibility to obtain debtor-

22  in-possession financing was to refinance some of our existing

23  facilities.

24      We've done that while creating substantially more

25  liquidity for the debtors.  So the initial proceeds of the loan

RESIDENTIAL CAPITAL, LLC, ET AL.

1    will go to refinance what we refer to as the GSAP facility,

2    which is about 662 million outstanding secured by nonagency

3    servicing advances and the BMMZ repo facility.  And BMMZ,

4    again, is a wholly owned subsidiary of Ally Financial.  I'll

5    explain a bit more, but in essence, the refinancing of these

6    two facilities will allow us to bring assets into the estate

7    that do not currently reside into the estate and might not have

8    otherwise been available to creditors.

9         First GSAP.  The debtors' largest cash need by far is

10   servicer advances.  And the primary facility the debtors

11   utilize to fund those advances is the GSAP facility.  The GSAP

12   facility, however, involves a nondebtor offshore special-

13   purpose borrower which the debtor had no ability to file in

14   these cases and thus no ability to access the cash collateral

15   of that debtor.

16        Under GSAP, the debtors sell certain of their

17   servicing rights -- advance reimbursement rights to the GSAP

18   borrower, which in turn pledges those to a lender.  Absent the

19   refinancing of that facility through the Barclays DIP facility,

20   the GSAP facility would have gone into rapid amortization,

21   which means all of the advance receivables that flow into that

22   facility would have gone simply to pay down the lender, which

23   in this case is also Barclays under that facility.  And that

24   would have severely constrained the debtors' liquidity, made it

25   almost impossible for them to make their advances.

RESIDENTIAL CAPITAL, LLC, ET AL.

1        And in addition, there's meaningful oversecurity in

2    GSAP.  There's about a 200-plus million dollar equity value,

3    and there was grave concern on the part of the debtors that if

4    they allowed that facility to go into rapid amortization, the

5    value of that equity interest might have dissipated or

6    disappeared altogether.

7        And we actually, through the DIP facility, were able

8    to obtain far more favorable terms for that lending than we

9    currently enjoy under GSAP.  GSAP has a seventy percent advance

10   rate; the DIP facility has a ninety to ninety-five percent

11   advance rate on the same assets, so substantially more

12   liquidity.

13       BMMZ is a similar issue.  BMMZ is a repo facility.  So

14   it's structured as a derivative repurchase agreement, pursuant

15   to which BMMZ is actually the owner of the assets.  And as this

16   Court is well aware, such repurchase facilities are not subject

17   to the automatic stay in bankruptcy.  And therefore there was a

18   concern that absent the refinancing of the BMMZ facility, BMMZ

19   could have taken immediate action to terminate the repurchase

20   agreement and sell the underlying mortgage loans to third

21   parties, likely impairing or potentially eliminating the

22   debtors' interests.

23       Like with the GSAP facility, there is meaningful

24   excess value in the BMMZ repo.  Specifically, as of the

25   petition date, the facility had about 250 million outstanding,

RESIDENTIAL CAPITAL, LLC, ET AL.

1    but was associated with underlying assets in the form of a

2    portion of the debtors' loan book, with a book value of

3    approximately 473 million, or about a 223 million dollar excess

4    value.  And again, like with the advances, the debtors are

5    getting a substantially higher advance rate through the

6    Barclays DIP facility than they enjoyed under BMMZ.  BMMZ was

7    about a sixty percent advance rate; and we will get seventy-

8    five percent under the DIP facility.

9          The process of bringing these assets into the estate

10   is being accomplished through a purchase transaction which is

11   proposed through the DIP order and the underlying documents.

12   Pursuant to those repurchase transactions, the debtor will

13   purchase the assets from GSAP and BMMZ and bring them into the

14   estate.  The order seeks findings that such purchase

15   transactions are true sales and should be free and clear of all

16   liens, claims and encumbrances, none of which we believe exist,

17   because all existing liens are being satisfied through the

18   refinancing.

19         Now, the other unusual aspect of this DIP facility is

20   that the borrowers under the DIP facility are two newly formed

21   special-purpose entities who are also debtors in this Chapter

22   11 proceeding.  Because Barclays was not taking a lien on all

23   of our assets, and because of the debtors' complex capital

24   structure, they requested that the debtors segregate the

25   primary collateral underlying their facility.  They believed

RESIDENTIAL CAPITAL, LLC, ET AL.

1    that that would help significantly in the syndication efforts

2    with the facility and ultimately keep the costs down to the

3    debtors on the facility.

4         Thus, the assets currently in GSAP and BMMZ will be

5    sold to and become the assets of the new DIP borrowers.

6    Following the closing, as the debtors create new receivables

7    for making advances with the proceeds of the DIP loan, those

8    receivables will likewise be sold from the applicable debtor

9    entity, generally either -- in all cases, either GMAC Mortgage

10   or Residential Funding Company, sometimes called RFC, and those

11   assets will be sold to the DIP borrower.

12        THE COURT:  You said a lot.  Let me ask you a question

13   about one thing that you said that really caught my attention.

14   Are you seeking, on the first day of the case, as a condition

15   to approval of the DIP facility, a court order that deems the

16   transfer of underlying assets from the BMMZ repo and the GSAP

17   facility to the special-purpose entities that have been created

18   for the express purpose of providing for this financing -- are

19   you asking that I, today, determine that these are true sales?

20        MR. GOREN:  That is in the interim order.

21        THE COURT:  How on earth am I going to do that?  And

22   what's your record that's going to support that?  And why won't

23   counsel give an opinion which is sufficient for the lenders?

24        Why don't you just give that opinion?  Why don't you

25   do what every attorney has to do in a structured finance

RESIDENTIAL CAPITAL, LLC, ET AL.

1    transaction?  Get comfortable, give the opinion.  If you can't

2    get comfortable, why should I be comfortable?

3          MR. GOREN:  Perhaps we can speak with lender's counsel

4    about that issue.

5          THE COURT:  I think we better have that conversation

6    right now.

7          Mr. Ziman?  Why won't an opinion do it for you?  And

8    what do you expect me to do today to support this transaction?

9          MR. ZIMAN:  Your Honor, you ask some fair questions,

10   so let's --

11         THE COURT:  You bet I am.

12         MR. ZIMAN:  I wouldn't doubt it, Your Honor.  To be

13   clear, let's specify what we're asking of you.  We're asking

14   that the debtors' acquisition of these assets be deemed

15   basically a true purchase by the debtors.  That's all we're

16   asking.  We're not --

17         THE COURT:  How do I know that?

18         MR. ZIMAN:  Well, I think -- they're taking money and

19   they're buying it from third parties.

20         THE COURT:  So why do you need me to tell you that?

21         MR. ZIMAN:  Well --

22         THE COURT:  You just told me that it's a true sale.

23   You should be satisfied.  You shouldn't need a court order that

24   says that.  Or, if you're going to get a court order that says

25   that, we're going to need an evidentiary hearing in which I

RESIDENTIAL CAPITAL, LLC, ET AL.

1    can, on the basis of whatever evidence you put forward that

2    would be the same evidence that would go in somebody's reasoned

3    opinion letter, that it's a true sale.  But I don't have that

4    record now.  And if you think I have it, point me to it.

5          MR. ZIMAN:  Well, I think we could step back, and I'll

6    talk to debtors' counsel if you need take a break.  But I think

7    if you look through -- if we go through the Whitlinger

8    affidavit and you go through Mr. Puntus' affidavit, but

9    probably more Mr. Whitlinger's, I think the evidence is there

10   that the price being paid for these is a fair price, that the

11   debtors are getting the benefit of essentially the ownership of

12   the assets, that there are no indemnification rights that

13   relate back to the sellers of the assets that would make it as

14   if they were still properties of the sellers' estates.

15         THE COURT:  Okay, so that's your reasoned true sale

16   opinion.  But why should I, a judge who just happened to be

17   here on a Monday, why should I as a help to Judge Glenn, and

18   obviously as a help to the transaction, and as quite literally

19   an officer of the court, not just counsel, why should I do what

20   lawyers should be doing, what lawyers do every day in

21   transactions pre-bankruptcy?  And if I'm going to be, in

22   effect, your insurance policy, you're going to have to do a lot

23   more than say I can look at these affidavits.  I read an

24   affidavit of the first-day orders that was a hundred pages

25   before exhibits.

RESIDENTIAL CAPITAL, LLC, ET AL.

1          MR. ZIMAN:  It was 500 pages with, Your Honor; I

2     appreciate that.

3          THE COURT:  So why on Earth should you assume that a

4     mere mortal, that would be me, should be in a position to give

5     you the kind of assurance you're seeking, to provide admittedly

6     a lot of money?  It's over a billion dollars.

7          MR. ZIMAN:  Well, I think that's part of what's going

8     on here.

9          THE COURT:  I realize there's a lot of money, but you

10    shouldn't be looking to the guy in the black robe to be giving

11    you an insurance policy without giving me the record that I

12    need.  And that record will not happen on day one unless you're

13    prepared to stay very late.

14         MR. ZIMAN:  Well, not --

15         THE COURT:  I'm prepared to do that if it's required.

16    But you're going to need witnesses; you're going to have to

17    explore the background of the transaction.  You're going to

18    have to explain this in a way that you would be comfortable

19    giving an opinion on behalf of your firm and you would be

20    comfortable committing your firm's malpractice coverage to the

21    quality of that opinion.  And if you can do that, you don't

22    need me.

23         MR. ZIMAN:  With all due respect, Your Honor, it sort

24    of becomes circular.  So if we could prove it to you that it's

25    a true sale, then you're going to tell us we don't get it

RESIDENTIAL CAPITAL, LLC, ET AL.

1    anyway.

2         THE COURT:  I believe that for you to be doing what

3    you're insisting on is fundamentally unfair.  I'm telling you

4    that very directly.  I should not be asked on day one of a

5    case, as a condition to the financing that supports a very

6    vital financial institution, to be committing that something is

7    a true sale, without your taking me through it soup to nuts.

8    And if you're going to take it soup to nuts, all you're really

9    saying is, 'We just want the protection of a court order that

10   says that.'  You actually don't need that, because you know

11   this deal so much better than I could ever learn it on the

12   basis of an evidentiary showing tonight.  I'd like you to

13   rethink what you're doing.

14        MR. ZIMAN:  I hear, Your Honor.  We'll have to take a

15   break, and we'll have to talk about it.

16        THE COURT:  Let's take a break.

17   (Recess from 5:27 p.m. until 6:00 p.m.)

18        THE COURT:  Be seated, please.

19        MR. ZIMAN:  Your Honor, Ken Ziman of Skadden, Arps,

20   Slate, Meagher & Flom, on behalf of Barclays Bank PLC as

21   proposed DIP agent and, for today's purposes, DIP lender.  Your

22   Honor, thank you for the time.  I think we've managed to

23   address the Court's issue.  It's going to take some working on

24   the order, which we'll undertake.  But just big picture,

25   there's two different buckets of assets, as Mr. Goren

RESIDENTIAL CAPITAL, LLC, ET AL.

1    explained, that are being acquired by the DIP borrowers; one is

2    what's referred to as the GSAP facility in purple.  With

3    respect to that transaction, that's a purchase between the

4    borrowers and the GSAP borrower, which is an off-balance-sheet

5    entity.  We won't require any findings from Your Honor

6    regarding true sale on any of this, but that transaction will

7    take place as it's intended, without those findings being made.

8           With respect to the BMMZ repo facility, as Your Honor

9    heard from counsel, BMMZ is an indirect or direct subsidiary of

10   AFI, the parent company, the nondebtor parent.  And in

11   discussing with AFI's counsel, BMMZ is essentially giving us a

12   representation -- giving the initial buyer, which is one of the

13   debtors, a representation that there are no liens on the assets

14   that are being reacquired.  In order to deal with this issue

15   for at least today's purposes, AFI will guarantee that

16   representation to give us the comfort that the DIP borrower, at

17   the end of the day, has an asset that's not subject to somebody

18   else's lien.

19          I think, Your Honor, what Mr. Goren can amplify, we do

20   intend to create a record regarding the good faith of these

21   transactions and the true-sale nature of these transactions,

22   for final order purposes.  I think Your Honor will tell me that

23   that's for Judge Glenn to decide on a full and complete record

24   when we show up there, but I just wanted to give Your Honor a

25   preview of that.

RESIDENTIAL CAPITAL, LLC, ET AL.

1        THE COURT:  Do I understand that you're going to put

2    some of that record on today?

3        MR. ZIMAN:  No, Your Honor.

4        THE COURT:  That's good.

5        MR. ZIMAN:  Today we're solving the issue by not

6    asking Your Honor --

7        THE COURT:  Fine.

8        MR. ZIMAN:  -- for those findings.

9        THE COURT:  But what you're telling me is that, for

10   purposes of the final order, there will be a request from the

11   Court, in the person of Judge Glenn, to enter a final order

12   that will include a determination that the transaction is a

13   true sale?

14       MR. ZIMAN:  Correct, Your Honor.

15       THE COURT:  All right.

16       MR. SCHROCK:  Good afternoon, Your Honor.  Ray Schrock

17   of Kirkland & Ellis, on behalf of Ally Financial and Ally Bank.

18       In participating in this solution, Your Honor, we

19   certainly would have been willing to take an opinion or the

20   like.  Just so you have some history on this BMMZ facility, I

21   think it's important for the Court and other parties to know

22   that this was a third-party repurchase facility that was in

23   place by Citibank and Goldman Sachs since 2010.  AFI refinanced

24   it in December.  Barclays, effectively, asked AFI to sign onto

25   the payoff letter from BMMZ so that the DIP facility could

RESIDENTIAL CAPITAL, LLC, ET AL.

1    close.  This has been one of the ongoing issues that Ally

2    Financial has been dealing with.  We've been giving and giving.

3    We want to make sure that the debtor is protected and gets the

4    debtor-in-possession financing.  And we're willing to rep for

5    the current period that the sale is free and clear, but we

6    would like the debtor to seek a free-and-clear order at the

7    final hearing.  We certainly don't intend to guarantee the

8    free-and-clear nature for the remainder of the proceedings.

9            THE COURT:  I understand what you've said.

10           MR. SCHROCK:  Okay.

11           THE COURT:  It's on the record.

12           MR. SCHROCK:  Thank you.

13           MR. GOREN:  Thank you, Your Honor, for your indulgence

14   during the break.  I'm glad we came to an acceptable resolution

15   there.  I mean, I had a bit more here.  I'm not sure if Your

16   Honor would like some further support of the need for the

17   immediate financing from the debtors.  I'd be happy to --

18           THE COURT:  There's no question you need the

19   financing.

20           MR. GOREN:  Okay.  Then I will let anyone else who has

21   any comments, objections rise.  Oh, I was asked to state for

22   the record, by Freddie Mac's counsel, that the DIP loan does

23   not encumber any of Freddie Mac's accounts.

24           THE COURT:  Okay.

25           Mr. Masumoto?

RESIDENTIAL CAPITAL, LLC, ET AL.

1          MR. MASUMOTO:  Thank you, Your Honor.  Your Honor, I

2    did want to mention again, as the U.S. Trustee had indicated,

3    that we tried to accelerate the organizational meeting process,

4    because of the rapid series of events that are occurring in

5    this case, as well as the magnitude.  And I think it will be

6    helpful if the debtor indicated why, for example, the

7    creditors' committee could not have input on this, particularly

8    the billion dollar rollup that they're proposing, as indicated.

9    We are scheduled to have an organizational meeting two days

10   from now, and we were concerned about whether or not the

11   committee should have an input into this large rollup.

12          In terms of specific features of the DIP financing

13   arrangement, we have spoken with both the DIP lender, and we

14   mentioned to the debtor our concern over the provision that

15   appears that whereas the liens carve out a -- there's a carve-

16   out -- perhaps that's not the correct term.  They exempt from

17   the liens the Chapter 5 causes of action.  But with respect to

18   the superpriority admin claim, there is no exemption for the

19   Chapter 5 causes of action.  From our standpoint, that's

20   effectively the same as impairing those Chapter 5 causes of

21   actions at this point, without, again, having the input of a

22   committee.  And therefore, we're concerned about those

23   provisions.

24          Similarly, I think, because the DIP financing and the

25   cash collateral orders tend to overlap, that concern appears to

RESIDENTIAL CAPITAL, LLC, ET AL.

1    be consistent throughout all of the orders, both the cash

2    collateral and the DIP, that with respect to superpriority

3    admin claim, Chapter 5 causes are not carved out.

4           MR. DONNELL:  Your Honor, Jim Donnell again, for the

5    Wachovia/Wells.  We have not consented to priming but, again,

6    the focus of our objection is with respect to the DIP financing

7    procedures and liens given to Ally Financial.  So I can wait,

8    or maybe this is the right time to bring that up.

9           THE COURT:  What is it you're bringing up?

10          MR. DONNELL:  I'm confused on whether we're

11   objecting -- whether we're addressing all of the DIP financing,

12   including that provided by Ally Financial, or only the Barclays

13   facility.

14          THE COURT:  I think we determined a while ago that we

15   were going sequentially.  We're currently dealing with the

16   Barclays DIP.

17          MR. DONNELL:  Okay, so then we're not consenting to

18   that.  We'll reserve our rights to the final.  But we'll

19   address our chief objection in the context of the Ally

20   Financial.  Thank you.

21          MR. CORDARO:  Good afternoon again, Your Honor.

22   Joseph Cordaro, Assistant United States Attorney, on behalf of

23   the United States.

24          And I just wanted to voice a concern that the

25   government has with the proposed DIP order.  Like most DIP

RESIDENTIAL CAPITAL, LLC, ET AL.

1    orders, it provides for a superpriority admin expense claim,

2    but it does not specify the right of the United States to

3    assert a valid right of setoff or recoupment.  Section 553

4    provides that the Bankruptcy Code doesn't affect what is

5    essentially the equitable right of setoff and recoupment.  And

6    just because a DIP financing order grants someone a

7    superpriority admin claim, that doesn't necessarily -- that

8    does not impinge on the United States' valid rights of setoff

9    and recoupment.  And for that reason, we typically ask for and

10   have received, in DIP financing orders in the past, language

11   such as "Nothing in this order shall discharge, release or

12   otherwise preclude any valid right of setoff or recoupment that

13   the United States, its agencies, departments or agents may

14   have."  We've had conversations with the DIP lenders through

15   debtors' counsel, and they have agreed to other language that

16   we have proposed, but this one is still a sticking point and we

17   don't believe that there's any basis under the Code to not

18   include this language in the order.

19        THE COURT:  Okay, sounds like we have a sticking

20   point.

21        MR. ZIMAN:  Your Honor, I'll address, I guess, both

22   those, maybe, if that's okay:  Mr. Masumoto's point and also

23   the U.S. Attorney's point.  I'll go backwards first.  The U.S.

24   Attorney's point:  On page 31 of the order, we actually

25   included language that reads, verbatim, "For the avoidance of

RESIDENTIAL CAPITAL, LLC, ET AL.

1    doubt, nothing in this order or the Credit Document shall

2    discharge, release or otherwise preclude any setoff or

3    recoupment rights of the United States of America, its

4    agencies, departments or agents."  And we put in the junior

5    lien collateral.  And that's, I think, the sticking point that

6    the U.S. Attorney wants to be plenary.  And I think that if

7    this were perhaps a different DIP financing, maybe that's a

8    well-taken comment, but I don't think here it is, because as we

9    talked about, these are very bucketed.  And the collateral --

10   the first lien collateral, distinct from the junior lien

11   collateral in this DIP financing -- I'll explain the

12   difference.  The first lien collateral is the stuff that's off

13   balance sheet today.  It's our view that nobody has rights in

14   that stuff, other than we're going to -- acquiring it free and

15   clear.  That's the colloquy we just had.  That's the recess we

16   took.  So we're not prepared to lend with people who are

17   reserving rights that we don't think they have but, if they

18   think they have, then they should articulate them other than in

19   a general sense, because at the end of the day, somebody who

20   has an interest in property has the burden of showing they have

21   an interest in property.  That's point one.

22          The junior lien collateral is comprised, in part, of

23   whole loans, which are nonagency whole loans, just loans that

24   the debtors have reacquired or were never sold -- they were

25   nonconforming loans, for instance -- or loans -- and also

RESIDENTIAL CAPITAL, LLC, ET AL.

1    there's a small piece of that collateral pool that is comprised

2    of Freddie Mac servicer advances.  So as the junior lien

3    collateral, we are acknowledging that Freddie has setoff

4    rights, recoupment rights, and that would then be consistent

5    with the reservation I just read, more generally the U.S.

6    Attorney asked for, the junior lien collateral.

7            Likewise, the other component of the junior lien

8    collateral is the Citi MSR.  And by definition, the Citi MSR, I

9    believe, finances Fannie Mae MSRs, or is lent against Fannie

10   Mae MSRs.  Again, that's an agency of the United States, I

11   guess.  I'm not exactly sure what the GSEs are these days.

12   But, again, we provided for comfort on that point.

13           So this is a very, very narrow issue.  And I think, in

14   the circumstance of this financing, that we're making

15   substantial advances to assets that are off the balance sheet.

16   We've given, yes, a slightly narrower carve-out than the U.S.

17   Attorney may have received in other cases, but I think that's

18   warranted here on the facts.  And if there's a specific

19   interest that they're asserting in this first lien collateral

20   that currently resides in third parties, well, we'd like to

21   know about it, because it's pretty important to us.  And we

22   don't want to provide a billion dollars or a billion-two-five

23   out the door to find that they're asserting some other

24   interest.

25           The typical example the U.S. Attorney's trying to

RESIDENTIAL CAPITAL, LLC, ET AL.

1    protect against is the tax refund, Your Honor.  I mean,

2    typically the U.S., they want to make sure that they're not

3    having a setoff and giving up tax refunds by virtue of a DIP

4    lender taking a security interest in a tax refund.  And we're

5    not taking security interests in tax refunds.

6          So I think, given this construction of this facility

7    and how it blends together with the others you'll hear about,

8    the carve-out we provided is ample protection for the United

9    States in these circumstances.

10         Mr. Masumoto's point on the 364(c)(1) issue, I think

11   there's a difference between having a claim against the estate

12   for a shortfall in your collateral, and having that claim rank

13   at the top of the heap and taking a lien on an asset that you

14   can control and dispose of to your own liking.  Now, all we're

15   saying is that if we're unpaid on our collateral at the end of

16   the day, that we're entitled to get paid from whatever's there.

17   And that's, I think, different in kind than taking a lien.  And

18   we were very careful not come in here, Your Honor, and take a

19   lien on Chapter 5 causes of action.  And generally I'm sure,

20   from your position, you look at counsel who stand in my

21   position and say you can't have that, a lien on avoidance

22   actions.  So we didn't come in and ask for it.  And we're not

23   asking for it on a final basis either.  But I do think what we

24   are asking for is just to rank at the top against all assets of

25   the estate, to the extent we're not paid back any of our

RESIDENTIAL CAPITAL, LLC, ET AL.

1    collateral, i.e., or the sale proceeds at the end of the day.

2         THE COURT:  Okay.

3         Any further comments?

4         MR. CORDARO:  I do, Your Honor.  Again, Joseph

5    Cordaro, Assistant United States Attorney, for the United

6    States.  Your Honor, I'm going to quote from Section 553.02 of

7    Collier:  "The Bankruptcy Code provides no general equitable

8    mechanism for disallowing rights of setoff that are expressly

9    preserved by Section 553."  Section 553 expressly preserves the

10   United States' right of setoff in this situation.  It is

11   language we --

12        THE COURT:  Well, Section 553 expressly preserves

13   rights of setoff that exist.

14        MR. CORDARO:  That's correct, Your Honor.

15        THE COURT:  It doesn't create rights of setoff.

16        MR. CORDARO:  Absolutely correct, Your Honor.

17        THE COURT:  So what Mr. Ziman is really saying, if I'm

18   hearing his argument correctly, is this is not debtor property

19   right now.  The nondebtor property is going to come into the

20   estate and we're going to be looking to that as new lenders

21   putting in over a billion dollars into this company.  And if

22   the government is saying they have some kind of right, I don't

23   want to hear about it in general terms.  I want to know what

24   you're telling me, because, as a new lender, I want to know if

25   I'm lending into a risky situation.

RESIDENTIAL CAPITAL, LLC, ET AL.

1              So a question to you is whether you're simply trying

2      to preserve something because that's what the government likes

3      to do in situations like this and is looking for broad

4      language, or do you have some kind of claim that you're

5      actually trying to protect?  If so, tell us.

6              MR. CORDARO:  Your Honor, no, at this point it's the

7      former.  We just want to be sure that the language that's in

8      the order doesn't suggest that we have given up some statutory

9      right of setoff that we have.  And by putting language in that

10     suggests that our right of setoff only goes to the junior lien

11     collateral, it could be inferred that we've given up setoff

12     rights that we are --

13             THE COURT:  No, you wouldn't have given anything up.

14     It would have been ordered that you don't have those rights.

15     So in effect what you're trying to protect against is the

16     efficacy of an interim order that gives the lenders what

17     they're looking for, correct?

18             MR. CORDARO:  To the extent they're seeking to -- yes,

19     they're seeking to confine our setoff rights to junior lien

20     collateral, yes, we think that's inappropriate and that --

21             THE COURT:  And do you believe, as a matter of law,

22     that you have any current claims of setoff or recoupment

23     applicable to the assets that are coming into the estate to

24     secure the new lending?

25             MR. CORDARO:  As I stand here, Your Honor, I don't.

RESIDENTIAL CAPITAL, LLC, ET AL.

1    But, again, I don't want to suggest that those don't exist.

2    These things are moving very fast, so I don't want to represent

3    to the Court that I have a belief, and then go back and find

4    out that that belief --

5            THE COURT:  Okay.

6            MR. CORDARO:  -- was incorrect.

7            THE COURT:  I understand.

8            MR. CORDARO:  Thank you.

9            MR. MASUMOTO:  Brian Masumoto for the Office of the

10   United States Trustee.  Just briefly, Your Honor.

11           I do want to articulate again the usual standard.  I

12   mean, many people regard the giving of a superpriority admin

13   expense over Chapter 5 essentially the equivalent of a lien.

14   And here Chapter 5 causes of action are bankruptcy-created

15   actions, typically an element for the creditors' committee to

16   at least have something to negotiate with.  So again, we urge

17   the Court not to, at least for the interim purposes, until a

18   committee's formed, allow the superpriority admin expense to

19   cover the Chapter 5 causes of action.  Thank you.

20           THE COURT:  Okay.

21           I think what's different about this situation as it's

22   playing out now this evening is that, contrary to what we often

23   see in pre-negotiated filings in large Chapter 11 cases where

24   pre-petition lenders are providing post-petition liquidity in

25   rollup facilities, this is a situation in which we have new

RESIDENTIAL CAPITAL, LLC, ET AL.

1   lenders with a new syndicate being put together by Barclays

2   Capital, and the collateral that secures the facility includes,

3   at least in this instance, assets that are not presently within

4   the debtor estates.  Based upon that and the critical need for

5   liquidity without interruption, and the importance that this

6   debtor represents in the marketplace for residential financing,

7   it seems to me that both objections should be overruled for

8   purposes of the interim order.

9           I'll start with the U.S. Attorney's position on setoff

10  and recoupment.  Of course he's right, because he's reading

11  what the law generally provides.  But just because the law

12  generally provides that does not mean that in extraordinary

13  circumstances such as this, DIP lenders are not entitled to

14  certain assurances, right at the beginning before they fund,

15  that they're going to be protected with respect to their

16  advances.  Under these circumstances, and particularly since,

17  as I understand the facts, the collateral base consists of

18  assets that presently reside outside the debtors and are to be

19  brought into the debtors' estates simultaneously with the

20  closing, I think that the broad language sought by the U.S.

21  Attorney is unnecessary.  I'm not going to say it's

22  inappropriate.  But I also think that rights need to be

23  reserved.  This is just the interim hearing.  And just because

24  certain provisions are set forth in the interim facility order

25  does not necessarily mean, after the formation of a committee

RESIDENTIAL CAPITAL, LLC, ET AL.

1   and time for the parties to reflect on the case as it unfolds

2   between now and the final hearing, that there might not be

3   changes.  For interim order purposes, I'm going to overrule the

4   U.S. Attorney's objection.

5           Similarly, with respect to the objection raised by Mr.

6   Masumoto on behalf of the U.S. Trustee, I would agree with him

7   that ordinarily there is equivalence between the grant of a

8   lien in avoidance actions and their proceeds, and a

9   superpriority that applies to such debtor rights.  But under

10  the present circumstances, I'm going to overrule that objection

11  as well.

12          I will note that in other situations I have from the

13  bench insisted that there be a carve-out of superpriority

14  claims as well as liens, with respect to Chapter 5 avoidance

15  actions and their proceeds.  But I'm going to draw a

16  distinction today as it relates to this financing.  In excess

17  of a billion dollars is a very significant new-money loan in

18  any market.  And to the extent that there is any loss on

19  account of the actual collateral that secures this loan, we're

20  in a very different environment from the environment that

21  supports the underwriting of this loan.  It seems to me highly

22  unlikely that the loan was underwritten with the view that

23  superpriority claims would be the last and ultimate way to

24  obtain a recovery, particularly as it relates to avoidance

25  actions and their proceeds.  If we're in that place sometime in

RESIDENTIAL CAPITAL, LLC, ET AL.

1   the future, everything that I was told at the outset of this

2   hearing will have proven to be completely unreliable and false.

3          In part for that reason, and because I believe that

4   the DIP loan in this instance is a necessary prerequisite to

5   the orderly commencement of these cases, I'm overruling this

6   objection, but it's not precedential in respect of other DIP

7   loans that may be submitted to me in the future in other

8   settings.  I think this is a special case.

9          But for reasons previously stated in reference to the

10  U.S. Attorney's objection on setoff and recoupment, this is

11  just an interim order and I'm just sitting here as a judge of

12  the moment, not a judge of the case.  And for that reason, I do

13  not wish my interim approval to in any way bind what Judge

14  Glenn might decide when he sits at the time of the final

15  hearing.

16         So the order will be entered in the form acceptable to

17  the DIP lenders as to both of these issues.  But as to what

18  happens at the time of the final, the committee and other

19  parties will need to convince Judge Glenn that such a

20  determination is appropriate in forty-five days.

21         MR. GOREN:  Thank you, Your Honor.  We will need a

22  final hearing.  Should we just consult directly with Judge

23  Glenn's chambers on that, I assume?  A final hearing date for

24  the purposes of the order, should we just --

25         THE COURT:  You're going to have to confer with Judge

RESIDENTIAL CAPITAL, LLC, ET AL.

1    Glenn's law clerks, who are present today.

2         MR. GOREN:  Okay.  We'll speak with them after the

3    hearing.

4         THE COURT:  Do you need that at this moment, or can we

5    do that --

6         MR. GOREN:  We can do it after the hearing.

7         THE COURT:  Let's do it after the hearing.  I'm also

8    going to, as a practical matter, have to so order this record

9    for purposes of all of the findings with respect to cash

10   collateral, cash management and DIP lending, because at this

11   hour it is not practical for us to actually enter orders on the

12   docket.  It's not going to happen till tomorrow morning.  I'm

13   assuming that the DIP loan, in particular, will not close until

14   sometime tomorrow.

15        MR. GOREN:  I believe that's the anticipation, Your

16   Honor.

17        THE COURT:  Fine.  So you'll have an order in form

18   satisfactory to you before you close.

19        MR. ZIMAN:  Your Honor, just to be clear, certain of

20   the orders tomorrow are conditions precedent to the DIP loan

21   closing, so we're -- you know, it'll close tomorrow.

22        THE COURT:  Fine.

23        MR. ZIMAN:  Thank you.

24        THE COURT:  All I was trying to make clear was that

25   we're not going to have orders filed on the electronic docket

RESIDENTIAL CAPITAL, LLC, ET AL.

1   this evening.

2         MR. ZIMAN:  Yes.

3         MR. GOREN:  Okay, thank you, Your Honor.  The next

4   motion I'd like to present is the motion to approve a second

5   debtor-in-possession financing facility with our parent, Ally

6   Financial, and the use of Ally Financial and the junior secured

7   bonds cash collateral.  Even though we obtained a, as you

8   noted, very substantial DIP facility from Barclays, we

9   realized, as the filing date approached and some of the

10  projections changed, that we lacked sufficient liquidity to

11  fund the debtors' second largest cash expense, which is,

12  repurchasing certain whole loans that were sold into

13  securitization trusts guaranteed by Ginnie Mae.  I'll call

14  those Ginnie buybacks.

15        Under the Ginnie Mae guides, if whole loans in a trust

16  guaranteed by Ginnie Mae collectively exceed the delinquency

17  rate specified by Ginnie Mae, the debtors are obligated to

18  repurchase a group of those loans sufficient to decrease the

19  delinquency rate below the specified level.  The amounts paid

20  by the debtors to repurchase these loans are substantial, but

21  they are reimbursable, because the loans are either partially

22  insured by the FHA or partially guaranteed by the VA.  So we

23  end up getting a substantial portion of the money we paid by

24  these loans back by submitting claims.  And we can also

25  frequently fix whatever the delinquency is and then sell them

RESIDENTIAL CAPITAL, LLC, ET AL.

1    back into a Ginnie Mae trust.  So it doesn't end up being that

2    big of a net cash outlay to the debtors, but the gross is

3    significant.  In fact, in 2011 the debtors repurchased over

4    4,700 loans at a value of approximately 745 million dollars.

5         If we were to stop doing the Ginnie Mae buybacks, we'd

6    face at least two serious consequences:  one, borrowers may

7    refuse to make their mortgage payments to the debtors,

8    impairing our ability to meet our servicing obligations; and

9    two, we would face the possible termination of our Ginnie Mae

10   servicing rights, which, as I noted before, is one of the

11   estate's unencumbered assets, and that could be a substantial

12   loss to the estate's general unsecured creditors.

13        So the debtors seek this additional debtor-in-

14   possession financing facility for the sole and limited purpose

15   of doing the Ginnie Mae buybacks.  AFI has agreed to provide us

16   that facility by means of an advance on the Ally line of

17   credit, which has substantial equity value in it.  There's

18   about -- as noted, there's about 380 million outstanding as of

19   the petition date on that facility.  And the collateral, on the

20   debtors' books at least, is valued at about 1.5 billion.  So

21   there's a substantial equity cushion in that asset, in that

22   collateral.  And so AFI, through the DIP loan, will be taking

23   liens on the Ginnie Mae assets that they purchase, and they're

24   priming themselves on the Ally LOC, for purposes of the loan.

25        So we're seeking eighty-five million today on an

RESIDENTIAL CAPITAL, LLC, ET AL.

1   interim basis, with the remaining sixty-five million to come

2   upon a final basis.  And there's also a possibility that Ally

3   will agree to provide another seventy million.  We're still

4   working through some of the numbers, trying to figure things

5   out.  So the documents currently provide that we'll negotiate

6   in good faith.  But the total ask at the final hearing could be

7   up to 220.

8         Under this facility, there are no fees payable to Ally

9   Financial.  They have agreed to the same interest rate as the

10   A-1 term loan on the Barclays facility, which is LIBOR plus

11   400.  And the proceeds use is limited to the Ginnie buybacks.

12   They're also seeking an administrative superpriority claim,

13   which is junior to Barclays' superpriority claim.

14         That is the DIP facility in essence, Your Honor.  The

15   motion also seeks the use of cash collateral of AFI in its

16   capacity as lender under the Ally line of credit -- AFI, in its

17   capacity as lender under the senior secured credit facility,

18   which is oftentimes called by people within the company as the

19   Ally revolver -- which is a bit of a misnomer.  It used to be a

20   revolver.  It no longer revolves, but that's how people in the

21   company refer to it, so I may refer to it occasionally in that

22   way, too.

23         The debtors propose to grant the following forms of

24   adequate protection on the Ally LOC.  They will give senior

25   liens on the LOC, which are junior only to the DIP lien but

RESIDENTIAL CAPITAL, LLC, ET AL.

1    senior to the liens granted to Barclays under their DIP

2    facility.  And they will make current interest payments to Ally

3    at the nondefault rate.  There will be, however, no payment of

4    Ally's professional fees.  And then Ally will be granted a

5    superpriority claim junior to Barclays' and the AFI DIP loan,

6    but pari passu with other cash collateral orders.

7           With respect to the Ally revolver or senior line of

8    credit, they will receive a similar adequate protection

9    package.  However, in addition, they are also receiving -- with

10   respect to both Ally and the junior secured bonds, we've also

11   agreed to grant them limited adequate protection replacement

12   liens -- adequate protection liens on the Ally line of credit,

13   since there's not enough collateral.  So to the extent there

14   was a diminution in value in solely the revolver and blanket

15   lien collateral that covers the revolver and the junior notes,

16   there was concern that they might not have adequate assets to

17   look to.  So we've agreed to give them a second lien on the

18   Ally LOC -- or fourth lien, I guess, behind the two DIP loans

19   and Ally adequate protection claims, solely to the extent of

20   any diminution in value in their collateral.

21          The other somewhat different aspect of their adequate

22   protection package is we're granting them a replacement lien in

23   the equity of the DIP borrowers.  And the reason for that is

24   the revolver and junior notes are secured.  One of their --

25   part of their current collateral is an equity pledge of the

RESIDENTIAL CAPITAL, LLC, ET AL.

1    preferred shares of the GSAP facility.  So, ultimately they

2    would have been entitled to any equity that would have flown up

3    to the debtors through the GSAP facility had that facility

4    unwound in the normal course.

5           Similarly with respect to BMMZ, because they have a

6    blanket lien that captures anything, the repurchase agreement

7    is arguably a general intangible.  And there was a view, which

8    the debtors did not dispute, that they had a lien on the

9    debtors' equity value in the repurchase facility, which is

10   captured by the blanket lien.  So because in two different

11   senses they had an equity interest in the assets that we were

12   putting into our DIP borrowers, the debtors believed it made

13   sense to grant them a replacement lien on the equity of the DIP

14   borrowers.  So that will be the other part of their adequate

15   protection package.

16          And then finally, Your Honor, we have stipulated to

17   the validity of the junior secured bonds, liens and claims,

18   subject to a seventy-five day challenge period.  I think it's

19   important to note we have not stipulated to the validity of

20   Ally's liens and claims.  Though as noted by my colleague

21   Mr. Nashelsky at the outset, we do propose a comprehensive

22   settlement with the parent, which would resolve our potential

23   claims with respect to those facilities, and that will be

24   consummated through a plan of reorganization.  But creditors

25   will have until the confirmation hearing to evaluate those

RESIDENTIAL CAPITAL, LLC, ET AL.

1    claims and the proposed settlement.  So we're not seeking to

2    impose any kind of a challenge period on creditors as to Ally's

3    debt.

4            And that is all I had on that, unless you have any

5    questions.

6            THE COURT:  Does anyone have comments on this?

7            MR. MASUMOTO:  Brian Masumoto again, for the Office of

8    the United States Trustee.  Your Honor, just to be consistent,

9    because there was a distinction made between the type of DIP

10   financing that was advanced by Barclays, in this case I believe

11   that the Ally DIP includes also a superpriority admin claim

12   over the Chapter 5.  If Your Honor regards this DIP advanced by

13   Ally to be comparable to Barclays, we understand your ruling.

14   But to the extent it does not, our objection to the extension

15   of the superpriority admin claim over Chapter 5 applies.  Thank

16   you.

17           THE COURT:  Okay.  Before I hear from Wells Fargo's

18   counsel, I'd like to hear from Ally's counsel on the issue of a

19   superpriority as against avoidance actions, given the

20   relationship of Ally as lender to the borrower entities.

21           MR. SCHROCK:  Your Honor, I'll have to confer with the

22   third lien holders, but Ally would be fine, solely for purposes

23   of the interim hearing, waiving a superpriority claim on

24   Chapter 5.

25           THE COURT:  I appreciate that, because you wouldn't

RESIDENTIAL CAPITAL, LLC, ET AL.

1   have gotten it.

2        MR. SCHROCK:  I thought so, Judge.  It informed my

3   decision.

4        MR. UZZI:  Just to close the record -- or the loop on

5   Mr. Schrock's comments, Your Honor -- just for the record,

6   Gerard Uzzi of White & Case, on behalf of certain ad hoc

7   consenting lenders, I should say, or consenting holders, what

8   we're referred to as under our PSA.

9        THE COURT:  It's not a group, it's not a committee;

10  they're just consenting lenders.

11       MR. UZZI:  We will be -- no, we will be filing a 2019

12  statement, Your Honor, so we won't be having that argument

13  again.

14       THE COURT:  Good.

15       MR. UZZI:  We're fine, Your Honor, with not taking

16  the -- as Your Honor had articulated, the 507(b) issue.

17       THE COURT:  Thank you.

18       MR. UZZI:  Thanks.

19       MR. DONNELL:  Your Honor, I'll be very brief.  We're

20  asking for two things:  one is preservation of our rights, our

21  contractual subordination rights, against Ally Financial.  We

22  have a subordination agreement in our deposit agreement that

23  provides that all of our claims are senior to the claims of

24  Ally Financial, with respect to any of the ResCap entities.

25  The order that's proposed to you would change that priority and

RESIDENTIAL CAPITAL, LLC, ET AL.

1    provide that Ally Financial has priority rights, subject only

2    to the carve-out and nothing else.  So I've outlined -- I've

3    highlighted the provisions of the order that I think are

4    problematic.

5           THE COURT:  Okay, I don't want to get into order-

6    drafting at this time, as much as I would like to get into the

7    concept that we're dealing with.  Are you objecting to the

8    priming by a DIP loan?  Is that what you're objecting to?  Or

9    are you saying whatever priming exists has to be subject to the

10   contractual subordination provisions that govern your contract?

11   I'm just trying to understand what you're --

12          MR. DONNELL:  No, it's a good point.

13          THE COURT:  -- what you're saying.

14          MR. DONNELL:  It's a good point.  They are two

15   separate things.  And it's the second that we're most focused

16   on.  I'm not consenting to the priming, because we haven't been

17   given replacement collateral.  Okay, that's the other thing I'm

18   asking for; that's the second thing.  So it's two things:

19   we've got contractual subordination rights that we want

20   preserved, against Ally Financial, and we understand that our

21   bank accounts in which we have security interests are going to

22   go poof or go to other lenders, but we need replacement

23   collateral for that.  And what we're suggesting is that we

24   simply get the same replacement collateral that Ally Financial

25   is getting, because that's also consistent with our

RESIDENTIAL CAPITAL, LLC, ET AL.

1    subordination agreement with Ally Financial.

2          THE COURT:  So your objection is seeking, A, in

3    effect, specific enforcement of the subordination provisions

4    and your financing arrangements, and B, adequate protection?

5    Is that right?

6          MR. DONNELL:  I would change A slightly.  Instead of

7    specific performance, I'm trying to undo what they have in

8    there that says our rights go away -- our subordination rights

9    go away.  And the second is correct, yes.  If all the money in

10   our bank accounts in which we have a first priority security

11   interest are going to go to another lender or are going to be

12   spent as cash collateral, then we need additional adequate

13   protection, not just what's in the cash management order but an

14   actual replacement lien.  And so as not to interfere with the

15   other lenders, it seems to me the simplest thing is to simply

16   give us the same adequate protection collateral that Ally

17   Financial is getting.

18         THE COURT:  Let me hear from Mr. Schrock.

19         MR. SCHROCK:  It's, Judge, Ray Schrock on behalf of

20   Ally Financial.

21         I have to admit, this one confounds me.  Just so Your

22   Honor has some context for what the relationship is of Wells

23   Fargo in the capital structure of ResCap, Wells Fargo was

24   formerly the cash management banker for ResCap.  There's

25   approximately thirty-three million dollars, we understand, left

RESIDENTIAL CAPITAL, LLC, ET AL.

1    in an account, now that ResCap has moved all of their cash

2    management over to JPMorgan.  So there's -- and that sits in an

3    account where the Ally revolver has a control agreement.  One,

4    we've asked counsel a number of times what are his setoff

5    rights, what are we protecting.  This account is going to be

6    closed next week.  They're moving -- we understand that the

7    debtors are moving the cash over, and we don't understand what

8    their claim is.  To the extent counsel wants adequate

9    protection, I would say have him -- I want him to articulate

10   what his loss is or what he's concerned about, and we could

11   certainly chat about that and giving him adequate protection,

12   but this isn't an account where we have a lien.

13          Second, Your Honor, Ally Financial is not going to

14   stipulate to this sua sponte, this guarantee that was put in

15   place unilaterally on a deposit account agreement in the months

16   leading up to the Chapter 11.  And I don't even understand what

17   the loss would be.  Here we're giving a DIP loan.  The debtor

18   has come to us and said we would like you, Ally, to make

19   another accommodation.  We said that we would be willing to do

20   so with a court order, under the right circumstances.  We want

21   to make sure that the taxpayers get repaid for their

22   investment, who own seventy-four percent of Ally Financial.

23   But to ask us to subordinate an entire DIP loan and an entire

24   pre-petition revolving credit facility to a thirty-three

25   million dollar account or some charges that we don't even know

RESIDENTIAL CAPITAL, LLC, ET AL.

1   about, seems out of line.

2        THE COURT:  Well, I don't really know enough to make a

3   ruling on this, but it seems that it falls into the category of

4   this either is or is not like a permitted lien in a DIP

5   financing arrangement in which certain prior rights are carved

6   out in order to, in effect, push to one side the litigation

7   time and expense and risk associated with having to litigate

8   such things right at the outset.  Now, that may or may not be

9   the right characterization, but that's the one that I'm making

10  having heard this argument.

11       What I don't understand is why the lawyers are arguing

12  about this in a warm courtroom at a quarter to 7 at night, as

13  opposed to working something out, because what you've just said

14  is that the Wells Fargo position is de minimis in relation to

15  the issues that are before the Court, and the amounts that are

16  involved.

17       MR. SCHROCK:  Yes, Your Honor.

18       THE COURT:  And so in effect what you're saying is 'I

19  don't know why they're being so difficult, because they have no

20  position here to protect.'  I'm paraphrasing.  Is that a fair

21  paraphrase?

22       MR. SCHROCK:  That is very fair, Your Honor.

23       THE COURT:  Okay.  So I'm inclined not to have Wells

24  Fargo lose, but they're about to.  So my suggestion is that the

25  two of you, before we close the record, have a conversation in

RESIDENTIAL CAPITAL, LLC, ET AL.

1    the hallway together to see if you can rationally resolve what

2    seems to be a very small issue.

3         MR. SCHROCK:  Thank you, Your Honor.  That's all we're

4    asking for.

5         THE COURT:  Okay.  Why don't you go do that.

6         MR. SCHROCK:  All right.  Thank you.

7         THE COURT:  Why don't you go do that now.

8         MR. DONNELL:  Yes, sir.

9         MR. SCHROCK:  Will do.

10        MR. GOREN:  This one should hopefully be a bit simpler

11   and a bit quicker.  The last cash collateral motion is the one

12   with Citibank, N.A.  As previously noted, they have a security

13   interest in various agency master servicing rights; those are

14   Fannie and Freddie master servicing rights.  They get -- we're

15   offering them a fairly standard adequate protection package of

16   replacement liens on their same assets, superpriority claim

17   junior to the DIP superpriority claim but pari passu with other

18   cash collateral providers, and interest paid at the nondefault

19   rate, and payment of fees.  We do believe the facility is

20   meaningfully oversecured, so we have no issue paying the

21   interest.  And in particular, the purchaser has -- the portion

22   of its bid allocable to the agency MSRs is about 360 million,

23   and there's about 150 million outstanding.  So there's a

24   significant equity cushion available in the facility.

25        The security interest, including adequate protection

RESIDENTIAL CAPITAL, LLC, ET AL.

1   interest taken by Citibank, is expressly subject to all of the

2   agency interests under the order, Fannie and Freddie's

3   interests in the servicing rights that are secured.  So I

4   believe we've agreed with language with them on that and they

5   find that satisfactory.

6        We do stipulate to the validity of their debt and

7   liens and claims, and provide a seventy-five day challenge

8   period.

9        Any other --

10       MR. MASUMOTO:  Your Honor, if I might ask the

11   concession on the Chapter 5 causes of action on the

12   superpriority --

13       THE COURT:  Let's see if we can get it for you.  I bet

14   we're going to get it.

15       MR. SOSNICK:  Good evening, Your Honor.  Fred Sosnick

16   from Shearman Sterling, on behalf of Citibank, N.A.  I think we

17   would be prepared to make that concession for tonight.  I think

18   we do have reasons why, for the final order, we think it's

19   appropriate, but I don't think we need to belabor that tonight.

20   I think we're adequately protected until the final hearing.

21       THE COURT:  I think you are, too.

22       Any other comments?

23       Fine.

24       MR. GOREN:  Thank you, Your Honor.  Your Honor, we did

25   also file a motion to file the Barclays fee letter under seal.

RESIDENTIAL CAPITAL, LLC, ET AL.

1    I'm not sure --

2         THE COURT:  Are we saving that to the very end?

3    That's probably the most problematic motion that I've seen in

4    this first-day packet.  So let's spend a little time on that.

5         MR. GOREN:  It's the debtors' point of view that it is

6    appropriate in this case to file the fee letter under seal, in

7    particular because this is a syndicated deal, there is market

8    flex available in the package, and we do believe it would be

9    harmful, not just to Barclays but to the debtors, for the

10   market to be able to see what type of flex is available.  We

11   think it more likely the facility to be flexed in that instance

12   and ultimately costing the debtors' estates more money.

13        THE COURT:  Okay, I understand the issue, and I'm

14   going to give the U.S. Trustee an opportunity to comment in

15   just a moment.  But let me frame my concern so you understand

16   how I look at this.  The amount of the fees has been disclosed

17   in gross amount, something in excess of fifty million dollars.

18        MR. GOREN:  That's correct.

19        THE COURT:  I saw that.  I also looked at the several

20   allegedly confidential documents to be filed under seal that

21   are the fee letters in question.  I recognize that when we're

22   talking about the pricing of a debtor-in-possession facility,

23   we are dealing with sensitive commercial information.  But

24   we're also dealing with that information in a somewhat unique

25   setting.  It's the fishbowl of bankruptcy.  And on day one you

RESIDENTIAL CAPITAL, LLC, ET AL.

1    are asking for a sealing order with respect to a document

2    that's clearly material to the financing as a whole.  Without

3    getting into the specifics of the flex as you describe it, I

4    noticed that there are any number of potentially material terms

5    to the financing that are built into the flex, in terms of

6    changes to the relative amounts in the designated facilities,

7    if I understood it correctly.

8         MR. GOREN:  That's correct, Your Honor.

9         THE COURT:  And in part for that reason, this isn't

10   just pricing; this is the very structure of the facility.  And

11   one of the terms that I noticed went to the maturity date,

12   which I believe can change by a number of months that I won't

13   state on the record because that is presumably confidential

14   information.  But the fact that that exists as a term is

15   material to all parties-in-interest in this case.

16        So in part for that reason, I'm just letting you

17   know -- and you can think about this overnight; we don't have

18   to decide this today, because we have another hearing date

19   tomorrow at 11, which will be here before you know it -- I have

20   some problems with this.  And I believe that it is at least

21   possible, instead of sealing these documents, to redact them,

22   and I believe it is also possible to provide summaries of the

23   relevant terms so that parties know what's at stake here.  I

24   don't view this as inconsequential, but I also recognize that

25   we're dealing with sensitive information, but it's sensitive

RESIDENTIAL CAPITAL, LLC, ET AL.

1    information that parties-in-interest have a right to know, at

2    least in general terms.

3         MR. GOREN:  Very much appreciated, Your Honor.  We

4    will speak with Barclays' counsel overnight and the U.S.

5    Trustee and see if we can come to resolution by tomorrow or, if

6    not, perhaps put the motion off a little bit and --

7         THE COURT:  Yeah.  Now, I saw that Mr. Masumoto was

8    standing to say something when I was speaking.

9         MR. MASUMOTO:  Your Honor, in fact, the redaction

10   procedure has been utilized in other cases and has been

11   satisfactory for our office.  So we're happy to discuss that

12   procedure with the debtor and the DIP lender.

13        THE COURT:  Okay.

14        MR. GOREN:  I'm sure we'll be able to come up with

15   something that works, Your Honor.

16        THE COURT:  Now, we have a couple of gentlemen who are

17   out in the hall, and it would be great if they could come in

18   and tell me that that particular loose end from the Ally

19   financing has been wrapped up.  And then we can go home, or go

20   back to work, as the case may be.

21        MR. SCHROCK:  Hello, Your Honor.

22        THE COURT:  Hello again.

23        MR. SCHROCK:  Ray Schrock on behalf of Ally Financial.

24   I think we have an agreement.

25        THE COURT:  Good.  What is it?

RESIDENTIAL CAPITAL, LLC, ET AL.

1          MR. SCHROCK:  Wells Fargo is going to get adequate

2    protection to the extent of the amount that is -- capped at the

3    amount that is in the accounts as of the petition date.  But

4    the parties will reserve rights as to the ranking of that

5    adequate protection.  And further, Wells Fargo would like to,

6    and Ally and the third lien lenders would like to reserve

7    rights on the subordination language that is quoted in the

8    objection, for the final hearing, provided that any new-money

9    loans that are issued before the final hearing shall be first

10   in priority.

11         THE COURT:  Is that acceptable?

12         MR. DONNELL:  That's acceptable, Your Honor.

13         THE COURT:  Fine.  I'm so ordering the record for this

14   evening.  I think it would be of some use to take that nicely-

15   stated agreement and to incorporate that into the form of order

16   to be entered as well.  Can you do that?

17         MR. DONNELL:  Yes, Your Honor.

18         THE COURT:  Great.  And I'll see those who wish to be

19   back here, at 11 o'clock tomorrow.  We're adjourned till then.

20         IN UNISON:  Thank you, Your Honor.

21   (Whereupon these proceedings were concluded at 6:55 PM)

22

23

24

25

```
 1

 2                              I N D E X

 3

 4                          E X H I B I T S

 5    DEBTORS'              DESCRIPTION        PAGE

 6                          Affidavit of Mr.   48

 7                          Whitlinger

 8                          Declaration of Mr. 48

 9                          Puntus

10

11                              RULINGS

12                                              Page    Line

13    Motion for joint administration of cases  46      19

14    granted.

15    Debtors' cash management motion granted.   67      10

16    Barclays DIP financing motion granted on   91      16

17    an interim basis.

18    All findings regarding cash collateral,    92       7

19    cash management and DIP lending motions,

20    will be so ordered.

21    Citibank cash collateral motion granted   105      23

22    Ally DIP financing motion granted on an   109      13

23    interim basis, as modified on the record.

24

25
```

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

11    _____

      PENINA WOLICKI
12
      AAERT Certified Electronic Transcriber CET**D-569
13

14

15

16    _____

17    CLARA RUBIN

18    AAERT Certified Electronic Transcriber CET**D-491

19

20    eScribers

21    700 West 192nd Street, Suite #607

22    New York, NY 10040

23

24    Date:  May 16, 2012

25