1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020(MG)

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              May 15, 2012

19              11:05 AM

20

21   B E F O R E:

22   HON. JAMES M. PECK (FOR HON. MARTIN GLENN)

23   U.S. BANKRUPTCY JUDGE

24

25

2

Debtors' Motion for Order Under Bankruptcy Code Section 521 and Bankruptcy Rule 1007(c) Extending Time for Filing Schedules and Statements

Debtors' Motion for an Order Under Bankruptcy Code Section 105(a) and Bankruptcy Rule 2002(a), (f), (l) and (m) (I) Waiving the Requirement that Each Debtor File a List of Creditors, (II) Authorizing the Debtors to File a Consolidated List of the Fifty Largest Unsecured Creditors, (III) Approving the Form and Manner of Notice of the Commencement of the Debtors' Chapter 11 Cases and (IV) Approving Publication Notice to Borrowers

Debtors' Motion for Entry of an Order Under Bankruptcy Code Sections 102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 and Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management and Administrative Procedures

Debtors' Application for an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. Section 156(c), 11 U.S.C. Section 105(a), S.D.N.Y. LBR 5075- 1 and General Order M-409

3

Debtors' Motion for Interim and Final Orders Pursuant to Sections 105(a), 363, 364, 503(b), 1107(a) and 1108 of the Bankruptcy Code Authorizing the Debtors to (I) Process and Where Applicable Fund Pre-Petition Mortgage Loan Commitments, (II) Continue Brokerage, Origination and Sale Activities Related to Loan Securitization, (III)Continue to Perform Under the Mortgage Loan Purchase and Sale Agreement with Ally Bank and Related Agreements, (IV) Pay Certain Pre-Petition Amounts Due to Critical Origination Vendors, and (IV) Continue Honoring Mortgage Loan Repurchase Obligations Arising in Connection with Loan Sales and Servicing, Each in the Ordinary Course of Business

**4**

Debtors' Motion for Interim and Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the Bankruptcy Code (I)Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Agency Loans; and (B) Foreclosure Activities Related to Certain Real Estate Owned By Fannie Mae, Freddie Mac, and Ginnie Mae, (II) Authorizing the Debtors to Pay Certain Pre-Petition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals, (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief

Debtors' Motion for Order Under Bankruptcy Code Sections 105(a) and 107(b) and Bankruptcy Rule 9018 (I) Authorizing the Debtors to File Under Seal Confidential Exhibit to the Servicing Motion and (II) Limiting Notice Thereof

5

1

2    Debtors' Motion for Interim and Final Orders Under Sections

3    105(a), 362, 363, 1107(a) and 1108 of the Bankruptcy Code (I)

4    Authorizing the Debtors to Continue in the Ordinary Course of

5    Business (A) Servicing Non-Governmental Association Loans; and

6    (B) Sale Activities Related to Certain Loans in Foreclosure and

7    Real Estate Owned Property; and (II) Granting Limited Stay

8    Relief to Enable Borrowers to Assert Related Counter-Claims in

9    Foreclosure and Eviction Proceedings

10

11    Debtors' Motion for Interim and Final Orders Under Bankruptcy

12    Code Sections 105(a) and 363 Authorizing the Debtors to

13    Continue to Perform Under the Ally Bank Servicing Agreements in

14    the Ordinary Course of Business

15

16    Debtors' Motion for Interim and Final Orders Under Bankruptcy

17    Code Sections 105(a), 363, 506(a), 507(a)(8), 541 and 1129 and

18    Bankruptcy Rule 6003 Authorizing Payment of Pre-Petition Taxes

19    and Regulatory Fees

20

21    Debtors' Motion for Order Under Bankruptcy Code Sections 105,

22    507 and 541 and Bankruptcy Rule 6003 Authorizing Debtors to

23    Honor Certain Pre-Petition Obligations to Customers

24

25

6

1

2  Debtors' Motion Seeking Authority to Provide Notice to

3  Borrowers that the Debtors Will Suspend Funding Draws Under

4  Certain Home Equity Lines of Credit

5

6  Debtors' Motion for Interim and Final Orders Under Bankruptcy

7  Code Sections 105(a), 363(b), 507(a), 1107 and 1108 and

8  Bankruptcy Rule 6003 (I) Authorizing But Not Directing

9  Debtors to (A) Pay and Honor Pre-Petition Wages, Compensation,

10  Employee Expense and Employee Benefit Obligations; and (B)

11  Maintain and Continue Employee Compensation and Benefit

12  Programs; and (II) Directing Banks to Honor Pre-Petition Checks

13  and Transfer Requests for Payment of Pre-Petition Employee

14  Obligations

15

16  Debtors' Motion for Interim and Final Orders Under Bankruptcy

17  Code Sections 105(a) and 363(b) Authorizing Residential

18  Capital, LLC to Enter into a Shared Services Agreement with

19  Ally Financial Inc. Nunc Pro Tunc to the Petition Date for the

20  Continued Receipt and Provision of Shared Services Necessary

21  for the Operation of the Debtors' Businesses

22

23

24

25

7

20   Transcribed by:   Lisa Bar-Leib

21   eScribers, LLC

22   700 West 192nd Street

23   Suite #607

24   New York, NY 10040

25   operations@escribers.net

**eScribers, LLC | (973) 406-2250**
**operations@escribers.net | www.escribers.net**

8

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Proposed Counsel for Debtors and Debtors-in-Possession

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8   BY:   LARREN M. NASHELSKY, ESQ.

9        LORENZO MARINUZZI, ESQ.

10       NORMAN S. ROSENBAUM, ESQ.

11       GARY S. LEE, ESQ.

12       TODD M. GOREN, ESQ.

13

14

15  MORRISON & FOERSTER LLP

16       Proposed Counsel for Debtors and Debtors-in-Possession

17       2000 Pennsylvania Avenue, NW

18       Suite 6000

19       Washington, DC 20006

20

21  BY:   ALEXANDRA S. BARRAGE, ESQ. (TELEPHONICALLY)

22

23

24

25

9

UNITED STATES DEPARTMENT OF JUSTICE

    Office of the United States Trustee

    33 Whitehall Street

    21st Floor

    New York, NY 10004


BY:   TRACY HOPE DAVIS, UST

    BRIAN S. MASUMOTO, ESQ.



UNITED STATES DEPARTMENT OF JUSTICE

    U.S. Attorney's Office

    86 Chambers Street

    3rd Floor

    New York, NY 10007


BY:   JOSEPH N. CORDARO, AUSA

10

1

2 GIBBS & BRUNS LLP

3          Attorneys for RMBS Holders

4          1100 Louisiana Street

5          Suite 5300

6          Houston, TX 77002

7

8 BY:   KATHY PATRICK, ESQ.

9

10

11 KIRKLAND & ELLIS LLP

12          Attorneys for Ally Financial Inc. and Ally Bank

13          601 Lexington Avenue

14          New York, NY 10022

15

16 BY:   STEPHEN E. HESSLER, ESQ.

17          RAY C. SCHROCK, ESQ.

18

19

20 KIRKLAND & ELLIS LLP

21          Attorneys for Ally Financial Inc. and Ally Bank

22          601 LaSalle Street

23          Chicago, IL

24

25 BY:   NOAH J. ORNSTEIN, ESQ. (TELEPHONICALLY)

11

MCKOOL SMITH

        Attorneys for Freddie Mac

        One Bryant Park

        47th Floor

        New York, NY 10036


BY:    MICHAEL R. CARNEY, ESQ.



MCKOOL SMITH

        Attorneys for Freddie Mac

        600 Travis Street

        Suite 7000

        Houston, TX 77002


BY:    PAUL MOAK, ESQ.



MORRISON COHEN LLP

        Attorneys for Independent Directors of ResCap

        909 Third Avenue

        New York, NY 10022


BY:    JOSEPH T. MOLDOVAN, ESQ.

12

1

2  ROPES & GRAY LLP

3        Attorneys for the Ad Hoc Committee of RMBS Holders

4        800 Boylston Street

5        Boston, MA 02199

6

7  BY:   D. ROSS MARTIN, ESQ.

8

9

10  ROPES & GRAY LLP

11        Attorneys for the Ad Hoc Committee of RMBS Holders

12        1211 Avenue of the Americas

13        New York, NY 10036

14

15  BY:   KEITH H. WOFFORD, ESQ.

16        DARREN AZMAN, ESQ. (TELEPHONICALLY)

17

18

19  SHEARMAN & STERLING LLP

20        Attorneys for Citibank, N.A.

21        599 Lexington Avenue

22        New York, NY 10022

23

24  BY:   SUSAN A. FENNESSEY, ESQ.

25        FREDRIC SOSNICK, ESQ.

13

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

     Attorneys for Barclays Bank PLC as Administrative Agent

      for the DIP Facility

     Four Times Square

     New York, NY 10036


BY:   KENNETH S. ZIMAN, ESQ.

     JAMIE B. BARON, ESQ. (TELEPHONICALLY)



WHITE & CASE LLP

     Attorneys for Ad Hoc Group of Junior Secured Noteholders

     1155 Avenue of the Americas

     New York, NY 10036


BY:   GERARD UZZI, ESQ.

     HARRISON DENMAN, ESQ.

14

1

2  WINSTON & STRAWN LLP

3        Attorneys for Wells Fargo

4        200 Park Avenue

5        New York, NY 10166

6

7  BY:    JAMES DONNELL, ESQ.

8

9

10  WINSTON & STRAWN LLP

11        Attorneys for Fannie Mae

12        200 Park Avenue

13        New York, NY 10166

14

15  BY:    CAREY D. SCHREIBER, ESQ.

16        DAVID NEIER, ESQ.

17

18

19  BARNES & THORNBURG LLP

20        Attorneys for USAA

21        1000 N. West Street

22        Suite 1200

23        Wilmington, DE 19801

24

25  BY:    DAVID M. POWLEN, ESQ. (TELEPHONICALLY)

15

BARNES & THORNBURG LLP

        Attorneys for USAA

        225 South Sixth Street

        Suite 2800

        Minneapolis, MN 55402


BY:    STEPHANIE M. SEIDL, ESQ. (TELEPHONICALLY)



BERGER SINGERMAN LLP

        Attorneys for Creditor, L.P.S., LLC

        1450 Brickell Avenue

        Suite 1900

        Miami, FL 33131


BY:    JORDI GUSO, ESQ. (TELEPHONICALLY)



CADWALADER, WICKERSHAM & TAFT LLP

        Attorneys for MBIA Insurance Co.

        One World Financial Center

        New York, NY 10281


BY:    MICHELE C. MAMAN-COHEN, ESQ. (TELEPHONICALLY)

16

1

2  KRAMER LEVIN NAFTALIS & FRANKEL LLP

3       Attorneys for Interested Party, Kramer Levin Naftalis &

4        Frankel LLP

5       1177 Avenue of the Americas

6       New York, NY 10036

7

8  BY:   ELAN DANIELS, ESQ. (TELEPHONICALLY)

9

10

11  MILBANK, TWEED, HADLEY & MCCLOY, LLP

12       Attorneys for Interested Party, Milbank, Tweed, Hadley &

13        McCloy LLP

14       601 South Figueroa Street

15       30th Floor

16       Los Angeles, CA 90017

17

18  BY:   MARK SHINDERMAN, ESQ. (TELEPHONICALLY)

19       GREGORY BRAY, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25

17

SIDLEY AUSTIN

    Attorneys for Nationstar Mortgage

    1 South Dearborn Street

    Chicago, IL 60603


BY:   JESSICA BOELTER, ESQ. (TELEPHONICALLY)

    BRETT MYRICK, ESQ. (TELEPHONICALLY)



U.S. DEPARTMENT OF JUSTICE

    Civil Division

    950 Pennsylvania Avenue

    Washington, DC 20530


BY:   GLENN GILLETT, ESQ. (TELEPHONICALLY)

18

1

2   ALSO PRESENT TELEPHONICALLY:

3        JEFFREY ANAPOLSKY, T. Rowe Price

4        JENNIFER H. ANDERSON, Farallon Capital Management

5        JUSTIN BRASS, Jefferies & Company

6        GEORGE BRICKFIELD, The Seaport Group

7        STEVEN H. CHURCH, Bloomberg LLP

8        DAVID DUNN, Arrowgrass Capital Partners

9        JOSEPH KRONSBERG, Cyrus Capital Partners, LP

10        SCOTT MATES, Blackstone

11        JOHN O'MEARA, Morgan Stanley

12        AMIT P. PATEL, Avenue Capital

13        DENNIS A. PRIETO, Aurelius Capital Management, LP

14        ANDREW REBACK, Credit Suisse

15        BILL J. SCHWARTZ, CitiGroup

16        MARC SCHWARTZ, Taconic Capital

17        MITCHELL SOCKETT, King Street Capital Management

18        DIANE STARKE, Momentii Research LLC

19        KEVIN J. STARKE, CRT Capital Group, LLC

20        DANIEL WANG, Elliott Management Co.

21        DI WU, Varde Partners, Inc.

22        MICHAIL ZEKYRGIAS, Merrill Lynch

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.                                    19

P R O C E E D I N G S

1

2          THE COURT:  Be seated.  Good morning.

3          MR. NASHELSKY:  Good morning, Your Honor.  Larren

4   Nashelsky from Morrison & Foerster, proposed counsel for the

5   debtors, Residential Capital, LLC.  Thank you again for

6   accommodating us for the second half of the first day hearings.

7   We hope after yesterday, everything will go smoothly today.  I

8   think we resolved all issues, so I think we should be able to

9   move quickly.

10         THE COURT:  Okay.

11         MR. NASHELSKY:  A couple of housekeeping matters.  I

12  know the Court has already signed the joint admin and cash

13  management, and the other three financing orders should be, as

14  I speak or moments, sent down to chambers.  So if there is a

15  break or right after, we can just have those entered.  Those

16  are the ones from yesterday.

17         In addition, with respect to the resolution of the

18  cash management with Wells Fargo, we added the language that

19  was discussed on the record and has been agreed to.  And the

20  debtors will be closing out those accounts shortly to resolve

21  the issue so that they don't have to worry about having a

22  concern.

23         So we're going to turn to some procedural motions

24  first and then go to some operational ones.  And Mr. Marinuzzi

25  is going to continue those.  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    20

1        MR. MARINUZZI:   Good morning, Your Honor.

2        THE COURT:  Good morning.

3        MR. MARINUZZI:  For the record, Lorenzo Marinuzzi,

4   Morrison & Foerster.  Your Honor, I'm going to try to get

5   through fairly quickly the procedural motions because we have a

6   number of items on the agenda that I think are going to require

7   some greater time.

8            The first motion is the debtors' motion to extend to

9   June 30th the deadline to file schedules and statements, Your

10  Honor.  No objection to the motion.  No objection from the

11  United States Trustee.  Request --

12           THE COURT:  Motion granted.

13        MR. MARINUZZI:  Thank you.  The next motion, Your

14  Honor, is the motion to file a consolidated list of top fifty

15  creditors and to approve the manner and notice of publication.

16  Your Honor, the unusual aspect of this, because these top fifty

17  creditor lists are now in cases like this, not unusual, is that

18  because the number of borrowers this company has is so great,

19  in order for them to serve notice of every motion, it would

20  cost a million dollars just for mailing.  So instead, what we

21  propose to do is to publicize notice of motions in Wall Street

22  Journal and USA Today, I believe are the two newspapers, to

23  provide notice in that fashion instead.  If there's a motion

24  that affects a particular individual who happens to be a

25  customer, they'll certainly get notice.  But generally, with

RESIDENTIAL CAPITAL, LLC, et al.                                        21

1   customers, we're trying to conserve on the cost of the

2   publication.

3            THE COURT:  Let me just ask if the U.S. Trustee has

4   any concerns with regard to that.

5            MR. MASUMOTO:  We do not, Your Honor.

6            THE COURT:  Fine.  It's granted.

7            MR. MARINUZZI:  Thank you, Your Honor.  Next item on

8   the agenda is the case management motion.  Your Honor, we're

9   going to withdraw that motion.  Now that we know that the case

10  has been assigned to Judge Glenn, we're going to work with

11  chambers to make sure the case management order is one that's

12  acceptable to the judge.

13           THE COURT:  That's fine.

14           MR. MARINUZZI:  And we'll go by notice of presentment

15  when that's done.

16            That brings us to the last procedural motion, Your

17  Honor.  It is the motion to retain KCC as claims and noticing

18  agent for the debtors.

19           THE COURT:  They're already working.

20           MR. MARINUZZI:  They are already working, Your Honor.

21  We're going to tweak the order a little bit at the request of

22  the United States Trustee but it's not controversial at all.

23           THE COURT:  Since it's not controversial and since you

24  know what the tweaks are and since they're already working,

25  it's granted.

**RESIDENTIAL CAPITAL, LLC, et al.**                    22

1    MR. MARINUZZI:  Thank you, Your Honor.  With that, I

2    will turn it over to Mr. Norman Rosenbaum.

3    MR. ROSENBAUM:  Good morning, Your Honor.  Norm

4    Rosenbaum, Morrison & Foerster for the debtors.

5    Your Honor, next up on the agenda are really four

6    related motions.  I think, as you heard yesterday from Mr.

7    Nashelsky, these motions really go to the heart of the debtors'

8    business which is the origination and servicing of mortgage

9    loans.

10    The first item on the agenda is number 12.  And this

11    we refer to as, really, our mortgage origination request to

12    continue mortgage origination in the ordinary course.  Your

13    Honor, some of the highlights of this motion and what we're

14    requesting authority to do is honor we call our pipeline

15    obligations.  Those are mortgage obligations that we either

16    have a commitment to fund for those limited loans that we fund

17    in the states of Nevada and Ohio and continuing processing

18    loans through our brokerage arrangements with Ally Bank.  Those

19    were in process prior to the petition date and we're seeking

20    authority to continue to process those through funding at Ally

21    Bank.  And then, as you'll hear -- and I think you heard

22    yesterday and you'll hear a little bit more today, that's sort

23    of the first step in the securitization process.

24    In connection with origination, we're also seeking to

25    continue a pre-petition process whereby GMAC Mortgage, one of

1   the debtors, actually purchases loans from Ally Bank, again,

2   for securitization purposes.  These loans relate solely just to

3   Ginnie Mae securitizations.  Based on arrangements that were

4   reached with the Fannie Mae and Freddie Mac prior to the

5   petition date, Ally Bank, our nondebtor affiliate, will now be

6   selling, and has been selling since May 1, directly into Fannie

7   and Freddie securitizations, loans that they originated or

8   acquired.

9           In connection with this authority, what we're seeking

10   to do is continue a relationship with Ally Bank whereby GMAC

11   Mortgages purchases loans from Ally Bank for subsequent sale to

12   Ginnie Mae securities.  And that's pursuant to a purchase and

13   sale agreement we referred to in the motion.  The actual name

14   of it is the Amended and Restated Master Mortgage Loan Purchase

15   and Sale Agreement.  And really, by that vehicle, Ally Bank is

16   allowing GMAC Mortgage to purchase these loans on credit for

17   certain subsets of them.  The loans are basically repaid or the

18   credit advances are paid when the loans are securitized.

19           In connection with that, prior to the petition date,

20   the parties had entered into a pledge and security agreement.

21   The security for that -- or relationship is specifically just

22   the loans that are basically sold on credit.  And that's what

23   the pledge and security agreement relates to.

24           And the final step in that relationship is the pre --

25   well, the master forward agreement.  And again, that's a third

RESIDENTIAL CAPITAL, LLC, et al.                                      24

1  step that allows the loans after they're securitized to be sold

2  into the market.  And that's a relationship between another

3  affiliate of Ally, AIM, and the debtors.

4        In connection with those relationships, we are

5  requesting authority to provide both the -- incur the secured

6  credit and grant certain administrative priorities to Ally Bank

7  in connection with those relationships.

8        These were, obviously, negotiated prior to the filing

9  and on consensual basis both with Ally Bank and the other

10 parties.

11       Your Honor, the other couple highlights of this

12 request is we're seeking authority to continue to honor our

13 obligations, in connection with the loans that have been

14 securitized, to continue to honor what we call is the make-

15 whole or repurchase obligations within our discretion as they

16 come due from the demands of the securitization trustees and

17 the other parties.

18       In connection with the process, Ginnie Mae has

19 requested that they be granted administrative expense claim

20 with claims that arise as a result of the sale of loans to

21 Ginnie Mae.  And we've agreed to do that as well, Your Honor.

22       Your Honor, the other component of this motion is a

23 critical vendor component.  The debtors, their advisors, and

24 counsel worked very hard prior to the petition date limiting

25 this to what we felt was the absolute critical component that

1  they need to continue to conduct their origination business.

2  We believe that the amounts due in the next thirty days that

3  we're seeking authority to pay to these critical vendors is

4  approximately 2.2 million.  We've incorporated into both the

5  motion and our order the standard critical vendor provisions in

6  terms of the ability to require demands upon the critical

7  vendors that they continue to provide credit terms and work

8  with us.  And to the extent they don't, we'd have the ability

9  to recoup the payments made to the critical vendors.

10          THE COURT:  And how do you determine that a vendor is

11  critical?

12          MR. ROSENBAUM:  This is a process that the company

13  worked very closely with FTI looking at different categories of

14  vendors -- we've outlined them in the motion -- and made a

15  determination of those that they could absolutely not live

16  without, the ones that they felt they would have a problem with

17  if they didn't pay.  And it's their judgment that these are

18  very important.  And it would not be -- it's not worth the risk

19  to the company of getting to that point where they couldn't pay

20  them.

21          THE COURT:  Who is making that determination?

22          MR. ROSENBAUM:  The company made that determination in

23  connection -- working closely with its financial advisors, FTI,

24  and really very much scrubbing what started as an original

25  vendor list and working its way in categories and who they

RESIDENTIAL CAPITAL, LLC, et al.                                      26

1   really felt were critical in this process.

2           THE COURT:  That's not exactly what I was asking.  Who

3   are the individuals who are exercising discretion to determine

4   those vendors that are critical for purposes of this more

5   favorable treatment?

6           MR. ROSENBAUM:  In terms of who at the company, Your

7   Honor?  Well, yes.

8           THE COURT:  Who is exercising business judgment to

9   determine that certain vendors are critical?  That's all I'm

10  asking.

11          MR. ROSENBAUM:  The company, Your Honor.  The --

12          THE COURT:  But "the company" is not identifying the

13  individuals who are exercising business judgment.  Who's doing

14  it?

15          MR. ROSENBAUM:  Excuse me, Your Honor?

16          THE COURT:  Sure.

17          MR. ROSENBAUM:  For this component of the motion for

18  the critical servicing vendors for origination, it's Louis Nees

19  at the company.

20          THE COURT:  Who?

21          MR. ROSENBAUM:  Louis Nees.

22          THE COURT:  And what's his position?

23          MR. ROSENBAUM:  Head of capital markets.

24          THE COURT:  I'm almost sorry I asked.  It doesn't help

25  me.  Is he in the room?

RESIDENTIAL CAPITAL, LLC, et al.                                    27

1          MR. NASHELSKY:  No.

2          MR. ROSENBAUM:  Your Honor, maybe Mr. Nashelsky --

3          THE COURT:  Here's what I'm trying to get at.  This --

4          MR. ROSENBAUM:  Mr. Whitlinger --

5          THE COURT:  This is a first day motion which is, by

6   its very nature, discriminatory in that the company is making

7   judgments that certain kinds of vendors are deemed to be so

8   vital to the success of the reorganization that even though

9   they're not legally entitled to get a hundred cents on the

10  dollar, they're going to get a hundred cents on the dollar in

11  an environment in which we don't know what unsecured creditors

12  are going to get but the best guess I have is they won't get a

13  hundred cents on the dollar.  That means, unless you're going

14  to tell me otherwise, that at the very beginning of the case,

15  this individual is charged with making a discrimination that

16  has economic consequences.  I'm trying to have an understanding

17  as to who that individual is, how he makes the judgment and if

18  the judgment is, in fact, a fair and reasonable one.  That's

19  the context in which I am asking these questions.  And I would

20  like some answers.

21         MR. ROSENBAUM:  Your Honor, Mr. Whitlinger is here and

22  can address that.  But I can tell you the process leading up to

23  this decision.  The company and the parties in the different

24  business lines that work on origination at the company in the

25  securitization activities started really almost on a blank

1   slate and looked at all their vendors.  And they worked in

2   their different groups to decide who they felt were critical.

3   And they reported that information up as to who they thought

4   were critical, who they really felt they could not live

5   without, and who they felt they needed to pay to have the

6   benefit of this order.  And Mr. Nees and Mr. Whitlinger would

7   sort of rely on the judgment of the people that they worked --

8   that worked for them but -- in performing that analysis.  It

9   was a very rigorous process.  And that's really how we arrived

10  at who we deemed to be critical, understanding that it is a

11  significant type of relief and it's not one to be taken

12  lightly.

13          THE COURT:  Okay.  I'm not going to press you further

14  on this except to say that it would be helpful to the Court to

15  have more of a record than you've provided to this moment in

16  understanding in greater detail and without general statements

17  how, in fact, particular vendors were identified for more

18  favorable treatment and what the thought process was that led

19  the deciders to conclude that particular vendors should receive

20  treatment that is more favorable.

21          Now, in other settings, where I have approved such

22  critical vendor motions, I have requested -- and perhaps the

23  order already makes this clear -- that the determination is not

24  a final determination.  In other words, if it turns out that a

25  critical or so-called critical vendor has received a hundred

RESIDENTIAL CAPITAL, LLC, et al.                                        29

1    cent payments and a creditors' committee later were to

2    determine that that vendor was actually not critical and that

3    the determination was not made for the right reasons, that

4    would then not be an incontestable payment, that the payment

5    would be subject to potential clawback under 549.

6            MR. ROSENBAUM:  Your Honor, may I have a minute to

7    consult, see if we can present a better record or if the

8    alternative is acceptable?

9            THE COURT:  Fine.

10           MR. ROSENBAUM:  Thank you.

11       (Pause)

12           MR. ROSENBAUM:  Thank you for the indulgence, Your

13   Honor.  We'd like to propose the following in terms of the

14   critical vendor relief.  Mr. Whitlinger would sign off on each

15   payment.  Whoever is seeking the payment would report to Mr.

16   Whitlinger.  Mr. Whitlinger and others that work closely with

17   him will continue to work with FTI in assessing this and will

18   include the framework that Your Honor outlined allowing the

19   committee to have its review and the clawback provision.

20           THE COURT:  Okay.

21           MR. ROSENBAUM:  Thank you.

22           THE COURT:  Does the U.S. Trustee have any comment on

23   this?

24           MR. MASUMOTO:  Yes, Your Honor.  Good morning, Your

25   Honor.  Brian Masumoto for the Office of the United States

1  Trustee.  Your Honor, we certainly appreciate the caveats and

2  restrictions that the Court has imposed.  We certainly endorse

3  them.

4          In addition, we would like to make sure that the

5  debtor will also represent, as I believe we've received

6  representation, that there won't be an acceleration of any

7  payments pursuant to any of these orders.

8          In addition, we would like to have a list of the

9  payments that are being made so that we can present those to

10  the creditors' committee, hopefully which will be appointed

11  shortly, in order to be able to evaluate what amounts.

12          We also, for purposes -- it's not clear to what extent

13  will be applicable, but to the extent that they are making

14  payments in the near future, we do need that information for

15  purposes of the appointment of the creditors' committee.  To

16  the extent that they're paying off critical vendors or seeking

17  to be on the committee, we would obviously need to have that

18  information.

19          THE COURT:  Those seem like reasonable requests.  I

20  assume the debtor won't have a problem complying.

21          MR. ROSENBAUM:  There's no objection, Your Honor.

22          THE COURT:  Fine.  Is there anything more on this?

23          MR. ROSENBAUM:  I don't have anything further, Your

24  Honor.

25          THE COURT:  Well, with the qualifications that have

1    just been stated on the record, it's approved.

2            MR. ROSENBAUM:  Thank you, Your Honor.

3            THE COURT:  You're a little late.  You're a little

4    late but come on forward.

5            MR. NEIER:  Good morning, Your Honor.  David Neier on

6    behalf of Fannie Mae.

7            I was a little bit confused and taken aback by the

8    presentation because we were told there were four related

9    motions and now we seem to be going on the sequential path that

10   we started yesterday.  So I can save my remarks for later

11   motions where they're more relevant but they're also relevant

12   to this motion.

13           THE COURT:  Well, I was a little confused by the

14   presentation as well in the sense that I heard a lot of

15   different things mentioned as part of the operational package.

16   I assumed that we were doing them sequentially and that while

17   we talked generally about the motions that we were doing this

18   sequentially which was the pattern established yesterday.  So

19   as far as I'm concerned, I've approved one motion.

20           MR. NEIER:  Okay.  Well --

21           THE COURT:  The first one.  But if, in fact, it was

22   debtors' counsel's intention for this to be presented as an

23   integrated package, that was not made clear to me nor is the

24   record clear on that.

25           MR. ROSENBAUM:  Your Honor, that was not our intention

1   and we're ready to proceed to the next motion which, I think,

2   to be --

3              THE COURT:  Okay.

4              MR. ROSENBAUM:  -- of more interest to Mr. --

5              MR. NEIER:  Well, I guess I would just say at this

6   point, Fannie Mae is the largest owner of the loans being

7   serviced by the debtor well in excess of 100 billion dollars,

8   probably in excess of 150 billion.  I think number two would be

9   Freddie Mac.  And number three would be Ginnie Mae.  Mr. Moak

10  and Mr. Cordaro are here representing their interests.

11             I guess I would say that there are certainly things we

12  find objectionable in the motion, and we may well object.  But

13  we are not opposed to the interim relief being sought by the

14  debtors.  Obviously, we hope to resolve any differences between

15  now and the final hearing.  Some of those issues concern the

16  splitting, if you will, of origination and servicing functions

17  in the different motions.  The debtors have included servicing

18  functions in the origination motion which creates a big problem

19  for us and may well result in objection at the final hearing or

20  may result in some kind of resolution between now and the final

21  hearing among the parties.  I think my colleagues might have

22  some of the same objections, as well.

23             THE COURT:  Well, before I hear from them, I just want

24  to understand what you're saying.  Which of the motions concern

25  you or do all the motions concern you?

RESIDENTIAL CAPITAL, LLC, et al.                                          33

1       MR. NEIER:  Really just two, the origination and the

2   servicing motion with respect to the Ginnie Mae, Freddie Mac

3   and Fannie Mae.  And if we're not considering them on an

4   integrated basis, we would go up each time and address the

5   specific points.

6       THE COURT:  To what extent is there anything before

7   the Court right now that changes ordinary course practices that

8   have been in effect pre-bankruptcy?

9       MR. NEIER:  As an integrated package, there is nothing

10  that changes ordinary course except there is a cash collateral

11  component to the servicing motion which I'm sure we'll get into

12  when the debtors present that motion.

13      THE COURT:  And is that what concerns you or is the --

14      MR. NEIER:  No.  I think we've reached -- we've

15  basically reached an agreement on the form of acceptable order

16  with respect to that aspect of the servicing motion.  But --

17      THE COURT:  Okay.  So I'll admit to being confused.

18  We have a package of motions.  We're taking them one at a time.

19  But we're describing them in an integrated way.  The purpose of

20  the motions taken together is to continue ordinary course pre-

21  bankruptcy conduct during the post-petition period so that

22  mortgages will continue to be originated and serviced in a

23  manner comparable to, if not precisely identical to, the way

24  that business has been conducted before yesterday.

25      MR. NEIER:  Yes.  And I think all of us are supportive

RESIDENTIAL CAPITAL, LLC, et al.                                34

1   of those efforts because they are the largest asset of the

2   debtors and their most important piece of their reorganization

3   efforts.

4           THE COURT:  Okay.  Fair enough.  So I'm just trying to

5   understand something.  You stood up and you indicated that

6   while you had no objection, for purposes of the entry of

7   interim relief, to what the debtor was seeking today that you

8   might have concerns that you will be addressing at the time of

9   the entry of final orders --

10          MR. NEIER:  Yes.

11          THE COURT:  -- sometime in the future.

12          MR. NEIER:  Yes, Your Honor.

13          THE COURT:  What's unclear to me is what those

14  problems are.  And I don't know if you want to inform the

15  debtor and other parties-in-interest what those problems are

16  now because it's not clear to me what they are.

17          MR. NEIER:  Okay.  I think the debtors are well aware

18  of the problem.  But the major issue is that we view the

19  servicing motion and the origination motion, which are actually

20  trying to get ordinary course under the same contract -- it's

21  the same contract or the same agreements, the same set of

22  agreements, for Fannie Mae, for Freddie Mac and for Ginnie Mae

23  that they've split into two different motions.  And they're

24  saying these are origination functions and these are servicing

25  functions, in their business judgment.  But they're one

1    contract.  And they're seeking ordinary course servicing and

2    origination under one agreement.

3            We think those things are intertwined.  We don't think

4    that they should be in two different motions.  And we don't

5    think that the relief requested is necessarily precisely split

6    in a proper way even if you were to think of them as separate

7    items for requesting relief.  So we think that, for instance,

8    having servicing errors as one of the things that they're going

9    to seek to correct in the ordinary course in the origination

10   motion is not correct.

11           THE COURT:  Okay.  So part of this is form rather than

12   substance.  I don't mean to denigrate it or diminish your

13   argument.  But you're concerned that there's a motion which is

14   seeking to do something under the label of, call it, servicing

15   that actually, in your view, is in the origination function and

16   vice versa.

17           MR. NEIER:  That's correct, Your Honor.

18           THE COURT:  Okay.

19           MR. NEIER:  And in some sense, it is form, but form

20   matters.

21           THE COURT:  I know it does.  That's why I'm here.

22           MR. NEIER:  Yes, Your Honor.

23           MR. NASHELSKY:  May I address Your Honor?  I may be

24   able to resolve this quicker.

25           THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    36

1          MR. NASHELSKY:  Your Honor, Larren Nashelsky again

2   from Morrison & Foerster.  The debtors did not split this up in

3   an attempt to create a permanent ruling by Your Honor that

4   these are all separate functions.  We split it up because we

5   believed that was the easiest way for parties to understand and

6   the way we have an origination business and a servicing

7   business.

8          I think we can represent that nothing in these orders

9   is going to affect anybody's rights to argue agreements are

10  integrated, agreements are one, cannot be bifurcated or

11  otherwise.  I think that's Mr. Neier's concern.  That's not the

12  intent of these orders to create that.  It's just to get the

13  relief we're requesting.  And we represent that we are not

14  trying to do that in these orders.  And I think that should

15  address his concern.

16         MR. NEIER:  Your Honor, that does address our concern.

17  I think it might the concerns of Freddie Mac and Ginnie Mae as

18  well.

19         THE COURT:  Since we're dealing with this subject, let

20  me just confirm that every potential agency that might have a

21  concern in fact is satisfied by the statements just made by

22  debtors' counsel.  And if you don't say anything, you'll be

23  deemed satisfied.

24         MR. NEIER:  Your Honor, with respect to agencies,

25  Freddie Mac and Fannie Mae are not agencies.  We're just now

RESIDENTIAL CAPITAL, LLC, et al.                                    37

1  owned by the government much like the debtors.  A lot of the

2  people are owned by the government but are not the government.

3  Mr. Cordaro is actually the government.  And our --

4          THE COURT:  I have a really hard time --

5          MR. NEIER:  The agency that regulates us is here.

6          THE COURT:  -- distinguishing the government from GSEs

7  and government-owned businesses that end up in bankruptcy.  So

8  I'm sorry that my language was imprecise.

9          MR. NEIER:  No.  It's not -- it's common parlance.

10          Your Honor, I think I can reserve the rest of what I'm

11  saying for when we get to the servicing motion.  I did want to

12  add one comment with respect to Mr. Nashelsky's opening remarks

13  which is that I believe they've submitted a DIP order to your

14  chambers.  We had request --

15          THE COURT:  I don't have it yet.

16          MR. NEIER:  Okay.  We had requested certain changes to

17  that which I understand were not included.  We're going to

18  reserve those comments as well for the final hearing.  Thank

19  you, Your Honor.

20          THE COURT:  Okay.  Now, I don't mean to squelch

21  comments from others who may wish to be heard on the subject

22  just covered.  Is there anyone who actually wishes to be heard

23  on that?

24          Okay, apparently not.

25          MR. ROSENBAUM:  Your Honor, the next item on the

1  agenda is at docket number 57.  And it's item number 13 on the

2  agenda, Your Honor.  And this was just previewed a little

3  bit -- is the motion of the debtors to continue servicing

4  functions in the ordinary course.  But this is specific to a

5  loan securitized with -- I'm going to have trouble not calling

6  them agencies but I'll try -- Fannie Mae, Freddie Mac and

7  Ginnie Mae.

8           THE COURT:  What would you call them?

9           MR. ROSENBAUM:  Well, we believe that a proper term

10  may be government associations.

11           THE COURT:  I saw that term and I'd never seen that

12  used before.

13           MR. ROSENBAUM:  Based on our view, it seemed to be an

14  acceptable definition for the agencies.  I understand their

15  sensitivity.  And I think the term GSE probably gets thrown

16  around a little too casually.  So we were trying to come up

17  with something that recognizes their concerns and helps us a

18  little bit with the shorthand.

19           THE COURT:  So we'll call them government

20  associations?

21           MR. ROSENBAUM:  That's fine with me, Your Honor.

22  That's what we suggest.

23           THE COURT:  Okay.

24           MR. ROSENBAUM:  Again, this is the authority to

25  continue servicing in the ordinary course with respect to

**RESIDENTIAL CAPITAL, LLC, et al.**                           39

1  Fannie Mae, Freddie Mac and Ginnie Mae securitizations.  Your

2  Honor, this is again something we worked closely with those

3  parties over the past several weeks.  There are items in this

4  motion and the relief sought that are specific to those

5  parties, to the associations.  And I can highlight some of

6  them, Your Honor.  But before I get there, some of the critical

7  relief that we're seeking in this motion, although it is

8  ordinary course, is to continue to fund advances as we defined

9  in the motion.  And those relate to corporate advances,

10  advances of principal and interest and advances of taxes.

11  We're required to do that under our different securitization

12  agreements and vehicles.  That's something absolutely critical

13  to the continuing operation of the business.

14          With respect to corporate advances as defined in the

15  motion, those primarily relate to advances that we make when

16  the properties go into foreclosure.  And those are related to

17  maintaining the properties in foreclosure and conducting the

18  foreclosure sales in certain instances.

19          Your Honor, this motion also has a critical vendor

20  component.  Our goal in doing this was to try to isolate

21  vendors -- that's critical vendors -- between origination and

22  servicing.  And we would clearly adopt the protocol that we

23  just agreed to or reviewed with the origination motion as part

24  of this servicing order.

25          THE COURT:  That's fine.

**RESIDENTIAL CAPITAL, LLC, et al.**                    40

1          MR. ROSENBAUM:   Thank you, Your Honor.   Your Honor,

2    part of the servicing function, a critical and important part

3    relates to foreclosure sales and conducting foreclosure

4    proceedings.   As servicers, the debtors are currently a party

5    to approximately 31,000 foreclosure proceedings.   And to allow

6    that process to continue in light of the bankruptcy filing,

7    what we are proposing in this motion and the proposed order is

8    to allow the defendants in those actions relief from the

9    automatic stay on a blanket basis, if you will, to assert their

10   counterclaims so we can allow those proceedings to continue as

11   uninterrupted as possible.   I, frankly, learned in the past two

12   days that that's already happening so this is an important

13   component of the motion.

14          The limitation that we put on granting this relief

15   from the automatic stay on a going forward basis without coming

16   back to court or other procedural vehicles is that the defense

17   or counterclaim has to relate to the subject of the

18   foreclosure.   It wouldn't relate to a TILA action or actions

19   related to the securitization that parties might bring.   We

20   would ask, Your Honor, that in some sense, the debtors be given

21   that discretion.   And to the extent the debtors felt that the

22   counterclaim asserted did not relate to the subject of the

23   foreclosure, those parties would be free to come to court as

24   they would be had we not gotten this relief to begin with.

25          THE COURT:   I'm not sure how that works in practice.

1  And I heard, and I think I understand the words you've used but

2  I need a better understanding as to how this is going to work

3  in the field.  You have pending foreclosure litigation.  We're

4  talking about claims that may be made within that pool of

5  litigation which is all over the country.

6          MR. ROSENBAUM:  That's correct.

7          THE COURT:  Defendants are either going to raise

8  claims that are subject to or not subject to the automatic stay

9  but that characterization is going to be ultimately in the

10 debtors' discretion?  That's where I'm having some trouble.

11         MR. ROSENBAUM:  Understood.  Well, I think the

12 starting point is, we would obviously not concede for all

13 purposes but for the purposes of going through and continuing

14 until these foreclosure proceedings could continue

15 uninterrupted, we start with the position that we believe the

16 counterclaims would be subject to the automatic stay.  And I

17 understand there's different case law on that issue.  But I

18 don't think there's a controlling precedent on that.  So we

19 start from the position that technically these parties, in

20 bringing even related counterclaims, could be in violation of

21 the stay.  So as the initial matter, we want to do away with

22 that hurdle; I know in my own practice it's something we face

23 all the day.  So we believe the counterclaim really shouldn't

24 be stayed but technically it is.  So we'd like to remove that

25 hurdle just to assure the hundreds and thousands of defense

RESIDENTIAL CAPITAL, LLC, et al.                                    42

1   counsel that they don't need to be worried about that.  It's a

2   matter of fundamental fairness to allow that proceeding to go

3   forward.

4          I think that what may be helpful if we try to work a

5   little harder with -- and again, it's a difficult process when

6   you have foreclosures in forty-nine states.  We could come up

7   with a little more guidance as to what might not be related to

8   the subject matter of the foreclosure.  But I think, for the

9   most part, what we're talking about are counterclaims that

10  really are related to the foreclosure.  So it's -- I think

11  maybe what we're struggling a little bit with is really

12  defining what wouldn't be subject to the relief we're

13  requesting.  But I think the large majority of counterclaims

14  that we're concerned about would be.  So it's really the

15  exceptions that, frankly, caused us a little trouble as well in

16  trying to define them.  But I think for the most part --

17         THE COURT:  So what's the definition?

18         MR. ROSENBAUM:  The definition we'd like to use is

19  that it's something that's related to the subject matter of the

20  foreclosure that would be a defense to the foreclosure action

21  itself not seeking a monetary relief against the debtors for

22  something that, although it maybe related to home ownership and

23  a mortgage, had nothing to do and wouldn't be barred to the

24  foreclosure.

25         THE COURT:  So is it your attempt to, in effect,

**RESIDENTIAL CAPITAL, LLC, et al.**                                      43

1    protect defense counsel, wherever located, from the argument

2    that they will be violating the automatic stay provided that

3    their defenses are all "related" to the foreclosure itself, but

4    to require those lawyers to seek relief from the stay whenever

5    seeking affirmative monetary relief against the debtor?

6           MR. ROSENBAUM:  That's essentially it, Your Honor,

7    yes.  I don't know if we can put into the exact bucket of

8    monetary relief but I think that's how we envision it.  And

9    that would be the most efficient way to apply this.

10          THE COURT:  The reason I'm struggling with this is

11   that from an individual defendant's perspective, and

12   particularly a lawyer that may or may not be familiar with

13   bankruptcy practice, it may be a mixed and ambiguous bag, the

14   defenses that are being raised.  And if there is potential risk

15   being assumed by that lawyer and the lawyer's client in raising

16   these issues without obtaining stay relief, there may be a

17   flood of requests for stay relief unless there is something

18   akin to a blanket exemption from the stay unless there are very

19   clear signs that was is occurring in the case is subject to the

20   stay or should be subject to the stay.  And it's very hard to

21   fashion general language at the beginning of the case that

22   applies to litigation that's everywhere that's being handled

23   presumably in non-uniform fashion.

24          MR. ROSENBAUM:  I couldn't agree more, Your Honor.

25   It's very true.  What -- one second, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                              44

1          Sorry, Your Honor.

2              MR. NASHELSKY:  We're checking with the general

3     counsel.  We may be able to resolve this, Your Honor.

4              THE COURT:  Okay.  Do you want to take a break or you

5     just want to con --

6              MR. NASHELSKY:  No.  I just need one minute.

7              THE COURT:  -- want to confer?

8         (Pause)

9              MR. NASHELSKY:  Your Honor, I think we need a minute

10    on this.

11             THE COURT:  Does that mean that we're going to take a

12    little break?

13             MR. NASHELSKY:  Yes.

14             THE COURT:  Okay.

15             MR. NASHELSKY:  Yes, Your Honor.

16             THE COURT:  Let's take a ten-minute break.

17        (Recess from 11:45 a.m. until 12:03 p.m.)

18             THE COURT:  Be seated, please.

19             MR. ROSENBAUM:  Thank you, Your Honor, for the

20    indulgence.  And again, Norm Rosenbaum, Morrison & Foerster,

21    for the debtors.

22             Your Honor, we consulted with various people in the

23    courtroom; obviously, this is a matter of interest to many

24    constituents.  And we believe the best course of action is to

25    allow a blanket relief for any counterclaim in the foreclosure

**RESIDENTIAL CAPITAL, LLC, et al.**                                    45

1  proceeding.  We'll do this on an interim basis.  And hopefully,

2  our experience will inform us if we need to make any changes or

3  if that results in any problems that need to be addressed and

4  we can address it at the final hearing.  If for some reason

5  this becomes a problem unanticipated with actions of

6  defendants, obviously we reserve our rights to come to this

7  court to address it.  But we think that it would be a workable

8  solution and we'll hopefully learn what we need to learn before

9  the final hearing if we need to make any adjustments.

10          THE COURT:  Okay.  That's fine.

11          MR. ROSENBAUM:  Thank you, Your Honor.

12          Your Honor, that's -- an important part of the relief

13  requested in this motion is to allow and permit the debtors to

14  continue the benefit of the financing under an early financing

15  facility with Fannie Mae.  It's basically in the nature of a

16  cash collateral accommodation.  This was a facility in place

17  prior to the filing.  We would continue -- the debtors would

18  continue to have the opportunity to access and utilize this

19  cash collateral.  These are basically Fannie advancing on

20  advances that the debtors have made that they're otherwise

21  entitled to recoup.  So it really is a early -- hence the term

22  "early advance facility".  Fannie Mae and the company

23  negotiated terms for adequate protection and the terms of

24  the -- under which the advances would continue to be made.

25  Those are incorporated into the motion and an exhibit to the

**RESIDENTIAL CAPITAL, LLC, et al.**                                          46

1    motion.  And we'd ask Your Honor to approve it on that basis.

2             Your Honor, I've also -- as this --

3             THE COURT:  I think --

4             MR. ROSENBAUM:  -- motion again was --

5             THE COURT:  I think there's going to be a comment.

6             MR. NEIER:  Never mind.  He's not done with this

7    motion.  I thought he was done with this motion and was moving

8    on to the next motion.  We can --

9             THE COURT:  Okay.  You're --

10            MR. NEIER:  -- address this --

11            THE COURT:  Do you want to say anything now?

12            MR. NEIER:  We can just address this part of it.

13   There are certain changes to the order which I believe the

14   debtors have agreed to with respect to the cash collateral

15   component.  And I believe Citibank has requested some language

16   and we've agreed to that language as well with Citibank with

17   respect to the cash collateral component of the servicing

18   motion.

19            THE COURT:  Okay.

20            MR. ROSENBAUM:  That's correct, Your Honor.  And we'll

21   address the changes to the order when we're done with the --

22   covering the relief in this motion which will be very brief.

23            The additional relief requested in this motion, again,

24   in consultation with Fannie, Freddie and Ginnie Mae, were

25   allowing specific reporting requirements that we've agreed to.

**RESIDENTIAL CAPITAL, LLC, et al.**                    47

1   Those are both set forth in the motion.  In addition, there is

2   an adequate assurance component regarding the future servicing

3   function and future service capabilities.  We've identified

4   those in two separate appendices to the motion both for Fannie

5   and Freddie, again, things that were negotiated between the

6   associations and the debtors.

7          In addition, Your Honor, we've also -- as part of this

8   motion, we filed a motion under seal for one exhibit to this

9   motion.  And that relates to metrics that were agreed to

10  between Freddie Mac and the company with respect to certain

11  servicing performance requirements or metrics that if the

12  debtors were not able to comply with, Freddie Mac would have

13  the right to remove servicing for their portfolio.  We feel

14  very confident that we'll have little difficulty in complying

15  with those metrics.  We're an excellent servicer for Freddie

16  Mac but, again, this is a consensual process as much as it can

17  be and we agreed to those terms.  Freddie Mac was sensitive and

18  I believe the debtors are to having those metrics in a public

19  document.  And we requested authority to file it under seal

20  pursuant to separate motions.

21          THE COURT:  I'm slightly confused by what you've

22  just --

23          MR. ROSENBAUM:  Sure.

24          THE COURT:  -- brought into the equation.  Are you

25  moving to that motion now or are you simply mentioning the fact

1    that that motion is one that we're going to be hearing in due

2    course?

3              MR. ROSENBAUM:  I did go out of order, Your Honor.

4    That is --

5              THE COURT:  Are you testing to see if I'm paying

6    attention?

7              MR. ROSENBAUM:  Well, you did a good job.  Let me look

8    at the calendar; sorry.  It was the following motion, number

9    14.  I can address it after this one.  But perhaps it should

10   have been number 12.  And I can address it after.  But that's

11   what the motion to seal related to.

12             Your Honor, the last component of this request was

13   reiterating and I'm sure -- Mr. Nashelsky addressed this

14   yesterday, but we're basically seeking as a comfort basis the

15   authority to continue to honor our commitments under the

16   settlement that the Department of Justice and the various AGs

17   and the consent order with the Federal Reserve Board.

18             That completes that motion, Your Honor.  There were

19   agreed upon changes to the order that I can --

20             THE COURT:  Okay.  Just so the record's clear, when

21   you say that completes that motion --

22             MR. ROSENBAUM:  This motion, number 13.

23             THE COURT:  Okay.  13.  We've also talked about 14.

24             MR. ROSENBAUM:  We did talk about 14.

25             THE COURT:  We're only talking about 13 right now.

RESIDENTIAL CAPITAL, LLC, et al.                                                    49

1          MR. ROSENBAUM:  That's correct.

2          THE COURT:  Okay.  And let's hear, since you've

3   completed your presentation, if there are comments from others

4   with regard to the substance of the motion.  Let's hear from

5   the U.S. Trustee and then anybody else.

6          MR. MASUMOTO:  Good morning, Your Honor.  Brian

7   Masumoto for the Office of the United States Trustee.  Your

8   Honor, just to -- wanted some clarification with respect to the

9   use of the cash collateral aspect.  I believe this is sort of

10  styled as a final order so it's not -- I don't believe it's --

11  is that correct?  There's no --

12         MR. NASHELSKY:  No.  It's interim/final.

13         MR. ROSENBAUM:  It's interim.

14         MR. MASUMOTO:  Oh, it's an interim?  For some reason,

15  I don't have the interim order.  But to the extent that the

16  interim order provides for liens -- replacement liens and

17  superpriority admin expense claims over Chapter 5 causes of

18  action, we reiterate our concern before the formation of a

19  committee.

20         I believe counsel has indicated that that would

21  include the carve-out for Chapter 5 causes of action for both

22  the replacement liens and the superpriority admin expense.

23         MR. ROSENBAUM:  That's acceptable from the debtors'

24  perspective, Your Honor.

25         THE COURT:  Okay.  Does anyone else have any comments

1  to make with regard to the motion we've been talking about

2  which is described at agenda number 13?

3          MR. SOSNICK:  Good afternoon, Your Honor.  Fred

4  Sosnick from Shearman Sterling on behalf of Citibank.  As Mr.

5  Neier said, I think we did agree on language.  I just wanted to

6  be a little bit careful about what we say.  It's not just their

7  cash collateral issues.  We actually don't have any problem

8  with the way the cash collateral order is working.  But if Your

9  Honor recalls from last night, there was discussion in

10  Citibank's cash collateral order about our rights being subject

11  to an acknowledgment letter with both Fannie Mae and Freddie

12  Mac.  That same acknowledgment letter has protections for us in

13  the event that servicing is moved.  And paragraph 23 of the

14  order is basically this automatic movement of servicing.  And

15  we just wanted to make sure that nothing affects our -- affects

16  the obligations of Fannie Mae or Freddie Mac in that.  And

17  that's what that language is addressing.  It's actually not

18  addressing the cash collateral per se.  It's addressing the

19  movement of servicing more.  I just wanted to clarify just

20  for --

21          THE COURT:  I heard your point.  I'm not sure that I

22  can give you the assurance you seek.

23          MR. SOSNICK:  No.  Your Honor, it's -- I'm sorry.  It

24  would be in the lang -- we would add a proviso in the order.

25  That's the agreed upon language that we're all talking about.

1   I just wanted to make clear it was not just cash collateral.

2          THE COURT:  Do you have agreed language on that?

3          MR. ROSENBAUM:  Yes, we do, Your Honor.

4          THE COURT:  Okay.

5          MR. NEIER:  Yes, we do, Your Honor.  I just -- just

6   while you were doing -- while the debtors were making this

7   presentation, I believe Ally Financial asked for a slight

8   change to the exhibit.  And that's also acceptable.  It

9   shouldn't materially affect anything.  It just confirms that

10  they also -- to the extent they're providing post-petition

11  credit in the origination motion, that would -- any

12  superpriority claim for Fannie Mae would be behind that.  And

13  the U.S. Trustee's comments -- they're perfectly fine because

14  we're behind that as well.

15         THE COURT:  Okay.

16         MR. NEIER:  I'm sorry that's confusing.  Do you want a

17  further explanation?  I can --

18         THE COURT:  Well, I think now we're going to hear from

19  Wells Fargo's counsel.  So I'm really sorry you brought that

20  up.

21         MR. DONNELL:  No.  Not in response to that.  Your

22  Honor, for Wells Fargo.  We just -- there are provisions in

23  this order purporting to give Ally Financial certain rights and

24  priorities.  We would just request the same reservation of

25  rights that we had yesterday in connection with the cash

1   management order.

2              THE COURT:  I just heard this morning that you're

3   going to be gone within days.  Is that true?  I mean, did you

4   hear the same thing I heard?

5              MR. DONNELL:  I don't agree with that, Your Honor, no.

6              THE COURT:  You don't agree with the fact that that

7   was said in court today?  Or you --

8              MR. DONNELL:  That I'm going to be gone.  I'm --

9              THE COURT:  I heard that you're going to be -- that

10  the account that you're concerned with is going to be closed.

11             MR. DONNELL:  That may be correct.  I'm not disputing

12  that.  But our claims -- we would continue to maintain our

13  claims against Ally Financial and our priority rights against

14  Ally Financial.

15             THE COURT:  Didn't you work out an agreement yesterday

16  with Ally Financial that was put on the record?

17             MR. DONNELL:  Yes, sir.  And I just want the same

18  reservation of rights to apply to what Ally Financial is

19  getting here.  That's all we request.

20             MR. NASHELSKY:  Your Honor, the confusion is nothing

21  in this motion has anything to do with Ally Financial.  I think

22  he's referring to the earlier origination motion which you

23  already approved which, I think, is probably where that would

24  have been referred to.  But -- because that's where Ally is

25  providing on credit the loans that are getting originated.  I'm

1  not sure where in this order -- but we'll work with him.  I

2  don't see a problem.

3        MR. DONNELL:  Thank you.

4        THE COURT:  Okay.  I don't know about you but I don't

5  understand what just happened.  And if you do, you're a better

6  man than I.

7        MR. ROSENBAUM:  I assure you I'm not, but I think we

8  understand the changes that we've agreed to make to the order.

9  And we will do that.  Your Honor, if no one else is going to be

10  heard on that, I think we're ready to proceed to the next

11  matter on the calendar.

12        THE COURT:  Which is sealing.

13        MR. ROSENBAUM:  Which is sealing.

14        THE COURT:  I looked at the attachment.  As to this

15  document, I personally do not have any concerns about sealing.

16  But I want to defer to counsel for the U.S. Trustee.  I looked

17  at the document and found it to be remarkably hard to decipher

18  as a layperson and recognized that at least it is represented

19  to include a number of confidential metrics.  But I'll hear

20  from counsel for the U.S. Trustee.  It's a one-pager.

21        MR. MASUMOTO:  Your Honor, during the break, the

22  counsel to the debtor provided us a copy -- counsel to Barclays

23  provided us a copy of several key --

24        MR. MARINUZZI:  Excuse me.  Brian, this is -- he's on

25  the other seal motion.

1        MR. MASUMOTO:  Oh, okay.  Wait.  Oh, I'm sorry.

2        MR. MARINUZZI:  This is the Freddie Mac standards.

3        MR. MASUMOTO:  I'm sorry.  This is the Freddie Mac?

4   My apologies.

5        THE COURT:  Well, while you're up, do you have any

6   issues with regard to the one-page document which sets forth

7   servicing metrics?

8        MR. MASUMOTO:  Your Honor, I don't think we saw a copy

9   of that.  I mean, we got binders today and I didn't see that

10  attachment.  I haven't seen that sealed -- they provided us

11  with a copy of the fee letter sealed just during the break.

12  But I'm sorry, Your Honor.  I guess the material we have did

13  not include that attachment.

14       THE COURT:  Can you provide that to the U.S. Trustee?

15       MR. ROSENBAUM:  Absolutely, Your Honor.  That's my

16  oversight and I can do that.

17       MR. MOAK:  Your Honor, Paul Moak on behalf of Freddie

18  Mac.  I have a copy right here.  Actually, as filed, it was

19  intended to be -- a copy of it was intended to be provided to

20  the U.S. Trustee.  So I don't know why it was not.  But they're

21  the one party who we agreed could see it.

22       THE COURT:  Okay.  Why don't we give them an

23  opportunity to take a minute to look at the document?  And

24  let's reserve on the sealing motion.  But before we move on to

25  the next motion, let me inquire if any other party-in-interest

RESIDENTIAL CAPITAL, LLC, et al.                                          55

1  has any issues with respect to the proposed sealing of this

2  motion -- of this attachment.

3        MR. SOSNICK:  Your Honor, Fred Sosnick again from

4  Shearman & Sterling for Citibank.  I think we may want to have

5  a discussion with the debtors and the government associations

6  over whether or not we should be seeing this, because our

7  rights, as we just explained, are subject to what happens with

8  them under our acknowledgment letters.  At this point, I'm

9  prepared to have it be sealed, subject to our ability at some

10  point to come back to the Court for relief in the event that we

11  can't work this out consensually.

12        THE COURT:  Fine.  And I'd like to be clear also as to

13  at least what my perspective is with regard to sealing motions.

14  I view them as temporal and circumstantial and subject to being

15  revisited for cause shown.  So to the extent that on an interim

16  order basis there is the grant of a sealing motion with the

17  understanding that certain parties may, subject to

18  confidentiality, have an opportunity to see the document in

19  question or to seek relief, I view this as a temporary sealing,

20  particularly in a situation such as this where I'm serving as

21  an understudy to Judge Glenn.

22        So I'm prepared, subject to any comments that the U.S.

23  Trustee may wish to assert at this point, to grant this on an

24  interim basis.

25        MR. MASUMOTO:  If it's on an interim basis, Your

1  Honor, it'll give us an opportunity to discuss with counsel,

2  I'm afraid, Your Honor, something that we did not see until

3  just now.  So I'd like the opportunity to discuss the matter

4  with counsel.

5           MR. ROSENBAUM:  Certainly acceptable to the debtors,

6  Your Honor.

7           THE COURT:  So that's approved on an interim basis,

8  subject to the ability of parties to obtain copies of the

9  document, subject to confidentiality restrictions and/or to

10  seek an unsealing of the document for cause shown.

11          MR. ROSENBAUM:  Thank you, Your Honor.  Your Honor,

12  the next item on the agenda is number -- item 15.  Your Honor,

13  though related to the motion we just discussed and presented,

14  this is a separate motion to continue servicing mortgage loans

15  in the ordinary course with respect to loans that were

16  generated through private label securitizations.  There's not

17  many differences between the motion to seek servicing -- to

18  continue servicing in the ordinary course with Fannie, Freddie

19  and Ginnie with respect to those loans and securitizations and

20  this current motion.  I can point out a couple of differences

21  that I think are relevant.  But again, the most part, this is

22  ordinary course request to continue the servicing functions.

23          Perhaps the biggest distinction is we are, as a

24  company, no longer involved in the securitization of loans for

25  private label purposes but we continue to service a large

1  amount of private label loans.  We're not seeking any special

2  relief for the securitization trustees similar to the relief

3  requested in favor of the Fannie, Freddie and Ginnie Mae in the

4  prior motion.

5        The one distinction in the current motion for the

6  private label securitization, in connection with the servicing

7  activities for those mortgage loans, the company does actually

8  conduct the foreclosure sales as part of its responsibilities

9  as servicer.  In addition, as part of this motion, the debtors

10  also do own certain properties which they're seeking to

11  foreclose upon.  We've asked for relief in this motion to sell

12  those properties on a going-forward basis free and clear of

13  interest under Section 363(f).  We do believe that, though,

14  it's an ordinary function of the company's business to do this,

15  we will report the results of those sales in our monthly

16  operating reports.  But other than that, we think it's pretty

17  ordinary-course, but we do want the protection of being able to

18  sell free and clear.  And I think that'll help facilitate any

19  resistance we might get in connection with those sales.

20        THE COURT:  Anything more on this?

21        MR. ROSENBAUM:  That completes the motion, Your Honor.

22        THE COURT:  Are there any comments with regard to this

23  motion?

24        I don't hear anything from anybody.  Does that

25  indicate consent or confusion?  Maybe a little of both.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    58

1    Anything from the U.S. Trustee on this?

2              MR. MASUMOTO:  No, Your Honor.  No objection.

3              THE COURT:  Well, I'm going to take silence as consent

4    to the entry of this order on an interim basis.

5              MR. ROSENBAUM:  Thank you, Your Honor.  The final

6    order in terms -- excuse me -- the final motion in terms of

7    this somewhat integrated presentation in terms of origination

8    and servicing is item 16.  This is a motion to continue

9    servicing activities under an agreement between Ally Bank and

10   GMAC Mortgage.  This agreement for which we seek authority to

11   continue to operate under is a replacement of a longstanding

12   agreement between Ally Bank and GMAC Mortgage which dates back

13   several years that was renewable annually.  We're advised that

14   Ally Bank no longer had the discretion to renew based on

15   requirements from the FDIC.  They bid out the servicing

16   contract to other parties but came to conclusion it was best to

17   renew with GMAC Mortgage.  And pursuant to this motion, we seek

18   authority to continue to provide servicing with respect to

19   mortgage service rights and mortgage loans owned by Ally Bank

20   continuing a longstanding relationship between the parties.

21             The terms of the agreement were renegotiated.  We

22   believe they're very fair to the debtors and -- on an economic

23   basis as well as in connection with this bankruptcy.  We did

24   agree to certain provisions in the proposed order that would

25   allow Ally Bank to seek to terminate the agreement in

**RESIDENTIAL CAPITAL, LLC, et al.**                                      59

1   accordance with its terms after 210 days.

2          Other than that, Your Honor, again, it's hopefully

3   business as usual under the agreement.  That would conclude our

4   presentation of that motion.

5          THE COURT:  All right.  Are there any comments with

6   regard to this motion?

7          MR. MASUMOTO:  No objection, Your Honor.

8          THE COURT:  All right.  It's approved.

9          MR. ROSENBAUM:  Thank you, Your Honor.  I believe the

10   next matter is on -- is number 17, and Mr. Marinuzzi will

11   address that.

12          MR. MARINUZZI:  Good afternoon, Your Honor.  The next

13   motion on the agenda is the debtors' motion to honor pre-

14   petition tax and regulatory license obligations.  It's in

15   keeping with the theme of business as usual.  This is

16   requesting both an interim and a final order.  And fortunately,

17   the debtors are mostly current with their franchise fees and

18   other licensing fee obligations as well as their taxes.  But

19   there are some amounts that are coming due that relate to the

20   pre-petition period.

21          In particular -- and fortunately, during the interim

22   period, there's not much that's due and owing.  The total of

23   what's due and owing during the interim period of what I'll

24   describe as the first twenty-one days of the post-petition

25   period is only about 18,000 dollars in regulatory fees.  That's

RESIDENTIAL CAPITAL, LLC, et al.                                60

1    not a lot of money -- which allows a committee to look at this

2    again in time for the final hearing.

3              There are no taxes due according to what the company

4    believes during this first twenty-one day period.  And the

5    largest portion of the pre-petition payments that would be made

6    directly by the debtors is really out -- extended when payments

7    become due probably ninety days or beyond.  But they are pre-

8    petition claims, so we are seeking authority to pay them.

9              There is an aspect to this motion that is different

10   from others, and that really is a function of the relationship

11   that we've just heard about through the servicing functions,

12   and shared services we'll hear a little bit about later.  And

13   that has to do with the fact that Ally, as the parent, pays

14   directly for the benefit of its subsidiary some of these

15   regulatory fees as well as federal taxes.  And the run rate has

16   generally been 70,000 dollars biweekly that ResCap will pay to

17   Ally.  And the way it works is the employees out in the field

18   that provide these services -- they're licensed as brokers in

19   helping with the servicing and origination business -- they

20   will use an Ally credit card.  And they will charge these fees

21   on their Ally credit card.  So it's an obligation that an

22   employee of ResCap incurs but it's paid by Ally.  And so, the

23   process is that the debtors will reimburse, on a biweekly

24   basis, the company for these credit card charges.

25              As I said, the run rate is 77,000 dollars or 70,000

**RESIDENTIAL CAPITAL, LLC, et al.**                                    61

1    generally.   Now there are payments that will have to be made as

2    people get their credit card statements or submit their

3    reimbursement requests, to the extent that they don't pay

4    directly with the Ally credit card, that are going to get

5    trapped in the system a bit.   But the reason we're asking for

6    this particular relief going forward in the future is because

7    our DIP order requires us to have Court approval of any

8    payments that are made by ResCap to Ally, which is

9    understandable; that's a negotiated term.   So what we want to

10   do in keeping with the theme of business as usual is to allow

11   our employees and those in the field to continue to use the

12   Ally credit card with Ally knowing that they'll be reimbursed

13   for those charges in due course.

14          Also, in recognizing the relationship, ResCap pays

15   quarterly estimated federal income taxes directly to Ally.

16   They contribute towards the consolidated tax obligations.   And

17   it's done under a pre-petition tax sharing agreement.   We're

18   not asking for authority to assume that agreement.   But there

19   will be a payment coming due in the middle of June -- I think

20   June 15th is the due date -- where we, effectively, treat Ally

21   as though they're the taxing authority.   In the same way we

22   would pay quarterly estimated federal income taxes to the

23   federal government, we would pay them to Ally instead.   And the

24   portion that relates to the pre-petition period is estimated to

25   be about three million dollars.

**RESIDENTIAL CAPITAL, LLC, et al.**                                    62

1          So on June 15th, what ResCap is asking for is the

2    ability to continue to honor those obligations and reimburse

3    Ally for the tax payments that it would be making on account of

4    ResCap.  And the way the tax share agreement is drafted, to the

5    extent the payment is not paid, it's as if you didn't make your

6    payments to the federal government.  There's a fee assessed

7    that it charges us on top of that, a late payment fee, in

8    effect.

9          But stepping back from that, this really is an

10   application cutting Ally out for the moment.  And if you put

11   them to the side, it's really an obligation to continue to be

12   able to make pre-petition regulatory and tax payments which

13   would otherwise potentially have priority or for which officers

14   or directors of the company might be liable themselves.

15         THE COURT:  I get that.  It's just that the money is

16   being paid to Ally and not to the government.

17         MR. MARINUZZI:  That's correct, Your Honor.  That's

18   correct.

19         MR. MASUMOTO:  I'm sorry, is counsel --

20         MR. MARINUZZI:  Yeah -- just, Your Honor, one point on

21   that.  I would assume, and I think this is correct, we're part

22   of a control group for tax purposes.  So to the extent that

23   Ally chose not to make federal income tax -- I'm not suggesting

24   that they won't; we hope that they will -- the government, in

25   theory -- or, actually, under law, could come after us for more

RESIDENTIAL CAPITAL, LLC, et al.                                              63

1  than our fair portion of those taxes.  Just wanted to add that

2  thought.  Thank you.

3          THE COURT:  So is ResCap a taxpayer itself?

4          MR. MARINUZZI:  No, it is not.

5          THE COURT:  Okay.

6          MR. MASUMOTO:  Good morning, Your Honor.  Your Honor

7  sort of put your finger on the point that concerned our office,

8  which is that the debtor is not making payments directly to the

9  taxing authorities.  It's an obligation of a nondebtor parent.

10 Accordingly, from our standpoint, we believe that based upon

11 the presentation, in fact, there will be no payments made,

12 certainly at least until a committee is in place.  And if

13 that's not the case, and there are any payments that may be

14 made prior to the formation of a committee, we would certainly

15 like to be apprised of those amounts.  But under the

16 understanding that all of the prospective payments, either

17 regulatory fees or taxes, will be -- should be made after a

18 committee is formed, we would like that provision to govern.  I

19 mean, we're essentially allowing the committee to weigh in and

20 determine whether or not these payments are appropriate.

21         Again, to emphasize the point Your Honor made, the

22 debtor itself does not pay the amounts directly to a taxing

23 authority.  In fact, it constitutes a reimbursement to a

24 nondebtor parent entity.

25         THE COURT:  What's your response to that?

**RESIDENTIAL CAPITAL, LLC, et al.**                                    64

1          MR. MARINUZZI:  Your Honor, we knew, obviously, this

2    was going to be an issue.  We had discussed with the U.S.

3    Trustee ahead of time.  And I began the presentation by

4    emphasizing that this was an interim order and that these

5    payments weren't going to come due until well after the

6    committee was formed.

7          I've been told, by the way, just to be clear, that

8    ResCap does itself pay and is a taxpayer for purposes of

9    franchise fees and certain franchise taxes as opposed to

10   federal income taxes.  I just want to make that point.

11         I think what we'd be prepared to do, since no payments

12   are being made to Ally at this point for reimbursement of

13   taxes, we would ask that the order be entered and that the

14   committee be given an opportunity to determine if it was

15   appropriate, in fact, to make those quarterly tax payments to

16   the parent.  I don't think that the concern is really with

17   respect to the reimbursement to the parent for the charges that

18   it is, really for a temporary period at least, absorbing on

19   account of our employees who are out in the field.  I don't see

20   that as the concern even though it is a reimbursement.  I think

21   the issue is really the tax payments.

22         MR. MASUMOTO:  Actually, Your Honor, it's sort of any

23   reimbursement to Ally at this point.  Given, as I said, the

24   hope that we'll have a committee in place shortly that all of

25   it be subject to the committee approval, perhaps the language

1    that Your Honor had indicated with clawback language for the

2    committee might be appropriate here.

3            MR. MARINUZZI:  Your Honor, I don't believe that the

4    payments that we're making during the twenty-one day period

5    have anything to do with Ally.  It's my understanding that

6    these are payments that are made directly by the company to

7    regulatory agencies.  Obviously, no one is opposing our payment

8    of those amounts.  We'll pay those amount with the Court's

9    permission.  We won't pay Ally any reimbursement for the taxes

10   or fees that are outlined in the motion, absent the final

11   order.  So it'll give us time to talk to the committee and help

12   them understand and hopefully get them on board.  And if

13   they're not on board and these are payments that the company

14   and Ally continue to desire that are made, we'll address it

15   with the Court.

16           THE COURT:  And what about your individual employees

17   that have Ally credit cards?  What's the effect on them?

18           MR. MARINUZZI:  Your Honor, if they're -- I don't know

19   under corporate policies it's an expense that they bore on

20   behalf of the company, effectively.  They just happen to use an

21   Ally credit card.  So I would envision that they would have a

22   claim against the company for the payments.  And then the issue

23   is whether we could treat it as a priority claim and actually

24   pay it or whether we're back in front of the judge trying to

25   get authority to make those pre-petition payments, depending

RESIDENTIAL CAPITAL, LLC, et al.                    66

1    upon the amounts and when they arose.

2              THE COURT:  I take it the fact that it's an Ally

3    credit card is coincidental.  It could be an American Express

4    card, for all practical purposes, correct?

5              MR. MARINUZZI:  Correct.  It's a corporate card that

6    Ally issued.  They're the bank; it's the Ally Bank.

7              THE COURT:  Why don't we wait for it?  The committee's

8    going to be appointed tomorrow.  It seems to me that it's

9    probably -- particularly if these are items that would exceed

10   an ordinary cap as a priority.  What kind of --

11             MR. MARINUZZI:  I don't think that that's --

12             THE COURT:  -- what kind of payments are they in terms

13   of amount?

14             MR. MARINUZZI:  Your Honor, according to my schedule,

15   the reimbursement to Ally for Ally credit card chargers are

16   70,000 dollars biweekly.  How that's broken down, I don't have

17   any more detail on that.

18             THE COURT:  So we don't know, at this point, other

19   than that bulk number, whether or not it's one employee with

20   70,000 or 70,000 employees with one dollar.

21             MR. MARINUZZI:  We don't.  We don't but I'm sure I can

22   obtain that information and get it to the U.S. Trustee to make

23   them comfortable.

24             THE COURT:  All right.  I think, partly given that

25   uncertainty, absent some demonstration of hardship to the

RESIDENTIAL CAPITAL, LLC, et al.                                67

1  individual, it seems to me that none of these payments should

2  be made until after a committee is formed and has a chance to

3  investigate this.  The amounts involved are not large, but I

4  think there's a special sensitivity as it relates to the

5  relationship between Ally and the ResCap companies and their

6  employees.  And so, while there may be nothing here, there's no

7  reason on day two to mandate outcomes that don't have to be

8  mandated.

9          MR. MARINUZZI:  Okay, Your Honor.  But with respect to

10 the licensing fees that the company pays directly and which are

11 coming due?

12         Ally's counsel is just indicating that that's fine

13 with Ally.  Sure, go ahead.

14         MR. HESSLER:  Good afternoon, Your Honor.

15         THE COURT:  You want to identify yourself on the

16 record --

17         MR. HESSLER:  Yes, sure.

18         THE COURT:  -- and speak louder than a whisper.

19         MR. HESSLER:  Yes, Your Honor.  Steve Hessler of

20 Kirkland & Ellis on behalf of Ally Financial and Ally Bank.

21 The construct that just was set forth to wait until after the

22 committee is in place, explain all these issues with them, get

23 all the requisite information before any of those payments

24 would be made, that's absolutely acceptable to Ally Financial

25 and Ally Bank, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                                     68

1      THE COURT:  Fine.  Thank you.

2      MR. HESSLER:  Thank you.

3      MR. MASUMOTO:  And Your Honor, with respect to Mr.

4  Marinuzzi's reference to licensing or franchise fees that are

5  directly paid by the debtor to the taxing authorities, as long

6  as they're not accelerated, we have no objection.

7      MR. MARINUZZI:  Your Honor, they're paid in the

8  ordinary course when they're due.  It's just that they happen

9  to come due during this twenty-one day period and it's 18,000

10  dollars.

11      THE COURT:  Fine.

12      MR. MARINUZZI:  Okay.  Your Honor.  We'll mark up the

13  order.

14      THE COURT:  Okay.  So with all those caveats, it's

15  approved.

16      MR. MARINUZZI:  Thank you.

17      THE COURT:  But I'm not sure what you've gotten as a

18  result of the approval.

19      MR. MARINUZZI:  The permission to pay 18,000 dollars,

20  it sounds like.

21      Your Honor, that brings us to the next item on the

22  agenda which is a request by ResCap for authority to honor

23  certain pre-petition obligations to customers.  Your Honor,

24  this is a function of how the servicing operations operate, and

25  it affects roughly 120,000 customers of ResCap. And these

RESIDENTIAL CAPITAL, LLC, et al.                                                    69

1    customers have determined that they want to take advantage of

2    insurance, typically, that's provided by a third-party service

3    provider.  And they bundle the payment with their mortgage

4    payment, and then it gets to ResCap, and ResCap collects a

5    small fee and then deducts -- takes some portion and sends it

6    directly back out to the third-party service provider so that

7    those services are maintained for the benefit of the customer.

8            Monthly, the company collects roughly 2.2 million

9    dollars in these service charges from their borrowers, and they

10   earn a fee of a little less than 400,000 dollars.  It's purely

11   administrative.  What happened was when they filed

12   approximately 975,000 dollars of these charges -- and they're

13   charges for the benefit of the third-party service provider --

14   got stuck in the system.  So what we're asking for is the

15   ability to be able to pay that amount of money to the third-

16   party service provider so we don't interrupt the services that

17   are being provided to the customers and let the customers know

18   it really is business as usual.

19           THE COURT:  These are conduit payments?

20           MR. MARINUZZI:  They're the conduit payments, Your

21   Honor.  Yes, exactly.

22           THE COURT:  Any issues?

23           MR. MASUMOTO:  No, Your Honor, as long as that's not a

24   form of acceleration or advance payment, we have no objection.

25           THE COURT:  It's approved.

**RESIDENTIAL CAPITAL, LLC, et al.**                    70

1          MR. MARINUZZI:  Thank you, Your Honor.

2          Your Honor, that brings us to the debtors' motion for

3    authority to provide notice to borrowers under home equity line

4    of credits that the debtors are no longer honoring draw

5    requests.  And just to be clear, we're not seeking approval

6    from Your Honor that the decision that the company has made is

7    fine.  That's the decision the company was economically

8    compelled to make, and I'll explain why in a second.  What

9    we're trying to do, as was done in the American Home Mortgage

10   case, is send to borrowers under the affected HELOCs, a notice

11   to let them know you're not going to be able to draw down on

12   your home equity line of credit any longer.  And it provides

13   them with notice so they understand they shouldn't expect to be

14   able to tap those funds if they're planning to do so in the

15   future.

16          Now, why is the company doing this?  The company is

17   doing this because of the enormous economic risk posed to them

18   by having these HELOC credit lines open.  And by order of

19   magnitude, if the home equity line of credits were drawn fully,

20   if people drew today what they were permitted to draw, the

21   company would have a draw of 400-plus million dollars today.

22   And Your Honor, we spent quite a bit of time yesterday getting

23   approval of the DIP financing, getting approval of cash

24   collateral orders, and the company simply doesn't have 400

25   million dollars to pay to HELOC borrowers.  Now, also, whatever

RESIDENTIAL CAPITAL, LLC, et al.                                    71

1  is loaned or funded for loans to HELOC borrowers, the company

2  can't expect to get it back.  So they'd send money out, but the

3  way the waterfall works -- for lack of a better description --

4  they get back a fractional portion of every dollar advanced.

5  So they're loaning money knowing they'll never see that money

6  back.

7            Third, Your Honor, if the company continued to honor

8  HELOC requests and some people -- not everybody but some

9  people -- pay down their HELOC loans and then really -- and

10  draw them back up.  And if that were to happen in this case

11  that people paid down their HELOCs and they still had the

12  ability to borrow, you're looking at a two billion dollar draw

13  request.  And that's just too much of a risk for the company to

14  bear.  And while in the ordinary course there were funds there

15  to maintain these operations -- because I think on average,

16  where the company had projected eighty-five million dollars of

17  draws under the HELOCs, the problem is now that the company is

18  in bankruptcy and it's public, the risk is that they'll be

19  inundated with draw requests.

20            And the notice that we'd like to provide is modeled

21  after the notice that the Court approved in American Home, and

22  it's attached to the order as an exhibit -- or to the motion as

23  an exhibit.  I don't know if the Court has any questions.

24            THE COURT:  I actually do have a question about this.

25  It's more theoretical.  In effect, what you're doing is giving

RESIDENTIAL CAPITAL, LLC, et al.                                    72

1   notice of a preemptive classwide breach of the contracts that

2   have been entered into with all of these borrowers and letting

3   them know that even though they entered into home equity lines

4   of credit with the full expectation of having availability,

5   that you're preemptively giving notice of breach, correct?

6          MR. MARINUZZI:  We're -- Your Honor, yes.  We're

7   letting them know that we've decided that we are no longer

8   honoring fund requests, yes.

9          THE COURT:  Okay.  And in addition to giving them

10  notice of the fact that you've welched on the agreement, are

11  you giving them any notice that they have rights in this

12  bankruptcy case as a result?

13         MR. MARINUZZI:  Your Honor, the notice itself does not

14  specify that they have rights but they'll -- we expect that

15  they will have claims.  They will get notice of a bar date and

16  they will file claims against the debtors' estates.  We're not

17  asking the Court to adjudicate any of those claims at this

18  point.  We recognize that they will have claims and we'll deal

19  with them in the claims process.  If Your Honor is requesting

20  that we add to the notice some provision regarding a bar date

21  that will be sought by the debtors at some point, that they

22  will receive notice of the bar date, then we can accommodate

23  the Court's concern there.

24         THE COURT:  My concern here is that you're dealing

25  with retail borrowers all over the country in a way that will

RESIDENTIAL CAPITAL, LLC, et al.                    73

1   cause consternation and confusion, I suspect.  And I think that

2   even though this is good for the company, it's obviously bad

3   for them.  And I think they should know a little bit more than

4   just that they're out of luck.  They should know that they have

5   legal rights and recourse to the extent that they're able to

6   demonstrate damages associated with the loss of access to these

7   funds.  And, frankly, I consider this to be a fairly important

8   matter.

9           MR. MARINUZZI:  Your Honor, as do we.  We recognize

10  that it's very important, and we understand that it will have

11  broad effects on our HELOC borrowers, and this is not something

12  we want to do; it's something, unfortunately, we have to do

13  based on the economic realities.

14          THE COURT:  I'm not saying you can't do it.  What

15  I'm -- in effect, you're exposing yourself to whatever claims

16  these parties choose to assert.  I'm concerned that the notice

17  be very explicit in giving the parties affected by this a

18  roadmap as to what they can now do, not just that they're going

19  to have to wait for some unknown period of time before a bar

20  date is put together.  I think parties have a right to know

21  what the debtor is contemplating in the notice.

22          MR. MARINUZZI:  That's fair, Your Honor.  So we'll

23  provide some more detail on the rights of HELOC borrowers.  One

24  thing I failed to note, but I think this is a positive thing.

25  There is an opportunity because -- we're okay servicing these

RESIDENTIAL CAPITAL, LLC, et al.                                    74

1   HELOC mortgages; that's not an issue.  The issue is when we

2   actually have a funding obligation that presents a problem for

3   us.  And so to the extent we are servicing these HELOC

4   mortgages for someone else, whether it's Ally or another bank

5   and Ally, in particular, is one that has already come to the

6   table because they were aware of the bankruptcy filing and

7   could take measures.  We're happy continuing to allow Ally, in

8   its case, to fund these HELOC requests when we get draws.  And

9   Ally has agreed that instead of relying on ResCap to put the

10  money up for the funding request, Ally itself will put the

11  money up for the funding requests.  So the borrowers -- and I

12  think it's 400 million dollars or so that's outstanding under

13  those HELOC lines of credit -- they'll be able to continue to

14  draw; they won't get this notice.

15          What we'd like to hear -- and we welcome it -- is some

16  of the other financial parties for whom we're servicing these

17  HELOC mortgages come to us and say I want to preserve those

18  HELOC lines and the value that I see for myself; I'm happy

19  funding as well.  We're happy to enter into arrangements to

20  service for them while allowing the funding to be made directly

21  by the other bank for whom we're servicing.  We hope that

22  happens.  And I think it's good news for the HELOC borrowers.

23          THE COURT:  I don't think when they get this notice,

24  they're going to think it's good news.  But I hear what you're

25  saying.  I don't fully understand how this is going to resolve

RESIDENTIAL CAPITAL, LLC, et al.                    75

1  itself in time, nor do I fully understand what the notice

2  should say to the extent that there is a contingency that

3  nobody can yet identify that some third party, perhaps, as in

4  accommodation, perhaps because it's potentially profitable

5  business, may step up and, in effect, underwrite these

6  commitments.  But the notice you're really giving is to the

7  extent it's ResCap's obligation to fund undrawn HELOCs, you're

8  out of luck.  That's the notice, in substance.

9         MR. MARINUZZI:  That's the way it will be interpreted,

10 Your Honor.  Recognizing that and listening to Your Honor's

11 concerns and understanding them and certainly sympathizing with

12 them, we'll take another stab at the notice.  We'll try to

13 build in provisions that will assist the HELOC borrowers so

14 when they get it, they will understand what rights they have.

15        THE COURT:  I think that would be a helpful

16 development.  And I recognize that it's difficult to do.  Do

17 you wish to say something on behalf of Ally?

18        MR. HESSLER:  Yes, Your Honor.  Your Honor, Again,

19 Steve Hessler of Kirkland & Ellis on behalf of Ally Financial

20 and Ally Bank.  I just wanted to make sure that the record

21 clearly reflected Ally Bank will continue to honor the draw

22 requests of the Ally Bank customers' HELOCs and no such notice

23 is going to be sent to the Ally Bank customers.

24        THE COURT:  I understand.

25        MR. HESSLER:  Thank you, Your Honor.

1      MR. MARINUZZI:  Your Honor, by my count -- I'm sorry.

2  I don't know if anyone else want to --

3      MR. MASUMOTO:  Your Honor, we just wanted to say that

4  we certainly endorse and support the additional notice to the

5  HELOC customers and to the extent we that we can assist in any

6  of the modifications of notice, we'll be happy to do so.

7      THE COURT:  Okay.  With the understanding that you're

8  going to be working on the notice provision, it's approved.

9      MR. MARINUZZI:  Thank you, Your Honor.  With that,

10  I'll cede the podium to my partner, Gary Lee who will address

11  the last two motions on the agenda today.

12      MR. LEE:  Good morning, Your Honor.  Gary Lee from

13  Morrison & Foerster, number 5 on the tag team, I think, in

14  total.  Here on, I think, the last two substantive motions.

15  The first motion I'd like to address is motion number 21 on the

16  docket which is the debtors' motion requesting authorization

17  but not direction to pay outstanding pre-petition wages,

18  salaries, commissions and employee benefits in connection --

19      THE COURT:  You're starting with 21 --

20      MR. LEE:  Yes, sir.

21      THE COURT:  -- not 20?

22      MR. LEE:  20.  Pardon me, Your Honor.  Okay.  I was

23  doing what Mr. Rosenbaum did.  I want to skip around.  Try not

24  to confuse the Court too much.

25      THE COURT:  So you're starting with 21?

RESIDENTIAL CAPITAL, LLC, et al.                                    77

1        MR. LEE:  I'll start with number 20, Your Honor.

2        THE COURT:  All right.  That's good.  Because that's

3    the next one.

4        MR. LEE:  We'll do that one.  Sorry, Your Honor.  To

5    pay outstanding pre-petition wages, salaries, commissions and

6    employee benefits in connection with the existing compensation

7    and benefit programs, to reimburse employees for unpaid pre-

8    petition business expenses and to continue the employee

9    compensation benefit programs post-petition.

10       Your Honor, the debtors' businesses derive their value

11   from the world-class service delivered by approximately 3,625

12   employees and 375 contractors.  These employees and contractors

13   are the debtors' single most valuable asset because their

14   professionalism, knowledge and reputation are at the core of

15   the success of the servicing business, the business that

16   Fortress is looking to buy.  The employees are what allows

17   ResCap to be leaders in government sponsored loan programs.

18   They are what allow the debtors to comply with the Federal

19   Reserve consent order and they are what's going to allow us to

20   comply with the DOJ/AG settlement borrower relief program.  And

21   again, they are what is going to deliver the billions of

22   dollars of value from the asset sales here.

23       As Mr. Nashelsky mentioned yesterday, and it's been

24   mentioned again today, the mortgage servicing industry is

25   extremely competitive at this time.  The debtors are losing

RESIDENTIAL CAPITAL, LLC, et al.                                    78

1  employees because of the uncertainty surrounding ResCap and

2  they're also losing them because of competitiveness in the

3  industry.  It is therefore, Your Honor, extremely important to

4  the debtors that their employees do not experience any personal

5  hardship that an interruption in compensation or benefits would

6  bring and that, Your Honor, is why we're seeking interim relief

7  today.  We recognize, Your Honor, that the situation and fear

8  that I'm describing is one from every debtor who comes before

9  you but we believe it's particularly acute in the mortgage and

10 servicing industry today.

11         Your Honor, for the purposes of the interim order,

12 we're seeking to continue our benefit and compensation

13 programs, consistent only with pre-petition policies and

14 practices.  Three things -- and we've discussed this at length

15 with Mr. Masumoto.  We're not seeking to pay any amounts that

16 would exceed the statutory cap of 11,725 under Section

17 507(a)(4) or (a)(5).  All of the relief that we're seeking in

18 this motion complies with Section 503(c).  There are no

19 payments to insiders that would violate 503(c).  And finally,

20 Your Honor, the debtors are not seeking any relief in the

21 motion that can be construed as an assumption of a contract

22 with an insider.

23         I will not, unless the Court wishes, go through every

24 single one of the employee programs that are offered by the

25 debtors.  I will leave that for another day.  But I will note

1   that the types of compensation and the types of benefits are

2   quite consistent with the size of the company that we're

3   dealing with and other compensation and benefit programs that

4   this Court is familiar with in other cases that it's seeing.

5              We're happy to represent here today, Your Honor, that

6   with the exception of a few items, substantially all costs

7   relating to wages and benefits have been paid through May the

8   13th.  We have basically less than a million dollars

9   outstanding.  I can explain what those exceptions are but I

10  believe that we've reached agreement with Mr. Masumoto in

11  relation to that and why don't I let him describe what that is.

12             THE COURT:  Mr. Masumoto?

13             MR. MASUMOTO:  Good morning, Your Honor.  Your Honor,

14  I just would like to clarify for the record.  It was my

15  understanding that under the wage order there are actually no

16  payments that are due.  The only amounts that may, potentially,

17  be paid by the debtor at this point are, essentially,

18  reimbursement of expenses.  I believe the motion referred to

19  seeking the authority to reimburse up to 700,000.

20             The agreement that we reached is that no payments in

21  excess of 1,000 dollars of nonluxury items would be paid absent

22  consent of the committee.  So at this point hopefully that will

23  be a relatively short period of time, but my understanding is

24  no wages need to be paid at this point, only reimbursement, and

25  at this point, once again, to repeat, up to 1,000 dollars in

RESIDENTIAL CAPITAL, LLC, et al.                                                    80

1   nonluxury items can be paid without consent of the committee,

2   but beyond that the committee needs to approve.

3          THE COURT:  And this is just an interim order at this

4   point?

5          MR. LEE:  This is just an interim order, and that

6   relates to just business expenses, Your Honor.

7          There's a second item, a second category, which is

8   severance.  There are, I believe, Your Honor, fifteen

9   noninsider employees who have pre-petition termination

10  agreements, which were entered into the ordinary course, and we

11  believe they're ordinary course under Section 363 post-

12  petition.  These are all noninsiders.  They're subject to the

13  503(b)(1) cap of 13,000 dollars.  These employees have agreed

14  to stay with the debtor and leave at various points in time

15  between now and the sale, so what we're looking for, Your

16  Honor, is authority to pay these obligations as these employees

17  effectively leave rather than force them to file a claim for an

18  administrative expense which they'd be entitled to anyway.

19         So we're talking about fifteen employees.  The total

20  amount to be paid is less than 181,000 dollars, so if I do my

21  math, we're below the cap.  And the termination dates start in

22  June of 2012, so I know that we're seeking interim relief, but

23  I think that there may be about 75,000 dollars worth of

24  payments in severance over the next thirty days, so --

25         MR. MASUMOTO:  Your Honor, for interim purposes we

RESIDENTIAL CAPITAL, LLC, et al.                                      81

1  will agree, except I would like to make sure that we reserve

2  all of our rights.  Their characterization of who is an insider

3  and who's not sometimes may be at issue, and we haven't had

4  that level of detail and certainly would like to make sure that

5  the committee has had a chance to also take a position with

6  respect to these severance payments.

7          THE COURT:  All right.  Subject to the comments made

8  this is approved.

9          MR. LEE:  Okay.  The last item, Your Honor, is the

10 employee compensation programs.  As I said, I don't intend to

11 go through all of them unless Your Honor would like me to, but

12 we would like to continue the pre-petition employee programs,

13 if we may.

14         MR. MASUMOTO:  No objection, Your Honor.

15         THE COURT:  I just approved the whole motion.

16         MR. LEE:  Good.  Thank you, Your Honor.

17         THE COURT:  We're moving on to 21.

18         MR. LEE:  Yes.  So the next item, Your Honor, is the

19 debtors' motion for interim and final orders under Section

20 105(a) and 363(b) authorizing ResCap to enter into a shared

21 services agreement with its nondebtor parent, AFI.  The purpose

22 of seeking the Court's approval is to ensure that we continue

23 to receive necessary services for the continued operation of

24 our business.

25         We're seeking interim and final relief.  In the

**RESIDENTIAL CAPITAL, LLC, et al.**                                    82

1  interim we're looking for authority to perform under the

2  agreement pending a final hearing, and then by the final order

3  we'll seek authority to enter into the agreement nunc pro tunc.

4  So, fundamentally, Your Honor, the objective is, obviously, to

5  preserve everybody's rights.  The committee will be appointed.

6  Everybody will get to look at it.  But in the meantime, the

7  water stays on, salary gets paid, IT gets paid, functionally we

8  can continue to perform what we need to do.  And because the

9  companies, Your Honor, are so integrated we fundamentally

10  require these services.  We can't get them from somewhere else.

11            So again, all I'm looking for, Your Honor, on an

12  interim basis is we will have that hearing in a month's time.

13            MR. MASUMOTO:  Your Honor, just to confirm.  My

14  understanding of reading the motion is that the debtors are not

15  seeking to pay any pre-petition claims under this motion, and

16  with that understanding we have no objection.

17            THE COURT:  Fine.  This motion is granted.

18            MR. LEE:  Thank you, Your Honor.

19            MR. NASHELSKY:  Your Honor, we have one or two

20  housekeeping items from the earlier financing motions that we

21  just wanted to address.  Mr. Goren?

22            MR. GOREN:  Thank you, Your Honor.  Todd Goren,

23  Morrison & Foerster, proposed counsel to the debtors.  Just a

24  couple of housekeeping matters on the DIP financing we wanted

25  to cover briefly.  Over the course of this hearing a proposed

RESIDENTIAL CAPITAL, LLC, et al.                                    83

1  form of a DIP financing motion with Barclays was submitted to

2  your chambers.  Just wanted to disclose the changes we all

3  agreed to on the record yesterday will be incorporated in

4  there.  There's no true sale finding or free and clear findings

5  in this order, though we will be seeking that as part of the

6  final order.

7           Ally has provided an indemnity to Barclays of the free

8  and clear nature of the transfer to the GMAC Mortgage and RFC

9  from BMMZ.  That is contained in the order.  That indemnity

10 falls away upon a finding by the Court of the fact that that

11 transfer was free and clear, and the debtors and Ally have also

12 stipulated to that, subject to challenge in the order.

13          THE COURT:  Have stipulated to the free and clear true

14 sale?

15          MR. GOREN:  Yes.

16          THE COURT:  Okay.

17          MR. GOREN:  And then, finally, Your Honor, we wanted

18 to unfortunately raise again the filing under seal of the fee

19 letters.  We've spoken with the U.S. Trustee over the course of

20 the last break.  We provided them with a copy of the fee

21 letters we proposed to file.  We would propose to file redacted

22 versions of the fee letter redacting out all the numbers.

23          The debtors -- and I believe the U.S. Trustee is

24 amenable to this -- would also propose to redact out all of the

25 market flex provisions, because we do believe if those become

**RESIDENTIAL CAPITAL, LLC, et al.**                                    84

1  public it will cause the DIP financing to be substantially more

2  expensive for the debtors.  Mr. Puntus, from Centerview

3  Partners, is here.  If you would like to hear from him he is

4  prepared to take the stand to explain in general the process of

5  marketing the DIP and how we came to those sorts of market flex

6  provisions and what sort of harm can come to the debtors if

7  those were to be made public.  I can also represent that that's

8  what he would testify to if that's acceptable to Your Honor.

9        THE COURT:  Well, you can provide a proffer of the

10  testimony that he would offer with respect to the economic harm

11  that would be suffered by the debtor if these so-called flex

12  provisions were to become public.

13       MR. GOREN:  Much of this is already in his

14  declaration, which was admitted into evidence yesterday.

15       THE COURT:  It was admitted into evidence, but it

16  wasn't admitted into evidence in connection with the attempt to

17  seal this document.

18       MR. GOREN:  Then I would say that I'd like to proffer

19  Mr. Puntus' testimony.

20       THE COURT:  This is your chance to do that.

21       MR. GOREN:  Okay.  Thank you, Your Honor.

22       If called upon to testify Mr. Puntus would testify

23  that in connection with the Barclays DIP facility, certain of

24  the debtors and Barclays executed certain fee letters.  The

25  debtors submit that the fee letters contain closely-guarded

**RESIDENTIAL CAPITAL, LLC, et al.**                                    85

1  proprietary commercial information that is sensitive to

2  Barclays and the debtors.  The debtors further submit that

3  disclosure of the fee letters would violate the debtors'

4  agreement with Barclays.

5         It is important to Barclays' method for calculating

6  fees that contents of the fee letters remain confidential.

7  Specifically, disclosing the market flex terms of the fee

8  letters puts great pressure on Barclays to effectively market

9  and syndicate the Barclays DIP facility to the marketplace and

10  could increase the cost of the Barclays DIP facility to the

11  debtors' estates.

12         Barclays, and the finance industry, in general,

13  customarily considers this information highly sensitive and

14  confidential.  Such information is rarely disclosed to the

15  public or made available to competitor financial institutions.

16         Given the investment banking and lending industry's

17  competitive nature it is of the utmost importance that the

18  terms set forth in the fee letters be kept confidential so that

19  Barclays' competitors may not use the information contained

20  therein to gain an unfair strategic advantage over Barclays in

21  the marketplace.  Disclosure of the fee letters would,

22  essentially, put a ceiling on the fees Barclays and its

23  affiliates could charge in future transactions.

24         Additionally, it is an imperative that the debtors,

25  particularly at this early stage of the Chapter 11 cases, be

1  able to assure counterparties with whom they contract that the

2  confidential and proprietary terms contained in any such

3  contracts will remain confidential so as to not further weaken

4  the debtors' bargaining position.

5          The debtors also submit that providing the fee letters

6  to the United States Trustee on a strictly confidential basis

7  and upon request to committee professionals on a strictly

8  confidential and professional-eyes-only basis will subject the

9  fee letters to sufficient scrutiny on the merits while at the

10  same time minimizing any impact on the debtors and Barclays

11  ongoing business objectives.

12          In addition, the debtors have disclosed in their DIP

13  motion the aggregate fees of approximately 52 million net of

14  credits, of which 18.75 million was paid prior to the petition

15  date.

16          Mr. Puntus would also testify that the market flex

17  provisions contained in the fee letters are standard market

18  flex provisions, that Centerview Partners undertook a search of

19  comparable transactions and determined that these market flex

20  provisions were within the range of reasonableness, and, in

21  fact, in general, the fees contained in the Barclays' fee

22  letters are below what the market would normally see for a

23  transaction of this type or very reasonable to the debtors and

24  that they negotiated as hard as possible and got the best

25  possible provisions possible for the debtors with respect to

RESIDENTIAL CAPITAL, LLC, et al.                87

1    these provisions.

2            Mr. Puntus would also testify that while the DIP

3    financing does contain an ability to reduce the maturity of the

4    DIP by some period of time, the debtors do not believe that

5    that provision is particularly material to them as they

6    operate, because the debtors view the DIP facility as a bridge

7    to a sale which they believe must occur within the next year,

8    and, in fact, the DIP facility, as negotiated, does contain

9    milestones to that effect.

10           THE COURT:  Is that the proffer?

11           MR. GOREN:  That is the proffer, Your Honor.

12           THE COURT:  Are there any objections to my receipt of

13   the proffer?  Okay.  I accept the proffer as the equivalent of

14   Mr. Puntus' direct testimony with regard to the facts in

15   dispute.

16           I do have a question, though, and maybe you could

17   amplify on the proffer in this respect through argument.  It is

18   not clear to me, based on the proffer, how disclosure of these

19   terms would cause harm to the debtor by making it more

20   expensive.  What is the triggering mechanism that makes this a

21   more expensive financing to the debtor?  I realize that it

22   could be awkward for Barclays.  I realize that it could

23   potentially have some impact upon the syndication of the loan.

24   But how does this actually hurt the debtor?

25           MR. GOREN:  Well, Your Honor, I'd be happy to explain

RESIDENTIAL CAPITAL, LLC, et al.                    88

1  that, and if I get anything wrong I'm sure Mr. Puntus would be

2  happy to step in, but I believe -- it's the view of the

3  debtors' advisors that to the extent the market flex provisions

4  become known, and there are certain types of market flex that

5  allow structure flex type provisions --

6         THE COURT:  Well, obviously, market flex provisions

7  are known in the market, because Mr. Puntus was able, according

8  to your proffer, to survey market flex provisions and to

9  determine that this is a relatively favorable set of such

10 terms.  So this is not -- and every time you syndicate the

11 loan, presumably everybody in the market, subject to

12 confidentiality restrictions, knows about these provisions.

13        MR. GOREN:  No.  That's --

14        MR. ZIMAN:  Your Honor?  Can I be heard?  It would be

15 helpful to -- Ken Ziman of Skadden Arps on behalf of Barclays.

16        These terms remain confidential to everybody other

17 than the borrower and the arranger.  And what it is, it's a

18 deal that if the arranger can't syndicate it with -- inside

19 those terms or on the original terms then it moves to that

20 extreme.  So the harm to the borrower, in this case the

21 debtors, would be that if we can't syndicate it, and there's

22 120-day period post-closing, they will be subject to some or

23 all of those flex provisions, and that will be the terms, the

24 ultimate terms of the DIP facility.  And that will be the case

25 with any syndicated financing.

RESIDENTIAL CAPITAL, LLC, et al.                                          89

1              THE COURT:  So to --

2              MR. ZIMAN:  So to just finish --

3              THE COURT:  -- to hearken back to the circular

4    argument that we had yesterday, but this is a slightly

5    different one.  You're basically saying that if this is subject

6    to disclosure in the market we're not really concerned about

7    creditors.  We're concerned about other sophisticated market

8    participants in a manner that would make it difficult for

9    Barclays to successfully syndicate the facility, that there

10   would be adverse consequences to the debtors, occasioned by

11   Barclays' ability to exercise the flex provisions within the

12   document.

13             MR. ZIMAN:  Correct.

14             MR. GOREN:  Yes.  I mean, that's, essentially, where I

15   was getting, that to the extent these become known to the whole

16   public or -- anyone who Barclays is trying to syndicate this to

17   will see exactly what type of flex is available and say to

18   Barclays, well, I'm only in it if you do this.  And once that

19   happens then the price to the debtors goes up.

20             THE COURT:  Okay.  Now, what are you proposing to do

21   with the document?

22             MR. GOREN:  We propose to file under seal after

23   consulting with the U.S. Trustee.  We'll file a redacted

24   version of the fee letter which would redact out all of the

25   numbers, the percentage points of the fees in the fee letter,

RESIDENTIAL CAPITAL, LLC, et al.                                    90

1  and then redact out the entire market flex section of the fee

2  letter.

3          THE COURT:  Okay.  Is that acceptable to the U.S.

4  Trustee?

5      MR. MASUMOTO:  Your Honor, we returned the fee letter

6  we're in the process of discussing.  We had some concerns about

7  the entire market flex.  I know the discussion was ongoing,

8  but, Your Honor, I'm not as familiar with the market flex

9  practice as, perhaps, you are, but I recall yesterday you had

10  the mention of the maturity date provisions and so forth.  My

11  understanding is that some of those provisions, apparently, are

12  not a major concern, and to the extent that they're -- as part

13  of the market flex there are any acceptable provisions we'd

14  want as much available as possible.

15          THE COURT:  Well, it's one thing to talk about

16  redacting, and it's another thing to actually do the redacting.

17  And that's where the judgment comes in.  What I believe I am

18  hearing the debtor say with ardent support from counsel for

19  Barclays and support from Mr. Puntus, as a financial advisor to

20  the debtors, is that for the market flex provisions to be in

21  the document at all, even in a redacted form, would provide

22  enough of a clue to the market that it would be potentially

23  detrimental to the debtor.

24          What I'm going to do on the basis of this proffer is

25  to allow the document to be redacted by the debtor and

1  Barclays, with the notion that as much should be disclosed as

2  can safely be disclosed to the market, with that being the

3  guide, but with also some sense of discretion that given the

4  sophistication of those who will be trying to understand what's

5  really hidden, that it may be necessary, at least as it

6  concerns the market flex provisions, to be fairly exclusive in

7  deleting those provisions.

8          Now, my understanding of the arrangement is that this

9  document will be available to the creditors' committee, at

10  least through counsel and the creditors' committee's

11  professionals, at least on a professional's-eyes-only basis,

12  correct?

13          MR. GOREN:  Right.  That is one hundred percent

14  correct.

15          THE COURT:  And, presumably, also available to other

16  parties who may, for example, be -- now I'm putting words in

17  Mr. Ziman's mouth -- presumably also available to others,

18  subject to confidentiality, to the extent that the professional

19  advisors, in order to carry out their responsibilities in

20  advising the committee, may need to share this information with

21  certain of the committee fiduciaries.  Now, I don't know how

22  that's going to work, and I don't need to decide that now.  But

23  it seems to me that there should be some appropriate sharing,

24  subject to confidentiality, of the confidential provisions so

25  the committee can actually carry out its functions here.

RESIDENTIAL CAPITAL, LLC, et al.                                              92

1   MR. GOREN:  I'm confident we'll be able to work those

2   issues out as they arise, Your Honor, and, as you previously

3   noted, you view these as subject to review at any time, so to

4   the extent we're not able to work them out we can come back.

5   But I'm confident we'll be able to work those issues out as

6   they arise.

7         THE COURT:  Fine.

8         UNIDENTIFIED SPEAKER:  That's fine.

9         THE COURT:  With that understanding, the document will

10  be redacted but available publicly in a redacted form and will

11  be available in unredacted form to the committee's

12  professionals and, perhaps, also to members of the committee,

13  subject to confidentiality restrictions.

14        With that have we completed the agenda?

15        MR. NASHELSKY:  Yes, Your Honor.

16        MR. GOREN:  Mr. Nashelsky might have something

17  briefly.

18        MR. NASHELSKY:  Very briefly.  I just wanted to

19  confirm.  First, we wanted to thank Your Honor for well over

20  four and a half hours in the last two days on our first day

21  motions, and the debtors very much appreciate your indulgence

22  and the other parties cooperating with us on getting through

23  these first day hearings.

24        I believe we have received a return date of June 12th

25  at 10 a.m. for the final hearings on the interim final motions,

**RESIDENTIAL CAPITAL, LLC, et al.**                                    93

1    and June 18th at -- sorry.  We're not sure on the sale motion.

2    I thought there was a full day on the 12th.  Yes.  So, we just

3    wanted to let parties know that we had that, the first date, so

4    that everybody had as much notice of that as possible.

5              With that, Your Honor, I will sit down and everybody

6    will be able to go to lunch.  Thank you.

7              THE COURT:  Okay.  We're adjourned.  Thank you.

8    (Whereupon these proceedings were concluded at 1:20 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

94

1

2                              I N D E X

3

4                              EXHIBITS

5

6   DEBTORS'       DESCRIPTION                      ID.      EVID.

7   ---           Proffer of Mr. Puntus' direct              86

8               Testimony

9

10

11                        R U L I N G S

12  DESCRIPTION                                  PAGE      LINE

13  Debtors' motion to extend to June 30th the      19        12

14  deadline to file schedules and statements granted

15  Debtors' motion to file a consolidated list     20         6

16  of top fifty creditors and to approve the manor

17  and notice of publication granted

18  Debtors' motion to retain Kurtzman Carson       20        23

19  Consultants as claims and noticing agent for

20  the debtors granted

21  Debtors' motion seeking authorization to        30         1

22  continue mortgage origination in the ordinary

23  course

24

25

95

I N D E X, cont'd


R U L I N G S


| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion seeking authorization to | 52 | 9 |
| continue servicing functions in the ordinary | | |
| course with respect to loans securitized by | | |
| Fannie Mae, Freddie Mac and Ginnie Mae | | |
| | | |
| Debtors' motion authorizing them to file under | 55 | 7 |
| seal confidential exhibit to the servicing | | |
| motion granted on an interim basis subject to | | |
| the following: | | |
| (1)ability of parties to obtain copies of the | | |
| document; | | |
| (2)subject to the confidentiality restrictions; | | |
| (3)to seek an unsealing of the document for | | |
| cause shown | | |
| Debtors' motion to continue servicing | 57 | 4 |
| mortgage loans in the ordinary course with | | |
| respect to loans that were generated through | | |
| private label securitizations granted on an | | |
| interim basis | | |

96

I N D E X, cont'd

R U L I N G S

| DESCRIPTION | PAGE | LINE |
| --- | --- | --- |
| Debtors' motion seeking authority to continue to provide servicing with respect to mortgage service rights and mortgage loans owned by Ally Bank granted on an interim basis | 58 | 8 |
| Debtors' motion to honor pre-petition tax and regulatory license obligations | 67 | 15 |
| Debtors' motion seeking authorization to honor certain pre-petition obligations to customers granted | 68 | 25 |
| Debtors' motion for authority to provide notice to borrowers under home equity line of credits that the debtors are no longer honoring draw requests approved | 75 | 8 |

97

I N D E X, cont'd

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion seeking authority but not direction to pay outstanding pre-petition wages, salaries, commissions and employee benefits in connection with the existing compensation and benefit programs, to reimburse employees for unpaid pre-petition business expenses and to continue the employee compensation benefit programs post-petition granted subject to provisions stated on the record | 80 | 8 |
| Debtors' motion for interim and final orders authorizing ResCap to enter into a shared services agreement with  Ally Financial Inc. granted | 81 | 17 |
| Proffer of Mr. Puntus' direct testimony admitted into evidence | 86 | 13 |

98

1

2                          I N D E X, cont'd

3

4                            R U L I N G S

5

6   DESCRIPTION                                    PAGE        LINE

7   Fee letters to be filed under seal in redacted    91          9

8   form but available publicly and will be available

9   in unredacted form to the committee's

10  professionals, committee members subject to

11  confidentiality restrictions

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**eScribers, LLC | (973) 406-2250**
**operations@escribers.net | www.escribers.net**

99

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

LISA BAR-LEIB (CET**D-486)

AAERT Electronic Certified Transcriber


eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040


Date:  May 16, 2012