MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| --------------------------------------------------------------- ) | |
| In re:                                                        ) | Case No. 12-12020 (MG) |
|                                                               ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,      ) | Chapter 11 |
|                                                               ) | |
| Debtors.                          ) | Jointly Administered |
|                                                               ) | |
| --------------------------------------------------------------- ) | |

**NOTICE OF FILING OF ADDITIONAL EXHIBIT TO DEBTORS' MOTION FOR
INTERIM AND FINAL ORDERS PURSUANT TO BANKRUPTCY CODE
SECTIONS 105, 361, 362, 363, AND 507(b) AND BANKRUPTCY RULES 4001 AND 6004:
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING ON A
SECURED, SUPERPRIORITY BASIS, (II) AUTHORIZING THE USE OF CASH
COLLATERAL AND RELATED RELIEF, (III) GRANTING ADEQUATE PROTECTION
AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY
<u>RULES 4001(b) and 4001(c), AND (V) GRANTING RELATED RELIEF</u>**

**(DEBTOR-IN-POSSESSION FINANCING AND ALLY FINANCIAL INC.
AND JUNIOR SECURED NOTEHOLDERS CASH COLLATERAL)**

**PLEASE TAKE NOTICE THAT** on May 14, 2012, the debtors and debtors in

possession in the above-captioned cases (collectively, the "Debtors")[1] filed the *Corrected*

*Debtors' Motion For Interim And Final Orders Pursuant To Bankruptcy Code Sections 105,*

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on <u>Exhibit 1</u> to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC in Support of the Chapter 11 Petitions and First Day Pleadings [Docket No. 6].

*361, 362, 363, And 507(b) And Bankruptcy Rules 4001 And 6004: (I) Authorizing The Debtors*

*To Obtain Postpetition Financing On A Secured, Superpriority Basis, (II) Authorizing The Use*

*Of Cash Collateral And Related Relief, (III) Granting Adequate Protection And (IV) Scheduling*

*A Final Hearing Pursuant To Bankruptcy Rules 4001(b) And 4001(c), And (V) Granting Related*

*Relief (Debtor In Possession Financing And Ally Financial Inc. And Junior Secured Noteholders*

*Cash Collateral)* [Docket No. 42] (the "AFI DIP Motion").

**PLEASE TAKE FURTHER NOTICE THAT** in further support of the AFI DIP

Motion, the Debtors hereby submit the attached Debtor-in-Possession Financing Amendment,

The Eighth Amendment to the Amended and Restated Loan Agreement (Line of Credit

Agreement), which implements the terms of the AFI DIP Facility (as such term is defined in the

AFI DIP Motion), as "Exhibit C" to the AFI DIP Motion.

Dated:  May 30, 2012
          New York, New York

<div style="margin-left:40%">

*/s/*   Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

</div>

**<u>EXHIBIT C</u>**

*Execution Copy*

DEBTOR-IN-POSSESSION FINANCING AMENDMENT
The Eighth Amendment to the Amended and Restated Loan Agreement
(Line of Credit Agreement)

Dated as of May 25, 2012

by and among

RESIDENTIAL FUNDING COMPANY, LLC,
as Borrower,

GMAC MORTGAGE, LLC,
as Borrower,

RESIDENTIAL CAPITAL, LLC,
AND CERTAIN OTHER AFFILIATES OF THE BORROWERS
as Guarantors,

ALLY FINANCIAL INC. (f/k/a GMAC Inc.),
as Initial Lender and as Lender Agent

and

Certain Other Financial Institutions and Persons from
time to time party hereto as Lenders

*Eighth Amendment
to A&R LOC Loan Agreement*

This DEBTOR-IN-POSSESSION FINANCING AMENDMENT (this "Agreement"), dated as of May 25, 2012, is by and among GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage"), Residential Funding Company, LLC, a Delaware limited liability company ("RFC" and, together with GMAC Mortgage, each a "Borrower" and collectively, the "Borrowers"), Residential Capital, LLC, a Delaware limited liability company ("ResCap"), and the various other parties signatory hereto as Guarantors (together with ResCap, each a "Guarantor" and collectively, the "Guarantors"), Ally Financial Inc. (f/k/a GMAC Inc.), a Delaware corporation ("Ally Financial"), as the initial lender (in such capacity, the "Initial Lender"), the financial institutions and other Persons that are or may from time to time become parties hereto as Lenders (together with the Initial Lender and their respective successors and assigns, each a "Lender" and collectively, the "Lenders"), and Ally Financial, as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Lender Agent").

Reference is hereby made to the Amended and Restated Loan Agreement (Line of Credit Agreement), dated as of December 30, 2009, among the Borrowers, the Guarantors, the Lenders and the Lender Agent (as amended and modified through the date hereof, the "LOC Loan Agreement"). The LOC Loan Agreement includes seven prior amendments, with this Agreement constituting the eighth amendment thereto as of the date first written above.

RECITALS

1.    Each of the parties hereto is a party to the LOC Loan Agreement.

2.    On May 14, 2012 (the "Petition Date"), the Borrowers and each of the Guarantors and certain of their respective Affiliates filed voluntary petitions with the Bankruptcy Court commencing their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.    GMAC Mortgage has requested that the Lenders provide Loans under the LOC Loan Agreement after the Petition Date, and the Lenders are willing to do so on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein contained and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

ARTICLE I
DEFINED TERMS

SECTION 1.1 Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the LOC Loan Agreement.

ARTICLE II
AMENDMENTS TO THE LOC LOAN AGREEMENT

SECTION 2.1  <u>Amendments to Article II of the LOC Loan Agreement</u>.

(a)      Section 2.08 of the LOC Loan Agreement is hereby amended by inserting the following paragraph (f):

"(f)      Notwithstanding the terms and provisions of this <u>Section 2.08</u>, following the PPL Closing Date, all payments made by or on behalf the Credit Parties to the Lender Agent for the benefit of the Lenders shall be applied in the following order: (i) first, to pay due and unpaid interest on the Post-Petition Loans, until fully paid; (ii) second, to reduce the aggregate principal amount of the Post-Petition Loans until fully paid; and (iii) third, to pay the other Obligations of the Credit Parties and in accordance with this Agreement and the other Facility Documents."

(b)      Article II of the LOC Loan Agreement shall be amended by adding the following Section 2.11:

"Section 2.11.  <u>Post-Petition Loans</u>.

(a)      <u>Post-Petition Loan Commitment; Use of Proceeds</u>.  On and subject to the terms and conditions of this Agreement, each of the Lenders, severally and for itself alone, agrees to make loans to GMACM on a non-revolving basis ("<u>Post-Petition Loans</u>") on and after the PPL Closing Date until the Termination Date in such Lender's Pro Rata Share of such aggregate amounts as GMACM may request from said Lenders; <u>provided</u>, however, that the PPL Outstandings shall not at any time exceed the lesser of the amount permitted under the Financing Orders (as then in effect) and the Buyout Commitment Amount.  Within the foregoing limits, the proceeds of any such Post-Petition Loans shall only be used, consistent with past practices, solely to fund the repurchase of whole loans from Ginnie Mae pools in order to (A) avoid GMACM being in violation of delinquency triggers applicable to GMACM under Chapter 18 of the Ginnie Mae Guide, (B) effect foreclosures, conveyances or other normal course loss mitigation activities of the related mortgaged properties in connection with the submission of HUD Claims, and (C) allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified (collectively, "<u>GNMA Repurchases</u>").  For the avoidance of doubt, no Post-Petition Loan may be used to fund the purchase of whole loans for any other purpose, including for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects, or for any other purpose other than as identified in the immediately preceding sentence.  The limitation on the use of funds set forth in the preceding sentences is referred to herein as the "<u>Use Restriction</u>".  The aggregate outstanding amount of PPL Obligations shall be due and payable on the Termination Date.

*Eighth Amendment to*
*A&R LOC Loan Agreement*

(b)    Post-Petition Loan Requests.    GMACM shall give written notice or telephonic notice (followed immediately by written confirmation thereof) to the Lender Agent of each proposed borrowing not later than 5:00 p.m. (New York City time), on the Business Day prior to any date of proposed borrowing of Post-Petition Loans. Each such notice shall be effective upon receipt by the Lender Agent, shall be irrevocable, and shall specify the date and amount of the proposed borrowing. Promptly upon receipt of such notice, the Lender Agent shall advise each Lender thereof. Not later than 1:00 p.m. (New York City time), on the date of a proposed borrowing, each Lender shall provide the Lender Agent at the office specified by the Lender Agent with immediately available funds covering such Lender's Pro Rata Share of such borrowing and, so long as the Lender Agent has not received written notice that the conditions precedent set forth in Section 5.03 with respect to such borrowing have not been satisfied, the Lender Agent shall pay over the funds received by the Lender Agent to GMACM on the requested borrowing date. The proceeds of all borrowings shall be credited to the applicable account nominated by GMACM from time to time in accordance with the Financing Orders.

(c)    Security Interest; Collateral.    Pursuant to the Financing Orders, as security for the full and timely payment and performance of all PPL Obligations hereunder, whether now existing or hereafter arising, Lender Agent, for the benefit of the Lender Agent and the Lenders, shall have (a) pursuant to Section 364(d) of the Bankruptcy Code, a valid, binding, enforceable, duly perfected security interest and priming lien upon all right, title and interest in the Repurchased Loans (including the related mortgage notes, mortgages, or any assignments of mortgages) and HUD Claims funded with Post-Petition Loans and any cash collateral thereof as permitted in the Financing Orders, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, whether tangible or intangible, whether real or personal, together with all proceeds, products, and supporting obligations with respect thereto; and (b) pursuant to Section 364(d) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected priming lien and security interest in all property of the Credit Parties, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, whether tangible or intangible, whether real or personal, together with all proceeds and products thereof, that constitutes Collateral. In addition to the foregoing, the repayment of the Post-Petition Loans and all other obligations of GMACM and the other Credit Parties arising under this Agreement shall, pursuant to Section 364(c)(1) of the Bankruptcy Code be Superpriority Claims. The execution and delivery of the DIP Financing Amendment shall not be construed as an acknowledgment by the Lender Agent or any Lender that such party is adequately protected with respect to its interests in any Collateral granted to secure Pre-Petition Indebtedness.

(d)    Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral.    Upon the PPL Closing Date, and on behalf of themselves and their estates, and for so long any PPL Obligations of the Credit Parties hereunder shall be outstanding, each Credit Party, on behalf of itself and its Subsidiaries, hereby

3                    *Eighth Amendment to*
                    *A&R LOC Loan Agreement*

irrevocably waives (i) any right, pursuant to Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the PPL Obligations of the Credit Parties hereunder, or to approve a claim of equal or greater priority than the PPL Obligations of the Credit Parties hereunder, except as permitted under the (x) the Interim Financing Order and Final Financing Order and (y) the order of the Bankruptcy Court approving the Barclays DIP Facility, and (ii) any right, pursuant to Section 363 of the Bankruptcy Code or otherwise, to use Post-Petition Collateral proceeds or any other Cash Collateral in any manner not permitted by the Financing Orders or otherwise without the consent of the Lender Agent and the Lenders.

(e)      Interest on Post-Petition Loans; Interest Payment Dates.   Interest shall accrue on the unpaid principal amount of each Post-Petition Loan for the period commencing on the date of such Post-Petition Loan until such Post-Petition Loan is paid in full at a rate equal to the LIBOR Rate plus 4% per annum, with a LIBOR Rate floor of 1.25% (the "Post-Petition Interest Rate"); provided that at any time an Event of Default exists under Section 8.03 hereof, the interest rate shall accrue on the Post-Petition Loans at a rate equal to the Post-Petition Interest Rate plus 2% per annum.  Accrued interest on each Post-Petition Loan shall be payable in arrears on the last day of each calendar month."

SECTION 2.2 Amendment to Article IV of the LOC Loan Agreement. Article IV of the LOC Loan Agreement shall be amended by adding the following Section 4.06:

"Section 4.06.  LOC DIP Account.

(a)      GMACM has established Account Number 796682920 with JPMorgan Chase Bank, N.A. (the "LOC DIP Account") for the sole purpose of holding and utilizing proceeds from Post-Petition Loans in accordance with the Use Restriction.

(b)      Pursuant to the Orders, as security for the full and timely payment and performance of all PPL Obligations hereunder, whether now existing or hereafter arising, GMACM hereby grants a continuing security interest to the Lender Agent (for the benefit of the Lender Agent and the Lenders) in all of GMACM's right, title and interest, in and to the LOC DIP Account and all funds deposited or carried therein, together with all proceeds and distributions on, and rights arising out of, such LOC DIP Account and all funds deposited or carried therein.   In furtherance of the security interest granted hereunder, GMACM shall deliver to the Lender Agent a Blocked Account Control Agreement in form and substance satisfactory to the Lender Agent executed by GMACM, JPMorgan Chase Bank, N.A. and Ally Financial, as Lender Agent (for the benefit of the Lender Agent and the Lenders), with delivery of such Blocked Account Control Agreement to occur prior to utilization of the LOC DIP Account as set forth in Section 4.06(c), below.  The LOC DIP Account shall be deemed a Collection Account under this Agreement, and the Lender Agent shall have all rights with respect to the LOC DIP Account as if pledged pursuant to the Security Documents.

4

(c)      Each of the Debtors covenant and agree to refrain from all use of the LOC DIP Account prior to the Bankruptcy Court approving the use thereof and acknowledging the first priority perfected security interest of the Lender Agent therein under the Final Financing Order and the Cash Management Order.  Utilization of the LOC DIP Account prior to satisfaction of each condition set forth in the immediately preceding sentence shall constitute a PPL Event of Default as set forth in Section 8.03(z).

(d)      Each of the Debtors covenant and agree to refrain from all use of the LOC DIP Account other than for purposes of (x) depositing collections and proceeds arising from, or in any way related to, Repurchased Loans and HUD Claims and (y) making withdrawals in compliance with the Use Restriction.  Any amounts to be deposited in the LOC DIP Account under the immediately preceding clause (x) shall be made within five (5) Business Days of receipt thereof by the applicable Debtor.

(e)      For avoidance of doubt, GMACM shall be permitted to obtain Post-Petition Loans following the PPL Closing Date and prior to authorized use of the LOC DIP Account as set forth in Section 4.06(c), above, so long as all proceeds, collections and other amounts related to such Post-Petition Loans are deposited in, and related withdrawals (subject to the Use Restriction) are made through, the LOC Concentration Account (as such term is defined in the Cash Management Order)."

SECTION 2.3 Amendment to Article V of the LOC Loan Agreement.  Article V of the LOC Loan Agreement shall be amended by adding the following Section 5.03:

"Section 5.03.  Conditions Precedent to Post-Petition Loans.

(a)      PPL Closing Date.   The Buyout Funding Commitment, and each Lender's obligation to make Post-Petition Loans thereunder, shall not be in effect until the date (the "PPL Closing Date") on which all of the following shall have occurred to the satisfaction of the Lender Agent or waived by the Lender Agent in writing:

(i)       the Bankruptcy Court shall have entered the Interim Financing Order, which order shall not have been (a) stayed, vacated or reversed, or (b) amended or modified except as otherwise agreed to in writing by the Lender Agent in its sole discretion;

(ii)      no trustee or examiner with expanded powers pursuant to section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Credit Party or their respective business, properties or assets;

(iii)     all of the "first day" orders entered by the Bankruptcy Court at the time of the commencement of the Cases (and if any such orders shall not have been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) shall be in form and substance reasonably satisfactory to the Lender Agent;

(iv)     (a) operational changes to track and allocate expenses relating to the Specified Prepetition Facilities, the Master Purchase Documents, the MSFTA and the First Lien Collateral (as such terms are defined in the Barclays DIP Facility as of the

5                                          *Eighth Amendment to*
                                                   *A&R LOC Loan Agreement*

date hereof) by asset type and facility shall have been implemented and cash management systems satisfactory to the Lender Agent (including with respect to cash dominion) shall have been established by the Credit Parties and (b) one or more orders, in form and substance satisfactory to the Lender Agent in its sole discretion, approving such cash management systems and arrangements (the "Cash Management Order") shall have been entered by the Bankruptcy Court (it being understood and agreed that the interim order entered by the Bankruptcy Court on May 15, 2012 under docket number 82 is acceptable to the Lender Agent and a final order in the form of such interim order shall also be deemed acceptable to the Lender Agent), which Cash Management Order shall not have been (1) stayed, vacated or reversed, or (2) amended or modified except as otherwise agreed to in writing by the Lender Agent in its sole discretion;

(v)     the Credit Parties and the other parties hereto shall have duly executed and delivered the DIP Financing Amendment;

(vi)     the Lenders and the Lender Agent shall have received all fees required to be paid and all expenses for which invoices have been presented;

(vii)     (a) all governmental and third party approvals necessary in connection with the transactions contemplated by the DIP Financing Amendment and (b) all material governmental and third party approvals necessary in connection with the continuing operations of the Debtors in all the foregoing cases, shall have been obtained on satisfactory terms and shall be in full force and effect (including shareholder approvals, if any);

(viii)     the Lender Agent shall have received copies of the Initial 20-Week Forecast as defined in the Interim Financing Order and provided under the Barclays DIP Facility; and

(ix)     each Credit Party shall have complied with the Financing Orders and satisfied the requirements specified therein as of the Credit Date (as such term is defined below).

(b)     Conditions to Each Post-Petition Loan. The obligation of any Lender to provide any Post-Petition Loan, including on the PPL Closing Date and from time to time thereafter and prior to the Termination Date (each, a "Credit Date"), is subject to satisfaction, or waiver by the Lender Agent, of the following conditions precedent:

(i)     Lender Agent shall have received a fully executed and delivered borrowing request in accordance with the applicable requirements set forth in Section 2.11(b), together with certification from an officer of GMACM that the proceeds of such Post-Petition Loan shall be utilized in compliance with (x) the Use Restriction and the requirements set forth in the Financing Orders, and (y) that the unpaid principal balance of the mortgage loans being repurchased from Ginnie Mae pools with the proceeds of such borrowing shall not represent an amount less than the Post-Petition Loan being requested in connection therewith;

<div align="center">6</div>

(ii)     after giving effect to such Post-Petition Loan and use of proceeds, the aggregate amount of Post-Petition Loans outstanding shall not exceed the Buyout Commitment Amount;

(iii)    both prior to and after giving effect to the requested Post-Petition Loan, the PPL Outstandings shall be in compliance with the Interim Financing Order or the Final Financing Order, as applicable;

(iv)     the Credit Parties shall be in compliance with, and there shall not have been any material amendment to, the Orders;

(v)      the Credit Parties shall be in compliance with the requirements set forth in Section 5.02 (as modified pursuant to the DIP Financing Amendment), Section 6.02 and Section 7.04 of this Agreement;

(vi)     as of such Credit Date, the representations and warranties contained herein and in each other Facility Document shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects subject to such qualification;

(vii)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Post-Petition Loan and application of the proceeds thereof that would constitute a PPL Event of Default, or after giving effect to clauses (c) and (d) below, an Event of Default or a Default;

(viii)   GMACM shall be an approved issuer by Ginnie Mae, and shall not have received written notice from Ginnie Mae indicating an intention to limit or withdraw such status;

(ix)     not later than forty-five (45) days after the entry of the Interim Financing Order, the Bankruptcy Court shall have entered the Final Financing Order in form and substance satisfactory to the Lender Agent in its sole discretion; and

(x)      the Interim Financing Order or the Final Financing Order, as the case may be, shall be in full force and effect, and shall not have been (a) vacated, reversed, or stayed, or (b) amended or modified except as otherwise agreed to in writing by Lender Agent in its sole discretion.

(c)      Conflict.  To the extent any representation or warranty set forth in Article VI, any covenant set forth in Article VII, or Event of Default set forth in Article VIII, has been breached or occurred solely as a result of the commencement or pendency of the Cases, or has been superseded by the terms of the Orders, a breach thereof shall be of no effect

*Eighth Amendment to*
*A&R LOC Loan Agreement*

to the extent the same would otherwise permit the Lenders not make the Post-Petition Loans so long as, and subject to, each Credit Party remaining in compliance with the Orders.  For the avoidance of doubt, nothing contained in this Section 5.03(c) shall be construed as a waiver of Events of Default or Defaults arising on or before the Petition Date.

(d)    Application of Certain Provisions to Post-Petition Loans.    The following provisions in this Agreement shall not be applicable to Post-Petition Loans: Section 2.01(b), Section 2.01(c), Section 2.08, Section 3.01(f), Schedule 5.02(a)-(c); Schedule 5.02(f)-(j), Section 7.01(u), Section 8.01(d), Section 8.01(e), Section 8.01(f), Section 8.01(n) and Section 8.01(p)."

SECTION 2.4  Amendment to Article VI of the LOC Loan Agreement.

(a)    Section 6.01(h) of the LOC Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(h)    Fraudulent Conveyance.  The amount of consideration being received by an Credit Party upon its pledge or provision of any Collateral to the Lender Agent constitutes reasonably equivalent value and fair consideration for such Collateral.  No Credit Party is pledging or providing any Collateral with any intent to hinder, delay, or defraud any of its creditors."

(b)    Section 6.01(k) of the LOC Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(k)    No Default.  No PPL Event of Default has occurred and is continuing and, after giving effect to Section 5.03(c)-(d), no Default has occurred and is continuing."

(c)    Article VI of the LOC Loan Agreement shall be amended by adding the following Section 6.02:

"Section 6.02.  Representations and Warranties Related to Post-Petition Loans.  Each Credit Party represents and warrants to each Lender Party that throughout the term of this Agreement:

(a)    Use of Proceeds.  The proceeds of each Post-Petition Loan shall be solely used in accordance with the Use Restriction.

(b)    Compliance with Orders.  Each Credit Party is in compliance with each applicable requirement set forth in the Orders."

SECTION 2.5  Amendment to Article VII of the LOC Loan Agreement. Article VII of the LOC Loan Agreement shall be amended by adding the following Section 7.04:

"Section 7.04.  Post-Petition Loan Covenants.  Each Credit Party covenants and agrees with the Lender Parties that, until all Post-Petition Loans and all other PPL Obligations

*Eighth Amendment to*
*A&R LOC Loan Agreement*

have been paid in full in cash and the Buyout Funding Commitment has been terminated or expired:

(a)    <u>Use of Proceeds</u>.  The proceeds of any Post-Petition Loan shall not be utilized for any purpose other than those complying with the Use Restriction.

(b)    <u>Compliance with Orders</u>.  Each Credit Party shall comply with each applicable requirement set forth in the Orders.

(c)    <u>Post-Petition Collateral</u>.  The proceeds of any Repurchased Loans and HUD Claims funded with Post-Petition Loans, and cash collateral thereof as permitted in the Financing Orders shall be solely used in accordance with the Use Restriction.  Each Obligor shall promptly mark its books and records to indicate that all such Repurchased Loans and HUD Claims have been pledged to the Lender Agent for so long as such Repurchased Loans and HUD Claims constitute Post-Petition Collateral.  Each Obligor further covenants and agrees to deliver the Mortgage File (as defined in the applicable Custody Agreement) with respect to each Repurchased Loan to one of the custodians pursuant to the Custody Agreements.

(e)    <u>Reporting Requirements</u>.  The Credit Parties shall deliver reports relating to the matters referred to on <u>Schedule 7.04</u> attached hereto, such reports to be in such form and substance as agreed between the Credit Parties and the Lender Agent acting reasonably. Additionally, each Credit Party shall provide; (a) the reporting provided for in the Financing Orders; (b) concurrent with delivery to the Administrative Agent under (and as such term is defined in) the Barclays DIP Facility, a copy of each document delivered pursuant to the following sections contained therein: (i) <u>Section 5.01(a)</u>, (<u>b</u>) and (<u>c</u>); and (ii) such other documents delivered to the Administrative Agent as may be requested by the Lender Agent in writing; and (c) immediately upon receipt thereof, written notice to the Lender Agent of any notice of default, proposed waiver, amendment or forbearance or similar document provided to such Credit Party by the Administrative Agent pursuant to the terms set forth in the Barclays DIP Facility."

SECTION 2.6  <u>Amendment to Article VIII of the LOC Loan Agreement</u>. Article VIII of the LOC Loan Agreement shall be amended by adding the following Section 8.03:

"Section 8.03.  <u>Post-Petition Loan Events of Default</u>.  The following events shall be "<u>PPL Events of Default</u>":

(a)    failure by any Credit Party to pay (i) when due any principal of any Post-Petition Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Post-Petition Loan within three (3) Business Days after the date due; or

(b)    any Event of Default under (and as such term is defined in) the Barclays DIP Facility shall occur and continue after giving effect to any applicable notice and grace period set forth therein and to any waiver by the Barclays Lenders with respect thereto; or

9

*Eighth Amendment to*
*A&R LOC Loan Agreement*

(c)    the proceeds of any Post-Petition Loan shall be utilized for any purpose other than as expressly permitted by the Use Restriction; or

(d)    any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or

(e)    a trustee (or comparable Person) under Chapter 7 or Chapter 11 of the Bankruptcy Code or a responsible officer or an examiner with expanded powers shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or

(f)    an order of the Bankruptcy Court shall be entered granting (i) any Lien or security interest that is pari passu with or senior to the Liens and security interest of the Lender Agent and the Lenders in the Repurchased Loans, the HUD Claims or the other Post-Petition Collateral securing the Post-Petition Loan, or (ii) a Superpriority Claim in any of the Cases which is senior to the claims of Lender Agent and the Lenders against any Credit Party under this Agreement or the Barclays DIP Facility; or

(g)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest in or Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Post-Petition Collateral of any of the Credit Parties with a value in excess of $5,000,000, either individually or in the aggregate; or

(h)    the Bankruptcy Court shall enter an order or orders permitting or authorizing any actions that could reasonably be expected to have a Material Adverse Effect (as defined in the Barclays DIP Facility), or a determination by a court of competent jurisdiction with respect to any motion, pleading or proceeding brought by another party that could reasonably be expected to have a Material Adverse Effect (as defined in the Barclays DIP Facility); or

(i)    any Financing Order shall cease to be in full force and effect or an order of the Bankruptcy Court shall be entered reversing, staying, vacating or (except as otherwise agreed to in writing by Lender Agent in its sole discretion) otherwise amending, supplementing or modifying the Interim Financing Order or the Final Financing Order; or

(j)    any Credit Party shall make any Prepetition Payment other than (i) as permitted by the Interim Financing Order or the Final Financing Order, (ii) as otherwise permitted by this Agreement or (iii) as authorized by the Bankruptcy Court in accordance with orders entered on, before or after the PPL Closing Date, which orders permitting any such payment are in form and substance satisfactory to the Lender Agent, or other orders of the

<div style="text-align:center">10</div>

<div style="text-align:right"><em>Eighth Amendment to
A&R LOC Loan Agreement</em></div>

Bankruptcy Court entered with the written consent of (or non-objection by) Lender Agent; or

(k)   any Credit Party shall not comply with any terms of the Interim Financing Order or the Final Financing Order or a termination event is declared with respect to any other order authorizing the use of Cash Collateral; or

(l)   any Credit Party shall file a motion seeking or take any action supporting a motion seeking, or the Bankruptcy Court shall enter, an order authorizing a sale of Post-Petition Collateral which would violate Section 7.04(c) (unless such order requires and directs payment in full in cash of the PPL Obligations at the closing of such sale, whether pursuant to a Confirmation Order or otherwise); or

(m)   any Credit Party or any of its Affiliates shall (x) seek to, or support or fail to oppose any other Person's motion or pleading to, disallow or subordinate the PPL Obligations or challenge the Liens held by the Lender Agent with respect thereto, or (y) oppose a motion by any Lender or Lender Agent to confirm its claims or Liens with respect to the PPL Obligations, or (ii) in any case of the foregoing, the Bankruptcy Court enters a final order granting such relief; or

(n)   any stipulation shall be entered into by any Credit Party or any order shall be entered by the Bankruptcy Court with respect to the provision of adequate protection to any Person or the use of Cash Collateral by any Credit Party, in each case that is not satisfactory in form and substance to Lender Agent in its sole and absolute discretion; or

(o)   the Bankruptcy Court shall enter an order or orders authorizing recovery from the Post-Petition Collateral for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than (i) as may be provided in the Financing Orders, (ii) de minimus amounts or (iii) with the consent of the Lender Agent; or

(p)   any material suspension by a Credit Party of operation of its business, other than pursuant to a transaction permitted under this Agreement; or

(q)   (i) the Ally Sale Agreement and/or the Nationstar Sale Agreement shall be terminated, rescinded or revoked (in whole or in part) by any party thereto and is not replaced by a Replacement Sale Agreement, which Replacement Sale Agreement shall have been approved by the Bankruptcy Court within such sixty (60) day period; or (ii) any party to any Sale Agreement shall (x) admit in writing or state publicly its intent not to pursue the transactions contemplated by the Sale Agreement, or (y) act or fail to act in a manner that impairs such party's ability to perform its obligations under, or otherwise constitutes an anticipatory repudiation of, or a breach or default under (to the extent not cured within the applicable

*Eighth Amendment to*
*A&R LOC Loan Agreement*

grace period), any Sale Agreement unless a Replacement Sale Agreement shall have been approved by the Bankruptcy Court within sixty (60) days from such act; or (iii) the denial (in whole or in part) by the Bankruptcy Court of any of the relief sought in the Sale Motion or in any motion seeking approval of a Replacement Sale Agreement unless the initial relief requested shall be approved by the Bankruptcy Court pursuant to a Sale Order within sixty (60) days of such denial; or

(r)    (i) the failure of the Sale Order, as entered by the Bankruptcy Court, to provide that the PPL Obligations shall be repaid in full in Cash at the closing of the transactions approved by the Sale Order or (ii) the failure of the PPL Obligations to be repaid in full in cash at the closing of the transactions approved by the Sale Order; or

(s)    one or more post-petition money judgments, writs or warrants of attachment or similar process involving an amount in the aggregate in excess of $10,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) or one or more post-petition non-monetary judgments that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect shall be entered or filed against any Credit Party or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

(t)    any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days, other than pursuant to a transaction permitted under this Agreement; or

(u)    an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to, individually or in the aggregate, (i) result in liabilities in excess of $5,000,000 in the aggregate or (ii) have a Material Adverse Effect; or

(v)    a Change of Control shall occur; or

(w)    a Reorganization Plan that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases, or any of the Debtors shall propose any such plan; or

(x)    any Lien purported to be created under any Security Document or any Order shall cease to be, or shall be asserted by any Credit Party not to be, a valid and perfected Lien on any material portion of the Collateral or the Post-Petition Collateral, with the priority required by the Interim

*Eighth Amendment to
A&R LOC Loan Agreement*

Financing Order or Final Financing Order, except as expressly permitted hereunder or thereunder; or any Credit Party seeks to disallow its obligations under any Facility Document or to revoke, terminate or rescind any provision of any Facility Document or any Lien granted under the Security Documents and the Orders; or

(y)     termination of the Settlement and Plan Sponsor Agreement among ResCap for itself and its Debtor subsidiaries, and Ally Financial, for itself and certain of its subsidiaries and affiliates other than the Debtors dated May 14, 2012, pursuant to Section 3.2(c) thereof; or

(z)     the Debtors utilize the LOC DIP Account in a manner inconsistent with Section 4.06;

THEN, if any PPL Event of Default occurs and is continuing, Lender Agent (x) shall declare the Buyout Funding Commitment of each Lender and the obligation of each Lender to make Post-Petition Loans to be automatically terminated, and (y) may, at the request of the Required Lenders shall, take any or all of the following actions, at the same or different times, in each case without further order or application of the Bankruptcy Court (provided that with respect to the enforcement of Liens or other remedies with respect to the Collateral under clause (iii) below, Lender Agent shall provide the Borrowers with at least seven (7) days' written notice prior to taking the action contemplated thereby); in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, a PPL Event of Default has occurred and is continuing:

(i)     declare all or any portion of the unpaid principal amount of all outstanding Post-Petition Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under this Agreement to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Credit Parties;

(ii)    exercise any other remedies that are provided for in the Financing Orders; and/or

(iii)   exercise any of the rights and remedies otherwise available to it following an Event of Default, whether pursuant to this Agreement, or otherwise.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of applicable law."

SECTION 2.7 Amendments to Exhibits and Schedules:

(a)     The definition of "Loan" in Schedule 1.01 to the LOC Loan Agreement is hereby amended and restated in full to read as follows:

*Eighth Amendment to
A&R LOC Loan Agreement*

""Loan" means, collectively (x) "Loans" as defined in <u>Section 2.01(a)</u> and (y) Post-Petition Loans, except to the extent specific terms and conditions in this Agreement relate specifically to such Post-Petition Loans."

(b)     The definition of "Repayment Date" in Schedule 1.01 to the LOC Loan Agreement is hereby amended by adding the following at the end of the existing definition:

", and <u>further</u> <u>provided</u> that, solely with respect to the Post-Petition Loans, the "Repayment Date" shall mean the earliest of (i) the closing of a sale of all or a substantial part of the assets of the Debtors approved under Section 363 of the Bankruptcy Code or under a Chapter 11 plan, (ii) the Termination Date, and (iii) the occurrence of a PPL Event of Default, provided further that, notwithstanding the foregoing, all PPL Obligations shall be due and payable concurrently with the repayment of the Barclays DIP Facility."

(c)     The following definitions shall be added to Schedule 1.01 of the LOC Loan Agreement in appropriate alphabetical order:

"<u>Acceptable Alternative Sale Agreement</u>" means a Replacement Sale Agreement that is acceptable under the Barclays DIP Facility and satisfies each of the requirements listed below and shall otherwise, in form and substance, be acceptable to the Lender Agent in its reasonable discretion:

(i)     the agreement shall not be subject to any diligence or financing conditions and the proposed purchaser shall have obtained all requisite corporate/organizational approvals, and has obtained, or is reasonably likely to obtain all necessary governmental and third-party consents, within a time frame such that the contemplated sale is capable of being consummated by April 15, 2013 (the "<u>Sale Closing Milestone</u>").

(ii)     The proposed purchaser(s) is/are capable of consummating the sale by the Sale Closing Milestone, after taking into account all relevant legal, regulatory and business considerations.

(iii)     The agreement, and in the event there is more than one Replacement Sale Agreement, such Replacement Sale Agreements collectively, shall provide for payment in full in cash of the PPL Obligations and termination of the Buyout Funding Commitment.

"<u>Acceptable Reorganization Plan</u>" means a Reorganization Plan that (i) authorizes and implements the sale transactions contemplated under the Sale Agreements, (ii) provides for the termination of the Buyout Funding Commitment and the payment in full in cash of the PPL Obligations (other than contingent indemnification obligations not yet due and payable) on the effective date of such Reorganization Plan and (iii) provides for (x) releases and exculpations of the Lenders and Lender Agent in their capacities as such with respect to the Buyout Funding Commitment and the PPL Obligations, reasonably acceptable to the

<div align="center">14</div>

*Eighth Amendment to*
*A&R LOC Loan Agreement*

Lender Agent and (y) that the PPL Obligations shall not be discharged pursuant to the terms of such Reorganization Plan or the Confirmation Order.

"Ally Sale Agreement" means the asset purchase agreement between ResCap, GMACM and RFC and Ally Financial and BMMZ Holdings LLC, in the form attached to the Sale Motion,  collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith.

"Bankruptcy Code" means title 11 of the United States Code entitled "Bankruptcy" as now and hereafter in effect (or any similar or equivalent legislation as in effect in any applicable jurisdiction), or any successor statutes.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Barclays DIP Facility" means the $1,450,000,000 Secured Debtor-in-Possession Credit Agreement, dated as of the PPL Closing Date, with Barclays Bank PLC as agent for various lenders party thereto (the "Barclays DIP Lenders"), provided to certain Credit Parties in connection with the Cases.

"Buyout Commitment Amount" means $150,000,000, subject to the terms of the Financing Orders.

"Buyout Funding Commitment" means the obligation of the Lenders to provide Post-Petition Loans to GMACM subject to the terms of this Agreement in an aggregate amount not to exceed the Buyout Commitment Amount.

"Cases" means collectively, each and all of the cases under chapter 11 of the Bankruptcy Code with respect to which one of the (x) Borrowers is the debtor and the debtor-in-possession and (y) the Guarantors is the debtor and the debtor-in-possession.

"Cash Collateral" shall have the meaning provided in Section 363(a) of the Bankruptcy Code.

"Cash Management Order" has the meaning specified in Section 5.03(a).

"Confirmation Order" means an order of the Bankruptcy Court confirming a chapter 11 plan or plans in any of the Cases.

"Debtors" means ResCap and each of its Subsidiaries that have filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code.

"DIP Financing Amendment" means the Debtor-In-Possession Financing Amendment to this Agreement dated as of the PPL Closing Date and providing for the availability of Post-Petition Loans hereunder.

*Eighth Amendment to*
*A&R LOC Loan Agreement*

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or was sponsored, maintained or contributed to by, or required to be contributed by, ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates.

"<u>ERISA Affiliate</u>" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (c) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.  Any former ERISA Affiliate of ResCap or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of ResCap or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of ResCap or such Subsidiary and with respect to liabilities arising after such period for which ResCap or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"<u>ERISA Event</u>" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding the reportable event under Section 4043(c)(10) of ERISA coincident to the commencement of the Cases and those for which the provision for 30 day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code or Section 302 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA), the application for a minimum funding waiver with respect to a Pension Plan under Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA or the failure to make any required contribution to a Multiemployer Plan; (c) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA); (e) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (f) the withdrawal by ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to ResCap, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (g) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the imposition of liability on ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section

16

4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (i) the withdrawal of ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, that it has been determined to be in "endangered" or "critical" status within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (j) the occurrence of an act or omission which could give rise to the imposition on ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (k) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; or (l) receipt from the IRS of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code.

"Final Financing Order" means a final order approving the DIP Financing Amendment that is in substantially the form of the Interim Financing Order with only such changes from the Interim Financing Order as are satisfactory in form and substance to the Lender Agent in its sole discretion.

"Financing Orders" means, collectively, the Interim Financing Order and the Final Financing Order.

"GNMA Repurchases" has the meaning set forth in Section 2.11(a).

"HUD Claims" has the meaning set forth on the Financing Orders.

"Initial Approved DIP Budget" has the meaning set forth in Section 5.03(a).

"Interim Financing Order" shall mean the order of the Bankruptcy Court entered on May 16, 2012 under docket number 89.

"LOC DIP Account" has the meaning specified in Section 4.06.

"Nationstar Sale Agreement" means the asset purchase agreement between certain of the Debtors and Nationstar Mortgage LLC, in the form  attached  to  the  Sale Motion, collectively  with  all  schedules  and  exhibits  thereto  and  all  other

<div align="center">17</div>

agreements, documents and instruments related thereto and executed and/or delivered in connection therewith.

"Orders" means, collectively, the Financing Orders and the Cash Management Order.

"Original Sale Agreements" means, collectively, the Ally Sale Agreement and the Nationstar Sale Agreement.

"Petition Date" means May 14, 2012.

"Post-Petition Collateral" means (v) the LOC DIP Account, (w) the Collateral, (x) the Repurchased Loans and HUD Claims, (y) the Cash Collateral and (z) a Superpriority Claim, together with any additions thereto and proceeds therefrom.

"Post-Petition Interest Rate" has the meaning set forth in Section 2.11(e).

"Post-Petition Loans" has the meaning set forth in Section 2.11(a).

"PPL Closing Date" has the meaning set forth in Section 5.03(a).

"PPL Event of Default" has the meaning set forth in Section 8.03.

"PPL Obligations" means all Obligations arising from, or in any way related to, the Post-Petition Loans.

"PPL Outstandings" means, at any time, the aggregate principal amount of all outstanding Post-Petition Loans.

"Pre-Petition Indebtedness" means any and all Indebtedness incurred by any Credit Party prior to the Petition Date.

"Prepetition Payment" means a payment (by way of adequate protection or otherwise) of principal, interest, fees or otherwise on account of (a) Pre-Petition Indebtedness or (b) trade payables (including, without limitation, in respect of reclamation claims) or other prepetition claims against any Credit Party.

"Reorganization Plan" means a chapter 11 plan or plans filed in any or all of the Cases.

"Repurchased Loans" has the meaning set forth in the Financing Orders.

"Replacement Sale Agreement" means one or more sale agreements entered into within sixty (60) days following the termination, rescission or revocation of an Original Sale Agreement, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, which Replacement Sale Agreement is an Acceptable Alternative Sale Agreement.

18

"<u>Sale Agreement</u>" means an Original Sale Agreement or a Replacement Sale Agreement.

"<u>Sale Motion</u>" means the motion filed with the bankruptcy court on May 14, 2012 under docket number 61, as amended from time to time.

"<u>Sale Order</u>" means (a) an order or orders of the Bankruptcy Court approving: (i) the Ally Sale Agreement; (ii) the Nationstar Sale Agreement; and/or (iii) an Acceptable Alternative Sale Agreement, and in each case, directing the repayment in full in cash of the PPL Obligations and the termination of the Buyout Funding Commitment upon the closing of the transactions collectively contemplated by the applicable agreement(s) and containing terms consistent, in the reasonable judgment of the Lender Agent, with the Financing Orders and the rights of the Lender Agent and the Initial Lender as lender under the Buyout Funding Commitment, and/or (b) a Confirmation Order.

"<u>Specified Prepetition Facilities</u>" means, collectively, (a) this Agreement, (b) the Senior Debt Facility, (c) the 9.625% Junior Secured Guaranteed Notes due 2015 issued by ResCap pursuant to the Prepetition Junior Secured Indenture, in an initial aggregate face amount of $4,010,280,000 (as amended or supplemented prior to the date hereof), (d) the financing facility under the Amended and Restated Addendum to the Fannie Mae Contracts, dated as of July 11, 2011, between Fannie Mae and GMACM (as amended or supplemented prior to the date hereof) and (e) the credit facility under (i) the Amended and Restated Loan and Security Agreement, dated as of June [30], 2010, among GMACM, ResCap and Citibank, N.A., as amended by Amendment Number One, dated as of August 19, 2010, as amended by Amendment Number Two, dated as of September 15, 2010, as amended by Amendment Number Three, dated as of September 30, 2010, as amended by Amendment Number Four, dated as of November 30, 2010, as amended by Amendment Number Five, dated as of January 18, 2011, as amended by Amendment Number Six, dated as of March 15, 2011, as amended by Amendment Number Seven, dated as of April 1, 2011, as amended by Amendment Number Eight, dated as of April 11, 2011, as amended by Amendment Number Nine, dated as of February 1, 2012, and as amended by Amendment Number Ten, dated as of March 30, 2012 (as further amended or supplemented prior to the date hereof, the "<u>Prepetition MSR Loan Agreement</u>") and (ii) the other Facility Documents (as defined in the Prepetition MSR Loan Agreement).

"<u>Superpriority Claim</u>" means a claim against any Credit Party in any of the Cases that is a superpriority administrative expense claim having the priority set forth in the Financing Orders.

"<u>Termination Date</u>" means the earliest to occur of (a) the stated maturity date of the Barclays DIP Facility as in effect on the PPL Closing Date, (b) the date that is forty-five (45) days after entry of the Interim Financing Order if the Final Financing Order has not been entered by the Bankruptcy Court prior to the

<div align="center">19</div>

<div align="right"><em>Eighth Amendment to
A&R LOC Loan Agreement</em></div>

expiration of such 45-day period, (c) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date thereof) of a reorganization plan for any Credit Party that is confirmed pursuant to an order entered by the Bankruptcy Court, and (d) the date on which maturity of the Post-Petition Loans is accelerated and the commitments therefor are terminated pursuant to Section 8.03.

"Use Restriction" has the meaning set forth in Section 2.11(a). For avoidance of doubt, proceeds from Post-Petition Loans shall not be used to repurchase whole loans for any purpose other than as contemplated by the Use Restriction, including without limitation for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects.

<div align="center">

ARTICLE III
CONDITIONS TO EFFECTIVENESS

</div>

SECTION 3.1 Amendment Effectiveness. The provisions of this Agreement shall become effective on the date hereof.

SECTION 3.2 Undertaking. Each Credit Party shall utilize best efforts to prepare and submit all necessary documentation to the Bankruptcy Court in order to obtain entry of the Final Financing Order no later than forty-five (45) days after the date of entry of the Interim Financing Order.

<div align="center">

ARTICLE IV
NOTICES, CONFIRMATION AND ACKNOWLEDGMENTS

</div>

SECTION 4.1 Notice. Each party hereto hereby acknowledges timely notice of the execution of this Agreement and of the transactions and amendments contemplated hereby. Each party hereto hereby waives any notice requirement contained in the LOC Loan Agreement or the other Facility Documents with respect to the execution of this Agreement.

SECTION 4.2 Reservation of Rights. The Credit Parties each hereby acknowledge and agree that none of this Agreement, the making of any loan under the LOC Loan Agreement (including without limitation the Post-Petition Loans) by any Lender and any Lender's or the Lender Agent's consent thereto either before or after the date hereof shall constitute (w) an approval of the accuracy of all or any portion of any Borrower funding request or any certification delivered pursuant to the Facility Documents, (x) a waiver or forbearance by any Lender or the Lender Agent under any of the Facility Documents, (y) the acceptance by any Lender or the Lender Agent of any course of conduct by any Credit Party or any other Person or (z) an agreement by any Lender or the Lender Agent to amend any of the Facility Documents without all required approvals or related certifications. The Credit Parties each hereby further acknowledge and agree that the Lenders and the Lender Agent reserve all rights, remedies and options under the Facility Documents, including to require the Borrowers to satisfy in all respects the conditions relating to the making of any loan under the Facility Documents and the right to require each Credit Party to perform all of its obligations under the Facility Documents which are then due and owing or are susceptible of performance, as the case may be.

<div align="center">20</div>

<div align="right">*Eighth Amendment to*
*A&R LOC Loan Agreement*</div>

SECTION 4.3 <u>Confirmation of the Facility Documents</u>.  The Credit Parties each hereby acknowledge and agree that the LOC Loan Agreement and each other Facility Document (each as amended as of the date hereof) are each ratified and confirmed in all respects and shall remain in full force and effect in accordance with their respective  terms.  Without limiting the foregoing, each Credit Party reaffirms its grant of a security interest in all the Collateral pledged by it, and agrees that such security interest secures all Obligations.  As of the date hereof, each reference in the LOC Loan Agreement to "this Agreement" or in any other Facility Document to the "Loan Agreement" shall mean the LOC Loan Agreement as amended by this Agreement, and as hereinafter amended, restated or modified.

SECTION 4.4 <u>Non-waiver of Events of Default</u>.  The Credit Parties each hereby acknowledge and agree that Events of Default have occurred and are continuing with respect to all Loans (other than the Post-Petition Loans) under the LOC Loan Agreement, and as condition to the effectiveness of this Agreement expressly acknowledge that nothing contained herein shall be deemed a waiver by the Lender Agent or Lenders of such Events of Default.

ARTICLE V
MISCELLANEOUS

SECTION 5.1 **GOVERNING LAW.    THIS   AGREEMENT   SHALL   BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE   OF   NEW   YORK   WITHOUT   REGARD   TO   CONFLICTS   OF   LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL   OBLIGATIONS   LAW,   WHICH   BY   ITS   TERMS   APPLIES   TO   THIS AGREEMENT).**

SECTION 5.2 <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents) and all of which when taken together shall constitute one and the same agreement.

SECTION 5.3 **WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

SECTION 5.4 <u>Entire Agreement</u>.    This Agreement, the Orders, the LOC Loan Agreement and the other Facility Documents embody the entire agreement and understanding of the parties hereto and supersede any and all prior agreements, arrangements and understanding relating to the matters provided for herein.

SECTION 5.5 <u>Captions</u>.  The various captions in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

*Eighth Amendment to*
*A&R LOC Loan Agreement*

SECTION 5.6 <u>Severability</u>.    If any provision of this Agreement, or the application thereof to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason (in any jurisdiction), the remaining terms of this Agreement, modified by the deletion of the unenforceable invalid or illegal portion (in any relevant jurisdiction), will continue in full force and effect, and such unenforceability, invalidity or illegality will not otherwise affect the enforceability, validity or legality of the remaining terms of this Agreement so long as this Agreement, as so modified, continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the deletion of such portion of this Agreement will not substantially impair the respective expectations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.

SECTION 5.7 **SUBMISSION TO JURISDICTION.    EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.    EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.    EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES.    THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.**

[signature pages follow]

22

*Eighth Amendment to*
*A&R LOC Loan Agreement*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

RESIDENTIAL FUNDING COMPANY, LLC
GMAC MORTGAGE, LLC
as Borrowers

By: _____
Name: Joseph Ruhlin
Title:   Treasurer and Treasury Executive


RESIDENTIAL CAPITAL, LLC,
as Guarantor

By: _____
Name: Joseph Ruhlin
Title:   Treasury Executive


HOMECOMINGS FINANCIAL, LLC,
as Guarantor

By: _____
Name: Joseph Ruhlin
Title:   Treasurer and Treasury Executive


RFC ASSET HOLDINGS II, LLC
PASSIVE ASSET TRANSACTIONS, LLC
GMAC RESIDENTIAL HOLDING COMPANY, LLC and
GMAC-RFC HOLDING COMPANY, LLC,
as Guarantors

By: _____
Name: Joseph Ruhlin
Title:   Treasurer and Treasury Executive

EQUITY INVESTMENT I, LLC,
as Guarantor

By:_____

Name: Heather Anderson
Title:    Assistant Treasurer

ALLY FINANCIAL INC.
(f/k/a GMAC Inc.),
as Lender Agent and Initial Lender

By: _____

Name: Christopher A. Halmy

Title: Corporate Treasurer

SCHEDULE 7.04

## POST-PETITION ADMINISTRATIVE AND REPORTING REQUIREMENTS

1.      Deliver its daily cash tracking report to the Lender Agent.

2.      Cash collections from domestic operations are moved into the LOC Concentration account or LOC DIP Account, as applicable, within 5 Business Days of receipt for amounts greater than $2 million, unless waived by Lender Agent. All other amounts moved as soon as administratively possible. These collections shall include advance collections, servicing fees, borrower payments and bond payments.

3.      Borrowing Base is delivered monthly, with pledged Repurchased Loans and HUD Claims added, at the same time as reports are delivered under the Financing Orders.  Borrower shall continue to deliver an Officer's certificate with respect to the Borrowing Base in form and substance similar to the certificate required under the LOC Loan Agreement.

4.      Post-Petition Loans will be made to fund GNMA Repurchases on one Business Day's notice, but repurchases will be funded with corporate cash before Post-Petition Loan is made.

5.      Any other pre-petition cash moves for collections or sales proceeds which simply moved cash into and out of a LOC bank account would cease as new collection process is implemented.

6.      Interest calculation and accrued interest.