MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

--------------------------------------------------------------

**DEBTORS' MOTION FOR SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE
SECTIONS 105(a), 362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019
(I) AUTHORIZING THE DEBTORS TO CONTINUE IMPLEMENTING LOSS
MITIGATION PROGRAMS; (II) APPROVING PROCEDURES FOR COMPROMISE
AND SETTLEMENT OF CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF
ACTION; (III) GRANTING LIMITED STAY RELIEF TO PERMIT FORECLOSURE
AND EVICTION PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE
DISPUTES TO PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE
<u>DEBTORS TO PAY SECURITIZATION TRUSTEE FEES AND EXPENSES</u>**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move for entry of an order, a proposed form of which is attached hereto

as <u>Exhibit 1</u> (the "Order"), under sections 105(a), 361, 362, 363, 502, 1107(a) and 1108 of title

11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on
<u>Exhibit 1</u> to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may
file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

Bankruptcy Procedure (the "Bankruptcy Rules") (i) authorizing the Debtors to continue implementing loss mitigation programs; (ii) approving procedures for the compromise and settlement of certain claims, litigations and causes of action in the ordinary course of the Debtors' business; (iii) granting limited stay relief to permit (w) borrowers or their tenants, as applicable, to prosecute direct claims and counter-claims in foreclosure and eviction proceedings (including in states in which non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where they service senior mortgage loans and own the junior mortgage loans on the underlying property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions involving the amount, validity or priority of liens on properties subject to foreclosure proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee fees and expenses.[2]  In support of the Motion, the Debtors rely upon and incorporate by reference the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings (D.E. 6) (the "Whitlinger Affidavit") and the Declaration of Sewit Bocresion (the "Bocresion Declaration"), Senior Vice President of Default Operations for certain of the Debtors, attached hereto as Exhibit 3.  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion

---

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

relief requested herein are Bankruptcy Code sections 105(a), 361, 362, 363, 502, 1107(a) and

1108 and Bankruptcy Rule 9019(b).

## BACKGROUND

2.      On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary

petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are

managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code

sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy

Rule 1015(b).  No trustee or examiner has been appointed in these Chapter 11 cases.

3.      On the Petition Date, the Debtors filed two motions requesting authority to

continue their loan servicing activities and certain related relief.  See Docket No. 57 (the "GA

Servicing Motion")[3] and (D.E. 46)[4] (the "Non-GA Servicing Motion" and together with the GA

Servicing Motion, the "Servicing Motions").  In support of this Motion, the Debtors rely upon

and incorporate by reference the Servicing Motions.[5]

4.      On May 15, 2012, the Court entered an order granting the GA Servicing Motion

on an interim basis (D.E. 91) (the "Interim GA Servicing Order"), and on May 16, 2012, the

---

[3]      Debtors' Motion for Interim and Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief

[4]      Debtors' Motion for Interim and Final Orders Under Sections 105(a), 362, 363, 1107(a) and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Non-Governmental Association Loans, and (B) Sale Activities Related to Certain Loans in Foreclosure and Real Estate Owned Property, and (II) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and Eviction Proceedings

[5]      Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Servicing Motions.

Court entered an order granting the Non-GA Servicing Motion on an interim basis (D.E. 87) (the

"Interim Non-GA Servicing Order" and together with the Interim GA Servicing Order, the

"Interim Servicing Orders").

5.    A hearing to consider approving the Servicing Motions on a final basis is

scheduled to be held on June 12, 2012.

6.    On May 16, 2012, the United States Trustee for the Southern District of New

York (the "U.S. Trustee") appointed a nine member official committee of unsecured creditors

(the "Creditors' Committee").

7.    The Debtors are a leading residential real estate finance company indirectly

owned by Ally Financial Inc., which is not a Debtor.  The Debtors and their non-debtor affiliates

operate the fifth largest mortgage servicing business and the tenth largest mortgage origination

business in the United States.  A more detailed description of the Debtors, including their

business operations, their capital and debt structure, and the events leading to the filing of these

bankruptcy cases, is set forth in the Whitlinger Affidavit.

**RELIEF REQUESTED**

8.    As explained more fully herein, since the Court granted the relief set forth in the

Interim Servicing Orders, the Debtors have confronted issues on a day-to-day basis in the

conduct of the ordinary course of their businesses that require a clarification of and a supplement

to the relief previously granted under the Interim Servicing Orders.  Accordingly, by this Motion,

the Debtors seek to so supplement and clarify the relief previously granted in the Interim

Servicing Orders by requesting entry of the Order, substantially in the form attached hereto as

Exhibit 1:  (i) authorizing the Debtors to continue implementing loss mitigation programs;

(ii) approving procedures for the compromise and settlement of certain claims, litigations and

causes of action in the ordinary course of the Debtors' business; (iii) granting limited stay relief

to permit (w) borrowers or their tenants, as applicable, to prosecute direct claims and counter-claims in foreclosure and eviction proceedings (including in states in which non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where they service senior mortgage loans and own the junior loans on the underlying property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions involving the amount, validity or priority of liens on properties subject to foreclosure proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee fees and expenses.

## BASIS FOR RELIEF

### A.    Loss Mitigation Programs

9.    In the ordinary course of their servicing business, the Debtors implement various loss mitigation programs, including, but not limited to, offering borrowers payments in order to incentivize them to pursue short sales where the estimated loss upon foreclosure is greater than the loss on a short sale,[6] or to vacate properties in lieu of a foreclosure or eviction,[7] or offering payments in the form of borrower rebates following loan payoffs.

10.    The Debtors' loss mitigation programs assist borrowers to avoid foreclosure while stabilizing the risk of loss to investors.  For borrowers who accept the offer to participate in these programs, the Debtors' foreclosure resolution timelines may be reduced considerably, thus

---

[6]    By way of example, with respect to certain Ginnie Mae Loans held on the Debtors' balance sheet, the Debtors may offer borrowers a portion of the proceeds from the short sale of their properties in order to expedite a short sale. The amount of the incentive payments under this program ranges between $5,000 and $10,000, and is based on the difference between the expected short sale liquidation proceeds and the estimated foreclosure sale proceeds.

[7]    This type of so-called "cash for keys" program may be implemented in a variety of circumstances, including as a loss mitigation measure or as part of a settlement in connection with foreclosure proceedings, eviction proceedings or borrower bankruptcy cases, the latter of which are addressed in more detail below.

reducing the amount of Foreclosure Timeline Penalties assessed against them and improving

their short term liquidity.

11.    The Debtors respectfully submit that these loss mitigation activities are in the

ordinary course and are authorized by the Interim Servicing Orders.  However, for the avoidance

of doubt as to whether the Interim Servicing Orders cover such actions, the Debtors hereby

request express authority to continue to implement loss mitigation programs currently in place

and to develop and implement additional programs as they deem reasonable and appropriate in

the exercise of their business judgment *nunc pro tunc* to the Petition Date.  Such programs may

include, but are not limited to, making payments to borrowers or other non-insider third parties.

**B.      Settlement Procedures**

12.    In their capacity as a loan servicer and/or owner, the Debtors are currently

participating (either as the plaintiff/creditor or as servicer for the plaintiff/creditor) in

approximately 65,000 foreclosure proceedings and 51,000 borrower bankruptcy proceedings.  It

is not uncommon for borrowers, mortgagors, and other lienholders to raise defenses and related

counter-claims against the Debtors in order to preserve their purported interests in the property

underlying the mortgage loans.  In addition, the Debtors may be required to bring eviction

proceedings against borrowers or their tenants residing in properties subject to mortgages upon

which the Debtors have foreclosed.  Many of these cases can be resolved more quickly and

inexpensively through settlements with the borrowers rather than through continued time-

consuming litigation.

13.    The Debtors do frequently settle such matters in the ordinary course of their

servicing businesses in connection with their Servicing Functions.  However, out of an

abundance of caution and in order to assure counter-parties and other tribunals that the Debtors

have this authority, the Debtors seek express authority from this Court pursuant to sections 105,

363 and 502 of the Bankruptcy Code and Bankruptcy Rule 9019(b) to resolve certain Claims

(defined below) without further notice or hearing, except as provided by the procedures outlined

below (the "Settlement Procedures").

14.     In addition, the Debtors are mindful that under Bankruptcy Rule 9019, the Court

typically is required to approve compromises and settlements out of the ordinary course.

Likewise, the Debtors appreciate that, particularly at this very early stage of the Chapter 11 cases

while the Creditors' Committee acquaints itself with the Debtors' operations, the compromise of

claims may be an issue of concern to the Creditors' Committee.

15.     While the Debtors submit that such settlements are in the ordinary course and are

authorized by the Interim Servicing Orders, absent the relief proposed herein, the Debtors'

counter-parties may be reluctant to consummate such settlements, thus requiring the Debtors to

seek specific court approval in each such instance.  This would require drafting and filing

individual pleadings and providing parties with an opportunity for a hearing with respect to each

proposed settlement.  Resolving all borrower claims related to foreclosures, evictions or

borrower bankruptcies in this manner would be extraordinarily expensive, burdensome and

inefficient for all parties, and particularly burdensome on the Court's docket.  Indeed, the costs

of obtaining such court approval would significantly reduce the benefits of many of these

settlements.

16.     To aid the Debtors' efforts to reduce expenses, maximize the value of their estates

and promote judicial economy, the Debtors respectfully request that the Court approve and

authorize the Settlement Procedures set forth below.

17.     The Debtors seek to implement the following two-tiered settlement process based

on the proposed settlement amount with respect to claims brought by the Debtors against any

non-insider third parties in connection with foreclosure, eviction or borrower bankruptcy

proceedings (each a "Settling Party") or by a Settling Party against any of the Debtors (each, a

"Claim"):

(a)  Tier I:  The Debtors, in their sole discretion, may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts not to exceed $50,000 in full settlement of such Claim (each, a "Tier I Settlement").

(b)  Tier II:  The Debtors, in their sole discretion, may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts exceeding $50,000 but less than $100,000 in full settlement of such Claims (each, a "Tier II Settlement"); provided, that in each case:

(i)  The Debtors must provide advance notice of the terms of any Tier II Settlement to (x) the U.S. Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn:  Brian S. Masumoto, (y) counsel for the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, NY 10036, Attn: Kenneth H. Eckstein and Douglas H. Mannal; and (z) counsel to the administrative agent for the Debtors' providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, Attn: Kenneth S. Ziman and Jonathan H. Hofer (collectively the "Notice Parties").

(ii)  Those Notice Parties wishing to object to any proposed Tier II Settlement must serve a written objection on the Debtors, so that it is received by no later than 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) calendar days from the date the Debtors provided written notice of such Tier II Settlement (the "Settlement Objection Deadline").  Objections should be addressed to the proposed attorneys for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Norman S. Rosenbaum).

(iii)  If the Debtors receive a timely objection from a Notice Party, the parties will confer and attempt to resolve any differences.  Failing that, the Debtors may petition the Court for approval of the Tier II Settlement in accordance with any case management orders entered in the Chapter 11 cases.  An objection by a Notice Party with respect to a given Tier II Settlement shall not delay the finality or effectiveness of any other settlement to which an objection has not timely been delivered.

8

(iv)     If the Debtors do not receive a written objection to a Tier II Settlement from a Notice Party by the Settlement Objection Deadline, then such Tier II Settlement shall be deemed approved and the Debtors and Settling Parties may carry out the terms of such Tier II Settlement without further notice or approval required.

18.     The Debtors shall be required to seek approval from the Court in order to enter into and consummate any proposed settlement of a Claim with a settlement amount in excess of $100,000.

19.     The Debtors represent that no settlement will be agreed to by the Debtors unless it is reasonable, in the sole discretion of the Debtors, and upon consideration of: (a) the probability of success if the Claim were to be litigated, arbitrated or otherwise resolved, (b) the complexity, expense and likely duration of any litigation, arbitration or resolution, (c) other factors relevant to assessing the settlement and (d) the equity of the settlement vis-à-vis the Debtors' estates, creditors and shareholders.

20.     These Settlement Procedures are without prejudice to the right of the Debtors to seek an order of this Court approving additional or different procedures with respect to specific claims or categories of claims. The Debtors anticipate that the may seek to expand or modify these procedures in connection with other litigation or disputes to which they are parties.

## C.     Limited Relief from Automatic Stay

### 1.     Borrower Foreclosure and Eviction Proceedings

21.     The Debtors in their capacity as loan servicer and, with respect to loans they own, in their capacity as mortgagee, conduct foreclosure proceedings in all fifty states, the District of Columbia, and the U.S. Virgin Islands.[8]  In approximately 23 of those jurisdictions, foreclosures are conducted through a judicial process (the "Judicial States").  In the remaining jurisdictions in

---

[8]     The Debtors' servicing agreements may also require them to bring foreclosure actions in other locations, including Puerto Rico, although no foreclosure actions are currently pending there.

ny-1042482

which the Debtors conduct foreclosures, the foreclosure action may also be conducted without the necessity for judicial action or through a quasi-judicial process (the "Non-Judicial States"). In the Judicial States, a borrower, mortgagor, or lienholder may oppose and respond to the foreclosure by asserting defenses and counterclaims in the judicial proceeding.  In the Non-Judicial States, a borrower who wishes to defend a non-judicial foreclosure must instead commence an action against the Debtors in which the borrower can assert direct claims and causes of action, including claims for money damages and other forms of relief.  In addition, in their capacity as a loan servicer, the Debtors may be required to bring eviction proceedings against borrowers or their tenants residing in properties subject to loans upon which the Debtors have foreclosed.

22.    The direct claims and counter-claims asserted by (a) borrowers in foreclosure actions (including actions in Non-Judicial States) or (b) tenants in eviction actions described above are or may be subject to the automatic stay under Bankruptcy Code section 362(a). Principles of fundamental fairness and administrative efficiency weigh in favor of a limited modification of the automatic stay in order to allow borrowers, or their tenants, as applicable, to assert those claims that would be a defense to the foreclosure or eviction actions.  However, as Judge Peck recognized during the continued first day hearing, crafting a definition of the modification that is both precise enough to provide borrowers with adequate guidance but flexible enough to be useful is an iterative process.[9]

23.    To address Judge Peck's concerns, and following consultation with parties in interest, the Debtors agreed that the best course of action under the circumstances would be to allow blanket relief for any counter-claim in a foreclosure or eviction proceeding on an interim

---

[9]    See Cont'd First Day Hr'g Tr. 43:11-23, May 15, 2012.

ny-1042482

basis, subject to the ability of the Debtors to return to the Court for clarification or modification

as necessary and appropriate in light of subsequent actions by borrowers.  As Judge Peck aptly

predicted, in the brief period of time that has elapsed since the first day hearing, the Debtors have

been confronted with numerous issues and requests for clarification by both their counsel and

borrowers' counsel regarding the scope of blanket stay relief.  Among other things, the Debtors

seek to clarify that the stay modification applies to foreclosure proceedings in Non-Judicial

States.  Additionally, the Debtors request that the Court make clear that the stay relief granted

pursuant to the Interim Servicing Orders does not apply to any class action or similar

proceedings.

      24.     After giving close consideration to the concerns expressed and the need to

implement precise guidelines that serve both the Debtors' and borrowers' interests, the Debtors

request that the Court modify the blanket stay relief granted to borrowers pursuant to the Interim

Servicing Orders as follows:

    (a)    except as otherwise set forth in the Order, a borrower, mortgagor, or lienholder (each, an "Interested Party") shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor, in defense of any foreclosure, whether in a Judicial State or a Non-Judicial State, or eviction proceeding, where a final judgment permitting the foreclosure or eviction has not been awarded, and to prosecute appeals with respect to any such direct claims or counter-claims;

    (b)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Interested Party direct claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for relief that if granted, would not terminate or preclude the prosecution and completion of a foreclosure or eviction; or (iii) asserted in the form of a class action or collective action;

    (c)    absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Interested Party on behalf of any other Interested Party or class of Interested Parties;

ny-1042482

(d)     under no circumstances shall an Interested Party be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of the Order;

(e)     the Debtors shall retain the right, upon appropriate motion and notice to any affected Interested Party, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Order; and

(f)     nothing set forth herein shall preclude or limit any Interested Party from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

### 2.     Borrower Bankruptcy Proceedings

25.     From time to time, individual borrowers may file for bankruptcy protection.  As of the Petition Date, the Debtors were participants (either as a creditor or as servicer for a creditor) in approximately 51,000 borrower bankruptcy cases in all fifty states, the District of Columbia, and Puerto Rico.[10]  The Debtors, in their capacity as servicer and/or mortgagee for such borrowers' mortgage loans and with the assistance of various outside counsel and professionals, monitor the borrowers' bankruptcy cases and are often responsible for filing a proof of claim on behalf of the owner of the loan, defending against attempts to avoid or reduce the secured interest or lien on the borrowers' property, responding to demands for an accounting, or filing and prosecuting motions for relief from the automatic stay to foreclose on the borrowers' property.  Arguably, the automatic stay imposed by section 362 of the Bankruptcy Code precludes Chapter 13 trustees, Chapter 7 trustees or debtor borrowers from taking any action adverse to the Debtors' interest in their respective bankruptcy cases.  Generally speaking, the Debtors would be afforded no benefit by delaying the resolution of a borrower's bankruptcy case as it would simply delay the Debtors' ultimate recovery, if any, on their mortgage loan in

---

[10]     The Debtors' servicing agreements may also require them to participate in borrower bankruptcy proceedings in other locations, including the U.S. Virgin Islands, although no borrower bankruptcy proceedings are currently pending there.

issue.  In many instances, the Debtors represent the interests of the second or third lien holders, which often have no secured value in the property.  It would be inefficient and inequitable to delay borrower relief in such instances.

26.     Accordingly, the Debtors request that the Court further modify the automatic stay with respect to any borrower who currently has filed, or in the future files, for bankruptcy protection under any chapter of the Bankruptcy Code (a "Bankruptcy Borrower") as follows:

(a)     except as otherwise set forth in the Order, a Bankruptcy Borrower or a trustee duly appointed under the Bankruptcy Code in the Bankruptcy Borrower's bankruptcy case (a "Bankruptcy Trustee") shall be entitled to:  (i) assert and prosecute or continue to prosecute an objection to the Debtors' proof of claim filed in the Bankruptcy Borrower's bankruptcy case; (ii) assert and prosecute or continue to prosecute an objection to the Debtors' motion for relief from the automatic stay filed in the Bankruptcy Borrower's bankruptcy case; (iii) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to determine the validity, priority or extent of a Debtor's lien against the Bankruptcy Borrower's property; (iv) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to reduce or fix the amount of the Debtors' claim or lien against the Bankruptcy Borrower's property; (v) seek an accounting from the Debtors with respect to the Bankruptcy Borrower's loan; and (vi) enter into, execute and consummate a written agreement of settlement with the Debtors where the Debtors elect to enter into such settlement in their sole discretion (but subject to the Settlement Procedures), to resolve items (i) through (v) above;

(b)     except as otherwise set forth in the Order, a Bankruptcy Borrower shall be entitled to (i) engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankruptcy Borrower's loan; and (ii) engage in discussions with the Debtors and execute a modification of the Bankruptcy Borrower's loan or otherwise discuss, enter into and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

(c)     absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all Bankruptcy Trustee's and Bankruptcy Borrower's direct claims, counter-claims, motions or adversary proceedings:  (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for violation of any local, state or federal statute or other law in connection with the origination of the Bankruptcy Borrower's loan; (iii) for relief that if granted, would have no effect on the amount, validity or priority of the Debtors' claim or lien against a Bankruptcy Borrower or the property of the Bankruptcy Borrower securing such claim or lien of the Debtors; or (iv) asserted in the form of a class action or collective action;

13

(d)     absent further order of the Court, the automatic stay shall remain in full force and
effect with respect to any party seeking to intervene to assert related claims against the
Debtors or any class action or collective action brought by any Bankruptcy Borrower
on behalf of any other class of borrowers;

(e)     under no circumstances shall a Bankruptcy Borrower or Bankruptcy Trustee be
entitled to recoup, setoff or collect from the Debtors any judgment or award related to
any direct claim or counter-claim for which the automatic stay has been lifted by the
terms of the Order;

(f)     the Debtors shall retain the right, upon appropriate motion and notice to any
Bankruptcy Borrower or Bankruptcy Trustee, to seek to impose any provision of
section 362(a) of the Bankruptcy Code modified by the Order; and

(g)     nothing set forth in the Order shall preclude or limit any Bankruptcy Borrower or
Bankruptcy Trustee from seeking relief from the automatic stay under section 362(a)
of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in
interest.

### 3.    Foreclosures By The Debtors On Senior Loans

27.    The Debtors own a number of mortgage loans that are subordinate (collectively,

the "Junior Loans") to the first lien on the underlying property (collectively, the "Senior Loans").

In addition, in some cases, the Debtors do not actually own the Junior Loan but are nonetheless

reflected as having an interest in the Junior Loan (as owner, servicer, originator, as mortgagee of

record or otherwise) in the applicable public land records.  For the sake of convenience, for

purposes of this Motion, references to the Debtors' "owned" Junior Loans include such recorded

non-ownership interests.

28.    The Debtors service the Senior Loans for approximately 17,000 properties for

which the Debtors also own the Junior Loans.[11]  Of these Senior Loans, nearly 200 are currently

in foreclosure and over 800 are otherwise in default and, therefore, may be subject to foreclosure

---

[11]    The Debtors also own Junior Loans with respect to numerous properties for which third party servicers service
the first priority mortgage.  By this Motion, the Debtors are not seeking to modify the automatic stay in order to
allow such third party servicers to prosecute foreclosure proceedings that may impact the Debtors' interests in the
Junior Loans and the automatic stay as to these third party servicers remains in full force and effect.

ny-1042482

in the near term.  Although the Debtors typically do not foreclose on Junior Loans, the applicable

servicing agreements may require the Debtors to pursue foreclosures with respect to the

delinquent Senior Loans.  As a result, in cases where the borrower is delinquent with respect to

the Senior Loan, the Debtors in their capacity as servicer are contractually bound to proceed with

a foreclosure on the Senior Loan.

29.     In many jurisdictions, in order to foreclose on a senior mortgage interest, a party

is required to name any and all holders of subordinate interests as defendants to the foreclosure

complaint or to take other action to divest the junior lien holder of its interest.  However, as a

consequence of the imposition of the automatic stay, the Debtors are precluded from taking such

actions with respect to properties for which they service the Senior Loans and own the Junior

Loans—and, as a result, from proceeding with the foreclosure of the Senior Loan—absent a

grant of relief from the automatic stay by the Court.

30.     Accordingly, the Debtors request that the automatic stay be modified to allow the

Debtors to initiate and continue foreclosure proceedings with respect to Senior Loans.

Specifically, in those circumstances where the Debtors act as servicer for the Senior Loan and

also own the Junior Loan, the Debtors request that the Court modify the automatic stay as

follows:

(a)     except as otherwise set forth in the Order, the Debtors shall be entitled to assert and
prosecute foreclosure actions relating to the Senior Loan, whether in a Judicial State
or a Non-Judicial State;

(b)     the Debtors shall be entitled to take such actions as are necessary to extinguish the
lien with respect to the Junior Loan or to otherwise ensure clear and marketable title
with respect to the property underlying the Senior Loan in connection with any sale or
disposition of such property; and

(c)     the Debtors shall be entitled to seek all appropriate relief with respect to the Senior
Loan in connection with the bankruptcy cases of a Bankruptcy Borrower without
further order of the Court.

31.    The relief requested will not have a detrimental impact on the Debtors' estates.  If the subject property has no value in excess of the first priority lien, then the Debtors' second priority lien is, for all practical purposes, without value, even absent the foreclosure.  If, on the other hand, the property does have excess value, then the Debtors are entitled to receive any excess proceeds from the foreclosure sale remaining after the Senior Loan is paid in full.  In either case, the Debtors are placed in no worse a position than they were prior to the foreclosure.

**D.    Actions Involving Amount, Validity Or Priority Of Liens**

32.    Actions involving the amount, validity, and/or priority of liens are regularly commenced by third parties purporting to have a lien interest or other claim ("Third Party Claimants") with respect to properties that are subject to mortgages owned or serviced by the Debtors (the "Title Disputes").  The existence of such suits may be a cloud on title, potentially precluding the Debtors from conducting foreclosure activities with respect to the subject properties.  As a consequence of the imposition of the automatic stay, the Title Disputes cannot proceed, nor can the Debtors' already delayed foreclosure activities.  Prompt resolution of pending Title Disputes is necessary to permit the efficient and expeditious conclusion of foreclosure proceedings.

33.    Accordingly, the Debtors request that the automatic stay be modified to allow Title Disputes filed in connection with foreclosure actions commenced by the Debtors to be resolved as follows:

(a)    except as otherwise set forth in the Order, a Third Party Claimant shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor in connection with any Title Dispute, and to prosecute appeals with respect to any such direct claims or counter-claims;

(b)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Third Party Claimant direct claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the

16

Debtors; (ii) for relief that is not necessary for the resolution of the Title Dispute; or (iii) asserted in the form of a class action or collective action;

(c)    absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Third Party Claimant on behalf of any other Third Party Claimant or class of Third Party Claimants;

(d)    under no circumstances shall a Third Party Claimant be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of the Order;

(e)    the Debtors shall be entitled to take such actions as are necessary to clear title with respect to property that is subject to a Title Dispute or to otherwise ensure clear and marketable title with respect to such property in connection with any sale, foreclosure or disposition of such property;

(f)    the Debtors shall retain the right, upon appropriate motion and notice to any affected Third Party Claimant, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Order; and

(g)    nothing set forth herein shall preclude or limit any Third Party Claimant from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

## E.    Payment Of Securitization Trustee Fees And Expenses

34.    As described in detail in the Servicing Motions, in the past, the Debtors facilitated the securitization of mortgage loans by purchasing loans and selling them to Debtor-sponsored securitization trusts (collectively, the "Securitization Trusts") for so-called "private label" securitization pools, in some cases through one or more intermediaries.  The interests in the Securitization Trusts—as well as the accompanying rights to receive the income generated by the mortgage loans held therein—are evidenced by certificates or, in some cases bonds or notes (collectively, "MBS"), which were issued and sold to various investors (the "MBS Holders"). The Debtors generally retained the rights to service the loans that were ultimately sold into the Securitization Trusts.

35.     The Debtors, either as sellers or as servicers of the loans sold to a Securitization

Trust, have certain obligations with respect to the loans held by the Securitization Trust, and to

the trustees that administer the Securitization Trusts (each a "Trustee") pursuant to the terms of

indentures, servicing agreements, pooling and servicing agreements, and other securitization

documents, as applicable (the "Agreements").  The Agreements contain provisions that provide

for the Debtors in their capacity as sellers of the loans to repurchase loans sold to the

Securitization Trust that breach certain representations and warranties.  The Agreements also

contain provisions that provide for the Debtors in their capacity as servicers of the loans to

perform servicing functions, including making principal, interest, and other servicing advances,

and reimbursing and indemnifying the Trustees for any liability, loss, fees, cost or expense

incurred by any of the Trustees in the performance of their duties or their administration of the

Securitization Trusts to the extent required by the terms of the Agreements.  Representative

excerpts of the applicable trustee fee, expense and indemnification provisions, which are

substantially similar across the vast majority of the Agreements, are attached as Exhibit 2 hereto.

36.     The Debtors have negotiated a proposed settlement agreement with certain MBS

Holders with respect to certain claims arising out of the sale and servicing of loans held by the

Securitization Trusts (the "MBS Settlement Agreement"), approval of which will be sought

pursuant to a motion that will be filed with the Court separately.  The Debtors believe that the

continued performance of their servicing functions and the payment of Trustees' fees pursuant to

the Agreements is within the ordinary course of the Debtors' servicing business.  However, out

of an abundance of caution and at the request of the Securitization Trustees, the Debtors request

express authorization and direction, pursuant to the applicable provisions of the Agreements, to

continue performing their servicing functions, including making principal, interest, and other

servicing advances, and reimbursing and indemnifying the Trustees for any liability, loss, fees,

cost or expense incurred by any of the Trustees in the performance of their duties or their

administration of the Securitization Trusts to the extent required by the terms of the Agreements,

including in connection with reviewing and analyzing the request by the Debtors to approve the

MBS Settlement Agreement, and in connection with reviewing and analyzing amendments to the

Agreements as necessary or appropriate in connection with any proposed Chapter 11 plan, the

MBS Settlement Agreement or the Platform Sale.

## APPLICABLE AUTHORITY

**A.     The Court Should Authorize The Debtors To Continue Implementing Loss
Mitigation Programs And To Pay Securitization Trustee Fees and Expenses
Pursuant To Section 363 Of The Bankruptcy Code**

37.     The Debtors' implementation of loss mitigation programs and the payment of

Trustee fees and expenses pursuant to the applicable Agreements each fall within the ordinary

course of the Debtors' business within the meaning of Bankruptcy Code section 363(c)(1).

Nonetheless, the relief requested herein is essential to provide comfort to those doing business

with the Debtors.  Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to

use, sell, or lease property of the estate in the ordinary course of its business.  See 11 U.S.C.

§ 363(c).  Section 363(c) of the Bankruptcy Code, in relevant part, provides:

> If the business of the debtor is authorized to be operated under section 721, 1108,
> 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee
> may enter into transactions, including the sale or lease of property of the estate, in
> the ordinary course of business, without notice or a hearing, and may use property
> of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

38.     The ordinary course of business standard was intended to allow a debtor in

possession the flexibility required to run its business and respond quickly to changes in the

business environment.  Moore v. Brewer (In re HMH Motor Servs., Inc.), 259 B.R. 440, 448-49

(Bankr. S.D. Ga. 2000).  A debtor in possession, thus, may use, sell or lease property of the

estate without need for prior court approval if the transaction is in the ordinary course.  Comm.

of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville

Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate

property do not require a prior hearing); Armstrong World Indus. v. James A. Phillips, Inc. (In re

James A. Phillips, Inc.), 29 B.R. 391, 394 (S.D.N.Y. 1983) (holding that where a debtor in

possession is merely exercising the privileges of his status, there is no general right to notice and

hearing concerning particular transactions conducted in the ordinary course of the business).

39.     Courts broadly interpret the term ordinary course.  Gassen v. Universal Bldg.

Materials, Inc. (In re Berkley Multi-Units, Inc.), 88 B.R 394, 396 (Bankr. M.D. Fla. 1988).  In

determining whether a transaction is in the ordinary course of business under Bankruptcy Code

section 363, the courts apply a two-pronged test: (1) the objective horizontal test, and (2) the

subjective vertical test.  See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379,

384-85 (2d Cir. 1997); see also In re Dana Corp., 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006)

(and cases cited therein); In re The Leslie Fay Cos., 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).

The horizontal test is a factual analysis as to whether the transaction in question is of the sort

commonly undertaken by companies in that industry.  In re Lavigne, 114 F.3d at 385.  That is,

the horizontal test focuses on whether the transaction is usual or abnormal for the industry.  The

vertical test, which is also called the creditor's expectation test, is an analysis conducted from the

perspective of a hypothetical creditor and analyzes whether the transaction subjects the creditor

to an economic risk of a nature different from those it accepted when it decided to extend credit.

Id. (internal quotations omitted); In re The Leslie Fay Cos., 168 B.R. at 304.  In making this

determination, courts look to the debtor's pre-petition business practices and conduct and compare them to the debtor's postpetition conduct.  In re The Leslie Fay Cos., 168 B.R. at 304.

40.     Here, the implementation of loss mitigation programs and the payment of Trustee fees and expenses satisfies both the horizontal and vertical tests.  The horizontal test is easily met.  Loss mitigation represents an essential component in continuing the Debtors' servicing business as it was conducted prior to the Petition Date.  Similarly, the Debtors' servicing activities with respect to MBS are governed by the Agreements, and payment of Trustee fees and expenses is required by the Agreements.  These activities are typically performed by similarly situated mortgage loan servicers in the mortgage lending and securitization industries.  Likewise, a hypothetical creditor should expect that the Debtors, in their capacity as loan servicer, would engage in activities designed to reduce the impact of distressed loans on the Debtors' servicing business, and would pay contractually required fees and expenses.  Granting the relief requested herein would not subject creditors to economic risks that would not have been contemplated by them.  Therefore, the vertical test is also satisfied.

**B.      The Settlement Procedures Should Be Approved
            Pursuant To Bankruptcy Rule 9019(b)**

41.     A settlement of a claim by a debtor constitutes a sale of property of the estate.  See Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 350-51 (3d Cir. 1999).  If a settlement is outside of the ordinary course of business of the debtor, it requires approval by the bankruptcy court pursuant to section 363(b) of the Bankruptcy Code, after notice and a hearing as required by Bankruptcy Rule 9019.  Id.

42.     Bankruptcy Rule 9019(b) expressly empowers the Court to approve procedures for the settlement of classes of controversies by a debtor in possession: "[a]fter a hearing . . . the court may fix a class or classes of controversies and authorize the trustee to compromise or settle

controversies within such class or classes without further hearing or notice." The rule requires that the proposed procedures be reasonable. See In re Check Reporting Serv., Inc., 137 B.R. 653 (Bankr. W.D. Mich. 1992).

43.    The Debtors believe that the settlement of Claims is within the ordinary course of the Debtors' operations. Nonetheless, out of an abundance of caution, the Debtors request that the Court expressly approve the Settlement Procedures. The Settlement Procedures are reasonable and appropriate based on the size of the Debtors' operations and the dollar amounts of the disputes the Debtors seek authority to resolve as either Tier I Settlements or Tier II Settlements. Moreover, settlements of the Claims are within the ordinary course of the Debtors' business, and therefore do not require the Court's approval. Claims settlement procedures similar to those proposed herein have routinely been approved by courts in other large chapter 11 cases. See, e.g., In re Pinnacle Airlines Corp., Case No. 12-11343 (REG) (Bankr. S.D.N.Y. April 23, 2012) (D.E. 170); In re Star Tribune Holdings Corp., No. 09-10244 (RDD) (Bankr. S.D.N.Y. Aug. 3, 2009) (D.E. 395); In re Frontier Airlines Holdings, Inc., No. 08-11298 (RDD) (Bankr. S.D.N.Y. Jun. 23, 2008) (D.E. 372); In re Delta Air Lines, Inc., No. 05-17923 (ASH) (Bankr. S.D.N.Y. Oct. 12, 2006) (D.E. 3382).

44.    Approval of the Settlement Procedures is in the best interests of the Debtors and their estates and will not unduly prejudice the rights of any parties herein. The Settlement Procedures will encourage resolution of Claims, thereby eliminating unnecessary expenditures of time and money with respect to disputes. Courts recognize the general rule in bankruptcy cases and other litigation that "[s]ettlement is intended to conserve [scarce judicial] resources, and is therefore encouraged." Magill v. Springfield Marine Bank (In re Heissinger Resources Ltd.), 67 B.R. 378, 382 (C.D. Ill. 1986); see also Thomas v. Fallon (In re Chicago Rapid Transit Co.), 196

F.2d 484, 490 (7th Cir. 1952) ("We fully realize the desirability of settling claims without resort

to litigation in bankruptcy matters . . . where any reasonable basis for compromise settlements

appears they should be encouraged.").

45.     Seeking separate court approval for each and every Claim settlement covered by

the Settlement Procedures would be unduly burdensome on the Court and a drain on the time and

other resources of the Debtors and their counsel.  The expense of such a practice would

significantly reduce the benefits of many of these settlements.  Thus, after careful analysis and in

the exercise of their sound business judgment, the Debtors have determined and respectfully

submit that for purposes of judicial efficiency and maximizing the value of the Debtors' estates,

the Settlement Procedures should be approved.

## C.     The Court Should Grant Limited Stay Relief Pursuant To Section 362(d)(1) Of The Bankruptcy Code

46.     The Debtors request that the Court clarify the scope of the modified automatic

stay pursuant to section 362(d)(1) to permit borrowers or their tenants to prosecute direct claims,

counter-claims, and defenses in connection with foreclosure or eviction proceedings initiated by

the Debtors.  The Debtors further request that the automatic stay be modified to permit borrowers

to take various actions in connection with their own bankruptcy cases, to allow third party

actions to clear title to proceed so that foreclosure actions may be completed, and to allow the

Debtors to take actions necessary to conduct foreclosure proceedings for properties in which they

both service the Senior Loan and own the Junior Loan.  The Bankruptcy Code provides the Court

may grant stay relief "for cause, including the lack of adequate protection of an interest in

property of such party in interest[.]" 11 U.S.C. §362(d)(1).  As discussed above, the Debtors

respectfully submit that it is in the best interests of their estates and borrowers to permit

borrowers or other tenants to raise applicable direct claims, defenses and counter-claims in their

related foreclosure or eviction proceedings (or, in Non-Judicial States, to initiate actions to

contest foreclosure proceedings), provided that those direct claims, defenses and counter-claims

are asserted by individual borrowers and are a defense to the foreclosure or eviction itself, rather

than a stand-alone claim for monetary damages or similar relief.  The Debtors believe that

limited stay relief for this purpose will allow for an efficient and fair mortgage foreclosure

process preserving both the interests of the Debtors' estates and borrowers.  Similarly, the

Debtors believe that allowing Bankruptcy Borrowers or Chapter 7 trustees or Chapter 13 trustees,

as applicable, to seek relief against the Debtors in Bankruptcy Borrower bankruptcy cases

subject to the terms and conditions set forth in the Order is in the best interests of their estates

and borrowers, because it will enable the Debtors to maintain the value of their servicing

portfolios while allowing Bankruptcy Borrower bankruptcy cases to proceed in an efficient

manner.  Additionally, the Debtors believe that allowing foreclosures to proceed against

properties for which they are Senior Servicer and own the Junior Loan will not prejudice the

Debtors or diminish the estates in any meaningful way, and will allow the Debtors to continue to

comply with their contractual obligations under the applicable servicing agreements.  Finally, the

Debtors believe it is appropriate under the circumstances to allow Title Disputes to proceed so

that foreclosure activities with respect to the underlying properties can be concluded in an

efficient and expeditious manner.

## NOTICE

47.    Notice of this Motion will be given to the following parties, or in lieu thereof, to

their counsel:  (a) the Office of the United States Trustee for the Southern District of New York;

(b) the Office of the United States Attorney General; (c) the Office of the New York Attorney

General; (d) the Office of the United States Attorney for the Southern District of New York; (e)

the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the

Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for

the Debtors' outstanding notes issuances; (i) Ally Financial Inc.; (j) Barclays Bank PLC, as

administrative agent for the lenders under the debtor in possession financing facility;

(k) Nationstar Mortgage LLC and its counsel; (l) the Creditors' Committee; (m) the parties

included on the Debtors' list of fifty (50) largest unsecured creditors; (n) each of the

Governmental Associations and their counsel; (o) counsel for the United States of America;

(p) the trustees for each of the GA Securitization Trusts; (q) the trustees for each of the Non-GA

Securitization Trusts; (r) all parties requesting notice pursuant to Bankruptcy Rule 2002.  The

Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other

or further notice need be provided.

48.    Any objections to the relief requested in the Motion must be filed with the Clerk

of the Bankruptcy Court and served upon and received by: (a) proposed counsel for the Debtors,

Morrison & Foerster LLP (Attn:  Larren M. Nashelsky, Gary S. Lee and Lorenzo Marinuzzi); (b)

the Office of the United States Trustee for the Southern District of New York, 33 Whitehall

Street, 21st Floor, New York, NY 10004 (Attn: Brian S. Masumoto, Esq.); (c) counsel to the

administrative agent for the Debtors' providers of debtor in possession financing, Skadden, Arps,

Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attn: Kenneth S.

Ziman and Jonathan H. Hofer); and (d) counsel for the Creditors' Committee, Kramer Levin

Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, NY 10036, Attn: Kenneth H.

Eckstein and Douglas H. Mannal, on or before the date scheduled by the Court.  If no objections

are filed to the Motion, the Court may enter the order without further notice or hearing.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order

substantially in the form attached hereto as <u>Exhibit 1</u> granting the relief requested in the Motion;

and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated:   May 31, 2012
       New York, New York

                           */s/*    Larren M. Nashelsky
                           Larren M. Nashelsky
                           Gary S. Lee
                           Norman S. Rosenbaum
                           MORRISON & FOERSTER LLP
                           1290 Avenue of the Americas
                           New York, New York 10104
                           Telephone: (212) 468-8000
                           Facsimile: (212) 468-7900

                           *Proposed Counsel for the Debtors and*
                           *Debtors in Possession*

**EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

|                                        |     |                          |
|----------------------------------------|-----|--------------------------|
|                                        | )   |                          |
| In re:                                 | )   | Case No. 12-12020 (MG)   |
|                                        | )   |                          |
| RESIDENTIAL CAPITAL, LLC, et al.,      | )   | Chapter 11               |
|                                        | )   |                          |
|                   Debtors.             | )   | Jointly Administered     |
|                                        | )   |                          |

------------------------------------------------------------

**SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS
105(a), 362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019
(I) AUTHORIZING THE DEBTORS TO CONTINUE IMPLEMENTING LOSS
MITIGATION PROGRAMS; (II) APPROVING PROCEDURES FOR COMPROMISE
AND SETTLEMENT OF CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF
ACTION; (III) GRANTING LIMITED STAY RELIEF TO PERMIT FORECLOSURE
AND EVICTION PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE
DISPUTES TO PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE
<u>DEBTORS TO PAY SECURITIZATION TRUSTEE FEES AND EXPENSES</u>**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of a

supplemental order under Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108, and

Bankruptcy Rule 9019 (i) authorizing the Debtors to continue implementing loss mitigation

programs; (ii) approving procedures for the compromise and settlement of certain claims,

litigations and causes of action in the ordinary course of the Debtors' business; (iii) granting

limited stay relief to permit (w) borrowers or their tenants, as applicable, to prosecute direct

claims and counter-claims in foreclosure and eviction proceedings (including in states in which

non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower

bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
granted herein may refer to http://www.kccllc.net/rescap for additional information.

they service senior mortgage loans and own the junior mortgage loans on the underlying

property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions

involving the amount, validity or priority of liens on properties subject to foreclosure

proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee

fees and expenses; and the Court having considered the Whitlinger Affidavit and the Bocresion

Declaration; and the Court having entered the Interim GA Servicing Order on May 15, 2012

granting the GA Servicing Motion on an interim basis; and the Court having entered the Interim

Non-GA Servicing Order on May 16, 2012 granting the Non-GA Servicing Motion on an interim

basis; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28

U.S.C. §§ 157 and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in

this district is proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this

proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient

notice of the Motion having been given; and it appearing that no other or further notice need be

provided; and upon the record of the hearing; and it appearing that the relief requested by the

Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest;

and after due deliberation thereon; and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED, as set forth herein.

<u>Loss Mitigation Programs</u>

2.      The Debtors are authorized, but not directed, in their sole and absolute

discretion and subject to available funding, to continue developing and implementing loss

mitigation programs and procedures in the ordinary course of their businesses *nunc pro tunc* to

the Petition Date, including, but not limited to, making incentive payments to borrowers in

connection with the closing of short sales, or vacating properties in lieu of foreclosure or eviction proceedings, or in the form of borrower rebates for loan payoffs.

Settlement Procedures

3.    The Debtors are authorized, but not directed, to compromise and settle certain claims brought by the Debtors against any non-insider third parties in connection with foreclosure, eviction, or borrower bankruptcy proceedings (each a "Settling Party") or by a Settling Party against any of the Debtors (each, a "Claim") in accordance with the following two-tiered procedures (the "Settlement Procedures"):

Tier I:  The Debtors, in their sole discretion, may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts not to exceed $50,000 in full settlement of such Claim (each, a "Tier I Settlement").

Tier II:  The Debtors, in their sole discretion, may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts exceeding $50,000 but less than $100,000 in full settlement of such Claims (each, a "Tier II Settlement"); provided, that in each case:

(a) The Debtors must provide advance notice of the terms of any Tier II Settlement to (x) the U.S. Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn:  Brian S. Masumoto, (y) counsel for the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, NY 10036, Attn: Kenneth H. Eckstein and Douglas H. Mannal; and (z) counsel to the administrative agent for the Debtors' providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, Attn: Kenneth S. Ziman and Jonathan H. Hofer (collectively the "Notice Parties")

(b) Those Notice Parties wishing to object to any proposed Tier II Settlement must serve a written objection on the Debtors, so

that it is received by no later than 4:00 p.m. (prevailing Eastern
Time) on the day that is seven (7) calendar days from the date the
Debtors provided written notice of such Tier II Settlement (the
"Settlement Objection Deadline"). Objections should be addressed
to the proposed attorneys for the Debtors, Morrison & Foerster
LLP, 1290 Avenue of the Americas, New York, New York 10104,
Attn: Norman S. Rosenbaum).

(c) If the Debtors receive a timely objection from a Notice
Party, the parties will confer and attempt to resolve any
differences. Failing that, the Debtors may petition the Court for
approval of the Tier II Settlement in accordance with any case
management orders entered in the Chapter 11 cases. An objection
by a Notice Party with respect to a given Tier II Settlement shall
not delay the finality or effectiveness of any other settlement to
which an objection has not timely been delivered.

(d) If the Debtors do not receive a written objection to a
Tier II Settlement from a Notice Party by the Settlement Objection
Deadline, then such Tier II Settlement shall be deemed approved
and the Debtors and Settling Parties may carry out the terms of
such Tier II Settlement without further notice or approval required.

4.        The Debtors shall be required to seek approval from the Court in order to

enter into and consummate any proposed settlement of a Claim with a settlement amount in

excess of $100,000.

5.        The Debtors are authorized in their sole discretion, but not directed, to

settle claims where some or all of the consideration is being provided by a third party and/or

where the Debtors are releasing claims against creditors or third parties provided the Debtors

otherwise comply with the Settlement Procedures.

6.        The Settlement Procedures are without prejudice to the right of the

Debtors to seek an order of this Court approving additional or different procedures with respect

to specific claims or categories of claims. For claims relating to matters specified in paragraphs

11(a) and 12(a) of this Order that were resolved pursuant to a settlement prior to the Petition

Date, but where such settlement has not been consummated, the Debtors are authorized, but not

directed to, consummate said settlement in accordance with the Settlement Procedures set forth in this Order.

7.     Notwithstanding anything to the contrary contained herein, this Order shall not affect, impair, impede or otherwise alter the right of the Debtors to resolve any prepetition or postpetition controversy arising in the ordinary course of the Debtors' businesses, or resolve any controversy authorized by any other order of the Court.

8.     Nothing in this Order or the Motion shall constitute a determination or admission of liability or of the validity or priority of any claim against the Debtors, and the Debtors reserve their rights to dispute the validity or priority of any claim asserted.

9.     The authority granted in this Order shall not replace or obviate the Debtors' internal procedures, legal or otherwise, for authorizing the settlements contemplated in the Motion.

10.    Any period prescribed or allowed by the Settlement Procedures shall be computed in accordance with Bankruptcy Rule 9006.

Limited Relief from Automatic Stay

*Borrower Foreclosure And Eviction Proceedings*

11.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to (a) pending and future foreclosure actions initiated by the Debtors or in those states providing for non-judicial foreclosures, by a borrower; and (b) pending and future eviction proceedings with respect to properties for which a foreclosure has been completed or pending, is hereby modified pursuant to the following terms and conditions:

(a)    except as set forth herein, a borrower, mortgagor, or lienholder (each, an "Interested Party") shall be entitled to assert and prosecute direct claims and

counter-claims relating exclusively to the property that is the subject of the loan owned or

serviced by a Debtor, in defense of any foreclosure, whether in a Judicial State or a Non-

Judicial State, or eviction proceeding, where a final judgment permitting the foreclosure or

eviction has not been awarded, and to prosecute appeals with respect to any such direct

claims or counter-claims;

(b)    absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all pending and future Interested Party direct claims

and counter-claims:  (i) for monetary relief of any kind and of any nature against the

Debtors; (ii) for relief that if granted, would not terminate or preclude the prosecution and

completion of a foreclosure or eviction; or (iii) asserted in the form of a class action or

collective action;

(c)    absent further order of the Court, the stay shall remain in full force

and effect with respect to any party seeking to intervene to assert related claims against the

Debtors or any class action or collective action brought by any Interested Party on behalf

of any other Interested Party or class of Interested Parties;

(d)    under no circumstances shall an Interested Party be entitled to

enforce against, recoup, setoff or collect from the Debtors any judgment or award related

to any direct claim or counter-claim for which the automatic stay has been lifted by the

terms of this Order;

(e)    the Debtors shall retain the right, upon appropriate motion and

notice to any affected Interested Party, to seek to impose any provision of section 362(a) of

the Bankruptcy Code modified by this Order; and

6

(f)        nothing set forth herein shall preclude or limit any Interested Party from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Borrower Bankruptcy Proceedings*

12.        The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who currently has filed, or in the future files, for bankruptcy protection under any chapter of the Bankruptcy Code (a "Bankruptcy Borrower"), is hereby modified pursuant to the following terms and conditions:

(a)        except as set forth herein, a Bankruptcy Borrower or a trustee duly appointed under the Bankruptcy Code in the Bankruptcy Borrower's bankruptcy case (a "Bankruptcy Trustee") shall be entitled to:  (i) assert and prosecute or continue to prosecute an objection to the Debtors' proof of claim filed in the Bankruptcy Borrower's bankruptcy case; (ii) assert and prosecute or continue to prosecute an objection to the Debtors' motion for relief from the automatic stay filed in the Bankruptcy Borrower's bankruptcy case; (iii) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to determine the validity, priority or extent of a Debtor's lien against the Bankruptcy Borrower's property; (iv) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to reduce or fix the amount of the Debtors' claim or lien against the Bankruptcy Borrower's property; (v) seek an accounting from the Debtors with respect to the Bankruptcy Borrower's loan; and (vi) enter into, execute and consummate a written agreement of settlement with the Debtors where the Debtors elect to enter into such settlement in their sole discretion (but subject to the Settlement Procedures), to resolve items (i) through (v) above;

7

(b)    except as set forth herein, a Bankruptcy Borrower shall be entitled to (i) engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankruptcy Borrower's loan; and (ii) engage in discussions with the Debtors and execute a modification of the Bankruptcy Borrower's loan or otherwise discuss, enter into and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

(c)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all Bankruptcy Trustee's and Bankruptcy Borrower's direct claims, counter-claims, motions or adversary proceedings:  (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for violation of any local, state or federal statute or other law in connection with the origination of the Bankruptcy Borrower's loan; (iii) for relief that if granted, would have no effect on the amount, validity or priority of the Debtors' claim or lien against a Bankruptcy Borrower or the property of the Bankruptcy Borrower securing such claim or lien of the Debtors; or (iv) asserted in the form of a class action or collective action;

(d)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankruptcy Borrower on behalf of any other class of borrowers;

(e)    under no circumstances shall a Bankruptcy Borrower or Bankruptcy Trustee be entitled to recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order;

ny-1042488

(f)     the Debtors shall retain the right, upon appropriate motion and notice to any Bankruptcy Borrower or Bankruptcy Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order; and

(g)     nothing set forth herein shall preclude or limit any Bankruptcy Borrower or Bankruptcy Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Foreclosures By The Debtors On Senior Loans*

13.     The stay imposed by section 362(a) of the Bankruptcy Code applicable to pending and future foreclosure actions initiated by the Debtors in cases where they act as servicer for the Senior Loan and also own (or for which the applicable public land records otherwise reflect that the Debtors hold an interest) the Junior Loan with respect to the underlying property is hereby modified pursuant to the following terms and conditions:

(a)     except as otherwise set forth herein, the Debtors shall be entitled to assert and prosecute foreclosure actions relating to the Senior Loan, whether in a Judicial State or a Non-Judicial State;

(b)     the Debtors shall be entitled to take such actions as are necessary to extinguish the lien with respect to the Junior Loan or to otherwise ensure clear and marketable title with respect to the property underlying the Senior Loan in connection with any sale or other disposition of such property; and

(c)     The Debtors shall be entitled to seek all appropriate relief with respect to the Senior Loan in connection with the bankruptcy cases of a Bankruptcy Borrower without further order of the Court.

9

D.    *Actions Involving Amount, Validity Or Priority Of Liens*

14.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens commenced by third parties purporting to have a lien interest or other claim ("Third Party Claimants") with respect to properties that are subject to mortgages owned or serviced by the Debtors ("Title Disputes") is hereby modified pursuant to the following terms and conditions:

(a)    except as otherwise set forth herein, a Third Party Claimant shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor in connection with any Title Dispute, and to prosecute appeals with respect to any such direct claims or counter-claims;

(b)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Third Party Claimant direct claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for relief that is not necessary for the resolution of the Title Dispute; or (iii) asserted in the form of a class action or collective action;

(c)    absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Third Party Claimant on behalf of any other Third Party Claimant or class of Third Party Claimants;

(d)    under no circumstances shall a Third Party Claimant be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related

10

to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of the Order;

(e)    the Debtors shall be entitled to take such actions as are necessary to clear title with respect to property that is subject to a Title Dispute or to otherwise ensure clear and marketable title with respect to such property in connection with any sale, foreclosure or other disposition of such property;

(f)    the Debtors shall retain the right, upon appropriate motion and notice to any affected Third Party Claimant, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Order; and

(g)    nothing set forth herein shall preclude or limit any Third Party Claimant from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

Payment of Securitization Trustee Fees and Expenses

15.    The Debtors shall continue to perform all of their respective servicing duties and servicing related duties, including, but not limited to, their duties as master servicer, under all the governing agreements (including, without limitation, pooling and servicing agreements, servicing agreements, or any other agreements concerning or relating to the Debtors' obligations to reimburse and/or indemnify for reasonable fees, costs, expenses, liabilities, and/or losses) (collectively, the "Agreements") relating to Debtor-sponsored securitization transactions to which any of The Bank of New York Mellon Trust Company, N.A., Wells Fargo Bank, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, or U.S. Bank National Association, or any affiliate of such entities acts as trustee for which any Debtor performs servicing duties, in each of their respective capacities as trustee (collectively, the

11

"Trustees") and one or more of the Debtors is a party, including but not limited to, making all

principal, interest or other servicing advances (including property protection advances) and

reimbursing, indemnifying, defending and holding harmless the Trustees and the securitization

trusts for any liability, loss, or reasonable fees, cost or expense (including fees and disbursements

of counsel or agents) incurred by any of the Trustees in the performance of their duties or their

administration of the trusts or other agencies under the Agreements to the extent required by the

Agreements.  For the avoidance of doubt, the Debtors shall pay the reasonable, actual out-of-

pocket costs and expenses of the Trustees in connection with reviewing and analyzing the

request by the Debtors to approve the MBS Settlement Agreement, and in connection with

reviewing and analyzing amendments to the Agreements as necessary or appropriate in

connection with any proposed Chapter 11 plan, the MBS Settlement Agreement or the Platform

Sale.  Notwithstanding the foregoing, nothing in this paragraph 15 shall require any Debtor (i) to

repurchase any mortgage loans on the basis of alleged breaches of representations, warranties or

other requirements of the Agreements, or make any make-whole payments with respect to any

mortgage loans pursuant to the Agreements; or (ii) to enforce, as against any other Debtor entity

or any non-Debtor affiliate, any provision of the Agreements under which such other Debtor

entity or non-Debtor affiliate are required to repurchase any mortgage loans on the basis of

alleged breaches of representations, warranties or other requirements of the Agreements, or make

any make-whole payments with respect to any mortgage loans pursuant to the Agreements; and

nothing in this paragraph 15 shall be deemed to impose liability on any Debtor with respect to

such alleged breaches or make-whole payment requirements.

16.    Within thirty (30) days after the submission of customary invoices by the

Trustees and without further order from the Court, the Debtors are authorized and directed to pay

all reasonable fees, costs and expenses and all indemnity claims referred to in paragraph 15

(including without limitation, attorney, financial advisor, consultant and expert fees and costs)

incurred postpetition by any of the Trustees relating to the performance of each of the Trustees'

duties or the administration of the trusts or other agencies under the Agreements (the "Trustee

Expenses").  All Trustee Expenses shall be entitled to administrative expense priority in the

Debtors' Chapter 11 cases notwithstanding the entry of an order authorizing the assumption and

assignment or rejection of any Agreement.  However, the Debtors will not be responsible for any

fees, costs and expenses incurred with respect to any Agreement after the entry of an order in the

Debtors' Chapter 11 cases authorizing the rejection of such Agreement.

17.    Notwithstanding the Debtors' obligations set forth in paragraphs 15 and

16, nothing in this Order shall be deemed to limit, extinguish, or prejudice the Debtors' rights in

any way to assume and assign or reject any Agreement in accordance with Bankruptcy Code

section 365.

Other Relief

18.    The Debtors are authorized and empowered to take all actions and execute

such documents as may be necessary or appropriate to carry out the relief granted herein.

19.    Nothing herein shall be deemed to limit the rights of the Debtors to

operate their business in the ordinary course, and no subsequent order shall be required to

confirm such rights.

20.    Notwithstanding the relief granted herein and any actions taken hereunder,

nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any

contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their

non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

21.     Notwithstanding anything to the contrary in this Order, any action to be taken pursuant to the relief authorized in this Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings. All amounts authorized to be paid pursuant to this Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement). To the extent that there is any inconsistency between the terms of this Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

22.     Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

23.     Nothing in this Order shall discharge, release, or otherwise preclude any setoff or recoupment right of the United States of America, its agencies, departments, or agents.

24.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

25.     Notwithstanding the possible applicability of Bankruptcy Rules

2002(a)(3), 6004(h), 7062 or 9014, the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry.

26.     This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.


Dated:                        , 2012
            New York, New York



_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 2</u>**

I.        Sample Language from Pooling and Servicing Agreements:

**Section 8.05. Master Servicer to Pay Trustee's Fees and Expenses; Indemnification.**

(a) The Master Servicer covenants and agrees to pay to the Trustee and any co-trustee from time to time, and the Trustee and any co-trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of them in the execution of the trusts hereby created and in the exercise and performance of any of the powers and duties hereunder of the Trustee and any co-trustee, and the Master Servicer will pay or reimburse the Trustee and any co-trustee upon request for all reasonable expenses, disbursements and advances incurred or made by the Trustee or any co-trustee in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ, and the expenses incurred by the Trustee or any co-trustee in connection with the appointment of an office or agency pursuant to Section 8.12) except any such expense, disbursement or advance as may arise from its negligence or bad faith.

(b) The Master Servicer agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense incurred without negligence or willful misconduct on its part, arising out of, or in connection with, the acceptance and administration of the Trust Fund, including the costs and expenses (including reasonable legal fees and expenses) of defending itself against any claim in connection with the exercise or performance of any of its powers or duties under this Agreement, and the Custodial Agreement and the Master Servicer further agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense arising out of, or in connection with, the provisions set forth in Section 2.01(a) hereof, including, without limitation, all costs, liabilities and expenses (including reasonable legal fees and expenses) of investigating and defending itself against any claim, action or proceeding, pending or threatened, relating to the provisions of such paragraph, provided that:

> (i) with respect to any such claim, the Trustee shall have given the Master Servicer written notice thereof promptly after the Trustee shall have actual knowledge thereof;

> (ii) while maintaining control over its own defense, the Trustee shall cooperate and consult fully with the Master Servicer in preparing such defense; and

> (iii) notwithstanding anything in this Agreement to the contrary, the Master Servicer shall not be liable for settlement of any claim by the Trustee entered into without the prior consent of the Master Servicer which consent shall not be unreasonably withheld.

No termination of this Agreement shall affect the obligations created by this Section 8.05(b) of the Master Servicer to indemnify the Trustee under the conditions and to the extent set forth herein.

Notwithstanding the foregoing, the indemnification provided by the Master Servicer in this Section 8.05(b) shall not pertain to any loss, liability or expense of the Trustee, including the costs and expenses of defending itself against any claim, incurred in connection with any actions taken by the Trustee at the direction of the Certificateholders pursuant to the terms of this Agreement.

1

II.      Sample Indenture and related Servicing Agreement Language:

A.      **Section 6.07 Compensation and Indemnity (Indenture).**

The Indenture Trustee shall be compensated and indemnified by the Servicer in accordance with Section 6.06 of the Servicing Agreement.  All amounts owing the Indenture Trustee hereunder in excess of such amount, as well as any amount owed to the Indenture Trustee in accordance with Section 6.06 of the Servicing Agreement, to the extent the Servicer has failed to pay such amount, shall be paid solely as provided in Section 3.05 hereof (subject to the priorities set forth therein).  The Indenture Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall reimburse the Indenture Trustee for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts.  The Issuer shall indemnify the Indenture Trustee against any and all loss, liability or expense (including attorneys' fees) incurred by it in connection with the administration of this trust and the performance of its duties hereunder.  The Indenture Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by the Indenture Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.  The Issuer shall defend any such claim, and the Indenture Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel.  The Issuer is not obligated to reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, negligence or bad faith.

The Issuer's payment obligations to the Indenture Trustee pursuant to this Section 6.07 shall survive the discharge of this Indenture or the termination or resignation of the Indenture Trustee.  When the Indenture Trustee incurs expenses after the occurrence of an Event of Default specified in clause (c) or (d) of the definition thereof with respect to the Issuer, such expenses are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

B.      **Section 6.06 Payment of Indenture Trustee's and Owner Trustee's Fees and Expenses; Indemnification (Servicing Agreement).**

(a) After the Closing Date, the Servicer covenants and agrees to pay to the Owner Trustee, the Indenture Trustee and any co-trustee of the Indenture Trustee or the Owner Trustee from time to time, and the Owner Trustee, the Indenture Trustee and any such co-trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust and, in the case of the Indenture Trustee, for so long as GMAC Mortgage, LLC is the Servicer shall be as set forth in the letter agreement between the Indenture Trustee and the Servicer dated as of March 29, 2007) for all services rendered by each of them in the execution of the trusts created under the Trust Agreement and the Indenture and in the exercise and performance of any of the powers and duties under the Trust Agreement or the Indenture, as the case may be, of the Owner Trustee, the Indenture Trustee and any co-trustee, and the Servicer will pay or reimburse the Indenture Trustee and any co-trustee upon request for all reasonable expenses, disbursements and advances incurred or made by the Indenture Trustee or any co-trustee in accordance with any of the provisions of this Agreement, the Indenture or the Trust Agreement except any such expense, disbursement or advance as may arise from its negligence, willful misfeasance or bad faith. In addition, the Indenture Trustee shall be entitled to be reimbursed from the Servicer for all reasonable costs associated with the transfer of servicing from the predecessor servicer pursuant to Section 7.02 hereunder, including, without limitation, any reasonable costs or expenses associated with the complete transfer of all servicing data and the completion,

2

correction or manipulation of such servicing data as may be required by the Indenture Trustee to correct any errors or insufficiencies in the servicing data or otherwise to enable the Indenture Trustee to service the Mortgage Loans properly and effectively.

(b) The Servicer agrees to indemnify the Indenture Trustee and the Owner Trustee for, and to hold the Indenture Trustee and the Owner Trustee, as the case may be, harmless against, any loss, liability or expense incurred without negligence, bad faith or willful misconduct on the part of the Indenture Trustee or the Owner Trustee, as the case may be, arising out of, or in connection with, the acceptance and administration of the Issuer and the assets thereof, including the costs and expenses (including reasonable legal fees and expenses) of defending the Indenture Trustee or the Owner Trustee, as the case may be, against any claim in connection with the exercise or performance of any of its powers or duties under any Basic Document; provided that:

>  (i) with respect to any such claim, the Indenture Trustee or Owner Trustee, as the case may be, shall have given the Servicer written notice thereof promptly after the Indenture Trustee or Owner Trustee, as the case may be, shall have actual knowledge thereof;

>  (ii) while maintaining control over its own defense, the Issuer, the Indenture Trustee or Owner Trustee, as the case may be, shall cooperate and consult fully with the Servicer in preparing such defense; and

>  (iii) notwithstanding anything in this Agreement to the contrary, the Servicer shall not be liable for settlement of any claim by the Indenture Trustee or the Owner Trustee, as the case may be, entered into without the prior consent of the Servicer.

No termination of this Agreement or resignation or removal of the Indenture Trustee shall affect the obligations created by this Section 6.06 of the Servicer to indemnify the Indenture Trustee and the Owner Trustee under the conditions and to the extent set forth herein.

Notwithstanding the foregoing, the indemnification provided by the Servicer in this Section 6.06(b) shall not pertain to any loss, liability or expense of the Indenture Trustee or the Owner Trustee, including the costs and expenses of defending itself against any claim, incurred in connection with any actions taken by the Indenture Trustee or the Owner Trustee at the direction of the Noteholders or Certificateholders, as the case may be, pursuant to the terms of this Agreement.

**<u>EXHIBIT 3</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- )
                                                                      )
In re:                                                                )       Case No. 12-12020 (MG)
                                                                      )
RESIDENTIAL CAPITAL, LLC, et al.,                                     )       Chapter 11
                                                                      )
                                         Debtors.                     )       Jointly Administered
                                                                      )
                                                                      )
                                                                      )
--------------------------------------------------------------------- )

**DECLARATION OF SEWIT BOCRESION IN SUPPORT OF DEBTORS' MOTION
FOR SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS
105(a), 362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019
(I) AUTHORIZING THE DEBTORS TO CONTINUE IMPLEMENTING LOSS
MITIGATION PROGRAMS; (II) APPROVING PROCEDURES FOR COMPROMISE
AND SETTLEMENT OF CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF
ACTION; (III) GRANTING LIMITED STAY RELIEF TO PERMIT FORECLOSURE
AND EVICTION PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE
DISPUTES TO PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE
DEBTORS TO PAY SECURITIZATION TRUSTEE FEES AND EXPENSES**

I, Sewit Bocresion, under penalty of perjury, declare as follows:

1.       I am Senior Vice President of Default Operations of GMAC Mortgage, LLC, a

debtor and debtor in possession in the above-captioned Chapter 11 cases and a subsidiary of

Residential Capital, LLC, a limited liability company organized under the laws of the state of

Delaware and the parent of the other debtors and debtors in possession in the above-captioned

Chapter 11 cases (collectively, the "Debtors"). I have been employed by GMAC Mortgage, LLC

since April of 2009 and I have held my current position since March of 2011. Prior to assuming

my current role, I managed various business process improvements for the company's servicing

operation. I am authorized to make this declaration on behalf of the Debtors and in support of

the motion (the "Motion")[1] of the Debtors for entry of an order (i) authorizing the Debtors to

continue implementing loss mitigation programs; (ii) approving procedures for the compromise

and settlement of certain claims, litigations and causes of action in the ordinary course of the

Debtors' business; (iii) granting limited stay relief to permit (w) borrowers or their tenants, as

applicable, to prosecute direct claims and counter-claims in foreclosure and eviction proceedings,

(x) borrowers to prosecute certain actions in borrower bankruptcy cases, (y) the Debtors to

prosecute foreclosure actions in those circumstances where they service senior mortgage loans

and own the junior loans on the underlying property, and (z) third party lien holders to prosecute

direct claims and counter-claims in actions involving the amount, validity or priority of liens on

properties subject to foreclosure proceedings; and (iv) authorizing and directing the Debtors to

pay certain securitization trustee fees and expenses.

2.        In my capacity as Senior Vice President of Default Operations, I am familiar with

the Debtors' day-to-day default servicing operations, loss mitigation and default-related legal

matters arising therefrom, including foreclosures and borrower bankruptcies.  I submit this

declaration (the "Declaration") on the Debtors' behalf in conjunction with and in support of the

Motion.  Except as otherwise indicated, all statements in this Declaration are based upon my

personal knowledge; information supplied or verified by personnel in departments within the

various business units of the Debtors; my review of the Debtors' relevant documents; or my

general experience, expertise, and knowledge of the Debtors' mortgage loan servicing operations.

In making my statements based on my review of the Debtors' relevant documents and other

information prepared or collected by the Debtors' employees, I have relied upon these employees

accurately recording, preparing, collecting, or verifying any such documentation and other

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

information.  If I were called to testify as a witness in this matter, I would testify competently to

the facts set forth herein.

3.      Since the Court granted the relief set forth in the Interim Servicing Orders, the

Debtors have confronted issues on a day-to-day basis in the conduct of the ordinary course of

their businesses that require a clarification of and a supplement to the relief previously granted

under the Interim Servicing Orders with respect to (a) the Debtors' loss mitigation programs,

(b) the settlement of certain claims in the ordinary course, (c) the extent to which the automatic

stay has been modified with respect to certain foreclosure related actions and borrower

bankruptcies, and (d) the payment of certain securitization trustee fees and expenses.

### Loss Mitigation Programs

4.      In the ordinary course of their servicing business, the Debtors implement various

loss mitigation programs, including, but not limited to, offering borrowers payments in order to

incentivize them to pursue short sales where the estimated loss upon foreclosure is greater than

the loss on a short sale or to vacate properties in lieu of a foreclosure or eviction.

5.      The Debtors' loss mitigation programs assist borrowers to avoid foreclosure while

stabilizing the risk of loss to investors.  For example, for borrowers who accept the offer to

participate in the short sale incentive program, the Debtors' foreclosure resolution timelines may

be reduced considerably, thus reducing the amount of Foreclosure Timeline Penalties assessed

against them and improving their short term liquidity.

6.      Loss mitigation represents an essential component in continuing the Debtors'

servicing business as it was conducted before the Petition Date.  Therefore, authority to continue

to implement loss mitigation programs currently in place and to develop and implement

additional programs as the Debtors deem reasonable and appropriate in the exercise of their

3

business judgment is needed in order for the Debtors to continue to operate their servicing

business efficiently and to provide comfort to those doing business with them.

## Settlement Procedures

7.       The Debtors, in their capacity as a loan servicer, are currently participating (either

as a plaintiff/creditor or servicer for a plaintiff/creditor) in approximately 65,000 foreclosure

proceedings and 51,000 borrower bankruptcy proceedings.  It is not uncommon for borrowers,

mortgagors, and other lienholders to raise defenses and related counter-claims against the

Debtors in order to preserve their purported interests in the property underlying the mortgage

loans.  In addition, the Debtors may be required to bring eviction proceedings against borrowers

or their tenants residing in properties subject to mortgages upon which the Debtors have

foreclosed.  Many of these cases can be resolved more quickly and inexpensively through

settlements with the borrowers rather than through continued time-consuming litigation.

8.       The Debtors frequently settle such matters in the ordinary course of their

servicing businesses in connection with their Servicing Functions on terms the Debtors consider

to be reasonable and in their best interests through the exercise of their business judgment.

9.       Authorizing the Debtors to resolve certain Claims subject to the Settlement

Procedures, and without further notice or hearing, will likely encourage resolution of Claims,

reduce the Debtors' expenses, maximize the value of the Debtors' estates and promote judicial

economy.

## Borrower Foreclosure and Eviction Proceedings

10.      The Debtors in their capacity as loan servicer and, with respect to loans they own,

in their capacity as mortgagee, conduct foreclosure proceedings in all fifty states, the District of

Columbia, and the U.S. Virgin Islands.[2]  In approximately 23 of those jurisdictions, foreclosures

are conducted through a judicial process (the "Judicial States").  In the remaining jurisdictions,

the foreclosure action may also be conducted without the necessity for judicial action or through

a quasi-judicial process (the "Non-Judicial States").  In the Judicial States, a borrower,

mortgagor, or lienholder may oppose and respond to the foreclosure by asserting defenses and

counter-claims in the judicial proceeding.  In the Non-Judicial States, a borrower who wishes to

defend a non-judicial foreclosure must instead commence an action against the mortgagee in

which the borrower can assert direct claims and causes of action, including claims for money

damages and other forms of relief.  In addition, in their capacity as a loan servicer, the Debtors

may be required to bring eviction proceedings against borrowers or their tenants residing in

properties subject to loans upon which the Debtors have foreclosed.

11.    Since the first day hearings, the Debtors have been confronted with numerous

issues and requests for clarification by both their counsel and borrowers' counsel regarding the

scope of blanket stay relief.  Consequently, it is necessary to implement the guidelines described

in the Motion to permit borrowers, mortgagors, lienholders, or other tenants to raise applicable

direct claims, defenses and counter-claims in their related foreclosure or eviction proceedings (or,

in Non-Judicial States, to initiate actions to contest foreclosure proceedings), provided that those

direct claims, defenses and counter-claims are asserted by individual borrowers and are a defense

to the foreclosure or eviction itself, rather than a stand-alone claim for monetary damages or

similar relief.  I further believe that the limited stay relief for this purpose will allow for an

---

[2]    The Debtors' servicing agreements may also require them to bring foreclosure actions in other locations, including Puerto Rico, although no foreclosure actions are currently pending there.

efficient and fair mortgage foreclosure process preserving both the interests of the Debtors' estates and borrowers.

### Borrower Bankruptcy Proceedings

12.    From time to time, individual borrowers may file for bankruptcy protection.  As of the Petition Date, the Debtors were participants (either as a creditor or as servicer for a creditor) in approximately 51,000 borrower bankruptcy cases in all fifty states, the District of Columbia, and Puerto Rico.[3]  The Debtors, in their capacity as servicer and/or mortgagee for such borrowers' mortgage loans and with the assistance of various outside counsel and professionals, monitor the borrowers' bankruptcy cases and are often responsible for filing a proof of claim on behalf of the owner of the loan, defending against attempts to avoid or reduce the secured interest or lien on the borrowers' property, responding to demands for an accounting, or filing and prosecuting motions for relief from the automatic stay to foreclose on the borrowers' property.

13.    The Debtors, in general, would be afforded no benefit by delaying the resolution of a borrower's bankruptcy case as it would simply delay the Debtors' ultimate recovery, if any, on the mortgage loan in issue.  Moreover, in many instances, the Debtors represent the interests of the second or third lien holders, which often have no secured value in the property.  Therefore, it would be inefficient to delay borrower relief under such circumstances.

14.    Accordingly, allowing Bankruptcy Borrowers or Chapter 7 trustees or Chapter 13 trustees, as applicable, to seek relief against the Debtors in Bankruptcy Borrower bankruptcy cases subject to the terms and conditions described in the Motion will enable the Debtors to

---

[3]    The Debtors' servicing agreements may also require them to participate in borrower bankruptcy proceedings in other locations, including the U.S. Virgin Islands, although no borrower bankruptcy proceedings are currently pending there.

maintain the value of their servicing portfolios while allowing Bankruptcy Borrower bankruptcy cases to proceed in an efficient manner.

**Foreclosures By The Debtors On Senior Loans**

15.    The Debtors own a number of mortgage loans that are subordinate (collectively, the "Junior Loans") to the first lien on the underlying property (collectively, the "Senior Loans"). In addition, in some cases, the Debtors do not actually own the Junior Loan but are nonetheless reflected as having an interest in the Junior Loan (as owner, servicer, originator, mortgagee of record or otherwise) in the applicable public land records.  The Debtors service the Senior Loans for approximately 17,000 properties for which the Debtors also own the Junior Loans.  Of these Senior Loans, nearly 200 are currently in foreclosure and over 800 are otherwise in default and, therefore, may be subject to foreclosure in the near term.

16.    Although the Debtors typically do not foreclose on Junior Loans, the applicable servicing agreements may require the Debtors to pursue foreclosures with respect to the delinquent Senior Loans.  As a result, in cases where the borrower is delinquent with respect to the Senior Loan, the Debtors in their capacity as servicer may be contractually bound to proceed with a foreclosure on the Senior Loan.

17.    In many jurisdictions, in order to foreclose on a senior mortgage interest, a party is required to name any and all holders of subordinate interests as defendants to the foreclosure complaint or to take other action to divest the junior lien holder of its interest.

18.    Allowing foreclosures by the Debtors with respect to Senior Loans will not have a detrimental impact on the Debtors' estates because if the subject property has no value in excess of the first priority lien, then the Debtors' second priority lien is, for all practical purposes, without value, even absent the foreclosure.  On the other hand, if the property does have excess

value, then the Debtors are entitled to receive any excess proceeds from the foreclosure sale

remaining after the Senior Loan is paid in full.  In either case, the Debtors are placed in no worse

a position than they were before the foreclosure.  Moreover, it is essential that the Debtors

continue to have the ability to meet their contractual servicing obligations.

19.     Allowing foreclosures to proceed against properties for which the Debtors are

servicer for the Senior Loan and own the Junior Loan should not prejudice the Debtors or

diminish the estates in any meaningful way, and will allow the Debtors to continue to comply

with their contractual obligations under their applicable servicing agreements.

### Actions Involving Amount, Validity Or Priority Of Liens

20.     Actions involving the amount, validity, and/or priority of liens are regularly

commenced by third parties purporting to have a lien interest or other claim ("Third Party

Claimants") with respect to properties that are subject to mortgages owned or serviced by the

Debtors (the "Title Disputes").  The existence of such suits may be a cloud on title, potentially

precluding the Debtors from conducting foreclosure activities with respect to the subject

properties.

21.     Prompt resolution of pending Title Disputes is necessary to permit the efficient

and expeditious conclusion of foreclosure proceedings.  Accordingly, obtaining limited stay

relief for the purpose of allowing Third Party Claimants to assert and prosecute title claims is

necessary to enable the Debtors to continue with their ordinary course operations and comply

with their servicing obligations.

### Payment Of Securitization Trustee Fees And Expenses

22.     In the past, the Debtors facilitated the securitization of mortgage loans by

purchasing loans and selling them to Debtor-sponsored securitization trusts (collectively, the

8

"Securitization Trusts") for so-called "private label" securitization pools, in some cases through one or more intermediaries. The interests in the Securitization Trusts—as well as the accompanying rights to receive the income generated by the mortgage loans held therein—are evidenced by certificates or, in some cases bonds or notes, which were issued and sold to various investors. The Debtors generally retained the rights to service the loans that were ultimately sold into the Securitization Trusts.

23.     I understand that the Debtors, either as sellers or as servicers of the loans sold to a Securitization Trust, have certain obligations with respect to the loans held by the Securitization Trust, and to the trustees that administer the Securitization Trusts (each a "Trustee") pursuant to the terms of indentures, servicing agreements, pooling and servicing agreements, and other securitization documents, as applicable (the "Agreements"). I have been informed that the Agreements contain provisions that provide for the Debtors in their capacity as sellers of the loans to repurchase loans sold to the Securitization Trust that breach certain representations and warranties. I have been further informed that the Agreements also contain provisions that provide for the Debtors in their capacity as servicers of the loans to perform servicing functions, including making principal, interest, and other servicing advances, and reimbursing and indemnifying the Trustees for any liability, loss, fees, cost or expense incurred by any of the Trustees in the performance of their duties or their administration of the Securitization Trusts subject to the conditions set forth in the Agreements.

24.     Therefore, the Debtors' compliance with their obligations under the applicable provisions of the Agreements, such as continuing to perform their servicing functions, including making principal, interest, and other servicing advances, and reimbursing and indemnifying the Trustees for any liability, loss, cost or expense incurred by any of the Trustees in the

9

performance of their duties or their administration of the Securitization Trusts to the extent

required by the terms of the Agreements, is within the ordinary course of the Debtors' servicing

business.  I further believe that such relief would not subject creditors to economic risks that

would not have been contemplated by them and will provide reassurance to the Trusts doing

business with the Debtors.

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is

true and correct.

Executed on May 31, 2012

By:    /s/ Sewit Bocresion
Sewit Bocresion
Senior Vice President of
Default Operations for
GMAC Mortgage, LLC

ny-1042979