---

## SERVICING AGREEMENT

by and between

SHELLPOINT MORTGAGE LLC
Owner

and

GMAC MORTGAGE, LLC
Servicer

Dated as of August 15th, 2011

---

# TABLE OF CONTENTS

ARTICLE I.................................................................................................................. 1

DEFINITIONS .......................................................................................................... 1
    SECTION 1.01.  DEFINITIONS............................................................................ 1

ARTICLE II. ........................................................................................................... 14

SERVICING ........................................................................................................... 14
    SECTION 2.01.  SERVICER TO ACT AS SERVICER ............................................ 14
    SECTION 2.02.  LIQUIDATION OF MORTGAGE LOANS ...................................... 18
    SECTION 2.03.  COLLECTION OF MORTGAGE LOAN PAYMENTS ....................... 20
    SECTION 2.04.  ESTABLISHMENT OF AND DEPOSITS TO CUSTODIAL ACCOUNTS ......... 20
    SECTION 2.05.  PERMITTED WITHDRAWALS FROM CUSTODIAL ACCOUNTS ........ 22
    SECTION 2.06.  ESTABLISHMENT OF AND DEPOSITS TO ESCROW ACCOUNTS ... 23
    SECTION 2.07.  PERMITTED WITHDRAWALS FROM ESCROW ACCOUNTS............ 24
    SECTION 2.08.  PAYMENT OF ESCROW ITEMS AND OTHER CHARGES............... 25
    SECTION 2.09.  PROTECTION OF ACCOUNTS ................................................... 25
    SECTION 2.10.  MAINTENANCE OF HAZARD AND FLOOD INSURANCE ............... 26
    SECTION 2.11.  MAINTENANCE OF BLANKET HAZARD INSURANCE COVERAGE....... 27
    SECTION 2.12.  MAINTENANCE OF PMI POLICIES ........................................... 28
    SECTION 2.13.  MAINTENANCE OF FIDELITY BOND AND ERRORS AND OMISSIONS INSURANCE............ 28
    SECTION 2.14.  INSPECTIONS .......................................................................... 29
    SECTION 2.15.  RESTORATION OF MORTGAGED PROPERTY ............................. 29
    SECTION 2.16.  TITLE, MANAGEMENT AND DISPOSITION OF REO PROPERTY ....... 29
    SECTION 2.17.  NOTIFICATION OF ADJUSTMENTS ........................................... 30
    SECTION 2.18.  NON-RECOVERABLE ADVANCES ............................................ 30
    SECTION 2.19.  SERVICING CHANGES ............................................................. 30
    SECTION 2.20.  PREPAYMENT CHARGES ......................................................... 31
    SECTION 2.21.  CREDIT REPORTING .............................................................. 31
    SECTION 2.22.  SAFEGUARDING CUSTOMER INFORMATION ............................. 31

ARTICLE III.......................................................................................................... 32

REMITTANCES AND STATEMENTS ............................................................... 32
    SECTION 3.01.  REMITTANCES FOR PORTFOLIO LOANS THAT ARE NOT HELOC LOANS ......... 32
    SECTION 3.02.  REMITTANCES FOR HELOC LOANS ...................................... 32
    SECTION 3.03.  REMITTANCE FOR AGENCY LOANS ........................................ 33
    SECTION 3.04.  RECONCILIATION OF SERVICING ADVANCES .......................... 33
    SECTION 3.05.  STATEMENTS TO OWNER ....................................................... 33
    SECTION 3.06.  INTERNAL REVENUE SERVICE REPORTS ................................. 34
    SECTION 3.07.  NO PRINCIPAL & INTEREST ADVANCES ................................. 34
    SECTION 3.08.  ODD DUE DATES .................................................................... 35

ARTICLE IV.......................................................................................................... 36

ADDITIONAL SERVICING PROCEDURES ..................................................... 36
    SECTION 4.01.  TRANSFERS OF MORTGAGED PROPERTY................................. 36
    SECTION 4.02.  SATISFACTION OF MORTGAGES UPON PAYMENT IN FULL ......... 36
    SECTION 4.03.  SERVICING COMPENSATION AND OWNER EXPENSES ............... 37
    SECTION 4.04.  POSSESSION OF MORTGAGE FILES ........................................ 37
    SECTION 4.05.  RIGHT TO EXAMINE SERVICER RECORDS ............................... 38
    SECTION 4.06.  LOSSES AND EXPENSES .......................................................... 38

SECTION 4.07.    REPURCHASE REQUESTS ................................................................. 39

ARTICLE V. ................................................................................................ 41

COMPLIANCE AND CONFIDENTIALITY ................................................ 41

SECTION 5.01.    ANNUAL STATEMENT AS TO COMPLIANCE ........................................ 41
SECTION 5.02.    ANNUAL INDEPENDENT PUBLIC ACCOUNTANTS' SERVICING REPORT ........... 41
SECTION 5.03.    COMPLIANCE WITH GRAMM-LEACH-BLILEY ACT OF 1999 ......................... 41
SECTION 5.04.    CONFIDENTIALITY OF INFORMATION ................................................. 42

ARTICLE VI. ............................................................................................... 44

REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER ........... 44

SECTION 6.01.    ORGANIZATION AND GOOD STANDING ............................................. 44
SECTION 6.02.    ORDINARY COURSE OF BUSINESS .................................................. 44
SECTION 6.03.    NO VIOLATIONS ........................................................................ 44
SECTION 6.04.    ABILITY TO PERFORM ................................................................ 44
SECTION 6.05.    LITIGATION ............................................................................. 44
SECTION 6.06.    NO CONSENT REQUIRED ............................................................. 45
SECTION 6.07.    OWNERSHIP ............................................................................ 45
SECTION 6.08.    ACCURACY ............................................................................. 45
SECTION 6.09.    ELIGIBILITY CRITERIA ............................................................... 45

ARTICLE VII. .............................................................................................. 46

REPRESENTATIONS, WARRANTIES AND COVENANTS OF SERVICER ...... 46

SECTION 7.01.    ORGANIZATION AND GOOD STANDING ............................................. 46
SECTION 7.02.    ORDINARY COURSE OF BUSINESS .................................................. 46
SECTION 7.03.    NO VIOLATION ......................................................................... 46
SECTION 7.04.    ABILITY TO PERFORM ................................................................ 46
SECTION 7.05.    ABILITY TO SERVICE .................................................................. 46
SECTION 7.06.    LITIGATION ............................................................................. 47
SECTION 7.07.    NO CONSENT REQUIRED ............................................................. 47
SECTION 7.08.    COMPLIANCE WITH LAWS ............................................................ 47
SECTION 7.09.    SERVICER APPROVALS ............................................................... 47
SECTION 7.10.    INSURANCE ............................................................................. 47
SECTION 7.11.    LICENSES AND PERMITS ............................................................. 48
SECTION 7.12.    AGENCY APPROVALS .................................................................. 48
SECTION 7.13.    BROKER FEES .......................................................................... 48
SECTION 7.14.    MERS ................................................................................... 48

ARTICLE VIII. ............................................................................................. 49

OWNER DEFAULT ...................................................................................... 49

SECTION 8.01.    OWNER EVENTS OF DEFAULT ....................................................... 49

ARTICLE IX. ............................................................................................... 51

SERVICER DEFAULT ................................................................................... 51

SECTION 9.01.    SERVICER EVENTS OF DEFAULT. ................................................... 51

ARTICLE X. ................................................................................................ 53

INDEMNIFICATION AND ASSIGNMENT ..................................................... 53

SECTION 10.01.    INDEMNIFICATION ................................................................... 53
SECTION 10.02.    LIMITATION ON LIABILITY OF SERVICER AND OTHERS ......................... 56

SECTION 10.03.    OPERATION OF INDEMNITIES ................................................................. 57
SECTION 10.04.    ASSIGNMENT ..................................................................................... 57
SECTION 10.05.    MERGER OR CONSOLIDATION OF THE SERVICER ................................. 58
SECTION 10.06.    COOPERATION OF SERVICER WITH AN AGENCY TRANSFER ................ 58
SECTION 10.07.    COOPERATION OF SERVICER WITH A RECONSTITUTION ...................... 59

## ARTICLE XI. ..................................................................................................... 62

## TERMINATION .................................................................................................. 62

SECTION 11.01.    TERMINATION .................................................................................... 62
SECTION 11.02.    TRANSFER PROCEDURES ..................................................................... 62

## ARTICLE XII. .................................................................................................... 65

## COMPLIANCE WITH REGULATION AB ........................................................ 65

SECTION 12.01.    INTENT OF THE PARTIES; REASONABLENESS ...................................... 65
SECTION 12.02.    ADDITIONAL REPRESENTATIONS AND WARRANTIES OF SERVICER ....... 66
SECTION 12.03.    INFORMATION TO BE PROVIDED BY SERVICER .................................. 67
SECTION 12.04.    SERVICER COMPLIANCE STATEMENT .................................................. 70
SECTION 12.05.    REPORT ON ASSESSMENT OF COMPLIANCE AND ATTESTATION ............ 71
SECTION 12.06.    USE OF SERVICERS AND SUBCONTRACTORS ....................................... 72

## ARTICLE XIII. ................................................................................................... 74

## MISCELLANEOUS PROVISIONS .................................................................... 74

SECTION 13.01.    NOTICES ............................................................................................ 74
SECTION 13.02.    WAIVERS ........................................................................................... 75
SECTION 13.03.    ENTIRE AGREEMENT; AMENDMENT .................................................. 75
SECTION 13.04.    COUNTERPARTS; BINDING EFFECT ..................................................... 75
SECTION 13.05.    NO-HIRE ........................................................................................... 75
SECTION 13.06.    HEADINGS .......................................................................................... 76
SECTION 13.07.    GOVERNING LAW ............................................................................... 76
SECTION 13.08.    RELATIONSHIP OF PARTIES ................................................................ 76
SECTION 13.09.    SEVERABILITY OF PROVISIONS ........................................................... 76
SECTION 13.10.    RECORDATION OF ASSIGNMENTS OF MORTGAGE ............................... 76
SECTION 13.11.    EXHIBITS ........................................................................................... 76
SECTION 13.12.    OWNER'S FINANCIALS ....................................................................... 77
SECTION 13.13.    NO SOLICITATION .............................................................................. 77
SECTION 13.14.    FORCE MAJEURE ................................................................................ 77
SECTION 13.15.    WAIVER OF TRIAL BY JURY ............................................................... 77
SECTION 13.16.    LIMITATION OF DAMAGES ................................................................. 78
SECTION 13.17.    SURVIVAL .......................................................................................... 78

# EXHIBITS

EXHIBIT I          PRICING EXHIBIT
EXHIBIT II         MORTGAGE LOAN DOCUMENTS
EXHIBIT III        ELIGIBILITY CRITERIA
EXHIBIT IV         APPROVAL MATRIX
EXHIBIT V          FORM OF LIMITED POWER OF ATTORNEY
EXHIBIT VI         FORM OF TRANSFER INSTRUCTIONS
EXHIBIT VII        FORM OF AGENCY TRANSFER ACKNOWLEDGMENT AGREEMENT
EXHIBIT VIII       FORM OF ADDITIONAL CUSTODIAL ACCOUNT REQUEST
EXHIBIT IX         FORM OF SALES, DELIVERY, TRANSFER FILE
EXHIBIT X          FORM OF MONTHLY REPORT
EXHIBIT XI         SERVICER INFORMATION
EXHIBIT XII        LEGAL OPINION

# SERVICING AGREEMENT

This Servicing Agreement ("Agreement") is entered into as of August 15TH, 2011, by and among GMAC MORTGAGE, LLC, a Delaware limited liability company (the "Servicer") and SHELLPOINT LLC, a Delaware limited liability company (the "Owner"). The Servicer and the Owner may be referred to herein as a "Party" or collectively as the "Parties".

WHEREAS, the Owner has purchased or originated and expects in the future to purchase or originate residential, first lien mortgage loans, closed–end subordinate lien mortgage loans and home equity lines of credit and/or the related servicing rights; and

WHEREAS, the Servicer regularly services such mortgage loans and lines and has agreed to service the mortgage loans that become subject to this Agreement and the Parties desire to provide the terms and conditions of such servicing by the Servicer.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I.
### DEFINITIONS

Section 1.01.  Definitions

The following terms are defined as follows:

Accepted Servicing Practices:  With respect to any Portfolio Loan or REO Property, in accordance with (i) the Fannie Mae Guides, (ii) any applicable mortgage insurer guides, (iii) the VA Regulations applicable for any VA Mortgage Loan and FHA regulations applicable for any FHA Mortgage Loans, (iv) Applicable Law, (v) the documents in the Mortgage File, and (vi) to the extent not inconsistent therewith, those customary mortgage servicing practices (including collection procedures) of prudent mortgage lending institutions which service mortgage loans of the same type as such Portfolio Loan or REO Property in the jurisdiction where the related Mortgaged Property is located, exercising at least a reasonable standard of care in performing those practices. With respect to any Agency Loan, in accordance with (i) the applicable Agency Guide including the VA Regulations applicable for any VA Mortgage Loan and FHA regulations applicable for any FHA Mortgage Loans, (ii) any applicable mortgage insurer guides, (iii) Applicable Law, (iv) the document in the Mortgage File, and (v) to the extent not inconsistent therewith , those customary mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such

Agency Loan in the jurisdiction where the related Mortgaged Property is located, exercising at least a reasonable standard of care in performing those practices.

Adjustable Rate Mortgage Loan: Any Mortgage Loan with respect to which the related Mortgage Note contains a provision whereby the Mortgage Interest Rate is subject to change from time to time in accordance with the terms of such Mortgage Note.

Advances: In connection with any Agency Loan, the Monthly Payment (or portion thereof) required to be remitted to an Agency according to the Agency Guide.

Affiliate: With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agency: Any of Fannie Mae, Freddie Mac or Ginnie Mae.

Agency Guide: The respective Fannie Mae Guide, Freddie Mac Guide or Ginnie Mae Guide, as they may be modified from time to time.

Agency Loan: Any Mortgage Loan sold to an Agency.

Agency Loan Remittance Date: The remittance date specified in the applicable Agency Guide.

Agency Transfer: The sale or transfer by Owner of some or all of the Portfolio Loans to Fannie Mae under its Cash Purchase Program (Special Servicing Option) or its MBS Swap Program (Special Servicing Option) or to Freddie Mac under its Freddie Mac Cash Program or Gold PC Program, or to Ginnie Mae, in each case retaining the Servicer as "servicer" thereunder.

Agency Transfer Acknowledgment Agreement: An acknowledgment agreement substantially in the form of Exhibit VII hereto to be executed by the Parties prior to each Agency Transfer with respect to the servicing of a pool of Agency Loans identified as part of such acknowledgment agreement.

Ancillary Income: All income derived from the Mortgage Loans and REO Properties that the Servicer may collect in connection with servicing the Mortgage Loans and REO properties, including, but not limited to (a) interest or other benefits earned in connection with funds on deposit in the Custodial Accounts and Escrow Account less the interest on escrowed funds required by Applicable Law to be paid to the Mortgagor, (b) fees payable in connection with the Home Affordable Modification Program, (c) loss mitigation agency fees, (d) late charges, (e) customer prepayment fees and line

termination fees, and (f) non-sufficient funds fees, ACH fees, assumption fees, amounts associated with marketing special products to the Mortgagors, and all other incidental fees and charges with respect to a Mortgage Loan or REO Property.

Applicable Law:  All federal, state or local laws or regulations applicable to any Mortgage Loan, Mortgaged Property, or any REO Property, or the Servicer's activities under this Agreement as if Servicer were servicing the Mortgage Loans for its own account.

Approval Matrix:  The approval matrix attached as Exhibit IV and applicable only to the Portfolio Loans and REO Properties to the extent not inconsistent with the requirements of any applicable mortgage insurer or guarantor or Applicable Law.  The Approval Matrix may be modified from time to time by mutual written consent of the Servicer and the Company.

Assignment of Mortgage:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer or sale of the Mortgage.

Attestation Report: Shall have the meaning set forth in Section 12.05(a)(ii) hereof.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions are authorized to be closed for business in the States of California, Iowa, New York, or Texas, or the Commonwealth of Pennsylvania.

Commission: The United States Securities and Exchange Commission

Compliance Assessment: Shall have the meaning set forth in Section 12.05(a)(i) hereof.

Condemnation Proceeds:  All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Confidential Information:  Shall have the meaning set forth in Section 5.04 hereof.

CPI: The Consumer Price Index for All Urban Consumers (CPI U), United States City Average, All Items (1982 84=100) (the CPI Index), published monthly by the Bureau of Labor Statistics of the US Department of Labor.

Credit Line Increase: An increase in the maximum available principal balance with respect to a HELOC Loan.

Custodial Account: The separate account or accounts created and maintained pursuant to Section 2.04(a) or Section 2.04(b).

Custodian: The custodian of the Mortgage Loan Documents as specified under any related custodial agreement between the Owner and their custodian.

Daily HELOC Report: The daily report to be provided by Servicer to Owner in connection with the HELOC Loans, as described in Section 3.05.

Deboarding Fee: With respect to each Mortgage Loan and REO Property, the deboarding fees set forth in the Pricing Exhibit.

Default: The status of a Mortgage Loan when one Monthly Payment is due and unpaid as of the last day of the calendar month in which the monthly payment was due.

Depositor: The depositor, as such term is defined in Regulation AB, with respect to any Securitization Transaction.

Determination Date: With respect to Portfolio Loans, the last Business Day of the month prior to the related Invoice Date. With respect to Agency Loans, the date specified in the applicable Agency Guide.

Due Date: The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Eligible Account: An account maintained at a Qualified Depository.

Eligibility Criteria: The eligibility criteria for residential mortgage loans and home equity lines of credit to be delivered by Owner and serviced by Servicer under this Agreement attached as Exhibit III.

Eligible Investments: Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than one day prior to the Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable, in each month (or such other date as permitted under this Agreement):

(i)      direct obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America ("Direct Obligations");

(ii)    federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company (including U.S. subsidiaries of foreign depositories) incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal or state banking authorities, so long as at the time of such investment or the contractual commitment providing for such investment the commercial paper or other short term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the commercial paper or other short term debt or deposit obligations of such holding company or deposit institution, as the case may be) have been rated by each Rating Agency in its highest short-term rating category or one of its two highest long-term rating categories;

(iii)    repurchase agreements collateralized by Direct Obligations or securities guaranteed by Fannie Mae or Freddie Mac with any registered broker/dealer subject to Securities Investors' Protection Corporation jurisdiction or any commercial bank insured by the Federal Deposit Insurance Corporation, if such broker/dealer or bank has an uninsured, unsecured and un-guaranteed obligation rated by each Rating Agency in its highest short-term rating category;

(iv)    securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof which have a credit rating from each Rating Agency, at the time of investment or the contractual commitment providing for such investment, at least equal to one of the two highest long term credit rating categories of each Rating Agency; provided, however, that securities issued by any particular corporation will not be Eligible Investments to the extent that investment therein will cause the then outstanding principal amount of securities issued by such corporation to exceed 20% of the aggregate principal amount of all Eligible Investments in the Custodial Accounts and the Escrow Accounts; provided, further, that such securities will not be Eligible Investments if they are published as being under review with negative implications from either Rating Agency;

(v)    commercial paper (including both non-interest-bearing discount obligations and interest bearing obligations payable on demand or on a specified date not more than 180 days after the date of issuance thereof) rated by each Rating Agency in its highest short-term rating category;

(vi)    certificates or receipts representing direct ownership interests in future interest or principal payments on obligations of the United States of America or its agencies or instrumentalities (which obligations are backed

by the full faith and credit of the United States of America) held by a custodian in safekeeping on behalf of the holders of such receipts; and

(vii)    any other demand, money market, common trust fund or time deposit or obligation, or interest bearing or other security or investment rated in the highest rating category by each Rating Agency; provided, however, that (a) any such instrument shall be acceptable to the Rating Agencies, and (b) no such instrument shall be an Eligible Investment if such instrument evidences either (i) a right to receive only interest payments with respect to the obligations underlying such instrument, or (ii) both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying obligations.

Environmental Liability:  Shall have the meaning set forth in Section 10.01 hereof.

Escrow Account:  The separate account or accounts created and maintained pursuant to Section 2.06(a) or Section 2.06(b).

Escrow Payment:  With respect to any Mortgage Loan, the amounts constituting real estate taxes, mortgage insurance premiums, fire and hazard insurance premiums, and any other payments required to be escrowed by the Mortgagor with the mortgagee or Servicer pursuant to the Mortgage Loan Documents.

Exchange Act: The Securities Exchange Act of 1934, as amended.

Extension Term:  Shall have the meaning set forth in Section 11.01 hereof.

Fannie Mae:  Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

Fannie Mae Guides:  The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto.

FHA:   The Federal Housing Administration of HUD, or any successor thereto.

Fitch:  Fitch, Inc., or any successor thereto.

Flood Act: The Flood Disaster Protection Act of 1973, as amended.

Forbearance:  Shall have the meaning set forth in Section 2.01(i) hereof.

Freddie Mac:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

Freddie Mac Guide:  The Single-Family Seller/Servicer Guide.

Ginnie Mae:  The Government National Mortgage Association or any successor thereto.

Ginnie Mae Guide: The Ginnie Mae MBS Guide.

HELOC Draw:  With respect to any HELOC Loan, a borrowing by the Mortgagor under the related Mortgage Note.

HELOC Loan:  Any revolving line of credit, secured by a lien on a one to four family residential real property, whether or not said line of credit has a loan balance.

HOEPA Loan:  A Mortgage Loan subject to the Home Ownership and Equity Protection Act of 1994 ("HOEPA").

HUD:  shall mean the United States Department of Housing and Urban Development or any successor thereto.

Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interest Rate Adjustment Date:  With respect to each Adjustable Rate Mortgage Loan, the date specified in the related Mortgage Note and the New Loan Data File, on which the Mortgage Interest Rate is adjusted.

Invoice Date:  The 7th Business Day of the month following the Determination Date.

Liability:  Shall have the meaning set forth in Section 10.01 hereof.

LIBOR Rate:  The three month London Inter-Bank Offered Rate as published in the Wall Street Journal (northeast edition).

Liquidation Proceeds:  Cash received by the Servicer in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

LPMI Policy:  A policy of primary mortgage guaranty insurance issued by an insurer pursuant to which the related premium is either (a) to be paid by the servicer of

the related Mortgage Loan from payments of interest made by the Mortgagor in an amount as is set forth in the related New Loan Data File, or (b) to be paid by the Owner.

Master Servicer: With respect to any Securitization Transaction, the "master servicer," if any, identified in the related transaction documents.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the state of Delaware, or any successor thereto.

Monthly Advice: The monthly report to be provided by Servicer to Owner in connection with each remittance, in the form of Exhibit X, as amended from time to time.

Monthly Payment: The monthly payment of principal and interest due on a Mortgage Loan under the applicable Mortgage Loan Documents.

Moody's: Moody's Investors Service, Inc., and any successor thereto.

Mortgage: The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first or subordinate lien, as applicable, on an unsubordinated estate in fee simple in real property securing the Mortgage Note; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the mortgage, deed of trust or other instrument securing the Mortgage Note may secure and create a first or subordinate lien, as applicable, upon a leasehold estate of the Mortgagor.

Mortgage File: The documents pertaining to a particular Mortgage Loan or REO Property referred to as the Mortgage File, listed in Exhibit II annexed hereto to the extent received by the Servicer from the Owner, prior servicer, sub-servicer or originator, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate: The annual rate of interest borne on a Mortgage Note with respect to each Mortgage Loan including any changes resulting from any amendment, modification, forbearance, application of the Servicemembers Civil Relief Act of 2003 or any court order.

Mortgage Loan: An individual mortgage loan conforming to the Eligibility Criteria and which is subject to this Agreement, consisting of any Agency Loans and the Portfolio Loans.

Mortgage Loan Documents: The documents pertaining to a particular Mortgage Loan or REO Property referred to as the Mortgage File in Exhibit II attached hereto.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property:  The real property (or leasehold estate, if applicable) located in one of the fifty states or the District of Columbia, securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor:  The obligor on a Mortgage Note.

Mortgagor Check:  A check intended to be used by a Mortgagor as a means for drawing down funds on a HELOC Loan.

New Loan Data File:  With respect to each Mortgage Loan delivered, or caused to be delivered, hereunder, the data file produced by Owner or the prior servicer pursuant to the Transfer Instructions, which is used to enable Servicer to set up each Mortgage Loan on its loan servicing system.

Non-recoverable Advance:  Any Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property which, in the good faith judgment of the Servicer, will not or, in the case of a proposed advance, may not, be ultimately recoverable from related Insurance Proceeds, Liquidation Proceeds or otherwise from such Mortgage Loan or REO Property.  The determination by the Servicer that it has made a Non-recoverable Advance shall be evidenced by an officer's certificate delivered to the Owner.

Original Term:  Shall have the meaning set forth in Section 11.01 hereof.

Owner Event of Default:  Any one of the conditions or circumstances enumerated in Section 8.01.

Owner Expense:  "Out-of-pocket" costs to third parties incurred by the Servicer in servicing the Mortgage Loans and REO Properties that are generally not reimbursable by the Mortgagor or from Liquidation Proceeds and that are customarily paid by the Owner. Owner Expenses may include, but are not limited to the cost of (a) Mortgagor counseling fees payable to a third party, (b) any Mortgage Loan assignment, recording, trustee, endorsement or release fee including recordation of powers of attorney and any MERS charges, which fees are not reimbursable to Servicer by any other party, (c) tax penalties as a result of a prior servicer or originator not paying taxes, (d) flood tracking contracts, (e) tax service contracts (f) tax certifications performed to research past due tax amounts, (g) LPMI premiums, (h) attorneys' fees and costs not chargeable to the Mortgagor, (i) funds to repurchase Agency Loans from the applicable Agency, (j) funds to buyout a superior lien, (k) environmental clean up costs, (l) costs from the sale of charged-off assets, or (m) any other fees or amounts contained in this Agreement, required to be processed by Servicer and not otherwise reimbursed. All such expenses are subject to change from time-to-time.

Owner Income:  That portion of Ancillary Income which is payable to the Owner pursuant to the Pricing Exhibit.

Owner Indemnified Parties:  Shall have the meaning set forth in Section 10.01(b) hereof.

Person:  Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

PMI Policy:  A policy of primary mortgage guaranty insurance issued by an insurer in connection with any Mortgage Loan.

Portfolio Loan:  Any Mortgage Loan that is not an Agency Loan. The Portfolio Loans shall include the HELOC Loans.

Portfolio Loan Remittance Date:  Each Business Day of the month .

Pricing Exhibit:  The pricing exhibit attached hereto as Exhibit I.

Principal Prepayment:  Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date (including any charge or premium thereon) and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Privacy Laws:  Shall have the meaning set forth in Section 5.03 hereof.

Program Form:  Any form of worksheet, checklist, summary, log, transmittal, request, order, report or other written form and any written document, instrument, statement, notice, request, authorization or communication, including, without limitation, customer billing forms and customer correspondence, utilized in connection with the servicing of the Mortgage Loans.

Proposed Rule:  Shall have the meaning set forth in Section 12.01 hereof.

Qualified Depository:  For Portfolio Loans and REO Properties, a depository the accounts of which are insured by the Federal Deposit Insurance Corporation, or any successor thereto.  For Agency Loans, a depository which meets the requirements of the applicable Agency Guide.

Rating Agency:  Any of Fitch, Moody's or Standard & Poor's.

Reconstitution Agreement: Shall have the meaning set forth is Section 10.07(a) hereof.

Recourse Obligation:  means, with respect to any Mortgage Loan, any obligation or liability (actual or contingent), as applicable, for loss of principal incurred in connection with the foreclosure or other disposition of, or other realization or attempt to realize upon the collateral securing such Mortgage Loan, or any repurchase obligation in connection with a Mortgage Loan.

Regulation AB: Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2007)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

REO Property:  A Mortgaged Property that secured a Portfolio Loan acquired by the Servicer on behalf of the Owner through foreclosure or by deed in lieu of foreclosure.

Repurchase Request:  A request to repurchase a Mortgage Loan.

Sarbanes Certification: Shall have the meaning set forth in Section 12.05(a)(iv) hereof.

Sarbanes Support Certification: Shall have the meaning set forth in Section 12.05(a)(iv) hereof.

Securities Act: The Securities Act of 1933, as amended.

Securities Law: The Securities Act, the Exchange Act and the rules and regulations of the Commission promulgated thereunder.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Servicer Employees:  Shall have the meaning set forth in Section 2.13 hereof.

Servicer Event of Default:  Any one of the conditions or circumstances enumerated in Section 9.01 hereof.

Servicer Indemnified Parties:  Shall have the meaning set forth in Section 10.01(a) hereof.

**Servicer Recovery Costs**: The costs of any necessary (a) Mortgagor credit reports, (b) asset searches or bankruptcy searches, (c) asset valuations, or (d) Mortgagor skip tracing, which costs shall be borne by the Servicer.

**Servicing Advances**:  All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred (a) in the performance by the Servicer of its servicing obligations pursuant to this Agreement including, but not limited to, the cost relating to (i) the preservation, restoration and protection of the Mortgaged Property, (ii) any enforcement or judicial proceedings, including, but not limited to proof of claim charges, (iii) foreclosure actions, (iv) property inspections, (v) property valuations including broker price opinions, appraisals, or automated values, (vi) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage (vii) taxes, assessments, water rates, sewer rents and other charges which are or may become a lien upon the Mortgaged Property, (viii) insurance premiums including PMI insurance premiums,  or (b) by a prior servicer prior to the applicable Transfer Date.

**Servicing Change**:  Shall have the meaning set forth in Section 2.19 hereof.

**Servicing Change Proposal**:  Shall have the meaning set forth in Section 2.19 hereof.

**Servicing Compensation**:  With respect to each Mortgage Loan and REO Property, the amounts Owner shall pay to the Servicer, (a) as set forth on the Pricing Exhibit, or (b) for any specially requested services by Owner.

**Servicing Rights**:  Any and all of the following: (a) any and all rights to service and administer, or direct the servicing or administration, of the Mortgage Loans; (b) any payments to or monies received by the Servicer for servicing the Mortgage Loans; (c) any Ancillary Income associated with the Mortgage Loans; (d) all agreements or documents creating, defining or evidencing any such servicing rights and all rights of the Servicer thereunder; (e) any and all rights to and in the Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected by the Servicer with respect thereto; (f) all accounts and other rights to payment related to any of the property described in this paragraph; and (g) any and all servicing files, servicing documents, servicing records, or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans.

**Standard & Poor's**:  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies Inc., and any successor thereto.

**Subcontractor**: Any vendor, subcontractor or other Person, except for an insurance tracking service, that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of

Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB with respect to Mortgage Loans under the direction or authority of the Servicer or a Subservicer.

> **Termination Date**:  Shall have the meaning set forth in Section 11.02 hereof.

> **Termination Fee**: With respect to each Mortgage Loan and REO Property, the termination fees set forth in the Pricing Exhibit, which is calculated as of the date of notice.

> **Third Party Claim**:  Shall have the meaning set forth in Section 10.01(c) hereof.

> **Transfer Date**:  With respect to each Mortgage Loan and REO Property, the date Servicer physically assumes its obligations of servicing pursuant to this Agreement.

> **Transfer Instructions**:  The form of transfer instructions used by the Servicer and provided to Owner or any prior servicer in connection with any given transfer of Mortgage Loans or REO Properties for servicing under this Agreement, as modified by Servicer from time to time. The current form of the Mortgage Loan (excluding HELOC Loan) Transfer Instructions is attached hereto as Exhibit VIA, the current form of the HELOC Loan Transfer Instructions is attached hereto as Exhibit VIB, the current form of recovery Transfer Instructions is attached hereto as Exhibit VIC, and the current form of REO Property Transfer Instructions is attached hereto as Exhibit VID

> **Transaction Servicer**: Shall have the meaning set forth in Section 12.03(b) hereof.

> **VA**:  The United States Department of Veterans Affairs, or any successor thereto.

> **VA No-Bid Instruction**:  An instruction given by the VA that the VA will not accept conveyance of the REO Property resulting from the foreclosure of a VA guaranteed Mortgage Loan or when the VA pays all or part of the difference between the net sale proceeds and the total indebtedness on a VA guaranteed loan following the private sale of the property where the proceeds are insufficient to fully payoff the existing Mortgage.

> **VA Regulations**:  Any and all regulations promulgated by the VA under the Servicemen's Readjustment Act of 1944, as amended.

> **Whole Loan Transfer**: Any sale or transfer of some or all of the Mortgage Loans, other than a Securitization Transaction.

# ARTICLE II.
## SERVICING

Section 2.01.    Servicer to Act as Servicer

(a)    From and after the date of this Agreement and the applicable Transfer Date (provided that all information required hereunder from Owner or any prior servicer has been provided to Servicer by such Transfer Date), the Servicer, as an independent contractor, shall service and administer each Mortgage Loan and REO Property and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable, consistent with the terms of this Agreement, Accepted Servicing Practices, and the Approval Matrix. The Owner shall not interfere with or itself attempt to perform the duties and activities of the Servicer hereunder, and Owner shall refer to Servicer any Mortgagor inquiries or correspondence, payments or payoff funds, or similar matters within the Servicer's responsibilities hereunder that Owner may receive. All Mortgage Loans and REO Properties transferred to Servicer hereunder shall conform to the Eligibility Criteria and shall be documented on those Mortgage Loan Documents that have been approved by Servicer. If Owner wishes the Servicer to assume the servicing of Mortgage Loans or REO Properties that do not meet the Eligibility Criteria or that are not documented on approved Mortgage Loan Documents, such request shall be subject to the Servicer's consent and may be subject to the Parties' agreement on a new Pricing Exhibit covering such loans and properties.

(b)    If the Owner has performed a due diligence review of the Mortgage Loans and REO Properties, (i) Owner shall inform the Servicer of such review and (ii) upon Servicer's reasonable request, Owner shall provide to the Servicer information obtained in such review.

(c)    Owner shall provide or cause to be provided by the prior servicer(s), in accordance with the Transfer Instructions, the New Loan Data File and any related Mortgage Loan documentation for each Mortgage Loan and REO Property to be serviced by the Servicer under this Agreement. For newly originated Mortgage Loans being transferred prior to the first payment due date of the Mortgage Loan, the Servicer must receive this information no later than five (5) Business Days before Servicer is to begin servicing such Mortgage Loan. For Mortgage Loans being transferred after the first payment due date, Owner agrees (i) to provide Servicer this information no later than two (2) Business Days following the Transfer Date, (ii) to provide Servicer notice of any incoming transfers no less than thirty (30) days prior to the Transfer Date, and (iii) to notify Servicer, in writing, within two (2) Business Days of Servicer's receipt of the New Loan Data File of any changes in the information contained therein. For all Mortgage Loans, Owner agrees to provide Servicer, within two (2) Business Days after Servicer's request, copies of the Mortgage Note, the Mortgage or any other documents with respect to a Mortgage Loan or REO Property that Servicer (i) deems reasonably necessary in connection with its performance of the servicing of such loan, or (ii) that Servicer requires in order to respond to or comply with any audit, examination or other review

conducted by any state or federal agency, department or regulator with jurisdiction over Servicer or any affiliate of Servicer. Owner agrees to, and shall use commercially reasonable efforts to cause any prior servicer to, comply with the Transfer Instructions. Owner is responsible for ensuring that all advances made by any prior servicer are communicated to Servicer within three (3) Business Days following the Transfer Date so as to enable Servicer to meet Mortgagor notification requirements of Applicable Law; if the foregoing timeframe is not met Servicer shall have no obligation to board or collect any such prior servicer advances. Owner is responsible for reconciling and funding all prior servicer advances directly with the prior servicer; Servicer will reasonably cooperate and assist in the reconciliation process but Servicer will not advance any of its own funds to reimburse the prior servicer or Owner for such amounts.

Owner hereby agrees that the Servicer shall net the costs or expenses incurred to transfer tax service contracts and flood service contracts or to obtain contracts that are not existing or transferable to the Servicer, in the amounts indicated on the Pricing Exhibit, which amounts can change from time to time, from amounts payable to the Owner.

Owner acknowledges that Servicer's obligations to pay taxes and insurance pursuant to Section 2.08 and this Section 2.01 are contingent upon the existence of life of loan tax and flood service contracts on a per Mortgage Loan or REO Property basis. To the extent Servicer has not received evidence of the existence of contracts that are acceptable to Servicer, as specified below, the Servicer shall obtain such contracts. Owner acknowledges that Servicer will accept life of loan service contracts from the following vendors: (i) for tax service contracts, (x) First American Real Estate Tax Services and (y) for Mortgage Loans more than one (1) year aged (based on the first payment due date of such Mortgage Loan) and provided the tax identification numbers for each Mortgaged Property are guaranteed, LSI, ZC Sterling and LandAmerica Tax & Flood Services, and (ii) for flood service contracts, First American Flood Data Services and LPS National Flood.

For newly originated Mortgage Loans being transferred prior to the first due date of the Mortgage Loan, Owner is responsible to ensure that any items included in Escrow Payments that are due within sixty (60) days following the closing date of the Mortgage Loan, are paid. For all other Mortgage Loans, Owner is responsible to ensure that any items included in Escrow Payments that are due within thirty (30) days following the Transfer Date are paid prior to transfer to Servicer. Owner is responsible for any loss of discount, tax penalties or lapses in hazard or flood coverage due to non-payment of such amounts prior to the Transfer Date.

(d)    In servicing and administering the Mortgage Loans and REO Properties, the Servicer shall comply in all material respects with Applicable Law, the Mortgage Loan Documents, and employ Accepted Servicing Practices except and to the extent that such practices conflict with the requirements of this Agreement. The Servicer shall retain adequate personnel to service and administer the Mortgage Loans and REO Properties.

(e)    In connection with any subordinate lien Portfolio Loan that succeeds to a superior lien position as a result of payment in full of the related superior lien mortgage loan, the Servicer may subordinate such subordinate lien Portfolio Loan in accordance with the Approval Matrix and Accepted Servicing Practices.

(f)    In connection with the HELOC Loans, the Servicer will, upon Owner's request, provide Mortgagor Checks to the Mortgagors and shall be reimbursed by Owner for all out of pocket expenses associated with providing such checks. The Servicer will verify the availability of funds prior to authorizing payment of Mortgagor Checks. The Mortgagor will also be able to access available funds by calling Servicer, via a toll free number. For each request made by a Mortgagor via the toll free number, such Mortgagor will be sent a wire request form and given instructions on where the form is to be sent once completed. Servicer will review the form and verify funds availability and funds will be wire transferred to the account designated by such Mortgagor requesting funds. Servicer will not issue payment of a Mortgagor Check and will not wire funds in response to a wire request form if Servicer has knowledge that the Mortgagor is not eligible to make a HELOC Draw from his or her HELOC Loan because HELOC Draw privileges have been suspended or terminated. If Servicer pays a Mortgagor Check or wires funds to a Mortgagor when Servicer had knowledge that the Mortgagor was not eligible to make a HELOC Draw from his or her HELOC Loan, Servicer shall be responsible for such payment or wire of funds.

(g)    The Servicer will process all Credit Line Increase requests received on a HELOC Loan in compliance with the Mortgage Loan Documents and Accepted Servicing Practices. The Servicer will obtain approvals in accordance with the Approval Matrix.

(h)    The Servicer's computer system shall clearly reflect (i) the Owner's ownership of (a) each Portfolio Loan and REO Property and (b) the Servicing Rights associated with the Mortgage Loans and REO Properties and (ii) the applicable Agency's ownership of each Agency Loan. The Servicer shall release from its custody the contents of any Mortgage File retained by it only in accordance with this Agreement.

(i)    In the event that any Mortgage Loan is in Default or, in the judgment of the Servicer, such a Default is reasonably foreseeable, the Servicer, consistent with Accepted Servicing Practices and Applicable Law, may waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Interest Rate, forgive the payment of principal or interest, or waive, in whole or in part, a prepayment charge), accept payment from the related Mortgagor of an amount less than the principal balance in final satisfaction of such Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor (any and all such waivers, modifications, payment plans, variances, forgiveness of principal or interest, postponements, or indulgences collectively referred to herein as "Forbearance"). Any approvals required in connection with such Forbearance shall be obtained in accordance with the Approval Matrix. The Servicer's analysis

supporting any Forbearance and the conclusion that any Forbearance meets the standards of this section, shall be appropriately reflected in the Servicer's records.

(j)    The Servicer shall, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Owner, all instruments and documents necessary to carry out its servicing and administrative duties under this Agreement including but not limited to instruments in connection with foreclosures; satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Owner shall furnish the Servicer with a power of attorney in the form of Exhibit V appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement. If reasonably required by the Servicer, the Owner shall furnish the Servicer with any powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

With respect to the performance of any service to be performed by the Servicer hereunder, including, without limitation, the obtaining of credit report data, the provision of field or other inspections, the provision of title-related services, and the sale or management of REO Properties, the Servicer may obtain such services from an Affiliate in accordance with Accepted Servicing Practices.

(k)    With respect to any Portfolio Loan in Default, if the Servicer determines that (i) no significant net recovery is possible through foreclosure proceedings or other liquidation of the related Mortgaged Property or (ii) the potential net recoveries are anticipated to be an amount, determined by the Servicer in its reasonable discretion, that is insufficient to warrant proceeding through foreclosure or other liquidation of the related Mortgaged Property, the Servicer may, at its discretion, forego foreclosing and treat such Portfolio Loan as a charge off. The Servicer will provide Owner with written notice of such charge offs and will seek the approval of the Owner where required under the Approval Matrix.   Servicer has no obligation to foreclose upon a charged off Portfolio Loan; however, Servicer shall continue to attempt to collect the Portfolio Loan as set forth below.

Servicer shall use all reasonable methods to collect the amounts due under each charged off Portfolio Loan. The Owner recognizes that not all amounts due under each charged off Portfolio Loan may be collectable, due to inadequate collateral value, Mortgagor inability or unwillingness to pay, or otherwise. Servicer shall use such methods, consistent with this Agreement, which in Servicer's reasonable judgment will maximize the recovery under the charged off Portfolio Loan. The Servicer shall pay all items constituting Servicer Recovery Costs, without reimbursement therefore from Owner. The Servicer shall be under no obligation to make any Servicing Advance in connection with a charged off Portfolio Loan, including advances to protect the lien status of such Portfolio Loan, but to the extent Servicer does so it shall be reimbursed as provided herein. The Servicer shall have no obligation to attempt to collect on any charged off Portfolio Loan via institution of litigation against the Mortgagor, whether via suit on the Mortgage Note or otherwise.

In the event the Servicer is unable to collect in full or in part from the Mortgagor on a charged off Portfolio Loan within a reasonable period of time following the date of charge off (determined by Servicer in its reasonable discretion), Servicer may, on behalf of Owner, sell such charged off Portfolio Loan or the Mortgage Note servicing released to a third party, either individually or as part of a bulk package of charged off mortgage loans. In furtherance of any such sale, Owner agrees and hereby authorizes Servicer to disclose information related to the charged off Portfolio Loans and make available for inspection the Mortgage Loan Documents (to the extent those documents are in Servicer's possession) to prospective purchasers of the charged off Portfolio Loans conducting a due diligence examination. Servicer shall obtain a non-disclosure agreement from any such prospective purchaser prior to releasing any information. Any such sale shall be evidenced by a purchase and sale agreement which shall be entered into between Servicer (on behalf of Owner) and the purchaser of such assets. Servicer shall negotiate such agreement on behalf of Owner and Owner agrees to cooperate in such negotiation and, if necessary, execute such agreement in a timely manner to accomplish such sale. Proceeds from any such sale shall be treated as a recovery on the Portfolio Loan(s), subject to Servicer's right to receive the fee specified in the Pricing Exhibit and recover any Servicing Advances as contemplated in this Agreement.

At the expiration of six months from the date of charge off, unless (i) the charged off Portfolio Loan is in a paying status or negotiations with the Mortgagor are pending to resolve the delinquency, or (ii) the charged off Portfolio Loan is in the process of being sold servicing released to a third party, Servicer shall cease active collections efforts and either (i) at Owner's request, transfer such Portfolio Loan servicing released to Owner or its designee pursuant to Section 11.02, or (ii) if Owner does not request such transfer or timely respond to Servicer's transfer request, satisfy the lien securing such Portfolio Loan and remove such Portfolio Loan from Servicer's servicing system. The Servicer shall have no further obligation to service such Portfolio Loan.

The Servicer, as permitted by Applicable Law, will continue to service a Portfolio Loan in recovery regarding which the Mortgagor files bankruptcy. Upon notice of a bankruptcy filing, the Owner agrees to pay the Servicer for any out of pocket costs incurred by Servicer. In addition, the Owner agrees to pay the Servicer a monthly fee as shown on the Pricing Exhibit while the Portfolio Loan remains in bankruptcy.

(l)    For all Agency Loans, the Servicer shall service, report and remit in compliance with the applicable Agency Guide as allowed or required by its role as "subservicer" on behalf of Owner; Owner retains the role and responsibility as "Issuer" and "Servicer" as defined by the Ginnie Mae Guide and as "Seller" and "Servicer" as defined by the Fannie Mae Guide or Freddie Mac Guide, as applicable.

Section 2.02.    Liquidation of Mortgage Loans

In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 2.01 is not paid when the same becomes due and payable,

or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as is consistent with Applicable Law, Accepted Servicing Practices, and the Approval Matrix. In the event that any payment due under any Mortgage Loan is not postponed pursuant to Section 2.01 and remains delinquent for a period of 90 days or any other default continues for a period of 90 days and provided that foreclosure is allowed by Applicable Law in the jurisdiction where the related Mortgaged Property is located and as allowed by Accepted Servicing Practices, and further provided that such Mortgage Loan has not been charged off pursuant to Section 2.01(k), the Servicer shall refer the Mortgage Loan for foreclosure. In connection with any such foreclosure, the Servicer shall make all necessary and proper Servicing Advances, provided, however, that the Servicer shall not be required to expend any funds in connection with any foreclosure or towards the restoration or preservation of any Mortgaged Property, unless it shall determine that such expense is beneficial to the Owner or will be recoverable by Servicer on behalf of Owner either through Liquidation Proceeds (respecting which Servicer shall have priority for purposes of withdrawals from the Custodial Account pursuant to Section 2.05) or through Condemnation Proceeds or Insurance Proceeds (respecting which Servicer shall have similar priority).

In connection with a foreclosure, in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, the Servicer shall cause the Mortgaged Property to be inspected by a qualified environmental inspector at the Owner's expense. Upon completion of the inspection, the Servicer shall promptly provide the Owner with a written report of the environmental inspection.

Notwithstanding anything to the contrary contained herein, after reviewing the environmental inspection report, the Owner shall determine how the Servicer shall proceed with respect to the Mortgaged Property; provided, that Servicer may determine in its sole discretion that it will not proceed with a foreclosure or acceptance of a deed in lieu of foreclosure with respect to a Mortgaged Property that has been determined to be contaminated by hazardous or toxic substances or wastes and with respect to which Servicer would be expected to take title in its own name. In the event (a) the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes and (b) the Owner directs the Servicer to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Owner shall be responsible for all reasonable costs associated with any related environmental clean up. The Servicer shall calculate such costs and Owner shall wire transfer the amount to the Servicer within one (1) Business Days of the Servicer's request.

In the event the Owner directs the Servicer not to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, or the Servicer is otherwise not proceeding to liquidation as a result of environmental contamination, the Servicer shall transfer the servicing of such Mortgage Loan or REO Property within fifteen (15) days of such determination following the procedures in Section 11.02 and Servicer will have no further obligation with regard to such Mortgage Loan or REO Property.

Section 2.03.    Collection of Mortgage Loan Payments

The Servicer shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take reasonable care in ascertaining and estimating Escrow Payments, to the extent applicable, and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the extent that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.  In connection with any Mortgage Loan that is in Default or regarding which the Servicer believes Default is reasonably foreseeable, the Servicer may, in accordance with Accepted Servicing Practices, recommend or counsel the Mortgagor to refinance their Mortgage Loan with the Servicer, an Affiliate of Servicer or with any third party lender. Notwithstanding the confidentiality provisions of this Agreement, the Servicer may (with any required Mortgagor consent) share Confidential Information relative to the Mortgagor's Mortgage Loan in connection with any such refinance.

Section 2.04.    Establishment of and Deposits to Custodial Accounts

(a)    The Servicer shall segregate and hold all funds collected and received pursuant to the Portfolio Loans and REO Properties separate and apart from any of its own funds and general assets and shall establish Custodial Accounts, in the form of time deposit or demand accounts, titled "GMAC Mortgage, LLC, in trust for ShellPoint Partners re: Fixed and Adjustable Rate Residential Mortgage Loans" (the "non-HELOC Custodial Account") and "GMAC Mortgage, LLC, in trust for ShellPoint Partners re: Home Equity Lines of Credit" (the "HELOC Custodial Account"), or such other title as is mutually agreed upon and directed in writing by Owner in accordance with Exhibit VIII. A separate Custodial Account shall be established for each entity that is providing financing for the Mortgage Loans and each such Custodial Account shall be an Eligible Account. The Custodial Accounts shall be established with a Qualified Depository which Qualified Depository may be an Affiliate of Servicer.  Any funds deposited in the Custodial Accounts shall at all times be fully insured to the full extent permitted under Applicable Law.

The Servicer shall deposit in the corresponding Custodial Account no more than two (2) Business Days following receipt thereof (unless otherwise noted), the following collections received by the Servicer or payments to be made by the Servicer, in connection with the Portfolio Loans and REO Properties, after the applicable Transfer Date:

(i)    all collections of principal, including all Principal Prepayments;

(ii)    all collections of interest;

(iii)    all Liquidation Proceeds (which shall be deposited as soon as practical after the expenses of such sale are paid and the Servicer has

reimbursed itself for any related un-reimbursed Servicing Advances, unpaid Servicing Compensation, and unpaid Owner Expenses);

(iv)    net cash flow, if any, from the REO Property, which shall equal the revenues from such REO Property net of expenses and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses;

(v)    all Insurance Proceeds, required to be deposited pursuant to Section 2.10, other than proceeds to be held in a suspense account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vi)    all Condemnation Proceeds which are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vii)    any amount required to be deposited in the Custodial Account pursuant to Section 2.09 (losses on Eligible Investments), or Section 3.01(interest on late remittances);

(viii)    [Reserved];

(ix)    any amounts required to be deposited by the Servicer pursuant to Section 2.11 in connection with the deductible clause in any blanket hazard insurance policy;

(x)    any amounts received by the Servicer under a PMI Policy or an LPMI Policy (which shall be deposited as soon as practical after Servicer has reimbursed itself for any related un-reimbursed Servicing Advances, unpaid Servicing Compensation, and unpaid Owner Expenses); and

(xi)    any other amount specifically required to be deposited in the Custodial Account pursuant to this Agreement.

The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, unless otherwise provided herein, payments consisting of Ancillary Income due the Servicer pursuant to the Pricing Exhibit need not be deposited by the Servicer into the Custodial Account.

(b)    The Servicer shall segregate and hold all funds collected and received in connection with the Agency Loans separate and apart from any of its own funds and general assets and shall establish separate Custodial Accounts in accordance with the applicable Agency Guide. The Servicer shall deposit in the corresponding Agency Custodial Accounts no more than two (2) Business Days following receipt thereof, the applicable collections received by the Servicer in accordance with the Agency Guide.

The Owner shall ensure the Agency Custodial Account shall be sufficiently funded to pay any Advances due by Owner to the applicable Agency.

(c)    Any interest paid on funds deposited in the Custodial Accounts by the depository institution or any other non-interest benefits shall accrue to the benefit of the Parties set forth in the Pricing Exhibit.

Section 2.05.    Permitted Withdrawals from Custodial Accounts

(a)    The Servicer shall be entitled to withdraw funds with respect to any Mortgage Loans from the related Custodial Accounts for the following purposes; provided, however, no such withdrawal from the Custodial Accounts relating to the Agency Loans shall be made if prohibited by the applicable Agency Guide:

(i)    to make payments to the Owner in the amounts and in the manner provided  in Section 3.01 and Section 3.02;

(ii)    to pay to itself Servicing Compensation and Owner Expenses in the manner provided in Section 3.01, Section 3.02, and Section 4.03;

(iii)    to reimburse itself for un-reimbursed Servicing Advances (except to the extent already reimbursed pursuant to any other provision of this Agreement including Section 3.04), any accrued but unpaid Servicing Compensation, and unpaid Owner Expenses. . The Servicer's right to reimbursement pursuant to this section shall be prior to the rights of the Owner;

(iv)    to reimburse itself for any un-reimbursed Non-recoverable Advances made by the Servicer in accordance with this Agreement;

(v)    to invest funds in Eligible Investments in accordance with Section 2.09;

(vi)    to withdraw funds deposited in error;

(vii)    to withdraw funds necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance and the fees of any managing agent acting on behalf of the Servicer.;

(viii)    to pay itself any interest earned on funds deposited in the Custodial Account as set forth in the Pricing Exhibit (all such interest to be withdrawn no later than each Portfolio Loan Remittance Date);

(ix)    to pay itself any amounts that are owed by Owner under this Agreement and that remain unpaid;

(x)    to pay for any LPMI Policy premiums;

(xi)    [Reserved];

(xii)    to transfer funds to another Qualified Depository in accordance with Section 2.09 hereof;  and

(xiii)    to clear and terminate the Custodial Account upon the termination of this Agreement.

Except as provided in Section 4.03, withdrawals with respect to a Mortgage Loan may be made only from the related Custodial Account.

Section 2.06.    Establishment of and Deposits to Escrow Accounts

(a)    The Servicer shall segregate and hold all funds collected and received pursuant to a Portfolio Loan constituting Escrow Payments separate and apart from any of its own funds and general assets in one or more Escrow Accounts, in the form of time deposit or demand accounts, titled, "GMAC Mortgage, LLC, in trust for ShellPoint Partners re: Residential Fixed and Adjustable Rate Mortgage Loans, and various Mortgagors," or such other title as is mutually agreed upon and directed in writing by Owner in accordance with Exhibit VIII.  The Escrow Account shall be established with a Qualified Depository, in a manner which shall provide the maximum available insurance thereunder.

The Servicer shall deposit in the Escrow Account or Accounts no more than two (2) Business Days following receipt thereof the following amounts received in connection with the Portfolio Loans:

(i)    all Escrow Payments collected for the purpose of effecting timely payment of any such items as required under the terms of this Agreement along with any refunds received in connection with Escrow Payment items;

(ii)    all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property; and

(iii)    buydown funds and other amounts held is suspense prior to application to the Mortgage Loan or REO Property.

(b)    The Servicer shall segregate and hold all funds collected and received pursuant to the Agency Loans separate and apart from any of its own funds and general assets and shall establish Escrow Accounts in accordance with the applicable Agency Guides. The Servicer shall deposit in the corresponding Agency Escrow Accounts no

more than two (2) Business Days following receipt thereof, the applicable collections received by the Servicer in accordance with the applicable Agency Guide

(c)    Any benefit related to the funds held in the Escrow Accounts and any obligation to pay interest on such funds to the related Mortgagor shall be allocated between the Servicer and Owner as set forth in the Pricing Exhibit.

Section 2.07.    Permitted Withdrawals from Escrow Accounts

(a)    The Servicer shall be entitled to withdrawal funds from the Escrow Accounts for the following purposes; provided, however, no such withdrawal from the Escrow Accounts relating to the Agency Loans shall be made if prohibited by the applicable Agency Guide:

(i)    to effect timely payments of real estate taxes, assessments, mortgage insurance premiums, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Portfolio Loan;

(ii)    to reimburse itself for any Servicing Advance constituting Escrow Payments made by the Servicer pursuant to this Agreement with respect to a related Portfolio Loan (except to the extent already reimbursed pursuant to any other provision of this Agreement), but only from amounts received on the related Portfolio Loan which represent late collections of Escrow Payments thereunder;

(iii)    to refund to any Mortgagor any funds found to be in excess of the amounts required under the terms of the related Portfolio Loan or Applicable Law;

(iv)    to transfer funds to the Custodial Account for application to reduce the principal balance of the Portfolio Loan in accordance with the terms of the related Mortgage and Mortgage Note;

(v)    to pay to itself, or any Mortgagor to the extent required by Applicable Law, any interest paid on the funds deposited in the Escrow Account;

(vi)    to restore or repair the Mortgaged Property in accordance with Section 2.15 ;

(vii)    to withdraw funds deposited in error; and

(viii)    to clear and terminate the Escrow Account on the termination of this Agreement.

Section 2.08.    Payment of Escrow Items and Other Charges

With respect to each first lien Mortgage Loan that provides for Escrow Payments, the Servicer shall maintain accurate records reflecting the status of real estate taxes and other charges which are or may become a lien upon the Mortgaged Property, and the status of hazard and flood insurance coverage, and shall obtain, from time to time, all bills for the payment of such charges that are part of Escrow Payments (including renewal premiums) and shall effect payment thereof prior to the applicable loss of discount, penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage.   The Servicer assumes full responsibility for the timely payment of all such bills and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments.

With respect to each first lien Mortgage Loan that does not provide for Escrow Payments, the Servicer shall monitor to ensure that any such payments are made by the Mortgagor.  The Servicer shall make Servicing Advances to effect such payments, if possible, within the time period required to avoid additional penalties and interest, and no later than the time required to avoid the loss of the related Mortgaged Property by foreclosure from a tax or other lien.   Servicer will charge the Mortgagor for such penalties and interest associated with such past due amounts paid by Servicer in connection with the Mortgaged Property.   Servicer may, at Servicer's discretion and in accordance with Applicable Law and Accepted Servicing Practices, establish an Escrow Account for any Mortgagor that fails to pay real estate taxes, flood or hazard insurance on the Mortgaged property in a timely manner.

With respect to each second lien Mortgage Loan, the Servicer shall not be required to collect any Escrow Payments and shall not be responsible for monitoring or paying any taxes, flood or hazard insurance, or other amounts constituting Escrow Payments.

Section 2.09.    Protection of Accounts

The Custodial Accounts and Escrow Accounts for the Mortgage Loans and REO Properties will be held by the Servicer at a Qualified Depository.  The Servicer may transfer the Custodial Accounts or the Escrow Accounts to a different Qualified Depository from time to time.  Such transfer shall be made only upon reasonable advance notice to the Owner.

Amounts on deposit in the Custodial Accounts may at the option of the Servicer be invested in Eligible Investments.  Any such Eligible Investment shall mature no later than one day prior to the Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable, in each month; provided, however, that if such Eligible Investment is an obligation of a Qualified Depository (other than the Servicer) that maintains the Custodial Account, then such Eligible Investment may mature on the

SERVICING AGREEMENT BY AND BETWEEN                                          AUGUST 15TH, 2011
SHELLPOINT MORTGAGE, LLC AND GMAC MORTGAGE, LLC

related Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable. Any losses incurred in respect of any such investment shall be deposited in the Custodial Account, by the Servicer out of its own funds prior to the next Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable.

    All suspense and clearing accounts in which funds relating to the Mortgage Loans and REO Properties are deposited shall be Eligible Accounts established with a Qualified Depository, in a manner which shall provide maximum available insurance thereunder.

    Section 2.10.    <u>Maintenance of Hazard and Flood Insurance</u>

    The Servicer shall cause to be maintained (a) for each first lien Portfolio Loan,  hazard insurance such that all buildings upon the Mortgaged Property are insured by a generally acceptable insurer acceptable under the Fannie Mae Guides against loss by fire, hazards of extended coverage and such other hazards as are required to be insured pursuant to the Fannie Mae Guides, in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such first lien Mortgage Loan or (ii) the outstanding principal balance of the first lien Mortgage Loan provided that such amount represents at least 80% of the insurable value of the Mortgaged Property and (b) for each Agency Loan, hazard insurance coverage as required under the terms of the applicable Agency Guide.  If a Mortgaged Property is not covered by hazard insurance or is covered in an amount less than the amount required, the Servicer shall notify the related Mortgagor in accordance with Accepted Servicing Practices that the Mortgagor must obtain such insurance coverage, and if said Mortgagor fails to obtain the required insurance coverage after such notification, the Servicer shall force place insurance on the Mortgagor's behalf within the time permitted by Applicable Law and Accepted Servicing Practices.

    The Servicer shall cause to be maintained  (a) for each first lien Portfolio Loan secured by a Mortgaged Property located in a special flood hazard area (where flood insurance is available, and where the originator or prior servicer maintained, such flood insurance), a flood insurance policy with an insurance carrier acceptable under the Fannie Mae Guides in an amount representing coverage not less than the lesser of (i) the aggregate unpaid principal balance of the Mortgage Loan, (ii) maximum amount of insurance which is available under the Flood Act , and (iii) the full replacement value of the improvements which are part of such Mortgaged Property and (b) for each Agency Loan secured by a Mortgaged Property located in a special flood hazard area (where flood insurance is available, and where the originator or prior servicer maintained, such flood insurance), flood insurance coverage as required under the terms of the applicable Agency Guide.  If a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Act, the Servicer shall notify the related Mortgagor in accordance with Accepted Servicing Practices that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage after

such notification, the Servicer shall force place flood insurance on the Mortgagor's behalf within the time permitted by Applicable Law and Accepted Servicing Practices.

All policies required hereunder shall name the Servicer and its successors and assigns as a mortgagee and loss payee and shall be endorsed with non contributory standard or New York mortgagee clauses which shall provide for at least 30 days prior written notice of any cancellation, reduction in amount or material change in coverage.

The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting a insurance carrier or agent, provided, however, that the Servicer shall not accept any insurance policies from insurance companies unless such companies are acceptable (a) for Portfolio Loans, in accordance with the Fannie Mae Guides or (b) for Agency Loans, in accordance with the applicable Agency Guide. The Servicer shall determine that such policies provide sufficient coverage in amounts as required pursuant to the applicable guide.

Any amounts collected by the Servicer under any such policies (other than amounts to be deposited in a suspense account and applied to the restoration or repair of the related Mortgaged Property, or to be released to the Mortgagor, in accordance with the Servicer's normal servicing procedures as specified in Section 2.15) shall be deposited in the Custodial Account pursuant to Section 2.04, subject to withdrawal pursuant to Section 2.05.

With respect to each subordinate lien Mortgage Loan, including HELOC Loans, the Servicer shall obtain and maintain the blanket hazard insurance and flood policy described in Section 2.11.

Section 2.11.   Maintenance of Blanket Hazard Insurance Coverage

In the event that the Servicer shall obtain and maintain a blanket policy insuring against losses arising from fire, hazards and flood covered under extended coverage on all of the Mortgage Loans, then, to the extent such policy complies with all of the requirements of Section 2.10 relating to hazard insurance, the Servicer shall conclusively be deemed to have satisfied its obligations as set forth in Section 2.10 to maintain such hazard and flood insurance. Any amounts collected by the Servicer under any such blanket policy relating to a Mortgage Loan shall be deposited in the applicable Custodial Account as provided in Section 2.04, subject to withdrawal as provided in Section 2.05. Such policy may contain a deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property an individual policy complying with Section 2.10, and there shall have been a loss which would have been covered by such individual policy, the Servicer shall deposit in the applicable Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause, such amount to be deposited from the Servicer's funds, without reimbursement therefore.

Section 2.12.    Maintenance of PMI Policies

With respect to each Mortgage Loan subject to a PMI Policy or LPMI Policy on the related Transfer Date, the Servicer shall maintain or cause the Mortgagor to maintain (to the extent that the Mortgage Loan Documents require the Mortgagor to maintain such insurance) in full force and effect such PMI Policy or LMPI Policy, and shall pay or shall cause the Mortgagor to pay their Escrow Payments relating thereto, on a timely basis. In connection with any assumption or substitution agreements entered into or to be entered into with respect to a Mortgage Loan, the Servicer shall promptly notify the insurer under the related PMI Policy or LPMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such PMI Policy or LPMI Policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under such PMI Policy or LPMI Policy.

The Servicer shall comply with all provisions of Applicable Law relating to the cancellation of, or collection of premiums with respect to, PMI Policies, including, but not limited to, the provisions of the Homeowners Protection Act of 1998, and all regulations promulgated thereunder, as amended from time to time.  The Servicer shall be obligated to make premium payments with respect to PMI Policies required to be maintained by the Mortgagor, if the Mortgagor is required but fails to pay any Escrow Payments, which shall be paid from the Escrow Account.

With respect to each Mortgage Loan covered by a PMI Policy or LPMI Policy, the Servicer shall take all such actions on behalf of the Owner as are necessary to service, maintain and administer the related Mortgage Loan in accordance with such policy and to enforce the rights under such policy.  Except as expressly set forth herein, the Servicer shall have full authority on behalf of the Owner to do anything it deems appropriate or desirable in connection with the servicing, maintenance and administration of such policy; provided that the Servicer shall not take any action with respect to such Mortgage Loan which would result in non-coverage under such LPMI Policy or PMI Policy of any loss which, but for actions of the Servicer, would have been covered thereunder.  The Servicer shall cooperate with the PMI Policy or LPMI Policy insurers and shall furnish all reasonable evidence and information in the possession of the Servicer to which the Servicer has access with respect to the related Mortgage Loan.

The Servicer agrees to prepare and present, on behalf of itself and the Owner, claims to the insurer under any PMI Policy or LPMI Policy in a timely fashion in accordance with the terms of such PMI Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any PMI Policy or LPMI Policy respecting a defaulted Mortgage Loan.

Section 2.13.    Maintenance of Fidelity Bond and Errors and Omissions Insurance

The Servicer shall maintain, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds,

money, documents or papers relating to the Mortgage Loans and REO Properties ("Servicer Employees"). Any such fidelity bond and errors and omissions insurance policy shall be in the form of the mortgage banker's blanket bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Servicer Employees. No provision of this Section 2.13 requiring such fidelity bond and errors and omissions insurance policy shall relieve the Servicer from its duties and obligations as set forth in this Agreement. The Servicer shall maintain minimum coverage amounts under any such fidelity bond and errors and omissions insurance policy acceptable to Fannie Mae. The Servicer shall provide proof of such coverage upon written request by Owner.

Section 2.14.    Inspections

Regarding Mortgage Loans in a first lien position, the Servicer shall perform inspections of the Mortgaged Property as required by Accepted Servicing Practices. Regarding subordinate lien Mortgage Loans, the Servicer shall have no obligation to perform inspections.

Section 2.15.    Restoration of Mortgaged Property

The Servicer shall release to the Mortgagor any Insurance Proceeds to be applied to the restoration or repair of the Mortgaged Property or any Condemnation Proceeds in accordance with (a) for Portfolio Loans and REO properties, the Fannie Mae Guide and (b) for Agency Loans, the applicable Agency Guide.

Section 2.16.    Title, Management and Disposition of REO Property

(a)    In the event that title to any Mortgaged Property securing a Portfolio Loan is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Owner or its designee.

The Servicer, either itself or through an agent selected by the Servicer, shall manage, protect and market for sale each REO Property for the Owner for the purpose of securing its prompt disposition and sale. The disposition of REO Property shall be carried out by the Servicer in accordance with the terms of the Approval Matrix.

The Servicer shall use commercially reasonable efforts to dispose of each REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless the Servicer determines that a longer period is necessary for the orderly liquidation of such REO Property.

The Servicer shall maintain on each REO Property fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Act, flood insurance.

(b)    In the event that title to any Mortgaged Property securing an Agency Loan is acquired in foreclosure or by deed in lieu of foreclosure, the Servicer shall take title and manage such property in accordance with the applicable Agency Guide.

Section 2.17.    Notification of Adjustments

With respect to each Adjustable Rate Mortgage Loan, the Servicer shall adjust the Mortgage Interest Rate on the related Interest Rate Adjustment Date in compliance with the requirements of the related Mortgage Note and Applicable Law. The Servicer shall deliver any and all notices required under Applicable Law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate and the Monthly Payment adjustments. The Servicer shall promptly upon written request thereof, deliver to the Owner any applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. In connection with any Forbearance entered into pursuant to Section 2.01(i), the Servicer may waive any Mortgage Interest Rate or Monthly Payment adjustments.

Section 2.18.    Non-Recoverable Advances

Notwithstanding anything to the contrary in this Agreement, if the Servicer determines in good faith a Servicing Advance may be a Non-recoverable Advance, the Servicer shall have no obligation to make such Servicing Advance.

Section 2.19.    Servicing Changes

If, following the date of this Agreement, Owner shall propose to (a) amend, supplement, discontinue or introduce any Program Form; and/or (b) alter, amend or supplement the servicing activities (any such amendment, supplement, discontinuation, introduction or other alteration being herein referred to as a "Servicing Change"), the Owner shall provide written notice of each such proposed Servicing Change to the Servicer by providing (i) a specimen of each Program Form proposed to be amended, supplemented or introduced, in the form in which it is proposed to be amended, supplemented or introduced; and/or (ii) a written description of each proposed amendment, supplement or other alteration to the servicing activities, which description shall in each case be sufficiently clear, comprehensive and detailed to provide a reasonable basis for the training of individuals who would be required to follow the procedures described thereby (such written notice, as accompanied by the items described in clauses (i) and (ii), is referred to herein as a "Servicing Change Proposal").

Upon receipt of a Servicing Change Proposal, the Servicer shall deliver a written response either (a) accepting such Servicing Change Proposal, in which case the Servicing Change shall become effective on the date that Servicer, in its reasonable discretion, is able to implement the Servicing Change, or (b) reject such Servicing Change Proposal, which rejection shall include the reasons for such rejection set forth in reasonable detail.  No Servicing Change shall become effective unless and until all terms, including the cost thereof, are agreed upon in writing by both Parties.

If, following the date of this Agreement, a change in Applicable Law or investor requirements, including Fannie Mae, Freddie Mac or Ginnie Mae requirements, the Servicer shall implement the change at the earliest possible date. If a change in Applicable Law or investor requirements, including Fannie Mae, Freddie Mac or Ginnie Mae requirements increases the Servicer's cost to service or otherwise negatively affects the Servicer's economics from that contained on the Pricing Exhibit, in each case determined by Servicer in its reasonable discretion, the Servicer may increase the pricing payable by Owner hereunder in an amount reasonably necessary to cover increased costs associated with complying with such change in Applicable Law or investor requirements, upon thirty (30) days advance written notice to Owner.

Section 2.20.   Prepayment Charges

The Servicer shall not waive any applicable prepayment charge with respect to any Mortgage Loan that prepays during the term of the prepayment charge. If the Servicer fails to collect the applicable prepayment charge upon any prepayment of any Mortgage Loan, the Servicer shall pay the Owner an amount equal to the prepayment charge not collected. Notwithstanding the foregoing, the Servicer may waive a prepayment charge without paying the Owner the amount of the prepayment charge if (a) the Mortgage Loan is in Default or Default is reasonably foreseeable and such waiver would maximize recovery of total proceeds taking into account the value of such prepayment charge and the other amounts due on the related Mortgage Loan, (b) the collection of the prepayment charge would be in violation of Applicable Law or Accepted Servicing Practices, or (c) the Approval Matrix allows for the waiver.

Section 2.21.   Credit Reporting

For each Mortgage Loan, the Servicer shall, on a monthly basis, accurately and fully furnish, in accordance with Applicable Law, accurate and complete information (e.g., favorable and unfavorable) on the Mortgagors to each of the following credit repositories:  Equifax Credit Information Services, Inc., Trans Union, LLC and Experian Information Solution, Inc.

Section 2.22.   Safeguarding Customer Information

The Servicer has implemented and will maintain security measures designed to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information published in final form on February 1, 2001, 66 Fed. Reg. 8616, and the rules promulgated thereunder, as amended from time to time.

# ARTICLE III.
## REMITTANCES AND STATEMENTS

Section 3.01.   Remittances for Portfolio Loans that are not HELOC Loans

On each Portfolio Loan Remittance Date the Servicer shall remit for each Portfolio Loan that is not a HELOC Loan and for each REO Property by wire transfer of immediately available funds to the Owner all amounts deposited in the applicable Custodial Account as of the applicable Portfolio Loan Remittance Date (net of charges against or withdrawals from the Custodial Account permitted by this Agreement).

With respect to any remittance not made to Owner on the Portfolio Loan Remittance Date on which such remittance was required to be made, the Servicer shall, if such remittance has not already been made when written notice of such nonpayment is provided from Owner to Servicer, pay to the Owner interest on any such late payment at an annual rate equal to the LIBOR Rate plus two (2) percent, adjusted as of the date of each change, but in no event greater than the maximum amount permitted by law.  Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the Business Day on which notice of such non-payment was given by Owner and ending with the Business Day on which such payment is made, both inclusive.  Such interest shall be remitted along with the distribution payable on the next succeeding Portfolio Loan Remittance Date.  The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Servicer Event of Default.

Section 3.02.   Remittances for HELOC Loans

(a)     The Servicer shall on each Business Day determine the amount of all HELOC Draws made on account of the HELOC Loans on the preceding Business Day and notify the Owner of such amount in the Daily HELOC Report.

(b)     Each Business Day, the Servicer shall remit for each HELOC Loan by wire transfer of immediately available funds to the Owner all amounts deposited in the Custodial Account on the previous Business Day, net of (i) charges against or withdrawals from the Custodial Account as permitted by this Agreement, and (ii) HELOC Draws not previously reimbursed.  To the extent HELOC Draws exceed the available funds in the Custodial Account, the Owner will be required to reimburse Servicer for the amount of HELOC Draws not previously reimbursed within one (1) Business Day.

(c)     If such payment is not made by Owner when due, in addition to any other rights or remedies available to Servicer under this Agreement, including but not limited to the right of the Servicer to collect interest on such late payment pursuant to Section 4.03, the amount payable to Servicer may be deducted from the Custodial Account or from any subsequent remittance due Owner.

Section 3.03.    Remittance for Agency Loans

The Owner shall remit to Servicer, or ensure the Agency Custodial Account has sufficient funds for, all Monthly Payments due to the applicable Agency, on the date such funds are due to the applicable Agency.    The Servicer requires any funds due to the Agency be in the Custodial Account on the day prior to the date such funds are due to be remitted to the Agency or deducted from the Agency Custodial Account.  This includes but is not limited to Monthly Payments, guaranty fees, buyout amounts and Repurchase Requests.

On each Invoice Date the Servicer shall also remit for each Agency Loan by wire transfer of immediately available funds, all amounts required to be remitted to the Owner pursuant to this Agreement, as of the close of business on the Determination Date. This amount shall include any Agency servicing fees collected by the Servicer and due Owner net of amounts due Servicer pursuant to Section 4.03.

Section 3.04.    Reconciliation of Servicing Advances

With respect to all Mortgage Loans and REO Properties, Servicer shall maintain a corporate account to monthly reconcile the amount of unreimbursed Servicing Advances and Servicing Advances recovered.  The Servicer shall, on each Determination Date determine all amounts representing Servicing Advances recovered and unreimbursed Servicing Advances on account of the Mortgage Loans and REO Properties. To the extent that the aggregate Servicing Advances recovered exceed the unreimbursed Servicing Advances, Servicer shall remit such difference to Owner by wire transfer of immediately available funds on the Invoice Date.  To the extent that the aggregate amount of unreimbursed Servicing Advances exceed the Servicing Advances recovered, (a) Servicer shall notify Owner of such difference in the Servicing Advance report which shall be provided on the Invoice Date following the Determination Date and (b) the Owner shall, by wire transfer, remit to Servicer such amount within two (2) Business Days of the Invoice Date.

If such payment is not made by Owner when due, in addition to any other rights or remedies available to Servicer under this Agreement, including but not limited to the right of the Servicer to collect interest on such late payment pursuant to Section 4.03, the amount payable to Servicer may be deducted from the Custodial Account or from any subsequent remittance.

Section 3.05.    Statements to Owner

Not later than each Invoice Date, the Servicer shall furnish to the Owner a Monthly Advice for the Mortgage Loans and REO Properties,  in electronic medium mutually acceptable to the Parties, as of the preceding remittance and the period ending on the preceding Determination Date. On each Portfolio Loan Remittance date the Servicer Shall furnish to the Owner a summary report.

No later than the Invoice Date, the Servicer shall provide the Owner with a billing statement for amounts owed to Servicer under the terms of this Agreement and which have either been withdrawn from the Custodial Account, deducted from a remittance or billed to Owner pursuant to Section 4.03.

Servicer shall furnish to the Owner a Servicing Advance report for all Mortgage Loans and REO Properties in accordance with Section 3.04.

Servicer shall furnish to the Owner a Daily HELOC Report in accordance with Section 3.02(a).

The Servicer shall provide the Owner with a report showing the amounts due the Agency no less than one (1) Business Day prior to the date such funds are due.

During the term of this Agreement, in addition to the reports specifically required under this Agreement, the Servicer shall also furnish to the Owner such other periodic, special, or other reports or information as shall be reasonably requested by the Owner to the extent such reports or information are readily accessible to the Servicer without any more than nominal expense or effort. To the extent any such report not otherwise provided for herein and requiring more than nominal expense or effort is reasonably requested by Owner, Servicer shall have no obligation to provide such report until Servicer and Owner agree on the additional compensation to be paid Servicer for such report using the Servicing Change process outlined in Section 2.19.

Section 3.06.    Internal Revenue Service Reports

The Servicer shall mail, on or before the dates required by Applicable Law, U.S. Internal Revenue Service ("IRS") Form No. 1099 to all parties entitled to receive interest on Escrow Accounts, where applicable, as well as IRS Form No. 1098 to each Mortgagor. The Servicer shall timely file all required reporting relating to the Mortgage Loans with the IRS, including, for all periods after the applicable Transfer Date. In addition, the Servicer shall provide the Owner with such information concerning the Mortgage Loans which is reasonably available to the Servicer and which is necessary for the Owner to prepare its federal income tax return as the Owner may reasonably request from time to time.

Following the foreclosure sale or abandonment of any Mortgaged Property, the Servicer shall report such foreclosure or abandonment to the U.S. Internal Revenue Service as required by Applicable Law.

Section 3.07.    No Principal & Interest Advances

The Servicer will service the Portfolio Loans on an "actual/actual" basis and the Servicer shall have no obligation to advance principal or interest payments not

collected from Mortgagors.  The Owner is responsible for providing sufficient funds to the Servicer for any Agency Loans that require Advances.

Section 3.08.    Odd Due Dates

Any Mortgage Loan which has a scheduled Due Date on a day other than the first day of each month shall, for the purposes of this Agreement, be considered due on the first day of the month following the month in which that payment is due.  For example, a Mortgage Loan with a scheduled payment due on August 15 shall be considered to have a Due Date of September 1 for the purposes of this Agreement, including investor reports and remittance, and for calculating the length of payment Default on such Mortgage Loan.

# ARTICLE IV.
## ADDITIONAL SERVICING PROCEDURES

Section 4.01.   Transfers of Mortgaged Property

The Servicer shall be required to enforce any "due-on-sale" provision contained in any Mortgage or Mortgage Note.  When the Mortgaged Property has been conveyed by the Mortgagor without repayment in full of the related Mortgage Loan, the Servicer shall, to the extent it has knowledge of such conveyance, exercise its right to accelerate the maturity of such Mortgage Loan under the applicable "due-on-sale" clause, provided, however, that the Servicer shall not exercise such right if prohibited by Applicable Law from doing so.

If the Servicer reasonably believes it is unable under Applicable Law to enforce a "due-on-sale" clause, the Servicer, shall, to the extent permitted by Applicable Law, attempt to enter into (a) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (b) in the event the Servicer is unable under Applicable Law to require that the original Mortgagor remain liable under the Mortgage Note and the Servicer has the prior consent of the PMI Policy or LPMI Policy provider, a substitution of liability agreement with the purchaser of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the purchaser of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note.  In connection with any such assumption, the Mortgage Interest Rate, the term of the Mortgage Loan and the outstanding principal amount of the Mortgage Loan shall not be changed.

To the extent that any Mortgage Loan is assumable, the Servicer shall inquire diligently into the creditworthiness of the proposed transferee, and shall follow Accepted Servicing Practices, subject to the Approval Matrix, including but not limited to conducting a review of the credit and financial capacity of the transferee, and may, subject to the Approval Matrix, approve the assumption if it believes the transferee is capable of performing the mortgage obligations.  If the credit of the proposed transferee does not satisfy the relevant underwriting criteria and the transfer of ownership actually occurs, the Servicer shall, to the extent permitted by the Mortgage, Mortgage Note and Applicable Law, accelerate the maturity of the Mortgage Loan.

Section 4.02.   Satisfaction of Mortgages Upon Payment in Full

Upon the payment in full of any Mortgage Loan, or if a HELOC Loan, the receipt of written notification from the Mortgagor to satisfy their HELOC Loan (provided that no amounts are due on such HELOC Loan),   the Servicer shall notify the Owner in the Monthly Advice, and may request the release of any Mortgage Loan Documents from the Owner or Custodian.  The Servicer shall satisfy the lien of record securing any such paid in full Mortgage Loan within the applicable time limit required by Applicable Law;

provided that the Owner or its Custodian has provided, or caused to be provided, all necessary documents requested by the Servicer.

Section 4.03.    Servicing Compensation and Owner Expenses

As consideration for servicing the Mortgage Loans pursuant to this Agreement, the Servicer shall be entitled to the applicable Servicing Compensation and the Owner also agrees to pay Owner Expenses and (when applicable) any other fees as mutually agreed. The Owner shall, by wire transfer, remit to Servicer such amounts within two (2) Business Days from the Invoice Date, unless a shorter period of time is provided elsewhere in this Agreement for Owner to make a particular payment, if not otherwise withdrawn from the Custodial Account pursuant to this Agreement.

To the extent any amounts due the Servicer per the Pricing Exhibit or this Agreement, including but not limited to Servicing Compensation, Owner Expenses, Servicing Advances, and Advances, are not paid within five (5) Business Days of the Invoice Date the amount payable to Servicer may be deducted from the Custodial Account or from any remittance.

If such amounts are not paid when required, the Owner shall pay to the Servicer interest on any such late payment at an annual rate equal to the LIBOR Rate, adjusted as of the date of each change, but in no event greater than the maximum amount permitted by law. Such interest shall be paid by Owner with the payment to which such interest relates, or withdrawn by Servicer from the Custodial Account with the withdrawal to which such interest relates, and shall cover the period commencing with the Business Day on which payment is to be made by Owner and ending with the Business Day on which such payment is made by Owner or withdrawn by Servicer, both inclusive. The payment by the Owner of any such interest shall not be deemed an extension of time for payment or a waiver of any Owner Event of Default.

The Servicer shall have the right to adjust the monthly base servicing fees (as set forth on the Pricing Exhibit) on each anniversary date of this Agreement. Such increased base servicing fees shall be calculated by multiplying (a) the CPI plus one percentage point (1.0%) times (b) the applicable then current monthly base servicing fees, and adding the result to the applicable then current monthly base servicing fees.

The Servicer shall have the right to offset any amounts due and unpaid under this Agreement with funds due Owner from Servicer or any of Servicer's Affiliates.

Section 4.04.    Possession of Mortgage Files

The contents of each Mortgage File are and shall be held in trust by the Servicer for the benefit of the Owner as the owner thereof. The possession of the Mortgage File by the Servicer is at the will of the Owner for the sole purpose of servicing the related Mortgage Loan, pursuant to this Agreement, and such retention and

possession by the Servicer is in its capacity as Servicer only and at the election of the Owner; provided that Servicer may keep copies of any records it deems necessary for compliance with any state or federal record retention requirements or as it deems advisable for use in defending any litigation, action or claim. The Servicer shall release the contents of any Mortgage File only in accordance with written instructions from the Owner, unless such release is required as incidental to the Servicer's servicing of the Mortgage Loans pursuant to this Agreement.

To the extent that original documents (other than the Mortgage Loan Documents) are not required for purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Servicer may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including but not limited to, optical imaging techniques so long as the Servicer complies with Accepted Servicing Practices.

The Owner agrees to make arrangements with its Custodian (if any) to provide Servicer with access to any Mortgage Loan Documents held by such Custodian as necessary in order for Servicer to service the Mortgage Loans as required by this Agreement.

Section 4.05.    <u>Right to Examine Servicer Records</u>

During the Original Term and any Extension Term of this Agreement, the Owner shall have the right to examine and audit, up to two times annually and upon reasonable advance written notice, any and all of the books, records, or other information of the Servicer, whether held by the Servicer or by another on its behalf, with respect to or concerning this Agreement, the Mortgage Loans or the REO Properties, during normal business hours or as otherwise agreed to by the Servicer. If Servicer incurs any out of pocket costs associated with such review, Owner shall reimburse Servicer for such costs.

Section 4.06.    <u>Losses and Expenses</u>

(a)    Notwithstanding any other provisions of this agreement, including Section 10.01(b), Owner shall remain responsible, as between Owner and Servicer, for losses related to Owner's investment in the Servicing Rights or, as applicable, the Mortgage Loans or REO Property, except to the extent such losses are as a result of Servicer's breach of its obligation to service such Mortgage Loans and REO Properties in accordance with Accepted Servicing Practices and or applicable provisions of this Agreement. Losses of the type referred to above for which Owner shall remain responsible include, but are not limited to: VA No-Bid Instruction, VA partial guaranties, FHA partial claims payments, shortages in the reimbursement amounts for fees paid by Servicer on FHA and VA Mortgage Loans, prepayment interest shortfall for Agency deliveries, investor repurchase demands, earthquake losses or other such special hazard losses not covered by the insurance required to be maintained under this Agreement, fraud, foreclosure losses, tax penalties related to taxing authorities supplying

bills only to Mortgagors, REO Property losses, Recourse Obligations, and losses resulting from application of the Servicemembers Civil Relief Act of 2003.

(b)    In addition to Servicing Advances and Owner Expenses regarding which the Servicer is entitled to reimbursement hereunder, Owner shall reimburse Servicer for expenses incurred in connection with the performance by Servicer at the request of Owner of any activity that is not specifically required to be performed by Servicer under this Agreement and is not reasonably ancillary to any specific obligation of Servicer under this Agreement. Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incurred in connection with the preparation of and performance under this Agreement, including, without limitation, its own legal fees and expenses of preparing and delivering the notices, documents, reports, accountings and any other information required of it hereunder. Owner shall be solely responsible for all custodial fees (including related shipping costs) of Owner's document Custodian, if any.

(c)    In the event that Servicer determines it is in the Owner's best interest to cure a Default under or pay off a superior lien mortgage loan related to a subordinate lien Mortgage Loan, Servicer shall notify Owner of the amount needed to effectuate such a cure or pay off. Owner agrees to remit such funds to Servicer within the time period specified by Servicer if Owner wishes to preserve the subordinate lien Mortgage Loan being serviced by Servicer. If Servicer does not receive the required funds within the time periods specified, Servicer will not cure or pay off such superior lien mortgage loan.

Section 4.07.    <u>Repurchase Requests</u>

In the event Servicer receives a Repurchase Request directly from an Agency, investor or any other Person, or a repurchase is otherwise required pursuant to the terms of the applicable Agency Guide, Servicer shall act in accordance with Accepted Servicing Practices and shall provide notice to the Owner within five (5) Business Days and provide Owner with reasonably requested information relating to such Repurchase Request as is in the Servicer's possession or control. If such repurchase request results from a violation of this Agreement by Servicer, Servicer shall respond in a timely manner directly to the Person making such Repurchase Request. For all other Repurchase Requests, Owner shall respond in a timely manner directly to the Person making such Repurchase Request.

In the event the Owner requests the seller or the originator of the Mortgage Loan to repurchase such Mortgage Loan and/or the Servicing Rights to such Mortgage Loan, Servicer agrees to cooperate with Owner to provide Owner with reasonably requested information relating to such request.

If the Mortgage Loan is to be repurchased, Servicer shall calculate, on behalf of Owner, amounts required to repurchase the Mortgage Loan and Owner shall wire such amount to Servicer within one (1) Business Day. In the event of a repurchase by the seller or originator at Owner's request with transfer of servicing to another servicer, Owner shall immediately reimburse Servicer (a) for any funds owed to or

advanced by Servicer; and (b) for any outstanding funds due Servicer according to Section 11.02 of this Agreement.

# ARTICLE V.
## COMPLIANCE AND CONFIDENTIALITY

Section 5.01.    Annual Statement as to Compliance

The Servicer shall deliver to the Owner, on or before March 31st each year beginning March 31, 2012, an officer's certificate, stating that (a) a review of the activities of the Servicer during the preceding calendar year and of performance under this Agreement has been made under such officer's supervision, and (b) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof and the action being taken by the Servicer to cure such default.

Section 5.02.    Annual Independent Public Accountants' Servicing Report

On or before March 31st of each year beginning March 31, 2012, the Servicer, at its expense, shall either (a) cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Owner to the effect that such firm has examined certain documents and records for the preceding fiscal year (or during the period from the date of commencement of such Servicer's duties hereunder until the end of such preceding fiscal year in the case of the first such certificate), and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Servicer's overall servicing operations have been conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers except for such exceptions that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report, in which case such exceptions shall be set forth in such statement, or (b) furnish to Owner the Servicer's assessment of Servicer's compliance with the servicing criteria set forth in Section 1122(d) of Securities and Exchange Commission Regulation AB (17 C.F.R. Section 229.1122(d)), which assessment shall be attested to by a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants. If pursuant to generally accepted accounting principles or accepted mortgage industry practice, material changes to the requirements of this Section 5.02 become necessary or desirable in the reasonable good faith judgment of either Party, the Parties agree to negotiate in good faith to modify the requirements of this Section 5.02.

Section 5.03.    Compliance with Gramm-Leach-Bliley Act of 1999

With respect to each Mortgage Loan and the related Mortgagor, each party shall as required comply with (a) Title V of the Gramm-Leach-Bliley Act of 1999 and all applicable regulations promulgated thereunder and (b) all applicable state and local privacy laws and regulations promulgated thereunder (collectively, the "Privacy Laws", and shall provide all notices required of such party thereunder.

Section 5.04.  Confidentiality of Information

The Servicer and the Owner each agree that any information and documents that are furnished by either Party for the purposes of performing under this Agreement or that are produced or are otherwise furnished by either Party to or come to the attention of either Party in connection herewith are confidential and proprietary and shall be used only for the purposes of carrying out such Party's obligations under this Agreement.  This information includes the terms of this Agreement, technical specifications and operating manuals, information concerning current, future, or proposed products and services and combinations of products and services; product and services descriptions; financial information; information related to mergers or acquisitions; passwords and security procedures; computer programs, loan servicing systems, software, and software documentation; customer and/or prospective client lists, mortgage loan files, and all other information relating in any way to the Mortgagor and/or prospective mortgagor; printouts; records; policies, practices and procedures; and any or all other information, data or materials relating to the business, trade secrets and technology of either Party, its customers, clients, employees, business affairs and Affiliates (all of the foregoing collectively referred to as "Confidential Information").

The obligations imposed under this Agreement shall not apply to Confidential Information that is (a) made public by the Party disclosing Confidential Information to the other Party (b) generally available to the public other than by a breach of this Agreement by the receiving Party, its employees or agents, (c) rightfully received from a third person having the legal right to disclose the Confidential Information free of any obligation of confidence or (d) necessary or appropriate to disclose in such Party's work with legal counsel, accountants, auditors or as required by law.  In the event that the receiving Party, or any of such Party's agents or employees, becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil or criminal investigative demand or similar process) to disclose any Confidential Information of the disclosing Party, such receiving Party shall, provided it is not legally prohibited from doing so, provide prompt prior notice to the disclosing Party so that it may seek a protective order or other appropriate remedy.  In the event that such protective order or other remedy is not obtained, the receiving Party will furnish only that portion of the Confidential Information which in the judgment of its counsel is legally required and will exercise reasonable efforts to obtain assurances that confidential treatment will be accorded the Confidential Information.

Each Party shall maintain the Confidential Information of the other in confidence using the same care and discretion to avoid disclosure of Confidential Information as it uses to protect its own confidential information that it does not want disclosed, but in no event less than a reasonable standard of care.  Each Party further agrees to restrict disclosure of Confidential Information of the disclosing Party solely to persons who need to know the Confidential Information to perform under this Agreement and inform those third parties and other persons who receive Confidential Information of

its confidential nature and obtain their agreement to abide by the obligations set forth herein.

Each Party acknowledges and agrees that any breach or threatened breach of any of the provisions of this section by the other Party may result in immediate and irreparable harm and that any remedies at law in such event will be inadequate. The Parties agree that such breaches, whether threatened or actual, will give the disclosing Party the right to obtain injunctive relief to restrain such disclosure or use. This right shall, however, be in addition to and not in lieu of any other remedies at law or in equity.

Upon termination of this Agreement, all copies of the Confidential Information will either be destroyed or returned to the disclosing Party immediately upon such Party's request. Each Party agrees that it will not retain any copy, summary or extract of the Confidential Information or any related work papers on any storage medium whatsoever, except as may be legally required for records retention compliance purposes. Notwithstanding anything to the contrary contained herein, neither Party shall be required to purge information from computer system back-up tapes or comparable back-up medium, and Servicer shall in no event have any obligation hereunder to destroy Mortgage Loan files or any documents related thereto.

# ARTICLE VI.
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER

As of the date of this Agreement (or such other date if set forth below), the Owner warrants and represents to, and covenants and agrees with, the Servicer as follows:

Section 6.01.   Organization and Good Standing

The Owner is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is licensed, qualified and in good standing in each state where a Mortgaged Property is located to the extent necessary to perform its obligations under this Agreement. The Owner has the power and authority to make, execute, deliver and perform this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement. When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Owner enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

Section 6.02.   Ordinary Course of Business

The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Owner.

Section 6.03.   No Violations

The execution, delivery and performance of this Agreement by the Owner will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Owner, except for violations that will not adversely affect the Owner's ability to perform its obligations under this Agreement, or constitute a material breach of any mortgage, indenture, contract or other agreement to which the Owner is a party or by which the Owner may be bound.

Section 6.04.   Ability to Perform

The Owner does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

Section 6.05.   Litigation

No litigation or administrative proceeding before any court, tribunal or governmental body is currently pending or to the knowledge of the Owner threatened, against the Owner or with respect to this Agreement, which if adversely determined

would, in Owner's reasonable judgment, have a material adverse effect on the transactions contemplated by this Agreement.

Section 6.06.    No Consent Required

The Owner is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of the Owner to perform all obligations hereunder.

Section 6.07.    Ownership

With respect to each Portfolio Loan and REO Property, Owner is the owner of all right, title, and interest in and to such loan or property and the Servicing Rights.  With respect to each Agency Loan, Owner is the owner of all right, title, and interest in and to the Servicing Rights. Each Mortgage Loan is a valid and collectible obligation of the respective Mortgagor.

Section 6.08.    Accuracy

All information provided to the Servicer, including but not limited to information in the New Loan Data File, is true, complete and correct in all material respects.

Section 6.09.    Eligibility Criteria

All Mortgage Loans and REO Properties conform to the Eligibility Criteria.

# ARTICLE VII.
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF SERVICER

As of the date of this Agreement (or such other date if set forth below), the Servicer warrants and represents to, and covenants and agrees with, the Owner as follows:

Section 7.01.  <u>Organization and Good Standing</u>

The Servicer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Servicer, and in any event the Servicer is in compliance with the laws of any such state to the extent necessary to perform its obligations in accordance with the terms of this Agreement.  The Servicer has the power and authority to make, execute, deliver and perform this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement.  When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Servicer enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

Section 7.02.  <u>Ordinary Course of Business</u>

The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Servicer.

Section 7.03.  <u>No Violation</u>

The execution, delivery and performance of this Agreement by the Servicer will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Servicer, except for violations that will not adversely affect the Servicer's ability to perform its obligations under this Agreement or the certificate of formation of the Servicer, or constitute a material breach of any mortgage, indenture, contract or other agreement to which the Servicer is a party or by which the Servicer may be bound.

Section 7.04.  <u>Ability to Perform</u>

The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

Section 7.05.  <u>Ability to Service</u>

The Servicer has the facilities, procedures, and experienced personnel necessary for the servicing of mortgage loans of the same type as the Mortgage Loans. The Servicer is in good standing to enforce and service mortgage loans in the jurisdiction wherein the Mortgaged Properties are located.

Section 7.06.    Litigation

No litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending or to the knowledge of the Servicer threatened, against the Servicer or with respect to this Agreement, which if adversely determined would, in Servicer's reasonable judgment,  have a material adverse effect on the transactions contemplated by this Agreement.

Section 7.07.    No Consent Required

The Servicer is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance or enforceability of this Agreement, except such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of the Servicer to perform all obligations hereunder.

Section 7.08.    Compliance with Laws

Servicer has complied with, and has not violated, any law, ordinance, requirement, regulation, rule or order applicable to its business or properties, the violation of which reasonably could be expected to materially and adversely affect the operations or financial condition of Servicer.

Section 7.09.    Servicer Approvals

There is no requirement applicable to Servicer to make any filing with, or to obtain any permit, authorization, consent or approval of, any governmental or regulatory authority as a condition to the lawful performance by Servicer of the functions contemplated by this Agreement.

Section 7.10.    Insurance

All property and assets of Servicer that are of an insurable character are insured against loss or damage by fire and other risks, including without limitation risks covered by title insurance, to the extent and in the manner customary for companies engaged in similar business.  Servicer maintains insurance against liability to third parties, to the extent and in the manner customary for companies engaged in similar business, including without limitation errors and omissions insurance and fidelity bond coverage in accordance with the requirements of the Applicable Requirements.  All such

insurance policies maintained by Servicer are in full force and effect, and Servicer is not in material default under any of such insurance policies.

Section 7.11.   Licenses and Permits

Servicer has all federal, state and local material licenses, permits, and other authorizations of governmental authorities used or required to service the Mortgage Loans to be serviced hereunder, and Servicer has not received any notice that revocation is being considered with respect to any of such licenses, permits, or authorizations. Without limiting the generality of the foregoing, Servicer is a Fannie Mae approved servicer in good standing.

Section 7.12.   Agency Approvals

Servicer is an approved servicer for, and in good standing with Fannie Mae, Freddie Mac and HUD and shall maintain such approvals throughout the term of this Agreement.  No event has occurred, including but not limited to, a change in insurance coverage, which would make Servicer unable to comply with Fannie Mae, Freddie Mac and HUD eligibility requirements or which would require notification to Fannie Mae, Freddie Mac or HUD and, to the best of Servicer's knowledge, there are no pending business issues with Fannie Mae, Freddie Mac or HUD that would likely materially adversely affect the ability of Servicer to service mortgage loans on behalf of such entities or to comply with Applicable Requirements.

Section 7.13.   Broker Fees

Servicer has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction.

Section 7.14.   MERS

Servicer is a member of MERS in good standing.

# ARTICLE VIII.
## OWNER DEFAULT

Section 8.01.    Owner Events of Default.

The following shall constitute an Owner Event of Default under this Agreement:

(a)    any failure by the Owner to remit to the Servicer any payment required to be made under the terms of this Agreement which continues un-remedied for a period of three (3) Business Days after the date upon which notice of such failure, requiring the same to be remedied, shall have been given to the Owner by the Servicer; or

(b)    the failure by the Owner duly to observe or perform in any material respect any other of the obligations of the Owner set forth in this Agreement which continues un-remedied for a period of sixty (60) days after the date on which notice of such failure, requiring the same to be remedied, shall have been given to the Owner by the Servicer; provided, however, that in the case of a failure that cannot be cured within sixty (60) days, the cure period shall be extended up to, but no more than, sixty (60) additional days if the Owner can demonstrate to the reasonable satisfaction of the Servicer that the failure can be cured and the Owner is diligently pursuing remedial action; or

(c)    a decree or order of a court, agency or supervisory authority having jurisdiction for the appointment of a conservator, receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Owner and such decree or order shall have remained in force un-discharged or un-stayed for a period of sixty (60) days; or

(d)    the Owner shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Owner or relating to all or substantially all of its property; or

(e)    the Owner shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

In each and every such case, in addition to whatever rights the Servicer may have at law or equity to damages, including injunctive relief and specific performance, the Servicer, by notice in writing to the Owner, may terminate this Agreement.

Upon receipt by the Owner of such written notice, Owner shall cooperate with Servicer to transfer the servicing to the successor appointed pursuant to Section 11.02. The Servicer agrees to reasonably cooperate with the Owner and such successor in transferring the servicing hereunder, as described in Section 11.02, and shall place in such successor's possession all Mortgage Files, and do or accomplish all other acts or things reasonably necessary or appropriate to effect the purposes of such notice of termination

# ARTICLE IX.
## SERVICER DEFAULT

Section 9.01.   Servicer Events of Default.

The following shall constitute a Servicer Event of Default under this Agreement on the part of the Servicer:

(a)    any failure by the Servicer to remit to the Owner any payment required to be made under the terms of this Agreement which continues un-remedied for a period of three (3) Business Days after the date upon which notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner; or

(b)    the failure by the Servicer duly to observe or perform in any material respect any other of the obligations of the Servicer set forth in this Agreement (other than the escrow waiver requirement in the Approval Matrix) which continues un-remedied for a period of sixty (60) days after the date on which notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner; provided, however, that in the case of a failure that cannot be cured within sixty (60) days, the cure period shall be extended up to, but no more than, sixty (60) additional days if the Servicer can demonstrate to the reasonable satisfaction of the Owner that the failure can be cured and the Servicer is diligently pursuing remedial action; or

(c)    a decree or order of a court, agency or supervisory authority having jurisdiction for the appointment of a conservator, receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and such decree or order shall have remained in force un-discharged or un-stayed for a period of sixty (60) days; or

(d)    the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of its property; or

(e)    the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(f)    the Servicer fails to maintain its license to do business or service residential mortgage loans in any jurisdiction where the Mortgaged Properties are located which failure continues un-remedied for a period of sixty (60) days after receiving actual notice of such failure and such failure has a material and adverse effect on the Servicer's ability to perform its obligations under the Agreement.

(g)    the Servicer fails to maintain a primary servicer rating of at least "average" from Standard & Poor's Financial Services or "SQ4" from Moody's Investors Service.

(h)    the Servicer fails to maintain its status as an approved seller/servicer for Freddie Mac and Fannie Mae, an approved servicer/issuer for Ginnie Mae and an approved mortgagee for HUD.

In each and every such case, in addition to whatever rights the Owner may have at law or equity to damages, including injunctive relief and specific performance, the Owner, by notice in writing to the Servicer, may terminate all the rights and obligations of the Servicer under this Agreement.

Upon receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to Section 11.02. The Servicer agrees to reasonably cooperate with the Owner and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder, as described in Section 11.02, and shall place in such successor's possession all Mortgage Files, and do or accomplish all other acts or things reasonably necessary or appropriate to effect the purposes of such notice of termination.

## ARTICLE X.
### INDEMNIFICATION AND ASSIGNMENT

Section 10.01. <u>Indemnification.</u>

(a)    The Owner shall defend and indemnify the Servicer, its employees, officers, Affiliates, agents and representatives (the "Servicer Indemnified Parties"), against any and all assessments, judgments, claims, liabilities, losses, costs, damages or expenses whatsoever (including, without limitation, reasonable attorneys' fees, expenses and disbursements in connection with any action, suit or proceeding and any such reasonable attorneys' fees, expenses and disbursements incurred in enforcing any right of indemnification) (collectively, the "Liability"), Servicer Indemnified Parties may sustain arising from:

(i)    the Servicer taking any action, or refraining from taking any action, in conformity with the express written direction of the Owner or this Agreement;

(ii)    the failure of the Owner to perform its duties under this Agreement or the Owner's breach of any of the terms of this Agreement;

(iii)    the failure of the Owner or any trustee or Custodian in possession of original Mortgage Loan Documents to provide to the Servicer the originals of any Mortgage Loan Documents within a reasonable amount of time after a request for such documents has been received in order to allow the Servicer sufficient time to process satisfactions, payoffs and releases;

(iv)    any act or omission to act of any Person, including but not limited to the originator of the Mortgage Loan or any prior servicer, prior to the Transfer Date, including, without limitation, any data integrity issue (and any costs of correcting such issue);

(v)    perpetuating the acts or omissions of prior servicers, unless (x) the Servicer has actual knowledge that perpetuating such act or omission will result in Liability to the Servicer, (y) the Servicer knowingly acts or fails to act and such act or failure to act, as a singular event, not in combination with any other act or omission of any prior servicer(s), results in Liability to the Servicer, or (z) the acts or omissions are based on a mistaken or false conception of the law that is obvious and significant and the Servicer, over a period of time, in more than a single instance, continues in its course of servicing to perpetuate such acts or omissions;

(vi)    the Owner's or a prior servicer's failure to comply with the Transfer Instructions;

(vii)    Advances and Servicing Advances, if any, incurred by a prior servicer and reimbursed by the Servicer that ultimately are not recoverable from the Mortgagor or other proceeds;

(viii)    a Mortgage Loan being classified as "high cost" under the Home Ownership and Equity Protection Act of 1994; or "high cost," "predatory," or similar classification under any law or regulation applicable to such Mortgage Loan;

(ix)    any VA No-Bid Instruction and for any interest curtailment associated with standard servicing of the FHA or the VA Mortgage Loans and timeline variances relating to referral to the attorney, foreclosure initiation or conveyance to HUD;

(x)    any claim by a purchaser or prospective purchaser of a Mortgage Loan or group of Mortgage Loans, including relating to any note sale agreement and;

(xi)    any Environmental Liability.

The term "Environmental Liability" shall mean any Liability arising out of the existence of environmentally hazardous materials on any Mortgaged Property, including, without limitation, (x) any liability under or on account of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as the same may be amended from time to time, and/or any other federal or state environmental laws, and specifically including, without limitation, any liability relating to asbestos and asbestos containing materials, polychlorinated biphenyls, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory", "usable work in process" or similar classification which would, if classified as unusable, be included in the foregoing definition, including the assertion of any lien thereunder, (y) claims brought by third parties for loss or damage incurred or sustained subsequent to the date hereof, and (z) liability with respect to any other matter affecting the Mortgaged Property within the jurisdiction of the federal Environmental Protection Agency or state environmental regulatory agencies pursuant to any state laws, and in the regulations adopted pursuant to any of said laws; provided, however, that the indemnity for Environmental Liability shall not be effective with respect to any liability caused by the Servicer that would otherwise be imposed by reason of the Servicer's willful misfeasance or bad faith in the performance of or failure to perform its duties hereunder.

(b)    Except as provided in Section 4.06, the Servicer shall defend and indemnify the Owner, its employees, officers, Affiliates, agents and representatives (the "Owner Indemnified Parties") against any and all Liability sustained by the Owner Indemnified Parties arising from the failure of the Servicer to perform its duties under this Agreement or the Servicer's breach of any of the terms of this Agreement (other than the escrow waiver requirement in the Approval Matrix).

(c)    As soon as is reasonably practicable after becoming aware of a claim for indemnification under this Agreement involving a claim (or the commencement of any proceeding or investigation) of a type described herein, the Party seeking indemnification (for purposes of this Section 10.01 (c), the "Indemnified Party") shall give written notice to the other Party (for purposes of this Section 10.01 (c), the "Indemnifying Party") of such claim; provided, that the failure of the Indemnified Party to give such written notice shall not relieve the Indemnifying Party of its obligations to indemnify except to the extent (if any) that the Indemnifying Party shall have been prejudiced thereby.  The Indemnifying party shall pay any undisputed claims within thirty (30) days.  If within such 30-day period the Indemnifying Party agrees that it has an indemnification obligation but objects that it is obligated to pay only a lesser amount, the Indemnified Party shall be entitled to recover from the Indemnifying Party and the Indemnifying Party shall promptly pay to the Indemnified Party the lesser amount, without prejudice to the Indemnified Party's claim for the difference.

The obligations of the Indemnifying Party to indemnify any Indemnified Party with respect to any Liability resulting from the assertion of any claim or the commencement of any proceeding or investigation by any Person not a party hereto (a "Third Party Claim"), shall be subject to the following additional terms and conditions:

(i)    The written notice required pursuant to Section 10.01(c) above by the Indemnified Party to the Indemnifying Party regarding the Third Party Claim shall contain reasonable details concerning such Third Party Claim. The Indemnifying Party may, at its own expense, (x) participate in the Indemnified Party's defense of any such Third Party Claim and (y) upon written notice to the Indemnified Party and the Indemnifying Party delivering to the Indemnified Party a written agreement that the Indemnified Party is entitled to indemnification pursuant to this Agreement for all Liability arising out of such Third Party Claim and that the Indemnifying Party shall be liable for the entire amount of any Liability resulting therefrom, at any time during the course of any such Third Party Claim assume the defense thereof; provided, that (a) the Indemnifying Party shall provide written evidence reasonably satisfactory to the Indemnified Party demonstrating that the Indemnifying Party has sufficient financial resources for purposes of such assumption of defense, (b) the Indemnifying Party's counsel is reasonably satisfactory to the Indemnified Party and (c) the Indemnifying Party shall thereafter consult with the Indemnified Party upon the Indemnified Party's reasonable request for such consultation from time to time with respect to such Third Party Claim.  If the Indemnifying Party assumes such defense, the Indemnified Party shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own cost and expense, separate from the counsel employed by the Indemnifying Party.  If, however, the Indemnified Party reasonably determines in its judgment that representation by the Indemnifying Party's counsel of both the

Indemnifying Party and the Indemnified Party would present such counsel with a conflict of interest, then such Indemnified Party may employ separate counsel to represent or defend it in any such Third Party Claim and the Indemnifying Party shall pay the reasonable fees and disbursements of such separate counsel. Whether or not the Indemnifying Party chooses to defend or contest any such Third Party Claim, upon the request of the Indemnified Party, the Indemnifying Party shall provide reasonable cooperation to the Indemnified Party with respect thereto.

(ii)    Any settlement or compromise made or caused to be made by the Indemnified Party or the Indemnifying Party, as the case may be, of any Third Party Claim shall also be binding upon the Indemnifying Party or the Indemnified Party, as the case may be, in the same manner as if a final judgment or decree had been entered by a court of competent jurisdiction in the amount of such settlement or compromise; provided, that (a) no obligation, restriction or Liability shall be imposed on the Indemnified Party as a result of such settlement without its prior written consent (i.e., the Indemnifying Party may not settle any Third Party Claim for other than the payment of money damages only, to be paid by the Indemnifying Party, without the Indemnified Party's prior written consent), and (b) the Indemnified Party shall not compromise or settle any Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(iii)    If the Indemnifying Party does not elect to assume the defense of any Third Party Claim, then any failure of the Indemnified Party to defend or to participate in the defense of any such Third Party Claim, or to cause the same to be done, shall not relieve the Indemnifying Party of its obligations hereunder.

(d)    As provided in Section 13.17 hereof, the foregoing indemnification obligations of Owner and Servicer shall survive termination of this Agreement or removal of some or all of the Mortgage Loans from the coverage of this Agreement, including removal due to an Agency Transfer.

Section 10.02. <u>Limitation on Liability of Servicer and Others</u>

Notwithstanding Section 10.01(b), the Servicer shall not incur any Liability to the Owner for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment, provided, however, that this provision shall not protect the Servicer against any breach of warranties or representations made herein, or failure to perform its obligations in compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement. The Servicer does not guarantee or warrant the collectability, in whole or in part, of any Mortgage Loan or REO Property or the results of the resolution or ultimate disposition of

any Mortgage Loan or REO Property. The Servicer Indemnified Parties may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Servicer may undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the Parties hereto. In such event, the Servicer shall be entitled to reimbursement from the Owner of the reasonable legal expenses and costs of such action.

Notwithstanding any other provision of this Agreement to the contrary, the Servicer's maximum cumulative Liability under this Agreement to Owner, whether in contract, tort or otherwise, shall in no event exceed the amount of the Servicing Compensation payable by Owner to Servicer during the twelve month period immediately preceding the month in which demand for indemnification and/or notice of breach of this Agreement is first provided by Owner to Servicer as provided herein; except that, the forgoing limitation on Liability shall be inapplicable in the event of (a) any third-party claims arising out of Servicer's failure to comply with, Accepted Servicing Practices, the Privacy Laws, or Regulation AB, or (b) gross negligence or willful misconduct of Servicer.

Section 10.03. Operation of Indemnities

If any Person has made any indemnity payments to any other Person pursuant to this Article X and such other Person thereafter collects any of such amounts from others, such other Person will repay such amounts collected, together with any interest collected thereon. The provisions of this Article X shall survive any termination of this Agreement, the liquidation of any Mortgage Loan, or the transfer or assignment by the Owner to another Person of any Mortgage Loan or REO Property or any interest in any Mortgage Loan or REO Property.

Section 10.04. Assignment

The Servicer shall not assign this Agreement or delegate its duties hereunder or any portion thereof without the prior written consent of the Owner; provided that the Servicer may, without the consent of the Owner, assign this Agreement or delegate any duty to an Affiliate capable of performing the Servicer's obligations hereunder. It is acknowledged and agreed that Servicer's Affiliate, Executive Trustee Services, LLC, may perform certain collection and recovery services hereunder on behalf of Servicer in connection with charged off Mortgage Loans.

Notwithstanding the foregoing, the Servicer or, as applicable, its Affiliates may also, without the consent of the Owner, retain third party contractors to perform certain servicing and loan administration functions, including without limitation, hazard insurance administration, tax payment and administration, flood certification and

administration, collection services, REO services and similar functions; provided, that the retention of such contractors by Servicer or its Affiliate shall not limit the obligation of the Servicer to service the Mortgage Loans and REO Properties pursuant to the terms and conditions of this Agreement.

The Owner shall not assign this Agreement or delegate its duties hereunder or any portion thereof without the prior written consent of the Servicer.

Section 10.05. Merger or Consolidation of the Servicer

Any Person into which the Servicer may be merged or consolidated, or any entity resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person succeeding to the business of the Servicer, shall be the successor of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the Parties hereto, anything herein to the contrary notwithstanding.

Section 10.06. Cooperation of Servicer with an Agency Transfer

(a)     The Servicer and the Owner agree that with respect to some or all of the Portfolio Loans, the Owner may effect Agency Transfers.

The Servicer shall reasonably cooperate with the Owner in connection with any Agency Transfer contemplated by the Owner pursuant to this Section 10.06, provided, however, that under no circumstances and in no event shall such Agency Transfer materially increase the Servicer's liabilities or obligations beyond those liabilities and obligations contained in this Agreement, or decrease the Servicer's profitability from that provided for herein, except as otherwise specifically set forth in this Section 10.06. Additionally, the Servicer does not service or participate in all of the Fannie Mae, Freddie Mac or Ginnie Mae programs or products including but not limited to bond programs and negotiated waivers.

(b)     In connection with any Agency Transfer the Owner shall provide the Servicer with an Agency Transfer Acknowledgment Agreement and a preliminary loan list in the form of Exhibit IX at least thirty (30) Business Days prior to the closing date of such Agency Transfer. Owner shall provide Servicer with a complete and final list of loans related to any Agency Transfer at least five (5) Business Days prior to the scheduled closing date of the Agency Transfer. In addition, any Portfolio Loans regarding which Owner wishes to affect an Agency Transfer must be transferred to Servicer and live on Servicer's servicing system at least five (5) Business Days prior to the month-end prior to the first reporting period. If any Agency Transfer involves the establishment of a new Custodial Account or new Escrow Account, the Owner shall provide information on the naming of the accounts no less than thirty (30) Business Days in advance of the Agency Transfer's closing date.

(c)    Owner agrees to timely coordinate with the Servicer to effectuate each Agency Transfer.  Owner agrees to deliver any agreement or other documents related to the Agency Transfer to the Servicer at least five (5) Business Days prior to the closing date for an Agency Transfer.  The Servicer shall promptly review any Agency Transfer agreement and/or related documents, and provided that such agreement or documents contain servicing provisions substantially similar to those herein or is otherwise acceptable to the Servicer in its sole discretion, Servicer shall execute such agreement and/or related documents.  The Servicer shall have no Liability to Owner and no obligation to cooperate with Owner if Owner fails to provide such notice or deliver such documents in a timely manner.

In addition, on each anniversary date of the Agency Transfer, if the Servicer determines that the monthly base servicing fee provided for in the Agency Transfer should be increased in a manner similar to the permitted increases in the Servicing Compensation permitted under this Agreement, Owner agrees to pay the difference between such increased fee and the servicing fee provided for in the Agency Transfer directly to Servicer.

Section 10.07. Cooperation of Servicer with a Reconstitution

(a)    Securitization Transaction or Whole Loan Transfer on One or More Reconstitution Dates. Owner and Servicer agree that with respect to some or all of the Mortgage Loans, Owner may effect one or more Whole Loan Transfers and one or more Securitization Transactions without Servicer's prior consent and may retain Servicer as servicer or subservicer thereof; provided, in the event Servicer is not retained as servicer or subservicer, Owner shall pay Servicer any applicable Termination Fee which may be due hereunder.  On the Reconstitution Date, the Mortgage Loans transferred may cease to be serviced under this Agreement; provided, however, that, in the event that any Mortgage Loan transferred pursuant to this Section 10.07 is rejected by the transferee or is repurchased by Owner, Servicer shall continue to service such rejected or repurchased Mortgage Loan on behalf of Owner in accordance with the terms and provisions of this Agreement.

Notwithstanding anything to the contrary, Servicer and Owner acknowledge and agree that the Servicer is not obligated hereunder to act as servicer in any Reconstitition and the Owner is not obligated hereunder to offer the Servicer the opportunity to act as servicer in any Reconstitution.

In connection with any Reconstitution in which Servicer, at Owner's sole discretion, has been selected to act as the servicer in the Reconstitution, Servicer shall reasonably cooperate with Owner in connection with any Whole Loan Transfer or Securitization Transaction contemplated by Owner pursuant to this Section 10.07, provided, however, that under no circumstances and in no event shall such cooperation include any act of Servicer or any event affecting Servicer which would increase Servicer's liabilities, costs, expenses or obligations beyond those liabilities and obligations contained in this Agreement.

In connection with any Reconstitution in which Servicer, at Owner's sole discretion, has been selected to act as the servicer in the Reconstitution, Owner shall deliver any agreement (the "Reconstitution Agreement") or other document related to the Whole Loan Transfer or Securitization Transaction to Servicer at least thirty (30) days prior to such Whole Loan Transfer or Securitization Transaction. In connection with any Reconstitution Agreement, Servicer shall be paid a monthly servicing fee, incentive fees and any other fees thereunder to be mutually agreed upon prior to the Reconstitution Date. Servicer shall promptly review such Reconstitution Agreement and/or related documents, and provided that such Reconstitution Agreement contains servicing provisions the same as those set forth herein and the conditions above are satisfied, then Servicer shall execute such Reconstitution Agreement and/or related documents. Nothing herein shall be construed to obligate the Servicer to enter into any Reconstitution Agreement where the Servicer determines, in its reasonable discretion, that the obligations to be assumed by Servicer under such Reconstitution Agreement (except as otherwise provided in this Section 10.07) are greater than Servicer's obligations hereunder, or the servicing compensation payable to Servicer under such Reconstitution Agreement is not sufficient remuneration for Servicer's services and commitment of resources thereunder; provided, however, that Servicer shall negotiate and cooperate with Owner in good faith to agree upon mutually acceptable servicing terms and remuneration for Servicer's servicing under the Reconstitution Agreement. In the event that Servicer is not selected as the servicer under such Reconstitution Agreement for any reason (including Servicer electing to exercise its right to decline entering into such Reconstitution Agreement following good faith negotiation as contemplated by the preceding sentence), then Owner shall pay to Servicer any applicable Termination Fee.

In connection with a Securitization Transaction, the Servicer shall, at the Owner's request, furnish information for use in an offering document for a Securitiziation Transaction relating to the Servicer and its servicing practices and portfolio substantially similar to that attached hereto as Exhibit XI (the "Servicer Information"). As requested by the Owner, the Servicer shall furnish a legal opinion relating the to Servicer substantially similar to that attached hereto as Exhibit XII. The Servicer shall indemnify the Owner, each Affiliate of the Owner participating in any such Reconstitution and each Person who controls the Owner or such Affiliate, and their respective officers and directors, and hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that each of them may sustain arising from any material misstatement or omission in the Servicer Information. The Owner shall indemnify the Servicer and each Person who controls the Servicer or such Affiliate and hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that each of them may sustain arising from any information other than the Servicer Information in any offering document prepared in connection with any Reconstitution. In connection with each Securitization Transaction or Whole Loan Transfer, Owner shall pay Servicer a securitization/whole loan transfer assistance fee in

the amount set forth on the Pricing Exhibit, together with Servicer's out-of-pocket costs and expenses not to exceed $10,000.

All Mortgage Loans not sold or transferred pursuant to Whole Loan Transfers or Securitization Transactions shall continue to be serviced under this Agreement and shall continue to be serviced in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.

(b)    Transfer of Servicing for Reconstitution. Owner or its designee shall use reasonable efforts to meet the following requirements in connection with any Securitization Transaction or Whole Loan Transfer contemplated by Owner pursuant to this Section 10.07. In that connection, Owner or its designee shall:

(i)    Provide notification to Servicer, no later than thirty (30) days prior to the Reconstitution Date, Pursuant to Section 10.07(a) hereof, such notification shall include copies of the proposed Reconstitution Agreement documents or if not available at such time, then at such time as reasonably necessary to allow the Servicer to review and negotiate the agreements.

(ii)    Provide contact information for the related trust, private investor or subsequent servicer, as applicable.

(iii)    Provide any information necessary to transfer the related Mortgage Loans including the following:

1. A preliminary loan listing no later than thirty (30) days prior to the Reconstitution Date; and

2. A complete and final loan listing no later than five (5) Business Days prior to the Reconstitution Date.

(iv)    Provide the new investor's wiring instructions for remittance and reporting, information related to the titling of any new Custodial Accounts or Escrow Accounts, and the investor's applicable notice address, no later than fifteen (15) Business Days prior to the Reconstitution Date.

In addition, any Mortgage Loans regarding which Owner wishes to affect a Reconstitution, the Transfer Date must occur prior to the Reconstitution Date and the Mortgage Loan must be added to the Servicer's system five (5) Business Days prior to the Reconstitution Date.

The Servicer shall have no liability to Owner and no obligation to cooperate with Owner if Owner fails to provide such notice or deliver such documents as described in this Section 10.07.

# ARTICLE XI.
## TERMINATION

Section 11.01. Termination

(a)    This Agreement shall continue in full force and effect for an original term (the "Original Term") of three 3 years from the date hereof, unless terminated sooner by mutual agreement or otherwise in accordance with this Agreement.  The term of this Agreement automatically shall be extended for successive one (1) year terms (each an "Extension Term") unless either Party delivers written notice of intent not to extend to the other Party not less than ninety (90) days before the end of, as applicable, (i) the Original Term or (ii) any Extension Term.

(b)    The Owner may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause, upon ninety (90) days advance written notice to Servicer. If the count of active Mortgage Loans serviced under this agreement falls to less than fifty (50) for a period of sixty (60) consecutive days, this Agreement shall be deemed to have been terminated without cause by the Owner, subject to Servicer's consent, at Servicer's sole discretion, in writing to Owner. The Servicer shall be entitled to receive the Deboarding Fees and Termination Fees for any termination under this Section 11.01(b).

(c)    Servicer may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause, upon one hundred twenty (120) days advance written notice to the Owner.

(d)    The Owner may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, with cause, upon the occurrence of a Servicer Event of Default as provided in Section 9.01.

(e)    The Servicer may terminate, at its sole option, this Agreement with respect to some or all of the Mortgage Loans or REO Property, with cause, upon the occurrence of an Owner Event of Default as provided in Section 8.01.  The Servicer shall be entitled to receive the Deboarding Fees and Termination Fees for any termination under this Section 11.01(e).

(f)    The Servicer may terminate this Agreement upon the determination that its duties hereunder are no longer permissible under Applicable Law and such incapacity cannot be cured by the Servicer.  Any such determination permitting the resignation of the Servicer shall be evidenced by an opinion of counsel to such effect delivered to the Owner.

Section 11.02. Transfer Procedures

(a)    In the event this Agreement is terminated in whole or in part, the Servicer agrees to reasonably cooperate with the Owner and with any party designated as the

successor servicer in transferring the servicing to such successor servicer in accordance with Accepted Servicing Practices, including sending the transferor's notice of transfer of servicing or "goodbye letter" in accordance with the requirements of Applicable Law. Owner agrees to cooperate with Servicer to provide any required information necessary to complete an orderly servicing transfer which shall include a loan schedule in the form of Exhibit IX no less than twenty (20) days prior to the Termination Date.

Within five (5) Business days following the date (the "Termination Date") on which this Agreement is terminated pursuant to Section 11.01, the Servicer shall deliver to the successor servicer any and all Mortgage Files in the possession of the Servicer. The Servicer shall provide the successor servicer with the net funds held in the Escrow Account and suspense funds related to the Mortgage Loans within five (5) Business Days following the Termination Date.

If Servicer is named as the mortgagee of record, Servicer may prepare certain documents which are necessary to effect the transfer of servicing from Servicer, including but not limited to the transfer and endorsement or assignment of the related Mortgage Loans and related documents at Owner's request and expense. The Servicer, at the Owner's expense, shall cause MERS to designate on the MERS system the Owner or its designee as the beneficial holder with respect to such Mortgage Loan. All other reasonable out-of-pocket expenses incurred in connection with any such transfer shall be borne by Owner, except in the case of termination of this Agreement without cause by Servicer pursuant to Section 11.01(c) or termination with cause by Owner pursuant to Section 11.01(d), in which cases such other reasonable out-of-pocket costs shall be borne by Servicer. In addition, in the event of termination of this Agreement without cause by Servicer pursuant to Section 11.01(c) or termination with cause by Owner pursuant to Section 11.01(d), no Deboarding Fees or Termination Fees will be payable by Owner.

On the Termination Date, the Servicer shall be entitled to be reimbursed from funds in the Custodial Account for all actual and estimated un-reimbursed Servicing Advances, unpaid Servicing Compensation, Owner Expenses, and any other amounts owed to Servicer under this Agreement, including, if applicable, the Deboarding Fees and Termination Fees. However, if the funds on deposit in the Custodial Account five (5) Business Days prior to the Termination Date are insufficient to pay Servicer such amounts due, Owner shall pay to Servicer an amount that, when combined with the amount on deposit in the Custodial Account, is sufficient to cover the amount due to Servicer. Such amount will be paid to the Servicer in advance of the Termination Date. If such funds are not received by the Termination Date, Servicer shall be entitled to interest pursuant to Section 4.03. Any funds related to the transferred Mortgage Loans held by Servicer in the Custodial Account after reimbursement to Servicer of the foregoing amounts will be remitted to Owner on the next Portfolio Loan Remittance Date following the Termination Date. In addition, the Owner shall cause the Servicer to be reimbursed within five (5) Business Days of request for any for any trailing expenses representing Servicing Advances and Owner Expenses for which invoices are received by the Servicer after the Termination Date.

Servicer agrees to cooperate with Owner on the transfer out of REO Properties. Owner agrees to pay the Servicer's cost to cancel the title preparation and the cost to dismiss the closing agent as indicated on the Pricing Exhibit. Such costs are subject to change. In addition, Owner agrees to reimburse Servicer for any costs associated with the preparation of any deeds.

Except as otherwise provided in this Agreement, on the related Termination Date for each related Mortgage Loan, this Agreement, except for the provisions described in Section 13.17 hereof which shall survive the related Termination Date, shall terminate with respect to such Mortgage Loan. For the avoidance of doubt, as provided in Section 13.17 hereof, the obligation of the Owner to pay any applicable Deboarding Fees, Termination Fees and out-of- pocket transfer expenses shall survive removal of some or all of the Mortgage Loans from the coverage of this Agreement, including removal due to an Agency Transfer.

(b)    If the Owner does not designate a successor servicer and transfer out the servicing of the Mortgage Loans and REO Properties by the Termination Date, Servicer shall be entitled to the following additional remedies (in addition in all other rights and remedies to which Servicer is entitled under this Agreement or in law or equity):

(i)    The Servicer shall not be required to make any remittances normally required on the Portfolio Loan Remittance Date after the Termination Date until such time Owner has transferred out the servicing of the Mortgage Loans and REO Properties Such amounts shall remain in the Custodial Account pursuant to Section 2.04. For the avoidance of doubt, the Servicer shall have no obligation to pay Owner interest on such amounts.

(ii)    The Owner shall pay the Servicer the following additional fees calculated as of the applicable Determination Date, in addition to the fees on the Pricing Exhibit, for each Mortgage Loan and REO Property for each additional month beyond the Termination Date the Servicer must service the Mortgage Loans and REO Properties: (x) First month beyond the Termination Date: $5 per Mortgage Loan and REO Property, (y) Second month beyond the Termination Date: $10 per Mortgage Loan and REO Property, and (z) Third and each additional month thereafter beyond the Termination Date: $20 per Mortgage Loan and REO Property, with a minimum of $50,000 in the aggregate due and payable in each such third month and each month thereafter.

# ARTICLE XII.
## COMPLIANCE WITH REGULATION AB

Section 12.01. <u>Intent of the Parties; Reasonableness</u>

Owner and Servicer acknowledge and agree that the purpose of Article XII of this Agreement is to facilitate compliance by Owner and any Depositor with the provisions of Regulation AB and related rules and regulations of the Commission. Although Regulation AB is currently applicable by its terms only to offerings of asset-backed securities that are registered under the Securities Act, Servicer acknowledges that investors in privately offered securities may require that Owner or any Depositor provide comparable disclosure in unregistered offerings. In addition, Servicer acknowledges that the Commission's proposed changes to Regulation AB, the Securities Act and the Exchange Act set forth in its Proposed Rule regarding Asset-Backed Securities set forth in Commission Release Nos. 33-9117; 34-61858; File No. S7-08-10 (the "Proposed Rule") may require the application of certain provisions of Regulation AB to unregistered offering. References in this Agreement to compliance with Regulation AB include provision of comparable disclosure in private offerings.

Neither Owner nor any Depositor shall exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder (or the provision in a private offering of disclosure comparable to that required under the Securities Act). Servicer acknowledges that the Securities Laws may be amended from time to time and that interpretations of the Securities Laws requirements may change over time, whether due to new legislation (e.g., the Dodd-Frank Act) or rule-making, new regulations, interpretive guidance provided by the Commission or its staff, consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with reasonable requests made by Owner, any Master Servicer or any Depositor in good faith for delivery of information under this Article XII on the basis of established and evolving interpretations of the Securities Laws, including any new requirements and obligations that may arise due to the interpretation of the Proposed Rule. In connection with any Securitization Transaction, Servicer shall cooperate fully with Owner and any Master Servicer to deliver to Owner (including any of its assignees or designees), any Master Servicer and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of Owner, the Master Servicer or any Depositor to permit Owner, such Master Servicer or such Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to Servicer, any Subservicer, or the servicing of the Mortgage Loans, reasonably believed by Owner or any Depositor to be necessary in order to effect such compliance. Pursuant to Section 10.07 regarding reconstitution of the Mortgage Loans, if the servicing compensation payable to Servicer under the Agreement is not sufficient remuneration for Servicer's services and commitment of resources necessary to perform Servicer's obligations under this Article XII, Servicer shall negotiate and cooperate with Owner in good faith to agree upon mutually acceptable servicing terms and remuneration for the

performance of Servicer's duties under this Article XII.  In the event of any conflict between Article XII and any other term or provision in this Agreement, the provisions of Article XII shall control.

Notwithstanding anything to the contrary in this Agreement, the Servicer shall be under no obligation to provide information that the Owner or any Depositor deems required under Regulation AB if (a) Servicer reasonably does not believe that such information is required under Regulation AB and (b) Servicer is not providing such information for its own securitizations unless the Owner or any Depositor pays all reasonable costs incurred by Servicer in connection with the preparation and delivery of such information and Servicer is given reasonable time to establish the necessary systems and procedures to produce such information.

Owner (including any of its assignees or designees) shall cooperate with Servicer by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required, in Owner's reasonable judgment, to comply with Regulation AB.

Section 12.02. Additional Representations and Warranties of Servicer

(a)    Servicer shall be deemed to represent to Owner, any Master Servicer and any Depositor, as of the date on which information is first provided to Owner, such Master Servicer or such Depositor under Section 12.03 that, except as disclosed in writing to Owner, such Master Servicer or such Depositor prior to such date:  (i) Servicer is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other securitization due to any act or failure to act of Servicer; (ii) Servicer has not been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; (iii) no material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving Servicer as servicer has been disclosed or reported by Servicer; (iv) except as disclosed, no material changes to Servicer's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans have occurred during the three (3) year period immediately preceding the related Securitization Transaction; (v) there are no aspects of Servicer's financial condition that could have a material adverse effect on the performance by Servicer of its servicing obligations under any Reconstitution Agreement; (vi) there are no material legal proceedings pending or governmental proceedings pending (or known to be contemplated) against Servicer or any Subservicer; and (vii) there are no affiliations, relationships or transactions relating to Servicer or any Subservicer with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB.

(b)    If so requested in writing by Owner, any Master Servicer or any Depositor on any date following the date on which information is first provided to Owner, any

Master Servicer or any Depositor under Section 12.03, Servicer shall as soon as reasonably practicable but in no event more than ten (10) Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in Section 12.02(a) or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

Section 12.03. Information to Be Provided by Servicer

(a)    In connection with any Securitization Transaction, Servicer shall (i) within ten (10) Business Days following a request by Owner or any Depositor, provide to Owner and such Depositor (or, as applicable, cause each Subservicer to provide), in writing and in form and substance reasonably satisfactory to Owner and such Depositor, the information and materials specified in Sections 12.03(b) and (f) and (ii) as promptly as practicable following notice to Servicer, provide to Owner and any Depositor (in writing and in form and substance reasonably satisfactory to Owner and such Depositor) the information specified in Section 12.03(c).

(b)    If so requested by Owner or any Depositor, Servicer shall provide such information regarding Servicer, as servicer of the Mortgage Loans, and each Servicer (each of Servicer and each Subservicer, for purposes of this Section 12.03(b), a "Transaction Servicer"), as is requested for the purpose of compliance with Item 1108, 1117 and 1119 of Regulation AB.  Such information shall include, at a minimum:

(i)    the Transaction Servicer's legal name and form of organization;

(ii)    a description of how long the Transaction Servicer has been servicing residential mortgage loans; a general discussion of the Transaction Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Transaction Servicer's experience in, and procedures for, the servicing function it will perform under this Agreement and any Reconstitution Agreements; information regarding the size, composition and growth of the Transaction Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Transaction Servicer that may be material, in the good faith judgment of Owner or any Depositor, to any analysis of the servicing of the Mortgage Loans or the related asset-backed securities, as applicable, including, without limitation:

1.    whether any prior securitizations of mortgage loans of a type similar to the Mortgage Loans involving the Transaction Servicer have defaulted or experienced an early amortization or other performance triggering event because of its servicing during the three (3) year period immediately preceding the related Securitization Transaction;

2.    the extent of outsourcing the Transaction Servicer utilizes;

3.  whether there has been previous disclosure of material noncompliance with the applicable servicing criteria on the part of the Transaction Servicer as servicer with respect to other securitizations of residential mortgage loans during the three (3) year period immediately preceding the related Securitization Transaction;

4.  whether the Transaction Servicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; and

5.  such other information as Owner or any Depositor may reasonably request for the purpose of compliance with Item 1108(b)(2) of Regulation AB;

> (iii)    a description of any material changes during the three (3) year period immediately preceding the related Securitization Transaction to the Transaction Servicer's policies or procedures with respect to the servicing function it will perform under any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans;

> (iv)    information regarding the Transaction Servicer's financial condition, to the extent that there is a material risk that an adverse financial event or circumstance involving the Transaction Servicer could have a material adverse effect on the performance by Transaction Servicer of its servicing obligations under this Agreement or any Reconstitution Agreement;

> (v)    a description of the Transaction Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as the Mortgage Loans;

> (vi)    information regarding advances made by the Transaction Servicer on the Mortgage Loans and the Transaction Servicer's overall servicing portfolio of residential mortgage loans for the three (3) year period immediately preceding the related Securitization Transaction, which may be limited to a statement by an authorized officer of the Transaction Servicer to the effect that the Transaction Servicer has made all advances required to be made on residential mortgage loans serviced by it during such period, or, if such statement would not be accurate, information regarding the percentage and type of advances not made as required, and the reasons for such failure to advance;

> (vii)    a description of the Transaction Servicer's processes for handling delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts;

(viii)    information as to how the Transaction Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience;

(ix)    a description of any material legal or governmental proceedings pending (or known to be contemplated) against the Transaction Servicer; and

(x)    a description of any affiliation or relationship between the Transaction Servicer and any of the following parties to a Securitization Transaction, as such parties are identified to the Transaction Servicer by Owner or any Depositor in writing in advance of such Securitization Transaction:

1. the sponsor;
2. the depositor;
3. the issuing entity;
4. any servicer;
5. any trustee;
6. any originator;
7. any significant obligor;
8. any enhancement or support provider; and
9. any other material transaction party.

(c)    For the purpose of satisfying the reporting obligation under the Exchange Act with respect to any class of asset-backed securities, Servicer shall (or shall cause each Servicer to) (i) provide prompt notice to Owner, any Master Servicer and any Depositor in writing of (A) any material litigation or governmental proceedings involving Servicer or any Subservicer, (B) any affiliations or relationships that develop following the closing date of a Securitization Transaction between Servicer or any Subservicer and any of the parties specified in clause (x) of Section 12.03(b) (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, (C) any event of default or termination without cause under the terms of this Agreement or any Reconstitution Agreement, (D) any merger, consolidation or sale of substantially all of the assets of Servicer, and (E) Servicer's entry into an agreement with a Subservicer or Subcontractor to perform or assist in the performance of any of Servicer's obligations under this Agreement or any Reconstitution Agreement and (ii) provide to Owner and any Depositor a description of such proceedings, affiliations or relationships.

(d)    As a condition to the succession to Servicer or any Subservicer as servicer or subservicer under this Agreement or any Reconstitution Agreement by any Person (i) into which Servicer or such Subservicer may be merged or consolidated, or (ii) which may be appointed as a successor to Servicer or any Subservicer, Servicer shall provide to Owner and any Depositor, at least fifteen (15) days prior to the effective date of such

succession or appointment, (A) written notice to Owner and any Depositor of such succession or appointment and (B) in writing and in form and substance reasonably satisfactory to Owner and such Depositor, all information reasonably requested by Owner or any Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to any class of asset-backed securities.

(e)    In addition to such information, Servicer is obligated to provide, not later than ten (10) days prior to the deadline for the filing of any distribution report on Form 10-D (which date shall be fifteen (15) days following the distribution date with respect to the related Securitization Transaction) in respect of any Securitization Transaction that includes any of the Mortgage Loans serviced by Servicer or any Subservicer, Servicer or such Subservicer, as applicable, shall provide to the party responsible for filing such report (including, if applicable, the Master Servicer) notice of the occurrence of any of the following events known to Servicer along with all information, data, and materials related thereto as may be required to be included in the related distribution report on Form 10-D:

(i)    any material modifications, extensions or waivers of pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time (Item 1121(a)(11) of Regulation AB);

(ii)    material breaches of pool asset representations or warranties or transaction covenants (Item 1121(a)(12) of Regulation AB); and

(iii)    information regarding new asset-backed securities issuances backed by the same pool assets or any pool asset changes (such as, additions, substitutions or repurchases).

(f)    Servicer shall provide to Owner and any Master Servicer and any Depositor such additional information as such party may reasonably request, including evidence of the authorization of the person signing any certification or statement, financial information and reports, and such other information related to Servicer or any Subservicer or Servicer's or such Subservicer's performance hereunder.

Section 12.04. Servicer Compliance Statement

On or before March 15th of each calendar year, commencing in the first year following a Securitization Transaction, Servicer shall deliver to Owner, any Master Servicer and any Depositor a statement of compliance pursuant to Item 1123 of Regulation AB (a "Compliance Statement") addressed to Owner, Master Servicer and such Depositor and signed by an authorized officer of Servicer, to the effect that (i) a review of Servicer's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under this Agreement and any applicable Reconstitution Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such

review, Servicer has fulfilled all of its obligations under this Agreement and any applicable Reconstitution Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

Section 12.05. <u>Report on Assessment of Compliance and Attestation</u>

(a)    On or before March 15th of each calendar year, commencing in the first year following a Securitization Transaction, Servicer shall:

(i)    deliver to Owner, any Master Servicer and any Depositor a report (in form and substance reasonably satisfactory to Owner, such Master Servicer and such Depositor) regarding Servicer's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB (a "Compliance Assessment"). Such Compliance Assessment shall be addressed to Owner, Master Servicer and such Depositor and signed by an authorized officer of Servicer, and shall address each of the Servicing Criteria applicable to Servicer as indicated in the related Reconstitution Agreement;

(ii)    deliver to Owner, any Master Servicer and any Depositor a report of a registered public accounting firm reasonably acceptable to Owner, such Master Servicer and such Depositor that attests to, and reports on, the assessment of compliance made by Servicer and delivered pursuant to the preceding paragraph (an "Attestation Report"). Such Attestation Report shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act;

(iii)    cause each Subservicer, and each Subcontractor determined by Servicer to be "participating in the servicing function" within the meaning of Instruction 2 to Item 1122 of Regulation AB, to deliver to Owner, any Master Servicer and any Depositor a Compliance Assessment and Attestation Report as and when provided in Sections 11.5(a)(i) and (ii); and

(iv)    if requested by Owner or any Depositor or any Master Servicer not later than March 15th of the calendar year in which such certification is to be delivered, deliver to Owner, any Depositor, any Master Servicer and any other Person that will be responsible for signing the certification required by Rules 13a- 14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002) on behalf of an asset-backed issuer (a "Sarbanes Certification") with respect to a Securitization Transaction, a certification in the form attached to the related Reconstitution Agreement (a "Sarbanes Support Certification").

Servicer acknowledges that the parties identified in Section 12.05(a)(iv) may rely on the Sarbanes Support Certification in signing a Sarbanes Certification and filing such Sarbanes Certification with the Commission. Owner, any Depositor or any Master Servicer will request delivery of a Sarbanes Support Certification unless a Depositor is required under the Exchange Act to file an annual report on Form 10-K with respect to an issuing entity whose asset pool includes Mortgage Loans.

(b)    Each Compliance Assessment provided by Servicer or a Subservicer shall address each of the Servicing Criteria that are applicable to Servicer or such Subservicer. A Compliance Assessment provided by a Subcontractor need not address any elements of the Servicing Criteria other than those specified by Servicer pursuant to Section 11.6.

Section 12.06. <u>Use of Servicers and Subcontractors</u>

(a)    (i)  Servicer shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of Servicer as servicer under this Agreement or any Reconstitution Agreement unless Servicer complies with the provisions of Section 12.06(b); and (ii) Servicer shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of Servicer under this Agreement or any Reconstitution Agreement unless Servicer complies with the provisions of Section 12.06(c).

(b)    It shall not be necessary for Servicer to seek the consent of Owner, any Master Servicer or any Depositor to use any Subservicer. Servicer shall cause any Servicer used by Servicer (or by any Subservicer) for the benefit of Owner and any Depositor to comply with the provisions of this Section 12.06 and with Sections 12.02, 12.03(b), (d), (e), (f), 12.04, 12.05, and 12.07 to the same extent as if such Servicer were Servicer, and to provide such information reasonably requested by Owner to comply with Regulation AB. Servicer shall be responsible for obtaining from each Subservicer and delivering to Owner, any Master Servicer and any Depositor any Compliance Statement, Compliance Assessment and Attestation Report required to be delivered by such Subservicer and any Sarbanes Support Certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 12.05 as and when required to be delivered.

(c)    It shall not be necessary for Servicer to seek the consent of Owner, any Master Servicer or any Depositor to use any Subcontractor. Servicer shall promptly upon request provide to Owner, any Master Servicer and any Depositor (or any designee of the Depositor, such as a master servicer or administrator) a written description (in form and substance satisfactory to Owner, such Depositor and such Master Servicer) of the role and function of each Subcontractor utilized by Servicer or any Subservicer, specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are "participating in the servicing function" within the meaning of Instruction 2 to Item 1122 of Regulation AB, and (iii) which elements of the Servicing Criteria will be addressed in

assessments of compliance provided by each Subcontractor identified pursuant to this paragraph.

As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Instruction 2 to Item 1122 of Regulation AB, Servicer shall cause any such Subcontractor used by Servicer (or by any Servicer) for the benefit of Owner and any Depositor to comply with the provisions of Sections 12.04 and 12.05 to the same extent as if such Subcontractor were Servicer. Servicer shall be responsible for obtaining from each Subcontractor and delivering to Owner, any Master Servicer and any Depositor any Compliance Assessment and Attestation Report required to be delivered by such Subcontractor, in each case as and when required to be delivered.

# ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

Section 13.01. Notices

All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon the mailing thereof, sent by registered or certified mail, return receipt requested, or nationally recognized overnight delivery service:

(a)    If to Owner:

Shellpoint Partners LLC
245 Park Aevenue, 39TH Floor
New York, New York 10167
Attention:  Andrew Rickert, SVP & Treasurer
           Telephone: (212) 850-5075
           Email: andy.rickert@shellpointllc.com

Attention:  Shari Kushner, SVP & General Counsel
           Telephone: (212) 850-7740
           Email: shari.kushner@shellpointllc.com


With a copy to:

Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Attention:  Amy McDaniel Williams, Esq.
           Telephone: (804) 788-7388
           Email: awilliams@hunton.com

(b)    If to Servicer:

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention: Chief Servicing Officer


With a copy to:

GMAC Mortgage, LLC
3451 Hammond Ave.

Waterloo, IA  50702-5345
Attention: General Manager


With a copy to:

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention: General Counsel

Section 13.02. <u>Waivers</u>

The Servicer or the Owner may, by written notice to the other, waive compliance with any of the terms, conditions or covenants required to be complied with by the other hereunder; and waive or modify performance of any of the obligations of the other hereunder. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

Section 13.03. <u>Entire Agreement; Amendment</u>

This Agreement, including all documents and exhibits incorporated by reference herein, constitutes the entire agreement between the Parties with respect to servicing of the Mortgage Loans.  This Agreement may be amended and any provision hereof waived, but, only in writing signed by the Party against whom enforcement of such amendment or waiver is sought.

Section 13.04. <u>Counterparts; Binding Effect</u>

This Agreement may be executed in one or more counterparts and by the different Parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement.  This Agreement shall inure to the benefit of and be binding upon the Servicer and the Owner and their respective permitted successors and assigns.

Section 13.05. <u>No-Hire</u>

During the term of this Agreement and for a period of 24 months following any termination of this Agreement, Owner shall not solicit for hire, or provide any information that would permit Owner's affiliates to solicit for hire, any employees of Servicer. It is acknowledged that advertising positions generally available to the public, such as positions posted online, advertised in newspapers, or similarly made available to the general public, shall not constitute solicitation for purposes of the foregoing.

Additionally, during the term of this Agreement and for a period of 24 months following any termination of this Agreement, regardless of any lack of

solicitation by Owner, Owner shall not hire all or substantially all of any team or functional group of employees of Servicer, including but not limited to any collections or loss mitigation team assigned to service the Mortgage Loans under this Agreement.

Section 13.06. Headings

Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

Section 13.07. Governing Law

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES, OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATION LAW.

Section 13.08. Relationship of Parties

Nothing contained herein shall be deemed or construed to create a partnership or joint venture, association, franchise or other form of business or relationship between the Parties. The duties and responsibilities of the Servicer shall be rendered by it as an independent contractor and not as an agent of the Owner. The Servicer shall have full control of all of its acts, doings, and proceedings relating to or required in connection with the discharge of its duties and responsibilities under this Agreement. Nothing contained in this Agreement shall be construed as making a party hereto liable for the debts or obligations of the other party, except only as expressly provided herein.

Section 13.09. Severability of Provisions

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remainder of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 13.10. Recordation of Assignments of Mortgage

If Assignments of Mortgage are required to be recorded, such recordation shall be effected, at the Owner's request or to effectuate the Servicer's responsibilities of this Agreement, by the Servicer or the Owner's designee at the Owner's expense.

Section 13.11. Exhibits

The exhibits to this Agreement are hereby incorporated and made a part hereof and are integral parts of this Agreement. If there are any discrepancies between the Agreement and any of the Exhibits, the Agreement shall prevail.

Section 13.12. Owner's Financials

The Owner shall deliver to the Servicer, on or before March 31st each year beginning March 31, 2012 (or within 60 days of the end of Owner's fiscal year, if Owner's fiscal year does not correspond to the calendar year), audited financial statements of Owner covering the year ended the previous December 31 (or such other period constituting Owner's fiscal year).

Section 13.13. No Solicitation

Unless in accordance with Section 2.03 for the purposes of loss mitigation, from and after the date hereof, the Servicer shall not, nor shall it take any action that would permit any Affiliate of Servicer, to solicit the Mortgagors for purposes of prepayment or refinance of the Mortgage Loans, without the written consent of the Owner, except as otherwise provided herein. Nothing in this Section 13.13 shall prohibit the Servicer from generalized advertising not targeted exclusively to the Mortgagors, including on its website, monthly account statements, or VRU (voice response unit), mortgage leads purchased from third parties, recorded communications, or otherwise engaging in a program directed to the general public at large to encourage or recommend mortgage loan products and other products and services provided by the Servicer or such Affiliate, or from taking applications for refinance from Mortgagors as a result thereof.

Section 13.14. Force Majeure

A Party will not be responsible for delays or failures in performance of its obligations under this Agreement resulting from acts beyond its reasonable control such as acts of God, strikes, riots, acts of war, terrorism, earthquakes or other similar events. A Party excused from performance pursuant to this section shall exercise reasonable efforts to continue to perform its obligations hereunder and shall thereafter continue with reasonable due diligence and good faith to remedy its inability to so perform, except that nothing herein shall obligate either Party to settle a strike or labor dispute when it does not wish to do so.

Section 13.15. Waiver of Trial by Jury

THE SERVICER AND THE OWNER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.16. <u>Limitation of Damages</u>

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PARTIES AGREE THAT NEITHER OWNER OR SERVICER SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, WHETHER IN CONTRACT, TORT OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE; PROVIDED, HOWEVER, THAT SUCH LIMITATION SHALL NOT BE APPLICABLE WITH RESPECT TO INDEMNIFICATION OBLIGATIONS FOR THIRD PARTY CLAIMS MADE AGAINST A PARTY.

Section 13.17. <u>Survival</u>

In addition to any provisions in this Agreement, which by their express terms shall survive termination, the following provisions shall survive termination of this Agreement or removal of some or all of the loans from the coverage of this Agreement due transfer to a successor servicer, or otherwise: Sections 3.04 (Reimbursement of Servicing Advances), 5.04 (Confidentiality of Information), Article VI (Representations, Warranties and Covenants of Owner), Article VII (Representations, Warranties and Covenants of Servicer), 10.01 (Indemnification), 10.02 (Limitation on Liability of Servicer and Others), 10.03 (Operation of Indemnities), 10.06 (Agency Transfers),11.01 (Termination), 11.02 (Transfer Procedures), Sections 13.01 (Notices), 13.02 (Waivers), 13.03 (Entire Agreement; Amendment), 13.04 (Counterparts; Binding Effect), 13.05 (No-Hire), 13.06 (Headings), 13.07 (Governing Law), 13.08 (Relationship of Parties), 13.09 (Severability of Provisions), 13.13 (No Solicitation), 13.14 (Force Majeure), 13.15 (Waiver of Trial by Jury), 13.16 (Limitation of Damages) and this Section 13.17 (Survival).

[SIGNATURES APPEAR ON NEXT PAGE]

SERVICING AGREEMENT BY AND BETWEEN
SHELLPOINT MORTGAGE, LLC AND GMAC MORTGAGE, LLC

AUGUST 15TH, 2011

IN WITNESS WHEREOF, the Parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

SHELLPOINT PARTNERS LLC
(Owner)

By:

Name: William Robert Mayer, Jr

Title: Chief Investment Officer

GMAC MORTGAGE, LLC
(Servicer)

By:

Name: CURTIS J. SCHARES
VICE PRESIDENT

Title: