**Hearing Date and Time: Requested to be held no later than June 18**
**Objection Deadline: To be determined by the Court**

MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702
Thomas B. Walper (Pro Hac Vice)
Seth Goldman (Pro Hac Vice)
Bradley R. Schneider (Pro Hac Vice application pending)

*Counsel for Berkshire Hathaway Inc.*

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, et al.,<br><br>    Debtors. | CASE NO. 12-12020 (MG)<br><br>Chapter 11<br><br>Jointly Administered |

# MOTION OF BERKSHIRE HATHAWAY INC.
# FOR THE APPOINTMENT OF AN EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

17595822.6

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND .......................................................................................................................... 4

    A.    The Debtors' Business and Related Party Transactions ......................................... 4

    B.    The Debtors' Bankruptcy Filing and Plan Support Agreements ........................... 5

JURISDICTION ........................................................................................................................... 6

RELIEF REQUESTED .................................................................................................................. 6

BASIS FOR THE RELIEF REQUESTED .................................................................................... 7

    A.    Section 1104(c)(2) Mandates Appointment of an Examiner ................................. 7

    B.    The Interests of Creditors Mandates the Appointment of an Examiner Under Section 1104(c)(1) ....................................................................................... 7

        1.    It is Undisputed That an Investigation is Necessary and in the Interests of Creditors ................................................................................. 7

        2.    Only an Examiner Can Conduct the Thorough, Public, and Efficient Investigation That is Needed in These Cases ............................ 9

    C.    The Proposed Scope of the Examiner's Investigation is Appropriate ................. 10

NOTICE ....................................................................................................................................... 11

CONCLUSION ............................................................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*In re FiberMark*,
  339 B.R. 321 (Bankr. D. Vt. 2006) ................................................................................................9

*In re Gilman Services, Inc.*,
  46 B.R. 322 (Bankr. Mass. 1985) ..................................................................................................8

*In re Gitto Global Corp.*,
  No. Civ. 05-10334, 2005 WL 1027348, at *2 (D. Mass. 2005) .....................................................9

*In re Keene Corp.*,
  164 B.R. 844 (Bankr. S.D.N.Y. 1994) ......................................................................................8, 10

*In re Loral Space & Communications, Ltd.*,
  2004 WL 2979785, at *4 (S.D.N.Y. 2004) ....................................................................................7

*Walton v. Cornerstone Ministries Invs., Inc.*,
  398 B.R. 77 (N.D. Ga. 2008) ..........................................................................................................7

**STATE CASES**

*Sternberg v. O'Neil*,
  550 A.2d 1105 (Del. 1988) .............................................................................................................9

*Trenwick Amer. Litig. Trust v. Ernst & Young, LLP*,
  906 A.2d 168 (Del. Ch. 2006) ........................................................................................................9

**FEDERAL STATUTES**

11 U.S.C § 1104(c) ............................................................................................................................1

11 U.S.C. § 1104(c)(1) .......................................................................................................................7

11 U.S.C. § 1106(b) .........................................................................................................................10

11 U.S.C. § 1141(c)(1) .......................................................................................................................7

28 U.S.C. §§ 157, 1334, 1408 and 1409 ...........................................................................................6

28 U.S.C. § 157(b)(2) ........................................................................................................................6

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**OTHER AUTHORITIES**

M. Bienenstock, BANKRUPTCY REORGANIZATION 299 (1987) .......................................................8

**EXHIBIT**

Exhibit A - Proposed Order

Berkshire Hathaway Inc. ("Berkshire") seeks the appointment of an examiner to investigate and report on the actions of Residential Capital, LLC ("ResCap") and its affiliated debtors (collectively with ResCap, the "Debtors"), including, without limitation, the Debtors' prepetition transactions with Ally Financial Inc. ("Ally"), any claims that the Debtors may hold against their officers or directors, any claims the Debtors may hold against Ally's officers and directors, and any claims that the Debtors propose to release as part of their plan. As set forth below, under section 1104(c) of the Bankruptcy Code, the appointment of an examiner is both mandatory and in the interests of ResCap's creditors and all other parties in interest.

## PRELIMINARY STATEMENT

1. Berkshire, which has for several years held in excess of 50% of ResCap's outstanding unsecured bonds and in excess of 40% of ResCap's junior secured bonds,[1] has a significant stake in the outcome of these cases. As one of ResCap's largest non-insider unsecured creditors, Berkshire agrees with the Official Committee of Unsecured Creditors ("UCC") that an investigation is necessary into the Debtors' prepetition transactions with Ally and its affiliates, and the settlements underlying the reorganization plan that the Debtors now seek to confirm on a highly abbreviated schedule.

2. That investigation must be conducted by an impartial examiner appointed by the Court pursuant to section 1104(c) of the Bankruptcy Code. Investigating potentially improper prepetition transactions between a debtor and its affiliates, and evaluating potential claims arising from those transactions, are quintessential duties of a bankruptcy examiner. Here, the Debtors' first-day pleadings and public securities filings reveal dozens of transactions with Ally and its affiliates involving billions of dollars of asset transfers and intercompany financing—

---

[1] *Decl. of R. Ted Weschler in Support of the Mot. of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c)* ¶ 2. These percentages have and may change over time.

transactions whose net effect was to transfer a substantial share of ResCap's operating assets to its parent. The Debtors now seek to release Ally from any claims arising from these transactions, even while they admit that the Debtors possess valid claims against Ally, including for fraudulent transfer, equitable subordination, and alter ego. An examiner should determine whether this proposed release is fair to the Debtors and all their stakeholders.

3.  An examiner should also be tasked with reviewing the propriety of the Debtors' request to release Ally from any third-party claims. As the Second Circuit and this Court have observed, such non-debtor releases are especially susceptible to abuse, as they effectively offer a non-debtor a bankruptcy discharge without affording creditors the protections that would attend a bankruptcy. If there is a basis for such an extraordinary remedy in this case, it is nowhere to be found in the pleadings the Debtors have filed to date. The Debtors' settlement agreement merely recites that Ally's third party release "is justified by truly unusual circumstances," none of which are identified, and that the release is an "essential component and important to the success of the Plan," for reasons that are neither explained nor evident.

4.  What is evident—abundantly so—is that the Debtors' plan fits neatly into Ally's publicly-stated goal of separating itself, once and for all, from ResCap. Whether Ally's agenda also happens to be in the best interest of ResCap and its creditors is another question, one that should be a focus of a searching inquiry.

5.  While the UCC has volunteered to carry out this investigation,[2] Berkshire submits that an examiner is preferable to a UCC investigation for several reasons. First, only an examiner will have the independence of being appointed by and reporting to the Bankruptcy

---

[2] *Mot. of the Official Committee of Unsecured Creditors of Debtors Residential Capital, LLC, et al., For Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Issuance of Subpoenas for the Production of Documents and the Provision of Testimony by the Debtors and Others* ("Rule 2004 Motion") [Docket No. 192].

Court and all parties in interest. The same cannot be said of the UCC, whose members have disparate and potentially conflicting interests with respect to the matters that require investigation. For example, the UCC includes trustees of ResCap's mortgage backed securitized trusts who, under a plan support agreement entered into by the Debtors before bankruptcy, will in many instances be directed by certificate holders to support the Ally-backed plan.

6. Second, an examiner will serve a single mandate to investigate and publicly report the results of the investigation, free from any distractions related to administering the cases or the Debtors' business operations. The UCC, in contrast, must attend to those matters and has no obligation to publicly report the results of its investigation. Moreover, the UCC may assert privilege over an investigation or decide to compromise the investigation in favor of a settlement with the Debtors or Ally.

7. Third, this Court can empower the examiner to access the Debtors' communications with their counsel and other advisors. An examiner therefore can review critical documents and other information that are not available to the UCC.

8. For these reasons, Berkshire requests that the Court appoint an examiner to investigate any transactions between the Debtors and Ally and any other affiliates, any claims that are proposed to be released or barred under the Ally-backed plan, including claims the Debtors may have against their officers and directors, Ally and Ally's officers and directors, or affiliates or shareholders of Ally, and the fairness of the Debtors' proposed settlements. To ensure that the examiner can carry out this mandate, the Court should direct the Debtors, Ally, and their affiliates to cooperate fully with the examiner. The examiner also should be permitted to review communications subject to ResCap's privileges and to retain outside counsel and any other advisors necessary to complete the investigation.

# BACKGROUND

### A.    The Debtors' Business and Related Party Transactions

9.    Together with their non-debtor affiliates, the Debtors are among the largest mortgage loan originators and servicers in the United States. The Debtors service approximately $373 billion of domestic residential mortgage loans and work with 2.4 million homeowners across the United States. *Affidavit of James Whitlinger in Support of Chapter 11 Petitions and First Day Pleadings* ("First Day Aff.") ¶ 9. Like many other companies in the mortgage business, the Debtors were hit hard by the collapse of the residential mortgage market in 2008 and the recession that ensued.

10.    The Debtors' financial pain has been shared by their parent, Ally. Ally has laid much of the blame for its financial difficulties on ResCap's mortgage operations and has publicly avowed its intention to make a clean break from ResCap and its liabilities.

11.    That break, however, comes after years of related-party transactions and asset transfers. For example, the Rule 2004 Motion identifies at least twenty different transactions with Ally and its affiliates involving the purchase of assets and businesses from ResCap, or the extension of credit secured by ResCap's assets. (Rule 2004 Mot., Ex. B, Definition of "Specified Transactions.") These transactions involved billions of dollars and sizable on-going businesses. Among the most significant of these transactions was Ally's acquisition, in January 2009, of ResCap's ownership stake in IB Finance Holding Company LLC, the direct holding company of Ally Bank (f/k/a GMAC Bank). This and other transactions may give rise to various potential claims that Ally and affiliates have harvested assets from ResCap and seek a quick and easy divorce through bankruptcy. In fact, according to press reports, shortly before the Debtors'

chapter 11 bankruptcy filing, Ally entered into a tolling agreement with certain ResCap bondholders, who alleged that this acquisition constituted a fraudulent transfer.[3]

### B.  The Debtors' Bankruptcy Filing and Plan Support Agreements

12.  The Debtors filed for bankruptcy on May 14, 2012.  As the UCC accurately observes, "the Debtors propose an ambitious and expedited reorganization of more than 50 entities, with more than $15 billion of assets, before the end of the year."  Rule 2004 Mot. ¶ 3.  The Debtors seek to implement this reorganization through the sale under a Chapter 11 plan of their mortgage servicing platform and their "legacy" whole loan portfolio, with Ally acting as the stalking horse bidder for the whole loan portfolio.  First Day Aff. ¶ 7.  Underpinning this reorganization plan are three plan support agreements that the Debtors entered before bankruptcy with Ally, a minority group of junior secured noteholders, and certain institutional investors in the Debtors' residential mortgage-backed securities ("RMBS").  *Id*. Ex. 8 ("Ally PSA"), Ex. 9 ("Junior Noteholder PSA"), and Ex. 10 ("RMBS PSA").

13.  The Ally PSA sets out the terms of the whole-loan sale and also incorporates what its describes as a "settlement" of all claims against Ally relating to the Debtors.  *Id*. Ex. 8.  According to the agreement, "the Debtors believe certain claims exist against Ally related to the corporate relationship between the Debtors and Ally, including with respect to certain transactions between the Debtors and Ally, including equitable subordination, debt recharacterization, fraudulent conveyance, avoidance liability under federal or state laws, and other causes of action under theories of veil piercing and alter ego liability."  *Id*. at p. 2.  The Debtors offer scant factual detail on the nature, strength, or value of the claims that they propose to release as part of the Ally settlement.

---

[3] *Ally Agrees to Postpone Lawsuit Deadline Over Bank Unit*, The Wall Street Journal, March 29, 2012, available at http://online.wsj.com/article/BT-CO-20120329-712266.html.

14. The Ally PSA also recites that "Ally denies each allegation of the Debtors and has substantial claims against the Debtors," *id.*, though it does not elaborate on what claims Ally believes that it has against the Debtors. Ally nevertheless has agreed to pay $750 million for a release of all claims of the Debtors *and* any claims held by Debtors' creditors or interest holders relating to the Debtors. *Id.* § 2.1(a), 3(d). The agreement does not allocate the value of the $750 million between the Debtors' release and the third-party release, nor does it specify the debtor entity or the specific creditors that will receive the Ally payment. Payment, however, is conditioned on the Debtors seeking to extend the automatic stay to Ally with respect to ResCap-related litigation while they press to shield Ally from such claims permanently.

15. Under the Junior Noteholder PSA, Ally has agreed to reorder lien priorities in exchange for the agreement of a minority of junior secured noteholders to support the Ally-backed plan. *See id.*, Ex. 9, § 5.1.

16. Finally, the RMBS PSA proposes to settle representation and warranty claims arising from the Debtors' residential mortgage backed securities by granting such claimants a maximum allowed claim of $8.7 billion against the Debtors. *See* Ex. 10, § 4. These are the same claims for which they have reserved little more than $800 million. *See* First Day Aff. ¶ 100.

## JURISDICTION

17. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157, 1334, 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## RELIEF REQUESTED

18. Berkshire respectfully requests appointment of an examiner to investigate, as more fully set forth in the proposed order attached hereto as Exhibit A, the Debtors' prepetition transactions with Ally, any claims that Debtors may hold against their officers or directors, any

claims Debtors may hold against Ally's officers and directors, and any claims that Debtors propose to release as part of their plan.

## BASIS FOR THE RELIEF REQUESTED

### A. Section 1104(c)(2) Mandates Appointment of an Examiner

19. Section 1104(c)(2) provides that a court "shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate . . . if the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." "On its face, Section 1104(c)(2) mandates the appointment of an examiner where a party in interest moves for an examiner and the debtor has $5,000,000 of qualifying debt." *Loral Stockholders Protective Comm. v. Loral Space & Communications Ltd.* (*In re Loral Space & Communications, Ltd.*), No. 04-Civ-8645, 2004 WL 2979785, at *4 (S.D.N.Y. 2004). *See also Walton v. Cornerstone Ministries Invs., Inc.*, 398 B.R. 77, 81-82 (N.D. Ga. 2008) ("[E]very district court and nearly every bankruptcy court that has confronted the question has also read the provision to be mandatory on its face") (citing cases).

20. Here, the Debtors indisputably have more than $5,000,000 of qualifying debt, and Berkshire is a party in interest. Accordingly, section 1104(c)(2) mandates the appointment of an examiner to conduct an appropriate investigation of the Debtors.

### B. The Interests of Creditors Mandates the Appointment of an Examiner Under Section 1104(c)(1)

#### 1. It is Undisputed That an Investigation is Necessary and in the Interests of Creditors

21. The Bankruptcy Code provides that a court "shall" appoint an examiner where such an appointment is in the "interests of creditors" or other stakeholders. 11 U.S.C. § 1104(c)(1). That standard is plainly satisfied here.

22.     First, ResCap's non-insider creditors need assurance that the impetus for these cases was to maximize the recovery for all of the Debtors' creditors and not to serve the agenda of the Debtors' parent company, Ally. It is no secret that Ally has been eager for some time now to find a way to separate itself from ResCap. As Ally's CEO commented shortly before the bankruptcy, "[i]t is the contingent liabilities on the capital structure of ResCap that are dragging the whole company down and we have to separate ourselves from those issues." First Day Aff. ¶ 80. That is just what the plan the Debtors negotiated with Ally would accomplish.

23.     Second, as the UCC's Rule 2004 Motion makes clear, there is wide agreement that an investigation is necessary into the billions of dollars of prepetition transactions between the Debtors, on the one hand, and Ally. The case law makes clear that appointing an examiner is warranted under these circumstances. *See, e.g.*, *In re Keene Corp.*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (appointing an examiner to review multiple transfers from the debtor to affiliates) (citing M. Bienenstock, BANKRUPTCY REORGANIZATION 299 (1987) ("Often, appointment of an examiner is warranted when the debtor's transactions with affiliates should be investigated.")); *In re Gilman Services, Inc.*, 46 B.R. 322, 327 -328 (Bankr. Mass. 1985) ("A debtor's sale of assets to a related corporation before the commencement of the bankruptcy case warrants an investigation by an examiner where there are unanswered questions concerning the transaction and interrelationships of the parties involved"). In reviewing these transactions, an examiner should determine whether they give rise to any causes of action against the Debtors' officers and directors, Ally, or other parties. *Id.* at 328 ("One of the functions of an examiner is to investigate potential causes of action available to the estate.").

24.     Such an investigation is all the more critical given that the Debtors propose to release Ally from any such claims—including those asserted by third parties—pursuant to a settlement that was negotiated before bankruptcy. First Day Aff. Ex. 8. The Debtors' assertion that the Ally releases were negotiated by independent directors, Greene Decl. ¶ 38, offers cold comfort in this regard. For one thing, as the directors of a wholly owned subsidiary, all of

ResCap's directors owe fiduciary duties to Ally, *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 (Del. 1988); *Trenwick Amer. Litig. Trust v. Ernst & Young, LLP,* 906 A.2d 168, 191 (Del. Ch. 2006), the very entity with whom they supposedly negotiated a settlement at arms length.  Moreover, Ally's certificate of incorporation requires Ally to indemnify ResCap's directors "to the full extent of Delaware law[,]" First Day Aff. Ex. 8, § 2.2(a), a fact that further calls into question the independence of ResCap's directors from Ally.

25.     None of this is to say that ResCap's directors acted improperly in entering the Ally Settlement.  Perhaps that settlement really is fair to the Debtors and their creditors.  And perhaps the Debtors' bankruptcy filing really was calculated to serve the interests of all of the Debtors' creditors, not just a select few.  But before creditors can begin to make an informed judgment on these and other matters, they need a thorough public investigation into the Debtors and their transactions with Ally and other related parties.

2.     Only An Examiner Can Conduct the Thorough, Public, and Efficient Investigation That Is Needed in These Cases

26.     In addition to being mandatory under the Code, appointing an examiner is the most sensible option available for several reasons.  First, it is critical that any investigation is viewed by all parties in interest as impartial.  The Debtors are among the largest mortgage servicers in the country and the outcome of these bankruptcy proceedings may well affect millions of homeowners throughout the United States.  The stakes, in other words, are quite high—too high to entrust an investigation to a party or entity that (rightly or wrongly) could be perceived as having a vested stake in the outcome.

27.     Unlike any party in interest, an "examiner answers solely to the Court and acts "as an objective nonadversarial party" whose only charge is to carry out an objective investigation, "thereby allowing the parties to make an information determination as to their substantive rights." *In re FiberMark*, 339 B.R. 321, 325 (Bankr. D. Vt. 2006); *see also In re Gitto Global*

*Corp.*, No. Civ. 05-10334, 2005 WL 1027348, at *2 (D. Mass. 2005) ("An Examiner's legal status is unlike that of any other court-appointed officer which comes to mind. He is first and foremost disinterested and nonadversarial."). An examiner therefore is capable of carrying out an investigation that is objective and perceived as such.

28. No other party can meet these requirements. The Debtors are obviously incapable of investigating the settlements they have entered or the bankruptcy path that they have agreed to pursue. While the UCC has sought to conduct an investigation, the UCC lacks the necessary independence and focus for the reasons discussed above. *See Keene*, 164 B.R. at 856 ("While a creditors' committee is well suited to overseeing the operations of a business, especially the financial and economic aspects of the debtor's operations, the examiner is far better able to undertake an in-depth investigation, a function warranted by the facts presented here.").

29. Finally, an examiner's investigation has little if any potential downside. While such an examination will entail costs, given the consensus that an investigation is necessary, the incurrence of substantial investigative costs is inevitable. These cases, moreover, are still in their early stages and thus, neither the UCC nor any other party in interest has invested significant time or resources in investigating the Debtors. Accordingly, an examiner's investigation will not be duplicative of any significant work that has been done so far. If there is a circumstance and time to appoint an examiner, it is here and now.

    C.    **The Proposed Scope of the Examiner's Investigation is Appropriate**

30. The proposed scope of the examiner's investigation as set forth in Exhibit A is well within an examiner's statutory authority under section 1106(b) of the Bankruptcy Code, and consistent with orders appointing examiners in analogous cases. *See, e.g.*, *In re DBSI, Inc.*, Case No. 08-12687 (PJW) (Bankr. D. Del.) [Docket No. 2974] ("The Examiner is directed to: (a) investigate the circumstances surrounding (i) any and all of the Debtors' inter-company transactions and transfers; (ii) any and all transactions and transfers between and among the

Debtors and any non-debtor affiliates, and (iii) any and all transactions and transfers between and among the Debtors and any insiders, officers, directors and principals of the Debtors . . . ."); *In re Washington Mutual, Inc.*, Case No. 08-12229 (MFW) (Bankr. D. Del. ) [Docket No. 5120] ("The Examiner is directed to investigate . . . (a) the claims and assets that may be property of the Debtors' estates that are proposed to be conveyed, released or otherwise compromised and settled under the Plan and Settlement Agreement"); *In re Dynegy Holdings, LLC*, Case No. 11-38111 (CGM) (Bankr. S.D.N.Y.) [Docket No. 276] (providing that "the examiner shall conduct an **_unfettered_** investigation of the Debtors . . . with respect to (i) the conduct of the Debtors in connection with the prepetition 2011 restructuring and reorganization of the Debtors and their non-Debtor affiliates . . . **_any possible fraudulent conveyances_**" and further ordering that "the Creditors' Committee cannot 'tag along' in the examiner's investigation") (emphasis in original).

31.  To facilitate the examiner's investigation, the Proposed Order directs the Debtors, Ally, and their affiliates to cooperate in the investigation. The Proposed Order also empowers the examiner to review communications subject to the Debtors' privilege and to retain outside counsel and any other advisors that are necessary for the examiner to complete the investigation. Further, to ensure the examination is conducted expeditiously, the Proposed Order requires the examiner to report to the Court within 90 days from the date of entry of the Court's order approving the appointment of an examiner.

## NOTICE

32.  Notice of this Motion has been provided in accordance with the Order Under Bankruptcy Code Sections 102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 and Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management and Administrative Procedures entered by this Court on May 23, 2012 [Docket No. 141] (the "Case Management Order"), and notice has been given to the parties identified on the Monthly Service

-12-

List (as defined in the Case Management Order) and Cerberus. Berkshire submits that such notice is sufficient and no other or further notice need be provided.

33. Concurrently with this Motion, Berkshire has filed a motion for an order to shorten time, requesting that the Court set a hearing on this Motion no later than June 18, 2012. Upon the Court's entry of an order establishing a hearing date for this Motion, Berkshire will promptly file a notice of hearing on all the parties served with this Motion.

34. No prior request for the relief sought in this Motion has been made by Berkshire to this or any other Court.

## CONCLUSION

35. For the reasons stated above, Berkshire respectfully requests entry of an order, substantially in the form attached as Exhibit A, (a) approving and directing the appointment of an independent examiner for the purposes of investigating and reporting to the Court and parties in interest with respect to the matters described above and (b) granting such other relief as the Court deems just and proper.

Dated: June 4, 2012

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

    /s/ - Thomas B. Walper
Thomas B. Walper
Seth Goldman
Bradley R. Schneider
355 South Grand Avenue
Los Angeles, California, 90071
thomas.walper@mto.com
seth.goldman@mto.com
bradley.schneider@mto.com

*Attorneys for Berkshire Hathaway Inc.*