MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------ | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------ | ) | |

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO**
**ENTRY OF FINAL ORDERS FOR SPECIFIC "FIRST DAY" MOTIONS AND**
<u>**RELATED RELIEF**</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………………………………. ……………..1

REPLY…………………………………………………………………………………….3

    A.      Reply to Servicing Motions Objections……………………….......................3

    B.      Reply to Cash Management Objection…………………………………………5

    C.      Reply to Miscellaneous Objections……………………………………………9

CONCLUSION……………………………………………………………………….11

ny-1044627

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Enron Corp.*,
2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006)..................................................6

*In re Refco, Inc. Securities Litigation*,
2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009)...........................................................7

*In re Serv. Merch. Co. Inc.*,
240 B.R. 894 (Bankr. M.D. Tenn. 1999)..................................................6

*In re Southmark Corp.*,
240 B.R. 894 (Bankr. M.D 1995). ...........................................................6

STATUTES

11 U.S.C. § 345(b) ...........................................................5, 6, 8

11 U.S.C. § 362...........................................................3

11 U.S.C. § 541...........................................................6

OTHER AUTHORITIES

12 CFR 223.14(D) ...........................................................8

140 Cong. Rec. H10752-01 (Oct. 4, 1994)...........................................................6

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

        The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[1] submit this omnibus reply (the "Reply"),[2] to objections (the "Objections") filed to certain of the Debtors' "first day" motions.  In support of the Reply, the Debtors rely, and incorporate by reference, (i) the affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in support of the Debtors' "first day" pleadings (the "Whitlinger Aff.") [Dkt No. 6], dated May 14, 2012 (the "Petition Date"), (ii) the supplemental declaration of James Whitlinger in further support of various "first day" pleadings (the "Supp. Whitlinger Decl.") filed contemporaneously herewith, and (iii) the declaration of Joseph A. Pensabene in further support of the Servicing Motions (defined below) filed contemporaneously herewith (the "Pensabene Decl.").  In further support of the Reply, the Debtors, by and through their undersigned counsel, respectfully represent:

## INTRODUCTION

        1.      Since the first day hearings on the Debtors' requests for relief held on May 14 and May 15, 2012, the Debtors and their advisors have worked tirelessly with their major stakeholders, including the Official Committee of Unsecured Creditors (the "Committee"), as well as the Office of the United States Trustee (the "UST") in an effort to help those entities better understand the complex businesses that the Debtors operate.  As a result of these frequent and extensive discussions, and various consensual modifications to the relief sought, the Debtors

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below).

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Reply may refer to http://www.kccllc.net/rescap for additional information.

have been fortunate to limit the filed objections to the motions currently scheduled for hearing on June 12, 2012 (collectively, the "June 12th Motions").

2.    As more fully described below, the objections and statements[3] concerning the June 12th Motions generally relate to two matters.[4]  The first matter is the operation of the Debtors' servicing business.  In particular, these objections (the "Servicing Objections") pertain to the Debtors' motion to continue servicing mortgages owned by governmental agencies [Dkt No. 57]; and those owned by private entities [Dkt No. 46] as well as those pertaining to the Debtors' supplemental motion confirming servicing functions [Dkt  No. 181] (collectively, the "Servicing Motions").  The second type of objection is with respect to the Debtors' request for relief in connection with their cash management system [Dkt No. 16], filed by the UST.  Certain parties also filed miscellaneous objections to the concept of first day relief.  The matters in dispute appear limited, and the Debtors will continue to engage in good faith negotiations with the objecting parties; however, the Debtors respectfully submit that in the absence of consensual resolution on all points, the relief requested by the Debtors is appropriate and should be granted.

---

[3]    The following responses and objections have been filed: (1) Omnibus Objection to Interim Orders [Dkt No. 118]; (2) First Amended Nora Obj.  [Dkt No. 121]; (3) Second Amended Nora Obj. [Dkt No. 227] (collectively, the "Nora Obj."); (4) Omnibus Objection [of Paul N. Papas II] [Dkt No. 157]; (5) Reservation of Rights of Federal National Mortgage Association to Debtors' Motions for Continued Servicing and Origination [Dkt No. 218]; (6) Limited Omnibus Objection to the Servicing Orders and Debtors' May 31, 2012 Motion for a Supplemental Order [Dkt No. 221]; (7) Limited Omnibus Objection  to the Servicing Orders and Debtors' May 31, 2012 Motion for a Supplemental Order [Dkt No. 223]; (8) Statement of the United States of America [Dkt No. 225]; (9) Objection of UST to Debtors' Cash Management Motion [Dkt No. 239] (the "UST Obj."); and  (10) Omnibus Response and Reservation of Rights of The Committee [Dkt No. 240].

[4]    Terms not otherwise defined herein shall have the meanings ascribed to them in the Whitlinger Aff. or the respective motion.

<u>**REPLY**</u>

## I.    OBJECTIONS TO SERVICING MOTIONS

### A.    NACBA Objection

3.    The National Association of Consumer Bankruptcy Attorneys, on its own

behalf and in a representative capacity ("NACBA"), two individuals who are debtors under

Chapter 13, and Edward Boltz, counsel for those individuals(collectively, the "<u>NACBA</u>

<u>Objectors</u>") have joined in an objection [Dkt No. 221][5] to the relief requested in the

Supplemental Servicing Motion on the grounds that the Debtors' request that borrowers be

provided with modified stay relief in their individual bankruptcy cases is not broad enough.  As

an initial matter, the Debtors' question the standing of NACBA and Mr. Boltz under section

1109(b) and note that neither of such parties have filed the statement required under Bankruptcy

Rule 2019(b)(i).  In addition, the pleading is truly a Stay Motion as defined in the Case

Management Order,[6] and therefore must be served with a minimum of 21 days' notice, a

requirement not satisfied by NACBA Objectors.  (Case Management Order, ¶ 13(a).).  Indeed,

the NACBA Objectors are apparently aware of the defect in their objection because they also

filed a motion for relief from the automatic stay seeking identical relief [Dkt No. 222].

4.    First off, any limitation on the ability of individual borrowers to prosecute

claims and causes of action against the Debtors is not the result of an affirmative request by the

---

[5].    Counsel to the NACBA Objectors, Storch Amini and Munves PC, also filed a separate objection and motion for relief from the automatic stay on behalf of the "Maine Action Plaintiffs" (Dkt Nos. 223 and 224) in connection with the Supplemental Servicing Motion.  Counsel to the Maine Action Plaintiffs has advised counsel to the Debtors that they do not intend to go forward with this objection, but will notice the motion for relief for the July 10, 2012 Omnibus Hearing date.

[6]    *Order Under Bankruptcy Code Sections 102(1), 105(a) And 105(d), Bankruptcy Rules 1015(c), 2002(m) And 9007 And Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management And Administrative Procedures* [Dkt No. 141]

Debtors to impose such limits.[7]  Rather, the automatic stay is a fundamental protection provided

to all debtors upon the commencement of a bankruptcy case, which remains in place unless a

party seeking to lift the stay establishes a basis for relief.  11 U.S.C. § 362.  The Debtors have

requested that this protection be lifted, to the extent necessary, to allow them to carry out their

day-to-day business in the ordinary course, and have agreed as a matter of expediency and

fundamental fairness to allow certain actions and counterclaims asserted against them by

borrowers both in foreclosure related cases and in borrower bankruptcy cases to proceed.  A

blanket grant of stay relief that would allow borrowers to pursue any and all claims they may

have against the Debtors such as the one requested by the NACBA Objectors would eviscerate

one of the key safeguards provided to the Debtors.  Such inappropriate relief would, among other

things, risk exposing the Debtors to a multitude of suits nationwide, which borrowers may assert

solely for their nuisance value.

>    **B.    Committee Response**

>    5.    As explained in the GA Servicing Motion, Fannie Mae and Freddie Mac

are two of the Debtors' most significant clients.  Collectively, the Debtors service approximately

1,320,000 loans for Fannie Mae and Freddie Mac, which comprise approximately 83% of the

Debtors' GA Loan servicing portfolio and have an aggregate unpaid principal balance of

approximately $213 billion.  The GA Servicing Motion requests certain relief designed to assure

Fannie Mae and Freddie Mac that the Debtors can and will continue servicing those loans

postpetition in accordance with prepetition performance standards.  The Committee has raised

two objections with respect to such relief:

---

[7]    The Debtors submit that the NACBA Objectors fail to appreciate the extent of the stay modification requested
by the Debtors.

4

6.      <u>First</u>, the Committee objects to the Debtors' request for authority to continue to pay Foreclosure Timeline Penalties.  The payment of these amounts (which are relatively *de minimis* given the magnitude of the Debtors' servicing operations) is a servicing obligation of the Debtors under the GA Guides and GA Servicing Agreements.  *See* Pensabene Decl. ¶ 15.  The Committee's efforts, however well-intentioned, would result in a disruption of the Debtors' business and their critical relationships with the Governmental Associations, to the detriment of all stakeholders.

7.      <u>Second</u>, the Committee takes issue with the Metrics, which are performance thresholds agreed upon between the Debtors and Freddie Mac.  The Metrics are intended to provide Freddie Mac with comfort that the Debtors will continue to service the Freddie Mac Loans at acceptable performance levels.  The Freddie Mac Metrics were the subject of negotiations between Freddie Mac and the Debtors.  *See* Pensabene Decl. ¶ 25.  After careful consideration, the Debtors believe them to be generally reasonable and achievable by the Debtors in the ordinary course.

8.      The Debtors are continuing to work with the Committee and other parties in interest to address any remaining concerns.  The Debtors are hopeful that all open issues are capable of consensual resolution prior to the hearing on June 12.  However, the Debtors reserve their rights to supplement and amend their reply in response to any further objections that may be raised by the Committee.

## II.    CASH MANAGEMENT MOTION

9.      The purpose of section 345(b) is to ensure that the funds of a bankrupt that may be available to satisfy creditor claims are invested prudently and safely.  The Bankruptcy Code gives the Court discretion to waive the section 345(b) investment and deposit requirements

for cause.  *See* 11 U.S.C. § 345(b); 140 Cong. Rec. H10752-01 (Oct. 4, 1994) (section 345(b)

investment guidelines may be "wise in the case of a smaller debtor with limited funds that cannot

afford a risky investment to be lost, [but] can work to needlessly handcuff larger, more

sophisticated debtors").  As discussed herein, the Custodial Accounts and the restricted cash

account at Ally Bank should not be subject to the limitations set forth in section 345(b) of the

Bankruptcy Code.

　　　　　10.　　　In determining whether the "for cause" standard has been met, the Court

should consider a "totality of the circumstances," utilizing the following factors: (a) the

sophistication of the debtor's business; (b) the size of the debtor's business operations; (c) the

amount of the investments involved; (d) the bank ratings (Moody's and Standard & Poor) of the

financial institutions where the debtor in possession funds are held; (e) the complexity of the

case; (f) the safeguards in place within the debtor's own business of insuring the safety of the

funds; (g) the debtor's ability to reorganize in the face of a failure of one or more of the financial

institutions; (h) the benefit to the debtor; (i) the harm, if any, to the estate; and (j) the

reasonableness of the debtor's request for relief from section 345(b) requirements in light of the

overall circumstances of the case. *In re Serv. Merch. Co. Inc.*, 240 B.R. 894, 896 (Bankr. M.D.

Tenn. 1999).

　　　　　11.　　　As an initial matter, funds held in the Custodial Accounts are not property

of the estate.  "[T]he primary consideration in determining if funds are property of the debtor's

estate is whether the payment of those funds diminished the resources from which the debtor's

creditors could have sought payment." *See In re Enron Corp.*, 2006 WL 2400369, at *6 (Bankr.

S.D.N.Y. May 11, 2006) (citing *In re Southmark Corp.*, 49 F.3d 1111, 1117 (5th Cir. 1995).  The

legislative history of Bankruptcy Code section 541 "indicates that funds in the debtor's

ny-1044627

possession held for a third party do not become part of the estate in bankruptcy." *In re Refco, Inc. Securities Litigation*, 2009 WL 7242548, at *13 (S.D.N.Y. Nov. 13, 2009)[8].

12.    The Debtors and their non-debtor affiliates operate the fifth largest servicing business in the United States, and as part of their servicing business, the Debtors manage 3,258 Custodial Accounts.  The Custodial Accounts are included among the 3,514 Bank Accounts referenced in the Motion.[9]  The aggregate amounts in the Custodial Accounts exceed $4.6 billion.  Funds in these accounts are not included among the Debtors' assets and are not reflected on the Debtors' balance sheet. The funds in these accounts can not be used by the Debtors to repay their debts to creditors.  *See* Supp. Whitlinger Decl. ¶ 28.

13.    For each securitization trust or whole loan transaction that the Debtors service, separate Custodial Accounts are established at both the primary and master servicing levels.  The accounts are held for the benefit of the securitization trustee or whole loan investor, which owns the underlying mortgage loans.  *See* Supp. Whitlinger Decl. ¶ 29.  Moreover, the funds in the Custodial Accounts must be distributed by the Debtors to non-debtor counterparties in a manner consistent with the terms of the servicing guides and agreements, which specify the scope of the Debtors' responsibilities and duties as a servicer.  Accordingly, the Debtors have no independent discretion as to how to spend the funds in the Custodial Accounts.  The Debtors simply serve as a pass through for the funds from the borrowers to the securitization trustees and investors. *See* Supp. Whitlinger Decl. ¶ 30.

---

[8]    Attached collectively hereto as <u>Exhibit A</u> are the *Enron* and *Refco* decisions cited above.
[9]    In order to clarify any ambiguity in paragraph 7 of the Motion, the Custodial Accounts are included among the accounts identified in <u>Exhibit B</u> to the Cash Management Motion.

ny-1044627

14.    The funds in the Custodial Accounts belong to third parties, not to the

Debtors.  In addition, the Debtors' disposition of the funds is governed by the explicit terms of

pre-existing agreements negotiated at arms' length which if breached, could threaten the

Debtors' ability to continue its servicing business.

15.    Were the Court to not grant a section 345 waiver, it would be very

difficult to close certain of the Custodial Accounts that reside at non-authorized depositories

because in certain instances, the Debtors would be required to first obtain investor approval, and

in other instances, transferring of the Custodial Accounts would be in violation of the explicit

terms of servicing agreements. *See* Supp. Whitlinger Decl. ¶ 32.  Accordingly, in light of the size

of these Chapter 11 cases, the complexities of the Debtors' businesses, the amount of funds

residing in the Custodial Accounts, and the benefit to the estate and its creditors of maintaining

continuity of the Debtors' operations, there is more than adequate cause to allow the Custodial

Accounts be free of the restrictions of section 345(b) of the Bankruptcy Code.

16.    Similarly, with regards to the one non-Custodial Account that remains

open at Ally Bank, sufficient cause exists to grant a similar waiver.  Because of federal banking

regulations, specifically Regulation W, 12 CFR 223.14(D), this restricted cash account must

remain at Ally Bank.  The account has a current balance of approximately $36 million.  The

Debtors deposit funds to collateralize Ally Bank's exposure to GMAC Mortgage, LLC ("GMAC

Mortgage") based on any credit transactions between the parties.  Although the account is titled

in the name of GMAC Mortgage, Ally Bank has a control agreement in place over the funds in

the account. *See* Supp. Whitlinger Decl. ¶ 25.  Section 345(b) is intended to protect creditors'

interests, and in this case, that is exactly what is being done – the funds in the account are

dedicated to protect Ally Bank's exposure arising out of transactions with a debtor entity.

Therefore, the safeguards intended by section 345(b) are already in place.

### III.    THE MISCELLANEOUS OBJECTIONS SHOULD BE OVERRULED BECAUSE THEY ARE NOT SUPPORTED BY THE FACTS OR EVIDENCE

17.    In the Nora Obj.[10], Wendy Alison Nora (the "Objector") states that the

Debtors have made or are intending to make preferential transfers.  *See* Nora Obj. ¶ 3.  The

Debtors are seeking Court approval for the sale of their assets to two stalking horse bidders (the

"Sales").  *See* Whitlinger Aff. ¶ 7.  The Nora Obj. is without basis in this regard.

18.    The Objector also takes issue with the Debtors' request for an extension to

file their Schedules and Statement of Financial Affairs (the "Schedules").  *See* Nora Obj. ¶ 8.

The Debtors sought, and received, a brief adjournment of time to file their Schedules to June 30,

2012.  Adjournments of much greater length are routinely granted in a case this size.[11]

19.    The Objector also disparages the Debtors' business practices.  *See* Nora

Obj. ¶ 4.  The Objector's mischaracterization of the Debtors' business practices are not supported

by any evidence, and the Debtors deny each of the assertions with respect to their business

practices.  Moreover, those allegations are not a basis to delay the Debtors' requests for relief.

Finally, to the extent the Debtors may have engaged in any objectionable practices in the past, as

a result of the April 13, 2011 Consent Order[12], the Debtors have made numerous improvements

to various aspects of their businesses.  *See* Whitlinger Aff. ¶ 89.  Further, on February 9, 2012,

---

[10]    The Nora Objection amends the two earlier objections requesting similar relief. [Dkt Nos. 118 and 121].

[11]    *See, e.g., In re Eastman Kodak Co.*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 19, 2012)[Dkt No. 48]; *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2012) [Dkt No. 62]; *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 15, 2010) [Dkt No. 80].

[12]    The Consent Order was entered into by and between the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Company, Residential Capital, LLC ("ResCap"), GMAC Mortgage, AFI and Ally Bank (the "Consent Order").

AFI, ResCap, and certain other of the Debtors, reached an agreement in principle with the federal government, 49 state attorneys general, and 48 state banking departments with respect to potential claims of the government parties arising out of origination and servicing activities and foreclosure matters (the "DOJ/AG Settlement").[13]  The Debtors intend to comply with all of their obligations under the Consent Order and DOJ/AG Settlement.

20.    The Nora Obj. further states that the Objector holds a contingent litigation claim (the "Claim")[14] in an amount greater than $10 billion dollars, which should have been included in the schedule of the Debtors' fifty largest creditors (the "Top 50").  *See* Nora Obj. ¶ 11.  The Claim is not listed on the Debtors' books and records in the amount asserted by the Objector.  Moreover, the alleged evidence of the Objector's claims is not a basis to deny the Debtors' relief.

21.    Lastly, the Nora Obj. also objects to the Court's approval of the Debtors' cash management practices, specifically the granting of administrative expense status for intercompany claims.  *See* Nora Obj. ¶ 8.  To the extent one Debtor advances money to another Debtor, its claim should be granted administrative expense status to ensure that value remains with the proper Debtor entities.

---

[13]    Pursuant to the DOJ/AG Settlement, ResCap paid approximately $110 million to a trustee, who is to distribute all such settlement funds to federal and state governmental entities.  In addition, AFI, ResCap and the other Debtors committed to provide a minimum of $200 million towards borrower relief and to participate in certain other programs.  *See* Whitlinger Aff. ¶89.

[14]    According to the Objection, the Claim arose in connection with an action brought by the Objector against one of the Debtors, which is pending in the United States District Court for the Western District of Wisconsin

## CONCLUSION

Accordingly, for the reasons set forth herein the Debtors respectfully request that

the Court overrule the Objections and grant such other and further relief as it deems just and

proper.

Dated: June 8, 2012
New York, New York

/s/ Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

11

ny-1044627

## EXHIBIT A

Westlaw.

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.
In re ENRON CORP., et al., Debtors.
Enron Corp. and National Energy Production Corpo-
ration, Plaintiffs,
v.
Granite Construction Co, Defendant.

Bankruptcy No. 01–16034 (AJG).
Adversary No. 03–93172 (AJG).
May 11, 2006.

Opinion on motion to dismiss filed by the defendant,
Granite Construction Co.

Jonathan Hook, Esq., Togut, Segal & Segal LLP, for
Debtors.

Sanjit Shah, Esq., Mound Cotton Wollan, for Defen-
dant.

**Minutes of Proceedings**
ARTHUR J. GONZALEZ, Bankruptcy Judge.
**\*1** For the reasons set forth in the opinion at-
tached hereto as Exhibit A, the relief sought is:

Granted in part and denied in part.

Exhibit A
The issue now before the Court is whether to
grant the motion to dismiss (the "Motion to Dis-
miss") the amended complaint (the "Amended Com-
plaint") pursuant to Rules 9(b) and 12(b)(6) of the
Federal Rules of Civil Procedure filed by the defen-
dant Granite Construction Company (the "Defen-
dant," alternatively, "Granite") against plaintiffs En-
ron Corp. ("Enron") and one of its affiliates, National
Energy Production Corporation ("NEPCO," collec-
tively with Enron, the "Plaintiffs").

On or about August 31, 2001, Defendant sent an
invoice (the "Invoice") to NEPCO demanding a
payment of $374,777.50 for construction work pro-

vided to NEPCO in connection with site preparation
at NEPCO's Panda Gila River, L.P. project ("Panda
Gila"). The Invoice required payment upon receipt.

By an electronic transfer (the "Transfer") or-
dered October 31, 2001, and completed on November
2, 2001, Enron satisfied the Invoice for the full
amount of $374,777.50. The Transfer occurred as
part of a larger wire transfer of funds to Granite. The
total amount of that wire transfer was $756,913.66.

As indicated in Enron accounts payable comput-
erized ledger reports and the bank statement, the
funds were drawn and electronically transferred from
bank account number 4080–7423 (the "Bank Ac-
count") to Defendant. Enron opened the Bank Ac-
count and held legal title to the Bank Account until it
transferred ownership thereof to Enron Engineering
& Construction Company ("EECC"), on November
26, 2001, almost one month after the date of the
Transfer.

On December 2, 2001, Enron and certain of its
various affiliates (the "Debtors") filed voluntary peti-
tions for relief under chapter 11 of Title 11 of the
United States Code, 11 U.S.C. § 101, et seq. (the
"Bankruptcy Code"). On May 20, 2002, NEPCO
filed its Chapter 11 petition.

On July 15, 2004, the Court entered an order
confirming the Debtors' Supplemental Modified Fifth
Amended Joint Plan of Affiliated Debtors (the
"Plan"). The Plan became effective on November 17,
2004. The assets of Enron and NEPCO were not sub-
stantively consolidated under the Plan.

In the financial statements initially filed with the
Court, neither Enron nor NEPCO named Granite as a
creditor to whom a transfer was made within ninety
days of the filing of the respective petitions. Rather,
NEPCO's statement names Granite as a subcontractor
to whom payment was made by a project owner on
behalf of NEPCO.

On November 18, 2003, Plaintiffs commenced
the Adversary Proceeding against Granite by filing
the original complaint (the "Original Complaint")

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))**

seeking to recover the Transfer as a preferential and/or a fraudulent transfer pursuant to sections 547(b), 548(a)(1)(B) and 550 of the Bankruptcy Code. The Original Complaint, in an attached exhibit, Exhibit A, listed the Transfer in the amount of $37,906.38.

**\*2** Thereafter, Plaintiffs discovered what it listed as the amount in the Original Complaint was a clerical error and, subsequently, on February 25, 2004, Plaintiffs amended the Original Complaint to reflect what the Plaintiffs assert is the correct amount of the Transfer—$374,777.50.

On March 3, 2005, the Defendant filed the Motion to Dismiss claiming, among other things, that Plaintiffs have failed to state a cause of action for which relief may be granted. The Defendant argues that Enron's preference claim should be dismissed on the grounds that Enron has no standing under section 547(b) to avoid a transfer by NEPCO and, since NEPCO is the proper party to bring this claim under section 547, it should be dismissed because the transfer occurred more than ninety days before NEPCO's May 20, 2002 petition. Furthermore, the Defendant argues that if the case were considered in the context of substantive consolidation the most the plaintiffs could recover would be the amount listed in the Original Complaint, $37,906.38. The Defendant makes the assertion because the Amended Complaint was filed more than two years after the December 2, 2001 petition date, and the Original Complaint is too vague to give notice and too indefinite for the Amended Complaint to relate back to the Original Complaint pursuant to Rule15(c)(2). Further, the Defendant argues that Enron and NEPCO's fraudulent conveyance claims should be dismissed on the grounds that, pursuant to Rule 9(b), fraud must be pleaded with particularity; and that the Amended Complaint should be dismissed with prejudice because NEPCO's preference claim on the Transfer was made more than ninety (90) days prior to NEPCO's filing for Chapter 11 relief and because Enron did not make the Transfer.

On March 28, 2005, Plaintiffs submitted their response. The Plaintiffs claimed that the monies paid were property of Enron, and that ample evidence supported the constructive fraudulent conveyance allegations contained in the Amended Complaint. Furthermore, Plaintiffs contend that the liberal plead-

ing requirements as set forth in Rule 8(a) would not suggest that this case be dismissed and that Rule 8(a) applies to pleadings in constructive fraud claims and not Rule 9(b). The Plaintiffs also counter the charge that the fraudulent conveyance claim was not sufficiently pleaded. The Plaintiffs assert that the Amended Complaint sets forth the date, amount and mode of the Transfer of Enron property. Furthermore, Plaintiffs argue that Defendant's assertion, that the amount of any recovery should be limited to the amount stated in the Original Complaint, $37,906.38, rather than the amended amount, $374,777.50, is misguided. If the Court considers whether the amended pleading here "relates back" to the earlier pleading for the purposes of Rule 15(c)(2), Plaintiffs argue the Defendant was given sufficient notice of the correct amount. The Plaintiffs assert that the Amended Complaint alleges sufficient facts to sustain Enron's fraudulent transfer claim. However, should the Court deem it appropriate, Plaintiffs request it be permitted to provide Defendant with a more definite statement, with an opportunity to replead as to Enron's fraudulent transfer claim.

**\*3** On March 30, 2005, the Defendant submitted memorandum of law in support of its Motion to Dismiss the Amended Complaint with prejudice. The Defendant argues that the Transfer could not be considered property of Enron's estate; therefore, the preference action should be dismissed. Additionally, NEPCO's section 547 preference claim should be dismissed because the Transfer occurred more than ninety days before NEPCO's May 20, 2002 bankruptcy petition. Furthermore, the Defendant asserts that the Amended Complaint cannot relate back to the Original Complaint, thus fulfilling the notice requirements of Rule 15(c)(2), since the Original Complaint provided no detail about the Transfer. Furthermore, the Amended Complaint should be dismissed because it does nothing more than allege "bald assertions and conclusions of law," which is insufficient to withstand a Rule 12(b)(6) motion to dismiss.

On March 31, 2005, the Court heard arguments regarding the Motion to Dismiss.

At this time, the Court addresses the Defendant's Motion to Dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))**

Fed. R. Bankr.P. 7012 has made Rule 12(b)(6) applicable in bankruptcy proceedings. Under Rule 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief ... When determining the sufficiency of the plaintiff's claim, the court 'must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally.' " In re Sharp International, 278 B.R. 28, 33 (Bankr.E.D.N.Y.2002), quoting Gregory v. Daly, 243 F.3d 687, 691 (2d Cir.2001) (citing Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir.2000)).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. Walker v. City of New York, 974 F.2d 293, 298 (2d Cir.1992). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. Id.

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Thus, where more specific allegations of the complaint contradict such legal conclusions, "[g]eneral, conclusory allegations need not be credited...." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir.1995). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. Friedl v. City of New York, 210 F.3d 79, 85–86 (2d Cir.2000).

**\*4** "Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998). Pursuant to Rule 8(a), which is made applicable to adversary proceedings by Fed. R. Bankr.P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). The simplicity

required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. Id. at 47–48. Based upon the liberal pleading standard established by Rule 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir.1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. Id.

In reviewing a Rule 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken; Brass v. Am. Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir.1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. Cortec Indus. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir.1991). However, mere notice or possession of the document is not sufficient. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002). Rather, a necessary prerequisite for a court's consideration of the document is that a plaintiff relied "on the terms and effect of a document in drafting the complaint." Id. As such, the document relied upon in framing the complaint is considered to be merged into the pleading. Id. at 153 n. 3 (citation omitted). In contrast, when assessing the sufficiency of the complaint, courts will not consider extraneous material because considering such would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. Id. at 154. Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under Fed.R.Evid. 201. In re Merrill Lynch & Co., Inc., 273 F.Supp.2d 351, 357 (S .D.N.Y.2003), citing Chambers, 282 F.3d at 153

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence, which may be offered to support it. Cooper v. Parsky, 140 F.3d at 440.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))**

**\*5** Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of the material allegations in the Amended Complaint.

The Court will first consider the fraudulent conveyance claim asserted against the Defendant by the Plaintiffs. Specifically, the Court must initially determine the amount of specificity that needs to be plead at this stage of litigation for a constructive fraudulent conveyance cause of action under section 548(a)(1)(B), to survive the Defendant's Motion to Dismiss. The Defendant contends that the more stringent pleading requirements as set forth in Rule 9(b) should be applied while the Plaintiffs argue for the more liberal application found in Rule 8(a). "While there is authority to the contrary, the better and majority rule is that a claim for constructive fraud under § 548(a)(1)(B) need not be pleaded with particularity, as the claim is not premised on fraud but on a transfer made for inadequate consideration at a time the transferor was insolvent." *In re Ticketplanet.com,* 313 B.R. 46, 68 (Bankr .S.D.N.Y.2004). The reason behind the more liberal application in Rule 8(a) is due to *scienter* not being an element of constructive fraud. *In re Ticketplanet.com,* 313 B.R. at 68, quoting *China Resource Prods. (USA), Ltd. v. Fayda Int'l, Inc.,* 788 F.Supp. 815, 819 (D.Del.1992). "Constructive fraudulent conveyance claims do not require proof of fraud or even wrongdoing. The cause of action is based on the transferor's financial condition, the value given in exchange for the transfer, and the terms and conditions of the transaction. *In re White Metal Rolling & Stamping Corp.,* 222 B.R. at 428. The purpose behind Rule 9(b), to protect the defendant's reputation and to guard against strike suits, has little relevance where the claim is not based on any kind of fraud. As the Court in *White Metal* stated, 'the sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery and defend against the charges.' Rule 9(b) does not apply to the constructive fraud claims...." *In re Actrade Financial Technologies Ltd.,* 337 B.R. 791, 802 (Bankr.S.D.N.Y.2005), quoting *In re White Metal Rolling & Stamping Corp.,* 222 B.R. 417, 428 (Bankr.S.D.N.Y.1998) citing *SIPC v. Stratton Oakmont,* 234 B.R. 293, 319 (Bankr.S.D.N.Y.1999).

This Court has recognized the use of Rule 8(a) when dealing with a motion to dismiss, under Rule 12(b)(6), for a constructive fraud cause of action brought under section 548(a)(1)(B). *In re Enron Corp.,* 323 B.R. 857, 861–862 (Bankr.S.D.N.Y.2005). The Court does not see any reason to break with its precedent in applying Rule 8(a) in evaluating the pleadings in a constructive fraudulent conveyance matter herein. Therefore, the Court finds the applicable pleading standard in this matter is the one set forth in Rule 8(a).

The Bankruptcy Rules only require a petitioner to set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Rule 8(a), which is made applicable herein by Fed. R. Bankr.P. 7008. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id.,* 355 U.S. at 47–48. Based upon the liberal pleading standard established by Rule 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. *Id.*

**\*6** The power of the debtor in possession to bring a fraudulent conveyance action is found in section 548(a)(1)(B). "Section 548 of the Bankruptcy Code, 11 U.S.C. § 548, sets forth the powers of a trustee in bankruptcy (or, in a Chapter 11 case, a debtor in possession) to avoid fraudulent transfers. It permits to be set aside not only transfers infected by actual fraud but certain other transfers as well-so-called constructively fraudulent transfers. The constructive fraud provision at issue in this case applies to transfers by insolvent debtors. It permits avoidance if the trustee can establish (1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received 'less than a reasonably equivalent value in exchange for such transfer.' " *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 535 (1994), quoting 11 U.S.C. § 548.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))**

The first element of this analysis is one that has been heavily called into question in these proceedings. The Court must consider whether the Amended Complaint properly alleged that the Transfer in this matter actually involved property of Enron being transferred to the Defendant. More specifically, the Court considers whether the Bank Account from which the Transfer was made was sufficiently alleged to be property of the Enron estate.

The Court discussed the parameters of determining property of the bankruptcy estate in *Begier v. I.R.S., 496 U.S. 53 (1990)* noting, "[t]he Bankruptcy Code does not define 'property of the debtor.' Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate-the property available for distribution to creditors 'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings. For guidance, then, we must turn to § 541, which delineates the scope of 'property of the estate' and serves as the postpetition analog to *§ 547(b)*'s 'property of the debtor.' " *Begier v. I.R.S., 496 U.S. 53, 58–59 (U.S.1990).*

Courts have generally held that for certain funds held in a bank or checking account to be considered property of the estate the debtor must have the requisite control over those funds. *In re Southmark Corp., 49 F.3d 1111, 1117 (5th Cir.1995)*, citing *Coral Petroleum, Inc. v. Banque Paribas–London, 797 F.2d 1351, 1358 (5th Cir.1986), In re Coutee, 984 F.2d 138, 141 & n. 3 (5th Cir.1993), In re Kemp Pac. Fisheries, Inc., 16 F.3d 313, 316–17 (9th Cir.1994)*, and *In re Chase & Sanborn Corp., 813 F.2d 1177, 1181 (11th Cir.1987).*

Evidence of controlling ownership interest in a bank account has been found where one party holds the legal title thereto, "all indicia of ownership, and unfettered discretion to pay creditors of its own choosing, including its own creditors," even where the same account contains commingled funds. *In re Southmark Corp., 49 F.3d at 1116.* For purposes of *sections 547(b)* and *548(a) of the Bankruptcy Code*, it is the transferor's control of the funds in the account and not the actual ownership that is dispositive. *In re Southmark Corp., 49 F.3d at 1117; Cassirer v. Her-*

skowitz ( *In re Schick), 234 B.R. 337, 342 (Bankr.S.D.N.Y.1999)*; *Stevenson v. J.C. Bradford Co. ( In re Cannon), 277 F.3d 838, 849 (6th Cir.2002).* "[T]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment." *In re Southmark Corp., 49 F.3d at 1116–1117.*

**\*7** Where the account is a cash management account, with proper bookkeeping allocations, the holder of all the indicia of control is the holder of the interest. *In re Regency Holdings (Cayman), Inc., 216 B.R. 371, 377 (Bankr.S.D.N.Y.1998).* In contrast, a parent's control, through an ownership structure or other corporate governance mechanism, of a subsidiary entity, does not constitute control of the subsidiary's assets, such as a bank account, where there is no legal title to a subject asset held by the parent. *Id . at 376.* A bankruptcy trustee has the burden of demonstrating that the debtor held the legal title to a bank account and control over the use of the account. *In re Schick, 234 B.R. at 343.*

In *In re Amura Corp., 75 F.3d 1447, 1451 (10th Cir.1996)*, the Tenth Circuit presumed, despite arguments to the contrary, that the deposits in a bank to the credit of the debtor were property of the estate. The court in *Amura,* considered the debtor's prepetition right to spend the money entirely as it saw fit. The account in question in *Amura,* was held in the name of the parent company, over that of its subsidiaries. The court in *Amura,* did not find it fatal, to the contention that the account was property of the parent corporation, that the parent corporation used the funds in the account to meet its own obligations and that of its subsidiary. *In re Amura Corp., 75 F.3d 1447, 1451 (10th Cir.1996).*

Here the similar question is whether the Amended Complaint sufficiently alleges facts related to Enron's control of the funds for the Court to evaluate the legal feasibility of the complaint while recognizing that a plaintiff need not make the complaint itself prove the allegations. *Koppel, 167 F.3d at 133; Cooper, 140 F.3d at 440.*

Enron contends that it owned the checking account at the time of the Transfer, and, therefore, the monies transferred to the Defendant in payment of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))**

the Invoice were property of Enron. To support its contention, it offers two affidavits by corporate officers of Enron asserting the control that Enron and its officers had over the account. Additionally, Enron has submitted bank account statements that show Enron on the account and the transfer papers that eventually turned over control of the account in question from Enron to it subsidiary. The Court will not make determinative conclusions of fact at this stage of the proceeding. Rather, the Court considers only, for the purposes of alleging sufficient facts, that at this time the submissions would suggest that, at the time of the pre-petition transfer, the debtor had the requisite control over the account to make payments for itself and that of its subsidiaries.

Under the liberal pleading requirements of Rule 8(a), the Court finds that the Plaintiffs have adequately plead that Enron had ownership in and controlled the account from which the Transfer was made. Thus, the Court accepts, for the purposes of this motion, that property of Enron was transferred to the Defendant.

**\*8** As to the other elements of the constructive fraudulent conveyance action, the Court finds that the Amended Complaint put the Defendant on notice as to the Plaintiffs' cause of action brought under section 548(a)(1)(B). The Amended Complaint set the date of the alleged fraudulent conveyance as October 31, 2001, the amount as \$374,777.50, and the mode of the Transfer as wire. In looking at the time period of the transfer, it is clear that the Transfer occurred within one year of the date of Enron's petition. The Plaintiffs also allege in their Amended Complaint that it received less than the equivalent value in exchange for the Transfer. Additionally, the Plaintiffs assert, upon information and belief, the insolvency of the Plaintiffs at the time of the Transfer. Since the issue of Enron's insolvency comes before the Court as part of a Rule 12(b)(6) motion, in consideration with Rule 8(a), the Court finds that this element has been plead adequately.

Thus, the Amended Complaint contains allegations for each of the four elements of a fraudulent conveyance action and does more then "parrot" the language of the statute.

As stated previously, the Court finds that under the liberal pleading standard as set forth in Rule 8(a),

the Plaintiffs have met the requirements to provide the Defendant with sufficient notice as to the allegations it will be called upon to defend. Therefore, drawing all factual inferences in favor of Enron, Enron has alleged a legally cognizable claim, and consequently, the Motion to Dismiss is denied, with respect to Enron.

With regard to NEPCO's constructive fraudulent conveyance action the Court grants the Defendant's Motion to Dismiss. The Plaintiffs argument centers on the checking account being property of Enron's estate. Although the Plaintiffs in the Original and Amended Complaint assert that the property is that of the "Plaintiffs," collectively Enron and NEPCO, the Plaintiffs only appear to argue in its memorandum of law and at the hearing held on March 31, 2005, that the Bank Account belonged to and was control by Enron. Assuming, in the alternative, the Plaintiffs also argue that the Bank Account was also part of NEPCO's estate, that cause of action is dismissed for insufficient pleadings under Rule 12(b)(6) in accordance with Rule 8(a), as the Plaintiffs have not plead all the elements of section 548(a)(1)(B) regarding NEPCO as plaintiff. Specifically, the Plaintiffs have failed to allege that NEPCO did not receive "reasonable equivalent value," as such is an element of a constructive fraud cause of action. Therefore, the Motion to Dismiss as to NEPCO's fraudulent conveyance action is dismissed.

The next issue is whether the preference action brought by the Plaintiffs under section 547(b) should be dismissed. "Under 11 U.S.C. § 547(b), the trustee for the debtor may void certain money transfers from the debtor to a creditor if those transfers occurred during the 90 days prior to the bankruptcy petition." *Gold Force Intern., Ltd. v. Official Committee of Unsecured Creditors of Cyberrebate.com, Inc., 2004 WL 287144, 1 n. 1 (E.D.N.Y.2004).*

**\*9** Even assuming the liberal pleading standards and deference that is granted in a motion to dismiss, the Court finds that the preference action should be dismissed. During the course of the oral arguments held on March 31, 2005, the Plaintiffs conceded that this was essentially a constructive fraudulent conveyance case and not a preference action under section 547. The Plaintiffs also noted during oral arguments that the preference action for the Transfer was clearly outside the ninety-day look back period for NEPCO.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))**

The debt here was for a legitimate debt owed by the debtor, NEPCO, but the Transfer does not appear to involve the transfer of NEPCO's property and was not within the ninety-day look back period from NECPO's petition date. Alternatively, in the case of Enron, this was a debt paid within the look back period of ninety days from Enron's date of petition, and appears to involve property of Enron, but the payment was not for a debt of Enron.

Assuming all of the facts, including those conceded at the oral argument held on March 31, 2005, in the light most favorable to the Plaintiffs, and drawing all reason inferences in favor of the Plaintiffs, the Court finds that the motion to dismiss regarding the preference action should be granted as no set of facts can be established to entitle the Plaintiffs to relief. *Walker*, 974 F.2d at 298.

The Defendant also notes that Enron did not list Granite as a creditor to whom Enron made a transfer within ninety days of it filing. Rather, NEPCO's statement names Granite as a subcontractor to whom a payment was made by a project owner on behalf of NEPCO. The objection to this lack of information appears to primarily revolve around the preference action brought by Enron, in that Granite is not listed as a creditor to whom Enron made a transfer within ninety days of filing its petition.

In a chapter 11 case, the debtor has the obligation to file by the required schedules and statements; the debtor in possession then inherits the schedules filed the debtor. §§ 1107(a) and 1106(a)(2). "The schedules and statements should be prepared with reasonable diligence ... [while] minor errors that do not result in giving a deceptive impression or other prejudice should not be the basis for limiting the debtor's rights." 9 *Collier on Bankruptcy* ¶ 1007.03 [1], at 1007–11 (15th Ed.2004). To obtain the overall benefits of chapter 11 reorganization, the Bankruptcy Code should not be construed as a "minefield" to the debtor. *In re Landing Assocs., Ltd.,* 157 B.R. 791, 811 (Bankr.W.D.Tex.1993).

In a chapter 11 case, section 1107(a) of the Bankruptcy Code grants the debtor in possession the powers of the trustee, including the power to avoid transfers of a debtor's interest in property under sections 547(b) and 548. §§ 1107(a), 547(b)(a). "The purpose of the requirement of filing a statement of financial affairs is to furnish the trustee ... with detailed information about the debtor's financial condition, thereby saving the expense of a ... long and protracted examination." 4 *Collier on Bankruptcy* ¶ 521.09.9, at 521–35 (15th Ed.2005)(noting *United States v. Stone,* 282 F.2d 547 (2d Cir.1960).

**\*10** While sections 547 and 548 of the Bankruptcy Code refer to "transfers," neither section references section 521(1) or rule 1007(b). *See e.g.* *In re DeLash,* 260 B.R. 4,10 (Bankr.E.D.Cal.2000). Therefore, nothing in sections 547 or 548 limits the avoidable interest of the debtor in property to payments scheduled pursuant to section 521(1). *In re Delash,* 260 B.R. at 10.

Because a trustee, or under certain circumstances a debtor in possession, may often face obstacles in sorting through books and records of a distressed debtor, the Court will not seek to impose a heightened pleading standard for constructive fraudulent conveyance matters. Instead, as noted above, the Court will apply the general standard as set forth in Rule 8. Therefore, whether Granite was listed, as a creditor to whom Enron made a transfer to on Enron's statement of financial affairs is not dispositive.

The allegations set out in the Amended Complaint were sufficient to provide Granite with notice of the claim because the allegations sufficiently allowed the defendant to answer upon a search of its records for the relevant receipt of the Transfer. Consequently, whether the payment appeared in the Plaintiffs' Statement of Financial Affairs would add little to the sufficiency of the Complaint and, therefore, the failure to list the transfer at issue in not determinative.

Finally, the Court considers whether the amount of $374,777.50 as sought in the Amended Complaint will be allowed to "relate back" under Rule 15(c) or whether the amount of $37,906.38 as listed on the Original Complaint will be the amount at issue. The primary issue for the Court in determining whether the Amended Complaint should relate back to the previously filed complaint is whether or not the earlier Original Complaint put the Defendant on notice of the cause of action being brought against it. Rule 15(c), made applicable by Fed. R. Bankr.P. 7015, provides in relevant part: "An amendment of a pleading relates back to the date of the original pleading

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))**

when ... (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Courts will not consider the subjective state of mind of what one party was thinking when it filed their original pleadings but will rather objectively consider whether the original pleadings put the other party on notice as to the cause of action being asserted against it. *In re Kam Kuo Seafood Corp.,* 67 B.R. 304, 306 (Bankr.S.D.N.Y.1986). "Under Fed.R.Civ.P. 15(c)(2), an amended pleading 'relates back' to an earlier pleading if the amended pleading sets forth claims arising out of the same conduct, transaction or occurrence set forth or attempted to be set forth in the earlier pleading. 'The principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party 'by the general fact situation alleged in the original pleading.' ' " *In re Alicea,* 230 B.R. 492, 498–499 (Bankr.S.D.N.Y.1999), citing *In re Chaus Sec. Litig.,* 801 F.Supp. 1257, 1264 (S.D.N.Y.1992) (quoting *Contemporary Mission, Inc. v. New York Times Co.,* 665 F.Supp. 248, 255 (S.D.N.Y.1987).

*\*11* Courts generally allow amending pleadings to relate back where the new submissions only further expand upon a prior factual assertion already made. "New allegations in the amended pleading relate back if they amplify the facts alleged in the original pleading or set forth those facts with greater specificity. A revised pleading will also relate back if it asserts new legal theories based on the same series of transactions or occurrences. Conversely, the amended complaint will not relate back if it is based on new facts and different transactions." *In re Alicea,* 230 B.R. at 498–499 (internal citations omitted).

Expanding upon a cause of action that was already asserted in the original pleadings is permissible. This includes increasing the amount of damages sought on the originally filed cause of action. "It has thus been established that an amended complaint will relate back notwithstanding the bar of the statute of limitations if it merely adds a new legal ground for relief, changes the date and location of the transaction alleged, or spells out the details of the transaction originally alleged. An amendment merely increasing the *ad damnum* clause also will relate back." *In re Kam Kuo Seafood Corp., 67 B.R. at 305–306* (internal citations omitted).

This Court follows the view of the Second Circuit of not dismissing a matter on a technicality. Rather, Rule 15 should be construed liberally, so a pleading can be amended where the opposing party should have already been on notice as to a special allegation. "The text of Rule 15 makes explicit Congress's intent that leave to amend a complaint 'shall be freely given when justice so requires .' Fed.R.Civ.P. 15(a). The purpose of Rule 15 'is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities.' " *Siegel v. Converters Transp., Inc.,* 714 F.2d 213, 216 (2d Cir.1983), quoting 6 C. Wright & A. Miller, Federal Practice and Procedure, § 1471, at 359 (1971). Accordingly, Rule 15(c) provides in part, "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. We held over forty years ago that Rule 15(c) was to be liberally construed, particularly where an amendment does not 'allege a new cause of action but merely ••• make[s] defective allegations more definite and precise.' " *Siegel v. Converters Transp., Inc.,* 714 F.2d at 216, quoting *Glint Factors, Inc. v. Schnapp,* 126 F.2d 207, 209 (2d Cir.1942), citing *Foman v. Davis,* 371 U.S. 178, 182 (1962).

The general factual allegations made in the original pleading must be enough to put the opposing party on notice as to the potential action that awaits it. "One test that many courts have employed in order to determine whether an amendment to pleadings will relate back is to determine whether the initial complaint put the defendants, both current and proposed, on notice of what must be defended against in the amended pleadings ... This test does not require that the prior complaint put the defendants on notice of new or additional legal theories that the plaintiffs seek to assert against the defendants, but it must inform the defendants of the facts that support those new claims." *In re Everfresh Beverages, Inc.,* 238 B.R. 558, 573–574 (Bankr.S.D.N.Y.1999).

*\*12* The Defendant here had notice of the potential action that awaited it in the Amended Complaint. The amount alleged in the Original Complaint was based upon a payment made by a wire transfer that the Plaintiffs identified. It satisfied, among other

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 2400369 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 2400369 (Bkrtcy.S.D.N.Y.))**

things, a specific invoice, previously defined as the
Invoice, issued by Granite to NEPCO. When the De-
fendant looked at its records upon receipt of the
Original Complaint, it would have found a record of
a wire transfer in the amount of $756,913.66 on or
around the date of October 31, 2001, as indicated in
the Original Complaint. Presumably, Granite would
have checked to see what invoice, or invoices, re-
garding Enron and NEPCO may have been satisfied
as a result of that wire transfer. That inquiry would
have revealed that an amount due of $374,777.50
regarding the Invoice issued to NEPCO was satisfied.
Therefore, the Court finds that the Defendants knew,
or should have known, that but for the mistake of the
Plaintiffs, that the amount at issue would have been
$374,777.50, not $37,906.78 as indicated in the
Original Complaint. Given the liberal manner in
which courts generally allow for pleadings to relate
back, the Court finds that the Amended Complaint
relates back to the Original Complaint for the pur-
poses of establishing the amount at issue.

For the foregoing reasons, the Motion to Dismiss
is granted regarding both NEPCO causes of action.
The Defendant's Motion to Dismiss is granted as to
the preference action brought by Enron, but is denied
as to the fraudulent conveyance action brought by
Enron. The Amended Complaint will relate back for
purposes of the amount at issue. Therefore, the
amount at issue is $374,777.50.

Bkrtcy.S.D.N.Y.,2006.
In re Enron Corp.
Not Reported in B.R., 2006 WL 2400369
(Bkrtcy.S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re REFCO, INC. SECURITIES LITIGATION.
George L. Miller, Chapter 7 Trustee for the Estate of
Suffolk, LLC, Plaintiff
v.
CSFB, Lab Morgan Corporation, ML IBK Positions,
Inc., Defendants.

No. 07 MDL 1902 GEL, 09 Civ. 2885 GEL, 09 Civ.
2990 GEL, 09 Civ. 2922 GEL.
Nov. 13, 2009.

REPORT AND RECOMMENDATION OF THE
SPECIAL MASTER

CAPRA, J.

**\*1** This is a report and recommendation to Hon.
Jed S. Rakoff concerning motions brought by the
defendants (collectively, the "Bank Defendants") to
dismiss the complaints filed against each by George
Miller as Trustee for the Estate of Suffolk LLC
("Suffolk") .[FN1] The Complaint seeks to avoid trans-
fers of funds to the Bank Defendants as part of a
transaction in which Suffolk acquired stock of Plus-
Funds Group, Inc. ("PlusFunds"). According to the
Complaint the PlusFunds shares were worth far less
than the amount paid by Suffolk for those shares.
Complaint ¶ 1. The purchase of the PlusFunds shares
was essentially funded by a loan of $204 million
made to Suffolk by Refco Capital LLC ("Refco").
Complaint ¶ 8.

> FN1. The Plaintiff filed a complaint against
> each defendant. As the complaints are iden-
> tical for purposes of this motion, they are re-
> ferred to collectively as the Complaint.

The facts surrounding the fall of Refco have
been recounted in a number of opinions by Judge
Lynch. See, e.g., *Kirschner v. Grant Thornton,* 2009
WL 996417 (S.D.N.Y. Apr. 14, 2009). To the extent
necessary for background on the instant motions,
familiarity with the financial schemes of Refco is
presumed.

The Complaint alleges that Suffolk was created
in order to purchase the shares of PlusFunds, an in-
vestment advisor that offered investment vehicles to
qualified investors, including the SPhinX family of
hedge funds; that the purchase of PlusFunds shares
was funded in large part by a loan of $204 million
made to Suffolk by Refco; that Suffolk was thinly
capitalized; and that Suffolk's principal assets after
the purchase of PlusFunds shares was the shares
themselves. Complaint ¶ 30–32. The Complaint al-
leges that the PlusFunds Shares were "of little or no
value" and that because Suffolk had no assets of its
own "and funded the PlusFunds Tender Offer with
money it borrowed from (and owed to) Refco, Suf-
folk rendered itself insolvent." Complaint ¶ 35.

Refco filed an involuntary petition against Suf-
folk, for relief under chapter 7 of the Bankruptcy
Code, on March 16, 2007; the Bankruptcy Court for
the District of Delaware entered an order for relief on
April 11, 2007, and the Plaintiff was appointed Trus-
tee on April 17, 2007. Complaint ¶¶ 11–13.

Plaintiff brings four counts for relief:

• Count 1 alleges a constructive fraudulent transfer
and seeks avoidance under Sections 548(a)(1)(B)
and 550 of the Bankruptcy Code.

• Count 2 alleges actual fraud in the transfer and
seeks avoidance under Sections 548(1)(1)(A) and
550 of the Bankruptcy Code.

• Count 3 seeks avoidance under New York law,
pursuant to Section 544(b) of the Bankruptcy Code
and New York Debtor Creditor Law § 270 et seq.

• Count 4 seeks recovery for unjust enrichment.

*As further developed and explained below, the
Special Master makes the following recommenda-
tions with respect to the four counts:*

• Counts 1 and 3 should be *dismissed with preju-
dice.* The purchase of PlusFunds shares is protected

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

from the trustee's avoidance powers by the "safe harbor" for settlement payments under 11 U.S.C. § 546(e).

**\*2** • The safe harbor provision does not apply to Count 2, which alleges actual fraud. The Plaintiff's claim of fraud is, however, thinly pleaded in a number of material respects, leaving questions about:

— whether there is any legitimate creditor who would benefit from the claim.

— whether Suffolk was anything more than a conduit for the sale of PlusFunds shares.

— whether the purchase of PlusFunds shares was a fraudulent transaction.

The Plaintiff must make a plausible showing on each of the above factors to survive a motion to dismiss. The Plaintiff has not pleaded sufficient facts to make a plausible showing that there is a legitimate creditor, or that Suffolk was more than a conduit. The question is closer on whether the Plaintiff has pleaded sufficient facts to make a showing that the purchase of PlusFunds shares was a fraudulent transaction. However, because leave to amend should be liberally granted, I recommend that Plaintiff be given such leave in order—if possible—to identify, with a specific factual basis, the existence of a legitimate creditor; the control that Suffolk had over the proceeds of the loan and the purchase of the PlusFunds shares; and the facts supporting an inference that the transaction was done with the intent to defraud a creditor of Suffolk.

• Plaintiff has abandoned Count 4, the unjust enrichment claim, subject to a concession from the Bank Defendants that an actual contract governed the Tender Offer for the PlusFunds shares. The Bank Defendants have so conceded for the purposes of this action.[FN2] Therefore the unjust enrichment claim must be dismissed with prejudice.

> **FN2.** The Plaintiff's abandonment of the unjust enrichment claim, subject to the Bank Defendants' concession that a contract governed the purchase of the PlusFunds shares, is found in Plaintiff's Memorandum of Law

in Response to Defendants' Motion to Dismiss the Complaint at 45. The Bank Defendants' concession on the contract point is found in the transcript of oral argument on the motion to dismiss at 16–17:

> PROFESSOR CAPRA: Plaintiff's Memorandum of Law * * * says "The trustee's willing to waive this count * * * if the Bank Defendants do not challenge the issue of whether an actual contract governs the tender offer." Are you challenging that issue?

> MR. ANKER: We do not deny that there was a contract * * * Obviously, unjust enrichment doesn't exist as a matter of State law in any event where there is a contract. Here there was a purchase and sale agreement. * * *

> PROFESSOR CAPRA: * * *. So you're not challenging the issue of whether an actual contract governs [the] tender offer; is that right?

> MR. ANKER: I acknowledge that there was a contract that governs the tender offer.

### Discussion
*I. Counts 1 and 3 and the Safe Harbor Provision:*

Section 546 of the Bankruptcy Code—entitled "Limitations on Avoiding Powers"—provides in subsection (e) for a safe harbor protecting certain transfers from a trustee's avoiding powers. Subsection (e) in pertinent part provides as follows:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a * * * settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a * * * financial institution * * *, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), * * *, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

Congress enacted section 546(e) "to minimize the displacement caused in the commodities and securities market in the event of a major bankruptcy affecting those industries." H.R.Rep. No. 97–420, 97th Cong., 2d Sess. 1 (1982), U.S.Code Cong. & Admin.News 583. Congress also sought to promote customer confidence in markets by protecting market stability. *Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 849 (10th Cir.1990).

**\*3** The Bank Defendants argue that each transfer the Plaintiff seeks to avoid under Counts 1 and 3 [FN3] is a "settlement payment" [FN4] by a "financial institution."

> FN3. The safe harbor is by its terms not applicable to the Plaintiff's Count 2, for actual fraud, as that claim is brought under Section 548(a)(1)(A) of the Bankruptcy Code—a section specifically excepted from the coverage of Section 546(e).

> FN4. As an alternative to the argument that the transaction involved a "settlement payment" the Bank Defendants contend that the transfer was made "in connection with a securities contract." The phrase "in connection with a securities contract" was added by Congress in 2006. See Financial Netting Improvements Act of 2006. The term "securities contract" is broadly defined in Section 741(7)—a definition that clearly covers the purchase of the PlusFunds shares. So there is a strong argument that under the plain meaning of its text, Section 546(e) provides a safe harbor for a purchase of PlusFunds shares because it was a transfer in connection with a securities contract. (The question of whether there was involvement of a "financial institution" is discussed in text below).

> But neither the parties nor the Special Master have found case law that has interpreted or applied the "securities contract" language. It is, in the end, unnecessary to decide whether the language covers the purchase of PlusFunds shares because, as discussed below, each transaction is within the safe harbor because it is a "settlement payment."

The Plaintiff argues that the safe harbor does not apply for two reasons: 1) the transaction for the Plus-Funds shares was not a "settlement payment"; 2) the Bank of New York, which served as the agent for the transaction, was not operating as a "financial institution." These arguments will be discussed in turn.

*A. Settlement Payment*
Settlement payments are defined tautologically in Section 741(8) of the Bankruptcy Code as follows:

> * * * a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar settlement payment commonly used in the securities trade.

The Plaintiff argues that the transaction sought to be avoided did not involve a settlement payment within the above definition, for two reasons: 1) It was a private transaction and the definition is intended to cover only public transactions; 2) it was not a transaction "commonly used in the security trade." Each of these sub-arguments will be discussed in turn.

*1. Private Transactions as Settlement Payments*
The Plaintiff contends that the safe harbor (and the definition of settlement payment) was never meant to shield payments in private transactions from avoidance actions. He relies on the legislative history of Section 546(e), and the discussion of that history by the Bankruptcy Appellate Panel of the Ninth Circuit in *Kipperman v. Circle Trust F.B.O. ( In re Grafton Partners, L.P.),* 321 B.R. 527, 538 (B.A.P. 9th Cir.2005). The *Grafton* court noted that the safe harbor provision was intended to protect clearance and settlement systems from the disruption that would occur when public securities transactions are unwound because of the bankruptcy of any one party in the chain. See *Grafton* at 536 ("The protection of settlement payments on securities trades responded to the concerns of the SEC and entities administering the market sales process that the bankruptcy of one firm in the clearance and settlement chain could produce a ripple effect that threatens other parties in the chain.").

The legislative history argument is not dispositive, however, for at least two reasons. First, nothing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

in the legislative history indicates that Congress intended to limit the safe harbor protection to public trades only. Put another way, while Congress may have been predominately concerned about public transactions, there is nothing to indicate that Congress affirmatively intended to *exclude* private transactions from the safe harbor. Second, and more importantly, there is nothing in the *text* of the rule— either in Section 546(e) or in the definition of settlement payments in Section 741(8)—that excludes private transactions from the safe harbor. Both rules are broadly stated, and the word "public" is nowhere to be found.

**\*4** Certainly Congress was aware of the frequent occurrence of private transactions, and that an entity in the clearance and settlement chain of a private transaction may at some point become insolvent. If Congress thought it less important—or not important at all—that private transactions would be subject to unwinding by a bankruptcy trustee, then it could have provided an exclusion from the safe harbor for private transactions. In this context, the textual silence is deafening.

Recent opinions by the Sixth and Eighth Circuits flatly reject the Plaintiff's argument that the safe harbor does not apply to private transactions. These cases rely on the plain meaning of the rule. In *Quality Stores, Inc. v. Alford,* ( *In re QSI Holdings, Inc.), 571 F.3d 545, 547–8 (8th Cir.2009),* the court reviewed the text of Section 546(e) and concluded that "nothing in the statutory language indicates that Congress sought to limit that protection to publicly traded securities" It also noted that the transaction at issue (involving a leveraged buyout of more than $100 million) was not insignificant: "The value of the privately held securities at issue is substantial and there is no reason to think that unwinding that settlement would have any less of an impact on financial markets than publicly traded securities." Id. at 550. Certainly the same can be said of the substantial transaction that the Plaintiff seeks to avoid in this case.

Similarly, in *Contemporary Indus. Corp. v. Frost, 564 F.3d 981 (8th Cir.2009),* the court considered whether the safe harbor applied to a private sale of securities. The court relied on the plain text of the rule:

To resolve these questions of statutory interpreta-

tion, we begin, as always, by looking to the relevant statutory text. *Lamie v. United States Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).* Where statutory language is plain, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." Id. (quotation omitted). Thus, if the relevant text is not reasonably susceptible to more than one interpretation, we will not look beyond it unless application of the plain language "will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)* (quotation omitted).

Id. at 984–5.

The *Contemporary Industries* court reviewed the text of Section 546(e) in the following passage:

Here, the relevant text has a sufficiently plain and unambiguous meaning. We agree with our sister circuits that § 741(8) was intended to sweep broadly. *In re Resorts, Int'l, Inc.,* 181 F.3d at 515–16; *In re Comark,* 971 F.2d at 326; *Kaiser Steel Corp., 913 F.2d at 848–49.* Thus, we conclude the term "settlement payment," as used therein, encompasses most transfers of money or securities made to complete a securities transaction. *See In re Resorts, Int'l, Inc.,* 181 F.3d at 515–16. That is exactly what we have before us: the payments at issue were transfers of money made to complete a securities transaction, namely, the sale of the Frosts' Contemporary Industries stock. Nothing in the relevant statutory language suggests Congress intended to exclude these payments from the statutory definition of "settlement payment" simply because the stock at issue was privately held. Section 741(8) is certainly not expressly limited to public securities transactions, and neither is § 546(e).

**\*5** The recent cases from the Sixth and Eighth Circuits are most persuasive interpretations of the statutory text of "settlement payments" and require the rejection of the Plaintiff's argument that the safe harbor does not apply to private transactions.

*2. Commonly Used in the Securities Trade*

The Plaintiff argues that the purchase of PlusFunds shares was not the kind of transaction "com-

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

monly used in the securities trade" and therefore does not fit the statutory definition of a settlement payment provided in Section 741(8). According to the Plaintiff the transaction was not one of common use because "the Bank Defendants were paid an excessive amount of money relative to the value of the PlusFunds shares as part of a scheme in which the Suffolk Insiders cashed out their interests in the essentially worthless PlusFunds stock by conducting a tender offer for the shares at a fraudulently-inflated value." [FN5] So the contention is that a transaction is not "commonly used in the securities trade" if its underlying facts (or the motives of the actors) indicate illegal or manipulative activity.

> FN5. Plaintiff's Memorandum of Law in Response to Defendants' Motion to Dismiss the Complaint 33.

The Plaintiff's interpretation of "commonly used in the securities trade" is questionable on a number of counts. First, as a matter of statutory construction: The phrase "or any other similar settlement payment commonly used in the securities trade" is a catch-all provision at the end of the Section 741(8) definition. It is set off by a comma from the other described settlement payments—including a "final settlement payment" which covers the transaction for the purchase of PlusFunds shares. There is no indication that the phrase "commonly used" is intended to modify "final settlement payment." Rather it simply describes the catch-all—"any other similar payment commonly used in the securities trade." Notably, the Sixth and Eight Circuits have both recently held that the phrase "any other similar payment commonly used in the securities trade" does not qualify the other types of settlement payments described in the statutory definition. Rather, it is "a catchall phrase intended to underscore the *breadth* of the § 546(e) exemption." *In re QSI Holdings, Inc., supra,* 571 F.3d at 550 (emphasis in original); *Contemporary Industries, supra,* 564 F.3d at 896 ("the phrase follows a long list of various kinds of settlement payments and so we think it is most naturally read as a catchall phrase intended to underscore the breadth of the § 546(e) exemption.").

Section 741(8) therefore cannot be read to impose a "commonly used" limitation on a final settlement payment. But even if it could, the term "commonly used" must, in context, be referring to the *me-*

*chanics* of the transaction—not its underlying fairness. Looking to the fraudulent nature of the transaction and thus exempting fraudulent transfers from the safe harbor would make no sense because, as all parties agree (and as the statute provides) the safe harbor is not even applicable to transactions that are actual fraudulent transfers. There would be no need to establish an exception for what is already excepted from the safe harbor.

**\*6** The only sensible interpretation of the phrase "or any other similar payment commonly used in the securities trade" is that it covers any payment 1) similar to the other settlement payments described in the text that was 2) effectuated with commonly used *procedures.* The Plaintiff does not argue that there was anything at all uncommon about the mechanics employed in the purchase of the PlusFunds shares.

Accordingly, the Plaintiff's argument that the purchase of PlusFunds shares is not subject to the safe harbor because it was a transaction not "commonly used in the securities trade" must be rejected for at least two reasons: 1) the language is not even applicable to the transaction; and 2) even if it were, the procedures used for the PlusFunds transaction were quite common in the securities trade.

*B. Bank of New York as a "Financial Institution"*

Section 546(e) provides the safe harbor for settlement payments "made by or to (or for the benefit of) a \* \* \* financial institution." The Plaintiff argues that there was no entity operating as a "financial institution" in the purchase of PlusFunds shares, because the institution that handled the transaction—the Bank of New York—was operating only as a conduit. According to the Plaintiff: "Upon receipt of stock certificates, the BONY sent payments for the account of Suffolk to the tendering stockholders who sent the certificates." [FN6]

> FN6. Plaintiff's Memorandum of Law in Response to Defendants' Motion to Dismiss the Complaint 34.
>
> There is a mild dispute between the parties on whether BONY might have had a more active or complicated role in the transaction, but any dispute of fact need not be resolved. Accepting the Plaintiff's assertion of BONY's role, this motion is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
(Cite as: 2009 WL 7242548 (S.D.N.Y.))

best resolved on a legal question: whether an entity that operates as a conduit for a sale of shares is within the legal definition of "financial institution" under Section 546(e).

The Plaintiff contends that if the safe harbor applies to transactions where the financial institution operates only as a conduit, Section 546(e) would protect from avoidance every transaction except those few that are directly between the parties on a cash basis. The Plaintiff contends that covering such conduit transactions would make the safe harbor the exception that would swallow the rule of avoidance. The Plaintiff further argues that because BONY provided no guarantees and took on no risk, the policy of the safe harbor—to protect against the unwinding of transactions that would expose securities clearing agencies if any entity in the chain became insolvent—is not applicable.

The Plaintiff relies principally on *Munford v. Valuation Research Corp. ( In re Munford), 98 F.3d 604, 610 (11th Cir.1996)*. There the court found that the bank that was an intermediary in a purchase of shares for a leveraged buyout did not operate as a "financial institution" within the meaning of the safe harbor because "the bank here was nothing more than an intermediary or conduit. Funds were deposited with the bank and when the bank received the shares from the selling shareholders, it sent funds to them in exchange. The bank never acquired a beneficial interest in either the funds or the shares."

More recent cases from other circuits have, however, rejected the *Munford* analysis. Thus, in *Contemporary Industries, supra,* the court found that the safe harbor covered a transfer much like the one in this case—a purchase of securities in which a bank acted only as an intermediary to transfer the funds. The court relied on the plain meaning of the term "financial institution"—and criticized *Munford*—in the following passage:

**\*7** We further conclude the payments were made "by or to a ... financial institution" within the plain meaning of § 546(e). * * * CIC contends this requirement is not satisfied because First National never obtained a beneficial interest in the payments made to the Frosts. We recognize that a divided panel of the Eleventh Circuit adopted this argument

in refusing to apply § 546(e) to protect similar payments made to selling shareholders in the course of a leveraged buyout. *Munford v. Valuation Research Corp. ( In re Munford, Inc.), 98 F.3d 604, 610 (11th Cir.1996)* (per curiam). Because the bank never obtained a beneficial interest in the funds, the *Munford* majority concluded the bank "was not a 'transferee' in the LBO transaction." Id. Instead, the majority reasoned that the payments were really made "by Munford to shareholders," and the bank merely acted as a conduit for the payments. Id. Thus, the majority concluded § 546(e) was inapplicable because the transaction did not involve an actual transfer of beneficial interest by or to the financial institution involved. Id. We agree with the Third Circuit, however, that the holding in *Munford* cannot be squared with § 546(e)'s plain language. *In re Resorts, Int'l, Inc.,* 181 F.3d at 516 * * *. By its terms, § 546(e) protects settlement payments "made by or to a ... financial institution," and does not expressly require that the financial institution obtain a beneficial interest in the funds. * * * Similarly, it is undisputed that First National received the payments from CIH and then distributed the payments to the Frosts in exchange for their stock. Thus, the settlement payments at issue were first made to, and then by, a financial institution. Under a literal reading of the relevant statutory language, the payments satisfy both requirements necessary to invoke the protections of § 546(e).

564 F.3d at 987–88.

The *Contemporary Industries* court then addressed the argument made by the Plaintiff in this case—that a literal interpretation of "financial institution" would protect intermediaries who take on no risk, have no beneficial interest, and therefore have nothing at stake if the transaction were unwound:

Where statutory language is plain and does not lead to an absurd result, we must enforce it as written. There is no reason to depart from that rule here. For the reasons discussed, the relevant text is not reasonably susceptible to the interpretation advanced by CIC—rather, the text plainly and unambiguously encompasses these payments. Moreover, that plain language does not lead to an absurd result in this case. CIC disagrees and contends it is unreasonable to construe § 546(e) as exempting

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

these payments, the reversal of which would in no way impact the stability of the financial markets, solely because the parties utilized a financial institution as an escrow agent to complete the transaction. CIC argues that although it would have been unreasonable to expect the parties to assemble $ 26.5 million in cash for the closing, the payments would fall outside the exemption's scope if they had done so. We see no absurdity in that result. Indeed, particularly because so much money is at stake, we question CIC's assertion that the reversal of the payments—at least a portion of which were probably reinvested—would in no way impact the nation's financial markets. At the very least, we can see how Congress might have believed undoing similar transactions could impact those markets, and why Congress might have thought it prudent to extend protection to payments such as these. * * * In sum, this is not one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," *Ron Pair Enters., 489 U.S. at 242* (alteration in original) (quotation omitted), and the plain language therefore controls. Applying that language, we conclude the payments made to the Frosts in exchange for their Contemporary Industries stock are exempt from avoidance in bankruptcy as "settlement payment[s] ... made by or to a ... financial institution."

**\*8** Id. See also *In re OSI Holdings, Inc., supra,* 571 F.3d at 550 ("the plain language of § 546(e) simply does not require a 'financial institution' to have a 'beneficial interest' in the transferred funds.").

The predominant view in the Circuits—that "financial institution" means what it says and covers financial institutions even when they act only as a conduit for a settlement payment—is cogent and persuasive. The better authority requires a finding that BONY acted as a "financial institution" in the purchase of PlusFunds shares.

Accordingly, the Special Master recommends that the Plaintiff's claims in Counts 1 and 3 be dismissed with prejudice. The safe harbor of *Section 546(e)* applies to the purchase of PlusFunds shares because the purchase involved a settlement payment to and by a financial institution. Therefore "the trustee may not avoid" the transfer where avoidance is sought under *Section 548(a)(1)(B)* (Count 1) or

*Section 544* (Count 3).

The dismissal should be with prejudice as it is on purely legal grounds—accepting all facts asserted by the Plaintiff about the transaction as true, the purchase of PlusFunds shares involves a settlement payment to and by a financial institution under *Section 546(e)*.

*II. Count 2—Claim to Avoid an Actual Fraudulent Transfer*

The parties agree that in order to survive a motion to dismiss on Count 2—the claim that the transaction must be avoided because it was an actual fraudulent transfer under *Section 548(a)(1)(A)*—the Plaintiff must plead the following:

1. The Plaintiff must be prosecuting the avoidance claim for the benefit of at least one legitimate creditor.

2. The transferred funds must have been property of Suffolk's estate—put another way, Suffolk cannot have been a mere conduit for Refco's purchase of PlusFunds shares.

3. The purchase of PlusFunds must have been a *fraudulent* transaction.

The Bank Defendants argue that the Plaintiff has not sufficiently pleaded the facts to support any of these requirements.

The legal standard for evaluating a pleading on a motion to dismiss is as follows:

1) The Plaintiff need not establish that he will ultimately prevail. The question is whether the Plaintiff is entitled to obtain discovery and offer evidence to support his claim. *Triestman v. Fed. Bureau of Prisons,* 470 f.3d 471, 476 (2d Cir.2006).

2) "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949,* quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).* If the Plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

*Twombly*, 550 U.S. at 547.

3) Claims of fraud must be "stated with particularity." Fed.R.Civ.P. 9(b). "The purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). The Plaintiff must specifically describe the acts alleged to be fraudulent and provide some factual basis that creates a plausible inference of fraudulent intent. *See generally Sharp Int'l Corp. v. State Street Bank and Trust Co., (In re Sharp Int'l Corp.),* 403 F.3d 43, 56 (2d Cir.2005) (finding the details and purposes of an alleged fraudulent transfer to be inadequately pleaded). The Second Circuit has found that an inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

*9 4) Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."

5) The particularity requirements of Rule 9(b) are relaxed somewhat for fraud claims brought by trustees, because trustees cannot be expected to have personal knowledge of the underlying events. *Silverman v. H.I.L. Assoc., (In re Allou Distributors, Inc .),* 387 B.R. 365, 385 (Bankr.E.D.N.Y.2008) ("A more liberal standard has been applied to fraud allegations in bankruptcy cases [because] it is often the trustee, a third party, who is pleading fraud on secondhand information.").

6) Leave to amend should be liberally granted—especially if the complaint has never been amended. Fed.R.Civ.P. 15(b). *See ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir.2007) (giving the plaintiff "at least one opportunity to plead fraud with more specificity.").

Applying these legal standards, the Special Master concludes that the Plaintiff has not alleged facts from which one could plausibly conclude that 1) the

Plaintiff represents a legitimate creditor or that 2) Suffolk operated as anything more than a conduit. The question of whether the Plaintiff has sufficiently pleaded that the transaction for PlusFunds shares was fraudulent is close. But at any rate the pleading comes close enough on each of these points that the Plaintiff should be given leave to amend. What follows is a discussion of the pleading as it relates to each of the three requirements for recovery on the fraud claim.

*A. Legitimate Creditor*

The Plaintiff must have standing to bring the avoidance claims in this case. FN7 The Second Circuit has stated that a bankruptcy trustee's standing

> FN7. Standing is of course needed for *all* the counts. But as will be seen below, standing involves questions of fact as to which the Plaintiff should be allowed leave to amend the complaint. In contrast, the claims for constructive fraud and fraudulent conveyance under state law are properly dismissed *with prejudice* because of the safe harbor for settlements that applies to those counts. Therefore, the discussion of standing is most important as a practical matter for the claim of actual fraud under Count 2.

> The Bank Defendants argue that standing is lacking for the state law claims (Counts 3 and 4) under the *Wagoner* rule—a rule of New York law providing that a trustee lacks standing to assert "a claim against a third party for defrauding a corporation with the cooperation of management" on behalf of "the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991). But as to Count 3, the courts have held that the *Wagoner* rule is not applicable to avoidance actions. See, e.g., *In re MarkeXT Holdings Corp.,* 376 B.R. 390, 423 (Bankr.S.D.N.Y.2007) (stating broadly that "avoidance actions do not fall within the *Wagoner* rule."). The Bank Defendants argue that the inapplicability of *Wagoner* to avoidance claims is dependent on a showing that there is a legitimate third party creditor who stands to gain from any recovery by the debtor or trus-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

tee. But that argument just circles back to whether there is a legitimate creditor in this case—the matter discussed in the text of this section. Thus, *Wagoner's* applicability or inapplicability to the state law avoidance count does not, by the Bank Defendant's own argument, add anything to the "triggering creditor" analysis discussed in text.

The *Wagoner* rule might serve to dispose of Count 4, for unjust enrichment under New York law. But the Plaintiff has abandoned that Count.

coincides with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own. *Shearson Lehman Hutton Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991).

The avoidance power of a trustee depends on whether there is a legitimate creditor to take advantage of the recovery. "[I]t is well settled in the Second Circuit, that avoiding powers may be exercised by a debtor in possession only for the benefit of creditors, and not for the benefit of the debtor itself." *In re Liggett,* 118 B.R. 219, 222 (Bankr.S.D.N.Y.1990).

While a legitimate creditor is required to establish standing, the requirement is not especially exacting. A single legitimate creditor is sufficient to "trigger" standing. *See MC Asset Recovery, LLC v. Southern Co.,* 2006 U.S. Dist. LEXIS 97034 at *18 (N.D.Ga. Dec. 11, 2006) ("[I]n order to maintain an avoidance action * * * a trustee must demonstrate the existence of a so-called 'golden' or 'triggering' creditor: (1) an unsecured creditor, (2) who holds an allowable unsecured claim"). When a trustee establishes the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer "not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate." *Silverman v. Sound Around, Inc. (In re Allou Distribs.),* 392 B.R. 24 (Bankr.E.D.N.Y.2008). The amount of the triggering creditor's interest is irrelevant. COLLIER ON BANKRUPTCY P 544.09 [5]

(15th ed. rev.2007) (a single triggering creditor provides a trustee with standing, and that standing is "not dependent at all upon the size of that creditor's claim against the debtor" because "an entire transfer can be set aside even though the creditor's claim is nominal.").

**\*10** The parties dispute whether the Plaintiff has pleaded facts establishing a plausible claim that there is a legitimate creditor of the Suffolk estate. It is fair to state that the Complaint is thin on factual information supporting the existence of a triggering creditor. The only references to creditors of Suffolk in the complaint are the following:

1. Paragraph 11 states that Refco Capital is "Suffolk's only known, non-contingent, liquidated creditor * * *."

2. Paragraph 40 states that the purchase of PlusFunds shares "vitiated essentially all of the assets of Suffolk available to creditors by stripping Suffolk of virtually all property available for execution and distribution."

3. Paragraph 42 asserts that the purchase of PlusFunds shares "was part of an on-going scheme to defraud creditors of Suffolk."

It is most difficult to find a triggering creditor from the above assertions. It is true that the Plaintiff is not required to identify specifically the triggering creditor. *See In re Leonard,* 125 F.3d 543, 544 (7th Cir.1997) ( "Barker and Lieblich complain that the Trustee has not articulated the specific creditor who could set aside [the transfer] but a trustee need not do so. Thirteen unsecured claims have been filed; the Trustee can assume the position of any one of them."). But the Plaintiff must at least provide facts from which it can be plausibly concluded that there is at least one legitimate creditor of the estate. Possible legitimate creditors are discussed in turn.

*1. Refco as a Legitimate Creditor*

The only creditor specifically identified in the Complaint is Refco. But Refco is not a legitimate creditor because it was an active party to the fraud alleged in the complaint. The Plaintiff argues strenuously that Refco may be a legitimate creditor, and that any inference to the contrary is found in other complaints and determinations, so that "Refco Capi-

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

tal's knowledge of the challenged transaction are based on unproven facts not found in the Trustee's Complaint." [FN8] But the Plaintiff's own Complaint belies any claim that Refco is a legitimate creditor of the Suffolk estate. The Complaint states the following:

> FN8. Memorandum of Law in Response to Defendant's Motion to Dismiss the Complaint 12–13.

1) Suffolk was created for the purpose of purchasing PlusFunds shares and was thinly capitalized. Complaint ¶ 30 and 31.

2) Suffolk's principal asset was a Refco letter of credit, which Suffolk drew upon to facilitate the purchase of PlusFunds shares. Complaint ¶ ¶ 8 and 31.

3) PlusFunds shares were of little or no value. Complaint ¶ 33.

4) Suffolk rendered itself insolvent by using the Refco funds to purchase the PlusFunds shares. Complaint ¶ 34.

5) Other actions in the MDL have alleged that PlusFunds placed SPhinX assets at risk and that those assets "were used to fund the loan to Suffolk so that Refco could 'buy out' the Suffolk Insiders' interests in PlusFunds for far more than those interests were worth." Those allegations "and their factual substantiation, are highly relevant to this action." ¶ 17.

**\*11** Any realistic assessment of the inferences raised by the above paragraphs leads to the conclusion that Refco was heavily involved in structuring the transaction for the purchase of PlusFunds shares. It is easily inferred that Refco knew about Suffolk's financial situation, given that Suffolk's main asset was a Refco letter of credit. Refco's intimate involvement in the transaction for assertedly worthless shares is more than enough to disqualify Refco as a legitimate creditor of the Suffolk estate. Moreover, the oblique reference to the allegations in related cases, while perhaps not an incorporation of all of the assertions in those other complaints, can at least be considered an implicit assertion that

Refco was engaged in fraud in arranging the Plus-Funds transaction.

Finally, paragraphs 8 and 31 of the Complaint specifically reference the credit agreement between Refco and Suffolk. The terms of that credit agreement may therefore be considered on a motion to dismiss. *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42 (2d Cir.1991). *See also Yak v. Brussels Lambert,* 252 F.3d 127 (2d Cir.2001) (document referred to in the complaint and in the possession of the plaintiff may be considered on a motion to dismiss). The Credit Agreement provides that the funds from Refco could be used only for the purchase of Plus-Funds shares, and could only be disbursed with the permission of Refco. [FN9] Refco was thus intimately involved with and voluntarily participated in what the Plaintiff readily asserts was a fraudulent transaction.

> FN9. See Firsenbaum Decl. Ex. B to Bank Defendant's Motion to Dismiss § 2.3.

Given the reasonable inferences to be drawn from the Plaintiff's own Complaint, it would be wasteful and it would blink reality to allow the action to proceed on the ground that the Plaintiff might be able to prove that Refco is a legitimate creditor of the Suffolk estate that had nothing to do with the purchase of PlusFunds shares. Therefore, Refco cannot be the triggering creditor, because it was a material participant in the alleged fraudulent transaction. *See HSBC Bank USA, N.A. v. Adelphia Communications Corp.,* 2009 WL 385474, at *6–7 (W.D.N.Y. Feb. 12, 2009) (fraudulent transfers not voidable where the benefit would run to a creditor that ratified the transfer).

### 2. Other Unsecured Creditors

The Plaintiff relies on the "publicly available claims register and Schedules, each of which demonstrate other [than Refco] purported creditors of the Suffolk estate." [FN10] The claims register indicates that a claim was filed by SphynX. The Schedules list the IRS and SEC as holding unsecured priority claims. The Schedules list Gibson Dunn & Crutcher and the Corporation Services Company as general unsecured creditors. At this point, SPhinX is the only creditor other than Refco to file a proof of claim.

> FN10. Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Com-

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
(Cite as: 2009 WL 7242548 (S.D.N.Y.))

plaint 10.

*a. SPhynX*

Nothing in the Complaint purports to explain the basis for SPhynX's claim as a creditor of the Suffolk estate, or even mentions SPhynX as being a creditor—though one cannot expect too much from the Trustee at this point because the claim is not the Trustee's but that of SPhynX, and this was an involuntary petition.

**\*12** The Bank Defendants argue that SPhynX cannot be a legitimate triggering creditor because 1) it has already been determined—by Judge Drain in the Refco bankruptcy proceedings—that the claims of SPhynX lack merit; 2) SphynX, like Refco, was involved in and ratified the fraudulent transaction; and 3) SPhynX is pursuing its claim for harm caused by the Suffolk loans in another action in this MDL.[FN11]

> **FN11.** Reply Memorandum in Further Support of the Bank Defendants' Motion to Dismiss the Complaint. 8–10. The other actions referred to include *Krys v. Sugrue,* 08 Civ. 3086(GEL).

The fact that common issues are being treated in other actions in this MDL does not justify dismissing this action on the pleadings for failure to establish SPhynX as a triggering creditor. If it comes to the point that 1) SPhynX is the only possible triggering creditor for the Suffolk estate and 2) it is established that the SPhynX claim arising from the Suffolk loans has no merit, then a motion to dismiss may be granted at that point.

Moreover, the Bank Defendants' argument that SPhynX was involved in and ratified the fraudulent transaction is not supported by the Plaintiff's pleading or by anything the Plaintiff has incorporated by reference. The only paragraphs of the Complaint that even refer to SPhynX are: 1) Paragraph 6, which simply describes PlusFunds as an investment advisor that offered investment vehicles to SphynX; and 2) Paragraph 17—the paragraph with the oblique reference to other actions in the MDL—which simply states that there are allegations that *PlusFunds* and Refco victimized SPhynX by placing its assets at risk. These references in the Complaint do not in any way indicate that the Plaintiff has pleaded facts indicating that SPhynX was involved in the fraud or is somehow not a legitimate creditor.

This does not mean, however, that the Plaintiff has sufficiently pleaded a plausible case that SPhynX is in fact a legitimate creditor of the Suffolk estate. The Plaintiff has not alleged any facts in the Complaint that give any basis to conclude that SPhynX has a valid claim against the Suffolk estate. The mere filing of a claim cannot be enough to establish a legitimate triggering creditor. If that were so, then even claimants who ratified the transfer sought to be avoided, or who were prime actors in the fraud and so could never obtain a remedy, could be deemed triggering creditors providing standing for the Trustee. That is not the law. *Smith v. Am. Founders Fin. Corp.,* 365 B.R. 647, 659 (S.D.Tex.2007) ("If the creditor is estopped or barred from recovery, so is the trustee.").

As stated above, the Complaint does not even mention that SPhynX is a creditor. But that does not mean that the Plaintiff could not plead facts indicating that SPhynX was a victim of fraud with a legitimate claim against the Suffolk estate. Under the circumstances—and as discussed below—Plaintiff should be given an opportunity to set forth factual assertions and provide an explanation of why SPhynX would be a legitimate triggering creditor. If the pleading is amended, there will then be time enough to consider the impact of determinations made in related matters in this MDL.

*b. Unsecured Creditors That Have Not Filed a Proof of Claim*

**\*13** Purported creditors listed on the Schedules, who have not filed a proof of claim at this point, may or may not be legitimate triggering creditors. At oral argument on this motion, the parties worked their way through the Bankruptcy Code and addressed whether creditors need to file a proof of claim in order to be a triggering creditor with a valid claim against the estate, at the time of a motion to dismiss. The Plaintiffs rely on Section 726(a)(1) of the Bankruptcy Code, which provides that tardily filed *priority* claims will be paid out if "filed on or before the earlier of—(A) the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or (B) the date on which the trustee commences final distribution under this section." This section is, however, by its terms limited to priority claims.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

Claims that are not priority claims cannot be paid out unless timely filed or the claimant did not have knowledge or notice of the need to file, and the claim is filed in time to pay it. Section 726(a)(2).

The parties agree that any filing of a proof of claim made at this point will be "tardy" within the meaning mean of Section 726. Therefore, for any such claim to be "timely" filed at this point, it must either be a priority claim or one from a claimant who has an excuse of lack of notice or knowledge.

Applying the Code sections to the facts asserted in the Complaint raises a number of issues, such as:

1) is there a legitimate *priority* creditor, whose claim would not be barred under Section 726(a)1? The IRS and SEC are potential priority creditors, but there is no reference at all to either claim in the Complaint, and nothing but speculation about why these agencies have not filed a proof of claim.

2) Can some claimants on the schedule take advantage of the exception provided by Section 726(a)(2)?

3) Assuming that the claims could be timely filed, is there any factual indication that the claims may be legitimate?

To state these questions is to illustrate that they cannot be resolved in the Plaintiff's favor under *Twombley* and *Iqbal* when the Complaint that does not even mention any creditor other than Refco. Put another way, the Plaintiff has not made a plausible case that these creditors have legitimate claims against the Suffolk estate, because he has not pleaded any facts on that subject. The In order to establish a triggering creditor for the group of those who have not filed a claim, the Plaintiff needs to plead in more detail his assertion that at least one of them has a legitimate claim and can still file it in a timely manner under the Bankruptcy Code. As discussed below, these detailed factual assertions should be the goal of an amended pleading.

*B. Suffolk as a Conduit for the Purchase of the Plus-Funds Shares.*

Even if there is a triggering creditor, the purchase of PlusFunds shares cannot be avoided unless it involved *property of the estate* . See Section 548(a) (the trustee "may avoid any transfer * * * of an interest of the debtor in property * * *.")[FN12] Section 541(d) of the Bankruptcy Code provides that the debtor must have an "equitable interest" in property in order for it to become property of the estate. The legislative history of 11 U.S.C.A. § 541 indicates that funds in the debtor's possession held for a third party do not become part of the estate in bankruptcy:

> FN12. Count 3 seeks to avoid the transfer under Section 544 of the Bankruptcy Code. Section 544 provides that the "trustee * * * may avoid any transfer of *property of the debtor * * *.*" As discussed above, Counts 1 and 3 are more easily disposed of under the safe harbor of Section 546(e).

*14 Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5868, 6324. *See also T & B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372, 1376 (11th Cir.1989) (when the debtor held funds that, pursuant to contract, were to be paid out to certain individuals, the debtor was simply an intermediary and the funds were not property of the estate); *City of Springfield v. Ostrander ( In re Lan Tamers, Inc.),* 329 F.3d 204, 210 (1st Cir.2003) ("The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers. Identical language found in both the House and Senate reports that accompanied passage of the Bankruptcy Code strongly reinforces this plain reading.").

Courts have determined that an asset is property of the estate when the debtor had "control" over that property. *See Kapila v. Espirito Santo Bank ( In re Bankest Capital Corp.),* 374 B.R. 333, 338

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

(Bankr.S.D.Fla.2007) ("The dispositive question is whether the Debtor had control over the subject funds."). Determining "control" requires courts "to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1199 (11th Cir.1988)*. "Control" has two components:

> first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.

> *In re Safe–T–Brake of South Florida, Inc., 162 B.R. 359, 365 (Bankr.S.D.Fla.1993)*.

Some courts have applied the two-component test of control by asking whether the transaction primarily serves the interests of the debtor. *In re Bowers–Siemon Chemicals Co., 139 B.R. 436 (Bankr.N.D.Ill.1992)*. Where the debtor's interests do not animate the transaction, courts are more likely to find that there was no transfer of property of the debtor. *See Nordberg v. Sanchez, (In re Chase & Sanborn Corp.), 813 F.2d 1177 (11th Cir.1987)* (funds not property of the debtor where they were deposited in a bank account as a conduit to pay a personal debt of the president of the company); *In re Scanlon, 239 F.3d 1195 (11th Cir.2001)* (funds in an escrow account were not property of the estate where the funds were not to benefit the debtor, and the debtor could not direct who would receive the funds).

*15 The Bank Defendants argue that the transaction for PlusFunds shares did not involve property of Suffolk, because Suffolk was nothing but a conduit for the transaction between Refco and the owners of the PlusFunds shares. They note that under the terms of the credit agreement between Refco and Suffolk, [FN13] Suffolk was permitted to use the proceeds of the Refco loan for only one purpose—to purchase PlusFunds shares. The Credit Agreement further provides that Suffolk could not engage in "any business activity other than the Transactions" to obtain the PlusFunds shares. Credit Agreement § 7.2.1. Thus, Suffolk was essentially prohibited from doing any business other than buying the PlusFunds shares with the loan given by Refco. Id. §§ 7.2.1–11. The Credit

Agreement further provides that Suffolk was required to deposit the loan funds into an escrow account with the Bank of New York, and those funds could not be disbursed to buy PlusFunds shares unless both Refco and Suffolk approved. The shares were then pledged to Refco to secure the loan. Credit Agreement §§ 2.3, 5.1.5, 5.1.8, 5.2.4. From all this the Bank Defendants conclude that "Suffolk was not permitted to retain Refco Capital's loans for its own use, and therefore the funds transferred from Refco Capital to the Bank Defendants did not constitute property of Suffolk." [FN14]

> FN13. See § 7.1.6 of the Credit Agreement, Firsenbaum Decl. Ex. B. As discussed above, the credit agreement is referenced in the Plaintiff's complaint and may be considered on these motions to dismiss.

> FN14. Memorandum of Law in Support of the Bank Defendants' Motion to Dismiss the Complaint 25.

The Plaintiff does not deny the legal principle that if Suffolk were operating as a mere conduit, then the funds used to purchase the PlusFunds shares were not Suffolk's property and the transaction could not be avoided. The Plaintiff contends, however, that Suffolk was more than a pass-through. The Plaintiff states that the transfer made to the Bank Defendants "deeply affected Suffolk's estate"; that Refco never exercised its call right or acquired the PlusFunds shares from Suffolk; and that the shares are still held by Suffolk. From this the Plaintiff concludes that Suffolk was the owner of the funds lent by Refco and owned the shares once they were purchased with those funds. [FN15]

> FN15. Memorandum of Law in Response to Defendants' Motion to Dismiss the Complaint 19–24.

Many of the plausible inferences that can be drawn from the Complaint would indicate that Suffolk was not a real player in the purchase of PlusFunds shares. As recounted previously, the Complaint avers that Suffolk's sole purpose was to facilitate the purchase of PlusFunds shares, and that its principal asset was the Refco letter of credit, from which it drew for the purchase of PlusFunds shares. These facts make Suffolk look like a paper interme-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
(Cite as: 2009 WL 7242548 (S.D.N.Y.))

diary. In the words of the cases on control, it would appear from the Complaint that the transaction did not primarily serve the interests of the debtor. *In re Bowers–Siemon Chemicals Co., supra.* The fact that Suffolk still has the PlusFunds shares in its custody is not dispositive—by the Plaintiff's own admission, the shares are worthless. Custody over worthless pieces of paper says little or nothing about whether the custodian had control over the transaction.

On the other hand, the Plaintiff does allege that the PlusFunds purchase rendered Suffolk insolvent—which is not the ordinary consequence one would expect from a debtor that acted solely as a pass-through.[FN16]

> **FN16.** The pass-through cases, cited above, usually involve a fact situation different from that presented in this case: there are assets assertedly within the bankrupt estate, and a party brings an adversary proceeding to have the assets distributed on the ground that the estate is just a stakeholder and so the assets are not property of the estate. See, e.g., *In re Scanlon,* 239 F.3d 1195 (11th Cir.2001) (funds in an escrow account maintained by the debtor). An exception is *In re Cannon,* 277 F.3d 838 (6th Cir.2002), where the lawyer-debtor stole money from client escrow accounts. The court held that the funds in the escrow accounts were not property of the estate because they were maintained for the benefit of the clients. *Cannon* is distinguishable from the facts of this case as well, however, because the trustee in that case could not argue that the transactions resulted in a negative impact on the estate—as the Plaintiff can do here.

**\*16** The Credit Agreement, which both parties cite, cuts both ways. From the Bank Defendants' perspective, the Credit Agreement could be read to cede most of the control over the transaction to Refco. And in the words of the cases on control, Suffolk appears not to have had "the power to designate which party will receive the funds." *In re Safe–T–Brake of South Florida, Inc., supra* On the other hand, as the Bank Defendants admit, the funds could not be disbursed unless *both* Suffolk and Refco signed off on the transaction. Thus the agreement indicates that Suffolk at least had *some* control over

the transaction. *See Georgia Pacific Corp. v. Sigma Serv. Corp.,* 712 F.2d 962 (5th Cir.1983) (checks in debtor's possession made payable jointly to claimant and debtor held part of debtor's estate because no clear bilateral agreement stated that checks belonged to claimant).[FN17]

> **FN17.** Notably, though, the control test has been construed to mean "control over identifying the payee, *and* control over whether the payee will actually be paid." *In re Safe–T–Brake of South Florida, Inc.,* 162 B.R. 359, 365 (Bankr.S.D.Fla.1993) (emphasis added).

The control cases require the court to evaluate a transaction in its entirety. *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), supra.* The problem is that the allegations in the Plaintiff's Complaint are too thin to draw a firm conclusion about the transaction in its entirety. How did the transaction actually operate—in strict accordance with the Credit Agreement? What was the day-to-day relationship, if any, between Suffolk and Refco? What would have happened if Suffolk (or Refco, for that matter) had refused to sign off on the disbursement of funds? Why didn't Refco exercise a call on the PlusFunds shares? These are questions on which one could speculate—and questions on which other actions in the MDL may shed some light—but there is not enough in the spare allegations of the Complaint to support a plausible conclusion that Suffolk had *real* control over the assets used to purchase PlusFunds shares.

One might argue that the only way to evaluate the transaction in its entirety is to go to discovery. But the Court in *Twombley* cautions courts to make certain that the pleadings are sufficiently detailed to assure that defendants are notified and the costs of discovery are not unnecessarily imposed. 550 U.S. at 558–60. Given the fact that Count 2 should be re-pleaded on the question of whether there is a triggering creditor (see *supra* ), it makes sense to require repleading as well on the question of whether Suffolk had control over the assets that are the subject of the avoidance claim.[FN18]

> **FN18.** Of course the court does not *require* a pleading to be amended. It *permits* it. But the reference to a requirement is that unless

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

the Plaintiff provides a more detailed factual assertion of Suffolk's role in the transaction, there will not be enough from which to plausibly infer that it had control over the funds used to purchase the PlusFunds shares.

*C. Was the Transaction Fraudulent?*

The Bank Defendants claim that the Plaintiff's fraud claim is not pleaded with the particularity required by Fed.R.Civ.P. 9(b).[FN19] As discussed above, the particularity requirement of Federal Rule 9(b) is relaxed somewhat when the fraud claim is asserted by a bankruptcy trustee because the trustee was not involved in the underlying transaction. But the Bank Defendants contend that even under a relaxed standard, Count 2 is wanting for at least two reasons: 1) The Plaintiff's fraud complaint is little more than conclusory assertions that essentially track the statute; and 2) The Plaintiff has not sufficiently pleaded Suffolk's fraudulent intent because there is no allegation that there was an intent to defraud a *creditor*.[FN20] These arguments will be taken in turn.

> FN19. The argument of insufficient pleading of fraud applies to Counts 2 and 3, and not to Count 1, which is a claim for constructive fraud, *see Eclaire Advisor Ltd. v. Daewoo Eng. & Constr. Co., Ltd.,* 375 F.Supp.2d 257, 267 (S.D.N.Y.2005) (Rakoff, J.). But as discussed above, the claims in Counts 1 and 3 should be dismissed in any event because of the safe harbor for settlement payments. Therefore the discussion in text focuses on the allegations in Count 2.

> FN20. As to the *state* fraud claims, the Bank Defendants claim that the Plaintiff must—and did not—sufficiently plead the fraudulent intent of each Bank Defendant. That argument does not apply to Count 2, as the Bank Defendants admit that Section 548 of the Bankruptcy Code "focuses exclusively on the transferor's intent ." Memorandum of Law in Support of the Bank Defendants' Motion to Dismiss the Complaint 33. As discussed above, the state law fraud claim should be dismissed because of the protection for settlement payments provided by Section 546(e). Therefore it is unnecessary to wade through and resolve the conflicting case law on whether transferee intent must

be proven under New York DCL § 276. *See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group LLC)* 396 B.R. 810, 826–7 (Bankr.S.D.N.Y.2008) (citing conflicting case law).

*1. Conclusory Assertions of Fraud:*

**\*17** It is fair to state that the factual assertions supporting a claim of fraud in the Complaint are spare. For example, Paragraph 56 simply says that "the Defendant and/or Suffolk acted with intent to hinder, delay, or defraud present and/or future creditors of Suffolk as a result of the Fraudulent Transfer." Even given the relaxed requirements for trustees, and even given Rule 9(b)'s proviso that a person's state of mind may be alleged generally, there is not much to go on in that paragraph. Essentially it tracks Section 548(a)(1)(A).

Subsequent paragraphs are somewhat more helpful. Paragraph 58 states that the purchase of PlusFunds amounted to a payment of all the assets of Suffolk in exchange for a worthless asset. That was a bad deal for Suffolk. While it does not necessarily mean that fraud was afoot, it at least raises an inference in that direction.

Paragraph 59 states that the transfer "ultimately benefited the Suffolk Insiders, who were shareholders of Plus Funds." This allegation raises a possibility of fraud, but its lack of detail is troubling. Similarly, Paragraph 60, which describes the Stock Purchase Agreement as a cashing out scheme "for the exclusive benefit of the Suffolk Insiders" raises an inference of fraud, but is troublingly vague.

The Plaintiff argues that he has pleaded "badges of fraud"—circumstantial evidence from which fraud can plausibly be concluded. As set forth in *In re Le Cafe Creme, Ltd.,* 244 B.R. 221, 239 (Bankr.S.D.N.Y.2000), the following factors have been found to be badges of fraud:

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

pattern or series of transactions or course of con-
duct after the incurring of debt, onset of financial
difficulties, or pendency or threat of suits by cred-
itors; and (6) the general chronology of the events
and transactions under inquiry.

Other relevant indicia of fraud are: (i) a transfer
for no consideration when the transferor and the
transferee know of the claims of creditors and know
that creditors cannot be paid and (ii) a vast discrep-
ancy between the value of the property transferred
and the consideration received for it. *Breeden v. Ben-
nett (In re The Bennett Funding Group, Inc.),* 220
B.R. 743, 755 (Bankr.N.D.N.Y.1997). *See also In re
Kaiser,* 722 F.2d 1574, 1582 (2d Cir.1983)(finding
transfer of property to be fraudulent where it was
made by a debtor to a family member while the
debtor was insolvent; the family relationship and the
debtor's financial condition of the debtor indicated
badges of fraud).

The Plaintiff has a fair argument that the allega-
tions in the complaint, while undetailed, do raise a
couple of badges of fraud. For example, the Com-
plaint raises inferences of a close relationship among
the actors, and a vast discrepancy between the value
of the property transferred and the consideration re-
ceived for it. But the case law does not establish that,
for example, asserting two (or three, etc.) badges of
fraud are enough to survive a motion to dismiss.
Rather, the badges are simply circumstantial evidence
of fraud, and the Plaintiff has pleaded some relevant
circumstances. Moreover, the Second Circuit requires
a strong showing of circumstantial evidence for a
successfully pleaded fraud claim. *Shields v. Citytrust
Bancorp., Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). It
is questionable whether the Plaintiff's allegations of
circumstantial evidence reach that level.

**\*18** Ultimately it is a close question whether the
Plaintiff has sufficiently pleaded a fraudulent transac-
tion. But because leave to amend should be granted
on the questions of the existence of a triggering cred-
itor and on whether the funds sought were property of
the estate, *see supra,* it makes sense to instruct the
Plaintiff that it if he does decide to amend, he should
also provide more detailed assertions on his claim
that the transaction was fraudulent.

*2. Intent to Defraud a Creditor*
The Bank Defendants argue that the fraud claim

must be dismissed because Section 548(a)(1)(A) re-
quires that the trustee show that the transfer was
made "with actual intent to hinder, delay, or defraud
any entity to which the debtor was or became, on or
after the date that such transfer was made or such
obligation was incurred, *indebted."* Thus, the Plain-
tiff must show that there is a legitimate creditor of the
Suffolk estate in order to establish a claim of fraud.
*See also Nisselson v. Softbank AM Corp. ( In re Mar-
ketXT Holdings Corp.),* 361 B.R. 369, 395
(Bankr.S.D.N.Y.2007) (act of fraud must result in
loss to a creditor).

The "defraud a creditor" argument is a rerun of
the "triggering creditor" argument discussed in Sec-
tion II A, albeit in a different context. If the Plaintiff,
should he decide to amend, makes a plausible claim
that there is a legitimate creditor of the Suffolk es-
tate—and thus establishes standing as discussed in
Section II A—then he will also have met the "credi-
tor" requirement for a proper pleading of the fraud
claim.

*III. Leave to Amend Count 2*
    As discussed above:

    • the Plaintiff has not provided enough in the Com-
    plaint for a plausible inference that a legitimate
    creditor exists to confer standing (and thereby to
    create a plausible inference that there was an intent
    to defraud a *creditor* );

    • the Plaintiff has not provided enough information
    about the purchase of the PlusFunds shares, the op-
    eration of the Credit Agreement, and the working
    relationship between Refco and Suffolk to establish
    that the funds were controlled by Suffolk and so
    became property of the Suffolk estate; and

    • the Plaintiff should provide more explicit and
    specific factual assertions concerning the Plus-
    Funds transaction to create a stronger inference that
    Suffolk had fraudulent intent.

Because the pleading on Count 2 raises a series
of close and difficult questions, the Plaintiff should
be allowed leave to amend. Judge Lynch's analysis in
*Kirschner v. Bennett,* 2009 WL 2601375 at \*15
(S.D.N.Y., August 25, 2009) is applicable here:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)
**(Cite as: 2009 WL 7242548 (S.D.N.Y.))**

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to replead should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). Leave to replead may be denied if repleading would be futile, *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995), but it is far from clear that repleading would be futile here. The complaint in this action was filed * * * prior to a number of other developments in related cases that may allow all parties to benefit from repleading. * * * [T]he Trustee deserves "at least one opportunity to plead fraud with greater specificity." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir.2007). One such opportunity will be afforded.

**\*19** Judge Lynch added a proviso in footnote 27 that is also applicable here:

That leave to replead is granted does not indicate that repleading is encouraged, or suggest that an amended complaint is likely to state a cause of action. It merely reflects that the Court, necessarily ignorant of the facts that plaintiff might be able to allege, cannot conclude that repleading is necessarily futilc.

*IV. Recommendations*

In accordance with the report above, the Special Master recommends the following with respect to the motions to dismiss by the Bank Defendants:

1. The motions to dismiss Count 1 of each Complaint should be *granted with prejudice,* because the transaction that the Plaintiff seeks to avoid was a settlement payment to and by a financial institution, and therefore is not subject to avoidance under 11 U.S.C. § 546(e).

2. The motions to dismiss Count 2 of each Complaint should be *granted with leave to amend* on the questions of

a. whether there is a legitimate creditor of the Suffolk estate (and thus a potentially defrauded creditor);

b. whether Suffolk controlled the funds used to purchase the PlusFunds shares and thus was not merely a conduit for the transaction; and

c. whether purchase of the PlusFunds shares was a fraudulent transaction.

3. The motions to dismiss Count 3 of each Complaint should be *granted with prejudice,* because the transaction that the Plaintiff seeks to avoid was a settlement payment to and by a financial institution, and therefore is not subject to avoidance under 11 U.S.C. § 546(e).

4. The motions to dismiss Count 4 of each Complaint must be *granted with prejudice* as that Count has been abandoned by the Plaintiff.

S.D.N.Y.,2009.
In re Refco, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2009 WL 7242548 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.