**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

**DECLARATION OF JOSEPH A. PENSABENE IN SUPPORT OF DEBTORS' GA SERVICING MOTION, NON-GA SERVICING MOTION AND SUPPLEMENTAL SERVICING MOTION**

I, Joseph A. Pensabene, under penalty of perjury, declare as follows:

1. I am Executive Vice President/Chief Servicing Officer of Residential Capital, LLC, a debtor and debtor in possession in the above-captioned Chapter 11 cases and a subsidiary of Residential Capital, LLC, a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"). I have been employed by the Debtors since May of 1996 and I have held my current position since August of 2008. Prior to assuming my current role, I was the Senior Vice President of Consumer Operations, responsible for fulfillment on new production for each of the Debtors' consumer lending channels. I am authorized to make this declaration on behalf of the Debtors and in support of the Debtors' GA Servicing Motion,[1] the

---

[1] The "GA Servicing Motion" refers to the *Debtors' Motion for Interim and Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and*
*(cont'd)*

Non-GA Servicing Motion[2] and the Supplemental Servicing Motion[3] (collectively, the "Motions").[4]

2.   In my capacity as Executive Vice President/Chief Servicing Officer, I am familiar with the Debtors' day-to-day servicing operations and related legal matters arising therefrom. I submit this declaration (the "Declaration") on the Debtors' behalf in conjunction with and in support of the Motions. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; information supplied or verified by personnel in departments within the various business units of the Debtors or the Debtors' advisors; my review of the Debtors' relevant documents; or my general experience, expertise, and knowledge of the Debtors' mortgage loan servicing operations. In making my statements based on my review of the Debtors' relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing, collecting, or verifying any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

---

*(cont'd from previous page)*
*Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief* [Docket No. 57].

[2]   The "Non-GA Servicing Motion" refers to the *Debtors' Motion for Interim and Final Orders Under Sections 105(a), 362, 363, 1107(a) and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Non-Governmental Association Loans, and (B) Sale Activities Related to Certain Loans in Foreclosure and Real Estate Owned Property, and (II) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and Eviction Proceedings* [Docket No. 46].

[3]   The "Supplemental Servicing Motion" refers to the *Debtors' Motion for Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a) and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 181].

[4]   Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the applicable Motion.

## GENERAL BACKGROUND

3.      As a general matter, if the Debtors are unable to demonstrate their ability to continue functioning as a servicer, notwithstanding the commencement of these Chapter 11 cases, then borrowers and the market will experience confusion and uncertainty.  Borrowers may refuse to make payments to the Debtors, thus impairing the Debtors' (a) ability to continue to meet their ongoing payment obligations with respect to loans they are servicing (for example, making payment advances required under certain circumstances for the benefit of investors and paying certain amounts owed to the Governmental Associations with respect to the GA Loans) and (b) future capacity to collect on these loans.

4.      In addition, if the Debtors' ability to ensure that borrowers continue making payments on their loans (for example, by sending out bills and ensuring the collection and proper distribution of funds received) is impaired, then there is a real risk that delinquencies and defaults will materially increase to the ultimate detriment of the Debtors' estates.

5.      Similarly, if the Debtors do not continue to honor their ordinary course servicing commitments to the Governmental Associations with respect to the GA Loans, then the Debtors face the possible termination of their GA Loan servicing rights, which, if successful, would result in the loss of future servicing fees, with potential tremendous (and potentially catastrophic) loss to the Debtors' estates.

## FORBEARANCE AGREEMENT AND ADVANCES

6.      The Debtors enter into Deferment and Forbearance Arrangements with borrowers in the ordinary course, which are designed to manage borrower relationships, maximize collections, and avoid foreclosure (or repossession of collateral, as applicable) if reasonably possible.

ny-1044508

7. Furthermore, the payment of T&I Advances and Corporate Advances are necessary to preserve the value of REO pending a sale of the asset and are also required pursuant to the Guides and/or servicing agreements, as applicable.

8. Moreover, with respect to Corporate Advances, (a) foreclosure attorneys are typically paid on a pre-approved, per service basis, (b) inspection companies charge a flat fee per inspection; (c) field service companies are compensated based on a fee structure that has been pre-approved by mortgage investors and (d) realtors receive a capped percentage from the proceeds of a successful property sale. The Debtors are generally reimbursed for fees related to these professionals upon a sale of the property.

## THE GA SERVICING MOTION

**I.     Third Party Reliance on Debtors' Continuation of Servicing**

9. As of March 31, 2012, the Debtors were servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion, approximately 68% of which are owned, insured or guaranteed by the Governmental Associations.

10. The mortgage backed securities ("MBS") issued or guaranteed by the Governmental Associations are owned by a broad range of investors, including pension funds, banks, insurance companies, governmental bodies and other public and private entities.

11. The MBS issuers depend on the performance of the servicer to ensure timely payment of amounts owed under the securities.

## II.    GA-Specific Obligations

12.    GMAC Mortgage is qualified to service the mortgage loans pooled in the GA Securitization Trusts because it is approved as a seller/servicer by Fannie Mae and Freddie Mac and as an issuer by Ginnie Mae.

13.    The Debtors service approximately 950,000 Fannie Mae Loans, with an aggregate unpaid principal balance of $153.2 billion.  Fannie Mae Loans comprise approximately 60% of the Debtors' GA Loan servicing portfolio.  In addition, the Debtors service approximately 370,000 Freddie Mac Loans, with an aggregate unpaid principal balance of $59.8 billion.  Freddie Mac Loans comprise approximately 23% of the Debtors' GA Loan servicing portfolio.

14.    All qualified servicers, subservicers, and servicing agents of GA Loans must comply with the servicing terms and procedures set forth by the Governmental Associations in the GA Servicing Agreements, which incorporate by reference the applicable Governmental Association servicing guides.

15.    Pursuant to the GA Guides, the Debtors are required to meet certain deadlines in connection with foreclosure proceedings.  If the foreclosure of a GA Loan exceeds the time allotted under the GA Guides (including any extensions for cause available thereunder), Fannie Mae or Freddie Mac, as applicable, may assess a penalty against the Debtors (a "<u>Foreclosure Timeline Penalty</u>").

## III.    Scope of Anticipated Expenditures in Connection with GA-Specific Obligations

16.    As of March 31, 2012, the Debtors held receivables totaling approximately $92.1 million on account of Corporate Advances made with respect to GA Loans.  The Debtors typically recover substantially all of the Corporate Advances in subsequent months.  The Debtors

ny-1044508

expect to make Corporate Advances in connection with the GA Loans in the average amount of approximately $25 million per month.

17. The Debtors, as of March 31, 2012, held receivables totaling approximately $283.3 million on account of T&I Advances made with respect to GA Loans and approximately $36.7 million on account of P&I Advances made with respect to GA Loans. The Debtors typically recover the P&I Advances and T&I Advances in subsequent months. The Debtors expect to make P&I Advances and T&I Advances in connection with the GA Loans in the average monthly amounts of $100 million and $50 million, respectively.

18. I also understand that, in February and March 2012, Foreclosure Timeline Penalties were assessed against the Debtors in the aggregate amounts of $1.38 million and $1.53 million, respectively.

### IV.  GA REO Obligations

19. In some circumstances, the Debtors, in their role as servicers, conduct foreclosure sales in their own names, rather than in the name of the owner of the loan. As a consequence, immediately following foreclosure, title to GA REO is occasionally held in the name of the Debtors, even though ownership of, and equitable title to, the GA REO are vested in the applicable Governmental Association as the owner of the GA Loan. On such occasions, in order to reflect actual ownership, the Debtors subsequently transfer or assign the deed relating to the GA REO to the true owner.

20. The Debtors do not own the GA REO and are not responsible for the marketing or sale of GA REO. Accordingly, their obligation to make Corporate Advances with respect to GA REO is typically limited to properties that have been sold at foreclosure sale but not yet

6

ny-1044508

conveyed. In February and March 2012, the Debtors made Corporate Advances in connection with the GA REO in the approximate amounts of $19,200 and $2,500, respectively.

21. Proceeds from third party foreclosure sales are deposited into a GMAC Mortgage clearing account. Upon conveyance of the property to a purchaser, the Debtors submit a claim for repayment of outstanding Advances to Ginnie Mae, Fannie Mae, or Freddie Mac, as applicable.

22. As of March 31, 2012, the Debtors estimate that they currently service approximately 370 GA REO properties that have been sold at foreclosure sales but not yet conveyed, with an aggregate unpaid principal balance of approximately $59.6 million.

## V.    FNMA EAF Facility

23. The EAF Terms were negotiated at arms' length and with the assistance of independent counsel.

24. I believe that the EAF Terms are fair and reasonable, and that use of Fannie Mae's cash collateral under the Fannie Mae EAF Facility is in the best interests of the Debtors' estates.

## VI.   FREDDIE MAC SERVICING TRANSFERS

25. In the ordinary course of business, prior to the Petition Date, the Debtors were required by Freddie Mac, pursuant to contractual terms of business, to transfer to other servicers the servicing relating to Freddie Mac Loans that failed to meet negotiated servicing standards or benchmarks. The Freddie Mac Metrics were the subject of thorough negotiations between Freddie Mac and the Debtors and I believe them generally to be reasonable and achievable by the Debtors in the ordinary course.

**NON-GA SERVICING MOTION**

I. **Third Party Reliance on Debtors' Continuation of Servicing**

26. As of March 31, 2011, of the over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion being serviced by the Debtors, approximately 17% were held by private investors or included in securitization trusts for "private label" securitization pools.

27. The holders of Non-GA Loans, including the purchasers of securities issued by private label securitization trusts, are comprised of a broad range of investors, such as pension funds, banks, insurance companies, governmental bodies and other public and private entities.

28. These investors depend on the performance of the servicer to ensure the recovery of their investments.

II. **Non-GA-Specific Obligations**

29. Advances paid by the Debtors, primarily GMAC Mortgage, with respect to the Non-GA Loans are handled in a similar manner to those paid with respect to GA Loans, except that, in connection with loans for which Debtor Residential Funding Company, LLC ("RFC"), holds the MSRs, in the event that the Debtors determine that future Advances will be non-recoverable, RFC reimburses GMAC Mortgage for any outstanding Advances immediately following such determination and holds the receivables on account of such Advances. RFC then has the right to recover such Advances upon the ultimate disposition of the loan.

III. **Scope of Anticipated Expenditures in Connection with Non-GA-Specific Obligations**

30. As of March 31, 2012, the Debtors held receivables totaling approximately $278.1 million on account of Corporate Advances made with respect to Non-GA Loans. The Debtors typically recover substantially all of the Corporate Advances. The Debtors expect to make

8

ny-1044508

Corporate Advances in connection with the Non-GA Loans in the average amount of approximately $75 million per month.

31.  As of March 31, 2012, the Debtors held receivables totaling approximately $579.7 million on account of T&I Advances made with respect to Non-GA Loans and approximately $890.6 million on account of P&I Advances made with respect to Non-GA Loans.  The Debtors expect to make P&I Advances and T&I Advances in connection with the Non-GA Loans in the average monthly amounts of $650 million and $125 million, respectively.

**IV.    Non-GA REO Obligations**

32.  Following the foreclosure of Non-GA Loans owned by the Debtors and certain of the Non-GA Loans serviced by the Debtors, the Debtors remain responsible for managing and maintaining the vast majority of Non-GA REO pending a sale, including making Advances.

33.  Following the foreclosure of loans owned by the Debtors of Non-GA Loans serviced by the Debtors, the Debtors market and sell the vast majority of REO themselves, often with the assistance of a real estate broker.  Where the Non-GA Loans are owned by third parties (and the Debtors have serviced the loans), the Debtors remit the net proceeds of any sale to the appropriate parties in accordance with the relevant Non-GA Servicing Agreement and submit a claim for repayment of outstanding Advances to the applicable investor.

34.  If the Debtors are unable to sell the sell their REO properties because of the refusal of third parties to close (or conditionally close) without an order of the Court granting the requested relief, the Debtors will incur significant administrative costs in connection with preservation of the REO that would have otherwise been sold.

35. Because the value of REO properties becomes more uncertain the longer they remain on the market, delaying the sale of the foreclosed Non-GA Loans and REO could lead to a reduction of the purchase price of these properties.

36. In February and March 2012, the Debtors made Corporate Advances in connection with the Non-GA REO in the approximate amounts of $13.5 million and $15.4, respectively. Corporate Advances with respect to Non-GA REO are significantly larger than with respect to GA REO because, unlike GA REO, the Debtors typically continue to service Non-GA REO following foreclosure, including conducting marketing and sales of such properties.

37. Proceeds from third party foreclosure sales are deposited into a clearing account. Upon conveyance of the property to a purchaser, the Debtors submit a claim for repayment of outstanding Advances to the applicable investor. The Debtors may also be required to refund overpayments to buyers in connection with post-sale cost adjustments. The remaining proceeds are then distributed to the appropriate parties.

## SUPPLEMENTAL SERVICING MOTION

38. The Debtors, either as sellers or as servicers of the loans sold to a Securitization Trust, have certain obligations with respect to the loans held by the Securitization Trust, and to the trustees that administer the Securitization Trusts (each a "Trustee") pursuant to the terms of indentures, servicing agreements, pooling and servicing agreements, and other securitization documents, as applicable (the "Trust Agreements").

39. The Trust Agreements also contain provisions that provide for the Debtors in their capacity as servicers of the loans to perform servicing functions, including making principal, interest, and other servicing advances, and reimbursing and indemnifying the Trustees for any

liability, loss, fees, cost or expense incurred by any of the Trustees in the performance of their duties or their administration of the Securitization Trusts subject to the conditions set forth in the Agreements.

40. The continued performance of the Debtors' servicing functions and the payment of Trustees' fees pursuant to the Trust Agreements are within the ordinary course of the Debtors' servicing business.

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed on June 8, 2012

By:   /s/ Joseph A. Pensabene
Joseph A. Pensabene
Executive Vice President/
Chief Servicing Officer of
Residential Capital, LLC