MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF JAMES WHITLINGER, CHIEF FINANCIAL
OFFICER OF RESIDENTIAL CAPITAL, LLC, IN FURTHER SUPPORT OF ENTRY
OF FINAL ORDERS FOR SPECIFIC "FIRST DAY" MOTIONS**

I, James Whitlinger, being duly sworn, depose and say:

1. I am the Chief Financial Officer of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"). I have held this position since May 2011. I joined ResCap in 1992, and before becoming its Chief Financial Officer, I served in a number of positions, including Chief Accounting Officer for a significant subsidiary of ResCap, Senior Vice President of mergers and acquisitions and Executive Director of Finance. In my role as Chief Financial Officer of ResCap, I am responsible for financial oversight, analysis, controls, accounting, reporting and business planning for the mortgage-related operations of the Debtors and their non-

ny-1042594

debtor subsidiaries. I am authorized to submit this declaration (the "Declaration") in further support of the entry of final orders for specific "first day" motions, as set forth below.[1]

2. In my capacity as Chief Financial Officer, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; information supplied or verified by personnel in departments within the Debtors' various business units; my review of the Debtors' books and records as well as other relevant documents; my discussions with other members of the Debtors' management team; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' operations, financial condition and history. In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees or consultants, I have relied upon these employees and consultants accurately recording, preparing, collecting, or verifying any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

### A. The Shared Services Motion[2]

3. The Shared Services Agreement (the "Agreement") for which ResCap seeks this Court's authorization to enter into is the product of extensive, arm's length negotiations between ResCap and AFI, over the course of several months, that resulted in an eminently fair and, indeed, beneficial agreement that is absolutely critical to ResCap's ongoing

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the applicable motion.

[2] Debtors' Motion For Interim And Final Orders Under Bankruptcy Code Sections 105(a) And 363(b) Authorizing Residential Capital, LLC To Enter Into A Shared Services Agreement With Ally Financial Inc. *Nunc Pro Tunc* To The Petition Date For The Continued Receipt And Provision Of Shared Services Necessary For The Operation Of The Debtors' Businesses [Docket No. 41].

ny-1042594                                    2

business. This Declaration will describe the negotiations that resulted in the Agreement and the crucial benefits that it provides to ResCap.

4.  Before any shared services agreement could be executed, ResCap and AFI were required to identify the services that were in fact shared among the two companies and their affiliates. Thus, ResCap and AFI embarked on a joint effort that began at the end of October, 2011 to document the services that each company provided to the other. In order to accomplish this task, ResCap appointed individual groups of employees that were designated responsibility for specific categories of services, or "Functional Service Areas." Those Functional Service Areas included: Finance/Tax; Audit; Treasury; Risk; Compliance; Loan Review; Human Resources; Legal; Communications and Investor Relations; Capital Markets and Investment Management; Marketing; Facilities; Supply Chain; Government Relations; and Information Technology.

5.  The individuals at ResCap responsible for each of the Functional Service Areas met on numerous occasions, and frequently corresponded, with their counterparts from AFI to examine their respective Functional Service Areas and develop highly detailed descriptions, or "Statements of Work" ("SOW"), of the services that were provided between ResCap and AFI. Additionally, outside counsel from Morrison & Foerster (for ResCap) and Kirkland & Ellis (for AFI) were involved in the process of identifying the various services provided across the Functional Service Areas. This process led to the creation of over fifty SOWs to document the services provided between ResCap and AFI.

6.  Following the creation of the SOWs, ResCap continued to analyze each of the SOWs to determine those that would be essential to the operation of the company after its bankruptcy filing and to consider necessary modifications to others. ResCap, recognizing that it

would not need the same breadth of services postpetition as it did prior to its Chapter 11 filing, because the company was preparing to be sold and had other changing requirements as a result of the Chapter 11 filing, only wanted to pay AFI for those services that would be critical to the continued operation of the business during the bankruptcy and sale process.

7.      The process of creating the SOWs and "scaling back" the services that were provided between the companies was subject to intensive negotiation between ResCap and AFI. The negotiations to eliminate and pare down the services that were required under the Agreement continued up until the filing of the Debtors' Chapter 11 cases. Ultimately, the negotiations resulted in a significant reduction in the services that were historically provided between the companies. As set forth in Schedule A-1 and A-2 to the Agreement, the services to be provided pursuant to the Agreement are documented in 31 SOWs where AFI is providing services to ResCap, and 20 SOWs where ResCap is providing services to AFI. In ResCap's business judgment, these services currently are the minimal amount of services required as of the Petition Date to allow ResCap to continue operating as a debtor in possession and to prepare itself for sale.

8.      A further step in the process of documenting the Agreement was determining the price that was to be charged for the services provided between the companies. Under the Agreement, the price for each Functional Service Area under the Agreement was subject to comprehensive negotiations between ResCap and AFI. In order to establish appropriate pricing measures, the managers within each Functional Service Area surveyed the percentage of time each individual associate spent performing work for the benefit of ResCap, AFI or their various affiliates. The percentage of time was applied to the functional costs – in essence the salary plus overhead – to arrive at the basis for the pricing of each of the SOWs.

9. In certain cases, AFI and ResCap pay costs to third-party providers for the provision of services to the other party. An example of this would relate to facilities. AFI engages Jones Lang LaSalle to provide security and maintenance for its facilities. In those cases where a third party is providing the services to ResCap through AFI, or vice versa, the amount of those services is passed through at cost.

10. The pricing negotiations, which were conducted at arm's length over the course of several months, resulted in the pricing for the Functional Service Areas that is reflected in Schedules C-1a and C-2a to the Agreement. Notably, when negotiations began between the companies, AFI was seeking compensation for shared services in an amount of approximately $300 million annually, which reflected the approximate annual cost of "shared services" for the total mortgage operations over the last several years prior to the filing. As a result of the intensive and thorough negotiations that occurred between the two companies, the final cost to ResCap for services provided by AFI under the Agreement was reduced to approximately $123 million – a significant reduction reflecting the provision of services that are absolutely necessary to the functioning of ResCap and its subsidiaries as debtors in possession.

11. The pricing methodology that was utilized in connection with the creation of the Agreement is also notable because it allowed ResCap to capture the reduction in or elimination of certain services. Historically, prior to the Agreement, a portion of AFI's overall costs for certain "shared services" was allocated to mortgage operations as a group. ResCap would then cash settle a percentage of the total costs allocated to mortgage operations. In connection with creating the Agreement, the parties agreed on the pricing methodology discussed above, which included a service by service analysis, as opposed to a top down allocation. Among other things, this new, more detailed and accurate, pricing methodology

allowed ResCap to properly capture from a pricing perspective the reduction or elimination of certain services, services for which AFI automatically allocated a portion of costs to ResCap in 2010 and 2011 under the prior system.  For example, ResCap eliminated or greatly reduced services for the following items from AFI:  (a) ResCap eliminated all services related to the Bank Holding Company; (b) ResCap eliminated all IT project costs not required to sustain the mortgage business, including, without limitation, IT costs related to AFI's General Ledger SAP support and the implementation of the Basel supervisory rules; (c) ResCap eliminated costs within Risk Management that covered Basel implementation and Federal Stress Test requirements; (d) ResCap eliminated all services related to the management of external and internal communications as functionality was established within the direct business; (e) ResCap greatly reduced the amount of external audit services that it receives because requirements have changed; and (f) ResCap greatly reduced the amount of general accounting services that it receives.

12. Simultaneously with the negotiations regarding the specific services to be provided and the prices for those services, the parties were engaged in active negotiations concerning the terms of the Agreement.  ResCap prepared the initial draft of the Agreement.  Subsequently, the parties negotiated the terms of the Agreement over the course of several months.  I understand that those negotiations were long, intensive, and thorough.  I have been informed that ResCap personnel engaged in approximately 100 phone calls during which the terms of the Agreement were negotiated.  Additionally, I have been informed that Morrison & Foerster and Kirkland & Ellis engaged in approximately 25 to 30 hours of phone conferences involving the negotiation of the terms of the Agreement.  Those comprehensive negotiations resulted in an Agreement that, in the business judgment of the Board of Directors of ResCap, is

highly beneficial to ResCap and essential to its operation as a debtor in possession preparing itself to be sold in these Chapter 11 cases.

13. Notably, under the Agreement, ResCap is able, with certain notice requirements, to terminate the receipt of services from AFI at any time, with a concomitant adjustment of pricing. Additionally, any termination of services does not relieve AFI from its obligations to provide continuing services that have not been terminated. This is significant given that ResCap anticipates that the services it requires will be significantly reduced following a sale. The Agreement will allow ResCap to reduce those services following such a sale while maintaining the limited services that it will require in order to complete the wind-down of its operations.

14. An urgent and critical need exists for authorization to enter into the Agreement. I believe that if the Debtors are not authorized to enter into the Agreement, the consequences will be immediate and widespread, resulting in a severe disruption of the Debtors' business operations. As a result, the value of the various Debtors' estates in these Chapter 11 cases will be significantly diminished and impede the Debtors' ability to complete a going concern sale with any buyer.

15. For example, absent the authorization to enter into the Agreement, the Debtors' use of information technology would be interrupted immediately. The Debtors rely upon AFI to develop, maintain, and service many of the information technology systems that are utilized in their core businesses. Additionally, fundamental administrative aspects of the Debtors' businesses would be thrown into disarray. Without the Agreement, for example, the Debtors' human resources services – which are managed by AFI – would be discontinued. As a result, the Debtors would be unable to offer basic health benefits to employees, continue other

benefit plans and, indeed, provide their employees with paychecks. This potentially could cause an exodus of employees while irreparably harming the morale of those that remain.

16. Replacement of the services that AFI provides to ResCap and its subsidiaries would be costly and time-consuming. ResCap would have to negotiate or renegotiate a variety of third-party contracts and, in essence, build its own technology infrastructure in order to duplicate the services to be provided under the Agreement. I have been informed that the process to recreate the services to be provided under the Agreement, exclusive of infrastructure, would take approximately nine months. Eighteen to twenty-four months would be required for the infrastructure. ResCap estimates that the cost of this exercise would be approximately $44 million. This approximated cost is based on the following estimated one-time expenses: (a) $34.2 million for IT related expenses to transition hardware and software; (b) $5 million for finance related expenses for general ledger, accounts payable and fixed assets; (c) approximately $3.2 million for human resources related expenses for implementation of benefit plans and payroll, and engaging consultants in connection with this transition; (d) approximately $1.2 million for supply chain related expenses for contract rewrites, break-up fees, and negotiation of new contracts; and (e) $750,000 for facilities related expenses to separate AFI's and Ally Bank's facilities from ResCap's facilities.

17. I believe, therefore, that the Agreement – an agreement that was heavily negotiated over the course of many months between representatives of ResCap and AFI along with their respective legal counsel – is eminently fair, provides critical services required for ResCap's continued operation as a debtor in possession, and represents the considered business judgment of the ResCap Board of Directors. The services to be provided under the Agreement are the bare minimum required for a 3,600 employee organization that is dependent upon

technology in a heavily regulated environment in an industry currently subject to substantial litigation.

### B.   GA and Non-GA Servicing Motions

*Necessity of Relief*

18.    The relief requested pursuant to the GA Servicing Motion[3], the Non-GA Servicing Motion[4], and the Supplemental Servicing Motion[5] is necessary to ensure that the Debtors can continue to perform their servicing activities in the ordinary course.  Maintenance of those operations is critical because, among other reasons, Nationstar requires, as a condition to closing, that the Debtors maintain their servicing operations at current volume and servicing quality standards until the sale is consummated.  In the event the Debtors are unable to satisfy that requirement, the sale of the Debtors' servicing platform would be jeopardized.

---

[3] Debtors' Motion for Interim and Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief [Docket No 57] (the "GA Servicing Motion").

[4] Debtors' Motion for Interim and Final Orders Under Sections 105(a), 362, 363, 1107(a) and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Non-Governmental Association Loans, and (B) Sale Activities Related to Certain Loans in Foreclosure and Real Estate Owned Property, and (II) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and Eviction Proceedings [Docket No 46] (the "Non-GA Servicing Motion").

[5] Debtors' Motion for Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a) and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses [Docket No. 181] (the "Supplemental Servicing Motion").

### C.     The GA Servicing Motion and the Origination Motion

*Critical Vendor Relief*

19.    As of the Petition Date, the Debtors estimate that the outstanding prepetition obligations related to the Critical Servicing Vendors total approximately $15.97 million, of which the Debtors expect to make payments of approximately $10.82 million in the first thirty (30) days of these bankruptcy cases, subject to Court approval.

20.    As of the Petition Date, the Debtors estimate that the outstanding prepetition obligations related to the Critical Origination Vendors total approximately $3.32 million, on account of which the Debtors expect to make payments of approximately $2.21 million in the first thirty (30) days of these bankruptcy cases, subject to Court approval.

21.    The determination of which vendors qualify as Critical Servicing Vendors or Critical Origination Vendors was managed primarily by Erik Ferguson, a Senior Vice President of Business Excellence, in consultation with: Jill Horner, a Managing Director of Finance; Melody Wright, Director for Strategic Planning for Servicing; Christine Hasson, Senior Vice President for Vendor Management for Originations; and FTI Consulting's professionals (collectively, the "Review Team"). The senior members of management responsible for functions that are impacted by the critical vendor relief each reviewed and approved the final recommendations made by the Review Team. After review by functional management, I reviewed and approved the determinations of the Review Team.

22.    I understand that in making such determination, the Review Team considered a variety of factors, including, but not limited to, the role each vendor plays in the Debtors' day-to-day operations, whether the vendor was the sole provider of the service, whether each vendor could be replaced easily and cost-effectively, and the likelihood that each vendor

would refuse to provide services postpetition if it did not receive payment on account of prepetition amounts outstanding.

23. Accordingly, without the services of the subset of vendors identified by the Debtors as Critical Servicing Vendors or Critical Origination Vendors, the Debtors' ability to perform their Servicing Functions or origination activities, respectively, would be greatly impaired and the time and cost to replace them would be potentially debilitating to the Debtors' operational efficiency.

24. As directed by the Court at the first day hearings on the GA Servicing Motion, the Non-GA Servicing Motion, and the Origination Motion, I have and will continue to personally review each request for payment to any Critical Servicing Vendor or Critical Origination Vendor on account of prepetition amounts and, with assistance from Debtors' management and FTI Consulting, will determine whether such vendor is in fact critical.

### D.    The Cash Management Motion[6]

#### *Waiver Of Bankruptcy Code Section 345*

25. The Debtors are seeking a waiver of the requirements of section 345(b) of the Bankruptcy Code. The Debtors are currently in the process of closing and transitioning non-Custodial Accounts currently at depositories not authorized by the Office of the U.S. Trustee for the Southern District of New York, and that process will be completed in the next forty-five

---

[6] Debtors' Motion For Order Under Bankruptcy Code Sections 105(a), 345, 363, 364, And 503(b)(1) And Bankruptcy Rules 6003 And 6004 Authorizing (I) Continued Use Of Existing Cash Management Services And Practices, (II) Continued Use Of Existing Bank Accounts, Checks, And Business Forms, (III) Implementation Of Modified Cash Management Procedures, (IV) Interim Waiver Of The Investment And Deposit Requirements Of Bankruptcy Code Section 345, (V) Debtors To Honor Specified Outstanding Prepetition Payment Obligations, (VI) Continuation Of Intercompany Transactions, Including Intercompany Transactions With Future Debtors, And Granting Administrative Expense Status To Intercompany Claims, And (VII) Scheduling A Final Hearing On The Relief Requested [Docket No. 16].

ny-1042594                                                 11

days. However, based on my discussions with my colleagues in the Debtors' Treasury group, it is my understanding that there is one non-Custodial Account at Ally Bank that must remain at Ally Bank pursuant to Regulation W. The account is a restricted cash account, with a current balance in excess of $36 million, into which the Debtors deposit funds to collateralize the exposure GMAC Mortgage has to Ally Bank based on any credit transactions between the parties. Even though the account is titled in the name of GMAC Mortgage, Ally Bank has control over the funds in the account.

26.   It is my understanding that the proposed form of final order, pursuant to the request of one of the Debtors' depository banks, also includes language clarifying that the Debtors' Custodial Accounts are not subject to the restrictions in section 345 of the Bankruptcy Code.

27.   The Debtors' primary business relates to the servicing of mortgage loans. One component of loan servicing is the collection and processing of mortgage loan payments. As a loan servicer, the Debtors establish custodial accounts to manage (i) principal and interest payments as well as (ii) payments for taxes, assessments, property maintenance fees, and insurance with respect to the mortgaged property.

28.   As of the Petition Date, the Debtors manage 3,258 Custodial Accounts. The Debtors do not own the Custodial Accounts. The Custodial Accounts are included among the 3,514 Bank Accounts referenced in the Motion.[7] Only 166 of the 3,258 Custodial Accounts reside at non-authorized depositories, and of these 166 accounts, 162 reside at Ally Bank with an approximate balance of $2.7 billion. The aggregate amount in the Custodial Accounts exceeds $4.6 billion. Funds in these accounts are not listed among the Debtors' assets and are not

---

[7] In order to clarify any ambiguity in paragraph 7 of the Motion, the Custodial Accounts are included among the accounts identified in Exhibit B to the Motion.

ny-1042594                                    12

reflected on the Debtors' balance sheet. Moreover, the funds in these accounts can not be used by the Debtors to repay the Debtors' debts.

29. For each securitization trust or whole loan transaction, the Debtors establish separate Custodial Accounts at both the primary and master servicing levels. The accounts are held for the benefit of the securitization trustee or whole loan investor, which own the underlying mortgage loans. In addition, I also understand that to the extent that the Debtors receive Servicing Fees, such fees are pulled out from the cash flows before funds are transferred into the Custodial Accounts. Therefore, it is my belief that estate funds are not commingled in the Custodial Accounts.

30. It is also my understanding that the funds in the Custodial Accounts must be distributed by the Debtors to non-debtor counterparties in a manner consistent with the terms of the servicing guides and agreements, which specify the scope of the Debtors' responsibilities and duties as a servicer. Accordingly, the Debtors have no independent discretion as to how to spend the funds in the Custodial Accounts. The Debtors simply serve as a pass through for the funds from the borrowers to the securitization trustees and investors.

31. I further understand that checks are not drawn on the Custodial Accounts. Funds are transferred, either by wire or ACH, from the Custodial Accounts to disbursement accounts, and then checks are drawn from disbursement accounts (residing at authorized depositories) to third parties.

32. Finally, it would be very difficult to close certain of the Custodial Accounts that reside at non-authorized depositories because in certain instance, the Debtors would be required to first obtain investor approval, and in other instances, transferring of the Custodial Accounts would be in violation of the explicit terms of servicing agreements.

*Cash Management Practices*

33. Although complex, due to the nature of the Debtors' businesses and operations, the Cash Management System generally operates as other sophisticated cash management systems operate in companies of similar size and complexity in the mortgage industry. The Debtors receive and collect cash, wires and pre-authorized drafts through various entry points in the Cash Management System, including lockboxes (where they receive borrower payments) and clearing accounts (where they receive payments and sales proceeds from servicers and buyers).

34. Notwithstanding the Debtors' desire to retain its prepetition cash management practices, at the request of its prepetition and postpetition lenders, certain modifications to the account structure were made in order to isolate the flow of proceeds from the different pools of collateral used to secure the lenders' respective financings. Specifically, the Debtors established new separate concentration accounts within the Cash Management System for each of their secured lenders. These accounts have been put in place in connection with the Debtors' anticipated postpetition implementation of certain modifications to the Cash Management System that segregate the proceeds of each lender's respective collateral. As a result of such modifications, portions of the Debtors' operating cash, along with cash generated from specific items of collateral, move into the separate Financing Concentration Accounts. The Debtors are funding their daily operations and paying ordinary course of business obligations by utilizing unencumbered cash as well as transferring funds from the Financing Concentration Accounts and other operating accounts to disbursement and other accounts, in accordance with the applicable facility.

35. I believe that the modifications recently made to the structure of the Bank Accounts is reasonable and appropriate and benefits the Debtors' secured lenders because it provides the necessary protections for the lenders' respective collateral pools and therefore, is beneficial to all of the estate's creditors.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 8, 2012

*/s/ James Whitlinger*
James Whitlinger
Chief Financial Officer of
Residential Capital, LLC