MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF GEORGE CROWLEY, SR. HUMAN RESOURCES DIRECTOR IN FURTHER SUPPORT OF DEBTORS' MOTION FOR A FINAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 363(b), 507(a), 1107 AND 1108 AND BANKRUPTCY RULE 6003 (I) AUTHORIZING BUT NOT DIRECTING DEBTORS TO (A) PAY AND HONOR PREPETITION WAGES, COMPENSATION, EMPLOYEE EXPENSE AND EMPLOYEE BENEFIT OBLIGATIONS; AND (B) MAINTAIN AND CONTINUE EMPLOYEE COMPENSATION AND BENEFIT PROGRAMS; AND (II) DIRECTING BANKS TO HONOR PREPETITION CHECKS AND TRANSFER REQUESTS FOR <u>PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS</u>**

I, George Crowley, being duly sworn, depose and say:

1.    I am a Senior Human Resources Director for Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"). I have held this position since 2010. I joined ResCap in 2005, and before becoming the Sr. Human Resources Director, I served in a number of positions, including

ny-1043896

Director of Human Resources and Manager of Workforce Administration.  In my role as Sr. Human Resources Director at ResCap, I am responsible for, along with the Sr. Vice President and Chief Human Resources Officer, working with the business heads to develop and maintain compensation and benefit programs that will attract talented employees who can help the Debtors achieve their business goals.  I am authorized to submit this declaration (the "Declaration") in support of Debtors' Motion for a Final Order Under Bankruptcy Code Sections 105(a), 363(b), 507(a), 1107 and 1108 and Bankruptcy Rule 6003 (I) Authorizing But Not Directing Debtors To (A) Pay and Honor Prepetition Wages, Compensation, Employee Expense and Employee Benefit Obligations; and (B) Maintain and Continue Employee Compensation and Benefit Programs; and (II) Directing Banks to Honor Prepetition Checks and Transfer Requests for Payment of Prepetition Employee Obligations (the "Motion").[1]

    2.  In my capacity as Sr. Human Resources Director, I am familiar with the Debtors' compensation and benefit programs.  Except as otherwise indicated, all statements in this Affidavit are based upon my personal knowledge; information supplied or verified by personnel in the department that is within my control; my discussions with other members of the Debtors' management team; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' business.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

    3.  The Employee wages, compensation and benefit program for which the Debtors seek this Court's authorization to pay prepetition amounts outstanding under and to continue in the ordinary course postpetition are absolutely critical to the Debtors' ability to successfully close the proposed sales of certain of its assets that will bring significant value to its

---

[1] Defined terms utilized in this Declaration but not defined herein shall have the meaning ascribed to such defined terms in the Motion.

ny-1043896  2

creditor constituents. The Debtors' businesses derive their value from the world-class service delivered by the approximately 3,625 Employees and 275 Contractors employed by the Debtors. These Employees and Contractors are the Debtors' single most valuable asset, because their professionalism, knowledge and reputation are at the core of the success of the servicing and origination businesses.

4.  The Employees are why ResCap is one of the leaders in government sponsored loan programs; they are what allow the Debtors to comply with the Federal Reserve Consent Order and the DOJ / AG settlement borrower relief program; and they are what will deliver billions of dollars in value to ResCap's creditors through the proposed asset sale to Nationstar.

5.  The mortgage servicing industry is extremely competitive at this point in time. The Debtors have lost a number of key employees because of the uncertainties of the last few months. Our competitors are continuously trying to hire our Employees away. It is extremely important to the Debtors that the Employees do not experience any personal hardship that an interruption in compensation or benefits would bring.

6.  I recognize that this situation and fear is faced by every party that files a petition for bankruptcy protection; however, it is particularly acute in the mortgage servicing business. And it is particularly acute in this enhanced regulatory environment.

7.  By the Motion, the Debtors sought the authority, but not direction to reimburse our ultimate parent company, Ally Financial Inc. ("AFI") for certain accrued but unpaid amounts owed to Employees and Contractors for prepetition wages, compensation and benefits. As described in the Motion, AFI acts as the Debtors' payroll processor and makes substantially all payments to Employees and Contractors. For purposes of this Final Order, the

Debtors are not seeking to make any payments that would exceed the statutory cap of $11,725 under section 507(a)(4) and 507(a)(5) of the Bankruptcy Code at this time.  Nor are the Debtors asking for authority to make payments to insiders that would violate section 503(c) of the Bankruptcy Code.  To the extent the Debtors want to pay a prepetition obligation to an Employee that exceeds $11,725, the Debtors will seek this court's approval with prior notice provided to the Official Committee of Unsecured Creditors (the "Committee").

8.    The Debtors also sought to reimburse Employees and Contractors for Business Expenses that may have been incurred prepetition but the reimbursement request was not submitted until after the Petition Date.  For purposes of the Final Order, I can confirm that the Debtors did not use any estate assets to reimburse Employees for prepetition Business Expenses.

9.    The Debtors are also seeking on a final basis, the Court's authority, but not direction, to make severance payments to 15 non-insider Employees who entered into termination/severance agreements with the Debtors prior to the Petition Date but whose end date falls after the Petition Date. The total amount to be paid to the 15 Employees is less than $181,000.  The termination dates range from June 2012 to December 2012.

10.    I have been advised that bankruptcy courts in this district generally grant administrative expense status to these types of severance payments because the Employees provide necessary postpetition services to the Debtors until their end date.  The Debtors are therefore seeking authority to pay these obligations as they become due without requiring the Employee to file a request for payment as an administrative expense.

11.    The Debtors are also seeking authority to continue their compensation and benefit programs consistent with their prepetition policies and practices.  Each Employee's

compensation consists of three components – Salary and Wages, Benefits and Variable Pay. The Debtors' seek court authority to continue these compensation programs to mitigate the impact of these chapter 11 cases on the Employees and provide a level of comfort that the components of their compensation will remain in tact.

12. As a result of AFI receiving loans under the Troubled Asset Relief Program ("TARP"), limitations are imposed on the amount, form and payment timing of compensation to certain Employees. The Debtors intend to continue their wage and benefit programs in a way that complies with the TARP regulations and the structure approved by the Special Paymaster that was appointed by the U.S. Treasury to oversee these programs.

*Wages*

13. The aggregate base salaries and wages paid to the Employees average about $17.35 million per month. In addition, the Debtors' four Independent Directors are paid $180,000 per annum, plus $10,000 for each Committee seat, $20,000 if they chair the Committee and $1,500 per meeting.

14. The Debtors also pay about $2.15 million per month for Contractors. These Contractors provide critical administrative and technology support. The Debtors are seeking to continue to utilize and pay Contractors in the same way we did prepetition.

*Benefits*

15. The Debtors also seek to continue the prepetition benefit programs offered to Employees. In addition, the Debtors seek approval to add, amend, supplement or remove benefit programs in the ordinary course. The Debtors continually review peer group benefit offerings to ensure that their benefit plans remain competitive in the marketplace.

16. The Debtors pay 11.75% of base payroll, or approximately $1.75 million per month, to AFI for the self-insured benefit programs, including Medical, Prescription Drug, Dental, Employee assistance, Life and Disability- - essentially all of the normal costs related to operating a business - - the Debtors offer their employees. At least annually, AFI compares the estimated Benefit cost payments made by the Debtors against the actual costs and a true-up payment is made either to or by the Debtors for the difference. The Debtors seek to continue paying the bi-weekly estimated benefit cost payment in the ordinary course and true-up as necessary.

17. Each of the Debtors' Full-time Employees is also eligible to receive benefits under the Debtors' severance program. The Debtors seek to continue their severance plan postpetition in the ordinary course, with one exception. I have been advised that section 503(c)(2) of the Bankruptcy Code caps severance payments to insiders at ten (10) times the mean amount paid to non-management Employees. As a result, the Debtors will cap any severance paid to an insider to the lower of their accrued severance benefit or 10 times the average severance payment to non-management Employees so as not to run afoul of section 503(c) of the Bankruptcy Code. The Debtors are still working with the Committee to identify appropriate oversight thresholds related to payments under the severance plan.

*Variable Pay*

18. The Debtors have three types of Variable Pay plans

Commission Variable Pay

19. Approximately 315 non-insider Employees receive all or a substantial portion of their pay in the form of commissions. Commission-eligible employees are loan originators and brokers that earn commissions upon the funding of a loan. Originators/brokers

earn 100% of their wages compensation through Commission Variable Pay and regional originator/broker managers earn 50-60% of the total compensation in the form of Commission Variable Pay.

### Production-Based Variable Pay

20. For loss mitigation, collection, loan recovery and consumer lending specialists, a portion of their pay (about 20 – 35%) is tied to the achievement of monthly and/or quarterly production targets.

21. The total cost to the Debtors for Commissions and Production-based variable pay is approximately $3.14 million per month. Variable pay is the most efficient and effective way for the Debtors to maximize the benefit of these Employees' services to the Debtors' estates and successfully restructure their businesses. No insiders are eligible for Commission or Production-Based variable pay and no prepetition amounts were due as of the Petition Date.

22. If the Debtors are prohibited from continuing these plans, it is my belief that there would be a mass exodus of experienced Employees and the Debtors would not be able to originate or broker mortgages in bankruptcy. As a result, the Debtors would not be able to derive any value from these platforms, which would result in a significant reduction in the proceeds the Debtors will receive from the proposed asset sales. Moreover, if the Debtors were required to replace these employees with new recruits, the new employees would require significantly higher base salaries without necessarily achieving the same level of production and service that the current Employees provide.

Discretionary Variable Pay

23. All other Employees - other than commission and production-based employees - receive a portion of their annual wages in the form of variable pay that is based on company and department performance targets established by management and approved by the Compensation Committee of the Debtor's board of directors.

**TARP**

24. There is one aspect of the Debtors' variable pay plans that requires more background. As a result of AFI receiving loans under the TARP, the Debtors are subject to a complicated set of regulations governing compensation.

25. TARP regulations limit certain Employees' ability to have their wages paid in cash. As a result, other forms of compensation, such as restricted stock, are provided to certain individuals to ensure that affected Employees receive the same wages they otherwise would have been paid in cash but for the TARP regulations.

26. The Special Paymaster, appointed by the U.S. Treasury, oversees the Debtors' compliance with the TARP regulations for executive pay and has approved the wage structure for the Debtors' senior management. The Debtors are seeking to continue the compensation structure approved by the Special Paymaster so that certain Employees can continue to receive postpetition, the same compensation, and in the same form as required for compliance with TARP, that the affected Employees received prepetition – nothing more.

Equity Variable Pay

27. Seventy-two (72) Employees are paid a portion of their annual wages in the form of restricted AFI stock under what is called the Long-Term Equity Compensation

Incentive Plan ("LTECIP"). The LTECIP is an AFI Plan for certain of AFI's and its subsidiary's executives.

28.     The Plan is structured to comply with TARP regulations and has been assessed and approved by the Special Paymaster appointed under TARP.

29.     Each recipient of restricted stock vests in accordance with the limitations dictated by TARP (*e.g.*, for certain recipients the stock only vests after and in proportion to the percentage of Loans repaid by AFI - - for others, the stock vests in 3 years).

30.     We are seeking court approval to allow Employees to continue accruing pay in the form of stock as required by TARP regulations and in the ordinary course of business, which is generally not awarded until year end. The Debtors are not seeking to make any payments for Equity Variable Pay at this time. The Debtors will only make such payments after receiving approval by the Court.

Cash Variable Pay

31.     All of the Debtors' Employees, other than Employees that receive commission variable pay and production-based variable pay, are eligible to receive an annual variable payment in cash that forms a part of their total wages under the ResCap AIP.

32.     TARP regulations have limited, however, the amount of variable pay that certain Employees may receive in the form of cash. As a result, certain executives must take 50% of their variable pay that would otherwise be payable in cash in the form of restricted Ally stock that does not vest for three years. The remaining 50% of the award may be taken in cash, but half must be deferred for one year.

33.     For the Debtors' non-executive Employees, the TARP restrictions have no impact on the cash variable pay they receive.

34. The Debtors are seeking to continue the Discretionary Cash Variable Pay plan for Employees in the ordinary course of their business and, where required by TARP regulations, substitute alternative forms of compensation to comport with the wage structures approved by the TARP Special Paymaster. The Debtors are not seeking to make any payments for Cash Variable Pay at this time. The Debtors will only make such payments after receiving approval by the Court.

35. The Debtors and I believe that it is necessary to continue each of these compensation programs in the ordinary course of our business to stem the loss of Employees to competitors that offer similar benefits that are not subject to TARP restrictions. In this hyper-competitive servicing and originating market, the Debtors would be at an unfair disadvantage to its competitors if it were not allowed to continue these programs. Moreover, without continuation of these programs, the Debtors will not have sufficient human resources to (i) comply with the Federal Reserve Consent Order and the DOJ / AG settlement borrower relief program, (ii) deliver billions of dollars in value to the Debtors' creditors through the proposed asset sales to Nationstar and AFI and (iii) replace Employees that leave as a result of natural attrition.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 8, 2012

/s/ George Crowley
George Crowley
Senior Human Resources Director for
Residential Capital, LLC