JACKSON WALKER LLP
Patricia B. Tomasco
SDNY PT0899
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2076 (direct line)
(512) 691-4138 (direct fax)
ptomasco@jw.com

*Counsel for The Frost National Bank*

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** | HEARING DATE: June 12, 2012 |
| **SOUTHERN DISTRICT OF NEW YORK** | HEARING TIME: 10:00 a.m. |

|   |   |   |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | (Chapter 11) |
| Debtors. | ) | Jointly Administered |

**LIMITED OBJECTION OF FROST BANK DEBTORS' MOTION
PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), AND (m), 365 AND1123, AND
FED R. BANKR. P. 2002, 6004, 6006, and 9014 FOR ORDERS: (A)(I) AUTHORIZING
AND APPROVING SALE PROCEDURES, INCLUDING BREAK-UP FEE AND
EXPENSE REIMBURSEMENT; (II) SCHEDULING BID DEADLINE AND SALE
HEARING; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND
(IV) GRANTING RELATED RELIEF AND (B)(I) AUTHORIZING THE SALE OF
CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
OTHER INTERESTS; (II) AUTHORIZING AND APPROVING ASSET PURCHASE
AGREEMENTS THERETO; (III) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
<u>LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF</u>**
[This Pleading Relates to Dkt. No. 61]

TO THE HONORABLE MARTIN GLENN, U.S. BANKRUPTCY JUDGE:

The Frost National Bank ("Frost"), a counterparty to a Servicing Agreement, creditor and party-in-interest in the above captioned bankruptcy case, files this Objection to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m) and 1123, and Fed. R. Bankr. P. 2002, 6004 and 9014 for Orders: (a)(i) Authorizing and Approving Sale Procedures, Including Break-

8216638v.1

Up Fee and Expense Reimbursement; (ii) Scheduling Bid Deadline and Sale Hearing; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief and (b)(i) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests; (ii) Authorizing and Approving Asset Purchase Agreements Thereto; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the "Sale Motion") [Dkt. No. 61]. In support, Frost respectfully shows the Court as follows:

## I. SUMMARY OF FROST'S LIMITED OBJECTION

1. A sale of the major part of the estate as proposed by the Sale Motion will have the practical effect of deciding issues that would normally arise in and be addressed in connection with the confirmation of a chapter 11 plan. Because there is some danger that the bid procedures in the sale motion might deprive Frost of substantial rights inherent in the plan confirmation process, it files this limited objection to preserve those rights. Specifically, Frost objects to the Sale Motion because the proposed bid procedures: (i) fail to disclose critical information regarding the disposition of the Frost Servicing Agreement such as whether it is included in one or more of the proposed APAs[1], whether defaults exist and what cure amount will be paid (ii) do not allow for the separate marketing or sale of the Frost Servicing Agreement (defined *infra*) or provide Frost with the ability to ascertain whether any proposed purchaser is capable of meeting servicing and servicer criteria embodied in the Frost Servicing Agreement going forward, (iii) impermissibly separate pre-closing liabilities under the Frost Servicing Agreement from the Assumed Liabilities. As proposed, the bid procedures presume too much and reveal too little to provide counterparties such as Frost to reasonably protect their interests in insuring that their

---

[1] Capitalized terms not defined herein shall have the meanings ascribed in the Sale Motion or the relevant APA.

8216638v.1

customers' mortgages are being serviced responsibly in accordance with the Purchased Servicing Agreements.

## II. BACKGROUND

### A. Procedural Background

2. On May 14, 2012 (the "Petition Date"), Residential Capital, LLC ("ResCap") and certain of its direct and indirect subsidiaries (each a "Debtor" and collectively, the "Debtors") each filed petitions for relief under chapter 11, title 11, United States Code (the "Bankruptcy Code"). The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank (f/k/a GMAC Bank), and other third parties.

3. The Debtors have negotiated and entered into two separate asset purchase agreements. The first, with Nationstar Mortgage LLC ("Nationstar") as the proposed stalking horse bidder for the sale of their mortgage loan origination and servicing businesses (the "Platform Sale"), and the second, with Ally Financial, Inc. ("AFI") as the proposed stalking horse bidder for the sale of the Debtors' "legacy" portfolio consisting mainly of mortgage loans and other residual financial assets (the "Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

4. On May 14, 2012, as part of its first day motions, the Debtors filed the Sale Motion, seeking approval of the Asset Sales.

5. On June 1, 2012, the Debtors filed and served their Notice of (i) Proposed Sale Procedures, Including Assumption And Assignment of Executory Contracts and Unexpired Leases, and (ii) Hearing on Proposed Sale Procedures (the "Notice"). The Notice provides that the deadline to object to the Sale Motion is June 11, 2011 at 4:00 p.m. (Eastern Time).

8216638v.1

**B.    The Servicing Agreement**

6.    Prior to the Petition Date, the Debtors engaged in the sale and servicing of real estate mortgages.

7.    On June 30, 2000, Frost and GMAC Mortgage Corporation, joint-debtor and subsidiary of ResCap ("GMAC") executed that certain servicing agreement for residential mortgage loans (the "Frost Servicing Agreement"). A true and correct copy of the Frost Servicing Agreement is attached hereto as Exhibit A. Frost is the "Owner" under the Frost Servicing Agreement, and GMAC served as the "Servicer"). The Frost Servicing Agreement is different from most servicing agreements. Frost is a Texas-based bank that values its customer relationships. Frost originated the mortgage loans subject to the Frost Servicing Agreement and subsequently determined to close its mortgage servicing operations relying on GMAC to carry on Frost's strong emphasis on customer service. Because Frost retained ownership and relied on its relationship with and confidence in GMAC to meet high servicing standards, the Frost Servicing Agreement contains various unique features.

8.    First, because the mortgages subject to the Frost Servicing Agreement are not held by a securitization, there is no securitization buffer between the mortgagors and Frost. As a result, unlike securitized loans, Frost continues to have a direct contractual relationship with the mortgagors. As a result, the Frost Servicing Agreement contains broad indemnification language to protect Frost from the effects of delegating the servicing function to GMAC. *See*, Frost Servicing Agreement § 8.01. Frost further prohibited GMAC from soliciting refinancings for any of the serviced loans. *See,* Frost Servicing Agreement § 4.16. Further, Frost placed strong restrictions on servicing transfers in addition to specifying that GMAC meet certain critical criteria of having and maintaining servicing or mortgagee licenses from FNMA, FHLMC, HUD or VA and complying with all of the servicing obligations in the Frost Servicing Agreement.

8216638v.1

Finally, the Frost Servicing Agreement is relatively small, covering only 547 mortgages totaling $22.1 million, with an average outstanding principal of $39,000.

9. Section 8.2 and 11.01 of the Servicing Agreement provide for any successor to GMAC meet criteria necessary to be capable of continued performance. First, section 8.2 requires that the successor servicer be an institution (i) having a GAAP net worth of not less than $100,000,000, (ii) the deposits of which are insured by the FDIC or which is a HUD-approved mortgagee whose primary business is the origination and servicing of first mortgage loans and (iii) who is an FNMA and/or FHLMC approved seller/servicer in good standing. In turn, section 11.01 provides that any successor servicer must "assume all of the Servicer's responsibilities, rights duties and obligations" under the Frost Servicing Agreement.

10. Events of Default include, without limitation: (i) failure to remit required payments to Frost, (ii) failure to observe any of the obligations, agreements or covenants of the Servicing Agreement, (iii) the Servicer is suspended or terminated by FNMA, FHLMC, HUD, or the VA.

C. **Deficiencies in the Sale Motion**

11. Frost is unable to evaluate whether the proposed Purchaser under either APA is capable of rendering future performance due to the paucity of detail embodied in the Sale Motion. First, the Sale Motion fails to provide executory contract counterparties with information regarding whether any particular contract is being assumed as part of the Sale Motion. Presumably, Exhibit F to the Motion and Exhibit A-3 to the Sales Procedures Order will be augmented to show which contracts are being assumed. The Nationstar APA states that Servicing Agreements are being assigned to Nationstar but the definition of "Servicing Agreements" refers to Schedule F and Schedule E, neither of which is attached. Section 2.1 of the APA provides for the Purchased Mortgage Servicing is being sold to Nationstar, but the

8216638v.1

definition of Purchased Mortgage Servicing "means all of Sellers' Mortgage Servicing" which in turn, is defined as all of the rights arising under "Other Serviced Loans" or "Private Investor Loans" identified on the "Mortgage Loan Schedule" purportedly disclosed in Schedule 4.9(a) that, again, is not attached.

12. More critically, the Nationstar APA purports to split pre-closing liabilities by keeping them with the estate, while permitting Nationstar to purchase all of the custodial accounts, escrows and other financial items. While most contracts lend themselves to identifying contract breaches as of the time of assignment, servicing agreements extend for the life of the mortgage that is typically 30 years. Often, non-monetary servicer defaults, particularly with respect to defaulted loans, are not asserted for many months or even years. Examples include mistakes in imposing forced-place insurance, excessive escrow payments and similar matters between the servicer and the mortgagor.

13. Section 2.2 of the APA states that Nationstar assumes the Servicing Contracts. In turn, Assumed Liabilities is defined as including only "the Liabilities arising under any Assumed Contract to the extent such Liabilities arise ***on or after the Closing***." Correspondingly, "Retained Liabilities" is defined as including the "Cure Amount" and "any act or omission of any … servicer of Mortgage Loans occurring prior to the Closing Date." This liability split is particularly troublesome given that (i) no cure amounts are disclosed in the Sale Motion (ii) most non-monetary servicer defaults are not capable of detection for many months or years and (iii) the monetary benefits of servicing accumulated over several years in the form of escrows, fee income and other pre-petition benefits are being transferred to Nationstar while the burdens are being retained solely by the estate. Absolutely no effort is reflected in the Sale Motion to

8216638v.1

address this dichotomy or to discern what non-monetary defaults exist or why the contract counterparties should have to bear the brunt of this improvident arrangement.

14. Finally, the Sale Motion fails to plead or prove that Nationstar or any other potential bidder will meet the ongoing servicing criteria outlined in the Frost Servicing Agreement. First, the Declaration of Samuel M. Greene tepidly states that "Nationstar holds *substantially all* [of] the mortgage operation licenses necessary to run the Purchased Assets … ." (emphasis added). It is surprising, then, that the Nationstar APA does not require that Nationstar (or any other purchaser) actually have the necessary licenses but only requires, under section 6.6, that the Purchaser use "commercially reasonable efforts" to have the necessary servicing licenses from the governmental agencies. Necessary licenses should be in hand upon the assignment to the purchaser, not at some later, undefined date.

### III. ARGUMENT

15. Section 365 of the Bankruptcy Code provides that the debtor cannot assume that contract unless it: (i) cures the default; (ii) compensates the nondebtor party for any actual pecuniary losses resulting from the default; and (iii) provides adequate assurance of future performance under the contract. 11 U.S.C. § 365(b). As made clear by the amendments effected by the Bankruptcy Abuse Prevention and Consumer Protection Act of 3005 ("BAPCPA"), with the limited exceptions of penalty rates and penalty provisions, the debtor is required to cure all nonmonetary defaults as well. *Id.*

**A.    Disclosure and Cure of Non-Monetary Defaults.**

16. Even if the Court were to determine that the Servicing Agreement may be assumed and assigned, the Frost Servicing Agreement may be assumed and assigned, if at all, with all of its benefits and burdens. Furthermore, any prospective purchaser would need to provide adequate assurance that it could perform the obligations under the Servicing Agreement,

8216638v.1

including without limitation, the requirement that the successor to the Servicing Agreement have the necessary agency licenses and a net worth of not less that $100,000,000.00. *See* Section 8.02.

17. Paragraph 6 of the proposed Sale Order and the "Assumed Liability" and "Excluded Liability" definitions of the APA purport to cut off Frost's ability to recover for any pre-Closing Date default while simultaneously absolving the Debtors of responsibility. This coupled with an inadequate mechanism for asserting or identifying non-monetary defaults or otherwise discerning what defaults need to be cured puts the Sale Motion on illegal footing. *See also, N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 531-32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere* and the exposés and liability incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate") *citing In re Italian Cook Oil Co.*, 190 F.2d 994, 996 (3rd Cir. 1951) ("The trustee, however, may not blow hot or cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits, he must adopt the burdens. He cannot accept one and reject the other."). The Sale Motion purports to assume and assign the Frost Servicing Agreement without any mechanism for addressing non-monetary defaults that are not knowable at this juncture. Any purchaser should be required to assume liability for non-monetary defaults regardless of their temporal origins. The Debtors attempt to assign contracts with no mechanism for paying or curing pre-Closing defaults is unfathomable. Accordingly, the Frost Servicing Agreement cannot be assumed and assigned absent a full cure of all outstanding obligations owing to Frost.

### B. Adequate Assurance of Future Performance

18. Further, adequate assurance of future performance includes showing that the assignee of the contract is capable of continued performance in every material respect. *See In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 693, 712-13 (Bankr. M.D. La. 1999) (otherwise permissible assignment resulted in an impermissible modification of electric supply contract by changing essential structure of arrangement). Here, the assignment of the Frost Servicing Agreement without compliance with the Successor Servicer provisions is an impermissible modification that cannot be cured. *Id.*

19. The Debtors must provide Frost with adequate assurance that any potential buyer can meet the net worth and licensure requirements enunciated in the Servicing Agreement. Accordingly, Frost reserves its right to later object to the financial or other qualifications of any proposed assignee, or to contest the assignment of the Frost Servicing Agreement to any assignee on all available grounds.

WHEREFORE, The Frost National Bank respectfully requests that any order granting the Sale Motion be modified to require that potential purchasers meet the Successor Servicing Requirements in the Frost Servicing Agreement, that potential purchasers be required to assume all non-monetary defaults under the Frost Servicing Agreement, and that Frost have such other and further relief to which it is entitled.

Dated: June 11, 2012.

        Respectfully submitted,

        JACKSON WALKER L.L.P.
        100 Congress Ave., Suite 1100
        Austin, Texas 78701
        (512) 236-2000
        (512) 236-2002 - FAX

        By: */s/Patricia B. Tomasco*
            Patricia B. Tomasco
            SDNY PT0899
            (512) 236-2076 – Direct Phone
            (512) 691-4438 – Direct Fax
            Email address:  ptomasco@jw.com

        **COUNSEL FOR THE FROST NATIONAL BANK**

8216638v.1

# CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of June 2012, a true and correct copy of the foregoing was served via electronic delivery on the parties listed below:

Larren M. Nashelsky,
Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY  10104

Office of the US Trustee
Tracy Hope Davis
Linda A. Rifking
Brian S. Masumoto
33 Whitehall Street, 21st Floor
New York, NY  10004
(**Via Facsimile 212-668-2255)**

Richard A. Cieri
Kirkland & Ellis, LLP
153 East 53rd Street
New York, NY 10022

Ken Ziman
Jonathan H. Hofer
Skadden Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

Kenneth Eckstein
George Horowitz
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY  10036

Jessica C. K. Boelter
Sidley Austin LLP
One South Dearborn
Chicago, IL  60603

　　　　　　　　　　　　　　　　　　　　/s/ *Patricia B. Tomasco*
　　　　　　　　　　　　　　　　　　　　Patricia B. Tomasco

8216638v.1