Hearing Date and Time: June 18, 2012, 10:00 a.m. (EDT)
Objection Deadline: June 11, 2012, 4:00 p.m. (EDT)

PREET BHARARA
United States Attorney for the
Southern District of New York
By:  JOSEPH N. CORDARO
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2745
Facsimile: (212) 637-2686
E-mail: joseph.cordaro@usdoj.gov

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**STATEMENT OF THE UNITED STATES OF AMERICA**
**CONCERNING DEBTORS' MOTION TO APPROVE SALE PROCEDURES**

The United States of America (the "United States" or the "Government"), by its attorney Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this statement concerning Debtors' motion to approve sale procedures and schedule a bid deadline and sale hearing [Docket # 61] (the "Motion") in connection with, *inter alia*, the Asset Purchase Agreement (the "Nationstar APA") between Nationstar Mortgage LLC ("Nationstar") and certain of the Debtors dated as of May 13, 2012.  *See* Motion, Ex. B.  The United States supports the efforts of everyone involved to formulate procedures leading to a sale of Debtors' assets, including their mortgage origination and servicing platforms, in an orderly manner, which hopefully will result in the least possible disruption to the mortgage servicing functions and the housing market as a whole.

Nevertheless, while not objecting to the specific procedural relief sought in the Motion, the United States files this Statement to express concern about the Nationstar APA's treatment of ResCap's and Ally's obligations to the United States and 49 state attorneys general under an historic mortgage servicing agreement reached earlier this year.  Under that consent judgment, in exchange for a release of claims alleging a variety of misconduct that contributed to the Nation's housing crisis, ResCap and Ally and four other major servicers agreed to, in addition to $25 billion in cash payments to governments and relief to borrowers, broad reforms that will reduce consumer confusion, improve service, and ensure more accurate representations in foreclosure and bankruptcy proceedings.  To ensure that the reforms are fully implemented, the servicers agreed to oversight by an independent monitor, cash payments for violations, and enforcement in the U.S. District Court for the District of Columbia.  As currently written, the Nationstar APA provides that the prospective purchaser of Debtors' mortgage origination and servicing businesses agrees to comply with some of the Debtors' non-monetary obligations under the agreement, but excludes certain other non-monetary obligations that are critical to protecting homeowners from future occurrences of mortgage-related abuse and fraud.  The United States reserves the right to object to this sale, and any other sale of assets, that does not provide for clear acceptance of such obligations on the part of the prospective purchaser.

## THE DOJ/AG MORTGAGE LOAN SERVICING AGREEMENT

1.     On February 9, 2012, the Department of Justice ("<u>DOJ</u>") announced that the Government and 49 state attorneys general reached a landmark agreement (the "<u>DOJ/AG Settlement</u>") addressing mortgage loan servicing and foreclosure abuses with the nation's five largest mortgage servicers: Bank of America Corporation, JPMorgan Chase & Co., Wells Fargo & Company, Citigroup Inc., and Ally Financial Inc. (the "Servicers").  The $25 billion

agreement—the largest federal-state civil settlement ever obtained—was the result of extensive investigations by federal agencies, including DOJ and the Department of Housing and Urban Development ("HUD") and the HUD Office of the Inspector General, and state attorneys general and state banking regulators across the country. The agreement was critical to homeowners because it provided them substantial financial relief along with significant new protections.

2. Under the DOJ/AG Settlement, the servicers were required to collectively dedicate $20 billion toward various forms of financial relief to borrowers, at least $10 billion of which will be directed toward reducing principal on loans for delinquent borrowers or borrowers at imminent risk of default. At least $3 billion will be committed to refinancing loans involving borrowers who are current on their payments, but who owe more on the mortgage than their homes are worth. Up to $7 billion will go toward other forms of relief, including, but not limited to, forbearance of principal for unemployed borrowers and benefits to service members forced to sell their homes at a loss as a result of a permanent change in station. Servicers receive only partial credit for dollars spent on certain activities; therefore, the direct benefit to borrowers will exceed the $20 billion number.

3. The DOJ/AG Settlement also mandates certain non-monetary obligations designed to protect homeowners. These critical reforms require, among other things, systems to ensure the accuracy of customer accounts, including with respect to amounts asserted on bankruptcy proofs of claim; limitations on fees and charges imposed upon homeowners in default, including debtors in a chapter 13 proceeding; a single point of contact for borrowers to inquire about their loans, as well as adequate staff to handle those inquiries; establishing procedures and timelines for reviewing loan modification applications; and giving homeowners the right to appeal denials of their applications. The DOJ/AG Settlement also changed the way

the Servicers handle foreclosures by requiring an evaluation of homeowners for other loss mitigation options in advance of foreclosure, and restricting banks from engaging in "dual tracking"—pursuing foreclosure while the homeowners is being considered for a loan modification.  The Servicers also agreed to protections for service members extending beyond the Servicemembers Civil Relief Act ("SCRA"), including thorough reviews to determine whether any service members were foreclosed upon or charged excessive interest in violation of SCRA during specified time periods, and compensation for any such service members in addition to the $25 billion settlement amount.

      4.      Another critical component of the DOJ/AG Settlement is the establishment of an independent monitor tasked with ensuring compliance with the agreement.  The monitor, agreed upon by the Government, the participating states, and the Servicers, is Joseph A. Smith Jr., who has served as the North Carolina Commissioner of Banks and Chairman of the Conference of State Banks Supervisors (CSBS).  Among the monitor's tasks are overseeing implementation of the servicing standards required by the agreement, imposing monetary penalties for violations, and publishing regular public reports that identify any quarter in which a Servicer failed to meet the standards in the DOJ/AG Settlement.  In order to ensure that the monitor is able to fulfill his responsibilities, the Servicers have agreed to provide him with regular reports analyzing servicing complaints and access to servicing complaints.  Each Servicer also has agreed to designate an independent internal quality control group to perform compliance reviews each quarter, and to allow the monitor access to the quality control group's work papers.

      5.      On April 5, 2012, the DOJ/AG Settlement was entered as five Consent Judgments—one for each Servicer—in the United States District Court for the District of Columbia (the "D.D.C.") in the matter styled *United States of America, et al. v. Bank of*

4

*America Corp., et al.,* No. 12-cv-00361-RCC (the "D.C. Action"). The relevant Consent Judgment for this bankruptcy was entered in the D.C. Action at Docket #13. The Servicers who are parties to that Consent Judgment are debtor Residential Capital, LLC, Ally Financial, Inc., and debtor GMAC Mortgage, LLC (the "Rescap Parties"). The Consent Judgment provides that the D.D.C. retains jurisdiction to enforce the terms of the Consent Judgment for its duration, which shall be three and one-half years from the date of entry.

6. The Consent Judgment contained a number of exhibits that impose substantive obligations on the parties. In Exhibit A, the parties agreed that "[r]eferences to Servicer shall mean Ally Financial, Inc., and its subsidiaries and affiliates Residential Capital, LLC, and GMAC Mortgage, LLC and shall include Servicer's successors and assignees in the event of a sale of all or substantially all of the assets of Servicer or of Servicer's division(s) or major business unit(s) that are engaged as a primary business in customer-facing servicing of residential mortgages on owner-occupied properties." Exhibit A, Section IX.B.2.

7. In recognition of the financial situation of the Rescap Parties and certain of their affiliates at the time of the settlement, the parties also agreed to an Addendum that was annexed to the Consent Judgment as Exhibit I. The Addendum provides assurances of continued performance of the Servicers' obligations in the event of certain "Transformative Transactions," including "a sale of all or substantially all of [the ResCap Parties'] assets . . . or a reorganization or similar transaction." Consent J., Ex. I at I-11. Among other things, the ResCap Parties agree to "requir[e] any successor or purchaser of substantially all the assets (or assets that together are material to the performance of the obligations of the ResCap Parties under the Consent Judgment) of a ResCap party to honor and perform the obligations (in the case of a purchase or other acquisition of assets, to honor and perform the obligations with respect to those assets)

5

under the Consent Judgment," with the exception of any monetary amounts owed by the ResCap parties under the Consent Judgment. *Id.* at I-12. These excepted monetary amounts are an exception to the obligations that are otherwise passed on to the Servicer's successors and assignees.

## THE NATIONSTAR APA

8. As described in the Motion, the "Purchased Assets" under the Nationstar APA include "Debtors' mortgage loan origination and servicing platform" along with "mortgage servicing rights and servicer advances belonging to [the Government National Mortgage Association ("Ginnie Mae")]. Motion ¶ 6. Debtors indicate that the purchase price for those assets is $2.3 billion. *Id.* Debtors acknowledge that their mortgage-servicing operations are "critical" to the "functioning of the U.S. mortgage market." *Id.* ¶ 3. The obligations imposed under the DOJ/AG Settlement are inextricably intertwined with these operations and are critical for providing a level playing field for homeowners and Servicers.

9. The Nationstar APA contains two key provisions addressing the DOJ/AG Settlement. Section 2.3(i) provides that the DOJ/AG Settlement is an "Excluded Asset," in other words, an asset that the Purchaser will not acquire from the Sellers under the agreement. Section 6.16 provides that "Purchaser agrees to comply with the mandated servicing standards as set forth in the DOJ/AG Settlement regarding the Purchased Mortgage Servicing, as set forth on Schedule 6.16." The Government interprets the phrase "mandated servicing standards" as a reference to Exhibit A of the Consent Judgment. Section 6.16 also provides that the Purchaser will use "commercially reasonable efforts" to cooperate with and assist Sellers with their foreclosure review obligations and certain monetary obligations related to borrower assistance.

In addition, the Nationstar APA is silent concerning any mechanism for enforcement of the DOJ/AG Settlement obligations that the Purchaser agrees to perform.

10. Accordingly, under the Nationstar APA, as currently worded, the Purchaser agrees to comply with only a subset of the DOJ/AG Settlement obligations. There is no indication, for example, that the Purchaser intends to comply with the enforcement requirements related to the monitor. Nor is there any provision regarding the review of service members' mortgages in order to find and correct improper foreclosures and the charging of excessive interest rates in violation of SCRA. Moreover, there is no mechanism by which the Government can seek specific performance directly against the Purchaser in the event of a failure to perform. These are matters of great concern to the Government.

11. While cognizant that the Court's present task is not to pass on the merits of the proposed sale, the Government raises this issue at this juncture in order to make all interested parties aware, including potential purchasers of the assets, of the Government's position with respect to the interplay of the obligations imposed by DOJ/AG Settlement and any potential sale of assets in this bankruptcy. The United States does not object to the Motion before the Court at this time, but reserves its right to object to a motion to approve any transfer of assets, including a motion to approve the sale contemplated under the Nationstar APA, on the ground that it does not provide for continued fulfillment by the purchaser of the non-monetary obligations of the DOJ/AG Settlement that are critical to protecting homeowners and deterring future abuse.

Dated: New York, New York
June 11, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

By:   /s/ Joseph N. Cordaro
JOSEPH N. CORDARO
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2745
Facsimile: (212) 637-2686
Email: joseph.cordaro@usdoj.gov