**Hearing Date: June 18, 2012 at 10:00 a.m.**

| | |
|---|---|
| **MORGAN, LEWIS & BOCKIUS LLP**<br>James L. Garrity, Jr.<br>John C. Goodchild, III (*pro hac vice* admission pending)<br>101 Park Avenue<br>New York, New York 10178-0600<br>Telephone: (212) 309-6000<br>Facsimile: (212) 309-6001<br>*Counsel to Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, as Trustees of Certain Mortgage Backed Securities Trusts* | **DECHERT LLP**<br>Glenn E. Siegel<br>Brian E. Greer<br>1095 Avenue of the Americas<br>New York, New York 10036-6797<br>Telephone: (212) 698-3500<br>Facsimile: (212) 698-3599<br><br>*Counsel to The Bank of New York Mellon Trust Company, N.A., as Trustees of Certain Mortgage Backed Securities Trusts* |
| **ALSTON & BIRD LLP**<br>Martin G. Bunin<br>William Hao<br>90 Park Avenue<br>New York, NY 10016<br>Telephone: (212) 210-9400<br>Facsimile: (212) 210-9444<br>*Counsel to Wells Fargo Bank, N.A., as Trustees of Certain Mortgage Backed Securities Trusts* | **SEWARD & KISSEL LLP**<br>Ronald L. Cohen<br>Arlene R. Alves<br>One Battery Park Plaza<br>New York, New York 10004<br>Telephone:  (212) 574-1200<br>Facsimile:  (212) 480-8421<br>*Counsel to U.S. Bank National Association, as Trustees of Certain Mortgage Backed Securities Trusts* |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | ) | **Case No. 12-12020 (MG)** |
| | ) | |
| **RESIDENTIAL CAPITAL, LLC, *et al.*,** | ) | **Chapter 11** |
| | ) | |
| | ) | **Jointly Administered** |
| **Debtors.** | ) | |

**LIMITED OBJECTION OF CERTAIN TRUSTEES FOR RESIDENTIAL MORTGAGE BACKED SECURITIES TRUSTS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), AND (m), 365 AND 1123, AND FED R. BANKR. P. 2002, 6004, 6006, and 9014 FOR ORDERS: (A)(I) AUTHORIZING AND APPROVING SALE PROCEDURES, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (II) SCHEDULING BID DEADLINE AND SALE HEARING; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF AND (B)(I) AUTHORIZING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENTS THERETO; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND .........................................................................................................................2

THE SALE PROCEDURES ........................................................................................................7

OBJECTIONS ...........................................................................................................................11

    A. SECOND CIRCUIT LAW MANDATES RESOLUTION OF ISSUES
    RELATING TO THE SEVERING PROVISIONS THROUGH AN ADVERSARY
    PROCEEDING.......................................................................................................................11

    B. THE PROCEDURES RELATING TO ASSUMPTION AND PAYMENT OF
    CURE AMOUNTS ARE UNFAIR, UNWORKABLE AND IMPERMISSIBLE
    UNDER THE BANKRUPTCY CODE .................................................................................16

    C. THE SALE PROCEDURES ARE NOT FAIR AND REASONABLE TO ALL
    PARTIES................................................................................................................................18

    D. THE TRUSTEES SHOULD BE AFFORDED ACCESS TO INFORMATION
    ABOUT PROPOSED PURCHASERS ...............................................................................21

CONCLUSION .........................................................................................................................22

DB2/ 23234583.9

## TABLE OF AUTHORITIES

Page(s)

CASES

*Cinicola v. Sharffenberger*,
  248 F.3d 110 (3rd. Cir. 2001) ................................................................................................17

*DB Structured Prods v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg.*
  *Holdings, Inc.),*
  402 B.R. 87 (Bankr. D. Del. 2009) .................................................................................11, 15

*In re AbitibiBowater, Inc.*,
  No. 09-11296, 2010 Bankr. LEXIS 5515 (Bankr. D. Del. June 22, 2010) ..............................18

*In re Access Beyond Technologies, Inc.*,
  237 B.R. 32 (Bankr. D. Del. 1999) ........................................................................................17

*In re American Safety Razor Co., LLC*,
  No. 10-12351 (Bankr. D. Del. Sept. 30, 2010), ECF No. 318 .................................................18

*In re MF Global Holdings Ltd.*,
  466 B.R. 239 (Bankr. S.D.N.Y. 2012) ...................................................................................12

*In re Orion Pictures Corp.*,
  4 F.3d 1095 (2d Cir. 1993)......................................................................................12, 13, 14

*The Leslie Fay Companies, Inc. v. Corporate Property Associates 3 (In re The Leslie Fay*
  *Companies, Inc.),*
  166 B.R. 802 (Bankr. S.D.N.Y. 1994) ...................................................................................12

STATUTES

11 U.S.C. § 365 ............................................................................................................... passim

28 U.S.C. § 157(b) ...............................................................................................................14

OTHER AUTHORITIES

Fed. R. Bankr. P. 6006(d) ......................................................................................................19

DB2/ 23234583.9

The Bank of New York Mellon Trust Company, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, U.S. Bank National Association and Wells Fargo Bank, N.A., in their capacities as trustees or indenture trustees for certain mortgaged backed securities trusts (collectively, the "**Trustees**")[1], hereby object to the *Debtors' Motion, inter alia, for an Order (I)(A) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expenses Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "**Motion**"). In support of this objection, the Trustees rely on the *Affidavit of James L. Garrity, Jr. in Support of the Limited Objections of Certain Trustees for Residential Mortgage Back Securities to the Debtors' Sale Motion and Postpetition Financing Motions* (the "**Garrity Affidavit**"), filed contemporaneously herewith, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors propose to sell substantially all of their assets, including their mortgage origination and servicing business, pursuant to a process and timeline that run afoul of Second Circuit precedent and fundamentally prejudice the rights of the Trustees. While the Trustees do not *per se* oppose a sale, it must proceed in an orderly manner that complies with applicable law. The Debtors propose to sever certain obligations in

---

[1]     The Trustees file this Objection solely in their capacity as trustees of the PLS Trusts and not in any of their capacities as members of the Official Committee of Unsecured Creditors (the "**Committee**").  Nothing in this Objection is intended to contradict the Committee's objections or other pleadings in respect of the Motion.

DB2/ 23234583.9

connection with such a sale, which raises fundamental yet complicated contract issues that require thorough, methodical consideration by an appropriate tribunal, rather than a summary proceeding. Further, the Debtors propose procedures for determination of cure disputes on a compressed schedule that not only leaves insufficient time for addressing cure issues and reducing defaults to liquidated amounts, but also fails to insure that the Debtors will be able to satisfy all of their cure obligations in connection with the proposed sale.

2.      Given the foregoing, the Trustees request that this Court deny the Motion to the extent the Debtors' proposed procedures prejudice the Trustees' ability to seek more than a mere summary decision of the very significant issues raised by the proposed sale. Instead, this Court should require appropriate proceedings and procedures, such as those described herein, for a considered resolution of these issues.

3.      Finally, the Trustees have significant ongoing rights and obligations (financial and otherwise) under their agreements with the Debtors, and have a vested interest in thoroughly examining the financial wherewithal and other qualifications and ability of a potential purchaser to assume the Debtors' obligations. Accordingly, the continuing role of the Trustees after the closing of a sale of the Debtors' assets mandates their increased participation in the selection of a purchaser.

## **BACKGROUND**

4.      On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors, together with their non-debtor subsidiaries, engage in two lines of business: (i) the origination and servicing

2

business and (ii) their so-called "legacy portfolio operations" consisting of mortgage loans and other residual financial assets. Whitlinger Aff. ¶16.[2]

5.    The Debtors' primary and most valuable operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank (f/k/a GMAC Bank) and other third parties. Whitlinger Aff. ¶ 6. As of March 31, 2012, the Debtors were servicing over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately $372 billion, making them the fifth largest servicer of residential mortgage loans in the United States. *Id.* ¶¶ 6, 9. Since 2008, mortgage loan servicing has been the Debtors' main source of ongoing revenue. *Id.* ¶ 25.

6.    The Debtors' business strategy also incorporates securitizing or selling substantially all of the mortgage loans they purchase or originate. Whitlinger Aff. ¶ 21. Through their capital market functions, the Debtors have participated in both securitization trusts holding Fannie Mae or Freddie Mac-owned mortgage loans and securitization trusts in which the mortgage loans are guaranteed by Ginnie Mae (collectively, the "**GA Securitization Trusts**"). In addition, prior to the collapse of the mortgage industry in 2007, the Debtors were active sponsors of private label securitizations which they pooled into securitization trusts and contributed loans and provided servicing to private label securitizations sponsored by third parties (collectively, the "**PLS Trusts**"). *Id.* ¶ 23 n.15. The securities issued by the GA Securitization Trusts and PLS Trusts are owned by a broad range of investors. *Id.* ¶ 23.

7.    The Trustees are trustees for hundreds of PLS Trusts, which the Trustees believe currently contain in excess of $100 billion in principal amount of mortgage loans serviced by

---

[2]    The term "Whitlinger Aff." refers to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 6].

Debtor entities.[3] The beneficial owners of the mortgage loans held by the PLS Trusts are investors in residential mortgage-backed securities ("**RMBS**"), which typically include public and private pension funds and other institutional fixed income investors.

8.        Each PLS Trust was formed pursuant to either a "Pooling and Servicing Agreement" or pursuant to a highly-integrated set of "Servicing Agreements," "Mortgage Loan Purchase Agreements," "Indentures," and/or "Trust Agreements," which, when combined, provided for administration of trust assets and the related RMBS. For convenience of reference herein, the integrated contract governing each PLS Trust will be referred to herein as a "**PSA**," even if the arrangements are physically memorialized in one or more differently styled contracts. This simplification of nomenclature should not, however, be taken to suggest uniformity in the terms and conditions of these contracts. Although there are groups of PSAs whose terms are quite similar, there are material differences among many of the PSAs affected by the Motion. Two exemplar PSAs are attached as **Exhibits A-1** and **A-2**, respectively, to the Garrity Affidavit. Exhibit A-1 ("**PSA Exemplar 1**") uses one of the so-called "Standard Terms" PSAs, which – in somewhat varying forms notwithstanding the "Standard Terms" moniker – govern many Debtor-sponsored RMBS transactions. Exhibit A-2 ("**PSA Exemplar 2**") uses very different documentation, including a separate Indenture, Trust Agreement and Servicing Agreement.

9.        Each PSA provides a comprehensive arrangement for (a) the administration of trust assets, which typically consist of thousands of mortgage loans and their proceeds (including cash and foreclosed real property, or "REO"), insurance policies or guaranties in respect of the

---

[3]    Based upon the Trustees' discussions with Debtors' counsel, the Trustees believe that they are the Trustees for the 290 securitizations referenced, but not specifically identified, in paragraph 108 of the Whitlinger Affidavit. The Trustees also serve as trustees for RMBS trusts to which Debtors sold loans that are not currently serviced by Debtors.  Although the Trustees may hold claims against Debtors with respect to the loans in those trusts, because the loans are not currently serviced by Debtors they not affected by the Motion.

loans or the RMBS, and other assets or financial instruments such as swap or other derivatives contracts, and (b) the administration of the related RMBS securities, whose complex terms require the calculation and distribution of trust asset cash flows to classes, or "tranches," of securities that have varying entitlements specified in the distribution provisions of the PSAs (commonly referred to as "waterfall" provisions). PSAs are voluminous (generally 100-200 pages) and intricate.

10.    Each PSA specifies the rights and obligations of the Debtors, the Trustees and RMBS investors and, as applicable, other parties in interest to the specific transaction. While the terms of specific transactions vary, in general the PSAs provide that Debtors are responsible for all tasks relating to the administration of the PLS Trusts' mortgage loan assets (billing, collecting, foreclosing, maintaining and selling REO properties), the investment of mortgage loan cash flows pending distribution to securities holders, and the compilation, computation and reporting of mortgage loan performance data. In some PSAs, the Debtors, in their capacity as servicer, are also required to enforce mortgage loan sellers' (including the Debtors') responsibility to repurchase defective loans. *See, e.g.,* PSA Exemplar 1 § 2.04. Finally, under many of the PSAs, Debtors, as servicer, are required to pay all fees and expenses of the Trustees, and to indemnify, defend and hold the Trustees harmless from all loss, liability, cost or expense arising from the Trustees' administration of the PLS Trusts. *See, e.g.,* PSA Exemplar 1 § 8.05(c).

11.    Prior to the occurrence of an event of default by the Debtor loan servicer, the PSAs typically assign the Trustees with limited duties, such as acting as paying agent with respect to the RMBS and, for some PLS Trusts, calculating RMBS investor distributions. After the occurrence of loan servicer events of default, however, the Trustees are assigned broader remedial powers and responsibilities, including, importantly, the duty to act as, or appoint or

consent to the appointment of, a substitute successor servicer upon termination of a servicer as to which an "Event of Default," "Event of Servicer Termination" or "Servicing Default" has occurred. *See*, *e.g.*, PSA Exemplar 1, Standard Terms at art. VII ("Default") and art. VIII ("Concerning the Trustee"); PSA Exemplar 2, Indenture § 6.01 (Duties of the Indenture Trustee), Servicing Agreement §§ 7.01 (Servicing Default), 7.02 (Indenture Trustee to Act; Appointment of Successor) .[4]

12.    The Trustees hold several different types of claims against the Debtors under the PSAs, arising from the Debtors' obligations in their capacities as originator and as servicer. First, the Trustees have claims arising from the Debtors' obligations under the PSAs to notify the Trustees and other parties in interest of the existence of material mortgage loan defects, including breaches of the representations and warranties under the PSAs, upon the Debtors' discovery thereof.  Second, the Trustees have repurchase claims against the Debtors with respect to any defective mortgage loans sold by Debtors to the PLS Trusts (the "**Repurchase Claims**"). Third, the Trustees have claims relating to the Debtors' (principally, Residential Funding LLC's and GMAC Mortgage LLC's) breaches of their mortgage loan administration obligations as master, primary or subservicers of various PLS Trusts' mortgage loans (the "**Loan Servicing Claims**").[5]  Fourth, the Trustees have claims against the Debtors for the payment of the fees and indemnification amounts arising from losses, liabilities, costs and expenses of administering the

---

[4]    Under some PSAs, these duties are imposed on a third-party "master servicer" and not the Trustees.

[5]    In some instances, Loan Servicing Claims may include Repurchase Claims, particularly in respect of the Debtors' obligation to enforce repurchase obligations of loan sellers.  In proposing a settlement granting an allowed claim of $8.7 billion in exchange for all of the above claims, including a release of both Repurchase Claims and Loan Servicing Claims by certain of the PLS Trusts, the Debtors have publicly recognized that such claims are extensive and that they involve complex interactions between the Debtors' loan origination, sale and servicing activities. *See, e.g.*, Whitlinger Aff. ¶108, Exhs. 10-A and 10-B.  Similarly, the DOJ/AG Settlement entered into by the Debtors addresses loan origination and servicing claims on an integrated basis. *See id.*  ¶89. ("The DOJ/AG Settlement generally resolves potential claims of the government parties arising out of the origination and servicing activities and foreclosure matters….")

PLS Trusts, including, but not limited to, costs relating to third-party claims relating to mortgage loans held in trust and the Debtors' loan origination and servicing activities with respect thereto (the "**Indemnification Claims**"). *See*, *e.g.*, PSA Exemplar 1, Standard Terms § 8.05(c)).[6] The Indemnification Claims also extend to the Debtors' failure to enforce mortgage loan sellers' (including the Debtors') obligations to repurchase defective mortgage loans sold to the PLS Trusts. Finally, as the Trustees conduct ongoing diligence on the myriad transactions in their portfolios involving the Debtors, they may have additional types of claims against the Debtors. The nature, scope and amount of all of the foregoing claims may vary based on the documentation setting forth the obligations with respect to each Trust.

## THE SALE PROCEDURES

13.    On the Petition Date, the Debtors announced their plans for an expedited reorganization of their businesses premised largely on two significant asset sales. The first sale contemplates Nationstar Mortgage LLC as the proposed stalking horse bidder for the sale of the Debtors' mortgage loan origination and servicing businesses (the "**Nationstar Sale**"). Whitlinger Aff. ¶ 7, Motion ¶ 2. The second sale contemplates AFI as the proposed stalking horse bidder for the sale of the Debtors' "legacy" portfolio consisting mainly of mortgage loans and other residual financial assets (the "**AFI Sale**" and collectively with the Nationstar Sale, the "**Sales**"). *Id.* The Debtors intend to implement their reorganization by consummating the Sales through a plan of reorganization. Whitlinger Aff. ¶ 7, Motion ¶ 4. The Motion also provides for the consummation of the Sales outside of the plan context pursuant to section 363(b) of the Bankruptcy Code. *Id.*

---

[6]    It is important to note that under many of the PSAs, the Debtor servicer's obligation to indemnify is not limited to circumstances in which the servicer has breached its duties under the PSA, but rather is a broad "no-fault" indemnification for all costs and liabilities incurred by the Trustee in connection with the Trustee's administration of the related Trust.

14.     The Motion seeks approval of the Sales and entry of three related orders: (i) an order authorizing and approving procedures (the "**Sale Procedures**") with respect to the Sales (the "**Sale Procedures Order**"); and (ii) orders authorizing the Sales (a) with respect to the Nationstar Sale (the "**Nationstar Order**") and (b) with respect to the AFI Sale (the "**AFI Order**" and collectively, the "**Sale Orders**"). Embedded within the Sale Procedures Order and the Sale Orders, particularly in connection with the Nationstar Sale, is a separate order that would approve the assumption and assignment of certain executory contracts, including an unspecified list of PSAs, and unexpired leases (the "**Assumed Contracts**") and establish cure amounts related to the Assumed Contracts (the "**Assumption and Cure Order**"). The Assumption and Cure Order should comply with Bankruptcy Code section 365 but it does not, because the Assumption and Cure Order is incongruous with the Sales and Sale Procedures that the Debtors are proposing, and also inappropriately seeks relief under Bankruptcy Code Section 363 that is unavailable with regard to executory contracts.

15.     The Sale Procedures contemplate a three-month process culminating in an auction on September 25, 2012 (the "**Auction**"). As outlined below, the Sale Procedures include a number of deadlines by which the Debtors, potential purchasers and various parties in interest, including the Trustees, would need to resolve substantial outstanding issues in these cases. Specifically, the Sale Procedures include the following important deadlines:

| | |
|---|---|
| June 25, 2012 | Deadline for Debtors to file list of Assumed Contracts |
| August 30, 2012 | Deadline for objections to assumption and assignment and Cure Amounts |
| September 18, 2012 | Deadline for bids |
| September 25, 2012 | Auction |
| October 8, 2012 | Deadline for objections to the Sales |
| October 15, 2012 | Sale Hearing |
| October 31, 2012 | Deadline to present the Sales to the Court as part of a plan |
| November 15, 2012 | Deadline for approval of the Sales outside of a plan |

| 2 business days prior to closing | Deadline to exclude servicing contracts from the Nationstar APA |
|---|---|

16.    In addition, the Debtors make clear in the Motion that "the assumption and assignment of the Assumed Contracts are part and parcel of the [Nationstar Sale]." Motion ¶ 31. As a result, the Sale Procedures include specific provisions with respect to the assumption and assignment of the Assumed Contracts, all of which together result in the Assumption and Cure Order. In particular, the Sale Procedures provide that the Debtors will serve a Notice of Assumption and Assignment on each counterparty to one or more Assumed Contracts, which notice shall apprise such counterparty of:

(i) the Debtors' estimate of the Cure Amount associated with each such contract;

(ii) that Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations relating to the pre-closing period under any Assumed Contract, whether such claims or obligations are known, unknown, fixed, contingent, unliquidated or liquidated at the time of the Closing, including, without limitation, any claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification claims or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date. Any parties holding such claims or obligations will be required to respond to the Debtors' cure notice if they disagree with the amounts set forth therein;

(iii) the deadline for objecting to approval of any Cure Amounts, the severing of any multi-agreement document (as described below) and/or the assumption by the Debtors and assignment to Nationstar of an Assumed Contract, shall be August 30, 2012, at 5:00 p.m. (Eastern Time); and

(iv) the Nationstar Sale Approval Order will generally provide that, in cases where a Servicing Agreement is contained within the same writing as an agreement related to origination or loan sales, that the Debtors intend to assume and assign to Nationstar only the Servicing Agreement and that the origination agreements and/or loan sale documents will be severed from the multi-

> agreement document pursuant to the Sale Order. Further, the Sale Order will generally require that no delay or failure of performance by the Debtors under or in respect to any origination agreement will (i) affect any right of Nationstar under any Servicing Agreement or (ii) permit, result in or give rise to any setoff, delay, deferral, defense, recoupment, claim, counterclaim, default or other impairment of the rights of Nationstar under any Servicing Agreement.

Motion ¶ 60, *see also* Motion at Ex. F (*Proposed Notice of Assumption and Assignment*) (the "**Cure Notice**").

13.     The Debtors also seek extraordinary relief in the Nationstar Order. In particular, the Nationstar Order would make the following unprecedented findings (the "**Severing Provisions**"):

> (i) The Servicing Agreements being assumed and assigned to the Purchaser pursuant to the Nationstar APA consist solely of enforceable contracts for providing servicing, subservicing or master servicing for Mortgage Loans;

> (ii) The Servicing Agreements do not include any Other Agreements,[7] regardless of whether such Other Agreements arise from, or are memorialized in, the same writing as the Servicing Agreements, and to the extent any Servicing Agreement arises from, or is memorialized in, one or more writings which include an

---

[7]     As defined in the Nationstar Order, "Other Agreements" means:

> any right, obligation, representation, covenant or agreement (i) contained in a Servicing Agreement that is <u>not</u> related to (a) collections with respect to, or the administration or servicing or subservicing or master servicing of, or reporting in respect of, mortgage loan, (b) servicing fees or ancillary income (c) the disbursement of collections with respect to Mortgage Loans, (d) the making of delinquency advances and servicing advances in connection with the servicing or subservicing or master servicing of Mortgage Loans, (e) payment of expenses associated with the administration, servicing or subservicing or master servicing of Mortgage Loans, (f) the limitation on liability of, and indemnification in favor of, the servicer, subservicer or master servicer thereunder, or (g) representations, warranties and covenants running in favor of the servicer, subservicer or master servicer thereunder, or (ii) that relates to mortgage loan origination, or the sale of mortgage loans, in all cases regardless of whether such Other Agreement arises from, or is memorialized in, the same writing as a Service Agreement.

Motion at Ex. D ¶ P.

Other Agreement, such Servicing Agreement is severable from any
Other Agreements;

(iii) The Sellers are not assuming and assigning to the Purchaser
and the Purchaser has no Liability under any Other Agreement;
and

(iv) The rights, if any, of parties against the Debtors in respect of
Other Agreements are not the subject matter of the Sale Hearing
and are expressly reserved; provided, however, that no party to an
Other Agreement may proceed against the Purchaser or the
Purchased Assets.

*See* Motion at Ex. D ¶ P.

14.    Among other things, the Severing Provisions would allow the Debtors and
Nationstar to (i) "sever" onerous provisions of integrated executory contracts and assume and
assign to Nationstar only the favorable provisions of such contracts, and (ii) arbitrarily limit
Nationstar's liability on account of provisions it would assume. In short, the Severing Provisions
are certain to generate litigation, the resolution of which will require extensive briefing and
potentially hundreds of individual trials concerning each PSA.  Rather than confronting that
certainty and providing appropriate procedures to resolve it before conducting an auction, the
Severing Provisions provide that the rights of the counterparties with respect to the Other
Agreements—*i.e.* the portions of the Assumed Contracts that Nationstar finds onerous—"are not
the subject matter of the Sale Hearing and are expressly reserved."  *Id.*

## OBJECTIONS

**A.    Second Circuit Law Mandates Resolution of Issues Relating to the Severing
Provisions Through an Adversary Proceeding**

15.    The Motion presumes that the proposed severing of portions of the PSAs is
permissible.  In support of the Severing Provisions, the Debtors cite just one case, *DB Structured
Prods v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.),* 402 B.R. 87

(Bankr. D. Del. 2009), which (i) is not precedential and (ii) turned specifically on the terms of the document in question.[8] Each PSA is different, and the integrated nature of each is a question of fact that must be decided in an appropriate proceeding, not a summary proceeding on a motion to assume. Accordingly, each PSA must be analyzed individually to determine whether and to what extent any portion is severable, and it may be necessary to create a separate record for each PSA.

16.     Absent an appropriate determination that a PSA is severable, each PSA is, on its face, a fully integrated executory contract, and therefore the Debtors cannot assume only a part of it. Section 365 of the Bankruptcy Code does not permit a debtor to assume only the beneficial portions of an executory contract and to leave behind undesirable liabilities. *See, e.g., In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012) ("The trustee must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits."); *The Leslie Fay Companies, Inc. v. Corporate Property Associates 3 (In re The Leslie Fay Companies, Inc.)*, 166 B.R. 802 (Bankr. S.D.N.Y. 1994) ("If an executory contract is assumed, it is said to be assumed *cum onere*, with all of its benefits and burdens."). Accordingly, the Trustees assert that the Debtors should be required to assume each PSA in its entirety, and to pay all amounts necessary to cure all existing defaults arising thereunder.

17.     Therefore, there is a threshold contractual dispute with respect to each PSA that must be addressed before this Court can make any determination on the Motion. Where such a dispute exists among parties, the Second Circuit has proscribed the summary determination of

---

[8]    In *In re Am. Home Mortg. Holdings*, the parties stipulated that the contract at issue was non-executory. *In re Am. Home Mortg. Holdings*, 402 B.R. at 92. The Trustees do not agree that any portion of the PSAs are non-executory.

12

contract rights issues by the Bankruptcy Court in the context of a motion to assume. *See, e.g., In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993).

18.    In *Orion*, the debtor was party to a licensing agreement (the "**Licensing Agreement**") with Showtime Networks, Inc. ("**Showtime**"). *Orion*, 4 F.3d at 1097. Showtime had previously notified the debtor that because it had violated a so-called "key-man clause," the debtor was out of compliance with the Licensing Agreement and Showtime would no longer be obligated to license films under the Agreement. *Id.* The debtor filed a motion to assume the Licensing Agreement, and, on the same date, commenced an adversary proceeding against Showtime, asserting anticipatory breach, and seeking declaratory relief of the parties' rights and either Showtime's specific performance or damages for breach of the Licensing Agreement. *Id.* Showtime made a motion to withdraw the reference of the adversary proceeding to the District Court, arguing that the issues therein were non-core, and should not be before the Bankruptcy Court, and also requested a jury trial. *Id.* Thereafter, the debtor filed an amended complaint, removing the request for damages. *Id.*

19.    The District Court found that the adversary proceeding was a core proceeding and denied Showtime's motion to withdraw the reference. *Id.* Thereafter, the Bankruptcy Court struck Showtime's request for a jury trial, determining that the motion to assume and the adversary proceeding were the same proceeding. *Id.* at 1097-98. Thereafter, in the course of deciding the motion to assume, the Bankruptcy Court determined that the debtor had not violated the Licensing Agreement, authorized the assumption by the debtor of the Licensing Agreement, and dismissed the adversary proceeding as moot. *Id.* at 1098. The District Court affirmed. *Id.*

20.    The Second Circuit vacated the Bankruptcy Court's granting of the motion to assume and the dismissal of the adversary proceeding (including the Bankruptcy Court's striking

of Showtime's demand for a jury trial). In doing so, the Second Circuit found that the

Bankruptcy Court "misapprehended the fundamental nature and purpose" of a motion to assume.

*Id*. Specifically, the Court determined:

> At heart, a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues. . . . [T]he process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the trustee or debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one. . . . Permitting a bankruptcy court to rule conclusively on a decisive issue of breach of contract would render the use of 'business judgment' . . . unnecessary, and is incompatible with the limited purpose of motions to assume of ensuring that valuable property is preserved and burdensome property discarded.

*Id*. at 1098-99.

21.     The Court further noted the potential Constitutional ramifications of determining

legal disputes in the context of a summary proceeding:

> [A]llowing a bankruptcy court to decide a disputed legal contract issue in the course of deciding a motion to assume could usurp litigants' Seventh Amendment jury-trial rights. Our holding that contract issues may not be decided as part of a motion to assume eliminates the possibility that any such constitutional problems will arise.

*Id*. at 1099.

22.     The Second Circuit also determined that the District Court had erred in

determining that the adversary proceeding was "core," under 28 U.S.C. § 157(b), finding instead

that a breach-of-contract action by a debtor against a party to a pre-petition contract is non-core.

*Id*. at 1102.  Accordingly, the Court of Appeals vacated and remanded the motion to withdraw

the reference to the District Court for redetermination in light of its finding that the adversary proceeding was non-core. *Id.* at 1101-02.

23.     Here, the Debtors are asking the Court to do the very thing that the Second Circuit proscribed in Orion—decide a disputed legal contract issue in the course of deciding a motion to assume.  Rather than a summary proceeding, the propriety of the Severing Provision must be determined after an appropriate court has taken evidence on each of the PSAs and made findings and conclusions regarding severability. In short, as a prerequisite for the Court to approve the Nationstar Order, and, in particular, the Severing Provisions, a court of appropriate jurisdiction must decide in a separate proceeding that each of the PSAs is severable.

24.     The litigation necessary to resolve such issues, including discovery, dispositive motions and potentially jury trials, will require significant time and must be conducted in an orderly fashion.[9] The Debtors' proposed schedule, which contemplates an auction occurring on September 25 and a sale approval hearing as early as November 15, simply does not permit sufficient time to accomplish those goals.[10]

---

[9]     The opinion in *In re Am. Mortg. Holdings, Inc.* shows that the determination of these fact-intensive issues requires significant time and resources.  There, the potential severing of obligations under only <u>one</u> agreement – memorialized in a single document – was contested:

> [T]here was extensive briefing by DBSP [the initial purchaser], and the Debtors . . . The Court held a five-day evidentiary hearing . . . at which it heard testimony from four fact witnesses and one expert witness for the Debtors, and one fact witness from DBSP, in addition to extensive oral argument by counsel for the Debtors and DBSP.

*In re Am. Home Mortg. Holdings, Inc.*, 402 B.R. at 92.

[10]    The Debtors have not yet identified, and do not propose to identify until immediately before the Sale, which PLS Trusts' PSAs (or which provisions of the PSAs, as the case may be) they intend to sever.  Because the PSAs do not have identical terms, it is not appropriate to consider them as a group or in the abstract.  Each PSA must be evaluated individually.  Therefore, the initial step must be the identification of the specific contracts at issue.

**B.      The Procedures Relating to Assumption and Payment of Cure Amounts Are Unfair, Unworkable and Impermissible Under the Bankruptcy Code**

25.      Similarly, the proposed schedule does not provide enough time for the Trustees to determine and resolve their cure claims.  Irrespective of whether the Debtors may sever any portion of the PSAs, there are multiple breaches of many, if not all, of the PSAs, at least certain of which are Loan Servicing Claims – in addition to Repurchase Claims and Indemnification Claims – that the Debtors would be required to cure in connection with the assumption and assignment of the PSAs.  The identification of the extent of these breaches, and calculation of the resulting claim amounts, is highly complex, and may vary from agreement to agreement.[11] Given the number of agreements in question, and given that the Debtors do not intend to identify which PSAs are at issue and the asserted cure amounts for each until June 25, the August 30 deadline for objections to proposed cure amounts is unrealistic.

26.      Further, the Motion attempts to characterize as "cure" amounts obligations that have not yet matured.  Specifically, the Cure Notice reads:

> Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations relating to the pre-closing period under any Assumed Contract (including any Servicing Agreement), whether such claims or obligations are known, unknown, fixed, contingent, unliquidated or liquidated at the time of the Closing, including, without limitation, any claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification claims or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date.  Any parties holding such claims or obligations will be required to file a Contract Objection if they disagree with the Cure Amount set forth on the Schedule.

Cure Notice ¶ 21.

---

[11]    The Debtors have previously acknowledged the complexity of these issues.  In describing the Debtors' litigation with certain monoline insurance companies, which arises from the same transactions that give rise to certain the Trustees' claims, the Debtors' CFO stated that "resolving such litigation will take substantial time and expense."  Whitlinger Aff. ¶ 101.

A "cure" payment relates specifically to a prior default under an executory contract or unexpired lease.  *See* 11 U.S.C. § 365(b).  A cure payment is not intended, and cannot be used, to absolve the assignee of the risk of future claims under the agreement.  Rather, the risk of future performance obligations necessarily lies with the assuming party.

27.    Section 365 of the Bankruptcy Code is not Section 363(f), and does not contemplate the assumption of an agreement free and clear of the obligations expressly set forth in such agreement.  *See Cinicola v. Sharffenberger*, 248 F.3d 110, 124 (3rd. Cir. 2001) ("[T]he sale of an executory contract triggers the protections afforded sales of bankruptcy estate property but also requires satisfaction of the requirements for assuming and/or assigning the same executory contract."); *In re Access Beyond Technologies, Inc.*, 237 B.R. 32, 48 (Bankr. D. Del. 1999) (holding that an executory contract does not become part of a debtor's estate until it is assumed, and that "[a] debtor cannot avoid the requirements of section 365 by saying it is 'selling' a lease or executory contract, rather than assuming and assigning it.").  Moreover, the assumption of an executory contract makes the debtor's estate liable for performance of all obligations arising thereunder; assignment of a contract once assumed merely obligates the assignee to the same terms.  *See*, *e.g.*, *American Flint Glass Workers Union vs. Anchor Resolution Corp.*, 197 F.3d 76, 81 (3d Cir. 1999) ("[A]n assignment of a contract as such involves a commitment by the assignee to perform all obligations under the contract, as well as to acquire all rights created by the contract.")

28.    Put simply, there is no provision of the Bankruptcy Code that permits assumption and assignment of any of the PSAs "free and clear" of the ongoing duty to perform all obligations, and honor all liabilities, arising thereunder.  If the Debtors' obligation has not yet matured at the time of assumption, then there can be no corresponding default that must be cured

at the time of assignment, because the obligation has not yet arisen. Accordingly, any proposed purchaser of the Debtors' assets cannot receive assignment of any PSA without also accepting all liabilities arising under it. Thus, to the extent the Trustees may, in the future, have Indemnification Claims, those claims have not yet been liquidated, and therefore – even if they are correctly characterized as cure claims – the Trustees cannot assert them in connection with their cure claims, and any assignment of the PSA does not extinguish them.

**C.    The Sale Procedures Are Not Fair and Reasonable to All Parties**

29.    As described above, even if the Debtors had identified all the PSAs to be assumed, which they have not, the Debtors' current timeline and proposal are not fair for all the parties, as they effectively ignore the complexity and importance of the threshold issues relating to severance of executory contracts, cure amount, and liability of the assignee under the PSAs.

30.    When weighing the approval of proposed bidding procedures, courts typically will consider whether the procedures are fair, reasonable and appropriately designed to maximize recovery for the benefit of the Debtors' estates, their creditors and other parties in interest. *See, e.g., In re AbitibiBowater, Inc.*, No. 09-11296, 2010 Bankr. LEXIS 5515, at *4-5 (Bankr. D. Del. June 22, 2010). As the Bankruptcy Court for the District of Delaware explained in *In re American Safety Razor Co., LLC*, bidding procedures are not evaluated based on a "business judgment" standard:

> I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters . . . for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case: to determine what is fair for <u>all</u> the parties.

18

Transcript of Motion Hearing at 132-33, *In re American Safety Razor Co., LLC*, No. 10-12351 (Bankr. D. Del. Sept. 30, 2010), ECF No. 318 (emphasis added).[12]

31.     In addition to the issues described above, the Cure Notice provides for the resolution of any cure disputes prior to the conclusion of the Sale Hearing, but it provides no process for such resolution, and provides no assurance that the Debtors will be able to satisfy all cure claims prior to the assumption of the contracts, as required in Section 365.  *See* Cure Notice ¶¶ 10-11.  Similarly, the Debtors have requested that the Court overrule any objections "based upon unquantifiable or unknown pre-closing liability," but have not proposed a structure that requires an escrow or otherwise provides for the possible later satisfaction of these claims.  *Id.* ¶ 11.  Moreover, even if an escrow of the entire proposed purchase price were required it is not clear that the sales will yield sufficient proceeds to satisfy the Trustees' claims.  Accordingly, there is a very real possibility that the Debtors will not be able to satisfy the key prerequisite to assumption of the PSAs:  they will not be able to cure the breaches of those agreements.  By requiring a process for the orderly assertion and calculation of cure claims, the Court may be able to avoid undue waste and delay attendant with a failure to cure at the point of sale.

32.     The Debtors' request that the Court waive the 14-day stay in connection with the closing of the sale is also inappropriate.  The issues in question likely will lead to controversial decisions with a meaningful possibility of appeal.  The assets in question are not of the "rotting on the vine" variety.  The Debtors propose to abrogate Federal Bankruptcy Rule 6006(d), which was specifically designed to give aggrieved parties the chance to appeal and to seek a more

---

[12]     A copy of this Transcript is attached to the Garrity Affidavit as **Exhibit B**.

lengthy stay in order to avoid mootness.[13]  The Debtors have come forward with no reason why this Court should take away that important right.

33.     Accordingly, the Trustees propose that this Court adopt the following steps to resolve issues relating to the proposed Sale Procedures and the Nationstar Sale, including the Severing Provisions and the Cure Notices:

- The Debtors should be required to identify with specificity in the Cure Notices those PSAs (or the provisions thereof, as the case may be) that they will sever, should they elect to assume and assign them.

- The issues relating to the Severing Provisions should be resolved through an adversary proceeding commenced by the Debtors, pursuant to which the appropriate tribunal can establish a briefing schedule with respect to the severing issue, and can conduct a trial and create a record on a trust-by-trust basis, based either on the terms of the applicable PSA, or, if not clear from the terms of the contract, such other evidence as such court deems appropriate.

- All deadlines relating to the Nationstar Sale, including the deadline for objections to cure, the bid deadline and any decision on the assumption and assignment of the PSAs, will be adjourned until the adversary proceeding is resolved, whether by settlement or by one or more decisions of the appropriate tribunal.

- Irrespective of whether or not this Court determines that the rights arising under the PSAs are severable and must be assumed and assigned (and all defaults must be cured in connection therewith), the parties are likely to have disagreements over the applicable cure amounts.  Therefore, the Trustees request that the Court require a procedure that assures that the Debtors will have sufficient resources to satisfy all asserted cure claims prior to assumption/assignment, and that provides for separate briefing with respect to appropriate cure amounts under each PSA.

- This Court should not deprive the parties of their rights under Bankruptcy Rule 6006(d) to a 14-day stay of any order.

---

[13]   Fed. R. Bankr. P. 6006(d) provides for a 14-day stay of an order authorizing a debtor or trustee to assign an executory contract or unexpired lease pursuant to Section 365(f) of the Bankruptcy Code.

**D.      The Trustees Should Be Afforded Access to Information About Proposed Purchasers**

34.      To the extent that any of the PSAs become Assumed Contracts, the Debtors must establish adequate assurance of future performance of such PSA by Nationstar, or any other purchaser. *See* 11 U.S.C. § 365(f)(2)(B). As the Debtors acknowledge, their loan servicing business – the fifth largest in the U.S. – is operationally complex and requires substantial financial wherewithal. *See* Whitlinger Aff., ¶¶9, 49-52.  Indeed, the Debtors attribute the extremely large DIP financing facility that they are requesting to the financial demands of advancing in accordance with the requirements of the PSAs. *See id.*, ¶¶ 53, 196.  As evidenced by the Debtors' discussion of their legal affairs, including the Federal and state investigations of mortgage servicing practices, failure to service loans in accordance with applicable servicing standards and law may subject the servicer and the PLS Trusts themselves to significant legal liabilities. *See id.,* ¶¶ 89-92; 166. Thus, Nationstar, or another purchaser, has a substantial burden to establish adequate assurance of their operational and financial capabilities.[14]

35.      Moreover, in light of the substantial legal affairs affecting the PLS Trusts, Nationstar, or any other prospective purchaser, must also demonstrate that it can perform the Debtors' indemnity obligations under the PSAs.  As a result, the Debtors should be required to provide the Trustees with information regarding Nationstar's or any other prospective purchaser's operational and financial capabilities to fulfill their obligations under the PSAs on an expedited basis, well in advance of the Auction and, in any event, in time to allow the Trustees to

---

[14]    The PSAs are replete with provisions evidencing the Trustees' and RMBS investors' strong interest in the identity and capabilities of any successor servicer.  Many of the PSAs require that any assignee (a) be "reasonably satisfactory to the Trustee," and (b) "execute[] and deliver[] to the Company and the Trustee an agreement, in form and substance reasonably satisfactory to the Company and the Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Master Servicer under this Agreement . . ."  *See, e.g., PSA Exemplar 1*, §6.02(c).  In addition, many PSAs provide that the Debtors' servicing rights and responsibilities cannot be assigned unless the credit rating agencies that rated RMBS issued thereunder have confirmed in writing that the assignment and delegation will not result in a downgrade of such securities ratings.  *Id.*

lodge timely adequate assurances objections.  The Trustees should also be given the opportunity to comment on the proposed Nationstar APA, or any mark-up thereof submitted by a Potential Bidder or a Qualified Bidder (as each is defined in the Motion).  Any failure by the Debtors to provide such information in a timely manner would infringe on the Trustees' ability to protect their rights to adequate assurance.

36.    The Debtors should also be required to promptly provide the Trustees with all "Ancillary Documents" (as defined in the Nationstar APA) or other proposed servicing sale and transfer documentation, including, but not limited to, the Servicing Transfer Agreement, which appears to be intended to set forth the details of how loan servicing will be transferred. In addition, the Trustees should be provided with any "markups" of the Nationstar APA that are submitted by other bidders immediately upon receipt by the Debtors.  The content of these agreements bears directly on the quality and completeness of the proposed PSA assumptions and on the content of the proposed future performance by Nationstar or any other purchaser.

37.    For similar reasons, the Trustees should also be permitted to attend the Auction, should one occur.  Because the Trustees may object to the proposed Sale on account of the Debtors' failure to establish adequate assurance, allowing the Trustees to attend the Auction will provide the Debtors the option to permit bidders to negotiate with the Trustees toward a resolution of the Trustees' adequate assurance issues.  In this way, allowing the Trustees to attend the Auction will actually add value to the Auction process, the bids under consideration and, ultimately, the Debtors' estates.

## CONCLUSION

38.    The Debtors have proposed a sale process that would have this Court determine complex disputed contractual issues regarding severance of the PSAs in a summary manner that

has been prohibited by the Second Circuit. The Sale Procedures also severely hamper the Trustees' ability to determine and protect their cure rights in connection with the proposed assumption and assignment of the PSAs. This Court should deny the Motion to the extent set forth herein and establish a process, consistent with the recommendations set forth herein, that protects the rights of the Trustees and treats all parties fairly.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**WHEREFORE**, for the reasons set forth herein, the Trustees respectfully request that this Court (i) deny the Motion to the extent set forth herein, (ii) establish a schedule and procedures based on the recommendations set forth herein,  and (iii) grant such other and further relief as the Court deems appropriate.

Dated: New York, New York                Respectfully submitted,
      June 11, 2012

| **MORGAN, LEWIS & BOCKIUS LLP** | **DECHERT LLP** |
|---|---|
| By:_s/James L. Garrity, Jr._____<br>James L. Garrity, Jr.<br>John C. Goodchild, III (*pro hac vice* admission pending)<br>101 Park Avenue<br>New York, New York 10178-0600<br>Telephone: (212) 309-6000<br>Facsimile: (212) 309-6001<br><br>*Counsel to Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, as Trustees of Certain Mortgage Backed  Securities Trusts* | By: _s/Glenn E. Siegel_____<br>Glenn E. Siegel<br>Brian E. Greer<br>1095 Avenue of the Americas<br>New York, New York 10036-6797<br>Telephone: (212) 698-3500<br>Facsimile: (212) 698-3599<br><br>*Counsel to The Bank of New York Mellon Trust Company, N.A., as Trustees of Certain Mortgage Backed Securities Trusts* |
| **ALSTON & BIRD LLP** | **SEWARD & KISSEL LLP** |
| By: _s/Martin G. Bunin_____ _____<br>Martin G. Bunin<br>William Hao<br>90 Park Avenue<br>New York, NY 10016<br>Telephone: (212) 210-9400<br>Facsimile: (212) 210-9444<br><br>*Counsel to Wells Fargo Bank, N.A., as Trustees of Certain Mortgage Backed Securities Trusts* | By:__s/Ronald L. Cohen_____<br>Ronald L. Cohen<br>Arlene R. Alves<br>One Battery Park Plaza<br>New York, New York  10004<br>Telephone:  (212) 574-1200<br>Facsimile:  (212) 480-8421<br><br>*Counsel to U.S. Bank National Association, as Trustees of Certain Mortgage Backed Securities Trusts* |

24