# EXHIBIT A

ACE SECURITIES CORP.
Depositor

OCWEN LOAN SERVICING, LLC
a Servicer

GMAC MORTGAGE, LLC
a Servicer

WELLS FARGO BANK, NATIONAL ASSOCIATION
Master Servicer and Securities Administrator

HSBC BANK USA, NATIONAL ASSOCIATION
Trustee

POOLING AND SERVICING AGREEMENT
Dated as of April 1, 2007

ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4
Asset Backed Pass-Through Certificates

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................................10

SECTION 1.01.    Defined Terms. ..........................................................................................10
SECTION 1.02.    Allocation of Certain Interest Shortfalls....................................................92
SECTION 1.03.    Rights of the NIMS Insurer........................................................................94

ARTICLE II CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF
                CERTIFICATES .................................................................................95

SECTION 2.01.    Conveyance of the Mortgage Loans. ..........................................................95
SECTION 2.02.    Acceptance of REMIC I by Trustee.............................................................96
SECTION 2.03.    Repurchase or Substitution of Mortgage Loans...........................................97
SECTION 2.04.    Representations and Warranties of the Master Servicer. ..........................100
SECTION 2.05.    Representations, Warranties and Covenants of Ocwen and GMAC. ......101
SECTION 2.06.    Issuance of the REMIC I Regular Interests and the Class R-I
                Interest......................................................................................................105
SECTION 2.07.    Conveyance of the REMIC I Regular Interests; Acceptance of
                REMIC II, REMIC III and REMIC IV by the Trustee. ............................106
SECTION 2.08.    Issuance of the Residual Certificates. .......................................................106
SECTION 2.09.    Conveyance of Subsequent Mortgage Loans.............................................107
SECTION 2.10.    Establishment of the Trust. ......................................................................109
SECTION 2.11.    Purpose and Powers of the Trust. .............................................................109
SECTION 2.12.    Representations and Warranties of the Trustee. .......................................110

ARTICLE III ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS;
                ACCOUNTS........................................................................................111

SECTION 3.01.    The Servicers to Act as Servicer................................................................111
SECTION 3.02.    Sub-Servicing Agreements Between a Servicer and Sub-Servicers........114
SECTION 3.03.    Successor Sub-Servicers. ..........................................................................116
SECTION 3.04.    No Contractual Relationship Between Sub-Servicer, Subcontractor,
                Trustee, the NIMS Insurer or the Certificateholders. ..............................116
SECTION 3.05.    Assumption or Termination of Sub-Servicing Agreement by
                Successor Servicer. ...................................................................................116
SECTION 3.06.    Collection of Certain Mortgage Loan Payments. .....................................117
SECTION 3.07.    Collection of Taxes, Assessments and Similar Items; Servicing
                Accounts. ..................................................................................................118
SECTION 3.08.    Collection Accounts and Distribution Account. .......................................119
SECTION 3.09.    Withdrawals from the Collection Accounts and Distribution
                Account......................................................................................................121
SECTION 3.10.    Investment of Funds in the Investment Accounts......................................124
SECTION 3.11.    Maintenance of Hazard Insurance, Errors and Omissions and
                Fidelity Coverage and Primary Mortgage Insurance................................125
SECTION 3.12.    Enforcement of Due-on-Sale Clauses; Assumption Agreements.............127
SECTION 3.13.    Realization Upon Defaulted Mortgage Loans. .........................................128
SECTION 3.14.    Trustee to Cooperate; Release of Mortgage Files....................................130

i

SECTION 3.15.    Servicing Compensation. ..........................................................132
SECTION 3.16.    Collection Account Statements.................................................132
SECTION 3.17.    Annual Statement as to Compliance............................................133
SECTION 3.18.    Assessments of Compliance and Attestation Reports............................133
SECTION 3.19.    [Reserved]...........................................................................135
SECTION 3.20.    Annual Certification; Additional Information. ..............................135
SECTION 3.21.    Access to Certain Documentation.................................................136
SECTION 3.22.    Title, Management and Disposition of REO Property..............................137
SECTION 3.23.    Obligations of the Servicers in Respect of Prepayment Interest
                 Shortfalls; Relief Act Interest Shortfalls.....................................140
SECTION 3.24.    Obligations of the Servicer in Respect of Mortgage Rates and
                 Monthly Payments. ...................................................................140
SECTION 3.25.    Reserve Fund. ..........................................................................141
SECTION 3.26.    Advance Facility. .....................................................................143
SECTION 3.27.    Indemnification. ......................................................................145
SECTION 3.28.    Pre-Funding Account. ................................................................145

ARTICLE IV ADMINISTRATION AND MASTER SERVICING OF THE
             MORTGAGE LOANS BY THE MASTER SERVICER ................148

SECTION 4.01.    Master Servicer. .......................................................................148
SECTION 4.02.    REMIC-Related Covenants. .......................................................149
SECTION 4.03.    Monitoring of Servicers. ............................................................149
SECTION 4.04.    Fidelity Bond. ..........................................................................150
SECTION 4.05.    Power to Act; Procedures. ..........................................................150
SECTION 4.06.    Due-on-Sale Clauses; Assumption Agreements. .....................................151
SECTION 4.07.    Documents, Records and Funds in Possession of Master Servicer To
                 Be Held for Trustee....................................................................152
SECTION 4.08.    Standard Hazard Insurance and Flood Insurance Policies.......................152
SECTION 4.09.    Presentment of Claims and Collection of Proceeds...............................152
SECTION 4.10.    Maintenance of Primary Mortgage Insurance Policies...........................153
SECTION 4.11.    Trustee to Retain Possession of Certain Insurance Policies and
                 Documents. ..............................................................................153
SECTION 4.12.    Realization Upon Defaulted Mortgage Loans. ..................................154
SECTION 4.13.    Compensation for the Master Servicer. ........................................154
SECTION 4.14.    REO Property............................................................................154
SECTION 4.15.    Master Servicer Annual Statement of Compliance................................155
SECTION 4.16.    Master Servicer Assessments of Compliance. ..................................156
SECTION 4.17.    Master Servicer Attestation Reports. ...........................................157
SECTION 4.18.    Annual Certification...................................................................158
SECTION 4.19.    Obligation of the Master Servicer in Respect of Prepayment Interest
                 Shortfalls. ................................................................................158
SECTION 4.20.    Prepayment Penalty Verification. ................................................159

ARTICLE V PAYMENTS TO CERTIFICATEHOLDERS.......................................160

SECTION 5.01.    Distributions............................................................................160
SECTION 5.02.    Statements to Certificateholders. ..............................................176

ii

SECTION 5.03.    Servicer Reports; P&I Advances. .............................................................180
SECTION 5.04.    Allocation of Realized Losses. ..................................................................182
SECTION 5.05.    Compliance with Withholding Requirements. ............................................186
SECTION 5.06.    Reports Filed with Securities and Exchange Commission. ......................186
SECTION 5.07.    Supplemental Interest Trust. .....................................................................191
SECTION 5.08.    Tax Treatment of Swap Payments and Swap Termination Payments. ....194
SECTION 5.09.    Swap Collateral Account. ..........................................................................195
SECTION 5.10.    Cap Collateral Account. .............................................................................195

ARTICLE VI THE CERTIFICATES .........................................................................................197

SECTION 6.01.    The Certificates. .........................................................................................197
SECTION 6.02.    Registration of Transfer and Exchange of Certificates. ............................199
SECTION 6.03.    Mutilated, Destroyed, Lost or Stolen Certificates. ...................................205
SECTION 6.04.    Persons Deemed Owners. ...........................................................................206
SECTION 6.05.    Certain Available Information. ...................................................................206

ARTICLE VII THE DEPOSITOR, THE SERVICERS AND THE MASTER SERVICER ......207

SECTION 7.01.    Liability of the Depositor, the Servicers and the Master Servicer. ..........207
SECTION 7.02.    Merger or Consolidation of the Depositor, the Servicer or the
                 Master Servicer. ........................................................................................207
SECTION 7.03.    Limitation on Liability of the Depositor, the Servicers, the Master
                 Servicer and Others. ..................................................................................207
SECTION 7.04.    Limitation on Resignation of the Servicers. ..............................................208
SECTION 7.05.    Limitation on Resignation of the Master Servicer. ...................................210
SECTION 7.06.    Assignment of Master Servicing. ...............................................................210
SECTION 7.07.    Rights of the Depositor in Respect of the Servicers and the Master
                 Servicer. ....................................................................................................211
SECTION 7.08.    Duties of the Credit Risk Manager. ...........................................................212
SECTION 7.09.    Limitation Upon Liability of the Credit Risk Manager. ...........................212
SECTION 7.10.    Removal of the Credit Risk Manager. ........................................................213
SECTION 7.11.    Transfer of Servicing by Sponsor to a Special Servicer. ..........................213

ARTICLE VIII DEFAULT ........................................................................................................214

SECTION 8.01.    Servicer Events of Default. ........................................................................214
SECTION 8.02.    Master Servicer to Act; Appointment of Successor. .................................219
SECTION 8.03.    Notification to Certificateholders. .............................................................221
SECTION 8.04.    Waiver of Events of Default. ......................................................................221

ARTICLE IX CONCERNING THE TRUSTEE AND THE SECURITIES
                 ADMINISTRATOR ....................................................................................222

SECTION 9.01.    Duties of Trustee and Securities Administrator. ........................................222
SECTION 9.02.    Certain Matters Affecting Trustee and Securities Administrator. ...........223
SECTION 9.03.    Trustee and Securities Administrator not Liable for Certificates or
                 Mortgage Loans. .......................................................................................227
SECTION 9.04.    Trustee and Securities Administrator May Own Certificates. ..................227

[TPW: NY.LEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

SECTION 9.05.    Fees and Expenses of Trustee, Custodians and Securities
                 Administrator. ................................................................................227
SECTION 9.06.    Eligibility Requirements for Trustee and Securities Administrator. ......228
SECTION 9.07.    Resignation and Removal of Trustee and Securities Administrator........229
SECTION 9.08.    Successor Trustee or Securities Administrator. ......................................230
SECTION 9.09.    Merger or Consolidation of Trustee or Securities Administrator. ...........231
SECTION 9.10.    Appointment of Co-Trustee or Separate Trustee. ...................................231
SECTION 9.11.    Appointment of Office or Agency. .........................................................232
SECTION 9.12.    Representations and Warranties...............................................................232

ARTICLE X TERMINATION.................................................................................................234

SECTION 10.01.    Termination Upon Repurchase or Liquidation of All Mortgage
                   Loans......................................................................................................234
SECTION 10.02.    Additional Termination Requirements. ..................................................237

ARTICLE XI REMIC PROVISIONS .....................................................................................239

SECTION 11.01.    REMIC Administration..........................................................................239
SECTION 11.02.    Prohibited Transactions and Activities...................................................242
SECTION 11.03.    Indemnification. .....................................................................................242

ARTICLE XII MISCELLANEOUS PROVISIONS ...............................................................244

SECTION 12.01.    Amendment.............................................................................................244
SECTION 12.02.    Recordation of Agreement; Counterparts. ..............................................245
SECTION 12.03.    Limitation on Rights of Certificateholders. ...........................................246
SECTION 12.04.    Governing Law. ......................................................................................246
SECTION 12.05.    Notices....................................................................................................246
SECTION 12.06.    Severability of Provisions.......................................................................247
SECTION 12.07.    Notice to Rating Agencies and NIMS Insurer. .......................................247
SECTION 12.08.    Article and Section References................................................................248
SECTION 12.09.    Grant of Security Interest........................................................................248
SECTION 12.10.    Survival of Indemnification. ..................................................................249
SECTION 12.11.    Intention of the Parties and Interpretation. ............................................249
SECTION 12.12.    Indemnification. .....................................................................................250
SECTION 12.13.    Swap Provider and NIMS Insurer as Third Party Beneficiaries..............250

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

Exhibits

| Exhibit A-1 | Form of Class A Certificate |
|---|---|
| Exhibit A-2 | Form of Class M Certificate |
| Exhibit A-3 | Form of Class CE-1 Certificate and Class CE-2 Certificate |
| Exhibit A-4 | Form of Class P Certificate |
| Exhibit A-5 | Form of Class R Certificate |
| Exhibit B-1 | Form of Transferor Representation Letter and Form of Transferee Representation Letter in Connection with Transfer of the Class P Certificates, Class CE-1 Certificates, Class CE-2 Certificates and Residual Certificates Pursuant to Rule 144A Under the Securities Act |
| Exhibit B-2 | Form of Transferor Representation Letter and Form of Transferee Representation Letter in Connection with Transfer of the Class P Certificates, Class CE-1 Certificates, Class CE-2 Certificates and Residual Certificates Pursuant to Rule 501(a) Under the Securities Act |
| Exhibit B-3 | Form of Transferor Representation Letter and Form of Transferee Representation Letter in Connection with Transfer of the Class P Certificates, Class CE-1 Certificates, Class CE-2 Certificates and Residual Certificates Pursuant to Rule 501(a) Under the Securities Act |
| Exhibit B-4 | Form of Transfer Affidavit and Agreement and Form of Transferor Affidavit in Connection with Transfer of Residual Certificates |
| Exhibit C | Form of Back-Up Certification |
| Exhibit D | Form of Power of Attorney |
| Exhibit E | Servicing Criteria |
| Exhibit F | Mortgage Loan Purchase Agreement |
| Exhibit G | Form 10-D, Form 8-K and Form 10-K Reporting Responsibility |
| Exhibit H | Additional Disclosure Notification |
| Exhibit I | Swap Agreement |
| Exhibit J | Cap Agreements |
| Exhibit K | Subsequent Transfer Instrument |
| Exhibit L | Addition Notice |
| Exhibit M | Identified Subsequent Mortgage Loans |
| Exhibit N | Assignment Agreement and Servicing Agreement |
| Schedule 1 | Mortgage Loan Schedule |
| Schedule 2 | Prepayment Charge Schedule |
| Schedule 3 | Reserved |
| Schedule 4 | Standard File Layout - Delinquency Reporting and Realized Losses and Gains |
| Schedule 5 | Standard File Layout – Master Servicing |
| Schedule 6 | Data Requirements of Servicing Advances Incurred Prior to Cut-off Date |

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

This Pooling and Servicing Agreement, is dated and effective as of April 1, 2007, among ACE SECURITIES CORP., as Depositor, OCWEN LOAN SERVICING, LLC, as a Servicer, GMAC MORTGAGE, LLC, as a Servicer, WELLS FARGO BANK, NATIONAL ASSOCIATION, as Master Servicer and Securities Administrator and HSBC BANK USA, NATIONAL ASSOCIATION, as Trustee.

### PRELIMINARY STATEMENT:

The Depositor intends to sell pass-through certificates to be issued hereunder in multiple classes, which in the aggregate will evidence the entire beneficial ownership interest of the Trust Fund created hereunder. The Trust Fund will consist of a segregated pool of assets comprised of the Mortgage Loans and certain other related assets subject to this Agreement.

### REMIC I

As provided herein, the Securities Administrator will elect to treat the segregated pool of assets consisting of the Mortgage Loans and certain other related assets subject to this Agreement (other than the Pre-Funding Account, the Capitalized Interest Account, the Reserve Fund and, for the avoidance of doubt, the Supplemental Interest Trust, the Cap Contracts and the Swap Agreement) as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC I". The Class R-I Interest will be the sole class of "residual interests" in REMIC I for purposes of the REMIC Provisions (as defined herein). The following table irrevocably sets forth the designation, the REMIC I Remittance Rate, the initial Uncertificated Balance and, for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC I Regular Interests (as defined herein). None of the REMIC I Regular Interests will be certificated.

| Designation | REMIC I Remittance Rate | Initial Uncertificated Balance | Latest Possible Maturity Date [1] |
|---|---|---|---|
| LT1 | Variable[2] | $451,652,231.00 | May 2037 |
| LT1PF | Variable[2] | $ 11,386,067.15 | May 2037 |
| LT2 | Variable[2] | $612,334,844.00 | May 2037 |
| LT2PF | Variable[2] | $ 10,489,349.93 | May 2037 |
| LTP | Variable[2] | $ 100.00 | May 2037 |
| LTCE2G | Variable[2] | N/A[3] | May 2037 |
| LTCE2C | Variable[2] | N/A[4] | May 2037 |

---

[1] For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC I Regular Interest.

[2] Calculated in accordance with the definition of "REMIC I Remittance Rate" herein.

[3] REMIC I Regular Interest LTCE2G will not have an Uncertificated Balance, but will accrue interest on its Notional Amount described in accordance with the definition of "Notional Amount" herein.

[4] REMIC I Regular Interest LTCE2C will not have an Uncertificated Balance, but will accrue interest on its Notional Amount described in accordance with the definition of "Notional Amount" herein.

## REMIC II

As provided herein, the Securities Administrator will elect to treat the segregated pool of assets consisting of the REMIC I Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC II." The Class R-II Interest will evidence the sole class of "residual interests" in REMIC II for purposes of the REMIC Provisions. The following table irrevocably sets forth the designation, the REMIC II Remittance Rate, the initial aggregate Uncertificated Balance and, for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC II Regular Interests. None of the REMIC II Regular Interests will be certificated.

| Designation | REMIC II Remittance Rate | Initial Uncertificated Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| I | Variable[2] | $ 71,721,908.97 | May 2037 |
| I-1-A | Variable[2] | $ 4,283,793.02 | May 2037 |
| I-1-B | Variable[2] | $ 4,283,793.02 | May 2037 |
| I-2-A | Variable[2] | $ 4,598,179.16 | May 2037 |
| I-2-B | Variable[2] | $ 4,598,179.16 | May 2037 |
| I-3-A | Variable[2] | $ 4,870,902.99 | May 2037 |
| I-3-B | Variable[2] | $ 4,870,902.99 | May 2037 |
| I-4-A | Variable[2] | $ 4,964,565.42 | May 2037 |
| I-4-B | Variable[2] | $ 4,964,565.42 | May 2037 |
| I-5-A | Variable[2] | $ 4,840,423.87 | May 2037 |
| I-5-B | Variable[2] | $ 4,840,423.87 | May 2037 |
| I-6-A | Variable[2] | $ 4,717,042.43 | May 2037 |
| I-6-B | Variable[2] | $ 4,717,042.43 | May 2037 |
| I-7-A | Variable[2] | $ 4,596,809.06 | May 2037 |
| I-7-B | Variable[2] | $ 4,596,809.06 | May 2037 |
| I-8-A | Variable[2] | $ 4,479,644.45 | May 2037 |
| I-8-B | Variable[2] | $ 4,479,644.45 | May 2037 |
| I-9-A | Variable[2] | $ 4,365,469.08 | May 2037 |
| I-9-B | Variable[2] | $ 4,365,469.08 | May 2037 |
| I-10-A | Variable[2] | $ 4,254,207.47 | May 2037 |
| I-10-B | Variable[2] | $ 4,254,207.47 | May 2037 |
| I-11-A | Variable[2] | $ 4,149,497.45 | May 2037 |
| I-11-B | Variable[2] | $ 4,149,497.45 | May 2037 |
| I-12-A | Variable[2] | $ 4,061,013.30 | May 2037 |
| I-12-B | Variable[2] | $ 4,061,013.30 | May 2037 |
| I-13-A | Variable[2] | $ 3,988,329.89 | May 2037 |
| I-13-B | Variable[2] | $ 3,988,329.89 | May 2037 |
| I-14-A | Variable[2] | $ 4,203,489.18 | May 2037 |
| I-14-B | Variable[2] | $ 4,203,489.18 | May 2037 |
| I-15-A | Variable[2] | $ 6,261,782.40 | May 2037 |
| I-15-B | Variable[2] | $ 6,261,782.40 | May 2037 |
| I-16-A | Variable[2] | $ 9,083,063.73 | May 2037 |
| I-16-B | Variable[2] | $ 9,083,063.73 | May 2037 |
| I-17-A | Variable[2] | $ 8,452,288.10 | May 2037 |
| I-17-B | Variable[2] | $ 8,452,288.10 | May 2037 |

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

| Designation | REMIC II Remittance Rate | Initial Uncertificated Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| I-18-A | Variable[2] | $ 7,637,427.36 | May 2037 |
| I-18-B | Variable[2] | $ 7,637,427.36 | May 2037 |
| I-19-A | Variable[2] | $ 5,605,691.87 | May 2037 |
| I-19-B | Variable[2] | $ 5,605,691.87 | May 2037 |
| I-20-A | Variable[2] | $ 3,089,846.24 | May 2037 |
| I-20-B | Variable[2] | $ 3,089,846.24 | May 2037 |
| I-21-A | Variable[2] | $ 2,974,844.04 | May 2037 |
| I-21-B | Variable[2] | $ 2,974,844.04 | May 2037 |
| I-22-A | Variable[2] | $ 2,890,064.88 | May 2037 |
| I-22-B | Variable[2] | $ 2,890,064.88 | May 2037 |
| I-23-A | Variable[2] | $ 2,808,016.33 | May 2037 |
| I-23-B | Variable[2] | $ 2,808,016.33 | May 2037 |
| I-24-A | Variable[2] | $ 2,728,759.16 | May 2037 |
| I-24-B | Variable[2] | $ 2,728,759.16 | May 2037 |
| I-25-A | Variable[2] | $ 2,651,726.64 | May 2037 |
| I-25-B | Variable[2] | $ 2,651,726.64 | May 2037 |
| I-26-A | Variable[2] | $ 2,576,911.96 | May 2037 |
| I-26-B | Variable[2] | $ 2,576,911.96 | May 2037 |
| I-27-A | Variable[2] | $ 2,504,158.82 | May 2037 |
| I-27-B | Variable[2] | $ 2,504,158.82 | May 2037 |
| I-28-A | Variable[2] | $ 2,433,321.82 | May 2037 |
| I-28-B | Variable[2] | $ 2,433,321.82 | May 2037 |
| I-29-A | Variable[2] | $ 2,364,449.37 | May 2037 |
| I-29-B | Variable[2] | $ 2,364,449.37 | May 2037 |
| I-30-A | Variable[2] | $ 2,297,789.62 | May 2037 |
| I-30-B | Variable[2] | $ 2,297,789.62 | May 2037 |
| I-31-A | Variable[2] | $ 47,545.48 | May 2037 |
| I-31-B | Variable[2] | $ 47,545.48 | May 2037 |
| I-32-A | Variable[2] | $ 1,866,497.50 | May 2037 |
| I-32-B | Variable[2] | $ 1,866,497.50 | May 2037 |
| I-33-A | Variable[2] | $ 1,813,925.33 | May 2037 |
| I-33-B | Variable[2] | $ 1,813,925.33 | May 2037 |
| I-34-A | Variable[2] | $ 1,762,852.05 | May 2037 |
| I-34-B | Variable[2] | $ 1,762,852.05 | May 2037 |
| I-35-A | Variable[2] | $ 1,713,246.51 | May 2037 |
| I-35-B | Variable[2] | $ 1,713,246.51 | May 2037 |
| I-36-A | Variable[2] | $ 1,665,051.80 | May 2037 |
| I-36-B | Variable[2] | $ 1,665,051.80 | May 2037 |
| I-37-A | Variable[2] | $ 1,618,224.64 | May 2037 |
| I-37-B | Variable[2] | $ 1,618,224.64 | May 2037 |
| I-38-A | Variable[2] | $ 1,572,720.88 | May 2037 |
| I-38-B | Variable[2] | $ 1,572,720.88 | May 2037 |
| I-39-A | Variable[2] | $ 1,528,508.76 | May 2037 |
| I-39-B | Variable[2] | $ 1,528,508.76 | May 2037 |
| I-40-A | Variable[2] | $ 1,485,549.06 | May 2037 |
| I-40-B | Variable[2] | $ 1,485,549.06 | May 2037 |

3

| Designation | REMIC II Remittance Rate | Initial Uncertificated Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| I-41-A | Variable[2] | $ 1,443,810.41 | May 2037 |
| I-41-B | Variable[2] | $ 1,443,810.41 | May 2037 |
| I-42-A | Variable[2] | $ 1,403,254.67 | May 2037 |
| I-42-B | Variable[2] | $ 1,403,254.67 | May 2037 |
| I-43-A | Variable[2] | $ 1,363,847.29 | May 2037 |
| I-43-B | Variable[2] | $ 1,363,847.29 | May 2037 |
| I-44-A | Variable[2] | $ 1,325,554.59 | May 2037 |
| I-44-B | Variable[2] | $ 1,325,554.59 | May 2037 |
| I-45-A | Variable[2] | $ 1,288,347.56 | May 2037 |
| I-45-B | Variable[2] | $ 1,288,347.56 | May 2037 |
| I-46-A | Variable[2] | $ 1,252,193.80 | May 2037 |
| I-46-B | Variable[2] | $ 1,252,193.80 | May 2037 |
| I-47-A | Variable[2] | $ 1,217,063.46 | May 2037 |
| I-47-B | Variable[2] | $ 1,217,063.46 | May 2037 |
| I-48-A | Variable[2] | $ 1,182,926.90 | May 2037 |
| I-48-B | Variable[2] | $ 1,182,926.90 | May 2037 |
| I-49-A | Variable[2] | $ 1,149,761.09 | May 2037 |
| I-49-B | Variable[2] | $ 1,149,761.09 | May 2037 |
| I-50-A | Variable[2] | $ 1,117,688.86 | May 2037 |
| I-50-B | Variable[2] | $ 1,117,688.86 | May 2037 |
| I-51-A | Variable[2] | $ 1,087,860.46 | May 2037 |
| I-51-B | Variable[2] | $ 1,087,860.46 | May 2037 |
| I-52-A | Variable[2] | $ 1,062,947.25 | May 2037 |
| I-52-B | Variable[2] | $ 1,062,947.25 | May 2037 |
| I-53-A | Variable[2] | $ 36,955,307.14 | May 2037 |
| I-53-B | Variable[2] | $ 36,955,307.14 | May 2037 |
| II | Variable[2] | $ 96,471,918.11 | May 2037 |
| II-1-A | Variable[2] | $ 5,762,048.98 | May 2037 |
| II-1-B | Variable[2] | $ 5,762,048.98 | May 2037 |
| II-2-A | Variable[2] | $ 6,184,923.84 | May 2037 |
| II-2-B | Variable[2] | $ 6,184,923.84 | May 2037 |
| II-3-A | Variable[2] | $ 6,551,759.51 | May 2037 |
| II-3-B | Variable[2] | $ 6,551,759.51 | May 2037 |
| II-4-A | Variable[2] | $ 6,677,743.08 | May 2037 |
| II-4-B | Variable[2] | $ 6,677,743.08 | May 2037 |
| II-5-A | Variable[2] | $ 6,510,762.63 | May 2037 |
| II-5-B | Variable[2] | $ 6,510,762.63 | May 2037 |
| II-6-A | Variable[2] | $ 6,344,804.57 | May 2037 |
| II-6-B | Variable[2] | $ 6,344,804.57 | May 2037 |
| II-7-A | Variable[2] | $ 6,183,080.94 | May 2037 |
| II-7-B | Variable[2] | $ 6,183,080.94 | May 2037 |
| II-8-A | Variable[2] | $ 6,025,485.05 | May 2037 |
| II-8-B | Variable[2] | $ 6,025,485.05 | May 2037 |
| II-9-A | Variable[2] | $ 5,871,909.92 | May 2037 |
| II-9-B | Variable[2] | $ 5,871,909.92 | May 2037 |
| II-10-A | Variable[2] | $ 5,722,254.03 | May 2037 |

4

| Designation | REMIC II Remittance Rate | Initial Uncertificated Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| II-10-B | Variable[2] | $ 5,722,254.03 | May 2037 |
| II-11-A | Variable[2] | $ 5,581,410.55 | May 2037 |
| II-11-B | Variable[2] | $ 5,581,410.55 | May 2037 |
| II-12-A | Variable[2] | $ 5,462,392.20 | May 2037 |
| II-12-B | Variable[2] | $ 5,462,392.20 | May 2037 |
| II-13-A | Variable[2] | $ 5,364,627.11 | May 2037 |
| II-13-B | Variable[2] | $ 5,364,627.11 | May 2037 |
| II-14-A | Variable[2] | $ 5,654,033.82 | May 2037 |
| II-14-B | Variable[2] | $ 5,654,033.82 | May 2037 |
| II-15-A | Variable[2] | $ 8,422,605.10 | May 2037 |
| II-15-B | Variable[2] | $ 8,422,605.10 | May 2037 |
| II-16-A | Variable[2] | $ 12,217,457.27 | May 2037 |
| II-16-B | Variable[2] | $ 12,217,457.27 | May 2037 |
| II-17-A | Variable[2] | $ 11,369,012.90 | May 2037 |
| II-17-B | Variable[2] | $ 11,369,012.90 | May 2037 |
| II-18-A | Variable[2] | $ 10,272,959.14 | May 2037 |
| II-18-B | Variable[2] | $ 10,272,959.14 | May 2037 |
| II-19-A | Variable[2] | $ 7,540,110.13 | May 2037 |
| II-19-B | Variable[2] | $ 7,540,110.13 | May 2037 |
| II-20-A | Variable[2] | $ 4,156,093.76 | May 2037 |
| II-20-B | Variable[2] | $ 4,156,093.76 | May 2037 |
| II-21-A | Variable[2] | $ 4,001,406.46 | May 2037 |
| II-21-B | Variable[2] | $ 4,001,406.46 | May 2037 |
| II-22-A | Variable[2] | $ 3,887,371.62 | May 2037 |
| II-22-B | Variable[2] | $ 3,887,371.62 | May 2037 |
| II-23-A | Variable[2] | $ 3,777,009.67 | May 2037 |
| II-23-B | Variable[2] | $ 3,777,009.67 | May 2037 |
| II-24-A | Variable[2] | $ 3,670,402.34 | May 2037 |
| II-24-B | Variable[2] | $ 3,670,402.34 | May 2037 |
| II-25-A | Variable[2] | $ 3,566,787.36 | May 2037 |
| II-25-B | Variable[2] | $ 3,566,787.36 | May 2037 |
| II-26-A | Variable[2] | $ 3,466,155.54 | May 2037 |
| II-26-B | Variable[2] | $ 3,466,155.54 | May 2037 |
| II-27-A | Variable[2] | $ 3,368,296.68 | May 2037 |
| II-27-B | Variable[2] | $ 3,368,296.68 | May 2037 |
| II-28-A | Variable[2] | $ 3,273,015.18 | May 2037 |
| II-28-B | Variable[2] | $ 3,273,015.18 | May 2037 |
| II-29-A | Variable[2] | $ 3,180,376.13 | May 2037 |
| II-29-B | Variable[2] | $ 3,180,376.13 | May 2037 |
| II-30-A | Variable[2] | $ 3,090,713.38 | May 2037 |
| II-30-B | Variable[2] | $ 3,090,713.38 | May 2037 |
| II-31-A | Variable[2] | $ 63,952.52 | May 2037 |
| II-31-B | Variable[2] | $ 63,952.52 | May 2037 |
| II-32-A | Variable[2] | $ 2,510,590.50 | May 2037 |
| II-32-B | Variable[2] | $ 2,510,590.50 | May 2037 |
| II-33-A | Variable[2] | $ 2,439,876.67 | May 2037 |

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

| Designation | REMIC II Remittance Rate | Initial Uncertificated Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| II-33-B | Variable[2] | $ 2,439,876.67 | May 2037 |
| II-34-A | Variable[2] | $ 2,371,178.95 | May 2037 |
| II-34-B | Variable[2] | $ 2,371,178.95 | May 2037 |
| II-35-A | Variable[2] | $ 2,304,455.49 | May 2037 |
| II-35-B | Variable[2] | $ 2,304,455.49 | May 2037 |
| II-36-A | Variable[2] | $ 2,239,629.70 | May 2037 |
| II-36-B | Variable[2] | $ 2,239,629.70 | May 2037 |
| II-37-A | Variable[2] | $ 2,176,643.36 | May 2037 |
| II-37-B | Variable[2] | $ 2,176,643.36 | May 2037 |
| II-38-A | Variable[2] | $ 2,115,437.12 | May 2037 |
| II-38-B | Variable[2] | $ 2,115,437.12 | May 2037 |
| II-39-A | Variable[2] | $ 2,055,968.24 | May 2037 |
| II-39-B | Variable[2] | $ 2,055,968.24 | May 2037 |
| II-40-A | Variable[2] | $ 1,998,183.94 | May 2037 |
| II-40-B | Variable[2] | $ 1,998,183.94 | May 2037 |
| II-41-A | Variable[2] | $ 1,942,042.09 | May 2037 |
| II-41-B | Variable[2] | $ 1,942,042.09 | May 2037 |
| II-42-A | Variable[2] | $ 1,887,491.33 | May 2037 |
| II-42-B | Variable[2] | $ 1,887,491.33 | May 2037 |
| II-43-A | Variable[2] | $ 1,834,485.21 | May 2037 |
| II-43-B | Variable[2] | $ 1,834,485.21 | May 2037 |
| II-44-A | Variable[2] | $ 1,782,978.41 | May 2037 |
| II-44-B | Variable[2] | $ 1,782,978.41 | May 2037 |
| II-45-A | Variable[2] | $ 1,732,931.94 | May 2037 |
| II-45-B | Variable[2] | $ 1,732,931.94 | May 2037 |
| II-46-A | Variable[2] | $ 1,684,302.20 | May 2037 |
| II-46-B | Variable[2] | $ 1,684,302.20 | May 2037 |
| II-47-A | Variable[2] | $ 1,637,049.04 | May 2037 |
| II-47-B | Variable[2] | $ 1,637,049.04 | May 2037 |
| II-48-A | Variable[2] | $ 1,591,132.60 | May 2037 |
| II-48-B | Variable[2] | $ 1,591,132.60 | May 2037 |
| II-49-A | Variable[2] | $ 1,546,521.91 | May 2037 |
| II-49-B | Variable[2] | $ 1,546,521.91 | May 2037 |
| II-50-A | Variable[2] | $ 1,503,382.14 | May 2037 |
| II-50-B | Variable[2] | $ 1,503,382.14 | May 2037 |
| II-51-A | Variable[2] | $ 1,463,260.54 | May 2037 |
| II-51-B | Variable[2] | $ 1,463,260.54 | May 2037 |
| II-52-A | Variable[2] | $ 1,429,750.25 | May 2037 |
| II-52-B | Variable[2] | $ 1,429,750.25 | May 2037 |
| II-53-A | Variable[2] | $ 49,707,884.86 | May 2037 |
| II-53-B | Variable[2] | $ 49,707,884.86 | May 2037 |
| P | Variable[2] | $        100.00 | May 2037 |
| I-CE-2 | Variable[2] | (3) | May 2037 |

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

(1)    For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC II Regular Interest.

(2)    Calculated in accordance with the definition of "REMIC II Remittance Rate" herein.

(3)    REMIC II Regular Interest 1-CE-2 will not have an Uncertificated Balance, but will accrue interest on its Notional Amount equal to the Notional Amounts of REMIC I Regular Interest LTCE2G and REMIC I Regular Interest LTCE2C.

7

## REMIC III

   As provided herein, the Securities Administrator will elect to treat the segregated pool of assets consisting of the REMIC II Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC III." The Class R-III Interest will evidence the sole class of "residual interests" in REMIC III for purposes of the REMIC Provisions. The following table irrevocably sets forth the designation, the Pass-Through Rate, the initial aggregate Certificate Principal Balance and, for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for the indicated Classes of Certificates.

| Designation | REMIC III Remittance Rate | Initial Uncertificated Balance | Latest Possible Maturity Date (1) |
|---|---|---|---|
| AA | Variable[2] | $532,072,621.12 | May 2037 |
| A-1 | Variable[2] | $ 225,000.00 | May 2037 |
| A-2A | Variable[2] | $ 1,081,155.00 | May 2037 |
| A-2B | Variable[2] | $ 431,825.00 | May 2037 |
| A-2C | Variable[2] | $ 707,880.00 | May 2037 |
| A-2D | Variable[2] | $ 186,285.00 | May 2037 |
| M-1 | Variable[2] | $ 168,670.00 | May 2037 |
| M-2 | Variable[2] | $ 115,800.00 | May 2037 |
| M-3 | Variable[2] | $ 80,555.00 | May 2037 |
| M-4 | Variable[2] | $ 83,075.00 | May 2037 |
| M-5 | Variable[2] | $ 70,490.00 | May 2037 |
| M-6 | Variable[2] | $ 75,520.00 | May 2037 |
| M-7 | Variable[2] | $ 57,900.00 | May 2037 |
| M-8 | Variable[2] | $ 50,350.00 | May 2037 |
| M-9 | Variable[2] | $ 52,865.00 | May 2037 |
| ZZ | Variable[2] | $ 7,471,254.92 | May 2037 |
| P | Variable[2X3] | $ 100.00 | May 2037 |
| IO | Variable[2] | (4) | May 2037 |
| I-SUB | Variable[2] | $ 41,803.83 | May 2037 |
| I-GRP | Variable[2] | $ 45,165.23 | May 2037 |
| II-SUB | Variable[2] | $ 17,865.22 | May 2037 |
| II-GRP | Variable[2] | $ 61,233.48 | May 2037 |
| XX | Variable[2] | $542,765,178.27 | May 2037 |
| CE-2 | (5) | (6) | May 2037 |

---

[1] For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC III Regular Interest.

[2] Calculated in accordance with the definition of "REMIC III Remittance Rate" herein.

[3] REMIC III Regular Interest P will be entitled to 100% of the Prepayment Charges.

[4] REMIC III Regular Interest IO will not have an Uncertificated Balance, but will accrue interest on its Notional Amount.

[5] REMIC III Regular Interest CE-2 will not have a REMIC III Remittance Rate, but will be entitled to 100% of the amounts distributed on REMIC II Regular Interest I-CE-20 and REMIC II Regular Interest I-CE-2G.

[6] For federal income tax purposes, the REMIC III Regular Interest CE-2 will not have an Uncertificated Balance, but will have a Notional Amount equal to the Notional Amount of REMIC II Regular Interest I-CE-2.

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

## REMIC IV

As provided herein, the Securities Administrator will elect to treat the segregated pool of assets consisting of the REMIC III Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC IV." The Class R-IV Interest will evidence the sole class of "residual interests" in REMIC IV for purposes of the REMIC Provisions. The following table irrevocably sets forth the designation, the Pass-Through Rate, the initial aggregate Certificate Principal Balance and, for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for the indicated Classes of Certificates.

| Designation | Pass-Through Rate | Initial Aggregate Certificate Principal Balance | Latest Possible Maturity Date [1] |
|---|---|---|---|
| Class A-1 | Variable[2] | $ 45,000,000.00 | May 2037 |
| Class A-2A | Variable[2] | $ 216,231,000.00 | May 2037 |
| Class A-2B | Variable[2] | $ 86,365,000.00 | May 2037 |
| Class A-2C | Variable[2] | $ 141,576,000.00 | May 2037 |
| Class A-2D | Variable[2] | $ 37,257,000.00 | May 2037 |
| Class M-1 | Variable[2] | $ 33,734,000.00 | May 2037 |
| Class M-2 | Variable[2] | $ 23,160,000.00 | May 2037 |
| Class M-3 | Variable[2] | $ 16,111,000.00 | May 2037 |
| Class M-4 | Variable[2] | $ 16,615,000.00 | May 2037 |
| Class M-5 | Variable[2] | $ 14,098,000.00 | May 2037 |
| Class M-6 | Variable[2] | $ 15,104,000.00 | May 2037 |
| Class M-7 | Variable[2] | $ 11,580,000.00 | May 2037 |
| Class M-8 | Variable[2] | $ 10,070,000.00 | May 2037 |
| Class M-9 | Variable[2] | $ 10,573,000.00 | May 2037 |
| Class P | N/A[3] | $ 100.00 | May 2037 |
| Class CE-1 | (4) | $ 408,388,492.08 | May 2037 |
| Class CE-2 | (5) | (6) | May 2037 |
| Class IO Interest | (7) | (7) | May 2037 |

---

[1]   For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each Class of Certificates.

[2]   Calculated in accordance with the definition of "Pass-Through Rate" herein.

[3]   The Class P Certificates will not accrue interest.

[4]   The Class CE-1 Certificates will accrue interest at their variable Pass-Through Rate on the Notional Amount of the Class CE-1 Certificates outstanding from time to time which shall equal the Uncertificated Balance of the REMIC III Regular Interests (other than REMIC III Regular Interest P). The Class CE-1 Certificates will not accrue interest on their Certificate Principal Balance.

[5]   The Class CE-2 Certificates are an interest only class and for each Distribution Date the Class CE-2 Certificates will be entitled to receive 100% of the amounts distributed on REMIC III Regular Interest CE-2.

[6]   For federal income tax purposes, the Class CE-2 Certificates will not have a Certificate Principal Balance, but will have a Notional Amount equal to the Notional Amount of REMIC III Regular Interest CE-2.

[7]   The Class IO Interest will not have a Pass-Through Rate or a Certificate Principal Balance, but will be entitled to 100% of amounts distributed on REMIC III Regular Interest IO.

The Mortgage Loans had an aggregate Scheduled Principal Balance as of the Cut-off Date, after deducting all Monthly Payments due on or before the Cut-off Date, of $1,063,987,175.00. As of the Cut-off Date, the Group I Mortgage Loans had an aggregate Scheduled Principal Balance equal to $451,652,331.00 and the Group II Mortgage Loans had an aggregate Scheduled Principal Balance equal to $612,334,844.00.

9

In consideration of the mutual agreements herein contained, the Depositor, the Servicers, the Master Servicer, the Securities Administrator and the Trustee agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01.    Defined Terms.

Whenever used in this Agreement, including, without limitation, in the Preliminary Statement hereto, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article. Unless otherwise specified, all calculations described herein shall be made on the basis of a 360-day year consisting of twelve 30-day months.

"Accepted Master Servicing Practices": With respect to any Mortgage Loan, as applicable, either (x) those customary mortgage master servicing practices of prudent mortgage servicing institutions that master service mortgage loans of the same type and quality as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, to the extent applicable to the Master Servicer (except in its capacity as successor to a Servicer), or (y) as provided in Section 3.01 hereof, but in no event below the standard set forth in clause (x).

"Accepted Servicing Practices": As defined in Section 3.01.

"Account": Any Collection Accounts, the Distribution Account and the Pre-Funding Account as the context may require.

"Accrued Certificate Interest": With respect to any Class A Certificate, Mezzanine Certificate, Class CE-1 Certificate or CE-2 Certificate and each Distribution Date, interest accrued during the related Interest Accrual Period at the Pass-Through Rate for such Certificate for such Distribution Date on the Certificate Principal Balance, in the case of the Class A Certificates and the Mezzanine Certificates, or on the Notional Amount in the case of the Class CE-1 Certificates and Class CE-2 Certificates, of such Certificate immediately prior to such Distribution Date. The Class P Certificates are not entitled to distributions in respect of interest and, accordingly, will not accrue interest. All distributions of interest on the Class A Certificates and the Mezzanine Certificates will be calculated on the basis of a 360-day year and the actual number of days in the applicable Interest Accrual Period. All distributions of interest on the Class CE-1 Certificates will be based on a 360-day year consisting of twelve 30-day months. Accrued Certificate Interest with respect to each Distribution Date, as to any Class A Certificate, Mezzanine Certificate or Class CE-1 Certificate shall be reduced by an amount equal to the portion allocable to such Certificate pursuant to Section 1.02 hereof, if any, of the sum of (a) the aggregate Prepayment Interest Shortfall, if any, for such Distribution Date to the extent not covered by payments pursuant to Section 3.23 or Section 4.19 of this Agreement or pursuant to the Servicing Agreement and (b) the aggregate amount of any Relief Act Interest Shortfall, if any, for such Distribution Date. In addition, Accrued Certificate Interest with respect to each Distribution Date, as to any Class CE-1 Certificate, shall be reduced by an amount equal to the

10

portion allocable to such Class CE-1 Certificate of Realized Losses, if any, pursuant to Section 1.02 and Section 5.04 hereof.

"Addition Notice":  With respect to the transfer of Subsequent Mortgage Loans to the Trust Fund pursuant to Section 2.09, a notice of the Depositor's designation of the Subsequent Mortgage Loans to be sold to the Trust Fund and the aggregate principal balance of such Subsequent Mortgage Loans as of the related Cut-off Date.  The Addition Notice shall be given not later than five (5) Business Days prior to the related Subsequent Transfer Date and shall be substantially in the form attached hereto as Exhibit L.

"Additional Disclosure Notification": Has the meaning set forth in Section 5.06(a).

"Additional Form 10-D Disclosure": Has the meaning set forth in Section 5.06(a) of this Agreement.

"Additional Form 10-K Disclosure": Has the meaning set forth in Section 5.06(d) of this Agreement.

"Additional Servicer": Means each affiliate of a Servicer that Services any of the Mortgage Loans and each Person who is not an affiliate of the related Servicer. For clarification purposes, the Master Servicer and the Securities Administrator are Additional Servicers.

"Adjustable Rate Mortgage Loan":  Each of the Mortgage Loans identified in the Mortgage Loan Schedule as having a Mortgage Rate that is subject to adjustment.

"Adjustment Date": With respect to each Adjustable Rate Mortgage Loan, the first day of the month in which the Mortgage Rate of an Adjustable Rate Mortgage Loan changes pursuant to the related Mortgage Note. The first Adjustment Date following the Cut-off Date as to each Adjustable Rate Mortgage Loan is set forth in the Mortgage Loan Schedule.

"Administration Fees": The sum of (i) the related Servicing Fee, (ii) the Master Servicing Fee and (iii) the Credit Risk Management Fee.

"Administration Fee Rate": The sum of (i) the Servicing Fee Rate, (ii) the Master Servicing Fee Rate and (iii) the Credit Risk Management Fee Rate.

"Advance Facility": As defined in Section 3.26(a).

"Advance Financing Person": As defined in Section 3.26(a).

"Advance Reimbursement Amounts":  As defined in Section 3.26(b).

"Affiliate": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the

11

ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Loss Severity Percentage": With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate amount of Realized Losses incurred on any Mortgage Loans from the Cut-off Date to the last day of the preceding calendar month and the denominator of which is the aggregate principal balance of such Mortgage Loans immediately prior to the liquidation of such Mortgage Loans.

"Agreement": This Pooling and Servicing Agreement, including all exhibits and schedules hereto and all amendments hereof and supplements hereto.

"Allocated Realized Loss Amount": With respect to any Class of Mezzanine Certificates and any Distribution Date, an amount equal to the sum of any Realized Loss allocated to that Class of Certificates on the Distribution Date and any Allocated Realized Loss Amount for that Class remaining unpaid from the previous Distribution Date.

"Amounts Held for Future Distribution": As to any Distribution Date, the aggregate amount held in the related Collection Account at the close of business on the immediately preceding Determination Date on account of (i) all Monthly Payments or portions thereof received in respect of the Mortgage Loans due after the related Due Period and (ii) Principal Prepayments and Liquidation Proceeds received in respect of such Mortgage Loans after the last day of the related Prepayment Period.

"Ancillary Income": All income derived from the Mortgage Loans, other than Servicing Fees and Prepayment Charges, including but not limited to, late charges, fees received with respect to checks or bank drafts returned by the related bank for non sufficient funds, assumption fees, optional insurance administrative fees and all other incidental fees and charges.

"Assignment": An assignment of Mortgage, notice of transfer or equivalent instrument, in recordable form, which is sufficient under the laws of the jurisdiction where the related Mortgaged Property is located to reflect of record the sale and assignment of the Mortgage, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by Mortgaged Properties located in the same county, if permitted by law.

"Assignment Agreement": The Assignment, Assumption and Recognition Agreement, dated as of April 30, 2007, by and among the Sponsor, the Depositor and Countrywide evidencing the assignment of the Servicing Agreement to the extent of the servicing of the Countrywide Mortgage Loans, to the Depositor, a copy of which is attached hereto as Exhibit N.

"Authorized Officers": A managing director of the whole loan trading desk and a managing director in global markets.

"Available Distribution Amount": With respect to any Distribution Date, an amount equal to (1) the sum of (a) the aggregate of the amounts on deposit in the Collection Accounts and the Distribution Account as of the close of business on the related Servicer

12

Remittance Date, (b) the aggregate of any amounts deposited in the Distribution Account by the Servicer or the Master Servicer in respect of Prepayment Interest Shortfalls for such Distribution Date pursuant to Section 3.23 or Section 4.19 of this Agreement or pursuant to the Servicing Agreement, (c) the aggregate of any P&I Advances for such Distribution Date made by the Servicers pursuant to Section 5.03 of this Agreement or pursuant to the Servicing Agreement (d) the aggregate of any P&I Advances made by a successor to a Servicer (including the Master Servicer) for such Distribution Date pursuant to Section 8.02 of this Agreement or pursuant to the Servicing Agreement, and (e) with respect to any Distribution Date during the Pre-Funding Period, any amounts required to be deposited into the Distribution Account from the Capitalized Interest Account pursuant to Section 3.28 of this Agreement, and with respect to the Distribution Date immediately following the termination of the Pre-Funding Period, any Remaining Pre-Funded Amount reduced (to an amount not less than zero) by (2) the portion of the amount described in clause (1)(a) above that represents (i) Amounts Held for Future Distribution, (ii) Principal Prepayments on the Mortgage Loans received after the related Prepayment Period (together with any interest payments received with such Principal Prepayments to the extent they represent the payment of interest accrued on the Mortgage Loans during a period subsequent to the related Prepayment Period), (iii) Liquidation Proceeds, Insurance Proceeds and Subsequent Recoveries received in respect of the Mortgage Loans after the related Prepayment Period, (iv) amounts reimbursable or payable to the Depositor, the Servicers, the Trustee, the Master Servicer, the Securities Administrator, the Credit Risk Manager or the Custodians pursuant to Section 3.09 or 9.05 of this Agreement or otherwise payable in respect of Extraordinary Trust Fund Expenses or reimbursable or payable under the Servicing Agreement, (v) the Credit Risk Management Fee, (vi) amounts deposited in a Collection Account or the Distribution Account in error, (vii) the amount of any Prepayment Charges collected by the Servicers in connection with the Principal Prepayment of any of the Mortgage Loans and (viii) amounts reimbursable to a successor Servicer (including the Master Servicer) pursuant to Section 8.02 of this Agreement.

"Balloon Mortgage Loan": A Mortgage Loan that provides for the payment of the unamortized principal balance of such Mortgage Loan in a single payment, that is substantially greater than the preceding monthly payment at the maturity of such Mortgage Loan.

"Balloon Payment": A payment of the unamortized principal balance of a Mortgage Loan in a single payment, that is substantially greater than the preceding Monthly Payment at the maturity of such Mortgage Loan.

"Bankruptcy Code": The Bankruptcy Reform Act of 1978 (Title 11 of the United States Code), as amended.

"Book-Entry Certificates": The Class A Certificates and Mezzanine Certificates for so long as the Certificates of such Class shall be registered in the name of the Depository or its nominee.

"Book-Entry Custodian": The custodian appointed pursuant to Section 6.01.

"Business Day": Any day other than a Saturday, a Sunday or a day on which banking or savings and loan institutions in the States of New York, Maryland, Minnesota,

13

Florída or in the city in which the Corporate Trust Office of the Trustee is located, are authorized or obligated by law or executive order to be closed.

"Cap Contracts": Shall mean the Group I Cap Contract and Group II Cap Contract.

"Cap Counterparty": The counterparty under each Cap Contract. Initially, the Cap Counterparty shall be Deutsche Bank AG, New York Branch.

"Cash-Out Refinancing": A Refinanced Mortgage Loan the proceeds of which are more than a nominal amount in excess of the principal balance of any existing first mortgage plus any subordinate mortgage on the related Mortgaged Property and related closing costs.

"Certificate": Any one of ACE Securities Corp., Asset Backed Pass-Through Certificates, Series 2007-HE4, Class A-1, Class A-2A, Class A-2B, Class A-2C, Class A-2D, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class P, Class CE-1, Class CE-2 and Class R Certificates issued under this Agreement.

"Certificate Factor": With respect to any Class of Certificates (other than the Residual Certificates) as of any Distribution Date, a fraction, expressed as a decimal carried to six places, the numerator of which is the aggregate Certificate Principal Balance (or Notional Amount, in the case of the Class CE-1 Certificates and Class CE-2 Certificates) of such Class of Certificates on such Distribution Date (after giving effect to any distributions of principal and allocations of Realized Losses resulting in reduction of the Certificate Principal Balance (or Notional Amount, in the case of the Class CE-1 Certificates and Class CE-2 Certificates) of such Class of Certificates to be made on such Distribution Date), and the denominator of which is the initial aggregate Certificate Principal Balance (or Notional Amount, in the case of the Class CE-1 Certificates and Class CE-2 Certificates) of such Class of Certificates as of the Closing Date.

"Certificate Margin": With respect to the Class A-1 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-1, 0.22% in the case of each Distribution Date through and including the Optional Termination Date and 0.44% in the case of each Distribution Date thereafter.

With respect to the Class A-2A Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-2A, 0.13% in the case of each Distribution Date through and including the Optional Termination Date and 0.26% in the case of each Distribution Date thereafter.

With respect to the Class A-2B Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-2B, 0.24% in the case of each Distribution Date through and including the Optional Termination Date and 0.48% in the case of each Distribution Date thereafter.

With respect to the Class A-2C Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-2C, 0.30% in the case of each Distribution Date

through and including the Optional Termination Date and 0.60% in the case of each Distribution Date thereafter.

With respect to the Class A-2D Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-2D, 0.36% in the case of each Distribution Date through and including the Optional Termination Date and 0.72% in the case of each Distribution Date thereafter.

With respect to the Class M-1 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-1, 0.47% in the case of each Distribution Date through and including the Optional Termination Date and 0.705% in the case of each Distribution Date thereafter.

With respect to the Class M-2 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-2, 0.55% in the case of each Distribution Date through and including the Optional Termination Date and 0.825% in the case of each Distribution Date thereafter.

With respect to the Class M-3 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-3, 0.70% in the case of each Distribution Date through and including the Optional Termination Date and 1.05% in the case of each Distribution Date thereafter.

With respect to the Class M-4 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-4, 1.25% in the case of each Distribution Date through and including the Optional Termination Date and 1.75% in the case of each Distribution Date thereafter.

With respect to the Class M-5 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-5, 1.60% in the case of each Distribution Date through and including the Optional Termination Date and 2.10% in the case of each Distribution Date thereafter.

With respect to the Class M-6 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-6, 1.90% in the case of each Distribution Date through and including the Optional Termination Date and 2.40% in the case of each Distribution Date thereafter.

With respect to the Class M-7 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-7, 2.50% in the case of each Distribution Date through and including the Optional Termination Date and 3.00% in the case of each Distribution Date thereafter.

With respect to the Class M-8 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest 2.50% in the case of each Distribution Date through and including the Optional Termination Date and 3.00% in the case of each Distribution Date thereafter.

15

With respect to the Class M-9 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-9, 2.50% in the case of each Distribution Date through and including the Optional Termination Date and 3.00% in the case of each Distribution Date thereafter.

"Certificateholder" or "Holder": The Person in whose name a Certificate is registered in the Certificate Register, except that a Disqualified Organization or a Non-United States Person shall not be a Holder of a Residual Certificate for any purposes hereof, and solely for the purposes of giving any consent pursuant to this Agreement, any Certificate registered in the name of or beneficially owned by the Depositor, the Sponsor, a Servicer, the Master Servicer, the Securities Administrator, the Trustee or any Affiliate thereof shall be deemed not to be outstanding and the Voting Rights to which it is entitled shall not be taken into account in determining whether the requisite percentage of Voting Rights necessary to effect any such consent has been obtained, except as otherwise provided in Section 12.01. The Trustee and the Securities Administrator may conclusively rely upon a certificate of the Depositor, the Sponsor, the Master Servicer, the Securities Administrator or a Servicer in determining whether a Certificate is held by an Affiliate thereof. All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as otherwise specified herein; provided, however, that the Trustee, the Securities Administrator and the NIMS Insurer shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register.

"Certificate Owner": With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Certificate as reflected on the books of the Depository or on the books of a Depository Participant or on the books of an indirect participating brokerage firm for which a Depository Participant acts as agent.

"Certificate Principal Balance": With respect to each Class A Certificate, Mezzanine Certificate or Class P Certificate as of any date of determination, the Certificate Principal Balance of such Certificate on the Distribution Date immediately prior to such date of determination plus any Subsequent Recoveries added to the Certificate Principal Balance of such Certificate (other than a Class P Certificate) pursuant to Section 5.04, minus (i) all distributions allocable to principal made thereon and (ii) Realized Losses allocated thereto, if any, on such immediately prior Distribution Date (or, in the case of any date of determination up to and including the first Distribution Date, the initial Certificate Principal Balance of such Certificate, as stated on the face thereof). With respect to each Class CE-1 Certificate as of any date of determination, an amount equal to the Percentage Interest evidenced by such Certificate times the excess, if any, of (A) the then aggregate Uncertificated Balances of the REMIC II Regular Interests over (B) the then aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates then outstanding. The aggregate initial Certificate Principal Balance of each Class of Regular Certificates is set forth in the Preliminary Statement hereto.

"Certificate Register": The register maintained pursuant to Section 6.02.

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

"Certification Parties": Has the meaning set forth in Section 3.20 of this Agreement.

"Certifying Person": Has the meaning set forth in Section 3.20 of this Agreement.

"Class": Collectively, all of the Certificates bearing the same class designation.

"Class A Certificate":  Any Class A-1, Class A-2A, Class A-2B, Class A-2C, Class A-2D Certificate.

"Class A Principal Distribution Amount": The Class A Principal Distribution Amount is an amount equal to the sum of: (i) the Class A-1 Principal Distribution Amount and (ii) the Class A-2 Principal Distribution Amount.

"Class A-1 Allocation Percentage": With respect to any Distribution Date is the percentage equivalent of a fraction, the numerator of which is (x) the Group I Principal Remittance Amount for such Distribution Date and the denominator of which is (y) the Principal Remittance Amount for such Distribution Date.

"Class A-1 Certificate":  Any one of the Class A-1 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-1 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class A-1 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the Certificate Principal Balance of the Class A-1 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 41.80% and (ii) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Group I Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class A-2 Allocation Percentage": With respect to any Distribution Date is the percentage equivalent of a fraction, the numerator of which is (x) the Group II Principal Remittance Amount for such Distribution Date and the denominator of which is (y) the Principal Remittance Amount for such Distribution Date.

"Class A-2 Certificate":  Any Class A-2A, Class A-2B, Class A-2C or Class A-2D Certificate.

17

"Class A-2 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of the Certificate Principal Balances of the Class A-2 A, Class A-2B, Class A-2C or Class A-2D Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 41.80% and (ii) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Group II Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class A-2A Certificate":  Any one of the Class A-2A Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-1 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class A-2B Certificate":  Any one of the Class A-2B Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-1 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class A-2C Certificate":  Any one of the Class A-2C Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-1 and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class A-2D Certificate":  Any one of the Class A-2D Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-1 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class CE-1 Certificate": Any one of the Class CE-1 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-3 and evidencing (i) a Regular Interest in REMIC IV, (ii) beneficial ownership of the Reserve Fund and (iii) beneficial ownership of the Supplemental Interest Trust.

"Class CE-2 Certificate": Any one of the Class CE-2 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the

18

form annexed hereto as Exhibit A-3 and evidencing a Regular Interest in REMIC IV for purposes of the REMIC Provisions.

"Class IO Distribution Amount":  As defined in Section 5.07(f) hereof.  For purposes of clarity, the Class IO Distribution Amount for any Distribution Date shall equal the amount payable to the Supplemental Interest Trust on such Distribution Date in excess of the amount payable on the Class IO Interest on such Distribution Date, all as further provided in Section 5.07(f) hereof.

"Class IO Interest":  An uncertificated interest in the Trust Fund held by the Trustee, evidencing a REMIC Regular Interest in REMIC III for purposes of the REMIC Provisions.

"Class M-1 Certificate": Any one of the Class M-1 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-1 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date and (ii) the Certificate Principal Balance of the Class M-1 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) 51.60% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class M-2 Certificate": Any one of the Class M-2 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-2 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking

19

into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date and (iii) the Certificate Principal Balance of the Class M-2 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) 60.50% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class M-3 Certificate": Any one of the Class M-3 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-3 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date and (iv) the Certificate Principal Balance of the Class M-3 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) 65.70% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class M-4 Certificate": Any one of the Class M-4 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-4 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of

20

(x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date, (iv) the Certificate Principal Balance of the Class M-3 Certificates after taking into account the payment of the Class M-3 Principal Distribution Amount on the Distribution Date and (v) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) 70.40% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class M-5 Certificate": Any one of the Class M-5 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-5 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date, (iv) the Certificate Principal Balance of the Class M-3 Certificates after taking into account the payment of the Class M-3 Principal Distribution Amount on the Distribution Date, (v) the Certificate Principal Balance of the Class M-4 Certificates after taking into account the payment of the Class M-4 Principal Distribution Amount on the Distribution Date and (vi) the Certificate Principal Balance of the Class M-5 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) 74.90% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal

21

balance of the Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class M-6 Certificate": Any one of the Class M-6 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-6 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date, (iv) the Certificate Principal Balance of the Class M-3 Certificates after taking into account the payment of the Class M-3 Principal Distribution Amount on the Distribution Date, (v) the Certificate Principal Balance of the Class M-4 Certificates after taking into account the payment of the Class M-4 Principal Distribution Amount on the Distribution Date, (vi) the Certificate Principal Balance of the Class M-5 Certificates after taking into account the payment of the Class M-5 Principal Distribution Amount on the Distribution Date and (vii) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) 78.80% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class M-7 Certificate": Any one of the Class M-7 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-7 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution

22

Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date, (iv) the Certificate Principal Balance of the Class M-3 Certificates after taking into account the payment of the Class M-3 Principal Distribution Amount on the Distribution Date, (v) the Certificate Principal Balance of the Class M-4 Certificates after taking into account the payment of the Class M-4 Principal Distribution Amount on the Distribution Date, (vi) the Certificate Principal Balance of the Class M-5 Certificates after taking into account the payment of the Class M-5 Principal Distribution Amount on the Distribution Date, (vii) the Certificate Principal Balance of the Class M-6 Certificates after taking into account the payment of the Class M-6 Principal Distribution Amount on the Distribution Date and (viii) the Certificate Principal Balance of the Class M-7 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) 82.60% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class M-8 Certificate": Any one of the Class M-8 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-8 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date, (iv) the Certificate Principal Balance of the Class M-3 Certificates after taking into account the payment of the Class M-3 Principal Distribution Amount on the Distribution Date, (v) the Certificate Principal Balance of the Class M-4 Certificates after taking into account the payment of the Class M-4 Principal Distribution Amount on the Distribution Date, (vi) the Certificate Principal Balance of the Class M-5 Certificates after taking into account the payment of the Class M-5 Principal Distribution Amount on the Distribution Date, (vii) the Certificate Principal Balance of the Class M-6 Certificates after taking into account the payment of the Class M-6 Principal Distribution Amount on the Distribution Date, (viii) the Certificate Principal Balance of the Class M-7 Certificates after taking into account the payment of the Class M-7 Principal Distribution Amount on the Distribution Date and (ix) the Certificate Principal Balance of the Class M-8 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the

23

product of (i) 86.20% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class M-9 Certificate": Any one of the Class M-9 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC IV, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-9 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date, (iv) the Certificate Principal Balance of the Class M-3 Certificates after taking into account the payment of the Class M-3 Principal Distribution Amount on the Distribution Date, (v) the Certificate Principal Balance of the Class M-4 Certificates after taking into account the payment of the Class M-4 Principal Distribution Amount on the Distribution Date, (vi) the Certificate Principal Balance of the Class M-5 Certificates after taking into account the payment of the Class M-5 Principal Distribution Amount on the Distribution Date, (vii) the Certificate Principal Balance of the Class M-6 Certificates after taking into account the payment of the Class M-6 Principal Distribution Amount on the Distribution Date, (viii) the Certificate Principal Balance of the Class M-7 Certificates after taking into account the payment of the Class M-7 Principal Distribution Amount on the Distribution Date, (ix) the Certificate Principal Balance of the Class M-8 Certificates after taking into account the payment of the Class M-8 Principal Distribution Amount on the Distribution Date and (x) the Certificate Principal Balance of the Class M-9 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) 89.30% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the

24

Cut-off Date (which includes the aggregate principal balance of the Identified Subsequent Mortgage Loans).

"Class P Certificate": Any one of the Class P Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-4 and evidencing a Regular Interest in REMIC IV for purposes of the REMIC Provisions.

"Class R Certificates": Any one of the Class R Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-5, and evidencing the Class R-I Interest, the Class R-II Interest, the Class R-III Interest and the Class R-IV Interest.

"Class R-I Interest": The uncertificated residual interest in REMIC I.

"Class R-II Interest": The uncertificated residual interest in REMIC II.

"Class R-III Interest": The uncertificated residual interest in REMIC III.

"Class R-IV Interest": The uncertificated residual interest in REMIC IV.

"Closing Date": April 30, 2007.

"Code": The Internal Revenue Code of 1986 as amended from time to time.

"Collection Account": The separate account or accounts created and maintained, or caused to be created and maintained, by (A) Ocwen and GMAC pursuant to Section 3.08(a) of this Agreement for the benefit of the Certificateholders, which shall be entitled (i) with respect to the Ocwen Mortgage Loans, "Ocwen Loan Servicing, LLC, as Servicer for HSBC Bank USA, National Association as Trustee, in trust for the registered holders of ACE Securities Corp., Home Equity Loan Trust, Series 2007-HE4, Asset Backed Pass-Through Certificates", (ii) with respect to the GMAC Mortgage Loans, "GMAC Mortgage, LLC, as Servicer for HSBC Bank USA, National Association as Trustee, in trust for the registered holders of ACE Securities Corp., Home Equity Loan Trust, Series 2007-HE4, Asset Backed Pass-Through Certificates or (B) Countrywide pursuant to the Servicing Agreement. Each Collection Account must be an Eligible Account as defined in this Agreement or, with respect to Countrywide, must conform to the requirements of the Servicing Agreement.

"Commission": The Securities and Exchange Commission.

"Controlling Person": Means, with respect to any Person, any other Person who "controls" such Person within the meaning of the Securities Act.

"Corporate Trust Office": The principal corporate trust office of the Trustee or the Securities Administrator, as the case may be, at which, at any particular time, its corporate trust business in connection with this Agreement shall be administered, which office at the date of the execution of this instrument is located at (i) with respect to the Trustee, HSBC Bank USA, National Association, 452 Fifth Avenue, New York, New York 10018, Attention: ACE

Securities Corp., 2007-HE4, or at such other address as the Trustee may designate from time to time by notice to the Certificateholders, the Depositor, the Master Servicer, the Securities Administrator and the Servicers, or (ii) with respect to the Securities Administrator, (A) for purposes of Certificate transfers and surrender, Wells Fargo Bank, National Association, Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, Attention: Corporate Trust (ACE 2007-HE4), and (B) for all other purposes, Wells Fargo Bank, National Association, P.O. Box 98, Columbia, Maryland 21046, Attention: Corporate Trust (ACE 2007-HE4) (or for overnight deliveries, at 9062 Old Annapolis Road, Columbia, Maryland 21045, Attention: Corporate Trust (ACE 2007-HE4)), or at such other address as the Securities Administrator may designate from time to time by notice to the Certificateholders, the Depositor, the Master Servicer, the Servicer and the Trustee.

"Corresponding Certificate": With respect to each REMIC III Regular Interest, as follows:

| REMIC III REGULAR INTEREST | CLASS |
|---|---|
| REMIC III REGULAR INTEREST A-1 | A-1 |
| REMIC III REGULAR INTEREST A-2A | A-2A |
| REMIC III REGULAR INTEREST A-2B | A-2B |
| REMIC III REGULAR INTEREST A-2C | A-2C |
| REMIC III REGULAR INTEREST A-2D | A-2D |
| REMIC III REGULAR INTEREST M-1 | M-1 |
| REMIC III REGULAR INTEREST M-2 | M-2 |
| REMIC III REGULAR INTEREST M-3 | M-3 |
| REMIC III REGULAR INTEREST M-4 | M-4 |
| REMIC III REGULAR INTEREST M-5 | M-5 |
| REMIC III REGULAR INTEREST M-6 | M-6 |
| REMIC III REGULAR INTEREST M-7 | M-7 |
| REMIC III REGULAR INTEREST M-8 | M-8 |
| REMIC III REGULAR INTEREST M-9 | M-9 |
| REMIC III REGULAR INTEREST P | P |
| REMIC III REGULAR INTEREST CE-2 | CE-2 |

"Countrywide": Countrywide Home Loans Servicing LP or any successor thereto.

"Countrywide Mortgage Loans": The Mortgage Loans being serviced by Countrywide pursuant to the Servicing Agreement.

"Countrywide Servicing Fee Rate": With respect to each Countrywide Mortgage Loan, 0.17% per annum.

"Credit Enhancement Percentage": For any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the sum of the aggregate Certificate Principal Balances of the Mezzanine Certificates and the Class CE-1 Certificates (which includes the Overcollateralization Amount), and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans, calculated after taking into account distributions of principal on

the Mortgage Loans and distribution of the Principal Distribution Amount to the Certificates then entitled to distributions of principal on such Distribution Date.

"Credit Risk Management Agreements": The agreements between the Credit Risk Manager and each Servicer and/or Master Servicer, each regarding the loss mitigation and advisory services to be provided by the Credit Risk Manager.

"Credit Risk Management Fee": The amount payable to the Credit Risk Manager on each Distribution Date as compensation for all services rendered by it in the exercise and performance of any and all powers and duties of the Credit Risk Manager under the Credit Risk Management Agreements, which amount shall equal one twelfth of the product of (i) the Credit Risk Management Fee Rate multiplied by (ii) the Stated Principal Balance of the Mortgage Loans and any related REO Properties as of the first day of the related Due Period.

"Credit Risk Management Fee Rate": 0.0135% per annum.

"Credit Risk Manager": Clayton Fixed Income Services Inc., a Colorado corporation and its successors and assigns.

"Custodial Agreement": Either of (i) the DBNTC Custodial Agreement or (ii) the Wells Fargo Custodial Agreement, or any other custodial agreement entered into after the date hereof with respect to any Mortgage Loan subject to this Agreement.

"Custodian": Either Wells Fargo or DBNTC or any other custodian appointed under any custodial agreement entered into after the date of this Agreement.

"Cut-off Date": With respect to each Mortgage Loan, April 1, 2007 (other than any Subsequent Mortgage Loan or Qualified Substitute Mortgage Loan. With respect to all Qualified Substitute Mortgage Loans, their respective dates of substitution. With respect to those Subsequent Mortgage Loans sold to the Trust pursuant to a Subsequent Transfer Instrument, the later of (i) first day of the month in which the related Subsequent Transfer Date occurs or (ii) the date of origination of such Mortgage Loan. References herein to the "Cut-off Date," when used with respect to more than one Mortgage Loan, shall be to the respective Cut-off Dates for such Mortgage Loans.

"DBNTC": Deutsche Bank National Trust Company, a national banking association, or its successor in interest.

"DBNTC Custodial Agreement": The Custodial Agreement, dated as of April 1, 2007, among the Trustee, DBNTC and the Servicers, as may be amended or supplemented from time to time.

"Debt Service Reduction": With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction resulting from a Deficient Valuation.

"Deficient Valuation": With respect to any Mortgage Loan, a valuation of the related Mortgaged Property by a court of competent jurisdiction in an amount less than the then outstanding principal balance of the Mortgage Loan, which valuation results from a proceeding initiated under the Bankruptcy Code.

"Definitive Certificates": As defined in Section 6.01(b).

"Deleted Mortgage Loan": A Mortgage Loan replaced or to be replaced by a Qualified Substitute Mortgage Loan.

"Delinquency Percentage": With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of all Mortgage Loans that, as of the last day of the previous calendar month, are sixty (60) or more days delinquent, are in foreclosure, have been converted to REO Properties or have been discharged by reason of bankruptcy, and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties as of the last day of the previous calendar month.

"Depositor": ACE Securities Corp., a Delaware corporation, or its successor in interest.

"Depository": The Depository Trust Company, or any successor Depository hereafter named. The nominee of the initial Depository, for purposes of registering those Certificates that are to be Book-Entry Certificates, is Cede & Co. The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(3) of the Uniform Commercial Code of the State of New York and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

"Depository Institution": Any depository institution or trust company, including the Trustee, that (a) is incorporated under the laws of the United States of America or any State thereof, (b) is subject to supervision and examination by federal or state banking authorities and (c) has outstanding unsecured commercial paper or other short-term unsecured debt obligations (or, in the case of a depository institution that is the principal subsidiary of a holding company, such holding company has unsecured commercial paper or other short-term unsecured debt obligations) that are rated at least A-1+ by S&P, F-1+ by Fitch and P-1 by Moody's (or, if such Rating Agencies are no longer rating the Offered Certificates, comparable ratings by any other nationally recognized statistical rating agency then rating the Offered Certificates).

"Depository Participant": A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"Determination Date": With respect to each Distribution Date and Ocwen and GMAC, the 15th day of the calendar month in which such Distribution Date occurs, or if such 15th day is not a Business Day, the Business Day immediately preceding such 15th day. With respect to each Distribution Date and Countrywide the date specified in the Servicing Agreement. The Determination Date for purposes of Article X hereof shall mean the 15th day of

28

the month, or if such 15th day is not a Business Day, the first Business Day following such 15th day.

"Directly Operate": With respect to any REO Property, the furnishing or rendering of services to the tenants thereof, the management or operation of such REO Property, the holding of such REO Property primarily for sale to customers, the performance of any construction work thereon or any use of such REO Property in a trade or business conducted by REMIC I other than through an Independent Contractor; provided, however, that the related Servicer, on behalf of the Trustee, shall not be considered to Directly Operate an REO Property solely because the Servicer establishes rental terms, chooses tenants, enters into or renews leases, deals with taxes and insurance, or makes decisions as to repairs or capital expenditures with respect to such REO Property.

"Disqualified Organization": Any of the following: (i) the United States, any State or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the foregoing (other than an instrumentality which is a corporation if all of its activities are subject to tax and, except for Freddie Mac, a majority of its board of directors is not selected by such governmental unit), (ii) any foreign government, any international organization, or any agency or instrumentality of any of the foregoing, (iii) any organization (other than certain farmers' cooperatives described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code (including the tax imposed by Section 511 of the Code on unrelated business taxable income), (iv) rural electric and telephone cooperatives described in Section 1381(a)(2)(C) of the Code, (v) an "electing large partnership" and (vi) any other Person so designated by the Trustee based upon an Opinion of Counsel that the holding of an Ownership Interest in a Residual Certificate by such Person may cause any Trust REMIC or any Person having an Ownership Interest in any Class of Certificates (other than such Person) to incur a liability for any federal tax imposed under the Code that would not otherwise be imposed but for the Transfer of an Ownership Interest in a Residual Certificate to such Person. The terms "United States," "State" and "international organization" shall have the meanings set forth in Section 7701 of the Code or successor provisions.

"Distribution Account": The separate trust account or accounts created and maintained by the Securities Administrator pursuant to Section 3.08(b) in the name of the Securities Administrator for the benefit of the Certificateholders and designated "Wells Fargo Bank, National Association, in trust for registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4": Funds in the Distribution Account shall be held in trust for the Certificateholders for the uses and purposes set forth in this Agreement. The Distribution Account must be an Eligible Account.

"Distribution Date": The 25th day of any month, or if such 25th day is not a Business Day, the Business Day immediately following such 25th day, commencing in May 2007.

"Due Date": With respect to each Distribution Date, the day of the month on which the Monthly Payment is due on a Mortgage Loan during the related Due Period, exclusive of any days of grace.

"Due Period": With respect to any Distribution Date, the period commencing on the second day of the month immediately preceding the month in which such Distribution Date occurs and ending on the first day of the month in which such Distribution Date occurs.

"Eligible Account": Any of (i) an account or accounts maintained with a Depository Institution, (ii) an account or accounts the deposits in which are fully insured by the FDIC, (iii) a trust account or accounts maintained with a federal depository institution or state chartered depository institution acting in its fiduciary capacity or (iv) an account of accounts acceptable to the NIMS Insurer and each Rating Agency as confirmed and approved in writing by each Rating Agency. Eligible Accounts may bear interest.

"ERISA": The Employee Retirement Income Security Act of 1974, as amended from time to time.

"Estate in Real Property": A fee simple estate in a parcel of land.

"Excess Liquidation Proceeds": To the extent that such amount is not required by law to be paid to the related Mortgagor, the amount, if any, by which Liquidation Proceeds with respect to a liquidated Mortgage Loan exceed the sum of (i) the outstanding principal balance of such Mortgage Loan and accrued but unpaid interest at the related Net Mortgage Rate through the last day of the month in which the related Liquidation Event occurs, plus (ii) related liquidation expenses or other amounts to which the related Servicer is entitled to be reimbursed from Liquidation Proceeds with respect to such liquidated Mortgage Loan pursuant to Section 3.09 of this Agreement or pursuant to the Servicing Agreement, as applicable.

"Excess Servicing Fee": Shall have the meaning set forth in Section 5.01(e) of this Agreement.

"Exchange Act": The Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Extraordinary Trust Fund Expense": Any amounts payable or reimbursable to the Trustee, the Master Servicer, the Securities Administrator, the Custodians or any director, officer, employee or agent of any such Person from the Trust Fund pursuant to the terms of this Agreement and any amounts payable from the Distribution Account in respect of taxes pursuant to Section 11.01(g)(v).

"Fannie Mae": Fannie Mae, formerly known as the Federal National Mortgage Association, or any successor thereto.

"FDIC": Federal Deposit Insurance Corporation or any successor thereto.

"Final Recovery Determination": With respect to any defaulted Mortgage Loan or any REO Property (other than a Mortgage Loan or REO Property purchased by an originator, the Sponsor or the Terminator pursuant to or as contemplated by Section 2.03, 3.13(c) or Section 10.01), a determination made by the related Servicer that all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries which such Servicer, in its reasonable good faith judgment, expects to be finally recoverable in respect thereof have been so recovered, which

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

determination shall be evidenced by a certificate of a Servicing Officer of such Servicer delivered to the Master Servicer and maintained in its records.

"Fitch": Fitch Ratings or any successor in interest.

"Form 8-K Disclosure Information": Has the meaning set forth in Section 5.06(b) of this Agreement.

"Freddie Mac": Freddie Mac, formerly known as the Federal Home Loan Mortgage Corporation, or any successor thereto.

"GMAC": GMAC Mortgage, LLC or any successor thereto appointed hereunder in connection with the servicing and administration of the GMAC Mortgage Loans.

"GMAC Mortgage Loans": The Mortgage Loans serviced by GMAC pursuant to the terms of this Agreement as specified on the Mortgage Loan Schedule.

"GMAC Servicing Fee Rate":  With respect to each GMAC Mortgage Loan, 0.20% per annum.

"Gross Margin": With respect to each Adjustable Rate Mortgage Loan, the fixed percentage set forth in the related Mortgage Note that is added to the Index on each Adjustment Date in accordance with the terms of the related Mortgage Note used to determine the Mortgage Rate for such Adjustable Rate Mortgage Loan.

"Group I Allocation Percentage": The aggregate principal balance of the Group I Mortgage Loans divided by the sum of the aggregate principal balance of the Group I Mortgage Loans and Group II Mortgage Loans.

"Group I Cap Contract": The Cap Contract, dated as of April 30, 2007, between the Trustee and the Cap Counterparty, including any schedule, confirmations, credit support annex or other credit support document relating thereto, and attached hereto as Exhibit J.

"Group I Cap Credit Support Annex":  The credit support annex, dated as of April 30, 2007, between the Trustee and the Cap Counterparty, which is annexed to and forms part of the Group I Cap Agreement.

"Group I Interest Remittance Amount": With respect to any Distribution Date is that portion of the Available Distribution Amount for such Distribution Date that represents interest received or advanced on the Group I Mortgage Loans (net of the Administration Fees and any Prepayment Charges and after taking into account amounts payable or reimbursable to the Trustee, the Custodians, the Securities Administrator, the Master Servicer, the Servicers or the Credit Risk Manager pursuant to this Agreement, the Custodial Agreements or the Servicing Agreement with respect to the Group I Mortgage Loans).

"Group I Mortgage Loans": Those Mortgage Loans identified on the Mortgage Loan Schedule as Group I Mortgage Loans.

31

"Group I Pre-Funding Sub-Account": The sub-account of the Pre-Funding Account into which the Original Group I Pre-Funded Amount will be deposited on the Closing Date.

"Group I Principal Distribution Amount": With respect to any Distribution Date the sum of (i) the principal portion of all Monthly Payments on the Group I Mortgage Loans due during the related Due Period, whether or not received on or prior to the related Determination Date; (ii) the principal portion of all proceeds received in respect of the repurchase of a Group I Mortgage Loan or, in the case of a substitution, certain amounts representing a principal adjustment, during the related Prepayment Period pursuant to or as contemplated by Section 2.03, Section 3.13(c) and Section 10.01 of this Agreement; (iii) the principal portion of all other unscheduled collections, including Insurance Proceeds, Liquidation Proceeds and all Principal Prepayments in full and in part, received during the related Prepayment Period, to the extent applied as recoveries of principal on the Group I Mortgage Loans, net in each case of payments or reimbursements to the Trustee, the Custodians, the Master Servicer, the Securities Administrator, the Servicers or the Credit Risk Manager; (iv) any portion of the Original Group I Pre-Funded Amount remaining at the end of the Pre-Funding Period and (v) the Class A-1 Allocation Percentage of the amount of any Overcollateralization Increase Amount for such Distribution Date *minus* (v) the Class A-1 Allocation Percentage of the amount of any Overcollateralization Reduction Amount for such Distribution Date.

"Group I Principal Remittance Amount": With respect to any Distribution Date the sum of the amounts described in clauses (i) through (iii) of the definition of Group I Principal Distribution Amount.

"Group II Allocation Percentage": The aggregate principal balance of the Group II Mortgage Loans divided by the sum of the aggregate principal balance of the Group I Mortgage Loans and Group II Mortgage Loans.

"Group II Cap Contract": The Cap Contract, dated as of April 30, 2007, between the Trustee and the Cap Counterparty, including any schedule, confirmations, credit support annex or other credit support document relating thereto, and attached hereto as Exhibit J.

"Group II Cap Credit Support Annex": The credit support annex, dated as of April 30, 2007, between the Trustee and the Cap Counterparty, which is annexed to and forms part of the Group II Cap Agreement.

"Group II Interest Remittance Amount": With respect to any Distribution Date is that portion of the Available Distribution Amount for such Distribution Date that represents interest received or advanced on the Group II Mortgage Loans (net of the Administration Fees and any Prepayment Charges and after taking into account amounts payable or reimbursable to the Trustee, the Custodians, the Securities Administrator, the Master Servicer, the Servicers or the Credit Risk Manager pursuant to this Agreement, the Custodial Agreements or the Servicing Agreement with respect to the Group II Mortgage Loans).

"Group II Mortgage Loans": Those Mortgage Loans identified on the Mortgage Loan Schedule as Group II Mortgage Loans.

32

"Group II Pre-Funding Sub-Account": The sub-account of the Pre-Funding Account into which the Original Group II Pre-Funded Amount will be deposited on the Closing Date.

"Group II Principal Distribution Amount": With respect to any Distribution Date the sum of (i) the principal portion of all Monthly Payments on the Group II Mortgage Loans due during the related Due Period, whether or not received on or prior to the related Determination Date; (ii) the principal portion of all proceeds received in respect of the repurchase of a Group II Mortgage Loan or, in the case of a substitution, certain amounts representing a principal adjustment, during the related Prepayment Period pursuant to or as contemplated by Section 2.03, Section 3.13(c) and Section 10.01 of this Agreement; (iii) the principal portion of all other unscheduled collections, including Insurance Proceeds, Liquidation Proceeds and all Principal Prepayments in full and in part, received during the related Prepayment Period, to the extent applied as recoveries of principal on the Group II Mortgage Loans, net in each case of payments or reimbursements to the Trustee, the Custodians, the Master Servicer, the Securities Administrator, the Servicers or the Credit Risk Manager; (iv) any portion of the Original Group II Pre-Funded Amount remaining at the end of the Pre-Funding Period and (v) the Class A-2 Allocation Percentage of the amount of any Overcollateralization Increase Amount for such Distribution Date *minus* (v) the Class A-2 Allocation Percentage of the amount of any Overcollateralization Reduction Amount for such Distribution Date.

"Group II Principal Remittance Amount": With respect to any Distribution Date will be the sum of the amounts described in clauses (i) through (iii) of the definition of Group II Principal Distribution Amount.

"Identified Subsequent Mortgage Loans": The mortgage loans relating to Group I and Group II as identified on Exhibit M attached hereto which the Depositor proposes to transfer to the Trust during the Pre-Funding Period.

"Indenture": An indenture relating to the issuance of notes secured by the Class CE-1 Certificates, the Class P Certificates, the Class R Certificates (or any portion thereof) which may or may not be guaranteed by the NIMS Insurer.

"Independent": When used with respect to any accountants, a Person who is "independent" within the meaning of Rule 2-01(B) of the Commission's Regulation S-X. When used with respect to any specified Person, any such Person who (a) is in fact independent of the Depositor, the Master Servicer, the Securities Administrator, the Servicers, the Sponsor, any originator and their respective Affiliates, (b) does not have any direct financial interest in or any material indirect financial interest in the Depositor, the Master Servicer, the Securities Administrator, the Servicers, the Sponsor, any originator or any Affiliate thereof, (c) is not connected with the Depositor, the Master Servicer, the Securities Administrator, the Servicers, the Sponsor, any originator or any Affiliate thereof as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions and (d) is not a member of the immediate family of a Person defined on clause (b) or (c) above.

"Independent Contractor": Either (i) any Person (other than a Servicer) that would be an "independent contractor" with respect to REMIC I within the meaning of Section

33

856(d)(3) of the Code if REMIC I were a real estate investment trust (except that the ownership tests set forth in that section shall be considered to be met by any Person that owns, directly or indirectly, 35% or more of any Class of Certificates), so long as REMIC I does not receive or derive any income from such Person and provided that the relationship between such Person and REMIC I is at arm's length, all within the meaning of Treasury Regulation Section 1.856-4(b)(5), or (ii) any other Person (including the Servicer) if the Trustee has received an Opinion of Counsel to the effect that the taking of any action in respect of any REO Property by such Person, subject to any conditions therein specified, that is otherwise herein contemplated to be taken by an Independent Contractor will not cause such REO Property to cease to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code (determined without regard to the exception applicable for purposes of Section 860D(a) of the Code), or cause any income realized in respect of such REO Property to fail to qualify as Rents from Real Property.

"Index": As of any Adjustment Date, the index applicable to the determination of the Mortgage Rate on each Adjustable Rate Mortgage Loan will be the average of the interbank offered rates for six-month United States dollar deposits in the London market as published in The Wall Street Journal and as most recently available either (a) as of the first Business Day forty-five (45) days prior to such Adjustment Date or (b) as of the first Business Day of the month preceding the month of such Adjustment Date, as specified in the related Mortgage Note.

"Institutional Accredited Investor": As defined in Section 6.01(c).

"Insurance Proceeds": Proceeds of any title policy, hazard policy or other insurance policy, covering a Mortgage Loan or the related Mortgaged Property, to the extent such proceeds are not to be applied to the restoration of the related Mortgaged Property or released to the Mortgagor or a senior lienholder in accordance with Accepted Servicing Practices, subject to the terms and conditions of the related Mortgage Note and Mortgage.

"Interest Accrual Period": With respect to any Distribution Date and the Class A Certificates and the Mezzanine Certificates, the period commencing on the Distribution Date of the month immediately preceding the month in which such Distribution Date occurs (or, in the case of the first Distribution Date, commencing on the Closing Date) and ending on the day preceding such Distribution Date. With respect to any Distribution Date and the Class CE-1 Certificates and Class CE-2 Certificates and the REMIC I Regular Interests, the one-month period commencing on the first day of the month prior to the month in which the Distribution Date occurs and ending on the last day of the calendar month immediately preceding the month in which such Distribution Date occurs.

"Interest Carry Forward Amount": With respect to any Distribution Date and any Class A Certificate or Mezzanine Certificate, the sum of (i) the amount, if any, by which (a) the Interest Distribution Amount for such Class as of the immediately preceding Distribution Date exceeded (b) the actual amount distributed on such Class in respect of interest on such immediately preceding Distribution Date and (ii) the amount of any Interest Carry Forward Amount for such Class remaining unpaid from the previous Distribution Date, plus accrued interest on such sum calculated at the related Pass-Through Rate for the most recently ended Interest Accrual Period.

34

"Interest Determination Date": With respect to the Class A Certificates, the Mezzanine Certificates, REMIC I Regular Interests, REMIC II Regular Interests, REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9 and any Interest Accrual Period therefor, the second London Business Day preceding the commencement of such Interest Accrual Period.

"Interest Distribution Amount": With respect to any Distribution Date and any Class A Certificates, any Mezzanine Certificates and any Class CE-1 Certificates, the aggregate Accrued Certificate Interest on the Certificates of such Class for such Distribution Date.

"Interest Remittance Amount": With respect to any Distribution Date, the sum of (i) the Group I Interest Remittance Amount and (ii) the Group II Interest Remittance Amount.

"Last Scheduled Distribution Date": The Distribution Date occurring in May 2037, which is the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date.

"Late Collections": With respect to any Mortgage Loan and any Due Period, all amounts received subsequent to the Determination Date immediately following such Due Period with respect to such Mortgage Loan, whether as late payments of Monthly Payments or as Insurance Proceeds, Liquidation Proceeds or otherwise, which represent late payments or collections of principal and/or interest due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) but delinquent for such Due Period and not previously recovered.

"Liquidation Event": With respect to any Mortgage Loan, any of the following events: (i) such Mortgage Loan is paid in full; (ii) a Final Recovery Determination is made as to such Mortgage Loan or (iii) such Mortgage Loan is removed from REMIC I by reason of its being purchased, sold or replaced pursuant to or as contemplated by Section 2.03, Section 3.13(c) or Section 10.01 of this Agreement. With respect to any REO Property, either of the following events: (i) a Final Recovery Determination is made as to such REO Property or (ii) such REO Property is removed from REMIC I by reason of its being purchased pursuant to Section 10.01.

"Liquidation Proceeds": The amount (other than Insurance Proceeds, amounts received in respect of the rental of any REO Property prior to REO Disposition, or required to be released to a Mortgagor or a senior lienholder in accordance with applicable law or the terms of the related Mortgage Loan Documents) received by the related Servicer in connection with (i) the taking of all or a part of a Mortgaged Property by exercise of the power of eminent domain or condemnation (other than amounts required to be released to the Mortgagor or a senior lienholder), (ii) the liquidation of a defaulted Mortgage Loan through a trustee's sale, foreclosure sale or otherwise, (iii) the repurchase, substitution or sale of a Mortgage Loan or an REO Property pursuant to or as contemplated by Section 2.03, Section 3.13(c), Section 3.22 or Section

35

10.01 of this Agreement or pursuant to the Servicing Agreement or (iv) any Subsequent Recoveries.

"Loan-to-Value Ratio": As of any date of determination, the fraction, expressed as a percentage, the numerator of which is the principal balance of the related Mortgage Loan at such date and the denominator of which is the Value of the related Mortgaged Property.

"London Business Day": Any day on which banks in the Cities of London and New York are open and conducting transactions in United States dollars.

"Loss Severity Percentage": With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the amount of Realized Losses incurred on a Mortgage Loan and the denominator of which is the principal balance of such Mortgage Loan immediately prior to the liquidation of such Mortgage Loan.

"Marker Rate": With respect to the Class CE-1 Certificates and any Distribution Date, a per annum rate equal to two (2) times the weighted average of the REMIC III Remittance Rate for each of REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9, and REMIC III Regular Interest ZZ, with the rate on each such REMIC III Regular Interest (other than REMIC III Regular Interest ZZ) subject to a cap equal to the lesser of (i) the related One-Month LIBOR Pass-Through Rate and (ii) the related Net WAC Pass-Through Rate for the Corresponding Certificate for the purpose of this calculation for such Distribution Date and with the rate on REMIC III Regular Interest ZZ subject to a cap of zero for the purpose of this calculation; provided however, each such cap for each REMIC III Regular Interest (other than REMIC III Regular Interest ZZ) shall be multiplied by a fraction the numerator of which is the actual number of days in the related Interest Accrual Period and the denominator of which is 30.

"Master Servicer":   As of the Closing Date, Wells Fargo Bank, National Association and thereafter, its respective successors in interest who meet the qualifications of this Agreement. The Master Servicer and the Securities Administrator shall at all times be the same Person or an Affiliate.

"Master Servicer Event of Default":   One or more of the events described in Section 8.01(b).

"Master Servicing Fee": With respect to each Mortgage Loan and for any calendar month, an amount equal to one-twelfth of the product of the Master Servicing Fee Rate multiplied by the Scheduled Principal Balance of the Mortgage Loans as of the Due Date in the preceding calendar month.

"Master Servicing Fee Rate": 0.000% per annum.

"Maximum ZZ Uncertificated Interest Deferral Amount": With respect to any Distribution Date, the excess of (i) accrued interest at the REMIC III Remittance Rate applicable to REMIC III Regular Interest ZZ for such Distribution Date on a balance equal to the Uncertificated Balance of REMIC III Regular Interest ZZ minus the REMIC III Overcollateralization Amount, in each case for such Distribution Date, over (ii) Uncertificated Interest on REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, and REMIC III Regular Interest M-9 for such Distribution Date, with the rate on each such REMIC III Regular Interest subject to a cap equal to the lesser of (i) the related One-Month LIBOR Pass-Through Rate and (ii) the related Net WAC Pass-Through Rate for the Corresponding Certificate for the purpose of this calculation for such Distribution Date; provided however, each such cap for each REMIC III Regular Interest shall be multiplied by a fraction the numerator of which is the actual number of days in the related Interest Accrual Period and the denominator of which is 30.

"Maximum Mortgage Rate": With respect to each Adjustable Rate Mortgage Loan, the percentage set forth in the related Mortgage Note as the maximum Mortgage Rate thereunder.

"MERS":   Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

"MERS® System": The system of recording transfers of mortgages electronically maintained by MERS.

"Mezzanine Certificate": Any Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 or Class M-9 Certificate.

"MIN": The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

"Minimum Mortgage Rate": With respect to each Adjustable Rate Mortgage Loan, the percentage set forth in the related Mortgage Note as the minimum Mortgage Rate thereunder.

"Minimum Servicing Requirements": With respect to a special servicer appointed pursuant to Section 7.06 hereunder:

(i)     the proposed special servicer is (1) an affiliate of the Master Servicer that services mortgage loans similar to the Mortgage Loans in the jurisdictions in which the related Mortgaged Properties are located or (2) the proposed special servicer has a rating of at least "Above Average" by S&P and either a rating of at least "RPS2" by Fitch or a rating of at least "SQ2" by Moody's; and

(ii)     the proposed special servicer has a net worth of at least $25,000,000.

"MOM Loan": With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

"Monthly Payment": With respect to any Mortgage Loan, the scheduled monthly payment of principal and interest on such Mortgage Loan which is payable by the related Mortgagor from time to time under the related Mortgage Note, determined: (a) after giving effect to (i) any Deficient Valuation and/or Debt Service Reduction with respect to such Mortgage Loan and (ii) any reduction in the amount of interest collectible from the related Mortgagor pursuant to the Relief Act or similar state or local laws; (b) without giving effect to any extension granted or agreed to by the related Servicer pursuant to Section 3.01 of this Agreement or pursuant to the Servicing Agreement; and (c) on the assumption that all other amounts, if any, due under such Mortgage Loan are paid when due.

"Moody's": Moody's Investors Service, Inc. or any successor in interest.

"Mortgage": The mortgage, deed of trust or other instrument creating a first or second lien on, or first or second priority security interest in, a Mortgaged Property securing a Mortgage Note.

"Mortgage File": The Mortgage Loan Documents pertaining to a particular Mortgage Loan.

"Mortgage Loan": Each mortgage loan transferred and assigned to the Trustee and the Mortgage Loan Documents for which have been delivered to the related Custodian pursuant to Section 2.01 of this Agreement and pursuant to the related Custodial Agreement, as held from time to time as a part of the Trust Fund, the Mortgage Loans so held being identified in the Mortgage Loan Schedule. After each Subsequent Transfer Date, Mortgage Loans shall include any Subsequent Mortgage Loans transferred to the Trust on such Subsequent Transfer Date.

"Mortgage Loan Documents": The documents evidencing or relating to each Mortgage Loan delivered to the applicable Custodian under the related Custodial Agreement on behalf of the Trustee.

"Mortgage Loan Purchase Agreement": Shall mean the Mortgage Loan Purchase Agreement dated as of April 30, 2007, between the Depositor and the Sponsor, a copy of which is attached hereto as Exhibit F.

"Mortgage Loan Schedule": As of any date, the list of Mortgage Loans included in REMIC I on such date, separately identifying the Group I Mortgage Loans and Group II Mortgage Loans, attached hereto as Schedule 1. The Depositor shall deliver or cause the delivery of the initial Mortgage Loan Schedule to the Servicers, the Master Servicer, the Custodians and the Trustee on the Closing Date. The Mortgage Loan Schedule shall set forth the following information with respect to each Mortgage Loan:

      (i)     the Mortgage Loan identifying number;

(ii)     the Mortgagor's first and last name;

(iii)    the street address of the Mortgaged Property including the state and zip code;

(iv)    a code indicating whether the Mortgaged Property is owner-occupied;

(v)     the type of Residential Dwelling constituting the Mortgaged Property;

(vi)    the original months to maturity;

(vii)   the original date of the Mortgage Loan and the remaining months to maturity from the Cut-off Date, based on the original amortization schedule;

(viii)  the Loan-to-Value Ratio at origination;

(ix)    the Mortgage Rate in effect immediately following the Cut-off Date;

(x)     the date on which the first Monthly Payment was due on the Mortgage Loan;

(xi)    the stated maturity date;

(xii)   the amount of the Monthly Payment at origination;

(xiii)  the amount of the Monthly Payment as of the Cut-off Date;

(xiv)   the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance;

(xv)    the original principal amount of the Mortgage Loan;

(xvi)   the Stated Principal Balance of the Mortgage Loan as of the close of business on the Cut-off Date;

(xvii)  with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date;

(xviii) with respect to each Adjustable Rate Mortgage Loan, the Gross Margin;

(xix)   a code indicating the purpose of the loan (i.e., purchase financing, rate/term refinancing, cash-out refinancing);

(xx)    with respect to each Adjustable Rate Mortgage Loan, the Maximum Mortgage Rate under the terms of the Mortgage Note;

39

(xxi)   with respect to each Adjustable Rate Mortgage Loan, the Minimum Mortgage Rate under the terms of the Mortgage Note;

(xxii)   the Mortgage Rate at origination;

(xxiii) with respect to each Adjustable Rate Mortgage Loan, the Periodic Rate Cap;

(xxiv) with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date immediately following the Cut-off Date;

(xxv)   with respect to each Adjustable Rate Mortgage Loan, the Index;

(xxvi) the date on which the first Monthly Payment was due on the Mortgage Loan and, if such date is not consistent with the Due Date currently in effect, such Due Date;

(xxvii) a code indicating whether the Mortgage Loan is an Adjustable Rate Mortgage Loan or a fixed rate Mortgage Loan;

(xxviii) a code indicating the documentation style (i.e., full, stated or limited);

(xxix)  a code indicating if the Mortgage Loan is subject to a primary insurance policy or lender paid mortgage insurance policy and the name of the insurer and, if applicable, the rate payable in connection therewith;

(xxx)   the Appraised Value of the Mortgaged Property;

(xxxi)  the sale price of the Mortgaged Property, if applicable;

(xxxii) a code indicating whether the Mortgage Loan is subject to a Prepayment Charge, the term of such Prepayment Charge and the amount of such Prepayment Charge;

(xxxiii) the product type (e.g., 2/28, 15 year fixed, 30 year fixed, 15/30 balloon, etc.);

(xxxiv) the Mortgagor's debt to income ratio;

(xxxv) the FICO score at origination;

(xxxvi) with respect to each Mortgage Loan registered on MERS, the MIN;

(xxxvii) a code indicating whether the Mortgage Loan is secured by a first or second lien;

(xxxviii) the applicable Custodian;

40

(xxxix) the applicable Servicer; and

(xl)     a code indicating whether the Mortgage Loan is an initial Mortgage Loan or a pre-funded Mortgage Loan.

The Mortgage Loan Schedule shall set forth the following information with respect to the Mortgage Loans in the aggregate as of the Cut-off Date: (1) the number of Mortgage Loans; (2) the current principal balance of the Mortgage Loans; (3) the weighted average Mortgage Rate of the Mortgage Loans; and (4) the weighted average maturity of the Mortgage Loans. The Mortgage Loan Schedule shall be amended from time to time by the Depositor in accordance with the provisions of this Agreement. With respect to any Qualified Substitute Mortgage Loan, the Cut-off Date shall refer to the related Cut-off Date for such Mortgage Loan, determined in accordance with the definition of Cut-off Date herein.

"Mortgage Note": The original executed note or other evidence of the indebtedness of a Mortgagor under a Mortgage Loan.

"Mortgage Rate": With respect to each Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note, which rate with respect to each Adjustable Rate Mortgage Loan (A) as of any date of determination until the first Adjustment Date following the Cut-off Date shall be the rate set forth in the Mortgage Loan Schedule as the Mortgage Rate in effect immediately following the Cut-off Date and (B) as of any date of determination thereafter shall be the rate as adjusted on the most recent Adjustment Date equal to the sum, rounded to the nearest 0.125% as provided in the Mortgage Note, of the Index, as most recently available as of a date prior to the Adjustment Date as set forth in the related Mortgage Note, plus the related Gross Margin; provided that the Mortgage Rate on such Adjustable Rate Mortgage Loan on any Adjustment Date shall never be more than the lesser of (i) the sum of the Mortgage Rate in effect immediately prior to the Adjustment Date plus the related Periodic Rate Cap, if any, and (ii) the related Maximum Mortgage Rate, and shall never be less than the greater of (i) the Mortgage Rate in effect immediately prior to the Adjustment Date less the Periodic Rate Cap, if any, and (ii) the related Minimum Mortgage Rate. With respect to each Mortgage Loan that becomes an REO Property, as of any date of determination, the annual rate determined in accordance with the immediately preceding sentence as of the date such Mortgage Loan became an REO Property.

"Mortgaged Property": The underlying property securing a Mortgage Loan, including any REO Property, consisting of an Estate in Real Property improved by a Residential Dwelling.

"Mortgagor": The obligor on a Mortgage Note.

"Net Monthly Excess Cashflow": With respect to any Distribution Date, the sum of (i) any Overcollateralization Reduction Amount for such Distribution Date and (ii) the excess of (x) the Available Distribution Amount for such Distribution Date over (y) the sum for such Distribution Date of (A) the aggregate Senior Interest Distribution Amounts payable to the Holders of the Class A Certificates, (B) the aggregate Interest Distribution Amounts payable to

41

the holders of the Mezzanine Certificates, (C) the Principal Remittance Amount and (D) any Net Swap Payment or Swap Termination Payment (not caused by the occurrence of a Swap Provider Trigger Event) owed to the Swap Provider (to the extent such amount has not been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Trustee on behalf of the Supplemental Interest Trust).

"Net Mortgage Rate": With respect to any Mortgage Loan (or the related REO Property) as of any date of determination, a per annum rate of interest equal to the then applicable Mortgage Rate for such Mortgage Loan minus the Administration Fee Rate.

"Net Swap Payment": With respect to each Distribution Date, the net payment required to be made pursuant to the terms of the Swap Agreement by either the Swap Provider or Securities Administrator from the Supplemental Interest Trust, which net payment shall not take into account any Swap Termination Payment.

"Net WAC Pass-Through Rate": With respect to the Class A-1 Certificates and any Distribution Date, a rate per annum (adjusted for the actual number of days elapsed in the related Interest Accrual Period) equal to the product of (i) twelve and (ii) a fraction, expressed as a percentage, the numerator of which is the amount of interest which accrued on the Group I Mortgage Loans in the prior calendar month plus the amount withdrawn from the Group I Capitalized Interest Sub-Account minus the fees payable to the Servicers, the Master Servicer and the Credit Risk Manager with respect to the Group I Mortgage Loans for such Distribution Date and the Group I Allocation Percentage of any Net Swap Payment payable to the Swap Provider and Swap Termination Payment payable to the Swap Provider which was not caused by the occurrence of a Swap Provider Trigger Event (to the extent such amount has not been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Trustee on behalf of the Supplemental Interest Trust), in each case for such Distribution Date and the denominator of which is the aggregate principal balance of the Group I Mortgage Loans as of the last day of the immediately preceding Due Period (or as of the Cut-off Date with respect to the first Distribution Date) after giving effect to Principal Prepayments received during the related Prepayment Period which were distributed on the immediately preceding Distribution Date plus any amounts on deposit in the Group I Pre-Funding Sub-Account. For federal income tax purposes, such rate shall be expressed as the weighted average of (adjusted for the actual number of days elapsed in the related Interest Accrual Period) the REMIC III Remittance Rate on REMIC III Regular Interest I-GRP, weighted on the basis of the Uncertificated Balance of such REMIC III Regular Interest.

With respect to the Class A-2 Certificates and any Distribution Date, a rate per annum (adjusted for the actual number of days elapsed in the related Interest Accrual Period) equal to the product of (i) twelve and (ii) a fraction, expressed as a percentage, the numerator of which is the amount of interest which accrued on the Group II Mortgage Loans in the prior calendar month plus the amount withdrawn from the Group II Capitalized Interest Sub-Account minus the fees payable to the Servicers, the Master Servicer and the Credit Risk Manager with respect to the Group II Mortgage Loans for such Distribution Date and the Group II Allocation Percentage of any Net Swap Payment payable to the Swap Provider and Swap Termination

42

Payment payable to the Swap Provider which was not caused by the occurrence of a Swap Provider Trigger Event (to the extent such amount has not been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Trustee on behalf of the Supplemental Interest Trust), in each case for such Distribution Date and the denominator of which is the aggregate principal balance of the Group II Mortgage Loans as of the last day of the immediately preceding Due Period (or as of the Cut-off Date with respect to the first Distribution Date) after giving effect to Principal Prepayments received during the related Prepayment Period which were distributed on the immediately preceding Distribution Date plus any amounts on deposit in the Group II Pre-Funding Sub-Account. For federal income tax purposes, such rate shall be expressed as the weighted average of (adjusted for the actual number of days elapsed in the related Interest Accrual Period) the REMIC III Remittance Rate on REMIC III Regular Interest II-GRP, weighted on the basis of the Uncertificated Balance of such REMIC III Regular Interest.

With respect to the Mezzanine Certificates and any Distribution Date a rate per annum equal to the weighted average (weighted in proportion to the results of subtracting from the Scheduled Principal Balance of each loan group, the aggregate Certificate Principal Balance of the related Class A Certificates), of (i) the Net WAC Pass-Through Rate for the Class A-1 Certificates, and (ii) the Net WAC Pass-Through Rate for the Class A-2 Certificates. For federal income tax purposes, such rate shall be expressed as the weighted average of (adjusted for the actual number of days elapsed in the related Interest Accrual Period) the REMIC III Remittance Rates on (a) REMIC III Regular Interest I-SUB, subject to a cap and a floor equal to the REMIC III Remittance Rate on REMIC III Regular Interest I-GRP and (b) REMIC III Regular Interest III-SUB, subject to a cap and a floor equal to the REMIC III Remittance Rate on REMIC III Regular Interest II-GRP, weighted on the basis of the Uncertificated Balance of each such REMIC III Regular Interest.

"Net WAC Rate Carryover Amount": With respect to any Class A Certificate or Mezzanine Certificate and any Distribution Date on which the Pass-Through Rate is limited to the applicable Net WAC Pass-Through Rate, an amount equal to the sum of (i) the excess of (x) the amount of interest such Class would have been entitled to receive on such Distribution Date if the applicable Net WAC Pass-Through Rate would not have been applicable to such Class on such Distribution Date over (y) the amount of interest paid to such Class on such Distribution Date at the applicable Net WAC Pass-Through Rate plus (ii) the related Net WAC Rate Carryover Amount for the previous Distribution Date not previously distributed to such Class together with interest thereon at a rate equal to the Pass-Through Rate for such Class for the most recently ended Interest Accrual Period without taking into account the applicable Net WAC Pass-Through Rate.

"New Lease": Any lease of REO Property entered into on behalf of REMIC I, including any lease renewed or extended on behalf of REMIC I, if REMIC I has the right to renegotiate the terms of such lease.

"NIMS Insurer": Any insurer that is guaranteeing certain payments under notes secured by collateral which includes all or a portion of the Class CE-1 Certificates, the Class P Certificates and/or the Class R Certificates.

43

"Nonrecoverable P&I Advance": Any P&I Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property that, in the good faith business judgment of the related Servicer or a successor to the Servicer (including the Master Servicer) will not or, in the case of a proposed P&I Advance, would not be ultimately recoverable from related Late Collections, Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan or REO Property as provided herein or in the Servicing Agreement.

"Nonrecoverable Servicing Advance": Any Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property that, in the good faith business judgment of the related Servicer or a successor to the related Servicer (including the Master Servicer) will not or, in the case of a proposed Servicing Advance, would not be ultimately recoverable from related Late Collections, Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan or REO Property as provided herein or in the Servicing Agreement.

"Non-United States Person": Any Person other than a United States Person.

"Notional Amount": With respect to the Class CE-1 Certificates and any Distribution Date, the Uncertificated Balance of the REMIC III Regular Interests (other than REMIC III Regular Interest P) for such Distribution Date. As of the Closing Date, the Notional Amount of the Class CE-1 Certificates is equal to $1,085,862,492.08. With respect to the Class CE-2 Certificates and any Distribution Date, the Notional Amount of the REMIC III Regular Interest CE-2 for such Distribution Date. With respect to the REMIC III Regular Interest CE-2 and any Distribution Date, the Notional Amount of the REMIC II Regular Interest I-CE-2 for such Distribution Date. With respect to REMIC II Regular Interest I-CE-2 and any Distribution Date, the Notional Amounts of the REMIC I Regular Interest LTCE2G and REMIC I Regular Interest LTCE2C. With respect to REMIC I Regular Interest LTCE2G and any Distribution Date, the sum of the aggregate principal balances of the GMAC Mortgage Loans for such Distribution Date. With respect to REMIC I Regular Interest LTCE2C and any Distribution Date, the sum of the aggregate principal balances of the Countrywide Mortgage Loans for such Distribution Date.

With respect to REMIC III Regular Interest IO and each Distribution Date listed below, the aggregate Uncertificated Balance of the REMIC II Regular Interests ending with the designation "A" listed below:

| Distribution Date | REMIC II Regular Interests |
|---|---|
| 1st through 7th | I-1-A through I-53-A and II-1-A through II-53-A |
| 8 | I-2-A through I-53-A and II-2-A through II-53-A |
| 9 | I-3-A through I-53-A and II-3-A through II-53-A |
| 10 | I-4-A through I-53-A and II-4-A through II-53-A |
| 11 | I-5-A through I-53-A and II-5-A through II-53-A |
| 12 | I-6-A through I-53-A and II-6-A through II-53-A |
| 13 | I-7-A through I-53-A and II-7-A through II-53-A |
| 14 | I-8-A through I-53-A and II-8-A through II-53-A |
| 15 | I-9-A through I-53-A and II-9-A through II-53-A |
| 16 | I-10-A through I-53-A and II-10-A through II-53-A |
| 17 | I-11-A through I-53-A and II-11-A through II-53-A |
| 18 | I-12-A through I-53-A and II-12-A through II-53-A |

44

| Distribution Date | REMIC II Regular Interests |
|---|---|
| 19 | I-13-A through I-53-A and  II-13-A through II-53-A |
| 20 | I-14-A through I-53-A and  II-14-A through II-53-A |
| 21 | I-15-A through I-53-A and  II-15-A through II-53-A |
| 22 | I-16-A through I-53-A and  II-16-A through II-53-A |
| 23 | I-17-A through I-53-A and  II-17-A through II-53-A |
| 24 | I-18-A through I-53-A and  II-18-A through II-53-A |
| 25 | I-19-A through I-53-A and II-19-A through II-53-A |
| 26 | I-20-A through I-53-A and II-20-A through II-53-A |
| 27 | I-21-A through I-53-A and II-21-A through II-53-A |
| 28 | I-22-A through I-53-A and II-22-A through II-53-A |
| 29 | I-23-A through I-53-A and II-23-A through II-53-A |
| 30 | I-24-A through I-53-A and II-24-A through II-53-A |
| 31 | I-25-A through I-53-A and II-25-A through II-53-A |
| 32 | I-26-A through I-53-A and II-26-A through II-53-A |
| 33 | I-27-A through I-53-A and II-27-A through II-53-A |
| 34 | I-28-A through I-53-A and II-28-A through II-53-A |
| 35 | I-29-A through I-53-A and II-29-A through II-53-A |
| 36th-37th | I-30-A through I-53-A and II-30-A through II-53-A |
| 38 | I-31-A through I-53-A and II-31-A through II-53-A |
| 39 | I-32-A through I-53-A and II-32-A through II-53-A |
| 40 | I-33-A through I-53-A and II-33-A through II-53-A |
| 41 | I-34-A through I-53-A and II-34-A through II-53-A |
| 42 | I-35-A through I-53-A and II-35-A through II-53-A |
| 43 | I-36-A through I-53-A and II-36-A through II-53-A |
| 44 | I-37-A through I-53-A and II-37-A through II-53-A |
| 45 | I-38-A through I-53-A and II-38-A through II-53-A |
| 46 | I-39-A through I-53-A and  II-39-A through II-53-A |
| 47 | I-40-A through I-53-A and  II-40-A through II-53-A |
| 48 | I-41-A through I-53-A and  II-41-A through II-53-A |
| 49 | I-42-A through I-53-A and  II-42-A through II-53-A |
| 50 | I-43-A through I-53-A and  II-43-A through II-53-A |
| 51 | I-44-A through I-53-A and  II-44-A through II-53-A |
| 52 | I-45-A through I-53-A and  II-45-A through II-53-A |
| 51 | I-46-A through I-53-A and  II-46-A through II-53-A |
| 51 | I-47-A through I-53-A and  II-47-A through II-53-A |
| 55 | I-48-A through I-53-A and  II-48-A through II-53-A |
| 56 | I-49-A through I-53-A and II-49-A through II-53-A |
| 57 | I-50-A through I-53-A and II-50-A through II-53-A |
| 58 | I-51-A through I-53-A and II-51-A through II-53-A |
| 59 | I-52-A and I-53-A and II-52-A and II-53-A |
| 60 | I-53-A and II-53-A |
| thereafter | $0.00 |

With respect to the Class IO Interest and any Distribution Date, an amount equal to the Notional Amount of the REMIC III Regular Interest IO.

"Ocwen": Ocwen Loan Servicing, LLC or any successor thereto appointed hereunder in connection with the servicing and administration of the Ocwen Mortgage Loans.

"Ocwen Mortgage Loans": The Mortgage Loans serviced and administered by Ocwen the terms and conditions of this Agreement and identified as such on the Mortgage Loan Schedule.

45

"Offered Certificates": The Class A Certificates and the Mezzanine Certificates, collectively.

"Officer's Certificate": With respect to any Person, a certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President or a vice president (however denominated), or by the Treasurer, the Secretary, or one of the assistant treasurers or assistant secretaries of such Person (or, in the case of a Person that is not a corporation, signed by the person or persons having like responsibilities).

"One-Month LIBOR": With respect to the Class A Certificates, the Mezzanine Certificates, REMIC I Regular Interests, REMIC II Regular Interests, REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9 and any Interest Accrual Period therefor, the rate determined by the Securities Administrator on the related Interest Determination Date on the basis of the offered rate for one-month U.S. dollar deposits, as such rate appears on Telerate Page 3750 as of 11:00 a.m. (London time) on such Interest Determination Date; provided that if such rate does not appear on Telerate Page 3750, the rate for such date will be determined on the basis of the offered rates of the Reference Banks for one-month U.S. dollar deposits, as of 11:00 a.m. (London time) on such Interest Determination Date. In such event, the Securities Administrator will request the principal London office of each of the Reference Banks to provide a quotation of its rate. If on such Interest Determination Date, two or more Reference Banks provide such offered quotations, One-Month LIBOR for the related Interest Accrual Period shall be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 1/16). If on such Interest Determination Date, fewer than two Reference Banks provide such offered quotations, One-Month LIBOR for the related Interest Accrual Period shall be the higher of (i) LIBOR as determined on the previous Interest Determination Date and (ii) the Reserve Interest Rate. Notwithstanding the foregoing, if, under the priorities described above, LIBOR for an Interest Determination Date would be based on LIBOR for the previous Interest Determination Date for the third consecutive Interest Determination Date, the Securities Administrator shall select an alternative comparable index (over which the Securities Administrator has no control), used for determining one-month Eurodollar lending rates that is calculated and published (or otherwise made available) by an independent party. The establishment of One-Month LIBOR by the Securities Administrator and the Securities Administrator's subsequent calculation of the One-Month LIBOR Pass-Through Rates for the relevant Interest Accrual Period, shall, in the absence of manifest error, be final and binding.

"One-Month LIBOR Pass-Through Rate": With respect to the Class A-1 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-1, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class A-2A Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-2A, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

46

With respect to the Class A-2B Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-2B, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class A-2C Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-2C, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class A-2D Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest A-2D, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-1 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-1, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-2 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-2, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-3 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-3, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-4 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-4, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-5 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-5, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-6 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-6, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-7 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-7, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-8 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-8, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-9 Certificates and, for purposes of the definition of "Marker Rate", REMIC III Regular Interest M-9, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

47

"Opinion of Counsel": A written opinion of counsel, who may, without limitation, be salaried counsel for the Depositor, the Servicers, the Securities Administrator or the Master Servicer, acceptable to the Trustee, except that any opinion of counsel relating to (a) the qualification of any REMIC as a REMIC or (b) compliance with the REMIC Provisions must be an opinion of Independent counsel.

"Optional Termination Date": The first Distribution Date on which the aggregate principal balance of the Mortgage Loans (and properties acquired in respect thereof) remaining in the Trust Fund as of the last day of the related Due Period has been reduced to less than or equal to 10% of the sum of (i) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date and (ii) the Original Pre-Funded Amount.

"Original Group I Pre-Funded Amount": The amount deposited by the Depositor in the Group I Pre-Funding Sub-Account on the Closing Date, which amount is $1,905,250.

"Original Group II Pre-Funded Amount": The amount deposited by the Depositor in the Group II Pre-Funding Sub-Account on the Closing Date, which amount is $5,709,188.

"Original Pre-Funded Amount": The sum of the Original Group I Pre-Funded Amount and the Original Group II Pre-Funded Amount.

"Overcollateralization Amount": With respect to any Distribution Date, the excess, if any, of (a) the sum of (i) the aggregate Stated Principal Balances of the Mortgage Loans (including any Subsequent Mortgage Loans transferred to the Trust) and REO Properties immediately following such Distribution Date and (ii) any funds on deposit in the Pre-Funding Account as of the related Determination Date (exclusive of any investment income therein) over (b) the sum of the aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates as of such Distribution Date (after taking into account the payment of the Principal Remittance Amount on such Distribution Date).

"Overcollateralization Increase Amount": With respect to any Distribution Date, the amount of Net Monthly Excess Cashflow actually applied as an accelerated payment of principal to the Class A Certificates and the Mezzanine Certificates then entitled to distributions of principal to the extent the Required Overcollateralization Amount exceeds the Overcollateralization Amount.

"Overcollateralization Reduction Amount": With respect to any Distribution Date, the lesser of (i) the amount by which the Overcollateralization Amount exceeds the Required Overcollateralization Amount and (ii) the Principal Remittance Amount; provided however that on any Distribution Date on which a Trigger Event is in effect, the Overcollateralization Reduction Amount shall equal zero.

"Ownership Interest": As to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

"P&I Advance": As to any Mortgage Loan or REO Property, any advance made by the related Servicer in respect of any Determination Date pursuant to (i) with respect to

48

Ocwen and GMAC, Section 5.03 of this Agreement, or by an Advance Financing Person pursuant to Section 3.26 of this Agreement (ii) with respect to Countrywide, pursuant to the Servicing Agreement or (iii) with respect to a successor Servicer, pursuant to Section 8.02 of this Agreement (which advances shall not include principal or interest shortfalls due to bankruptcy proceedings or application of the Relief Act or similar state or local laws.)

"Pass-Through Rate": With respect to the Class A Certificates and the Mezzanine Certificates, and any Distribution Date, a rate per annum equal to the lesser of (i) the related One-Month LIBOR Pass-Through Rate for such Distribution Date and (ii) the related Net WAC Pass-Through Rate for such Distribution Date.

With respect to the Class CE-1 Certificates and any Distribution Date, a rate per annum equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (i) through (xv) below, and the denominator of which is the aggregate Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9 and REMIC III Regular Interest ZZ. For purposes of calculating the Pass-Through Rate for the Class CE-1 Certificates, the numerator is equal to the sum of the following components:

(i)    the REMIC III Remittance Rate for REMIC III Regular Interest AA minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest AA;

(ii)    the REMIC III Remittance Rate for REMIC III Regular Interest A-1 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest A-1;

(iii)    the REMIC III Remittance Rate for REMIC III Regular Interest A-2 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest A-2A;

(iv)    the REMIC III Remittance Rate for REMIC III Regular Interest A-2B minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest A-2B;

(v)    the REMIC III Remittance Rate for REMIC III Regular Interest A-2C minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest A-2C;

(vi)    the REMIC III Remittance Rate for REMIC III Regular Interest A-2D minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest A-2D;

(vii)    the REMIC III Remittance Rate for REMIC III Regular Interest M-1 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-1;

(viii)    the REMIC III Remittance Rate for REMIC III Regular Interest M-2 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-2;

(ix)    the REMIC III Remittance Rate for REMIC III Regular Interest M-3 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-3;

(x)    the REMIC III Remittance Rate for REMIC III Regular Interest M-4 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-4;

(xi)    the REMIC III Remittance Rate for REMIC III Regular Interest M-5 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-5;

(xii)    the REMIC III Remittance Rate for REMIC III Regular Interest M-6 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-6;

(xiii)    the REMIC III Remittance Rate for REMIC III Regular Interest M-7 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-7;

(xiv)    the REMIC III Remittance Rate for REMIC III Regular Interest M-8 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-8;

(xv)    the REMIC III Remittance Rate for REMIC III Regular Interest M-9 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest M-9;

(xvi)    the REMIC III Remittance Rate for REMIC III Regular Interest ZZ minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC III Regular Interest ZZ; and

(xvii)    100% of the interest on REMIC III Regular Interest P.

With respect to the Class CE-2 Certificates and any Distribution Date, an amount equal to 100% of the amounts distributed on REMIC III Regular Interest CE-2.

The Class IO Interest shall not have a Pass-Through Rate, but current interest for the Class IO Interest and each Distribution Date shall be an amount equal to 100% of the amounts distributable to REMIC III Regular Interest IO for such Distribution Date.

50

"PCAOB":   Means the Public Company Accounting Oversight Board.

"Percentage Interest":  With respect to any Class of Certificates (other than the Residual Certificates), the undivided percentage ownership in such Class evidenced by such Certificate, expressed as a percentage, the numerator of which is the initial Certificate Principal Balance represented by such Certificate and the denominator of which is the aggregate initial Certificate Principal Balance or Notional Amount of all of the Certificates of such Class. The Class A Certificates and the Mezzanine Certificates are issuable only in minimum Percentage Interests corresponding to minimum initial Certificate Principal Balances of $25,000 and integral multiples of $1.00 in excess thereof.  The Class P Certificates are issuable only in Percentage Interests corresponding to initial Certificate Principal Balances of $20 and integral multiples thereof. The Class CE-1 Certificates and Class CE-2 Certificates are issuable only in minimum Percentage Interests corresponding to minimum initial Notional Amounts of $10,000 and integral multiples of $1.00 in excess thereof; provided, however, that a single Certificate of each such Class of Certificates may be issued having a Percentage Interest corresponding to the remainder of the aggregate initial Notional Amount of such Class or to an otherwise authorized denomination for such Class plus such remainder. With respect to any Residual Certificate, the undivided percentage ownership in such Class evidenced by such Certificate, as set forth on the face of such Certificate. The Residual Certificates are issuable in Percentage Interests of 20% and integral multiples of 5% in excess thereof.

"Periodic Rate Cap":  With respect to each Adjustable Rate Mortgage Loan and any Adjustment Date therefor, the fixed percentage set forth in the related Mortgage Note, which is the maximum amount by which the Mortgage Rate for such Adjustable Rate Mortgage Loan may increase or decrease (without regard to the Maximum Mortgage Rate or the Minimum Mortgage Rate) on such Adjustment Date from the Mortgage Rate in effect immediately prior to such Adjustment Date.

"Permitted Investments":  Any one or more of the following obligations or securities acquired at a purchase price of not greater than par, regardless of whether issued by the Depositor, the Servicers, the Master Servicer, the NIMS Insurer, the Trustee or any of their respective Affiliates:

(i)     direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)     (A) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by or federal funds sold by any depository institution or trust company (including the Trustee or its agent acting in their respective commercial capacities) incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, so long as, at the time of such investment or contractual commitment providing for such investment, such depository institution or trust company (or, if the only Rating Agency is S&P, in the case of the principal depository institution in a depository institution holding company, debt obligations of the depository institution holding company) or its ultimate

51

parent has a short-term uninsured debt rating in the highest available rating category of Moody's and S&P and provided that each such investment has an original maturity of no more than 365 days; and provided further that, if the only Rating Agency is S&P and if the depository or trust company is a principal subsidiary of a bank holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the bank holding company; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of S&P if S&P is the Rating Agency; and (B) any other demand or time deposit or deposit which is fully insured by the FDIC;

(iii)    repurchase obligations with a term not to exceed 30 days with respect to any security described in clause (i) above and entered into with a depository institution or trust company (acting as principal) rated A-1+ or higher by S&P, and A2 or higher by Moody's, provided, however, that collateral transferred pursuant to such repurchase obligation must be of the type described in clause (i) above and must (A) be valued daily at current market prices plus accrued interest, (B) pursuant to such valuation, be equal, at all times, to 105% of the cash transferred by a party in exchange for such collateral and (C) be delivered to such party or, if such party is supplying the collateral, an agent for such party, in such a manner as to accomplish perfection of a security interest in the collateral by possession of certificated securities;

(iv)    securities bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any state thereof and that are rated by each Rating Agency that rates such securities in its highest long-term unsecured rating categories at the time of such investment or contractual commitment providing for such investment;

(v)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than 30 days after the date of acquisition thereof) that is rated by each Rating Agency that rates such securities in its highest short-term unsecured debt rating available at the time of such investment;

(vi)    units of money market funds that have been rated "AAAm" or "AAAm-G" by S&P or "Aaa" by Moody's including any such money market fund managed or advised by the Master Servicer, the Trustee or any of their Affiliates; and

(vii)    if previously confirmed in writing to the Trustee and consented to by the NIMS Insurer, any other demand, money market or time deposit, or any other obligation, security or investment, as may be acceptable to the Rating Agencies as a permitted investment of funds backing securities having ratings equivalent to its highest initial rating of the Class A Certificates;

provided, however, that no instrument described hereunder shall evidence either the right to receive (a) only interest with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument and the

52

interest and principal payments with respect to such instrument provide a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations.

"Permitted Transferee": Any Transferee of a Residual Certificate other than a Disqualified Organization or Non-United States Person.

"Person": Any individual, limited liability company, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Plan": Any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code.

"Pre-Funding Account": The account established and maintained pursuant to Section 3.27.

"Pre-Funding Period": The period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Pre-Funding Account (exclusive of investment income) is reduced to zero or (ii) July 29, 2007.

"Prepayment Assumption": A prepayment rate for (a) the Adjustable Rate Mortgage Loans of 100% PPC, which represents (i) a per annum prepayment rate of 5% of the then outstanding principal balance of the Adjustable Rate Mortgage Loans in the first month of the life of the Adjustable Rate Mortgage Loans, (ii) an additional 2% per annum in each month thereafter through the eleventh month, (iii) building to a constant prepayment rate of 27% per annum beginning in the twelfth month and remaining constant until the twenty-third month, (iv) increasing to and remaining constant at a prepayment rate of 60% per annum beginning in the twenty-fourth month until the twenty-seventh month and (v) decreasing and remaining constant at a prepayment rate of 30% per annum from the twenty-eighth month and thereafter; provided, however, the prepayment rate will not exceed 85% per annum in any period for any percentage of PPC; and (b) the fixed-rate Mortgage Loans of 100% PPC, which represents (i) a per annum prepayment rate of 4% of the then outstanding principal balance of the fixed rate Mortgage Loans in the first month of the life of such Mortgage Loans, (ii) an additional 1.72727% per annum in each month thereafter through the eleventh month and (iii) a constant prepayment rate of 23% per annum beginning in the twelfth month and in each month thereafter during the life of the fixed rate Mortgage Loans; provided, however, the prepayment rate will not exceed 85% per annum in any period for any percentage of PPC. The Prepayment Assumption is used solely for determining the accrual of original issue discount on the Certificates for federal income tax purposes.

"Prepayment Charge": With respect to any Principal Prepayment, any prepayment premium, penalty or charge payable by a Mortgagor in connection with any Principal Prepayment on a Mortgage Loan pursuant to the terms of the related Mortgage Note.

"Prepayment Charge Schedule": As of any date, the list of Mortgage Loans providing for a Prepayment Charge included in the Trust Fund on such date, attached hereto as Schedule 2 (including the prepayment charge summary attached thereto). The Depositor shall deliver or cause the delivery of the Prepayment Charge Schedule to the Servicers, the Master Servicer and the Trustee on the Closing Date. The Prepayment Charge Schedule shall set forth the following information with respect to each Prepayment Charge:

        (i)     the Mortgage Loan identifying number;

        (ii)    a code indicating the type of Prepayment Charge;

        (iii)   the date on which the first Monthly Payment was due on the related Mortgage Loan;

        (iv)   the term of the related Prepayment Charge;

        (v)    the original Stated Principal Balance of the related Mortgage Loan; and

        (vi)   the Stated Principal Balance of the related Mortgage Loan as of the Cut-off Date.

"Prepayment Interest Excess": With respect to each Ocwen Mortgage Loan or GMAC Mortgage Loan that was the subject of a Principal Prepayment in full during the portion of the related Prepayment Period occurring between the first day of the calendar month in which such Distribution Date occurs and the fifteenth (15th) day of the calendar month in which such Distribution Date occurs, an amount equal to interest (to the extent received) at the applicable Net Mortgage Rate on the amount of such Principal Prepayment for the number of days commencing on the first day of the calendar month in which such Distribution Date occurs and ending on the last date through which interest is collected from the related Mortgagor. Ocwen and GMAC may withdraw such Prepayment Interest Excess from the related Collection Account in accordance with Section 3.09(a)(x). The entitlement of Countrywide, if any, with respect to Prepayment Interest Excess is set forth in the Servicing Agreement.

"Prepayment Interest Shortfall": With respect to any Distribution Date, for each such Mortgage Loan that was the subject of a Principal Prepayment in full or in part during the portion of the related Prepayment Period occurring between the first day of the related Prepayment Period and the last day of the calendar month preceding the month in which such Distribution Date occurs that was applied by the related Servicer to reduce the outstanding principal balance of such Mortgage Loan on a date preceding the Due Date in the succeeding Prepayment Period, an amount equal to interest at the applicable Net Mortgage Rate on the amount of such Principal Prepayment for the number of days commencing on the date on which the prepayment is applied and ending on the last day of the calendar month preceding such Distribution Date. The obligations of Servicers in respect of any Prepayment Interest Shortfalls are set forth in Section 3.23 of this Agreement or the Servicing Agreement, as applicable. The obligations of the Master Servicer in respect of any Prepayment Interest Shortfalls are set forth in Section 4.19 of this Agreement.

"Prepayment Period": For any Distribution Date and (A) the Ocwen Mortgage Loans (i) with respect to Principal Prepayments in part, the calendar month immediately preceding the month in which the related Distribution Date occurs and (ii) with respect to Principal Prepayments in full, the period from the 16th day of the month immediately preceding the month in which the related Distribution Date occurs (or with respect to the first Prepayment Period, the period commencing on the Cut-off Date) to the 15th day of the month in which such Distribution Date occurs and (B) the GMAC Mortgage Loans and the Countrywide Mortgage Loans, the period from the 16th day of the month immediately preceding the month in which the related Distribution Date occurs (or with respect to the first Prepayment Period, the period commencing on the Cut-off Date) to the 15th day of the month in which such Distribution Date occurs.

"Principal Prepayment": Any voluntary payment of principal made by the Mortgagor on a Mortgage Loan which is received in advance of its scheduled Due Date and which is not accompanied by an amount of interest representing the full amount of scheduled interest due on any Due Date in any month or months subsequent to the month of prepayment.

"Principal Distribution Amount": With respect to any Distribution Date is the sum of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount.

"Principal Remittance Amount": With respect to any Distribution Date is the sum of the Group I Principal Remittance Amount and the Group II Principal Remittance Amount.

"Purchase Price": With respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03, Section 3.13(c) or Section 10.01 of this Agreement, and as confirmed by a certification of a Servicing Officer to the Trustee, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of purchase (or such other price as provided in Section 10.01), (ii) in the case of (x) a Mortgage Loan, accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or a P&I Advance by the related Servicer, which payment or P&I Advance had as of the date of purchase been distributed pursuant to Section 5.01, through the end of the calendar month in which the purchase is to be effected and (y) an REO Property, the sum of (1) accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or a P&I Advance by the related Servicer through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, plus (2) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, net of the total of all net rental income, Insurance Proceeds, Liquidation Proceeds and P&I Advances that as of the date of purchase had been distributed as or to cover REO Imputed Interest pursuant to Section 5.01, (iii) any unreimbursed Servicing Advances and P&I Advances (including Nonrecoverable P&I Advances and Nonrecoverable Servicing Advances) and any unpaid Servicing Fees allocable to such Mortgage Loan or REO Property and (iv) in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03, expenses reasonably incurred or to be incurred by the NIMS Insurer, the related

55

Servicer or the Trustee in respect of the breach or defect giving rise to the purchase obligation and any costs and damages incurred by the Trust Fund and the Trustee in connection with any violation by any such Mortgage Loan of any predatory or abusive lending law.

"QIB": As defined in Section 6.01(c).

"Qualified Substitute Mortgage Loan": A mortgage loan substituted for a Deleted Mortgage Loan pursuant to the terms of this Agreement which must, on the date of such substitution, (i) have an outstanding principal balance, after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of the Scheduled Principal Balance of the Deleted Mortgage Loan as of the Due Date in the calendar month during which the substitution occurs, (ii) have a Mortgage Rate not less than (and not more than one percentage point in excess of) the Mortgage Rate of the Deleted Mortgage Loan, (iii) if the mortgage loan is an Adjustable Rate Mortgage Loan, have a Maximum Mortgage Rate not less than the Maximum Mortgage Rate on the Deleted Mortgage Loan, (iv) if the mortgage loan is an Adjustable Rate Mortgage Loan, have a Minimum Mortgage Rate not less than the Minimum Mortgage Rate of the Deleted Mortgage Loan, (v) if the mortgage loan is an Adjustable Rate Mortgage Loan, have a Gross Margin equal to the Gross Margin of the Deleted Mortgage Loan, (vi) if the mortgage loan is an Adjustable Rate Mortgage Loan, have a next Adjustment Date not more than two months later than the next Adjustment Date on the Deleted Mortgage Loan, (vii) have a remaining term to maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan, (viii) have the same Due Date as the Due Date on the Deleted Mortgage Loan, (ix) have a Loan-to-Value Ratio as of the date of substitution equal to or lower than the Loan-to-Value Ratio of the Deleted Mortgage Loan as of such date, (x) be secured by the same lien priority on the related Mortgaged Property as the Deleted Mortgage Loan, (xi) have a credit grade at least equal to the credit grading assigned on the Deleted Mortgage Loan, (xii) be a "qualified mortgage" as defined in the REMIC Provisions and (xiii) conform to each representation and warranty set forth in Section 6 of the Mortgage Loan Purchase Agreement applicable to the Deleted Mortgage Loan.  In the event that one or more mortgage loans are substituted for one or more Deleted Mortgage Loans, the amounts described in clause (i) hereof shall be determined on the basis of aggregate principal balances, the Mortgage Rates described in clause (ii) hereof shall be determined on the basis of weighted average Mortgage Rates, the terms described in clause (vii) hereof shall be determined on the basis of weighted average remaining term to maturity, the Loan-to-Value Ratios described in clause (ix) hereof shall be satisfied as to each such mortgage loan, the credit grades described in clause (x) hereof shall be satisfied as to each such mortgage loan and, except to the extent otherwise provided in this sentence, the representations and warranties described in clause (xiii) hereof must be satisfied as to each Qualified Substitute Mortgage Loan or in the aggregate, as the case may be.

"Rate/Term Refinancing": A Refinanced Mortgage Loan, the proceeds of which are not more than a nominal amount in excess of the existing first mortgage loan and any subordinate mortgage loan on the related Mortgaged Property and related closing costs, and were used exclusively (except for such nominal amount) to satisfy the then existing first mortgage loan and any subordinate mortgage loan of the Mortgagor on the related Mortgaged Property and to pay related closing costs.

"Rating Agency or Rating Agencies": Moody's and S&P or their successors. If such agencies or their successors are no longer in existence, "Rating Agencies" shall be such nationally recognized statistical rating agencies, or other comparable Persons, designated by the Depositor, notice of which designation shall be given to the Trustee and the Servicers.

"Realized Loss": With respect to each Mortgage Loan as to which a Final Recovery Determination has been made, an amount (not less than zero), as reported by the Servicer to the Master Servicer (in substantially the form of Schedule 4 hereto or in the form specified in the Servicing Agreement) equal to (i) the unpaid principal balance of such Mortgage Loan as of the commencement of the calendar month in which the Final Recovery Determination was made, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor through the end of the calendar month in which such Final Recovery Determination was made, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on such Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of such Mortgage Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) any amounts previously withdrawn from the Collection Account in respect of such Mortgage Loan pursuant to Section 3.09(a)(ix) and Section 3.13(b) of this Agreement or pursuant to the Servicing Agreement, as applicable, minus (iv) the proceeds, if any, received in respect of such Mortgage Loan during the calendar month in which such Final Recovery Determination was made, net of amounts that are payable therefrom to the related Servicer with respect to such Mortgage Loan pursuant to Section 3.09(a)(iii) of this Agreement or pursuant to the Servicing Agreement, as applicable.

With respect to any REO Property as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of the related Mortgage Loan as of the date of acquisition of such REO Property on behalf of REMIC I, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor in respect of the related Mortgage Loan through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on the related Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of the related Mortgage Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such Final Recovery Determination was made, plus (iv) any amounts previously withdrawn from the Collection Account in respect of the related Mortgage Loan pursuant to Section 3.09(a)(ix) and Section 3.13(b) of this Agreement or pursuant to corresponding sections of the Servicing Agreement, minus (v) the aggregate of all P&I Advances and Servicing Advances (in the case of Servicing Advances, without duplication of amounts netted out of the rental income, Insurance Proceeds and Liquidation Proceeds described in clause (vi) below) made by the related Servicer in respect of such REO Property or the related Mortgage Loan for which the related Servicer has been or, in connection with such Final Recovery Determination, will be reimbursed pursuant to Section 3.22 of this Agreement or pursuant to the Servicing Agreement, as applicable out of rental income, Insurance Proceeds and Liquidation Proceeds received in respect of such REO Property, minus (vi) the total of all net rental income, Insurance Proceeds and Liquidation Proceeds received in respect of such REO Property that has been, or in connection with such Final

Recovery Determination, will be transferred to the Distribution Account pursuant to Section 3.22 of this Agreement or pursuant to the Servicing Agreement, as applicable.

With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation.

With respect to each Mortgage Loan which has become the subject of a Debt Service Reduction, the portion, if any, of the reduction in each affected Monthly Payment attributable to a reduction in the Mortgage Rate imposed by a court of competent jurisdiction. Each such Realized Loss shall be deemed to have been incurred on the Due Date for each affected Monthly Payment.

To the extent a Servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of Realized Loss with respect to that Mortgage Loan will be reduced to the extent such recoveries are applied to reduce the Certificate Principal Balance of any Class of Certificates on any Distribution Date.

"Record Date": With respect to each Distribution Date and the Class A Certificates and the Mezzanine Certificates, the Business Day immediately preceding such Distribution Date for so long as such Certificates are Book-Entry Certificates. With respect to each Distribution Date and any other Class of Certificates, including any Definitive Certificates, the last day of the calendar month immediately preceding the month in which such Distribution Date occurs.

"Reference Banks": Barclays Bank PLC, The Tokyo Mitsubishi Bank and National Westminster Bank PLC and their successors in interest; provided, however, that if any of the foregoing banks are not suitable to serve as a Reference Bank, then any leading banks selected by the Securities Administrator (after consultation with the NIMS Insurer) which are engaged in transactions in Eurodollar deposits in the International Eurocurrency market (i) with an established place of business in London, (ii) not controlling, under the control of or under common control with the Depositor or any Affiliate thereof and (iii) which have been designated as such by the Securities Administrator.

"Refinanced Mortgage Loan": A Mortgage Loan the proceeds of which were not used to purchase the related Mortgaged Property.

"Regular Certificate": Any Class A Certificate, Mezzanine Certificate, Class CE-1 Certificate, Class CE-2 Certificate or Class P Certificate.

"Regular Interest": A "regular interest" in a REMIC within the meaning of Section 860G(a)(1) of the Code.

"Regulation AB": Means Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531

(Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"Relevant Servicing Criteria": Means the Servicing Criteria applicable to the various parties, as set forth on Exhibit E attached hereto. For clarification purposes, multiple parties can have responsibility for the same Relevant Servicing Criteria. With respect to a Servicing Function Participant engaged by the Master Servicer, the Securities Administrator, the Trustee or a Servicer, the term "Relevant Servicing Criteria" may refer to a portion of the Relevant Servicing Criteria applicable to such parties.

"Relief Act": The Servicemembers Civil Relief Act, as amended, or similar state or local laws.

"Relief Act Interest Shortfall": With respect to any Distribution Date and any Mortgage Loan, any reduction in the amount of interest collectible on such Mortgage Loan for the most recently ended Due Period as a result of the application of the Relief Act.

"REMIC": A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"REMIC I": The segregated pool of assets subject hereto, constituting the primary trust created hereby and to be administered hereunder, with respect to which a REMIC election is to be made, consisting of: (i) such Mortgage Loans and Prepayment Charges as from time to time are subject to this Agreement, together with the Mortgage Files relating thereto, and together with all collections thereon and proceeds thereof; (ii) any REO Property, together with all collections thereon and proceeds thereof; (iii) the Trustee's rights with respect to the Mortgage Loans under all insurance policies required to be maintained pursuant to this Agreement and any proceeds thereof; (iv) the Depositor's rights under the Mortgage Loan Purchase Agreement (including any security interest created thereby), the Assignment Agreement and the Servicing Agreement; and (v) the Collection Accounts, the Distribution Account and any REO Account, and such assets that are deposited therein from time to time and any investments thereof, together with any and all income, proceeds and payments with respect thereto. Notwithstanding the foregoing, however, REMIC I specifically excludes (i) all payments and other collections of principal and interest due on the Mortgage Loans on or before the Cut-off Date and all Prepayment Charges payable in connection with Principal Prepayments made before the Cut-off Date; (ii) the Reserve Fund and any amounts on deposit therein from time to time and any proceeds thereof; (iii) the Swap Agreement; (iv) the Cap Contracts; (v) the Supplemental Interest Trust and (vi) the Pre-Funding Account.

"REMIC I Regular Interest": Any of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a "regular interest" in REMIC I. Each REMIC I Regular Interest shall accrue interest at the related REMIC I Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto. The designations for the respective REMIC I Regular Interests are set forth in the Preliminary Statement hereto.

"REMIC I Remittance Rate":  With respect to REMIC I Regular Interest LT1 and REMIC I Regular Interest LTP, and (i) for the first three Distribution Dates, the weighted average of the Expense Adjusted Mortgage Rates of the Initial Group I Mortgage Loans and (ii) thereafter, the weighted average of the Expense Adjusted Mortgage Rates of the Group I Mortgage Loans. With respect to REMIC I Regular Interest LT2, and (i) for the first three Distribution Dates, the weighted average of the Expense Adjusted Mortgage Rates of the Initial Group II Mortgage Loans and (ii) thereafter, the weighted average of the Expense Adjusted Mortgage Rates of the Group II Mortgage Loans. With respect to REMIC I Regular Interest LT1PF and (i) the first three Distribution Dates, 0.00% and (ii) thereafter, the weighted average of the Expense Adjusted Mortgage Rates of the Group I Mortgage Loans. With respect to REMIC I Regular Interest LT2PF and (i) the first three Distribution Dates, 0.00% and (ii) thereafter, the weighted average of the Expense Adjusted Mortgage Rates of the Group II Mortgage Loans. With respect to REMIC I Regular Interest LTCE2G, a weighted average per annum rate, determined on a Mortgage Loan by Mortgage Loan basis (and solely with respect to the GMAC Mortgage Loans), equal to the excess, if any, of (i) the excess of (a) the Mortgage Rate for each such Mortgage Loan over (b) the sum of the (w) GMAC Servicing Fee Rate, (x) Master Servicing Fee Rate and (y) Credit Risk Manager Fee Rate, over (ii) the Net Mortgage Rate of each such Mortgage Loan.  With respect to REMIC I Regular Interest LTCE2C, a weighted average per annum rate, determined on a Mortgage Loan by Mortgage Loan basis (and solely with respect to the Countrywide Mortgage Loans), equal to the excess, if any, of (i) the excess of (a) the Mortgage Rate for each such Mortgage Loan over (b) the sum of the (x) Countrywide Servicing Fee Rate, (y) Master Servicing Fee Rate and (z) Credit Risk Manager Fee Rate, over (ii) the Net Mortgage Rate of each such Mortgage Loan.

"REMIC II Group I Regular Interests": REMIC II Regular Interest I and REMIC II Regular Interest I-1-A through REMIC II Regular Interest I-53-B as designated in the Preliminary Statement hereto.

"REMIC II Group II Regular Interests":  REMIC II Regular Interest II and REMIC II Regular Interest II-1-A through REMIC III Regular Interest II-53-B as designated in the Preliminary Statement hereto.

"REMIC II Regular Interest":  Any of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a "regular interest" in REMIC II. Each REMIC II Regular Interest shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Remittance Rate": With respect to REMIC II Regular Interest I, a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group I Mortgage Loans. With respect to each REMIC II Group I Regular Interest ending with the designation "A", a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group I Mortgage Loans multiplied by 2, subject to a maximum rate of 9.9350%. With respect to each REMIC II Group I Regular Interest ending with the designation "B", the greater of (x) a per annum rate equal to the excess, if any, of (i) 2 multiplied by the weighted average of the Net Mortgage Rates of the Group I Mortgage Loans over (ii) 9.9350% and (y) 0.00%.  With respect

60

to REMIC II Regular Interest II, a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group II Mortgage Loans. With respect to each REMIC II Group II Regular Interest ending with the designation "A", a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group II Mortgage Loans multiplied by 2, subject to a maximum rate of 9.9350%. With respect to each REMIC II Group II Regular Interest ending with the designation "B", the greater of (x) a per annum rate equal to the excess, if any, of (i) 2 multiplied by the weighted average of the Net Mortgage Rates of the Group II Mortgage Loans over (ii) 9.9350% and (y) 0.00%. With respect to REMIC II Regular Interest CE-2, an amount equal to 100% of the amounts distributed on REMIC I Regular Interest LTCE2G and REMIC I Regular Interest LTCE2C.

"REMIC III": The segregated pool of assets consisting of all of the REMIC II Regular Interests conveyed in trust to the Trustee, for the benefit of the REMIC III Regular Interests pursuant to Section 2.07, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC III Interest Loss Allocation Amount": With respect to any Distribution Date, an amount equal to (a) the product of (i) 50% of the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties then outstanding and (ii) the REMIC III Remittance Rate for REMIC III Regular Interest AA minus the Marker Rate, divided by (b) 12.

"REMIC III Marker Allocation Percentage": 50% of any amount payable or loss attributable from the Mortgage Loans, which shall be allocated to REMIC III Regular Interest AA, REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9, REMIC III Regular Interest ZZ and REMIC III Regular Interest P.

"REMIC III Overcollateralization Amount": With respect to any date of determination, (i) 0.50% of the aggregate Uncertificated Balances of the REMIC III Regular Interests (other than REMIC III Regular Interest P) minus (ii) the aggregate of the Uncertificated Balances of REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8 and REMIC III Regular Interest M-9, in each case as of such date of determination.

"REMIC III Principal Loss Allocation Amount": With respect to any Distribution Date, an amount equal to (a) the product of (i) 50% of the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties then outstanding and (ii) 1 minus a fraction, the numerator of which is two times the aggregate of the Uncertificated Balances of REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III

61

Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8 and REMIC III Regular Interest M-9 and the denominator of which is the aggregate of the Uncertificated Balances of REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9 and REMIC III Regular Interest ZZ.

"REMIC III Regular Interest": Any of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a "regular interest" in REMIC III. Each REMIC III Regular Interest shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto. The designations for the respective REMIC III Regular Interests are set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest AA": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest AA shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest A-1": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest A-1 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest A-2A": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest A-2A shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest A-2B": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest A-2B shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest A-2C": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest A-2C shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest A-2D": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest A-2D shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest CE-2": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest CE-2 will be entitled to 100% of the amounts distributed on REMIC II Regular Interest I-CE-2.

"REMIC III Regular Interest IO": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest IO shall accrue interest at the related REMIC III Remittance Rate in effect from time to time and shall not be entitled to distributions of principal.

"REMIC III Regular Interest M-1": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest M-1 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest M-2": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest M-2 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest M-3": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest M-3 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest M-4": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in

REMIC III. REMIC III Regular Interest M-4 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest M-5": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest M-5 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest M-6": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest M-6 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest M-7": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest M-7 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest M-8": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest M-8 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest M-9": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest M-9 shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest P": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest P shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest XX": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest XX shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest ZZ": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest ZZ shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest I-SUB": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest I-SUB shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest I-GRP": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest I-GRP shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest II-SUB": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest II-SUB shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Regular Interest II-GRP": One of the separate non-certificated beneficial ownership interests in REMIC III issued hereunder and designated as a Regular Interest in REMIC III. REMIC III Regular Interest II-GRP shall accrue interest at the related REMIC III Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC III Remittance Rate": With respect to REMIC III Regular Interest AA, REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6,

65

REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9, REMIC III Regular Interest ZZ, REMIC III Regular Interest P, REMIC III Regular Interest I-SUB, REMIC III Regular Interest II-SUB and REMIC III Regular Interest XX, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC II Regular Interest I and REMIC II Regular Interest II, the REMIC II Remittance Rate for each such REMIC II Regular Interest for each such Distribution Date, (x) with respect to each REMIC II Regular Interest ending with the designation "B", the weighted average of the REMIC II Remittance Rates for such REMIC II Regular Interests, weighted on the basis of the Uncertificated Balances of such REMIC II Regular Interests for each such Distribution Date and (y) with respect to REMIC II Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for each such REMIC II Regular Interest listed below, weighted on the basis of the Uncertificated Balances of each such REMIC II Regular Interest for each such Distribution Date:

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| 1st through 6th | I-1-A through I-53-A | REMIC II Remittance Rate |
| | II-1-A through II-53-A | REMIC II Remittance Rate |
| 7 | I-1-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| 8 | I-2-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-2-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate REMIC II Remittance Rate |
| | I-1-A | REMIC II Remittance Rate |
| | II-1-A | REMIC II Remittance Rate |
| 9 | I-3-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-3-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A and I-2-A | REMIC II Remittance Rate |
| | II-1-A and II-2-A | REMIC II Remittance Rate |
| 10 | I-4-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-4-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-3-A | REMIC II Remittance Rate |
| | II-1-A through II-3-A | REMIC II Remittance Rate |
| 11 | I-5-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-5-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-4-A | REMIC II Remittance Rate |
| | II-1-A through II-4-A | REMIC II Remittance Rate |
| 12 | I-6-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-6-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-5-A | REMIC II Remittance Rate |
| | II-1-A through II-5-A | REMIC II Remittance Rate |
| 13 | I-7-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-7-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-6-A | REMIC II Remittance Rate |
| | II-1-A through II-6-A | REMIC II Remittance Rate |
| 14 | I-8-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |

66

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| | II-8-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-7-A | REMIC II Remittance Rate |
| | II-1-A through II-7-A | REMIC II Remittance Rate |
| 15 | I-9-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-9-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-8-A | REMIC II Remittance Rate |
| | II-1-A through II-8-A | REMIC II Remittance Rate |
| 16 | I-10-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-10-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-9-A | REMIC II Remittance Rate |
| | II-1-A through II-9-A | REMIC II Remittance Rate |
| 17 | I-11-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-11-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-10-A | REMIC II Remittance Rate |
| | II-1-A through II-10-A | REMIC II Remittance Rate |
| 18 | I-12-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-12-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-11-A | REMIC II Remittance Rate |
| | II-1-A through II-11-A | REMIC II Remittance Rate |
| 19 | I-13-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-13-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-12-A | REMIC II Remittance Rate |
| | II-1-A through II-12-A | REMIC II Remittance Rate |
| 20 | I-14-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-14-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-13-A | REMIC II Remittance Rate |
| | II-1-A through II-13-A | REMIC II Remittance Rate |
| 21 | I-15-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-15-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-14-A | REMIC II Remittance Rate |
| | II-1-A through II-14-A | REMIC II Remittance Rate |
| 22 | I-16-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-16-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-15-A | REMIC II Remittance Rate |
| | II-1-A through II-15-A | REMIC II Remittance Rate |
| 23 | I-17-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-17-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-16-A | REMIC II Remittance Rate |
| | II-1-A through II-16-A | REMIC II Remittance Rate |
| 24 | I-18-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-18-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-17-A | REMIC II Remittance Rate |
| | II-1-A through II-17-A | REMIC II Remittance Rate |
| 25 | I-19-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC |

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| | | II Remittance Rate |
| | II-19-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-18-A | REMIC II Remittance Rate |
| | II-1-A through II-18-A | REMIC II Remittance Rate |
| 26 | I-20-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-20-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-19-A | REMIC II Remittance Rate |
| | II-1-A through II-19-A | REMIC II Remittance Rate |
| 27 | I-21-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-21-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-20-A | REMIC II Remittance Rate |
| | II-1-A through II-20-A | REMIC II Remittance Rate |
| 28 | I-22-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-22-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-21-A | REMIC II Remittance Rate |
| | II-1-A through II-21-A | REMIC II Remittance Rate |
| 29 | I-23-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-23-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-22-A | REMIC II Remittance Rate |
| | II-1-A through II-22-A | REMIC II Remittance Rate |
| 30 | I-24-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-24-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-23-A | REMIC II Remittance Rate |
| | II-1-A through II-23-A | REMIC II Remittance Rate |
| 31 | I-25-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-25-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-24-A | REMIC II Remittance Rate |
| | II-1-A through II-24-A | REMIC II Remittance Rate |
| 32 | I-26-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-26-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-25-A | REMIC II Remittance Rate |
| | II-1-A through II-25-A | REMIC II Remittance Rate |
| 33 | I-27-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-27-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-26-A | REMIC II Remittance Rate |
| | II-1-A through II-26-A | REMIC II Remittance Rate |
| 34 | I-28-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-28-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-27-A | REMIC II Remittance Rate |
| | II-1-A through II-27-A | REMIC II Remittance Rate |
| 35 | I-29-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-29-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-28-A | REMIC II Remittance Rate |
| | II-1-A through II-28-A | REMIC II Remittance Rate |

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| 36th-37th | I-30-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-30-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-29-A | REMIC II Remittance Rate |
|  | II-1-A through II-29-A | REMIC II Remittance Rate |
| 38 | I-31-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-31-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-30-A | REMIC II Remittance Rate |
|  | II-1-A through II-30-A | REMIC II Remittance Rate |
| 39 | I-32-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-32-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-31-A | REMIC II Remittance Rate |
|  | II-1-A through II-31-A | REMIC II Remittance Rate |
| 40 | I-33-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-33-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-32-A | REMIC II Remittance Rate |
|  | II-1-A through II-32-A | REMIC II Remittance Rate |
| 41 | I-34-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-34-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-33-A | REMIC II Remittance Rate |
|  | II-1-A through II-33-A | REMIC II Remittance Rate |
| 42 | I-35-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-35-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-34-A | REMIC II Remittance Rate |
|  | II-1-A through II-34-A | REMIC II Remittance Rate |
| 43 | I-36-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-36-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-35-A | REMIC II Remittance Rate |
|  | II-1-A through II-35-A | REMIC II Remittance Rate |
| 44 | I-37-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-37-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-36-A | REMIC II Remittance Rate |
|  | II-1-A through II-36-A | REMIC II Remittance Rate |
| 45 | I-38-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-38-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-37-A | REMIC II Remittance Rate |
|  | II-1-A through II-37-A | REMIC II Remittance Rate |
| 46 | I-39-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-39-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-38-A | REMIC II Remittance Rate |
|  | II-1-A through II-38-A | REMIC II Remittance Rate |
| 47 | I-40-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-40-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-39-A | REMIC II Remittance Rate |

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
|  | II-1-A through II-39-A | REMIC II Remittance Rate |
| 48 | I-41-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-41-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-40-A | REMIC II Remittance Rate |
|  | II-1-A through II-40-A | REMIC II Remittance Rate |
| 49 | I-42-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-42-A through II-41-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-41-A | REMIC II Remittance Rate |
|  | II-1-A through II-21-A | REMIC II Remittance Rate |
| 50 | I-43-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-43-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-42-A | REMIC II Remittance Rate |
|  | II-1-A through II-42-A | REMIC II Remittance Rate |
| 51 | I-44-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-44-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-43-A | REMIC II Remittance Rate |
|  | II-1-A through II-43-A | REMIC II Remittance Rate |
| 52 | I-45-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-45-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-44-A | REMIC II Remittance Rate |
|  | II-1-A through II-44-A | REMIC II Remittance Rate |
| 51 | I-46-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-46-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-45-A | REMIC II Remittance Rate |
|  | II-1-A through II-45-A | REMIC II Remittance Rate |
| 51 | I-47-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-47-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-46-A | REMIC II Remittance Rate |
|  | II-1-A through II-46-A | REMIC II Remittance Rate |
| 55 | I-48-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-48-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-47-A | REMIC II Remittance Rate |
|  | II-1-A through II-47-A | REMIC II Remittance Rate |
| 56 | I-49-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-49-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-48-A | REMIC II Remittance Rate |
|  | II-1-A through II-48-A | REMIC II Remittance Rate |
| 57 | I-50-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-50-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-49-A | REMIC II Remittance Rate |
|  | II-1-A through II-49-A | REMIC II Remittance Rate |
| 58 | I-51-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | II-51-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |

70

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| | I-1-A through I-50-A | REMIC II Remittance Rate |
| | II-1-A through II-50-A | REMIC II Remittance Rate |
| 59 | I-52-A and I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-52-A and II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-51-A | REMIC II Remittance Rate |
| | II-1-A through II-51-A | REMIC II Remittance Rate |
| 60 | I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-52-A | REMIC II Remittance Rate |
| | II-1-A through II-52-A | REMIC II Remittance Rate |
| Thereafter | I-1-A through I-53-A | REMIC II Remittance Rate |
| | II-1-A through II-53-A | REMIC II Remittance Rate |

With respect to REMIC III Regular Interest I-GRP, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC II Regular Interest I, the REMIC II Remittance Rate for such REMIC II Regular Interest for each such Distribution Date, (x) with respect to REMIC II Group I Regular Interests ending with the designation "B", the weighted average of the REMIC II Remittance Rates for such REMIC II Regular Interests, weighted on the basis of the Uncertificated Balances of each such REMIC II Regular Interest for each such Distribution Date and (y) with respect to REMIC II Group I Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for such REMIC II Regular Interests listed below, weighted on the basis of the Uncertificated Balances of each such REMIC II Regular Interest for each such Distribution Date:

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| 1st through 6th | I-1-A through I-53-A | REMIC II Remittance Rate |
| 7 | I-1-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| 8 | I-2-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A | REMIC II Remittance Rate |
| 9 | I-3-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A and I-2-A | REMIC II Remittance Rate |
| 10 | I-4-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-3-A | REMIC II Remittance Rate |
| 11 | I-5-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-4-A | REMIC II Remittance Rate |
| 12 | I-6-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-5-A | REMIC II Remittance Rate |

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| 13 | I-7-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-6-A | REMIC II Remittance Rate |
| 14 | I-8-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-7-A | REMIC II Remittance Rate |
| 15 | I-9-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-8-A | REMIC II Remittance Rate |
| 16 | I-10-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-9-A | REMIC II Remittance Rate |
| 17 | I-11-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-10-A | REMIC II Remittance Rate |
| 18 | I-12-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-11-A | REMIC II Remittance Rate |
| 19 | I-13-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-12-A | REMIC II Remittance Rate |
| 20 | I-14-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-13-A | REMIC II Remittance Rate |
| 21 | I-15-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-14-A | REMIC II Remittance Rate |
| 22 | I-16-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-15-A | REMIC II Remittance Rate |
| 23 | I-17-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-16-A | REMIC II Remittance Rate |
| 24 | I-18-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-17-A | REMIC II Remittance Rate |
| 25 | I-19-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-18-A | REMIC II Remittance Rate |
| 26 | I-20-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-19-A | REMIC II Remittance Rate |
| 27 | I-21-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-20-A | REMIC II Remittance Rate |

72

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| 28 | I-22-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-21-A | REMIC II Remittance Rate |
| 29 | I-23-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-22-A | REMIC II Remittance Rate |
| 30 | I-24-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-23-A | REMIC II Remittance Rate |
| 31 | I-25-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-24-A | REMIC II Remittance Rate |
| 32 | I-26-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-25-A | REMIC II Remittance Rate |
| 33 | I-27-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-26-A | REMIC II Remittance Rate |
| 34 | I-28-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-27-A | REMIC II Remittance Rate |
| 35 | I-29-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-28-A | REMIC II Remittance Rate |
| 36th-37th | I-30-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-29-A | REMIC II Remittance Rate |
| 38 | I-31-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-30-A | REMIC II Remittance Rate |
| 39 | I-32-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-31-A | REMIC II Remittance Rate |
| 40 | I-33-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-32-A | REMIC II Remittance Rate |
| 41 | I-34-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-33-A | REMIC II Remittance Rate |
| 42 | I-35-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-34-A | REMIC II Remittance Rate |
| 43 | I-36-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-35-A | REMIC II Remittance Rate |

73

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| 44 | I-37-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-36-A | REMIC II Remittance Rate |
| 45 | I-38-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-37-A | REMIC II Remittance Rate |
| 46 | I-39-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-38-A | REMIC II Remittance Rate |
| 47 | I-40-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-39-A | REMIC II Remittance Rate |
| 48 | I-41-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-40-A | REMIC II Remittance Rate |
| 59 | I-42-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-41-A | REMIC II Remittance Rate |
| 50 | I-43-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-42-A | REMIC II Remittance Rate |
| 51 | I-44-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-43-A | REMIC II Remittance Rate |
| 52 | I-45-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-44-A | REMIC II Remittance Rate |
| 51 | I-46-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-45-A | REMIC II Remittance Rate |
| 51 | I-47-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-46-A | REMIC II Remittance Rate |
| 55 | I-48-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-47-A | REMIC II Remittance Rate |
| 56 | I-49-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
|  | I-1-A through I-48-A | REMIC II Remittance Rate |
| 57 |  |  |
|  | I-50-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| 58 | I-1-A through I-49-A | REMIC II Remittance Rate |
|  | I-51-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| 59 | I-1-A through I-50-A | REMIC II Remittance Rate |
|  | I-52-A through I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

74

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| | | REMIC II Remittance Rate |
| 60 | I-1-A through I-51-A | REMIC II Remittance Rate |
| | I-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | I-1-A through I-52-A | REMIC II Remittance Rate |
| thereafter | I-1-A through I-53-A | REMIC II Remittance Rate |

With respect to REMIC III Regular Interest II-GRP, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC II Regular Interest II, the REMIC II Remittance Rate for such REMIC II Regular Interest for each such Distribution Date, (x) with respect to REMIC II Group II Regular Interests ending with the designation "B", the weighted average of the REMIC II Remittance Rates for such REMIC II Regular Interests, weighted on the basis of the Uncertificated Balances of each such REMIC II Regular Interest for each such Distribution Date and (y) with respect to REMIC II Group II Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for such REMIC II Regular Interests listed below, weighted on the basis of the Uncertificated Balances of each such REMIC II Regular Interest for each such Distribution Date:

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| 1st through 6th | II-1-A through II-53-A | REMIC II Remittance Rate |
| 7 | II-1-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| 8 | II-2-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A | REMIC II Remittance Rate |
| 9 | II-3-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A and II-2-A | REMIC II Remittance Rate |
| 10 | II-4-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-3-A | REMIC II Remittance Rate |
| 11 | II-5-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-4-A | REMIC II Remittance Rate |
| 12 | II-6-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-5-A | REMIC II Remittance Rate |
| 13 | II-7-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-6-A | REMIC II Remittance Rate |
| 14 | II-8-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-7-A | REMIC II Remittance Rate |
| 15 | II-9-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |

75

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| | II-1-A through II-8-A | REMIC II Remittance Rate |
| 16 | II-10-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-9-A | REMIC II Remittance Rate |
| 17 | II-11-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-10-A | REMIC II Remittance Rate |
| 18 | II-12-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-11-A | REMIC II Remittance Rate |
| 19 | II-13-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-12-A | REMIC II Remittance Rate |
| 20 | II-14-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-13-A | REMIC II Remittance Rate |
| 21 | II-15-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-14-A | REMIC II Remittance Rate |
| 22 | II-16-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-15-A | REMIC II Remittance Rate |
| 23 | II-17-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-16-A | REMIC II Remittance Rate |
| 24 | II-18-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-17-A | REMIC II Remittance Rate |
| 25 | II-19-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-18-A | REMIC II Remittance Rate |
| 26 | II-20-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-19-A | REMIC II Remittance Rate |
| 27 | II-21-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-20-A | REMIC II Remittance Rate |
| 28 | II-22-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-21-A | REMIC II Remittance Rate |
| 29 | II-23-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-22-A | REMIC II Remittance Rate |
| 30 | II-24-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |

76

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| | II-1-A through II-23-A | REMIC II Remittance Rate |
| 31 | II-25-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-24-A | REMIC II Remittance Rate |
| 32 | II-26-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-25-A | REMIC II Remittance Rate |
| 33 | II-27-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-26-A | REMIC II Remittance Rate |
| 34 | II-28-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-27-A | REMIC II Remittance Rate |
| 35 | II-29-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-28-A | REMIC II Remittance Rate |
| 36th-37th | II-30-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-29-A | REMIC II Remittance Rate |
| 38 | II-31-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-30-A | REMIC II Remittance Rate |
| 39 | II-32-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-31-A | REMIC II Remittance Rate |
| 40 | II-33-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-32-A | REMIC II Remittance Rate |
| 41 | II-34-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-33-A | REMIC II Remittance Rate |
| 42 | II-35-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-34-A | REMIC II Remittance Rate |
| 43 | II-36-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-35-A | REMIC II Remittance Rate |
| 44 | II-37-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-36-A | REMIC II Remittance Rate |
| 45 | II-38-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-37-A | REMIC II Remittance Rate |
| 46 | II-39-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |

77

| Distribution Date | REMIC II Regular Interest | Rate |
|---|---|---|
| | II-1-A through II-38-A | REMIC II Remittance Rate |
| 47 | II-40-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-39-A | REMIC II Remittance Rate |
| 48 | II-41-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-40-A | REMIC II Remittance Rate |
| 59 | II-42-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-41-A | REMIC II Remittance Rate |
| 50 | II-43-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-42-A | REMIC II Remittance Rate |
| 51 | II-44-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-43-A | REMIC II Remittance Rate |
| 52 | II-45-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-44-A | REMIC II Remittance Rate |
| 51 | II-46-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-45-A | REMIC II Remittance Rate |
| 51 | II-47-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-46-A | REMIC II Remittance Rate |
| 55 | II-48-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-47-A | REMIC II Remittance Rate |
| 56 | II-49-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-48-A | REMIC II Remittance Rate |
| 57 | | |
| | II-50-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| 58 | II-1-A through II-49-A | REMIC II Remittance Rate |
| | II-51-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| 59 | II-1-A through II-50-A | REMIC II Remittance Rate |
| | II-52-A through II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| 60 | II-1-A through II-51-A | REMIC II Remittance Rate |
| | II-53-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC II Remittance Rate |
| | II-1-A through II-52-A | REMIC II Remittance Rate |
| thereafter | II-1-A through II-53-A | REMIC II Remittance Rate |

With respect to REMIC III Regular Interest IO, and (i) the 1st Distribution Date through the 6th Distribution Date, the excess of (x) the weighted average of the REMIC II Remittance Rates for REMIC II Regular Interests including the designation "A", over (y) the

78

weighted average of the REMIC II Remittance Rates for REMIC II Regular Interests including the designation "A", (ii) the 7th Distribution Date through the 60th Distribution Date, the excess of (x) the weighted average of the REMIC II Remittance Rates for REMIC II Regular Interests including the designation "A", over (y) 2 multiplied by Swap LIBOR and (iii) thereafter, 0.00%. With respect to REMIC III Regular Interest CE-2, an amount equal to 100% of the amounts distributed on REMIC II Regular Interest I-CE-2.

"REMIC III Sub WAC Allocation Percentage": 50% of any amount payable or loss attributable from the Mortgage Loans, which shall be allocated to REMIC III Regular Interest I-SUB, REMIC III Regular Interest I-GRP, REMIC III Regular Interest II-SUB, REMIC III Regular Interest II-GRP and REMIC III Regular Interest XX.

"REMIC III Subordinated Balance Ratio": The ratio among the Uncertificated Balances of each REMIC III Regular Interest ending with the designation "SUB,", equal to the ratio between, with respect to each such REMIC III Regular Interest, the excess of (x) the aggregate Stated Principal Balance of the Group I Mortgage Loans or Group II Mortgage Loans, as applicable over (y) the current Certificate Principal Balance of related Class A Certificates.

"REMIC III Required Overcollateralization Amount": 0.50% of the Required Overcollateralization Amount.

"REMIC IV": The segregated pool of assets consisting of all of the REMIC III Regular Interests conveyed in trust to the Trustee, for the benefit of the REMIC IV Certificateholders pursuant to Section 2.07, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC IV Certificate": Any Regular Certificate or Class R Certificate.

"REMIC IV Certificateholder": The Holder of any REMIC IV Certificate.

"REMIC Provisions": Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Section 860A through 860G of the Code, and related provisions, and proposed, temporary and final regulations and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

"REMIC Regular Interest": Any REMIC I Regular Interest, REMIC II Regular Interest or REMIC III Regular Interest.

"REMIC Remittance Rate": The REMIC I Remittance Rate, REMIC II Remittance Rate or the REMIC III Remittance Rate.

"Remittance Report": A report by the Servicers pursuant to Section 5.03(a) of this Agreement or pursuant to the Servicing Agreement.

"Rents from Real Property": With respect to any REO Property, gross income of the character described in Section 856(d) of the Code as being included in the term "rents from real property."

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

"REO Account": The account or accounts maintained, or caused to be maintained, by each Servicer in respect of an REO Property pursuant to Section 3.22 of this Agreement or pursuant to the Servicing Agreement.

"REO Disposition": The sale or other disposition of an REO Property on behalf of REMIC I.

"REO Imputed Interest": As to any REO Property, for any calendar month during which such REO Property was at any time part of REMIC I, one month's interest at the applicable Net Mortgage Rate on the Stated Principal Balance of such REO Property (or, in the case of the first such calendar month, of the related Mortgage Loan, if appropriate) as of the close of business on the Distribution Date in such calendar month.

"REO Principal Amortization": With respect to any REO Property, for any calendar month, the excess, if any, of (a) the aggregate of all amounts received in respect of such REO Property during such calendar month, whether in the form of rental income, sale proceeds (including, without limitation, that portion of the Termination Price paid in connection with a purchase of all of the Mortgage Loans and REO Properties pursuant to Section 10.01 of this Agreement that is allocable to such REO Property) or otherwise, net of any portion of such amounts (i) payable in respect of the proper operation, management and maintenance of such REO Property or (ii) payable or reimbursable to the related Servicer pursuant to Section 3.22(d) of this Agreement or pursuant to the Servicing Agreement for unpaid Servicing Fees in respect of the related Mortgage Loan and unreimbursed Servicing Advances and P&I Advances in respect of such REO Property or the related Mortgage Loan, over (b) the REO Imputed Interest in respect of such REO Property for such calendar month.

"REO Property": A Mortgaged Property acquired by the related Servicer or its nominee on behalf of REMIC I through foreclosure or deed-in-lieu of foreclosure, as described in Section 3.22 of this Agreement or pursuant to the Servicing Agreement.

"Reportable Event": Has the meaning set forth in Section 5.06(b) of this Agreement.

"Required Overcollateralization Amount": With respect to any Distribution Date (i) prior to the Stepdown Date, the product of (A) 5.35% and (B) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date (ii) on or after the Stepdown Date provided a Trigger Event is not in effect, the greater of (x) 10.70% of the aggregate Stated Principal Balance of the Mortgage Loans (after giving effect to principal payments to be distributed on such Distribution Date) and (y) an amount equal to the product of (A) 0.50% and (B) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, and (iii) on or after the Stepdown Date and a Trigger Event is in effect, the Required Overcollateralization Amount for the immediately preceding Distribution Date. Notwithstanding the foregoing, on and after any Distribution Date following the reduction of the aggregate Certificate Principal Balance of the Class A Certificates and Mezzanine Certificates to zero, the Required Overcollateralization Amount shall be zero.

"Reserve Fund": A fund created pursuant to Section 3.25 which shall be an asset of the Trust Fund but which shall not be an asset of any Trust REMIC.

"Reserve Interest Rate": With respect to any Interest Determination Date, the rate per annum that the Securities Administrator determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/16%) of the one-month U.S. dollar lending rates which New York City banks selected by the Securities Administrator, after consultation with the Depositor, are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Securities Administrator can determine no such arithmetic mean, the lowest one-month U.S. dollar lending rate which New York City banks selected by the Securities Administrator are quoting on such Interest Determination Date to leading European banks.

"Residential Dwelling": Any one of the following: (i) a attached, detached or semi-detached one to four-family dwelling, (ii) a one-family dwelling unit in a Fannie Mae eligible condominium project or (iii) a detached one-family dwelling in a planned unit development, none of which is a co-operative or mobile home.

"Residual Certificate": Any one of the Class R Certificates.

"Residual Interest": The sole class of "residual interests" in a REMIC within the meaning of Section 860G(a)(2) of the Code.

"Responsible Officer": When used with respect to the Trustee, any officer of the Trustee having direct responsibility for the administration of this Agreement and, with respect to a particular matter, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Rule 144A": Rule 144A under the Securities Act.

"S&P": Standard & Poor's, a division of the McGraw-Hill Companies, Inc.

"Sarbanes-Oxley Act": Means the Sarbanes-Oxley Act of 2002 and the rules and regulations of the Commission promulgated thereunder (including any interpretations thereof by the Commission's staff).

"Sarbanes-Oxley Certification": A written certification signed by an officer of the Master Servicer that complies with (i) the Sarbanes-Oxley Act of 2002, as amended from time to time, and (ii) Exchange Act Rules 13a-14(d) and 15d-14(d), as in effect from time to time; provided that if, after the Closing Date (a) the Sarbanes-Oxley Act of 2002 is amended, (b) the Rules referred to in clause (ii) are modified or superseded by any subsequent statement, rule or regulation of the Commission or any statement of a division thereof, or (c) any future releases, rules and regulations are published by the Commission from time to time pursuant to the Sarbanes-Oxley Act of 2002, which in any such case affects the form or substance of the required certification and results in the required certification being, in the reasonable judgment of the Master Servicer, materially more onerous that then form of the required certification as of the Closing Date, the Sarbanes-Oxley Certification shall be as agreed to by the Master Servicer, the

Depositor and the Sponsor following a negotiation in good faith to determine how to comply with any such new requirements.

"Scheduled Principal Balance": With respect to any Mortgage Loan: (a) as of the Cut-off Date, the outstanding principal balance of such Mortgage Loan as of such date, net of the principal portion of all unpaid Monthly Payments, if any, due on or before such date; (b) as of any Due Date subsequent to the Cut-off Date up to and including the Due Date in the calendar month in which a Liquidation Event occurs with respect to such Mortgage Loan, the Scheduled Principal Balance of such Mortgage Loan as of the Cut-off Date, minus the sum of (i) the principal portion of each Monthly Payment due on or before such Due Date but subsequent to the Cut-off Date, whether or not received, (ii) all Principal Prepayments received before such Due Date but after the Cut-off Date, (iii) the principal portion of all Liquidation Proceeds and Insurance Proceeds received before such Due Date but after the Cut-off Date, net of any portion thereof that represents principal due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) on a Due Date occurring on or before the date on which such proceeds were received and (iv) any Realized Loss incurred with respect thereto as a result of a Deficient Valuation occurring before such Due Date, but only to the extent such Realized Loss represents a reduction in the portion of principal of such Mortgage Loan not yet due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) as of the date of such Deficient Valuation; and (c) as of any Due Date subsequent to the occurrence of a Liquidation Event with respect to such Mortgage Loan, zero. With respect to any REO Property: (a) as of any Due Date subsequent to the date of its acquisition on behalf of the Trust Fund up to and including the Due Date in the calendar month in which a Liquidation Event occurs with respect to such REO Property, an amount (not less than zero) equal to the Scheduled Principal Balance of the related Mortgage Loan as of the Due Date in the calendar month in which such REO Property was acquired, minus the aggregate amount of REO Principal Amortization, if any, in respect of REO Property for all previously ended calendar months; and (b) as of any Due Date subsequent to the occurrence of a Liquidation Event with respect to such REO Property, zero.

"Securities Act": The Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Securities Administrator": As of the Closing Date, Wells Fargo Bank, National Association and thereafter, its respective successors in interest that meet the qualifications of this Agreement. The Securities Administrator and the Master Servicer shall at all times be the same Person or Affiliates.

"Senior Interest Distribution Amount": With respect to any Distribution Date, an amount equal to the sum of (i) the Interest Distribution Amount for such Distribution Date for the Class A Certificates and (ii) the Interest Carry Forward Amount, if any, for such Distribution Date for the Class A Certificates.

"Servicer": Ocwen, GMAC or Countrywide, as applicable, or any successor thereto appointed hereunder in connection with the servicing and administration of the related Mortgage Loans.

"Servicer Event of Default": One or more of the events described in Section 8.01(a).

"Servicer Remittance Date":  With respect to any Distribution Date and the GMAC Mortgage Loans, by 12:00 p.m. New York time on the 18th day of the month in which such Distribution Date occurs; provided that if such 18th day of a given month is not a Business Day, the Servicer Remittance Date for such month shall be the Business Day immediately preceding such 18th day. With respect to any Distribution Date and the Ocwen Mortgage Loans, by 12:00 p.m. New York time on the 22nd day of each month in which such Distribution Date occurs; provided that if such 22nd day of a given month is not a Business Day, the Servicer Remittance Date for such month shall be the Business Day immediately preceding such 22nd day. With respect to any Distribution Date and the Countrywide Mortgage Loans, the 22nd day of each month in which such Distribution Date occurs; provided that if the 22nd day of a given month is not a business day, the Servicer Remittance Date for such month shall be the business day immediately preceding such 22nd day; provided, further, that if the Servicer Remittance Date falls on a Friday, the Servicer Remittance Date shall be the business day immediately preceding such Friday.

"Servicer Report": A report (substantially in the form of Schedule 5 hereto) or otherwise in form and substance acceptable to the Master Servicer and Securities Administrator on an electronic data file or tape prepared by the Servicers pursuant to Section 5.03(a) of this Agreement or pursuant to the Servicing Agreement, with such additions, deletions and modifications as agreed to by the Master Servicer, the Securities Administrator and the Servicer.

"Service(s)(ing)": Means, in accordance with Regulation AB, the act of servicing and administering the Mortgage Loans or any other assets of the Trust by an entity that meets the definition of "servicer' set forth in Item 1101 of Regulation AB and is subject to the disclosure requirements set forth in Item 1108 of Regulation AB.  For clarification purposes, any uncapitalized occurrence of this term shall have the meaning commonly understood by participants in the residential mortgage-backed securitization market.

"Servicing Advances": The customary and reasonable "out-of-pocket" costs and expenses incurred prior to or on or after the Cut-off Date (the amounts incurred prior to the Cut-off Date shall be identified on the Servicing Advance Schedule by (a) each Servicer with respect to any Mortgage Loans serviced by such Servicer that were transferred to the related Servicer prior to the Cut-off Date and/or (b) the Depositor with respect to any Mortgage Loans that were transferred to the Servicer after the Cut-off Date, as applicable) by the related Servicer in connection with a default, delinquency or other unanticipated event by the Servicer in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property, (ii) any enforcement or judicial proceedings, including but not limited to foreclosures, in respect of a particular Mortgage Loan, including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered on the MERS® System, (iii) the management (including reasonable fees in connection therewith) and liquidation of any REO Property, (iv) the performance of its obligations under Section 3.01, Section 3.07, Section 3.11, Section 3.13 and Section 3.22 of this Agreement or under the corresponding provisions of the Servicing Agreement; (v) refunding to any Mortgagor the portion of any prepaid origination fees or finance

83

charges that are subject to reimbursement upon a principal prepayment of the related Mortgage Loan to the extent such refund is required by applicable law; and (vi) obtaining any legal documentation required to be included in the Mortgage File and/or correcting any outstanding title issues (i.e., any lien or encumbrance on the Mortgaged Property that prevents the effective enforcement of the intended lien position) reasonably necessary for the related Servicer to perform its obligations under this Agreement or under the Servicing Agreement. Servicing Advances also include any reasonable "out-of-pocket" cost and expenses (including legal fees) incurred by the Servicer in connection with executing and recording instruments of satisfaction, deeds of reconveyance or Assignments to the extent not recovered from the Mortgagor or otherwise payable under this Agreement. The Servicers shall not be required to make any Nonrecoverable Servicing Advances.

"Servicing Advance Schedule": With respect to any Servicing Advances incurred prior to the Cut-off Date, the schedule or schedules provided by (a) the related Servicer with respect to any Mortgage Loans that were transferred to the related Servicer prior to the Cut-off Date and/or (b) the Depositor with respect to any Mortgage Loans that were transferred to the Servicer after the Cut-off Date, as applicable, to the Master Servicer and, if such schedule is provided by the Depositor, to the related Servicer, on the date on which such Servicer seeks reimbursement for a Servicing Advance made by the related Servicer, which schedule or schedules shall contain the information set forth on Schedule 6.

"Servicing Agreement": The Flow Servicing Agreement dated as of June 30, 2006, by and between the Sponsor and Countrywide, as modified by the Assignment Agreement.

"Servicing Criteria": Means the criteria set forth in paragraph (d) of Item 1122 of Regulation AB, as such may be amended from time to time.

"Servicing Fee": With respect to each Mortgage Loan and for any calendar month, an amount equal to one-twelfth of the product of the Servicing Fee Rate multiplied by the Scheduled Principal Balance of the Mortgage Loans as of the Due Date in the preceding calendar month; provided, however, that GMAC shall only be entitled to a portion of the Servicing Fee calculated on the GMAC Mortgage Loans at the GMAC Servicing Fee Rate and Countrywide shall only be entitled to a portion of the Servicing Fee calculated on the Countrywide Mortgage Loans at the Countrywide Servicing Fee Rate. The Servicing Fee is payable solely from collections of interest on the Mortgage Loans, except as otherwise provided in Section 3.09 of this Agreement or as provided in the Servicing Agreement.

"Servicing Fee Rate": 0.50% per annum.

"Servicing Function Participant": Means any Sub-Servicer, Subcontractor or any other Person, other than the Servicers, the Master Servicer, each Custodian, the Trustee and the Securities Administrator, that is determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, without regard to any threshold referenced therein.

"Servicing Officer": Any officer of the Servicers or the Master Servicer involved in, or responsible for, the administration and servicing of Mortgage Loans, whose name and specimen signature appear on a list of Servicing Officers furnished by the related Servicer or the

84

Master Servicer, to the Trustee, the Master Servicer (in the case of a Servicer), the Securities Administrator and the Depositor on the Closing Date, as such list may from time to time be amended.

"Single Certificate":  With respect to any Class of Certificates (other than the Residual Certificates), a hypothetical Certificate of such Class evidencing a Percentage Interest for such Class corresponding to an initial Certificate Principal Balance of $1,000. With respect to the Residual Certificates, a hypothetical Certificate of such Class evidencing a 100% Percentage Interest in such Class.

"Sponsor": DB Structured Products, Inc. or its successor in interest, in its capacity as seller under the Mortgage Loan Purchase Agreement.

"Startup Day": With respect to each Trust REMIC, the day designated as such pursuant to Section 11.01(b) hereof.

"Stated Principal Balance": With respect to any Mortgage Loan: (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, the Scheduled Principal Balance of such Mortgage Loan as of the Cut-off Date, as shown in the Mortgage Loan Schedule, minus the sum of (i) the principal portion of each Monthly Payment due on a Due Date subsequent to the Cut-off Date, to the extent received from the Mortgagor or advanced by the related Servicer or a successor to such Servicer and distributed pursuant to Section 5.01 of this Agreement on or before such date of determination, (ii) all Principal Prepayments received after the Cut-off Date, to the extent distributed pursuant to Section 5.01 of this Agreement on or before such date of determination, (iii) all Liquidation Proceeds and Insurance Proceeds applied by the Servicer as recoveries of principal in accordance with the provisions of Section 3.13 of this Agreement or in accordance with the Servicing Agreement, to the extent distributed pursuant to Section 5.01 of this Agreement on or before such date of determination, and (iv) any Realized Loss incurred with respect thereto as a result of a Deficient Valuation made during or prior to the Prepayment Period for the most recent Distribution Date coinciding with or preceding such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, zero. With respect to any REO Property: (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, an amount (not less than zero) equal to the Stated Principal Balance of the related Mortgage Loan as of the date on which such REO Property was acquired on behalf of REMIC I, minus the sum of (i) if such REO Property was acquired before the Distribution Date in any calendar month, the principal portion of the Monthly Payment due on the Due Date in the calendar month of acquisition, to the extent advanced by the related Servicer or a successor to the related Servicer and distributed pursuant to Section 5.01 of this Agreement, on or before such date of determination and (ii) the aggregate amount of REO Principal Amortization in respect of such REO Property for all previously ended calendar months, to the extent distributed pursuant to Section 5.01 of this Agreement on or before such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, zero.

85

"Stepdown Date": The earlier to occur of (i) the later to occur of (a) the Distribution Date occurring in May 2010 and (b) the first Distribution Date on which the Credit Enhancement Percentage (calculated for this purpose only after taking into account distributions of principal on the Mortgage Loans, but prior to any distribution of the Principal Distribution Amount to the holders of the Certificates then entitled to distributions of principal on such Distribution Date), is greater than or equal to 58.20% and (ii) the first Distribution Date on which the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero.

"Subcontractor": Means any vendor, subcontractor or other Person that is not responsible for the overall servicing of Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB (without regard to any threshold percentage specified therein) with respect to Mortgage Loans under the direction or authority of any Servicer (or a Sub-Servicer of any Servicer), the Master Servicer, the Trustee, a Custodian or the Securities Administrator.

"Subordinate Certificates": Collectively, the Mezzanine Certificates and the Class CE-1 Certificates.

"Subsequent Group I Mortgage Loan": A Subsequent Mortgage Loan identified and expected to be purchased by the Trust during the Pre-Funding Period and assigned to the Group I Mortgage Loans.

"Subsequent Group II Mortgage Loan": A Subsequent Mortgage Loan identified and expected to be purchased by the Trust during the Pre-Funding Period and assigned to the Group II Mortgage Loans.

"Subsequent Mortgage Loan": A Mortgage Loan sold by the Depositor to the Trust Fund pursuant to Section 2.09, such Mortgage Loan being identified on the Mortgage Loan Schedule attached to a Subsequent Transfer Instrument.

"Subsequent Mortgage Loan Purchase Agreement": The agreement between the Depositor and the Sponsor, regarding the transfer of the Subsequent Mortgage Loans by the Sponsor to the Depositor.

"Subsequent Recoveries": As of any Distribution Date, amounts received during the related Prepayment Period by the related Servicer specifically related to a defaulted Mortgage Loan or disposition of an REO Property prior to the related Prepayment Period that resulted in a Realized Loss after the liquidation or disposition of such defaulted Mortgage Loan net of any amounts reimbursable to such Servicer related to such Mortgage Loan or REO Property.

"Subsequent Transfer Date": With respect to each Subsequent Transfer Instrument, the date on which the related Subsequent Mortgage Loans are transferred to the Trust Fund.

"Subsequent Transfer Instrument": Each Subsequent Transfer Instrument, dated as of a Subsequent Transfer Date, executed by the Trustee and the Depositor substantially in the

form attached hereto as Exhibit K, by which Subsequent Mortgage Loans are transferred to the Trust Fund.

"Sub-Servicer": Means any Person that services Mortgage Loans on behalf of any Servicer and is responsible for the performance (whether directly or through sub-servicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed under this Agreement or any related Sub-Servicing Agreement that is identified in Item 1122(d) of Regulation AB.

"Sub-Servicing Agreement": The written contract between a Servicer and a Sub-Servicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02 of this Agreement or the Servicing Agreement, as applicable.

"Substitution Shortfall Amount": As defined in Section 2.03.

"Supplemental Interest Trust":  The corpus of a trust created pursuant to Section 5.07 of this Agreement and designated as the "Supplemental Interest Trust," consisting of the Swap Agreement, the Class IO Interest and the right to receive payments in respect of the Class IO Distribution Amount. For the avoidance of doubt, the Supplemental Interest Trust does not constitute a part of the Trust Fund.

"Supplemental Interest Trust Trustee":  HSBC Bank USA, National Association a national banking association, or its successor in interest, or any successor supplemental interest trust trustee appointed as provided herein or in the Swap Agreement provided.

"Swap Agreement":  The Interest Rate Swap Agreement, dated as of April 30, 2007, between the Supplemental Interest Trust Trustee, and the Swap Provider, including any schedule, confirmations, credit support annex or other credit support document relating thereto, and attached hereto as Exhibit I.

"Swap Credit Support Annex:  The credit support annex, dated as of April 30, 2007, between the Supplemental Interest Trust Trustee and the Swap Provider, which is annexed to and forms part of the Swap Agreement.

"Swap LIBOR":  LIBOR as determined pursuant to the Swap Agreement.

"Swap Notional Amount": For each calculation period as defined in the Swap Agreement, the lesser of (i) the aggregate Certificate Principal Balance of the Offered Certificates and (ii) the amount set forth below:

| Distribution Date | Swap Notional Amount ($) |
|---|---|
| November 2007 | 917,668,665 |
| December 2007 | 897,576,981 |
| January 2008 | 876,010,775 |
| February 2008 | 853,165,450 |
| March 2008 | 829,880,833 |
| April 2008 | 807,178,460 |
| May 2008 | 785,054,766 |

87

| Distribution Date | Swap Notional Amount ($) |
| --- | --- |
| June 2008 | 763,494,986 |
| July 2008 | 742,484,727 |
| August 2008 | 722,009,969 |
| September 2008 | 702,057,046 |
| October 2008 | 682,595,230 |
| November 2008 | 663,548,419 |
| December 2008 | 644,842,505 |
| January 2009 | 625,127,459 |
| February 2009 | 595,758,684 |
| March 2009 | 553,157,642 |
| April 2009 | 513,515,040 |
| May 2009 | 477,694,267 |
| June 2009 | 451,402,663 |
| July 2009 | 436,910,783 |
| August 2009 | 422,958,282 |
| September 2009 | 409,403,409 |
| October 2009 | 396,233,357 |
| November 2009 | 383,435,034 |
| December 2009 | 370,998,006 |
| January 2010 | 358,911,871 |
| February 2010 | 347,166,960 |
| March 2010 | 335,754,286 |
| April 2010 | 324,664,635 |
| May 2010 | 313,887,629 |
| June 2010 | 313,887,629 |
| July 2010 | 313,664,633 |
| August 2010 | 304,910,457 |
| September 2010 | 296,402,853 |
| October 2010 | 288,134,791 |
| November 2010 | 280,099,387 |
| December 2010 | 272,290,024 |
| January 2011 | 264,700,288 |
| February 2011 | 257,323,972 |
| March 2011 | 250,155,018 |
| April 2011 | 243,187,552 |
| May 2011 | 236,415,847 |
| June 2011 | 229,834,355 |
| July 2011 | 223,437,690 |
| August 2011 | 217,220,624 |
| September 2011 | 211,178,065 |
| October 2011 | 205,305,073 |
| November 2011 | 199,596,848 |
| December 2011 | 194,048,729 |
| January 2012 | 188,656,163 |
| February 2012 | 183,414,021 |

[TPW: NY LEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

| Distribution Date | Swap Notional Amount ($) |
|---|---|
| March 2012 | 178,311,779 |
| April 2012 | 173,326,384 |

"Swap Provider":  The swap provider under the Swap Agreement either (a) entitled to receive payments from the Supplemental Interest Trust or (b) required to make payments to the Supplemental Interest Trust, in either case pursuant to the terms of the Swap Agreement, and any successor in interest or assign.  Initially, the Swap Provider shall be Deutsche Bank AG, New York Branch.

"Swap Provider Trigger Event":  A Swap Provider Trigger Event shall have occurred if any of the following has occurred: (i) an Event of Default under the Swap Agreement with respect to which the Swap Provider is a Defaulting Party (as defined in the Swap Agreement), (ii) a Termination Event under the Swap Agreement with respect to which the Swap Provider is the sole Affected Party (as defined in the Swap Agreement) or (iii) an Additional Termination Event under the Swap Agreement with respect to which the Swap Provider is the sole Affected Party.

"Swap Termination Payment":  Upon the designation of an "Early Termination Date" as defined in the Swap Agreement, the payment to be made by the Securities Administrator on behalf of the Supplemental Interest Trust Trustee from the Supplemental Interest Trust to the Swap Provider, or by the Swap Provider to the Supplemental Interest Trust, as applicable, pursuant to the terms of the Swap Agreement.

"Tax Returns": The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holders of REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed on behalf of the Trust REMICs under the REMIC Provisions, together with any and all other information reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

"Telerate Page 3750": The display designated as page "3750" on the Dow Jones Telerate Capital Markets Report (or such other page as may replace page 3750 on that report for the purpose of displaying London interbank offered rates of major banks).

"Termination Price": As defined in Section 10.01.

"Terminator": As defined in Section 10.01.

"Transfer": Any direct or indirect transfer, sale, pledge, hypothecation, or other form of assignment of any Ownership Interest in a Certificate.

"Transferee": Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

"Transferor": Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

89

"Trigger Event": With respect to any Distribution Date, a Trigger Event is in effect if (x) the percentage obtained by dividing (i) the principal amount of Mortgage Loans delinquent 60 days or more (including Mortgage Loans in foreclosure, bankruptcy and REO) by (ii) the aggregate principal balance of the Mortgage Loans, in each case as, of the last day of the previous calendar month exceeds approximately 27.50% of the Credit Enhancement Percentage with respect to such Distribution Date or (y) the aggregate amount of Realized Losses incurred since the Cut-off Date through the last day of the related Due Period divided by the aggregate principal balance of the Mortgage Loans as of the Cut-off exceeds the applicable percentages set forth below with respect to such Distribution Date:

| Distribution Date | Percentages |
|---|---|
| May 2009 to April 2010 | 2.15% plus 1/12 of 2.45% for each month thereafter |
| May 2010 to April 2011 | 4.60% plus 1/12 of 2.55% for each month thereafter |
| May 2011 to April 2012 | 7.15% plus 1/12 of 2.10% for each month thereafter |
| May 2012 to April 2013 | 9.25% plus 1/12 of 0.50% for each month thereafter |
| May 2013 and thereafter | 9.75% |

"Trust": ACE Securities Corp., Home Equity Loan Trust, Series 2007-HE4, the trust created hereunder.

"Trust Fund": Collectively, all of the assets of REMIC I, REMIC II, REMIC III, REMIC IV, the Pre-Funding Account, the Capitalized Interest Account and the Reserve Fund and any amounts on deposit therein and any proceeds thereof and the Cap Contracts. For avoidance of doubt, the Trust Fund does not include the Supplemental Interest Trust.

"Trust REMIC": REMIC I, REMIC II, REMIC III or REMIC IV.

"Trustee": HSBC Bank USA, National Association, a national banking association, or its successor in interest, or any successor trustee appointed as herein provided.

"Uncertificated Balance": The amount of the REMIC Regular Interests outstanding as of any date of determination. As of the Closing Date, the Uncertificated Balance of each REMIC Regular Interest shall equal the amount set forth in the Preliminary Statement hereto as its initial uncertificated balance. On each Distribution Date, the Uncertificated Balance of the REMIC Regular Interest shall be reduced by all distributions of principal made on such REMIC Regular Interest on such Distribution Date pursuant to Section 5.01 and, if and to the extent necessary and appropriate, shall be further reduced on such Distribution Date by Realized Losses as provided in Section 5.04 and the Uncertificated Balance of REMIC II Regular Interest ZZ shall be increased by interest deferrals as provided in Section 5.01. The Uncertificated Balance of each REMIC Regular Interest shall never be less than zero.

"Uncertificated Interest": With respect to any REMIC Regular Interest for any Distribution Date, one month's interest at the related REMIC Remittance Rate applicable to such REMIC Regular Interest for such Distribution Date, accrued on the Uncertificated Balance thereof immediately prior to such Distribution Date. Uncertificated Interest in respect of the REMIC Regular Interests shall accrue on the basis of a 360-day year consisting of twelve 30-day months. Uncertificated Interest with respect to each Distribution Date, as to any REMIC Regular Interest, shall be reduced by an amount equal to the sum of (a) the aggregate Prepayment Interest

90

Shortfall, if any, for such Distribution Date to the extent not covered by payments pursuant to Section 3.23 or Section 4.19 of this Agreement or pursuant to the Servicing Agreement and (b) the aggregate amount of any Relief Act Interest Shortfall, if any allocated, in each case, to such REMIC Regular Interest or REMIC Regular Interest pursuant to Section 1.02. In addition, Uncertificated Interest with respect to each Distribution Date, as to any REMIC Regular Interest, shall be reduced by Realized Losses, if any, allocated to such REMIC Regular Interest pursuant to Section 1.02 and Section 5.04.

"Uninsured Cause": Any cause of damage to a Mortgaged Property such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies required to be maintained pursuant to Section 3.11.

"United States Person": A citizen or resident of the United States, a corporation, partnership or other entity created or organized in, or under the laws of, the United States or any political subdivision thereof (except, in the case of a partnership, to the extent provided in regulations) provided that, for purposes solely of the restrictions on the transfer of any Class R Certificate, no partnership or other entity treated as a partnership for United States federal income tax purposes shall be treated as a United States Person unless all persons that own an interest in such partnership either directly or through any entity that is not a corporation for United States federal income tax purposes are required to be United States Persons, or an estate whose income is subject to United States federal income tax regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust. To the extent prescribed in regulations by the Secretary of the Treasury, a trust which was in existence on August 20, 1996 (other than a trust treated as owned by the grantor under subpart E of part I of subchapter J of chapter I of the Code), and which was treated as a United States person on August 20, 1996 may elect to continue to be treated as a United States person notwithstanding the previous sentence. The term "United States" shall have the meaning set forth in Section 7701 of the Code.

"Value": With respect to any Mortgaged Property, the lesser of (i) the lesser of (a) the value thereof as determined by an appraisal made for the related originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac and (b) the value thereof as determined by a review appraisal conducted by the related originator of the Mortgage Loan in accordance with the related originator's underwriting guidelines, and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan; provided, however, (A) in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the lesser of (1) the value determined by an appraisal made for the related originator of the Mortgage Loan of such Refinanced Mortgage Loan at the time of origination of such Refinanced Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac and (2) the value thereof as determined by a review appraisal conducted by the related originator of the Mortgage Loan in accordance with the related originator's underwriting guidelines, and (B) in the case of a Mortgage Loan originated in connection with a "lease-option purchase," such value of the Mortgaged Property is based on the lower of the value determined by an appraisal made for the originator of such Mortgage Loan at the time of origination or the sale price of such Mortgaged Property if the "lease option purchase price" was

91

set less than 12 months prior to origination, and is based on the value determined by an appraisal made for the related originator of such Mortgage Loan at the time of origination if the "lease option purchase price" was set 12 months or more prior to origination.

"Verification Report": As defined in Section 4.20.

"Voting Rights": The portion of the voting rights of all of the Certificates which is allocated to any such Certificate. With respect to any date of determination, 98% of all Voting Rights will be allocated among the holders of the Class A Certificates, the Mezzanine Certificates and the Class CE-1 Certificates in proportion to the then outstanding Certificate Principal Balances of their respective Certificates, 1% of all Voting Rights will be allocated among the holders of the Class P Certificates and 1% of all Voting Rights will be allocated among the holders of the Class R Certificates. The Voting Rights allocated to each Class of Certificate shall be allocated among Holders of each such Class in accordance with their respective Percentage Interests as of the most recent Record Date.

"Wells Fargo": Wells Fargo Bank, National Association in its capacity as a Custodian under the Wells Fargo Custodial Agreement, or any successor thereto.

"Wells Fargo Custodial Agreement": The Custodial Agreement dated as of April 1, 2007, among the Trustee, Wells Fargo and the Servicers, as may be amended or supplemented from time to time.

SECTION 1.02.    Allocation of Certain Interest Shortfalls.

For purposes of calculating the amount of Accrued Certificate Interest and the amount of the Interest Distribution Amount for the Class A Certificates, the Mezzanine Certificates and the Class CE-1 Certificates for any Distribution Date, (1) the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicers pursuant to Section 3.23 of this Agreement or pursuant to the Servicing Agreement or by the Master Servicer pursuant to Section 4.19 of this Agreement) and any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first, to the Class CE-1 Certificates, second, to the Class M-9 Certificates, third, to the Class M-8 Certificates, fourth, to the Class M-7 Certificates, fifth, to the Class M-6 Certificates, sixth, to the Class M-5 Certificates, seventh, to the Class M-4 Certificates, eighth, to the Class M-3 Certificates, ninth, to the Class M-2 Certificates, tenth, to the Class M-1 Certificates and eleventh, to the Class A Certificates, on a *pro rata* basis, in each case based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Certificate Principal Balance or Notional Amount, as applicable, of each such Certificate and (2) the aggregate amount of any Realized Losses allocated to the Mezzanine Certificates and Net WAC Rate Carryover Amounts paid to the Class A Certificates and the Mezzanine Certificates incurred for any Distribution Date shall be allocated to the Class CE-1 Certificates on a *pro rata* basis based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Certificate Principal Balance or Notional Amount thereof, as applicable.

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

For purposes of calculating the amount of Uncertificated Interest for the REMIC I Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicers pursuant to Section 3.22 of this Agreement or the Master Servicer pursuant to Section 4.18 or by the Interim Servicer pursuant to the Interim Servicing Agreement) shall be allocated first, (i) with respect to the Group I Mortgage Loans, to REMIC I Regular Interest LT1 and REMIC I Regular Interest LT1PF, in each case to the extent of one month's interest at the then applicable respective REMIC I Remittance Rate on the respective Uncertificated Balance of each such REMIC I Regular Interest; provided, however, with respect to the first three Distribution Dates, such amounts relating to the Initial Group I Mortgage Loans shall be allocated to REMIC I Regular Interest LT1 and such amounts relating to the Subsequent Group I Mortgage Loans shall be allocated to REMIC I Regular Interest LT1PF and (b) with respect to the Group II Mortgage Loans, to REMIC I Regular Interest LT2 and REMIC I Regular Interest LT2PF, in each case to the extent of one month's interest at the then applicable respective REMIC I Remittance Rate on the respective Uncertificated Balance of each such REMIC I Regular Interest; provided, however, with respect to the first three Distribution Dates, such amounts relating to the Initial Group II Mortgage Loans shall be allocated to REMIC I Regular Interest LT2 and such amounts relating to the Subsequent Group II Mortgage Loans shall be allocated to REMIC I Regular Interest LT2PF.

For purposes of calculating the amount of Uncertificated Interest for the REMIC II Group I Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the related Servicer pursuant to Section 3.23 of this Agreement or pursuant to the Servicing Agreement or the Master Servicer pursuant to Section 4.19) and any Relief Act Interest Shortfalls incurred in respect of Group I Mortgage Loans shall be allocated first, to REMIC II Regular Interest I and to the REMIC II Group I Regular Interests ending with the designation "B", *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC II Remittance Rates on the respective Uncertificated Principal Balances of each such REMIC II Regular Interest, and then, to REMIC II Group I Regular Interests ending with the designation "A", pro rata based on, and to the extent of, one month's interest at the then applicable respective REMIC II Remittance Rates on the respective Uncertificated Balances of each such REMIC II Regular Interest.

For purposes of calculating the amount of Uncertificated Interest for the REMIC II Group II Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the related Servicer pursuant to Section 3.23 of this Agreement or pursuant to the Servicing Agreement or the Master Servicer pursuant to Section 4.19) and any Relief Act Interest Shortfalls incurred in respect of Group II Mortgage Loans shall be allocated first, to REMIC II Regular Interest II and to the REMIC II Group II Regular Interests ending with the designation "B", *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC II Remittance Rates on the respective Uncertificated Principal Balances of each such REMIC II Regular Interest , and then, to REMIC II Group II Regular Interests ending with the designation "A", pro rata based on, and to the extent of, one month's interest at the then applicable respective REMIC II Remittance Rates on the respective Uncertificated Balances of each such REMIC II Regular Interest.

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

For purposes of calculating the amount of Uncertificated Interest for the REMIC III Regular Interests for any Distribution Date:

(A)    The REMIC III Marker Allocation Percentage of the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicers pursuant to Section 3.23 of this Agreement or the Master Servicer pursuant to Section 4.19) and the REMIC III Marker Allocation Percentage of any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated among REMIC III Regular Interest AA, REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9, REMIC III Regular Interest ZZ and REMIC III Regular Interest P *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC III Remittance Rate on the respective Uncertificated Balance of each such REMIC III Regular Interest; and

(B)    The REMIC III Sub WAC Allocation Percentage of the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicers pursuant to Section 3.23 of this Agreement or by the Master Servicer pursuant to Section 4.19 of this Agreement) and the REMIC III Sub WAC Allocation Percentage of any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first, to Uncertificated Interest payable to REMIC III Regular Interest I-SUB, REMIC III Regular Interest I-GRP, REMIC III Regular Interest II-SUB, REMIC III Regular Interest II-GRP and REMIC III Regular Interest XX, *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC III Remittance Rate on the respective Uncertificated Balance of each such REMIC III Regular Interest.

SECTION 1.03.    Rights of the NIMS Insurer.

Each of the rights of the NIMS Insurer set forth in this Agreement shall exist so long as (i) the NIMS Insurer has undertaken to guarantee certain payments of notes issued pursuant to the Indenture and (ii) the notes issued pursuant to the Indenture remain outstanding or the NIMS Insurer is owed amounts in respect of its guarantee of payment on such notes; provided, however, the NIMS Insurer shall not have any rights hereunder (except pursuant to Section 11.01 and any rights to indemnification hereunder in the case of clause (ii) below) so long as (i) the NIMS Insurer has not undertaken to guarantee certain payments of notes issued pursuant to the Indenture or (ii) any default has occurred and is continuing under the insurance policy issued by the NIMS Insurer with respect to such notes.

[TPW: NY.LEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
ORIGINAL ISSUANCE OF CERTIFICATES

SECTION 2.01.        Conveyance of the Mortgage Loans.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee, on behalf of the Trust, without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement, the Subsequent Mortgage Loan Purchase Agreement and such assets as shall from time to time be credited or required to be credited by the terms of this Agreement to the Pre-Funding Account and the Capitalized Interest Account, the Assignment Agreement, the Servicing Agreement (including, without limitation the right to enforce the obligations of the other parties thereto thereunder), the rights of the Depositor under the Cap Contracts, the right to any payments made by the Cap Counterparty under the Cap Contracts, the right to any Net Swap Payment and any Swap Termination Payment made by the Swap Provider, and all other assets included or to be included in REMIC I. Such assignment includes all interest and principal received by the Depositor and the Servicer on or with respect to the Mortgage Loans (other than payments of principal and interest due on such Mortgage Loans on or before the Cut-off Date). A copy of the Mortgage Loan Purchase Agreement is attached hereto as Exhibit F.

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with the related Custodian pursuant to the related Custodial Agreement the documents with respect to each Mortgage Loan as described under Section 2 of the Custodial Agreements (the "Mortgage Loan Documents"). In connection with such delivery and as further described in the Custodial Agreements, the Custodians will be required to review such Mortgage Loan Documents and deliver to the Trustee, the Depositor, the Servicers and the Sponsor certifications (in the forms attached to the Custodial Agreements) with respect to such review with exceptions noted thereon.  In addition, under the Custodial Agreements the Depositor will be required to cure certain defects with respect to the Mortgage Loan Documents for the related Mortgage Loans after the delivery thereof by the Depositor to the Custodians as more particularly set forth therein.

Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the functions of the Trustee with respect to the custody, acceptance, inspection and release of the Mortgage Files, including, but not limited to certain insurance policies and documents contemplated by Section 4.11, and preparation and delivery of the certifications shall be performed by the Custodians pursuant to the terms and conditions of the Custodial Agreements.

The Depositor shall deliver or cause the related originator to deliver to the Servicer copies of all trailing documents required to be included in the Mortgage File at the same time the originals or certified copies thereof are delivered to the Trustee or Custodians, such documents including the mortgagee policy of title insurance and any Mortgage Loan Documents

95

upon return from the recording office.  The Servicers shall not be responsible for any custodian fees or other costs incurred in obtaining such documents and the Depositor shall cause the Servicers to be reimbursed for any such costs the related Servicer may incur in connection with performing its obligations under this Agreement or under the Servicing Agreement, as applicable.

The Mortgage Loans permitted by the terms of this Agreement to be included in the Trust are limited to (i) Mortgage Loans (which the Depositor acquired pursuant to the Mortgage Loan Purchase Agreement, which contains, among other representations and warranties, a representation and warranty of the Sponsor that no Mortgage Loan is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 or as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, as defined in the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (Mass. Ann. Laws Ch. 183C) or as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9) or a "high risk home loan" under the Illinois High Risk Home Loan Act, effective as of January 1, 2004) and (ii) Qualified Substitute Mortgage Loans (which, by definition as set forth herein and referred to in the Mortgage Loan Purchase Agreement, are required to conform to, among other representations and warranties, the representation and warranty of the Sponsor that no Qualified Substitute Mortgage Loan is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 or as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, as defined in the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (Mass. Ann. Laws Ch. 183C) or as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9) or a "high risk home loan" under the Illinois High Risk Home Loan Act, effective as of January 1, 2004).  The Depositor and the Trustee on behalf of the Trust understand and agree that it is not intended that any Mortgage Loan be included in the Trust that is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003, as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, as defined in the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (Mass. Ann. Laws Ch. 183C) or as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9) or a "high risk home loan" under the Illinois High Risk Home Loan Act, effective as of January 1, 2004.

SECTION 2.02.    Acceptance of REMIC I by Trustee.

The Trustee acknowledges receipt, subject to the provisions of Section 2.01 hereof and Section 2 of the related Custodial Agreement, of the Mortgage Loan Documents and all other assets included in the definition of "REMIC I" under clauses (i), (iii), (iv) and (v) (to the extent of amounts deposited into the Distribution Account) and declares that it holds (or the applicable Custodian on its behalf holds) and will hold such documents and the other documents delivered to it constituting a Mortgage Loan Document, and that it holds (or the applicable Custodian on its behalf holds) or will hold all such assets and such other assets included in the definition of "REMIC I" in trust for the exclusive use and benefit of all present and future Certificateholders.

SECTION 2.03.        Repurchase or Substitution of Mortgage Loans.

(a)        Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File or of a breach by the Sponsor of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement or Subsequent Mortgage Loan Purchase Agreement in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Sponsor and the related Servicer of such defect, missing document or breach and request that the Sponsor deliver such missing document, cure such defect or breach within sixty (60) days from the date the Sponsor was notified of such missing document, defect or breach, and if the Sponsor does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Sponsor under the Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price within ninety (90) or the Subsequent Mortgage Loan Purchase Agreement, as applicable, days after the date on which the Sponsor was notified of such missing document, defect or breach, if and to the extent that the Sponsor is obligated to do so under the Mortgage Loan Purchase Agreement or the Subsequent Mortgage Loan Purchase Agreement, as applicable. The Purchase Price for the repurchased Mortgage Loan shall be remitted to the related Servicer for deposit in the related Collection Account and the Trustee, upon receipt of written certification from the related Servicer of such deposit, shall release or cause the applicable Custodian (upon receipt of a request for release in the form attached to the related Custodial Agreement) to release to the Sponsor the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment, in each case without recourse, representation or warranty, as the Sponsor shall furnish to it and as shall be necessary to vest in the Sponsor any Mortgage Loan released pursuant hereto, and the Trustee shall not have any further responsibility with regard to such Mortgage File. In lieu of repurchasing any such Mortgage Loan as provided above, if so provided in the Mortgage Loan Purchase Agreement or the Subsequent Mortgage Loan Purchase Agreement, as applicable, the Sponsor may cause such Mortgage Loan to be removed from REMIC I (in which case it shall become a Deleted Mortgage Loan) and substitute one or more Qualified Substitute Mortgage Loans in the manner and subject to the limitations set forth in Section 2.03(b). It is understood and agreed that the obligation of the Sponsor to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such omission, defect or breach available to the Trustee and the Certificateholders. Notwithstanding anything to the contrary contained herein, any breach of a representation or warranty with respect to the Group I Mortgage Loans contained in clauses (viii), (xxxviii), (xxxix), (xl), (xli), (xlviii), (xlix), (lviii), (lxii), (lxv), (lxx), (lxxi), (lxxiii) and/or (lxxiv) of Section 6 of the Mortgage Loan Purchase Agreement or the Subsequent Mortgage Loan Purchase Agreement, as applicable, shall be automatically deemed to affect materially and adversely the interests of the Holders of the Group I Certificates.

In addition, promptly upon the earlier of discovery by a Servicer or receipt of notice by a Servicer of the breach of the representation or covenant of the Sponsor set forth in Section 5(xii) of the Mortgage Loan Purchase Agreement or the Subsequent Mortgage Loan Purchase Agreement, as applicable, which materially and adversely affects the interests of the Holders of the Class P Certificates in any Prepayment Charge, the related Servicer shall

97

promptly notify the Sponsor and the Trustee of such breach. The Trustee shall enforce the obligations of the Sponsor under the Mortgage Loan Purchase Agreement or the Subsequent Mortgage Loan Purchase Agreement, as applicable, to remedy such breach to the extent and in the manner set forth in the Mortgage Loan Purchase Agreement or the Subsequent Mortgage Loan Purchase Agreement, as applicable.

(b)     Any substitution of Qualified Substitute Mortgage Loans for Deleted Mortgage Loans made pursuant to Section 2.03(a) must be effected prior to the date which is two years after the Startup Day for REMIC I.

As to any Deleted Mortgage Loan for which the Sponsor substitutes a Qualified Substitute Mortgage Loan or Loans, such substitution shall be effected by the Sponsor delivering to the Trustee or the applicable Custodian on behalf of the Trustee, for such Qualified Substitute Mortgage Loan or Loans, the Mortgage Note, the Mortgage, the Assignment to the Trustee, and such other documents and agreements, with all necessary endorsements thereon, as are required by Section 2 of the related Custodial Agreement, as applicable, together with an Officers' Certificate providing that each such Qualified Substitute Mortgage Loan satisfies the definition thereof and specifying the Substitution Shortfall Amount (as described below), if any, in connection with such substitution. The applicable Custodian on behalf of the Trustee shall acknowledge receipt of such Qualified Substitute Mortgage Loan or Loans and, within ten (10) Business Days thereafter, review such documents and deliver to the Depositor, the Trustee, the NIMS Insurer and the related Servicer, with respect to such Qualified Substitute Mortgage Loan or Loans, an initial certification pursuant to the related Custodial Agreement, with any applicable exceptions noted thereon. Within one year of the date of substitution, the applicable Custodian on behalf of the Trustee shall deliver to the Depositor, the Trustee, the NIMS Insurer and the related Servicer a final certification pursuant to the related Custodial Agreement with respect to such Qualified Substitute Mortgage Loan or Loans, with any applicable exceptions noted thereon. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution are not part of REMIC I and will be retained by the Sponsor. For the month of substitution, distributions to Certificateholders will reflect the Monthly Payment due on such Deleted Mortgage Loan on or before the Due Date in the month of substitution, and the Sponsor shall thereafter be entitled to retain all amounts subsequently received in respect of such Deleted Mortgage Loan. The Depositor shall give or cause to be given written notice to the Certificateholders and the NIMS Insurer that such substitution has taken place, shall amend the Mortgage Loan Schedule to reflect the removal of such Deleted Mortgage Loan from the terms of this Agreement and the substitution of the Qualified Substitute Mortgage Loan or Loans and shall deliver a copy of such amended Mortgage Loan Schedule to the Trustee, the NIMS Insurer and the Servicer. Upon such substitution, such Qualified Substitute Mortgage Loan or Loans shall constitute part of the Trust Fund and shall be subject in all respects to the terms of this Agreement and the Mortgage Loan Purchase Agreement or Subsequent Mortgage Loan Purchase Agreement, as applicable, including all applicable representations and warranties thereof included herein or in the Mortgage Loan Purchase Agreement or Subsequent Mortgage Loan Purchase Agreement, as applicable.

For any month in which the Sponsor substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the related Servicer will determine the amount (the "Substitution Shortfall Amount"), if any, by which the aggregate Purchase Price

98

of all such Deleted Mortgage Loans exceeds the aggregate of, as to each such Qualified Substitute Mortgage Loan, the Scheduled Principal Balance thereof as of the date of substitution, together with one month's interest on such Scheduled Principal Balance at the applicable Net Mortgage Rate, plus all outstanding P&I Advances and Servicing Advances (including Nonrecoverable P&I Advances and Nonrecoverable Servicing Advances) related thereto. On the date of such substitution, the Sponsor will deliver or cause to be delivered to the related Servicer for deposit in the related Collection Account an amount equal to the Substitution Shortfall Amount, if any, and the Trustee or the applicable Custodian on behalf of the Trustee, upon receipt of the related Qualified Substitute Mortgage Loan or Loans, upon receipt of a request for release in the form attached to the related Custodial Agreement and certification by the related Servicer of such deposit, shall release to the Sponsor the related Mortgage File or Files and the Trustee shall execute and deliver such instruments of transfer or assignment, in each case without recourse, representation or warranty, as the Sponsor shall deliver to it and as shall be necessary to vest therein any Deleted Mortgage Loan released pursuant hereto.

In addition, the Sponsor shall obtain at its own expense and deliver to the Trustee an Opinion of Counsel to the effect that such substitution will not cause (a) any federal tax to be imposed on any Trust REMIC, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code, or (b) any Trust REMIC to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(c)    Upon discovery by the Depositor, the Sponsor, the related Servicer, the NIMS Insurer or the Trustee that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall within two (2) Business Days give written notice thereof to the other parties. In connection therewith, the Sponsor shall repurchase or substitute one or more Qualified Substitute Mortgage Loans for the affected Mortgage Loan within ninety (90) days of the earlier of discovery or receipt of such notice with respect to such affected Mortgage Loan. Such repurchase or substitution shall be made by (i) the Sponsor if the affected Mortgage Loan's status as a non-qualified mortgage is or results from a breach of any representation, warranty or covenant made by the Sponsor under the Mortgage Loan Purchase Agreement or Subsequent Mortgage Loan Purchase Agreement, as applicable, or (ii) the Depositor, if the affected Mortgage Loan's status as a non-qualified mortgage does not result from a breach of a representation or warranty. Any such repurchase or substitution shall be made in the same manner as set forth in Section 2.03(a). The Trustee shall reconvey to the Sponsor the Mortgage Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty.

(d)    With respect to a breach of the representations made pursuant to Section 5(xii) of the Mortgage Loan Purchase Agreement or Subsequent Mortgage Loan Purchase Agreement, as applicable, that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Sponsor shall be required to take the actions set forth in this Section 2.03.

(e)    Within ninety (90) days of the earlier of discovery by a Servicer or receipt of notice by a Servicer of the breach of any representation, warranty or covenant of the related

99

Servicer set forth in Section 2.05 which materially and adversely affects the interests of the Certificateholders in any Mortgage Loan or Prepayment Charge, such Servicer shall cure such breach in all material respects.

SECTION 2.04.    Representations and Warranties of the Master Servicer.

The Master Servicer hereby represents, warrants and covenants to Ocwen, GMAC, the Depositor and the Trustee, for the benefit of each of the Trustee and the Certificateholders, that as of the Closing Date or as of such date specifically provided herein:

(i)    The Master Servicer is a national banking association duly formed, validly existing and in good standing under the laws of the United States of America and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by the Master Servicer;

(ii)    The Master Servicer has the full power and authority to conduct its business as presently conducted by it and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Master Servicer has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of the Master Servicer, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity;

(iii)    The execution and delivery of this Agreement by the Master Servicer, the consummation by the Master Servicer of any other of the transactions herein contemplated, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of the Master Servicer and will not (A) result in a breach of any term or provision of the charter and by-laws of the Master Servicer or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which the Master Servicer is a party or by which it may be bound, or any statute, order or regulation applicable to the Master Servicer of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Master Servicer; and the Master Servicer is not a party to, bound by, or in breach or violation of any indenture or other agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects or, to the Master Servicer's knowledge, would in the future materially and adversely affect, (x) the ability of the Master Servicer to perform its obligations under this Agreement or (y) the business, operations, financial condition, properties or assets of the Master Servicer taken as a whole;

(iv)    The Master Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant made by it and contained in this Agreement;

100

(v)    No litigation is pending against the Master Servicer that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Master Servicer to perform any of its other obligations hereunder in accordance with the terms hereof;

(vi)    There are no actions or proceedings against, or investigations known to it of, the Master Servicer before any court, administrative or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Master Servicer of its obligations under, or validity or enforceability of, this Agreement;

(vii)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Master Servicer of, or compliance by the Master Servicer with, this Agreement or the consummation by it of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date; and

(viii)    There are no affiliations, relationships or transactions relating to the Master Servicer of a type that are described under Item 1119 of Regulation AB with DBNTC, the Depositor, the Sponsor, the Servicers, the Credit Risk Manager, the Swap Provider or the Trustee.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.04 shall survive the resignation or termination of the parties hereto and the termination of this Agreement and shall inure to the benefit of the Trustee, the Depositor and the Certificateholders.

SECTION 2.05.    Representations, Warranties and Covenants of Ocwen and GMAC.

(a)    Ocwen hereby represents, warrants and covenants to the Master Servicer, the Securities Administrator, the Depositor and the Trustee, for the benefit of each of such Persons and the Certificateholders that as of the Closing Date or as of such date specifically provided herein:

(i)    Ocwen is a limited liability company duly organized and validly existing under the laws of the jurisdiction of its formation, and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by Ocwen in any state in which a Mortgaged Property related to an Ocwen Mortgage Loan is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such State, to the extent necessary to ensure its ability to enforce each Mortgage Loan and to service the Ocwen Mortgage Loans in accordance with the terms of this Agreement;

(ii)    Ocwen has the full power and authority to conduct its business as presently conducted by it and to execute, deliver and perform, and to enter into and

101

consummate, all transactions contemplated by this Agreement. Ocwen has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of Ocwen, enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity;

(iii) The execution and delivery of this Agreement by Ocwen, the servicing of the Ocwen Mortgage Loans by Ocwen hereunder, the consummation by Ocwen of any other of the transactions herein contemplated, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of Ocwen and will not (A) result in a breach of any term or provision of Ocwen's formation documents or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which Ocwen is a party or by which it may be bound, or any statute, order or regulation applicable to Ocwen of any court, regulatory body, administrative agency or governmental body having jurisdiction over Ocwen; and Ocwen is not a party to, bound by, or in breach or violation of any indenture or other agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects or, to Ocwen's knowledge, would in the future materially and adversely affect, (x) the ability of Ocwen to perform its obligations under this Agreement, (y) the business, operations, financial condition, properties or assets of Ocwen taken as a whole or (z) the legality, validity or enforceability of this Agreement;

(iv) Ocwen does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant made by it and contained in this Agreement;

(v) No litigation is pending against Ocwen that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of Ocwen to service the Ocwen Mortgage Loans or to perform any of its other obligations hereunder in accordance with the terms hereof;

(vi) There are no actions or proceedings against, or investigations known to it of, Ocwen before any court, administrative or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by Ocwen of its obligations under, or the validity or enforceability of, this Agreement;

(vii) No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Ocwen of, or compliance by Ocwen with, this Agreement or the consummation by it of

the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date;

(viii)    Ocwen has fully furnished and will continue to fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g., favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company or their successors on a monthly basis;

(ix)    Ocwen is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Ocwen Mortgage Loans that are registered with MERS; and

(x)    Ocwen will not waive any Prepayment Charge related to an Ocwen Mortgage Loan other than in accordance with the standard set forth in Section 3.01.

(b)    GMAC hereby represents, warrants and covenants to the Master Servicer, the Securities Administrator, the Depositor and the Trustee, for the benefit of each of such Persons and the Certificateholders that as of the Closing Date or as of such date specifically provided herein:

(i)    GMAC is a limited liability company duly organized and validly existing under the laws of the jurisdiction of its formation, and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by GMAC in any state in which a Mortgaged Property related to a GMAC Mortgage Loan is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such State, to the extent necessary to ensure its ability to enforce each GMAC Mortgage Loan and to service the Mortgage Loans in accordance with the terms of this Agreement;

(ii)    GMAC has the full power and authority to conduct its business as presently conducted by it and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement. GMAC has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of GMAC, enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity;

(iii)    The execution and delivery of this Agreement by GMAC, the servicing of the GMAC Mortgage Loans by GMAC hereunder, the consummation by GMAC of any other of the transactions herein contemplated, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of GMAC and will not (A) result in a breach of any term or provision of GMAC's formation documents

103

or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which GMAC is a party or by which it may be bound, or any statute, order or regulation applicable to GMAC of any court, regulatory body, administrative agency or governmental body having jurisdiction over GMAC; and GMAC is not a party to, bound by, or in breach or violation of any indenture or other agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects or, to GMAC's knowledge, would in the future materially and adversely affect, (x) the ability of GMAC to perform its obligations under this Agreement, (y) the business, operations, financial condition, properties or assets of GMAC taken as a whole or (z) the legality, validity or enforceability of this Agreement;

(iv)    GMAC does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant made by it and contained in this Agreement;

(v)    No litigation is pending against GMAC that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of GMAC to service the GMAC Mortgage Loans or to perform any of its other obligations hereunder in accordance with the terms hereof;

(vi)    There are no actions or proceedings against, or investigations known to it of, GMAC before any court, administrative or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by GMAC of its obligations under, or the validity or enforceability of, this Agreement;

(vii)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by GMAC of, or compliance by GMAC with, this Agreement or the consummation by it of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date;

(viii)    GMAC has fully furnished and will continue to fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g., favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company or their successors on a monthly basis;

(ix)    GMAC is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS; and

(x)      GMAC will not waive any Prepayment Charge related to a GMAC Mortgage Loan other than in accordance with the standard set forth in Section 3.01.

(c)      Notwithstanding anything to the contrary contained in this Agreement, if the covenant of the related Servicer set forth in Section 2.05(a)(x) or 2.05(b)(x) above is breached, the related Servicer will pay the amount of such waived Prepayment Charge, from its own funds without any right of reimbursement, for the benefit of the Holders of the Class P Certificates, by depositing such amount into the Collection Account within 90 days of the earlier of discovery by the related Servicer or receipt of notice by the related Servicer of such breach; provided, however, the Servicers shall not have any obligation to pay the amount of any uncollected Prepayment Charge under this Section 2.05 if the related Servicer did not have a copy of the related Mortgage Note, such Servicer requested a copy of the same from the related Custodian in accordance with the terms of the related Custodial Agreement and such Custodian failed to provide such copy within the time frame set forth in the related Custodial Agreement. Furthermore, notwithstanding any other provisions of this Agreement, any payments made by the Servicers in respect of any waived Prepayment Charges pursuant to this paragraph shall be deemed to be paid outside of the Trust Fund.

(d)      It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.05 shall survive the resignation or termination of the parties hereto, the termination of this Agreement and the delivery of the Mortgage Files to the related Custodian and shall inure to the benefit of the Trustee, the Master Servicer, the Securities Administrator, the Servicers, the Depositor, the Certificateholders. Upon discovery by any such Person, the NIMS Insurer or the Servicer of a breach of any of the foregoing representations, warranties and covenants which materially and adversely affects the value of any Mortgage Loan, Prepayment Charge or the interests therein of the Certificateholders, the party discovering such breach shall give prompt written notice (but in no event later than two (2) Business Days following such discovery) to the Trustee. Subject to Section 8.01, unless such breach shall not be susceptible of cure within ninety (90) days, the obligation of the related Servicer set forth in Section 2.03(e) to cure breaches shall constitute the sole remedy against the related Servicer available to the Certificateholders, the Depositor or the Trustee on behalf of the Certificateholders respecting a breach of the representations, warranties and covenants contained in this Section 2.05.

SECTION 2.06.      Issuance of the REMIC I Regular Interests and the Class R-I Interest.

The Trustee acknowledges the assignment to it of the Mortgage Loans and the delivery to the applicable Custodian on its behalf of the Mortgage Loan Documents, subject to the provisions of Section 2.01 and Section 2.02 hereof and Section 2 of the related Custodial Agreement, together with the assignment to it of all other assets included in REMIC I, the receipt of which is hereby acknowledged. The interests evidenced by the Class R-I Interest, together with the REMIC I Regular Interests, constitute the entire beneficial ownership interest in REMIC I. The rights of the Holders of the Class R-I Interest and REMIC I (as holder of the REMIC I Regular Interests) to receive distributions from the proceeds of REMIC I in respect of the Class R-I Interest and the REMIC I Regular Interests, respectively, and all ownership interests

105

evidenced or constituted by the Class R-I Interest and the REMIC I Regular Interests, shall be as set forth in this Agreement.

SECTION 2.07.        Conveyance of the REMIC I Regular Interests; Acceptance of REMIC II, REMIC III and REMIC IV by the Trustee.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee, without recourse all the right, title and interest of the Depositor in and to the REMIC I Regular Interests for the benefit of the Class R-II Interest and REMIC II (as holder of the REMIC I Regular Interests). The Trustee acknowledges receipt of the REMIC I Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future Holders of the Class R-II Interest and REMIC II (as holder of the REMIC I Regular Interests). The rights of the Holder of the Class R-II Interest and REMIC II (as holder of the REMIC I Regular Interests) to receive distributions from the proceeds of REMIC II in respect of the Class R-II Interest and the REMIC II Regular Interests, respectively, and all ownership interests evidenced or constituted by the Class R-II Interest and the REMIC II Regular Interests, shall be as set forth in this Agreement. The Class R-II Interest and the REMIC II Regular Interests shall constitute the entire beneficial ownership interest in REMIC II. The Trustee acknowledges receipt of the REMIC II Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future Holders of the Class R-III Interest and REMIC III (as holder of the REMIC II Regular Interests). The Trustee acknowledges receipt of the REMIC II Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future Holders of the Class R-III Interest and REMIC III (as holder of the REMIC II Regular Interests). The rights of the Holder of the Class R-III Interest and REMIC III (as holder of the REMIC II Regular Interests) to receive distributions from the proceeds of REMIC III in respect of the Class R-III Interest and the REMIC III Regular Interests, respectively, and all ownership interests evidenced or constituted by the Class R-III Interest and the REMIC III Regular Interests, shall be as set forth in this Agreement. The Class R-III Interest and the REMIC III Regular Interests shall constitute the entire beneficial ownership interest in REMIC III. The Trustee acknowledges receipt of the REMIC III Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future Holders of the Class R-IV Interest and REMIC IV (as holder of the REMIC III Regular Interests). The rights of the Holder of the Class R-IV Interest and REMIC IV (as holder of the REMIC III Regular Interests) to receive distributions from the proceeds of REMIC IV in respect of the Class R-IV Interest, the Class IO Interest and the Regular Certificates, respectively, and all ownership interests evidenced or constituted by the Class R-IV Interest, the Class IO Interest and the Regular Certificates, shall be as set forth in this Agreement. The Class R-IV Interest, the Class IO Interest and the Regular Certificates shall constitute the entire beneficial ownership interest in REMIC IV.

SECTION 2.08.        Issuance of the Residual Certificates.

The Trustee acknowledges the assignment to it of the REMIC I Regular Interests and, concurrently therewith and in exchange therefor, pursuant to the written request of the Depositor executed by an officer of the Depositor, the Securities Administrator has executed and authenticated and the Trustee has delivered to or upon the order of the Depositor, the Class R

106

Certificates in authorized denominations. The Class R Certificates evidence ownership in the Class R-I Interest, the Class R-II Interest, the Class R-III Interest and the Class R-IV Interest.

SECTION 2.09.    Conveyance of Subsequent Mortgage Loans.

(a)    Subject to the conditions set forth in paragraph (b) below in consideration of the Securities Administrator's delivery, on behalf of the Trustee, on the Subsequent Transfer Dates to or upon the order of the Depositor of all or a portion of the balance of funds in the Pre-Funding Account, the Depositor shall on any Subsequent Transfer Date sell, transfer, assign, set over and convey without recourse to the Trust Fund but subject to the other terms and provisions of this Agreement all of the right, title and interest of the Depositor in and to (i) the Subsequent Mortgage Loans identified on the Mortgage Loan Schedule attached to the related Subsequent Transfer Instrument delivered by the Depositor on such Subsequent Transfer Date, (ii) all interest accruing thereon on and after the related Cut-off Date and all collections in respect of interest and principal due after the related Cut-off Date and (iii) all items with respect to such Subsequent Mortgage Loans to be delivered pursuant to Section 2.01 and the other items in the related Mortgage Files; provided, however, that the Depositor reserves and retains all right, title and interest in and to principal received and interest accruing on the Subsequent Mortgage Loans prior to the related Cut-off Date. The transfer to the Trustee for deposit in the mortgage pool by the Depositor of the Subsequent Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the Servicer, the Trustee and the Certificateholders to constitute and to be treated as a sale of the Subsequent Mortgage Loans by the Depositor to the Trust Fund. The related Mortgage File for each Subsequent Mortgage Loan shall be delivered to the Trustee (or the Custodian on its behalf) at least three (3) Business Days prior to the related Subsequent Transfer Date.

The purchase price paid on behalf of the Trustee from amounts released from the Group I Pre-Funding Sub-Account or the Group II Pre-Funding Sub-Account, as applicable, shall be one-hundred percent (100%) of the aggregate Stated Principal Balance of the related Subsequent Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule provided by the Depositor). This Agreement shall constitute a fixed-price purchase contract in accordance with Section 860G(a)(3)(A)(ii) of the Code.

(b)    The Depositor shall transfer to the Trustee for deposit in the mortgage pool the Subsequent Mortgage Loans and the other property and rights related thereto as described in paragraph (a) above, and the Securities Administrator shall release funds from the Group I Pre-Funding Sub-Account or the Group II Pre-Funding Sub-Account, as applicable, only upon the satisfaction of each of the following conditions on or prior to the related Subsequent Transfer Date:

(i)    the Depositor shall have provided the Trustee, the Securities Administrator, the Servicer and the Rating Agencies with a timely Addition Notice and shall have provided any information reasonably requested by the Trustee with respect to the Subsequent Mortgage Loans;

(ii)    the Depositor shall have delivered to the Trustee and the Securities Administrator a duly executed Subsequent Transfer Instrument, which shall include a

107

Mortgage Loan Schedule listing the Subsequent Mortgage Loans, and the Sponsor shall have delivered a computer file acceptable to the Trustee and the Securities Administrator containing such Mortgage Loan Schedule to the Trustee and the Securities Administrator at least three (3) Business Days prior to the related Subsequent Transfer Date;

(iii)    as of each Subsequent Transfer Date, as evidenced by delivery of the Subsequent Transfer Instrument, substantially in the form of Exhibit K, the Depositor shall not be insolvent nor shall it have been rendered insolvent by such transfer nor shall it be aware of any pending insolvency;

(iv)    such sale and transfer shall not result in a material adverse tax consequence to the Trust Fund or the Certificateholders;

(v)    the Pre-Funding Period shall not have terminated;

(vi)    the Depositor shall not have selected the Subsequent Mortgage Loans in a manner that it believed to be adverse to the interests of the Certificateholders;

(vii)    the Depositor shall have delivered to the Trustee (with a copy to the Securities Administrator) a Subsequent Transfer Instrument confirming the satisfaction of the conditions precedent specified in this Section 2.09 and, pursuant to the Subsequent Transfer Instrument, assigned to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, in, to and under the Subsequent Mortgage Loan Purchase Agreement, to the extent of the Subsequent Mortgage Loans; and

(viii)    the Depositor shall have delivered to the Trustee an Opinion of Counsel addressed to the Trustee and the Rating Agencies with respect to the transfer of the Subsequent Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Trustee on the Closing Date regarding the true sale of the Subsequent Mortgage Loans.

(c)    Each Subsequent Mortgage Loan that has been identified and is expected to be sold to the trust on the related Subsequent Transfer Date will have the characteristics set forth below as of the Cut-off Date. In addition, the obligation of the Trust Fund to purchase any Subsequent Mortgage Loan that has not been identified on the Cut-off Date, but is sold to the Trust during the Pre-Funding Period, is subject to the satisfaction of the conditions set forth in the immediately preceding paragraph and the accuracy of the following representations and warranties with respect to each such Subsequent Mortgage Loan determined as of the applicable Subsequent Transfer Date: (i) such Subsequent Mortgage Loan may not be sixty (60) or more days delinquent as of the last day of the month preceding the related Cut-off Date; (ii) the servicer of each Subsequent Mortgage Loan will be Ocwen or GMAC; (iii) such Subsequent Mortgage Loan will be secured by a first lien; (iv) the original term to stated maturity of such Subsequent Mortgage Loan will not be less than and will not exceed 360 months; (v) the latest maturity date of any Subsequent Mortgage Loan will be no later than January 1, 2037; (vi) no Subsequent Mortgage Loan will have a first payment date occurring after February 1, 2007; (vii) such Subsequent Mortgage Loan will have a credit score of not less than approximately 546;

(viii) such Subsequent Mortgage Loan will not have a combined loan-to-value ratio greater than 100%; (ix) such Subsequent Mortgage Loan will not have a principal balance greater than approximately $693,900; (x) if such Subsequent Mortgage Loan is an Adjustable Rate Mortgage Loan, it will have a Gross Margin not less than approximately 5.375% per annum; and (x) such Subsequent Mortgage Loan will have a Maximum Mortgage Rate not less than approximately 12.250%.

(d)    As of each related Cut-off Date, the aggregate of the Subsequent Mortgage Loans identified and expected to be sold to the trust on the related Subsequent Transfer Date, including the Subsequent Mortgage Loans that have not been identified on the Cut-off Date and are sold to the Trust during the Pre-Funding Period, will satisfy the following criteria: (i) have a weighted average Gross Margin of approximately 6.000% per annum; (ii) have a weighted average credit score greater than approximately 630; (iii) have no less than approximately 80.00% of the Mortgaged Properties be owner occupied; (iv) have no less than approximately 50.00% of the Mortgaged Properties be single family detached or planned unit developments; (v) have no more than approximately 50.00% of the Subsequent Mortgage Loans be cash out refinance; (vi) have a weighted average remaining term to stated maturity of not less than approximately 348 months; (vii) have a weighted average combined loan-to-value ratio of not more than approximately 88.00%; (viii) no more than approximately 10.00% of the Subsequent Mortgage Loans by aggregate principal balance will be balloon loans; (ix) no more than approximately 75.00% of the Subsequent Mortgage Loans by aggregate principal balance will be concentrated in one state; (x) have a weighted average Maximum Mortgage Rate not less than approximately 11.000%; and (xi) be acceptable to the Rating Agencies.

Notwithstanding the foregoing, any Subsequent Mortgage Loan may be rejected by any Rating Agency if the inclusion of any such Subsequent Mortgage Loan would adversely affect the ratings of any Class of Certificates. At least one (1) Business Day prior to the Subsequent Transfer Date, each Rating Agency shall notify the Trustee as to which Subsequent Mortgage Loans, if any, shall not be included in the transfer on the Subsequent Transfer Date; provided, however, that the Sponsor shall have delivered to each Rating Agency at least three (3) Business Days prior to such Subsequent Transfer Date a computer file acceptable to each Rating Agency describing the characteristics specified in paragraphs (c) and (d) above.

SECTION 2.10.    Establishment of the Trust.

The Depositor does hereby establish, pursuant to the further provisions of this Agreement and the laws of the State of New York, an express trust to be known, for convenience, as "ACE Securities Corp., Home Equity Loan Trust, Series 2007-HE4" and does hereby appoint HSBC Bank USA, National Association as Trustee in accordance with the provisions of this Agreement.

SECTION 2.11.    Purpose and Powers of the Trust.

The purpose of the common law trust, as created hereunder, is to engage in the following activities:

(a)     acquire and hold the Mortgage Loans and the other assets of the Trust Fund and the proceeds therefrom;

(b)     to issue the Certificates sold to the Depositor in exchange for the Mortgage Loans;

(c)     to make payments on the Certificates;

(d)     to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(e)     subject to compliance with this Agreement, to engage in such other activities as may be required in connection with conservation of the Trust Fund and the making of distributions to the Certificateholders.

The trust is hereby authorized to engage in the foregoing activities. The Trustee shall not cause the trust to engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement (or those ancillary thereto) while any Certificate is outstanding, and this Section 2.11 may not be amended, without the consent of the Certificateholders evidencing 51% or more of the aggregate voting rights of the Certificates.

SECTION 2.12.     Representations and Warranties of the Trustee.

The Trustee hereby represents and warrants to the Sponsor and the Depositor, for the benefit of each of the Certificateholders, that as of the Closing Date:

(a)     There are no affiliations relating to the Trustee of a type that are described under Item 1119(a) of Regulation AB; and

(b)     There are no legal proceedings pending or contemplated, including legal proceedings pending or contemplated by governmental authorities, against the Trustee that could be material to the Certificateholders.

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

## ARTICLE III

## ADMINISTRATION AND SERVICING
## OF THE MORTGAGE LOANS; ACCOUNTS

SECTION 3.01.        The Servicers to Act as Servicer.

The obligations of each of Ocwen and GMAC hereunder to service and administer the Mortgage Loans shall be limited to the Ocwen Mortgage Loans and the GMAC Mortgage Loans, respectively, and with respect to the duties and obligations of each Servicer references herein to the related Mortgage Loans shall be limited to the Ocwen Mortgage Loans (and the related proceeds thereof and related REO Properties) in the case of Ocwen, and the GMAC Mortgage Loans (and the related proceeds thereof and related REO Properties) in the case of GMAC, and in no event shall either Ocwen or GMAC have any responsibility or liability with respect to any Mortgage Loans serviced by the other Servicer hereunder. In addition, from and after the Closing Date, the Countrywide Mortgage Loans will be serviced and administered by Countrywide pursuant to the Servicing Agreement, and neither Ocwen nor GMAC will have any responsibility to service or administer the Countrywide Mortgage Loans or have any other obligation with respect to the Countrywide Mortgage Loans (including reporting or remitting funds to the Master Servicer). Except as otherwise expressly stated herein, references in this Article III to "Servicer" shall refer to Ocwen or GMAC, as the case may be, and any successor thereto as a Servicer.

From and after the Closing Date, Ocwen and GMAC shall service and administer the related Mortgage Loans on behalf of the Trust Fund and in the best interests of and for the benefit of the Certificateholders (as determined by the related Servicer in its reasonable judgment) in accordance with the terms of this Agreement and the respective Mortgage Loans and all applicable law and regulations and, to the extent consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of prudent mortgage lenders and loan servicers administering similar mortgage loans but without regard to:

(i)        any relationship that the related Servicer or any Affiliate of the related Servicer may have with the related Mortgagor;

(ii)        the ownership of any Certificate by the related Servicer or any Affiliate of the Servicer;

(iii)        the related Servicer's obligation to make P&I Advances or Servicing Advances; or

(iv)        the related Servicer's right to receive compensation for its services hereunder.

To the extent consistent with the foregoing, the Servicers shall also seek to maximize the timely and complete recovery of principal and interest on the related Mortgage Notes and shall waive (or permit a Sub-Servicer to waive) a Prepayment Charge only under the following circumstances: (i) such waiver is standard and customary in servicing similar

111

Mortgage Loans and such waiver is related to a default or reasonably foreseeable default and would, in the reasonable judgment of the related Servicer, maximize recovery of total proceeds taking into account the value of such Prepayment Charge and the related Mortgage Loan and, if such waiver is made in connection with a refinancing of the related Mortgage Loan, such refinancing is related to a default or a reasonably foreseeable default, (ii) such Prepayment Charge is unenforceable in accordance with applicable law or the collection of such related Prepayment Charge would otherwise violate applicable law or (iii) the collection of such Prepayment Charge would be considered "predatory" pursuant to written guidance published or issued by any applicable federal, state or local regulatory authority acting in its official capacity and having jurisdiction over such matters.   In addition, the Servicers shall not impose a Prepayment Charge in any instance when the related Mortgage Loan is accelerated or where the Mortgagor has made a Principal Prepayment in full in connection with the workout of a delinquent Mortgage Loan or due to a default by the Mortgagor.  Notwithstanding any provision in this Agreement to the contrary, in the event the Prepayment Charge payable under the terms of the Mortgage Note is less than the amount of the Prepayment Charge set forth in the Prepayment Charge Schedule or other information provided to the related Servicer, neither the related Servicer nor the Master Servicer shall have any liability or obligation with respect to such difference (including any obligation to recalculate any Prepayment Charges), and in addition shall not have any liability or obligation to pay the amount of any uncollected Prepayment Charge if the failure to collect such amount is the direct result of inaccurate or incomplete information on the Prepayment Charge Schedule.

In the event any Servicer waives a Prepayment Charge in connection with clauses (ii) or (iii) of the preceding paragraph, the related Servicer shall provide a written explanation of such Servicer's determination to the Master Servicer, and the Master Servicer shall provide a copy of such writing to the Sponsor and the Depositor.

Subject only to the above-described servicing standards (the "Accepted Servicing Practices") and the terms of this Agreement and of the related Mortgage Loans, each Servicer shall have full power and authority, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable with the goal of maximizing proceeds of the related Mortgage Loan.  Without limiting the generality of the foregoing, each Servicer in its own name is hereby authorized and empowered by the Trustee when the related Servicer believes it appropriate in its best judgment, to execute and deliver, on behalf of the Trust Fund, the Certificateholders and the Trustee or any of them, and upon written notice to the Trustee, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge or subordination, and all other comparable instruments, with respect to the related Mortgage Loans and the related Mortgaged Properties and to institute foreclosure proceedings or obtain a deed-in-lieu of foreclosure so as to convert the ownership of such properties, and to hold or cause to be held title to such properties, on behalf of the Trustee, for the benefit of the Trust Fund and the Certificateholders. The Servicers shall service and administer the related Mortgage Loans in accordance with applicable state and federal law and shall provide to the Mortgagors any reports required to be provided to them thereby. The Servicers shall also comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any standard hazard insurance policy. Subject to Section 3.14, the Trustee shall execute, at the written request of any Servicer, and furnish to the related Servicer a power of attorney in the form of Exhibit D hereto and other documents necessary or

112

appropriate to enable the related Servicer to carry out its servicing and administrative duties hereunder and furnished to the Trustee by the related Servicer, and the Trustee shall not be liable for the actions of the related Servicer under such powers of attorney and shall be indemnified by such Servicer for any cost, liability or expense incurred by the Trustee in connection with the related Servicer's use or misuse of any such power of attorney.

Each Servicer is hereby authorized and empowered in its own name or in the name of the Sub-Servicer engaged by such Servicer, when the related Servicer or the Sub-Servicer, as the case may be, believes it is appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns. Any reasonable expenses incurred in connection with the actions described in the preceding sentence or as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS® System, shall be reimbursable by the Trust Fund to the related Servicer.

In accordance with Accepted Servicing Practices, each Servicer shall make or cause to be made Servicing Advances as necessary for the purpose of effecting the payment of taxes and assessments on the related Mortgaged Properties, which Servicing Advances shall be reimbursable in the first instance from related collections from the related Mortgagors pursuant to Section 3.07, and further as provided in Section 3.09; provided, however, the Servicers shall only make such Servicing Advance if the related Mortgagor has not made such payment and if the failure to make such Servicing Advance would result in the loss of the related Mortgaged Property due to a tax sale or foreclosure as result of a tax lien; provided, however, that the Servicers shall be required to make such Servicing Advances only to the extent that such Servicing Advances, in the good faith judgment of the related Servicer, will be recoverable by such Servicer out of Insurance Proceeds, Liquidation Proceeds, or otherwise out of the proceeds of the related Mortgage Loan. Any cost incurred by the Servicers in effecting the payment of taxes and assessments on a Mortgaged Property shall not, for the purpose of calculating the Stated Principal Balance of such Mortgage Loan or distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit. The parties to this Agreement acknowledge that Servicing Advances shall be reimbursable pursuant to Section 3.09 of this Agreement, and agree that no Servicing Advance shall be rejected or disallowed by any party unless it has been shown that such Servicing Advance was not made in accordance with the terms of this Agreement. Notwithstanding the foregoing, the parties understand and agree that, with respect to any Mortgage Loan or Subsequent Mortgage Loan (1) the Master Servicer shall not approve the reimbursement of any Servicing Advance made with respect to such Mortgage Loan or Subsequent Mortgage Loan prior to the Cut-off Date (each, a "Pre-Cut-off Date Advance") unless and until it has received a Servicing Advance Schedule listing the amount of Pre-Cut-off Date Advances made in respect of such Mortgage Loan or Subsequent Mortgage Loan from (a) the related Servicer with respect to any Mortgage Loans or Subsequent Mortgage Loans that were transferred to such Servicer prior to the Cut-off Date and/or (b) the Depositor with respect to any Mortgage Loans that were transferred to the Servicers after the Cut-off Date, as applicable, (2) the aggregate Pre-Cut-off Date Advances reimbursable hereunder with respect to

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

such Mortgage Loan shall not exceed the amount of Pre-Cut-off Date Advances for such Mortgage Loan shown on the Servicing Advance Schedule delivered to the Master Servicer, (3) the Depositor shall be deemed to have agreed with and approved the Pre-Cut-off Date Advances shown on any Servicing Advance Schedule furnished to the Master Servicer, and (4) the Master Servicer will have no liability to the Depositor, the Servicer or any other Person, including any Certificateholder, for approving reimbursement of related Pre-Cut-off Date Advances so long as the aggregate amount of such advances reimbursed hereunder does not exceed of the amount of Pre-Cut-off Date Advances for such Mortgage Loan shown on the Servicing Advance Schedule.

Notwithstanding anything in this Agreement to the contrary, the Servicers may not make any future advances with respect to a Mortgage Loan and the Servicers shall not permit any modification with respect to any related Mortgage Loan that would change the Mortgage Rate, reduce or increase the principal balance (except for reductions resulting from actual payments of principal) or change the final maturity date on such related Mortgage Loan (unless, as provided in Section 3.06, the related Mortgagor is in default with respect to the related Mortgage Loan or such default is, in the judgment of the Servicer, reasonably foreseeable) or any modification, waiver or amendment of any term of any related Mortgage Loan that would both (A) effect an exchange or reissuance of such Mortgage Loan under Section 1001 of the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) and (B) cause any Trust REMIC created hereunder to fail to qualify as a REMIC under the Code or the imposition of any tax on "prohibited transactions" or "contributions after the startup date" under the REMIC Provisions.

In the event that the Mortgage Loan Documents relating to a Mortgage Loan contain provisions requiring the related Mortgagor to arbitrate disputes (at the option of the Trustee, on behalf of the Trust), the Trustee hereby authorizes the related Servicer to waive the Trustee's right or option to arbitrate disputes and to send written notice of such waiver to the Mortgagor, although the Mortgagor may still require arbitration at its option.

From and after the Closing Date, each Servicer will fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g., favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company or their successors on a monthly basis.

SECTION 3.02.    Sub-Servicing Agreements Between a Servicer and Sub-Servicers.

(a)    Each Servicer may arrange for the subservicing of any Mortgage Loan by a Sub-Servicer pursuant to a Sub-Servicing Agreement; provided that such sub-servicing arrangement and the terms of the related Sub-Servicing Agreement must provide for the servicing of such Mortgage Loans in a manner consistent with the servicing arrangements contemplated hereunder and the related Servicer shall cause any Sub-Servicer to comply with the provisions of this Agreement as required by Regulation AB (including, without limitation, to provide the information required to be delivered under Sections 3.17, 3.18 and 3.20 hereof), to the same extent as if such Sub-Servicer were the related Servicer. Each Servicer shall be responsible for obtaining from each Sub-Servicer engaged by such Servicer and delivering to the Master Servicer any annual statement of compliance, assessment of compliance, attestation

114

report and Sarbanes Oxley related certification as and when required to be delivered. Each Sub-Servicer shall be (i) authorized to transact business in the state or states where the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Sub-Servicer to perform its obligations hereunder and under the Sub-Servicing Agreement and (ii) a Freddie Mac or Fannie Mae approved mortgage servicer. Notwithstanding the provisions of any Sub-Servicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between any Servicer or a Sub-Servicer or reference to actions taken through the related Servicer or otherwise, the related Servicer shall remain obligated and liable to the Depositor, the Trustee and the Certificateholders for the servicing and administration of the related Mortgage Loans in accordance with the provisions of this Agreement without diminution of such obligation or liability by virtue of such Sub-Servicing Agreements or arrangements or by virtue of indemnification from the Sub-Servicer and to the same extent and under the same terms and conditions as if the related Servicer alone were servicing and administering the related Mortgage Loans. Every Sub-Servicing Agreement entered into by a Servicer shall contain a provision giving the successor servicer the option to terminate such agreement in the event a successor servicer is appointed. All actions of each Sub-Servicer performed pursuant to the related Sub-Servicing Agreement shall be performed as an agent of the related Servicer with the same force and effect as if performed directly by the related Servicer.

(b)    Notwithstanding the foregoing, the Servicers shall be entitled to outsource one or more separate servicing functions to a Subcontractor that does not meet the eligibility requirements for a Sub-Servicer, so long as such outsourcing does not constitute the delegation of the related Servicer's obligation to perform all or substantially all of the servicing of the related Mortgage Loans to such Subcontractor. The related Servicer shall promptly, upon request, provide to the Master Servicer, the Trustee and the Depositor a written description (in form and substance reasonably satisfactory to the Master Servicer, the Trustee and the Depositor) of the role and function of each Subcontractor utilized by such Servicer, specifying (i) the identity of each such Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (ii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (i) of this subsection; provided, however, that the related Servicer shall not be required to provide the information in clauses (i) or (ii) of this subsection until such time that the applicable assessment of compliance is due pursuant to Section 3.18 of this Agreement. The use by a Servicer of any such Subcontractor shall not release the related Servicer from any of its obligations hereunder and such Servicer shall remain responsible hereunder for all acts and omissions of such Subcontractor as fully as if such acts and omissions were those of the related Servicer, and the related Servicer shall pay all fees and expenses of the Subcontractor from such Servicer's own funds.

(c)    As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Servicers shall cause any such Subcontractor used by such Servicer for the benefit of the Master Servicer, the Trustee and the Depositor to comply with the provisions of Sections 3.18 and 3.20 of this Agreement to the same extent as if such Subcontractor were the related Servicer. The Servicers shall be responsible for obtaining from each such Subcontractor and delivering to the Master Servicer, and any Depositor any assessment of compliance, attestation report and

115

Sarbanes-Oxley related certification required to be delivered by such Subcontractor under Sections 3.18 and 3.20, in each case as and when required to be delivered.

(d)    For purposes of this Agreement, the related Servicer shall be deemed to have received any collections, recoveries or payments with respect to the related Mortgage Loans that are received by a Sub-Servicer regardless of whether such payments are remitted by the Sub-Servicer to such Servicer.

SECTION 3.03.    Successor Sub-Servicers.

Any Sub-Servicing Agreement shall provide that the related Servicer shall be entitled to terminate any Sub-Servicing Agreement and to either itself directly service the related Mortgage Loans or enter into a Sub-Servicing Agreement with a successor Sub-Servicer which qualifies under Section 3.02. Any Sub-Servicing Agreement shall include the provision that such agreement may be immediately terminated as soon as is reasonably possible by any successor to the related Servicer without fee or, in the event a termination fee exists, such fee shall be payable by the Servicer from its own funds without reimbursement therefor, in accordance with the terms of this Agreement, in the event that the related Servicer (or any successor to such Servicer) shall, for any reason, no longer be the Servicer of the related Mortgage Loans (including termination due to a Servicer Event of Default). Each Servicer shall be entitled to enter into an agreement with its Sub-Servicer and Subcontractor for indemnification of the related Servicer or Subcontractor, as applicable, by such Sub-Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

SECTION 3.04.    No Contractual Relationship Between Sub-Servicer, Subcontractor, Trustee, the NIMS Insurer or the Certificateholders.

Any Sub-Servicing Agreement and any other transactions or services relating to the Mortgage Loans involving a Sub-Servicer or the Subcontractor, as applicable, shall be deemed to be between the Sub-Servicer or Subcontractor, as applicable, and the related Servicer alone and the Master Servicer, Trustee, the NIMS Insurer and the Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to any Sub-Servicer or the Subcontractor except as set forth in Section 3.05.

SECTION 3.05.    Assumption or Termination of Sub-Servicing Agreement by Successor Servicer.

In connection with the assumption of the responsibilities, duties and liabilities and of the authority, power and rights of the Servicer hereunder by a successor servicer pursuant to Section 8.02, it is understood and agreed that the Servicer's rights and obligations under any Sub-Servicing Agreement then in force between the Servicer and a Sub-Servicer shall be assumed simultaneously by such successor servicer without act or deed on the part of such successor servicer; provided, however, that any successor servicer may terminate the Sub-Servicer.

The Servicer shall, upon the reasonable request of the Master Servicer, but at its own expense, deliver to the assuming party documents and records relating to each Sub-Servicing Agreement and an accounting of amounts collected and held by it and otherwise use its

116

best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreements to the assuming party.

The Servicing Fee payable to any such successor servicer shall be payable from payments received on the Mortgage Loans in the amount and in the manner set forth in this Agreement.

SECTION 3.06.    Collection of Certain Mortgage Loan Payments.

Each Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the related Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement and Accepted Servicing Practices, follow such collection procedures as it would follow with respect to mortgage loans comparable to the Mortgage Loans and held for its own account. Consistent with the foregoing, a Servicer may in its discretion (i) waive any late payment charge or, if applicable, penalty interest or (ii) extend the due dates for the Monthly Payments due on a Mortgage Note related to a Mortgage Loan for a period of not greater than 180 days; provided that any extension pursuant to this clause shall not affect the amortization schedule of any Mortgage Loan for purposes of any computation hereunder. Notwithstanding the foregoing, in the event that any Mortgage Loan is in default or, in the judgment of the related Servicer, such default is reasonably foreseeable, the related Servicer, consistent with Accepted Servicing Practices may waive, modify or vary certain terms of such Mortgage Loan, subject to the limitations set forth herein, accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor if in such Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders (taking into account any estimated Realized Loss that might result absent such action); provided, however, no servicing modifications may result in any of the following: any amounts added to the principal balance of the Mortgage Loan, or capitalized amounts added to the Mortgage Loan, will be required to be fully amortized over the remaining term, or the extended term, of the Mortgage Loan; all capitalizations are to be implemented in accordance with the related Servicer's standards and may be implemented only by such Servicer for that purpose; the final maturity of any Mortgage Loan will not be extended beyond the Assumed Final Distribution Date; and no servicing modification with respect to a Mortgage Loan will have the effect of reducing the Mortgage Rate below one half of the Mortgage Rate as in effect on the Cut off Date, but not less than the Servicing Fee Rate. Further, the aggregate principal balance of all Mortgage Loans subject to modifications can be no more than five percent (5%) of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, but this limit may increase from time to time with the consent of S&P. The Servicers shall not be required to institute or join in litigation with respect to collection of any payment (whether under a Mortgage, Mortgage Note or otherwise or against any public or governmental authority with respect to a taking or condemnation) if it reasonably believes that enforcing the provision of the Mortgage or other instrument pursuant to which such payment is required is prohibited by applicable law.

117

SECTION 3.07.    Collection of Taxes, Assessments and Similar Items; Servicing Accounts.

To the extent the terms of the Mortgage provide for Escrow payments each Servicer shall establish and maintain one or more accounts (the "Servicing Accounts"), into which all collections from the Mortgagors (or related advances from Sub-Servicers) for the payment of taxes, assessments, fire, flood, and hazard insurance premiums, and comparable items for the account of the Mortgagors ("Escrow Payments") shall be deposited and retained. Servicing Accounts shall be Eligible Accounts. Each Servicer shall deposit in the clearing account in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the related Servicer's receipt thereof, all Escrow Payments collected on account of the related Mortgage Loans and shall thereafter deposit such Escrow Payments in the Servicing Accounts, in no event later than the second Business Day after the deposit of good funds into the clearing account, and retain therein, all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting the timely payment of any such items as required under the terms of this Agreement. Withdrawals of amounts from a Servicing Account may be made by a Servicer only to (i) effect timely payment of taxes, assessments, fire, flood, and hazard insurance premiums, and comparable items; (ii) reimburse itself out of related collections for any Servicing Advances made pursuant to Section 3.01 (with respect to taxes and assessments) and Section 3.11 (with respect to fire, flood and hazard insurance); (iii) refund to Mortgagors any sums as may be determined to be overages; (iv) for application to restore or repair the related Mortgaged Property in accordance with Section 3.11; (v) pay interest, if required and as described below, to Mortgagors on balances in the Servicing Account; or, only to the extent not required to be paid to the related Mortgagors, to pay itself interest on balances in the Servicing Account; or (vi) clear and terminate the Servicing Account at the termination of the related Servicer's obligations and responsibilities in respect of the related Mortgage Loans under this Agreement in accordance with Article X. As part of its servicing duties, each Servicer shall pay to the Mortgagors interest on funds in Servicing Accounts, to the extent required by law and, to the extent that interest earned on funds in the Servicing Accounts is insufficient, to pay such interest from its own funds, without any reimbursement therefor. Notwithstanding the foregoing, the Servicers shall not be obligated to collect Escrow Payments if the related Mortgage Loan does not require such payments but the Servicer shall nevertheless be obligated to make Servicing Advances as provided in Section 3.01 and Section 3.11. In the event a Servicer shall deposit in the Servicing Accounts any amount not required to be deposited therein, it may at any time withdraw such amount from the Servicing Accounts, any provision to the contrary notwithstanding.

To the extent that a Mortgage does not provide for Escrow Payments, the Servicers (i) shall determine whether any such payments are made by the Mortgagor in a manner and at a time that is necessary to avoid the loss of the Mortgaged Property due to a tax sale or the foreclosure as a result of a tax lien and (ii) shall ensure that all insurance required to be maintained on the Mortgaged Property pursuant to this Agreement is maintained. If any such payment has not been made and the related Servicer receives notice of a tax lien with respect to the Mortgage Loan being imposed, such Servicer shall, promptly and to the extent required to avoid loss of the Mortgaged Property, advance or cause to be advanced funds necessary to discharge such lien on the Mortgaged Property unless the related Servicer determines the

118

advance to be nonrecoverable. Each Servicer assumes full responsibility for the payment of all such bills and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make Servicing Advances to effect such payments subject to its determination of recoverability.

SECTION 3.08.    Collection Accounts and Distribution Account.

(a)    On behalf of the Trust Fund, each Servicer shall establish and maintain one or more "Collection Accounts", held in trust for the benefit of the Trustee and the Certificateholders. On behalf of the Trust Fund, the Servicers shall deposit or cause to be deposited in the clearing account in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the related Servicer's receipt thereof, and shall thereafter deposit in the related Collection Account, in no event later than two Business Days after the deposit of good funds into the clearing account, as and when received or as otherwise required hereunder, the following payments and collections received or made by it on or subsequent to the Cut-off Date other than amounts attributable to a Due Date on or prior to the Cut-off Date:

(i)    all payments on account of principal, including Principal Prepayments, on the related Mortgage Loans;

(ii)    all payments on account of interest (net of the related Servicing Fee and any Prepayment Interest Excess) on each related Mortgage Loan;

(iii)    all Insurance Proceeds and Liquidation Proceeds (other than proceeds collected in respect of any particular REO Property) and all Subsequent Recoveries with respect to the related Mortgage Loans;

(iv)    any amounts required to be deposited by the related Servicer pursuant to Section 3.10 in connection with any losses realized on Permitted Investments with respect to funds held in the related Collection Account;

(v)    any amounts required to be deposited by the related Servicer pursuant to the second paragraph of Section 3.11(a) in respect of any blanket policy deductibles;

(vi)    any Purchase Price or Substitution Shortfall Amount delivered to the related Servicer and all proceeds (net of amounts payable or reimbursable to the related Servicer, the Master Servicer, the Trustee, the Custodians or the Securities Administrator) of Mortgage Loans purchased in accordance with Section 2.03, Section 3.13 or Section 10.01; and

(vii)    any Prepayment Charges collected by the related Servicer in connection with the Principal Prepayment of any of the related Mortgage Loans or amounts required to be deposited by the Servicer in connection with a breach of its obligations under Section 2.05.

119

The foregoing requirements for deposit in the related Collection Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, Ancillary Income, Prepayment Interest Excess and payments in the nature of late payment charges, assumption fees or other similar fees need not be deposited by the related Servicer in the related Collection Account and may be retained by such Servicer as additional servicing compensation.  In the event a Servicer shall deposit in the related Collection Account any amount not required to be deposited therein, it may at any time withdraw such amount from the related Collection Account, any provision herein to the contrary notwithstanding.

(b)    On behalf of the Trust Fund, the Securities Administrator shall establish and maintain one or more accounts (such account or accounts, the "Distribution Account"), held in trust for the benefit of the Trustee, the Trust Fund and the Certificateholders. On behalf of the Trust Fund, Countrywide shall deliver funds to the Securities Administrator for deposit in the Distribution Account as specified in the Servicing Agreement and Ocwen and GMAC shall deliver to the Securities Administrator in immediately available funds for deposit in the Distribution Account on or before 12:00 noon New York time on the Servicer Remittance Date, that portion of the Available Distribution Amount (calculated without regard to the references in clause (2) of the definition thereof to amounts that may be withdrawn from the Distribution Account) for the related Distribution Date then on deposit in the related Collection Account and the amount of all Prepayment Charges collected by the related Servicer in connection with the Principal Prepayment of any of the related Mortgage Loans then on deposit in the related Collection Account and the amount of any funds reimbursable to an Advance Financing Person pursuant to Section 3.26. If the balance on deposit in a Collection Account exceeds $100,000 as of the commencement of business on any Business Day and the Collection Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of "Eligible Account," the related Servicer shall, on or before 5:00 p.m. New York time on such Business Day, withdraw from the related Collection Account any and all amounts payable or reimbursable to the Depositor, the related Servicer, the Trustee, the Master Servicer, the Securities Administrator or the Sponsor pursuant to Section 3.09 and shall pay such amounts to the Persons entitled thereto or shall establish a separate Collection Account (which shall also be an Eligible Account) and withdraw from the existing Collection Account the amount on deposit therein in excess of $100,000 and deposit such excess in the newly created Collection Account.

With respect to any remittance received by the Securities Administrator after the Servicer Remittance Date on which such payment was due, the Securities Administrator shall send written notice thereof to the related Servicer. The related Servicer shall pay to the Securities Administrator interest on any such late payment by the related Servicer at an annual rate equal to Prime Rate (as defined in *The Wall Street Journal*) plus one percentage point, but in no event greater than the maximum amount permitted by applicable law.  Such interest shall be paid by the related Servicer to the Securities Administrator on the date such late payment is made and shall cover the period commencing with the day following such Servicer Remittance Date and ending with the Business Day on which such payment is made, both inclusive.  The payment by a Servicer of any such interest, or the failure of the Securities Administrator to notify the related Servicer of such interest, shall not be deemed an extension of time for payment or a waiver of any Event of Default by the related Servicer.

120

(c)    Funds in the Collection Accounts and funds in the Distribution Account may be invested in Permitted Investments in accordance with the provisions set forth in Section 3.10.  Each Servicer shall give notice to the Trustee, the Securities Administrator and the Master Servicer of the location of the related Collection Account when established and prior to any change thereof.  The Securities Administrator shall give notice to the Servicers and the Depositor of the location of the Distribution Account when established and prior to any change thereof.

(d)    Funds held in the Collection Accounts at any time may be delivered by the related Servicer in immediately available funds to the Securities Administrator for deposit in the Distribution Account.  In the event any Servicer shall deliver to the Securities Administrator for deposit in the Distribution Account any amount not required to be deposited therein, it may at any time request that the Securities Administrator withdraw such amount from the Distribution Account and remit to it any such amount, any provision herein to the contrary notwithstanding.  In no event shall the Securities Administrator incur liability as a result of withdrawals from the Distribution Account at the direction of a Servicer in accordance with the immediately preceding sentence.  In addition, each Servicer shall deliver to the Securities Administrator no later than the Servicer Remittance Date the amounts set forth in clauses (i) through (iv) below:

(i)    any P&I Advances, as required pursuant to Section 5.03;

(ii)    any amounts required to be deposited pursuant to Section 3.22(d) or 3.21(f) in connection with any related REO Property;

(iii)    any amounts to be paid in connection with a purchase of Mortgage Loans and REO Properties pursuant to Section 10.01; and

(iv)    any amounts required to be deposited pursuant to Section 3.23 in connection with any Prepayment Interest Shortfalls.

SECTION 3.09.    Withdrawals from the Collection Accounts and Distribution Account.

(a)    Each Servicer shall, from time to time, make withdrawals from the related Collection Account for any of the following purposes or as described in Section 5.03:

(i)    to remit to the Securities Administrator for deposit in the Distribution Account the amounts required to be so remitted pursuant to Section 3.08(b) or permitted to be so remitted pursuant to the first sentence of Section 3.08(d);

(ii)    subject to Section 3.13(d), to reimburse itself (including any successor Servicer) for P&I Advances made by it, but only to the extent of amounts received which represent Late Collections (net of the related Servicing Fees) of Monthly Payments or rental and other income from the related REO Property on related Mortgage Loans with respect to which such P&I Advances were made in accordance with the provisions of Section 5.03;

(iii)    subject to Section 3.13(d), to pay itself any unpaid Servicing Fees and reimburse itself any unreimbursed Servicing Advances with respect to each related

121

Mortgage Loan, but only to the extent of any Liquidation Proceeds and Insurance Proceeds received with respect to such related Mortgage Loan or rental or other income from the related REO Property;

(iv)    to pay to itself as servicing compensation (in addition to the Servicing Fee or any portion thereof payable to the related Servicer) on the Servicer Remittance Date any interest or investment income earned on funds deposited in the related Collection Account;

(v)    to pay to itself or the Sponsor, as the case may be, with respect to each Mortgage Loan serviced by such Servicer that has previously been purchased or replaced pursuant to Section 2.03 or Section 3.13(c) all amounts received thereon not included in the Purchase Price or the Substitution Shortfall Amount;

(vi)    to reimburse itself (including any successor to such Servicer) for

(A)    any P&I Advance or Servicing Advance previously made by it which the Servicer has determined to be a Nonrecoverable P&I Advance or a Nonrecoverable Servicing Advance in accordance with the provisions of Section 5.03;

(B)    any unpaid Servicing Fees payable to the related Servicer to the extent not recoverable from Liquidation Proceeds, Insurance Proceeds or other amounts received with respect to the related Mortgage Loan under Section 3.08(a)(iii); or

(C)    any P&I Advance or Servicing Advance made with respect to a delinquent Mortgage Loan which Mortgage Loan has been modified by the related Servicer in accordance with the terms of this Agreement; provided that the related Servicer shall only reimburse itself for such P&I Advances and Servicing Advances at the time of such modification, or as otherwise provided in this Section 3.09;

(vii)    to reimburse itself or the Depositor for expenses incurred by or reimbursable to itself or the Depositor, as the case may be, pursuant to Section 3.01 or Section 7.03;

(viii)    to reimburse itself, the NIMS Insurer or the Trustee, as the case may be, for expenses reasonably incurred in respect of the breach or defect giving rise to the purchase obligation under Section 2.03 of this Agreement that were included in the Purchase Price of the related Mortgage Loan, including any expenses arising out of the enforcement of the purchase obligation;

(ix)    to pay, or to reimburse itself for advances in respect of, expenses incurred in connection with any related Mortgage Loan pursuant to Section 3.13(b);

(x)    to pay to itself any Prepayment Interest Excess on the related Mortgage Loans to the extent not retained pursuant to Section 3.08(a)(ii);

(xi)    with respect to Ocwen, to reimburse itself pursuant to Section 5.03(b) for any unreimbursed P&I Advances (made from its own funds) from Amounts Held for Future Distribution for such Distribution Date (provided that such amounts must be replaced by Ocwen by deposit in the related Collection Account no later than the close of business on the Servicer Remittance Date immediately following the Due Period or Prepayment Period for which such amounts relate); and

(xii)    to clear and terminate the Collection Account pursuant to Section 10.01.

Each Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the related Collection Account, to the extent held by or on behalf of it, pursuant to subclauses (ii), (iii), (v), (vi), (vii), (viii), (ix), (x) and, with respect to Ocwen, (xi) above.

(b)    The Securities Administrator shall, from time to time, make withdrawals from the Distribution Account, for any of the following purposes, without priority:

(i)    to make distributions to Certificateholders in accordance with Section 5.01;

(ii)    to pay to itself, the Custodians and the Master Servicer amounts to which it is entitled pursuant to Section 9.05 or any other provision of this Agreement and any Extraordinary Trust Fund Expenses;

(iii)    to reimburse itself or the Master Servicer pursuant to Section 8.02;

(iv)    to pay any Net Swap Payment or Swap Termination Payment payable to the Supplemental Interest Trust (unless the Swap Provider is the sole Defaulting Party or the sole Affected Party (as defined in the Swap Agreement)) owed to the Swap Provider;

(v)    to pay any amounts in respect of taxes pursuant to Section 11.01(g)(v);

(vi)    to pay the Master Servicing Fee to the Master Servicer;

(vii)    to pay the Credit Risk Management Fee to the Credit Risk Manager; and

(viii)    to clear and terminate the Distribution Account pursuant to Section 10.01.

SECTION 3.10.    Investment of Funds in the Investment Accounts.

(a)    Each Servicer may direct, by means of written directions (which may be standing directions), any Depository Institution maintaining the related Collection Account to invest the funds in such Collection Account (for purposes of this Section 3.10, an "Investment Account") in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Securities Administrator is the obligor thereon, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Securities Administrator is the obligor on such Permitted Investment. Amounts in the Distribution Account may be invested in Permitted Investments as directed in writing by the Master Servicer and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Securities Administrator is the obligor thereon, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Securities Administrator is the obligor thereon. All such Permitted Investments shall be held to maturity, unless payable on demand. Any investment of funds shall be made in the name of the Trustee (in its capacity as such) or in the name of a nominee of the Trustee. The Securities Administrator shall be entitled to sole possession over each such investment in the Distribution Account and, subject to subsection (b) below, the income thereon, and any certificate or other instrument evidencing any such investment shall be delivered directly to the Securities Administrator or its agent, together with any document of transfer necessary to transfer title to such investment to the Trustee or its nominee. In the event amounts on deposit in a Collection Account are at any time invested in a Permitted Investment payable on demand, the party with investment discretion over such Investment Account shall:

(x)    consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may otherwise mature hereunder in an amount equal to the lesser of (1) all amounts then payable thereunder and (2) the amount required to be withdrawn on such date; and

(y)    demand payment of all amounts due thereunder promptly upon receipt by such party of written notice from the Servicer that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in the Investment Account.

(b)    All income and gain realized from the investment of funds deposited in a Collection Account shall be for the benefit of the related Servicer and shall be subject to its withdrawal in accordance with Section 3.09. Each Servicer shall deposit into the related Collection Account the amount of any loss incurred in respect of any such Permitted Investment made with funds in such account immediately upon realization of such loss. All earnings and gain realized from the investment of funds deposited in the Distribution Account shall be for the benefit of the Master Servicer. The Master Servicer shall remit from its own funds for deposit

124

into the Distribution Account the amount of any loss incurred on Permitted Investments in the Distribution Account.

(c)    Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment, or if a default occurs in any other performance required under any Permitted Investment, the Trustee may and, subject to Section 9.01 and Section 9.02(a)(v), shall, at the written direction of the Servicer or the NIMS Insurer, take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings.

(d)    The Trustee, the Master Servicer or their respective Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's or the Master Servicer's economic self-interest for (i) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the Permitted Investments, (ii) using Affiliates to effect transactions in certain Permitted Investments and (iii) effecting transactions in certain Permitted Investments.    Such compensation shall not be considered an amount that is reimbursable or payable to the Trustee or the Master Servicer pursuant to Section 3.09 or 3.10 or otherwise payable in respect of Extraordinary Trust Fund Expenses.  Such additional compensation shall not be an expense of the Trust Fund.

SECTION 3.11.    Maintenance of Hazard Insurance, Errors and Omissions and Fidelity Coverage and Primary Mortgage Insurance.

(a)    The terms of each Mortgage Note require the related Mortgagor to maintain fire, flood and hazard insurance policies. To the extent such policies are not maintained by the related Mortgagor, the related Servicer shall cause to be maintained for each Mortgaged Property fire and hazard insurance with extended coverage as is customary in the area where the Mortgaged Property is located in an amount which is at least equal to the lesser of the current principal balance of the related Mortgage Loan and the amount necessary to compensate fully for any damage or loss to the improvements which are a part of such property on a replacement cost basis, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. Each Servicer shall also cause to be maintained fire and hazard insurance on each REO Property with extended coverage as is customary in the area where the Mortgaged Property is located in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements which are a part of such property and (ii) the outstanding principal balance of the related Mortgage Loan (including, with respect to each second lien Mortgage Loan, the outstanding principal balance of the related first lien) at the time it became an REO Property, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. The Servicers will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies. Any amounts to be collected by a Servicer under any such policies be applied to any related First Mortgage Loan and application of amounts to the restoration or repair of the property subject to the related Mortgage or amounts to be released to the Mortgagor in accordance with Accepted Servicing Practices, subject to the terms and conditions of the related

125

Mortgage and Mortgage Note) shall be deposited into the related Collection Account, subject to withdrawal pursuant to Section 3.09, if received in respect of a Mortgage Loan, or in the REO Account, subject to withdrawal pursuant to Section 3.22, if received in respect of an REO Property. Any cost incurred by a Servicer in maintaining any such insurance shall not, for the purpose of calculating distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. If the Mortgaged Property or REO Property is at any time in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, the related Servicer will cause to be maintained a flood insurance policy in respect thereof. Such flood insurance shall be in an amount equal to the lesser of (i) the unpaid principal balance of the related Mortgage Loan and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program), in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy.

In the event that any Servicer shall obtain and maintain a blanket policy with an insurer having a General Policy Rating of B:VI or better in Best's Key Rating Guide or otherwise acceptable to Fannie Mae or Freddie Mac insuring against hazard losses on all of the related Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations to cause fire and hazard insurance to be maintained on the Mortgaged Properties, it being understood and agreed that such policy may contain a deductible clause, in which case the related Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy complying with this Section 3.11, and there shall have been one or more losses which would have been covered by such policy, deposit into the related Collection Account from its own funds the amount not otherwise payable under the blanket policy because of such deductible clause. In connection with its activities as administrator and servicer of the related Mortgage Loans, each Servicer agrees to prepare and present, on behalf of itself, the Trustee, the Trust Fund, the Certificateholders, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy.

(b)       Each Servicer shall keep in force during the term of this Agreement a policy or policies of insurance covering errors and omissions for failure in the performance of its respective obligations under this Agreement, which policy or policies shall be in such form and amount that would meet the requirements of Fannie Mae or Freddie Mac if it were the purchaser of the related Mortgage Loans, unless the related Servicer, has obtained a waiver of such requirements from Fannie Mae or Freddie Mac. Each Servicer shall also maintain a fidelity bond in the form and amount that would meet the requirements of Fannie Mae or Freddie Mac, unless the related Servicer, has obtained a waiver of such requirements from Fannie Mae or Freddie Mac. A Servicer shall be deemed to have complied with this provision if an Affiliate of the Servicer has such errors and omissions and fidelity bond coverage and, by the terms of such insurance policy or fidelity bond, the coverage afforded thereunder extends to the Servicer. Any such errors and omissions policy and fidelity bond shall by its terms not be cancelable without thirty (30) days' prior written notice to the Trustee and the NIMS Insurer.

126

(c)      (c)      The related Servicer shall not take any action that would result in noncoverage under any applicable primary mortgage insurance policy of any loss which, but for the actions of such Servicer would have been covered thereunder. The related Servicer shall use its best efforts to keep in force and effect any applicable primary mortgage insurance policy and, to the extent that the related Mortgage Loan requires the Mortgagor to maintain such insurance, any other primary mortgage insurance applicable to any Mortgage Loan serviced by such Servicer. Except as required by applicable law or the related Mortgage Loan Documents, the related Servicer shall not cancel or refuse to renew any such primary mortgage insurance policy that is in effect at the date of the initial issuance of the related Mortgage Note and is required to be kept in force hereunder.

Each Servicer agrees to present on behalf of the Trustee and the Certificateholders claims to the applicable insurer under any primary mortgage insurance policies and, in this regard, to take such reasonable action as shall be necessary to permit recovery under any primary mortgage insurance policies respecting defaulted Mortgage Loans. Pursuant to Section 3.08 of this Agreement, any amounts collected by a Servicer under any primary mortgage insurance policies shall be deposited in the related Collection Account, subject to withdrawal pursuant to Section 3.09 of this Agreement. Notwithstanding any provision to the contrary, no Servicer shall have any responsibility with respect to a primary mortgage insurance policy unless such Servicer has been made aware of such policy, as reflected on the Mortgage Loan Schedule or otherwise and have been provided with adequate information to administer such policy.

(d)      The Servicers need not obtain the approval of the Master Servicer prior to releasing any Insurance Proceeds to the Mortgagor to be applied to the restoration or repair of the Mortgaged Property if such release is in accordance with Accepted Servicing Practices. At a minimum, the Servicers shall comply with the following conditions in connection with any such release of Insurance Proceeds in excess of $10,000:

(i)      the related Servicer shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

(ii)      the related Servicer shall take all steps necessary to preserve the priority of the lien of the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens; and

(iii)      pending repairs or restoration, the related Servicer shall place the Insurance Proceeds in the related Escrow Account, if any.

SECTION 3.12.      Enforcement   of   Due-on-Sale   Clauses;   Assumption Agreements

Each Servicer shall, to the extent it has knowledge of any conveyance of any related Mortgaged Property by any related Mortgagor (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause, if any, applicable thereto; provided, however,

127

that the Servicers shall not exercise any such rights if prohibited by law from doing so. If a Servicer reasonably believes that it is unable under applicable law to enforce such "due-on-sale" clause, or if any of the other conditions set forth in the proviso to the preceding sentence apply, the related Servicer shall enter into an assumption and modification agreement from or with the person to whom such property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon. Each Servicer is also authorized to enter into a substitution of liability agreement with such person, pursuant to which the original Mortgagor is released from liability and such person is substituted as the Mortgagor and becomes liable under the Mortgage Note, provided that no such substitution shall be effective unless such person satisfies the then current underwriting criteria of the related Servicer for mortgage loans similar to the related Mortgage Loans. In connection with any assumption or substitution, the related Servicer shall apply such underwriting standards and follow such practices and procedures as shall be normal and usual in its general mortgage servicing activities and as it applies to other mortgage loans owned solely by it. The Servicers shall not take or enter into any assumption and modification agreement, however, unless (to the extent practicable in the circumstances) it shall have received confirmation, in writing, of the continued effectiveness of any applicable hazard insurance policy. Any fee collected by a Servicer in respect of an assumption or substitution of liability agreement will be retained by the related Servicer as additional servicing compensation. In connection with any such assumption, no material term of the Mortgage Note (including but not limited to the related Mortgage Rate and the amount of the Monthly Payment) may be amended or modified, except as otherwise required pursuant to the terms thereof. The related Servicer shall notify the Trustee (or the applicable Custodian) that any such substitution or assumption agreement has been completed by forwarding to the Trustee (or the applicable Custodian) the executed original of such substitution or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof.

Notwithstanding the foregoing paragraph or any other provision of this Agreement, the related Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or by the terms of the Mortgage Note or any assumption which the related Servicer may be restricted by law from preventing, for any reason whatever. For purposes of this Section 3.12, the term "assumption" is deemed to also include a sale (of the Mortgaged Property) subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

SECTION 3.13.     Realization Upon Defaulted Mortgage Loans.

(a)     Each Servicer shall use commercially reasonable efforts, consistent with Accepted Servicing Practices, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.06. Each Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings; provided, however, that such costs and expenses will be recoverable as Servicing Advances by the related Servicer as contemplated in Sections 3.09 and 3.21. The

foregoing is subject to the provision that, in any case in which a Mortgaged Property shall have suffered damage from an Uninsured Cause, the related Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its discretion that such restoration will increase the proceeds of liquidation of the related Mortgage Loan after reimbursement to itself for such expenses.

(b)    Notwithstanding the foregoing provisions of this Section 3.13 or any other provision of this Agreement, with respect to any Mortgage Loan as to which the a Servicer has received actual notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the related Mortgaged Property, the related Servicer shall not, on behalf of the Trust Fund, either (i) obtain title to such Mortgaged Property as a result of or in lieu of foreclosure or otherwise, or (ii) otherwise acquire possession of, or take any other action with respect to, such Mortgaged Property, if, as a result of any such action, the Trust Fund, the Trustee or the Certificateholders would be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or "operator" of such Mortgaged Property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, or any comparable law, unless the related Servicer has also previously determined, based on its reasonable judgment and a prudent report prepared by an Independent Person who regularly conducts environmental audits using customary industry standards, that:

(1)    such Mortgaged Property is in compliance with applicable environmental laws or, if not, that it would be in the best economic interest of the Trust Fund to take such actions as are necessary to bring the Mortgaged Property into compliance therewith; and

(2)    there are no circumstances present at such Mortgaged Property relating to the use, management or disposal of any hazardous substances, hazardous materials, hazardous wastes or petroleum-based materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation, or that if any such materials are present for which such action could be required, that it would be in the best economic interest of the Trust Fund to take such actions with respect to the affected Mortgaged Property.

The cost of the environmental audit report contemplated by this Section 3.13 shall be advanced by the related Servicer, subject to such Servicer's right to be reimbursed therefor from the related Collection Account as provided in Section 3.09(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the related Collection Account received in respect of the affected Mortgage Loan or other Mortgage Loans.

If the related Servicer determines, as described above, that it is in the best economic interest of the Trust Fund to take such actions as are necessary to bring any such Mortgaged Property into compliance with applicable environmental laws, or to take such action with respect to the containment, clean-up or remediation of hazardous substances, hazardous materials, hazardous wastes, or petroleum-based materials affecting any such Mortgaged Property, then such Servicer shall take such action as it deems to be in the best economic interest

129

of the Trust Fund. The cost of any such compliance, containment, cleanup or remediation shall be advanced by the related Servicer, subject to its right to be reimbursed therefor from the related Collection Account as provided in Sections 3.09(a)(iii) or 3.09(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the related Collection Account received in respect of the affected Mortgage Loan or other Mortgage Loans.

(c)    Each of Ocwen and GMAC shall have the right to purchase from REMIC I any defaulted Mortgage Loan serviced by such Servicer that is 90 days or more delinquent, which such Servicer determines in good faith will otherwise become subject to foreclosure proceedings (evidence of such determination to be delivered in writing to the Trustee and the Master Servicer, in form and substance satisfactory to the Master Servicer prior to purchase), at a price equal to the Purchase Price. The Purchase Price for any Mortgage Loan purchased hereunder shall be deposited in the related Collection Account, and the Trustee, upon receipt of written certification from the related Servicer of such deposit, shall release or cause to be released to the related Servicer the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment, in each case without recourse, representation or warranty, as the related Servicer shall furnish and as shall be necessary to vest in the related Servicer title to any Mortgage Loan released pursuant hereto.

(d)    Proceeds received in connection with any Final Recovery Determination, as well as any recovery resulting from a partial collection of Insurance Proceeds or Liquidation Proceeds, in respect of any Mortgage Loan, will be applied in the following order of priority: first, to reimburse the related Servicer for any related unreimbursed Servicing Advances and P&I Advances, pursuant to Section 3.09(a)(ii) or (a)(iii); second, to accrued and unpaid interest on the related Mortgage Loan, to the date of the Final Recovery Determination, or to the Due Date prior to the Distribution Date on which such amounts are to be distributed if not in connection with a Final Recovery Determination; and third, as a recovery of principal of the related Mortgage Loan. If the amount of the recovery so allocated to interest is less than the full amount of accrued and unpaid interest due on such Mortgage Loan, the amount of such recovery will be allocated by the related Servicer as follows: first, to unpaid Servicing Fees; and second, to the balance of the interest then due and owing. The portion of the recovery so allocated to unpaid Servicing Fees shall be reimbursed to the related Servicer pursuant to Section 3.09(a)(iii). The portion of the recovery allocated to interest (net of unpaid Servicing Fees) and the portion of the recovery allocated to principal of the related Mortgage Loan shall be applied as follows: first, to reimburse the related Servicer for any related unreimbursed Servicing Advances or P&I Advances in accordance with Section 3.09(a)(ii) and any other amounts reimbursable to the related Servicer pursuant to Section 3.09, and second, as part of the amounts to be transferred to the Distribution Account in accordance with Section 3.08(b). Excess proceeds, if any, from the liquidation of a Liquidated Mortgage Loan will be retained by the related Servicer as additional servicing compensation pursuant to Section 3.15.

SECTION 3.14.    Trustee to Cooperate; Release of Mortgage Files.

(a)    Upon becoming aware of the payment in full of any Mortgage Loan, or the receipt by a Servicer of a notification that payment in full has been escrowed in a manner customary for such purposes for payment to Certificateholders on the next Distribution Date, the related Servicer will promptly furnish to the applicable Custodian, on behalf of the Trustee, two

copies of a request for release substantially in the form attached to the related Custodial Agreement signed by a Servicing Officer or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer (which certification shall include a statement to the effect that all amounts received in connection with such payment that are required to be deposited in the related Collection Account have been or will be so deposited) and shall request that the applicable Custodian, on behalf of the Trustee, deliver to the related Servicer the related Mortgage File. Upon receipt of such certification and request, the related Custodian, on behalf of the Trustee, shall within five (5) Business Days release the related Mortgage File to the related Servicer and the Trustee and the related Custodian shall have no further responsibility with regard to such Mortgage File. Upon any such payment in full, the related Servicer is authorized, to give, as agent for the Trustee, as the mortgagee under the Mortgage that secured the Mortgage Loan, an instrument of satisfaction (or assignment of mortgage without recourse) regarding the Mortgaged Property subject to the Mortgage, which instrument of satisfaction or assignment, as the case may be, shall be delivered to the Person or Persons entitled thereto against receipt therefor of such payment, it being understood and agreed that no expenses incurred in connection with such instrument of satisfaction or assignment, as the case may be, shall be chargeable to the related Collection Account, unless it shall represent a Servicing Advance.

(b)    From time to time and as appropriate for the servicing or foreclosure of any Mortgage Loan, the Trustee shall execute such documents as shall be prepared and furnished to the Trustee by the related Servicer (in form reasonably acceptable to the Trustee) and as are necessary to the prosecution of any such proceedings. The applicable Custodian, on behalf of the Trustee, shall, upon the request of the related Servicer, and delivery to the applicable Custodian, on behalf of the Trustee, of two copies of a request for release signed by a Servicing Officer substantially in the form attached to the related Custodial Agreement (or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer), release within five (5) Business Days the related Mortgage File held in its possession or control to the related Servicer. Such trust receipt shall obligate the related Servicer to return the Mortgage File to the applicable Custodian on behalf of the Trustee, when the need therefor by the related Servicer no longer exists unless the related Mortgage Loan shall be liquidated, in which case, upon receipt of a certificate of a Servicing Officer similar to that hereinabove specified, the Mortgage File shall be released by the applicable Custodian, on behalf of the Trustee, to the related Servicer.

Notwithstanding the foregoing, in connection with a Principal Prepayment in full of any Mortgage Loan, the Master Servicer may request release of the related Mortgage File from the applicable Custodian, in accordance with the provisions of the related Custodial Agreement, in the event the related Servicer fails to do so.

Upon written certification of a Servicing Officer, the Trustee shall execute and deliver to the related Servicer, any court pleadings, requests for trustee's sale or other documents prepared and delivered to the Trustee and reasonably acceptable to it and necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity. Each such certification shall include a

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

request that such pleadings or documents be executed by the Trustee and a statement as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee will not invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale. So long as no Servicer Event of Default shall have occurred and be continuing, the related Servicer shall have the right to execute any and all such court pleadings, requests and other documents as attorney-in-fact for, and on behalf of the Trustee. Notwithstanding the preceding sentence, the Trustee shall in no way be liable or responsible for the willful malfeasance of a Servicer, or for any wrongful or negligent actions taken by a Servicer, while such Servicer is acting in its capacity as attorney-in-fact for and on behalf of the Trustee.

SECTION 3.15.    Servicing Compensation.

As compensation for its activities hereunder or under the Servicing Agreement, each Servicer shall be entitled to the Servicing Fee (or, (i) for as long as GMAC is the Servicer of the GMAC Mortgage Loans, the Servicing Fee calculated using the GMAC Servicing Fee Rate and (ii) for so long as Countrywide is the Servicer of the Countrywide Mortgage Loans, the Servicing Fee calculated using the Countrywide Servicing Fee Rate) with respect to each Mortgage Loan serviced by it payable solely from payments of interest in respect of such Mortgage Loan, subject to Section 3.23. In addition, the Servicers shall be entitled to recover unpaid Servicing Fees out of Insurance Proceeds or Liquidation Proceeds to the extent permitted by Section 3.09(a)(iii), Section 3.09(a)(vi) and out of amounts derived from the operation and sale of an REO Property to the extent permitted by Section 3.22. Except as permitted under Section 7.04, the right to receive the Servicing Fee (or, with respect to GMAC, the Servicing Fee calculated using the GMAC Servicing Fee Rate) may not be transferred in whole or in part except in connection with the transfer of all of the related Servicer's responsibilities and obligations under this Agreement to the extent permitted herein.

Additional servicing compensation in the form of Ancillary Income (other than Prepayment Charges) shall be retained by the Servicers only to the extent such fees or charges are received by such Servicer. The Servicers shall also be entitled pursuant to Section 3.09(a)(iv) to withdraw from the related Collection Account and pursuant to Section 3.22(b) to withdraw from any REO Account, as additional servicing compensation, interest or other income earned on deposits therein, subject to Section 3.10. In addition, the Servicers shall be entitled to retain or withdraw from the related Collection Account, pursuant to Section 3.09(a)(x), any Prepayment Interest Excess with respect to the Mortgage Loans serviced by it as additional servicing compensation. Each Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided herein.

SECTION 3.16.    Collection Account Statements.

Upon request, not later than fifteen (15) days after each Distribution Date, the Servicers shall forward to the Master Servicer, the Securities Administrator, the NIMS Insurer and the Depositor, a statement prepared by the institution at which the related Collection Account is maintained setting forth the status of the related Collection Account as of the close of business on such Distribution Date and showing, for the period covered by such statement, the

132

aggregate amount of deposits into and withdrawals from the related Collection Account. Copies of such statement and any similar statements provided by the Servicers shall be provided by the Securities Administrator to any Certificateholder and to any Person identified to the Securities Administrator as a prospective transferee of a Certificate, upon request at the expense of the requesting party, provided such statement is delivered by the related Servicer to the Securities Administrator.

SECTION 3.17.    Annual Statement as to Compliance.

(a)    Each Servicer shall deliver (and shall cause any Sub-Servicer engaged by it to deliver) to the Master Servicer and to the Depositor on or before March 15 of each year, commencing in March 2008, an Officer's Certificate stating, as to the signer thereof, that (A) a review of such party's activities during the preceding calendar year or portion thereof and of the related Servicer's performance under this Agreement, or such other applicable agreement in the case of a Sub-Servicer, has been made under such officer's supervision and (B) to the best of such officer's knowledge, based on such review, such party has fulfilled all its obligations under this Agreement, or such other applicable agreement in the case of a Sub-Servicer, in all material respects throughout such year or portion thereof, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof. Promptly after receipt of each such Officer's Certificate from the related Servicer, any Sub-Servicer engaged by such Servicer, the Depositor shall review such Officer's Certificate and, if applicable, consult with each such party, as applicable, as to the nature of any failures by such party, in the fulfillment of any of the related Servicer's obligations hereunder or, in the case of a Sub-Servicer, under such other applicable agreement.

(b)    Failure of a Servicer to comply timely with this Section 3.17 shall be deemed a Servicer Event of Default as to the related Servicer, automatically, without notice and without any cure period, and the Master Servicer may, in addition to whatever rights the Master Servicer may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the related Servicer under this Agreement and in and to the related Mortgage Loans and the proceeds thereof without compensating the related Servicer for the same (other than such Servicer's right to reimbursement of unreimbursed P&I Advances and Servicing Advances and accrued and unpaid Servicing Fees in the manner provided in this Agreement). This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

(c)    In the event a Servicer or any Sub-Servicer engaged by a Servicer is terminated, assigns its rights and obligations under or resigns pursuant to the terms of this Agreement, or any applicable agreement in the case of a Sub-Servicer, as the case may be, such party shall provide an Officer's Certificate with respect to the related year pursuant to this Section 3.17(c) or to such other applicable agreement, as the case may be, notwithstanding any such termination, assignment or resignation for the related year.

SECTION 3.18.    Assessments of Compliance and Attestation Reports.

(a)    By March 15 of each year, commencing in March 2008, each Servicer, at its own expense, shall furnish, and shall cause any Servicing Function Participant engaged by it

133

to furnish, each at its own expense, to the Master Servicer, a report on an assessment of compliance with the Relevant Servicing Criteria that contains (A) a statement by such party of its responsibility for assessing compliance with the Relevant Servicing Criteria, (B) a statement that such party used the Relevant Servicing Criteria to assess compliance with the Relevant Servicing Criteria, (C) such party's assessment of compliance with the Relevant Servicing Criteria as of and for the fiscal year covered by the Form 10-K required to be filed pursuant to Section 5.06(d), including, if there has been any material instance of noncompliance with the Relevant Servicing Criteria, a discussion of each such failure and the nature and status thereof, and (D) a statement that a registered public accounting firm has issued an attestation report on such party's assessment of compliance with the Relevant Servicing Criteria as of and for such period. Notwithstanding the foregoing, neither a Servicer nor any Servicing Function Participant engaged by a Servicer shall be required to deliver any assessments until March 31st in any given year so long as it has not received written confirmation from the Depositor that a Form 10-K is required to be filed in respect of the Trust for the preceding calendar year; provided however that, notwithstanding the foregoing, no Subcontractor will be required to deliver any assessments in any given year in which the Form 10-K is not required to be filed.

(b)    By March 15 of each year, commencing in March 2008, each Servicer, at its own expense, shall cause, and each Servicer shall cause any Servicing Function Participant engaged by it to cause, each at its own expense, a registered public accounting firm (which may also render other services to the related Servicer or such other Servicing Function Participants, as the case may be) and that is a member of the American Institute of Certified Public Accountants to furnish a report to the Master Servicer, to the effect that (i) it has obtained a representation regarding certain matters from the management of such party, which includes an assertion that such party has complied with the Relevant Servicing Criteria, and (ii) on the basis of an examination conducted by such firm in accordance with standards for attestation engagements issued or adopted by the PCAOB, it is expressing an opinion as to whether such party's compliance with the Relevant Servicing Criteria was fairly stated in all material respects, or it cannot express an overall opinion regarding such party's assessment of compliance with the Relevant Servicing Criteria. In the event that an overall opinion cannot be expressed, such registered public accounting firm shall state in such report why it was unable to express such an opinion. Such report must be available for general use and not contain restricted use language. Notwithstanding the foregoing, neither the Servicers nor any Servicing Function Participant engaged by a Servicer shall be required to deliver or cause the delivery of such reports until March 31st in any given year so long as the related Servicer has not received written confirmation from the Depositor that a Form 10-K is required to be filed in respect of the Trust for the preceding fiscal year; provided however that, notwithstanding the foregoing, no Subcontractor will be required to deliver any reports in any given year in which the Form 10-K is not required to be filed.

(c)    Failure of a Servicer to comply timely with this Section 3.18 shall be deemed a Servicer Event of Default as to the related Servicer, automatically, without notice and without any cure period, and the Master Servicer may, in addition to whatever rights the Master Servicer may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the related Servicer under this Agreement and in and to the related Mortgage Loans and the proceeds thereof without compensating the related Servicer for the same (other than the related Servicer's

134

right to reimbursement of unreimbursed P&I Advances and Servicing Advances and accrued and unpaid Servicing Fees in the manner provided for in this Agreement). This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

(d)    In the event a Servicer or any Servicing Function Participant engaged by a Servicer is terminated, assigns its rights and obligations under, or resigns pursuant to the terms of this Agreement, or any applicable agreement in the case of a Servicing Function Participant, as the case may be, such party shall provide a report on assessment of compliance with respect to the related year pursuant to this Section 3.18(d) or to such other applicable agreement, notwithstanding any such termination, assignment or resignation for the related year.

SECTION 3.19.    [Reserved].

SECTION 3.20.    Annual Certification; Additional Information.

(a)    Each Servicer shall and shall cause any Servicing Function Participant engaged by it to, provide to the Person who signs the Sarbanes-Oxley Certification (the "Certifying Person"), by March 15 of each year in which the Trust is subject to the reporting requirements of the Exchange Act, a certification (each, a "Back-Up Certification"), in the form attached hereto as Exhibit C, upon which the Certifying Person, the entity for which the Certifying Person acts as an officer, and such entity's officers, directors and Affiliates (collectively with the Certifying Person, "Certification Parties") can reasonably rely. The officer of the Master Servicer in charge of the master servicing function shall serve as the Certifying Person on behalf of the Trust. In the event a Servicer or any Servicing Function Participant engaged by it is terminated or resigns pursuant to the terms of this Agreement, or any applicable Sub-Servicing agreement, as the case may be, such party shall provide a Back-Up Certification to the Certifying Person pursuant to this Section 3.20 with respect to the period of time it was subject to this Agreement or any applicable Sub-Servicing Agreement, as the case may be.

(b)    Each Servicer shall indemnify and hold harmless the Master Servicer, the Securities Administrator, the Trustee, the Depositor and their respective officers, directors, agents and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach by the related Servicer or any of its officers, directors, agents or affiliates of its obligations under this Section 3.20 or the related Servicer's negligence, bad faith or willful misconduct in connection therewith. Such indemnity shall survive the termination or resignation of the parties hereto or the termination of this Agreement. If the indemnification provided for herein is unavailable or insufficient to hold harmless the Master Servicer, the Securities Administrator, the Trustee and the Depositor, then the related Servicer agrees that it shall contribute to the amount paid or payable by the Master Servicer, the Securities Administrator, the Trustee and the Depositor as a result of the losses, claims, damages or liabilities of the Master Servicer, the Securities Administrator, the Trustee and the Depositor in such proportion as is appropriate to reflect the relative fault of the Master Servicer, the Securities Administrator, the Trustee and the Depositor on the one hand and the related Servicer on the other in connection with a breach of the Servicer's obligations under this Section 3.20.

135

(c)    Each Servicer shall provide to the Master Servicer prompt notice of the occurrence of any of the following:

(i)    any Servicer Event of Default under the terms of this Agreement, any merger, consolidation or sale of substantially all of the assets of the related Servicer, the related Servicer's engagement of any Sub-Servicer to perform or assist in the performance of any of such Servicer's obligations under this Agreement, any material litigation involving the related Servicer that is material to the Certificateholders, and to the extent disclosure is required under Regulation AB, any affiliation or other significant relationship between the related Servicer and any other Servicer, DB Home Lending LLC, the Sponsor, the Depositor, the Master Servicer, the Securities Administrator, the Trustee, the Custodians, the Cap Counterparty and the Swap Provider.

(ii)    If a Servicer has knowledge of the occurrence of any of the events described in this clause (ii), then no later than ten days prior to the deadline for the filing of any Distribution Report on Form 10-D in respect of the Trust, the related Servicer shall provide to the Master Servicer notice of the occurrence of any of the following events along with all information, data, and materials related thereto as may be required to be included in the related Distribution Report on Form 10-D (as specified in the provisions of Regulation AB referenced below):

(A)    any material modifications, extensions or waivers of pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time (Item 1121(a)(11) of Regulation AB);

(B)    material breaches of pool asset representations or warranties or transaction covenants (Item 1121(a)(12) of Regulation AB); and

(C)    any material pool asset changes (such as, additions, substitutions or repurchases) relating to the Mortgage Loans serviced by the related Servicer (Item 1121(a)(14) of Regulation AB).

(d)    Each Servicer shall provide to the Securities Administrator and Master Servicer such additional information as the Securities Administrator and the Master Servicer may reasonably request, including evidence of the authorization of the person signing any certification or statement, financial information and reports and of the fidelity bond and errors and omissions insurance policy required to be maintained by the related Servicer pursuant to this Agreement, and such other information related to the related Servicer or its performance hereunder.

SECTION 3.21.    Access to Certain Documentation.

Each Servicer shall provide to the Office of Thrift Supervision, the FDIC, and any other federal or state banking or insurance regulatory authority that may exercise authority over any Certificate Owner, access to the documentation regarding the related Mortgage Loans required by applicable laws and regulations. Such access shall be afforded without charge, but only upon reasonable request and during normal business hours at the offices of the related Servicer designated by it. Nothing in this Section 3.21 shall limit the obligation of the Servicers

136

to comply with any applicable law prohibiting disclosure of information regarding the Mortgagors and the failure of a Servicer to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section. Nothing in this Section 3.21 shall require the Servicers to collect, create, collate or otherwise generate any information that it does not generate in its usual course of business. The Servicers shall not be required to make copies of or ship documents to any Person unless provisions have been made for the reimbursement of the costs thereof.

SECTION 3.22.    Title, Management and Disposition of REO Property.

(a)    The deed or certificate of sale of any REO Property related to a Mortgage Loan shall be taken in the name of the Trustee, or its nominee, on behalf of the Trust Fund and for the benefit of the Certificateholders. The related Servicer, on behalf of REMIC I, shall either sell any REO Property by the close of the third calendar year following the calendar year in which REMIC I acquires ownership of such REO Property for purposes of Section 860(a)(8) of the Code or request from the Internal Revenue Service, no later than sixty (60) days before the day on which the three-year grace period would otherwise expire, an extension of the three-year grace period, unless the related Servicer had delivered to the Trustee and the NIMS Insurer an Opinion of Counsel, addressed to the Trustee, the Depositor and the NIMS Insurer, to the effect that the holding by REMIC I of such REO Property subsequent to three (3) years after its acquisition will not result in the imposition on any Trust REMIC created hereunder of taxes on "prohibited transactions" thereof, as defined in Section 860F of the Code, or cause any Trust REMIC hereunder to fail to qualify as a REMIC under Federal law at any time that any Certificates are outstanding. Each Servicer shall manage, conserve, protect and operate each REO Property for the Certificateholders solely for the purpose of its prompt disposition and sale in a manner which does not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or result in the receipt by any Trust REMIC created hereunder of any "income from non-permitted assets" within the meaning of Section 860F(a)(2)(B) of the Code, or any "net income from foreclosure property" which is subject to taxation under the REMIC Provisions.

(b)    Each Servicer shall segregate and hold all funds collected and received in connection with the operation of any REO Property separate and apart from its own funds and general assets and shall establish and maintain with respect to REO Properties an account held in trust for the Trustee, on behalf of the Trust Fund and for the benefit of the Certificateholders (the "REO Account"), which shall be an Eligible Account. The Servicers shall be permitted to allow the related Collection Account to serve as the REO Account, subject to the maintenance of separate ledgers for each REO Property. The Servicers shall be entitled to retain or withdraw any interest income paid on funds deposited in the related REO Account.

(c)    The Servicers shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement, to do any and all things in connection with any REO Property related to a Mortgage Loan serviced by it as are consistent with the manner in which the related Servicer manages and operates similar property owned by it or any of its Affiliates, all on such terms and for such period as the related Servicer deems to be in the best interests of Certificateholders. In connection therewith, the related Servicer shall deposit, or cause to be deposited in the clearing account in which it customarily deposits payments and

137

collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one (1) Business Day after the related Servicer's receipt thereof, and shall thereafter deposit in the REO Account, in no event more than two (2) Business Days after the deposit of good funds into the clearing account, all revenues received by it with respect to an REO Property related to a Mortgage Loan serviced by it and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of such REO Property including, without limitation:

> (i)     all insurance premiums due and payable in respect of such REO Property;

> (ii)    all real estate taxes and assessments in respect of such REO Property that may result in the imposition of a lien thereon; and

> (iii)   all costs and expenses necessary to maintain such REO Property.

To the extent that amounts on deposit in the REO Account with respect to an REO Property are insufficient for the purposes set forth in clauses (i) through (iii) above with respect to such REO Property, the related Servicer shall advance from its own funds such amount as is necessary for such purposes if, but only if, the related Servicer would make such advances if such Servicer owned the REO Property and if in such Servicer's judgment, the payment of such amounts will be recoverable from the rental or sale of the REO Property.

Subject to compliance with applicable laws and regulations as shall at any time be in force, and notwithstanding the foregoing, the Servicers, on behalf of the Trust Fund, shall not:

> (i)     enter into, renew or extend any New Lease with respect to any REO Property, if the New Lease by its terms will give rise to any income that does not constitute Rents from Real Property;

> (ii)    permit any amount to be received or accrued under any New Lease other than amounts that will constitute Rents from Real Property;

> (iii)   authorize or permit any construction on any REO Property, other than the completion of a building or other improvement thereon, and then only if more than ten percent of the construction of such building or other improvement was completed before default on the related Mortgage Loan became imminent, all within the meaning of Section 856(e)(4)(B) of the Code; or

> (iv)    allow any Person to Directly Operate any REO Property on any date more than ninety (90) days after its date of acquisition by the Trust Fund;

unless, in any such case, the related Servicer has obtained an Opinion of Counsel, provided to the related Servicer, the NIMS Insurer and the Trustee, to the effect that such action will not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code at any time that it is held by REMIC I, in which case the related Servicer may take such actions as are specified in such Opinion of Counsel.

The Servicers may contract with any Independent Contractor for the operation and management of any REO Property, provided that:

(i)    the terms and conditions of any such contract shall not be inconsistent herewith;

(ii)    any such contract shall require, or shall be administered to require, that the Independent Contractor pay all costs and expenses incurred in connection with the operation and management of such REO Property, including those listed above and remit all related revenues (net of such costs and expenses) to the related Servicer as soon as practicable, but in no event later than thirty (30) days following the receipt thereof by such Independent Contractor;

(iii)    none of the provisions of this Section 3.22(c) relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the related Servicer of any of its duties and obligations to the Trustee on behalf of the Trust Fund and for the benefit of the Certificateholders with respect to the operation and management of any such REO Property; and

(iv)    the related Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such REO Property.

The Servicers shall be entitled to enter into any agreement with any Independent Contractor performing services for it related to its duties and obligations hereunder for indemnification of the related Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification. The related Servicer shall be solely liable for all fees owed by it to any such Independent Contractor, irrespective of whether such Servicer's compensation pursuant to Section 3.15 is sufficient to pay such fees. Any such agreement shall include a provision that such agreement may be immediately terminated by any successor Servicer without fee, in the event the related Servicer shall for any reason, no longer be the Servicer of the related Mortgage Loans (including termination due to a Servicer Event of Default).

(d)    In addition to the withdrawals permitted under Section 3.22(c), the Servicers may from time to time make withdrawals from the REO Account for any REO Property: (i) to pay itself unpaid Servicing Fees in respect of the related Mortgage Loan; and (ii) to reimburse itself or any Sub-Servicer for unreimbursed Servicing Advances and Advances made in respect of such REO Property or the related Mortgage Loan. On the Servicer Remittance Date, the related Servicer shall withdraw from each REO Account and deposit into the Distribution Account in accordance with Section 3.08(d)(ii), for distribution on the related Distribution Date in accordance with Section 5.01, the income from the related REO Property received during the prior calendar month, net of any withdrawals made pursuant to Section 3.22(c) or this Section 3.22(d).

(e)    Subject to the time constraints set forth in Section 3.22(a), each REO Disposition shall be carried out by the Servicers at such price and upon such terms and

139

conditions as the related Servicer shall deem necessary or advisable, as shall be normal and usual in accordance with Accepted Servicing Practices.

(f)    The proceeds from the REO Disposition, net of any amount required by law to be remitted to the Mortgagor under the related Mortgage Loan and net of any payment or reimbursement to the Servicer as provided above, shall be deposited in the Distribution Account in accordance with Section 3.08(d)(ii) on the Servicer Remittance Date in the month following the receipt thereof for distribution on the related Distribution Date in accordance with Section 5.01. Any REO Disposition shall be for cash only (unless changes in the REMIC Provisions made subsequent to the Startup Day allow a sale for other consideration).

(g)    Each Servicer shall file information returns (and shall provide a certification of a Servicing Officer to the Master Servicer that such filings have been made) with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 6050J and 6050P of the Code, respectively. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

SECTION 3.23.    Obligations of the Servicers in Respect of Prepayment Interest Shortfalls; Relief Act Interest Shortfalls.

Each Servicer shall deliver to the Securities Administrator for deposit into the Distribution Account on or before 12:00 noon New York time on the Servicer Remittance Date from its own funds an amount equal to the lesser of (i) the aggregate amount of the Prepayment Interest Shortfalls attributable to Principal Prepayments in full on the related Mortgage Loans for the related Distribution Date resulting solely from voluntary Principal Prepayments received by the Servicer during the portion of the related Prepayment Period occurring between the sixteenth (16th) day of the month preceding the month in which the related Distribution Date occurs and ending on the last day of such month and (ii) the aggregate amount of the related Servicing Fees payable to the related Servicer on such Distribution Date with respect to the related Mortgage Loans. The Servicers shall not have the right to reimbursement for any amounts remitted to the Securities Administrator in respect of this Section 3.23. The Servicers shall not be obligated to pay the amounts set forth in this Section 3.23 with respect to shortfalls resulting from the application of the Relief Act.

SECTION 3.24.    Obligations of the Servicer in Respect of Mortgage Rates and Monthly Payments.

In the event that a shortfall in any collection on or liability with respect to any Mortgage Loan results from or is attributable to adjustments to Mortgage Rates, Monthly Payments or Stated Principal Balances that were made by the related Servicer in a manner not consistent with the terms of the related Mortgage Note and this Agreement, such Servicer, upon discovery or receipt of notice thereof, immediately shall deliver to the Securities Administrator for deposit in the Distribution Account from its own funds the amount of any such shortfall and shall indemnify and hold harmless the Trust Fund, the Trustee, the Securities Administrator, the Master Servicer, the Depositor and any successor servicer in respect of any such liability. Such

140

indemnities shall survive the termination or discharge of this Agreement. Notwithstanding the foregoing, this Section 3.24 shall not limit the ability of the related Servicer to seek recovery of any such amounts from the related Mortgagor under the terms of the related Mortgage Note and Mortgage, to the extent permitted by applicable law.

SECTION 3.25.    Reserve Fund.

(a)    No later than the Closing Date, the Securities Administrator shall establish and maintain a separate, segregated trust account entitled, "Reserve Fund, Wells Fargo Bank, National Association, in trust for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4, Asset Backed Pass-Through Certificates." On the Closing Date, the Depositor will deposit, or cause to be deposited, into the Reserve Fund $1,000. In addition, the amount deposited in the Reserve Fund shall be increased by any payments received by the Securities Administrator under the Group I Cap Contract and deposited into the Reserve Fund for the benefit of the Class A-1 Certificates and the Mezzanine Certificates and under the Group II Cap Contract and deposited in the Reserve Fund for the benefit of the Class A-2 Certificates and the Mezzanine Certificates.

(b)    On each Distribution Date, the Securities Administrator shall deposit into the Reserve Fund the amounts described in Section 5.01(c)(8)(vi), rather than distributing such amounts to the Class CE-1 Certificateholders pursuant to Section 5.01(c)(8)(viii). On each such Distribution Date, the Securities Administrator shall hold all such amounts for the benefit of the Holders of the Class A Certificates and the Mezzanine Certificates and will distribute such amounts to the Holders of the Class A Certificates and the Mezzanine Certificates, in the amounts and priorities set forth in Section 5.01(c). If no Net WAC Rate Carryover Amounts are payable on a Distribution Date, the Securities Administrator shall deposit, into the Reserve Fund on behalf of the Class CE-1 Certificateholders, from amounts otherwise distributable to the Class CE-1 Certificateholders, an amount such that when added to other amounts already on deposit in the Reserve Fund, the aggregate amount on deposit therein is equal to $1,000.

(c)    The Reserve Fund constitutes an "outside reserve fund" within the meaning of Treasury Regulation § 1.860G-2(h) and is not an asset of any REMIC. It is the intention of the parties hereto that, for federal and state income and state and local franchise tax purposes, the Reserve Fund be disregarded as an entity separate from the Holder of the Class CE-1 Certificates unless and until the date when either (a) there is more than one Class CE-1 Certificateholder or (b) any Class of Certificates in addition to the Class CE-1 Certificates is recharacterized as an equity interest in the Reserve Fund for federal income tax purposes, in which case it is the intention of the parties hereto that, for federal and state income and state and local franchise tax purposes, the Reserve Fund be treated as a partnership. The Master Servicer shall not be required to prepare and file partnership tax returns in respect of such partnership unless it receives additional reasonable compensation (not to exceed $10,000 per year) for the preparation of such filings, written notification recognizing the creation of a partnership agreement or comparable documentation evidencing the partnership. All amounts deposited into the Reserve Fund (other than the initial deposit therein of $1,000 and any amounts paid to the Reserve Fund from the Cap Contracts) shall be treated as amounts distributed by REMIC IV to the Holders of the Class CE-1 Certificates. Upon the termination of the Trust Fund, or the payment in full of the Class A Certificates and the Mezzanine Certificates, all amounts

141

remaining on deposit in the Reserve Fund will be released by the Trust Fund and distributed to the Class CE-1 Certificateholders or their designees. The Reserve Fund will be part of the Trust Fund but not part of any REMIC and any payments to the Holders of the Class A Certificates or the Mezzanine Certificates of Net WAC Rate Carryover Amounts will not be payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860(G)(a)(1).

(d)     By accepting a Class CE-1 Certificate, each Class CE-1 Certificateholder hereby agrees that the Securities Administrator will deposit into the Reserve Fund the amounts described above on each Distribution Date rather than distributing such amounts to the Class CE-1 Certificateholders. By accepting a Class CE-1 Certificate, each Class CE-1 Certificateholder further agrees that its agreement to such action by the Securities Administrator is given for good and valuable consideration, the receipt and sufficiency of which is acknowledged by such acceptance.

(e)     At the direction of the Holders of a majority in Percentage Interest in the Class CE-1 Certificates, the Securities Administrator shall direct any Depository Institution maintaining the Reserve Fund to invest the funds in such account in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Securities Administrator or an Affiliate manages or advises such investment, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Securities Administrator or an Affiliate manages or advises such investment. All income and gain earned upon such investment shall be deposited into the Reserve Fund. In no event shall the Securities Administrator be liable for any investments made pursuant to this clause (e). If the Holders of a majority in Percentage Interest in the Class CE-1 Certificates fail to provide investment instructions, funds on deposit in the Reserve Fund shall be held uninvested by the Securities Administrator without liability for interest or compensation.

(f)     For federal tax return and information reporting, the right of the Class A Certificateholders and the Mezzanine Certificateholders to receive payments from the Reserve Fund and the Supplemental Interest Trust in respect of any Net WAC Rate Carryover Amount shall be assigned a value of $12,000.

(g)     In the event that a Cap Contract is terminated prior to the Distribution Date in October 2007, the Securities Administrator, at the direction of the Depositor, shall use reasonable efforts to appoint a successor cap counterparty using any cap agreement termination payments paid by the Cap Counterparty. If the Securities Administrator is unable to locate a qualified successor cap counterparty within thirty (30) days of the Early Termination Date (as defined in the Cap Contract), any cap agreement termination payments paid by the Cap Counterparty will be deposited into a separate non-interest bearing Eligible Account and the Securities Administrator, on each subsequent Distribution Date (until the termination date of the Cap Contract or the appointment of a successor cap counterparty), will withdraw from the amount then remaining on deposit in such reserve account an amount equal to the payment, if any, that would have been paid to the Securities Administrator by the original Cap Counterparty calculated in accordance with the terms of the original Cap Contract, and distribute such amount to the holders of the Certificates in accordance with Section 5.01.

142

(h)    In the event that the Cap Counterparty fails to perform any of its obligations under a Cap Contract (including, without limitation, its obligation to make any payment or transfer collateral), or breaches any of its representations and warranties thereunder, or in the event that an Event of Default, Termination Event, or Additional Termination Event (each as defined in the Cap Contract) occurs with respect to the related Cap Contract, the Securities Administrator shall immediately, but no later than the next Business Day following such failure or breach, notify the Depositor and send any notices and make any demands, on behalf of the Holders of the Offered Certificates, in accordance with the Cap Contract.

(i)    In the event that the Cap Counterparty's obligations are guaranteed by a third party under a guaranty relating to a Cap Contract (such guaranty the "Guaranty" and such third party the "Guarantor"), then to the extent that the Cap Counterparty fails to make any payment by the close of business on the day it is required to make payment under the terms of the Cap Contract, the Securities Administrator shall, as soon as practicable, but no later than two (2) business days after the Swap Provider's failure to pay, demand that the Guarantor make any and all payments then required to be made by the Guarantor pursuant to such Guaranty; provided, that the Securities Administrator shall in no event be liable for any failure or delay in the performance by the Cap Counterparty or any Guarantor of its obligations hereunder or pursuant to the Cap Contract and the Guaranty, nor for any special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits) in connection therewith.

SECTION 3.26.    Advance Facility.

(a)    Notwithstanding anything to the contrary contained herein, (i) each Servicer is hereby authorized to enter into an advance facility ("Advance Facility") but no more than two Advance Facilities without the prior written consent of the Trustee, which consent shall not be unreasonably withheld, under which (A) the related Servicer sells, assigns or pledges to an advancing person (an "Advance Financing Person") its rights under this Agreement to be reimbursed for any P&I Advances or Servicing Advances and/or (B) an Advance Financing Person agrees to finance some or all P&I Advances or Servicing Advances required to be made by the related Servicer pursuant to this Agreement and (ii) the related Servicer is hereby authorized to assign its rights to the Servicing Fee (which rights shall terminate upon the resignation, termination or removal of the Servicer pursuant to the terms of this Agreement) or pledge its servicing rights; it being understood that neither the Trust Fund nor any party hereto shall have a right or claim (including without limitation any right of offset) to any amounts for reimbursement of P&I Advances or Servicing Advances so assigned or to the portion of the Servicing Fee so assigned or the servicing rights so pledged. Subject to the provisions of the first sentence of this Section 3.26(a), no consent of the Depositor, Trustee, Master Servicer, Certificateholders or any other party is required before a Servicer may enter into an Advance Facility, but the related Servicer shall provide notice to the Depositor, Master Servicer and the Trustee of the existence of any such Advance Facility promptly upon the consummation thereof stating (a) the identity of the Advance Financing Person and (b) the identity of any Person ("Servicer's Assignee") who has the right to receive amounts in reimbursement of previously unreimbursed P&I Advances or Servicing Advances. Notwithstanding the existence of any Advance Facility under which an advancing person agrees to finance P&I Advances and/or Servicing Advances on the related Servicer's behalf, such Servicer shall remain obligated

143

pursuant to this Agreement to make P&I Advances and Servicing Advances pursuant to and as required by this Agreement, and shall not be relieved of such obligations by virtue of such Advance Facility.

(b)    Reimbursement amounts ("Advance Reimbursement Amounts") shall consist solely of amounts in respect of P&I Advances and/or Servicing Advances made with respect to the related Mortgage Loans for which the related Servicer would be permitted to reimburse itself in accordance with this Agreement, assuming the Servicer had made the related P&I Advance(s) and/or Servicing Advance(s).

(c)    The related Servicer shall maintain and provide to any successor Servicer (with, upon request, a copy to the Trustee) a detailed accounting on a loan-by-loan basis as to amounts advanced by, pledged or assigned to, and reimbursed to any Advance Financing Person. The successor Servicer shall be entitled to rely on any such information provided by the predecessor Servicer, and the successor Servicer shall not be liable for any errors in such information.

(d)    Reimbursement amounts distributed with respect to each Mortgage Loan shall be allocated to outstanding unreimbursed P&I Advances or Servicing Advances (as the case may be) made with respect to that Mortgage Loan on a "first-in, first out" (FIFO) basis. The documentation establishing any Advance Facility shall require the related Servicer to provide to the related Advance Financing Person or its designee loan-by-loan information with respect to each such reimbursement amount distributed to such Advance Financing Person or Advance Facility trustee on each Distribution Date, to enable the Advance Financing Person or Advance Facility trustee to make the FIFO allocation of each such reimbursement amount with respect to each Mortgage Loan. The related Servicer shall remain entitled to be reimbursed by the Advance Financing Person or Advance Facility trustee for all P&I Advances and Servicing Advances funded by the related Servicer to the extent the related rights to be reimbursed therefor have not been sold, assigned or pledged to an Advance Financing Person.

(e)    Any amendment to this Section 3.26 or to any other provision of this Agreement that may be necessary or appropriate to effect the terms of an Advance Facility as described generally in this Section 3.26, including amendments to add provisions relating to a successor Servicer, may be entered into by the Trustee, the Depositor, and the related Servicer without the consent of any Certificateholder, notwithstanding anything to the contrary in this Agreement, provided, that the Trustee has been provided an Opinion of Counsel that such amendment is authorized hereunder and has no material adverse effect on the Certificateholders, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee or the Trust Fund; provided, further, that the amendment shall not be deemed to adversely affect in any material respect the interests of the Certificateholders if the Person requesting the amendment obtains a letter from each Rating Agency (instead of obtaining an Opinion of Counsel to such effect) stating that the amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates; it being understood and agreed that any such rating letter in and of itself will not represent a determination as to the materiality of any such amendment and will represent a determination only as to the credit issues affecting any such rating. Prior to entering into an Advance Facility, the related Servicer shall notify the lender under such facility in writing that: (a) the P&I

144

Advances and/or Servicing Advances financed by and/or pledged to the lender are obligations owed to the related Servicer on a non-recourse basis payable only from the cash flows and proceeds received under this Agreement for reimbursement of P&I Advances and/or Servicing Advances only to the extent provided herein, and neither the Master Servicer, the Securities Administrator, the Trustee nor the Trust are otherwise obligated or liable to repay any P&I Advances and/or Servicing Advances financed by the lender; (b) the related Servicer will be responsible for remitting to the lender the applicable amounts collected by it as Servicing Fees and as reimbursement for P&I Advances and/or Servicing Advances funded by the lender, as applicable, subject to the restrictions and priorities created in this Agreement; and (c) neither the Master Servicer, the Securities Administrator nor the Trustee shall have any responsibility to calculate any amount payable under an Advance Facility or to track or monitor the administration of the financing arrangement between the Servicer and the lender or the payment of any amount under an Advance Facility.

(f)     The related Servicer shall indemnify the Master Servicer, the Securities Administrator, the Trustee and the Trust Fund for any cost, liability or expense relating to the Advance Facility including, without limitation, a claim, pending or threatened, by an Advance Financing Person.

SECTION 3.27.     Indemnification.

Each Servicer agrees to indemnify the Trustee, Master Servicer and the Securities Administrator, from, and hold the Trustee, Master Servicer and the Securities Administrator harmless against, any loss, liability or expense (including reasonable attorney's fees and expenses) incurred by any such Person by reason of the related Servicer's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Agreement or by reason of the related Servicer's reckless disregard of its obligations and duties under this Agreement. Such indemnity shall survive the termination or discharge of this Agreement and the resignation or removal of the related Servicer, the Trustee, the Master Servicer and the Securities Administrator. Any payment hereunder made by the a Servicer to any such Person shall be from such Servicer's own funds, without reimbursement from REMIC I therefor.

SECTION 3.28.     Pre-Funding Account.

(a)     No later than the Closing Date, the Securities Administrator shall establish and maintain a trust account which shall at all times be an Eligible Account and shall be titled "Pre-Funding Account, Wells Fargo Bank, N.A., in trust for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4, Asset-Backed Pass Through Certificates" (the "Pre-Funding Account"). The Pre-Funding Account shall consist of two sub-accounts, the "Group I Pre-Funding Sub-Account" and the "Group II Pre-Funding Sub-Account". The Securities Administrator shall, promptly upon receipt, deposit in the Group I Pre-Funding Sub-Account and the Group II Pre-Funding Sub-Account and retain therein the Original Group I Pre-Funded Amount and the Original Group II Pre-Funded Amount remitted on the Closing Date by the Depositor. Funds deposited in the Pre-Funding Account shall be held in trust for the Certificateholders for the uses and purposes set forth herein.

(b)    The Securities Administrator will invest funds deposited in the Pre-Funding Account as directed by the Depositor in Permitted Investments with a maturity date (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Securities Administrator or an Affiliate manages or advises such investment, (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Securities Administrator or an Affiliate manages or advises such investment or (iii) within one (1) Business Day of the Securities Administrator's receipt thereof. For federal income tax purposes, the Depositor shall be the owner of the Pre-Funding Account and shall report all items of income, deduction, gain or loss arising therefrom. All income and gain realized from investment of funds deposited in the Pre-Funding Account shall be transferred to the Depositor. The Depositor shall deposit in the Pre-Funding Account the amount of any net loss incurred in respect of any such Permitted Investment immediately upon realization of such loss without any right of reimbursement therefor. At no time will the Pre-Funding Account be an asset of any REMIC created hereunder.

(c)    Amounts on deposit in the Pre-Funding Account shall be withdrawn by the Securities Administrator as follows:

(i)    On any Subsequent Transfer Date, the Securities Administrator shall withdraw from the Group I Pre-Funding Sub-Account or the Group II Pre-Funding Sub-Account, as applicable, an amount equal to 100% of the Stated Principal Balances of the Subsequent Group I Mortgage Loans or the Subsequent Group II Mortgage Loans, as applicable, transferred and assigned to the Trustee for deposit in the Trust on such Subsequent Transfer Date and pay such amount to or upon the order of the Depositor upon satisfaction of the conditions set forth in Section 2.09 with respect to such transfer and assignment;

(ii)    If the amount on deposit in the Pre-Funding Account (exclusive of any investment income therein) has not been reduced to zero during the Pre-Funding Period, on the day immediately following the termination of the Pre-Funding Period, the Securities Administrator shall deposit into the Distribution Account any amounts remaining in the Pre-Funding Account (exclusive of any investment income therein) for distribution in accordance with the terms hereof;

(iii)    To withdraw any amount not required to be deposited in the Pre-Funding Account or deposited therein in error; and

(iv)    To clear and terminate the Pre-Funding Account upon the earlier to occur of (A) the Distribution Date immediately following the end of the Pre-Funding Period and (B) the termination of this Agreement, with any amounts remaining on deposit therein being paid to the Holders of the Certificates then entitled to distributions in respect of principal.

Withdrawals pursuant to clauses (i), (ii) and (iii) shall be treated as contributions of cash to REMIC I on the date of withdrawal.

146

147

ARTICLE IV

ADMINISTRATION AND MASTER SERVICING
OF THE MORTGAGE LOANS BY THE MASTER SERVICER

SECTION 4.01.    Master Servicer.

The Master Servicer shall, from and after the Closing Date supervise, monitor and oversee the obligations of Ocwen and GMAC under this Agreement and Countrywide under the Servicing Agreement to service and administer the related Mortgage Loans in accordance with the terms of this Agreement or the Servicing Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices. Furthermore, the Master Servicer shall oversee and consult with the Servicers as necessary from time-to-time to carry out the Master Servicer's obligations hereunder, shall receive, review and evaluate all reports, information and other data provided to the Master Servicer by the Servicers and shall cause each Servicer to perform and observe the covenants, obligations and conditions to be performed or observed by such Servicer under this Agreement or the Servicing Agreement. The Master Servicer shall independently and separately monitor each Servicer's servicing activities with respect to each Mortgage Loan, reconcile the results of such monitoring with such information provided in the previous sentence on a monthly basis and coordinate corrective adjustments to each Servicer's and Master Servicer's records, and based on such reconciled and corrected information, prepare the statements specified in Section 5.03 and any other information and statements required to be provided by the Master Servicer hereunder. The Master Servicer shall reconcile the results of its Mortgage Loan monitoring with the actual remittances of each Servicer to the Distribution Account pursuant to the terms hereof based on information provided to the Master Servicer by each Servicer.

The Trustee shall furnish the Servicers and the Master Servicer with any limited powers of attorney and other documents in form acceptable to it necessary or appropriate to enable the Servicer and the Master Servicer to service and administer the Mortgage Loans and REO Properties. The Trustee shall have no responsibility for any action of the Master Servicer or the Servicers pursuant to any such limited power of attorney and shall be indemnified by the Master Servicer or the related Servicer, as applicable, for any cost, liability or expense incurred by the Trustee in connection with such Person's misuse of any such power of attorney.

The Trustee, the Custodians and the Securities Administrator shall provide access to the records and documentation in possession of the Trustee, the Custodians or the Securities Administrator regarding the Mortgage Loans and REO Property and the servicing thereof to the Certificateholders, the FDIC, and the supervisory agents and examiners of the FDIC, such access being afforded only upon reasonable prior written request and during normal business hours at the office of the Trustee, the Custodians or the Securities Administrator; provided, however, that, unless otherwise required by law, none of the Trustee, the Custodians or the Securities Administrator shall be required to provide access to such records and documentation if the provision thereof would violate the legal right to privacy of any Mortgagor. The Trustee, the Custodians and the Securities Administrator shall allow representatives of the above entities to

148

photocopy any of the records and documentation and shall provide equipment for that purpose at a charge that covers the Trustee's, the Custodians' or the Securities Administrator's actual costs.

The Trustee shall execute and deliver to the related Servicer or the Master Servicer upon request any court pleadings, requests for trustee's sale or other documents necessary or desirable to (i) the foreclosure or trustee's sale with respect to a Mortgaged Property; (ii) any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or any other Mortgage Loan Document; (iii) obtain a deficiency judgment against the Mortgagor; or (iv) enforce any other rights or remedies provided by the Mortgage Note or any other Mortgage Loan Document or otherwise available at law or equity.

SECTION 4.02.    REMIC-Related Covenants.

For as long as each REMIC shall exist, the Trustee and the Securities Administrator shall act in accordance herewith to treat such REMIC as a REMIC, and the Trustee and the Securities Administrator shall comply with any directions of the Sponsor, the Servicers or the Master Servicer to assure such continuing treatment. In particular, the Trustee shall not (a) sell or permit the sale of all or any portion of the Mortgage Loans or of any investment of deposits in an Account unless such sale is as a result of a repurchase of the Mortgage Loans pursuant to this Agreement or the Trustee has received a REMIC Opinion prepared at the expense of the Trust Fund; and (b) other than with respect to a substitution pursuant to the Mortgage Loan Purchase Agreement, Subsequent Mortgage Loan Purchase Agreement or Section 2.03 of this Agreement, as applicable, accept any contribution to any REMIC after the Startup Day without receipt of an Opinion of Counsel stating that such contribution will not result in an Adverse REMIC Event as defined in Section 11.01(f).

SECTION 4.03.    Monitoring of Servicers.

(a)    The Master Servicer shall be responsible for monitoring the compliance by Ocwen and GMAC with their respective duties under this Agreement and Countrywide with its duties under the Servicing Agreement. In the review of a Servicer's activities, the Master Servicer may rely upon an Officer's Certificate of the related Servicer with regard to the related Servicer's compliance with the terms of this Agreement or the Servicing Agreement, as applicable. In the event that the Master Servicer, in its judgment, determines that a Servicer should be terminated in accordance with the terms hereof or the terms of the Servicing Agreement or that a notice should be sent pursuant to the terms hereof with respect to the occurrence of an event that, unless cured, would constitute a Servicer Event of Default or an event of default under the Servicing Agreement, the Master Servicer shall notify the related Servicer, the Sponsor and the Trustee thereof and the Master Servicer shall issue such notice or take such other action as it deems appropriate.

(b)    The Master Servicer, for the benefit of the Trustee and the Certificateholders, shall enforce the obligations of Ocwen and GMAC under this Agreement and shall, in the event that Ocwen or GMAC fails to perform its obligations in accordance with this Agreement, subject to this Section and Article VIII, notify the Trustee and the Trustee shall terminate the rights and obligations of the related Servicer hereunder in accordance with the provisions of Article VIII. In the event that Countrywide fails to perform its obligations in

149

accordance with the Servicing Agreement, the Master Servicer shall terminate the rights and obligations of such Servicer as servicer in accordance with the Servicing Agreement. In the event the rights and obligations of a Servicer (or any successor thereto) are terminated, the Master Servicer shall act as servicer of the related Mortgage Loans or a successor servicer shall be appointed in accordance with the provisions of Article VIII or the Servicing Agreement, as applicable. Such enforcement, including, without limitation, the legal prosecution of claims and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the Mortgage Loans. The Master Servicer shall pay the costs of such enforcement at its own expense, provided that the Master Servicer shall not be required to prosecute or defend any legal action except to the extent that the Master Servicer shall have received reasonable indemnity for its costs and expenses in pursuing such action.

(c)     The Master Servicer shall be entitled to be reimbursed by the Servicers (or from amounts on deposit in the Distribution Account if the related Servicer is unable to fulfill its obligations hereunder or under the Servicing Agreement) for all reasonable out-of-pocket or third party costs associated with the transfer of servicing from the predecessor Servicer (or if the predecessor Servicer is the Master Servicer, from the Servicer immediately preceding the Master Servicer), including without limitation, any reasonable out-of-pocket or third party costs or expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the successor servicer to correct any errors or insufficiencies in the servicing data or otherwise to enable the successor servicer to service the related Mortgage Loans properly and effectively, upon presentation of reasonable documentation of such costs and expenses.

(d)     The Master Servicer shall require the Servicers to comply with the remittance requirements and other obligations set forth in this Agreement and the Servicing Agreement.

(e)     If the Master Servicer acts as a successor to a Servicer, it will not assume any liability for the representations and warranties of the terminated Servicer.

SECTION 4.04.     Fidelity Bond.

The Master Servicer, at its expense, shall maintain in effect a blanket fidelity bond and an errors and omissions insurance policy, affording coverage with respect to all directors, officers, employees and other Persons acting on such Master Servicer's behalf, and covering errors and omissions in the performance of the Master Servicer's obligations hereunder. The errors and omissions insurance policy and the fidelity bond shall be in such form and amount generally acceptable for entities serving as master servicers or trustees.

SECTION 4.05.     Power to Act; Procedures.

The Master Servicer shall master service the Mortgage Loans and shall have full power and authority, subject to the REMIC Provisions and the provisions of Article XI, to do any and all things that it may deem necessary or desirable in connection with the master servicing and administration of the Mortgage Loans, including but not limited to the power and authority

150

(i) to execute and deliver, on behalf of the Certificateholders and the Trustee, customary consents or waivers and other instruments and documents, (ii) to consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages, (iii) to collect any Insurance Proceeds and Liquidation Proceeds, and (iv) to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan, in each case, in accordance with the provisions of this Agreement; provided, however, that the Master Servicer shall not (and, consistent with its responsibilities under Section 4.03, shall not permit a Servicer to) knowingly or intentionally take any action, or fail to take (or fail to cause to be taken) any action reasonably within its control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, would cause REMIC I, REMIC II, REMIC III or REMIC IV to fail to qualify as a REMIC or result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) unless the Master Servicer has received an Opinion of Counsel (but not at the expense of the Master Servicer) to the effect that the contemplated action will not cause REMIC I, REMIC II, REMIC III or REMIC IV to fail to qualify as a REMIC or result in the imposition of a tax upon REMIC I, REMIC II, REMIC III or REMIC IV, as the case may be. The Trustee shall furnish the Master Servicer, upon written request from a Servicing Officer, with any powers of attorney prepared and delivered to it and reasonably acceptable to it by empowering the Master Servicer or the Servicer to execute and deliver instruments of satisfaction or cancellation, or of partial or full release or discharge, and to foreclose upon or otherwise liquidate Mortgaged Property, and to appeal, prosecute or defend in any court action relating to the Mortgage Loans or the Mortgaged Property, in accordance with this Agreement, and the Trustee shall execute and deliver such other documents prepared and delivered to it and reasonably acceptable to it, as the Master Servicer or the related Servicer may request, to enable the Master Servicer to master service and administer the Mortgage Loans and carry out its duties hereunder, in each case in accordance with Accepted Master Servicing Practices (and the Trustee shall have no liability for misuse of any such powers of attorney by the Master Servicer or the related Servicer and shall be indemnified by the Master Servicer or the related Servicer, as applicable, for any cost, liability or expense incurred by the Trustee in connection with such Person's use or misuse of any such power of attorney). If the Master Servicer or the Trustee has been advised that it is likely that the laws of the state in which action is to be taken prohibit such action if taken in the name of the Trustee or that the Trustee would be adversely affected under the "doing business" or tax laws of such state if such action is taken in its name, the Master Servicer shall join with the Trustee in the appointment of a co-trustee pursuant to Section 9.10. In the performance of its duties hereunder, the Master Servicer shall be an independent contractor and shall not, except in those instances where it is taking action in the name of the Trustee, be deemed to be the agent of the Trustee.

SECTION 4.06.        Due-on-Sale Clauses; Assumption Agreements.

To the extent Mortgage Loans contain enforceable due-on-sale clauses, the Master Servicer shall cause the Servicers to enforce such clauses in accordance with this Agreement or the Servicing Agreement. If applicable law prohibits the enforcement of a due-on-sale clause or such clause is otherwise not enforced in accordance with this Agreement or the Servicing Agreement and, as a consequence, a Mortgage Loan is assumed, the original

151

Mortgagor may be released from liability in accordance with this Agreement or the Servicing Agreement.

SECTION 4.07.    Documents, Records and Funds in Possession of Master Servicer To Be Held for Trustee.

(a)    The Master Servicer shall transmit to the Trustee or the applicable Custodian such documents and instruments coming into the possession of the Master Servicer from time to time as are required by the terms hereof to be delivered to the Trustee or the applicable Custodian. Any funds received by the Master Servicer in respect of any Mortgage Loan or which otherwise are collected by the Master Servicer as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan shall be remitted to the Securities Administrator for deposit in the Distribution Account. The Master Servicer shall, and, subject to Section 3.21 of this Agreement or to the extent provided therein, the Servicing Agreement, shall cause the Servicers to, provide access to information and documentation regarding the related Mortgage Loans to the Trustee, its agents and accountants at any time upon reasonable request and during normal business hours, and to Certificateholders that are savings and loan associations, banks or insurance companies, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of such Office and Corporation or examiners of any other federal or state banking or insurance regulatory authority if so required by applicable regulations of the Office of Thrift Supervision or other regulatory authority, such access to be afforded without charge but only upon reasonable request in writing and during normal business hours at the offices of the Master Servicer designated by it. In fulfilling such a request the Master Servicer shall not be responsible for determining the sufficiency of such information.

(b)    All Mortgage Files and funds collected or held by, or under the control of, the Master Servicer, in respect of any Mortgage Loans, whether from the collection of principal and interest payments or from Liquidation Proceeds or Insurance Proceeds, shall be remitted to the Securities Administrator for deposit in the Distribution Account.

SECTION 4.08.    Standard Hazard Insurance and Flood Insurance Policies.

For each Mortgage Loan, the Master Servicer shall enforce the obligation of Ocwen and GMAC under this Agreement and Countrywide under the Servicing Agreement to maintain or cause to be maintained standard fire and casualty insurance and, where applicable, flood insurance, all in accordance with the provisions of this Agreement. It is understood and agreed that such insurance shall be with insurers meeting the eligibility requirements set forth in Section 3.11 of this Agreement or the eligibility requirements set forth in the Servicing Agreement and that no earthquake or other additional insurance is to be required of any Mortgagor or to be maintained on property acquired in respect of a defaulted loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.

SECTION 4.09.    Presentment of Claims and Collection of Proceeds.

The Master Servicer shall enforce each Servicer's obligations under this Agreement or under the Servicing Agreement, as applicable, to prepare and present on behalf of

152

the Trustee and the Certificateholders all claims under any insurance policies and take such actions (including the negotiation, settlement, compromise or enforcement of the insured's claim) as shall be necessary to realize recovery under such policies. Any proceeds disbursed to the Master Servicer (or disbursed to the Servicer and remitted to the Master Servicer) in respect of such policies, bonds or contracts shall be promptly deposited in the Distribution Account upon receipt, except that any amounts realized that are to be applied to the repair or restoration of the related Mortgaged Property as a condition precedent to the presentation of claims on the related Mortgage Loan to the insurer under any applicable insurance policy need not be so deposited or remitted.

SECTION 4.10.    Maintenance of Primary Mortgage Insurance Policies.

(a)    The Master Servicer shall not take, or permit a Servicer to take (to the extent such action is prohibited by this Agreement or the Servicing Agreement), any action that would result in noncoverage under any primary mortgage insurance policy of any loss which, but for the actions of the Master Servicer or the related Servicer, as applicable, would have been covered thereunder. The Master Servicer shall use its best reasonable efforts to cause the related Servicer to keep in force and effect (to the extent that the Mortgage Loan requires the Mortgagor to maintain such insurance), primary mortgage insurance applicable to each Mortgage Loan serviced by such Servicer in accordance with the provisions of this Agreement or the Servicing Agreement, as applicable. The Master Servicer shall not, and shall not permit the Servicer to, cancel or refuse to renew any primary mortgage insurance policy that is in effect at the date of the initial issuance of the Mortgage Note and is required to be kept in force hereunder except in accordance with the provisions of this Agreement or the Servicing Agreement.

(b)    The Master Servicer agrees to cause the Servicer to present, on behalf of the Trustee and the Certificateholders, claims to the insurer under any primary mortgage insurance policies and, in this regard, to take such reasonable action as shall be necessary to permit recovery under any primary mortgage insurance policies respecting defaulted Mortgage Loans..

SECTION 4.11.    Trustee to Retain Possession of Certain Insurance Policies and Documents.

The Trustee or the applicable Custodian, shall retain possession and custody of the originals (to the extent available) of any primary mortgage insurance policies, or certificate of insurance if applicable, and any certificates of renewal as to the foregoing as may be issued from time to time as contemplated by this Agreement. Until all amounts distributable in respect of the Certificates have been distributed in full and the Master Servicer and the Servicers have otherwise fulfilled their respective obligations under this Agreement or the Servicing Agreement, as applicable, the Trustee or the applicable Custodian shall also retain possession and custody of each Mortgage File in accordance with and subject to the terms and conditions of this Agreement and the related Custodial Agreement. The Master Servicer shall promptly deliver or cause to be delivered to the Trustee or the applicable Custodian, upon the execution or receipt thereof the originals of any primary mortgage insurance policies, any certificates of renewal, and such other documents or instruments that constitute Mortgage Loan Documents that come into the possession of the Master Servicer from time to time.

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

SECTION 4.12.        Realization Upon Defaulted Mortgage Loans.

The Master Servicer shall cause the Servicers to foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such of the Mortgage Loans serviced by such Servicer as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments, all in accordance with this Agreement or the Servicing Agreement, as applicable.

SECTION 4.13.        Compensation for the Master Servicer.

As compensation for the activities of the Master Servicer hereunder, the Master Servicer shall be entitled to the Master Servicing Fee and the income from investment of or earnings on the funds from time to time in the Distribution Account, as provided in Section 3.10. The compensation payable to the Master Servicer in respect of any Distribution Date shall be reduced in accordance with Section 4.19. The Master Servicer shall be required to pay all expenses incurred by it in connection with its activities hereunder and shall not be entitled to reimbursement therefor except as provided in this Agreement.

SECTION 4.14.        REO Property.

(a)        In the event the Trust Fund acquires ownership of any REO Property in respect of any Mortgage Loan, the deed or certificate of sale shall be issued to the Trustee, or to its nominee, on behalf of the related Certificateholders. The Master Servicer shall cause the Servicers to sell, any REO Property as expeditiously as possible and in accordance with the provisions of this Agreement or the Servicing Agreement, as applicable. Further, the Master Servicer shall cause the Servicers to sell any REO Property prior to three years after the end of the calendar year of its acquisition by REMIC I unless (i) the Trustee shall have been supplied by the related Servicer with an Opinion of Counsel to the effect that the holding by the Trust Fund of such REO Property subsequent to such three-year period will not result in the imposition of taxes on "prohibited transactions" of any REMIC hereunder as defined in section 860F of the Code or cause any REMIC hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding, in which case the Trust Fund may continue to hold such Mortgaged Property (subject to any conditions contained in such Opinion of Counsel) or (ii) the related Servicer shall have applied for, prior to the expiration of such three-year period, an extension of such three-year period in the manner contemplated by Section 856(e)(3) of the Code, in which case the three-year period shall be extended by the applicable extension period. The Master Servicer shall cause the related Servicer to protect and conserve, such REO Property in the manner and to the extent required by this Agreement or the Servicing Agreement, as applicable, in accordance with the REMIC Provisions and in a manner that does not result in a tax on "net income from foreclosure property" or cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code.

(b)        The Master Servicer shall cause the Servicers to deposit all funds collected and received in connection with the operation of any REO Property into the related REO Account or in the account designated for such amounts under the Servicing Agreement.

154

SECTION 4.15.    Master Servicer Annual Statement of Compliance.

(a)    The Master Servicer and the Securities Administrator shall deliver (or otherwise make available) (and the Master Servicer and Securities Administrator shall cause any Additional Servicer or Servicing Function Participant engaged by it to deliver) to the Depositor and the Securities Administrator on or before March 15 of each year, commencing in March 2008, an Officer's Certificate stating, as to the signer thereof, that (A) a review of such party's activities during the preceding calendar year or portion thereof and of such party's performance under this Agreement, or such other applicable agreement in the case of an Additional Servicer or Servicing Function Participant, has been made under such officer's supervision and (B) to the best of such officer's knowledge, based on such review, such party has fulfilled all its obligations under this Agreement, or such other applicable agreement in the case of an Additional Servicer or Servicing Function Participant, in all material respects throughout such year or portion thereof, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

(b)    The Master Servicer shall include all annual statements of compliance received by it with its own annual statement of compliance to be submitted to the Securities Administrator pursuant to this Section 4.15.

(c)    In the event the Master Servicer, the Securities Administrator or any Servicing Function Participant engaged by the parties is terminated, assigns its rights and obligations under, or resigns pursuant to the terms of this Agreement, or any applicable agreement in the case of a Servicing Function Participant, as the case may be, such party shall provide an Officer's Certificate pursuant to this Section 4.15 or to such applicable agreement, as the case may be, notwithstanding any such termination, assignment or resignation.

(d)    Failure of the Master Servicer to comply timely with this Section 4.15 shall be deemed a Master Servicer Event of Default, automatically, without notice and without any cure period, and the Trustee may, in addition to whatever rights the Trustee may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Master Servicer for the same.    This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

(e)    Copies of such Master Servicer annual statements of compliance shall be provided to any Certificateholder upon request, by the Master Servicer or by the Trustee at the Master Servicer's expense if the Master Servicer failed to provide such copies (unless (i) the Master Servicer shall have failed to provide the Trustee with such statement or (ii) the Trustee shall be unaware of the Master Servicer's failure to provide such statement).

(f)    Delivery under this Section 4.15 of such reports, information and documents to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Master Servicer's compliance with any of its

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

covenants hereunder (as to which the Trustee is entitled to conclusively rely exclusively on an Officer's Certificate).

SECTION 4.16.    Master Servicer Assessments of Compliance.

(a)    By March 15 of each year, commencing in March 2008, the Master Servicer and the Securities Administrator, each at its own expense, shall furnish, or otherwise make available, and each such party shall cause any Servicing Function Participant engaged by it to furnish, each at its own expense, to the Securities Administrator and the Depositor, a report on an assessment of compliance with the Relevant Servicing Criteria that contains (A) a statement by such party of its responsibility for assessing compliance with the Relevant Servicing Criteria, (B) a statement that such party used the Relevant Servicing Criteria to assess compliance with the Relevant Servicing Criteria, (C) such party's assessment of compliance with the Relevant Servicing Criteria as of and for the fiscal year covered by the Form 10-K required to be filed pursuant to Section 5.06(d), including, if there has been any material instance of noncompliance with the Relevant Servicing Criteria, a discussion of each such failure and the nature and status thereof, and (D) a statement that a registered public accounting firm has issued an attestation report on such party's assessment of compliance with the Relevant Servicing Criteria as of and for such period.

(b)    No later than the end of each fiscal year for the Trust for which a 10-K is required to be filed, the Master Servicer shall forward to the Securities Administrator and to the Depositor the name of each Servicing Function Participant engaged by it and what Relevant Servicing Criteria will be addressed in the report on assessment of compliance prepared by such Servicing Function Participant (provided, however, that the Master Servicer need not provide such information to the Securities Administrator so long as the Master Servicer and the Securities Administrator are the same Person). When the Master Servicer and the Securities Administrator (or any Servicing Function Participant engaged by them) submit their assessments to the Securities Administrator, such parties will also at such time include the assessment (and attestation pursuant to Section 4.17) of each Servicing Function Participant engaged by it.

(c)    Promptly after receipt of each such report on assessment of compliance, (i) the Depositor shall review each such report and, if applicable, consult with the Master Servicer, the Securities Administrator and any Servicing Function Participant engaged by such parties as to the nature of any material instance of noncompliance with the Relevant Servicing Criteria by each such party, and (ii) the Securities Administrator shall confirm that the assessments, taken as a whole, address all of the Servicing Criteria and taken individually address the Relevant Servicing Criteria for each party as set forth on Exhibit E and on any similar exhibit set forth in the Servicing Agreement and notify the Depositor of any exceptions.

(d)    The Master Servicer shall include all annual reports on assessment of compliance received by it from the Servicers with its own assessment of compliance to be submitted to the Securities Administrator pursuant to this Section 4.16.

(e)    In the event the Master Servicer, the Securities Administrator or any Servicing Function Participant engaged by the parties is terminated, assigns its rights and obligations under, or resigns pursuant to the terms of this Agreement, or any other applicable

156

agreement in the case of a Servicing Function Participant, as the case may be, such party shall provide a report on assessment of compliance pursuant to this Section 4.16 or to such other applicable agreement, notwithstanding any such termination, assignment or resignation.

(f)    Failure of the Master Servicer to comply timely with this Section 4.16 shall be deemed a Master Servicer Event of Default, automatically, without notice and without any cure period, and the Trustee may, in addition to whatever rights the Trustee may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Master Servicer for the same. This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

SECTION 4.17.    Master Servicer Attestation Reports.

(a)    By March 15 of each year, commencing in March 2008, the Master Servicer and the Securities Administrator, each at its own expense, shall cause, and each such party shall cause any Servicing Function Participant engaged by it to cause, each at its own expense, a registered public accounting firm (which may also render other services to the Master Servicer, the Securities Administrator, or such other Servicing Function Participants, as the case may be) and that is a member of the American Institute of Certified Public Accountants to furnish an attestation report to the Securities Administrator and the Depositor, to the effect that (i) it has obtained a representation regarding certain matters from the management of such party, which includes an assertion that such party has complied with the Relevant Servicing Criteria, and (ii) on the basis of an examination conducted by such firm in accordance with standards for attestation engagements issued or adopted by the PCAOB, it is expressing an opinion as to whether such party's compliance with the Relevant Servicing Criteria was fairly stated in all material respects, or it cannot express an overall opinion regarding such party's assessment of compliance with the Relevant Servicing Criteria. In the event that an overall opinion cannot be expressed, such registered public accounting firm shall state in such report why it was unable to express such an opinion. Such report must be available for general use and not contain restricted use language.

(b)    Promptly after receipt of such assessment of compliance and attestation report from the Master Servicer, the Securities Administrator or any Servicing Function Participant engaged by such parties, the Securities Administrator shall confirm that each assessment submitted pursuant to Section 4.16 is coupled with an attestation meeting the requirements of this Section and notify the Depositor of any exceptions.

(c)    The Master Servicer shall include each such attestation furnished to it from the Servicers with its own attestation to be submitted to the Securities Administrator pursuant to this Section 4.17.

(d)    In the event the Master Servicer, the Securities Administrator or any Servicing Function Participant engaged by the parties is terminated assigns its rights and duties under, or resigns pursuant to the terms of this Agreement, or any applicable custodial agreement or servicing or sub-servicing agreement in the case of a Servicing Function Participant, as the

157

case may be, such party shall cause a registered public accounting firm to provide an attestation pursuant to this Section 4.17, or such other applicable agreement, notwithstanding any such termination, assignment or resignation.

(e)    Failure of the Master Servicer to comply timely with this Section 4.17 shall be deemed a Master Servicer Event of Default, automatically, without notice and without any cure period, and the Trustee may, in addition to whatever rights the Trustee may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Master Servicer for the same.    This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

SECTION 4.18.    Annual Certification.

(a)    Each Form 10-K required to be filed for the Trust pursuant to Section 5.06 shall include a Sarbanes-Oxley Certification required to be included therewith pursuant to the Sarbanes-Oxley Act. Each of the Master Servicer and the Securities Administrator shall provide, and shall cause any Servicing Function Participant engaged by it to provide to the Person who signs the Sarbanes-Oxley Certification (the "Certifying Person"), by March 15 of each year in which the Trust is subject to the reporting requirements of the Exchange Act and otherwise within a reasonable period of time upon request, a certification (each, a "Back-Up Certification"), in the form attached hereto as Exhibit C, upon which the Certifying Person, the entity for which the Certifying Person acts as an officer, and such entity's officers, directors and Affiliates (collectively with the Certifying Person, "Certification Parties") can reasonably rely. The officer of the Master Servicer in charge of the master servicing function shall serve as the senior Certifying Person on behalf of the Trust.  Such officer of the Certifying Person can be contacted by e-mail at cts.sec.notifications@wellsfargo.com or by facsimile at 410-715-2380.  In the event any such party or any Servicing Function Participant engaged by any such party is terminated, assigns its rights or duties under, or resigns pursuant to the terms of this Agreement, or any applicable sub-servicing agreement, as the case may be, such party shall provide a Back-Up Certification to the Certifying Person pursuant to this Section 4.18 with respect to the period of time it was subject to this Agreement or any applicable sub-servicing agreement, as the case may be. Notwithstanding the foregoing, (i) the Master Servicer and the Securities Administrator shall not be required to deliver a Back-Up Certification to each other if both are the same Person and the Master Servicer is the Certifying Person and (ii) the Master Servicer shall not be obligated to sign the Sarbanes-Oxley Certification in the event that it does not receive any Back-Up Certification required to be furnished to it pursuant to this Section.

SECTION 4.19.    Obligation of the Master Servicer in Respect of Prepayment Interest Shortfalls.

In the event of any Prepayment Interest Shortfalls, the Master Servicer shall deposit into the Distribution Account not later than the related Distribution Date an amount equal to the lesser of (i) the aggregate amounts required to be paid by the Servicers with respect to Prepayment Interest Shortfalls attributable to Principal Prepayments in full on the Mortgage Loans for the related Distribution Date, and not so paid by the Servicers and (ii) the aggregate

158

amount of the compensation payable to the Master Servicer for such Distribution Date in accordance with Section 4.13, without reimbursement therefor.

SECTION 4.20.    Prepayment Penalty Verification.

On or prior to each Servicer Remittance Date, each Servicer shall provide in an electronic format acceptable to the Master Servicer the data necessary for the Master Servicer to perform its verification duties set forth in this Section 4.20. The Master Servicer or a third party reasonably acceptable to the Master Servicer and the Depositor (the "Verification Agent") will perform such verification duties and will use its best efforts to issue its findings in a report (the "Verification Report") delivered to the Master Servicer and the Depositor within ten (10) Business Days following the related Distribution Date; provided, however, that if the Verification Agent is unable to issue the Verification Report within ten (10) Business Days following the Distribution Date, the Verification Agent may issue and deliver to the Master Servicer and the Depositor the Verification Report upon the completion of its verification duties. The Master Servicer shall forward the Verification Report to the related Servicer and shall notify the related Servicer if the Master Servicer has determined that such Servicer did not deliver the appropriate Prepayment Charge to the Securities Administrator in accordance with this Agreement. Such written notification from the Master Servicer shall include the loan number, prepayment penalty code and prepayment penalty amount as calculated by the Master Servicer or the Verification Agent, as applicable, of each Mortgage Loan for which there is a discrepancy. If the related Servicer agrees with the verified amounts, such Servicer shall adjust the immediately succeeding Servicer Report and the amount remitted to the Securities Administrator with respect to prepayments accordingly. If the related Servicer disagrees with the determination of the Master Servicer, such Servicer shall, within five (5) Business Days of its receipt of the Verification Report, notify the Master Servicer of such disagreement and provide the Master Servicer with detailed information to support its position. The related Servicer and the Master Servicer shall cooperate to resolve any discrepancy on or prior to the immediately succeeding Servicer Remittance Date, and the related Servicer will indicate the effect of such resolution on the Servicer Report and shall adjust the amount remitted with respect to prepayments on such Servicer Remittance Date accordingly.

During such time as the related Servicer and the Master Servicer are resolving discrepancies with respect to the Prepayment Charges, no payments in respect of any disputed Prepayment Charges will be remitted to the Securities Administrator for deposit in the Distribution Account and the Master Servicer shall not be obligated to deposit such payments, unless otherwise required pursuant to Section 8.01 hereof. In connection with such duties, the Master Servicer shall be able to rely solely on the information provided to it by the Servicers in accordance with this Section. The Master Servicer shall not be responsible for verifying the accuracy of any of the information provided to it by the Servicers.

159

# ARTICLE V

## PAYMENTS TO CERTIFICATEHOLDERS

SECTION 5.01.    Distributions.

(a)    (1) On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC I to REMIC II on account of the REMIC I Regular Interests or withdrawn from the Distribution Account and distributed to the Holders of the Class R Certificates, in respect of the Class R-I Interest, as the case may be:

With respect to the Group I Mortgage Loans:

(i)    to the Holders of REMIC I Regular Interest LT1, REMIC I Regular Interest LT1PF, REMIC I Regular Interest LTCE2G, REMIC I Regular Interest LTCE2C and REMIC I Regular Interest LTP in an amount equal to (A) the Uncertificated Interest for each REMIC I Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates; and

(ii)    to the Holders of REMIC I Regular Interest LTP, on the Distribution Date immediately following the expiration of the latest Prepayment Charge as identified on the Prepayment Charge Schedule or any Distribution Date thereafter until $100 has been distributed pursuant to this clause;

(2)    to the Holders of REMIC I Regular Interest LT1 and REMIC I Regular Interest LT1PF, in an amount equal to the remainder of the Available Distribution Amount for such Distribution Date after the distributions made pursuant to clause (i) above, allocated as follows:

(a)    to the Holders of REMIC I Regular Interest LT1, until the Uncertificated Balance of REMIC I Regular Interest LT1 is reduced to zero;

(b)    to the Holders of REMIC I Regular Interest LT1PF, until the Uncertificated Balance of REMIC I Regular Interest LT1PF is reduced to zero; and

(c)    any remaining amount to the Holders of the Class R Certificates (in respect of the Class R-1 Interest);

provided, however, that for the first three Distribution Dates, such amounts relating to the Initial Group I Mortgage Loans shall be allocated to REMIC I Regular Interest I-LT1 and such amounts relating to the Subsequent Group I Mortgage Loans shall be allocated to REMIC I Regular Interest LT1PF.

160

With respect to the Group II Mortgage Loans:

(3)    to the Holders of REMIC I Regular Interest LT2, REMIC I Regular Interest LTCE2G, REMIC I Regular Interest LTCE2C and REMIC I Regular Interest LT2PF in an amount equal to (A) the Uncertificated Interest for each REMIC I Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates;

(4)    to the Holders of REMIC I Regular Interest LT2 and REMIC I Regular Interest LT2PF, in an amount equal to the remainder of the Available Distribution Amount for such Distribution Date after the distributions made pursuant to clause (1) above, allocated as follows:

(a)    to the Holders of REMIC I Regular Interest LT2, until the Uncertificated Balance of REMIC I Regular Interest LT2 is reduced to zero;

(b)    to the Holders of REMIC I Regular Interest LT2PF, until the Uncertificated Balance of REMIC I Regular Interest LT2PF is reduced to zero; and

(c)    any remaining amount to the Holders of the Class R Certificates (in respect of the Class R-1 Interest);

provided, however, that for the first three Distribution Dates, such amounts relating to the Initial Group II Mortgage Loans shall be allocated to REMIC I Regular Interest LT2 and such amounts relating to the Subsequent Group II Mortgage Loans shall be allocated to REMIC I Regular Interest LT2PF.

On each Distribution Date, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period will be distributed by REMIC I to the Holders of REMIC I Regular Interest LTP. The payment of the foregoing amounts to the Holders of REMIC I Regular Interest LTP shall not reduce the Uncertificated Balance thereof.

(b)    On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC II to REMIC III on account of the REMIC II Regular Interests and distributed to the holders of the Class R Certificates (in respect of the Class R-II Interest), as the case may be:

(1)    With respect to the Group I Mortgage Loans:

(i)    to Holders of REMIC II Regular Interest I, REMIC II Regular Interest I-CE-2 and REMIC II Regular Interest I-1-A through I-53-B, *pro rata*, in an amount equal to (A) Uncertificated Interest for such REMIC II Regular Interests for such Distribution Date, plus (B) any amounts payable in respect thereof remaining unpaid from previous Distribution Dates;

161

(ii)     to the extent of amounts remaining after the distributions made pursuant to clause (i) above, to the Holders of REMIC II Regular Interest I, an amount of principal shall be distributed to such Holders until the Uncertificated Balance of REMIC II Regular Interest I is reduced to zero; and

(iii)     to the extent of amounts remaining after distributions made pursuant to clauses (i) and (ii) above, payments of principal shall be allocated to REMIC II Regular Interests I-1-A through I-53-B starting with the lowest numerical denomination until the Uncertificated Balance of each such REMIC II Regular Interest is reduced to zero, provided that, for REMIC II Regular Interests with the same numerical denomination, such payments of principal shall be allocated *pro rata* between such REMIC II Regular Interests.

(2)     With respect to the Group II Mortgage Loans:

(i)     to Holders of REMIC II Regular Interest II, REMIC II Regular Interest I-CE-2 and each of REMIC II Regular Interest II-1-A through II-53-B, *pro rata*, in an amount equal to (A) Uncertificated Interest for such REMIC II Regular Interests for such Distribution Date, plus (B) any amounts payable in respect thereof remaining unpaid from previous Distribution Dates;

(ii)     to the extent of amounts remaining after the distributions made pursuant to clause (i) above, to the Holders of REMIC II Regular Interest II, an amount of principal shall be distributed to such Holders until the Uncertificated Balance of REMIC II Regular Interest II is reduced to zero; and

(iii)     to the extent of amounts remaining after distributions made pursuant to clauses (i) and (ii) above, payments of principal shall be allocated to REMIC II Regular Interests II-1-A through II-53-B starting with the lowest numerical denomination until the Uncertificated Balance of each such REMIC II Regular Interest is reduced to zero, provided that, for REMIC II Regular Interests with the same numerical denomination, such payments of principal shall be allocated *pro rata* between such REMIC II Regular Interests.

(c)     to the Holders of REMIC II Regular Interest I-53-B, all amounts representing Prepayment Charges in respect of the Group I Mortgage Loans received during the related Prepayment Period and to the Holders of REMIC II Regular Interest II-53-B, all amounts representing Prepayment Charges in respect of the Group II Mortgage Loans received during the related Prepayment Period.

(d)     (1) On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC III to REMIC IV on account of the REMIC III Regular Interests or withdrawn from the Distribution Account and distributed to the Holders of the Class R Certificates (in respect of the Class R-III Interest), as the case may be:

(i)     first to the Holders of REMIC III Regular Interest IO, in an amount equal to (A) Uncertificated Interest for such REMIC III Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from

162

previous Distribution Dates and second, to the Holders of REMIC III Regular Interest AA, REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8, REMIC III Regular Interest M-9, REMIC III Regular Interest ZZ and REMIC III Regular Interest P, *pro rata*, in an amount equal to (A) the Uncertificated Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates. Amounts payable as Uncertificated Interest in respect of REMIC III Regular Interest ZZ shall be reduced when the REMIC III Overcollateralization Amount is less than the REMIC III Required Overcollateralization Amount, by the lesser of (x) the amount of such difference and (y) the Maximum ZZ Uncertificated Interest Deferral Amount and such amount will be payable to the Holders of REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8 and REMIC III Regular Interest M-9 in the same proportion as the Overcollateralization Increase Amount is allocated to the Corresponding Certificates and the Uncertificated Balance of REMIC III Regular Interest ZZ shall be increased by such amount;

(ii)     to Holders of REMIC III Regular Interest I-SUB, REMIC III Regular Interest I-GRP, REMIC III Regular Interest II-SUB, REMIC III Regular Interest II-GRP, and REMIC III Regular Interest XX, *pro rata*, in an amount equal to (A) the Uncertificated Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates;

(iii)     to the Holders of REMIC III Regular Interests, in an amount equal to the remainder of the REMIC III Marker Allocation Percentage of the available funds for such Distribution Date after the distributions made pursuant to clause (i) above, allocated as follows:

(A)     98.00% of such remainder to the Holders of REMIC III Regular Interest AA, until the Uncertificated Balance of such REMIC III Regular Interest is reduced to zero;

(B)     2.00% of such remainder, first, to the Holders of REMIC III Regular Interest A-1, REMIC III Regular Interest A-2A, REMIC III Regular Interest A-2B, REMIC III Regular Interest A-2C, REMIC III Regular Interest A-2D, REMIC III Regular Interest M-1, REMIC III Regular Interest M-2, REMIC III Regular Interest M-3, REMIC III Regular Interest M-4, REMIC III Regular Interest M-5, REMIC III Regular Interest M-6, REMIC III Regular Interest M-7, REMIC III Regular Interest M-8 and REMIC III Regular Interest M-9, 1% of and in the same proportion as principal payments are allocated to the Corresponding

163

Certificates, until the Uncertificated Balances of such REMIC III Regular Interests are reduced to zero and second to the Holders of REMIC III Regular Interest ZZ, until the Uncertificated Balance of such REMIC III Regular Interest is reduced to zero;

(C)    to the Holders of REMIC III Regular Interest P, (1) 100% of the Prepayment Charges deemed distributed on REMIC I Regular Interest I-53-B and REMIC I Regular Interest II-53-B and (2) on the Distribution Date immediately following the expiration of the latest Prepayment Charge as identified on the Prepayment Charge Schedule or any Distribution Date thereafter until $100 has been distributed pursuant to this clause; then

(D)    any remaining amount to the Holders of the Class R Certificate, in respect of the Class R-III Interest;

provided, however, that 98.00% and 2.00% of any principal payments that are attributable to an Overcollateralization Reduction Amount shall be allocated to Holders of REMIC III Regular Interest AA and REMIC III Regular Interest ZZ, respectively.

(iv)    to the Holders of REMIC III Regular Interests, in an amount equal to the remainder of the REMIC III Sub WAC Allocation Percentage of available funds for such Distribution Date after the distributions made pursuant to clause (c)(ii) above, such that distributions of principal shall be deemed to be made to the REMIC III Regular Interests first, so as to keep the Uncertificated Balance of each REMIC III Regular Interest ending with the designation "GRP" equal to 0.01% of the aggregate Stated Principal Balance of the Mortgage Loans in the related loan group; second, to each REMIC III Regular Interest ending with the designation "SUB," so that the Uncertificated Balance of each such REMIC III Regular Interest is equal to 0.01% of the excess of (x) the aggregate Stated Principal Balance of the Mortgage Loans in the related loan group over (y) the current Certificate Principal Balance of the Class A Certificate in the related loan group (except that if any such excess is a larger number than in the preceding distribution period, the least amount of principal shall be distributed to such REMIC III Regular Interests such that the REMIC III Subordinated Balance Ratio is maintained); and third, any remaining principal to REMIC III Regular Interest XX.

(v)    Notwithstanding the distributions described in Section 5.01(c)(1), distributions of funds shall be made to Certificateholders only in accordance with Section 5.01(c)(2) through (8) and Section 5.01(e).

(vi)    Notwithstanding the distributions described in Section 5.01(c)(1), distributions of funds shall be made to Certificateholders only in accordance with Section 5.01(c)(2) through (8) and Section 5.01(e).

(2)    On each Distribution Date, the Securities Administrator shall withdraw from the Distribution Account to the extent on deposit therein an amount equal to the Group I Interest Remittance Amount and make the following disbursements and transfers

164

in the order of priority described below, in each case to the extent of the Group I Interest Remittance Amount remaining for such Distribution Date:

*first*, commencing on the Distribution Date in November 2007, to the Supplemental Interest Trust, an amount equal to (x) the Group I Allocation Percentage of (i) any Net Swap Payment owed to the Swap Provider and (ii) any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event (to the extent such amount has not been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Trustee on behalf of the Supplemental Interest Trust) and (y) any Net Swap Payment and Swap Termination Payment not paid pursuant to clause (x) in *first* under Section 5.01(c)(3) below;

*second*, to the Holders of the Class A-1 Certificates, the Senior Interest Distribution Amount allocable to the Class A-1 Certificates; and

*third*, concurrently, to the Holders of the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates, the Senior Interest Distribution Amount allocable to each such Class, to the extent remaining unpaid after the distribution of the Group II Interest Remittance Amount as set forth in Section 5.01(c)(3) below on a pro rata basis, based on the entitlement of each such Class.

(3)     On each Distribution Date, the Securities Administrator shall withdraw from the Distribution Account to the extent on deposit therein an amount equal to the Group II Interest Remittance Amount and make the following disbursements and transfers in the order of priority described below, in each case to the extent of the Group II Interest Remittance Amount remaining for such Distribution Date:

*first*, commencing on the Distribution Date in November 2007, to the Supplemental Interest Trust, an amount equal to (x) the Group II Allocation Percentage of (i) any Net Swap Payment owed to the Swap Provider and (ii) any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event (to the extent such amount has not been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Trustee on behalf of the Supplemental Interest Trust) and (y) any Net Swap Payment and Swap Termination Payment not paid pursuant to clause (x) in *first* under Section 5.01(c)(2) above;

*second*, concurrently, to the Holders of the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates, the Senior Interest Distribution Amount allocable to each such Class, on a pro rata basis, based on the entitlement of each such Class; and

*third*, to the Holders of the Class A-1 Certificates, the Senior Interest Distribution Amount allocable to the Class A-1 Certificates, to the extent remaining unpaid

165

after the distribution of the Group I Interest Remittance Amount as set forth in Section 5.01(c)(2) above.

(4)     On each Distribution Date, the Securities Administrator shall withdraw from the Distribution Account to the extent on deposit therein an amount equal to the Group I Interest Remittance Amount and the Group II Interest Remittance Amount remaining after the distributions required by clauses (2) and (3) above and make the following disbursements and transfers in the order of priority described below, in each case to the extent of the Group I Interest Remittance Amount and Group II Interest Remittance Amount remaining for such Distribution Date:

> sequentially, to the Holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, in that order, to the extent of the Interest Distribution Amount allocable to each such Class.

(5)     On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, the Securities Administrator shall withdraw from the Distribution Account to the extent on deposit therein an amount equal to the Group I Principal Distribution Amount and Group II Principal Distribution Amount and distribute to the Certificateholders the following amounts, in the following order of priority:

(i)     The Group I Principal Distribution Amount shall be distributed in the following order of priority:

> *first*, commencing on the Distribution Date in November 2007, to the Supplemental Interest Trust, an amount equal to (x) the Group I Allocation Percentage of (i) any Net Swap Payment owed to the Swap Provider and (ii) any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event to the extent not paid from the Interest Remittance Amount on such Distribution Date and (y) any Net Swap Payment and Swap Termination Payment not paid pursuant to clause (x) in *first* of 5.01(c)(5)(ii) below;

> *second*, to the Holders of the Class A-1 Certificates, until the Certificate Principal Balance of the Class A-1 Certificates has been reduced to zero; and

> *third*, sequentially, to the Holders of the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates, in that order, after taking into account the distribution of the Group II Principal Distribution Amount as described in Section 5.01(c)(5)(ii) below, until the Certificate Principal Balance of each such Class has been reduced to zero.

(ii)     The Group II Principal Distribution Amount shall be distributed in the following order of priority:

> *first*, commencing on the Distribution Date in November 2007, to the Supplemental Interest Trust, an amount equal to (x) the Group II Allocation

Percentage of (i) any Net Swap Payment owed to the Swap Provider and (ii) any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event to the extent not paid from the Interest Remittance Amount on such Distribution Date and (y) any Net Swap Payment and Swap Termination Payment not paid pursuant to clause (x) in *first* of 5.01(c)(5)(i) above;

*second*, sequentially, to the Holders of the Class A-2A Class A-2B, Class A-2C and Class A-2D Certificates, in that order, until the Certificate Principal Balance of each such Class has been reduced to zero; and

*third*, to the Holders of the Class A-1 Certificates after taking into account the distribution of the Group I Principal Distribution Amount as described in Section 5.01(c)(5)(i) above, until the Certificate Principal Balance of the Class A-1 Certificates has been reduced to zero.

(iii)     The Group I Principal Distribution Amount and Group II Principal Distribution Amount remaining after distributions pursuant to Sections 5.01(c)(5)(i) and (ii) above shall be distributed in the following order of priority:

sequentially, to the Holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, in that order, until the Certificate Principal Balance of each such Class has been reduced to zero.

(6)     On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, the Securities Administrator shall withdraw from the Distribution Account to the extent on deposit therein an amount equal to the Group I Principal Distribution Amount and Group II Principal Distribution Amount and distribute to the Certificateholders the following amounts, in the following order of priority:

(i)     The Group I Principal Distribution Amount shall be distributed in the following order of priority:

*first*, commencing on the Distribution Date in November 2007 to the Supplemental Interest Trust, an amount equal to (x) the Group I Allocation Percentage of (i) any Net Swap Payment owed to the Swap Provider and (ii) any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event to the extent not paid from the Interest Remittance Amount on such Distribution Date and (y) any Net Swap Payment and Swap Termination Payment not paid pursuant to clause (x) in *first* of 5.01(c)(6)(ii) below;

*second*, to the Holders of the Class A-1 Certificates, the Class A-1 Principal Distribution Amount, until the Certificate Principal Balance of such Class has been reduced to zero; and

167

*third*, sequentially, to the Holders of the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates, in that order, after taking into account the distribution of the Group II Principal Distribution Amount pursuant to Section 5.01(c)(6)(ii) below, up to an amount equal to the amount, if any, of the Class A-2 Principal Distribution Amount remaining unpaid on such Distribution Date, until the Certificate Principal Balance of each such Class has been reduced to zero.

(ii)    The Group II Principal Distribution Amount shall be distributed in the following order of priority:

*first*, commencing on the Distribution Date in November 2007, to the Supplemental Interest Trust, an amount equal to (x) the Group II Allocation Percentage of (i) any Net Swap Payment owed to the Swap Provider and (ii) any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event to the extent not paid from the Interest Remittance Amount on such Distribution Date and (y) any Net Swap Payment and Swap Termination Payment not paid pursuant to clause (x) in *first* of 5.01(c)(6)(i) above;

*second*, sequentially, to the Holders of the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates, in that order, the Class A-2 Principal Distribution Amount, until the Certificate Principal Balance of each such Class has been reduced to zero; and

*third*, to the Holders of the Class A-1 Certificates, after taking into account the distribution of the Group I Principal Distribution Amount pursuant to Section 5.01(c)(6)(i) above on such Distribution Date, up to an amount equal to the amount, if any, of the Class A-1 Principal Distribution Amount remaining unpaid on such Distribution Date, until the Certificate Principal Balance of such Class has been reduced to zero.

(iii)    The Principal Distribution Amount remaining after distributions pursuant to Sections 5.01(c)(6)(i) and (ii) above shall be distributed in the following order of priority:

*first*, to the Holders of the Class M-1 Certificates, the lesser of (x) the remaining Principal Distribution Amount and (y) the Class M-1 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-1 Certificates has been reduced to zero;

*second*, to the Holders of the Class M-2 Certificates, the lesser of (x) the excess of (i) the remaining Principal Distribution Amount over (ii) the amount distributed to the Holders of the Class M-1 Certificates under clause *first* above, and (y) the Class M-2 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-2 Certificates has been reduced to zero;

*third*, to the Holders of the Class M-3 Certificates, the lesser of (x) the excess of (i) the remaining Principal Distribution Amount over (ii) the sum of the amounts

distributed to the Holders of the Class M-1 Certificates under clause *first* above and to the Holders of the Class M-2 Certificates under clause *second* above, and (y) the Class M-3 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-3 Certificates has been reduced to zero;

*fourth*, to the Holders of the Class M-4 Certificates, the lesser of (x) the excess of (i) the remaining Principal Distribution Amount over (ii) the sum of the amounts distributed to the Holders of the Class M-1 Certificates under clause *first* above, to the Holders of the Class M-2 Certificates under clause *second* above and to the Holders of the Class M-3 Certificates under clause *third* above, and (y) the Class M-4 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-4 Certificates has been reduced to zero;

*fifth*, to the Holders of the Class M-5 Certificates, the lesser of (x) the excess of (i) the remaining Principal Distribution Amount over (ii) the sum of the amounts distributed to the Holders of the Class M-1 Certificates under clause *first* above, to the Holders of the Class M-2 Certificates under clause *second* above, to the Holders of the Class M-3 Certificates under clause *third* above and to the Holders of the Class M-4 Certificates under clause *fourth* above, and (y) the Class M-5 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-5 Certificates has been reduced to zero;

*sixth*, to the Holders of the Class M-6 Certificates, the lesser of (x) the excess of (i) the remaining Principal Distribution Amount over (ii) the sum of the amounts distributed to the Holders of the Class M-1 Certificates under clause *first* above, to the Holders of the Class M-2 Certificates under clause *second* above, to the Holders of the Class M-3 Certificates under clause *third* above, to the Holders of the Class M-4 Certificates under clause *fourth* above and to the Holders of the Class M-5 Certificates under clause *fifth* above, and (y) the Class M-6 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-6 Certificates has been reduced to zero;

*seventh*, to the Holders of the Class M-7 Certificates, the lesser of (x) the excess of (i) the remaining Principal Distribution Amount over (ii) the sum of the amounts distributed to the Holders of the Class M-1 Certificates under clause *first* above, to the Holders of the Class M-2 Certificates under clause *second* above, to the Holders of the Class M-3 Certificates under clause *third* above, to the Holders of the Class M-4 Certificates under clause *fourth* above, to the Holders of the Class M-5 Certificates under clause *fifth* above and to the Holders of the Class M-6 Certificates under clause *sixth* above, and (y) the Class M-7 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-7 Certificates has been reduced to zero;

*eighth*, to the Holders of the Class M-8 Certificates, the lesser of (x) the excess of (i) the remaining Principal Distribution Amount over (ii) the sum of the amounts distributed to the Holders of the Class M-1 Certificates under clause *first* above, to the Holders of the Class M-2 Certificates under clause *second* above, to the

169

Holders of the Class M-3 Certificates under clause *third* above, to the Holders of the Class M-4 Certificates under clause *fourth* above, to the Holders of the Class M-5 Certificates under clause *fifth* above, to the Holders of the Class M-6 Certificates under clause *sixth* above and to the Holders of the Class M-7 Certificates under clause *seventh* above, and (y) the Class M-8 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-8 Certificates has been reduced to zero; and

*ninth*, to the Holders of the Class M-9 Certificates, the lesser of (x) the excess of (i) the remaining Principal Distribution Amount over (ii) the sum of the amounts distributed to the Holders of the Class M-1 Certificates under clause *first* above, to the Holders of the Class M-2 Certificates under clause *second* above, to the Holders of the Class M-3 Certificates under clause *third* above, to the Holders of the Class M-4 Certificates under clause *fourth* above, to the Holders of the Class M-5 Certificates under clause *fifth* above, to the Holders of the Class M-6 Certificates under clause *sixth* above, to the Holders of the Class M-7 Certificates under clause *seventh* above and to the Holders of the Class M-8 Certificates under clause *eighth* above, and (y) the Class M-9 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-9 Certificates has been reduced to zero.

Notwithstanding the priority of distributions described in this Section 5.01(c) with respect to the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates, on any Distribution Date which occurs after the Certificate Principal Balances of the Mezzanine Certificates and Class CE Certificates have been reduced to zero distributions in respect of principal to the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates will be made on a pro rata basis, based on the Certificate Principal Balance of each such Class, until the Certificate Principal Balance of each such Class has been reduced to zero.

(7)     On each Distribution Date, the Net Monthly Excess Cashflow (or, in the case of clause (i) below, the Net Monthly Excess Cashflow exclusive of any Overcollateralization Reduction Amount) shall be distributed as follows:

(i)     *first,* to the Holders of the Class or Classes of Certificates then entitled to receive distributions in respect of principal, in an amount equal to the Overcollateralization Increase Amount, payable to such Holders, to be paid as part of the Principal Distribution Amount;

(ii)     *second*, sequentially, to the holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, in that order, in an amount equal to the Interest Distribution Amount and Interest Carry Forward Amount allocable to each such Class;

(iii)     *third*, sequentially, to the Holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, in that order, in an amount equal to the Allocated Realized Loss Amount allocable to each such Class;

(iv)    *fourth*, concurrently, to the Holders of the Class A Certificates, in an amount equal to such Certificates' allocated share of any Prepayment Interest Shortfalls on the Mortgage Loans to the extent not covered by payments pursuant to Section 3.23 or 4.19 of this Agreement or pursuant to the Servicing Agreement and any shortfalls resulting from the application of the Relief Act or similar state or local law or the bankruptcy code with respect to the Mortgage Loans to the extent not previously reimbursed pursuant to Section 1.02;

(v)    *fifth*, sequentially, to the Holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, in that order, in an amount equal to such certificates' share of any Prepayment Interest Shortfalls on the Mortgage Loans to the extent not covered by payments pursuant to Sections 3.23 or Section 4.19 of this Agreement or pursuant to the Servicing Agreement and any Relief Act Interest Shortfall, in each case that were allocated to such Class for such Distribution Date and for any prior Distribution Date, to the extent not previously reimbursed pursuant to Section 1.02;

(vi)    *sixth*, to the Reserve Fund, the amount by which the Net WAC Rate Carryover Amounts, if any, with respect to the Class A Certificate and Mezzanine Certificates exceeds any amount in the Reserve Fund that was not distributed on prior Distribution Dates;

(vii)    *seventh*, commencing on the Distribution Date in November 2007, to the Supplemental Interest Trust, an amount equal to any Swap Termination Payment owed to the Swap Provider due to a Swap Provider Trigger Event pursuant to the Swap Agreement (to the extent such amount has not been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Trustee on behalf of the Supplemental Interest Trust);

(viii)    *eighth*, to the Holders of the Class CE-1 Certificates the Interest Distribution Amount and any Overcollateralization Reduction Amount for such Distribution Date; and

(ix)    *ninth*, to the Holders of the Class R Certificates, in respect of the Class R-III Interest, any remaining amounts; provided that if such Distribution Date is the Distribution Date immediately following the expiration of the latest Prepayment Charge term as identified on the Mortgage Loan Schedule or any Distribution Date thereafter, then any such remaining amounts will be distributed first, to the Holders of the Class P Certificates, until the Certificate Principal Balance thereof has been reduced to zero and second, to the Holders of the Class R Certificates.

The Class CE-1 Certificates are intended to receive all principal and interest received by the Trust on the Mortgage Loans that is not otherwise distributable to any other Class of Regular Certificates or REMIC Regular Interests. If the Securities Administrator determines that the Residual Certificates are entitled to any distributions on any Distribution Date other than the final Distribution Date, the Securities Administrator, prior to any such

distribution to any Residual Certificate, shall notify the Depositor of such impending distribution. Upon such notification, the Depositor will prepare and request that the other parties hereto enter into an amendment to the Pooling and Servicing Agreement pursuant to Section 12.01, to revise such mistake in the distribution provisions.

On the day prior to each Distribution Date, the Securities Administrator shall deposit all amounts received with respect to the Cap Contracts into the Reserve Fund. On each Distribution Date, after making the distributions of the Available Distribution Amount as set forth above, the Securities Administrator will first, withdraw from the Reserve Fund all income from the investment of funds in the Reserve Fund and distribute such amount to the Holders of the Class CE Certificates, and second, withdraw from the Reserve Fund, to the extent of amounts remaining on deposit therein (which shall include any payments received under the Cap Contracts), the amount of any Net WAC Rate Carryover Amount for such Distribution Date and distribute such amount first, with respect to any amounts received by the Securities Administrator on account of the Group I Cap Contract to the Holders of the Class A-1 Certificates and with respect to any amounts received by the Securities Administrator on account of the Group II Cap Contract concurrently to the Holders of the Class A-2 Certificates on a pro rata basis, based on the entitlement of each such Class; and, with respect to any amounts remaining undistributed paid pursuant to the Cap Contracts, second, to the Class M-1 Certificates, third, to the Class M-2 Certificates, fourth, to the Class M-3 Certificates, fifth, to the Class M-4 Certificates, sixth, to the Class M-5 Certificates, seventh, to the Class M-6 Certificates, eighth, to the Class M-7 Certificates, ninth, to the Class M-8 Certificates and tenth, to the Class M-9 Certificates, in each case to the extent to the extent any Net WAC Rate Carryover Amount is allocable to each such Class.

On each Distribution Date, after making the distributions of the Available Distribution Amount as set forth above, the Securities Administrator will withdraw from the Reserve Fund all income from the investment of funds in the Reserve Fund and distribute such amount to the Holders of the Class CE-1 Certificates. With respect to any amounts deposited in the Reserve Fund from the Net Monthly Excess Cashflow under Section 5.01(c)(7)(viii) above and not distributed pursuant to the preceding paragraph, first, concurrently, (i) to the Holders of the Class A-1 Certificates, the related Net WAC Rate Carryover Amount remaining unpaid for such Distribution Date, on a *pro rata* basis, based on the entitlement of each Class and (ii) to the Holders of the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates, the related Net WAC Rate Carryover Amount remaining unpaid for such Distribution Date; second, sequentially to the Holders of the Class M-1 Certificates, Class M-2 Certificates, Class M-3 Certificates, Class M-4 Certificates, Class M-5 Certificates, Class M-6 Certificates, Class M-7 Certificates, Class M-8 Certificates and Class M-9 Certificates, in that order, in respect of the related Net WAC Rate Carryover Amount remaining unpaid for each such Class for such Distribution Date and third to the Class CE-1 Certificates.

(e)     As described in Section 5.01(c)(2), (3), (5) and (6) above, Net Swap Payments and Swap Termination Payments (other than Swap Termination Payments resulting from a Swap Provider Trigger Event) payable by the Supplemental Interest Trust to the Swap Provider pursuant to the Swap Agreement (to the extent not paid by the Securities Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) shall be deducted from the

Interest Remittance Amount, and to the extent of any such remaining amounts due, from the Principal Remittance Amount, prior to any distributions to the Certificateholders.

On or before each Distribution Date commencing on the Distribution Date occurring in November 2007, such amounts will be distributed to the Supplemental Interest Trust and paid by the Securities Administrator to the Swap Provider as follows:

*first*, to make any Net Swap Payment owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date; and

*second*, to make any Swap Termination Payment (not due to a Swap Provider Trigger Event) owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date (to the extent not paid by the Securities Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee).

Any Swap Termination Payment triggered by a Swap Provider Trigger Event owed to the Swap Provider pursuant to the Swap Agreement will be subordinated to distributions to the Holders of the Offered Certificates and shall be paid pursuant to Section 5.01(c)(7)(viii).

(f)    On each Distribution Date commencing on the Distribution Date occurring in November 2007 and ending immediately following the Distribution Date in April 2012, to the extent required, following the distribution of the Net Monthly Excess Cashflow and withdrawals from the Reserve Fund, any Net Swap Payments payable to the Securities Administrator on behalf of the Supplemental Interest Trust by the Swap Provider will be withdrawn by the Securities Administrator from amounts on deposit in the Supplemental Interest Trust and distributed on the related Distribution Date in the following order of priority:

*first*, concurrently, to each Class of Class A Certificates, the related Senior Interest Distribution Amount remaining undistributed after the distributions of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Net Monthly Excess Cashflow, on a *pro rata* basis based on such respective remaining Senior Interest Distribution Amounts;

*second*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, in that order, the related Interest Distribution Amount and Interest Carry Forward Amount, to the extent remaining undistributed after the distributions of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Net Monthly Excess Cashflow;

*third*, to the Holders of the Class or Classes of Certificates then entitled to receive distributions in respect of principal, in an amount necessary to maintain the Required Overcollateralization Amount after taking into account distributions made pursuant to Section 5.01(c)(7)(i) above;

*fourth*, sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, in that order, in each case up to

173

the related Allocated Realized Loss Amount related to such Certificates for such Distribution Date remaining undistributed after distribution of the Net Monthly Excess Cashflow;

*fifth*, concurrently, to each class of Class A Certificates, the related Net WAC Rate Carryover Amount, to the extent remaining undistributed after distributions of Net Monthly Excess Cashflow on deposit in the Reserve Fund, on a *pro rata* basis based on such respective Net WAC Rate Carryover Amounts remaining unpaid;

*sixth*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, in that order, the related Net WAC Rate Carryover Amount, to the extent remaining undistributed after distributions are made from the Reserve Fund;

*seventh*, to the Swap Provider, an amount equal to any Swap Termination Payment owed to the Swap Provider due to a Swap Provider Trigger Event pursuant to the Swap Agreement (to the extent such amount has not been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee); and

*eighth*, to the Class CE-1 Certificates, any remaining amounts.

(g)    On each Distribution Date, for so long as GMAC is the Servicer of the GMAC Mortgage Loans, the Securities Administrator shall distribute from amounts on deposit in the Distribution Account to the Holders of the Class CE-2 Certificates, with respect to each such Mortgage Loan, one-twelfth of the product of (i) the excess of the Servicing Fee Rate over the GMAC Servicing Fee Rate, if any, multiplied by (ii) the Scheduled Principal Balance of the related Mortgage Loan as of the Due Date in the preceding calendar month (the "GMAC Excess Servicing Fee").

(h)    On each Distribution Date, for so long as Countrywide is the Servicer of the Countrywide Mortgage Loans, the Securities Administrator shall distribute from amounts on deposit in the Distribution Account to the Holders of the Class CE-2 Certificates, with respect to each such Mortgage Loan, one-twelfth of the product of (i) the excess of the Servicing Fee Rate over the Countrywide Servicing Fee Rate, if any, multiplied by (ii) the Scheduled Principal Balance of the related Mortgage Loan as of the Due Date in the preceding calendar month (the "Countrywide Excess Servicing Fee, together with the Ocwen Excess Servicing Fee, the "Excess Servicing Fee").

(i)    On each Distribution Date, the Securities Administrator shall withdraw any amounts then on deposit in the Distribution Account that represent Prepayment Charges and shall distribute such amounts to the Class P Certificateholders as described above.

(j)    All distributions made with respect to each Class of Certificates on each Distribution Date shall be allocated *pro rata* among the outstanding Certificates in such Class based on their respective Percentage Interests. Payments in respect of each Class of Certificates on each Distribution Date will be made to the Holders of the respective Class of record on the related Record Date (except as otherwise provided in Section 5.01(i) or Section 10.01 respecting the final distribution on such Class), based on the aggregate Percentage Interest represented by

174

their respective Certificates, and shall be made by wire transfer of immediately available funds to the account of any such Holder at a bank or other entity having appropriate facilities therefor, if such Holder shall have so notified the Securities Administrator in writing at least five (5) Business Days prior to the Record Date immediately prior to such Distribution Date and is the registered owner of Certificates having an initial aggregate Certificate Principal Balance that is in excess of the lesser of (i) $5,000,000 or (ii) two-thirds of the initial Certificate Principal Balance of such Class of Certificates, or otherwise by check mailed by first class mail to the address of such Holder appearing in the Certificate Register. The final distribution on each Certificate will be made in like manner, but only upon presentment and surrender of such Certificate at the Corporate Trust Office of the Securities Administrator or such other location specified in the notice to Certificateholders of such final distribution.

Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, as Holder thereof, and the Depository shall be responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. None of the Trustee, the Depositor, the Servicer, the Securities Administrator or the Master Servicer shall have any responsibility therefor except as otherwise provided by this Agreement or applicable law.

(k)    The rights of the Certificateholders to receive distributions in respect of the Certificates, and all interests of the Certificateholders in such distributions, shall be as set forth in this Agreement. None of the Holders of any Class of Certificates, the Trustee, the Servicer, the Securities Administrator or the Master Servicer shall in any way be responsible or liable to the Holders of any other Class of Certificates in respect of amounts properly previously distributed on the Certificates.

(l)    Except as otherwise provided in Section 10.01, whenever the Securities Administrator expects that the final distribution with respect to any Class of Certificates will be made on the next Distribution Date, the Securities Administrator shall, no later than three (3) days before the related Distribution Date, mail to each Holder on such date of such Class of Certificates a notice to the effect that:

(i)    the Securities Administrator expects that the final distribution with respect to such Class of Certificates will be made on such Distribution Date but only upon presentation and surrender of such Certificates at the office of the Securities Administrator therein specified, and

(ii)    no interest shall accrue on such Certificates from and after the end of the related Interest Accrual Period.

Any funds not distributed to any Holder or Holders of Certificates of such Class on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held in trust by the Securities Administrator and

credited to the account of the appropriate non-tendering Holder or Holders. If any Certificates as to which notice has been given pursuant to this Section 5.01(i) shall not have been surrendered for cancellation within six months after the time specified in such notice, the Securities Administrator shall mail a second notice to the remaining non-tendering Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second notice all such Certificates shall not have been surrendered for cancellation, the Securities Administrator shall, directly or through an agent, mail a final notice to the remaining non-tendering Certificateholders concerning surrender of their Certificates but shall continue to hold any remaining funds for the benefit of non-tendering Certificateholders. The costs and expenses of maintaining the funds in trust and of contacting such Certificateholders shall be paid out of the assets remaining in such trust fund. If within one year after the final notice any such Certificates shall not have been surrendered for cancellation, the Securities Administrator shall pay to the Depositor all such amounts, and all rights of non-tendering Certificateholders in or to such amounts shall thereupon cease. No interest shall accrue or be payable to any Certificateholder on any amount held in trust by the Securities Administrator as a result of such Certificateholder's failure to surrender its Certificate(s) on the final Distribution Date for final payment thereof in accordance with this Section 5.01(i). Any such amounts held in trust by the Securities Administrator shall be held uninvested in an Eligible Account.

(m)    Notwithstanding anything to the contrary herein, (i) in no event shall the Certificate Principal Balance of a Class A Certificate or a Mezzanine Certificate be reduced more than once in respect of any particular amount both (a) allocated to such Certificate in respect of Realized Losses pursuant to Section 5.04 and (b) distributed to the Holder of such Certificate in reduction of the Certificate Principal Balance thereof pursuant to this Section 5.01 from Net Monthly Excess Cashflow and (ii) in no event shall the Uncertificated Balance of a REMIC Regular Interest be reduced more than once in respect of any particular amount both (a) allocated to such REMIC Regular Interest in respect of Realized Losses pursuant to Section 5.04 and (b) distributed on such REMIC Regular Interest in reduction of the Uncertificated Balance thereof pursuant to this Section 5.01.

SECTION 5.02.    Statements to Certificateholders.

On each Distribution Date, the Securities Administrator (based on the information set forth in the Servicer Reports for such Distribution Date and information provided by the Swap Provider under the Swap Agreement with respect to payments made pursuant to the Swap Agreement and information provided by the Cap Counterparty with respect to payments made pursuant to the Cap Contracts) shall make available to each Holder of the Certificates, the Servicer and the Credit Risk Manager, a statement as to the distributions made on such Distribution Date setting forth:

(i)    the applicable Interest Accrual Periods and general Distribution Dates;

(ii)    with respect to each loan group, the total cash flows received and the general sources thereof;

(iii)    the aggregate Servicing Fee received by the Servicers and Master Servicing Fee received by the Master Servicer during the related Due Period;

(iv)    the amount, if any, of other fees or expenses accrued and paid, with an identification of the payee and the general purpose of such fees;

(v)    with respect to each loan group, the amount of the related distribution to Holders of the Certificates (by class) allocable to principal, separately identifying (A) the aggregate amount of any Principal Prepayments included therein, (B) the aggregate of all scheduled payments of principal included therein and (C) any Overcollateralization Increase Amount included therein;

(vi)    with respect to each loan group, the amount of such distribution to Holders of the Certificates (by class) allocable to interest and the portion thereof, if any, provided by the Swap Agreement in the aggregate;

(vii)    with respect to each loan group, the Interest Carry Forward Amounts and any Net WAC Rate Carryover Amounts for the related Certificates (if any);

(viii)    with respect to each loan group, the number and aggregate principal balance of any Mortgage Loans (not including a Liquidated Mortgage Loan as of the end of the Prepayment Period) that were delinquent (exclusive of Mortgage Loans in foreclosure) using the "OTS" method (1) one scheduled payment is delinquent, (2) two scheduled payments are delinquent, (3) three scheduled payments are delinquent and (4) foreclosure proceedings have been commenced, and loss information for the period;

(ix)    the number, aggregate principal balance, weighted average remaining term to maturity and weighted average Mortgage Rate of the Mortgage Loans as of the related Due Date;

(x)    with respect to each loan group and any Mortgage Loan that was liquidated during the preceding calendar month, the loan number and Scheduled Principal Balance of, and Realized Loss on, such Mortgage Loan as of the end of the related Prepayment Period;

(xi)    the total number and principal balance of any real estate owned, or REO Properties, as of the end of the related Prepayment Period;

(xii)    with respect to each loan group, whether the Stepdown Date has occurred and whether Trigger Event is in effect;

(xiii)    with respect to each loan group, the cumulative Realized Losses through the end of the preceding month;

(xiv)    the aggregate amount of Extraordinary Trust Fund Expenses withdrawn from the Distribution Account for such Distribution Date;

177

(xv)    with respect to each loan group, the Certificate Principal Balance of the related Certificates before and after giving effect to the distribution of principal and allocation of Allocated Realized Loss Amounts on such Distribution Date;

(xvi)    with respect to each loan group, the number and Scheduled Principal Balance of all the Mortgage Loans for the following Distribution Date;

(xvii)    with respect to each loan group, the three-month rolling average of the percent equivalent of a fraction, the numerator of which is the aggregate Scheduled Principal Balance of the Mortgage Loans in such loan group that are 60 days or more delinquent or are in bankruptcy or foreclosure or are REO Properties, and the denominator of which is the Scheduled Principal Balances of all of the Mortgage Loans in such loan group;

(xviii)    the Certificate Factor for each such Class of Certificates applicable to such Distribution Date;

(xix)    the Interest Distribution Amount in respect of the Class A Certificates, the Mezzanine Certificates and the Class CE-1 Certificates for such Distribution Date and the Interest Carry Forward Amount, if any, with respect to the Class A Certificates and the Mezzanine Certificates on such Distribution Date, and in the case of the Class A Certificates and the Mezzanine Certificates separately identifying any reduction thereof due to allocations of Prepayment Interest Shortfalls and interest shortfalls including the following Realized losses, Relief Act Interest Shortfalls and Net WAC Rate Carryover Amounts;

(xx)    the aggregate amount of any Prepayment Interest Shortfall for such Distribution Date, to the extent not covered by payments by Ocwen or GMAC pursuant to Section 3.23 of this Agreement, Countrywide pursuant to the Servicing Agreement or the Master Servicer pursuant to Section 4.19 of this Agreement;

(xxi)    the aggregate amount of Relief Act Interest Shortfalls for such Distribution Date;

(xxii)    the amount of, if any, of Net Monthly Excess Cashflow or excess spread and the application of such Net Monthly Excess Cashflow;

(xxiii)    the Required Overcollateralization Amount and the Credit Enhancement Percentage for such Distribution Date;

(xxiv)    the Overcollateralization Increase Amount, if any, for such Distribution Date;

(xxv)    the Overcollateralization Reduction Amount, if any, for such Distribution Date;

(xxvi)    the Pass-Through Rate for each class of Certificates for such Distribution Date;

178

(xxvii) the amount of any deposit to the Reserve Fund contemplated by Section 3.25(b);

(xxviii)the balance of the Reserve Fund prior to the deposit or withdrawal of any amounts on such Distribution Date;

(xxix) the amount of any deposit to the Reserve Fund pursuant to Section 5.01(c)(7)(vii);

(xxx)   the Aggregate Loss Severity Percentage;

(xxxi) with respect to each loan group, the amount of the Prepayment Charges remitted by the Servicer;

(xxxii) the amount of any Net Swap Payment payable to the Trust, any related Net Swap Payment payable to the Swap Provider, any Swap Termination Payment payable to the Trust and any related Swap Termination Payment payable to the Swap Provider;

(xxxiii)amounts received under the Cap Contracts;

(xxxiv)the amount withdrawn from the Pre Funding Account pursuant to Section 3.28(c) on that Distribution Date, the amount remaining on deposit in the Pre-Funding Account following such Distribution Date, and the amount withdrawn from the Pre-Funding Account and used to buy Subsequent Mortgage Loans prior to such Distribution Date;

(xxxv) for the distribution occurring on the Distribution Date immediately following the end of the Pre-Funding Period, the balance on deposit in the Group I Pre-Funding Sub-Account and/or the Group II Pre-Funding Sub-Account that has not been used to purchase Subsequent Group I Mortgage Loans and/or Subsequent Group II Mortgage Loans, as applicable, and that is being distributed to the related Class A Certificates as a mandatory distribution of principal, if any, on such Distribution Date; and

(xxxvi)the amount withdrawn from the Capitalized Interest Account pursuant to Section 3.29 on that Distribution Date and the amount remaining on deposit in the Capitalized Interest Account..

The Securities Administrator will make such statement (and, at its option, any additional files containing the same information in an alternative format) available each month to the Certificateholders and the Rating Agencies via the Securities Administrator's internet website. The Securities Administrator's internet website shall initially be located at http:\\www.ctslink.com and assistance in using the website can be obtained by calling the Securities Administrator's customer service desk at 1 (866) 846-4526. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Securities Administrator shall have the right to change the way such statements are distributed in order to make such

179

distribution more convenient and/or more accessible to the above parties and the Securities Administrator shall provide timely and adequate notification to all above parties regarding any such changes.

In the case of information furnished pursuant to subclauses (i) and (ii) above, the amounts shall be expressed as a dollar amount per Single Certificate of the relevant Class.

Within a reasonable period of time after the end of each calendar year, the Securities Administrator shall furnish upon request to each Person who at any time during the calendar year was a Holder of a Regular Certificate a statement containing the information set forth in subclauses (i) through (iii) above, aggregated for such calendar year or applicable portion thereof during which such person was a Certificateholder. Such obligation of the Securities Administrator shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Securities Administrator pursuant to any requirements of the Code as from time to time are in force.

Within a reasonable period of time after the end of each calendar year, the Securities Administrator shall furnish upon request to each Person who at any time during the calendar year was a Holder of a Residual Certificate a statement setting forth the amount, if any, actually distributed with respect to the Residual Certificates, as appropriate, aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder.

The Securities Administrator shall, upon request, furnish to the NIMS Insurer and each Certificateholder during the term of this Agreement, such periodic, special, or other reports or information, whether or not provided for herein, as shall be reasonable with respect to the Certificateholder, as applicable, or otherwise with respect to the purposes of this Agreement, all such reports or information to be provided at the expense of the Certificateholder, in accordance with such reasonable and explicit instructions and directions as the Certificateholder may provide.

On each Distribution Date the Securities Administrator shall provide Bloomberg Financial Markets, L.P. ("Bloomberg") CUSIP level factors for each Class of Certificates as of such Distribution Date, using a format and media mutually acceptable to the Securities Administrator and Bloomberg.

SECTION 5.03.    Servicer Reports; P&I Advances.

(a)    On or before 12:00 noon New York time on the 18th calendar day of the month, and if the 18th calendar day is not a Business Day, the immediately following Business Day, Ocwen and GMAC shall deliver to the Master Servicer and the Securities Administrator by telecopy or electronic mail (or by such other means as the related Servicer, the Master Servicer and the Securities Administrator may agree from time to time) a remittance report containing such information with respect to the related Mortgage Loans and the related Distribution Date as is reasonably available to the related Servicer as the Master Servicer or the Securities Administrator may reasonably require so as to enable the Master Servicer to master service the Mortgage Loans and oversee the servicing by the related Servicer and the Securities Administrator to fulfill its obligations hereunder with respect to securities and tax reporting.

180

(b)      The amount of P&I Advances to be made by Ocwen or GMAC on any Distribution Date shall equal, subject to Section 5.03(d), (i) the aggregate amount of Monthly Payments (net of the related Servicing Fees), due during the related Due Period in respect of the Mortgage Loans serviced by such Servicer, which Monthly Payments were delinquent as of the close of business on the related Determination Date and (ii) with respect to each REO Property, which was acquired during or prior to the related Prepayment Period and as to which an REO Disposition did not occur during the related Prepayment Period, an amount equal to the excess, if any, of the REO Imputed Interest on such REO Property for the most recently ended calendar month, over the net income from such REO Property deposited in the related Collection Account pursuant to Section 3.22 of this Agreement for distribution on such Distribution Date; provided, however, the Servicer shall not be required to make P&I Advances with respect to Relief Act Interest Shortfalls, shortfalls due to bankruptcy proceedings or with respect to Prepayment Interest Shortfalls in excess of its obligations under Section 3.23. For purposes of the preceding sentence, the Monthly Payment on each Balloon Mortgage Loan with a delinquent Balloon Payment is equal to the assumed monthly payment that would have been due on the related Due Date based on the original principal amortization schedule for such Balloon Mortgage Loan.

By 12:00 noon New York time on the Servicer Remittance Date, each of Ocwen and GMAC shall remit in immediately available funds to the Securities Administrator for deposit in the Distribution Account an amount equal to the aggregate amount of P&I Advances, if any, to be made in respect of the related Mortgage Loans for the related Distribution Date either (i) from its own funds or (ii) from the related Collection Account, to the extent of any Amounts Held For Future Distribution on deposit therein (in which case it will cause to be made an appropriate entry in the records of the related Collection Account that Amounts Held For Future Distribution have been, as permitted by this Section 5.03, used by the related Servicer in discharge of any such P&I Advance) or (iii) in the form of any combination of (i) and (ii) aggregating the total amount of P&I Advances to be made by the related Servicer with respect to the Mortgage Loans. In addition, the Servicer shall have the right to reimburse itself for any outstanding P&I Advance or Servicing Advance made from its own funds from Amounts Held for Future Distribution. Each of Ocwen and GMAC will be obligated to advance or cause to be advanced to the Master Servicer for deposit in the Distribution Account, from time to time, from (i) its own funds, (ii) funds in the Collection Account that are Amounts Held For Future Distribution or (iii) a combination of (i) and (ii), Servicing Advances. Any Amounts Held For Future Distribution used by Ocwen or GMAC to make P&I Advances or Servicing Advances or to reimburse itself for outstanding P&I Advances or Servicing Advances shall be appropriately reflected in the related Servicer's records and replaced by the related Servicer by deposit in the related Collection Account no later than the close of business on the Servicer Remittance Date immediately following the Due Period or Prepayment Period for which such amounts relate. The Securities Administrator will notify the related Servicer, the Master Servicer and the NIMS Insurer by the close of business on the Business Day prior to the Distribution Date in the event that the amount remitted by the related Servicer to the Securities Administrator on such date is less than the P&I Advances required to be made by the related Servicer for the related Distribution Date.

In addition, the Servicers will be obligated to advance or cause to be advanced to the Master Servicer, from time to time, from (i) from its own funds or (ii) from the related Collection Account, to the extent of any Amounts Held For Future Distribution on deposit therein (in which case it will cause to be made an appropriate entry in the records of the

181

Collection Account that Amounts Held For Future Distribution have been, as permitted by this Section 5.03, used by the related Servicer in discharge of any such Servicing Advance) or (iii) in the form of any combination of (i) and (ii), Servicing Advances. Any Amounts Held For Future Distribution used by a Servicer to make Servicing Advances shall be appropriately reflected in such Servicer's records and replaced by such Servicer by deposit in the related Collection Account no later than the close of business on the Servicer Remittance Date immediately following the Due Period or Prepayment Period for which such amounts relate.

(c)     The obligation of the Servicers to make such P&I Advances is mandatory, notwithstanding any other provision of this Agreement but subject to (d) below, and, with respect to any related Mortgage Loan or REO Property, shall continue until a Final Recovery Determination in connection therewith or the removal thereof from the Trust Fund pursuant to any applicable provision of this Agreement, except as otherwise provided in this Section.

(d)     Notwithstanding anything herein to the contrary, no P&I Advance or Servicing Advance shall be required to be made hereunder by the Servicers if such P&I Advance or Servicing Advance would, if made, constitute a Nonrecoverable P&I Advance or Nonrecoverable Servicing Advance, respectively. The determination by a Servicer that it has made a Nonrecoverable P&I Advance or a Nonrecoverable Servicing Advance or that any proposed P&I Advance or Servicing Advance, if made, would constitute a Nonrecoverable P&I Advance or Nonrecoverable Servicing Advance, respectively, shall be evidenced by a certification of a Servicing Officer delivered to the Master Servicer and the NIMS Insurer.

(e)     Subject to and in accordance with the provisions of Article VIII of this Agreement, in the event Ocwen or GMAC fails to make any required P&I Advance, then the Master Servicer (in its capacity as successor Servicer) shall be required to make such P&I Advance on the Distribution Date on which Ocwen or GMAC, as applicable, was required to make such Advance, subject to its determination of recoverability. In addition, in the event that Countrywide fails to make a required P&I Advance under the Servicing Agreement, the Master Servicer (in its capacity as successor Servicer) will be required to make such P&I Advance on the Distribution Date on which Countrywide was required to make such P&I Advance, subject to its determination of recoverability.

SECTION 5.04.     Allocation of Realized Losses.

(a)     Prior to the Determination Date, each Servicer shall determine as to each Mortgage Loan serviced by such Servicer and any related REO Property and include in the monthly remittance report provided to the Master Servicer and the Securities Administrator (substantially in the form of Schedule 4 hereto or as set forth in the Servicing Agreement) such information as is reasonably available to the related Servicer as the Master Servicer or the Securities Administrator may reasonably require so as to enable the Master Servicer to master service the related Mortgage Loans and oversee the servicing by the related Servicer and the Securities Administrator to fulfill its obligations hereunder with respect to securities and tax reporting, which shall include, but not be limited to: (i) the total amount of Realized Losses, if any, incurred in connection with any Final Recovery Determinations made during the related Prepayment Period; and (ii) the respective portions of such Realized Losses allocable to interest and allocable to principal. Prior to each Determination Date, each Servicer shall also determine

as to each related Mortgage Loan: (i) the total amount of Realized Losses, if any, incurred in connection with any Deficient Valuations made during the related Prepayment Period; and (ii) the total amount of Realized Losses, if any, incurred in connection with Debt Service Reductions in respect of Monthly Payments due during the related Due Period.

(b)     All Realized Losses on the Mortgage Loans allocated to any REMIC I Regular Interest pursuant to Section 5.04(c) on the Mortgage Loans shall be allocated by the Securities Administrator on each Distribution Date as follows: first, to Net Monthly Excess Cashflow and to Net Swap Payments received from the Swap Provider under the Swap Agreement for that purpose; second, to the Class CE-1 Certificates; third, to the Class M-9 Certificates, until the Certificate Principal Balance of the Class M-9 Certificates has been reduced to zero; fourth, to the Class M-8 Certificates, until the Certificate Principal Balance of the Class M-8 Certificates has been reduced to zero; fifth, to the Class M-7 Certificates, until the Certificate Principal Balance of the Class M-7 Certificates has been reduced to zero; sixth, to the Class M-6 Certificates, until the Certificate Principal Balance of the Class M-6 Certificates has been reduced to zero; seventh, to the Class M-5 Certificates, until the Certificate Principal Balance of the Class M-5 Certificates has been reduced to zero; eighth, to the Class M-4 Certificates, until the Certificate Principal Balance of the Class M-4 Certificates has been reduced to zero, ninth, to the Class M-3 Certificates, until the Certificate Principal Balance of the Class M-3 Certificates has been reduced to zero; tenth, to the Class M-2 Certificates, until the Certificate Principal Balance of the Class M-2 Certificates has been reduced to zero, and eleventh, to the Class M-1 Certificates, until the Certificate Principal Balance of the Class M-1 Certificates has been reduced to zero. All Realized Losses to be allocated to the Certificate Principal Balances of all Classes on any Distribution Date shall be so allocated after the actual distributions to be made on such date as provided above. All references above to the Certificate Principal Balance of any Class of Certificates shall be to the Certificate Principal Balance of such Class immediately prior to the relevant Distribution Date, before reduction thereof by any Realized Losses, in each case to be allocated to such Class of Certificates, on such Distribution Date.

Any allocation of Realized Losses to a Mezzanine Certificate on any Distribution Date shall be made by reducing the Certificate Principal Balance thereof by the amount so allocated; any allocation of Realized Losses to a Class CE-1 Certificate shall be made by reducing the amount otherwise payable in respect thereof pursuant to Section 5.01(c)(8)(ix). No allocations of any Realized Losses shall be made to the Certificate Principal Balances of the Class A Certificates or Class P Certificates.

As used herein, an allocation of a Realized Loss on a "*pro rata* basis" among two or more specified Classes of Certificates means an allocation on a *pro rata* basis, among the various Classes so specified, to each such Class of Certificates on the basis of their then outstanding Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date. All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the, Certificates of such Class in proportion to the Percentage Interests evidenced thereby.

In addition, in the event that any Servicer receives any Subsequent Recoveries with respect to a Mortgage Loan serviced by it, such Servicer shall deposit such funds into the

related Collection Account pursuant to Section 3.08 or pursuant to the Servicing Agreement. If, after taking into account such Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the Class of Mezzanine Certificates with the highest payment priority to which Realized Losses have been allocated, but not by more than the amount of Realized Losses previously allocated to that Class of Mezzanine Certificates pursuant to this Section 5.04 and not previously reimbursed to such Class of Mezzanine Certificates with Net Monthly Excess Cashflow pursuant to Section 5.01(c)(8). The amount of any remaining Subsequent Recoveries will be applied to sequentially increase the Certificate Principal Balance of the Mezzanine Certificates, beginning with the Class of Mezzanine Certificates with the next highest payment priority, up to the amount of such Realized Losses previously allocated to such Class of Mezzanine Certificates pursuant to this Section 5.04 and not previously reimbursed to such Class of Mezzanine Certificates with Net Monthly Excess Cashflow pursuant to Section 5.01(c)(7). Holders of such Certificates will not be entitled to any payment in respect of current interest on the amount of such increases for any Interest Accrual Period preceding the Distribution Date on which such increase occurs. Any such increases shall be applied to the Certificate Principal Balance of each Mezzanine Certificate of such Class in accordance with its respective Percentage Interest.

(c)    All Realized Losses on the Mortgage Loans shall be allocated by the Securities Administrator, based solely on information received from the Servicers relating to the amounts of such Realized Losses, on each Distribution Date to the following REMIC I Regular Interests, as follows: to REMIC I Regular Interest LT1 and REMIC I Regular Interest LT1PF until the Uncertificated Balance of each such REMIC I Regular Interest has been reduced to zero; provided however, with respect to the first three Distribution Dates, all Realized Losses on the Initial Group I Mortgage Loans shall be allocated to REMIC I Regular Interest LT1 until the Uncertificated Balance of each such REMIC I Regular Interest has been reduced to zero, and all Realized Losses on the Subsequent Group I Mortgage Loans shall be allocated to REMIC I Regular Interest LT1PF until the Uncertificated Balance thereof has been reduced to zero. All Realized Losses on the Group II Mortgage Loans shall be allocated by the Securities Administrator on each Distribution Date to REMIC I Regular Interest LT2 and REMIC I Regular Interest LT2PF until the Uncertificated Balance of each such REMIC I Regular Interest has been reduced to zero; provided however, with respect to the first three Distribution Dates, all Realized Losses on the Initial Group II Mortgage Loans shall be allocated to REMIC I Regular Interest LT2 until the Uncertificated Balance of such REMIC I Regular Interest has been reduced to zero, and all Realized Losses on the Subsequent Group II Mortgage Loans shall be allocated to REMIC I Regular Interest LT2PF until the Uncertificated Balance thereof has been reduced to zero.

(d)    With respect to the REMIC II Regular Interests, all Realized Losses on the Group I Mortgage Loans shall be allocated on each Distribution Date first to REMIC II Regular Interest I until the Uncertificated Balance of such REMIC II Regular Interest has been reduced to zero and second, to REMIC II Regular Interest I-1-A through REMIC II Regular Interest I-53-B, starting with the lowest numerical denomination until such REMIC II Regular Interest has been reduced to zero, provided that, for REMIC II Regular Interests with the same numerical denomination, such Realized Losses shall be allocated *pro rata* between such REMIC II Regular Interests. All Realized Losses on the Group II Mortgage Loans shall be allocated on each

184

Distribution Date first, to REMIC II Regular Interest II until the Uncertificated Balance of such REMIC II Regular Interest has been reduced to zero and second, to REMIC II Regular Interest II-1-A through REMIC II Regular Interest II-53-B, starting with the lowest numerical denomination until such REMIC II Regular Interest has been reduced to zero, provided that, for REMIC II Regular Interests with the same numerical denomination, such Realized Losses shall be allocated *pro rata* between such REMIC II Regular Interests.

(i)    The REMIC III Marker Allocation Percentage of all Realized Losses on the Mortgage Loans shall be allocated by the Securities Administrator, on each Distribution Date to the following REMIC III Regular Interests in the specified percentages, as follows: first, to Uncertificated Interest payable to the REMIC III Regular Interest AA and REMIC III Regular Interest ZZ up to an aggregate amount equal to the REMIC III Interest Loss Allocation Amount, 98.00% and 2.00%, respectively; second, to the Uncertificated Balances of the REMIC III Regular Interest AA and REMIC III Regular Interest ZZ up to an aggregate amount equal to the REMIC III Principal Loss Allocation Amount, 98.00% and 2.00%, respectively; third, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-9, and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-9 has been reduced to zero; fourth, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-8 and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-8 has been reduced to zero; fifth, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-7 and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-7 has been reduced to zero; sixth, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-6 and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-6 has been reduced to zero; seventh, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-5 and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-5 has been reduced to zero; eighth, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-4 and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-4 has been reduced to zero; ninth, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-3 and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-3 has been reduced to zero; tenth, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-2 and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-2 has been reduced to zero;  and eleventh, to the Uncertificated Balances of REMIC III Regular Interest AA, REMIC III Regular Interest M-1 and REMIC III Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Balance of REMIC III Regular Interest M-1 has been reduced to zero.

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

(ii)    The REMIC III Sub WAC Allocation Percentage of all Realized Losses shall be applied after all distributions have been made on each Distribution Date first, so as to keep the Uncertificated Balance of each REMIC III Regular Interest ending with the designation "GRP" equal to 0.01% of the aggregate Stated Principal Balance of the Mortgage Loans in the related loan group; second, to each REMIC III Regular Interest ending with the designation "SUB," so that the Uncertificated Balance of each such REMIC III Regular Interest is equal to 0.01% of the excess of (x) the aggregate Stated Principal Balance of the Mortgage Loans in the related loan group over (y) the current Certificate Principal Balance of the Class A Certificate in the related loan group (except that if any such excess is a larger number than in the preceding distribution period, the least amount of Realized Losses shall be applied to such REMIC III Regular Interests such that the REMIC III Subordinated Balance Ratio is maintained); and third, any remaining Realized Losses shall be allocated to REMIC III Regular Interest XX.

SECTION 5.05.    Compliance with Withholding Requirements.

Notwithstanding any other provision of this Agreement, the Securities Administrator shall comply with all federal withholding requirements respecting payments to Certificateholders of interest or original issue discount that the Securities Administrator reasonably believes are applicable under the Code. The consent of Certificateholders shall not be required for such withholding. In the event the Securities Administrator does withhold any amount from interest or original issue discount payments or advances thereof to any Certificateholder pursuant to federal withholding requirements, the Securities Administrator shall indicate the amount withheld to such Certificateholders.

SECTION 5.06.    Reports Filed with Securities and Exchange Commission.

(a)    (i)    Within 15 days after each Distribution Date (subject to permitted extensions under the Exchange Act), the Securities Administrator shall prepare and file on behalf of the Trust any Form 10-D required by the Exchange Act, in form and substance as required by the Exchange Act. The Securities Administrator shall file each Form 10-D with a copy of the related Monthly Statement attached thereto. Any disclosure in addition to the Monthly Statement that is required to be included on Form 10-D ("Additional Form 10-D Disclosure") shall be reported by the parties set forth on Exhibit G to the Depositor and the Securities Administrator and directed and approved by the Depositor pursuant to the following paragraph, and the Securities Administrator will have no duty or liability for any failure hereunder to determine or prepare any Additional Form 10-D Disclosure, except as set forth in the next paragraph.

(ii)    As set forth on Exhibit G hereto, within 5 calendar days after the related Distribution Date, (A) certain parties to the ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4 transaction shall be required to provide to the Securities Administrator and the Depositor, to the extent known by a responsible officer thereof, in EDGAR-compatible form, or in such other form as otherwise agreed upon by the Securities Administrator and such party, the form and substance of any Additional Form 10-D Disclosure, if applicable, together with an Additional Disclosure Notification in the form of Exhibit H hereto (an "Additional Disclosure Notification") and (B) the Depositor will approve, as to form and substance, or

186

disapprove, as the case may be, the inclusion of the Additional Form 10-D Disclosure on Form 10-D. The Depositor will be responsible for any reasonable fees and expenses assessed or incurred by the Securities Administrator in connection with including any Additional Form 10-D Disclosure on Form 10-D pursuant to this paragraph.

(iii) After preparing the Form 10-D, the Securities Administrator shall upon request, forward electronically a copy of the Form 10-D to the Depositor (provided that such Form 10-D includes any Additional Form 10-D Disclosure). Within two (2) Business Days after receipt of such copy but no later than the 12th calendar day after the Distribution Date, the Depositor shall notify the Securities Administrator in writing (which may be furnished electronically) of any changes to or approval of such Form 10-D. In the absence of receipt of any written changes or approval by the due date specified herein, or if the Depositor does not request a copy of a Form 10-D, the Securities Administrator shall be entitled to assume that such Form 10-D is in final form and the Securities Administrator may proceed with the execution and filing of the Form 10-D. A duly authorized representative of the Master Servicer shall sign the Form 10-D. If a Form 10-D cannot be filed on time or if a previously filed Form 10-D needs to be amended, the Securities Administrator will follow the procedures set forth in Section 5.06(c)(ii). Promptly (but no later than 1 Business Day) after filing with the Commission, the Securities Administrator will make available on its internet website a final executed copy of each Form 10-D prepared and filed by the Securities Administrator. Each party to this Agreement acknowledges that the performance by the Securities Administrator and the Master Servicer of their duties under this Section 5.06(a) related to the timely preparation, execution and filing of Form 10-D is contingent upon such parties strictly observing all applicable deadlines in the performance of their duties as set forth in this Agreement. Neither the Master Servicer nor the Securities Administrator shall have any liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare, execute and/or timely file such Form 10-D, where such failure results from the Securities Administrator's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 10-D, not resulting from its own negligence, bad faith or willful misconduct.

(b) (i) Within four (4) Business Days after the occurrence of an event requiring disclosure on Form 8-K (each such event, a "Reportable Event"), and if requested by the Depositor, the Securities Administrator shall prepare and file on behalf of the Trust a Form 8-K, as required by the Exchange Act, provided that the Depositor shall file the initial Form 8-K in connection with the issuance of the Certificates. Any disclosure or information related to a Reportable Event or that is otherwise required to be included on Form 8-K other than the initial Form 8-K ("Form 8-K Disclosure Information") shall be reported by the parties set forth on Exhibit G to the Depositor and the Securities Administrator and directed and approved by the Depositor pursuant to the following paragraph, and the Securities Administrator will have no duty or liability for any failure hereunder to determine or prepare any Form 8-K Disclosure Information or any Form 8-K, except as set forth in the next paragraph.

(ii) As set forth on Exhibit G hereto, for so long as the Trust is subject to the Exchange Act reporting requirements, no later than the close of business New York City time on the 2nd Business Day after the occurrence of a Reportable Event (i) the parties to the ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4 transaction  shall be required

187

to provide to the Securities Administrator and Depositor, to the extent known by a responsible officer thereof, in EDGAR-compatible form, or in such other form as otherwise agreed upon by the Securities Administrator and such party, the form and substance of any Form 8-K Disclosure Information, if applicable, together with an Additional Disclosure Notification and (ii) the Depositor will approve, as to form and substance, or disapprove, as the case may be, the inclusion of the Form 8-K Disclosure Information. The Depositor will be responsible for any reasonable fees and expenses assessed or incurred by the Securities Administrator in connection with including any Form 8-K Disclosure Information on Form 8-K pursuant to this paragraph.

(iii)    After preparing the Form 8-K, the Securities Administrator shall upon request, forward electronically a copy of the Form 8-K to the Depositor. Promptly, but no later than the close of business on the third Business Day after the Reportable Event, the Depositor shall notify the Securities Administrator in writing (which may be furnished electronically) of any changes to or approval of such Form 8-K. In the absence of receipt of any written changes or approval by the third Business Day, or if the Depositor does not request a copy of a Form 8-K, the Securities Administrator shall be entitled to assume that such Form 8-K is in final form and the Securities Administrator may proceed with the execution and filing of the Form 8-K. A duly authorized representative of the Master Servicer shall sign each Form 8-K. If a Form 8-K cannot be filed on time or if a previously filed Form 8-K needs to be amended, the Securities Administrator will follow the procedures set forth in Section 5.06(c)(ii). Promptly (but no later than 1 Business Day) after filing with the Commission, the Securities Administrator will, make available on its internet website a final executed copy of each Form 8-K that has been prepared and filed by the Securities Administrator. The parties to this Agreement acknowledge that the performance by the Master Servicer and the Securities Administrator of their duties under this Section 5.06(b) related to the timely preparation, execution and filing of Form 8-K is contingent upon such parties strictly observing all applicable deadlines in the performance of their duties under this Agreement. Neither the Master Servicer nor the Securities Administrator shall have any liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare, execute and/or timely file such Form 8-K, where such failure results from the Securities Administrator's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, execute or arrange for execution or file such Form 8-K, not resulting from its own negligence, bad faith or willful misconduct.

(c)    (i)    On or prior to January 30th of the first year in which the Securities Administrator is able to do so under applicable law, the Securities Administrator shall prepare and file a Form 15 suspension notification relating to the automatic suspension of reporting in respect of the Trust under the Exchange Act.

(ii)    In the event that the Securities Administrator is unable to timely file with the Commission all or any required portion of any Form 8-K, 10-D or 10-K required to be filed by this Agreement because required disclosure information was either not delivered to it or delivered to it after the delivery deadlines set forth in this Agreement or for any other reason, the Securities Administrator will promptly electronically notify the Depositor. In the case of Form 10-D and 10-K, the parties to this Agreement will cooperate to prepare and file a Form 12b-25 and a 10-DA and 10-KA as applicable, pursuant to Rule 12b-25 of the Exchange Act. In the case of Form 8-K, the Securities Administrator will, upon receipt of all required Form 8-K Disclosure Information and upon the approval and direction of the Depositor, include such

disclosure information on the next Form 10-D. In the event that any previously filed Form 8-K, 10-D or 10-K needs to be amended and such amendment includes any Additional Form 10-D Disclosure (other than for the purposes of restating any Monthly Report), any Additional Form 10-K Disclosure or any Form 8-K Disclosure Information or any amendment to such disclosure, the Securities Administrator will electronically notify the Depositor only if the amendment pertains to an additional reporting item being revised and/or amended on such form, but not if an amendment is being filed as a result of a Remittance Report revision, and the Depositor will cooperate with the Securities Administrator in preparing any necessary 8-KA, 10-DA or 10-KA. Any Form 15, Form 12b-25 or any amendment to Form 8-K, 10-D or 10-K shall be signed by a duly authorized representative, or senior officer in charge of master servicing, as applicable, of the Master Servicer. The parties to this Agreement acknowledge that the performance by the Securities Administrator and the Master Servicer of their duties under this Section 5.06(c) related to the timely preparation, execution and filing of Form 15, a Form 12b-25 or any amendment to Form 8-K, 10-D or 10-K is contingent upon each such party performing its duties under this Agreement. Neither the Master Servicer nor the Securities Administrator shall have any liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare, execute and/or timely file any such Form 15, Form 12b-25 or any amendments to Forms 8-K, 10-D or 10-K, where such failure results from the Securities Administrator's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, execute or arrange for execution or file such Form 15, Form 12b-25 or any amendments to Forms 8-K, 10-D or 10-K, not resulting from its own negligence, bad faith or willful misconduct.

(d)     (i)     On or prior to the 90th day after the end of each fiscal year of the Trust or such earlier date as may be required by the Exchange Act (the "10-K Filing Deadline") (it being understood that the fiscal year for the Trust ends on December 31st of each year), commencing in March 2008, the Securities Administrator shall prepare and file on behalf of the Trust a Form 10-K, in form and substance as required by the Exchange Act. Each such Form 10-K shall include the following items, in each case to the extent they have been delivered to the Securities Administrator within the applicable time frames set forth in this Agreement, the related servicing agreement and custodial agreements, (i) an annual compliance statement for the Servicer, each Additional Servicer, the Master Servicer and the Securities Administrator and any Servicing Function Participant engaged by such parties (each, a "Reporting Servicer") as described under Section 3.17 and Section 4.15 and in such other agreements, (ii)(A) the annual reports on assessment of compliance with servicing criteria for each Reporting Servicer, as described under Section 3.18 and Section 4.16 and in such other agreements, and (B) if each Reporting Servicer's report on assessment of compliance with servicing criteria described under Section 3.18 and Section 4.16 identifies any material instance of noncompliance, disclosure identifying such instance of noncompliance, or if each Reporting Servicer's report on assessment of compliance with servicing criteria described under Section 3.18 and Section 4.16 is not included as an exhibit to such Form 10-K, disclosure that such report is not included and an explanation why such report is not included, (iii)(A) the registered public accounting firm attestation report for each Reporting Servicer, as described under Section 3.18 and Section 4.17, or in such other agreement and (B) if any registered public accounting firm attestation report described under Section 3.18 and Section 4.17 identifies any material instance of noncompliance, disclosure identifying such instance of noncompliance, or if any such registered public accounting firm attestation report is not included as an exhibit to such Form 10-K, disclosure

189

that such report is not included and an explanation why such report is not included, and (iv) a Sarbanes-Oxley Certification as described in Section 3.20 and Section 4.18 (provided, however, that the Securities Administrator, at its discretion, may omit from the Form 10-K any annual compliance statement, assessment of compliance or attestation report that is not required to be filed with such Form 10-K pursuant to Regulation AB). Any disclosure or information in addition to (i) through (iv) above that is required to be included on Form 10-K ("Additional Form 10-K Disclosure") shall be reported by the parties set forth on Exhibit G to the Depositor and the Securities Administrator and directed and approved by the Depositor pursuant to the following paragraph, and the Securities Administrator will have no duty or liability for any failure hereunder to determine or prepare any Additional Form 10-K Disclosure, except as set forth in the next paragraph.

(ii)    As set forth on Exhibit G hereto, no later than March 15 of each year that the Trust is subject to the Exchange Act reporting requirements, commencing in 2008, (i) parties to the ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4 transaction shall be required to provide to the Securities Administrator and Depositor, to the extent known, by a responsible officer thereof, in EDGAR-compatible form, or in such other form as otherwise agreed upon by the Securities Administrator and such party, the form and substance of any Additional Form 10-K Disclosure, if applicable, together with an Additional Disclosure Notification and (ii) the Depositor will approve, as to form and substance, or disapprove, as the case may be, the inclusion of the Additional Form 10-K Disclosure on Form 10-K.   The Depositor will be responsible for any reasonable fees and expenses assessed or incurred by the Securities Administrator in connection with including any Additional Form 10-K Disclosure on Form 10-K pursuant to this paragraph.

(iii)    After preparing the Form 10-K, the Securities Administrator shall upon request, forward electronically a copy of the Form 10-K to the Depositor.  Within three (3) Business Days after receipt of such copy, but in no event later than March 25th of each year that the Trust is subject to Exchange Act reporting requirements, the Depositor shall notify the Securities Administrator in writing (which may be furnished electronically) of any changes to or approval of such Form 10-K.  In the absence of receipt of any written changes or approval by March 25th, or if the Depositor does not request a copy of a Form 10-K, the Securities Administrator shall be entitled to assume that such Form 10-K is in final form and the Securities Administrator may proceed with the execution and filing of the Form 10-K.  A senior officer of the Master Servicer in charge of the master servicing function shall sign the Form 10-K.  If a Form 10-K cannot be filed on time or if a previously filed Form 10-K needs to be amended, the Securities Administrator will follow the procedures set forth in Section 5.06(c)(ii).  Promptly (but no later than 1 Business Day) after filing with the Commission, the Securities Administrator will make available on its internet website a final executed copy of each Form 10-K prepared and filed by the Securities Administrator.  The parties to this Agreement acknowledge that the performance by the Master Servicer and the Securities Administrator of their respective duties under this Section 5.06(d) related to the timely preparation, execution and filing of Form 10-K is contingent upon such parties (and any Additional Servicer or Servicing Function Participant) strictly observing all applicable deadlines in the performance of their duties under this Section 5.06(d), Section 3.17, Section 3.18, Section 3.20, Section 4.16, Section 4.17 and Section 4.18. Neither the Master Servicer nor the Securities Administrator shall have any liability for any loss, expense, damage or claim arising out of or with respect to any failure to properly prepare,

190

execute and/or timely file such Form 10-K, where such failure results from the Securities Administrator's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 10-K, not resulting from its own negligence, bad faith or willful misconduct.

(e)    Each of Form 10-D and Form 10-K requires the registrant to indicate (by checking "yes" or "no") that it "(1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days." The Depositor hereby represents to the Securities Administrator that the Depositor has filed all such required reports during the preceding 12 months and that it has been subject to such filing requirement for the past 90 days. The Depositor shall notify the Securities Administrator in writing, no later than the fifth calendar day after the related Distribution Date with respect to the filing of a report on Form 10-D and no later than March 15th with respect to the filing of a report on Form 10-K, if the answer to the question should be "no" as a result of filings that relate to other securitization transactions of the Depositor for which the Securities Administrator does not have the obligation to prepare and file Exchange Act reports.

(f)    The Securities Administrator shall indemnify and hold harmless the Depositor, the Trustee and their respective officers, directors and Affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach of the Master Servicer's obligations under this Section 5.06 or the Master Servicer's negligence, bad faith or willful misconduct in connection therewith.

(g)    Notwithstanding the provisions of Section 12.01, this Section 5.06 may be amended without the consent of the Certificateholders.

SECTION 5.07.    Supplemental Interest Trust.

(a)    On the Closing Date, the Securities Administrator shall establish and maintain in the name of the Trustee a separate account for the benefit of the holders of the Offered Certificates (the "Supplemental Interest Trust"). The Supplemental Interest Trust shall be an Eligible Account, and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including, without limitation, other moneys of the Trustee or of the Securities Administrator held pursuant to this Agreement.

(b)    On the Business Day prior to each Distribution Date, the Securities Administrator shall deposit into the Supplemental Interest Trust amounts distributable to the Swap Provider by the Supplemental Interest Trust pursuant to Section 5.01(c)(2), (3), (5) and (6) and Section 5.01(c)(7)(viii) of this Agreement and shall distribute such amounts on the Business Day prior to such Distribution Date in accordance with the foregoing sections.

(c)    On the Business Day prior to each Distribution Date, the Securities Administrator shall deposit into the Supplemental Interest Trust amounts received by it from the Swap Provider and shall distribute from the Supplemental Interest Trust on the Distribution Date

191

an amount equal to the amount of any Net Swap Payment received from the Swap Provider under the Swap Agreement in the order of priority set forth in Section 5.01.

(d)    The Supplemental Interest Trust constitutes an "outside reserve fund" within the meaning of Treasury Regulation § 1.860G-2(h) and is not an asset of any REMIC. The Holders of the Class CE-1 Certificates shall be the beneficial owner of the Supplemental Interest Trust, subject to the power of the Securities Administrator to transfer amounts under this Agreement.  The Securities Administrator shall keep records that accurately reflect the funds on deposit in the Supplemental Interest Trust.  The Securities Administrator shall, at the written direction of the majority of the Class CE-1 Certificateholders, invest amounts on deposit in the Supplemental Interest Trust in Permitted Investments. In the absence of written direction to the Securities Administrator from the majority of the Class CE-1 Certificateholders, all funds in the Supplemental Interest Trust shall remain uninvested. On each Distribution Date, the Securities Administrator shall distribute, not in respect of any REMIC, any interest earned on the Supplemental Interest Trust to the Holders of the Class CE-1 Certificates.

(e)    For federal income tax purposes, amounts paid to the Supplemental Interest Trust on each Distribution Date pursuant to Section 5.01(c)(2), (3), (5) and (6) and Section 5.01(c)(7)(vii) shall first be deemed paid to the Supplemental Interest Trust in respect of the Class IO Interest to the extent of the amount distributable on such Class IO Interest on such Distribution Date, and any remaining amount shall be deemed paid to the Supplemental Interest Trust in respect of a Class IO Distribution Amount.  It is the intention of the parties hereto that, for federal and state income and state and local franchise tax purposes, the Supplemental Interest Trust be disregarded as an entity separate from the Holder of the Class CE-1 Certificates unless and until the date when either (a) there is more than one Class CE-1 Certificateholder or (b) any Class of Certificates in addition to the Class CE-1 Certificates is recharacterized as an equity interest in the Supplemental Interest Trust for federal income tax purposes, in which case it is the intention of the parties hereto that, for federal and state income and state and local franchise tax purposes, the Supplemental Interest Trust be treated as a partnership.   The Master Servicer shall not be required to prepare and file partnership tax returns in respect of such partnership unless it receives additional reasonable compensation (not to exceed $10,000 per year) for the preparation of such filings, written notification recognizing the creation of a partnership agreement or comparable documentation evidencing the partnership.

(f)    The Securities Administrator shall treat the Holders of Certificates (other than the Class P, Class CE-1, Class CE-2 and Class R Certificates) as having entered into a notional principal contract with respect to the Holders of the Class CE-1 Certificates.  Pursuant to each such notional principal contract, all Holders of Certificates (other than the Class P, Class CE-1, Class CE-2 and Class R Certificates) shall be treated as having agreed to pay, on each Distribution Date, to the Holder of the Class CE-1 Certificates an aggregate amount equal to the excess, if any, of (i) the amount payable on such Distribution Date on the REMIC IV Regular Interest ownership of which is represented by such Class of Certificates over (ii) the amount payable on such Class of Certificates on such Distribution Date (such excess, a "Class IO Distribution Amount").  A Class IO Distribution Amount payable from interest collections shall be allocated pro rata among such Certificates based on the amount of interest otherwise payable to such Certificates, and a Class IO Distribution Amount payable from principal collections shall be allocated to the most subordinate Class of such Certificates with an outstanding principal

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

balance to the extent of such balance. In addition, pursuant to such notional principal contract, the Holder of the Class CE-1 Certificates shall be treated as having agreed to pay Net WAC Rate Carryover Amounts to the Holders of the Certificates (other than the Class CE-1, Class CE-2, Class P and Class R Certificates) in accordance with the terms of this Agreement. Any payments to such Certificates from amounts deemed received in respect of this notional principal contract shall not be payments with respect to a Regular Interest in a REMIC within the meaning of Code Section 860G(a)(1). However, any payment from the Certificates (other than the Class CE-1, Class CE-2, Class P and Class R Certificates) of a Class IO Distribution Amount shall be treated for tax purposes as having been received by the Holders of such Certificates in respect of the REMIC IV Regular Interest ownership of which is represented by such Certificates, and as having been paid by such Holders to the Supplemental Interest Trust pursuant to the notional principal contract. Thus, each Certificate (other than the Class P Certificates and Class R Certificates) shall be treated as representing not only ownership of a Regular Interest in REMIC IV, but also ownership of an interest in, and obligations with respect to, a notional principal contract.

(g)     For federal tax return and information reporting, the right of the Class A Certificateholders and the Mezzanine Certificateholders to receive payments from the Supplemental Interest Trust and the Reserve Fund in respect of any Net WAC Rate Carryover Amount shall be assigned a value of $12,000.

(h)     Upon a Swap Early Termination other than in connection with the optional termination of the trust, the Securities Administrator on behalf of the Supplemental Interest Trust, at the direction f the Depositor, will use reasonable efforts to appoint a successor swap provider to enter into a new interest rate swap agreement on terms substantially similar to the Swap Agreement, with a successor swap provider meeting all applicable eligibility requirements. If the Securities Administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, the Securities Administrator will apply such Swap Termination Payment to any upfront payment required to appoint the successor swap provider. If the Securities Administrator is required to pay a Swap Termination Payment to the Swap Provider in connection with such Swap Early Termination, the Securities Administrator will apply any upfront payment received from the successor swap provider to pay such Swap Termination Payment.

If the Securities Administrator is unable to appoint a successor swap provider within 30 days of the Swap Early Termination, then the Securities Administrator will deposit any Swap Termination Payment received from the original Swap Provider into a separate, non-interest bearing reserve account and will, on each subsequent Distribution Date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the Net Swap Payment, if any, that would have been paid to the Securities Administrator by the original Swap Provider calculated in accordance with the terms of the original Swap Agreement, and distribute such amount in accordance with the terms of this Agreement.

(i)     In the event that the Swap Provider fails to perform any of its obligations under the Swap Agreement (including, without limitation, its obligation to make any payment or transfer collateral), or breaches any of its representations and warranties thereunder, or in the event that an Event of Default, Termination Event, or Additional Termination Event (each as

193

defined in the Swap Agreement) occurs with respect to the Swap Agreement, the Securities Administrator on behalf of the Supplemental Interest Trust Trustee shall immediately, but no later than the next Business Day following such failure or breach, notify the Depositor and send any notices and make any demands, on behalf of the Supplemental Interest Trust, in accordance with the Swap Agreement.

(j)    In the event that the Swap Provider's obligations are guaranteed by a third party under a guaranty relating to the Swap Agreement (such guaranty the "Guaranty" and such third party the "Guarantor"), then to the extent that the Swap Provider fails to make any payment by the close of business on the day it is required to make payment under the terms of the Swap Agreement, the Securities Administrator on behalf of the Supplemental Interest Trust Trustee shall, as soon as practicable, but no later than two (2) business days after the Swap Provider's failure to pay, demand that the Guarantor make any and all payments then required to be made by the Guarantor pursuant to such Guaranty; provided, that the Securities Administrator shall in no event be liable for any failure or delay in the performance by the Swap Provider or any Guarantor of its obligations hereunder or pursuant to the Swap Agreement and the Guaranty, nor for any special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits) in connection therewith.

SECTION 5.08.    Tax Treatment of Swap Payments and Swap Termination Payments.

(a)    For federal income tax purposes, each holder of an Offered Certificate is deemed to own an undivided beneficial ownership interest in a REMIC Regular Interest and the right to receive payments from either the Reserve Fund or the Supplemental Interest Trust in respect of any Net WAC Rate Carryover Amounts or the obligation to make payments to the Supplemental Interest Trust. For federal income tax purposes, the Securities Administrator will account for payments to each Offered Certificate as follows: each Offered Certificate will be treated as receiving their entire payment from REMIC IV (regardless of any Swap Termination Payment or obligation under the Swap Agreement) and subsequently paying their portion of any Swap Termination Payment in respect of each such Class's obligation under the Swap Agreement. In the event that any such Class is resecuritized in a REMIC, the obligation under the Swap Agreement to pay any such Swap Termination Payment (or any shortfall in Net Swap Payment), will be made by one or more of the REMIC Regular Interests issued by the resecuritization REMIC subsequent to such REMIC Regular Interest receiving its full payment from any such Offered Certificate.

(b)    The REMIC Regular Interest corresponding to an Offered Certificate will be entitled to receive interest and principal payments at the times and in the amounts equal to those made on the certificate to which it corresponds, except that (i) the maximum interest rate of that REMIC regular interest will equal the Net WAC Pass-Through Rate computed for this purpose by limiting the Swap Notional Amount of the Swap Agreement to the aggregate Stated Principal Balance of the Mortgage Loans and (ii) any Swap Termination Payment will be treated as being payable solely from amounts otherwise payable to the Class CE-1 Certificates. As a result of the foregoing, the amount of distributions and taxable income on the REMIC Regular Interest corresponding to an Offered Certificate may exceed the actual amount of distributions on the Offered Certificate.

194

SECTION 5.09.    Swap Collateral Account.

The Securities Administrator is hereby directed to perform the obligations of the Custodian as defined under the Swap Credit Support Annex (the "Swap Custodian").

On or before the Closing Date, the Swap Custodian shall establish a Swap Collateral Account. The Swap Collateral Account shall be held in the name of the Swap Custodian in trust for the benefit of the Offered Certificates. The Swap Collateral Account shall be an Eligible Account and shall be entitled "Swap Collateral Account, Wells Fargo Bank, National Association for the benefit of holders of ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4, Asset Backed Pass-Through Certificates."

The Swap Custodian shall credit to the Swap Collateral Account all collateral (whether in the form of cash or securities) posted by the Swap Provider to secure the obligations of the Swap Provider in accordance with the terms of the Swap Agreement. Except for investment earnings, the Swap Provider shall not have any legal, equitable or beneficial interest in the Swap Collateral Account other than in accordance with the Swap Agreement and applicable law. The Swap Custodian shall maintain and apply all collateral and earnings thereon on deposit in the Swap Collateral Account in accordance with Swap Credit Support Annex.

Cash collateral posted by the Swap Provider in accordance with the Swap Credit Support Annex shall be invested at the direction of the Swap Provider in Permitted Investments in accordance with the requirements of the Swap Credit Support Annex. All amounts earned on amounts on deposit in the Swap Collateral Account (whether cash collateral or securities) shall be for the account of and taxable to the Swap Provider. If no investment direction is provided, funds will be held uninvested.

Upon the occurrence of an Event of Default or Specified Condition (each as defined in the Swap Agreement) with respect to the Swap Provider or upon occurrence or designation of an Early Termination Date (as defined in the Swap Agreement) as a result of any such Event of Default or Specified Condition with respect to the Swap Provider, and, in either such case, unless the Swap Provider has paid in full all of its Obligations (as defined in the Swap Credit Support Annex) that are then due, then any collateral posted by the Swap Provider in accordance with the Swap Credit Support Annex shall be applied to the payment of any Obligations due to Party B (as defined in the Swap Agreement) in accordance with the Swap Credit Support Annex. Any excess amounts held in such Swap Collateral Account after payment of all amounts owing to Party B under the Swap Agreement shall be withdrawn from the Swap Collateral Account and paid to the Swap Provider in accordance with the Swap Credit Support Annex.

SECTION 5.10.    Cap Collateral Account

The Securities Administrator is hereby directed to perform the obligations of the Custodian as defined under the Cap Credit Support Annex (the "Cap Custodian").

On or before the Closing Date, the Cap Custodian shall establish a Cap Collateral Account with respect to each of the Cap Contracts (the "Cap Collateral Account"). The Cap

Collateral Account shall be held in the name of the Cap Custodian in trust for the benefit of the Class A Certificates and Mezzanine Certificates. The Cap Collateral Account shall be an Eligible Account and shall be entitled "Cap Collateral Account, Wells Fargo Bank, National Association for the benefit of holders of ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4, Class A, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9."

The Cap Custodian shall credit to the Cap Collateral Account all collateral (whether in the form of cash or securities) posted by the Cap Counterparty to secure the obligations of the Cap Counterparty in accordance with the terms of the related Cap Contract. Except for investment earnings, the Cap Counterparty shall not have any legal, equitable or beneficial interest in the Cap Collateral Account other than in accordance with the related Cap Contract and applicable law. The Cap Custodian shall maintain and apply all collateral and earnings thereon on deposit in any Cap Collateral Account in accordance with the Cap Credit Support Annex.

Cash collateral posted by the Cap Counterparty in accordance with the related Cap Credit Support Annex shall be invested at the direction of the Cap Counterparty in Permitted Investments in accordance with the requirements of the Cap Credit Support Annex. All amounts earned on amounts on deposit in a Cap Collateral Account (whether cash collateral or securities) shall be for the account of and taxable to the Cap Counterparty. If no investment direction is provided, funds will be held uninvested.

Upon the occurrence of an Event of Default or a Specified Condition (each as defined in the related Cap Contract) with respect to the Cap Counterparty or upon occurrence or designation of an Early Termination Date (as defined in the related Cap Contract) as a result of any such Event of Default or Specified Condition with respect to the Cap Counterparty, and, in either such case, unless the Cap Counterparty has paid in full all of its Obligations (as defined in the related Cap Credit Support Annex) that are then due, then any collateral posted by the Cap Counterparty in accordance with the related Cap Credit Support Annex shall be applied to the payment of any Obligations due to Party B (as defined in the related Cap Contract) in accordance with the related Cap Credit Support Annex. Any excess amounts held in such Cap Collateral Account after payment of all amounts owing to Party B under the related Cap Contract shall be withdrawn from the Cap Collateral Account and paid to the Cap Counterparty in accordance with the related Cap Credit Support Annex.

ARTICLE VI

THE CERTIFICATES

SECTION 6.01.    The Certificates.

(a)    The Certificates in the aggregate will represent the entire beneficial ownership interest in the Mortgage Loans and all other assets included in REMIC I, REMIC II, REMIC III or REMIC IV.

The Certificates will be substantially in the forms annexed hereto as Exhibits A-1 through A-5. The Certificates of each Class will be issuable in registered form only, in denominations of authorized Percentage Interests as described in the definition thereof. Each Certificate will share ratably in all rights of the related Class.

Upon original issue, the Certificates shall be executed and authenticated by the Securities Administrator and delivered by the Trustee to and upon the written order of the Depositor. The Certificates shall be executed by manual or facsimile signature on behalf of the Trust by the Securities Administrator by an authorized signatory. Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Securities Administrator shall bind the Trust, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificates or did not hold such offices at the date of such Certificates. No Certificate shall be entitled to any benefit under this Agreement or be valid for any purpose, unless there appears on such Certificate a certificate of authentication substantially in the form provided herein executed by the Securities Administrator by manual signature, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Certificate has been duly authenticated and delivered hereunder. All Certificates shall be dated the date of their authentication.

(b)    The Class A Certificates and the Mezzanine Certificates shall initially be issued as one or more Certificates held by the Book-Entry Custodian or, if appointed to hold such Certificates as provided below, the Depository and registered in the name of the Depository or its nominee and, except as provided below, registration of such Certificates may not be transferred by the Securities Administrator except to another Depository that agrees to hold such Certificates for the respective Certificate Owners with Ownership Interests therein. The Certificate Owners shall hold their respective Ownership Interests in and to such Certificates through the book-entry facilities of the Depository and, except as provided below, shall not be entitled to definitive, fully registered Certificates ("Definitive Certificates") in respect of such Ownership Interests. All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall only transfer the Ownership Interests in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures. The Securities Administrator is hereby initially appointed as the Book-Entry Custodian and hereby agrees to act as such in accordance herewith and in accordance with the agreement that it has with the Depository authorizing it to act as such. The Book-Entry Custodian may, and, if it is no longer qualified to act as such, the Book-Entry

197

Custodian shall, appoint, by a written instrument delivered to the Depositor, the Servicer and, if the Trustee is not the Book-Entry Custodian, the Trustee, any other transfer agent (including the Depository or any successor Depository) to act as Book-Entry Custodian under such conditions as the predecessor Book-Entry Custodian and the Depository or any successor Depository may prescribe, provided that the predecessor Book-Entry Custodian shall not be relieved of any of its duties or responsibilities by reason of any such appointment of other than the Depository. If the Securities Administrator resigns or is removed in accordance with the terms hereof, the successor Securities Administrator or, if it so elects, the Depository shall immediately succeed to its predecessor's duties as Book-Entry Custodian. The Depositor shall have the right to inspect, and to obtain copies of, any Certificates held as Book-Entry Certificates by the Book-Entry Custodian.

(c)    The Class CE-1 Certificates initially offered and sold in offshore transactions in reliance on Regulation S shall be issued in the form of a temporary global certificate in definitive, fully registered form (each, a "Regulation S Temporary Global Certificate"), which shall be deposited with the Securities Administrator or an agent of the Securities Administrator as custodian for the Depository and registered in the name of Cede & Co. as nominee of the Depository for the account of designated agents holding on behalf of Euroclear or Clearstream.    Beneficial interests in each Regulation S Temporary Global Certificate may be held only through Euroclear or Clearstream; provided, however, that such interests may be exchanged for interests in a Definitive Certificate in accordance with the requirements described in Section 6.02. After the expiration of the Release Date, a beneficial interest in a Regulation S Temporary Global Certificate may be exchanged for a beneficial interest in the related permanent global certificate of the same Class (each, a "Regulation S Permanent Global Certificate"), in accordance with the procedures set forth in Section 6.02. Each Regulation S Permanent Global Certificate shall be deposited with the Securities Administrator or an agent of the Securities Administrator as custodian for the Depository and registered in the name of Cede & Co. as nominee of the Depository.

The Class CE-1, Class CE-2 and  Class P Certificates offered and sold to QIBs in reliance on Rule 144A will be issued in the form of Definitive Certificates.

(d)    The Trustee, the Servicer, the Securities Administrator, the Master Servicer and the Depositor may for all purposes (including the making of payments due on the Book-Entry Certificates and Global Certificates) deal with the Depository as the authorized representative of the Certificate Owners with respect to the Book-Entry Certificates and Global Certificates for the purposes of exercising the rights of Certificateholders hereunder.  The rights of Certificate Owners with respect to the Book-Entry Certificates and Global Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners.  Multiple requests and directions from, and votes of, the Depository as Holder of the Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners. The Securities Administrator may establish a reasonable record date in connection with solicitations of consents from or voting by Certificateholders and shall give notice to the Depository of such record date.

[TPW: NY.LEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

If (i)(A) the Depositor advises the Securities Administrator in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository, and (B) the Depositor is unable to locate a qualified successor, (ii) the Depositor at its option advises the Securities Administrator in writing that it elects to terminate the book-entry system through the Depository or (iii) after the occurrence of a Servicer Event of Default, Certificate Owners representing in the aggregate not less than 51% of the Ownership Interests of the Book-Entry Certificates advise the Securities Administrator through the Depository, in writing, that the continuation of a book-entry system through the Depository is no longer in the best interests of the Certificate Owners, the Securities Administrator shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same. Upon surrender to the Securities Administrator of the Book-Entry Certificates by the Book-Entry Custodian or the Depository, as applicable, the Securities Administrator shall cause the Definitive Certificates to be issued. Such Definitive Certificates will be issued in minimum denominations of $10,000 except that any beneficial ownership that was represented by a Book-Entry Certificate in an amount less than $10,000 immediately prior to the issuance of a Definitive Certificate shall be issued in a minimum denomination equal to the amount represented by such Book-Entry Certificate. None of the Depositor, the Servicer, the Master Servicer, the Securities Administrator or the Trustee shall be liable for any delay in the delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates all references herein to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Securities Administrator, to the extent applicable with respect to such Definitive Certificates, and the Securities Administrator shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder.

SECTION 6.02.    Registration of Transfer and Exchange of Certificates.

(a)    The Securities Administrator shall cause to be kept at one of the offices or agencies to be appointed by the Securities Administrator in accordance with the provisions of Section 9.11, a Certificate Register for the Certificates in which, subject to such reasonable regulations as it may prescribe, the Securities Administrator shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided.

(b)    No transfer of any Class CE-1 Certificate, Class CE-2 Certificate, Class P Certificate or Residual Certificate shall be made unless that transfer is made pursuant to an effective registration statement under the Securities Act, and effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. In the event that such a transfer of a Class CE-1 Certificate, Class CE-2 Certificate, Class P Certificate or Residual Certificate is to be made without registration or qualification (other than in connection with the initial transfer of any such Certificate by the Depositor), the Securities Administrator shall require receipt of: (i) if such transfer is purportedly being made in reliance upon Rule 144A under the Securities Act, written certifications from the Certificateholder desiring to effect the transfer and from such Certificateholder's prospective transferee, substantially in the form attached hereto as Exhibit B-1; (ii) if such transfer is purportedly being made in reliance upon Rule 501(a) under the Securities Act, written certifications from the Certificateholder desiring to effect the transfer and

199

from such Certificateholder's prospective transferee, substantially in the form attached hereto as Exhibit B-2; and (iii) in all other cases, an Opinion of Counsel satisfactory to the Securities Administrator that such transfer may be made without such registration or qualification (which Opinion of Counsel shall not be an expense of the Trust Fund or of the Depositor, the Trustee, the Master Servicer, the Securities Administrator or the Servicer), together with copies of the written certification(s) of the Certificateholder desiring to effect the transfer and/or such Certificateholder's prospective transferee upon which such Opinion of Counsel is based, if any. Neither of the Depositor nor the Securities Administrator is obligated to register or qualify any such Certificates under the Securities Act or any other securities laws or to take any action not otherwise required under this Agreement to permit the transfer of such Certificates without registration or qualification. Any Certificateholder desiring to effect the transfer of any such Certificate shall, and does hereby agree to, indemnify the Trustee, the Depositor, the Master Servicer, the Securities Administrator and the Servicers against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

A holder of a beneficial interest in a Regulation S Temporary Global Certificate must provide Euroclear or Clearstream, as the case may be, with a certificate in the form of Annex A to Exhibit B-2 hereto certifying that the beneficial owner of the interest in such Global Certificate is not a U.S. Person (as defined in Regulation S), and Euroclear or Clearstream, as the case may be, must provide to the Securities Administrator a certificate in the form of Exhibit B-2 hereto prior to (i) the payment of interest or principal with respect to such holder's beneficial interest in the Regulation S Temporary Global Certificate and (ii) any exchange of such beneficial interest for a beneficial interest in a Regulation S Permanent Global Certificate.

(c)     No transfer of a Class CE-1 Certificate, Class CE-2 Certificate, Class P Certificate or a Residual Certificate or any interest therein shall be made to any Plan, any Person acting, directly or indirectly, on behalf of any Plan or any Person acquiring such Certificates with "Plan Assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. § 2510.3-101 as modified by Section 3(42) of ERISA ("Plan Assets") unless the Securities Administrator is provided with an Opinion of Counsel on which the Depositor, the Master Servicer, the Securities Administrator, the Trustee and the Servicers may rely, which establishes to the satisfaction of the Securities Administrator that the purchase of such Certificates is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Depositor, the Servicers, the Trustee, the Master Servicer, the Securities Administrator or the Trust Fund to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Depositor, the Servicer, the Trustee, the Master Servicer, the Securities Administrator, the Trust Fund. An Opinion of Counsel will not be required in connection with the initial transfer of any such Certificate by the Depositor to an affiliate of the Depositor (in which case, the Depositor or any affiliate thereof shall have deemed to have represented that such affiliate is not a Plan or a Person investing Plan Assets) and the Securities Administrator shall be entitled to conclusively rely upon a representation (which, upon the request of the Securities Administrator, shall be a written representation) from the Depositor of the status of such transferee as an affiliate of the Depositor.

200

For so long as the Supplemental Interest Trust is in existence, each beneficial owner of an Offered Certificate or any interest therein, shall be deemed to have represented, by virtue of its acquisition or holding of the Offered Certificate, or interest therein, that either (i) it is not a Plan or (ii)(A) it is an accredited investor within the meaning of Prohibited Transaction Exemption 2007-05, as amended from time to time (the "Exemption") and (B) the acquisition and holding of such Certificate and the separate right to receive payments from the Supplemental Interest Trust are eligible for the exemptive relief available under Prohibited Transaction Class Exemption ("PTCE") 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts), 95-60 (for transactions by insurance company general accounts) or 96-23 (for transactions effected by "in-house asset managers").

Each Transferee of a Mezzanine Certificate or any interest therein that is acquired after the termination of the Supplemental Interest Trust shall be deemed to have represented by virtue of its purchase or holding of such Certificate (or interest therein) that either (a) such Transferee is not a Plan or purchasing such Certificate with Plan Assets, (b) it has acquired and is holding such Certificate in reliance on the Exemption, and that it understands that there are certain conditions to the availability of the Exemption including that such Certificate must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by a rating agency recognized under the Exemption or (c) the following conditions are satisfied: (i) such Transferee is an insurance company, (ii) the source of funds used to purchase or hold such Certificate (or interest therein) is an "insurance company general account" (as defined in PTCE 95-60), and (iii) the conditions set forth in Sections I and III of PTCE 95-60 have been satisfied.

If any Certificate or any interest therein is acquired or held in violation of the conditions described in this Section 6.02(c), the next preceding permitted beneficial owner will be treated as the beneficial owner of that Certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of any certificate or interest therein was effected in violation of the conditions described in this Section 6.02(c) shall indemnify and hold harmless the Depositor, the Trustee, the Servicers, the Master Servicer, the Securities Administrator and the Trust Fund from and against any and all liabilities, claims, costs or expenses incurred by those parties as a result of that acquisition or holding.

(d)    (i) Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions and to have irrevocably authorized the Securities Administrator or its designee under clause (iii)(A) below to deliver payments to a Person other than such Person and to negotiate the terms of any mandatory sale under clause (iii)(B) below and to execute all instruments of Transfer and to do all other things necessary in connection with any such sale. The rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(A)    Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Permitted Transferee and shall promptly notify the Securities Administrator of any change or impending change in its status as a Permitted Transferee.

201

(B)    In connection with any proposed Transfer of any Ownership Interest in a Residual Certificate, the Securities Administrator shall require delivery to it, and shall not register the Transfer of any Residual Certificate until its receipt of, an affidavit and agreement (a "Transfer Affidavit and Agreement," in the form attached hereto as Exhibit B-4) from the proposed Transferee, in form and substance satisfactory to the Securities Administrator, representing and warranting, among other things, that such Transferee is a Permitted Transferee, that it is not acquiring its Ownership Interest in the Residual Certificate that is the subject of the proposed Transfer as a nominee, trustee or agent for any Person that is not a Permitted Transferee, that for so long as it retains its Ownership Interest in a Residual Certificate, it will endeavor to remain a Permitted Transferee, and that it has reviewed the provisions of this Section 6.02(d) and agrees to be bound by them.

(C)    Notwithstanding the delivery of a Transfer Affidavit and Agreement by a proposed Transferee under clause (B) above, if an authorized officer of the Securities Administrator who is assigned to this transaction has actual knowledge that the proposed Transferee is not a Permitted Transferee, no Transfer of an Ownership Interest in a Residual Certificate to such proposed Transferee shall be effected.

(D)    Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (x) to require a Transfer Affidavit and Agreement from any other Person to whom such Person attempts to transfer its Ownership Interest in a Residual Certificate and (Y) not to transfer its Ownership Interest unless it provides a Transferor Affidavit (in the form attached hereto as Exhibit B-4) to the Securities Administrator stating that, among other things, it has no actual knowledge that such other Person is not a Permitted Transferee.

(E)    Each Person holding or acquiring an Ownership Interest in a Residual Certificate, by purchasing an Ownership Interest in such Certificate, agrees to give the Securities Administrator written notice that it is a "pass-through interest holder" within the meaning of temporary Treasury regulation Section 1.67-3T(a)(2)(i)(A) immediately upon acquiring an Ownership Interest in a Residual Certificate, if it is, or is holding an Ownership Interest in a Residual Certificate on behalf of, a "pass-through interest holder."

(ii)    The Securities Administrator will register the Transfer of any Residual Certificate only if it shall have received the Transfer Affidavit and Agreement and all of such other documents as shall have been reasonably required by the Securities Administrator as a condition to such registration. In addition, no Transfer of a Residual Certificate shall be made unless the Securities Administrator shall have received a representation letter from the Transferee of such Certificate to the effect that such Transferee is a Permitted Transferee.

(iii)    (A) If any purported Transferee shall become a Holder of a Residual Certificate in violation of the provisions of this Section 6.02(d), then the last

preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights as holder thereof retroactive to the date of registration of such Transfer of such Residual Certificate. The Securities Administrator shall be under no liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by this Section 6.02(d) or for making any payments due on such Certificate to the holder thereof or for taking any other action with respect to such holder under the provisions of this Agreement.

(B)     If any purported Transferee shall become a holder of a Residual Certificate in violation of the restrictions in this Section 6.02(d) and to the extent that the retroactive restoration of the rights of the holder of such Residual Certificate as described in clause (iii)(A) above shall be invalid, illegal or unenforceable, then the Securities Administrator shall have the right, without notice to the holder or any prior holder of such Residual Certificate, to sell such Residual Certificate to a purchaser selected by the Securities Administrator on such terms as the Securities Administrator may choose. Such purported Transferee shall promptly endorse and deliver each Residual Certificate in accordance with the instructions of the Securities Administrator. Such purchaser may be the Securities Administrator itself or any Affiliate of the Securities Administrator. The proceeds of such sale, net of the commissions (which may include commissions payable to the Securities Administrator or its Affiliates), expenses and taxes due, if any, will be remitted by the Securities Administrator to such purported Transferee. The terms and conditions of any sale under this clause (iii)(B) shall be determined in the sole discretion of the Securities Administrator, and the Securities Administrator shall not be liable to any Person having an Ownership Interest in a Residual Certificate as a result of its exercise of such discretion.

(iv)     The Securities Administrator shall make available to the Internal Revenue Service and those Persons specified by the REMIC Provisions all information necessary to compute any tax imposed (A) as a result of the Transfer of an Ownership Interest in a Residual Certificate to any Person who is a Disqualified Organization, including the information described in Treasury regulations sections 1.860D-1(b)(5) and 1.860E-2(a)(5) with respect to the "excess inclusions" of such Residual Certificate and (B) as a result of any regulated investment company, real estate investment trust, common trust fund, partnership, trust, estate or organization described in Section 1381 of the Code that holds an Ownership Interest in a Residual Certificate having as among its record holders at any time any Person which is a Disqualified Organization. Reasonable compensation for providing such information may be charged or collected by the Securities Administrator.

(v)     The provisions of this Section 6.02(d) set forth prior to this subsection (v) may be modified, added to or eliminated, provided that there shall have been delivered to the Securities Administrator and the NIMS Insurer at the expense of the party seeking to modify, add to or eliminate any such provision the following:

[TPW: NY LEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

(A)    written notification from each Rating Agency to the effect that the modification, addition to or elimination of such provisions will not cause such Rating Agency to downgrade its then-current ratings of any Class of Certificates; and

(B)    an Opinion of Counsel, in form and substance satisfactory to the Securities Administrator and the NIMS Insurer, to the effect that such modification of, addition to or elimination of such provisions will not cause any Trust REMIC to cease to qualify as a REMIC and will not cause any Trust REMIC, as the case may be, to be subject to an entity-level tax caused by the Transfer of any Residual Certificate to a Person that is not a Permitted Transferee or a Person other than the prospective transferee to be subject to a REMIC-tax caused by the Transfer of a Residual Certificate to a Person that is not a Permitted Transferee.

(e)    Subject to the preceding subsections, upon surrender for registration of transfer of any Certificate at any office or agency of the Securities Administrator maintained for such purpose pursuant to Section 9.11, the Securities Administrator shall execute, authenticate and deliver, in the name of the designated Transferee or Transferees, one or more new Certificates of the same Class of a like aggregate Percentage Interest.

(f)    At the option of the Holder thereof, any Certificate may be exchanged for other Certificates of the same Class with authorized denominations and a like aggregate Percentage Interest, upon surrender of such Certificate to be exchanged at any office or agency of the Securities Administrator maintained for such purpose pursuant to Section 9.11. Whenever any Certificates are so surrendered for exchange, the Securities Administrator shall execute, authenticate and deliver, the Certificates which the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for transfer or exchange shall (if so required by the Securities Administrator) be duly endorsed by, or be accompanied by a written instrument of transfer in the form satisfactory to the Securities Administrator duly executed by, the Holder thereof or his attorney duly authorized in writing.  In addition, with respect to each Class R Certificate, the holder thereof may exchange, in the manner described above, such Class R Certificate for three separate certificates, each representing such holder's respective Percentage Interest in the Class R-I Interest, the Class R-II Interest and the Class R-III Interest, respectively, in each case that was evidenced by the Class R Certificate being exchanged.

(g)    No transfer of any Class CE-1 Certificate shall be made unless the proposed transferee of such Class CE-1 Certificate (1) provides to the Securities Administrator the appropriate tax certification forms that would eliminate any withholding or deduction for taxes from amounts payable by the Cap Counterparty and the Swap Provider to the Securities Administrator pursuant Cap Contracts and the Swap Agreement (i.e., IRS Form W-9 or IRS Form W-8BEN, W-8IMY, W-8EXP or W-8ECI, as applicable (or any successor form thereto), together with any applicable attachments) and (2) agrees to update such forms (a) upon expiration of any such form, (b) as required under then applicable U.S. Treasury regulations and (c) promptly upon learning that any such form has become obsolete or incorrect, each as a condition to such transfer so long as they are in physical form.  In addition, no transfer of any Class CE-1 Certificate shall be made if such transfer would cause the Reserve Fund or the

204

Supplemental Interest Trust to be beneficially owned by two or more persons for federal income tax purposes, or continue to be so treated, unless (i) each proposed transferee of such Class CE-1 Certificate complies with the foregoing conditions, (ii) the proposed majority holder of the Class CE-1 Certificates (or each holder, if there is or would be no majority holder) (A) provides, or causes to be provided, on behalf of the Reserve Fund and the Supplemental Interest Trust, if applicable, the appropriate tax certification form that would be required from the Supplemental Interest Trust to eliminate any withholding or deduction for taxes from amounts payable by the Cap Counterparty and the Swap Provider to the Securities Administrator pursuant the Cap Contracts and the Swap Agreement (i.e., IRS Form W-9 or IRS Form W-8BEN, W-8IMY, W-8EXP or W-8ECI, as applicable (or any successor form thereto), together with any applicable attachments) and (B) agrees to update such forms (x) upon expiration of any such form, (y) as required under then applicable U.S. Treasury regulations and (z) promptly upon learning that any such form has become obsolete or incorrect. If, under applicable U.S. Treasury regulations, such tax certification form may only be signed by a trustee acting on behalf of the Supplemental Interest Trust, then the Securities Administrator, the Trustee or the Supplemental Interest Trust Trustee, as appropriate, shall sign such certification form if so requested by a holder of the Class CE-1 Certificates.    Upon receipt of any tax certification form pursuant to the preceding conditions from a proposed transferee of any Class CE-1 Certificate, the Securities Administrator shall forward each tax certification form attributable to the Cap Contracts to the Cap Counterparty and each tax certification form attributable to the Swap Agreement to the Swap Provider so long as the Securities Administrator is permitted to provide such tax certification form. Each holder of a Class CE-1 Certificate and each transferee thereof shall be deemed to have consented to the Securities Administrator forwarding to Swap Provider any tax certification form it has provided and updated in accordance with these transfer restrictions. Any purported sales or transfers of any Class CE-1 Certificate to a transferee which does not comply with the requirements of this paragraph shall be deemed null and void under this Agreement. In the event that the Securities Administrator is unable to provide a tax certification pursuant to this paragraph, it shall immediately notify the Depositor, the Cap Counterparty and the Swap Provider.

(h)    No service charge to the Certificateholders shall be made for any transfer or exchange of Certificates, but the Securities Administrator may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

(i)    All Certificates surrendered for transfer and exchange shall be canceled and destroyed by the Securities Administrator in accordance with its customary procedures.

SECTION 6.03.    Mutilated, Destroyed, Lost or Stolen Certificates.

If (i) any mutilated Certificate is surrendered to the Securities Administrator, or the Securities Administrator receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and of the ownership thereof, and (ii) there is delivered to the Securities Administrator such security or indemnity as may be required by it to save it harmless, then, in the absence of actual knowledge by the Securities Administrator that such Certificate has been acquired by a protected purchaser, the Securities Administrator, shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a

205

new Certificate of the same Class and of like denomination and Percentage Interest. Upon the issuance of any new Certificate under this Section, the Securities Administrator may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Securities Administrator) connected therewith. Any replacement Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the applicable REMIC created hereunder, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

SECTION 6.04.    Persons Deemed Owners.

The Depositor, the Servicers, the Trustee, the Master Servicer, the NIMS Insurer, the Securities Administrator and any agent of any of them may treat the Person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions pursuant to Section 5.01 and for all other purposes whatsoever, and none of the Depositor, the Servicers, the Trustee, the Master Servicer, the Securities Administrator or any agent of any of them shall be affected by notice to the contrary.

SECTION 6.05.    Certain Available Information.

On or prior to the date of the first sale of any Class M-9 Certificate, Class CE-1 Certificate, Class CE-2 Certificate, Class P Certificate or Residual Certificate to an Independent third party, the Depositor shall provide to the Securities Administrator ten copies of any private placement memorandum or other disclosure document used by the Depositor in connection with the offer and sale of such Certificate. In addition, if any such private placement memorandum or disclosure document is revised, amended or supplemented at any time following the delivery thereof to the Securities Administrator, the Depositor promptly shall inform the Securities Administrator of such event and shall deliver to the Securities Administrator ten copies of the private placement memorandum or disclosure document, as revised, amended or supplemented. The Securities Administrator shall maintain at its office as set forth in Section 12.05 hereof and shall make available free of charge during normal business hours for review by any Holder of a Certificate or any Person identified to the Securities Administrator as a prospective transferee of a Certificate, originals or copies of the following items: (i) in the case of a Holder or prospective transferee of a Class M-9 Certificate, Class CE-1 Certificate, Class CE-2 Certificate, Class P Certificate or Residual Certificate, the related private placement memorandum or other disclosure document relating to such Class of Certificates, in the form most recently provided to the Securities Administrator; and (ii) in all cases, (A) this Agreement and any amendments hereof entered into pursuant to Section 12.01, (B) all monthly statements required to be delivered to Certificateholders of the relevant Class pursuant to Section 5.02 since the Closing Date, and all other notices, reports, statements and written communications delivered to the Certificateholders of the relevant Class pursuant to this Agreement since the Closing Date and (C) any copies of all Officers' Certificates of the Servicers since the Closing Date delivered to the Master Servicer to evidence such Person's determination that any P&I Advance or Servicing Advance was, or if made, would be a Nonrecoverable P&I Advance or Nonrecoverable Servicing Advance. Copies and mailing of any and all of the foregoing items will be available from the Securities Administrator upon request at the expense of the Person requesting the same.

206

ARTICLE VII

THE DEPOSITOR, THE SERVICERS AND THE MASTER SERVICER

SECTION 7.01.    Liability of the Depositor, the Servicers and the Master Servicer.

The Depositor, the Servicers and the Master Servicer each shall be liable in accordance herewith only to the extent of the obligations specifically imposed by this Agreement upon them in their respective capacities as Depositor, Servicers and Master Servicer and undertaken hereunder by the Depositor, the Servicers and the Master Servicer herein. References to the Servicers in this Article VII (other than with respect to Sections 7.08, 7.09, 7.10 and 7.11) shall be deemed to refer to Ocwen and GMAC.

SECTION 7.02.    Merger or Consolidation of the Depositor, the Servicer or the Master Servicer.

Subject to the following paragraph, the Depositor will keep in full effect its existence, rights and franchises as a corporation under the laws of the jurisdiction of its incorporation. Subject to the following paragraph, each Servicer will keep in full effect its existence, rights and franchises as a limited liability company under the laws of the jurisdiction of its formation. Subject to the following paragraph, the Master Servicer will keep in full effect its existence, rights and franchises as a national banking association. The Depositor, the Servicers and the Master Servicer each will obtain and preserve its qualification to do business as a foreign entity in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its respective duties under this Agreement.

The Depositor, the Servicers or the Master Servicer may be merged or consolidated with or into any Person, or transfer all or substantially all of its assets to any Person, in which case any Person resulting from any merger or consolidation to which the Depositor, the related Servicer or the Master Servicer shall be a party, or any Person succeeding to the business of the Depositor, the related Servicer or the Master Servicer, shall be the successor of the Depositor, the related Servicer or the Master Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that any successor to the related Servicer or the Master Servicer shall meet the eligibility requirements set forth in clauses (i) and (iii) of the last paragraph of Section 8.02(a) or Section 7.06, as applicable.

SECTION 7.03.    Limitation on Liability of the Depositor, the Servicers, the Master Servicer and Others.

None of the Depositor, the Servicers, the Securities Administrator, the Master Servicer, the NIMS Insurer or any of the directors, officers, employees or agents of the Depositor, the Servicer, the NIMS Insurer or the Master Servicer shall be under any liability to the Trust Fund or the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided,

207

however, that this provision shall not protect the Depositor, the Servicers, the Securities Administrator, the Master Servicer or any such person against any breach of warranties, representations or covenants made herein or against any specific liability imposed on any such Person pursuant hereto or against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder. The Depositor, the Servicers, the Securities Administrator, the Master Servicer, the NIMS Insurer and any director, officer, employee or agent of the Depositor, the Servicers, the Securities Administrator and the Master Servicer may rely in good faith on any document of any kind which, prima facie, is properly executed and submitted by any Person respecting any matters arising hereunder. The Depositor, the Servicers, the Securities Administrator, the Master Servicer and any director, officer, employee or agent of the Depositor, the Servicers, the Securities Administrator or the Master Servicer shall be indemnified and held harmless by the Trust Fund against any loss, liability or expense incurred in connection with any legal action relating to this Agreement, the Servicing Agreement, the Certificates or any Credit Risk Management Agreement or any loss, liability or expense incurred other than by reason of willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder. None of the Depositor, the Servicers, the Securities Administrator or the Master Servicer shall be under any obligation to appear in, prosecute or defend any legal action unless such action is related to its respective duties under this Agreement and, in its opinion, does not involve it in any expense or liability; provided, however, that each of the Depositor, each Servicer, the Securities Administrator and the Master Servicer may in its discretion undertake any such action which it may deem necessary or desirable with respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder. In such event, the legal expenses and costs of such action and any liability resulting therefrom (except any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder) shall be expenses, costs and liabilities of the Trust Fund, the Depositor, the related Servicer, the Securities Administrator and the Master Servicer shall be entitled to be reimbursed therefor from the related Collection Account or the Distribution Account as and to the extent provided in Article III and Article IV, any such right of reimbursement being prior to the rights of the Certificateholders to receive any amount in the related Collection Account and the Distribution Account.

Notwithstanding anything to the contrary contained herein, the Servicers shall not be liable for any actions or inactions prior to the Cut-off Date of any prior servicer of the related Mortgage Loans and the Master Servicer shall not be liable for any action or inaction of the Servicers, except to the extent expressly provided herein, or the Credit Risk Management Agreement.

SECTION 7.04.    Limitation on Resignation of the Servicers.

(a)    Except as expressly provided herein, neither Servicer shall assign all or substantially all of its rights under this Agreement or the servicing hereunder nor delegate all or substantially all of its duties hereunder or sell or otherwise dispose of all or substantially all of its property or assets without, in each case, the prior written consent of the Master Servicer, which consent shall not be unreasonably withheld; provided, that in each case, there must be delivered

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

to the Trustee and the Master Servicer a letter from each Rating Agency to the effect that such transfer of servicing or sale or disposition of assets will not result in a qualification, withdrawal or downgrade of the then-current rating of any of the Certificates (the "Rating Condition"). Notwithstanding the foregoing, each Servicer, without the consent of the Trustee or the Master Servicer, may retain third-party contractors to perform certain servicing and loan administration functions, including without limitation hazard insurance administration, tax payment and administration, flood certification and administration, collection services and similar functions, provided, however, that the retention of such contractors by the related Servicer shall not limit the obligation of the related Servicer to service the related Mortgage Loans pursuant to the terms and conditions of this Agreement. No Servicer shall resign from the obligations and duties hereby imposed on it except (i) upon determination that its duties hereunder are no longer permissible under applicable law or (ii) upon the related Servicer's written proposal of a successor servicer reasonably acceptable to each of the Sponsor, the Depositor and the Master Servicer. No such resignation under clause (i) above shall become effective unless evidenced by an Opinion of Counsel to such effect obtained at the expense of the related Servicer and delivered to the Trustee and the Rating Agencies. No such resignation of a Servicer under clause (ii) shall be effective unless:

(i)    the proposed successor Servicer is (1) an affiliate of the Master Servicer that services mortgage loans similar to the Mortgage Loans in the jurisdictions in which the related Mortgaged Properties are located or (2) the proposed successor Servicer has a rating of at least "Above Average" by S&P and either a rating of at least "RPS2" by Fitch or a rating of at least "SQ2" by Moody's;

(ii)    the Rating Agencies have confirmed to the Trustee that the appointment of the proposed successor servicer as the servicer under this Agreement will not result in the reduction or withdrawal of the then current ratings of any of the Certificates; and

(iii)    the proposed successor servicer has a net worth of at least $25,000,000.

Notwithstanding anything to the contrary, no resignation of a Servicer shall become effective until the Master Servicer or a successor servicer shall have assumed the related Servicer's responsibilities, duties, liabilities (other than those liabilities arising prior to the appointment of such successor) and obligations under this Agreement. In addition, the Sponsor shall promptly inform the Credit Risk Manager of a Servicer's resignation under this Section 7.04.

(b)    Except as expressly provided herein, no Servicer shall assign or transfer any of its rights, benefits or privileges hereunder to any other Person, or delegate to or subcontract with, or authorize or appoint any other Person to perform any of the duties, covenants or obligations to be performed by the related Servicer hereunder. The foregoing prohibition on assignment shall not prohibit a Servicer from designating a Sub-Servicer as payee of any indemnification amount payable to the related Servicer hereunder; provided, however, that as provided in Section 3.02, no Sub-Servicer shall be a third-party beneficiary hereunder and

209

the parties hereto shall not be required to recognize any Sub-Servicer as an indemnitee under this Agreement.

(c)    Notwithstanding anything to the contrary herein, Ocwen may pledge or assign as collateral all its rights, title and interest under this Agreement to a lender (the "Servicing Rights Lender") and allow such Servicing Rights Lender (i) to cause the transfer of servicing to a successor Servicer that meets the Rating Condition if Ocwen defaults under its agreements with the Servicing Rights Lender and (ii) upon an Event of Default and receipt of notice of termination by Ocwen, the Servicing Rights Lender may direct Ocwen or its designee to appoint a successor Servicer pursuant to the provisions, and subject to the conditions set forth in Section 8.02 regarding Ocwen's appointment of a successor Servicer, provided, that:

(i)    the Servicing Rights Lender's rights are subject to this Agreement; and

(ii)    such Servicer shall remain subject to termination as servicer under this Agreement pursuant to the terms hereof.

SECTION 7.05.    Limitation on Resignation of the Master Servicer.

The Master Servicer shall not resign from the obligations and duties hereby imposed on it except upon determination that its duties hereunder are no longer permissible under applicable law. Any such determination pursuant to the preceding sentence permitting the resignation of the Master Servicer shall be evidenced by an Opinion of Counsel to such effect obtained at the expense of the Master Servicer and delivered to the Trustee and the Rating Agencies. No resignation of the Master Servicer shall become effective until the Trustee or a successor Master Servicer meeting the criteria specified in Section 7.06 shall have assumed the Master Servicer's responsibilities, duties, liabilities (other than those liabilities arising prior to the appointment of such successor) and obligations under this Agreement.

SECTION 7.06.    Assignment of Master Servicing.

The Master Servicer may sell and assign its rights and delegate its duties and obligations in its entirety as Master Servicer under this Agreement; provided, however, that: (i) the purchaser or transferee accept in writing such assignment and delegation and assume the obligations of the Master Servicer hereunder (a) shall have a net worth of not less than $25,000,000 (unless otherwise approved by each Rating Agency pursuant to clause (ii) below); (b) shall be reasonably satisfactory to the Trustee (as evidenced in a writing signed by the Trustee and the NIMS Insurer); and (c) shall execute and deliver to the Trustee an agreement, in form and substance reasonably satisfactory to the Trustee and the NIMS Insurer, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by it as master servicer under this Agreement, any custodial agreement from and after the effective date of such agreement; (ii) each Rating Agency shall be given prior written notice of the identity of the proposed successor to the Master Servicer and each Rating Agency's rating of the Certificates in effect immediately prior to such assignment, sale and delegation will not be downgraded, qualified or withdrawn as a result of such assignment, sale and delegation, as evidenced by a letter to such effect delivered

210

to the Master Servicer, the Trustee and the NIMS Insurer; and (iii) the Master Servicer assigning and selling the master servicing shall deliver to the Trustee an Officer's Certificate and an Opinion of Independent counsel, each stating that all conditions precedent to such action under this Agreement have been completed and such action is permitted by and complies with the terms of this Agreement. No such assignment or delegation shall affect any liability of the Master Servicer arising out of acts or omissions prior to the effective date thereof.

SECTION 7.07.       Rights of the Depositor in Respect of the Servicers and the Master Servicer.

Each of the Master Servicer and each Servicer shall afford (and any Sub-Servicing or Sub-Contracting Agreement shall provide that each Sub-Servicer or Subcontractor, as applicable shall afford) the Depositor and the Trustee, upon reasonable notice, during normal business hours, access to all records maintained by the Master Servicer or the related Servicer (and any such Sub-Servicer or Subcontractor, as applicable) in respect of the related Servicer's rights and obligations hereunder and access to officers of the Master Servicer or the related Servicer (and those of any such Sub-Servicer or Subcontractor, as applicable) responsible for such obligations, and the Master Servicer shall have access to all such records maintained by the related Servicer and any Sub-Servicers or Subcontractors. Upon request, each of the Master Servicer and the Servicers shall furnish to the Depositor and the Trustee its (and any such Sub-Servicer's or Subcontractor's) most recent financial statements and such other information relating to the Master Servicer's or the related Servicer's capacity to perform its obligations under this Agreement as it possesses (and that any such Sub-Servicer or Subcontractor possesses). To the extent that the Master Servicer or a Servicer informs the Depositor and the Trustee that such information is not otherwise available to the public, the Depositor and the Trustee shall not disseminate any information obtained pursuant to the preceding two sentences without the Master Servicer's or the related Servicer's written consent, except as required pursuant to this Agreement or to the extent that it is appropriate to do so (i) to its legal counsel, auditors, taxing authorities or other governmental agencies and the Certificateholders, (ii) pursuant to any law, rule, regulation, order, judgment, writ, injunction or decree of any court or governmental authority having jurisdiction over the Depositor and the Trustee or the Trust Fund, and in any case, the Depositor or the Trustee, (iii) disclosure of any and all information that is or becomes publicly known, or information obtained by the Trustee from sources other than the Depositor, the related Servicer or the Master Servicer, (iv) disclosure as required pursuant to this Agreement or (v) disclosure of any and all information (A) in any preliminary or final offering circular, registration statement or contract or other document pertaining to the transactions contemplated by the Agreement approved in advance by the Depositor, the related Servicer or the Master Servicer or (B) to any affiliate, independent or internal auditor, agent, employee or attorney of the Trustee having a need to know the same, provided that the Trustee advises such recipient of the confidential nature of the information being disclosed, shall use its best efforts to assure the confidentiality of any such disseminated non-public information. Nothing in this Section 7.07 shall limit the obligation of the Servicers to comply with any applicable law prohibiting disclosure of information regarding the Mortgagors and the failure of a Servicer to provide access as provided in this Section 7.07 as a result of such obligation shall not constitute a breach of this Section. Nothing in this Section 7.07 shall require the Servicers to collect, create, collate or otherwise generate any information that it does not generate in its usual course of business. The Servicers shall not be required to make copies of or ship documents to any party

unless provisions have been made for the reimbursement of the costs thereof. The Depositor may, but is not obligated to, enforce the obligations of the Master Servicer, Ocwen and GMAC under this Agreement and Countrywide under the Servicing Agreement and may, but is not obligated to, perform, or cause a designee to perform, any defaulted obligation of the Master Servicer, Ocwen or GMAC under this Agreement or Countrywide under the Servicing Agreement or exercise the rights of the Master Servicer or the related Servicer under this Agreement or the Servicing Agreement, as applicable; provided that neither the Master Servicer nor the Servicer shall be relieved of any of its obligations under this Agreement or the Servicing Agreement, as applicable, by virtue of such performance by the Depositor or its designee. The Depositor shall not have any responsibility or liability for any action or failure to act by the Master Servicer or the Servicers and is not obligated to supervise the performance of the Master Servicer or the Servicers under this Agreement or the Servicing Agreement, as applicable, or otherwise.

SECTION 7.08.    Duties of the Credit Risk Manager.

For and on behalf of the Depositor, the Credit Risk Manager will provide reports and recommendations concerning certain delinquent and defaulted Mortgage Loans, and as to the collection of any Prepayment Charges with respect to the Mortgage Loans.  Such reports and recommendations will be based upon information provided to the Credit Risk Manager pursuant to the Credit Risk Management Agreements, and the Credit Risk Manager shall look solely to the Servicers and/or Master Servicer for all information and data (including loss and delinquency information and data) relating to the servicing of the related Mortgage Loans.  Upon any termination of the Credit Risk Manager or the appointment of a successor Credit Risk Manager, the Depositor shall give written notice thereof to the Servicers, the Master Servicer, the Securities Administrator, the Trustee, and each Rating Agency.  Notwithstanding the foregoing, the termination of the Credit Risk Manager pursuant to this Section shall not become effective until the appointment of a successor Credit Risk Manager.

SECTION 7.09.    Limitation Upon Liability of the Credit Risk Manager.

Neither the Credit Risk Manager, nor any of its directors, officers, employees, or agents shall be under any liability to the Trustee, the Certificateholders, or the Depositor for any action taken or for refraining from the taking of any action made in good faith pursuant to this Agreement, in reliance upon information provided by the Servicers or the Master Servicer under the related Credit Risk Management Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Credit Risk Manager or any such person against liability that would otherwise be imposed by reason of willful malfeasance or bad faith in its performance of its duties.  The Credit Risk Manager and any director, officer, employee, or agent of the Credit Risk Manager may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder, and may rely in good faith upon the accuracy of information furnished by the Servicers or the Master Servicer pursuant to the related Credit Risk Management Agreement in the performance of its duties thereunder and hereunder.  The Trustee is hereby authorized to enter into any Credit Risk Management Agreement necessary to effect the foregoing.

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

SECTION 7.10.        Removal of the Credit Risk Manager.

The Credit Risk Manager may be removed as Credit Risk Manager by Certificateholders holding not less than 66 2/3% of the Voting Rights in the Trust Fund, in the exercise of its or their sole discretion. The Certificateholders shall provide written notice of the Credit Risk Manager's removal to the Trustee. Upon receipt of such notice, the Trustee shall provide written notice to the Credit Risk Manager of its removal, which shall be effective upon receipt of such notice by the Credit Risk Manager, with a copy to the Securities Administrator and the Master Servicer.

SECTION 7.11.        Transfer of Servicing by Sponsor to a Special Servicer.

With respect to any Mortgage Loan serviced by Ocwen or Countrywide which becomes 60 or more days delinquent after the Closing Date, the Sponsor may, at its option, transfer the servicing responsibilities of such Servicer hereunder or under the Servicing Agreement, as applicable, with respect to such Mortgage Loan. With respect to any Mortgage Loan serviced by GMAC which becomes 60 or more days delinquent, the Sponsor shall transfer the servicing responsibilities of GMAC hereunder to a special servicer. No such servicing transfer shall become effective unless and until a successor to such Servicer shall have been appointed to service and administer the related Mortgage Loans pursuant to a special servicing agreement acceptable to the Depositor, the Master Servicer and the Trustee. No appointment shall be effective unless (i) such special servicer meets the Minimum Servicing Requirements and (ii) all amounts reimbursable to the related Servicer pursuant to the terms of this Agreement or the Servicing Agreement, as applicable, shall have been paid to the related Servicer by the special servicer including without limitation, all unreimbursed P&I Advances and Servicing Advances made by the related Servicer relating to such Mortgage Loan and all out-of-pocket expenses of the related Servicer incurred in connection with the transfer of servicing to such special servicer, all accrued and unpaid Servicing Fees relating to such Mortgage Loan and, in the case of Ocwen, reimbursement of the applicable portion of the purchase price paid by Ocwen for the servicing rights relating to such Mortgage Loans as set forth in a separate letter agreement with the Sponsor or an affiliate. The Sponsor shall provide a copy of the agreement executed by the special servicer to the Trustee and the Master Servicer. If the proposed special servicer does not meet the Minimum Servicing Requirements, the Sponsor shall be required to obtain written confirmation from the Rating Agencies that such appointment will not result in a downgrade, qualification or withdrawal of the then current rating of the Offered Certificates. The Sponsor shall notify the Credit Risk Manager of any transfer of servicing pursuant to this Section 7.11.

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

## ARTICLE VIII

## DEFAULT

SECTION 8.01.        Servicer Events of Default.

(a)        "Servicer Event of Default," wherever used herein, means any one of the following events:

(i)        any failure by the related Servicer to remit to the Securities Administrator for distribution to the Certificateholders any payment (other than a P&I Advance required to be made from its own funds on any Servicer Remittance Date pursuant to Section 5.03 of this Agreement) required to be made by the Servicer under the terms of the Certificates and this Agreement which continues unremedied until 3:00 p.m. New York time on the Business Day immediately following the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the related Servicer by the Depositor, the Securities Administrator or the Trustee (in which case notice shall be provided by telecopy), or to the Servicer, the Depositor and the Trustee by the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights; or

(ii)        any failure on the part of the related Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in this Agreement, or the material breach by the Servicer of any representation and warranty contained in Section 2.05, which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the related Servicer by the Depositor or the Trustee or to the Servicer, the Depositor and the Trustee by the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights; provided, however, that in the case of a failure that cannot be cured within thirty (30) days, the cure period may be extended for an additional thirty (30) days if the related Servicer can demonstrate to the reasonable satisfaction of the Trustee that such Servicer is diligently pursuing remedial action; or

(iii)        a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceeding, or for the winding-up or liquidation of its affairs, shall have been entered against the related Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of ninety (90) days; or

(iv)        the related Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to it or of or relating to all or substantially all of its property; or

214

(v)    the related Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations;

(vi)    failure by the related Servicer to duly perform, within the required time period, its obligations under Sections 3.17, 3.18 or 3.20; or

(vii)    any failure of the related Servicer to make any P&I Advance on any Servicer Remittance Date required to be made from its own funds pursuant to Section 5.03 which continues unremedied until 3:00 p.m. New York time on the Business Day immediately following the related Servicer Remittance Date; or

(viii)    failure of the related Servicer to maintain at least an "average" rating from the Rating Agencies.

A "Servicer Event of Default" whenever used herein means, with respect to Countrywide, an event of default by Countrywide under the Servicing Agreement.

If a Servicer Event of Default described in clauses (i) through (vi) or (viii) of this Section or a corresponding Servicer Event of Default under the Servicing Agreement shall occur, then, and in each and every such case, so long as such Servicer Event of Default shall not have been remedied, the Depositor or the Trustee may, and at the written direction of the Holders of Certificates entitled to at least 51% of Voting Rights or at the direction of the NIMS Insurer, the Trustee shall, by notice in writing to the defaulting Servicer (and to the Depositor if given by the Trustee or to the Trustee if given by the Depositor) with a copy to the Master Servicer and each Rating Agency, terminate all of the rights and obligations of the defaulting Servicer in its capacity as a Servicer under this Agreement, to the extent permitted by law, and in and to the related Mortgage Loans and the proceeds thereof. If a Servicer Event of Default described in clause (vii) hereof or a corresponding Servicer Event of Default under the Servicing Agreement shall occur, the Trustee shall, by notice in writing to the defaulting Servicer, the Depositor and the Master Servicer, terminate all of the rights and obligations of the defaulting Servicer in its capacity as a Servicer under this Agreement and in and to the related Mortgage Loans and the proceeds thereof. Subject to Section 8.02, on or after the receipt by the defaulting Servicer of such written notice, all authority and power of the defaulting Servicer under this Agreement or the Servicing Agreement, as applicable, whether with respect to the Certificates (other than as a Holder of any Certificate) or the Mortgage Loans or otherwise, shall pass to and be vested in the Master Servicer pursuant to and under this Section, and, without limitation, the Master Servicer is hereby authorized and empowered, as attorney-in-fact or otherwise, to execute and deliver, on behalf of and at the expense of the defaulting Servicer, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise. The defaulting Servicer agrees promptly (and in any event no later than ten (10) Business Days subsequent to such notice) to provide the Master Servicer with all documents and records requested by it to enable it to assume the defaulting Servicer's functions under this Agreement, and to cooperate with the Master Servicer in effecting the termination of the defaulting Servicer's responsibilities and

215

rights under this Agreement, including, without limitation, the transfer within one (1) Business Day to the Master Servicer for administration by it of all cash amounts which at the time shall be or should have been credited by the defaulting Servicer to the related Collection Account held by or on behalf of the defaulting Servicer or thereafter be received with respect to the related Mortgage Loans or any related REO Property (provided, however, that the defaulting Servicer shall continue to be entitled to receive all amounts accrued or owing to it under this Agreement on or prior to the date of such termination, whether in respect of P&I Advances, Servicing Advances, accrued and unpaid Servicing Fees or otherwise, and shall continue to be entitled to the benefits of Section 7.03, notwithstanding any such termination, with respect to events occurring prior to such termination). Reimbursement of unreimbursed P&I Advances, Servicing Advances and accrued and unpaid Servicing Fees shall be made on a first in, first out ("FIFO") basis no later than the related Servicer Remittance Date. For purposes of this Section 8.01(a), the Trustee shall not be deemed to have knowledge of a Servicer Event of Default unless a Responsible Officer of the Trustee assigned to and working in the Trustee's Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such a Servicer Event of Default is received by the Trustee at its Corporate Trust Office and such notice references the Certificates, the Trust or this Agreement. The Trustee shall promptly notify the Master Servicer and the Rating Agencies of the occurrence of a Servicer Event of Default of which it has knowledge as provided above.

The Master Servicer shall be entitled to be reimbursed by the defaulting Servicer (or from amounts on deposit in the Distribution Account if the defaulting Servicer is unable to fulfill its obligations hereunder) for all reasonable out-of-pocket or third party costs associated with the transfer of servicing from the defaulting Servicer, including without limitation, any reasonable out-of-pocket or third party costs or expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the Master Servicer to correct any errors or insufficiencies in the servicing data or otherwise to enable the Master Servicer to service the related Mortgage Loans properly and effectively, upon presentation of reasonable documentation of such costs and expenses.

(b)    "Master Servicer Event of Default," wherever used herein, means any one of the following events:

(i)    any failure on the part of the Master Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement, or the breach by the Master Servicer of any representation and warranty contained in Section 2.04, which continues unremedied for a period of 30 days after the date on which written notice of such failure, or after such other period as set forth in this Agreement, requiring the same to be remedied, shall have been given to the Master Servicer by the Depositor or the Trustee or to the Master Servicer, the Depositor and the Trustee by the Holders of Certificates entitled to at least 25% of the Voting Rights; or

(ii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets

216

and liabilities or similar proceeding, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 90 days; or

        (iii)     the Master Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to it or of or relating to all or substantially all of its property; or

        (iv)     the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

        (v)     failure by the Master Servicer to duly perform, within the required time period, its obligations under Sections 4.15, 4.16, 4.17 or 4.18.

If a Master Servicer Event of Default shall occur, then, and in each and every such case, so long as such Master Servicer Event of Default shall not have been remedied, the Depositor or the Trustee may, and at the written direction of the Holders of Certificates entitled to at least 51% of Voting Rights, the Trustee shall, by notice in writing to the Master Servicer (and to the Depositor if given by the Trustee or to the Trustee if given by the Depositor) with a copy to each Rating Agency, terminate all of the rights and obligations of the Master Servicer in its capacity as Master Servicer under this Agreement, to the extent permitted by law, and in and to the Mortgage Loans and the proceeds thereof. On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer under this Agreement, whether with respect to the Certificates (other than as a Holder of any Certificate) or the Mortgage Loans or otherwise including, without limitation, the compensation payable to the Master Servicer under this Agreement, shall pass to and be vested in the Trustee pursuant to and under this Section, and, without limitation, the Trustee is hereby authorized and empowered, as attorney-in-fact or otherwise, to execute and deliver, on behalf of and at the expense of the Master Servicer, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise. The Master Servicer agrees promptly (and in any event no later than ten Business Days subsequent to such notice) to provide the Trustee with all documents and records requested by it to enable it to assume the Master Servicer's functions under this Agreement, and to cooperate with the Trustee in effecting the termination of the Master Servicer's responsibilities and rights under this Agreement (provided, however, that the Master Servicer shall continue to be entitled to receive all amounts accrued or owing to it under this Agreement on or prior to the date of such termination and shall continue to be entitled to the benefits of Section 7.03, notwithstanding any such termination, with respect to events occurring prior to such termination). For purposes of this Section 8.01(b), the Trustee shall not be deemed to have knowledge of a Master Servicer Event of Default unless a Responsible Officer of the Trustee assigned to and working in the Trustee's Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such a Master Servicer Event of Default is received by the Trustee and such notice references the Certificates, the Trust or this

217

Agreement. The Trustee shall promptly notify the Rating Agencies of the occurrence of a Master Servicer Event of Default of which it has knowledge as provided above.

On and after the time the Master Servicer receives a notice of termination, the Trustee shall be the successor in all respects to the Master Servicer (and, if applicable, the Securities Administrator) in its capacity as Master Servicer (and, if applicable, the Securities Administrator) under this Agreement and the transactions set forth or provided for herein, and all the responsibilities, duties and liabilities relating thereto and arising thereafter shall be assumed by the Trustee (except for any representations or warranties of the Master Servicer under this Agreement, the responsibilities, duties and liabilities contained in Section 2.03 and the obligation to deposit amounts in respect of losses pursuant to Section 3.10) by the terms and provisions hereof including, without limitation, but subject to the Master Servicer's and Trustee's determination of recoverability, the Master Servicer's obligations to make P&I Advances no later than each Distribution Date pursuant to Section 5.03; provided, however, that if the Trustee is prohibited by law or regulation from obligating itself to make advances regarding delinquent mortgage loans, then the Trustee shall not be obligated to make P&I Advances pursuant to Section 5.03; and provided further, that any failure to perform such duties or responsibilities caused by the Master Servicer's failure to provide information required by Section 8.01 shall not be considered a default by the Trustee as successor to the Master Servicer hereunder and neither the Trustee nor any other successor master servicer shall be liable for any acts or omissions of the terminated master servicer. As compensation therefor, the Trustee shall be entitled to the Master Servicing Fee and all funds relating to the Loans, investment earnings on the Distribution Account and all other remuneration to which the Master Servicer would have been entitled if it had continued to act hereunder.

Notwithstanding the foregoing, the Trustee may, if it shall be unwilling to continue to act, or shall, if it is unable to so act, petition a court of competent jurisdiction to appoint, or appoint on its own behalf, any established housing and home finance institution servicer, master servicer, servicing or mortgage servicing institution having a net worth of not less than $25,000,000 and meeting such other standards for a successor master servicer as are set forth in this Agreement, as the successor to such Master Servicer in the assumption of all of the responsibilities, duties or liabilities of a master servicer.

To the extent that the costs and expenses of the Trustee related to the termination of the Master Servicer, appointment of a successor Master Servicer or the transfer and assumption of the master servicing by the Trustee (including, without limitation, (i) all legal costs and expenses and all due diligence costs and expenses associated with an evaluation of the potential termination of the Master Servicer as a result of a Master Servicer Event of Default and (ii) all costs and expenses associated with the complete transfer of the master servicing, including all servicing files and all servicing data and the completion, correction or manipulation of such servicing data as may be required by the successor Master Servicer to correct any errors or insufficiencies in the servicing data or otherwise to enable the successor Master Servicer to master service the Mortgage Loans in accordance with this Agreement) are not fully and timely reimbursed by the terminated Master Servicer, the Trustee shall be entitled to reimbursement of such costs and expenses from the Distribution Account.

218

Neither the Trustee nor any other successor master servicer shall be deemed to be in default hereunder by reason of any failure to make, or any delay in making, any distribution hereunder or any portion thereof or any failure to perform, or any delay in performing, any duties or responsibilities hereunder, in either case caused by the failure of the Master Servicer to deliver or provide, or any delay in delivering or providing, any cash, information, documents or records to it.

SECTION 8.02.    Master Servicer to Act; Appointment of Successor.

(a)    Subject to the following paragraph, on and after the time a Servicer receives a notice of termination, the Master Servicer shall be the successor in all respects to the related Servicer in its capacity as a Servicer under this Agreement or the Servicing Agreement, as applicable, and the transactions set forth or provided for herein, and all the responsibilities, duties and liabilities relating thereto and arising thereafter shall be assumed by the Master Servicer (except for any representations or warranties of the related Servicer under this Agreement or the Servicing Agreement, as applicable, the responsibilities, duties and liabilities contained in Section 2.03 and the obligation to deposit amounts in respect of losses pursuant to Section 3.10(b)) by the terms and provisions hereof including, without limitation, the related Servicer's obligations to make P&I Advances pursuant to Section 5.03 of this Agreement or pursuant to the Servicing Agreement; provided, however, that if the Master Servicer is prohibited by law or regulation from obligating itself to make advances regarding delinquent mortgage loans, then the Master Servicer shall not be obligated to make P&I Advances pursuant to Section 5.03 of this Agreement; and provided further, that any failure to perform such duties or responsibilities caused by the related Servicer's failure to provide information required by Section 8.01 shall not be considered a default by the Master Servicer as successor to such Servicer hereunder or under the Servicing Agreement; provided, however, that (1) it is understood and acknowledged by the parties hereto that there will be a period of transition (not to exceed 120 days) before the actual servicing functions can be fully transferred to the Master Servicer or any successor servicer appointed in accordance with the following provisions and (2) any failure to perform such duties or responsibilities caused by the related Servicer's failure to provide information required by Section 8.01 of this Agreement or under the Servicing Agreement shall not be considered a default by the Master Servicer as successor to such Servicer. As compensation therefor, the Master Servicer shall be entitled to the Servicing Fee and all funds relating to the Mortgage Loans to which the terminated Servicer would have been entitled if it had continued to act hereunder or under the Servicing Agreement. Notwithstanding the above and subject to the immediately following paragraph, the Master Servicer may, if it shall be unwilling to so act, or shall, if it is unable to so act promptly appoint or petition a court of competent jurisdiction to appoint, a Person that satisfies the eligibility criteria set forth below as the successor to the terminated Servicer under this Agreement or under the Servicing Agreement in the assumption of all or any part of the responsibilities, duties or liabilities of the terminated Servicer under this Agreement or under the Servicing Agreement.

Notwithstanding any provision in this Agreement to the contrary, for a period of 30 days following the date on which Ocwen shall have received a notice of termination pursuant to Section 8.01 of this Agreement, Ocwen or its designee may appoint a successor Servicer with respect to the Ocwen Mortgage Loans that satisfies the eligibility criteria of a successor Servicer set forth below, which appointment shall be subject to the consent of the Depositor, the Sponsor,

219

the Master Servicer, and the Trustee, which consent shall not be unreasonably withheld or delayed; provided that such successor Servicer agrees to fully effect the servicing transfer within 120 days following the termination of Ocwen and to make all P&I Advances that would otherwise be made by the Master Servicer under Section 8.01 as of the date of such appointment, and to reimburse the Master Servicer for any unreimbursed P&I Advances they have made and any reimbursable expenses that they may have incurred in connection with this Section 8.02. Any proceeds received in connection with the appointment of such successor Servicer shall be the property of Ocwen or its designee. This 30-day period shall terminate immediately (i) at the close of business on the second Business Day of such 30-day period if (A) Ocwen was terminated because of an Event of Default described in Section 8.01(a)(vii) for failing to make a required P&I Advance, and (B) Ocwen shall have failed to make (or cause to be made) such P&I Advance, or shall fail to reimburse (or cause to be reimbursed) the Master Servicer for a P&I Advance made by the Master Servicer, by the close of business on such second Business Day, or (ii) at the close of business on the second Business Day following the date (if any) during such 30-day period on which a P&I Advance is due to be made, if Ocwen shall have failed to make (or caused to be made) such P&I Advance, or Ocwen shall have failed to reimburse (or cause to be reimbursed) the Master Servicer for such P&I Advance, by the close of business on such second Business Day; provided, that such 30-day period shall only be terminated to the extent that the Servicing Rights Lender has received notice of such failure from the Master Servicer and the Servicing Rights Lender has not cured or caused the cure of such failure within two (2) Business Days following receipt of notice, provided, however, that such notice requirement shall only be applicable to the extent that the Master Servicer has been provided with the written address and contact information for the Servicing Rights Lender.

Notwithstanding anything herein to the contrary, in no event shall the Trustee or the Master Servicer be liable for any Servicing Fee or Master Servicing Fee, as applicable, or for any differential in the amount of the Servicing Fee or Master Servicing Fee, as applicable, or paid hereunder or under the Servicing Agreement and the amount necessary to induce any successor Servicer or successor Master Servicer to act as successor Servicer or successor Master Servicer under this Agreement or under the Servicing Agreement and the transactions set forth or provided for herein.

Any successor servicer appointed under this Agreement must (i) be an established mortgage loan servicing institution that is a Fannie Mae and Freddie Mac approved seller/servicer, (ii) be approved by each Rating Agency by a written confirmation from each Rating Agency that the appointment of such successor servicer would not result in the reduction or withdrawal of the then current ratings of any outstanding Class of Certificates, (iii) have a net worth of not less than $25,000,000 and (iv) assume all the responsibilities, duties or liabilities of the Servicer (other than liabilities of the Servicer hereunder or under the Servicing Agreement incurred prior to termination of the Servicer under Section 8.01 herein) under this Agreement or under the Servicing Agreement as if originally named as a party to this Agreement or the Servicing Agreement, as applicable.

(b)    (1)    All servicing transfer costs (including, without limitation, servicing transfer costs of the type described in Section 8.02(a) and incurred by the Trustee, the Master Servicer and any successor servicer under paragraph (b)(2) below) in connection with the termination of the Servicer shall be paid by the terminated Servicer upon presentation of

reasonable documentation of such costs, and if such predecessor or initial Servicer, as applicable, defaults in its obligation to pay such costs, the successor servicer, the Master Servicer and the Trustee shall be entitled to reimbursement therefor from the assets of the Trust Fund.

(2)    No appointment of a successor to a Servicer under this Agreement shall be effective until the assumption by the successor of all of the related Servicer's responsibilities, duties and liabilities hereunder. In connection with such appointment and assumption described herein, the Trustee may make such arrangements for the compensation of such successor out of payments on the related Mortgage Loans as it and such successor shall agree; provided, however, that no such compensation shall be in excess of 50 basis points. The Depositor, the Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. Pending appointment of a successor to a Servicer under this Agreement, the Master Servicer shall act in such capacity as hereinabove provided.

SECTION 8.03.    Notification to Certificateholders.

(a)    Upon any termination of any Servicer or the Master Servicer pursuant to the Servicing Agreement or Section 8.01(a) or (b) or any appointment of a successor to the related Servicer or the Master Servicer pursuant to the Servicing Agreement or Section 8.02, the Trustee shall give prompt written notice thereof to the Certificateholders at their respective addresses appearing in the Certificate Register.

(b)    Not later than the later of sixty (60) days after the occurrence of any event, which constitutes or which, with notice or lapse of time or both, would constitute a Servicer Event of Default or a Master Servicer Event of Default or five (5) days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Holders of Certificates notice of each such occurrence, unless such default or Servicer Event of Default or Master Servicer Event of Default shall have been cured or waived.

SECTION 8.04.    Waiver of Events of Default.

The Holders representing at least 66% of the Voting Rights evidenced by all Classes of Certificates affected by any default, Servicer Event of Default or Master Servicer Event of Default hereunder may waive such default, Servicer Event of Default or Master Servicer Event of Default; provided, however, that a Servicer Event of Default under clause (i) or (vii) of Section 8.01(a) may be waived only by all of the Holders of the Regular Certificates. Upon any such waiver of a default, Servicer Event of Default or Master Servicer Event of Default, such default, Servicer Event of Default or Master Servicer Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder. No such waiver shall extend to any subsequent or other default, Servicer Event of Default or Master Servicer Event of Default or impair any right consequent thereon except to the extent expressly so waived.

221

## ARTICLE IX

## CONCERNING THE TRUSTEE AND THE SECURITIES ADMINISTRATOR

SECTION 9.01.    Duties of Trustee and Securities Administrator.

The Trustee, prior to the occurrence of a Master Servicer Event of Default and after the curing or waiver of all Master Servicer Events of Default which may have occurred, and the Securities Administrator each undertake to perform such duties and only such duties as are specifically set forth in this Agreement as duties of the Trustee and the Securities Administrator, respectively. During the continuance of a Master Servicer Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. Any permissive right of the Trustee enumerated in this Agreement shall not be construed as a duty.

Each of the Trustee and the Securities Administrator, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to it, which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement. If any such instrument is found not to conform to the requirements of this Agreement in a material manner, the Trustee or the Securities Administrator, as the case may be, shall take such action as it deems appropriate to have the instrument corrected, and if the instrument is not corrected to its satisfaction, the Securities Administrator will provide notice to the Trustee thereof and the Trustee will provide notice to the Certificateholders and the NIMS Insurer.

The Trustee shall promptly remit to the related Servicer any complaint, claim, demand, notice or other document (collectively, the "Notices") delivered to the Trustee as a consequence of the assignment of any Mortgage Loan hereunder and relating to the servicing of the Mortgage Loans; provided than any such notice (i) is delivered to the Trustee at its Corporate Trust Office, (ii) contains information sufficient to permit the Trustee to make a determination that the real property to which such document relates is a Mortgaged Property. The Trustee shall have no duty hereunder with respect to any Notice it may receive or which may be alleged to have been delivered to or served upon it unless such Notice is delivered to it or served upon it at its Corporate Trust Office and such Notice contains the information required pursuant to clause (ii) of the preceding sentence.

No provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own misconduct; provided, however, that:

(i)    Prior to the occurrence of a Master Servicer Event of Default and after the curing or waiver of all such Master Servicer Events of Default which may have occurred with respect to the Trustee and at all times with respect to the Securities Administrator, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, neither the Trustee nor the Securities Administrator

222

shall be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee or the Securities Administrator and, in the absence of bad faith on the part of the Trustee or the Securities Administrator, respectively, the Trustee or the Securities Administrator, respectively, may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee or the Securities Administrator, respectively, that conform to the requirements of this Agreement;

(ii)      Neither the Trustee nor the Securities Administrator shall be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee or an officer or officers of the Securities Administrator, respectively, unless it shall be proved that the Trustee or the Securities Administrator, respectively, was negligent in ascertaining the pertinent facts; and

(iii)      Neither the Trustee nor the Securities Administrator shall be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Securities Administrator or exercising any trust or power conferred upon the Trustee or the Securities Administrator under this Agreement.

SECTION 9.02.      Certain Matters Affecting Trustee and Securities Administrator.

(a)      Except as otherwise provided in Section 9.01:

(i)      Before taking any action hereunder, the Trustee and the Securities Administrator may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)      The Trustee and the Securities Administrator may consult with counsel of its selection and any advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(iii)      Neither the Trustee nor the Securities Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders or the NIMS Insurer, pursuant to the provisions of this Agreement, unless such Certificateholders or the NIMS Insurer, as applicable, shall have offered to the Trustee or the Securities Administrator, as the case

223

may be, reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby; nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of a Master Servicer Event of Default (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs;

(iv)    Neither the Trustee nor the Securities Administrator shall be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of a Master Servicer Event of Default hereunder and after the curing or waiver of all Master Servicer Events of Default which may have occurred with respect to the Trustee and at all times with respect to the Securities Administrator, neither the Trustee nor the Securities Administrator shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights; provided, however, that if the payment within a reasonable time to the Trustee or the Securities Administrator of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee or the Securities Administrator, as applicable, not reasonably assured to the Trustee or the Securities Administrator by such Certificateholders, the Trustee or the Securities Administrator, as applicable, may require reasonable indemnity satisfactory to it against such expense, or liability from such Certificateholders as a condition to taking any such action;

(vi)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(vii)    The Trustee shall not be liable for any loss resulting from (a) the investment of funds held in the Collection Accounts, (b) the investment of funds held in the Distribution Account, (c) the investment of funds held in the Reserve Fund or (d) the redemption or sale of any such investment as therein authorized;

(viii)    The Trustee shall not be deemed to have notice of any default, Master Servicer Event of Default or Servicer Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Certificates and this Agreement;

(ix)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, each agent, custodian and other Person employed to act hereunder; and

(x)    Should the Trustee or the Securities Administrator deem the nature of any action required on its part to be unclear, the Trustee or the Securities Administrator may require prior to taking such action that it be provided by the Depositor with reasonable further instructions.

(xi)    No provision of this Agreement shall require the Trustee (regardless of the capacity in which it is acting) to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against risk or liability is not reasonably assured to it.

(xii)    The Trustee shall not have any duty to conduct any affirmative investigation as to the occurrence of any condition requiring the repurchase of any Mortgage Loan by the Sponsor pursuant to this Agreement or the Mortgage Loan Purchase Agreement, as applicable, or the eligibility of any Mortgage Loan for purposes of this Agreement.

(b)    All rights of action under this Agreement or under any of the Certificates, enforceable by the Trustee, may be enforced by it without the possession of any of the Certificates, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Certificates, subject to the provisions of this Agreement.

(c)    The Trustee, not in its individual capacity but solely in its separate capacity as Supplemental Interest Trust Trustee, is hereby directed to exercise the rights, perform the obligations, and make any representations to be exercised, performed, or made by the Supplemental Interest Trust Trustee, as described herein.  The Supplemental Interest Trust Trustee is hereby directed to execute and deliver the Swap Agreement on behalf of Party B (as defined therein) and to exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Supplemental Interest Trust Trustee on behalf of Party B (as defined therein) and not in its individual capacity.

The Sponsor, the Servicers, the Depositor and the Certificateholders (by acceptance of their Certificates) acknowledge and agree that:

(i)    the Supplemental Interest Trust Trustee shall execute and deliver the Swap Agreement on behalf of Party B (as defined therein),

(ii)    the Supplemental Interest Trust Trustee shall exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Supplemental Interest Trust Trustee on behalf of Party B (as defined therein) and not in its individual capacity, and

(iii)     the Securities Administrator shall also be entitled to exercise the rights and obligated to perform the obligations of Party B under the Swap Agreement.

Every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Trustee's execution, as Supplemental Interest Trust Trustee, of the Swap Agreement, and the performance of its duties and satisfaction of its obligations thereunder.

(d)     The Trustee is hereby directed to exercise the rights, perform the obligations, and make any representations to be exercised, performed, or made, as described herein. The Trustee is hereby directed to execute and deliver the Cap Contracts on behalf of Party B (as defined therein) and to exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Trustee on behalf of Party B (as defined therein) and not in its individual capacity.

The Sponsor, the Servicer, the Depositor and the Certificateholders by acceptance of their Certificates acknowledge and agree that:

(i)     the Trustee shall execute and deliver the Cap Contracts for Party B (as defined therein)

(ii)     the Trustee shall exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Trustee on behalf of Party B (as defined therein) and not in its individual capacity, and

(iii)     the Securities Administrator shall also be entitled to exercise the rights and obligated to perform the obligations of Party B under the Cap Contracts.

Every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Trustee shall apply to the Trustee's execution of the Cap Contracts, and the performance of its duties and satisfaction of its obligations thereunder.

Every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Securities Administrator shall apply to the Securities Administrator's execution of the Cap Contracts, and the performance of its duties and satisfaction of its obligations thereunder.

(e)     The Trustee is hereby directed to execute and deliver the Cap Contracts for Party B (as defined therein) and to perform the obligations of Party B thereunder on the Closing Date and thereafter on behalf of the Holders of the Certificates. The Sponsor, the Depositor and the Certificateholders by acceptance of their Certificates acknowledge and agree that the Trustee shall execute and deliver the Cap Contracts for Party B (as defined therein) and to perform the obligations of Party B thereunder and shall do so solely in its capacity as Trustee and not in its individual capacity. The Trustee is hereby directed and does hereby direct the Securities Administrator and the Securities Administrator is hereby empowered under this Agreement to act on behalf of the Trustee. Any funds payable by the Securities Administrator under the Cap Contracts at closing shall be paid by the Depositor. Notwithstanding anything to the contrary contained herein, neither the Trustee nor the Securities Administrator shall be

226

required to make any payments to the Cap Counterparty under the Cap Contracts unless otherwise set forth in the Cap Contracts.

(f)    None of the Securities Administrator, the Master Servicer, the Servicers, the Sponsor, the Depositor, the Custodians or the Trustee shall be responsible for the acts or omissions of the others or the Swap Provider, it being understood that this Agreement shall not be construed to render those partners joint venturers or agents of one another.

SECTION 9.03.    Trustee and Securities Administrator not Liable for Certificates or Mortgage Loans.

The recitals contained herein and in the Certificates (other than the signature of the Securities Administrator, the authentication of the Securities Administrator on the Certificates, the acknowledgments of the Trustee contained in Article II and the representations and warranties of the Trustee in Sections 2.11 and 9.12) shall be taken as the statements of the Depositor and neither the Trustee nor the Securities Administrator assumes any responsibility for their correctness. Neither the Trustee nor the Securities Administrator makes any representations or warranties as to the validity or sufficiency of this Agreement (other than as specifically set forth in Section 9.12), the Swap Agreement or of the Certificates (other than the signature of the Securities Administrator and authentication of the Securities Administrator on the Certificates) or of any Mortgage Loan or related document. The Trustee and the Securities Administrator shall not be accountable for the use or application by the Depositor of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Collection Account by the Servicer, other than with respect to the Securities Administrator any funds held by it or on behalf of the Trustee in accordance with Sections 3.24, 3.25 and 5.07 of this Agreement.

SECTION 9.04.    Trustee and Securities Administrator May Own Certificates.

Each of the Trustee and the Securities Administrator in its individual capacity or any other capacity may become the owner or pledgee of Certificates and may transact business with other interested parties and their Affiliates with the same rights it would have if it were not Trustee or the Securities Administrator.

SECTION 9.05.    Fees and Expenses of Trustee, Custodians and Securities Administrator.

The fees of the Trustee and the Securities Administrator hereunder, of Wells Fargo as the Custodian under the Wells Fargo Custodial Agreement and of DBNTC as the Custodian under the DBNTC Custodial Agreement shall be paid in accordance with a side letter agreement with the Master Servicer and at the sole expense of the Master Servicer. In addition, the Trustee, the Securities Administrator, the Custodians and any director, officer, employee or agent of the Trustee, the Securities Administrator and the Custodians shall be indemnified by the Trust and held harmless against any loss, liability or expense (including reasonable attorney's fees and expenses) incurred by the Trustee, the Custodians or the Securities Administrator in

227

connection with any claim or legal action or any pending or threatened claim or legal action arising out of or in connection with the acceptance or administration of its respective obligations and duties under this Agreement, including the Swap Agreement and any and all other agreements related hereto, other than any loss, liability or expense, as applicable (i) solely with respect to the Trustee, for which the Trustee is indemnified by the Master Servicer or a Servicer, (ii) that constitutes a specific liability of the Trustee or the Securities Administrator pursuant to Section 11.01(g) or (iii) any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder by the Trustee or the Securities Administrator, as applicable, or by reason of reckless disregard of obligations and duties hereunder. In no event shall the Trustee, the Custodians, the Master Servicer or the Securities Administrator be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if it has been advised of the likelihood of such loss or damage and regardless of the form of action. The Master Servicer agrees to indemnify the Trustee, from, and hold the Trustee harmless against, any loss, liability or expense (including reasonable attorney's fees and expenses) incurred by the Trustee by reason of the Master Servicer's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Agreement or by reason of the Master Servicer's reckless disregard of its obligations and duties under this Agreement. In addition, the Sponsor agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense arising out of, or in connection with, the provisions set forth in the last paragraph of Section 2.01, including, without limitation, all costs, liabilities and expenses (including reasonable legal fees and expenses) of investigating and defending itself against any claim, action or proceeding, pending or threatened, relating to the provisions of such paragraph. The indemnities in this Section 9.05 shall survive the termination or discharge of this Agreement and the resignation or removal of the Master Servicer, the Trustee, the Securities Administrator or the Custodians. Any payment under this Section 9.05 made by the Master Servicer to the Trustee in respect of the Trustee's fees or the Master Servicer's indemnification obligation to the Trustee shall be from the Master Servicer's own funds, without reimbursement from REMIC I therefor.

SECTION 9.06.        Eligibility    Requirements    for    Trustee    and    Securities Administrator.

The Trustee and the Securities Administrator shall at all times be a corporation or an association (other than the Depositor, the Sponsor, the Master Servicer or any Affiliate of the foregoing) organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 (or a member of a bank holding company whose capital and surplus is at least $50,000,000) and subject to supervision or examination by federal or state authority. If such corporation or association publishes reports of conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation or association shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time the Trustee or the Securities Administrator, as applicable, shall cease to be eligible in accordance with the provisions of this Section, the Trustee or the Securities Administrator, as applicable, shall resign immediately in the manner and with the effect specified in Section 9.07.

228

Additionally, the Securities Administrator (i) may not be an originator, Servicer, the Depositor or an affiliate of the Depositor unless the Securities Administrator is in an institutional trust department, (ii) must be authorized to exercise corporate trust powers under the laws of its jurisdiction of organization, and (iii) must be rated at least "A/F1" by Fitch, if Fitch is a Rating Agency, or the equivalent rating by S&P (or such rating acceptable to Fitch pursuant to a rating confirmation). If no successor securities administrator shall have been appointed and shall have accepted appointment within 60 days after Wells Fargo Bank, National Association, as Securities Administrator, ceases to be the securities administrator pursuant to this Section 9.06, then the Trustee shall petition any court of competent jurisdiction, at the expense of the Trust, for the appointment of a successor securities administrator which satisfies the eligibility criteria set forth herein. The Trustee shall notify the Rating Agencies of any change of Securities Administrator.

SECTION 9.07.    Resignation and Removal of Trustee and Securities Administrator.

The Trustee and the Securities Administrator may at any time resign and be discharged from the trust hereby created by giving written notice thereof to the Depositor, to the Master Servicer, to the Securities Administrator (or the Trustee, if the Securities Administrator resigns), to the NIMS Insurer and to the Certificateholders. Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor trustee or successor securities administrator acceptable to the NIMS Insurer by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee or Securities Administrator, as applicable, and to the successor trustee or successor securities administrator, as applicable. A copy of such instrument shall be delivered to the Certificateholders, the Trustee, the Securities Administrator and the Master Servicer by the Depositor. If no successor trustee or successor securities administrator shall have been so appointed and have accepted appointment within thirty (30) days after the giving of such notice of resignation, the resigning Trustee or Securities Administrator, as the case may be, may, at the expense of the Trust Fund, petition any court of competent jurisdiction for the appointment of a successor trustee, successor securities administrator, Trustee or Securities Administrator, as applicable.

If at any time the Trustee or the Securities Administrator shall cease to be eligible in accordance with the provisions of Section 9.06 and shall fail to resign after written request therefor by the Depositor, or if at any time the Trustee or the Securities Administrator shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or the Securities Administrator or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or the Securities Administrator or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Depositor or the NIMS Insurer may remove the Trustee or the Securities Administrator, as applicable and the Depositor shall appoint a successor trustee or successor securities administrator, as applicable, acceptable to the NIMS Insurer by written instrument, in duplicate, which instrument shall be delivered to the Trustee or the Securities Administrator so removed and to the successor trustee or successor securities administrator. A copy of such instrument shall be delivered to the Certificateholders, the Trustee, the Securities Administrator and the Master Servicer by the Depositor.

229

The Holders of Certificates entitled to at least 51% of the Voting Rights (or the NIMS Insurer upon the failure of the Trustee to perform its obligations hereunder) may at any time remove the Trustee or the Securities Administrator and appoint a successor trustee or successor securities administrator acceptable to the NIMS Insurer by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered to the Depositor, one complete set to the Trustee or the Securities Administrator so removed and one complete set to the successor so appointed. A copy of such instrument shall be delivered to the Certificateholders, the Trustee (in the case of the removal of the Securities Administrator), the Securities Administrator (in the case of the removal of the Trustee) and the Master Servicer by the Depositor.

Any resignation or removal of the Trustee or the Securities Administrator and appointment of a successor trustee or successor securities administrator pursuant to any of the provisions of this Section shall not become effective until acceptance of appointment by the successor trustee or successor securities administrator, as applicable, as provided in Section 9.08.

Any Person appointed as successor trustee pursuant to Section 9.07 shall also be required to serve as successor supplemental interest trust trustee.

Notwithstanding anything to the contrary contained herein, the Master Servicer and the Securities Administrator shall at all times be the same Person.

SECTION 9.08.    Successor Trustee or Securities Administrator.

Any successor trustee or successor securities administrator appointed as provided in Section 9.07 shall execute, acknowledge and deliver to the Depositor and its predecessor trustee or predecessor securities administrator an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee or predecessor securities administrator shall become effective and such successor trustee or successor securities administrator without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee or securities administrator herein. The predecessor trustee or predecessor securities administrator shall deliver to the successor trustee or successor securities administrator all Mortgage Loan Documents and related documents and statements to the extent held by it hereunder, as well as all monies, held by it hereunder, and the Depositor and the predecessor trustee or predecessor securities administrator shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee or successor securities administrator all such rights, powers, duties and obligations.

No successor trustee or successor securities administrator shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee or successor securities administrator shall be eligible under the provisions of Section 9.06 and the appointment of such successor trustee or successor securities administrator shall not result in a downgrading of any Class of Certificates by any Rating Agency, as evidenced by a letter from each Rating Agency.

230

Upon acceptance of appointment by a successor trustee or successor securities administrator as provided in this Section, the Depositor shall mail notice of the succession of such trustee hereunder to all Holders of Certificates at their addresses as shown in the Certificate Register. If the Depositor fails to mail such notice within ten (10) days after acceptance of appointment by the successor trustee or successor securities administrator, the successor trustee or successor securities administrator shall cause such notice to be mailed at the expense of the Depositor.

SECTION 9.09.    Merger or Consolidation of Trustee or Securities Administrator.

Any corporation or association into which the Trustee or the Securities Administrator may be merged or converted or with which it may be consolidated or any corporation or association resulting from any merger, conversion or consolidation to which the Trustee or the Securities Administrator shall be a party, or any corporation or association succeeding to the business of the Trustee or the Securities Administrator shall be the successor of the Trustee or the Securities Administrator hereunder, provided such corporation or association shall be eligible under the provisions of Section 9.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

SECTION 9.10.    Appointment of Co-Trustee or Separate Trustee.

Notwithstanding any other provisions hereof, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the REMIC I or property securing the same may at the time be located, the Trustee shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, or separate trustee or separate trustees, of all or any part of REMIC I, and to vest in such Person or Persons, in such capacity, and for the benefit of the Holders of the Certificates, such title to REMIC I, or any part thereof, and, subject to the other provisions of this Section 9.10, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable. Any such co-trustee or separate trustee shall be subject to the written approval of the Mezzanine Insurers, the NIMS Insurer. If the NIMS Insurer shall not have joined in such appointment within 15 days after the receipt by it of a request to do so, the Trustee alone shall have the power to make such appointment. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 9.06 hereunder and no notice to Holders of Certificates of the appointment of co-trustee(s) or separate trustee(s) shall be required under Section 9.08 hereof.

In the case of any appointment of a co-trustee or separate trustee pursuant to this Section 9.10 all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed by the Trustee (whether as Trustee hereunder or as successor to a defaulting Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to REMIC I or any portion thereof in any such

231

jurisdiction) shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article IX. Each separate trustee and co-trustee, upon its acceptance of the trust conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee, or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee and a copy thereof given to the NIMS Insurer.

Any separate trustee or co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee or co-trustee.

SECTION 9.11.    Appointment of Office or Agency.

The Certificates may be surrendered for registration of transfer or exchange at the Securities Administrator's office located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, and presented for final distribution at the Corporate Trust Office of the Securities Administrator where notices and demands to or upon the Securities Administrator in respect of the Certificates and this Agreement may be served.

SECTION 9.12.    Representations and Warranties.

The Trustee hereby represents and warrants to the Master Servicer, the Securities Administrator, the Servicer and the Depositor as applicable, as of the Closing Date, that:

(i)    It is a national banking association duly organized, validly existing and in good standing under the laws of the United States of America.

(ii)    The execution and delivery of this Agreement by it, and the performance and compliance with the terms of this Agreement by it, will not violate its articles of association or bylaws or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material agreement or other instrument to which it is a party or which is applicable to it or any of its assets.

(iii)    It has the full power and authority to enter into and consummate all transactions contemplated by this Agreement, has duly authorized the execution, delivery and performance of this Agreement, and has duly executed and delivered this Agreement.

232

(iv)    This Agreement, assuming due authorization, execution and delivery by the other parties hereto, constitutes a valid, legal and binding obligation of it, enforceable against it in accordance with the terms hereof, subject to (A) applicable bankruptcy, insolvency, receivership, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally, and (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

(v)    It is not in violation of, and its execution and delivery of this Agreement and its performance and compliance with the terms of this Agreement will not constitute a violation of, any law, any order or decree of any court or arbiter, or any order, regulation or demand of any federal, state or local governmental or regulatory authority, which violation, in its good faith and reasonable judgment, is likely to affect materially and adversely either the ability of it to perform its obligations under this Agreement or its financial condition.

(vi)    No litigation is pending or, to the best of its knowledge, threatened against it, which would prohibit it from entering into this Agreement or, in its good faith reasonable judgment, is likely to materially and adversely affect either the ability of it to perform its obligations under this Agreement or its financial condition.

233

## ARTICLE X

## TERMINATION

SECTION 10.01.    Termination Upon Repurchase or Liquidation of All Mortgage Loans.

(a)    Subject to Section 10.02, the respective obligations and responsibilities under this Agreement of the Depositor, the Master Servicer, the Securities Administrator, the Servicers and the Trustee (other than the obligations of the Master Servicer to the Trustee pursuant to Section 9.05 and of the Servicers to make remittances to the Securities Administrator and the Securities Administrator to make payments in respect of the REMIC I Regular Interests, REMIC I Regular Interests or the Classes of Certificates as hereinafter set forth) shall terminate upon payment to the Certificateholders and the deposit of all amounts held by or on behalf of the Trustee and required hereunder to be so paid or deposited on the Distribution Date coinciding with or following the earlier to occur of (i) the purchase by the Terminator (as defined below) of all Mortgage Loans and each REO Property remaining in REMIC I and (ii) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or REO Property remaining in REMIC I; provided, however, that in no event shall the trust created hereby continue beyond the earlier of (i) the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James, living on the date hereof and (ii) the Last Scheduled Distribution Date.  The purchase by the Terminator of all Mortgage Loans and each REO Property remaining in REMIC I shall be at a price (the "Termination Price") equal to the sum of (i) the greater of (A) the aggregate Purchase Price of all the Mortgage Loans included in REMIC I, plus the appraised value of each REO Property, if any, included in REMIC I, such appraisal to be conducted by an appraiser mutually agreed upon by the Terminator and the Trustee in their reasonable discretion and (B) the aggregate fair market value of all of the assets of REMIC I (as determined by the Terminator (defined below) and the Trustee, as of the close of business on the third Business Day next preceding the date upon which notice of any such termination is furnished to Certificateholders pursuant to the third paragraph of this Section 10.01), (ii) any amounts due and owing to the Swap Provider under the Swap Agreement and any previous swap provider as of the termination date (including a Swap Termination Payment owed to the Swap Provider in connection with such optional termination) plus (iii) any amounts due the Servicers and the Master Servicer in respect of unpaid Servicing Fees, Master Servicing Fees and outstanding P&I Advances and Servicing Advances; provided, however, such option may only be exercised if the Termination Price is sufficient to pay all interest accrued on, as well as amounts necessary to retire the principal balance of, each class of notes issued pursuant to the Indenture and any remaining amounts owed to the trustee under the Indenture and the NIMS Insurer on the date such notes are retired .

(b)    The Master Servicer or, if the Master Servicer fails to exercise such optional termination right, Ocwen (either the Master Servicer or Ocwen, the "Terminator") shall have the right to purchase all of the Mortgage Loans and each REO Property remaining in REMIC I pursuant to clause (i) of the preceding paragraph no later than the Determination Date in the month immediately preceding the Distribution Date on which the Certificates will be retired; provided, however, that the Terminator may elect to purchase all of the Mortgage Loans

234

on a servicing retained basis and each REO Property remaining in REMIC I pursuant to clause (i) above only if the aggregate Scheduled Principal Balance of the Mortgage Loans and each REO Property remaining in the Trust Fund at the time of such election has been reduced to less than or equal to 10% of the aggregate Scheduled Principal Balance of the Mortgage Loans as of the Cut-off Date plus the Original Pre-Funded Amount. By acceptance of the Residual Certificates, the Holder of the Residual Certificates agrees for so long as any notes insured by the NIMS Insurer and secured by all or a portion of the Class CE-1, Class P or Class R Certificates are outstanding, in connection with any termination hereunder, to assign and transfer any amounts in excess of par, and to the extent received in respect of such termination, to pay any such amounts to the Holders of the Class CE-1 Certificates. Notwithstanding the foregoing, the optional termination right may only be exercised by Ocwen if (1) Ocwen receives written notification from the Master Servicer that the Master Servicer will not exercise such optional termination right or (2) Ocwen does not receive such written notification from the Master Servicer, and the Master Servicer fails to exercise its optional termination right by the third Distribution Date following the date such right became exercisable; provided, however, in no event shall a Servicer exercise its optional termination right under (1) or (2) above unless it first provides written notice to the Authorized Officers of the Sponsor that it intends to exercise such optional termination right.

(c)     In connection with any optional termination, four Business Days prior to the final Distribution Date specified in the notice required pursuant to Section 10.01(f), the Securities Administrator shall, no later than 4:00 pm New York City time on such day, request in writing (in accordance with the applicable provision of the Swap Agreement and by phone from the Swap Provider the amount of the Estimated Swap Termination Payment (as defined in the Swap Agreement). The Swap Provider shall, no later than 2:00 pm on the following Business Day, notify in writing (which may be done in electronic format) the Securities Administrator of the amount of the Estimated Swap Termination Payment; the Securities Administrator shall promptly on the same day notify the Terminator of the amount of the Estimated Swap Termination Payment.

(d)     Two Business Days prior to the final Distribution Date specified in the notice required pursuant to Section 10.01(f), (i) the Terminator shall, no later than 1:00 pm New York City time on such day, deposit funds in the Distribution Account in an amount equal to the sum of the Termination Price (other than the Swap Termination Payment) and the Estimated Swap Termination Payment, and (ii) if the Securities Administrator shall have determined that the aggregate Scheduled Principal Balance of all of the Mortgage Loans as of the related Determination Date is not more than 10% of the aggregate Principal Balance of the Mortgage Loans as of the Cut-off Date and that all other requirements of the optional termination have been met, including without limitation, the deposit required pursuant to the immediately preceding clause (i) as well as the requirements specified in Section 10.03, then the Securities Administrator shall, on the same Business Day, provide written notice to the Depositor, the Master Servicer, the Servicers, the Supplemental Interest Trust Trustee, the Trustee and the Swap Provider confirming (in accordance with the applicable provisions of the Swap Agreement) (a) its receipt of the Termination Price (other than the Swap Termination Payment) and the Estimated Swap Termination Payment and (b) that all other requirements of the optional termination have been met. Upon the Securities Administrator's providing the notice described in the preceding sentence, the optional termination shall become irrevocable, the notice to

235

Certificateholders of such optional termination provided pursuant to the Section 10.01(f) shall become unrescindable, the Swap Provider shall determine the Swap Termination Payment in accordance with the Swap Agreement, and the Swap Provider shall provide to the Securities Administrator written notice of the amount of the Swap Termination Payment not later than one Business Day prior to the final Distribution Date specified in the notice required pursuant to Section 10.01(f).

(e)    In connection with any optional termination, only an amount equal to the Termination Price less any Swap Termination Payment shall be made available for distribution to the Regular Certificates. Any Estimated Swap Termination Payment deposited into the Distribution Account by the Terminator shall be withdrawn by the Securities Administrator from the Distribution Account on the related final Distribution Date and distributed as follows: (i) to the Supplemental Interest Trust for payment to the Swap Provider in accordance with Section 5.07, an amount equal to the Swap Termination Payment calculated pursuant to the Swap Agreement, provided that in no event shall the amount distributed to the Swap Provider in respect of the Swap Termination Payment exceed the Estimated Swap Termination Payment, and (ii) to the Terminator an amount equal to the excess, if any, of the Estimated Swap Termination Payment over the Swap Termination Payment. The Swap Termination Payment shall not be part of any REMIC and shall not be paid into any account which is part of any REMIC.

(f)    Notice of the liquidation of the Certificates shall be given promptly by the Securities Administrator by letter to the Certificateholders mailed (a) in the event such notice is given in connection with the purchase of the Mortgage Loans and each REO Property by the Master Servicer, not earlier than the 15th day and not later than the 25th day of the month next preceding the month of the final distribution on the Certificates or (b) otherwise during the month of such final distribution on or before the Determination Date in such month, in each case specifying (i) the Distribution Date upon which the Trust Fund will terminate and the final payment in respect of the REMIC I Regular Interests or the Certificates will be made upon presentation and surrender of the related Certificates at the office of the Securities Administrator therein designated, (ii) the amount of any such final payment, (iii) that no interest shall accrue in respect of the REMIC I Regular Interests or the Certificates from and after the Interest Accrual Period relating to the final Distribution Date therefor and (iv) that the Record Date otherwise applicable to such Distribution Date is not applicable, payments being made only upon presentation and surrender of the Certificates at the office of the Securities Administrator. In the event such notice is given in connection with the purchase of all of the Mortgage Loans and each REO Property remaining in REMIC I by the Terminator, the Terminator shall deliver to the Securities Administrator for deposit in the Distribution Account not later than the Business Day prior to the Distribution Date on which the final distribution on the Certificates an amount in immediately available funds equal to the above-described Termination Price. The Securities Administrator shall remit to the Servicers the Master Servicer, the Trustee and the applicable Custodian from such funds deposited in the Distribution Account (i) any amounts which the Servicers would be permitted to withdraw and retain from the Collection Accounts pursuant to Section 3.09 or pursuant to the Servicing Agreement as if such funds had been deposited therein (including all unpaid Servicing Fees, Master Servicing Fees and all outstanding P&I Advances and Servicing Advances) and (ii) any other amounts otherwise payable by the Securities Administrator to the Master Servicer, the Trustee, the applicable Custodian, the Swap Provider and the Servicers from amounts on deposit in the Distribution Account pursuant to the terms of

236

this Agreement prior to making any final distributions pursuant to Section 10.01(d) below. Upon certification to the Trustee by the Securities Administrator of the making of such final deposit, the Trustee shall promptly release or cause to be released to the Terminator the Mortgage Files for the remaining Mortgage Loans, and Trustee shall execute all assignments, endorsements and other instruments delivered to it and necessary to effectuate such transfer.

(g)     Upon presentation of the Certificates by the Certificateholders on the final Distribution Date, the Securities Administrator shall distribute to each Certificateholder so presenting and surrendering its Certificates the amount otherwise distributable on such Distribution Date in accordance with Section 5.01 in respect of the Certificates so presented and surrendered. Any funds not distributed to any Holder or Holders of Certificates being retired on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held in trust and credited to the account of the appropriate non-tendering Holder or Holders. If any Certificates as to which notice has been given pursuant to this Section 10.01 shall not have been surrendered for cancellation within six months after the time specified in such notice, the Securities Administrator shall mail a second notice to the remaining non-tendering Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second notice all such Certificates shall not have been surrendered for cancellation, the Securities Administrator shall, directly or through an agent, mail a final notice to the remaining non-tendering Certificateholders concerning surrender of their Certificates. The costs and expenses of maintaining the funds in trust and of contacting such Certificateholders shall be paid out of the assets remaining in the trust funds. If within one (1) year after the final notice any such Certificates shall not have been surrendered for cancellation, the Securities Administrator shall pay to the Depositor all such amounts, and all rights of non-tendering Certificateholders in or to such amounts shall thereupon cease. No interest shall accrue or be payable to any Certificateholder on any amount held in trust by the Securities Administrator as a result of such Certificateholder's failure to surrender its Certificate(s) on the final Distribution Date for final payment thereof in accordance with this Section 10.01. Any such amounts held in trust by the Securities Administrator shall be held uninvested in an Eligible Account.

SECTION 10.02.    Additional Termination Requirements.

(a)     In the event that the Terminator purchases all the Mortgage Loans and each REO Property or the final payment on or other liquidation of the last Mortgage Loan or REO Property remaining in REMIC I pursuant to Section 10.01, the Trust Fund shall be terminated in accordance with the following additional requirements:

(i)     The Securities Administrator shall specify the first day in the 90-day liquidation period in a statement attached to each Trust REMIC's final Tax Return pursuant to Treasury regulation Section 1.860F-1 and shall satisfy all requirements of a qualified liquidation under Section 860F of the Code and any regulations thereunder, as evidenced by an Opinion of Counsel obtained by and at the expense of the Terminator;

(ii)    During such 90-day liquidation period and, at or prior to the time of making of the final payment on the Certificates, the Trustee shall sell all of the assets of REMIC I to the Terminator for cash; and

237

(iii)      At the time of the making of the final payment on the Certificates, the Securities Administrator shall distribute or credit, or cause to be distributed or credited, to the Holders of the Residual Certificates all cash on hand in the Trust Fund (other than cash retained to meet claims), and the Trust Fund shall terminate at that time.

(b)      At the expense of the Terminator (or, if the Trust Fund is being terminated as a result of the occurrence of the event described in clause (ii) of the first paragraph of Section 10.01, at the expense of the Trust Fund), the Terminator shall prepare or cause to be prepared the documentation required in connection with the adoption of a plan of liquidation of each Trust REMIC pursuant to this Section 10.02.

(c)      By their acceptance of Certificates, the Holders thereof hereby agree to authorize the Securities Administrator to specify the 90-day liquidation period for each Trust REMIC, which authorization shall be binding upon all successor Certificateholders.

238

## ARTICLE XI

## REMIC PROVISIONS

SECTION 11.01.    REMIC Administration.

(a)    The Securities Administrator shall elect to treat each Trust REMIC as a REMIC under the Code and, if necessary, under applicable state law.  Each such election will be made by the Securities Administrator on Form 1066 or other appropriate federal tax or information return or any appropriate state return for the taxable year ending on the last day of the calendar year in which the Certificates are issued. For the purposes of the REMIC election in respect of REMIC I, the REMIC I Regular Interests shall be designated as the "regular interests" in REMIC I and the Class R-I Interest shall be designated as the "residual interest" in REMIC I. For the purposes of the REMIC election in respect of REMIC II, the REMIC II Regular Interests shall be designated as the "regular interests" in REMIC II and the Class R-II Interest shall be designated as the "residual interest" in REMIC II.  For the purposes of the REMIC election in respect of REMIC III, the REMIC III Regular Interests shall be designated as the "regular interests" in REMIC III and the Class R-III Interest shall be designated as the "residual interest" in REMIC III.  The Class A Certificates, the Mezzanine Certificates, the Class P Certificates, Class IO Interest, the Class CE-1 Certificates (exclusive of any right to receive payments from or obligation to make payments to the Reserve Fund or the Supplement Interest Trust) and the Class CE-2 Certificates shall be designated as the "regular interests" in REMIC IV and the Class R-IV Interest shall be designated as the "residual interest" in REMIC IV. The Trustee shall not permit the creation of any "interests" in each Trust REMIC (within the meaning of Section 860G of the Code) other than the REMIC I Regular Interests, REMIC II Regular Interests, REMIC III Regular Interests, Class IO Interest and the interests represented by the Certificates.

(b)    The Closing Date is hereby designated as the "Startup Day" of each Trust REMIC within the meaning of Section 860G(a)(9) of the Code.

(c)    The Securities Administrator shall be reimbursed for any and all expenses relating to any tax audit of the Trust Fund (including, but not limited to, any professional fees or any administrative or judicial proceedings with respect to each Trust REMIC that involve the Internal Revenue Service or state tax authorities), including the expense of obtaining any tax related Opinion of Counsel except as specified herein. The Securities Administrator, as agent for each Trust REMIC's tax matters person shall (i) act on behalf of the Trust Fund in relation to any tax matter or controversy involving any Trust REMIC and (ii) represent the Trust Fund in any administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority with respect thereto. The holder of the largest Percentage Interest of each Class of Residual Certificates shall be designated, in the manner provided under Treasury regulations section 1.860F-4(d) and Treasury regulations section 301.6231(a)(7)-1, as the tax matters person of the related REMIC created hereunder. By their acceptance thereof, the holder of the largest Percentage Interest of the Residual Certificates hereby agrees to irrevocably appoint the Securities Administrator or an Affiliate as its agent to perform all of the duties of the tax matters person for the Trust Fund.

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

(d)     The Securities Administrator shall prepare and file and the Trustee shall sign all of the Tax Returns in respect of each REMIC created hereunder. The expenses of preparing and filing such returns shall be borne by the Securities Administrator without any right of reimbursement therefor.

(e)     The Securities Administrator shall perform on behalf of each Trust REMIC all reporting and other tax compliance duties that are the responsibility of such REMIC under the Code, the REMIC Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority. Among its other duties, as required by the Code, the REMIC Provisions or other such compliance guidance, the Securities Administrator shall provide (i) to any Transferor of a Residual Certificate such information as is necessary for the application of any tax relating to the transfer of a Residual Certificate to any Person who is not a Permitted Transferee upon receipt of additional reasonable compensation, (ii) to the Certificateholders such information or reports as are required by the Code or the REMIC Provisions including reports relating to interest, original issue discount and market discount or premium (using the Prepayment Assumption as required) and (iii) to the Internal Revenue Service the name, title, address and telephone number of the person who will serve as the representative of each Trust REMIC. The Depositor shall provide or cause to be provided to the Securities Administrator, within ten (10) days after the Closing Date, all information or data that the Securities Administrator reasonably determines to be relevant for tax purposes as to the valuations and issue prices of the Certificates, including, without limitation, the price, yield, prepayment assumption and projected cash flow of the Certificates.

(f)     To the extent in the control of the Trustee or the Securities Administrator, each such Person (i) shall take such action and shall cause each REMIC created hereunder to take such action as shall be necessary to create or maintain the status thereof as a REMIC under the REMIC Provisions, (ii) shall not take any action, cause the Trust Fund to take any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (A) endanger the status of each Trust REMIC as a REMIC or (B) result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, an "Adverse REMIC Event") unless such action or inaction is permitted under this Agreement or the Trustee, the NIMS Insurer and the Securities Administrator have received an Opinion of Counsel, addressed to the them (at the expense of the party seeking to take such action but in no event at the expense of the Trustee or the Securities Administrator) to the effect that the contemplated action will not, with respect to any Trust REMIC, endanger such status or result in the imposition of such a tax, nor (iii) shall the Securities Administrator take or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that it has received an Opinion of Counsel to the effect that an Adverse REMIC Event could occur with respect to such action; provided that the Securities Administrator may conclusively rely on such Opinion of Counsel and shall incur no liability for its action or failure to act in accordance with such Opinion of Counsel. In addition, prior to taking any action with respect to any Trust REMIC or the respective assets of each, or causing any Trust REMIC to take any action, which is not contemplated under the terms of this Agreement, the Securities Administrator will consult with the Trustee or its designee, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to any Trust REMIC,

and the Securities Administrator shall not take any such action or cause any Trust REMIC to take any such action as to which the Trustee has advised it in writing that an Adverse REMIC Event could occur. The Trustee may consult with counsel (and conclusively rely upon the advice of such counsel) to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Agreement, but in no event shall such cost be an expense of the Trustee.

(g)    In the event that any tax is imposed on "prohibited transactions" of any REMIC created hereunder as defined in Section 860F(a)(2) of the Code, on the "net income from foreclosure property" of such REMIC as defined in Section 860G(c) of the Code, on any contributions to any such REMIC after the Startup Day therefor pursuant to Section 860G(d) of the Code, or any other tax is imposed by the Code or any applicable provisions of state or local tax laws, such tax shall be charged (i) to the Trustee pursuant to Section 11.03, if such tax arises out of or results from a breach by the Trustee of any of its obligations under this Article XI, (ii) to the Securities Administrator pursuant to Section 11.03, if such tax arises out of or results from a breach by the Securities Administrator of any of its obligations under this Article XI, (iii) to the Master Servicer pursuant to Section 11.03, if such tax arises out of or results from a breach by the Master Servicer of any of its obligations under Article IV or under this Article XI, (iv) to the related Servicer pursuant to Section 11.03, if such tax arises out of or results from a breach by such Servicer of any of its obligations under Article III or under this Article XI, or (v) in all other cases, against amounts on deposit in the Distribution Account and shall be paid by withdrawal therefrom.

(h)    The Securities Administrator shall, for federal income tax purposes, maintain books and records with respect to each Trust REMIC on a calendar year and on an accrual basis.

(i)    Following the Startup Day, neither the Securities Administrator nor the Trustee shall accept any contributions of assets to any Trust REMIC other than in connection with any Qualified Substitute Mortgage Loan delivered in accordance with Section 2.03 unless it shall have received an Opinion of Counsel to the effect that the inclusion of such assets in the Trust Fund will not cause the related REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding or subject such REMIC to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(j)    Neither the Trustee nor the Securities Administrator shall knowingly enter into any arrangement by which any Trust REMIC will receive a fee or other compensation for services nor permit either REMIC to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(k)    The Securities Administrator shall apply for an employer identification number with the Internal Revenue Service via a Form SS-4 or other comparable method for each REMIC. In connection with the foregoing, the Securities Administrator shall provide the name and address of the person who can be contacted to obtain information required to be reported to the holders of Regular Interests in each REMIC as required by IRS Form 8811.

241

SECTION 11.02.    Prohibited Transactions and Activities.

None of the Depositor, the Servicers, the Securities Administrator, the Master Servicer or the Trustee shall sell, dispose of or substitute for any of the Mortgage Loans (except in connection with (i) the foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by deed in lieu of foreclosure, (ii) the bankruptcy of REMIC I, (iii) the termination of REMIC I pursuant to Article X of this Agreement, (iv) a substitution pursuant to Article II of this Agreement or (v) a purchase of Mortgage Loans pursuant to Article II of this Agreement), nor acquire any assets for any Trust REMIC (other than REO Property acquired in respect of a defaulted Mortgage Loan), nor sell or dispose of any investments in the related Collection Account or the Distribution Account for gain, nor accept any contributions to any Trust REMIC after the Closing Date (other than a Qualified Substitute Mortgage Loan delivered in accordance with Section 2.03), unless it has received an Opinion of Counsel, addressed to the Trustee, the Securities Administrator and the NIMS Insurer (at the expense of the party seeking to cause such sale, disposition, substitution, acquisition or contribution but in no event at the expense of the Trustee) that such sale, disposition, substitution, acquisition or contribution will not (a) affect adversely the status of any Trust REMIC as a REMIC or (b) cause any Trust REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.

SECTION 11.03.    Indemnification.

(a)    The Trustee agrees to be liable for any taxes and costs incurred by the Trust Fund, the Depositor, the Master Servicer, the Securities Administrator or the Servicers including, without limitation, any reasonable attorneys fees imposed on or incurred by the Trust Fund, the Depositor, the Master Servicer, the Securities Administrator or the Servicer as a result of the Trustee's failure to perform its covenants set forth in this Article XI in accordance with the standard of care of the Trustee set forth in this Agreement.

(b)    Each of Ocwen and GMAC agrees to indemnify the Trust Fund, the Depositor, the Master Servicer, the Securities Administrator and the Trustee for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Depositor, the Master Servicer, the Securities Administrator or the Trustee, as a result of the related Servicer's failure to perform its covenants set forth in Article III in accordance with the standard of care of the related Servicer set forth in this Agreement.

(c)    The Master Servicer agrees to indemnify the Trust Fund, the Depositor, the Servicers and the Trustee for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Depositor, the Servicer or the Trustee, as a result of the Master Servicer's failure to perform its covenants set forth in Article IV in accordance with the standard of care of the Master Servicer set forth in this Agreement.

(d)    The Securities Administrator agrees to be liable for any taxes and costs incurred by the Trust Fund, the Depositor, the Servicers or the Trustee including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Depositor, the Servicer or the Trustee as a result of the Securities Administrator's failure to

242

perform its covenants set forth in this Article XI in accordance with the standard of care of the Securities Administrator set forth in this Agreement.

[TPW: NYLEGAL:668339.7] 17988-00651  09/11/2007 07:42 PM

## ARTICLE XII

### MISCELLANEOUS PROVISIONS

SECTION 12.01.    Amendment.

This Agreement may be amended from time to time by the Depositor, Ocwen, GMAC, the Master Servicer, the Securities Administrator, the NIMS Insurer and the Trustee but without the consent of any of the Certificateholders, (i) to cure any ambiguity or defect, (ii) to correct, modify or supplement any provisions herein (including to give effect to the expectations of Certificateholders), (iii) to ensure compliance with Regulation AB or (iv) to make any other provisions with respect to matters or questions arising under this Agreement which shall not be inconsistent with the provisions of this Agreement and that such action shall not, as evidenced by an Opinion of Counsel delivered to the Trustee and the NIMS Insurer, adversely affect in any material respect the interests of any Certificateholder; provided that any such amendment shall be deemed not to adversely affect in any material respect the interests of the Certificateholders and no such Opinion of Counsel shall be required if the Person requesting such amendment obtains a letter from each Rating Agency stating that such amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates. No amendment shall be deemed to adversely affect in any material respect the interests of any Certificateholder who shall have consented thereto, and no Opinion of Counsel shall be required to address the effect of any such amendment on any such consenting Certificateholder.

This Agreement may also be amended from time to time by the Depositor, Ocwen, GMAC, the Master Servicer, the Securities Administrator, the NIMS Insurer and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders of Certificates; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments received on Mortgage Loans which are required to be distributed on any Certificate without the consent of the Holder of such Certificate, (ii) adversely affect in any material respect the interests of the Holders of any Class of Certificates in a manner, other than as described in (i), without the consent of the Holders of Certificates of such Class evidencing at least 66% of the Voting Rights allocated to such Class, or (iii) modify the consents required by the immediately preceding clauses (i) and (ii) without the consent of the Holders of all Certificates then outstanding. Notwithstanding any other provision of this Agreement, for purposes of the giving or withholding of consents pursuant to this Section 12.01, Certificates registered in the name of the Depositor, Ocwen or GMAC or any Affiliate thereof shall be entitled to Voting Rights with respect to matters affecting such Certificates. Without limiting the generality of the foregoing, any amendment to this Agreement required in connection with the compliance with or the clarification of any reporting obligations described in Section 5.06 hereof shall not require the consent of any Certificateholder and without the need for any Opinion of Counsel or Rating Agency confirmation.

Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless it shall have first received an Opinion of Counsel to the effect that such amendment is permitted hereunder, that all conditions precedent

244

to the execution of such amendment by the Trustee have been satisfied, such amendment will not result in the imposition of any tax on any Trust REMIC pursuant to the REMIC Provisions or cause any Trust REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Certificateholder.

It shall not be necessary for the consent of Certificateholders under this Section 12.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

The cost of any Opinion of Counsel to be delivered pursuant to this Section 12.01 shall be borne by the Person seeking the related amendment, but in no event shall such Opinion of Counsel be an expense of the Trustee.

The Trustee may, but shall not be obligated to enter into any amendment pursuant to this Section that affects its rights, duties and immunities under this Agreement or otherwise.

Notwithstanding any of the other provisions of this Section 12.01, none of the parties to this Agreement shall enter into any amendment to this Agreement that could reasonably be expected to have a material adverse effect on the interests of the Swap Provider hereunder (excluding, for the avoidance of doubt, any amendment to the Pooling and Servicing Agreement that is entered into solely for the purpose of appointing a successor servicer, master servicer, securities administrator, trustee or other service provider) without the prior written consent of the Swap Provider, which consent shall not be unreasonably withheld, conditioned or delayed.

SECTION 12.02.    Recordation of Agreement; Counterparts.

To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Depositor at the expense of the Certificateholders, but only upon direction of the Trustee accompanied by an Opinion of Counsel (which Opinion of Counsel shall not be at the expense of the Trustee) to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

[TPW: NYLEGAL:668339.7] 17988-00651 09/11/2007 07:42 PM

SECTION 12.03.    Limitation on Rights of Certificateholders.

The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Fund, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Certificateholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of any of the Certificates, be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates entitled to at least 25% of the Voting Rights shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 15 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding. It is understood and intended, and expressly covenanted by each Certificateholder with every other Certificateholder. and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatsoever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Agreement, except in the manner herein provided and for the equal, ratable and common benefit of all Certificateholders. For the protection and enforcement of the provisions of this Section, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

SECTION 12.04.    Governing Law.

This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflicts of laws principles thereof other than Section 5-1401 of the New York General Obligations Law which shall govern.

SECTION 12.05.    Notices.

All directions, demands and notices hereunder shall be in writing and shall be deemed to have been duly given when received if sent by facsimile, receipt confirmed, if

246

personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service or delivered in any other manner specified herein, to (a) in the case of the Depositor, ACE Securities Corp., AMACAR GROUP, 6525 Morrison Boulevard, Suite 318, Charlotte, North Carolina 28211, Attention: Juliana Johnson (telecopy number: (704) 365-1362) with a copy to Deutsche Bank Securities, Inc. 60 Wall Street, New York, New York, Attention: Legal Department (telecopy number: (212) 797-4561), or such other address or telecopy number as may hereafter be furnished to the Servicers, the Master Servicer, the NIMS Insurer, the Securities Administrator and the Trustee in writing by the Depositor, (b) in the case of Ocwen, Ocwen Loan Servicing, LLC, 1661 Worthington Road, Centrepark West, Suite 100, West Palm Beach, Florida 33409, Attention: Secretary (telecopy number: (561) 682-8177, or such other address or telecopy number as may hereafter be furnished to the Trustee, the Master Servicer, the NIMS Insurer, the Securities Administrator and the Depositor in writing by Ocwen, (d) , GMAC Mortgage, LLC, 100 Witmer Road, Horsham, Pennsylvania 19044, Attention: ACE 2007-HE4, or such other address or telecopy number as may hereafter be furnished to the Trustee, the Master Servicer, the Securities Administrator and the Depositor in writing by GMAC (e) in the case of the Master Servicer and the Securities Administrator, P.O. Box 98, Columbia, Maryland 21046 and for overnight delivery to 9062 Old Annapolis Road, Columbia, Maryland 21045, Attention: Ace Securities Corp., 2007-HE4 (telecopy number: (410) 715-2380), or such other address or telecopy number as may hereafter be furnished to the Trustee, the Depositor, the NIMS Insurer and the Servicer in writing by the Master Servicer or the Securities Administrator and (f) in the case of the Trustee, at the Corporate Trust Office or such other address or telecopy number as the Trustee may hereafter be furnish to the Servicers, the Master Servicer, the Securities Administrator and the Depositor in writing by the Trustee. Any notice required or permitted to be given to a Certificateholder shall be given by first class mail, postage prepaid, at the address of such Holder as shown in the Certificate Register. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given when mailed, whether or not the Certificateholder receives such notice. A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above.

SECTION 12.06.    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

SECTION 12.07.    Notice to Rating Agencies and NIMS Insurer.

The Trustee shall use its best efforts promptly to provide notice to the Rating Agencies and the NIMS Insurer with respect to each of the following of which a Responsible Officer has actual knowledge:

1.    Any material change or amendment to this Agreement;

247

2.    The occurrence of any Servicer Event of Default or Master Servicer Event of Default that has not been cured or waived;

3.    The resignation or termination of a Servicer, the Master Servicer or the Trustee;

4.    The repurchase or substitution of Mortgage Loans pursuant to or as contemplated by Section 2.03;

5.    The final payment to the Holders of any Class of Certificates; and

6.    Any change in the location of the Distribution Account.

In addition, the Securities Administrator shall promptly make available to each Rating Agency and the NIMS Insurer copies of each report to Certificateholders described in Section 5.02.

The Servicer shall make available to each Rating Agency copies of the following:

1.    Each annual statement of compliance described in Section 3.17 of this Agreement; and

2.    Each assessment of compliance and attestation report described in Section 3.18.

Any such notice pursuant to this Section 12.07 shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service to Standard & Poor's, a division of the McGraw-Hill Companies, Inc., 55 Water Street, New York, New York 10041; and to Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007 or such other addresses as the Rating Agencies may designate in writing to the parties hereto.

SECTION 12.08.    Article and Section References.

All article and section references used in this Agreement, unless otherwise provided, are to articles and sections in this Agreement.

SECTION 12.09.    Grant of Security Interest.

It is the express intent of the parties hereto that the conveyance of the Mortgage Loans by the Depositor to the Trustee, on behalf of the Trust and for the benefit of the Certificateholders, be, and be construed as, a sale of the Mortgage Loans by the Depositor and not a pledge of the Mortgage Loans to secure a debt or other obligation of the Depositor. However, in the event that, notwithstanding the aforementioned intent of the parties, the Mortgage Loans are held to be property of the Depositor, then, (a) it is the express intent of the parties that such conveyance be deemed a pledge of the Mortgage Loans by the Depositor to the Trustee, on behalf of the Trust and for the benefit of the Certificateholders, to secure a debt or other obligation of the Depositor and (b)(1) this Agreement shall also be deemed to be a security

248

agreement within the meaning of Articles 8 and 9 of the Uniform Commercial Code as in effect from time to time in the State of New York; (2) the conveyance provided for in Section 2.01 shall be deemed to be a grant by the Depositor to the Trustee, on behalf of the Trust and for the benefit of the Certificateholders, of a security interest in all of the Depositor's right, title and interest in and to the Mortgage Loans and all amounts payable to the holders of the Mortgage Loans in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts in the Capitalized Interest Account including investment earnings and all amounts, other than investment earnings, from time to time held or invested in the Collection Accounts, the Distribution Account and any Pre-Funding Account whether in the form of cash, instruments, securities or other property; (3) the obligations secured by such security agreement shall be deemed to be all of the Depositor's obligations under this Agreement, including the obligation to provide to the Certificateholders the benefits of this Agreement relating to the Mortgage Loans and the Trust Fund; and (4) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Trustee for the purpose of perfecting such security interest under applicable law. Accordingly, the Depositor hereby grants to the Trustee, on behalf of the Trust and for the benefit of the Certificateholders, a security interest in the Mortgage Loans and all other property described in clause (2) of the preceding sentence, for the purpose of securing to the Trustee the performance by the Depositor of the obligations described in clause (3) of the preceding sentence. Notwithstanding the foregoing, the parties hereto intend the conveyance pursuant to Section 2.01 to be a true, absolute and unconditional sale of the Mortgage Loans and assets constituting the Trust Fund by the Depositor to the Trustee, on behalf of the Trust and for the benefit of the Certificateholders.

SECTION 12.10.    Survival of Indemnification.

Any and all indemnities to be provided by any party to this Agreement shall survive the termination and resignation of any party hereto and the termination of this Agreement.

SECTION 12.11.    Intention of the Parties and Interpretation.

Each of the parties acknowledges and agrees that the purpose of Sections 3.17, 3.18, 3.20, 4.15, 4.16, 4.17, 4.18 and 5.06 of this Agreement is to facilitate compliance by the Sponsor, the Master Servicer, the Securities Administrator and the Depositor with the provisions of Regulation AB promulgated by the Commission under the Exchange Act (17 C.F.R. §§ 229.1100 - 229.1123), as such may be amended from time to time and subject to clarification and interpretive advice as may be issued by the staff of the Commission from time to time. Therefore, each of the parties agrees that (a) the obligations of the parties hereunder shall be interpreted in such a manner as to accomplish that purpose, (b) the parties' obligations hereunder will be supplemented and modified as necessary to be consistent with any such amendments, interpretive advice or guidance, convention or consensus among active participants in the asset-backed securities markets, advice of counsel, or otherwise in respect of the requirements of Regulation AB and (c) the parties shall comply with requests made by the Master Servicer, Securities Administrator, Sponsor or the Depositor for delivery of additional or different

249

information as the Master Servicer, Securities Administrator, Sponsor or the Depositor may determine in good faith is necessary to comply with the provisions of Regulation AB.

SECTION 12.12.    Indemnification.

Each of the Depositor, Master Servicer, Securities Administrator, Servicers and any Servicing Function Participant engaged by such party, respectively, shall indemnify and hold harmless the Master Servicer, the Securities Administrator and the Depositor, respectively, and each of its directors, officers, employees, agents, and affiliates from and against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments and other costs and expenses arising out of or based upon (a) any breach by such party of any if its obligations under hereunder, including particularly its obligations to provide any assessment of compliance, attestation report, annual statement of compliance or any information, data or materials required to be included in any 1934 Act report, (b) any material misstatement or omission in any information, data or materials provided by such party (or, in the case of the Securities Administrator or Master Servicer, any material misstatement or material omission in (i) any assessment of compliance, attestation report or annual statement of compliance delivered by it, or by any Servicing Function Participant engaged by it, pursuant to this Agreement, or (ii) any Additional Form 10-D Disclosure, Additional Form 10-K Disclosure or Form 8-K Disclosure concerning the Master Servicer or the Securities Administrator), or (c) the negligence, bad faith or willful misconduct of such indemnifying party in connection with its performance hereunder. If the indemnification provided for herein is unavailable or insufficient to hold harmless the Master Servicer, the Securities Administrator or the Depositor, as the case may be, then each such party agrees that it shall contribute to the amount paid or payable by the Master Servicer, the Securities Administrator or the Depositor, as applicable, as a result of any claims, losses, damages or liabilities incurred by such party in such proportion as is appropriate to reflect the relative fault of the indemnified party on the one hand and the indemnifying party on the other. This indemnification shall survive the termination of this Agreement or the termination of any party to this Agreement.

SECTION 12.13.    Swap Provider and NIMS Insurer as Third Party Beneficiaries.

The Swap Provider and the NIMS Insurer each shall be an express third-party beneficiary of this Agreement to the extent of its express rights to receive any payments under this Agreement or any other express rights of the Swap Provider or NIMS Insurer explicitly stated in this Agreement, and shall have the right to enforce such rights under this Agreement as if each were a party hereto.

250

IN WITNESS WHEREOF, the Depositor, the Servicer, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, in each case as of the day and year first above written.

ACE SECURITIES CORP.,
as Depositor

By: _____

Name:

Title:     Evelyn Echevarria
           Vice President


By: _____

Name:

Title:     Doris J. Hearn
           Vice President


OCWEN LOAN SERVICING, LLC
as a Servicer


By: _____

Name:

Title:


GMAC MORTGAGE, LLC
as a Servicer


By: _____

Name:

Title:


(Pooling Agreement ACE 2007-HE4)

IN WITNESS WHEREOF, the Depositor, the Servicer, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, in each case as of the day and year first above written.

ACE SECURITIES CORP.,
as Depositor

By:_____

Name:

Title:

By:_____

Name:

Title:

OCWEN LOAN SERVICING, LLC
as a Servicer

By: _____

Name:

Title:    **Scott W. Anderson**
**Authorized Representative**

GMAC MORTGAGE, LLC
as a Servicer

By: _____

Name:

Title:

(Pooling Agreement ACE 2007-HE4)

IN WITNESS WHEREOF, the Depositor, the Servicer, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, in each case as of the day and year first above written.

ACE SECURITIES CORP.,
as Depositor


By:_____
Name:
Title:


By:_____
Name:
Title:


OCWEN LOAN SERVICING, LLC
as a Servicer


By: _____
Name:
Title:


GMAC MORTGAGE, LLC
as a Servicer


By: _____
Name:    Wesley B. Howland
Title:    Vice President

HSBC BANK USA, NATIONAL
ASSOCIATION
not in its individual capacity but solely as Trustee

By: _____
Name:    **Fernando Acebedo**
Title:    **Vice President**


WELLS FARGO BANK, NATIONAL
ASSOCIATION
as Master Servicer and Securities Administrator

By:_____
Name:
Title:


**Acknowledged and Agreed for purposes of
Section 9.05:**


DB STRUCTURED PRODUCTS, INC

By: _____
Name:
Title:


By: _____
Name
Title:


(Pooling Agreement ACE 2007-HE4)

HSBC BANK USA, NATIONAL
ASSOCIATION
not in its individual capacity but solely as Trustee

By: _____
Name:
Title:


WELLS FARGO BANK, NATIONAL
ASSOCIATION
as Master Servicer and Securities Administrator

By: _____
Name:        Stacey M. Taylor
Title:          Vice President


**Acknowledged and Agreed for purposes of
Section 9.05:**


DB STRUCTURED PRODUCTS, INC

By: _____
Name:
Title:


By: _____
Name
Title:

HSBC BANK USA, NATIONAL
ASSOCIATION
not in its individual capacity but solely as Trustee

By: _____
Name:
Title:


WELLS FARGO BANK, NATIONAL
ASSOCIATION
as Master Servicer and Securities Administrator

By:_____
Name:
Title:


**Acknowledged and Agreed for purposes of
Section 9.05:**


DB STRUCTURED PRODUCTS, INC

By: _____    ERNEST CALABRESE
Name:                                              DIRECTOR
Title:



By: _____
Name:
Title:                                    SUSAN VALENTI
                                          DIRECTOR


(Pooling Agreement ACE 2007-HE4)

Acknowledged and Agreed for purposes of
Sections 7.08, 7.09 and 7.10:

CLAYTON FIXED INCOME SERVICES INC.

By: _____

Name: Kevin J. Kanouff
Title: President and General Counsel

| STATE OF NORTH CAROLINA | ) |
|---|---|
|  | ) ss.: |
| COUNTY OF MECKLENBURG | ) |
|  |  |

On the 26th day of April 2007, before me, a notary public in and for said State, personally appeared Evenlyn Echevarria known to me to be an Officer of ACE Securities Corp., one of the entities that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[Notarial Seal]

My commission expires: July 4, 2011

| STATE OF NORTH CAROLINA | ) |
|---|---|
| | ) ss.: |
| COUNTY OF MECKLENBURG | ) |
| | |

On the 26th day of April 2007, before me, a notary public in and for said State, personally appeared __Doris J. Hearn__ known to me to be an Officer of ACE Securities Corp., one of the entities that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public

[Notarial Seal]

My commission expires: July 4, 2011

| STATE OF Florida | ) |
| | ) ss.: |
| COUNTY OF PalmBeach | ) |
| | |

On the 20th day of April 2007, before me, a notary public in and for said State, personally appeared Scott Anderson known to me to be a Auth Representative of Ocwen Loan Servicing, LLC, one of the entities that executed the within instrument, and also known to me to be the person who executed it on behalf of said limited liability company, and acknowledged to me that such limited liability company executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

K S FERRUGGIA
Notary Public - State of Florida
My Commission Expires Jun 3, 2009
Commission # DD 422809
Bonded By National Notary Assn.

My commission expires: 03 June 2009

| STATE OF _Iowa_ | ) |
|---|---|
|  | ) ss.: |
| COUNTY OF _Black Hawk_ | ) |
|  |  |

On the _30_ day of April 2007, before me, a notary public in and for said State, personally appeared _Wesley B Howland_ known to me to be a _Vice President_ of GMAC Mortgage, LLC, one of the entities that executed the within instrument, and also known to me to be the person who executed it on behalf of said limited liability company, and acknowledged to me that such limited liability company executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.



—————————————————————
Notary Public

[Notarial Seal]                    My commission expires:

```
SUSAN E. BRINDLE
Commission Number 718176
My Commission Expires
August 26, 2008
```

| | |
|---|---|
| STATE OF New York | ) |
| | ) ss.: |
| COUNTY OF New York | ) |
| | |

On the 30 day of April 2007, before me, a notary public in and for said State, personally appeared Fernando Acebedo known to me to be a Vice President of HSBC Bank USA, National Association, one of the entities that executed the within instrument, and also known to me to be the person who executed it on behalf of said national banking association, and acknowledged to me that such national banking association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_Audrey H Zabriskie_
Notary Public

[Notarial Seal]                    My commission expires:

AUDREY H. ZABRISKIE
No. 01ZA6158890
Notary Public, State of New York
Qualified in New York County
My Commission Expires 01/16/2011

STATE OF MARYLAND     )
                              )    ss.:

COUNTY OF HOWARD      )

        On the 30th day of April, 2007 before me, a notary public in and for said State, personally appeared Stacey M. Taylor known to me to be a Vice President of Wells Fargo Bank, N.A., one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of such corporation, and acknowledged to me that such corporation executed the within instrument.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                                              Notary Public

[SEAL]

> JENNIFER RICHARDSON
> NOTARY PUBLIC
> ANNE ARUNDEL COUNTY
> MARYLAND
> MY COMMISSION EXPIRES APR. 1, 2010