**Hearing Date and Time: June 18, 2012 at 10:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Barry H. Berke
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

----------------------------------------------------------- x

**RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**TO THE MOTION OF BERKSHIRE HATHAWAY INC. FOR THE**
**<u>APPOINTMENT OF AN EXAMINER PURSUANT TO 11 U.S.C. § 1104(C)</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

TABLE OF EXHIBITS ........................................................................................... iv

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 5

RESPONSE............................................................................................................ 7

     A.     Section 1104(c)(2) Does Not Mandate the Appointment of an Examiner
              to Displace the Committee from its Investigative Watchdog Role........................ 8

     B.     The Proposed Appointment of an Examiner is Not Appropriate Here,
              Given the Nature of the Committee and the Investigation that is Already
              Underway ............................................................................................. 11

     C.     The Examiner Motion Should be Denied, Held in Abeyance,
              or Granted with a Limited Scope ........................................................... 19

CONCLUSION..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

In re Advisory Comm. of Major Funding Corp.,
   109 F.3d 219 (5th Cir. 1997) ................................................................................13

In re Am. Home Mortgage Holdings, Inc.,
   Case No. 07-11047 (CSS) (Bankr. D. Del. Oct. 31, 2007)....................................10 n.3, 11 n.4

In re Bohack Corp.,
   607 F.2d 258 (2d Cir. 1979)............................................................................... 12-13

In re Bradlees Stores, Inc.,
   209 B.R. 36 (Bankr. S.D.N.Y. 1997)........................................................................9

In re Calpine Corp.,
   Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 24, 2007)........................................9, 10 n.3

In re Dow Corning Corp.,
   194 B.R. 121 (Bankr. E.D. Mich. 1996) ..................................................................14

In re Gliatech, Inc.,
   305 B.R. 832 (Bankr. N.D. Ohio 2004) ...............................................................12 n.5

In re Hills Stores Co.,
   137 B.R. 4 (Bankr. S.D.N.Y. 1992) ........................................................................14

In re Innkeepers USA Trust,
   Case No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2010)........................................9, 10, 12

In re Keene Corp.,
   165 B.R. 844 (Bankr. S.D.N.Y. 1994) ................................................................17 n.7

In re Loral Space & Commc'ns, Ltd.,
   No. 04-Civ-8645, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004)..........................10, 11, 11 n.4

In re Magna Entm't Corp.,
   No. 09-10720 (Bankr. D. Del. May 4, 2009)......................................................14, 19

In re Metromedia Fiber Network, Inc.,
   416 F.3d 136 (2d Cir. 2005)....................................................................................15

In re Owens Corning,
   Case No. 00-3837 (JKF) (Bankr. W.D. Pa. Apr. 8, 2003)......................................19

In re Refco Inc.,
    336 B.R. 187 (Bankr. S.D.N.Y. 2006) ................................................................ 16-17

In re Revco D.S., Inc.,
    898 F.2d 498 (6th Cir. 1990) ...................................................................... 11 n.4, 20

In re Sharon Steel Corp.,
    100 B.R. 767 (W.D. Pa. 1989) ............................................................................. 14

In re Sletteland,
    260 B.R. 657 (Bankr. S.D.N.Y. 2001) ...................................................... 12, 12 n.5

In re Spansion, Inc.,
    426 B.R. 114 (Bankr. D. Del. 2010) ..................................................................... 10

In re SPM Mfg. Corp.,
    984 F.2d 1305 (1st Cir. 1993) ........................................................................ 13 n.6

In re Visteon Corp.,
    Case No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010) ................................ 10 n.3

In re Washington Mut., Inc.,
    No. 08-12229 (Bankr. D. Del. May 5, 2010) .................................................. 13-14

## STATUTES

11 U.S.C. § 1104(c) ............................................................................................ passim

## OTHER AUTHORITIES

Dakin Campbell, ResCap Junior Notes Projected to Get 105 Cents on the Dollar,
    Bloomberg News, May 15, 2012, available at http://www.bloomberg.com/news/2012-
    05-15/rescap-junior-notes-projected-to-get-105-cents-on-the-dollar.html. ............................... 2

Harvey Miller, The Changing Face of Chapter 11: A Reemergence of the Bankruptcy
    Judge as Producer, Director and Sometimes Star of the Reorganization Play, 69 AM.
    BANKR. L.J. 431, 449 (1995) ..................................................................... 13 n.6, 14

## TABLE OF EXHIBITS

**Exhibit**

In re Calpine Corp.,
   Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 24, 2007), Transcript Excerpt ...................A

In re Innkeepers USA Trust,
   Case No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2010), Transcript Excerpt .................B

In re Visteon Corp.,
   Case No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010), Transcript Excerpt .....................C

In re Am. Home Mortgage Holdings, Inc.,
   Case No. 07-11047 (CSS) (Bankr. D. Del. Oct. 31, 2007), Transcript Excerpt ......................D

In re Washington Mut., Inc.,
   No. 08-12229 (Bankr. D. Del. May 5, 2010), Transcript Excerpt ..........................................E

In re Magna Entm't Corp.,
   No. 09-10720 (Bankr. D. Del. May 4, 2009), Transcript Excerpt ..........................................F

In re Owens Corning,
   Case No. 00-3837 (JKF) (Bankr. W.D. Pa. Apr. 8, 2003), Transcript Excerpt .......................G

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby files this response (the "**Response**") to the motion of Berkshire Hathaway Inc. ("**Berkshire**") for the appointment of an examiner (the "**Examiner**") pursuant to 11 U.S.C. § 1104(c) (the "**Examiner Motion**") [Dkt. No. 208].  In support of the Response, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      From the first days of its formation, the Committee has galvanized itself to conduct the comprehensive investigation that all parties, including Berkshire, agree is essential to the success of these cases.  The Committee mobilized a highly qualified team of professionals, who in turn have launched a Rule 2004 inquiry designed to exhaustively evaluate the complex relationships, transactions, and settlements underlying the Debtors' proposed reorganization. This effort has garnered the initial cooperation of the Debtors, Ally, and all major secured and unsecured creditor groups.  Not a single objection was received to the consensual Rule 2004 order entered by the Court last week, and the Debtors have already begun sharing (and the Committee reviewing) the information necessary to perform the investigation.  The investigation is off to exactly the right start and, for this reason alone, the appointment of an Examiner is simply inappropriate and unwarranted.

2.      Berkshire's choice to bring this motion notwithstanding its apparent support for the Committee's investigation was initially puzzling and now seems even more questionable.  In its motion, Berkshire positioned itself as "one of ResCap's largest non-insider unsecured creditors" with a "significant stake in the outcome of these cases."  Examiner Motion

¶ 1.  But within two days of filing the Examiner Motion, Berkshire says that it liquidated its entire position in ResCap unsecured bonds.  *See* Supplemental Declaration of R. Ted Weschler in Support of the Motion of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. S 1104(C) ¶ 2 ("**Supplemental Weschler Decl.**") (explaining that between June 5 and 6, 2012, Berkshire sold its holdings in unsecured Residential Capital, LLC ("**ResCap**") bonds).

3.     Berkshire now stands before the Court solely as holder of $900 million (or 40%) of ResCap's junior *secured* bonds.  Id. ¶ 3.  And, of course, Berkshire's secured interest was represented by an *ad hoc* group that prepetition negotiated a settlement with the Debtors that they believe will pay such claims *in full*.  See Dakin Campbell, ResCap Junior Notes Projected to Get 105 Cents on the Dollar, Bloomberg News, May 15, 2012, available at http://www.bloomberg.com/news/2012-05-15/rescap-junior-notes-projected-to-get-105-cents-on-the-dollar.html.  Accordingly, the Examiner Motion now represents an effort by the *largest secured* creditor to interfere with an investigation by the Committee – the entity best situated to protect the interests of unsecured creditors – into the fairness of a series of transactions that includes, among other things, the Debtors' settlements with secured creditors.  As discussed below, several courts have denied examiner motions that, like this one, appear to be driven by litigation tactics.  We respectfully submit that the Court should deny Berkshire's motion for this reason alone, if Berkshire does not, as the Committee has requested, withdraw it first.

4.     But Berkshire's motion fails regardless of its motives.  The process now in place with the support of all major constituencies is the best process to move these cases forward.  Adding an Examiner would only create unnecessary expense, delay, confusion, and duplication.  In such circumstances, Section 1104(c) of the Bankruptcy Code does not mandate

appointment of an Examiner, because even if all other prerequisites are met, the statute requires that an Examiner be appointed only "to conduct such an investigation of the debtor *as is appropriate*." 11 U.S.C. § 1104(c) (emphasis added). Here, respectfully, there is no appropriate investigation for an Examiner to conduct, because the Committee is already well under way conducting precisely the same investigation that Berkshire purports to seek.

5.    Indeed, even if it did not have such a meaningful head start, the Committee would still be the most appropriate party to conduct the investigation. Our adversary system presumes that highly motivated, self-interested parties are best situated to vindicate their own interests, and the Committee represents the parties whose interests are at stake. The plan now on the table would settle billions of dollars in claims and provide a global release for Ally Financial, Inc. ("**AFI**") and its affiliates, including an involuntary third-party release that would be imposed on all dissenting creditors. This plan can be confirmed *only* if it achieves broad and deep – indeed, nearly universal – support across the spectrum of unsecured creditors represented by the Committee. Contrary to Berkshire's vaguely expressed conflict concerns, it is precisely *because* the Committee represents such a diverse range of interests that it is best positioned to evaluate the plan-related settlements, negotiate to improve them if appropriate, and foster a comprehensive resolution of these cases.

6.    And there *is* no conflict. The members of the Committee – leading financial institutions selected by the U.S. Trustee to represent the broad range of unsecured creditor interests – are united in their desire to maximize the assets available to unsecured creditors. They unanimously support a vigorous and exhaustive investigation. Moreover, the possibility that the Committee will eventually *settle* and support a global resolution of the cases

is not something to fear but rather the ultimate goal of the reorganization process.  Of course, any such concerns that Berkshire may have had as an unsecured creditor are now moot.

7.      Berkshire's other purported concerns are equally unfounded, starting with its peculiar suggestion that the Committee will be "distracted" from its investigation by its other administrative duties.  The Committee has hired leading professional firms with deep expertise in bankruptcy practice, complex litigation, and internal investigations that have fulfilled both the litigation and case administration function in many complex bankruptcy cases.  There is no risk of "distraction."  Berkshire's speculation that the Court might give an Examiner special access to privileged documents appears to be moot, as the Debtors have already stated that they intend to provide the Committee with access to privileged materials.  Finally, the concern for a public report will be met by the Committee's commitment to make its findings and analysis publicly known either through a detailed memorandum in support of an overall settlement or one in opposition to the Debtors' plan.

8.      In short, there is no good reason to disrupt the widely supported investigation already underway on behalf of the real parties in interest by adding another, undefined one conducted by a neutral who speaks for no one and is less equipped to deliver consensus.  In such circumstances there is no appropriate investigation for an Examiner to conduct, and the Examiner Motion therefore should be denied or, in the alternative, held in abeyance pending progress of the Committee's investigation.[1]

---

[1]      In the event the Court determines that an appointment is mandatory, the Committee respectfully suggests that an Examiner be appointed with duties sufficiently circumscribed to avoid interfering with, duplicating, or delaying the Committee's already-launched investigation.

## BACKGROUND

9.      Debtor ResCap is the direct or indirect corporate parent of each of the other Debtors.  AFI is the corporate parent of the intermediate non-Debtor company that owns 100% of ResCap's equity, GMAC Mortgage Group, LLC.  AFI has been partially owned by Cerberus Capital Management, L.P. since November, 2006.

10.     The Debtors are among the largest servicers and originators of residential mortgage loans in the United States.  As of March 31, 2012, they reported $15.7 billion in total assets and $15.3 billion in total liabilities.  As of the Petition Date, the Debtors reported $612.5 million in unrestricted cash and $275.5 million in restricted cash, with net revenues of $426,657,000 and net income of $113,016,000 for the three months ended March 31, 2012.

11.     On May 14, 2012 (the **"Petition Date"**), the Debtors filed voluntary petitions for relief under Chapter 11 (collectively, the **"Chapter 11 Cases"**). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

12.     As set forth in the First Day Affidavit, the stated purpose of these Chapter 11 Cases is to (i) facilitate an orderly sale of the Debtors' most valuable assets, (ii) settle the Debtors' claims with their parent AFI, (iii) resolve the Debtors' legacy liabilities, and (iv) complete an orderly wind-down of their remaining assets.  First Day Affidavit ¶ 105.

13.     On May 16, 2012, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Committee.[2]  No trustee or examiner has been appointed in these Chapter 11 Cases.

---

[2]      The members of the Committee are: (a) AIG Asset Management (U.S.) LLC, (b) Allstate Life Insurance Company, (c) the Bank of New York Mellon Trust Company, N.A., (d) Deutsche Bank Trust Company Americas, (e) Rowena L. Drennen, (f) Financial Guaranty Insurance Company, (g) MBIA Insurance Corporation, (h) U.S. Bank National Association, and (i) Wilmington Trust, N.A.

14.    On June 1, 2012, the Committee filed and served a motion (the "**2004 Motion**") [Dkt. No. 192] for entry of an order, pursuant to 11 U.S.C. §§ 105(a) and 1103(c), Rules 2004, 9006(c)(1), and 9013 of the Federal Rules of Bankruptcy Procedure, and Rule 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York, authorizing, among other things, the Committee to issue subpoenas compelling the production of documents and the provision of testimony by the Debtors and other entities and persons.  The 2004 Motion was filed to facilitate the comprehensive independent investigation that the Committee, as an independent estate fiduciary, must promptly conduct in light of the Debtors' stated goal of a highly expedited, consensual reorganization.

15.    No objections were filed in response to the 2004 Motion, and indeed the Committee was able to facilitate a broad consensus in favor of its proposed process, negotiating a revised, consensual proposed order that was submitted on June 4, 2012, on behalf of the Committee, the Debtors, and AFI (the "**Revised 2004 Order**"), and entered by the Court on June 5, 2012 [Dkt. No. 217].

16.    Both before and after submission of the Revised 2004 Order, the Committee's proposed counsel, Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**"), engaged in discussions with counsel for the Debtors and AFI concerning (i) the production of documents in response to the subpoena (the "**2004 Subpoena**") annexed to the 2004 Motion, and (ii) a confidentiality agreement governing the production of documents in response to the 2004 Subpoena.  In addition, since its appointment, the Committee has retained two experienced financial advisors, Moelis & Company LLC ("**Moelis**") and AlixPartners LLP ("**AlixPartners**"), to assist with the investigation, and Kramer Levin has assembled a qualified team of attorneys

6

experienced in corporate, securities, and bankruptcy litigation to conduct the investigation in cooperation with lawyers from its Creditors' Rights group.

17.     Without advance notice, late on the evening of June 4, 2012, Berkshire filed the Examiner Motion, along with a declaration stating that Berkshire was both a significant unsecured and secured creditor.  In the two days that followed the filing of the Examiner Motion, Berkshire reports that it liquidated its entire position in ResCap unsecured bonds.  Supplemental Weschler Decl. ¶ 2.

## RESPONSE

18.     There is no need for an Examiner here because the Committee is, even by Berkshire's own account, already performing precisely the investigation that needs to be conducted.  The initial cooperation and momentum that the Committee has been able to generate in a few short weeks should not be jeopardized based on the whim of a single secured creditor that (1) is already slated to be paid in full, and (2) is hardly motivated to maximize the assets available to unsecured creditors.

19.     Berkshire takes no issue with the investigation as framed by the Committee, simply arguing that an impartial inquiry by an independent Examiner is the "most sensible option available."  Examiner Motion ¶ 26.  Berkshire's plea for impartiality rings hollow in light of its conflicting interests with unsecured creditors.  But it also turns the adversary process on its head.  It is the Committee, reflecting the diverse spectrum of creditors, that has the greatest interest in conducting a thorough investigation and maximizing the value in the estates for unsecured creditors.  Not only is the Committee the statutorily designated watchdog for creditors – its role in *this* case is particularly central because the proposed Chapter 11 plan demands an extraordinary level of creditor consensus that can be accomplished only after a thorough investigation by the Committee.

20.     Berkshire offers only weak arguments for disrupting the Committee's investigation by adding another cook in the kitchen.  Its statutory argument ignores the Court's considerable discretion to determine that no appropriate Examiner investigation is now needed, particularly where the motion to appoint an Examiner is transparently a litigation tactic. Berkshire's vague, unsubstantiated allusions to theoretical Committee conflicts are belied by the Committee's harmonious resolve to pursue the largest possible pool of assets for unsecured creditors.  The concern over privilege is moot because the Debtors are making privileged materials available to the Committee.  And any perceived need for a public report will be met when the Committee publicly reports on its reasons for supporting a settlement or opposing the Debtors' plan.  Complicating the current investigation by adding an Examiner would advance no legitimate interest but would only disadvantage unsecured creditors and other stakeholders while unnecessarily complicating an inquiry that everyone agrees must be conducted expeditiously.

**A.      Section 1104(c)(2) Does Not Mandate the Appointment of an Examiner to Displace the Committee from its Investigative Watchdog Role**

21.     Contrary to Berkshire's contention, Section 1104(c)(2) of the Bankruptcy Code does not mandate that the Court appoint an Examiner, much less dictate that an Examiner be appointed with broad investigative powers that would interfere with the Committee's statutory role in conducting this investigation.  Berkshire's analysis glosses over the key language in Section 1104(c):  "the court shall order the appointment of an examiner to conduct such an investigation of the debtor *as is appropriate* . . . . if . . . (2) the debtor's fixed, liquidated, unsecured debts . . . exceed $5,000,000."  11 U.S.C.A. § 1104(c)(2) (emphasis added).  Section 1104(c) gives the Court discretion in deciding the extent to which an Examiner should be appointed, if at all.

22.     As an initial matter, the Court need not resolve whether or not Section 1104(c)(2) mandates the appointment of an Examiner because the Examiner Motion has been revealed as little more than a litigation tactic by the largest secured creditor to block an investigation by the watchdog for unsecured creditors.  Courts have denied motions to appoint examiners where the application prejudiced other interested parties and/or served as a self-interested litigation tactic.  See In re Calpine Corp., No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 24, 2007), Hr'g Tr. at 72:23-73:19 [Dkt. No. 6467] (denying appointment of examiner although $5 million statutory threshold was met because belated motion "smack[ed] more of litigation leverage than the protection of the unrepresented public") (relevant excerpt attached hereto as **Exhibit A**); In re Bradlees Stores, Inc., 209 B.R. 36, 39 (Bankr. S.D.N.Y. 1997) (declining to resolve whether Section 1104(c)(2) was mandatory because movant had otherwise waived its right to seek examiner through delay and because "the request is nothing more than a litigation/negotiation tactic"); see also In re Innkeepers USA Trust, No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2010), Hr'g Tr. at 167:21-168:03 [Dkt. No. 546] ("As the request for the appointment of an examiner[] has increasingly been used as a litigation tactic by parties . . . courts have quite understandably and properly, I believe, pushed back and declined to appoint an examiner to join an otherwise crowded fray, in which the many combatants are well armed and highly motivated.") (relevant excerpt attached hereto as **Exhibit B**).  The Court should exercise its discretion to do the same here.

23.     But even if the Court were inclined to address the issue, it should reject as unreasonable a reading of Section 1104(c)(2) that denies all discretion to decline appointment of an examiner once the $5 million threshold is reached, even where the court believes such an appointment would be inappropriate, counterproductive, or would waste estate assets.  Many

bankruptcy courts – charged with overseeing Chapter 11 cases on a daily basis – have resisted

such a reading of the Code because doing so would contravene the policies underling Chapter 11.

See In re Innkeepers, No. 10-13800 (SCC), Hr'g Tr. at 167:11-170:22 (observing that growing

number of courts reject construction of Section 1104(c)(2) that mandates appointment of

Examiner simply because $5 million threshold was exceeded if other facts do not make such

appointment "appropriate," or have appointed Examiners with limited or no authority, although

court ultimately determined it could deny appointment of Examiner without deciding whether

Section 1104(c)(2) is mandatory); In re Spansion, Inc., 426 B.R. 114, 128 (Bankr. D. Del. 2010)

(rejecting mandatory interpretation of Section 1104(c)(2) and denying motion to appoint

examiner pursuant to Section 1104(c)(2) because "is appropriate" language afforded court

discretion to deny appointment that would result in waste and delay).[3]

24.       As these cases discuss, there is a split of authority on this question, with

some courts holding that Section 1104(c)(2) mandates appointment of an examiner whenever the

$5 million threshold is exceeded.  While there is no binding authority in the Second Circuit,

Berkshire cites the decision of one district judge in the Southern District who held that

appointment of an examiner to perform some type of investigation is mandatory in such

circumstances.  See In re Loral Space & Commc'ns, Ltd., No. 04-Civ-8645, 2004 WL 2979785,

at *4 (S.D.N.Y. Dec. 23, 2004).  But that decision required appointment of an examiner only for

---

[3]       See also In re Visteon Corp., No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010), Hr'g Tr. at 170:16-20
[Dkt. No. 3145] (denying appointment of examiner and finding "it would be an absurd result to find that in every
case where the financial criteria is met and a party-in-interest asks, the Court must appoint an examiner.  There has
to be an appropriate investigation that needs to be done") (relevant excerpt attached hereto as **Exhibit C**); In re Am.
Home Mortgage Holdings, Inc., No. 07-11047 (CSS) (Bankr. D. Del. Oct. 31, 2007), Hr'g Tr. at 76:09-12 [Dkt. No.
1997] (rejecting mandatory interpretation of Section 1104(c)(2) because financial threshold was only one part of
inquiry and "the other piece of the puzzle is that there has to be an investigation to perform that's appropriate," and
denying motion to appoint examiner) (relevant excerpt attached hereto as **Exhibit D**); In re Calpine Corp., Hr'g Tr.
at 72:23-73:19 (denying "mandatory" appointment of examiner where $5 million statutory threshold was arguably
met because appointment was otherwise inappropriate).

a limited purpose and did *not* hold that the mere request for an examiner requires a bankruptcy court to assign an Examiner a lead investigative role that would duplicate and interfere with the statutory authority of an official committee. To the contrary, the court held that it had a "duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings." Id. at *5. The Loral decision did not expressly address the potential discretion to find *no* investigation appropriate on a particular set of facts.[4]

25.     The Committee respectfully submits that Section 1104(c)(2) can and should be read to give the Court the discretion *not* to appoint an Examiner if doing so would not be appropriate, and indeed could harm the interests of creditors, on the facts of a particular case. The Committee demonstrates below there is no appropriate investigation for an Examiner to conduct at this point in these cases.

**B.      The Proposed Appointment of an Examiner is Not Appropriate Here, Given the Nature of the Committee and the Investigation that is Already Underway**

26.     Berkshire moves for the appointment of an Examiner under both subparagraphs of Section 1104(c) of the Bankruptcy Code, but fails by a wide margin to

---

[4]     Loral also misconstrues the relationship between the main text of Section 1104(c) and its subparagraphs (1) and (2). The Loral court "reviewed the two alternatives created by Section 1104(c) and concluded that unless paragraph (c)(2) requires appointment of an examiner in cases exceeding the debt threshold, 'it becomes indistinguishable' from paragraph (c)(1)." Id. at *4 (citing and quoting In re Revco D.S., Inc., 898 F.2d 498, 501 (6th Cir. 1990)). This is not a correct. Section 1104(c) creates two scenarios in which a court shall appoint an examiner: (1) in a small case, i.e., one at or below the $5 million threshold, where the court finds that the such an appointment is in the interests of all the stakeholders in the estate, or (2) in a large case, i.e., one above the $5 million threshold, where the complexity and stakes of the case may warrant an examiner. These two clauses are readily distinguishable because they contemplate different scenarios for which an examiner may be warranted, but each subparagraph is still subject to the requirements set forth in the main text of Section 1104(c), which require the court to determine that an examiner investigation "is appropriate." In re Am. Home Mortgage Holdings, Inc., No. 07-11047 (CSS), Hr'g Tr. at 75:08-76:12 (holding that Section 1104(c)(2) must be read in conjunction with the main text of Section 1104(c), including the "is appropriate" clause, and concluding therefore that appointment of an examiner under Section 1104(c)(2) is subject to court's determination that there is an appropriate investigation for an examiner to perform, regardless of whether the $5 million threshold is met).

demonstrate that complicating the Committee's work by empowering an as-yet-unnamed Examiner to conduct its own investigation would be appropriate for any reason.[5]

27.     The precise investigation that Berkshire claims is necessary, focused on the related party transactions and agreements implicated by the Debtors' proposed settlements (*see* Examiner Motion ¶¶ 22-25) is already underway, and Berkshire appears to concede that the Committee is already doing what needs to be done:  "[A]s the UCC's Rule 2004 Motion makes clear, there is wide agreement that an investigation is necessary into the billions of dollars of prepetition transactions between the Debtors, on the one hand, and Ally."  Id. ¶ 23.

28.     Berkshire simply prefers that the necessary investigation be conducted by a "neutral" rather than the Committee.  But this is an insufficient reason to launch a new investigation duplicative of one that has already started.  See In re Innkeepers, No. 10-13800 (SCC), Hr'g Tr. at 168:21-169:11 (finding that all of requested examination topics would be addressed by litigation or by "multiple layers of interested parties" and it would not be appropriate to have estate pay for third party to duplicate efforts of others as movant would have access to discovery on these topics and be able to "uncover and [marshal] additional facts on the issues of concern"); In re Sletteland, 260 B.R. at 672 (observing, in dicta, that examiner appeared unwarranted where official committee could appropriately perform investigation).

29.     In addition, for a variety of reasons, the Committee is the *most* appropriate party to conduct this investigation.  The Committee's central function is to serve as the statutory watchdog for the interests of all unsecured creditors.  See In re Bohack Corp., 607 F.2d 258, 262

---

[5]     Section 1104(c)(1) permits the appointment of an Examiner when a court finds it appropriate and that it is in the best interests of all of the debtor's various stakeholders, i.e., "creditors, any equity security holders, and other interests of the estate."  See In re Sletteland, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (denying appointment of examiner pursuant to Section 1104(c)(1) because movant "must show that the appointment is in the interests of all those with a stake in the estate, which in this case would include the Debtor" and that showing had not been made); In re Gliatech, Inc., 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004) (appointment of examiner must be in interests of all creditors and equity holders).  As discussed herein, Berkshire fails to make such a showing.

n.4 (2d Cir. 1979) ("[T]he committee owes a fiduciary duty to the creditors, and must guide its

actions so as to safeguard as much as possible the rights of minority as well as majority

creditors."); see also In re Advisory Comm. of Major Funding Corp., 109 F.3d 219, 224 (5th Cir.

1997) ("Creditors Committees have the responsibility to protect the interest of the creditors; in

essence, 'the function of a creditors' committee is to act as a watchdog on behalf of the larger

body of creditors which it represents.'") (quoting In re AKF Foods, Inc., 36 B.R. 288, 289

(Bankr. E.D.N.Y. 1984)).

        30.     Particularly in cases that turn on transactions between and among a debtor

and its affiliates, parents, and secured creditors, the official creditors committee may be the only

truly independent estate fiduciary, and as a result may be required to assume an adversarial or

investigative role to ensure that the interests of unsecured creditors are protected.[6]   And our

adversary system prefers that such investigations be conducted by motivated fiduciaries rather

than neutrals:  "[T]he appointment of a third party to conduct [an] investigation and to report to

the Court its conclusion is no substitute for the adversarial process extant in bankruptcy court

and the duty of the Court, after hearing the views of the opposing parties, to make a decision as

to what assets the debtor owns, what the value of those assets is, whether a settlement is

reasonable, in resolving a conflicting claim to those – to ownership of those assets."   In re

Washington Mut., Inc., No. 08-12229 (Bankr. D. Del. May 5, 2010) (Walrath, J.), Hr'g Tr. at

100:05-21 [Dkt. No. 3699] (denying appointment of examiner to scrutinize global settlement

---

[6]     See In re SPM Mfg. Corp., 984 F.2d 1305, 1316 (1st Cir. 1993) ("[A]n effective creditors' committee must sometimes be adversarial if it is to fulfill its role in a Chapter 11 case.") (citing In re Seaescape Cruises, Ltd., 131 B.R. 241, 243 (Bankr. S.D. Fla. 1991) ("A creditors' committee is not merely a conduit through which the debtor speaks to and negotiates with creditors generally.  An effective committee must necessarily be adversarial if it is to fulfill its role as 'watchdog' in a Chapter 11 case.") (citation omitted)); see also Harvey Miller, The Changing Face of Chapter 11:  A Reemergence of the Bankruptcy Judge as Producer, Director and Sometimes Star of the Reorganization Play, 69 AM. BANKR. L.J. 431, 449 (1995) ("The mandatory appointment of a creditors' committee was intended to provide dynamic tension with the debtor that would stimulate the reorganization process through effective and efficient oversight and negotiation.").

where official equity committee was capable of conducting investigation through Rule 2004) (relevant excerpt attached hereto as **Exhibit E**); see also In re Magna Entm't Corp., No. 09-10720 (Bankr. D. Del. May 4, 2009) (Walrath, J.), Hr'g Tr. at 82:13-83:25 [Dkt. No. 546] (adjourning motion to appoint examiner under Section 1104(c)(2) to investigate purchase agreement and debtor-in-possession financing agreement entered into between debtors and related parties and stating that "I am satisfied at this point that the committee is proceeding with that . . . [and] it is typical that it is the Creditors' Committee that performs such an investigation") (relevant excerpt attached hereto as **Exhibit F**).

31.    While Berkshire raises a vague, wholly unsubstantiated specter of potential conflict within the Committee, the very purpose of a creditors' committee is to represent the full gamut of interests among unsecured creditors in a case.  See, e.g., In re Dow Corning Corp., 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996) (creditors' committee required to adequately represent range of conflicting views of diverse creditors), rev'd on other grounds, 212 B.R. 258 (E.D. Mich. 1997); In re Sharon Steel Corp., 100 B.R. 767, 777-78 (W.D. Pa. 1989) (intra-creditor conflicts inevitable in complex cases but representation of diverse interests on one committee is norm).  Indeed, including creditors holding diverse views in a single committee is an important mechanism to foster consensus and serve Chapter 11's goal of a consensual plan process.  See, e.g., In re Hills Stores Co., 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992) (rejecting motion to appoint separate committee or subcommittee of subordinated bondholders because inclusion of different groups of creditors in one committee "may facilitate the consensual resolution of the conflicting priorities among the holders of unsecured claims and thereby facilitate the negotiation of a consensual plan"); see also Miller, The Changing Face of Chapter 11, supra ("By working

together as a single committee, differences among committee members are often resolved consensually.").

32.     There is no conflict here. The Committee members, selected by the U.S. Trustee, represent a typically wide range of interests arising from a variety of obligations, transactions, and relationships of the Debtors, including claims related to the Debtors' unsecured notes, the Debtors' securitization of mortgage loans, insurance agreements and policies relating to such securitizations, and alleged violations of federal and state laws. Recognizing that issues may arise in these cases on which members may have divergent interests, the Committee has bylaws in place to deal with actual conflicts that may emerge, including provisions for the recusal of any individual member if a conflict on an issue were to arise. But these issues are not implicated here, because all members of the Committee are indisputably united in their desire to maximize the pool of resources devoted to paying unsecured claims in these cases – the central issue presented by the current investigation.

33.     The ordinary consensus-building role of a creditors' committee is particularly indispensable here. The Debtors seek not just a highly accelerated exit from bankruptcy, but truly extraordinary relief on behalf of their parent entities: a global release from all liability, including a non-consensual third party release from all ResCap related claims. Such a release may be granted only in rare and extraordinary circumstances. See In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142-43 (2d Cir. 2005). At minimum, such a release will require overwhelming support from the various classes of creditors holding the released claims – a level of consensus that can be achieved, if at all, only with the enthusiastic support of the Committee, which in turn can be earned only through a process in which the Committee is at the forefront of investigating, analyzing, evaluating, and negotiating with respect to, among other

things, the nature and value of the claims to be released and the consideration being paid to the estates (and their creditors) for such releases.

34.     In this context, Berkshire's reasons for preferring an independent Examiner carry little weight.   First, Berkshire simply states that an objective investigator is inherently preferable to an investigation by a committee of interested unsecured creditors. Examiner Motion ¶¶ 5, 26-28.   Berkshire also hints at unspecified conflicts among the interests of the various members of the Committee in choosing whether to support the "Ally-backed plan" (which is distinct from a conflict over whether or how to pursue an investigation).  Id. ¶ 5.   In any event, a particular conflict is not even described, much less substantiated.

35.     Second, Berkshire contends that the investigation's findings should be public, and that the Committee may choose to keep its investigation private.  Id. ¶ 6.   However, the Committee has committed to explain in detail its reasons either for endorsing a particular global settlement or for opposing the Debtors' plan.

36.     Third, Berkshire suggests that the Committee will be "distracted" in conducting the investigation because it must also monitor the Debtors' business operations.  Id. Any such claim is frivolous.  The Committee has retained Kramer Levin as counsel.  Kramer Levin has deep experience both as bankruptcy counsel in large, complex cases and as litigation counsel in connection with internal investigations and a wide range of corporate, securities, and bankruptcy disputes, and it is backed up by two experienced financial advisors, Moelis and AlixPartners.  Monitoring the debtors' business and investigating potential claims are among the basic responsibilities of a creditors' committee in all large cases, and examiners are not routinely appointed.   See In re Refco Inc., 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006) ("Official committees have diverse duties:  they are the primary negotiating bodies for a chapter 11 plan;

they also provide supervision of the debtor and execute an oversight function; they may investigate the debtor's assets and affairs; and they may perform such other services as are in the interest of the unsecured creditor body.").  In short, there is no risk of "distraction."[7]

37.    Fourth, Berkshire contends that the Committee may "decide to compromise the investigation in favor of a settlement with the Debtors or Ally."  Examiner Motion ¶ 6.  Berkshire fails to explain why settlement is something to fear, when that is the very goal of the reorganization process.  Berkshire may have meant to state that the Committee may recommend settlement on inappropriate terms, but the diverse interests of the Committee members and their overarching desire to maximize the value assigned to pay unsecured creditors makes it unlikely, if not unthinkable, that the Committee would compromise its own investigation and settle the case to the material detriment of creditors.  And Berkshire should no longer be heard to raise such concerns on behalf of unsecured creditors.

38.    In any event, given the proposed plan's aggressive third party release provisions, confirmation is possible only with a broad, nearly unanimous consensus among creditors – underscoring the advantage of having a Committee at the helm of the investigation.  The current plan simply cannot be approved without a comprehensive investigation of the underlying transactions and agreements by the only fiduciary that represents the full range of affected creditors.

39.    Fifth, Berkshire observes that the Court might permit an Examiner special access to the Debtors' privileged materials.  Id. ¶ 7.  But leaving aside that Examiners do not

---

[7]    The only authority Berkshire cites for its conclusory "distraction" argument is woefully inapposite.  *See* Examiner Motion ¶ 28 (citing In re Keene Corp., 164 B.R. 844, 857 (Bankr. S.D.N.Y. 1994) (appointing examiner where motion was made before unsecured creditors committee was appointed, committee subsequently displayed a "'gung ho' attitude of prosecuting claims which may lack merit or be time-barred" and the court found "indications that the Committee has abdicated its responsibility to exercise independent judgment on behalf of the creditors")).

automatically obtain such access, the point is moot because the Debtors have stated that they intend to share with the Committee privileged materials similar to what an Examiner might receive pursuant to a court order.

40.     Sixth, Berkshire declares that there is no harm in appointing an Examiner because "neither the UCC nor any other party in interest has invested significant time or resources in investigating the Debtors. . . .  If there is a circumstance and time to appoint an examiner, it is here and now." Id. ¶ 29.  But that is simply not true, and authorizing a dueling investigation would inevitably create confusion and delay, to the detriment of all unsecured creditors.

41.     The Committee *has* invested significant time and resources in gearing up this investigation on the tight timeline mandated by the Debtors.  The Committee was appointed several weeks ago.   During that period, the Committee retained two experienced financial advisors, which have spent considerable time analyzing and evaluating the transactions and agreements at issue.  The Committee, the Debtors, and other parties in interest negotiated the terms of a proposed Rule 2004 order, the Court entered the order without the need for a hearing, subpoenas have been issued, and negotiations have commenced with counsel for the Debtors and AFI concerning the subpoenas.  In addition, a document data room has been established and the actual production and review of documents has already begun.  Kramer Levin litigation attorneys have also spent considerable time meeting with the Debtors' counsel and examining the transactions, agreements, and legal issues surrounding these Chapter 11 Cases.  In other words, the Committee is primed to delve into a factual analysis and review of the underlying documents and to pursue the timely investigation necessary for these cases to be successful.   This

momentum would be lost and the process materially impaired if an Examiner were authorized to launch its own competing investigation.

### C. The Examiner Motion Should be Denied, Held in Abeyance, or Granted with a Limited Scope

42.    For the reasons explained above, the Examiner Motion is an inappropriate litigation tactic and, in any event, there is no "appropriate" investigation for an Examiner to conduct at this time in these cases.  The Court should thus exercise its discretion to deny the Examiner Motion.  In the alternative, the Court should hold the motion in abeyance and revisit the need for an Examiner based on an assessment of the progress of the Committee's investigation at a later point in the process.  See In re Magna Entm't Corp., No. 09-10720, Hr'g Tr. at 82:13-83:25 (adjourning motion to appoint examiner under Section 1104(c)(2) because facts presented did not warrant appointment at that time).

43.    In the event that the Court determines that appointment of an Examiner is mandatory, it need not accept Berkshire's demand that the Examiner be assigned a broad investigative mandate.  If an Examiner must be appointed, the Court has discretion to make the appointment now but determine later if the Examiner should be assigned any specific duties.  See, e.g., In re Owens Corning, No. 00-3837 (JKF) (Bankr. W.D. Pa. Apr. 8, 2003), Hr'g Tr. at 7:05-7:11, 27:24-28:25 [Dkt. No. 8135] (assuming, but expressing doubt over whether, Section 1104(c)(2) mandates the appointment of an examiner, and appointing examiner, but finding that it was not appropriate, at that time, to have examiner do anything) (relevant excerpt attached hereto as **Exhibit G**).

44.    At most, any Examiner appointed should be assigned limited duties that will not interfere with the Committee's charge to investigate the Debtors' transactions and proposed settlements.  The Court may appoint an Examiner to perform specific appropriate tasks

while the principal investigative duties remain with the Committee.  <u>See generally</u> <u>Revco</u>, 898

F.2d at 501 (holding that under previous Section 1104(b)(2), now Section 1104(c)(2), "the

bankruptcy court retains broad discretion to direct the examiner's investigation, including its

nature, extent, and duration").   There is no need, and certainly no statutory compulsion, to

appoint an Examiner with a broad mandate that would disrupt the widely supported investigation

already underway.

## <u>CONCLUSION</u>

45.     For all the reasons set forth above, the Committee respectfully submits

that the Examiner Motion should be denied or held in abeyance, or, in the alternative, that the

scope of any Examiner's role be appropriately limited given the circumstances of this case.

Dated:    New York, New York
          June 11, 2012

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP

                              /s/  Kenneth H. Eckstein
                              Kenneth H. Eckstein
                              Barry H. Berke
                              1177 Avenue of the Americas
                              New York, New York 10036
                              Telephone: (212) 715-9100
                              Facsimile: (212) 715-8000
                              *Proposed Counsel for the Official*
                              *Committee of Unsecured Creditors*

**<u>Exhibit A</u>**

1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------x

4        In the Matter of:

5                                Case No.

                                 05-60200

6      CALPINE CORPORATION, et al.,

7                    Debtors.

8    --------------------------------x

9                        October 24, 2007

                         United States Custom House

10                       One Bowling Green

                         New York, New York 10004

11

12

13

                 Hearing Pursuant to Kirkland and Ellis LLP

14

     Notice of Agenda of Matters Scheduled for Hearing.

15

16

17

18

     B E F O R E:

19

20            HON. BURTON R. LIFLAND,

21                    U.S. Bankruptcy Judge

22

23

24

25

70

1        Most importantly, M&T and the other CalGen

2   Lenders, who are highly sophisticated parties have been

3   zealously represented in these cases by highly

4   sophisticated professional who have demonstrated that they

5   are more than capable of protecting their economic

6   interests and are fully participating in these cases as

7   evidenced by their recent objections to the Disclosure

8   Statement, requests for discovery regarding substantive

9   consolidation, appeal of the CalGen Order and the Chapter

10  11 trustee motion among others.

11       Lastly, given the strong interests of the

12  Debtors and all of their constituencies in bringing these

13  cases to a close without duplication of effort and

14  unnecessary expense, the request for an additional

15  committee at this late stage of the case is denied.

16       With respect to the request for an

17  examiner.  Section 1104(c)(2) of the Bankruptcy Code

18  mandates the appointment of an examiner upon the request of

19  a party in interest "at any time before confirmation of a

20  plan," if a trustee is not appointed and "the debtor's

21  fixed, liquidated, unsecured debts, other than debts for

22  goods, services, or taxes, or owing to an insider, exceed

23  five million dollars."  11 U.S.C. 1104(c)(2).  The

24  legislative history of 1104(c)(2) demonstrates Congress'

25  desire to protect stockholders of public companies through

71

1    the mechanism of an independent functionary.  See Loral

2    Stockholders Protective Committee against Loral Space and

3    Communications Ltd. (In re Loral Space and Communications,

4    Ltd.), 2004 Westlaw 2979785, at footnote 4 (S.D.N.Y. Dec.

5    23, 2004.)  [Here the CalGen subsidiaries are privately

6    owned.]

7                    First, the parties dispute whether the

8    CalGen estates have the threshold amount requiring the

9    appointment of an examiner.  Additionally, the Debtors and

10   Creditors' Committee urge the Court to find that M&T has

11   waived its right to request the appointment of an examiner.

12   Alternatively, the Debtors assert that the examiner's

13   investigation should be delayed until after the

14   confirmation hearing.

15                    M&T asserts that the dollar amount of

16   unsecured debt is met because the damages claim they were

17   awarded by this Court - claims that they are contending on

18   appeal are actually secured claims.  Other than M&T's

19   claims, the only CalGen estate that has unsecured claims

20   exceeding five million dollars is Columbia Energy, LLC,

21   however, those claims are related to the rejection of

22   service contracts and do not qualify under Section

23   1104(c)(2).  See GHR Companies, 43 B.R. at 176, (discussing

24   the types of debt to be applied in determining whether the

25   five million dollar threshold is met, i.e. unsecured

72

1   claims).  Accordingly, it is far from clear to this Court

2   whether the CalGen unsecured debt meets the threshold

3   amount for mandatory appointment.  Indeed it appears not.

4                 However, even if the fixed, unsecured debt

5   threshold were met, M&T has waived its right to request an

6   examiner by waiting until now, almost two years after the

7   petition date, more than seven months after Calpine first

8   disclosed the possibility of substantive consolidation in

9   February, and less than two months before the confirmation

10  hearings.  M&T has been active in these cases since

11  February, filing pleadings relating to discovery disputes,

12  the confirmation hearing schedule, an objection to the

13  refinancing motion and the disclosure statement motion,

14  joinder to a motion for appointment of a Chapter 11

15  trustee, and joinder to a motion for a stay pending appeal

16  of the order approving the disclosure statement.  Yet M&T

17  waited until these late stages of the proceedings to

18  request an examiner basing its request on the same

19  complaints that M&T had to the disclosure statement.  M&T's

20  contention that its motion is based on the "recent"

21  determination by this Court of the damages relating to the

22  CalGen Secured Debt is disingenuous as that determination

23  was made by this Court eight months ago.  Practically

24  speaking, M&T seeks an examiner to perform the type of

25  discovery that M&T believes it needs to oppose confirmation

73

1    and is already in the midst of.  At this stage of these

2    cases, that request is simply too late to be of any real

3    value to any party.  Moreover, the appointment of an

4    examiner and the attendant delay and expense could

5    jeopardize all the Debtors' cases.  See In re Schepps Food

6    Stores, Inc., 148 B.R. 27, and 30 (relying on laches); in

7    re Bradlee Stores, Inc. 209 B.R. 36, 38 (Bankr. S.D.N.Y.

8    1997) (also relying on laches).  As noted by one

9    commentator, "the mandatory nature of [Section 1104(c)] was

10   not intended and should not be relied upon to permit

11   blatant interference with the Chapter 11 case or the plan

12   confirmation process...  Nor should the mandatory nature of

13   the provision be used to allow one group of creditors or

14   interest holders to obtain a protagonist supporting its

15   litigation position under the guise of investigation."

16   Colliers on Bankruptcy 1104.03[2][b]

17                M&T's ill-timed motion smacks more of

18   litigation leverage than the protection of the

19   unrepresented public as the statute intended.

20                Accordingly for all the reasons I just set

21   forth herein and in conjunction with the Committee Motion,

22   the Motion for an Examiner is denied.

23                It is so ordered.

24                MR. SELIGMAN:  Your Honor, the next matters

25   on the agenda, which I'll take collectively, matters

**<u>Exhibit B</u>**

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 10-13800-scc

5    - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    INNKEEPERS USA TRUST, et al.,

9

10          Debtors.

11

12    - - - - - - - - - - - - - - - - - - -x

13

14                U.S. Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                September 30, 2010

19                10:05 AM

20

21

22    B E F O R E:

23    HON. SHELLEY C. CHAPMAN

24    U.S. BANKRUPTCY JUDGE

25

12-12020-mg    Doc 397    Filed 06/11/12    Entered 06/11/12 15:57:29    Main Document
12-13000-scc    Doc 540    Filed 10/04/12    Entered 10/04/12 15:57:29    Main Document
Pg 466 of 980
In re: RESIDENTIAL CAPITAL USA TRUST, et al.

- 166 -

 1    25 to 4:00, I think I'd like to try to give you a ruling today,

 2    in the interest of allowing this case to move forward.

 3        So I'm going to want to take a break, but before I

 4    take a break, and before we get to a ruling and the Jefferies'

 5    application, I'd like to speak to some of you in chambers.  And

 6    I'd like to limit it to, you know, the usual suspects without

 7    clients, counsel, Mr. Schwartzberg, I think you know who you

 8    are.  So if we could -- it's 25 to 4:00, let's do this and then

 9    let's say we're going to come back at 4:30.  All right.  Thank

10    you.

11    (Recessed at 3:34 p.m.; reconvened at 4:34 p.m.)

12        THE COURT:  Okay.  All right.  Let me give you my

13    ruling on the examiner and once again, I'm moving quickly in

14    the interest of getting a decision to you, and if there needs

15    to be an appeal, reserving my right to write a more fulsome

16    opinion.

17        Section 1104(c) of Title XI of the United States Code

18    provides two independent grounds upon which a party-in-interest

19    may move for the appointment of an examiner.  Specifically, the

20    statute provides that quote, the Court shall order the

21    appointment of an examiner to conduct such an investigation of

22    the debtor, as is appropriate if either one, the Court in its

23    discretion decides that such appointment is in the interests of

24    the estate, and all of its stakeholders; or two, the debtor's

25    fixed liquidated unsecured debts, other than for goods,

- 167 -

1    services, taxes, or owing to an insider, exceed five million

2    dollars.

3            Authorities have been submitted to me and arguments

4    made in the various papers filed by the ad hoc committee and

5    the objectors, on the question of whether an appointment of an

6    examiner is mandatory upon the five million dollar threshold

7    being exceeded.

8            In this district, of course, there is the Loral

9    decision which so held in 2004.  The Sixth Circuit came to a

10   similar conclusion in Refco, as did the Court in UAL.

11           A growing number of courts have attempted to reconcile

12   the mandatory language of the statute, that is the word shall,

13   with the words that follow shortly thereafter, quote, to

14   conduct such examination as is appropriate, end quote, and have

15   appointed examiners with extremely limited or in some

16   instances, no duties in cases in which the five million dollar

17   threshold is met.

18           And a number of courts have entirely declined to find

19   that an appointment in such instances is mandatory, and denied

20   requests to appoint examiners.

21           As the request for the appointment of an examiner, has

22   increasingly been used as a litigation tactic by parties

23   unhappy with the status or conduct of a case, and unhappy at

24   the prospect of continuing to fund the prosecution of their

25   particular issues, courts have quite understandably and

12-12020-mg   Doc 297   Filed 06/11/12   Entered 06/11/12 15:57:29   Main Document
12-13000-scc   Doc 546   Filed 10/04/12   Entered IN RE: PSA TRUST, et al.   Main Document
Pg 368 of 980

- 168 -

1    properly, I believe, pushed back and declined to appoint an

2    examiner to join an otherwise crowded fray, in which the many

3    combatants are well armed and highly motivated.

4           Based on the record before me, I find that there is no

5    basis to appoint an examiner under either 1104(c)(1) or

6    1104(c)(2).  And thus, I need not reach the question of whether

7    and to what extent Section 1104(c) is mandatory in nature.

8           First, with respect to 1104(c)(1), Section 1104(c)(1)

9    of the Code provides that a bankruptcy court shall order the

10   appointment of an examiner, to conduct such an investigation of

11   the debtor, as is appropriate, including an investigation of

12   any allegations of fraud, dishonesty, incompetence, misconduct,

13   mismanagement, or irregularity in the management of the affairs

14   of the debtor of or by current or former management of the

15   debtor if such appointment is in the interest of creditors, any

16   equity security holders, and other interest of the estate.

17          As a result of Section 1104(c)(1)'s use of the word

18   and, an examiner should only be appointed under that

19   subsection, if doing so would serve the interest of all the

20   debtor's stakeholders.

21          Because all of the requested examination topics

22   either, one, have been addressed in the litigation surrounding

23   the motion to approve the PSA, or two, will be addressed by

24   multiple layers of interested parties, including without

25   limitation, as part of the committee's investigation, or in the

11-12020-mg    Doc 297    Filed 06/11/12    Entered 06/11/12 15:57:29    Main Document
11-13000-scc    Doc 546    Filed 10/04/12    Entered 10/04/12 15:57:39    Main Document
In re KODAK USA TRUST, et al.
Pg 369 of 980
Pg 37 of 79

- 169 -

1    plan process, it is not in the best interests of all of the

2    debtor's stakeholders to appoint, and have the estate pay for a

3    third party to duplicate the efforts of others.

4         Even a cursory examination of the topics listed in the

5    ad hoc committee's motion, which list was not substantially

6    revised, post PSA, reveals that one or more parties has each

7    and every one of these topics on its dance card.  And the ad

8    hoc preferreds will have access to discovery in these cases, as

9    they proceed, and thus will have the ability to uncover and

10   martial additional facts on the issues of concern to the

11   preferreds.

12        These same issues are, of course, of tremendous

13   concern to the stakeholders throughout the capital structure of

14   the debtors and to the Court.  It is certainly my expectation

15   that at some point, the fruits of the committee's investigation

16   will be shared with the parties and the Court.

17        Second, with respect to Section 1104(c)(2), under the

18   plain language of the statute, the party moving for the

19   appointment of an examiner must at a minimum, aggregate the

20   fixed and liquidated unsecured debts, other than for goods,

21   services, taxes, or owing to an insider, and demonstrate that

22   the sum thereof is greater than five million dollars.

23        As the United States Trustee noted in her objection,

24   although the ad hoc committee declares that it is quote,

25   reasonable to assume, end quote, that the five million dollar

- 170 -

1    threshold is met.  Additional evidence is needed in order to

2    make a determination of the issue.

3        The only evidence in the record is the uncontroverted

4    statement in the declaration of the debtor's CFO, Nathan Cook

5    at paragraph four that quote, the debtor's fixed liquidated

6    unsecured debts other than debts for good, services, or taxes

7    do not exceed five million dollars.

8        In reply, the ad hoc committee adduces no evidence,

9    but instead points to the secured lenders' alleged deficiency

10   claims or the fact that when issued, the mortgage debt was

11   fixed and liquidated.  But neither characterization of such

12   debt works for purposes of the statute.

13       Deficiency claims, while definition unsecured, are not

14   fixed and liquidated in this case at this juncture, for the

15   purposes of this statute.  I find the language of the statute

16   clear and unambiguous on this point.

17       Accordingly, I am denying the motion of the ad hoc

18   committee for the appointment of an examiner, but I will deny

19   it without prejudice.  If the ad hocs at some point, and what

20   is shaping up to be a highly contentious process uncover

21   evidence of five million dollars of fixed liquidated unsecured

22   debt, they can take another run at it.

23       Moreover, as the plan process unfolds, if there

24   develop facts and circumstances that warrant a second look at

25   whether an appointment of an examiner under 1104(c)(1) is

- 171 -

1    warranted, nothing will preclude the filing of an appropriate

2    motion.

3              Okay.  As I said, if a more fulsome written opinion is

4    needed, I'll be happy to provide one.

5              With that, I think we're left with Jefferies.

6              MR. MARINUZZI:  Thank you, Your Honor.  For the record

7    again, Lorenzo Marinuzzi from Morrison & Foerster.

8              Your Honor, the last item on the agenda is the

9    committee's application to retain Jefferies as their financial

10    advisor and investment banker in this bankruptcy case.

11              I assume that the Court has read the papers, read the

12    objections --

13              THE COURT:  Yes.

14              MR. MARINUZZI:  -- read our supplemental submissions.

15    I did want to bring to the Court's attention that there have

16    been some changes proposed for the retention of Jefferies.

17              In particular, under the terms of their current

18    engagement letter that was filed with the application, they

19    were seeking a monthly fee of 125,000 dollars, plus a success

20    fee of 750,000 dollars.

21              They have decided that they will not today seek a

22    success fee.  That will not be part of the retention that we'd

23    ask the Court to approve today.  What they would like to do,

24    and what the order, assuming Your Honor is okay with this

25    retention, would provide is that Jefferies and the committee

**<u>Exhibit C</u>**

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 09-11786-CSS

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


VISTEON CORPORATION, et al.



            Debtors.



- - - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            824 North Market Street

            5th Floor

            Wilmington, Delaware


            May 12, 2010

            10:05 AM



B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  LESLIE MURIN

169

1    this phrase -- some judge did -- but this really is "crying

2    examiner in a crowded room", and it should be denied.  Thanks,

3    Your Honor.

4         THE COURT:  All right, anyone else?  Mr. Bienenstock,

5    reply?

6         MR. BIENENSTOCK:  Yes, Your Honor.  I'm delighted

7    with what I heard, because the creditors' committee apparently

8    feels that they can rewrite the Bankruptcy Code and argue to

9    Your Honor that because the equity holders have competent

10   counsel and financial advisors, they said, that's a defense to

11   an examiner motion.  No, that's a defense, perhaps, to a motion

12   to establish a statutory committee.  The Code doesn't have any

13   balancing test, any defense that if parties are adequately

14   represented, that that's a defense to the appointment of an

15   examiner.

16        Similarly, Mr. Willett has asked the Court, what will

17   the world think.  What will others think?  It doesn't matter.

18   The Code doesn't say appoint an examiner when there's five

19   million dollars of debt unless other people will think bad

20   thoughts.  We have a right.  I'm tickled pink that my

21   adversaries have felt the need to construct out of the clear

22   blue sky defenses that don't exist.  And I think what that

23   tells the Court is that we're entitled to an examiner to

24   investigate the things we asked for, and we hope the Court will

25   grant them.

170

1          THE COURT:  Thank you.  Excuse me.  All right, the

2     issue, of course, before the Court, is whether to appoint an

3     examiner, pursuant to the motion in front of the Court.  And

4     the statute which is applicable, of course, is 1104(c).  "If

5     the Court does not order the appointment of a trustee," which I

6     have not, "then at any time before the confirmation ... on

7     request of a party in interest ... and after notice and a

8     hearing, the court shall order the appointment of an examiner

9     to conduct such an investigation of the debtor as is

10    appropriate, including" and then it goes on, "if such

11    appointment is in the interests of creditors" equity holders,

12    et cetera, "or the debtor's fixed, liquidated, unsecured debts

13    ... exceed $5,000,000."  It's a troubling -- well, troubling,

14    it's a somewhat ambiguous statute notwithstanding the fact that

15    it says "shall", because it immediately limits the scope of

16    that "shall".  I don't think it's true, and I think it would be

17    an absurd result to find that in every case where the financial

18    criteria is met and a party-in-interest asks, the Court must

19    appoint an examiner.  There has to be an appropriate

20    investigation that needs to be done.

21          Now, it's -- until someone does an investigation, of

22    course, you don't know whether an investigation really needed

23    to be done or not.  But at some point there has to be a level

24    of smoke, if you will -- not a lot but more than none, more

25    than just a whiff of smoke -- but some sort of indication, some

1    sort of allegation or facts that make the Court think in a

2    whole that, hmm, somebody needs to look into this independently

3    and tell the Court what's going on.  It's easy in Lehman or

4    Revco to figure out that somebody's got to figure this out.

5    But not every case that has over five million dollars of

6    nontrade needs an examiner.

7         This case does not need an examiner.  We are in a

8    good old fashioned brawl, all right?  We all know it.  And the

9    prize is an automobile company -- excuse me, a parts -- well,

10   an automobile manufacturer of parts -- with a nice healthy

11   client.  Kind of a rarity, but it's nice to have.  And we're

12   going to fight.  There's going to be a fight.  Well, let's get

13   to it.  And I don't think there's any reason to keep tiptoeing

14   around it.  Equity thinks they're in the money.  They're going

15   to come to confirmation and they're going to try to prove it.

16   Mr. Willett's clients have an issue with what's on the table.

17   They're going to come in and litigate it.  The bondholders like

18   what's on the table or support it; they're going to come in and

19   litigate it.  There are no hidden motivations, here.  There are

20   hidden agendas, here.  I think this is just a good old

21   fashioned fight over a debtor that has some value, if it's

22   restructured.  It's a good company with a bad balance sheet.

23   That's what it looks like.  Maybe that's wrong.  Maybe it's a

24   good company with a good balance sheet.  But that's what

25   confirmation is going to tell us.

172

1          To say that, well, look, Judge, you know, they say

2     they don't want more than 400 million dollars in debt, well,

3     all right, that's their business judgment.  When we get to

4     confirmation and we're looking at value and part of the value

5     is a debt analysis or a debt carry analysis and the absolute --

6     applicability of the absolute priority rule, we'll hear about

7     it, and we'll figure out whether that makes sense or not.  We

8     don't need an examiner to look into that.

9          Has the debtor not fulfilled its fiduciary duties by

10     not taking enough attention to what the value is to equity,

11     first of all, I think the Gheewalla decision and those other

12     cases, it's important to remember that that arises in the

13     context of a defense, of a shareholder suit based on a breach

14     of fiduciary duty by the board when it takes actions of an

15     insolvent corporation that are for the benefit of creditors.

16     And the Court says that's not a breach of fiduciary duty of

17     care or loyalty to the corporation or its shareholders.  It's a

18     very narrow focus.  Is it true that insolvent debtors owe a

19     fiduciary duty to their creditors?  I think it becomes a bit of

20     a "how many angels are there on the head of a pin".  I think

21     the reality is that the board of directors of a company in this

22     kind of context owes a fiduciary duty to the company, which is

23     probably the best way to say it, to maximize value.  And that

24     means reorganization value in this context, and that can take

25     into account debt load.

173

1           So again, and I'm probably rambling more than I

2      should because it's late, but I just don't see any appropriate

3      investigation in this case for which we need the time and

4      expense of an examiner.  We don't need an ad hoc -- we don't

5      need an official committee of equity holders.  We don't need,

6      frankly, continuing status reports on a plan.  We need to get

7      busy and get it done and roll the dice and see what happens.

8      That's just me.  Probably talking more than I should.

9           All right.  Motion denied.  Debtors submit an order,

10     please.

11          MR. KIESELSTEIN:  We will do so, Your Honor.  Thank

12     you.  One last housekeeping item, Your Honor, relates to the

13     19th.  We do have a motion to shorten notice on file with

14     regard to our motion to approve the ECA, the plan support

15     agreement, and the rights offering procedures.  Again, at least

16     in our view, and I know we're imposing a burden on the Court,

17     it doesn't make sense to decouple that from the disclosure

18     statement hearing itself, given that those are the foundation

19     documents associated with our toggle plan of disclosure

20     statement.  So if the Court can -- if I can impose on the Court

21     at this late hour for guidance in that regard, I think it would

22     help all parties prepare for the next few days or week.

23          THE COURT:  Well, I have the motion.  I just hadn't

24     decided it yet.  Well, does anyone wish to be heard on that?

25     Mr. Willett?

174

1          MR. WILLETT:  Your Honor, I think I should just say,

2     I don't expect a complicated disclosure statement hearing.  But

3     I do think -- and I don't expect evidence -- but I do think you

4     will find that the documents underlying this motion to approve

5     plan support agreement and equity commitment agreement, they

6     are difficult, they are complex, and it will take a while to

7     unpack the problems.  We'll do it in argument, and we'll start

8     at 4 in the afternoon if you want, and we'll do it as soon as

9     you want.  But I just want you to know, it's not a quick, easy,

10    cut-and-dried legal argument.  Thanks.

11          THE COURT:  Mr. Bienenstock?

12          MR. BIENENSTOCK:  Your Honor, in the same vein, one

13    of the elements of that agreement is that fifteen million

14    dollars, approximately, gets paid out before the confirmation

15    hearing even starts.  It's like, you're, from my point of view,

16    the Court's being asked to confirm a plan, a little bit, before

17    confirmation hearing.  I agree with Mr. Willett; the plan

18    support agreement is -- or, the equity commitment agreement and

19    the plan support agreement are complicated.  They're going to

20    take some time.  I don't anticipate witnesses, but it's a lot

21    of issues --

22          THE COURT:  Yup.

23          MR. BIENENSTOCK:  -- and a lot of time.

24          THE COURT:  Having just told you people to get busy,

25    would it be hypocritical to say that's too busy?  Go ahead.

**<u>Exhibit D</u>**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .   Chapter 11
                                          .
AMERICAN HOME MORTGAGE                    .   Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware                .   (Jointly Administered)
corporation, *et al.*,                    .
                                          .   Oct. 31, 2007 (10:09 a.m.)
              Debtors.                    .   (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1   budget.  Her view was that if the Code required the

2   appointment of an examiner, she would appoint one and have

3   the examiner ready to go if an issue arose later in the case

4   that required an examination, but because there was no

5   examination required at that time, she would merely put the

6   examiner in place to satisfy some reading of 1004©)(2) and

7   keep that examiner in place until or unless an issue arose in

8   the case that required some examination.  So, we've seen

9   through the treatises and case law and largely this is

10  unreported in how courts have dealt with this, courts

11  applying a practical approach to 1104©)(2) because again,

12  Your Honor, burdening this estate with an examiner where

13  there is no apparent need or no established need for an

14  examination would simply waste the creditors' money.  So with

15  that, we would ask that the Court deny the request.

16      THE COURT: All right.  Thank you, Mr. Brady.  You

17  read from the elements of <u>Colliers</u> that I have actually up

18  here on the bench and marked, and I think it's important -

19  Clearly, and I'm dealing here with the narrow issue of

20  1104©)(2) because I don't think the appointment of an

21  examiner would be in the best interest of the creditors or

22  the equity security holders or the interests of the estate.

23  So, I would deny, as I said earlier, I would deny the motion

24  for appointment of an examiner under ©)(1), and I'd like to

25  pick up before I sort of speak more on, I think, Mr. Brady's

```
 1   comment earlier in connection with the trustee motion and I
 2   think it's equally applicable to the examiner motion, I
 3   didn't see any real factual allegations contained in the
 4   motion when it came to these issues.  I felt that the movants
 5   basically parroted the language of the statute and sort of
 6   said, Because I just said what the statute says, a trustee or
 7   an examiner should be appointed, and obviously, you need to
 8   do more than that.  The problem of course is that shall means
 9   shall, and the courts require, when I see something like that
10   it obviously means the court's required to appoint an
11   examiner if the criteria are met.  I think it's important to
12   look at ©)(2) though as - not on its own, but as it relates
13   to the rest of the sentence.  So, the Court shall order the
14   appointment of an examiner to conduct such an investigation
15   of the debtor as is appropriate if the financial criteria are
16   met.  The problem isn't so much shall, it's that if and
17   whether if means, you know, if the financial criteria are met
18   you have to appoint an examiner.  Well, if you read it that
19   way, the first part of the sentence doesn't make any sense.
20   So I think you have to read it as a whole, and I think - I
21   have tons of respect for Judge Fitzgerald, but I think, you
22   know, appointing an examiner and then giving that examiner no
23   budget and no duties is tantamount to not appointing an
24   examiner, and having one ready to go, I mean, the process of
25   appointing an examiner is not particularly onerous, it
```

1    doesn't take a ton of time.  So - and I'm sensitive to this

2    issue and I know the Office of the United States Trustee is

3    sensitive, and I understand their position in connection with

4    shall meaning shall, and I think that's true, but I think in

5    order for - I would draw a bit of a distinction between what

6    Judge Walsh and Judge Balick have appeared to rule which is

7    simply that it's a best interest test.  I don't think that's

8    correct.  The best interest is in ©)(1).  It's not in ©)(2).

9    I think the financial criteria are important, and obviously,

10   they're met in this case, but that's only one piece of the

11   puzzle, and the other piece of the puzzle is that there has

12   to be an investigation to perform that's appropriate.  I

13   think the cases cited in the Colliers treatise discuss that.

14   I think that's a more nuance approach than sort of saying it

15   is what it is, and if you cry "examiner" in a crowded case,

16   you get one.  In this case, reading the motion carefully, I

17   really didn't see a request for any investigation.  There was

18   a complaint about practices.  A 2004 request for information

19   about individual loan files that we've already discussed, but

20   no real articulation of what it was that the movants wanted

21   to be investigated by an examiner, and even if one were to

22   sort of assume, okay, they want someone to examine the

23   debtors' practices in connection with loan origination and

24   servicing that may be violations of state or federal law, I

25   don't think that at this time giving someone sort of carte

1  blanche to look into that issue will be appropriate.  Again,

2  the Committee is extremely involved in this case.  There are

3  ongoing investigations, possibly by other governmental

4  entities.  There's obviously a lot of issues going on in

5  Congress right now in connection with these types of

6  practices that allegedly the debtor participated in, so I'm

7  not - I don't think in this case there would be anything to

8  be gained by appointing an examiner and giving that examiner

9  a budget and saying, I'd like you to investigate the debtors'

10  loan origination and servicing policies in connection with

11  whether it may have violated state or federal law.  I think

12  that's asking for a $20 million report, and I'm not sure what

13  it would accomplish.  So, with regard to the temporal

14  requirement, again, I'm not - I understand there are those

15  cases.  I think it would be more appropriate to deny the

16  motion without prejudice than to sort of say, Okay, I'm

17  granting the motion, but I'm not at this point going to

18  appoint an examiner.  Again, I think that's just tantamount

19  to denying the motion.  So, I'm going to do that.  I'm going

20  to deny the motion without prejudice to be brought again if

21  new facts arise or if the status of the case changes.  And

22  just an aside, I mean, I don't know what this case ultimately

23  ends up with, whether we end up in with a liquidating plan,

24  whether we convert to 7.  I mean, I know - I'm sure there are

25  discussions that I'm very happy to not be participating in

1    that may be focused on that, but my instincts tell me that to

2    the extent there's some real issues out here, that they are

3    going to be investigated by somebody in the future, and if

4    turns out that that's not the case, I'm certainly open to

5    hearing someone ask me to appoint someone to do that on

6    behalf of the debtors' estate at the appropriate time.  All

7    right?  Are there any other issues?  I'm going to - So, I

8    think we've addressed the issues raised by - Oh, there was

9    the issue of the injunction.  I think that's very easily

10   dealt with.  You can't get an injunction by filing a motion.

11   I've said it many times before.  You have to file an

12   adversary proceeding under Rule 7001, and you need to meet

13   the criteria to get an injunction and you have to support it

14   by evidence, and without that, I'll deny that.  So I'm going

15   to deny - For the foregoing reasons, I'm going to deny all

16   three motions, and I'd ask the debtors to submit a form of

17   order, please, under certification of counsel.

18        MR. BRADY: Your Honor, we will prepare forms of

19   order for each motion.

20        THE COURT: I think that turns me to cash

21   collateral.  I don't have those papers.  I know they came

22   over yesterday in connection with the motion to shorten,

23   which I granted, but I didn't actually save them, so -

24        MR. WAITE: Your Honor, I can hand up - I have a

25   copy of the motion and a copy of the order; is that helpful

**<u>Exhibit E</u>**

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 08-12229 (MFW)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


WASHINGTON MUTUAL, INC., et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          824 North Market Street

          Wilmington, Delaware


          May 5, 2010

          10:30 AM


B E F O R E:

HON. MARY F. WALRATH

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:   BRANDON MCCARTHY

96

1          THE COURT:  Good afternoon.

2          MR. CLARKE:  John Clarke from DLA Piper, for the FDIC

3     receiver.

4          As the Court is aware, we haven't taken a position

5     either for or against this motion.  I just needed to respond to

6     Mr. Rosen's comments.  I would refer back to the comments that

7     I made at the omnibus hearing on April 6 as to the status.  We

8     don't have any changed status to report from those comments,

9     and the record stands for itself as to what I said then.  Thank

10    you, Your Honor.

11         THE COURT:  You want to remind us what you said then?

12         MR. CLARKE:  We said that there were still significant

13    open issues with the parties to the proposed settlement; that

14    we continued to have discussions with those parties; that we

15    had not yet resolved those issues; and there are other

16    conditions to the settlement that still haven't been satisfied,

17    but we're working with the goal of trying to achieve all that

18    and get the proposed settlement agreed to and presented to this

19    Court.

20         THE COURT:  Thank you.

21         MR. CLARKE:  Thank you.

22         THE COURT:  Well, let me make my ruling.  First, a

23    preliminary issue.  The filing of a motion to appoint a trustee

24    will not eliminate the need for the Court to address the equity

25    committee's motion to appoint an examiner.  I made that point

1     the other day.  And it could certainly lead to strategic

2     filings of motions for appointment of trustees just to defeat a

3     motion for appointment of an examiner.  So that is of no moment

4     to my ruling on this motion.

5          As I have recently ruled orally, so you can't really

6     rely on it, but I will follow myself.  I do believe that

7     1104(c)(2) gives the Court some discretion, even if the debt

8     level is reached, and the discretion is that the Court has the

9     discretion to determine what appropriate investigation of the

10    debtor should occur and that, if the Court determines that

11    there's no appropriate investigation that needs to be

12    conducted, the Court has the discretion to deny the appointment

13    of an examiner.

14         The Courts have looked at various factors in

15    determining whether an appropriate investigation is warranted.

16    They include whether that investigation, that same

17    investigation, has already been conducted by other parties.

18    They have looked at whether the appointment of an examiner will

19    increase costs and cause a delay with no corresponding benefit.

20    Of course I've looked at the timing of the motion.  I've looked

21    at whether the motion is a litigation tactic, which includes

22    the consideration of the timing, not just how soon it is in a

23    case but whether it is timed such as to evidence a litigation

24    tactic.

25         I think in this case it's a very close call.  I don't

98

1    find that this is a litigation tactic, although it's been

2    suggested that the shareholders are simply seeking to delay

3    things while they replace management so that they can have --

4    or, excuse me, the directors -- board of directors, so that

5    they can tank the settlement.  I'll accept their motion as

6    being -- as they state it:  an effort to have an investigation

7    conducted by an independent third party to determine whether or

8    not the plan proposed by the debtor, or this global settlement

9    referred to by the parties, is appropriate and whether,

10    instead, prosecution of those claims would result in a greater

11    recovery for the estate.

12        Notwithstanding that, reviewing the factors, I think

13    it is clear that the motion has to be denied at this point.

14    First, it is clear to me that this debtor has been investigated

15    to death.  And I'm sure that even the most experienced and

16    talented examiner that the United States Trustee could appoint

17    would not find any stone unturned.  The investigations have

18    been conducted not only by the debtor and the creditors'

19    committee, but by -- the equity committee itself has done some

20    investigation; the Office of Thrift Supervision; the FDIC; the

21    government task force, including the U.S. Attorney for the

22    Western District of Washington; the Department of Labor; the

23    Department of Justice; the FBI; the IRS; the SEC; the Attorney

24    General for the State of New York; the class action plaintiffs;

25    Congress; the U.S. Treasury; and the President's Financial

99

1    Fraud Task Force have all taken a look at Washington Mutual.

2    It is true that their investigations exceeded the scope of what

3    this Court need concern itself with.  They have talked about

4    systemic problems.  They have investigated possible criminal

5    actions by the parties.  In this case the Court is limited to,

6    as the equity committee suggests, the value of the estates and

7    how they will be distributed in this bankruptcy case.

8          I don't think it is fair to the creditors in this case

9    to be saddled with the cost of an investigation into systemic

10   problems, that would only benefit future parties but not

11   benefit the parties in this case.  In this case specifically,

12   the debtor and the creditors' committee have investigated the

13   specific assets owned by the debtor, or that the debtor claims

14   it owns.  The debtor has vigorously appeared in and prosecuted

15   its position in several adversaries in this case, in addition

16   to filing a claim in the FDIC receivership and prosecuting

17   claims it has in that forum.  All of that information should be

18   available to the equity committee.  And I don't want to hear

19   about obstacles being placed in their path to getting full and

20   open access to that information, whether it's documentary or

21   interviews with the debtors' management or others who have

22   conducted these investigations; and the same goes with the

23   creditors' committee, who's been actively involved in all of

24   this.

25         Again, the appointment of an examiner here really

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

100

1   would -- an examiner really would only have the task of

2   reviewing what others have already done.  I don't think there's

3   any original investigation left to be done.  So I think that's

4   just a waste of assets.

5       Secondly, I think the equity committee is fully able

6   to conduct the investigation that it seeks to have the examiner

7   conduct.  It has the benefit of Rule 2004, it has the benefit

8   of the discovery rules, because there are contested matters

9   presently and anticipated in which the equity committee could

10  fully avail itself of that discovery.  But, again, I'm strongly

11  urging the committee and the debtor to provide all the

12  information to the equity committee without testing the Court's

13  patience with discovery motions.

14      The -- again, the appointment of a third party to

15  conduct that investigation and to report to the Court its

16  conclusion is no substitute for the adversarial process extant

17  in bankruptcy court and the duty of the Court, after hearing

18  the views of the opposing parties, to make a decision as to

19  what assets the debtor owns, what the value of those assets is,

20  whether a settlement is reasonable, in resolving a conflicting

21  claim to those -- to ownership to those assets.

22      Finally, the timing of the motion.  I don't think that

23  this is a factor that I'll rely on in this case.  I think that

24  in other cases it's been evident that parties have been

25  litigating for many, many months, and only at the last minute

1    when a party thought it was going to lose did it file the

2    motion for a tactical reason.  In this case, the equity

3    committee is relatively new to this case, only since January,

4    and I don't think that the timing was meant -- is too late to

5    consider it, nor was it meant as a litigation strategy.

6          Let's see.  I don't know whether -- I'm not going to

7    accept the debtors' arguments or the committee's arguments

8    regarding delay here being a negative.  I'm not sure how

9    quickly the debtor honestly can proceed with its proposed plan

10   but, at any rate, I think there is sufficient time -- should be

11   sufficient time for the equity committee to conduct whatever

12   investigation it feels is relevant.  So I will deny the motion.

13         MR. ROSEN:  Your Honor, we have prepared a very short

14   order that says "Ordered that the motion is denied.  And it is

15   further ordered that this Court shall retain jurisdiction over

16   any and all matters arising from or related to the

17   implementation or interpretation of this order."  With that,

18   may I approach the bench?

19         THE COURT:  You may.  All right, I'll enter that

20   order.

21         MR. ROSEN:  Thank you.  That concludes this morning's

22   agenda.

23         THE COURT:  Well, before we conclude, where do we

24   stand on the 2019?  Did you send out a notice of a hearing on

25   that?

## Exhibit F

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                        FOR THE DISTRICT OF DELAWARE

IN RE:                          )     Case No. 09-10720
                                )     (Jointly Administered)
                                )
MAGNA ENTERTAINMENT CORP, INC.) )     Chapter 11
     Et al.                     )
                                )     Courtroom 4
                                )     824 Market Street
              Debtors.          )     Wilmington, Delaware
                                )
                                )     May 4, 2009
                                )     10:33 a.m.

                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE MARY F. WALRATH
                     UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor:                     Richards, Layton & Finger
                                BY:  MARK D. COLLINS, ESQ.
                                One Rodney Square
                                920 North King Street
                                Wilmington, DE  19801
                                (302)651-7700

                                Weil, Gotshal & Manges
                                BY:  BRIAN S ROSEN, ESQ.
                                BY:  SAIMA MAJID, ESQ.
                                767 Fifth Avenue
                                New York, NY  10153
                                (212)310-8000

For Trustee:                    U. S. Trustee
                                BY:  MARK KENNEY, ESQ.
                                844 King Street, Rm. 2207
                                Wilmington, DE  19899-0035
                                (302)573-6491

ECRO:                           AL LUGANO

Transcription Service:          DIAZ DATA SERVICES
                                331 Schuylkill Street
                                Harrisburg, Pennsylvania 17110
                                (717) 233-6664

Proceedings recorded by electronic sound recording;
transcript produced by transcription service
```

1    corporate governance changes?

2         MR. KENNEY:  I'm not sure that it has, Your

3    Honor, because there's still the issue of to whom are these

4    people ultimately beholden?  And putting in a resolution

5    doesn't change the fact that he's the shareholder who votes

6    those shares.

7         Now, we can wait until the end of this month,

8    Your Honor, and at that point, perhaps, react if we feel

9    that the -- there hasn't been a robust process, or we could

10   put somebody, you know, put some boots on the ground now,

11   have somebody in the field who can look at it, and if there

12   are difficulties with the process, not force us to wait

13   until the end of the month to find out that we're not

14   getting bids on these assets because nobody's interested in

15   competing with Mr. Stronach.  And that would also give us

16   the ability to know by the end of the month, if there isn't

17   adequate bidding, is that because of the process or is it

18   simply because of the market.  And if it's because of the

19   market, we all have to live with that, Your Honor.  But do

20   we want to wait until the end of the month and then react to

21   something, or do we want to try to be proactive?

22        THE COURT:  All right.  The debtor's response?

23        MR. ROSEN:  Well, Your Honor, Mr. Kenney and some

24   others try to paint somebody as a bad person here, and what

25   we've -- or at least having too much of an involvement in a

1   process, and all we really have, Your Honor, is the

2   opportunity of a secured lender to represent their own

3   interests and to take whatever actions are appropriate.  We

4   have the corporate governance provisions in place here.  We

5   believe that protocols there.  I think we should take the

6   opportunity to get us to June 11th, past the 5/27 expression

7   of interest date.  We're happy, and we think we should, Your

8   Honor, report to the Court at that time with respect to

9   where we are in the sale process.

10        As we indicated in the amended motion, there are

11  already 70 parties in interest that have expressed an

12  interest and sought a confidentiality agreement.  Thirty-

13  five have already executed those.  During the next period of

14  time, there's going to be due diligence undertaken.  We're

15  going to know where we are by May 27th, Your Honor.  I

16  believe that we should at least afford the Creditors'

17  Committee and the debtors that opportunity and then report

18  back to the Court at that time.

19        With respect to the investigation, I think we're

20  similarly confused by some of Mr. Galardi's comments, but I

21  think the Creditors' Committee should take that opportunity,

22  and it will -- and we encourage the Creditors' Committee to

23  do what they have to do, and we look forward to what their

24  answers are, Your Honor.  Again, the Creditors' Committee,

25  during the next few weeks, will be given documents.  They

1  will have access to individuals.  They will be allowed to do

2  whatever investigation they think appropriate.  Certainly,

3  MEC has already made themselves available and will continue

4  to do so.  I believe, Your Honor, based upon what I have

5  heard, that MID has similarly made itself available to the

6  Creditors' Committee and making documents available for

7  them.

8         So Your Honor, again, I think we should come back

9  on June 11th.  The Court will have a good understanding

10 there where we are at that point in time with respect to the

11 sale process and the investigation process, the two points

12 that Greenlight has requested an examiner involvement on.

13        THE COURT:  Well, let me do this.  I believe that

14 the sale process is now appropriate, and that is why I've

15 already approved it.  I'm not sure that an examiner's needed

16 with respect to the sale process.  But I agree with the

17 debtor that more information can be garnered once we get the

18 initial expression of interest.  So I will continue the

19 examiner motion to June 11th and would be prepared to change

20 my mind and determine that the sale process needs an

21 overseer at that time, but it is not typical to have an

22 examiner to oversee a sale process.  And with the full

23 involvement of the committee with the lenders cooperating

24 now and assuring that the process is free of taint, that

25 they are controlling it, I'm satisfied that the sale process

1    can proceed.

2             With respect to the other basis, or scope, of any

3    examiner that is suggested by Greenlight, the investigation,

4    I am satisfied at this point that the committee is

5    proceeding with that.  Again, it is typical that it is the

6    Creditors' Committee that performs such an investigation.

7    But I will want a report from the committee on the results,

8    as of June 11th, of its investigation, what efforts it has

9    made in conducting that investigation and what it's

10   preliminary report is because to the extent there is need

11   for additional investigation or to the extent Mr. Galardi --

12   as Mr. Galardi suggests that the committee is either too

13   aggressive or, in my opinion, has perhaps settled some

14   issues for other reasons, an investigator -- an

15   investigation by an examiner may be appropriate.

16             I'm not disturbed that the deadline is June 30th

17   because to the extent there is cause for appointment of an

18   examiner for that purpose, I suspect that I would find cause

19   to extend the deadline to give the examiner time to complete

20   its investigation.  So I'm going to continue the examiner

21   motion to June 11th.  I think those are the only two reasons

22   articulated for having an examiner, although I'm not going

23   to restrict it to that because I think that to the extent an

24   examiner is required, its scope can be anything that is

25   appropriate and in the best interest of the creditors.

1          MR. ROSEN:  Thank you, Your Honor.

2          MR. GALARDI:  Your Honor, just one clarification,

3  and I don't think this is -- I believe the June 30th date,

4  and I may be confusing my case.  Is this the date by which

5  Your Honor would have to actually grant standing?

6          THE COURT:  (No audible response.)

7          MR. GALARDI:  No.  I've confused my cases.

8  That's fine.  It's -- Your Honor, I just wanted to make sure

9  that whatever the deadline was to do by June 30th, that it's

10  preserved for people to seek based on a June 11th report,

11  including the examiner, to seek an extension of that

12  deadline.

13          MR. ECKSTEIN:  My recollection is that the DIP

14  order provides that we have until June 30th to complete an

15  investigation, and I believe the DIP order provided us with

16  standing if we determine that we wanted to go forward.

17          THE COURT:  You did.

18          MR. GALARDI:  Thank you.  That won't change.

19  Thank you.

20          THE COURT:  Okay.

21          MR. ROSEN:  Thank you, Your Honor.  I believe

22  that's all on the agenda this morning -- or this afternoon.

23          THE COURT:  All right.  We'll stand adjourned

24  then.

25  [Whereupon at 12:22 p.m., the hearing was adjourned.]

**<u>Exhibit G</u>**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                              .   Case No. 00-3837
                                    .
    OWENS CORNING, ET AL.           .
                                    .   5414 USX Tower Building
                                    .   Pittsburgh, PA 15222
                        Debtors.    .
                                    .
                                    .
                                    .   April 8, 2003
. . . . . . . . . . . . . . . ..   12:50 p.m.

TRANSCRIPT OF MOTION BY PLANT INSULATION TO APPOINT AN EXAMINER
            BEFORE HONORABLE JUDITH K. FITZGERALD
            UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:                Devoise & Plimpton
                                By:  MARY BETH HOGAN, ESQ.
                                919 Third Avenue
                                New York, NY 10022

For the Debtors:                Saul Ewing LLP
                                By:  KATE STICKLES, ESQ.
                                222 Delaware Avenue, Suite 1200
                                Wilmington DE 19801

For the U.S. Trustee:           FRANK PERCH, ESQ.

For Plant Insulation:           JOHN M. GREGORY, ESQ.

For Plant Insulation:           Travis & Pon
                                By:  MONTE TRAVIS, ESQ.
                                San Francisco, CA


Audio Operator:                 Janet Kozloski


Proceedings recorded by electronic sound recording, transcript
            Produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

6

1  on the agenda.  That's why I was asking, to be sure.

2          MS. STICKLES:  Your Honor, this is Kate Stickles.

3  You may recall that there was a motion for an expedited

4  hearing, which Your Honor placed on the agenda for 12:45 in the

5  event an objection was filed.  No objections were filed and

6  that particular hearing was cancelled and a certification of

7  counsel forwarded to Ms. Bellow.

8          THE COURT:  Yes, I instructed her to enter that order

9  but I hadn't heard back from her yet, so I doubt that it has

10 been entered on the docket; but I was aware of that, thank you.

11         MS. STICKLES:  And that's the only other matter other

12 than the Plant matter before Your Honor today.

13         THE COURT:  All right.  Then who for Plant would like

14 to argue this motion, please?

15         MR. GREGORY:  That'll be me, Your Honor, John Gregory

16 here.  This matter has been the subject of -- by now -- I think

17 five briefs, a couple from everybody -- a couple from when the

18 motion was first argued, then the appellate briefs, and now two

19 each this go around.  I don't think there's a whole lot to add

20 to that.  I would make one comment, though, and that is that in

21 over 50 pages of briefing there hasn't been a single sentence

22 devoted by the debtors or anybody opposing this motion to what

23 we believe is the unanswerable fact that if C2 is discretionary

24 it's superfluous.  Nobody has even tried to deal with that

25 because I don't think it's dealable with.  For the reasons

1  stated, the Plant's standing -- we think it's incontestable and

2  the statute is, indeed, as it says on it's face mandatory.

3  With that, unless the Court has questions, that's all I've got

4  to say at this point.

5          THE COURT:  Actually, I'm not necessarily of the view

6  that it's mandatory, but I'm wondering rather than worrying

7  about whether it is or isn't I should simply appoint an

8  examiner.  But here's the problem I have -- at the moment I

9  honestly don't know what more an examiner can do in this case

10  than the parties and the various committees are already in the

11  process of doing.  And what the statute says is that the Court

12  shall appoint an examiner to do what is appropriate in the

13  case, and there's where I'm having the difficulty.  I just

14  don't see right now that there's anything appropriate for an

15  examiner to do.  So if we want to go through the exercise of

16  having an examiner appointed to sit out there unless and until

17  I'm convinced that there's something that's available or right

18  -- I suppose -- proper for the examiner to do, then I guess we

19  can do that.  So, Mr. Gregory, I think what may be more helpful

20  for me is for you to tell me what it is that you think the

21  examiner ought to do that hasn't already been done or isn't

22  being done and why anything that the examiner might do isn't

23  really moot based on the way that the debtor's plan has been

24  structured, which is to bifurcate the Owens Trusts from the

25  Fiberboard Trusts.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. GREGORY: Well, okay, you got a couple things
2  there.  We suggested in our reply brief that what really should
3  happen is that -- although I think technically the order is
4  that the -- the order comes from the Court to the U.S. Trustee
5  and the U.S. Trustee then appoints.  There should be a period
6  of meeting and conferring, and we've been left in the dark
7  here.  We -- you know, we've asserted and we believe that the
8  futures representative has a conflict in this matter as does
9  the Official Committee of Unsecured Creditors.  But aside from
10 that, we think there are lots of ways to get at this and that
11 reasonable people could differ about that, but that we should
12 be ordered to get together with some ideas.  We think, for
13 example, that -- we believe, okay -- Plant believes right down
14 to its, you know, whatever that very large sums of money,
15 scores of millions of dollars were, in fact, given away in the
16 NSP Agreement with Weitz and Luxemberg.  Now, what we'd like to
17 see is, you know, maybe the examiner should be tasked to -- in
18 consultation with those who supposedly are investigating this.
19 I mean, maybe the examiner should simply examine, first of all,
20 whether the Court is right in its assumption that this is
21 already being done by others.  If that's so, that shouldn't
22 take much time for them to demonstrate that and the examiner to
23 so report.
24          THE COURT: Well, you can ask the same question with
25 respect to the various committees that are already operating

1  and have looked into this.  And I think it's unfair to say that

2  Plant has been kept in the dark.  Plant has had the same

3  opportunity to look at the same documentation that all the

4  other parties have had an opportunity to look at and to

5  participate with respect to objections to the stipulations.

6  Plant decided to come to the table late.  It wasn't somebody

7  else deciding for Plant to come to the table late.  So it's not

8  a fair statement to say that Plant has been kept in the dark;

9  it hasn't.  It has chosen not to participate and now it wants

10  an examiner appointed to do what it could have done on its own,

11  and that's not an appropriate use of an examiner.  If there's

12  something that this case needs -- not Plant, but the case needs

13  -- to look at that's one thing, but Plant doesn't have the

14  right to have an examiner.  The case -- the Court -- the case

15  has the right to have an examiner, not Plant.  Plant can look

16  into this on its own and has had the opportunity to do it.  And

17  everything I'm hearing form you is Plant believes this, Plant

18  believes that, Plant wants this.  I'm not seeing the need for

19  the estate, and that's the problem I'm having.

20      MR. GREGORY:  We're talking about the Fiberboard

21  Estate, not the Owens Corning Estate.

22      THE COURT:  Fiberboard Estate has been broken out

23  form the Owens Corning Estate in the plan.  The Fiberboard

24  Estate and the trust that is set up is devoted in the plan to

25  Fiberboard creditors, which is why I'm really at a loss.  I had

1 | duties as are appropriate.  Right now, I simply don't see any

2 | duties that are appropriate.  So if it's necessary to go

3 | through this exercise, we'll go through the exercise, and

4 | simply not assign any duties right now.  If something pops up

5 | that is necessary, there will be an examiner in place to look

6 | at it.  That's all.

7 |          MS. HOGAN:  Okay, I have nothing further, Your Honor.

8 | Thank you.

9 |          MR. GREGORY:  Very well, Your Honor.

10 |          THE COURT:  Mr. Perch.

11 |          MR. PERCH:  Your Honor, I think it's clear from our

12 | papers that we filed on a couple of occasions in this case that

13 | we do believe that the statute is mandatory.  And I agree

14 | completely with the observation that Mr. Gregory made at the

15 | outset of this proceeding that if 1104(c)(2) is not mandatory

16 | then it is superfluous.  And, of course, it's a cardinal

17 | principle of statutory construction that the statute should no

18 | be interpreted in a way that makes a provision of it

19 | superfluous.  The question that arises whether the range of

20 | discretion under such investigation of the debtor as is

21 | appropriate includes zero, and the -- once again, the only

22 | observation I'll make on that, Your Honor, is that there is a

23 | value to putting this issue to bed.  And what I'm concerned

24 | about is that appointing an examiner who is directed then to

25 | stand down may not serve to put this issue to bed because it

1  will resurface at some time when we get closer to confirmation
2  and then there's a request for the examiner to do something.
3  I'm just wondering whether we're deferring the issue.  There
4  has been -- I agree, Your Honor -- a great deal of
5  investigation of many things by various parties.  I do think
6  that this issue is probably somewhat of a sideshow to the
7  dispute that has divided the bank and nonbank members of the
8  committee, and that is the subject of a lot of other
9  litigation, some of which was going on today.  But it is there.
10 But what I keep hearing is that there is at least one party
11 Plant -- and I'm not going to really try to comment on their
12 standing, that's already been discussed at great length  But
13 there seems to be some theory that all of the people who have
14 investigated it have an ax to grind.  The examiner would not
15 have an ax to grind.

16         THE COURT:  Well, I don't know why the unsecured
17 creditors would necessarily have an ax to grind.  I mean, they
18 have an obligation to try to do the best for their
19 constituents.  I would think that that's what's going on.  I
20 don't know that the debtor has an ax to grind.  The debtor is
21 not going to end up with anything in this case.  All of its
22 assets are being devoted to pay creditors.  So, I don't quite
23 understand why there should be an ax.  Nonetheless, I agree
24 that an examiner should be a disinterested person.  Right now I
25 simply don't think it's time or necessary for the examiner to

28

1 do anything.  I'm not sure that I won't at some point think

2 this -- think that it may be appropriate to have a look at this

3 issue.  But I think the parties who have spent so much time

4 over the last several months ought to have a first go around.

5 If there can be a consensual plan put together, then there is

6 no issue that's going to need an examiner and I don't see the

7 reason to expend additional estate resources for that purpose.

8 To the extent that an examiner may have some duties that will

9 be required to be carried out in the future, then we'll have an

10 examiner in place and ready to go if and when it's appropriate

11 to do something, but for now I simply don't see that there is.

12        With respect to putting the issue to bed, it may not

13 get to bed until after the plan is confirmed and the tolling

14 agreements either expire or are about to expire or there isn't

15 some consensual plan.  I don't know.  Right now, however, the

16 plan seems to me to try very carefully to separate the Owens

17 creditors from the Fiberboard creditors and the Owens assets

18 from the Fiberboard assets.  If that changes, there may be some

19 need for an examiner.  But right now, it appears that that's

20 what the plan does.  As of now, I haven't seen any objections

21 by any creditors saying that it's been unsuccessful; but, of

22 course, the order that's setting those dates is just going out

23 so objections aren't yet due.  So, we'll see in connection with

24 the plan whether it's necessary to take a look at it or not.

25 Right now I don't see tat it is.

**J&J COURT TRANSCRIBERS, INC.**

1        With respect to Plant's standing, I don't think Plant
2  has standing.  I said that on the record earlier.  I think they
3  are a contingent creditor with disputed and unliquidated
4  claims.  They certainly don't seem to be a creditor of Owens in
5  any respect, maybe of Fiberboard, but they have not, at this
6  point in time, suffered the advantage of having an actual claim
7  litigated.  However, to the extent that they're able to file
8  proofs of claim, I think that's enough for purposes of today in
9  looking at this examiner position.  If their claims turn out to
10  be somehow or other not allowed, then they won't be creditors
11  and this issue won't be going anywhere with respect to Plant
12  anyway; so that's another reason I think the issue should be
13  deferred.  Let's get an examiner in place and then we'll sort
14  all this out later on.  I don't see the need for spending
15  estate resources right now, but I'm not opposed to getting
16  somebody in place so that if it is necessary at any future date
17  we'll be ready to go.  So, Mr. Perch, what kind of an order do
18  you need from me?

19        MR. PERCH:  Your Honor, there actually is a very
20  similar order already in place it ACNS case.  I think at least
21  some of the parties o the phone are familiar with that.  Judge
22  Newsome made a somewhat similar ruling.  Perhaps we could use
23  that as a model.

24        MR. GREGORY:  May I be favored with a copy of that?
25  This is Mr. Gregory.