KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
*sdavidson@kslaw.com*
Scott Davidson

- and -

Paul K. Ferdinands
W. Austin Jowers
Thaddeus D. Wilson
1180 Peachtree Street, NE
Atlanta, GA  30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
*pferdinands@kslaw.com*
*ajowers@kslaw.com*
*thadwilson@kslaw.com*

*Counsel for Lone Star U.S. Acquisitions, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) ) | Chapter 11 |
| Debtors. | ) ) ) | Jointly Administered |

**RESPONSE OF LONE STAR U.S. ACQUISITIONS, LLC TO
DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), AND (m), 365 AND
1123, AND FED. R. BANKR. P. 2002, 6004, 6006, AND 9014 FOR ORDERS: (A)(I)
AUTHORIZING AND APPROVING SALE PROCEDURES, INCLUDING BREAK-UP
FEE AND EXPENSE REIMBURSEMENT; (II) SCHEDULING BID DEADLINE AND
SALE HEARING; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF;
AND (IV) GRANTING RELATED RELIEF AND (B)(I) AUTHORIZING THE SALE OF
CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
OTHER INTERESTS; (II) AUTHORIZING AND APPROVING ASSET PURCHASE
AGREEMENTS THERETO; (III) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

Lone Star U.S. Acquisitions, LLC (together with its affiliates, "Lone Star"), by and through its undersigned counsel, hereby responds to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the "Sale Motion").[1]  In support of its Response, Lone Star respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Lone Star is an investment firm that has extensive experience investing in residential mortgage assets, and Lone Star is very interested in buying the AFI Purchased Assets and, possibly, the Nationstar Purchased Assets.  However, the Debtors' proposed Sale Procedures are structured in a way that discourages potential purchasers from expending the time and money needed to pursue an acquisition of the Debtors' assets.  The most objectionable features of the Sale Procedures include: (i) the requirement that the Debtors' parent company serve as the stalking horse bidder for the loan pool assets, (ii) linking the sale of the loan pool assets to an AFI settlement (release) with the Debtors' estates, (iii) proposing that the loan pool be sold under a potentially lengthy plan process (rather than a standard Section 363 sale), and (iv) trying to sell two completely different asset classes (*i.e.*, the mortgage servicing platform and

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

the pool of whole loans) using Sale Procedures that do not reflect the different levels of due diligence needed to evaluate the different asset classes. Because the proposed Sale Procedures tilt the playing field in favor of an insider stalking horse, they will inevitably chill bidding. As a result, the Court should permit the acceptance of a new stalking horse bid with a legitimate, arm's length, third-party buyer that will result in a sale of the loan pool assets in a conventional Section 363 sale process.

## RESPONSE

**A.     Background Regarding Lone Star.**

2.     Lone Star is a global investment firm that invests in financial institutions and operating companies. It acquires both debt and equity assets, including corporate, commercial real estate, single family residential, and consumer debt products. Lone Star's investors include leading public and corporate pension funds, insurance companies, college endowments, and affluent individuals.

3.     Since the establishment of its first fund in 1995, Lone Star's principals have organized private equity funds with total capital exceeding $33 billion. In 2011, Lone Star raised over $10 billion in capital for purposes of investing in credit-sensitive opportunities, particularly corporate and financial services opportunities in the United States.

4.     Hudson Americas, LLC ("Hudson"), an affiliate of Lone Star, provides asset management and underwriting services for all investments made by Lone Star. Hudson has world-class functional experts in the areas of asset underwriting and valuation, transaction structuring, government and regulatory relations, and asset strategy and management. As a result, when Lone Star makes investments, it performs pricing analytics in-house and does not

rely on third-party vendors. Because Lone Star has equity capital and financing facilities in place, it can enter into investment transactions without including any financing contingencies.

5. Since 2008, Lone Star has purchased more than $12.3 billion in UPB of whole residential mortgage loans in the United States, including Lone Star's purchase of CIT Group's home lending and servicing operations.

6. Lone Star has also invested heavily in residential mortgage-backed securities. For example, Lone Star acquired more than $33 billion UPB of super senior CDO positions, junior CDO bonds, and Option ARM, Alt-A, and prime bonds from Merrill Lynch. Merrill Lynch chose Lone Star to be the purchaser of these assets because of Lone Star's proven track record, ability to underwrite the acquisition quickly and discretely, and the speed of the deal's execution.

7. Lone Star acquired a captive special servicer, Vericrest Financial, Inc. ("Vericrest"), when it closed the CIT transaction (referenced in paragraph 5 above) in 2008. Vericrest is highly rated by both S&P and Fitch, and its ratings were upgraded by both agencies in 2011. Vericrest is an industry leader among special servicers with respect to its loss mitigation practices, with modification recidivism rates well below the industry average. Furthermore, Vericrest currently has between $5 billion - $7 billion in immediately available servicing capacity.

8. Based on the foregoing, Lone Star is a willing and capable buyer for the AFI Purchased Assets with an ability to move forward with an acquisition on an expedited timeframe. Indeed, prior to the commencement of these Chapter 11 cases, Lone Star contacted the Debtors and AFI on multiple occasions in writing and otherwise about the prospect of entering into discussions regarding a potential acquisition of residential whole loan pools. However, the Debtors and AFI did not affirmatively respond to Lone Star's inquiries.

**B.     The Proposed Sale Procedures Are Flawed and Should Not Be Approved by the Court.**

9.    As described above, Lone Star is one of the most active buyers of residential whole loans in the marketplace, and Lone Star is highly interested in acquiring the AFI Purchased Assets. However, Lone Star believes the proposed Sale Procedures are flawed, will chill demand for the loan pool assets, do not create a level playing field for potential buyers, and are not in the best interests of the Debtors' unaffiliated creditors.

10.    One main problem with the Sale Procedures is that they appear to be designed to enable AFI to obtain a release of all claims between AFI and the Debtors rather than to maximize the value of the loan pool. For example, the AFI stalking horse bid values the loan pool at approximately $200 million higher if the sale is completed under a plan (rather than pursuant to a Section 363 sale). In effect, under a plan scenario, competing buyers are being asked to pay for an asset (*i.e.*, AFI's release) that they do not need and will not get. Lone Star submits that the sale of the loan pool assets should be separated from the AFI release/settlement issues.

11.    Another problem is the Debtors propose to use the same Sale Procedures for the sale of the mortgage-servicing platform and the sale of the loan pool assets. These are materially different asset classes, and the diligence period needed for each asset class is different. Based upon its experience in acquiring the CIT servicing platform, Lone Star believes the minimum reasonable diligence period for competing bidders interested in the servicing platform is five to six months; this longer time period is supported by Samuel Greene's description in the Greene Declaration of the lengthy, exclusive diligence performed by Nationstar and Fortress. In contrast, the three-month diligence period embedded in the Sale Procedures is longer than needed for the residential loan portfolio. Although Lone Star could complete its due diligence regarding the loan pool in several weeks, other potential buyers may need a diligence period of

5

up to two months for the loan pool. The different nature of these asset classes suggests that the sales of the servicing platform and the loan pool should be de-linked and conducted under specifically tailored procedures that are appropriate for each such asset class.

12. Another obvious flaw in the Sale Procedures is that the amount of the minimum acceptable initial overbid for the loan pool assets is not specified. In addition, the Sale Procedures do not disclose if competing buyers for the loan pool assets will need to bid using the form of the AFI APA.[2] This lack of clarity will not promote bidding and will reduce the likelihood that competing buyers would be willing to spend the significant time and resources needed to perform their due diligence.

13. Moreover, the Debtors' proposal to sell the loan pool under a plan is inherently problematic because potential buyers of financial assets do not want to get bogged down in a possibly protracted and contentious plan process. Instead, these assets should be sold pursuant to a conventional sale process under Section 363 of the Bankruptcy Code, which could be completed before the competing bid deadline currently proposed by the Debtors in the Sale Procedures. Under the Debtors' Sale Procedures, competing bids are due on September 18,[3] but the sale or confirmation hearing may not be held until the end of October, with the closing potentially not occurring until sometime in November (or, possibly, December). Because purchasers of this type of financial assets want to get control of the assets as soon as possible

---

[2]  This is a significant problem because Lone Star (and, presumably, other competing bidders) would be unwilling to bid on the loan pool assets if it were required to have Nationstar act as servicer of the loans after the closing. *See* AFI APA, § 6.17.

[3]  The Sale Procedures and the Sale Motion are inconsistent with respect to the bid deadline, with the Sale Procedures indicating that competing bids are due September 18, 2012 while the Sale Motion indicates that the competing bid deadline is September 14, 2012.

6

after submitting a successful bid, the delay embedded in the proposed Sale Procedures will chill bidding.

**C.      A Sale Process with an Unaffiliated Stalking Horse Will Maximize Value.**

14.   In addition to the specific concerns regarding the proposed Sale Procedures that are detailed above, the fundamental problem presented by the proposed sale of the whole loan pool is that the Debtors desire to conduct the sale process using their parent company as the stalking horse.[4]  Requiring competing bidders to compete for the loan pool assets against an insider that has common management with the Debtors creates uncertainty regarding the fairness of the process — an uncertainty that will naturally chill bidding.  The Debtors' unaffiliated stakeholders would be better served by the Debtors' acceptance of a new stalking horse bid with a legitimate, credible, arm's length, third-party buyer.

15.   Although Lone Star has not been afforded an opportunity to perform <u>any</u> due diligence regarding the Debtors' assets, Lone Star would be willing to serve as the stalking horse buyer for the loan pool assets under two alternative transaction structures.  Both of these alternative transaction structures would provide a higher initial baseline bid for the assets, would allow the assets to be monetized on an accelerated and more predictable timetable, and would give competing buyers comfort that they are competing for the assets on a level playing field.

16.   Under the first alternative, Lone Star is prepared to immediately enter into a stalking horse asset purchase agreement in the form attached to this Response as <u>Exhibit A</u> (the "<u>Lone Star APA</u>").[5]  The Lone Star APA provides for a purchase price equal to approximately

---

[4]   After reviewing the disclosures in the Debtors' sale motion and the supporting declarations, the scope and duration of the Debtors' marketing process for the loan pool before selecting AFI as a stalking horse is unclear.

[5]   A copy of the Lone Star APA that is marked to show changes from the AFI APA is attached hereto as <u>Exhibit B</u>.

7

42% of the UPB of the whole loans included in the AFI Purchased Assets,[6] provides for the posting by Lone Star of a cash deposit equal to $25 million, does not contain any financing contingency or contingency relating to unperformed due diligence, and is premised upon a conventional Section 363 sale of the loan pool assets.

17.     Pursuant to the Lone Star APA, competing bids would be due within approximately eight weeks from entry of a sale procedures order, Lone Star would be entitled to a breakup fee in an amount equal to $10 million, and any sale of the loan pool assets would be closed and funded at or before the September 18 bid deadline contemplated by the Debtors' Sale Procedures.

18.     Under the second alternative, Lone Star would be permitted to conduct due diligence for a two-week period regarding the AFI Purchased Assets and the Debtors' remaining assets that are not currently the subject of any purchase agreement (the "Remaining Assets").[7] At the end of the two-week diligence period, Lone Star would be prepared to enter into a definitive stalking horse agreement (without any financing or due diligence contingencies) for the purchase of the AFI Purchased Assets at a purchase price equal to 44% - 48% of the UPB of the whole loans included in the AFI Purchased Assets and would be willing to acquire the Remaining Assets at a purchase price to be agreed upon by the parties.

19.     The second alternative would also provide for an eight week due diligence period for competing bidders and a conventional Section 363 sale process, would entitle Lone Star to a breakup fee in an amount equal to $20 million, and would permit the AFI Purchased Assets and

---

[6]     Upon information and belief, the purchase prices under the AFI APA are equal to approximately 41% (363 sale) and 46.5% (plan/AFI release), respectively.

[7]     Upon information and belief, the Remaining Assets have a book value equal to approximately $1.7 billion.

the Remaining Assets to be sold before the end of the third calendar quarter.  The increase in the break-up fee from $10 million to $20 million under the second alternative is attributable to the substantial increase in due diligence and the significantly increased purchase price for the assets.

20.     Under either of these two alternatives, the AFI Purchased Assets would be sold in an arm's length, conventional Section 363 process with an unaffiliated stalking horse buyer, and the sale would not be tainted by being linked to an AFI release/settlement or the uncertainty caused by a possibly lengthy and contentious plan process.

21.     In addition to the AFI Purchased Assets and the Remaining Assets, Lone Star would also be interested in bidding on the Nationstar Purchased Assets.  Because Lone Star owns and operates Vericrest, one of only a handful of credible and independent residential mortgage servicers, Lone Star is a highly qualified and legitimate potential bidder.  However, as a result of the extensive due diligence that would be needed to evaluate the Nationstar Purchased Assets and the associated costs and expenses, and given that Lone Star would be conducting its due diligence at the same time as other bidders (compared to the exclusive opportunity afforded to Fortress/Nationstar), the period in which competing bidders may conduct due diligence would need to be expanded to at least five months.  In addition, given the nature of some of the assets included in the Nationstar Purchased Assets, the proposed bid increment of 1% is too high and the proposed breakup fee of $72 million plus a $10 million expense reimbursement is grossly excessive.  Lone Star submits that the breakup fee attributable to the portion of the Nationstar Purchased Assets that constitutes servicing advances should not be more than 1% of the amount of such servicing advances.

## **CONCLUSION**

The sale of the Debtors' assets should be conducted in an open, transparent process with a level playing field for potential buyers. The value of the Debtors' assets will not be maximized if the stalking horse for the loan pool assets is an insider, the process is designed to get the insider a release, and there is no clarity regarding the method of sale. All stakeholders would benefit from having a credible, unaffiliated, third-party stalking horse buyer, and Lone Star is willing to play that role.

*** 

WHEREFORE, Lone Star respectfully requests that this Court (i) deny entry of the proposed Sale Procedures Order; and (ii) grant such other and further relief as this Court deems just, reasonable and proper.

Dated: June 11, 2012
New York, New York

KING & SPALDING LLP

*/s/* Scott Davidson
Scott Davidson
1185 Avenue of the Americas
New York, New York  10036
(212) 556-2100
(212) 556-2222 (facsimile)
*sdavidson@kslaw.com*

- and -

Paul K. Ferdinands
W. Austin Jowers
Thaddeus D. Wilson
1180 Peachtree Street, NE
Atlanta, GA  30309
(404) 572-4600
(404) 572-5100 (facsimile)
*pferdinands@kslaw.com*
*ajowers@kslaw.com*
*thadwilson@kslaw.com*

*Counsel for Lone Star U.S. Acquisitions, LLC*