# __EXHIBIT B__

EXECUTION VERSION

## ASSET PURCHASE AGREEMENT

**Between**

**ALLY FINANCIAL INC.**

**and**

**BMMZ HOLDINGS LLC**

**LONE STAR U.S. ACQUISITIONS, LLC**

**and**

**RESIDENTIAL CAPITAL, LLC**

**RESIDENTIAL FUNDING COMPANY, LLC**

**GMAC MORTGAGE, LLC**

**and**

**THE ADDITIONAL SELLERS IDENTIFIED ON
SCHEDULE A HERETO**

**dated as of**

**May 13, June ___, 2012**

## TABLE OF CONTENTS

**Page**

ARTICLE I.            DEFINITIONS AND INTERPRETATION ...............................................1
    Section 1.1    Definitions.......................................................................................1
    Section 1.2    Interpretation ..............................................................................~~16~~15

ARTICLE II.           PURCHASE AND SALE OF ASSETS ...........................................17
    Section 2.1    Purchase and Sale of Assets .........................................................17
    Section 2.2    Excluded Assets ............................................................................18
    Section 2.3    Post-Closing Asset Deliveries .................................................~~19~~18
    Section 2.4    Conveyance of Assets by Affiliate Sellers ..............................~~19~~18
    Section 2.5    Non-Assignable Purchased Assets; Necessary Consents .........19
    Section 2.6    Retained Liabilities ................................................................~~20~~19
    Section 2.7    Closing......................................................................................~~20~~19
    Section 2.8    Ancillary Agreements ............................................................~~21~~20
    Section 2.9    Deliveries by Purchaser ..........................................................~~21~~20
    Section 2.10   Deliveries by Sellers ..............................................................~~21~~20
    Section 2.11   Consumer Privacy Matters .....................................................~~22~~21
    Section 2.12   "As Is, Where Is" Transaction ...............................................~~22~~21

ARTICLE III.          PURCHASE PRICE; ADJUSTMENT; ALLOCATION .........................22
    Section 3.1    Purchase Price; Payment of Purchase Price ................................22
    Section 3.2    Purchase Price Adjustment; Final Payment ...........................~~24~~23
    Section 3.3    Allocation of the Purchase Price for Tax Purposes ...................24
    **Section 3.4    Deposit**............................................................................................25

ARTICLE IV.           REPRESENTATIONS AND WARRANTIES OF SELLERS..............~~26~~25
    Section 4.1    Organization and Authority.........................................................26
    Section 4.2    Non-Contravention ......................................................................26
    Section 4.3    Consents and Approvals...............................................................27
    Section 4.4    Title to Assets..............................................................................27
    Section 4.5    Mortgage Loan Portfolio.............................................................27
    Section 4.6    [Reserved.] ...................................................................................27
    Section 4.7    Litigation and Claims ..................................................................27
    Section 4.8    Brokers, Finders and Financial Advisors ...............................~~28~~27
    Section 4.9    Whole Loans .................................................................................28
    Section 4.10   Mortgage Securities .....................................................................30

ARTICLE V.            REPRESENTATIONS AND WARRANTIES OF PURCHASER ...........30
    Section 5.1    Organization and Authority.........................................................30
    Section 5.2    Non-Contravention ......................................................................30
    Section 5.3    Consents and Approvals...........................................................~~31~~30
    Section 5.4    Financing .....................................................................................31
    Section 5.5    Non-reliance.................................................................................31
    Section 5.6    Brokers, Finders and Financial Advisors ...................................31

ARTICLE VI.          PRE-CLOSING MATTERS AND OTHER COVENANTS....................31
    Section 6.1    Subsequent Actions; Further Assurances................................................31
    Section 6.2    Third Party Consents ....................................................................~~32~~31
    Section 6.3    Access to Information .................................................................................32
    Section 6.4    Records; Post-Closing Access to Information ...........................................32
    Section 6.5    Interim Operations .....................................................................................33
    Section 6.6    Mortgage Approvals and Licenses ............................................................34
    Section 6.7    Notices of Certain Events ...........................................................................34
    Section 6.8    Tax Matters .................................................................................................35
    Section 6.9    Insurance .....................................................................................................~~36~~35
    Section 6.10   Mortgage Loan Schedules ..........................................................................36
    Section 6.11   Schedules and Disclosure Memorandum ...................................................36
    Section 6.12   Bankruptcy Actions ....................................................................................37
    Section 6.13   Antitrust Clearances and Obligations.......................................................38
    Section ~~6.14~~    ~~Post-Closing Amounts Received and Paid~~ ...................................................~~38~~
    ~~Section~~ 6.15    Confidentiality ............................................................................................39
    Section 6.16   Delivery of Mortgage Files ........................................................................40
    Section 6.17   ~~Third Party Servicing Agreement~~ ..................................................................40[Intentionally
    Section 6.18   Transfer of Servicing ..................................................................................41
    Section 6.19   Use of Proceeds ...........................................................................................42
    Section 6.20   Electronic Data Files ..................................................................................42
    Section 6.21   Transfer of Assets to DIP Borrowers .......................................................42
    Section 6.22   Mortgage Loan Modifications ...................................................................42

ARTICLE VII.         BANKRUPTCY COURT MATTERS .....................................................43
    Section 7.1    Competing Transaction ..............................................................................43
    Section 7.2    Bankruptcy Court Filings ..........................................................................43

ARTICLE VIII.        CONDITIONS ..............................................................................~~43~~44
    Section 8.1    Conditions to Obligations of Purchaser and Sellers ..............................~~43~~44
    Section 8.2    Conditions to Obligations of Sellers .........................................................45
    Section 8.3    Conditions to Obligations of Purchaser ...................................................45

ARTICLE IX.          TERMINATION AND SURVIVAL ........................................................46
    Section 9.1    Termination .................................................................................................46
    Section 9.2    Procedure and Effect of Termination .......................................................48
    Section 9.3    No Survival ..............................................................................................~~49~~48

ARTICLE X.           MISCELLANEOUS ..................................................................~~49~~48
    Section 10.1   Expenses ..................................................................................................~~49~~48
    Section 10.2   Amendment; Waiver ...................................................................................49
    Section 10.3   Notices .........................................................................................................49
    Section 10.4   Waivers ....................................................................................................~~51~~50
    Section 10.5   Counterparts ...............................................................................................51
    Section 10.6   Applicable Law; WAIVER OF JURY TRIAL; Venue and
            —— Retention of Jurisdiction .......................................................51

**Section 10.7**    **Assignment**......................................................................~~52~~51

**Section 10.8**    **No Third-Party Beneficiaries**...............................................52

**Section 10.9**    **Public Announcements**...........................................................52

**Section 10.10**   **Severability**..............................................................................52

**Section 10.11**   **Specific Performance**...........................................................~~53~~52

**Section 10.12**   **Waiver of Bulk Transfer Laws**............................................~~53~~52

**Section 10.13**   **Personal Liability**...................................................................53

**Section 10.14**   **Entire Agreement**....................................................................53

~~Section 10.15         Parent Guaranty~~ .......................................................................~~53~~

**SCHEDULES**

Schedule A          Additional Sellers

Schedule B          Contents of Credit File

Schedule C          DIP Financing Agreements

Schedule D          Knowledge of Sellers

Schedule E          Mortgage Securities

Schedule F          Purchase Price Schedule

Schedule 4.3        Seller Consents and Approvals

Schedule 4.5        Mortgage Loan Data Fields

Schedule 5.3        Purchaser Consents and Approvals

~~Schedule 6.12(f)         Terms of the Chapter 11 Plan~~

**EXHIBITS**

Exhibit 1           Sale Approval Order

Exhibit 2           Sale Procedures

Exhibit 3           Sale Procedures Order

**Exhibit 4**           **Form of Escrow Deposit Agreement**

**DISCLOSURE MEMORANDUM**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of ~~May 13,~~**June [___],** 2012, is entered into between ~~Ally Financial Inc., a Delaware corporation ("Parent") and BMMZ Holdings~~**Lone Star U.S. Acquisitions,** LLC, a Delaware limited liability company ("Purchaser"), and Residential Capital, LLC ("ResCap"), Residential Funding Company, LLC ("RFC"), and GMAC Mortgage, LLC ("GMAC Mortgage"), each of which is a Delaware limited liability company, and the additional sellers identified on Schedule A hereto (together with ResCap, RFC and GMAC Mortgage, "Sellers").

**WHEREAS,** Sellers, together with other Affiliates (as hereinafter defined), ~~intend to file~~**filed** voluntary petitions ("Petitions") for relief (collectively, the "Bankruptcy Case") under Chapter 11 of Title 11, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") ~~on or shortly after the date this Agreement is executed~~;

**WHEREAS,** upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser (or Purchaser's assignee or assignees pursuant to Section 10.7 hereof) wishes to purchase from Sellers, the Purchased Assets (as hereinafter defined); and

**WHEREAS,** Sellers, as debtors and debtors-in-possession, ~~will continue~~**are** in the possession of their respective assets pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.1    Definitions.**  As used in this Agreement, the following terms have the meanings set forth below:

"Acceptable Servicing Procedures" means the procedures, including collection and loan administration procedures, for servicing mortgage loans using the same standard of care that Sellers customarily employ and exercise in servicing and administering similar mortgage loans for their own account, which shall be in compliance with Applicable Law.

"Accrued Interest" means interest accrued in accordance with the AFI Global Accounting Policy #2255 whereby interest is accrued up to the date the Whole Loan is classified as 60 days delinquent or, in the case the Whole Loan was previously modified, has had a sustained period of repayment performance of at least six months by the borrower.

"Adjustment Amount" has the meaning specified in Section 3.2(b).

1

"Adjustment Report" has the meaning specified in Section 3.2(d).

"Advances" means, with respect to each Mortgage Loan, the aggregate outstanding amount that, as of any date of determination, has been advanced directly by Sellers from their own funds or from funds advanced under any loan facility in connection with servicing of such Mortgage Loans in accordance with Acceptable Servicing Procedures solely with respect to Taxes, insurance premiums and corporate advances as permitted by Applicable Requirements, including in each case the right to reimbursement for, and enforce payment of, such Advances. For the avoidance of doubt, "Advances" shall not include (i) any HELOC draws and (ii) any advances of, or on account of, principal and interest.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 20% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by Contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.  ~~Notwithstanding the foregoing, for purposes of this Agreement, unless otherwise specifically provided, Affiliates of Sellers include only direct or indirect Subsidiaries of ResCap, and other Affiliates of Purchaser are excluded from the definition of Sellers' Affiliates and references to Affiliates of Purchaser exclude Sellers and their Affiliates.~~

"Affiliate Purchased Assets" has the meaning specified in Section 2.4(a).

"Affiliate Seller" has the meaning specified in Section 2.4(a).

**"AFI" means Ally Financial Inc., a Delaware corporation.**

"Agency" means a government-sponsored secondary mortgage market enterprise or Government Entity acquiring, owning or guaranteeing Mortgage Loans, including for purposes of this Agreement, Fannie Mae, Ginnie Mae, Freddie Mac, FHA and HUD.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the Exhibits, Schedules and Disclosure Memorandum attached hereto, as any of them may be amended from time to time.

"Allocation Schedule" has the meaning specified in Section 3.3(a).

"ALTA" means the American Land Title Association or any successor thereto.

~~"Alternative Restructuring" means a proposal or offer for a chapter 11 plan or other restructuring transaction which Sellers and their respective Boards of Directors have determined in good faith constitutes a proposal that is reasonably likely to be more favorable to Sellers' estates, their creditors and other parties to whom Sellers owe fiduciary duties than the Chapter 11 Plan.~~

"Amended Disclosure Memorandum" has the meaning specified in Section 6.11(b).

"<u>Ancillary Agreements</u>" has the meaning specified in <u>Section 2.8</u>.

"<u>Antitrust Authority</u>" has the meaning specified in <u>Section 6.13(b)</u>.

"<u>Applicable Law</u>" means, as of the time of reference and as applicable, any Law that is applicable to the Purchased Assets.

"<u>Applicable Requirements</u>" means and includes, as of the time of reference, with respect to the origination, purchase, sale and servicing of Mortgage Loans, (in each case to the extent applicable to any particular Mortgage Loan): (i) contractual obligations of Sellers (except those rendered unenforceable by the Bankruptcy Code **<u>against both the applicable Seller and any assignee of that Seller</u>**), including with respect to any Mortgage Loan Document or any other commitment or other contractual obligation relating to a Mortgage Loan, (ii) Applicable Laws, (iii) other applicable requirements and guidelines of any Government Entity and (iv) applicable requirements of MERS.

"<u>April Collateral Exceptions Report</u>" means the collateral exceptions report prepared by Sellers' custodians in April 2012 and most recently updated as of May 6, 2012, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the Mortgage Loan Documents are not in its possession, to the extent applicable, or have document deficiencies.  No Seller shall have any obligation to deliver any documents included in the April Collateral Exceptions Report or cure any document deficiencies identified in the April Collateral Exceptions Report.

"<u>Auction</u>" has the meaning specified in the Sale Procedures Order.

"<u>Bankruptcy Case</u>" has the meaning specified in the preamble.

"<u>Bankruptcy Code</u>" has the meaning specified in the preamble.

"<u>Bankruptcy Court</u>" has the meaning specified in the preamble.

"<u>Bankruptcy Exceptions</u>" means (i) as a result of Sellers operating as debtors in possession under the Bankruptcy Code, (a) Sellers' inability to maintain the services of their officers or other employees, including the possibility that a substantial number of Sellers' employees have left, or will leave, their positions, and (b) vendors and counterparties of Sellers failing to continue to perform their obligations to Sellers, and (ii) any limitation or obligation imposed on Sellers by Order of the Bankruptcy Court or the DIP Financing Agreements.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure.

"<u>Bill of Sale</u>" means one or more bills of sale to be executed by Sellers and Purchaser in respect of certain Purchased Assets, in a customary form as mutually agreed between Sellers and Purchaser.

**"<u>Break-Up Fee</u>" has the meaning specified in Section 6.12(c).**

"Business Day" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

~~"Chapter 11 Plan" shall mean the Chapter 11 plan of reorganization, in form and substance in accordance with the terms set forth in Schedule 6.12(f) and otherwise satisfactory to Sellers and Purchaser, which shall be confirmed by the Bankruptcy Court in accordance with section 1129 of the Bankruptcy Code.~~

~~"Chapter 11 Plan Effective Date" shall mean the date upon which all the conditions to effectiveness of the Chapter 11 Plan shall have been satisfied or waived and the transactions contemplated hereunder shall have been substantially consummated.~~

**"Cash Deposit" has the meaning specified in Section 3.4.**

"Claims" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, known or unknown.

"Closing" has the meaning specified in Section 2.7.

"Closing Collateral Exceptions Report" means the collateral exceptions report generated by Sellers' custodians upon Sellers' request and at Purchaser's expense, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the Mortgage Loan Documents are not in Sellers' possession, to the extent applicable, or have document deficiencies. No Seller shall have any obligation to deliver any documents included in the Closing Collateral Exceptions Report or cure any document deficiencies identified in the Closing Collateral Exceptions Report.

"Closing Date" means the date upon which the Closing occurs.

"Closing Date Mortgage Loan Schedule" has the meaning specified in Section 4.5.

"Closing Date Purchase Price" has the meaning specified in Section 3.2(a).

"Collateral Exceptions Report" means the April Collateral Exceptions Report or the Closing Collateral Exceptions Report, as applicable.

"Competing Transaction" has the meaning specified in Section 7.1.

"Confidential Information" has the meaning specified in Section 6.15(a).

~~"Confirmation Order" means the order of the Bankruptcy Court confirming the Chapter 11 Plan in accordance with section 1129 of the Bankruptcy Code.~~

"Consent" means the Permits, authorizations, consents, waivers, approvals and licenses from third parties or Government Entities necessary to consummate this Agreement and the transactions contemplated hereby and for Purchaser to hold the Purchased Assets after the Closing.

"Consent Order" means the Consent Order entered into on April 13, 2011, by and among the FDIC, the FRB and ~~Parent~~**AFI**, Ally Bank, ResCap and GMAC Mortgage.

"Consumer Privacy Ombudsperson" has the meaning specified in Section 2.11.

"Contract" means any agreement, consensual obligation, promise, understanding, arrangement, commitment or undertaking of any nature (whether written or oral and whether express or implied), including leases, subleases, licenses, sublicenses, purchase orders, indentures and loan agreements (other than this Agreement and the Ancillary Agreements) (including each amendment, extension, exhibit, attachment, addendum, appendix, statement of work, change order and any other similar instrument or document relating thereto).

"Credit File" means with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan that contains, if available, the documents described on Schedule B hereto, together with the credit documentation relating to the origination of such Mortgage Loan which may be maintained on microfilm, optical storage or any other comparable medium.

"Cut-off Date" means the last day of the month immediately preceding the month of the ~~expected~~ Closing Date or such other date as Purchaser and Sellers may agree.

"Cut-off Date Mortgage Loan Schedule" has the meaning specified in Section 4.5.

"Cut-off Date Purchase Price" has the meaning specified in Section 3.1(d).

**"Deposit Escrow Agreement" means an escrow agreement by and among Purchaser, Sellers and the Escrow Agent, in substantially the form set forth in Exhibit 4 hereto, executed and delivered simultaneously with the execution and delivery hereof.**

"Determination" has the meaning specified in Section 3.3 (a).

"DIP Financing Agreements" means the Debtor-in-Possession Loan and Security Agreements identified on Schedule C hereto, as such agreements may be amended from time to time.

"DIP Borrowers" means GMACM Borrower LLC, a wholly owned subsidiary of GMAC Mortgage, and RFC Borrower LLC, a wholly owned subsidiary of RFC.

"Disclosure Memorandum" has the meaning specified in Section 6.11(a).

"Dispute Notice" has the meaning specified in Section 3.2(c).

"<u>DOJ/AG Settlement</u>" means the Consent Judgment filed with the U.S. District Court for the District of Columbia on March 12, 2012 to which ~~Parent~~**AFI**, ResCap and GMAC Mortgage are parties.

"<u>Electronic Data File</u>" means test tape(s), sale tape(s) and/or transfer tape(s) containing Mortgage Loan information delivered or to be delivered by Sellers to Purchaser in connection with the transfer of the Whole Loans contemplated hereby.

"<u>Enforceability Exceptions</u>" has the meaning specified in <u>Section 4.1</u>.

**"<u>Escrow Agent</u>" means Wells Fargo Bank, N.A. or such other bank or other financial institution reasonably acceptable to Sellers and Purchaser.**

"<u>Escrow Payments</u>" means the aggregate amount of the escrows for real estate taxes, insurance, private mortgage insurance, and other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to any Mortgage Loan.

"<u>Excluded Assets</u>" has the meaning specified in <u>Section 2.2</u>.

"<u>Fannie Mae</u>" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"<u>FDIC</u>" means the Federal Deposit Insurance Corporation or any successor thereto.

"<u>Fed Funds Rate</u>" means, for any date, the weighted average of the rates set forth in the weekly statistical release H.15(519) (or any successor publication) published by the Board of Governors of the Federal Reserve System opposite the caption "Federal Funds (Effective)."

"<u>FHA</u>" means the Federal Housing Administration of HUD, or any successor thereto.

"<u>FHA Loans</u>" means mortgages insured by the FHA.

"<u>Final Order</u>" means an Order (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the Order has been affirmed by the highest court to which such Order was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such Order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; <u>provided</u>, that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules, may be filed with respect to such order or judgment shall not prevent such Order from being considered a Final Order.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System.

"<u>Freddie Mac</u>" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

"Ginnie Mae" means the Government National Mortgage Association, a body corporate organized and existing under the laws of the United States of America within HUD, or any successor thereto.

"GMAC Mortgage" has the meaning specified in the preamble.

"Government Entity" means any United States federal, state or local, or any supranational, court, judicial or arbitral body, administrative or regulatory body or other governmental or quasi-Government Entity with competent jurisdiction (including any political or other subdivision thereof), including the Agencies, the FHA, HUD, the VA, the FRB, the FDIC, the IRS, any state agency and any Antitrust Authority.

"Guaranteed Obligations" has the meaning specified in Section 10.15.

"HAMP" means the Treasury Department's Home Affordable Modification Program established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HARP" means the Treasury Department's Home Affordable Refinance Program established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HASP" means the Treasury Department's Homeowner Affordability and Stability Plan established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HELOC" means a Mortgage Loan that is a home equity line of credit.

"Homes Act" means the Helping Families Save Their Homes Act of 2009, as amended.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"HUD" means the Department of Housing and Urban Development of the United States of America.

"Indebtedness" means (i) all indebtedness for borrowed money or for the deferred purchase price of property or services (other than current trade Liabilities incurred in the Ordinary Course of Business and payable in accordance with customary practices), (ii) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument, (iii) liabilities under or in connection with letters of credit or bankers' acceptances or similar items, (iv) all obligations under financing leases, (v) all Liabilities secured by any Lien on any property, and (vi) all guarantee obligations.

"Independent Accounting Firm" means a nationally recognized independent accounting firm mutually chosen by Purchaser and ResCap.

"Insurance Policy" means (i) any private mortgage insurance or commitment of any private mortgage insurer to insure, (ii) any title insurance policy, (iii) any hazard insurance policy, (iv) any flood insurance policy, (v) any fidelity bond, direct surety bond, or errors and omissions insurance policy required by private mortgage insurers, (vi) any surety bonds required by state banking authorities for licensing purposes or (vii) any surety or guaranty agreement.

"Insurer" means an issuer of an Insurance Policy.

"IRS" means the Internal Revenue Service.

"Knowledge of Sellers" concerning a particular subject, the affairs of any Seller or the Purchased Assets, means the actual knowledge of any individual listed on Schedule D hereto.

"Law" means any law, statute, ordinance, rule, regulation, code, Order, Permit, or other legal requirement enacted, issued, promulgated, enforced, or entered by a Government Entity.

"Liabilities" means any and all Indebtedness, liabilities, costs, Losses, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability), and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Licenses" means the Permits required by Law or an Agency or other Government Entity in order to hold the Purchased Assets.

"Lien" means any lien, charge, pledge, deed of trust, right of first refusal, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, option, proxy, hypothecation, voting trust agreement, transfer restriction, easement, servitude, encroachment, or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Loss" or "Losses" means any and all damages, losses, actions, proceedings, causes of action, Liabilities, claims, Liens, penalties, fines, demands, Taxes, assessments, awards, judgments, settlements, costs and expenses, including (i) court costs and similar costs of litigation; (ii) reasonable attorneys' and consultants' fees, including those incurred in connection with (a) investigating or attempting to avoid the matter giving rise to the Losses or (b) successfully establishing a valid right to indemnification for Losses; and (iii) interest awarded as part of a judgment or settlement, if any, but in any event "Loss" or "Losses" shall exclude punitive damages claimed, incurred or suffered by any Person (which exclusion does not include any such damages for which such Person is liable to a third party as a direct, out-of-pocket cost of such Person).

"Master Servicing Rights" means any and all rights of a Seller to master service the Mortgage Loans and to monitor the performance of the primary servicers, including to the extent

applicable any and all rights of a Seller to the following:  (a) any payments or monies received as compensation for master servicing the Mortgage Loans; (b) collection of any late fees, penalties or similar payments with respect to the Mortgage Loans; (c) administration and maintenance of all agreements or documents creating, defining or evidencing any such master servicing rights of the related Seller thereunder; (d) maintenance of all accounts and other rights to payment related to any of the property described in this paragraph; and (e) administration and maintenance of any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records, or other information pertaining to the applicable Mortgage Loans.

"<u>Material Adverse Effect</u>" means any condition, circumstance, event, state of facts, change or effect that is materially adverse to the Purchased Assets or to Sellers' ability to effect the transactions contemplated herein or to perform their obligations under this Agreement and the Ancillary Agreements; <u>provided</u>, that, for purposes of this Agreement, a Material Adverse Effect shall not include any condition, circumstance, event, state of facts, change or effect to the Purchased Assets resulting from (i) conditions, circumstances, events or changes to the housing or mortgage market or the mortgage servicing industry; (ii) the announcement or disclosure of the transactions contemplated herein, (iii) general economic, regulatory or political conditions or changes in the United States; (iv) military action or acts of terrorism; (v) changes in Law or changes in GAAP or in the application of GAAP that become effective after the date hereof that Sellers are required to adopt in accordance therewith; (vi) actions taken or not taken, in each case, at the request of Purchaser; (vii) conditions in or changes to any financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or market index); (viii) changes in or with respect to any of the Agencies, including in their legal organization, responsibilities, oversight obligations or roles in the mortgage loan and securities markets; or (ix) any effects on the Purchased Assets resulting from the fact that Sellers will be operating as debtors-in-possession under the Bankruptcy Code; and <u>provided</u>, <u>further</u>, that, in the case of each of <u>clauses (i)</u>, (iii), (iv), (v)<u>, (vii),</u> and (~~vii~~<u>viii</u>), the Purchased Assets are not, or not reasonably likely to be, materially disproportionately affected by such condition, circumstance, event, state of facts, change or effect compared to similar assets of other Persons engaged in the conduct of similar businesses.

"<u>MERS</u>" means the Mortgage Electronic Registration System maintained by Merscorp Holdings, Inc.

"<u>MERS Loan</u>" means any Mortgage Loan registered on the MERS system for which MERS is listed as the record mortgagee or beneficiary on the related mortgage or assignment thereof.

"<u>MIN</u>" means the mortgage identification number issued to each MERS Loan.

"<u>MOM Loan</u>" means any Mortgage Loan that was registered on the MERS system at the time of origination thereof and for which MERS appears as the record mortgagee or beneficiary on the related mortgage.

"<u>Mortgage File</u>" means, with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan that contains each of the Mortgage Loan Documents except as specified in any applicable Collateral Exceptions Report.

"Mortgage Loan" means any U.S. individual residential (one-to-four family) mortgage loan or other extension of credit secured by a Lien on U.S. real property of a borrower ~~originated, purchased or serviced~~**currently owned** by a Seller or any Affiliate Seller (which may be a charged-off Mortgage Loan or the receivable with respect to a funded HELOC advance)**, including all guarantees and other secondary obligations**.

"Mortgage Loan Documents" means, for any Mortgage Loan:

(A) either:

(i) the original Mortgage Note, endorsed **by the original payee** (on the Mortgage Note or an allonge attached thereto) "Pay to the order of _____ without recourse," and signed by facsimile signature in the name of ~~the last~~**each** holder of record by an authorized officer**, reflecting an unbroken chain of endorsements to the last holder of record**; or

(ii) a copy of the Mortgage Note (endorsed as provided above) together with a lost note affidavit and indemnity, bearing all intervening endorsements, to the extent of any such endorsements, from the original payee to an endorsement in blank, and if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee;

(B) the original mortgage, with evidence of recording thereon (and, in the case of a MOM Loan, with evidence of the MIN); provided, that (A) if the original mortgage has been delivered for recording to the public recording office of the jurisdiction in which the Mortgaged Property is located but has not yet been returned to the applicable Seller by such recording office, such Seller shall (i) provide to Purchaser a copy of the mortgage, and (ii) as soon as the original mortgage becomes available, deliver to Purchaser the original of such mortgage, with evidence of recording thereon, and (B) if such original mortgage is not available, has been lost or if such public recording office retains the original recorded mortgage, such Seller shall deliver or cause to be delivered to Purchaser a photocopy of such mortgage with the recording information **and evidence of recording** included on such copy, certified by such Seller to be a copy of the original recorded mortgage;

(C) unless such Mortgage Loan is a MERS Loan, the original assignment of the mortgage, from the applicable Seller signed by original signature of an authorized officer, in blank, which assignment shall be in form and substance acceptable for recording (except for the insertion of the names of the assignee and the recording information);

(D) unless such Mortgage Loan is a MOM Loan, originals ~~or copies~~ of all recorded intervening assignments of the mortgage **from the original mortgagee of record to the applicable Seller**; provided, that (A) if any original intervening assignment of the mortgage has been delivered for recording to the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located but has not yet been returned to the applicable Seller by such recording office, such Seller shall

deliver to Purchaser such original intervening assignment of the mortgage, with evidence of recording thereon, if and when such assignment of the mortgage becomes available, and (B) if such intervening assignment of the mortgage is not available or if such public recording office retains the original recorded intervening assignment of the mortgage, a Seller may deliver a photocopy of such intervening assignment of the mortgage showing **recording information and** evidence of recordation;

(E)    the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any, or if such assumption, modification, consolidation or extension agreements are not available, a copy of such assumption, modification, consolidation or extension agreements **with evidence of recording thereon**; and

(F)    the original copy of the original lender's title insurance policy in the form of an ALTA mortgage title insurance policy and insuring Purchaser and its successors and assigns as to the first priority lien of the mortgage in the original principal amount of the Mortgage Loan or, if the original lender's title insurance policy has not been issued, the commitment to issue the same; provided, that this ~~subSection~~**subsection** (F) shall not apply to second lien Mortgage Loans.

"Mortgage Loan Schedule" has the meaning specified in Section 4.5.

"Mortgage Note" means, with respect to a Mortgage Loan, a promissory note or notes, a loan agreement or other evidence of Indebtedness with respect to such Mortgage Loan, secured by a mortgage or mortgages or a deed or deeds of trust, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"Mortgage Securities" means the trading/financing securities to be included in the Purchased Assets, which are identified on Schedule E hereto.

"Mortgage Securities Purchase Price Percentage" means 0.8194%.

"Mortgaged Property" means the real property securing repayment of the Indebtedness evidenced by a Mortgage Note pursuant to a related Mortgage Loan.

"Mortgagor" means the obligor on a Mortgage Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related mortgage and such grantor's or mortgagor's successors in title to the Mortgaged Property.

~~"Nationstar" means Nationstar Mortgage LLC.~~

"Necessary Consent" has the meaning specified in Section 2.5.

"Non-performing" means, with respect to any Mortgage Loan as of any date of determination, that (a) such Mortgage Loan is 30 or more days past due with respect to a scheduled payment of principal and interest, or (b) there exists an event of default under the terms of the related Mortgage Note or mortgage.

"Order" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Government Entity affecting such Person or any of its properties.

"Ordinary Course of Business" means the ordinary course of business of Sellers during the six months immediately preceding the date of this Agreement as modified from time to time in order to comply with the Consent Order, the DOJ/AG Settlement and any other change required by any Government Entity or MERS, and, from and after the Petition Date, in accordance with the budget contemplated by the DIP Financing Agreements.

"Performing" means, with respect to any Mortgage Loan as of any date of determination, **(a)** such Mortgage Loan is current or fewer than 30 days past due with respect to a scheduled payment of principal and interest**, and (b) no event of default exists (or would exist with notice or the lapse of time or both) under the Mortgage Note or mortgage**.

"Permits" means permits, concessions, grants, franchises, licenses, variances, exemptions, exceptions, clearances, registrations, qualifications, filings and other authorizations and approvals required or issued by any Government Entity and related to the Purchased Assets.

"Permitted Liens" means (i) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable ~~or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; provided, that an appropriate reserve is established therefor against the carrying amount of the related assets; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business and the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; provided, that an appropriate reserve is established therefor against the carrying amount of the related assets; and (iii~~**, and (ii**) Liens that will be and are discharged or released either prior to, or simultaneously with**,** the Closing~~; provided, that, except in the case of clause (i), such exceptions (a) do not render title to the property encumbered thereby unmarketable and (b) do not, individually or in the aggregate, materially detract from the value or use of such property for its current purposes~~.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity or organization.

"Petition Date" means the date on which the Petitions in respect of the Bankruptcy Case ~~are~~**were** filed with the Bankruptcy Court.

"Petitions" has the meaning specified in the preamble.

~~"Primary APA" means that certain Asset Purchase Agreement, dated as of the date hereof, between Sellers, on the one hand, and Nationstar or another Winning Bidder that is acceptable to Sellers, on the other hand.~~

"Primary Servicing Rights" means any and all rights of a Seller to service the Mortgage Loans, including to the extent applicable any and all rights of a Seller to the following:  (a) any

payments or monies received for servicing the Mortgage Loans; (b) any late fees, penalties or similar payments with respect to the Mortgage Loans; (c) all agreements or documents creating, defining or evidencing any such servicing rights to the extent they relate to such servicing rights and all rights of the related Seller thereunder; (d) Escrow Payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto, subject to the rights of the related Mortgagor in such amounts; (e) all accounts and other rights to payment related to any of the property described in this paragraph; and (f) any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans.

"Privileged Documents" has the meaning specified in Section 2.3.

"Purchase Price" has the meaning specified in Section 3.1(a).

"Purchase Price Adjustment Statement" has the meaning specified in Section 3.2(a).

"Purchase Price Document Deficiency Multiplier" means, for each Whole Loan Bucket, the multiplier to be applied to the Whole Loan Purchase Price Percentage for such Whole Loan Bucket based on the percentage of Mortgage Files in such Whole Loan Bucket determined to contain deficiencies (as set forth in the Closing Collateral Exceptions Report) as follows:

| Percentage Deficient | Purchase Price Document Deficiency Multiplier |
|---|---|
| < =6% | 1.033 |
| 8% | 1.029 |
| 10% | 1.021 |
| 12% | 1.013 |
| 15% | 1.000 |
| 18% | 0.979 |
| 20% | 0.962 |
| 22% | 0.948 |
| > =24% | 0.937 |

"Purchase Price Schedule" means Schedule F hereto which sets forth an example of the calculations to be made pursuant to Section 3.1 in order to calculate the Purchase Price as if calculated as of December 31, 2011.

"Purchased Assets" has the meaning specified in Section 2.1.

"Purchased Servicing Rights" means (i) with respect to Mortgage Loans indicated on the Mortgage Loan Schedule as being primary serviced by an SBO Servicer, the Master Servicing Rights, (ii) with respect to Mortgage Loans indicated on the Mortgage Loan Schedule as being primary serviced by a Seller, the Primary Servicing Rights and the Master Servicing Rights, and (iii) with respect to 41 Mortgage Loans as to which a Seller owns both the Primary Servicing

Rights and the Master Servicing Rights, but which are indicated on the Mortgage Loan Schedule as being primary serviced by a third-party servicer on a subservicing basis, the Primary Servicing Rights and the Master Servicing Rights.

"<u>Purchaser</u>" has the meaning specified in the preamble.

"<u>Report Request Date</u>" has the meaning specified in <u>Section 3.1(d)</u>.

"<u>ResCap</u>" has the meaning specified in the preamble.

"<u>Retained Liabilities</u>" means any and all Liabilities of any kind or nature whatsoever of a Seller or any of its Affiliates, including but not limited to any Liabilities relating to the origination or securitization of Mortgage Loans by Sellers or any Affiliate of Sellers **or relating to the servicing of Mortgage Loans prior to the Closing Date**, including repurchase obligations relating thereto.

"<u>RFC</u>" has the meaning specified in the preamble.

"<u>Sale Approval Order</u>" means a Final Order or Final Orders of the Bankruptcy Court issued pursuant to sections 105, 363, and 365 of the Bankruptcy Code, in substantially the form set forth in <u>Exhibit 1</u> hereto, authorizing and approving, among other things, (i) the sale, transfer and assignment of the Purchased Assets to Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Claims and Liens and (ii) that Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code. ~~References to the "Sale Approval Order" in this Agreement shall be deemed to include the Confirmation Order provided (1) the Confirmation Order has been entered by the Bankruptcy Court by October 31, 2012, (2) the Chapter 11 Plan Effective Date has occurred by December 15, 2012, (3) the provisions of the Confirmation Order are reasonably acceptable to Purchaser, (4) the Confirmation Order has become a Final Order by December 15, 2012 and (5) Purchaser and Sellers agree, in their reasonable judgment, that the Sale Approval Order should be incorporated into the Confirmation Order.~~

"<u>Sale Hearing</u>" has the meaning specified in the Sale Procedures Order.

"<u>Sale Motion</u>" means the motion filed by Sellers with the Bankruptcy Court for the ~~approval of the Sale Procedures Order~~**entry of a sale procedures order** and the Sale Approval Order~~, in form and substance reasonably satisfactory to Purchaser, Parent and Sellers~~.

"<u>Sale Procedures</u>" means the Sale Procedures substantially in the form set forth in <u>Exhibit 2</u>, as such procedures may be amended and approved in the Sale Procedures Order and in form and substance reasonably satisfactory to Purchaser, ~~Parent~~ and Sellers.

"<u>Sale Procedures Order</u>" means a Final Order of the Bankruptcy Court, in the form set forth in <u>Exhibit 3</u>, with modifications, if any, to be in form and substance reasonably satisfactory to Purchaser that, among other things, approves the Sale Procedures and designates Purchaser as a "stalking horse bidder" for the Purchased Assets.

"SBO Loan" means a Mortgage Loan serviced by an SBO Servicer under an SBO Servicing Agreement.

"SBO Servicer" means the Person responsible for performing loan servicing functions with respect to a Mortgage Loan under an SBO Servicing Agreement.

"SBO Servicing Agreements" means the servicing agreements between any Seller, on the one hand, and any third-party servicer or subservicer, on the other hand.

"Section 363 Sale" means a sale process conducted by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code.

"Sellers" has the meaning specified in the preamble.

"Servicing File" means for each Mortgage Loan other than an SBO Loan, all loan documents and information (including any servicing tapes, images and conversion reports) received or obtained through the efforts of servicing the Mortgage Loan, which may be maintained on CD or DVD or by other electronic means.  To the extent available, each Servicing File shall contain:  (a) documentation relating to any releases of collateral, (b) any correspondence between the current servicer of the mortgage and the Mortgagor, (c) payment history, (d) collection letters or form notices, and (e) foreclosure correspondence and legal notification.  For the SBO Loans, the term "Servicing File" means only such copies of the foregoing documents as shall have been provided by the primary servicer and retained by the master servicing group of the applicable Seller.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (i) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries or (ii) such Person or any other Subsidiary of such Person is a general partner (excluding any such partnership where such Person or any Subsidiary of such Person does not have a majority of the voting interest in such partnership).

"Tax" or "Taxes" means all (i) taxes, charges, fees, duties, levies, penalties or other assessments imposed by any federal, state, local or foreign Government Entity, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable thereto or attributable to any failure to comply with any requirement regarding Tax Returns, (ii) liability for the payment of any Taxes as a result of being or having been on or before the Closing Date a member of an affiliated, consolidated, combined or unitary group or other association, and (iii) any transferee or secondary Liability in respect of Taxes, and, in each case, any interest or penalty thereon or addition thereto, whether disputed or not.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto or amendment thereof.

"<u>Third Party Servicing Agreement</u>" means the servicing agreement to be executed by and between Purchaser and the Winning Bidder.

"<u>Transaction Proceeds</u>" mean the proceeds obtained by Sellers in connection with the payment of the Purchase Price pursuant to <u>Article III</u> hereof.

"<u>Transfer Taxes</u>" means any federal, state, county, local, foreign and other excise, sales, use, value added, transfer (including real property transfer or gains), conveyance, stamp, documentary transfer, filing, recording or other similar Tax, fee or charge, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, resulting directly from the transactions contemplated by this Agreement.

"<u>UPB</u>" means, with respect to each Mortgage Loan as of any date of determination, the unpaid principal balance of such Mortgage Loan as of the close of business on such date of determination, after deduction and application of all payments of principal received by such date of determination.

"<u>VA</u>" means the Department of Veteran Affairs of the United States of America, or any successor thereto.

"<u>VA Loans</u>" means mortgages guaranteed by the VA.

"<u>Whole Loan Bucket</u>" means each of the following categories of Whole Loans included in the Purchased Assets, calculated as set forth in the Purchase Price Schedule:  Performing First Lien, Non-Performing First Lien, Performing Second Lien, Non-Performing Second Lien, Other and HELOC Advances.

"<u>Whole Loan Purchase Price Percentage</u>" means, for the Whole Loans in each Whole Loan Bucket included in the Purchased Assets, the following percentages with respect to a Chapter 11 Plan and a Section 363 Sale, respectively, which shall be adjusted by applying the applicable Purchase Price Document Deficiency Multiplier to reflect the percentage of Mortgage Files determined to be deficient based on the Closing Collateral Exceptions Report:

| Whole Loan Bucket | Purchase Price Percentage with respect to a Chapter 11 Plan | Purchase Price Percentage with respect to a Section 363 Sale |
| --- | --- | --- |
| Performing First Lien………………………………… | 49.20**43.05** | 43. |
| Non-Performing First Lien……………………………… | 34.50**30.1875**% | 30.18 |
| Performing Second Lien………………………………... | 52.80**46** | 46 |
| Non-Performing Second Lien…………………………... | 17.10**14.962** | 14.9 |

| | | |
|---|---|---|
| Other…………………………………………………….. | ~~40.003~~5 | ~~3~~5 |
| HELCO Advances……………………………………. | ~~58.80~~5] | ~~5~~] |

"<u>Whole Loans</u>" means the first and second lien Mortgage Loans, HELOCs and other Mortgage Loans owned by Sellers and intended to be purchased by Purchaser, and any collateral, insurance, guaranty or other credit support arrangement related thereto, as identified on the Mortgage Loan Schedule, the Cut-off Date Mortgage Loan Schedule or the Closing Date Mortgage Loan Schedule, as applicable.

~~"Winning Bidder" means Nationstar or any other winning bidder for substantially all of the assets of Sellers contemplated to be sold by Sellers substantially on the terms and conditions set forth in the Primary APA.~~

**Section 1.2    Interpretation.**  For purposes of this Agreement:

(a)    The headings preceding the text of Articles and Sections included in this Agreement are for convenience only and shall not be deemed part of this Agreement or be given any effect in interpreting this Agreement.

(b)    The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement.

(c)    The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.

(d)    Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement.  Reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(e)    Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

(f)    Underscored references to Articles, Sections, paragraphs, clauses or Exhibits shall refer to those portions of this Agreement.  The use of the terms "hereunder," "hereby," "hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Article, Section, paragraph or clause of, or Schedule or Exhibit to, this Agreement.

(g)    All references to amounts denominated in dollars shall mean U.S. dollars, except where specifically noted otherwise.

(h)    Whenever any payment hereunder is to be paid in "cash," payment shall be made in U.S. dollars and the method for payment shall be by wire transfer of immediately available funds.

(i)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(j)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(k)    Each of the parties has participated in the drafting and negotiation of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

## ARTICLE II.

## PURCHASE AND SALE OF ASSETS

**Section 2.1    Purchase and Sale of Assets.**  On the terms and subject to the conditions set forth herein, at the Closing, Sellers shall sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in, to and under the following assets (collectively, the "Purchased Assets"), in each case free and clear of all Claims and Liens except Permitted Liens, as approved for sale, transfer and assignment pursuant to the Sale Approval Order:

(a)    the pool of Whole Loans, servicing released to the extent of the Purchased Servicing Rights (including any and all Primary Servicing Rights and Master Servicing Rights included in the Purchased Servicing Rights owned by a Seller), and the right to all payments of Accrued Interest **and any other interest**, principal, penalties, fees, charges and other amounts received or receivable on or in respect of the Mortgage Loans after the Closing Date (except to the extent that an SBO Servicer is entitled to such amounts under an SBO Servicing Agreement), together with the Mortgage Files and the Credit Files, and any and all proceeds of the foregoing; provided, that HELOCs shall only be included in the Purchased Assets if the condition set forth in Section 8.3(d)(i) is satisfied or waived by Purchaser;

(b)    the Mortgage Securities;

(c)    the Advances as of the Closing Date;

(d)    the Purchased Servicing Rights and the related Servicing Files;

(e)    the causes of action, lawsuits, judgments, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or

Claims, including those indicated by the presence of a "litigation flag" or indicated to be in bankruptcy or active foreclosure on the Mortgage Loan Schedule, including all preference or avoidance claims and actions of any of the Sellers, in each case that are related to the Purchased Assets, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code (<u>provided</u>, that Sellers shall be entitled to participate in the defense of any counterclaim);

(f)        all rights to receive mail and other communications addressed to Sellers that pertains to the Purchased Assets, including any mail and communications from any Person who holds any Whole Loan (or any interest therein), trustees, customers, suppliers, distributors and their respective representatives;

(g)        to the extent transferable, all rights under insurance policies and insurance proceeds directly relating to Whole Loans serviced pursuant to any servicing agreement **<u>and any other Purchased Asset</u>**, and all escrow accounts and any other accounts related to the Purchased Assets and all funds and property credited thereto; and

(h)        to the extent transferable, all guaranties, warranties, indemnities and similar rights in favor of any Seller or any Affiliate Seller to the extent related to any Purchased Asset.

**Section 2.2    Excluded Assets.**    Notwithstanding anything herein to the contrary, Sellers will not sell, assign, convey, transfer or deliver to Purchaser, and Purchaser will not purchase, acquire or assume or take assignment or delivery of, any and all assets, Contracts or rights that are not expressly Purchased Assets, whether tangible, real, personal or mixed (collectively, the "<u>Excluded Assets</u>").  For the avoidance of doubt, the servicing rights of SBO Servicers under the SBO Servicing Agreements are not the property of Sellers and are Excluded Assets.

**Section 2.3    Post-Closing Asset Deliveries.**    If any Seller or Purchaser, in its reasonable discretion, determines after the Closing that any other materials or assets constituting Purchased Assets are still in the possession of such Seller or any Affiliate Seller, such Seller shall, or shall cause such Affiliate Seller to, promptly deliver them to Purchaser at no additional cost or expense to Purchaser.  If any Seller or Purchaser, in its reasonable discretion, determines after the Closing that other materials or assets constituting Excluded Assets were delivered to Purchaser in error, Purchaser shall promptly return them to the applicable Seller at Sellers' sole cost and expense.  In furtherance and not in limitation of the foregoing (and notwithstanding any provision in this Agreement to the contrary), each of Sellers and Purchaser acknowledges and agrees that**<u>, other than the contents of the Servicing Files and similar documents,</u>** it is neither Sellers' nor Purchaser's intention to sell, assign or transfer possession of any documents or communications of Sellers that are subject to Sellers' attorney-client privilege and/or the work-product immunity doctrine (the "<u>Privileged Documents</u>").  If it is discovered that any such Privileged Documents have been inadvertently or unintentionally turned over to Purchaser, Purchaser agrees, upon Sellers' request, to promptly turn over to Sellers or destroy such Privileged Documents, in each case at Sellers' sole cost and expense; <u>provided</u>, that (i) Purchaser shall in no way be obligated or responsible for reviewing, identifying or making a determination that any documents or communications in its possession are Privileged Documents and (ii)

Purchaser shall not be obligated to take any actions under this <u>Section 2.3</u> that may subject it to any liability or otherwise be in violation with any applicable Law.

**Section 2.4    Conveyance of Assets by Affiliate Sellers.**

(a)    Notwithstanding anything to the contrary contained in this Agreement, if it is determined by Sellers and Purchaser before, at or after the Closing that any direct or indirect Subsidiary of ResCap (an "<u>Affiliate Seller</u>") owns or possesses any assets or properties that would be deemed to be Purchased Assets if such Affiliate Seller were a Seller under this Agreement (such assets and properties, the "<u>Affiliate Purchased Assets</u>"), then Sellers shall, upon Purchaser's request, promptly cause such Affiliate Seller to transfer, assign, convey and deliver to Purchaser such Affiliate Purchased Assets in accordance with the terms and conditions of this Agreement; <u>provided</u>, that Purchaser shall not be obligated to pay any additional amounts to Sellers in consideration for the transfer of such Affiliate Purchased Assets to Purchaser other than those amounts that Purchaser is obligated to pay to Sellers pursuant to <u>Section 3.1</u>.

(b)    To the extent that any Affiliate Purchased Assets are transferred, assigned, conveyed and delivered by an Affiliate Seller to Purchaser pursuant to this <u>Section 2.4</u>, then each representation and warranty set forth in <u>Article IV</u> and each covenant in <u>Article VI</u> shall be deemed to be applicable to such Affiliate Seller as if such Affiliate Seller were a Seller and to such Affiliate Purchased Assets as if such Affiliate Purchased Assets were Purchased Assets.

**Section 2.5    Non-Assignable    Purchased    Assets;    Necessary    Consents.** Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder unless the Bankruptcy Court has entered a Final Order (which may include the Sale Approval Order) whose effectiveness has not been stayed providing that (i) such Necessary Consent is not required or (ii) the Purchased Assets shall be assigned or transferred regardless of any such Necessary Consent and there shall be no breach or adverse effect on the rights of Purchaser thereunder for the failure to obtain any such Necessary Consent. As Purchaser may reasonably request, if the Bankruptcy Court has not entered such an Order, Sellers and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser.  If any such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Purchaser would not in fact receive all such rights, such Seller and Purchaser will cooperate in a mutually agreeable arrangement under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including, to the extent that such an arrangement would be permitted by Law and the related Contract, subcontracting, sub-licensing or sub-leasing to Purchaser, or under which such Seller would enforce for the benefit of Purchaser, with Purchaser assuming such

Seller's obligations in accordance with this Agreement, any and all rights of such Seller against a third party thereto.

**Section 2.6    Retained Liabilities.**    Sellers shall retain and be responsible for all Retained Liabilities and Purchaser shall not have any obligation of any nature or kind with respect thereto.

**Section 2.7    Closing.**    Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the transactions contemplated hereby shall take place at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 on the second Business Day following the date on which the conditions set forth in Sections 8.1, 8.2 and 8.3 (other than those conditions that by their nature can be satisfied only at the Closing but subject to the fulfillment or waiver of those conditions) have been satisfied or waived but no earlier than 18 Business Days following the Cut-off Date nor, at Purchaser's option, later than the last Business Day of the month in which such conditions are satisfied or waived, or at such other time and place as the parties hereto may mutually agree.  At the Closing, Purchaser shall deliver the Purchase Price in accordance with Sections 2.9 and 3.1, the transfer of title to the Purchased Assets shall take place, and the appropriate parties shall take all actions required under Sections 2.8, 2.9 and 2.10 and all other actions not previously taken but required to be taken hereunder at or prior to the Closing Date.  It is a condition of the Closing that all matters of payment and the execution and delivery of documents by any party to the others pursuant to the terms of this Agreement be concurrent requirements, and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

**Section 2.8    Ancillary Agreements.**    At the Closing, Sellers shall duly execute and deliver to Purchaser, and Purchaser shall duly execute and deliver to Sellers, as applicable, each of the following agreements (the "Ancillary Agreements"):

(a)    Bills of Sale;

(b)    Transfer Tax forms, if applicable, in the form required by Law;

(c)    such other agreements as may be entered into between the parties in connection with this Agreement;

(d)    all instruments or documents necessary to change the names of the individuals who have access to or are authorized to make withdrawals from or dispositions of all escrow or other accounts related to the Purchased Assets; and

(e)    any other documents that may be required by the Sale Approval Order or pursuant to any other direction by the Bankruptcy Court to be effected on or prior to the Closing.

**Section 2.9    Deliveries by Purchaser**.

(a)    At the Closing, Purchaser shall deliver to Sellers the following:

(i)        the Cut-off Date Purchase Price, in immediately available funds by wire transfer to an account or accounts designated by Sellers at least two Business Days prior to the Closing Date;

(ii)        the certificate to be delivered pursuant to Section 8.2(c);

(iii)        Ancillary Agreements duly executed by Purchaser; and

(iv)        such other customary instruments of transfer and assumption and other instruments or documents, in form and substance reasonably acceptable to Sellers, as may be necessary to effectuate the assignment of the Purchased Assets or to give effect to this Agreement or any Ancillary Agreement.

**Section 2.10    Deliveries by Sellers**.

(a)        At the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following:

(i)        the certificates to be delivered pursuant to Section 8.3(c);

(ii)        a receipt acknowledging payment of the Cut-off Date Purchase Price payable in accordance with Section 3.1(b);

(iii)        affidavits of Sellers' non-foreign status, in form and substance reasonably satisfactory to Purchaser, that comply with Section 1445 of the Tax Code and the regulations thereunder;

(iv)        Ancillary Agreements duly executed by the applicable Sellers;

(v)        ~~if the Confirmation~~**a copy of the Sale Approval** Order~~is received,~~ a certified ~~copy of the Confirmation Order~~**by the clerk of the Bankruptcy Court**, which shall be a Final Order;

(vi)        the Mortgage Files delivered pursuant to Section 6.16(a); provided, that if the Mortgage Files are in the possession of a custodian, Purchaser shall have received a trust receipt or similar document from such custodian acknowledging that such custodian holds the Mortgage Files for the benefit of Purchaser, and such custodian shall provide a copy of such trust receipt or similar document to Sellers; and

(vii)        such other customary instruments of transfer and assumption and other instruments or documents, in form and substance reasonably acceptable to Purchaser, as may be necessary to effect this Agreement, including Sellers' assignment of the Purchased Assets to Purchaser (or its assignee), or as may be required to give effect to any Ancillary Agreement.

**Section 2.11    Consumer Privacy Matters.**    The sale, if any, of customer lists, customer data and other consumer privacy information pursuant to this Agreement is subject to and shall

conform to the recommendations of any consumer privacy ombudsperson that may be appointed pursuant to Section 332 of the Bankruptcy Code (the "<u>Consumer Privacy Ombudsperson</u>") (to the extent that appointment of a Consumer Privacy Ombudsperson is determined to be necessary) in connection with the transactions contemplated in this Agreement.

**Section 2.12    "As Is, Where Is" Transaction.**    Purchaser hereby acknowledges and agrees that, except as expressly set forth in this Agreement, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets.    Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.    Purchaser further acknowledges that it is proceeding with its acquisition of the Purchased Assets, based solely upon its independent inspections and investigations and the representations and warranties herein and in the Ancillary Agreements.    Accordingly, except as expressly set forth in this Agreement, Purchaser will accept the Purchased Assets on the Closing Date "AS IS" and "WHERE IS."

## ARTICLE III.

## PURCHASE PRICE; ADJUSTMENT; ALLOCATION

**Section 3.1    Purchase Price; Payment of Purchase Price**.

(a)    Subject to the terms and conditions of this <u>Article III</u>, as aggregate consideration for the Purchased Assets, Purchaser will pay an aggregate amount in cash (the "<u>Purchase Price</u>") on the Closing Date equal to:

(i)    the product of (a) the sum, for each Whole Loan included in a Whole Loan Bucket (other than the Whole Loan Buckets related to HELOC Advances and Other), of the Whole Loan Purchase Price Percentage of the aggregate UPB of such Whole Loans included in such Whole Loan Buckets as of the Cut-off Date, times (b) the applicable Purchase Price Document Deficiency Multiplier;

(ii)    the sum, for each Whole Loan included in a Whole Loan Bucket related to the HELOC Advances and Other, of the Whole Loan Purchase Price Percentage of the aggregate UPB of such Whole Loans included in such Whole Loan Buckets as of the Cut-off Date; <u>provided</u>, that if the condition in <u>Section 8.3(d)(i)</u> is not satisfied or waived by Purchaser, then the Purchase Price shall be reduced by an amount equal to the sum, for each Whole Loan that is a HELOC Advance, of the Whole Loan Purchase Price Percentage applicable to such HELOC Advances of the aggregate UPB of such HELOC Advances as of the Cut-off Date;

(iii)    for each Whole Loan, to the extent applicable, the aggregate amount of unpaid Accrued Interest as of the Cut-off Date; ~~and~~

(iv)    the Mortgage Securities Purchase Price Percentage of the aggregate UPB of the Mortgage Securities included in the Purchased Assets as of the Cut-off Date.; and

(v)    cash in an amount equal to $[_____]. [PURCHASER TO INSERT AMOUNT SUFFICIENT TO RESULT IN TOTAL PURCHASE PRICE BEING EQUAL TO A BLENDED AVERAGE OF 42% OF THE UPB OF WHOLE LOANS INCLUDED IN THE PURCHASED ASSETS.]

(b)    As soon as reasonably practical following the Cut-off Date, but in no event later than 15 Business Days following the Cut-off Date (and, in any event, at least three Business Days prior to the Closing Date), Sellers shall deliver to Purchaser the Cut-off Date Mortgage Loan Schedule, prepared in good faith consistently with the preparation of the Mortgage Loan Schedule.  The Cut-off Date Mortgage Loan Schedule shall be subject to approval by Purchaser, such approval not to be unreasonably withheld, conditioned or delayed.

(c)    The April Collateral Exceptions Report has beenshall be delivered to Purchaser prior to the date hereof as document #16.8.2 in the data room established in connection withwithin two (2) Business Days of the date of this Agreement.  Sellers shall have the right, but not the obligation, to remedy any document deficiencies identified in the April Collateral Exceptions Report up to and including the Report Request Date.

(d)    On the date that is twelve Business Days prior to the Closing Date, or such earlier date as the custodians shall require (the "Report Request Date"), Sellers shall instruct the custodians who prepared the April Collateral Exceptions Report to produce the Closing Collateral Exceptions Report and deliver it to Sellers and Purchaser as soon as reasonably practicable.  Purchaser shall be responsible for all costs, expenses and fees incurred in connection with the production of the Closing Collateral Exceptions Report. Not less than five Business Days prior to the Closing Date, Sellers will provide Purchaser with a statement of Sellers' good faith calculation of the Purchase Price as of the Cut-off Date (the "Cut-off Date Purchase Price") prepared in a manner consistent with, and using the same principles, methodologies and policies as those set forth in, the Purchase Price Schedule.  The Closing Collateral Exceptions Report and the calculation of the Cut-off Date Purchase Price shall be subject to approval by Purchaser, such approval not to be unreasonably withheld, conditioned or delayed.

**Section 3.2    Purchase Price Adjustment; Final Payment**.

(a)    Post-Closing Determination.  As soon as reasonably practical following the Closing Date, but in no event later than 30 days following the Closing Date, Purchaser shall deliver to Sellers (i) the Closing Date Mortgage Loan Schedule and (ii) a statement (the "Purchase Price Adjustment Statement") setting forth Purchaser's calculation (prepared in a manner consistent with, and using the same principles, methodologies and policies as those set forth in, the Purchase Price Schedule) of the Purchase Price as of the Closing Date (the "Closing Date Purchase Price").  Sellers shall

provide Purchaser and its representatives full cooperation, including full access to books, records and employees in connection with the preparation of the Purchase Price Adjustment Statement.

(b)    <u>Purchase Price True-up</u>.    Subject to <u>Section 3.2(d)</u>, within 30 days of delivery of the Purchase Price Adjustment Statement (or within 15 days of the final determination of the Purchase Price in accordance with <u>Section 3.2(d)</u>), (i) if the Closing Date Purchase Price is less than the Cut-off Date Purchase Price, then Sellers shall pay to Purchaser an amount equal to such shortfall; and (ii) if the Closing Date Purchase Price is greater than the Cut-off Date Purchase Price, then Purchaser shall pay to Sellers an amount equal to such excess (in either event, the "<u>Adjustment Amount</u>").    The Adjustment Amount will (A) bear simple interest from the Closing Date to the date of payment at an interest rate equal to the Fed Funds Rate per annum as published in *The Wall Street Journal* as of the Closing Date and (B) be paid by wire transfer of immediately available funds to an account or accounts designated by the recipient thereof.

(c)    <u>Objections</u>.    Unless Sellers deliver written notice to Purchaser of an objection to all or a part of the Purchase Price Adjustment Statement (a "<u>Dispute Notice</u>") prior to the expiration of the 30-day period provided in <u>Section 3.2(b)</u> above, the Purchase Price Adjustment Statement shall become binding in its entirety at the end of such 30-day period.  The Dispute Notice shall set forth, in reasonable detail on a line-item by line-item basis, the basis for such dispute, the amounts involved and Sellers' determination of the Purchase Price.  If Sellers deliver a Dispute Notice to Purchaser within such period and the parties are unable to agree as to all issues in the Dispute Notice within the ten Business Day period immediately following the day after the Dispute Notice is received by Purchaser, then the Dispute Notice may be submitted by either Sellers or Purchaser to an Independent Accounting Firm to resolve the disputed items set forth therein in accordance with <u>Section 3.2(d)</u>.

(d)    <u>Dispute Resolution</u>.    An Independent Accounting Firm shall conduct a review of the Dispute Notice and any supporting documentation submitted by either Purchaser or Sellers.  The parties shall direct the Independent Accounting Firm to, as promptly as practicable and in no event later than 30 days following its receipt of the Dispute Notice, deliver to Sellers and Purchaser a report (the "<u>Adjustment Report</u>") setting forth in reasonable detail the Independent Accounting Firm's determination with respect to the issues specified in the Dispute Notice, and the revisions, if any, to be made to the Purchase Price Adjustment Statement together with supporting calculations.  The Independent Accounting Firm has no authority to review or raise items not expressly identified in the Dispute Notice.  With respect to each disputed line item, such determination, if not in accordance with the position of either Sellers or Purchaser, shall not be in excess of the higher, nor less than the lower, of the amounts advocated by either Sellers or Purchaser in the Dispute Notice or the Purchase Price Adjustment Statement, respectively, with respect to such disputed line item.  Such Adjustment Report and the revisions, if any, to be made to the Purchase Price Adjustment Statement shall be final and binding on the parties, absent arithmetical error, and shall be deemed a final arbitration award that is enforceable against each of the parties in any court of competent

jurisdiction, and the Purchase Price shall be adjusted according to such Adjustment Report and paid in accordance with <u>Section 3.2(b)</u>.  The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers and 50% by Purchaser.

**Section 3.3     Allocation of the Purchase Price for Tax Purposes**.

(a)     The Purchase Price shall be allocated among the Purchased Assets in accordance with Section 1060 of the Tax Code and the Treasury Regulations thereunder in a manner consistent with an allocation schedule (the "<u>Allocation Schedule</u>"), which Allocation Schedule shall be prepared by Purchaser and provided to Sellers for their review and the parties' mutual agreement within 90 days after the Closing Date.  The parties shall cooperate reasonably in attempting to reach such a mutual agreement.  If the Allocation Schedule is not mutually agreed upon within such period, the parties shall submit such dispute to an Independent Accounting Firm for a decision that shall be rendered in a timely manner in order to permit the timely filing of all applicable Tax forms.  The Independent Accounting Firm's review shall be final and binding on the parties except as otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code or similar provision of other Tax law (a "<u>Determination</u>").  The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers and 50% by Purchaser.

(b)     Each of Sellers and Purchaser shall (i) be bound by such allocation for purposes of determining Taxes (but not for any other purpose), (ii) prepare and file, and cause its Affiliates to prepare and file, its Tax Returns on a basis consistent with such allocation, and (iii) take no position, and cause its Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return, except in each case as otherwise required by a Determination.  If the allocation set forth on the Allocation Schedule is disputed by any Government Entity with taxing authority, the party receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of, material developments regarding, and resolution of such dispute.

**Section 3.4     Deposit. Upon execution of this Agreement, Purchaser will execute and deliver the Deposit Escrow Agreement to Sellers and the Escrow Agent and, upon execution and delivery thereof by each of the other parties thereto, Purchaser will deliver to the Escrow Agent, pursuant to the terms of the Deposit Escrow Agreement and within two Business Days following the date hereof, $25,000,000.00 in immediately available funds (the "Cash Deposit"). The Cash Deposit shall be held by the Escrow Agent in an interest-bearing account reasonably acceptable to Purchaser and Sellers. For the avoidance of doubt, the Cash Deposit shall not be the property of any Seller during such time that the Cash Deposit is held by the Escrow Agent. The Cash Deposit shall be held by the Escrow Agent to serve as an earnest money deposit under this Agreement to be released as follows:**

**(a)     Effect of Closing. If the Closing occurs, Sellers and Purchaser shall jointly instruct the Escrow Agent to, on the Closing Date, apply the Cash Deposit, together with all accrued investment income thereon, toward the payment of the Cut-off Date Purchase Price in accordance with the terms of the Escrow Agreement.**

**(b)    Effect of Termination.  In the event this Agreement is terminated by Sellers pursuant to Section 9.1(d)(ii), the receipt by Sellers of the Cash Deposit shall be Sellers' sole and exclusive remedy as liquidated damages and the Escrow Agent shall, on the first Business Day after receipt of joint written notice from Purchaser and Sellers, disburse the Cash Deposit to Sellers to be retained by Sellers for their own account.  If this Agreement is terminated for any reason other than the termination of this Agreement by Sellers pursuant to Section 9.1(d)(ii), the Escrow Agent shall, on the first Business Day after receipt of joint written notice from Purchaser and Sellers, return to Purchaser the Cash Deposit, and Purchaser shall have no further obligation or Liability of any kind to Sellers or any of their Affiliates.**

## ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed to Purchaser by Sellers in the Disclosure Memorandum, Sellers jointly and severally represent and warrant to Purchaser, as of the date hereof and as of the Closing Date (except to the extent any such representations and warranties shall have been expressly made as of a particular date, in which case such representations and warranties shall be made only as of such date), as follows:

**Section 4.1    Organization and Authority.**  Each Seller is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate or other organizational power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted.  Each Seller has the corporate or other organizational power, authority and right to enter into and deliver this Agreement and the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder, and to complete the transactions contemplated hereby and thereby (subject to entry of the Sale Procedures Order, ~~and~~ the Sale Approval ~~Order and the Confirmation~~ Order).  The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and (subject to entry of the Sale Procedures Order, ~~and~~ the Sale Approval ~~Order and the Confirmation~~ Order) validly authorized by all appropriate corporate or other organizational authority, and no other corporate or other organizational action on the part of any Seller is necessary to authorize the execution, delivery and performance by such Seller of this Agreement or any of the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby.  This Agreement constitutes the valid and legally binding obligations of each Seller, enforceable against each Seller in accordance with its terms, except (i) as such enforceability may be limited by principles of public policy and subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting ~~creditor's~~**creditors'** rights or by general equity principles (the "Enforceability Exceptions"); (ii) that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry of the Sale Approval Order or any other Order by the Bankruptcy Court; and (iii) that enforceability of all other provisions hereof is subject to entry of the Sale Procedures Order, the ~~Confirmation~~**Sale Approval** Order and any other action by the Bankruptcy Court.  Each Ancillary Agreement,

**27**

when required by this Agreement to be delivered to Purchaser, will be duly and validly executed and delivered by each Seller that will be a party thereto, and upon such execution and delivery (assuming such Ancillary Agreement constitutes a valid and binding obligation of each other party thereto) will constitute the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its respective terms, subject to the Enforceability Exceptions.

Section 4.2    Non-Contravention.    Assuming all Consents, declarations, filings or registrations set forth on Schedule 4.3 have been obtained or made, as applicable, and receipt of the Sale Approval Order and the Confirmation Order, the execution, delivery and performance of this Agreement and the Ancillary Agreement by Sellers and the consummation of the transactions contemplated hereby and thereby and the compliance by Sellers with the applicable terms and conditions hereof and thereof, do not and will not (a) conflict with or violate, result in a material breach or violation of or default (or an event which with notice or the passage of time or both would become a material breach or default) under, give rise to a right of termination, cancellation, acceleration of any material obligation or loss of any material benefit under (i) the organizational or governing documents of any Seller, (ii) any Law or Order applicable to Sellers, or (iii) any material terms, conditions or provisions of any SBO Servicing Agreement or (b) result in the creation of any Lien, other than Permitted Liens, on the Purchased Assets.

Section 4.3    Consents and Approvals.    Upon entry of the Sale Approval Order and the Confirmation Order and the satisfaction of the conditions set forth therein (if any), no material Consent of, or declaration, filing or registration with, any Government Entity or any other Person is required to be obtained or made, as applicable, by any Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated hereby or thereby, except for (i) Consents, declarations, filings and registrations listed on Schedule 4.3 or (ii) the failure to have which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, that Sellers are not making any representation with respect to any Consent, including Permits, or declarations, filings or registrations with, any Government Entity or any other Person that must be or may be made by Purchaser (as a result of facts and circumstances specific to Purchaser) in order to acquire the Purchased Assets.

Section 4.4    Title to Assets.    Upon entry of the Sale Approval Order at the Closing, Sellers shall transfer to Purchaser good and valid title to the Purchased Assets free and clear of any Lien or Claim, other than Permitted Liens.

Section 4.5    Mortgage Loan Portfolio.    Within two Business Days of the date of execution of this Agreement, Sellers have delivered shall deliver to Purchaser Electronic Data Files dated as of March 31, 2012 that provide loan level information with respect to the Whole Loans, with the loan level fields being those described on Schedule 4.5 (collectively, the "Mortgage Loan Schedule," which term includes, except where the context requires otherwise, updated data tapes to be prepared as of (i) the close of business on the day immediately preceding the Cut-off Date (the "Cut-off Date Mortgage Loan Schedule"), and (ii) the close of business on the day immediately preceding the Closing Date (the "Closing Date Mortgage Loan Schedule"), each to be delivered pursuant to Section 6.10).    The information set forth in the Mortgage Loan Schedule is true, complete and correct in all material respects as of the date

thereof and the information in each of the Cut-off Date Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule to be prepared and delivered to Purchaser in accordance with Section 6.10 will be true, complete and correct in all material respects as of their applicable dates.

Section 4.6    [Reserved.]

Section 4.7    **Litigation and Claims.**  Except as listed on Section 4.7 of the Disclosure Memorandum or as may be ordered by the Bankruptcy Court, as of the date hereof, (i) there is no action, suit, demand, inquiry, proceeding, claim, cease and desist letter, hearing or investigation by or before any Government Entity pending, or, to the Knowledge of Sellers, threatened in respect of the **Sellers or** Purchased Assets that could materially and adversely affect **the Purchased Assets or** the ability of Sellers to complete the transactions contemplated by this Agreement, and (ii) no Purchased Asset is subject to any material Order.

Section 4.8    **Brokers, Finders and Financial Advisors.**  Except for Centerview Partners LLC, whose fees will be paid by ResCap in the Bankruptcy Case, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers or any Affiliate Seller, or will be entitled to any brokers' or finders' fee or any other commission or similar fee from Sellers or any Affiliate Seller, in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

Section 4.9    **Whole Loans**

(a)    Subject to the related Collateral Exception Reports, the Mortgage Loan Documents include customer information and originals or copies of all material documents (either in physical or electronic form) that are required in order to service such Whole Loan in accordance with Applicable Requirements.

(b)    Except as set forth on the Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule, no payment of principal or interest is more than ~~60 days past due on any~~**30 days past due on any Whole Loan and no event of default exists (or would exist with notice or the lapse of time or both) under the related Mortgage Note or mortgage.  The consummation of the transactions contemplated by this Agreement will not impair or otherwise adversely affect rights or remedies in connection with any private mortgage insurance policy applicable to a Whole Loan or any guarantee or other secondary obligation applicable to a Whole Loan.  When the transactions contemplated by this Agreement are consummated, the Purchaser will become the beneficiary under any private mortgage insurance policy applicable to a** Whole Loan.

(c)    Sellers are the sole owners and holders of each Whole Loan, and Sellers have full right and authority to sell and assign each Whole Loan to Purchaser pursuant to this Agreement.  Except as set forth on Section 4.9(c) of the Disclosure Memorandum, the Whole Loans have not been assigned or pledged by any Seller (except for pledges or other grants of security interests which will be released on or prior to the Closing), and Sellers have good and marketable thereto.

(d)    Each Whole Loan is genuine and constitutes the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms in all material respects, except as such enforcement may be limited by the Enforceability Exceptions.

(e)    Except as set forth on <u>Section 4.9(e)</u> of the Disclosure Memorandum, for each Whole Loan that is a first lien residential mortgage loan on the applicable Mortgaged Property, including all improvements on such Mortgaged Property, such lien is subject only to (i) the Lien of current real property taxes and assessments, (ii) covenants, conditions, restrictions, rights of way, mineral right reservations, zoning and other land use restrictions, easements and other matters of public record as of the date of recording of the mortgage, (iii) any state of facts an accurate land survey of the Mortgaged Property might show, (iv) such exceptions appearing of record that are acceptable to mortgage lending institutions generally in the area where the Mortgaged Property is located or specifically reflected in any appraisal obtained in connection with the origination of the Whole Loan, and (v) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such mortgage.

(f)    Except as set forth on <u>Section 4.9(f)</u> of the Disclosure Memorandum, for each Whole Loan that is a second lien residential mortgage loan on the applicable Mortgaged Property, including all improvements on such Mortgaged Property, such lien is subject only to (i) any first lien, (ii) the Lien of current real property taxes and assessments, (iii) covenants, conditions, restrictions, rights of way, mineral right reservations, zoning and other land use restrictions, easements and other matters of public record as of the date of recording of the mortgage, (iv) any state of facts an accurate land survey of the Mortgaged Property might show, (v) such exceptions appearing of record that are acceptable to mortgage lending institutions generally in the area where the Mortgaged Property is located or specifically reflected in any appraisal obtained in connection with the origination of the Whole Loan, and (vi) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such mortgage.

(g)    Except as set forth on <u>Section 4.9(g)</u> of the Disclosure Memorandum, no provision of any Whole Loan has been impaired, waived, altered or modified in any respect, except by written instrument that has been recorded, if required by Applicable Law or if necessary to maintain the lien priority of the Whole Loan, and that is included in the Mortgage Loan Documents relating to such Whole Loan.

(h)    Each Whole Loan that is a first lien Mortgage Loan is covered by either an ALTA mortgage title insurance policy acceptable to Sellers and issued by a title insurer duly qualified to do business in the jurisdiction where the Mortgaged Property is located, or such other generally used and acceptable form of policy and applicable endorsements acceptable to prudent mortgage lending institutions making loans in the area where the Mortgaged Property is located**, and when the transactions contemplated by this Agreement are consummated, the Purchaser will become the beneficiary of such policies**.

(i)    As of the date hereof and as of the Closing Date, no Whole Loan that is a first lien Mortgage Loan, has been satisfied, canceled, or subordinated in whole or in part or rescinded (other than pursuant to a statutory right of rescission), and no Mortgaged Property has been released from the Lien of the related mortgage in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination, or rescission.

(j)    As of the date hereof and as of the Closing Date, no Whole Loan that is a second lien Mortgage Loan has been satisfied **or,** canceled**, or subordinated** in whole or in part or rescinded (other than pursuant to a statutory right of rescission), and no Mortgaged Property has been released from the Lien of the related mortgage in whole or in part, nor has any instrument been executed that would effect any such release, cancellation**, subordination,** or rescission.

(k)    All improvements upon the Mortgaged Property pursuant to each Whole Loan are insured against loss by fire and such other hazards as are customary in the area where such Mortgaged Property is located, pursuant to insurance policies maintained by the Mortgagor or a blanket insurance policy maintained by Sellers or the applicable SBO Servicer.

(l)    Except with respect to the Whole Loans listed in <u>Section 4.9(l)</u> of the Disclosure Memorandum, none of the Whole Loans provides for recourse to or against Sellers.

**Section 4.10    Mortgage Securities.**    In connection with the sale and purchase of the Mortgage Securities hereunder, on the Closing Date Sellers shall convey to Purchaser (or, if applicable, its designee) all right, title and interest in the Mortgage Securities being delivered on the Closing Date free and clear of any and all Liens **and Claims** (including any counterclaim, defense or right of set off by or of the issuer of the Mortgage Securities).  The transfer of the Mortgage Securities by Sellers to Purchaser shall not require or cause Purchaser to assume, and shall not subject Purchaser to, any obligation, Liability or commitment to lend additional funds, including any outstanding contingent commitment.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed to Sellers by Purchaser in writing on the date hereof, Purchaser represents and warrants to Sellers, as of the date hereof and as of the Closing Date (except to the extent any such representations and warranties shall have been expressly made as of a particular date, in which case such representations and warranties shall be made only as of such date), as follows:

**Section 5.1    Organization and Authority.**    Purchaser has been duly incorporated**organized**, and is validly existing and in good standing under the Laws of its jurisdiction of incorporation**organization**, has all corporate**limited liability company** power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby, and has taken all

necessary ~~corporate~~**limited liability company** or other organizational action to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements. This Agreement has been, and the Ancillary Agreements to which it is a party will be, duly and validly executed and delivered by Purchaser and this Agreement constitutes, and each of the Ancillary Agreements to which it is a party will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions.

**Section 5.2   Non-Contravention.**   The execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchaser and the consummation of the transactions contemplated hereby and thereby and the compliance by Purchaser with the applicable terms and conditions hereof or thereof, do not and will not conflict with or violate, result in a material breach of or default (or an event which with notice or the passage of time or both would become a material breach or default) under, give rise to a right of termination, cancellation, acceleration of any material obligation or loss of any material benefit under (i) the organizational or governing documents of Purchaser or (ii) assuming all Consents, declarations, filings or registrations set forth on Schedule 5.3 have been obtained or made, as applicable, any Law or Order applicable to Purchaser.

**Section 5.3   Consents and Approvals.**   No Consent of, or declaration, filing or registration with, any Government Entity or any other Person is required to be obtained or made, as applicable, by Purchaser in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated by this Agreement or by any of the Ancillary Agreements, except for Consents, declarations, filings and registrations (i) listed on Schedule 5.3, or (ii) Consents, the failure to have which, individually or in the aggregate, would not reasonably be expected to materially impact the ability of Purchaser to consummate the transactions contemplated hereby and satisfy all its obligations hereunder.

**Section 5.4   Financing.**   Purchaser ~~has and~~ will have, as of the Closing Date, all necessary financial resources available to consummate the transactions contemplated hereby.

**Section 5.5   Non-reliance.**   Purchaser has not relied and is not relying on any representations, warranties or other statements whatsoever, whether written or oral (from or by Sellers, or any Person acting on their behalf) other than those expressly set out in this Agreement (or other related documents referred to herein) and acknowledges and agrees that, except for any fraud claim, it will not have any right or remedy rising out of any representation, warranty or other statement not expressly set out in this Agreement.

**Section 5.6   Brokers, Finders and Financial Advisors.**   ~~Except for Evercore Partners Inc., whose fees will be paid by Parent, no~~**No** agent, broker, investment banker, financial advisor or other firm or Person is or will be entitled to any brokers' or finder's fee or any other commission or similar fee in connection with the transactions contemplated hereby as a result of any action taken by Purchaser.

## ARTICLE VI.

## PRE-CLOSING MATTERS AND OTHER COVENANTS

**Section 6.1    Subsequent Actions; Further Assurances.**  ~~Subject to the Bankruptcy Exceptions,~~ Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable, including, (i) opposing any objections to, appeals from or petitions to reconsider or reopen any such approval by Persons not a party to this Agreement and (ii) obtaining any Final Orders approving the transactions contemplated by this Agreement or the Ancillary Agreements, if required.  If at any time after the Closing, Purchaser shall consider or be advised that any assurances or any other actions or things are necessary or desirable (a) to vest, perfect or confirm ownership (of record or otherwise) in Purchaser, as applicable, its title or interest in the Purchased Assets **free and clear of all Liens and Claims** or (b) otherwise to carry out this Agreement or the Ancillary Agreements, Sellers shall use commercially reasonable efforts to execute and deliver all bills of sale, instruments of conveyance, UCC filings, powers of attorney, assignments, assurances and orders and take and do all such other actions and things as may be reasonably requested by Purchaser, in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Purchased Assets.

**Section 6.2    Third Party Consents.**  Sellers and Purchaser shall use commercially reasonable efforts to obtain, as soon as reasonably practicable, all Necessary Consents, including from Government Entities and Insurers; provided, that Purchaser shall not be required to agree to actions, conditions or restrictions that would materially impair the value to Purchaser of the Purchased Assets or have a materially adverse effect on the business of Purchaser or its Affiliates.  Each party hereto shall promptly provide the other parties with copies of any communication, including any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby received by such party from any Government Entity or any other Person regarding transactions contemplated hereby.

**Section 6.3    Access to Information.**  From and after the date of this Agreement until the Closing Date, Sellers shall afford to Purchaser and its accountants, counsel and other representatives reasonable access, upon reasonable notice during normal business hours, to the Mortgage Files, Servicing Files and Credit Files for the Mortgage Loans and personnel with knowledge thereof; provided, that such access shall not unreasonably disrupt the business of Sellers and that nothing herein will obligate Sellers to violate any Applicable Law.

**Section 6.4    Records; Post-Closing Access to Information.**

(a)    On and after the Closing Date, Sellers shall **(i) deliver to Purchaser the Mortgage Securities, and (ii)** execute, deliver, file and record any specific assignment, novation or other document and take any other action that may be necessary, customary or desirable and reasonably requested by Purchaser in connection with Sellers' delivery of the Mortgage Securities.

(b)    From and after the Closing Date, each party shall, and shall cause its Affiliates to, afford the other party and its counsel, accountants and other authorized representatives, with five Business Days' prior notice, reasonable access during normal business hours to the respective premises, properties, personnel, books and records and to any other assets or information, in each case relating to the Purchased Assets, that such other party reasonably deems necessary, including in connection with the Bankruptcy Case or any report or Tax Return required to be filed under applicable Law (but so as not to unduly disrupt the normal course of operations of Purchaser).

(c)    If and for so long as any party hereto is contesting or defending against any third-party charge, complaint, action, suit, proceeding, hearing, investigation, claim or demand, including in the Bankruptcy Case, in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving the Purchased Assets ~~or the Excluded Assets and Retained Liabilities~~ in any respect, each other party hereto shall (A) reasonably cooperate with and assist it and its counsel and other advisors in the contest or defense, (B) make available its personnel (including for purposes of fact finding, consultation, interviews, depositions and, if required, as witnesses) and (C) provide such information, testimony and access to its books and records, in each case as shall be reasonably requested in connection with the contest or defense, all at the sole cost and expense (not including employee compensation and benefits costs) of the contesting or defending party.  For the avoidance of doubt, this <u>Section 6.4(c)</u> shall not apply with respect to disputes between the parties hereto.

(d)    Purchaser agrees, at Sellers' cost and expense, to make available, at the reasonable request of Sellers, any books and records that may be included in the Purchased Assets to the extent they may relate to Excluded Assets and, if necessary, to provide such original books and records to any purchaser of such Excluded Assets and to retain only a copy thereof, subject to the delivery by such purchaser of a non-disclosure agreement as reasonably requested by Purchaser.

(e)    Notwithstanding anything to the contrary in this Agreement, each of the parties will comply with federal and state laws and regulations regarding the confidentiality and privacy relating to information collected and used in connection with the application for and processing and servicing of Mortgage Loans.

**Section 6.5    Interim Operations.**    Sellers covenant and agree that, after the date hereof and prior to the Closing, subject to the Bankruptcy Exceptions and except as (i) set forth

in <u>Section 6.5</u> of the Disclosure Memorandum, (ii) expressly provided in or as a result of the consummation of this Agreement, (iii) provided in the DIP Financing Agreements, (iv) ordered by the Bankruptcy Court or (v) may be agreed in writing by Purchaser:

(a)    Sellers' business relating to the Purchased Assets shall be conducted in the Ordinary Course of Business in compliance with the Applicable Requirements and Acceptable Servicing Procedures; <u>provided</u>, that notwithstanding the foregoing, Sellers shall not be obligated to fund any draws under HELOCs except in accordance with any motion approved by the Bankruptcy Court;

(b)    Sellers and Affiliate Sellers shall service, or cause to be serviced, the Mortgage Loans in the Ordinary Course of Business and in accordance with all requirements of any Applicable Requirements and Acceptable Servicing Procedures. With respect to the Mortgage Loans, Sellers and Affiliate Sellers shall take no action, and refrain from taking action, which, in either case, would reasonably be expected to (i) impair the ability of Purchaser to realize on or enforce any Mortgage Note or the lien of the mortgage or any other document related thereto or (ii) jeopardize the rights or remedies available to Purchaser with respect to any Mortgage Loan or otherwise impair the ability of Purchaser to realize on the Mortgaged Property with respect to such Mortgage Loan.  For the avoidance of doubt, nothing in this Agreement shall prevent Sellers from making payments to former mortgagors pursuant to the Consent Order or from**, in the Ordinary Course of Business,** offering, and effecting refinancing of or modifications to~~,~~ Mortgage Loans as contemplated by the terms of the DOJ/AG Settlement, or by HAMP, HARP, HASP or any similar program that Sellers have or may develop in the Ordinary Course of Business; <u>provided</u>, that Sellers shall promptly provide copies to Purchaser of any reports provided to the settlement master under the DOJ/AG Settlement with respect to such agreements, arrangements and actions;

(c)    Sellers and Affiliate Sellers shall not terminate or permit to lapse any material Permits that are necessary for the ownership or servicing of the Purchased Assets;

(d)    Sellers and Affiliate Sellers shall not change ~~its~~**their** servicing or administration practices with respect to the Whole Loans or the Mortgage Securities in any material respect~~, except in the Ordinary Course of Business~~;

(e)    With respect to any Purchased Asset, Sellers shall not, and shall use their best efforts to ensure that any Affiliates shall not:  (i) agree to allow any form of relief from the automatic stay in the Bankruptcy Case; or (ii) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Case;

(f)    Sellers and Affiliate Sellers shall not **(i)** take, or agree to or commit to take, any action ~~that~~**, or (ii) fail to take any action, if not taken, that, in either case,** would or is reasonably likely to result in any of the conditions set forth in <u>Article VIII</u>~~,~~ not being satisfied, or would make any representation or warranty of Sellers contained herein inaccurate in any material respect at, or as of any time prior to, the Closing Date or

that would materially impair the ability of Sellers or Purchaser to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(g)    With respect to <u>clauses (a)</u> through <u>(f)</u> (inclusive), Sellers and Affiliate Sellers shall not enter into any Contract to do any of the foregoing, or authorize, recommend, propose or announce an intention to do, any of the foregoing.

**Section 6.6    Mortgage Approvals and Licenses.**    Promptly following execution of this Agreement, in each case to the extent not already obtained by Purchaser, Purchaser shall have filed or shall file all applications and use commercially reasonable efforts to (i) be approved (A) by HUD to hold FHA Loans and (B) by the VA to hold VA Loans, in each case to the extent necessary; (ii) obtain all necessary licenses in all states in which it proposes to hold the Purchased Assets; and (iii) obtain all other material Permits and Licenses that are necessary to hold the Purchased Assets.  All such actions shall be at Purchaser's cost and expense, and Sellers shall cooperate with, and use commercially reasonable efforts to provide assistance to, Purchaser in all such efforts.

**Section 6.7    Notices of Certain Events.**    From the date hereof until the Closing Date,

(a)    A Seller shall promptly notify Purchaser of:

(i)    any written notice or other written communication from any Person (including any notices or communications filed with the Bankruptcy Court other than notices or other written communications that provide for a copy to be provided to Purchaser) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii)    any written notice or other written communication from any Government Entity in connection with the transactions contemplated by this Agreement;

(iii)    any change or fact with respect to any of Sellers' representations, warranties or obligations hereunder of which Seller becomes aware that, with notice or lapse of time or both, will or is reasonably expected to result in a material breach by Sellers of this Agreement or otherwise result in any of the conditions set forth in <u>Article VIII</u> becoming incapable of being satisfied; or

(iv)    any Material Adverse Effect (but without giving effect to clause (ix) of the definition of Material Adverse Effect).

(b)    Purchaser shall promptly notify Sellers of

(i)    any written notice or other written communication from any Person (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchaser) alleging that the consent of such Person is or may be required in connection with the transactions

contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii)    any written notice or other written communication from any Government Entity (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchaser) in connection with the transactions contemplated by this Agreement; or

(iii)    any change or fact with respect to any of Purchaser's representations, warranties or obligations hereunder of which it becomes aware that, with notice or lapse of time or both, will or is reasonably expected to result in a material breach by Purchaser of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied.

No disclosure by any party hereto pursuant to this Section 6.7 shall be deemed to amend or supplement the Disclosure Memorandum with respect thereto or prevent or cure any misrepresentation or breach of warranty for purposes of this Agreement.

**Section 6.8    Tax Matters**.

(a)    Purchaser shall pay and be responsible for all Transfer Taxes imposed in connection with the closings of the transactions contemplated hereby.  Sellers and Purchaser shall cooperate to timely prepare, and Purchaser shall file or cause to be filed any returns or other filings relating to such Transfer Taxes (unless Sellers are required by applicable Law to file the return), including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

(b)    Sellers and Purchaser shall cooperate with each other and furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Purchased Assets as is reasonably requested for the preparation or filing of any Tax Returns and for the satisfaction of legitimate Tax or accounting requirements.

**Section 6.9    Insurance.**  Purchaser and Sellers shall not take any action that may adversely affect the rights of the other with respect to any outstanding claims made or for new claims that may be made against insurance policies **(including hazard, title, private mortgage, or flood insurance policies)** relating to the Purchased Assets purchased or maintained by Purchaser for the benefit of itself and its Subsidiaries and Affiliates that the other may or will have as of the Closing Date and shall use commercially reasonable efforts to cooperate with the other in the settlement or other resolution of such claims.

**Section 6.10    Mortgage Loan Schedules.**  Sellers shall deliver to Purchaser (i) an updated version of the Mortgage Loan Schedule within 15 Business Days after the end of each month during the period from the date hereof to the Closing Date, and (ii) the Cut-off Date Mortgage Loan Schedule as provided in Section 3.1(b).

**Section 6.11    Schedules and Disclosure Memorandum.**

(a)    Concurrently with the execution and delivery of this Agreement, Sellers are delivering to Purchaser the Schedules to be provided by Sellers identified in the Table of Contents (the "Schedules") and a disclosure memorandum (the "Disclosure Memorandum") that sets forth all of the items that it deems to be necessary or appropriate (i) as an exception to a provision of this Agreement, (ii) in response to an express disclosure requirement contained in a provision hereof or (iii) as an exception to one or more representations or warranties contained in Article IV, as applicable, or to one or more of the covenants of Sellers contained in this Agreement; provided, that the mere inclusion of an item in the Schedules or Disclosure Memorandum as an exception to a provision or representation or warranty shall not be deemed an admission by any Seller or Purchaser, as applicable, that such item represents a material exception or event, state of facts, circumstance, development, change or effect or that such item would reasonably be expected to have or result in a Material Adverse Effect; and provided, further, that any disclosures or exceptions made with respect to a Section or ~~subSection~~**subsection** of this Agreement shall be deemed to qualify not only the specific section(s) referenced but also such other sections or subsections that may be affected thereby to the extent the relevance of such disclosure or exception to such other sections or subsections is readily apparent on its face.  In the event of an inconsistency between the statements in the body of this Agreement and those in the Schedules or Disclosure Memorandum, the statements in the Schedules or Disclosure Memorandum will control.

(b)    Sellers and Purchaser agree that, with respect to Sellers' representations and warranties contained in this Agreement, Sellers shall have the obligation until the Closing to correct, supplement or amend no later than five Business Days prior to the ~~expected~~ Closing Date the Disclosure Memorandum with respect to any matter arising or discovered after the date of this Agreement (whether or not existing or known at the date of this Agreement) that causes the representations and warranties of Sellers to be untrue or inaccurate in any material respect (as so amended, the "Amended Disclosure Memorandum"); provided, that ~~until May 31, 2012, any such correction, supplement or amendment shall be taken into account when determining the accuracy, truth and correctness of the representations and warranties of Sellers for purposes of Article VIII, including the certificates to be delivered pursuant to Section 8.3(iii) except to the extent any such correction, supplement or amendment would reasonably be expected to result in a Material Adverse Effect, but thereafter,~~ in no event shall any such correction, supplement or amendment be taken into account when determining the accuracy, truth and correctness of the representations and warranties of Sellers for purposes of Article VIII, including the certificates to be delivered pursuant to Section 8.3(c), except for the updates explicitly required by the representations set forth in Section 4.5 (which required updates shall only be taken into account when determining the accuracy, truth and correctness of such representations and warranties as of the Closing Date); and provided, further, that there is no obligation to update any representation that is as of a specified date.

**Section 6.12    Bankruptcy Actions**.

~~(a)    As soon as practicable, but not later than two Business Days after the date hereof, Sellers shall file Petitions for relief under Chapter 11 of the Bankruptcy Code.  On~~

~~the Petition Date, Sellers shall file, together with other customary "first day" motions, the Sale Motion with the Bankruptcy Court.~~

**(a)** ~~(b)~~ Sellers shall, and Sellers shall cause all of their Subsidiaries to, comply with all of the obligations of Sellers under the Sale Procedures Order (after entry of such Order by the Bankruptcy Court) and the Sale Approval Order (after the entry of such Order by the Bankruptcy Court).

**(b)** ~~(c)~~ Sellers shall use reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement. Sellers shall serve on all required Persons in the Bankruptcy Case, including (i) all Persons who are known to possess or assert a Claim or Lien against or interest in any of the Purchased Assets, (ii) the IRS, (iii) all applicable state attorneys general, and local Government Entities, (iv) all applicable state and local Government Entities with taxing authority, (v) all other Persons required by any order of the Bankruptcy Court, and (vi) using their commercially reasonable efforts to serve any other Persons that Purchaser reasonably may request, any notice of the Sale Motion, the Sale Hearing, the Sale Procedures Order, the Sale Approval Order, and all objection deadlines in accordance with all applicable Bankruptcy Rules, the Sale Procedures Order, and any applicable local rules of the Bankruptcy Court.

**(c)** **In the event that this Agreement is terminated pursuant to Section 9.1(e), Sellers shall pay to Purchaser a cash amount equal to $10,000,000 (the "Break-Up Fee"), which shall be treated as priority administrative expenses in the Bankruptcy Case. The Break-Up Fee will be due and payable on the Business Day immediately following such termination. Notwithstanding anything to the contrary contained in this Agreement, (i) upon payment of the Break-Up Fee in accordance herewith, Sellers and their respective Representatives and Affiliates shall be fully released and discharged from any Liability under or resulting from this Agreement and neither Purchaser nor any other Person shall have any other remedy or cause of action under or relating to this Agreement, including for reimbursement of expenses, and (ii) Sellers' obligations hereunder shall be joint and several. Notwithstanding this Section 6.12(c), if Purchaser is the Next-Highest Bidder (as such term is defined in the Sale Procedures) and Purchaser closes under this Agreement as a result of a failure to close under a Competing Transaction, then Sellers shall have no obligation to pay, and Purchaser shall not be entitled to receive, the Break-Up Fee.**

(d) ~~The Chapter 11 Plan, any and all exhibits and attachments to the Chapter 11 Plan, the Disclosure Statement with respect to the Chapter 11 Plan and the Orders approving the same (including the Confirmation Order), to the extent any of the foregoing impact the transactions contemplated under this Agreement, shall be in accordance with the terms set forth in Schedule 6.12(f) and reasonably acceptable in form and substance to Purchaser.~~ **Notwithstanding Section 6.12(c), Sellers' agreement to pay the Break-Up Fee is subject to Bankruptcy Court approval of this Agreement, including approval of payment of the Break-Up Fee, which approval shall be**

**requested in the Sale Motion. Sellers acknowledge and agree that (i) approval of the Break-Up Fee is an integral part of this Agreement; (ii) in the absence of Sellers' obligation to pay the Break-Up Fee, Purchaser would not have entered into this Agreement; (iii) entry of the Purchaser into this Agreement is necessary for preservation of the estate of Sellers and is beneficial to Sellers because, in Sellers' business judgment, it will enhance Sellers' ability to maximize the value of their assets for the benefit of their creditors; (iv) the Break-Up Fee is reasonable in relation to Purchaser's efforts and to the magnitude of the transactions contemplated by this Agreement and Purchaser's lost opportunities resulting from the time spent pursuing such transactions; and (v) time is of the essence with respect to entry of the Sale Procedures Order by the Bankruptcy Court approving, among other things, the Sale Procedures and the payment of the Break-Up Fee.**

**Section 6.13   Antitrust Clearances and Obligations**.

(a)     Each of Purchaser and Sellers shall promptly after the date of this Agreement and in any event by ~~July~~**August** 1, 2012, prepare and file all notification and report forms required to be filed under the HSR Act with respect to the transactions contemplated by this Agreement, and request early termination of the waiting period under the HSR Act.  Purchaser, on the one hand, and Sellers, on the other hand, shall be responsible for payment of their own fees and expenses incurred in connection with or relating to the review of the transactions contemplated hereby pursuant to the HSR Act or their efforts to consummate the transactions contemplated hereby pursuant to this <u>Section 6.13</u>, and shall each bear the cost of 50% of the applicable filing fee under the HSR Act.

(b)     Each of Purchaser and Sellers shall (i) respond as promptly as practicable to any inquiries or requests for additional information or documentation received from the Federal Trade Commission, the Department of Justice, any attorney general of any state of the United States, or any other antitrust or competition authority of any jurisdiction ("<u>Antitrust Authority</u>"); (ii) keep the other party reasonably informed of any communication received by such party from, or given by such party to, any Antitrust Authority regarding the transactions contemplated by this Agreement, and any communication received or given in connection with any proceeding by a private party regarding the transactions contemplated by this Agreement, in each case in a manner that protects attorney-client or attorney work product privilege; (iii) provide copies of any written communications received from or given to any Antitrust Authority unless prohibited by applicable Law; and (iv) permit the other party to review and incorporate the other party's reasonable comments in any communication given by it to any Antitrust Authority or in connection with any proceeding by a private party related to Antitrust Laws with any other person, in each case regarding the transactions contemplated under this Agreement and in a manner that protects attorney-client or attorney work product privilege.

(c)     Neither Purchaser nor Sellers shall, after the entry of the Sale Approval Order, agree to accept any agreement that would have the effect of delaying the consummation of any action contemplated by this Agreement without the written consent of the other party.  For the avoidance of doubt, no party shall commit to or agree with any

Antitrust Authority to stay, toll or extend any applicable waiting period under the HSR Act or other applicable Laws, without the prior written consent of the other parties.

(d)      Neither Purchaser nor any of its controlled Subsidiaries shall take any action or acquire any assets or securities of any other Person or agree to acquire assets or securities of any other Person if such action, acquisition or agreement would reasonably be expected to impair Purchaser's ability to consummate the transactions contemplated hereby.

**Section 6.14  Post-Closing Amounts Received and Paid.**   All amounts that are received by a Seller or any Affiliate of Seller in respect of any of the Purchased Assets with respect to a period following the Closing shall be received by such Person as agent, in trust for and on behalf of Purchaser and shall be paid pursuant to Section 6.18(i).  All amounts that are received by Purchaser or any of its Affiliates following the Closing in respect of any Excluded Assets with respect to a period prior to the Closing shall be received by such Person as agent, in trust for and on behalf of Sellers, and Purchaser shall, on a monthly basis, pay or cause to be paid all such amounts over to Sellers by wire transfer of immediately available funds and shall provide Seller with information as to the nature and source of all such payments, including any invoice relating thereto.

**Section 6.15  Confidentiality.**

(a)      After the Closing, Sellers shall, and shall cause their respective Subsidiaries and instruct their respective Affiliates to, hold in confidence and not use in any manner detrimental to ~~Sellers'~~**Purchaser's** business all Confidential Information concerning the Purchased Assets, except to the extent that such information can be shown to have been (i) in the public domain prior to the Closing or (ii) in the public domain at or after the Closing through no fault of Sellers or any of their Affiliates or any of their respective representatives.  If, after the Closing, Sellers or any of their Affiliates or any of their respective representatives are legally required to disclose any Confidential Information, Sellers shall to the extent permitted by Law (A) promptly notify Purchaser to permit Purchaser, at its expense, to seek a protective order or take other appropriate action and (B) cooperate as reasonably requested by Purchaser in Purchaser's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be accorded such Confidential Information, but only at Purchaser's sole cost and expense. If, after the Closing and in the absence of a protective order, Sellers or any of their Affiliates or any of their respective Representatives are compelled as a matter of Law to disclose any such Confidential Information to a third party, such Person may disclose to the third party compelling disclosure only the part of such Confidential Information as is required by Law to be disclosed; provided, that to the extent permitted by Law, prior to any such disclosure, such Person consults in good faith with Purchaser and its legal counsel as to such disclosure and the nature and wording of such disclosure. "Confidential Information" shall mean any confidential information concerning the Purchased Assets, including methods of operation, products, prices, fees, costs, markets or other specialized information or proprietary matters.

(b)      If the Closing does not occur, each party shall, upon the written request of the other party, return to the other party or destroy (such destruction to be confirmed in writing to the other party upon written request) all materials, documentation, data, records and other papers and copies thereof (whether on paper or in electronic, magnetic, photographic, mechanical or optical storage) that constitutes Confidential Information of the other party, and not use any such information or knowledge for any purpose whatsoever, provided that a party may maintain such information to the extent required by Law or such party's established document retention policies (including any requirement to retain email on an automated email archival system) or relating to the safeguarding or backup storage of electronic data or in connection with a legal dispute with the other party.

(c)      Notwithstanding the foregoing, the parties to this Agreement acknowledge that each of them (and each of their employees, representatives, or other agents) has been and is permitted to disclose to any and all persons, without limitation of any kind, the federal tax treatment and structure of this Agreement (including Confidential Information) and all materials of any kind (including opinions or other tax analyses) that are or have been provided to them relating to such federal tax treatment and structure. This provision is intended to qualify for the presumption that this Agreement is not offered under conditions of confidentiality as set forth in Treasury Regulation Section 1.6011-4(b)(3) and shall be interpreted to authorize disclosure only to the extent necessary to so qualify.

## Section 6.16    Delivery of Mortgage Files.

(a)      Not later than five Business Days prior to the Closing Date (or on such later date as Purchaser shall reasonably request), Sellers shall deliver to Purchaser or Purchaser's custodian as Purchaser's designee the Mortgage File for each Mortgage Loan.

(b)      In connection with the transfer of any MERS Loan pursuant to Section 2.1 hereof, Sellers shall request that the MERS system indicate that such MERS Loan has been assigned to Purchaser.  Purchaser may, at its cost and in its discretion, direct Sellers to deliver for recording to the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located, and cause to be duly recorded, any of the original assignments of mortgage.  Purchaser shall pay all recording fees relating to the recordation of the assignments of mortgage from a Seller to Purchaser and any intervening assignments.

(c)      Purchaser shall cause the notice required by Section 404 of the Homes Act to be provided within 30 days of the Closing Date to each Mortgagor with respect to each Mortgage Loan and each such notice shall, to the extent permitted by the Helping Families Act, specify (i) Purchaser or its assignee as designated by Purchaser on the Closing Date is a "creditor" for purposes of the Homes Act; (ii) the address of Purchaser or its assignee as designated by Purchaser, as applicable; (iii) the Closing Date; (iv) that the entity selected by Purchaser to assume obligations to service the Mortgage Loan on the Closing Date is the contact person with authority to act on behalf of Purchaser or its

assignee, as applicable; and (v) assignments of mortgage are not being recorded in connection with the sale of the Mortgage Loans.  If the Mortgage Loan is a MERS Loan, such notice shall state: "Ownership of your Mortgage Loan is also recorded on Mortgage Electronic Registrations System's registry at 1818 Library Street, Suite 300 Reston, Virginia 20190."

**Section 6.17**  ~~**Third Party Servicing Agreement.**  Sellers and Purchaser shall use commercially reasonable efforts to cooperate with each other in order to negotiate and enter into the Third Party Servicing Agreement with the Winning Bidder, pursuant to which the Winning Bidder or its subservicer will provide servicing to Purchaser following the Closing Date.~~**[Intentionally deleted].**

**Section 6.18**  **Transfer of Servicing.**  Without limiting the generality of this <u>Section 6.18</u>, Sellers or their designees shall take, or cause to be taken, the following actions with respect to the Mortgage Loans (other than SBO Loans) prior to the Closing Date (or within such time as may otherwise be specified below) in order to effect the transfer of the servicing of such Mortgage Loans to Purchaser or its designee on the Closing Date:

(a)    <u>Notice to Mortgagors</u>.  Sellers (or their designees) shall inform in writing all Mortgagors of the change in servicer from any Seller (or its designee) to Purchaser (or its designee) all in accordance with Applicable Law and the terms of such "goodbye" letter (which may be combined, to the extent permitted by Applicable Law, with any "hello" letter to be sent to Mortgagors by Purchaser) shall be reasonably acceptable to Purchaser.

(b)    <u>Transfer of Servicing</u>.  On the Closing Date (or such later date as Purchaser shall reasonably request), Sellers shall transfer servicing of the related Mortgage Loans to Purchaser or its designee pursuant to the terms of this Agreement and the procedures set forth in reasonable and customary servicing transfer instructions agreed to by Purchaser and Sellers**, and Sellers shall cooperate in good faith in connection with the transfer of the servicing of the related Mortgage Loans, including addressing any platform compatibility issues and providing any interim servicing as reasonably requested by Purchaser.**

(c)    <u>Delivery of Files</u>.  Within 10 Business Days after the Closing Date (or such later date as Purchaser shall reasonably request), Sellers shall forward to Purchaser the Servicing Files and the Credit Files for each Mortgage Loan.

(d)    <u>Payments Received Prior to the Closing Date</u>.  Sellers shall transfer all amounts received with respect to the Mortgage Loans on and after the Cut-off Date and prior to the Closing Date to Purchaser by wire transfer within three Business Days after the Closing Date to such account or accounts as may be designated by Purchaser to Sellers by prior written notice.

(e)    <u>Escrow Payments</u>.  The aggregate balances of all Escrow Payments as of the Closing Date shall be remitted to Purchaser by wire transfer within three Business

Days after the Closing Date to such account or accounts as may be designated by Purchaser to Sellers by prior written notice.

       (f)      <u>Reconciliation Statement</u>.  On the Closing Date or within three Business Days thereafter, Sellers shall provide Purchaser with an electronic accounting statement in a format agreed to by Sellers and Purchaser of the amounts received with respect to the Mortgage Loans on and after the Cut-off Date, Escrow Payments and remaining negative escrow balances, if any, sufficient to enable Purchaser to reconcile the amount of such payments with the accounts of the related Mortgage Loans.

       (g)      <u>Notice to Hazard, Flood and Earthquake Insurers</u>.  Sellers shall deliver an electronic or written notice to all hazard, flood and earthquake insurance companies or their agents of the transfer of servicing within five Business Days after the Closing Date (or such other date as Purchaser shall reasonably request).

       (h)      <u>Notice to Taxing Authorities and Tax Servicers</u>.  Sellers shall deliver an electronic or written notice to all taxing authorities and tax servicers and/or their agents of the transfer of servicing within five Business Days after the Closing Date (or such other date as Purchaser shall reasonably request).

       (i)      <u>Payments Received After the Closing Date</u>.  Any payments with respect to the Mortgage Loans received by Sellers on the Closing Date or within 90 days after the Closing Date shall be remitted to Purchaser by wire transfer within two Business Day to such account or accounts as may be designated by Purchaser to Sellers by prior written notice, <u>provided</u>, that any payment received by Sellers for the purposes of a full payoff shall be forwarded to Purchaser within two Business Days of receipt by courier or overnight mail.

    **Section 6.19   Use of Proceeds.**   In no event shall any Seller use the Transaction Proceeds under this Agreement to directly or indirectly fund any challenge, complaint, action, suit, proceeding, hearing, investigation, claim or demand, whether in law, equity or otherwise, either (a) against Purchaser or its Affiliates or (b) that has a material adverse effect on Purchaser or its Affiliates; <u>provided</u>, that this <u>Section 6.19</u> shall in no way prevent Sellers from using the Transaction Proceeds to repay loans outstanding under the DIP Financing Agreements in accordance with the terms thereof.

    **Section 6.20   Electronic Data Files.**   Sellers shall deliver to Purchaser an updated version of the Electronic Data Files, which shall provide loan level information with respect to the Whole Loans, with the loan level fields set forth on the Mortgage Loan Schedule, within 15 Business Days after the end of each month during the period from the date hereof to the Closing Date.

    **Section 6.21   Transfer of Assets to DIP Borrowers.**   In accordance with the terms and conditions of the DIP Financing Agreements, promptly after approval of such agreements by the Bankruptcy Court, Sellers will transfer the Purchased Assets that are currently pledged to Purchaser under the Master Repurchase Agreement, dated as of December 21, 2011, as amended,

by and among Purchaser, GMAC Mortgage, RFC and ResCap to the respective DIP Borrowers, and from and after that transfer, the DIP Borrowers will be "Additional Sellers" hereunder.

Section 6.22    Mortgage Loan Modifications.    With respect to each HAMP Loan and each Mortgage Loan that becomes subject to a HAMP modification agreement after the Cut-off Date, Purchaser shall, or shall cause its servicer to, comply with the terms of each modification agreement applicable to such Mortgage Loan and all guidelines, procedures and directives issued by the United States Treasury, Fannie Mae or Freddie Mac applicable to the servicing of such Mortgage Loan.    With respect to any Mortgage Loan that is the subject of an application for modification or is in its trial period pursuant to the terms of the related modification on the Closing Date, and is not a HAMP Loan, Purchaser shall, or shall cause its servicer to, accept and continue processing such pending loan modification requests and shall honor trial and permanent loan modifications entered into by the prior servicer in effect on the Closing Date, in all cases to the extent set forth on a schedule to be delivered by Sellers to Purchaser no later than June 1, 2012.    The parties hereto acknowledge and agree that the related Mortgagor on any such Mortgage Loan shall be deemed a third party beneficiary of this <u>Section 6.22</u> with respect to its Mortgage Loan.

## ARTICLE VII.

## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.    From the date hereof until the earlier of the entry of the Sale Procedures Order and the termination of this Agreement, no Seller shall and each Seller shall cause its Affiliates and such Seller's and Affiliates' respective officers, directors, managers, employees, representatives and agents not to, directly or indirectly, (i) engage in substantive negotiations or discussions with, or enter into any agreement or understanding with, any Person (other than Purchaser and its Affiliates, agents and representatives) concerning any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of **all or a material portion of** the Purchased Assets (each a "<u>Competing Transaction</u>")**, including any such sale, transfer or other disposition occurring pursuant to a plan of reorganization or liquidation, stock sale or issuance, or merger, restructuring or other transaction of any kind or nature whatsoever**, or (ii) furnish any non-public information concerning any of the Purchased Assets; <u>provided</u>, that notwithstanding the foregoing, Seller and its Affiliates shall be permitted to (a) communicate with prospective bidders concerning the proposed sale process, including the proposed timetable and the requirements for Qualified Bids (as defined in the Sale Procedures Order), and (b) enter into confidentiality agreements with prospective bidders (no more favorable to such bidders than the Confidentiality Agreement) and take such other actions that may facilitate a prospective bidder's ability immediately to commence (or resume) diligence as soon as the Sale Procedures Order has been entered. Following entry of the Sale Procedures Order, other than pursuant to and in compliance with the terms and conditions of the Sale Procedures Order, in no event may Sellers or their respective Affiliates initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser and its Affiliates, agents and representatives) with respect to a Competing Transaction or accept an offer or proposal from any Person (other than Purchaser and its Affiliates, agents and representatives) with respect to a Competing Transaction.

**Section 7.2    Bankruptcy Court Filings.** ~~As promptly as practicable but no later than two Business Days following the execution of this Agreement, Sellers shall file Petitions for relief under Chapter 11 of the Bankruptcy Code and shall file, together with other customary "first day" motions, the Sale Motion with the Bankruptcy Court.~~ Subject to <u>Section 7.1</u>, Sellers shall ~~thereafter~~ pursue diligently the entry of the Sale Procedures Order and the Sale Approval Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Procedures Order and the Sale Approval Order and all parties hereto shall use their respective reasonable best efforts to obtain a finding demonstrating that Purchaser is a "good-faith" purchaser under Section 363(m) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court. In the event the entry of the Sale Procedures Order or the Sale Approval Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII.

## CONDITIONS

**Section 8.1    Conditions to Obligations of Purchaser and Sellers.** The respective obligations of each party to consummate the Closing shall be subject to the satisfaction, or waiver by Purchaser and Sellers, on or prior to the Closing Date of all of the following conditions precedent:

(a)    <u>Sale Procedures Order</u>. The Sale Procedures Order (i) shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, (ii) shall not have been modified or amended in any manner ~~materially adverse to Purchaser~~ unless agreed to in writing by Purchaser in its sole discretion and (iii) shall have become a Final Order; <u>provided</u>, that the condition set forth in clause (iii) shall be waivable only by Purchaser on behalf of the parties.

(b)    <u>Sale Approval Order</u>. The Sale Approval Order (i) shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, (ii) shall not have been modified or amended in any manner ~~adverse to Purchaser~~ unless agreed to in writing by Purchaser in its sole discretion and (iii) shall have become a Final Order.

~~(c)    The Confirmation Order. The Confirmation Order shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, and the Chapter 11 Plan Effective Date shall have occurred as of or concurrently with the Closing Date; provided, that if the Confirmation Order has not been entered by October 31, 2012, or the Chapter 11 Plan Effective Date has not occurred by December 15, 2012, then this condition precedent shall be deemed to be waived by all parties.~~

**(c)**    ~~(d)~~ <u>No Law, Judgments, Etc</u>. No Government Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or any decree, judgment, injunction or other Order, which is in effect and that restricts, prevents, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement **or has a Material Adverse Effect**. No proceeding or investigation by

any Government Entity or other Person shall have been instituted that restricts, prevents, prohibits, makes illegal, enjoins or results in material damages in respect of the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement **or has a Material Adverse Effect**.

**(d)** (e) Injunctions.   No Government Entity shall have issued an Order enjoining, restraining or prohibiting the completion of the transactions contemplated hereby and no suit, action or proceeding shall have been instituted by a Government Entity or any other Person that would reasonably be expected to have a Material Adverse Effect on the Purchased Assets or enjoin, restrain, prohibit or otherwise challenge the transactions contemplated by this Agreement, or that would be reasonably likely to prevent or make illegal the consummation of the transactions contemplated by this Agreement, and no Government Entity shall have notified Purchaser or Sellers in writing that this Agreement or the consummation of the transactions contemplated by this Agreement would in any manner constitute a violation of any Law and that it intends to commence any suit, action, or proceeding to restrain, enjoin or prohibit the transactions contemplated by this Agreement.

**(e)** (f) Agency Approvals.   Purchaser shall be approved (i) by HUD to hold FHA Loans and (ii) by the VA to hold VA Loans, in each case to the extent necessary.

**(f)** (g) Antitrust Clearances.   The waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated.

**Section 8.2    Conditions to Obligations of Sellers.**   The obligations of Sellers to consummate the Closing shall be subject to the satisfaction or waiver, at or prior to the Closing Date, of the following conditions:

(a)    Warranties of Purchaser True as of Closing Date. The representations and warranties of Purchaser contained herein that are qualified by materiality or Material Adverse Effect shall be accurate, true and correct in all respects, and all other representations and warranties of Purchaser contained herein shall be accurate, true and correct in all material respects, in each case on and as of the date hereof and as of the Closing Date as though made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date).

(b)    Compliance with Covenants.   Purchaser shall have performed and complied in all material respects with each of the covenants and agreements contained in this Agreement required to be performed and complied with by it on or prior to the Closing Date.

(c)    Certificate.   Sellers shall have received a certificate, signed by a duly authorized officer of Purchaser and dated the Closing Date, to the effect that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied.

(d)    Third Party Consents.   All Consents set forth on Schedule 5.3 shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory

to Sellers, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

**Section 8.3    Conditions to Obligations of Purchaser.** The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction or waiver, at or prior to the Closing Date of each of the following conditions:

(a)    <u>Warranties of Sellers True as of Closing Date</u>.  The representations and warranties of Sellers or any Affiliate Seller contained herein that are qualified by materiality or Material Adverse Effect shall be accurate, true and correct in all respects, and all other representations and warranties of Sellers or any Affiliate Seller contained herein shall be accurate, true and correct in all material respects, in each case on and as of the date hereof and as of the Closing Date as though made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date).

(b)    <u>Compliance with Covenants</u>.  Sellers shall have performed and complied ~~with the covenants set forth in Sections 6.12(d) in all respects, and shall have performed and complied~~ in all material respects with each of the covenants and agreements contained in this Agreement required to be performed and complied with by them on or prior to the Closing Date.

(c)    <u>Certificate</u>.  Purchaser shall have received certificates, signed by duly authorized officers of Sellers and dated the Closing Date, to the effect that the conditions set forth in <u>Sections 8.3(a)</u> and <u>8.3(b)</u> have been satisfied.

(d)    <u>Sale Approval Order</u>.

(i)    Solely with respect to the purchase of HELOCs under this Agreement, the Sale Approval Order shall have been entered and become a Final Order in form and substance reasonably satisfactory to Purchaser (including with respect to the treatment of HELOC advances); and

(ii)    With respect to obligations and benefits that can be realized prior to the Closing Date, Sellers shall have complied, in all material respects, with all of their obligations under, and Purchaser shall have received the benefits of, the Sale Approval Order.

(e)    <u>Other Third Party Consents</u>.  All Consents set forth on <u>Schedule 4.3</u> shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

(f)    <u>Licenses</u>.  Purchaser shall have obtained all Licenses and Permits necessary to own the Purchased Assets in all material respects, including those set forth in <u>Section 6.6</u>, or, with respect to any License or Permit, shall have received a written waiver by the relevant licensing Government Entity to operate the business without such License or Permit, pending the final issuance thereof.

# ARTICLE IX.

## TERMINATION AND SURVIVAL

**Section 9.1    Termination.**  Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time on or prior to the Closing Date:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by Sellers or Purchaser if any court of competent jurisdiction shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Order shall have become a Final Order unless such Final Order or action was issued or taken at the request or with the support of the party seeking to terminate this Agreement (or any of its Affiliates); it being agreed that the parties hereto shall promptly appeal any such adverse order or other determination that is appealable (and ~~argue~~**pursue** such appeal ~~with~~**using commercially** reasonable ~~diligence~~**efforts**);

(c)    by Purchaser, upon written notice to Seller if:

(i)    any condition to the obligations of Purchaser set forth in Sections 8.1 and 8.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(ii)    there has been a material violation or breach by any Seller of any covenant, agreement, representation or warranty contained in this Agreement, which violation or breach (A) has not been cured within ten Business Days following the delivery of written notice of such violation or breach or (B) is not capable of being cured within a ten Business Day period;

~~(iii)    Sellers do not file the Petitions within two Business Days of the date hereof;~~

~~(iv)    the Sale Motion is not filed on the Petition Date;~~

**(iii)**    ~~(v)~~the Sale Procedures Order has not been entered by the Bankruptcy Court by ~~June 18,~~**July 2,** 2012, or if the Sale Procedures Order, once entered, is changed ~~in a manner that is materially adverse to Purchaser~~ without the consent of Purchaser in its sole discretion;

**(iv)**    ~~(vi)~~the Sale Procedures Order does not provide for the final bid deadline to occur not later than ~~90~~**60** calendar days following the entry by the Bankruptcy Court of the Sale Procedures Order;

**(v)**    ~~(vii)~~the Auction, if any, is not concluded within seven Business Days following the final bid deadline;

**49**

**(vi)** (viii) the Sale Hearing does not occur within ~~30 days following the conclusion of the Auction, or such other date as may be scheduled by the Bankruptcy Court that is no more than 40~~**7** days following the conclusion of the Auction;

**(vii)** (ix) the ~~Confirmation~~**Sale Approval** Order has not been entered ~~by October 31, 2012 and the Sale Approval Order has not been entered~~ and become a Final Order without stay of its effectiveness by ~~November 15,~~**October 1,** 2012;

~~(x)    the Chapter 11 Plan Effective Date has not occurred by December 15, 2012 and the Sale Approval Order has not been entered and become a Final Order without stay of effectiveness by December 20, 2012;~~

**(viii)** (xi) the Sale Approval Order**,** once entered, is changed ~~in a manner that is adverse to Purchaser~~ without the consent of Purchaser in its sole discretion; **or**

**(ix)** (xii) any Seller seeks to have the Bankruptcy Court enter an order dismissing the Bankruptcy Case of any Seller or converting it to a case under Chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Bankruptcy Case of any Seller or converting the Bankruptcy Case of any Seller to a case under Chapter 7 of the Bankruptcy Code, or appoints a trustee in any Seller's Bankruptcy Case or an examiner with enlarged powers relating to the operation of Sellers' businesses, and such dismissal, conversion or appointment is not reversed or vacated within three business days after the entry thereof~~; or~~**.**

~~(xiii)    Sellers' respective Boards of Directors approve an Alternative Restructuring or Sellers execute a letter of intent (or similar document) indicating their intention to pursue an Alternative Restructuring;~~

(d)    by Sellers, upon written notice to Purchaser:

(i)    if any condition to the obligations of Sellers set forth in Sections 8.1 and 8.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers; or

(ii)    if there has been a material violation or breach by Purchaser or any covenant, agreement, representation or warranty contained in this Agreement, which violation or breach (A) has not been cured within ten Business Days following the delivery of written notice of such violation or breach or (B) is not capable of being cured within a ten Business Day period;

(e)    automatically if the Bankruptcy Court shall enter an Order approving a Competing Transaction**, subject to Purchaser's right to payment of the Break-Up Fee pursuant to Section 6.12(c)**; provided, **however,** that if the Auction is held pursuant to the Sale Procedures, and Purchaser is designated as the Next-Highest Bidder (as such

term is defined in the Sale Procedures), then this Agreement shall not terminate pursuant to this ~~subSection~~**subsection** (e) until the earlier of (i) the Bankruptcy Court approval of the "Successful Bid" (as such term is defined in the Sale Procedures)~~; and~~ **or** (ii) 30 calendar days following the Auction.  While Purchaser remains the Next-Highest Bidder (as such term is defined in the Sale Procedures), the obligations of Purchaser and Sellers described in Sections 6.1 and 6.12**(b) and** (c) shall be held in abeyance **and the Deposit Escrow Agreement shall remain in full force and effect** until the purchase agreement with the bidder or purchase agreements with the bidders, as the case may be, who made the "Successful Bid" at the Auction (as such term is defined in the Sale Procedures) are terminated; or

(f)    by Sellers or Purchaser if the Closing shall not have occurred on or before ~~December 31,~~**October 15,** 2012 (or such later date as mutually agreed to by Sellers and Purchaser).

**Section 9.2    Procedure and Effect of Termination.**  In the event of termination of this Agreement and abandonment of the transactions contemplated by this Agreement by either or both of the parties pursuant to Section 9.1, three Business Days' written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto; provided, that no notice shall be required with respect to termination pursuant to Section 9.1(e) and provided, further, that (a) this Section 9.2 and Article X ~~(other than Section 10.15)~~ shall survive the termination of this Agreement and (b) no such termination shall relieve any party from any Losses arising out of any breach of this Agreement by a party that occurs upon or prior to the termination of this Agreement.

**Section 9.3    No Survival.**  Sellers and Purchaser agree that all of the representations, warranties and covenants of Sellers and Purchaser contained in this Agreement, or any instrument delivered pursuant to this Agreement, shall terminate at the Closing Date, except that the representations, warranties and covenants that by their terms survive the Closing Date shall survive the Closing Date.

## ARTICLE X.

### MISCELLANEOUS

**Section 10.1    Expenses.**  Except as otherwise provided in this Agreement or the Sale Procedures Order, (i) all expenses relating to the preparation of assignments, the transfer of ownership of MERS Loans, and other transfer taxes, fees and expenses shall be paid by Sellers, (ii) all expenses relating to the recording of assignments from Sellers to Purchaser shall be paid by Purchaser**,** and (iii) all other costs and expenses incurred in connection with this Agreement and the consummation of the transactions hereunder shall be paid by the party incurring such expenses**.  Subject to approval by the Bankruptcy Court, the Break-Up Fee payable to Purchaser (i) shall rank as administrative expense claims against the Sellers pursuant to Section 503(b)(1)(A) of the Bankruptcy Code; and (ii) shall be paid promptly by the Sellers as set forth herein**.  Following approval of the Sale Procedures Order, any claims arising from breaches by any Sellers of their obligations pursuant to the terms of this Agreement shall

constitute administrative expense claims against Sellers under Sections 503(b)(1) and 507(a)(1), as applicable, of the Bankruptcy Code.

**Section 10.2   Amendment; Waiver.**   This Agreement may be amended, modified or supplemented only in writing signed by each of the parties hereto.   Any provisions of this Agreement may be waived, but only if such waiver is in writing and signed by the party against whom the waiver is to be effective.   No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**Section 10.3   Notices.**   Any written notice to be given hereunder shall be deemed given: (a) when received if given in person or by nationally recognized courier; (b) on the date of transmission if sent by telecopy, e-mail or other wire transmission (receipt confirmed in each case); (c) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid, return receipt requested; and (d) if sent by an internationally recognized overnight delivery service, the second Business Day following the date given to such overnight delivery service (specified for overnight delivery and receipt confirmed).   All notices shall be addressed as follows:

if to Sellers, to:

Residential Capital, LLC
1177 Avenue of the Americas
New York, New York 10036
Facsimile:       646-257-2703
Attention:       Mr. Thomas Marano
Telephone:     646-257-2703
email:             tom.marano@gmacrescap.com

with copies to (which copies shall not constitute notice):

Residential Capital, LLC
1100 Virginia Drive
Fort Washington, Pennsylvania 19034
Facsimile:       866-572-7524
Attention:       Tammy Hamzehpour, Esq., General Counsel
Telephone:     215-682-1307
email:             tammy.hamzehpour@gmacrescap.com

*and*

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
Facsimile:       212-468-7900

| Attention: | Gary S. Lee, Esq. |
|---|---|
| Telephone: | 212-468-8163 |
| email: | glee@mofo.com |

and

| Attention: | Larren M. Nashelsky, Esq. |
|---|---|
| Telephone : | 212-506-7365 |
| email: | lnashelsky@mofo.com |

if to Purchaser, to:

~~BMMZ Holdings LLC~~
~~c/o Ally Financial Inc.~~
~~200 Renaissance Center~~
~~Detroit, Michigan 48265~~
**Lone Star U.S. Acquisitions, LLC**
**2711 N. Haskell Ave., Ste. 1700**
**Dallas, Texas 75204**

| Facsimile: | ~~313-656-6124~~**214-721-1691** |
|---|---|
| Attention: | ~~William B. Solomon, VP and General Counsel~~**Chad Patton** |
| Telephone: | ~~313-656-6128~~**214-754-8691** |
| email: | ~~william.b.solomon@ally~~**cpatton@lonestarfunds**.com |

 with copies to (which copies shall not constitute notice):

~~Ally Financial Inc.~~
~~200 Renaissance Center, 12th Floor~~
~~Detroit, MI 48265~~
**King & Spalding LLP**
**1180 Peachtree St. NE**
**Atlanta, GA 30309**

| Facsimile: | ~~313-656-6124~~**404-572-5131** |
|---|---|
| Attention: | ~~William B. Solomon, VP and General Counsel~~**Paul Ferdinands** |
| Telephone: | ~~313-656-6128~~**404-572-4600** |
| email: | ~~william.b.solomon@ally~~**pferdinands@kslaw**.com |

~~and~~

~~Mayer Brown LLP~~
~~71 South Wacker Drive~~
~~Chicago, Illinois 60606~~
~~Facsimile:        312-706-8192~~
~~Attention:        Elizabeth A. Raymond~~
~~Telephone:        312-701-7322~~

email:          eraymond@mayerbrown.com

**Section 10.4    Waivers.**  The failure of a party to require performance of any provision hereof shall not affect its right at a later time to enforce the same.  No waiver by a party of any term, covenant, representation or warranty contained herein shall be effective unless in writing. No such waiver in any one instance shall be deemed a further or continuing waiver of any such term, covenant, representation or warranty in any other instance.

**Section 10.5    Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 10.6    Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction.**

(a)    This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to any conflicts of law principles thereof or any other jurisdiction that would apply the law of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b)    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND THE TRANSACTIONS CONTEMPLATED HEREBY.

(c)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.3 hereof; provided, that if the Bankruptcy Case of Sellers has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.3.

**Section 10.7    Assignment.**    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns; provided, that no assignment of ~~either party's~~**Sellers'** rights or obligations may be made without the written consent of the ~~other party~~**Purchaser**, which consent shall not be unreasonably withheld or delayed; and provided, further, that Purchaser may assign this Agreement **(in its sole discretion and without the necessity of obtaining any consent)** and any or all rights or obligations hereunder (including Purchaser's rights to purchase the Purchased Assets) to one or more Affiliates of Purchaser if any such Affiliate has at the Closing all Licenses necessary to own such Purchased Assets; provided, that Purchaser shall remain obligated to fulfill its obligations pursuant to this Agreement and for any damages arising from an unlawful breach hereof.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

**Section 10.8    No Third-Party Beneficiaries.**    Except as provided in Section 6.22, this Agreement is solely for the benefit of the parties hereto, and no provision of this Agreement shall be deemed to confer any remedy, claim or right upon any third party, including any employee or former employee of Sellers or any participant or beneficiary in any benefit plan, program or arrangement.

**Section 10.9    Public Announcements.**    Sellers and Purchaser each agree that they and their Affiliates shall not issue any press release or otherwise make any public statement or respond to any media inquiry with respect to this Agreement or the transactions contemplated hereby without the prior approval of the other parties, which shall not be unreasonably withheld or delayed, except as may be required by Law or by any stock exchanges having jurisdiction over Sellers, Purchaser or their Affiliates.  Sellers, Affiliate Sellers and Purchaser will consult with each other regarding the content and timing of any internal announcements regarding the transactions contemplated by this Agreement and the Ancillary Agreements to Sellers' employees.

**Section 10.10  Severability.**    Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

**Section 10.11  Specific Performance.**    The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that Purchaser shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court referenced in

Section 10.6(c), this being in addition to any other remedy to which they are entitled at Law or in equity.

**Section 10.12 Waiver of Bulk Transfer Laws.**   Seller and Purchaser agree to waive compliance with Article 6 of the Uniform Commercial Code as adopted in each of the jurisdictions in which any of the Purchased Assets are located to the extent that such Article is applicable to the transactions contemplated hereby and any other bulk sale or bulk transfer or similar Law.

**Section 10.13 Personal Liability.**   This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any officer, director, employee, representative or investor of any party hereto.

**Section 10.14 Entire Agreement.**   This Agreement, together with the Ancillary Agreements, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof.

~~**Section 10.15 Parent Guaranty.**   Parent hereby irrevocably, absolutely and unconditionally guarantees to Sellers the prompt and full payment by Purchaser of all of Purchaser's monetary obligations under this Agreement and any Ancillary Agreements as and when payment is due and payable in accordance with the terms hereof and thereof (collectively, the "Guaranteed Obligations").   Parent acknowledges and agrees that, with respect to all Guaranteed Obligations, such guaranty constitutes a guaranty of payment and not of collection and shall not be conditioned or contingent upon the pursuit by Sellers of any remedies which they now or may hereafter have against Purchaser, whether at law, in equity or otherwise.   Upon receipt of written notice requesting payment of the Guaranteed Obligations, Parent shall forthwith make full payment of any amount due with respect thereto, at its sole cost and expense, to the extent that such payment has not previously been made by Purchaser.   This Section 10.15 shall terminate and be of no further force or effect upon and after the date that the Guaranteed Obligations shall have been paid in full.~~

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**ALLY FINANICAL INC.**

By: _____
Name: Michael A. Carpenter
Title: Chef Executive Officer

**BMMZ HOLDINGS LLC**
**LONE STAR U.S. ACQUISITIONS, LLC**

By: _____
Name:
Title:

**RESIDENTIAL CAPITAL, LLC**

By: _____
Name:
Title:

**RESIDENTIAL FUNDING COMPANY, LLC**

By: _____
Name:
Title:

**GMAC MORTGAGE, LLC**

By: _____
Name:
Title:

**RESIDENTIAL CAPITAL, LLC**


By:_____
Name:
Title:


**RESIDENTIAL FUNDING COMPANY, LLC**


By:_____
Name:
Title:


**GMAC MORTGAGE, LLC**


By:_____
Name:
Title:**GMACM BORROWER, LLC**


By:_____
Name:
Title:


**RFC BORROWER, LLC**


By:_____
Name:
   Title:**EXHIBIT B**

**EXHIBIT 3**

**SALE PROCEDURES ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER UNDER 11 U.S.C. §§ 105, 363(b) AND 365 (I) AUTHORIZING AND
APPROVING SALE PROCEDURES, INCLUDING BREAK-UP FEE ~~AND EXPENSE
REIMBURSEMENT~~; (II) SCHEDULING BID DEADLINE, AUCTION (IF
NECESSARY) AND SALE HEARING; AND (III) ESTABLISHING ~~ASSUMPTION AND
ASSIGNMENT PROCEDURES, INCLUDING PROCEDURES FOR FIXING CURE
AMOUNTS; AND (IV) ESTABLISHING~~ NOTICE PROCEDURES AND
APPROVING FORMS OF NOTICE**

Upon the motion, dated May 14, 2012 (the "Motion"),[1] of Residential Capital,
LLC ("ResCap") and certain of its affiliates, as debtors in possession (collectively, the
"Debtors") for entry of an Order,[2] under Bankruptcy Code sections 105, 363, 365, 503, 507 and
1123 of title 11, United States Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and
9014 for, among other things: (i) authorizing and approving ~~the~~**certain** proposed sale procedures
~~annexed hereto as Exhibit A-1 (the "Sale Procedures") and the payment of the Break-Up Fee and
Expense Reimbursement to Nationstar under the terms set forth in the Nationstar APA~~, (ii)
scheduling a Bid Deadline, Auction (if necessary) and Sale Hearing, ~~(iv) establishing procedures
for assuming and assigning the Assumed Contracts, including procedures for fixing cure~~

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion, the Sale Procedures, or the ~~APAs (as defined in the Motion~~**Asset Purchase Agreement by and
between Lone Star U.S. Acquisitions, LLC ("Lone Star") and Residential Capital, LLC, Residential
Funding Company, LLC, GMAC Mortgage, LLC and the additional Sellers thereto, dated June __,
2012 (the "Lone Star APA")**). Creditors and parties-in-interest with questions or concerns regarding the
Debtors' Chapter 11 cases or the relief granted herein may refer to http://www.kccllc.net./rescap for
additional information.

amounts (the "Cure Amounts") to be paid under section 365 of the Bankruptcy Code, determining whether alleged defaults (if any) exist and evaluating the Purchaser's ability to provide adequate assurance of future performance (the "Assumption and Assignment Procedures"), and (v**and (iii**) establishing notice procedures and approving forms of notice; and upon the (a) Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital LLC in Support of the Chapter 11 Petitions and First Day Pleadings, pursuant to Local Bankruptcy Rule 1007-2, **and** (b) the Declaration of Samuel M. Greene in Support of the Proposed Sale of the Debtors' Assets and (c) the Declaration of Tammy Hamzehpour in Support of the Proposed Sale of the Nationstar Purchased Assets Without a Privacy Ombudsman; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been given under the particular circumstances and it appearing that no further notice need be provided; and a hearing having been held on June 18, 2012, to consider the relief requested in the Motion (the "Sale Procedures Hearing"); and upon the record of the Sale Procedures Hearing, and all of the proceedings before this Court; and this Court having reviewed the Motion and any**all** objections **and responses** thereto (the "Objections") and **having** found and determined that the relief sought in the Motion with respect to the **approving the sale procedures attached hereto (the "**Sale Procedures**")** as provided herein is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon; and sufficient cause appearing therefore, it is FOUND AND DETERMINED THAT:[32]

---

[32][32]Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See FED. R. BANKR. P. 7052.

A.      The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, 365, 503, 507 and 1123(a) of the Bankruptcy Code, and rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

B.      The Motion and this Order comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Guidelines for the Conduct of Asset Sales established by the Bankruptcy Court on November 18, 2009 pursuant to General Order M-383.

C.      The Sale Procedures comply with the requirements of Local Rule 6004-1.

D.      The Debtors have articulated compelling and sound business justifications for this Court to grant the Sale Procedures Relief **as and to the extent contemplated by this Order**, including this Court's (i) approval of payment of the Break-Up Fee ~~and Expense Reimbursement~~ under the circumstances, timing, and procedures set forth herein~~, in the Motion,~~ and in the ~~Nationstar~~**Lone Star** APA; (ii) approval of the Sale Procedures; (iii) scheduling of the Bid Deadline, Auction, and Sale Hearing; **and** (iv)~~ approval of and authorization to serve the Sale Notice and the Assumption and Assignment Notice (each as hereinafter defined); and (v)~~ approval of and authorization to publish the Sale Notice.

E.      The Debtors have set a Sale Hearing (as described below), where they will seek authorization of the sale of the Purchased Assets ~~and the assumption and assignment of the Assumed Contracts subject of the APAs~~**(as such term is defined in the Lone Star APA)** free and clear of all liens, encumbrances, and interests to ~~Nationstar and AFI, respectively.~~**Lone Star** or such other Successful Bidders as may result from the Auction.

F.    Entry into ~~each of the APAs with Nationstar and AFI, respectively,~~**the Lone Star APA** is in the best interest of the Debtors and the Debtors' estates and creditors.  The ~~APAs~~**Lone Star APA** will enable the Debtors to secure an adequate floor for the Auction and will provide a clear benefit to the Debtors' estates.  The terms of the ~~Nationstar~~**Lone Star** APA were negotiated by the Debtors and ~~Nationstar~~**Lone Star** in good faith and at arm's length.  ~~The terms of the AFI APA were negotiated by the Debtors and AFI in good faith and at arm's length.~~

G.    The Break-Up Fee ~~and Expense Reimbursement~~ subject of the ~~Nationstar~~**Lone Star** APA ~~are~~**is** fair and reasonable and provide a benefit to the Debtors' estates and creditors.

H.    The Debtors' payment of the Break-Up Fee ~~and Expense Reimbursement to Nationstar~~**to Lone Star** under the conditions set forth in the ~~Nationstar~~**Lone Star** APA was negotiated by the parties in good faith and at arm's length and is (i) an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtors' estates and creditors and all parties in interest; (iii) reasonable and appropriate; and (iv) necessary to ensure that ~~Nationstar~~**Lone Star** will continue to pursue the proposed ~~Nationstar~~**Lone Star** APA to undertake the sale of the Purchased Assets subject of the ~~Nationstar~~**Lone Star** APA.  Notwithstanding anything to the contrary in this or any other order of this Court, the Break-Up Fee ~~and Expense Reimbursement~~ shall constitute allowed administrative expenses with priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

I.    The Sale Procedures, a copy of which is annexed hereto as <u>Exhibit A-1</u>, are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Purchased Assets subject of the ~~APAs~~**Lone Star APA**.

4

J.      The Notice of Auction and Sale Hearing (the "Sale Notice"), a copy of which is annexed hereto as Exhibit A-2, is reasonably calculated to provide parties in interest with proper notice of the proposed sale of the Purchased Assets subject of ~~each~~**the Lone Star** APA, the Sale Procedures, the Sale ~~Transactions~~**Transaction**, the Auction (if necessary), and the Sale Hearing, and no other or further notice is required.

K.      Publication of the Sale Notice is reasonably calculated to provide all unknown creditors and parties not otherwise required to be served with a copy of the Sale Notice pursuant to this Order with proper notice of the proposed sale of the Purchased Assets subject of ~~each~~**the Lone Star** APA, the Sale Procedures, the ~~Sales~~**Sale**, the Auction (if necessary), and the Sale Hearing, and no other or further notice is required.

~~L.      The Assumption and Assignment Notice, a copy of which is annexed hereto as Exhibit A-3, is reasonably calculated to provide all counterparties to the Assumed Contracts with proper notice of the potential assumption and assignment of their respective executory contracts or Leases, any Cure Amounts relating thereto, and the Assumption and Assignment Procedures.~~

**L.**      ~~M.~~ Due, sufficient, and adequate notice of the relief requested in the Motion and granted herein has been given to parties in interest and no further notice is required. A reasonable opportunity to object or be heard regarding the relief granted by this Order (including with respect to the proposed Sale Procedures**, and** the Break-Up Fee~~, and the Expense Reimbursement~~) has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

**M.**      ~~N.~~ Although the Sale ~~Transactions include~~**Transaction with Lone Star includes** the transfer of "personally identifiable information" (as defined in 101(41)(A) of the

Bankruptcy Code), the transfer of such information is consistent with the Debtors**'** existing

privacy policies.  No consumer privacy ombudsman is required and the Debtors may disclose

customer "personally identifiable information" to a purchaser of its assets in a bankruptcy sale in

a manner that is consistent with applicable federal requirements.

**N.**    ~~O.~~ This Order constitutes a final order within the meaning of 28 U.S.C. §

158(a).

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED

THAT:

## **The Sale Procedures**

1.    The Sale Procedures Relief requested in the Motion is granted as **and to
the extent** provided herein.

2.    The [Objections~~] are overruled~~ **are sustained to the extent set forth
herein**.

3.    The Sale Procedures, attached hereto as Exhibit 1, which are incorporated
herein by reference, are approved and shall govern all bids and sale procedures relating to the
Purchased Assets subject of ~~each~~**the Lone Star** APA.  The Debtors are authorized to take any
and all actions necessary or appropriate to implement the Sale Procedures.

4.    This Order and the Sale Procedures shall govern the sale of the Purchased
Assets ~~under any sale pursuant to a Chapter 11 plan~~**subject of the Lone Star APA under
Section 363 of the Bankruptcy Code**.

5.    The Sale Procedures shall apply to (i) except as otherwise provided in the
Sale Procedures or the ~~respective APAs, Nationstar and AFI, respectively~~**Lone Star APA, Lone
Star**; (ii) Potential Bidders and Qualified Bidders; (iii) the conduct of the ~~Sales~~**Sale**; and (iv) the
Auction.

6

6.    ~~Each of Nationstar and AFI, respectively,~~**Lone Star** shall constitute a Qualified Bidder for all purposes and in all respects with respect to the Sale Procedures.

7.    In light of ~~the extensive prepetition negotiations culminating in the Nationstar APA in addition to Nationstar~~**Lone Star**'s payment of the ~~Nationstar~~**Lone Star** Deposit, ~~Nationstar~~**Lone Star** is excused from submitting an additional deposit.   The ~~Nationstar~~**Lone Star** Deposit shall be deemed ~~Nationstar~~**Lone Star**'s Good Faith Deposit (as defined in the Sale Procedures) for all purposes under the Sale Procedures.

~~8.    AFI shall be excused from submitting a Good Faith Deposit (as defined in the Sale Procedures) required of Qualified Bidders in light of the extensive prepetition negotiations culminating in the AFI APA, in addition to AFI's irrevocable, absolute, and unconditional guarantee (as described in section 10.15 of the AFI APA) to Sellers (as defined in the AFI APA) of the prompt and full payment by BMMZ of all of BMMZ's monetary obligations under the AFI APA and any Ancillary Agreements as and when payment is due and payable in accordance with the terms under the AFI APA.~~

**8.**    ~~9.~~The deadline for submitting a Qualified Bid shall be ~~September 18,~~**August 20,** 2012 (the "Bid Deadline"), as further described in the Sale Procedures.

**The Break-Up Fee and Expense Reimbursement**

**9.**    ~~10.~~The Debtors are authorized and directed to pay to ~~Nationstar~~**Lone Star** the Break-Up Fee of $~~72 million (of which 8.44% is allocable to the Ginnie Mae MSRs and 91.56% is allocable to the remaining Nationstar Purchased Assets) and the Expense Reimbursement~~**10 million** under the terms set forth in the ~~Nationstar~~**Lone Star** APA, without the need for any application, motion, or further order of this Court.

**10.**    ~~11.~~The Debtors' obligations to pay the Break-Up Fee ~~and Expense Reimbursement~~ in accordance with the terms of the ~~Nationstar~~**Lone Star** APA, shall survive

7

termination of the ~~Nationstar~~**Lone Star** APA, shall constitute allowed administrative expense claims against each Debtor's estate, shall be entitled to priority under sections 503(b)(1)(A) and 507(a)of the Bankruptcy Code, and shall be (i) fully payable from proceeds of the Successful Bid upon closing or (ii) payable from proceeds of any deposit forfeited to the Debtors in the event that the Successful Bid does not close or otherwise by the Debtors if any such deposit is insufficient.

**Notice Procedures**

~~12.    The Assumption and Assignment Notice is sufficient to provide effective notice of the assumption and assignment of the Assumed Contracts and Cure Amounts to all non-debtor parties to the Assumed Contracts, any known third party beneficiaries to such Assumed Contracts, all trustees, certificateholders, investors, rating agencies, mortgage insurers and any other parties to any pooling and servicing agreements, assignment, assumption and recognition agreements, Servicing Agreements, subservicing agreements or similar agreements, pursuant to Bankruptcy Rules 2002 and 6006, and are hereby approved.~~

**11.**    ~~13.~~ The Sale Notice and the Publications Notice are sufficient to provide effective notice to all interested parties of the Sale Procedures, the Auction (if any), and the Sale ~~Transactions~~**Transaction with Lone Star**, pursuant to Bankruptcy Rules 2002(a)(2) and 6004, and are hereby approved.

**12.**    ~~14.~~ The notices described in subparagraphs (a)-(d) below are approved and shall be good and sufficient, and no other or further notice shall be required if given as follows:

(a)    The Debtors (or their agent) serve, within three (3) days after entry of this Order (the "Mailing Deadline"), by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a copy of this Order and the Notice of Auction and Sale Hearing upon: (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for ResCap's prepetition

secured credit facilities, (iv) the attorneys for the agent under the Debtors'
prepetition amended and restated secured revolving credit agreement, (v)
the attorneys for the statutory committee of unsecured creditors appointed
in the Debtors' Chapter 11 cases (the "Creditors' Committee") (if no
statutory committee of unsecured creditors has been appointed, the holders
of the fifty largest unsecured claims against the Debtors on a consolidated
basis), (vi) the attorneys for the ad hoc bondholders' committee, (vii) the
attorneys for the Federal National Mortgage Association, the Federal
Home Loan Mortgage Corporation, and the Government National
Mortgage Association, (viii) any party who, in the past year, expressed in
writing to the Debtors an interest in the Purchased Assets and who the
Debtors and their representatives reasonably and in good faith determine
potentially have the financial wherewithal to effectuate the transaction
contemplated in the **Lone Star** APA, (ix) each non-debtor counterparty to
the Assumed Contracts, any known third party beneficiaries to such
Assumed Contracts, all trustees, certificateholders, investors, rating
agencies, mortgage insurers and any parties to any pooling and servicing
agreements, assignment, assumption and recognition agreements,
Servicing Agreements, subservicing agreements or similar agreements; (x)
all parties who are known to have asserted or believed by Debtors to hold
any lien, claim, encumbrance, or interest in or on the Purchased Assets,
(xi**x**) the Securities and Exchange Commission, (xii**xi**) the Internal
Revenue Service, (xiii**xii**) all applicable state attorneys' general, and local
authorities, (xiv**xiii**) all applicable state and local taxing authorities,
(xv**xiv**) the Federal Trade Commission**, (xv) the United States
Department of Justice**, (xvi) the United States Department of Justice,
(xvii) the United States Attorney's Office, (xviii**xvii**) the office of the New
York Attorney General; and (xix**xiii**) all entities that requested notice in
these Chapter 11 cases under Bankruptcy Rule 2002; and

(b)    On or before the Mailing Deadline, the Debtors (or their agent) serve by
first-class mail, postage prepaid, or other method reasonably calculated to
provide notice, the Sale Notice, substantially in the form annexed hereto
as <u>Exhibit A-2</u>, upon any other known creditors and interestholders.

(c)    On the Mailing Deadline, or as soon as practicable thereafter, the Debtors
shall cause the Sale Notice, substantially in the form annexed hereto as
<u>Exhibit A-2</u>, to be published (i) once (a) in the global edition of *The Wall
Street Journal* and (b) the national edition of *The New York Times*, and (ii)
on the website of the Debtors' proposed claims and noticing agent
Kurtzman Carson Consultants, LLC at <u>http://www.kccllc.net</u>.

(d)    On or before June 25, 2012 the Debtors shall file a schedule (the
"Schedule") of Assumed Contracts that Nationstar has designated as
Assumed Contracts, including the cure amounts relating such Assumed
Contracts (the "Cure Amount"), and serve by first-class mail, postage
prepaid, or other method reasonably calculated to provide notice, a notice

9

of the assumption and assignment of the Assumed Contracts and the proposed Cure Amounts relating to the Assumed Contracts (the "Assumption and Assignment Notice"), substantially in the form annexed hereto as Exhibit A-3, upon (i) each counterparty to the Assumed Contracts (including the Servicing Agreements); (ii) any known third party beneficiaries to such Assumed Contracts, all trustees, certificateholders, investors, rating agencies, mortgage insurers and any parties to any pooling and servicing agreements, assignment, assumption and recognition agreements, Servicing Agreements, subservicing agreements or similar agreements and (iii) all trustees that are parties to the Pooling and Servicing Agreements.   In addition, Debtors will use their commercially reasonable efforts to identify and provide notice of the terms of the proposed assumption and assignment of the relevant Assumed Contracts to investors and certificateholders.

15.   Subject to certain exceptions expressly provided for in the Nationstar APA, Nationstar shall be entitled to remove any Assumed Contract from the relevant Schedule until two business days prior to the Closing Date, in which case the contract or lease shall cease to be an Assumed Contract.  The counterparty to such removed Assumed Contract shall be furnished promptly with notice of such removal.

**Objection Deadlines**

**13.**   16.  Any party that seeks to object to the relief requested in the Motion pertaining to approval of the Sales**Sale to Lone Star (or to another party that submits the Successful Bid)** shall file a formal objection that complies with the objection procedures as set forth in the Motion.  Each objection shall state the legal and factual basis of such objection.

**14.**   17.  Any and all objections as contemplated by this Order must be: (i) in writing; (ii) signed by counsel or attested to by the objecting party; (iii) in conformity with the Bankruptcy Rules, the Local Rules, and the Order Under Bankruptcy Code Sections 102(2), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 and Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management and Administrative Procedures (the "CMO"); (iv) filed with the Bankruptcy Court; and (v) served on (a) the Debtors; (b) Morrison &

Foerster LLP, counsel to the Debtors; (c) ~~Sidley Austin~~**King & Spalding** LLP, counsel to ~~Nationstar; (d) Kirkland & Ellis LLP, counsel to AFI; and (e~~**Lone Star; and (d**) the Notice Parties in accordance with the CMO (the "Objection Notice Parties") so as to be received on or before the appropriate deadline as set forth below.

**15.**    ~~18.~~ The deadline for objecting to approval of ~~(i) any Cure Amounts, and/or (ii) the assumption by the Debtors and assignment to Nationstar of an Assumed Contract shall be~~ **~~August 30, 2012, at 5:00 p.m.~~** ~~(Eastern Time) (the "Cure Objection Deadline"), provided, however, that in the event the Sale Procedures result in a Successful Bidder other than Nationstar, the deadline for objecting to the sale of the Purchased Assets to such Successful Bidder shall be at the Sale Hearing.   The deadline for objecting to approval of the Sale Transactions~~**the Sale Transaction with Lone Star**, including the sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests (including rights or claims based on any successor or transferee liability) shall be ~~October 8,~~**August 20,** 2012, at 5:00 p.m. (Eastern Time).

**16.**    ~~19.~~ Failure to object to the relief requested in the Motion shall be deemed to be "consent" for purposes of section 363(f) of the Bankruptcy Code and shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, and to the consummation and performance of the Sale ~~Transactions~~**Transaction** contemplated by the ~~APAs~~**Lone Star APA** (including the transfer free and clear of all liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability, of each of the **Lone Star** Purchased Assets transferred as part of the Sale ~~Transactions~~**Transaction**).

~~20.     If a timely objection is raised either to the proposed assumption and assignment of an Assumed Contract or to the proposed Cure Amount (a "Contract Objection"),~~

(i) the Debtors; (ii) Nationstar; and (iii) the objecting party may meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If (i) the Debtors; (ii) Nationstar; and (iii) the objecting party resolve any Contract Objection, they may enter into a written stipulation, which stipulation is not required to be filed with or approved by the Court.  If a Contract Objection cannot be consensually resolved, it shall be heard by the Court at the discretion of the Debtors and Nationstar or AFI, respectively, either at the Sale Hearing or such other date as determined by the Court (such other date being no later than the Sale Hearing).

21.    Any Contract Objection that challenges a Cure Amount, or otherwise asserts that there exist outstanding defaults under an Assumed Contract, must set forth with specificity the Cure Amount being claimed by the objecting party or the nature of the asserted default, as applicable, and must include appropriate documentation in support thereof satisfactory to the Debtors and Nationstar.  If no objection to the Cure Amount or the proposed assumption and assignment of an Assumed Contract is timely filed and served, the pertinent Debtor may assume and assign the Assumed Contract to Nationstar (or, alternatively, to the Successful Bidder for the applicable Purchased Assets), and the Cure Amount set forth in the Assumption and Assignment Notice shall be binding upon all non-debtor parties to the Assumed Contracts, any known third party beneficiaries to such Assumed Contracts, all trustees, certificateholders, investors, rating agencies, mortgage insurers and any parties to any pooling and servicing agreements, assignment, assumption and recognition agreements, Servicing Agreements, subservicing agreements or similar agreements (collectively, the "Assumption Notice Parties"), for all purposes in such Debtor's Chapter 11 cases.  The respective Assumption Notice Parties shall be forever barred from (i) objecting to the assumption and assignment of the relevant Assumed Contract and/or Cure Amount, and (ii) asserting at any time any condition to

~~assignment, default, claims, obligations or breach and/or any additional cure, damage or other~~
~~amount with respect to the respective Assumed Contract on the basis of events of any kind of~~
~~nature occurring or arising prior to the Closing Date, whether such events constituted acts or~~
~~omissions by the Debtors or other person and regardless of whether such events are known or~~
~~unknown, including, without limitation, claims or liabilities relating to any act or omission of~~
~~any originator, holder or servicer of mortgage loans prior to the Closing Date, and any~~
~~indemnification obligations, claims or liabilities relating to any act or omission of the Sellers or~~
~~any other person prior to the Closing Date.~~

~~22.    All Assumed Contracts will be assumed and assigned to Nationstar on the~~
~~Closing Date of the Nationstar APA, except as may be otherwise set forth therein or agreed~~
~~between the Debtors and Nationstar.~~

**17.**    ~~23.~~ The Court shall conduct the Sale Hearing on ~~October 15,~~**August 30,**
**2012 at _:00 _.m.** (Eastern Time) or such other date ~~before October 31, 2012 that the Court~~
~~conducts the Confirmation Hearing, at which time~~**that** the Court will consider approval of the
Sale ~~Transactions~~**Transaction** to the Successful Bidder. ~~The Sale Hearing shall, if applicable, be~~
~~conducted in connection with, and as part of, any hearing to consider confirmation of a plan of~~
~~reorganization under section 1129 of the Bankruptcy Code; provided, however, that if Nationstar~~
~~is the Successful Bidder and a plan of reorganization is not confirmed by the Bankruptcy Court~~
~~on or before October 31, 2012 or if a plan of reorganization that is confirmed by such date does~~
~~not become effective on or before December 15, 2012, the Debtors shall seek to consummate the~~
~~Sale Transactions to Nationstar and AFI, respectively, pursuant to section 363 of the Bankruptcy~~
~~Code.~~

**18.** 24. In the event the Successful Bidder is not Nationstar or AFI, respectively, non-debtor parties to the Assumed Contracts may raise objections to adequate assurance of future performance at the Sale Hearing, but shall not be permitted to raise objections to the Cure Amount if not asserted by the Cure Objection Deadline. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing or by the filing of a hearing agenda.

**Other Relief Granted**

**19.** 25. In the event the Debtors receive, on or before the Bid Deadline, one or more Qualified Bids in addition to the Nationstar or AFI**Lone Star** bid, the Debtors will conduct an Auction, commencing at **10:00 a.m. (Eastern Time) on** September 25,**August 27,** **2012** at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, or such later time on such date or other location as shall be timely communicated in accordance with the Sale Procedures. If (i) no Qualified Bids with respect to the Nationstar**Lone Star** Purchased Assets other than Nationstar**Lone Star**'s Qualified Bid are timely received or (ii) the Debtors only timely receive Qualified Bids for the Ginnie Mae MSRs and do not timely receive a Qualified Bid for the remaining Nationstar Purchased Assets other than Nationstar's Qualified Bid, the Debtors shall not conduct the Auction with respect to such Nationstar**Lone Star** Purchased Assets for which no Qualified Bids were received (other than Nationstar's Qualified Bid), and instead shall seek approval of the sale of the relevant Nationstar**Lone Star** Purchased Assets to Nationstar**Lone Star** pursuant to the provisions of the Nationstar**Lone Star** APA at the Sale Hearing.

14

**20.** ~~26.~~ The Debtors are authorized to conduct the Sale ~~Transactions~~**Transaction** without the necessity of complying with any state or local bulk transfer laws or requirements.

**21.** ~~27.~~ In the event there is a conflict between this Order and the Motion, this Order shall control and govern.

**22.** ~~28.~~ Notwithstanding any possible applicability of Bankruptcy Rules 6004 or 6006, or otherwise, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry. For the avoidance of doubt, the Break-Up Fee ~~and Expense Reimbursement~~ approved by this Order shall be immediately appealable and failure to appeal in accordance with the Bankruptcy Rules or other applicable law shall constitute a waiver of such rights.

**23.** ~~29.~~ Subject to the provisions of this Order governing payment of the Break-Up Fee ~~and Expense Reimbursement~~, all net proceeds from the consummation of the Sale ~~Transactions~~**Transaction** or a Competing Transaction (as defined in the ~~APAs~~**Lone Star APA**) shall be treated in accordance with the terms of the Debtors' ~~proposed~~ postpetition secured debtor-in-possession financing (the "DIP Financing") and any order of this Court approving the DIP Financing.

**24.** ~~30.~~ With the exception of this Order's provisions pertaining to the Break-Up Fee ~~and Expense Reimbursement~~, to the extent that any inconsistency exists between this Order and the terms of the DIP Financing or any order of this Court approving such DIP Financing, the terms of the DIP Financing and the order approving the same shall control.

**25.** ~~31.~~ The requirements set forth in Local Rule 9013-1(b) are satisfied.

**26.** ~~32.~~ The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

**27.**    33. Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

**28.**    34. The Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: New York, York
               [_____], 2012

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT A-1**

### **PROPOSED SALE PROCEDURES**

## SALE PROCEDURES

By motion dated May 14, 2012 (the "Motion"), Residential Capital LLC ("ResCap") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), requested, among other things, approval of the process and procedures through which it will determine the highest or otherwise best price for the purchase of certain assets (collectively, the "Purchased Assets") of the Debtors under two ~~separate~~**different** asset purchase agreements~~, each as described below~~.  On _____ __, 2012, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Sale Procedures Order"), which, among other things, authorized the Debtors to determine the highest or otherwise best price for the **Lone Star** Purchased Assets through the process and procedures set forth below (the "Sale Procedures").

On _____ __, 2012, as further described below, in the Motion, and in the Sale Procedures Order, the Bankruptcy Court shall conduct a hearing (the "Sale Hearing"), at which the Debtors shall seek entry of an ~~orders~~**order** (~~each,~~ a "Sale Order") authorizing and approving the sale of **certain of** the Purchased Assets (the "Sale ~~Transactions~~**Transaction**") pursuant to (i) that certain Asset Purchase Agreement**, date June __, 2012** (the "~~Nationstar~~**Lone Star** APA")**,** between certain of the Debtors and ~~Nationstar Mortgage~~**Lone Star U.S. Acquisition,** LLC ("~~Nationstar~~**Lone Star**"), providing for the sale of certain assets as identified therein (the "~~Nationstar~~**Lone Star** Purchased Assets")~~ substantially in the form annexed as Exhibit B to the Motion~~, subject to the submission of higher or better offers in an auction process (the "Auction")~~; and (ii) that certain Asset Purchase Agreement (the "AFI APA", together with the Nationstar APA, the "APAs") between certain of the Debtors and (a) Ally Financial Inc. ("AFI") and (b) BMMZ Holdings LLC ("BMMZ"), providing for the sale of certain assets identified therein (the "AFI Purchased Assets") substantially in the form annexed as Exhibit C to the Motion, subject to the submission of higher or better offers in an Auction.  The Sale Hearing may be conducted in connection and in accordance with a hearing to consider confirmation of a plan of reorganization proposed in these Chapter 11 cases by the Debtors (the "Confirmation Hearing")~~.  **The Sale Hearing will be conducted pursuant to Section 363 of the Bankruptcy Code**.

## Participation Requirements

In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in purchasing the Purchased Assets (a "Potential Bidder") must first deliver the following materials to the Debtors, c/o Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Gary S. Lee and Larren M. Nashelsky) and Centerview Partners, 31 West 52nd Street, New York, NY 10019 (Attn: Samuel M. Greene and Marc D. Puntus):

(i) An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; and

(ii) Evidence of ~~corporate authority~~**financial ability** to ~~commit to~~**close** the Sale Transaction~~(s)~~, including the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the

Potential Bidder is an entity formed for the purpose of the Sale Transaction(s), (a) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, and (b) a written commitment acceptable to the Debtors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale Transaction(s).

A "Qualified Bidder" is a Potential Bidder whose Financials (or the Financials of its equity holder(s), if applicable) demonstrate the financial capability to consummate the Sale Transaction(s), whose bid meets all of the Bid Requirements described below and that the Debtors, in their discretion, but after consulting with the statutory committee of unsecured creditors appointed in these Chapter 11 cases (the "Creditors' Committee"), determine is likely to consummate the Sale Transaction(s), if selected as the Successful Bidder, after taking into account all relevant legal, regulatory, and business considerations.

## Obtaining Due Diligence Access

To obtain due diligence access or additional information regarding the **Lone Star** Purchased Assets or the Sellers subject of the APAs, a Qualified Bidder (other than Nationstar or AFI**Lone Star**) must first provide the Debtors with a written nonbinding expression of interest (the "Expression of Interest") regarding (i) the Qualified Bidder's proposed Sale Transaction(s), (ii) the purchase price range, (iii) the structure and financing of the Sale Transaction(s), (iv) any conditions to closing that it may wish to impose, and (v) the nature and extent of additional due diligence it may wish to conduct. If the Debtors, in their business judgment, determine that a Qualified Bidder that has submitted an Expression of Interest is reasonably likely to make a bona fide offer (a "Qualifying Expression of Interest"), then the Debtors shall afford such Qualified Bidder reasonable due diligence, including the ability to access information from a confidential electronic data room concerning the Purchased Assets (the "Data Room"). The Debtors will notify each party that submits an Expression of Interest regarding whether such party has made a Qualifying Expression of Interest within five (5) business days of the Debtors' receipt of the Qualifying Expression of Interest.

Neither the Debtors nor any of their affiliates (or any of their respective representatives) are obligated to furnish any information relating to the Sellers subject of the APAs**Lone Star APA**, the **Lone Star** Purchased Assets, and/or the Sale Transactions**Transaction** to any person except to Nationstar and AFI, respectively,**Lone Star** or another Qualified Bidder who makes a Qualifying Expression of Interest. The Debtors shall promptly give Nationstar and AFI, respectively,**Lone Star** any confidential memoranda (the "Confidential Memoranda") containing information and financial data and any other relevant materials or information that Nationstar or AFI, as applicable,**Lone Star** may reasonably request with respect to the **Lone Star** Purchased Assets and access to all due diligence information provided to any other Qualified Bidder.

The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders who make a Qualifying Expression of Interest. If the Debtors determine that due diligence material requested by such Qualified Bidder is reasonable and appropriate under the circumstances, but such material has not previously been

provided to any other Qualified Bidder who has made a Qualifying Expression of Interest, the Debtors shall post such materials in the Data Room and provide notification of such posting by electronic transmission to such Qualified Bidders and ~~Nationstar and AFI, respectively~~**Lone Star**.

Unless the Debtors determine otherwise, the availability of additional due diligence to a Qualified Bidder who has made a Qualifying Expression of Interest will cease after the Bid Deadline (as defined below).

## Bid Deadline

**The deadline for submitting Bid Packages (as defined below) by a Qualified Bidder shall be ~~September 18th,~~August 20, 2012, at 5:00 p.m. (Eastern Time) (the "Bid Deadline").**

On or prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver (i) one written copy of its bid (a "Bid Proposal"); (ii) a copy of such bidder's proposed APA~~(s)~~ that has been marked to show amendments and modifications to the ~~Nationstar APA and/or the AFI APA, as applicable~~**Lone Star APA**, including price and terms, and with respect to which the Qualified Bidder agrees to be bound (each a "Marked Agreement"~~); and (iii) a list of executory contracts and leases that the Qualified Bidder intends to assume (the "Proposed Assumption Contracts"~~) and together with a Bid Proposal ~~and a Marked Agreement~~, a "Bid Package") to the Debtors, c/o Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Gary S. Lee (glee@mofo.com) and Larren M. Nashelsky (lnashelsky@mofo.com), Centerview Partners, 31 West 52nd Street, New York, NY 10019 (Attn: Samuel M. Greene (sgreene@centerviewpartners.com) and Marc Puntus (mpuntus@centerviewpartners.com), and counsel to the Creditors' Committee~~, when formed~~.

On the Bid Deadline, the Debtors will provide copies of the Bid Packages to counsel to the Creditors' Committee~~, Nationstar (with respect to the Nationstar Purchased Assets), and AFI (with respect to the AFI Purchased Assets)~~ **and Lone Star**.

~~A Qualified Bidder may submit Bid Proposals and Bid Packages for the Nationstar Purchased Assets and/or the AFI Purchased Assets; provided, however, that a Qualified Bidder that bids on both the Nationstar Purchased Assets and the AFI Purchased Assets must provide separate Bid Proposals for the Nationstar Purchased Assets and the AFI Purchased Assets. The Debtors will consider Qualified Bids for all of the Nationstar Purchased Assets or for only the Ginnie Mae MSRs (as defined in the Nationstar APA); provided that to the extent a Qualified Bidder seeks to bid only on the Ginnie Mae MSRs, such bid must also be provided separately. Under no other~~**Under no** circumstances may a Qualified Bidder submit separate bids for any portion of the ~~Nationstar Purchased Assets (other than in respect of the Ginnie Mae MSRs) or the AFI~~**Lone Star** Purchased Assets. Only **a** bulk ~~bids~~**bid** for these assets will be deemed **a** Qualified ~~Bids~~**Bid** (as defined below) provided the other requirements are met.

## Due Diligence from Bidders

The Debtors and their advisors shall be entitled to due diligence from a Qualified Bidder, upon execution of a confidentiality agreement that is reasonably satisfactory to the

Debtors.   Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors.  Failure of a Qualified Bidder to fully comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by the Qualified Bidder is not a Qualified Bid.

### Bid Requirements

A Bid Proposal must be a written irrevocable offer from a Qualified Bidder (i) stating that the Qualified Bidder offers to consummate a Sale Transaction pursuant to the Marked Agreement~~(s)~~, (ii) confirming that the offer shall remain open until the closing of a Sale Transaction to the Successful Bidder (as defined below), (iii) enclosing a copy of the Marked Agreement~~(s) and Proposed Assumption Contracts~~, and (iv)~~(A) in the case of the Nationstar APA,~~ including a certified or bank check, or wire transfer, in the amount of $~~72~~**25** million ~~(of which $6,076,799 shall apply only to the Ginnie Mae MSRs)~~ to be held in escrow as a "Good Faith Deposit~~"; (B) in the case of the AFI APA including a certified or bank check, or wire transfer, in the amount of $25 million to be held in escrow as a Good Faith Deposit.  Nationstar~~**,"** **Lone Star** has made a deposit in the amount of $~~72~~**25** million in connection with its execution of the ~~Nationstar~~**Lone Star** APA, which shall be deemed to be its Good Faith Deposit for all purposes under these Sale Procedures.

All Good Faith Deposits will be non-refundable if the Qualified Bidder is selected as the Successful Bidder and fails to consummate the Sale Transaction (other than as a result of a breach by the respective Sellers under the ~~APAs~~**APA**) and refundable if it is not selected as the Successful Bidder (other than as a result of its own breach).

In addition to the foregoing requirements, a Bid Proposal or Bid Proposals must:

(i) not be conditioned on the outcome of unperformed due diligence by the bidder;

(ii) not **contain any financing contingency;**

**(iii) not** request or entitle the bidder to any breakup fee, expense reimbursement, or similar type of payment;

(~~iii~~**iv**) fully disclose the identity of each entity that will be bidding for the **Lone Star** Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

~~(iv) for a Bid Proposal on the Nationstar Purchased Assets, except as provided in subclause (v) below,~~**v)** provide consideration for the **Lone Star** Purchased Assets solely in the form of cash;**and**

~~(v) for a Bid Proposal on the Nationstar Purchased Assets provide consideration for the Purchased Assets in a combination of cash and seller debt financing excluding credit bidding ("Seller Financing") if, prior to or contemporaneous with the submission of such bid, the Debtors have permitted Nationstar to modify the~~

~~APA to substitute Seller Financing, on terms identical to those contained in such bid, for cash consideration on a dollar for dollar basis; and~~

~~(vi) (a) for a Bid Proposal on all of the Nationstar Purchased Assets,~~

**(vi)** provide for the aggregate cash ~~and Seller Financing (if any) portions~~**portion** of such bid being at least equal to the sum of (1) the cash portion of the consideration provided for in the ~~Nationstar APA, plus (2) the Seller Financing portion (if any) of the consideration provided for in the Nationstar APA following a permitted amendment under subclause (v) above, plus (3) the amount of the Break-Up Fee and Expense Reimbursement, plus (4) an amount of cash equal to 1% of the sum of the amounts provided for in subsections (1) and (2) of this subclause (vi)(a); or~~

~~(b) for a Bid Proposal on only the Ginnie Mae MSRs, provide for the aggregate cash and Seller Financing (if any) portions of such bid being at least equal to the sum of (1) the cash portion of the consideration provided for in the Nationstar APA for the Ginnie Mae MSRs, plus (2) the Seller Financing portion (if any) of the consideration provided for in the Nationstar APA following a permitted amended under subclause (v) above, plus (3) the proportional amount of the Break-Up Fee and Expense Reimbursement allocable to the Ginnie Mae MSRs based upon the allocation of the Purchase Price (as defined in the Nationstar APA) between the Ginnie Mae MSRs and the other Nationstar Purchased Assets, plus (4) an amount of cash equal to 1% of the sum of the amounts provided for in subsections (1) and (2) of this subclause (vi)(b).~~**Lone Star APA, plus (2) the amount of the Break-Up Fee, plus (3) an additional amount of cash equal to or greater than $15 million.**

A timely Bid Proposal received from a Qualified Bidder and that meets the requirements set forth above (collectively, the "Bid Requirements") will be considered a Qualified Bid if the Debtors and their advisors, in consultation with the Creditors' Committee, reasonably believe that such bid would be consummated if selected as the Successful Bid (as defined below).  For all purposes hereof, ~~Nationstar's and AFI's respective offers~~**Lone Star's offer** to acquire the Purchased Assets in accordance ~~with each of~~ the ~~APAs~~**Lone Star APA**, shall ~~each~~ constitute a Qualified Bid.  The Debtors shall notify ~~Nationstar~~**Lone Star** promptly after qualifying any bidder as a Qualified Bidder or receiving any Qualified Bids for the ~~Nationstar~~**Lone Star** Purchased Assets ~~or the Ginnie Mae MSRs.  The Debtors shall notify AFI promptly after qualifying any bidder as a Qualified Bidder or receiving any Qualified Bids for the AFI Purchased Assets.~~**.**

## Auction

In the event that, on or before the Bid Deadline, the Debtors receive one or more Qualified Bid Packages, the Debtors will conduct ~~one or more separate auctions~~**an auction** in accordance with the following procedures upon notice to all Qualified Bidders.  The Auction will commence at 10:00 a.m., Eastern Time, on ~~September 25,~~**August 27,** 2012, at the offices of Morrison & Foerster LLP, 1290 Avenue of the America, New York, NY 10104 or such later

5

time on such date or other place as the Debtors shall timely notify ~~Nationstar, AFI~~**Lone Star**, all other Qualified Bidders and the Notice Parties.  The Auction shall conclude within seven (7) business days following the Bid Deadline.   If ~~(a)~~ no Qualified Bids with respect to the ~~Nationstar~~**Lone Star** Purchased Assets other than ~~Nationstar~~**Lone Star**'s Qualified Bid are timely received ~~or (b) the Debtors only timely receive Qualified Bids for the Ginnie Mae MSRs and do not timely receive a Qualified Bid for the remaining Nationstar Purchased Assets other than Nationstar's Qualified Bid~~, no auction will be held with respect to such ~~Nationstar~~**Lone Star** Purchased Assets ~~for which no Qualified Bids were received (other than Nationstar's Qualified Bid)~~, and the Debtors will request that the Bankruptcy Court enter a Sale Order approving the sale of the ~~relevant Nationstar~~**Lone Star Purchased** Assets to ~~Nationstar~~**Lone Star** pursuant to the ~~Nationstar~~**Lone Star** APA.

Unless the Debtors otherwise determine, only the Debtors, ~~Nationstar (in the case of the Nationstar APA), and AFI (in the case of the AFI APA)~~**Lone Star**, a representative of each of the Creditors' Committee and any Qualified Bidder (and the legal and financial advisors to each of the foregoing), will be entitled to attend the Auction, and only ~~Nationstar and AFI, respectively,~~**Lone Star** and Qualified Bidders will be entitled to make any subsequent bids at the Auction.

The Debtors may employ and announce at the Auction additional procedural rules that they determine appropriate under the circumstances for conducting the Auction, provided that such rules (i) are not inconsistent with the Sale Procedures Order, the Bankruptcy Code, the Bankruptcy Rules or any order of the Bankruptcy Court entered in connection herewith; (ii) are disclosed to each Qualified Bidder; and (iii) do not provide any Qualified Bidder with more favorable treatment than that afforded to ~~Nationstar or AFI~~**Lone Star**.

Each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale Transaction~~(s)~~.

Bidding at the Auction for the ~~Nationstar Purchased Assets and the AFI~~**Lone Star** Purchased Assets will begin with the Qualified Bid selected and announced by the Debtors (the "Starting Bid") and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid"), and (ii) the Debtors determine that such Subsequent Bid is (a) for the first round, a higher or otherwise better offer than the Starting Bid, and (b) for subsequent rounds, a higher or otherwise better offer than the leading bid. ~~In the case of the Nationstar Purchased Assets, for purposes of determining whether a Subsequent Bid is a higher or otherwise better offer, the AFI Purchased Assets shall be excluded.~~

With respect to the ~~Nationstar~~**Lone Star** Purchased Assets ~~(including the Ginnie Mae MSRs)~~, the initial minimum bid increment at the Auction shall be $25 million, and cannot be reduced or increased without the consent of ~~Nationstar.  To the extent applicable, and only for the Ginnie Mae MSRs, the initial minimum bid increment at the Auction shall be $2 million, and cannot be reduced or increased without the consent of Nationstar.  With respect to the AFI Purchased Assets, the initial minimum bid increment at the Auction shall be $15 million, and cannot be reduced or increased without the consent of AFI~~**Lone Star**.   Thereafter, in each

circumstance, minimum bid increments at the Auction shall be determined by the Debtors in their **reasonable** discretion.

For purposes of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by ~~Nationstar~~**Lone Star**), the Debtors will give ~~Nationstar~~**Lone Star** a credit equal to the ~~sum of the Break-Up Fee and Expense Reimbursement. To the extent the Ginnie Mae MSRs may be sold under a separate auction process, the Break-Up Fee and Expense Reimbursement may be proportionally allocated between the Ginnie Mae MSRs and the other assets subject of the Nationstar APA based on the allocation of the Purchase Price (as such term is defined in the Nationstar APA) between the Ginnie Mae MSRs and the other assets subject of the Nationstar APA~~**amount of the Break-Up Fee**.

No additional bids may be considered after the Auction is closed.

Following any Auction, the Debtors, in their sole discretion, in consultation with the Creditors' Committee, shall determine the highest or best bid (the "Successful Bid") and the bidder with respect thereto, (the "Successful Bidder"). The next highest bidder after the Successful Bidder shall be deemed the ("Next-Highest Bidder"). The Next-Highest Bidder shall be required to hold open its bid until the earlier of (i) the closing of the sale to the Successful Bidder; and (ii) the ~~Confirmation~~**date that is ten days after the date of the Sale** Hearing (the "Back-Up Bid Release Date"); provided, however, that the terms of the ~~Nationstar~~**Lone Star** APA shall apply in all respects with respect to the period of time ~~Nationstar~~**Lone Star** is required to hold its bid open.

## Acceptance of Qualified Bids

No later than ~~October 31,~~**August 30,** **2012**, the Debtors shall present to the Bankruptcy Court at the Sale Hearing ~~or the Confirmation Hearing, as applicable~~, the Successful Bid. At the Sale Hearing ~~or the Confirmation Hearing, as applicable~~, certain findings will be sought from the Bankruptcy Court, including that (i) the Successful Bidder was selected in accordance with these Sale Procedures, and (ii) consummation of the Sale ~~Transactions~~**Transaction** as contemplated by the Successful Bid will provide the highest or otherwise best result and is in the best interests of the Sellers and their estates in these Chapter 11 cases.

In the event that, for any reason, the Successful Bidder fails to close the relevant Sale Transaction contemplated by its Successful Bid, then, without notice to any other party or further Bankruptcy Court order, the Debtors shall be authorized to close with the Next-Highest Bidder.

## Return of Good Faith Deposit

Except as otherwise provided in this paragraph with respect to the Successful Bidder and the Next-Highest Bidder, the Good Faith Deposits of all Qualified Bidders required to submit such a deposit under the Sale Procedures shall be returned upon or within two (2) business days after entry of the Sale Order. The Good Faith Deposit of the Successful Bidder shall be held until the closing of the Sale Transaction and applied in accordance with the

Successful Bid.  The Good Faith Deposit of the Next-Highest Bidder shall be retained in escrow until the Back-Up Bid Release Date and returned to the Next-Highest Bidder within two (2) business days of such date.  Until the return of the Good Faith Deposit in accordance with the above, the Debtors shall hold such deposits in an interest-bearing escrow account.  If the closing does not occur, the disposition of Good Faith Deposits shall be as provided in the Successful Bid and Next-Highest Bidder Bid, as applicable.  The ~~Nationstar~~**Lone Star** APA (including any escrow agreement entered into in connection therewith) shall apply in all respects to the application or return of the Good Faith Deposit of ~~Nationstar~~**Lone Star** and the provisions of this paragraph shall not apply.

## EXHIBIT A-2

**PROPOSED NOTICE OF AUCTION AND SALE HEARING**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**NOTICE OF PUBLIC AUCTION AND SALE HEARING TO SELL CERTAIN OF**
**DEBTORS' ASSETS PURSUANT TO ASSET PURCHASE**
**~~AGREEMENTS~~AGREEMENT WITH**
**~~NATIONSTAR MORTGAGE LLC AND ALLY FINANCIAL INC.~~**
**LONE STAR U.S. ACQUISITIONS, LLC AND RELATED RELIEF AND DATES**

PLEASE TAKE NOTICE THAT upon the motion (the "Motion") of Residential Capital LLC ("ResCap") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), dated May 14, 2012, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has issued an order dated [          ], 2012 (the "Sale Procedures Order"), among other things, (i) authorizing and approving certain procedures for the submission and acceptance of any competing bids (the "Sale Procedures"); (ii) scheduling a bid deadline, an auction and sale hearing (the "Sale Hearing") to approve asset sales by certain of the Debtors of:~~ (a)~~ the Purchased Assets (as such term is defined in the Asset Purchase Agreement by and between ~~Nationstar Mortgage LLC ("Nationstar") and certain of the Debtors (the "Nationstar APA") and (b) the Purchased Assets (as such term is defined in the Asset Purchase Agreement by and between Ally Financial Inc. ("AFI") and BMMZ Holdings LLC ("BMMZ"~~Lone Star U.S. Acquisitions, LLC ("Lone Star") and certain of the Debtors (the "~~AFI APA," together with the Nationstar APA, the "APAs"~~Lone Star APA")), free and clear of all liens, claims, encumbrances, and other interests, and subject to higher or better offers (the "Sale ~~Transactions~~Transaction" or the "~~Sales~~Sale") subject to the submission of higher or better offers in an auction process (the "Auction"); (iii) approving the Break-Up Fee ~~and the Expense Reimbursement~~; (iv) approving forms of notice; and (v) granting related relief.

A.    <u>AUCTION</u>

**PLEASE TAKE FURTHER NOTICE** that the Auction and sales of the Purchased Assets by the Debtors will occur in accordance with procedures established by the Sale Procedures Order, entered on [_____], 2012 [Docket No. [____]], attached hereto as Exhibit 1.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Procedures Order, any party wishing to participate in the Auction must do so in accordance with the Sale Procedures Order, including, without limitation, the requirements for qualifying as a "Qualified Bidder" and

submitting a "Qualified Bid" such that it is actually **received not later than** ~~[September 18,~~**August 20,** 2012,~~]~~ at __:00 p.m. (ET) by the parties identified in the Sale Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Sale Procedures, the Debtors will conduct the Auction on ~~[September 25,~~**August 27,** 2012 at __:00 _.m. (ET) at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104, or such later time on such date or other place as the Debtors shall timely notify all Qualified Bidders and the Notice Parties (as defined in the Sale Procedures Order).

B.    SALE HEARING

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing will be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Courtroom [____] of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, on ~~[October 15, 2012],~~**August 30, 2012,** at __:__ _.m. (ET). The Sale Hearing may be ~~conducted in connection with, and as part of, a hearing to consider confirmation of a plan of reorganization under section 1129 of the Bankruptcy Code and~~ may be adjourned without notice by an announcement of the adjourned date at the Sale Hearing.

C.    SALE FREE AND CLEAR

**PLEASE TAKE FURTHER NOTICE** that the order approving ~~each of~~ the Sale ~~Transactions~~**Transaction** will provide that, except for any Assumed Liabilities set forth in ~~each of~~ the ~~Nationstar APA and AFI~~**Lone Star** APA, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets purchased by ~~Nationstar and AFI, respectively,~~**Lone Star** shall be transferred to ~~Nationstar and AFI and the Assumed Contracts under the Nationstar APA shall be assumed and assigned to Nationstar~~**Lone Star**, and such transfer and assignment shall be free and clear of all claims, liabilities, interests, liens, obligations, and encumbrances of any Person (including, without limitation, claims, obligations or liabilities based on any successor or transferee theory of liability or relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification claims, obligations or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date) and any and all rights and claims under any bulk transfer statutes and similar laws, whether arising by agreement, by statute or otherwise and whether occurring or arising before, on or after the date on which the Chapter 11 cases were commenced, whether known, unknown, contingent or unliquidated, arising prior to the Closing Date. Any person holding any such claims, liabilities, interests, liens, obligations, or encumbrances shall be enjoined and forever barred from asserting such claims, liabilities, interests, liens, obligations, or encumbrances against ~~Nationstar or AFI, respectively, the~~**Lone Star and the Lone Star** Purchased Assets ~~purchased by Nationstar and AFI and any of their affiliates~~, as more particularly described and provided for in the proposed order approving the Sale ~~Transactions to Nationstar and AFI, respectively~~**Transaction to Lone Star**.

D.    <u>OBJECTIONS</u>

**PLEASE TAKE FURTHER NOTICE THAT RESPONSES OR OBJECTIONS, IF ANY, TO THE RELIEF SOUGHT UPON IN THE MOTION SHALL BE FILED** with the Clerk of the Bankruptcy Court and served upon: (i) Morrison & Foerster LLP, attorneys for the Debtors, 1290 Avenue of the Americas, New York, New York 10104 (Attn: Larren M. Nashelsky, Esq. (lnashelsky@mofo.com) and Gary S. Lee, Esq. and glee@mofo.com)); (ii) ~~Sidley Austin LLP, attorneys for Nationstar, One South Dearborn, Chicago Illinois 60603 (Attn: Richard M. Cieri (richard.cieri@kirkland.com), Larry Nyhan (lnyhan@sidley.com) and Stephen E. Hessler (stephen.hessler@kirkland.com); (iii) Kirkland & Ellis LLP, attorneys for AFI, (Attn: Ray C. Schrock (rschrock@kirkland.com); (iv) Mayer Brown LLP, attorneys for AFI, 71 South Wacker Drive, Chicago, Illinois 60606 (Attn: Elizabeth A. Raymond (eraymond@mayerbrown.com)); (v) [_____]~~**King & Spalding LLP, attorneys for Lone Star, 1180 Peachtree Street, NE, Atlanta, Georgia 30309 (Attn: Paul Ferdinands (pferdinands@kslaw.com) and Austin Jowers (ajowers@kslaw.com)); (iii) Kramer Levin Naftalis & Frankel LLP (Attn:_____)**, attorneys for the Creditors' Committee; and (vi) the Office of the United States Trustee for the Southern District of New York (Attn: ~~[_____]~~), 33 Whitehall Street, 21st Floor, New York, New York 10004, **SO AS TO BE RECEIVED NO LATER THAN** ~~[October 8, 2012]~~**August 20, 2012,** **AT 5:00 P.M. (EASTERN TIME) (the "Objection Deadline").**

**PLEASE TAKE FURTHER NOTICE** that the failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the Sale ~~Transactions~~**Transaction** and the other relief requested in the Motion, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the Sale ~~Transactions~~**Transaction**, the approval of related agreements, and the Debtors' consummation of the Sale ~~Transactions~~**Transaction**.

E.    <u>COPIES OF THE MOTION AND RELATED SALE DOCUMENTS</u>

**PLEASE TAKE FURTHER NOTICE** that this Notice provides only a partial summary of the relief sought in the Motion, the terms of the Sale Procedures Order and the Sale Approval Orders.  Copies of such documents are available for inspection (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants, at www.kccllc.net/rescap or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Morrison & Foerster LLP (Attn: Larren M. Nashelsky, Esq. and Gary S. Lee, Esq. at (212) 468-7900).  The terms of such documents shall control in the event of any conflict with this Notice.

Dated:    New York, New York
              [_____], 2012

_____
Larren M. Nashelsky

Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
*Proposed Counsel for the Debtors and
Debtors in Possession*

# EXHIBIT A-3

## PROPOSED NOTICE OF ASSUMPTION AND ASSIGNMENT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF (I) DEBTORS' INTENT TO ASSUME AND ASSIGN CERTAIN
EXECUTORY CONTRACTS, UNEXPIRED LEASES OF PERSONAL PROPERTY,
AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY AND
(II) CURE AMOUNTS RELATED THERETO**

PLEASE TAKE NOTICE THAT:

1.    By the motion dated May 14, 2012 (the "Motion"), Residential Capital LLC ("ResCap") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"),[3] sought, among other things, (i) authorization and approval of certain proposed procedures (the "Sale Procedures") with respect to two proposed sales (the "Sale Transactions" or "the Sales") by certain of the Debtors of (a) the Purchased Assets (as such term is defined in the Asset Purchase Agreement by and between Nationstar Mortgage LLC and certain of the Debtors (the "Nationstar APA")); and (b) the Purchased Assets (as such term is defined in the Asset Purchase Agreement by and between Ally Financial Inc. ("AFI") and BMMZ Holdings LLC ("BMMZ") and certain of the Debtors (the "AFI APA," together with Nationstar APA, the "APAs"); (ii) scheduling of a hearing on the Sales (the "Sale Hearing") and setting objection deadlines and bidding deadlines with respect to the Sales and Auction; (iii) approving the form and manner of notices for (a) an auction of the purchased assets (the "Auction") and (b) the Sale Hearing; and (iii) the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assumed Contracts") in connection with the sale of the Purchased Assets pursuant to the Nationstar APA (the "Assumption and Assignment Procedures").

2.    The Nationstar APA, together with its respective ancillary agreements, contemplates (i) the sale of the Purchased Assets subject to higher or better offers (the "Nationstar Sale Transaction") and (ii) the assumption and assignment of the Assumed Contracts.

3.    The Nationstar APA contemplates, and the proposed order approving the Nationstar Sale Transaction (the "Nationstar Sale Approval Order"), which may be incorporated

---

[3] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital LLC in Support of the Chapter 11 Petitions and First Day Pleadings.

into a confirmation order, if approved, shall authorize the assumption and assignment of certain executory contracts and leases pursuant to the Nationstar APA, to the Purchaser (as defined in the Nationstar APA).  The Sellers maintain schedules (the "Schedules") containing the Assumed Contracts that the Purchaser has designated as Assumed Contracts (the "Designated Agreements").  You are receiving this Notice because you are a party to one or more of the Designated Agreements.

4.      **THE ATTACHED SCHEDULES CONTAIN A LIST OF ASSUMED CONTRACTS THAT _MAY_ BE ASSUMED.  SUBJECT TO CERTAIN EXCEPTIONS EXPRESSLY PROVIDED FOR IN THE NATIONSTAR APA, THE PURCHASER RESERVES ITS RIGHTS UNDER THE NATIONSTAR APA TO EXCLUDE ANY ASSUMED CONTRACT FROM THE LIST OF ASSUMED CONTRACTS TO BE ASSUMED AND ASSIGNED BY NO LATER THAN THE DESIGNATION DEADLINE THAT IS TWO BUSINESS DAYS PRIOR TO THE CLOSING DATE, AS DISCUSSED IN PARAGRAPH 14 BELOW.**

**5.**      Bankruptcy Code section 365(b)(1) requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure any defaults under executory contracts and unexpired leases at the time of assumption.  The required cure amount the ("Cure Amount") for each Designated Agreement calculated by the Debtors is listed on the Schedule attached hereto. Please note that if no amount is stated for a particular Designated Agreement, the Debtors believe that there is no Cure Amount outstanding for such Designated Agreement.

6.      Please review the Cure Amount for your Assumed Contract.  In some instances, additional terms or conditions of assumption and assignment with respect to a particular Assumed Contract are provided.

7.      In cases where a Servicing Agreement is contained within the same writing as an agreement related to origination, (i) the Debtors intend to assume and assign to the Purchaser only the Servicing Agreement; (ii) the origination agreement shall be severed from the multi-agreement document pursuant to the Nationstar Sale Approval Order; and (iii) the Purchaser shall have no liability under any origination agreement. The Nationstar Sale Approval Order will also generally provide that no delay or failure of performance by the Debtors under or in respect to any origination agreement will (i) affect any right of Nationstar under any Servicing Agreement or (ii) permit, result in or give rise to any setoff, delay, deferral, defense, recoupment, claim, counterclaim, default or other impairment of the rights of the Purchaser under any Servicing Agreement.

8.      Objections, if any, to the proposed assumption and assignment of the Assumed Contracts, including, but not limited to, (a) objections related to adequate assurance of future performance or whether applicable law excuses the non-debtor counterparty to the Designated Agreement (the "Non-debtor Counterparty") from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code (an "Assignment Objection"), (b) the severing of a Servicing Agreement from any multi-agreement document or (c) the proposed Cure Amount (a "Cure Amount Objection," and, together with an Assignment Objection and an objection described in clause (b), a "Contract Objection") must be made in writing and filed with the United States Bankruptcy Court for the

Southern District of New York (the "Bankruptcy Court") so as to be received [**August 30, 2012**] (the "Assignment Objection Deadline") by (i) the Debtors, Residential Capital, LLC, 1100 Virginia Drive, Fort Washington, Pennsylvania 19034, Attn: Tammy Hamzehpour, Esq. (tammy.hamzehpour@ally.com); (ii) Morrison & Foerster LLP, attorneys for the Debtors, 1290 Avenue of the Americas, New York, New York 10104 (Attn: Larren M. Nashelsky and Gary S. Lee); (iii) with respect to Assumed Contracts listed in the Nationstar APA, Sidley Austin LLP, attorneys for the Nationstar, One South Dearborn, Chicago, Illinois 60603 (Attn: Jessica C.K. Boelter jboelter@sidley.com); (vi) the attorneys for the Creditors' Committee; and (vii) the Office of the United States Trustee for the Southern District of New York (Attn: [            ]), 33 Whitehall Street, 21st Floor, New York, New York 10004.  Any objection that challenges a Cure Amount, or otherwise asserts that there exist outstanding defaults under an Assumed Contract, must set forth with specificity the Cure Amount being claimed by the objecting party or the nature of the asserted default, as applicable, and must include appropriate documentation in support thereof satisfactory to the Debtors and Nationstar.

9.    Upon the filing of any Contract Objection, the Debtors, the Purchaser, and the objecting non-debtor counterparty shall meet and confer in good faith to attempt to resolve any such Objection without Bankruptcy Court intervention, with any resolution memorialized in a joint stipulation or as otherwise agreed by the parties.  If the Contract Objection is solely as to the Cure Amount, then the Assumed Contract shall nevertheless be assumed and assigned to the Purchaser on the Assumption Effective Date (as defined in paragraph 16), the Sellers shall pay the undisputed portion of the Cure Amount, and the disputed portion of the Cure Amount shall be determined via the meet and confer process or by the Bankruptcy Court as described herein. The Purchasers shall have no liability to any contract counter party for any Cure Amount (whether disputed or undisputed).

10.    All objections to the assumption and assignment of the Assumed Contracts and the Cure Amounts shall be resolved by no later than the conclusion of the Sale Hearing.  The Debtors will request that Contract Objections to the proposed Cure Amounts based upon unquantifiable or unknown pre-closing liability be overruled; provided, however, that no such liabilities may asserted against the Purchaser or the Purchased Assets, as further described in the Sale Approval Order.

11.    If the Debtors, Purchaser, and the non-debtor counterparty determine that the Contract Objection cannot be resolved without judicial intervention, then such Contract Objection shall be determined by the Bankruptcy Court either at the Sale Hearing or such other date as determined by the Bankruptcy Court, unless the Debtors, the Purchaser, and the non-debtor counterparty to the Assumed Contract agree otherwise; if the Bankruptcy Court determines at such hearing that the Assumed Contract should not be assumed and assigned, then such contract or lease shall no longer be considered an Assumed Contract.

12.    If you agree with the respective Cure Amount(s) listed in the Schedules with respect to your Assumed Contract(s), and otherwise do not object to the Debtors' assumption and assignment of your Assumed Contract, you are not required to take any further action.

4

13.     Unless an Objection is filed and served before the Objection Deadline, you shall be deemed to have consented to the assumption and assignment of your Assumed Contract and the Cure Amount(s) for your Assumed Contract(s), and acknowledged that no default exists under the Assumed Contract other than those being cured by the Cure Amounts or defaults that are not required to be cured under section 365(b)(2).  You shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Debtors, their estates, or the Purchaser.

14.     No later than two business days prior to the Closing Date under the Nationstar APA (the "Contract Designation Deadline"), the Purchaser may, in its sole discretion, subject to certain limitations specified in the Nationstar APA (applicable only as between the parties thereto), exclude any of the Assumed Contracts by providing notice to the Sellers.  Upon such designation, the contract or Lease referenced therein shall no longer be considered an Assumed Contract, shall not be deemed to be, or to have been, assumed or assigned, and shall remain subject to assumption, rejection, or assignment by the Debtors.  Until the Contract Designation Deadline, the Purchaser also may, subject to certain limitations specified in the Nationstar APA (applicable only as between the parties thereto), designate additional contracts or leases as Assumed Contracts to be assumed and assigned by providing notice to the affected non-debtor counterparties indicating that the Debtors intend to assume and assign additional Assumed Contracts.

15.     The Debtors' decision to assume and assign the Assumed Contracts is subject to Bankruptcy Court approval and consummation of the Nationstar Sale Transaction, and, absent such consummation, each of the Assumed Contracts will not be assumed or assigned to the Purchaser and shall in all respects be subject to further administration under the Bankruptcy Code.

16.     All Assumed Contracts will be assumed by and assigned to the Purchaser on the Closing Date, except as may be otherwise set forth in the APA.

17.     Until the Assumption Effective Date, assumption and assignment thereof is subject to the Purchaser's rights to modify the designation of Assumed Contracts as set forth in paragraph 14 above.  Except as otherwise provided by the APA, the Purchaser shall have no rights in and to a particular Assumed Contract until such time as the particular Assumed Contract is assumed and assigned in accordance with the procedures set forth herein.

18.     The inclusion of any document on the list of Designated Agreements shall not constitute or be deemed to be a determination or admission by the Debtors or the Purchaser that such document is, in fact, an executory contract or Lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved.

19.     Any Assignment Objection or Cure Amount Objection shall not constitute an objection to the relief generally requested in the Motion (e.g., the sale of the Purchased Assets by the Debtors to the Purchaser free and clear of liens, claims, encumbrances, and interests), and parties wishing to object to the relief generally requested in the Motion must file and serve a separate objection in accordance with the procedures approved and set forth in the order of the Bankruptcy Court approving the Sale Procedures (the "Sale Procedures Order").

20.     If a party other than Nationstar is determined to be the highest and best bidder for the assets to be sold pursuant to the Nationstar Sale Transactions, you will receive a separate notice providing additional information regarding the treatment of your contract(s) or Lease(s); *provided, however*, that if the applicable Cure Amount has been established pursuant to the procedures set forth in this Notice, it shall not be subject to further dispute if the new purchaser seeks to acquire such contract or Lease.

21.     Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations relating to the pre-closing period under any Assumed Contract (including any Servicing Agreement), whether such claims or obligations are known, unknown, fixed, contingent, unliquidated or liquidated at the time of the Closing, including, without limitation, any claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification claims or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date.  Any parties holding such claims or obligations will be required to file a Contract Objection if they disagree with the Cure Amount set forth on the Schedule.

22.     This Notice is subject to the full terms and conditions of the Sale Procedures Order, which shall control in the event of any conflict.  The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

Dated:   New York, New York
              [_____], 2012


Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
Alexandra Steinberg Barrage

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and Debtors in Possession*