RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.,

as Depositor


and


WILMINGTON TRUST COMPANY,

as Owner Trustee


_____

AMENDED AND RESTATED TRUST AGREEMENT

Dated as of July 21, 2006

_____


Home Loan-Backed Certificates,
Series 2006-HI3


## TABLE OF CONTENTS

ARTICLE I        Definitions.................................................................1

        Section 1.01.    Definitions........................................................1

        Section 1.02.    Other Definitional Provisions.....................................1

ARTICLE II       Organization...............................................................2

        Section 2.01.    Name...............................................................2

        Section 2.02.    Office.............................................................2

        Section 2.03.    Purposes and Powers................................................2

        Section 2.04.    Appointment of Owner Trustee.......................................3

        Section 2.05.    Initial Capital Contribution of Owner Trust Estate................3

        Section 2.06.    Declaration of Trust...............................................3

        Section 2.07.    Liability of the Holders of the Certificates.......................4

        Section 2.08.    Title to Trust Property............................................4

        Section 2.09.    Situs of Trust.....................................................4

        Section 2.10.    Representations and Warranties of the Depositor....................4

        Section 2.11.    Payment of Trust Fees..............................................5

ARTICLE III          Conveyance of the Home Loans; the Certificates..................................5

        Section 3.01.      Conveyance of the Home Loans......................................5

        Section 3.02.      Initial Ownership.................................................5

        Section 3.03.      The Certificates..................................................5

        Section 3.04.      Authentication of Certificates....................................6

        Section 3.05.      Registration of and Limitations on Transfer and Exchange of
                           Certificates......................................................6

        Section 3.06.      Mutilated, Destroyed, Lost or Stolen Certificates.................9

        Section 3.07.      Persons Deemed Certificateholders.................................9

        Section 3.08.      Access to List of Certificateholders' Names and Addresses........9

        Section 3.09.      Maintenance of Office or Agency..................................10

        Section 3.10.      Certificate Paying Agent.........................................10

        Section 3.11.      Cooperation......................................................11

ARTICLE IV           Authority and Duties of Owner Trustee...................................11

        Section 4.01.      General Authority................................................11

        Section 4.02.      General Duties...................................................12

        Section 4.03.      Action upon Instruction..........................................12

        Section 4.04.      No Duties Except as Specified under Specified Documents or
                           in Instructions..................................................12

        Section 4.05.      Restrictions.....................................................13

        Section 4.06.      Prior Notice to Certificateholders and the Credit Enhancer
                           with Respect to Certain Matters..................................13

        Section 4.07.      Action by Certificateholders with Respect to Certain Matters.....14

        Section 4.08.      Action by Certificateholders with Respect to Bankruptcy..........14

        Section 4.09.      Restrictions on Certificateholders' Power........................14

        Section 4.10.      Majority Control.................................................14

        Section 4.11.      Doing Business in Other Jurisdictions............................14

ARTICLE V            Application of Trust Funds..............................................15

        Section 5.01.      Distributions....................................................15

        Section 5.02.      Method of Payment................................................15

        Section 5.03.      Signature on Returns.............................................16

        Section 5.04.      Statements to Certificateholders.................................16

        Section 5.05.      Tax Reporting....................................................16

        Section 5.06.      Derivative Contracts.............................................16

ARTICLE VI          Concerning the Owner Trustee..............................................17

          Section 6.01.     Acceptance of Trusts and Duties.................................17

          Section 6.02.     Furnishing of Documents.........................................18

          Section 6.03.     Representations and Warranties..................................18

          Section 6.04.     Reliance; Advice of Counsel.....................................19

          Section 6.05.     Not Acting in Individual Capacity...............................20

          Section 6.06.     Owner Trustee Not Liable for Certificates or Related
                            Documents.......................................................20

          Section 6.07.     Owner Trustee May Own Certificates and Notes....................20

ARTICLE VII         Compensation of Owner Trustee...............................................20

          Section 7.01.     Owner Trustee's Fees and Expenses...............................20

          Section 7.02.     Indemnification.................................................21

ARTICLE VIII        Termination of Trust Agreement..............................................21

          Section 8.01.     Termination of Trust Agreement..................................21

ARTICLE IX          Successor Owner Trustees and Additional Owner Trustees..................22

          Section 9.01.     Eligibility Requirements for Owner Trustee......................22

          Section 9.02.     Replacement of Owner Trustee....................................22

          Section 9.03.     Successor Owner Trustee.........................................23

          Section 9.04.     Merger or Consolidation of Owner Trustee........................23

          Section 9.05.     Appointment of Co-Trustee or Separate Trustee...................24

ARTICLE X           Miscellaneous...............................................................25

          Section 10.01.    Amendments......................................................25

          Section 10.02.    No Legal Title to Owner Trust Estate............................27

          Section 10.03.    Limitations on Rights of Others.................................27

          Section 10.04.    Notices.........................................................27

          Section 10.05.    Severability....................................................28

          Section 10.06.    Separate Counterparts...........................................28

          Section 10.07.    Successors and Assigns..........................................28

          Section 10.08.    No Petition.....................................................28

          Section 10.09.    No Recourse.....................................................28

          Section 10.10.    Headings........................................................28

          Section 10.11.    GOVERNING LAW...................................................28

          Section 10.12.    Integration.....................................................28

          Section 10.13.    Rights of Credit Enhancer to Exercise Rights of

Certificateholders...................................................28

ARTICLE XI          Compliance with Regulation AB............................................29

        Section 11.01.      Intent of the Parties; Reasonableness............................29

        Section 11.02.      Additional Representations and Warranties of the Owner
                            Trustee........................................................29

        Section 11.03.      Information to Be Provided by the Owner Trustee.................30

        Section 11.04.      Indemnification; Remedies.......................................31

This Amended and Restated Trust Agreement, dated as of July 21, 2006 (as amended from time to time, this "Trust Agreement"), between RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC., a Delaware corporation, as depositor (the "Depositor") and WILMINGTON TRUST COMPANY, a Delaware banking corporation, as owner trustee (the "Owner Trustee"),

WITNESSETH THAT:

WHEREAS, the Depositor and the Owner Trustee entered into a trust agreement dated as of July 11, 2006, in connection with the formation of a Delaware statutory trust (the "Original Trust Agreement");

WHEREAS, the Depositor and the Owner Trustee wish to amend and restate the Original Trust Agreement;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the Depositor and the Owner Trustee agree as follows:

ARTICLE I

Definitions

Section 1.01...  Definitions.  For all purposes of this Trust Agreement, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in Appendix A to the Indenture dated July 21, 2006 (the "Indenture"), between Home Loan Trust 2006-HI3, as issuer, and JPMorgan Chase Bank, National Association, as indenture trustee.  All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02...  Other Definitional Provisions.

(a)     All terms defined in this Trust Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(b)     As used in this Trust Agreement and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Trust Agreement or in any such certificate or other document, and accounting terms partly defined in this Trust Agreement or in any such certificate or other document to the extent not defined,

shall have the respective meanings given to them under generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Trust Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Trust Agreement or in any such certificate or other document shall control.

(c)     The words "hereof," "herein," "hereunder" and words of similar import when used in this Trust Agreement shall refer to this Trust Agreement as a whole and not to any particular provision of this Trust Agreement; Article, Section and Exhibit references contained in this Trust Agreement are references to Articles, Sections and Exhibits in or to this Trust Agreement unless otherwise specified; and the term "including" shall mean "including without limitation".

(d)     The definitions contained in this Trust Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(e)     Any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

ARTICLE II

Organization

Section 2.01...  Name.  The trust created hereby (the "Trust") shall be known as "Home Loan Trust 2006-HI3," in which name the Owner Trustee may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued.

Section 2.02...  Office.  The office of the Trust shall be in care of the Owner Trustee at the Corporate Trust Office or at such other address in Delaware as the Owner Trustee may designate by written notice to the Certificateholders and the Depositor.

Section 2.03...  Purposes and Powers.  The purpose of the Trust is to engage in the following activities:(i) to issue the Notes pursuant to the Indenture and the Certificates pursuant to this Trust Agreement and to sell the Notes and the Certificates; (ii) to purchase the Home Loans and to pay the organizational, start-up and transactional expenses of the Trust; (iii) to assign, grant, transfer, pledge and convey the Home Loans pursuant to the Indenture and to hold, manage and distribute to the Certificateholders pursuant to Section 5.01 any portion of the Home Loans released from the Lien of, and remitted to the Trust pursuant to, the Indenture; (iv) to enter into and perform its obligations under the Basic Documents to which it is to be a party; (v) to engage in those activities, including entering into agreements, that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith, including, without limitation, to accept additional contributions of equity that are not subject to the Lien of the Indenture; and (vi) subject to compliance with the Basic Documents, to engage in such other activities as may be required in connection with conservation of the Trust Estate and the making of distributions to the Certificateholders and the Noteholders.  The Trust is hereby authorized to engage in the foregoing activities.  The Trust shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Trust Agreement or the Basic Documents while any Note is outstanding without the consent of the Holders of a majority of the Certificate Percentage Interest of the Certificates and the Indenture Trustee.

Section 2.04... Appointment of Owner Trustee. The Depositor hereby appoints the Owner Trustee as trustee of the Trust effective as of the date hereof, to have all the rights, powers and duties set forth herein.

Section 2.05... Initial Capital Contribution of Owner Trust Estate. The Depositor hereby sells, assigns, transfers, conveys and sets over to the Trust, as of the date hereof, the sum of $1. The Owner Trustee hereby acknowledges receipt in trust from the Depositor, as of the date hereof, of the foregoing contribution, which shall constitute the initial corpus of the Trust and shall be deposited in the Certificate Distribution Account. The Owner Trustee also acknowledges on behalf of the Issuer, the receipt in trust of the Home Loans and such other collateral assigned to the Trust pursuant to Section 3.01, which shall constitute the Owner Trust Estate.

Section 2.06... Declaration of Trust. The Owner Trustee hereby declares that it shall hold the Owner Trust Estate in trust upon and subject to the conditions set forth herein for the use and benefit of the Certificateholders, subject to the obligations of the Trust under the Basic Documents. It is the intention of the parties hereto that the Trust constitute a statutory trust under the Statutory Trust Statute and that this Trust Agreement constitute the governing instrument of such statutory trust. Effective as of the date hereof, the Owner Trustee shall have all rights, powers and duties set forth herein and in the Statutory Trust Statute with respect to accomplishing the purposes of the Trust. For purposes of this Declaration of Trust, "Statutory Trust Statute" means Chapter 38 of Title 12 of the Delaware Code, 12 Del. C.ss.3801 et. Seq. as the same may be amended or supplemented from time to time. It is the intention of the parties hereto that, solely for federal, state and local income and franchise tax purposes, the Trust shall be treated as an entity disregarded from the sole holder of 100% of the Certificates, which Certificates shall initially be owned by the Depositor or an affiliate thereof, and the provisions of this Trust Agreement shall be interpreted to further this intention. If more than one person owns the Certificates for federal income tax purposes, then it is the intention of the parties hereto, that solely for federal, state and local income and franchise tax purposes the Trust shall be treated as a partnership (other than a publicly traded partnership), with the assets of the partnership being the Trust Estate, the partners of the partnership being the Certificateholders and the Notes being debt of the partnership and the provisions of this Trust Agreement shall be interpreted to further this intention. The parties agree that, unless otherwise required by appropriate tax authorities, the Owner Trustee will file or cause to be filed annual or other necessary returns, reports and other forms consistent with the characterization of the Trust as an entity wholly owned by the Depositor or an affiliate thereof, or, if two or more persons own the Certificates, as a partnership (other than a publicly traded partnership) for such tax purposes.

Section 2.07... Liability of the Holders of the Certificates. The Holders of the Certificates shall be liable for any entity level taxes imposed on the Trust.

Section 2.08... Title to Trust Property. Legal title to the Owner Trust Estate shall be vested at all times in the Trust as a separate legal entity except where applicable law in any jurisdiction requires title to any part of the Owner Trust Estate to be vested in a trustee or trustees, in which case title shall be deemed to be vested in the Owner Trustee, a co-trustee and/or a separate trustee, as the case may be.

Section 2.09... Situs of Trust. The Trust will be located and administered in the State of Delaware. All bank accounts maintained by the Owner Trustee on behalf of the Trust shall be located in the State of Delaware or the State of New York. The Trust shall not have any employees in any state other than Delaware; provided, however, that nothing herein shall restrict or prohibit the Owner Trustee from having employees within or without the State of Delaware or taking actions outside the State of Delaware in order to comply with Section 2.03. Payments will be received by the Trust only in Delaware or New York, and payments will be made by the Trust only from Delaware or New York. The only office of the Trust will be at the Corporate Trust Office in Delaware.

Section 2.10... Representations and Warranties of the Depositor. The Depositor hereby represents and warrants to the Owner Trustee that:

(i)      The Depositor is duly organized and validly existing as a corporation in good standing under the laws of the State of Delaware, with power and authority to own its properties and to conduct its business as such properties are currently

owned and such business is presently conducted.

(ii)     The Depositor is duly qualified to do business as a foreign corporation in good
         standing and has obtained all necessary licenses and approvals in all jurisdictions
         in which the ownership or lease of its property or the conduct of its business shall
         require such qualifications and in which the failure to so qualify would have a
         material adverse effect on the business, properties, assets or condition (financial
         or other) of the Depositor and the ability of the Depositor to perform under this
         Trust Agreement.

(iii)    The Depositor has the power and authority to execute and deliver this Trust Agreement
         and to carry out its terms; the Depositor has full power and authority to sell and
         assign the property to be sold and assigned to and deposited with the Trust as part
         of the Trust and the Depositor has duly authorized such sale and assignment and
         deposit to the Trust by all necessary corporate action; and the execution, delivery
         and performance of this Trust Agreement have been duly authorized by the Depositor by
         all necessary corporate action.

(iv)     The consummation of the transactions contemplated by this Trust Agreement and the
         fulfillment of the terms hereof do not conflict with, result in any breach of any of
         the terms and provisions of, or constitute (with or without notice or lapse of time)
         a default under, the articles of incorporation or bylaws of the Depositor, or any
         indenture, agreement or other instrument to which the Depositor is a party or by
         which it is bound; nor result in the creation or imposition of any Lien upon any of
         its properties pursuant to the terms of any such indenture, agreement or other
         instrument (other than pursuant to the Basic Documents); nor violate any law or, to
         the best of the Depositor's knowledge, any order, rule or regulation applicable to
         the Depositor of any court or of any federal or state regulatory body, administrative
         agency or other governmental instrumentality having jurisdiction over the Depositor
         or its properties.

Section 2.11.    Payment of Trust Fees.  The Owner Trustee shall pay the Trust's fees and
expenses incurred with respect to the performance of the Trust's duties under the Indenture.

---

ARTICLE III

Conveyance of the Home Loans;
Certificates

Section 3.01.    Conveyance of the Home Loans.  The Depositor, concurrently with the
execution and delivery hereof, does hereby transfer, convey, sell and assign to the Trust,
on behalf of the Holders of the Notes and the Certificates and the Credit Enhancer, without
recourse, all its right, title and interest in and to (i) the Home Loans, all interest
accruing thereon and all collections in respect thereof received on or after the Cut-off
Date, (ii) property which secured a Home Loan and which has been acquired by foreclosure or
deed in lieu of foreclosure, (iii) the interest of the Depositor in any insurance policies
in respect of the Home Loans, and (iv) all proceeds of the foregoing. The Depositor will
also provide the Trust with the Credit Enhancement Instrument.

       The parties hereto intend that the transaction set forth herein be a sale by the
Depositor to the Trust of all of its right, title and interest in and to the Home Loans.  In
the event that the transaction set forth herein is not deemed to be a sale, the Depositor
hereby grants to the Trust a security interest in all of its right, title and interest in,
to and under (i) the Home Loans, all interest accruing thereon and all collections in
respect thereof received on or after the Cut-off Date, (ii) property which secured a Home
Loan and which has been acquired by foreclosure or deed in lieu of foreclosure, (iii) the
interest of the Depositor in any insurance policies in respect of the Home Loans, and (iv)

all proceeds of the foregoing and all distributions thereon and all proceeds thereof; and this Trust Agreement shall constitute a security agreement under applicable law.

Section 3.02.    Initial Ownership.  Upon the formation of the Trust by the contribution by the Depositor pursuant to Section 2.05 and until the conveyance of the Home Loans pursuant to Section 3.01 and the issuance of the Certificates, the Depositor shall be the sole Certificateholder.

Section 3.03.    The Certificates.  The Certificates shall be issued in a single denomination of a 100% Certificate Percentage Interest.

The Certificates shall be executed on behalf of the Trust by manual or facsimile signature of an authorized officer of the Owner Trustee and authenticated in the manner provided in Section 3.04.  Certificates bearing the manual or facsimile signatures of individuals who were, at the time when such signatures shall have been affixed, authorized to sign on behalf of the Trust, shall be validly issued and entitled to the benefit of this Trust Agreement, notwithstanding that such individuals or any of them shall have ceased to be so authorized prior to the authentication and delivery of such Certificates or did not hold such offices at the date of authentication and delivery of such Certificates.  A Person shall become a Certificateholder and shall be entitled to the rights and subject to the obligations of a Certificateholder hereunder upon such Person's acceptance of a Certificate duly registered in such Person's name, pursuant to Section 3.05.

A transferee of a Certificate shall become a Certificateholder and shall be entitled to the rights and subject to the obligations of a Certificateholder hereunder upon such transferee's acceptance of a Certificate duly registered in such transferee's name pursuant to and upon satisfaction of the conditions set forth in Section 3.05.

Section 3.04.    Authentication of Certificates.  Concurrently with the acquisition of the Home Loans by the Trust, the Owner Trustee or the Certificate Paying Agent shall cause the Certificates in an initial Certificate Percentage Interest of 100% to be executed on behalf of the Trust, authenticated and delivered to or upon the written order of the Depositor, signed by its chairman of the board, its president or any vice president, without further corporate action by the Depositor, in authorized denominations.  No Certificate shall entitle its holder to any benefit under this Trust Agreement or be valid for any purpose unless there shall appear on such Certificate a certificate of authentication substantially in the form set forth in Exhibit A, executed by the Owner Trustee or the Certificate Paying Agent, by manual signature; such authentication shall constitute conclusive evidence that such Certificate shall have been duly authenticated and delivered hereunder.  All Certificates shall be dated the date of their authentication.

Section 3.05.    Registration of and Limitations on Transfer and Exchange of Certificates.

(a)    The Certificate Registrar shall keep or cause to be kept, at the office or agency maintained pursuant to Section 3.09, a Certificate Register in which, subject to such reasonable regulations as it may prescribe, the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided.  The Indenture Trustee shall be the initial Certificate Registrar.  If the Certificate Registrar resigns or is removed, the Owner Trustee shall appoint a successor Certificate Registrar.

Subject to satisfaction of the conditions set forth below, upon surrender for registration of transfer of any Certificate at the office or agency maintained pursuant to Section 3.09, the Owner Trustee shall execute, authenticate and deliver (or shall cause the Certificate Registrar as its authenticating agent to authenticate and deliver), in the name of the designated transferee or transferees, one or more new Certificates in authorized denominations of a like aggregate amount dated the date of authentication by the Owner Trustee or any authenticating agent.  At the option of a Certificateholder, Certificates may be exchanged for other Certificates of authorized denominations of a like aggregate amount upon surrender of the Certificates to be exchanged at the office or agency maintained pursuant to Section 3.09.

Every Certificate presented or surrendered for registration of transfer or exchange shall be accompanied by a written instrument of transfer in form satisfactory to the Certificate Registrar duly executed by the Certificateholder or such Certificateholder's attorney duly authorized in writing.  Each Certificate surrendered for registration of

transfer or exchange shall be cancelled and subsequently disposed of by the Certificate Registrar in accordance with its customary practice.

No service charge shall be made for any registration of transfer or exchange of Certificates, but the Owner Trustee or the Certificate Registrar may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

Except as described below, no transfer of any Certificate or interest therein shall be made to any Person that is not a United States Person.  Each Certificateholder shall establish its non-foreign status by submitting to the Certificate Paying Agent an IRS Form W-9 and the Certificate of Non-Foreign Status set forth in Exhibit F hereto.

A Certificate may be transferred to a Certificateholder unable to establish its non-foreign status as described in the preceding paragraph only if such Certificateholder provides an Opinion of Counsel, which Opinion of Counsel shall not be an expense of the Trust, the Owner Trustee, the Certificate Registrar or the Depositor, satisfactory to the Depositor and the Credit Enhancer, that such transfer (1) will not affect the tax status of the Trust and (2) will not adversely affect the interests of any Certificateholder, any Noteholder or the Credit Enhancer, including, without limitation, as a result of the imposition of any United States federal withholding taxes on the Trust (except to the extent that such withholding taxes would be payable solely from amounts otherwise distributable to the Certificate of the prospective transferee).  If such transfer occurs and such foreign Certificateholder becomes subject to such United States federal
withholding taxes, any such taxes will be withheld by the Indenture Trustee.  Each Certificateholder unable to establish its non-foreign status shall submit to the Certificate Paying Agent a copy of its Form W-8BEN and shall resubmit such Form W-8BEN every three years.

(b)      (i) No transfer, sale, pledge or other disposition of a Certificate shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act and any applicable state securities laws or is made in accordance with said Act and laws.  In the event of any such transfer, the Certificate Registrar or the Depositor shall prior to such transfer require the transferee to execute (A) either (i) an investment letter in substantially the form attached hereto as Exhibit C (or in such form and substance reasonably satisfactory to the Certificate Registrar and the Depositor) which investment letters shall not be an expense of the Trust, the Owner Trustee, the Certificate Registrar, the Master Servicer or the Depositor and which investment letter states that, among other things, such transferee (a) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (b) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the Securities Act, provided by Rule 144A or (ii) (a) a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Certificate Registrar and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trust, the Owner Trustee, the Certificate Registrar, the Master Servicer or the Depositor and (b) the transferee executes a representation letter, substantially in the form of Exhibit D hereto, and the transferor executes a representation letter, substantially in the form of Exhibit E hereto, each acceptable to and in form and substance satisfactory to the Certificate Registrar and the Depositor certifying the facts surrounding such transfer, which representation letters shall not be an expense of the Trust, the Owner Trustee, the Certificate Registrar, the Master Servicer or the Depositor and (B) the Certificate of Non-Foreign Status (in substantially the form attached hereto as Exhibit F) acceptable to and in form and substance reasonably satisfactory to the Certificate Registrar and the Depositor, which certificate shall not be an expense of the Trust, the Owner Trustee, the Certificate Registrar or the Depositor.  If the Certificateholder is unable to provide a Certificate of Non-Foreign Status, the Certificateholder must provide an Opinion of Counsel as described in the preceding paragraph.  The Certificateholder desiring to effect such transfer shall, and does hereby agree to, indemnify the Trust, the Owner Trustee, the Certificate Registrar, the Master Servicer and the Depositor against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

(ii)  No transfer of Certificates or any interest therein shall be made to any Person unless the Depositor, the Owner Trustee, the Certificate Registrar and the Master Servicer

are provided with an Opinion of Counsel acceptable to and in form and substance satisfactory to the Depositor, the Owner Trustee, the Certificate Registrar and the Master Servicer to the effect that the purchase and holding of Certificates is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments) and will not subject the Depositor, the Owner Trustee, the Certificate Registrar or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Trust Agreement, which Opinion of Counsel shall not be an expense of the Depositor, the Owner Trustee, the Certificate Registrar or the Master Servicer.  In lieu of such Opinion of Counsel, a Person acquiring such Certificates may provide a certification in the form of Exhibit G to this Trust Agreement, which the Depositor, the Owner Trustee, the Certificate Registrar and the Master Servicer may rely upon without further inquiry or investigation, or such other certifications as the Depositor, the Owner Trustee, the Certificate Registrar or the Master Servicer may deem desirable or necessary in order to establish that such Person is not an employee benefit plan or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (each, a "Plan"), or any Person (including, without limitation, an insurance company investing its general accounts, an investment manager, a named fiduciary or a trustee of any Plan) who is using "plan assets," within the meaning of the U.S. Department of Labor regulation promulgated at 29 C.F.R. Section 2510.3-101, of any Plan (each, a "Plan Investor") to effect such acquisition.  Neither an Opinion of Counsel nor a certification will be required in connection with the initial transfer of any such Certificate by the Depositor to an affiliate of the Depositor (in which case, the Depositor or any affiliate thereof shall be deemed to have represented that such affiliate is not a Plan or a Plan Investor and the Owner Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Owner Trustee, shall be a written representation) from the Depositor of the status of such transferee as an affiliate of the Depositor.

(iii)  In addition, no transfer of a Certificate shall be permitted, and no such transfer shall be registered by the Certificate Registrar or be effective hereunder, unless evidenced by an Opinion of Counsel, which establishes that such transfer or the registration of such transfer would not cause the Trust to be classified as a publicly traded partnership, an association taxable as a corporation, a corporation or a taxable mortgage pool for federal and relevant state income tax purposes, which Opinion of Counsel shall not be an expense of the Certificate Registrar and shall be an expense of the proposed transferee.  No Opinion of Counsel will be required if such transfer is made to a nominee of an existing beneficial holder of a Certificate.

(iv)  In addition, no transfer, sale, assignment, pledge or other disposition of a Certificate shall be made unless the proposed transferee certifies, in form and substance reasonably satisfactory to the Certificate Registrar and the Depositor that (1) the transferee is acquiring the Certificate for its own behalf and is not acting as agent or custodian for any other person or entity in connection with such acquisition and (2) the transferee is not a partnership, grantor trust or S corporation for federal income tax purposes.

Section 3.06.    Mutilated, Destroyed, Lost or Stolen Certificates.  If (a) any mutilated Certificate shall be surrendered to the Certificate Registrar, or if the Certificate Registrar shall receive evidence to its satisfaction of the destruction, loss or theft of any Certificate and (b) there shall be delivered to the Certificate Registrar and the Owner Trustee such security or indemnity as may be required by them to save each of them and the Issuer from harm, then in the absence of notice to the Certificate Registrar or the Owner Trustee that such Certificate has been acquired by a bona fide purchaser, the Owner Trustee shall execute on behalf of the Trust and the Owner Trustee or the Certificate Paying Agent, as the Trust's authenticating agent, shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor and denomination.  In connection with the issuance of any new Certificate under this Section 3.06, the Owner Trustee or the Certificate Registrar may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith.  Any duplicate Certificate issued pursuant to this Section 3.06 shall constitute conclusive evidence of ownership in the Trust, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

Section 3.07.    Persons Deemed Certificateholders.  Prior to due presentation of a Certificate for registration of transfer, the Owner Trustee, the Certificate Registrar or any Certificate Paying Agent may treat the Person in whose name any Certificate is

registered in the Certificate Register as the owner of such Certificate for the purpose of receiving distributions pursuant to Section 5.02 and for all other purposes whatsoever, and none of the Trust, the Owner Trustee, the Certificate Registrar or any Paying Agent shall be bound by any notice to the contrary.

Section 3.08.    Access to List of Certificateholders' Names and Addresses.  The Certificate Registrar shall furnish or cause to be furnished to the Depositor or the Owner Trustee, within 15 days after receipt by the Certificate Registrar of a written request therefor from the Depositor or the Owner Trustee, a list, in such form as the Depositor or the Owner Trustee, as the case may be, may reasonably require, of the names and addresses of the Certificateholders as of the most recent Record Date.  Each Holder, by receiving and holding a Certificate, shall be deemed to have agreed not to hold any of the Trust, the Depositor, the Certificate Registrar or the Owner Trustee accountable by reason of the disclosure of its name and address, regardless of the source from which such information was derived.

Section 3.09.    Maintenance of Office or Agency.  The Owner Trustee, on behalf of the Trust, shall maintain in the City of New York an office or offices or agency or agencies where Certificates may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Owner Trustee in respect of the Certificates and the Basic Documents may be served.  The Owner Trustee initially designates the Corporate Trust Office of the Indenture Trustee as its office for such purposes.  The Owner Trustee shall give prompt written notice to the Depositor and the Certificateholders of any change in the location of the Certificate Register or any such office or agency.

Section 3.10.    Certificate Paying Agent.  (a)  The Certificate Paying Agent shall make distributions to Certificateholders from the Certificate Distribution Account on behalf of the Trust in accordance with the provisions of the Certificates and Section 5.01 hereof from payments remitted to the Certificate Paying Agent by the Indenture Trustee pursuant to Section 3.05 of the Indenture.  The Trust hereby appoints the Indenture Trustee as Certificate Paying Agent (the "Certificate Paying Agent") and the Indenture Trustee hereby accepts such appointment and further agrees that it will be bound by the provisions of this Trust Agreement relating to the Certificate Paying Agent and shall:

(i)      hold all sums held by it for the payment of amounts due with respect to the Certificates in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided;

(ii)     give the Owner Trustee notice of any default by the Trust of which it has actual knowledge in the making of any payment required to be made with respect to the Certificates;

(iii)    at any time during the continuance of any such default, upon the written request of the Owner Trustee, forthwith pay to the Owner Trustee on behalf of the Trust all sums so held in trust by such Certificate Paying Agent;

(iv)     immediately resign as Certificate Paying Agent and forthwith pay to the Owner Trustee on behalf of the Trust all sums held by it in trust for the payment of Certificates if at any time it ceases to meet the standards required to be met by the Certificate Paying Agent at the time of its appointment;

(v)      comply with all requirements of the Code with respect to the withholding from any payments made by it on any Certificates of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith; and

(vi)     deliver to the Owner Trustee a copy of the report to Certificateholders prepared with respect to each Payment Date by the Master Servicer pursuant to Section 4.01 of the Servicing Agreement.

(b)      The Trust may revoke such power and remove the Certificate Paying Agent if the Owner Trustee determines in its sole discretion that the Certificate Paying Agent shall have failed to perform its obligations under this Trust Agreement in any material respect.  The Indenture Trustee shall be permitted to resign as Certificate Paying Agent upon 30 days' written notice to the Owner Trustee; provided the Indenture Trustee is also resigning as Paying Agent under the Indenture at such time.  In the event that the Indenture Trustee

shall no longer be the Certificate Paying Agent under this Trust Agreement and Paying Agent under the Indenture, the Owner Trustee shall appoint a successor to act as Certificate Paying Agent (which shall be a bank or trust company) and which shall also be the successor Paying Agent under the Indenture.  The Owner Trustee shall cause such successor Certificate Paying Agent or any additional Certificate Paying Agent appointed by the Owner Trustee to execute and deliver to the Owner Trustee an instrument to the effect set forth in this Section 3.10 as it relates to the Certificate Paying Agent.  The successor Certificate Paying Agent shall covenant and agree that it will not at any time institute against the Depositor or the Trust, or join in any institution against the Depositor or the Trust of, any bankruptcy proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations with respect to any Certificate, this Trust Agreement or any of the other Basic Documents.  The Certificate Paying Agent shall return all unclaimed funds to the Trust and upon removal of a Certificate Paying Agent such Certificate Paying Agent shall also return all funds in its possession to the Trust.  The provisions of Sections 6.01, 6.03, 6.04 and 7.01 shall apply to the Certificate Paying Agent to the extent applicable.  Any reference in this Trust Agreement to the Certificate Paying Agent shall include any co-paying agent unless the context requires otherwise.

(c)     The Certificate Paying Agent shall establish and maintain with itself the Certificate Distribution Account in which the Certificate Paying Agent shall deposit, on the same day as it is received from the Indenture Trustee, each remittance received by the Certificate Paying Agent with respect to payments made pursuant to the Indenture.  The Certificate Paying Agent shall make all distributions of Certificate Distribution Amounts on the Certificates, from moneys on deposit in the Certificate Distribution Account.

Section 3.11.  Cooperation.  The Owner Trustee shall cooperate in all respects with any reasonable request by the Credit Enhancer for action to preserve or enforce the Credit Enhancer's rights or interest under this Trust Agreement or the Insurance Agreement, so long as such cooperation is consistent with this Trust Agreement and does not limit the rights of the Certificateholders, except as otherwise expressly set forth in this Trust Agreement.


ARTICLE IV

Authority and Duties of Owner Trustee

Section 4.01.     General Authority.  The Owner Trustee is authorized and directed to execute and deliver the Basic Documents to which the Trust is to be a party and each certificate or other document attached as an exhibit to or contemplated by the Basic Documents to which the Trust is to be a party and any amendment or other agreement or instrument described herein, in each case, in such form as the Owner Trustee shall approve, as evidenced conclusively by the Owner Trustee's execution thereof.  In addition to the foregoing, the Owner Trustee is obligated to take all actions required of the Trust pursuant to the Basic Documents.

Section 4.02.     General Duties.  The Owner Trustee shall be responsible to administer the Trust pursuant to the terms of this Trust Agreement and the Basic Documents to which the Trust is a party and in the interest of the Certificateholders, subject to the Basic Documents and in accordance with the provisions of this Trust Agreement.

Section 4.03.     Action upon Instruction.  (a)  Subject to this Article IV and in accordance with the terms of the Basic Documents, the Certificateholders may by written instruction direct the Owner Trustee in the management of the Trust.  Such direction may be exercised at any time by written instruction of the Certificateholders pursuant to this Article IV.

(b)     Notwithstanding the foregoing, the Owner Trustee shall not be required to take any action hereunder or under any Basic Document if the Owner Trustee shall have reasonably determined, or shall have been advised by counsel, that such action is likely to result in liability on the part of the Owner Trustee or is contrary to the terms hereof or of any Basic Document or is otherwise contrary to law.

(c)      Whenever the Owner Trustee is unable to decide between alternative courses of action permitted or required by the terms of this Trust Agreement or under any Basic Document, or in the event that the Owner Trustee is unsure as to the application of any provision of this Trust Agreement or any Basic Document or any such provision is ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or in the event that this Trust Agreement permits any determination by the Owner Trustee or is silent or is incomplete as to the course of action that the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee shall promptly give notice (in such form as shall be appropriate under the circumstances) to the Certificateholders (with a copy to the Credit Enhancer) requesting instruction as to the course of action to be adopted, and to the extent the Owner Trustee acts in good faith in accordance with any written instructions received from Holders of Certificates representing a majority of the Certificate Percentage Interest thereof, the Owner Trustee shall not be liable on account of such action to any Person.  If the Owner Trustee shall not have received appropriate instruction within 10 days of such notice (or within such shorter period of time as reasonably may be specified in such notice or may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking such action not inconsistent with this Trust Agreement or the Basic Documents, as it shall deem to be in the best interests of the Certificateholders, and the Owner Trustee shall have no liability to any Person for such action or inaction.

Section 4.04.    No Duties Except as Specified under Specified Documents or in Instructions. The Owner Trustee shall not have any duty or obligation to manage, make any payment with respect to, register, record, sell, dispose of, or otherwise deal with the Owner Trust Estate, or to otherwise take or refrain from taking any action under, or in connection with, any document contemplated hereby to which the Owner Trustee is a party, except as expressly provided (i) in accordance with the powers granted to and the authority conferred upon the Owner Trustee pursuant to this Trust Agreement, (ii) in accordance with the Basic Documents and (iii) in accordance with any document or instruction delivered to the Owner Trustee pursuant to Section 4.03; and no implied duties or obligations shall be read into this Trust Agreement or any Basic Document against the Owner Trustee.  The Owner Trustee shall have no responsibility for filing any financing or continuation statement in any public office at any time or to otherwise perfect or maintain the perfection of any security interest or lien granted to it hereunder or to prepare or file any Securities and Exchange Commission filing for the Trust or to record this Trust Agreement or any Basic Document.  The Owner Trustee nevertheless agrees that it will, at its own cost and expense, promptly take all action as may be necessary to discharge any liens on any part of the Trust Estate that result from actions by, or claims against, the Owner Trustee that are not related to the ownership or the administration of the Owner Trust Estate.

Section 4.05.    Restrictions.  (a) The Owner Trustee shall not take any action (x) that is inconsistent with the purposes of the Trust set forth in Section 2.03 or (y) that, to the actual knowledge of the Owner Trustee, would result in the Trust becoming taxable as a corporation for federal income tax purposes.  The Certificateholders shall not direct the Owner Trustee to take action that would violate the provisions of this Section 4.05.

(b)      The Owner Trustee shall not convey or transfer any of the Trust's properties or assets, including those included in the Trust Estate, to any person unless (x) it shall have received an Opinion of Counsel to the effect that such transaction will not have any material adverse tax consequence to the Trust or any Certificateholder and (y) such conveyance or transfer shall not violate the provisions of Section 3.16(b) of the Indenture.

Section 4.06.    Prior Notice to Certificateholders and the Credit Enhancer with Respect to Certain Matters.  With respect to the following matters, the Owner Trustee shall not take action unless, at least 30 days before the taking of such action, the Owner Trustee shall have notified the Certificateholders and the Credit Enhancer in writing of the proposed action and Holders of Certificates representing a majority of the Certificate Percentage Interest thereof and the Credit Enhancer shall not have notified the Owner Trustee in writing prior to the 30th day after such notice is given that such Certificateholders and the Credit Enhancer have withheld consent or provided alternative direction:

(a)      the initiation of any claim or lawsuit by the Trust (except claims or lawsuits brought in connection with the collection of cash distributions due and owing under the Home Loans) and the compromise of any action, claim or lawsuit brought by or against the Trust (except with respect to the aforementioned claims or lawsuits for

collection of cash distributions due and owing under the Home Loans);

(b)      the election by the Trust to file an amendment to the Certificate of Trust (unless such amendment is required to be filed under the Statutory Trust Statute);

(c)      the amendment of the Indenture by a supplemental indenture in circumstances where the consent of any Noteholder is required;

(d)      the amendment of the Indenture by a supplemental indenture in circumstances where the consent of any Noteholder is not required and such amendment materially adversely affects the interest of the Certificateholders; and

(e)      the appointment pursuant to the Indenture of a successor Note Registrar, Paying Agent or Indenture Trustee or pursuant to this Trust Agreement of a successor Certificate Registrar or Certificate Paying Agent or the consent to the assignment by the Note Registrar, Paying Agent, Indenture Trustee, Certificate Registrar or Certificate Paying Agent of its obligations under the Indenture or this Trust Agreement, as applicable.

Section 4.07.    Action by Certificateholders with Respect to Certain Matters.  The Owner Trustee shall not have the power, except upon the direction of Certificateholders evidencing not less than a majority of the outstanding Certificate Percentage Interest of the Certificates, and with the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing), to (a) remove the Master Servicer under the Servicing Agreement pursuant to Section 7.01 thereof or (b) except as expressly provided in the Basic Documents, sell the Home Loans after the termination of the Indenture.  The Owner Trustee shall take the actions referred to in the preceding sentence only upon written instructions signed by Certificateholders evidencing not less than a majority of the outstanding Certificate Percentage Interest of the Certificates and with the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing).

Section 4.08.    Action by Certificateholders with Respect to Bankruptcy.  The Owner Trustee shall not have the power to commence a voluntary proceeding in bankruptcy relating to the Trust without the unanimous prior approval of all Certificateholders and with the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing) and the delivery to the Owner Trustee by each such Certificateholder of a certificate certifying that such Certificateholder reasonably believes that the Trust is insolvent.

Section 4.09.    Restrictions on Certificateholders' Power.  The Certificateholders shall not direct the Owner Trustee to take or to refrain from taking any action if such action or inaction would be contrary to any obligation of the Trust or the Owner Trustee under this Trust Agreement or any of the Basic Documents or would be contrary to Section 2.03, nor shall the Owner Trustee be obligated to follow any such direction, if given.

Section 4.10.    Majority Control.  Except as expressly provided herein, any action that may be taken by the Certificateholders under this Trust Agreement may be taken by the Certificateholders evidencing not less than a majority of the outstanding Certificate Percentage Interest of the Certificates.  Except as expressly provided herein, any written notice of the Certificateholders delivered pursuant to this Trust Agreement shall be effective if signed by Certificateholders evidencing not less than a majority of the outstanding Certificate Percentage Interest of the Certificates at the time of the delivery of such notice.

Section 4.11.    Doing Business in Other Jurisdictions.  Notwithstanding anything contained herein to the contrary, neither Wilmington Trust Company nor the Owner Trustee shall be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action will, even after the appointment of a co-trustee or separate trustee in accordance with Section 9.05 hereof, (i) require the consent or approval or authorization or order of or the giving of notice to, or the registration with or the taking of any other action in respect of, any state or other governmental authority or agency of any jurisdiction other than the State of Delaware; (ii) result in any fee, tax or other governmental charge under the laws of the State of Delaware becoming payable by Wilmington Trust Company, or (iii) subject Wilmington Trust Company to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from acts unrelated to the consummation of the transactions by Wilmington Trust Company or the Owner Trustee, as the case may be, contemplated hereby.

ARTICLE V

Application of Trust Funds

Section 5.01.    Distributions.  (a) On each Payment Date, the Certificate Paying Agent shall distribute to the Certificateholders all funds on deposit in the Certificate Distribution Account and available therefor (as provided in Section 3.05 of the Indenture), as the Certificate Distribution Amount for such Payment Date.  Upon termination of the Indenture in accordance with the terms thereof, distributions to the Certificateholder shall continue to be determined in accordance with the provisions for distributions in Section 3.05 of the Indenture.  All distributions made pursuant to this Section shall be distributed to the Certificateholders on a pro rata basis based on the Certificate Percentage Interests thereof.

(b)     In the event that any withholding tax is imposed on the distributions (or allocations of income) to a Certificateholder, such tax shall reduce the amount otherwise distributable to the Certificateholder in accordance with this Section 5.01.  The Certificate Paying Agent is hereby authorized and directed to retain or cause to be retained from amounts otherwise distributable to the Certificateholders sufficient funds for the payment of any tax that is legally owed by the Trust (but such authorization shall not prevent the Owner Trustee from contesting any such tax in appropriate proceedings, and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings).  The amount of any withholding tax imposed with respect to a Certificateholder shall be treated as cash distributed to such Certificateholder at the time it is withheld by the Certificate Paying Agent and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution (such as a distribution to a non-U.S. Certificateholder), the Certificate Paying Agent may in its sole discretion withhold such amounts in accordance with this paragraph (b).

(c)     Distributions to Certificateholders shall be subordinated to the creditors of the Trust, including the Noteholders.

(d)     Allocations of profits and losses, as determined for federal income tax purposes, shall be made to the Certificateholders on a pro rata basis based on the Certificate Percentage Interests thereof.

Section 5.02.    Method of Payment.  Subject to Section 8.01(c), distributions required to be made to Certificateholder on any Payment Date as provided in Section 5.01 shall be made to the Certificateholder of record on the preceding Record Date either by wire transfer, in immediately available funds, to the account of such Holder at a bank or other entity having appropriate facilities therefor, if the Certificateholder shall have provided to the Certificate Registrar appropriate written instructions at least five (5) Business Days prior to such Payment Date or, if not, by check mailed to such Certificateholder at the address of the Holder appearing in the Certificate Register.

Section 5.03.    Signature on Returns.  To the extent required and unless otherwise required by law, the Owner Trustee shall sign on behalf of the Trust the tax returns of the Trust.

Section 5.04.    Statements to Certificateholders.  On each Payment Date, the Certificate Paying Agent shall make available electronically at www.jpmorgan.com/sfr the statement or statements provided to the Owner Trustee and the Certificate Paying Agent by the Master Servicer pursuant to Section 4.01 of the Servicing Agreement with respect to such Payment Date.

Section 5.05.    Tax Reporting.  So long as the Depositor or any affiliate of the Depositor owns 100% of the Certificates (the "Original Certificateholder"), then no separate federal and state income tax returns and information returns or statements will be filed with respect to the Trust and a federal employer identification number shall not be applied for

from the IRS.  If the Original Certificateholder is no longer the sole Certificateholder and
the Certificates are held by the Original Certificateholder and one or more persons for
federal income tax purposes, the subsequent holders of the Certificates by their acceptance
hereof, agree to appoint the Original Certificateholder as their agent for the tax matters
partner and the Original Certificateholder, as agent for such holders, agrees to perform
(itself or through its agent) all duties necessary to comply with federal and state income
tax laws including but not limited to applying for a federal employer identification number
and filing tax returns.

Section 5.06.    Derivative Contracts.  (a)  The Owner Trustee shall, at the direction of the
Master Servicer, on behalf of the Trust Estate, enter into Derivative Contracts, solely for
the benefit of the Certificateholder.  Any such Derivative Contract shall constitute a fully
prepaid agreement.  The Master Servicer shall determine, in its sole discretion, whether any
Derivative Contract conforms to the requirements of Section 5.06(b) and (c).  All
collections, proceeds and other amounts in respect of the Derivative Contracts payable by
the Derivative Counterparty shall be distributed to the Certificateholder on the Payment
Date following receipt thereof by the Owner Trustee.

(b)      Any Derivative Contract that provides for any payment obligation on the part of the
Trust Estate must (i) be without recourse to the assets of the Trust Estate, (ii) contain a
non-petition covenant provision from the Derivative Counterparty, (iii) limit payment dates
thereunder to Payment Dates and (iv) contain a provision limiting any cash payment due to
the Derivative Counterparty on any day under such Derivative Contract solely to funds
available therefor in the Custodial Account available to make payment to the
Certificateholder on such Payment Date.

(c)      Each Derivative Contract must (i) provide for the direct payment of any amounts by
the Derivative Counterparty thereunder to the Custodial Account at least one (1) Business
Day prior to the related Payment Date, (ii) contain an assignment of all of the Trust Estate
rights (but none of its obligations) under such Derivative Contract to the Owner Trustee on
behalf of the Certificateholder and shall include an express consent to the Derivative
Counterparty to such assignment, (iii) provide that in the event of the occurrence of a
Servicer Default, such Derivative Contract shall terminate upon the direction of a majority
Percentage Interest of the Owner Trust Certificates, and (iv) prohibit the Derivative
Counterparty from "setting-off" or "netting" other obligations of the Trust Estate and its
Affiliates against such Derivative Counterparty's payment obligations thereunder.

(d)      Notwithstanding the provisions of paragraphs (a), (b) and (c) of this Section 5.06,
no Derivative Contract shall (i) provide for the payment of any amounts that would otherwise
be payable to the Holders of any Class of Notes, or (ii) materially adversely affect the
rights of the Holders of any Class of Notes or the Credit Enhancer.

ARTICLE VI

Concerning the Owner Trustee

Section 6.01.    Acceptance of Trusts and Duties.  The Owner Trustee accepts the trusts
hereby created and agrees to perform its duties hereunder with respect to such trusts but
only upon the terms of this Trust Agreement.  The Owner Trustee and the Certificate Paying
Agent also agree to disburse all moneys actually received by it constituting part of the
Owner Trust Estate upon the terms of the Basic Documents and this Trust Agreement.  The
Owner Trustee shall not be answerable or accountable hereunder or under any Basic Document
under any circumstances, except (i) for its own willful misconduct, negligence or bad faith
or negligent failure to act or (ii) in the case of the inaccuracy of any representation or
warranty contained in Section 6.03 expressly made by the Owner Trustee.  In particular, but
not by way of limitation (and subject to the exceptions set forth in the preceding sentence):

(a)     No provision of this Trust Agreement or any Basic Document shall require the Owner Trustee to expend or risk funds or otherwise incur any financial liability in the performance of any of its rights, duties or powers hereunder or under any Basic Document if the Owner Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(b)     Under no circumstances shall the Owner Trustee be liable for indebtedness evidenced by or arising under any of the Basic Documents, including the principal of and interest on the Notes;

(c)     The Owner Trustee shall not be responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Depositor or for the form, character, genuineness, sufficiency, value or validity of any of the Owner Trust Estate, or for or in respect of the validity or sufficiency of the Basic Documents, the Notes, the Certificates, other than the certificate of authentication on the Certificates, if executed by the Owner Trustee and the Owner Trustee shall in no event assume or incur any liability, duty, or obligation to any Noteholder or to any Certificateholder, other than as expressly provided for herein or expressly agreed to in the Basic Documents;

(d)     The execution, delivery, authentication and performance by it of this Trust Agreement will not require the authorization, consent or approval of, the giving of notice to, the filing or registration with, or the taking of any other action with respect to, any governmental authority or agency;

(e)     The Owner Trustee shall not be liable for the default or misconduct of the Depositor, the Indenture Trustee or the Master Servicer under any of the Basic Documents or otherwise and the Owner Trustee shall have no obligation or liability to perform the obligations of the Trust under this Trust Agreement or the Basic Documents that are required to be performed by the Indenture Trustee under the Indenture or the Seller under the Home Loan Purchase Agreement; and

(f)     The Owner Trustee shall be under no obligation to exercise any of the rights or powers vested in it or duties imposed by this Trust Agreement, or to institute, conduct or defend any litigation under this Trust Agreement or otherwise or in relation to this Trust Agreement or any Basic Document, at the request, order or direction of any of the Certificateholders, unless such Certificateholders have offered to the Owner Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities that may be incurred by the Owner Trustee therein or thereby.  The right of the Owner Trustee to perform any discretionary act enumerated in this Trust Agreement or in any Basic Document shall not be construed as a duty, and the Owner Trustee shall not be answerable for other than its negligence, bad faith or willful misconduct in the performance of any such act.

Section 6.02.     Furnishing of Documents.  The Owner Trustee shall furnish to the Securityholders promptly upon receipt of a written reasonable request therefor, duplicates or copies of all reports, notices, requests, demands, certificates, financial statements and any other instruments furnished to the Trust under the Basic Documents.

Section 6.03.     Representations and Warranties.  The Owner Trustee hereby represents and warrants to the Depositor, for the benefit of the Certificateholders, that:

(a)     It is a banking corporation duly organized and validly existing in good standing under the laws of the State of Delaware.  It has all requisite corporate power and authority to execute, deliver and perform its obligations under this Trust Agreement;

(b)     It has taken all corporate action necessary to authorize the execution and delivery by it of this Trust Agreement, and this Trust Agreement will be executed and delivered by one of its officers who is duly authorized to execute and deliver this Trust Agreement on its behalf;

(c)     Neither the execution nor the delivery by it of this Trust Agreement, nor the consummation by it of the transactions contemplated hereby nor compliance by it with any of the terms or provisions hereof will contravene any federal or Delaware law, governmental rule or regulation governing the banking or trust powers of the Owner Trustee or any judgment or order binding on it, or constitute any default under its

charter documents or bylaws or any indenture, mortgage, contract, agreement or instrument to which it is a party or by which any of its properties may be bound;

(d)    This Trust Agreement, assuming due authorization, execution and delivery by the Owner Trustee and the Depositor, constitutes a valid, legal and binding obligation of the Owner Trustee, enforceable against it in accordance with the terms hereof subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law;

(e)    The Owner Trustee is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Owner Trustee or its properties or might have consequences that would materially adversely affect its performance hereunder; and

(f)    No litigation is pending or, to the best of the Owner Trustee's knowledge, threatened against the Owner Trustee which would prohibit its entering into this Trust Agreement or performing its obligations under this Trust Agreement.

Section 6.04.    Reliance; Advice of Counsel.    (a)    The Owner Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond, or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties.    The Owner Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect.    As to any fact or matter the method of determination of which is not specifically prescribed herein, the Owner Trustee may for all purposes hereof rely on a certificate, signed by the president or any vice president or by the treasurer or other authorized officers of the relevant party, as to such fact or matter and such certificate shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(b)    In the exercise or administration of the Trust hereunder and in the performance of its duties and obligations under this Trust Agreement or the Basic Documents, the Owner Trustee (i) may act directly or through its agents, attorneys, custodians or nominees (including persons acting under a power of attorney) pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable for the conduct or misconduct of such agents, attorneys, custodians or nominees (including persons acting under a power of attorney) if such persons have been selected by the Owner Trustee with reasonable care, and (ii) may consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by it at the expense of the Trust.    The Owner Trustee shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the opinion or advice of any such counsel, accountants or other such Persons and not contrary to this Trust Agreement or any Basic Document.

Section 6.05.    Not Acting in Individual Capacity.    Except as provided in this Article VI, in accepting the trusts hereby created Wilmington Trust Company acts solely as Owner Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Owner Trustee by reason of the transactions contemplated by this Trust Agreement or any Basic Document shall look only to the Owner Trust Estate for payment or satisfaction thereof.

Section 6.06.    Owner Trustee Not Liable for Certificates or Related Documents.    The recitals contained herein and in the Certificates (other than the signatures of the Owner Trustee on the Certificates) shall be taken as the statements of the Depositor, and the Owner Trustee assumes no responsibility for the correctness thereof.    The Owner Trustee makes no representations as to the validity or sufficiency of this Trust Agreement, of any Basic Document or of the Certificates (other than the signatures of the Owner Trustee on the Certificates) or the Notes, or of any Related Documents.    The Owner Trustee shall at no time have any responsibility or liability with respect to the sufficiency of the Owner Trust Estate or its ability to generate the payments to be distributed to Certificateholders under this Trust Agreement or the Noteholders under the Indenture, including, the compliance by the Depositor or the Seller with any warranty or representation made under any Basic

Document or in any related document or the accuracy of any such warranty or representation, or any action of the Certificate Paying Agent, the Certificate Registrar or the Indenture Trustee taken in the name of the Owner Trustee.

Section 6.07.    Owner Trustee May Own Certificates and Notes.  The Owner Trustee in its individual or any other capacity may become the owner or pledgee of Certificates or Notes and may deal with the Depositor, the Seller, the Certificate Paying Agent, the Certificate Registrar and the Indenture Trustee in transactions with the same rights as it would have if it were not Owner Trustee.

ARTICLE VII

Compensation of Owner Trustee

Section 7.01.    Owner Trustee's Fees and Expenses.  The Owner Trustee shall receive as compensation for its services hereunder such fees as have been separately agreed upon before the date hereof, and the Owner Trustee shall be reimbursed for its reasonable expenses hereunder and under the Basic Documents, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may reasonably employ in connection with the exercise and performance of its rights and its duties hereunder and under the Basic Documents which shall be payable by the Master Servicer pursuant to Section 3.09 of the Servicing Agreement.

Section 7.02.    Indemnification.  The Master Servicer shall indemnify, defend and hold harmless the Owner Trustee as provided in Section 6.06 of the Servicing Agreement.

ARTICLE VIII

Termination of Trust Agreement

Section 8.01.    Termination of Trust Agreement.  (a) This Trust Agreement (other than this Article VIII) and the Trust shall terminate and be of no further force or effect upon the earliest of (i) the final distribution of all moneys or other property or proceeds of the Owner Trust Estate in accordance with the terms of the Indenture and this Trust Agreement, (ii) the Payment Date in February 2036, or (iii) the purchase by the Master Servicer of all Home Loans pursuant to Section 8.08(a) of the Servicing Agreement.  The bankruptcy, liquidation, dissolution, death or incapacity of any Certificateholder shall not (x) operate to terminate this Trust Agreement or the Trust or (y) entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of all or any part of the Trust or the Owner Trust Estate or (z) otherwise affect the rights, obligations and liabilities of the parties hereto.

(b)      Except as provided in Section 8.01(a), neither the Depositor nor any Certificateholder shall be entitled to revoke or terminate the Trust.

(c)      Notice of any termination of the Trust, specifying the Payment Date upon which Certificateholders shall surrender their Certificates to the Certificate Paying Agent for payment of the final distribution and cancellation, shall be given by the Certificate Paying

Agent by letter to Certificateholders and the Credit Enhancer mailed within five (5) Business Days of receipt of notice of such termination from the Owner Trustee, stating (i) the Payment Date upon or with respect to which final payment of the Certificates shall be made upon presentation and surrender of the Certificates at the office of the Certificate Paying Agent therein designated, (ii) the amount of any such final payment and (iii) that the Record Date otherwise applicable to such Payment Date is not applicable, payments being made only upon presentation and surrender of the Certificates at the office of the Certificate Paying Agent therein specified. The Certificate Paying Agent shall give such notice to the Owner Trustee and the Certificate Registrar at the time such notice is given to Certificateholders. Upon presentation and surrender of the Certificates, the Certificate Paying Agent shall cause to be distributed to Certificateholders amounts distributable on such Payment Date pursuant to Section 5.01.

In the event that all of the Certificateholders shall not surrender their Certificates for cancellation within six months after the date specified in the above mentioned written notice, the Certificate Paying Agent shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto. Subject to applicable laws with respect to escheat of funds, if within one year following the Payment Date on which final payment of the Certificates was to have been made pursuant to Section 3.10, all the Certificates shall not have been surrendered for cancellation, the Certificate Paying Agent may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Certificateholders concerning surrender of their Certificates, and the cost thereof shall be paid out of the funds and other assets that shall remain subject to this Trust Agreement. Any funds remaining in the Certificate Distribution Account after exhaustion of such remedies shall be distributed by the Certificate Paying Agent to the holder of the majority of the Certificate Percentage Interest of the Certificates.

(d)     Upon the winding up of the Trust and its termination, the Owner Trustee shall cause the Certificate of Trust to be cancelled by filing a certificate of cancellation with the Secretary of State in accordance with the provisions of Section 3810(c) of the Statutory Trust Statute.

ARTICLE IX

### Successor Owner Trustees and Additional Owner Trustees

Section 9.01.    Eligibility Requirements for Owner Trustee.  The Owner Trustee shall at all times be a corporation satisfying the provisions of Section 3807(a) of the Statutory Trust Statute; authorized to exercise corporate trust powers; having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal or state authorities; and having (or having a parent that has) long-term debt obligations with a rating of at least A by Moody's and/or Standard & Poor's.  If such corporation shall publish reports of condition at least annually pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purpose of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  In case at any time the Owner Trustee shall cease to be eligible in accordance with the provisions of this Section 9.01, the Owner Trustee shall resign immediately in the manner and with the effect specified in Section 9.02.

Section 9.02.    Replacement of Owner Trustee.  The Owner Trustee may at any time resign and be discharged from the trusts hereby created by giving 30 days' prior written notice thereof to the Credit Enhancer and the Depositor.  Upon receiving such notice of resignation, the Indenture Trustee shall promptly appoint a successor Owner Trustee with the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing), which consent shall not be unreasonably withheld, by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Owner Trustee and one copy to

12-12020-mg   Doc 300-2   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit A-2
Pg 21 of 159

the successor Owner Trustee. If no successor Owner Trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Owner Trustee may petition any court of competent jurisdiction for the appointment of a successor Owner Trustee.

If at any time the Owner Trustee shall cease to be eligible in accordance with the provisions of Section 9.01 and shall fail to resign after written request therefor by the Indenture Trustee, or if at any time the Owner Trustee shall be legally unable to act, or shall be adjudged bankrupt or insolvent, or a receiver of the Owner Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Owner Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Indenture Trustee may with the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing), which consent shall not be unreasonably withheld, and shall at the direction of the Credit Enhancer, remove the Owner Trustee. If the Indenture Trustee shall remove the Owner Trustee under the authority of the immediately preceding sentence, the Indenture Trustee shall promptly appoint a successor Owner Trustee acceptable to the Credit Enhancer by written instrument, in duplicate, one copy of which instrument shall be delivered to the outgoing Owner Trustee so removed and one copy to the successor Owner Trustee, and shall pay all fees owed to the outgoing Owner Trustee. Any resignation or removal of the Owner Trustee and appointment of a successor Owner Trustee pursuant to any of the provisions of this Section shall not become effective until acceptance of appointment by the successor Owner Trustee pursuant to Section 9.03 and payment of all fees and expenses owed to the outgoing Owner Trustee.

Section 9.03.   Successor Owner Trustee.  Any successor Owner Trustee appointed pursuant to Section 9.02 shall execute, acknowledge and deliver to the Indenture Trustee and to its predecessor Owner Trustee an instrument accepting such appointment under this Trust Agreement, and thereupon the resignation or removal of the predecessor Owner Trustee shall become effective, and such successor Owner Trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Owner Trustee. The predecessor Owner Trustee shall upon payment of its fees and expenses deliver to the successor Owner Trustee all documents and statements and monies held by it under this Trust Agreement; and the predecessor Owner Trustee shall execute and deliver such instruments and do such other things as may reasonably be required for fully and certainly vesting and confirming in the successor Owner Trustee all such rights, powers, duties and obligations.

No successor Owner Trustee shall accept appointment as provided in this Section 9.03 unless at the time of such acceptance such successor Owner Trustee shall be eligible pursuant to Section 9.01.

Upon acceptance of appointment by a successor Owner Trustee pursuant to this Section 9.03, the Indenture Trustee shall mail notice thereof to all Certificateholders, the Indenture Trustee, the Noteholders and the Rating Agencies. If the Indenture Trustee shall fail to mail such notice within 10 days after acceptance of such appointment by the successor Owner Trustee, the successor Owner Trustee shall cause such notice to be mailed at the expense of the Indenture Trustee.

Section 9.04.   Merger or Consolidation of Owner Trustee.  Any Person into which the Owner Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Owner Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Owner Trustee, shall be the successor of the Owner Trustee hereunder, without the execution or filing of any instrument or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, that such Person shall be eligible pursuant to Section 9.01 and, provided, further, that the Owner Trustee shall mail notice of such merger or consolidation to the Rating Agencies.

Section 9.05.   Appointment of Co-Trustee or Separate Trustee.  Notwithstanding any other provisions of this Trust Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Owner Trust Estate may at the time be located, the Owner Trustee shall have the power and shall execute and deliver all instruments to appoint one or more Persons to act as co-trustee, jointly with the Owner Trustee, or as separate trustee or trustees, of all or any part of the Owner Trust Estate, and to vest in such Person, in such capacity, such title to the Trust or any part thereof

and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Owner Trustee may consider necessary or desirable.  No co-trustee or separate trustee under this Trust Agreement shall be required to meet the terms of eligibility as a successor Owner Trustee pursuant to Section 9.01 and no notice of the appointment of any co-trustee or separate trustee shall be required pursuant to Section 9.03.

Each separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(a)    All rights, powers, duties and obligations conferred or imposed upon the Owner Trustee shall be conferred upon and exercised or performed by the Owner Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Owner Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed, the Owner Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Owner Trust Estate or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Owner Trustee;

(b)    No trustee under this Trust Agreement shall be personally liable by reason of any act or omission of any other trustee under this Trust Agreement;

(c)    The Owner Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee; and

(d)    All steps have been taken prior to any such appointment to perfect any security interest granted pursuant to the Indenture.

Any notice, request or other writing given to the Owner Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Trust Agreement and the conditions of this Article.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Owner Trustee or separately, as may be provided therein, subject to all the provisions of this Trust Agreement, specifically including every provision of this Trust Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Owner Trustee.  Each such instrument shall be filed with the Owner Trustee.

Any separate trustee or co-trustee may at any time appoint the Owner Trustee as its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Trust Agreement on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Owner Trustee, to the extent permitted by law, without the appointment of a new or successor co-trustee or separate trustee.

ARTICLE X

Miscellaneous

Section 10.01.  Amendments.  (a)  This Trust Agreement may be amended from time to time by the parties hereto as specified in this Section 10.01, provided that any amendment, except as provided in subparagraph (e) below, be accompanied by an Opinion of Counsel to the Owner Trustee to the effect that such amendment (i) complies with the provisions of this Section and (ii) will not cause the Trust to be subject to an entity level tax.

(b)      If the purpose of the amendment (as described herein) is to correct any mistake, eliminate any inconsistency, cure any ambiguity or deal with any matter not covered (i.e., to give effect to the intent of the parties), it shall not be necessary to obtain the consent of any Holders, but the Owner Trustee shall be furnished with (A) a letter from the Rating Agencies that the amendment will not result in the downgrading or withdrawal of the rating then assigned to any Security if determined without regard to the Credit Enhancement Instrument and (B) an Opinion of Counsel to the effect that such action will not adversely affect in any material respect the interests of any Holders and the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing) shall be obtained.

(c)      If the purpose of the amendment is to prevent the imposition of any federal or state taxes at any time that any Security is outstanding (i.e., technical in nature), it shall not be necessary to obtain the consent of any Holder, but the Owner Trustee shall be furnished with an Opinion of Counsel that such amendment is necessary or helpful to prevent the imposition of such taxes and is not materially adverse to any Holder and the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing) shall be obtained.

(d)      If the purpose of the amendment is to add or eliminate or change any provision of the Trust Agreement other than as contemplated in (b) and (c) above, the amendment shall require (A) the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing) and an Opinion of Counsel to the effect that such action will not adversely affect in any material respect the interests of any Holders and (B) either (a) a letter from the Rating Agencies that the amendment will not result in the downgrading or withdrawal of the rating then assigned to any Security if determined without regard to the Credit Enhancement Instrument or (b) the consent of Holders of Certificates evidencing a majority of the Certificate Percentage Interest of the Certificates and the Indenture Trustee; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments received that are required to be distributed on any Certificate without the consent of the related Certificateholder and the Credit Enhancer, or (ii) reduce the aforesaid percentage of Certificates the Holders of which are required to consent to any such amendment, without the consent of the Holders of all such Certificates then outstanding.

(e)      If the purpose of the amendment is to provide for the holding of any of the Certificates in book-entry form, it shall require the consent of Holders of all such Certificates then outstanding; provided, that the Opinion of Counsel specified in subparagraph (a) above shall not be required.

(f)      If the purpose of the amendment is to provide for the issuance of additional certificates representing an interest in the Trust, it shall not be necessary to obtain the consent of any Holder, but the Owner Trustee shall be furnished with (A) an Opinion of Counsel to the effect that such action will not adversely affect in any material respect the interests of any Holders and (B) a letter from the Rating Agencies that the amendment will not result in the downgrading or withdrawal of the rating then assigned to any Security, if determined without regard to the Credit Enhancement Instrument and the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing) shall be obtained.

(g)      Promptly after the execution of any such amendment or consent, the Owner Trustee shall furnish written notification of the substance of such amendment or consent to each Certificateholder, the Indenture Trustee, the Credit Enhancer and each of the Rating Agencies. It shall not be necessary for the consent of Certificateholders or the Indenture Trustee pursuant to this Section 10.01 to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents (and any other consents of Certificateholders provided for in this Trust Agreement or in any other Basic Document) and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable requirements as the Owner Trustee may prescribe.

(h)      In connection with the execution of any amendment to any agreement to which the Trust is a party, other than this Trust Agreement, the Owner Trustee shall be entitled to receive and conclusively rely upon an Opinion of Counsel to the effect that such amendment is authorized or permitted by the documents subject to such amendment and that all conditions

precedent in the Basic Documents for the execution and delivery thereof by the Trust or the
Owner Trustee, as the case may be, have been satisfied.

(i)       Any amendment to this Trust Agreement affecting the rights, duties and obligations of
the Indenture Trustee, Certificate Registrar or the Certificate Paying Agent shall be
consented to by such party and such party shall be an addressee on any Opinion of Counsel
and receive any rating letter provided in connection therewith.

          Promptly after the execution of any amendment to the Certificate of Trust, the Owner
Trustee shall cause the filing of such amendment with the Secretary of State of the State of
Delaware.

Section 10.02.   No Legal Title to Owner Trust Estate.   The Certificateholders shall not have
legal title to any part of the Owner Trust Estate.   The Certificateholders shall be entitled
to receive distributions with respect to their undivided beneficial interest therein only in
accordance with Articles V and VIII.   No transfer, by operation of law or otherwise, of any
right, title or interest of the Certificateholders to and in their ownership interest in the
Owner Trust Estate shall operate to terminate this Trust Agreement or the trusts hereunder
or entitle any transferee to an accounting or to the transfer to it of legal title to any
part of the Owner Trust Estate.

Section 10.03.   Limitations on Rights of Others.   Except for Section 2.07, the provisions of
this Trust Agreement are solely for the benefit of the Owner Trustee, the Depositor, the
Certificateholders, the Credit Enhancer and, to the extent expressly provided herein, the
Indenture Trustee and the Noteholders, and nothing in this Trust Agreement (other than
Section 2.07), whether express or implied, shall be construed to give to any other Person
any legal or equitable right, remedy or claim in the Owner Trust Estate or under or in
respect of this Trust Agreement or any covenants, conditions or provisions contained herein.

Section 10.04.   Notices.  (a)  Unless otherwise expressly specified or permitted by the
terms hereof, all notices shall be in writing and shall be deemed given upon receipt, if to
the Owner Trustee, addressed to Wilmington Trust Company, Corporate Trust Administration,
Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890, Attention:
Corporate Trust Administration; if to the Indenture Trustee, addressed to JPMorgan Chase
Bank, National Association, 4 New York Plaza, 6th Floor, New York, New York 10004,
Attention: Worldwide Securities Services/Structured Finance Services, Home Loan Trust
2006-HI3, if to the Depositor, addressed to Residential Funding Mortgage Securities II,
Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437; if to the
Credit Enhancer, addressed to Financial Guaranty Insurance Company, 125 Park Avenue, New
York, New York 10017, Attention: Structured Finance Surveillance (Home Loan Trust 2006-HI3);
if to the Rating Agencies, addressed to Moody's Investors Service, Inc., 99 Church Street,
4th Floor, New York, New York 10001 and Standard & Poor's, 55 Water Street - 41st Floor, New
York, New York 10041, Attention: Structured Finance Department - MBS or, as to each party,
at such other address as shall be designated by such party in a written notice to each other
party.

(b)       Any notice required or permitted to be given to a Certificateholder shall be given by
first-class mail, postage prepaid, at the address of such Holder as shown in the Certificate
Register.   Any notice so mailed within the time prescribed in this Trust Agreement shall be
conclusively presumed to have been duly given, whether or not the Certificateholder receives
such notice.

(c)       A copy of any notice delivered to the Owner Trustee or the Trust shall also be
delivered to the Depositor.

Section 10.05.   Severability.   Any provision of this Trust Agreement that is prohibited or
unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the
extent of such prohibition or unenforceability without invalidating the remaining provisions
hereof, and any such prohibition or unenforceability in any jurisdiction shall not
invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.06.   Separate Counterparts.   This Trust Agreement may be executed by the parties
hereto in separate counterparts, each of which when so executed and delivered shall be an
original, but all such counterparts shall together constitute but one and the same
instrument.

Section 10.07.   Successors and Assigns.   All representations, warranties, covenants and
agreements contained herein shall be binding upon, and inure to the benefit of, each of the
Depositor, the Owner Trustee and its successors and each Certificateholder and its
successors and permitted assigns, all as herein provided and the Credit Enhancer.  Any
request, notice, direction, consent, waiver or other instrument or action by a
Certificateholder shall bind the successors and assigns of such Certificateholder.

Section 10.08.   No Petition.  The Owner Trustee, by entering into this Trust Agreement and
each Certificateholder, by accepting a Certificate, hereby covenant and agree that they will
not at any time institute against the Depositor or the Trust, or join in any institution
against the Depositor or the Trust of, any bankruptcy proceedings under any United States
federal or state bankruptcy or similar law in connection with any obligations with respect
to the Certificates, the Notes, this Trust Agreement or any of the Basic Documents.

Section 10.09.   No Recourse.  Each Certificateholder by accepting a Certificate acknowledges
that such Certificateholder's Certificates represent beneficial interests in the Trust only
and do not represent interests in or obligations of the Depositor, the Seller, the Owner
Trustee, the Indenture Trustee or any Affiliate thereof and no recourse may be had against
such parties or their assets, except as may be expressly set forth or contemplated in this
Trust Agreement, the Certificates or the Basic Documents.

Section 10.10.   Headings.  The headings of the various Articles and Sections herein are for
convenience of reference only and shall not define or limit any of the terms or provisions
hereof.

Section 10.11.   GOVERNING LAW.  THIS TRUST AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH
THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW
PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE
DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 10.12.   Integration.  This Trust Agreement constitutes the entire agreement among
the parties hereto pertaining to the subject matter hereof and supersedes all prior
agreements and understanding pertaining thereto.

Section 10.13. Rights of Credit Enhancer to Exercise Rights of Certificateholders.

(a)      By accepting its Certificate, each Certificateholder agrees that unless a Credit
Enhancer Default exists, the Credit Enhancer shall have the right to exercise all rights of
the Certificateholders under this Trust Agreement without any further consent of the
Certificateholders.  Nothing in this Section, however, shall alter or modify in any way, the
fiduciary obligations of the Owner Trustee to the Certificateholders pursuant to this Trust
Agreement, or create any fiduciary obligation of the Owner Trustee to the Credit Enhancer.
The Credit Enhancer is an express third-party beneficiary to this Agreement.

(b)      From and after the date on which the Notes are no longer outstanding under the
Indenture and no amounts are owed to the Credit Enhancer pursuant to the terms of the
Insurance Agreement, including but not limited to, amounts owed to the Credit Enhancer in
respect of draws made on the Credit Enhancement Instrument and for unpaid premiums, the
Credit Enhancer shall have no rights or benefits hereunder and all references to the Credit
Enhancer in this Trust Agreement shall be disregarded.

ARTICLE XI

Compliance with Regulation AB

Section 11.01.   Intent of the Parties; Reasonableness.  The Depositor and the Owner Trustee
acknowledge and agree that the purpose of this Article XI is to facilitate compliance by the
Depositor with the provisions of Regulation AB and related rules and regulations of the

Commission. The Depositor shall not exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission under the Securities Act and the Exchange Act. The Owner Trustee acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the mortgage-backed securities markets, advice of counsel, or otherwise, and agrees to comply with reasonable requests made by the Depositor in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. The Owner Trustee shall cooperate in good faith with any reasonable request by the Depositor for information regarding the Owner Trustee that is necessary or required, in the reasonable good faith determination of the Depositor, to permit the Depositor to comply with the provisions of Regulation AB.

Section 11.02.   Additional Representations and Warranties of the Owner Trustee.

(a)      The Owner Trustee shall be deemed to represent and warrant to the Depositor as of the date hereof and on each date on which information is provided to the Depositor under Sections 11.01, 11.02(b) or 11.03 that, except as disclosed in writing to the Depositor prior to such date:  (i) it is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other Securitization Transaction due to any default of the Owner Trustee; (ii) there are no material aspects of its financial condition that could have a material adverse effect on the performance by it of its trustee obligations under this Trust Agreement or any other Securitization Transaction as to which it is the trustee; (iii) there are no material legal or governmental proceedings pending (or known to be contemplated) against it that would be material to Noteholders; (iv) there are no relationships or transactions (as described in Item 1119(b) of Regulation AB) relating to the Owner Trustee with respect to the Depositor or any sponsor, issuing entity, servicer, trustee, originator, significant obligor, enhancement or support provider or other material transaction party (as each of such terms are used in Regulation AB) relating to the Securitization Transaction contemplated by this Trust Agreement, as identified by the Depositor to the Owner Trustee in writing as of the Closing Date (each, a "Transaction Party") that are outside the ordinary course of business or on terms other than would be obtained in an arm's length transaction with an unrelated third party, apart from the Securitization Transaction, and that are material to the investors' understanding of the Notes; and (v) the Owner Trustee is not an affiliate (as contemplated by Item 1119(a) of Regulation AB) of any Transaction Party. The Depositor shall notify the Owner Trustee of any change in the identity of a Transaction Party after the Closing Date at least five (5) Business Days prior to January 31 of each calendar year.

(b)      If so requested by the Depositor on any date following the Closing Date, the Owner Trustee shall, within five (5) Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such confirmation, provide the pertinent facts, in writing, to the Depositor. Any such request from the Depositor shall not be given more than once each calendar quarter, unless the Depositor shall have a reasonable basis for questioning the accuracy of any of the representations and warranties.

Section 11.03.   Information to Be Provided by the Owner Trustee.

(a)      For so long as the Notes are outstanding, for the purpose of satisfying the Depositor's reporting obligation under the Exchange Act with respect to any class of Notes, the Owner Trustee shall provide to the Depositor a written description of (i) the commencement of, a material development in or, if applicable, the termination of, any and all legal proceedings against the Owner Trustee or any and all proceedings of which any property of the Owner Trustee is the subject, that would be material to Noteholders; and (ii) any such proceedings known to be contemplated by governmental authorities that would be material to Noteholders. The Owner Trustee shall also notify the Depositor, in writing, as promptly as practicable following notice to or discovery by a Responsible Officer of the Owner Trustee of any material changes to proceedings described in the preceding sentence. In addition, the Owner Trustee will furnish to the Depositor, in writing, the necessary disclosure regarding the Owner Trustee describing such proceedings required to be disclosed under Item 1117 of Regulation AB, for inclusion in reports filed by or on behalf of the Depositor pursuant to the Exchange Act. The Depositor will allow the Owner Trustee to review any disclosure relating to material litigation against the Owner Trustee prior to

filing such disclosure with the Commission or to the extent the Depositor changes the information provided by the Owner Trustee.  Any descriptions required with respect to legal proceedings, as well as updates to previously provided descriptions, under this Section 11.03(a) shall be given no later than five (5) Business Days prior to the Determination Date following the month in which the relevant event occurs.

(b)      For so long as the Notes are outstanding, for the purpose of satisfying the Depositor's reporting obligation under the Exchange Act with respect to any class of Notes, the Owner Trustee shall, no later than January 31 of each calendar year,  (i) provide to the Depositor such information regarding the Owner Trustee as is required for the purpose of compliance with Item 1119 of Regulation AB; provided, however, the Owner Trustee shall not be required to provide such information in the event that there has been no change to the information previously provided by the Owner Trustee to the Depositor; and (ii) as promptly as practicable following notice to or discovery by a Responsible Officer of the Owner Trustee of any changes to such information, provide to the Depositor, in writing, such updated information.  Such information shall include, at a minimum, a description of any affiliation between the Owner Trustee and any of the following parties to the Securitization Transaction contemplated by this Trust Agreement, as such parties and their affiliates are identified to the Owner Trustee by the Depositor in connection with the closing of each Securitization Transaction or, if there has been a change in any such party, as such party is identified by the Depositor in a written notice to the Owner Trustee at least five (5) Business Days prior to January 31 of each calendar year:

(i)      the sponsor;

(ii)     any depositor;

(iii)    the issuing entity;

(iv)     any servicer;

(v)      any other trustee;

(vi)     any originator;

(vii)    any significant obligor;

(viii)   any enhancement or support provider; and

(ix)     any other material party related to any Securitization Transaction.

      In addition, the Owner Trustee shall provide a description of whether there is, and if so the general character of, any business relationship, agreement, arrangement, transaction or understanding between the Owner Trustee and any above-listed party that is entered into outside the ordinary course of business or is on terms other than would be obtained in an arm's length transaction with an unrelated third party, apart from the Securitization Transaction contemplated by this Trust Agreement, that currently exists or that existed during the past two years and that is material to an investor's understanding of the Notes.

(c)      As of the related Payment Date with respect to each Report on Form 10-D with respect to the Notes filed by or on behalf of the Depositor, and as of March 15 preceding the date each Report on Form 10-K with respect to the Notes is filed, the Owner Trustee shall be deemed to represent and warrant that any information previously provided by the Owner Trustee under this Article XI is materially correct and does not have any material omissions unless the Owner Trustee has provided an update to such information.

Section 11.04.    Indemnification; Remedies.

(a)      The Owner Trustee shall indemnify the Depositor, each affiliate of the Depositor, the Master Servicer and each affiliate of the Master Servicer, and the respective present and former directors, officers, employees and agents of each of the foregoing, and shall hold each of them harmless from and against any claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs and expenses (including reasonable fees and expenses of attorneys or, as necessary, consultants and auditors and

reasonable costs of investigations) that any of them may sustain arising out of or based upon:

(i)     (A) any untrue statement of a material fact contained or alleged to be contained in any information, report, certification or other material provided under this Article XI by or on behalf of the Owner Trustee (collectively, the "Owner Trustee Information"), or (B) the omission or alleged omission to state in the Owner Trustee Information a material fact required to be stated in the Owner Trustee Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

(ii)    any failure by the Owner Trustee to deliver any information, report, certification or other material when and as required under this Article XI.

(b)     In the case of any failure of performance described in clause (ii) of Section 11.04(a), the Owner Trustee shall (i) promptly reimburse the Depositor for all costs reasonably incurred by the Depositor in order to obtain the information, report, certification or other material not delivered by the Owner Trustee as required and (ii) cooperate with the Depositor to mitigate any damages that may result from such failure.

(c)     The Depositor and the Master Servicer shall indemnify the Owner Trustee, each affiliate of the Owner Trustee and the respective present and former directors, officers, employees and agents of the Owner Trustee, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon (i) any untrue statement of a material fact contained or alleged to be contained in any information provided under this Trust Agreement by or on behalf of the Depositor or the Master Servicer for inclusion in any report filed with Commission under the Exchange Act (collectively, the "RFC Information"), or (ii) the omission or alleged omission to state in the RFC Information a material fact required to be stated in the RFC Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(d)     Notwithstanding any provision in this Section 11.04 to the contrary, the parties agree that none of the Owner Trustee, the Depositor or the Master Servicer shall be liable to the other for any consequential or punitive damages whatsoever, whether in contract, tort (including negligence and strict liability), or any other legal or equitable principle; provided, however, that such limitation shall not be applicable with respect to third party claims made against a party.

---

        IN WITNESS WHEREOF, the Depositor and the Owner Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

                                RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.


                                By:/s/ Christopher Martinez
                                Name:  Christopher Martinez
                                Title:   Vice President


                                WILMINGTON TRUST COMPANY, not in its individual
                                capacity but solely as Owner Trustee, except with
                                respect to the representations and warranties
                                contained in Sections 6.03 and 11.02 hereof,

By:/s/ Michele C. Harra
Name: Michele C. Harra
Title:   Financial Services Officer

Acknowledged and Agreed:
JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
as Indenture Trustee, Certificate Registrar
and Certificate Paying Agent


By:    /s/ Joanne M. Murray
Name: Joanne M. Murray
Title: Assistant Vice President



Acknowledged and Agreed
solely with respect to Article XI:
RESIDENTIAL FUNDING CORPORATION


By:/s/ Tim Jacobson
Name: Tim Jacobson
Title:    Associate

---

EXHIBIT A

FORM OF HOME LOAN BACKED CERTIFICATE

THIS CERTIFICATE (THE "CERTIFICATE") IS SUBORDINATED IN RIGHT OF PAYMENT TO THE NOTES AS DESCRIBED IN THE AGREEMENT (AS DEFINED HEREIN).

THIS CERTIFICATE IS NOT TRANSFERABLE EXCEPT UPON SATISFACTION OF THE CONDITIONS IN SECTION 3.05 OF THE AGREEMENT.

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 3.05 OF THE AMENDED AND RESTATED TRUST AGREEMENT ("THE AGREEMENT").

NO TRANSFER OF THIS CERTIFICATE (OR ANY INTEREST HEREIN) MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES THE COMPANY, THE OWNER TRUSTEE, THE CERTIFICATE REGISTRAR AND THE MASTER SERVICER WITH EITHER (A) A CERTIFICATION IN THE FORM OF EXHIBIT G TO THE AGREEMENT OR (B) AN OPINION OF COUNSEL ACCEPTABLE TO AND IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY, THE OWNER TRUSTEE, THE CERTIFICATE REGISTRAR AND THE MASTER SERVICER TO THE EFFECT THAT THE PURCHASE AND HOLDING OF THIS CERTIFICATE IS PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") (OR COMPARABLE PROVISIONS OF ANY SUBSEQUENT ENACTMENTS) AND WILL NOT SUBJECT THE COMPANY, THE OWNER TRUSTEE, THE CERTIFICATE REGISTRAR OR THE MASTER SERVICER TO ANY OBLIGATION OR LIABILITY (INCLUDING OBLIGATIONS AND LIABILITIES UNDER ERISA OR SECTION 4975 OF THE CODE) IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT, WHICH OPINION OF COUNSEL SHALL NOT BE AN EXPENSE OF THE COMPANY, THE OWNER TRUSTEE, THE CERTIFICATE REGISTRAR OR THE MASTER SERVICER.

THIS CERTIFICATE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE SELLER, THE
COMPANY, THE MASTER SERVICER, THE INDENTURE TRUSTEE, OR THE OWNER TRUSTEE OR ANY OF THEIR
RESPECTIVE AFFILIATES, EXCEPT AS EXPRESSLY PROVIDED IN THE AGREEMENT OR THE BASIC DOCUMENTS.

Certificate No. _____

Cut-off Date:
July 1, 2006

Date of Amended and
Restated Trust Agreement:
July 21, 2006

First Payment Date:
August 25, 2006

Assumed Final Payment Date:
February 25, 2036

Certificate Percentage Interest of
this Certificate: 100%

HOME LOAN-BACKED CERTIFICATE
SERIES 2006-HI3

Evidencing a 100% interest in the Trust Estate, the property of which consists
primarily of the Home Loans, created by RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.
(hereinafter called the "Company," which term includes any successor entity under the
Agreement referred to below).

This Certificate is payable solely from the assets of the Trust Estate, and does not
represent an obligation of or interest in the Company, the Seller, the Master Servicer, the
Indenture Trustee, the Owner Trustee or any of their affiliates.  This Certificate, is not
guaranteed or insured by any governmental agency or instrumentality or by the Company, the
Seller, the Master Servicer, the Indenture Trustee, the Owner Trustee or any of their
affiliates.  None of the Company, the Seller, the Master Servicer, the Indenture Trustee,
the Owner Trustee or any of their affiliates will have any obligation with respect to any
certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that [name of Holder] is the registered owner of the Certificate
Percentage Interest evidenced by this Certificate (as set forth on the face hereof) in
certain distributions with respect to the Trust Estate, consisting primarily of the Home
Loans, created by Residential Funding Mortgage Securities II, Inc.  The Trust (as defined
herein) was created pursuant to a Trust Agreement, dated as of July 11, 2006 and an Amended
and Restated Trust Agreement, dated as specified above (as amended and supplemented from
time to time, the "Agreement") between the Company and Wilmington Trust Company, as owner
trustee (the "Owner Trustee," which term includes any successor entity under the Agreement),
a summary of certain of the pertinent provisions of which is set forth hereafter.  To the
extent not defined herein, the capitalized terms used herein have the meanings assigned in
the Agreement.  This Certificate is issued under and is subject to the terms, provisions and
conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of
the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day
of each month or, if such 25th day is not a Business Day, the Business Day immediately
following (the "Payment Date"), commencing on the first Payment Date specified above, to the
Person in whose name this Certificate is registered at the close of business on the last day
(or if such last day is not a Business Day, the Business Day immediately preceding such last
day) of the month immediately preceding the month of such distribution (the "Record Date"),
in an amount equal to the pro rata portion evidenced by this Certificate (based on the
Certificate Percentage Interest stated on the face hereon) of the Certificate Distribution

Amount, if any, required to be distributed to Holder of Certificate on such Payment Date. Distributions on this Certificate will be made as provided in the Agreement by the Certificate Paying Agent by wire transfer or check mailed to the Certificateholder of record in the Certificate Register without the presentation or surrender of this Certificate or the making of any notation hereon.

Except as otherwise provided in the Agreement and notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Certificate Paying Agent of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency maintained by the Certificate Registrar for that purpose in the City and State of New York.

No transfer of this Certificate will be made unless such transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws or is made in accordance with said Act and laws. In the event that such a transfer is to be made, the Certificate Registrar or the Company shall require either (i) an opinion of counsel acceptable to and in form and substance satisfactory to the Certificate Registrar and the Company that such transfer is exempt (describing the applicable exemption and the basis therefor) from or is being made pursuant to the registration requirements of the Securities Act of 1933, as amended, and of any applicable statute of any state or (ii) an investment letter executed by the Transferee in the form described in the Agreement and which investment letter or Opinion of Counsel shall not be at the expense of the Trust, the Owner Trustee, the Company, the Master Servicer, the Indenture Trustee, the Certificate Registrar or the Company. The Holder hereof desiring to effect such transfer shall, and does hereby agree to, indemnify the Trust, the Owner Trustee, the Company, the Master Servicer, the Indenture Trustee and the Certificate Registrar against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

As described above, no transfer of this Certificate (or any interest herein) shall be made unless the transferee provides the Company, the Owner Trustee, the Certificate Registrar and the Master Servicer with either (a) a certification in the form of Exhibit G to the Agreement stating that the transferee is not an employee benefit plan or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (each, a "Plan"), or any Person (including, without limitation, an insurance company investing its general accounts, an investment manager, a named fiduciary or a trustee of any Plan) who is using "plan assets," within the meaning of the U.S. Department of Labor regulation promulgated at 29 C.F.R. Section 2510.3-101, of any Plan (each, a "Plan Investor") to effect such acquisition, or (b) an opinion of counsel acceptable to and in form and substance satisfactory to the Company, the Owner Trustee, the Certificate Registrar and the Master Servicer to the effect that the purchase and holding of this Certificate is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Company, the Owner Trustee, the Certificate Registrar and the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Agreement, which opinion of counsel shall not be an expense of the Company, the Owner Trustee, the Certificate Registrar or the Master Servicer.

In addition, no transfer of a Certificate shall be permitted, and no such transfer shall be registered by the Certificate Registrar or be effective hereunder, unless evidenced by an Opinion of Counsel which establishes that such transfer or the registration of such transfer would not cause the Trust to be classified as a publicly traded partnership, an association taxable as a corporation, a corporation or a taxable mortgage pool for federal and relevant state income tax purposes, which Opinion of Counsel shall not be an expense of the Certificate Registrar and shall be an expense of the proposed transferee. No Opinion of Counsel will be required if such transfer is made to a nominee of an existing beneficial holder of a Certificate.

This Certificate is issued pursuant to a duly authorized issue of Certificate designated as Home Loan-Backed Certificate of the Series specified hereon. All terms used in this Certificate which are defined in the Agreement shall have the meanings assigned to them in the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the funds on deposit in the Certificate Distribution Account that have been

released from the Lien of the Indenture for payment hereunder and that neither the Owner Trustee in its individual capacity nor the Company is personally liable to the Certificateholder for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

The Holder of this Certificate acknowledges and agrees that its rights to receive distributions in respect of this Certificate are subordinated to the rights of the Noteholders as described in the Indenture, dated as of July 21, 2006 between Home Loan Trust 2006-HI3 (the "Trust") and JPMorgan Chase Bank, National Association, as Indenture Trustee (the "Indenture").

The Certificateholder, by its acceptance of this Certificate, covenants and agrees that such Certificateholder will not at any time institute against the Company, or join in any institution against the Company or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Certificate, the Notes, the Agreement or any of the Basic Documents.

The Agreement permits the amendment thereof as specified below, provided that any amendment be accompanied by the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing) and an Opinion of Counsel to the Owner Trustee to the effect that such amendment complies with the provisions of the Agreement and will not cause the Trust to be subject to an entity level tax.  If the purpose of the amendment is to correct any mistake, eliminate any inconsistency, cure any ambiguity or deal with any matter not covered, it shall not be necessary to obtain the consent of any Holder, but the Owner Trustee shall be furnished with a letter from the Rating Agencies that the amendment will not result in the downgrading or withdrawal of the rating then assigned to any Security if determined without regard to the Credit Enhancement Instrument and the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing) shall be obtained.  If the purpose of the amendment is to prevent the imposition of any federal or state taxes at any time that any Security is outstanding, it shall not be necessary to obtain the consent of the Holder, but the Owner Trustee shall be furnished with an Opinion of Counsel that such amendment is necessary or helpful to prevent the imposition of such taxes and is not materially adverse to the Holder and the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing) shall be obtained.  If the purpose of the amendment is to add or eliminate or change any provision of the Agreement, other than as specified in the preceding two sentences, the amendment shall require the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing), an Opinion of counsel to the effect that such action will not adversely affect in any material respect the interests of any Holders and either (a) a letter from the Rating Agencies that the amendment will not result in the downgrading or withdrawal of the rating then assigned to any Security, if determined without regard to the Credit Enhancement Instrument or (b) the consent of the Certificateholder and the Indenture Trustee; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the time of, payments received that are required to be distributed on the Certificate without the consent of the Certificateholder and the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing), or (ii) reduce the aforesaid percentage of the Certificate without the consent of the Holder of the Certificate.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registerable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies of the Certificate Registrar maintained in the City and State of New York, accompanied by a written instrument of transfer in form satisfactory to the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Certificate Percentage Interest will be issued to the designated transferee.  The initial Certificate Registrar appointed under the Agreement is the Indenture Trustee.

The Certificate is issuable only in minimum denominations of a 100% Certificate Percentage Interest.

The Certificate is intended to be a certificated security under Article 8 of the UCC of the State of New York and under the corresponding provisions of the UCC of any other State that may be applicable.

No service charge will be made for any registration of transfer or exchange, but the Owner Trustee or the Certificate Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith.

The Owner Trustee, the Certificate Paying Agent, the Certificate Registrar and any agent of the Owner Trustee, the Certificate Paying Agent, or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Owner Trustee, the Certificate Paying Agent, the Certificate Registrar or any such agent shall be affected by any notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of Delaware.

The obligations created by the Agreement in respect of the Certificate and the Trust created thereby shall terminate upon the earliest of (i) the final distribution of all moneys or other property or proceeds of the Trust Estate in accordance with the terms of the Indenture and the Agreement, (ii) the Payment Date in February 2036 or (iii) the purchase by the Master Servicer of all the Home Loans pursuant to Section 8.08(a) of the Servicing Agreement.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Owner Trustee, or an authenticating agent by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Trust and not in its individual capacity, has caused this Certificate to be duly executed.

HOME LOAN TRUST 2006-HI3

by     WILMINGTON TRUST COMPANY,
       not in its individual capacity but solely
       as Owner Trustee

Dated: _____
                    Authorized Signatory

CERTIFICATE OF AUTHENTICATION

This is the Certificate referred to in the within mentioned Agreement.

WILMINGTON TRUST COMPANY,
not in its individual capacity
but solely as Owner Trustee

By: _____
        Authorized Signatory

or    _____,
        as Authenticating Agent of the Trust

By: _____
        Authorized Signatory

ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY OR
OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____
(Please print or type name and address, including postal zip code, of assignee)

_____
the within Certificate, and all rights thereunder, hereby irrevocably constituting and
appointing

_____
to transfer said Certificate on the books of the Certificate Registrar, with full power of
substitution in the premises.

Dated:

                         _____*/
                         Signature Guaranteed:


                    _____*/




_____

*/ NOTICE:  The signature to this assignment must correspond with the name as it appears
upon the face of the within Certificate in every particular, without alteration, enlargement
or any change whatever.  Such signature must be guaranteed by a member firm of the New York
Stock Exchange or a commercial bank or trust company.

DISTRIBUTION INSTRUCTIONS

        The assignee should include the following for the information of the Certificate
Paying Agent:

        Distribution shall be made by wire transfer in immediately available funds to
_____ for the
account of _____, account number _____, or, if
mailed by check, to _____.

        Applicable statements should be mailed to _____.

                         _____
                         Signature of assignee or agent
                         (for authorization of wire transfer only)

EXHIBIT B

TO THE TRUST AGREEMENT

CERTIFICATE OF TRUST

OF

HOME LOAN TRUST 2006-HI3

THIS Certificate of Trust of HOME LOAN TRUST 2006-HI3 (the "Trust") is being duly executed and filed on behalf of the Trust by the undersigned, as trustee, to form a statutory trust under the Delaware Statutory Trust Act (12 Del.  C.ss. 3801 et seq.) (the "Act").

1.      Name.  The name of the statutory trust formed by this Certificate of Trust is HOME LOAN TRUST 2006-HI3.

2.      Delaware Trustee.  The name and business address of the trustee of the Trust in the State of Delaware are _____, _____, _____, Delaware _____.

3.      Effective Date.  This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Trust in accordance with Section 3811(a)(1) of the Act.

                                        [NAME OF OWNER TRUSTEE],
                                        not in its individual capacity
                                        but solely as Owner Trustee


                                        By: _____
                                        Name:
                                        Title:

EXHIBIT C

[FORM OF RULE 144A INVESTMENT REPRESENTATION]

Description of Rule 144A Securities, including numbers:

                _____
                _____
                _____
                _____


The undersigned seller, as registered holder (the "Seller"), intends to

transfer the Rule 144A Securities described above to the undersigned buyer (the "Buyer").

1.      In connection with such transfer and in accordance with the agreements pursuant to which the Rule 144A Securities were issued, the Seller hereby certifies the following facts: Neither the Seller nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the Securities Act of 1933, as amended (the "1933 Act"), or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, and that the Seller has not offered the Rule 144A Securities to any person other than the Buyer or another "qualified institutional buyer" as defined in Rule 144A under the 1933 Act.

2.      The Buyer warrants and represents to, and covenants with, the Owner Trustee and the Depositor (as defined in the Amended and Restated Trust Agreement (the "Agreement"), dated as of July 21, 2006 between Residential Funding Mortgage Securities II, Inc., as Depositor and Wilmington Trust Company as Owner Trustee pursuant to Section 3.05 of the Agreement and JPMorgan Chase Bank, National Association, as indenture trustee, as follows:

        a.      The Buyer understands that the Rule 144A Securities have not been registered under the 1933 Act or the securities laws of any state.

        b.      The Buyer considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Rule 144A Securities.

        c.      The Buyer has been furnished with all information regarding the Rule 144A Securities that it has requested from the Seller, the Indenture Trustee, the Owner Trustee or the Master Servicer.

        d.      Neither the Buyer nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the 1933 Act or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Rule 144A Securities.

        e.      The Buyer is a "qualified institutional buyer" as that term is defined in Rule144A under the 1933 Act and has completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2.  The Buyer is aware that the sale to it is being made in reliance on Rule 144A.  The Buyer is acquiring the Rule 144A Securities for its own account or the accounts of other qualified institutional buyers, understands that such Rule144A Securities may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the 1933 Act.

        3.      The Buyer represents that:

(i)      either (a) or (b) is satisfied, as marked below:

_____    a.      The Buyer is not an employee benefit plan or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (each, a "Plan"), or any Person (including, without limitation, an insurance company investing its general accounts, an investment manager, a named fiduciary or a trustee of any Plan) who is using "plan assets," within the meaning of the U.S. Department of Labor regulation promulgated at 29 C.F.R. Section 2510.3-101, of any Plan (each, a "Plan Investor") to effect such acquisition; or

_____    b.      The Buyer will provide the Depositor, the Owner Trustee, the Certificate Registrar and the Master Servicer with an opinion of counsel acceptable to and in form and substance satisfactory to the Depositor, the Owner Trustee, the Certificate Registrar and the Master Servicer to the effect that the purchase and holding of this Certificate is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Depositor, the Owner Trustee, the Certificate Registrar and the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Agreement, which opinion of counsel shall not be an expense of the Depositor, the Owner Trustee, the Certificate Registrar or the Master Servicer; and

4.      This document may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same document.

IN WITNESS WHEREOF, each of the parties has executed this document as of the date set forth below.

- ------------------------------------------          ------------------------------------------------
- ------------------------------------------          ------------------------------------------------
Print Name of Seller                                 Print Name of Buyer

By: _____                 By: _____
    Name:                                                Name:
    Title:                                               Title:

Taxpayer Identification:                             Taxpayer Identification:

No. _____                 No. _____
Date: _____                 Date: _____

ANNEX 1 TO
EXHIBIT C

QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers Other Than Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A

Investment Representation to which this Certification is attached:

       1.     As indicated below, the undersigned is the President, Chief  Financial Officer, Senior Vice President or other executive officer of the Buyer.

       2.     In connection with purchases by the Buyer, the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because (i) the Buyer owned and/or invested on a discretionary basis $_____(1) in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A) and (ii) the Buyer satisfies the criteria in the category marked below.

    ____    Corporation, etc.  The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar statutory trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code.

    ____    Bank.  The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

____    State or Local Plan.  The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

____    ERISA Plan.  The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

_____
(1)  Buyer must own and/or invest on a discretionary basis at least $100,000,000 in securities unless Buyer is a dealer, and, in that case, Buyer must own and/or invest on a discretionary basis at least $10,000,000 in securities.

    ____    Investment Adviser.  The Buyer is an investment adviser registered under the Investment Advisers Act of 1940.

    ____    SBIC.  The Buyer is a Small Business Investment Company licensed by the U.S.  Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

    ____    Business Development Company.  The Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

    ____    Trust Fund.  The Buyer is a trust fund whose trustee is a bank or trust company and whose participants are exclusively (a) plans established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees, or (b) employee benefit plans within the meaning of Title I of the Employee Retirement Income Security Act of 1974, but is not a trust fund that includes as participants individual retirement accounts or H.R.  10 plans.

       3.     The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) bank deposit

notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

4.      For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph.  Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the Buyer, but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction.  However, such securities were not included if the Buyer is a majority-owned, consolidated subsidiary of another enterprise and the Buyer is not itself a reporting company under the Securities Exchange Act of 1934.

5.      The Buyer acknowledges that it is familiar with Rule 144A and understands that the seller to it and other parties related to the Rule 144A Securities are relying and will continue to rely on the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

___     ___     Will the Buyer be purchasing the Rule 144A
Yes     No      Securities only for the Buyer's own account?

6.      If the answer to the foregoing question is "no", the Buyer agrees that, in connection with any purchase of securities sold to the Buyer for the account of a third party (including any separate account) in reliance on Rule 144A, the Buyer will only purchase for the account of a third party that at the time is a "qualified institutional buyer" within the meaning of Rule 144A.  In addition, the Buyer agrees that the Buyer will not purchase securities for a third party unless the Buyer has obtained a current representation letter from such third party or taken other appropriate steps contemplated by Rule 144A to conclude that such third party independently meets the definition of "qualified institutional buyer" set forth in Rule 144A.

7.      The Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein.  Until such notice is given, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification as of the date of such purchase.

                              Print Name of Buyer


                          By:  _____
                              Name:
                              Title:


                          Date:  _____


_____

                                                      ANNEX 2 TO
                                                      EXHIBIT C

              QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

              [For Buyers That Are Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A
Investment Representation to which this Certification is attached:

1.    As indicated below, the undersigned is the President, Chief Financial
Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional
buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A")
because Buyer is part of a Family of Investment Companies (as defined below), is such an
officer of the Adviser.

2.    In connection with purchases by Buyer, the Buyer is a "qualified
institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment
company registered under the Investment Company Act of 1940, and (ii) as marked below, the
Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in
securities (other than the excluded securities referred to below) as of the end of the
Buyer's most recent fiscal year.  For purposes of determining the amount of securities owned
by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was
used.

_____    The Buyer owned $_____ in securities (other than the excluded
         securities referred to below) as of the end of the Buyer's most recent fiscal
         year (such amount being calculated in accordance with Rule 144A).

_____    The Buyer is part of a Family of Investment Companies which owned in the
         aggregate $_____ in securities (other than the excluded securities
         referred to below) as of the end of the Buyer's most recent fiscal year (such
         amount being calculated in accordance with Rule 144A).

3.    The term "Family of Investment Companies" as used herein means two or
more registered investment companies (or series thereof) that have the same investment
adviser or investment advisers that are affiliated (by virtue of being majority owned
subsidiaries of the same parent or because one investment adviser is a majority owned
subsidiary of the other).

4.    The term "securities" as used herein does not include (i) securities of
issuers that are affiliated with the Buyer or are part of the Buyer's Family of Investment
Companies, (ii) bank deposit notes and certificates of deposit, (iii) loan participations,
(iv) repurchase agreements, (v) securities owned but subject to a repurchase agreement and
(vi) currency, interest rate and commodity swaps.

5.    The Buyer is familiar with Rule 144A and understands that each of the
parties to which this certification is made are relying and will continue to rely on the
statements made herein because one or more sales to the Buyer will be in reliance on Rule
144A.  In addition, the Buyer will only purchase for the Buyer's own account.

6.    The undersigned will notify each of the parties to which this
certification is made of any changes in the information and conclusions herein.  Until such
notice, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this
certification by the undersigned as of the date of such purchase.


_____
Print Name of Buyer

By:  _____
     Name:
     Title:


IF AN ADVISER:

_____
Print Name of Buyer

Date: _____


---


EXHIBIT D

FORM OF INVESTOR REPRESENTATION LETTER

_____, 20___


Residential Funding Mortgage Securities II, Inc.
Street8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

JPMorgan Chase Bank, National Association
[4 New York Plaza, 6th Floor
New York, New York 10004
Attention: Worldwide Securities Services/Structured Finance Services]

                    Re:    Home Loan-Backed Certificates
                           Series 2006-HI3

Ladies and Gentlemen:

_____ (the "Purchaser") intends to purchase from (the "Seller") a ___% Certificate Percentage Interest of Certificates of Series 2006-HI3 (the "Certificates"), issued pursuant to the Amended and Restated Trust Agreement (the "Trust Agreement"), dated as of July 21, 2006 between Residential Funding Mortgage Securities II, Inc. as depositor (the "Company") and Wilmington Trust Company, as owner trustee (the "Owner Trustee"), as acknowledged and agreed by JPMorgan Chase Bank, National Association, as Certificate Registrar. All terms used herein and not otherwise defined shall have the meanings set forth in the Trust Agreement. The Purchaser hereby certifies, represents and warrants to, and covenants with, the Company and the Certificate Registrar that:

        1.    The Purchaser understands that (a) the Certificates have not been and will not be registered or qualified under the Securities Act of 1933, as amended (the "Act") or any state securities law, (b) the Company is not required to so register or qualify the Certificates, (c) the Certificates may be resold only if registered and qualified pursuant to the provisions of the Act or any state securities law, or if an exemption from such registration and qualification is available, (d) the Trust Agreement contains restrictions regarding the transfer of the Certificates and (e) the Certificates will bear a legend to the foregoing effect.

        2.    The Purchaser is acquiring the Certificates for its own account for investment only and not with a view to or for sale in connection with any distribution thereof in any manner that would violate the Act or any applicable state securities laws.

        3.    The Purchaser is (a) a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters, and, in particular, in such matters related to securities similar to the Certificates, such that it is capable of evaluating the merits and risks of investment in the Certificates, (b) able to bear the economic risks of such an investment and (c) an "accredited investor" within the meaning of Rule 501(a) promulgated pursuant to the Act.

4.     The Purchaser has been furnished with, and has had an opportunity to
review (a) [a copy of the Private Placement Memorandum, dated _____, 20__,
relating to the Certificates (b)] a copy of the Trust Agreement and [b] [c] such
other information concerning the Certificates, the Home Loans and the Company as has
been requested by the Purchaser from the Company or the Seller and is relevant to the
Purchaser's decision to purchase the Certificates.  The Purchaser has had any
questions arising from such review answered by the Company or the Seller to the
satisfaction of the Purchaser.  [If the Purchaser did not purchase the Certificates
from the Seller in connection with the initial distribution of the Certificates and
was provided with a copy of the Private Placement Memorandum (the "Memorandum")
relating to the original sale (the "Original Sale") of the Certificates by the
Company, the Purchaser acknowledges that such Memorandum was provided to it by the
Seller, that the Memorandum was prepared by the Company solely for use in connection
with the Original Sale and the Company did not participate in or facilitate in any
way the purchase of the Certificates by the Purchaser from the Seller, and the
Purchaser agrees that it will look solely to the Seller and not to the Company with
respect to any damage, liability, claim or expense arising out of, resulting from or
in connection with (a) error or omission, or alleged error or omission, contained in
the Memorandum, or (b) any information, development or event arising after the date
of the Memorandum.]


5.     The Purchaser has not and will not nor has it authorized or will it
authorize any person to (a) offer, pledge, sell, dispose of or otherwise transfer any
Certificate, any interest in any Certificate or any other similar security to any
person in any manner, (b) solicit any offer to buy or to accept a pledge, disposition
of other transfer of any Certificate, any interest in any Certificate or any other
similar security from any person in any manner, (c) otherwise approach or negotiate
with respect to any Certificate, any interest in any Certificate or any other similar
security with any person in any manner, (d) make any general solicitation by means of
general advertising or in any other manner or (e) take any other action, that (as to
any of (a) through (e) above) would constitute a distribution of any Certificate
under the Act, that would render the disposition of any Certificate a violation of
Section 5 of the Act or any state securities law, or that would require registration
or qualification pursuant thereto.  The Purchaser will not sell or otherwise transfer
any of the Certificates, except in compliance with the provisions of the Trust
Agreement.


6.     The Purchaser represents:

(i) that either (a) or (b) is satisfied, as marked below:

_____     a.     The Purchaser is not an employee benefit plan or other plan
subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (each,
a "Plan"), or any Person (including, without limitation, an insurance company investing its
general accounts, an investment manager, a named fiduciary or a trustee of any Plan) who is
using "plan assets," within the meaning of the U.S. Department of Labor regulation
promulgated at 29 C.F.R. Section 2510.3-101, of any Plan (each, a "Plan Investor") to effect
such acquisition; or


_____     b.     The Purchaser will provide the Company, the Owner Trustee, the
Certificate Registrar and the Master Servicer with an opinion of counsel acceptable to and
in form and substance satisfactory to the Company, the Owner Trustee, the Certificate
Registrar and the Master Servicer to the effect that the purchase and holding of this
Certificate is permissible under applicable law, will not constitute or result in a
non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or
comparable provisions of any subsequent enactments), and will not subject the Company, the
Owner Trustee, the Certificate Registrar and the Master Servicer to any obligation or
liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in
addition to those undertaken in the Agreement, which opinion of counsel shall not be an
expense of the Company, the Owner Trustee, the Certificate Registrar or the Master Servicer;
and


7.     The Purchaser is acquiring the Certificate for its own behalf and is
not acting as agent or custodian for any other person or entity in connection with
such acquisition;

8.    The Purchaser is not a non-United States person for federal income tax purposes.

                              Very truly yours,


                              _____


                              By:  _____
                              Name:
                              Title:


EXHIBIT E

FORM OF TRANSFEROR REPRESENTATION LETTER

_____, 20__

Residential Funding Mortgage Securities II, Inc.
Street8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota  55437

JPMorgan Chase Bank, National Association
[4 New York Plaza, 6th Floor
New York, New York 10004
Attention: Worldwide Securities Services/Structured Finance Services]

                    Re:    Home Loan-Backed Certificates
                           Series 2006-HI3

Ladies and Gentlemen:

                    _____ (the "Purchaser") intends to purchase from (the "Seller") a ___% Certificate Percentage Interest of Certificates of Series 2006-HI3 (the "Certificates"), issued pursuant to the Amended and Restated Trust Agreement (the "Trust Agreement"), dated as of July 21, 2006 between Residential Funding Mortgage Securities II, Inc. as depositor (the "Company") and Wilmington Trust Company, as owner trustee (the "Owner Trustee"), as acknowledged and agreed by JPMorgan Chase Bank, National Association, as Certificate Registrar.  All terms used herein and not otherwise defined shall have the meanings set forth in the Trust Agreement.  The Seller hereby certifies, represents and warrants to, and covenants with, the Company and the Certificate Registrar that:

                    Neither the Seller nor anyone acting on its behalf has (a) offered, pledged, sold, disposed of or otherwise transferred the Certificate, any interest in the Certificate or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of the Certificate, any interest in the Certificate or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to the Certificate, any interest in the Certificate or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, or (e) has

taken any other action, that (as to any of (a) through (e) above) would constitute a distribution of the Certificates under the Securities Act of 1933 (the "Act"), that would render the disposition of the Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto.  The Seller will not act, in any manner set forth in the foregoing sentence with respect to the Certificate.  The Seller has not and will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Trust Agreement.

                              Very truly yours,


                              _____
                                                (Seller)


                         By: _____
                              Name:
                              Title:


EXHIBIT F

CERTIFICATE OF NON-FOREIGN STATUS

        This Certificate of Non-Foreign Status ("certificate") is delivered pursuant to Section 3.05 of the Amended and Restated Trust Agreement, dated as of July 21, 2006 (the "Trust Agreement"), between Residential Funding Mortgage Securities II, Inc., as depositor and Wilmington Trust Company, as Owner Trustee, in connection with the acquisition of, transfer to or possession by the undersigned, whether as beneficial owner (the "Beneficial Owner"), or nominee on behalf of the Beneficial Owner of the Residential Home Loan-Backed Certificates, Series 2006-HI3 (the "Certificate").  Capitalized terms used but not defined in this certificate have the respective meanings given them in the Trust Agreement.

        Each holder must complete Part I, Part II (if the holder is a nominee), and in all cases sign and otherwise complete Part III.

        In addition, each holder shall submit with the Certificate an IRS Form W-9 relating to such holder.

        To confirm to the Trust that the provisions of Sections 871, 881 or 1446 of the Internal Revenue Code (relating to withholding tax on foreign shareholders and partners) do not apply in respect of the Certificate held by the undersigned, the undersigned hereby certifies:

Part I -                        Complete Either A or B

        A.      Individual as Beneficial Owner

                1.      I am (The Beneficial Owner is) not a non-resident alien for purposes of
                        U.S.  income taxation;

                2.      My (The Beneficial Owner's) name and home address are:


                        _____
                        _____
                        _____; and

                3.      My (The Beneficial Owner's) U.S.  taxpayer
                        identification number (Social Security Number) is _____.

        B.      Corporate, Partnership or Other Entity as Beneficial Owner

1.    (Name of the Beneficial Owner) is not a foreign corporation, foreign
      partnership, foreign trust or foreign estate (as those terms are
      defined in the Code and Treasury Regulations;

2.    The Beneficial Owner's office address and place of incorporation (if
      applicable) is _____; and

3.    The Beneficial Owner's U.S. employer identification
      number is _____.

Part II -          Nominees

     If the undersigned is the nominee for the Beneficial Owner, the undersigned certifies
that this certificate has been made in reliance upon information contained in:

      _____ an IRS Form W-9

      _____ a form such as this or substantially similar

provided to the undersigned by an appropriate person and (i) the undersigned agrees to
notify the Trust at least thirty (30) days prior to the date that the form relied upon
becomes obsolete, and (ii) in connection with change in Beneficial Owners, the undersigned
agrees to submit a new Certificate of Non-Foreign Status to the Trust promptly after such
change.

Part III -          Declaration

     The undersigned, as the Beneficial Owner or a nominee thereof, agrees to notify the
Trust within sixty (60) days of the date that the Beneficial Owner becomes a foreign
person. The undersigned understands that this certificate may be disclosed to the Internal
Revenue Service by the Trust and any false statement contained therein could be punishable
by fines, imprisonment or both.

_____

     Under penalties of perjury, I declare that I have examined this certificate and to
the best of my knowledge and belief it is true, correct and complete and will further
declare that I will inform the Trust of any change in the information provided above, and,
if applicable, I further declare that I have the authority* to sign this document.

_____
Name

_____
Title (if applicable)

_____
Signature and Date


*NOTE: If signed pursuant to a power of attorney, the power of attorney must accompany this
certificate.

_____

EXHIBIT G

FORM OF ERISA REPRESENTATION LETTER

_____, 20__


Residential Funding Mortgage Securities II, Inc.
Street8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota  55437


Wilmington Trust Company
Rodney Square North
1100 StreetNorth Market Street
Wilmington, Delaware  19890


Residential Funding Corporation
Street8400 Normandale Lake Boulevard
Suite 600
Minneapolis, Minnesota  55437


[CERTIFICATE REGISTRAR]

                    Re:    Residential Funding Mortgage Securities II, Inc.
                           Home Loan-Backed Certificates, Series 2006-HI3


Dear Sirs:

_____ (the "Transferee") intends to acquire from
_____ (the "Transferor") a ___% Certificate Percentage Interest of
Residential Mortgage Securities II, Inc.  Home Loan-Backed Certificates, Series 2006-HI3
(the "Certificates"), issued pursuant to an Amended and Restated Trust Agreement (the "Trust
Agreement") dated July 21, 2006 among Residential Funding Mortgage Securities II, Inc., as
depositor (the "Depositor") and Wilmington Trust Company, as trustee (the "Owner Trustee").
Capitalized terms used herein and not otherwise defined shall have the meanings assigned
thereto in the Trust Agreement.

         The Transferee hereby certifies, represents and warrants to, and covenants
with, the Depositor, the Owner Trustee, the Certificate Registrar and the Master Servicer
that:

         (1)    The Transferee is not an employee benefit plan or other plan subject to
the prohibited transaction provisions of ERISA or Section 4975 of the Code (each, a
"Plan"), or any Person (including, without limitation, an insurance company investing
its general accounts, an investment manager, a named fiduciary or a trustee of any
Plan) who is using "plan assets," within the meaning of the U.S. Department of Labor
regulation promulgated at 29 C.F.R. Section 2510.3-101, of any Plan (each, a "Plan
Investor") to effect such acquisition; or

         (2)    The Transferee has provided the Depositor, the Owner Trustee, the
Certificate Registrar and the Master Servicer with an opinion of counsel acceptable
to and in form and substance satisfactory to the Depositor, the Owner Trustee, the
Certificate Registrar and the Master Servicer to the effect that the purchase and
holding of this Certificate is permissible under applicable law, will not constitute
or result in a non-exempt prohibited transaction under Section 406 of ERISA or
Section 4975 of the Code (or comparable provisions of any subsequent enactments), and
will not subject the Depositor, the Owner Trustee, the Certificate Registrar and the
Master Servicer to any obligation or liability (including obligations or liabilities
under ERISA or Section 4975 of the Code) in addition to those undertaken in the
Agreement, which opinion of counsel shall not be an expense of the Depositor, the
Owner Trustee, the Certificate Registrar or the Master Servicer.

         In addition, the Transferee hereby certifies, represents and warrants to, and
covenants with, the Depositor, the Owner Trustee, the Certificate Registrar and the Master
Servicer that the Transferee will not transfer such Certificates to any transferee unless
such transferee meets the requirements set forth in either (1) or (2).

                              Very truly yours,

_____

By:
Name:
Title:

HOME LOAN TRUST 2006-HI3

ISSUER

AND

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

INDENTURE TRUSTEE


INDENTURE

DATED AS OF JULY 21, 2006

_____

HOME LOAN-BACKED NOTES, SERIES 2006-HI3

_____

ARTICLE I        DEFINITIONS.................................................................2

        Section 1.01.    Definitions.......................................................2

        Section 1.02.    Incorporation by Reference of Trust Indenture Act.................2

        Section 1.03.    Rules of Construction.............................................2

ARTICLE II       ORIGINAL ISSUANCE OF NOTES................................................3

        Section 2.01.    Form..............................................................3

        Section 2.02.    Execution, Authentication and Delivery............................3

ARTICLE III      COVENANTS.................................................................4

        Section 3.01.    Collection of Payments with respect to the Home Loans............4

        Section 3.02.    Maintenance of Office or Agency...................................4

        Section 3.03.    Money for Payments To Be Held in Trust; Paying Agent.............4

        Section 3.04.    Existence.........................................................5

        Section 3.05.    Payment of Principal and Interest; Defaulted Interest............6

        Section 3.06.    Protection of Trust Estate........................................8

        Section 3.07.    Opinions as to Trust Estate.......................................8

        Section 3.08.    Performance of Obligations; Servicing Agreement...................9

        Section 3.09.    Negative Covenants................................................9

        Section 3.10.    Annual Statement as to Compliance................................10

Section 3.11.      Recording of Assignments.....................................10

Section 3.12.      Representations and Warranties Concerning the Home Loans.........10

Section 3.13.      Assignee of Record of the Home Loans............................10

Section 3.14.      Master Servicer as Agent and Bailee of the Indenture Trustee.....11

Section 3.15.      Investment Company Act..........................................11

Section 3.16.      Issuer May Consolidate, etc.....................................11

Section 3.17.      Successor or Transferee.........................................13

Section 3.18.      No Other Business...............................................13

Section 3.19.      No Borrowing....................................................13

Section 3.20.      Guarantees, Loans, Advances and Other Liabilities...............13

Section 3.21.      Capital Expenditures............................................13

Section 3.22.      Owner Trustee Not Liable for the Certificate or Related
                   Documents.......................................................13

Section 3.23.      Restricted Payments.............................................14

Section 3.24.      Notice of Events of Default.....................................14

Section 3.25.      Further Instruments and Acts....................................14

Section 3.26.      Statements to Noteholders.......................................14

Section 3.27.      Payments under the Credit Enhancement Instrument................14

Section 3.28.      Reserved........................................................15

Section 3.29.      Determination of Class A-1 Note Rate............................15

Section 3.30.      Liquidation on Final Insured Payment Date.......................15

Section 3.31.      No Recourse.....................................................15

Section 3.32.      Additional UCC Representations and Warranties....................15

ARTICLE IV        THE NOTES; SATISFACTION AND DISCHARGE OF INDENTURE...............16

Section 4.01.      The Notes.......................................................16

Section 4.02.      Registration of and Limitations on Transfer and Exchange of
                   Notes; Appointment of Certificate Registrar.....................17

Section 4.03.      Mutilated, Destroyed, Lost or Stolen Notes......................18

Section 4.04.      Persons Deemed Owners...........................................18

Section 4.05.      Cancellation....................................................19

Section 4.06.      Book Entry Notes................................................19

Section 4.07.      Notices to Depository...........................................20

Section 4.08.      Definitive Notes................................................20

Section 4.09.      Tax Treatment...................................................20

Section 4.10.    Satisfaction and Discharge of Indenture............................21

Section 4.11.    Application of Trust Money......................................22

Section 4.12.    Subrogation and Cooperation.....................................22

Section 4.13.    Repayment of Monies Held by Paying Agent........................23

Section 4.14.    Temporary Notes.................................................23

ARTICLE V        DEFAULT AND REMEDIES...........................................23

Section 5.01.    Events of Default...............................................23

Section 5.02.    Acceleration of Maturity; Rescission and Annulment..............23

Section 5.03.    Collection of Indebtedness and Suits for Enforcement by
                 Indenture Trustee...............................................24

Section 5.04.    Remedies; Priorities............................................26

Section 5.05.    Optional Preservation of the Trust Estate.......................28

Section 5.06.    Limitation of Suits.............................................28

Section 5.07.    Rights of Noteholders to Receive Principal and Interest.........29

Section 5.08.    Restoration of Rights and Remedies..............................29

Section 5.09.    Rights and Remedies Cumulative..................................29

Section 5.10.    Delay or Omission Not a Waiver..................................30

Section 5.11.    Control by the Credit Enhancer or the Noteholders...............30

Section 5.12.    Waiver of Past Defaults.........................................30

Section 5.13.    Undertaking for Costs...........................................31

Section 5.14.    Waiver of Stay or Extension Laws................................31

Section 5.15.    Sale of Trust Estate............................................31

Section 5.16.    Action on Notes.................................................33

Section 5.17.    Performance and Enforcement of Certain Obligations..............33

ARTICLE VI       THE INDENTURE TRUSTEE..........................................34

Section 6.01.    Duties of Indenture Trustee.....................................34

Section 6.02.    Rights of Indenture Trustee.....................................35

Section 6.03.    Individual Rights of Indenture Trustee..........................35

Section 6.04.    Indenture Trustee's Disclaimer..................................36

Section 6.05.    Notice of Event of Default......................................36

Section 6.06.    Reports by Indenture Trustee to Holders.........................36

Section 6.07.    Compensation and Indemnity......................................36

Section 6.08.    Replacement of Indenture Trustee................................36

Section 6.09.    Successor Indenture Trustee by Merger.............................37

Section 6.10.    Appointment of Co-Indenture Trustee or Separate Indenture
                 Trustee...................................................................37

Section 6.11.    Eligibility; Disqualification....................................39

Section 6.12.    Preferential Collection of Claims Against Issuer.................39

Section 6.13.    Representations and Warranties...................................39

Section 6.14.    Directions to Indenture Trustee..................................40

Section 6.15.    Indenture Trustee May Own Securities.............................40

ARTICLE VII      NOTEHOLDERS' LISTS AND REPORTS....................................41

Section 7.01.    Issuer to Furnish Indenture Trustee Names and Addresses of
                 Noteholders.............................................................41

Section 7.02.    Preservation of Information; Communications to Noteholders.......41

Section 7.03.    Reports by Issuer................................................41

Section 7.04.    Reports by Indenture Trustee.....................................42

Section 7.05.    Exchange Act Reporting...........................................42

ARTICLE VIII     ACCOUNTS, DISBURSEMENTS AND RELEASES..............................42

Section 8.01.    Collection of Money..............................................42

Section 8.02.    Trust Accounts...................................................42

Section 8.03.    Officer's Certificate............................................43

Section 8.04.    Termination Upon Payment to Noteholders..........................43

Section 8.05.    Release of Trust Estate..........................................43

Section 8.06.    Surrender of Notes Upon Final Payment............................44

ARTICLE IX       SUPPLEMENTAL INDENTURES...........................................44

Section 9.01.    Supplemental Indentures Without Consent of Noteholders...........44

Section 9.02.    Supplemental Indentures With Consent of Noteholders..............46

Section 9.03.    Execution of Supplemental Indentures.............................47

Section 9.04.    Effect of Supplemental Indenture.................................47

Section 9.05.    Conformity with Trust Indenture Act..............................48

Section 9.06.    Reference in Notes to Supplemental Indentures....................48

ARTICLE X        MISCELLANEOUS.....................................................48

Section 10.01.   Compliance Certificates and Opinions, etc........................48

Section 10.02.   Form of Documents Delivered to Indenture Trustee.................50

Section 10.03.   Acts of Noteholders..............................................50

Section 10.04.   Notices, etc., to Indenture Trustee, Issuer, Credit Enhancer
                 and Rating Agencies.....................................................51

Section 10.05.    Notices to Noteholders, Transfer.............................................52

Section 10.06.    Alternate Payment and Notice Provisions.........................52

Section 10.07.    Conflict with Trust Indenture Act.................................52

Section 10.08.    Effect of Headings.................................................53

Section 10.09.    Successors and Assigns............................................53

Section 10.10.    Separability.......................................................53

Section 10.11.    Benefits of Indenture.............................................53

Section 10.12.    Legal Holidays....................................................53

Section 10.13.    GOVERNING LAW.....................................................53

Section 10.14.    Counterparts......................................................53

Section 10.15.    Recording of Indenture............................................53

Section 10.16.    Issuer Obligation.................................................54

Section 10.17.    No Petition.......................................................54

Section 10.18.    Inspection........................................................54

RECONCILIATION AND TIE BETWEEN TRUST INDENTURE
ACT OF 1939 AND INDENTURE PROVISIONS*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 6.11 |
| (a)(2) | 6.11 |
| (a)(3) | 6.10 |
| (a)(4) | Not Applicable |
| (a)(5) | 6.11 |
| (b) | 6.08, 6.11 |
| (c) | Not Applicable |
| 311(a) | 6.12 |
| (b) | 6.12 |
| (c) | Not Applicable |
| 312(a) | 7.01, 7.02(a) |
| (b) | 7.02(b) |
| (c) | 7.02(c) |
| 313(a) | 7.04 |
| (b) | 7.04 |
| (c) | 7.03(a)(iii), 7.04 |
| (d) | 7.04 |
| 314(a) | 3.10, 7.03(a) |
| (b) | 3.07 |
| (c)(1) | 8.05(c), 10.01(a) |
| (c)(2) | 8.05(c), 10.01(a) |
| (c)(3) | Not Applicable |
| (d)(1) | 8.05(c), 10.01(b) |
| (d)(2) | 8.05(c), 10.01(b) |

(d) (3)............................................    8.05(c), 10.01(b)
(e)................................................    10.01(a)
315 (a)...........................................    6.01(b)
(b)...............................................    6.05
(c)...............................................    6.01(a)
(d)...............................................    6.01(c)
(d) (1)...........................................    6.01(c)
(d) (2)...........................................    6.01(c)
(d) (3)...........................................    6.01(c)
(e)...............................................    5.13
316 (a) (1) (A)...................................    5.11
316 (a) (1) (B)...................................    5.12
316 (a) (2).......................................    Not Applicable
316 (b)...........................................    5.07
317 (a) (1).......................................    5.04
317 (a) (2).......................................    5.03(d)
317 (b)...........................................    3.03(a)
318 (a)...........................................    10.07

*This reconciliation and tie shall not, for any purpose, be deemed to be part of the within indenture.

---

This is the Indenture, dated as of July 21, 2006, between HOME LOAN TRUST 2006-HI3, a Delaware statutory trust, as Issuer (the "Issuer"), and JPMorgan Chase Bank, National Association, as Indenture Trustee (the "Indenture Trustee"),

WITNESSETH THAT:

Each party hereto agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Issuer's Series 2006-HI3 Home Loan-Backed Notes (the "Notes").

GRANTING CLAUSE

The Issuer and the Owner Trustee hereby Grant to the Indenture Trustee at the Closing Date, as trustee for the benefit of the Holders of the Notes, all of the Issuer's and the Owner Trustee's right, title and interest in and to whether now existing or hereafter created (a) the Home Loans, (b) all funds on deposit from time to time in the Payment Account and in all proceeds thereof; (c) all property securing the payment or performance of the Home Loans and all supporting obligations for the Home Loans; and (d) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in respect of, any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, the "Trust Estate" or the "Collateral").

The foregoing Grant is made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Notes, equally and ratably without prejudice, priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

The foregoing Grant shall inure to the benefit of the Credit Enhancer in respect of draws made on the Credit Enhancement Instrument and amounts owing from time to time pursuant to the Insurance Agreement (regardless of whether such amounts relate to the Notes or the

Certificates), and such Grant shall continue in full force and effect for the benefit of the Credit Enhancer until all such amounts owing to it have been repaid in full.

The Indenture Trustee, as trustee on behalf of the Holders of the Notes: (i) acknowledges such Grant, (ii) accepts the trust under this Indenture in accordance with the provisions hereof, (iii) agrees to perform its duties as Indenture Trustee as required herein and (iv) acknowledges receipt of the Credit Enhancement Instrument and shall hold such Credit Enhancement Instrument in accordance with the terms of this Indenture for the benefit of the Holders of the Notes.

ARTICLE I

DEFINITIONS

Section 1.01.    Definitions.  For all purposes of this Indenture, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Definitions attached hereto as Appendix A which is incorporated by reference herein.  All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02.    Incorporation by Reference of Trust Indenture Act.  Whenever this Indenture refers to a provision of the Trust Indenture Act (the "TIA"), the provision is incorporated by reference in and made a part of this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"Commission" means the Securities and Exchange Commission.

"indenture securities" means the Notes.

"indenture security holder" means a Noteholder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Indenture Trustee.

"obligor" on the indenture securities means the Issuer and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule have the meaning assigned to them by such definitions.

Section 1.03.    Rules of Construction.  Unless the context otherwise requires:

(i)      a term has the meaning assigned to it;

(ii)     an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect from time to time;

(iii)    "or" is not exclusive;

(iv)     "including" means including without limitation;

(v)      words in the singular include the plural and words in the plural include the singular; and

(vi)     any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement,

instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

ARTICLE II

ORIGINAL ISSUANCE OF NOTES

Section 2.01.    Form.   The Notes, together with the Indenture Trustee's certificate of authentication, shall be in substantially the form set forth in Exhibit A, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined by the officers executing such Notes, as evidenced by their execution of the Notes.   Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

The Notes shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods (with or without steel engraved borders), all as determined by the Authorized Officers executing such Notes, as evidenced by their execution of such Notes.   The terms of the Notes set forth in Exhibit A are part of the terms of this Indenture.

Section 2.02.    Execution, Authentication and Delivery.   The Notes shall be executed on behalf of the Issuer by any of its Authorized Officers.   The signature of any such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signature of individuals who were at any time Authorized Officers of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of such Notes.

The Indenture Trustee shall upon Issuer Request authenticate and deliver Notes for original issue in an aggregate initial principal amount of $91,411,000 with respect to the Class A-1 Notes, $21,019,000 with respect to the Class A-2 Notes, $45,586,000 with respect to the Class A-3 Notes and $65,142,000 with respect to the Class A-4 Notes.

The Notes shall be dated the date of their authentication.   The Notes shall be issuable as registered Notes.   The Notes shall be issuable in the minimum initial Note Balances of $100,000 and in integral multiples of $1 in excess thereof.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Indenture Trustee by the manual signature of one of its authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

ARTICLE III

Section 3.01.    Collection of Payments with respect to the Home Loans.  The Indenture
Trustee shall establish and maintain with itself the Payment Account in which the Indenture
Trustee shall, subject to the terms of this paragraph, deposit, on the same day as it is
received from the Master Servicer, each remittance received by the Indenture Trustee with
respect to the Home Loans.  The Payment Account shall be a segregated account and an
Eligible Account.  The Indenture Trustee shall make all payments of principal of and
interest on the Notes, subject to Section 3.03, as provided in Section 3.05 herein from
monies on deposit in the Payment Account.

Section 3.02.    Maintenance of Office or Agency.  The Issuer will maintain in the City of
New York, an office or agency where, subject to satisfaction of conditions set
forth herein, Notes may be surrendered for registration of transfer or exchange, and where
notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be
served.  The Issuer hereby initially appoints the Indenture Trustee to serve as its agent
for the foregoing purposes.  If at any time the Issuer shall fail to maintain any such
office or agency or shall fail to furnish the Indenture Trustee with the address thereof,
such surrenders, notices and demands may be made or served at the Corporate Trust Office,
and the Issuer hereby appoints the Indenture Trustee as its agent to receive all such
surrenders, notices and demands.

Section 3.03.    Money for Payments To Be Held in Trust; Paying Agent.  (a) As provided in
Section 3.01, all payments of amounts due and payable with respect to any Notes that are to
be made from amounts withdrawn from the Payment Account pursuant to Section 3.01 shall be
made on behalf of the Issuer by the Indenture Trustee or by the Paying Agent, and no amounts
so withdrawn from the Payment Account for payments of Notes shall be paid over to the Issuer
except as provided in this Section 3.03.  The Issuer will cause each Paying Agent other than
the Indenture Trustee to execute and deliver to the Indenture Trustee an instrument in which
such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee acts
as Paying Agent it hereby so agrees), subject to the provisions of this Section 3.03, that
such Paying Agent will:

(i)    hold all sums held by it for the payment of amounts due with respect to the Notes in
trust for the benefit of the Persons entitled thereto until such sums shall be paid to such
Persons or otherwise disposed of as herein provided and pay such sums to such Persons as
herein provided;

(ii)    give the Indenture Trustee and the Credit Enhancer written notice of any default by
the Issuer of which it has actual knowledge in the making of any payment required to be made
with respect to the Notes;

(iii)    at any time during the continuance of any such default, upon the written request of
the Indenture Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by
such Paying Agent;

(iv)    immediately resign as Paying Agent and forthwith pay to the Indenture Trustee all
sums held by it in trust for the payment of Notes if at any time it ceases to meet the
standards required to be met by a Paying Agent at the time of its appointment;

(v)    comply with all requirements of the Code with respect to the withholding from any
payments made by it on any Notes of any applicable withholding taxes imposed thereon and
with respect to any applicable reporting requirements in connection therewith; and

(vi)    deliver to the Indenture Trustee a copy of the report to Noteholders prepared with
respect to each Payment Date by the Master Servicer pursuant to Section 4.01 of the
Servicing Agreement.

The Issuer may at any time, for the purpose of obtaining the satisfaction and
discharge of this Indenture or for any other purpose, by Issuer Request direct any Paying
Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums
to be held by the Indenture Trustee upon the same trusts as those upon which the sums were
held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture
Trustee, such Paying Agent shall be released from all further liability with respect to such
money.

Subject to applicable laws with respect to escheat of funds, any money held by the Indenture Trustee or any Paying Agent in trust for the payment of any amount due with respect to any Note and remaining unclaimed for one year after such amount has become due and payable shall be discharged from such trust and be paid to the Issuer on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Indenture Trustee or such Paying Agent with respect to such trust money shall thereupon cease; provided, however, that the Indenture Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense and direction of the Issuer cause to be published once, in an Authorized Newspaper, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Issuer.  The Indenture Trustee may also adopt and employ, at the expense and direction of the Issuer, any other reasonable means of notification of such repayment (including, but not limited to, mailing notice of such repayment to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in monies due and payable but not claimed is determinable from the records of the Indenture Trustee or of any Paying Agent, at the last address of record for each such Holder).

Section 3.04.    Existence.  The Issuer will keep in full effect its existence, rights and franchises as a statutory trust under the laws of the State of Delaware (unless it becomes, or any successor Issuer hereunder is or becomes, organized under the laws of any other state or of the United States of America, in which case the Issuer will keep in full effect its existence, rights and franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, the Home Loans and each other instrument or agreement included in the Trust Estate.

Section 3.05.    Payment of Principal and Interest; Defaulted Interest.  (a) On each Payment Date from amounts on deposit in the Payment Account, the Paying Agent shall pay to the Noteholders, the Certificate Paying Agent on behalf of the Certificateholder and to other Persons the amounts to which they are entitled, as set forth in the statements delivered to the Indenture Trustee pursuant to Section 4.01 of the Servicing Agreement, as set forth below in the following order of priority:

(i)      to the Credit Enhancer, the Premium for the Credit Enhancement Instrument, plus any unpaid Premium from any prior Payment Date (with interest thereon as provided in the Insurance Agreement);

(ii)     to the Noteholders, Accrued Note Interest for such Payment Date, on a pro rata basis, based on the amount of Accrued Note Interest for such Payment Date, plus any Accrued Note Interest remaining unpaid from any prior Payment Date, less any Prepayment Interest Shortfalls and Relief Act Shortfalls allocated thereto as provided in Section 3.05(d) below;

(iii)    to the Noteholders as principal on the Notes, the Principal Collection Payment Amount for such Payment Date, in the order described in Section 3.05(f) below, until the Note Balances thereof have been reduced to zero;

(iv)     to the Noteholders as principal on the Notes, the Liquidation Loss Payment Amount for such Payment Date, in the order described in Section 3.05(f) below, until the Note Balances thereof have been reduced to zero;

(v)      to the Credit Enhancer, to reimburse it for prior draws made on the Credit Enhancement Instrument (with interest thereon as provided in the Insurance Agreement);

(vi)     to the Noteholders as principal on the Notes, the Reserve Increase Amount for such Payment Date, in the order described in Section 3.05(f) below, until the Note Balances thereof have been reduced to zero;

(vii)    to the Credit Enhancer, any other amounts owed to the Credit Enhancer pursuant to the Insurance Agreement; and

(viii)    any remaining amount to the Certificate Paying Agent, on behalf of the holders of the Certificates;

provided, however, in the event that on a Payment Date a Credit Enhancer Default shall have occurred and be continuing, (a) no payments will be made to the Credit Enhancer pursuant to clause (v) above until all Insured Payments that are due and required to be paid by the Credit Enhancer on the Notes on such Payment Date or were due and required to be paid by the Credit Enhancer on any prior Payment Date have been paid in full and (b) any amounts payable to the Credit Enhancer pursuant to clause (v) shall instead be paid pursuant to clause (vii). In addition, on the Final Insured Payment Date or other final Payment Date (including the Payment Date following any purchase by the Master Servicer of the Home Loans pursuant to Section 8.08 of the Servicing Agreement), the amount to be paid pursuant to clause (ii) above shall be equal to the aggregate Note Balance of the Notes immediately prior to such Payment Date.

(b)    On each Payment Date, the Certificate Paying Agent shall deposit in the Certificate Distribution Account all amounts it received pursuant to this Section 3.05 for the purpose of distributing such funds to the Certificateholder.

(c)    The amounts paid to Noteholders shall be paid to the Notes in accordance with the applicable percentage as set forth in the definition of Note Rate.  Interest will accrue on the Notes (other than the Class A-1 Notes) on the basis of a 360-day year consisting of twelve 30-day months.  Interest will accrue on the Class A-1 Notes on the basis of a 360-day year and the actual number of days in the related Interest Accrual Period.

(d)    To the extent the amount available for interest distributions on the Notes is less than the aggregate amount of Accrued Note Interest on the Notes, a draw on the Credit Enhancement Instrument will be made; provided, however, that to the extent such shortfall is a result of Prepayment Interest Shortfalls or Relief Act Shortfalls, whether related to the current Collection Period or a prior Collection Period, the shortfall will not be covered by the Credit Enhancement Instrument, and the shortfall will be allocated to the amount of Accrued Note Interest on the Notes on a pro rata basis.

(e)    Any installment of interest or principal, if any, payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall, if such Holder holds Notes of an aggregate initial Note Balance of at least $1,000,000, be paid to each Holder of record on the preceding Record Date, by wire transfer to an account specified in writing by such Holder reasonably satisfactory to the Indenture Trustee as of the preceding Record Date or in all other cases or if no such instructions have been delivered to the Indenture Trustee, by check or money order to such Noteholder mailed to such Holder's address as it appears in the Note Register the amount required to be paid to such Holder on such Payment Date pursuant to such Holder's Securities; provided, however, that the Indenture Trustee shall not pay to such Holders any amount required to be withheld from a payment to such Holder by the Code.

(f)    Any payments to the Notes pursuant to clauses 3.05(a)(iii), (iv) and (vi) above plus amounts drawn on the Credit Enhancement Instrument in respect of principal shall be distributed to the Class A-1, Class A-2, Class A-3 and Class A-4 Notes, in that order, in each case until the outstanding Note Balance thereof has been reduced to zero.

(g)    The Note Balance of each Note shall be due and payable in full on the Final Insured Payment Date as provided in the form of Note set forth in Exhibit A.  All principal payments on the Notes shall be made to the Noteholders entitled thereto in accordance with the Percentage Interests represented by such Notes.  Upon written notice to the Indenture Trustee by the Issuer (or by the Master Servicer on behalf of the Issuer, pursuant to Section 8.08(c) of the Servicing Agreement) of the Final Insured Payment Date for the Notes or other final Payment Date, the Indenture Trustee shall notify the related Noteholders of record of the Final Insured Payment Date or other final Payment Date, by mail or facsimile, no later than five Business Days prior to the Final Insured Payment Date or other final Payment Date and shall specify:

(i)    that the Record Date otherwise applicable to such Payment Date is not applicable;

(ii)    that payment of the principal amount and any interest due with respect to such Note at the Final Insured Payment Date or other final Payment Date will be payable only upon presentation and surrender of such Note and shall specify the place where such

Note may be presented and surrendered for such final payment; and

(iii)    the amount of any such final payment, if known.

Section 3.06.    Protection of Trust Estate.  (a) The Issuer will from time to time execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(i)    maintain or preserve the lien and security interest (and the priority thereof) of this Indenture or carry out more effectively the purposes hereof;

(ii)   perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iii)  cause the Trust to enforce any of the Home Loans; and

(iv)   preserve and defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties.

(b)    Except as otherwise provided in this Indenture, the Indenture Trustee shall not remove any portion of the Trust Estate that consists of money or is evidenced by an instrument, certificate or other writing from the jurisdiction in which it was held at the date of the most recent Opinion of Counsel delivered pursuant to Section 3.07 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.07(a), if no Opinion of Counsel has yet been delivered pursuant to Section 3.07(b)) unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.  The Issuer hereby designates the Indenture Trustee its agent and attorney in fact to execute any financing statement, continuation statement or other instrument required to be executed pursuant to this Section 3.06.

Section 3.07.    Opinions as to Trust Estate.  (a)  On the Closing Date, the Issuer shall furnish to the Indenture Trustee and the Owner Trustee an Opinion of Counsel at the expense of the Issuer either stating that, in the opinion of such counsel, such action has been taken with respect to the recording and filing of this Indenture, any indentures supplemental hereto, and any other requisite documents, and with respect to the execution and filing of any financing statements and continuation statements, as are necessary to perfect and make effective the lien and security interest in the Home Loans and reciting the details of such action, or stating that, in the opinion of such counsel, no such action is necessary to make such lien and security interest effective.

(b)    On or before December 31st in each calendar year, beginning in 2006, the Issuer shall furnish to the Indenture Trustee and the Credit Enhancer an Opinion of Counsel at the expense of the Issuer either stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, rerecording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and with respect to the execution and filing of any financing statements and continuation statements as is necessary to maintain the lien and security interest in the Home Loans and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain such lien and security interest.  Such Opinion of Counsel shall also describe the recording, filing, re recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such counsel, be required to maintain the lien and security interest in the Home Loans until December 31 in the following calendar year.

Section 3.08.    Performance of Obligations; Servicing Agreement.  (a) The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the Basic Documents and in the instruments and agreements included in the Trust Estate.

(b)    The Issuer may contract with other Persons to assist it in performing its duties

under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer.

(c)      The Issuer will not take any action or permit any action to be taken by others which would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Home Loans or under any instrument included in the Trust Estate, or which would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any of the documents relating to the Home Loans or any such instrument, except such actions as the Master Servicer is expressly permitted to take in the Servicing Agreement.

(d)      The Issuer may retain an administrator and may enter into contracts with other Persons for the performance of the Issuer's obligations hereunder, and performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer.

Section 3.09.      Negative Covenants.      So long as any Notes are Outstanding, the Issuer shall not:

(i)      except as expressly permitted by this Indenture, sell, transfer, exchange or otherwise dispose of the Trust Estate, unless directed to do so by the Indenture Trustee;

(ii)     claim any credit on, or make any deduction from the principal or interest payable in respect of, the Notes (other than amounts properly withheld from such payments under the Code) or assert any claim against any present or former Noteholder by reason of the payment of the taxes levied or assessed upon any part of the Trust Estate;

(iii)    (A) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof or any interest therein or the proceeds thereof or (B) permit the lien of this Indenture not to constitute a valid first priority security interest in the Trust Estate; or

(iv)     waive or impair, or fail to assert rights under the Home Loans, or impair or cause to be impaired the Home Loans or the Issuer's interest in the Home Loans, the Home Loan Purchase Agreement or in any Basic Document, if any such action would materially and adversely affect the interests of the Noteholders.

Section 3.10.      Annual Statement as to Compliance.      The Issuer will deliver to the Indenture Trustee and the Credit Enhancer, within 120 days after the end of each fiscal year of the Issuer (commencing with the fiscal year 2006), an Officer's Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that:

(i)      a review of the activities of the Issuer during such year and of its performance under this Indenture and the Trust Agreement has been made under such Authorized Officer's supervision; and

(ii)     to the best of such Authorized Officer's knowledge, based on such review, the Issuer has complied with all conditions and covenants under this Indenture and the provisions of the Trust Agreement throughout such year, or, if there has been a default in its compliance with any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

Section 3.11.      Recording of Assignments.      The Issuer shall enforce the obligation of the Seller under the Home Loan Purchase Agreement to submit or cause to be submitted for recording all Assignments of Mortgages within 60 days of receipt of recording information by the Master Servicer.

Section 3.12.      Representations and Warranties Concerning the Home Loans.      The Indenture

Trustee, as pledgee of the Home Loans, has the benefit of the representations and warranties made by the Seller in Section 3.1(a) and Section 3.1(b) of the Home Loan Purchase Agreement concerning the Home Loans and the right to enforce the remedies against the Seller provided in such Section 3.1(a) or Section 3.1(b) to the same extent as though such representations and warranties were made directly to the Indenture Trustee.

Section 3.13.    Assignee of Record of the Home Loans.  The Issuer hereby directs and authorizes the Indenture Trustee to hold record title to the Home Loans by being named as payee in the endorsements of the Mortgage Notes and assignee in the Assignments of Mortgage to be recorded under Section 2.1 of the Home Loan Purchase Agreement.  Except as expressly provided in the Home Loan Purchase Agreement or in the Servicing Agreement with respect to any specific Home Loan, the Indenture Trustee shall not execute any endorsement or assignment or otherwise release or transfer such record title to any of the Home Loans until such time as the remaining Trust Estate may be released pursuant to Section 8.05(b).  The Indenture Trustee's holding of such record title shall in all respects be subject to its fiduciary obligations to the Noteholders hereunder.

Section 3.14.    Master Servicer as Agent and Bailee of the Indenture Trustee.  Solely for purposes of perfection under Section 9-305 of the Uniform Commercial Code or other similar applicable law, rule or regulation of the state in which such property is held by the Master Servicer, the Issuer and the Indenture Trustee hereby acknowledge that the Master Servicer is acting as agent and bailee of the Indenture Trustee in holding amounts on deposit in the Custodial Account pursuant to Section 3.02 of the Servicing Agreement that are allocable to the Home Loans, as well as its agent and bailee in holding any Related Documents released to the Master Servicer pursuant to Section 3.06(c) of the Servicing Agreement, and any other items constituting a part of the Trust Estate which from time to time come into the possession of the Master Servicer.  It is intended that, by the Master Servicer's acceptance of such agency pursuant to Section 3.02 of the Servicing Agreement, the Indenture Trustee, as a pledgee of the Home Loans, will be deemed to have possession of such Related Documents, such monies and such other items for purposes of Section 9-305 of the Uniform Commercial Code of the state in which such property is held by the Master Servicer.

Section 3.15.    Investment Company Act.  The Issuer shall not become an "investment company" or "controlled by" an investment company as such terms are defined in the Investment Company Act of 1940, as amended (or any successor or amendatory statute), and the rules and regulations thereunder (taking into account not only the general definition of the term "investment company" but also any available exceptions to such general definition); provided, however, that the Issuer shall be in compliance with this Section 3.15 if it shall have obtained an order exempting it from regulation as an "investment company" so long as it is in compliance with the conditions imposed in such order.

Section 3.16.    Issuer May Consolidate, etc.  (a) The Issuer shall not consolidate or merge with or into any other Person, unless:

(i)      the Person (if other than the Issuer) formed by or surviving such consolidation or merger shall be a Person organized and existing under the laws of the United States of America or any state or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form reasonably satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and to the Certificate Paying Agent, on behalf of the Certificateholder and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)     immediately after giving effect to such transaction, no Event of Default shall have occurred and be continuing;

(iii)    the Issuer receives consent of the Credit Enhancer (so long as no Credit Enhancer Default exists) and the Rating Agencies shall have notified the Issuer (with a copy to the Indenture Trustee) that such transaction shall not cause the rating of the Notes, without regard to the Credit Enhancement Instrument, to be reduced, suspended or withdrawn or to be considered by either Rating Agency to be below investment grade without taking into account the Credit Enhancement Instrument;

(iv)     the Issuer shall have received an Opinion of Counsel (and shall have delivered copies

thereof to the Indenture Trustee and the Credit Enhancer) to the effect that such transaction will not have any material adverse tax consequence to the Issuer, any Noteholder or any Certificateholder;

(v)      any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(vi)     the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such consolidation or merger and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

(b)      The Issuer shall not convey or transfer any of its properties or assets, including those included in the Trust Estate, to any Person, unless:

(i)      the Person that acquires by conveyance or transfer the properties and assets of the Issuer the conveyance or transfer of which is hereby restricted shall (A) be a United States citizen or a Person organized and existing under the laws of the United States of America or any state, (B) expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein, (C) expressly agree by means of such supplemental indenture that all right, title and interest so conveyed or transferred shall be subject and subordinate to the rights of Holders of the Notes, (D) unless otherwise provided in such supplemental indenture, expressly agree to indemnify, defend and hold harmless the Issuer against and from any loss, liability or expense arising under or related to this Indenture and the Notes and (E) expressly agree by means of such supplemental indenture that such Person (or if a group of Persons, then one specified Person) shall make all filings with the Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes;

(ii)     immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iii)    the Issuer receives consent of the Credit Enhancer (so long as no Credit Enhancer Default exists) and the Rating Agencies shall have notified the Issuer (with a copy to the Indenture Trustee) that such transaction shall not cause the rating of the Notes, without regard to the Credit Enhancement Instrument, to be reduced, suspended or withdrawn;

(iv)     the Issuer shall have received an Opinion of Counsel (and shall have delivered copies thereof to the Indenture Trustee and the Credit Enhancer) to the effect that such transaction will not have any material adverse tax consequence to the Issuer or any Noteholder;

(v)      any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(vi)     the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such conveyance or transfer and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

Section 3.17.    Successor or Transferee. (a) Upon any consolidation or merger of the Issuer in accordance with Section 3.16(a), the Person formed by or surviving such consolidation or merger (if other than the Issuer) shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture with the same effect as if such Person had been named as the Issuer herein.

(b)      Upon a conveyance or transfer of all the assets and properties of the Issuer pursuant to Section 3.16(b), the Issuer will be released from every covenant and agreement of this

Indenture to be observed or performed on the part of the Issuer with respect to the Notes immediately upon the delivery of written notice to the Indenture Trustee of such conveyance or transfer.

Section 3.18.    No Other Business.  The Issuer shall not engage in any business other than financing, purchasing, owning and selling and managing the Home Loans and the issuance of the Notes and the Certificate in the manner contemplated by this Indenture and the Basic Documents and all activities incidental thereto.

Section 3.19.    No Borrowing.  The Issuer shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except for the Notes.

Section 3.20.    Guarantees, Loans, Advances and Other Liabilities.  Except as contemplated by this Indenture or the Basic Documents, the Issuer shall not make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person.

Section 3.21.    Capital Expenditures.  The Issuer shall not make any expenditure (by long term or operating lease or otherwise) for capital assets (either realty or personalty).

Section 3.22.    Owner Trustee Not Liable for the Certificate or Related Documents.  The recitals contained herein shall be taken as the statements of the Depositor, and the Owner Trustee assumes no responsibility for the correctness thereof.  The Owner Trustee makes no representations as to the validity or sufficiency of this Indenture, of any Basic Document or of the Certificate (other than the signatures of the Owner Trustee on the Certificate) or the Notes, or of any Related Documents, or of MERS or the MERS(R)System.  The Owner Trustee shall at no time have any responsibility or liability with respect to the sufficiency of the Trust Estate or its ability to generate the payments to be distributed to the Certificateholder under the Trust Agreement or the Noteholders under this Indenture, including, the compliance by the Depositor or the Seller with any warranty or representation made under any Basic Document or in any related document or the accuracy of any such warranty or representation, or any action of the Certificate Paying Agent, the Certificate Registrar or the Indenture Trustee taken in the name of the Owner Trustee.

Section 3.23.    Restricted Payments.  The Issuer shall not, directly or indirectly, (i) pay any dividend or make any payment (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial interest in the Issuer or otherwise with respect to any ownership or equity interest or security in or of the Issuer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; provided, however, that the Issuer may make, or cause to be made, (x) payments to the Owner Trustee and the Certificateholder as contemplated by, and to the extent funds are available for such purpose under the Trust Agreement, and (y) payments to the Master Servicer pursuant to the terms of the Servicing Agreement.  The Issuer will not, directly or indirectly, make payments to or payments from the Custodial Account except in accordance with this Indenture and the Basic Documents.

Section 3.24.    Notice of Events of Default.  The Issuer shall give the Indenture Trustee, the Credit Enhancer and the Rating Agencies prompt written notice of each Event of Default hereunder and any default under the Trust Agreement.

Section 3.25.    Further Instruments and Acts.  Upon request of the Indenture Trustee, the Issuer will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

Section 3.26.    Statements to Noteholders.  On each Payment Date, the Indenture Trustee and the Certificate Registrar shall forward by mail or make available on its website initially located at "www.jpmorgan.com/sfr" to the Credit Enhancer and each Noteholder and Certificateholder, respectively, the statement delivered to it, on the Business Day following the related Determination Date pursuant to Section 4.01 of the Servicing Agreement.

Section 3.27.    Payments under the Credit Enhancement Instrument.  (a)  On or prior to 12:00 noon New York City time on the second Business Day before any Payment Date, including the Final Insured Payment Date, the Indenture Trustee shall make a draw on the Credit Enhancement Instrument in an amount, if any, equal to the Insured Payment.

(b)    The Indenture Trustee shall submit, if an Insured Payment is specified in any Servicing Certificate prepared by the Master Servicer pursuant to Section 4.01 of the Servicing Agreement, the notice (in the form attached as Exhibit A to the Credit Enhancement Instrument) in the amount of the Insured Payment to the Credit Enhancer no later than 12:00 noon New York City time, on the second Business Day prior to the applicable Payment Date. Upon receipt of such Insured Payment in accordance with the terms of the Credit Enhancement Instrument, the Indenture Trustee shall deposit such Insured Payment in the Payment Account for distribution to Noteholders pursuant to Section 3.05.

Section 3.28.    Reserved.

Section 3.29.    Determination of Class A-1 Note Rate.  On the second LIBOR Business Day immediately preceding (i) the Closing Date in the case of the first Interest Accrual Period and (ii) the first day of each succeeding Interest Accrual Period, the Indenture Trustee shall determine LIBOR and the Note Rate for the Class A-1 Notes for such Interest Accrual Period and shall inform the Issuer, the Master Servicer, the Credit Enhancer and the Depositor at their respective facsimile numbers given to the Indenture Trustee in writing. All determinations of LIBOR by the Indenture Trustee shall, in the absence of manifest error, be conclusive for all purposes, and each holder of a Class A-1 Note, by accepting its Class A-1 Note, agrees to be bound by such determination.

Section 3.30.    Liquidation on Final Insured Payment Date.  On the Final Insured Payment Date, if the Notes are not paid in full on or prior to the Final Insured Payment Date, the Indenture Trustee shall take full account of the assets and liabilities of the Trust, shall liquidate the assets, in a commercially reasonable manner and on commercially reasonable terms, as promptly as is consistent with obtaining the fair value thereof and in accordance with Section 5.15, and shall apply and distribute the proceeds therefrom in the order of priority described in Section 3.05(c).

Section 3.31.    No Recourse.  Upon the occurrence of an Event of Default under the Notes, this Indenture or the other Basic Documents, Holders of the Notes shall have recourse only to the Collateral and all proceeds thereof, as and to the extent provided herein, and no recourse shall be had by such Holders against the Issuer or its other assets or properties.

Section 3.32.    Additional UCC Representations and Warranties.  The Issuer hereby represents and warrants that:

(i)      this Agreement creates a valid and continuing security interest (as defined in the applicable UCC) in the Trust Estate in favor of the Indenture Trustee on behalf of the Holders of the Notes, which security interest is prior to all other liens, and is enforceable as such as against creditors of the Issuer.

(ii)     the Issuer owns and has good and marketable title to the Trust Estate free and clear of any lien, claim or encumbrance of any Person.

(iii)    the Issuer will cause the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law within 10 days of the Closing Date in order to perfect the security interest in the Trust Estate granted to the Indenture Trustee on behalf of the Holders of the Notes.

(iv)     other than the security interest granted to the Indenture Trustee on behalf of the Holders of the Notes pursuant to the Basic Documents, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Trust Estate. The Issuer is not aware of any judgment or tax lien filings against it.  The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Trust Estate other than any financing statement (i) relating to the security interest granted to Indenture Trustee on behalf of the Holders of the Notes hereunder or (ii) that has been terminated.

The foregoing representations may not be waived and shall survive the issuance of the Notes.

ARTICLE IV

THE NOTES; SATISFACTION AND DISCHARGE OF INDENTURE

Section 4.01.    The Notes.  The Notes shall be registered in the name of a nominee designated by the Depository.  Beneficial Owners will hold interests in the Notes as set forth in Section 4.06 herein.  The minimum initial Note Balances with respect to the Notes shall be $100,000 and integral multiples of $1 in excess thereof.

        The Indenture Trustee may for all purposes (including the making of payments due on the Notes) deal with the Depository as the authorized representative of the Beneficial Owners with respect to the Notes for the purposes of exercising the rights of Holders of Notes hereunder.  Except as provided in the next succeeding paragraph of this Section 4.01, the rights of Beneficial Owners with respect to the Notes shall be limited to those established by law and agreements between such Beneficial Owners and the Depository and Depository Participants.  Except as provided in Section 4.08, Beneficial Owners shall not be entitled to definitive certificates for the Notes as to which they are the Beneficial Owners.  Requests and directions from, and votes of, the Depository as Holder of the Notes shall not be deemed inconsistent if they are made with respect to different Beneficial Owners.  The Indenture Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Noteholders and give notice to the Depository of such record date.  Without the consent of the Issuer and the Indenture Trustee, no Note may be transferred by the Depository except to a successor Depository that agrees to hold such Note for the account of the Beneficial Owners.

        In the event the Depository Trust Company resigns or is removed as Depository, the Indenture Trustee with the approval of the Issuer may appoint a successor Depository.  If no successor Depository has been appointed within 30 days of the effective date of the Depository's resignation or removal, each Beneficial Owner shall be entitled to certificates representing the Notes it beneficially owns in the manner prescribed in Section 4.08.

        The Notes shall, on original issue, be executed on behalf of the Issuer by the Owner Trustee, not in its individual capacity but solely as Owner Trustee, authenticated by the Note Registrar and delivered by the Indenture Trustee to or upon the order of the Issuer.

Section 4.02.    Registration of and Limitations on Transfer and Exchange of Notes; Appointment of Certificate Registrar.  The Issuer shall cause to be kept at the Indenture Trustee's Corporate Trust Office a Note Register in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes as herein set provided.

        Subject to the restrictions and limitations set forth below, upon surrender for registration of transfer of any Note at the Corporate Trust Office, the Issuer shall execute and the Note Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes in authorized initial Note Balances evidencing the same aggregate Percentage Interests.

        Subject to the foregoing, at the option of the Noteholders, Notes may be exchanged for other Notes of like tenor, in authorized initial Note Balances evidencing the same aggregate Percentage Interests upon surrender of the Notes to be exchanged at the Corporate Trust Office of the Note Registrar.  Whenever any Notes are so surrendered for exchange, the Issuer shall execute and the Note Registrar shall authenticate and deliver the Notes which the Noteholder making the exchange is entitled to receive.  Each Note presented or surrendered for registration of transfer or exchange shall (if so required by the Note Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form reasonably satisfactory to the Note Registrar duly executed by, the Holder thereof or

his attorney duly authorized in writing with such signature guaranteed by a commercial bank or trust company located or having a correspondent located in the city of New York.  Notes delivered upon any such transfer or exchange will evidence the same obligations, and will be entitled to the same rights and privileges, as the Notes surrendered.

No service charge shall be imposed for any registration of transfer or exchange of Notes, but the Note Registrar shall require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes.

All Notes surrendered for registration of transfer and exchange shall be cancelled by the Note Registrar and delivered to the Indenture Trustee for subsequent destruction without liability on the part of either.

The Issuer hereby appoints the Indenture Trustee as Certificate Registrar to keep at its Corporate Trust Office a Certificate Register pursuant to Section 3.09 of the Trust Agreement in which, subject to such reasonable regulations as it may prescribe, the Certificate Registrar shall provide for the registration of the Certificate and of transfers and exchanges thereof pursuant to Section 3.05 of the Trust Agreement.  The Indenture Trustee hereby accepts such appointment.

Each purchaser and transferee of a Note, by its acceptance of the Note, shall be deemed to have represented and warranted that either (i) it is not acquiring the Note with the assets of an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to the provisions of Title I of ERISA, a "plan" described in Section 4975(e)(1) of the Code, an entity whose underlying assets include "plan assets" by reason of an employee benefit plan's or other plan's investment in such entity or any other plan that is subject to a law that is similar to Title I of ERISA or Section 4975 of the Code or (ii) the acquisition and holding of the Note will not give rise to a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or any similar applicable law.

Section 4.03.    Mutilated, Destroyed, Lost or Stolen Notes.  If (i) any mutilated Note is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Indenture Trustee such security or indemnity as may be required by it to hold the Issuer and the Indenture Trustee harmless, then, in the absence of notice to the Issuer, the Note Registrar or the Indenture Trustee that such Note has been acquired by a bona fide purchaser, and provided that the requirements of Section 8-405 of the UCC are met, the Issuer shall execute, and upon its request the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note; provided, however, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become or within seven days shall be due and payable, instead of issuing a replacement Note, the Issuer may pay such destroyed, lost or stolen Note when so due or payable without surrender thereof.  If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the proviso to the preceding sentence, a bona fide purchaser of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Issuer and the Indenture Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection therewith.

Upon the issuance of any replacement Note under this Section 4.03, the Issuer may require the payment by the Holder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Indenture Trustee) connected therewith.

Every replacement Note issued pursuant to this Section 4.03 in replacement of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly

issued hereunder.  The provisions of this Section 4.03 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 4.04.    Persons Deemed Owners.  Prior to due presentment for registration of transfer of any Note, the Issuer, the Credit Enhancer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name any Note is registered (as of the day of determination) as the owner of such Note for the purpose of receiving payments of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and none of the Issuer, the Credit Enhancer, the Indenture Trustee or any agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

Section 4.05.    Cancellation.  All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly cancelled by the Indenture Trustee.  The Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly cancelled by the Indenture Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 4.05, except as expressly permitted by this Indenture.  All cancelled Notes may be held or disposed of by the Indenture Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Issuer shall direct by an Issuer Request that they be destroyed or returned to it; provided, however, that such Issuer Request is timely and the Notes have not been previously disposed of by the Indenture Trustee.

Section 4.06.    Book Entry Notes.  Each Class of Notes shall initially be issued as one or more Notes held by the Book Entry Custodian or, if appointed to hold such Notes as provided below, the Depository Trust Company, the initial Depository, and registered in the name of its nominee Cede & Co.  Except as provided below, registration of such Notes may not be transferred by the Indenture Trustee except to another Depository that agrees to hold such Notes for the respective Beneficial Owners.  The Indenture Trustee is hereby initially appointed as the Book Entry Custodian and hereby agrees to act as such in accordance herewith and in accordance with the agreement that it has with the Depository authorizing it to act as such.  The Book Entry Custodian may, and, if it is no longer qualified to act as such, the Book Entry Custodian shall, appoint, by a written instrument delivered to the Depositor, the Master Servicer and, if the Indenture Trustee is not the Book Entry Custodian, the Indenture Trustee, any other transfer agent (including the Depository or any successor Depository) to act as Book Entry Custodian under such conditions as the predecessor Book Entry Custodian and the Depository or any successor Depository may prescribe, provided that the predecessor Book Entry Custodian shall not be relieved of any of its duties or responsibilities by reason of any new appointment, except if the Depository is the successor to the Book Entry Custodian.  If the Indenture Trustee resigns or is removed in accordance with the terms hereof, the successor trustee or, if it so elects, the Depository shall immediately succeed to its predecessor's duties as Book Entry Custodian.  The Depositor shall have the right to inspect, and to obtain copies of, any Notes held as Book Entry Notes by the Book Entry Custodian.  No Beneficial Owner will receive a Definitive Note representing such Beneficial Owner's interest in such Note, except as provided in Section 4.08.  Unless and until definitive, fully registered Notes (the "Definitive Notes") have been issued to Beneficial Owners pursuant to Section 4.08:

(i)     the provisions of this Section 4.06 shall be in full force and effect;

(ii)    the Note Registrar and the Indenture Trustee shall be entitled to deal with the Depository for all purposes of this Indenture (including the payment of principal of and interest on the Notes and the giving of instructions or directions hereunder) as the sole holder of the Notes, and shall have no obligation to the Owners of Notes;

(iii)   to the extent that the provisions of this Section 4.06 conflict with any other provisions of this Indenture, the provisions of this Section 4.06 shall control;

(iv)    the rights of Beneficial Owners shall be exercised only through the Depository and shall be limited to those established by law and agreements between such Owners of Notes and the Depository and/or the Depository Participants.  Unless and until

Definitive Notes are issued pursuant to Section 4.08, the initial Depository will make book-entry transfers among the Depository Participants and receive and transmit payments of principal of and interest on the Notes to such Depository Participants; and

(v)     whenever this Indenture requires or permits actions to be taken based upon instructions or directions of Holders of Notes evidencing a specified percentage of the aggregate Note Balance of the Notes, the Depository shall be deemed to represent such percentage only to the extent that it has received instructions to such effect from Beneficial Owners and/or Depository Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to the Indenture Trustee.

Section 4.07.   Notices to Depository.  Whenever a notice or other communication to the Note Holders is required under this Indenture, unless and until Definitive Notes shall have been issued to Beneficial Owners pursuant to Section 4.08, the Indenture Trustee shall give all such notices and communications specified herein to be given to Holders of the Notes to the Depository, and shall have no obligation to the Beneficial Owners.

Section 4.08.   Definitive Notes.  If (i) the Indenture Trustee determines that the Depository is no longer willing or able to properly discharge its responsibilities with respect to the Notes and the Indenture Trustee is unable to locate a qualified successor, (ii) the Indenture Trustee elects to terminate the book-entry system through the Depository or (iii) after the occurrence of an Event of Default, Owners of Notes representing beneficial interests aggregating at least a majority of the aggregate Note Balance of the Notes advise the Depository in writing that the continuation of a book-entry system through the Depository is no longer in the best interests of the Beneficial Owners, then the Depository shall notify all Beneficial Owners and the Indenture Trustee of the occurrence of any such event and of the availability of Definitive Notes to Beneficial Owners requesting the same.  Upon surrender to the Indenture Trustee of the typewritten Notes representing the Book Entry Notes by the Book Entry Custodian or the Depository, as applicable, accompanied by registration instructions, the Issuer shall execute and the Indenture Trustee shall authenticate the Definitive Notes in accordance with the instructions of the Depository. None of the Issuer, the Note Registrar or the Indenture Trustee shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions.  Upon the issuance of Definitive Notes, the Indenture Trustee shall recognize the Holders of the Definitive Notes as Noteholders.

Section 4.09.   Tax Treatment.  The Issuer has entered into this Indenture, and the Notes will be issued, with the intention that, for federal, state and local income, single business and franchise tax purposes, the Notes will qualify as indebtedness of the Issuer. The Issuer, by entering into this Indenture, and each Noteholder, by its acceptance of its Note (and each Beneficial Owner by its acceptance of an interest in the applicable Book Entry Note), agree to treat the Notes for federal, state and local income, single business and franchise tax purposes as indebtedness of the Issuer.

Section 4.10.   Satisfaction and Discharge of Indenture.  This Indenture shall cease to be of further effect with respect to the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, (iv) Sections 3.03, 3.04, 3.06, 3.09, 3.16, 3.17, 3.18, 3.19 and 3.20, (v) the rights, obligations and immunities of the Indenture Trustee hereunder (including the rights of the Indenture Trustee under Section 6.07 and the obligations of the Indenture Trustee under Section 4.11) and (vi) the rights of Noteholders as beneficiaries hereof with respect to the property so deposited with the Indenture Trustee payable to all or any of them, and the Indenture Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to the Notes, when

(A)     either

(1)     the Notes theretofore authenticated and delivered (other than (i) Notes that have been destroyed, lost or stolen and that have been replaced or paid as provided in Section 4.03 and (ii) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the

Issuer or discharged from such trust, as provided in Section 3.03) have been delivered to the Indenture Trustee for cancellation; or

(2)      the Notes not theretofore delivered to the Indenture Trustee for cancellation

a.       have become due and payable,

b.       will become due and payable at the Final Insured Payment Date within one year, or

c.       have been declared immediately due and payable pursuant to Section 5.02.

and the Issuer, in the case of a. or b. above, has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature prior to the date such amounts are payable), in trust for such purpose, in an amount sufficient to pay and discharge the entire indebtedness on such Notes then outstanding not theretofore delivered to the Indenture Trustee for cancellation when due on the Final Insured Payment Date;

(B)      the Issuer has paid or caused to be paid all other sums payable hereunder and under the Insurance Agreement by the Issuer; and

(C)      the Issuer has delivered to the Indenture Trustee and the Credit Enhancer an Officer's Certificate and an Opinion of Counsel, each meeting the applicable requirements of Section 10.01 and each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with and, if the Opinion of Counsel relates to a deposit made in connection with Section 4.10(A)(2)b. above, such opinion shall further be to the effect that such deposit will not have any material adverse tax consequences to the Issuer, any Noteholders or any Certificateholder.

Section 4.11.      Application of Trust Money.  All monies deposited with the Indenture Trustee pursuant to Section 4.10 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent or Certificate Paying Agent, as the Indenture Trustee may determine, to the Holders of Securities, of all sums due and to become due thereon for principal and interest; but such monies need not be segregated from other funds except to the extent required herein or required by law.

Section 4.12.      Subrogation and Cooperation.  The Issuer and the Indenture Trustee acknowledge that (i) to the extent the Credit Enhancer makes payments under the Credit Enhancement Instrument on account of principal of or interest on the Home Loans, the Credit Enhancer will be fully subrogated to the rights of the Noteholders to receive such principal and interest from the Home Loans, and (ii) the Credit Enhancer shall be paid such principal and interest but only from the sources and in the manner provided herein and in the Insurance Agreement for the payment of such principal and interest.

The Indenture Trustee shall cooperate in all respects with any reasonable request by the Credit Enhancer for action to preserve or enforce the Credit Enhancer's rights or interest under this Indenture or the Insurance Agreement, consistent with this Indenture and without limiting the rights of the Noteholders as otherwise set forth in the Indenture, including, without limitation, upon the occurrence and continuance of a default under the Insurance Agreement, a request to take any one or more of the following actions:

(i)      institute Proceedings for the collection of all amounts then payable on the Notes, or under this Indenture in respect to the Notes and all amounts payable under the Insurance Agreement and to enforce any judgment obtained and collect from the Issuer monies adjudged due;

(ii)     sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or private Sales (as defined in Section 5.15 hereof) called and conducted in any manner permitted by law;

(iii)    file or record all assignments that have not previously been recorded;

(iv)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture; and

(v)     exercise any remedies of a secured party under the Uniform Commercial Code and take any other appropriate action to protect and enforce the rights and remedies of the Credit Enhancer hereunder.

Following the payment in full of the Notes, the Credit Enhancer shall continue to have all rights and privileges provided to it under this Section and in all other provisions of this Indenture, until all amounts owing to the Credit Enhancer have been paid in full.

Section 4.13.    Repayment of Monies Held by Paying Agent.  In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Person other than the Indenture Trustee under the provisions of this Indenture with respect to such Notes shall, upon demand of the Issuer, be paid to the Indenture Trustee to be held and applied according to Section 3.05 and thereupon such Paying Agent shall be released from all further liability with respect to such monies.

Section 4.14.    Temporary Notes.  Pending the preparation of any Definitive Notes, the Issuer may execute and upon its written direction, the Indenture Trustee may authenticate and make available for delivery, temporary Notes that are printed, lithographed, typewritten, photocopied or otherwise produced, in any denomination, substantially of the tenor of the Definitive Notes in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Notes may determine, as evidenced by their execution of such Notes.

If temporary Notes are issued, the Issuer will cause Definitive Notes to be prepared without unreasonable delay.  After the preparation of the Definitive Notes, the temporary Notes shall be exchangeable for Definitive Notes upon surrender of the temporary Notes at the office or agency of the Indenture Trustee, without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Notes, the Issuer shall execute and the Indenture Trustee shall authenticate and make available for delivery, in exchange therefor, Definitive Notes of authorized denominations and of like tenor and aggregate principal amount.  Until so exchanged, such temporary Notes shall in all respects be entitled to the same benefits under this Indenture as Definitive Notes.

ARTICLE V

DEFAULT AND REMEDIES

Section 5.01.    Events of Default.  The Issuer shall deliver to the Indenture Trustee and the Credit Enhancer within five calendar days after learning of the occurrence of any event which with the giving of notice and the lapse of time would become an Event of Default under clause (iii) of the definition of "Event of Default" written notice in the form of an Officer's Certificate of its status and what action the Issuer is taking or proposes to take with respect thereto.

Section 5.02.    Acceleration of Maturity; Rescission and Annulment.  If an Event of Default should occur and be continuing, then and in every such case the Indenture Trustee or the Holders of Notes representing not less than a majority of the aggregate Note Balance of all Notes with the written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) may declare the Notes to be immediately due and payable, by a notice in writing to the Issuer (and to the Indenture Trustee if given by Noteholders), and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

At any time after such declaration of acceleration of maturity with respect to an Event of Default has been made and before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter in this Article V provided, the Holders of Notes representing a majority of the aggregate Note Balance of all Notes, by written notice to the Issuer and the Indenture Trustee with the written consent of the

Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) may in writing waive the related Event of Default and rescind and annul such declaration and its consequences if:

(i)      the Issuer has paid or deposited with the Indenture Trustee a sum sufficient to pay:

>       (A)      all sums due and payable to the Credit Enhancer; and

>       (B)      all payments of principal of and interest on the Notes and all other amounts that would then be due hereunder or upon the Notes if the Event of Default giving rise to such acceleration had not occurred; and

>       (C)      all sums paid or advanced by the Indenture Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel; and

(ii)      all Events of Default, other than the nonpayment of the principal of the Notes that has become due solely by such acceleration, have been cured or waived as provided in Section 5.12.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

Section 5.03.     Collection of Indebtedness and Suits for Enforcement by Indenture Trustee. (a) Subject to Section 3.31, the Issuer covenants that if default in the payment of (i) any interest on any Note when the same becomes due and payable, and such default continues for a period of five days, or (ii) the principal of or any installment of the principal of any Note when the same becomes due and payable, the Issuer shall, upon demand of the Indenture Trustee, pay to it, for the benefit of the Holders of Notes, the whole amount then due and payable on the Notes for principal and interest, with interest upon the overdue principal, and in addition thereto such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel.

(b)      In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, subject to the provisions of Section 10.17 hereof may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor upon the Notes and collect in the manner provided by law out of the property of the Issuer or other obligor upon the Notes, wherever situated, the monies adjudged or decreed to be payable.

(c)      If an Event of Default occurs and is continuing, the Indenture Trustee subject to the provisions of Section 10.17 hereof may, as more particularly provided in Section 5.04, in its discretion, proceed to protect and enforce its rights and the rights of the Noteholders, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law.

(d)      In case there shall be pending, relative to the Issuer or any other obligor upon the Notes or any Person having or claiming an ownership interest in the Trust Estate, Proceedings under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or Person, or in case of any other comparable judicial Proceedings relative to the Issuer or other obligor upon the Notes, or to the creditors or property of the Issuer or such other obligor, the Indenture Trustee, irrespective of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any demand pursuant to the provisions of this Section, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee, except as a result of negligence, willful misconduct or bad faith) and of the Noteholders allowed in such Proceedings;

(ii)    unless prohibited by applicable law and regulations, to vote on behalf of the Holders of Notes in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

(iii)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Noteholders and of the Indenture Trustee on their behalf; and

(iv)    to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee or the Holders of Notes allowed in any judicial proceedings relative to the Issuer, its creditors and its property; and any trustee, receiver, liquidator, custodian or other similar official in any such Proceeding is hereby authorized by each of such Noteholders to make payments to the Indenture Trustee, and, in the event that the Indenture Trustee shall consent to the making of payments directly to such Noteholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee except as a result of negligence, willful misconduct or bad faith.

(e)     Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f)     All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any such action or proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee and their respective agents and attorneys, shall be for the ratable benefit of the Holders of the Notes.

(g)     In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the Indenture Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Noteholder a party to any such Proceedings.

Section 5.04.    Remedies; Priorities.  (a) If an Event of Default shall have occurred and be continuing, the Indenture Trustee subject to the provisions of Section 10.17 hereof may with the written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or shall at the written direction of the Credit Enhancer (so long as no Credit Enhancer Default exists), do one or more of the following (subject to Section 5.05):

(i)     institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the Notes or under this Indenture with respect thereto, whether by declaration or otherwise, and all amounts payable under the Insurance Agreement enforce any judgment obtained, and collect from the Issuer and any other obligor upon such Notes monies adjudged due;

(ii)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Trust Estate;

(iii)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes;

(iv)     sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or private sales called and conducted in any manner permitted by law; provided, however, that the Indenture Trustee may not sell or otherwise liquidate the Trust Estate following an Event of Default, unless (A) the Indenture Trustee obtains the consent of the Credit Enhancer, or if a Credit Enhancer Default has occurred and is continuing, the consent of the Holders of 100% of the aggregate Note Balance of the Notes, (B) the proceeds of such Sale distributable to Holders are sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest and to reimburse the Credit Enhancer for any amounts drawn under the Credit Enhancement Instrument and any other amounts due the Credit Enhancer under the Insurance Agreement or (C) the Indenture Trustee determines that the Home Loans will not continue to provide sufficient funds for the payment of principal of and interest on the Notes as they would have become due if the Notes had not been declared due and payable, and the Indenture Trustee obtains the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), which consent will not be unreasonably withheld;  provided further that the Indenture Trustee shall not sell or otherwise liquidate the Trust Estate if the proceeds of such sale or liquidation will not be sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest and to reimburse the Credit Enhancer for any amounts drawn under the Credit Enhancement Instrument and any other amounts due the Credit Enhancer under the Insurance Agreement unless the Indenture Trustee obtains the consent of the Holders of 66 2/3% of the aggregate Note Balance of the Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists).  In determining such sufficiency or insufficiency with respect to clauses (B) and (C), the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose. Notwithstanding the foregoing, so long as a Servicing Default has not occurred, any Sale of the Trust Estate shall be made subject to the continued servicing of the Home Loans by the Master Servicer as provided in the Servicing Agreement.

(b)      If the Indenture Trustee collects any money or property pursuant to this Article V, it shall pay out the money or property in the following order:

FIRST: to the Indenture Trustee for all amounts due under Section 6.07 herein;

SECOND:  to the Holders of the Notes for amounts due and unpaid on the Notes for interest, according to the order and priority set forth in Section 3.05(a)(ii) from amounts available in the Trust Estate for such Noteholders;

THIRD:  on a pro rata basis, to Holders of the Notes for amounts due and unpaid on the Notes for principal, from amounts available in the Trust Estate for such Noteholders, according to the amounts due and payable on the Notes for principal, until the related Note Balances of the Notes are reduced to zero;

FOURTH:  [reserved];

FIFTH:  to the payment of all amounts due and owing to the Credit Enhancer under the Insurance Agreement;

SIXTH: to the Certificate Paying Agent for amounts due under Article VIII of the Trust Agreement; and

SEVENTH: to the payment of the remainder, if any, to the Issuer or any other person legally entitled thereto.

The Indenture Trustee may fix a record date and payment date for any payment to Noteholders pursuant to this Section 5.04.  At least 15 days before such record date, the

Indenture Trustee shall mail to each Noteholder a notice that states the record date, the payment date and the amount to be paid.

Section 5.05.    Optional Preservation of the Trust Estate.  If the Notes have been declared to be due and payable under Section 5.02 following an Event of Default and such declaration and its consequences have not been rescinded and annulled, the Indenture Trustee may, but need not (but shall at the written direction of the Credit Enhancer, so long as no Credit Enhancer Default exists) elect to take and maintain possession of the Trust Estate.  It is the desire of the parties hereto and the Noteholders that there be at all times sufficient funds for the payment of principal of and interest on the Notes and other obligations of the Issuer including payment to the Credit Enhancer and the Indenture Trustee shall take such desire into account when determining whether or not to take and maintain possession of the Trust Estate.  In determining whether to take and maintain possession of the Trust Estate, the Indenture Trustee may, but need not, obtain (at the expense of the Issuer) and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose.

Section 5.06.    Limitation of Suits.  No Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless and subject to the provisions of Section 10.17 hereof:

(i)      such Holder has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(ii)     the Holders of not less than 25% of the aggregate Note Balance of the Notes have made written request to the Indenture Trustee to institute such Proceeding in respect of such Event of Default in its own name as Indenture Trustee hereunder;

(iii)    such Holder or Holders have offered to the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in complying with such request;

(iv)     the Indenture Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute such Proceedings; and

(v)      no direction inconsistent with such written request has been given to the Indenture Trustee during such 60 day period by the Holders of a majority of the aggregate Note Balance of the Notes or by the Credit Enhancer.

It is understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided.

In the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of Notes, each representing less than a majority of the aggregate Note Balance of the Notes, the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.07.    Rights of Noteholders to Receive Principal and Interest.  Notwithstanding any other provisions in this Indenture, but subject to Section 3.31, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any, on such Note on or after the respective due dates thereof expressed in such Note or in this Indenture and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

Section 5.08.    Restoration of Rights and Remedies.  If the Indenture Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Indenture Trustee or to such Noteholder, then and in every such case the Issuer, the Indenture Trustee and the Noteholders shall, subject to any determination in

such Proceeding, be restored severally and respectively to their respective former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.09.    Rights and Remedies Cumulative.  No right or remedy herein conferred upon or reserved to the Indenture Trustee, the Credit Enhancer or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.10.    Delay or Omission Not a Waiver.  No delay or omission of the Indenture Trustee, the Credit Enhancer or any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article V or by law to the Indenture Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

Section 5.11.    Control by the Credit Enhancer or the Noteholders.  The Holders of a majority of the aggregate Note Balance of Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee; provided that:

(i)     such direction shall not be in conflict with any rule of law or with this Indenture;

(ii)    subject to the express terms of Section 5.04, any direction to the Indenture Trustee to sell or liquidate the Trust Estate shall be by Holders of Notes representing not less than 100% of the aggregate Note Balance of Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists);

(iii)   if the conditions set forth in Section 5.05 have been satisfied and the Indenture Trustee elects to retain the Trust Estate pursuant to such Section, then any direction to the Indenture Trustee by Holders of Notes representing less than 100% of the aggregate Note Balance of Notes to sell or liquidate the Trust Estate shall be of no force and effect; and

(iv)    the Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with such direction.

Notwithstanding the rights of Noteholders set forth in this Section, subject to Section 6.01, the Indenture Trustee need not take any action that it determines might involve it in liability or might materially adversely affect the rights of any Noteholders not consenting to such action unless the Indenture Trustee has received satisfactory indemnity from the Credit Enhancer or the Noteholders.

Section 5.12.    Waiver of Past Defaults.  Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.02, the Holders of Notes of not less than a majority of the aggregate Note Balance of the Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) may waive any past Event of Default and its consequences except an Event of Default (a) with respect to payment of principal of or interest on any of the Notes or (b) in respect of a covenant or provision hereof which cannot be modified or amended without the consent of the Holder of each Note.  In the case of any such waiver, the Issuer, the Indenture Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

Upon any such waiver, any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent

Section 5.13.     Undertaking of Costs.  All parties to this Indenture agree, and each Holder of any Note by such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.13 shall not apply to (a) any suit instituted by the Indenture Trustee, (b) any suit instituted by any Noteholder, or group of Noteholders, in each case holding in the aggregate more than 10% of the aggregate Note Balance of the Notes or (c) any suit instituted by any Noteholder for the enforcement of the payment of principal of or interest on any Note on or after the respective due dates expressed in such Note and in this Indenture.

Section 5.14.     Waiver of Stay or Extension Laws.  The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead or in any manner whatsoever, claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.15.     Sale of Trust Estate.  (a) The power to effect any sale, liquidation or other disposition (a "Sale") of any portion of the Trust Estate pursuant to Section 5.04 is expressly subject to the provisions of Section 5.05 and this Section 5.15.  The power to effect any such Sale shall not be exhausted by any one or more Sales as to any portion of the Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate shall have been sold or all amounts payable on the Notes and under this Indenture and under the Insurance Agreement shall have been paid.  The Indenture Trustee may from time to time postpone any public Sale by public announcement made at the time and place of such Sale.  The Indenture Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale.

(b)     The Indenture Trustee shall not in any private Sale sell the Trust Estate, or any portion thereof, unless:

(1)     the Holders of all Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) consent to, or direct the Indenture Trustee to make, such Sale, or

(2)     the proceeds of such Sale would not be less than the entire amount which would be payable to the Noteholders under the Notes, the Certificateholder under the Certificate and the Credit Enhancer in respect of amounts drawn under the Credit Enhancement Instrument and any other amounts due the Indenture Trustee in connection with expenses incurred by reason of such sale and any other amounts due the Credit Enhancer under the Insurance Agreement, in full payment thereof in accordance with Section 5.02, on the Payment Date next succeeding the date of such Sale, or

(3)     the Indenture Trustee determines, in its sole discretion, that the conditions for retention of the Trust Estate set forth in Section 5.05 cannot be satisfied (in making any such determination, the Indenture Trustee may rely upon an opinion of an Independent investment banking firm obtained and delivered as provided in Section 5.05), and the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Holders representing at least 66-2/3% of the aggregate Note Balance of the Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), consent to such Sale.

The purchase by the Indenture Trustee of all or any portion of the Trust Estate at a private Sale shall not be deemed a Sale or other disposition thereof for purposes of

(c)      Unless the Holders with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) have otherwise consented or directed the Indenture Trustee, at any public Sale of all or any portion of the Trust Estate at which a minimum bid equal to or greater than the amount described in paragraph (2) of subsection (b) of this Section 5.15 has not been established by the Indenture Trustee and no Person bids an amount equal to or greater than such amount, the Indenture Trustee shall bid an amount at least $1.00 more than the highest other bid.

(d)      In connection with a Sale of all or any portion of the Trust Estate:

(1)      any Holder or Holders of Notes may bid for and with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists) purchase the property offered for sale, and upon compliance with the terms of sale may hold, retain and possess and dispose of such property, without further accountability, and may, in paying the purchase money therefor, deliver any Notes or claims for interest therein in lieu of cash up to the amount which shall, upon payment of the net proceeds of such sale, be payable thereon, and such Notes, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after being appropriately stamped to show such partial payment;

(2)      the Indenture Trustee may bid for and acquire the property offered for Sale in connection with any Sale thereof, and, subject to any requirements of, and to the extent permitted by, applicable law in connection therewith, may purchase all or any portion of the Trust Estate in a private sale, and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting the gross Sale price against the sum of (A) the amount which would be distributable to the Holders of the Notes and the Holder of the Certificate and amounts owing to the Credit Enhancer as a result of such Sale in accordance with Section 5.04(b) on the Payment Date next succeeding the date of such Sale and (B) the expenses of the Sale and of any Proceedings in connection therewith which are reimbursable to it, without being required to produce the Notes in order to complete any such Sale or in order for the net Sale price to be credited against such Notes, and any property so acquired by the Indenture Trustee shall be held and dealt with by it in accordance with the provisions of this Indenture;

(3)      the Indenture Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof;

(4)      the Indenture Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof, and to take all action necessary to effect such Sale; and

(5)      no purchaser or transferee at such a Sale shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.16.    Action on Notes.  The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Trust Estate or upon any of the assets of the Issuer.  Any money or property collected by the Indenture Trustee shall be applied in accordance with Section 5.04(b).

Section 5.17.    Performance and Enforcement of Certain Obligations.  (a) Promptly following a written request from the Credit Enhancer or the Indenture Trustee with the written consent of the Credit Enhancer to do so (so long as no Credit Enhancer Default exists), the Issuer, in its capacity as holder of the Home Loans, shall, with the written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), take all such lawful action as the

Indenture Trustee may request to cause the Issuer to compel or secure the performance and observance by the Seller and the Master Servicer, as applicable, of each of their obligations to the Issuer under or in connection with the Home Loan Purchase Agreement and the Servicing Agreement, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Issuer under or in connection with the Home Loan Purchase Agreement and the Servicing Agreement to the extent and in the manner directed by the Indenture Trustee, as pledgee of the Home Loans, including the transmission of notices of default on the part of the Seller or the Master Servicer thereunder and the institution of legal or administrative actions or proceedings to compel or secure performance by the Seller or the Master Servicer of each of their obligations under the Home Loan Purchase Agreement and the Servicing Agreement.

(b)     If an Event of Default has occurred and is continuing, the Indenture Trustee, as pledgee of the Home Loans, subject to the rights of the Credit Enhancer under the Servicing Agreement may, and at the direction (which direction shall be in writing or by telephone (confirmed in writing promptly thereafter)) of the Credit Enhancer (or if a Credit Enhancer Default has occurred and is continuing, Holders of 66-2/3% of the aggregate Note Balance of the Notes) shall, exercise all rights, remedies, powers, privileges and claims of the Issuer against the Seller or the Master Servicer under or in connection with the Home Loan Purchase Agreement and the Servicing Agreement, including the right or power to take any action to compel or secure performance or observance by the Seller or the Master Servicer, as the case may be, of each of their obligations to the Issuer thereunder and to give any consent, request, notice, direction, approval, extension or waiver under the Home Loan Purchase Agreement and the Servicing Agreement, as the case may be, and any right of the Issuer to take such action shall not be suspended.  In connection therewith, as determined by the Indenture Trustee, the Issuer shall take all actions necessary to effect the transfer of the Home Loans to the Indenture Trustee.

ARTICLE VI

THE INDENTURE TRUSTEE

Section 6.01.    Duties of Indenture Trustee.  (a) If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)     Except during the continuance of an Event of Default:

(i)     the Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee; and

(ii)    in the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Indenture; however, the Indenture Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)     The Indenture Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)     this paragraph does not limit the effect of paragraph (b) of this Section 6.01;

(ii)    the Indenture Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Indenture Trustee was negligent in ascertaining the pertinent facts; and

(iii)    the Indenture Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it (A) pursuant to Section 5.11 or (B) from the Credit Enhancer, which it is entitled to give under any of the Basic Documents.

(d)    The Indenture Trustee shall not be liable for interest on any money received by it except as the Indenture Trustee may agree in writing with the Issuer.

(e)    Money held in trust by the Indenture Trustee need not be segregated from other funds except to the extent required by law or the terms of this Indenture or the Trust Agreement.

(f)    No provision of this Indenture shall require the Indenture Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g)    Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Indenture Trustee shall be subject to the provisions of this Section and to the provisions of the TIA.

Section 6.02.    Rights of Indenture Trustee.  (a) The Indenture Trustee may rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Indenture Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Indenture Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel.  The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officer's Certificate or Opinion of Counsel.

(c)    The Indenture Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee, and the Indenture Trustee shall not be responsible for any misconduct or negligence on the part of, or for the supervision of, any such agent, attorney, custodian or nominee appointed with due care by it hereunder.

(d)    The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, however, that the Indenture Trustee's conduct does not constitute willful misconduct, negligence or bad faith.

(e)    The Indenture Trustee may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

Section 6.03.    Individual Rights of Indenture Trustee.  The Indenture Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Indenture Trustee.  Any Note Registrar, co registrar or co paying agent may do the same with like rights.  However, the Indenture Trustee must comply with Sections 6.11 and 6.12.

Section 6.04.    Indenture Trustee's Disclaimer.  The Indenture Trustee shall not be (i) responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, (ii) accountable for the Issuer's use of the proceeds from the Notes or (iii) responsible for any statement of the Issuer in the Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Indenture Trustee's certificate of authentication.

Section 6.05.    Notice of Event of Default.  If an Event of Default occurs and is continuing and if it is known to a Responsible Officer of the Indenture Trustee, the Indenture Trustee shall give notice thereof to the Credit Enhancer.  The Indenture Trustee shall mail to each Noteholder notice of the Event of Default within 90 days after it occurs.  Except in the

case of an Event of Default in payment of principal of or interest on any Note, the Indenture Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of Noteholders.

Section 6.06.    Reports by Indenture Trustee to Holders.  The Indenture Trustee shall deliver to each Noteholder such information as may be required to enable such holder to prepare its federal and state income tax returns.  In addition, upon the Issuer's written request, the Indenture Trustee shall promptly furnish information reasonably requested by the Issuer that is reasonably available to the Indenture Trustee to enable the Issuer to perform its federal and state income tax reporting obligations.

Section 6.07.    Compensation and Indemnity.  The Indenture Trustee shall be compensated and indemnified by the Master Servicer in accordance with Section 6.06 of the Servicing Agreement.  The Indenture Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.

Section 6.08.    Replacement of Indenture Trustee.  No resignation or removal of the Indenture Trustee and no appointment of a successor Indenture Trustee shall become effective until the acceptance of appointment by the successor Indenture Trustee pursuant to this Section 6.08.  The Indenture Trustee may resign at any time by so notifying the Issuer and the Credit Enhancer.  The Holders of a majority of the aggregate Note Balance of the Notes or the Credit Enhancer (so long as no Credit Enhancer Default exists) may remove the Indenture Trustee by so notifying the Indenture Trustee and the Credit Enhancer and may appoint a successor Indenture Trustee.  The Issuer shall remove the Indenture Trustee if:

(i)      the Indenture Trustee fails to comply with Section 6.11;

(ii)     the Indenture Trustee is adjudged a bankrupt or insolvent;

(iii)    a receiver or other public officer takes charge of the Indenture Trustee or its property; or

(iv)     the Indenture Trustee otherwise becomes incapable of acting.

If the Indenture Trustee resigns or is removed or if a vacancy exists in the office of the Indenture Trustee for any reason (the Indenture Trustee in such event being referred to herein as the retiring Indenture Trustee), the Issuer shall promptly appoint a successor Indenture Trustee with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), which consent will not be unreasonably withheld.  In addition, the Indenture Trustee will resign to avoid being directly or indirectly controlled by the Issuer.

A successor Indenture Trustee shall deliver a written acceptance of its appointment to the retiring Indenture Trustee and to the Issuer.  Thereupon, the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture.  The successor Indenture Trustee shall mail a notice of its succession to Noteholders.  The retiring Indenture Trustee shall promptly transfer all property held by it as Indenture Trustee to the successor Indenture Trustee.

If a successor Indenture Trustee does not take office within 60 days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Issuer or the Holders of a majority of the aggregate Note Balance of the Notes may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

If the Indenture Trustee fails to comply with Section 6.11, any Noteholder may petition any court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

Notwithstanding the replacement of the Indenture Trustee pursuant to this Section, the Issuer's obligations under Section 6.07 shall continue for the benefit of the retiring Indenture Trustee.

Section 6.09.    Successor Indenture Trustee by Merger.  If the Indenture Trustee consolidates with, merges or converts into, or transfers all or substantially all its

corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Indenture Trustee; provided, that such corporation or banking association shall be otherwise qualified and eligible under Section 6.11.  The Indenture Trustee shall provide the Rating Agencies written notice of any such transaction occurring after the Closing Date.

In case at the time such successor or successors by merger, conversion or consolidation to the Indenture Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Indenture Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Indenture Trustee shall have.

Section 6.10.   Appointment of Co-Indenture Trustee or Separate Indenture Trustee.  (a) Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Trust Estate may at the time be located, the Indenture Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Trust Estate, and to vest in such Person or Persons, in such capacity and for the benefit of the Noteholders, such title to the Trust Estate, or any part thereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Indenture Trustee may consider necessary or desirable.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.11 and no notice to Noteholders of the appointment of any co-trustee or separate trustee shall be required under Section 6.08 hereof.

(b)     Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)     all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed upon and exercised or performed by the Indenture Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Indenture Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Estate or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Indenture Trustee;

(ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)   the Indenture Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)     Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VI.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Indenture Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee. Every such instrument shall be filed with the Indenture Trustee.

(d)     Any separate trustee or co-trustee may at any time constitute the Indenture Trustee, its agent or attorney in fact with full power and authority, to the extent not prohibited by

law, to do any lawful act under or in respect of this Agreement on its behalf and in its
name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign
or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and
be exercised by the Indenture Trustee, to the extent permitted by law, without the
appointment of a new or successor trustee.

Section 6.11.    Eligibility; Disqualification.  The Indenture Trustee shall at all times
satisfy the requirements of TIAss.310(a).  The Indenture Trustee shall have a combined
capital and surplus of at least $50,000,000 as set forth in its most recent published annual
report of condition and it or its parent shall have a long term debt rating of A or better
by Moody's.  The Indenture Trustee shall comply with TIAss.310(b), including the optional
provision permitted by the second sentence of TIAss.310(b)(9); provided, however, that there
shall be excluded from the operation of TIAss.310(b)(1) any indenture or indentures under
which other securities of the Issuer are outstanding if the requirements for such exclusion
set forth in TIAss.310(b)(1) are met.

    Within 90 days after ascertaining the occurrence of an Event of Default which shall
not have been cured or waived, unless authorized by the Securities and Exchange Commission,
the Indenture Trustee shall resign with respect to one or more Classes of Notes in
accordance with Section 6.08 of this Indenture, and the Issuer shall appoint a successor
Indenture Trustee for such Classes.  In the event the Indenture Trustee fails to comply with
the terms of the preceding sentence, the Indenture Trustee shall comply with clause (ii) of
TIAss.310(b).

    In the case of the appointment hereunder of a successor Indenture Trustee with
respect to any Class of Notes pursuant to this Section 6.11, the Issuer, the retiring
Indenture Trustee and the successor Indenture Trustee with respect to such Class of Notes
shall execute and deliver an indenture supplemental hereto wherein each successor Indenture
Trustee shall accept such appointment and which (i) shall contain such provisions as shall
be necessary or desirable to transfer and confirm to, and to vest in, the successor
Indenture Trustee all the rights, powers, trusts and duties of the retiring Indenture
Trustee with respect to the Notes of the Class to which the appointment of such successor
Indenture Trustee relates, (ii) if the retiring Indenture Trustee is not retiring with
respect to all Classes of Notes, shall contain such provisions as shall be deemed necessary
or desirable to confirm that all the rights, powers, trusts and duties of the retiring
Indenture Trustee with respect to the Notes of each Class as to which the retiring Indenture
Trustee is not retiring shall continue to be vested in the Indenture Trustee, and
(iii) shall add to or change any of the provisions of this Indenture as shall be necessary to
provide for or facilitate the administration of the trusts hereunder by more than one
Indenture Trustee, it being understood that nothing herein or in such supplemental indenture
shall constitute such Indenture Trustees co-trustees of the same trust and that each such
Indenture Trustee shall be trustee of a trust or trusts hereunder separate and apart from
any trust or trusts hereunder administered by any other such Indenture Trustee; and upon the
removal of the retiring Indenture Trustee shall become effective to the extent provided
therein.

Section 6.12.    Preferential Collection of Claims Against Issuer.  The Indenture Trustee
shall comply with TIAss.311(a), excluding any creditor relationship listed in TIAss.311(b).
An Indenture Trustee who has resigned or been removed shall be subject to TIAss.311(a) to
the extent indicated.

Section 6.13.    Representations and Warranties.  The Indenture Trustee hereby represents
that:

(i)     The Indenture Trustee is a banking association duly organized, validly existing and
        in good standing under the laws of the United States with power
        and authority to own its properties and to conduct its business as such properties
        are currently owned and such business is presently conducted.

(ii)    The Indenture Trustee has the power and authority to execute and deliver this
        Indenture and to carry out its terms; and the execution, delivery and performance of
        this Indenture have been duly authorized by the Indenture Trustee by all necessary
        corporate action.

(iii)   The consummation of the transactions contemplated by this Indenture and the

fulfillment of the terms hereof do not conflict with, result in any breach of any of
the terms and provisions of, or constitute (with or without notice or lapse of time)
a default under, the articles of organization or bylaws of the Indenture Trustee or
any agreement or other instrument to which the Indenture Trustee is a party or by
which it is bound.

(iv)     To the Indenture Trustee's best knowledge, there are no proceedings or investigations
pending or threatened before any court, regulatory body, administrative agency or
other governmental instrumentality having jurisdiction over the Indenture Trustee or
its properties:  (A) asserting the invalidity of this Indenture (B) seeking to
prevent the consummation of any of the transactions contemplated by this Indenture or
(C) seeking any determination or ruling that might materially and adversely affect
the performance by the Indenture Trustee of its obligations under, or the validity or
enforceability of, this Indenture.

(v)      The Indenture Trustee does not have notice of any adverse claim (as such terms are
used in Delaware UCC Section 8-302) with respect to the Home Loans.

Section 6.14.    Directions to Indenture Trustee.  The Indenture Trustee is hereby directed:

(a)      to accept the pledge of the Home Loans and hold the assets of the Trust in trust for
the Noteholders and the Credit Enhancer;

(b)      to authenticate and deliver the Notes substantially in the form prescribed by
Exhibits A-1 and A-2 in accordance with the terms of this Indenture;

(c)      on the Closing Date, to enter into the Credit Enhancement Instrument for the benefit
of the Noteholders with the Credit Enhancer; and

(d)      to take all other actions as shall be required to be taken by the terms of this
Indenture.

Section 6.15.    Indenture Trustee May Own Securities.  The Indenture Trustee, in its
individual or any other capacity may become the owner or pledgee of Securities with the same
rights it would have if it were not Indenture Trustee.

ARTICLE VII

NOTEHOLDERS' LISTS AND REPORTS

Section 7.01.    Issuer to Furnish Indenture Trustee Names and Addresses of Noteholders.  The
Issuer will furnish or cause to be furnished to the Indenture Trustee (a) not more than five
days after each Record Date, a list, in such form as the Indenture Trustee may reasonably
require, of the names and addresses of the Holders of Notes as of such Record Date and, (b)
at such other times as the Indenture Trustee and the Credit Enhancer may request in writing,
within 30 days after receipt by the Issuer of any such request, a list of similar form and
content as of a date not more than 10 days prior to the time such list is furnished;
provided, however, that so long as the Indenture Trustee is the Note Registrar, no such list
shall be required to be furnished.

Section 7.02.    Preservation of Information; Communications to Noteholders.  (a) The
Indenture Trustee shall preserve, in as current a form as is reasonably practicable, the
names and addresses of the Holders of Notes contained in the most recent list furnished to
the Indenture Trustee as provided in Section 7.01 and the names and addresses of Holders of
Notes received by the Indenture Trustee in its capacity as Note Registrar.  The Indenture
Trustee may destroy any list furnished to it as provided in such Section 7.01 upon receipt
of a new list so furnished.

(b)      Noteholders may communicate pursuant to TIAss.312(b) with other Noteholders with

respect to their rights under this Indenture or under the Notes.

(c)      The Issuer, the Indenture Trustee and the Note Registrar shall have the protection of TIAss.312(c).

Section 7.03.      Reports by Issuer.  (a) The Issuer shall:

(i)      file with the Indenture Trustee, within 15 days after the Issuer is required to file the same with the Commission, copies of the annual reports and the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe) that the Issuer may be required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act;

(ii)      file with the Indenture Trustee, and the Commission in accordance with rules and regulations prescribed from time to time by the Commission such additional information, documents and reports with respect to compliance by the Issuer with the conditions and covenants of this Indenture as may be required from time to time by such rules and regulations; and

(iii)      supply to the Indenture Trustee (and the Indenture Trustee shall transmit by mail to all Noteholders described in TIAss.313(c)) such summaries of any information, documents and reports required to be filed by the Issuer pursuant to clauses (i) and (ii) of this Section 7.03(a) and by rules and regulations prescribed from time to time by the Commission.

(b)      Unless the Issuer otherwise determines, the fiscal year of the Issuer shall end on December 31 of each year.

Section 7.04.      Reports by Indenture Trustee.  If required by TIAss.313(a), within 60 days after each January 1 beginning with January 1, 2007, the Indenture Trustee shall mail to each Noteholder as required by TIAss.313(c) and to the Credit Enhancer a brief report dated as of such date that complies with TIAss.313(a).  The Indenture Trustee also shall comply with TIAss.313(b).  A copy of each report at the time of its mailing to Noteholders shall be filed by the Indenture Trustee with the Commission and each stock exchange, if any, on which the Notes are listed.  The Issuer shall notify the Indenture Trustee if and when the Notes are listed on any stock exchange.

Section 7.05.      Exchange Act Reporting.  In connection with the preparation and filing of periodic reports by the Master Servicer pursuant to Section 4.04 of the Servicing Agreement, the Indenture Trustee shall timely provide to the Master Servicer (I) a list of Holders as shown on the Note Register or Certificate Register as of the end of each calendar year, (II) copies of all pleadings, other legal process and any other documents relating to any claims, charges or complaints involving the Indenture Trustee, as indenture trustee hereunder, or the Trust Estate that are received by the Indenture Trustee, (III) notice of all matters that, to the actual knowledge of a Responsible Officer of the Indenture Trustee, have been submitted to a vote of the Holders, other than those matters that have been submitted to a vote of the Holders at the request of the Depositor or the Master Servicer, and (IV) notice of any failure of the Indenture Trustee to make any payment to the Holders as required pursuant to this Indenture.  Neither the Master Servicer nor the Indenture Trustee shall have any liability with respect to the Master Servicer's failure to properly prepare or file such periodic reports resulting from or relating to the Master Servicer's inability or failure to obtain any information not resulting from the Master Servicer's own negligence or willful misconduct.

ARTICLE VIII

ACCOUNTS, DISBURSEMENTS AND RELEASES

Section 8.01.    Collection of Money.  Except as otherwise expressly provided herein, the
Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly
and without intervention or assistance of any fiscal agent or other intermediary, all money
and other property payable to or receivable by the Indenture Trustee pursuant to this
Indenture.  The Indenture Trustee shall apply all such money received by it as provided in
this Indenture.  Except as otherwise expressly provided in this Indenture, if any default
occurs in the making of any payment or performance under any agreement or instrument that is
part of the Trust Estate, the Indenture Trustee may take such action as may be appropriate
to enforce such payment or performance, including the institution and prosecution of
appropriate Proceedings.  Any such action shall be without prejudice to any right to claim a
Default or Event of Default under this Indenture and any right to proceed thereafter as
provided in Article V.

Section 8.02.    Trust Accounts.  (a) On or prior to the Closing Date, the Issuer shall cause
the Indenture Trustee to establish and maintain, in the name of the Indenture Trustee, for
the benefit of the Noteholders and the Certificate Paying Agent, on behalf of the
Certificateholder and the Credit Enhancer, the Payment Account as provided in Section 3.01
of this Indenture.

(b)     All monies deposited from time to time in the Payment Account pursuant to the
Servicing Agreement and all deposits therein pursuant to this Indenture are for the benefit
of the Noteholders and the Certificate Paying Agent, on behalf of the Certificateholder and
all investments made with such monies including all income or other gain from such
investments are for the benefit of the Master Servicer as provided by the Servicing
Agreement.

        On each Payment Date, the Indenture Trustee shall distribute all amounts on deposit
in the Payment Account to Noteholders in respect of the Notes and in its capacity as
Certificate Paying Agent to the Certificateholder in the order of priority set forth in
Section 3.05 (except as otherwise provided in Section 5.04(b)).

        The Master Servicer shall direct the Indenture Trustee in writing to invest any funds
in the Payment Account in Permitted Investments maturing no later than the Business Day
preceding each Payment Date and shall not be sold or disposed of prior to the maturity.

Section 8.03.    Officer's Certificate.  The Indenture Trustee shall receive at least seven
days notice when requested by the Issuer to take any action pursuant to Section 8.05(a),
accompanied by copies of any instruments to be executed, and the Indenture Trustee shall
also require, as a condition to such action, an Officer's Certificate, in form and substance
satisfactory to the Indenture Trustee, stating the legal effect of any such action,
outlining the steps required to complete the same, and concluding that all conditions
precedent to the taking of such action have been complied with.

Section 8.04.    Termination Upon Payment to Noteholders.  This Indenture and the respective
obligations and responsibilities of the Issuer and the Indenture Trustee created hereby
shall terminate upon the payment to the Noteholders, the Certificate Paying Agent (on behalf
of the Certificateholder), the Credit Enhancer and the Indenture Trustee of all amounts
required to be paid pursuant to Article III; provided, however, that in no event shall the
trust created hereby continue beyond the expiration of 21 years from the death of the
survivor of the descendants of Joseph P.  Kennedy, the late ambassador of the
United States to the Court of St.  James, living on the date hereof.

Section 8.05.    Release of Trust Estate.  (a) Subject to the payment of its fees and
expenses, the Indenture Trustee may, and when required by the provisions of this Indenture
shall, execute instruments to release property from the lien of this Indenture, or convey
the Indenture Trustee's interest in the same, in a manner and under circumstances that are
not inconsistent with the provisions of this Indenture.  No party relying upon an instrument
executed by the Indenture Trustee as provided in Article VIII hereunder shall be bound to
ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions
precedent, or see to the application of any monies.

(b)     The Indenture Trustee shall, at such time as (i) there are no Notes Outstanding, (ii)
all sums due the Indenture Trustee pursuant to this Indenture and other Basic Documents have
been paid and (iii) all sums due the Credit Enhancer have been paid, release any remaining
portion of the Trust Estate that secured the Notes from the lien of this Indenture.

(c)        The Indenture Trustee shall release property from the lien of this Indenture pursuant
to this Section 8.05 only upon receipt of a request from the Issuer accompanied by an
Officers' Certificate and a letter from the Credit Enhancer, stating that the Credit
Enhancer has no objection to such request from the Issuer.

(d)        The Indenture Trustee shall, at the request of the Issuer or the Depositor, surrender
the Credit Enhancement Instrument to the Credit Enhancer for cancellation, upon final
payment on the Notes.

Section 8.06.       Surrender of Notes Upon Final Payment.   By acceptance of any Note, the
Holder thereof agrees to surrender such Note to the Indenture Trustee promptly, prior to
such Noteholder's receipt of the final payment thereon.

---

ARTICLE IX

SUPPLEMENTAL INDENTURES

Section 9.01.       Supplemental Indentures Without Consent of Noteholders.   (a) Without the
consent of the Holders of any Notes but with prior notice to the Rating Agencies and the
written consent of the Credit Enhancer (which consent shall not be unreasonably withheld),
unless a Credit Enhancer Default has occurred and is continuing, the Issuer and the
Indenture Trustee, when authorized by an Issuer Request, at any time and from time to time,
may enter into one or more indentures supplemental hereto (which shall conform to the
provisions of the Trust Indenture Act as in force at the date of the execution thereof), in
form satisfactory to the Indenture Trustee, for any of the following purposes:

(i)        to correct or amplify the description of any property at any time subject to the lien
           of this Indenture, or better to assure, convey and confirm unto the Indenture Trustee
           any property subject or required to be subjected to the lien of this Indenture, or to
           subject to the lien of this Indenture additional property;

(ii)       to evidence the succession, in compliance with the applicable provisions hereof, of
           another person to the Issuer, and the assumption by any such successor of the
           covenants of the Issuer herein and in the Notes contained;

(iii)      to add to the covenants of the Issuer, for the benefit of the Holders of the Notes or
           the Credit Enhancer, or to surrender any right or power herein conferred upon the
           Issuer;

(iv)       to convey, transfer, assign, mortgage or pledge any property to or with the Indenture
           Trustee;

(v)        to cure any ambiguity, to correct any error, or to correct or supplement any
           provision herein or in any supplemental indenture that may be inconsistent with any
           other provision herein, in any supplemental indenture or in the Prospectus Supplement;

(vi)       to make any other provisions with respect to matters or questions arising under this
           Indenture or in any supplemental indenture; provided, that such action shall not
           materially and adversely affect the interests of the Holders of the Notes or the
           Credit Enhancer;

(vii)      to evidence and provide for the acceptance of the appointment hereunder by a
           successor trustee with respect to the Notes and to add to or change any of the
           provisions of this Indenture as shall be necessary to facilitate the administration
           of the trusts hereunder by more than one trustee, pursuant to the requirements of
           Article VI; or

(viii)     to modify, eliminate or add to the provisions of this Indenture to such extent as
           shall be necessary to effect the qualification of this Indenture under the TIA or

under any similar federal statute hereafter enacted and to add to this Indenture such other provisions as may be expressly required by the TIA; provided, however, that no such indenture supplements shall be entered into unless the Indenture Trustee shall have received an Opinion of Counsel that entering into such indenture supplement will not have any material adverse tax consequences to the Noteholders.  The Indenture Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

(b)     The Issuer and the Indenture Trustee, when authorized by an Issuer Request, may, also without the consent of any of the Holders of the Notes, but with prior notice to the Rating Agencies and with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, however, that such action shall not, as evidenced by an Opinion of Counsel (a copy of which shall be delivered to the Credit Enhancer), (i) adversely affect in any material respect the interests of any Noteholder or the Credit Enhancer or (ii) cause the Issuer to be subject to an entity level tax.

(c)     The Issuer and the Indenture Trustee shall, as directed by the Holders of Certificates which represent not less than 100% of the Certificate Percentage Interests thereof, enter into an indenture or indentures supplemental hereto for the purpose of providing for the issuance of one or more additional classes of Notes entitled to payments derived solely from all or a portion of the payments to which the Certificate issued on the Closing Date pursuant to the Trust Agreement are entitled; provided, however, that such action shall not, as evidenced by an Opinion of Counsel (a copy of which shall be delivered to the Credit Enhancer), (i) adversely affect in any material respect the interests of any Noteholder or the Credit Enhancer or (ii) cause the Issuer to be subject to an entity level tax.  Each such class of Notes shall be a non-recourse obligation of the Issuer and shall be entitled to interest and principal in such amounts, and to such security for the repayment thereof, as shall be specified in such amendment or amendments.  Promptly after the execution by the Issuer and the Indenture Trustee of any amendments pursuant to this Section or the creation of a new indenture and the issuance of the related class or classes of Notes, the Issuer shall require the Indenture Trustee to give notice to the Holders of the Notes and the Rating Agencies setting forth in general terms the substance of the provisions of such amendment.  Any failure of the Indenture Trustee to provide such notice as is required under this paragraph, or any defect therein, shall not, however, in any way impair or affect the validity of such amendment or any class of Notes issued pursuant thereto.  Unless the Credit Enhancer agrees in writing, (i) any classes of Notes issued pursuant to a supplemental indenture shall not be entitled to the insurance provided by the Credit Enhancement Instrument and (ii) the Holders of any such classes of Notes shall be entitled only to such distributions or a portion of such distributions as the Holders would have received as Holder of Certificate.

Section 9.02.     Supplemental Indentures With Consent of Noteholders.  The Issuer and the Indenture Trustee, when authorized by an Issuer Request, also may, with prior notice to the Rating Agencies and with the consent of the Holders of not less than a majority of the aggregate Note Balance of the Notes affected thereby and the Credit Enhancer (so long as no Credit Enhancer Default exists), by Act (as defined in Section 10.03 hereof) of such Holders delivered to the Issuer and the Indenture Trustee, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, however, that no such supplemental indenture shall, without the consent of the Holder of each Note affected thereby:

(i)     change the date of payment of any installment of principal of or interest on any Note, or reduce the principal amount thereof or the interest rate thereon, change the provisions of this Indenture relating to the application of collections on, or the proceeds of the Sale of, the Trust Estate to payment of principal of or interest on the Notes, or change any place of payment where, or the coin or currency in which, any Note or the interest thereon is payable, or impair the right to institute suit for the enforcement of the provisions of this Indenture requiring the application of funds available therefor, as provided in Article V, to the payment of any such amount

due on the Notes on or after the respective due dates thereof;

(ii)     reduce the percentage of the related Note Balance of any Class of Notes, the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences provided for in this Indenture;

(iii)    modify or alter the provisions of the proviso to the definition of the term "Outstanding" or modify or alter the exception in the definition of the term "Holder";

(iv)     reduce the percentage of the aggregate Note Balance of the Notes required to direct the Indenture Trustee to direct the Issuer to sell or liquidate the Trust Estate pursuant to Section 5.04;

(v)      modify any provision of this Section 9.02 except to increase any percentage specified herein or to provide that certain additional provisions of this Indenture or the Basic Documents cannot be modified or waived without the consent of the Holder of each Note affected thereby;

(vi)     modify any of the provisions of this Indenture in such manner as to affect the calculation of the amount of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation); or

(vii)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Trust Estate or, except as otherwise permitted or contemplated herein, terminate the lien of this Indenture on any property at any time subject hereto or deprive the Holder of any Note of the security provided by the lien of this Indenture; and provided, further, that such action shall not, as evidenced by an Opinion of Counsel, cause the Issuer to be subject to an entity level tax.

and provided, further, that no such indenture supplements shall be entered into unless the Indenture Trustee shall have received an Opinion of Counsel that entering into such indenture supplement will not adversely affect in any material respect the interests of the Certificateholder or shall have received the express written consent of the Certificateholder to the indenture supplement.

The Indenture Trustee may in its discretion determine whether or not any Notes would be affected by any supplemental indenture and any such determination shall be conclusive upon the Holders of all Notes, whether theretofore or thereafter authenticated and delivered hereunder.  The Indenture Trustee shall not be liable for any such determination made in good faith.

It shall not be necessary for any Act of Noteholders under this Section 9.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Issuer and the Indenture Trustee of any supplemental indenture pursuant to this Section 9.02, the Indenture Trustee shall mail to the Holders of the Notes and the Custodian to which such amendment or supplemental indenture relates a notice setting forth in general terms the substance of such supplemental indenture.  Any failure of the Indenture Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Notwithstanding anything to the contrary herein, so long as there does not exist a failure by the Credit Enhancer to make a required payment under the Credit Enhancement Instrument, the Credit Enhancer shall have the right to exercise all rights of the Holders of the Notes under this Indenture and the Servicing Agreement without any consent of such Holders, and such Holders may exercise such rights only with the prior written consent of the Credit Enhancer.

Section 9.03.     Execution of Supplemental Indentures.  In executing, or permitting the

additional trusts created by, any supplemental indenture permitted by this Article IX or the modification thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive, and subject to Sections 6.01 and 6.02, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and conforms to the requirements of the Trust Indenture Act.  The Indenture Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise.

Section 9.04.    Effect of Supplemental Indenture.  Upon the execution of any supplemental indenture pursuant to the provisions hereof, this Indenture shall be and shall be deemed to be modified and amended in accordance therewith with respect to the Notes affected thereby, and the respective rights, limitations of rights, obligations, duties, liabilities and immunities under this Indenture of the Indenture Trustee, the Issuer and the Holders of the Notes shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 9.05.    Conformity with Trust Indenture Act.  Every amendment of this Indenture and every supplemental indenture executed pursuant to this Article IX shall conform to the requirements of the Trust Indenture Act as then in effect so long as this Indenture shall then be qualified under the Trust Indenture Act.

Section 9.06.    Reference in Notes to Supplemental Indentures.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article IX may, and if required by the Indenture Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture.  If the Issuer or the Indenture Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for Outstanding Notes.

ARTICLE X

MISCELLANEOUS

Section 10.01.  Compliance Certificates and Opinions, etc.  (a) Upon any application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee and to the Credit Enhancer (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that, in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished.  Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1)      a statement that each signatory of such certificate or opinion has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)      a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with;

(4)    a statement as to whether, in the opinion of such such signatory, such condition or covenant has been complied with; and

(5)    if the signer of such certificate or Opinion is required to be Independent, the statement required by the definition of the term "Independent".

(b)    (i)    Prior to the deposit of any Collateral or other property or securities with the Indenture Trustee that is to be made the basis for the release of any property or securities subject to the lien of this Indenture, the Issuer shall, in addition to any obligation imposed in Section 10.01(a) or elsewhere in this Indenture, furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days of such deposit) to the Issuer of the Collateral or other property or securities to be so deposited.

(ii)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (i) above, the Issuer shall also deliver to the Indenture Trustee an Independent Certificate as to the same matters, if the fair value to the Issuer of the securities to be so deposited and of all other such securities made the basis of any such withdrawal or release since the commencement of the then current fiscal year of the Issuer, as set forth in the certificates delivered pursuant to clause (i) above and this clause (ii), is 10% or more of the aggregate Note Balance of the Notes, but such a certificate need not be furnished with respect to any securities so deposited, if the fair value thereof to the Issuer as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the aggregate Note Balance of the Notes.

(iii)    Whenever any property or securities are to be released from the lien of this Indenture, the Issuer shall also furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days of such release) of the property or securities proposed to be released and stating that in the opinion of such person the proposed release will not impair the security under this Indenture in contravention of the provisions hereof.

(iv)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (iii) above, the Issuer shall also furnish to the Indenture Trustee an Independent Certificate as to the same matters if the fair value of the property or securities and of all other property, other than property as contemplated by clause (v) below or securities released from the lien of this Indenture since the commencement of the then current calendar year, as set forth in the certificates required by clause (iii) above and this clause (iv), equals 10% or more of the aggregate Note Balance of the Notes, but such certificate need not be furnished in the case of any release of property or securities if the fair value thereof as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the then aggregate Note Balance of the Notes.

(v)    Notwithstanding any provision of this Indenture, the Issuer may, without compliance with the requirements of the other provisions of this Section 10.01, (A) collect, sell or otherwise dispose of the Home Loans as and to the extent permitted or required by the Basic Documents or (B) make cash payments out of the Payment Account as and to the extent permitted or required by the Basic Documents, so long as the Issuer shall deliver to the Indenture Trustee every six months, commencing six months after the closing date, an Officer's Certificate of the Issuer stating that all the dispositions of Collateral described in clauses (A) or (B) above that occurred during the preceding six calendar months were in the ordinary course of the Issuer's business and that the proceeds thereof were applied in accordance with the Basic Documents.

Section 10.02.    Form of Documents Delivered to Indenture Trustee.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer may be based,

insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Seller or the Issuer, stating that the information with respect to such factual matters is in the possession of the Seller or the Issuer, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Issuer shall deliver any document as a condition of the granting of such application, or as evidence of the Issuer's compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

Section 10.03.   Acts of Noteholders.  (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 6.01) conclusive in favor of the Indenture Trustee and the Issuer, if made in the manner provided in this Section 10.03.

(b)      The fact and date of the execution by any person of any such instrument or writing may be proved in any manner that the Indenture Trustee deems sufficient.

(c)      The ownership of Notes shall be proved by the Note Registrar.

(d)      Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Indenture Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 10.04.   Notices, etc., to Indenture Trustee, Issuer, Credit Enhancer and Rating Agencies.  Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture shall be in writing and if such request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders is to be made upon, given or furnished to or filed with:

(i)      the Indenture Trustee by any Noteholder or by the Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Indenture Trustee at the Corporate Trust Office.  The Indenture Trustee shall promptly transmit any notice received by it from the Noteholders to the Issuer,

(ii)      the Issuer by the Indenture Trustee or by any Noteholder shall be sufficient for every purpose hereunder if in writing and mailed first class, postage prepaid to the Issuer addressed to: Home Loan Trust 2006-HI3, in care of Wilmington Trust Company, or at any other address previously furnished in writing to the Indenture Trustee by

the Issuer.  The Issuer shall promptly transmit any notice received by it from the Noteholders to the Indenture Trustee, or

(iii)   the Credit Enhancer by the Issuer, the Indenture Trustee or by any Noteholders shall be sufficient for every purpose hereunder to in writing and mailed, first class postage pre-paid, or personally delivered or telecopied to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Structured Finance Surveillance (Home Loan Trust 2006-HI3), telecopier number (212) 312-3220, confirmation number (800) 352-0001. The Credit Enhancer shall promptly transmit any notice received by it from the Issuer, the Indenture Trustee or the Noteholders to the Issuer or Indenture Trustee, as the case may be.

Notices required to be given to the Rating Agencies by the Issuer, the Indenture Trustee or the Owner Trustee shall be in writing, personally delivered or mailed by certified mail, return receipt requested, to (i) in the case of Moody's, at the following address: Moody's Investors Service, Inc., ABS Monitoring Department, 99 Church Street, New York, New York 10007 and (ii) in the case of Standard & Poor's, at the following address: Standard & Poor's, a Division of the McGraw Hill Companies, Inc., 55 Water Street, 41st Floor, New York, New York 10041, Attention of Asset Backed Surveillance Department; or as to each of the foregoing, at such other address as shall be designated by written notice to the other parties.

Section 10.05.   Notices to Noteholders; Waiver.  Where this Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first class, postage prepaid to each Noteholder affected by such event, at such Person's address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.  In any case where notice to Noteholders is given by mail, neither the failure to mail such notice nor any defect in any notice so mailed to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice that is mailed in the manner herein provided shall conclusively be presumed to have been duly given regardless of whether such notice is in fact actually received.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Indenture Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such a waiver.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice to the Rating Agencies, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstance constitute an Event of Default.

Section 10.06.   Alternate Payment and Notice Provisions.  Notwithstanding any provision of this Indenture or any of the Notes to the contrary, the Issuer may enter into any agreement with any Holder of a Note providing for a method of payment, or notice by the Indenture Trustee to such Holder, that is different from the methods provided for in this Indenture for such payments or notices.  The Issuer shall furnish to the Indenture Trustee a copy of each such agreement and the Indenture Trustee shall cause payments to be made and notices to be given in accordance with such agreements.

Section 10.07.   Conflict with Trust Indenture Act.  If any provision hereof limits, qualifies or conflicts with another provision hereof that is required to be included in this Indenture by any of the provisions of the Trust Indenture Act, such required provision shall control.  The provisions of TIAss.ss.310 through 317 that impose duties on any Person (including the provisions automatically deemed included herein unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

Section 10.08.   Effect of Headings.   The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

Section 10.09.   Successors and Assigns.   All covenants and agreements in this Indenture and the Notes by the Issuer shall bind its successors and assigns, whether so expressed or not. All agreements of the Indenture Trustee in this Indenture shall bind its successors, co trustees and agents.

Section 10.10.   Separability.   In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 10.11.   Benefits of Indenture.   Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Noteholders, the Credit Enhancer and any other party secured hereunder, and any other Person with an ownership interest in any part of the Trust Estate, any benefit or any legal or equitable right, remedy or claim under this Indenture.   The Credit Enhancer is a third-party beneficiary of this Indenture.

Section 10.12.   Legal Holidays.   In any case where the date on which any payment is due shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date on which nominally due, and no interest shall accrue for the period from and after any such nominal date.

Section 10.13.   GOVERNING LAW.   THIS INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 10.14.   Counterparts.   This Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 10.15.   Recording of Indenture.   If this Indenture is subject to recording in any appropriate public recording offices, such recording is to be effected by the Issuer and at its expense accompanied by an Opinion of Counsel (which may be counsel to the Indenture Trustee or any other counsel reasonably acceptable to the Indenture Trustee) to the effect that such recording is necessary either for the protection of the Noteholders or any other Person secured hereunder or for the enforcement of any right or remedy granted to the Indenture Trustee under this Indenture.

Section 10.16.   Issuer Obligation.   No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being understood that the Indenture Trustee and the Owner Trustee have no such obligations in their respective individual capacities) and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.   For all purposes of this Indenture, in the performance of any duties or obligations of the Issuer hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VI, VII and VIII of the Trust Agreement.

Section 10.17.   No Petition.   The Indenture Trustee, by entering into this Indenture, and each Noteholder, by its acceptance of a Note, hereby covenant and agree that they will not at any time institute against the Depositor or the Issuer, or join in any institution against the Depositor or the Issuer of, any bankruptcy, reorganization, arrangement,

insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, this Indenture or any of the Basic Documents.

Section 10.18.    Inspection.    The Issuer agrees that, on reasonable prior notice, it shall permit any representative of the Indenture Trustee, during the Issuer's normal business hours, to examine all the books of account, records, reports and other papers of the Issuer, to make copies and extracts therefrom, to cause such books to be audited by Independent certified public accountants, and to discuss the Issuer's affairs, finances and accounts with the Issuer's officers, employees, and Independent certified public accountants, all at such reasonable times and as often as may be reasonably requested.   The Indenture Trustee shall and shall cause its representatives to hold in confidence all such information except to the extent disclosure may be required by law (and all reasonable applications for confidential treatment are unavailing) and except to the extent that the Indenture Trustee may reasonably determine that such disclosure is consistent with its obligations hereunder.

---

        IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

                        HOME LOAN TRUST 2006-HI3
                        as Issuer


                        By:  WILMINGTON TRUST COMPANY not in
                             its individual capacity but solely as
                             Owner Trustee



                        By:/s/ Michele C. Harra
                        Name: Michele C. Harra
                        Title:  Financial Services Officer


                        JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
                        as Indenture Trustee



                        By:  /s/ Joanne M. Murray
                        Name: Joanne M. Murray
                        Title:   Assistant Vice President


JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
hereby accepts the appointment as Paying Agent
pursuant to Section 3.03 hereof and as
Note Registrar pursuant to Section 4.02 hereof.


By:/s/Terry Stewart
Name: Terry Stewart
Title:   Vice President

STATE OF StateTEXAS              )
                                ) ss.:
placePlaceTypeCOUNTY OF PlaceNameHARRIS      )

     On this 14th day of July, 2006, before me personally appeared Joanne M. Murray, to me known, who being by me duly sworn, did depose and say that he/she resides at Houston, Texas, that he/she is the Assistant Vice President of the Indenture Trustee, a national banking association described in and which executed the above instrument; and that he/she signed his/her name thereto by like order.

                  /s/ Mary Phu Yeung
                  Notary Public

---

STATE OF StateTEXAS              )
_____                         ) ss.:
placePlaceTypeCOUNTY OF        PlaceNameHARRIS      )

     On this 14th day of July, 2006, before me, the undersigned Notary Public of said State, personally appeared Terry Stewart, personally known to me to be a duly authorized officer of JPMorgan Chase Bank, National Association that executed the within instrument, and personally known to me to be the person who executed the within instrument on behalf of JPMorgan Chase Bank, National Association therein named, and acknowledged to me such JPMorgan Chase Bank, National Association executed the within instrument pursuant to its by-laws.

                  /s/ Mary Phu Yeung
                  Notary Public

---

STATE OF placeStateDELAWARE      )
_____                         ) ss.:
COUNTY OF NEW CASTLE  )

     On this 13th day of July, 2006, before me personally appeared Michele C. Harra, to me known, who being by me duly sworn, did depose and say that he/she resides at Wilmington, Delaware, that he/she is the Financial Services Officer of Wilmington Trust Company, as Owner Trustee, a Delaware banking corporation described in and which executed the above instrument; and that he/she signed his/her name thereto by like order.

                  /s/ Janel R. Havrilla
                  Notary Public

EXHIBIT A

FORM OF NOTES

CLASS A __ NOTES

        UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST
COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF
TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.
OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY
PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY
OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN
INTEREST HEREIN.

        THE PRINCIPAL OF THIS NOTE IS PAYABLE IN INSTALLMENTS AS SET FORTH HEREIN.
ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE
AMOUNT SHOWN ON THE FACE HEREOF.

        THIS NOTE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE SELLER, THE
DEPOSITOR, THE MASTER SERVICER, THE INDENTURE TRUSTEE, THE OWNER TRUSTEE OR ANY OF THEIR
RESPECTIVE AFFILIATES, EXCEPT AS EXPRESSLY PROVIDED IN THE INDENTURE OR THE BASIC DOCUMENTS.

        EACH PURCHASER AND TRANSFEREE OF THIS NOTE, BY ITS ACCEPTANCE OF THIS NOTE, SHALL BE
DEEMED TO HAVE REPRESENTED AND WARRANTED THAT EITHER (I) IT IS NOT ACQUIRING THIS NOTE WITH
THE ASSETS OF AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), WHICH IS SUBJECT TO THE
PROVISIONS OF TITLE I OF ERISA, A "PLAN" DESCRIBED IN SECTION 4975(e)(1) OF THE INTERNAL
REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE
"PLAN ASSETS" BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR OTHER PLAN'S INVESTMENT IN SUCH
ENTITY OR ANY OTHER PLAN THAT IS SUBJECT TO A LAW THAT IS SIMILAR TO TITLE I OF ERISA OR
SECTION 4975 OF THE CODE OR (II) THE ACQUISITION AND HOLDING OF THIS NOTE WILL NOT GIVE RISE
TO A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA, SECTION 4975 OF THE CODE
OR ANY SIMILAR APPLICABLE LAW.

---

HOME LOAN TRUST 2006-HI3

HOME LOAN-BACKED NOTE

Registered                                              Principal Amount: $_____

Class A __
No.  __                                                 Percentage Interest: _____%

CUSIP No.  _____                                 Note Rate: [___%][Adjustable Rate]

        Home Loan Trust 2006-HI3, a statutory trust duly organized and existing under the
laws of the State of Delaware (herein referred to as the "Issuer"), for value received,
hereby promises to pay to Cede & Co. or registered assigns, the principal sum of
$_____, payable on each Payment Date in an amount equal to the Percentage Interest
specified above of the aggregate amount, if any, payable from the Payment Account in respect
of principal on the Class A-__ Notes pursuant to Section 3.05 of the Indenture dated as of
July 21, 2006 (the "Indenture") between the Issuer, as Issuer, and JPMorgan Chase Bank,
National Association, as Indenture Trustee (the "Indenture Trustee"); provided, however,
that the entire unpaid principal amount of this Note shall be due and payable on the Payment
Date in February 2036, to the extent not previously paid on a prior Payment Date.
Capitalized terms used but not defined herein are defined in Appendix A of the Indenture.

        [Interest on the Class A-__ Notes will be paid monthly on each Payment Date at the
Note Rate.  The Note Rate for the Class A-__ Notes will be _____% per annum.  Interest will
be computed on the basis of a 30 day month and a 360 day year.  Principal of and interest on

this Note shall be paid in the manner specified on the reverse hereof.  On the Step Up Date, the Note Rate on the Class A-__ Notes will increase by 0.50% per annum.]

[Interest on the Class A-1 Notes will be paid monthly on each Payment Date at the Note Rate for the related Interest Accrual Period.  The Note Rate for each Interest Accrual Period will be equal to the lesser of (i) LIBOR plus___% per annum and (ii) ___% per annum.  LIBOR for each applicable Interest Accrual Period will be determined on the second LIBOR Business Day immediately preceding (i) the Closing Date in the case of the first Interest Accrual Period and (ii) the first day of each succeeding Interest Accrual Period by the Indenture Trustee as set forth in the Indenture.  All determinations of LIBOR by the Indenture Trustee shall, in the absence of manifest error, be conclusive for all purposes, and each holder of this Class A-1 Note, by accepting this Class A-1 Note, agrees to be bound by such determination.  Interest on this Class A-1 Note will accrue for each Payment Date from the most recent Payment Date on which interest has been paid (in the case of the first Payment Date, from the Closing Date) to but excluding such Payment Date.  Interest will be computed on the basis of the actual number of days in each Interest Accrual Period and a year assumed to consist of 360 days.  Principal of and interest on this Class A-1 Note shall be paid in the manner specified in the Indenture.]

Principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.  All payments made by the Issuer with respect to this Note shall be applied first to interest due and payable on this Note as provided above and then to the unpaid principal of this Note.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note.

Unless the certificate of authentication hereon has been executed by the Indenture Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Notes of the Issuer, designated as its Home Loan-Backed Notes (herein called the "Notes"), all issued under the Indenture, to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights and obligations thereunder of the Issuer, the Indenture Trustee and the holders of the Notes.  The Notes are subject to all terms of the Indenture.

The Notes are and will be equally and ratably secured by the Collateral pledged as security therefor as provided in the Indenture.

This Note is entitled to the benefits of an irrevocable and unconditional financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

Principal of and interest on this Note will be payable on each Payment Date, commencing on August 25, 2006, as described in the Indenture.  "Payment Date" means the twenty fifth day of each month, or, if any such date is not a Business Day, then the next Business Day.

The entire unpaid principal amount of this Note shall be due and payable in full on the Payment Date in February 2036, pursuant to the Indenture, to the extent not previously paid on a prior Payment Date.  Notwithstanding the foregoing, if an Event of Default shall have occurred and be continuing, then the Indenture Trustee or the holders of Notes representing not less than a majority of the aggregate Note Balance of all Notes with the consent of the Credit Enhancer, or the Credit Enhancer may declare the Notes to be immediately due and payable in the manner provided in Section 5.02 of the Indenture.  All principal payments on the Notes shall be paid in the manner and priority set forth in Section 3.05 of the Indenture.

Any installment of interest or principal, if any, payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall, if such Holder holds Notes of an aggregate initial Note Balance of at least $1,000,000, be paid to each Holder of record on the preceding Record Date, by wire transfer to an account specified in writing by such Holder reasonably satisfactory to the Indenture Trustee as of

the preceding Record Date or in all other cases or if no such instructions have been
delivered to the Indenture Trustee, by check or money order to such Noteholder mailed to
such Holder's address as it appears in the Note Register the amount required to be paid to
such Holder on such Payment Date pursuant to such Holder's Securities; provided, however,
that the Indenture Trustee shall not pay to such Holders any amount required to be withheld
from a payment to such Holder by the Code.

As provided in the Indenture and subject to certain limitations set forth therein,
the transfer of this Note may be registered on the Note Register upon surrender of this Note
for registration of transfer at the Corporate Trust Office, duly endorsed by, or accompanied
by a written instrument of transfer in form satisfactory to the Indenture Trustee duly
executed by, the holder hereof or such holder's attorney duly authorized in writing, with
such signature guaranteed by an "eligible guarantor institution" meeting the requirements of
the Note Registrar, which requirements include membership or participation in the Securities
Transfer Agent's Medallion Program ("STAMP") or such other "signature guarantee program" as
may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all
in accordance with the Securities Exchange Act of 1934, as amended, and thereupon one or
more new Notes in authorized denominations and in the same aggregate principal amount will
be issued to the designated transferee or transferees.  No service charge will be charged
for any registration of transfer or exchange of this Note, but the Note Registrar shall
require payment of a sum sufficient to cover any tax or governmental charge that may be
imposed in connection with any registration of transfer or exchange of this Note.

Each holder or Beneficial Owner of a Note, by acceptance of a Note, or, in the case
of a Beneficial Owner of a Note, a beneficial interest in a Note, covenants and agrees that
no recourse may be taken, directly or indirectly, with respect to the obligations of the
Issuer, the Owner Trustee, the Seller, the Master Servicer, the Depositor or the Indenture
Trustee on the Notes or under the Indenture or any certificate or other writing delivered in
connection therewith, against (i) the Indenture Trustee or the Owner Trustee in its
individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any
partner, owner, beneficiary, agent, officer, director or employee of the Indenture Trustee
or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the
Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the
Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person
may have expressly agreed and except that any such partner, owner or beneficiary shall be
fully liable, to the extent provided by applicable law for any unpaid consideration for
stock, unpaid capital contribution or failure to pay any installment or call owing to such
entity.

Each holder or Beneficial Owner of a Note, by acceptance of a Note or, in the case of
a Beneficial Owner of a Note, a beneficial interest in a Note, covenants and agrees by
accepting the benefits of the Indenture that such holder or Beneficial Owner of a Note will
not at any time institute against the Depositor, the Seller, the Master Servicer or the
Issuer, or join in any institution against the Depositor, the Seller, the Master Servicer or
the Issuer of, any bankruptcy, reorganization, arrangement, insolvency or liquidation
proceedings under any United States federal or state bankruptcy or similar law in connection
with any obligations relating to the Notes, the Indenture or the Basic Documents.

The Issuer has entered into the Indenture and this Note is issued with the intention
that, for federal, state and local income, single business and franchise tax purposes, the
Notes will qualify as indebtedness of the Issuer.  Each holder of a Note, by acceptance of a
Note (and each Beneficial Owner of a Note by acceptance of a beneficial interest in a Note),
agrees to treat the Notes for federal, state and local income, single business and franchise
tax purposes as indebtedness of the Issuer.

Prior to the due presentment for registration of transfer of this Note, the Issuer,
the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the
Person in whose name this Note is registered (as of the day of determination or as of such
other date as may be specified in the Indenture) as the owner hereof for all purposes,
whether or not this Note be overdue, and none of the Issuer, the Indenture Trustee or any
such agent shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment
thereof and the modification of the rights and obligations of the Issuer and the Indenture
Trustee and the rights of the holders of the Notes under the Indenture at any time by the

Issuer and the Indenture Trustee with the consent of the holders of Notes representing a majority of the aggregate Note Balance of all Notes at the time Outstanding and the Credit Enhancer with prior notice to the Rating Agencies.  The Indenture also contains provisions permitting the holders of Notes representing specified percentages of the aggregate Note Balance of all Notes, on behalf of the holders of all the Notes with the consent of the Credit Enhancer, or the Credit Enhancer (so long as no Credit Enhancer Default exists), to waive compliance by the Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences.  Any such consent or waiver by the Credit Enhancer and the holder of this Note (or any one of more Predecessor Notes) shall be conclusive and binding upon such holder and upon all future holders of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.  The Indenture also permits the Issuer and the Indenture Trustee to amend or waive certain terms and conditions set forth in the Indenture without the consent of holders of the Notes issued thereunder but with prior notice to the Rating Agencies and with the consent of the Credit Enhancer.

The term "Issuer" as used in this Note includes any successor or the Issuer under the Indenture.

The Issuer is permitted by the Indenture, under certain circumstances, to merge or consolidate, subject to the rights of the Indenture Trustee and the holders of Notes under the Indenture.

The Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations therein set forth.

This Note and the Indenture shall be construed in accordance with the laws of the State of placeStateNew York, without reference to its conflict of law provisions and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair, the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, none of Wilmington Trust Company in its individual capacity, JPMorgan Chase Bank, National Association, in its individual capacity, any owner of a beneficial interest in the Issuer, or any of their respective partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on this Note or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in the Indenture.  The holder of this Note by its acceptance hereof agrees that, except as expressly provided in the Basic Documents, in the case of an Event of Default under the Indenture, the holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Note.

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Issuer and not in its individual capacity, has caused this Note to be duly executed.

HOME LOAN TRUST 2006-HI3

                                    By   WILMINGTON TRUST COMPANY, not in its
                                         individual capacity but solely as Owner
                                         Trustee
Dated: July 21, 2006



                                    By _____
                                         Authorized Signatory




                         CERTIFICATE OF AUTHENTICATION

          This is one of the Class A-__ Notes referred to in the within mentioned Indenture.

                                    JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, not in
                                    its individual capacity but solely as Indenture
                                    Trustee
Dated: July 21, 2006



                                    By _____
                                         Authorized Signatory




---


                                 ASSIGNMENT

Social Security or taxpayer I.D.  or other identifying number of assignee: _____

_____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfer unto _____

_____
                                              (name and address of assignee)


the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints ___

_____,

attorney, to transfer said Note on the books kept for registration thereof, with full power
of substitution in the premises.

Dated: _____         _____    (1)/
                                     Signature Guaranteed:




(1) NOTICE:  The signature to this  assignment  must correspond with the name of
the  registered  owner as it  appears  on the face of the  within  Note in every
particular,  without  alteration,  enlargement  or  any  change  whatever.  Such

signature must be guaranteed by an "eligible guarantee institution" meeting the
requirements of the Note Registrar, which requirements include membership or
participation in STAMP or such other "signature guarantee program" as may be
determined by the Note Registrar in addition to, or in substitution for, STAMP,
all in accordance with the Securities Exchange Act of 1934, as amended.

---

## APPENDIX A

### DEFINITIONS

Accrued Note Interest:  With respect to any class of Notes and any Payment Date, an
amount equal to interest accrued for the related Interest Accrual Period on the related Note
Balance immediately prior to that Payment Date at the related Note Rate for that Payment
Date.  Accrued Note Interest for the Class A Notes (other than the Class A-1 Notes) will be
calculated on the basis of a 30-day month in the related Interest Accrual Period and a
360-day year.  Accrued Note Interest for the Class A-1 Notes will be calculated on the basis
of the actual number of days in the related Interest Accrual Period and a 360-day year.

Administrative Fees:  The Servicing Fees and the fees payable to the Owner Trustee
and the Indenture Trustee.

Affiliate:  With respect to any Person, any other Person controlling, controlled by
or under common control with such Person. For purposes of this definition, "control" means
the power to direct the management and policies of a Person, directly or indirectly, whether
through ownership of voting securities, by contract or otherwise and "controlling" and
"controlled" shall have meanings correlative to the foregoing.

Appraised Value:  For any Home Loan the value of the related Mortgaged Property
determined by the appraisal, sales price for such Mortgaged Property or alternative
valuation method used in the origination of such Home Loan (which may have been obtained at
an earlier time); provided that if such Home Loan was originated simultaneously with or not
more than 12 months after a senior lien on the related Mortgaged Property which was
originated in a purchase or cash-out refinance transaction, the appraised value shall be the
lesser of the appraised value at the origination of the senior lien and the sales price for
such Mortgaged Property.

Assignment of Mortgage:  With respect to any Mortgage, an assignment, notice of
transfer or equivalent instrument, in recordable form, sufficient under the laws of the
jurisdiction in which the related Mortgaged Property is located to reflect the sale of the
Mortgage, which assignment, notice of transfer or equivalent instrument may be in the form
of one or more blanket assignments covering Mortgages secured by Mortgaged Properties
located in the same jurisdiction.

Authorized Newspaper: A newspaper of general circulation in the Borough of Manhattan,
The City of New York, printed in the English language and customarily published on each
Business Day, whether or not published on Saturdays, Sundays or holidays.

Authorized Officer:  With respect to the Issuer, any officer of the Owner Trustee who
is authorized to act for the Owner Trustee in matters relating to the Issuer and who is
identified on the list of Authorized Officers delivered by the Owner Trustee to the
Indenture Trustee on the Closing Date (as such list may be modified or supplemented from
time to time thereafter).

Bankruptcy Code:  The Bankruptcy Code of 1978, as amended.

Basic Documents:  The Trust Agreement, the Indenture, the Home Loan Purchase
Agreement, the Servicing Agreement, the Insurance Agreement, the Credit Enhancement

Instrument, the Custodial Agreement and the other documents and certificates delivered in connection with any of the above.

Beneficial Owner:  With respect to any Note, the Person who is the beneficial owner of such Note as reflected on the books of the Depository or on the books of a Person maintaining an account with such Depository (directly as a Depository Participant or indirectly through a Depository Participant, in accordance with the rules of such Depository).

Book-Entry Custodian:  The custodian appointed pursuant to Section 4.06 of the Indenture.

Book-Entry Notes:  Beneficial interests in the Notes, ownership and transfers of which shall be made through book entries by the Depository as described in Section 4.06 of the Indenture.

Business Day:  Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the States of New York, California, Texas, Minnesota, Pennsylvania, Illinois or Delaware are required or authorized by law to be closed.

Calendar Quarter:  A Calendar Quarter shall consist of one of the following time periods in any given year:  January 1 through March 31, April 1 through June 30, July 1 though September 30, and October 1 through December 31.

Certificate:  The certificate issued in the form of Exhibit A to the Trust Agreement and outstanding pursuant to the terms of the Trust Agreement, evidencing a beneficial ownership interest in the Trust.

Certificate Distribution Account:  The account or accounts created and maintained by the Certificate Paying Agent pursuant to Section 3.10(c) of the Trust Agreement. The Certificate Paying Agent will make all distributions on the Certificate from money on deposit in the Certificate Distribution Account. The Certificate Distribution Account shall be an Eligible Account.

Certificate Distribution Amount:  The amount payable to the Certificate Paying Agent under Section 3.05 of the Indenture for payment to the holders of the Certificate under the Trust Agreement.

Certificate Paying Agent:  The meaning specified in Section 3.10 of the Trust Agreement.

Certificate Percentage Interest:  With respect to the Certificate and any date of determination, the percentage interest as stated on the face of the Certificate, which percentage may be recalculated in accordance with Section 3.03 of the Trust Agreement.

Certificate Principal Balance:  As of any Payment Date, with respect to the Certificate, an amount equal to the then applicable Certificate Percentage Interest of such Certificate, multiplied by the Outstanding Reserve Amount immediately prior to such Payment Date.

Certificate Register:  The register maintained by the Certificate Registrar in which the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges of the Certificates.

Certificate Registrar:  Initially, the Indenture Trustee, in its capacity as Certificate Registrar, or any successor to the Indenture Trustee in such capacity.

Certificate of Trust:  The Certificate of Trust filed for the Trust pursuant to Section 3810(a) of the Statutory Trust Statute, including all amendments and restatements.

Certificateholder:  The Person in whose name a Certificate is registered in the Certificate Register except that, any Certificate registered in the name of the Issuer, the Owner Trustee or the Indenture Trustee or any Affiliate of any of them shall be deemed not to be outstanding and the registered holder will not be considered a Certificateholder or a holder for purposes of giving any request, demand, authorization, direction, notice, consent

or waiver under the Indenture or the Trust Agreement; provided that, in determining whether the Indenture Trustee or the Owner Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Certificates that the Indenture Trustee or the Owner Trustee knows to be so owned shall be so disregarded. Owners of the Certificates that have been pledged in good faith may be regarded as Holders if the pledgee establishes to the satisfaction of the Indenture Trustee or the Owner Trustee, as the case may be, the pledgee's right so to act with respect to such Certificates and that the pledgee is not the Issuer, any other obligor upon the Certificates or any Affiliate of any of the foregoing Persons.

Class:  Collectively, all of the Notes bearing the same designation.

Closing Date:  July 21, 2006.

Code:  The Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

Collateral:  The meaning specified in the Granting Clause of the Indenture.

Collection Period:  As to any Payment Date, the calendar month preceding the month of that Payment Date.

Combined Loan-to-Value Ratio:  With respect to each Home Loan, the ratio, expressed as a percentage, of (i) the sum of (A) the original principal balance of such Home Loan, and (B) any outstanding principal balance, at origination of such Home Loan, of all other mortgage loans, if any, secured by senior or subordinate liens on the related Mortgaged Property, to (ii) the Appraised Value, or, if permitted by the Program Guide, the purchase price of the Mortgaged Property, a statistical valuation or the Stated Value.

Commission:  The Securities and Exchange Commission.

Corporate Trust Office:  With respect to the Indenture Trustee, Certificate Registrar, Certificate Paying Agent and Paying Agent, the principal corporate trust office of the Indenture Trustee and Note Registrar at which at any particular time its corporate trust business shall be administered, which office at the date of the execution of this instrument is located at 4 New York Plaza, 6th Floor, New York, New York 10004, Attention: Worldwide Securities Services/Structured Finance Services - Home Loan Trust 2006-HI3. With respect to the Owner Trustee, the principal corporate trust office of the Owner Trustee at which at any particular time its corporate trust business shall be administered, which office at the date of the execution of this Trust Agreement is located at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890, Attention:  Corporate Trust Administration.

Credit Enhancement Instrument:  The Financial Guaranty Insurance Policy, Number 06030087, dated as of the Closing Date, issued by the Credit Enhancer to the Indenture Trustee.

Credit Enhancer:  Financial Guaranty Insurance Company, a placeStateNew York stock insurance corporation or any successor thereto.

Credit Enhancer Default:  If the Credit Enhancer fails to make a payment required under the Credit Enhancement Instrument in accordance with its terms.

Credit Repository:  Equifax, Transunion and Experian, or their successors in interest.

Credit Scores:  The figure assigned to a Home Loan that is designed to assess the Mortgagor's credit history which is obtained from credit reports provided by various credit reporting organizations and obtained by many lenders in connection with Home Loan applications to help assess a Mortgagor's creditworthiness.

Custodial Account:  The account or accounts created and maintained by the Master Servicer pursuant to Section 3.02(b) of the Servicing Agreement, in which the Master Servicer shall deposit or cause to be deposited certain amounts in respect of the Home Loans.

Custodial Agreement:  Any Custodial Agreement among the Custodian, the Indenture

Trustee and the Master Servicer relating to the custody of the Home Loans and the Related Documents.

Custodian:  Wells Fargo Bank, N.A., a national association, and its successors and assigns.

Cut-off Date:  July 1, 2006.

Cut-off Date Loan Balance:  With respect to any Home Loan, the unpaid principal balance thereof as of the close of business on the Business Day immediately prior to the Cut-off Date.

Default:  Any occurrence which is or with notice or the lapse of time or both would become an Event of Default.

Deficiency Amount:  With respect to any class of Notes and any Payment Date, the sum of (i) the excess, if any, of (A) (1) the aggregate amount of Accrued Note Interest on such Payment Date less (2) an amount equal to any Prepayment Interest Shortfalls and Relief Act Shortfalls on the Home Loans during the related Collection Period, over (B) the amount available for interest distributions on the Notes on that Payment Date pursuant to the Indenture, (ii) any Liquidation Loss Amount, to the extent not distributed as part of the Liquidation Loss Payment Amount or covered by a reduction of the Outstanding Reserve Amount and (iii) amounts due on the Notes on the Final Insured Payment Date, if outstanding after giving effect to all other payments of principal on such Notes on such Payment Date from all sources other than the Credit Enhancement Instrument.

Deficient Valuation:  With respect to any Home Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Home Loan, or any reduction in the amount of principal to be paid in connection with any scheduled payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

Definitive Notes:  The meaning specified in Section 4.06 of the Indenture.

Deleted Loan:  A Home Loan replaced or to be replaced with an Eligible Substitute Loan.

Delinquent:  As used herein, a Home Loan is considered to be "30 to 59 days" or "30 or more days" delinquent when a payment due on any due date remains unpaid as of the close of business on the next following monthly due date. Since the determination as to whether a Home Loan falls into these categories is made as of the close of business on the last business day of each month, a Home Loan with a payment due on July 1 that remained unpaid as of the close of business on July 31 would still be considered current as of July 31. If that payment remained unpaid as of the close of business on August 31, the Home Loan would then be considered 30-59 days delinquent. Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

Depositor:  Residential Funding Mortgage Securities II, Inc., a placeStateDelaware corporation, or its successor in interest.

Depository or Depository Agency:  The Depository Trust Company or a successor appointed by the Indenture Trustee with the approval of the Depositor. Any successor to the Depository shall be an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the Securities and Exchange Commission thereunder.

Depository Participant:  A Person for whom, from time to time, the Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Derivative Contract:  Any ISDA Master Agreement, together with the related schedule and confirmation, entered into by the Owner Trustee and a Derivative Counterparty in accordance with Section 5.06 of the Trust Agreement.

Derivative Counterparty:  Any counterparty to a Derivative Contract as provided in

Determination Date:  With respect to any Payment Date, the 20th day of the month in which such Payment Date occurs or if such day is not a Business Day, the next succeeding Business Day.

Due Date:  The date on which the Monthly Payment on the related Home Loan is due in accordance with the terms of the related Mortgage Note.

Eligible Account:  An account that is any of the following:  (i) maintained with a depository institution the short-term debt obligations of which have been rated by each Rating Agency in its highest rating category available, or (ii) an account or accounts in a depository institution in which such accounts are fully insured to the limits established by the FDIC, provided that any deposits not so insured shall, to the extent acceptable to each Rating Agency, as evidenced in writing, be maintained such that (as evidenced by an Opinion of Counsel delivered to the Indenture Trustee and each Rating Agency) the Indenture Trustee has a claim with respect to the funds in such account or a perfected first security interest against any collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such account is maintained, or (iii) in the case of the Custodial Account, either (A) a trust account or accounts maintained at the corporate trust department of the Indenture Trustee or (B) an account or accounts maintained at the corporate trust department of the Indenture Trustee, as long as its short term debt obligations are rated P-1 by Moody's and A-1+ by Standard & Poor's (or the equivalent) or better by each Rating Agency and its long term debt obligations are rated A2 by Moody's and AA- by Standard & Poor's (or the equivalent) or better, by each Rating Agency, or (iv) in the case of the Custodial Account and the Payment Account, a trust account or accounts maintained in the corporate trust division of the Indenture Trustee, or (v) an account or accounts of a depository institution acceptable to each Rating Agency (as evidenced in writing by each Rating Agency that use of any such account as the Custodial Account or the Payment Account will not reduce the rating assigned to any of the Securities by such Rating Agency (if determined without regard to the Credit Enhancement Instrument) below the lower of the then-current rating or the rating assigned to such Securities (if determined without regard to the Credit Enhancement Instrument) as of the Closing Date by such Rating Agency).

Eligible Substitute Loan:  A Home Loan substituted by the Seller for a Deleted Loan which must, on the date of such substitution, as confirmed in an Officers' Certificate delivered to the Indenture Trustee, (i) have an outstanding principal balance, after deduction of the principal portion of the monthly payment due in the month of substitution (or in the case of a substitution of more than one Home Loan for a Deleted Loan, an aggregate outstanding principal balance, after such deduction), not in excess of the outstanding principal balance of the Deleted Loan (the amount of any shortfall to be deposited by the Seller in the Custodial Account in the month of substitution); (ii) comply with each representation and warranty (other than a statistical representation or warranty) set forth in Section 3.1(b) of the Home Loan Purchase Agreement as of the date of substitution; (iii) have a Loan Rate no lower than and not more than 1% in excess of the Loan Rate of such Deleted Loan; (iv) have a Combined Loan-to-Value Ratio at the time of substitution no higher than that of the Deleted Loan at the time of substitution; (v) have, at the time of substitution, a remaining term to stated maturity not greater than (and not more than one year less than) that of the Deleted Loan; (vi) be ineligible for inclusion in a real estate mortgage investment conduit ("REMIC") (a "REMIC Ineligible Loan") if the Deleted Loan was a REMIC Ineligible Loan (because (a) the value of the real property securing the Deleted Loan was not at least equal to eighty percent of the adjusted issue price of such loan at the time of origination, calculated by subtracting the amount of any liens that are senior to such Home Loan and a proportionate amount of any lien of equal priority from the value of such property when the Deleted Loan was originated and (b) substantially all of the proceeds of the Deleted Loan were not used to acquire, improve or protect an interest in the real property securing such loan and such real property was the only security for such Deleted Loan); and (vii) not be 30 or more days delinquent.

ERISA:  The Employee Retirement Income Security Act of 1974, as amended.

Event of Default:  With respect to the Indenture, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order

of any court or any order, rule or regulation of any administrative or governmental body):

(i)    a default in the payment of any interest on any Note when the same becomes due and payable, and such default shall continue for a period of five days; or

(ii)    a default in the payment of the principal of or any installment of the principal of any Note when the same becomes due and payable other than as a result of Prepayment Interest Shortfalls or Relief Act Shortfalls, and such default shall continue for a period of five days; or

(iii)    there occurs a default in the observance or performance of any covenant or agreement of the Issuer made in the Indenture, or any representation or warranty of the Issuer made in the Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proving to have been incorrect in any material respect as of the time when the same shall have been made which has a material adverse effect on Securityholders or the Credit Enhancer, and such default shall continue or not be cured, or the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the outstanding Note Balance of the Notes or the Credit Enhancer, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of default hereunder; or

(iv)    there occurs the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer or any substantial part of the Trust Estate in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial part of the Trust Estate, or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or

(v)    there occurs the commencement by the Issuer of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial part of the assets of the Trust Estate, or the making by the Issuer of any general assignment for the benefit of creditors, or the failure by the Issuer generally to pay its debts as such debts become due, or the taking of any action by the Issuer in furtherance of any of the foregoing.

Event of Servicer Termination:  With respect to the Servicing Agreement, a Servicing Default as defined in Section 7.01 of the Servicing Agreement.

Exchange Act:  The Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

Expenses:  The meaning specified in Section 7.02 of the Trust Agreement.

FDIC:  The Federal Deposit Insurance Corporation or any successor thereto.

FHLMC:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

Final Insured Payment Date:  The Payment Date in February 2036.

FNMA:  The Federal National Mortgage Association, or any successor thereto.

Foreclosure Profit:  With respect to a Liquidated Home Loan, the excess, if any, of (x) Net Liquidation Proceeds over (y) the sum of (a) the Loan Balance of the related Home Loan immediately prior to the date it became a Liquidated Home Loan, less any Net Liquidation Proceeds previously received with respect to such Home Loan and applied as a recovery of principal, and (b) accrued and unpaid interest on the related Home Loan at the Net Loan Rate through the date of receipt of the proceeds.

Form 10-K Certification:  As defined in Section 4.04(b) of the Servicing Agreement.

Grant:  Pledge, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to the Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of such collateral or other agreement or instrument and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

Holder:  Any of the Noteholders or Certificateholders.

Homeownership Act:  The Home Ownership Protection Act of 1994.

Home Loans:  At any time, the Home Loans that have been sold by the Seller under the Home Loan Purchase Agreement, together with the Related Documents, and that remain subject to the terms thereof.

Home Loan Purchase Agreement:  The Home Loan Purchase Agreement, between the Seller, as seller, and the Depositor, as purchaser, with respect to the Home Loans, dated as of the Cut-off Date.

Home Loan Schedule:  The initial schedule of Home Loans as of the Cut-off Date set forth in Exhibit A of the Servicing Agreement, which schedule sets forth as to each Home Loan, among other things:

(i)   the Home Loan identifying number ("RFC LOAN #");

(ii)   the state, city and zip code of the Mortgaged Property;

(iii)   the maturity of the Mortgage Note ("MATURITY DATE");

(iv)   the Loan Rate ("CUR RATE");

(v)   the Principal Balance at origination ("ORG AMT");

(vi)   the type of property securing the Mortgage Note ("PROPERTY TYPE");

(vii)   the appraised value ("APPRSL");

(viii) the initial scheduled monthly payment of principal, if any, and interest ("ORIGINAL P & I");

(ix)   the Cut-off Date Loan Balance ("CUT-OFF BAL");

(x)   the Combined Loan-to-Value Ratio at origination ("CLTV");

(xi)   the date of the Mortgage Note ("NOTE DATE");

(xii)   the original term to maturity of the Home Loan ("ORIGINAL TERM");

(xiii) under the column "OCCP CODE," a code indicating whether the Home Loan is secured by a non-owner occupied residence;

(xiv)   the Principal Balance of any Home Loan senior thereto ("SR BAL");

(xv)   the Credit Score ("CR SCORE");

(xvi)   the debt to income ratio ("DTI");

(xvii) product code ("PRODUCT CODE");

(xviii) loan purpose ("PURPOSE");

(xix)   the lien position of the related Mortgage ("LIEN");

(xx)    the Subservicer loan number (SERVICER LOAN #); and

(xxi)   the remaining term of the Home Loan (REMAINING TERM).

        Such schedule may consist of multiple reports that collectively set forth all of the information required.

        Indemnified Party:  The meaning specified in Section 7.02 of the Trust Agreement.

        Indenture:  The indenture dated as of the Closing Date between the Issuer, as debtor, and the Indenture Trustee, as indenture trustee.

        Indenture Trustee:  JPMorgan Chase Bank, National Association, and its successors and assigns or any successor indenture trustee appointed pursuant to the terms of the Indenture.

        Indenture Trustee Information:  As specified in Section 9.05(a)(i)(A) of the Servicing Agreement.

        Independent:  When used with respect to any specified Person, the Person (i) is in fact independent of the Issuer, any other obligor on the Notes, the Seller, the Issuer, the Depositor and any Affiliate of any of the foregoing Persons, (ii) does not have any direct financial or any material indirect financial interest in the Issuer, any such other obligor, the Seller, the Issuer, the Depositor or any Affiliate of any of the foregoing Persons and (iii) is not connected with the Issuer, any such other obligor, the Seller, the Issuer, the Depositor or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

        Independent Certificate:  A certificate or opinion to be delivered to the Indenture Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of Section 10.01 of the Indenture, made by an Independent appraiser or other expert appointed by an Issuer Request and approved by the Indenture Trustee in the exercise of reasonable care, and such opinion or certificate shall state that the signer has read the definition of "Independent" in this Indenture and that the signer is Independent within the meaning thereof.

        Initial Certificate:  The Home Loan-Backed Certificates, Series 2006-HI3, issued on the Closing Date, each evidencing undivided beneficial interests in the Issuer and executed by the Owner Trustee.

        Initial Note Balance:  With respect to the Class A-1 Notes, $91,411,000, with respect to the Class A-2 Notes, $21,019,000, with respect to the Class A-3 Notes, $45,586,000 and with respect to the Class A-4 Notes, $65,142,000.

        Insolvency Event:  With respect to a specified Person, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or (b) the commencement by such Person of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, or the failure by such Person generally to pay its debts as such debts become due or the admission by such Person in writing (as to which the Indenture Trustee shall have notice) of its inability to pay its debts generally, or the adoption by the Board of Directors or managing member of such Person of a resolution which authorizes action by such Person in furtherance of any of the foregoing.

Insurance Agreement:  The Insurance and Indemnity Agreement dated as of July 21, 2006, among the Master Servicer, the Depositor, the Issuer, the Indenture Trustee and the Credit Enhancer, including any amendments and supplements thereto.

Insured Payment:  With respect to (a) any Payment Date, the sum of (i) any Deficiency Amount and (ii) any Preference Amount and (b) any other date, any Preference Amount.

Insurance Proceeds:  Proceeds paid by any insurer (other than the Credit Enhancer) pursuant to any insurance policy covering a Home Loan which are required to be remitted to the Master Servicer, or amounts required to be paid by the Master Servicer pursuant to the next to last sentence of Section 3.04 of the Servicing Agreement, net of any component thereof (i) covering any expenses incurred by or on behalf of the Master Servicer in connection with obtaining such proceeds, (ii) that is applied to the restoration or repair of the related Mortgaged Property, (iii) released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures or (iv) required to be paid to any holder of a mortgage senior to such Home Loan.

Interest Accrual Period:  With respect to (i) the Class A-1 Notes (a) as to the Payment Date in August 2006, the period commencing on the Closing Date and ending on the day preceding the Payment Date in August 2006, and (b) as to any Payment Date after the Payment Date in August 2006, the period commencing on the Payment Date in the month immediately preceding the month in which that Payment Date occurs and ending on the day preceding that Payment Date and (ii) each class of Notes, other than the Class A-1 Notes, and any Payment Date, the calendar month preceding the month in which the related Payment Date occurs.

Interest Collections:  With respect to any Payment Date, the sum of (i) the portion allocable to interest of all scheduled monthly payments on the Home Loans received during the related Collection Period reduced by the Administrative Fees for such Collection Period, (ii) the portion allocable to interest of all Net Liquidation Proceeds and proceeds from repurchases of, and some amounts received in connection with any substitutions for, the related Home Loans, received or deemed received during the related Collection Period, reduced by any related Administrative Fees for that Collection Period, (iii) the interest portion of the cash purchase price paid in connection with any optional purchase of the Home Loans by the Master Servicer and (iv) any proceeds and recoveries received during the related Collection Period on a Home Loan after it becomes a Liquidated Home Loan allocated to Interest Collections in accordance with the last paragraph of Section 3.07 of the Servicing Agreement, reduced by the Administrative Fees for such Collection Period.

Issuer or Trust:  The Home Loan Trust 2006-HI3, a placeStateDelaware statutory trust, or its successor in interest.

Issuer Request:  A written order or request signed in the name of the Issuer by any one of its Authorized Officers and delivered to the Indenture Trustee.

LIBOR:  For any Interest Accrual Period other than the first Interest Accrual Period, the rate for country-regionUnited States dollar deposits for one month which appears on the Dow Jones Telerate Screen Page 3750 as of 11:00 A.M., placeCityLondon, country-regionEngland time, on the second LIBOR Business Day prior to the first day of such Interest Accrual Period. With respect to the first Interest Accrual Period, the rate for country-regionUnited States dollar deposits for one month which appears on the Dow Jones Telerate Screen Page 3750 as of 11:00 A.M., placeCityLondon, country-regionEngland time, two LIBOR Business Days prior to the Closing Date. If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be reasonably selected by the Indenture Trustee after consultation with the Master Servicer and the Credit Enhancer), the rate will be the Reference Bank Rate. If no such quotations can be obtained and no Reference Bank Rate is available, LIBOR will be LIBOR applicable to the preceding Payment Date.

LIBOR Business Day:  Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the city of CityLondon, placecountry-regionEngland are required or authorized by law to be closed.

Lien:  Any mortgage, deed of trust, pledge, conveyance, hypothecation, assignment, participation, deposit arrangement, encumbrance, lien (statutory or other), preference,

priority right or interest or other security agreement or preferential arrangement of any
kind or nature whatsoever, including, without limitation, any conditional sale or other
title retention agreement, any financing lease having substantially the same economic effect
as any of the foregoing and the filing of any financing statement under the UCC (other than
any such financing statement filed for informational purposes only) or comparable law of any
jurisdiction to evidence any of the foregoing; provided, however, that any assignment
pursuant to Section 6.02 of the Servicing Agreement shall not be deemed to constitute a Lien.

Limited Repurchase Right Holder:  The Master Servicer.

Liquidated Home Loan: As to any Payment Date, any Home Loan which the Master Servicer
has determined, based on the servicing procedures specified in the Servicing Agreement, as
of the end of the preceding Collection Period, that all Liquidation Proceeds which it
expects to recover in connection with the disposition of the related Mortgaged Property have
been recovered. In addition, the Master Servicer will treat any Home Loan that is 180 days
or more delinquent as having been finally liquidated.

Liquidation Expenses:  Out-of-pocket expenses (exclusive of overhead) which are
incurred by or on behalf of the Master Servicer in connection with the liquidation of any
Home Loan and not recovered under any insurance policy, such expenses including, without
limitation, legal fees and expenses, any unreimbursed amount expended (including, without
limitation, amounts advanced to correct defaults on any loan which is senior to such Home
Loan and amounts advanced to keep current or pay off a loan that is senior to such Home
Loan) respecting the related Home Loan and any related and unreimbursed expenditures for
real estate property taxes or for property acquisition, restoration, preservation or
disposition, or insurance against casualty loss or damage.

Liquidation Loss Amount: With respect to any Payment Date and any Home Loan that
became a Liquidated Home Loan during the related Collection Period, the unrecovered portion
of the related Loan Balance thereof at the end of such Collection Period, after giving
effect to the Net Liquidation Proceeds applied to reduce the related Loan Balance. In
addition, as to any Home Loan for which the principal balance has been reduced in connection
with bankruptcy proceedings, the amount of the reduction will be treated as a Liquidation
Loss Amount.

Liquidation Loss Payment Amount: As to any Payment Date, an amount equal to the
lesser of (i) the amount available for payment of the Liquidation Loss Payment Amount for
that Payment Date, as provided in clause (iv) of Section 3.05(a) of the Indenture and (ii)
the sum of (a) 100% of the Liquidation Loss Amounts incurred on the related Home Loans
during the related Collection Period and (b) any Liquidation Loss Amounts remaining unpaid
from any preceding Collection Period, to the extent not reflected on such preceding Payment
Date by a reduction of the Outstanding Reserve Amount.

Liquidation Proceeds:  Proceeds (including Insurance Proceeds but not including
amounts drawn under the Credit Enhancement Instrument) if any received in connection with
the liquidation of any Home Loan or related REO, whether through trustee's sale, foreclosure
sale, the exercise of the power of eminent domain or condemnation or otherwise.

Loan Balance:  With respect to any Home Loan, other than a Liquidated Home Loan, and
as of any day, the related Cut-off Date Loan Balance, minus all collections in respect of
principal in accordance with the related Mortgage Note and applied in reduction of the Loan
Balance thereof. For purposes of this definition, a Liquidated Home Loan shall be deemed to
have a Loan Balance equal to zero.

Loan Rate or Mortgage Rate:  With respect to any Home Loan and any day, the per annum
rate of interest set forth in the related Mortgage Note.

Lost Note Affidavit:  With respect to any Home Loan as to which the original Mortgage
Note has been permanently lost or destroyed and has not been replaced, an affidavit from the
Seller certifying that the original Mortgage Note has been lost, misplaced or destroyed
(together with a copy of the related Mortgage Note).

Master Servicer:  Residential Funding Corporation, a placeStateDelaware corporation,
and its successors and assigns.

Master Servicer Extension Notice: The meaning specified in Section 7.04(d) of the Servicing Agreement.

Master Servicing Fee:  With respect to any Home Loan and any Collection Period, the product of (i) the Master Servicing Fee Rate divided by 12 and (ii) the Loan Balance of such Home Loan as of the first day of such Collection Period.

Master Servicing Fee Rate:  With respect to any Home Loan, 0.08% per annum.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of placeStateDelaware, or any successor thereto.

MERS(R) System:  The system of recording transfers of Mortgages electronically maintained by MERS.

MIN:  The Mortgage Identification Number for Home Loans registered with MERS on the MERS(R) System.

MOM Loan:  With respect to any Home Loan, MERS acting as the mortgagee of such Home Loan, solely as nominee for the originator of such Home Loan and its successors and assigns, at the origination thereof.

Monthly Payment:  With respect to any Home Loan (including any REO Property) and any Due Date, the payment of principal and interest due thereon in accordance with the amortization schedule at the time applicable thereto (after adjustment, if any, for partial prepayments and for Deficient Valuations occurring prior to such Due Date but before any adjustment to such amortization schedule by reason of any bankruptcy, other than a Deficient Valuation, or similar proceeding or any moratorium or similar waiver or grace period).

Moody's:  Moody's Investors Service, Inc. or its successor in interest.

Mortgage:  The mortgage, deed of trust or other instrument creating a first or second lien on an estate in fee simple or leasehold interest in real property securing a Home Loan.

Mortgage File:  The file containing the Related Documents pertaining to a particular Home Loan and any additional documents required to be added to the Mortgage File pursuant to the Home Loan Purchase Agreement or the Servicing Agreement.

Mortgage Note:  With respect to a Home Loan, the mortgage note pursuant to which the related mortgagor agrees to pay the indebtedness evidenced thereby and secured by the related Mortgage as modified or amended.

Mortgaged Property:  The underlying property, including real property and improvements thereon, securing a Home Loan.

Mortgagor:  The obligor or obligors under a Mortgage Note.

Net Liquidation Proceeds:  As to any Liquidated Home Loan, the proceeds, including Insurance Proceeds but excluding amounts drawn on the Credit Enhancement Instrument, received in connection with the liquidation of the Home Loan, whether through trustee's sale, foreclosure sale or otherwise, reduced by related expenses, but not including the portion, if any, of the proceeds that exceed the principal balance of the Home Loan at the end of the Collection Period immediately preceding the Collection Period in which the Home Loan became a Liquidated Home Loan.

Net Loan Rate:  With respect to any Home Loan and any date of determination, a per annum rate of interest equal to the then applicable Loan Rate for such Home Loan minus the Servicing Fee Rate and the Premium Percentage.

Note Balance:  With respect to any Payment Date and any Class of Notes, the Initial Note Balance thereof reduced by all payments of the Principal Payment Amount thereon prior to and as of such Payment Date.

Note Owner:  The Beneficial Owner of a Note.

Note Rate:  With respect to (i) the Class A-1 Notes, will be the lesser of (a) LIBOR plus 0.10% per annum and (b) 9.000% per annum; and (ii) the Class A-2 Notes, Class A-3 Notes, and Class A-4 Notes and any Interest Accrual Period, 5.95%, 5.96% and 6.31% per annum, respectively; provided, that on the Step-Up Date, the Note Rate on the Class A-4 Notes shall increase by 0.50% per annum.

Note Register:  The register maintained by the Note Registrar in which the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes.

Note Registrar:   The Indenture Trustee, in its capacity as Note Registrar.

Noteholder:   The Person in whose name a Note is registered in the Note Register, except that, any Note registered in the name of the Depositor, the Issuer or the Indenture Trustee or any Affiliate of any of them shall be deemed not to be outstanding and the registered holder will not be considered a Noteholder or holder for purposes of giving any request, demand, authorization, direction, notice, consent or waiver under the Indenture or the Trust Agreement provided that, in determining whether the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that the Indenture Trustee or the Owner Trustee knows to be so owned shall be so disregarded. Owners of Notes that have been pledged in good faith may be regarded as Holders if the pledgee establishes to the satisfaction of the Indenture Trustee or the Owner Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, any other obligor upon the Notes or any Affiliate of any of the foregoing Persons.  Any Notes on which payments are made under the Credit Enhancement Instrument shall be deemed Outstanding until the Credit Enhancer has been reimbursed with respect thereto and the Credit Enhancer shall be deemed the Noteholder thereof to the extent of such unreimbursed payment.

Notes:  Any one of the Class A-1, Class A-2, Class A-3 or Class A-4 Notes issued and outstanding at any time pursuant to the Indenture.

Officer's Certificate:  With respect to the Master Servicer, a certificate signed by the President, Managing Director, a Director, a Vice President or an Assistant Vice President, of the Master Servicer and delivered to the Indenture Trustee. With respect to the Issuer, a certificate signed by any Authorized Officer of the Issuer, under the circumstances described in, and otherwise complying with, the applicable requirements of Section 10.01 of the Indenture, and delivered to the Indenture Trustee. Unless otherwise specified, any reference in the Indenture to an Officer's Certificate shall be to an Officer's Certificate of any Authorized Officer of the Issuer.

Opinion of Counsel:  A written opinion of counsel. Any Opinion of Counsel for the Master Servicer may be provided by in-house counsel for the Master Servicer if reasonably acceptable to the Indenture Trustee, the Credit Enhancer and the Rating Agencies or counsel for the Depositor, as the case may be.

Optional Redemption:  The right of the Master Servicer to purchase the Home Loans on any Payment Date on which the aggregate Principal Balance of the Home Loans as of the end of the related Collection Period is less than 10% of the Cut-off Date Balance, pursuant to Section 8.08 of the Servicing Agreement.

Original Trust Agreement:  The Trust Agreement, dated as of July 11, 2006, between the Owner Trustee and the Depositor.

Outstanding:  With respect to the Notes, as of the date of determination, all Notes theretofore executed, authenticated and delivered under this Indenture except:

(i)    Notes theretofore cancelled by the Note Registrar or delivered to the Indenture Trustee for cancellation; and

(ii)   Notes in exchange for or in lieu of which other Notes have been executed, authenticated and delivered pursuant to the Indenture unless proof satisfactory to the Indenture Trustee is presented that any such Notes are held by a holder in due course;

provided, however, that for purposes of effectuating the Credit Enhancer's right of

subrogation as set forth in Section 4.12 of the Indenture only, all Notes that have been paid with funds provided under the Credit Enhancement Instrument shall be deemed to be Outstanding until the Credit Enhancer has been reimbursed with respect thereto.

Outstanding Reserve Amount:  With respect to any Payment Date, the amount, if any, by which the Pool Balance after applying payments received in the related Collection Period exceeds the aggregate Note Balance of the Notes on such Payment Date, after application of Principal Collections and the Liquidation Loss Payment Amounts for that Payment Date.  The Outstanding Reserve Amount will be increased by distributions of Reserve Increase Amount, if any, to the Notes.  As of the Closing Date, the Outstanding Reserve Amount will be equal to approximately 1.65% of the aggregate unpaid principal balance of the Home Loans on the Business Day prior to the Cut-off Date.

Owner Trust Estate:  The meaning specified in Section 2.05 of the Trust Agreement.

Owner Trustee:  Wilmington Trust Company not in its individual capacity but solely as Owner Trustee of the Trust, and its successors and assigns or any successor owner trustee appointed pursuant to the terms of the Trust Agreement.

Owner Trustee Information:  As specified in Section 11.04(a)(i)(A) of the Trust Agreement.

Paying Agent:  Any paying agent or co-paying agent appointed pursuant to Section 3.03 of the Indenture, which initially shall be the Indenture Trustee.

Payment Account:  The account established by the Indenture Trustee pursuant to Section 8.02 of the Indenture and Section 5.01 of the Servicing Agreement. Amounts deposited in the Payment Account will be paid by the Indenture Trustee in accordance with Section 3.05 of the Indenture.

Payment Date:  The 25th day of each month, or if such day is not a Business Day, then the next Business Day.

Percentage Interest:  With respect to any Note and any date of determination, the percentage obtained by dividing the Note Balance of such Note, by the aggregate of the Note Balances of all Notes of the same Class.

Permitted Investments:  One or more of the following:

(i)    obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(ii)    repurchase agreements on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each Rating Agency in its highest short-term rating category available;

(iii)    federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company (or, if the only Rating Agency is Standard & Poor's, in the case of the principal depository institution in a depository institution holding company, debt obligations of the depository institution holding company) at the date of acquisition thereof have been rated by each Rating Agency in its highest short-term rating category available; and provided further that, if the only Rating Agency is Standard & Poor's and if the depository or trust company is a principal subsidiary of a bank holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the bank holding company; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such

institution shall be A-1+ in the case of Standard & Poor's if Standard & Poor's is the Rating Agency;

(iv)    commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has been rated by each Rating Agency in its highest short-term rating category available; provided that such commercial paper shall have a remaining maturity of not more than 30 days;

(v)    a money market fund or a qualified investment fund rated by each Rating Agency in its highest long-term rating category available; and

(vi)    other obligations or securities that are acceptable to each Rating Agency as an Permitted Investment hereunder and will not reduce the rating assigned to any Securities by such Rating Agency below the current rating or the rating assigned to such Securities as of the Closing Date by such Rating Agency, and which are acceptable to the Credit Enhancer, as evidenced in writing, provided that if the Master Servicer or any other Person controlled by the Master Servicer is the issuer or the obligor of any obligation or security described in this clause (vi) such obligation or security must have an interest rate or yield that is fixed or is variable based on an objective index that is not affected by the rate or amount of losses on the Home Loans;

provided, however, that no instrument shall be a Permitted Investment if it represents, either (1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the right to receive both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations References herein to the highest rating available on unsecured long-term debt shall mean AAA in the case of Standard & Poor's and Aaa in the case of Moody's, and references herein to the highest rating available on unsecured commercial paper and short-term debt obligations shall mean A-1+ in the case of Standard & Poor's and P-1 in the case of Moody's.

Person:  Any legal individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Pool Balance:  With respect to any date, the aggregate of the Loan Balances of all Home Loans as of such date.

Predecessor Note:  With respect to any particular Note, every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purpose of this definition, any Note authenticated and delivered under Section 4.03 of the Indenture in lieu of a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note.

Preference Amount:  Any amount previously paid to a Noteholder that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy court pursuant to the United States Bankruptcy Code (11 U.S.C.), as amended from time to time, in accordance with a final non-appealable order of a court exercising proper jurisdiction in an insolvency proceeding.

Premium:  The amount of premium due to the Credit Enhancer in accordance with the terms of the Insurance Agreement.

Premium Percentage:  As set forth in the Insurance Agreement.

Prepayment Assumption:  A 100% Prepayment Assumption used solely for determining the accrual of original issue discount, market discount and premium, if any, on the Notes for federal income tax purposes.  A 100% Prepayment Assumption assumes a constant prepayment rate of 5% per annum for the first month, increasing each month by an additional 20%/14 until the fifteenth month.  Beginning in the fifteenth month and in each month thereafter during the life of the Home Loans, a 100% Prepayment Assumption assumes a constant prepayment rate of 25% per annum each month.

Prepayment Interest Shortfall:  With respect to any Payment Date, the aggregate shortfall, if any, in collections of interest, adjusted to the related Net Loan Rate, resulting from borrower prepayments during the related Collection Period.  These shortfalls will not be covered by the Master Servicer, the Credit Enhancer or any other person.

Principal Collection Payment Amount:  As to any Payment Date, the total Principal Collections (reduced by any portion used to pay interest on the Notes) for such Payment Date; provided, however, on any Payment Date as to which the Outstanding Reserve Amount that would result without regard to this proviso exceeds the Reserve Amount Target, the Principal Collection Payment Amount will be reduced by the amount not less than zero by the amount of the excess until the Outstanding Reserve Amount equals the Reserve Amount Target.

Principal Collections:  As to any Payment Date, an amount equal to the sum of:

(i)    the principal portion of all scheduled Monthly Payments on the related Home Loans received during the related Collection Period;

(ii)    the principal portion of all proceeds of the repurchase of any Home Loans (or, in the case of a substitution, any Substitution Adjustment Amounts) as required by the Servicing Agreement received during the related Collection Period and the principal portion of the cash purchase price paid in connection with any optional purchase of the Home Loans by the Master Servicer; and

(iii)    the principal portion of all other unscheduled collections received on the Home Loans during the related Collection Period (or deemed to be received during the related Collection Period) (including, without limitation, full and partial Principal Prepayments made by the respective Mortgagors, Insurance Proceeds and Net Liquidation Proceeds), to the extent not previously paid;

provided, however, that Principal Collections shall be reduced by any amounts withdrawn from the Custodial Account pursuant to Section 3.03(ii), (v), (vi) and (vii) of the Servicing Agreement.

Principal Prepayment:  Any payment of principal made by the Mortgagor on a Home Loan which is received in advance of its scheduled Due Date and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Proceeding:  Any suit in equity, action at law or other judicial or administrative proceeding.

Program Guide:  Together, the Seller's Seller Guide and Servicing Guide, as in effect from time to time.

Prospectus Supplement:  The prospectus supplement, dated July 20, 2006, relating to the issuance of the Home Loan-Backed Notes, Series 2006-HI3.

Purchase Price:  The meaning specified in Section 2.2(a) of the Home Loan Purchase Agreement.

Purchaser:   Residential Funding Mortgage Securities II, Inc., a Delaware corporation, and its successors and assigns.

Qualified Insurer:  A mortgage guaranty insurance company duly qualified as such under the laws of the state of its principal place of business and each state having jurisdiction over such insurer in connection with the insurance policy issued by such insurer, duly authorized and licensed in such states to transact a mortgage guaranty insurance business in such states and to write the insurance provided by the insurance policy issued by it, approved as an insurer by the Master Servicer and as a FNMA-approved mortgage insurer.

Rating Agency:  Any nationally recognized statistical rating organization, or its successor, that rated the Securities at the request of the Depositor at the time of the initial issuance of the Securities, which initially shall be Moody's or Standard & Poor's. If such organization or a successor is no longer in existence, "Rating Agency" shall be such

nationally recognized statistical rating organization or other comparable Person, designated by the Depositor, notice of which designation shall be given to the Indenture Trustee. References herein to the highest short term unsecured rating category of a Rating Agency shall mean A-1 or better in the case of Standard & Poor's and P-1 or better in the case of Moody's and in the case of any other Rating Agency shall mean such equivalent ratings. References herein to the highest long-term rating category of a Rating Agency shall mean "AAA" in the case of Standard & Poor's and "Aaa" in the case of Moody's and in the case of any other Rating Agency, such equivalent rating.

Record Date:  With respect to the Class A-1 Notes and any Payment Date, the Business Day next preceding such Payment Date and with respect to the Notes (other than the Class A-1 Notes) and the Certificates and any Payment Date, the last Business Day of the month preceding the month of such Payment Date.

Reference Bank Rate:  With respect to any Interest Accrual Period, as follows:  the arithmetic mean (rounded upwards, if necessary, to the nearest one sixteenth of a percent) of the offered rates for United States dollar deposits for one month which are offered by the Reference Banks as of 11:00 A.M., London, England time, on the second LIBOR Business Day prior to the first day of such Interest Accrual Period to prime banks in the London interbank market for a period of one month in amounts approximately equal to the sum of the outstanding Note Balance of the Class A-1 Notes; provided that at least two such Reference Banks provide such rate. If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Indenture Trustee after consultation with the Master Servicer and the Credit Enhancer, as of 11:00 a.m., New York time, on such date for loans in U.S. Dollars to leading European Banks for a period of one month in amounts approximately equal to the aggregate Note Balance of the Class A-1 Notes. If no such quotations can be obtained, the Reference Bank Rate shall be LIBOR applicable to the preceding Payment Date; provided however, that if, under the priorities indicated above, LIBOR for a Payment Date would be based on LIBOR for the previous Payment Date for the third consecutive Payment Date, the Indenture Trustee shall select an alternative comparable index over which the Indenture Trustee has no control, used for determining one-month Eurodollar lending rates that is calculated and published or otherwise made available by an independent party.

Reference Banks:  Barclays Bank PLC, Credit Suisse and Abbey National PLC.

Registered Holder:  The Person in whose name a Note is registered in the Note Register on the applicable Record Date.

Regulation AB:  Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. ss.ss.229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

Related Documents:  With respect to each Home Loan, the documents specified in Section 2.1(c) of the Home Loan Purchase Agreement and any documents required to be added to such documents pursuant to the Home Loan Purchase Agreement, the Trust Agreement or the Servicing Agreement.

Release Agreement:  A Release Agreement as defined in Section 3.05 of the Servicing Agreement.

Relief Act Shortfall:  With respect to any Payment Date, the aggregate shortfall, if any, in collections of interest, as a result of the application of the Servicemembers Civil Relief Act or similar legislation or regulations.  These shortfalls will reduce the amount of Interest Collections on the Home Loans and will not be amounts paid by the Master Servicer, the Credit Enhancer or any other person.

REO:  A Mortgaged Property that is acquired by the Issuer in foreclosure or by deed in lieu of foreclosure.

Repurchase Event:  With respect to any Home Loan, one of the following:  (i) a discovery that, as of the Closing Date, the related Mortgage was not a valid lien on the

related Mortgaged Property subject only to (A) the lien of any prior mortgage indicated on the Home Loan Schedule, (B) the lien of real property taxes and assessments not yet due and payable, (C) covenants, conditions, and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage and such other permissible title exceptions as are listed in the Program Guide and (D) other matters to which like properties are commonly subject which do not materially adversely affect the value, use, enjoyment or marketability of the related Mortgaged Property, or (ii) with respect to any Home Loan as to which the Seller delivers a Lost Note Affidavit, a subsequent default on such Home Loan if the enforcement thereof or of the related Mortgage is materially and adversely affected by the absence of the original Mortgage Note.

Repurchase Price:  With respect to any Home Loan required to be repurchased on any date pursuant to the Home Loan Purchase Agreement or purchased by the Master Servicer or the Limited Repurchase Right Holder pursuant to the Servicing Agreement, an amount equal to the sum of (i) 100% of the Loan Balance thereof (without reduction for any amounts charged off) and (ii) unpaid accrued interest at the Loan Rate (or with respect to the last day of the month in the month of repurchase, the Loan Rate will be the Loan Rate in effect as to the second to last day in such month) on the outstanding principal balance thereof from the Due Date to which interest was last paid by the Mortgagor to the first day of the month following the month of purchase.

Request for Release:  The form attached as Exhibit 4 to the Custodial Agreement or an electronic request in a form acceptable to the Custodian.

Reserve Amount Floor:  An amount equal to 0.50% of the Pool Balance as of the Cut-off Date.

Reserve Amount Target:  As to any Payment Date prior to the Stepdown Date, an amount equal to 6.85% of the Cut-off Date Pool Balance.  On or after the Stepdown Date, the Reserve Amount Target will be equal to the lesser of:

(a)     13.70% of the Pool Balance after applying payments received in the related Collection Period; and

(b)     the Reserve Amount Target as of the Cut-off Date;

provided, however, that the Reserve Amount Target shall not be less than the Reserve Amount Floor; provided further, that any scheduled reduction to the Reserve Amount Target on or after the Stepdown Date as described above shall not be made on any Payment Date unless:

(i)     either (a) the aggregate cumulative Liquidation Loss Amount on the Home Loans from the Cut-off Date through the end of the Collection Period immediately prior to such Payment Date is less than:

(A)     7.50% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 31st through 36th Payment Dates,

(B)     8.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 37th  through 48th Payment Dates, or

(C)     9.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 49th through 60th Payment Dates, or

(D)     12.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 61st through 72nd Payment Dates, or

(E)     14.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 73rd Payment Date (or any Payment Date thereafter) or

(b)     the average of the aggregate Liquidation Loss Amount on the Home Loans that became Liquidated Home Loans during the related Collection Period, as determined for the current and five previous Payment Dates, is less than 50% of the average of the amount remaining in the Payment Account on such Payment Date following distributions pursuant to clauses (i)-(v) of Section 3.05(a) of the Indenture (other than distributions made pursuant to clause

(iii) thereof), as determined for the current and five previous Payment Dates and

    (ii)    there has been no draw on the Credit Enhancement Instrument on such Payment Date that remains unreimbursed.

    In addition, the Reserve Amount Target may be reduced with the prior written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists) and notice to the Rating Agencies.

    Reserve Increase Amount:  As to the any Payment Date, an amount equal to the lesser of (i) the amount available for payment of the Reserve Increase Amount for that Payment Date, as provided in clause (vi) of Section 3.05(a) of the Indenture and (ii) the excess, if any of (x) the Reserve Amount Target over (y) the Outstanding Reserve Amount.

    Responsible Officer:  With respect to the Indenture Trustee, any officer of the Indenture Trustee, with direct responsibility for the administration of the Indenture, , as applicable, and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

    Sale:  The meaning specified in Section 5.15 of the Indenture.

    Securities Act:  The Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

    Securitization Transaction:  Any transaction involving a sale or other transfer of mortgage loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities.

    Security:  Any of the Certificates or Notes.

    Securityholder or Holder:  Any Noteholder or a Certificateholder.

    Security Instrument:  A written instrument creating a valid first lien on a Mortgaged Property securing a Mortgage Note, which may be any applicable form of mortgage, deed of trust, deed to secure debt or security deed, including any riders or addenda thereto.

    Seller:  Residential Funding Corporation, a Delaware corporation, and its successors and assigns.

    Servicing Agreement:  The Servicing Agreement dated as of the Closing Date among the Indenture Trustee, the Issuer and the Master Servicer, as master servicer.

    Servicing Certificate:  A certificate prepared by a Servicing Officer on behalf of the Master Servicer in accordance with Section 4.01 of the Servicing Agreement.

    Servicing Criteria:  The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

    Servicing Default:  The meaning specified in Section 7.01 of the Servicing Agreement.

    Servicing Fee:  With respect to any Home Loan, the sum of the related Master Servicing Fee and the related Subservicing Fee.

    Servicing Fee Rate:  With respect to any Home Loan, the sum of the related Master Servicing Fee Rate and the related Subservicing Fee Rate.

    Servicing Officer:  Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Home Loans whose name and specimen signature appear on a list of servicing officers furnished to the Indenture Trustee by the Master Servicer, as such list may be amended from time to time.

    Servicing Trigger:  As of any Payment Date, for purposes of Section 7.04 of the Servicing Agreement, "Servicing Trigger; Removal of Master Servicer," the aggregate

cumulative Liquidation Loss Amount on the Home Loans from the Cut-off Date through the end of the Collection Period immediately prior to such Payment Date is greater than:

(A)    13.50% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 31st through 36th Payment Dates,

(B)    14.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 37th through 48th Payment Dates, or

(C)    16.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 49th through 60th Payment Dates, or

(D)    22.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 61st through 72nd Payment Dates, or

(E)    26.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 73rd Payment Date (or any Payment Date thereafter).

Standard & Poor's:  Standard & Poor's, a Division of The McGraw-Hill Companies, Inc. or its successor in interest.

Stated Value:  The value of the Mortgaged Property as stated by the related Mortgagor in his or her application.

Statutory Trust Statute:  Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code ss.ss.3801 et seq., as the same may be amended from time to time.

Step-Up Date:  The second Payment Date immediately following the Payment Date on which the Master Servicer can purchase all or some of the Home Loans from the Trust pursuant to Section 8.08 of the Servicing Agreement.

Stepdown Date:  The later of (a) the Payment Date in February 2009 and (b) the first Payment Date on which the aggregate Pool Balance, after applying payments received in the related Collection Period, is less than or equal to 50.00% of the aggregate Pool Balance as of the Cut-off Date.

Subservicer:  Any Person with whom the Master Servicer has entered into a Subservicing Agreement as a Subservicer by the Master Servicer.

Subservicing Account:  An Eligible Account established or maintained by a Subservicer as provided for in Section 3.02(c) of the Servicing Agreement.

Subservicing Agreement:  The written contract between the Master Servicer and any Subservicer relating to servicing and administration of certain Home Loans as provided in Section 3.01 of the Servicing Agreement.

Subservicing Fee:  With respect to any Collection Period, the fee retained monthly by the Subservicer (or, in the case of a nonsubserviced Home Loan, by the Master Servicer) equal to the product of (i) the Subservicing Fee Rate divided by 12 and (ii) the Pool Balance as of the first day of such Collection Period.

Subservicing Fee Rate:  With respect to each Home Loan, the amount payable to the related Subservicer, equal to 0.50% per annum.

Substitution Adjustment Amounts:  With respect to any Eligible Substitute Loan, the amount as defined in Section 3.1(b) of the Home Loan Purchase Agreement and any Deleted Loan, the amount, if any, as determined by the Master Servicer, by which the aggregate principal balance of all such Eligible Substitute Loans as of the date of substitution is less than the aggregate principal balance of all such Deleted Loans (after application of the principal portion of the Monthly Payments due in the month of substitution that are to be distributed to the Payment Account in the month of substitution).

Termination Price:  In the event that all of the Home Loans are purchased by the Master Servicer, the Termination Price will be an amount equal to 100% of the unpaid Loan Balance of each Home Loan so purchased, plus accrued and unpaid interest thereon at the

weighted average of the Loan Rates through the day preceding the Payment Date on which such purchase occurs, plus any amounts owed by the Seller pursuant to the second paragraph of Section 3.1(c) of the Home Loan Purchase Agreement in respect of any liability, penalty or expense that resulted from a breach of the representation and warranty set forth in clause (x) of Section 3.1(b) of the Home Loan Purchase Agreement, that remain unpaid on the date of such purchase.

Transaction Party:  As specified in Section 9.02(a) of the Servicing Agreement.

Treasury Regulations:  Regulations, including proposed or temporary Regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

Trust Agreement: The Amended and Restated Trust Agreement, dated as of the Closing Date, between the Owner Trustee and the Depositor.

Trust Estate:  The meaning specified in the Granting Clause of the Indenture.

Trust Indenture Act or TIA:  The Trust Indenture Act of 1939, as amended from time to time, as in effect on any relevant date.

UCC:  The Uniform Commercial Code, as amended from time to time, as in effect in any specified jurisdiction.

Underwriters:  Bear, Stearns & Co. Inc. and Residential Funding Securities, LLC.

United States Person:  A citizen or resident of the United States, a corporation, partnership or other entity created or organized in, or under the laws of, the United States or any state thereof or the District of Columbia (except, in the case of a partnership, to the extent provided in regulations), or an estate whose income is subject to United States federal income tax regardless of its source, or a trust other than a "foreign trust" within the meaning of Section 7701(a)(30) of the Code.

RESIDENTIAL FUNDING CORPORATION,
as Master Servicer


HOME LOAN TRUST 2006-HI3,
as Issuer


and


JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
as Indenture Trustee

_____


SERVICING AGREEMENT
Dated as of July 21, 2006

_____


Home Loans

- -------------------------------------------------------------------------------



TABLE OF CONTENTS

PAGE

ARTICLE I         DEFINITIONS...............................................................1

        Section 1.01.     Definitions......................................................1

        Section 1.02.     Other Definitional Provisions....................................1

        Section 1.03.     Interest Calculations............................................2

ARTICLE II        REPRESENTATIONS AND WARRANTIES...........................................2

        Section 2.01.     Representations and Warranties Regarding the Master Servicer......2

        Section 2.02.     Representations and Warranties of the Issuer.....................3

        Section 2.03.     Enforcement of Representations and Warranties....................4

ARTICLE III       ADMINISTRATION AND SERVICING OF HOME LOANS...............................5

        Section 3.01.     The Master Servicer..............................................5

        Section 3.02.     Collection of Certain Home Loan Payments.........................8

        Section 3.03.     Withdrawals from the Custodial Account..........................11

        Section 3.04.     Maintenance of Hazard Insurance; Property Protection Expenses....12

        Section 3.05.     Modification Agreements; Release or Substitution of Lien.........13

        Section 3.06.     Trust Estate; Related Documents.................................15

        Section 3.07.     Realization Upon Defaulted Home Loans; Loss Mitigation..........15

        Section 3.08.     Issuer and Indenture Trustee to Cooperate.......................17

Section 3.09.    Servicing Compensation; Payment of Certain Expenses by Master Servicer..........................................................18

Section 3.10.    Annual Statement as to Compliance...............................19

Section 3.11.    Annual Independent Public Accountants' Servicing Report.........19

Section 3.12.    Access to Certain Documentation and Information Regarding the Home Loans...............................................................19

Section 3.13.    Maintenance of Certain Servicing Insurance Policies.............20

Section 3.14.    Information Required by the Internal Revenue Service and Reports of Foreclosures and Abandonments of Mortgaged Property..................................................................20

Section 3.15.    Optional Repurchase of Defaulted Home Loans.....................20

Section 3.16.    Limited Home Loan Repurchase Right..............................20

ARTICLE IV       SERVICING CERTIFICATE..........................................21

Section 4.01.    Statements to Securityholders..................................21

Section 4.02.    Tax Reporting..................................................24

Section 4.03.    Calculation of Adjusted Issue Price............................24

Section 4.04.    Exchange Act Reporting.........................................24

ARTICLE V        PAYMENT ACCOUNT................................................26

Section 5.01.    Payment Account................................................26

ARTICLE VI       THE MASTER SERVICER............................................26

Section 6.01.    Liability of the Master Servicer...............................26

Section 6.02.    Merger or Consolidation of, or Assumption of the Obligations of, the Master Servicer...................................................26

Section 6.03.    Limitation on Liability of the Master Servicer and Others.......27

Section 6.04.    Master Servicer Not to Resign..................................27

Section 6.05.    Delegation of Duties...........................................28

Section 6.06.    Master Servicer to Pay Indenture Trustee's and Owner Trustee's Fees and Expenses; Indemnification.....................28

ARTICLE VII      DEFAULT........................................................29

Section 7.01.    Servicing Default..............................................29

Section 7.02.    Indenture Trustee to Act; Appointment of Successor..............31

Section 7.03.    Notification to Securityholders................................33

Section 7.04.    Servicing Trigger; Removal of Master Servicer..................33

ARTICLE VIII     MISCELLANEOUS PROVISIONS.......................................34

Section 8.01.    Amendment......................................................34

Section 8.02.    GOVERNING LAW..................................................34

Section 8.03.    Notices........................................................35

Section 8.04.    Severability of Provisions.....................................35

Section 8.05.    Third-Party Beneficiaries.....................................35

Section 8.06.    Counterparts.....................................................35

Section 8.07.    Effect of Headings and Table of Contents........................36

Section 8.08.    Termination Upon Purchase by the Master Servicer or
                 Liquidation of All Home Loans; Partial Redemption...............36

Section 8.09.    Certain Matters Affecting the Indenture Trustee.................37

Section 8.10.    Owner Trustee Not Liable for Related Documents..................37

ARTICLE IX       COMPLIANCE WITH REGULATION AB...........................................37

Section 9.01.    Intent of the Parties; Reasonableness...........................37

Section 9.02.    Additional Representations and Warranties of the Indenture
                 Trustee.........................................................38

Section 9.03.    Information to Be Provided by the Indenture Trustee.............38

Section 9.04.    Report on Assessment of Compliance and Attestation..............39

Section 9.05.    Indemnification; Remedies.......................................39

EXHIBIT A - HOME LOANS..................................................................A-1

EXHIBIT B - POWER OF ATTORNEY..........................................................B-1

EXHIBIT C - FORM OF REQUEST FOR RELEASE ...............................................C-1

EXHIBIT D - FORM OF FORM 10-K CERTIFICATE ............................................D-1

EXHIBIT E - FORM OF BACK-UP CERTIFICATION TO FORM 10-K CERTIFICATE .....................E-1

EXHIBIT F - SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE .............F-1

This is a Servicing Agreement, dated as of July 21, 2006 (the "Servicing Agreement"), among Residential Funding Corporation (the "Master Servicer"), the Home Loan Trust 2006-HI3 (the "Issuer") and JPMorgan Chase Bank, National Association (the "Indenture Trustee").

W I T N E S S E T H   T H A T:

WHEREAS, pursuant to the terms of the Home Loan Purchase Agreement, Residential Funding Corporation (in its capacity as Seller) will sell to the Depositor the Home Loans together with the Related Documents on the Closing Date;

WHEREAS, the Depositor will sell the Home Loans and all of its rights under the Home Loan Purchase Agreement to the Issuer, together with the Related Documents on the Closing Date;

WHEREAS, pursuant to the terms of the Trust Agreement, the Issuer will issue and transfer to or at the direction of the Depositor, the Certificates;

WHEREAS, pursuant to the terms of the Indenture, the Issuer will issue and transfer to or at the direction of the Depositor, the Notes; and

WHEREAS, pursuant to the terms of this Servicing Agreement, the Master Servicer will service the Home Loans directly or through one or more Subservicers;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

---

ARTICLE I

DEFINITIONS

Section 1.01...  Definitions.  For all purposes of this Servicing Agreement, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Definitions contained in Appendix A to the Indenture dated July 21, 2006 (the "Indenture"), between Home Loan Trust 2006-HI3, as issuer and JPMorgan Chase Bank, National Association, as indenture trustee, which is incorporated by reference herein.  All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02...  Other Definitional Provisions.  (a)  All terms defined in this Servicing Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(b)    As used in this Servicing Agreement and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Servicing Agreement or in any such certificate or other document, and accounting terms partly defined in this Servicing Agreement or in any such certificate or other document, to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Servicing Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Servicing Agreement or in any such certificate or other document shall control.

(c)    The words "hereof," "herein," "hereunder" and words of similar import when used in this Servicing Agreement shall refer to this Servicing Agreement as a whole and not to any particular provision of this Servicing Agreement; Section and Exhibit references contained in this Servicing Agreement are references to Sections and Exhibits in or to this Servicing Agreement unless otherwise specified; and the term "including" shall mean "including without limitation".

(d)    The definitions contained in this Servicing Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as the feminine and neuter genders of such terms.

(e)    Any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

Section 1.03...  Interest Calculations.  All calculations of interest hereunder that are made in respect of the Loan Balance of a Home Loan shall be made in accordance with the Mortgage Note.  All calculations of interest on the Securities (other than the Class A-1 Notes) shall be made on the basis of a 30-day month and a year assumed to consist of 360 days. Calculation of interest on the Class A-1 Notes shall be made on the basis of the actual number of days in the applicable Interest Accrual Period and a year assumed to consist of 360 days.  The calculation of the Servicing Fee shall be made on the basis of a 30-day month and a year assumed to consist of 360 days.  All dollar amounts calculated hereunder shall be rounded to the nearest penny with one-half of one penny being rounded up.

ARTICLE II

REPRESENTATIONS AND WARRANTIES

Section 2.01...  Representations and Warranties Regarding the Master Servicer.  The Master Servicer represents and warrants to the Issuer and for the benefit of the Indenture Trustee, as pledgee of the Home Loans and the Credit Enhancer, as of the Cut-off Date:

(i)      The Master Servicer is a corporation duly organized, validly existing and in good standing under the laws of the State of placeStateDelaware and has the corporate power to own its assets and to transact the business in which it is currently engaged.  The Master Servicer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it or properties owned or leased by it requires such qualification and in which the failure to so qualify would have a material adverse effect on the business, properties, assets, or condition (financial or other) of the Master Servicer;

(ii)     The Master Servicer has the power and authority to make, execute, deliver and perform this Servicing Agreement and all of the transactions contemplated  under this Servicing Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance of this Servicing Agreement.  When executed and delivered, this Servicing Agreement will constitute the legal, valid and binding obligation of the Master Servicer enforceable in accordance with its terms, except as enforcement of such terms may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies;

(iii)    The Master Servicer is not required to obtain the consent of any other Person or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Servicing Agreement, except for such consent, license, approval or authorization, or registration or declaration, as shall have been obtained or filed, as the case may be;

(iv)     The execution and delivery of this Servicing Agreement and the performance of the transactions contemplated hereby by the Master Servicer will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Master Servicer or any provision of the Certificate of Incorporation or Bylaws of the Master Servicer, or constitute a material breach of any mortgage, indenture, contract or other agreement to which the Master Servicer is a party or by which the Master Servicer may be bound;

(v)      No litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending, or to the knowledge of the Master Servicer threatened, against the Master Servicer or any of its properties or with respect to this Servicing Agreement or the Securities which in the opinion of the Master Servicer has a reasonable likelihood of resulting in a material adverse effect on the transactions contemplated by this Servicing Agreement; and

(vi)     The Master Servicer is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Home Loans that are registered with MERS.

       The foregoing representations and warranties shall survive any termination of the Master Servicer hereunder.

Section 2.02.     Representations and Warranties of the Issuer.  The Issuer hereby represents and warrants to the Master Servicer and for the benefit of the Indenture Trustee, as pledgee of the Home Loans, and the Credit Enhancer, as of the Cut-off Date:

(i)      The Issuer is a statutory trust duly formed and in good standing under the laws of the State of Delaware and has full power, authority and legal right to execute and

deliver this Servicing Agreement and to perform its obligations under this Servicing Agreement, and has taken all necessary action to authorize the execution, delivery and performance by it of this Servicing Agreement; and

(ii)     The execution and delivery by the Issuer of this Servicing Agreement and the performance by the Issuer of its obligations under this Servicing Agreement will not violate any provision of any law or regulation governing the Issuer or any order, writ, judgment or decree of any court, arbitrator or governmental authority or agency applicable to the Issuer or any of its assets.  Such execution, delivery, authentication and performance will not require the authorization, consent or approval of, the giving of notice to, the filing or registration with, or the taking of any other action with respect to, any governmental authority or agency regulating the activities of statutory trusts.  Such execution, delivery, authentication and performance will not conflict with, or result in a breach or violation of, any mortgage, deed of trust, lease or other agreement or instrument to which the Issuer is bound.

Section 2.03.   Enforcement of Representations and Warranties.  The Master Servicer,  on behalf of and subject to the direction of the  Indenture  Trustee,  as pledgee of the Home Loans,  or the Issuer or the Credit  Enhancer,  shall enforce the  representations  and warranties of the Seller  pursuant to the Home Loan Purchase  Agreement.  Upon the discovery by the Seller,  the Depositor,  the Master Servicer,  the Indenture  Trustee,  the Issuer,  the Credit  Enhancer or any Custodian of a breach of any of the  representations  and warranties made in the Home Loan Purchase  Agreement or of the  existence of a  Repurchase  Event,  in respect of any Home Loan which  materially  and adversely  affects the interests of the  Securityholders  or the Credit Enhancer,  the party  discovering such breach or existence shall give prompt written notice to the other parties.  The Master  Servicer  shall  promptly  notify the Seller of such breach or existence and request that,  pursuant to the terms of the Home Loan  Purchase  Agreement,  the Seller  either (i) cure such breach or  Repurchase  Event in all material  respects  within 45 days (with  respect to a breach of the  representations  and  warranties  contained in Section 3.1(a) of the Home Loan Purchase  Agreement or Repurchase  Event) or 90 days (with respect to a breach of the  representations  and warranties  contained in Section 3.1(b) of the Home Loan Purchase  Agreement)  from the date the Seller was notified of such breach or Repurchase  Event or (ii)  purchase  such Home Loan from the  Issuer at the price and in the manner set forth in Section 3.1(c) of the Home Loan Purchase  Agreement;  provided that the Seller shall,  subject to compliance  with all the  conditions  set forth in the Home Loan Purchase  Agreement,  have the option to  substitute an  Eligible  Substitute  Loan or Loans for such Home Loan.  In the event that the Seller elects to substitute one or more Eligible  Substitute  Loans pursuant to Section  3.1(c) of the Home Loan  Purchase  Agreement,  the Seller shall deliver to the Issuer with respect to such Eligible  Substitute  Loans,  the original  Mortgage  Note, the Mortgage, and such other  documents  and  agreements  as are  required  by the  Home Loan Purchase Agreement.   Payments  due  with  respect  to  Eligible  Substitute  Loans  in  the  month  of substitution  shall not be  transferred  to the  Issuer and will be  retained  by the  Master Servicer  and  remitted by the Master  Servicer to the Seller on the next  succeeding  Payment Date  provided a payment at least equal to the  applicable  Monthly  Payment has been received by the Issuer for such month in respect of the Home Loan to be  removed.  The Master  Servicer shall  amend or cause to be amended  the Home Loan  Schedule  to reflect  the  removal of such Home Loan and the  substitution  of the  Eligible  Substitute  Loans and the  Master  Servicer shall  promptly  deliver the amended Home Loan Schedule to the Owner Trustee and the Indenture Trustee.

    It is understood and agreed that the obligation of the Seller to cure such breach or purchase or substitute for such Home Loan as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such breach available to the Issuer and the Indenture Trustee,  as pledgee of the Home Loans, against the Seller.  In connection with the purchase of or substitution for any such Home Loan by the Seller, the Issuer shall assign to the Seller all of its right, title and interest in respect of the Home Loan Purchase Agreement applicable to such Home Loan.  Upon receipt of the Repurchase Price, or upon completion of such substitution, the Master Servicer shall notify the Custodian and then the Custodian shall deliver the Mortgage Files to the Master Servicer, together with all relevant endorsements and assignments prepared by the Master Servicer which the Indenture Trustee shall execute.  If the Master Servicer is Residential Funding Corporation, then the Indenture Trustee may, and at the direction of the Credit Enhancer, shall, give the notification and require the purchase or substitution provided for in the first preceding paragraph in the event of such a breach of a representation or warranty made by Residential Funding Corporation in the Home Loan Purchase Agreement.

ARTICLE III

ADMINISTRATION AND SERVICING
OF HOME LOANS

Section 3.01.    The Master Servicer.    (a)    The Master Servicer shall service and administer the Home Loans in accordance with the terms of this Servicing Agreement, following such procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities, and shall have full power and authority, acting alone or through a Subservicer, to do any and all things in connection with such servicing and administration which it may deem necessary or desirable, it being understood, however, that the Master Servicer shall at all times remain responsible to the Issuer and the Indenture Trustee, as pledgee of the Home Loans, and the Credit Enhancer for the performance of its duties and obligations hereunder in accordance with the terms hereof, without diminution of such obligation or liability by virtue of such Subservicing agreements or arrangements or by virtue of indemnification from the Subservicer and to the same extent and under the same terms and conditions as if the Master Servicer alone were servicing and administering the Home Loans.    Without limiting the generality of the foregoing, the Master Servicer shall continue, and is hereby authorized and empowered by the Issuer and the Indenture Trustee, as pledgee of the Home Loans, to execute and deliver, on behalf of itself, the Issuer, the Indenture Trustee or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, or of consent to modification in connection with a proposed conveyance, or of assignment of any Mortgage and Mortgage Note in connection with the repurchase of a Home Loan and all other comparable instruments with respect to the Home Loans and with respect to the Mortgaged Properties, or with respect to the modification or re-recording of a Mortgage for the purpose of correcting the Mortgage, the subordination of the lien of the Mortgage in favor of a public utility company or government agency or unit with powers of eminent domain, the taking of a deed in lieu of foreclosure, the commencement, prosecution or completion of judicial or non-judicial foreclosure, the acquisition of any property acquired by foreclosure or deed in lieu of foreclosure, or the management, marketing and conveyance of any property acquired by foreclosure or deed in lieu of foreclosure.    The Issuer, the Indenture Trustee and the Custodian, as applicable, shall furnish the Master Servicer with any powers of attorney and other documents necessary or appropriate to enable the Master Servicer to carry out its servicing and administrative duties hereunder.    In addition, the Master Servicer may, at its own discretion and on behalf of the Indenture Trustee, obtain credit information in the form of a Credit Score from a credit repository.    On the Closing Date, the Indenture Trustee shall deliver to the Master Servicer a limited power of attorney substantially in the form of Exhibit B hereto.    The Master Servicer further is authorized and empowered by the Issuer and the Indenture Trustee, on behalf of the Noteholders, the Credit Enhancer and the Indenture Trustee, in its own name or in the name of the Subservicer, when the Master Servicer or the Subservicer, as the case may be, believes it is appropriate in its best judgment to register any Home Loan on the MERS(R)System, or cause the removal from the registration of any Home Loan on the MERS(R)System, to execute and deliver, on behalf of the Indenture Trustee and the Noteholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Indenture Trustee and its successors and assigns.    Any expenses incurred in connection with the actions described in the preceding sentence shall be borne by the Master Servicer in accordance with Section 3.09, with no right of reimbursement; provided, that if, as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS(R)System, it becomes necessary to remove any Home Loan from registration on the MERS(R)System and to arrange for the assignment of the related Mortgages to the Indenture Trustee, then any related expenses shall be reimbursable to the Master Servicer as set forth in Section 3.03(ii).

If the Mortgage relating to a Home Loan did not have a lien senior to the Home Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may not consent to the placing of a lien senior to that of the Mortgage on the related Mortgaged Property.    If the Mortgage relating to a Home Loan had a lien senior to the Home Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may consent to the refinancing of the prior senior lien, provided that the following requirements are met:

(i)        (A)            the Mortgagor's debt-to-income ratio resulting from such refinancing is less than the original debt-to-income ratio as set forth on the Mortgage Loan Schedule and, in the event that the resulting Combined Loan-to-Value Ratio of such Home Loan increases by more than 10% above the Combined Loan-to-Value Ratio prior to such refinancing, the Master Servicer shall obtain the prior consent of the Credit

Enhancer (so long as no Credit Enhancer Default has occurred and is continuing),
which consent shall not be unreasonably withheld; provided, however, that in no
instance shall the resulting Combined Loan-to-Value Ratio of such Home Loan be higher
than that permitted by the Program Guide; or

(B)      the resulting Combined Loan-to-Value Ratio of such Home Loan is no higher than the
         Combined Loan-to-Value Ratio prior to such refinancing; provided, however, if such
         refinanced mortgage loan is a "rate and term" mortgage loan (meaning, the Mortgagor
         does not receive any cash from the refinancing), the Combined Loan-to-Value Ratio may
         increase to the extent of either (a) the reasonable closing costs of such refinancing
         or (b) any decrease in the value of the related Mortgaged Property, if the Mortgagor
         is in good standing as defined by the Program Guide;

(ii)     the interest rate, or, in the case of an adjustable rate existing senior lien, the
         maximum interest rate, for the loan evidencing the refinanced senior lien is no more
         than 2.0% higher than the interest rate or the maximum interest rate, as the case may
         be, on the loan evidencing the existing senior lien immediately prior to the date of
         such refinancing; provided, however (a) if the loan evidencing the existing senior
         lien prior to the date of refinancing has an adjustable rate and the loan evidencing
         the refinanced senior lien has a fixed rate, then the current interest rate on the
         loan evidencing the refinanced senior lien may be up to 2.0% higher than the
         then-current loan rate of the loan evidencing the existing senior lien and (b) if the
         loan evidencing the existing senior lien prior to the date of refinancing has a fixed
         rate and the loan evidencing the refinanced senior lien has an adjustable rate, then
         the maximum interest rate on the loan evidencing the refinanced senior lien shall be
         less than or equal to (x) the interest rate on the loan evidencing the existing
         senior lien prior to the date of refinancing plus (y) 2.0%; and

(iii)    the loan evidencing the refinanced senior lien is not subject to negative
         amortization.

         The relationship of the Master Servicer (and of any successor to the Master Servicer
as servicer under this Servicing Agreement) to the Issuer under this Servicing Agreement is
intended by the parties to be that of an independent contractor and not that of a joint
venturer, partner or agent.

(b)      The Master Servicer may continue in effect Subservicing Agreements entered into by
Residential Funding and Subservicers prior to the execution and delivery of this Servicing
Agreement, and may enter into Subservicing Agreements with Subservicers for the servicing
and administration of certain of the Home Loans.  Each Subservicer of a Home Loan shall be
entitled to receive and retain, as provided in the related Subservicing Agreement and in
Section 3.02, the related Subservicing Fee from payments of interest received on such Home
Loan after payment of all amounts required to be remitted to the Master Servicer in respect
of such Home Loan.  For any Home Loan not subject to a Subservicing Agreement, the Master
Servicer shall be entitled to receive and retain an amount equal to the Subservicing Fee
from payments of interest.  References in this Servicing Agreement to actions taken or to be
taken by the Master Servicer in servicing the Home Loans include actions taken or to be
taken by a Subservicer on behalf of the Master Servicer.  Each Subservicing Agreement will
be upon such terms and conditions as are not inconsistent with this Servicing Agreement and
as the Master Servicer and the Subservicer have agreed.  With the approval of the Master
Servicer, a Subservicer may delegate its servicing obligations to third-party servicers, but
such Subservicers will remain obligated under the related Subservicing Agreements.  The
Master Servicer and the Subservicer may enter into amendments to the related Subservicing
Agreements; provided, however, that any such amendments shall not cause the Home Loans to
be serviced in a manner that would be materially inconsistent with the standards set forth
in this Servicing Agreement.  The Master Servicer shall be entitled to terminate any
Subservicing Agreement in accordance with the terms and conditions thereof and without any
limitation by virtue of this Servicing Agreement; provided, however, that in the event of
termination of any Subservicing Agreement by the Master Servicer or the Subservicer, the
Master Servicer shall either act as servicer of the related Home Loan or enter into a
Subservicing Agreement with a successor Subservicer which will be bound by the terms of the
related Subservicing Agreement.  The Master Servicer shall be entitled to enter into any
agreement with a Subservicer for indemnification of the Master Servicer and nothing
contained in this Servicing Agreement shall be deemed to limit or modify such
indemnification.  The Program Guide and any other Subservicing Agreement entered into
between the Master Servicer and any Subservicer shall require the Subservicer to accurately
and fully report its borrower credit files to each of the Credit Repositories in a timely
manner.

         In the event that the rights, duties and obligations of the Master Servicer are
terminated hereunder, any successor to the Master Servicer in its sole discretion may, to

the extent permitted by applicable law, terminate the existing Subservicing Agreement with
any Subservicer in accordance with the terms of the applicable Subservicing Agreement or
assume the terminated Master Servicer's rights and obligations under such subservicing
arrangements which termination or assumption will not violate the terms of such arrangements.

As part of its servicing activities hereunder, the Master Servicer, for the benefit
of the Securityholders and the Credit Enhancer, shall use reasonable efforts to enforce the
obligations of each Subservicer under the related Subservicing Agreement, to the extent that
the non-performance of any such obligation would have a material adverse effect on a Home
Loan.  Such enforcement, including, without limitation, the legal prosecution of claims,
termination of Subservicing Agreements and the pursuit of other appropriate remedies, shall
be in such form and carried out to such an extent and at such time as the Master Servicer
would employ in its good faith business judgment and which are normal and usual in its
general mortgage servicing activities.  The Master Servicer shall pay the costs of such
enforcement at its own expense, and shall be reimbursed therefor only (i) from a general
recovery resulting from such enforcement to the extent, if any, that such recovery exceeds
all amounts due in respect of the related Home Loan or (ii) from a specific recovery of
costs, expenses or attorneys fees against the party against whom such enforcement is
directed.

Section 3.02.    Collection of Certain Home Loan Payments.  (a) The Master Servicer shall
make reasonable efforts to collect all payments called for under the terms and provisions of
the Home Loans, and shall, to the extent such procedures shall be consistent with this
Servicing Agreement and generally consistent with any related insurance policy, follow such
collection procedures as it would employ in its good faith business judgment and which are
normal and usual in its general mortgage servicing activities.  Consistent with the
foregoing, and without limiting the generality of the foregoing, the Master Servicer may in
its discretion waive any late payment charge, prepayment charge or penalty interest or other
fees which may be collected in the ordinary course of servicing such Home Loan.  The Master
Servicer may also extend the Due Date for payment due on a Home Loan in accordance with the
Program Guide, provided, however, that the Master Servicer shall first determine that any
such waiver or extension will not impair the coverage of any related insurance policy or
materially adversely affect the lien of the related Mortgage (except as described below) or
the interests of the Securityholders and the Credit Enhancer.  Notwithstanding anything in
this Section to the contrary, the Master Servicer or any Subservicer shall not enforce any
prepayment charge to the extent that such enforcement would violate any applicable law.
Consistent with the terms of this Servicing Agreement, the Master Servicer may also:

(i)     waive, modify or vary any term of any Home Loan;

(ii)    consent to the postponement of strict compliance with any such term or in any manner
        grant indulgence to any Mortgagor;

(iii)   arrange with a Mortgagor a schedule for the payment of principal and interest due and
        unpaid;

(iv)    forgive any portion of the amounts contractually owed under the Home Loan;

(v)     capitalize past due amounts owed under the Home Loan by adding any amounts in
        arrearage to the existing principal balance of the Home Loan (a "Capitalization
        Workout") of which will result in an increased Monthly Payment amount, provided that:
        (A) the amount added to the existing principal balance of the Home Loan (the
        "Capitalized Amount") shall be no greater than five times the Mortgagor's current
        Monthly Payment amount; and (B) the Master Servicer shall not enter into a
        Capitalization Workout unless the Combined Loan-to-Value Ratio of the Home Loan prior
        to the Capitalization Workout equals or exceeds 80% and the Mortgagor has qualified
        for the Capitalization Workout under the Master Servicer's servicing guidelines; and

(vi)    reset the Due Date for the Home Loan, or any combination of the foregoing;

if in the Master Servicer's determination such waiver, modification, postponement or
indulgence, arrangement or other action referred to above is not materially adverse to the
interests of the Securityholders or the Credit Enhancer and is generally consistent with the
Master Servicer's policies with respect to mortgage loans similar to those in the Home Loan
Pool (meaning, mortgage loans used for home improvement or debt consolidation); provided,
however, that the Master Servicer may not modify or permit any Subservicer to modify any
Home Loan (including without limitation any modification that would change the Loan Rate,
forgive the payment of any principal or interest (unless in connection with the liquidation
of the related Home Loan) or extend the final maturity date of such Home Loan) unless such
Home Loan is in default or, in the judgment of the Master Servicer, such default is
reasonably foreseeable.  The general terms of any waiver, modification, forgiveness,

postponement of indulge with respect to any of the Home Loans will not be included in the Servicing Certificate, and such Home Loans will not be considered "delinquent" for the purposes of the Basic Documents so long as the Mortgagor complies with the terms of such waiver, modification, forgiveness, postponement or indulgence.

(b)     The Master Servicer shall establish a Custodial Account, which shall be an Eligible Account in which the Master Servicer shall deposit or cause to be deposited any amounts representing payments and collections in respect of the Home Loans received by it subsequent to the Cut-off Date (other than in respect of the payments referred to in the following paragraph) within one Business Day following receipt thereof (or otherwise on or prior to the Closing Date), including the following payments and collections received or made by it (without duplication):

(i)      all payments of  principal or interest on the Home Loans received by the Master Servicer from the respective Subservicer, net of any portion of the interest thereof retained by the Subservicer as Subservicing Fees;

(ii)     the aggregate Repurchase Price of the Home Loans purchased by the Master Servicer pursuant to Section 3.15 or by the Limited Repurchase Price Holder pursuant to Section 3.16;

(iii)    Net Liquidation Proceeds net of any related Foreclosure Profit;

(iv)     all proceeds of any Home Loans repurchased by the Seller pursuant to the Home Loan Purchase Agreement, and all Substitution Adjustment Amounts required to be deposited in connection with the substitution of an Eligible Substitute Loan pursuant to the Home Loan Purchase Agreement;

(v)      Insurance Proceeds, other than Net Liquidation Proceeds, resulting from any insurance policy maintained on a Mortgaged Property; and

(vi)     amounts required to be paid by the Master Servicer pursuant to Sections 3.04 and 8.08.

provided, however, that with respect to each Collection Period, the Master Servicer shall be permitted to retain from payments in respect of interest on the Home Loans, the Master Servicing Fee for such Collection Period.  The foregoing requirements respecting deposits to the Custodial Account are exclusive, it being understood that, without limiting the generality of the foregoing, the Master Servicer need not deposit in the Custodial Account amounts representing Foreclosure Profits, fees (including annual fees), late charge penalties and prepayment charges payable by Mortgagors (such amounts to be retained as additional servicing compensation in accordance with Section 3.09 hereof), or amounts received by the Master Servicer for the accounts of Mortgagors for application towards the payment of taxes, insurance premiums, assessments and similar items.  In the event any amount not required to be deposited in the Custodial Account is so deposited, the Master Servicer may at any time withdraw such amount from the Custodial Account, any provision herein to the contrary notwithstanding.  The Custodial Account may contain funds that belong to one or more trust funds created for the notes or certificates of other series and may contain other funds respecting payments on other mortgage loans belonging to the Master Servicer or serviced or master serviced by it on behalf of others.  Notwithstanding such commingling of funds, the Master Servicer shall keep records that accurately reflect the funds on deposit in the Custodial Account that have been identified by it as being attributable to the Home Loans and shall hold all collections in the Custodial Account to the extent they represent collections on the Home Loans for the benefit of the Trust, the Securityholders, the Credit Enhancer and the Indenture Trustee, as their interests may appear.  The Master Servicer shall retain all Foreclosure Profits as additional servicing compensation.

The Master Servicer may cause the institution maintaining the Custodial Account to invest any funds in the Custodial Account in Permitted Investments (including obligations of the Master Servicer or any of its Affiliates, if such obligations otherwise qualify as Permitted Investments), which investments shall mature not later than the Business Day preceding the next succeeding Payment Date and which investments shall not be sold or disposed of prior to maturity.  Except as provided above, all income and gain realized from any such investment shall inure to the benefit of the Master Servicer and shall be subject to its withdrawal or order from time to time.  The amount of any losses incurred in respect of the principal amount of any such investments shall be deposited in the Custodial Account by the Master Servicer out of its own funds immediately as realized.

(c)     The Master Servicer shall require each Subservicer to hold all funds constituting collections on the Home Loans, pending remittance thereof to the Master Servicer, in one or more accounts meeting the requirements of an Eligible Account, and invested in Permitted

Investments.

Section 3.03.    Withdrawals from the Custodial Account.  The Master Servicer shall, from time to time as provided herein, make withdrawals from the Custodial Account of amounts on deposit therein pursuant to Section 3.02 that are attributable to the Home Loans for the following purposes:

(i)      to remit to the Paying Agent for deposit in the Payment Account, on the Business Day prior to each Payment Date, an amount equal to the Interest Collections and Principal Collections required to be distributed on such Payment Date;

(ii)     to the extent deposited to the Custodial Account, to reimburse itself or the related Subservicer for previously unreimbursed expenses, made pursuant to Section 3.01, incurred in maintaining individual insurance policies pursuant to Section 3.04, or Liquidation Expenses, paid pursuant to Section 3.07 or otherwise reimbursable pursuant to the terms of this Servicing Agreement (to the extent not payable pursuant to Section 3.09), such withdrawal right being limited to amounts received on particular Home Loans (other than any Repurchase Price in respect thereof) which represent late recoveries of the payments for which such advances were made, or from related Net Liquidation Proceeds or the proceeds of the purchase of such Home Loan;

(iii)    to pay to itself out of each payment received on account of interest on a Home Loan as contemplated by Section 3.09, an amount equal to the related Master Servicing Fee (to the extent not retained pursuant to Section 3.02), and to pay to any Subservicer any Subservicing Fees not previously withheld by the Subservicer;

(iv)     to the extent deposited in the Custodial Account to pay to itself as additional servicing compensation any interest or investment income earned on funds deposited in the Custodial Account and Payment Account that it is entitled to withdraw pursuant to Sections 3.02(b) and 5.01;

(v)      to the extent deposited in the Custodial Account, to pay to itself as additional servicing compensation any Foreclosure Profits;

(vi)     to pay to itself or the Seller, with respect to any Home Loan or property acquired in respect thereof that has been purchased or otherwise transferred to the Seller, the Master Servicer, the Limited Repurchase Right Holder or other entity, all amounts received thereon and not required to be distributed to Securityholders as of the date on which the related Purchase Price or Repurchase Price is determined;

(vii)    to clear and terminate the Custodial Account upon the termination of this Agreement; and

(viii)   to withdraw any other amount deposited in the Custodial Account that was not required to be deposited therein pursuant to Section 3.02.

        Since, in connection with withdrawals pursuant to clauses (ii), (iii), (v) and (vi), the Master Servicer's entitlement thereto is limited to collections or other recoveries on the related Home Loan, the Master Servicer shall keep and maintain separate accounting, on a Home Loan by Home Loan basis, for the purpose of justifying any withdrawal from the Custodial Account pursuant to such clauses.  Notwithstanding any other provision of this Servicing Agreement, the Master Servicer shall be entitled to reimburse itself for any previously unreimbursed expenses incurred pursuant to Section 3.07 or otherwise reimbursable pursuant to the terms of this Servicing Agreement that the Master Servicer determines to be otherwise nonrecoverable (except with respect to any Home Loan as to which the Repurchase Price has been paid), by withdrawal from the Custodial Account of amounts on deposit therein attributable to the Home Loans on any Business Day prior to the Payment Date succeeding the date of such determination.

Section 3.04.    Maintenance of Hazard Insurance; Property Protection Expenses.  The Master Servicer shall cause to be maintained for each Home Loan hazard insurance naming the Master Servicer or related Subservicer as loss payee thereunder providing extended coverage in an amount which is at least equal to at least 100% of the insurable value of the improvements (guaranteed replacement) or the sum of the unpaid principal balance of the first mortgage loan and the Home Loan amount.  The Master Servicer shall also cause to be maintained on property acquired upon foreclosure, or deed in lieu of foreclosure, of any Home Loan, fire insurance with extended coverage in an amount which is at least equal to the amount necessary to avoid the application of any co-insurance clause contained in the related hazard insurance policy.  Amounts collected by the Master Servicer under any such policies (other than amounts to be applied to the restoration or repair of the related Mortgaged Property or property thus acquired or amounts released to the Mortgagor in accordance with

the Master Servicer's normal servicing procedures) shall be deposited in the Custodial
Account to the extent called for by Section 3.04. In case in which any Mortgaged Property
is located at any time during the life of a Home Loan in a federally designated flood area,
the hazard insurance to be maintained for the related Home Loan shall include flood
insurance (to the extent available).  All such flood insurance shall be in amounts equal to
the lesser of (i) the amount required to compensate for any loss or damage to the related
Mortgaged Property on a replacement cost basis and (ii) the maximum amount of such insurance
available for such Mortgaged Property under the national flood insurance program (assuming
that the area in which such Mortgaged Property is located is participating in such
program).  The Master Servicer shall be under no obligation to require that any Mortgagor
maintain earthquake or other additional insurance and shall be under no obligation itself to
maintain any such additional insurance on property acquired in respect of a Home Loan, other
than pursuant to such applicable laws and regulations as shall at any time be in force and
as shall require such additional insurance.  If the Master Servicer shall obtain and
maintain a blanket policy consistent with its general mortgage servicing activities insuring
against hazard losses on all of the Home Loans, it shall conclusively be deemed to have
satisfied its obligations as set forth in the first sentence of this Section 3.04, it being
understood and agreed that such blanket policy may contain a deductible clause, in which
case the Master Servicer shall, in the event that there shall not have been maintained on
the related Mortgaged Property a policy complying with the first sentence of this Section
3.04 and there shall have been a loss which would have been covered by such policy, deposit
in the Custodial Account the amount not otherwise payable under the blanket policy because
of such deductible clause.  Any such deposit by the Master Servicer shall be made on the
last Business Day of the Collection Period in the month in which payments under any such
policy would have been deposited in the Custodial Account.  In connection with its
activities as servicer of the Home Loans, the Master Servicer agrees to present, on behalf
of itself, the Issuer and the Indenture Trustee, claims under any such blanket policy.

Section 3.05.    Modification Agreements; Release or Substitution of Lien.  (a)  The Master
Servicer or the related Subservicer, as the case may be, shall be entitled to (A) execute
assumption agreements, modification agreements, substitution agreements, and instruments of
satisfaction or cancellation or of partial or full release or discharge, or any other
document contemplated by this Servicing Agreement and other comparable instruments with
respect to the Home Loans and with respect to the Mortgaged Properties subject to the
Mortgages (and the Issuer and the Indenture Trustee each shall promptly execute any such
documents on request of the Master Servicer) and (B) approve the granting of an easement
thereon in favor of another Person, any alteration or demolition of the related Mortgaged
Properties or other similar matters, in each case if it has determined, exercising its good
faith business judgment in the same manner as it would if it were the owner of the related
Home Loans, that the security for, and the timely and full collectability of, such Home
Loans would not be adversely affected thereby.  A partial release pursuant to this Section
3.05 shall be permitted only if the Combined Loan-to-Value Ratio for such Home Loan after
such partial release does not exceed the Combined Loan-to-Value Ratio for such Home Loan as
of the Cut-off Date.  Any fee collected by the Master Servicer or the related Subservicer
for processing such request will be retained by the Master Servicer or such Subservicer as
additional servicing compensation.

(b)     The Master Servicer may enter into an agreement with a Mortgagor to release the lien
on the Mortgaged Property relating to a Home Loan (the "Existing Lien"), if at the time of
such agreement the Home Loan is current in payment of principal and interest, under any of
the following circumstances:

(i)     in any case in which, simultaneously with the release of the Existing Lien, the
        Mortgagor executes and delivers to the Master Servicer a Mortgage on a substitute
        Mortgaged Property, provided that the Combined Loan-to-Value Ratio of the Home Loan
        (calculated based on the Appraised Value of the substitute Mortgaged Property) is not
        greater than the Combined Loan-to-Value Ratio prior to releasing the Existing Lien;

(ii)    in any case in which, simultaneously with the release of the Existing Lien, the
        Mortgagor executes and delivers to the Master Servicer a Mortgage on a substitute
        Mortgaged Property, provided that: (A) the Combined Loan-to-Value Ratio of the Home
        Loan (calculated based on the Appraised Value of the substitute Mortgaged Property)
        is not greater than the lesser of (1) 125% and (2) 105% of the Combined Loan-to-Value
        Ratio prior to releasing the Existing Lien; and (B) the Master Servicer determines
        that at least two appropriate compensating factors are present (compensating factors
        may include, without limitation, an increase in the Mortgagor's monthly cash flow
        after debt service, the Mortgagor's debt-to-income ratio has not increased since
        origination, or an increase in the Mortgagor's credit score); or

(iii)   in any case in which, at the time of release of the Existing Lien, the Mortgagor does
        not provide the Master Servicer with a Mortgage on a substitute Mortgaged Property

(any Home Loan that becomes and remains unsecured in accordance with this subsection,
an "Unsecured Loan"), provided that: (A) the Mortgagor, in addition to being current
in payment of principal and interest on the related Home Loan, is current in payment
of principal and interest on any loan senior to the Home Loan; (B) the Mortgagor's
Credit Score, as determined by the Master Servicer at the time of the request for
release of lien, is not less than 640; (C) the Mortgagor makes a cash contribution in
reduction of the outstanding principal balance of the Home Loan, which may include
any net proceeds from the sale of the original Mortgaged Property, of not less than
20% of the unpaid principal balance of the Home Loan; and (D) the Mortgagor signs a
reaffirmation agreement acknowledging that they must continue to pay in accordance
with the terms of the original Mortgage Note;

(iv)     If the above conditions (iii)(A) through (iii)(D) are not met, the Master Servicer
         may still enter into an agreement to release the Existing Lien, provided that:
         (A) the Master Servicer shall not permit the release of an Existing Lien under this
         clause (iv) as to more than 200 Home Loans in any calendar year; (B) at no time shall
         the aggregate Principal Balance of Unsecured Loans exceed 5% of the then Pool
         Balance; (C) the Mortgagor agrees to an automatic debit payment plan; and (D) the
         Master Servicer shall provide notice to each Rating Agency that has requested notice
         of such releases.

     In connection with any Unsecured Loan, the Master Servicer may require the Mortgagor
to enter into an agreement under which:  (i) the Loan Rate may be increased effective until
a substitute Mortgage meeting the criteria under (i) or (ii) above is provided; or (ii) any
other provision may be made which the Master Servicer considers to be appropriate.
Thereafter, the Master Servicer shall determine in its discretion whether to accept any
proposed Mortgage on any substitute Mortgaged Property as security for the Home Loan, and
the Master Servicer may require the Mortgagor to agree to any further conditions which the
Master Servicer considers appropriate in connection with such substitution, which may
include a reduction of the Loan Rate (but not below the Loan Rate in effect at the Closing
Date).  Any Home Loan as to which a Mortgage on a substitute Mortgaged Property is provided
in accordance with the preceding sentence shall no longer be deemed to be an Unsecured Loan.

Section 3.06.    Trust Estate; Related Documents.  (a)  When required by the provisions of
this Servicing Agreement, the Issuer or the Indenture Trustee shall execute instruments to
release property from the terms of the Trust Agreement, Indenture or Custodial Agreement, as
applicable, or convey the Issuer's or the Indenture Trustee's interest in the same, in a
manner and under circumstances which are not inconsistent with the provisions of this
Servicing Agreement.  No party relying upon an instrument executed by the Issuer or the
Indenture Trustee as provided in this Section 3.06 shall be bound to ascertain the Issuer's
or the Indenture Trustee's authority, inquire into the satisfaction of any conditions
precedent or see to the application of any monies.

(b)     If from time to time the Master Servicer shall deliver to the Custodian copies of any
written assurance, assumption agreement or substitution agreement or other similar agreement
pursuant to Section 3.05, the Custodian shall check that each of such documents purports to
be an original executed copy (or a copy of the original executed document if the original
executed copy has been submitted for recording and has not yet been returned) and, if so,
shall file such documents, and upon receipt of the original executed copy from the
applicable recording office or receipt of a copy thereof certified by the applicable
recording office shall file such originals or certified copies with the Related Documents.
If any such documents submitted by the Master Servicer do not meet the above qualifications,
such documents shall promptly be returned by the Custodian to the Master Servicer pursuant
to the related Custodial Agreement, with a direction to the Master Servicer to forward the
correct documentation.

(c)     Upon receipt of a Request for Release from the Master Servicer substantially in the
form of Exhibit C, to the effect that a Home Loan has been the subject of a final payment or
a prepayment in full and the related Home Loan has been terminated or that substantially all
Liquidation Proceeds which have been determined by the Master Servicer in its reasonable
judgment to be finally recoverable have been recovered, and upon deposit to the Custodial
Account of such final monthly payment, prepayment in full together with accrued and unpaid
interest to the date of such payment with respect to such Home Loan or, if applicable, Net
Liquidation Proceeds, the Custodian shall promptly release the Related Documents to the
Master Servicer pursuant to the related Custodial Agreement, which the Indenture Trustee
shall execute, along with such documents as the Master Servicer or the related Mortgagor may
request to evidence satisfaction and discharge of such Home Loan, upon request of the Master
Servicer.  If from time to time and as appropriate for the servicing or foreclosure of any
Home Loan, the Master Servicer requests the Custodian to release the Related Documents and
delivers to the Custodian a trust receipt reasonably satisfactory to the Custodian and
signed by a Responsible Officer of the Master Servicer, the Custodian shall release the

Related Documents to the Master Servicer pursuant to the related Custodial Agreement. If such Home Loans shall be liquidated and the Custodian receives a certificate from the Master Servicer as provided above, then, upon request of the Master Servicer, the Custodian shall release the trust receipt to the Master Servicer pursuant to the related Custodial Agreement.

Section 3.07.   Realization Upon Defaulted Home Loans; Loss Mitigation.  With respect to such of the Home Loans as come into and continue in default, the Master Servicer shall decide whether to (i) foreclose upon the Mortgaged Properties securing such Home Loans, (ii) write off the unpaid principal balance of the Home Loans as bad debt, (iii) take a deed in lieu of foreclosure, (iv) accept a short sale (a payoff of the Home Loan for an amount less than the total amount contractually owed in order to facilitate a sale of the Mortgaged Property by the Mortgagor) or permit a short refinancing (a payoff of the Home Loan for an amount less than the total amount contractually owed in order to facilitate refinancing transactions by the Mortgagor not involving a sale of the Mortgaged Property), (v) arrange for a repayment plan, (vi) agree to a modification in accordance with this Servicing Agreement, or (vii) take an unsecured note, in connection with a negotiated release of the lien of the Mortgage in order to facilitate a settlement with the Mortgagor; in each case subject to the rights of any related first lien holder; provided that in connection with the foregoing if the Master Servicer has actual knowledge that any Mortgaged Property is affected by hazardous or toxic wastes or substances and that the acquisition of such Mortgaged Property would not be commercially reasonable, then the Master Servicer shall not cause the Issuer or the Indenture Trustee to acquire title to such Mortgaged Property in a foreclosure or similar proceeding.  In connection with such decision, the Master Servicer shall follow such practices (including, in the case of any default on a related senior mortgage loan, the advancing of funds to correct such default if deemed to be appropriate by the Master Servicer) and procedures as it shall deem necessary or advisable and as shall be normal and usual in its general mortgage servicing activities and as shall be required or permitted by the Program Guide; provided that the Master Servicer shall not be liable in any respect hereunder if the Master Servicer is acting in connection with any such foreclosure or attempted foreclosure which is not completed or other conversion in a manner that is consistent with the provisions of this Servicing Agreement.  The foregoing is subject to the proviso that the Master Servicer shall not be required to expend its own funds in connection with any foreclosure or attempted foreclosure which is not completed or towards the correction of any default on a related senior mortgage loan or restoration of any property unless it shall determine that such expenditure will increase Net Liquidation Proceeds.  In the event of a determination by the Master Servicer that any such expenditure previously made pursuant to this Section 3.07 will not be reimbursable from Net Liquidation Proceeds, the Master Servicer shall be entitled to reimbursement of its funds so expended pursuant to Section 3.03.

Notwithstanding any provision of this Servicing Agreement, a Home Loan may be deemed to be finally liquidated if substantially all amounts expected by the Master Servicer to be received in connection with the related defaulted Home Loan have been received; provided, however, the Master Servicer shall treat any Home Loan that is 180 days or more delinquent as having been finally liquidated.  Any subsequent collections with respect to any such Home Loan shall be deposited to the Custodial Account.  For purposes of determining the amount of any Liquidation Proceeds or Insurance Proceeds, or other unscheduled collections, the Master Servicer may take into account minimal amounts of additional receipts expected to be received or any estimated additional liquidation expenses expected to be incurred in connection with the related defaulted Home Loan.

In the event that title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be issued to the Indenture Trustee, who shall hold the same on behalf of the Issuer in accordance with Section 3.13 of the Indenture.  Notwithstanding any such acquisition of title and cancellation of the related Home Loan, such Mortgaged Property shall (except as otherwise expressly provided herein) be considered to be an outstanding Home Loan held as an asset of the Issuer until such time as such property shall be sold.

Any proceeds from the purchase or repurchase that occurs prior to the Home Loan becoming a Liquidated Home Loan of any Home Loan pursuant to the terms of this Servicing Agreement (including without limitation Sections 2.03, 3.15 and 3.16) will be applied in the following order of priority: first, to the Master Servicer or the related Subservicer, all Servicing Fees payable therefrom to the Payment Date on which such amounts are to be deposited in the Payment Account; second, as Interest Collections, accrued and unpaid interest on the related Home Loan, at the Net Loan Rate to the Payment Date on which such amounts are to be deposited in the Payment Account; and third, as Principal Collections, as a recovery of principal on the Home Loan.

Liquidation Proceeds with respect to a Liquidated Home Loan will be applied in the following order of priority: first, to reimburse the Master Servicer or the related

Subservicer in accordance with this Section 3.07, for any Liquidation Expenses; second, to
the Master Servicer or the related Subservicer, all unpaid Servicing Fees through the date
of receipt of the final Liquidation Proceeds; third, as Principal Collections, as a recovery
of principal on the Home Loan, up to an amount equal to the Loan Balance of the related Home
Loan immediately prior to the date it became a Liquidated Home Loan; fourth, as Interest
Collections, accrued and unpaid interest on the related Home Loan at the Net Loan Rate
through the date of receipt of the final Liquidation Proceeds; and fifth, to Foreclosure
Profits.

Proceeds and other recoveries from a Home Loan after it becomes a Liquidated Home
Loan will be applied in the following order of priority: first, to reimburse the Master
Servicer or the related Subservicer in accordance with this Section 3.07 for any expenses
previously unreimbursed from Liquidation Proceeds or otherwise; second, to the Master
Servicer or the related Subservicer, all unpaid Servicing Fees payable thereto through the
date of receipt of the proceeds previously unreimbursed from Liquidation Proceeds or
otherwise; third, as Interest Collections, up to an amount equal to the sum of (a) the Loan
Balance of the related Home Loan immediately prior to the date it became a Liquidated Home
Loan, less any Net Liquidation Proceeds previously received with respect to such Home Loan
and applied as a recovery of principal, and (b) accrued and unpaid interest on the related
Home Loan at the Net Loan Rate through the date it became a Liquidation Home Loan; and
fourth, to Foreclosure Profits.

Section 3.08.    Issuer and Indenture Trustee to Cooperate.  On or before each Payment Date,
the Master Servicer will notify the Indenture Trustee or the Custodian, with a copy to the
Issuer, of the termination of or the payment in full and the termination of any Home Loan
during the preceding Collection Period.  Upon receipt of payment in full, the Master
Servicer is authorized to execute, pursuant to the authorization contained in Section 3.01,
if the assignments of Mortgage have been recorded if required under the Home Loan Purchase
Agreement, an instrument of satisfaction regarding the related Mortgage, which instrument of
satisfaction shall be recorded by the Master Servicer if required by applicable law and be
delivered to the Person entitled thereto, and to cause the removal from the registration on
the MERS(R)System of such Mortgage, if applicable.  It is understood and agreed that any
expenses incurred in connection with such instrument of satisfaction or transfer shall be
reimbursed from amounts deposited in the Custodial Account.  From time to time and as
appropriate for the servicing or foreclosure of any Home Loan, the Indenture Trustee or the
Custodian shall, upon request of the Master Servicer and delivery to the Indenture Trustee
or Custodian, with a copy to the Issuer, of a Request for Release, signed by a Servicing
Officer, release or cause to be released the related Mortgage File to the Master Servicer
and the Issuer or Indenture Trustee shall promptly execute such documents, in the forms
provided by the Master Servicer, as shall be necessary for the prosecution of any such
proceedings or the taking of other servicing actions.  Such trust receipt shall obligate the
Master Servicer to return the Mortgage File to the Indenture Trustee or the Custodian (as
specified in such receipt) when the need therefor by the Master Servicer no longer exists
unless the Home Loan shall be liquidated, in which case, upon receipt of a certificate of a
Servicing Officer similar to that hereinabove specified, the trust receipt shall be released
to the Master Servicer.

In order to facilitate the foreclosure of the Mortgage securing any Home Loan that is
in default following recordation of the related Assignment of Mortgage in accordance with
the provisions of the Home Loan Purchase Agreement, the Indenture Trustee or the Issuer
shall, if so requested in writing by the Master Servicer, promptly execute an appropriate
assignment in the form provided by the Master Servicer to assign such Home Loan for the
purpose of collection to the Master Servicer (any such assignment shall unambiguously
indicate that the assignment is for the purpose of collection only), and, upon such
assignment, such assignee for collection will thereupon bring all required actions in its
own name and otherwise enforce the terms of the Home Loan and deposit or credit the Net
Liquidation Proceeds, exclusive of Foreclosure Profits, received with respect thereto in the
Custodial Account.  In the event that all delinquent payments due under any such Home Loan
are paid by the Mortgagor and any other defaults are cured, then the assignee for collection
shall promptly reassign such Home Loan to the Indenture Trustee and return all Related
Documents to the place where the related Mortgage File was being maintained.

In connection with the Issuer's obligation to cooperate as provided in this Section
3.08 and all other provisions of this Servicing Agreement requiring the Issuer to authorize
or permit any actions to be taken with respect to the Home Loans, the Indenture Trustee, as
pledgee of the Home Loans and as assignee of record of the Home Loans on behalf of the
Issuer pursuant to Section 3.13 of the Indenture, expressly agrees, on behalf of the Issuer,
to take all such actions on behalf of the Issuer and to promptly execute and return all
instruments reasonably required by the Master Servicer in connection therewith; provided
that if the Master Servicer shall request a signature of the Indenture Trustee, on behalf of
the Issuer, the Master Servicer shall deliver to the Indenture Trustee an Officer's

Certificate stating that such signature is necessary or appropriate to enable the Master
Servicer to carry out its servicing and administrative duties under this Servicing
Agreement.

Section 3.09.    Servicing Compensation; Payment of Certain Expenses by Master Servicer.  The
Master Servicer shall be entitled to receive the Master Servicing Fee in accordance with
Sections 3.02 and 3.03 as compensation for its services in connection with servicing the
Home Loans.  Moreover, additional servicing compensation in the form of late payment
charges, prepayment charges, investment income on amounts in the Custodial Account or the
Payment Account and other receipts not required to be deposited in the Custodial Account as
specified in Section 3.02 shall be retained by the Master Servicer.  The Master Servicer
shall be required to pay all expenses incurred by it in connection with its activities
hereunder (including payment of all other fees and expenses not expressly stated hereunder
to be for the account of the Securityholders, including, without limitation, the fees and
expenses of the Owner Trustee, Indenture Trustee and any Custodian) and shall not be
entitled to reimbursement therefor.

Section 3.10.    Annual Statement as to Compliance.  (a) The Master Servicer will deliver to
the Depositor, the Issuer, the Credit Enhancer and the Indenture Trustee on or before the
earlier of (a) March 31 of each year or (b) with respect to any calendar year during which
the Depositor's annual report on Form 10-K is required to be filed in accordance with the
Exchange Act and the rules and regulations of the Commission, the date on which the annual
report on Form 10-K is required to be filed in accordance with the Exchange Act and the
rules and regulations of the Commission, a servicer compliance certificate, signed by an
authorized officer of the Master Servicer, as described in Items 1122(a), 1122(b) and 1123
of Regulation AB, to the effect that:

(i)      A review of the Master Servicer's activities during the reporting period and of its
         performance under this Servicing Agreement has been made under such officer's
         supervision.

(ii)     To the best of such officer's knowledge, based on such review, the Master Servicer
         has fulfilled all of its obligations under this Servicing Agreement in all materials
         respects throughout the reporting period or, if there has been a failure to fulfill
         any such obligation in any material respect, specifying each such failure known to
         such officer and the nature and status thereof.

         The Master Servicer shall use commercially reasonable efforts to obtain from all
other parties participating in the servicing function any additional certifications required
under Item 1123 of Regulation AB to the extent required to be included in a Report on Form
10-K; provided, however, that a failure to obtain such certifications shall not be a breach
of the Master Servicer's duties hereunder if any such party fails to deliver such a
certification.

(b)      The Master Servicer shall deliver to the Issuer and the Indenture Trustee, with a
copy to the Credit Enhancer, promptly after having obtained knowledge thereof, but in no
event later than five Business Days thereafter, written notice by means of an Officer's
Certificate of any event which with the giving of notice or the lapse of time or both, would
become a Servicing Default.

Section 3.11.    Annual Independent Public Accountants' Servicing Report.  On or before the
earlier of (a) March 31 of each year or (b) with respect to any calendar year during which
the Depositor's annual report on Form 10-K is required to be filed in accordance with the
Exchange Act and the rules and regulations of the Commission, the date on which the annual
report is required to be filed in accordance with the Exchange Act and the rules and
regulations of the Commission, the Master Servicer at its expense shall cause a firm of
independent public accountants, which shall be members of the American Institute of
Certified Public Accountants, to furnish a report to the Depositor, the Credit Enhancer and
the Indenture Trustee the attestation required under Item 1122(b) of Regulation AB.  In
rendering such statement, such firm may rely, as to matters relating to the direct servicing
of home loans by Subservicers, upon comparable statements for examinations conducted by
independent public accountants substantially in accordance with standards established by the
American Institute of Certified Public Accountants (rendered within one year of such
statement) with respect to such Subservicers.

Section 3.12.    Access to Certain Documentation and Information Regarding the Home Loans.
Whenever required by statute or regulation, the Master Servicer shall provide to the Credit
Enhancer and any Securityholder upon reasonable request (or a regulator for a
Securityholder) or the Indenture Trustee, reasonable access to the documentation regarding
the Home Loans such access shall be afforded without charge but only upon reasonable request
and during normal business hours at the offices of the Master Servicer.  Nothing in this

Section 3.12 shall derogate from the obligation of the Master Servicer to observe any applicable law prohibiting disclosure of information regarding the Mortgagors and the failure of the Master Servicer to provide access as provided in this Section 3.12 as a result of such obligation shall not constitute a breach of this Section 3.12.

Section 3.13.   Maintenance of Certain Servicing Insurance Policies.  The Master Servicer shall during the term of its service as servicer maintain in force (i) a policy or policies of insurance covering errors and omissions in the performance of its obligations as master servicer hereunder and (ii) a fidelity bond in respect of its officers, employees or agents.  Each such policy or policies and fidelity bond shall be at least equal to the coverage that would be required by FNMA or FHLMC, whichever is greater, for Persons performing servicing for loans similar to the Home Loans purchased by such entity.

Section 3.14.   Information Required by the Internal Revenue Service and Reports of Foreclosures and Abandonments of Mortgaged Property.  The Master Servicer shall prepare and deliver all federal and state information reports when and as required by all applicable state and federal income tax laws.  In particular, with respect to the requirement under Section 6050J of the Code to the effect that the Master Servicer or Subservicer shall make reports of foreclosures and abandonments of any mortgaged property for each year beginning in 2006, the Master Servicer or Subservicer shall file reports relating to each instance occurring during the previous calendar year in which the Master Servicer (i) on behalf of the Issuer, acquires an interest in any Mortgaged Property through foreclosure or other comparable conversion in full or partial satisfaction of a Home Loan, or (ii) knows or has reason to know that any Mortgaged Property has been abandoned.  The reports from the Master Servicer or Subservicer shall be in form and substance sufficient to meet the reporting requirements imposed by Section 6050J and Section 6050H (reports relating to mortgage interest received) of the Code.

Section 3.15.   Optional Repurchase of Defaulted Home Loans.  Notwithstanding any provision in Section 3.07 to the contrary, the Master Servicer, at its option and in its sole discretion, may repurchase any Home Loan delinquent in payment for a period of 90 days or longer for a price equal to the Repurchase Price.

Section 3.16.   Limited Home Loan Repurchase Right.  The Limited Repurchase Right Holder will have the irrevocable option at any time to purchase any of the Home Loans at the Repurchase Price, up to a maximum of five Home Loans.  In the event that this option is exercised as to any five Home Loans in the aggregate, this option will thereupon terminate. If at any time the Limited Repurchase Right Holder makes a payment to the Custodial Account covering the amount of the Repurchase Price for such a Home Loan, and the Limited Repurchase Right Holder provides to the Indenture Trustee a certification signed by a Servicing Officer stating that the amount of such payment has been deposited in the Custodial Account, then, at the request of the Limited Repurchase Right Holder, the Indenture Trustee shall execute the assignment of such Home Loan, without recourse, to the Limited Repurchase Right Holder which shall succeed to all the Indenture Trustee's right, title and interest in and to such Home Loan, and all security and documents relative thereto.  Such assignment shall be an assignment outright and not for security.  The Limited Repurchase Right Holder will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Indenture Trustee with respect thereto.

ARTICLE IV

SERVICING CERTIFICATE

Section 4.01.   Statements to Securityholders.  (a)  With respect to each Payment Date, on the Business Day following the related Determination Date (or with respect to any Payment Date for which an Insured Payment will occur, no later than 12:00 P.M.  New York City time, on the second Business Day prior to the applicable Payment Date), the Master Servicer shall forward to the Indenture Trustee and the Indenture Trustee pursuant to Section 3.26 of the Indenture shall forward or cause to be forwarded by mail or otherwise make available electronically at www.jpmorgan.com/sfr to each Certificateholder, Noteholder, the Credit Enhancer, the Depositor, the Owner Trustee, the Certificate Paying Agent and each Rating Agency, a statement setting forth the following information (the "Servicing Certificate") as to the Notes and Certificates, to the extent applicable:

(i)      the applicable Record Date, Determination Date and Payment Date;

(ii)        the aggregate amount of payments received with respect to the Home Loans, including
            prepayment amounts;

(iii)       the Servicing Fee and Subservicing Fee payable to the Master Servicer and the
            Subservicer;

(iv)        the amount of any other fees or expenses paid, and the identity of the party
            receiving such fees or expenses;

(v)         the aggregate amount of (a) Interest Collections, (b) Principal Collections and (c)
            Substitution Adjustment Amounts for such Collection Period;

(vi)        (a) the amount of such distribution to the Securityholders of such Class applied to
            reduce the Note Balance or Certificate Principal Balance thereof, and (b) the
            aggregate amount included therein representing Principal Prepayments;

(vii)       the amount of such distribution to Holders of such Class of Securities allocable to
            interest;

(viii)      if the distribution to the Holders of such Class of Securities is less than the full
            amount that would be distributable to such Holders if there were sufficient funds
            available therefor, the amount of the shortfall;

(ix)        the aggregate Note Balance or Certificate Principal Balance of each Class of
            Securities, before and after giving effect to the amounts distributed on such Payment
            Date, separately identifying any reduction thereof due to Liquidation Loss Amounts
            other than pursuant to an actual distribution of principal;

(x)         the Note Rate for each Class of Notes for such Payment Date, separately identifying
            LIBOR for such Payment Date, if applicable;

(xi)        the weighted average remaining term to maturity of the Home Loans after giving effect
            to the amounts distributed on such Payment Date;

(xii)       the weighted average Loan Rates of the Home Loans after giving effect to the amounts
            distributed on such Payment Date;

(xiii)      the percentage of the outstanding principal balances of the Notes after giving effect
            to the distributions on that Payment Date;

(xiv)       the number and Pool Balance of the Home Loans after giving effect to the distribution
            of principal on such Payment Date and the number of Home Loans at the beginning and
            end of the preceding Collection Period;

(xv)        on the basis of the most recent reports furnished to it by Sub-Servicers, the number
            and aggregate Loan Balances of Home Loans (a) as to which the Monthly Payment is
            Delinquent 30-59 days, 60-89 days and 90 or more days, respectively, (b) that are
            foreclosed, (c) that have become REO and (d) that have been finally liquidated due to
            being 180 days or more delinquent, in each case as of the end of the related
            Collection Period; provided, however, that such information will not be provided on
            the statements relating to the first Payment Date;

(xvi)       the aggregate Liquidation Loss Amounts with respect to the related Collection Period,
            the amount of any Liquidation Loss Payment Amounts with respect to the Notes, and the
            aggregate of the Liquidation Loss Amounts from all Collection Periods to date
            expressed as dollars and as a percentage of the aggregate Cut-off Date Loan Balance;

(xvii)      any material modifications, extensions or waivers to the terms of the Home Loans
            during the Collection Period or that have cumulatively become material over time;

(xviii)     any material breaches of Home Loan representations or warranties or covenants in the
            Home Loan Purchase Agreement.

(xix)       The amount of any Insured Payment, if any, for such Payment Date and the aggregate
            amount of prior draws thereunder not yet reimbursed;

(xx)        the number, aggregate principal balance and book value of any REO properties;

(xxi)       the aggregate accrued interest remaining unpaid, if any, for each Class of
            Securities, after giving effect to the distribution made on such Payment Date;

(xxii)    (a) the number and principal amount of release agreements pursuant to Section 3.05(b)(iv) entered into during the calendar year and since the Closing Date, stated separately, for the Home Loans and, the aggregate outstanding principal amount of such release agreements expressed as a percentage of the Pool Balance with information provided separately with respect to all Unsecured Loans and (b) the number and principal amount of Capitalization Workouts pursuant to Section 3.02(a)(v) entered into since the Closing Date;

(xxiii)    the aggregate amount recovered during the related Collection Period consisting of all subsequent recoveries on any Home Loan that was 180 days or more delinquent;

(xxiv)    [reserved];

(xxv)    the aggregate amount of any recoveries on previously foreclosed loans from Sellers due to a breach of a representation or warranty assigned to the Trustee;

(xxvi)    the amount, if any, to be paid by a Derivative Counterparty under a Derivative Contract;

(xxvii)    whether or not a Servicing Trigger has occurred; and

(xxviii)    the Outstanding Reserve Amount and the Reserve Amount Target immediately following such Payment Date.

In the case of information furnished pursuant to clauses (vi) and (vii) above, the amounts shall be expressed as an aggregate dollar amount per Note or Certificate, as applicable, with a $1,000 denomination.

(b)    In addition, with respect to each Payment Date, on the Business Day following the related Determination Date, the Master Servicer shall forward to the Credit Enhancer and the Rating Agencies the following information for each Capitalization Workout entered into during the related Collection Period:

(i)    the original Home Loan amount;

(ii)    the Home Loan amount after the Capitalization Workout;

(iii)    the original Monthly Payment amount;

(iv)    the Monthly Payment amount after the Capitalization Workout;

(v)    the Capitalized Amount as defined in Section 3.02(a)(v) herein;

(vi)    the Combined Loan-to-Value Ratio prior to the Capitalization Workout;

(vii)    the Combined Loan-to-Value Ratio after the Capitalization Workout; and

(viii)    if an appraisal was used in determining the Combined Loan-to-Value Ratio referred to in (vii) above, the type and date of appraisal.

The Master Servicer shall also forward to the Indenture Trustee any other information reasonably requested by the Indenture Trustee necessary to make distributions pursuant to Section 3.05 of the Indenture.  Prior to the close of business on the Business Day next succeeding each Determination Date, the Master Servicer shall furnish a written statement to the Certificate Paying Agent and the Indenture Trustee setting forth the aggregate amounts required to be withdrawn from the Custodial Account and deposited into the Payment Account on the Business Day preceding the related Payment Date pursuant to Section 3.03.  The determination by the Master Servicer of such amounts shall, in the absence of obvious error, be presumptively deemed to be correct for all purposes hereunder and the Owner Trustee and Indenture Trustee shall be protected in relying upon the same without any independent check or verification.  In addition, upon the Issuer's written request, the Master Servicer shall promptly furnish information reasonably requested by the Issuer that is reasonably available to the Master Servicer to enable the Issuer to perform its federal and state income tax reporting obligations.

The Master Servicer shall also forward to the Credit Enhancer and/or its designees any additional information, including without limitation, loss and delinquency information requested by the Credit Enhancer, with respect to the Home Loans.

Section 4.02.    Tax Reporting.  So long as 100% of the Certificates are owned by the same

person, then no separate federal and state income tax returns or information returns or reports will be filed with respect to the Issuer, and the Issuer will be treated as an entity disregarded from the 100% Certificateholder.

Section 4.03.    Calculation of Adjusted Issue Price.  The Master Servicer shall calculate the Adjusted Issue Price for purposes of calculating the Termination Price.

Section 4.04.    Exchange Act Reporting.

(a)    The Master Servicer shall, on behalf of the Depositor and in respect of the Trust Estate, sign and cause to be filed with the Commission any periodic reports required to be filed under the provisions of the Exchange Act, and the rules and regulations of the Commission thereunder including, without limitation, reports on Form 10-K, Form 10-D and Form 8-K.  In connection with the preparation and filing of such periodic reports, the Indenture Trustee shall timely provide to the Master Servicer (I) a list of Securityholders as shown on the Register as of the end of each calendar year, (II) copies of all pleadings, other legal process and any other documents relating to any claims, charges or complaints involving the Indenture Trustee, as trustee hereunder, or the Trust Estate that are received by the Indenture Trustee, (III) notice of all matters that, to the actual knowledge of a Responsible Officer of the Indenture Trustee, have been submitted to a vote of the Securityholders, other than those matters that have been submitted to a vote of the Securityholders at the request of the Depositor or the Master Servicer, and (IV) notice of any failure of the Indenture Trustee to make any distribution to the Securityholders as required pursuant to this Agreement. Neither the Master Servicer nor the Indenture Trustee shall have any liability with respect to the Master Servicer's failure to properly prepare or file such periodic reports resulting from or relating to the Master Servicer's inability or failure to obtain any information not resulting from the Master Servicer's own negligence or willful misconduct

(b)    Any Form 10-K filed with the Commission in connection with this Section 4.04 shall include:

(i)    A certification, signed by the senior officer in charge of the servicing functions of the Master Servicer, in the form attached as Exhibit D hereto or such other form as may be required or permitted by the Commission (the "Form 10-K Certification"), in compliance with Rules 13a-14 and 15d-14 under the Exchange Act and any additional directives of the Commission.

(ii)    A report regarding its assessment of compliance during the preceding calendar year with all applicable servicing criteria set forth in relevant Commission regulations with respect to mortgage-backed securities transactions taken as a whole involving the Master Servicer that are backed by the same types of assets as those backing the certificates, as well as similar reports on assessment of compliance received from other parties participating in the servicing function as required by relevant Commission regulations, as described in Item 1122(a) of Regulation AB.  The Master Servicer shall obtain from all other parties participating in the servicing function any required certifications.

(iii)    With respect to each assessment report described immediately above, a report by a registered public accounting firm that attests to, and reports on, the assessment made by the asserting party, as set forth in relevant Commission regulations, as described in Regulation 1122(b) of Regulation AB and Section 3.11.

(iv)    The servicer compliance certificate required to be delivered pursuant Section 3.10.

(c)    In connection with the Form 10-K Certification, the Indenture Trustee shall provide the Master Servicer with a back-up certification substantially in the form attached hereto as Exhibit E.

(d)    This Section 4.04 may be amended in accordance with this Servicing Agreement without the consent of the Securityholders.

(e)    The Indenture Trustee shall make available on the Indenture Trustee's internet website each of the reports filed with the Commission by or on behalf of the Depositor under the Exchange Act, as soon as reasonably practicable upon delivery of such reports to the Indenture Trustee.

ARTICLE V

PAYMENT ACCOUNT

Section 5.01.    Payment Account.  The Indenture Trustee shall establish and maintain a
Payment Account entitled "JPMorgan Chase Bank, National Association, as Indenture Trustee,
for the benefit of the Securityholders, the Credit Enhancer and the Certificate Paying Agent
pursuant to the Indenture, dated as of July 21, 2006, between Home Loan Trust 2006-HI3 and
JPMorgan Chase Bank, National Association".  The Payment Account shall be an Eligible
Account.  On each Payment Date, amounts on deposit in the Payment Account will be
distributed by the Indenture Trustee in accordance with Section 3.05 of the Indenture.  The
Indenture Trustee shall, upon written request from the Master Servicer, invest or cause the
institution maintaining the Payment Account to invest the funds in the Payment Account in
Permitted Investments designated in the name of the Indenture Trustee, which shall mature
not later than the Business Day next preceding the Payment Date next following the date of
such investment (except that (i) any investment in the institution with which the Payment
Account is maintained or a fund for which such institution serves as custodian may mature on
such Payment Date and (ii) any other investment may mature on such Payment Date if the
Indenture Trustee shall advance funds on such Payment Date to the Payment Account in the
amount payable on such investment on such Payment Date, pending receipt thereof to the
extent necessary to make distributions on the Securities) and shall not be sold or disposed
of prior to maturity.  All income and gain realized from any such investment shall be for
the benefit of the Master Servicer and shall be subject to its withdrawal or order from time
to time.  The amount of any losses incurred in respect of any such investments shall be
deposited in the Payment Account by the Master Servicer out of its own funds immediately as
realized.

ARTICLE VI

THE MASTER SERVICER

Section 6.01.    Liability of the Master Servicer.  The Master Servicer shall be liable in
accordance herewith only to the extent of the obligations specifically imposed upon and
undertaken by the Master Servicer herein.

Section 6.02.    Merger or Consolidation of, or Assumption of the Obligations of, the Master
Servicer.  Any corporation into which the Master Servicer may be merged or converted or with
which it may be consolidated, or any corporation resulting from any merger, conversion or
consolidation to which the Master Servicer shall be a party, or any corporation succeeding
to the business of the Master Servicer, shall be the successor of the Master Servicer,
hereunder, without the execution or filing of any paper or any further act on the part of
any of the parties hereto, anything herein to the contrary notwithstanding.

        The Master Servicer may assign its rights and delegate its duties and obligations
under this Servicing Agreement; provided that the Person accepting such assignment or
delegation shall be a Person which is qualified to service Home Loans is reasonably
satisfactory to the Indenture Trustee (as pledgee of the Home Loans), the Credit Enhancer
and the Issuer, is willing to service the Home Loans and executes and delivers to the
Indenture Trustee and the Issuer an agreement in form and substance reasonably satisfactory
to the Credit Enhancer, the Indenture Trustee and the Issuer, which contains an assumption
by such Person of the due and punctual performance and observance of each covenant and
condition to be performed or observed by the Master Servicer under this Servicing Agreement;
provided further that each Rating Agency's rating of the Securities in effect immediately
prior to such assignment and delegation will not be qualified, reduced, or withdrawn as a
result of such assignment and delegation (as evidenced by a letter to such effect from each
Rating Agency), if determined without regard to the Credit Enhancement Instrument, and
provided further that the Owner Trustee receives an Opinion of Counsel to the effect that
such assignment or delegation shall not cause the Trust to be treated as a corporation for
federal or state income tax purposes.

        Notwithstanding anything to the contrary set forth herein, any Person into which the
Master Servicer may be merged or converted or with which it may be consolidated, or any
Person resulting from any merger, conversion or consolidation to which the Master Servicer

shall be a party, or any Person succeeding to the business of the Master Servicer, shall be
the successor of the Master Servicer, hereunder without the execution or filing of any
paper or any further act on the part of any of the parties hereto.

The conversion of Residential Funding Corporation's organizational structure from a
Delaware corporation to a limited liability company shall not require the consent of any
party or notice to any party and shall not in any way affect the rights or obligations of
Residential Funding Corporation hereunder.

Section 6.03.    Limitation on Liability of the Master Servicer and Others.  Neither the
Master Servicer nor any of the directors or officers or employees or agents of the Master
Servicer shall be under any liability to the Issuer, the Owner Trustee, the Indenture
Trustee or the Securityholders for any action taken or for refraining from the taking of any
action in good faith pursuant to this Servicing Agreement, provided, however, that this
provision shall not protect the Master Servicer or any such Person against any liability
which would otherwise be imposed by reason of its willful misfeasance, bad faith or gross
negligence in the performance of its duties hereunder or by reason of its reckless disregard
of its obligations and duties hereunder.  The Master Servicer and any director or officer or
employee or agent of the Master Servicer may rely in good faith on any document of any kind
prima facie properly executed and submitted by any Person respecting any matters arising
hereunder.  The Master Servicer and any director or officer or employee or agent of the
Master Servicer shall be indemnified by the Issuer and held harmless against any loss,
liability or expense incurred in connection with any legal action relating to this Servicing
Agreement or the Securities, including any amount paid to the Owner Trustee or the Indenture
Trustee pursuant to Section 6.06(b), other than any loss, liability or expense incurred by
reason of its willful misfeasance, bad faith or gross negligence in the performance of its
duties hereunder or by reason of its reckless disregard of its obligations and duties
hereunder.  The Master Servicer shall not be under any obligation to appear in, prosecute or
defend any legal action which is not incidental to its duties to service the Home Loans in
accordance with this Servicing Agreement, and which in its opinion may involve it in any
expense or liability; provided, however, that the Master Servicer may in its sole discretion
undertake any such action which it may deem necessary or desirable in respect of this
Servicing Agreement, and the rights and duties of the parties hereto and the interests of
the Securityholders.  In such event, the reasonable legal expenses and costs of such action
and any liability resulting therefrom shall be expenses, costs and liabilities of the
Issuer, and the Master Servicer shall be entitled to be reimbursed therefor.  The Master
Servicer's right to indemnity or reimbursement pursuant to this Section 6.03 shall survive
any resignation or termination of the Master Servicer pursuant to Section 6.04 or 7.01 with
respect to any losses, expenses, costs or liabilities arising prior to such resignation or
termination (or arising from events that occurred prior to such resignation or termination).

Section 6.04.    Master Servicer Not to Resign.  Subject to the provisions of Section 6.02,
the Master Servicer shall not resign from the obligations and duties hereby imposed on it
except (i) upon determination that the performance of its obligations or duties hereunder
are no longer permissible under applicable law or are in material conflict by reason of
applicable law with any other activities carried on by it or its subsidiaries or Affiliates,
the other activities of the Master Servicer so causing such a conflict being of a type and
nature carried on by the Master Servicer or its subsidiaries or Affiliates at the date of
this Servicing Agreement or (ii) upon satisfaction of the following conditions:  (a) the
Master Servicer shall have proposed a successor servicer to the Issuer and the Indenture
Trustee in writing and such proposed successor servicer is reasonably acceptable to the
Issuer, the Credit Enhancer and the Indenture Trustee;  (b) each Rating Agency shall have
delivered a letter to the Issuer, the Credit Enhancer and the Indenture Trustee prior to the
appointment of the successor servicer stating that the proposed appointment of such
successor servicer as Master Servicer hereunder will not result in the reduction or
withdrawal of the then current rating of the Securities, if determined without regard to the
Credit Enhancement Instrument; and (c) such proposed successor servicer is reasonably
acceptable to the Credit Enhancer, as evidenced by a letter to the Issuer and the Indenture
Trustee, provided, however, that no such resignation by the Master Servicer shall become
effective until such successor servicer or, in the case of (i) above, the Indenture Trustee,
as pledgee of the Home Loans, shall have assumed the Master Servicer's responsibilities and
obligations hereunder or the Indenture Trustee, as pledgee of the Home Loans, shall have
designated a successor servicer in accordance with Section 7.02.  Any such resignation shall
not relieve the Master Servicer of responsibility for any of the obligations specified in
Sections 7.01 and 7.02 as obligations that survive  the resignation or termination of the
Master Servicer.  Any such determination permitting the   resignation of the Master Servicer
shall be evidenced by an Opinion of Counsel to such effect delivered to the Indenture
Trustee and the Credit Enhancer.

Section 6.05.    Delegation of Duties.  In the ordinary course of business, the Master
Servicer at any time may delegate any of its duties hereunder to any Person, including any

of its Affiliates, who agrees to conduct such duties in accordance with standards comparable to those with which the Master Servicer complies pursuant to Section 3.01. Such delegation shall not relieve the Master Servicer of its liabilities and responsibilities with respect to such duties and shall not constitute a resignation within the meaning of Section 6.04.

Section 6.06.    Master Servicer to Pay Indenture Trustee's and Owner Trustee's Fees and Expenses; Indemnification.  (a)  The Master Servicer covenants and agrees to pay to the Owner Trustee, the Indenture Trustee and any co-trustee of the Indenture Trustee or the Owner Trustee from time to time, and the Owner Trustee, the Indenture Trustee and any such co-trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of them in the execution of the trusts created under the Trust Agreement and the Indenture and in the exercise and performance of any of the powers and duties under the Trust Agreement or the Indenture, as the case may be, of the Owner Trustee, the Indenture Trustee and any co-trustee, and the Master Servicer will pay or reimburse the Indenture Trustee and any co-trustee upon request for all reasonable expenses, disbursements and advances incurred or made by the Indenture Trustee or any co-trustee in accordance with any of the provisions of this Servicing Agreement or the Indenture except any such expense, disbursement or advance as may arise from its negligence, willful misfeasance or bad faith.

(b)    The Master Servicer agrees to indemnify the Indenture Trustee and the Owner Trustee for, and to hold the Indenture Trustee and the Owner Trustee, as the case may be, harmless against, any loss, liability or expense incurred without negligence, bad faith or willful misconduct on the part of the Indenture Trustee or the Owner Trustee, as the case may be, arising out of, or in connection with, the acceptance and administration of the Issuer and the assets thereof, including the costs and expenses (including reasonable legal fees and expenses) of defending the Indenture Trustee or the Owner Trustee, as the case may be, against any claim in connection with the exercise or performance of any of its powers or duties under any Basic Document (including, without limitation, any claim against the Indenture Trustee or the Owner Trustee alleging a violation of the Homeownership and Equity Protection Act of 1994, as amended), provided that:

(i)     with respect to any such claim, the Indenture Trustee or Owner Trustee, as the case may be, shall have given the Master Servicer written notice thereof promptly after the Indenture Trustee or Owner Trustee, as the case may be, shall have actual knowledge thereof;

(ii)    while maintaining control over its own defense, the Issuer, the Indenture Trustee or Owner Trustee, as the case may be, shall cooperate and consult fully with the Master Servicer in preparing such defense; and

(iii)   notwithstanding anything in this Servicing Agreement to the contrary, the Master Servicer shall not be liable for settlement of any claim by the Indenture Trustee or the Owner Trustee, as the case may be, entered into without the prior consent of the Master Servicer.

No termination of this Servicing Agreement shall affect the obligations created by this Section 6.06 of the Master Servicer to indemnify the Indenture Trustee and the Owner Trustee under the conditions and to the extent set forth herein.

Notwithstanding the foregoing, the indemnification provided by the Master Servicer in this Section 6.06(b) shall not be available (a) for any loss, liability or expense of the Indenture Trustee or the Owner Trustee, including the costs and expenses of defending itself against any claim, incurred in connection with any actions taken by the Indenture Trustee or the Owner Trustee at the direction of the Noteholders or Certificateholders, as the case may be, pursuant to the terms of this Servicing Agreement or (b) where indemnification by the Indenture Trustee is required pursuant to Section 9.05(a).

ARTICLE VII

DEFAULT

Section 7.01.    Servicing Default.  If any one of the following events ("Servicing Default") shall occur and be continuing:

(i)     Any failure by the Master Servicer to deposit in the Custodial Account or to remit to
        the Paying Agent for deposit in the Payment Account any deposit required to be made
        under the terms of this Servicing Agreement which continues unremedied for a period
        of five Business Days after the date upon which notice of such failure shall
        have been given to the Master Servicer by the Issuer or the Indenture Trustee, or to
        the Master Servicer, the Issuer and the Indenture Trustee by the Credit Enhancer; or

(ii)    Failure on the part of the Master Servicer duly to observe or perform in any material
        respect any other covenants or agreements of the Master Servicer set forth in the
        Securities or in this Servicing Agreement, which failure, in each case, materially
        and adversely affects the interests of Securityholders or the Credit Enhancer and
        which continues unremedied for a period of 45 days after the date on which written
        notice of such failure, requiring the same to be remedied, and stating that such
        notice is a "Notice of Default" hereunder, shall have been given to the Master
        Servicer by the Issuer or the Indenture Trustee, or to the Master Servicer, the
        Issuer and the Indenture Trustee by the Credit Enhancer; or

(iii)   The entry against the Master Servicer of a decree or order by a court or agency or
        supervisory authority having jurisdiction in the premises for the appointment of a
        trustee, conservator, receiver or liquidator in any insolvency, conservatorship,
        receivership, readjustment of debt, marshalling of assets and liabilities or similar
        proceedings, or for the winding up or liquidation of its affairs, and the continuance
        of any such decree or order undischarged or unstayed and in effect for a period of 60
        consecutive days; or

(iv)    The Master Servicer shall voluntarily go into liquidation, consent to the appointment
        of a conservator, receiver, liquidator or similar person in any insolvency,
        readjustment of debt, marshalling of assets and liabilities or similar proceedings of
        or relating to the Master Servicer or of or relating to all or substantially all of
        its property, or a decree or order of a court, agency or supervisory authority having
        jurisdiction in the premises for the appointment of a conservator, receiver,
        liquidator or similar person in any insolvency, readjustment of debt, marshalling of
        assets and liabilities or similar proceedings, or for the winding-up or liquidation
        of its affairs, shall have been entered against the Master Servicer and such decree
        or order shall have remained in force undischarged, unbonded or unstayed for a period
        of 60 days; or the Master Servicer shall admit in writing its inability to pay its
        debts generally as they become due, file a petition to take advantage of any
        applicable insolvency or reorganization statute, make an assignment for the benefit
        of its creditors or voluntarily suspend payment of its obligations.

Then, and in every such case, so long as a Servicing Default shall not have been remedied by
the Master Servicer, either the Issuer or the Indenture Trustee, with the consent of the
Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing), or
the Credit Enhancer (so long as no Credit Enhancer Default has occurred and is continuing),
by notice then given in writing to the Master Servicer (and to the Issuer and the Indenture
Trustee if given by the Credit Enhancer) may terminate all of the rights and obligations of
the Master Servicer as servicer under this Servicing Agreement other than its right to
receive servicing compensation and expenses for servicing the Home Loans hereunder during
any period prior to the date of such termination and the Issuer or the Indenture Trustee
with the consent of the Credit Enhancer (so long as no Credit Enhancer Default has occurred
and is continuing), or the Credit Enhancer (so long as no Credit Enhancer Default has
occurred and is continuing) may exercise any and all other remedies available at law or
equity.  Any such notice to the Master Servicer shall also be given to each Rating Agency,
the Credit Enhancer and the Issuer.  On or after the receipt by the Master Servicer of such
written notice, all authority and power of the Master Servicer under this Servicing
Agreement, whether with respect to the Securities or the Home Loans or otherwise, shall pass
to and be vested in the Indenture Trustee as successor Master Servicer, pursuant to and
under this Section 7.01; and, without limitation, the Indenture Trustee is hereby authorized
and empowered to execute and deliver, on behalf of the Master Servicer, as attorney-in-fact
or otherwise, any and all documents and other instruments, and to do or accomplish all other
acts or things necessary or appropriate to effect the purposes of such notice of
termination, whether to complete the transfer and endorsement of each Home Loan and related
documents, or otherwise.  The Master Servicer agrees to cooperate with the Indenture Trustee
in effecting the termination of the responsibilities and rights of the Master Servicer
hereunder, including, without limitation, the transfer to the Indenture Trustee for the
administration by it of all cash amounts relating to the Home Loans that shall at the time
be held by the Master Servicer and to be deposited by it in the Custodial Account, or that
have been deposited by the Master Servicer in the Custodial Account or thereafter received
by the Master Servicer with respect to the Home Loans.  All reasonable costs and expenses
(including, but not limited to, attorneys' fees) incurred in connection with amending this
Servicing Agreement to reflect such succession as Master Servicer pursuant to this Section

7.01 shall be paid by the predecessor Master Servicer (or if the predecessor Master Servicer
is the Indenture Trustee, the initial Master Servicer) upon presentation of reasonable
documentation of such costs and expenses.

Notwithstanding any termination of the activities of the Master Servicer hereunder,
the Master Servicer shall be entitled to receive, out of any late collection of a payment on
a Home Loan which was due prior to the notice terminating the Master Servicer's rights and
obligations hereunder and received after such notice, that portion to which the Master
Servicer would have been entitled pursuant to Sections 3.03 and 3.09 as well as its Master
Servicing Fee in respect thereof, and any other amounts payable to the Master Servicer
hereunder the entitlement to which arose prior to the termination of its activities
hereunder.

Notwithstanding the foregoing, a delay in or failure of performance under Section
7.01(i) or under Section 7.01(ii) after the applicable grace periods specified in such
Sections, shall not constitute a Servicing Default if such delay or failure could not be
prevented by the exercise of reasonable diligence by the Master Servicer and such delay or
failure was caused by an act of God or the public enemy, acts of declared or undeclared war,
public disorder, rebellion or sabotage, epidemics, landslides, lightning, fire, hurricanes,
earthquakes, floods or similar causes.  The preceding sentence shall not relieve the Master
Servicer from using reasonable efforts to perform its respective obligations in a timely
manner in accordance with the terms of this Servicing Agreement and the Master Servicer
shall provide the Indenture Trustee, the Credit Enhancer and the Securityholders with notice
of such failure or delay by it, together with a description of its efforts to so perform its
obligations.  The Master Servicer shall immediately notify the Indenture Trustee, the Credit
Enhancer and the Issuer in writing of any Servicing Default.

Section 7.02.    Indenture Trustee to Act; Appointment of Successor. (a)  On and after the
time the Master Servicer receives a notice of termination pursuant to Section 7.01 or sends
a notice pursuant to Section 6.04, the Indenture Trustee shall be the successor in all
respects to the Master Servicer in its capacity as servicer under this Servicing Agreement
and the transactions set forth or provided for herein and shall be subject to all the
responsibilities, duties and liabilities relating thereto placed on the Master Servicer by
the terms and provisions hereof.  Nothing in this Servicing Agreement or in the Trust
Agreement shall be construed to permit or require the Indenture Trustee to (i) succeed to
the responsibilities, duties and liabilities of the initial Master Servicer in its capacity
as Seller under the Home Loan Purchase Agreement, (ii) be responsible or accountable for any
act or omission of the Master Servicer prior to the issuance of a notice of termination
hereunder, (iii) require or obligate the Indenture Trustee, in its capacity as successor
Master Servicer, to purchase, repurchase or substitute any Home Loan, (iv) fund any losses
on any Permitted Investment directed by any other Master Servicer or (v) be responsible for
the representations and warranties of the Master Servicer.  As compensation therefor, the
Indenture Trustee shall be entitled to such compensation as the Master Servicer would have
been entitled to hereunder if no such notice of termination had been given.  Notwithstanding
the above, (i) if the Indenture Trustee is unwilling to act as successor Master Servicer, or
(ii) if the Indenture Trustee is legally unable so to act, the Indenture Trustee may (in the
situation described in clause (i)) or shall (in the situation described in clause (ii))
appoint or petition a court of competent jurisdiction to appoint any established housing and
home finance institution, bank or other mortgage loan or home equity loan servicer having a
net worth of not less than $10,000,000 as the successor to the Master Servicer hereunder in
the assumption of all or any part of the responsibilities, duties or liabilities of the
Master Servicer hereunder; provided that any such successor Master Servicer shall be
acceptable to the Credit Enhancer, as evidenced by the Credit Enhancer's prior written
consent (so long as no Credit Enhancer Default has occurred and is continuing), which
consent shall not be unreasonably withheld, and provided further that the appointment of any
such successor Master Servicer will not result in the qualification, reduction or withdrawal
of the ratings assigned to the Securities by the Rating Agencies, if determined without
regard to the Credit Enhancement Instrument.  Pending appointment of a successor to the
Master Servicer hereunder, unless the Indenture Trustee is prohibited by law from so acting,
the Indenture Trustee shall act in such capacity as herein above provided.  In connection
with such appointment and assumption, the successor Master Servicer shall be entitled to
receive compensation out of payments on Home Loans in an amount equal to the compensation
which the Master Servicer would otherwise have received pursuant to Section 3.09 (or such
lesser compensation as the Indenture Trustee and such successor shall agree).  The
appointment of a successor Master Servicer shall not affect any liability of the predecessor
Master Servicer which may have arisen under this Servicing Agreement prior to its
termination as Master Servicer (including, without limitation, the obligation to purchase
Home Loans pursuant to Section 3.01, to pay any deductible under an insurance policy
pursuant to Section 3.04 or to indemnify the Indenture Trustee pursuant to Section 6.06),
nor shall any successor Master Servicer be liable for any acts or omissions of the
predecessor Master Servicer or for any breach by such Master Servicer of any of its

representations or warranties contained herein or in any related document or agreement. The Indenture Trustee and such successor shall take such action, consistent with this Servicing Agreement, as shall be necessary to effectuate any such succession.

(b)      Any successor, including the Indenture Trustee, to the Master Servicer as servicer shall during the term of its service as servicer (i) continue to service and administer the Home Loans for the benefit of the Securityholders, (ii) maintain in force a policy or policies of insurance covering errors and omissions in the performance of its obligations as Master Servicer hereunder and a fidelity bond in respect of its officers, employees and agents to the same extent as the Master Servicer is so required pursuant to Section 3.13 and (iii) be bound by the terms of the Insurance Agreement.

(c)      Any successor Master Servicer, including the Indenture Trustee, shall not be deemed in default or to have breached its duties hereunder if the predecessor Master Servicer shall fail to deliver any required deposit to the Custodial Account or otherwise cooperate with any required servicing transfer or succession hereunder.

(d)      In connection with the termination or resignation of the Master Servicer hereunder, either (i) the successor Master Servicer, including the Indenture Trustee if the Indenture Trustee is acting as successor Master Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Home Loans that are registered with MERS, in which case the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to revise its records to reflect the transfer of servicing to the successor Master Servicer as necessary under MERS' rules and regulations, or (ii) the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Indenture Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Home Loan or servicing of such Home Loan on the MERS System to the successor Master Servicer.  The predecessor Master Servicer shall file or cause to be filed any such assignment in the appropriate recording office.  The predecessor Master Servicer shall bear any and all fees of MERS, costs of preparing any assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this subsection (d).  The successor Master Servicer shall cause such assignment to be delivered to the Indenture Trustee or the Custodian promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

Section 7.03.    Notification to Securityholders.  Upon any termination of or appointment of a successor to the Master Servicer pursuant to this Article VII or Section 6.04, the Indenture Trustee shall give prompt written notice thereof to the Securityholders, the Credit Enhancer, the Issuer and each Rating Agency.

Section 7.04.    Servicing Trigger; Removal of Master Servicer.  (a)  Upon determination by the Credit Enhancer that a Servicing Trigger has occurred, the Credit Enhancer shall give notice of such Servicing Trigger to the Master Servicer, the Depositor, the Indenture Trustee and to each Rating Agency.

(b)      At any time after such determination and while a Servicing Trigger is continuing, the Credit Enhancer may direct the Indenture Trustee to remove the Master Servicer if the Credit Enhancer makes a determination that the manner of master servicing was a factor contributing to the size of the delinquencies or losses incurred in the Trust Estate.

(c)      Upon receipt of directions to remove the Master Servicer pursuant to the preceding clause (b), the Indenture Trustee shall notify the Master Servicer that it has been terminated and the Master Servicer shall be terminated in the same manner as specified in Sections 7.01 and 7.02.

(d)      After notice of occurrence of a Servicing Trigger has been given and while a Servicing Trigger is continuing, until and unless the Master Servicer has been removed as provided in clause (b), the Master Servicer covenants and agrees to act as the Master Servicer for a term from the occurrence of the Servicing Trigger to the end of the calendar quarter in which such Servicing Trigger occurs, which term may at the Credit Enhancer's discretion be extended by notice to the Indenture Trustee for successive terms of three (3) calendar months each, until the termination of the Trust Estate.  The Master Servicer will, upon the receipt of each such notice of extension (a "Master Servicer Extension Notice") become bound for the duration of the term covered by such Master Servicer Extension Notice to continue as Master Servicer subject to and in accordance with this Agreement.  If, as of the fifteenth (15th) day prior to the last day of any term as the Master Servicer, the Indenture Trustee shall not have received any Master Servicer Extension Notice from the

Credit Enhancer, the Indenture Trustee shall, within five (5) Business Days thereafter, give
written notice of such no receipt to the Credit Enhancer and the Master Servicer.  If any
such term expires without a Master Servicer Extension Notice then the Indenture Trustee
shall act as successor Master Servicer as provided in Section 7.02.


(e)    No provision of this Section 7.04 shall have the effect of limiting the rights of the
Depositor, the Indenture Trustee, the Securityholders or the Credit Enhancer under Section
7.01.


ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.01.    Amendment.  This Servicing Agreement may be amended from time to time by the
parties hereto, provided that any amendment be accompanied by a letter from the Rating
Agencies that the amendment will not result in the downgrading or withdrawal of the rating
then assigned to the Securities, if determined without regard to the Credit Enhancement
Instrument, and the consent of the Credit Enhancer (so long as no Credit Enhancer Default
has occurred and is continuing) and the Indenture Trustee.  Promptly after the execution by
the Master Servicer, the Issuer and the Indenture Trustee of any amendment of this Servicing
Agreement pursuant to this Section 8.01, the Indenture Trustee shall provide the Custodian
with written copies thereof.  Any failure of the Indenture Trustee to mail such notice, or
any defect therein, shall not, however, in any way impair or affect the validity of any such
amendment.

Section 8.02.    GOVERNING LAW.  THIS SERVICING AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE
WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS
(OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE
OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE
WITH SUCH LAWS.

Section 8.03.    Notices.  All demands, notices and communications hereunder shall be in
writing and shall be deemed to have been duly given if personally delivered at or mailed by
certified mail, return receipt requested, to (a) in the case of the Master Servicer, 2255
North Ontario Street, Suite 400, Burbank, California 91504-3120, Attention: Addition
Director - Bond Administration, (b) in the case of Moody's, Home Mortgage Loan Monitoring
Group, 99 Church Street, 4th Floor, New York, New York 10007, (c) in the case of Standard &
Poor's, 55 Water Street - 41st Floor, New York, New York 10041, Attention: Residential
Mortgage Surveillance Group, (d) in the case of the Owner Trustee, Wilmington Trust Company,
Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attention:
Corporate Trust Administration, (e) in the case of the Issuer, to Home Loan Trust 2006-HI3,
c/o Owner Trustee, Wilmington Trust Company, Rodney Square North, 1100 North Market Street,
Wilmington, Delaware 19890-0001, Attention: Corporate Trust Administration, (f) in the case
of the Indenture Trustee, JPMorgan Chase Bank, National Association, 4 New York Plaza, 6th
Floor, New York, New York 10004, Attention: Worldwide Securities Services/Structured Finance
Services, Home Loan Trust 2006-HI3, (g) in the case of the Credit Enhancer, Financial
Guaranty Insurance Company, 125 Park Avenue, New York, New York 10017, Attention: Structured
Finance Surveillance (Home Loan Trust 2006-HI3) (h) in the case of the Underwriter to Bear,
Stearns & Co, Inc., 383 Madison Avenue, New York, New York 10179 Attention:  Matthew
Perkins; or, as to each party, at such other address as shall be designated by such party in
a written notice to each other party.  Any notice required or permitted to be mailed to a
Securityholder shall be given by first class mail, postage prepaid, at the address of such
Securityholder as shown in the Register.  Any notice so mailed within the time prescribed in
this Servicing Agreement shall be conclusively presumed to have been duly given, whether or
not the Securityholder receives such notice.  Any notice or other document required to be
delivered or mailed by the Indenture Trustee to any Rating Agency shall be given on a
reasonable efforts basis and only as a matter of courtesy and accommodation and the
Indenture Trustee shall have no liability for failure to delivery such notice or document to
any Rating Agency.

Section 8.04.    Severability of Provisions.  If any one or more of the covenants,
agreements, provisions or terms of this Servicing Agreement shall be for any reason
whatsoever held invalid, then such covenants, agreements, provisions or terms shall be
deemed severable from the remaining covenants, agreements, provisions or terms of this
Servicing Agreement and shall in no way affect the validity or enforceability of the other

provisions of this Servicing Agreement or of the Securities or the rights of the Securityholders thereof.

Section 8.05.    Third-Party Beneficiaries.  This Servicing Agreement shall inure to the benefit of and be binding upon the parties hereto, the Securityholders, the Credit Enhancer, the Owner Trustee and their respective successors and permitted assigns.  Except as otherwise provided in this Servicing Agreement, no other Person shall have any right or obligation hereunder.  The Credit Enhancer is a third-party beneficiary of this Servicing Agreement.

Section 8.06.    Counterparts.  This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 8.07.    Effect of Headings and Table of Contents.  The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 8.08.    Termination Upon Purchase by the Master Servicer or Liquidation of All Home Loans; Partial Redemption.  (a)  The respective obligations and responsibilities of the Master Servicer, the Issuer and the Indenture Trustee created hereby shall terminate upon the last action required to be taken by the Issuer pursuant to the Trust Agreement and by the Indenture Trustee pursuant to the Indenture following the earlier of:

(i)       the date on or before which the Indenture or Trust Agreement is terminated, or

(ii)      the purchase by the Master Servicer from the Issuer of all Home Loans and all property acquired in respect of any Home Loan at a price equal to the Termination Price.

The right of the Master Servicer to purchase the assets of the Issuer pursuant to clause (ii) above on any Payment Date is conditioned upon the Pool Balance (after applying payments received in the related Collection Period) as of such Payment Date being less than ten percent of the aggregate of the Cut-off Date Loan Balances of the Home Loans; provided, however, that no such purchase will be permitted if it would result in a draw under the Credit Enhancement Instrument or will result in any amounts owing to the Credit Enhancer remaining unreimbursed, unless, in either case, the Credit Enhancer consents (so long as no Credit Enhancer Default has occurred and is continuing) in writing to the purchase.  If such right is exercised by the Master Servicer, the Master Servicer shall deposit the Termination Price calculated pursuant to clause (ii) above with the Indenture Trustee pursuant to Section 4.10 of the Indenture and, upon the receipt of such deposit, the Indenture Trustee or Custodian shall release to the Master Servicer, the files pertaining to the Home Loans being purchased.

(b)      The Master Servicer, at its expense, shall prepare and deliver to the Indenture Trustee for execution, at the time the Home Loans are to be released to the Master Servicer, appropriate documents assigning each such Home Loan from the Indenture Trustee or the Issuer to the Master Servicer or the appropriate party.

(c)      The Master Servicer shall give the Indenture Trustee not less than seven Business Days' prior written notice of the Payment Date on which the Master Servicer anticipates that the final distribution will be made to Noteholders.  Notice of any termination, specifying the anticipated Final Insured Payment Date or other Payment Date (which shall be a date that would otherwise be a Payment Date) upon which the Noteholders may surrender their Notes to the Indenture Trustee (if so required by the terms hereof) for payment of the final distribution and cancellation, shall be given promptly by the Master Servicer to the Indenture Trustee specifying:

(i)       the anticipated Final Insured Payment Date or other Payment Date upon which final payment of the Notes is anticipated to be made upon presentation and surrender of Notes at the office or agency of the Indenture Trustee therein designated; and

(ii)      the amount of any such final payment, if known.

Section 8.09.    Certain Matters Affecting the Indenture Trustee.  For all purposes of this Servicing Agreement, in the performance of any of its duties or in the exercise of any of its powers hereunder, the Indenture Trustee shall be subject to and entitled to the benefits of Article VI of the Indenture.

Section 8.10.    Owner Trustee Not Liable for Related Documents.  The recitals contained herein shall be taken as the statements of the Depositor, and the Owner Trustee assumes no

responsibility for the correctness thereof. The Owner Trustee makes no representations as
to the validity or sufficiency of this Servicing Agreement, of any Basic Document or of the
Certificates (other than the signatures of the Owner Trustee on the Certificates) or the
Notes, or of any Related Documents, or of MERS or the MERS(R)System. The Owner Trustee shall
at no time have any responsibility or liability with respect to the sufficiency of the Owner
Trust Estate or its ability to generate the payments to be distributed to Certificateholders
under the Trust Agreement or the Noteholders under the Indenture, including, the compliance
by the Depositor or the Seller with any warranty or representation made under any Basic
Document or in any related document or the accuracy of any such warranty or representation,
or any action of the Certificate Paying Agent, the Certificate Registrar or the Indenture
Trustee taken in the name of the Owner Trustee.

---

ARTICLE IX

COMPLIANCE WITH REGULATION AB

Section 9.01.    Intent of the Parties; Reasonableness.

        The Depositor, the Indenture Trustee and the Master Servicer acknowledge and agree
that the purpose of this Article IX is to facilitate compliance by the Depositor with the
provisions of Regulation AB and related rules and regulations of the Commission. The
Depositor shall not exercise its right to request delivery of information or other
performance under these provisions other than in good faith, or for purposes other than
compliance with the Securities Act, the Exchange Act and the rules and regulations of the
Commission under the Securities Act and the Exchange Act. Each of the Master Servicer and
the Indenture Trustee acknowledges that interpretations of the requirements of Regulation AB
may change over time, whether due to interpretive guidance provided by the Commission or its
staff, consensus among participants in the mortgage-backed securities markets, advice of
counsel, or otherwise, and agrees to comply with reasonable requests made by the Depositor
in good faith for delivery of information under these provisions on the basis of evolving
interpretations of Regulation AB. Each of the Master Servicer and the Indenture Trustee
shall cooperate reasonably with the Depositor to deliver to the Depositor (including any of
its assignees or designees), any and all disclosure, statements, reports, certifications,
records and any other information necessary in the reasonable good faith determination of
the Depositor to permit the Depositor to comply with the provisions of Regulation AB.

Section 9.02.    Additional Representations and Warranties of the Indenture Trustee.

(a)    The Indenture Trustee shall be deemed to represent and warrant to the Depositor as of
the date hereof and on each date on which information is provided to the Depositor under
Sections 9.01, 9.02(b) or 9.03 that, except as disclosed in writing to the Depositor prior
to such date:  (i) there are no material legal or governmental proceedings pending (or known
to be contemplated) against it that would be material to Noteholders; (ii) there are no
relationships or transactions (as described in Item 1119(b) of Regulation AB) relating to
the Indenture Trustee with respect to the Depositor or any sponsor, issuing entity,
servicer, trustee, originator, significant obligor, enhancement or support provider or other
material transaction party (as each of such terms are used in Regulation AB) relating to the
Securitization Transaction contemplated by this Servicing Agreement, as identified by the
Depositor to the Indenture Trustee in writing as of the Closing Date (each, a "Transaction
Party") that are outside the ordinary course of business or on terms other than would be
obtained in an arm's length transaction with an unrelated third party, apart from the
Securitization Transaction, and that are material to the investors' understanding of the
Notes; and (iii) the Indenture Trustee is not an affiliate (as contemplated by Item 1119(a)
of Regulation AB) of any Transaction Party. The Depositor shall notify the Indenture
Trustee of any change in the identity of a Transaction Party after the Closing Date.

(b)    If so requested by the Depositor on any date following the Closing Date, the
Indenture Trustee shall, within five Business Days following such request, confirm in
writing the accuracy of the representations and warranties set forth in paragraph (a) of
this Section or, if any such representation and warranty is not accurate as of the date of
such confirmation, provide the pertinent facts, in writing, to the Depositor. Any such
request from the Depositor shall not be given more than once each calendar quarter, unless
the Depositor shall have a reasonable basis for questioning the accuracy of any of the
representations and warranties.

Section 9.03.    Information to be Provided by the Indenture Trustee.

For so long as the Depositor is subject to Exchange Act reporting requirements with respect to the Trust, for the purpose of satisfying the Depositor's reporting obligation under the Exchange Act with respect to any class of Notes, the Indenture Trustee shall provide to the Depositor a written description of (a) any litigation or governmental proceedings pending against the Indenture Trustee as of the last day of each calendar month that would be material to Noteholders, and (b) any affiliations or relationships (as described in Item 1119 of Regulation AB) that develop following the Closing Date between the Indenture Trustee and any Transaction Party of the type described in Section 9.02(a)(ii) or 9.02(a)(iii) as of the last day of each calendar year.  Any descriptions required with respect to legal proceedings, as well as updates to previously provided descriptions, under this Section 9.03 shall be given no later than five Business Days prior to the Determination Date following the month in which the relevant event occurs, and any notices and descriptions required with respect to affiliations, as well as updates to previously provided descriptions, under this Section 9.03 shall be given no later than January 31 of the calendar year following the year in which the relevant event occurs.  As of the related Payment Date with respect to each Report on Form 10-D with respect to the Notes filed by or on behalf of the Depositor, and as of March 15 preceding the date each Report on Form 10-K with respect to the Notes is filed, the Indenture Trustee shall be deemed to represent and warrant that any information previously provided by the Indenture Trustee under this Article IX is materially correct and does not have any material omissions unless the Indenture Trustee has provided an update to such information.  The Depositor will allow the Indenture Trustee to review any disclosure relating to material litigation against the Indenture Trustee prior to filing such disclosure with the Commission to the extent the Depositor changes the information provided by the Indenture Trustee.

Section 9.04.    Report on Assessment of Compliance and Attestation.

On or before March 15 of each calendar year, the Indenture Trustee shall:

(a)      deliver to the Depositor a report (in form and substance reasonably satisfactory to the Depositor) regarding the Indenture Trustee's assessment of compliance with the applicable Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB.  Such report shall be signed by an authorized officer of the Indenture Trustee, and shall address each of the Servicing Criteria specified on Exhibit F hereto; and

(b)      deliver to the Depositor a report of a registered public accounting firm satisfying the requirements of Rule 2-01 of Regulation S-X under the Securities Act and the Exchange Act that attests to, and reports on, the assessment of compliance made by the Indenture Trustee and delivered pursuant to the preceding paragraph.  Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act.

Section 9.05.    Indemnification; Remedies.

(a)      The Indenture Trustee shall indemnify the Depositor, each affiliate of the Depositor, the Master Servicer and each affiliate of the Master Servicer, and the respective present and former directors, officers, employees and agents of each of the foregoing, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)      (A) any untrue statement of a material fact contained or alleged to be   contained in any information, report, certification, accountants' attestation or other material provided under this Article IX by or on behalf of the Indenture Trustee (collectively, the "Indenture Trustee Information"), or (B) the omission or alleged omission to state in the Indenture Trustee Information a material fact required to be stated in the Indenture Trustee Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

(ii)     any failure by the Indenture Trustee to deliver any information, report, certification, or other material when and as required under this Article IX, other than a failure by the Indenture Trustee to deliver an accountants' attestation.

(b)      In the case of any failure of performance described in clause (ii) of Section 9.05(a), as well as a failure to deliver an accountants' attestation, the Indenture Trustee shall (i) promptly reimburse the Depositor for all costs reasonably incurred by the Depositor in order to obtain the information, report, certification, accountants'

attestation of other material not delivered by the Indenture Trustee as required and (ii) cooperate with the Depositor to mitigate any damages that may result from such failure.

(c)      The Depositor and the Master Servicer shall indemnify the Indenture Trustee, each affiliate of the Indenture Trustee and the respective present and former directors, officers, employees and agents of the Indenture Trustee, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon (i) any untrue statement of a material fact contained or alleged to be contained in any information provided under this Servicing Agreement by or on behalf of the Depositor or Master Servicer for inclusion in any report filed with Commission under the Exchange Act (collectively, the "RFC Information"), or (ii) the omission or alleged omission to state in the RFC Information a material fact required to be stated in the RFC Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(d)      Notwithstanding any provision in this Section 9.05 to the contrary, the parties agree that none of the Indenture Trustee, the Depositor or the Master Servicer shall be liable to the other for any consequential or punitive damages whatsoever, whether in contract, tort (including negligence and strict liability), or any other legal or equitable principle; provided, however, that such limitation shall not be applicable with respect to third party claims made against a party.

---

IN WITNESS WHEREOF, the Master Servicer, the Indenture Trustee and the Issuer have caused this Servicing Agreement to be duly executed by their respective officers or representatives all as of the day and year first above written.

RESIDENTIAL FUNDING CORPORATION,
as Master Servicer


By:/s/ Tim Jacobson
Name:  Tim Jacobson
Title:    Associate

HOME LOAN TRUST 2006-HI3


By:  WILMINGTON TRUST COMPANY not in its
     individual capacity but solely as Owner
     Trustee


By:/s/ Michele C. Harra
Name: Michele C. Harra
Title:   Financial Services Officer


JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION
as Indenture Trustee


By:/s/ Joanne M. Murray
Name: Joanne M. Murray
Title:  Assistant Vice President

Acknowledged and Agreed
solely with respect to Article IX:

RESIDENTIAL
FUNDING
MORTGAGE SECURITIES II, INC.


By:/s/ Christopher Martinez

Name:   Christopher Martinez
Title:   Vice President

EXHIBIT A

HOME LOAN SCHEDULE

TO BE PROVIDED UPON REQUEST

EXHIBIT B

LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PREMISES:

That JPMorgan Chase Bank, National Association, as Indenture Trustee (the "Trustee"), under the Indenture (the "Indenture") among _____ and the Indenture Trustee, a national banking association organized and existing under the laws of the State of New York, and having its principal office located at 4 New York Plaza, in the City of New York in the State of New York, hath made, constituted and appointed, and does by these presents make, constitute and appoint Residential Funding Corporation, a corporation organized and existing under the laws of the State of Delaware, its true and lawful Attorney-in-Fact, with full power and authority to sign, execute, acknowledge, deliver, file for record, and record any instrument on its behalf and to perform such other act or acts as may be customarily and reasonably necessary and appropriate to effectuate the following enumerated transactions in respect of any of the mortgages or deeds of trust (the "Mortgages" and the "Deeds of Trust", respectively) creating a trust or second lien or an estate in fee simple interest in real property securing a Home Loan and promissory notes secured thereby (the "Mortgage Notes") for which the undersigned is acting as Indenture Trustee for various Securityholders (whether the undersigned is named therein as mortgagee or beneficiary or has become mortgagee by virtue of Endorsement of the Mortgage Note secured by any such Mortgage or Deed of Trust) and for which Residential Funding Corporation is acting as master servicer pursuant to a Servicing Agreement, dated as of July 21, 2006 (the "Servicing Agreement").  This appointment shall apply only to transactions which the Trustee is authorized to enter into under the Indenture, but in no event shall apply to any transactions other than the following enumerated transactions only:

1.      The modification or re-recording of a Mortgage or Deed of Trust, where said modification or re-recording is for the purpose of correcting the Mortgage or Deed of Trust to conform same to the original intent of the parties thereto or to correct title errors discovered after such title insurance was issued and said modification or re-recording, in either instance, does not adversely affect the lien of the Mortgage or Deed of Trust as insured.

2.      The subordination of the lien of a Mortgage or Deed of Trust to an easement in favor of a public utility company or a government agency or unit with powers of eminent domain; this section shall include, without limitation, the execution of partial satisfactions/releases, partial reconveyances or the execution of requests to trustees to accomplish same.

3.      With respect to a Mortgage or Deed of Trust, the foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure or termination, cancellation or rescission of any such

foreclosure, including, without limitation, any and all of the following acts:

a.    The substitution of trustee(s) serving under a Deed of Trust, in accordance with state law and the Deed of Trust;

b.    Statements of breach or non-performance;

c.    Notices of default;

d.    Cancellations/rescissions of notices of default and/or notices of sale;

e.    The taking of a deed in lieu of foreclosure; and

f.    Such other documents and actions as may be necessary under the terms of the Mortgage, Deed of Trust or state law to expeditiously complete said transactions.

4.    The conveyance of the properties to the mortgage insurer, or the closing of the title to the property to be acquired as real estate owned, or conveyance of title to real estate owned.

5.    The completion of loan assumption agreements.

6.    The full satisfaction/release of a Mortgage or Deed of Trust or full reconveyance upon payment and discharge of all sums secured thereby, including, without limitation, cancellation of the related Mortgage Note.

7.    The assignment of any Mortgage or Deed of Trust and the related Mortgage Note, in connection with the repurchase of the Home Loan secured and evidenced thereby pursuant to the requirements of a Residential Funding Corporation Seller Contract, or the removal of any Mortgage from the MERS(R)System or the re-recording of such Mortgage in the name of MERS.

8.    The full assignment of a Mortgage or Deed of Trust upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof, including, without limitation, the endorsement of the related Mortgage Note.

9.    The modification or re-recording of a Mortgage or Deed of Trust, where said modification or re-recording is for the purpose of any modification pursuant to Section 3.01 of the Servicing Agreement.

10.   The subordination of the lien of a Mortgage or Deed of Trust, where said subordination is in connection with any modification pursuant to Section 3.01 of the Servicing Agreement, and the execution of partial satisfactions/releases in connection with such same Section 3.01.

The undersigned gives said Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully as the undersigned might or could do, and hereby does ratify and confirm to all that said Attorney-in-Fact shall lawfully do or cause to be done by authority hereof.

Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in Appendix A to the Indenture.

Third parties without actual notice may rely upon the exercise of the power granted under this Limited Power of Attorney; and may be satisfied that this Limited Power of Attorney shall continue in full force and effect has not been revoked unless an instrument of revocation has been made in writing by the undersigned.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Indenture Trustee under the Servicing Agreement and the Indenture

Name: _____        Name:_____
Title: _____                              Title: _____


STATE OF _____              )
        _____               ss.
COUNTY OF _____             )


        On this ___ day of _____, 2006, before me the undersigned, Notary Public of
said State, personally appeared _____ personally known to me to be
duly authorized officers of JPMorgan Chase Bank, National Association that executed the
within instrument and personally known to me to be the persons who executed the within
instrument on behalf of JPMorgan Chase Bank, National Association therein named, and
acknowledged to me such JPMorgan Chase Bank, National Association executed the within
instrument pursuant to its by-laws.

                        WITNESS my hand and official seal.


                        _____
                        Notary Public in and for the
                        State of _____


After recording, please mail to:

_____
_____
Attn: _____



                        EXHIBIT C

                FORM OF REQUEST FOR RELEASE

DATE:

TO:

RE:    REQUEST FOR RELEASE OF DOCUMENTS

In connection with your administration of the Home Loans, we request the release of the
Mortgage File described below.

Servicing Agreement Dated:
Series #:
Account #:
Pool #:
Loan #:
Borrower Name(s):
Reason for Document Request: (circle one)           Home Loan Prepaid in Full

                                                    Home Loan Repurchased

"We hereby certify that all amounts received or to be received in connection with such
payments which are required to be deposited have been or will be so deposited as provided in
the Servicing Agreement."


_____
Residential Funding Corporation
Authorized Signature


*****************************************************************************

TO CUSTODIAN/INDENTURE TRUSTEE:  Please acknowledge this request, and check off documents
being enclosed with a copy of this form.  You should retain this form for your files in
accordance with the terms of the Servicing Agreement.

        Enclosed Documents:            [ ]    Promissory Note
                                       [ ]    Mortgage or Deed of Trust
                                       [ ]    Assignment(s) of Mortgage or
                                              Deed of Trust
                                       [ ]    Title Insurance Policy
                                       [ ]    Other: _____


_____
Name
_____
Title
_____
Date



EXHIBIT D

FORM OF FORM 10-K CERTIFICATE

        I, [identify the certifying individual], certify that:

1.     I have  reviewed  this report on Form 10-K and all reports on Form 10-D required to be
filed in  respect of the  period  covered  by this  report  on Form  10-K of the  trust  (the
Exchange Act periodic  reports)  pursuant to the Servicing  Agreement dated July 21, 2006 (the
"Agreement")  among Residential  Funding  Corporation (the "Master  Servicer"),  Home Loan Trust
2006-HI3  (the  "Issuer")  and JPMorgan  Chase Bank,  National  Association  (the  "Indenture
Trustee") and acknowledged and agreed to by Residential Funding Mortgage Securities II, Inc.

2.     Based on my  knowledge,  Exchange  Act  periodic  reports,  taken  as a whole,  do not
contain any untrue  statement of a material  fact or omit to state a material  fact  necessary
to make the statements  made, in light of the  circumstances  under which such statements were
made, not misleading with respect to the period covered by this report;

3.     Based on my  knowledge,  all of the  distribution,  servicing  and  other  information
required to be provided  under Form 10-D for the period  covered by this report is included in
the Exchange Act periodic reports;

4.     I am  responsible  for reviewing the activities  performed by the Master  Servicer and
based  on my  knowledge  and  the  compliance  review  conducted  in  preparing  the  servicer
compliance  statement  required in this report under Item 1123 of  Regulation AB and except as
disclosed in the  Exchange  Act  periodic  reports,  the Master  Servicer  has  fulfilled  its
obligations under the Agreement; and

        5._____All of the reports on  assessment  of compliance  with  servicing  criteria for
asset-backed  securities  and their  related  attestation  reports on assessment of compliance
with servicing  criteria for  asset-backed  securities  required to be included in this report
in  accordance  with Item 1122 of  Regulation AB and Exchange  Act Rules 13a-18 and 15d-18 have
been  included as an exhibit to this  report,  except as  otherwise  disclosed in this report.
Any material  instances  of noncompliance  described  in such reports have been  disclosed in
this report on Form 10-K.

In giving the certifications above, I have reasonably relied on the information provided to me by the following unaffiliated parties: [the Indenture Trustee].

Date:_____

_____*
[Signature]
Name:
Title:


* - to be signed by the senior officer in charge of the servicing functions of the Master
Servicer


EXHIBIT E

[FORM OF BACK-UP CERTIFICATION TO FORM 10-K CERTIFICATE]

    The undersigned, a Responsible Officer of [_____] (the "Indenture Trustee")
certifies that:

        (a)    The Indenture Trustee has performed all of the duties
    specifically required to be performed by it pursuant to the provisions of the
    Servicing Agreement dated as of July 21, 2006 (the "Agreement") by and among
    Residential Funding Corporation, as Master Servicer, Home Loan Trust 2006-HI3, as
    Issuer and the Indenture Trustee in accordance with the standards set forth therein.

        (b)    Based on my knowledge, the list of Securityholders as shown on
    the Register as of the end of each calendar year that is provided by the Indenture
    Trustee pursuant to the Agreement is accurate as of the last day of the 20[__]
    calendar year.

Capitalized terms used and not defined herein shall have the meanings given such terms in
the Agreement.

    IN WITNESS WHEREOF, I have duly executed this certificate as of _____, 20__.]


                        Name: _____
                        Title:


EXHIBIT F

SERVICING CRITERIA

SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

    The assessment of compliance to be delivered by the Indenture Trustee shall address, at a
        minimum, the criteria identified as below as "Applicable Servicing Criteria":

| SERVICING CRITERIA | APPLICABLE SERVICING CRITERIA |
| --- | --- |
| REFERENCE                                CRITERIA | |
| GENERAL SERVICING CONSIDERATIONS | |

| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | |
| --- | --- | --- |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the pool assets are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | |

CASH COLLECTION AND ADMINISTRATION

| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | \|X\|  (as to accounts held by Trustee) |
| --- | --- | --- |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | \|X\|  (as to investors only) |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | \|X\|  (as to accounts held by Trustee) |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | |

INVESTOR REMITTANCES AND REPORTING

| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the | |
| --- | --- | --- |

transaction agreement and applicable Commission
requirements. Specifically, such reports (A) are
prepared in accordance with timeframes and other terms
set forth in the transaction agreements; (B) provide
information calculated in accordance with the terms
specified in the transaction agreements; (C) are filed
with the Commission as required by its rules and
regulations; and (D) agree with investors' or the
trustee's records as to the total unpaid principal
balance and number of pool assets serviced by the
servicer.

---

| | | |
|---|---|---|
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | \|X\| |

---

| | | |
|---|---|---|
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the servicer's investor records, or such other number of days specified in the transaction agreements. | \|X\| |

---

| | | |
|---|---|---|
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | \|X\| |

---

POOL ASSET ADMINISTRATION

---

| | |
|---|---|
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related asset pool documents. |

---

| | |
|---|---|
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements. |

---

| | |
|---|---|
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. |

---

| | |
|---|---|
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool assets documents are posted to the servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. |

---

| | |
|---|---|
| 1122(d)(4)(v) | The servicer's records regarding the pool asset agree with the servicer's records with respect to an obligor's unpaid principal balance. |

---

| | |
|---|---|
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool asset (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. |

---

| | |
|---|---|
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. |

---

| | |
|---|---|
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring |

delinquent pool assets including, for example, phone
calls, letters and payment rescheduling plans in cases
where delinquency is deemed temporary (e.g., illness or
unemployment).

---------------------------------------------------------------------------------------------

1122(d)(4)(ix) | Adjustments to interest rates or rates of return for
pool assets with variable rates are computed based on
the related pool asset documents.

---------------------------------------------------------------------------------------------

1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such
as escrow accounts): (A) such funds are analyzed, in
accordance with the obligor's pool asset documents, on
at least an annual basis, or such other period specified
in the transaction agreements; (B) interest on such
funds is paid, or credited, to obligors in accordance
with applicable pool asset documents and state laws; and
(C) such funds are returned to the obligor within 30
calendar days of full repayment of the related pool
asset, or such other number of days specified in the
transaction agreements.

---------------------------------------------------------------------------------------------

1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or
insurance payments) are made on or before the related
penalty or expiration dates, as indicated on the
appropriate bills or notices for such payments, provided
that such support has been received by the servicer at
least 30 calendar days prior to these dates, or such
other number of days specified in the transaction
agreements.

---------------------------------------------------------------------------------------------

1122(d)(4)(xii) | Any late payment penalties in connection with any
payment to be made on behalf of an obligor are paid from
the servicer's funds and not charged to the obligor,
unless the late payment was due to the obligor's error
or omission.

---------------------------------------------------------------------------------------------

1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted
within two business days to the obligor's records
maintained by the servicer, or such other number of days
specified in the transaction agreements.

---------------------------------------------------------------------------------------------

1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts
are recognized and recorded in accordance with the
transaction agreements.

---------------------------------------------------------------------------------------------

1122(d)(4)(xv) | Any external enhancement or other support, identified in
Item 1114(a)(1) through (3) or Item 1115 of Regulation
AB, is maintained as set forth in the transaction                    |X|
agreements.

---------------------------------------------------------------------------------------------