1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  Case No. 10-12351 (MFW)

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  AMERICAN SAFETY RAZOR COMPANY, LLC, et al.,

9

10          Debtors.

11  - - - - - - - - - - - - - - - - - - - - - -x

12

13              U.S. Bankruptcy Court

14              824 North Market Street

15              Wilmington, Delaware

16

17              September 30, 2010

18              8:35 AM

19

20

21  B E F O R E:

22  HON. MARY F. WALRATH

23  U.S. BANKRUPTCY JUDGE

24

25  ECR OPERATOR:  BRANDON MCCARTHY

Page 2

1

2  HEARING re First Application for Compensation and Reimbursement

3  of Expenses Incurred by Committee Members for the period August

4  4, 2010 to August 7, 2010 Filed by Official Committee of

5  Unsecured Creditors (Filed 09/10/10; Docket No. 202)

6

7  HEARING re Debtors' Motion, Pursuant to Sections 105(a), 363

8  and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002,

9  6004, 6006, for Entry of an Order (A) Approving the Sale of

10  Substantially All of the Debtors' Assets Free and Clear of

11  Encumbrances and (B) Authorizing the Assumption and Assignment

12  of Certain Executory Contracts and Unexpired Leases (Filed

13  07/28/10; Docket No. 28

14

15  HEARING re Motion to File Under Seal Motion by the Second-Lien

16  Lenders Pursuant to 11 U.S.C. Sections 105(a) and 107(b),

17  Bankruptcy Rule 9018, and Local Rule 9018 1 Permitting the

18  Second-Lien Lenders to File Temporarily Under Seal the

19  Objection of the Second-Lien Lenders to the Debtors' Sale

20  Motion, and Emergency Cross Motion Requesting: (I) Authority to

21  Commence an Investigation of the Debtors' Auction Process

22  Pursuant to Bankruptcy Rule 2004; (II) Appointment of an

23  Examiner; and/or (III) Appointment of a Chapter 11 Trustee

24  Filed by Blackrock Kelso Capital Corporation, GSO/Blackstone

25  Debt Funds Management LLC (Filed 09/22/2010, Docket No. 247)

Page 3

1

2    A P P E A R A N C E S:

3    DRINKER BIDDLE & REATH LLP

4          Attorneys for the Debtors and Debtors-in-Possession

5    BY:   HOWARD A. COHEN, ESQ.

6

7

8    SIMPSON THACHER & BARTLETT LLP

9          Attorneys for the Debtors and Debtors-in-Possession

10   BY:   MARK J. THOMPSON, ESQ.

11         LINDA MARTIN, ESQ.

12         ANNE KNIGHT, ESQ.

13         MINTA J. NESTER, ESQ.

14         MARY BETH FORSHAW, ESQ. (TELEPHONICALLY)

15         TERRY SANDERS, ESQ. (TELEPHONICALLY)

16

17

18   BLANK ROME LLP

19         Attorneys for the Official Committee of Unsecured

20          Creditors

21   BY:   ALAN M. ROOT, ESQ.

22

23

24

25

Page 4

 1

 2    BROWN RUDNICK LLP

 3          Attorneys for the Second-Lien Lenders

 4    BY:   ROBERT J. STARK, ESQ.

 5          ANDREW DASH, ESQ.

 6          JARED A. ELLIAS, ESQ. (TELEPHONICALLY)

 7          JEFFREY L. JONAS, ESQ. (TELEPHONICALLY)

 8          ANDREAS ANDROMALOS, ESQ. (TELEPHONICALLY)

 9

10

11    BRYAN CAVE LLP

12          Attorneys for Energizer Holdings

13    BY:   LLOYD A. PALANS, ESQ.

14          GREGORY D. WILLARD, ESQ.

15

16

17    DUANE MORRIS

18          Attorneys for UBS AG Stanford Branch

19    BY:   RICHARD RILEY, ESQ.

20

21

22    GIBSON DUNN & CRUTCHER LLP

23          Attorneys for Energizer Holdings

24    BY:   JOSHUA LIPTON

25

Page 5

1

2   LOWENSTEIN SANDLER PC

3        Attorneys for the Official Committee of Unsecured

4   BY:   WOJCIECH F. JUNG, ESQ.

5        SEAN QUIGLEY, ESQ.

6

7   PAUL, HASTINGS, JANOFSKY & WALKER LLP

8        Attorneys for UBS AG Stanford Branch

9   BY:   JESSE AUSTIN, ESQ.

10        REBECCA BOROWITZ, ESQ. (TELEPHONICALLY)

11        FRANK LAYSON, ESQ. (TELEPHONICALLY)

12

13   RICHARDS LAYTON & FINGER

14        Attorneys for Energizer Holdings

15   BY:   MARK D. COLLINS, ESQ.

16        L. KATHERINE GOOD, ESQ.

17

18   WOMBLE CARLYLE

19        Attorneys for the Second-Lien Lenders

20   BY:   STEVEN K. KORTANEK, ESQ.

21

22   FINN DIXON HERLIN LLP

23        Attorneys for a Potential Purchaser

24   BY:   HENRY BAER, ESQ. (TELEPHONICALLY)

25

Page 6

1

2   HAYNES AND BOONE, LLP

3        Attorneys for Creditor, Total Petro Chemicals USA, Inc.

4   BY:   PETER RUGGERO, ESQ. (TELEPHONICALLY)

5

6   ALADDIN CREDIT PARTNERS LLC

7        For Creditor, UBS AG, Stamford Branch

8   BY:   SEAN SHEEHAN (TELEPHONICALLY)

9

10  ALIXPARTNERS, LLC

11       For the Debtors

12  BY:   KEVIN M. CAMODY (TELEPHONICALLY)

13

14  BLACKROCK KELSO

15       For the Second-Lien Lenders

16  BY:   SCOTT BOOTH (TELEPHONICALLY)

17       JASON MEHRING (TELEPHONICALLY)

18       LARRY PAREDES (TELEPHONICALLY)

19

20  FARALLON CAPITAL MANAGEMENT

21       For Creditor, UBS AG, Stamford Branch

22  BY:   MATTHEW FORD (TELEPHONICALLY)

23

24

25

Page 7

1

2   GENERAL ELECTRIC CAPITAL CORPORATION

3        For Creditor, UBS AG, Stamford Branch, as Agent

4   BY:   PAMELA CORRIE (TELEPHONICALLY)

5         SCOTT RENZULLI (TELEPHONICALLY)

6         PETER WIKANDER (TELEPHONICALLY)

7

8   HOULIHAN LOKEY

9        For Creditor, UBS AG, Stamford Branch

10  BY:   RUSSELL MASON (TELEPHONICALLY)

11

12  LEZARD MIDDLE MARKET

13        Creditor

14  BY:   DIANNA SELTZ (TELEPHONICALLY)

15

16  PROVIDENCE CAPITAL

17        For Creditor, UBS AG, Stamford Branch, as Agent

18  BY:   TOM SCHMIDT (TELEPHONICALLY)

19

20  UBS INVESTMENT BANK

21        Creditor

22  BY:   KRISTINE SHYROCK (TELEPHONICALLY)

23

24

25

Page 8

1                     P R O C E E D I N G S

2               THE CLERK:  All rise.  You may be seated.

3               THE COURT:  Good morning.

4               MR. STARK:  Good morning, Your Honor.  First, a

5     personal thank you for allowing us to come earlier.  I have a

6     very happy little boy because he got to see his daddy last

7     night.

8               We have an issue, though, coordinating with Womble

9     Carlyle, our Delaware co-counsel.  They were to produce the

10    binders this morning and haven't yet been able to locate the

11    person.  But what we've worked out and I think would work, if

12    it works for Your Honor, is, since the debtors' and the first-

13    lien lenders' exhibits are in, and I presume their argument

14    would go first, we would then put in -- move to -- move in our

15    exhibits before our argument.

16              THE COURT:  That's fine.

17              MR. STARK:  Thank you.

18              THE COURT:  All right.

19              MR. THOMPSON:  Good morning, Your Honor.  Mark

20    Thompson on behalf of the debtors.

21              Your Honor, I will refrain from going over several of

22    the arguments that are set forth in our brief, such as the

23    response to the sub rosa plan argument and to the argument that

24    this is merely some sort of a credit bid.  We rest on our

25    briefs on those.  And also I would incorporate by reference the

Page 9

1    arguments that were made in response to the motion to shorten

2    time and the response to the Energizer notice of appearance,

3    and try not to cover ground again.

4            I'd like to begin, however, Your Honor, with what the

5    debtors have repeatedly called the biggest issue with the

6    Energizer bid:  the right to walk away on November 23rd if it

7    has not received full antitrust clearance.  The evidence --

8        (Gap in audio from 8:37:22 a.m. until 8:43:05 a.m.)

9        (Pause)

10           THE COURT:  All right, I'm sorry.

11           MR. THOMPSON:  Thank you, Your Honor.

12           I'd like to begin with what Debtors have repeatedly

13   called the biggest issue with the Energizer bid --

14           THE COURT:  Yes.

15           MR. THOMPSON:  -- the right to walk away on November

16   23rd if it has not received full antitrust clearance.  It's set

17   forth in the markups that Energizer delivered on Septembers 14,

18   20 and 27.  The language is essentially the same in each

19   document.  Mr. Torgove testified to this on his direct and was

20   not cross-examined on it.

21           Section 3.4(b) of the Energizer bid -- and for the

22   record I'll be reading from the September 14th draft markup of

23   the asset purchase agreement that Energizer transmitted.  Your

24   Honor, if you're working with the ASR binder, that is at tab 9

25   of that binder.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 10 of 152

Page 10

1          THE COURT:  Yes.

2          MR. THOMPSON:  It says, starting with 3.4, Termination

3    of Agreement:  "This Agreement may be terminated only in

4    accordance with this Section 3.4.  This Agreement may be

5    terminated at any time prior to the Closing Date as follows:

6    ... (b) by written notice of either the Seller or the Purchaser

7    if the Closing shall not have been consummated prior to October

8    29, 2010 (the 'Outside Date') for any reason other than delay

9    or nonperformance of or breach by the party seeking such

10   termination, provided, however, that if on such date the only

11   date (sic) to Closing in Article VIII that has not been (or

12   would not be) satisfied or waived on such date is the condition

13   set forth in Section 8.1(c), then the Outside Date shall be

14   extended until the earlier of:  (1) five business days

15   following the date as of which the condition set forth in

16   Section 8.1(c) has been satisfied or waived and (2) November

17   23rd, 2010, provided, however, that if the Purchaser is not the

18   Prevailing Party at the conclusion of the Auction, the

19   Purchaser shall not be permitted to terminate this Agreement

20   pursuant to this Section 3.4(b) unless the Outside Backup Date

21   has passed."

22          THE COURT:  Okay.

23          MR. THOMPSON:  If the Energizer bid were to have been

24   accepted in that form, the second-lien constituency would have

25   had a chance of making a forty-six to fifty-seven million

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 11 of 152

Page 11

1    dollar recovery, based on the varying testimony, but to do that

2    the debtors would have had to put the recoveries of all other

3    stakeholders in this case under the stalking-horse bid at risk.

4    Debtors fought hard to eliminate that walkaway right and to

5    obtain certainty of closing, but Energizer was stubborn on this

6    point, and the parties were not able to have a meeting of the

7    minds.

8            What I want the record to ref -- I think the record

9    does reflect, and what I want to bring out from it, is that

10   when the debtors fought for certainty of closing, they were

11   fighting for that for the estate and for all constituencies,

12   including the second-lien lenders.  They were not fighting for

13   certainty of closing of the Energizer bid at the expense of

14   anybody.

15           Another piece of uncontroverted evidence that is

16   vitally significant on this issue is the testimony of Mr.

17   Antalics, debtors' expert witness, that if a second request

18   were to be issued upon any HSR application, it would take, in

19   his best-case scenario, two to three months, and more typically

20   four to six months, for the parties to comply with that

21   request.

22           It's true Mr. Antalics was hired only last week, a

23   fact that was unavoidable given that the objections were only

24   served upon us just last week as well.  But his testimony on

25   this point, the length of time it takes to comply with a second

AMERICAN SAFETY RAZOR COMPANY, LLC, et al.

Page 12

1    HSR request, was not specific to HSR but was in response to a

2    general question how long does it take generally to comply with

3    a second request.

4         Effectively, his testimony says there is no precedent

5    that he knows of, if parties to a business combination get the

6    second request, to comply within the time that the Energizer

7    bid provided before they could walk away.  Nor was Mr. Antalics

8    cross-examined on that specific issue.  And his testimony of

9    that issue was not based on a few days of work and a few

10   documents at ASR but on his career, twenty-plus years at the

11   FTC and a decade in private practice in this field.  That's

12   what he drew upon.  And his testimony on that point is entitled

13   to great weight.

14        Mr. Antalics also testified that the degree of

15   concentration in the wet-shaving industry, with the duopoly of

16   Schick and Gillette, and a handful of smaller players like the

17   debtors, would make the Energizer transaction presumptively

18   illegal, significantly increasing the odds of a second request.

19        Your Honor may recall the reference to the Herfindahl-

20   Hirschman Index, which involves relatively simple calculations,

21   squaring market shares of the competitors in the industry pre

22   the business combination and post the proposed combination, and

23   checking the difference and measuring them against certain

24   fixed thresholds.  It's an arithmetically simple calculation

25   based on readily available data.  Mr. Antalics' foundation was

Page 13

1    indeed a few documents and a few days' work, and something was

2    made of that on cross-examination.  But it's a simple

3    calculation, and the data is relatively simple and readily

4    available.

5            To the extent there's any question about the

6    foundation on market shares, it was provided or supported again

7    in Mr. Bolt's testimony when he testified to the market share

8    data of Gillette and Schick.  And so the foundation is there in

9    the record that supports Mr. Antalics' opinion that the risk of

10   the second request is significant.

11           And in any case, the evidence to the contrary is

12   negligible.  Mr. Russell did make a factual assertion about

13   what he thinks the real market share of Gillette and Schick

14   are.  His statement cannot be given any weight as a statement

15   of fact, because he was testifying as an expert.  As an expert,

16   he cited no sources for his opinion on that question.  It

17   appeared to be simply his personal opinion.  We know from his

18   testimony at the DIP hearing that he has not worked in the wet-

19   shaving industry for many years.  And he admitted he was not

20   testifying as antitrust expert, and provided no justification

21   or foundation for that assertion.  So we suggest that evidence

22   is entitled to no weight.  The debtors have carried the burden

23   of proof, and the risk of a second request is indeed

24   significant.

25           Further on this point, Mr. Antalics testified that the

Page 14

1   prospects for a second request would be increased if the

2   parties competed against each other and if one of them had

3   recently taken significant business from the other.  And there

4   was no cross of him on that point either.

5           Now, Mr. Bolt's testimony showed, and it is

6   uncontroverted, that Schick and ASR do in fact compete head to

7   head, and the debtors did lose their biggest customer to Schick

8   just about a year ago.

9           Finally, Mr. Antalics did agree, on cross-examination,

10  that there were many strategies that could be employed to try

11  to avoid a second request, but no evidence was ever brought

12  before this Court that any of them would work to avoid the

13  second request.

14          When the debtors rested, no evidence of any kind was

15  offered by any other party to show a likelihood that the

16  proposed transaction obtained full antitrust clearance by the

17  walkaway date, November 23rd, which is only about fifty-five

18  days away.  No evidence on this, the biggest issue -- as we

19  headlined, the biggest issue in the bid.

20          Energizer, who wants the debtors and their

21  constituencies to assume that risk as a business matter, put on

22  no evidence concerning its likelihood.  Energizer, who's been

23  trying to induce this Court to use this forum to substitute the

24  Court's judgment for the debtors' and the constituencies'

25  business judgment concerning the relative risks and merits of

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 15 of 152

Page 15

1    these two transactions, put on no evidence that may have

2    persuaded Your Honor to take that rather unusual step.

3            In addition, the second-lien agent, the authorized

4    representative of all the second-lien lenders, including those

5    who are here opposing the sale, admitted to Mr. Torgove on

6    September 15th that the risk of the Energizer bid not closing

7    by the walkaway date was significant.  Mr. Torgove was not

8    cross-examined on that point.  And when it came time for the

9    objectors to put on their case, their factual case, the second-

10   lien agent did not appear to contradict Mr. Torgove's

11   testimony.

12           The debtors have carried their burden of proof on that

13   issue.  The risk of a second request, giving Energizer the

14   right to walk away by November 23rd, is indeed quite

15   significant.

16           Now, the last two Energizer bids contain a five

17   million dollar deposit as a supposed protection against the

18   risk of Energizer of walking away on November 23rd, but that

19   has been somewhat misrepresented in the cross-examination,

20   because even that paltry deposit is illusory.  I would look at

21   the September 20th markup from Energizer, specifically section

22   2.3 of that markup.

23           UNIDENTIFIED SPEAKER:  Which tab?

24           MR. THOMPSON:  Which is at tab 13 of the debtors'

25   binder.  To move things along, I'll summarize the first

Page 16

1    sentence, which simply says that "The Purchaser shall escrow an

2    earnest money deposit" --

3             THE COURT:  Excuse me.  13?

4             MR. THOMPSON:  13.

5             Am I correct?

6             I apologize.  12.  I was looking at 13.

7             THE COURT:  And where are you on that?  Because I --

8             MR. THOMPSON:  I'm on page 11, the bottom; and top of

9    page 12 of the markup.

10            THE COURT:  Gotcha.  Okay.

11            MR. THOMPSON:  (Pause).  Shall I proceed?

12            THE COURT:  I have it.

13            MR. THOMPSON:  Okay.

14            THE COURT:  I have it.  Sorry.

15            MR. THOMPSON:  All right.  So 2.3(a) says "Within one

16   business day of the execution of the Agreement, Purchaser shall

17   put up a five million dollar deposit as security for

18   performance of their obligations under this Agreement."

19            The last sentence of 2.3(a) says as follows:  "Except

20   as set forth in Section 2.3(b)," which I'll read in a second,

21   "if this Agreement shall be terminated pursuant to Section

22   3.4," including the clause I just read into the record a few

23   minutes ago, "the Purchase Price deposit, together with any

24   interested earned thereon, shall be delivered to the

25   Purchaser", Energizer, "no later than one business day after

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 17 of 152

Page 17

1    such termination."

2         Now, (b) says "If the Agreement is terminated by

3    Seller pursuant to 3.4(b) or 3.4(f)", not relevant in this

4    context, "the Purchase Price Deposit shall be delivered from

5    Escrow to the Seller," the debtors.  But recall that 3.4(b)

6    said either Energizer or the debtors could terminate pursuant

7    to 3.4(b).  So if Energizer terminates pursuant to 3.4(b)

8    before the debtors terminate pursuant to 3.4(b), Energizer gets

9    the deposit back.

10         So that project was, in our view, completely illusory.

11    All the debtors really had was a race to the e-mail to send out

12    the termination notice.  That's what that was about:  a race to

13    the keyboard.  And the debtors were -- did not consider the

14    amount to be sufficient in the first place, but I wanted to

15    underscore its illusory nature.

16         So the decision of the board of directors to select a

17    stalking-horse bid over the Energizer bid, in the face of this

18    risk and other issues, was an exercise of their sound business

19    judgment.  The board of directors here had five persons:  two

20    in management and three who are not.  Of the three

21    nonmanagement directors, one, Mr. Kramer, is also not

22    affiliated with an equityholder and has conceded to be

23    independent by the objectors.  The other two work for a private

24    equity firm, Lyon Capital, that is the controlling shareholder.

25    All three nonmanagement directors have worked on multiple

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 18 of 152

Page 18

1    transactions that were subject to the HSR review process and

2    have a businessperson's understanding of that.

3            As Mr. Bolt testified on his redirect, the

4    shareholders here are receiving no recovery under either bid

5    but are being wiped out under both.  Therefore they have no

6    economic incentive to choose one bid over the other.  They are

7    disinterested in the choice between the two bids.  They have

8    acted with due care, receiving frequent updates, summaries of

9    the key terms of the Energizer bids and input from Lazard and,

10    on legal matters, my firm.

11            It was suggested on cross-examination that the board

12    members might have -- should have read the entire document or

13    have performed written analyses of the antitrust risk, but

14    there's no support at all for that in any cases or authorities.

15    Directors are allowed, under Delaware law, to rely on

16    independent advisors and management presentations in making

17    decisions.  They're not required to do everything themselves.

18            There was some effort by the second-lien objectors to

19    foster the impression that the two management directors were

20    incentivized to oppose the Energizer bid by fears of job

21    security, but a reading of Energizer's cover letters from

22    September 14th and September 20th dispels that notion entirely.

23    Energizer characterizes the ASR management team as key, and

24    offered to honor their employment agreements, creating a level

25    playing field between the two bids.  But in any case, beyond

Page 19

1    innuendo, there was never any evidence offered of any improper

2    motive or bias on the part of any of the company's directors.

3            While we're on the subject of financial incentives, it

4    is very important to recognize that Mr. Torgove testified that

5    his firm would actually gain an additional 1.5 million dollars,

6    nearly a 50 percent premium, if the Energizer bid is selected

7    and closes.  So the Court, I think, can draw the inference that

8    Lazard, who, acknowledged by everybody, ran the sale process,

9    had a significant incentive to make sure that the benefits of

10   the Energizer bid were fully disclosed to the board and got the

11   fullest consideration from the board.  Indeed, one could say

12   that Lazard's financial incentives were in some respects

13   aligned with those of the second-lien lenders here.

14           Mr. Torgove's testimony indeed showed him working hard

15   to put the Energizer bid together.  He was on the phone

16   constantly, nights, weekends, this past weekend and Monday

17   morning, up until the morning before the hearing.  And

18   notwithstanding his own firm's economic incentives, he did

19   testify on the witness stand that Energizer never made enough

20   movement on the key issue, the issue of closing risk, to enable

21   him to recommend the deal to the debtors or put a deal

22   together.

23           In addition to the risk of not closing, the directors

24   also had to consider the possible losses, the consequences of

25   that risk that the company might suffer in 2011 if an Energizer

Page 20

1    transaction was announced at the start of the peak selling

2    season but failed to close at the end of it.  And one might ask

3    'So what?  There's a backup bid.  What's the big deal?  You

4    just give the company, in whatever shape it's in, to the backup

5    bidder.'  Well, it wasn't that easy, unfortunately, for the

6    directors.  The backup bid is not a blanket insurance policy

7    like some letter of credit or surety bond.  It has a material-

8    adverse-change clause in it.  I'll refer to that document,

9    which is at Exhibit A to the sale motion.

10             UNIDENTIFIED SPEAKER:  Tab 26.

11             MR. THOMPSON:  Tab 26 in the ASR binder.

12             MR. STARK:  Your Honor, it's not my habit to interrupt

13   counsel, but it's my understanding that -- I thought that there

14   was evidence on this that that provision was removed by the

15   first-lien lenders.  That was our understanding coming in

16   today.  Again, I don't interrupt counsel, but if it's moving in

17   an area that's not correct, we should deal with that now.

18             MR. THOMPSON:  I believe that was an incorrect

19   understanding.  There may be some ambiguity in the record, but

20   that is not the debtors' understanding; that is not the

21   document that is in the record.  So I'm not sure how to respond

22   to that.

23             8.3(d), as in "David", of the --

24             THE COURT:  Let me find the motion.

25             MR. THOMPSON:  It's --

Page 21

1          UNIDENTIFIED SPEAKER:  At what page?

2          MR. THOMPSON:  It's at tab 26, and then this would be

3     page 32 of Exhibit A.

4        (Pause)

5          THE COURT:  Page 32?

6          MR. THOMPSON:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. THOMPSON:  (Pause).

9          THE COURT:  Okay, I have it.

10         MR. THOMPSON:  All right, so this section 8.3 are

11    conditions precedent to the obligations of the parent and the

12    purchaser, and (d), as in "David", says "There shall not have

13    occurred and be continuing a material adverse effect since the

14    Petition Date," July 28th, "and no event shall have occurred

15    since the date of this Agreement that, in combination with any

16    other events or circumstances, would reasonably be expected to

17    have a material adverse effect."

18         So the directors had to take that into account in

19    considering the risk posed by the Energizer bid.  The risk that

20    they faced was, if Energizer walked away on November 23rd, the

21    backup bidder -- and if during that period of time there had

22    been significant customer erosion because customers were

23    thinking ahead to 2011 and either directing orders to Energizer

24    or some third party, that the company might be in such bad

25    shape that the stalking-horse bidder was unwilling to close on

Page 22

1    the previously negotiated terms.  And while that might be a

2    litigable issue, that would just be an awful result to leave

3    the estate in.

4            Now, it's uncontroverted that the period of HSR review

5    would overlap almost completely with the debtors' peak selling

6    session, and also uncontroverted that the debtors would be

7    launching their most important new product in their history

8    during that season.  Mr. Bolt, with twenty-four years of

9    experience in the consumer products industry, and ten at ASR,

10    did prepare an estimate of losses for 2011 that could be as

11    high as twenty-five million dollars and, in a best-case

12    scenario, in the ten to fifteen million dollar range, a

13    significant loss for a company with projected 2011 EBITDA of

14    about fifty million and pension payments of nearly twenty

15    million dollars that year.

16            Mr. Bolt was cross-examined extensively on those

17    projections, but the cross simply proved that Mr. Bolt did his

18    job in the ordinary course of business and prepared his

19    projections the way executives do.  The fact that he personally

20    does not talk frequently to customers may be of significance in

21    a hearsay objection, but it has no significance in terms of how

22    people working in big organizations do their job properly.

23            He approached these projections the same way he

24    approaches other aspects of his job:  He talked to the

25    employees of the company most knowledgeable about the matter,

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 23 of 152

Page 23

1   most knowledgeable about the customer relationships, those in

2   charge of sales and marketing for various regions; developed

3   assumptions after talking to them; and then worked with an

4   outside professional to financially model those on a

5   spreadsheet.  He drew on his expertise and the expertise within

6   his organization; that's what organizations do.  They do not

7   run themselves based on hearsay rules.

8         The suggestion of cross-examination that he should

9   have somehow hired an outside professional research firm three

10  weeks before the sale hearing to look at that is frivolous.

11  You only have to look at the testimony of Mr. Russell, who had

12  access to the debtors' most sensitive business information

13  going back to March of this year, for several months, and he

14  testified that even with that exposure he admits that ASR knows

15  its customer relationships better than he does.  So any outside

16  professional hired for three weeks would have to admit the

17  same.

18        The cross-examination of Mr. Bolt also attempted to

19  foster the impression that he prepared these projections as

20  some sort of panicked response to seeing the September 7th two-

21  page indication of interest from Energizer.  That's absurd.

22  Energizer's interest was well known.  Mr. Torgove testified

23  that Lazard solicited Energizer's interest.  Energizer

24  contacted them as early as the 6th of August, a month earlier.

25  The record shows nothing of Mr. Bolt preparing projections

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 24 of 152

Page 24

1    about damages to the business from an Energizer deal for that

2    month.   The evidence shows it is far back in April and May when

3    there was no prospect of a takeover by Energizer, and the

4    parties were working on a standalone recap.   Mr. Bolt was

5    saying exactly the same thing about the potential adverse

6    effects on customer relationships from uncertainty if the

7    restructuring process should last into the peak selling season.

8         The September 10th SlideDeck related to this issue, as

9    Mr. Bolt testified, was not given to the lenders, and that is

10   uncontroverted.   It contained -- that presentation contained

11   many other items, and it is a fair inference that the purpose

12   of the meeting was just a broad update from a borrower to its

13   lenders.

14        Mr. Russell's testimony actually supports Mr. Bolt's

15   judgment in several respects.   For example, Mr. Bolt testified,

16   quote, "Switching vendors is an extremely big decision,"

17   unquote.   But that's just what the Schick acquisition does:   It

18   switches vendors.   It's an asset purchase.   Takes it out of one

19   entity; puts it into another entity.   For customers, in

20   substance as well as form, they know they're dealing with

21   Schick going forward.   That's a switch in vendors.   It is an

22   important decision.   That's what -- that's our point.

23        He also said financial stability is important to

24   customers.   Exactly.   That's consistent with ASR's concerns,

25   because with Schick's walkaway right in seven and a half weeks,

Page 25

1    who knows what's going to happen with the HSR process?  Now

2    you've introduced significant uncertainty into the future of

3    this company.  That's the antithesis of stability.  That

4    supports the debtors' concerns.

5        The debtors' selection of a bid with a lower nominal

6    value but dramatically greater certainty of closing has ample

7    support and precedent.  The committee's memorandum in support

8    of the motion has helpfully listed no fewer than thirteen

9    reported decisions where Courts have approved similar decisions

10   as sound exercises of debtors' business judgment under Section

11   363.  And, I respectfully submit, neither the second-lien

12   lenders, who are bound by the intercreditor agreement, nor the

13   disgruntled bidder, who lacks standing, can object to the

14   board's substantive decision, which has nothing to do with the

15   sales process, to which I shall now turn.

16       And while Debtors had the burden of proof, it's worth

17   noting at the start that when it came time for the objectors to

18   put on their evidence, they put on no evidence of any kind

19   related to any problems with the sales process.  Just because

20   the debtors ran a customary and good process -- Mr. Torgove

21   went over again, as he did at the DIP hearing, the extensive

22   efforts the debtors made in conjunction with Goldman Sachs and

23   both constituencies pre-petition to recapitalize the company.

24   He testified that after the -- Angelo, Gordon, one of the

25   leading financier -- financing parties, dropped out of the

Page 26

1    process on July 14th, Lazard and Goldman worked together to

2    sell, as he described it, a controlling stake in the company,

3    but to no avail.

4            Mr. Palans' cross of Mr. Torgove implied -- I'm sorry,

5    of Mr. Bolt yesterday implied that the debtors did something

6    wrong in not running a formal market check pre-petition.  We've

7    pointed out the law, in our reply on this motion, that shows

8    that under Delaware law it's a perfectly legitimate way to run

9    a sales process, to lock in somebody and then do your market

10   check.

11           But, in addition, the evidence is clear that, pre-

12   petition, the debtors had a highly confident letter from

13   Goldman Sachs there was no reason to go run a process in the

14   face of that, and that the debtors were working as the

15   constituencies wanted them to work, to put together a

16   standalone recap and not run a broad process that would have

17   distracted everybody's energies and efforts from what the

18   constituencies wanted done at that time.

19           Post-petition, it is uncontroverted the debtors

20   solicited 141 bidders, including all of the strategic

21   competitors, and that 24 of them received diligence of one

22   level or another.  Mr. Torgove called that a good level of

23   interest, and, again, that's uncontroverted.  Mr. Torgove has

24   run over fifteen sales of companies before.

25           The debtors governed themselves according to the

Page 27

1    bidding procedures during this case; those are set forth as

2    Exhibit C to the sale motion.  One theme that runs through the

3    bidding procedures, and I vividly remember saying 'Put it in'

4    when we were drafting it, was that of constant consultation

5    with the first-lien agent, the second-lien agent and the

6    committee.  Although there was little testimony regarding the

7    committee; that's because consultations there mainly happen

8    between law firms.  And the committee has acknowledged the

9    degree of consultation that occurred in its papers on this

10   motion.  The evidence shows that the debtors did provide

11   updates to those three constituencies -- or those three

12   entities on a more or less weekly basis at the start of the

13   sales process.  And then when bids came in, the debtors touched

14   base with each constituency every time before responding to the

15   bidder.  The debtors were faithful to their undertaking to run

16   this case for the benefit of their constituencies.  And

17   respectfully I submit that the degree of consultation goes a

18   long way to dispel any aspersions that might be cast after I

19   sit down on the sales process.

20          I'd like, if I may, to take Your Honor through the

21   text of the bid procedures at this point, and I'd like to

22   begin -- those are set forth as Exhibit C to the sale motion at

23   tab 26.

24          THE COURT:  I have them.

25          MR. THOMPSON:  On tab -- page 3, there's a heading

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 28 of 152

Page 28

1    called "Due Diligence".

2           THE COURT:  Okay.

3           MR. THOMPSON:  And if Your Honor could read down to

4    the sentence that begins "Neither the Debtors nor their

5    representatives".  I'll read that into the record:  "Neither

6    their Debtors nor their representatives shall be obligated to

7    furnish information of any kind whatsoever to any person that

8    the Debtors determine not to be a qualified bidder, provided,

9    however, that the Debtors, in their discretion, may provide

10   information to bidders that the Debtors believe may become

11   qualified bidders."  And I asked Mr. Torgove on direct if that

12   happened here, and he said "Yes, all of them," referring to the

13   twenty-four persons who were invited to perform due diligence,

14   although not one of them ever qualified as a bidder.  So the

15   debtors used the bidding procedures and their discretion under

16   it to expand, not to restrict, the universe of people who could

17   become qualified bidders.

18          THE COURT:  Well, tell me what you need to do to be a

19   qualified bidder.

20          MR. THOMPSON:  Yes, Your Honor.

21          THE COURT:  Don't you just have to give a price and

22   the financial wherewithal?

23          MR. THOMPSON:  No, and that's very important, Your

24   Honor.  That's on page 2, at the bo -- and you'll see at the

25   top there are those two points that Your Honor said:

Page 29

1    indication of interest, and financial wherewithal.  But then it

2    says right below that, "In addition," when we get out of the

3    indented text and back to the full margin, "a Potential Bidder

4    is" someone who delivered these "and that the Debtors

5    determine", and this is the key point, "and that the Debtors

6    determine, in consultation" --

7            THE COURT:  I'm sorry, I don't see where you're

8    reading.

9            MR. THOMPSON:  I think the problem is -- I'm not sure,

10    is this --

11        (Pause)

12            THE COURT:  Page 2?  Bottom of page 2?

13            MR. THOMPSON:  Yes, this -- Exhibit C, Bidding

14    Procedures, bottom of page 2.

15            THE COURT:  I'm there.

16            MR. THOMPSON:  Okay, "A Qualified Bidder"?

17            THE COURT:  "is a potential bidder" --

18            MR. THOMPSON:  "is a potential bidder", yes --

19            THE COURT:  -- "that delivers the documents".

20            MR. THOMPSON:  -- "that delivers the documents"

21    described in those two subparagraphs, "and that the Debtors

22    determine, in consultation with the first-lien agent, the

23    second-lien agent and the Committee (if any) is", this is key,

24    "reasonably likely, based on financing documentation submitted

25    by the potential bidder, the ability of financing, experience

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 30 of 152

Page 30

1    and other consideration deemed relevant by the Debtors, to

2    submit a bona fide offer and be able to consummate a

3    transaction if selected as the successful bidder."  And that

4    had to come in, as you can see from the bold higher up above

5    the subparagraphs, not later than September 15th, 2010.

6           And what did Energizer send us on September 14th,

7    2010?  They sent us a document that contained the right to walk

8    away by November 23rd.  And applying those criteria to that

9    clause, the debtors determined, in consultation, as it

10   previously described, with the first-lien agent, the committee

11   and the second-lien agent, all of whom said the risk of closing

12   is great -- the risk of not closing is great.  All of them --

13   the debtors said this is not somebody who is reasonably likely

14   to close, not reasonably likely to be able to consummate a

15   transaction if selected.  And that's why we tried to remove

16   that clause so we could qualify.

17          But I think the point about Energizer, Your Honor, is

18   that even though, going back to August, they had not given us

19   any of this  stuff -- they didn't give it to us until the stuff

20   in -- I'm sorry, the stuff -- the materials in the

21   subparagraphs (1) and (2) were only provided on September 7th.

22   Nonetheless, starting on August 23rd, as the testimony of Mr.

23   Karmity (ph.) showed, Debtors began providing Energizer with

24   substantial diligence.  In fact, the debtors provided more

25   diligence to Energizer than any other interested bidder.  They

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 31 of 152

Page 31

1    got over 12,000 pages of financial statements, financial

2    projections, leases, HR information, tax information, diligence

3    calls, in-person presentations from ASR's management, the only

4    one that got those.  Three plantors (sic), the only one who got

5    those.  All that was withheld, and this is despite never giving

6    us what we asked for to be a qualified bidder, all that was

7    withheld were the crown-jewel kind of information, customer-

8    specific sales and profitability, for the obvious reasons that

9    Mr. Bolt testified to yesterday:  because that's what

10   competitors seek from -- they want -- that's the most important

11   information.  We couldn't give it to them until there was a

12   certainty of closing; salary information for key employees that

13   they might try to lure away if they could make them a better

14   offer.  Just that limited stuff that was really competitively

15   sensitive was withheld.  But that was justified, because when

16   you're dealing with Energizer, ASR has to be especially

17   sensitive.  They are head-to-head competitors.  Schick recently

18   knocked ASR into financial distress by taking away most of

19   their sales at the largest customer.

20           And Energizer is a much bigger company than the

21   debtors.  Mr. Palans used the words "five billion dollars

22   market cap".  And here the debtors are being valued at 250 to

23   300 million dollars, less than a tenth of that.  Energizer's a

24   rough competitor, they've engaged in bare-knuckle tactics

25   throughout the past several weeks, threatening litigation on

1    multiple occasions and litigating vigorously here.  So when

2    you're dealing with a company of Energizer's power and size,

3    the debtors, for the benefit of their constituencies, and the

4    estate, as small as they are, cannot afford to make any

5    mistakes and had to be especially cautious.

6          If I may, Your Honor, turn to the discussion of the

7    bidding requirements, not the qualified bidder but now the

8    qualified bid requirements, which are on page 4.  What I would

9    like to do now, Your Honor, if I may work with tab 12 of our

10   binder, the Ener -- I don't that Your Honor will necessarily

11   need to refer to this, but I'm going to be speaking

12   specifically about the September 20th bid submission, because

13   that was the qualified bid deadline.

14          THE COURT:  And what tab is that?

15          MR. THOMPSON:  12.

16          THE COURT:  Okay.

17          MR. THOMPSON:  So --

18          THE COURT:  Yes.

19          MR. THOMPSON:  -- beginning with bid requirement I, a

20   letter stating that the bidder's offer is irrevocable until the

21   first business day after the assets on which the qualified

22   bidder is submitting a bid have been sold pursuant to the sale

23   approved by the bankruptcy court.  We do not believe Energizer

24   satisfied that -- Energizer's September 20th bid satisfied

25   that, because their cover letter said, at the top of page 7 of

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 33 of 152

Page 33

1     their cover letter, the September 20th bid -- I will be

2     reading; I'm going to skip the first three words and begin with

3     these words:  "If our analysis of the materials and information

4     provided would, in Antitrust Counsel's opinion, alter our

5     assessment of the antitrust considerations associated with this

6     transaction, then Energizer may withdraw its offer prior to

7     execution of a definitive agreement."  That wasn't irrevocable.

8          I'll move to clause II.  Qualified bid had to have --

9     I'm going to skip the first sentence:  "All qualified bids must

10    provide:  (a) a commitment to close within the later of (i)

11    fourteen days after the entry of the Transaction Agreement

12    Approval Order and (ii) the expiration or termination of the

13    applicable HSR (defined below) Waiting Period."  Now it goes

14    on, and in fact during cross-examination much was made of

15    clause (b) which refers to HSR, but never was anybody cross-

16    examined about clause (a) which also refers to HSR, and that's

17    really the problem with this bid.  It's a closing risk, the

18    absence of a closing commitment, that endures throughout the

19    entire HSR approval period.  The walkaway right gave Energizer

20    the right to walk away in the middle of the HSR period.  That

21    was not the commitment to close that was sought by (ii).

22          I'll move to (iii):  "a good-faith cash deposit, in an

23    amount to be determined by the Debtors, in consultation with

24    the First-Lien Agent, the Second-Lien Agent and the Committee,

25    if any".  The five million dollar deposit was not, in the

Page 34

1    debtors' judgment, a good-faith deposit, and it was not

2    determined in consultation with the debtors or the first-lien

3    agent.  It was determined unilaterally by Energizer and, as we

4    saw, all it did was create a race to the keyboard to try to

5    pull it back on the 23rd of November.

6            Number (iv):  "The Bid shall provide for payment in

7    full of all Assumed Liabilities, as defined in the Stalking

8    Horse APA."  There's no exceptions in that.  If I may refer

9    Your Honor to the September 20th markup, pages 9 to 10.

10   (Pause).  Section 1.3 is the list of assumed liabilities.  This

11   markup is marked up against the stalking-horse bid.  Your Honor

12   can see the extent of the markup is considerable.  There are

13   many things I could point out, but the simplest one to point

14   out is clause (g) at the top of page 10.  And assumed

15   liabilities include "taxes imposed with respect to the

16   Purchased Assets or the Assumed Liabilities for any taxable

17   period that ends on or prior to the Closing Date, and taxes of

18   the Debtors in the bankruptcy cases arising from the sale of

19   the Purchased Assets contemplated by this Agreement, in an

20   amount not to exceed to $[blank]."  Completely different.

21   Capped.  Who knows what the cap is?  It's blank.  But it wasn't

22   an assumed -- we have no idea what the assumed liability -- and

23   the point is, what's in that bracketed language is an

24   administrative-priority tax by definition.  It's taxes

25   occurring in this case, during this case, by virtue of this

Page 35

1   transaction.  It created tremendous risk of administrative

2   insolvency.  In addition, it created a procedural problem.

3   What we had noticed out was a tax-free transaction.  This is a

4   taxable transaction.  Respectfully, I could not have walked in

5   here and just handed it to Your Honor with such a massive

6   change from the taxing authority's perspective, creating

7   administrative liability and not giving them notice.  This was

8   one of the other showstoppers in the whole negotiations.

9          So there was no qualified bid.  "The Bid shall

10  identify" -- if I move down to (viii), "The Bid shall identify

11  with particularity the Debtors' executory contracts."  That

12  just wasn't there, wasn't completed.  I can move down to clause

13  (xi):  "The Bid shall not contain any due-diligence

14  requirements."  But they were still requesting diligence, in

15  the cover letter and in conversations, on the antitrust issues,

16  employee issues, et cetera, et cetera.

17         So the debtors, in consultation with the first-lien

18  agent, the second-lien agent and the committee, and recognizing

19  the second-lien agent, said 'You know, pursue it.'  They had

20  nothing to lose.  The debtors determined that they could not --

21  with all these issues, when this bid was reviewed by the board

22  on September 20th, as the testimony shows, they could not treat

23  this as a qualified bid.  The testimony shows that after that,

24  and notwithstanding there weren't (sic) a qualified bid, an

25  effort was made, just outside of this bidding process, to try

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 36 of 152

Page 36

1    and say 'Can we get a deal done?  Our constituencies are

2    willing to work on something like this.'  The record shows that

3    we had discussions, and there was no movement.  So we just --

4    yeah, there was no meeting of the minds.  That's just where we

5    are, and so it's where we came to court and that's where we

6    are.

7          If I may just briefly, to finish up the discussion of

8    the bidding procedures, flip ahead, if I may, to page 6, Your

9    Honor.  At the end -- still in the section on qualified bid.

10          THE COURT:  Yes.

11          MR. THOMPSON:  The -- if we get out of the

12    subparagraphs and into the regular text, "A bid received from a

13    Qualified Bidder that includes all of the required bid

14    materials and is received by the Bid Deadline is a Qualified

15    Bid."

16          Next sentence, I think, is important here:  "The

17    Debtors reserve the right to determine the value of any

18    Qualified Bid and which Qualified Bid constitutes the highest

19    or best offer in each case after consultation with the First-

20    Lien Agent, the Second-Lien Agent and the Committee, if any."

21    And that's the process I just described that we did.  So even

22    if you say 'Hey, that was a qualified bid' or whatever, 'it

23    still became a qualified bid,' there's still a valuation

24    judgment that went on in consultation.  And that -- so the

25    process that the debtors went through rises to that level as

Page 37

1   well.

2           On that point, if I may, just make one further note.

3   I apologize, Your Honor.  This is -- I'm actually reading from

4   somebody else's draft of my argument here, so I'm hopping

5   around.  If I could take you down to the auction and auction

6   procedures, paragraph 1 that same page, page 6, the first

7   paragraph.  I would like to call Your Honor's attention to the

8   sentence that says, in the end of the first paragraph, "In

9   considering whether a Qualified Bid is higher or otherwise

10  better, the Debtors shall consider, among other things, the

11  amount of consideration, the probability of closing, the amount

12  of time and expense projected to be required to close, and the

13  views of the First-Lien Agent, the Second-Lien Agent and the

14  Committee, if any."  So, again, closing risk was key in

15  determining what was a qualified bid.

16          And when we filed these on the 28th of July, that was

17  disclosed to the world that we would be focusing on the

18  probability of closing and evaluating bids.  And there's

19  nothing unusual about that.  That's something that every

20  process takes into account.  And we cited in our reply papers

21  here several other recent bidding-procedure orders from this

22  Court:  the Comonda (ph.) case that we have in front of Your

23  Honor; MiddleBrook Pharmaceuticals; Moll Industries, who was

24  here yesterday; Anaverde; Tele-G (ph.).  You know, and every

25  one of them resembles these bidding procedures in substantial

Page 38

1    measure.  There was, you know, really no deviation.  This was

2    plain-vanilla ordinary-course "how to run a sale in bankruptcy"

3    stuff.  I apologize for that word again.

4             These bidding procedures contain no breakup fee, no

5    expense reimbursement, no minimum overbid of any kind.  Mr.

6    Torgove testified:

7    "Q.  Do the bidding procedures have bidder protections of any

8    kind?

9    "A.  No.

10   "Q.  Under these bidding procedures, could the company have

11   accepted any kind of proposal it deemed to be higher or

12   otherwise better than the stalking-horse bid?

13   "A.  Yes.

14   "Q.  Have you ever had any concern that anything in here

15   deterred potential bidders or investors from coming forth to

16   submit bids?

17   "A.  Never.  No."

18            Never cross-examined on that.  I asked him:

19   "Q.  Are you aware of any person who you believe to be acting

20   in good faith has ever expressed such a concern?

21   "A.  No."

22            Never cross-examined.  No witnesses produced on any of

23   those points.  The record is uncontroverted that these bidding

24   procedures governed a good process.

25            Both objectors have observed, and I want to underline

Page 39

1    the word "observed", the bidding procedures were not

2    preapproved, but neither one has stated an objection to the

3    text of the bidding procedures.  Neither one has said there was

4    something in that document that was bad.  The second liens, in

5    fact, at paragraph 14 of their objection, described the bidding

6    procedures as, quote, "obvious intent to show commercial

7    reasonableness and an impartial market testing".  So, really

8    there's no objection to these bidding procedures that has ever

9    been filed, at least stated.

10        The legal reasons why it was not submitted for

11    preapproval, as I mentioned at the first-day hearing:  There

12    was no use of property of the estate called for any of the

13    bidding procedures, no administrative expense being created, no

14    restriction whatsoever on the debtors' fiduciary duty, business

15    judgment, any of that, any of those points.

16        In the -- as cross-examination of Mr. Bolt yesterday,

17    Mr. Palans brought up the concept of fairness about the bidding

18    procedures; fairness to all parties, he referred to.  Found

19    that a little odd coming from a company that is fifteen, twenty

20    times the size of the company that the witness works for.

21    That's somewhat like, you know, the USA basketball team going

22    up to the ref before they play, in goal, and say 'Make sure

23    this is called fair.'

24        But in any case, as to Energizer, they were treated

25    fairly.  They got more diligence than anybody else, and they

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 40 of 152

Page 40

1    got it even without going -- being held to the standards of the

2    bidding procedures, being a qualified bidder.  They were

3    allowed to do diligence even after the qualified-bidder

4    deadline expired, because we were hoping we could bring them on

5    for a deal; we were hoping that, as the deadline approached,

6    their position on closing risk would change.

7          Even after the qualified-bid deadline, parties kept

8    trying to negotiate with them.  They were treated fairly.  And

9    that was unlike anybody else, because we had nobody else to

10   work with other than the stalking horse.  We tried very hard.

11   We bent the rules as far in favor of getting a deal done with

12   them as we could.

13         In any case, I respectfully submit, the question of

14   fairness to the bidder is not the paramount question.  A debtor

15   has a fiduciary duty to its creditors, and one of those duties

16   is the duty of loyalty.  That means you can't have conflicting

17   duties, which means you can't have any kind of a fiduciary duty

18   to a bidder.  That's reflected in the doctrine that disgruntled

19   bidders don't have standing in situations like this, because

20   they can't complain about the debtor breaching a duty to them.

21   The process is not run for them; it's run for the creditors.

22         And the debtor can't go around running a process,

23   worrying about whether it's got a duty to the bidders or duty

24   to the creditors.  It's got to focus single-mindedly on getting

25   as much out of the bidders as it can for the benefit of the

Page 41

1   estate.

2       So there may come a time when the debtor has to say in

3   the interest of the estate 'I'm going to treat a bidder in a

4   way that it might not like, it might not call fair later on.'

5   There might be some hard bargaining.  Deadlines might be set

6   and used to try to force the bidder to put its best offer on

7   the table.  Sometimes you might just in discussions walk away

8   from the negotiating table as a negotiating tactic, hoping it

9   gets a response, a more productive response.  Some of the cases

10  we've cited in our brief I think talk about this.  Those are

11  business judgments.  Negotiating tactics is a classic business

12  judgment and not subject to criticism.

13      And indeed that's what happened here.  On the biggest

14  issue, the issue of the risk of Energizer walking away, the

15  debtors made strong demands for the benefit of the estate.  We

16  saw certainty from the start, not to the exclusion -- I want to

17  emphasize this again:  It's not to the exclusion or at the

18  expense of recovery for the second-lien lenders; it was to

19  bring in a recovery for everybody, including them.

20      If we look at Mr. Palans' letter to me of August 27th,

21  you can see Energizer understood that that's what we were

22  trying to do.  That, Your Honor, is set forth at tab 31.

23  (Pause).  It was a sentence -- it's a fairly long sentence,

24  which I covered with Mr. Torgove on direct examination.

25  Paragraph 2.  And I have to say Mr. Torgove's answer showed who

Page 42

1    was reading the sentence a lot more carefully than I was when I

2    asked the question.  The sentence occupies -- starts at the

3    fourth line, with the words (sic) "Although":  "Although

4    Energizer has executed a confidentiality agreement with ASR,

5    ASR continues to deny Energizer from obtaining access to over

6    eighty percent of the documents in the data room unless and

7    until Energizer first:  (1) agrees to assume all HSR risks;

8    (2)", and this is the point I'm trying to underscore here --

9            THE COURT:  Which paragraph are you --

10           MR. THOMPSON:  This is on page 2, second paragraph.

11           THE COURT:   Um-hum.

12           UNIDENTIFIED SPEAKER:  This is tab 31.

13           MR. THOMPSON:  Tab 31.

14           THE COURT:  Okay.

15           MR. THOMPSON:  So tab 31, second paragraph, third

16   sentence, about five lines down, now that I pushed my glasses

17   back on my face:  "Although Energizer has executed a

18   confidentiality agreement with ASR, ASR continues to deny

19   Energizer from obtaining access to over eighty percent of the

20   documents in the data room, unless and until Energizer first:

21   (1) agrees to assume all HSR risks; (2)", and this is my point,

22   "commits that Energizer is serious about paying consideration

23   greater than the current bid of the stalking-horse bidder",

24   i.e., the first-lien lenders.

25           Now, since all the other creditors are being paid in

Page 43

1    full under the stalking-horse bid, what that said was we were

2    trying to get him to put money on the table for the second-lien

3    lenders to justify working with him.  This is August 27th.  We

4    haven't seen any numbers from them, but they're asking for

5    diligence.  Who knows?  They could come in and say 'We valued

6    your company at less than the stalking-horse bid.  Thanks.

7    Bye.'  We couldn't afford that risk.  What we were trying to

8    get them to say was 'Put something on the table, put some

9    certainty on the table, put some value on the table for the

10   second-lien lenders, and we'd love to talk to you.'

11          Throughout the process, the debtors' board insisted on

12   a hell-or-high-water clause to ensure certainty of closing.

13   There was some suggestion on cross that that position was

14   unreasonable or, quote, "unfair", unquote, or that Debtors were

15   going far beyond the latitude they reserved for themselves in

16   the bidding procedures, although I think I've proven, by

17   reference to the bidding procedures, that the probability of

18   closing was disclosed as an important factor in evaluating a

19   qualified bid.

20          Again, given the vast disparity in size between

21   Energizer, 5 billion dollar company, Debtors, 250 to 300

22   million dollars, the debtors have to be careful and cautious

23   with respect to the risk they took in opening their books to a

24   big competitor, going head to head with them, having already

25   won one customer and having repeatedly throughout this so-

Page 44

1    called negotiation process, you know, litigated or threatened

2    litigation with us.

3            I think the evidence just within the negotiations is

4    sufficient, but to the extent any further proof of

5    reasonableness would benefit the Court in assessing that, we

6    put into evidence with Your Honor's permission the 2009 SC

7    Johnson deal, which is very similar in some superficial

8    respects to this deal:  One, like this deal, it's an asset

9    purchase; two, the purchase prices are very similar, 275

10   million versus 301; three, it was in the wet-shaving business.

11   And we thought it was pretty significant to justify objectively

12   our demanding a take -- a hell-or-high-water clause, that we

13   saw what we believe is a hell-or-high-water clause in there.

14   Since it's just one sentence, I would like to read it again.

15   This, I believe, is Exhibit 103.  It's not in our binder since

16   we only learned about it yesterday.

17            THE COURT:  I have it.

18            MR. THOMPSON:  And it's page 22 of the asset purchase

19   agreement exhibited to this 8-K:  "Buyer", i.e., Energizer --

20            THE COURT:  What page?

21            MR. THOMPSON:  Well, it's 22, Your Honor, of the asset

22   purchase agreement, which --

23            THE COURT:  I should have had that yesterday.

24            MR. THOMPSON:  And it's double-paginated, so --

25            THE COURT:  Say the number again.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 45 of 152

Page 45

1          MR. THOMPSON:  22.

2          THE COURT:  I have it.  All right.  Yes.

3          MR. THOMPSON:  "Buyer shall take any and all actions

4    necessary", any and all actions necessary, "to ensure that:

5    ... (x) no requirement of or waiver, consent or approval of the

6    FTC, the DOJ, any state attorney general or other governmental

7    entity; (y) no decree, judgment, injunction, temporary

8    restraining order or any other order in any suit or proceeding;

9    and (z) no other matter relating to any antitrust or

10   competition law", no other matter, "would preclude consummation

11   of the transactions contemplated by this Agreement by the

12   Outside Date."  We said -- it was argued yesterday, well,

13   that's not a hell-or-high-water clause.  Since we only learned

14   about it yesterday -- we were in court; we didn't have any

15   research with us.  We thought it was pretty clear.  So we went

16   back last night, we researched it, said can we find some

17   authority that says that's a hell-or-high-water clause to give

18   to Her Honor?

19          So what we found was Hexion Specialty Chemicals v.

20   Huntsman Corp., 965 A.2d 715, jump cite 756, where the Court of

21   Chancery for this state just two years ago took -- said the

22   following, which I have to read off my e-mail, quote:  "Section

23   5.4 of the Merger Agreement requires Hexion to:", internal

24   quotes and bold, "'take any and all action necessary'",

25   internal quote, "to obtain antitrust approval for the

Page 46

1    Transaction, and prohibits Hexion from taking any action with

2    the intent to, or that could reasonably be expected to, hinder

3    or delay the obtaining of such approval, unlike the reasonable

4    best efforts Hexion is obligated to make under over covenants

5    in the Merger Agreement.  Both parties have characterized this

6    obligation as 'come hell or high water'."

7           So we think that's a hell-or-high-water clause, and

8    that's what we were looking for.  And we were also obviously

9    trying to take out that walkaway right.  We never got there,

10   and that's the record.  But the record is, I think, our

11   position was reasonable, it was done in good faith, for the

12   benefit of the estate and its constituencies, not to harm any

13   constituency.

14          When it comes to negotiating, the record is

15   uncontroverted, because no one from Energizer took the stand

16   that Energizer gave as good as it got.  It was extremely

17   difficult and stubborn in these -- on certain points in this.

18   It's entitled to.  It has no fiduciary duty to anybody in this

19   case.  Duty is to its stakeholders.  So we're not complaining,

20   but we're trying to explain our positions were quite justified.

21   In terms of fairness, they gave as good as they got.

22          Mr. Torgove's testimony was uncontroverted.  We have

23   Mr. Palans' letter of the 27th; it was the first threat of

24   litigation in these negotiations.  Mr. Torgove referred to

25   unfriendly calls with the financial advisor concerning the

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 47 of 152

Page 47

1     abse -- 'We're not going to give you any protection for that

2     antitrust risk.'  Mr. Torgove referred to representations that

3     he received from Energizer's financial advisor that significant

4     movements were going to occur on positions.  Then he went to a

5     conference call the next day; no movement on those positions.

6          We have the events, you know, of last weekend and

7     Monday morning; they're in the record.  I won't impose upon the

8     court to recite them in any further detail.  They were treated

9     fairly, we dealt with them fairly, and they -- I think they

10    have nothing to complain about.

11         At the end, the board was left with no choice, no

12    choice.  There was no meeting of the minds with Energizer on a

13    major issue.  There was no competing bid that we could present,

14    that the board would accept, that our first-lien lenders would

15    accept or that our second -- or our committee would support.

16         What we had was one front deal, the stalking-horse

17    bid.  And because of the focus on the objections, it's really

18    been overlooked what a great deal that is for a bankruptcy

19    case, for most of our constituents.  We come in here with the

20    first liens having a lien on essentially everything.  There's

21    really nothing left.  And notwithstanding that, we've gotten

22    them not only to relieve the estate of all of their debt, but

23    to take a roughly ninety-five million dollar pension liability,

24    all the trade, all the employees, any tax liability that's out

25    there.  They've taken it all, completely.  So that's a great

AMERICAN SAFETY RAZOR COMPANY, LLC, et al.

Page 48

1    deal.  It's firm.  It's ready to close.

2         I believe, as I've been speaking -- I understand a

3    little bit about Mr. Stark's reference to the MAC clause being

4    changed.  It's our understanding, and both -- counsel for both

5    parties are here; my understanding is that the first-lien agent

6    has agreed, if the stalking horse bid is approved by this

7    Court, then they will remove the MAC.  And the committee has --

8    I think that's -- the committee can verify that they were the

9    ones who asked for that.  But for purposes of the Energizer bid

10   and the Energizer walkaway right, the MAC clause remains in the

11   asset purchase agreement.

12        So I --

13        THE COURT:  I'm sorry, I missed --

14        MR. THOMPSON:  I'm sorry.

15        THE COURT:  What other changes were there in the first

16   deal that you --

17        MR. THOMPSON:  In the first-lien deal, if it's

18   approved -- this is the -- and that's the most important

19   headline.  If it --

20        THE COURT:  I understand that.

21        MR. THOMPSON:  Okay.

22        THE COURT:  Before that, you made some reference to

23   some changes.  Did I miss them?

24        MR. THOMPSON:  No.  I think that is the only change.

25   If their bid is approved as the stalking horse bid, then

AMERICAN SAFETY RAZOR COMPANY, LLC, et al.

Page 49

1    they'll waive the MAC out, because I think that's what they

2    want; they want to close.  And I believe the committee will say

3    that that was being done at their instigation.

4              THE COURT:  I understand.

5              MR. THOMPSON:  The point I wanted to make is, to the

6    extent that Your Honor's considering the Energizer bid as a

7    competing bid, the MAC remains in the first-lien bid because

8    they do not -- they're not willing to take the risk of closing,

9    the risk of deterioration of the business in connection with

10   the Energizer bid.  And I think they're probably the best ones

11   to speak to Your Honor about that.

12             I have nothing further, Your Honor.

13             THE COURT:  Okay.

14             I'll hear from the firsts here.

15        (Pause)

16             MR. AUSTIN:  Thank you, Your Honor.  For the record,

17   I'm Jesse Austin on behalf of UBS as the agent and the first-

18   lien credit facility as well as the agent under the debtor-in-

19   possession credit facility.  I will try not to reargue all of

20   the points made by Mr. Thompson.  I certainly will not be

21   making the references which he did to the record, the

22   testimony.  I think he was abundantly clear as well as very

23   thorough in that presentation.  We adopt those references into

24   the record in support of our argument and our position.

25             THE COURT:  Thank you.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 50 of 152

Page 50

1          MR. AUSTIN:  Also, Your Honor, we do want you to make

2    sure that you adopt into the record the briefs and points of

3    authorities which we have filed in the case.

4          In connection with the sale motion and this hearing,

5    this Court, from at least the perspective of the first-lien

6    agent and its advisors, has made what I think we would call a

7    couple of surprising rulings:  One, you have allowed the

8    second-lien lenders to test the sale process, however that may

9    be defined, where we have believed, and certainly argued, that

10   the intercreditor agreement prohibits them from doing so;

11   secondly, Energizer, a disgruntled bidder, has been allowed to

12   participate in this sale.

13         We have pointed out in our papers, and we would make a

14   record here, that the intercreditor agreement, we believe, is

15   clear that the second-lien lenders cannot object to the sale.

16   We've previously noted to the Court Section 6.1 and 6.11, but

17   we also note to the Court Sections 3.1(a) and 3.1(ii), all of

18   which specifically says that the second lienholders' sole

19   remedy here is to hold only the collateral.  They are not to

20   file motions; they are not to object; they are not to in any

21   way, and have indeed waived their right to, contest the

22   procedure and process by which the first-lien lenders recover

23   on their claim.  And heretofore the law, we believed, had been

24   that the disgruntled bidder does not have standing to oppose a

25   sale.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 51 of 152

Page 51

1          Be that as it may, where is the evidence that the sale

2    process here was flawed?  Where is the evidence that something

3    else should have been done?  To paraphrase, where's the beef?

4    We submit there is none.  The second liens and Energizer have

5    produced absolutely no evidence, produced no witnesses showing

6    that the sale process, assuming you can really subdivide it

7    somehow from the sale motion, was in any way other than a

8    normal customary 363 sale process with full access by all

9    interested parties to new information.  The second liens' only

10   witness, Mr. George Russell, did not offer any evidence or make

11   any opinion regarding the sale process.  Indeed, he

12   specifically testified he had no opinion on the propriety of

13   that process.

14          Mr. Russell's testimony went to the substance of the

15   debtors' application and analysis of the business judgment in

16   determining whether or not to deem Energizer's bid a qualified

17   bid.  That is not process.  That is substance.  And it's

18   substance as to the business judgment of a business where, as

19   noted at the final DIP hearing, Mr. Russell's last direct

20   employment in the wet-shaving business was over thirteen years

21   ago.  He left the employment of Schick in 1997 and has not been

22   directly employed by anyone in the manufacture and distribution

23   of wet-shaving products since that time.  And his testimony

24   relied not on anything independently he did but some generic

25   summary of materials received from Bain & Company from May of

1   this year.

2          So at the outset, we think this Court should ask what

3   more should the debtors have done with regard to the sale

4   process.  We submit that the debtors did everything and that

5   nothing more should be required of them than what was done.

6   They ran a fair and open process pursuant to normal bidding

7   procedures, with consultation with the first-lien agent, the

8   second-lien agent and the committee throughout the entire

9   process.

10         The litigation by the second lienholders over the last

11  week and through this hearing is exactly the type of litigation

12  tactics prohibited by the intercreditor agreement and strongly

13  condemned and rejected by the Erickson Retirement Communities

14  and the ION Communication courts.  The tactics here are aimed

15  solely at slowing the process and trying to gain leverage to

16  create or enhance recoveries in direct violation of the

17  intercreditor agreement.   We think this Court, certainly by

18  this time, should follow the leads of the Erickson Retirement

19  case and the ION case and cut off and limit comments by the

20  second liens and Energizer for the remainder of this hearing.

21         I stand before this Court today representing the only

22  party with a qualified bidder for these debtors' assets; it's

23  the stalking-horse bid of the first-lien lenders.  Much has

24  been made, or tried to be made, that my clients just simply

25  wanted to own the business.  And I think, as the evidence has

Page 53

1    been clear, we have certainly encouraged the debtor to find a

2    cash-out offer.  And indeed from the very beginning of this

3    case, one of the first contested matters we had here with Mr.

4    Stark addressed that particular issue, because if you review,

5    Your Honor, section 3.4(l) of the stalking-horse asset purchase

6    agreement, it is specifically provided in there that, if these

7    debtors received a cash offer, a bona fide written proposal,

8    that would repay in full in cash the first-lien indebtedness

9    and they did not take that offer, we could terminate this

10   agreement in forty days and proceed to implement that deal.

11   And what Mr. Stark was looking for, which we then gave, was we

12   didn't also then have an automatic termination of the DIP

13   financing.  We would provide that DIP financing to actually get

14   that deal done.  So from the very beginning, anyone that came

15   into this court should look at it and say 'If I can get a

16   qualified bidder that cashes out the first-lien lenders, I

17   should be golden.'

18          Now, the issues before the Court, I think, should be

19   framed what are the standards to approve a 363 sale.  There are

20   four:  There must be adequate and reasonable notice and market

21   exposure relative to the assets; that has been provided.  There

22   must be a determination that the consideration paid for the

23   assets is fair; that has been determined.  It must be shown

24   that the parties have acted in good faith; that has been shown

25   and there's been absolutely no issue raised concerning the good

Page 54

1    faith of my clients with respect to this transaction.  And

2    lastly, there must be shown the exercise of sound business

3    judgment by the debtors in making their decision to determine

4    which offer, if there's competing offers, is the highest, the

5    best.  The debtors have more than carried their burden of proof

6    on all of these points.

7            And if there's no issue with the sale process, then

8    the second liens and Energizer have no basis, no basis

9    whatsoever, to walk in here today and object to the sale

10   motion.  And the evidence, we believe, as Mr. Thompson clearly

11   pointed out, has been uncontroverted that the sale process was

12   adequate, reasonable, with full market exposure, and provided

13   no restrictions and no limitations.  The evidence also has been

14   uncontroverted that the remaining standards to approve a 363

15   sale have been satisfied.  Accordingly, Your Honor, we think

16   this motion should be approved today.

17           Now, there's been a lot of noise over the last forty-

18   eight hours regarding alleged defects in the sale process.

19   There's not really been a lot of substance to that.  And as we

20   have attempted to assert, we think this noise is nothing more

21   than a backdoor effort to attack the sale itself.  An example

22   of that noise, I think is very clear as the type of questioning

23   from Mr. Palans yesterday, is the apparent focus by the second

24   liens and Energizer on the provisions in the bid procedures and

25   the stalking-horse APA that any purchaser other than the first

Page 55

1    lienholders would have to undergo Hart-Scott-Rodino review.  Of

2    course that provision is in the bid procedures and the APA.

3    Any third party, be it a financial buyer or a strategic buyer,

4    because of the size of this deal, would have to undergo Hart-

5    Scott review.  There's only one other party other than the

6    first-lien lenders who would not have to undergo Hart-Scott

7    review to get this deal approved and that's the second

8    lienholders, if they decided to step up and do a credit bid,

9    which they obviously did not.

10        Hart-Scott review, though, is -- in and of itself, is

11   not the issue.  The real issue is the market, the antitrust

12   risk that's created by an extended review.  In that regard,

13   Your Honor, if you had a financial buyer that didn't have the

14   market concentration that you potentially are going to get with

15   an Energizer bid, that's going to get done in fifteen days, it

16   wouldn't even generate a second review.  The only parties that

17   would generate an extended review are going to be competitors:

18   Gillette; Schick; Energizer's we have; potentially BIC.  So the

19   question then becomes how do you protect against that risk?

20   What do you ask of Energizer to cover the perceived antitrust

21   risk and possible harm to the debtors' business for an extended

22   Hart-Scott review?

23        You know, I'm just a simple guy from Atlanta and, you

24   know, I don't think it takes an expert to figure out that an

25   extended Hart-Scott review for Energizer's proposed bid for ASR

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 56 of 152

Page 56

1    will occur.  And I don't think it's going to take an expert to

2    figure out that it's going to be an involved process.  And

3    indeed they presented no evidence to the contrary.  And they

4    presented no evidence to controvert testimony of the debtors'

5    witnesses that they don't think, under the circumstances, an

6    Energizer bid could close by November 23, if at all.

7          So when you evaluate and try to address what that risk

8    then creates from either a no closing or an extended closing,

9    it's within the debtors' sound business judgment to come up and

10   evaluate that risk.  The debtor -- the bid procedures, as Mr.

11   Thompson pointed out, specifically provided that the debtors,

12   in consultation with the committee and the first-lien agent and

13   the second-lien agent, could ask for a deposit.  Such a request

14   was made.  That request was thirty-five million dollars.

15   Energizer only countered with a five million dollar offer.

16   That is not significant protection when the potential damage to

17   the business may be significant.

18          Mr. Bolt testified by his analysis that damage for

19   2011 could be a reduction in the company's EBITDA of

20   approximately up to twenty-five million dollars.  If he is

21   right, which I would hope not, that's fifty percent of the

22   projected EBITDA.  If he is right, which I hope he is not, they

23   can't operate the business next year.  And if my clients,

24   then -- if they were the backup lender, we'd have to put more

25   money into this deal.  We've already got 244 million; we're

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 57 of 152

Page 57

1    already going to be assuming under the stalking-horse

2    transaction another 90-plus.  I don't think my clients have

3    that big an open pocketbook.  Five million dollars, one percent

4    of the value of the Energizer bid, it's less than one-tenth of

5    one percent of the market cap of the assets of Energizer.  It's

6    petty cash.  It may not even rise to the level of petty cash

7    with Energizer.

8            We're not focusing here on the hell-or-high-water

9    clause.  Debtor could get it.  We're, like, 'Go for it.'  Love

10   nothing better.  We're saying, though, 'Just give us a deposit.

11   If you really mean this, give us a deposit.'  We're focused on

12   Energizer.  'Put your money where your mouth is.  You say you

13   want this deal.  You say there's no antitrust risk.  Fine.  Put

14   up a deposit,' because this is where the second liens and

15   Energizer are being disingenuous.  On the one hand they're

16   saying 'Don't worry.  We'll get this done.  We can get through;

17   get this Hart-Scott approval done.  It's overblown.'  And the

18   second liens are saying 'Yeah, you go, guy.'  But Energizer's

19   not willing to protect against what it itself may argue is a

20   low risk.  If it's that low a risk, putting up a deposit is

21   nothing more than a prepayment to the recoveries of the second

22   lienholders.

23           What both of them want here, Your Honor, is a free

24   option.  The problem is that, if the bet on this option is

25   wrong, Energizer and the second liens have not bet with their

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 58 of 152

Page 58

1   money, their own money; they have bet with the recoveries of my

2   clients the first-lien lenders; they've bet with the recoveries

3   represented by the committee, which are the trade creditors and

4   the pension claimants; and they've bet on the recoveries of the

5   company's employees.

6         As has been established, if Energizer does not obtain

7   Hart-Scott approval by November 23rd and close its deal, there

8   is significant risk of having the aforementioned

9   constituents -- of harm to the aforementioned constituents and

10  the overall enterprise value of ASR.  In that instance, the

11  second-lien lenders are going to receive nothing; they get

12  nothing now, they get nothing then.  Of course they support

13  trying to have Energizer qualified, because, again, for both of

14  them it's a free no-risk option.

15        But let's cut through the hyperbole of the emotion,

16  the use of terms like "hell or high water", and again just

17  focus on what's got to be shown to approve a 363 sale.

18  Adequate and reasonable notice and market exposure go to the

19  sale process.  The evidence showed the process run by a bid

20  procedure's normal and customary for a 363 sale.  No one, not

21  in argument, not in the papers, have complained that the bid

22  procedures themselves were not anything but normal and

23  customary.  The inference that they may need to be approved by

24  this Court is a red herring, because all the parties here knew

25  what the bid procedures were and not once, not once, did they

Page 59

1    come in from the very beginning of this case to seek

2    modification, relief or otherwise complain.

3            And, indeed, Energizer itself effectively tried to

4    comply with them, presented a letter of interest on September

5    15th and a supposed bid package by September 20th, and had been

6    undertaking the diligence since sometime in August.  The fact

7    that Energizer and the second liens do not like the outcome of

8    the application of the bid procedures does not make those

9    procedures bad.  The process here was normal and customary,

10   noticed on the first day of the case.  The parties have had

11   since July to undertake diligence and develop its bid.  No one

12   complained, came to the Court seeking an extension or

13   modifications of the September 15 deadline or September 20.

14   Energizer, as the evidence clearly showed, was fully engaged

15   and doing diligence since August, like no other interested

16   party.  They have visited the U.S. plants.  Their environmental

17   people visited every plant, even the ones overseas.  They've

18   received more diligence information than anybody else.  The

19   fact that they may not have gotten to Mexico substantively was

20   not because it wasn't offered.  It didn't meet their schedule.

21   They've gotten more information and diligence information than

22   even the first-lien lenders.

23            The bid procedures were very clear.  They're no

24   different than any other 363 sale that's been noticed out.  To

25   be deemed qualified, you must present an acceptable marked APA

Page 60

1   with no diligence outs.  And the bid procedures provided that,

2   based upon them reviewing your material, the debtor, in

3   consultation with the committee, the first-lien agent, second-

4   lien agent, could ask for a deposit.

5          The only limit here to Energizer was to competitive

6   information.  No other evidence has been presented they did not

7   get what they wanted.  In limiting access to a competitor who

8   wants customer information, in this instance who has already

9   snagged one of the cust -- the debtors' biggest customers, is

10  quite reasonable under the circumstances.

11         Energizer's bid, as Mr. Thompson noted, upon review by

12  the debtors' board and management, in consultation with the

13  first-lien agent and the second-lien agent, was not deemed

14  qualified for many reasons:  It had a diligence out of not one

15  but a number of items; the terms of the APA didn't match up to

16  the stalking-horse bid; and then there was absolutely no

17  protection for the perceived antitrust risk.  And that has not

18  changed since September 20, even though Energizer has been

19  advised by representatives of the committee, by myself, by

20  representatives of the debtor, of what it would take,

21  unequivocally what it would take, for Energizer to be deemed a

22  qualified bid to allow the committee and even the first-lien

23  lenders to get behind that bid.  It is disingenuous and

24  unconscionable for anyone to suggest and argue that Energizer,

25  as a direct competitor, should essentially get a free option to

Page 61

1    obtain HSR approval on this deal, when there's no acceptable

2    drafted APA and there's no antitrust risk protection in the

3    form of a significant nonrefundable deposit.  Simply because

4    Energizer proposes to pay more is not enough.  A five million

5    dollar deposit is nothing for Energizer simply to take a peek

6    at this company and then take a walk.

7              The risk of not closing here is real, it's not

8    ephemeral, and that risk with respect to Energizer primarily

9    would be on the first-lien lenders.  But it is also on the

10   trade, the pension and employee claimants.  The real risk here

11   is possibly not ever getting HSR approval, but it's certainly

12   not getting that approval by November 23rd.  And the

13   uncontroverted testimony here is that it will be an extended

14   review, and no one anticipates it getting done by November

15   23rd.

16             My clients acknowledge that they have been and are

17   willing to accept some risk relative to the HSR review; that's

18   why we've had it in the contract, no question about it, and

19   that's because we knew anybody but us, unless the second

20   lienholders found their financing, was going to have to undergo

21   some of that review.  But that risk is not open-ended.  We're

22   not asking for the hell-or-high-water clause.  We're asking for

23   a real deposit.

24             So the issue is not whether Energizer can afford to

25   put up a larger deposit.  The issue is not whether Energizer

Page 62

1    can present and agree to an acceptable contract.  It simply is

2    that Energizer does not want to do either one of those and not

3    assume -- it does not want to assume any of the antitrust risk

4    even when it recognizes there's some inherent risk in that

5    transaction.

6           The Court must keep in mind that if a deal does not

7    close by the end of November, based on the current terms, the

8    first-lien stalking-horse deal will not -- will go away.  We

9    are willing to have been a backup bidder to a qualified

10   contract.  Unfortunately, the Energizer bid as currently

11   constructed, as has been presented in the final versions we've

12   seen, doesn't meet that standard.  And we are not willing to be

13   an unlimited stalking-horse backup bidder for that contract

14   that's on the table, and we will not remove our MAC clause

15   relative to that contract if that contract is forced upon this

16   debtor.  If there's MAC in the -- if there's deterioration in

17   the company's business because they come in and do an extended

18   review and then don't close on November 23rd, we have to have

19   another look-see, because at that point what we think we're

20   buying today is not the company we would then be buying at that

21   time.

22          Mr. Russell's analysis -- or his testimony suggested

23   that management's analysis of that potential harm to the

24   business was a cowboy analysis.  And I think, as my partner Mr.

25   Goldman got Mr. Russell to acknowledge, maybe that is so, but

Page 63

1   at least it was some analysis, because Mr. Russell offered

2   none.  He offered no basis by which his judgment should be

3   substituted for the management -- for the judgment of the

4   management of the board, who are involved with this debtor on a

5   day-to-day basis, involved in its operations, its customers,

6   its finances and its business.

7        Mr. Russell's view, in our mind, is simply wrong.  And

8   if he is wrong, he does not suffer the loss.  Again, it's the

9   first-lien lenders that do; it's the trade; it's the pension.

10  Frankly, from our perspective, Mr. Russell is nothing more than

11  a wannabe CEO of ASR who effectively has been stalking this

12  company, I think, since 1997.  The first-lien lenders do not

13  buy what Mr. Russell's trying to sell, and we ask this Court to

14  certainly discount his testimony.

15       And if the first-lien deal goes away and there's been

16  no closing, I fear this case will take an entirely different

17  view.  There'll be no sale on the current terms.  Certainly any

18  subsequent deal, from the first-lien lenders' perspective, I

19  don't think is going to assume all of the trade, and it's

20  certainly not assuming a ninety million dollar pension claim.

21  I don't know the impact on the employees.  I don't know whether

22  the second liens will ever get anything.  I do know it's going

23  to be a long and drawn-out process.

24       So when you cut through all the hype, all the

25  argument, what have you got left?  You got a sale process that

Page 64

1    was open and conformed to normal and usual bid procedures for a

2    363 sale, where all the interested parties had full access to

3    the appropriate noncompetitive diligence information, where the

4    first-lien lenders put no restrictions on the debtors in the

5    sale process, no breakup up, no overbid amount, no

6    reimbursement of expenses, and actively encouraged these

7    debtors to find a cash-out alternative to the stalking-horse

8    bid, but unfortunately where the result was that only one

9    interested party who had more access to diligence material than

10   anyone else, Energizer, submitted a bid which simply was not

11   qualified.  Nothing more.  Nothing less.  And the only

12   qualified bid before this Court is that of the stalking-horse

13   lenders.

14        This leads us to focus on why was the bid not

15   qualified.  We've talked about it.  It didn't meet the

16   standards.  It didn't meet the -- it had a diligence out.  It

17   did not provide for the protection that was necessary for the

18   antitrust risk.  As a matter of law, these debtors -- there

19   should be deference to these debtors' business judgment in

20   making the determination that that bid was not qualified.  And

21   even though Energizer has been unequivocally advised what it

22   needs to do to be qualified, it still has not chinned to that

23   bar.

24        The debtors have undertaken significant analysis of

25   that proposal.  They have analyzed the contracts, the terms,

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 65 of 152

Page 65

1    the antitrust risk, the impact on the business, the customers'

2    employees, if the deal did not close.  And even the second

3    lienholders have acknowledged there's going to be potential

4    risk associated with it not closing by November 23, and that

5    analysis shows there may be harm to this debtor, up to twenty-

6    five million dollars of EBITDA for next year.  Even if it's ten

7    million or fifteen million, that's still twenty to thirty

8    percent of the company's EBITDA.  It's cash flow.  By any

9    measure, that is significant for these debtors; insignificant

10   in comparison to Energizer.

11           Now, I think at one point Mr. Palans said 'Well, why

12   didn't you do a market check of this company?'  Well, I submit

13   to you, Your Honor, that a sale process is indeed a market

14   check, and that sale process only brought forth one bidder.

15   But I would also suggest there was a market check done here,

16   and guess who did it:  the second lienholders, because since

17   the entry of the first forbearance agreement, they have been

18   out in the marketplace trying to find financing.  They had

19   engaged not one but two financial advisors -- they engaged

20   Chanin and Goldman -- in efforts to find refinancing.

21   Actually, they've engaged three financial advisors, because

22   they engaged Chanin and Goldman pre-bankruptcy in an effort to

23   find financing that would repay in full the first-lien lenders

24   and allow them to take the company, and they came up apropers

25   (ph.), we would say.  But secondly, they engaged post-Chapter

Page 66

1    11 another financial advisor to do the same thing and still

2    couldn't find the financing.  I suggest there's your market

3    check.  That says to you that there is no value here to the

4    second lienholders.  So that when you bring someone in like

5    Energizer and you bring in the second liens, they're saying

6    'Hey, that's another bid.  Go try and get it done.'  All they

7    want is an option.

8          And I don't care -- we don't care who puts up a

9    deposit.  I don't care if it's Energizer.  I don't care if it's

10   the second lienholders.  But guess what?  Nobody's putting it

11   up.  The only thing they want is for us to take the risk.

12   We're not taking a hundred percent of that risk.

13         In determining the highest and best bid, price is but

14   one consideration.  One must also evaluate the impact on the

15   business of an uncertain and longer process.  One must also

16   evaluate the certainty of closing.  There are two things that

17   are certain here, and I'm not talking necessarily death and

18   taxes but they may be getting close:  The first is the

19   stalking-horse bid is ready to close and can close quickly even

20   before August 29; the second thing is we're not sticking around

21   forever and under all circumstances.  Our bid expires on the

22   29th of November.  And if the debtors are forced to accept the

23   current version of the Energizer bid, we will insist on our MAC

24   provisions.

25         In light of the certainty of closing under the

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 67 of 152

Page 67

1   stalking-horse APA, the fact that Energizer will not post an

2   acceptable deposit and agree to an acceptable APA with no

3   diligence out is an appropriate exercise of the debtors'

4   business judgment to proceed with the stalking-horse bid.  The

5   price is fair, trade claims are paid, pension is paid,

6   administrative claims are paid.  There's no payment to the

7   second lenders (sic); it's a risk they took by being

8   subordinated creditors per the terms of the intercreditor

9   agreement.

10       So we come back to where we started; we reiterate that

11   the second liens have no standing to contest this sale, and we

12   reiterate and oppose that Energizer, a disgruntled bidder, has

13   no standing to appear and be heard.  But irrespective of that,

14   Your Honor, neither of them have put on any evidence, whether

15   by direct or cross-examination, showing a flawed or tainted

16   sale process or in any way a misapplication of the debtors'

17   business judgment.  Innuendos and inferences are not evidence.

18       The bottom line is that all standards to approve a 363

19   sale and the sale motion have been met by the debtors.  Time is

20   now to clear this chapter of the debtors' corporate life.  We

21   believe this Court should overrule the objections of the second

22   lienholders and any issues which may be raised by Energizer,

23   and enter an order approving the sale motion and the stalking-

24   horse APA.

25       And one further clarification, Your Honor, relative to

Page 68

1    the MAC clause, we will -- if we are the stalking horse deemed

2    to be the highest and best bid and the stalking-horse bidder,

3    we are removing the MAC clause, as Mr. Thompson noted, with

4    respect to our closing associated, which we would close by

5    October 29.  Thank you, Your Honor.

6           THE COURT:  Thank you.

7           MR. JUNG:  Good morning, Your Honor.  Wojciech Jung

8    from Lowenstein Sandler, on behalf of the committee.

9           As Your Honor knows, the committee did file a

10   confidential statement with this Court this past Monday.

11   Unfortunately, Your Honor, after two days -- two full days of

12   testimony, the committee's position with respect to the

13   debtors' decision to pursue closing an approval of the

14   stalking-horse transaction has not changed.  The committee

15   favored the stalking horse at the outset of this trial and does

16   so now.

17          Your Honor, the committee engaged in substantial

18   negotiations with a stalking-horse bidder right after its

19   appointment in these cases.  The negotiations resulted in

20   significant improvements to the stalking-horse APA as far as

21   the committee is concerned.  The improvements were not limited

22   to provision for full payment of trade debt.  There was no

23   distinction made on the type of trade debt that would be

24   assumed.

25          The APA -- the stalking-horse APA also provides for

Page 69

1    the assumption of pension liabilities.  It provides for the

2    employment of substantially if not all of the debtors'

3    employees.  And as recently discussed, the committee negotiated

4    with the stalking horse bidder the removal of the MAC clause

5    should the stalking horse be the prevailing bidder.

6         Most importantly, Your Honor, the committee assured

7    the majority of its constituency the guarantee of payment and

8    certainty of closing.  Although the committee was satisfied

9    with the agreement that has been reached with the debtors as

10   well as the stalking horse, the committee naturally sought and

11   hoped for a better offer from Energizer.  To that end, Your

12   Honor, the committee discussed with Energizer, the debtors and

13   other parties ways to improve the Energizer offer to match and

14   then bid the stalking-horse proposal.  And this was both in

15   terms of cash consideration as well as the assumption of

16   similar liabilities and providing sufficient assurance of

17   closing.

18        Your Honor, the Energizer offer remains unclear as to

19   Energizer's payment of trade debt.  As currently structured, it

20   only purports to assume ordinary trade debt, whatever that term

21   implies.  In addition, the stalking-horse APA provides for the

22   retention of all employees.  The Energizer APA, however,

23   requires due diligence on that issue.  In addition, as has been

24   discussed, the Energizer APA provides no certainty of closing

25   and provides for a contingent deposit during the antitrust

Page 70

1   review period.

2        The trial testimony in this case, Your Honor, confirms

3   that Energizer's offer is speculative and contingent.

4   Energizer offered a de minimis five million semi-refundable

5   deposit, a deposit insufficient, as the testimony has shown, to

6   protect the debtors and the creditors from established losses

7   should Energizer not close on its offer.  The committee asked

8   for a higher firm deposit and Energizer refused.

9        Your Honor, the debtors' creditors stand to lose if

10  the sale motion is not approved as presently proposed.  First,

11  the stalking horse -- if the stalking horse is not approved, it

12  goes away and the consideration provided for it arguably goes

13  away.

14       Your Honor, there has been reference made to

15  Energizer's not getting all the due diligence it had requested.

16  The testimony has shown that Energizer has been in a due-

17  diligence process since only August.  The record is clear, Your

18  Honor, that at no point did Energizer come to Your Honor

19  complaining that it has been shut down out of the due-diligence

20  process.  The committee believes that this speaks volumes as to

21  what diligence has actually been provided.

22       In conclusion, Your Honor, before the Court is a

23  stalking-horse bid negotiated by the committee and

24  significantly improved from its original offer.  On the other

25  hand, we have a nonqualifying proposal that, while purporting

Page 71

```
 1    to offer more cash, provides no assurance of closing and no

 2    other protection against estate losses should closing not

 3    happen by the end of November.  Your Honor, we believe that

 4    sufficient record has been established for Your Honor's entry

 5    of an order approving the stalking-horse transaction as it is

 6    presently presented.  Thank you.

 7              THE COURT:  Thank you.

 8              MR. STARK:  Thank you, Your Honor.  Robert Stark from

 9    Brown Rudnick, on behalf of the second-lien group.  I note on

10    my clock it's twenty-two after 10.

11              THE COURT:  How long are you going to be?

12              MR. STARK:  I'd like to say "quick", but I'm not sure

13    that I can say that.  I --

14              THE COURT:  Well, Energizer promised to be ten

15    minutes.  Do I want to hear them first, or do I want to hear --

16              MR. STARK:  Well, I was thinking that we could use the

17    time that we have to move the documents into evidence.  I

18    presume it would be best for Your Honor if both sets of the

19    argument, the second liens and Energizer, are heard at the same

20    time.

21              THE COURT:  That's fine.  Do we have an issue, then,

22    on the documents?

23              MR. STARK:  I think we actually have agreement on it

24    of the --

25              MR. DASH:  No, Your Honor --
```

Page 72

1           MR. STARK:  Oh, excuse me.

2           MR. DASH:  Andy Dash, Brown Rudnick, Your Honor.

3           We have binders for the Court and your clerk.

4    However, counsel this morning indicated to us that two of the

5    documents in the sealed portions at tabs 1 and 3 don't need to

6    be in the sale portion.  I don't have access to an ability to

7    redo the index now, but I think we can get by with them in the

8    sealed portion for the moment.  And if we need to unseal them,

9    we can do that with a revised index.

10           THE COURT:  Is that acceptable, then, to the debtors?

11           MS. MARTIN:  That's acceptable to us, Judge.  Thank

12    you.

13           MR. DASH:  If I may approach, Your Honor.  I have

14    binders for you and for your clerk.

15           THE COURT:  All right, so 1 and 3 will be sealed?

16           MR. DASH:  No, there are three items in the sealed

17    portion --

18           THE COURT:  That don't have to be?

19           MS. MARTIN:  Two.

20           MR. DASH:  -- that don't have to be sealed.

21           MS. MARTIN:  Two, Andy.

22           THE COURT:  1, 2 and 3, or just 1 and 3?

23           UNIDENTIFIED SPEAKER:  Andy, it's just two.

24           MR. DASH:  I'm sorry, Your Honor.  There are three

25    items listed in the debtors' portion of the sealed book and, of

Page 73

1    them, numbers 1 and 3 do not need to be sealed.

2            THE COURT:  Okay.

3            MR. DASH:  Okay.  If I may approach?

4            THE COURT:  Okay.

5            MR. DASH:  Thank you.

6            THE COURT:  You may.

7        (Pause)

8            THE COURT:  And are these just repeats of what I have

9    in my binders elsewhere?

10           MR. DASH:  Some of the material is duplicative.

11   Unfortunately the case coordinator --

12           THE COURT:  Okay.

13       (Pause)

14           THE COURT:  All right, then do we want to -- I'm

15   sorry -- come back after my 10:30?

16           MR. STARK:  We'd be happy to, Your Honor.  Is there a

17   particular time you expect that we should come back?  Or we

18   could just stand by.

19           THE COURT:  Mr. Kortanek might be able to tell us how

20   long he thinks the 10:30 will be.

21           MR. KORTANEK:  Your Honor, that'll probably be about a

22   half hour, forty-five minutes at the most; maybe less.

23           THE COURT:  All right, you want to -- come back at 11

24   and we'll see if we can -- if we're done.

25           MR. STARK:  Thank you, Your Honor.

Page 74

1          THE COURT:  All right, we'll recess until 11.

2       (Recess from 10:21 a.m. until 11:02 a.m.)

3          THE CLERK:  All rise.  Please be seated.

4          THE COURT:  All right.

5          MR. STARK:  Thank you, Your Honor.  Again, for the

6    record, Robert Stark from Brown Rudnick, appearing on behalf of

7    GSO Capital, Blackrock Kelso; we've referred to them as the

8    second-lien lenders.

9          I'm going to break my presentation down into two

10   parts, Your Honor:  first, addressing the question, the

11   fundamental question, can the debtors carry their burdens of

12   proof and persuasion for the relief requested today?  More

13   specifically, has this process ended is the -- pretty much the

14   question on the process.  The second part of my presentation

15   will focus on the intercreditor agreement and hopefully we can

16   move that relatively quickly.

17         Has this process ended?  Before we can really delve

18   into where we are right now, I'd ask Your Honor to go back just

19   a little bit with me and lay a little bit of a foundation.  The

20   Court may recall the final DIP hearing, and that was the first

21   time we introduced Your Honor to Mr. Russell.  We put him on

22   the stand, and he was qualified on that day, as he was

23   yesterday, as an expert regarding the business in which ASR

24   operates.  He advised the Court that ASR makes a good product,

25   it makes a product that people need, that people want; it has a

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 75 of 152

Page 75

1    good business with a large market share and has a bright

2    future, but it has performed poorly recently, it lost the Wal-

3    Mart business, and our contention and his testimony was that's

4    largely because of a management team that's been inattentive to

5    the needs of customer clients.

6         But we can change management; that's something in

7    bankruptcy that we can do.  And we -- and our case theory was

8    that if we -- and Mr. Russell testified at that time that had

9    we done that, things would improve dramatically for this

10   company.  And from this testimony, we argued at the DIP hearing

11   that we don't necessarily have to have a sale here; we can do a

12   plan of reorganization.  In fact, we'd worked pretty hard pre-

13   petition on a refinancing effort, we had that highly confident

14   letter from Goldman Sachs, and there was every reason to

15   believe that we could put a structure together here post-

16   petition; we just needed the opportunity.  And when Your Honor

17   entered the DIP order, we didn't interpret that as meaning that

18   all opportunities for alternative plans, alternative bids,

19   would be foreclosed.

20        But the case did become a show-me-the-money case.

21   Admittedly our theory only worked if we showed up with money,

22   if there was a bid, if there was alternative financing.  And so

23   we worked awfully hard on that between the final DIP hearing

24   and this past week, and in our travels we learned a couple of

25   things.  The first thing we learned is that ASR views our

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 76 of 152

Page 76

 1    efforts as a hostile bid.  All of those e-mails that were

 2    attached to our motion, which are now entered into evidence,

 3    showed that they would use confidentiality agreements, threats,

 4    litigation assaults, to alienate us from the effort to find

 5    refinancing dollars, and that certainly made it very difficult

 6    for us and certainly made for a funny moment when we were

 7    listening to Mr. Austin tell us how really interested he is in

 8    getting cash.

 9            The second point was, standing alone, Mr. Russell's

10    view of the company, while we think fairly credible, certainly

11    business-logical, still may not make this company bankable

12    without additional corroborating evidence, corroborating

13    evidence proving that.  If you take this enterprise and you put

14    it in the hands of people who actually know how to run a wet-

15    shave business, the implied value of the business is

16    substantially greater than the amount of the first-lien debt.

17    And that's what so very satisfying about the Energizer-Schick

18    bid.  Most assuredly, Schick knows how to run a wet-shave

19    business.  Their bid is that additional corroboration, but

20    they're willing to bid 301 million and assume all the

21    liabilities because they know that in their hands the

22    enterprise can realize its potential.  This is a show-me-the-

23    money case, and the money has been shown.

24            So let's go through the uncontroverted facts.  We have

25    the bid procedures that are before Your Honor.  They express an

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 77 of 152

Page 77

 1    auction methodology.  They were not approved by this Court.

 2    That's an important point.  In fact, there was no opportunity

 3    to come before Your Honor and talk about the bid procedures,

 4    because when they filed the motion on the petition date, it set

 5    up today as the day to talk about the bid procedures.  And

 6    let's talk about that.  We'll talk about that, about court --

 7    the failure to get court authorization going forward, in a

 8    minute.

 9             Under these bid procedures, a party had to submit an

10    initial indication of interest by September 15th.  An initial

11    indication of interest, which in common parlance, and according

12    to these bid procedures, only had to give a price estimate.  It

13    had to be supported by a showing of financial wherewithal that

14    you could complete the transaction, could be subject to due

15    diligence and could be subject to antitrust clearance.  If a

16    party met these qualifications, then they would be qualified to

17    go the next round, meaning that ASR would then provide them

18    with the due diligence, and that due diligence would then

19    facilitate a final bid by September 20th.  And then if a fully-

20    baked alternative bid was submitted by September 20th, then

21    we'd have ourselves an auction.

22             On their face, these bid procedures suggest an open

23    and fair process intending to maximize value.  And so what did

24    Energizer-Schick do?  On September 7th, one week before the

25    deadline for initial indications of interest, it submitted an

Page 78

1    initial indication of interest.  That initial indication of

2    interest complied with the bid procedures; it included a price

3    estimate.  The bid amount would be, quote, "at least equal to

4    the current stalking-horse bid", close quote.  It was supported

5    by a substantial showing of financial wherewithal, the public

6    statements of Energizer-Schick showing substantial liquidity to

7    consummate this deal.  It's never been in contest.

8           It was subject to due diligence but, again, that is

9    allowed under the bid procedures.  And it was subject to

10   antitrust clearance, but that initial indication of interest

11   said two things:  Number one, we're simply submitting this

12   consistent with the bid procedures that enabled us to go

13   forward on the antitrust, but number two, we started the

14   process, we hired counsel; we now know it's Gibson, Dunn &

15   Crutcher.  They started the process of going out and working

16   towards antitrust clearance and they started the diligence

17   effort.  Based on these bid procedures, this was an appropriate

18   indication of interest, and Energizer-Schick should have been

19   qualified to go the next round.

20          But there was immediate deal hostility; it sensed that

21   from the company.  So it refined its initial indication of

22   interest on September 14th, one day before the deadline for

23   initial indications of interest.  The estimated purchase price

24   was replaced with an actual number:  301 million dollars plus

25   assumption of the liabilities.  Clarity was provided regarding

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 79 of 152

Page 79

1    the liability assumption, the same as the first-lien lender

2    bid.  Antitrust risk was ameliorated significantly.  A new

3    provision was included:  ASR could terminate at their will if

4    HSR clearance was not obtained by November 23rd.  That gave

5    additional several days for them to close on the backup bid.

6    The due diligence out was limited; it became confirmatory due

7    diligence stating that we would -- they would conduct it and

8    complete it in a week, presuming that ASR actually complied.

9            But ASR still refused to qualify Energizer-Schick.  On

10   September 18th, Simpson Thacher letter, ASR said that

11   Energizer-Schick can't qualify because, vaguely, a higher bid

12   may mean incremental taxes, continued vagaries around assumed

13   liabilities, timing and closing conditions, and antitrust

14   concerns.  We're still at the qualifying stage.  This makes no

15   sense, especially in light of the fact that you have a backup

16   bid and they're going to -- and they give the termination right

17   before the backup bid expires.

18           But, regardless, Energizer-Schick continued to work.

19   On September 20th, they sent another letter to ASR.  They would

20   assume all incremental tax liabilities.  They would assume all

21   liabilities that the first-lien lenders are assuming.  There is

22   no additional timing or closing conditions that they could

23   identify in their agreement.  And on antitrust, they reiterated

24   that ASR could terminate if HSR clearance was not obtained by

25   November 23rd, giving sufficient time to close on the backup

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 80 of 152

Page 80

1    bid.  But you have something new now:  a five million dollar

2    forfeitable deposit.  If you exercise your right to terminate

3    before the -- on the 23rd or before the 23rd --

4              THE COURT:  Who's "you"?

5              MR. STARK:  If you, ASR, exercise your right to

6    terminate and go with the backup bidder, you get five million

7    dollars from us on top.  And as a footnote, as an aside, in

8    both arguments they kept saying that that five million dollars

9    was, you know, illusory, they could take it back at will.  And

10   in fact Mr. Thompson -- he went through a bunch of different

11   versions with you, but what he didn't do is go through the most

12   recent version that's now here where that five million

13   dollars -- there's no conditionality.  There's no termination

14   of right by which they can pull it back and make it illusory.

15   It's theirs.  Again, just a reminder, we're still at the

16   qualifying stage.

17             THE COURT:  Which document establishes that?

18             UNIDENTIFIED SPEAKER:  Enterprise -- Energizer Exhibit

19   3.

20             MR. STARK:  It's Energizer Exhibit 3, Your Honor.

21             THE COURT:  Is that one of the doc --

22             THE COURT:  Your Honor, just -- we're happy to go

23   through it now, or it may be easier to wait till Mr. Palans --

24   because I'm sure he's going to walk Your Honor through it.

25             THE COURT:  Okay.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 81 of 152

Page 81

1          MR. STARK:  Still --

2          MS. MARTIN:  If I could just ask a -- Exhibit 3 in the

3     sealed or unsealed?

4          UNIDENTIFIED SPEAKER:  It's Energizer-3.

5          MS. MARTIN:  Oh, Energizer-3 --

6          THE COURT:  Energizer-3.

7          MS. MARTIN:  -- I'm sorry.

8          THE COURT:  Okay.  Go ahead.

9          MR. STARK:  I guess hope springs eternal

10    notwithstanding the hostile approach to their bid.  September

11    22nd letter from Bryan Cave reiterating "The bid includes

12    assumption of the same liabilities as the first-lien lenders'

13    bid.  It's intended to be mirror-image in that regard.  If a

14    five million dollar deposit is insufficient, come back with a

15    number and let's negotiate."

16         And the MAC complaint -- there was now an issue about

17    the MAC complaint.  Mr. Palans said "But the MAC is the same

18    MAC as in their agreement.  We're mirroring their agreement to

19    give a competitive alternative bid."  It didn't matter.

20    There's no further discussions.  Energizer-Schick was not

21    qualified.  No diligence occurred and no auction occurred.

22         So what's going on here?  What's going on behind the

23    curtain?  I've been involved in a lot of M&A transactions in

24    the 363 context, perhaps as many as Mr. Torgove, and I've never

25    seen anything like this before.  Why won't management accept an

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 82 of 152

Page 82

1    all-cash bid that's fifty-seven million dollars over the first-

2    lien debt on essentially the same terms as the first-lien bid,

3    when you've got a backup and as Hart-Scott-Rodino is a

4    contingency?  We do Hart-Scott-Rodino all the time in this

5    courtroom.  What's going on here?  We've always had problems,

6    or, at least in the context of Your Honor's contested matters,

7    always expressed that we've had a hard time understanding a lot

8    of the decisions management has made that brought us to this

9    point.

10           And we could speculate any of the following based upon

11   the evidence that Your Honor has:  We've got a board of five

12   members, two of whom are the equity sponsor who are not getting

13   anything out of this deal anymore, two of whom are the

14   executives of this company, one of whom is an independent

15   director who failed to show up.  Maybe this board stopped

16   caring.  We could speculate the first-lien lenders as taking

17   over and not knowing how to run a wet-shave business.

18   Management looks at that as an opportunity.  Perhaps it's just

19   they like the first-lien lenders and they don't like us because

20   we've been throwing stones at them for quite a while now.

21   Whatever the reason is, we came to the courtroom learning as

22   much, because it was such a truncated discovery, hoping to hear

23   evidence to explain to us what's going on here, because we

24   don't get it.  And the testimony helps, but it doesn't help

25   directly, and it's certainly not consistent with their case

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 83 of 152

Page 83

1    theory, because it lacks credibility, it doesn't stand up.

2          It can't help, if you're in our shoes anyway, starting

3    to smell a rat.  When you think about all of the efforts to

4    oppose us in our refinancing efforts to take out the first-lien

5    debt, when you think about how you have a live -- a great big

6    company with a live bid, who's made series of iterations to

7    improve, to improve, to improve, up until moments before this

8    hearing even started, and got pushed out, when you think about

9    the fact that they didn't get the bid procedures approved

10   before they got this process, which unto itself is unusual, you

11   start beginning to feel like management will create excuses to

12   create any bid but for the first-lien lender bid.

13         So -- but let's go through the testimony.  There's all

14   this antitrust risk.  ASR retained and put before Your Honor an

15   antitrust expert to tell you all about this antitrust risk.

16   And for the ten documents that he saw in the twelve hours he

17   was on the case, his testimony didn't -- it was barely even

18   understandable if he even knew what business we're in.  He was

19   a hired gun, brought in after they determined that there was

20   antitrust risk, to paper it up, to tell Your Honor that there's

21   all this antitrust risk.  And there was no analysis underlying

22   his conclusion.  He hadn't studied the case.  He had no real

23   business -- had no real basis to conclude that there was

24   antitrust risk.  But it's irrelevant anyway, because it's a

25   backup bid that remains there.  If there's HSR, second look,

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 84 of 152

Page 84

1      they close the first-lien lenders anyway.

2            And what about all of this twenty-five million dollar

3      EBITDA harm that we're going to be perceiving?  It's

4      nonsensical.  There was no analysis here.  There was no factual

5      support for Mr. Bolt's testimony.  There was no method at work.

6      He hasn't even spoken to, what, five customers over the span of

7      his career at ASR.  He's -- and when -- and think about the

8      timing this all came in:  right around the time that the

9      original offer came in from Energizer.  He's making up the

10     numbers to paper up why they don't want to do the Energizer-

11     Schick bid.

12            Mr. Russell called it a cowboy analysis.  I'll use a

13     different analogy:  This is spaghetti thrown against the wall

14     with a frame around it and telling you it's the Mona Lisa.

15     He's not a good artist, because the spaghetti falls off.  There

16     was nothing to that analysis at all but him sitting in a room

17     and saying 'Twenty-five million.  I got to get there somehow.'

18            You heard Mr. Russell testify, with the Bain study as

19     backup, that the Energizer-Schick acquisition would actually

20     augment customer relationships during the sixty-day waiting

21     period, and that too is consistent with experience and business

22     logic.  Customers tend to like it when weaker trading partners

23     marry with a big company, especially in an industry, strong

24     industry players that can offer financial management and

25     customer relations support.  It doesn't work in the inverse.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 85 of 152

Page 85

1    People aren't going to be afraid of a Schick-ASR combination.

2    They're going to applaud them.  This company's in bankruptcy;

3    it's weak.  Now it's not so weak anymore.

4           And what's really critical is what's missing from this

5    trial.  What did they fail to put on? Where is that independent

6    director who's going to vet out the board decision-making?  How

7    come -- we subpoenaed him, we took his deposition, but he

8    didn't show up.  Isn't that curious?

9           And where was the piece of paper that was the

10   antitrust analysis?  I'm no antitrust expert by any stretch of

11   the imagination, but I saw nothing that sounded like the

12   complex kind of HSR analysis that boards who want to rely upon

13   business judgment usually demand of their professionals to

14   enable them to draw conclusions that there is in fact a HSR

15   risk.  There was zero written documents of analysis by anyone.

16          Where is the list of transactions where anyone has

17   ever signed off on a hell-or-high-water clause?  Where is the

18   analysis?  Where is the expert telling us that's market, that's

19   a commercially reasonable thing to ask of a bidder?  Where is

20   the list of 363 processes where they didn't get prior bid

21   procedures approval?  Now, think about that, Your Honor.  In

22   all of my experience, you get these bid procedures approved

23   right up at the forefront because that governs behavior.

24   People feel confident -- or the process is made confident by

25   the fact that the bid procedures are approved by Your Honor,

Page 86

1    and this is how behavior will be run going forward.

2         And we actually do negotiate and argue over who gets

3    consent rights and whose views are appropriate in terms of

4    qualification and bidding and what's a higher or better (sic).

5    They didn't do that.  Curious, is (sic) it?  It enables maximum

6    flexibility to enforce it as they want to, or not; ignore it,

7    modify it as they see fit.  And now they're claiming 'Well,

8    they have a MAC out.  If we don't close this right now, oh, you

9    know, and some problems happen.'  They're going to exercise

10   their MAC out if Mr. Bolt's twenty-five million dollar

11   spaghetti-against-the-wall artwork actually proves to be

12   fortuitous.

13        Your Honor, I'd respectfully draw Your Honor's

14   attention to IBP, Inc. v. Tyson, 789 A.2d 14 (Del. Ch. 2001).

15   You can't MAC out of a deal that you knew and could foresee

16   what the issues were going to be in that transaction.  They

17   knew this was an auction process; it's in their own agreement.

18   They knew that somebody could bid and that the bid would face

19   HSR approval and that it may not receive HSR approval and then

20   they would be a backup bidder.  That's about as clear as day in

21   their own agreement.  They can't claim MAC if they -- if that

22   auction process ultimately happens.  That would violate

23   Delaware law.

24        So in our opinion, Your Honor, what we are smelling

25   here actually is a rat.  ASR held itself out as conducting a

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 87 of 152

Page 87

1    commercially reasonable auction.  They produced bid procedures,

2    holding them to the Court and the world like a talisman:

3    "Commercially reasonable.  We're doing everything the way

4    that's normally done in Delaware."  They promised to

5    objectively test the market, consistent with the law and the

6    practice in Delaware, and all the while they subverted the

7    process.  They just hoped nobody would ever find about it,

8    because no one was allowed to talk to us and we were the only

9    objecting party.

10             They're not acting like an honest broker here like you

11   normally would.  They have an interest in this deal.  And it's

12   not an appropriate interest.  They just don't want to be owned

13   by anyone other than the first lienholders.  And the first

14   lienholders -- first the creditors' committee says 'Go with the

15   first-lien deal, but understand the economic incentives of

16   every member of the committee.'  Their liabilities are assumed.

17   They just want it now.  Same, by the way, of the Energizer

18   deal; it just may take a little bit longer.

19             But think about the first lienholders' incentives,

20   Your Honor.  Go back to the foundation.  The theory of the case

21   is that the applied value of this business would be enhanced

22   considerably if we changed management, and the external

23   corroborating evidence is that Schick is going to change

24   management and they're going to realize the value.  And at

25   least as of now, we know that excess value is at least fifty-

Page 88

1    seven million dollars more than the first-lien debt.  Perhaps

2    they don't necessarily disagree with our theory of the case.

3    Perhaps they don't want a hundred percent cash and they'd much

4    prefer to have the stock.  It's all about Gen-Y, you heard Mr.

5    Russell say, and this thing could take off like a rocket.

6    Perhaps they agree with us, and perhaps they want that upside

7    and they're joining in the debtors' efforts to insulate

8    competitive bidding so that they get it.  That, we submit, Your

9    Honor, is the real smell that we're smelling right now.

10           And think again, Your Honor, just a minute about

11   what's going on with Energizer-Schick.  It would be kind of

12   funny if it wasn't so tragic.  They say 'You can't qualify

13   because you haven't negotiated an acceptable antitrust risk

14   allocation.  But since you haven't qualified, you can't get

15   diligence to negotiate an acceptable antitrust risk

16   allocation.'

17           You heard Mr. Bolt testify, contrary to what Mr.

18   Austin said, that the first-lien lenders actually did receive

19   more information than Energizer.  You heard Mr. Karmity's

20   proffered testimony about the data room.  It doesn't include

21   customer information, presumably of the kind that one would

22   need to do an antitrust analysis.  And, remember, they left

23   them on the tarmac as they were going to Mexico, because they

24   chose not to qualify him.

25           They had the temerity to argue before Your Honor that

Page 89

1    it's all Energizer's fault, because they won't accept a hell-

2    or-high-water clause, prior to finishing the due diligence,

3    when the company has a backup bid in place, when no one accepts

4    the hell-or-high-water clause.  And their SC Johnson proposal

5    of 'Well, here's the market, because our market expert just

6    didn't do a very good job explaining it to you' doesn't have a

7    hell-or-high-water clause in it.  They point to an affirmative

8    covenant and then they said 'Don't look at the actual events of

9    default,' because they actually get a walk.  So it's really not

10   a hell-or-high-water clause, but that kind of defeats their

11   argument.  They also say it's Energizer's fault because they

12   won't put up thirty-five million dollars' forfeitable deposit.

13            Let's talk about scale.  Mr. Austin was fond of

14   talking about scale.  Projected EBITDA is fifty million

15   dollars, and they want a thirty-five million dollar deposit.

16   The scale seems skewed when you start talking about risk-reward

17   profile about the specific deal as opposed to Energizer-Schick

18   versus ASR.  And by the way, they want a thirty-five million

19   dollar deposit when they haven't finished diligence, when there

20   is no analysis from the company showing there really is any

21   antitrust risk at all, and when they have their backup bid.

22            Your Honor, under the law, this simply will not do.

23   Contrary to the debtors' argument, the applicable standard

24   isn't judicial laissez-faire business judgment.  Your Honor's

25   not supposed to just rubberstamp it because they said it.  The

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 90 of 152

Page 90

1   law does not like bulk 363 sales, Your Honor.  It's not the

2   preferred means.  Congress told us that 1129 is the preferred

3   means, and all those protections in 1129 get thrown out the

4   window in a 363 context, especially here where you've got

5   assumption of liabilities and you've isolated the class and

6   said 'You get nothing.'  This is sub rosa.

7        The law therefore imposes on the debtor a higher

8   burden.  The burden of proof on persuasion is well-established

9   in the law.  The debtor must prove -- and Mr. Thompson's wrong.

10  It's his burden across the board.  It's not my burden.  I have

11  none.  It's his burden across the board that objectively this

12  sale has sound business justification; that objectively the

13  price is fair; that the debtors did provide adequate and

14  reasonable notice to all interested parties and the parties

15  acted in good faith, especially as Mr. Austin demands that he

16  gets a 363(m) good-faith finding in the order approving the

17  sale.

18        In my mind, Your Honor, and forgive me if I'm doing

19  this a little bit different than Your Honor would like, these

20  concepts boil down to something and you feel them in your gut.

21  Does this sale really feel like it is the right way to go?  The

22  sale to the first-lien lenders, does that really feel right?

23  Do you feel in your gut that the price that's been offered by

24  the first-lien lenders is truly the highest and best that's

25  available?  Did they really, in your gut, run an open fair

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 91 of 152

Page 91

1    process like an honest broker directed towards maximizing

2    value?  Or is it, as Judge Spector, I think, sort of famously

3    said in the In re Dow Corning case, you have a sense of

4    queasiness about what's going on here?   Your Honor, we would

5    submit that -- go with the gut.  The evidence supports

6    queasiness, doesn't support comfort.

7            But let's go to the bottom line, because the argument

8    is about process.  What can this Court conclude?  You can

9    conclude they're still negotiating.  They're not done yet.

10   This process isn't over today.  This bid pro -- the bid

11   procedures, again, we think it can be done in a plan, but we'll

12   move in that milieu.  Approve the bid procedures today as a

13   governing mechanism in order to bring order to the process, and

14   make it be enforced according to the terms.  Energizer-Schick

15   should be qualified -- I think they've established that pretty

16   readily -- per the bid procedures.  They should get the due

17   diligence that the bid procedures says they should get.  And if

18   they're being difficult about it, they should be enabled to

19   call up Your Honor and say 'I need this' and Your Honor can

20   make the call "ball" or "strike", and they should be enabled to

21   finalize their bid per the bid procedures.  And then there

22   should be an auction.  But since we've got all of this agita

23   about the debtors' ability to come to a fair conclusion, we

24   think the auction should happen here and that Your Honor should

25   be the overseer of the auction and decide who's the highest and

1    the best.  That's how we think this trial should conclude, Your

2    Honor.

3            If I may, I'd like to move into the intercreditor

4    agreement, unless Your Honor has specific questions about the

5    process argument.

6            THE COURT:  No, you can go ahead.

7            MR. STARK:  And I'll try to be as brief as I can,

8    because it seems almost too much at the conclusion of a three-

9    day trial to then say, well, we shouldn't have had any of it

10   because we had an intercreditor-agreement issue.  But there

11   are -- but we based our position that the intercreditor

12   agreement doesn't prevent what we've done here on three points

13   of law.  The first, interestingly enough, is standing, and this

14   gets metaphysical so I'll try to move it quickly in the

15   agreement itself.  If you take a close look at the signature

16   page of the intercreditor agreement, you'll see that there's no

17   debtors' signature on that intercreditor agreement.  UBS signs

18   that agreement twice:  one for the first-lien agent and one for

19   the second-lien agent.  If you go to section 8.1(7) and 8.1(6)

20   of the intercreditor agreement -- I'll read it to Your Honor so

21   you don't have to look it up -- 8.1(7) is titled "Provisions

22   Solely to Define the Relative Rights".  It's on page 31.

23   Quote, "The provisions of this Agreement are and are intended

24   solely for the purpose of defining the relative rights of the

25   First-Lien Secured Parties on the one hand, and the Second-Lien

Page 93

1    Secured Parties on the other hand.  None of the Borrower, any

2    other Loan Party or any other creditor thereof shall have any

3    rights hereunder."  That marries with section 8.1(6), No Third-

4    Party Beneficiaries:  "This Agreement and the rights and

5    benefits hereof shall inure to the benefit of each of the

6    parties hereto and their respective successors and assigns, and

7    shall inure to the benefit of each of the First-Lien Secured

8    parties and the Second-Lien Secured Parties.  No other person

9    shall have or be entitled to assert rights or benefits

10   hereunder."

11          What does this mean?  The debtors have no ability to

12   come before Your Honor and say 'I can't object to their motion

13   on the grounds that I've waived the right.'  The only party

14   that could conceivably make that argument is the first-lien

15   lenders.  But this is the debtors' motion, and that makes

16   sense, because if you look at Section 363(b)(1), only a debtor

17   can make a motion to use assets out of the ordinary course, not

18   the first-lien lenders.  They can't even join in the request,

19   as a matter of statutory law.  And the debtor specifically

20   excludes -- the agreement specifically excludes the debtors

21   from asserting third-party beneficiary rights to a claim that

22   we have waived.  This doesn't mean that there's no legal

23   consequences for us, but that's not legal consequences before

24   Your Honor.  A court of alternative jurisdiction may have the

25   ability to assert rights against us, but not this Court.  Since

1    this is a situation where we have two bids that are apparently

2    offering hundred-cent value to the first lienholders, Section

3    510(a) is not implicated.  So therefore this Court doesn't have

4    core jurisdiction over the other aspects of the agreement.

5            And in fact, essentially, this was Judge Wizmer's

6    ruling in the most recent Trump bankruptcy case, In re TCI 2

7    Holdings, LLC, 429 B.R. 1117, when the first-lien lenders there

8    said no second-lien plan could ever be confirmed, it would

9    violate the intercreditor agreement.  She didn't see it that

10   way.

11           A second argument, Your Honor, focuses on implied

12   covenants in the agreement.  If you take a hard look at the

13   breadth of the waiver contained in 6.1 and 6.1(1), we're not

14   supposed to object to a sale or an asset disposition.  And they

15   talk about it very generically and broadly:  can't object to a

16   sale or asset disposition.  And the debtors, and more

17   specifically the first-lien lenders, contend that, by these

18   words, if our argument relates to, pertains to, touches by a

19   ten-foot pole, any sort of sale transaction, then we've waived

20   the ability to make the argument.  So any proposed auction

21   procedures we can't object to, how those procedures might have

22   been implemented, if people acted -- how people acted or what

23   they said to whom, even if implementation was designed to be

24   and was actually a complete sham or fraud.  Similarly, we can't

25   object to the timing of the sale or any terms of the sale

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 95 of 152

Page 95

1    agreement even if, hypothetically speaking, such provisions

2    were violative of the public interest law, illegal or a fraud

3    on the Court.  We're supposed to sit idly by and allow all that

4    to happen.  We don't agree with that reading.  We think it's

5    too far of a reading.  Let me explain by a hypothetical.

6          Suppose the debtors agree to give themselves, the

7    first-lien lenders, via a one-dollar credit bid, while Warren

8    Buffett offers a hundred billion dollars cash in the

9    barrelhead, no contingencies, no questions asked.  And if the

10   debtors press forward, because I really want the first-lien

11   lenders to own them, we would, I think, have the ability to

12   come before Your Honor and say that doesn't seem right to us,

13   and I don't think Your Honor would read 6.1 and 6.1(1) as

14   saying we can't, 'They're going to be paid out.  Why are you

15   doing the things that you're doing?'

16         So there must be some implicit ambiguity in the notion

17   that we can't object to a sale or an asset disposition, because

18   an awful lot goes into the ultimate conclusion of sale or asset

19   disposition.  And what we think informs the interpretation of

20   those provisions are those implied covenants which are implied

21   in every contract under New York law.  They obligate

22   commercially reasonable behavior.  That's the implied covenant

23   of good faith and also, perhaps more importantly, fair dealing,

24   their fair dealing with us.  You can find this under statement

25   Second of Contracts 205.  And as the Second Circuit informed

Page 96

1    us, the implied covenants preclude each party from engaging in

2    conduct that will deprive the other side of the benefits of

3    their bargain.  That's Leberman v. John Blair, 880 F.2d 1555.

4         And just as importantly, these implied covenants

5    inform the interpretation of contract provisions that fill in

6    interpretive gaps like the one we have here, towards what

7    Justice Cardozo famously called the intent of the deal.  Wood

8    v. Lucy Lady-Duff Gordon, 222 N.Y. 88.

9         So, for example, courts have held, including the Third

10   Circuit Court of Appeals, that where debtors have sent notices

11   to bondholders, consistent with the agreement but in a way

12   clearly intended and designed to ensure the bondholders never

13   actually read those notices, the implied covenants will enable

14   the Court to interpret a greater obligation on the part of the

15   debtor.  They have to actually deliver them so that they will

16   be received.  The Third Circuit case is Pittsburgh Terminal

17   Corp. v. Baltimore and Ohio Railroad, 680 F.2d 933.

18        So we believe that these implied covenants of good

19   faith and fair dealing inform us how the Court should interpret

20   section 6.1 and section 6.1(1).  Remember earlier I quoted for

21   Your Honor 8.1(7); it says that "The provisions of this

22   Agreement are and are intended solely for the purpose of

23   defining the relative rights of the First-Lien Lenders (sic) on

24   the one hand, and the Second-Lien Parties on the other hand."

25   The instinct of this agreement is that if there's an auction,

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 97 of 152

Page 97

1    the first-lien lenders take first and the second-lien lenders

2    take second, and the second-lien lenders can't complain as long

3    as the auction is done in a commercially reasonable manner.

4    And there are deal parameters in that second part of my last

5    statement.  If this is a sham auction or a sham transaction, if

6    it's not conducted in a commercially reasonable manner, if it's

7    being orchestrated to spurn a true that would pay the second-

8    lien lenders in full -- the first-lien lenders in full and

9    leave fifty to sixty million dollars for the second-lien

10   lenders, that certainly would not be consistent with the

11   instinct of the deal.  We respectfully submit, Your Honor,

12   these implied covenants enable a more appropriate reading of

13   6.1 and 6.1(1) to enable process, process, to ensure

14   maximization of creditor recoveries.

15          And this brings us to the final argument, and I'll

16   move quickly.  There are fundamental bankruptcy rights that

17   can't be contracted away between creditors.  Cases like, and

18   these are famous cases, In re 208 (sic) North LaSalle Street

19   Partnership, 246 B.R. 325, and the older case, In re Hart Ski

20   Manufacturing Co., 5 B.R. 734, they stand for a proposition.

21   The Bankruptcy Code and the Bankruptcy Rules are important.

22   Bankruptcy courts are important.  They serve socially useful

23   purposes and macroeconomic socially useful purposes.  The rules

24   that have been told on parties when they're extending loans, if

25   a loan goes foul, ought to be enforced.

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 98 of 152

Page 98

1        And cases are supposed to be run according to these

2    principles in a commercially reasonable manner.  When an

3    intercreditor agreement provides terms that overreach,

4    resulting in the inability of a party to get before the Court

5    and say 'What's going on is wrongful, not commercially

6    reasonable.  There's better opportunities,' I don't perceive --

7    I would perceive that that waiver would be inconsistent with

8    these fundamental rights and can't be enforced.

9        And that's what we have here.  We've got two bids,

10   both of which provide the first-lien lenders full payment.  The

11   Energizer bid yields significantly additional amounts for the

12   second-lien lenders.  That means, if that's the market test,

13   implicitly the value of the company is at least the hundred

14   percent recovery for Mr. Austin's client, and the intercreditor

15   agreement is being used, we would say exploited, abused, to

16   enable the first-lien lenders to say 'Don't' -- the debtors to

17   say 'Don't listen to these people.  Go with our process.  We

18   didn't want them even to know about any of this anyhow.'  We

19   think that's a perversion of the process, Your Honor, and we

20   think it shouldn't be interpreted that way.

21       And as far as ION Media -- my last point -- we think

22   the reliance by Mr. Austin on ION Media is misplaced.  It's a

23   distinguishable case.  And as much respect as I have for Judge

24   Peck, and I have all the respect in the world, he didn't

25   address certain points in reaching his conclusion.  He didn't

Page 99

1   address whether or not the debtor had the rights, as a third-

2   party beneficiary, to oppose the objectors in that case.  And

3   actually more fundamental than that, the waiver at issue was

4   raised in the context of an objection to a plan of

5   reorganization that incorporated Section 510(a), contractual

6   seniority and subordination, clearly a matter within the

7   Court's jurisdiction under the statute.

8           But there's even a more fundamental differing

9   characteristic in that case versus here.  That case involved

10  nasty strategizing by pennyholder distressed investors that

11  bought post-petition, intending to upset a good deal to extort

12  value, in behavior that he could find -- Judge Peck could find

13  was destructive and not commercially reasonable.  That's not

14  our case.  My clients are par holders.  They've been holding

15  their debt far, far before this case filed, and they're facing

16  a complete loss, not levels of gain.  And here again we have

17  200-percent offers.  We're simply arguing give the excess value

18  to the second-lien lenders, which is kind of sort of consistent

19  with fundamental bankruptcy process.  We're not opposing the

20  sale for holdup value.  We're saying 'Go with the sale.  Get it

21  done quickly.  Let Energizer get it done quickly, okay, because

22  we would like our excess cash, please, soon too.'  We're not

23  trying to upset a good deal.  We're urging the acceptance of a

24  far better deal, once they've been allowed to finish their

25  process.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 100 of 152

Page 100

1          In this regard, again citing to Judge Wizmer's

2     decision in the Trump case, our behavior we think is more like

3     those silent seconds there where the first liens said 'Don't

4     listen to them.  It violates their intercreditor agreement'

5     when they proposed their own plan.  And Judge Wizmer

6     essentially said 'They're being constructive.  They're trying

7     to help the process.  I won't not allow their plan.  In fact,

8     I'm going to confirm their plan.'  Your Honor, we think we

9     should receive the same treatment by this Court as well.

10          Does Your Honor have any questions for me?

11          THE COURT:  No, thank you.

12          MR. PALANS:  Good morning, Your Honor.  If the Court

13     please.  Lloyd Palans, Bryan Cave, on behalf of Energizer

14     Holdings, LLC.

15          Your Honor, I'd like to introduce to the Court some

16     people that have been in the courtroom with us since the outset

17     of this hearing:  our Energizer team.

18          Fellows, if you would, just stand.

19          This team consists of Energizer's CFO, the treasury

20     group, outside antitrust counsel, internal legal counsel,

21     financial advisor.  Your Honor, the point of me introducing

22     this group is one simple reason:  Energizer has spent a lot of

23     time and effort and devoted a lot of people to this process to

24     acquire this business.  All of this demonstrates clearly that

25     Energizer continues to believe that it can and will be

Page 101

1    successful in obtaining a successful acquisition, in obtaining

2    HSR approval.

3            Energizer is a sophisticated company with

4    sophisticated antitrust counsel, which Gibson Dunn is present

5    in the courtroom.  We have enough belief in the likelihood of

6    success that we have put five million dollars -- will put --

7    strike that -- five million dollars nonrefundable deposit

8    available to back up what we say.

9            May I begin a bit out of order, but I think it's

10   nonetheless important to be responsive.  Mr. Thompson said that

11   the biggest issue is Energizer's right to walk away.  Your

12   Honor has before her two exhibits; those two exhibits are

13   Energizer Exhibit 2, which is an e-mail transmittal, and

14   Energizer Exhibit 3, which is a marked-up APA.  I think you

15   have to take them in tandem to understand what they are.

16           When you look at Energizer Exhibit 2, you'll note the

17   date of it.  It was dated this Monday, September 27th.  The bid

18   process -- the bid deadline was September 20.  And it

19   references "Further to our discussions from this morning,

20   attached is a redline marked against the version received on

21   Friday afternoon.  We believe we have resolved the APA issues

22   discussed, with the exception of your request for an increased

23   deposit.  The draft is subject to our mutual agreement on

24   resolution of the outstanding due-diligence items with respect

25   to the Mexican operations, the antitrust information and the

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 102 of 152

Page 102

1    Brazilian agreement.  With the cooperation of ASR, we are

2    prepared to complete this due diligence within seventy-two

3    hours of receipt of the due-diligence information.  We firmly

4    believe that our proposed agreement constitutes the highest and

5    best offer for the transaction.  We are available to discuss."

6            Your Honor, attached is Exhibit 3, Energizer Exhibit

7    3.  We took a revised APA that was given to us by ASR on Friday

8    afternoon, September 24, and we marked it with minor changes.

9    The redline -- blackline that appears in that draft are our

10   changes from the draft which they submitted.  I'm only going to

11   briefly describe it.  Mr. Thompson referenced two provisions:

12   paragraphs 2.3, 3.4(b), for purposes of trying to say that we

13   were trying to conceal that we have a soft deposit.  Your

14   Honor, that is not our intent.  Nobody has said that to us with

15   regard to this language until today.  If there is any

16   ambiguity, we are here to correct it.  If there is a problem in

17   interpretation, we are here to correct it.  I am here to state

18   for this Court on this record that that deposit, once made, is

19   irrevocable, forfeitable; no ifs, ands or buts.  If there's a

20   word in this document that says otherwise it causes concern,

21   we'll change it.

22           Your Honor, that agreement, and I'm going to be brief

23   because I've got an argument to make here on some other points

24   that I don't want to lose time for, this agreement, in sections

25   1.1 and 1.2, identify purchased assets and excluded assets, as

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 103 of 152

Page 103

1    requested by the seller.  1.3:  It assumes all liabilities, as

2    requested by the seller.  Paragraph 1.4:  The only excluded

3    liabilities relate to other parties' taxes and offsite or

4    former-site environmental, which does not impact the claims

5    against this estate.

6         There are no comments on the disclosure schedules or

7    assumed contracts.  In Section 2.1, our price of 301 million

8    compares favorably to their price of 244 million.  In paragraph

9    3.4, we agree with their termination provisions, other than

10   technical language that Your Honor can read related to the

11   violation of law and inapplicable language.

12        Article 4:  The seller's reps and warranties are

13   substantially as requested, with minor changes, and a reduced

14   MAC rep that I'll get to in a moment.

15        Section 7.8:  We agree with their substantially

16   revised antitrust cooperation covenants, with minor changes.

17        Paragraph 7.1(6):  We agreed to a one-year severance

18   for all employees, which means simply all employees are

19   guaranteed one year of payment, salary, benefits, severance.

20        Section 7.2(0):  There are tax comments that are not

21   necessary since we assume all taxes.

22        And paragraph 8.3(b):  We were advised that the MAC

23   condition was objectionable, and what we did in this agreement

24   was we eliminated the MAC with regard to any commercial loss of

25   customers that is in reference to this sensitivity study that

Page 104

1    was identified in yesterday's testimony, and we limited our MAC

2    purely to the purchased assets, defined term "Purchased

3    Assets", hard assets, property, plant, equipment,

4    infrastructure, acts of God.

5              Now, to say that this is not an agreement that is

6    workable, given cooperation, given the opportunity to complete

7    three limited areas of due diligence that are identified in our

8    e-mail, is not genuine and it shouldn't be acceptable.

9              Let me move away for a moment.  Your Honor, before I

10   do, I have prepared a very brief summary that compares -- may I

11   approach the bench?

12             THE COURT:  You may.

13             MR. PALANS:  It's a comparative summary of the

14   stalking-horse bid and our revised APA, as submitted in

15   Energizer-3.  It's just summarizing the terms of Exhibits that

16   are in evidence.  It is offered for no other purpose.

17             MR. AUSTIN:  I want -- Your Honor, I want the record

18   to be clear, first time we've seen this and we certainly don't

19   accept that this may be an accurate description of whatever he

20   wants to try and summarize.

21             THE COURT:  All right, well, I'll use it as a

22   demonstrative, subject to it being confirmed as accurate.

23             MR. PALANS:  Your Honor, as we sit here today, the

24   debtors have a burden; they have a burden to establish that

25   this process, this sale process, was fair.  They are going to

Page 105

1    ask Your Honor to enter findings of fact to the extent that,

2    and I'm going to be very brief, that the disclosures made by

3    the debtors concerning the purchase agreement, the auction, the

4    sale, the sale hearing, and the assumption and the assignment

5    of assigned contracts were good, complete and adequate.  And

6    there is no record to support that.

7            Your Honor, Energizer is one of 140 parties that were

8    invited to participate in this process; 140 invitations; 140

9    invitees; zero qualified bids.  Is that an effective market

10   test?  No auction as a result of this?  They rely upon a lot of

11   cutesy stuff.  Well, Energizer was provided more due diligence

12   than any other party.  Huh?  Goldman Sachs had full access to a

13   data room.  We, as best I can tell, were the only party that

14   really took it to a point of submitting a qualified bid.  And

15   is it unreasonable for us to be requesting information and to

16   say that 'Oh, we were provided more information'?  That just

17   doesn't fly.

18           The testimony of Alix that was proffered yesterday was

19   that we have thirty-one days of due diligence.  That time ended

20   on September 21st when they shut down the data room, pulled a

21   plane off a tarmac to prevent an inspection in Mexico, refused

22   to provide a Brazilian distributor agreement, and will not even

23   provide basic documents to allow us to look at, for antitrust,

24   in order to get any level of comfort to post a deposit that

25   they keep insisting be higher and greater than what we have.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 106 of 152

Page 106

1    How can we get comfort in dealing with this kind of action to

2    expose to risk additional money from a group that is dealing

3    with us and won't disclose, and now have the nerve to say

4    'Well, it's hell or high water' or 'It's thirty-five million

5    dollars forfeitable'?  That just is a disconnect.

6            There's a disincentive.  By putting any additional

7    money up, we're creating an incentive to subvert this process.

8    That doesn't make sense.  It's a disincentive.  The more money

9    that goes up, who does that money go to the benefit of, and

10   what's the purpose?  I take it that the purpose is not only to

11   show our good faith, which I think we have shown up till now,

12   but it is also to compensate them for a perceived risk of loss,

13   as identified in a sensitivity analysis that's based upon

14   assumptions.

15           And the amount they're asking for, thirty-five million

16   dollars, compared to their EBITDA, where does that go if we are

17   unable to get HSR compliance clearance from Justice (sic) by

18   November 23?  And time's a wasting.  We're not trying to sit

19   here and extend this.  It goes to the banks.  It goes to the

20   benefit of the banks.

21           This is a process under which the debtors refuse to

22   give notice and/or seek approval of sale procedures in advance

23   of an auction that was destined never to be held.  We never had

24   an opportunity to sit in a room and sit and hear Mr. Thompson

25   say 'Well, gee, Lloyd, you know, that section 2.3 and 3.4, we

Page 107

1    just don't think it does what we need it to do.'  'Okay, let's

2    fix it.'  We never had that opportunity.  What else you got?

3    Because that's where we are.

4          There was no reason for ASR to ignore the sale

5    procedures that all parties, financial and strategic, are being

6    asked to comply with and adhere to as a procedure moves

7    forward.  The U.S. Trustee, creditors, potential bidders, other

8    parties-in-interest, did not have any opportunity to review and

9    fully and clearly understand what the sale procedures were, or

10   to even object to them.

11         There's an old adage:  Sunlight is the best

12   disinfectant.  In this instance, Energizer and all bidders,

13   strategic, financial, whatever, were kept in the dark.  We were

14   kept in the dark to allow this debtor, which created these

15   procedures with its financial advisor Lazard, and in

16   consultation with its secured lender, now stalking-horse

17   bidder, now wearing two hats, determined to be fair under the

18   circumstances, and interpreted by them as this process evolved,

19   and it evolved.  Unfortunately, it did not evolve well.

20         Everyone has been hurt.  ASR professes that it has a

21   real need for timing on the sale, given the launch of its new

22   product line.  Energizer, which believed it was following bid

23   procedures that required neither a hell-or-high-water

24   requirement or a thirty-five million dollar forfeitable

25   deposit, has also been hurt.  We did not know that the ticket

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 108 of 152

Page 108

1    to this game required that we take that risk upfront without

2    even reviewing antitrust documents in order to make a risk

3    assessment of success.  Thirty-five million dollars is a

4    handsome price to pay.

5           And they -- it's interesting how they couch the terms

6    of the sale.  'Oh, it's so benign.  There's no breakup fee.

7    There's no reimbursement of expenses.  There's no topping bid.'

8    But by operation of these procedures, there's a thirty-five

9    million dollars topping bid or agreeing to swallow HSR in toto

10   as a price to get to an auction.  That's just not right, nor

11   was it advertised.

12          Your Honor, it cannot be the goal of this Court to see

13   a practice develop where any exigencies of a case are used to

14   justify ignoring proper procedures or not providing the Court

15   and interested parties with notice and an opportunity to be

16   heard on procedures which the debtor is using.

17          Your Honor, this procedure -- this sale procedure was

18   never launched pre-petition; that's clear.  They were trying to

19   do some type of a recapitalization with their lender groups.

20   There was no market test pre-petition.  The only market test

21   that has occurred has occurred with regard to these bid

22   procedures, flawed as they are.  They began July 28th; they

23   weren't approved.  They were to culminate September 28th, a

24   sixty-day period, sixty days which resulted in the bid which

25   Your Honor has, Energizer Exhibit 3, which is fifty-seven

12-12020-mg   Doc 300-3   Filed 06/11/12   Entered 06/11/12 16:05:55   Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 109 of 152

Page 109

1    million dollars more in consideration, five million dollars

2    more in a forfeitable deposit, and fifty-seven million reasons

3    why this bid should be not only considered but should be

4    accepted with waiting arms here.

5         This bid pays all claims, all creditor claims, all

6    cure claims, all employee claims, all environment claims, all

7    pension claims.  And the second liens, you know what, they get

8    some money too, and not an insignificant amount at that.

9         By the very terms of these bid procedures, they

10   expressly made antitrust approval a condition of closing, a

11   permissible condition for closing, to Energizer or anyone else.

12   By the terms of the stalking-horse offer, the banks are

13   required, as a backup bidder, to keep their bid open until

14   Energizer's HSR approval time runs out.  And there's even a DIP

15   that stays in place thereafter.

16        By the terms of the bid procedures and the stalking-

17   horse offer, an auction sale was contemplated to be held on

18   September 23.  You could have bowled us over with a feather on

19   September 21st when we were told that we weren't qualified.

20        Your Honor raised a question during the course of

21   prior argument, and the question was, to be a qualified bidder,

22   you need financial wherewithal and price.  That's what we

23   thought.  We also thought that if you had financial wherewithal

24   and price, you got a ticket to the auction; you had the ability

25   to offer your highest and best bid.  Your Honor, we have never

Page 110

 1    been presented with that opportunity.  That's what these

 2    procedures didn't do.  That's what these procedures, and as

 3    interpreted by this group, did not provide.

 4            MR. THOMPSON:  I have to object, Your Honor, and would

 5    just strike the last sentence -- two sentences stating 'We

 6    thought what the bid procedures meant'.

 7            THE COURT:  Overruled.

 8            MR. THOMPSON:  There was no witness --

 9            THE COURT:  Overruled.  You can respond in argument.

10            MR. PALANS:  Your Honor, HSR -- I'm not an antitrust

11    lawyer, but we fortunately have somebody on our side that knows

12    this stuff.  HSR, really, in order to get approval requires

13    cooperation.  It requires cooperation in order to get there,

14    and it especially requires cooperation given a short time.  The

15    time here is November 23.  The record will reflect that on or

16    about August 20 we proposed that we expedite the HSR approval,

17    and that we go hand in hand with ASR to justice to begin the

18    process so that we might expedite it, accelerate it, and be in

19    a position so that we may be able to get clearance much earlier

20    than would ordinarily occur.

21            That was resisted, for reasons that have been

22    articulated on the record.  That's all we want to do.  Had we

23    been able to do that, we may be in a position today to increase

24    the amount of that offer if we had received the ability to

25    review documents and enhance, or consider enhancing, our

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 111 of 152

Page 111

1    proposal.  We were not even given that opportunity.

2            We learned yesterday in testimony that the hell-or-

3    high-water clause has been a gating issue from the inception.

4    It has been a gating issue not only from the inception but

5    through today.  They want that.  They never told us that at the

6    outset.  Instead, we learned on Friday afternoon, after the bid

7    deadline had closed, after we were told we were not qualified,

8    that oh, thirty-five million bucks, put it in, and, you know,

9    we may have something to talk about.  That's not in the

10   procedures.  So, if we're trying to identify what are the rules

11   that we're all playing under, beats me, because it's changing

12   every day.

13           I'm going to focus on antitrust for a moment.  The way

14   the debtors use this cry of antitrust to foreclose us from the

15   process, the only interested bidder, it really demonstrates the

16   failure of the process here.  The imposition of a hell-or-high-

17   water clause as a condition precedent to do a deal or posting a

18   thirty-five million dollar nonrefundable deposit.  We're not

19   here to argue the merits of Energizer's antitrust arguments.

20   As we have told ASR's representatives repeatedly, we believe

21   that this transaction is pro-competitive.  We are optimistic

22   about our chances of success in review.  But the point today is

23   how the debtors have used the antitrust card to stifle any

24   meaningful process.

25           When they told us in August that they were concerned

Page 112

1  about antitrust review we told them that we would work

2  together, we would engage with the government and get antitrust

3  clearance before the auction was even scheduled to take place.

4  They turned us down.  They had the opportunity to take this

5  issue off the table all together, and they turned us down.

6        Then they told us that they were concerned about the

7  risk that an antitrust review would drag on the company and

8  could be harmful for the transaction if it didn't close for

9  many months.  We told them that we would get antitrust

10  clearance by November 23, and if we weren't able to do that

11  they could unilaterally cancel, and they could close with the

12  stalking horse on the same schedule that they had originally

13  proposed in their procedures.  Putting the antitrust review

14  into such a short window is going to make it harder for us to

15  get that clearance.  But we have enough confidence in our

16  competitive story that we are willing to do this in an effort

17  to remove any antitrust risk from this equation.

18        Under our proposal the debtor is guaranteed to achieve

19  a closing November 26.  If we fail to get antitrust clearance

20  by November 23 they close under the stalking horse bid, and if

21  we succeed in getting antitrust clearance they close under our

22  bid and obtain an additional 57 million dollars in value for

23  this estate.

24        Mr. Thompson, at the onset of this proceeding,

25  referred to an adage, the proverb about a bird in the hand

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 113 of 152

Page 113

1    being better than two in the bush.  What we offered them was

2    both.  The bird in hand, the stalking horse bid, and the

3    opportunity to go after fifty-seven million dollars worth of

4    birds in the bush.

5              But, again, they told us that was not good enough to

6    even qualify us as a bidder.  That position is striking,

7    because of their own bid procedures that make clear that

8    antitrust clearance is not a condition to closing.  It's a

9    permitted exception to closing.

10             By this point we had gone beyond the requirements in

11   their own bid procedures, but, still, it has not been enough to

12   qualify to participate at an auction.  Their new excuse is that

13   our plan to assure them of a closing by November 26 isn't good

14   enough because they're afraid the company would lose value if a

15   proposed acquisition by Energizer were announced.

16             We then saw the analysis, the sensitivity analysis

17   that was introduced yesterday.  Your Honor can draw her own

18   conclusions as to the reasonable likely loss that is suffered

19   based upon the assumptions that that analysis is founded upon

20   and the conjectures that flow with it.

21             Nonetheless, we have said that we would take this risk

22   off the table by offering a nonrefundable deposit of five

23   million dollars, ten percent of ASR's EBITDA.  We told them

24   that we would keep this deposit of record, and if we did not

25   obtain any trust clearance it was theirs.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 114 of 152

Page 114

 1          In connection with this proposal we told them we

 2     wanted to conduct antitrust due diligence before putting five

 3     million dollars on the table.  We asked them to see basic

 4     documents that would be provided to the government early in the

 5     process and to speak to some company representatives.  We told

 6     them that our outside counsel would review these documents on

 7     information on an outside counsel basis.  They refuse.  To this

 8     day they have not provided any access to this diligence, this

 9     antitrust diligence that we requested.

10          At the same time as it has refused to provide

11     antitrust due diligence ASR has requested that we accept the

12     unusual hell-or-high-water clause or put a thirty-five million

13     dollar deposit on the table, representing seventy percent of

14     their EBITDA.  They demanded that we agree to these

15     extraordinary provisions without affording us any opportunity

16     to conduct any due diligence and just to be deemed a qualified

17     bidder.  In light of this approach it was really striking to

18     hear the testimony of ASR's purported antitrust expert.  If you

19     credit Mr. Antalics' testimony, his review on Friday night of

20     approximately ten ASR documents was enough to convince him that

21     this deal was, quote, "very unlikely to get antitrust

22     approval".  Apparently, in Mr. Antalics' view there is

23     something so damning in those documents that he can forego all

24     of the things antitrust reviewers normally examine in a merger.

25     The buyer's documents and reviews with business people and

Page 115

1    understanding of the assets of the buyer or seller, interviews

2    with customers and so forth, and stop his analysis at the ten

3    or so documents that he reviewed on a Friday night.

4           We would submit that Mr. Antalics' testimony is not at

5    all credible, and it's highly unlikely that these documents

6    contain the kryptonite that he suggests is contained within

7    them.

8           But if you credit that testimony that there is

9    something extremely relevant to the antitrust analysis in the

10   documents, in these ten documents, we ought to know about it,

11   because we would walk away.  If we can't get success within the

12   time that we need, if there's something so bad, just show it to

13   outside counsel.  Spare us the pain.

14          Your Honor, we have spent -- I'm not going to quote a

15   number -- an amount in excess of one million dollars in efforts

16   to be here today, perform due diligence, inspect plants, be in

17   court, all to learn that at the end of the day you shouldn't

18   really have spent the money to begin with because, you know, at

19   the outset there was this hurdle, and, boy, if -- I could tell

20   you.  If we had known these were the rules we could have saved

21   a lot of time and effort and a lot of time of people, valuable

22   people within our company, and would have done other things

23   more productive.  But we didn't know that.

24          The bottom line is, Your Honor, there is not a

25   credible sale process that is designed to achieve the highest

Page 116

1    and best value for this estate.  Mr. Stark made a proposal to

2    the Court that was acceptable with us with regard to where we

3    go from here.  I think the preliminary, my preliminary

4    statement is based upon this record, the debtors have failed to

5    establish their burden of proof that this process was fair.

6    Under this record this sale motion cannot be sustained.  The

7    bid procedures are flawed, and they've never been applied in a

8    consistent or fair manner.  We have asked in what is marked as

9    Energizer's Exhibit 2, the transmittal e-mail, for a limited

10   due diligence in three finite areas, a Mexican site visit, a

11   Brazilian distribution agreement, antitrust documents for

12   counsel review, that we said that if we can have those

13   documents, that due diligence, within seventy-two hours, three

14   business days, of receipt of those items, we would be in a

15   position to say whether we'll sign that APA, but I have

16   submitted to Your Honor and put five million dollars at risk or

17   not.

18          I also would say this.  That even with the APA in

19   front of Your Honor we, to this day, have never been invited to

20   participate in an auction process.  I apologize if I've gone

21   beyond my ten minutes, but I had more than ten minutes worth of

22   stuff to say.  So thank you, Your Honor.

23          THE COURT:  Thank you.  Brief reply?

24          MR. THOMPSON:  I'd like to use ten minutes to reply.

25   Maybe Mr. Palans' ten minutes, if I may?

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 117 of 152

Page 117

1         THE COURT:  Okay.

2         MR. THOMPSON:  And it sort of goes to the point in an

3    indirect way.  Mr. Palans told you ten minutes.  He didn't

4    stick to his word.  What he's trying to sell you, very loudly,

5    very strongly, very vividly, is what he's been trying to sell

6    business people out of court.  Sending letters, sending

7    documents.  Unfortunately for his client the business people

8    who have value at risk, unsecured creditors' committee, which

9    represents over a hundred million dollars of unsecured debts,

10   secured creditors' first lien which have over 245 million

11   dollars first-lien debt, they're not buying what he's selling.

12   Debtors as fiduciaries are not buying what he's selling.

13        So now he's trying to sell to Your Honor.  Substitute

14   Your Honor's business judgment for the business people that

15   have value at risk.  Of course Mr. Stark's proposal is

16   satisfactory to him, because otherwise they can't buy this

17   company that they want for the price they want or the terms

18   they want with the walkaway right that they want, with the

19   deposit that they unilaterally have.

20        He referred to the bid procedures and my client's

21   demands for a hell-or-high-water clause, and my client's

22   demand's backed up by, and with, as I said in my cover letter

23   to them, in conjunction with the first-lien agent and the

24   creditors' committee, a thirty-five million dollar deposit.  I

25   respectfully submit he was trying to confuse Your Honor.  Those

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 118 of 152

Page 118

1    are substantive terms of negotiation.  He seems to be arguing

2    that the bid procedures, if you don't say in there and I'm

3    going to negotiate substantive terms with you, you can't,

4    because this big company, advised by people they spent a

5    million dollars on, is somehow surprised to learn that we're

6    going to negotiate substantive terms and we're going to take a

7    hard position on some of these major issues.  The bid

8    procedures have nothing to do with it.

9         I understand hyperbole, but let's just go through some

10   of this stuff.  There was no proper procedure, no notice of an

11   opportunity to be heard on the bidding procedures.  They were

12   filed on the first day of this case.  There were fifty days to

13   get to the objection deadline, and neither of these objectors

14   filed any objection.  They laid in the weeds to wait to get

15   here and he walks up at closing argument and starts saying I've

16   got an objection.  The statement was made why there wasn't an

17   opportunity to call Mr. Thompson and sit down and say let's

18   talk about this.  Sorry.  In my later to Mr. Palans on August

19   30th, which is at tab 32 in the binder, in response to his

20   threats of litigation on August 27th, because his client

21   misunderstood what was in the data room, I went through in

22   excruciating detail, as I have done here today, line by line,

23   how the bidding procedures work as applied to his client.  At

24   the top of page 5 -- do you recall Mr. Palans' statement we

25   thought that financial wherewithal was sufficient?  Well, I

Page 119

1    don't know if he -- does he read his correspondence?  I have to

2    wonder.  Because on August 30th I laid out the provisions of

3    the bidding procedures that went beyond -- I said this goes

4    beyond financial wherewithal, and I quoted the provisions about

5    being reasonably likely to close and how important that was in

6    the bidding procedures.  I explained this to him in detail.

7    This is just hyperbole.

8            A reference was made to my September 18th letter

9    telling him he was not a qualified bidder.  Of course what he

10   failed to tell you was that on page 3 of that letter, which

11   Your Honor can find at tab 11 of our binder, age page 3 I said

12   "Accordingly, at this point".  It says "as this point" because

13   I was typing it myself.  "At this point the company is not

14   prepared to qualify Energizer as a bidder".  But I went on to

15   say "However, as noted on the first page of this letter, we

16   will rely on the statement, the September 17th letter, that

17   Energizer will be, quote, 'addressing and/or mitigating those

18   concerns in our final binding submission to ASR on September

19   20'".  I'm quoting him when he says final binding submission.

20   "The company will await receipt of that revised bid before

21   reaching any definitive conclusion.  In formulating what we

22   expect will be its best and final offer Energizer should be

23   aware that the company will not accept any material risk

24   concerning the likelihood of closing or administrative

25   insolvency."  And, then, on September 20th they served up

Page 120

1    something with a walkaway risk and, on its face, administrative

2    solvency.

3          Now, it is true on September 27th, the day before this

4    hearing started, Mr. Palans' colleagues sent out, while we were

5    involved in preparation for this trial that they've all put us

6    to, he sent out a revised asset purchase agreement.  That's

7    true.  And he made some changes in there.  But what's also true

8    in the record is that that morning we had held an all hands

9    conference call in which none of those changes were actually

10   disclosed to us.  And everybody walked away from that.

11         Now, perhaps he changed his position, changed their

12   minds later on.  But there comes a time in every process where

13   you have to say it's done.  All right?  We've got to prepare

14   for a trial.  We can't sit there and just say well, we got a

15   new bid.  So what should we do there?  And what he refuses to

16   discuss, he can say we made that purchase price deposit

17   refundable at the last minute.  Okay.  But they never took out

18   the walkaway right.  They still always had the walkaway right,

19   and the five million dollar deposit was, in the judgment of the

20   first-lien agent and the creditors' committee, too little.

21         Mr. Stark referred to the material-adverse-change

22   clause and the changes that Energizer made to that.  You know,

23   let me just tell Your Honor, as the debtors' counsel we were

24   okay with that change.  We would have said that was an okay

25   response.  But the creditors' committee said no.  We got it out

Page 121

1    of -- we got the MAC clause out of the first-lien stalking

2    horse bid in toto.  Zip.  Nothing.  No risk.  They want no risk

3    from Energizer.  So they're the ones who's -- we're going back

4    and saying that's not good enough.  Sorry.  That's not good

5    enough.  All right?  This is not the debtors stiff-arming a

6    constituency recovery here.  This is the debtors representing

7    the people that have value at risk trying to protect the

8    estate.

9          Again, let's look at the things Mr. Palans didn't

10   disclose.  He never disclosed, never discussed with Your Honor

11   the walkaway right on November 23rd.  Five million dollars.

12   Take it or leave it.  Actually, you know what I should say?

13   Their stance is not take it or leave it.  Their stance is take

14   it or litigate it.  That's how they negotiated with us.  Their

15   claim of good faith, I reject that claim of good faith.  This

16   is the stuff you sit down and negotiate at a bargain table.  If

17   you don't like it you get up and you walk away.

18         He never addressed, neither he nor Mr. Stark addressed

19   the clause in the bidding procedures that has the commitment to

20   close.  They never gave us a commitment to close after the

21   expiration of the HSR record.  They'll only commit to close up

22   to November 23rd, whether that period is still running or not.

23         Thirty-five million dollar deposit.  Recall the

24   evidence.  It's unconverted from Mr. Bolt's testimony yesterday

25   and from Mr. Austin's examination.  The company has a twenty

1  million dollar pension payment next year.  The company doesn't

2  have twenty million dollars in the bank.  The company doesn't

3  have twenty million dollars lined up as a credit facility for

4  next year.  The company needs money.  It needs a lot of cash

5  next year to pay its pension debts.  Thirty-five million

6  dollars is an appropriate number for this company to ask for.

7           Mr. Palans talks about how they spent one million

8  dollars.  Right.  That was my point in opening argument.  Let's

9  think about the poor big bidder over here.  That's, I'm sorry,

10 that is just a completely irrelevant point, how much money they

11 spent.  There was no auction.  There was no auction because

12 there was no qualified bid.  Even if Energizer had submitted a

13 fully guaranteed bid there wouldn't have been an auction,

14 because the first liens want to take it and be paid out in

15 cash.  They're not going to overbid and pay -- come out of

16 pocket to buy the company and bid against a strategic

17 purchaser.  Unless we had some other buyer show up there was

18 not going to be an auction anyway.  So there are plenty of good

19 reasons why we did not have an auction.

20          On an honest ten minutes, Your Honor, can you tell me

21 how much time I have left?  How much time will you indulge me,

22 I guess, is my question.

23          THE COURT:  Well --

24          MR. THOMPSON:  You can say zero.  It's up to Your

25 Honor.  I'll take Your Honor's --

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 123 of 152

Page 123

 1          THE COURT:  Well, I won't stop you from finishing your

 2   argument.

 3          MR. THOMPSON:  Okay.

 4          THE COURT:  Good ahead.

 5          MR. THOMPSON:  Thank you.  Mr. Stark claimed that ASR

 6   viewed their efforts as a hostile bid.  Recall the testimony of

 7   Mr. Torgove that their representative had said we're doing

 8   something that you don't like, and we're not going to tell you

 9   what it is.  I mean, we're not that dumb.  Yes, that's a

10   hostile bid.  But we had a basis for it.  It wasn't, like, just

11   a bad motive on our part.

12          Mr. Stark questioned why the independent -- or,

13   actually, I think he alleged the independent director, quote,

14   "failed to show up".  Completely false.  Independent director

15   was here the first day of trial.  Unfortunately, contrary to

16   our expectations, the examination and cross of Mr. Torgove went

17   on for so long he had to leave.  This should represent to the

18   Court that he -- he was deposed in New York on Saturday.  He

19   flew from Chicago to New York on Saturday.  Was deposed.  Flew

20   to Texas, his home, on Sunday.  Flew back to New York -- I

21   think it was a Sunday.  (Pause).  Sorry.  He flew to Texas

22   Saturday night, to his home.  Sunday night he flew from Texas

23   to Philadelphia, came here, and was available all day, but we

24   just couldn't get him on.

25          UNIDENTIFIED SPEAKER:  I don't see that in the record.

Page 124

1          UNIDENTIFIED SPEAKER:  On Monday.

2          THE COURT:  Yes, it's not in the record, and I'm not

3     even sure it's relevant.

4          MR. THOMPSON:  Thank you, Your Honor.  Mr. Stark asked

5     where's the expert testimony to say hell or high water to his

6     market.  Where's the law that says the debtors are limited to

7     asking for what's, quote, "market"?  Mr. Stark referred to in

8     case IBP v. Tyson, you can always litigate a MAC clause.  Okay,

9     let's look at that realistically.  We could litigate, but IBP

10    and Tyson were two solvent companies.  They were fighting about

11    closing a merger at a premium.

12          In this case, if we have a failed deal, if we're

13    litigating a MAC clause on a backup bid, remember, all of our

14    assets are pledged.  This case was administratively insolvent

15    day one without the DIP from the first-lien lenders and without

16    the stalking horse bid, which provided a cash fund to ensure

17    administrative solvency if it closed.

18          If we lose the backup bid this case is

19    administratively insolvent.  The use, the idea that we're going

20    to litigate in that context, I'm sorry, is highly impractical.

21          Mr. Stark attributed to me the statements that I was

22    saying it was all Energizer's fault.  All right?  It was not

23    fault.  It's a matter of decision.  They made decisions.

24    They're big boys.  We were unable to meet in our minds.  It has

25    nothing to do with fault.

Page 125

1          They also attributed to me the assertion that I said

2     his clients had a burden of proof.  I did not.  I said we had

3     the burden of proof.  I simply pointed to their failure to go

4     forward with any proof on most issues, which I think the Court

5     can infer from they don't have any proof on those issues.

6          The question was also suggested that Your Honor should

7     apparently draw an inference that the parties are, quote,

8     "still negotiating".  But the tone of Mr. Palans and my

9     comments will tell you that that's highly unlikely.  But

10    besides what you heard today there's nothing in the record to

11    show that the representatives of the first-lien agent and the

12    creditors' committee have come in and have anything -- anybody

13    has any desire to negotiate any further with Energizer.

14    They've made clear they're not changing that five million

15    dollar number.  We've all made clear that's not good enough.

16    And it's over.  I think the record amply supports that.  And I

17    actually would invite the -- because we've always consulted

18    with the first-lien agent and the committee, the ones who have

19    values at risk.  I would just ask counsel for those parties to

20    come up and agree with me that there's not going to be anymore

21    negotiations voluntarily on our part with Energizer in this

22    context.

23          MR. JUNG:  For the record, Your Honor, Wojciech Jung

24    on behalf of the committee.  Your Honor, the committee,

25    naturally, does not take lightly any allegations by any bidder

Page 126

1    in a bankruptcy situation that it was somehow, for that offer,

2    closed from presenting its bid in a good faith manner.

3            Your Honor, the committee has reviewed the September

4    20th submissions.  The committee has confirmed with the

5    debtors.  The committee has reviewed that September 27th

6    submission that came just hours before the scheduled sale

7    hearing.  Your Honor, the committee was present at the

8    conference call held on Monday morning.  There were a number of

9    contingencies expressly stated by Energizer during that call

10   that would prevent a quick or immediate closing.

11           MR. STARK:  Objection, Your Honor.  He's not allowed

12   to go into matters that are not automatically part of the

13   record.

14           THE COURT:  Yes, let's stick to the record.

15           MR. JUNG:  Your Honor, it was made in the record that

16   the conference was held and --

17           UNIDENTIFIED SPEAKER:  Absolutely.

18           MR. STARK:  But he's going into the conference call.

19           MR. THOMPSON:  Mr. Torgove testified to the conference

20   call.

21           THE COURT:  He didn't go into the details of what --

22   you don't agree with --

23           MR. STARK:  Understood.

24           THE COURT:  -- what was said.

25           MR. JUNG:  Your Honor, the point of my statement is

Page 127

1    solely that the debtors made an attempt and did, in fact,

2    confer with the committee, and Energizer, although requested by

3    the committee, did not come with sufficient assurance from the

4    committee's point of view that their deal is, in fact, real and

5    that it, in fact, could close in a timely fashion.  Thank you.

6         MR. AUSTIN:  Jesse Austin for the record, Your Honor.

7    I'll answer Mr. Thompson's question first.  He is correct that

8    there is no -- there are no more negotiations with Energizer.

9    We've been very clear with Energizer as to what it had to do to

10   deliver an acceptable asset purchase agreement to get into

11   game, as Mr. Palans has suggested.  In fact, they can own the

12   game.  They can own the fill, the uniform, the football,

13   everything.  But with respect to that APA that Mr. Palans gave

14   reference to you and gave you a summary, is we reviewed that

15   APA.  We reviewed it and rejected it.  Why?  The record is

16   clear.  The language on the assumed liabilities and the other

17   provisions in that agreement were still unacceptable.  There

18   were still diligence outs.  And it only had a five million

19   dollar deposit.

20        From our perspective, frankly, I'd characterize that

21   APA as being a number of days late and thirty million dollars

22   short.  And even today he's standing here professing how much

23   they're ready to do, but they're still not willing to put the

24   money where their mouth is and to cover the perceived antitrust

25   risk of an extended antitrust process.  And they're asking the

Page 128

1  first-lien lenders and the committee and the pension holders

2  and the employees to accept all that risk.  We will not agree

3  to do that.

4         The sale procedures were filed on day one.  The public

5  record has been there.  The second liens knew about it.

6  Apparently, Mr. Palans knew about it, or at least his clients,

7  because they actually reached out, signed an NDA and haven't

8  been engaged in the process.  Unfortunately, and it's not

9  unusual, especially in today's market, that no one submits a

10 bid.  If you get two bids, in most instances you're, like, man

11 I hit the mother load in these auctions.

12        We have been made clear, the rules have been made

13 clear from day one, and they've been applied per their terms.

14 It was very clear in those bid procedures.  No diligence out

15 and a deposit may be required.  There's nothing that Mr.

16 Palans, at least, has presented to alter the ultimate

17 conclusion that the sale motion should be approved and his

18 objections, as well as the objections of the second

19 lienholders, should be overruled.

20        Let's go to the second lienholders.  I want to address

21 one point at the outset, because there was a request by Mr.

22 Stark for you to review the signature lines of the

23 intercreditor agreement.  I anticipate that he thought to draw

24 some inference from the fact that UBS was, at least one time,

25 the first-lien and the second-lien agent.  Not an unusual

Page 129

1   development in the commercial markets at the time that this

2   transaction was entered into, which was July 31, 2006.  I can

3   assure this Court that UBS is not now the second lien.  Indeed,

4   that is the second-lien agent is represented -- is Cantor

5   Fitzgerald.

6        The first-lien lenders are not exploiting the terms of

7   the intercreditor agreement.  Indeed, the second-lien lenders

8   here have been given plenty of time to come to another

9   conclusion than the first-lien credit itself.  Under the terms

10  of the intercreditor agreement itself the second-lien lenders

11  could credit bid.  They've been given the opportunity to raise

12  financing.  They could actually be, which we assume they have

13  been, trying to work with and find the qualified bidder.  None

14  of these things have happened.

15       Mr. Stark wants to argue that there's an implied

16  covenant of good faith and fair dealing.  Well, whether there

17  is or is not, when you have clear contractual terms there is no

18  evidence that there's been any bad faith or unfair dealing by

19  the first-lien agent and the first-lien lenders with the

20  second-lien lenders and agent and the application of this

21  intercreditor agreement.  The language of the intercreditor

22  agreement before this Court is the same as that language that

23  was enforced by in limited objections and overruled objection

24  by second-lien lenders and subordinated creditors in the

25  Erickson Retirement Communities case and the Ion Communications

Page 130

1    case.  Mr. Star's citation to the recent Trump case is

2    absolutely in opposite.  That was a cramdown case.  That was

3    where a second-lien group of lenders was presenting a plan of

4    reorganization to try and cram down the first-lien lenders.

5    The Court there specifically noted there is a limited exception

6    under the code of when an intercreditor agreement will be

7    applied, and that happens to be under Section 1129(b).  It

8    specifically says at the very beginning except as relates to

9    510(a) if you satisfy all these other terms we can do a

10   cramdown.  But in all other instances intercreditor agreements

11   under Section 510(a) are enforced, pursuant to their terms, in

12   bankruptcy cases.

13           The problem we have here, at least for Mr. Stark and

14   his clients, is that they bought into a deal, apparently at

15   par, so apparently at the very beginning, where they knew what

16   were the contractual limitations at the outset.  They knew that

17   upon a default they would have no rights to contest a sale of

18   the debtors' assets to which the first-lien lenders consented.

19           The action that has been taken here by the second-lien

20   lenders is in clear violation of the terms of the intercreditor

21   agreement.  Mr. Stark, basically, wants you to ignore the plain

22   language of that contract.  We suggest this is something you

23   cannot do.  Intercreditor agreements are enforceable under

24   Section 510.  The Erickson cases and ION Communications says

25   you should overrule their position.  And we ask that you

Page 131

1    enforce the intercreditor agreement in accordance with these

2    terms.

3              With respect to their substance arguments, there were

4    a lot of allegations or assertions thrown around about the

5    aroma of things relative to this case.

6              THE COURT:  You don't have to address that.  I'm

7    basing my decision on the facts not on any snub test.

8              MR. AUSTIN:  Well, my point was, Your Honor, all we've

9    had here, all their arguments were was based on speculation,

10   innuendo and inferences.  There was no substance in either of

11   their arguments, which counters a solid case and the evidence

12   presented by the debtors.  We ask that you overrule their

13   positions and enter an order approving the sale motion as has

14   been presented by these debtors.  Thank you.

15             THE COURT:  All right.  I'm going to take -- no

16   replies.  Let me have ten minutes and I'll come out and issue

17   my ruling.

18        (Recess from 12:32 p.m. until 12:51 p.m.)

19             THE CLERK:  All rise.  Please be seated.

20             THE COURT:  All right, I want to thank the parties for

21   their cogent arguments this morning.  I think the night of rest

22   did all of us some good.

23             Let me say this:  With respect to the motion that is

24   before me, I understand that it asked me to make two decisions,

25   and the first decision is were the bid procedures reasonable as

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 132 of 152

Page 132

1    the debtor applied them.  And I say the "as the debtor applied

2    them" because apparently it is not simply what is written on

3    the procedures that I'm asked to decide.  This is not the usual

4    procedure, because the debtor did not ask the Court to approve

5    the procedures in advance, nor give notice to parties with an

6    opportunity to object to the procedures before they were

7    applied.  The result of that is that we are here at what should

8    be the end of the process, to decide whether the process is

9    appropriate.

10         As I stated before -- or ruled before, I find that

11    disgruntled bidders always have the right to be heard, solely

12    on the issue of process.  They do have standing to object to a

13    process for a sale in a bankruptcy case that seeks approval of

14    this Court.  Like -- similarly, I do find that the second-lien

15    lenders, under the terms of their intercreditor agreement, are

16    not barred from objecting to process issues.  And I'm not going

17    to go, then, into the argument that I should ignore the terms

18    of waivers contained in there, executed by sophisticated

19    parties, or consider whether or not the debtor has standing to

20    raise that agreement, et cetera.  I don't think it's necessary.

21    I think Second-Lien Lenders have not waived their right to

22    object to the process.

23         Thirdly, I don't think, as the debtors suggest, that

24    my consideration of bid procedures is based on the business

25    judgment rule.  I need not accept the debtors' business

Page 133

1    judgment with respect to process.  The Bankruptcy Code and

2    Rules and the process under the Bankruptcy Code are all matters

3    for the debtor -- for the Court's determination as to what is

4    fair and reasonable.  In fact, I think that's my only role in

5    this case:  to determine what is fair for all the parties.

6         So let me review these provisions for reasonableness

7    and whether they are designed to elicit the highest and best

8    offer for the debtors' assets as advertised.  First, it's a

9    two-part process.  In order even to participate or to qualify

10   as a qualified bidder, a party is required to give a letter of

11   indication of the estimated price they're willing to pay, and

12   provide written evidence of financial wherewithal to make that

13   payment.  Significantly, this is before any due diligence can

14   be done.  That's unusual.  But, further, it requires that the

15   debtors determine that they are reasonably likely to submit a

16   bona fide offer and be able to consummate the bid.  The debtor

17   has used that latter phrase to refuse to qualify Energizer as a

18   bidder because, in the debtors' opinion, Energizer will never

19   be able to consummate a transaction.  Based on the testimony

20   I've heard, I find that that determination by the debtor was

21   not reasonable, was not even made in its business -- in

22   reasonable business judgment.

23        There are any number of ways that Energizer, even with

24   HSR review, extended review, could consummate this deal.  There

25   are many ways by which that risk could be eliminated or

Page 134

1    reduced.  And I think that a simple refusal to qualify

2    Energizer as a qualified bidder based on that is not

3    reasonable, particularly since the remaining provisions of the

4    bid procedures, including the determination of whether or not a

5    bid itself is qualified, the second step, contemplated that

6    there would be antitrust implications by many bids submitted.

7    I think the debtors' use of that clause could have, and

8    possibly did -- I don't know what happened to other bidders --

9    but could have precluded any strategic buyer from being

10   considered a qualified bidder, and I think that's just not

11   appropriate.  The discretion resting in the debtor is simply

12   too much.

13           I will not make any finding, because I find no

14   evidence that any of the parties here were acting in anything

15   other than good faith.  I will leave that for the conclusion,

16   because any final sale is going to be dependent on that.  But

17   the evidence presented so far -- I will not leap to any

18   conclusions or accept any of the implications that parties were

19   acting other than as they should.

20           With respect to the timing of the procedures, let me

21   say that also I found it unusual, again, that an indication of

22   interest had to be submitted with a price, without any due

23   diligence.  I found it even more remarkable that, based on the

24   bid procedures, the debtor was not required to give any due

25   diligence until a bidder was qualified, and that could have

Page 135

1    been as late as September 15th.  With final bids due September

2    20th, that could have provided a bidder with only five days of

3    due diligence.  Again, I don't know what happened to other

4    bidders, but I do accept that, with respect to Energizer at

5    least, the debtor did not preclude Energizer from conducting

6    due diligence despite the debtor not having, quote, "qualified"

7    it as a bidder, in the debtors' words.

8           A point, I think, that -- from the perspective of

9    Energizer or any other bidder in that context:  I think that

10   the debtors' permitting due diligence under the terms of the

11   bid procedures could lead the bidder to think it had been

12   qualified as a bidder.  And I note that the debtor continued to

13   negotiate with Energizer, notwithstanding its taking the

14   position now that Energizer failed the first test of even

15   becoming a qualified bidder.

16          With respect to other issues, though, I think my most

17   problematic -- biggest problem with the process was the

18   debtors' insistence on either a nonrefundable deposit or a

19   hell-and-high-water -- hell-or-high-water provision.  The

20   debtor says that market is not the test, but, quite frankly,

21   for the Court to determine what is reasonable, I do look to the

22   market.  It is an indication of what is reasonable under the

23   circumstances.

24          I do accept the testimony.  I think it's not

25   controverted that there are many ways to deal with antitrust

Page 136

1    risk, that hell-or-high-water is not the only way.  So the

2    debtor's insistence on that -- what the debtor says it insisted

3    on from the beginning I don't think was reasonable, certainly

4    not without allowing Energizer to do the due diligence that is

5    necessary to determine what that risk might be.  And I think

6    the suggestion of attorneys'-eyes-only due diligence on that

7    point is reasonable, although it was rejected by the debtors.

8           With respect to the nonrefundable deposit in the

9    amount of thirty-five million dollars, the bid procedures did

10   allow the debtor, at its option, at its discretion, to demand a

11   deposit from any bidder.  I think that provision alone is not

12   reasonable, because it could permit the debtors to discriminate

13   among bidders, requiring more of a deposit from one bidder than

14   from another.  I just don't think that's fair.  It is not

15   unusual to require deposits.  They are typically a percentage

16   of the cash price.  But they are applied across the board.  Ten

17   percent deposit is normal.  So the amount is not critical.

18   However, deposits are normally refundable.  And in fact the

19   debtor's own provisions do provide that any deposit by a bidder

20   would be returned to that bidder once the successful bid

21   closes.  It does not appear that there's any discretion of the

22   debtor to insist on a nonrefundable deposit.

23          But as I alluded to earlier, the way to address the

24   risk of not closing by Energizer because of antitrust risk

25   could in fact be met by a nonrefundable deposit.  I will leave

Page 137

1    that to the parties to discuss further.  But I think that any

2    nonrefundable feature has to be tied to damage to the estate

3    that may accrue, and has to have a feature that the Court will

4    decide what can be refunded if there's any dispute whatsoever

5    on that.

6          Let's see, other provisions that are problematic.

7          I didn't understand this provision, and maybe now I do

8    based on a comment made by one of counsel.  There was a

9    provision that if more than one qualified bid is accepted, the

10   debtor may, but apparently need not, hold an auction with a

11   statement that perhaps the firsts will not bid.  I don't know

12   whether that's true or not, but I think, if there is more than

13   one bid, you have to hold an auction.  I don't think the debtor

14   can have the discretion to go forward without holding an

15   auction, even if it is that another party will not up their

16   bid.

17         The provisions also provide that all other bidders are

18   required to serve as backup bidders until the successful bid

19   closes, with the exception of the firsts whose bid apparently

20   expires November 26th.  Again, that discriminates among

21   bidders.  And I think it's -- it gives me a problem.  I don't

22   think it's practically of any consequence.  But any

23   discrimination in procedures between one or another bidder is

24   problematic to the Court.

25         With respect to the actual bid -- well, as a result of

Page 138

1    my ruling, I think that the process has not been fair.  I think

2    that we have to give Energizer an opportunity to submit a bid

3    under the second process because I find they are a qualified

4    bidder under the first process.  And just to lay out some

5    ground rules for that and for the debtor's consideration of

6    that, I agree with the debtors that the bid procedures are

7    appropriate in calling for an irrevocable bid, with this

8    exception:  The debtor has concern about the closing by

9    Energizer within a time consistent with keeping the firsts as a

10   backup bid.  The testimony was that Energizer therefore gave

11   the debtor the opportunity to terminate its bid, if it is a

12   successful bidder, if there is not HSR clearance by November

13   23rd.  I think that is reasonable.

14         So I don't think that makes any bid by Energizer

15   irrevocable -- excuse me, revocable, but it does give the

16   debtor some leeway on accepting Energizer as a successful

17   bidder, notwithstanding that the debtor may choose to go with

18   the backup bidder.

19         With respect to the other terms, I heard -- and I'm

20   not going to go line by line in each of the asset purchase

21   agreements, because I think the onus will be on Energizer to

22   conform its final bid to the asset purchase agreement as

23   written by the firsts with respect to assumed liabilities,

24   contracts being assumed, pension liabilities, et cetera,

25   material adverse clause, et cetera.

12-12020-mg    Doc 300-3    Filed 06/11/12    Entered 06/11/12 16:05:55    Exhibit B
AMERICAN SAFETY RAZOR COMPANY, LLC, et al.
Pg 139 of 152

Page 139

1          Oh, one other point on the deposit that gave me some

2     concern, and that was apparently, although it's not clear,

3     certainly not from the bid procedures, was that apparently the

4     nonrefundable deposit demanded by the debtors was going to be

5     given to the first lenders.  That is problematic because any

6     deposit is meant to protect the debtors' estates.

7          With respect to -- and to help the parties in going

8     forward, with respect to the entire issue that the debtor has

9     of the -- has raised regarding the probability of closing, and

10    that being a final term of any final bid or consideration by

11    the debtor of any final bid which may be submitted by

12    Energizer, I think that it is important to note that the

13    debtor's concern has to be solely the impact on the debtor's

14    estate.  I find there is no harm to the debtor's estate if the

15    debtor were to accept an Energizer bid that was subject to HSR

16    clearance, so long as the debtor has the right to terminate it

17    by November 23rd and sign up with a backup bidder.  The backup

18    bidder, the firsts, are obligated to go forward with their

19    deal.  And the testimony that was presented regarding impact on

20    the debtor's business doesn't answer the question, because the

21    impact has to be the impact on the estate, and I don't find

22    that any creditor's going to be harmed by going ahead with the

23    deal with -- because of the existence of the backup bidder.

24          Further, the evidence that was presented did not

25    present any evidence of a harm resulting from the delay in the

Page 140

1   next sixty days.  For one thing, the first-lien lenders

2   themselves have thirty days to the end of October to close.  So

3   any delay occasioned by accepting an Energizer bid really is

4   only thirty days.  And there's no evidence that there will be

5   any harm to the debtor's business or assets that will be felt

6   in that thirty days.

7            Again, I think I have to consider the harm to the

8   estate, not the harm to any other party.  And while a delay may

9   result in a harm to the business, an ephemeral unarticulated

10  harm to the business that may result in lower sales in the

11  future after the first buys, is obligated to, and does buy the

12  debtor I don't think can be considered by me or by the debtors.

13           I think, quite frankly, there's no harm.  The

14  debtor -- this is the question of the debtor already having the

15  burden in hand but still being permitted, as stated from day

16  one in this case, that the debtor could consider and go out and

17  try to get two in the bush.  I think the debtor's actions have

18  not gone forward in doing that, and I think the debtor has to

19  step back and do that.

20           Again, I won't make any rulings on anybody's

21  motivations, other than to caution both sides, including the

22  bidder, that there are sanctions that are available to me and,

23  quite frankly, there are criminal sanctions for anybody who

24  proceeds with a sale process in bankruptcy court for ulterior

25  and improper motives.  There's no evidence of that to date, and

Page 141

1    I will encourage the parties not to give me any reason to refer

2    this to anybody for investigation.

3         I think -- as a result of my ruling, I think that we

4    do need at least a week, a business week, by which Energizer

5    can complete its due diligence and submit a final bid.  Under

6    the truncated terms of the bid procedures, they're entitled to

7    at least that.  So the debtor will be required to provide the

8    due diligence requested.  Again, with respect to HSR, it'll be

9    for attorneys' eyes only.  And I suggest that be done within

10   forty-eight hours and that a bid by Energizer be submitted

11   within seventy-two hours after that.

12        And then to the extent there is a bid that's qualified

13   under the terms, as I just articulated, then we'll hold an

14   auction.  I don't know that I need to hold the auction; I'll

15   leave it to the parties if they want me to.  But just timing --

16   I will be in New Orleans at the National Conference of

17   Bankruptcy Judges the week of October 12th.  So unless you want

18   the auction before me there, you may want to hold it yourself.

19        All right, I'm going to let the parties chat.  And if

20   the parties want to say anything further on the record, let Ms.

21   Capp know.  I don't have a hearing till 2, so I'll be

22   available.

23        Mr. Austin?

24        MR. AUSTIN:  I'd like to ask for either clarification

25   or guidance in this regard, Your Honor.  Obviously, one could

Page 142

1    surmise from the Court's ruling that the sale motion as

2    presented has been denied.

3            THE COURT:  No, it's being postponed.

4            MR. AUSTIN:  That's what I wanted the clarification

5    for.

6            THE COURT:  It's being postponed.  I'm only dealing

7    with step one, which is the bid procedures, which I think I

8    have to do before I can consider who the debtor thinks is the

9    winning bidder.

10           MR. AUSTIN:  That's the clarification I need, Your

11   Honor.  Thank you.

12           THE COURT:  Okay.

13           MR. RILEY:  Your Honor, Richard Riley from Duane

14   Morris, on behalf of the first-lien lenders.  Just a

15   housekeeping matter.  We filed our response under seal, and I

16   didn't see a seal order entered yet.  Can I hand one up?  I

17   don't know --

18           THE COURT:  Thought I might have, but you may hand it

19   up and I'll make sure it gets signed.

20       (Pause)

21           THE COURT:  All right.

22           MR. RILEY:  Thank you, Your Honor.

23           THE COURT:  If somebody wants to give me a form of

24   order that articulates the bid procedures that I've just

25   approved, you can.

Page 143

1          All right, let's recess and, if the parties want to

2     speak -- I'm sorry, the committee?

3          MR. JUNG:  Your Honor, if I may, also on the agenda

4     for Tuesday, which presumably could be addressed today, was the

5     committee's motion for approval of expenses of committee

6     members --

7          THE COURT:  Oh, yeah.

8          MR. JUNG:  -- incurred through shortly after its

9     appointment.  I do not believe an order has been entered, and

10    there has been no objections filed.

11         THE COURT:  I had one question:  Is this being

12    submitted in accordance with our usual procedure?  Because it

13    seems like it's early.  Did we have an interim compensation

14    procedure?

15         MR. JUNG:  Yes, Your Honor.  There was an order

16    entered, and I believe it is in compliance with that order.

17         THE COURT:  I thought we had these quarterly rather

18    than monthly.  If nobody objected to monthly, do I approve

19    them?

20         MR. JUNG:  Your Honor, I don't have that order in

21    front of me, but I believe it was in compliance, but I can

22    certainly check.

23         THE COURT:  Check that, and do a certification of

24    counsel, because it just occurred --

25         MR. JUNG:  Will do.

Page 144

1          THE COURT:  I wasn't sure it was timely or that I was

2    to do it this early.

3          MR. JUNG:  Okay.

4          THE COURT:  Thank you.

5          MR. JUNG:  Thank you, Your Honor.

6          MR. STARK:  Your Honor, it's Robert Stark.  We were

7    just -- I was just confirming with Mr. Thompson about how

8    procedurally we move next.  And if I may have a moment just to

9    confer with him.

10          MR. THOMPSON:  I think she's given us until 2.

11          THE COURT:  Yeah --

12          MR. STARK:  Oh, is that what we do?

13          THE COURT:  -- I've given you till 2 o'clock to talk.

14          MR. STARK:  And then we'll come back.

15          THE COURT:  Yeah.

16          MR. STARK:  Understood.

17          THE COURT:  Let's come back at ten of 2.

18          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

19        (Recess from 1:14 p.m. until 1:55 p.m.)

20          THE CLERK:  All rise.  You may be seated.

21          MR. THOMPSON:  Your Honor, during the conference Mr.

22    Stark and I agreed that Mr. Stark, as the prevailing party,

23    will draft the bidding procedures order that Your Honor has

24    read into the record.

25          THE COURT:  Okay.

Page 145

1          MR. THOMPSON:  And, obviously, we'll have a chance to

2     comment on that.  In the meantime, I think we will use our best

3     efforts to comply with the schedule Your Honor laid out with

4     respect to delivering documents to Gibson, Dunn & Crutcher's.

5     I've asked, and I believe Mr. Palans is agreeable, we would ask

6     that Your Honor, for the protection of our client, order, and

7     also to address any professional responsibility issues that he

8     may have, Your Honor order him not to disclose information to

9     anybody else outside of his law firm.

10          THE COURT:  I will do so.

11          MR. THOMPSON:  Or, maybe, I guess I should say order

12     his law firm including -- we'll work on the language, but

13     that's the concept.

14          THE COURT:  Okay.

15          MR. THOMPSON:  And I think the debtors are done from

16     their side, and other parties may have some questions or

17     clarification requests.

18          THE COURT:  Okay.

19          MR. AUSTIN:  Thank you, Your Honor.  Jesse Austin for

20     the first-lien lenders.

21          I do have some clarifications and questions I have for

22     the Court.  One thing I wanted to be clear.  I think the Court

23     at one point may raise the question.  Whatever deposit was to

24     be paid over here was never to be paid over to the first-lien

25     lenders.  It was always going to go to the debtors' estate.  So

Page 146

1    I wanted that, just so the record is clear on that.

2         THE COURT:  Okay.

3         MR. AUSTIN:  But by your ruling one can infer that no

4    deposit might well be required here, because I think the

5    comments you said stated that there may not be harm to the

6    estate as distinguished from what may go forward.  At some

7    point you suggested that maybe there might be a ten percent

8    deposit where it may be refundable.  What I'm looking for is,

9    frankly, some level of clarification, because I want to go

10   ahead and advise the Court that if Energizer comes back with no

11   deposit or a deposit of only five million dollars, if it's

12   going to be nonrefundable, I want it to be very clear that the

13   current draft of the first-lien credit stalking horse APA has a

14   MAC clause, and we're not in a position to remove that clause.

15   The only way that clause could be removed was either if we had

16   a real nonrefundable deposit, which is, I think you've heard

17   our argument, from our perspective is not five million dollars,

18   or if there was a significant refundable, but, at least, some

19   procedure before this Court that before those dollars went back

20   you may well be able to decide issues of damages.  I just want

21   to put all of that on the record, because I want it very clear.

22   We may still have a MAC clause in here that may, come November

23   26th, even though we may be the backup bidder --

24        THE COURT:  I think that's why I suggested there were

25   lots of ways to deal with the HSR risk.

Page 147

1          MR. AUSTIN:  Okay.  All right.  Lastly, I think, from

2     discussions with our client, if I follow the schedule, well,

3     forty-eight hours to deliver information to the Energizer teams

4     or representatives, that takes us through Saturday.  Seventy-

5     two hours for yet to review that material takes us through

6     Tuesday.  A week for it to submit whatever is its highest and

7     best bid, which I'm measuring a week from today, so that would

8     put us to next Thursday.  To the extent that there needs to be

9     an auction, or if there is an auction, I think, then, I don't

10    know what the Court's availability is on Friday of next week,

11    but we would certainly like for this Court either to -- even if

12    it's only telephonically - to at least be available to oversee

13    to the extent there's disputes, issues or questions that may

14    come up.

15          THE COURT:  Well, other parties on the timing?

16          MR. THOMPSON:  I think everybody concurs that from the

17    perspective of the value of the estate the sooner that we can

18    get finality on this process, within human constraints, the

19    better the situation will be, even if it's -- even if it is

20    worse, at least it limits the damages.  So we would echo that

21    we should try to get this done before the NCBJ conference and

22    the three day holiday weekend.

23          THE COURT:  Okay.

24          MR. THOMPSON:  So the 8th would be our preference as

25    well.

Page 148

1          THE COURT:  Okay.

2          MR. PALANS:  Your Honor, sooner is better than later,

3    but, as I stand before you, it's all dependent upon the

4    information we get and the timing of the information we get.

5    The forty-eight hours, if we're given access -- I don't know.

6    I'm standing at the podium trying to talk off the stream of my

7    mind as to what could happen, given the situation, on a

8    Thursday afternoon, and whether it's important that a Mexican

9    facility be seen in operation and whether we can get somebody

10   in -- whether that's important to our side or not, I just don't

11   know.  Perhaps they can see it on Sunday.  Perhaps, but they

12   may need to see the equipment operating and people in place.

13   (Pause).  We'll do our best.  I can't speak for scheduling, but

14   we'll do our best.  If we were to have an auction, that's

15   Friday the 8th, which is a week from tomorrow.  Under

16   procedures outlined when would our bid be due in connection

17   with that October 8 auction?

18          UNIDENTIFIED SPEAKERS:  The 7th.

19          MR. PALANS:  The 7th?

20          THE COURT:  A week from today.

21          MR. PALANS:  A week from today.

22          THE COURT:  Well, let me ask Mr. Collins if he knows

23   if Washington Mutual is going forward on the 8th on their

24   disclosure statement.

25          MR. COLLINS:  Your Honor, I don't know offhand.  I can

Page 149

1    definitely e-mail co-counsel, though, and find out what the

2    current status is and hopefully get a quick response.

3              THE COURT:  All right.  That's currently scheduled for

4    10:30.  It's the only matter I have that day, so if we wanted

5    to take a chance and start at noon.

6              MR. PALANS:  That's fine.  Sight unseen, I think we

7    can live with that schedule, assuming that we get the

8    cooperation that we anticipate on due diligence.

9              THE COURT:  Okay.

10             MR. THOMPSON:  The debtors will make every effort

11   humanly possible to cooperate with respect to the diligence

12   that Your Honor has ordered.  Absolutely.  I mean, I can't -- I

13   have no idea how much information there is to give, but we will

14   work very, very hard to make it happen.

15             THE COURT:  Okay.

16             MR. PALANS:  And, Your Honor, with regard to the bid,

17   it's very difficult for me to identify a precise time.  We'll

18   try and get a bid to everyone circulated at least the day

19   before, on October 7th.  We will try to get it to everybody by

20   12 p.m. Eastern Time, but, certainly, no later than 4 p.m.

21   Eastern Time.

22             MR. STARK:  Your Honor, now that the contested matter

23   is resolved there may not be issues to bring before Your Honor,

24   but may I make this respectful suggestion.  If Energizer is

25   perceiving that it has issues on diligence in this short window

Page 150

1    that they have, if we could avail Your Honor of the -- or they

2    could avail Your Honor of the opportunity to call and resolve

3    any sort of issues that may be, that might be a way to

4    facilitate and streamline.

5              THE COURT:  That's true on both sides.  I will make

6    myself available by phone.

7              MR. STARK:  Thank you.

8              THE COURT:  All right.  Then I guess we'll continue

9    the motion till October 8th at noon.

10        (Whereupon these proceedings were concluded at 2:03 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 151

1

2                              I N D E X

3

4                           R U L I N G S

5   DESCRIPTION                                   PAGE        LINE

6   Sale motion postponed; debtors are to         141          7

7   provide the due diligence requested to

8   Energizer.

9

10  Motion to File Under Seal Motion by the       142         19

11  Second-Lien Lenders Permitting the

12  Second-Lien Lenders to File Temporarily

13  Under Seal the Objection of the Second

14  Lien Lenders to the Debtors' Sale Motion,

15  granted.

16

17

18

19

20

21

22

23

24

25

Page 152

1

2                    C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10

11    Veritext

12    200 Old Country Road

13    Suite 580

14    Mineola, NY 11501

15

16    Date: October 4, 2010

17

18

19

20

21

22

23

24

25