**Hearing Date and Time: June 18, 2012 at 10:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip Bentley
Douglas H. Mannal
Joshua K. Brody
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000


*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et</u> <u>al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**OMNIBUS OBJECTION OF**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**TO THE DEBTORS' MOTIONS SEEKING (I) ENTRY INTO THE BARCLAYS DIP**
**FACILITY, (II) ENTRY INTO THE ALLY DIP FACILITY AND THE USE OF CERTAIN**
<u>**CASH COLLATERAL, AND (III) THE USE OF THE CITIBANK CASH COLLATERAL**</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................................................ii

PRELIMINARY STATEMENT ..................................................................................................1

GENERAL BACKGROUND........................................................................................................6

OBJECTION..................................................................................................................................9

    A.       The DIP Facilities Should Not Force the Debtors to Close on Both Sales Simultaneously at Potentially Great Cost to the Estate. .........................................10

    B.       The Ally DIP Order Should Not Require this Court to Grant the Ally Plan Support Agreement ...................................................................................................13

    C.       The DIP Facilities Unduly Restrict the Committee's Ability to Conduct Its Investigation...........................................................................................................15

    D.       The Superpriority Claims Should Only be Payable from Unencumbered Assets After Exhausting Collection from Collateral ...............................................17

    E.       The Fees Under the Barclays DIP Facility are Unreasonable..................................18

    F.       Other Provisions of the DIP and Cash Collateral Motions are Unreasonable. ........19

RESERVATION OF RIGHTS ....................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps">Cases</span>

<u>In re Ames Dep't. Stores, Inc.,</u>
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ...........................................................................9

<u>In re Barbara K. Enters., Inc.,</u>
    No. 08-11474 (MG), 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2011) ...........................9

<u>In re Great Atlantic & Pacific Tea Co.,</u>
    No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011)...........................................................16

<u>In re Saint Vincents Catholic Med. Ctr. of New York,</u>
    No. 10-11963 (CGM) (Bankr. S.D.N.Y. May 17, 2010)...........................................................16

<u>In re Tenney Village Co.,</u>
    104 B.R. 562 (Bankr. D.N.H. 1989) ...........................................................................9

<u>In re TerreStar Networks, Inc.,</u>
    No. 10-15446 (SHL) (Bankr. S.D.N.Y. Nov. 18, 2010)...........................................................16

<u>Resolution Trust Co. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores
    Inc.),</u>
    145 B.R. 312 (B.A.P. 9th Cir. 1992)...........................................................................9

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the debtors

and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned cases (the

"**Chapter 11 Cases**") hereby files this omnibus objection (the "**Objection**") to the (i) Debtors'

motion seeking to enter into the Barclays DIP Facility and use of Barclay's cash collateral (as

defined herein) (the "**Barclays DIP Motion**") [Docket No. 13], (ii) the Debtors' Motion seeking

to enter into the Ally DIP Facility (as defined herein) and use of the cash collateral of Ally and the

Junior Secured Noteholders (each as defined herein) (the "**Ally DIP Motion**") [Docket No. 42],

and (iii) the Debtors' motion seeking to allow the Debtors to use the Citibank Cash Collateral (as

defined herein) (the "**Citibank Motion**," and together with Barclays DIP Motion and the Ally DIP

Motion, the "**DIP and Cash Collateral Motions**") [Docket No. 13].[1]  In support of the

Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     The Debtors have a complex capital structure.  Prior to the Petition Date,

the Debtors had six secured financing facilities in the aggregate amount of approximately $2.25

billion, each with first liens on separate collateral packages, as well as approximately $2.1 billion

in second lien notes and approximately $1 billion in unsecured notes.[2]  The Debtors also have

significant unencumbered assets (including approximately $250 million in cash).  To facilitate the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the respective DIP and Cash Collateral Motions.

[2] As of the Petition Date, the Debtors had the following prepetition facilities: (i) a repurchase facility with BMMZ Holdings, LLC, a non-debtor, indirect, wholly-owned subsidiary of Ally (the "**BMMZ Repo Facility**"), with approximately $250 million outstanding; (ii) the Ally LOC (as defined herein), with approximately $380 million outstanding; (iii) a loan agreement with Ally, as agent and lender (the "**Ally Revolver**"), with approximately $747 million outstanding; (iv) the Citibank MSR Facility (as defined herein), with approximately $152 million outstanding; (v) a facility whereby Fannie Mae provides GMAC Mortgage with early partial reimbursement of certain required Fannie Mae servicing (the "**Fannie EAF Facility**"), with approximately $40.3 million outstanding; and (vi) a servicing advance facility with Barclays, as administrative agent and purchaser (the "**GSAP Facility**"), with approximately $680 million outstanding.

use of cash collateral under the secured facilities and obtain additional liquidity to finance their operations, the Debtors filed the DIP and Cash Collateral Motions.[3]

2.    In addition to the DIP and Cash Collateral Motions, the Debtors filed a motion to establish procedures to sell substantially all of their assets (the "**Sale Procedures Motion**").[4]  By the Sale Procedures Motion, the Debtors seek to simultaneously sell, subject to an auction process, (i) their mortgage origination and servicing business (the "**Origination and Servicing Business**") for approximately $2.3 billion to Nationstar, and (ii) their portfolio of non-conforming held-for-sale loans and other securities/mortgage assets ("**HFS Assets**") for approximately at least $1.4 billion to the Debtors' corporate parent, Ally Financial Inc. ("**Ally**"). The Debtors seek to complete the sales by the end of the year.[5]

3.    Notwithstanding the substantial resources that the Debtors will be required to devote to market and sell these assets over the next few months, the Debtors also obligated themselves to: (i) obtain Court approval of a plan support agreement with certain certificate holders under certain securitization trusts in July 2012; (ii) obtain Court approval of a plan support agreement with Ally in August 2012; (iii) obtain Court approval of a plan support agreement with the Junior Secured Noteholders in August 2012; and (iv) obtain confirmation of a chapter 11 plan, which includes the settlement of the multiple estate causes of action against Ally and non-consensual third-party releases for Ally (together, the "**Ally Releases**") by October 31, 2012.

---

[3] The Debtors also filed a motion seeking to continue the use of cash collateral under the Debtors' prepetition facility under which the Debtors received early partial reimbursement of servicing advance from Fannie Mae (the "**Fannie EAF Motion**").  The Committee does not object to the relief sought in the Fannie EAF Motion.

[4] Contemporaneously herewith, the Committee is filing a separate objection to the Sale Procedures Motion.

[5] Under the Barclays DIP Agreement the Debtors must obtain a sale order approving the sale of both the Origination and Servicing Business and the HFS Assets by February 15, 2013, and close on such sales no later than April 15, 2013 (the "**Sale Milestones**").

4.      Under the terms of the stalking horse bids, the sale of the Origination and Servicing Business and the HFS Assets is expected to generate proceeds to repay most, but not all, of the Debtors' secured debt.  To the extent higher bidders do not emerge, the primary source of any recovery for general unsecured creditors will be the Debtors' unencumbered assets, the proceeds of a settlement with Ally, and certain other assets which are not being sold under the asset sales.  The Committee is therefore keenly focused on (i) ensuring that the asset sales are conducted efficiently to maximize value to the estates, and (ii) investigating the propriety of an Ally settlement and the validity of the claims and liens of the prepetition secured lenders.

5.      The Debtors' ambitious goal of selling substantially all their assets and confirming a chapter 11 plan in less than five months will impose an enormous and untenable burden on the Debtors.  The Committee has serious concerns that if the Debtors proceed in this fashion, it will lead to a haphazard and inefficient sale process that will not maximize the value of the Debtors' assets to the detriment of unsecured creditors.

6.      Therefore, while the Committee generally supports the relief sought in the DIP and Cash Collateral Motions, the Committee urges the Court to deny those aspects of the motions that (i) obstruct the Debtors' ability to run a full and open sale process, and (ii) limit the Committee's ability to investigate the Debtors' numerous prepetition transactions, including the validity of the various prepetition credit facilities, as well as the propriety of the Ally settlement. The Committee's main issues with the DIP and Cash Collateral Motions are as follows:

7.      First, the DIP Facilities contain provisions which will inhibit the Debtors' ability to run a sale process that maximizes value.  In the first instance, the Barclays DIP Facility provides that any asset sale of over $25 million must provide for the payment *in full* of the Barclays DIP Facility in cash.  Moreover, both the Barclays DIP Facility and the Ally DIP Facility

require that the sale orders for both the Origination and Servicing Business and the HFS Assets provide for the payment in full in cash of the respective facilities.  Since the sale of the HFS Assets will not be sufficient to pay off the Barclays DIP Facility and it is unclear whether the sale of the Origination and Servicing Business alone will generate sufficient proceeds to pay off the Barclays DIP Facility, the requirement that the Debtors pay down both facilities upon either sale will only unnecessarily force the Debtors to close on both sales simultaneously.  Removing the linkage between the payoff in full of the DIP Facilities in connection with the first asset sale (rather than the second asset sale) will permit a more stable and orderly sale process without altering the sale milestones in the DIP Facilities.

8.    Second, the Ally DIP Facility prematurely and covertly locks the Debtors into pursuing the Ally settlement before the Ally PSA (defined herein) is approved by the Court. The Ally DIP Order currently provides that Ally can terminate the Ally DIP Facility if the Debtors do not comply with the Ally settlement.  Ally should not be able to use the Ally DIP Order as a means to bootstrap the terms of the Ally PSA on the Debtors.

9.    Third, the proposed orders provide extensive restrictions on the Committee's ability to investigate the Debtors' numerous prepetition transactions, including the validity of the various prepetition credit facilities, as well as the propriety of the Ally settlement. As an initial matter, the proposed orders only give the Committee 75 days from the Petition Date to investigate and challenge the liens and claims of the prepetition lenders.  This narrow time period is insufficient.  This is not the typical case where the Committee is seeking to review the liens and claims of one or two prepetition lender groups.  As noted above, the Debtors have a diverse and complex capital structure with seven secured facilities totaling over $4 billion in claims and separate collateral pools.  The Committee intends to engage in a thorough investigation

of the prepetition lenders' liens and claims. The Committee submits that it needs at least 120 days from entry of the final orders to complete a review and, if appropriate, commence actions in respect of the prepetition lenders' claims and liens.

10. Further, the proposed orders limit the Committee to a budget of (i) $100,000 to investigate claims and liens of the prepetition facilities rolled up into the Barclays DIP Facility and (ii) $100,000 to investigate the claims and liens of the two Ally prepetition facilities and the Junior Secured Notes. The review of the prepetition facilities and perfection of liens thereon is a fact-intensive analysis that will require the review of extensive documents and filings. While the Committee acknowledges there are unencumbered assets which could be used to fund an investigation, as noted below, the unencumbered assets are now subject to superpriority claims. The Committee's professionals should not bear the risk that there are limited unencumbered assets at the end of the chapter 11 cases to satisfy their fees.[6] The Committee's investigation budgets should be increased to $250,000 per facility.

11. Fourth, the proposed orders provide (i) the DIP Lenders with superpriority claims against all of the Debtors and (ii) the prepetition lenders with superpriority claims against all of the Debtors for the diminution in value of their collateral. While the Committee does not object to the granting of superpriority claims, these superpriority claims should only be payable out of unencumbered property and the proceeds of avoidance actions after the lenders exhaust recoveries from their respective collateral.

12. Fifth, the Barclays DIP Facility contemplates approximately $52 million in fees to the Barclays. The fees are excessive because (i) almost one-half of the Barclays DIP Facility was used to roll up the prepetition facility in which Barclays was the sole lender (GSAP

---

[6] In addition, the proposed final orders should be clarified to provide that the proposed budgets will not apply to the use of unencumbered assets.

Facility), (ii) Barclays already received significant fees in March 2012 in connection with the funding of the GSAP Facility, and (iii) when taking into account the automatic payoff of the Barclays DIP Facility under the asset sales, the term of the Barclays DIP Facility will not last longer than 11 months, rather than the 18 months advertised.

13.     Lastly, the proposed DIP orders and DIP Facilities contain certain additional provisions described in Section F below that should not be approved because they are not reasonable.

14.     Prior to the filing of this Objection, the Committee engaged in negotiations with the Debtors, the DIP Lenders, and the prepetition lenders in an effort to consensually resolve these issues.  Although progress was made with respect to certain issues, the parties have been unable to agree on a final resolution as of the filing of this Objection.  Thus, the Committee is filing this Objection to preserve its rights in the event a consensual resolution is not reached with all the parties on the DIP and Cash Collateral Motions.

## **GENERAL BACKGROUND**

15.     The Debtor Residential Capital, LLC ("**ResCap**") is the direct or indirect corporate parent of each of the other Debtors.  Ally is the corporate parent of the intermediate non-debtor company, GMAC Mortgage Group, LLC, which owns 100% of ResCap's equity.  Ally has been partially owned by Cerberus since November 2006.

16.     On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are jointly administered for procedural purposes only.

17.     On the Petition Date, the Debtors filed the following DIP and Cash Collateral Motions:

(a)      The Barclays DIP.  By the Barclays DIP Motion, the Debtors seek to enter into a DIP facility (the "**Barclays DIP Facility**," and the agreement thereunder, the "**Barclays DIP Agreement**") in the aggregate principal amount of $1,450,000,000 to be provided by Barclays Bank PLC ("**Barclays**") as Administrative Agent on behalf of a syndicate of lenders (collectively, the "**Barclays DIP Lenders**," and together with the lenders under the Ally DIP Facility (defined below), the "**DIP Lenders**").  The Barclays DIP Facility will be used to provide the Debtors with extra liquidity and refinance approximately $680 million outstanding under the Debtors' prepetition GSAP Facility and $250 million under the BMMZ Repo Facility.  It is secured by a first lien on the assets of the rolled-up GSAP and BMMZ facilities, as well as a junior lien on the AFI LOC Collateral (as defined in the Ally DIP Motion) and the Citi MSR Collateral.

(b)      The Ally DIP and Cash Collateral. By the Ally DIP Motion, the Debtors seek to draw an additional $150 million (the "**Ally DIP Facility**," and the agreement thereunder, the "**Ally Amendment**") under the Debtors' prepetition line of credit facility with Ally (the ("**Ally LOC**").  Approximately $380 million was outstanding under the Ally LOC as of the Petition Date and was secured by first liens on the AFI LOC Collateral.  The Debtors also seek to use cash collateral of the AFI Revolver Collateral.  The holders (the "**Junior Secured Noteholders**") of the Debtors' 9.625% junior secured notes due 2015 (the "**Junior Secured Notes**") have a second priority lien on the AFI Revolver Collateral (as defined in the Ally DIP Motion).

(c)      The Citibank Cash Collateral.  By the Citibank Motion, the Debtors seek to use the cash collateral (the "**Citibank Cash Collateral**," and together with the Barclays DIP Facility and the Ally DIP Facility, the "**DIP Facilities**") granted under the Debtors'

prepetition credit facility (the "**Citibank MSR Facility**") with Citibank, N.A. ("**Citibank**") that was used to finance the origination or acquisition of certain mortgage loan servicing rights ("**MSRs**").   As of the Petition Date, approximately $152 million was outstanding under the Citibank MSR Facility and was secured primarily by first liens on the Debtors' MSRs with Freddie Mac and Fannie Mae (the "**Citi MSR Collateral**").

18.    Following the "First Day Hearing," the Court entered orders granting the DIP and Cash Collateral Motions on an interim basis (the "**Interim Orders**") [Docket Nos. 79, 80, 89].  A hearing to consider entry of orders granting the DIP and Cash Collateral Motions on a final basis (the "**Proposed Final Orders**") is currently scheduled for June 18, 2012.

19.    On May 16, 2012, the United States Trustee appointed the Committee.[7]

20.    On May 24, 2012, the Committee submitted formal document requests to the Debtors regarding the proposed DIP Facilities and sale process.  On June 6, 7, and 8 the Committee conducted depositions of the Debtors in connection with the DIP and Cash Collateral Motions as well as the sale process.

21.    On June 1, 2012, the Committee filed an *ex parte* motion seeking authority to issue subpoenas compelling the production of documents and the provision of testimony by the Debtors and other entities relating to the Debtors' proposed postpetition transactions, including their settlement with Ally, and the Debtors' significant pre-petition transactions, financings, and relationships with Ally, Cerberus, and Ally Bank [Docket No. 194] (the "**2004 Motion**").   An order was entered approving the 2004 Motion on June 5, 2012 [Docket No. 217].

---

[7]   The Committee consists of the following members: Wilmington Trust, N.A.; Deutsche Bank Trust Company Americas; The Bank of New York Mellon Trust Company; MBIA Insurance Corporation; Rowena L. Drennen (as representative for plaintiffs in certain prepetition litigations against the Debtors); AIG Asset Management (U.S.), LLC; U.S. Bank National Association; Allstate Life Insurance Company; and Financial Guaranty Insurance Company.

## **OBJECTION**

22.     The standard for approval of postpetition financing is whether "the terms of the [proposed postpetition financing] are fair, reasonable, and adequate" under the circumstances. See, e.g., In re Barbara K. Enters., Inc., No. 08-11474 (MG), 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2011) (citing In re Crouse Group, Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987)).   Due to a debtors' diminished capacity to negotiate financing on favorable terms, postpetition lenders "often extract favorable terms that harm the estate and creditors" especially "when the lender has a prepetition lien on cash collateral."   Resolution Trust Co. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores Inc.), 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (citing In re Ames Dep't. Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990); In re Tenney Village Co., 104 B.R. 562, 567-70 (Bankr. D.N.H. 1989)).

23.     Prior to approving the terms of a postpetition financing, a bankruptcy court must ensure that the proposed financing will not "skew the carefully designed balance of debtor and creditor protections that Congress drew in crafting Chapter 11" by approving postpetition financing on terms that "prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors."   Ames, 115 B.R. at 37; see also Tenney Village, 104 B.R.  at 568 (stating that postpetition financing should not be approved where effect is to "disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank, seize control of the reins of reorganization, and steal a march on other creditors in numerous ways").

24.     As the centerpiece of the Debtors' restructuring is a comprehensive settlement with Ally (including the Ally Releases) *plus* the simultaneous sale of most estate assets, it is critical for the Court to ensure that the terms of the Debtors' postpetition financing do not impair the Committee's ability to investigate the Debtors' relationship with Ally or otherwise

jeopardize the role of the Committee to ensure an extensive marketing and sale process.  As set

forth in more detail below, the following terms of the proposed DIP Facilities and orders should

not be approved because they are not in the best interests of the estates.

      **A.**      **The DIP Facilities Should Not Force the Debtors to Close on Both Sales
Simultaneously at Potentially Great Cost to the Estate.**

      25.      The Ally DIP Facility and the Barclays DIP Facility grant significant

control over the Debtors' sale process to the DIP Lenders.  This control should be scaled back

because it limits the Debtors' ability to adequately market the sale of the Origination and

Servicing Business and the HFS Assets.

      26.      Most importantly, both the Barclays DIP Agreement and the Ally

Amendment unnecessarily require that the respective facilities be paid down in full in cash upon

the sale of either the Origination and Servicing Business or the HFS Assets.  Specifically, each

agreement provides that it is an event of default if the order approving the sale of either the

Origination and Servicing Business or the HFS Assets does not provide for a payoff of the facility

in full in cash.  See Barclays DIP Agreement § 8.01(r); Ally Amendment § 8.03(r).  In addition,

the Barclays DIP Agreement provides that the Debtors may not sell more than $25 million of the

collateral under the Barclays DIP Facility without fully paying down the Barclays DIP Facility.

See Barclays DIP Agreement §§ 6.08(d), 8.01(s).

      27.      Since the sale of the HFS Assets will not be sufficient to pay off the

Barclays DIP Facility and it is unclear whether the sale of the Origination and Servicing Business

alone will generate sufficient proceeds to pay off the Barclays DIP Facility, these provisions will

only unnecessarily force the Debtors to prematurely close on the sale of both the Origination and

Servicing Business and the HFS Assets simultaneously.  This is plainly impractical and will only

lead the Debtors to run an inefficient sale process.  As the Debtors themselves admit, both sales

include a myriad of complex assets.  It is highly likely that each sale will need to run on its own

timeline, as there will be differing circumstances depending on the presence, absence, or number

of potential bidders for each asset.  For example, if a number of bidders come forward for one of

the asset groups but not the other, the asset group with significant interest should be able to close

on a suitable timeline, and the Debtors should not feel compelled to rush a sale against the estates'

interests just because the other asset group can proceed to closing expeditiously.[8]

       28.     Likewise, if the Debtors are ready to complete the sale of the HFS Assets,

but need additional time to market and sell the Origination and Servicing Business, the Debtors

should be able to sell the HFS Assets without a default under the Barclays DIP Facility.  As the

Barclays DIP Agreement is currently drafted, if the Debtors close on the sale of the HFS Assets

prior to the closing of a sale on the Origination and Servicing Business, the Barclays DIP Facility

will be in default.  This scenario is not only a theoretical risk.  The Committee understands there

may be significant consents that are required before the sale of the Origination and Servicing

Business could close, while the closing period for the sale of the HFS Assets should be much

shorter.

       29.     In sum, forcing the Debtors to keep the two sale processes concurrent limits

the Debtors' options, at potentially great cost to the estates.  There is no colorable justification or

necessity for forcing the Debtors to proceed in this manner.  To maximize value, the Debtors need

to be able to consummate each asset sale on its own timeline.  The Barclays DIP Agreement and

Ally Amendment should only provide that any sale order of assets that is collateral under either of

the DIP Facilities must direct that the proceeds go to pay down the relevant DIP Facility secured

by such assets, irrespective of whether such facility is paid in full.  So long as the Debtors obtain

---

[8] Linking the sales this way will also put premature pressure on the Debtors to implement the sales through a chapter 11 plan, rather than through separate asset sales, and potentially shift negotiating leverage towards Ally as it relates to a settlement.

sale orders approving the asset sales and close on the sales within the Sale Milestones, this revision will not prejudice the DIP Lenders.

30.    Additionally, the Barclays DIP Agreement and the Ally Amendment each provides that it is an event of default if either of the Ally Sale Agreement or the Nationstar Sale Agreement is terminated and another agreement is not approved by the Court within 60 days. See Barclays DIP Agreement § 8.01(q); Ally Amendment § 8.03(q).  Because it is entirely unrealistic to expect the Debtors to negotiate and obtain Court approval of a replacement agreement in such a short time frame, the effect of these provisions is to give Ally and Barclays a trump card to play in the event that one of the stalking horse agreements is terminated.  Ally and Barclays will be in a position to demand concessions of the Debtors under the threat of calling an event of default under their respective facilities.  That Ally is one of the parties to the stalking horse agreement makes this provision particularly perverse, because it is possible that Ally, acting in its capacity as a stalking horse, may be incentivized to threaten termination of its sale agreement knowing that it alone will have the power to waive the resulting default under the Ally Amendment.

31.    This provision of the DIP Facilities should be revised to provide that the Debtors have 60 days to enter into a new sale agreement rather than get an alternative agreement approved by the court.  So long as the Debtors obtain sale orders approving the asset sales and close on the sales within the Sale Milestones, this revision will not prejudice the DIP Lenders.

**B.    The Ally DIP Order Should Not Require this Court to Grant
the Ally Plan Support Agreement.**

32.    The Ally DIP Order should be modified to eliminate the requirement that the Debtors comply with the Ally settlement.  As drafted, the Ally DIP Order provides that the Debtors covenant to "perform and comply with all obligations under the Ally Settlement in accordance with the terms thereof." See Ally DIP Order, ¶ (a)(vii).[9]  The "Ally Settlement," as defined in the Ally DIP order, is the Settlement and Plan Sponsor Agreement entered into between Ally and the Debtors on the Petition Date (the "**Ally PSA**").  The failure of the Debtors to comply with the Ally PSA will provide Ally with a termination event under the Ally DIP.  See Ally Order, ¶ 18(g).

33.    The Ally PSA imposes significant obligations on the Debtors. Among other things, the Ally PSA obligates the Debtors to:

- use commercially reasonable efforts to obtain approval of the Debtors' obligations under the Ally PSA contemporaneously with approval of the Disclosure Statement (Ally PSA § 3.1(a));

- use good faith efforts to file and prosecute the Plan as set forth in the term sheet attached to the Ally PSA (the "**Ally Term Sheet**") (Ally PSA § 3.1(b));

- include in the Plan and confirmation order the Ally Releases (Ally PSA Art. § 3.1(d));

- effectuate and consummate the restructuring contemplated in the Ally Term Sheet in accordance with the following milestones, among others: (i) approval of a disclosure statement in form and substance satisfy to Ally on or before 90 days following the Petition Date, (ii) entry of a confirmation order approving the Ally Plan and the asset sales on or before October 31, 2012, and (iii) the effective date of the Ally Plan shall have occurred on or before December 15, 2012 (Ally PSA § 3.2(a));

---

[9] Furthermore, the Debtors stipulated in paragraph 3(a) of the Ally DIP Order that they "agreed to use commercially reasonable efforts to seek this Court's approval of the Plan (and the Ally Settlement Agreement), whether under the Plan or otherwise."

- not "directly or indirectly seek, solicit, support, or vote in favor of any alternative restructuring that could reasonably be expected to prevent, delay, or impede" the restructuring contemplated by the Ally Term Sheet or the Ally PSA (Ally PSA § 4.1(b));

- not "directly nor indirectly (i) engage in, continue, or otherwise participate in any negotiations regarding any alternative restructuring, (ii) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any alternative restructuring or (iii) withhold, withdraw, qualify, or modify its approval or recommendation of this Agreement, the Plan Term Sheet, the Plan, or the Restructuring" (Ally PSA § 4.1(c)); and

- not "take any action that is inconsistent with [the Ally PSA], the [Ally] Term Sheet, or the Plan, or that would obstruct or delay approval of the Disclosure Statement or confirmation and consummation of the Plan." (Ally PSA § 4.1(e))

34.     Rather than seek to bootstrap approval of the Ally PSA with approval of the Ally DIP Facility, the Debtors should be required to seek approval of the Ally PSA separately. Indeed, the very terms of the Ally PSA require that the Debtors must file a motion seeking court approval of the agreement on or before June 15, 2012.  If the Court does not approve the Ally PSA by August 12, 2012,[10] the Debtors will have failed to comply with the Ally PSA and would therefore be in breach of the covenants set forth in the Ally DIP Order (providing Ally with a termination event under the Ally Amendment).

35.     The ultimate effect of this covenant is to obligate the Debtors to the terms of the Ally PSA before it is brought before the Court for approval; failure to comply will risk a DIP default.  As it is currently unknown whether the Court will approve the Ally PSA – in fact, the motion seeking such approval has not yet been filed – it is simply premature to obligate the Debtors to comply with a plan support agreement that is neither approved nor before the Court.

---

[10] Pursuant to the milestones set forth in the Ally PSA, the deadline for entry of an order approving the Ally PSA is 90 days from the Petition Date, or August 12, 2012.

C.     **The DIP Facilities Unduly Restrict the
       Committee's Ability to Conduct Its Investigation.**

36.     The deadlines for the Committee to complete its investigations of the prepetition facilities, as well as the Committee's budgets for such investigations, are simply unrealistic.  The proposed orders include the following restrictions on the Committee: (i) the Committee has 75 days from the Petition Date to file its objection to the validity of the claims and liens of the Ally Revolver, the Ally LOC, the Junior Secured Noteholders, the rolled up GSAP Facility, the rolled up BMMZ facility, and Citibank MSR Facility; and (ii) the Committee's fees and expenses for investigating the validity of such indebtedness is capped at $100,000 under the Barclays DIP Order and an additional $100,000 under the Ally DIP Order.  See Ally DIP Order ¶¶ 25, 29; Barclays DIP Order ¶¶ 18, 19.

37.     As noted above, this is not the typical case where the Committee is seeking to review the liens and claims of one or two prepetition lender groups.  The nature of the Debtors' prepetition relationship with Ally and the other prepetition lenders are complex.  Moreover, the Debtors have a diverse and complex capital structure with seven secured facilities totaling over $4 billion in claims and separate collateral pools.  The Committee intends to engage in a thorough investigation of the prepetition lenders' liens and claims.  The Committee submits that it needs at least 120 days from the entry of the final orders to complete a review and, if appropriate, commence actions in respect of the prepetition lenders' claims and liens.

38.     Furthermore, the review of the prepetition facilities and perfection of liens thereon is a fact-intensive analysis that will require the review of extensive documents and filings.  When considering the nature and extent of the Debtors' prepetition relationships with each of Ally, Barclays, and Citibank, it is entirely inappropriate for the Debtors to seek to limit the Committee's investigation.

39.     Accordingly, with respect to Barclays, the Junior Secured Noteholders and Citibank, the budget for the Committee's investigations should be increased to $250,000 with respect to each facility.[11]   This amount is in accordance with other large postpetition financing approved in this district.  See In re Great Atlantic & Pacific Tea Co., No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) [Docket No. 479] (approving, upon committee's objection, increase in cap on committee's investigation budget from $100,000 to $250,000);  In re TerreStar Networks, Inc., No. 10-15446 (SHL) (Bankr. S.D.N.Y. Nov. 18, 2010) [Docket No. 181] (approving, upon committee's objection, increase in cap on committee's investigation budget from $200,000 to $250,000); In re Saint Vincents Catholic Med. Ctr. of New York, No. 10-11963 (CGM) (Bankr. S.D.N.Y. May 17, 2010) [Docket No. 285] (approving, upon committee's objection, increase in cap on committee's investigation budget from $20,000 to $250,000).

40.     With respect to the Committee's investigation of Ally's prepetition collateral, the Committee submits that its investigation is sufficiently complex as to warrant no cap.  As detailed in the Committee's 2004 Motion, the Debtors' prepetition relationship with Ally involved billions of dollars in numerous financings and asset transfers.  Further, the Debtors are currently proposing billions in postpetition transactions with Ally and a plan that will provide Ally with broad releases.  Given the significance of these transactions to the bankruptcy cases, the Committee's role in investigating Ally is imperative.  No monetary limitations should be used to limit the Committee's key role as an estate fiduciary in investigating these key issues.

---

[11]   Although the Debtors purport to have a significant amount of unencumbered assets, under the proposed orders, the unencumbered assets are subject to the superpriority claims of Ally, Barclays, and Citibank.  The Committee's professionals should not bear the risk that there are limited unencumbered assets at the end of the chapter 11 cases to satisfy their fees.

**D.** **The Superpriority Claims Should Only be Payable from Unencumbered
Assets After Exhausting Collection from Collateral.**

41.     The proposed orders provide (i) the DIP Lenders with superpriority claims
against all of the Debtors and (ii) the prepetition lenders with superpriority claims against all of
the Debtors for the diminution in value of their collateral.  The superpriority claims have recourse
against all of the Debtors' assets including unencumbered assets and the proceeds of avoidance
actions.[12]

42.     The Committee understands that the DIP Facilities are substantially
oversecured.  Thus, providing the DIP Lenders with the superpriority claims with recourse to all
estate property including avoidance actions and unencumbered property should not be necessary.
Nevertheless, the Committee is willing to not object to the current superpriority claim construct so
long as superpriority claims are only payable out of unencumbered property and the proceeds of
avoidance actions after the secured lenders exhaust recoveries from their collateral.[13]  As noted
above, depending on the outcome of the auction of the Debtors' assets, the unencumbered assets
and the proceeds of avoidance actions are one of the main sources of recovery for unsecured
creditors.  The prepetition lenders and the DIP Lenders should not be able to dissipate these
critical assets without first recovering from their collateral packages.  As the DIP Facilities are
oversecured and substantially all of the Debtors' assets are being sold to benefit their secured
creditors, this protection for unsecured creditors is more than reasonable.

---

[12] The Committee understands that Ally and the Junior Secured Noteholders will not be seeking superpriority claims
against the proceeds of avoidance actions.  To the extent this position has changed, the Committee reserves all rights.

[13] The proposed orders provide that the DIP Lenders and the prepetition lenders will not be subject to the equitable
doctrine of marshaling.  The waiver of the marshaling doctrine should be subject to the parties first seeking a recovery
from the relevant collateral before seeking a recovery from unencumbered property.

E.      **The Fees Under the Barclays DIP Facility are Unreasonable.**

43.      Pursuant to the Barclays DIP Agreement, the Debtors seek to pay Barclays $52 million fee (the "**Barclays DIP Fee**").  See Barclays DIP Motion ¶ 87.  The Committee believes that the Barclays DIP Fee is unreasonable in light of the following facts:

44.      <u>First,</u> Barclays is the lender under the Debtors' prepetition GSAP Facility that is being refinanced under the Barclays DIP Facility.  See Barclays DIP Agreement §§ 1.01, 2.06(a).  The outstanding amount under the GSAP Facility as of the Petition Date was approximately $680 million.  It is not reasonable to award Barclays fees on that portion of the Barclays DIP Facility that was used to pay down the Debtors' prepetition indebtedness to Barclays.  Accordingly, the Barclays fees should be reduced by approximately 46% (or $24.4 million) to reflect that paydown of the GSAP Facility encompassed by the Barclays DIP Facility.

45.      <u>Second</u>, the Debtors entered into the GSAP Facility in March 2012.  At that time, Barclays earned a substantial fee in connection with that transaction.  Thus, the Barclays DIP Fees not only compensate Barclays for the privilege of refinancing certain of its own indebtedness, but Barclays already received millions of dollars in connection with such indebtedness only months before the Petition Date. Accordingly, the Barclays DIP Fee should be further reduced to reflect the fees Barclays received on account of its indebtedness just months ago.[14]

46.      These proposed reductions to the Barclays DIP Fee are all the more reasonable when considering the actual term of the Barclays DIP.  Although the Barclays DIP Facility was advertised and priced as an 18-month facility, it is in fact only an 11-month facility because, as discussed above, the Debtors are obligated to close under the Nationstar Sale

---

[14] The Committee understands that certain of the fees earned by Barclays has been credited toward the Barclays DIP Fee and the $52 million figure used for the Barclays DIP Fee takes into account this credit.

Agreement and the Ally Sale Agreement by April 15, 2013 and to pay down the Barclays DIP Facility in full upon the closing of either sale.

47.    Accordingly, the Court should not approve the Barclays DIP Fee until such fee is reduced to reflect to the refinancing of the GSAP Facility and the fees paid to Barclays in March 2012.

**F.    Other Provisions of the DIP and Cash Collateral Motions are Unreasonable.**

48.    The Committee has a number of additional issues with respect to the relief sought in the Ally DIP Motion. Due to the Debtors' extensive prepetition relationship with Ally, the Committee believes that the Court should more carefully scrutinize the relief sought in the Ally DIP Motion to ensure that the Debtors are not prejudicing the rights of, and sources of recovery for, unsecured creditors at this early stage in these cases. The Committee's issues with respect to the Ally DIP Motion are as follows:

- Adequate Protection Liens. The Ally DIP Order provides Ally and the Junior Secured Noteholders with various replacement liens as adequate protection. See Ally DIP Order ¶ 14(f). The Final Order should make clear that any adequate protection liens are solely to the extent of diminution of value in prepetition collateral and that in the event it is determined that the prepetition indebtedness is undersecured, any payments under the Ally DIP Order will be credited towards the principal balance of the prepetition indebtedness.

- Waiver of Claims. The Ally DIP Order provides that the Debtors waive any claims and causes of action against Ally, its affiliates, directors, and officers relating to the Ally DIP Order or negotiating the terms of the Ally DIP Order. See Ally DIP Order ¶ 32. The Final Order should clarify that the waiver does not apply to the Committee or any other non-Debtor estate representative.

- Remedies. The Ally DIP Order provides that, upon an event of default under the Ally DIP Facility, the automatic stay is immediately modified to permit Ally and the Junior Secured Noteholders to terminate the right of the Debtors to use prepetition collateral and cash collateal. See Ally DIP Order ¶ 19(a)(i). The Final Order should provide for a 7 day notice period before any collateral can be used.

- <u>Extent of Adequate Protection Liens</u>.  The Ally DIP Order provides that Ally and the Junior Secured Noteholders will receive liens as adequate protection on the Debtors' equity in two newly-formed entities that are borrowers under the Barclays DIP Facility (GMACM Borrower, LLC and RFC Borrower, LLC).  <u>See</u> Ally DIP Order ¶¶ 14(b)(iv), 14(c)(iii).  The Final Order should make clear that the value of these adequate protection liens should only be to the extent Ally and the Junior Secured Noteholders had valid prepetition liens on the assets transferred to borrowers under the Barclays DIP Facility.

49.    The DIP and Cash Collateral Motions also seek approval of a number of other provisions which are not reasonable and should be modified.  Such provisions include:

- <u>Reports and Budget</u>.  The Debtors are required to provide various financial reports to the DIP Lenders and the prepetition lenders, as well as a budget.  <u>See</u> Ally DIP Order ¶ 12, Barclays DIP Order ¶ 8(c), Citibank Order ¶ 10(a).  The Debtors should be required to provide the Committee with such reports at the same time they are provided to the lenders and the Committee should have consultation rights over the budgets.

- <u>Use of Proceeds</u>.  The Barclays DIP Agreement provides that the proceeds of the Barclays DIP Facility may not be used for any act which has the effect of "materially or adversely modifying or compromising the rights and remedies of any Agent or DIP Lender as set forth [in the Order] and in the other Credit Documents, or which results in the occurrence of an Event of Default."  <u>See</u> Barclays DIP Order ¶ 18.  Given the over broad effect of this provision, it should be stricken.

- <u>§ 506(c) and 552(b) Waiver</u>.  The DIP and Cash Collateral Motions provide Barclays, the Junior Secured Noteholders, Ally and Citibank with a waiver of the Debtors' right to surcharge their collateral for the cost of preserving or disposing such collateral.  See Ally DIP Order ¶ 20, Citibank Order ¶ 18.  The Committee understands that the lenders are only seeking the section 552(b) waiver for the Debtors.  The section 506(c) waiver should be conditioned on the proposed orders being satisfactory to the Committee.

## **<u>RESERVATION OF RIGHTS</u>**

50.    The Committee expressly reserves its rights to supplement and amend this Objection, seek discovery with respect to same, and introduce evidence at any hearing relating to the DIP and Cash Collateral Motions or this Objection.

## <u>CONCLUSION</u>

WHEREFORE, the Committee respectfully requests that the Court modify the

proposed Final Orders as set forth herein and grant such other and further relief as may be just and

proper.

Dated: New York, New York
       June 11, 2012

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/  Kenneth H. Eckstein
Kenneth H. Eckstein
Philip Bentley
Douglas H. Mannal
Joshua K. Brody
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000


*Proposed Counsel for the Official
Committee of Unsecured Creditors*