**Hearing Date and Time: June 18, 2012 at 10:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip Bentley
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et</u> <u>al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS'**
**(I) ORIGINATION MOTION AND (II) ALLY SERVICING MOTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND .......................................................................................................................... 2

**A.**    Ally Relationship and Debtors' Businesses ................................................................... 2

**B.**    The Origination Activities ............................................................................................. 4

      1.    Pre-April 2012 Activities ...................................................................................... 4

      2.    April and May 2012 Actions .................................................................................. 5

      3.    The Origination Motion ......................................................................................... 6

**C.**    The Ally Bank Servicing Activities ............................................................................... 7

      1.    Prepetition Agreements .......................................................................................... 7

      2.    The Servicing Motion ............................................................................................. 8

OBJECTION ................................................................................................................................. 9

**A.**    The Final Orders Should Not Contain Advance Limitations on the Debtors' Rights Under the Bankruptcy Code or Elevate Affiliates' Claims to Administrative Expense Status _____ .... 9

**D.**    The Debtors' Request for Blanket Authority to Pay Prepetition Claims Relating to Repurchase Obligations Should be Denied ................................................................................ 12

**E.**    Additional Technical Revisions to the Proposed Orders Are Needed .............................. 14

RESERVATION OF RIGHTS .................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.),
   4 F.3d 1329 (5th Cir. 1993) ........................................................................................13

Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe &
   Assocs.),
   713 F.2d 211 (6th Cir. 1983) ......................................................................................13

In re Allegheny Int'l, Inc.,
   118 B.R. 282 (W.D. Pa. 1990).....................................................................................13

Official Comm. of Equity Sec. Holders v. Mabey (In re A.H. Robins, Co.),
   832 F.2d 299 (4th Cir. 1987) .......................................................................................13

Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,
   789 F.2d 98 (2d Cir. 1986)...........................................................................................10

STATUTES

11 U.S.C. § 365.................................................................................................................10

11 U.S.C. § 503(b) .....................................................................................................11, 12

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

      The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby files this limited objection and reservation of rights (the "**Objection**") to the Debtors' (A) motion for an order authorizing the Debtors to (i) process and, where applicable, fund prepetition mortgage loan commitments, (ii) continue brokerage origination and sale activities related to loan securitization, (iii) continue to perform, and incur postpetition secured indebtedness, under the mortgage loan purchase and sale agreement with Ally Bank and related agreements, (iv) pay certain prepetition amounts due to critical origination vendors, and (v) continue honoring mortgage loan repurchase obligations arising in connection with loan sales and servicing, each in the ordinary course of business (the "**Origination Motion**") [Docket No. 44]; and (B) motion for an order authorizing the Debtors to continue to perform under the Ally Bank Servicing Agreement in the ordinary course of business (the "**Ally Servicing Motion**", [Docket No. 47] collectively with the Origination Motion, the "**Motions**").[1]  In support of the Objection, the Committee respectfully submits as follows:

## PRELIMINARY STATEMENT

      The Committee is mindful of the Debtors' need to continue its origination and servicing activities in the ordinary course with certain affiliates of Ally Financial, Inc. ("**Ally**") and thus does not object to the majority of the relief sought by the Motions.  The Committee does object, however, to a limited number of unwarranted provisions of the proposed orders, including provisions that would (i) curtail in advance the Debtors' statutory rights under

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Origination Motion and Ally Servicing Motion, as applicable.

Bankruptcy Code section 365 to assign its servicing agreement without Ally Bank's consent; (ii) grant a blanket advance waiver of the automatic stay permitting affiliates of Ally to terminate agreements with the Debtors in certain future circumstances; (iii) elevate certain prepetition claims of Ally affiliates to administrative expense status; and (iv) give the Debtors blanket authority, in their sole discretion, to pay any or all prepetition claims relating to repurchase obligations in full and in cash, outside of a plan of reorganization. Each of these provisions constitutes a significant departure from the Bankruptcy Code's requirements and from standard bankruptcy practice, for which the Debtors have not presented any proper justification.

In addition, while the Committee does not object to the Debtors continuing their ordinary course origination and servicing activities with certain Ally affiliates, the Committee notes that the agreements and amendments that the Debtors entered into with those affiliates in the weeks preceding the Debtors' bankruptcy filings warrant close scrutiny. Those agreements and amendments contained numerous concessions, which may be contrary to the Debtors' interests and may be subject to challenge under the Debtors' avoidance powers or otherwise. As the Court is aware, the Committee has only just commenced its investigation of the Debtors' prepetition relationships and transactions with its affiliates. The Committee therefore expressly reserves its rights to raise any appropriate challenge to these prepetition agreements and amendments at a later time.

## **BACKGROUND**

### A.   **Ally Relationship and Debtors' Businesses**

1.   In these Chapter 11 cases, Ally and its non-debtor subsidiary affiliates, including Ally Bank, Ally Investment Management ("**AIM**") and BMMZ Holdings LLC, occupy significant roles. These entities serve as: (i) ultimate parent of the Debtors; (ii) stalking horse purchaser for a portfolio of mortgage loans and securities owned by the Debtors under a $1.6

billion asset purchase agreement; (iii) postpetition secured lender under a $150 million DIP loan to the Debtors under an amendment to a pre-petition secured loan agreement; (iv) prepetition secured lender under $1.1 billion of credit facilities; (v) plan sponsor through its agreement to contribute $750 million in cash and other consideration to the Debtors' estates to support the Debtors' proposed plan of reorganization, in exchange for the Ally Releases; and (vi) contract counterparty to the various mortgage loan servicing and origination-related agreements.

2.     The Debtors are among the largest servicers and originators of residential mortgage loans in the United States.  The Debtors' businesses are comprised of two primary components: the Debtors (a) broker, originate, purchase, sell and securitize residential mortgage loans and (b) service residential mortgage loans for the Debtors, Ally and other investors in residential mortgage loan and mortgage-backed securities ("**MBS**").  The Debtors' origination platform and servicing business are closely intertwined, as the Debtors' origination activities produce inventory for their servicing business.

3.     The Debtors' engage in three primary origination activities: (i) brokering mortgage loans for funding by Ally Bank; (ii) purchasing mortgage loans from Ally Bank and subsequently selling such loans to securitization trusts guaranteed by Ginnie Mae pursuant to the Purchase and Sale Agreement, the Pledge and Security Agreement, and the Master Forward Agreement; and (iii) selling mortgage loans originated by the Debtors in Ohio and Nevada directly to securitization trusts guaranteed by Ginnie Mae for securitization or to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac.

4.     The Debtors also have substantial mortgage loan servicing activities that generate the vast majority of the Debtors revenues.  Generally, the Debtors service loans in one of three capacities: (i) as master servicer (collecting loan payments from primary servicer or

subservicer and distributing to investors and securitization trusts); (ii) as primary servicer (interacting collecting principal/interest and otherwise interacting with the borrower); and/or (iii) as subservicer (serving similar functions to both primary and master servicers, but fee structure is less, because subservicers do not own the mortgage servicing rights). Most relevant to this Objection, GMAC Mortgage acts as subservicer for certain loans whose mortgage service rights Ally Bank owns.

B.    **The Origination Activities**

1. *Pre-April 2012 Activities*

5.    Prior to the Petition Date, the Debtors, principally GMAC Mortgage, LLC ("**GMAC Mortgage**"), purchased mortgage loans from Ally Bank (including loans brokered by the Debtors to Ally Bank, as well as loans sold to Ally Bank by third parties) in exchange for a repayment obligation to Ally Bank. Those mortgage loans were then sold to Fannie Mae, Freddie Mac or securitization trusts guaranteed by Ginnie Mae (together with Fannie Mae and Freddie Mac, the "**GAs**"), pursuant to a master mortgage loan purchase and sale agreement (the "**MMLPSA**") between Ally Bank and GMAC Mortgage, LLC dated as of July 1, 2008.[2]

6.    As payment for the mortgage loans, the GAs or securitization trusts would issue MBS to GMAC Mortgage, who would direct the MBS to be delivered to AIM. AIM would then sell those MBS to third party investors for cash to be deposited in GMAC Mortgage's

---

[2]    Fannie Mae and Freddie Mac would have transferred such loans to securitization trusts, who in turn issue mortgage backed securities. The Debtors also sold mortgage loans to Non-GA securitization trusts, a business they no longer conduct. The Debtors also originate loans in Ohio and Nevada (i.e., do not purchase them from Ally Bank) and sell such loans directly to securitization trusts guaranteed by Ginnie Mae or to Ally Bank for resale to Fannie Mae or Freddie Mac.

account.[3]  The cash proceeds from the transactions under the Master Forward Agreement were then used to repay Ally Bank for the purchase of such loans.

### 2. *April and May 2012 Actions*

7.       At the end of April and the beginning of May 2012, the Debtors entered into a series of agreements and amendments that provided more favorable terms for the non-Debtor affiliates (and thus Ally) and had a material impact on the Debtors' prepetition origination activities:

- First, Debtors GMAC Mortgage and Residential Capital, LLC entered into a Pledge and Security Agreement with Ally, Ally Bank, GMAC Mortgage Group, LLC, and AIM (the "**Security Agreement**"), pursuant to which the Debtors granted liens in favor of the non-Debtor affiliates party thereto to secure certain obligations arising out of the origination process.[4]  Those liens extended to then-outstanding Ginnie Mae loans, new loans to be acquired, the new servicing rights by the Debtors relating to such new loans, the MBS to be acquired in exchange for such loans and any proceeds of the foregoing.[5]  In addition, the Security Agreement permits the netting of claims by and among various Ally entities and the Debtors under such agreements, without regard to mutuality of claims.  (Security Agreement at § 13(n).)

- Shortly thereafter, the Debtors also amended the MSFTA (as amended and restated, the "**Master Forward Agreement**"), which afforded AIM significant rights and protections they did not previously have, including a new requirement that the Debtors post an initial margin of $10 million (previously $0 for both parties) and an incremental margin in an unlimited amount—at the discretion of AIM—for any given transaction. (Master Forward Agreement at Annex 3, § 1(b), 2(f).)[6]  AIM is also given numerous new termination rights, which can be exercised on thirty days' notice without cause and on five days' notice with cause.

- Finally, on May 1, 2012, the Debtors narrowed their prepetition origination activities (and thus, their presumptive postpetition activities) through an amendment to the

---

[3]      These transfers were conducted pursuant to a master securities forward transaction agreement, dated March 18, 2009 ("**MSFTA**"), entered into by GMAC Mortgage and AIM's predecessor in interest.

[4]      Specifically, the liens under the Security Agreement secure obligations arising out of the MMLPSA, the MSFTA and a December 5, 2011 letter ("**Pipeline Letter**").

[5]      The Debtors have indicated that the Ginnie mortgage servicing rights are the Debtors' most valuable unencumbered asset, with a book value in excess of $400.  (Origination Motion ¶ 23.)  The Security Agreement only contemplates a temporary pledge of the servicing rights, until the Debtors pay for the purchased loans.

[6]      The Master Forward Agreement also permits an in-the-money party to demand variation margin.  MSFTA Annex 3, § 2(a).  The Committee understands that the margin requirements may have been amended at the request of the DIP lenders, such that the concept of incremental initial margin no longer exists.

MMLPSA (the "**Purchase and Sale Agreement**") pursuant to which the Debtors' origination activities were scaled back to only the purchase of loans from Ally Bank that are sold to Ginnie Mae guaranteed securitization trusts (and conform to the Ginnie Mae standards). Ally Bank is now able to sell loans directly to Fannie Mae and Freddie Mac without the need for a conduit, and collect associated fees previously payable to the Debtors.[7] In addition, GMAC Mortgage is now obligated to repurchase the loans for which Ally Bank extends credit regardless of whether such loans are actually sold to the securitizations. Ally Bank was also given new termination rights under this amendment, which can be exercised on thirty days' notice without cause and on five days' notice with cause.

### 3. The Origination Motion

8.      By the Origination Motion, the Debtors seek to continue their origination activities in the ordinary course of business, including performing under the above agreements with affiliates of Ally. In addition, the Origination Motion seeks to (a) grant to Ally Bank and AIM superpriority administrative expense claims with recourse only to the collateral under the Security Agreement, and general administrative claims for any amounts owing under such agreements in excess of such collateral (i.e., as post-petition obligations), and (b) authorize Ally Bank or AIM to modify the automatic stay, at their discretion, to allow them to exercise termination rights after October 11, 2012.

9.      The Debtors also seek authority to pay certain securitization fees ($60,000-$65,000 per month) owing to Fannie Mae and Freddie Mac and commitment fees ($400,000 per quarter) to guarantee timely payment of investors and to extend the Debtors' ability to participate in Ginnie Mae securitizations, respectively.[8] Pursuant to the Origination Motion, the Debtors seek authority to pay certain unspecified third parties for critical general support services, legal compliance and advisory and customer communication and

---

[7]      This change coincided with the approval of Ally Bank as an authorized seller of mortgage loans by Fannie Mae and Freddie Mac, allowing Ally Bank to sell loans to such entities directly, instead of through the Debtors.

[8]      Although the Debtors no longer sell mortgage loans to Fannie Mae or Freddie Mac, they apparently continue to pay such fees. No reason has been given and the Debtors have indicated that they do not intend to pay such fees, although the Interim Order approved such payments. Origination Interim Order ¶ 13.

documentation.  The Debtors seek to pay $3.32 million in prepetition obligations in the ordinary course to such service providers, in their sole discretion.  Any such payment is to be conditioned on the agreement of the recipient to provide post-petition services on customary trade terms, consistent with prepetition practices.

10.    The Debtors also seek authority to continue to process future originations (including loans in the pipeline and those that are added in the future), loan refinancing programs and to refund prepaid loan fees, to the extent mortgages are not extended.  The Debtors also seek authority, in their discretion, to honor the mortgage repurchase obligations in accordance with their applicable representations and warranties in connection with their sale and servicing of GA loans *and* Non-GA loans, without regard to whether such obligations arose prepetition or post-petition.  Finally, the Debtors seek authority (to the extent necessary) to permit the GAs to submit repurchase requests.[9]

C.    **The Ally Bank Servicing Activities**

1.    *Prepetition Agreements*

11.    Prior to the Petition Date, GMAC Mortgage acted as subservicer for mortgage loans whose servicing rights were owned by Ally Bank pursuant to servicing agreement date August 21, 2001 (as amended, "**Prior Servicing Agreement**").  As of March 31, 2012, GMAC Mortgage serviced 690,000 loans with an aggregate unpaid principal balance of $140.8 billion in this capacity.  The Prior Ally Servicing Agreement automatically renewed every year unless either party provided 120 days' advance notice of a termination or non-renewal.

---

[9]    There is no mention of a corresponding right to deliver requests for Non-GAs.

12.    On April 19, 2012, Ally Bank allegedly provided notice to the Debtors of their intent to not renew such an agreement, which as a result would then have terminated on August 21, 2012.  Thereafter, apparently at the behest of the FDIC, Ally Bank conducted a competitive bidding process for the subservicing agreements.   To avoid a significant disruption in the efficient servicing of the loans that could be caused by its replacement, GMAC Mortgage was selected as the winning bidder.  In early May 2012, the Debtors negotiated a replacement servicing agreement (the "**A&R Servicing Agreement**"), containing new terms, including a new pricing schedule and more comprehensive rights and obligations.    The A&R Servicing Agreement has a one-year term, subject to earlier termination by mutual agreement or after 120 days' prior notice by either party.  The A&R Servicing Agreement limits the Debtors' ability to assign such an agreement, without the consent of Ally Bank. (A&R Servicing Agreement § 10.04(a).)

### 2.    *The Servicing Motion*

13.    Under the Ally Servicing Motion, the Debtors seek to allow GMAC Mortgage to continue servicing and related functions for Ally Bank in the ordinary course pursuant to the A&R Servicing Agreement.  Notably, the proposed final order acknowledges that the A&R Servicing Agreement is a prepetition contract, even though it did not take effect until the entry of the interim order.  Notwithstanding the status of such contract, the proposed final order limits the Debtors ability to assign such agreement under section 365 of the Bankruptcy Code.  Under the proposed final order, the A&R Agreement is also not terminable by Ally Bank or GMAC Mortgage within the first 90 days after the Petition Date except that Ally Bank may terminate immediately if certain bankruptcy events occur, notwithstanding the automatic stay.  In addition, the Debtors seek an advance lifting of the automatic stay to permit Ally Bank to exercise termination rights under the A&R Agreement.

14. Although the Servicing Motion indicates that the A&R Servicing Agreement provides for lower fees in the aggregate than under the Prior Servicing Agreement (Ally Servicing Motion ¶ 27), the Committee now understands, based on discussions with the Debtors, that going forward, such fees will actually be slightly higher. The Debtors contemplate monthly fees of approximately $5.3 million under such an agreement.

### OBJECTION

15. The Committee understands the importance of the Motions to the Debtors' going-concern business operations and therefore supports the principal proposed relief, namely, the Debtors' continued performance of various subservicing and origination activities.[10]   The Committee objects, however, to a limited number of unwarranted provisions of the proposed orders, which would improperly limit, in advance, the Debtors' statutory rights under the Bankruptcy Code or elevate certain prepetition claims of Ally affiliates to administrative expense status. (Point A.) The Committee also objects to the Debtors' request for blanket authority to pay prepetition claims relating to repurchase obligations outside of a plan of reorganization. (Point B.)

**A.    The Final Orders Should Not Contain Advance Limitations on the Debtors' Rights Under the Bankruptcy Code or Elevate Affiliates' Claims to Administrative Expense Status**

16. Although each of their agreements with affiliates is a prepetition contract, the Debtors seek to extend a number of significant <u>post</u>-petition protections to their counterparties. Each of these proposed provisions is improper and should be stricken from the proposed final orders.

---

[10]    The Debtors have represented that continuing such relationships is in the best interests of the estate. The Committee has asked for financial information to support this conclusion but to date has not received information sufficient to confirm these representations with certainty.  While continuing to work with the Debtors on such diligence, the Committee reserves its right to seek appropriate relief in the event the facts do not bear out the Debtors' representations.

17.     First, the Debtors propose an express limitation, in the proposed final order for the Servicing Motion, on their statutory power under Bankruptcy Code section 365 to assign the Servicing Agreement without Ally Bank's consent:

> Notwithstanding any provision in the Servicing Agreement or the Bankruptcy Code, including under section 365 of the Bankruptcy Code, to the contrary, the ***Debtors may***, without the consent of Ally Bank, ***assign the Servicing Agreement only*** to an Eligible Servicer (as such term is defined in the Servicing Agreement) as to whom Ally Bank's engagement as a subservicer under the Servicing Agreement for the Agency Loans (as such term is defined in the Servicing Agreement) has been approved by the applicable Agencies (as such term is defined in the Servicing Agreement).

(Ally Servicing Proposed Final Order ¶ 9, emphasis added).    Under section 365 of the Bankruptcy Code, a debtor may ordinarily assume and assign an executory contract such as the A&R Servicing Agreement, without giving effect to anti-assignment provisions, so long as a debtor cures certain types of defaults, compensates the counterparty for any pecuniary loss resulting from such defaults and provides adequate assurance of future performance by the assignee.  11 U.S.C. § 365(b), (f).  Although the A&R Servicing Agreement and the proposed final order permit assignments to Eligible Servicers (as defined in the A&R Servicing Agreement) without Ally Bank's consent, paragraph 9 of the Final Order limits the Debtors' statutory assignment rights to "only" Eligible Servicers who satisfy specific conditions.  The Debtors do not cite any legal basis for providing such an advance limitation of its assignment rights.  The provision is improper and should be stricken.

18.     Second, the Debtors are asking this Court to authorize a blanket advance stay modification, without further briefing or court order, that would permit the Ally-affiliated parties to terminate each of the foregoing contracts in a variety of circumstances.  Specifically, the proposed final orders for the Origination Motion and the Servicing Motion would permit:

- Ally Bank to terminate the A&R Servicing Agreement (a) immediately to the extent the proposed final order is not entered within 50 days from the petition date and upon the occurrence of certain other case-related events; (b) immediately, taking effect 120 days later, with respect to 3,000 loans; and (c) beginning 90 days after the petition date, taking effect 120 days later, with respect to any remaining loans (Ally Servicing Proposed Final Order ¶¶ 3, 6);

- Ally Bank to terminate the Purchase and Sale Agreement (a) beginning 150 days after the petition date, taking effect 30 days later, without cause, and (b) immediately, taking effect 5 days later, with cause (Origination Proposed Final Order ¶ 6);[11] and

- AIM to terminate the Master Forward Agreement (a) beginning 150 days after the petition date, taking effect 30 days later, without cause and (b) immediately, taking effect 5 days later, with cause (Origination Proposed Final Order ¶ 10).[12]

(Origination Proposed Final Order at ¶¶ 6, 10; Ally Servicing Proposed Final Order ¶¶ 3, 5, 6, 7.)  At the same time, the Debtors have agreed to limit their own ability to terminate the A&R Servicing Agreement during the first 90 days of these cases (Ally Servicing Proposed Final Order ¶ 5) and to obtain a hearing on a proposed rejection the contract on less than 120 days' notice (Ally Servicing Proposed Final Order ¶ 7), thereby requiring the Debtors to perform through the first 210 days of the cases before a hearing could be held.  As with the waivers concerning section 365, the Debtors have not offered any legal basis or justification for the advance stay waivers they seek.

19.    Third, the Debtors propose to extend administrative expense priority to all claims arising under all Specified Documents (as defined in the Security Agreement), all of which are prepetition agreements with the Debtors' affiliates, regardless of whether such obligations arose prepetition or postpetition.  (Origination Proposed Final Order ¶¶ 8, 11.)  To qualify as an administrative expense claim under section 503(b)(1)(a), a claim must arise "out of

---

[11]    The Purchase and Sale Agreement automatically terminates on the earlier of December 31, 2012 and the date the Debtors can originate on their own. (Purchase and Sale Agreement § 6.1.)

[12]    Notably, AIM does not have a termination right under section 555 (the safe harbor provisions) of the Bankruptcy Code.  (See Master Forward Agreement Annex 1, § 5(B).)

a transaction between the creditor and the bankrupt's trustee or debtor in possession" – i.e., it must be a post-petition claim.  Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 101 (2d Cir. 1986).  However, any claims arising  under the Specified Documents existing as of the petition date would be prepetition claims, which should not be elevated to administrative expense status under section 503(b) of the Bankruptcy Code unless and until such contracts are assumed.

**D.     The Debtors' Request for Blanket Authority to Pay Prepetition Claims Relating to Repurchase Obligations Should be Denied**

20.     Historically, as part of their origination activities, the Debtors have offered certain representations and warranties concerning the quality of the loans and/or servicing, to purchasers of mortgage loans and the parties for whom they service, as applicable.  To the extent such representations are breached, on a loan-by-loan basis, the Debtors may be liable for repurchase claims (i.e., obligations of the seller to repurchase a non-compliant mortgage loan from the purchaser of the mortgage) or indemnity claims (obligations of seller to indemnify purchaser for losses relating to such loan).  The Debtors' potential liability under such claims could be very substantial.

21.     The Proposed Final Order approving the Origination Motion would give the Debtors broad authority to honor:

> in their ***sole and absolute discretion*** all mortgage loan repurchase or repurchase-related obligations (or, in their sole discretion, to pay "make-whole" payments in lieu of repurchase), in accordance with their applicable representations and warranty obligations, arising in the ordinary course of business in connection with: (a) their sale of GA Loans to Fannie Mae, Freddie Mac or Ginnie Mae securitization trusts; and (b) their sale of Non-GA Loans, in each case ***without regard to whether such obligations arose prepetition or postpetition*** . . . .

(Origination Proposed Final Order ¶ 21; emphasis added.)  Similarly, the same order authorizes the Debtors to perform their repurchase obligations with respect to breaches of representations

and warranties arising from their servicing activities, and to honor repurchase obligations in connection with loan modifications, foreclosures and short sales, all without regard to whether such obligations arose prepetition or postpetition. (Id. ¶ 22.)

22.     A debtor generally is not permitted to pay its pre-petition unsecured claims prior to confirmation of a plan.  See, e.g., Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.), 4 F.3d 1329, 1334 (5th Cir. 1993) (holding bankruptcy court improperly allowed payment of postpetition funds to satisfy prepetition claims and stating "[n]either the appellees nor the bankruptcy court cited a specific provision of the Code that would allow the payment of postpetition funds to satisfy prepetition claims"); Official Comm. of Equity Sec. Holders v. Mabey (In re A.H. Robins, Co.), 832 F.2d 299, 302 (4th Cir. 1987) ("The Bankruptcy Code does not permit a distribution to creditors in a Chapter 11 proceeding except under and pursuant to a plan of reorganization that has been properly presented and approved."); Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs.), 713 F.2d 211, 216 (6th Cir. 1983) (stating bankruptcy courts do not have power to authorize debtors to pay prepetition claims prior to plan of reorganization); In re Allegheny Int'l, Inc., 118 B.R. 282, 296 (W.D. Pa. 1990) ("It is beyond dispute that a debtor may not pay creditors outside of a plan or reorganization.").

23.     The Debtors advance no persuasive reason why they should be permitted to do so here.  Although the Debtors have suggested that the governmental associations may seek to terminate their servicing agreements with the Debtors if such repurchase obligations are not honored (Origination Motion ¶ 53), this has not been established, nor have the Debtors advanced any justification whatsoever for paying the prepetition claims arising under Non-GA Loans outside of a plan of reorganization.  Moreover, the "doctrine of necessity" does not apply,

because if, as the Committee understands, such liabilities are to be assumed, they can be paid when the servicing agreements are assumed in connection with a sale. Finally, giving the Debtors the broad discretion they seek to honor repurchase obligations has the potential to allow the Debtors to manipulate creditor support through their ability to honor such obligations without being subject to monitoring or judicial oversight.

24.    At a minimum, should the Court find that circumstances warrant permitting the Debtors to honor repurchase obligations arising under GA Loans, the Court should (i) limit that authority to GA Loans, as distinct from Non-GA Loans; and (ii) condition the Debtors' authority to honor its prepetition repurchase obligations arising under GA Loans on the establishment of a process that would require consultation with the Committee and, absent agreement, would give the Committee the opportunity to challenge such action by application to the Court.

E.    **Additional Technical Revisions to the Proposed Orders Are Needed**

25.    Apart from the issues discussed above, the Committee has highlighted a number of technical changes to the final order approving the Origination Motion, which remain subject to negotiation. To the extent not resolved prior to the hearing, the Committee would request the following: (a) increased reporting, consisting with prior servicing orders, on payments of prepetition obligations (Origination Proposed Final Order ¶ 15-17);[13] (b) elimination of any authority to pay GA Securitization Fees, as the Debtors no longer sell loans directly to Fannie Mae or Freddie Mac (Origination Proposed Final Order ¶ 13); (c) clarification or elimination of any authority to purchase whole loans for resale to third parties (Origination Proposed Final Order ¶ 12); and (d) inclusion of a reservation of rights relating to the Debtors'

---

[13]    It is anticipated that the proposed final order will be modified to track the language in the interim order (paragraphs 15 to 21), but the Committee has not been provided with a copy to confirm. The Committee has made similar comments in connection with the proposed final order for approving the GA Servicing Motion [Dkt. No. 57].

performance under various consent orders and any related entitlement to contribution, and/or indemnification from Ally.

## **RESERVATION OF RIGHTS**

26.    As noted above, in the weeks prior to bankruptcy, the Debtors granted numerous significant concessions to Ally Bank and AIM, both of which are insiders, in the form of renegotiated agreements.  The Committee is concerned that, given the relationship between the Debtors and their non-Debtor affiliates, these transactions may not have been negotiated in arms' length and may improperly divert value from the Debtors.  Pending the outcome of the Committee's investigation into these relationships and transactions, the Committee reserves its rights to challenge the transactions covered by the Motions, under the applicable provisions of chapter 5 of the Bankruptcy Code or otherwise.

WHEREFORE, the Committee respectfully requests that the Court modify the proposed final orders on the Motions as set forth herein and grant such other and further relief as may be just and proper.

Dated: New York, New York
        June 11, 2012

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/  Kenneth H. Eckstein
Kenneth H. Eckstein
Philip Bentley
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*