**Hearing Date and Time: June 18, 2012 at 10:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip Bentley
Douglas H. Mannal
Joshua K. Brody
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

--------------------------------------------------------- x

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**TO THE DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING**
**AND APPROVING SALE PROCEDURES, INCLUDING BREAK-UP FEES**
**AND EXPENSE REIMBURSEMENT; (II) SCHEDULING BID DEADLINE**
**AND SALE HEARING; (III) APPROVING FORM AND MANNER**
<u>**OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF**</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

TABLE OF EXHIBITS ...................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND .............................................................................................. 4

    A.    General Background ............................................................................ 4

    B.    The Debtors' Businesses and Assets ..................................................... 6

    C.    The Pre-Petition Marketing Process ..................................................... 8

OBJECTION ................................................................................................... 9

    I.    The Timeline For The Sale Transactions Should Be Extended ................ 10

        A.    The Compressed Timeline For the Nationstar Sale Will Chill Bidding ...... 10

        B.    Extending the Ally Sale Timeline Will Allow Additional Time to
            Investigate the Propriety of the Ally Releases ............................................ 12

    II.    Other Issues With The Ally Sale ...................................................... 14

        A.    The Debtors Should Not Link the Sale of the HFS Assets to the Ally
            Settlement ...................................................................................... 14

        B.    Several Provisions of the Ally APA and Bid Procedures Would Improperly
            Benefit Ally At the Estate's Expense ..................................................... 16

    III.    Other Issues With The Nationstar Sale ............................................. 17

        A.    The Nationstar Break-Up Fee is Much Too High ..................................... 18

        B.    The Bidding Increment is Too High ..................................................... 22

    IV.    Other Aspects of the Bid Procedures Should be Modified ...................... 23

RESERVATION OF RIGHTS ............................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Gey Assocs. General P'ship v. 310 Assocs., L.P. (In re 310 Assocs.),
    346 F.3d 31 (2d. Cir. 2003)............................................................................................18, 19

In re 995 Fifth Avenue Assoc. L.P.,
    96 B.R. 24 (Bankr. S.D.N.Y. 1989)...........................................................................................18

In re Biddermann Indus. U.S.A., Inc.,
    203 B.R. 547 (Bankr. S.D.N.Y. 1997).......................................................................................21

In re Chrysler LLC,
    405 B.R. 84 (Bankr. S.D.N.Y. 2009)...........................................................................................9

In re Cryptometrics, Inc.,
    No. 10-53622, 2010 BL 318895 (Bankr. W.D. Tex. Sept. 17, 2010)........................................9

In re Integrated Resources, Inc.,
    147 B.R. 650 (S.D.N.Y. 1992).......................................................................................18, 19, 21

In re Metaldyne Corp.,
    409 B.R. 661 (Bankr. S.D.N.Y. 2009) (Glenn, J.).........................................................18, 19, 22

In re Randall's Island Family Golf Ctrs. Inc.,
    261 B.R. 96 (Bankr. S.D.N.Y. 2001), aff'd, 272 B.R. 521 (S.D.N.Y. 2002) .........................21

In re Residential Capital, LLC,
    No. 12-12020 (MG) (Bankr. S.D.N.Y. May 14, 2012).............................................................5

In re Residential Capital, LLC,
    No. 12-12020 (MG) (Bankr. S.D.N.Y. May 31, 2012).............................................................14

In re RSL COM Primecall, Inc. & RSL COM USA, Inc.,
    No. 01-11457, 2002 Bankr. LEXIS 367 (Bankr. S.D.N.Y. Apr. 11, 2002)............................22

In re Steve & Barry's Manhattan LLC,
    No. 08- 12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) ....................................................21, 22

In re Young Broad., Inc.,
    Case No. 09-10645 (Bankr. S.D.N.Y. April 2, 2009).............................................................21

STATUTES

11 U.S.C. § 363............................................................................................................................9

**OTHER AUTHORITIES**

Informal Staff Opinion 0804012, April 22, 2008
http://www.ftc.gov/bc/hsr/informal/opinions/0804012.htm .........................................................21

## TABLE OF EXHIBITS

**Exhibit**

Whitlinger Deposition Excerpt ......................................................................................................**A**

May 14, 2012 Transcript Excerpt
    In re Residential Capital, LLC,No. 12-12020 (MG) (Bankr. S.D.N.Y. May 14, 2012) ...........**B**

Greene Deposition Excerpt ...........................................................................................................**C**

May 31, 2012 Transcript Excerpt
    In re Residential Capital, LLC, No. 12-12020 (MG) (Bankr. S.D.N.Y. May 31, 2012) ..........**D**

Expressions of Interest from Fortress .............................................................................................**E**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby files this objection (the "**Objection**") to the Debtors' motion for an order (the "**Bid Procedures Order**") (i) authorizing and approving the sale procedures (the "**Bid Procedures**"), including break-up fees and expense reimbursement; (ii) scheduling bid deadline and sale hearing; (iii) approving form and manner of notice thereof; and (iv) granting related relief (the "**Bid Procedures and Sale Motion**").[1]  In support of the Objection, the Committee respectfully submits as follows:

### PRELIMINARY STATEMENT

The Debtors have proposed an ambitious chapter 11 reorganization on a highly compressed schedule.  At the heart of this reorganization is a proposed settlement with the Debtors' corporate parent, Ally Financial Inc. ("**Ally**"), under which Ally would obtain releases of all estate causes of action, plus non-consensual third-party releases of billions of dollars of litigation claims.  At the same time, the Debtors propose to dispose of most of their assets – their mortgage origination and servicing platform and their "legacy" whole loan portfolio – with Nationstar Mortgage LLC ("**Nationstar**") and Ally serving as the stalking horse bidders for the mortgage origination and servicing platform and the whole loan portfolio, respectively.

As the Court is aware, the Committee has just commenced an investigation into the proposed Ally settlement and is not yet in a position to assess that settlement's merits or propriety. However, the Committee is gravely concerned that the auction and sale procedures proposed by the Bid Procedures and Sale Motion are not designed to maximize recoveries for unsecured creditors.  Instead, those procedures appear designed to further Ally's objective – obtaining

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Bid Procedures and Sale Motion.

closure at the earliest possible date with releases for Ally – at the expense of the estate's interest in structuring an effective auction process that will encourage robust bidding and yield the highest possible price for the Debtors' assets.

In addition, the Committee and its financial and legal professionals have not yet determined whether the Debtors' proposed auction process for the sale of the whole loan portfolio will maximize value for creditors, including whether the stalking horse price is sufficient to justify a sale now, as opposed to retaining these assets for a run-off over time. These assets are very complex, and the Committee's professionals are just beginning their diligence on these assets. The Committee anticipates that the sale process will be dynamic, and we will continue to discuss our concerns with the Debtors. The Committee therefore reserves all of its rights to later object to any proposed sale, and this Objection focuses only on the specific issues with the bid procedures.

The Committee has three principal concerns with the proposed Bid Procedures:

First, the three-month time frame proposed for completion of the marketing and bidding process is too short. The assets that comprise the Debtors' mortgage origination and servicing business are highly complex, and in order to best create an environment conducive to multiple bids, the Debtors will need to give bidders more than three months to conduct necessary due diligence and to submit a Qualified Bid. The need for more time is compounded by the very limited nature of the Debtors' pre-petition marketing efforts: The Debtors contacted only five potential bidders, who were given approximately one week to review the Debtors' data room before soliciting bids. As a result, this is not a situation where the Debtors can assume that most of the work needed to be done by a potential bidder has already been done pre-petition. Indeed, the Committee has been informed by a number of bidders that the 90 day marketing period is not sufficient. Finally, more time is needed for the sale of the whole loan portfolio as well, because

(as discussed below) the Ally stalking horse bid is conditioned on obtaining the Ally Releases, and the Committee needs additional time to investigate the various Ally transactions and the propriety of the proposed releases. The Committee therefore submits that the deadlines for both Sale Transactions should be extended by an additional 60 days.

Second, the Bid Procedures and Sale Motion improperly seeks to link Ally's stalking horse bid to the comprehensive settlement that Ally is seeking to obtain through a chapter 11 plan. Specifically, Ally's bid provides that the purchase price Ally will pay for the Debtors' whole loan portfolio will depend on the process by which the sale is consummated. If the transaction is completed through a chapter 11 plan that incorporates the estate and third-party releases that Ally is seeking, Ally will pay approximately $1.6 billion. However, if the transaction is completed through a section 363 sale, Ally will pay only about $1.4 billion. This $200 million purchase price differential has nothing to do with the value of the purchased assets. Rather, as the Debtors have admitted,[2] it is part of the price that Ally has agreed to pay for the Ally releases. By requiring bidders to bid in excess of $1.6 billion, the Bid Procedures in effect compel bidders to pay the same $200 million for a release that only Ally needs.

By linking Ally's purchase price to the Ally releases, the Debtors have disadvantaged true third-party bidders, and created uncertainty in the market and potential costly disruptions to the sale process, because Ally is effectively bidding on two assets: the HFS Assets and the Ally releases. Potential bidders will not know what price they are bidding against. Worse still, bidders may be barred (if the Debtors have their way) from bidding at amounts less than $1.6 billion. Compounding the problem further, the Bid Procedures Order would anoint the Debtors as the sole party responsible for determining the highest and best bid, despite the conflicts of interest

---

[2] See Whitlinger Deposition at 117:20-118:24. Excerpts of deposition transcript of James M. Whitlinger, dated June 8, 2012 (the "**Whitlinger Deposition**") are annexed hereto as **Exhibit A**.

they face due to their close ties to Ally.  As discussed below, these flaws in the sale process could cause the Debtors' estates to lose up to $200 million of value.  In order to fix these flaws, the Committee asks that   (i) the Bidding Procedures be modified to start the bidding at $1.4 billion, rather than $1.6 billion, and (ii) the Committee be given a consent right as to the determination of the highest and best bid.

Third, the stalking horse protections for Nationstar are not designed to maximize value.  Specifically, the exorbitant size of the combined break-up fee ($72 million), expense reimbursement ($10 million) and initial minimum overbid   ($23.3 million) – requiring an incremental *$105.3 million* to be considered a "qualified bid" – is virtually certain to have a chilling effect on other prospective bidders, particularly in light of the limited pre-petition marketing efforts.  Accordingly, the Committee believes that, to ensure that the Debtors obtain the highest price possible, (i) the Break-Up Fee should be reduced to $19.2 million, and (ii) the minimum overbid requirement should be reduced to $7.5 million.

## BACKGROUND

### A.   General Background

1.      The Debtors are among the largest servicers and originators of residential mortgage loans in the United States, servicing more than $370 billion of residential mortgage loans for more than 2.4 million homeowners, which makes them the fifth largest servicer in the nation.  In 2011, they, along with their non-debtor affiliate Ally Bank, produced more than $56 billion in loan origination volume, making them the tenth largest residential mortgage loan originator in the nation.  Debtor Residential Capital, LLC ("**ResCap**"), which is the parent company of each of the other debtors, is a subsidiary of Ally, formerly known as GMAC LLC.

2.      ResCap and Ally have a significantly intertwined corporate and business relationship.  As set forth in the Committee's motion for 2004 discovery [Docket No. 192] (the

"2004 Motion"), prior to the Petition Date, Ally and ResCap consummated a series of significant related party transactions involving the transfer of billions of dollars of assets by ResCap to Ally and/or its affiliates, including the transfer of Ally Bank to Ally. In addition, Ally is a significant lender to ResCap, having extended $1.1 billion of secured indebtedness to certain of the Debtors prior to the Petition Date. Ally is also ResCap's single largest source of mortgage loans.

3.    In these chapter 11 cases, the Debtors propose an ambitious and expedited reorganization of more than 50 entities, with more than $15 billion of assets, before the end of the year. See Whitlinger Affidavit at ¶ 48 & Ex. 1. The proposed reorganization includes transactions between the Debtors and Ally that are valued in excess of $2.75 billion. These transactions, which are set forth in the May 14, 2012 Settlement and Plan Sponsor Agreement between the Debtors and Ally (the "**Ally Settlement Agreement**"), include (i) Ally's agreement to act as the stalking horse bidder for the Debtors' portfolio of non-conforming held-for-sale loans and certain other securities/mortgage assets ("**HFS Assets**"), (ii) Ally's $150 million DIP loan to the Debtors under an amendment to a pre-petition secured loan agreement, and (iii) Ally's agreement to contribute $750 million in cash and other consideration to the Debtors' estates and to support the Debtors' proposed plan of reorganization. In exchange, the Ally Settlement Agreement provides for Ally to receive, pursuant to a plan of reorganization, (a) releases of all estate claims (the "**Estate Releases**") and (b) non-consensual third-party releases (the "**Third Party Releases**"; together with the Estate Releases, the "**Ally Releases**") of billions of dollars of litigation claims related to residential mortgage loans and mortgage-backed securities. Consistent with the Ally APA, the Ally Settlement Agreement provides that Ally will purchase the HFS assets for approximately $1.6 billion if the sale is consummated through a plan that provides for the Ally Releases, but that Ally will pay only about $1.4 billion if the sale is consummated in a section 363 sale. See

- 5 -

Whitlinger Affidavit at Ex. 8. <u>See also</u> Whitlinger Deposition 117:20-118:24 (testifying that the additional $200 million Ally would pay for purchasing the HFS Assets through a Chapter 11 plan rather than a section 363 sale process represents a portion of the Ally Settlement). The Debtors' proposed reorganization also includes additional settlement agreements with certain creditor constituencies, including the holders of the Debtors' junior secured notes and the holders of certain RMBS-related claims.

4.      The appropriateness of the Debtors' proposed settlements, including the proposed Ally Releases, lies at the heart of these chapter 11 cases. No plan of reorganization can be confirmed until the fairness of these transactions and the conduct of the interested parties has been thoroughly examined. Indeed, at the first day hearing, the Court alluded to the necessity of such an independent investigation, observing that there appears to be a "conflict within the corporate structure" that invites "some independent fiduciary" to make an assessment. <u>In re Residential Capital, LLC</u>, No. 12-12020 (MG) (Bankr. S.D.N.Y. May 14, 2012), Hr'g Tr. at 36:20 – 37:9.[3]

5.      Because of the intertwined relationship between Ally and the Debtors, the Committee is the only independent estate fiduciary capable of carrying out an investigation of these transactions. In connection therewith, on June 1, 2012, the Committee filed the 2004 Motion, which was approved by the Court on June 5, 2012.

B.      **The Debtors' Businesses and Assets**

6.      Although the Debtors have a number of businesses and asset types, the most significant of the Debtors' businesses is the mortgage origination and servicing business ("**Origination and Servicing Business**"), which itself is comprised of two primary components: the Debtors (a) broker, originate, purchase, sell and securitize residential mortgage loans (the

---

[3] Excerpts of the May 14, 2012 transcript are annexed hereto as **Exhibit B**.

"**Origination Platform**") and (b) service residential mortgage loans for the Debtors, Ally and other investors in residential mortgage loan and mortgage-backed securities (the "**Servicing Platform**").

7.      As part of the Origination Platform, the Debtors broker and/or originate mortgage loans through a consumer lending business that consists of internet and telephone-based call center operations and a network of loan officers.  The Debtors broker their loan production in 47 states to Ally Bank, a non-debtor subsidiary of Ally; Ally Bank underwrites and originates loans based on loan application packages submitted by the Debtors.  The Debtors then either (i) securitize or sell the mortgage loans that they purchase or originate to Fannie Mae or Freddie Mac, (ii) deposit the mortgage loans into securitization trusts backed by Ginnie Mae guaranties, or (iii) deposit the loans into so-called "private label" securitization trusts.

8.      The Servicing Platform is the Debtors' main source of ongoing revenue. Bid Procedures and Sale Motion at ¶ 22.  The Debtors retain the mortgage servicing rights with respect to mortgage loans they have originated and sold, as well as for mortgages purchased from Ally Bank and sold into Ginnie Mae-guaranteed securitizations.   The Servicing Platform has two principal components:  (i) mortgage servicing rights, i.e., the right to service mortgages and mortgage pools in exchange for a specified fee, and (ii) the obligation to make certain advances relating to the mortgages and mortgage pools being serviced, together with the corresponding right to be repaid for such advances.

9.      In addition to the Debtors' Origination and Servicing Business, the Debtors also own a significant amount of other assets (the "**Legacy Assets**"), which consist primarily of loan-related assets remaining from their non-conforming domestic residential mortgage loan

origination and securitization activities.[4]  The Debtors remaining activities for these assets consist of loss mitigation and monetization/run-off of the mortgage loan assets, which are serviced by either the Debtors or third party subservicers.

C.    **The Pre-Petition Marketing Process**

10.    In December 2011, the Debtors, together with their financial advisor, Centerview Partners LLC ("**Centerview**"), began to focus their restructuring efforts on evaluating an in-court sale of substantially all of the Debtors' assets.  On or about January 23, 2012, Centerview commenced a narrowly targeted marketing process for certain of the Debtors' assets – namely, the Origination and Servicing Business.  The Debtors' financial advisor contacted five potential investors and allowed these potential bidders just one week to review the information contained in the data room, prior to holding management presentations with three of these five potential investors.  Around February 13, 2012, Centerview received three preliminary indications of interest for the Mortgage and Servicing Business.  Although five additional potential bidders contacted either Centerview or the Debtors during this time, these additional potential opportunities were not explored further.  Declaration of Samuel M. Greene in Support of the Proposed Sale of Debtors' Assets (the "**Greene Declaration**") at ¶¶ 20-23, 25.

11.    The Debtors elected to engage in further exploration with only two of the potential bidders and, after receipt of the additional information, decided to negotiate exclusively with Nationstar in connection with its bid for the Mortgage and Servicing Business.  Upon going exclusive with Nationstar, which occurred after one month of preliminary due diligence, the Debtors and Centerview provided Nationstar with extensive due diligence over a 12 week time frame, including access to over 1.2 million pages of electronic diligence materials and additional presentation materials.  The Debtor and Nationstar conducted more than 80 hours for on-site, in-

---

[4] The HFS Assets being purchased by Ally are included in the Legacy Assets.

person diligence meetings and had almost daily telephone conferences. The Debtors and Nationstar negotiated the terms of the Nationstar APA between March 2, 2012 and May 13, 2012. *Id*. at ¶¶ 26 – 27, 29 and 33.

12.    In February 2012, Nationstar also submitted an offer to purchase the HFS Assets for either a set purchase price (provided that Ally would provide the financing) or that same purchase price minus $200 million (without Ally financing).    There was no resolution in negotiations with Ally over the financing.  Greene Deposition at 160: 2-5.[5]  In mid-April 2012, during the course of its discussions over the settlement of its claims with the Debtors, Ally offered to purchase the HFS Assets.  Greene Declaration at ¶ 34, Greene Deposition at 169: 3 - 7.  The Debtors did not engage in any marketing process for the HFS Assets.  Between April 29, 2012 and May 13, 2012, the Debtors and Ally negotiated the terms of the Ally APA.  Greene Declaration at ¶ 34-35.

## OBJECTION

13.    Under section 363 of the Bankruptcy Code, bid procedures and the sale process must be designed to encourage, not hamper, bidding.  See In re Chrysler LLC, 405 B.R. 84, 109 (Bankr. S.D.N.Y. 2009) (stating that bidding procedures were previously approved where the Court concluded that "the bidding procedures would encourage bidding from any interested party with the wherewithal and interest to consummate a purchase transaction to ensure that the highest and best offer was attained"); In re Cryptometrics, Inc., No. 10-53622, 2010 BL 318895 (Bankr. W.D. Tex. Sept. 17, 2010) ("courts uniformly recognize that [bidding] procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and thus are appropriate in the context of bankruptcy sales.").

---

[5] Excerpts of the deposition transcript of Samuel M. Greene, dated June 6, 2012 (the "**Greene Deposition**") are annexed hereto as **Exhibit C**.

14.     In the present case, the marketing and sale process that the Debtors seek to implement will not maximize the value of the Debtors' assets.  Instead, the proposed process – including the overly expedited timeline for the sale transactions, the "toggled" stalking horse price for the HFS Assets, and the excessive bid protections being offered to Nationstar – will chill, rather than enhance, bidding.

## I.    The Timeline For The Sale Transactions Should Be Extended

15.     The desire of the Debtors and Ally for a quick chapter 11 process should not divert the Court from scheduling a proper time frame to maximize the value of these assets. The Debtors seek to establish a Bid Deadline of September 18, 2012, an auction on September 25, 2012 and a sale hearing on October 15, 2012 (or such other date before October 31, 2012 that the Court conducts the Confirmation Hearing).  The Committee requests that the proposed Bid Deadline and all subsequent dates be extended by an additional 60 days.[6]  Such an extension is consistent with the DIP milestones, which require entry of a Sale Order by February 15, 2013 and closing of the Sale Transactions by April 15, 2013.

### A.    The Compressed Timeline For the Nationstar Sale Will Chill Bidding

16.     The assets that make up the Origination and Servicing Business are extremely large and complex.  According to the Debtors, "by any measure, the regulatory complexity, size, and nature of the Sales are almost unprecedented."  Bid Procedures and Sale Motion at ¶ 5.  The Debtors' proposed timeline, however, requires completion of the marketing process and submission of bids three months following entry of the Bid Procedures Order.

---

[6] In addition, the Committee notes that, although the Debtors assert that their proposed time frame will provide them with 90 days to market the Origination and Servicing Business, that presumes that they will actually be able to commence the marketing process in earnest once the Bid Procedures and Sale Motion is approved by the Court.  The Committee therefore further requests that the 90 day period sought by the Debtors, as extended by the 60 days requested by the Committee, not actually commence until the Debtors' marketing materials are finalized and the data room is completed.

17.    Potential bidders will have only three months to, among other things, (i) review and analyze the complex Nationstar APA and the proposed purchase prices for the various categories of assets, (ii) perform appropriate due diligence, (iii) value the assets and formulate bids, and (iv) prepare a multi-million cash deposit.  One indication of the time and effort required to perform due diligence on these assets is that the one prepetition bidder other than Nationstar that submitted an expression of interest on the Mortgage and Servicing Business retained seven investment bankers or financial advisors, two major law firms and one accounting firm to assist with its analysis.  Moreover, potential bidders will need access to and additional information from the Debtors, who will also be occupied with simultaneously running the Ally Sale and undertaking the multiple steps needed to implement their proposed restructuring, including filing a plan and disclosure statement and seeking approval of multiple complex settlements in the next few months.  As is evident by the pre-petition negotiations with Nationstar (who added in a significant downward purchase price adjustment a week prior to finalizing the Nationstar APA[7]), every day of diligence matters.  Extending the Bid Deadline by 60 days will afford potential bidders needed time to conduct the required due diligence and properly formulate a bid.

18.    Further, the Debtors cannot rely on their very limited pre-petition marketing process as evidence of having tested the market.  As discussed above and in the Greene Declaration, the Debtors began the marketing process less than four months prior to the Petition Date.  The Debtors contacted only five potential bidders and, after approximately one month of diligence, elected to engage in negotiations solely with Nationstar.  Moreover, during this time, the Debtors rebuffed expressions of interest it received from five other potential bidders.  Because the Debtors only implemented a confidential targeted pre-petition marketing process, this is the

---

[7] See Greene Deposition at 165:3 to 166:7.

first time that many of the potential bidders will have an opportunity to review the due diligence

materials. Additional time will enable more bidders to participate in the process, thus maximizing

value to the estate.

19.    In addition to affording bidders the additional time necessary to complete

due diligence, extending the marketing process by an additional 60 days will also benefit the

Debtors by giving them more time to complete the pooling and servicing agreement amendment

process. The Debtors have servicing rights with respect to both government sponsored entity

("**GSE**") securitizations and private label securitizations. With respect to the MSRs for private

label securitizations, pursuant to section 3.1(a) of the Nationstar APA, the Debtors are only

entitled to payment for such MSRs if the private label securitizations have "eligible" servicing

agreements. In addition, Nationstar will be entitled to a more significant discount with respect to

the servicer advances relating to the non-eligible servicing agreements than it is for "eligible"

servicing agreements.

20.    The Debtors have informed the Committee that they are beginning the

process of seeking amendments to the non-eligible servicing agreements in order to make them

eligible. The Debtors do not know how long such a process will take. By extending the bid

deadline, the Debtors will benefit from having more time to complete the amendment process.

Providing additional certainty around the amendment process before final bids are due will be

beneficial to the auction process and likely result in receiving higher bids.

**B.    Extending the Ally Sale Timeline Will Allow Additional Time to Investigate
the Propriety of the Ally Releases**

21.    While the Debtors go to some lengths to explain the need for the sale of the

Origination and Servicing Business to move on an expedited time frame (which, as discussed

above, the Committee does not believe is sufficient to justify a 90-day marketing process), the

Debtors have not provided any justification whatsoever as to why there is a need to sell the HFS Assets in the next three months. The Debtors have already stated their intention to wind down the HFS Assets (Whitlinger Affidavit at ¶ 105), and these assets are not further deteriorating in value.

22.    In fact, there is no need to fast-track the Ally Sale, and decelerating the Ally Sale process will likely maximize value. As an initial matter, extending the timeline for the HFS Assets will enable the Debtors to focus more on the sale of the Origination and Servicing Business, which is more diligence-intensive. More importantly, the additional time will give the Committee the additional time it needs to properly undertake its investigation. As described in more detail below, Ally's stalking horse bid is directly tied to the global settlement between Ally and the Debtors (the "**Ally Settlement**"), particularly the Ally Releases. The Committee has just begun its investigation of the various transactions with Ally and needs additional time to adequately assess whether the additional $200 million consideration provided by Ally as stalking horse in the context of a chapter 11 plan is appropriate or sufficient. Finally, extending the Ally sale process will give the Committee valuable additional time to assess the crucial question of how best to maximize the value of the HFS Assets – i.e., whether the best course is to sell those assets now through the proposed auction process (either to Ally or to another bidder) or instead to retain the HFS Assets and dispose of them at a later time. The Committee is hopeful that, with this additional time, it will have more clarity as to whether the proposed auction of the HFS Assets is indeed the best way to maximize the value of those assets, as well as whether the Debtors are likely to obtain the Ally Releases in a chapter 11 plan.

23.    In the event that, closer to the Bid Deadline or the Auction for the HFS Assets, it is still unclear whether the Debtors will likely be able to confirm a chapter 11 plan containing the Ally Releases – and therefore whether Ally would pay $1.4 billion or instead $1.6

billion for the HFS Assets – the Committee reserves the right to ask that the timeline for the sale

of the HFS Assets be further extended.  The Bid Procedures Order should be clarified to permit

the Committee to request, and the Court to grant, such an extension.

## II.    Other Issues With The Ally Sale

### A.    The Debtors Should Not Link the Sale of the HFS Assets to the Ally Settlement

24.    As noted above, the Ally APA and the Ally Settlement Agreement provide

for a "toggle" purchase price in connection with Ally's stalking horse bid.  Ally will purchase the

HFS Assets at a higher price, which the Debtors estimate will be $1.6 billion, if the sale is

consummated through the chapter 11 plan that provides for the Ally Releases.  If the sale is

consummated outside of the chapter 11 plan process, then Ally will pay a lower price for the HFS

Assets, estimated by the Debtors to be approximately $1.4 billion.  In this fashion, Ally has

conditioned its higher stalking horse purchase price on the Debtors' ability to implement the Ally

Settlement Agreement by confirming a chapter 11 plan containing the Ally Releases.  This

condition creates a highly uncertain process, which will serve to chill bidding.

25.    It is far too early in these chapter 11 cases for any party to know whether

the Court will approve a chapter 11 plan containing the Ally Releases.  Indeed, the Court has

already noted the difficult burden the Debtors carry with respect to obtaining the Third Party

Releases.  In re Residential Capital, LLC, No. 12-12020 (MG) (Bankr. S.D.N.Y. May 31, 2012),

Hr'g Tr. at 31:20-32:11[8] ("[T]he third-party nondebtor release issue jumped out at me as being a

very significant issue. . . . Extensive briefing is going to be required if the debtor expects to get

something approved with third-party nondebtor releases").  Moreover, the Court is only likely to

approve the Third Party Releases with significant creditor support – and the Committee, whose

opinion will have an impact on the general unsecured creditor body's vote on the chapter 11 plan,

---

[8] Excerpts of the May 31, 2012 transcript are annexed hereto as **Exhibit D**.

has only just begin its investigation of the Debtors' relationships with Ally. There is therefore no way for anyone to know at this point whether the Ally bid of $1.6 billion is even a likely outcome.

26.    Although the Bidding Procedures are silent as to the minimum bid required to be considered a "Qualified Bid," the Debtors have told the Committee that they believe a potential bidder must bid at least $1.6 billion for the HFS Assets to be a Qualified Bid. This will lead to a situation that may significantly decrease the value provided to the estate. A potential bidder who would otherwise be prepared to bid an amount between $1.4 billion and $1.6 billion will be discouraged from bidding, and may even be told by the Debtors that it is disqualified from bidding such an amount.[9] This could cause the estate to lose up to $200 million in sale proceeds – if, for example, Ally's $1.6 billion bid were to fail because a plan containing the Ally Releases was not confirmed. Indeed, even if such a plan were confirmed, a third-party bid at $1.6 billion could be worth substantially more to the estate than an Ally bid at that amount, since the third-party bidder would not require the Debtors to give the Ally Releases. The Bidding Procedures must therefore be clarified to provide that a bid of $1.4 billion or more is a Qualified Bid.

27.    Moreover, the Committee does not believe that it is appropriate that the Debtors be the sole party making a determination as to what is the highest and best bid at the auction. The Debtors' close ties with Ally, compounded by their obligation under the Ally Settlement Agreement to seek confirmation of a chapter 11 plan containing the Ally Releases, create conflicts of interest that will make it impossible for them to make a disinterested choice between any Ally bid and a third-party bid. In addition, if the Debtors are the sole party to make a

---

[9] The Debtors' financial advisor has admitted that the Bid Procedures are unclear as to the amount of the minimum bid required to participate in the Auction for the HFS Assets. Greene Deposition at 173:10-14. In addition, during depositions, both the Debtors' financial advisor and ResCap's CFO admitted that if Ally emerged from the Auction process as the winning stalking horse bidder at $1.6 billion and then a chapter 11 plan containing the Ally Releases was not confirmed, the Debtors would likely re-auction the HFS Assets with a starting bid of $1.4 billion. Greene Deposition at 175:8–179:9; Whitlinger Deposition at 127:22-128:7. Notably, the concept of a "re-auction" is not provided for anywhere in the Bid Procedures or any of the other sale documents. The Debtors' ad hoc responses to the Committee's questions further underscore the lack of clarity in the Bid Procedures.

determination as to the highest and best bid, this could also have a further chilling effect on

bidders, who may be justifiably concerned that the playing field is not level.  For both of these

reasons, the Committee requests that it be given a consent right as to the determination of the

Starting Bid at the Auction and the highest and best bid for the HFS Assets.

**B.**     **Several Provisions of the Ally APA and Bid Procedures Would Improperly
         Benefit Ally At the Estate's Expense**

28.     The Ally APA and the proposed Bid Procedures contain several provisions

that could improperly benefit Ally at substantial cost to the Debtors' estates.[10]

29.     First, the Bid Procedures Order contains a proposed finding that the terms

of the Ally APA were negotiated by the Debtors and Ally in good faith and at arm's length.  Bid

Procedures Order at ¶  F.  The Committee has just started its investigation of the Debtors' pre-

petition relationships with Ally and proposed post-petition transactions with Ally, and it would be

premature for the Court to make a finding that the Ally APA was negotiated in good faith.

30.     Second, Section 6.19 of the Ally APA prohibits the Debtors from using the

proceeds from the sale to fund any suit against Ally or its affiliates.  This could preclude a suit to

enforce the billions of dollars of potential estate claims against Ally that the Committee is

currently investigating – a potentially disastrous result for the estate if a plan containing the Ally

Releases is not confirmed and an estate representative seeks to prosecute these claims.  This

provision also could impede the prosecution of estate claims of other sorts, such as a suit seeking

post-closing adjustments to the Purchase Price.

31.     If Ally is not willing to withdraw this improper provision, the Committee

submits that this will be a significant factor in evaluating the highest and best bid at the Auction.

The presence of this provision underscores the need for the Committee to be given a consent right

---

[10] The Committee reserves all rights to raise any additional issues with regard to the Ally APA and the  Sale Order in
connection with the Sale Hearing.

as to the determination of the highest and best bid for the HFS Assets, so that the Committee can consider the potentially significant negative impact of this provision on the estates in determining which bid provides the greatest overall value to the estates.

32.    Third, Section 2.1(e) of the Ally APA provides that Ally is purchasing causes of actions associated with the purchased mortgage loans, including any preference or avoidance claims of the Debtors that are related to the purchased assets.  While it appears the intent is to transfer causes of actions related to the whole loans, clarification that this provision will not impact any claims the Debtors have against Ally, including with regard to the whole loans,  is needed.

## III.    Other Issues With The Nationstar Sale

33.    As described above and in the Bid Procedures and Sale Motion, the Debtors are seeking approval of Nationstar as the stalking horse bidder for the Origination and Servicing Business.  In connection therewith, the Debtors seek approval of bid protections for Nationstar that include a $72 million Break-Up Fee and a $10 million Expense Reimbursement in the event Nationstar is not the successful bidder.[11]   In addition, the proposed Bid Procedures require an initial overbid amount of $23.3 million.  Although the Committee recognizes that it is appropriate to provide Nationstar with bid protections for its pre-petition work, the Committee is concerned that the totality of the stalking horse protections being sought – requiring an incremental *$105.3 million* to be considered a "qualified bid" – will discourage competing bids and undermine the effectiveness of the sale process.

---

[11] It is far from clear that the Debtors' board of directors ever gave any consideration to the size of the Break-Up Fee. Notwithstanding the Committee's repeated discovery requests, the Debtors have not been able to produce a single document which demonstrates that the Board considered the reasonableness of the Break-Up Fee before approving the Debtors' entry in the Nationstar APA.  Furthermore, ResCap's CFO, who is also a member of ResCap's board, testified:  "I don't remember [the Board] discussing breakup fees specifically."  Whitlinger Deposition 98:14-25.

C.    **The Nationstar Break-Up Fee is Much Too High**

34.    The Nationstar APA provides that Nationstar will receive a Break-Up Fee of $72 million if it is not the Successful Bidder.  While the Committee agrees that Nationstar is entitled to a break-up fee, the proposed fee is far too large.  Together with Nationstar's $10 million expense reimbursement and the required $23.3 million initial overbid in order to be a Qualified Bid, this break-up fee may render the auction ineffective.

35.    Stalking horse protections, such as break-up fees and expense reimbursements, are designed to reimburse bidders who provide a floor for bidding and bear the risk of performing due diligence, allowing the debtor to search for higher offers.  Courts in this district have adopted a three-part test for evaluating break-up fees: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation?; (2) does the fee hamper, rather than encourage, bidding?; and (3) is the amount of the fee unreasonable relative to the proposed purchase price?  In re Integrated Resources, Inc., 147 B.R. 650, 657 (S.D.N.Y. 1992); In re Metaldyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (Glenn, J.)  In assessing the third of these factors – the reasonableness of the fee – courts have observed that the fee "should be reasonably related to the risk, effort, and expenses of the prospective purchaser." Integrated, 147 B.R. at 662.  See also Gey Assocs. General P'ship v. 310 Assocs., L.P. (In re 310 Assocs.), 346 F.3d 31, 34 (2d. Cir. 2003) ("Breakup fees . . . provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders. . . . The breakup fee compensates the stalking horse for the risk it shoulders in being the first bidder.") (citation omitted); In re 995 Fifth Avenue Assoc. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, breakup fees are generally permissible.").

36.    In the present case, the $72 million Break-Up Fee is excessive on its face. It is difficult to see how Nationstar could possibly argue that the $72 million fee, on top of its $10 million Expense Reimbursement, bears any reasonable relationship to the pre-petition efforts it expended in conducting due diligence and formulating its bid.  The fee would amount to a windfall – a sum far in excess of the amount needed to "provide an incentive for [Nationstar] to serve" as a stalking horse or to "compensate [Nationstar] for the risk it shoulder[ed] in being the first bidder," Gey Assocs., 346 F.3d at 34.  As a payment much larger than needed for these purposes, the fee is improper:  It hampers, rather than encourages, bidding, and it is not "reasonably related to [Nationstar's] risk, effort, and expenses." Integrated, 147 B.R. at 662.

37.    The Debtors may argue that the $72 million Break-Up Fee is appropriate because it amounts to approximately 3.1% of the $2.3 billion purchase price. See Metaldyne Corp., 409 B.R. at 670 (finding that break-up fee and expense reimbursement of less than 3% of the total purchase price "falls within the range of what courts in this jurisdiction have found to be acceptable break-up fees.").  As a threshold matter, it is far from clear whether a 3.1% break-up fee is appropriate in a transaction of this size.[12]  Moreover,  in the present case, any reliance on a 3%-of-purchase-price yardstick would be unwarranted for an independent reason:  Any percentage measure should be applied not to the entire $2.3 billion purchase price, but only to the approximately $640 million portion of the price that Nationstar is paying for the Debtors' mortgage servicing rights ("**MSRs**") platform, which includes the MSRs and related assets (less deducted liabilities).[13]  The balance of the purchase price – approximately $1.7 billion –

---

[12] In *Metaldyne* and most other cases that have approved break-up fees of approximately 3%, the amount of the purchase price and of the resulting fee was a small fraction of the amounts involved here.  *See, e.g., Metaldyne* (break-up fee of $1.5 million for purchase price of $78 million).  In contrast, in bankruptcy sale transactions that approach the size of the sale here, the break-up fee is often less than 3%.

[13] As set forth on Schedule 3.1(a) to the Nationstar APA and further clarified on Exhibit G to the Bid Procedures and Sale Motion, the purchase price under the Nationstar APA consists of two principal parts:  the amount that Nationstar

constitutes payment for the Debtors' servicer advances, which are tantamount to cash assets and therefore should not be considered for this purpose.

38.     To understand why this is so, it is important to understand the nature of and difference between MSRs and servicer advances, both of which arise under the Debtors loan servicing agreements, but which fundamentally differ in their nature and suitability as a measure of the enterprise being sold.  An MSR is the right to be paid a fee for acting as a servicer (whether a primary servicer, a subservicer or a master servicer) for a mortgage pool or an individual loan. The amount of the fee is generally computed as a percentage of the unpaid principal balance of the mortgage pool or the loan.  A servicer advance , in contrast, is an advance of funds that a servicer is required to make in a variety of circumstances for the benefit of investors in the mortgage pool. Whereas MSRs have a going concern value – i.e., the Debtors receive fees for services rendered – servicer advances are more properly characterized as a financial asset, i.e., an entitlement to repayment for monies advanced.  In almost all circumstances, servicer advance receivables are entitled to priority payment from the loan pool for which the advance was made.  *See* Bid Procedures and Sale Motion at ¶ 26 ("Advances are generally reimbursable to the Debtors on a priority basis").  For this reason, servicer advance receivables are virtually assured of collection.

39.     Because servicer advances have no meaningful collection risk and are therefore tantamount to cash, Nationstar is not providing a benefit to the estate by setting a "floor" for such assets.  Any other bidder would similarly have valued the servicer advances at or close to par; thus, any higher bid would presumably rest on the bidder attributing a greater value to the MSRs, rather than to the servicer advances.  These cash-like assets should therefore be excluded from the baseline purchase price for purposes of evaluating the reasonableness of the Break-Up

is paying for the MSR platform, which includes the MSRs and related assets less deducted liabilities  (approximately $640 million), and the amount it is paying for the Servicer Advances (approximately $1.7 billion).

Fee.  See In re Biddermann Indus. U.S.A., Inc., 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997) (it is appropriate to exclude cash generated by debtors' assets from calculation of value for purposes of determining break-up fee); Integrated, 147 B.R. at 662  (excluding company's expected cash on hand in calculating the purchasers' investment and appropriate break-up fee).[14]

40.    Notably, it is clear that both Nationstar and the Debtors view the servicer advances as similar to cash.  For example, in Nationstar's initial expression of interest to buy the Origination and Servicing Business assets, Nationstar proposed to exclude servicer advances from the purchase.  Instead, Nationstar proposed that it would collect and remit those advances to ResCap, apparently at no cost, for 18 months – and it estimated that, during that time, it would recover 80-90% of the servicer advances at par.  At the same time, Nationstar committed to purchase any remaining advances at the end of the 18 months at 95% of the face amount of such advances.  See Expressions of Interest from Fortress on February 17, 2012, attached hereto as **Exhibit E**.

41.    That the Debtors and Nationstar view servicer advances as tantamount to cash is also apparent from their determination of the amount of Nationstar's good faith deposit.  It is common for qualified bidders to be required to give a good faith deposit of approximately 10% of the purchase price.  See, e.g., In re Randall's Island Family Golf Ctrs. Inc., 261 B.R. 96, 98 (Bankr. S.D.N.Y. 2001) (requiring 10% deposit), aff'd, 272 B.R. 521 (S.D.N.Y. 2002); In re Young Broad., Inc., Case No. 09-10645 (Bankr. S.D.N.Y. April 2, 2009) (requiring deposit of lesser of 10% of $25 million); In re Steve & Barry's Manhattan LLC, No. 08- 12579 (ALG)

---

[14] The staff of the Federal Trade Commission (the "**FTC**") has adopted a similar approach in its determinations, under the Hart-Scott-Rodino Act ("**HSR Act**"), of the size of transactions involving the acquisition of MSRs.  The HSR Act requires parties to report to the FTC for review of certain transactions prior to consummation.  Whether a transaction is subject to review, and the amount of the fee payable to the FTC if the transaction is reviewable, depends on the size of the transaction.  The staff of the FTC's Premerger Notification Office has advised that, in transactions involving the acquisition of MSRs, servicer advances should be disregarded in determining the size of the transaction, because they are regarded as cash equivalents.  See Informal Staff Opinion 0804012, April 22, 2008 letter to Mike Verne: http://www.ftc.gov/bc/hsr/informal/opinions/0804012.htm).

(Bankr. S.D.N.Y. Aug. 5, 2008) (requiring deposit of 10% of purchase price). Here, by contrast, Nationstar was required to post a good-faith deposit of only $72 million, i.e., approximately 10% of the purchase price *exclusive of the servicer advances*.

42.     If one computes the Break-Up fee on a similar basis – i.e., as a percentage of the purchase price exclusive of the servicer advances – the $72 million fee amounts to **11.2**% of the purchase price. An 11.2% break-up fee, of course, vastly exceeds the range of break-up fees customarily approved by courts in this District. See e.g., Metaldyne Corp., 409 B.R. at 670 (break-up fee and expense reimbursement totaling less than 3% was within range of fees approved in this jurisdiction); In re RSL COM Primecall, Inc. & RSL COM USA, Inc., No. 01-11457, 2002 Bankr. LEXIS 367, at *12-13 (Bankr. S.D.N.Y. Apr. 11, 2002) (3.1% break-up fee was "reasonable and customary").[15]

43.     For these reasons, the Committee respectfully requests that the proposed Break-Up Fee be reduced to $19.2 million, i.e., approximately 3% of the purchase price exclusive of the servicer advances.

D.      **The Bidding Increment is Too High**

44.     The Bid Procedures provide that a Qualified Bid include an initial overbid amount equal to 1% of the Purchase Price, or approximately $23.3 million. At the Auction, pursuant to the Bid Procedures, the bidding increment for the Origination and Servicing Business is $25 million. This required bidding increment is far too high, when one considers that the

---

[15] Moreover, even if the Court ascribed some value to the servicer advances in calculating the Break-Up Fee, it still would not be appropriate to use $2.3 billion as the purchase price for this purpose. As discussed above, the Nationstar bid is subject to significant downward adjustments if the Debtors are unable to obtain amendments to the existing non-eligible servicing agreements. Specifically, Nationstar would not pay anything for MSRs associated with non-eligible servicing agreements and would be entitled to a significant discount for servicer advances associated with the non-eligible agreements. The Debtors' financial advisor testified at deposition (Greene Deposition at 155:5-6) that the resulting reduction to Nationstar's bid could exceed $200 million. Nationstar should not receive a break-up fee based on value they may very well not provide to the estate.

stalking horse purchase price for the income-producing aspect of the Original and Servicing

Business being purchased (i.e. the MSRs) is less than $700 million, and that the balance of the

$2.3 billion purchase price is for assets that are tantamount to cash (i.e., the servicer advances).

To avoid unduly chilling the bidding process, the Committee requests that the bidding increment

for the Origination and Servicing Business be reduced to $7.5 million.

## IV.    **Other Aspects of the Bid Procedures Should be Modified**

45.    The Committee serves as the watchdog to ensure that the Debtors are taking

all steps necessary to maximize value for the estate.  While the Committee is given consultation

rights over what offers constitute a "Qualified Bid" and which bid is the "Highest and Best" at the

Auction, the Bid Procedures should be modified to:

- Provide the Committee with consent rights as to whether a bidder has submitted a "Qualifying Expression of Interest" to ensure that the maximum number of parties are giving due diligence access, *see* Bid Procedures at page 2;

- Provide the Committee with consent rights over the amount of the Starting Bid and leading Subsequent Bids at each Auction, *see* Bid Procedures at page 6;

- Provide the Committee with consent rights over any additional rules that the Debtors seek to employ at the Auctions, *see* Bid Procedures at page 6; and

- Provide the Committee with copies of all submissions of confidentiality agreements, financials and any other diligence from prospective bidders, *see* Bid Procedures at page 3.

46.    In addition, the Ally APA only allows a competing bidder to submit one bid

for the entire portfolio of HFS Assets and the Nationstar APA only allows a competing bidder to

submit a bid for the entire portfolio of Origination and Servicing Business or a separate bid for the

Ginnie Mae MSRs.  The proposed asset sales are highly complex and potential bidders who may

only be interested in specific pools of assets will be discouraged from engaging in the due

diligence/bidding process.[16]  In order to maximize total value, the Bid Procedures should allow potential purchasers to bid on different pools of assets.

47.    The Bidding Procedures Order also provides that the Nationstar Break-Up Fee and Expense Reimbursement is entitled to administrative expense status and payable from (i) the proceeds of a Successful Bid or (ii) from proceeds of any forfeited deposit if the Successful Bid does not close.  If the Successful Bid does not close, Nationstar should not be entitled to payment of its Break-Up Fee.  Therefore, the Bid Procedures Order should be modified to provide that the Break-Up Fee and Expense Reimbursement are only payable from the proceeds of a Successful Bid (and not a forfeited deposit).

48.    Lastly, the Nationstar APA provides that the Debtors are responsible for Cure Claims in excess of $10 million.  The Bid Procedures Order provides that if an objection is filed to either the proposed assumption and assignment or the proposed Cure Amount, the Debtors, Nationstar and the objecting party can enter into a stipulation to consensually resolve any objection without submission to or approval by the Court.  As the amount of potential Cure Claims may be significant, the Bid Procedures should be modified to require the Debtors to obtain the consent of the Committee before agreeing to consensually resolve any objection without Court authority.

## RESERVATION OF RIGHTS

49.    The Committee reserves all its rights to object to the relief requested in the Bid Procedures and Sale Motion with respect to the Sale Approval Orders at the appropriate time, including, without limitation, the right to object to the propriety of the proposed sales themselves.

---

[16] ResCap's CFO testified that he thinks there are bidders "that would bid [for] pieces of [the] held for sale portfolio" (Whitlinger Deposition. 111:14-22), but he had no recollection of ResCap ever discussing the possibility of breaking up the HFS Assets and marketing these assets for sale in smaller pieces.  (*Id*. 112:18-113:4).

WHEREFORE, the Committee respectfully requests that the Court modify the proposed Bid Procedures and Bid Procedures Order as set forth herein and grant such other and further relief as may be just and proper.

Dated:    New York, New York
          June 11, 2012

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Philip Bentley
Douglas H. Mannal
Joshua K. Brody
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Counsel for the Official
Committee of Unsecured Creditors*

**<u>EXHIBIT A</u>**

**Whitlinger Deposition Excerpt**

# In The Matter Of:

*RESIDENTIAL CAPITAL, LLC, ET AL.*

_____

*JAMES M. WHITLINGER - Vol. 1*
*June 8, 2012*

_____

*HIGHLY CONFIDENTIAL*

**MERRILL CORPORATION**
**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

Page 1

H I G H L Y   C O N F I D E N T I A L

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                           Case No.
In re                      12-12020(MG)

RESIDENTIAL CAPITAL, LLC, et al.,

        Debtors.
-----------------------------------x

                June 8, 2012

                10:01 a.m.


        Deposition of JAMES M. WHITLINGER,
pursuant to notice, at the offices of
Kramer Levin Naftalis & Frankel LLP, 1177
Avenue of the Americas, New York, New
York, before Gail F. Schorr, a Certified
Shorthand Reporter, Certified Realtime
Reporter and Notary Public within and for
the State of New York.

JAMES WHITLINGER - 6/8/2012

Page 2

```
 1       H I G H L Y   C O N F I D E N T I A L

 2    A P P E A R A N C E S :

 3    KRAMER LEVIN NAFTALIS & FRANKEL LLP
      Attorneys for the Official Committee of
 4    Unsecured Creditors
              1177 Avenue of the Americas
 5            New York, NY 10017

 6    BY:    CRAIG L. SIEGEL, ESQ.
             GREGORY AARON HOROWITZ, ESQ.
 7                -and-
             KIMBERLY E. FRIEDMAN, ESQ.
 8            (ghorowitz@kramerlevin.com)
              (kfriedman@kramerlevin.com)
 9

10    MORRISON & FOERSTER LLP
      Attorneys for Debtors and Debtors in
11    Possession
              1290 Avenue of the Americas
12            New York, NY 10104

13    BY:    STEFAN W. ENGELHARDT, ESQ.
                  -and-
14            ALEXANDER STEINBERG BARRAGE, ESQ.
              (sengelhardt@mofo.com)
15             (abarrage@mofo.com)

16
      KIRKLAND & ELLIS LLP
17    Attorneys for Ally Financial
              655 Fifteenth Street, N.W.
18            Washington, D.C. 20005

19    BY:    PATRICK M. BRYAN, ESQ.
                  -and-
20            ANTHONY GROSSI, ESQ.
              (patrick.bryan@kirkland.com)
21            (anthony.grossi@kirkland.com)

22

23

24

25
```

JAMES WHITLINGER - 6/8/2012

```
                                                      Page 3

  1      H I G H L Y   C O N F I D E N T I A L

  2   A P P E A R A N C E S  (Continued):

  3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      Attorneys for Barclays Bank DIP Lender
  4        Four Times Square
           New York, NY 10036
  5
      BY:    ANTHONY W. CLARK, ESQ.
  6          (anthony.clark@skadden.com)

  7
      WHITE & CASE LLP
  8   Attorneys for Secured Notes
           1155 Avenue of the Americas
  9        New York, NY 10036-2787

 10   BY:    J. CHRISTOPHER SHORE, ESQ.
                 -and-
 11        VANESSA SODERBERG, ESQ.
           (cshore@whitecase.com)
 12        (vsoderberg@whitecase.com)

 13
      SHEARMAN & STERLING LLP
 14   Attorneys for Citibank, N.A.
           599 Lexington Avenue
 15        New York, NY 10022-6069

 16   BY:    WILLIAM J.F. ROLL, III, ESQ.
                 -and-
 17        SUSAN A. FENNESSEY, ESQ.
           (wroll@shearman.com)
 18        (sfennessey@shearman.com)

 19
      SIDLEY AUSTIN LLP
 20   Attorneys for Nationstar Mortgage, LLC
           One South Dearborn
 21        Chicago, IL 60603

 22   BY:    BRETT H. MYRICK, ESQ. (Via phone)
           (bmyrick@sidley.com)
 23

 24

 25
```

JAMES WHITLINGER - 6/8/2012

```
 1      H I G H L Y   C O N F I D E N T I A L

 2    A P P E A R A N C E S (Continued):

 3    KELLEY DRYE & WARREN LLP
      Attorneys for U.S. Bank National
 4    Association
           101 Park Avenue
 5         New York, NY 10178

 6    BY:    BENJAMIN D. FEDER, ESQ. (Via phone)
             (bfeder@kelleydrye.com)
 7

 8    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
      Conflicts Counsel for the Debtors
 9         101 Park Avenue
           New York, NY 10178-0061
10
      BY:    THERESA A. FOUDY, ESQ.
11           (tfoudy@curtis.com)

12
      ROPES & GRAY LLP
13    Attorneys for Consenting Noteholders to
      the Plan Support Agreement
14         Prudential Tower
           800 Boylston Street
15         Boston, MA 02199-3600

16    BY:    STEVEN T. HOORT, ESQ.
             (steven.hoort@ropesgray.com)
17

18

19

20

21

22

23

24

25
```

Page 5

1       H I G H L Y   C O N F I D E N T I A L

2    A P P E A R A N C E S (Continued):

3    WINSTON & STRAWN LLP
     Attorneys for Wells Fargo
4         200 Park Avenue
          New York, NY 10166-4193
5
     BY:    JAMES DONNELL, ESQ.
6           (jdonnell@winston.com)

7
     ALSO PRESENT:
8
     HASAN SYED
9    Moelis & Company

10   DAVID GREENWALD
     Moelis & Company
11
     WILLIAM THOMPSON
12   ResCap

13   ALIYA SHAIN
     Kramer Levin Naftalis & Frankel LLP
14
     JESSICA ARETT
15   Morrison & Foerster LLP

16

17

18

19

20

21

22

23

24

25

JAMES WHITLINGER - 6/8/2012

Page 6

```
 1        H I G H L Y   C O N F I D E N T I A L
 2              JAMES M. WHITLINGER,
 3          called as a witness, having been
 4          first duly sworn by the Notary
 5          Public (Gail F. Schorr), was
 6          examined and testified as
 7          follows:
 8              EXAMINATION BY MR. SIEGEL:
 9       Q.    Good morning, Mr. Whitlinger.
10       A.    Good morning.
11       Q.    My name is Craig Siegel.  I'm
12   an attorney at Kramer Levin Naftalis &
13   Frankel and we represent the Creditors'
14   Committee in the ResCap Chapter 11
15   bankruptcy.  I'm going to ask you some
16   questions today.
17              MR. SIEGEL:  As we discussed
18          beforehand, before I start asking
19          you questions, this deposition, as
20          everyone knows, is being taken
21          pursuant to notice because several
22          parties have expressed interest in
23          participating and attending.
24              During the deposition I may
25          ask questions or use documents that
```

JAMES WHITLINGER - 6/8/2012

Page 98

1    JAMES M. WHITLINGER - HIGHLY CONFIDENTIAL

2    May 13th meeting?

3                MR. ENGELHARDT:  Objection to

4         form.

5         A.    It's possible.  Our board's

6    pretty detailed.  I don't recall.

7         Q.    Do you see any reference

8    specifically to the breakup fee that's in

9    the Nationstar APA in this presentation

10   that's Puntus Exhibit 9?

11               MR. ENGELHARDT:  Objection to

12        form.

13        A.    I don't see any.

14        Q.    Did ResCap's board at this

15   meeting or at any other time prior to

16   entering into the Nationstar APA, review

17   any analyses or comparisons of breakup

18   fees in similar deals of similar sizes to

19   the Nationstar APA?

20               MR. ENGELHARDT:  Objection to

21        form.

22        A.    I don't recall.  I mean we

23   definitely reviewed bid proposal

24   comparisons.  I don't remember discussing

25   breakup fees specifically.

JAMES WHITLINGER - 6/8/2012

Page 111

1    JAMES M. WHITLINGER - HIGHLY CONFIDENTIAL

2      A F T E R N O O N   S E S S I O N

3              12:55 p.m.

4          JAMES M. WHITLINGER,

5        resumed, having been previously

6        duly sworn, was examined and

7        testified further as follows:

8          CONTINUED EXAMINATION

9          BY MR. SIEGEL:

10   Q.    Welcome back, Mr. Whitlinger.

11   I just have a handful of topics to finish

12   covering today.  I don't think it will

13   take too long.

14          My first question is based on

15   your experience with having marketed

16   ResCap's assets in the past, do you think

17   that there are potential bidders who may

18   be interested in purchasing some but not

19   all of the held for sale portfolio?

20   A.    Yes, I think there is people

21   that would bid pieces of that held for

22   sale portfolio.

23   Q.    And did ResCap consider

24   structuring a bidding process that would

25   allow bidders to bid for portions of the

JAMES WHITLINGER - 6/8/2012

Page 112

1    JAMES M. WHITLINGER - HIGHLY CONFIDENTIAL

2    held for sale portfolio rather than all

3    of it?

4        A.    Portions of the held for sale?

5        Q.    Right.

6        A.    We considered selling the

7    platform as a whole, selling it in maybe

8    groups and then lower level asset sales.

9        Q.    When you say the platform, is

10   that different than the held for sale

11   portfolio?

12       A.    Yes, the held for sale we

13   didn't, I wouldn't consider that a

14   platform.  That's whole loans.

15       Q.    And that's what has been

16   referred to as legacy assets?

17       A.    Yes.

18       Q.    So my question is, maybe I'm

19   just misunderstanding, but the legacy

20   assets which I understand is the held for

21   sale portfolio, did ResCap ever consider

22   allowing bidders to bid not on all of

23   those assets, but only on some of them?

24       A.    I don't recall.

25       Q.    You don't recall any --

JAMES WHITLINGER - 6/8/2012

Page 113

1    JAMES M. WHITLINGER - HIGHLY CONFIDENTIAL

2         A.    If we talked about breaking

3    that up, that one subset into smaller

4    pieces and market it, I don't recall.

5         Q.    Are you aware that the current

6    book value of the MSRs I believe as of

7    March 31st, 2012, was about $1.25

8    billion?

9              MR. ENGELHARDT:  Objection to

10        form.

11        A.    That's in the ball park.  It

12   changes daily based on interest rates,

13   but that's in the ball park.

14        Q.    Are you aware that under the

15   relevant accounting standards the book

16   value of the MSRs is supposed to

17   represent the fair value of the MSRs?

18        A.    Yes.

19              MR. ENGELHARDT:  Objection to

20        form.

21        Q.    And are you aware that under

22   the Nationstar asset purchase agreement

23   Nationstar is, it's estimated that

24   Nationstar will purchase the MSRs for

25   around $650 million?

JAMES WHITLINGER - 6/8/2012

Page 117

1    JAMES M. WHITLINGER - HIGHLY CONFIDENTIAL

2    around the same time it was discussing

3    with Ally what became the settlement

4    agreement with Ally?

5              MR. ENGELHARDT:  Objection to

6         form.

7         A.    Yes, there were overlapping

8    time periods.

9         Q.    You understand that under the

10   Ally asset purchase agreement Ally's

11   stalking-horse bid is either $1.6 billion

12   if the Chapter 11 plan is confirmed, that

13   includes the Ally settlement agreement,

14   or 1.4 billion if there isn't a plan

15   confirmed and there's a 363 sale?

16        A.    Yes.

17        Q.    And obviously there's a $200

18   million difference between those numbers?

19        A.    Yes.

20        Q.    And is it true, as far as you

21   know, that the benefit Ally will get from

22   purchasing the legacy assets through the

23   Chapter 11 plan for 1.6 billion rather

24   than through a 363 sale, is that through

25   the Chapter 11 plan they will get certain

JAMES WHITLINGER - 6/8/2012

Page 118

1    JAMES M. WHITLINGER - HIGHLY CONFIDENTIAL

2    releases from potential liabilities

3    through the Ally settlement agreement?

4            MR. BRYAN:  Objection to form.

5            MR. ENGELHARDT:  Objection to

6        form to the extent it calls for a

7        legal conclusion.

8        Q.    Do you want me to say the

9    question again?

10       A.    Yes, that would be helpful.

11           MR. SIEGEL:  Can I ask you to

12       read it back.

13           (Record read as requested.)

14       A.    Yes, by providing 200 million

15   incremental value above the bid that

16   Nationstar had, that $200 million is

17   settlement value that was described.

18       Q.    When you say settlement value

19   that was described, you're talking to a

20   portion of the value of the settlement

21   that includes the releases for Ally,

22   correct?

23       A.    Yes, that's all part, cash

24   consideration.

25       Q.    The Ally settlement agreement

JAMES WHITLINGER - 6/8/2012

Page 127

1    JAMES M. WHITLINGER - HIGHLY CONFIDENTIAL

2    that sitting here right now, you don't

3    have an understanding of exactly what

4    will happen if Ally wins the bid at 1.6,

5    the court doesn't confirm the plan?

6         A.    My understanding if the court

7    doesn't confirm the plan the bid is 1.4.

8         Q.    And what does it mean that the

9    bid is 1.4?

10        A.    That's what Ally's bid to

11   purchase the whole, you know, the whole

12   loan portfolio, the legacy portfolio

13   would be.  That would be the price.

14        Q.    The price for the legacy

15   assets?

16        A.    Yes, for the loan portfolio.

17        Q.    That's the price that they

18   would pay for the loan portfolio in that

19   scenario?

20        A.    Yes.

21             MR. ENGELHARDT:  Objection.

22        Q.    Are you aware of anything in

23   any of the bankruptcy filings by ResCap,

24   including the bidding procedures, that

25   would allow for a second auction after

JAMES WHITLINGER - 6/8/2012

Page 128

1    JAMES M. WHITLINGER - HIGHLY CONFIDENTIAL

2    you conduct the auction as currently

3    proposed?

4              MR. ENGELHARDT:  Objection.

5         A.    I believe there would be a

6    second auction, second opportunity to

7    market that loan portfolio in the market.

8         Q.    Under what scenario?

9         A.    If the plan wasn't confirmed

10   and the fall-back bid was 1.4 billion,

11   that we have the opportunity to have that

12   value beat.

13        Q.    So you would have another

14   auction and Ally's stalking-horse bid

15   would be 1.4 billion?

16        A.    I believe that's possible.

17        Q.    Can you point to any provision

18   in the bidding procedures or any document

19   the debtors have filed that provides or

20   allows for a second auction as you've

21   just described?

22             MR. ENGELHARDT:  Objection.

23        A.    I can't point to that right

24   now.  We've had conversations with your

25   unsecured creditors' committee that that

## EXHIBIT B

**May 14, 2012 Transcript Excerpt**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020(MG)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            May 14, 2012

            4:03 PM


B E F O R E:

HON. JAMES M. PECK (FOR HON. MARTIN GLENN)

U.S. BANKRUPTCY JUDGE

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              36

1   Nationstar.

2        As will be discussed in more detail below, Ally is

3   also providing a DIP loan to allow the debtors to continue to

4   make required Ginnie Mae buybacks.  Finally, Ally is providing

5   essential service to the debtors during the Chapter 11 cases to

6   allow the debtors to operate as a going concern through the

7   sale to Nationstar and any subsequent wind down.

8        Based on those contributions that the debtors valued

9   well in excess of a billion dollars, and which also allowed the

10  debtors to propose a plan that implements the sales to

11  Nationstar and Ally, the independent directors concluded that

12  the truly unusual circumstances justified a settlement that

13  includes third-party releases.

14       I want to be clear, none of the relief being sought

15  today or tomorrow limits in any way third parties' rights with

16  respect to challenging the settlement, third-party releases, or

17  anything else.  Those issues are for another day.  We just

18  wanted to give the Court and the parties an overview of what

19  the settlement entails.

20       THE COURT:  I have one question about process.  And

21  it's probably premature, but I'm going to ask it anyway.  To

22  the extent that there is a competitive process that is being

23  undertaken here, starting with June sale procedures to be

24  approved and a September auction, if one were to assume

25  hypothetically a robust competition for the assets that are the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    37

1   subject of Ally's stalking-horse bid of 1.6 billion dollars,

2   how does the company independently assess that, given what

3   appears to be a conflict within the corporate structure, since

4   Ally is benefitted by this transaction by reason of the

5   releases?  It almost seems to be inviting a Chapter 11 trustee

6   or some independent fiduciary to be involved in assessing this.

7          And my question is, to what extent has any

8   consideration been given pre-filing to how that aspect of the

9   case will be managed?

10         MR. NASHELSKY:  We've given significant thought, Your

11  Honor.  We believe that with the investigation we've done, and

12  with the a creditors' committee who will be shortly appointed,

13  we believe we can have a robust process that looks at the

14  investigation, looks at the materials, looks at the facts, and

15  determines whether the board's judgment was reasonable, given

16  the circumstances.

17         On the bid you just noted, Ally Financial is

18  completely exposed to being overbid on that bid.  They do

19  not -- they're not locking up those assets.  I attributed a 200

20  million dollar value between the Fortress bid and the Ally bid.

21  That's the value today based on having a 200 million dollar

22  higher bid than we have.  That value may not be there come the

23  end of the case if they get overbid, and we'd have to have a

24  different discussion about what that value would be.

25         THE COURT:  But the decider will be the debtor-in-

## **EXHIBIT C**

**Greene Deposition Excerpt**

# In The Matter Of:

*RESIDENTIAL CAPITAL, LLC, et al.*

_____

*SAMUEL M. GREENE - Vol. 1*
*June 6, 2012*

_____

*HIGHLY CONFIDENTIAL*

**MERRILL CORPORATION**
**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

H I G H L Y   C O N F I D E N T I A L

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                            Case No.
In re                       12-12020(MG)

RESIDENTIAL CAPITAL, LLC, et al.,

          Debtors.
-----------------------------------x

          VOLUME 1


          June 6, 2012
          10:02 a.m.


      Videotaped deposition of SAMUEL M.

GREENE, pursuant to notice, at the

offices of Kramer Levin Naftalis &

Frankel LLP, 1177 Avenue of the Americas,

New York, New York, before Gail F.

Schorr, a Certified Shorthand Reporter,

Certified Realtime Reporter and Notary

Public within and for the State of New

York.

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 2

```
 1    A P P E A R A N C E S :
 2    KRAMER LEVIN NAFTALIS & FRANKEL LLP
      Attorneys for the Official Committee of
 3    Unsecured Creditors
              1177 Avenue of the Americas
 4        New York, NY 10017
 5    BY:   GREGORY AARON HOROWITZ, ESQ.
                  -and-
 6        KIMBERLY E. FRIEDMAN, ESQ.
          (ghorowitz@kramerlevin.com)
 7        (kfriedman@kramerlevin.com)
 8
      MORRISON & FOERSTER LLP
 9    Attorneys for Debtors and Debtors in
      Possession
10        1290 Avenue of the Americas
          New York, NY 10104
11
      BY:   STEFAN W. ENGELHARDT, ESQ.
12                -and-
          ALEXANDRA STEINBERG BARRAGE, ESQ.
13        (sengelhardt@mofo.com)
          (sbarrage@mofo.com)
14
15    KIRKLAND & ELLIS LLP
      Attorneys for Ally Financial
16        655 Fifteenth Street, N.W.
          Washington, D.C. 20005
17
      BY:   PATRICK M. BRYAN, ESQ.
18                -and-
          CRAIG A. BRUENS, ESQ.
19        (patrick.bryan@kirkland.com)
          (craig.bruens@kirkland.com)
20
21    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      Attorneys for Barclays Bank DIP Lender
22        Four Times Square
          New York, NY 10036
23
      BY:   SUZANNE D.T. LOVETT, ESQ.
24        (suzanne.lovett@skadden.com)
25
```

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 3

```
 1
 2    A P P E A R A N C E S (Continued):
 3    WHITE & CASE LLP
      Attorneys for Secured Notes
 4         1155 Avenue of the Americas
           New York, NY 10036-2787
 5
      BY:   J. CHRISTOPHER SHORE, ESQ.
 6            -and-
           VANESSA SODERBERG, ESQ.
 7         (cshore@whitecase.com)
           (vsoderberg@whitecase.com)
 8
 9    SHEARMAN & STERLING LLP
      Attorneys for Citibank, N.A.
10         599 Lexington Avenue
           New York, NY 10022-6069
11
      BY:   WILLIAM J.F. ROLL, III, ESQ.
12            -and-
           SUSAN A. FENNESSEY, ESQ.
13         (wroll@shearman.com)
           (sfennessey@shearman.com)
14
15    SIDLEY AUSTIN LLP
      Attorneys for Nationstar Mortgage, LLC
16         One South Dearborn
           Chicago, IL 60603
17
      BY:   BRETT H. MYRICK, ESQ. (Via phone)
18         (bmyrick@sidley.com)
19
      KELLEY DRYE & WARREN LLP
20    Attorneys for U.S. Bank National
      Association
21         101 Park Avenue
           New York, NY 10178
22
      BY:   JASON R. ADAMS, ESQ. (Via phone)
23         (jadams@kelleydrye.com)
24
25
```

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 4

```
 1    A P P E A R A N C E S (Continued):

 2    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
      Attorneys for Federal Housing Finance Agency
 3          1633 Broadway
            New York, NY 10019
 4
      BY:    DANIEL A. FLIMAN, ESQ. (Via phone)
 5           (dfliman@kasowitz.com)
 6
      CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 7    Conflicts Counsel for the Debtors
            101 Park Avenue
 8          New York, NY 10178-0061
 9    BY:    THERESA A. FOUDY, ESQ.
             (tfoudy@curtis.com)
10
11    ROPES & GRAY LLP
      Attorneys for Consenting Noteholders to the
12    Plan Support Agreement
            Prudential Tower
13          800 Boylston Street
            Boston, MA 02199-3600
14
      BY:    STEVEN T. HOORT, ESQ.
15           (steven.hoort@ropesgray.com)
16
      ALSO PRESENT:
17
      LANDON D. PARSONS
18    Moelis & Company
19    DAVID GREENWALD
      Moelis & Company
20
      ALIYA SHAIN
21    Kramer Levin Naftalis & Frankel LLP
22    MELISSA CRESPO
      Morrison & Foerster LLP
23
      JOANNA ZDANYS
24    Morrison & Foerster LLP
25
```

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 5

1              HIGHLY CONFIDENTIAL

2                  SAMUEL M. GREENE,

3          called as a witness, having been

4          first duly sworn by the Notary

5          Public (Gail F. Schorr), was

6          examined and testified as

7          follows:

8              EXAMINATION BY MR. HOROWITZ:

9     Q.    Good morning, Mr. Greene.

10    A.    Good morning.

11         MR. HOROWITZ:  I want to make

12    a statement for the record before

13    we start the deposition.  This is a

14    deposition that's being taken

15    pursuant to notice.  At a hearing

16    before the court last week when Ken

17    Eckstein mentioned that the

18    Creditors' Committee was likely to

19    take depositions a number of

20    parties expressed an interest in

21    being advised and participating and

22    of course we had an obligation to

23    accommodate that desire.  We posted

24    the deposition notice on the docket

25    so that everyone would be advised.

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 155

1      SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2                First of all, what is the

3      potential magnitude of this downward

4      adjustment?

5           A.    I think it's in the

6      neighborhood of 200 plus million dollars.

7           Q.    And of that 200 plus million

8      dollars -- by the way, has the debtor

9      prepared any written estimate of the

10     potential exposure?

11               MR. ENGELHARDT:  Objection to

12          form.

13          A.    I'm not sure.  It's certainly

14     been discussed and I think if you look at

15     the APA agreement you could come to that

16     conclusion.

17          Q.    And of that 200 million, a

18     portion of that relates to a downward

19     adjustment in the price being paid for

20     MSRs and a portion of it is a downward

21     adjustment in the price being paid for

22     advances, right?

23          A.    Yes.

24          Q.    And the majority of it is

25     actually a potential downward adjustment

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 160

1         SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2         Q.    So there'd been no resolution

3    of the negotiations with Ally over

4    stretch financing at that point, right?

5         A.    Correct.

6              MR. ENGELHARDT:  Objection to

7         form.

8         A.    Sorry.

9         Q.    And by the way, just because

10   sometimes I admit when I'm wrong, this

11   one actually does refer to the interest

12   rate that Nationstar was requesting in

13   the stretch financing, right?

14        A.    Yes, it does.

15             MR. HOORT:  You dropped your

16        voice.

17             MR. HOROWITZ:  That's because

18        I was wrong and I didn't want to

19        say it very loud.  What I said was

20        this document does actually reflect

21        the interest rate that Nationstar

22        was requesting in the stretch

23        financing.

24        Q.    This document does not contain

25   any request from Nationstar for a

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 165

1        SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2            A.    Yes.

3            Q.    And if I can direct your

4    attention to page 79.  Do you see section

5    6.22 entitled "PSA amendments"?

6            A.    Yes.

7            Q.    And do you see that it reads

8    "Prior to closing sellers shall use

9    commercially reasonable efforts to obtain

10   any PSA amendment requested by

11   purchaser"?  And then it goes on to say

12   "Purchaser agrees to provide seller such

13   assistance as sellers may reasonably

14   request to obtain any PSA amendment."

15            Does that refresh your

16   recollection that as late as May 9th the

17   only thing that was being required of the

18   seller was to use commercially reasonable

19   efforts to obtain the amendments to the

20   PSA?

21            MR. ENGELHARDT:  Objection to

22        form.

23            A.    Yes.

24            Q.    And looking at 14, which is

25   the Sidley draft redline for May 10th on

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 166

1       SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2       page 78, 6.22, I'm not going to read it

3       out, but you see that now section 6.22

4       has been substantially revised to include

5       the price adjustment mechanism that we've

6       been referring to?

7            A.    Yes.

8            Q.    So were you part of

9       negotiations with Nationstar in May,

10      around May 9th and 10th over Nationstar's

11      demand for a price adjustment?

12           A.    Yes, I was aware of it, yes.

13           Q.    And at that point the debtors

14      knew that they had to file bankruptcy

15      immediately, right?

16           A.    Yes.

17           Q.    And they had been negotiating

18      exclusively with Nationstar for three

19      months now?

20           A.    Yes.

21           Q.    So is it fair to say that at

22      that point the debtors had very little

23      negotiating leverage to resist

24      Nationstar's demand for an adjustment

25      mechanism?

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 169

1    SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2    time we filed.

3         Q.    Well, we looked at the April

4    12th, 2012 Fortress revision of bid and

5    in that revision of bid Fortress is still

6    bidding on the legacy assets, right?

7         A.    Yes.

8         Q.    So is it fair to infer that

9    the AFI offer to purchase occurred

10   sometime after April 12th?

11        A.    Yes.

12        Q.    You say that the offer was 1.6

13   -- well, withdrawn.

14             You say the offer came up as

15   part of the settlement discussions.  What

16   do you mean by that?

17        A.    I mean that during the process

18   of discussing a settlement agreement

19   between ResCap and Ally along the lines

20   of the one that was filed, the concept of

21   purchasing these assets for a price

22   higher than any other price that we had

23   been able to procure from the market

24   became part of the discussion.

25        Q.    Higher than any price you

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 173

1      SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2    are told if you want to participate in

3    this auction you have to be prepared to

4    start at this increment over the existing

5    bid, right?

6        A.    Yes.

7        Q.    So $15 million over what?

8        A.    Sorry, can you repeat the

9    question.

10       Q.    Are they being told they have

11   to beat 1.4 billion by 15 million or 1.6

12   billion by 15 million?

13       A.    The bidding procedures

14   actually aren't clear on this point.

15       Q.    So what's the answer?  Bidders

16   are going to need to be told in advance

17   of an auction, right?

18       A.    Yes.  The debtors' position is

19   1.6.

20       Q.    So if somebody was willing to

21   pay 1.5 billion for these assets, and the

22   current plan is not approved --

23   withdrawn.

24           If I understand this

25   stalking-horse bid, if the plan as

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 175

1      SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2      settlement falls apart, then we would

3      start the bidding at 1.4.

4          Q.    Okay, but what if the

5      settlement is still in limbo at that

6      point?

7          A.    We'd start it at 1.6.

8          Q.    And then if the settlement

9      falls apart after that the debtor will

10     have lost the opportunity to potentially

11     get more than 1.4 billion for the assets,

12     right?

13             MR. ENGELHARDT:  Objection to

14         form.

15         A.    I think it's our belief that

16     there would be enough time to re-auction

17     the assets at 1.4.

18         Q.    But would there be a right to

19     re-auction the assets?  Withdrawn.

20             If the settlement falls apart,

21     Ally still has a right to purchase the

22     assets at 1.4, right?

23         A.    Correct.

24         Q.    The debtors will not have the

25     ability to conduct a new auction at that

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 176

1        SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2        point, correct?

3               A.     I'm not sure that's --

4                      MR. ENGELHARDT:  Objection.

5               A.     I'm not sure that's true.

6               Q.     Do you believe that the Ally

7        APA gives the debtors the right to

8        rescind in the event that the settlement

9        falls apart?

10                     MR. ENGELHARDT:  Objection.

11              A.     Sorry, I don't understand the

12       question.

13              Q.     The debtors are asking the

14       court for approval to enter into a

15       stalking-horse APA with Ally?

16              A.     Yes.

17              Q.     If the auction proceeds and no

18       bidder comes in willing to top 1.6.

19              A.     Correct.

20              Q.     Then the sale to Ally will be

21       approved, right?

22              A.     If the settlement is in place,

23       we start at 1.6, nobody shows up, the

24       settlement is ultimately, the sale is

25       confirmed pursuant to a plan, assets are

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 177

1      SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2      sold to Ally for 1.6.

3          Q.    What if the settlement has not

4      yet been confirmed -- the settlement is

5      not going to be confirmed outside the

6      plan, right?

7          A.    No.

8              MR. ENGELHARDT:  Objection.

9          Q.    The debtors are seeking to

10     have the settlement confirmed by way of

11     the proposed plan, right?

12         A.    That's my understanding.

13         Q.    And the plan isn't going to

14     come up for confirmation before the date

15     that the debtors are seeking to conduct

16     this auction, right?

17         A.    I think it's unlikely.

18         Q.    So if the auction takes place

19     before the plan is confirmed, the debtors

20     are going to take the position that a bid

21     has to be above 1.6 to be qualified?

22         A.    Yes.  We have a $1.6 billion

23     bid on the table, yes.

24         Q.    If as a result no other

25     bidders show up, the debtors will take

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 178

1      SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2     the position that Ally's offer is highest

3     and best and will ask the court to

4     confirm the sale to Ally, right?

5          A.    Yes.

6          Q.    At that point, I'm trying to

7     get your understanding because it's going

8     to be better than my understanding of the

9     APA, at that point, Ally -- well,

10    withdrawn.

11              At that point, if the plan is

12    confirmed, Ally has to close on the

13    transaction and pay 1.6 billion for the

14    portfolio, right?

15         A.    Yes.

16         Q.    If the plan is not confirmed,

17    is my understanding wrong that Ally then

18    has the right to acquire the assets

19    through a 363 sale for 1.4 billion?

20              MR. ENGELHARDT:  Objection.

21         A.    I don't know the answer to the

22    question directly.  What I think we're

23    contemplating is the ability to

24    re-auction those assets at 1.4 billion

25    should the settlement fall apart and we'd

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 179

1      SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

2      be able to do so within the time frame --

3      without violating the overall time frame

4      of the deal, a la when confirmation has

5      to happen, etc.

6          Q.    When the confirmation has to

7      happen under the DIP milestones?

8          A.    The settlement agreement, the

9      DIP milestones, yes, basically those two

10     documents.

11         Q.    And the hypothetical --

12         A.    Then the settlement agreement

13     is blown up at that point, so it's the

14     DIP document.  Look, I think -- look --

15             MR. ENGELHARDT:  There's no

16         question pending.

17         A.    Okay.

18         Q.    That said, we were making

19     progress.  In paragraph 36, the bottom of

20     page 14, in paragraph 36 you're

21     discussing the nature and extent of the

22     negotiations with the GSEs, right?

23         A.    Yes.

24         Q.    On the next page, page 15, at

25     the top of the page you say "The debtors

## EXHIBIT D

**May 31, 2012 Transcript Excerpt**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


                Debtors.


- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                May 31, 2012

                3:04 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

**RESIDENTIAL CAPITAL, LLC, et al.**                    31

1  and center in this case.  We'll deal with that.  One way or the

2  other we'll get through -- we'll get through that process.

3         What I wanted to point out, if I may, just a moment

4  longer, is there's a second stage to this case.  As Your Honor

5  probably appreciates from seeing what was presented on the

6  first day, the debtor has contemplated not only the financing

7  and the sale transactions, the debtor contemplates that it is

8  going to proceed with a plan of reorganization very quickly.

9  That will involve a variety of settlements that it has put in

10  place pre-petition, including a settlement of a wide array of

11  issues between the debtor and its parent company, Ally.

12         The proposed resolution, on its face, contemplates not

13  only a settlement with the debtor of all claims and causes of

14  action that belong to the estate, but it contemplates a third-

15  party release to be included in a plan of reorganization.  We

16  don't need today to discuss the issues surrounding a third-

17  party release.  I certainly understand those issues quite well.

18  And I know that all the parties in this case understand them

19  quite well.

20         THE COURT:  Let me just say, when I read the 1007

21  affidavit, read the first-day motions, the third-party

22  nondebtor release issue jumped out at me as being a very

23  significant issue.  For those of you who've been in other cases

24  with me, you know that it is an issue that I pay particular

25  attention to.  Extensive briefing is going to be required if

RESIDENTIAL CAPITAL, LLC, et al.                    32

1  the debtor expects to get something approved with third-party

2  nondebtor releases.

3          Now is not the time to delve into it in any more

4  detail.  There are both jurisdiction issues; the Manville

5  trilogy, I think, set's that out.  Even if the Court has the

6  jurisdiction, there are then issues about under what

7  circumstances a bankruptcy court can issue a third-party

8  nondebtor release.  So I just forewarn you now that there will

9  be a lot of attention paid to that, if that's the direction the

10 debtors seek to go, which certainly is indicated in the papers

11 that I read so far.

12         Go ahead, Mr. Eckstein.

13         MR. ECKSTEIN:  To round out, I think from a status

14 standpoint, Your Honor, what we have proposed -- and I have

15 discussed this with the Morrison & Foerster firm and I have had

16 the occasion to briefly discuss this with counsel for Ally as

17 well -- is that the committee understands the schedule that is

18 being proposed and understands the goals of the case.  And in

19 order to, we believe, try to facilitate the possibility of

20 achieving a plan in this case, the committee is proposing to

21 undertake an extensive investigation of the pre-petition

22 transactions that are publicly disclosed, but are complicated

23 and significant, and obviously were relevant to the

24 negotiations between the debtor and its parent company that

25 involve, currently, a very significant settlement proposal.

## **EXHIBIT E**

**Expressions of Interest from Fortress**



# FORTRESS
## INVESTMENT GROUP LLC

1345 AVENUE OF THE AMERICAS
46TH FLOOR
NEW YORK, NY 10105
TEL 212 798-6100

**CONFIDENTIAL**

February 17, 2012

Centerview Partners LLC
Attention: Karn Chopra
31 West 52nd Street
New York, NY 10019

**RE: Project Bounce**

Dear Mr. Chopra:

Fortress Investment Group LLC, on behalf of its affiliates, including investment funds and accounts managed by its affiliates and companies owned by such funds and accounts (collectively, "Fortress" or "Buyer"), is pleased to express its interest in acquiring the "NewCo" assets and business of Residential Capital, LLC ("ResCap") as well as various other ResCap and Ally Bank assets (ResCap and Ally collectively, the "Seller").

Fortress is a New York Stock Exchange-listed public company with a $2.0 billion market capitalization. Fortress is a global multi-strategy alternative investment and asset management firm founded in 1998 with approximately $43.6 billion in assets under management as of September 30, 2011. Headquartered in New York, Fortress' affiliates also have offices in Atlanta, Dallas, Frankfurt, London, Los Angeles, New Canaan, Philadelphia, Rome, San Francisco, Seoul, Shanghai, Singapore, Sydney, and Tokyo and employ over 900 employees. Fortress, through its affiliates, manages approximately $12.7 billion of private equity capital, through which it primarily makes long-term, control-oriented investments in cash-flowing assets and asset-based businesses.

Fortress has developed significant financial services expertise, through investment in, among others, Nationstar Mortgage LLC ("Nationstar") and Newcastle Investment Corp. ("Newcastle"). As such, we believe we are particularly well-positioned to evaluate this opportunity as well as to acquire and grow the Company's business and operations. We are excited to work together towards a successful transaction.

Nationstar, acquired by Fortress in July 2006, is the 11th largest US servicer with servicing unpaid principal balance ("UPB") of $106.6 billion as of December 31, 2011 having grown servicing from approximately $10 billion at the time of the Fortress acquisition. In addition to its servicing operations, Nationstar originates residential mortgages via its direct retail and wholesale platforms, originating $3.4 billion in 2011. Nationstar services loans in all 50 states and is licensed as a residential mortgage loan servicer and/or third party debt collector in all states that require such licensing.

The senior management team is comprised of experienced mortgage industry executives with a track record of generating financial and operational improvements. This management team has demonstrated its ability to adapt to changing market conditions and has developed a proven ability to identify, evaluate and execute successful portfolio and platform acquisitions. Nationstar currently services loans for Fannie Mae, Freddie Mac, major government agencies and private investors, among others.



1

CONFIDENTIAL - ATTORNEY EYES ONLY                                                    RC00000567

Newcastle is a public real estate investment and finance company that invests in and actively manages a portfolio of real estate securities, loans and other real estate related assets. Newcastle is organized and conducts its operations to qualify as a real estate investment trust (REIT) for federal income tax purposes. Newcastle's completed its initial public offering in October 2002, and is listed on the NYSE under the symbol "NCT". Newcastle is managed by Fortress Investment Group LLC and currently owns a $3.8 billion portfolio of real estate related investments, including securities, loans and Excess Mortgage Servicing Rights ("Excess MSRs"). As contemplated currently, Newcastle would invest alongside Nationstar in the funding of the MSRs.

## 1. Purchase Price

We propose to acquire the MSR assets, mortgage servicing operations and Consumer Lending (Retention/Retail) platform contemplated within the NewCo structure, as well as the PLS MSR assets, Legacy Portfolio assets, and the Business Lending platform of ResCap/Ally Bank. This Proposal does not contemplate acquiring any of the currently existing servicing advance assets; we would like to discuss with the Seller a structure whereby Buyer would be responsible for collecting existing advances for the Seller, and Buyer would be responsible for all new advances as of the closing date. Our proposal is that we would collect on behalf of the Seller the existing advances for the first 18 months and then at that time, we would purchase from the Seller at 95% of par the then-outstanding advances. Our estimate is that the vast majority of the advances (80-90 percent) will be collected during the first 18 months at par and are prepared to purchase any residual tail at the end of the period. We are open to engage in collaborative discussions with the Seller regarding the advances, including other alternative options.

Our initial, non-binding indication of interest ("Proposal") is provided below, with further detail outlined in Appendix A.

| Asset | Purchase Price ($ in millions) | | | |
|---|---|---|---|---|
| a. NewCo<br>• FNMA, FHLMC, GNMA MSRs owned by ResCap<br><br>• NewCo bid excludes value of PLS portfolio subservicing, as we propose to acquire the PLS MSRs (See "d" below)<br><br>• Ally-owned FNMA/FHLMC subservicing, other fee-based subservicing arrangements, including Master Servicing<br><br>• Excludes currently existing servicing advances<br><br>• Servicing Platform (including corporate SG&A)<br><br>• Retention/Retail Origination Platform | ($ in millions) | UPB | Book Value | Px |
| | FN/FH MSR | $90,044 | $630 | $520 |
| | GNMA MSR | 46,413 | 382 | 280 |
| | | $136,457 | $1,012 | $800 |
| | FN/FH Advances | | $230 | NA* |
| | GNMA Advances | | 112 | NA* |
| | | | $342 | NA* |
| | *Excludes servicing advances, with combined FN/FH/GN book value of $342mm. Buyer to collect existing advances for Seller, with new advances being responsibility of Buyer. At 18 months post closing date, we propose to purchase from Seller at 95% of par the then-outstanding advances. | | | |
| b. Correspondent Lending | Assume Platform – see side letter | | | |
| c. Wholesale Lending | Assume Platform – see side letter | | | |
| d. Private Label Securitization MSR | ($ in millions) | UPB | Book Value | Px |
| | PLS MSR | $71,122 | $192 | $200 |

 FORTRESS

2

CONFIDENTIAL - ATTORNEY EYES ONLY

| e. Private Label Securitization Advances | ($ in millions) | Book Value | Px |
|---|---|---|---|
| | PLS Advances | $1,243 | NA* |
| | *Excludes servicing advances, with book value of $1,243mm. Buyer to collect existing advances for Seller, with new advances being responsibility of Buyer. At 18 months post closing date, we propose to purchase from Seller at 95% of par the then-outstanding advances. | | |
| **a. – e. Subtotal** | | | **Px = $1,000** |
| f. Legacy Whole Loan Portfolio | | | Px = $1,600 |

Our Proposal is "all or none" for items "a" through "e" as referenced in the table above and in Appendix A. The allocation of value presented is for illustrative purposes only.

We propose to assume the Business Lending platform ("b" and "c" above), contingent upon Ally continuously originating during the bankruptcy process and up to closing.

Included in our Proposal, we have assumed subservicing at market rates for the Ally-owned FNMA/FHLMC MSRs, other fee-based subservicing portfolios and the Master Servicing, together in aggregate representing approximately $228 billion of unpaid principal balance ("UPB").

## 2. Financing

We intend to source funds from our portfolio companies and Newcastle. As part of the transaction, we would like to ask for financing at 80-85% advance rate and market rates from the Seller for the Legacy Portfolio (whole loans and trading securities).

## 3. Due Diligence Plan

We are in the process of conducting our due diligence. We appreciate the collective efforts of Centerview and the Seller to date in promptly responding to our diligence requests. As we proceed with the process and work towards a successful transaction, we plan to work together with Centerview and the Seller to advance our due diligence investigation. Our due diligence will be conventional in nature and consist of the following items:

- On-site visits and diligence meetings with management
- Review of the Servicing and Originations platforms
- Review of operating expenses, including better understanding historical to projected numbers
- Review of shared services arrangements
- Further understanding of headcount, functional departments and productivity
- Further review of legal matters, including but not limited to: representations/warranties, buybacks, PSAs, governmental/regulatory matters
- Completion of outstanding diligence requests previously submitted
- Other customary financial/accounting, tax, legal/litigation, operational, IT and HR reviews

 FORTRESS

3

CONFIDENTIAL - ATTORNEY EYES ONLY

RC00000569

We plan to conduct due diligence of the Company's operations and all corporate subject matters and intend to move expeditiously with the goal of minimizing employee disruption in the process. We appreciate the condensed timing for this process and will conduct our diligence accordingly. Fortress has significant experience in undertaking and closing complex acquisitions in a timely and collaborative manner.

4.  **Timing/Material Conditions**

We have received all necessary internal approvals to submit this Proposal. Prior to submitting a final bid, we would require approval of the Fortress Investment Committee and, as appropriate, the portfolio company boards. At this time, we do not foresee any issues with our ability to sign mutually agreed upon definitive documentation in March 2012. We intend to explore with the Seller using existing Nationstar licenses to expedite this transaction. We are prepared to move as expeditiously as required and hope to work together with the Seller to provide a comprehensive solution.

We propose to acquire the foregoing assets free and clear of all liens, claims and encumbrances pursuant to a sale conducted under Section 363 of the United States Bankruptcy Code (11 U.S.C. §101 et. seq.) in a Chapter 11 case commenced by ResCap.

5.  **Approvals**

Prior to signing definitive documentation, we would require the internal corporate approvals as referenced in 4) above. We do not foresee any issues receiving the corporate approvals necessary to consummate this transaction, and members of the Fortress Investment Committee and portfolio company boards have been intimately involved with this process to date.

We plan to rely on the collective expertise of Fortress and its affiliates, including Nationstar Mortgage to garner any and all necessary regulatory, government and significant third-party approvals for this transaction. Nationstar is currently an approved Fannie Mae, Freddie Mac, and Ginnie Mae servicer. We anticipate the transaction will require approvals from GSEs/FHA for the transfer of the agency and government portfolios, as well as any third-party approvals required for the private label portfolio.

Our internal Compliance teams and internal and external regulatory advisors have extensive experience in these areas and we are confident all such approvals will be received in order to close the proposed transaction in the timeframe required by the Seller.

 FORTRESS

4

CONFIDENTIAL - ATTORNEY EYES ONLY

RC00000570

6. **Contacts and Availability**

Please contact Wes Edens with any questions regarding our Proposal.

Wes Edens
Fortress Investment Group LLC
1345 Avenue of the Americas
New York, NY 10105

Office: (212) 798-6111
Mobile: (917) 969-2012
Fax: (212) 798-6122
Email: wedens@fortress.com

We have retained Sidley Austin LLP as outside legal counsel.

Chris Abbinante
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603

Office: (312) 853-7530
Email: cabbinante@sidley.com

We plan to retain additional outside advisors (accounting, tax) in due course.

7. **Other Matters**

Our Proposal includes assuming the Business Lending (wholesale, correspondent) platform of Ally Bank. Our ability to take on this platform is contingent upon Ally continuously originating up until the closing date. We do not contemplate assuming the Warehouse Lending.

Fortress has significant experience structuring, executing and completing complex transactions. Additionally, we have a proven track record of receiving the necessary regulatory and governmental approvals required to close transactions. For example, in connection with our acquisitions of CW Financial and Springleaf, we received various regulatory approvals in expedited time frames. It is our expectation that the required approvals for this transaction will be received in similar fashion. For example, Fortress obtained regulatory approvals and acquired CW Financial on September 1, 2010, approximately 60 days after signing definitive documentation (Springleaf, approximately 110 days).

 FORTRESS

5

CONFIDENTIAL - ATTORNEY EYES ONLY
RC00000571

This Proposal is an indication of our interest and does not create any binding obligations on the part of Fortress. Fortress will have no binding obligation regarding the transactions contemplated herein unless and until it executes mutually agreed upon definitive documentation. This proposal is governed by the internal laws of the State of New York without giving effect to the conflicts of laws principles included therein. The foregoing conclusions and indication of value are specifically based upon our due diligence findings to date and are subject to the material accuracy and completeness of the information provided by the Seller and Centerview Partners LLC. The existence and terms of our Proposal are confidential and may not be disclosed publicly or otherwise without our prior written consent.

Fortress is excited to participate in the process and looks forward to the possibility of completing a transaction. As such, we plan to move expeditiously to complete our due diligence, negotiate mutually agreed upon definitive documentation and proceed to closing.

Sincerely,

Fortress Investment Group

Wesley R. Edens
Principal and Co-Chairman of the Board

FORTRESS

6

CONFIDENTIAL - ATTORNEY EYES ONLY
RC00000572

Project Bounce
Non-binding Indication of Interest

Exhibit A          February 17, 2012

| ($ in millions) | Book Value | UPB or Par Amount | Indication | Comments |
|---|---|---|---|---|
| **a. NEWCO** | | | | |
| **MSRs** | | | | |
| FNMA/FHLMC | $630 | $90,044 | $520 | Acquire MSR |
| GNMA | 382 | 46,413 | 280 | Acquire MSR |
| **Subtotal** | $1,012 | $136,457 | $800 | |
| **Advances** | | | | |
| FNMA/FHLMC | $230 | $230 | NA | Buyer to collect existing advances for Seller; Buyer responsible for new advances |
| GNMA | 112 | 112 | NA | Buyer to collect existing advances for Seller; Buyer responsible for new advances |
| **Subtotal** | $342 | $342 | NA | Buyer to purchase any remaining advance balances at 95% of par, 18 months from closing |
| **Subservicing** | | | | |
| FNMA/FHLMC - Ally | exclude, see "d" below | $131,165 | – | Proposal EXCLUDES PLS subservicing within NewCo; we propose to acquire the PLS MSRs ("d" below) |
| Private Label Securitization | | | – | |
| Other fee-based subservicing | | 43,297 | – | |
| Master Servicing | | 53,290 | – | Assume subservicing at market rates, $0 price |
| | | $227,752 | | |
| **Consumer Lending** | | | | |
| Retention | | NA | – | Assume Platform, $0 price |
| Retail | | NA | – | Assume Platform, $0 price |
| a.   Total NewCo | | NA | $800 | |
| b.   Correspondent Lending | | NA | – | Assume Platform; $0 price, Contingent upon Seller continuing to originate up to transaction closing |
| c.   Wholesale Lending | | NA | – | Assume Platform; $0 price, Contingent upon Seller continuing to originate up to transaction closing |
| d.   Private Label Securitization MSR | $192 | $71,122 | $200 → | Acquire MSR |
| e.   Private Label Securitization Advances | $1,243 | $1,243 | NA → | Buyer to collect existing advances for Seller; Buyer responsible for new advances / Buyer to purchase any remaining advance balances at 95% of par, 18 months from closing |
| **a. - e. SUBTOTAL** | | | $1,000 | Indication pricing for items a. through e. is presented on an all or none basis. Allocation of total price for items a. through e. among assets is for illustrative purposes only |
| f.   Legacy Whole Loan Portfolio | $1,546 | $10,600 | $1,600 → | Acquire Legacy Portfolio |
| **TOTAL** | | | $2,600 | |

NOTE:
| | | | | |
|---|---|---|---|---|
| MSR + Subservicing Total | $1,204 | $435,331 | $1,000 → | Buyer to collect existing advances for Seller; Buyer responsible for new advances |
| Advance Total | $1,585 | $1,585 | NA | |
| Origination Total | | | NA → | Assume Platform, $0 price |
| Legacy Whole Loans Total | $1,546 | | $1,600 → | |
| Grand Total | | | $2,600 | |

FORTRESS

CONFIDENTIAL - ATTORNEY EYES ONLY          RC00000573