# EXHIBIT 2

# Hamzehpour Declaration

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Anthony Princi
Jamie A. Levitt

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF TAMMY HAMZEHPOUR, IN SUPPORT OF DEBTORS'
MOTIONS TO ASSUME PLAN SUPPORT AGREEMENTS**

I, Tammy Hamzehpour, being duly sworn, depose and say:

1. I am the General Counsel of Residential Capital, LLC ("ResCap"), a Delaware limited liability company. I joined ResCap in 1998 and have held my current position since October 2007. In my role as General Counsel of ResCap, I am responsible for oversight of all legal affairs of the company. I am authorized to submit this declaration (the "Declaration") in support of (i) the *Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 365 and Bankruptcy Rule 6006 Authorizing the Debtors to Assume Plan Support Agreements with Steering Committee Consenting Claimants* and (ii) the *Debtors' Motion for Entry of an Order Under Bankruptcy Code*

ny-1044053                                               1

*Section 365 and Bankruptcy Rule 6006 Authorizing the Debtors to Assume Plan Support Agreements with Consenting Claimants Represented by Talcott Franklin, P.C.* (collectively, the "Assumption Motions").

2. In my capacity as General Counsel, I am familiar with ResCap's business, ResCap's previous experience with repurchase demands and litigation in connection with alleged representation and warranty breaches, and ResCap's preparation for and filing of its Chapter 11 bankruptcy proceeding. I was privy to the negotiations with Gibbs & Bruns LLP and Ropes & Gray LLP, which represent certain investors (the "Steering Committee Group") in residential mortgage-backed securities ("RMBS"), as well as those negotiations Talcott Franklin, P.C., which represents a group of investors in RMBS (the "Talcott Franklin Group" and, together with the Steering Committee Group, the "Consenting Claimants"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; my discussions and correspondence with ResCap employees, and my review of the relevant agreements between the Debtors and the Consenting Claimants. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

3. Prior to the Petition Date, the Debtors and the Consenting Claimants, through counsel, engaged in extensive, arm's length negotiation resulting in two substantially similar settlement agreements (the "RMBS Trust Settlement Agreements") that set forth the terms of a potential settlement intended to resolve claims held by all trustees (the "Trustees") for securitization trusts associated with securitizations sponsored by the Debtors between 2004 and 2007 (the "RMBS Trust Settlement"). Pursuant to the RMBS Trust Settlement Agreements, the Debtors agreed to

make an irrevocable offer, open for a period of 45 days after the filing of a motion seeking approval of the RMBS Trust Settlement Agreements and associated RMBS Trust Settlement, to permit the Trusts to share in an allowed general unsecured claim in the maximum aggregate amount of $8.7 billion (the "Allowed Claim"), the amount of which would be subject to reduction depending on the proportion of Trusts accepting the Debtors' offer.

4.  In conjunction with the RMBS Trust Settlement Agreements, the Debtors also negotiated plan support agreements with both the Steering Committee Group (the "Steering Committee PSA") and the Talcott Franklin Group (the "Talcott Franklin PSA," and together with the Steering Committee PSA, the "Plan Support Agreements"). Given the magnitude of the potential claims held by the Trusts, and the consenting claimants ability to influence the Trustees, the Debtors believed that it would be beneficial to engage the Consenting Claimants in negotiations in an effort to develop Debtors' plan or reorganization (the "Plan") in a manner acceptable to the Consenting Claimants and the Debtors' other major creditor constituencies, Ally Financial Inc. ("AFI") and holders of the Debtors' Junior Secured Notes.

5.  The Plan Support Agreements provide significant benefits to the Debtors. In particular, the Consenting Claimants agree to direct the Trustees to vote in favor of and support confirmation the Plan consistent with the Plan Term Sheet (as defined in the Assumption Motions). The Consenting Claimants also agreed to (i) support, and direct the Trustees to support, various motions and applications to be filed by the Debtors, including the Debtors' motion to stay litigation against AFI and (ii) use

commercially reasonable efforts to persuade other Trusts to accept the irrevocable offer described in the RMBS Trust Settlement Agreements.

6. During the negotiations, the Debtors were informed that the Consenting Claimants would not be able to agree to inclusion of a term in the Plan Support Agreements that would require the Consenting Claimants to maintain all of their holdings because certain of the Consenting Claimants control RMBS for others, on behalf of whom the Consenting Claimants act as fiduciaries. As a result, the Debtors ultimately agreed to the modified holdings maintenance provisions contained in the Plan Support Agreements.

7. By obtaining the Consenting Claimants' support regarding the RMBS Trust Settlement and numerous aspects of the Debtors bankruptcy cases, the Debtors were able to consensually resolve a significant hurdle to Plan confirmation – support from the constituents of the Trust that hold the single largest set of disputed unsecured claims in this case– for a Plan that has additionally been agreed upon by the Debtors' secured creditors. Moreover, by obtaining support from the Consenting Claimants as a group, the Debtors hope to avoid fractured objections from this large constituency and the delay associated with such objections.

8. While the Debtors have obtained the beneficial support outlined above from the Consenting Claimants, assumption of the Plan Support Agreements has little potential downside for the Debtors. The Debtors negotiated Plan Support Agreements for which specific performance – and not damages – are the only remedy for breach. Likewise, the Plan Support Agreements contain a "fiduciary out," permitting the Debtors to pursue a proposed alternative restructuring that the Debtors and their

respective Boards of Directors determine is reasonably likely to be more favorable than the proposed restructuring to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties – so long as such alternative restructuring is not less favorable to the Consenting Claimants than the Plan.

9. After careful assessment, the Debtors determined that obtaining the support of the Consenting Claimants provided a sound approach to assist in the expeditious sale of the Debtors' businesses and confirmation of the Plan. Further to the goals of an expeditious sale and confirmation of the Plan, the Debtors determined that entry into, and the subsequent assumption of, the Plan Support Agreements was an integral part of the settlement with the Consenting Claimants; beneficial to the Debtors, their estates and their stakeholders; and was appropriate under the circumstances in which these agreements were made.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: June 11, 2010

Tammy Hamzehpour