**Hearing Date: July 10, 2012 at 10:00 a.m. (ET)**
**Objection Deadline:  June 21, 2012 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Jamie A. Levitt

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
|  )  |
In re:  |  )  |  Case No. 12-12020 (MG)
|  )  |
RESIDENTIAL CAPITAL, LLC, et al.,  |  )  |  Chapter 11
|  )  |
Debtors.  |  )  |  Jointly Administered
---------------------------------------------------------------  )

**NOTICE OF HEARING ON DEBTORS' MOTION PURSUANT TO FED. R.**
**BANKR. P. 9019 FOR APPROVAL OF RMBS TRUST SETTLEMENT AGREEMENTS**

**PLEASE TAKE NOTICE** that, on June 11, 2012, the above-captioned debtors and

debtors in possession (collectively, the "Debtors") filed Debtors' Motion Pursuant to Fed. R.

Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held on the Motion before

the Honorable Martin Glenn, United States Bankruptcy Judge, at the United States Bankruptcy

Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court") on **July 10, 2012 at 10:00 a.m. (prevailing Eastern**

**Time)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion and the

relief requested therein must be filed with the United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, NY 10004 and served so as to be

received by the following parties no later than **4:00 p.m. Eastern time on June 21, 2012**:

(a) Residential Capital, LLC, 1177 Avenue of the Americas, New York, NY 10036 (Attn:

Tammy Hamzehpour); (b) proposed counsel for the Debtors, Morrison & Foerster LLP, 1290

Avenue of the Americas, New York, NY 10104 (Attn: Gary S. Lee, Anthony Princi, Jamie

Levitt, and Larren Nashelsky); (c) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn:  Tracy Hope

Davis, Linda A. Riffkin, and Brian S. Masumoto); (d) the Office of the United States Attorney

General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-

0001 (Attn: US Attorney General, Eric H. Holder, Jr.); (e)  Office of the New York State

Attorney General, The Capitol, Albany, NY 12224-0341 (Attn: Nancy Lord, Esq. and Neal

Mann, Esq.); (f) Office of the U.S. Attorney for the Southern District of New York, One St.

Andrews Plaza, New York, NY 10007 (Attn: Joseph N. Cordaro, Esq.) (g) counsel for Official

Committee of Unsecured Creditors, Kramer Levin Naftalis & Frankel LLP, 1117 Avenue of the

Americas, New York, NY 10036 (Attn: Ken Eckstein and Douglas H. Mannal); (h) Citibank

N.A., 390 Greenwich Street, 6th Floor, New York, NY 10013 (Attn: Bobbie Theivakurnaran);

(i) Fannie Mae, 3900 Wisconsin Avenue NW, Mail Stop 8H-504, Washington, D.C. 20016

(Attn: Vice President, Credit Management, John S. Forlines); (j) counsel for Ally Financial Inc.,

Kirkland & Ellis, 601 Lexington Avenue, New York, NY 10022 (Attn: Richard M. Cieri and

Ray C. Schrock) (k) Deutsche Bank Trust Company Americas, 25 DeForest Avenue, Summit,

NJ 07901 (Attn: Kevin Vargas); (l) The Bank of New York Mellon, Asset Backed Securities

Group, 101 Barclays Street 4W, New York, NY 10286; (m) U.S. Bank National Association, 50

South 16th Street, Suite 2000, Philadelphia, PA 19102 (Attn: George Rayzis); (n) U.S. Bank

National Association, 60 Livingston Avenue, EP-MN-WS1D, St. Paul, MN 55107 (Attn: Irina

Palchuk); (o) counsel to U.S. Bank National Association, Kelley Drye & Warren LLP, 101 Park

Avenue, New York, NY 10178 (Attn: James S. Carr and Eric R. Wilson); (p) Wells Fargo Bank,

N.A., P.O. Box 98, Columbia, MD 21046 (Attn: Corporate Trust Services, GMACM Home

Equity Notes 2004 Variable Funding Trust); (q) counsel to the administrative agent for the

Debtors' proposed providers of debtor in possession financing, Skadden, Arps, Slate, Meagher &

Flom LLP, Four Times Square, New York, New York 10036 (Attention: Kenneth S. Ziman and

Jonathan H. Hofer); (r) Nationstar Mortgage LLC, 350 Highland Drive, Lewisville, TX 75067

(Attn: General Counsel) (s) counsel to Nationstar Mortgage LLC, Sidley Austin LLP, One South

Dearborn, Chicago, IL 60603 (Attn: Larry Nyhan and Jessica CK Boelter); (t) Internal Revenue

Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market

Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); and (u) Securities and Exchange

Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY

10281-1022 (Attn: George S. Canellos, Regional Director).

**PLEASE TAKE FURTHER NOTICE** that the relief requested in the Motion may be

granted without a hearing if no objection is timely filed and served as set forth above and in

accordance with the order, dated February 15, 2012, implementing certain notice and case

management procedures in these cases [Docket No. 362] (the "Case Management Order").

Dated: June 11, 2012
        New York, New York

                                        /s/ Gary S. Lee
                                        Gary S. Lee
                                        Anthony Princi
                                        Jamie A. Levitt
                                        MORRISON & FOERSTER LLP
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        Telephone: (212) 468-8000
                                        Facsimile: (212) 468-7900


                                        *Proposed Counsel for the Debtors and
                                        Debtors in Possession*

ny-1044351

**Hearing Date: July 11, 2012 at 10:00 a.m. (ET)**
**Objection Deadline: June 21, 2012 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468 8000
Facsimile:    (212) 468 7900
Gary S. Lee
Anthony Princi
Jamie A. Levitt

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ———————————————————————————— ) | | |
| In re:                                          ) | Case No. 12-12020 (MG) | |
|                                                     ) | | |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al.</u>,   ) | Chapter 11 | |
|                                                     ) | | |
|                         Debtors.    ) | Jointly Administered | |
| --------------------------------------------------------------------------------------- ) | | |

## DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019
## FOR APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................2

JURISDICTION AND VENUE ............................................................................................6

BACKGROUND ...................................................................................................................6

    A.    THE MECHANICS OF THE RMBS TRUST SETTLEMENT ..........................10

    B.    THE AGREED-UPON ALLOWED CLAIM ....................................................13

    C.    PLAN SUPPORT ...............................................................................................17

RELIEF REQUESTED ........................................................................................................18

ANALYSIS ..........................................................................................................................18

    A.    THE BALANCE BETWEEN THE LITIGATION'S POSSIBILITY OF
           SUCCESS AND THE SETTLEMENT'S FUTURE BENEFITS ......................20

    B.    THE LIKELIHOOD OF COMPLEX AND PROTRACTED
           LITIGATION ......................................................................................................24

    C.    THE PARAMOUNT INTERESTS OF CREDITORS.........................................26

    D.    SUPPORT FOR THE SETTLEMENT BY THE PARTIES IN INTEREST.......27

    E.    THE NATURE OF THE RELEASES TO BE OBTAINED BY
           DEBTORS' OFFICERS AND DIRECTORS ....................................................28

    F.    THE PROPOSED RMBS TRUST SETTLEMENT SATISFIES THE
           REMAINING IRIDIUM FACTORS ..................................................................28

CONCLUSION ....................................................................................................................29

NOTICE ...............................................................................................................................29

NO PRIOR REQUEST........................................................................................................30

i

# TABLE OF AUTHORITES

**Page(s)**

CASES

*Federal Housing Finance Agency, as Conservator for The Federal Home Loan Mortgage
Corporation v. Ally Financial Inc., et al.*,
11 Civ. 7010 (S.D.N.Y. Sept. 2, 2011) .................................................................................. 16

*Finkelstein v. W. T. Grant Co. (In re W.T. Grant Co.)*,
699 F.2d 599 (2d Cir. 1983) ......................................................................................... 19, 29

*In re Hibbard Brown & Co., Inc.*,
217 B.R. 41 (Bankr. S.D.N.Y. 1998) ............................................................................ 18, 20

*In re Ionosphere Clubs, Inc.*,
156 B.R. 414 (S.D.N.Y. 1993) ............................................................................................. 18

*In re Lehman Bros. Holdings Inc.*,
No. 08–13555 (Bankr. S.D.N.Y. Feb. 22, 2012) ............................................................ 20, 22

*In re Purofied Down Prods.*,
150 B.R. 519 (S.D.N.Y. 1993) ...................................................................................... 18, 19

*In re Residential Capital, et al*,
Case No. 12-12020 (Bankr. S.D.N.Y. May 14, 2012).............................................................7

*Kame v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ................................................................................................ 19

*Mass. Mutual Life Ins. Co. v. Residential Funding Co.*,
No. 11-cv-30035-MAP (D. Mass. May 17, 2012) ................................................................ 16

*MBIA Insurance Co. v. Residential Funding Company*,
Case No. 603552/2008 (Sup. Ct., N.Y. Cnty. Dec. 4, 2008).................................................15

*MBIA Insurance Company v. Countrywide Home Loans, Inc., et al.*,
Case No. 602825/08 (Sup. Ct. N.Y. Cnty) .......................................................................... 26

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ................................................................................................ 19

*Nellis v. Shugrue*,
165 B.R. 115 (S.D.N.Y. 1994) ............................................................................................. 18

*Newman v. Stein*,
464 F.2d 689 (2d Cir. 1972) ................................................................................................ 18

*Ogle v. Fid. & Deposit Co. Ogle.*,
    586 F.3d 143 (2d Cir. 2009) ...................................................................... 19

*Porges v. Gruntal & Co., Inc.* (*In re Porges*),
    44 F.3d 159 (2d Cir. 1995) ...................................................................... 19

**STATUTES**

11 U.S.C. § 365 ............................................................................................ 5

11 U.S.C. § 510 .......................................................................................... 12

28 U.S.C. § 157 ............................................................................................ 6

28 U.S.C. § 1334 .......................................................................................... 6

28 U.S.C. § 1408 .......................................................................................... 6

28 U.S.C. § 1409 .......................................................................................... 6

Fed. R. Bankr. P. 2002 ............................................................................... 30

Fed. R. Bankr. P. 6006 ................................................................................. 5

Fed. R. Bankr. P. 9019 .............................................................. 6, 17, 18, 29


EXHIBIT 1 – Proposed Order

EXHIBIT 2 – RMBS Trust Settlement Agreement with the Steering Committee Group

EXHIBIT 3 – Amendment to the RMBS Trust Settlement Agreement with the Steering Committee Group

EXHIBIT 4 – RMBS Trust Settlement Agreement with the Talcott Franklin Group

EXHIBIT 5 – Amendment to the RMBS Trust Settlement Agreement with the Talcott Franklin Group

EXHIBIT 6 – Sample Pooling and Servicing Agreement

EXHIBIT 7 – Declaration of William J. Nolan

EXHIBIT 8 – Declaration of Frank Sillman

EXHIBIT 9 – Declaration of Jeffrey Lipps

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Residential Capital, LLC ("ResCap") and each of its debtor affiliates, as debtors and

debtors-in-possession (collectively, the "Debtors"), submit this motion (the "Motion") under

Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Debtors

seek entry of an order substantially in the form annexed hereto as Exhibit 1 (the "Order")

approving the compromise and settlement of an allowed claim of up to $8.7 billion against

debtors Residential Funding Company, LLC ("RFC") and GMAC Mortgage LLC ("GMAC

Mortgage") (the "Allowed Claim") to be offered to and allocated amongst certain securitization

trusts in accordance with the terms and conditions of the settlement agreements,[1] and

amendments thereto,[2] attached hereto as Exhibits 2-5 (collectively, the "RMBS Trust

Settlement").  In support of this Motion, the Debtors have filed the affidavit of James Whitlinger,

the declaration of Jeffrey Lipps, the declaration of Frank Sillman, and the declaration of William

---

[1]  The Debtors entered into two substantially similar settlement agreements with two sets of
institutional investors.  The first is a group of seventeen large institutions represented by Kathy
Patrick of Gibbs & Bruns LLP (the "Steering Committee Group").  The other group of investors
is represented by Talcott Franklin of Talcott Franklin, P.C. (the "Talcott Franklin Group" and,
together with the Steering Committee Group, the "Institutional Investors").  As explained below,
these settlements will jointly draw on the same allowed claim against the Debtors' estates, and,
accordingly, this settlement process warrants a single motion for their approval by the Court
under the Bankruptcy Code and the Bankruptcy Rules.

[2]  In connection with filing this Motion, the parties amended the RMBS Trust Settlement
Agreements with the Steering Committee Group and the Talcott Franklin Group to extend some
deadlines based on case developments.  The parties have agreed to deem those changes effective
as of May 25, 2012.  References in this motion to the either or both of the RMBS Trust
Settlement Agreements are meant to include the May 25, 2012 amendments.  As of the filing of
this motion, counsel for the Talcott Franklin Group has received approval to sign the May 25,
2012 amendments on behalf of approximately 33 of his 47 clients.  Counsel for the Talcott
Franklin Group has represented that he believes that he will receive approval to sign on behalf of
the remaining client within the next two days.

J. Nolan, as well as other supporting materials, and respectfully state as follows:[3]

## **INTRODUCTION**

1.       The RMBS Trust Settlement resolves, in exchange for the Allowed Claim, alleged and potential representation and warranty claims (the "R&W Claims") held by up to 392 securitization trusts (each a "Trust" and collectively the "Trusts") in connection with approximately 1.6 million mortgage loans and approximately $221 billion in original issue balance ("OIB") of associated residential mortgage-backed securities ("RMBS"), comprising all of such securities issued by the Debtors' affiliates from 2004 to 2007.  While the exact amount is the subject of debate, in aggregate the R&W Claims represent tens of billions of dollars in potential contingent claims against the Debtors' estates.[4]  The R&W Claims allegedly arise under Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and other documents governing the Trusts (collectively, the "Governing Agreements").  These Governing Agreements require mortgage Sellers,[5] in certain circumstances, to repurchase securitized Mortgage Loans that materially breach applicable representations and warranties.  While the Debtors dispute the Trusts' claims, the Debtors have repurchased approximately $1.16 billion in loans out of $30.3 billion cumulative losses to date since 2005 to resolve similar contractual representation and warranty claims.  The Debtors dispute the R&W Claims and will vigorously defend future contractual representation and warranty claims brought against them.  However, absent the RMBS Trust Settlement, the

---

[3]  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the RMBS Trust Settlement.

[4]  For instance, Ally Financial Inc. ("AFI"), the Debtors' ultimate parent company and a secured creditor in the Debtors' bankruptcy cases, has also taken reserves in the billions of dollars and, for accounting purposes, made disclosures that these liabilities could be significant.  *See, e.g.*, AFI Form 10-Q, filed April 27, 2012.

[5]  In descriptions of the terms of the Governing Agreements, capitalized terms have the meaning ascribed to them in the Governing Agreements.

Debtors' estates face substantial litigation costs and risks in connection with the R&W Claims

and potentially disabling disruption to confirmation of a Chapter 11 plan.

      2.     The R&W Claims are the single largest set of disputed claims against the

Debtors' estates by a wide margin, and the RMBS Trust Settlement would resolve them without

the need for protracted, costly, and all-consuming litigation.  The enormous expense to the

Debtors' estates and delays in administering the Debtors' bankruptcy cases that pursuing such

litigation would cause are clear.  Prepetition litigation of similar claims by RFC, for example,

which involved just five securitizations and only 63,000 home equity lines of credit or closed-

end second mortgages issued by RFC in just one year, required RFC to produce 1,000,000 pages

of documents along with a terabyte of data and involved 80 days of fact depositions of current or

former RFC and other personnel alone.  In contrast, and dwarfing the scope of this litigation,

litigation of the R&W Claims would be based on almost 400 separate securitizations and would

involve approximately 1.6 million mortgage loans of varying sizes and loan types securitized

over many years.  Resolving the R&W Claims through litigation would drain exponentially more

resources of the estate than Debtors' prepetition litigation of similar claims.  As discussed below,

the litigation of the R&W Claims would lead to objections and additional litigation by the Trusts

and Institutional Investors in the bankruptcy cases, which could undermine the cornerstones of

the Debtors' restructuring strategy and substantially hinder the Debtors' reorganization.

      3.     As described at the first-day hearings in these cases, the Debtors and two large

groups of investors, which include some of the world's largest and most sophisticated,[6]

---

[6]  Many of the investors in the Steering Committee Group were previously involved in similar
negotiations with other major financial institutions that were involved in mortgage origination,
and were able to use their collective negotiating position to reach an $8.5 billion settlement with
Bank of America, N.A., approval of which is pending in a New York state court.  *See In the*

extensively negotiated the terms of the proposed compromise in the period leading up to the

Debtors' May 14, 2012 bankruptcy filing (the "Petition Date").[7]  The Steering Committee Group

alone represents 25% or more of the Holders of one or more classes of certificates in at least 290

of the 392 Trusts, which Trusts account for approximately 74% of the total OIB.  As of the filing

of this Motion, the Talcott Franklin Group represents 25% or more of the Holders of 295 classes

of certificates in at least 189 Trusts, which accounts for an additional $17 billion in OIB and adds

---

*Matter of the Application of the Bank of New York Mellon, et al.*, Index No. 651786/2011 (Sup. Ct. N.Y. Cnty. June 29, 2011).

[7]  The investors in the Steering Committee Group consist of AEGON USA Investment Management, LLC, Bayerische Landesbank, BlackRock Financial Management Inc., Cascade Investment, LLC, Federal Home Loan Bank of Atlanta, Goldman Sachs Asset Management, L.P., ING Investment Management Co. LLC, ING Investment Management LLC, Kore Advisors, L.P., Pacific Investment Management Company LLC, Maiden Lane LLC and Maiden Lane III LLC (by the Federal Reserve Bank of New York as managing member), Metropolitan Life Insurance Company, Neuberger Berman Europe Limited, The TCW Group, Inc., Teachers Insurance and Annuity Association of America, Thrivent Financial for Lutherans, Western Asset Management Company, and certain of their affiliates, either in their own capacities or as advisors or investment managers.

As of the filing of this motion, the investors in the Talcott Franklin Group consist of: Anchor Bank, fsb, Bankwest, Inc., Caterpillar Life Insurance Company, Caterpillar Insurance Co. Ltd., Caterpillar Product Services Corporation, Cedar Hill Mortgage Opportunity Master Fund, L.P., Commonwealth Advisors, Inc., CQS Select Master Fund Limited, CQS ABS Select Master Fund Limited, CQS ABS Alpha Master Fund Limited, Citizens Bank and Trust Company, DNB National Bank, Doubleline Capital LP, Ellington Management Group, LLC., Everest Reinsurance (Bermuda) Ltd., Everest International Re, Ltd., Farallon Capital Management, L.L.C., Farmers and Merchants Trust Company of Chambersburg, First National Bank and Trust Company of Rochelle, First National Banking Company, First National Bank of Wynne, First Federal Bank of Florida, First Farmers State Bank, First Bank, First Reliance Standard Life Ins. Co., HBK Master Fund L.P., Heartland Bank, Kerndt Brothers Savings Bank, Knights of Columbus, LL Funds LLC, Lea County State Bank, Pinnacle Bank of South Carolina, Peoples Independent Bank, Perkins State Bank, Northwestern Bank N.A., Mutual Savings Association FSA, Radian Asset Assurance Inc., Randolph Bank and Trust, Reliance Standard Life Ins. Co., Rocky Mountain Bank & Trust, Royal Park Investments SA/NV,  Safety National Casualty Corp., Summit Credit Union, South Carolina Medical Malpractice Liability JUA, Thomaston Savings Bank, Union Investment Luxembourg S.A., Wells River Savings Bank, Vertical Capital, LLC, and certain of their affiliates, either in their own capacities or as advisors or investment managers.  Collectively, these Institutional Investors and their clients have aggregate holdings of securities of greater than 25% of the voting rights in one more classes of securities issued by not less than 328 of the Trusts covered by the RMBS Trust Settlement.

ny-1044351

35 additional Trusts to the Institutional Investors' holdings.  Cumulatively, the Institutional

Investors have represented to the Debtors that they hold at least 25% of the voting rights (as

required by the Governing Agreements) of a class of the RMBS in not less than 328 of the

Trusts, with OIB of approximately $182.8 billion, and that they have the authority to direct —

and indeed that they will direct — the Trustees of these Trusts to accept the settlement.[8]  The

RMBS Trust Settlement is structured to provide the same settlement opportunity to all Trusts,

not just those in which the Institutional Investors have significant holdings.

4.     While the RMBS Trust Settlement was negotiated by the Institutional Investors,

the Trustees of each of the Trusts will also evaluate the reasonableness of the settlement and can

accept or reject the proposed compromise on behalf of each Trust.  The Debtors and the

Institutional Investors have agreed upon a compromise that the parties believe provides holders

of RMBS more favorable economics than litigating the R&W Claims with the Debtors and, thus,

anticipate a high acceptance rate among the Trusts.

5.     Additionally, the RMBS Trust Settlement is an integral component of the

Debtors' efforts to restructure, including obtaining certain releases for key stakeholders.  The

Debtors negotiated Plan Support Agreements (the "Plan Support Agreements") in conjunction

with the RMBS Trust Settlement.[9]  Thus, because the Institutional Investors have the authority to

---

[8]  In addition to the holdings of each group, the Institutional Investors add three Trusts with
approximately $1.8 billion OIB when their holdings are aggregated.

[9]  The Debtors will file separate motions, and accompanying affidavits in support thereof, for the
Court's approval of the Debtors' assumption of the Plan Support Agreements.  The Plan Support
Agreement with the Steering Committee Group ("Steering Committee Group PSA") is attached
as Exhibits 3 and 4 to the Debtors' Motion for Entry of an Order Under Bankruptcy Code
Section 365 and Bankruptcy Rule 6006 Authorizing the Debtors to Assume Plan Support
Agreements with Steering Committee Consenting Claimants.  The PSA with the Talcott Franklin
Group ("Talcott Franklin Group PSA") is attached as Exhibits 3 and 4 to the Debtors' Motion for
Entry of an Order Under Bankruptcy Code Section 365 and Bankruptcy Rule 6006 Authorizing
the Debtors to Assume Plan Support Agreements with Consenting Claimants Represented by

direct most of the Trusts to release all claims against the Debtors, and to support the Debtors'

restructuring plan, the RMBS Trust Settlement will allow the Debtors and all of their

stakeholders to focus on their primary task at hand:  implementing a confirmable (and hopefully

consensual) Chapter 11 plan.  The Institutional Investors' support will remove hurdles to the

resolution of substantial impediments to a successful restructuring and permit the Debtors to

promptly emerge from Chapter 11.

6.      In short, the Debtors believe that the RMBS Trust Settlement represents a fair and

equitable resolution of the R&W Claims and satisfies the Second Circuit's standard for approval

of a compromise under Bankruptcy Rule 9019.  The Debtors respectfully request that the Court

authorize the Debtors to enter into, and perform under, the RMBS Trust Settlement.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction to consider this Motion pursuant to

28 U.S.C. §§ 157 and 1334, and this Motion is a "core proceeding" arising in the Chapter 11

cases.

8.      Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

9.      The Debtors are a leading residential real estate finance company indirectly

owned by AFI, which is not a Debtor.  The Debtors and their non-debtor affiliates operate the

fifth-largest mortgage servicing business and the tenth-largest mortgage origination business in

the United States.  A more detailed description of the Debtors, including their business

operations, their capital and debt structure, and the events leading to the filing of these

---

Talcott Franklin, P.C.  For clarity's sake, the Debtors note that the Institutional Investors are
referred to as the "Consenting Claimants" in the Plan Support Agreements.

bankruptcy cases, is set forth in the affidavit of James Whitlinger, dated May 14, 2012

("Whitlinger Affidavit").[10]

10.    Prior to the Petition Date, a principal business of the Debtors was the origination,

acquisition, and securitization of residential mortgages.[11]  From 2004 to 2007, the Debtors were

involved in securitizations of residential mortgage-backed securities with OIB of approximately

$221 billion.[12]

11.    To securitize mortgage loans, Debtors RFC or GMAC Mortgage originated or

acquired residential mortgage loans which were then sold to a Trust, in some cases through one

or more Debtors, acting as depositor.[13]  The interests in these Trusts — as well as the

accompanying rights to receive the income generated by the mortgage loans held therein — are

evidenced by the RMBS, which were created and sold to various investors ("Holders").[14]

12.    In connection with selling mortgage loans to the Trusts, one or more of the

Debtors provided contractual representations and warranties in the Governing Agreements

regarding the sold mortgage loans.[15]  These representations and warranties vary based on the

Governing Agreements, but typically pertain to, among other things: (a) the standards and

practices used in underwriting each mortgage loan; (b) the creditworthiness of the borrowers on

the mortgage loans; (c) the percentage of a mortgage pool which has certain characteristics, such

---

[10]  Submitted in *In re Residential Capital, et al.*, No. 12-12020, (Bankr. S.D.N.Y. May 14, 2012)
ECF No. 6.

[11]  *See* Whitlinger Aff. ¶¶ 9-37.

[12]  *See id.* ¶ 108; *see also* RMBS Trust Settlement Agreements, Exhibits 2-5 hereto ("Settlement
Agrmts."), Ex. A.

[13]  *See* Whitlinger Aff. ¶ 23.

[14]  *See id.*

[15]  *See id.* ¶ 83.  The Debtors issued their RMBS securitizations in series, so they adopted a
standardized set of terms that generally applied to a particular series.  Exhibit 6 hereto is an
exemplar of a typical pooling and servicing agreement.

as owner-occupancy and documentation type; (d) the disclosure of information on the loan tape; (e) the completeness of each mortgage loan file; (f) the origination of the loans in accordance with applicable federal and state laws; and/or (g) various characteristics of each specific mortgage loan such as loan-to-value ratio, debt-to-income ratio, lien position and whether the property mortgaged is owner-occupied.[16]

13.     The Governing Agreements contain provisions that require the mortgage Seller to repurchase or substitute Mortgage Loans sold to a Trust that materially breach the stated representations and warranties when certain conditions are met.[17]  In the aftermath of the substantial downturn in the real estate and financial markets beginning in 2007, investors in securitization trusts and other interested parties — such as the government-sponsored entities ("GSEs") or "monoline" insurers, which are third-party or financial guarantors or credit enhancers — have questioned and brought claims regarding alleged breaches of representations and warranties contained in the agreements governing those trusts.[18]  The Debtors have vigorously defended such claims, but, where appropriate, the Debtors have repurchased approximately $1.16 billion in loans out of $30.3 billion cumulative losses to date since 2005 to resolve similar contractual representation and warranty claims.[19]  Though the Debtors do not admit liability for any repurchases associated with the R&W Claims, this previous liability suggests the potential for successful claims against the Debtors if the RMBS Trust Settlement is not approved.

---

[16]  *See* Exhibit 6 hereto, Pooling and Servicing Agreement ("Pooling and Serv. Agrmnt") § 2.03.

[17]  *See* Pooling and Serv. Agrmnt § 2.04.

[18]  *See, e.g.*, Whitlinger Aff. ¶¶ 101-103.

[19]  *See* Declaration of William J. Nolan, attached hereto as Exhibit 7 ("FTI Decl.") ¶¶ 9, 23; Whitlinger Aff. ¶¶ 83-84.

ny-1044351

14.     Under the Governing Agreements, the Mortgage Loans belong to the Trusts, which hold them for the benefit of the Holders in the Trusts.[20]  The same is true of the contractual mortgage repurchase claims: the Trustees own the claims and hold them for the benefit of the Holders.[21]  The Trustee for each Trust is the party ultimately authorized to pursue representation and warranty claims and to receive the proceeds from any repurchase of loans for which there is a breach of a representation or warranty.[22]  Monoline insurers also have contractual rights in certain cases to enforce breaches of representations and warranties regarding the mortgage loans.[23]

15.     As the ongoing housing-downturn unfolded, with an unsurprising impact on the performance of the securitizations, the Institutional Investors organized themselves into voting blocs with sufficient holdings to direct or otherwise persuade trustees to pursue claims for alleged breaches of loan-level representations and warranties.[24]  As of the date of the filing of this Motion, the Institutional Investors hold RMBS that give them 25% of the voting rights for at least 328 of the 392 outstanding securitization Trusts created by the Debtors, with approximately $182.8 billion OIB.[25]

16.     After weeks of negotiations with the Institutional Investors, the Debtors concluded that a reasonable resolution of the Trusts' repurchase claims could be achieved that

---

[20]  *See* Pooling and Serv. Agrmnt § 2.01(a) ("The Company, concurrently with the execution and delivery hereof, does hereby assign to the Trustee for the benefit of the Certificateholders, without recourse all the right, title and interest of the Company in and to the Mortgage Loans…") and § 2.02 (acceptance by Trustee).

[21]  *Id.* § 2.04 (Trustee owns and holds right to enforce mortgage repurchase claims.).

[22]  *See id.*

[23]  *See* Whitlinger Aff. ¶ 108.

[24]  Most of the Trusts permit holders of 25% or more of the certificates or notes in any tranche to direct the Trustee with respect to such Trust.  *See* Pooling and Serv. Agrmnt § 11.03.

[25]  *See* Steering Committee PSA, Ex. F; Talcott Franklin PSA, Ex. F.

would benefit not just Holders, but all of the Debtors' creditors, by removing the risks associated

with protracted, expensive and uncertain litigation over billions of dollars in potential mortgage

repurchase claims.  As negotiated, such resolution would also secure the Institutional Investors'

support for the Debtors' Plan and avoid an inevitable disruption and delay to the confirmation of

the Plan.  These arm's-length and exhaustive negotiations culminated in the up to $8.7 billion

Allowed Claim under the RMBS Trust Settlement.

## A.    THE MECHANICS OF THE RMBS TRUST SETTLEMENT

17.    As set forth in the RMBS Trust Settlement, the Debtors have agreed to offer each

Trust that accepts the settlement an allocated share of the Allowed Claim.[26]  The Trustees, on

behalf of the Trusts, will have 45 days from the date of the filing of this Motion to elect to

participate in the RMBS Trust Settlement to allow the Trusts to receive their allocable portion of

the Allowed Claim.[27]  The final amount of the Allowed Claim will be reduced from $8.7 billion

by the percentage, based on OIB, of Trusts that do not accept the offer to participate in the

Allowed Claim.[28]

18.    Each Trust's share of the Allowed Claim will be allocated under the agreed-upon

formulation attached to each RMBS Trust Settlement Agreement as "Exhibit B – Allocated

Allowed Claims."[29]  To ensure the fairness of such allocation, an independent expert will be

hired to allocate the Allowed Claim based on net expected lifetime losses among the accepting

Trusts, including expected lifetime claims to be paid by the monoline insurers on the

---

[26]  The RMBS Trust Settlement Agreements with the Steering Committee Group and the Talcott
Franklin Group contain substantially similar terms, and identical operative provisions as
described in this Motion.

[27]  *See* Settlement Agrmts. § 5.01.

[28]  *See id.*

[29]  *See id.* § 6.01; *id.*, Ex. B.

ny-1044351

securitizations they insured.[30]  Deposits into each Trust will be treated as a "Subsequent

Recovery" and distributed by the terms of the waterfall in the Governing Agreements.[31]

Accordingly, the RMBS Trust Settlement and its claims allocation will prevent a windfall to any

one Trust or Institutional Investor, treat the Holders equitably and in accordance with their

contractual rights under the Governing Agreements and maximize recoveries for all Holders.

19.      In exchange for their allocable portion of the Allowed Claim, the Institutional

Investors agree to release all R&W Claims against the Debtors, effective upon Court approval of

the RMBS Trust Settlement.[32]  The Institutional Investors also agree to direct the Trustees to

accept the terms set forth in the RMBS Trust Settlement, which includes a release and waiver by

the accepting Trusts and Trustees of all R&W Claims against the Debtors — again, effective as

of the date the Court approves the compromise — and not to take any actions inconsistent with

the acceptance of the RMBS Trust Settlement by all Trusts, including those in which they do not

have voting power.[33]  The Institutional Investors also agree to direct the Trustees to comply with

the Plan Support Agreements entered into by AFI, ResCap and the Institutional Investors to,

among other things, support the Debtors' Plan, including third-party releases for AFI.[34]  If, and

when, a Trustee for a particular Trust accepts the RMBS Trust Settlement, the Trust will be

bound thereby, and the Holders of the RMBS in that particular Trust will benefit from the

Allowed Claim.[35]

---

[30]  *See id.,* Ex. B.

[31]  *See id.*

[32]  *See id.* § 7.01.

[33]  *See id.* §§ 4.01, 4.02.

[34]  *See id.*

[35]  *See id.* § 5.01.

ny-1044351

20.     In addition to the claims discussed above based on alleged breaches of representations and warranties made in connection with the origination, sale, or delivery of loans to the Trusts, the RMBS Trust Settlement includes a release by the Trusts, the Institutional Investors and persons claiming derivatively through the Trusts of all other non-securities claims, including claims arising under the Governing Agreements and/or relating to: (a) any alleged obligation of ResCap to repurchase the loans or otherwise compensate the Trusts for any alleged breaches of representations and warranties; (b) the documentation of the loans held by the Trusts, including allegedly defective, incomplete, or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a mortgage or mortgage note, or any alleged failure to provide notice of such defective, incomplete or non-existent documentation; (c) the servicing of the Loans held by the Trusts (including any claim relating to the timing of collection efforts or foreclosure efforts, loss mitigation, transfers to subservicers, advances, servicing advances, or claims that servicing includes an obligation to take any action or provide any notice towards, or with respect to, the possible repurchase of loans by the applicable Master Servicer, Seller, or any other Person); (d) setoff or recoupment under the governing agreements against ResCap; and (e) any loan seller that either sold loans to ResCap or AFI that were sold and transferred to such Trust or sold loans directly to such Trust, in all cases prior to the Petition Date.[36]

21.     The RMBS Trust Settlement carves out particular claims which will not be released by the Institutional Investors or the Trusts, including: (1) such rights of any monoline insurers, if any, that are not derivative or duplicative of the rights of the Institutional Investors, Trustees, or the Trusts; (2) claims based on the servicing of residential mortgages by the Debtors

---

[36] *See id.* § 7.01.

or their assignees which arise after the effective date of the settlement; and (3) any claims against Debtors based on allegedly improper disclosures under federal or state securities laws.[37]

22.    If a Trust does not accept the settlement — for any reason, including a decision by a Trustee or by a monoline insurer that has contractual rights with regard to a particular Trust — that Trust remains free to assert a claim in the bankruptcy cases that will then be subject to the ordinary — albeit lengthy — claims allowance process.  For the reasons set out in this Motion, however, the Debtors and the Institutional Investors believe that almost all of the Trusts will evaluate the RMBS Trust Settlement, recognize that it is a fair deal, and accept the settlement.

## B.    THE AGREED-UPON ALLOWED CLAIM

23.    The Debtors and the Institutional Investors extensively negotiated the RMBS Trust Settlement, and, in particular, the Allowed Claim, based on differing views of the Debtors' potential liability.  Based on the Institutional Investors' assertions that a certain percentage of the loans in the securitizations should be repurchased or made whole due to alleged breaches of representations and warranties (the "Alleged Breach Rate") and the percentage of loans that the Debtors would agree should be repurchased or made whole (the "Agree Rate"), the parties arrived at a "Loss Share Rate" of approximately 20%, which all parties agree represents a fair and reasonable means of assessing and resolving the Debtors' potential liability, while avoiding costly and risky litigation.[38]  The Allowed Claim was calculated by multiplying the Loss Share Rate by the "Estimated Lifetime Losses" for the Trusts.[39]  Estimated Lifetime Losses were calculated by combining actual Trust losses to date with projected losses on the remaining loan

---

[37]  *See id.* § 7.02.  With regard to any allegedly improper disclosures under federal or state securities laws, the Debtors intend to pursue the subordination of such claims under Section 510 of the Bankruptcy Code.

[38]  *See* Declaration of Frank Sillman, attached hereto as Exhibit 8 ("Sillman Decl.") ¶¶ 64-70.

[39]  *See id.* ¶¶ 26, 68.  Terms defined in this section are explained in greater detail in the Sillman Declaration.

portfolios based on an assumed frequency and severity of losses due to the foreclosure, short sale or write-off of liquidated loans.[40]  The parties agree that the Loss Share Rate used here represents a fair and reasonable means of assessing and resolving the Debtors' potential liability, while avoiding protracted and expensive litigation and obtaining the Institutional Investors' support for the Plan.[41]

24.    Like all institutions that have had R&W Claims asserted against them, the Debtors believe that in order for a contractual representation and warranty breach claim to prevail, each individual loan file must be examined to assess the existence of a breach, the significance or materiality of the alleged breaches, and whether such alleged breaches had a material or adverse impact on the loan.[42]  With the number of loans at issue here, 1.6 million, a loan-by-loan examination and the related litigation would be extremely lengthy and immeasurably costly for all parties.[43]

25.    Before they entered into this settlement, the Debtors had extensive experience litigating, and settling certain repurchase claims asserted by GSEs, monoline insurers, and whole loan buyers ("Investor Repurchase Claims").[44]  Structurally, the claims the Debtors previously reviewed and have attempted to resolve are similar to the claims settled in the RMBS Trust Settlement.[45]  The procedures governing repurchases in connection with Investor Repurchase Claims are similar to those procedures that would govern the Trust repurchase claims if such

---

[40]  *See id.* ¶¶ 25, 67-68.

[41]  *See id.* ¶¶ 44-66.

[42]  *See id.* ¶ 18; *see also* Declaration of Jeffrey Lipps, submitted in *Residential Capital, et al., v. Allstate Ins. Co., et al.*, Case No. 12-01671-mg, at Docket No. 6, attached hereto as Exhibit 9 ("Lipps Decl.") ¶ 15.

[43]  *See* Lipps Decl. ¶¶ 7, 8, 17-18, 38-43, 58-62, 67; FTI Decl. ¶ 12.

[44]  *See, e.g.*, Whitlinger Aff. ¶¶ 54, 72, 83; Lipps Decl. ¶ 27.

[45]  *See* FTI Decl. ¶ 13.

claims were litigated because each involved a loan-by-loan review of all documents in the mortgage file to assess: (a) whether a breach existed; (b) whether the breach was material; (c) whether the breach had a material and adverse impact on the interests of the investor in a particular mortgage loan; and (d) whether repurchase was required. It should be noted that the proper application of all four of these factors has been vigorously disputed between the Debtors and the parties pursuing Investor Repurchases, and there is little definitive legal precedent regarding the proper application of these factors.[46]

26.    The Debtors face considerable uncertainty and risk associated with the R&W Claims. Although the calculation and estimation of repurchase exposure depends on a number of uncertain factors that parties to, and beneficiaries of, the Governing Agreements value and measure differently, the plaintiffs in similar RMBS litigation have asserted claims in the tens of billions of dollars.[47] For instance, in its First Amended Complaint against RFC, MBIA alleged that more than 88% of 7,913 delinquent mortgage loans it had reviewed breached a representation or warranty.[48] If this alleged breach rate were applied across all of the Debtors' securitizations, it would yield a repurchase claim in excess of $40 billion.[49] While the Debtors vigorously dispute the accuracy and methodology of MBIA's allegations, it is notable that the loans MBIA claims to have examined were acquired on the same platforms as many of the loans held by the Trusts.[50]

---

[46]    *See id.*; Lipps Decl. ¶ 50.

[47]    *See* Lipps Decl. ¶¶ 1, 8, 12, 20, 29, 33, 45, and 64.

[48]    *See MBIA Insurance Corp. v. Residential Funding Company, LLC*, Case No. 603552/2008 (Sup. Ct. N.Y. Cnty. Dec. 4, 2008), Docket No. 28 at ¶ 50; *see also* Lipps Decl. ¶¶ 26-30.

[49]    *See, e.g.*, Sillman Decl. ¶ 67.

[50]    *See* FTI Decl. ¶ 13.

27.    In prepetition securities cases brought against the Debtors, plaintiffs alleged that

37% to 88% of the loans at issue in those cases, and which are also included in the RMBS Trust

Settlement, contained breaches.[51]  For instance, the Federal Housing Finance Agency alleged

that the Debtors misstated loan-to-value ratios by approximately 18-25% and misstated owner

occupancy rates by more than 10%.[52]  Massachusetts Mutual, another securities plaintiff, alleged

that nearly 30% of loans in certain of the Trusts exceeded the required loan-to-value ratio

threshold.[53]  While the Debtors vigorously dispute these allegations, such allegations illustrate

the potential exposure of the Debtors to these types of claims.

28.    Additionally, other factors may significantly affect the size of the potential

repurchase claims the Debtors might face.  Any repurchase claim necessarily involves the

conveyance of an existing home mortgage out of the collateral pool and back to the seller.[54]  This

conveyance (and thus, the net cost of a repurchase to the Debtors) occurs at a given point in time,

in a given market for real estate.[55]  Thus, to value any individual repurchase claim — and to

estimate the exposure represented by all potential repurchase claims — the Debtors also

considered additional factors such as:  estimated loss severity at the time of repurchase,

conditions in the housing market, roll rates (a measure of the percentage of loans that are current

and/or in various stages of delinquency that ultimately "roll" to default), the number of modified

---

[51]  *See, e.g.*, First Amended Complaint filed by Allstate Insurance Co., et al. in Civil File No. 27-CV-11-3480 (Minn. Dist. Ct., Hennepin Cnty. Apr. 15, 2011) at ¶ 130;  *MBIA Insurance Corp. v. Residential Funding Company, LLC*, Case No. 603552/2008 (Sup. Ct., N.Y. Cnty.), Docket No. 28 at ¶ 50.

[52]  *See* Complaint at ¶¶ 98, 01, *Federal Housing Finance Agency, as Conservator for The Federal Home Loan Mortgage Corporation v. Ally Financial Inc., et al.*, 11 Civ. 7010 (S.D.N.Y. Sept. 2, 2011) ECF No. 1; *see also* Lipps Decl. ¶¶ 63-68.

[53]  *See* First Am. Compl. at ¶¶ 74-181, *Mass. Mutual Life Ins. Co. v. Residential Funding Co.*, No. 11-cv-30035-MAP (D. Mass. May 17, 2012) ECF No. 86.

[54]  *See* Sillman Decl. ¶¶ 28-42.

[55]  *See id.*

loans, the likelihood that modified loans would re-default, and the rate at which losses would be realized in the future.[56]  A new downturn in the housing market, or even a continuation of the present soft market, could thus magnify the Debtors' potential exposure.[57]

29.      Accordingly, after a robust, arm's-length negotiation with the Institutional Investors that have the contractual power to direct the Trustees for a majority of the Trusts, the Debtors and the Institutional Investors agreed to the Allowed Claim that was calculated based on a reasonable Loss Share Rate of approximately 20%.  All parties agree that the RMBS Trust Settlement, which is based on this Loss Share Rate, is an appropriate, prudent, objectively reasonable, and indeed preferable manner in which to settle R&W Claims.[58]

## C.    PLAN SUPPORT

30.      In connection with the RMBS Trust Settlement, and subject to Bankruptcy Court approval, the Debtors, following extensive, good-faith, and arm's-length, multi-party negotiations, have entered into substantially the same Chapter 11 Plan Support Agreement with each of the Steering Committee Group, the Talcott Franklin Group, and AFI.  Absent the RMBS Trust Settlement, the Debtors could not have compelled the Institutional Investors to agree, or agree to instruct the Trustees to agree, to support the Debtors' restructuring plan.  The ability of the Institutional Investors and the Trustees to object to the plan and otherwise interfere with the Debtors' attempt to complete transactions necessary for the Debtors' successful reorganization could thwart or delay the Debtors' restructuring efforts.[59]  Additionally, if the RMBS Trust

---

[56] *See id.* ¶¶ 31-34.

[57] *See id.*

[58] *See id.* ¶¶ 67-70.

[59] *See* FTI Decl. ¶¶ 21, 26.

Settlement is not approved, the Institutional Investors and Trustees remain free to object to every

step of the Debtors' Chapter 11 cases, a right that they surely will exercise.

## RELIEF REQUESTED

31.    The Debtors respectfully request that this Court enter an order substantially in the

form of the Order, including the allowance of the Allowed Claim, pursuant to Bankruptcy Rule

9019(a).

## ANALYSIS

32.    Rule 9019(a) provides, in part, that "[o]n motion by the [debtor-in-possession]

and after notice and a hearing, the court may approve a compromise or settlement." Fed. R.

Bankr. P. 9019(a). This rule empowers bankruptcy courts to approve a settlement agreement

where "it is supported by adequate consideration, is 'fair and equitable,' and is in the best

interests of the estate." *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993). The

Court's analysis is not a mechanical process, but rather contemplates a "range of reasonableness

. . . which recognizes the uncertainties of law and fact in any particular case and the concomitant

risks and costs necessarily inherent in taking any litigation to completion…." *Newman v. Stein*,

464 F.2d 689, 693 (2d Cir. 1972).

33.    The decision to approve a particular settlement lies within the sound discretion of

the Bankruptcy Court. *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994); *In re*

*Ionosphere Clubs, Inc.*, 156 B.R. at 426. Discretion should be exercised by the Bankruptcy

Court "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.,*

*Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *Shugrue*, 165 B.R. at 123 ("[T]he general rule [is]

that settlements are favored and, in fact, encouraged.").

34.    To approve a proposed settlement, the Court need not definitively decide the

numerous issues of law and fact raised by the settlement. Rather, the Court should "canvass the

issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Finkelstein v. W.T. Grant Co. (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *see also In re Purofied Down Prods.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("the court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute]"). [60]

35.    In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following "*Iridium*" factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay"; (c) the paramount interests of creditors; (d) whether other parties in interest support the settlement; (e) "the nature and breadth of releases to be obtained by officers and directors"; (f) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing the settlement; and (g) "the extent to which the settlement is the product of arm's-length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations omitted).

---

[60]   While the Court need not resolve the numerous issues of law and fact raised by the proposed settlement, the Court would have to address the validity of the Trusts' claims absent the settlement.  Under Second Circuit law, a bankruptcy court is required "to determine the validity of the claim[s] and the amount allowed."  *Porges v. Gruntal & Co., Inc. (In re Porges)*, 44 F.3d 159, 164 (2d Cir. 1995) (citing *Kame v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2d Cir. 1988). Unless a specific provision of the Bankruptcy Code requires otherwise, the Court must make this determination under applicable nonbankruptcy substantive law.  *See Ogle v. Fid. & Deposit Co. of Md*, 586 F.3d 143, 147-48 (2d Cir. 2009).  Thus, in resolving any future objection to the proofs of claim that the Trustees would surely file on behalf of the Trusts alleging breaches of the Governing Agreements if the settlement is not approved, the Court would be required to address the same kinds of complicated legal and factual issues faced by other courts when dealing with prepetition lawsuits alleging the Debtors breached the Governing Agreements.

36.     The Debtors respectfully submit that each of the *Iridium* factors weighs in favor

of this Court's approval of the RMBS Trust Settlement.

## A.    THE BALANCE BETWEEN THE LITIGATION'S POSSIBILITY OF SUCCESS AND THE SETTLEMENT'S FUTURE BENEFITS

37.     The RMBS Trust Settlement is the result of tough, arm's-length negotiations

between sophisticated parties.  As part of these negotiations, the Institutional Investors and the

Debtors each concluded that a Loss Share Rate of approximately 20% was reasonable based on

their own assessments of the possibility of success of the litigation and the benefits of the

settlement.[61]  This percentage reflects the Debtors' reasonable assessment of the risk, as well as

the substantial expense of litigation, of the R&W Claims that could be brought by the 392 Trusts,

and the related impact on the Debtors' restructuring efforts, balanced against the benefits to all

parties of early resolution of such litigation.[62]  The RMBS Trust Settlement also resolves

substantial impediments to the Debtors' successful restructuring and corresponding prompt

emergence from Chapter 11.

38.     Although the resolution of disputes through litigation always involves some

measure of uncertainty, that is particularly true in the complex RMBS securitization context.[63]

However, any uncertainty regarding the possibility for success in the litigation is not a bar to

approval.  *See, e.g., In re Hibbard Brown & Co., Inc.*, 217 B.R. at 45 (approving settlement after

finding that the multiple legal issues presented were "complex" and carried "no guarantee of

success"); *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 22, 2012)

(approving the establishment of $5 billion reserve, pursuant to the terms of the debtors' plan of

---

[61]  *See* Sillman Decl. ¶¶ 64-70.

[62]  *See* FTI Decl. ¶¶ 14-17; Sillman Decl. ¶¶ 58, 64-70.

[63]  *See* Lipps Decl. ¶¶ 17-18.

reorganization, for claims asserted by indenture trustees arising out of RMBS sold by non-debtor affiliates).

39.    Determining the precise percentage of loans that the Debtors would be required to repurchase under the Governing Agreements if the matter were litigated would involve a Herculean and contentious loan-file-by-loan-file-review.[64] Even if only a subset were ultimately reviewed — defaulted loans only, for example — the number of individual loans that would need to be examined across 392 securitizations containing over 1.6 million loans would still be massive.[65] The Debtors and Institutional Investors agree that the cost, burden and time that would need to be dedicated to that litigation exercise are prohibitive. Short of a loan-by-loan review, various analyses and review metrics can be used to estimate Alleged Breach Rates and Agree Rates in the mortgage loan industry, each ranging from approximately 30% to 50%, which equates to a Loss Share Rate ranging from 9% to 25%.[66] Naturally, if claimants could prove a Loss Share Rate above 20%, it would give rise to liability greater than the $8.7 billion Allowed Claim, and, of course, a Loss Share Rate of less than 20% would give rise to less liability.[67] However, after careful, practical and independent assessment, and taking into consideration the cost, burden and risk of litigation, the Debtors and the Institutional Investors agreed that utilizing a Loss Share Rate of approximately 20% is an objectively fair and reasonable way of resolving the Debtors' potential liability and obtaining the support of the Institutional Investors for the Debtors' Plan.[68]

---

[64]  *See* Lipps Decl. ¶¶ 17-18.

[65]  *See, e.g.*, *id*. ¶ 28.

[66]  *See* Sillman Decl. ¶¶ 44-46, 64-69.

[67]  *See id.* ¶¶ 64-70.

[68]  *See id.*

ny-1044351

40.    Notably, comparable settlements with other sponsors have applied Breach Rates and Agree Rates within the ranges provided above.[69]  Similar claims brought by certain trustees against Bank of America, N.A., on account of securitized mortgage loans sold and/or serviced by its Countrywide Financial Corporation subsidiaries, assumed a 36% Breach Rate and a 40% Agree Rate.[70]  In the settlement reached between the debtors and potential claimants in the Lehman Brothers Holdings Inc. Chapter 11 proceeding, the debtors calculated their estimate of potential claims using a range of 30% to 35% for the Breach Rate and a range of 30 to 40% for the Agree Rate.[71]

41.    Although the Parties may have differing views of the possibility of success in the litigations (but agree that applying a Loss Share Rate of approximately 20% is reasonable here), there is universal agreement among the Parties that the proposed RMBS Trust Settlement provides substantial benefits to the Debtors, all Trusts accepting the compromise, and other stakeholders relative to any alternative path.  Litigating these issues would distract the Debtors from focusing on critical aspects of their restructuring and would potentially interfere with the multi billion-dollar sale of mortgage servicing rights and other assets.[72]  Moreover, lengthy claims litigation would not likely improve matters for the Debtors' other unsecured creditors.[73]  The claims of the other unsecured creditors are largely fixed in nature, and are dwarfed by the size of the R&W Claims.[74]  Increasing the size of the R&W Claims (or instituting an estimation

---

[69]  *See id.* ¶¶ 59-63.

[70]  *See id.*; *see also In the Matter of the Application of the Bank of New York Mellon, et al.*, Index No. 651786/2011 (Sup. Ct. N.Y. Cnty. June 29, 2011).

[71]  *See In re Lehman Bros. Holdings Inc.*, No. 08–13555 JMP (Bankr. S.D.N.Y); Sillman Decl. ¶¶ 59-63.

[72]  *See* FTI Decl. ¶¶ 18-22.

[73]  *See id.* ¶ 22.

[74]  *See id.* ¶ 29.

procedure that risks increasing their potential size) could dramatically lower recoveries for the other creditors whose claims will be paid from the same, limited pool of funds.[75]

42.     The R&W Claims involve a multitude of issues, arguments, and discovery requirements from both sides.[76]  Particularly in the context of almost 400 complex mortgage securitizations and the varied loan products in each, the Debtors submit that the complexity of the litigation at issue, the difficulty inherent in predicting the success of either party with respect to any particular disputed issue, and the risks and unnecessary distractions associated with complex and protracted claims litigation render the RMBS Trust Settlement particularly reasonable and appropriate.[77]

43.     The RMBS Trust Settlement proposed in this Motion provides certainty to the Debtors with respect to the single largest set of disputed claims against the Debtors' estates and removes hurdles to resolving substantial impediments to a successful restructuring of the Debtors in order to permit a prompt emergence from Chapter 11.[78]  In particular, the Debtors' entry into the RMBS Trust Settlement was necessary to obtain the Institutional Investors' commitment to perform under the Plan Support Agreements, which is critical to the Debtors' obtaining the necessary relief throughout these bankruptcy cases and, ultimately, a successful reorganization.[79]  Additionally, if the RMBS Trust Settlement is not approved and the R&W Claims are increased, the recovery by the holders of the Debtors' Junior Secured Bonds will be diluted and could

---

[75] *See id.*

[76] *See* Lipps Decl. ¶¶ 17-18, 38-43, 58-62, 67.

[77] *See id.*

[78] *See* FTI Decl. ¶¶ 18-22, 29.

[79] *See id.* ¶ 29.

compromise the Debtors' plan support agreement with such bondholders and impede the

Debtors' Chapter 11 proceedings.[80]

44.    In short, although the potential outcome of the R&W Claims after a lengthy

litigation process could be more or less than the Allowed Claim of up to $8.7 billion, the

administrative costs of an extended bankruptcy case and the costs and uncertainty of such

litigation make settlement a more efficient and reasonable way to resolve these claims in the best

interest of all parties, including the Debtors' estates and creditors.  The compromise of offering

the $8.7 billion Allowed Claim will, if accepted by the Trusts, fully resolve these matters,

increase recoveries for investors, and greatly facilitate the confirmation of the Debtors' Plan.

## B.    THE LIKELIHOOD OF COMPLEX AND PROTRACTED LITIGATION

45.    The claims by the 392 Trusts involving OIB of approximately $221 billion of

RMBS securitizations and dozens of parties, if not resolved in settlement, will likely continue in

litigation for years and will inevitably delay the implementation of the Debtors' Plan, increase

administrative costs, and tie up significant assets which would otherwise be available to

creditors.[81]

46.    As set out above, the litigation of alleged representation and warranty breaches

alone is extremely complex, labor-intensive, costly and time-consuming.[82]  The discovery

required to resolve claims based on the 1.6 million loans in the Trusts would be massive, as the

relevant documents and information will differ from case to case.[83]  As an example, each claim

will involve a different securitization, and RFC and GMAC Mortgage each ran their own

---

[80]  *See id.*

[81]  *See id.* ¶¶ 14-22.

[82]  *See* Lipps Decl. ¶¶ 17-18, 38-43, 58-62, and 67.

[83]  *See id.* ¶¶ 17-18.

securitization efforts with different personnel and procedures during this timeframe.[84]  Each

Trust involves a unique set of mortgage loans, and each securitization shelf (an entities that

registers with the SEC to publicly offer securities through the Trusts) involves unique

documents, processes and personnel, all of which also varied over time for each shelf.[85]

Different loan products — second liens, first liens, prime, Alt-A, subprime — likewise involved

different teams of employees, different automated processes, different evolving underwriting

guidelines, different diligence standards, and different quality audit practices.[86]  As a result, the

litigation of each claim poses a new discovery challenge and unique discovery burdens.  For

instance, a claim involving 2005 RALI securitizations of Alt-A first liens will involve different

documents and witnesses from a lawsuit involving 2006 RFMSII home equity securitizations,

which would be different again from a lawsuit involving RASC subprime securitizations of any

vintage.

47.    Due to the complexity of the transactions at issue, as well as the number of parties

involved, in breach of representation and warranty litigation, the fact discovery requirements are

crippling.  ResCap's experience in *MBIA Insurance Corp. v. Residential Funding Company,

LLC*[87] illustrates the true enormity and difficulty of such litigation.[88]  MBIA's lawsuit against

RFC involved just five trusts securitizing approximately 63,000 Alt-A home equity lines of

credit or closed-end second mortgages — just two of the many loan types involved in the 392

trusts — brought to market over the course of less than one year.[89]  Yet, fact discovery has not

---

[84]  *See id.*

[85]  *See id.*

[86]  *See id.*

[87]  This case is now subject to the automatic stay.

[88]  *See* Lipps Decl. ¶¶ 26-30.

[89]  *See id.*

been completed over three and a half years after MBIA first sued RFC.[90]  RFC has produced

more than a million pages of documents, including loan files for more than 63,000 mortgage

loans.[91]  RFC has produced nearly one terabyte of data, including a variety of source code, other

application data, and back-end loan-level data relating to automated systems used in connection

with underwriting, pricing, acquiring, pooling, auditing, and servicing the mortgage loans.[92]

48.     Further, MBIA has taken over 80 days of depositions of current or former ResCap

entity personnel over the course of more than a year.  RFC has taken 50 days of depositions of

current or former MBIA personnel.[93]  A number of third-party depositions have been taken or

would be required, and the parties exchanged 10 expert reports without including rebuttal

reports.[94]

49.     The extent of the discovery in the MBIA case against RFC is anything but

aberrational — indeed, litigation of the separate MBIA lawsuit against Countrywide has been

even more protracted[95] — and the litigation of the R&W Claims potentially held by the 392

Trusts invited to take part in the RMBS Trust Settlement would mire the Debtors' estates in

litigation for years, and at great expense.[96]

## C.    THE PARAMOUNT INTERESTS OF CREDITORS

50.     The RMBS Trust Settlement is beneficial to the Debtors' estates and their

stakeholders because the proposed settlement will resolve the single largest group of unsecured

---

[90]  *See id.*

[91]  *See id.*

[92]  *See id.*

[93]  *See id.*

[94]  *See id.*

[95]  *See MBIA Insurance Company v. Countrywide Home Loans, Inc., et al.,* Case No. 602825/08,
(Sup. Ct. N.Y. Cnty) Decision dated May 25, 2012 (granting in part MBIA's motion to compel
production of additional documents) (Docket No. 1726).

[96]  *See* FTI Decl. ¶¶ 18-22.

claims against the Debtors, thereby providing much-needed predictability with respect to the Debtors' claims pool, a critical step towards obtaining consensus around a Chapter 11 plan.[97] Moreover, the certainty of the proposed settlement avoids the necessity of setting aside substantial reserves for the potential payment of R&W Claims, which could delay (and reduce) recoveries to other stakeholders.[98]

51.    Additionally, the RMBS Trust Settlement removes an incredible number of potential objectors.  As noted above, absent the terms of the RMBS Trust Settlement, the Institutional Investors and Trustees would remain free to object to and complicate every step of the Debtors' Chapter 11 cases.  The resolution of the potential claims held by these parties, as well as the releases given under the RMBS Trust Settlement, assures a more efficient and expeditious reorganization process.

52.    It is indisputable that the litigation of claims brought by the 392 Trusts would inevitably burden the Debtors' estates with significant legal expenses.  Even if the Debtors were to defeat each claim, the legal fees and other burdens of litigation would necessarily harm the Debtors' estates and reduce and delay recoveries for the Debtors' creditors.[99]

**D.    SUPPORT FOR THE SETTLEMENT BY THE PARTIES IN INTEREST**

53.    The RMBS Trust Settlement is supported by a significant percentage of the Holders, and this number continues to grow as more investors join the RMBS Trust Settlement. As noted above, the Steering Committee Group alone represents 25% or more of the Holders of one or more classes of certificates in at least 290 of the 392 Trusts, which Trusts account for

---

[97] *See id.* ¶¶ 23-30.

[98] *See id.* ¶ 14.

[99] *See id.* ¶¶ 14-22.

27

approximately 74% of the total OIB.[100]  As of the filing of this Motion, the Talcott Franklin

Group represents 25% or more of the Holders of 295 classes of certificates in at least 189 Trusts,

which accounts for an additional $17 billion in OIB and adds 35 additional Trusts to the

Institutional Investors' holdings.[101]  Accordingly, under the RMBS Trust Settlement, the claims

held by approximately 83% of the Trusts and total OIB at issue are expected to be resolved.

### E.    THE NATURE OF THE RELEASES TO BE OBTAINED BY DEBTORS' OFFICERS AND DIRECTORS

54.    The RMBS Trust Settlement does not release the Debtors' officers or directors, so

this *Iridium* factor weighs in favor of approval.  However, the Institutional Investors, and each

Trust which opts in to the RMBS Trust Settlement, have agreed to support any such release

included in the Plan.[102]  Any such release in the Plan is subject to confirmation by the

Bankruptcy Court, and all interested stakeholders will have an opportunity to vote on and/or

object to the Plan.

### F.    THE PROPOSED RMBS TRUST SETTLEMENT SATISFIES THE REMAINING *IRIDIUM* FACTORS

55.    For the reasons stated above, the Debtors believe that the paramount interests of

all parties are best served by approval of the RMBS Trust Settlement.  Moreover, the final two

*Iridium* factors are satisfied because the RMBS Trust Settlement was negotiated separately

between the Debtors and the Steering Committee Group and the Debtors and the Talcott Franklin

Group, without collusion, in good faith, and from arm's-length bargaining positions, and all

parties were represented by experienced and sophisticated counsel.

---

[100]  *See* Steering Committee Group PSA, Ex. F.

[101]  *See* Talcott Franklin Group PSA, Ex. F.

[102]  *See* Settlement Agrmnt. § 4.01; *see also* Plan Support Agreements § 3.1.

56.     Furthermore, the RMBS Trust Settlement is intentionally structured to reduce the

Allowed Claim proportionally if Trusts do not opt in, and to preserve the rights of those Trusts to

bring their claim in the normal course if they wish to do so.  The RMBS Trust Settlement is a

binding offer by the Debtors to all Trustees to accept, or to decline if they prefer the uncertainties

of litigation.  Accordingly, only those Trustees that are contractually directed to accept and/or

independently decide that the RMBS Trust Settlement is beneficial for their respective

Institutional Investors will accept the settlement.[103]

## CONCLUSION

57.     In sum, the Debtors have determined, exercising their sound business judgment

that the RMBS Trust Settlement is fair, equitable, and eminently reasonable to the Debtors'

estates and creditors, thereby satisfying the standards of Bankruptcy Rule 9019.  The timely

resolution of these extensive claims is in the best interests of the Debtors and their creditors.  The

Debtors therefore submit that the RMBS Trust Settlement is fair and well within the range of

reasonableness — and certainly not "below the lowest point in the range of reasonableness."

*Finkelstein*, 699 F.2d at 608.  Accordingly, the Debtors respectfully request that the Court

approve the RMBS Trust Settlement pursuant to Bankruptcy Rule 9019.

## NOTICE

58.     Notice of this Motion will be given to the following parties, or in lieu thereof, to

their counsel:  (a) the Office of the United States Trustee for the Southern District of New York;

(b) the Office of the United States Attorney General; (c) the Office of the New York Attorney

General; (d) the Office of the United States Attorney for the Southern District of New York;

---

[103]   As noted above, Debtors believe, and the Steering Committee Group and the Talcott Franklin
Group have each represented with regard to their holdings, that the Institutional Investors will
cumulatively direct approximately 83% of the 392 Trusts.

ny-1044351

(e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the

Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for

the Debtors' outstanding notes issuances; (i) Ally Financial Inc.; (j)  the Steering Committee

Group; (k) the Talcott Franklin group (l) Barclays Bank PLC, as administrative agent for the

lenders under the debtor in possession financing facility; (m) Nationstar Mortgage LLC and its

counsel; (n) the Creditors' Committee; and (o) all parties requesting notice pursuant to

Bankruptcy Rule 2002.  The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

### NO PRIOR REQUEST

59.    Except as otherwise noted herein, no prior application for the relief requested

herein has been made to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request the entry of the Order granting the

relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: New York, NY
        June 11, 2012

Respectfully submitted,

/s/ Gary S. Lee
Gary S. Lee
Anthony Princi
Jamie A. Levitt


MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel to the Debtors and
Debtors in Possession*

30