# EXHIBIT 2

RMBS Trust Settlement Agreement with the
Steering Committee Group

**EXECUTION COPY**

# RMBS TRUST SETTLEMENT AGREEMENT

This RMBS Trust Settlement Agreement is entered into as of May 13, 2012, by and between Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap" or the "Debtors"), on the one hand, and the Institutional Investors (as defined below), on the other hand (the "Settlement Agreement"). Each of ResCap and the Institutional Investors may be referred to herein as a "Party" and collectively as the "Parties."

# RECITALS

WHEREAS, certain ResCap entities were the Seller, Depositor, Servicer and/or Master Servicer for the securitizations identified on the attached Exhibit A (the "Trusts");

WHEREAS, certain ResCap entities are parties to certain applicable Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the Trusts (the "Governing Agreements"), and certain ResCap entities have, at times, acted as Master Servicer and/or Servicer for the Trusts pursuant to certain of the Governing Agreements;

WHEREAS, pursuant to the Governing Agreements, certain ResCap entities have contributed or sold loans into the Trusts (the "Mortgage Loans");

WHEREAS, the Institutional Investors have alleged that certain loans held by the Trusts were originally contributed in breach of representations and warranties contained in the Governing Agreements, allowing the Investors in such Trusts to seek to compel the trustee or indenture trustee (each, a "Trustee") to take certain actions with respect to those loans, and further have asserted past and continuing covenant breaches and defaults by various ResCap entities under the Governing Agreements;

WHEREAS, the Institutional Investors have indicated their intent under the Governing Agreements for each Trust in which the Institutional Investors collectively hold or are authorized investment managers for holders of at least 25% of a particular tranche of the Securities (as defined below) held by such Trust either to seek action by the Trustee for such Trust or to pursue claims, including but not limited to claims to compel ResCap to cure the alleged breaches of representations and warranties, and ResCap disputes such claims and allegations of breach and waives no rights, and preserves all of its defenses, with respect to such allegations and putative cure requirements;

WHEREAS, the Institutional Investors are jointly represented by Gibbs & Bruns, LLP ("Gibbs & Bruns") and Ropes & Gray LLP ("Ropes & Gray") and have, through counsel, engaged in arm's length settlement negotiations with ResCap that included the exchange of confidential materials;

WHEREAS, ResCap contemplates filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, ResCap and the Institutional Investors have reached agreement on a plan support agreement (the "Plan Support Agreement") pursuant to which the Institutional Investors will support the confirmation of a chapter 11 plan for ResCap;

WHEREAS, Ally Financial Inc. and its subsidiaries and affiliates, other than ResCap (collectively, "Ally") have agreed to a settlement with ResCap in return for releases of any alleged claims held by ResCap and certain third parties against Ally;

WHEREAS, ResCap and the Institutional Investors have reached agreement concerning all claims under the Governing Agreements; and

WHEREAS, the Parties therefore enter into this Settlement Agreement to set forth their mutual understandings and agreements for terms for resolving the disputes regarding the Governing Agreements.

## **AGREEMENT**

NOW, THEREFORE, after good faith, arm's length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

### ARTICLE I.    DEFINITIONS.

As used in this Settlement Agreement, in addition to the terms otherwise defined herein, the following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Settlement Agreement).  Any capitalized terms not defined in this Settlement Agreement shall have the definition given to them in the Governing Agreements.

Section 1.01    "Bankruptcy Code" shall mean title 11 of the United States Code;

Section 1.02    "Direction" shall mean the direction by the Institutional Investors, to the extent permitted by the Governing Agreements, directing any Trustee to take or refrain from taking any action; *provided*, *however*, that in no event shall the Institutional Investors be required to provide a Trustee with any security or indemnity for action or inaction taken at the direction of the Institutional Investors and the Institutional Investors shall not be required to directly or indirectly incur any costs, fees, or expenses to compel any action or inaction by a Trustee, except that the Institutional Investors shall continue to retain contingency counsel;

Section 1.03    "Effective Date" shall have the meaning ascribed in Section 2.01;

Section 1.04    "Governmental Authority" shall mean any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to the foregoing, or any other authority, agency, department, board, commission, or instrumentality of the United States, any State of the United States or any political subdivision thereof or any foreign jurisdiction, and any court, tribunal, or arbitrator(s) of competent jurisdiction, and any United States or foreign governmental or non-governmental self-regulatory organization, agency, or

EXECUTION COPY

authority (including the New York Stock Exchange, Nasdaq, and the Financial Industry Regulatory Authority);

Section 1.05    "<u>Institutional Investors</u>" shall mean the authorized investment managers and Investors identified in the attached signature pages;

Section 1.06    "<u>Investors</u>" shall mean all certificateholders, bondholders and noteholders in the Trusts, and their successors in interest, assigns, pledgees, and/or transferees;

Section 1.07    "<u>Person</u>" shall mean any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a Governmental Authority;

Section 1.08    "<u>Petition Date</u>" means the date on which ResCap files petitions under chapter 11 of the Bankruptcy Code;

Section 1.09    "<u>Plan</u>" has the meaning ascribed to it in the Plan Support Agreement; and

Section 1.10    "<u>Restructuring</u>" shall have the meaning ascribed to it in the Plan Support Agreement.

ARTICLE II.  <u>SETTLEMENT PROCESS</u>.

Section 2.01    <u>Effective Date.</u>  This Settlement Agreement shall be effective immediately except as to the granting of allowed claims to the Trusts and the releases set forth herein.  The claims allowance and releases shall only be effective, with respect to Trusts that timely accept the compromise, on the date on which the Bankruptcy Court enters an order approving the settlement contemplated hereby (the "<u>Effective Date</u>").

Section 2.02    <u>Bankruptcy Court Approval</u>.  The Debtors shall (a) orally present this Settlement Agreement in court on the Petition date, including the agreed amount of the Allowed Claim (as defined below), (b) file a motion in the Bankruptcy Court as soon as practicable, but in no event later than fourteen (14) days after the Petition Date, seeking authority to perform under this Settlement Agreement and for approval of this Settlement Agreement and the compromise contained herein, and (c) obtain an order from the Bankruptcy Court approving such motion by the earlier of (i) 60 days after the Petition Date and (ii) the date on which the Disclosure Statement is approved by the Bankruptcy Court.  The Trustee for each Trust may accept the offer of a compromise contemplated by this Settlement Agreement in writing pursuant to a form of acceptance to be included in the proposed order for approval of this Settlement Agreement to be submitted to the Bankruptcy Court.

Section 2.03    <u>Standing</u>.  The Debtors agree that the Institutional Investors are parties in interest in the chapter 11 cases of ResCap for the purposes of enforcing rights and complying with obligations under this Settlement Agreement and the Plan Support Agreement.

ny-1040888

**EXECUTION COPY**

## ARTICLE III. <u>REPRESENTATIONS AND WARRANTIES.</u>

Section 3.01    <u>Holdings and Authority</u>.  Lead counsel to the Institutional Investors, Gibbs & Bruns, has represented to ResCap that the Institutional Investors have or advise clients who have aggregate holdings of securities of greater than 25% of the voting rights in one or more classes of the securities, certificates or other instruments backed by the mortgages held by each of the Covered Trusts (as defined in the Plan Support Agreement).  Each Institutional Investor represents that (i) it has the authority to take the actions contemplated by this Settlement Agreement, to the extent that it has the authority with respect to any other entities, account holders, or accounts for which or on behalf of which it is signing this Settlement Agreement, and (ii) it holds, or is the authorized investment manager for the holders of, the securities listed in the schedule attached to the Plan Support Agreement as Exhibit F thereto, in the respective amounts set forth therein by CUSIP number, that such schedule was accurate as of the date set forth for the respective institution, and that since the date set forth for the Institutional Investor, the Institutional Investor has not, in the aggregate, materially decreased the Institutional Investor's holdings in the Securities.  The Parties agree that the aggregate amounts of Securities collectively held by the Institutional Investors for each Trust may be disclosed publicly, but that the individual holdings shall remain confidential, subject to review only by ResCap, Ally, the Bankruptcy Court, the Office of the United States Trustee, and any official committee of creditors that may be appointed in the Chapter 11 Cases.

Section 3.02    <u>Holdings Retention</u>.  The Institutional Investors currently and collectively hold Securities representing in aggregate 25% of the voting rights in one or more classes of Securities of not less than 290 of the Covered Trusts.  The Institutional Investors, collectively, shall maintain holdings aggregating 25% of the voting rights in one or more classes of Securities of not less than 235 of the Covered Trusts ("<u>Requisite Holdings</u>") until the earliest of: (i) confirmation of the Plan, (ii) December 31, 2012, (iii) a Consenting Claimant Termination Event, (iv) a Debtor Termination Event, or (v) an Ally Termination Event (as terms (iii), (iv) and (v) are defined in the Plan Support Agreement); <u>provided</u>, <u>however</u>, that any reduction in Requisite Holdings caused by: (a) sales by Maiden Lane I and Maiden Lane III; or (b) exclusion of one or more trusts due to the exercise of Voting Rights by a third party guarantor or financial guaranty provider, shall not be considered in determining whether the Requisite Holdings threshold has been met.  If the Requisite Holdings are not maintained, each of Ally and ResCap shall have the right to terminate the Settlement Agreement, but neither Ally nor ResCap shall terminate the Settlement Agreement before  it has conferred in good faith with the Institutional Investors concerning whether termination is warranted.  For the avoidance of doubt, other than as set forth above, this Settlement Agreement shall not restrict the right of any Institutional Investor to sell or exchange any Securities issued by a Trust free and clear of any encumbrance.  The Institutional Investors will not sell any of the Securities for the purpose of avoiding their obligations under this Settlement Agreement, and each Institutional Investor (except Maiden Lane I and Maiden Lane III) commits to maintain at least one position in one of the Securities in one of the Trusts until the earliest of the dates set forth above.  If the Debtor or Ally reach a similar agreement to this with another bondholder group, the Debtor and Ally will include a substantially similar proportionate holdings requirement in that agreement as contained herein.

ny-1040888

**EXECUTION COPY**

### ARTICLE IV. DIRECTION TO TRUSTEES AND INDENTURE TRUSTEES.

Section 4.01    Direction to Trustees and Indenture Trustees.  The relevant Institutional Investors for each Trust shall, by the time of the filing of a motion to approve this Settlement Agreement, provide the relevant Trustee with Direction to accept the settlement and compromises set forth herein.  The Institutional Investors hereby agree to confer in good faith with ResCap as to any further or other Direction that may be reasonably necessary to effectuate the settlement contemplated herein, including those actions listed in Section 3.1 of the Plan Support Agreement, filing motions and pleadings with the Bankruptcy Court and making statements in open court in support of the Restructuring.

Section 4.02    No Inconsistent Directions.  Except for providing instructions in accordance with Section 4.01, the Institutional Investors agree that (i) between the date hereof and the Effective Date, with respect to the Securities on the Holdings Schedule, they will not, individually or collectively, direct, vote for, or take any other action that they may have the right or the option to take under the Governing Agreements or to join with any other holders or the trustee of any note, bond or other security issued by the Trusts, to cause the Trustees to enforce (or seek derivatively to enforce) any representations and warranties regarding the Mortgage Loans or the servicing of the Mortgage Loans, and (ii) to the extent that any of the Institutional Investors have already taken any such action, the applicable Institutional Investor will promptly rescind or terminate such action.  Nothing in the foregoing shall restrict the ability of the Institutional Investors to demand that any other Investor who seeks to direct the Trustee for a Trust post any indemnity or bond required by the Governing Agreements for the applicable Trust.

Section 4.03    Amendments to Governing Agreements Regarding Financing of Advances.  The Institutional Investors agree to use commercially reasonable efforts (which shall not require the giving of any indemnity or other payment obligation or expenditure of out-of-pocket funds) to negotiate any request by the Debtors or the Trustees for Trusts that are being assumed, and if any Trustee shall require a vote of the certificate or note holders with respect thereto, shall vote in favor of (to the extent agreement is reached) any amendment to the relevant Governing Agreements and related documents requested by the Debtors in order to permit "Advances" (as it or any similar term may be defined in the Governing Agreements) to be financeable and to make such other amendments thereto as may be reasonably requested by the Debtors in accordance with any agreement to acquire all or substantially all of the Debtors' servicing assets pursuant to the Restructuring and the Plan, so long as such changes would not cause material financial detriment to the Trusts, their respective trustees, certificate or note holders, or the Institutional Investors.

### ARTICLE V. ALLOWANCE OF CLAIM.

Section 5.01    The Allowed Claim.  ResCap hereby makes an irrevocable offer to settle, expiring at 5:00 p.m. prevailing New York time on the date that is forty five (45) days after the Petition Date, with each of the Trusts that timely agrees to the terms of this Settlement Agreement (the "Accepting Trusts"). In consideration for such agreement, ResCap will provide a general unsecured claim of $8,700,000,000 (the "Total Allowed Claim").  For the avoidance of doubt, the Total Allowed Claim shall be shared among any Trusts accepting the offer contained

-5-

**EXECUTION COPY**

in this Section 5.01, subject to the provisions of this Settlement Agreement. Any Trusts accepting the offer contained in this Section 5.01, subject to the provisions of this Settlement Agreement shall be allowed claims in an amount calculated as set forth below (the "Allowed Claim"), but in no case shall the amount of the Allowed Claim exceed $8,700,000,000. The amount of the Allowed Claim shall equal (i) $8,700,000,000, less (ii) $8,700,000,000 multiplied by the percentage represented by (a) the total dollar amount of original principal balance for the Trusts not accepting the offer outlined above, divided by (b) the total dollar amount of original principal balance for all Trusts.

Section 5.02    Waiver of Setoff and Recoupment. By accepting the offer to settle contained in Section 5.01, each accepting Trust irrevocably waives any right to setoff and/or recoupment such Trust may have against Ally and ResCap.

ARTICLE VI. ALLOCATION OF ALLOWED CLAIM.

Section 6.01    The Allocation Schedule. The allocation of the amounts of the Allowed Claim as to each Trust (each, an "Allocated Allowed Claim"), is set forth on Exhibit B hereto.

Section 6.02    Legal Fees.

(a)  ResCap and the Institutional Investors agree that Gibbs & Bruns and Ropes & Gray shall, on the Effective Date of the Plan, be paid legal fees as follows, as an integrated and nonseverable part of this Settlement Agreement. First, Gibbs & Bruns and Ropes & Gray, as counsel to the Institutional Investors, shall be allocated by ResCap without conveyance to the Trustees the percentages of the Allowed Claim set forth on Exhibit C, without requirement of submitting any form of estate retention or fee application, for their work relating to these cases and the settlement. Second, the Debtors and Institutional Investors may further agree at any time, that the Debtors may pay Gibbs & Bruns and Ropes & Gray in cash, in an amount that Gibbs & Bruns and Ropes & Gray respectively agree is equal to the cash value of their respective portions of the Allowed Claim, and in any such event, no estate retention application, fee application or further order of the Bankruptcy Court shall be required as a condition of the Debtors making such agreed payment. Third, the Debtors agree and the settlement approval order shall provide that the amount of the Allowed Claim payable to Gibbs & Bruns and Ropes & Gray may be reduced to a separate claim stipulation for convenience of the parties.

(b)  In the event that, prior to acceptance of this compromise by a Trustee for a Trust other than an original Covered Trust (as defined in the Plan Support Agreement), counsel to Investors in such Trust cause a direction to be given by more than 25% of the holders of a tranche of such Trust to accept this compromise, then the same provisions as contained in Section 6.02(a) shall apply to such counsel, solely as to the amounts allocated to such Trust. Such counsel shall be entitled to a share of the fee for such trust equal to the ratio of (a) 25% minus the percentage of such tranche held by Institutional Investors divided by (b) 25%. Counsel would be required to identify itself and satisfy the Debtors and Institutional Investors as to the holdings of client-investors and that counsel caused such directions.

-6-

**EXECUTION COPY**

## ARTICLE VII.        RELEASES.

Section 7.01   Releases.  Except as set forth in Article VIII, as of the Effective Date, with respect to each and every Trust for whom the Trustee accepts the compromise contemplated by this Settlement Agreement, the Investors, Trustee, Trust, and any Persons claiming by, through or on behalf of such Trustee (including Institutional Investors claiming derivatively) or such Trust (collectively, the "Releasors"), irrevocably and unconditionally grant a full, final, and complete release, waiver, and discharge of all alleged or actual claims, demands to repurchase, demands to cure, demands to substitute, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities, losses, debts, costs, expenses, obligations, demands, claims for accountings or audits, alleged events of default, damages, rights, and causes of action of any kind or nature whatsoever, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct or derivative, arising under law or equity, against ResCap that arise under the Governing Agreements.  Such released claims include, but are not limited to, claims arising out of and/or relating to (i) the origination, sale, or delivery of Mortgage Loans to the Trusts, including the representations and warranties made in connection with the origination, sale, or delivery of Mortgage Loans to the Trusts or any alleged obligation of ResCap to repurchase or otherwise compensate the Trusts for any Mortgage Loan on the basis of any representations or warranties or otherwise or failure to cure any alleged breaches of representations and warranties, (ii) the documentation of the Mortgage Loans held by the Trusts including with respect to allegedly defective, incomplete, or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note, or any alleged failure to provide notice of such defective, incomplete or non-existent documentation, (iii) the servicing of the Mortgage Loans held by the Trusts (including any claim relating to the timing of collection efforts or foreclosure efforts, loss mitigation, transfers to subservicers, advances, servicing advances, or claims that servicing includes an obligation to take any action or provide any notice towards, or with respect to, the possible repurchase of Mortgage Loans by the applicable Master Servicer, Seller, or any other Person), (iv) setoff or recoupment under the Governing Agreements against ResCap, and (v) any loan seller that either sold loans to ResCap or AFI that were sold and transferred to such Trust or sold loans directly to such Trust, in all cases prior to the Petition Date (collectively, all such claims being defined as the "Released Claims").  For the avoidance of doubt, this release does not include individual direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities.

Section 7.02   Release of Claims Against Investors.  Except as set forth in Article VIII, as of the Effective Date, ResCap irrevocably and unconditionally grants to the Investors a full, final, and complete release, waiver, and discharge of all alleged or actual claims from any claim it may have under or arising out of the Governing Agreements.  For the avoidance of doubt, nothing in this provision shall affect Ally's rights in any way.

Section 7.03   Agreement Not to Pursue Relief from the Stay.  The Institutional Investors agree that neither they nor their successors in interest, assigns, pledges, delegates, affiliates, subsidiaries, and/or transferees, will seek relief from the automatic stay imposed by section 362 of the Bankruptcy Code in order to institute, continue or otherwise prosecute any action relating to the Released Claims; provided, however, nothing contained herein shall preclude the

-7-

Institutional Investors or their advised clients from seeking any such relief with respect to direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities. ResCap reserves its rights and defenses therewith.

Section 7.04   Inclusion of Accepting Trustees in Plan Exculpation Provisions.   The Trustees of any Trust accepting the offer to settle described in Section 5.01 and their respective counsel shall be entitled to the benefit of any plan exculpation provision, if any, included in the Plan, which exculpation shall be no less favorable than the plan exculpation provisions extended to similarly situated creditors or parties in interest who are parties to any plan support agreement with ResCap.

Section 7.05   Servicing of the Mortgage Loans. Except as provided in Section 8.01, the release and waiver in Article VII includes all claims based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the Trusts prior to the Petition Date.

ARTICLE VIII.   CLAIMS NOT RELEASED

Section 8.01   Administration of the Mortgage Loans.   The releases and waivers in Article VII herein do not include claims that first arise after the Effective Date which are based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the Trusts in their aggregation and remittance of Mortgage Loan Payments, accounting for principal and interest, and preparation of tax-related information, in connection with the Mortgage Loans and the ministerial operation and administration of the Trusts and the Mortgage Loans held by the Trusts, for which the Master Servicer, Servicer, or Subservicer received servicing fees, unless, as of the date hereof, the Institutional Investors, have or should have knowledge of the actions, inactions, or practices of ResCap in connection with such matters.

Section 8.02   Financial-Guaranty Provider Rights and Obligations. To the extent that any third party guarantor or financial-guaranty provider with respect to any Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustees, or the Trusts, the releases and waivers in Article VII are not intended to and shall not release such rights.

Section 8.03   Settlement Agreement Rights. The Parties do not release or waive any rights or claims against each other to enforce the terms of this Settlement Agreement or the Allowed Claim.

Section 8.04   Disclosure Claims.   The releases and waivers in Article VII do not include any claims based on improper disclosures under federal or state securities law.

Section 8.05   Reservation of Rights.   Notwithstanding anything in this Settlement Agreement to the contrary, the Institutional Investors have not waived their right to file an objection to a motion of the holders of the ResCap 9 5/8% bonds requesting payment of any interest on account of their ResCap 9 5/8% bond claims that may be due and owing after the Petition Date.

-8-

ARTICLE IX. <u>RELEASE OF UNKNOWN CLAIMS</u>.

Each of the Parties acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and expressly waives any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to the provisions of the California Civil Code Section 1542, including that provision itself, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM
> OR HER MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR."

The Parties acknowledge that inclusion of the provisions of this Article IX to this Settlement Agreement was a material and separately bargained for element of this Settlement Agreement.

ARTICLE X. <u>OTHER PROVISIONS</u>

Section 10.01 <u>Voluntary Agreement</u>. Each Party acknowledges that it has read all of the terms of this Settlement Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Settlement Agreement voluntarily and without duress.

Section 10.02 <u>No Admission of Breach or Wrongdoing</u>. ResCap has denied and continues to deny any breach, fault, liability, or wrongdoing. This denial includes, but is not limited to, breaches of representations and warranties, violations of state or federal securities laws, and other claims sounding in contract or tort in connection with any securitizations, including those for which ResCap was the Seller, Servicer and/or Master Servicer. Neither this Settlement Agreement, whether or not consummated, any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, whether or not consummated, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap with respect to any claim or of any breach, liability, fault, wrongdoing, or damage whatsoever, or with respect to any infirmity in any defense that ResCap has or could have asserted.

Section 10.03 <u>No Admission Regarding Claim Status</u>. ResCap expressly states that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, then neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap that any claims asserted by the Institutional Investors are not contingent, unliquidated or disputed. The Institutional Investors expressly state that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the

-9-

**EXECUTION COPY**

Institutional Investors that any claims asserted by the Institutional Investors and Trustees are not limited to the amounts set forth in this Settlement Agreement or are of any particular priority.

Section 10.04  Counterparts.  This Settlement Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Settlement Agreement.  Delivery of a signature page to this Settlement Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Settlement Agreement.

Section 10.05  Joint Drafting.  This Settlement Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Settlement Agreement, no provision shall be construed and interpreted for or against any of the Parties because such provision or any other provision of the Settlement Agreement as a whole is purportedly prepared or requested by such Party.

Section 10.06  Entire Agreement.  This document contains the entire agreement between the Parties, and may only be modified, altered, amended, or supplemented in writing signed by the Parties or their duly appointed agents.  All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Settlement Agreement and the Plan Support Agreement.

Section 10.07  Specific Performance.  It is understood that money damages are not a sufficient remedy for any breach of this Settlement Agreement, and the Parties shall have the right, in addition to any other rights and remedies contained herein, to seek specific performance, injunctive, or other equitable relief from the Bankruptcy Court as a remedy for any such breach. The Parties hereby agree that specific performance shall be their only remedy for any violation of this Agreement.

Section 10.08  Authority.  Each Party represents and warrants that each Person who executes this Settlement Agreement on its behalf is duly authorized to execute this Settlement Agreement on behalf of the respective Party, and that such Party has full knowledge of and has consented to this Settlement Agreement.

Section 10.09  No Third Party Beneficiaries.  There are no third party beneficiaries of this Settlement Agreement.

Section 10.10  Headings.  The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

Section 10.11  Notices.  All notices or demands given or made by one Party to the other relating to this Settlement Agreement shall be in writing and either personally served or sent by registered or certified mail, postage paid, return receipt requested, overnight delivery service, or by electronic mail transmission, and shall be deemed to be given for purposes of this Settlement Agreement on the earlier of the date of actual receipt or three days after the deposit thereof in the mail or the electronic transmission of the message.  Unless a different or additional address for

-10-

**EXECUTION COPY**

subsequent notices is specified in a notice sent or delivered in accordance with this Section, such notices or demands shall be sent as follows:

> To:    Institutional Investors
> c/o Kathy Patrick
> Gibbs & Bruns LLP
> 1100 Louisiana
> Suite 5300
> Houston, TX 77002
> Tel: 713-650-8805
> Email: kpatrick@gibbsbruns.com
> -and-
> Keith H. Wofford
> D. Ross Martin
> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036
> Tel:  212-841-5700
> Email: keith.wofford@ropesgray.com
>         ross.martin@ropesgray.com

> To:    ResCap
> c/o Gary S. Lee
> Jamie A. Levitt
> Morrison & Foerster LLP
> 1290 Avenue of the Americas
> New York, NY 10104
> Tel: 212-468-8000
> Email: glee@mofo.com
>         jlevitt@mofo.com

    Section 10.12 <u>Disputes</u>.  This Settlement Agreement, and any disputes arising under or in connection with this Settlement Agreement, are to be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of laws principles thereof.  Further, by its execution and delivery of this Settlement Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Settlement Agreement, *provided*, *however*, that, upon commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Settlement Agreement.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

-11-

**EXECUTION COPY**

Dated the 13 day of May, 2012.


Residential Capital, LLC
for itself and its direct and indirect subsidiaries

Signature: _____

Name: _Tammy Hamzehpour_

Title: _General Counsel_

-12-

_Western Asset Management Company_

Name:         W. Stephen Venable, Jr.
Title:         Attorney

Dated: May ___, 2012

*Thrivent Financial for Lutherans*

Name: David S. Royal

Title:  Vice President and Deputy General Counsel

Dated:  May 11, 2012

*Teachers Insurance and Annuity Association of America*

Name:  SANJEEV HANDA

Title:  MANAGING DIRECTOR

Dated:  May 13, 2012

*The TCW Group, Inc. on behalf of itself and its
subsidiaries*

Name:  Michael E. Cahill

Title:    Executive Vice President

Name:   David S. DeVito

Title:    Executive Vice President

Dated:  May ___, 2012

*Pacific Investment Management Company LLC*

Name:  Douglas M. Hodge

Title:   Chief Operating Officer

Dated:  May 13, 2012

*Maiden Lane LLC and Maiden Lane III LLC by*
*Federal Reserve Bank of New York, as*
*managing member*

Name:    Stephanie Heller

Title:    Senior Vice President and Deputy General Counsel

Dated:    May ___, 2012

*Neuberger Berman Europe Limited*

Name: HEATHER ZUCKERMAN

Title: DIRECTOR

Dated: May 13, 2012

*Metropolitan Life Insurance Company*

Name: Nancy Mueller Handal

Title: Managing Director

Dated: May __13__, 2012

*Kore Advisors, L.P.*

Name: Cory B. Nass

Title: General Counsel

Dated: May ___, 2012

*ING Investment Management Co. LLC*

Name: Gerald T. Lins

Title: Managing Director and Secretary

Dated: May 13, 2012

*ING Investment Management LLC*

Name: Christine Hurtsellers

Title: Executive Vice President

Dated:  May 11, 2012

_Goldman Sachs Asset Management, L.P._

Name:

Title:

Dated:  May 10, 2012

*Federal Home Loan Bank of Atlanta*

Name:  Reginald T. O'Shields

Title:  General Counsel and Senior Vice President

Dated:  May ___, 2012

*Cascade Investment, L.L.C.*

Name:  Keith Traverse

Title:    Authorized Representative

Dated:  May ___, 2012

*Bayerische Landesbank, acting through
its New York Branch*

Name:  Oliver Molitor

Title:     Executive Vice President

Dated:  May ___, 2012


*Bayerische Landesbank, acting through
its New York Branch*

Name:  Bert von Stuelpnagel

Title:     Executive Vice President

Dated:  May ___, 2012

*BlackRock Financial Management Inc. and its advisory affiliates*

Name: RANDY ROBERTSON

Title: MANAGING DIRECTOR

Dated: May 11 , 2012

_____

AEGON USA Investment Management, LLC

Name:

Title:

Dated: May 13, 2012

## Exhibit A- Trusts

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2004-AR1 | 635.0 | 2004-QS12 | 424.3 |
| 2004-AR2 | 510.1 | 2004-QS13 | 129.2 |
| 2004-GH1 | 224.1 | 2004-QS14 | 212.9 |
| 2004-HE1 | 1,292.3 | 2004-QS15 | 213.7 |
| 2004-HE2 | 711.5 | 2004-QS16 | 534.7 |
| 2004-HE3 | 977.3 | 2004-QS2 | 292.3 |
| 2004-HE4 | 1,018.0 | 2004-QS3 | 207.8 |
| 2004-HE5 | 700.0 | 2004-QS4 | 320.6 |
| 2004-HI1 | 235.0 | 2004-QS5 | 293.7 |
| 2004-HI2 | 275.0 | 2004-QS6 | 156.5 |
| 2004-HI3 | 220.0 | 2004-QS7 | 449.2 |
| 2004-HLTV1 | 175.0 | 2004-QS8 | 271.0 |
| 2004-HS1 | 477.1 | 2004-QS9 | 105.1 |
| 2004-HS2 | 604.1 | 2004-RP1 | 199.5 |
| 2004-HS3 | 284.0 | 2004-RS1 | 1,400.0 |
| 2004-J1 | 401.0 | 2004-RS10 | 1,250.0 |
| 2004-J2 | 400.6 | 2004-RS11 | 925.0 |
| 2004-J3 | 350.0 | 2004-RS12 | 975.0 |
| 2004-J4 | 600.1 | 2004-RS2 | 875.0 |
| 2004-J5 | 551.9 | 2004-RS3 | 600.0 |
| 2004-J6 | 408.0 | 2004-RS4 | 1,100.0 |
| 2004-KR1 | 2,000.0 | 2004-RS5 | 1,050.0 |
| 2004-KR2 | 1,250.0 | 2004-RS6 | 1,000.0 |
| 2004-KS1 | 950.0 | 2004-RS7 | 1,183.7 |
| 2004-KS10 | 986.0 | 2004-RS8 | 900.0 |
| 2004-KS11 | 692.7 | 2004-RS9 | 950.0 |
| 2004-KS12 | 541.8 | 2004-RZ1 | 485.0 |
| 2004-KS2 | 990.0 | 2004-RZ2 | 475.0 |
| 2004-KS3 | 675.0 | 2004-RZ3 | 360.0 |
| 2004-KS4 | 1,000.0 | 2004-RZ4 | 276.6 |
| 2004-KS5 | 1,175.0 | 2004-S1 | 307.7 |
| 2004-KS6 | 1,000.0 | 2004-S2 | 362.0 |
| 2004-KS7 | 850.0 | 2004-S3 | 228.3 |
| 2004-KS8 | 600.0 | 2004-S4 | 460.3 |
| 2004-KS9 | 600.0 | 2004-S5 | 423.5 |
| 2004-PS1 | 100.1 | 2004-S6 | 527.2 |
| 2004-QA1 | 201.3 | 2004-S7 | 105.3 |
| 2004-QA2 | 365.1 | 2004-S8 | 311.0 |
| 2004-QA3 | 320.1 | 2004-S9 | 645.9 |
| 2004-QA4 | 290.2 | 2004-SA1 | 250.1 |
| 2004-QA5 | 325.1 | 2004-SL1 | 632.9 |
| 2004-QA6 | 720.3 | 2004-SL2 | 499.0 |
| 2004-QS1 | 319.9 | 2004-SL3 | 222.5 |
| 2004-QS10 | 216.6 | 2004-SL4 | 206.5 |
| 2004-QS11 | 217.5 | 2004-SP1 | 233.7 |

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2004-SP2 | 145.1 | 2005-KS8 | 1,165.8 |
| 2004-SP3 | 306.9 | 2005-KS9 | 487.0 |
| 2004-VFT | 820.7 | 2005-NC1 | 870.8 |
| 2005-AA1 | 265.6 | 2005-QA1 | 296.7 |
| 2005-AF1 | 235.5 | 2005-QA10 | 621.8 |
| 2005-AF2 | 296.9 | 2005-QA11 | 525.1 |
| 2005-AHL1 | 463.7 | 2005-QA12 | 285.2 |
| 2005-AHL2 | 434.2 | 2005-QA13 | 560.2 |
| 2005-AHL3 | 488.8 | 2005-QA2 | 501.0 |
| 2005-AR1 | 399.8 | 2005-QA3 | 500.0 |
| 2005-AR2 | 458.4 | 2005-QA4 | 525.2 |
| 2005-AR3 | 523.7 | 2005-QA5 | 241.8 |
| 2005-AR4 | 386.1 | 2005-QA6 | 575.5 |
| 2005-AR5 | 597.2 | 2005-QA7 | 575.0 |
| 2005-AR6 | 592.0 | 2005-QA8 | 519.5 |
| 2005-EFC1 | 1,101.5 | 2005-QA9 | 650.5 |
| 2005-EFC2 | 679.3 | 2005-QO1 | 711.1 |
| 2005-EFC3 | 731.9 | 2005-QO2 | 425.1 |
| 2005-EFC4 | 707.8 | 2005-QO3 | 500.6 |
| 2005-EFC5 | 693.3 | 2005-QO4 | 797.0 |
| 2005-EFC6 | 672.7 | 2005-QO5 | 1,275.1 |
| 2005-EFC7 | 698.2 | 2005-QS1 | 214.6 |
| 2005-EMX1 | 792.8 | 2005-QS10 | 265.7 |
| 2005-EMX2 | 620.4 | 2005-QS11 | 213.6 |
| 2005-EMX3 | 674.5 | 2005-QS12 | 528.9 |
| 2005-EMX4 | 492.6 | 2005-QS13 | 639.2 |
| 2005-EMX5 | 380.0 | 2005-QS14 | 615.8 |
| 2005-HE1 | 991.1 | 2005-QS15 | 431.5 |
| 2005-HE2 | 1,113.5 | 2005-QS16 | 428.0 |
| 2005-HE3 | 988.0 | 2005-QS17 | 540.1 |
| 2005-HI1 | 240.0 | 2005-QS2 | 213.0 |
| 2005-HI2 | 240.0 | 2005-QS3 | 475.6 |
| 2005-HI3 | 224.9 | 2005-QS4 | 211.7 |
| 2005-HS1 | 853.8 | 2005-QS5 | 214.0 |
| 2005-HS2 | 577.5 | 2005-QS6 | 265.1 |
| 2005-HSA1 | 278.8 | 2005-QS7 | 370.0 |
| 2005-J1 | 525.5 | 2005-QS8 | 104.1 |
| 2005-KS1 | 708.8 | 2005-QS9 | 371.0 |
| 2005-KS10 | 1,299.2 | 2005-RP1 | 343.1 |
| 2005-KS11 | 1,339.3 | 2005-RP2 | 301.1 |
| 2005-KS12 | 1,117.2 | 2005-RP3 | 282.5 |
| 2005-KS2 | 543.4 | 2005-RS1 | 975.0 |
| 2005-KS3 | 413.5 | 2005-RS2 | 725.0 |
| 2005-KS4 | 411.1 | 2005-RS3 | 741.3 |
| 2005-KS5 | 401.8 | 2005-RS4 | 522.4 |
| 2005-KS6 | 596.2 | 2005-RS5 | 497.5 |
| 2005-KS7 | 387.6 | 2005-RS6 | 1,183.2 |

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2005-RS7 | 493.0 | 2006-HI4 | 272.7 |
| 2005-RS8 | 660.0 | 2006-HI5 | 247.5 |
| 2005-RS9 | 1,179.0 | 2006-HLTV1 | 229.9 |
| 2005-RZ1 | 203.8 | 2006-HSA1 | 461.4 |
| 2005-RZ2 | 333.7 | 2006-HSA2 | 447.9 |
| 2005-RZ3 | 340.0 | 2006-HSA3 | 201.0 |
| 2005-RZ4 | 411.2 | 2006-HSA4 | 402.1 |
| 2005-S1 | 463.1 | 2006-HSA5 | 295.6 |
| 2005-S2 | 260.9 | 2006-J1 | 550.0 |
| 2005-S3 | 183.1 | 2006-KS1 | 840.1 |
| 2005-S4 | 259.4 | 2006-KS2 | 977.5 |
| 2005-S5 | 258.2 | 2006-KS3 | 1,125.9 |
| 2005-S6 | 412.9 | 2006-KS4 | 687.8 |
| 2005-S7 | 311.7 | 2006-KS5 | 687.1 |
| 2005-S8 | 312.3 | 2006-KS6 | 529.1 |
| 2005-S9 | 366.6 | 2006-KS7 | 532.7 |
| 2005-SA1 | 295.2 | 2006-KS8 | 535.9 |
| 2005-SA2 | 500.8 | 2006-KS9 | 1,197.1 |
| 2005-SA3 | 675.2 | 2006-NC1 | 536.8 |
| 2005-SA4 | 850.5 | 2006-NC2 | 745.2 |
| 2005-SA5 | 355.3 | 2006-NC3 | 504.9 |
| 2005-SL1 | 370.5 | 2006-QA1 | 603.9 |
| 2005-SL2 | 168.9 | 2006-QA10 | 375.5 |
| 2005-SP1 | 831.0 | 2006-QA11 | 372.4 |
| 2005-SP2 | 490.2 | 2006-QA2 | 394.0 |
| 2005-SP3 | 285.7 | 2006-QA3 | 398.5 |
| 2006-AR1 | 508.7 | 2006-QA4 | 304.4 |
| 2006-AR2 | 373.0 | 2006-QA5 | 695.6 |
| 2006-EFC1 | 593.2 | 2006-QA6 | 625.8 |
| 2006-EFC2 | 387.6 | 2006-QA7 | 588.2 |
| 2006-EMX1 | 424.6 | 2006-QA8 | 795.1 |
| 2006-EMX2 | 550.1 | 2006-QA9 | 369.2 |
| 2006-EMX3 | 773.6 | 2006-QH1 | 337.9 |
| 2006-EMX4 | 661.7 | 2006-QO1 | 901.2 |
| 2006-EMX5 | 580.2 | 2006-QO10 | 895.7 |
| 2006-EMX6 | 620.5 | 2006-QO2 | 665.5 |
| 2006-EMX7 | 495.3 | 2006-QO3 | 644.8 |
| 2006-EMX8 | 698.6 | 2006-QO4 | 843.2 |
| 2006-EMX9 | 728.8 | 2006-QO5 | 1,071.6 |
| 2006-HE1 | 1,274.2 | 2006-QO6 | 1,290.3 |
| 2006-HE2 | 626.2 | 2006-QO7 | 1,542.4 |
| 2006-HE3 | 1,142.3 | 2006-QO8 | 1,288.1 |
| 2006-HE4 | 1,159.1 | 2006-QO9 | 895.6 |
| 2006-HE5 | 1,244.5 | 2006-QS1 | 323.8 |
| 2006-HI1 | 214.2 | 2006-QS10 | 533.6 |
| 2006-HI2 | 237.4 | 2006-QS11 | 751.5 |
| 2006-HI3 | 223.2 | 2006-QS12 | 541.3 |

| Deal Name | Original Issue Balance (in Thousands) | Deal Name | Original Issue Balance (in Thousands) |
|---|---|---|---|
| 2006-QS13 | 641.0 | 2006-SP3 | 291.9 |
| 2006-QS14 | 753.7 | 2006-SP4 | 303.9 |
| 2006-QS15 | 538.6 | 2007-EMX1 | 692.9 |
| 2006-QS16 | 752.1 | 2007-HE1 | 1,185.9 |
| 2006-QS17 | 537.0 | 2007-HE2 | 1,240.9 |
| 2006-QS18 | 1,181.9 | 2007-HE3 | 350.6 |
| 2006-QS2 | 881.7 | 2007-HI1 | 255.0 |
| 2006-QS3 | 969.8 | 2007-HSA1 | 546.8 |
| 2006-QS4 | 752.3 | 2007-HSA2 | 1,231.4 |
| 2006-QS5 | 698.0 | 2007-HSA3 | 796.4 |
| 2006-QS6 | 858.8 | 2007-KS1 | 415.6 |
| 2006-QS7 | 537.5 | 2007-KS2 | 961.5 |
| 2006-QS8 | 966.3 | 2007-KS3 | 1,270.3 |
| 2006-QS9 | 540.1 | 2007-KS4 | 235.9 |
| 2006-RP1 | 293.0 | 2007-QA1 | 410.1 |
| 2006-RP2 | 317.0 | 2007-QA2 | 367.0 |
| 2006-RP3 | 290.4 | 2007-QA3 | 882.4 |
| 2006-RP4 | 357.4 | 2007-QA4 | 243.5 |
| 2006-RS1 | 1,173.6 | 2007-QA5 | 504.1 |
| 2006-RS2 | 785.6 | 2007-QH1 | 522.3 |
| 2006-RS3 | 741.6 | 2007-QH2 | 348.4 |
| 2006-RS4 | 887.5 | 2007-QH3 | 349.5 |
| 2006-RS5 | 382.6 | 2007-QH4 | 401.0 |
| 2006-RS6 | 372.2 | 2007-QH5 | 497.5 |
| 2006-RZ1 | 483.8 | 2007-QH6 | 597.0 |
| 2006-RZ2 | 368.6 | 2007-QH7 | 347.0 |
| 2006-RZ3 | 688.3 | 2007-QH8 | 560.1 |
| 2006-RZ4 | 851.8 | 2007-QH9 | 594.4 |
| 2006-RZ5 | 505.1 | 2007-QO1 | 625.1 |
| 2006-S1 | 367.1 | 2007-QO2 | 529.3 |
| 2006-S10 | 1,087.7 | 2007-QO3 | 296.3 |
| 2006-S11 | 623.2 | 2007-QO4 | 502.8 |
| 2006-S12 | 1,204.3 | 2007-QO5 | 231.2 |
| 2006-S2 | 260.6 | 2007-QS1 | 1,297.4 |
| 2006-S3 | 337.8 | 2007-QS10 | 435.8 |
| 2006-S4 | 313.9 | 2007-QS11 | 305.8 |
| 2006-S5 | 678.1 | 2007-QS2 | 536.7 |
| 2006-S6 | 599.6 | 2007-QS3 | 971.6 |
| 2006-S7 | 469.7 | 2007-QS4 | 746.9 |
| 2006-S8 | 416.3 | 2007-QS5 | 432.7 |
| 2006-S9 | 442.3 | 2007-QS6 | 808.3 |
| 2006-SA1 | 275.1 | 2007-QS7 | 803.3 |
| 2006-SA2 | 791.3 | 2007-QS8 | 651.8 |
| 2006-SA3 | 350.9 | 2007-QS9 | 707.0 |
| 2006-SA4 | 282.3 | 2007-RP1 | 334.4 |
| 2006-SP1 | 275.9 | 2007-RP2 | 263.3 |
| 2006-SP2 | 348.1 | 2007-RP3 | 346.6 |

| Deal Name | Original Issue Balance (in Thousands) |
|---|---|
| 2007-RP4 | 239.2 |
| 2007-RS1 | 478.3 |
| 2007-RS2 | 376.8 |
| 2007-RZ1 | 329.3 |
| 2007-S1 | 522.5 |
| 2007-S2 | 472.2 |
| 2007-S3 | 575.3 |
| 2007-S4 | 314.5 |
| 2007-S5 | 524.8 |
| 2007-S6 | 707.7 |
| 2007-S7 | 419.1 |
| 2007-S8 | 488.8 |
| 2007-S9 | 172.4 |
| 2007-SA1 | 310.8 |
| 2007-SA2 | 385.1 |
| 2007-SA3 | 363.8 |
| 2007-SA4 | 414.9 |
| 2007-SP1 | 346.6 |
| 2007-SP2 | 279.3 |
| 2007-SP3 | 298.1 |
| **Grand Total** | **220,987.7** |

## Exhibit B – Allocated Allowed Claims

1. The Allowed Claim shall be allocated amongst the Accepting Trusts by the Trustees pursuant to the determination of a qualified financial advisor (the "Expert") who will make any determinations and perform any calculations required in connection with the allocation of the Allowed Claim among the Accepting Trusts. To the extent that the collateral in any Accepting Trust is divided by the Governing Agreements into groups of loans ("Loan Groups") so that ordinarily only certain classes of investors benefit from the proceeds of particular Loan Groups, those Loan Groups shall be deemed to be separate Accepting Trusts for purposes of the allocation and distribution methodologies set forth below.  The Expert to apply the following allocation formula:

(i) *First*, the Expert shall calculate the amount of net losses for each Accepting Trust that have been or are estimated to be borne by that trust from its inception date to its expected date of termination as a percentage of the sum of the net losses that are estimated to be borne by all Accepting Trusts from their inception dates to their expected dates of termination (such amount, the "Net Loss Percentage");

(ii) *Second*, the Expert shall calculate the "Allocated Allowed Claim" of the Allowed Claim for each Accepting Trust by multiplying (A) the amount of the Allowed Claim by (B) the Net Loss Percentage for such Accepting Trust, expressed as a decimal; provided that the Expert shall be entitled to make adjustments to the Allocated Allowed Claim of each Accepting Trust to ensure that the  effects of rounding do not cause the sum of the Allocated Allowed Claims for all Accepting Trusts to exceed the applicable Allowed Claim; and

(iii) *Third*, if applicable, the Expert shall calculate the portion of the Allocated Allowed Claim that relates to principal-only certificates or notes and the portion of the Allocated Allowed Claim that relates to all other certificates or notes.

2. All distributions from the Estate to a Trust on account of any Allocated Allowed Claim shall be treated as Subsequent Recoveries, as that term is defined in the Governing Agreement for that trust; provided that if the Governing Agreement for a particular Covered Trust does not include the term "Subsequent Recovery," the distribution resulting from the Allocated Allowed Claim Trust shall be distributed as though it was unscheduled principal available for distribution on that distribution date.

3. Notwithstanding any other provision of any Governing Agreement, the Debtors and all Servicers agree that neither the Master Servicer nor any Subservicer shall be entitled to receive any portion of any distribution resulting from any Allocated Allowed Claim for any purpose, including without limitation the satisfaction of any Servicing Advances, it being understood that the Master Servicer's other entitlements to payments, and to reimbursement or recovery, including of Advances and Servicing Advances, under the terms of the Governing Agreements shall not be affected by this

Settlement Agreement except as expressly provided here.  To the extent that as a result of the distribution resulting from an Allocated Allowed Claim in a particular Trust a principal payment would become payable to a class of REMIC residual interests, whether on the distribution of the amount resulting from the Allocated Allowed Claim or on any subsequent distribution date that is not the final distribution date under the Governing Agreement for such Trust, such payment shall be maintained in the distribution account and the relevant Trustee shall distribute it on the next distribution date according to the provisions of this section.

4.  In addition, after any distribution resulting from an Allocated Allowed Claim pursuant to section 3 above, the relevant Trustee will allocate the amount of the distribution for that Trust in the reverse order of previously allocated Realized Losses, to increase the Class Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance, as applicable, of each class of Certificates or Notes (or Components thereof) (other than any class of REMIC residual interests) to which Realized Losses have been previously allocated, but in each case by not more than the amount of Realized Losses previously allocated to that class of Certificates or Notes (or Components thereof) pursuant to the Governing Agreements.  For the avoidance of doubt, for Trusts for which the Credit Support Depletion Date shall have occurred prior to the allocation of the amount of the Allocable Share in accordance with the immediately preceding sentence, in no event shall the foregoing allocation be deemed to reverse the occurrence of the Credit Support Depletion Date in such Trusts.  Holders of such Certificates or Notes (or Components thereof) will not be entitled to any payment in respect of interest on the amount of such increases for any interest accrual period relating to the distribution date on which such increase occurs or any prior distribution date.  Any such increase shall be applied pro rata to the Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance of each Certificate or Note of each class.  For the avoidance of doubt, this section 4 is intended only to increase Class Certificate Balances, Component Balances, Component Principal Balances, and Note Principal Balances, as provided for herein, and shall not affect any distributions resulting from Allocated Allowed Claims provided for in section 3 above.

5.  Except as set forth above, nothing in this Settlement Agreement amends or modifies in any way any provisions of any Governing Agreement.  To the extent any credit enhancer or financial guarantee insurer receives a distribution on account of the Allowed Claim, such distribution shall be credited at least dollar for dollar against the amount of any claim it files against the Debtor that does not arise under the Governing Agreements.

6. In no event shall the distribution to a Trust as a result of any Allocated Allowed Claim be deemed to reduce the collateral losses experienced by such Covered Trust.

## Exhibit C -- Fee Schedule

Percentage of the Allowed Claim (being the sum of the Allocated Allow Claims) allocable to trusts which accept the settlement, subject to adjustment pursuant to section 6.02(b) for trusts other than original "Covered Trusts."

Gibbs & Bruns, L.L.P.:  4.75%

Ropes & Gray LLP:

If Effective Date of Plan occurs on or before Sept. 2, 2012, 0.475%

If Effective Date of Plan occurs after Sept. 2, 2012 and on or before Dec. 2, 2012, 0.7125%

If Effective Date of Plan occurs after Dec. 3, 2012 and on or before May 2, 2013, 0.855%

If Effective Date of Plan occurs after May 2, 2013, 0.95%