**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**DECLARATION OF JARED DERMONT IN SUPPORT OF THE OBJECTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS'
MOTION FOR AN ORDER (I) AUTHORIZING AND APPROVING SALE
PROCEDURES, INCLUDING BREAK-UP FEES AND EXPENSE REIMBURSEMENT;
(II) SCHEDULING BID DEADLINE AND SALE HEARING; (III) APPROVING FORM
AND MANNER OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF**

I, Jared Dermont, hereby declare as follows under penalty of perjury:

1. I am a Managing Director and Partner of the Recapitalization and Restructuring Group of Moelis & Company LLC ("**Moelis**"), resident in Moelis' New York office, located at 399 Park Avenue, 5th Floor, New York, New York 10022.

2. I submit this Declaration (the "**Declaration**") in support of the objection (the "**Bid Procedures Objection**") of the Official Committee of Unsecured Creditors (the "**Committee**") to the motion of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") for an order (the "**Bid Procedures Order**") (i) authorizing and approving the sale procedures, including break-up fees and expense reimbursement; (ii) scheduling bid deadline and sale hearing; (iii) approving form and manner of notice thereof; and (iv) granting related relief (the "**Bid Procedures and Sale Motion**").[1]

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Bid Procedures Objection.

3. Except as otherwise noted herein, I have personal knowledge of the matters set forth herein. If called and sworn as a witness, I would testify to the facts and opinions set forth herein.

**Preliminary Statement**

4. I offer this Declaration in support of the Bid Procedures Objection to offer the following opinions and explain the reasons supporting them. I believe that neither the bid procedures proposed for the sale of the Debtors' HFS Assets nor the bid procedures proposed for the sale of the Origination and Servicing Business were designed in a manner that will maximize value of the Debtors' assets. To the contrary, if approved, the proposed bid procedures will fail to provide an adequate marketing period for the Debtors' assets, will chill bidding by potential buyers, and will render it likely that the Debtors will not obtain the highest and best consideration in exchange for their assets.

**Professional Background**

5. I am a Managing Director and Partner in the Recapitalization and Restructuring Group at Moelis, an investment banking firm. I have sixteen years of restructuring and mergers and acquisitions experience.

6. My restructuring assignments have involved in excess of $150 billion of debt and liabilities. I have advised on numerous situations involving domestic and global financial institutions, including representing monolines in the context of restructurings and remediation, advising on CDO and financial guarantee commutations, RMBS tenders, interest rate and total return swap derivative structures, leasing arrangements, Tier 1 Capital considerations and "bad bank" strategic and financial considerations. The chapter 11 cases I have worked on include,

among others, Orchard Brands, Harry & David, Neenah, Almatis, Chemtura, Atrium, Charter Communications, Lyondell Basell, Sea Containers, Tronox, Solutia, Tower Automotive, Northwest Airlines, Adelphia Communications, United Airlines, aaiPharma, Superior Telecom, Barney's, and Zenith Electronics.  These matters include experience representing government-related entities, specifically working on behalf of the Pension Benefit Guaranty Corporation in Tower Automotive and Northwest Airlines, as well as interfacing with the New York State Department of Financial Services with respect to multiple monoline financial guarantor engagements.  I am also currently serving as an expert with respect to the chapter 9 of a large municipality.

7. My mergers & acquisitions experience includes both non-distressed and distressed buy-side and sell-side assignments, as well as Special Committee representations involving companies such as International Specialty Products (ISP), Tronox, DEPFA, Fisher Communications, Benihana, Jason Industries, Grakon, Cornell Companies, Evenflow, Covidien, PW Eagle, Flexsys, Dequest, Pharmaceutical Service division of Solutia, Astaris, Varsity Brands, McKesson, Barr Laboratories, and Alpharama.

8. My financing experience includes secured bank debt financing, DIP financing, exit financing, second lien loans, convertible notes, rights offerings, preferred stock investments, and common equity.

9. I have rendered numerous fairness opinions including for transactions involving Security Capital Assurance, PW Eagle, Cornell Companies (2 separate opinions), Alpharma, Varsity Brands, Superior Telecom, Neomorphic, Baxter International (2 separate opinions), Barr Pharmaceuticals, Healtheon WebMD, Office Depot, McKesson (multiple opinions), and Mayor's

Jewelers and served as an expert witness for Huntsman with respect to litigation related to its proposed transaction with Hexion/Apollo.

10.   Prior to joining Moelis, I was a Managing Director in Rothschild's Restructuring Group. Previously, I was a Vice President in Banc of America Securities' Healthcare Group, where I focused on mergers & acquisitions assignments and debt and equity financings. Prior to Banc of America Securities, I was an Associate in Peter J. Solomon Company's Mergers & Acquisitions and Restructuring Groups.

11.   I have guest lectured on the topic of valuation at the University of Chicago and New York University business schools. I received my B.A. in Economics from Tufts University.

## The Bid Procedures

**The Nationstar Sale**

### A.    The Timeline for the Nationstar Sale is Too Compressed

12.   The proposed timeline for the Nationstar Sale contemplates completion of the marketing process and submission of bids in three months from the hearing on approval of the Bid Procedures Order. In my view, this diligence period is simply inadequate to ensure an active bidding process that will produce the maximum number of viable bidders and thereby maximize value for the Debtors' estates. While a 90-day auction process is not uncommon in the context of more straightforward bankruptcy sales (particularly those that involved more comprehensive pre-petition marketing periods), adopting such a period here would be unwise, and would very likely chill bidding by certain parties, for at least three reasons.

13.   First, the assets that potential buyers are expected to evaluate – in particular, the mortgage servicing rights (the "**MSRs**") that form a key component of the Debtors' Servicing Platform – are highly complex. In my experience, potential buyers for assets of such complexity

- 4 -

need more than three months to perform appropriate diligence, value the assets, interface with relevant government agencies and formulate bids if they have not engaged with the seller pre-petition. Each potential buyer will have to review more than 1.2 million pages of electronic diligence and additional presentation materials, engage in numerous telephone conferences and face-to-face meetings with the Debtors' personnel and financial advisors in order to reach a definitive position on value. Perhaps equally important, the bidders should have an adequate opportunity to interact with Fannie Mae, Freddie Mac and Ginnie Mae and other various Government Associations (together, the "GAs").

14.  It is telling that Nationstar (and here I refer also to Nationstar's parent Fortress Investment Group LLC) itself required a longer period of diligence before committing to provide a stalking horse bid. Nationstar had substantial familiarity with the Debtors' assets through participation in the 2010 sale process run by Goldman Sachs and had exclusive negotiating status affording it the undivided attention of the Debtors' representatives as well as the GAs during the pre-petition period. I understand that during the 2010 sale process Fortress conducted more than three months of due diligence. Beginning in the end of January of this year, Nationstar had approximately one month during which it conducted preliminary due diligence before being anointed the exclusive bidder, and then an additional twelve weeks of intensive continuous due diligence including daily telephone calls with the Debtors and over 80 hours of on-site, in-person diligence meetings conducted in the Debtors' offices in New York, New York, Fort Washington, Pennsylvania, and Dallas, Texas. Importantly, Fortress continues to conduct due diligence and a significant aspect of their bid, the PSA amendment process, is on-going, and will remain on-going over the next several months.

15.     Interfacing with multiple potential buyers, each undertaking this level of inquiry during a condensed diligence period, will pose great burdens on the Debtors' management and advisors, particularly as the Debtors propose simultaneously marketing the HFS Assets, dealing with the many other issues that will need to be addressed in these chapter 11 cases, and – perhaps not incidentally – managing the business.

16.     Moreover, unlike other situations where a 90-day post-petition marketing period might be adequate, in this case very few potential bidders have had any meaningful exposure to the assets by virtue of the remarkably constrained "targeted" pre-petition marketing process. In the typical bankruptcy stalking horse bidder process, debtors will have conducted a robust pre-petition process during which a broad universe of potential purchasers are approached and invited to conduct due diligence. While potential purchasers sometimes decline to make stalking horse proposals, preferring to participate during the post-filing period when the framework of a transaction is clearly defined, the pre-petition process should ensure that many or most of the potential buyers have been exposed to the assets prior to the petition date, and likely have drawn some preliminary conclusions as to their value. This case is starkly different. Here, for whatever reason, only five potential bidders were contacted prior to the Petition Date (in fact, an additional five unsolicited bidders were turned away without even being allowed to view the Confidential Information Memorandum), and the Debtors elected to engage in negotiations exclusively with Nationstar, neglecting other potentially interested participants. Further, we now understand that Lone Star, a global investment firm with $33 billion of total capital, a servicer platform and $10 billion of recently raised funds for investment opportunities of this kind, contacted the Debtors and Ally on multiple occasions, including in writing, about the prospect of participating in the process – but was ignored.

17.     By the admission of the Debtors' own advisor, the expedited pre-petition marketing process limited the scope of potential buyers contacted.[2] Had a more fulsome process been run, the Debtors may have attained better terms from the stalking horse bidders. In a matter of this complexity, it is particularly damaging that so few potential buyers have gotten a head start on this process and this provides all the more reason why at least an additional 60 days over what has been proposed should be reserved for the diligence period.

18.     In order to become even a potential participant in the auction process, a would-be bidder must assess whether the enormous amount of time and resources required to effectively evaluate the assets is justified given the compressed time frame (particularly since one of the proposed stalking-horse bidders is an insider). We now know, for instance, that the only other bidder seriously considered by the Debtors during the pre-petition process engaged <u>ten</u> separate advisors, including major law, consulting, accounting, asset valuation, and lending institutions as well as two investment banks in connection with its diligence. The amount of due diligence effort required is also illustrated by Nationstar's requested expense reimbursement of $10 million.[3] While other bidders may use smaller teams, it is beyond question that any potential purchaser participating in this process will have to dedicate tremendous resources, including the attention of senior management and the expenditure of millions of dollars in expenses, before even getting to the auction. Any potential buyer considering whether to embark on such an extensive diligence effort will want to ensure at the outset that it will have sufficient time and engagement from the Debtors to do all that is reasonable to effectively participate in the sale process if it so chooses, including sufficient dialogue with the GAs. A compressed timeline may discourage such would-

---

[2] Per the deposition of Sam Greene, "Because we didn't think we had enough time to approach a very wide group of people."
[3] The Committee now understands that Nationstar was reimbursed $4 million in expenses pre-petition beyond the incremental $10 million requested

be bidders from even attempting to participate.  This is a point that has already found explicit support by a potential bidder: Lone Star, a highly sophisticated investment firm, states in its response to the Bid Procedures Motion its belief that the minimum reasonable diligence period for competing bidders who have not conducted any diligence pre-petition should be five to six months.

### B.    The Stalking Horse Protections for Nationstar Are Excessive

19.    In my view, the size of the combined Break-Up Fee ($72 million), incremental Expense Reimbursement ($10 million above and beyond the $4 million in expenses reimbursed pre-petition) and initial minimum overbid ($23.3 million) are excessive and unreasonable on a total and relative value basis.  Unless the Break-Up Fee is eliminated/substantially reduced, as a practical matter these protections will have a substantial chilling effect on other prospective bidders.  Taken together, the stalking horse protections will require an incremental ***$105.3 million*** for a bid to be considered a "qualified bid."  This is 4.5% of the total purchase price, but I believe it is even more relevant that they constitute a full 16.4% of the portion of the Nationstar purchase price attributed to the MSR platform, which is the only true going-concern asset being sold in this transaction. The remainder of the purchase price relates to high quality Servicer Advances that are super senior cash flows that are near cash-like; in other words, they are virtually cash equivalents as to which there is little room for disagreement about value, and therefore do not warrant similar break-up fee protection.  Incremental value creation will largely be driven by potential bidders' perspective regarding the MSR platform.

20.    Assessing the Break-Up Fee by itself, I do not believe it is reasonable in its size or consistent with market standards when viewed in the proper context of the transaction.  When viewed as a percentage of purchase price, the $72 million Break-Up Fee is speciously within

market range for all transactions – though at 3.1% indisputably at the high end of that range – but such an analysis is overly simplistic and yields an unreasonable result in this situation.

21.     As a preliminary matter, I do not view a 3.1% break-up fee as appropriate in a transaction of this size. As set forth in Exhibit A annexed hereto, the mean break-up fee for transactions valued at $2.0 to $3.0 billion is 2.4%[4], reflecting the well-recognized fact that the amount necessary to induce a bidder to act as a stalking horse is not in direct proportion to the size of the transaction. The need to compensate Nationstar based on the full nominal purchase price of the deal is even less compelling here because such a large proportion of the transaction – more than two-thirds – is payment for nearly cash-equivalent Servicer Advances (and at a discount).

22.     More specifically, the purchase price under the Nationstar APA can almost entirely be split into two parts: the amount that Nationstar is paying for the MSR platform (approximately $640 million) and the amount it is paying for the Servicer Advances (approximately $1.7 billion). Given that the Servicer Advances are entitled to priority of payment from the various loan pools and, as such, have a high likelihood of collection, they can essentially be viewed as buying a cash-like asset from the Debtors. For this reason, I do not believe it is reasonable to provide for a break-up fee that is calculated based on the entirety of the purchase price. Rather, given the certainty of recovery on the Servicer Advances (i.e., their cash-like nature), these assets should be excluded from the baseline purchase price for evaluating the reasonableness of the Break-Up Fee. Utilizing the full purchase price is even less defensible given that, in addition to certain standard closing provisions, Nationstar added a purchase price adjustment related to certain PSA amendments that could be a downward adjustment of over $200 million (this adjustment is uni-

---

[4] Analysis of 363 bankruptcy auctions of $1 billion and greater suggests that the break-up fee should be lower than 2.4%

directionally down, there is no upside value opportunity).  Based upon the one-way negative impact of this adjustment, utilizing the full purchase price is inappropriate.

23.   After excluding the Servicer Advances from the Nationstar bid, the Break-Up Fee of $72 million is approximately 11.2% of the balance of the purchase price.  An 11.2% Break-Up Fee is far in excess of customary break-up fees and is, in my experience, patently unreasonable.  A more appropriate Break-Up Fee would be arrived at by calculating 3.0% of the value of the MSR platform (which is more appropriate given the size of that asset).  In light of the proposal set forth in Berkshire Hathaway's recently-filed objection to the Bid Procedures Motion, the break-up fee should be no more than $24 million and in fact an argument could be made that no break-up fee is necessary at all.

24.   I also do not believe that the initial minimum overbid of 1.0% of the total purchase price ($23.3 million) is reasonable in its size or consistent with market standards when viewed in the proper context of the transaction.  While the initial minimum overbid of 1.0% may make sense in the context of relatively smaller transactions, I do not believe that $23.3 million is appropriate in a transaction of this size and should be reduced to $7.5 million. In an auction process, the purpose of the initial minimum overbid is to assess the relevance of a potential bid and to avoid unreasonably small incremental adjustments to a current bid, not to protect the current bidder.

25.   In addition, given that Nationstar was paid $4 million pre-petition for its diligence efforts, and in light of Berkshire Hathaway's willingness to act as a stalking horse bidder absent expense reimbursement, no further expense reimbursement should be granted to Nationstar or any other potential stalking horse bidder.

**The Ally Sale**

26.     The proposed bidding procedures with respect to the HFS Assets are also designed in a way that will chill bidding and will fail to maximize the value of the Debtors' assets, for the following reasons. First, one of the ways in which Ally may purchase the HFS Assets is through a chapter 11 plan that incorporates the estate and third-party releases that Ally is seeking.  In my experience, bidders would consider it far better to acquire these assets through a standard section 363 sale process not linked to plan confirmation and hence tied to the confirmation timeline. Potential purchasers of the HFS Assets are bidding for the right to acquire and manage those assets themselves, as soon as possible, not at some later date artificially postponed by the length of a chapter 11 confirmation process.  The disadvantage built into the current proposed structure can easily be avoided if the transaction is conducted through an ordinary section 363 sale process. Again, this is a point that is supported by a potential bidder in the marketplace: in its response to the Bid Procedures Motion, Lone Star indicated that it preferred acquiring the HFS Assets via a 363 sales process given that it does "not want to get bogged down in a possibly protracted and contentious plan process" and because "purchasers of this type of financial assets (sic) want to get control of the assets as soon as possible after submitting a successful bid."[5]

27.     Second, potential bidders should be given the opportunity to bid on portions of the loan portfolio, particularly in light of the portfolio size and the quantum of buyers who could be paired up to effect a value maximizing bid.  Making this adjustment to the Bid Procedures will likely encourage bidding and may inure additional value to the Debtors' estates.

28.     Third, separate and apart from the inappropriateness of conducting the transaction through a Plan, the "toggle" purchase price structure set forth in the Ally APA is unusual, unreasonable, and inconsistent with market standards.   By introducing uncertainty into the

---

[5] Lone Star response dated June 11, 2012, paragraph 13

- 11 -

process, the toggle structure will leave other bidders in the dark as to how much they must bid to prevail and will discourage their participation (essentially, Ally is bidding on two assets and potential bidders are being asked to bid on one).  I note that at deposition even the Debtors' own witnesses have been unable to explain how this process is supposed to work.  It is simply unclear whether competing bidders must beat the $1.4 billion that Ally would pay if it does not get confirmation of a plan that releases claims against it, or if they must top the $1.6 billion that Ally would pay to obtain the assets through a plan – notwithstanding that the extra $200 million would obviously represent partial payment for the releases, not for the HFS Assets.  Debtors have suggested that they think bidding must start at $1.6 billion, but this makes no sense:  if the plan is not confirmed, Ally may attempt to get the HFS Assets through a 363 sale for $1.4 billion, even though no other bidder was offered the opportunity to make an offer above that amount (but below $1.6 billion).  It is regrettable that the Debtors allowed Ally to divert $200 million of the proposed settlement amount into the sale process, causing this confusion.  At the very least, bidding should begin at $1.4 billion, with the Committee allowed to determine whether a bid above that amount, but below $1.6 billion, is superior for the estate.

29.     Fourth, I also do not believe that the minimum bid increment of $15 million is reasonable in its size or consistent with market standards when viewed in the proper context of the transaction and should be reduced to $7.5 million.  As discussed in paragraph 24, the purpose of the minimum bid increment is to assess the relevance of a potential bid and to avoid unreasonably small incremental adjustments to a current bid, not to protect the current bidder.

30.     As a related point, bidding is likely to be chilled because under the Bid Procedures, the Debtors have unchecked discretion to determine what constitutes the best and highest bid. Potential buyers will have no confidence that the Debtors, who have already contractually

committed themselves to seeking approval of the Plan, Ally Settlement and Ally Releases, will make an objective decision when choosing the highest and best bidder (particularly since highly credible and qualified parties such as Lone Star were not contacted pre-petition). I believe that the only way to give bidders the confidence needed to fully participate is to grant the Committee full consent rights as to the determination of which is the winning bidder.

Pursuant to 28 U.S.C. § 1746, 1 declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: June 13, 2012

By: /s/ Jared Dermont
Jared Dermont
Managing Director
Moelis & Company

| Exhibit A - Break-Up Fee Summary | | | | | CONFIDENTIAL |
|---|---|---|---|---|---|

**Criteria:**
1. Transactions Announced Between 1/1/2009 - 6/8/2012
2. Total Transaction Value Between $2,000 million - $3,000 million
3. Targets in the United States
4. All Industries (including Financial Institutions)

| ($ millions) Announced Date | Target | Buyer | Total Transaction Value | Break-Up Fee | Break-Up Fee (% of TV) |
|---|---|---|---:|---:|---:|
| 5/1/12 | Collective Brands, Inc. | Blum Capital; Wolverine World Wide; Golden Gate Capital | 2,001.4 | 44.0 | 2.2% |
| 3/19/12 | AboveNet, Inc. | Zayo Group Inc. | 2,333.1 | 75.0 | 3.2% |
| 3/12/12 | ZOLL Medical Corporation | Asahi Kasei Corporation | 2,216.2 | 64.0 | 2.9% |
| 3/9/12 | Quest Software Inc. | Insight Venture Partners | 2,176.3 | 4.2 | 0.2% |
| 1/7/12 | Inhibitex, Inc. | Bristol-Myers Squibb Company | 2,579.0 | 75.9 | 2.9% |
| 8/1/11 | PAETEC Holding Corp. | Windstream Corporation | 2,356.5 | 40.0 | 1.7% |
| 6/28/11 | BJ's Wholesale Club Inc. | CVC Capital Partners Ltd.; Leonard Green & Partners, L.P. | 2,572.2 | 80.0 | 3.1% |
| 6/13/11 | Timberland LLC | V.F. Corporation | 2,225.5 | 87.2 | 3.9% |
| 6/13/11 | M&F Worldwide Corp. | MacAndrews & Forbes Holdings, Inc. | 2,529.1 | 8.3 | 0.3% |
| 4/28/11 | SunPower Corporation | Total Gas & Power USA S.A.S | 2,249.2 | 42.5 | 1.9% |
| 4/11/11 | American Medical Systems Holdings Inc. | Endo Health Solutions Inc. | 2,825.1 | 90.0 | 3.2% |
| 3/28/11 | GSI Commerce, Inc. | eBay Inc. | 2,381.4 | 74.0 | 3.1% |
| 3/11/11 | Lawson Software, Inc. | Golden Gate Capital; Infor Global Solutions, Inc. | 2,081.5 | 75.0 | 3.6% |
| 2/14/11 | Hughes Communications, Inc. | EchoStar Satellite Services, L.L.C. | 2,124.2 | 45.0 | 2.1% |
| 2/13/11 | Wood Group ESP, Wood Group Pressure Control and Wood Group Logging Services | GE Energy Manufacturing, Inc. | 2,800.0 | 28.0 | 1.0% |
| 12/13/10 | Dionex Corp. | Thermo Fisher Scientific, Inc. | 2,206.3 | 65.0 | 2.9% |
| 12/7/10 | Nicor Inc. | AGL Resources Inc. | 2,382.5 | 67.0 | 2.8% |
| 12/6/10 | Citadel Broadcasting Corporation | Cumulus Media Inc. | 2,765.4 | 80.0 | 2.9% |
| 11/23/10 | J. Crew Group, Inc. | Leonard Green & Partners, L.P.; TPG Capital | 2,991.1 | 20.0 | 0.7% |
| 11/22/10 | Novell, Inc. | Attachmate Corporation | 2,144.6 | 60.0 | 2.8% |
| 10/28/10 | Syniverse Holdings, Inc. | The Carlyle Group LP | 2,721.5 | 60.0 | 2.2% |
| 9/27/10 | AirTran Holdings, LLC | Southwest Airlines Co. | 2,148.1 | 39.0 | 1.8% |
| 6/1/10 | ev3 Inc. | Covidien Group S.a.r.l. | 2,709.0 | 83.7 | 3.1% |
| 5/17/10 | GLG Partners, Inc. | Man Group plc | 2,084.9 | 48.0 | 2.3% |
| 3/23/10 | Vought Aircraft Industries, Inc. | Triumph Group, Inc. | 2,183.4 | 75.0 | 3.4% |
| 12/21/09 | Chattem, Inc. | Sanofi | 2,238.5 | 64.6 | 2.9% |
| 12/16/09 | Cedar Fair, L.P. | Apollo Global Management, LLC | 2,326.8 | 19.6 | 0.8% |
| 10/26/09 | Allied Capital Corporation | Ares Capital Corporation | 2,217.0 | 30.0 | 1.4% |
| 10/13/09 | Starent Networks, Corp. | Cisco Systems, Inc. | 2,827.8 | 63.5 | 2.2% |
| 9/3/09 | Sepracor Inc. | Dainippon Sumitomo Pharma America Holdings, Inc. | 2,857.2 | 77.4 | 2.7% |
| 7/22/09 | Medarex, Inc. | Bristol-Myers Squibb Company | 2,325.2 | 70.8 | 3.0% |
| 6/1/09 | Data Domain, Inc. | EMC Corporation | 2,741.8 | 57.0 | 2.1% |
| 5/20/09 | Data Domain, Inc. | NetApp, Inc. | 2,380.7 | 57.0 | 2.4% |
| **Mean** | | | **$2,415.2** | **$56.7** | **2.4%** |

Source: CapitalIQ and company filings