Hearing Date and Time: June 18, 2012 at 10:00 a.m.

MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone:     (213) 683-9100
Facsimile:      (213) 687-3702
Thomas B. Walper (Admitted Pro Hac Vice)
Seth Goldman (Admitted Pro Hac Vice)
Bradley R. Schneider (Admitted Pro Hac Vice)

*Counsel for Berkshire Hathaway Inc.*

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,<br><br>Debtors. | CASE NO.  12-12020 (MG)<br><br>Chapter 11<br><br>Jointly Administered |

# REPLY IN SUPPORT OF MOTION OF BERKSHIRE HATHAWAY INC. FOR THE APPOINTMENT OF AN EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

17680687

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ................................................................................................ 1
II. BERKSHIRE IS A SIGNIFICANT PARTY IN INTEREST ........................................................... 2
III. SECTION 1104(C)(2) MANDATES APPOINTMENT OF AN EXAMINER ................ 2
IV. THE OBJECTORS FAIL TO REFUTE BERKSHIRE'S SHOWING THAT APPOINTING AN EXAMINER IS IN THE BEST INTERESTS OF THE DEBTORS' STAKEHOLDERS ................................................................................................ 5
V. THE OBJECTORS' STATED EFFICIENCY CONCERNS ARE MISPLACED: AN EXAMINER'S INVESTIGATION WILL BE MORE EFFICIENT THAN THE ALTERNATIVE ................................................................................................ 7
VI. CONCLUSION ................................................................................................ 8

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*In re Bradlees Stores, Inc.*,
209 B.R. 36 (Bankr. S.D.N.Y. 1997) ................................................................................5

*In re Calpine Corp.*,
Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 24, 2007) ...................................4, 5

*In re Enron Corp.*,
279 B.R. 671 (Bankr. S.D.N.Y. 2002) ..............................................................................7

*In re Gitto Global Corp.*,
No. Civ. 05-10334, 2005 WL 1027348 (D. Mass. 2005) ................................................6

*In re Innkeepers USA Trust*,
Case No. 10-138000 (Bankr. S.D.N.Y. Sep. 30, 2010) (SCC) .......................................4

*In re Sletteland*,
260 B.R. 657 (Bankr. S.D.N.Y. 2001) ..............................................................................4

*In re Visteon Corp.*,
No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010) .......................................................3

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ..............................................................................................................4

**FEDERAL STATUTES**

11 U.S.C. § 1104(c) ...............................................................................................2, 3, 4

11 U.S.C. § 1104(c)(1) .................................................................................................4

11 U.S.C. § 1104(c)(2) .........................................................................................3, 4, 5

**FEDERAL RULES**

Fed. R. Bankr. P. 2004 ........................................................................................2, 8, 9

Fed. R. Bankr. P. 6006 ...................................................................................................6

## TABLE OF EXHIBITS

**Exhibit**

*In re Washington Mutual, Inc.*, Case No. 08-12229 (Bankr. D. Del.), Order..........................A

17680687

**I.      Preliminary Statement**

1.      It is undisputed that an investigation of the Debtors and their prepetition dealings is both necessary and inevitable.  The only question is who should lead the investigation: (a) a neutral examiner, who is duty-bound to conduct an independent investigation and report publicly to the Court and all parties in interest, or (b) a creditors' committee that owes its duties to only one constituency in these cases and that is composed of members with potentially conflicting interests on many of the issues that need to be investigated.  Even if section 1104(c)(2) of the Bankruptcy Code did not mandate the selection of an examiner under these circumstances, as it does, the choice would be clear.

2.      In resisting an independent inquiry, the UCC and the Debtors (the "Objectors") contend that appointing an examiner is not "appropriate" because the UCC has spent the past week or so "gearing up" for Rule 2004 discovery.  As the Court noted at the June 12 hearing, however, approval of the Rule 2004 discovery does not preclude the appointment of an examiner. Rather, the key issue is avoiding duplication of effort.  As discussed more fully below, an examiner's investigation promises to be substantially more efficient and timely than one led by the UCC.  Unlike the UCC, an examiner's mandate, timeline, and budget are fixed by this Court.  The approach urged by the Objectors—to allow the UCC to lead the investigation and revisit the issue of an examiner later if the UCC's investigation is not as successful as advertised—is a prescription for unnecessary delay and undue expense.  That is something the Debtors' stakeholders simply cannot afford.

**II.     Berkshire is a Significant Party in Interest**

3.      Berkshire filed the Motion on June 4, 2012 to avoid any risk of delay or prejudice from the UCC's motion to conduct Rule 2004 discovery (the "Rule 2004 Motion"), which was

17680687.4                                              -1-

scheduled for hearing on June 5, 2012.  As Berkshire previously disclosed, it sold its holdings of ResCap's unsecured bonds after filing the Motion and continues to hold in excess of $900 million of junior secured bonds issued by ResCap.  *See Supplemental Decl. of R. Ted Weschler in Support of the Motion of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c)* ¶ 2-3 [Docket No. 250].  Thus, Berkshire remains a significant party in interest within the meaning of section 1104(c).

4.      The Objectors' suggestion that, in light of the sales of unsecured bonds, Berkshire should not even be heard on the Motion rests on a fundamental misapprehension of the role of a bankruptcy examiner.  In providing for the appointment of examiners, Congress was concerned with *all* parties in interests, not just unsecured creditors.  *See* 11 U.S.C. § 1104(c)(1) (requiring the appointment of an examiner if "such appointment is in the interests of creditors, any equity security holders, and *other interests of the estate*") (emphasis added).  It is perfectly appropriate for the UCC to focus on the varying interests of unsecured creditors.  But this investigation must be carried out for the benefit of all stakeholders—including unsecured creditors, some of whom of course support the appointment of an examiner.[1]

### III.    Section 1104(c)(2) Mandates Appointment of an Examiner

5.      The plain language of section 1104(c)(2) mandates the appointment of an examiner in these cases.  Section 1104(c)(2) provides that a court "***shall*** order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate" if the debtor's qualifying debts exceed $5,000,000.  There is no dispute that section 1104(c)(2)'s statutory debt threshold is satisfied.  Nor is there any dispute that an investigation of the Debtors is appropriate

---

[1] See Docket Nos. 329-30.

and, in fact, quite necessary. The dispute, rather, centers on *who* should take the lead in conducting this investigation: the UCC, which answers only to its constituency, or an independent examiner, who reports to this Court and all parties in interest. Section 1104(c)(2) resolves that question unequivocally in favor of an examiner.

6. The Debtors and the UCC attempt to avoid this conclusion by seizing on section 1104(c)'s proviso that a court shall appoint an examiner to conduct an investigation "as is appropriate."[2] But all this language means is that a court must appoint an examiner only to the extent that there is "an appropriate investigation that needs to be done." *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010), Hr'g Tr. at 170:16-20) (attached as Exhibit C to UCC Objection). Here, all parties agree that an investigation "needs to be done."

7. Nothing in the phrase "as is appropriate" implies that a court may deny appointment of an examiner under these circumstances on the ground that a creditors' committee is seeking to perform the same investigation. Indeed, such a construction of the statute would render section 1104(c)(2) superfluous. If a court has discretion to weigh the relative merits of an examiner or creditors' committee's investigation—even where the statutory debt thresholds are satisfied and even where an investigation is appropriate—section 1104(c)(2) performs no role whatsoever. Under the interpretation urged by the Objectors, the only avenue for appointment of an examiner would be section 1104(c)(1). That construction of the statute, however, violates a cardinal principle of statutory construction. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31

---

[2] This Reply responds to the *Debtors' Objection to Motion of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c)* ("Debtors' Obj.") [Docket No. 304] and the *Response of the Official Committee of Unsecured Creditors to the Motion of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c)* ("UCC Obj.") [Docket No. 297]. Berkshire reserves all rights as to the responses of Ally Financial Inc. and the Ad Hoc Group of Junior Secured Noteholders, neither of which takes a position on whether an examiner should e appointed. *See* Docket Nos. 289 and 295.

(2001) (noting the canon that statutes should be ready to avoid making any provision "superfluous, void, or insignificant").

8.  Contrary to the Objectors' suggestion, the court's decision in *In re Sletteland*, 260 B.R. 657 (Bankr. S.D.N.Y. 2001) is not to the contrary. In *Sletteland*, the moving party did not argue that appointing an examiner was mandatory under section 1104(c)(2). *Id*. at 671. The court referenced the creditors' committee's ability to perform an investigation in connection with its discussion of whether the appointment of an examiner was warranted under section 1104(c)(1). *Id*. at 672. This only proves Berkshire's point: if the potential for an investigation by a creditors' committee is a relevant factor under the discretionary interests-analysis of section 1104(c)(1), it cannot be a basis for denying the appointment of an examiner where the objective criteria of section 1104(c)(2) are satisfied. Moreover, the moving parties in *Sletteland* sought an examiner to investigate matters that had "previously been the subject of a full trial[,]" *id*. at 672, whereas here Berkshire is seeking an independent examiner to investigate transactions and other matters that have never been reviewed by a third party.

9.  The Objectors' other cases are similarly inapposite. In *Innkeepers* and *Calpine*, for example, the court found that, as in *Sletteland*, section 1104(c)(2)'s debt threshold was not satisfied. *In re Innkeepers USA Trust*, Case No. 10-138000 (SCC), Hr'g Tr. at 168-170 (Bankr. S.D.N.Y. Sept. 30, 2010) (declining to reach the question of whether and to what extent section 1104(c) is mandatory and finding that additional evidence was needed to determine whether debt threshold was met); *In re Calpine Corp*., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 24, 2007), Hr'g Tr. at 72:2-3 (noting that "it is far from clear to this Court whether the CalGen

unsecured debt meets the threshold amount for mandatory appointment.").[3] In *In re Bradlees Stores, Inc.*, 209 B.R. 36 (Bankr. S.D.N.Y. 1997), the court found that the moving parties had waived the right to seek appointment of an examiner by allowing the Debtors' professionals to spend thirteen-months on the same investigation "without seeking the appointment of an independent third party." *Id*. at 39. Here, in contrast, Berkshire promptly moved for the appointment of an examiner at the very outset of these cases. And in *Washington Mutual*, while the Court initially declined to appoint an examiner, the Court subsequently appointed an examiner, over objections, to investigate issues quite similar to those that require investigation here. *See In re Washington Mutual, Inc.*, Case No. 08-12229 [Ex. A] (appointing an examiner to investigate, *inter alia*, "the claims and assets that may be property of the Debtors' estates that are proposed to be conveyed, released or otherwise compromised and settled under the Plan and Settlement Agreement, including all Released Claims").

10.     Significantly, the Objectors do not cite a single case in which a court denied appointment of an examiner where there was a consensus that (a) section 1104(c)(2)'s debt threshold was met and (b) an investigation of the debtor was appropriate. Because both of those conditions indisputably exist in these cases, appointment of an examiner is mandatory under section 1104(c)(2).

**IV.     The Objectors Fail to Refute Berkshire's Showing That Appointing an Examiner is in the Best Interests of the Debtors' Stakeholders**

11.     Appointing an independent examiner, who "is first and foremost disinterested and nonadversarial," is undoubtedly in the best interests of all stakeholders. Mot. ¶ 27 (quoting *In re*

---

[3] The relevant excerpts of the *Calpine* and *Innkeepers* transcripts are attached as Exhibits A and B, respectively, to the UCC's objection.

*Gitto Global Corp.*, No. Civ. 05-10334, 2005 WL 1027348, at *2 (D. Mass. 2005)). The UCC owes its duties exclusively to unsecured creditors, who potentially have sharply diverging interests with respect to the very matters the UCC proposes to investigate. If the UCC leads an investigation, it inevitably will have to grapple with these conflicts, which may undercut the credibility of the investigation and will certainly cause delay and inefficiency in these cases where time and impartiality are of the essence.

12. The UCC's potential conflicts are readily apparent, even if the Objectors refuse to acknowledge them. As explained in the Motion, for example, the UCC's membership includes three trustees of ResCap's mortgage backed securitized trusts who will be directed by certificate holders in at least 328 of 392 trusts to support the Ally-backed plan. *See Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 365 and Bankruptcy Rule 6006 Authorizing the Debtors to Assume Plan Support Agreements with Steering Committee Consenting Claimants* at 5-6 [Docket No. 318].

13. The UCC tries to dismiss any concern with conflicts by blithely asserting that all of its members share the goal of maximizing the Debtors' value. UCC Obj. ¶ 32. But this ignores the fact that the UCC's members may have sharply divergent interests on how the Debtors' value should be allocated across the Debtors and among the Debtors' various claimants. Wilmington Trust, for example, is the trustee for unsecured bondholders at ResCap, who clearly have a strong financial interests in reducing the claims against ResCap's subsidiaries held by the other eight members of the Committee. The investigation that is needed in these cases may well raise many other issues that pit one class of unsecured creditors against another.

14. While the UCC claims that it has bylaws in place to address conflicts, UCC Obj. ¶ 32, accommodating such conflicts through internal procedures is a prescription for unnecessary delay and expense. Indeed, courts have recognized that appointment of an examiner provides an

efficient means of addressing such intra-committee conflicts. *See In re Enron Corp.*, 279 B.R. 671, 693 (Bankr. S.D.N.Y. 2002) ("[A]ny argument that there should be a separate committee to investigate the alleged questionable transactions is alleviated by the investigating and reporting role" of the examiner). Furthermore, the UCC may confront conflicts that its bylaws cannot resolve. In that case, the UCC would need to turn the investigation of that issue over to an examiner—a process that will entail significant delay. There is simply too much at stake in these cases to run this risk, especially when an examiner has no such risk.

15. An examiner has many other advantages. An examiner's report, for example, will be available to the public. Mot. ¶ 6. The Debtors now claim that the UCC has "committed to release the findings" of its investigation publicly. Debtors' Obj. ¶ 16. The UCC's objection, however, merely states that "any perceived need for a public report will be met when the Committee publicly reports on its reason for supporting a settlement or opposing the Debtors' plan." UCC Obj. ¶ 20. Thus, the UCC has "committed" to do nothing more than file a pleading that it would have filed anyway. Such an advocacy piece, moreover, is no substitute for an independent report prepared by a court-appointed neutral.

16. An examiner's report will also have the advantage of being informed by the most complete record available because this Court can authorize the examiner to review communications subject to the Debtors' attorney-client privilege. Mot. ¶ 7. Remarkably, the Debtors' response to this point is to announce that they intend to share privileged materials with the UCC. Yet eight of the nine members of the UCC hold disputed, contingent, and unliquidated claims. The Objectors do not explain how the Debtors can disclose privileged materials to actual or potential litigation adversaries without waiving privilege and potentially undermining the Debtors' ability to defend against ongoing litigation. Moreover, the administrative hoops the Debtors and the UCC would need to jump through to avoid a waiver, assuming that is possible, will inevitably add even more unnecessary delay and expense.

Appointing an examiner with the authority to review privileged communications is a far more efficient course for the Court and all parties in interest.

V.     **The Objectors' Purported Efficiency Concerns Are Misplaced:  An Examiner's Investigation Will Be More Efficient Than the Alternative**

17.    In addition to independence and the other advantages discussed above, an examiner's investigation will be more expeditious and efficient than one carried out by the UCC. Mot. ¶¶ 26-29.  Unlike an investigation by the UCC, the scope, timing, and budget for the examiner's work will be set by this Court.  This Court's comprehensive control of the examiner's investigation creates a safeguard against unnecessary expense and delay.

18.    The Objectors maintain that an examiner's investigation would be duplicative of the UCC's Rule 2004 investigation.  UCC Obj. ¶ 4; Debtors' Obj. ¶ 11.  But this argument assumes that upon an examiner's appointment, the UCC will proceed headlong with its Rule 2004 discovery.  That should not and need not happen.  In appointing an examiner, this Court can stay or vacate the Rule 2004 order and direct the UCC to transfer to the examiner any documents and discovery materials they have collected to date.  To be clear, Berkshire is not proposing that the UCC be walled off from the investigation.  Rather, Berkshire submits that the UCC can and should monitor the examiner's investigation by, for example, participating in depositions jointly with the examiner.  This will allow the UCC to play a constructive and active role in these cases, while avoiding any unnecessary duplication of efforts.

19.    While the UCC claims that it has already "invested significant time and resources gearing up [its] investigation," UCC Obj. ¶ 41, the Rule 2004 order was entered less than two weeks ago.  If there is a time to transfer the primary responsibility for the investigation from the UCC to an examiner, the time is now.  As this Court observed at the June 12 hearing, the

examiner can take advantage of the work the UCC has performed to date. *See* 6/12/12 Hr'g Tr. at 106-07.  For example, the examiner can adopt the UCC's subpoenas rather than crafting his or her own discovery requests from scratch.  Likewise, the Debtors can share the same documents with the examiner as are being provided to the UCC.

20. Finally, the UCC objects that it "is best positioned to evaluate the plan-related settlements, negotiate to improve them if appropriate, and foster a comprehensive resolution of these cases."  UCC Obj. ¶ 5.  But an examiner will not stop the UCC from doing any of these things.  On the contrary, an examiner's investigation will provide not just the UCC, but importantly, all parties in interest, including Berkshire, with the information needed to evaluate and respond to the Ally-backed plan and related settlements.  There is simply no reason why the UCC needs to monopolize the investigation of the Debtors.

**VI.   Conclusion**

21. For the reasons stated above and in its Motion, Berkshire respectfully requests entry of an order, substantially in the form attached as Exhibit A to the Motion, (a) approving and directing the appointment of an independent examiner for the purposes of investigating and reporting to the Court and parties in interest with respect to the matters described above and (b) granting such other relief as the Court deems just and proper.

12-12020-mg    Doc 355    Filed 06/14/12    Entered 06/14/12 11:38:31    Main Document
       Pg 14 of 14

Dated: June 14, 2012

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

/s/ Seth Goldman
Thomas B. Walper
Seth Goldman
Bradley R. Schneider
355 South Grand Avenue
Los Angeles, California, 90071
thomas.walper@mto.com
seth.goldman@mto.com
bradley.schneider@mto.com

*Attorneys for Berkshire Hathaway Inc.*