**Hearing Date and Time: June 18, 2012 at 10:00 a.m. (prevailing Eastern Time)**

Larry J. Nyhan
Jessica C.K. Boelter
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000 (tel)
(312) 853-7036 (fax)

-and-

John Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

Attorneys for Nationstar Mortgage LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                                         :
In re:                                                   :          Chapter 11
                                                         :
RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al.</u>,          :          Case No. 12-12020 (MG)
                                                         :
                                                         :          Jointly Administered
                                      Debtors.           :
-------------------------------------------------------- x

### NATIONSTAR MORTGAGE LLC'S RESPONSE IN SUPPORT OF DEBTORS' REQUEST FOR ENTRY OF THE SALE PROCEDURES ORDER

## Table of Contents

**Table of Authorities** ....................................................................................................... 3

**Table of Exhibits** .......................................................................................................... 3

**I. Preliminary Statement** ............................................................................................. 4

**II. Background on Nationstar** ..................................................................................... 8

**III. The Berkshire Objection is an Improper Attempt to Gain Leverage Over the Chapter 11 Cases and it Should Be Rejected** ............................................................................. 8

**IV. The Proposed Break-Up Fee is Reasonable and Will Not Chill Bidding** ........................ 13

    The Break-Up Fee Encourages Bidding .................................................................... 14

    The Fee is Not Unreasonable Compared to the Total Purchase Price ....................................... 16

**V. The Time Periods Contemplated by the APA are Reasonable** .......................................... 18

**VI.  The Other Objections are Objections to the Sale and Should Not Be Considered at This Time** ........................................................................................................................ 20

**VII. Conclusion and Reservation of Rights** .............................................................. 22

## <u>Table of Authorities</u>

### <u>Cases</u>

<u>Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)</u>, 346 F. 3d 31 (2d Cir. 2003) <u>(aff'd on other grounds)</u>................................................................................................................... 10

<u>In re 995 Fifth Ave. Associates, L. P.</u>, 96 B.R. 24 (Bankr. S.D.N.Y. 1989) ................................ 16

<u>In re Asia Global Crossing, Ltd.</u>, 326 B.R. 240 (Bankr. S.D.N.Y. 2005) .................................... 11

<u>In re Bally Total Fitness of Greater New York, Inc.</u>, No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007)................................................................................................................................. 16

<u>In re BearingPoint, Inc.</u>, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) ......................... 16

<u>In re Bidermann Indus.</u>, 203 B.R. 547 (Bankr. S.D.N.Y. 1997)................................................... 18

<u>In re G+G Retail, Inc.</u>, No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) ......................... 16

<u>In re Global Crossing Ltd.</u>, 295 B.R. 726 (Bankr. S.D.N.Y. 2003)................................................ 9

<u>In re Integrated Resources, Inc.</u>, 147 B.R. 650 (S.D.N.Y. 1992) ......................................... passim

<u>In re Metaldyne</u>, 409 B.R. 661 (Bankr. S.D.N.Y. 2009) .............................................................. 11

<u>In re RSL Com Primecall, Inc. & RSL COM USA, Inc.</u>, 2002 Bankr. LEXIS 367 (Bankr. S.D.N.Y., 2002)................................................................................................................... 16

<u>In re Twinlab Corp.</u>, No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 26, 2003) .............................. 16

<u>In re Urban Telecommunications, Inc.</u>, Case No. 09-10487 (MG) (Bankr. S.D.N.Y. June 17, 2009).................................................................................................................................... 16

### <u>Other Authorities</u>

David H. Kleiman, <u>Alternatives for Awarding Break-Up Fees to Stalking-Horse Bidders</u>, 29-8 ABIJ 26, (Oct. 2010) ............................................................................................................ 8

## <u>Table of Exhibits</u>

Nationstar 10-Q dated 3/31/2012………………………………….…………….**Exhibit A**

Greene Deposition Excerpt...……………..…………………………………………**Exhibit B**

Whitlinger Deposition Excerpt……………………………………….……………**Exhibit C**

Nationstar Mortgage LLC ("Nationstar"), the purchaser under that certain Asset Purchase

Agreement dated May 13, 2012 between Nationstar and certain of the Debtors[1] (the "Nationstar

APA"), hereby files this response (the "Response") in support of and reservation of rights to the

(i) Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123 and Fed. R.

Bankr. P. 2002, 6004, 6006, 9007, 9008, and 9014 for Orders: (A)(I) Authorizing and Approving

Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid

Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV)

Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of

Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Assets

Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain

Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief

(D.I. 61) (the "Sale Motion"), and in response to the objections to the Sale Procedures Relief.[2]

In support of this Response, Nationstar respectfully states as follows:[3]

## I. PRELIMINARY STATEMENT

1.      The Nationstar APA is the culmination of an exhaustive diligence, analytical and

negotiation process spanning the last several months.  Nationstar and its affiliates have expended

---

[1] Capitalized terms not defined in this Response shall have the meanings ascribed to them in Sale Motion.

[2] Thirteen objections were filed to the Sale Procedures Relief.  They include objections by the Unsecured Creditors' Committee (D.I. 306) (the "UCC" and the objection, the "UCC Objection"), Berkshire Hathaway, Inc. (D.I. 284) ("Berkshire" and the objection, the "Berkshire Objection"), the United States Trustee (D.I. 271) (the "U.S. Trustee Objection"), Digital Lewisville, LLC (D.I. 278) ("Lewisville" and the objection, the "Lewisville Objection"), Wells Fargo Bank as successor to Wachovia Bank (D.I. 281), ("Wells Fargo" and "Wachovia" and the objection, the "Wachovia Objection"), U.S. Bank National Association (D.I. 282), the Federal Home Loan Mortgage Corporation (D.I. 283), Frost National Bank (D.I. 286) ("Frost" and the objection, the "Frost Objection"), the United States of America (D.I. 290) (the "United States" and the objection, the "United States' Objection"), Lone Star U.S. Acquisitions (D.I. 298), Certain Mortgage Backed Securities Trustees (D.I. 291) (the "MBS Trustees" and the objection the "MBS Objection"), Wells Fargo (D.I. 292) (the "Wells Fargo Joinder") and Fannie Mae (D.I. 302) ("Fannie Mae" and the objection, the "Fannie Mae Statement"), all together, the "Objections" were filed by the "Objectors."

[3] This Response is limited to certain of the Objections.  The failure  to include a reply herein to any specific Objection  should not be interpreted as Nationstar's agreement to any such Objection, but Nationstar defers to the Debtors to address those other Objections.

countless senior management and employee hours reviewing and assessing the ResCap[4] assets,

liabilities and regulatory requirements, understanding the complex and intertwined Ally and

ResCap businesses, examining various structures for the sale of the Nationstar Purchased Assets

to Nationstar, assessing the compatibility of Nationstar's systems with ResCap's systems to

ensure the successful merger of the two systems, evaluating employee compensation, benefit

plans and programs, and negotiating the Nationstar APA, the extensive schedules attached

thereto, the Sale Procedures Order, the Sale Procedures, the Sale Approval Order, and the Sale

Motion.  And these efforts did not end with the execution of the Nationstar APA and the

bankruptcy filing.  Since then, Nationstar has continued its analysis of the business issues

associated with the purchase of the Nationstar Purchased Assets and has sought to work

constructively with various constituents in these chapter 11 cases, including the UCC, the GSEs[5],

the U.S. Department of Justice and the U.S. Department of Housing and Urban Development.

The opportunity costs – not to mention the economic costs, including the considerable personnel

time and resources – associated with Nationstar's work have been enormous, and by definition,

those costs and resources could have been targeted to other projects.[6]

      2.      In devoting the time and resources required by this process, Nationstar has

conferred a tremendous benefit on the Debtors' estates.  The Debtors were able to file these

chapter 11 cases with a fully negotiated, executed, and legally binding agreement providing for

the sale—on a going concern basis—of their servicing platform to a reputable industry player,

thereby providing substantial comfort to employees, creditors, borrowers and other stakeholders

---

[4] As used herein, the term "ResCap" refers to the following Debtors, Residential Capital, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC, and certain additional sellers identified on Schedule A of the Nationstar APA.

[5] As used herein, the term "GSEs" refers to the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and Government National Mortgage Association.

[6] In connection with the execution of the Nationstar APA, Nationstar was reimbursed for its reasonable, actual out-of-pocket costs and expenses in the incurred prior to the execution of the Nationstar APA in the amount of approximately $2.8 million.

that the Debtors have a credible and viable strategy for maximizing the value of their estates, as opposed to wallowing in bankruptcy. Additionally, it was a condition precedent to the Debtors' debtor-in-possession financing facility that the Debtors enter into the Nationstar APA and that the Sale Motion be filed before the facility closed. <u>See</u> Barclay's DIP Facility Motion[7], Exhibit A at 3.01(r). Without the Barclay's DIP facility, the Debtors would have been unable to continue their operations, substantially devaluing the Debtors' assets and significantly impairing the ability of many creditors to receive any meaningful recovery in these chapter 11 cases. <u>See</u> Barclay's DIP Facility Motion at ¶¶ 8-9, 11. Moreover, the Nationstar APA, including the exhibits and schedules thereto, and the framework for the sale of the Nationstar Purchased Assets, have established a bid standard for others to follow and will enable the Debtors to attract additional bidders for the benefit of all of their stakeholders (to the extent such other bidders are prepared to submit higher and better offers). <u>See</u> <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650 (S.D.N.Y. 1992).

3.    From the moment the Nationstar APA was executed, Nationstar has been unflinching in its commitment to the transaction, and has not provided the Debtors or this Court with any basis to even speculate, let alone conclude, that the Debtors' decision to execute the Nationstar APA was anything other than a perfectly legitimate and reasonable exercise of the Debtors' business judgment.

4.    Notwithstanding these substantial and exhaustive efforts, and the benefits such efforts have conferred on the estates, one Objector has sought to usurp the results of Nationstar's

---

[7] The "<u>Barclay's DIP Facility Motion</u>" is the Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b)(1), 363(f), 363(m), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing the Debtors to (A) Enter Into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements relating to Additional Receivables and (B) Obtaining Postpetition Financing on a Secured, Superpriority Basis, (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (III) Granting Related Relief (D.I. 13).

efforts by making an eleventh hour attempt to become the stalking horse bidder.  Based upon

information and belief, Berkshire was afforded the opportunity to participate in the Debtors'

prepetition process and declined.  Now, Berkshire wants to secure for itself the benefits of

Nationstar's labors, despite the fact that Berkshire did nothing to advance the sale process

prepetition or during the pendency of these cases (other than filing its Objection).  If potential

bidders were permitted to sit idly by while a stalking horse bidder performed the work necessary

to develop a viable agreement—only to be displaced at the bidding procedures hearing by a party

that did not expend the same effort—suitable bidders would most certainly be deterred from

devoting the time and money required to be the stalking horse, if exposed to a meaningful risk

that the debtors' exercise of reasonable business judgment will later be ignored.  As described

below, courts in this district have recognized the benefits stalking horse bidders bring to the sale

process, and it is entirely inappropriate for Berkshire to seek to displace Nationstar as the

stalking horse bidder and appropriate those benefits for itself.  Berkshire will be free to make any

and all bids it wants to make in the Auction, and its conduct leaves no doubt that it will be

neither chilled nor deterred in that process.  Nationstar respectfully submits that this Court

should not sanction the tactics Berkshire seeks to employ.

    5.    The Debtors' selection of Nationstar as the stalking horse bidder and their entry

into the Nationstar APA was an exercise of the Debtors' reasonable business judgment for all of

the reasons set forth in the Greene Declaration.  See Greene Declaration at ¶¶ 39-41.  It is

perfectly reasonable for the Debtors to continue to support the Nationstar APA (and indeed

unreasonable to do otherwise), notwithstanding Berkshire's offer to reduce the break-up fee and

expense reimbursement, because, as described below, Nationstar is an appropriate stalking horse

bidder and the terms of the Nationstar APA are reasonable.  The consequence to the Debtors'

estates of rejecting the Nationstar APA outweighs any eleventh-hour benefits that Berkshire offers.

6.      The other objections to the bidding procedures should also be overruled.  Certain objectors have argued that the proposed Break-Up Fee is too high and must be reduced. Contrary to their contentions, the Break-Up Fee is reasonable, within market, will not chill bidding and was agreed to by the Debtors as part of a substantial and exhaustive negotiation and exercise of their reasonable business judgment.  The UCC has argued that the proposed timeline is too compressed and will chill bidding.  Not so.  The proposed timeline is reasonable in light of the comprehensive dataroom that has been established and the parties efforts in executing an asset purchase agreement that potential bidders may work from.   Finally, a handful of parties have raised issues that are not appropriately considered at this time.  Rather, they are, in substance, objections to the terms of the sale itself and should be considered at the Sale Hearing.

## II. BACKGROUND ON NATIONSTAR

7.      Nationstar is a leading non-bank residential mortgage loan servicer with a broad array of servicing capabilities across the residential mortgage spectrum.  See Exhibit A (Nationstar 10-Q dated 3/31/2012).[8]  Its principal business is the servicing of residential mortgage loans for others and the origination and selling of single-family conforming mortgage loans to GSEs.  Id.    Nationstar's clients include national and regional banks, GSEs, securitization trusts, private investment funds and other owners of residential loans and securities.  Nationstar employs 2,600 people and is licensed in all 50 states.  Id.

## III. THE BERKSHIRE OBJECTION IS AN IMPROPER ATTEMPT TO GAIN LEVERAGE OVER THE CHAPTER 11 CASES AND IT SHOULD BE REJECTED.

---

[8] See also About Nationstar, https://www.nationstarmtg.com/CustomerCenter/AboutUs.aspx.

8.      At the eleventh hour, Berkshire has lodged an Objection in which it proposes itself as the stalking horse bidder for the Nationstar Purchased Assets.   Berkshire's request should be rejected.  Based upon information and belief, the Debtors' advisors invited Berkshire to participate in their prepetition marketing process and Berkshire declined.  Having determined not to participate in the Debtors' prepetition efforts to secure a viable stalking horse bidder, and after Nationstar expended extraordinary time, effort and resources in developing and executing a legally binding asset purchase agreement for the purchase of the Nationstar Purchased Assets, Berkshire now wants to displace Nationstar as the stalking horse without  having made any contributions to the sale process and without offering one modicum of support for the proposed displacement, other than a purported savings to the estate from a reduced break-up fee and the elimination of the expense reimbursement.[9]

9.      In an exercise of their business judgment, the Debtors determined that Nationstar had presented the highest and best proposal for the purchase of the Nationstar Purchased Assets.  See Greene Declaration at ¶ 27.  There has been no suggestion that the Debtors did not adhere to their fiduciary duties in making such decision and thus their reasonable business judgment in choosing Nationstar as the stalking horse bidder should be respected.  In re Global Crossing Ltd., 295 B.R. 726, 744-745 (Bankr. S.D.N.Y. 2003) (finding in the absence of a failure to comply with fiduciary duties, a debtor's exercise of reasonable business judgment stands).  Nationstar has not engaged in conduct since the execution of the Nationstar APA that calls into question its commitment to, and ability to perform, the transaction.

10.     Moreover, displacing Nationstar at this time would violate fundamental principles inherent in developed law in the Second Circuit and other jurisdictions recognizing the

---

[9] The purported savings to the estate offered by Berkshire may be largely illusory if the Debtors were to reject the Nationstar APA and select Berkshire because the savings would be consumed by any damages claim that could result from such rejection of the Nationstar APA and any section 503(b) claims.

importance of stalking horse bidders and the award of bid protections.  Indeed, if a stalking horse

bidder in a transaction of this complexity, who was selected by the seller in an unquestionable

and reasonable exercise of its business judgment at the time the APA was executed, could be

displaced in the manner proposed by Berkshire, future bidders would likely be unwilling to forgo

other opportunities, or to devote the considerable time and expend the significant financial

resources to conduct the due diligence, perform the financial and legal analyses and undertake

the negotiations required of stalking horse bidders in complex bankruptcy asset sales—to the

detriment of all stakeholders.   As the United States Court of Appeals for the Second Circuit has

explained, this is precisely the reason stalking horse bidders are afforded bid protections

"[b]ecause they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,'

*whose initial research, due diligence, and subsequent bid may encourage later bidders*" and

"[c]ompensate[] the stalking horse for the risk it shoulders in being the first bidder."   Gey

Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.), 346 F. 3d 31, 34 (2d Cir. 2003) (aff'd on

other grounds) (emphasis added); see also David H. Kleiman, Alternatives for Awarding Break-

Up Fees to Stalking-Horse Bidders, 29-8 ABIJ 26, (Oct. 2010) (observing that without stalking

horse arrangements, initial bidders would be reluctant to conduct due diligence and generate

interest in a sale because subsequent bidders could simply rely on the information at the initial

bidder's expense).

11.    As the court observed in Integrated Resources, the provision of bid protections

(break-up fees in particular) serve "any of three possible useful functions: (1) to attract or retain a

potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow,

or (3) to attract additional bidders."   Integrated Resources, 147 B.R. at 661-62.  It is indisputable

that Nationstar's efforts (1) have provided a binding floor bid that will result in significant value

to the estates, (2) have established a bid standard for an extraordinarily complex transaction for other bidders to follow, and (3) will, and already have, attracted additional bidders (assuming they are willing to submit higher and better offers).

12.    Berkshire's reliance on this Court's opinion in In re Metaldyne, 409 B.R. 661 (Bankr. S.D.N.Y. 2009) to support replacement of Nationstar as the stalking horse bidder is easily distinguishable.[10]  First, the original stalking horse bidder in Metaldyne--an insider— failed to fulfill its duties as a stalking horse bidder by failing to timely deliver to the debtors its due diligence satisfaction notice as required under the Court-approved bidding procedures order. Id. at 664 (noting that due to delays and the due diligence "out" the original stalking horse bidder was not a "formal stalking horse" and did not provide a floor for the bidding).  In this case, Nationstar does not have a due diligence "out" and has unquestionably served as a value-added and stable stalking horse bidder at every turn, by not only providing a floor for the bidding but also a "structure for potential competing bids." Id. at 670.  To allow Berkshire to sweep into the stalking horse role at the last minute without providing any support for displacing Nationstar, or any argument that it was unreasonable of the Debtors to execute the Nationstar APA, would radically depart from well-established stalking horse bidder expectations and sale processes. This Court should not permit the original stalking horse bidder to itself be stalked by a bidder that has made no contribution to the sale process, and has simply marked up the Nationstar APA

---

[10] The other case cited by Berkshire is similarly distinguishable.  Berkshire references In re Asia Global Crossing, Ltd., 326 B.R. 240 (Bankr. S.D.N.Y. 2005), a case mentioned in this Court's Metaldyne opinion as an example of a decision in this jurisdiction holding that court approval is required before a debtor is bound to perform under a sale contract.  See Metaldyne, 409 B.R. at 667 & n.10 (further observing that the Second Circuit has not decided the issue).  The legal question in Asia Global Crossing concerned whether the court's approval of a sale contract supported the non-debtor party's damages claim premised on anticipatory repudiation, and did not deal at all with a factually similar situation.  See Asia Global Crossing, 326 B.R. at 256.  In any case, the Debtors remain committed to Nationstar as the stalking horse bidder and have rejected the Berkshire overture, and therefore are not seeking to modify the stalking horse bidder in the Proposed Bid Procedures.

that was arduously developed through Nationstar's diligence, structuring, and commitment to this transaction.

13.    Second, unlike here, the debtors in <u>Metaldyne</u>, in an exercise of their business judgment, undoubtedly sought the replacement of the original stalking horse because the insider bidder had dragged its feet and not complied with court-ordered deadlines, thereby permitting a higher offer to be presented.  Here, Nationstar has done nothing of the kind, and this Court should defer to the Debtors' business judgment and approve Nationstar as the stalking horse bidder.

14.    Third, this Court reiterated in Metaldyne that "a stalking horse bid brings value to the estate." <u>Id.</u> at 670 (citing evidence that the stalking horse bid provided comfort to employees and customers).  As a major player in the mortgage servicing industry, Nationstar is best suited to convey such comfort and stability to the Debtors' stakeholders, their regulators, the GSEs, and, importantly, their employees and customers.  Nationstar brings to its role as the stalking horse bidder the business knowledge, reputation, and expertise necessary to add value to the estate, and, if it prevails at auction, the stewardship necessary to guide the servicing business toward a stronger and brighter future.   It is more than reasonable for the Debtors to continue to support Nationstar as the stalking horse bidder for the Nationstar Purchased Assets.  As the Debtors stated in the Sale Motion, the Debtors selected Nationstar as the stalking horse bidder because, among other compelling reasons: (a) "Nationstar represented an ideal bidder because it is a strategic purchaser with a recent track record of purchasing mortgage assets";[11]  (b) "Nationstar holds substantially all the mortgage operations licenses necessary to run the

---

[11]Nationstar's recent track record of purchasing mortgage assets includes its recent purchase from Bank of America of government sponsored enterprise servicing rights with an unpaid principal balance of approximately $10.4 billion, and its recent purchase of  government sponsored enterprise servicing rights from Aurora Bank with an unpaid principal balance of approximately $16.1 billion.

Purchased Assets"; and (c) "Nationstar has strong relationships with Fannie Mae, Freddie Mac and Ginnie Mae".  Sale Motion at ¶ 42; <u>see also</u> Greene Declaration at ¶ 27.

15.    Finally, as this Court observed in <u>Metaldyne</u>:

> The Court "walks a tightrope between, on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate."

<u>Metaldyne</u>, 409 B.R. at 670 (quoting <u>Fin. News Network</u>, 980 F.2d 165, 166 (2d Cir. 1992)).  In this case, disrupting the stalking horse bidder process would be unfair, unwarranted and wholly unreasonable for all of the reasons set forth herein.  Any remote benefit to the estates would be substantially outweighed by these considerations, particularly because Berkshire and any other interested party will have the opportunity to participate in the auction process and submit higher and better offers in connection therewith.  If Berkshire's request is granted, Nationstar will have provided an invaluable benefit to the estates for no consideration. Accordingly, the Berkshire objection should be overruled.

## IV. THE PROPOSED BREAK-UP FEE IS REASONABLE AND WILL NOT CHILL BIDDING

16.    Three objections were lodged to the amount of the Break-Up Fee.  The proposed Break-Up Fee is amply supported by Second Circuit precedent, and these objections should be overruled.  It is well settled that courts, when assessing break-up fees, look to (1) the relationship of the parties that negotiated the break-up fee and whether this relationship tainted the deal, (2) whether the fee hampers, rather than encourages, bidding and (3) whether the fee is unreasonable relative to the proposed purchase price.  <u>Integrated Resources</u>, 147 B.R. at 657.  No Objector suggests any issue with the relationship between the Debtors and Nationstar, an unrelated third-

party that has negotiated at arm's-length throughout the process, and accordingly the first prong

is easily satisfied.

<u>The Break-Up Fee Encourages Bidding</u>

17.    The proposed Break-Up Fee encourages and does not hamper bidding.  A court

reviews this determination under the business judgment standard.  <u>Id.</u> at 660.  The Debtors have

represented, multiple times, that the Break-Up Fee is an appropriate exercise of their business

judgment and that it is fair and reasonable.  <u>See</u> Greene Declaration at ¶ 40 ("It is my opinion

that Nationstar's Break-Up Fee is fair, reasonable and necessary to induce Nationstar to serve as

the stalking-horse bidder for the Nationstar Purchased Assets."); Greene Deposition pg. 186: 6-9

("we reviewed various break-up fees in Chapter 11 context[s] and there was a range and that this

fee was in that range.")[12]; <u>Id.</u> at pg. 187: 19-22 (UCC: "Was there vigorous negotiation over [the

Break-Up Fee]?"  Greene: "Sure.  It was brought up a number of times."); <u>Id.</u> pg. 194: 2-23 (after

the UCC asked whether the Debtors considered if the Break-Up fee would chill bidding, Greene

replied "[the Break-Up Fee] will not [chill bidding]… we looked at precedent transactions… we

looked at the size of the deal… we looked at the increment that we were looking to bid over the

deal, and we didn't think it would be a problem.").

18.    In assessing the "incentive effect" of a break-up fee, a court should consider

whether the proposed acquirer "attracted other bidders or simply received a potential windfall."

<u>Id.</u>  First, Nationstar's commitment to purchase the Nationstar Purchased Assets and the

Nationstar APA are the product of several months of hard work by Nationstar representatives.

This work will enable other bidders to submit competing bids from a well-developed platform,

thereby removing a significant barrier to entry.  Indeed, that is precisely what Berkshire has

done.  Moreover, as noted above, the commitments set forth in the Nationstar APA served a

---

[12] Cited Excerpts to the Greene Deposition are attached hereto as <u>Exhibit B</u>.

hugely valuable function for the Debtors, by providing their DIP lender, creditors, employees,

regulators, GSEs and borrowers with comfort that a reasonably satisfactory and stable

buyer/servicer exists, assuaging fears that may have been created by the chapter 11 filings,

therefore maintaining the viability of the servicing rights that Nationstar seeks to purchase.

19.    In addition, Nationstar's diligence requests were instrumental in causing the

Debtors to populate a comprehensive dataroom.  The court in Integrated found that the acquirer

prompted the seller to establish a data room, and that this "enhance[d] rather than detract[ed]

from the bidding process." Id.  In addition, working through the complete diligence process with

Nationstar enabled the Debtors to identify diligence issues, which will result in a more expedited

diligence process for future bidders and enable the Debtors to readily handle the multiple

diligence requests likely to result from the bidding process.[13]  Clearly, the efforts undertaken by

the Debtors at Nationstar's request have provided a trove of information and working knowledge

that will act as a "magnet for other bids." Id.

20.    Further, a break-up fee ensures that a bidder does not retract its bid.  Id. at 661.

Nationstar spent a substantial amount of time and resources preparing its bid and has executed a

legally binding asset purchase agreement.  In addition, it is likely that the sale process will

require significantly more time and more resources on the part of Nationstar.  A fee to

compensate Nationstar for the significant opportunity and economic costs it has already incurred

and for additional future uncertainty is appropriate.  If there is a higher and better offer,

Nationstar will have certainly encouraged bidding rather than hampered it, passing the second

prong of the Integrated test.

---

[13] Whitlinger Deposition at pg. 76-77.  "Yes, I believe we've already done a lot of the work as part of the Nationstar
process, so we have a lot ready to go for any bidder to look at.  There's quite a lot created and ready to go… [w]e
have a data room that we used for the pre-marketing process and we're making some updates to our offering
memorandum to reflect the asset purchase agreement with Nationstar."  Cited excerpts from the Whitlinger
Deposition are attached hereto as Exhibit C.

<u>The Fee is Not Unreasonable Compared to the Total Purchase Price</u>

21.     The final <u>Integrated</u> factor, whether the fee is unreasonable relative to the

proposed purchase price, is satisfied here.  A break-up fee is reasonable if it is "related to the

risk, effort, and expenses of the prospective purchaser… and to the magnitude of the

transaction."  <u>Id.</u> <u>citing</u> <u>In re 995 Fifth Ave. Associates, L. P.</u>, 96 B.R. 24 (Bankr. S.D.N.Y.

1989).  First, the transaction agreed upon by the Debtors and Nationstar is risky, complex, and of

a magnitude not often seen in a chapter 11 proceeding.  Secondly, the involvement of the GSEs,

the U.S. Treasury and other regulators, and the interrelated relationship between Ally and

ResCap, create a number of complications.[14]  Break-up fees of 3% or greater and expense

reimbursements are consistently granted in the Second Circuit.  <u>See</u>, <u>e.g.</u>, <u>In re Urban</u>

<u>Telecommunications, Inc.</u>, Case No. 09-10487 (MG) (Bankr. S.D.N.Y. June 17, 2009)

(approving break-up fee of 5%); <u>In re RSL Com Primecall, Inc. & RSL COM USA, Inc.</u>, 2002

Bankr. LEXIS 367, at *12-13 (Bankr. S.D.N.Y., 2002) (3.1% break-up fee was "reasonable and

customary."); <u>In re BearingPoint, Inc.</u>, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009)

(approving 3.0% breakup fee and additional 0.43% expense reimbursement); <u>In re Bally Total</u>

<u>Fitness of Greater New York, Inc.</u>, No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007)

(approving 4.28% breakup fee and additional 2.14% expense reimbursement); <u>In re G+G Retail,</u>

<u>Inc.</u>, No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) (approving 3.0% breakup fee); <u>In re</u>

<u>Twinlab Corp.</u>, No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 26, 2003) (approving 3.93%  breakup

fee and additional 1.46% expense reimbursement).

22.     Notably, the UCC has essentially conceded that 3% is an appropriate amount for a

break-up fee.  <u>See</u> UCC Objection at ¶ 43. Instead, its principal argument is that Nationstar

---

[14] Further, <u>Integrated Resources</u> notes a preference for buyers that have entered a binding agreement when awarding
break-up fees.  <u>Id.</u> at 663.  Despite the complicated nature of the transaction, Nationstar entered into a binding
agreement prior to the bankruptcy filing, and it has not wavered from that commitment.

should not receive the Break-Up Fee for the portion of the sale which is attributable to servicing advances, as these advances are effectively cash in the UCC's view.  See UCC Objection at ¶ 37.  Servicing advances are *not* effectively cash.  See Greene Deposition at 189: 7-8 ("…we don't view the advances as cash or cash equivalents.").  First, these advances are paid back over time, which is not equivalent to cash on hand.  See Whitlinger Affidavit at ¶¶ 28-29; Greene Deposition at pg. 129: 12-20 (UCC: "So as you sit here today, you don't have any understanding as to what the debtor expected the time profile of recovery of those advances to be?  Greene: "No, I said that my recollection was that a very high percentage of them would be collected within 18 months.").  Second, the securitization trustees have the right to dispute reimbursement of these advances, adding risk that does not exist with cash.  See Whitlinger Affidavit at ¶ 30.  Finally, the UCC's argument mischaracterizes Nationstar's preferences with respect to the purchase of the advances. In fact, it was not Nationstar's original intention to purchase the advances--the Debtors insisted on the purchase as a condition of the deal.   See Greene Deposition at 130: 10-14 (UCC: "And among other things, you asked Nationstar to make a proposal to purchase the advances rather than this collection proposal, right?"  Greene: "Yes, we did.").  Rather, Nationstar's original proposal provided that it would collect and remit the advances to the Debtors.  See Greene Deposition at pgs. 111-112 (UCC: "… [Nationstar's] proposal was rather than purchasing the [advances] on day 1, Nationstar would collect the advances on the debtors' behalf for 18 months, right?"  Greene: "Yes."). Because of the Debtors' desire that Nationstar purchase the advances, Nationstar was required to solicit and obtain outside financing, thereby increasing the complexity of the process and costing Nationstar financing fees and interest.   Nationstar should receive the Break-Up Fee for its time and effort in accommodating the Debtors' request.

23.     Further, the estate is benefitting greatly from Nationstar's purchase.  Instead of waiting 18 months or more to recoup servicing advances, potentially hindering distributions to creditors and the DIP lenders, the Debtors receive the cash up-front without the typically associated time lag, creating immediate value for the Debtors' estates.  See Greene Declaration pg. 132: 2-5 ("I think we thought it was in the best interest of the estate to, you know, bring in the cash as soon as possible so that it could be distributed quickly.").  Further, the cases the UCC cites in support of its proposition are inapposite.  Unlike Bidermann, the servicer advances here are not "monies which are to be generated from the debtors' own assets," rather they are rights to payment.  In re Bidermann Indus., 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997).  In the same way, they are not the "cash on hand" referenced in Integrated, as the cash is not on hand, and may not come back to the Debtors' estates for a long while, and may come back in diminished amounts.  Integrated, 147 B.R. 650 at 662.

24.     As the servicing advances are not effectively cash and because the Debtors' requested that Nationstar's stalking horse proposal include buying $1.7 billion in these servicing advances, Nationstar is entitled to the Break-Up Fee protections with respect to the amount of the bid attributable to the entire purchase price.

## V. THE TIME PERIODS CONTEMPLATED BY THE APA ARE REASONABLE

25.     The UCC has objected to the timeline proposed for the bidding and auction process on the grounds that the timeline is too compressed and will chill bidding.  This objection is completely unfounded.  First, the proposed timeline provides more than adequate time–a period of 90 days–for interested parties to review diligence materials and formulate a bid proposal.   As described above, the Debtors have established a comprehensive dataroom for prospective bidders and, due to the Debtors' and Nationstar's prepetition efforts, the dataroom

has been populated with materials that are directly pertinent to a prospective bidder's

consideration of the sale transaction.  The presence of a dataroom with relevant information

should largely obviate the need for prospective bidders to submit diligence lists and the

associated time period during which the Debtors would gather responsive material, thereby

significantly shortening the amount of time needed before bid deadline.

26.     Second, as noted above, Nationstar is a sophisticated player in the residential

mortgage servicing industry.  As a result of its experience (and its exhaustive efforts), Nationstar

negotiated an asset purchase agreement uniquely suited for the purchase of the Nationstar

Purchased Assets.  Consequently, it is highly likely that prospective bidders will have very few

changes to the Nationstar APA itself and will focus their energies on price and other economics.

In fact, Berkshire made virtually no changes to the form of asset purchase agreement attached to

its Objection other than those needed to reflect its proposal with respect to the Break-Up Fee and

Expense Reimbursement.

27.     Finally, the UCC argued – and the GSEs question – whether, there is insufficient

time after the auction for the GSEs to conduct a review of the successful bidder and approve that

successful bidder.  The proposed timeline provides at least three weeks between the auction and

sale hearing.  It is unclear why the GSEs cannot complete their review during this time period;

however, similar to other cases where obtaining regulatory approval is a condition to a sale, it

will likely be a condition precedent to the closing of any sale of the Nationstar Purchased Assets

that GSE approval is obtained.  There is no reason such approvals cannot be received after the

bankruptcy court enters the sale order.  Consequently, if the GSEs are unable to complete their

review process during the allocated time period, such process can continue after the Sale Hearing and prior to closing.[15]

## VI. THE OTHER OBJECTIONS ARE OBJECTIONS TO THE SALE AND SHOULD NOT BE CONSIDERED AT THIS TIME

28.      As a threshold matter, there are a handful of Objections that Nationstar believes can be resolved consensually.  The U.S. Trustee has objected to the Expense Reimbursement on the basis that Nationstar's expenses should be subject to appropriate Court review and approval.  U.S. Trustee Objection at p. 8.  Nationstar is amenable to a modification to the Sale Procedures Order to provide for such review and approval.  The UCC has requested various consent rights as to (i) what constitutes a Qualifying Expression of Interest, (ii) the appropriate Starting Bid, (iii) additional rules that the Debtors seek to employ at the Auction, and (iv) whether the Debtors should need the consent of the UCC before consensually resolving any cure objection without court authority.  See UCC Objection at ¶ 45.  Although these matters are more appropriately addressed by the Debtors, Nationstar has no objection to modifications to the Sale Procedures to accommodate the UCC with respect to these issues.

29.      Most of the remaining objections raised by the Objecting Parties are at best premature, and in any event are not ripe for review in connection with the Debtor's request for the approval of the Sale Procedures.  Specifically, the Sale Motion contemplates two separate and distinct hearings, one relating to bidding and notice procedures and the other relating to formal approval of the proposed sale of the assets described in the Nationstar APA (with the final sale hearing to be scheduled by the Court).  Thus, a substantial number of objections filed in connection with the Proposed Bid Procedures are simply premature.

---

[15] The Nationstar APA provides that if Nationstar is the back-up bidder, the Nationstar APA will not terminate until the earlier of (1) the Bankruptcy Court's approval of the successful bid or (2) thirty days after the auction.  See Nationstar APA at 10.1(e).

30.    By way of example, several Objecting Parties filed papers specifically noting that their objections were not directed towards the Proposed Bid Procedures, but instead to the Sale Motion.  For example, the United States provides that it is "not objecting to the specific procedural relief sought in the Motion . . . " See United States Objection at pg. 2.   Similarly, Wachovia states that it "recognizes that the instant motion is merely a Sales Procedure motion and that the Sale Procedure Order is distinct from the proposed AFI Sale Approval Order." Wachovia Objection at ¶ 1.  Wachovia also states that it "has no objection to the form of the NationStar Approval Order." Id. at ¶ 2.  The U.S. Trustee also recognizes that its objections relating to the successor liability provisions of the Sale Motion as they relate to section 363(o) are "not directly applicable to the hearing on the sale procedures." U.S. Trustee Objection at 10. Fannie Mae likewise notes that "substantive objections to the proposed sale set forth in the Motion are preserved for a later hearing," and that it makes its statement so that "prospective bidders, including any approved stalking horse bidder, are apprised of the position of Fannie Mae with respect to the proposed sale." Fannie Mae Statement at ¶ 1.

31.    While other Objecting Parties do not explicitly acknowledge that their objection is properly a response towards the Sale Motion and not the Sale Procedures, such a distinction is often evident from the substance of the Objection.  For example, Frost has alleged that it is unable to determine, based on the Sale Motion, whether the Proposed Purchaser will be able to "render future performance" and has also alleged objections concerning determinations of contract cure amounts. See Frost Objection at ¶ 11.  In a related request for relief, the MBS Trustees state that they should have access to certain information about any party that assumes their contracts.  See MBS Trustee Objection at ¶ 34.   These parties also object that certain unmatured liabilities will be characterized as cure amounts instead of liabilities to be assumed by

the assuming party. See MBS Trustees Objection at ¶ 28; see also Frost Objection at ¶ 12;

Lewisville Objection at ¶ 9.   However, all of these objections are premature, as the assumption

of contracts is not presently before the Court; the Assumed Contract schedule has not yet been

filed and served; the deadline for submission of objections pursuant to Section 365 has not yet

been scheduled; and bidding has not yet commenced.

32.    The MBS Trustees have also objected to the Debtors' proposed assumption of the

servicing rights as separate contracts from certain other contracts, collectively referred to as the

"Pooling and Servicing Agreements" ("PSAs"). However, this determination, as the MBS

Trustees specifically note, is properly raised in connection with the approval of the Sale Order,

and not the Sale Procedures. See MBS Trustee Objection at ¶ 22 ("In short, as a prerequisite for

the Court to approve the [Nationstar Sale Order], and, in particular, the Severing Provisions, a

court of appropriate jurisdiction must decide in a separate proceeding that each of the PSAs is

severable.").  To the extent that the MBS Trustee Objection alleges that the Sale Procedures are

inadequate for the review of this severing process, Nationstar is amenable to implementing an

appropriate process for the resolution of such issues.

## VII. CONCLUSION AND RESERVATION OF RIGHTS

33.    For all of the foregoing reasons, Nationstar respectfully submits that the Court

overrule the Objections, enter the Sale Procedures Order and approve the payment of the Break-

Up Fee and Expense Reimbursement to Nationstar as provided therein.

34.    Nationstar reserves its right to supplement and amend this Response and

introduce evidence at any hearing related to the proposed sale transactions or this Response.

Dated: New York, New York                    SIDLEY AUSTIN  LLP
       June 14, 2012

By:       _/s/ John Hutchinson_____
       John Hutchinson
       787 Seventh Avenue
       New York, NY 10019
       (212) 839-5300 (tel)
       (212) 839-5599 (fax)

       -and-

       Larry J. Nyhan
       Jessica C.K. Boelter
       SIDLEY AUSTIN LLP
       One South Dearborn
       Chicago, IL  60603
       (312) 853-7000 (tel)
       (312) 853-7036 (fax)

       Attorneys for Nationstar Mortgage LLC