HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 1

CERTIFIED COPY

H I G H L Y   C O N F I D E N T I A L

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
                            Case No.
In re                       12-12020(MG)

RESIDENTIAL CAPITAL, LLC, et al.,

        Debtors.
-------------------------------------x

   VOLUME 1

   June 6, 2012

   10:02 a.m.


   Videotaped deposition of SAMUEL M. GREENE, pursuant to notice, at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, before Gail F. Schorr, a Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public within and for the State of New York.

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 2

```
 1   A P P E A R A N C E S:
 2   KRAMER LEVIN NAFTALIS & FRANKEL LLP
     Attorneys for the Official Committee of
 3   Unsecured Creditors
         1177 Avenue of the Americas
 4       New York, NY 10017
 5   BY:    GREGORY AARON HOROWITZ, ESQ.
                -and-
 6          KIMBERLY E. FRIEDMAN, ESQ.
            (ghorowitz@kramerlevin.com)
 7          (kfriedman@kramerlevin.com)
 8
     MORRISON & FOERSTER LLP
 9   Attorneys for Debtors and Debtors in
     Possession
10       1290 Avenue of the Americas
         New York, NY 10104
11
     BY:    STEFAN W. ENGELHARDT, ESQ.
12              -and-
            ALEXANDRA STEINBERG BARRAGE, ESQ.
13          (sengelhardt@mofo.com)
            (sbarrage@mofo.com)
14
15   KIRKLAND & ELLIS LLP
     Attorneys for Ally Financial
16       655 Fifteenth Street, N.W.
         Washington, D.C. 20005
17
     BY:    PATRICK M. BRYAN, ESQ.
18              -and-
            CRAIG A. BRUENS, ESQ.
19          (patrick.bryan@kirkland.com)
            (craig.bruens@kirkland.com)
20
21   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     Attorneys for Barclays Bank DIP Lender
22       Four Times Square
         New York, NY 10036
23
     BY:    SUZANNE D.T. LOVETT, ESQ.
24          (suzanne.lovett@skadden.com)
25
```

```
 1

 2    A P P E A R A N C E S (Continued):

 3    WHITE & CASE LLP
      Attorneys for Secured Notes
 4         1155 Avenue of the Americas
           New York, NY 10036-2787
 5
      BY:    J. CHRISTOPHER SHORE, ESQ.
 6               -and-
             VANESSA SODERBERG, ESQ.
 7           (cshore@whitecase.com)
             (vsoderberg@whitecase.com)
 8

 9    SHEARMAN & STERLING LLP
      Attorneys for Citibank, N.A.
10         599 Lexington Avenue
           New York, NY 10022-6069
11
      BY:    WILLIAM J.F. ROLL, III, ESQ.
12               -and-
             SUSAN A. FENNESSEY, ESQ.
13           (wroll@shearman.com)
             (sfennessey@shearman.com)
14

15    SIDLEY AUSTIN LLP
      Attorneys for Nationstar Mortgage, LLC
16         One South Dearborn
           Chicago, IL 60603
17
      BY:    BRETT H. MYRICK, ESQ. (Via phone)
18           (bmyrick@sidley.com)

19
      KELLEY DRYE & WARREN LLP
20    Attorneys for U.S. Bank National
      Association
21         101 Park Avenue
           New York, NY 10178
22
      BY:    JASON R. ADAMS, ESQ. (Via phone)
23           (jadams@kelleydrye.com)

24

25
```

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 4

```
 1    A P P E A R A N C E S (Continued):

 2    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
      Attorneys for Federal Housing Finance Agency
 3         1633 Broadway
           New York, NY 10019
 4
      BY:    DANIEL A. FLIMAN, ESQ. (Via phone)
 5            (dfliman@kasowitz.com)

 6
      CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 7    Conflicts Counsel for the Debtors
           101 Park Avenue
 8         New York, NY 10178-0061

 9    BY:    THERESA A. FOUDY, ESQ.
              (tfoudy@curtis.com)
10

11    ROPES & GRAY LLP
      Attorneys for Consenting Noteholders to the
12    Plan Support Agreement
           Prudential Tower
13         800 Boylston Street
           Boston, MA 02199-3600
14
      BY:    STEVEN T. HOORT, ESQ.
15            (steven.hoort@ropesgray.com)

16
      ALSO PRESENT:
17
      LANDON D. PARSONS
18    Moelis & Company

19    DAVID GREENWALD
      Moelis & Company
20
      ALIYA SHAIN
21    Kramer Levin Naftalis & Frankel LLP

22    MELISSA CRESPO
      Morrison & Foerster LLP
23
      JOANNA ZDANYS
24    Morrison & Foerster LLP

25
```

```
 1     SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
 2   Nationstar proposes not to acquire the
 3   advances, right?
 4         A.    I think they're purchasing
 5   some advances, but not all advances.
 6         Q.    Which advances are they
 7   proposing to purchase?  I think I may
 8   have missed that.
 9         A.    In the box on page 2, second
10   from the middle, it says advances.
11         Q.    The box (e), private label
12   securitization advances?
13         A.    On page 2.
14         Q.    Under purchase price for those
15   advances it says NA with an asterisk,
16   right?
17         A.    Right.
18         Q.    It explains that it's actually
19   proposing to exclude those advances, but
20   to collect them on behalf of the debtors?
21         A.    Right, but it says it would
22   purchase them for a certain percentage of
23   par at the end.
24         Q.    So I'm clear, the proposal was
25   that rather than purchasing the assets on
```

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 112

```
 1       SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
 2   day 1, Nationstar would collect the
 3   advances on the debtors' behalf for 18
 4   months, right?
 5       A.    Yes.
 6       Q.    Am I right in understanding
 7   that that would be for no charge, the
 8   asset collection service, the asset
 9   collection?
10              MR. ENGELHARDT:  Objection to
11         form.
12       A.    I believe so, yes.
13       Q.    And then any advances that
14   remained uncollected at the end of 18
15   months Nationstar would undertake to
16   purchase at 95 percent of par?
17              MR. ENGELHARDT:  Let him
18         finish the question, please don't
19         refer to the numbers on the
20         document.
21              MR. HOROWITZ:  There's going
22         to be a whole line of questioning
23         that I'm going to have to do again
24         in the absence of people.  I'll do
25         as much as I can with folks here.
```

12-12020-mg    Doc 360-2    Filed 06/14/12    Entered 06/14/12 12:03:40    Exhibit B - Greene Depo Excpts    Pg 7 of 15
HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 129

```
 1        SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
 2        form.
 3        A.    I would imagine it's really
 4   done on a loan-by-loan or PSA-by-PSA
 5   basis.  They could really be quite
 6   different.
 7        Q.    Depending on the nature of the
 8   advance?
 9        A.    Depending upon the nature of
10   the advance, the quality of the
11   underlying loan, things of that nature.
12        Q.    So as you sit here today, you
13   don't have any understanding as to what
14   the debtor expected the time profile of
15   recovery of those advances to be?
16        A.    Which advances?
17        Q.    The advances that Nationstar
18   was proposing to collect on the debtors'
19   behalf for 18 months?
20        A.    No, I said that my
21   recollection was that a very high
22   percentage of them would be collected
23   within 18 months.
24        Q.    But within that 18 months,
25   would the majority of them have been
```

1  SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
2  collected within the first three months,
3  for example?
4      A.    That I don't know.
5      Q.    Now, you responded to this
6  initial indication of interest with a
7  letter seeking clarification of the bid,
8  right?
9      A.    Yes.
10      Q.    And among other things, you
11  asked Nationstar to make a proposal to
12  purchase the advances rather than this
13  collection proposal, right?
14      A.    Yes, we did.
15      Q.    And in the clarification of
16  bid letter that was marked as Greene
17  Exhibit 11, on page 5 under items 9 and
18  10 Nationstar responds to that request
19  separately with regard to the PLS
20  advances and the agency advances, right?
21      A.    Yes.
22      Q.    The response is essentially
23  the same for both, that Nationstar was
24  prepared to bid what it's actually ending
25  up paying in this deal for those

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 131

```
 1        SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
 2    advances, right?
 3        A.    Yes.
 4        Q.    And since that's public I can
 5    say it, they're proposing to pay 95 cents
 6    on the dollar for these advances, right?
 7        A.    Yes.
 8        Q.    But they reiterate their
 9    proposal to have the sellers retain the
10    advances, right?
11        A.    Hold on, let me just read.
12    They reiterate their offer should we
13    desire to retain them.
14        Q.    And they add to that an offer
15    to assist the seller in obtaining
16    financing on the retained advances?
17        A.    Correct.
18        Q.    And that's an offer to obtain
19    financing on terms that -- well,
20    withdrawn.  That's about as much as I can
21    comfortably do publicly.
22              Why did the debtor choose to
23    go with the Nationstar purchase of the
24    advances as opposed to the proposal to
25    collect on the debtors' behalf?
```

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 132

```
 1      SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
 2          A.    I think we thought it was in
 3   the best interest of the estate to, you
 4   know, bring in the cash as soon as
 5   possible so that it could be distributed
 6   quickly.
 7              I also think that while the
 8   seller, while Fortress represented that
 9   they anticipate being able to help us, it
10   wasn't a commitment to get that
11   financing, that when you looked at the
12   DIP financing and that was going to be
13   the more likely vehicle that was going to
14   be required here in order to service the
15   advances on a go-forward basis and the
16   pricing of the DIP was materially higher
17   than L plus 350.
18          Q.    You said it, not me, I was
19   avoiding that, but that's fine.
20          A.    Oh.
21          Q.    So their proposal was that
22   they could provide financing on the
23   advances, on that portion of the debtors'
24   collateral on cheaper terms than what was
25   then the DIP proposal, right?
```

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 186

1    SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
2    as a stalking-horse bidder for the
3    Nationstar purchased assets."
4         What is the basis for that
5    opinion?
6         A.   The basis for that opinion is
7    we reviewed various break-up fees in
8    Chapter 11 context and there was a range
9    and that this fee was in that range.
10        Q.   Did you present any written
11   analysis of break-up fees to the debtors'
12   Board of Directors?
13        A.   I believe we did.
14        Q.   You say you believe you did.
15   Do you specifically recall presenting
16   one?
17
18        A.   I specifically remember
19   putting together a piece of analysis that
20   demonstrated the range of break-up fees
21   and historical transactions and I believe
22   it was either presented to ResCap
23   management or ResCap, someone at the
     client.
          Q.   Before we get to that, how was
     break-up fee negotiated?

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 187

1  SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
2      A.      Well, it was -- it's not, you
3  know, in any of these situations it's
4  not, you know, we don't serially go
5  through items and knock them off and get
6  to the next one.  It was a bunch of
7  negotiations going around and a bunch of
8  things that we wanted and a bunch of
9  things that they wanted and, you know, we
10 settled on 3 percent and, you know,
11 presumably we got things we wanted in
12 other areas.
13     Q.      In fact, Nationstar never
14 asked for higher than 3 percent, right?
15     A.      No, I don't believe they did.
16     Q.      And the debtors originally
17 suggested one percent, right?
18     A.      Correct.
19     Q.      Was there vigorous negotiation
20 over this?
21     A.      Sure.  It was brought up a
22 number of times.
23     Q.      Was there any discussion about
24 what base -- withdrawn.
25             Was there any discussion about

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 188

SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

whether it was reasonable to apply that 3 percent figure to all of the assets that Nationstar would be purchasing?

A.   As opposed to some of the assets?

Q.   Yes.

A.   No.

Q.   In the Nationstar transaction, I'm going to get the numbers wrong, but Nationstar is bidding, what is it, 1.1 billion for the MSRs and platform, approximately?

A.   Yes, I would have to check the number, but it's in that neighborhood.

Q.   And something in the neighborhood of, I'm going to get it wrong, so please correct me, 1.6 billion for the advances?

A.   Well the whole bid is 2.3, so.

Q.   So 1.2 billion.

A.   In that range.

Q.   Thank you.  When you did an analysis of precedent transactions, did you look at how break-up fees are

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 189

SAMUEL M. GREENE - HIGHLY CONFIDENTIAL

1  calculated in transactions where a
2  significant percentage of the deal is to
3  acquire cash or cash equivalents?
4      A.    I think that was a factor in
5  the analysis that we looked at, but no, I
6  don't think we -- we don't view the
7  advances as cash or cash equivalents.
8      Q.    Even though as you told me
9  before, it's not uncommon for purchasers
10 to pay 100 cents on the dollar for
11 advances, right?
12           MR. ENGELHARDT:  Objection to
13     form.
14     A.    Sometimes they do, sometimes
15 they don't.  It depends on the situation.
16     Q.    In negotiations did you ever
17 suggest to Nationstar that it would be
18 appropriate to exclude advances from the
19 base the break-up fee was based on?
20     A.    No, we simply asked for a
21 lower fee.
22     Q.    Did you ever suggest that a
23 lower percentage of the advances would be
24 appropriate?

HIGHLY CONFIDENTIAL
SAMUEL M. GREENE - 6/6/2012

Page 194

```
 1      SAMUEL M. GREENE - HIGHLY CONFIDENTIAL
 2          Q.    Which is?
 3          A.    About 105 or something.
 4          Q.    Okay.  In reaching the opinion
 5   that Nationstar's break-up fee is fair,
 6   reasonable and necessary to induce
 7   Nationstar to serve as a stalking-horse
 8   bidder, did you consider whether that
 9   size break-up fee will have a chilling
10   effect on competitive bidding?
11          A.    Yes.
12          Q.    And what did you conclude?
13          A.    It will not.
14          Q.    What's the basis for that
15   conclusion?
16          A.    Again, we looked at precedent
17   transactions and we found that in
18   bankruptcy break-up fees range anywhere
19   from one to 3 percent.  We looked at the
20   size of the deal.  We looked at the
21   increment that we were looking to bid
22   over the deal, and we didn't think it
23   would be a problem.
24          Q.    Of the 2.3 billion,
25   approximately 1.2 billion is purchasing
```