MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------

| | ) | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

------------------------------------------------------------------------

**SECOND SUPPLEMENTAL DECLARATION OF JAMES WHITLINGER, CHIEF
FINANCIAL OFFICER OF RESIDENTIAL CAPITAL, LLC, IN FURTHER SUPPORT
OF ENTRY OF FINAL ORDERS FOR SPECIFIC "FIRST DAY" MOTIONS**

I, James Whitlinger, being duly sworn, depose and say:

1.    I am the Chief Financial Officer of Residential Capital, LLC ("<u>ResCap</u>"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "<u>Debtors</u>").  I have held this position since May 2011.  I joined ResCap in 1992, and before becoming its Chief Financial Officer, I served in a number of positions, including Chief Accounting Officer for a significant subsidiary of ResCap, Senior Vice President of mergers and acquisitions and Executive Director of Finance.  In my role as Chief Financial Officer of ResCap, I am responsible for financial oversight, analysis, controls, accounting, reporting and business planning for the mortgage-related operations of the Debtors and their non-

ny-1045517

debtor subsidiaries. I am authorized to submit this declaration (the "Declaration") in further support of the entry of final orders for specific "first day" motions, as set forth below.[1]

2. In my capacity as Chief Financial Officer, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; information supplied or verified by personnel in departments within the Debtors' various business units; my review of the Debtors' books and records as well as other relevant documents; my discussions with other members of the Debtors' management team; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' operations, financial condition and history. In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees or consultants, I have relied upon these employees and consultants accurately recording, preparing, collecting, or verifying any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

### A. The Origination Motion[2]

3. The Purchase and Sale Agreement and the Master Forward Agreement, each of which the Debtors seek this Court's authorization to continue to honor, are the product of

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the applicable motion.

[2] The term "Origination Motion" refers to the *Debtors' Motion for Interim and Final Orders Under Sections 105(a), 363, 364, 503(b), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to (I) Process and Where Applicable Fund Prepetition Mortgage Loan Commitments, (II) Continue Brokerage, Origination and Sale Activities Related to Loan Securitization, (III) Continue to Perform, and Incur Postpetition Secured Indebtedness, Under the Mortgage Loan Purchase and Sale Agreement With Ally Bank and Related Agreements, (IV) Pay Certain Prepetition Amounts Due to Critical Origination Vendors, and (V) Continue Honoring Mortgage Loan Repurchase Obligations Arising in Connection With Loan Sales and Servicing, Each in the Ordinary Course of Business* [Docket No. 44].

ny-1045517                            2

extensive, arm's length negotiations between the Debtors, Ally Bank, and AFI, over the course of several months, that resulted in a fair and, indeed, beneficial agreement that is absolutely critical to ResCap's ongoing business.

4.   The Purchase and Sale Agreement and the Master Forward Agreement are components of a complex series of transactions that enable the Debtors to continue earning any gain on sale with respect to Ginnie Mae-guaranteed MBS and generating servicing inventory. As a condition to receiving that benefit, the Debtors have agreed to seek stay relief on terms that will provide AFI and its affiliates with comfort that they will be able to protect their interests if, in approximately six months, circumstances arise that cast doubt on the Debtors' ability to consummate the various transactions contemplated at the outset of these Chapter 11 cases. I understand that such provisions were necessitated in part by applicable federal regulations governing Ally Bank's transactions with affiliates. Nonetheless, the Debtors vigorously negotiated the best possible terms. There is no downside to these agreements, because Ally Bank and AFI were not obligated to allow the Debtors to originate in bankruptcy. They did so as an accommodation to the Debtors. That accommodation is estimated to net the Debtors approximately $100 million in profits.

5.   During the months leading up to the filing of these Chapter 11 cases, the Debtors also engaged in extensive prepetition discussions and negotiations with the Governmental Associations regarding the Debtors' continued servicing of GA Loans. During those discussions, the Debtors were informed that the Governmental Associations required that the Debtors continue to honor any and all repurchase obligations under the applicable GA Guides and GA Servicing Agreements, whether related to the Debtors' origination or servicing activities, during these Chapter 11 cases as a condition to their support of the Debtors' continued servicing

of GA Loans during the Chapter 11 cases. The Governmental Associations also indicated that the Debtors must continue honoring those repurchase obligations as a condition to the Governmental Associations' potential consent to the transfer of the GA Servicing Agreements to a third party purchaser.

6. These repurchase obligations are an integral part of the Debtors' duties required under the GA Guides. If the Debtors do not continue to honor their repurchase obligations, the Debtors may face actions to terminate their right to continue servicing GA Loans, as the applicable agreements with the Governmental Associations generally permit them to terminate a servicer at will. Further, the Governmental Associations could likewise prevent a purchaser from servicing such loans following the closing of the Platform Sale. Such a result would be potentially catastrophic to the value of the Debtors' servicing platform and the estates in general. It is therefore critical that the Debtors be permitted to continue to honor their repurchase obligations to the Governmental Associations.

### B. The AFI DIP Financing/Cash Collateral Motion[3]

7. It is imperative that the Debtors obtain financing to meet their Ginnie Mae Obligations because, pursuant to the documents related to the sale of mortgage loans to Ginnie Mae Trusts, if the Ginnie Mae Loans collectively exceed the delinquency rate specified by Ginnie Mae, the Debtors are obligated to repurchase a group of Ginnie Mae Loans sufficient to decrease the delinquency rate below the specified level. Amounts paid by the Debtors to repurchase Ginnie Mae Loans from the Ginnie Mae Trusts are in substantial part reimbursable to

---

[3] *Corrected Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 507(b) and Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate Protection and (IV) Scheduling A Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief* [Dkt. No. 42]

the Debtors, as each of these mortgage loans are either partially insured by the FHA or partially guaranteed by the VA.

8. As an alternative to submitting a claim to HUD for reimbursement by the FHA or VA in connection with repurchased Ginnie Mae loans, the Debtors may also modify the repurchased loan and resell it into a Ginnie Mae Trust, sell it to a third party, or retain it in a Debtor-owned portfolio. In 2011, the Debtors were obligated to, and did in fact, repurchase over 4,000 mortgage loans with an aggregate value of approximately $745 million from Ginnie Mae securitization trusts in connection with delinquency thresholds, the majority of which have been or will subsequently be reimbursed by the FHA and VA.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 14, 2012

/s/ James Whitlinger
James Whitlinger
Chief Financial Officer of
Residential Capital, LLC