**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------------
)
In re:                                                    )          Case No. 12-12020 (MG)
                                                          )
RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,     )          Chapter 11
                                                          )
                                          Debtors.   )          Jointly Administered
                                                          )
                                                          )
                                                          )
-------------------------------------------------------------------   )

**DECLARATION OF MATTHEW DETWILER IN SUPPORT OF DEBTORS'**
**ALLY SERVICING MOTION**

I, Matthew Detwiler, under penalty of perjury, declare as follows:

1.      I am Senior Vice President of Servicing Solutions for GMAC Mortgage, LLC, a

debtor and debtor in possession in the above-captioned Chapter 11 cases and a subsidiary of

Residential Capital, LLC, a limited liability company organized under the laws of the state of

Delaware and the parent of the other debtors and debtors in possession in the above-captioned

Chapter 11 cases (collectively, the "<u>Debtors</u>").  I have held my current title since August 2011,

and have worked in the mortgage loan industry for over fifteen years.  In my capacity as Senior

Vice President, I am responsible for business development, contract negotiations and

administration, and client management activities with respect to the Debtors' subservicing

operations.  I am authorized to make this declaration on behalf of the Debtors and in support of

the Debtors' Ally Servicing Motion[1] (the "<u>Motion</u>").[2]

---

[1]    The "<u>Ally Servicing Motion</u>" refers to the *Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business* [Docket No. 47].

[2]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.      In my capacity as Senior Vice President, I am familiar with the Debtors' day-to-day subservicing operations.  I submit this declaration (the "Declaration") on the Debtors' behalf in conjunction with and in support of the Motion.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; information supplied or verified by personnel in departments within the various business units of the Debtors or the Debtors' advisors; my review of the Debtors' relevant documents; or my general experience, expertise, and knowledge of the Debtors' mortgage loan servicing operations.  In making my statements based on my review of the Debtors' relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing, collecting, or verifying any such documentation and other information.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

### The Debtors' Subservicing Activities Generally

3.      In connection with their mortgage loan origination activities, the Debtors, in their capacities as licensed mortgage brokers, broker loan applications and supporting materials with Ally Bank across a 47 state platform.  Ally Bank then underwrites, originates and funds loans based on the loan application packages.  Ally Bank also acquires loans from other parties as part of its correspondent loan business.  The substantial majority of these loans are pooled and securitized as MBS guaranteed by Fannie Mae or Freddie Mac (collectively, the "GA Loans") for which the Debtors typically act as loan servicers, including as subservicer for mortgage servicing rights ("MSRs") held by Ally Bank.

4.      As a subservicer, the Debtors perform servicing functions pursuant to contractual arrangements with third parties who hold MSRs or mortgage loans, such as the Servicing

2

ny-1045515

Agreement with Ally Bank. Those subservicing functions include collecting and remitting

mortgage loan payments, responding to borrower inquiries, accounting for principal and interest,

holding custodial and escrow funds for payment of property taxes, insurance premiums, and

ancillary products, counsel or otherwise working with delinquent borrowers (including, but not

limited to, granting borrowers leniency under certain circumstances and structuring loan

modifications and repayment plans for certain borrowers), supervising foreclosures and property

dispositions, making advances of required principal, interest, and certain "property protection"

costs with respect to delinquent mortgage loans, reporting and remitting payments due to

investors, and generally administering the loans consistent with their contractual undertakings

and business practices.

### The Prior Servicing Agreement

5.      Prior to the Petition Date, GMAC Mortgage and certain of its affiliates performed

subservicing activities for Ally Bank pursuant to a servicing agreement between the parties dated

as of August 21, 2001 (the "Prior Servicing Agreement").

6.      The Prior Servicing Agreement renewed automatically every year unless either

party terminated it on 120 days' advance notice. The Debtors were advised that the FDIC would

not permit Ally Bank to renew the Prior Servicing Agreement upon its stated expiration on

August 21, 2012, and instead required Ally Bank to solicit offers for the contractual right to

provide subservicing for Ally Bank. Under the Prior Servicing Agreement, GMAC Mortgage

serviced approximately 680,000 mortgage loans on behalf of Ally Bank.

7.      Following Ally Bank's solicitation of offers from third party servicers, Ally Bank

selected GMAC Mortgage to continue providing subservicing for the Ally Bank loans. Ally

Bank advised GMAC Mortgage that, although third parties had offered more favorable pricing

terms, GMAC Mortgage was chosen in large part to avoid the disruption of having to move Ally Bank's entire portfolio of MSRs to a new third party provider, or—as would be more likely given the significant size and variety of the Ally Bank loan portfolio—coordinating the transfer of those loans to multiple third party servicers.

8.     Ally Bank provided notice to GMAC Mortgage that it would not renew the Prior Servicing Agreement on April 19, 2012.  Accordingly, the Prior Servicing Agreement will expire pursuant to its terms on August 21, 2012.

## The Servicing Agreement

9.     Following Ally Bank's decision to maintain subservicing of its loan portfolio with GMAC Mortgage, the Debtors and Ally Bank engaged in lengthy and arms' length negotiations regarding the terms of a new servicing agreement, including the termination provisions under which both parties would be bound in the event of a GMAC Mortgage bankruptcy filing.  In my capacity as Senior Vice President, I was directly involved in those negotiations.  I understand that Ally Bank's ability to enter into transactions with affiliates is governed by federal regulations and statutes and that those statutes and regulations placed constraints upon Ally Bank in connection with the negotiation of the Servicing Agreement.

10.     GMAC Mortgage and Ally Bank entered into the Servicing Agreement on May 11, 2012, which amends and restates the Prior Servicing Agreement.  By its terms, the Servicing Agreement will become effective only upon the entry of an order of the Court authorizing the Debtors to operate under the Servicing Agreement.  The Servicing Agreement incorporated certain requirements under the Consent Order and DOJ/AG Settlement.

11.     The Servicing Agreement will allow the Debtors to continue servicing for Ally Bank into December 2012 or longer, and the pricing is the Servicing Agreement is on terms

4

ny-1045515

favorable to the Debtors.  During the negotiations regarding the terms of the Servicing

Agreement, Ally Bank indicated that it was very concerned about entering into a long-term

contract without flexibility to protect its interests, particularly in light of the anticipated filing of

these Chapter 11 cases.  In exchange for providing the ability to terminate the Servicing

Agreement on specified terms, the Debtors were able to obtain pricing terms for subservicing the

Ally Bank loans that are materially higher than the subservicing fees they would have received

under the Prior Servicing Agreement, as set forth on Exhibit 1 attached hereto.  The Debtors also

successfully negotiated a number of other terms that improved upon the Prior Servicing

Agreement, including the right to receive termination fees in the event the Servicing Agreement

is terminated by Ally Bank during the first twelve months.  In addition, the 120-day notice period

required for termination of the Servicing Agreement is the same as under the Prior Servicing

Agreement, and is longer than the notice period typically provided under subservicing

agreements with other clients.  Accordingly, I believe the terms and conditions of the Servicing

Agreement ultimately agreed upon reflect the sound exercise of the Debtors' business judgment.

12.    Furthermore, the grant of stay relief in order to permit the termination of servicing

rights with respect to the 3,000 loans is necessary in order to permit Ally Bank to engage a

backup servicer.  The engagement of a backup servicer is standard practice in the mortgage loan

servicing industry in circumstances where the owner of the mortgage servicing rights has

legitimate concerns about the current servicer's long-term capacity.  Based on my experience and

knowledge of the mortgage loan servicing industry, I believe it is both reasonable and

appropriate to permit Ally Bank to transfer the servicing of a very small subset representing just

four-tenths of a percent (0.4%) of the approximately 685,000 Ally Bank loans the Debtors

service for such a purpose.

5

13.     The Servicing Agreement provides that the Debtors may assign the Servicing

Agreement with Ally Bank's consent to "Eligible Servicers" (as such term is defined in the

Servicing Agreement).  I understand that the proposed Final Ally Servicing Order permits the

Debtors to assign the Servicing Agreement without Ally Bank's consent to Eligible Servicers as

to whom Ally Bank's engagement as a subservicer under the Servicing Agreement for the GA

Loans has been approved by the applicable Governmental Associations.

14.     In the context of the negotiations regarding the terms of the Servicing Agreement,

under the circumstances, I considered this to be a reasonable term.  A significant portion of Ally

Bank's loans are GA Loans, and my understanding is that any servicer of those loans would have

to be approved by the Governmental Associations.  In addition, most Non-GA Servicing

Agreements governing Ally Bank's Non-GA Loans also require servicers to be licensed by

Fannie Mae and/or Freddie Mac.  An Eligible Servicer would be qualified to service Ally Bank's

loans in accordance with the requirements imposed by the Governmental Associations under the

GA Guides and GA Servicing Agreements.  As a practical matter, GMAC Mortgage would be

unlikely to assign subservicing contracts to a subservicer that did not satisfy those criteria, absent

special circumstances.

ny-1045515

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the

foregoing is true and correct.

Executed on June 14, 2012

By:  /s/ Mattew Detwiler
Matthew Detwiler
Senior Vice President
GMAC Mortgage, LLC

7