MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

| | ) | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' REPLY TO THE LIMITED OBJECTION AND RESERVATION OF
RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE
DEBTORS' (I) ORIGINATION MOTION AND (II) ALLY SERVICING MOTION**

ny-1045429

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 2
II. REPLY ............................................................................................................................ 3
    A. Committee Objections Regarding The Ally Servicing Motion ............................ 3
        1. Limitation on Assignment Without Ally Bank Consent ............................ 3
        2. Stay Modifications ..................................................................................... 4
    B. Committee Objections Regarding The Origination Motion ................................. 7
        1. Stay Modifications ..................................................................................... 7
        2. Authority To Honor Repurchase Obligations ............................................ 8
        3. Administrative Expense Priority For Certain Claims ............................... 9
        4. Additional Technical Revisions ................................................................ 9
III. RESERVATION OF RIGHTS ...................................................................................... 10
IV. CONCLUSION ............................................................................................................. 10

ny-1045429

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

11 U.S.C. § 365(f)(1) ..................................................................................................................4

11 U.S.C. § 365(f)(2)(b) .............................................................................................................4

12 U.S.C. § 371c-1 .....................................................................................................................5

12 U.S.C. § 1801 ........................................................................................................................5

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[1] submit this reply (the "Reply"), to the *Limited Objection And Reservation Of Rights Of The Official Committee Of Unsecured Creditors To The Debtors' (I) Origination Motion And (II) Ally Servicing Motion* [Dkt. No. 303] (the "Objection").[2] In support of the Reply, the Debtors rely upon, and incorporate by reference, (i) the affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC ("ResCap"), in support of the Debtors' "first day" pleadings (the "Whitlinger Affidavit") [Dkt. No. 6], dated May 14, 2012 (the "Petition Date"), (ii) the supplemental affidavit of James Whitlinger in further support of the Origination Motion,[3] filed contemporaneously herewith (the "Supp. Whit Aff."), and (iii) the supplemental declaration of Matthew Detwiler in further support of the Ally Servicing Motion,[4] filed contemporaneously herewith (the "Supp. Detwiler Decl."). In further support of the Reply, the Debtors, by and through their undersigned counsel, respectfully represent:

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below).

[2] Terms not otherwise defined herein shall have the meanings ascribed to them in the Whitlinger Affidavit or the respective motion.

[3] The term "Origination Motion" refers to the *Debtors' Motion for Interim and Final Orders Under Sections 105(a), 363, 364, 503(b), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to (I) Process and Where Applicable Fund Prepetition Mortgage Loan Commitments, (II) Continue Brokerage, Origination and Sale Activities Related to Loan Securitization, (III) Continue to Perform, and Incur Postpetition Secured Indebtedness, Under the Mortgage Loan Purchase and Sale Agreement With Ally Bank and Related Agreements, (IV) Pay Certain Prepetition Amounts Due to Critical Origination Vendors, and (V) Continue Honoring Mortgage Loan Repurchase Obligations Arising in Connection With Loan Sales and Servicing, Each in the Ordinary Course of Business* [Dkt. No. 44].

[4] The term "Ally Servicing Motion" refers to the Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business [Dkt. No. 47].

**I.   INTRODUCTION**

1.   Since the first day hearings on the Debtors' requests for relief held on May 14 and May 15, 2012, the Debtors and their advisors have worked closely with their major stakeholders, including the Official Committee of Unsecured Creditors (the "Committee"), to assist those parties in gaining an understanding of the Debtors' complex businesses and restructuring objectives.  This has been and will continue to be a productive process involving extensive communications and the sharing of data.  The Debtors appreciate that the exigencies of these Chapter 11 cases require all parties in interest to digest and process in "real time" large quantities of information.  Significant progress has been made; however, notwithstanding these efforts, certain issues raised by the Committee could not be resolved in advance of the objection deadline.  Certain of those issues have already been resolved and will be reflected in amended proposed final orders granting the relief requested in the Origination Motion and Ally Servicing Motion to be filed with the Court (respectively, the "Final Origination Order" and "Final Ally Servicing Order").  The matters still in dispute are limited, and the Debtors will continue to engage in good faith negotiations with the Committee and other parties in interest; however, the Debtors respectfully submit that, in the absence of consensual resolution on all points, the relief requested by the Debtors is appropriate and should be granted without modification.

2.   As discussed below, the Servicing Agreement and the various transactions and agreements that are the subject of the Origination Motion must be viewed in the context of these Chapter 11 cases and in the context of the significant value provided by Ally Financial Inc. ("AFI") and Ally Bank to the Debtors.  The agreements among the Debtors and their non-Debtor affiliates, including AFI, and Ally Investment Management LLC ("AIM"), were negotiated in contemplation of these bankruptcy filings and under a regulatory framework.  Mitigating, in part,

the risks to their non-Debtor affiliates arising as a result of the bankruptcy filing was essential to the Debtors' consummation of these agreements.

## II.    REPLY

### A.    Committee Objections Regarding The Ally Servicing Motion

#### 1.    Limitation on Assignment Without Ally Bank Consent

3.    Following Ally Bank's decision to maintain subservicing of its loan portfolio with GMAC Mortgage, and subject to the regulatory limitations imposed upon Ally Bank (discussed in more detail below), the Debtors and Ally Bank engaged in lengthy and arms' length negotiations regarding the terms of the new Servicing Agreement, including the termination provisions under which both parties would be bound in the event of a bankruptcy filing.  (Supp. Detwiler Dec. ¶ 9.)  These were the best provisions the Debtors could obtain in the context of the overall agreement.  The Servicing Agreement will allow the Debtors to continue servicing for Ally Bank into December 2012 or longer, and the pricing in the Servicing Agreement is on terms favorable to the Debtors.  (Supp. Detwiler Dec. ¶ 11; Exhibit 1.) Accordingly, the Servicing Agreement reflects the sound exercise of the Debtors' business judgment.  (Supp. Detwiler Dec. ¶ 11.)

4.    The Committee objects to the limitation contained in the Final Ally Servicing Order that permits the Debtors to assign the Servicing Agreement without Ally Bank's consent to "Eligible Servicers" (as such term is defined in the Servicing Agreement)[5] "who

---

[5]  The Servicing Agreement defines "Eligible Servicer" to mean "[a]n entity that (a) is an approved servicer by the Agencies, with the power and authority to service the Mortgage Loans in accordance with the guidelines of the Agencies, and is in good standing with the Agencies, (b) is a mortgagee approved by the Secretary of HUD pursuant to Section 203 of the National Housing Act, (c) is licensed, qualified and in good standing pursuant to the terms of Section 7.01 herein, (d) has the insurance required to be maintained pursuant to the terms of Section 2.12 herein, and (e) is an eligible HAMP servicer in good standing and has signed a Servicer Participation Agreement that is in effect."

ny-1045429                                3

satisfy specific conditions," on the grounds that it violates the ability of a debtor pursuant to section 365(f)(1) of the Bankruptcy Code to assume and assign an executory contract without giving effect to anti-assignment provisions. (Objection ¶ 17). The "specific condition" of which the Committee complains is the requirement that that any Eligible Servicer to whom the Servicing Agreement is assigned must be one "as to whom Ally Bank's engagement as a subservicer under the Servicing Agreement for the Agency Loans . . . has been approved by the applicable Agencies." (Objection ¶ 17; Final Ally Servicing Order ¶ 9).

5. In the context of their negotiations, and in light of all of the facts and circumstances, the Debtors considered this to be a reasonable term, particularly since the Servicing Agreement itself requires Ally Bank's consent for any assignment. Moreover, it is consistent with Bankruptcy Code section 365(f)(2), which requires, as a condition of assignment, that a debtor may assign an executory contract only if the counterparty is provided with adequate assurance of future performance by the assignee. 11 U.S.C. § 365(f)(2)(b). A significant portion of Ally Bank's loans are GA Loans, and any servicer of those loans would have to be approved by the Governmental Associations. In addition, most Non-GA Servicing Agreements governing Ally Bank's Non-GA Loans also require servicers to be licensed by Fannie Mae and/or Freddie Mac. (Supp. Detwiler Dec. ¶ 14.) An "Eligible Servicer" approved by the Governmental Associations to act as a subservicer for Ally Bank constitutes adequate assurance under Bankruptcy Code section 365(f)(2), because it would be qualified to service Ally Bank's loans. (Id.) As a practical matter, GMAC Mortgage would be unlikely to assign subservicing contracts to a subservicer that did not satisfy those criteria, absent special circumstances. (Id.) Accordingly, this objection should be overruled.

ny-1045429                                         4

**2.     Stay Modifications**

6.      The Committee objects to the requested lifting of the automatic stay to permit Ally Bank to terminate the Servicing Agreement (a) immediately to the extent the proposed final order is not entered within 50 days from the Petition Date (July 3, 2012) and upon the occurrence of certain other case-related events; (b) immediately, taking effect 120 days later, with respect to any 3,000 loans; and (c) beginning 90 days after the Petition Date (August 12, 2012), taking effect 120 days later (December 10, 2012), with respect to any remaining loans.

7.      Ally Bank provided notice to GMAC Mortgage that it would not renew the Debtors' prior servicing contract with Ally Bank (the "Prior Servicing Agreement") on April 19, 2012, prior to the Petition Date. (Supp. Detwiler Dec. ¶ 8.) As a result, the Prior Servicing Agreement will expire pursuant to its terms on August 21, 2012. (Id.)

8.      The Debtors were advised by Ally Bank that the reason for the termination was that the FDIC would not permit Ally Bank to renew the Prior Servicing Agreement upon its stated expiration on August 21, 2012. Ally Bank is subject to the rules and regulations of the FDIC pursuant to 12 U.S.C. § 1801, et seq. In addition, by virtue of its status as a thrift under the Federal Deposit Act, Ally Bank is subject to 12 U.S.C. § 371c-1, a provision of the Federal Reserve statute that places restrictions on transactions by member banks with affiliates (the "Affiliate Transaction Conditions"). Pursuant to that statute, Ally Bank's transactions with affiliates, including the Debtors, are required to be negotiated at arms' length and in good faith.[6]

---

[6] 12 U.S.C. § 371c-1(a) provides, in relevant part:

    (1) A member bank and its subsidiaries may engage in any of the transactions described in paragraph (2) only -

*(cont'd)*

At the direction of the FDIC and in compliance with the Affiliate Transaction Conditions, Ally Bank solicited offers from third party servicers for the contractual right to provide subservicing for Ally Bank.  (Supp. Detwiler Dec. ¶ 6.)

9.    Following Ally Bank's solicitation of offers from third party servicers, Ally Bank selected GMAC Mortgage to continue providing subservicing for the Ally Bank loans. (Supp. Detwiler Dec. ¶ 7.)  Ally Bank advised GMAC Mortgage that, although third parties had offered more favorable pricing terms, GMAC Mortgage was chosen in large part to avoid the disruption of having to move Ally Bank's entire portfolio of MSRs to a new third party provider, or—as would be more likely given the significant size and variety of the Ally Bank loan portfolio—coordinating the transfer of those loans to multiple third party servicers.  (Id.)

10.    As described above, the terms and conditions of the Servicing Agreement were thoroughly negotiated, including the termination provisions that are the subject of the Objection, and provide for the servicing of the Ally Bank loans into December and potentially

_____
*(cont'd from previous page)*

(A) on terms and under circumstances, including credit standards, that are substantially the same, or at least as favorable to such bank or its subsidiary, as those prevailing at the time for comparable transactions with or involving other nonaffiliated companies, or

(B) in the absence of comparable transactions, on terms and under circumstances, including credit standards, that in good faith would be offered to, or would apply to, nonaffiliated companies.

(2) Transactions covered

Paragraph (1) applies to the following:

(A) Any covered transaction with an affiliate.

(B) The sale of securities or other assets to an affiliate, including assets subject to an agreement to repurchase.

(C) The payment of money or the furnishing of services to an affiliate under contract, lease, or otherwise.

*(cont'd)*

longer, on terms favorable to the Debtors. The Debtors submit that when viewed in the entire context of these Chapter 11 cases and taking into consideration the entirety of Servicing Agreement, the right afforded Ally Bank to terminate the agreement after December 10, 2012 is imminently reasonable.

11. Furthermore, the grant of stay relief in order to permit the termination of servicing rights with respect to the 3,000 loans is necessary in order to permit Ally Bank to engage a backup servicer. The engagement of a backup servicer is standard in the mortgage loan servicing industry in circumstances where the owner of the mortgage servicing rights has legitimate concerns about the current servicer's long-term capacity. (Supp. Detwiler Dec. ¶ 12.) The Debtors believe it is both reasonable and appropriate to permit Ally Bank to transfer the servicing of a very small subset of the approximately 685,000 Ally Bank loans the Debtors service for such a purpose. (Id.)

### B. Committee Objections Regarding The Origination Motion

#### 1. Stay Modifications

12. The Committee objects to the lifting of the automatic stay to permit Ally Bank to terminate the Purchase and Sale Agreement under certain enumerated conditions, on the basis that the Debtors have failed to offer any justification for such relief. (Objection ¶ 18.) For the same reason, the Committee also objects to the lifting of the automatic stay to permit AIM to terminate the Master Forward Agreement under similar conditions. (Objection ¶ 18.)

---

*(cont'd from previous page)*

(D) Any transaction in which an affiliate acts as an agent or broker or receives a fee for its services to the bank or to any other person.

ny-1045429                                  7

13. The modified stay relief was a negotiated term that was required by Ally Bank and AIM in order to induce those parties to agree to continue to transact business with the Debtors relating to the sale of Ginnie Mae Loans postpetition. Ally Bank and AIM were under no obligation to do so, and in exchange for providing funding for origination, the Debtors agreed to the lift stay relief. The terms of those transactions—including the requested stay relief—are the product of extensive arms' length negotiations between the parties in accordance with the Affiliate Transaction Conditions. (Supp. Whitlinger Decl. ¶ 3.)

14. The Purchase and Sale Agreement and the Master Forward Agreement are components of a complex series of transactions that enable the Debtors to continue earning any gain on sale with respect to Ginnie Mae-guaranteed MBS and generating servicing inventory. (Supp. Whitlinger Decl. ¶ 4.) As a condition to receiving that benefit, the Debtors have agreed to seek stay relief on terms that will provide AFI and its affiliates with comfort that they will be able to protect their interests if, in approximately six months, circumstances arise that cast doubt on the Debtors' ability to consummate the various transactions contemplated at the outset of these Chapter 11 cases. (Supp. Whitlinger Decl. ¶ 4.) The Debtors understand that such provisions were necessitated in part by the Affiliate Transaction Conditions. Nonetheless, the Debtors vigorously negotiated the best possible terms.

15. Accordingly, the Debtors submit that sufficient justification exists to permit the modification of the automatic stay on the terms set forth in the Final Origination Order.

### 2. Authority To Honor Repurchase Obligations

16. As set forth in the Supp. Whitlinger Aff., the Debtors engaged in extensive prepetition discussions and negotiations with the Governmental Associations regarding the Debtors' continued servicing of GA Loans. (Supp. Whitlinger Aff. ¶ 5.) During those

discussions, the Debtors were informed that the Governmental Associations required that the Debtors continue to honor any and all repurchase obligations under the applicable GA Guides and GA Servicing Agreements, whether related to the Debtors' origination or servicing activities, during these Chapter 11 cases as a condition to their support of the Debtors' continued servicing of GA Loans during the Chapter 11 cases. (Id.) The Governmental Associations also indicated that the Debtors must continue honoring those repurchase obligations as a condition to the Governmental Associations' potential consent to the transfer of the GA Servicing Agreements to a third party purchaser. (Id.)

17.     These repurchase obligations are an integral part of the Debtors' duties required under the GA Guides. If the Debtors do not continue to honor their repurchase obligations, the Debtors may face actions to terminate their right to continue servicing GA Loans, as the applicable agreements with the Governmental Associations generally permit them to terminate a servicer at will. Further, the Governmental Associations could likewise prevent a purchaser from servicing such loans following the closing of the Platform Sale. (Supp. Whitlinger Aff. ¶ 6.) Such a result would be potentially catastrophic to the value of the Debtors' servicing platform and the estates in general. (Id.) It is therefore critical that the Debtors be permitted to continue to honor their repurchase obligations to the Governmental Associations. (Id.) In the absence of any indication from the Governmental Associations that they are amenable to extra-contractual limitations being placed on those obligations, the Debtors must be allowed to honor their repurchase obligations in connection with the GA Loans without hindrance.

18.     In order to address the Committee's concerns with respect to the Non-GA Loans, the Debtors are willing to limit their request for full discretionary authority to honor

repurchase obligations to post-petition repurchase and related obligations arising in connection with their servicing activities (the "Servicing Repurchase Obligations"), and will agree not to honor any repurchase and related obligations arising in connection with their sale of Non-GA Loans or prepetition Servicing Repurchase Obligations with respect to the Non-GA Loans absent the consent of the Committee or further order of the Court.

### 3. Administrative Expense Priority For Certain Claims

19. The Debtors are unaware of any prepetition claims under the Specified Documents (as defined in the Pledge and Security Agreement dated as of April 25, 2012 by and among GMAC Mortgage, ResCap, and non-Debtor affiliates Ally Bank, AFI, GMAC Mortgage Group, LLC and AIM). However, the language in the proposed Final Origination Order will be revised to clarify that administrative expense status under section 503(b) of the Bankruptcy Code will apply only to postpetition claims under the Specified Documents.

### 4. Additional Technical Revisions

20. The Debtors have agreed to the Committee's request for reporting with respect to payments to Critical Origination Vendors on account of prepetition claims, which will be reflected in the revised Final Origination Order on terms consistent with those already in place with respect to the Debtors' payments to servicing vendors. (Objection ¶ 25).

21. The Debtors will continue to work with the Committee to address the Debtors' other requests for technical changes to the proposed Final Ally Servicing Order and Final Origination Order. (Objection ¶ 25).

## III. RESERVATION OF RIGHTS

22. As indicated, the Debtors are continuing to work with the Committee to address the Committee's remaining concerns. The Debtors are hopeful that all open issues will

ny-1045429                                          10

be resolved prior to the hearing on June 18, 2012 (the "Final Hearing"). However, the Debtors reserve their rights to supplement and amend their reply in response to any further objections that may be raised by the Committee either prior to or during the Final Hearing.

## IV. CONCLUSION

Accordingly, for the reasons set forth herein the Debtors respectfully request that the Court overrule the Objection to the extent it is not resolved prior to the Final Hearing and grant such other and further relief as it deems just and proper.

Dated: June 14, 2012
New York, New York

                */s/* Larren M. Nashelsky
                Larren M. Nashelsky
                Gary S. Lee
                Norman S. Rosenbaum
                MORRISON & FOERSTER LLP
                1290 Avenue of the Americas
                New York, New York 10104
                Telephone: (212) 468-8000
                Facsimile: (212) 468-7900

                *Proposed Counsel for the Debtors and Debtors in Possession*