MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**SUPPLEMENTAL DECLARATION OF MARC D. PUNTUS IN SUPPORT OF THE
DEBTORS' MOTIONS FOR INTERIM AND FINAL ORDERS AUTHORIZING
THE DEBTORS TO ENTER INTO THE BARCLAYS DIP FACILITY AND
THE AFI DIP FACILITY**

I, Marc D. Puntus, make this Supplemental Declaration under 28 U.S.C. § 1746 and state:

1.    I am a Partner and co-head of the Restructuring Group at Centerview Partners LLC ("Centerview"), investment banker to Residential Capital LLC ("ResCap") and the other above-captioned debtors and debtors in possession (collectively the "Debtors").[1] I submit this supplemental declaration in further support of (i) the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2),*

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below). Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis. As used herein, the term "Debtors" includes any such entities.

ny-1045354

*364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing the Debtors to (A) Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (III) Granting Related Relief* (the "Barclays DIP Motion"),[2] and (ii) the *Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 507(b) and Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate Protection and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief (Debtor in Possession Financing and Ally Financial Inc. and Junior Secured Noteholders Cash Collateral)* (the "AFI DIP Motion", and together with the Barclays DIP Motion, the "DIP Motions") filed by the Debtors on May 14, 2012 (the "Petition Date").

    2.    Except as otherwise indicated, all statements in this Supplemental Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, and my personal knowledge and experience. If I were called upon to testify, I could and would testify to each of the facts set forth below.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable DIP Motion.

**Introduction**

3.  In January 2012, the Debtors, with the assistance of their advisors, commenced a marketing process to obtain debtor-in-possession financing for these Chapter 11 cases. As part of that process, the Debtors approached several potential lenders, including Ally Financial, Inc. ("AFI"), Barclays Bank PLC ("Barclays"), other prepetition providers of debt capital to the Debtors and certain third party lenders with experience in financing mortgage origination and servicing businesses and providing debtor-in-possession financings of the magnitude required in these Chapter 11 cases (collectively, the "Potential Lenders"). After engaging in extensive discussions and negotiations with the Potential Lenders, the Debtors ultimately determined that Barclays' proposal was superior to those of the other Potential Lenders. Over the course of the following months, the Debtors, Barclays, and their respective advisors engaged in extensive diligence and negotiations regarding the terms and structure of the Barclays DIP Facility. I believe that the terms of the Barclays DIP Facility, including its structure, collateral required to be pledged, principal amount, pricing and fees, are more favorable to the Debtors than what could have been achieved with any of the other Potential Lenders. Notably, none of the Potential Lenders, including Barclays, were willing to provide financing that was not specifically tied to an asset purchase agreement or agreements that would provide for the repayment in full of such financing. Barclays' approval of the "stalking horse" agreement or agreements for the Asset Sales (defined below), and the Chapter 11 timeline for consummating such sales (or sales to higher or better bidders), was a condition precedent to the Barclays DIP Facility.

**Amendments to the DIP Facilities**

4.  Currently, both the AFI DIP Facility and the Barclays DIP Facility (collectively, the "DIP Facilities") require that the Debtors repay such facilities in full upon the

closing of any asset sale in excess of $25 million.[3] The Debtors intend to repay the DIP Facilities in full using the proceeds from the sale of the origination and servicing business (the "Platform Sale"), the sale of the HFS portfolio (the "Legacy Sale", and together with the Platform Sale, the "Asset Sales"). Together, based on current pricing the Asset Sales likely will generate sufficient proceeds (i) to pay off all of the Debtors' prepetition secured debt (other than the Junior Secured Notes) and the DIP Facilities, and (ii) that should provide between $600 - $700 million in value to unsecured creditors (not including additional value attributable to unencumbered cash and other remaining assets to be sold post-closing). The Committee has asserted that it might be preferable to stagger the sales and consummate the Legacy Sale prior to the Platform Sale. As reflected in more detail in the Declarations of my partner Sam Greene, the Debtors ran a comprehensive pre-chapter 11 marketing process and have obtained very favorable "stalking horse" bids for the Platform Sale and the Legacy Sale (aggregating approximately $3.9 billion). Both of such bids, or any higher or better bids that may be obtained through the post-petition marketing process the Debtors will run, will be consummated under section 363 of the Bankruptcy Code to the extent the Debtors' ability to confirm a plan of reorganization incorporating the Asset Sales is derailed. As a consequence, I do not believe that there is any rationale to delay or stagger the Asset Sales.

5. In its objection, the Committee asks the Court to require that the credit agreements supporting the DIP Facilities be amended to provide that the Debtors may consummate the Asset Sales separately, allowing for the pay down of only a portion of the DIP Facilities upon the first Asset Sale and requiring any remaining portion of the DIP Facilities to

---

[3] Such a condition is unlikely to occur prior to the closing of the Asset Sales as substantially all of the first lien collateral supporting the Barclays DIP Facility is subject to the asset purchase agreements.

remain outstanding pending subsequent sales.  With respect to the Barclays DIP Facility, I believe that it makes little sense for the Debtors to seek such an amendment at this time. The Barclays DIP Facility has been fully and successfully syndicated by Barclays to approximately 80 institutions (more detail below).  Inasmuch as the "stalking horse" bids and the proposed timing of the Asset Sales were critical components of the structure that such institutions signed up for, it is unclear whether, at this point in time, the Debtors would even be able to obtain the requisite consents to amend the Barclays DIP Facility to accommodate the Committee's objection.  Even assuming that such consents could be obtained, the DIP Lenders would undoubtedly charge the Debtors a sizeable amendment fee.  The Debtors believe that the current sale process will maximize value for their estates and creditors and that there is no need for the Debtors to seek to amend the Barclays DIP Facility as requested by the Committee.  If, as the sale process unfolds, the Debtors determine that it is in the best interests of their estates and creditors to remove the linkage between the sales and the repayment of the Barclays DIP Facility, to consummate one of the proposed sales in advance of the other or that some other amendment is required to maximize value, the Debtors can and will seek an amendment at that time when they are in a position to provide real time information to the DIP Lenders to support such request.

6. Further, under the Barclays DIP Facility as currently structured, the Debtors are not permitted to pay down the Term Loans unless the Revolver has been paid in full and terminated.  Consistent with the proposed timing of the Asset Sales, the Debtors structured the Barclays DIP Facility such that the proceeds of the Asset Sales would pay off each of the Revolver and Term Loans contemporaneously upon consummation of the Asset Sales.  If the Debtors were to stagger the Asset Sales as requested by the Committee, the Debtors would be

required to pay off the Revolver with the initial sale proceeds, and thereby lose access to the Revolver, which is projected to be required to fund operations in November and December 2012, creating a liquidity crisis prior to the consummation of any subsequent Asset Sale.[4]

### The DIP Lenders' Fees are Reasonable

7. As set forth in my prior Declaration, the Debtors believe that the overall structure and pricing of the Barclays DIP Facility, including the proposed fees, is reasonable. As discussed above and in my prior Declaration, the terms of the Barclays DIP Facility, as agreed upon prior to the Petition Date, were more favorable to the Debtors than what could have been achieved with any of the other Potential Lenders. Moreover, following the Petition Date, Barclays successfully syndicated the Barclays DIP Facility. In connection with such syndication, the economic terms of the facility improved and the non-economic terms remained unchanged. With respect to economics, the interest rate payable by the Debtors decreased, with the $190 million Revolver pricing at LIBOR + 3.75% (an improvement of 25 basis points), the $1.06 billion A-1 Term Loan pricing at LIBOR + 3.75% (an improvement of 25 basis points) and the $200 million A-2 Term Loan pricing at LIBOR + 5.50% (an improvement of 50 basis points).

8. The Committee in its objection unfairly criticizes one isolated economic component of Barclays DIP Facility -- the DIP Lenders' fees[5] -- while ignoring the all in yield, which incorporates fees, interest rates and OID calculated over the life of the facility. Accounting for OID, interest rate and aggregate fees under the Barclays DIP Facility, the all in

---

[4] Although the AFI DIP Facility also links the Asset Sales to each other and to payment of the AFI DIP Facility, either of the Asset Sales likely will generate sufficient proceeds of AFI LOC collateral to repay the AFI DIP Facility in full. Thus, no amendment to the AFI DIP Facility would be necessary to accommodate the Committee's concern.

[5] The assertion that the Debtors paid Barclays $52mm is inaccurate. The $52 million in fees described in the Barclays DIP Motion and the Committee's Objection includes original issue discount (OID). OID is the discount from par value at the time that a bond or other debt instrument is issued. It is the difference between the price at maturity and the issue price.

yield is 8.87%, calculated over a twelve month period. Based on such yield, the Barclays DIP Facility is more favorably priced than any other recent, similarly sized DIP facility. Specifically, prior to the Petition Date, I reviewed the DIP Facilities in *Eastman Kodak Company, et al.*, Case No. 12-10202 (MG) (Bankr. S.D.N.Y.) (the "Kodak DIP Facility") and *In re NewPage Corporation, et al.*, Case No. 11-12804 (KG) (Bankr. D. Del.) (the "NewPage DIP Facility"), two recent, large debtor-in-possession facilities. The Kodak DIP Facility is a twelve month, $950 million facility. The NewPage DIP Facility is a twelve month, $600 million facility. Based on the information gathered with respect to each of these facilities, the Kodak DIP Facility has an all in yield of 11.49%, and the NewPage DIP Facility has an all in yield of 9.22%.

9. Barclays offered the Debtors a financing facility that would permit the Debtors to operate as it sought to consummate the Asset Sales on terms more favorable than those offered by any other Potential Lenders—both in terms of fees and other non-economic terms. Barclays was the only Potential Lender willing to commit on terms that did not require priming liens or liens on the Debtors' unencumbered assets. Due to the volatility of the Debtors' financial assets, no Potential Lender, including Barclays, was willing to commit to anything other than a DIP facility that was and is a bridge to a comprehensive sale or sales of the Debtors' assets and operations. The structure and pricing of the Barclays DIP Facility led to significant interest among the lender community in participating in the Barclays DIP Facility, which resulted in the interest rate improvements noted above. In my opinion, there is no doubt that Barclays has earned its arranger fees under the Barclays DIP Facility, which fees, in and of themselves, are at a level consistent with market, particularly given the size and complexity of this facility. Indeed, such fees are the same, on a percentage basis, as the arranger fees under the Kodak DIP Facility and the NewPage DIP Facility.

10. The Debtors do not believe that any crediting of the Barclays DIP Facility fees against the amount used to pay off the GSAP Facility is appropriate as suggested by the Committee.  A portion of the Barclays DIP Facility fees were paid to Barclays prepetition to compensate Barclays for entering into the Commitment Letter, pursuant to which Barclays had committed to be the sole party responsible for funding the Debtors' proposed $1.50 billion facility (which was ultimately funded at $1.45 billion at the Debtor's request) and to leave such commitment open for a period of approximately forty-five (45) days.  The entirety of the $1.45 billion facility was and is new money financing.  Proceeds of the Barclays DIP Facility were not used to "roll up" prepetition debt in the traditional sense.  It is completely irrelevant that the Barclays DIP Facility proceeds were used to pay off the GSAP Facility, as that facility would have needed to be refinanced under any circumstances regardless of who provided the DIP facility.  As set forth in my initial Declaration, the GSAP Facility is an offshore facility that would have gone into rapid amortization absent the refinancing, and Barclays, as lender under the GSAP Facility, would have been repaid in full within several months under the terms of the GSAP Facility documents, severely constraining the Debtors' liquidity and harming their estates in the process.  The Committee and its financial advisors are well aware that lenders refinance themselves, both in and outside of chapter 11, all the time, with full, market level fees charged for the new financing.  There is no reason Barclays should provide a credit simply because they were prepetition lenders to the Debtors with a facility that would have been repaid in full in any instance notwithstanding the chapter 11 filing.  No crediting with respect to the refinancing of the GSAP Facility is appropriate under the circumstances.

11. The Committee also attempts to second guess the crediting of the fees paid to Barclays in connection with the prepetition extension of the GSAP Facility that the Debtors

were able to obtain.  The fees paid in connection with the March refinancing of the GSAP Facility were for a one year extension of such facility, pursuant to which Barclays agreed to upsize its position from $350 to up to $800 million to refinance the public lenders under such facility and provide the Debtors with necessary liquidity prior to the Petition Date.  The March refinancing was not simply a "bridge" to a chapter 11 filing as the amended GSAP Facility would have permitted the Debtors to operate for an extended period of time outside of chapter 11.  Nevertheless, recognizing the likelihood of a subsequent chapter 11 filing, the Debtors did negotiate at the time to obtain partial crediting against subsequent DIP facility fees.  Specifically, pursuant to an agreement reached with Barclays in connection with the March refinancing of the GSAP Facility, Barclays agreed to and has already credited 40% of the GSAP Facility refinancing fee towards the Barclays DIP Facility fees.  Such amount was negotiated at arm's length and the Debtors believe, in their business judgment, that such amount is fair and reasonable.

12.    Lastly, the Committee's view that the Barclays DIP Facility is an 11 month facility is not entirely inaccurate.  Clearly, the Barclays DIP Facility is a bridge to the Asset Sales.  Clearly, the Barclays DIP Facility contains a covenant that provides that the failure of the Debtors to consummate the Asset Sales by April 15, 2013 is a termination event.  Clearly, the Debtors propose to consummate the Asset Sales by year end 2012, well prior to April 15, 2013.  Nevertheless, the actual tenor of the Barclays DIP Facility is 18 months.  To the extent required, the Barclays DIP Facility can be amended to amend or remove the sale milestone covenant with a vote of 51% of the DIP Lenders, whereas a vote of 100% of the DIP Lenders would be required to amend the credit agreement to change the maturity date.

ny- 1045354                                                9

## Conclusion

13. In summary, the Debtors have been crystal clear that the Barclays DIP Facility is a bridge to a comprehensive asset sale or sales. No Potential Lender was willing to provide financing for "traditional" Chapter 11 cases that did not begin with "stalking horse" agreements. Given the volatility of the Debtors' business and financial assets, the Debtors believe the Asset Sales are entirely appropriate and will maximize value. The tenor, sale milestones, fees and pricing under the Barclays DIP Facility are at least as favorable, if not more so, when compared to cases of similar size, complexity and structure. Based on the foregoing, I believe that the Barclays DIP Facility (together with the AFI DIP Facility) addresses the Debtors' working capital and liquidity needs on the best terms available, will enable the Debtors to preserve their value as a going concern and should be approved in all respects.

Dated: June 14, 2012
       New York, New York

                                              /s/   Marc D. Puntus
                                              Marc D. Puntus