MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| In re: | ) ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) ) ) | Chapter 11 |
| Debtors. | ) ) | Jointly Administered |

---

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO
## DIP FINANCING AND CASH COLLATERAL MOTIONS

ny-1045214

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 2

REPLY ................................................................................................................................... 2

I. REPLY TO THE COMMITTEE'S OBJECTION ........................................................ 2

    A. The Proposed DIP Facilities Reflect an Appropriate Exercise of the Debtors' Business Judgment ................................................................................ 2

    B. It Is Not Practical or Necessary to Amend the DIP Facilities At This Time ......... 4

    C. The DIP Lenders' Fees Are Reasonable ............................................................... 6

    D. The Committee Has Adequate Resources and Time to Investigate the Debtors' Prepetition Transactions ......................................................................... 10

    E. Recovery on Superpriority Claims Against Unencumbered Assets ..................... 11

    F. Other Obligations .................................................................................................. 12

II. REPLY TO RMBS TRUSTEES' OBJECTION AND WELLS FARGO'S JOINDER ....................................................................................................................... 12

III. REPLY TO GREEN PLANET'S OBJECTION ............................................................ 15

IV. REPLY TO THE UNITED STATES OF AMERICA'S OBJECTION ......................... 16

CONCLUSION ....................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Global Cable, Inc., v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),
  No. 02-CIV-9770, 2006 WL 1559437 (S.D.N.Y. June 7, 2006)..............................14

In re American Home Mortgage Holdings, Inc., 402 B.R. 87 (Bankr. D. Del. 2009)....................14

In re Ames Dep't Stores, Inc.,
  115 B.R.34, 40 (Bankr. S.D.N.Y. 1990)...................................................................3

In re Barbara K. Enters., Inc.,
  Case No. 08-11474, 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008)..............................2

In re Eastman Kodak Co.,
  No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 19, 2012)...............................................7

In re Lehman Bros. Holdings Inc.,
  433 B.R. 101 (Bankr. S.D.N.Y. 2010).....................................................................14

In re NewPage Corp.,
  No. 11-12804 (KG) (Bankr. D. Del. Sept. 7, 2011)...................................................7

**STATUTES**

11 U.S.C. 506(a) .................................................................................................15

11 U.S.C. § 363(f)(4) ..........................................................................................15

11 U.S.C. § 553 ..................................................................................................14

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[1] submit this omnibus reply (the "Reply"),[2] to objections (the "Objections")[3] filed to the Barclays DIP Motion [Dkt. No. 13], the AFI DIP Motion [Dkt. No. 42], and the Citibank Cash Collateral Motion (Dkt. No. 15) (collectively, the "DIP and Cash Collateral Motions").[4] In support of the Reply, the Debtors rely upon, and incorporate by reference, (i) the affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in support of the Debtors' "first day" pleadings (the "Whitlinger Aff.") [Dkt No. 6], dated May 14, 2012 (the "Petition Date"), (ii) the declaration of Marc D. Puntus in support of the Barclays DIP Motion and the AFI DIP Motion (the "Puntus Decl.") [Dkt No. 20] filed on the Petition Date, and (iii) the supplemental declaration of Marc D. Puntus in further support of the Barclays DIP Motion and AFI DIP Motion, filed contemporaneously herewith (the "Supp. Puntus Decl."). In further support of the Reply, the Debtors, by and through their undersigned counsel, respectfully represent:

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below).
[2] Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Reply may refer to http://www.kccllc.net/rescap for additional information.
[3] The following objections have been filed: (1) Omnibus Objection of the Committee to the DIP and Cash Collateral Motions [Dkt No. 301] (the "Comm. Obj."); (2) Limited Objection of the RMBS Trustees [Dkt. No. 288]; (3) Joinder of Wells Fargo Bank to RMBS Trustee's Objection [Dkt. No. 292]; (4) Limited Objection of the United States of America to the Barclays DIP Motion [Dkt. No. 299]; (5) Limited Objection of the United States of America to the AFI DIP Motion [Dkt No. 294]; (6) Second Amended Nora Objection [Dkt No. 227] (the "Nora Objection"); and (7) Omnibus Objection of Green Planet Servicing, LLC [Dkt No. 293]. The Debtors have separately responded to the Nora Objection. See *Debtors' Omnibus Reply to Objections to Entry of Final Orders for Specific "First Day" Motions and Related* [Dkt. No. 254].
[4] Terms not otherwise defined herein shall have the meanings ascribed to them in the Whitlinger Aff. or the respective motion.

ny-1045214

**INTRODUCTION**

Since the first day hearings on the Debtors' requests for relief held on May 14 and May 15, 2012, the Debtors and their advisors have worked closely with their major stakeholders, particularly with the Official Committee of Unsecured Creditors (the "Committee"), in an effort to help those parties better understand the Debtors' financing needs. Notwithstanding these efforts, certain issues could not be resolved in advance of the objection deadline, and several parties filed objections to the DIP and Cash Collateral Motions. Certain of the issues raised by the objecting parties have already been resolved.[5] The matters in dispute appear limited, and the Debtors will continue to engage in good faith negotiations with the objecting parties; however, the Debtors respectfully submit that in the absence of consensual resolution on all points, the relief requested by the Debtors is appropriate and should be granted.

**REPLY**

**I.    REPLY TO THE COMMITTEE'S OBJECTION**

    **A.    The Proposed DIP Facilities Reflect an Appropriate Exercise of the Debtors' Business Judgment**

1. The DIP Facilities reflect an appropriate exercise of the Debtors' business judgment. Bankruptcy courts routinely defer to a debtor's business judgment in considering whether to approve the debtor's request to obtain postpetition financing. See e.g., In re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one

---

[5] The Debtors expect to file proposed final orders reflecting these revisions prior to the hearing. The Debtors understand that the Committee may no longer pursue its objections to the Citibank Cash Collateral Motion, based on changes recently agreed to between Citibank and the Committee with respect to the revised order.

party in interest."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (The court should defer to debtor's "reasonable business judgment . . . so long as the financing agreement does not . . . leverage the bankruptcy process . . ." and its purpose is to benefit the estate rather than another party-in-interest.).

2. In January 2012, the Debtors, with the assistance of their advisors, commenced a marketing process to obtain debtor-in-possession financing for these Chapter 11 cases. As part of that process, the Debtors approached several potential lenders, including AFI, Barclays, other prepetition providers of debt capital to the Debtors and certain third party lenders with experience in financing mortgage origination and servicing businesses and providing debtor in possession financings of the magnitude required in these Chapter 11 cases (collectively, the "Potential Lenders"). See Supp. Puntus Decl. ¶ 3. After engaging in extensive discussions and negotiations with the Potential Lenders, the Debtors ultimately determined that Barclays' proposal was superior to those of the other Potential Lenders. See Supp. Puntus Decl. ¶ 3. Over the course of the following months, the Debtors, Barclays, and their respective advisors engaged in extensive diligence and negotiations regarding the terms and structure of the Barclays DIP Facility. See Supp. Puntus Decl. ¶ 3. The Debtors determined that the terms of the Barclays DIP Facility, including its structure, collateral required to be pledged, principal amount, pricing and fees, are more favorable to the Debtors than what could have been achieved with any of the other Potential Lenders. See Supp. Puntus Decl. ¶ 3. Thus, the Debtors submit that entry of orders granting the motions is in their sound business judgment.

3

ny-1045214

**B.      It Is Not Practical or Necessary to Amend the DIP Facilities At This Time**

3.      Currently, both of the AFI and Barclays DIP Facilities (collectively, the "DIP Facilities") require that the Debtors repay such facilities in full upon the closing of any asset sale in excess of $25 million.[6] The Debtors intend to repay the DIP Facilities in full using the proceeds from the sale of the origination and servicing business (the "Platform Sale") and the sale of the HFS portfolio (the "Legacy Sale", and together with the Platform Sale, the "Asset Sales"). The Committee has asserted that it might be preferable to stagger the sales and consummate the Legacy Sale prior to the Platform Sale (or vice versa). See Comm. Obj. ¶ 29. The Debtors ran a comprehensive pre-chapter 11 marketing process and have obtained favorable stalking horse bids for the Asset Sales. Both of such bids, or any higher and better bids that may be obtained through the postpetition marketing process run by Debtors, will be consummated under section 363 of the Bankruptcy Code to the extent the Debtors' ability to confirm a plan of reorganization incorporating the Asset Sales is derailed**.** Therefore, there is no reason to stagger the Asset Sales. See Supp Puntus Decl. ¶ 4.

4.      The Committee has objected to the DIP Facilities on the grounds that the Court should require that the credit agreements supporting the DIP Facilities be amended to provide that the Debtors may consummate the Asset Sales separately, and pay down a portion of the DIP Facilities upon the first Asset Sale while any remaining portion of the DIP Facilities remains outstanding pending subsequent sales. See Comm. Obj. ¶ 29. With respect to the Barclays DIP Facility, it makes little sense for the Debtors to seek such an amendment at this

---

[6]   A substantial portion of the assets that are collateral of the DIP Facilities are being sold though the Asset Sales. Thus, there is little likelihood that the Debtors' would consummate a sale in excess of $25 million outside of the Asset Sales.

time. The Barclays DIP Facility has been fully and successfully syndicated by Barclays to approximately 80 institutions. See Supp. Puntus Decl. ¶5. The stalking horse bids and the proposed timing of the Asset Sales were critical components of the structure of the Barclays DIP Facility and it is unclear whether the Debtors would even be able to obtain the requisite consents to amend the Barclays DIP Facility. See Supp. Puntus Decl. ¶ 5. Even if such consents could be obtained, the DIP Lenders would undoubtedly charge the Debtors a sizeable amendment fee. See Supp. Puntus Decl. ¶5. The Debtors believe that the current sale process will maximize value for their estates and creditors and that there is no need for the Debtors to seek to amend the Barclays DIP Facility as requested by the Committee. If, as the sale process unfolds, the Debtors determine that it is in the best interests of their estates and creditors to remove the linkage between the sales and the repayment of the Barclays DIP Facility, to consummate one of the proposed sales in advance of the other or that some other amendment is required to maximize value, the Debtors can and will seek an amendment at that time when they are in a position to provide real time information to the DIP Lenders to support such request.

5.          Further, under the Barclays DIP Facility, as currently structured, the Debtors are not permitted to pay down the Term Loans unless the Revolver has been paid in full and terminated. Consistent with the proposed timing of the Asset sales, the Debtors structured the Barclays DIP Facility such that the proceeds of the Asset Sales would pay off each of the Revolver and Term Loans contemporaneously upon consummation of the Asset Sales. In the event that the Asset Sales are staggered as requested by the Committee, the Debtors would be required to pay off the Revolver with the initial sale proceeds, and thereby lose access to the Revolver, which is projected to be required to fund operations in November and December 2012

creating a liquidity crisis prior to the consummation of any subsequent Asset Sale[7].  See Supp. Puntus Decl. ¶ 6.

### C.  The DIP Lenders' Fees Are Reasonable

6.  The Debtors believe that the overall structure and pricing of the Barclays DIP Facility, including the proposed fees, are reasonable.  See Puntus Decl. ¶ 17.  As discussed above and in the Puntus Decl, the terms of the Barclays DIP Facility, as agreed upon prior to the Petition Date, were more favorable to the Debtors than what could have been achieved with any of the other Potential Lenders.  See Puntus Decl. ¶ 17.  Moreover, following the Petition Date, Barclays successfully syndicated the Barclays DIP Facility.  In connection with such syndication, the economic terms of the facility improved and the non-economic terms remained unchanged.  The interest rate payable by the Debtors decreased, with the $190 million Revolver pricing at LIBOR + 3.75% (an improvement of 25 basis points), the $1.06 billion A-1 Term Loan pricing at LIBOR + 3.75% (an improvement of 25 basis points and the $200 million A-2 Term Loan pricing at LIBOR + 5.50% (an improvement of 50 basis points).

7.  The Committee has not presented any evidence that the proposed fees are unreasonably high.  The Committee unfairly criticizes one isolated economic component of the Barclays DIP Facility -- the DIP Lenders' fees,[8] while ignoring the "all in yield," which incorporates fees, interest rates, and OID calculated over the life of the facility.  Accounting for

---

[7]  Although the AFI DIP Facility also links the Asset Sales to each other and to payment of the AFI DIP Facility, either of the Asset Sales likely will generate sufficient proceeds of AFI LOC collateral to repay the AFI DIP Facility in full.  Thus, no amendment to the AFI DIP Facility would be necessary to accommodate the Committee's concern.  See Suppl. Puntus Decl. ¶ 6, fn 3.

[8]  The $52 million in fees described in the Barclays DIP Motion and the Committee's Objection includes original issue discount (OID), which is a part of the yield on which an investor makes an investment decision.  OID is the discount from par value at the time that a bond or other debt instrument is issued.  It is the difference between the price at maturity and the issue price.

6

ny-1045214

OID, interest rate, and aggregate fees under the Barclays DIP Facility, the all in yield is 8.87% calculated over a twelve month period.  See Supp. Puntus Decl. ¶ 8.  Based on such yield, the Barclays DIP Facility is more favorably priced than any other similarly sized DIP facility.  See Supp. Puntus Decl. ¶ 8.  Specifically, the DIP Facilities in In re Eastman Kodak Co., No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 19, 2012) (the "Kodak DIP Facility") and *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Sept. 7, 2011) (the "NewPage DIP Facility"), two recent, large debtor-in-possession facilities, contained "all in yields" that were higher than that proposed in these cases.  The Kodak DIP Facility is a twelve month, $950 million facility, and the NewPage DIP Facility is a twelve month $600 million facility.  Based on the information gathered by the Debtors' advisors with respect to each of these facilities, the Kodak DIP Facility has an all in yield of 11.49%, and the NewPage DIP Facility has an all in yield of 9.22%.[9]

8.      Barclays offered the Debtors a financing facility that would permit the Debtors to operate while the Asset Sales are pending on terms more favorable than those offered by any other Potential Lenders—both in terms of fees and other non-economic terms.  Barclays was the only Potential Lender willing to commit on terms that did not require priming liens or liens on the Debtors' unencumbered assets.  See Supp. Puntus Decl. ¶ 10.  Due to the volatility of the Debtors' financial assets, no Potential Lender, including Barclays, was willing to commit to anything other than a DIP Facility that was and is a bridge to a comprehensive sale or sales of the Debtors' assets and operations.  See Supp. Puntus Decl. ¶ 10.  The structure and pricing of the Barclays DIP Facility led to significant interest among the lender community in participating in the Barclays DIP Facility, which resulted in the interest rate improvements noted above.

---

[9]   These all in yield calculations for the Barclays DIP Facility and the DIP facilities in the Kodak and New Page cases were calculated on a 12-month basis.

7

Barclays has earned its arranger fees under the Barclays DIP Facility—which fees are at a level consistent with market, particularly given the size and complexity of the facility.  See Supp. Puntus Decl. ¶ 10.

9. The Debtors also do not believe that any crediting of the Barclays DIP Facility fees against the amount used to pay off the GSAP Facility is appropriate as suggested by the Committee.  See Comm. Obj. ¶ 44 & 45.  A portion of the Barclays DIP Facility fees were paid to Barclays prepetition in part to compensate Barclays for entering into the Commitment Letter, pursuant to which Barclays had committed to be the sole party responsible for funding the Debtors' proposed $1.45 billion facility and to leave such commitment open for a period of approximately forty-five (45) days.  The entirety of the $1.45 billion commitment and facility was and is new money financing.  Proceeds of the Barclays DIP Facility were not used to "roll up" prepetition debt in the traditional sense.  See Supp. Puntus Decl. ¶ 11.  It is irrelevant that the Barclays DIP Facility proceeds were used to pay off the GSAP Facility as that facility would have needed to be refinanced under any circumstances regardless of who provided the DIP Facility.  Specifically, as set forth in the Puntus Declaration, the GSAP Facility is an offshore facility that would have gone into rapid amortization absent the refinancing, and Barclays, as lender under the GSAP Facility, would have been repaid in full the ordinary course within several months under the terms of the GSAP Facility documents, severely constraining the Debtors' liquidity and harming their estates in the process.  See Puntus Decl. ¶ 15.  The Committee and its financial advisors have not set forth any reason why Barclays should provide a credit simply because they were prepetition lenders to the Debtors with a facility that would have been repaid in full in any instance notwithstanding the filing of these Chapter 11 cases.  No

8

ny-1045214

crediting with respect to the refinancing of the GSAP Facility is appropriate under the circumstances.

10.     The Committee also attempts to second guess the crediting of the fees paid to Barclays in connection with the prepetition extension of the GSAP Facility that the Debtos were able to obtain.  See Comm. Obj. ¶ 45.  The fees paid in connection with the March refinancing of the GSAP Facility were for a one year extension of such facility, pursuant to which Barclays agreed to upsize its position from $350 to up to $800 million to refinance the public lenders under such facility and provide the Debtors with necessary liquidity prior to the Petition Date.  See Supp. Puntus Decl. ¶ 12.  The March refinancing was not simply a "bridge" to the chapter 11 filing because as amended the GSAP Facility would have permitted the Debtors to operate for an extended period of time outside of chapter 11.  See Supp. Puntus Decl. ¶ 12.  Nevertheless, recognizing the likelihood of a subsequent chapter 11 filing, the Debtors did negotiate at the time to obtain partial crediting against subsequent DIP facility fees.  See Supp. Puntus Decl. ¶ 12.  Specifically, pursuant to an agreement reached with Barclays in connection with the March refinancing of the GSAP Facility, Barclays agreed to and has already credited 40% of the GSAP Facility refinancing fee towards the Barclays DIP Facility fees.  Such amount was negotiated at arms length, and the Debtors believe, in their business judgment, that such amount is fair and reasonable.  See Supp. Puntus Decl. ¶ 12.

11.     Finally, the Committee's view that the Barclays DIP Facility is an 11 month facility is not entirely inaccurate.  See Comm. Obj. ¶ 46.  The Barclays DIP Facility is a bridge to the Asset Sales.  The Barclays DIP facility contains a covenant that provides that the failure of the Debtors to consummate the Asset Sales by April 15, 2013 is a termination event. The Debtors propose to consummate the Asset Sales by year end 2012, well prior to April 15,

9

2013. Nevertheless, the actual tenor of the Barclays DIP Facility is 18 months. To the extent required, the Barclays DIP Facility can be amended to amend or remove the sale milestone covenant with a vote of 51% of the DIP Lenders, whereas a vote of 100% of the DIP Lenders would be required to amend the credit agreement to change the maturity date. See Supp. Puntus Decl. ¶ 13.

### D. The Committee Has Adequate Resources and Time to Investigate the Debtors' Prepetition Transactions|Outline2_L2|ZZMPTAG|

12. The Committee argues that the DIP Facilities restrict the Committee's ability to conduct a full investigation of the prepetition lenders' claims. See Comm. Obj. ¶ 9. The Debtors understand that the Committee and applicable lenders have discussed increasing the time and funds available for the Committee to complete its investigation as part of an overall settlement. To the extent such issues are not resolved consensually, the Debtors believe that the orders as currently drafted provide the Committee with adequate time and resources to complete its investigation. Specifically, it is important to note that the investigation period does not apply to any investigation of AFI. The Committee will have until confirmation of a plan to assert any claims against AFI.

13. The Committee also misses the mark in arguing that it needs more funds to conduct an investigation. Specifically, the Committee contends that its fees and expenses for conducting the investigation are capped at $100,000 under the Barclays DIP Order and at $100,000 under the AFI DIP Order, and that such amounts are insufficient to cover the Committee's costs in investigating each of the prepetition lenders, including AFI, and the related transactions. See Comm. Obj. ¶ 36. But in making this argument, the Committee misconstrues the effect of those caps. When those caps are properly understood, the Debtors submit that the Debtors believe the Committee has adequate resources to complete its investigation. In fact,

10

ny-1045214

there is effectively no budget on the Committee whatsoever in light of the fact that there is $250 million of unencumbered cash (plus significant other unencumbered assets) that can be used without restriction for the Committee's investigation. To the extent the Committee is concerned that the lenders' superpriority claims could have senior rights to such cash in the event of a meltdown, the Committee is protected because their fees and expenses will be paid on a monthly basis in accordance with the terms of an interim compensation procedures order, for which the Debtors intend to seek court approval shortly. Thus, the Committee will bear little risk, if any, that there will be "limited unencumbered assets at the end of the chapter 11 cases to satisfy their fees." See Comm. Obj. ¶ 10. Further, the $100,000 budget per facility should be more than sufficient to cover any accrued and unpaid fees and expenses in the unlikely event that the Debtors' significant unencumbered assets are depleted by the lenders' superpriority claims.

### E.    Recovery on Superpriority Claims Against Unencumbered Assets

14.    The Committee objects to the superpriority claims granted to the DIP Lenders and the prepetition lenders to the extent such claims may be recovered against unencumbered assets and the proceeds of avoidance actions prior to exhaustion of the lenders' collateral See Comm. Obj. ¶ 11. The Debtors understand that the Committee and the applicable lenders have had discussions on language that would resolve this concern as part of an overall settlement.[10]

---

[10]    The Committee bases its argument that changes along these lines are appropriate, in part, based on the misconception that "substantially all of the Debtors' assets are being sold to benefit their secured creditors". See Comm. Obj. ¶ 42. The Committee's assumption, however, is not accurate. Together, based on current pricing, the Asset Sales likely will generate sufficient proceeds (i) to pay off all of the Debtors' prepetition secured debt (other than the Junior Secured Notes) and the DIP Facilities, and (ii) should provide between $600 - $700 million in value to unsecured creditors (not including additional value attributable to unencumbered cash and other remaining assets to be sold post-closing). See Supp. Puntus Decl. ¶4.

11

ny-1045214

    **F.**    **Other Obligations**

15.    The Committee argues that the Debtors are prematurely locked into the Settlement and Plan Sponsor Agreement entered into between Ally Financial, Inc. ("AFI") and the Debtors prior to the Petition Date (the "Ally PSA") before the Ally PSA is properly before the Court. The Debtors believe that their obligations under the Ally PSA are limited and pose little risk to the Debtors continued use of cash collateral and the AFI DIP. See Comm. Obj. ¶ 8. Nonetheless, it is the Debtors' understanding that AFI and the Committee have come to an agreement on this issue. Should an agreement not be reached, the Debtors will address this issue at the hearing scheduled for June 18, 2012.

16.    The Committee also objects to the DIP and Cash Collateral Motions on various other grounds. See Comm. Obj. ¶ 48. The Debtors expect all of those issues to be resolved. To the extent they are not resolved, they will be addressed at the hearing scheduled for June 18, 2012.

**II.**    **REPLY TO RMBS TRUSTEES' OBJECTION AND WELLS FARGO'S JOINDER**

17.    Certain RMBS Trustees have objected (the "Objecting RMBS Trustees") on the basis that the Debtors cannot unilaterally terminate their setoff and recoupment rights and have requested adequate protection against the diminution in value of such rights. Specifically, the RMBS Trustees have argued that the Debtors should not be permitted to consummate the Purchase Transactions under the Barclays DIP Motion free and clear of all liens, claims and encumbrances.

18.    The DIP and cash collateral orders do not impact any alleged setoff and recoupment rights held by the RMBS Trustees. With respect to the Barclays DIP Motion, the

Debtors have proposed to address the RMBS Trustees' concerns by adding the following language to the Barclays DIP Order:

> Nothing herein effects the rights of setoff or recoupment, if any, that any Objecting MBS Trustee may have had under applicable law with respect to Receivables generated prior to the Petition Date. With respect to Receivables generated by GMACM and RFC as of and following the Petition Date, which are being sold to the DIP Borrowers "free and clear" pursuant to the terms of this Order (and the Interim Order), any setoff or recoupment rights that the Objecting MBS Trustees may have had under applicable law shall attach to the proceeds of such sale received by GMACM or RFC, as applicable. All rights of the Debtors, the Administrative Agent, and the DIP Lenders to contest any such setoff or recoupment claims are fully preserved.

19. For the avoidance of doubt, the Debtors are not seeking a "free and clear" finding with respect to the sale of the Initial Receivables whereby the assets are sold by the GSAP Transferor, a non-debtor entity. Instead, the Debtors are seeking a "free and clear" finding only with respect to the sale of the Additional Receivables, from Debtor entities GMAC Mortgage and RFC to Debtor entities GMACM Borrower and RFC Borrower following the Petition Date.[11] The language above makes clear that to the extent the RMBS Trustees hold valid claims, their claims attach to the proceeds of the sales, and the RMBS Trustees will continue to hold claims against GMAC Mortgage and RFC. Thus, any alleged interest the RMBS Trustees have in such assets is protected.

20. The RMBS Trustees have also asserted that the Debtors are not entitled to a free and clear sale because they do not meet the section 363(f) requirements. For the avoidance of doubt, the Debtors dispute that the RMBS Trustees have any valid setoff or recoupment rights

---

[11] The Debtors are also seeking a free and clear finding with respect to the sale of the mortgage loans that were previously the subject of the prepetition Ally Repo Facility and are being sold by GMACM and RFC to the DIP Borrowers pursuant to the Purchase Transactions under the Barclays DIP Facility. No party has challenged such free and clear sale.

13

against the assets—most notably because unmatured, contingent litigation claims cannot, as a matter of law, form the basis of setoff or recoupment as against a servicer advance receivable. see Global Cable, Inc., v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), No. 02-CIV-9770, 2006 WL 1559437, at *2 (S.D.N.Y. June 7, 2006) (affirming a bankruptcy court order determining that a creditor lacked "a valid right of setoff under 11 U.S.C. § 553 or a common-law right of recoupment as its claim against [Adelphia] is disputed and not a liability that is 'absolutely owed.'") Furthermore, the doctrine of recoupment does not apply on these facts; recoupment is a narrow transaction-based concept, and the transaction(s) giving rise to the RMBS Trustees' alleged unmatured, contingent litigation claims (e.g., breach of representation and warranty by the trust depositor) are distinct and severable from the hundreds of thousands of transaction(s) giving rise to servicing advances on a particular loan and the related reimbursement rights comprising the DIP Collateral. See e.g. In re American Home Mortgage Holdings, Inc., 402 B.R. 87 (Bankr. D. Del. 2009) (approving the sale of a debtor's servicing rights as separate from its repurchasing obligations).

21.     Finally, Section 553 of the Bankruptcy Code requires that debts to be offset must be mutual, prepetition debts. *See* 11 U.S.C. § 553; In re Lehman Bros. Holdings Inc., 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010) (To be eligible for setoff under Section 553, "(1) the amount owed by the debtor must be a prepetition debt; (2) the debtor's claim against the creditor must also be prepetition; and (3) the debtor's claim against the creditor and the debt owed the creditor must be mutual.") (citations omitted). There is no mutuality with respect to the proposed "free and clear" transaction because RMBS Trustees hold at most prepetition, contingent claims and the Advances being sold to the DIP Borrowers free and clear only involve postpetition receivables, which would thus not be subject to setoff under Section 553 of the

14

Bankruptcy Code.[12] Accordingly, a free and clear sale with respect to Additional Receivables is appropriate pursuant to section 363(f)(4). 11 U.S.C. § 363(f)(4) ("such interest is in bona fide dispute").[13]

22. However, whether or not the RMBS Trustees have valid setoff or recoupment rights need not be addressed at this time because any valid setoff and recoupment rights attach to the proceeds of the sale received by the GSAP Borrower, thereby protecting the RMBS Trustees with respect to the proposed "free and clear" sales. [14]|

## III. REPLY TO GREEN PLANET'S OBJECTION|OUTLINE2_L1|ZZMPTAG|

23. Green Planet objects to the DIP and Cash Collateral Motions to the extent that the Debtors seek to use the Green Planet Servicing Funds (as defined in the Green Planet

---

[12] Likewise, language proposed by AFI in paragraph 30 of the AFI DIP Facility and Cash Collateral Interim Order, stating that "the parties on whose behalf the Borrowers are making servicer advances hereby waive any and all rights of setoff or recoupment against the Debtors and AFI to the extent such advances are directly funded by Cash Collateral" is appropriate because it merely provides that the Trustees should not be permitted to exercise setoff rights with respect to their contingent disputed prepetition claims against postpetition advances funded with cash collateral, which such advances are being funded for the benefit of the Trustees and their constituents.

[13] The Debtors have numerous other factual arguments as to why no valid setoff or recoupment rights exist, and they will assert such arguments at the appropriate time, including that (i) a substantial portion of the PSA's have an express waiver of setoff. See PSA Exemplar 1 (the "PSA") annexed as Exhibit A-1 to the *Affidavit of James L. Garrity Junior in Support of the Limited Objections of Certain Trustees for Residential Mortgage Backed Securities Trusts to the Debtors' Sale Motion and Postpetition Financing Motions* [Dkt. No. 300] §3.22(h) and (ii) all of the PSAs provide that the Servicing Advance Receivables are not actually obligations of the trust because reimbursements are limited to collections, which come directly to the Debtors from the borrowers. See the PSA, § 3.10(a).

[14] The Trustees also request adequate protection with respect to the Debtors' reimbursement of Advance receivables post-petition. Initially, it does not appear that this request in any way relates to the relief requested in any of the DIP and Cash Collateral Motions, and that the Trustees should be required to file a separate motion so that the issues can be properly briefed for the Court. However, to the extent the Court is inclined to reach the issue, the Debtors submit that no adequate protection is necessary because, as set forth above, the Trustees do not have current valid setoff or recoupment rights because all of their claims against the Debtors remain contingent. As a result, pursuant to Section 506(a), the Trustees are not recognized as a secured creditor because such section requires that the creditor have "an allowed claim" in order for such claim to be recognized as a secured claim. See 11 U.S.C. 506(a). Further, even if adequate protection were required, the Trustees are adequately protected by the fact that substantially all of the proceeds of pre-petition advances received by the Debtors are being used to make new Advances, which are paid to the Trustees for the benefit of their constituents.

Objection) or pledge such funds as collateral under the DIP Facilities. The Green Planet Servicing Funds are not collateral for any of the DIP Facilities or any prepetition facility, and the Debtors intend to use such funds only in accordance with the Green Planet Servicing Agreement (as defined in the Green Planet Objection).

**IV.    REPLY TO THE UNITED STATES OF AMERICA'S OBJECTION**

24.    The United States of America (the "United States") objects to the Barclays and AFI motions (the "U.S. Obj."). The Debtors understand that Barclays and AFI have substantially agreed to the CERCLA - related language proposed by the United States. With respect to the setoff language requested by the United States, AFI addresses their view in their response to the U.S. Obj. [Docket No. 356]. With respect to the Barclays DIP Facility, the Interim Order contains language generally consistent with the United States' proposed setoff language, but limited to only the Junior Lien Collateral. This limitation is appropriate because Primary Collateral under the Barclays DIP Facility includes only advances funded under private label (i.e. non-governmental) securitizations and mortgage loans, neither of which the United States has any interest in.

## CONCLUSION

Accordingly, for the reasons set forth herein the Debtors respectfully request that the Court overrule the Objections and grant such other and further relief as it deems just and proper.

Dated: June 14, 2012
New York, New York

*/s/* Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and Debtors in Possession*