MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

- and -

MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue
Washington, DC  20006
Telephone:    (202) 887-1500
Facsimile:    (202) 887-0763
Alexandra Steinberg Barrage

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------
|                                        |    |                          |
| In re:                                 | )  | Case No. 12-12020 (MG)   |
|                                        | )  |                          |
| RESIDENTIAL CAPITAL, LLC, et al.,      | )  | Chapter 11               |
|                                        | )  |                          |
|                        Debtors.        | )  | Jointly Administered     |
-------------------------------------------------------------------

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO
SALE PROCEDURES ORDER**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 2

OVERVIEW OF OBJECTIONS ............................................................................................. 6

I.      THE SALE PROCEDURES WILL NOT CHILL BIDDING ......................................... 6

II.     THE SALE PROCEDURES PROVIDE BIDDERS AND GOVERNMENT
        ASSOCIATIONS WITH A SUFFICIENT DUE DILIGENCE AND VETTING
        PERIOD ...................................................................................................................... 9

III.    NATIONSTAR AND AFI SHOULD REMAIN IN PLACE AS STALKING
        HORSE BIDDERS ..................................................................................................... 11

IV.     ISSUES RELATING TO SEVERABILITY OF ASSUMED CONTRACTS ARE
        NOT RIPE FOR THIS COURT'S DETERMINATION ................................................. 12

V.      THE GIAMPORCARO DECLARATION ADEQUATELY SUPPORTS WHY
        NO PRIVACY OMBUDSMAN IS REQUIRED AND HOW THE SALE OF
        THE SERVICING PLATFORM IS CONSISTENT WITH THE DEBTORS'
        PRIVACY POLICIES; DEBTORS WILL RECOGNIZE THE REQUIREMENTS
        OF SECTION 363(O) ................................................................................................. 14

VI.     THE DEBTORS PROPOSE A COMPROMISE IN RESPECT OF THEIR
        REQUEST TO ELIMINATE CREDIT BIDDING RIGHTS FOR THE SALE OF
        THE SERVICING PLATFORM ................................................................................... 16

CONCLUSION ..................................................................................................................... 19

ny-1044988

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg.
Holdings, Inc.),
402 B.R. 87 (Bankr. D. Del. 2009) ........................................................................13

In re Metaldyne Corp.,
409 B.R. 662 (Bankr. S.D.N.Y. 2009) ....................................................................8

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated
Res., Inc.),
147 B.R. 650 (S.D.N.Y. 1992) .................................................................................7

### STATUTES

11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123 ....................................................1

Bankruptcy Code section 363(b)(1) ..............................................................................15

Bankruptcy Code section 363(o) ...................................................................14, 15, 16

Bankruptcy Code section 365(f)(2)(B) ..........................................................................12

### OTHER AUTHORITIES

12 CFR pt 1016, App., § C.2(d)(1) ..............................................................................14

Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 .............................................................1

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[1] submit this omnibus reply (the "Reply)[2] to objections and responses filed (collectively, the "Objections")[3] in connection with the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Dkt. No. 61] (the "Sale Motion").  The Reply relates only to this Court's consideration of the Sale Procedures Relief, as defined in the Sale Motion.[4]

In support of the Reply, the Debtors rely on, and incorporate by reference, (i) the affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in support of the Debtors' "first day" pleadings (the "Whitlinger Affidavit") [Dkt No. 6], dated May 14, 2012 (the

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below).

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Reply may refer to http://www.kccllc.net/rescap for additional information.

[3]    Attached hereto as Exhibit 1 is an objection chart that lists all the formal and informal objections received to the Sale Motion, the basis for such objections, and the status of the objections (the "Objection Chart").  The current form of order reflecting changes the Debtors agreed to in order to resolve parties' objections is attached as Exhibit A to the Objection Chart (the "Order").  A blackline version of the current order against the form of order filed with the Sale Motion is attached as Exhibit B to the Objection Chart.

"Petition Date"); (ii) the Declaration of Samuel M. Greene in Support of the Proposed Sale of Debtors' Assets [Dkt. No. 63], dated May 14, 2012; (iii) the Amended Declaration of Peter Giamporcaro in Support of the Sale of the Nationstar Purchased Assets Without a Privacy Ombudsman (the "Giamporcaro Declaration") [Dkt. No. 189], dated June 1, 2012; and (iv) the Supplemental Declaration of Samuel M. Greene in Further Support of the Proposed Sale of Debtors' Assets (the "Supp. Greene Declaration). In further support of the Reply, the Debtors, by and through their undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.      The Debtors commenced these Chapter 11 Cases to consummate the Sales and formulate a Plan that maximizes value to the Debtors' estates. The Debtors remain committed to accomplishing these objectives and avoiding any material disruption to the servicing of millions of residential mortgages. To that end, the Debtors seek approval of sale procedures that are fair, transparent, and that further a robust sale process resulting in the highest price or greatest overall benefit for the Debtors' estates.

2.      Prior to the Petition Date, the Debtors, with Centerview Partners LLC ("Centerview"), launched a targeted prepetition marketing process to determine the highest and best stalking horse bid for the Purchased Assets. This process was carefully crafted to maximize value to the Debtors' estates by providing the Debtors with a reasonable amount of time to assess the stalking horse bidder's understanding of the complexity of the Debtors' businesses and likely issues in selling the Purchased Assets through a bankruptcy process. The Debtors also

---

*(cont'd from previous page)*

[4]     Any capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

2

accompanied Nationstar to Washington D.C. to meet with Fannie Mae, Freddie Mac, and Ginnie Mae — the governmental associations (the "GAs") that own, insure, or guarantee approximately 68% of the mortgage loans serviced by the Debtors. The Debtors sought to ensure that those entities understood the bankruptcy sale process and were supportive of Nationstar potentially becoming the owner of the Purchased Assets.

3.    **Prepetition Outreach to Berkshire Hathaway.** As part of the process to obtain the highest and best stalking horse bid, on or about January 23, 2012, Samuel M. Greene, Partner and co-head of the restructuring group of Centerview, contacted Berkshire Hathaway Inc. ("Berkshire") — the same entity that now seeks to propose a stalking horse bid and appoint an examiner in these Chapter 11 Cases — inviting Berkshire to participate in the sale process and potentially be a stalking horse bidder in a Section 363 sale of ResCap's Servicing Platform. (Supp. Greene Decl. ¶ 22) Despite the invitation, Berkshire chose not to participate in any prepetition stalking horse bidding process. (Supp. Greene Decl. ¶ 22) At no time in the next three months did Berkshire ever contact the Debtors or their advisors requesting to be involved in the bidding process.

4.    In mid-April 2012, Berkshire met with AFI CEO Michael Carpenter. (See Ex. 5) Following that meeting, R. Ted Weschler of Berkshire indicated in a letter dated May 3, 2012 that "neither ResCap entering into bankruptcy nor a sale of ResCap's mortgage production platform is in the best interests of Ally, the US Treasury, Berkshire and other significant stakeholders in both Ally and ResCap." Id. In this letter, Berkshire submitted an alternative transaction proposing, among other things, that Berkshire (or its affiliate) acquire 100% of the equity interests of ResCap from Ally for $1. Id.

3

5.      At no time during these discussions did Berkshire approach the Debtors or indicate to the Debtors any interest in the stalking horse process.  Even after the Debtors filed for bankruptcy, Berkshire never approached the Debtors asking to be part of the bidding process.  Then, again without approaching the Debtors, Berkshire filed its motion to appoint an examiner.  Not even in advance of filing an objection to the Sale Procedures and making a bid on the Purchased Assets did Berkshire have even one conversation with the Debtors or Centerview.  (Supp. Greene Decl. ¶ 23)  Berkshire's actions are atypical of parties interested in becoming a stalking horse.

6.      **Prepetition Discussions with Nationstar.**  On or about February 13, 2012, Centerview received three preliminary indications of interest on the stalking horse bid, including one from Nationstar.  (Greene Decl. ¶ 23)  On February 17, 2012, after careful evaluation of the assets contemplated to be purchased under each of these three bids, the Debtors narrowed the field to two bidders. (Greene Decl. ¶ 26)  After obtaining further information from both parties, including on key licensing issues, the Debtors and their professionals compared the bids and determined, in their business judgment, to negotiate exclusively with Nationstar.  (Greene Decl. ¶ 27)  Over the following three months prior to the Petition Date, the Debtors and Centerview facilitated Nationstar's extensive due diligence and discussions with the GA's (Greene Decl. ¶¶ 29, 36), ultimately culminating in the execution of the Nationstar APA.

7.      Entering into the stalking horse agreement with Nationstar was a reasonable exercise of the Debtors' business judgment, consistent with its fiduciary obligations to creditors, and consistent with the overall objective of maximizing value.  Throughout the prepetition marketing process, Nationstar gained the confidence of the Debtors and their professionals that they had a very strong likelihood of consummating the purchase of the Servicing Platform and

4

providing the greatest overall benefit to the Debtors' estates. Nationstar has expended considerable resources throughout this process and comes before this Court with a clear agenda. (Supp. Greene Decl. ¶ 15)

8.      Nevertheless, as of the filing of this Reply, and in connection with the Objections, discussions remain ongoing with Nationstar regarding the bid protections negotiated with the Debtors. Even in light of these discussions, the Debtors believe that Nationstar's offer will likely remain the highest and best offer for the Debtors' Servicing Platform. Nationstar's recent track record as a strategic purchaser of mortgage assets, its possession of substantially all the mortgage operations licenses necessary to run the Servicing Platform, its strong relationships with the GA's, and its working knowledge of the Debtors' operations and management all remain critical considerations for the Debtors as they embark on this sale process. (Greene Decl. ¶ 27).

9.      Moreover, Nationstar understands first hand the risks and intricacies of the servicing business, having vetted a host of complex issues with the Debtors and their representatives — the same way any Qualified Bidder would during the due diligence process. At this juncture, the Debtors have no knowledge of whether Berkshire could realistically meet the GAs concerns or various obligations contained in their proposed asset purchase agreement. For all these reasons, Nationstar should remain in place as stalking horse bidder for the Servicing Platform. (Supp. Greene Decl. ¶ 27)

5

## OVERVIEW OF OBJECTIONS

10.    A total of eleven Objections were filed with this Court as of the filing of this Reply.[5] Given the common themes throughout many of the Objections, this overview combines the Objections into a few general categories.[6]

## I.    THE SALE PROCEDURES WILL NOT CHILL BIDDING

11.    Four objecting parties — the U.S. Trustee,[7] the Committee,[8] Berkshire,[9] and Lone Star U.S. Acquisitions, LLC ("Lone Star")[10] each filed Objections, in respect of the Nationstar Purchased Assets, generally noting that the Break-Up Fee and bidding increments are too high. Although the Debtors remain in discussions with Nationstar on these issues, the Debtors maintain that the Break-Up Fee, Expense Reimbursement, and initial minimum overbid satisfy

---

[5]    This does not include two Statements filed by each of Fannie Mae and the United States and America, and one "Reservation of Rights" filed by WFBNA, as noted on Exhibit 1.

[6]    For a synopsis of each Objection, see Exhibit 1.  To the extent an Objection does not fall under any of the general categories listed in this Overview, the proposed resolution of such Objection is noted in Exhibit 1.

[7]    Objection of the United States Trustee to Debtors' Motion for Approval of Sale Procedures, Including Break-Up Fee and Expense Reimbursement and Related Relief [Dkt No. 271].

[8]    Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for an Order (I) Authorizing and Approving Sale Procedures, Including Break-up Fees and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief [Dkt No. 306].

[9]    Objection of Berkshire Hathaway Inc. to Debtors' Motion for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Dkt No. 284].

[10]    Response of Lone Star U.S. Acquisitions, LLC to Debtors' Motion for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the "Lone Star Response.") [Dkt No. 298].

the three-part test for evaluating break-up fees set forth in <u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)</u>, 147 B.R. 650, 656-57 (S.D.N.Y. 1992), and are within the range approved by courts in this jurisdiction.[11]

12.    Under the <u>Integrated Resources</u> test, this Court evaluates (i) whether the relationship of the parties who negotiated the breakup fee was tainted by self-dealing or manipulation; (ii) whether the breakup fee hampers, rather than encourages, bidding; and (iii) whether the amount of the breakup fee is unreasonable relative to the proposed purchase price. *Id.* at 657.    An analysis of each of these factors supports awarding the Break-Up Fee and Expense Reimbursement to Nationstar.

13.    First, negotiations on the Break-Up Fee and Expense Reimbursement have not in any been tainted by self-dealing or manipulation.    These negotiations have proceeded at arm's length and were approved by the independent members of the Debtors' independent directors. (Greene Decl. at ¶ 18).    The Debtors, with the advice of Centerview and counsel, agreed to the Break-Up Fee and Expense Reimbursement independently, after careful consideration of many other critical issues, and absent the influence of any other parties, including AFI.    (Greene Decl. at ¶ 18).

14.    Second, there is no evidence that the Break-Up Fee will hamper bidding.    In fact, the existence of a competing bid on the Nationstar Purchased Assets by Berkshire in the Berkshire Objection (based closely on the terms of the Nationstar APA), in addition to the

---

[11]    Lone Star is a potential bidder.    It is not a creditor in these Chapter 11 cases.    Potential bidders are not parties in interest with standing to object to sale procedures.    <u>Cf.</u>, General Order Amending M-331, M-383, In re Adoption of Amended Guidelines for the Conduct of Sales (M-383) (Bankr. S.D.N.Y. Nov. 18, 2009) ("<u>M-383</u>") (M-383 notes that despite its recommendation that debtors "send a copy of the [sale] motion to entities known or reasonably believed to have expressed an interest in acquiring any of the assets offered for sale . . . [n]othing in [M-383] is meant to imply that prospective bidders have standing to be heard with respect to the Sale Procedures.")

expression of interest filed by Lone Star in its response, are two independent indications of how Nationstar's stalking horse bid has already brought value to the Debtors' estates. Nationstar's stalking horse bid has set a floor price for the Servicing Platform and provided a clear structure for potential competing bids. (Greene Decl. at ¶¶ 15-16). These facts are analogous to facts weighed by this Court when approving the proposed break-up fee in the <u>Metaldyne</u> case. *See* <u>In re Metaldyne Corp.</u>, 409 B.R. 662, 670 (Bankr. S.D.N.Y. 2009)(noting existence of competing bids between the replacement stalking horse bidder and the initial stalking horse bidder as dispositive of the second factor in the <u>Integrated Resources</u> analysis).

15.     Third, the amount of the Break-Up Fee is reasonable relative to the proposed purchase price and consistent with break-up fees approved in comparable Chapter 11 cases and within the range of historical transactions. (Supp. Green Decl. at ¶ 19). In this jurisdiction, break-up fees are determined on a case-by-case basis, and range from 1% to 3% of the purchase price. (Supp. Green Decl. at ¶ 19).

16.     The Break-Up Fee and Expense Reimbursement are fair, reasonable, and appropriate in light of the size and nature of the proposed Sale, comparable transactions, the commitments made by Nationstar, and the efforts that have been and will be expended by Nationstar in furtherance of the Nationstar APA. In addition, as set forth in section 6.15 of the Nationstar APA, in the absence of the Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement, Nationstar would not have entered into the Nationstar APA. (Supp. Green Decl. at ¶ 20); Nationstar APA at § 6.15.

8

II.    **THE SALE PROCEDURES PROVIDE BIDDERS AND GOVERNMENT ASSOCIATIONS WITH A SUFFICIENT DUE DILIGENCE AND VETTING PERIOD**

17.    Three objecting parties — the Committee, Lone Star, and Freddie Mac[12] object in some form to the proposed bid deadline, originally set for September 18, 2012, with an auction originally set for September 25, 2012, and a sale hearing originally set October 15, 2012 (or such other date before October 31, 2012 that this Court conducts a Confirmation Hearing).  While the Committee proposes an extension of 60 days of the proposed bid deadline, Lone Star posits a shorter bid deadline on the AFI Purchased Assets and a 30-60 day extension on the Nationstar Purchased Assets.  Freddie Mac requests that if Nationstar is the Successful Bidder, no sale hearing shall occur prior to October 31, 2012, or prior to November 30, 2012 if Nationstar is not the Successful Bidder.

18.    The Sale Procedures call for a 90-day sale process.  The Debtor is currently negotiating non-disclosure agreements with a number of parties interested in the Nationstar Purchased Assets.  No party who has declined to participate in the process has cited the sale timeline as a concern.  (Supp. Green Decl. at ¶ 11).

19.    Furthermore, the pre-petition marketing process is not representative of the time required by bidders to diligence ResCap for the following reasons: (i) during the prepetition process, ResCap was simultaneously preparing for its Chapter 11 filings, raising $1.45 billion in debtor-in-possession financing, and negotiating settlements/support agreements with various creditor constituencies; (ii) Nationstar and the Debtors worked extensively to determine which assets/liabilities should be included in the Nationstar Purchased Assets, which analysis will not

---

[12]    Federal Home Loan Mortgage Corporation's Response and Limited Objection to Debtors' Motion to Approve Sale Procedures [Dkt No. 283].

be required of prospective bidders; and (iii) prospective bidders will have the benefit of working from existing APAs that were heavily negotiated with Nationstar and AFI.

20.     Nationstar's actual diligence period was Nationstar's was approximately 105 days, 15 days longer than the 90 day period the Debtors are seeking approval for.  (Supp. Green Decl. at ¶ 10).  That period included devising a sale structure and negotiating an APA from scratch, which no other Qualified Bidders would have to do.  (Supp. Green Decl. at ¶ 10).  Other market participants agree. (Supp. Green Decl. at ¶ 11).  In fact, Berkshire's bid involved no due diligence whatsoever. (Supp. Green Decl. at ¶¶ 11, 24).

21.     There are a number of additional reasons why the Debtors believe the sale process should be completed in the proposed timeframe.  First, a protracted sale process may put at risk the Debtors' origination and servicing assets.  These assets are not easy to maintain outside of bankruptcy; maintaining the value of a mortgage company in bankruptcy is even more tenuous.  The sooner the Debtors are able to sell their assets, the higher the value it can obtain for those assets, and the lower the probability of a loss of that value.

22.     Fannie Mae, Freddie Mac, and Ginnie Mae (collectively, the "GA's") are supportive of a quick sale.  They have never allowed a mortgage company to continue to service their loans during a bankruptcy for as long as is contemplated by the Debtors' current sale timeline.  Any longer timeline risks losing their support.  (Supp. Greene Decl. ¶ 14).

23.     Nevertheless, in light of these concerns, the Debtors have offered Freddie Mac consultation rights (and would extend the same proposal to Freddie Mac and Ginnie Mae) in connection with the Sale Procedures.

ny-1044988

## III.    NATIONSTAR AND AFI SHOULD REMAIN IN PLACE AS STALKING HORSE BIDDERS

24.    For the reasons discussed above, the Debtors submit that Nationstar should remain the stalking horse bidder for the Servicing Platform.

25.    The Debtors also believe that AFI should remain the stalking horse bidder for the AFI Purchased Assets, and that such structure provides three significant benefits to the estate: (i) the AFI Purchased Assets are de-linked from the sale of the Nationstar Purchased Assets, allowing such assets to be sold through a separate auction which will enhance bidder interest; (ii) the lack of a break-up fee or expense reimbursement in the AFI APA provides the Debtors with a "free floor" upon which to conduct an auction; and (iii) AFI's bid of $1.6 billion may create up to an additional $200 million of proceeds for distribution to creditors.  (Supp. Greene Decl. ¶ 5).

26.    Moreover, in response to concerns over the auction process, and in connection with the AFI APA, the Debtors have agreed to start the auction process for the AFI Purchased Assets at $1.4 billion, which bid is de-linked from any plan process.  To that end, the Debtors propose modifying the Sale Procedures Order to provide:

> Each of Nationstar and AFI, respectively, shall constitute a Qualified Bidder for all purposes and in all respects regarding the Sale Procedures; provided, however, that AFI's bid shall be deemed to be worth $1.4 billion for purposes of comparison with any other Qualified Bids.

27.    In addition, the Debtors have agreed to delete the "Qualified Expression of Interest" determination in the Sale Procedures and provide the Committee with all submissions of financial information and confidentially agreements submitted by potential Qualified Bidders, subject to appropriate confidentiality restrictions.

28.    It is additionally worth noting all the benefits AFI has provided the Debtors,  all in exchange for the right to prosecute a settlement and plan with the Debtors that, among other

things, provides the estate with $750 million in cash.  In connection with the sale of the Legacy Portfolio, AFI is setting a floor with no break-up fee or expense reimbursement, which promotes competing bids and thereby benefits all creditors.

## IV.    ISSUES RELATING TO SEVERABILITY OF ASSUMED CONTRACTS ARE NOT RIPE FOR THIS COURT'S DETERMINATION

29.    Deutsche Bank, Wells Fargo, U.S. Bank and Bank of New York[13] (collectively, the "Trustees"), who are trustees for many of the securitizations sponsored by the Debtors, (i) object to Nationstar's proposed assumption of servicing, but not origination obligations related to the securitizations; (ii) object to the procedures for resolution of cure amount objections; and (iii) request information to help them evaluate whether adequate assurance of future performance will be provided under section 365(f)(2)(B) of the Bankruptcy Code.  Wells Fargo filed a separate joinder to this objection in its capacity as master servicer for certain securitizations.[14]  Frost National Bank, who contracts with the Debtors to service loans, filed a

---

[13]   Limited Objection of Certain Trustees for Residential Mortgage Backed Securities to Debtors' Motion for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Dkt No. 291].

[14]   Joinder of Wells Fargo Bank, N.A. as Master Servicer for Residential Mortgage Backed Securities Trusts to    (a) Limited Objection of Certain Trustees for Residential Mortgage Backed Securities Trusts to Debtors' Motion for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (b) Limited Objection of Certain Trustees for Residential Mortgage Backed Securities Trusts to the Debtors' Postpetition Financing Motions [Dkt No. 292].

similar objection to the cure amount procedures and also requested information to assess adequate assurance of future performance.[15]

30.     Nothing in the Sales Procedure Relief sought by the Sale Motion impairs the Trustees' rights to object to the separate treatment of servicing and origination obligations.[16] Nevertheless, the Debtors have agreed to (i) reserve the Trustees' rights with respect to the points raised in its Limited Objection; (ii) continue providing information that will inform the Trustees on the facts supporting the Debtors' request to sever certain of the Assumed Contracts, potentially obviating the need for litigation; (iii) work together to agree on a process for resolving the severing issue, including (if necessary), by a determination of this Court; (iv) allow the Trustees to attend any auction of the Purchased Assets; and (v) identify with specificity in the Cure Notices those PSAs (or the provisions thereof, as the case may be) that they will sever, should they elect to assume and assign such PSAs. The proposed reservation of rights language to be inserted in the Sale Approval Order (which has yet to be approved by the Trusteees) is as follows:

> The Limited Objection of Certain Trustees for Residential Mortgage Backed Securities (Docket No. 291) to the Sale Motion and the Joinder of Wells Fargo Bank, N.A., as Master Servicer to such limited objection (Docket No. 292) (collectively, the "Limited

---

[15]   Limited Objection of Frost Bank to Debtors' Motion for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Dkt No. 286].

[16]   While the Trustees' severability objection is not properly before this Court, the Trustees' contention that the Debtors' proposed severability relief is "unprecedented" is incorrect as a matter of law.  See, e.g., DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.), 402 B.R. 87 (Bankr. D. Del. 2009) (holding that mortgage servicing rights included in the same document as other commitments are severable from loan sale commitments).

Objection"), and all of the objections contained therein pertaining to the proposed severing of Assumed Contracts, or any other issues in connection with the assumption of executory contracts and payment of Cure Amounts, including the timing of any hearing on any motion by the Debtors to sever and/or assume any executory contract, are hereby adjourned until July [10], 2012, and no relief granted in this Order shall prejudice any rights of The Bank of New York Mellon Trust Company, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, U.S. Bank National Association and Wells Fargo Bank, N.A., in their capacities as trustees, indenture trustees or master servicers (the "Trustees"), in connection with the prosecution of the Limited Objection, the granting of relief by this Court in respect of the Limited Objection or the filing of any additional or supplemental objections, declarations, joinders or other pleadings with respect to the Sale Motion; provided, however, that any prosecution by the Trustees of the Limited Objection shall not seek to object to the Sale Procedures or related deadlines relating solely to the bidding procedures or resulting auction, as set forth in the Sale Procedures Order.

31.      In addition, in respect of the objection filed by Frost National Bank, the Debtors maintain that the proposed procedures for handling cure amounts, which provide contract parties with more than one month prior notice of the objection deadline for proposed cure amounts, are reasonable.  The Debtors also plan on providing the Trustees, Frost National Bank and any other counterparty information to help them better understand their alleged cure claims and demonstrate adequate assurance of future performance.  As a result, the Debtors believe that the current proposed Sale Procedures Relief adequately protects the cure claim and adequate assurance rights of contract counterparties and can be approved in the present proposed form.

## V.      THE GIAMPORCARO DECLARATION ADEQUATELY SUPPORTS WHY NO PRIVACY OMBUDSMAN IS REQUIRED AND HOW THE SALE OF THE SERVICING PLATFORM IS CONSISTENT WITH THE DEBTORS' PRIVACY POLICIES; DEBTORS WILL RECOGNIZE THE REQUIREMENTS OF SECTION 363(o)

32.      First, the U.S. Trustee contends that the Debtors have not adequately addressed consumer protection issues and that the declaration and privacy policies provided by the Debtor

14

do not "clearly address the Debtors' ability to sell the assets to a non-affiliate under the Nationstar APA and the AFI APA." The U.S. Trustee requests that the Debtors produce additional evidence regarding the manner in which the sales are consistent with the privacy policies in light of its concern that the concept of providing personally identifiable information for "everyday business purposes," only covers "ordinary course business transactions," not the proposed Sales.[17]

33.    Respectfully, the Debtors submit that the U.S. Trustee's understanding is incorrect. Paragraph 11 of the Giamporcaro Declaration cites to 12 CFR pt 1016, App., § C.2(d)(1), the instructions to the Gramm-Leach-Bliley Act (the "GLBA") Model Privacy Form, which make clear that the concept of "everyday business purposes" set forth in the privacy policies encompass an asset sale pursuant to the GLBA.[18] The GLBA and the Model Privacy Form, which the Debtors' privacy policies track, specifically permit a financial institution to disclose personally identifiable information to unaffiliated third parties "[i]n connection with a proposed or actual sale, merger, transfer, or exchange of all or a portion of a business or operating unit if the disclosure of nonpublic [personally identifiable information] concerns solely consumers of such business or unit."  For these reasons, the Debtors submit that the disclosure of personally identifiable information is in compliance with the GLBA and is consistent with the privacy notices delivered by the Debtors to mortgage borrowers, and no consumer privacy ombudsman is necessary under section 363(b)(1) of the Bankruptcy Code.  The Debtors therefore request that the Bankruptcy Court overrule this portion of the U.S. Trustee's objection.

---

[17]    See U.S. Trustee objection at 9.

[18]    Relevant excerpts of this regulation are attached hereto as Exhibit 2.

ny-1044988

34.     Second, the U.S. Trustee contends that, absent removal of the successor liability provisions or a modification to include recognition of the requirements of Bankruptcy Code section 363(o), the Debtors should provide broad notice of a detailed explanation of the effect of the waiver of successor liability to ensure that interested parties will have an opportunity to be heard.  In response to the U.S. Trustee's concerns, the Debtors have agreed to add a proviso to the Sale Procedures Order and Sale Approval Orders to make clear that the proposed sales do not alter the provisions of section 363(o) of the Bankruptcy Code.

## VI.    THE DEBTORS PROPOSE A COMPROMISE IN RESPECT OF THEIR REQUEST TO ELIMINATE CREDIT BIDDING RIGHTS FOR THE SALE OF THE SERVICING PLATFORM

35.     Only one party, U.S. Bank in its capacity as Indenture Trustee with respect to certain 9.625% Junior Secured Guaranteed Notes Due 2015 (the "Junior Secured Notes"), has filed a limited objection[19] with respect to the proposed elimination of credit bidding in the Sale Procedures.  In addition, no party that holds Junior Secured Notes objected to the Debtors' proposal to eliminate credit bidding rights in respect of the sale of the Servicing Platform.

36.     As U.S. Bank notes, as of June 11, 2012, U.S. Bank had yet to receive a majority vote of the holders of the Junior Secured Notes with respect to the credit bidding issue.[20]  U.S.

---

[19]    Limited Objection of U.S. Bank National Association, as Indenture Trustee, to Debtors' Motion for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Dkt No. 282].

[20]    See U.S. Bank Limited Objection at ¶¶1, 4.

Bank states that it is currently unable to agree to a wholesale elimination of credit bid rights and requests certain reservation of rights language in the Sale Procedures Order.[21]

37.    The Debtors propose the following addition to U.S. Bank's requested reservation of rights language (as noted in italics):

> Notwithstanding anything set forth in the Sale Procedures to the contrary, each of (i) the right of any Qualified Bidder that holds a lien on any of the Purchased Assets to submit a credit bid as part of its Bid Proposal, and (ii) the right of the Debtors to seek a further order of the Court denying such Qualified Bidder the rights to credit bid "for cause" pursuant to section 363(i) of the Bankruptcy Code, are hereby expressly reserved; *provided that the Indenture Trustee shall be required to provide notice to the Debtors by July 15, 2012 regarding whether it has received direction to credit bid all outstanding debt under the Junior Secured Notes in respect of the Nationstar Purchased Assets. If the Indenture Trustee fails to provide such notice by July 15, 2012 (unless such date is waived or extended by the Debtors), credit bidding rights are waived. To the extent a majority of the Consenting Holders direct the Indenture Trustee to preserve credit bidding rights by July 15, 2012, the Debtors reserve their rights to request a hearing before the Bankruptcy Court to determine the credit bidding issue.*

38.    Furthermore, the Debtors and U.S. Bank have agreed that upon either (i) the giving of notice of no direction; (ii) the waiving of credit bidding rights by failing to give notice by July 15, 2012 (or any extended date); or (iii) a final order of the Court denying credit bidding rights, the Indenture Trustee shall be deemed to be a consultation party pursuant to the Sale Procedures.

39.    The Debtors will continue to engage in good faith negotiations with U.S. Bank and all the objecting parties; however, the Debtors respectfully submit that in the absence of

---

[21]    Id. at ¶ 4.

ny-1044988

consensual resolution on all points, the relief requested by the Debtors is appropriate and should

be granted.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

ny-1044988

## CONCLUSION

Accordingly, for the reasons set forth herein, the Debtors respectfully request that the

Court overrule the Objections and grant such other and further relief as it deems just and proper.

Dated: June 14, 2012
New York, New York

<div style="margin-left:40%">

           */s/*Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

- and -

Alexandra Steinberg Barrage
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue
Washington, DC  20006
Telephone:    (202) 887-1500
Facsimile:    (202) 887-0763

*Proposed Counsel for the Debtors and
Debtors in Possession*

</div>

19