MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW, Suite 6000
Washington, DC 20006-1888
Telephone: (202) 887-1500
Facsimile:  (202) 887-0763
Alexandra Steinberg Barrage

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) ) ) | Chapter 11 |
| Debtors. | ) ) | Jointly Administered |

**SUPPLEMENTAL DECLARATION OF SAMUEL M. GREENE**
**IN FURTHER SUPPORT OF THE PROPOSED SALE OF DEBTORS' ASSETS**

I, Samuel M. Greene, make this Supplemental Declaration under 28 U.S.C. § 1746 and state:

1. I am a Partner and co-head of the restructuring group of Centerview Partners LLC ("Centerview"), investment banker to Residential Capital LLC ("ResCap")[1] and the other above-captioned debtors and debtors in possession

---

[1] Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed R. Bankr. P. 2002, 6005,

ny-1044822                         1

(collectively the "Debtors").  I submit this Supplemental Declaration in further support of the proposed sales (the "Sales") which may be effectuated in connection with a Chapter 11 plan of reorganization or sale under section 363 of the Bankruptcy Code of (i) certain of the Debtors' assets (the "Nationstar Purchased Assets") to Nationstar Mortgage LLC and its affiliates (collectively, "Nationstar")[2] pursuant to an asset purchase agreement dated May 13, 2012 (the "Nationstar APA"), all as more fully described in the Motion and (ii) certain of the Debtors' whole loans, trading securities and certain other financial assets (collectively, the "AFI Purchased Assets," together with the Nationstar Purchased Assets, the "Purchased Assets") to BMMZ Holdings LLC, a wholly owned indirect subsidiary of Ally Financial Inc., the parent of the Debtors ("AFI"),[3] pursuant to an asset purchase agreement dated May 13, 2012 (the "AFI APA," together with the Nationstar APA, the "APAs"), all as more fully described in the Motion.

2. Except as otherwise indicated, all statements in this Supplemental Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, and my personal knowledge and experience.  If I were called upon to testify, I could and would testify to each of the facts set forth below.

---

and 6006 for Orders (A)(I) Authorizing and Approving Sale Procedures Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the "Motion") or the Whitlinger Affidavit, as defined in the Motion.

[2] As used in this Declaration and solely for purposes thereof, Nationstar includes Fortress Investment Group LLC and its affiliates.

[3] For purposes of the Declaration, AFI will be treated as the purchaser of the AFI Purchased Assets.

## WHOLE LOAN PORTFOLIO SALE PROCESS

3. As detailed in my previous declaration, the Debtors, with the assistance of Centerview, ran a prepetition marketing process for the Purchased Assets that resulted in three bids for various assets of the Debtors. Of these three proposals, one bidder elected not to bid on the Whole Loan Portfolio, Nationstar bid $1.4 billion on the Whole Loan Portfolio in conjunction with its bid for the Servicing Platform, and the third bidder offered significantly below $1.4 billion. In addition, Nationstar proposed increasing its bid on the Whole Loan Portfolio to $1.6 billion if AFI provided "stretch" financing on terms that were not available in the public debt capital markets. AFI declined to provide such financing.

4. After Nationstar was selected as the exclusive bidder for both the Servicing Assets and the Whole Loan Portfolio (and with Nationstar's consent), the Debtors and AFI discussed the possibility of AFI bidding for the Whole Loan Portfolio and becoming the stalking horse bidder for these assets. After a lengthy period of negotiation, AFI eventually agreed to purchase the Whole Loan Assets for $200 million more than any other bidder (if consummated through a Chapter 11 plan) and serve as a stalking horse without a breakup fee or expense reimbursement. During the negotiation with AFI, the Debtors and Centerview insisted that that the Debtors preserve the right to sell the Whole Loan Portfolio for $1.4 billion pursuant to a 363 process if a Chapter 11 plan was not able to be consummated. The Debtors' negotiated with AFI on an arm's length basis that resulted in a more favorable APA then was achievable with any other bidder in the process.

5. The Debtors' decision to execute the AFI APA has three significant benefits to the estate: (i) the AFI Purchased Assets are de-linked from the

sale of the Nationstar Purchased Assets, allowing such assets to be sold through a separate auction which will enhance bidder interest; (ii) the lack of a break-up fee or expense reimbursement in the AFI APA provides the Debtors with a "free floor" upon which to conduct an auction; and (iii) AFI's bid of $1.6 billion may create up to an additional $200 million of proceeds for distribution to creditors.

6. In an effort to respond to concerns over the auction process for the Whole Loan Portfolio, the Debtors will agree to start the auction process for the AFI Purchased Assets at $1.4 billion instead of $1.6 billion.

## PROPOSED TIMING FOR SALE PROCESS

7. It is my opinion that a 90-day sale process is an appropriate period of time for Qualified Purchasers to conduct diligence and make an offer for the Purchased Assets.

8. The pre-petition marketing process is not representative of the time required by bidders to diligence the Debtors assets. During the pre-petition marketing and due diligence period, the Debtors and their advisors expended significant time, both on their own and with the bidders determining and negotiating the optimum structure of a transaction. This process included an analysis of which assets and liabilities should or needed to be included in a sale and/or retained by the estate and what type of transition and/or shared services would be required.

9. This complex and time consuming work which occupied the Debtors and their advisors significantly during the pre-petition marketing period has been completed and does not need to be replicated by a prospective bidder. Prospective bidders will have the benefit of working from existing APAs that were heavily

negotiated with Nationstar and AFI. In addition, a comprehensive data room has been assembled and populated based on extensive due diligence inquires from Nationstar and AFI.

10. Nationstar's active due diligence period was approximately 105 days, 15 days longer than the 90 day period the Debtors are seeking approval for. As I noted above, the pre-petition process did not have the benefit of all the work that has been completed in advance of the proposed marketing process. Effectively, the Debtors will be able to manage a more efficient due diligence process based on the extensive work completed in the prepetition period. No other bidder needs to spend material time on the tasks identified above.

11. Both Mr. Jared Dermont, Managing Director of Moelis & Company, and Lone Star claim that the "minimum reasonable diligence period for competing bidders who have not conducted any diligence pre-prepetition should be five to six months." The opinion of one bidder, who it should be noted is providing a last minute competing proposal to become the stalking horse bidder for the AFI Purchased Assets and is seeking a reduction in the sale process timeline for those assets to eight weeks, is not dispositive. In fact, other market participants clearly feel differently. Ocwen is quoted in a June 12th article in the National Mortgage News article titled "Berkshire, Ocwen in the Hunt for ResCap/GMAC" saying that the proposed sale timeline is more than sufficient: A new report from Keefe, Bruyette & Woods—which gathers comments made at its recent mortgage finance conference—quotes Ocwen officials as saying "there is plenty of time and room for new bidders to emerge through

ny-1044822                                5

the auction process." In addition, Berkshire just submitted a bid for the Nationstar Purchased Assets with no diligence at all.

13. Mr. Dermont's assertion that Fortress continues to conduct due diligence is untrue. Fortress concluded diligence prior to the petition date and most importantly does not have a diligence condition in its APA.

13. The Debtors are ready to begin the diligence process with Qualified Bidders as soon as bid procedures are approved. Centerview and the Debtors have created a comprehensive list of prospective buyers that has been reviewed and approved by the financial advisor to the UCC. The Debtors, with Centerview's assistance, have already communicated with over 50 prospective purchasers and have begun negotiating dozens of non-disclosure agreements. A Confidential Information Memorandum is nearly finalized and will be ready for distribution the week of June 18th. In addition, the Debtor has a data room that is fully populated with information required for bidders to diligence all the Purchased Assets. Finally, no party who has declined to participate in the post-petition sale processes for either the Nationstar of AFI Purchased assets has cited the sale timeline as a concern.

14. Further, a longer amount of time presents additional risks. First, a protracted sale process may put at risk the Debtors' origination and servicing assets. These assets are volatile and the sooner the Debtors are able to sell their assets the lower the risk of loss of value. Second, Fannie Mae, Freddie Mac, and Ginnie Mae (collectively, the "GA's") seem to prefer a sale as soon as possible. The GA's have never allowed a mortgage company to continue to service their loans during a bankruptcy for as long as is contemplated by the Debtors' current sale timeline.

ny-1044822                                6

## THE NATIONSTAR BREAK-UP FEE AND EXPENSE REIMBURSEMENT

15. Nationstar has expended considerable resources as a proposed stalking horse bidder for the Nationstar Purchased Assets. By expending these resources, Nationstar has provided considerable value to the estate — it has provided a floor for bidding, laying the foundation for other potential bidders to conduct due diligence and submit a higher or better offer. The fact that Berkshire has expressed a willingness to execute the Nationstar APA without diligence further supports the value Nationstar has already provided to the estate.

16. The Committee contends that the Break Up Fee should be based solely on the value ascribed to the Debtors' MSR assets. When the prepetition sale process began in January 2012 the Debtors approached bidders with the intent to sell a "going-concern business" and not purely its financial assets. In fact, Nationstar has agreed to purchase the Debtors servicing and origination platform, which will likely include a substantial majority of the Debtors existing employee base, its current locations, processes, etc.

17. While the platform includes related servicing assets (MSR and servicing advances), it also provides the buyer the ability to generate incremental profits, in this case from future servicing arrangements and origination activities (similar to any going concern business). It was the Debtors' explicit request that prospective bidders allocate the going concern value across the Debtors' assets due to the Debtors' complex capital structure that contains secured debt facilities with separate collateral packages. The Committee's position that purchase price allocation to certain assets can be viewed individually implies that, for example, Nationstar is paying no value for profit generated by origination activities, which is expected to exceed $100mm from the petition date

through year-end. It is inaccurate to say that bidders will only improve their bid based on the value they ascribe to the Debtor's existing MSR. Nor do I believe that servicing advances are equivalent to cash. In my business judgment, the break-up fee percentage should be calculated as a percentage of Nationstar's total purchase price.

18. The Nationstar APA, which provides for payment of the Break-Up Fee and Expense Reimbursement, was negotiated at arm's length and approved by the Debtors, including the independent members of the Debtors' Board of Directors. The Debtors, with the advice of Centerview and counsel, agreed to the Break-Up Fee and Expense Reimbursement independently, after careful consideration, and absent the influence of any other parties, including AFI.

19. It is my opinion that the Break-Up Fee is reasonable in comparison to break-up fees approved in comparable Chapter 11 cases and within the range of historical transactions. To my knowledge, in bankruptcy cases, break-up fees are determined on a case-by-case basis and range from 1% to 3% of the purchase price.[4]

20. Further, it is my opinion that the Break-Up Fee and Expense Reimbursement are fair, reasonable, and appropriate in light of the size and nature of the proposed sale, comparable transactions, the commitments made by Nationstar, and the efforts that have been and will be expended by Nationstar in furtherance of the Nationstar APA. As set forth in section 6.15 of the Nationstar APA, in the absence of the Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement, Nationstar would not have entered into the Nationstar APA.

---

[4] See attached Exhibit 1 entitled "Chapter 11 Break-Up Fee Comparables."

21. I am satisfied that the Break-Up Fee and the Expense Reimbursement reflect the best outcome that is possible for the Debtors and the Debtors' estates under the circumstances.

## CONSIDERATION OF BERKSHIRE'S RECENT STALKING HORSE PROPOSAL

22. In anticipation of an upcoming sales process and due to the fact that Berkshire was the Debtors' largest financial creditor, I contacted Warren Buffet's office in either late 2011 or January 2012 to inquire of Berkshire's interest in participating in the Debtors' prepetition marketing process. Mr. Buffet's office referred me to Mark Millard, Berkshire's Director of Financial Assets, who represented to me that he was in charge of managing Berkshire's ResCap holdings. Mr. Millard told me that Berkshire had no interest in participating in a process. Even if there was some sort of miscommunication (which is difficult to imagine), due to Berkshire's position as the single largest financial creditor of ResCap, the pure size of their holdings (believed to be ~$1.4 billion), the sophisticated nature of the Berkshire organization and the robust amount of press coverage, it seems unlikely that Berkshire was unaware that a sale process was ongoing. Berkshire simply chose not to participate.

23. To this day, Centerview has not heard from anyone at Berkshire regarding their interest in acting as the stalking horse bidder for the Purchased Assets. This also includes a conference call with Berkshire's counsel and Ted Weschler of Berkshire, initiated at Centerview's request on May 25, 2012. During that call Mr. Weschler made no mention of Berkshire's desire to make a bid.

## CONSIDERATION OF LONE STAR'S RECENT STALKING HORSE PROPOSAL

24. Despite Mr. Dermont's assertion that Lone Star reached out to the Debtors and Ally on multiple occasions Centerview did not receive any inquiry from Lone Star or its advisors during the prepetition period. Centerview did receive a call from Lone Star's counsel on May 17, 2012. Centerview contacted Lone Star in early June, consistent with the kick-off of the post-petition marketing process. An NDA was sent to a representative of Lone Star on June 6th. Centerview has yet to hear a reply on the terms of the agreement.

25. Further, Lone Star's stalking horse proposal contains material negative changes to the AFI APA. As such, the Debtors believe it is inappropriate to consider at this time. Lone Star will have ample opportunity to bid over AFI at the auction and, again, it is worth noting that AFI has no break-up fee or expense reimbursement.

## CONCLUSION

26. As stated in my prior declaration, the Debtors, with the assistance of Centerview, ran a prepetition marketing process with the goal of seeking the highest and best offer for the Purchased Assets. The Debtor is seeking approval of sale procedures in an effort to run a post-petition marketing process during which both Berkshire and Lone Star will be given the opportunity to participate.

27. The pre-petition auction has been run in the most productive and value maximizing way possible under the circumstances. It concluded with two very attractive bids which provide a floor upon which to conduct an auction.

28. I declare, under penalty of perjury, that the foregoing is true and correct, to the best of my knowledge.

Executed this 14 day of June, 2012                               /s/ Samuel M. Greene
                                                                                           Samuel M. Greene

# **EXHIBIT 1**

CHAPTER 11 BREAK-UP FEE COMPARABLES

# Chapter 11 Break-Up Fee Analysis

**Criteria:**
1. Chapter 11 cases between 2008 and 2012.
2. Total transaction value $500mm and above.
3. Targets in United States.

| | | | Chapter 11 Break-Up Fee Analysis | | |
|---|---|---|---|---|---|
| Debtor | Filing Date | Stalking Horse | Stalking Horse Bid ($mm) | Break-Up Fee ($mm) | Fee % of Bid |
| Simmons | 11/16/2009 | Ares, Teachers' Private Capital | $759.0 | $21.0 | 2.77% |
| Terrestar | 10/19/2009 | Dish[1] | 1,375.0 | 27.5 | 2.00% |
| DBSD | 5/15/2009 | Dish[2] | 1,000.0 | 25.0 | 2.50% |
| Nortel | 1/14/2009 | Nokia | 650.0 | 19.5 | 3.00% |
| Nortel | 1/14/2009 | Ciena | 534.8 [3] | 16.0 | 3.00% |
| Nortel | 1/14/2009 | Google | 900.0 | 25.0 | 2.78% |
| Lehman Brothers | 9/15/2008 | Bain, Hellman & Friedman | 1,750.0 [4] | 52.5 | 3.00% |
| **Min** | | | **$534.8** | **$16.0** | **2.00%** |
| **Median** | | | **900.0** | **25.0** | **2.78%** |
| **Max** | | | **1,750.0** | **52.5** | **3.00%** |

Source: Court Documents.
(1) Dish's parent, EchoStar, was Terrestar's largest secured creditor.
(2) Dish acquired DBSD's pre-petition senior debt and a substantial portion of its second-lien debt after DBSD announced the terms of its Plan in May 2009.
(3) $390 million in cash plus 10 million shares of Ciena common stock.
(4) Purchase price net of $400 million in employee retention arrangements.