**<u>EXHIBIT 1</u>**

**AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION**

**CREDIT AND GUARANTY AGREEMENT,**

**dated as of May 16, 2012,**

**as amended and restated as of June [__], 2012,**

**among**

**GMACM BORROWER LLC,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**
**as a Borrower,**

**RFC BORROWER LLC,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**
**as a Borrower,**

**RESIDENTIAL CAPITAL, LLC,**
**GMAC MORTGAGE, LLC,**
**RESIDENTIAL FUNDING COMPANY, LLC and**
**CERTAIN SUBSIDIARIES OF RESIDENTIAL CAPITAL, LLC,**
**each a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**
**as Guarantors,**

**GMAC MORTGAGE, LLC and**
**RESIDENTIAL FUNDING COMPANY, LLC,**
**as Administrators, Originators, Receivables Custodians and Servicers,**

**GMAC MORTGAGE, LLC,**
**as GMACM Servicer,**

**THE LENDERS PARTY HERETO,**

**BARCLAYS BANK PLC,**
**as Administrative Agent,**

**BARCLAYS BANK PLC,**
**as Collateral Agent,**

**BARCLAYS BANK PLC,**
**as Syndication Agent and as Documentation Agent,**

**and**

**BARCLAYS BANK PLC,**
**as Bookrunner and Lead Arranger for the Credit Facilities**

---

**$190,000,000 Superpriority Debtor-in-Possession Revolving Facility**

**$1,060,000,000 Superpriority Debtor-in-Possession Term A-1 Facility**

**$200,000,000 Superpriority Debtor-in-Possession Term A-2 Facility**

# TABLE OF CONTENTS

PAGE

**ARTICLE I DEFINITIONS AND INTERPRETATION** .............................................................**2**
 Section 1.01  Definitions.............................................................................2
 Section 1.02  Accounting Terms................................................................64
 Section 1.03  Interpretation, Etc. ..............................................................65
 Section 1.04  Effect of Restatement..........................................................65
**ARTICLE II LOANS** .................................................................................................................**66**
 Section 2.01  Term Loans ..........................................................................66
 Section 2.02  Revolving Loans ..................................................................67
 Section 2.03  [Reserved].............................................................................68
 Section 2.04  [Reserved].............................................................................68
 Section 2.05  Pro Rata Shares; Availability of Funds................................68
 Section 2.06  Use of Proceeds...................................................................69
 Section 2.07  Evidence of Debt; Register; Lenders' Books and Records;
          Notes ....................................................................................70
 Section 2.08  Interest on Loans..................................................................70
 Section 2.09  Conversion/Continuation ....................................................72
 Section 2.10  Default Interest.....................................................................72
 Section 2.11  Fees ......................................................................................73
 Section 2.12  Protective Advances.............................................................73
 Section 2.13  Voluntary Prepayments/Commitment Reductions .............74
 Section 2.14  Mandatory Prepayments ......................................................75
 Section 2.15  Application of Prepayments.................................................76
 Section 2.16  General Provisions Regarding Payments.............................76
 Section 2.17  Ratable Sharing....................................................................77
 Section 2.18  Making or Maintaining Eurodollar Rate Loans...................78
 Section 2.19  Increased Costs; Capital Adequacy .....................................80
 Section 2.20  Taxes: Withholding, Etc. .....................................................81
 Section 2.21  Obligation to Mitigate.........................................................84
 Section 2.22  Defaulting Lenders...............................................................85
 Section 2.23  Removal or Replacement of a Lender ..................................85
 Section 2.24  Determination of Borrowing Base and Collateral Amount ...........86
 Section 2.25  Priority and Liens Applicable to Credit Parties ..................89
 Section 2.26  Payment of Obligations........................................................90
 Section 2.27  No Discharge; Survival of Claims .......................................90
**ARTICLE III CONDITIONS PRECEDENT** .............................................................................**91**
 Section 3.01  Closing Date.........................................................................91
 Section 3.02  Conditions to Revolver Post-Closing Availability Date................96
 Section 3.03  Conditions to Each Credit Date ...........................................96
 Section 3.04  Conditions to Each Withdrawal Date ..................................98
 Section 3.05  Conditions to Effectiveness of this Agreement ..................100
**ARTICLE IV REPRESENTATIONS AND WARRANTIES** ....................................................**101**
 Section 4.01  Organization; Requisite Power and Authority; Qualification......101
 Section 4.02  Capital Stock and Ownership.............................................102

i

| | | |
|---|---|---|
| Section 4.03 | Due Authorization | 102 |
| Section 4.04 | No Conflict | 102 |
| Section 4.05 | Governmental and Other Consents | 103 |
| Section 4.06 | Binding Obligation | 103 |
| Section 4.07 | Financial Statements | 103 |
| Section 4.08 | Projections | 104 |
| Section 4.09 | Approved DIP Budget | 104 |
| Section 4.10 | No Material Adverse Effect | 104 |
| Section 4.11 | Insurance | 104 |
| Section 4.12 | Adverse Proceedings, Etc. | 104 |
| Section 4.13 | Payment of Taxes | 104 |
| Section 4.14 | Properties | 105 |
| Section 4.15 | Environmental Matters | 105 |
| Section 4.16 | No Defaults | 106 |
| Section 4.17 | Material Contracts | 106 |
| Section 4.18 | Governmental Regulation | 106 |
| Section 4.19 | Margin Stock | 107 |
| Section 4.20 | Employee Matters | 107 |
| Section 4.21 | Employee Benefit Plans | 107 |
| Section 4.22 | Specified Permitted Indebtedness Documents and Underlying Documents | 108 |
| Section 4.23 | Compliance with Statutes, Etc. | 108 |
| Section 4.24 | Accuracy of First Lien Collateral Schedules | 108 |
| Section 4.25 | Disclosure | 108 |
| Section 4.26 | Patriot Act | 109 |
| Section 4.27 | Location of Books and Records | 109 |
| Section 4.28 | Accuracy of Borrowing Base and Collateral Amount | 109 |
| Section 4.29 | Post-Audit Asset Dispositions | 109 |
| Section 4.30 | Collateral Documents | 109 |
| Section 4.31 | ResCap | 110 |
| Section 4.32 | Borrowers | 110 |
| Section 4.33 | Adverse Actions | 110 |
| Section 4.34 | The Orders | 110 |
| Section 4.35 | Cash Collateral and Other Orders | 111 |
| Section 4.36 | Provision of Information | 111 |
| Section 4.37 | MERS | 111 |
| Section 4.38 | GMACM Serviced /Specified Mortgage Loans | 112 |
| Section 4.39 | Mortgage Loan Level Representations and Warranties | 112 |
| Section 4.40 | Administrators' and Servicers' Additional Representation and Warranty | 112 |
| Section 4.41 | Servicers and Subservicers | 112 |
| **ARTICLE V AFFIRMATIVE COVENANTS** | | **112** |
| Section 5.01 | Financial Statements and Other Reports | 112 |
| Section 5.02 | Approved DIP Budget | 121 |
| Section 5.03 | Existence | 122 |
| Section 5.04 | Payment of Taxes | 122 |

1760935.07-New York Server 7A - MSW

Section 5.05        Maintenance of Properties ..........................................................122
Section 5.06        Insurance ..................................................................................122
Section 5.07        Maintaining Records; Access to Properties and Inspections; Lender Discussions ....................................................................123
Section 5.08        Compliance with Credit Documents ...........................................124
Section 5.09        Compliance with Laws ...............................................................124
Section 5.10        Environmental ...........................................................................124
Section 5.11        Subsidiaries ...............................................................................125
Section 5.12        Security Interests; Further Assurances........................................125
Section 5.13        Non-Consolidation.....................................................................126
Section 5.14        Information Regarding Collateral ...............................................126
Section 5.15        LOC Junior Lien Collateral .......................................................126
Section 5.16        Credit Rating ..............................................................................127
Section 5.17        Final Financing Order.................................................................127
Section 5.18        Advisory Firm ............................................................................127
Section 5.19        Servicing ....................................................................................127
Section 5.20        Receivables ................................................................................128
Section 5.21        Obligations and Contractual Exercise of Rights and Remedies ....................................................................................128
Section 5.22        Custodial Procedures .................................................................128
Section 5.23        REO Property .............................................................................129
Section 5.24        Mortgage Loan Level Representations and Warranties...............129
Section 5.25        MERS.........................................................................................129
Section 5.26        Servicing of GMACM Serviced Mortgage Loans ......................129
Section 5.27        Corporate Separateness of Borrowers; Related Matters and Covenants...................................................................................130
Section 5.28        Corporate Separateness of the Borrowers' REO Subsidiaries; Related Matters and Covenants.............................130
Section 5.29        Amendments to Servicing Agreements .......................................130
Section 5.30        Notice of Security Interest in Receivables...................................130
Section 5.31        Acquisition of Residual Interests ...............................................130
Section 5.32        Compliance with Designated Servicing Agreements ..................130
Section 5.33        Payment of Fees and Administrative Expenses ..........................130
Section 5.34        Reimbursement of Non-Recoverable Advances..........................131
Section 5.35        MBS Trust Collection Accounts.................................................131
Section 5.36        Verification Agent Duties with respect to MBS Trust Accounts ....................................................................................131
Section 5.37        Broker's Price Opinions .............................................................131
Section 5.38        Senior Management ...................................................................131
Section 5.39        Obligations Regarding Sale Process............................................131
Section 5.40        Servicer Acknowledgment and Instruction Letters.....................132
Section 5.41        Borrowing Base and Collateral Amount Certificate Variances....................................................................................132
Section 5.42        Notification of MBS Trustees.....................................................132
Section 5.43        Collections; Blocked Accounts...................................................132
Section 5.44        Delaware Statutory Trusts...........................................................133

iii

**ARTICLE VI NEGATIVE COVENANTS** ...............................................................**133**
    Section 6.01    Indebtedness..........................................................................133
    Section 6.02    Liens........................................................................................134
    Section 6.03    No Further Negative Pledges ....................................................136
    Section 6.04    Restricted Junior Payments......................................................136
    Section 6.05    Restrictions on Subsidiary Distributions .................................137
    Section 6.06    Investments.............................................................................137
    Section 6.07    Financial Covenants................................................................138
    Section 6.08    Fundamental Changes; Disposition of Assets; Acquisitions .......139
    Section 6.09    Disposal Of Subsidiary Interests.............................................140
    Section 6.10    Mortgage Loan Servicing Fees ................................................140
    Section 6.11    Transactions with Shareholders and Affiliates .........................140
    Section 6.12    Conduct of Business ...............................................................141
    Section 6.13    Permitted Activities of ResCap................................................141
    Section 6.14    Amendments or Waivers of Certain Agreements .......................141
    Section 6.15    Fiscal Year .............................................................................142
    Section 6.16    Use of Proceeds......................................................................142
    Section 6.17    Other Superpriority Claims .....................................................142
    Section 6.18    Servicing Practices..................................................................142
    Section 6.19    Dispositions of LOC Junior Lien Collateral ..............................142
    Section 6.20    Amendment to MSFTA ...........................................................143
**ARTICLE VII GUARANTY** ..............................................................................**143**
    Section 7.01    Guaranty of the Obligations.....................................................143
    Section 7.02    Contribution by Guarantors .....................................................143
    Section 7.03    Payment by Guarantors ...........................................................144
    Section 7.04    Liability of Guarantors Absolute ..............................................144
    Section 7.05    Waivers by Guarantors ............................................................146
    Section 7.06    Guarantors' Rights of Subrogation, Contribution, Etc. ...............147
    Section 7.07    Subordination of Other Obligations ..........................................147
    Section 7.08    Continuing Guaranty...............................................................148
    Section 7.09    Authority of Guarantors or Borrowers.......................................148
    Section 7.10    Financial Condition of Borrowers.............................................148
    Section 7.11    Discharge of Guaranty Upon Sale of Guarantor.........................148
    Section 7.12    Taxes .....................................................................................148
    Section 7.13    Assignments...........................................................................148
    Section 7.14    Reinstatement.........................................................................149
**ARTICLE VIII EVENTS OF DEFAULT** ..............................................................**149**
    Section 8.01    Events of Default ....................................................................149
    Section 8.02    Application of Funds................................................................155
**ARTICLE IX CASH MANAGEMENT; COLLECTIONS** ........................................**157**
    Section 9.01    Accounts; Cash Management ...................................................157
    Section 9.02    Daily Deposits of Receivables Proceeds....................................160
    Section 9.03    Restoration of Amounts Held for Future Distribution.................161
**ARTICLE X AGENTS** .....................................................................................**161**
    Section 10.01    Appointment and Authorization of Agents.................................161
    Section 10.02    Rights as a Lender...................................................................161

Section 10.03    Exculpatory Provisions ............................................................162
Section 10.04    Reliance by Agents ..................................................................163
Section 10.05    Delegation of Duties ................................................................163
Section 10.06    Indemnification of Agents ........................................................163
Section 10.07    Resignation or Removal of Administrative Agent and
                 Collateral Agent ......................................................................164
Section 10.08    Non-Reliance on Agents and Other Lenders ..............................166
Section 10.09    Administrative Agent May File Proofs of Claim........................166
Section 10.10    Collateral Documents and Guaranty..........................................166

**ARTICLE XI RECEIVABLES CUSTODIAN; VERIFICATION AGENT........................167**
Section 11.01    Receivable Files ......................................................................167
Section 11.02    Duties of Receivables Custodian with Respect to the
                 Receivables Files ....................................................................168
Section 11.03    Removal and Replacement of Verification Agent ......................168

**ARTICLE XII MISCELLANEOUS .........................................................................169**
Section 12.01    Notices ....................................................................................169
Section 12.02    Expenses .................................................................................171
Section 12.03    Indemnity ................................................................................172
Section 12.04    Set Off ....................................................................................174
Section 12.05    Amendments and Waivers ........................................................175
Section 12.06    Successors and Assigns; Participations .....................................179
Section 12.07    Independence of Covenants ......................................................183
Section 12.08    Survival of Representations, Warranties and Agreements ..........183
Section 12.09    No Waiver; Remedies Cumulative .............................................183
Section 12.10    Marshalling; Payments Set Aside ..............................................183
Section 12.11    Severability .............................................................................184
Section 12.12    Obligations Several; Independent Nature of Lenders' Rights......184
Section 12.13    Headings .................................................................................184
Section 12.14    Applicable Law........................................................................185
Section 12.15    Jurisdiction; Etc ......................................................................185
Section 12.16    **Waiver of Jury Trial**................................................................186
Section 12.17    Confidentiality ........................................................................186
Section 12.18    Usury Savings Clause ..............................................................187
Section 12.19    Counterparts ............................................................................187
Section 12.20    Effectiveness ...........................................................................187
Section 12.21    Patriot Act ..............................................................................188
Section 12.22    Electronic Execution of Assignments........................................188
Section 12.23    No Fiduciary Duty ...................................................................188
Section 12.24    Borrowers' Obligations ............................................................189
Section 12.25    Inconsistency...........................................................................193
Section 12.26    Liability of Administrator; Indemnities .....................................193

APPENDICES:    A-1    Commitments as of the Closing Date
               A-2    Commitments as of the Restatement Effective Date
               B      Notice Addresses

SCHEDULES:     1.01A       Designated Servicing Agreement Schedule
               1.01B       Market Value
               1.01C       Senior Management
               3.01        Closing Date Credit Documents and Certain Deliverables
               3.05        Restatement Effective Date Credit Documents and Certain
                           Deliverables
               4.01        Jurisdictions of Organization and Qualification
               4.02        Capital Stock and Ownership
               4.11        Insurance
               4.12        Adverse Proceedings
               4.13        Taxes
               4.14        Real Estate Assets
               4.15        Environmental Matters
               4.17        Material Contracts
               4.21        Employee Benefit Plans
               4.24        Eligible Receivables, Eligible Mortgage Loans and other First
                           Lien Collateral
               4.27        Locations of Books and Records
               4.30        Filing Offices
               4.39        Representations and Warranties Relating to Eligible Mortgage
                           Loans
               4.41(a)     Servicers and Subservicers of Eligible Mortgage Loans
               4.41(b)     Specified Servicing Agreements
               6.01        Existing Indebtedness
               6.02(h)(i)  Existing Liens – Borrowers and Borrowers REO Subsidiaries
               6.02(h)(ii) Existing Liens – Junior Lien Collateral
               6.05        Existing Restrictions on Subsidiary Distributions
               6.06        Existing Investments
               6.08        Excluded Assets
               6.10        Certain Mortgage Loan Servicing Fees

EXHIBITS:      A-1    Funding Notice
               A-2    Conversion/Continuation Notice
               A-3    Withdrawal Notice
               A-4    Withdrawal Direction Letter
               A-5    Notice of Payment/Commitment Termination
               B-1    Term A-1 Loan Note
               B-2    Term A-2 Loan Note
               B-3    Revolving Loan Note
               C      Compliance Certificate
               D      Assignment Agreement

1760935.07-New York Server 7A - MSW

| E | Form of U.S. Tax Certificate |
|---|---|
| F | Counterpart Agreement |
| G | Servicer Acknowledgement and Instruction Letter |
| H-1 | GMACM Mortgage Loan Purchase and Contribution Agreement |
| H-2 | RFC Mortgage Loan Purchase and Contribution Agreement |
| I | Borrowing Base and Collateral Amount Certificate |
| J | Monthly Collateral Report |
| K | Initial Approved DIP Budget |
| L-1 | Perfection Certificate |
| L-2 | Perfection Certificate Supplement |
| M | Cash Management Order |
| N-1 | Interim Financing Order |
| N-2 | Final Financing Order |
| O | AFI/Junior Secured Notes Order |
| P | EAF Order |
| Q | MSR Order |
| R | Origination Order |
| S | Agreed Upon Procedures Report |
| T-1 | Deposit Account Control Agreement – Collection Account |
| T-2 | Deposit Account Control Agreement – Borrower Account/Concentration Account |
| U-1 | GMACM Receivables Pooling and Purchase Agreement |
| U-2 | RFC Receivables Pooling and Purchase Agreement |
| V-1 | GMACM Receivables Purchase Agreement |
| V-2 | RFC Receivables Purchase Agreement |
| W | Borrowers Pledge and Security Agreement |
| X | Deposit Security Agreement |
| Y | LOC Security Agreement |
| Z | MSR Security Agreement |
| AA | ResCap Security Agreement |

1760935.07-New York Server 7A - MSW

## AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT, dated as of May 16, 2012, and amended and restated as of June [__], 2012, is entered into by and among GMACM BORROWER LLC, a Delaware limited liability company and special purpose entity, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as a borrower ("**GMACM Borrower**"), RFC BORROWER LLC, a Delaware limited liability company and special purpose entity, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as a borrower ("**RFC Borrower**," and together with GMACM Borrower, "**Borrowers**," and each, a "**Borrower**"), RESIDENTIAL CAPITAL, LLC, a Delaware limited liability company ("**ResCap**"), GMAC MORTGAGE, LLC, a Delaware limited liability company ("**GMACM**"), RESIDENTIAL FUNDING COMPANY, LLC, a Delaware limited liability company ("**RFC**"), and CERTAIN SUBSIDIARIES OF RESCAP, each a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as Guarantors, GMACM and RFC, as Administrators, Originators, Receivables Custodians and Servicers, GMACM, as GMACM Servicer, the Lenders party hereto from time to time, BARCLAYS BANK PLC ("**Barclays**"), as administrative agent for the Secured Parties (together with its successors and assigns in such capacity, "**Administrative Agent**"), BARCLAYS, as collateral agent for the Secured Parties (together with its successors and assigns in such capacity, "**Collateral Agent**"), and BARCLAYS, as syndication agent (together with its successors and assigns in such capacity, "**Syndication Agent**").

### RECITALS:

WHEREAS, capitalized terms used in the preamble hereto and in these Recitals shall have the respective meanings set forth for such terms in Section 1.01;

WHEREAS, on May 14, 2012 (the "**Petition Date**"), the Credit Parties filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrowers and the other Credit Parties are party to that certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of May 16, 2012 (the "**Original Credit Agreement**"), among Borrowers, the other Credit Parties party thereto, the Lenders from time to time party thereto and Barclays, as Administrative Agent, Collateral Agent and Syndication Agent, under which the Lenders (i) made Initial Term A-1 Loans in an initial aggregate principal amount of $1,050,000,000, (ii) made Term A-2 Loans in an initial aggregate principal amount of $200,000,000, and (iii) agreed to Revolving Commitments in an initial aggregate principal amount of $200,000,000, in each case, on the terms and conditions set forth in the Original Credit Agreement;

WHEREAS, the Primary Credit Parties have requested that Barclays, as Administrative Agent and the sole Lender under the Original Credit Agreement, agree to (a)

1

reduce the Applicable Margin with respect to the Term A-1 Loans and Term A-2 Loans and (b) not exercise its rights pursuant to Section 3(a) of the Original Facility Fee Letter to decrease the principal amount of the Revolving Facility by the full amount permitted thereby, in consideration for which, the Primary Credit Parties would agree to pay additional upfront fees with respect to certain of the Revolving Commitments, in each case as provided for and subject to the terms and conditions set forth in the Facility Fee Letter Amendment;

WHEREAS, the parties hereto have agreed to amend and restate the Original Credit Agreement as provided in this Agreement to, among other things, (a) reduce the Revolving Commitments in an aggregate principal amount of $10,000,000, (b) add a Delayed Draw Term A-1 Facility in an aggregate principal amount of $10,000,000, and (c) reflect the other agreements set forth in the Facility Fee Letter Amendment, in each case as provided for and subject to the terms and conditions set forth in this Agreement;

WHEREAS, the respective priorities of the Facilities with respect to the Collateral shall be as set forth in the Interim Financing Order and the Final Financing Order, in each case upon entry thereof by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree that the Original Credit Agreement shall be and, subject to the satisfaction or waiver of the conditions set forth in Section 3.05, hereby is amended and restated in its entirety as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 1.01     Definitions.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**2-Week Variance Report**" as defined in Section 5.01(e).

"**4-Week Variance Report**" as defined in Section 5.02(a).

"**4-Week Variance Period**" as defined in Section 5.02(a).

"**A-1/Revolver Trigger Advance Rate**" means, as of any date, the rate equal to (a) 100% minus (b) the product of (i) the Stressed Interest Rate as of such date, multiplied by (ii) the applicable Stressed Time as of such date.

"**A-2 Trigger Advance Rate**" means, as of any date, the rate equal to (a) 100% minus (b) the product of (i) the Stressed Interest Rate as of such date, multiplied by (ii) the applicable Stressed Time as of such date.

"**ABR Loan**" means a Loan bearing interest at a rate determined by reference to the Alternate Base Rate.

2

"**Acceptable Alternative Sale Agreement**" means an Overbid Sale Agreement or Replacement Sale Agreement, as the case may be, that satisfies each of the requirements listed below and shall otherwise, in form and substance, be acceptable to Administrative Agent in its reasonable discretion:

(a)    The agreement shall be on terms that are not more conditional and that are no less favorable to the Debtors than the terms of the Original Sale Agreements.

(b)    Without limiting the generality of clause (a) above, the agreement shall not be subject to any diligence or financing conditions and the proposed purchaser shall have obtained all requisite corporate/organizational approvals, and has obtained, or is reasonably likely to obtain all necessary governmental and third-party consents, within a time frame such that the contemplated sale is capable of being consummated by the Sale Closing Milestone.

(c)    The proposed purchaser(s) is/are capable of consummating the sale by the Sale Closing Milestone, after taking into account all relevant legal, regulatory, and business considerations.

(d)    The proposed purchaser(s) shall have provided such financial and other information demonstrating the proposed purchaser's financial wherewithal and business capabilities to fulfill all obligations in connection with the transactions contemplated by the agreement, including, without limitation, any equity or debt financing commitment letters.

(e)    The agreement shall fully disclose the identity of the proposed purchaser(s) and, if applicable, the proposed investors therein.

(f)    The agreement, and in the event there is more than one Replacement Sale Agreement and/or Overbid Sale Agreement, such Replacement and/or Overbid Sale Agreements collectively, shall provide for payment in full in Cash of the Obligations and termination of the Commitments on the closing date of the sale(s).

"**Acceptable Reorganization Plan**" means a Reorganization Plan that (a) authorizes and implements the sale transactions contemplated under the Sale Agreements, (b) provides for the termination of the Commitments and the payment in full in Cash of the Obligations under the Credit Documents (other than contingent indemnification obligations not yet due and payable) on the effective date of such Reorganization Plan and (c) provides (i) for releases and exculpations reasonably acceptable to Administrative Agent (which, for the avoidance of doubt, will extend to the Credit Facilities and the Prepetition GSAP Facility) and (ii) that the Obligations shall not be discharged pursuant to the terms of such Reorganization Plan or the Confirmation Order.

"**Accepted Servicing Practices**" means with respect to any Mortgage Loan, REO Property, Serviced Loan and owned real property resulting from the foreclosure of a Serviced Loan, those mortgage servicing practices that are in accordance with the applicable Guidelines and consistent with past practices, in all the foregoing cases, subject to the following exceptions: (a) servicing practices may be modified to conform to the applicable Guidelines, other than conforming to modifications made to the GMAC-RFC Servicer Guide, (b) as otherwise expressly consented to by Administrative Agent, and (c) to the extent that complying with any

3

such practice as to any Serviced Loan or owned real property resulting from the foreclosure of a
Serviced Loan would cause the related Servicer to violate any provision of the related
Designated Servicing Agreement.

"**Account Bank**" means the Borrower Account Bank, Collection Account Bank
or Concentration Account Bank, as applicable.

"**Activation Notice**" as defined in Section 9.01(c)(i).

"**Activation Period**" means the period on and after the date that an Activation
Notice has been received.

"**Activation Trigger Event**" means, at any time, Revolver Excess Availability
shall be less than $25,000,000 for a period of three (3) consecutive Business Days.

"**Additional Receivables**" means all Receivables created on or after the Closing
Date under the Designated Servicing Agreements that are sold, transferred and contributed by the
Originators to the Borrowers pursuant to the Receivables Pooling and Purchase Agreements, as
described in Section 2(a) of each such Receivables Pooling and Purchase Agreement.  For the
avoidance of doubt, the Additional Receivables to be funded on any Credit Date or Withdrawal
Date shall be identified in the annexes (and, in the aggregate, in the schedules) to the applicable
Borrowing Base and Collateral Amount Certificate delivered with respect to such Credit Date or
Withdrawal Date.

"**Adjustable Rate Mortgage Loan**" means a Mortgage Loan that provides for the
adjustment of the Mortgage Interest Rate payable in respect thereto.

"**Adjusted Eurodollar Rate**" means, for any Interest Period, an interest rate per
annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the Eurodollar Rate
for such Interest Period multiplied by (b) the Statutory Reserve Rate; <u>provided</u> that the Adjusted
Eurodollar Rate for purposes of interest rate determinations with respect to the Term Loans shall
at no time be less than 1.25% per annum.

"**Administrative Agent**" as defined in the preamble hereto.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a
form supplied by Administrative Agent.

"**Administrator**" means each of GMACM or RFC, each in its capacity as an
administrator hereunder on behalf of each Agent and each Lender, and any successor to
GMACM or RFC in such capacity.  References herein to the Administrator shall be read as
references to GMACM or RFC with respect to Collateral originated or serviced by GMACM or
RFC, as applicable.  However, each Administrator shall be jointly and severally responsible for
the duties of the other Administrator hereunder.  Each Agent and each Lender may rely on
directions, instructions and reports furnished by either Administrator as valid directions,
instructions or reports of both Administrators.  In certain cases, directions, instructions or reports
of the Administrator will be delivered by GMACM or RFC with respect to one or more

4

Designated Servicing Agreements and such directions, instructions or reports of both GMACM and RFC shall together constitute complete directions, instructions or reports, as applicable.

"**Advance**" means any P&I Advance, T&I Advance or Corporate Advance.

"**Advance Ratio**" means, as of any date of determination with respect to any Servicing Agreement, the ratio (expressed as a percentage) of (a) the Stressed Non-Recoverable Advance Amount with respect to each mortgage loan serviced under such Servicing Agreement to (b) the aggregate outstanding principal balance of all non-delinquent mortgage loans serviced under such Servicing Agreement.

"**Advance Reimbursement Amount**" means any amount which the related Servicer collects on a Serviced Loan, withdraws from an MBS Trust Collection Account or receives from an MBS Trustee, to reimburse an Advance made by such Servicer (including reimbursement of P&I Advances that were advanced by such Servicer using Amounts Held for Future Distribution) pursuant to a Designated Servicing Agreement.

"**Advance to Pool Balance Ratio**" means, as of any date of determination with respect to any Designated Servicing Agreement, the ratio (expressed as a percentage) of (a) the aggregate amount of all outstanding Advances made by GMACM or RFC, as Servicer, under such Designated Servicing Agreement (not including any Advances that were funded using Amounts Held for Future Distribution) to (b) the aggregate outstanding principal balance of all non-delinquent Serviced Loans serviced by GMACM or RFC, as Servicer, under such Designated Servicing Agreement.

"**Adverse Proceeding**" means any action, suit, litigation, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of ResCap or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of ResCap or any of its Subsidiaries, threatened against ResCap or any of its Subsidiaries or any property of ResCap or any of its Subsidiaries.

"**Affected Lender**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person. For the purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlling**," "**controlled by**" and "**under common control with**"), as applied to any Person, means the possession, directly or indirectly, of the power (a) to vote 5% or more of the Securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"**AFI**" means Ally Financial Inc., a Delaware corporation.

"**AFI/Junior Secured Notes Order**" as defined in Section 3.01(o).

5

"**Agent-Related Persons**" as defined in Section 10.03(c).

"**Agents**" means, collectively, Administrative Agent, Collateral Agent and Syndication Agent.

"**Agreed Upon Procedures Report**" as defined in Section 5.01(y).

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Aggregate Credit Exposure**" means, at any time, the aggregate Credit Exposure of all Lenders.

"**Aggregate Payments**" as defined in Section 7.02.

"**Aggregate Revolving/Term A-1 Credit Exposure**" means, at any time, the sum of the aggregate Revolving Exposure and the aggregate Term A-1 Credit Exposure of all Lenders.

"**Agreement**" means this Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of the Closing Date, and amended and restated as of the Restatement Effective Date, by and among the Borrowers, the Guarantors from time to time party hereto, the Lenders from time to time party hereto, Administrative Agent, Collateral Agent, Syndication Agent and the other Persons from time to time party hereto, as the same may be amended, amended and restated, supplemented or modified from time to time after the Restatement Effective Date in accordance with the terms hereof.

"**Ally Line of Credit**" means the credit facility under (a) the Prepetition Ally LOC Agreement, as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof (as so amended or supplemented, the "**Ally LOC Agreement**"), (b) the Prepetition Ally LOC Security Agreements, as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof (as so amended or supplemented, collectively, the "**Ally LOC Security Agreements**") and (c) the other Facility Documents (as defined in the Ally LOC Agreement), as amended or supplemented on or after the Petition Date, solely to the extent in accordance with the terms hereof.

"**Ally LOC Agreement**" as defined in the definition of "Ally Line of Credit."

"**Ally LOC DIP Amendment**" as defined in Section 3.01(o).

"**Ally LOC Security Agreements**" as defined in the definition of "Ally Line of Credit."

"**Ally Sale Agreement**" means the asset purchase agreement between ResCap, GMACM and RFC and Ally Financial Inc. and BMMZ Holdings LLC, in the form attached to the Sale Motion, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, as such agreement may be amended, supplemented and/or modified from time to time as permitted by Section 5.39.

6

"**Ally Superpriority Claim**" means, collectively, (a) AFI's rights, as lender under the AFI DIP Loan (as defined in the AFI/Junior Secured Notes Order ), in the AFI DIP Loan Collateral, as provided in paragraph 7 of the AFI/Junior Secured Notes Order; (b) Ally Bank's rights in the Collateral (as defined in the Master Purchase Pipeline Security Agreement), as provided in paragraph 8 of the Origination Order; and (c) Ally Investment Management LLC's rights in the Collateral (as defined in that certain MSFTA), as provided in paragraph 11 of the Origination Order.

"**Alternate Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> ½ of 1% and (c) the Adjusted Eurodollar Rate for a three (3) month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) <u>plus</u> 1%; <u>provided</u> that, for the avoidance of doubt, the Adjusted Eurodollar Rate for any day shall be based on the rate appearing on Reuters Page LIBOR01 (or on any successor or substitute page) at approximately 11:00 a.m. London time on such day (without any rounding). Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Eurodollar Rate, respectively; <u>provided</u> that the Alternate Base Rate for purposes of interest rate determinations with respect to the Term Loans shall at no time be less than 2.25% per annum.

"**Amounts Held for Future Distribution**" as defined in Section 9.03.

"**Applicable Margin**" and "**Applicable Revolving Commitment Fee Percentage**" mean:

(a) for the period commencing on the Closing Date until (but not including) the Restatement Effective Date, with respect to each Class of Loans and the Applicable Revolving Commitment Fee Percentage, the percentage per annum set forth in the table below:

| Applicable Margin for Term A-1 Loans | | Applicable Margin for Term A-2 Loans | | Applicable Margin for Revolving Loans and Protective Advances | | Applicable Revolving Commitment Fee Percentage |
|---|---|---|---|---|---|---|
| Eurodollar Rate Loan | ABR Loan | Eurodollar Rate Loan | ABR Loan | Eurodollar Rate Loan | ABR Loan | |
| 4.00% | 3.00% | 6.00% | 5.00% | 4.00% | 3.00% | 0.75% |

(b) for the period commencing on the Restatement Effective Date until all Obligations are repaid in full in Cash and all Commitments terminated, with respect to each Class of Loans and the Applicable Revolving Commitment Fee Percentage, the percentage per annum set forth in the table below:

| Applicable Margin for Term A-1 Loans | | Applicable Margin for Term A-2 Loans | | Applicable Margin for Revolving Loans and Protective Advances | | Applicable Revolving Commitment Fee Percentage |
|---|---|---|---|---|---|---|
| Eurodollar Rate Loan | ABR Loan | Eurodollar Rate Loan | ABR Loan | Eurodollar Rate Loan | ABR Loan | |
| 3.75% | 2.75% | 5.50% | 4.50% | 3.75% | 2.75% | 0.75% |

7

"**Appraised Value**" means, as of any date of determination, (a) with respect to any Mortgaged Property, the lesser of (i) the appraised value thereof based upon the appraisal made at the time of origination of the related Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac and (ii) the sales price of the related Mortgaged Property at such time of origination, except in the case of a Mortgaged Property securing a refinanced or modified Mortgage Loan, as to which it is either the appraised value determined above, or the appraised value determined in an appraisal at the time of refinancing or modification, as the case may be, and (b) with respect to any REO Property owned by a Borrower's REO Subsidiary included or proposed to be included in the Borrowing Base and Collateral Amount, the valuation set forth in a Broker's Price Opinion as of a date within ninety (90) days prior to such date of determination; <u>provided</u> that if, after the date of valuation set forth in the most recent Broker's Price Opinion with respect to such REO Property, but prior to the date such REO Property is included or proposed to be included in the Borrowing Base and Collateral Amount, a material casualty or condemnation event with respect to the REO Property shall have occurred, an updated Broker's Price Opinion shall be required prior to such REO Property being included in the Borrowing Base and Collateral Amount, and the "Appraised Value" shall be the valuation of the REO Property set forth in such updated Broker's Price Opinion.

"**Approved DIP Budget**" means each Cash flow forecast, on a line item basis and in reasonable detail, of (a) Cash receipts, Cash disbursements and net Cash flows, each as to the First Lien Collateral, including Eligible Receivables, Eligible Mortgage Loans, Eligible REO Property, Cash and Cash Equivalents in the Blocked Accounts, and Collections, (b) aggregate outstanding Loans, (c) the Book Value of Eligible Receivables, Market Value of Eligible Mortgage Loans and Appraised Value of Eligible REO Property and (d) projected availability under the Revolving Facility, for a period of twenty (20) weeks, set forth on a weekly basis, as approved by Administrative Agent in accordance with Section 5.02(a) (or, with respect to the Initial Approved DIP Budget, as delivered pursuant to Section 3.01(h)), commencing with the Initial Approved DIP Budget and as updated from time to time as required under Section 5.02.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Agents, the Lenders or the Credit Parties by means of electronic communications pursuant to Section 12.01(b).

"**Approved Fund**" means any Person (other than a natural person) that is engaged in making, holding or investing in extensions of credit in its ordinary course of business and is administered or managed by (a) a Lender, (b) an entity that administers or manages a Lender or (c) an Affiliate of either of the foregoing.

"**Approved Trust Receipt**" means, a Trust Receipt issued by the Custodian to Collateral Agent pursuant to the Custodial Agreement, evidencing delivery of a Note-Only Mortgage File or Complete Mortgage File, as the case may be, with respect to any Eligible Mortgage Loan and subject only to those Exceptions approved by Collateral Agent in its sole discretion.

"**Asset Sale**" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property (including, without limitation, any Capital Stock) with, any Person, in one transaction or a series of transactions, of all or any part of any Credit Party's businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether owned as of the Closing Date or thereafter acquired, other than (a) the liquidation or short sale, in the ordinary course of the servicing business, of REO Property, (b) the use or transfer of Cash and Cash Equivalents (including the transfer of funds by any Borrower to the Concentration Account) to the extent and in a manner that is not prohibited by the terms of this Agreement or any other Credit Document, (c) the creation of a Permitted Lien, (d) the sale or other disposition (other than by any Borrower or any Borrower's REO Subsidiary) of equipment that is obsolete, worn-out, condemned or no longer used or useful in the business of ResCap or any of its Subsidiaries, (e) the sale or other disposition (other than by any Borrower or any Borrower's REO Subsidiary) of other assets set forth on Schedule 6.08, (f) the sale, assignment, conveyance, transfer, exchange or other disposition of any Receivables or Mortgage Loans to any Borrower pursuant to and in accordance with the terms of the Receivables Pooling and Purchase Agreements, the Receivables Purchase Agreements and the Mortgage Loan Purchase and Contribution Agreements, in each case, in accordance with the Approved DIP Budget and to the extent not otherwise prohibited pursuant to the terms of this Agreement, and (g) the sale, assignment, conveyance, transfer, exchange, contribution or other disposition of REO Property by any Borrower to its Borrower's REO Subsidiary to the extent and in a manner that is not prohibited by the terms of this Agreement or any other Credit Document.

"**Assignee Group**" means two (2) or more Eligible Assignees that are Affiliates of one another or two (2) or more Approved Funds managed by the same investment advisor.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent.

"**Attorney Bailee Letter**" as defined in the Custodial Agreement.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of one of its vice presidents (or the equivalent thereof), any Senior Officer or member of Senior Management, secretary, or other Person expressly authorized by resolution or written consent to represent such entity in such capacity.

"**Banking Services**" means treasury management services (including without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts, interstate depository network services and purchasing cards and similar programs) provided to any Credit Party by any Banking Services Provider.

"**Banking Services Obligations**" means any and all obligations of any Credit Party, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefore) owing to any Banking Services Provider in connection with Banking Services.

9

"**Banking Services Provider**" means any Lender or any of its Affiliates.

"**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy" as in effect as of the Closing Date or thereafter in effect (or any similar or equivalent legislation as in effect in any applicable jurisdiction), or any successor statutes.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time.

"**Bankruptcy Event**" means, with respect to any Person, any event whereby such Person (a) becomes the subject of a bankruptcy or insolvency proceeding, (b) has a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or (c) in the good faith determination of Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment; provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof; provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"**Barclays**" as defined in the preamble hereto.

"**Barclays Fee Letter**" means the Fee Letter, dated as of April 9, 2012, by and among ResCap, RFC, GMACM and Barclays, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Beneficiary**" means each Agent and Lender.

"**Blocked Accounts**" as defined in Section 9.01(e)(ii).

"**Board**" means the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" means (a) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board; (b) with respect to a partnership, the Board of Directors of the general partner of the partnership; (c) with respect to a limited liability company, the manager, managing member or members, board of managers or any controlling committee or board of directors of such company or the sole member or the managing member thereof; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"**Book Value**" means, as of any date of determination, with respect to any Eligible Receivable, the Receivable Balance of such Eligible Receivable (any Charged-Off Receivable Balance being considered to have a Book Value of zero).

"**Borrower Account Bank**" as defined in Section 9.01(a).

"**Borrower Accounts**" as defined in Section 9.01(a).

"**Borrower Materials**" as defined in Section 12.01(d).

"**Borrowers**" as defined in the preamble hereto.

"**Borrower's Case**" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which one of the Borrowers is the debtor and the debtor-in-possession.

"**Borrower's REO Subsidiary**" means (a) with respect to GMACM Borrower, GMACM REO Subsidiary, and (b) with respect to RFC Borrower, RFC REO Subsidiary; "**Borrowers' REO Subsidiaries**" means, collectively, GMACM REO Subsidiary and RFC REO Subsidiary.

"**Borrowers Security Agreement**" means the Debtor-in-Possession Security Agreement, substantially in the form of Exhibit W, dated as of the Closing Date, among Borrowers, the Borrowers' REO Subsidiaries and Collateral Agent, as the same may be amended, amended and restated, supplemented or  modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**Borrowing Base**" means at any time, an amount equal to the sum of, without duplication:

(a)      (i) the sum of (x) the Market Value of Eligible Mortgage Loans plus (y) the Appraised Value of Eligible REO Property, multiplied by (ii) an advance rate of 50%, plus

(b)      the Book Value of Eligible Receivables multiplied by the lesser of (i) an advance rate of 90% or (ii) the A-1/Revolver Trigger Advance Rate, plus

(c)      100% of the aggregate amount of Cash and Cash Equivalents on deposit in the Borrower Accounts and the Concentration Account (or, following the receipt of an Activation Notice but prior to the commencement of a Dominion Period, 100% of the aggregate amount of Cash and Cash Equivalents on deposit in the Collection Account), minus

(d)      (i) the Carve Out Reserves and (ii) effective immediately upon notification thereof to Borrowers by Administrative Agent, any other Reserves established from time to time in accordance with the provisions set forth in the definition of "Reserves."

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base and Collateral Amount Certificate theretofor delivered to Collateral Agent and Administrative Agent with such adjustments as Collateral Agent deems appropriate in its Permitted Discretion to assure that the Borrowing Base is calculated in accordance with the terms of this Agreement.

11

"**Borrowing Base and Collateral Amount Certificate**" means a certificate from the Primary Credit Parties, to be executed and delivered by the Chief Financial Officer, Treasurer or, to the extent expressly permitted hereunder or otherwise in the sole discretion of Collateral Agent, Assistant Treasurer or any Senior Treasury Services Officer of each Primary Credit Party, substantially in the form of, and containing the information prescribed by, Exhibit I, delivered to Administrative Agent and Collateral Agent and setting forth the Primary Credit Parties' calculations of the Borrowing Base and the Collateral Amount.

"**Borrowing Base Shortfall**" as defined in Section 2.14(b).

"**Broker's Price Opinion**" means, with respect to a Mortgaged Property or REO Property, a broker's price opinion (a) prepared by a duly licensed real estate broker (i) who has no interest, direct or indirect, in the related Mortgaged Property or REO Property or in either Borrower or any Affiliate of either Borrower and (ii) whose compensation is not affected by the results of the broker's price opinion and (b) containing a valuation which indicates the expected proceeds for a sale of the related Mortgaged Property or REO Property and includes certain assumptions, including those as to the condition of the interior of the applicable Mortgaged Property or REO Property and marketing time.

"**Business Day**" means (a) any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (b) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "Business Day" means any day that is a Business Day described in clause (a) and that is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of such Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Carve Out**" means (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code, (b) any and all allowed and unpaid claims of professionals whose retention is approved by the Bankruptcy Court during the Cases pursuant to Sections 327 and 1103 of the Bankruptcy Code for unpaid fees and expenses incurred (i) prior to the occurrence of an Event of Default and (ii) at any time after the occurrence and during the continuance of an Event of Default in an aggregate amount not exceeding the Carve Out Cap, which shall be used to pay fees and expenses incurred by the Credit Parties' professionals retained in the Cases and fees and expenses incurred by professionals of any official committee (the "**Committee**") (including the reimbursement of out-of-pocket expenses of the members of such Committee) appointed in the Cases and (c) all

12

reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $500,000. Any payments of the allowed professional fees incurred after an Event of Default shall reduce the amount of the Carve Out by the amount of any such payment. The Carve Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including any Credit Party, any Committee, unofficial committee or ad hoc group or any professional, in connection with (1) any challenge to the validity, perfection, priority, extent or enforceability of the Loans and the other Obligations under the Credit Facilities, or the Liens on any Collateral or security interests securing the Obligations, (2) any investigation or assertion of any other claims or causes of action against any Lender, any Agent or any other holder of any Obligations, (3) any challenge to the validity, perfection, priority, extent or enforceability of the Prepetition GSAP Facility, or the Liens on the trust estate and collateral under the Prepetition GSAP Facility or other security interests securing the Prepetition GSAP Facility (but may be used by professionals for the Committee to investigate such matters in an amount not to exceed $100,000), or (4) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of Administrative Agent, Collateral Agent or any Lender as set forth herein and in the other Credit Documents, or which results in the occurrence of an Event of Default, unless otherwise agreed in writing by Administrative Agent in its sole discretion. For the avoidance of doubt, the Carve Out Cap shall neither be reduced nor increased by the amount of compensation or reimbursement of allowed fees and/or expenses incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked, and nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in this definition.

"**Carve Out Cap**" means $25,000,000 or such lesser amount determined by the Bankruptcy Court in connection with an allocation of such $25,000,000 between the Collateral and the AFI DIP Loan Collateral (as defined in the AFI/Junior Secured Notes Order).

"**Carve Out Reserves**" means, at any time, the reserves established by Administrative Agent or Collateral Agent in an amount equal to the sum of (a) the aggregate remaining available amount of the Carve Out Cap at such time, if any and (b) $500,000 (or any such lesser unused amount) to be used in accordance with clause (c) of the definition of "Carve Out."

"**Cases**" means collectively, each and all of (x) Borrower's Cases and (y) the Guarantor's Cases.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means (a) securities with maturities of ninety (90) days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with weighted average maturities of ninety (90) days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000 and a rating of at least "A+" and "A1" from S&P and Moody's, respectively, (c) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven (7) days with respect to securities issued or fully

13

guaranteed or insured by the United States Government, (d) securities with weighted average maturities of ninety (90) days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A" by S&P or "A" by Moody's, (e) securities with maturities of ninety (90) days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition, or (f) shares of "2a-7" money market mutual funds rated "AAA" by Moody's and S&P that have a weighted average maturity of ninety (90) days or less or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (e) of this definition.

"**Cash Management Order**" as defined in Section 3.01(d).

"**Change in Law**" means (a) the adoption or taking effect of any law, rule or regulation or treaty after the date of this Agreement, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, central bank or comparable agency after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.19(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority, central bank or comparable agency made or issued after the date of this Agreement.  Notwithstanding the foregoing, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines, requirements and directives promulgated thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to have been introduced or adopted after the Closing Date, regardless of the date enacted, adopted, issued or implemented.

"**Change of Control**" means, at any time, the occurrence of any of the following events:

(a)    any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act), other than the Investors, the U.S. Department of the Treasury, the GM Trusts, or any purchaser of the beneficial interest of General Motors in the GM Trusts, shall acquire ownership, directly or indirectly, beneficially or of record, in the aggregate, Capital Stock representing a majority of the Capital Stock of ResCap having the right to vote for election of directors (or the equivalent thereof) of ResCap under ordinary circumstances;

(b)    AFI shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of ResCap;

14

(c)     ResCap shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of any Borrower or any Guarantor Subsidiary (except, in the case of any Guarantor Subsidiary (other than any Restricted Entity) pursuant to a transaction permitted under Section 6.08 or 6.09);

(d)     GMACM shall fail to directly own and control 100% of the aggregate issued and outstanding Capital Stock of GMACM Borrower;

(e)     RFC shall fail to directly own and control 100% of the aggregate issued and outstanding Capital Stock of RFC Borrower;

(f)      the applicable Borrower shall fail to directly own and control 100% of the aggregate issued and outstanding Capital Stock of its Borrower's REO Subsidiary; or

(g)     the majority of the seats (other than vacant seats) on the Board of Directors (or similar governing body) of any Primary Credit Party cease to be occupied by Persons who either (i) were members of the Board of Directors (or similar governing body) of such Primary Credit Party on the Closing Date or (ii) were nominated for election by the Board of Directors (or similar governing body) of such Primary Credit Party, a majority of whom were directors on the Closing Date or whose election or nomination or appointment for election was previously approved by a majority of such directors or by the Investors, as applicable.

"**Charged-Off Receivable Balance**" means any portion of the Receivable Balance of any Receivable which has not been paid in full following application of the liquidation proceeds or the last collection in respect of the related Serviced Loan, and any portion of a Receivable's Receivable Balance which the related Servicer determines it will not recover, pursuant to its customary practices in place on the date of this Agreement.

"**Class**" (a) when used with respect to Lenders, refers to whether such Lenders are Initial Term A-1 Lenders, Delayed Draw Term A-1 Lenders, Term A-2 Lenders or Revolving Lenders, (b) when used with respect to Commitments, refers to whether such Commitments are Initial Term A-1 Commitments, Delayed Draw Term A-1 Commitments, Term A-2 Commitments or Revolving Commitments and (c) when used with respect to Loans, refers to whether such Loans are Initial Term A-1 Loans, Delayed Draw Term A-1 Loans, Term A-2 Loans, Revolving Loans or Protective Advances.

"**Closing Date**" means May 16, 2012.

"**Collateral**" means, collectively, all of the property in which Liens are granted pursuant to the Collateral Documents and the Orders as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Agent Fee Letter**" means the Fee Letter, dated as of May 13, 2012, by and among ResCap, RFC, GMACM and Barclays, as it may be amended, supplemented or otherwise modified from time to time.

"**Collateral Amount**" means, at any time, an amount equal to the sum of, without duplication:

(a)    (i) the sum of (x) the Market Value of Eligible Mortgage Loans plus (y) the Appraised Value of Eligible REO Property, multiplied by (ii) an advance rate of 75%, plus

(b)    the Book Value of Eligible Receivables multiplied by the lesser of (i) an advance rate of 95% or (ii) the A-2 Trigger Advance Rate, plus

(c)    100% of the aggregate amount of Cash and Cash Equivalents on deposit in the Borrower Accounts and the Concentration Account (or, following the receipt of an Activation Notice but prior to the commencement of a Dominion Period, 100% of the aggregate amount of Cash and Cash Equivalents on deposit in the Collection Account), minus

(d)    (i) the Carve Out Reserves and (ii) effective immediately upon notification thereof to Borrowers by Administrative Agent, any other Reserves established from time to time in accordance with the provisions set forth in the definition of "Reserves."

The Collateral Amount at any time shall be determined by reference to the most recent Borrowing Base and Collateral Amount Certificate theretofor delivered to Collateral Agent and Administrative Agent with such adjustments as Collateral Agent deems appropriate in its Permitted Discretion to assure that the Collateral Amount is calculated in accordance with the terms of this Agreement.

"**Collateral Amount Shortfall**" as defined in Section 2.14(c).

"**Collateral Documents**" means (a) the Borrowers Security Agreement, (b) the MSR Security Agreement, (c) the LOC Security Agreement, (d) the ResCap Security Agreement, (e) the Perfection Certificate, (f) the Deposit Account Control Agreements, (g) the Custodial Agreement, (h) the Deposit Security Agreement and (i) all other customary instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of the Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations, in each of the foregoing cases, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.  The Collateral Documents shall supplement, and shall not limit, the grant of Liens on and security interests in Collateral pursuant to the Orders.

"**Collection Account**" as defined in Section 9.01(e)(ii).

"**Collections**" means, (a) with respect to Receivables, all Cash collected by GMACM or RFC, as Servicer, in reimbursement of Receivables, including Advance Reimbursement Amounts and any sale proceeds related to Receivables earned by GMACM or RFC, (b) with respect to Mortgage Loans, any principal payments and/or interest payments made thereon and Net Liquidation Proceeds thereof, but excluding: (i) escrow payments received on all Mortgage Loans; (ii) servicing and subservicing fees on Specified Mortgage Loans; (iii) reimbursements of any servicing advances with respect to such Specified Mortgage Loans; (iv)

16

any incentive payments or recovery fees received (or, in the case of Specified Mortgage Loans, earned) by any servicer, special servicer or subservicer for loss mitigation efforts or collection efforts authorized by the Guidelines on any Mortgage Loan, including any incentives paid to the applicable servicer by HAMP paid or payable by GMACM or RFC, as servicer; and (v) late charges or other ancillary income customarily charged by any servicer, special servicer or subservicer (and in the case of GMACM Serviced Mortgage Loans, to the extent received), such as fees on any Mortgage Loan, including, without limitation, to prepare demand statements, lien releases and subordination agreements paid or payable by GMACM or RFC, as servicer, and (c) with respect to REO Property, all Cash collected from the disposition of such REO Property.

"**Commitment Letter**" means that certain Commitment Letter, dated as of April 9, 2012, by and among ResCap, GMACM, RFC and Barclays.

"**Commitment**" means, with respect to each Lender, the sum of such Lender's Revolving Commitment, Initial Term A-1 Commitment, the Delayed Draw Term A-1 Commitment and Term A-2 Commitment, together with the commitment of such Lender to acquire participations in Protective Advances hereunder.

"**Committee**" as defined in the definition of "Carve Out."

"**Complete Mortgage File**" shall have the meaning set forth in the Custodial Agreement.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C, as amended and restated on the Restatement Effective Date.

"**Concentration Account**" as defined in Section 9.01(b).

"**Concentration Account Bank**" as defined in Section 9.01(b).

"**Confirmation Order**" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to Administrative Agent, confirming an Acceptable Reorganization Plan.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by such Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which such Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.02.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion of any Loans, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

17

"**Corporate Advance**" means, collectively, (a) any advance (other than those described in clause (b) below) made by a Servicer pursuant to a Designated Servicing Agreement to inspect, protect, preserve or repair properties that secure defaulted Serviced Loans or that have been acquired through foreclosure or deed in lieu of foreclosure or other similar action pending disposition thereof, or for similar or related purposes, including, but not limited to, necessary legal fees and costs expended or incurred by such Servicer in connection with foreclosure, bankruptcy, eviction or litigation actions with or involving Obligors on defaulted Serviced Loans, as well as costs to obtain clear title to such a property, to protect the priority of the lien created by a Serviced Loan on such a property and to dispose of properties taken through foreclosure or by deed in lieu thereof or other similar action, (b) any advance made by a Servicer pursuant to a Designated Servicing Agreement to foreclose or undertake similar action with respect to a Serviced Loan and (c) any other out of pocket expenses incurred by a Servicer pursuant to a Designated Servicing Agreement (including, for example, costs and expenses incurred in loss mitigation efforts and in processing assumptions of Serviced Loans), to the extent such advances are reimbursable in the manner required for an Eligible Receivable pursuant to the related Designated Servicing Agreement.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit F delivered by a Credit Party pursuant to Section 5.11.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of (a) this Agreement, (b) the Notes, if any, (c) the Collateral Documents, (d) the Fee Letters, (e) the Receivables Pooling and Purchase Agreements, (f) the Receivables Purchase Agreements, (g) the Mortgage Loan Purchase and Contribution Agreements and (h) all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent or any Lender in connection herewith on or after the Closing Date.

"**Credit Exposure**" means, with respect to any Lender at any time, the sum of (a) such Lender's Revolving Exposure at such time, plus (b) an amount equal to the aggregate principal amount of its Term A-1 Loans outstanding at such time, plus (c) an amount equal to the aggregate principal amount of its Term A-2 Loans outstanding at such time, plus (d) an amount equal to its Pro Rata Share, if any, of the aggregate principal amount of Protective Advances outstanding at such time.

"**Credit Extension**" means the making of a Loan.

"**Credit Facility**" means the Revolving Facility, the Initial Term A-1 Facility, the Delayed Draw Term A-1 Facility or the Term A-2 Facility, as the context may require, and "**Credit Facilities**" means all of the foregoing, collectively.

"**Credit Parties**" means, collectively, the Borrowers, Guarantors, Grantors, Administrators, Originators, Receivables Custodians, Servicers and GMACM Servicer; each such Person in its respective capacity or capacities, a "**Credit Party**."

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement.

"**Current Period**" means, with respect to any Approved DIP Budget, the twenty-week period covered thereby.

"**Custodial Agreement**" mean the Custodial Agreement, dated as of the Closing Date, among the Borrowers, Collateral Agent and the Custodian, providing for the custody of Mortgage Files relating to the Mortgage Loans, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**Custodian**" means Wells Fargo Bank, N.A. or such other Person as may be appointed by Collateral Agent from time to time pursuant to the Custodial Agreement and who is reasonably acceptable to Administrative Agent.

"**Debtor Relief Law**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or any political subdivision of the foregoing jurisdictions or other applicable jurisdictions from time to time in effect.

"**Debtors**" means, collectively, ResCap and each of its Subsidiaries that have filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Rate**" as defined in Section 2.10.

"**Defaulting Lender**" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, unless such Lender notifies Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, or (ii) pay over to any Agent or any Lender any other amount required to be paid by it hereunder, (b) has notified any Borrower, any Agent or any Lender in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by any Agent or any Lender, acting in good faith, to provide a certification in writing from an Authorized Officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement; <u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant

19

to this clause (c) upon such Agent's or Lender's receipt of such certification in form and substance satisfactory to it and Administrative Agent, or (d) has become the subject of a Bankruptcy Event.  Notwithstanding the foregoing, no Lender shall be a Defaulting Lender solely by virtue of any Governmental Authority owning any of its or its Affiliates' Capital Stock or other equity interests.

"**Delayed Draw Term A-1 Commitment**" means the commitment of a Lender to make or otherwise fund any Delayed Draw Term A-1 Loan hereunder, and "**Delayed Draw Term A-1 Commitments**" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Delayed Draw Term A-1 Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the Delayed Draw Term A-1 Commitments as of the Restatement Effective Date is $10,000,000.

"**Delayed Draw Term A-1 Facility**" means, at any time, the aggregate amount of the Delayed Draw Term A-1 Commitments or Delayed Draw Term A-1 Loans at such time.

"**Delayed Draw Term A-1 Lender**" means each Lender having a Delayed Draw Term A-1 Commitment as set forth on Appendix A-2 hereto or in the Assignment Agreement by which such Lender becomes a Delayed Draw Term A-1 Lender, or after the making of the Delayed Draw Term A-1 Loans, each Lender holding any Delayed Draw Term A-1 Loan.

"**Delayed Draw Term A-1 Loan**" means a delayed draw term A-1 loan made by a Delayed Draw Term A-1 Lender pursuant to Section 2.01(b) on the Restatement Effective Date.

"**Delinquent**" means a Mortgage Loan (a) that is thirty (30) days or more delinquent using the Mortgage Bankers Association delinquency calculation method or (b) with respect to which the related Mortgage Loan is a Lost Note Mortgage Loan.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Deposit Account Control Agreement**" means, in the case of any Blocked Account, an agreement with a bank which maintains one or more Blocked Accounts, which provides, among other things, for the depository institution's agreement that it will comply with instructions originated by Collateral Agent directing disposition of funds in the deposit account in accordance with the terms of this Agreement without further consent by any Credit Party, and (a) in the case of the Collection Account, which provides that no Credit Party shall have any right to issue any instructions or withdraw any funds from the Collection Account, and substantially in the form of Exhibit T-1 or otherwise in form and substance acceptable to Collateral Agent, and (b) in the case of the Borrower Accounts and the Concentration Account, which provides that following the receipt of an Activation Notice no Credit Party shall have any right to issue any instructions or withdraw any funds from such Blocked Accounts, and substantially in the form of Exhibit T-2 or otherwise in form and substance acceptable to Collateral Agent, as any such agreement may be amended, amended and restated, supplemented

20

or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**Deposit Security Agreement**" means the Debtor-in-Possession Security Agreement, substantially in the form of Exhibit X, dated as of the Closing Date, among the Credit Parties thereto and Collateral Agent, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**Designated Mortgage Loans**" means, at any time, Mortgage Loans designated by Administrative Agent, in consultation with the Primary Credit Parties, to be transferred to the Delaware statutory trusts described in Section 5.44.

"**Designated Servicing Agreement**" means, as of any date, any Servicing Agreement that is an Eligible Servicing Agreement listed on the Designated Servicing Agreement Schedule as of such date, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Designated Servicing Agreement Schedule**" means the list of all Designated Servicing Agreements.  The Designated Servicing Agreement Schedule is attached hereto as Schedule 1.01A.

"**Disqualified Assignee**" means any of AFI, Ally Insurance Holdings Inc., Ally Investment Management LLC, Ally Securities LLC, Ally Bank, BMMZ Inc., BMMZ Holdings LLC, Motors Insurance Corporation, MIC Property and Casualty Insurance Corporation and CIM Insurance Corporation.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary (whether existing as of the Closing Date or subsequently acquired or organized) organized under the laws of the United States, any State thereof or the District of Columbia.

"**Dominion Period**" means the period on and after the date that an Activation Notice has been received and an Event of Default has occurred.

"**EAF Collateral**" means the reimbursement rights that are subject to the EAF Facility for certain advances required to be made by GMACM under the Fannie Mae Servicing Guide with respect to the mortgage loans serviced by GMACM pursuant to the Fannie Mae Contracts and the other assets of GMACM subject to a Lien in favor of Fannie Mae pursuant to the terms of the EAF Facility.

"**EAF Facility**" means the early advance reimbursement facility under the Amendment and Restatement of the Early Advance Funding Mechanism Addendum, dated as of August 1, 2011, between Fannie Mae and GMACM (as amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date).

21

"**EAF Order**" as defined in Section 3.01(p).

"**Eligible Asset**" means any Eligible Mortgage Loan, Eligible Receivable or Eligible REO Property.

"**Eligible Assignee**" means (a) any Lender, any Affiliate of any Lender and any Related Fund (any two (2) or more Related Funds being treated as a single Eligible Assignee for all purposes hereof) or (b) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and that extends credit or buys loans in the ordinary course; provided, no Credit Party nor any of its Subsidiaries shall be an Eligible Assignee; provided, further, that no Disqualified Assignee shall be an Eligible Assignee; provided, further, no Affiliate of ResCap, AFI or Sponsor other than a Sponsor Affiliated Lender or Sponsor Affiliated Institutional Lender shall be an Eligible Assignee.

"**Eligible Mortgage Loan**" as defined in Section 2.24(b).

"**Eligible Receivable**" as defined in Section 2.24(a).

"**Eligible Receivables Schedule**" means a schedule prepared and updated from time to time by the Administrator, in substantially the same form as the initial Eligible Receivables Schedule delivered on the Closing Date or otherwise acceptable to Collateral Agent, which sets forth, as of any date, for each Designated Servicing Agreement, (a) the aggregate Receivable Balance of Receivables originated under such Designated Servicing Agreement constituting Eligible Receivables owned by the Borrowers as of such date, (b) the name or other unique identifier for such Designated Servicing Agreement, (c) the aggregate outstanding principal balance of Serviced Loans under such Designated Servicing Agreement, (d) total number of Serviced Loans under such Designated Servicing Agreement, (e) the aggregate amount of all outstanding (i) P&I Advances, (ii) T&I Advances, (iii) Corporate Advances and (iv) total Advances, in each such case, made by GMACM or RFC, as Servicer, under such Designated Servicing Agreement (not including any Advances that were funded using Amounts Held for Future Distribution), as well as such other fields mutually agreed to by Borrowers and Administrative Agent from time to time, as such schedule shall be amended from time to time in accordance with this Agreement.

"**Eligible REO Property**" as defined in Section 2.24(c).

"**Eligible Servicing Agreement**" means any Servicing Agreement that meets all of the following criteria:

(a)     an Authorized Officer of GMACM or RFC, as the case may be, has received neither (i) any notice, or otherwise obtained actual knowledge, of the occurrence of an Unmatured Default or Servicer Termination Event, or of the suspension, termination, removal or resignation by or with respect to GMACM or RFC, as the case may be, as the Servicer under such Servicing Agreement except to the extent that, (x) in the case of an Unmatured Default, such Unmatured Default has been cured prior to its becoming a Servicer Termination Event and (y) in the case of any Unmatured Default or Servicer Termination Event caused solely by the failure of a test measuring the delinquency performance of the related pool

22

of mortgage loans subject to such Servicing Agreement, the related Servicer has not received a notice of termination from one or more parties authorized to terminate the Servicer under such Servicing Agreement, nor (ii) any notice of a claim for monetary loss against the Servicer by a party to such Servicing Agreement or by a related securityholder, whose claim is for an aggregate amount greater than 5% of the aggregate Receivable Balance of the Receivables created pursuant to such Servicing Agreement;

(b)    (i)    such Servicing Agreement provides that the Servicer is permitted to reimburse itself for each Advance made thereunder out of late collections, insurance proceeds and liquidation proceeds from the Serviced Loan with respect to which such Advance was made, prior to the distributions of payments on any related securities, which securities in the case of a Servicing Agreement include a "AAA (sf)" or equivalent rated class at the time of execution of the Servicing Agreement, and prior to payment of any party subrogated to the rights of the holders of such securities (such as a reimbursement right of a credit enhancer) or any hedge or derivative termination fees, or to the related MBS Trust; and

(ii)    in the case of any Receivable, if the Servicer determines that the related Advance will not be recoverable out of late collections of the amounts advanced or out of insurance proceeds or liquidation proceeds from the Serviced Loan with respect to which such Advance was made, the Servicer has the right under such Servicing Agreement to reimburse itself for such Advance out of any funds in the related MBS Trust Collection Account or out of general collections received by the Servicer with respect to any Serviced Loans serviced under the same Servicing Agreement, prior to any payment of any holders of any notes, certificates or other securities backed by the related Serviced Loan pool, which securities include a "AAA (sf)" or equivalent rated class at the time of execution of such Servicing Agreement, and prior to payment of any party subrogated to the rights of the holders of such securities (such as a reimbursement right of a credit enhancer) or any hedge or derivative termination fees, or to the related MBS Trust;

(c)    such Servicing Agreement (or an effective amendment thereto) provides that the Servicer may enter into a facility with any Person which provides that (i) such Person may receive an assignment or pledge of the Servicer's rights to be reimbursed for Advances under such Servicing Agreement, (ii) all Advances as to a Serviced Loan are reimbursed on a "first-in, first-out" or "FIFO" basis, such that the Advances of a particular type that were disbursed first in time will be reimbursed prior to Advances of the same type with respect to that Serviced Loan that were disbursed later in time and (iii) the related MBS Trustee, master servicer, securities administrator, credit enhancer and any other party entitled to payment under such Servicing Agreement waives all rights of setoff or recoupment with respect to any Advance Reimbursement Amount;

(d)    all Receivables arising under such Servicing Agreement are free and clear of any Lien in favor of any Person (other than Liens described in clause (a) of the definition of "Permitted Collateral Liens");

23

(e)    such Servicing Agreement is in full force and effect and no Servicer Termination Event or similar event, however named, shall have occurred and be continuing under such Servicing Agreement (except any Servicer Termination Event caused solely by the failure of a collateral performance test under such Servicing Agreement, in respect of which the related Servicer has not received a notice of termination from one or more parties authorized to terminate the Servicer under such Servicing Agreement); and

(f)    as of the end of the most recently concluded calendar month, the unpaid principal balance of the Serviced Loans serviced under such Servicing Agreement is at least $1,000,000 and at least fifteen (15) Serviced Loans are being serviced under such Servicing Agreement.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or was sponsored, maintained or contributed to by, or required to be contributed by, ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, written notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other written order or directive, by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of or liability under any Environmental Law, (b) in connection with any Release or threatened Release of Hazardous Material or any actual or alleged Hazardous Materials Activity or (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, state, local or provincial (or any subdivision of either of them) laws (statutory, common or otherwise), statutes, ordinances, orders, rules, regulations, judgments, writs, injunctions or decrees, Governmental Authorizations, or any other legally enforceable requirements, including any legally binding judicial or agency interpretation, of Governmental Authorities relating to (a) pollution of the environment, including those relating to protection or rehabilitation of the land, water (surface or subsurface water) or air, or relating to any Hazardous Materials Activity; (b) the generation, use, storage, transportation or disposal of Hazardous Materials; or (c) occupational safety and health, industrial hygiene, land use, natural resources or the protection of human, plant or animal health or welfare, in any manner applicable to ResCap or any of its Subsidiaries or any of their respective properties.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time (or any similar or equivalent legislation as in effect in any applicable jurisdiction) and any successors thereto.

"**ERISA Affiliate**" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which such Person is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which such Person is a member; and (c) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which such Person, any corporation described in clause (a)

24

above or any trade or business described in clause (b) above is a member.  Any former ERISA
Affiliate of ResCap or any of its Subsidiaries shall continue to be considered an ERISA Affiliate
of ResCap or any such Subsidiary within the meaning of this definition with respect to the period
such entity was an ERISA Affiliate of ResCap or such Subsidiary and with respect to liabilities
for which ResCap or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section
4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan
(excluding the reportable event under Section 4043(c)(10) of ERISA coincident to the
commencement of the Cases and those for which the provision for thirty (30) days notice to the
PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of
Section 412 of the Internal Revenue Code or Section 302 of ERISA with respect to any Pension
Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code or
Section 302(c) of ERISA), the application for a minimum funding waiver with respect to a
Pension Plan under Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA or
the failure to make any required contribution to a Multiemployer Plan; (c) the conditions for
imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any
Pension Plan; (d) a determination that any Pension Plan is in "at risk" status (within the meaning
of Section 303 of ERISA); (e) the provision by the administrator of any Pension Plan pursuant to
Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination
described in Section 4041(c) of ERISA; (f) the withdrawal by ResCap, any of its Subsidiaries or
any of their respective ERISA Affiliates from any Pension Plan with two (2) or more
contributing sponsors or the termination of any such Pension Plan resulting in liability to ResCap,
any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of
ERISA; (g) the institution by the PBGC of proceedings to terminate any Pension Plan, or the
occurrence of any event or condition which might constitute grounds under ERISA for the
termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the
imposition of liability on ResCap, any of its Subsidiaries or any of their respective ERISA
Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of
Section 4212(c) of ERISA; (i) the withdrawal of ResCap, any of its Subsidiaries or any of their
respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections
4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability
therefore, or the receipt by ResCap, any of its Subsidiaries or any of their respective ERISA
Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency
pursuant to Section 4241 or 4245 of ERISA, that it has been determined to be in "endangered" or
"critical" status within the meaning of Section 432 of the Internal Revenue Code or Section 305
of ERISA or that it intends to terminate or has terminated under Section 4041A or 4042 of
ERISA; (j) the occurrence of an act or omission which could give rise to the imposition on
ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines,
penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under
Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee
Benefit Plan; (k) the assertion of a material claim (other than routine claims for benefits) against
any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against
ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with
any Employee Benefit Plan; or (l) receipt from the IRS of notice of the failure of any Pension
Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the
Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the

25

failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code.

"**Eurodollar Rate**" means for any Interest Period with respect to a Eurodollar Rate Loan, the rate appearing on Reuters Page LIBOR01 (or on any successor or substitute page of such service, or any successor or to substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m. (London time), two (2) Business Days prior to the commencement of such Interest Period, as the rate for Dollar deposits with a maturity comparable to such Interest Period.  In the event that such rate is not available at such time for any reason, then the "Eurodollar Rate" with respect to such Eurodollar Rate Loan for such Interest Period shall be the rate at which Dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m. (London time), two (2) Business Days prior to the commencement of such Interest Period.

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Default**" means each of the conditions or events set forth in Section 8.01.

"**Exceptions**" as defined in the Custodial Agreement.

"**Exception Report**" as defined in the Custodial Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Subsidiary**" means CapRe of Vermont, LLC and Phoenix Residential Securities, LLC.

"**Excluded Taxes**" means, with respect to any payment made by a Borrower under this Agreement, any of the following Taxes imposed on or with respect to a Recipient:  (a) income or franchise Taxes imposed on (or measured by) its net income by the United States, or by the jurisdiction under the laws of which such Recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States or any similar Taxes imposed by any other jurisdiction in which any Borrower is located, (c) in the case of a Non-U.S. Lender (other than an assignee pursuant to a request by Borrowers under Section 2.23), any U.S. federal withholding Taxes resulting from any law in effect on the date such Non-U.S. Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Non-U.S. Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 2.20(f), except to the extent that such Non-U.S. Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts

26

from Borrowers with respect to such withholding Taxes pursuant to Section 2.20(a) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Facility Fee Letter**" means the Original Facility Fee Letter, as amended by the Facility Fee Letter Amendment, as it may be further amended, supplemented or otherwise modified from time to time.

"**Facility Fee Letter Amendment**" means the Amendment Agreement to Facility Fee Letter, dated as of June 1, 2012, by and among Borrowers, ResCap, RFC, GMACM and Barclays.

"**Fair Share**" as defined in Section 7.02.

"**Fair Share Contribution Amount**" as defined in Section 7.02.

"**Fannie Mae**" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"**Fannie Mae Contracts**" means the Mortgage Selling and Servicing Contracts between GMACM and Fannie Mae, the applicable Master Commitments between GMACM and Fannie Mae, and the applicable Schedules of Mortgages (Form 2005), in each case, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Fannie Mae Guides**" means the Fannie Mae Seller's Guide, the Fannie Mae Servicing Guide and all amendments and additions thereto.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by Administrative Agent.

"**Fee Letters**" means, collectively, the Barclays Fee Letter, Collateral Agent Fee Letter and the Facility Fee Letter.

"**Final Financing Order**" as defined in Section 3.05(a).

27

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the Chief Financial Officer or Treasurer of ResCap that such financial statements fairly present, in all material respects, the financial condition of ResCap and its Subsidiaries as at the dates indicated and the results of their operations and, with respect to any monthly financial statements required by Section 5.01(a), their cash flows for the periods indicated, subject to changes resulting from ordinary, good faith year-end audit adjustments and the absence of footnotes.

"**First Lien Collateral**" means that portion of the Collateral in which the Secured Parties have a First Priority Lien and as to which no other Person has a *pari passu* or senior Lien (other than Liens described in clause (a) of the definition of "Permitted Collateral Liens").

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document and the Orders, that such Lien is the only Lien to which such Collateral is subject, other than Liens described in clause (a) of the definition of "Permitted Collateral Liens."

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of ResCap and its Subsidiaries ending on December 31 of each calendar year.

"**Foreign Cash Equivalents**" means the foreign equivalent of Cash and Cash Equivalents described in clauses (a), (b) and (d) of the definition of Cash Equivalents in respect of each country in which a Foreign Subsidiary is organized.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Freddie Mac**" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"**Freddie Mac Contracts**" means the applicable Purchase Contract (as defined in the Freddie Mac Guide) between GMACM and Freddie Mac, the related Purchase Documents (as defined in the Freddie Mac Guide), the applicable Mortgage Submission Schedule (Form 11), and the applicable Agreement for Subsequent Transfer of Servicing (Form 981) or Agreement for Concurrent Transfer of Servicing (Form 960), in each case, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Freddie Mac Guides**" means the Freddie Mac Seller/Servicer Guide, and all amendments and additions thereto.

"**Funding Guarantor**" as defined in Section 7.02.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.02, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Ginnie Mae**" means the Government National Mortgage Association, or any successor thereto.

"**Ginnie Mae Guides**" means the Ginnie Mae Handbook 5500.3 and all amendments and additions thereto.

"**GM Trusts**" means one or more trusts initially naming General Motors as beneficiary thereof that were or will be established to hold Capital Stock in AFI held directly or indirectly by General Motors as of May 20, 2009.

"**GMAC-RFC Servicer Guide**" means the Servicer Guide for RFC's mortgage loan purchase and conduit servicing program and all supplements and amendments thereto published by RFC from time to time.

"**GMACM**" as defined in the preamble hereto, and its successors and assigns permitted hereunder.

"**GMACM Borrower**" as defined in the preamble hereto.

"**GMACM Borrower Accounts**" as defined in Section 9.01(a).

"**GMACM Mortgage Loan Purchase and Contribution Agreement**" means the Mortgage Loan Purchase and Contribution Agreement, substantially in the form of Exhibit H-1, dated as of the Closing Date, between GMACM, as seller, and GMACM Borrower, as purchaser, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**GMACM Receivables Pooling and Purchase Agreement**" means the Receivables Pooling and Purchase Agreement, substantially in the form of Exhibit U-1, dated as of the Closing Date, between GMACM, as Originator and Servicer, and GMACM Borrower, as purchaser, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**GMACM Receivables Purchase Agreement**" means the Receivables Purchase Agreement, substantially in the form of Exhibit V-1, dated as of the Closing Date, between the GSAP Transferor, as seller, GMACM Borrower, as purchaser, and GMACM, as Originator and Servicer, and acknowledged by PATI A, LLC, a Delaware limited liability company, as a preference shareholder of the GSAP Transferor, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**GMACM REO Subsidiary**" means GMACM REO LLC, a Delaware limited liability company, a debtor and debtor-in-possession, and Wholly Owned Subsidiary of GMACM Borrower.

29

"**GMACM Serviced Mortgage Loans**" means those certain Mortgage Loans owned by a Borrower and identified on a Mortgage Schedule, as delivered from time to time pursuant to this Agreement, by a listing of "GMACM(MortgageServ)" under the column titled "SERVICER NAME."

"**GMACM Servicer**" means GMACM in its capacity as servicer of the GMACM Serviced Mortgage Loans.

"**Government Modification Program**" means the HAMP, the Home Affordable Unemployment Program, the Home Affordable Foreclosure Alternatives Program, the Second Lien Modification Program or any similar federal, state or local program providing for the modification of Mortgage Loans.

"**Government Sponsored Entities**" means, collectively, Fannie Mae, Freddie Mac and Ginnie Mae.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof, any government sponsored entity or any entity or officer exercising executive, legislative, judicial (including any arbitrator), regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantors**" means, collectively, the Credit Parties, as grantors and pledgors under the Orders and the Collateral Documents to which they are a party.

"**GSAP Transferor**" means GMAC Mortgage Servicer Advance Funding Company Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands.

"**GSE Repurchase Obligation**" means any obligation to repurchase any mortgage loan and any other any "Home Equity Loan," "Mortgage Loan," "Loan," "Contract" or other mortgage loan or installment sales contract or similar asset owed to Government Sponsored Entities or any other Governmental Authority.

"**Guaranteed Obligations**" as defined in Section 7.01.

"**Guarantor**" means each of ResCap and each direct or indirect Domestic Subsidiary of ResCap (other than Borrowers and any Excluded Subsidiary) and, in the case of each such Domestic Subsidiary, to the extent such guarantee of the Obligations by such Domestic Subsidiary would not be prohibited by applicable law or regulation and would not result in adverse tax consequences as determined by ResCap in good faith and reasonably agreed by Administrative Agent.

"**Guarantor Subsidiary**" means each Guarantor other than ResCap.

30

"**Guarantor's Case**" means one of the cases under chapter 11 of the Bankruptcy Code with respect to which one of the Guarantors is the debtor and the debtor-in-possession.

"**Guaranty**" means the guaranty of each Guarantor set forth in Article VII.

"**Guidelines**" means the Freddie Mac Guides, the Fannie Mae Guides, the Ginnie Mae Guides or the GMAC-RFC Servicer Guide, as applicable, and all amendments and additions thereto.

"**HAMP**" means the Home Affordable Modification Program established pursuant to Sections 101 and 109 of the Emergency Economic Stabilization Act of 2008, as such program may be amended or modified from time to time.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited or regulated by any Governmental Authority or which may or could pose a hazard (a) to the health and safety of the owners, occupants or any Persons in the vicinity of any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by ResCap or any of its Subsidiaries or any of their respective predecessors or (b) to the environment.

"**Hazardous Materials Activity**" means any activity involving the use, storage, Release, threatened Release, generation, transportation, processing, treatment, disposal, disposition or handling of any Hazardous Materials, including any Remedial Action.

"**Hedge Agreement**" means (a) an Interest Rate Agreement or a Currency Agreement, (b) an option or forward contract to purchase or sell a security or securities, (c) a commodity futures contract, forward contract, option to purchase or sell a commodity, or option, warrant or other right with respect to a commodity futures contract or other similar agreement or arrangement or (d) any other hedging agreement.

"**HELOC**" means a home equity revolving line of credit secured by a mortgage, deed of trust or other instrument creating a second lien on the related Mortgaged Property, which lien secures the related line of credit.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender from time to time in effect.

"**Immaterial Subsidiary**" means any Subsidiary of ResCap, designated in writing to Administrative Agent by the Primary Credit Parties as an "Immaterial Subsidiary," that, individually and collectively with all other Immaterial Subsidiaries as of the relevant date of determination, has (a) total assets as of such date of less than 2% of the consolidated total assets of ResCap and its Subsidiaries as of such date and (b) total revenues for the four-fiscal-quarter period most recently ended prior to such date of less than 2% of the consolidated total revenues of ResCap and its Subsidiaries for such period, in each case as determined in accordance with GAAP.

"**Increased Cost Lender**" as defined in Section 2.23.

31

"**Indebtedness**" means, as applied to any Person, without duplication, any or all of the following, whether or not included as indebtedness or liabilities of such Person in accordance with GAAP:

(a)    all indebtedness for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    that portion of obligations with respect to Capital Leases that would appear on a balance sheet of such Person in conformity with GAAP;

(c)    notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money;

(d)    any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA and any trade accounts payable in the ordinary course of business and not past due for more than thirty (30) days after the date on which such trade account was created);

(e)    all indebtedness secured by any Lien on any property or asset owned, held or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements) regardless of whether the indebtedness secured thereby shall have been assumed by such Person or is nonrecourse to the credit of such Person;

(f)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), banker's acceptances, bank guaranties, surety bonds and similar instruments;

(g)    the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another Person or having the economic effect of guarantying any Indebtedness or other obligation payable or performable by another Person in any manner, whether directly or indirectly;

(h)    any direct or indirect obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof;

(i)    any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (x) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (y) to maintain working capital, equity capital, the solvency, liquidity or any balance sheet item, level of income, cash flow or financial condition of another if, in the case of any agreement described under subclauses (x) or (y) of this clause (i), the primary purpose or intent thereof is as described in clause (h) above;

32

(j)     all obligations of such Person in respect of any Hedge Agreement or any exchange traded or over the counter derivative transaction, whether entered into for hedging or speculative purposes; and

(k)     GSE Repurchase Obligations.

For purposes of this definition, (1) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, (2) the amount of any Indebtedness described in clause (e) above for which recourse is limited to certain property of such Person shall be the lower of the amount of the obligation and fair market value of the property securing such obligation, and (3) the principal amount of the Indebtedness under any Hedge Agreement at any time shall be equal to the amount payable as a result of the termination of such Hedge Agreement at such time.  For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"**Indemnified Liabilities**" as defined in Section 12.03(a).

"**Indemnified Party**" as defined in Section 12.26(b).

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by Borrower under this Agreement and (b) Other Taxes.

"**Indemnitee**" as defined in Section 12.03(a).

"**Initial Approved DIP Budget**" as defined in Section 3.01(h).

"**Initial Receivables**" means the Receivables sold by the GSAP Transferor to the Borrowers on the Closing Date pursuant to the Receivables Purchase Agreements.

"**Initial Term A-1 Commitment**" means the commitment of a Lender to make or otherwise fund any Initial Term A-1 Loan under the Original Credit Agreement on the Closing Date, and "**Initial Term A-1 Commitments**" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Initial Term A-1 Commitment, if any, as of the Closing Date is set forth on Appendix A-1.  The aggregate amount of the Initial Term A-1 Commitments as of the Closing Date was $1,050,000,000 (without giving effect to the Initial Term A-1 Loans made on the Closing Date).  The aggregate amount of Initial Term A-1 Commitments as of the Restatement Effective Date is $0.

"**Initial Term A-1 Facility**" means, at any time, the aggregate amount of the Initial Term A-1 Commitments or Initial Term A-1 Loans at such time.

"**Initial Term A-1 Lender**" means each Lender having an Initial Term A-1 Commitment on the Closing Date as set forth on Appendix A-1 hereto, or after the making of the Initial Term A-1 Loans, each Lender holding any Initial Term A-1 Loan.

"**Initial Term A-1 Loan**" means an initial term A-1 loan made by an Initial Term A-1 Lender pursuant to Section 2.01(a)(i) on the Closing Date.

"**Intercreditor Provisions**" means the intercreditor provisions set forth in the Interim Financing Order and the Final Financing Order, as applicable, that are similar or equivalent, or having parallel or like concepts, to, with respect to the Interim Financing Order, paragraphs 11(e), 11(f), 13(e), 13(f) and 13(g) in the Interim Financing Order attached hereto as Exhibit N-1, and with respect to the Final Financing Order, paragraphs [11(e), 11(f), 13(e), 13(f) and 13(g)][1] in the Final Financing Order attached hereto as Exhibit N-2, which intercreditor provisions shall be in form and substance satisfactory to Administrative Agent, describing the relative rights and priorities of the Junior Priority Lien of Collateral Agent on the LOC Junior Lien Collateral and the MSR Junior Lien Collateral.

"**Interest Payment Date**" means with respect to (a) any ABR Loan, the last Business Day of each March, June, September and December, commencing on the first such date to occur after the Closing Date through the final maturity date of such Loan and (b) any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Eurodollar Rate Loan; provided, in the case of each Interest Period of longer than three (3) months, "Interest Payment Date" shall also include each date that is three (3) months, or an integral multiple thereof, after the commencement of such Interest Period.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one-, two-, three- or six-months, as selected by Borrowers in the applicable Funding Notice or Conversion/Continuation Notice, (a) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (b) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (i) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (ii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (iii), of this definition, end on the last Business Day of a calendar month; and (iii) no Interest Period with respect to any portion of the Loans shall extend beyond the Termination Date.

"**Interest Rate Agreement**" means any interest rate swap agreement (whether from fixed to floating or from floating to fixed), interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

---

[1] To be confirmed.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"**Interim Financing Order**" as defined in Section 3.01(n).

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the Closing Date and from time to time thereafter and any successor statutes.

"**Investment**" means, with respect to any Person, (a) any direct or indirect purchase or other acquisition of or investment in any of the Securities of any other Person or any beneficial interest therein; (b) any direct or indirect purchase or other acquisition for value of or investment in any Capital Stock of any other Person; (c) any direct or indirect loan, advance (other than (except by any Borrower or any Borrower's REO Subsidiary) advances to officers and employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution to, guaranty or assumption of debt of or purchase or other acquisition of any other debt or interest in any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business; (d) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of such Person, (e) hedging activities pursuant to any Hedge Agreement and (f) any repurchase pursuant to the terms of GSE Repurchase Obligations.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, write ups, write downs or write offs with respect to such Investment.

"**Investors**" means, collectively, General Motors and the Sponsor.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**JPMCB**" means JPMorgan Chase Bank, N.A.

"**Judgment Currency**" as defined in Section 12.03(e).

"**Junior Lien Collateral**" means, collectively, the MSR Junior Lien Collateral and the LOC Junior Lien Collateral.

"**Junior Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document and the Orders, that such Lien is the only Lien to which such Collateral is subject, other than Liens described in clause (b) of the definition of "Permitted Collateral Liens."

"**Lead Arranger**" means Barclays, in its capacity as lead arranger under the Original Credit Agreement and lead arranger under this Agreement.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**Lien**" means (a) any lien (statutory or other), mortgage, deed of trust, pledge, hypothecation, preference, participation interest, assignment, deposit arrangement, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), and (c) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a Term Loan, a Revolving Loan or a Protective Advance.

"**LOC Account**" as defined in the LOC Security Agreement.

"**LOC Grantors**" means, collectively, ResCap, GMACM, RFC, Passive Asset Transactions, LLC, a Delaware limited liability company, RFC Asset Holdings II, LLC, a Delaware limited liability company, Homecomings Financial, LLC, a Delaware limited liability company, and Equity Investment I, LLC, a Delaware limited liability company.

"**LOC Junior Lien Collateral**" means "Collateral" as defined in the LOC Security Agreement.

"**LOC Security Agreement**" means the Second Lien Debtor-in-Possession Pledge and Security Agreement and Irrevocable Proxy, substantially in the form of Exhibit Y, dated as of the Closing Date, among the Credit Parties party thereto and Collateral Agent, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**Lost Note Mortgage Loan**" means a Mortgage Loan for which the original Mortgage Note has been permanently lost or destroyed and the related Mortgage File contains a duly executed lost note affidavit containing customary indemnities.

"**Margin Stock**" as defined in Regulation U of the Board, as in effect from time to time.

"**Market Value**" means the value, determined by the Valuation Agent in its sole discretion, of the Mortgage Loans, individually or in the aggregate, as the context may require, which may be determined by the Valuation Agent as if such Mortgage Loans are sold in their entirety to a single third-party purchaser and/or taking into account the fact that the Mortgage Loans may be sold under circumstances in which the Borrowers are in default under this Agreement.  The initial Market Value of the Mortgage Loans shall equal the amount set forth opposite such Mortgage Loan on Schedule 1.01B.  The initial Market Value of each of the Mortgage Loans shall have no effect on the Valuation Agent's determination of Market Value in its sole discretion as contemplated by this definition.  The Valuation Agent's determination of Market Value shall be conclusive upon the parties, absent manifest error on the part of the Valuation Agent.  The Valuation Agent may determine the Market Value of the Mortgage Loans

36

on a daily basis, which Market Value may be determined to be zero with respect to one or more of the Mortgage Loans.  The Primary Credit Parties acknowledge that the Valuation Agent's determination of Market Value is for the limited purpose of determining the value of the Eligible Mortgage Loans hereunder without the ability to perform customary purchaser's due diligence and is not necessarily equivalent to a determination of the fair market value of the Mortgage Loans achieved by obtaining competing bids in an orderly market in which the originator/ servicer is not in default under a debt facility and the bidders have adequate opportunity to perform customary loan and servicing due diligence. The Borrowers further acknowledge and agree that the Valuation Agent may from time to time re-determine the Market Value of such Eligible Mortgage Loan, including without, limitation, if such Eligible Mortgage Loan becomes a Note-Only Mortgage Loan or as a result of any adverse (in the sole discretion of Collateral Agent) due diligence results or the Mortgagor or related Mortgaged Property or any portion thereof is subject to any bankruptcy proceeding or foreclosure proceeding.  For the purpose of determining the related Market Value, the Valuation Agent and Administrative Agent each shall have the right to conduct due diligence and request at any time from each Borrower, an updated valuation for each Mortgaged Property, in a form acceptable to the Valuation Agent or Administrative Agent, as applicable, in their sole discretion, not more than once in any three-month period.  The Market Value shall be deemed to be zero with respect to each Mortgage Loan for which such valuation is not provided within thirty (30) days after the Valuation Agent's or Administrative Agent's request therefor.  Without limiting the foregoing, the Market Value shall be deemed to be zero with respect to each Mortgage Loan:

   (a) in respect of which there is a material breach of a representation or warranty set forth on Schedule 4.39 (assuming each representation and warranty is made as of the date Market Value with respect to such Mortgage Loan is determined);

   (b) which has been released from the possession of the Custodian under Section 5 of the Custodial Agreement to any Borrower or its bailee for a period in excess of the time limit set forth in the Custodial Agreement;

   (c) which has been released from the possession of the Custodian (i) under Section 5 of the Custodial Agreement under any Transmittal Letter after the time period for release stated in such Transmittal Letter or (ii) under Section 5 of the Custodial Agreement under an Attorney Bailee Letter, from and after the date such Attorney Bailee Letter is terminated or ceases to be in full force and effect;

   (d) in respect of which (i) the related Mortgage Note has been extinguished under relevant state law in connection with a judgment of foreclosure, foreclosure sale or otherwise or (ii) the related Mortgaged Property has become an REO Property; or

   (e) if such Mortgage Loan has been modified, in respect of which the Custodian is not in possession of an original Mortgage Note and the applicable modification agreements.

   For the avoidance of doubt, the Market Value for any Mortgage Loan shall never exceed the Redemption Value of such Mortgage Loan after taking into account any principal

reductions, principal forgiveness or any other value reduction mandated by any Government Modification Program.

Notwithstanding anything to the contrary set forth in this definition, if Collateral Agent shall determine in good faith that any determination of Market Value by Valuation Agent shall have been unreasonable, the Market Value shall be as determined by Collateral Agent otherwise in accordance with the parameters set forth above.

"**Master Purchase Agreement**" means the Amended and Restated Master Mortgage Loan Purchase and Sale Agreement (FHA, USDA and VA Residential Mortgage Loans), dated as of May 1, 2012, between Ally Bank, as seller, and GMACM, as purchaser, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Master Purchase Documents**" means, collectively, (a) the Master Purchase Agreement and (b) the Master Purchase Pipeline Security Agreement.

"**Master Purchase Pipeline Security Agreement**" means the Pledge and Security Agreement, dated as of April 25, 2012, by and among Ally Bank, ResCap, AFI, GMAC Mortgage Group, LLC, GMACM and Ally Investment Management LLC, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Material Adverse Effect**" means a material adverse effect on and/or a material adverse development with respect to (a) the business, assets, properties, operations, liabilities or condition (financial or otherwise) of (i) either Borrower, (ii) any Servicer or Administrator or (iii) the Credit Parties, taken as a whole, in any such case, other than as a result of those events that customarily occur leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Cases and the continuation and prosecution thereof; provided that nothing disclosed (x) in the Annual Report on Form 10-K of AFI for the year ended December 31, 2011, or (y) otherwise in writing to Administrative Agent prior to April 9, 2012, in any such case, shall, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein), be deemed to constitute a "Material Adverse Effect"; (b) the ability of the Credit Parties, taken as a whole, to fully and timely perform the Obligations; (c) the legality, validity, binding effect or enforceability against any Credit Party of any Credit Document to which it is a party; (d) the rights, remedies and/or benefits available to, or conferred upon, Administrative Agent, Collateral Agent, any Lender or any other Secured Party under any Credit Document; or (e) the Collateral, Collateral Agent's Liens (on behalf of itself, the Lenders and the other Secured Parties) on the Collateral or the priority of such Liens.

"**Material Contract**" means any contract or other written agreement to which ResCap or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Maximum Ally Line of Credit Amount**" means, as of any date of determination, an amount equal to the excess of (a) $600,000,000 over (b) the aggregate amount of all principal payments made on the Ally Line of Credit since the Closing Date.

"**Maximum Prepetition MSR Facility Amount**" means, as of any date of determination, an amount equal to the excess of (a) $160,000,000 over (b) the aggregate amount of all principal payments made on the Prepetition MSR Facility since the Closing Date.

"**MBS Trust**" means any of the bankruptcy remote trusts or trust estates in which the Serviced Loans being serviced by a Servicer pursuant to the Designated Servicing Agreements are held by the related MBS Trustee.

"**MBS Trust Collection Account**" means, with respect to GMACM and RFC, for any MBS Trust, the segregated, non-commingled account or accounts, specified in the related Servicing Agreement, into which the related Servicer is required to deposit principal and interest collections with respect to the Serviced Loans included in that MBS Trust, which may be called a "Certificate Account," a "Custodial Account," a "Custodial P&I Account," a "Principal and Interest Account" or be known by another name specified in the related Servicing Agreement.

"**MBS Trustee**" means a trustee or indenture trustee for an MBS Trust.

"**MERS**" as defined in the Custodial Agreement.

"**MERS Mortgage Loan**" means any Mortgage Loan as to which the related Mortgage or assignment of Mortgage has been recorded in the name of MERS, as agent for the holder from time to time of a Mortgage Note, and which is identified as a MERS Mortgage Loan on any Mortgage Schedule delivered from time to time pursuant to this Agreement.

"**Monthly Collateral Report**" means the report in the form of Exhibit J.

"**Monthly Reimbursement Rate**" means, as of any date, the arithmetic average of the fractions (expressed as percentages), determined of the three (3) most recently concluded calendar months, obtained by dividing for each month (a) the aggregate Advance Reimbursement Amounts collected by the Servicers during such period by (b) the aggregate Receivable Balances of all Eligible Receivables, as of the close of business on the last day of the preceding calendar month.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means the mortgage, deed of trust or other instrument creating a lien on an estate in fee simple interest (including a leasehold estate) in real property securing a Mortgage Note.

"**Mortgage Bankers Association**" means the Mortgage Bankers Association of America.

"**Mortgage File**" as defined in the Custodial Agreement.

39

"**Mortgage Identification Number**" means the eighteen (18) digit number permanently assigned by MERS to each Eligible Mortgage Loan that is a MERS Mortgage Loan.

"**Mortgage Interest Rate**" means with respect to each Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note.

"**Mortgage Loan**" means a first lien mortgage loan or second lien mortgage loan (including without limitation, an Adjustable Rate Mortgage Loan, HELOC or an Option ARM Mortgage Loan) that the Custodian has been instructed to hold for Collateral Agent pursuant to the Custodial Agreement, and which Mortgage Loan includes, without limitation, (a) a Mortgage Note, the related Mortgage and all other mortgage loan documents, (b) all right, title and interest of the Borrowers in and to the Mortgaged Property covered by such Mortgage and (c) with respect to each GMACM Serviced Mortgage Loan, the related Servicing Rights.

"**Mortgage Loan Purchase and Contribution Agreement**" means either the GMACM Mortgage Loan Purchase and Contribution Agreement or the RFC Mortgage Loan Purchase and Contribution Agreement, as the context may require.

"**Mortgage Loan Reporting Dates**" as defined in Section 5.01(k)(ii).

"**Mortgage Note**" means either (a) an original promissory note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan or (b) a copy of a promissory note or other evidence of indebtedness of a Mortgagor under a Mortgage Loan accompanied by a duly executed lost note affidavit (containing customary indemnities).

"**Mortgage Schedule**" means the "collateral tape" identifying each Eligible Mortgage Loan, in hard copy or electronic format incorporating fields identifying, as of any date, with respect to each Eligible Mortgage Loan, (a) with respect to each Eligible Mortgage Loan that is a MERS Mortgage Loan, the Mortgage Identification Number, and with respect to each other Eligible Mortgage Loan, the related mortgage loan number or other unique identifier, (b) borrower name, (c) Redemption Balance, (d) original principal balance and (e) servicer name, as well as such other fields mutually agreed to by Borrowers and Administrative Agent from time to time, as the same shall be amended from time to time in accordance with this Agreement.

"**Mortgaged Property**" means the real property securing either (a) with respect to any Mortgage Loan, repayment of the debt evidenced by a Mortgage Note or (b) with respect to any Receivable, any "Home Equity Loan," "Mortgage Loan," "Loan," "Contract" or other mortgage loan or installment sales contract or similar asset serviced by the Servicer pursuant to a Designated Servicing Agreement.

"**Mortgagor**" means the obligor or obligors on a Mortgage Note, including any Person who has assumed or guaranteed the obligations of the obligor thereunder.

"**MSR GSE Consents**" means, as applicable, (a) an acknowledgement agreement by and among Freddie Mac, GMACM, as servicer, and Collateral Agent, as secured party, pursuant to which Freddie Mac shall acknowledge Collateral Agent's security interest in the Freddie Mac Contracts, together with any amendments and addenda thereto and (b) an

40

acknowledgement agreement by and among Fannie Mae, GMACM, as servicer, and Collateral Agent, as secured party, pursuant to which Fannie Mae shall acknowledge Collateral Agent's security interest in the Fannie Mae Contracts, together with any amendments and addenda thereto, in each case, in form and substance consistent with the Freddie Mac and Fannie Mae acknowledgement agreements executed and delivered in connection with the Prepetition MSR Facility or otherwise in form and substance reasonably satisfactory to Administrative Agent.

"**MSR Junior Lien Collateral**" means "Collateral" as defined in the MSR Security Agreement.

"**MSR Order**" as defined in Section 3.01(q).

"**MSR Security Agreement**" means the Second Lien Debtor-in-Possession Security Agreement, substantially in the form of Exhibit Z, dated as of the Closing Date, between GMACM and Collateral Agent, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**MSFTA**" means the Master Securities Forward Transaction Agreement, dated as of April 30, 2012, between Ally Investment Management LLC and GMACM, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Multiemployer Plan**" means any Employee Benefit Plan that is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of ResCap and its Subsidiaries in the form prepared for presentation to the audit committee of the Board of Directors of ResCap for the applicable Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate; provided that such narrative report may be in the form of a management's discussion and analysis of financial condition and results of operations customarily included in filings made with the Securities and Exchange Commission.

"**Nationstar Sale Agreement**" means the asset purchase agreement between certain of the Debtors and Nationstar Mortgage LLC, in the form attached to the Sale Motion, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, as the same may be amended, supplemented and/or modified from time to time as permitted by Section 5.39.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to (a) Cash payments received by any Credit Party from such Asset Sale, minus (b) bona fide costs incurred in connection with such Asset Sale consisting of (i) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale and

41

any transfer, documentary or other taxes payable by any Credit Party or any of its Subsidiaries, as a seller, in connection therewith, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the subject assets and that is required to be repaid under the terms thereof as a result of such Asset Sale and (iii) legal fees, costs and expenses and other customary fees, costs and expenses actually incurred by any Credit Party or any of its Subsidiaries in connection with such Asset Sale.

"**Net Liquidation Proceeds**" means any proceeds from prepayments in full, short sales, note sale or third-party foreclosure sale, hazard insurance proceeds, mortgage insurance proceeds or other similar collections on a Mortgage Loan reduced by amounts owed to the servicer for expenses and advances on the related Mortgage Loan as allowed by the Guidelines.

"**Net Outflows**" means, at any time, without duplication, (a) the sum of (i) the aggregate amount of the purchase prices of all Specified Non-Collateral Mortgage Loans purchased by any Credit Party or Subsidiary under the commitment stated in Section 2.1 of the Master Purchase Agreement and (ii) the aggregate repayment of any loans or other extensions of credit made to any Credit Party or Subsidiary by the seller under Section 2.3 of the Master Purchase Agreement minus (b) the sum of (i) the aggregate amount of proceeds of sales or securitizations of such Specified Non-Collateral Mortgage Loans by any Credit Party or Subsidiary as authorized by the Origination Order and (ii) the aggregate of any proceeds of loans or other extensions of credit made to any Credit Party or Subsidiary by the seller under Section 2.3 of the Master Purchase Agreement.

"**Net Proceeds**" means, (a) with respect to any Prepayment Event (other than an Asset Sale), (i) the Cash proceeds received in respect of such event including (x) any Cash received in respect of any non-Cash proceeds, but only as and when received, (y) in the case of a casualty, insurance proceeds, and (z) in the case of a condemnation or similar event, condemnation awards and similar payments, in each case net of (ii) all reasonable fees and out-of-pocket expenses paid by the Credit Parties to non-Affiliate third parties in connection with such event and (b) with respect to any Asset Sale, the Net Asset Sale Proceeds.

"**Non-Consenting Lender**" as defined in Section 2.23.

"**Non-Credit Party**" means any Subsidiary of ResCap that is not a Borrower or Guarantor.

"**Non-U.S. Lender**" means a Lender that is not a U.S. Person.

"**Note**" means a Term A-1 Loan Note, Term A-2 Loan Note or a Revolving Loan Note.

"**Note-Only Mortgage File**" means a Mortgage File for any Mortgage Loan that is not a Complete Mortgage File, but with respect to which the Custodian is able to certify possession of the original Mortgage Note (and any intervening endorsements) and (if applicable) any related loan modification agreements.

"**Note-Only Mortgage Loan**" means a Mortgage Loan with respect to which a Note-Only Mortgage File has been delivered to the Custodian (and an Approved Trust Receipt issued to Collateral Agent), but a Complete Mortgage File has not been delivered to the Custodian for such Mortgage Loan.  For avoidance of doubt, if a Complete Mortgage File with respect to any Note-Only Mortgage Loan shall be delivered to the Custodian (and an Approved Trust Receipt issued to Collateral Agent), such Mortgage Loan shall cease to be a Note-Only Mortgage Loan for all purposes of this Agreement and the other Credit Documents.

"**Notice**" means a Funding Notice, a Withdrawal Notice, a Conversion/Continuation Notice or a Notice of Payment/Commitment Termination, as the context may require.

"**Notice of Payment/Commitment Termination**" means a notice substantially in the form of Exhibit A-5.

"**Obligations**" means (a) all obligations of every nature of each Credit Party from time to time owed to the Agents (including former Agents), the Lenders or any of them under any Credit Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise, and (b) the due and punctual payment and performance of all Banking Services Obligations.

"**Obligee Guarantor**" as defined in Section 7.07.

"**Obligor**" means any Person who owes or may be liable for payments under a Serviced Loan.

"**Option ARM Mortgage Loan**" means an Adjustable Rate Mortgage Loan in respect of which the related Mortgage Note provides the Mortgagor with multiple monthly payment options.

"**Orders**" means, collectively, the Interim Financing Order and the Final Financing Order, as the same may be amended, supplemented or modified from time to time on or after entry thereof in accordance with the terms hereof.

"**Organizational Documents**" means (a) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, or, as the case may be, its memorandum and articles or comparable instruments and documents, as amended, (b) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, (d) with respect to any limited liability company, its articles of organization, as amended, and its operating or limited liability company agreement, as amended, and (e) with respect to any other Person, comparable instruments and documents.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

43

"**Original Credit Agreement**" as defined in the recitals hereto.

"**Original Facility Fee Letter**" means the Facility Fee Letter, dated as of April 9, 2012, by and among ResCap, RFC, GMACM and Barclays.

"**Original Sale Agreements**" means, collectively, the Ally Sale Agreement and the Nationstar Sale Agreement.

"**Origination Order**" as defined in Section 3.01(dd).

"**Originator**" means GMACM or RFC, as the entity that disburses Advances, thereby originating the related Receivables, in its capacity as Servicer under a Designated Servicing Agreement.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, this Agreement, or sold or assigned an interest in this Agreement).

"**Other Taxes**" means any present or future stamp, court, documentary, intangible, recording, filing or similar excise or property Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, or from the registration, receipt or perfection of a security interest under, or otherwise with respect to, this Agreement, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment under Section 2.23).

"**Overbid Sale Agreement**" means one or more asset purchase agreements entered into pursuant to the bidding procedures and following the auction conducted pursuant to the Sale Procedures Order, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, which Overbid Sale Agreement is an Acceptable Alternative Sale Agreement, as such Overbid Sale Agreement may be amended, supplemented and/or modified from time to time as permitted by Section 5.39.

"**P&I Advance**" means any advance disbursed by a Servicer pursuant to any Designated Servicing Agreement, of delinquent interest and/or principal that have not been timely paid by Obligors, including any amounts deposited by a Servicer into an MBS Trust Collection Account in order to reimburse such MBS Trust Collection Account for Amounts Held for Future Distribution previously on deposit therein which such Servicer had used to make a previous P&I Advance in accordance with the related Designated Servicing Agreement.

"**Participant**" as defined in Section 12.06(d).

"**Participant Register**" as defined in Section 12.06(d).

"**Patriot Act**" means the U.S.A. Patriot Act Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Perfection Certificate**" means a supplement to the Perfection Certificate in the form of Exhibit L-1 or any other form approved by Administrative Agent, as it shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" means a certificate supplement in the form of Exhibit L-2 or any other form approved by Administrative Agent.

"**Permitted Business**" means any business engaged in by ResCap and its Subsidiaries on the Closing Date and any business or other activities that are reasonably similar or related to the business in which ResCap and its Subsidiaries is engaged on such date.

"**Permitted Collateral Liens**" means (a) with respect to any First Lien Collateral or any reference to any First Priority Lien, the Liens described in clauses (a), (b), (c), (d) with respect to Liens on Cash and Cash Equivalents only, (e), (i) and (j) of Section 6.02, subject to the limitations set forth in such clauses, and (b) with respect to any Junior Lien Collateral or any reference to any Junior Priority Lien, the Liens described in clauses (a), (b), (c), (d) with respect to Liens on Cash and Cash Equivalents only, (e), (i), (j) and (k) of Section 6.02, subject to the limitations set forth in such clauses.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of commercially reasonable (from the perspective of a secured asset-based lender) business judgment.

"**Permitted Expenditures**" as defined in Section 9.01(b).

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.02.

"**Permitted TBA Transactions**" means the forward sale by GMACM of to-be-announced mortgage-backed securities to be backed by mortgage loans originated or acquired by GMACM and to be guaranteed by Ginnie Mae (a) with an interest rate within one hundred (100) basis points of the interest rate of the mortgage loans originated or acquired by GMACM to be included in such mortgage-backed securities, (b) representing no more than $500,000,000 in aggregate net notional amount of such mortgage-backed securities (meaning the sum of all long positions in such securities net of all short positions that have the same issuer, the same coupon and the same settlement date), and (c) under the MSFTA if and as amended pursuant to Section 6.20.

"**Person**" means and includes any natural person, corporation, limited partnership, general partnership, limited liability company, limited liability partnership, joint stock company,

45

Joint Venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**Petition Date**" as defined in the recitals hereto.

"**Platform**" as defined in Section 5.01(ee).

"**Portfolio Remittance Report**" means a report in form and substance reasonably satisfactory to Borrowers and Administrative Agent with respect to each Borrower (in electronic form) listing, among other things (a) any prepayments in whole or in part with respect to the Mortgage Loans constituting First Lien Collateral and (b) any Mortgage Loans for which the Mortgagor or the related Mortgaged Property or any portion thereof is subject to any bankruptcy proceeding or foreclosure proceeding (and indicating any such Mortgage Loans with a dated bankruptcy proceeding or foreclosure proceeding which have been added to such report from the last Portfolio Remittance Report).

"**Prepayment Event**" means:

        (a)     any Asset Sale by any Credit Party of (i) First Lien Collateral or (ii) Junior Lien Collateral; <u>provided</u> that any Indebtedness secured by a Lien on such Junior Lien Collateral that is senior to the Liens of the Secured Parties has been repaid in full (or Net Asset Sale Proceeds in an amount necessary to repay such Indebtedness have been set aside for the benefit of the holder of such Indebtedness); or

        (b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset constituting (i) First Lien Collateral or (ii) Junior Lien Collateral;

        (c)     the incurrence by any Credit Party or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted by Section 6.01; or

        (d)     any Credit Party shall receive (and have the right to retain pursuant to the terms of the Nationstar Sale Agreement or any other Sale Agreement, as applicable) all or a portion of any cash deposits or proceeds from any escrow agreement or other security or credit enhancements provided by or on behalf of a purchaser under any Sale Agreement, including the Cash Deposit (as defined in the Nationstar Sale Agreement).

"**Prepetition Ally Line of Credit**" means the credit facility under (a) the Amended and Restated Loan Agreement, dated as of December 30, 2009, by and among the LOC Grantors party thereto, and GMAC Inc. (n/k/a Ally Financial Inc.), as amended by the First Amendment, dated as of April 30, 2010, as amended by the Second Amendment, dated as of May 14, 2010, as amended by the Third Amendment, dated as of August 31, 2010, as amended by the Fourth Amendment, dated as of December 23, 2010, as amended by the Fifth Amendment, dated as of April 18, 2011, as amended by the Sixth Amendment, dated as of May 27, 2011, and as amended by the Seventh Amendment, dated as of April 10, 2012 (as further amended and supplemented prior to the Closing Date, the "**Prepetition Ally LOC Agreement**"), (b) the Prepetition Ally LOC Security Agreements and (c) the other Facility Documents (as defined in the Prepetition Ally LOC Agreement) (as amended or supplemented prior to the Closing Date).

"**Prepetition Ally LOC Agreement**" as defined in the definition of "Prepetition Ally Line of Credit."

"**Prepetition Ally LOC Security Agreements**" means, collectively, (a) the Amended and Restated Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009, among the LOC Grantors party thereto and GMAC Inc. (n/k/a Ally Financial Inc.), as amended by the First Amendment Agreement, dated as of May 14, 2010, as amended by the Second Amendment Agreement, dated as of May 27, 2011 and as amended by the Third Amendment Agreement, dated as of April 26, 2012 (as further amended or supplemented prior to the Closing Date) and (b) the Amended and Restated Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009, among the LOC Grantors party thereto, GMAC Investment Management LLC (n/k/a Ally Investment Management LLC), as a secured party, and GMAC Inc. (n/k/a Ally Financial Inc.), as omnibus agent, as lender agent and as a secured party, as amended by the First Amendment Agreement, dated as of May 14, 2010, the Second Amendment Agreement, dated as of May 27, 2011 and as amended by the Third Amendment Agreement, dated as of April 26, 2012 (as further amended or supplemented prior to the Closing Date).

"**Prepetition Ally Repo**" means the repurchase facility under (a) the Master Repurchase Agreement, dated as of December 21, 2011, by and among BMMZ Holdings LLC, GMACM, RFC and ResCap and (b) the Master Guarantee, dated as of December 21, 2011, by ResCap and BMMZ Holdings LLC (each as amended or supplemented as of or prior to the Closing Date).

"**Prepetition Ally Revolver**" means the credit facility under (a) the Amended and Restated Loan Agreement, dated as of December 30, 2009, by and among RFC, GMACM, ResCap, certain other affiliates of ResCap party thereto, Wells Fargo Bank, N.A., and GMAC Inc. (n/k/a Ally Financial Inc.), as amended by the First Amendment, dated as of April 30, 2010, as amended by the Second Amendment, dated as of August 31, 2010, as amended by the Third Amendment, dated as of December 21, 2010, as amended by the Joinder Agreement, dated as of February 16, 2011, as amended by the Fourth Amendment, dated as of April 18, 2011, and as amended by the Fifth Amendment, dated as of April 10, 2012 (as further amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date, the "**Prepetition Ally Revolving Credit Agreement**") and (b) the other Facility Documents (as defined in the Prepetition Ally Revolving Credit Agreement) (as amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date).

"**Prepetition Ally Revolver/Junior Secured Notes Collateral**" means assets and property of the Credit Parties and their respective Subsidiaries that do not constitute Collateral and (a) with respect to the Prepetition Ally Revolver, that constitute "Collateral" as defined in the Prepetition Ally Revolving Credit Agreement, and (b) with respect to the Prepetition Junior Secured Notes, that constitute "Collateral" as defined in the Prepetition Junior Secured Notes.

"**Prepetition Ally Revolving Credit Agreement**" as defined in the definition of "Prepetition Ally Revolver."

47

"**Prepetition GSAP Facility**" means the financing facility under (a) the Prepetition GSAP Indenture, (b) that certain Variable Funding Note Purchase Agreement, dated as of March 13, 2012, by and among the GSAP Transferor, GMAC, RFC, GMACR Mortgage Products, LLC, RFC-GSAP Servicer Advance, LLC and Barclays, as administrative agent and purchaser relating to the GMAC Mortgage Servicer Advance Funding Company Ltd., GMAC Mortgage Advance Receivables-Backed Notes, Series 2012-VF1 (the "**Series 2012-VF1 Notes**") issued pursuant to the Prepetition GSAP Indenture (as amended or supplemented on or prior to the Closing Date) and (c) the Series 2012-VF1 Notes and all other notes issued pursuant to the Prepetition GSAP Indenture (as amended or supplemented on or prior to the Closing Date).

"**Prepetition GSAP Indenture**" means the Fourth Amended and Restated Indenture, dated as of March 15, 2011, which amends and restates the Third Amended and Restated Indenture, dated as of April 15, 2010 (as amended by Amendment No. 1 dated as of January 26, 2011), which amended and restated a Second Amended and Restated Indenture, dated as of March 6, 2008, which amended and restated a First Amended and Restated Indenture, dated as of March 18, 2005, which amended and restated an Indenture dated as of June 30, 2004, among the GSAP Transferor, GMACM, as an administrator and a servicer, RFC, as an administrator and a servicer, and The Bank of New York Mellon, as indenture trustee, calculation agent and paying agent (the "Base Indenture"), as such Base Indenture was amended by the Series 2012-VF1 Indenture Supplement and Amendment No. 1, dated as of March 13, 2012, by and among the GSAP Transferor, GMACM, RFC, The Bank of New York Mellon, as indenture trustee, and Barclays, as administrative agent (as further amended or supplemented on or prior to the Closing Date).

"**Prepetition Indebtedness**" means, collectively, the Indebtedness of each Debtor outstanding and unpaid on the date on which such Person becomes a Debtor.

"**Prepetition Junior Secured Indenture**" means the Indenture, dated as of June 6, 2008, among ResCap, as issuer, the Subsidiaries of ResCap party thereto as guarantors, U.S. Bank National Association, as trustee (as amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date).

"**Prepetition Junior Secured Notes**" means the 9.625% Junior Secured Guaranteed Notes due 2015 issued by ResCap pursuant to the Prepetition Junior Secured Indenture, in an initial aggregate face amount of $4,010,280,000 (as amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date).

"**Prepetition MSR Facility**" means the credit facility under (a) the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010, among GMACM, ResCap and Citibank, N.A., as amended by Amendment Number One, dated as of August 19, 2010, as amended by Amendment Number Two, dated as of September 15, 2010, as amended by Amendment Number Three, dated as of September 30, 2010, as amended by Amendment Number Four, dated as of November 30, 2010, as amended by Amendment Number Five, dated as of January 18, 2011, as amended by Amendment Number Six, dated as of March 15, 2011, as amended by Amendment Number Seven, dated as of April 1, 2011, as amended by Amendment

48

Number Eight, dated as of April 11, 2011, as amended by Amendment Number Nine, dated as of February 1, 2012, and as amended by Amendment Number Ten, dated as of March 30, 2012 (as further amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date, the "**Prepetition MSR Loan Agreement**") and (b) the other Facility Documents (as defined in the Prepetition MSR Loan Agreement) (as amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date).

"**Prepetition MSR Loan Agreement**" as defined in the definition of "Prepetition MSR Facility."

"**Prepetition Refinanced Facilities**" means, collectively, the Prepetition Ally Repo and the Prepetition GSAP Facility.

"**Prepetition Refinanced Indebtedness**" means, collectively, all Indebtedness under the Prepetition Refinanced Facilities.

"**Prepetition Payment**" means a payment (by way of adequate protection or otherwise) of principal, interest, fees or otherwise on account of any (a) Prepetition Indebtedness or (b) trade payables (including, without limitation, in respect of reclamation claims) or other prepetition claims against any Debtor.

"**Primary Credit Parties**" means, collectively, each Borrower and each of ResCap, GMACM and RFC, in their respective capacities as Credit Parties; each such Person in its respective capacities, a "**Primary Credit Party**."

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by Barclays as its prime rate in effect at its principal office in New York, New York; each change in the Prime Rate shall be effective on the date such change is publicly announced as being effective.

"**Principal Office**" means, for Administrative Agent, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrowers and each Lender.

"**Pro Rata Share**" means, with respect to any Lender, (a) with respect to Revolving Loans, a percentage equal to a fraction the numerator of which is such Lender's Revolving Commitment and the denominator of which is the aggregate Revolving Commitments of all Revolving Lenders (if the Revolving Commitments have terminated or expired, the Pro Rata Share shall be determined based upon such Lender's share of the aggregate Revolving Exposures at that time); provided that, in the case of Section 2.22, a Defaulting Lender's Revolving Commitment shall be disregarded in the calculation for so long as such Lender is a Defaulting Lender, (b) with respect to the Term A-1 Loans, a percentage equal to a fraction the numerator of which is such Lender's outstanding principal amount of the Term A-1 Loans and the denominator of which is the aggregate outstanding amount of the Term A-1 Loans of all Term A-1 Lenders, (c) with respect to the Term A-2 Loans, a percentage equal to a fraction the

49

numerator of which is such Lender's outstanding principal amount of the Term A-2 Loans and the denominator of which is the aggregate outstanding amount of the Term A-2 Loans of all Term A-2 Lenders and (d) with respect to Protective Advances or with respect to the Aggregate Credit Exposure, a percentage based upon such Lender's share of the Aggregate Credit Exposure and the unused Commitments; provided that, in the case of Section 2.22, a Defaulting Lender's Commitment shall be disregarded in the calculation for so long as such Lender is a Defaulting Lender.

"**Prohibited Interest**" means (a) in the case of an MBS Trust with respect to which one or more REMIC elections have been or will be made, a residual interest in one or more of the related underlying REMICs and (b) in the case of an MBS Trust with respect to which no REMIC elections have been or will be made, a security issued by such MBS Trust that is not classified, for United States federal income tax purposes, as indebtedness of the MBS Trust.

"**Projections**" means the DIP Projections, dated May 14, 2012, of ResCap and its Subsidiaries for the thirteen (13) month-period commencing with the month that includes the Petition Date and ending May 31, 2013, after giving pro forma effect to the Transactions contemplated on the Closing Date.

"**Property**" means any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Capital Stock or other ownership interests of any Person and whether in existence or owned as of the Closing Date or thereafter entered into or acquired, including, without limitation, all Real Estate Assets.

"**Proposed DIP Budget**" as defined in Section 5.02(a).

"**Protective Advances**" as defined in Section 2.12(a).

"**Public Lender**" as defined in Section 12.01(d).

"**Rate of Exchange**" means the rate at which Administrative Agent is able to purchase Dollars with the Judgment Currency on the foreign exchange market on the relevant date and shall include any premiums and other reasonable costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency.

"**RCRA**" as defined in Section 4.15.

"**Real Estate Asset**" means, at any time of determination, any fee interest then owned by any Credit Party in any real property.

"**Receivable**" means the contractual right to reimbursement, pursuant to the terms of a Designated Servicing Agreement, for an Advance made by an Originator as Servicer pursuant to such Designated Servicing Agreement, which Advance has not previously been reimbursed, including all rights of the Servicer to enforce payment of such obligation under the related Designated Servicing Agreement.  For the avoidance of doubt, any right to reimbursement created upon the funding of an Advance at any time with respect to an MBS

50

Trust or Serviced Loan with respect to which (a) neither GMACM nor RFC acts at such time as Servicer or (b) any other Person acts at such time as a master servicer, servicer or subservicer, shall not constitute a Receivable.

"**Receivable Balance**" means, as of any date of determination and with respect to any Receivable, the outstanding amount of such Receivable; provided, however that any Receivable related to a Serviced Loan that is a HELOC will be deemed to have a Receivable Balance of zero.

"**Receivable File**" as defined in Section 11.01(a).

"**Receivables Custodian**" as defined in Section 11.01(a).

"**Receivables Pooling and Purchase Agreement**" means either the GMACM Receivables Pooling and Purchase Agreement or the RFC Receivables Pooling and Purchase Agreement, as the context may require.

"**Receivables Proceeds**" means, for any date, all Collections received or collected on the Serviced Loans by GMACM or RFC, as Servicer, or withdrawn by or at the direction of the Servicer from the MBS Trust Collection Accounts for each of the MBS Trusts, or, as applicable, remitted by the related MBS Trustee to the Servicer, pursuant to each of the related Designated Servicing Agreements on such date.

"**Receivables Purchase Agreement**" means either the GMACM Receivables Purchase Agreement or the RFC Receivables Purchase Agreement, as the context may require.

"**Recipient**" means, as applicable, (a) Administrative Agent and (b) any Lender.

"**Records**" means all instruments, agreements and other books, records, reports and data generated by other media for the storage of information maintained by the Borrowers, any of their respective Affiliates or agents, or their servicer or custodian with respect to a Mortgage Loan.  Records shall include the Mortgage File, the Servicing Records, the credit file and any other instruments necessary to document or service a Mortgage Loan, including, without limitation, the complete payment and modification history of each Eligible Mortgage Loan.

"**Redemption Balance**" means, as of any date of determination and with respect to any Mortgage Loan, the outstanding principal amount of such Mortgage Loan.

"**Register**" as defined in Section 2.07(b).

"**Regulation D**" means Regulation D of the Board, as in effect from time to time.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents, trustees, partners and advisors of such Person and such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, emptying, seeping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material into, upon or through the air, soil, surface water or groundwater.

"**Remedial Action**" means all actions taken to (a) clean up, investigate, delineate, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the environment including as a result of any Release or Hazardous Materials Activity; (b) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (c) any response actions authorized by 42 U.S.C. 9601 et. seq.

"**REMIC**" means a real estate mortgage investment conduit.

"**REO Property**" means real property improved by a residential dwelling, which real property was acquired by foreclosure, by deed in lieu of foreclosure or by power of sale of a Mortgage Loan, together with all buildings, fixtures and improvements thereon and all other rights, benefits and proceeds arising from and in connection with such property.

"**Reorganization Plan**" means a chapter 11 plan or plans filed in any or all of the Cases.

"**Replacement Lender**" as defined in Section 2.23.

"**Replacement Sale Agreement**" means one or more sale agreements entered into within sixty (60) days following the termination, rescission or revocation of an Original Sale Agreement or Overbid Sale Agreement, as the case may be, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, which Replacement Sale Agreement is an Acceptable Alternative Sale Agreement, as such Replacement Sale Agreement may be amended, supplemented and/or modified from time to time as permitted by Section 5.39.

"**Requisite Lenders**" means, at any time, Lenders having or holding Credit Exposure and unused Commitments representing more than 50% of (a) the Aggregate Credit Exposure and unused Commitments at such time <u>less</u> (b) the aggregate Credit Exposure and unused Commitments held by any Sponsor Affiliated Lender at such time.

"**Requisite Revolving Lenders**" means, at any time, Lenders having or holding Revolving Exposure and unused Revolving Commitments representing more than 50% of (a) the aggregate Revolving Exposure and unused Revolving Commitments at such time <u>less</u> (b) the aggregate Revolving Exposure and unused Revolving Commitments held by any Sponsor Affiliated Lender at such time.

52

"**Requisite Term Lenders**" means, at any time, Lenders holding more than 50% of (a) the aggregate principal amount of Term Loans outstanding at such time <u>less</u> (b) the aggregate principal amount of Term Loans and unused Term Commitments (if any) held by any Sponsor Affiliated Lender at such time.

"**ResCap**" as defined in the preamble hereto.

"**ResCap Security Agreement**" means the Debtor-in-Possession Security Agreement, substantially in the form of Exhibit AA, dated as of the Closing Date, between ResCap and Collateral Agent, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**Reserves**" means (a) the Carve Out Reserves and (b) any other reserves established against the Borrowing Base or the Collateral Amount that Collateral Agent may, in its Permitted Discretion, establish from time to time.  Collateral Agent shall seek, in good faith, to reach a consensual decision with the Borrowers with respect to the establishment of such other reserves.

"**Restatement Effective Date**" means June [__], 2012.

"**Restricted Entities**" means, collectively, (a) each of the Persons or other entities within the definition of "Restricted Entities" as defined in the Ally LOC Agreement and (b) any Borrower's REO Subsidiary.

"**Restricted Junior Payments**" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of ResCap or any of its Subsidiaries outstanding as of the Closing Date or thereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of ResCap or any of its Subsidiaries outstanding as of the Closing Date or thereafter outstanding; (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of ResCap or any of its Subsidiaries outstanding as of the Closing Date or thereafter outstanding; (d) management or similar fees payable to Sponsor or any of its Affiliates; or (e) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal defeasance), sinking fund or similar payment with respect to, any Specified Prepetition Indebtedness or any Indebtedness incurred pursuant to the Master Purchase Documents or the Origination Order.

"**Revolver Excess Availability**" means, as of any date of determination, an amount equal to the least of (a) the Revolving Commitments of all of the Lenders <u>minus</u> the sum of (i) the Total Utilization of Revolving Commitments and (ii) the aggregate outstanding principal amount of Protective Advances, (b) the Borrowing Base, <u>minus</u> the sum of (i) the Aggregate Revolving/Term A-1 Credit Exposure and (ii) the aggregate outstanding principal amount of Protective Advances and (c) the Collateral Amount, <u>minus</u> the sum of (i) the

Aggregate Credit Exposure and (ii) the aggregate outstanding principal amount of Protective Advances, in each case as of such date of determination.

"**Revolver Post-Closing Availability Date**" as defined in Section 3.02.

"**Revolving Commitment**" means the commitment of a Lender to make or otherwise fund any Revolving Loan hereunder and "Revolving Commitments" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Revolving Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The initial aggregate amount of the Revolving Commitments as of the Closing Date was $200,000,000. The aggregate amount of the Revolving Commitments as of the Restatement Effective Date is $190,000,000.

"**Revolving Commitment Availability Period**" means the period from the Revolver Post-Closing Availability Date to, but excluding, the Termination Date.

"**Revolving Exposure**" means, with respect to any Lender as of any date of determination, the aggregate outstanding principal amount of the Revolving Loans of that Lender.

"**Revolving Facility**" means, at any time, the aggregate amount of the Revolving Commitments at such time.

"**Revolving Lender**" means, as of any date of determination, a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"**Revolving Loan**" means a Loan made by a Lender to any Borrower pursuant to Section 2.02(a).

"**Revolving Loan Note**" means a promissory note in the form of Exhibit B-3, as it may be amended, supplemented or otherwise modified from time to time.

"**RFC**" as defined in the preamble hereto, and any successors and assigns permitted hereunder.

"**RFC Borrower**" as defined in the preamble hereto.

"**RFC Borrower Accounts**" as defined in Section 9.01(a).

"**RFC Mortgage Loan Purchase and Contribution Agreement**" means the Mortgage Loan Purchase and Contribution Agreement, substantially in the form of Exhibit H-2, dated as of the Closing Date, between RFC, as seller, and RFC Borrower, as purchaser, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms hereof and thereof.

"**RFC Receivables Pooling and Purchase Agreement**" means the Receivables Pooling and Purchase Agreement, substantially in the form of Exhibit U-2, dated as of the

Closing Date, between RFC, as Originator, and Servicer, and RFC Borrower, as purchaser, as the
same may be amended, amended and restated, supplemented or modified from time to time after
the Closing Date in accordance with the terms hereof and thereof.

"**RFC Receivables Purchase Agreement**" means the Receivables Purchase
Agreement, dated as of the Closing Date, substantially in the form of Exhibit V-2, between the
GSAP Transferor, as seller, RFC, as Originator and Servicer, and RFC Borrower, as purchaser,
and acknowledged by RAHI A, LLC, a Delaware limited liability company, as a preference
shareholder of the GSAP Transferor, as the same may be amended, amended and restated,
supplemented or modified from time to time after the Closing Date in accordance with the terms
hereof and thereof.

"**RFC REO Subsidiary**" means RFC REO LLC, a Delaware limited liability
company, a debtor and debtor-in-possession, and Wholly Owned Subsidiary of RFC Borrower.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill
Corporation.

"**Sale Agreement**" means an Original Sale Agreement, an Overbid Sale
Agreement or a Replacement Sale Agreement.

"**Sale Closing Milestone**" means April 15, 2013.

"**Sale Motion**" as defined in Section 3.01(r), with such amendments, supplements
and modifications (including, without limitation, in connection with a Replacement Sale
Agreement) as are reasonably acceptable to Administrative Agent.

"**Sale Procedures Order**" as defined in Section 3.01(r) and as such Sale
Procedures Order is amended, supplemented or otherwise modified (including, without limitation,
in connection with a Replacement Sale Agreement) with the consent of Administrative Agent.

"**Sale Order**" means (a) an order or orders of the Bankruptcy Court, in form and
substance reasonably satisfactory to Administrative Agent, approving (i) the Ally Sale
Agreement; (ii) the Nationstar Sale Agreement; and/or (iii) an Acceptable Alternative Sale
Agreement, and, in each case, directing the repayment in full in Cash of the Obligations and the
termination of the Commitments upon the closing of the transactions collectively contemplated
by the applicable agreement(s) and/or (b) a Confirmation Order.

"**Sale Order Milestone**" means February 15, 2013.

"**Secured Parties**" means, collectively, the Lenders, the Agents and any other
holder of the Obligations, and "Secured Party" means any one of them.

"**Securities**" means any stock, shares, partnership interests, voting trust
certificates, certificates of interest or participation in any profit sharing agreement or
arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness,
secured or unsecured, convertible, subordinated or otherwise, or in general any instruments
commonly known as "securities" or any certificates of interest, shares or participations in

55

temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Senior Management**" means, with respect to any Primary Credit Party, each officer of such Primary Credit Party listed on Schedule 1.01C, as may be updated from time to time in compliance with the terms of this Agreement, and any other officer of such Primary Credit Party with substantially the same or similar duties and powers as the officers listed on Schedule 1.01C as in effect as of the Closing Date.

"**Senior Officer**" means, with respect to any Person, the Chairman of the Board of Directors (if an officer), President, Chief Executive Officer, Chief Financial Officer, Executive Vice President, General Counsel, Treasurer or, other than with respect to any Financial Officer Certification or any Compliance Certificate, any Senior Vice President, in each case of such Person.  Unless the context requires otherwise, "**Senior Officer**" refers to a Senior Officer of a Primary Credit Party.

"**Senior Treasury Services Officer**" means, with respect to any Person, the Senior Treasury Services Officer, Designated Banking Officer or Chief Treasury Management Officer, in each case of such Person.  Unless the context requires otherwise, "**Senior Treasury Services Officer**" refers to a Senior Treasury Services Officer of a Primary Credit Party.

"**Series 2012-VF1 Notes**" as defined in the definition of "Prepetition GSAP Facility."

"**Serviced Loan**" means any "Home Equity Loan," "Mortgage Loan," "Loan," "Contract" or other mortgage loan or installment sales contract or similar asset serviced by the Servicer pursuant to a Designated Servicing Agreement.

"**Servicer**" means either GMACM or RFC, as the case may be, in its capacity as master servicer or servicer of Serviced Loans for and on behalf of the MBS Trustees and any successor servicer appointed under any particular Designated Servicing Agreement.

"**Servicer Acknowledgment and Instruction Letter**" means, with respect to any Specified Mortgage Loans, a letter in the form of Exhibit G executed by a Borrower and acknowledged by the servicer or subservicer of such Specified Mortgage Loans.

"**Servicer Termination Event**" means, with respect to any Designated Servicing Agreement, the occurrence of any event or condition, and the passage of any cure periods and giving to and receipt by the Servicer of any required notices, as a result of which any Person has the current right to terminate the Servicer as Servicer under such Designated Servicing Agreement.

"**Servicer's Tape**" means a data file which shall contain all relevant information customarily included on a "servicer's tape" as mutually agreed by Administrative Agent and the Borrowers.

"**Servicing Agreement**" means any pooling and servicing agreement, sale and servicing agreement, servicing agreement, subservicing agreement or similar agreement pursuant to which a Servicer is servicing Serviced Loans for and on behalf of an MBS Trust, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**Servicing Practices**" means the practices and procedures employed by the Servicers to service the Serviced Loans in accordance with the terms and requirements of the related Servicing Agreement and applicable law.

"**Servicing Records**" means all Records relating to servicing and subservicing, including but not limited to any and all servicing agreements, subservicing agreements, files, documents, records, computer tapes, copies of computer tapes, proof of insurance coverage, insurance policies, appraisals, other closing documentation, payment history records and any other records relating to or evidencing the servicing and subservicing of such Mortgage Loans.

"**Servicing Rights**" means contractual, possessory or other rights of any Borrower and/or GMACM Servicer to administer or service any Mortgage Loans (or to possess any Records relating thereto), except with respect to the Specified Mortgage Loans, including (a) the rights to service the Mortgage Loans; (b) the right to receive compensation (whether direct or indirect) for such servicing, including the right to receive and retain the related servicing fee and all other fees with respect to such Mortgage Loans and (c) all rights, powers and privileges incidental to the foregoing, together with all Records relating thereto.

"**Specified Governmental Authority**" means each of Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Deposit Insurance Corporation, the U.S. Department of Justice, any state attorney general, any state mortgage banking licensing agency or instrumentality, the Board, any Federal Reserve Bank, the U.S. Department of the Treasury, the Consumer Financial Protection Bureau, the Department of Veteran Affairs, the Federal Housing Administration and the United States Department of Housing and Urban Development and the United States Department of Agriculture.  Any reference in any Credit Document to any Specified Governmental Authority, whether by name or to such defined term, includes any successor organization thereto.

"**Specified Mortgage Loans**" means those certain Mortgage Loans owned by a Borrower and identified on a Mortgage Schedule, as delivered from time to time pursuant to this Agreement, by a listing of a servicer other than "GMACM(MortgageServ)" under the column titled "SERVICER NAME."

"**Specified Non-Collateral Mortgage Loan**" means (a) with respect to the Master Purchase Documents, any mortgage loan purchased by GMACM under the commitment stated in Section 2.1 of the Master Purchase Agreement and (b) with respect to the definition of "Net Outflows," Investments approved pursuant to the Origination Order in any individual mortgage loan that (i) is secured by an interest in residential (1 to 4 family) real estate and (ii) is insured or guaranteed by the Department of Veteran Affairs, the Federal Housing Administration or the United States Department of Agriculture, and in any case of the foregoing clauses (a) and (b), that does not constitute Collateral.

57

"**Specified Permitted Facilities**" means, collectively, the Ally Line of Credit, the Prepetition Ally Revolver, the Prepetition Junior Secured Notes, the EAF Facility and the Prepetition MSR Facility.

"**Specified Permitted Indebtedness**" means, collectively, all Indebtedness under the Specified Permitted Facilities.

"**Specified Permitted Indebtedness Documents**" means, collectively, any document, agreement or instrument that represents or relates to any of the Specified Permitted Indebtedness, including all amendments thereto (as amended or supplemented prior to the Closing Date and, solely to the extent in accordance with the terms hereof, as otherwise amended or supplemented on or after the Closing Date).

"**Specified Permitted Liens**" means, collectively and without duplication, (a) the Liens granted by the Credit Parties pursuant to the Specified Prepetition Indebtedness Documents as in effect on the Closing Date and (b) Liens permitted under Section 6.02(k).

"**Specified Servicing Agreements**" as defined in Section 4.41(b).

"**Sponsor**" means Cerberus Capital Management, L.P., any of its affiliates and any affiliated investment funds or managed accounts which are managed or advised by Cerberus Capital Management, L.P. or any of its affiliates.

"**Sponsor Affiliated Institutional Lender**" means a bank, insurance company, investment bank, commercial finance company or other institutional lender (or any securitization vehicle that is wholly owned by such a bank, insurance company, investment bank, commercial finance company or other institutional lender) that is an Affiliate of ResCap or any Borrower as a result of common direct or indirect ownership by Sponsor, so long as (a) Sponsor owns directly or indirectly less than all of the Capital Stock of such Lender and (b) Sponsor does not directly appoint any Person with responsibility for reviewing or approving credit decisions with respect to the transactions contemplated by the Credit Documents; <u>provided</u> that such Person shall agree in the applicable Assignment Agreement that it will not provide any information obtained by such Sponsor Affiliated Institutional Lender in its capacity as a Lender to Sponsor or any Affiliate of Sponsor that is not itself a Sponsor Affiliated Institutional Lender.

"**Sponsor Affiliated Lender**" means investment funds or managed accounts with respect to which Sponsor or an Affiliate of Sponsor is an advisor or manager in the ordinary course of business and pursuant to written agreements provided such Person executes a waiver in form and substance reasonably satisfactory to Administrative Agent stating that such Person shall have no right whatsoever so long as such Person is an Affiliate of a Borrower, ResCap or Sponsor, and except as provided under Section 12.05(c), to (a) consent to any amendment, modification, waiver, consent or other such action with respect to any of the terms of this Agreement or any other Credit Document, (b) require any Agent or other Lender to undertake any action (or refrain from taking any action) with respect to this Agreement or any other Credit Document, (c) otherwise vote on any matter related to this Agreement or any other Credit Document, (d) attend any meeting with any Agent or Lender or receive any information from any Agent or Lender or (e) make or bring any claim, in its capacity as Lender, against any Agent

or any Lender with respect to the duties and obligations of such Persons under the Credit
Documents.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the
numerator of which is the number one and the denominator of which is the number one <u>minus</u>
the aggregate of the maximum reserve percentages (including any marginal, special, emergency
or supplemental reserves) expressed as a decimal established by the Board to which
Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency
Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed
pursuant to such Regulation D of the Board.  Eurodollar Rate Loans shall be deemed to
constitute Eurocurrency funding and to be subject to such reserve requirements without benefit
of or credit for proration, exemptions or offsets that may be available from time to time to any
Lender under such Regulation D of the Board or any comparable regulation.  The Statutory
Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any
reserve percentage.

"**Stressed Interest Rate**" means, for any Class of Loans as of any date, one-
twelfth (1/12) of the sum of (a) the Adjusted Eurodollar Rate for the longest Interest Period then
in effect for such Class of Loans <u>plus</u> (b) the per annum Weighted Average Margin of all Classes
of Loans <u>plus</u> (c) 2.50%.

"**Stressed Non-Recoverable Advance Amount**" means, as of any date of
determination with respect to any Serviced Loan:

(a)    if such Serviced Loan is secured by a first lien on the related
Mortgaged Property, the greater of (i) zero and (ii) the excess of (x) the amount of all
outstanding Advances, including any Advances made using Amounts Held for Future
Distribution (collectively, including such Amounts Held for Future Distribution, "**Total
Advances**") with respect to such Serviced Loan at such time over (y) the product of 50% and the
market value of such Mortgaged Property (determined by the related Servicer in accordance with
its servicing guidelines, which must be determined by reference to a Broker's Price Opinion or
new appraisal that is less than 180 days old in the case of any Serviced Loan that is 150 days or
more contractually delinquent, or the property value shall be deemed to be zero); and

(b)    if such Serviced Loan is secured by a second lien on the related
Mortgaged Property, the greater of (i) zero and (ii) the lesser of (x) the amount of all outstanding
Total Advances with respect to such Serviced Loan at such time and (y) the excess of (A) the
amount of all outstanding Total Advances with respect to such Serviced Loan at such time <u>plus</u>
the balance of the related first lien mortgage loan secured by the same Mortgaged Property at
such time over (B) the product of 50% and the market value of such Mortgaged Property
(determined by the related Servicer in accordance with its servicing guidelines, which must be
determined by reference to a Broker's Price Opinion or new appraisal that is less than 180 days
old in the case of any Serviced Loan that is 150 days or more contractually delinquent, or the
property value shall be deemed to be zero).

59

"**Stressed Time**" means, as of any date of determination, a fraction, the numerator of which is 1, and the denominator of which equals the product of the applicable Stressed Time Percentage times the Monthly Reimbursement Rate.

"**Stressed Time Percentage**" means, as of any date of determination, (a) 30%, in the case of Revolving Loans and Term A-1 Loans and (b) 60%, in the case of Term A-2 Loans, in each case as of such date.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, Joint Venture, trust or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof; provided that, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless the context requires otherwise, "**Subsidiary**" refers to any of ResCap's direct or indirect Subsidiaries.

"**Supermajority Revolving Lenders**" means, at any time, Lenders having or holding Revolving Exposure and unused Revolving Commitments representing more than 66 2/3% of (a) the aggregate Revolving Exposure and unused Revolving Commitments at such time less (b) the Revolving Exposure and unused Revolving Commitments held by any Sponsor Affiliated Lender at such time.

"**Supermajority Term A-1 Lenders**" means, at any time, Term A-1 Lenders holding more than 66 2/3% of (a) the aggregate principal amount of Term A-1 Loans outstanding at such time plus (b) the aggregate principal amount of unused Delayed Draw Term A-1 Commitments (if any) at such time less (c) the aggregate principal amount of Term A-1 Loans and unused Delayed Draw Term A-1 Commitments (if any) held by any Sponsor Affiliated Lender at such time.

"**Supermajority Term A-2 Lenders**" means, at any time, Term A-2 Lenders holding more than 66 2/3% of (a) the aggregate principal amount of Term A-2 Loans outstanding at such time less (b) the aggregate principal amount of Term A-2 Loans and unused Term A-2 Commitments (if any) held by any Sponsor Affiliated Lender at such time.

"**Superpriority Claim**" means a claim against any Credit Party in any of the Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other postpetition claims of the kind specified in, or otherwise arising or ordered under, any section of the Bankruptcy Code (including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Financing Order, to the extent therein approved), 507(a), 507(b), 546(c), 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"**Syndication Agent**" as defined in the preamble hereto.

"**T&I Advance**" means an advance made by an Originator as Servicer with respect to a Serviced Loan pursuant to such Servicer's obligation to do so under a Designated Servicing Agreement, of real estate taxes and assessments, or of hazard, flood or primary mortgage insurance premiums, required to be paid by the related Obligor under the terms of the related Serviced Loan.

"**Taxes**" means any present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Commitment**" means the Term A-1 Commitment and the Term A-2 Commitment.  The aggregate amount of undrawn Term Commitments as of the Restatement Effective Date is $10,000,000 (without giving effect to Delayed Draw Term A-1 Loans, if any, made on the Restatement Effective Date).

"**Term A-1 Commitment**" means the Initial Term A-1 Commitment and the Delayed Draw Term A-1 Commitment.

"**Term A-1 Credit Exposure**" means, with respect to any Lender, at any time, an amount equal to the amount of its Term A-1 Loans outstanding at such time.

"**Term A-1 Facility**" means the Initial Term A-1 Facility or the Delayed Draw Term A-1 Facility; collectively, the "**Term A-1 Facilities**."

"**Term A-1 Lender**" means any Initial Term A-1 Lender or Delayed Draw Term A-1 Lender; collectively, the "**Term A-1 Lenders**."

"**Term A-1 Loan**" means any Initial Term A-1 Loan or any Delayed Draw Term A-1 Loan; collectively, "**Term A-1 Loans**."

"**Term A-1 Loan Note**" means a promissory note in the form of Exhibit B-1, as it may be amended, supplemented or otherwise modified from time to time.

"**Term A-2 Commitment**" means the commitment of a Lender to make or otherwise fund any Term A-2 Loan under the Original Credit Agreement on the Closing Date, and "**Term A-2 Commitments**" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Term A-2 Commitment, if any, as of the Closing Date is set forth on Appendix A-1.  The aggregate amount of the Term A-2 Commitments as of the Closing Date was $200,000,000 (without giving effect to the Term A-2 Loans made on the Closing Date).  The aggregate amount of Term A-2 Commitments as of the Restatement Effective Date is $0.

"**Term A-2 Facility**" means, at any time, the aggregate amount of the Term A-2 Commitments or Term A-2 Loans at such time.

"**Term A-2 Lender**" means each Lender having a Term A-2 Commitment on the Closing Date as set forth on Appendix A-1 hereto, or after the making of the Term A-2 Loans, each Lender holding any Term A-2 Loan.

"**Term A-2 Loan**" means a term A-2 loan made by a Term A-2 Lender pursuant to Section 2.01(a)(ii) on the Closing Date.

"**Term A-2 Loan Note**" means a promissory note in the form of Exhibit B-2, as it may be amended, supplemented or otherwise modified from time to time.

"**Term Facility**" means the Initial Term A-1 Facility, the Delayed Draw Term A-1 Facility or the Term A-2 Facility; collectively, the "**Term Facilities**."

"**Term Lender**" means any Initial Term A-1 Lender, Delayed Draw Term A-1 Lender or Term A-2 Lender; collectively, the "**Term Lenders**."

"**Term Loan**" means any Initial Term A-1 Loan, Delayed Draw Term A-1 Loan or Term A-2 Loan; collectively, "**Term Loans**."

"**Terminated Lender**" as defined in Section 2.23.

"**Termination Date**" means the earliest to occur of (a) November 18, 2013, (b) the date that is forty-five (45) days after entry of the Interim Financing Order if the Final Financing Order has not been entered by the Bankruptcy Court prior to the expiration of such 45-day period, (c) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date thereof) of a Reorganization Plan for any Debtor that is confirmed pursuant to an order entered by the Bankruptcy Court, and (d) the date on which maturity of the Loans is accelerated and the Commitments are terminated pursuant to Section 8.01.

"**Total Advances**" as defined in the definition of Stressed Non-Recoverable Advance Amount.

"**Total Utilization of Revolving Commitments**" means, as at any date of determination, the aggregate principal amount of all outstanding Revolving Loans.

"**Trade Date**" as defined in Section 12.06(b)(i).

"**Transactions**" means (a) the execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party, the borrowing of Loans and the use of the proceeds thereof, (b) the refinancing of the Prepetition Refinanced Indebtedness and (c) and all other related transactions, including the payment of fees and expenses in connection therewith.

"**Transmittal Letter**" as defined in the Custodial Agreement.

"**Trust Receipt**" means the receipt and certification for Mortgage Loans as further described in the Custodial Agreement.

"**Type of Loan**" means, with respect to Term Loans or Revolving Loans, an ABR Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"**Underlying Documents**" means, collectively, (a) the Fannie Mae Contracts, (b), the Freddie Mac Contracts, (c) any "Underlying Document" as defined in the Ally LOC Agreement, (d) the Servicing Agreements, and (e) any other material agreement or document that relates to Collateral or any Primary Credit Party, the termination, material breach or material modification of such agreement or document could reasonably be expected to give rise to a Material Adverse Effect, in all the foregoing cases, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof.

"**United States**" and "**U.S.**" mean the United States of America.

"**Unmatured Default**" means, with respect to any Designated Servicing Agreement, the occurrence of any event or condition that, with notice and/or the passage of any applicable cure period, will result in a Servicer Termination Event under such Designated Servicing Agreement.

"**Unrestricted Cash**" means, at any time, the aggregate amount of Cash and Cash Equivalents (consisting solely of Dollars and Cash Equivalents held at all times in the United States) held at such time by ResCap and its Subsidiaries to the extent that (a) such Cash and Cash Equivalents are (subject to any customary and necessary corporate or other organizational action that could not reasonably be expected to result in any material delay) readily available for general use by ResCap or such Subsidiary (other than pursuant to restrictions imposed by the Cash Management Order, the AFI/Junior Secured Notes Order, the EAF Order, the MSR Order or the Origination Order), (b) such Cash or Cash Equivalents do not appear (or would not be required to appear) as "restricted" on a consolidated balance sheet of ResCap or of any such Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder and under the Orders) and (c) ResCap or such Subsidiary, as the case may be, is not at such time prohibited by any applicable law, rule or regulation or its Organizational Documents or any order or decree of any Governmental Authority or any binding Contractual Obligation from distributing or otherwise transferring such Cash and Cash Equivalents to any Borrower. For avoidance of doubt, any Cash pledged pursuant to 6.02(m) shall not constitute Unrestricted Cash.

"**U.S. Person**" means a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code.

"**U.S. Tax Certificate**" as defined in Section 2.20(f)(ii)(D).

"**Valuation Agent**" means Pentalpha Funding, LLC, a New York limited liability company, or such other Person or Persons as may be approved from time to time by the Requisite Lenders.

"**Verification Agency Agreement**" means the letter agreement, dated as of the Closing Date, by and among the Primary Credit Parties, the Verification Agent, and for certain limited purposes described therein, Barclays, as the same may be amended, amended and restated, supplemented or modified from time to time after the Closing Date in accordance with the terms thereof and hereof.

"**Verification Agent**" means American Mortgage Consultants, Inc. or such other Person as may be selected by Administrative Agent from time to time in consultation with the Borrowers.

"**Weekly Calculation Period**" as defined in Section 5.01(f).

"**Weighted Average Margin**" means, as of any date of determination, the weighted average of the Applicable Margins for Revolving Loans, Term A-1 Loans and Term A-2 Loans weighted by the respective aggregate principal amounts outstanding of each such Class of Loans (a) in the case of Term Loans, as of such date of determination and (b) in the case of Revolving Loans, based on the average daily outstanding principal amount of Revolving Loans during the Interest Period most recently ended prior to such date of determination.

"**Wholly Owned Subsidiary**" means, with respect to any Person, (a) any corporation 100% of whose Capital Stock (other than directors' qualifying shares) is at the time owned by such Person and/or one or more Wholly Owned Subsidiaries of such Person and (b) any partnership, association, limited liability company or other entity in which such Person and/or one or more Wholly Owned Subsidiaries of such Person own 100% of the Capital Stock of such partnership, association, limited liability company or other entity at such time.  Unless otherwise set forth herein, reference in this Agreement to "Wholly Owned Subsidiary" means any of ResCap's direct and indirect Wholly Owned Subsidiaries.

"**Withdrawal Date**" means the date on which ResCap or any Borrower makes a withdrawal of any funds from the Concentration Account or any Borrower Account (or, following the receipt of an Activation Notice but prior to the commencement of a Dominion Period, the Collection Account), as applicable, in accordance with Article IX.

"**Withdrawal Direction Letter**" means a Withdrawal Direction Letter substantially in the form of Exhibit A-4, or such other form of communication as may be acceptable to Administrative Agent and Collateral Agent instructing Collateral Agent to initiate the transfers requested in a Withdrawal Notice.

"**Withdrawal Notice**" means a Withdrawal Notice substantially in the form of Exhibit A-3.

"**Withholding Agent**" means Borrowers and Administrative Agent.

Section 1.02    <u>Accounting Terms</u>.  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by ResCap to Lenders pursuant to Sections 5.01(a), 5.01(b) and 5.01(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation.  Subject to the foregoing,

calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the financial statements referred to in Section 3.01(h).  In the event that any accounting change shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then ResCap and Administrative Agent agree to enter into negotiations to amend such provisions of this Agreement so as to equitably reflect such accounting change with the desired result that the criteria for evaluating ResCap's financial condition shall be the same after such accounting change as if such accounting change had not been made.  Until such time as such an amendment shall have been executed and delivered by the appropriate Credit Parties and the Requisite Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such accounting change had not occurred.

Section 1.03    Interpretation, Etc.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law, rule or regulation shall, unless otherwise specified, refer to such law, rule or regulation as amended, modified or supplemented from time to time.  Any references in this Agreement to "Articles" and/or "Sections" which make reference to any particular piece of legislation or statute, including without limitation, Bankruptcy Code, ERISA, Internal Revenue Code and/or UCC shall for greater certainty mean the equivalent section in the applicable piece of legislation to the extent that the context implies reference to such other similar or equivalent legislation as is in effect from time to time in any other applicable jurisdiction, as applicable.  Furthermore, where any such reference is meant to apply to such other similar or equivalent legislation where such other similar or equivalent legislation has parallel or like concepts, then such references shall import such parallel or like concepts from such other similar or equivalent legislation, as applicable. Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as (a) including the exhibits, schedules, appendices, annexes and other attachments thereto and (b) referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, amendments and restatements, supplements or modifications set forth herein or in any other Credit Document).  Any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions thereon herein or in any other Credit Document).

Section 1.04    Effect of Restatement.  This Agreement shall, except as otherwise expressly set forth herein, supersede the Original Credit Agreement from and after the

65

Restatement Effective Date with respect to the transactions hereunder and with respect to the Loans outstanding under the Original Credit Agreement as of the Restatement Effective Date. The parties hereto acknowledge and agree, however, that (a) this Agreement and all other Credit Documents executed and delivered herewith do not constitute a novation, payment and reborrowing or termination of the Obligations under the Original Credit Agreement and the other Credit Documents as in effect prior to the Restatement Effective Date, (b) such Obligations are in all respects continuing with only the terms being modified as provided in this Agreement and the other Credit Documents, (c) the Guaranties are in all respects continuing and remain in full force and effect with respect to all Obligations, (d) the Liens and security interests in favor of the Collateral Agent for the benefit of the Secured Parties securing payment of such Obligations are in all respects continuing and in full force and effect with respect to all Obligations and (e) all references in the other Credit Documents, any Order or any other order of the Bankruptcy Court to the "Credit Agreement" shall be deemed to refer without further amendment to this Agreement.

## ARTICLE II

## LOANS

Section 2.01    Term Loans.

(a)    Making of the Initial Term A-1 Loans and Term A-2 Loans

(i)    One (1) Business Day prior to the Closing Date, the Borrowers delivered a duly executed irrevocable Funding Notice with respect to the Initial Term A-1 Loans.  On the Closing Date, each Initial Term A-1 Lender made an Initial Term A-1 Loan to Borrowers in a principal amount equal to such Initial Term A-1 Lender's Initial Term A-1 Commitment.  All such Initial Term A-1 Loans remain outstanding as of the Restatement Effective Date.  Amounts repaid in respect of Initial Term A-1 Loans may not be reborrowed.  All Initial Term A-1 Loans and all other amounts owed hereunder with respect to the Initial Term A-1 Loans shall be paid in full on the Termination Date.

(ii)    One (1) Business Day prior to the Closing Date, the Borrowers delivered a duly executed irrevocable Funding Notice with respect to the Term A-2 Loans.  On the Closing Date, each Term A-2 Lender made a Term A-2 Loan to Borrowers in a principal amount equal to such Term A-2 Lender's Term A-2 Commitment.  All such Term A-2 Loans remain outstanding as of the Restatement Effective Date.  Amounts repaid in respect of Term A-2 Loans may not be reborrowed. All Term A-2 Loans and all other amounts owed hereunder with respect to the Term A-2 Loans shall be paid in full on the Termination Date.

(iii)    On the Closing Date, the Initial Term A-1 Loans and Term A-2 Loans were made as ABR Loans.

(b)    Making of the Delayed Draw Term A-1 Loans.  On the Restatement Effective Date, each Delayed Draw Term A-1 Lender severally agrees to make a Delayed Draw Term A-1 Loan to Borrowers in a principal amount equal to such Delayed Draw

66

Term A-1 Lender's Delayed Draw Term A-1 Commitment.  Amounts repaid in respect of Delayed Draw Term A-1 Loans may not be reborrowed.  All Delayed Draw Term A-1 Loans and all other amounts owed hereunder with respect to the Delayed Draw Term A-1 Loans shall be paid in full on the Termination Date.

        (c)        <u>Borrowing Mechanics for Delayed Draw Term A-1 Loans</u>.

        (i)        On the Restatement Effective Date, the Delayed Draw Term A-1 Loans shall be made as ABR Loans.

        (ii)        Borrowers shall deliver to Administrative Agent a Funding Notice with respect to the Delayed Draw Term A-1 Loans no later than 5:00 p.m. (New York City time) one (1) Business Day prior to the Restatement Effective Date, which Funding Notice shall be duly executed by a Senior Officer of each of the Borrowers and irrevocable once delivered.

        (iii)        Each Delayed Draw Term A-1 Lender shall make the amount of its Delayed Draw Term A-1 Commitment available to Administrative Agent not later than 1:00 p.m. (New York City time) on the Restatement Effective Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein with respect to the making of the Delayed Draw Term A-1 Loans, Administrative Agent shall make the proceeds of such Delayed Draw Term A-1 Loans available to Borrowers on the Restatement Effective Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Delayed Draw Term A-1 Loans received by Administrative Agent from Delayed Draw Term A-1 Lenders to be credited to the account of Borrowers at the Principal Office designated by Administrative Agent or such other account as may be designated in writing to Administrative Agent by Borrowers.

        Section 2.02    <u>Revolving Loans</u>.

        (a)        <u>Revolving Commitments</u>.  During the Revolving Commitment Availability Period, subject to the terms and conditions hereof (including, without limitation, Section 3.03), each Revolving Lender severally agrees to make Revolving Loans to Borrowers in an aggregate amount up to but not exceeding such Lender's Revolving Commitment; <u>provided</u> that, after giving effect to the making of any Revolving Loans, in no event shall (i) the sum of (x) the Total Utilization of Revolving Commitments <u>plus</u> (y) the aggregate outstanding principal amount of Protective Advances exceed the Revolving Commitments then in effect nor (ii) the sum of (x) the Aggregate Revolving/Term A-1 Credit Exposure <u>plus</u> (y) the aggregate outstanding principal amount of Protective Advances exceed the Borrowing Base then in effect nor (iii) the Aggregate Credit Exposure exceed the Collateral Amount then in effect.  Amounts borrowed pursuant to this Section 2.02(a) may be repaid and reborrowed during the Revolving Commitment Availability Period.  Each Lender's Revolving Commitment shall expire on the Termination Date and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Loans and the Revolving Commitments shall be paid in full on the Termination Date.

(b)    <u>Borrowing Mechanics for Revolving Loans</u>.

(i)    Revolving Loans that are ABR Loans shall be made in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount, and Revolving Loans that are Eurodollar Rate Loans shall be in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount.

(ii)    Whenever a Borrower desires that Lenders make Revolving Loans, the applicable Borrower shall deliver to Administrative Agent a Funding Notice, duly executed by a Senior Officer of each of the Borrowers, no later than 2:00 p.m. (New York City time) at least three (3) Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Revolving Loan that is an ABR Loan.  Except as otherwise provided herein, a Funding Notice for a Revolving Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and Borrowers shall be bound to make a borrowing in accordance therewith.  On the Revolver Post-Closing Availability Date, Revolving Loans shall be made as ABR Loans.

(iii)    Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each applicable Lender by telefacsimile with reasonable promptness, but (<u>provided</u> that Administrative Agent shall have received such notice by 11:00 a.m. (New York City time)) on the same day as Administrative Agent's receipt of such Notice from the applicable Borrower.

(iv)    Each Lender shall make the amount of its Revolving Loan available to Administrative Agent not later than 1:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Revolving Loans available to the applicable Borrower by 3:00 p.m. (New York City time) on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by Administrative Agent from Lenders to be credited to the account of the applicable Borrower at the Principal Office designated by Administrative Agent or such other account as may be designated in writing to Administrative Agent by the applicable Borrower with reasonable promptness on the applicable Credit Date.

Section 2.03    [Reserved].

Section 2.04    [Reserved].

Section 2.05    <u>Pro Rata Shares; Availability of Funds</u>.

(a)    <u>Pro Rata Shares</u>.  All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it

68

being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b)      Availability of Funds.  Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Borrowers a corresponding amount on such Credit Date.  If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation.  If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Borrowers and Borrowers shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for ABR Loans.  Nothing in this Section 2.05(b) shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrower may have against any Lender as a result of any default by such Lender hereunder.

Section 2.06   Use of Proceeds.  The proceeds of the Loans will be used, in each case in accordance with the Approved DIP Budget, (a) on the Closing Date, to repay in full the indebtedness outstanding as of the commencement of the Cases under the Prepetition Refinanced Facilities and to pay the fees, costs and expenses incurred or payable by ResCap and its Subsidiaries in connection with the Credit Documents and the Transactions and (b) for general corporate purposes of ResCap and its Subsidiaries, including the acquisition of Receivables and Mortgage Loans, working capital, allowed administrative expenses incurred during the Cases or such expenses as have otherwise been approved by the Bankruptcy Court and for the purposes set forth in the Orders, in each case as otherwise permitted by this Agreement, following commencement of the Cases.  The proceeds of the Credit Facilities may not be used in connection with the investigation, initiation or prosecution of any claims against any Agent or any Lender or other holder of Obligations under the Credit Documents or against any noteholder, agent, trustee or other holder of obligations under the Prepetition GSAP Facility and/or the Credit Facilities; provided that, without duplication of the limitations on the use of the Carve Out, up to $250,000 in the aggregate of such proceeds may be used to pay allowed fees and expenses of professionals to any Committee to investigate (but not initiate or prosecute any claims with respect to) the Liens granted pursuant to the Prepetition GSAP Facility or the Prepetition Ally Repo.  No portion of the proceeds of any Credit Extension shall be used (x) to make any Prepetition Payment (except as would not constitute an Event of Default under Section 8.01(o), and then only in accordance with the Approved DIP Budget), (y) for any act which results in the occurrence of an Event of Default or which modifies or compromises the rights and remedies of

69

Administrative Agent, Collateral Agent or any Lender in a material and adverse manner, or (z) in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board or any other regulation thereof or to violate the Exchange Act.  No portion of the proceeds of any Credit Extension or the Collateral, including cash collateral, shall be used for any purpose other than as provided for in the Approved DIP Budget.

Section 2.07    Evidence of Debt; Register; Lenders' Books and Records; Notes.

(a)    Lenders' Evidence of Debt.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrowers to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Borrowers, absent manifest error; provided that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrowers' Obligations in respect of any applicable Loans; and provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    Register.  Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at the Principal Office a register for the recordation of the names and addresses of Lenders and the Revolving Commitments and Loans of each Lender from time to time (the "**Register**").  The Register shall be available for inspection by Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or shall cause to be recorded, in the Register the Revolving Commitments and the Loans in accordance with the provisions of Section 12.06, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrowers and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Commitments or Borrowers' Obligations in respect of any Loan.  Each Borrower hereby designates Barclays to serve as such Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.07, and each Borrower hereby agrees that, to the extent Barclays serves in such capacity, Barclays and its officers, directors, employees, agents, sub-agents and Affiliates shall constitute "Indemnitees" as defined under this Agreement.

(c)    Notes.  If so requested by any Lender by written notice to Borrowers (with a copy to Administrative Agent) at least two (2) Business Days prior to the Restatement Effective Date, or at any time thereafter, Borrowers shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to and in accordance with Section 12.06) on the Restatement Effective Date (or, if such notice is delivered after the Restatement Effective Date, promptly after Borrowers' receipt of such notice) a Note or Notes to evidence such Lender's Term Loan or Revolving Loan, as the case may be.

Section 2.08    Interest on Loans.

(a)    Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through but excluding the date of repayment (whether by acceleration or otherwise) thereof as follows:

(i)    in the case of Term Loans or Revolving Loans,

(A)    if an ABR Loan, at the Alternate Base Rate plus the Applicable Margin; or

(B)    if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate plus the Applicable Margin; and

(ii)    in the case of Protective Advances, at the Alternate Base Rate plus the Applicable Margin for Revolving Loans that are ABR Loans.

(b)    The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any Eurodollar Rate Loan, shall be selected by the applicable Borrower and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be.  If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be an ABR Loan.

(c)    In connection with Eurodollar Rate Loans, there shall be no more than ten (10) Interest Periods outstanding at any time.  In the event Borrowers fail to specify between an ABR Loan or a Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into an ABR Loan on the last day of the then current Interest Period for such Loan (or if outstanding as an ABR Loan will remain as, or (if not then outstanding) will be made as, an ABR Loan).  In the event Borrowers fail to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, Borrower shall be deemed to have selected an Interest Period of one month.  As soon as practicable after 2:00 p.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrowers and each Lender.

(d)    Interest payable pursuant to Section 2.08(a) shall be computed (i) in the case of ABR Loans on the basis of a 365 day or 366 day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360 day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to an ABR Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such ABR Loan, as the case may be, shall be

71

included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to an ABR Loan being converted to a Eurodollar Rate Loan, the date of conversion of such ABR Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)    Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans; provided, however, with respect to any voluntary prepayment of an ABR Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.

Section 2.09    Conversion/Continuation.

(a)    Subject to Section 2.18 and so long as no Default or Event of Default shall have occurred and then be continuing, Borrowers shall have the option:

(i)    to convert at any time all or any part of any Term Loan or Revolving Loan equal to $5,000,000 and integral multiples of $1,000,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a Eurodollar Rate Loan may only be converted on the expiration of the Interest Period applicable to such Eurodollar Rate Loan unless Borrower shall pay all amounts due under Section 2.18 in connection with any such conversion; or

(ii)    upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $5,000,000 and integral multiples of $1,000,000 in excess of that amount as a Eurodollar Rate Loan.

(b)    Borrowers shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 2:00 p.m. (New York City time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to an ABR Loan) and at least three (3) Business Days in advance of the proposed Conversion/Continuation Date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Eurodollar Rate Loans (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Borrowers shall be bound to effect a conversion or continuation in accordance therewith.

Section 2.10    Default Interest.    Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and not paid when due, and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder and not paid when due, shall thereafter bear interest payable on demand at a rate (the "**Default Rate**") that is 2.00% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such

72

fees and other amounts, at a rate which is 2.00% per annum in excess of the interest rate otherwise payable hereunder for ABR Loans); provided, in the case of Eurodollar Rate Loans that are not paid when due, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become ABR Loans and shall thereafter bear interest payable upon demand at a rate which is 2.00% per annum in excess of the interest rate otherwise payable hereunder for ABR Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.10 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of any Agent or any Lender.

Section 2.11    Fees.

(a)    Borrower agrees to pay to Revolving Lenders unused line fees equal to (A) the average of the daily difference between (1) the Revolving Commitments, and (2) the Total Utilization of Revolving Commitments, times (B) the Applicable Revolving Commitment Fee Percentage, per annum. All fees referred to in this Section 2.11(a) shall be paid to Administrative Agent at its Principal Office and upon receipt, Administrative Agent shall promptly distribute to each Revolving Lender its Pro Rata Share thereof.

(b)    All fees referred to in Section 2.11(a) shall be calculated on the basis of a 360 day year and the actual number of days elapsed and shall be payable monthly in on the first day of each calendar month until the Termination Date, commencing on the first such date to occur after the Closing Date, and on the Termination Date.

(c)    In addition to any of the foregoing fees, Borrowers agree to pay to Agents such other fees, if any, in the amounts and at the times separately agreed upon.

Section 2.12    Protective Advances.

(a)    Subject to the limitations set forth below, Administrative Agent is authorized by Borrowers and the Lenders, from time to time in Administrative Agent's sole discretion (but shall have absolutely no obligation to), to make Loans to Borrowers, on behalf of all Lenders, which Administrative Agent, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof or (ii) to pay any other amount chargeable to or required to be paid by Borrowers pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 12.02) and other sums payable under the Credit Documents (any of such Loans are herein referred to as "**Protective Advances**"); provided that, the aggregate amount of Protective Advances made at any time, together with any other Protective Advances then outstanding, shall not exceed $50,000,000; provided further that, the aggregate amount of outstanding Protective Advances plus the aggregate Revolving Exposure shall not exceed the aggregate Revolving Commitments. Protective Advances may be made even if the conditions precedent set forth in Section 3.03 have not been satisfied. The Protective Advances shall be secured by the Liens in favor of Administrative Agent in and to the Collateral and shall constitute Obligations hereunder. All Protective Advances shall be ABR Loans. Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Requisite Lenders. Any such revocation must be in writing and shall become effective prospectively upon

73

Administrative Agent's receipt thereof.  At any time that the conditions precedent set forth in
Section 3.03 have been satisfied, Administrative Agent may request the Revolving Lenders to
make a Revolving Loan to repay a Protective Advance.  At any other time, Administrative Agent
may require the Lenders to fund their risk participations described in Section 2.12(b).

(b)    Upon the making of a Protective Advance by Administrative
Agent (whether before or after the occurrence of a Default), each Lender shall be deemed,
without further action by any party hereto, to have unconditionally and irrevocably purchased
from Administrative Agent without recourse or warranty, an undivided interest and participation
in such Protective Advance in proportion to its Pro Rata Share.  From and after the date, if any,
on which any Lender is required to fund its participation in any Protective Advance purchased
hereunder, Administrative Agent shall promptly distribute to such Lender, such Lender's Pro
Rata Share of all payments of principal and interest and all proceeds of Collateral received by
Administrative Agent in respect of such Protective Advance.

Section 2.13    Voluntary Prepayments/Commitment Reductions.

(a)    Voluntary Prepayments.

(i)    Subject to Section 2.18(c), any time and from time to time,
Borrowers may prepay any Loans without penalty or premium on any Business Day in
whole or in part, in an aggregate minimum amount of $5,000,000 and integral multiples
of $1,000,000 in excess of that amount; provided that Term Loans may not be prepaid
under this Section 2.13(a) unless (A) all Revolving Commitments have been terminated
and (B) all Revolving Loans and Protective Advances have been repaid in full; provided,
further that Term A-2 Loans may not be prepaid under this Section 2.13(a) unless (A) all
Revolving Commitments have been terminated and (B) all Revolving Loans, Protective
Advances and Term A-1 Loans have been repaid in full.

(ii)    All such prepayments shall be made:

(A)    upon not less than one Business Day's prior written
or telephonic notice in the case of ABR Loans; and

(B)    upon not less than three Business Days' prior
written or telephonic notice in the case of Eurodollar Rate Loans;

in each case given to Administrative Agent by 12:00 noon (New York City time)
on the date required and, if given by telephone, promptly confirmed in writing to
Administrative Agent (and Administrative Agent will promptly transmit such
telephonic or original notice for Revolving Loans by telefacsimile or telephone to
each Lender).  Upon the giving of any such notice, the principal amount of the
Loans specified in such notice shall become due and payable on the prepayment
date specified therein.  Any such voluntary prepayment shall be applied as
specified in Section 2.15.

(b)    Voluntary Commitment Reductions.

(i)       Borrowers may, upon not less than three Business Days' prior written notice through delivery of a Notice of Payment/Commitment Termination (which notice Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Lender), at any time and from time to time irrevocably terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the sum of (x) the Total Utilization of Revolving Commitments plus (y) the aggregate outstanding principal amount of Protective Advances at the time of such proposed termination or reduction; provided, any such partial reduction of the Revolving Commitments shall be in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount.

Borrowers' notice to Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in Borrowers' notice and shall reduce the Revolving Commitment of each Revolving Lender proportionately to its Pro Rata Share thereof.

Section 2.14    <u>Mandatory Prepayments</u>

(a)       In the event that (i) the sum of the Total Utilization of Revolving Commitments and the aggregate outstanding principal amount of Protective Advances exceeds (ii) the Revolving Commitments, Borrowers shall, within one (1) Business Day, (x) deposit Cash or Cash Equivalents into the Borrower Accounts in an aggregate amount equal to the excess of clause (i) over clause (ii), and/or (y) without penalty or premium but subject to Section 2.18(c), first, prepay Protective Advances until paid in full and second, prepay Revolving Loans until paid in full in an aggregate amount equal to the excess of clause (i) over clause (ii).

(b)       In the event that (i) the sum of the Aggregate Revolving/Term A-1 Credit Exposure and the aggregate outstanding principal amount of Protective Advances exceeds (ii) the Borrowing Base (the excess of clause (i) over clause (ii), a "**Borrowing Base Shortfall**"), Borrowers shall, within one (1) Business Day, (x) deposit Cash or Cash Equivalents into the Borrower Accounts in an aggregate amount equal to such Borrowing Base Shortfall, and/or (y) without penalty or premium but subject to Section 2.18(c) (in accordance with Section 8.02), *first*, prepay Protective Advances until paid in full, *second*, prepay Revolving Loans until paid in full and *third*, prepay the Term A-1 Loans until paid in full, in an aggregate amount equal to such Borrowing Base Shortfall; <u>provided</u> that the Borrowers shall be required to terminate the Revolving Commitments in full prior to prepaying any Term A-1 Loans as required hereunder.

(c)       In the event that (i) the Aggregate Credit Exposure exceeds (ii) the Collateral Amount (the excess of clause (i) over clause (ii), a "**Collateral Amount Shortfall**"), Borrowers shall, within one (1) Business Day, (x) deposit Cash or Cash Equivalents into the Borrower Accounts in an aggregate amount equal to such Collateral Amount Shortfall and/or (y) without penalty or premium but subject to Section 2.18(c) (in accordance with Section 8.02), *first*, prepay Protective Advances until paid in full, *second*, prepay Revolving Loans until paid in full, *third*, prepay the Term A-1 Loans until paid in full, and *fourth*, prepay the Term A-2 Loans until paid in full, in an amount equal to such Collateral Amount Shortfall; <u>provided</u> that the

75

Borrowers shall be required to terminate the Revolving Commitments in full prior to prepaying any Term A-1 Loans or Term A-2 Loans as required hereunder.

(d)    In the event that any Net Proceeds are received by or on behalf of a Credit Party or any of its Subsidiaries in respect of a Prepayment Event, such Credit Party shall, or shall cause its Subsidiaries to, without penalty or premium but subject to Section 2.18(c), within one (1) Business Day first, prepay Protective Advances until paid in full, second, prepay Revolving Loans until paid in full, third, prepay the Term A-1 Loans until paid in full, and fourth, prepay the Term A-2 Loans until paid in full, in an aggregate amount equal to such Net Proceeds; provided that the Borrowers shall be required to terminate the Revolving Commitments in full prior to prepaying any Term A-1 Loans or Term A-2 Loans as required hereunder; provided, further, that any Indebtedness secured by a Lien on any Junior Lien Collateral that is the subject of a Prepayment Event and is senior to the Liens of the Secured Parties has been repaid in full (or Net Proceeds in an amount necessary to repay such Indebtedness have been set aside for the benefit of the holder of such Indebtedness).

Section 2.15    Application of Prepayments.

(a)    Application of Voluntary Prepayments of Revolving Loans.  Any prepayment of any Loan pursuant to Section 2.13(a) shall be applied as specified by Borrowers in the applicable notice of prepayment; provided, in the event Borrowers fail to specify the Revolving Loans to which any such prepayment shall be applied, such prepayment shall be applied as follows (without reduction of the Revolving Commitments): first, to repay outstanding Protective Advances to the full extent thereof; and second, to repay outstanding Revolving Loans to the full extent thereof.

(b)    Application of Prepayments of Loans to ABR Loans and Eurodollar Rate Loans.  Any prepayment of any Loan of any Class shall be applied first to ABR Loans of such Class to the full extent thereof before application to Eurodollar Rate Loans of such Class, in each case in a manner that minimizes the amount of any payments required to be made by Borrowers pursuant to Section 2.18(c).

Section 2.16    General Provisions Regarding Payments.

(a)    All payments by Borrowers of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 12:00 p.m. (New York City time) on the date due at the Principal Office designated by Administrative Agent for the account of Lenders, together with, in the event of any voluntary or mandatory prepayment of the Loans or reduction of the Commitments under Sections 2.13 or 2.14, a Notice of Payment/Commitment Termination; for purposes of computing interest and fees, funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Borrowers on the next succeeding Business Day.

(b)    Except as otherwise set forth in Section 2.08(e), all payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.

76

(c)    Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)    Notwithstanding the foregoing provisions hereof, if any Conversion/Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes ABR Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)    Subject to the provisos set forth in the definition of "Interest Period" as they may apply to Revolving Loans, whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and, with respect to Revolving Loans only, such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment fees hereunder.

(f)    Each Borrower hereby authorizes Administrative Agent to charge such Borrower's accounts with Administrative Agent in order to cause timely payment to be made to Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(g)    Administrative Agent shall deem any payment by or on behalf of Borrowers hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.  Administrative Agent shall give prompt telephonic notice to each applicable Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming.  Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.01(a).  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.10 from the date such amount was due and payable until the date such amount is paid in full.

(h)    If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.01, all payments or proceeds received by Administrative Agent hereunder in respect of any of the Obligations, shall be applied in accordance with Section 8.02.

Section 2.17    Ratable Sharing.  Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or

77

otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest.  Each Borrower expressly consents to the foregoing arrangement and agrees that, to the extent permitted by law, any holder of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by Borrowers to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

Section 2.18     Making or Maintaining Eurodollar Rate Loans.

(a)     Inability to Determine Applicable Interest Rate.  In the event that Administrative Agent shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Adjusted Eurodollar Rate, Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Borrowers and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, Eurodollar Rate Loans until such time as Administrative Agent notifies Borrowers and Lenders that the circumstances giving rise to such notice no longer exist and (ii) any Funding Notice or Conversion/Continuation Notice given by a Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by such Borrower.

(b)     Illegality or Impracticability of Eurodollar Rate Loans.  In the event that on any date any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Borrowers and Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith could not be unlawful) or (ii) has become impracticable, as a result of contingencies occurring after the Closing Date which materially and adversely affect the London interbank market or the position of such Lender in

78

that market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to Borrowers and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). Thereafter (A) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (B) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by a Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) an ABR Loan, (C) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (D) the Affected Loans shall automatically convert into ABR Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by a Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, Borrower shall have the option, subject to the provisions of Section 2.18(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.18(b) shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms hereof.

(c)    Compensation for Breakage or Non-Commencement of Interest Periods. Borrowers shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Lender to Lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Borrowers.

(d)    Booking of Eurodollar Rate Loans. Subject to Section 2.21, any Lender may make, carry or transfer Eurodollar Rate Loans at, to or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)    Assumptions Concerning Funding of Eurodollar Rate Loans. Calculation of all amounts payable to a Lender under this Section 2.18 and under Section 2.19

shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (a) of the definition of Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States; provided, however, each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.18 and under Section 2.19.

Section 2.19    Increased Costs; Capital Adequacy.

(a)    Compensation For Increased Costs and Taxes.  In the event that any Lender or Recipient shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any Change in Law:  (i) subjects any Recipient to any Taxes (other than (x) Indemnified Taxes and (y) Other Connection Taxes on gross or net income, profits or revenue (including value-added or similar Taxes)) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, Federal Deposit Insurance Corporation insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to Eurodollar Rate Loans that are reflected in the definition of Adjusted Eurodollar Rate); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender or such other Recipient of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto (whether of principal, interest or any other amount); then, in any such case, Borrowers shall promptly pay to such Lender or such other Recipient, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender or such other Recipient in its sole discretion shall determine) as may be necessary to compensate such Lender or such other Recipient for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to Borrowers (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.19(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)    Capital Adequacy Adjustment.  In the event that any Lender shall have determined that any Change in Law has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Revolving Commitments or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase in, applicability,

80

change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five Business Days after receipt by Borrowers from such Lender of the statement referred to in the next sentence, Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after tax basis for such reduction.  No Lender shall be entitled to request any payment pursuant to this Section 2.19(b) unless such Lender is generally demanding payment under comparable provisions of its agreements with similarly situated borrowers.  Such Lender shall deliver to Borrowers (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.19(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(c)    Notwithstanding anything to the contrary contained herein, Borrowers will not be required to compensate any Lender for any such increased costs or reduced return incurred by such Lender more than six (6) months prior to such Lender's written request to Borrowers for such compensation.

Section 2.20    Taxes: Withholding, Etc.

(a)    Withholding of Taxes; Gross-Up.  Each payment by any Credit Party under this Agreement shall be made without withholding for any Taxes, unless such withholding is required by any law.  If any Withholding Agent determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Withholding Agent may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by any Credit Party shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section 2.20), the applicable Recipient receives the amount it would have received had no such withholding been made.

(b)    Payment of Other Taxes by Borrower.  Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes by Borrower to a Governmental Authority, Borrower shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(d)    Indemnification by the Credit Parties.  The Credit Parties shall jointly and severally indemnify each Recipient for any Indemnified Taxes that are paid or payable by such Recipient in connection with this Agreement (including amounts paid or payable under this Section 2.20(d)) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this Section 2.20(d) shall be paid within ten (10) days after the Recipient delivers to Borrower a certificate stating the amount of any Indemnified Taxes so paid or payable by such Recipient and describing the basis

81

for the indemnification claim.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.  Such Recipient shall deliver a copy of such certificate to Administrative Agent.

(e)    <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify Administrative Agent for any Taxes (but, in the case of any Indemnified Taxes, only to the extent that Borrower has not already indemnified Administrative Agent for such Indemnified Taxes and without limiting the obligation of Borrower to do so) attributable to such Lender that are paid or payable by Administrative Agent in connection with this Agreement and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this Section 2.20(e) shall be paid within ten (10) days after Administrative Agent delivers to the applicable Lender a certificate stating the amount of Taxes so paid or payable by Administrative Agent.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

(f)    <u>Status of Lenders</u>.

(i)    Any Lender that is entitled to an exemption from, or reduction of, any applicable withholding Tax with respect to any payments under this Agreement shall deliver to Borrower and Administrative Agent, at the time or times reasonably requested by Borrower or Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or Administrative Agent as will permit such payments to be made without, or at a reduced rate of, withholding.  In addition, any Lender, if requested by Borrower or Administrative Agent, shall deliver such other documentation prescribed by law or reasonably requested by Borrower or Administrative Agent as will enable Borrower or Administrative Agent to determine whether or not such Lender is subject to any withholding (including backup withholding) or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.20(f)(ii)(A) through (E) below) shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense (or, in the case of a Change in Law, any incremental material unreimbursed cost or expense) or would materially prejudice the legal or commercial position of such Lender.  Upon the reasonable request of Borrower or Administrative Agent, any Lender shall update any form or certification previously delivered pursuant to this Section 2.20(f).  If any form or certification previously delivered pursuant to this Section 2.20(f) expires or becomes obsolete or inaccurate in any respect with respect to a Lender, such Lender shall promptly notify Borrower and Administrative Agent in writing of such expiration, obsolescence or inaccuracy and update the form or certification if it is legally eligible to do so.

(ii)    Without limiting the generality of the foregoing, any Lender with respect to Borrower shall, if it is legally eligible to do so, deliver to Borrower and Administrative Agent (in such number of copies reasonably requested by Borrower and Administrative Agent) on or prior to the date on which such Lender

becomes a party hereto, duly completed and executed copies of whichever of the following is applicable:

(A)    in the case of a Lender that is a U.S. Person, IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (1) with respect to payments of interest under this Agreement, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (2) with respect to any other applicable payments under this Agreement, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(C)    in the case of a Non-U.S. Lender for whom payments under this Agreement constitute income that is effectively connected with such Lender's conduct of a trade or business in the United States, IRS Form W-8ECI;

(D)    in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code both (1) IRS Form W-8BEN and (2) a certificate substantially in the form of Exhibit E (a "**U.S. Tax Certificate**") to the effect that such Lender is not (a) a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (b) a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, (c) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code and (d) conducting a trade or business in the United States with which the relevant interest payments are effectively connected;

(E)    in the case of a Non-U.S. Lender that is not the beneficial owner of payments made under this Agreement (including a partnership or a participating Lender) (1) an IRS Form W-8IMY on behalf of itself and (2) the relevant forms prescribed in clauses (A), (B), (C), (D) and (F) of this Section 2.20(f)(ii) that would be required of each such beneficial owner or partner of such partnership if such beneficial owner or partner were a Lender; provided, however, that if the Lender is a partnership and one or more of its partners are claiming the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, such Lender may provide a U.S. Tax Certificate on behalf of such partners; or

(F)    any other form prescribed by law as a basis for claiming exemption from, or a reduction of, U.S. federal withholding Tax together with such supplementary documentation necessary to enable Borrower or

Administrative Agent to determine the amount of Tax (if any) required by law to
be withheld.

(iii)    If a payment made to a Lender under this Agreement would
be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to
fail to comply with the applicable reporting requirements of FATCA (including those
contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable),
such Lender shall deliver to the Withholding Agent, at the time or times prescribed by
law and at such time or times reasonably requested by the Withholding Agent, such
documentation prescribed by applicable law (including as prescribed by Section
1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation
reasonably requested by the Withholding Agent as may be necessary for the Withholding
Agent to comply with its obligations under FATCA, to determine that such Lender has or
has not complied with such Lender's obligations under FATCA or to determine the
amount to deduct and withhold from such payment.  Solely for purposes of this Section
2.20(f)(iii), "**FATCA**" shall include any amendments made to FATCA after the date of
this Agreement.

(g)    Treatment of Certain Refunds.  If any party determines, in its sole
discretion exercised in good faith, that it has received a refund of any Taxes as to which it has
been indemnified pursuant to this Section 2.20 (including additional amounts paid pursuant to
this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but
only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes
giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of such
indemnified party and without interest (other than any interest paid by the relevant Governmental
Authority with respect to such refund).  Such indemnifying party, upon the request of such
indemnified party, shall repay to such indemnified party the amount paid to such indemnified
party pursuant to the previous sentence (plus any penalties, interest or other charges imposed by
the relevant Governmental Authority) in the event such indemnified party is required to repay
such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this
Section 2.20(g), in no event will any indemnified party be required to pay any amount to any
indemnifying party pursuant to this Section 2.20(g) if such payment would place such
indemnified party in a less favorable position (on a net after-Tax basis) than such indemnified
party would have been in if the indemnification payments or additional amounts giving rise to
such refund had never been paid.  This Section 2.20(g) shall not be construed to require any
indemnified party to make available its Tax returns (or any other information relating to its
Taxes which it deems confidential) to the indemnifying party or any other Person.

(h)    Survival.  Each party's obligations under this Section 2.20 shall
survive any assignment of rights by, or the replacement of, a Lender, the termination of the
Commitments and the repayment, satisfaction or discharge of all other obligations under this
Agreement.

Section 2.21    Obligation to Mitigate.  Each Lender agrees that, as promptly as
practicable after the officer of such Lender responsible for administering its Loans becomes
aware of the occurrence of an event or the existence of a condition that would cause such Lender
to become an Affected Lender or that would entitle such Lender to receive payments under

Section 2.18, 2.19 or 2.20, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.18, 2.19 or 2.20 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Commitments or Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Commitments or Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.21 unless Borrowers agree to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described in clause (a) above. A certificate as to the amount of any such expenses payable by Borrowers pursuant to this Section 2.21 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Borrowers (with a copy to Administrative Agent) shall be conclusive absent manifest error.

Section 2.22   Defaulting Lenders.   Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)   fees described in Section 2.11 shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender and such Defaulting Lender shall not be entitled to receive any such fee pursuant to Section 2.11 with respect to such Defaulting Lender's unfunded Commitment; and

(b)   the Commitment and Credit Exposure of such Defaulting Lender shall not be included for purposes of voting on any matters except (i) such Defaulting Lender's Commitment may not be increased or extended without its consent and (ii) the principal amount of, or interest or fees payable on, Loans may not be reduced or excused or the scheduled date of payment may not be postponed as to such Defaulting Lender (other than pursuant to Section 2.22(a) above) without such Defaulting Lender's consent.

(c)   In the event that Administrative Agent and Borrowers each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then on such date such Lender shall purchase at par such of the Protective Advances and Revolving Loans of the other Revolving Lenders as Administrative Agent shall determine may be necessary in order for such Lender to hold such Protective Advances and Revolving Loans in accordance with its Pro Rata Share.

Section 2.23   Removal or Replacement of a Lender.   Anything contained herein to the contrary notwithstanding, in the event that:  (a) (i) any Lender (an "**Increased Cost Lender**") shall give notice to Borrowers that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice

85

within five Business Days after Borrowers' request for such withdrawal; or (b) (i) any Lender shall become a Defaulting Lender and (ii) such Defaulting Lender shall fail to cure the default as a result of which it has become a Defaulting Lender within five Business Days after Borrowers' request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 12.05(a), the consent of Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a "**Non-Consenting Lender**") whose consent is required shall not have been obtained; then, with respect to each such Increased Cost Lender, Defaulting Lender or Non-Consenting Lender (the "**Terminated Lender**"), Borrowers may, by giving written notice to Administrative Agent and any Terminated Lender of their election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans and its Revolving Commitments, if any, in full to one or more Eligible Assignees (each a "**Replacement Lender**") in accordance with the provisions of Section 12.06 and Borrowers shall pay any fees payable thereunder in connection with such assignment; provided, (A) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (1) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender, and (2) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.11; (B) on the date of such assignment, Borrowers shall pay any amounts payable to such Terminated Lender pursuant to Section 2.18(c), 2.19 or 2.20; (C) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender; and (D) in the event such Terminated Lender is an Increased Cost Lender, such assignment shall not cause any Replacement Lender or any other Lender to be entitled to receive payments under Section 2.18, 2.19 or 2.20. Upon the prepayment of all amounts owing to any Terminated Lender and the termination of such Terminated Lender's Commitments, if any, in accordance with this Section 2.23, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.

Section 2.24    Determination of Borrowing Base and Collateral Amount.

(a)    Eligible Receivables. On any date of determination of the Borrowing Base or the Collateral Amount, any Receivable owned by a Borrower that satisfies the following criteria and is reflected in the most recent Borrowing Base and Collateral Amount Certificate delivered to Collateral Agent and Administrative Agent shall be an "**Eligible Receivable**" for the purposes of this Agreement. On any date of determination of the Borrowing Base or the Collateral Amount, an Eligible Receivable must satisfy the following criteria:

(i)    it constitutes a "general intangible" within the meaning of Section 9-102(a)(42) or an "account" within the meaning of Section 9-102(a)(2) (or the corresponding provision in effect in a particular jurisdiction) of the UCC in all applicable jurisdictions;

(ii)    it is denominated in U.S. Dollars and is payable in the United States;

(iii)    it arises under a Designated Servicing Agreement and, at the time it was made, (A) was reasonably determined by the related Servicer to be ultimately recoverable from the proceeds of the related Serviced Loan, related liquidation proceeds or otherwise from the proceeds of or collections on the related Serviced Loan, (B) the related Servicer complied with all requirements for reimbursement thereunder, and (C) it was authorized to be made pursuant to the terms of the related Designated Servicing Agreement;

(iv)    pursuant to the terms of the related Designated Servicing Agreement:

(A)    the Servicer is permitted to reimburse itself for the related Advance out of late collections of the amounts advanced, including from insurance proceeds and liquidation proceeds from the Serviced Loan with respect to which such Advance was made, prior to the distributions or payments to any other party, including without limitation any investor, trustee, custodian, hedge counterparty or credit enhancement provider; and

(B)    if the Servicer determines that the related P&I Advance will not be recoverable out of late collections of the amounts advanced or out of insurance proceeds or liquidation proceeds from the Serviced Loan with respect to which such P&I Advance was made, the Servicer has the right to reimburse itself for such P&I Advance out of any funds in the related MBS Trust Collection Account, or out of general collections received by the Servicer with respect to any Serviced Loans serviced under the same Servicing Agreement, prior to any payment of any holders of any notes, certificates or other securities backed by the related Loan pool, which securities in the case of a Servicing Agreement include a "AAA (sf)" or equivalent rated class at the time of execution of the Servicing Agreement, and prior to payment of any party subrogated to the rights of the holders of such securities (such as a reimbursement right of a credit enhancer) or any hedge or derivative termination fees, or the expenses of the related MBS Trust;

(v)    all right, title and interest in and to such Receivable have been validly (A) sold by the GSAP Transferor to the Borrowers or (B) sold and/or contributed by GMACM to GMACM Borrower or by RFC to RFC Borrower;

(vi)    all representations and warranties made by RFC or GMACM, as applicable, as Originator in the related Receivables Purchase Agreement or the related Receivables Pooling and Purchase Agreement with respect to such Receivable are true and correct in all material respects, and no breach of covenant of RFC or GMACM, as applicable, or the related Borrower, exists with respect to such Receivables under this Agreement, or under the related Receivables Purchase Agreement or the related Receivables Pooling and Purchase Agreement;

(vii)    as of the date such Receivable was sold and/or contributed by the GSAP Transferor under the related Receivables Purchase Agreement or by

1760935.07-New York Server 7A - MSW

GMACM or RFC, as applicable, the related Receivables Pooling and Purchase Agreement, none of RFC, GMACM or the GSAP Transferor had (1) taken any action that would impair the right, title and interest of the Secured Parties therein, or (2) failed to take any action that was necessary to avoid impairing the Secured Parties' right, title or interest therein;

(viii)    the Advance related to such Receivable has been fully funded by the related Servicer using its own funds and/or Amounts Held for Future Distribution (to the extent permitted under the related Designated Servicing Agreement);

(ix)    as of the date such Receivable was funded, the Advance Ratio for the related Designated Servicing Agreement determined as of the end of the most recently concluded calendar month was less than 1%; provided that this clause (ix) shall not apply to Receivables sold and/or contributed by the GSAP Transferor to the Borrowers on the Closing Date;

(x)    as of the end of the most recently concluded calendar month, (A) the Advance to Pool Balance Ratio for the related Designated Servicing Agreement was less than 33.33% and (B) the unpaid principal balance of Serviced Loans serviced under such related Designated Servicing Agreement was at least $8,000,000 and at least 50 Serviced Loans were being serviced under such Designated Servicing Agreement;

(xi)    as of the date such Receivable was funded,  the aggregate Receivable Balances of all Eligible Receivables arising under the related Designated Servicing Agreement determined as of the end of the most recently concluded calendar month does not exceed 15% of the aggregate Receivable Balance of all Eligible Receivables in respect of all Designated Servicing Agreements; and

(xii)    no Servicer Termination Event shall have occurred with respect to the Designated Servicing Agreement related to such Receivable (except any Servicer Termination Event caused solely by the failure of a collateral performance test under such Designated Servicing Agreement, in respect of which the related Servicer has not received a notice of termination from one or more parties authorized to terminate the Servicer under such Designated Servicing Agreement).

(b)    Eligible Mortgage Loans.  On any date of determination of the Borrowing Base or the Collateral Amount, any Mortgage Loan owned by a Borrower that satisfies the following criteria and is reflected in the most recent Borrowing Base and Collateral Amount Certificate delivered to Collateral Agent and Administrative Agent shall be an "**Eligible Mortgage Loan**" for the purposes of this Agreement.  On any date of determination of the Borrowing Base or the Collateral Amount, an Eligible Mortgage Loan must satisfy the following criteria:

(i)    it constitutes a Mortgage Loan on a one to four family residential property;

88

(ii)    the representations and warranties set forth in this Agreement, including without limitation the representations and warranties set forth on Schedule 4.39, with respect to such Mortgage Loan are true and correct as of each date on which any Commitments are in effect or any Obligations are outstanding under this Agreement; and

(iii)    such Mortgage Loan is, in the sole discretion of Collateral Agent, eligible for sale to a prudent third-party investor.

(c)    Eligible REO Property.  On any date of determination of the Borrowing Base or the Collateral Amount, any REO Property (i) owned by a Borrower's REO Subsidiary, which Subsidiary is a Guarantor and a "Grantor" under and as defined in the Borrowers Security Agreement and whose Capital Stock is subject to a perfected First Priority Lien pursuant to the Borrowers Security Agreement and the Orders, and (ii) as to which Collateral Agent has received a Broker's Price Opinion as of a date within ninety (90) days prior to such date of determination and that is reflected in the most recent Borrowing Base and Collateral Amount Certificate delivered to Collateral Agent and Administrative Agent shall be an "**Eligible REO Property**" for the purposes of this Agreement.  For the avoidance of doubt, there is no Eligible REO Property as of the Closing Date or as of the Restatement Effective Date.

Section 2.25    Priority and Liens Applicable to Credit Parties.  Each Credit Party hereby covenants and agrees that, upon the execution of this Agreement and upon the entry of the Interim Financing Order (and when applicable, the Final Financing Order), the Obligations of the Credit Parties:

(a)    pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute joint and several Superpriority Claims in the Cases;

(b)    pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code, shall at all times be secured by (i) a valid, binding, perfected first priority Lien on all real, personal, tangible and intangible property of the Borrowers' and the Borrowers' REO Subsidiaries' respective estates in the Cases that (x) is not subject to valid, perfected and non-avoidable Liens as of the Petition Date or (y) becomes unencumbered and is no longer subject to a Lien as a result of the repayment of Prepetition Refinanced Indebtedness with the proceeds of the Loans, and (ii) a valid, binding, perfected first priority priming Lien on all such property to the extent that such property is subject to any valid, perfected and non-avoidable Lien as of the Petition Date that is not being terminated as a result of the repayment of Prepetition Refinanced Indebtedness;

(c)    pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code, shall at all times be secured by (i) a valid, binding, perfected first priority Lien on all right, title and interest of ResCap in the Concentration Account and all funds from time to time held or deposited in the Concentration Account to the extent such property is not subject to valid, perfected and non-avoidable Liens as of the Petition Date, and (ii) a valid, binding, perfected first priority priming Lien on all such property to the extent that such property is subject to any valid, perfected and non-avoidable Lien as of the Petition Date;

(d)        pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, perfected first priority Lien on all rights of the Credit Parties to all cash deposits, rights under escrow agreements or other security or credit enhancements provided by or on behalf of a purchaser under any Sale Agreement, whether existing as of the Closing Date or thereafter arising, including the Credit Parties' rights under the Nationstar Sale Agreement to retain the Cash Deposit (as defined in the Nationstar Sale Agreement) and all right, title and interest of the Credit Parties in, under and to the Deposit Escrow Agreement (as defined in the Nationstar Sale Agreement), including, without limitation, the right to receive and retain the Cash Deposit thereunder;

(e)        pursuant to Section 364(c)(3) of the Bankruptcy Code, shall at all times be secured by a valid, binding, perfected junior priority Lien on all real, personal, tangible and intangible property of the Debtors' respective estates in the Cases that constitutes LOC Junior Lien Collateral and that is subject to (i) valid, perfected and non-avoidable Liens in existence on the Petition Date, (ii) valid and non-avoidable rights of setoff held by depository institutions (and any replacement Liens therefor of the same extent and priority ordered by the Bankruptcy Court), and (iii) valid Liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code); and

(f)        pursuant to Section 364(c)(3) of the Bankruptcy Code, shall at all times be secured by a valid, binding perfected junior priority Lien on all real, personal, tangible and intangible property of the Debtors' respective estates in the Cases that constitutes MSR Junior Lien Collateral and that is subject to (i) valid, perfected and non-avoidable Liens in existence on the Petition Date, (ii) valid and non-avoidable rights of setoff held by depository institutions (and any replacement Liens therefor of the same extent and priority ordered by the Bankruptcy Court), and (iii) valid Liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code);

subject in the case of each of the preceding paragraphs, only to the Carve Out, and, in each case, as set forth in the Orders.

Section 2.26    Payment of Obligations.  Subject to the provisions of Section 8.01, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Credit Parties under this Agreement or any of the other Credit Documents, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

Section 2.27    No Discharge; Survival of Claims.  Each Credit Party agrees that to the extent that the Obligations hereunder have not been satisfied in full in Cash (a) its Obligations arising hereunder shall not be discharged by the entry of any order of the Bankruptcy Court confirming a Reorganization Plan (and each Credit Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to Administrative Agent and the Lenders pursuant to the Orders and described in Section 2.25(a) and the Liens granted to Administrative Agent pursuant to the Orders and described in

90

Section 2.25(b) through (f) shall not be affected in any manner by the entry of any order of the
Bankruptcy Court confirming a Reorganization Plan.

## ARTICLE III

## CONDITIONS PRECEDENT

Section 3.01    Closing Date.  The effectiveness of the Original Credit Agreement
and the obligation of any Lender to make a Credit Extension under the Initial Term A-1 Facility
or Term A-2 Facility on the Closing Date was subject to the satisfaction, or waiver in accordance
with Section 12.05, of the following conditions on or before the Closing Date:

(a)    the Credit Parties shall have each commenced the Cases with the
Bankruptcy Court by no later than May 18, 2012;

(b)    no trustee or examiner with expanded powers pursuant to section
1104(c) of the Bankruptcy Code shall have been appointed or designated with respect to any
Credit Party or their respective business, properties or assets;

(c)    all of the "first day" orders entered by the Bankruptcy Court at the
time of the commencement of the Cases (and if any such orders shall not have been entered by
the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval)
shall be in form and substance reasonably satisfactory to Administrative Agent;

(d)    (i) operational changes to track and allocate expenses relating to
the Specified Permitted Facilities, the Master Purchase Documents, the MSFTA and the First
Lien Collateral by asset type and facility shall have been implemented and cash management
systems consistent with the requirements under the Credit Documents and otherwise satisfactory
to Administrative Agent (including with respect to cash dominion) shall have been established
by the Credit Parties and (ii) one or more orders, in form and substance satisfactory to
Administrative Agent in its sole discretion, approving such cash management systems and
arrangements (as the same may be amended, supplemented or modified from time to time after
entry thereof in accordance with the terms hereof, the "**Cash Management Order**") shall have
been entered by the Bankruptcy Court (it being understood and agreed that an order in the form
of Exhibit M shall, if entered by the Bankruptcy Court, be deemed to be acceptable to
Administrative Agent), which Cash Management Order shall not have been (x) stayed, vacated
or reversed, or (y) amended or modified except as otherwise agreed to in writing by
Administrative Agent in its sole discretion;

(e)    (i) the Credit Parties and the other parties hereto shall have duly
executed and delivered this Agreement and (ii) the Credit Parties and the other parties thereto
shall have duly executed and delivered the other Credit Documents contemplated to be executed
on the Closing Date and set forth on Schedule 3.01, such Credit Documents, in each case, in
form and substance mutually satisfactory to Borrowers and the Lenders;

(f)    the Lenders, the Agents and the Lead Arranger shall have received
all fees required to be paid (including, without limitation, as required by the Fee Letters), and all
expenses for which invoices have been presented, on or before the Closing Date;

(g)      (i) all governmental and third-party approvals necessary in connection with (w) the execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party and the consummation by the Credit Parties of the transactions contemplated by such Credit Documents, (x) the grant by each Credit Party of the Liens granted by it pursuant to the Collateral Documents, (y) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof to the extent provided for in the Orders) and (z) the exercise by any Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents and (ii) all material governmental and third-party approvals necessary in connection with the continuing operations of ResCap and its Subsidiaries, in all the foregoing cases, shall have been obtained on satisfactory terms and shall be in full force and effect (including shareholder approvals, if any);

(h)      Administrative Agent and the Lenders shall have received: (i) the audited consolidated financial statements of ResCap for the two (2) most recent Fiscal Years ended prior to the Closing Date as to which such financial statements are available, (ii) unaudited interim condensed consolidated financial statements of ResCap for each Fiscal Quarter ended subsequent to the date of the latest financial statement delivered pursuant to clause (i) of this Section 3.01(h) and at least thirty (30) days prior to the Closing Date, (iii) the monthly unaudited consolidated balance sheet and income statement of ResCap for each monthly period ended subsequent to the date of the latest interim condensed consolidated quarterly financial statements delivered pursuant to clause (ii) of this Section 3.01(h) and at least ten (10) days prior to the Closing Date, and (iv) a Cash flow forecast, on a line item basis and in reasonable detail, including each item set forth in the definition of "Approved DIP Budget," in form and substance acceptable to Administrative Agent, for the twenty (20) weeks commencing with the week that includes the Petition Date, substantially in the form of Exhibit K (the "**Initial Approved DIP Budget**");

(i)      Administrative Agent shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to the documents set forth on Schedule 3.01;

(j)      Administrative Agent shall have received valuations of the Eligible Mortgage Loans included in the Borrowing Base and Collateral Amount as specified by Administrative Agent from independent appraisers satisfactory to Administrative Agent engaged directly by Administrative Agent;

(k)      Administrative Agent shall have received a Borrowing Base and Collateral Amount Certificate as of a date as recent as reasonably practicable (but in no event more than seven (7) Business Days prior to the most recent Saturday prior to the Closing Date) with all supporting documentation required in connection therewith (as described in the form of Borrowing Base and Collateral Amount Certificate attached as Exhibit I), duly executed and delivered by the Chief Financial Officer or Treasurer of each Primary Credit Party, which Borrowing Base and Collateral Amount Certificate shall include, without limitation, a pro forma calculation of the Borrowing Base and Collateral Amount after giving effect to the amounts to be borrowed on the Closing Date;

92

(l)  substantially concurrently with the initial borrowings of the Term Loans, repayment in full of all obligations under the Prepetition Refinanced Facilities, termination of the commitments thereunder and release of all Liens granted thereunder shall have occurred (with such prepayment in full, termination and release being evidenced by payoff letters and other termination documents reasonably acceptable to Administrative Agent and appropriate provisions in the Interim Financing Order confirming such terminations and releases), which repayment shall be made with the initial borrowings of Term Loans;

(m)  Credit Parties shall be in compliance with all applicable requirements of Regulations U, T and X of the Board;

(n)  not later than four (4) Business Days following the commencement of the Cases, entry of an interim order approving the Credit Documents in form and substance satisfactory to Administrative Agent in its sole discretion (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, the "**Interim Financing Order**") (it being understood and agreed that an order in the form of Exhibit N-1 shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which Interim Financing Order shall (i) have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, (ii) authorize the extensions of credit in respect of the Revolving Facility and the Term Facilities, each in the amounts and on the terms set forth herein, (iii) grant the Superpriority Claim status and other Collateral and Liens referred to herein and in the other Credit Documents, including without limitation, a junior Lien on the Junior Lien Collateral, (iv) approve the payment by the Borrowers of the fees provided for herein, (v) approve the repayment in full of the Prepetition Refinanced Facilities from the proceeds of the Term Loans and the release of all Liens securing the Prepetition Refinanced Facilities, (vi) provide that each Borrower is a separate and distinct legal entity from the GSAP Transferor, GMACM and RFC, and that the Lenders are extending credit in reliance upon the separateness of each Borrower and that the Borrowers shall not be subject to consolidation into the estate of the GSAP Transferor, GMACM, RFC or any other Debtor (in any such case, whether through the doctrine of substantive consolidation, veil piercing or any similar remedy), (vii) provide for the waiver of section 506(c) of the Bankruptcy Code by the Debtors as to the Collateral, and (viii) not have been (A) stayed, vacated or reversed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(o)  entry of one or more orders, in form and substance satisfactory to Administrative Agent in its sole discretion, (i) authorizing the Debtors to use the cash collateral of AFI and the holders of the Prepetition Junior Secured Notes under the Prepetition Ally Revolver and granting adequate protection in respect thereof and (ii) approving and authorizing the Debtors to enter into an amendment to the Prepetition Ally Line of Credit providing for up to $150,000,000 of debtor-in-possession financing (the "**Ally LOC DIP Amendment**") and to use the cash collateral of AFI under the Ally Line of Credit and granting adequate protection in respect thereof (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, collectively, the "**AFI/Junior Secured Notes Order**") (it being understood and agreed that an order in the form of Exhibit O shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which AFI/Junior Secured Notes Order (i) shall have been entered on such prior notice to such parties

as may be satisfactory to Administrative Agent in its sole discretion, and (ii) shall not have been (A) stayed, vacated or reversed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(p)    entry of one or more orders, in form and substance satisfactory to Administrative Agent in its sole discretion, authorizing the Debtors to use the EAF Facility and granting adequate protection (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, collectively, the "**EAF Order**") (it being understood and agreed that an order in the form of Exhibit P shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which EAF Order (i) shall have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, and (ii) shall not have been (A) stayed, vacated or reversed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(q)    entry of one or more orders, in form and substance satisfactory to Administrative Agent in its sole discretion, approving and authorizing the Debtors to either (i) enter into a debtor-in-possession financing facility refinancing the Prepetition MSR Facility, or (ii) use the cash collateral of Citibank, N.A. under the Prepetition MSR Facility and granting adequate protection (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, collectively, the "**MSR Order**") (it being understood and agreed that an order in the form of Exhibit Q shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which MSR Order (x) shall have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, and (y) shall not have been (A) stayed, vacated or reversed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(r)    the Credit Parties shall have entered into the Ally Sale Agreement and the Nationstar Sale Agreement, and the Credit Parties shall have filed with the Bankruptcy Court a motion in form and substance reasonably acceptable to Administrative Agent (the "**Sale Motion**") seeking entry of orders by the Bankruptcy Court, respectively, approving (i) the Original Sale Agreements and (ii) bidding procedures, which bidding procedures shall be in form and substance reasonably satisfactory to Administrative Agent (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, the "**Sale Procedures Order**") in connection with the sales contemplated thereby;

(s)    the Credit Parties shall be in pro forma compliance with the Borrowing Base, the Collateral Amount and the financial covenants set forth in Section 6.07 (after giving effect to the amounts to be borrowed and the use of proceeds on the Closing Date);

(t)    the Eligible Receivables and Eligible Mortgage Loans and other assets comprising First Lien Collateral shall have been identified in reasonable detail to Administrative Agent on Schedule 4.24, in form and substance reasonably satisfactory to Administrative Agent, and Administrative Agent shall be satisfied that all such Eligible Receivables and Eligible Mortgage Loans and other assets comprising First Lien Collateral are

94

subject to no Liens other than Liens described in clause (a) of the definition of "Permitted Collateral Liens";

(u)    since April 9, 2012, there shall not have occurred any change, development, circumstance or event that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect;

(v)    no Default or Event of Default, both immediately prior to and giving effect to the Credit Extensions on the Closing Date, shall, in each case, have occurred under any of the Credit Documents;

(w)    Administrative Agent shall have received the results of satisfactory lien searches (including, without limitation, the results of satisfactory tax lien searches) showing the absence of any Liens on any of the Collateral other than Liens expressly permitted by Section 6.02 or Liens to be terminated or discharged on the Closing Date;

(x)    Administrative Agent shall have received evidence of Servicing Practices of the Servicers and servicing practices of GMACM Servicer that are reasonably satisfactory to Administrative Agent;

(y)    [Reserved];

(z)    Borrowers shall have provided to Administrative Agent a written description of all servicing and subservicing fees relating to the Mortgage Loan portfolio of the Borrowers, which description shall be in form and substance reasonably satisfactory to Administrative Agent;

(aa)    the Credit Parties shall have used commercially reasonable efforts to obtain the MSR GSE Consents;

(bb)    the Credit Parties shall have established the Blocked Accounts and shall have delivered a duly authorized and executed Deposit Account Control Agreement with respect to each Blocked Account satisfying the criteria set forth in Section 9.01(d);

(cc)    GMACM Servicer shall deliver to the Agents the Servicer's Tape with respect to the GMACM Serviced Mortgage Loans; including those fields reasonably requested by Administrative Agent;

(dd)    entry of one or more orders, in form and substance reasonably satisfactory to Administrative Agent in its sole discretion, approving the origination and purchases and sales by the Credit Parties of certain mortgage loans and activities authorized in such order related to such originations or purchases (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, collectively, the "**Origination Order**") (it being understood and agreed that an order in the form of Exhibit R shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), which Origination Order (i) shall have been entered on such prior notice to such parties as may be satisfactory to Administrative Agent in its sole discretion, and (ii) shall

95

not have been (x) stayed, vacated or reversed, or (y) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion; and

(ee)    Administrative Agent shall have received a certificate, signed by a Senior Officer of each Primary Credit Party, on the Closing Date, confirming compliance (other than, as applicable, with respect to the satisfaction of any Agent) with the conditions set forth in Sections 3.01(a), (b), (c), (d), (g), (l), (m), (n), (o), (p), (q), (r), (s), (t), (u), (v), (w), (aa) and (bb) and Sections 3.03(c), (d), (e) and (g).

Section 3.02    <u>Conditions to Revolver Post-Closing Availability Date</u>.  The obligation of any Revolving Lender to make a Credit Extension under the Revolving Facility is subject to the satisfaction, or waiver in accordance with Section 12.05, of the following conditions precedent (the date upon which all such conditions shall be satisfied or waived, the "**Revolver Post-Closing Availability Date**"):

(a)    the Restatement Effective Date shall have occurred;

(b)    [Reserved];

(c)    [Reserved];

(d)    Term Loans in an aggregate principal amount equal to the maximum amount of the Initial Term A-1 Commitment and Term A-2 Commitment available shall have been borrowed on the Closing Date;

(e)    Delayed Draw Term A-1 Loans in an aggregate principal amount equal to the maximum amount of the Delayed Draw Term A-1 Commitment available shall have been borrowed on the Restatement Effective Date;

(f)    Administrative Agent shall have received a certificate, signed by a Senior Officer of each Borrower, on the Revolver Post-Closing Availability Date, confirming compliance (other than, as applicable, with respect to the satisfaction of any Agent) with the conditions set forth in Sections 3.03(c), (d), (e), (f) and (g).

Section 3.03    <u>Conditions to Each Credit Date</u>.  The obligation of each Lender to make any Loan on any Credit Date, including the Closing Date, the Restatement Effective Date and the Revolver Post-Closing Availability Date, is subject to satisfaction or waiver in accordance with Section 12.05, of the following conditions precedent:

(a)    Administrative Agent shall have received a fully executed and delivered Funding Notice in accordance with the applicable requirements set forth in Article II;

(b)    other than with respect to Loans made on the Closing Date, which, for the avoidance of doubt, shall be subject to the delivery of a Borrowing Base and Collateral Amount Certificate pursuant to Section 3.01(k), Collateral Agent shall have received, no later than 2:00 p.m. (New York City time) on the Business Day immediately preceding the requested Credit Date, a Borrowing Base and Collateral Amount Certificate, with all supporting documentation required in connection therewith (as provided in the form of Borrowing Base and

96

Collateral Amount Certificate attached as Exhibit I), duly executed and delivered by the Chief Financial Officer, Treasurer, Assistant Treasurer or any Senior Treasury Services Officer of each Primary Credit Party, which certificate shall include: (i) Cash and Cash Equivalent balances in the Borrower Accounts, the Concentration Account and the Collection Account as of the end of the Business Day that is two (2) Business Days prior to the requested Credit Date, (ii) a calculation of the Book Value of Eligible Receivables as of the end of the Business Day that is two (2) Business Days prior to the requested Credit Date , (iii) a calculation of the Market Value of Eligible Mortgage Loans and the Appraised Value of Eligible REO Property as of the date of the most recent Borrowing Base and Collateral Amount Certificate provided to Collateral Agent pursuant to Section 5.01(f), updated to reflect any Eligible Mortgage Loans that have been added, liquidated or paid off as of the end of the Business Day that is two (2) Business Days prior to the requested Credit Date, (iv) a calculation of the Borrowing Base and Collateral Amount reflecting the calculations described in clauses (i), (ii) and (iii) of this Section 3.03(b), (v) a pro forma calculation of the Borrowing Base and the Collateral Amount reflecting the calculations described in clauses (i), (ii) and (iii) of this Section 3.03(b) and giving effect to any borrowings of Loans, withdrawals of funds from any Blocked Account, and the use of proceeds of such borrowings and funds withdrawn made or expected to be made on the Business Day that is one (1) day prior to the requested Credit Date, (vi) a pro forma calculation of the Borrowing Base and the Collateral Amount after giving effect to the proposed borrowing on the Credit Date and use of proceeds (for the avoidance of doubt calculations under this clause (vi) shall give pro forma effect to any Eligible Receivables to be created by the use of proceeds from the proposed borrowing), and (vii) such other calculations as required by the Borrowing Base and Collateral Amount Certificate; provided that if the first Business Day for which complete end-of-day information is available is three (3) Business Days  prior to the requested Credit Date, any amounts in clauses (i) through (vii) above to be reported or calculated as of the Business Day that is two (2) Business Days prior to the requested Credit Date shall instead be reported or calculated as of such third (3rd) Business Day prior to the requested Credit Date, and any updates or pro forma calculations under clauses (iv) and (v) above shall be reported for each of the Business Days that is two (2) Business Days prior and one (1) Business Day prior to the requested Credit Date; provided, further that the form of Borrowing Base and Collateral Amount Certificate and the date of the foregoing calculations may be modified by agreement of the Borrowers and the Administrative Agent;

(c)    after giving effect to such Credit Extension and use of proceeds, (i) the Total Utilization of Revolving Commitments and the aggregate outstanding principal amount of Protective Advances shall not exceed the Revolving Commitments; (ii) the sum of the Aggregate Revolving/Term A-1 Credit Exposure and the aggregate outstanding principal amount of Protective Advances shall not exceed the Borrowing Base; and (iii) the sum of the Aggregate Credit Exposure and the aggregate outstanding principal amount of Protective Advances shall not exceed an amount equal to the lesser of (x) the Collateral Amount and (y) the aggregate principal amount of Loans authorized by the Interim Financing Order or the Final Financing Order, as applicable;

(d)    as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in

which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects subject to such qualification;

(e)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension and application of the proceeds thereof that would constitute an Event of Default or a Default;

(f)    not later than forty-five (45) days after the entry of the Interim Financing Order, the Bankruptcy Court shall have entered the Final Financing Order in form and substance satisfactory to Administrative Agent in its sole discretion; and

(g)    the Interim Financing Order or the Final Financing Order, as the case may be, shall be in full force and effect, and shall not have been (i) vacated, reversed, or stayed, or (ii) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion.

Section 3.04    Conditions to Each Withdrawal Date.  The right of  ResCap or any Borrower to make a withdrawal of any funds from the Concentration Account or any Borrower Account (or, following the receipt of an Activation Notice but prior to the commencement of a Dominion Period, the Collection Account) in accordance with Article IX is subject to satisfaction or waiver in accordance with Section 12.05, of the following conditions precedent:

(a)    Administrative Agent shall have received a fully executed and delivered Withdrawal Notice in accordance with the applicable requirements set forth in Article IX;

(b)    other than with respect to withdrawals and disbursements made on the Closing Date, which, for the avoidance of doubt, shall be subject to the delivery of a Borrowing Base and Collateral Amount Certificate pursuant to Section 3.01(k), Collateral Agent shall have received, no later than 11:00 a.m. (New York City time) on the proposed Withdrawal Date, or such later time on the proposed Withdrawal Date agreed to by Administrative Agent in its sole discretion but in any event no later than 1:00 p.m. (New York City time), a Borrowing Base and Collateral Amount Certificate, with all supporting documentation required in connection therewith (as provided in the form of Borrowing Base and Collateral Amount Certificate attached as Exhibit I), duly executed and delivered by the Chief Financial Officer, Treasurer, Assistant Treasurer or any Senior Treasury Services Officer of each Primary Credit Party, which certificate shall include (i) Cash and Cash Equivalent balances in the Borrower Accounts, the Concentration Account and the Collection Account as of end of the Business Day that is two (2) Business Days prior to the Withdrawal Date, (ii) a calculation of the Book Value of Eligible Receivables as of the end of the Business Day that is two (2) Business Days prior to the Withdrawal Date, (iii) a calculation of the Market Value of Eligible Mortgage Loans and the Appraised Value of Eligible REO Property as of the date of the most recent Borrowing Base and Collateral Amount Certificate provided to Collateral Agent pursuant to Section 5.01(f), updated to reflect any Eligible Mortgage Loans that have been added, liquidated or paid off as of end of the Business Day that is two (2) Business Days prior to the Withdrawal Date, (iv) a calculation

98

of the Borrowing Base and the Collateral Amount  reflecting the calculations described in clauses (i), (ii) and (iii) of this Section 3.04(b), (v) a pro forma calculation of the Borrowing Base and the Collateral Amount after giving effect to the proposed withdrawal on the Withdrawal Date and use of funds (for the avoidance of doubt calculations under this clause (v) shall give pro forma effect to any Eligible Receivables to be created by the use of proceeds from the proposed withdrawal), and (vi) such other calculations as required by the Borrowing Base and Collateral Amount Certificate; provided that if the first Business Day for which complete end-of-day information is available is two (2) Business Days  prior to the requested Withdrawal Date, any amounts in clauses (i) through (vi) above to be reported or calculated as of the Business Day immediately preceding the requested Withdrawal Date shall instead be reported or calculated as of such second (2nd ) Business Day prior to the requested Withdrawal Date and, in addition to the calculations described in clauses (i) through (v) above, the Borrowing Base and Collateral Amount Certificate shall include a pro forma calculation of the Borrowing Base and the Collateral Amount reflecting the calculations described in clauses (i), (ii) and (iii) of this Section 3.04(b) and giving effect to any borrowings of Loans, withdrawals of funds from any Blocked Account, and the use of proceeds of such borrowings and funds withdrawn made or expected to be made on the Business Day that is one (1) day prior to the requested Withdrawal Date; provided, further that the form of Borrowing Base and Collateral Amount Certificate and the date of the foregoing calculations may be modified by agreement of the Borrowers and the Administrative Agent;

(c)        after giving effect to such withdrawal of funds and use of funds, (i) the Total Utilization of Revolving Commitments and the aggregate outstanding principal amount of Protective Advances shall not exceed the Revolving Commitments; (ii) the sum of the Aggregate Revolving/Term A-1 Credit Exposure and the aggregate outstanding principal amount of Protective Advances shall not exceed the Borrowing Base; and (iii) the sum of the Aggregate Credit Exposure and the aggregate outstanding principal amount of Protective Advances shall not exceed an amount equal to the lesser of (x) the Collateral Amount and (y) the aggregate principal amount of Loans authorized by the Interim Financing Order or the Final Financing Order, as applicable;

(d)        as of such Withdrawal Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Withdrawal Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects subject to such qualification;

(e)        as of such Withdrawal Date, no event shall have occurred and be continuing or would result from the consummation of such withdrawal of funds and application of the proceeds thereof that would constitute an Event of Default or a Default;

(f)        not later than forty-five (45) days after the entry of the Interim Financing Order, the Bankruptcy Court shall have entered the Final Financing Order in form and substance satisfactory to Administrative Agent in its sole discretion; and

99

(g)    the Interim Financing Order or the Final Financing Order, as the case may be, shall be in full force and effect, and shall not have been (i) vacated, reversed, or stayed, or (ii) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion.

Section 3.05    <u>Conditions to Effectiveness of this Agreement</u>.  The effectiveness of the amendment and restatement of the Original Credit Agreement in the form of this Agreement and the obligation of any Delayed Draw Term A-1 Lender to make a Credit Extension under the Delayed Draw Term A-1 Facility are subject to satisfaction or waiver in accordance with Section 12.05, of the following conditions precedent:

(a)    a final order approving the Credit Documents (including, without limitation, the Facility Fee Letter Amendment, in accordance with the terms and conditions set forth therein), in form and substance satisfactory to Administrative Agent in its sole discretion (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, the "**Final Financing Order**") (it being understood and agreed that an order in the form of Exhibit N-2 shall, if entered by the Bankruptcy Court, be deemed to be acceptable to Administrative Agent), (i) shall have been entered by the Bankruptcy Court and shall be in full force and effect and (ii) shall not have been (A) vacated, reversed, or stayed, or (B) amended or modified except as otherwise agreed to in writing by Administrative Agent in its sole discretion;

(b)    all of the "second day" orders entered by the Bankruptcy Court (and if any such orders shall not have been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) shall be in form and substance reasonably satisfactory to Administrative Agent;

(c)    the Credit Parties and the other parties hereto shall have duly executed and delivered this Agreement;

(d)    the Lenders, the Agents and the Lead Arranger shall have received all fees required to be paid (including, without limitation, as required by the Fee Letters), and all expenses for which invoices have been presented, on or before the Restatement Effective Date;

(e)    (i) all governmental and third-party approvals necessary in connection with (w) the execution, delivery and performance by each Credit Party of this Agreement and the consummation by the Credit Parties of the transactions contemplated by this Agreement and the other Credit Documents, (x) the grant by each Credit Party of the Liens granted by it pursuant to the Collateral Documents and the Final Financing Order, (y) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof to the extent provided for in the Final Financing Order) and (z) the exercise by any Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents and (ii) all material governmental and third-party approvals necessary in connection with the continuing operations of ResCap and its Subsidiaries, in all the foregoing cases, shall have been obtained on satisfactory terms and shall be in full force and effect (including shareholder approvals, if any);

100

(f)        Administrative Agent shall have received such closing documents
as are customary for an amendment and restatement transaction of this type or as it may
reasonably request, including but not limited to the documents set forth on Schedule 3.05;

(g)        the Credit Parties shall be in pro forma compliance with the
Borrowing Base, the Collateral Amount and the financial covenants set forth in Section 6.07
(after giving effect to any Credit Extensions made and the use of proceeds thereof on the
Restatement Effective Date);

(h)        no Default or Event of Default, both immediately prior to and after
giving effect to the amendment and restatement of the Original Credit Agreement pursuant to
this Agreement and any Credit Extensions made on the Restatement Effective Date, shall, in
each case, have occurred under any of the Credit Documents;

(i)        both immediately prior to and after giving effect to the amendment
and restatement of the Original Credit Agreement pursuant to this Agreement and any Credit
Extensions made on the Restatement Effective Date, the representations and warranties
contained herein and in the other Credit Documents shall be true and correct in all material
respects on and as of the Restatement Effective Date to the same extent as though made on and
as of that date, except to the extent such representations and warranties specifically relate to an
earlier date, in which case such representations and warranties shall have been true and correct in
all material respects on and as of such earlier date and any representation and warranty that is
qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects
subject to such qualification; and

(j)        Administrative Agent shall have received a certificate, signed by a
Senior Officer of each Primary Credit Party, on the Restatement Effective Date, confirming
compliance (other than, as applicable, with respect to the satisfaction of any Agent, Lender or the
Lead Arranger) with the conditions set forth in this Section 3.05 and Sections 3.03(c), (d), (e)
and (g).

## ARTICLE IV

## <u>REPRESENTATIONS AND WARRANTIES</u>

In order to induce Lenders to enter into this Agreement and to make each Credit
Extension to be made thereby, each Credit Party represents and warrants to each Agent and each
Lender, on the Closing Date, the Restatement Effective Date, each Credit Date and each
Withdrawal Date and on the date of each Compliance Certificate delivered pursuant to Section
5.01(d) and each Borrowing Base and Collateral Amount Certificate delivered pursuant to
Section 5.01(f), that the following statements are true and correct:

Section 4.01    <u>Organization; Requisite Power and Authority; Qualification</u>.  Each
of ResCap and its Subsidiaries (a) is duly organized, validly existing and, to the extent such
concept or a similar concept is applicable, in good standing under the laws of its jurisdiction of
organization as identified on Schedule 4.01, (b) subject to entry of an applicable order of the
Bankruptcy Court, has all requisite power and authority to own and operate its properties, to

101

carry on its business as now conducted and as proposed to be conducted, and had at all relevant times, and now has, all necessary power, authority and legal right to own the portion of the Collateral that it owns and to grant the Liens under the Collateral Documents, (c) subject to entry of an applicable order of the Bankruptcy Court has all necessary power and authority and legal right to (i) execute and deliver each of the Credit Documents to be executed and delivered by it in connection herewith, (ii) carry out the transactions contemplated thereby and to perform its obligations under each of the Credit Documents to which it is a party and (iii) borrow the Loans or provide the Guaranty hereunder (as applicable) and grant a security interest or Lien (as applicable) in the portion of the Collateral that it owns on the terms and conditions herein provided or as otherwise required by the Credit Documents and (d) is duly qualified to do business and in good standing, and has obtained all necessary licenses and approvals, in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

Section 4.02    Capital Stock and Ownership.  The Capital Stock of each of ResCap and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable.  Except as set forth on Schedule 4.02, as of the Closing Date, there is no existing option, warrant, call, right, commitment or other agreement to which ResCap or any of its Subsidiaries is a party requiring, and there is no Capital Stock of ResCap or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by ResCap or any of its Subsidiaries of any additional Capital Stock of ResCap or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, Capital Stock of ResCap or any of its Subsidiaries.  Schedule 4.02 is a complete and accurate list of ResCap and all of its Subsidiaries and their respective jurisdictions of organization, organizational identification number and taxpayer identification number. Schedule 4.02 correctly sets forth the organizational structure chart for ResCap and its Subsidiaries and all of the ownership interest of ResCap and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date.

Section 4.03    Due Authorization.  Subject to entry of the Interim Financing Order (or the Final Financing Order, when applicable), the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

Section 4.04    No Conflict.  Subject to entry of the Interim Financing Order (or the Final Financing Order, when applicable), the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation or order, writ, judgment, injunction, decree, determination or award applicable to ResCap or any of its Subsidiaries or any of their respective properties, or any order, judgment or decree of any court or other agency of government binding on ResCap or any of its Subsidiaries except to the extent such violation could not reasonably be expected to have a Material Adverse Effect; (b) violate any provision of, conflict with or result in a breach of any of the Organizational Documents of AFI, ResCap or any of its Subsidiaries; (c) conflict with, result in a breach of or constitute (with or without notice, lapse of time or both) a default or require any payment to be made under any Contractual Obligation of ResCap or any of

102

its Subsidiaries entered into, assumed or binding after the Petition Date (other than the repayment of indebtedness under the Prepetition Refinanced Facilities contemplated by Section 3.01(l)); (d) result in or require the creation or imposition of any Lien upon any of the properties or assets of ResCap or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral Agent, on behalf of Secured Parties); or (e) require any approval of any Board of Directors, stockholders, members or partners, except for any such approvals or consents that have been obtained on or before the Closing Date or the Restatement Effective Date, as applicable, and in each such case, are in full force and effect and were disclosed in writing to Administrative Agent.

Section 4.05    <u>Governmental and Other Consents</u>.  Subject to entry of the Interim Financing Order (or the Final Financing Order, when applicable), (i) the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation by the Credit Parties of the transactions contemplated by the Credit Documents, (ii) the grant by any Credit Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof to the extent provided for in the Orders) and (iv) except for any notices that may be required by Article VIII or pursuant to any applicable Intercreditor Provisions, the exercise by any Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, in any case of the foregoing, do not and will not require any registration with, consent, authorization or approval of, or notice to or filing with, or other action to, with or by, any Governmental Authority or any other Person except (x) as have been obtained prior to the Closing Date or the Restatement Effective Date, as applicable, and, in each such case, are in full force and effect and disclosed in writing to Administrative Agent, (y) when the failure of which to be so made or delivered could not reasonably be expected to have a Material Adverse Effect or (z) except for filings and recordings with any Governmental Authority with respect to the Liens created under the Credit Documents.

Section 4.06    <u>Binding Obligation</u>.  Subject to entry of the Interim Financing Order (or the Final Financing Order, when applicable), each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms.

Section 4.07    <u>Financial Statements</u>.  The financial statements of ResCap and its consolidated subsidiaries most recently delivered pursuant to Section 3.01(h) or Section 5.01(a), (b) or (c) were prepared in conformity with GAAP, consistently applied, and fairly present, in all material respects, the financial condition of ResCap and its Subsidiaries, on a consolidated basis, as at the respective dates indicated therein and the results of their operations and (with respect to financial statements delivered pursuant to Section 5.01(a)(ii) and any quarterly and annual financial statements delivered pursuant to Section 3.01(h)) cash flows, on a consolidated basis, for each of the periods then ended, subject, in the case of any such unaudited financial statements, to the absence of footnotes and changes resulting from ordinary, good faith audit and normal year-end adjustments.

Section 4.08    <u>Projections</u>.  The Projections delivered on or before the Closing Date are based on good faith estimates and assumptions made by the management of ResCap, GMACM and RFC believed to be reasonable at the time delivered to the Lead Arranger and reflect reasonable estimates of the future performance of ResCap and its Subsidiaries for the periods set for therein; <u>provided</u> that the Projections are not to be viewed as facts and that actual results during the period or periods covered by the Projections may differ from such Projections and that the differences may be material.

Section 4.09    <u>Approved DIP Budget</u>.  The Credit Parties represent and affirm that each Approved DIP Budget was prepared in good faith based upon assumptions believed to be reasonable at the time such Approved DIP Budget was delivered.

Section 4.10    <u>No Material Adverse Effect</u>.  Since April 9, 2012, no event, circumstance, condition or change has occurred that has caused or evidences or could reasonably be expected to cause or evidence, either in any case or in the aggregate, a Material Adverse Effect.

Section 4.11    <u>Insurance</u>.  Schedule 4.11 sets forth as of the Closing Date a list of all material insurance maintained by AFI which covers ResCap and its Subsidiaries and their respective property.  As of the Closing Date, all premiums in respect of such insurance, to the extent due, have been paid.  The insurance maintained by AFI on behalf of ResCap and its Subsidiaries is in full force and effect in all material respects in accordance with its terms and complies with the requirements set forth in Section 5.06.

Section 4.12    <u>Adverse Proceedings, Etc.</u>  Except (x) for the commencement of the Cases and (y) as set forth on Schedule 4.12, there are no unstayed Adverse Proceedings, individually or in the aggregate, (a) that could reasonably be expected to have a Material Adverse Effect or (b) that involve any of the Credit Documents, the consummation of the transactions contemplated thereby or performance of the obligations thereunder (other than objections or pleadings that may have been filed in the Cases with respect to the Credit Parties seeking authorization to enter into the Credit Documents and incur the Obligations under this Agreement).  No Credit Party or any of its Subsidiaries (i) is in violation of any applicable laws, rules or regulations (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (ii) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or other Governmental Authority, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 4.13    <u>Payment of Taxes</u>.  Except as otherwise permitted under Section 5.04 or as set forth on Schedule 4.13, all tax returns and reports of ResCap and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon ResCap and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable.  Neither ResCap nor any of its Subsidiaries knows of any proposed tax assessment against ResCap or any of its Subsidiaries which is not being actively contested by ResCap or such Subsidiary in good faith and by appropriate proceedings; <u>provided</u>, such reserves or other appropriate provisions, if any,

104

as shall be required in conformity with GAAP shall have been made or provided therefor.  The charges, accruals and reserves on the books of such Credit Party or Subsidiary in respect of taxes and other governmental charges are, in the reasonable opinion of such Credit Party or Subsidiary, adequate.

Section 4.14    Properties.

(a)    Title.  Each of ResCap and its Subsidiaries has (i) good and marketable fee simple title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in the most recent financial statements of ResCap and its Subsidiaries delivered pursuant to Section 3.01(h) or Section 5.01(a), (b) or (c), in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.08 or 6.09.  Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b)    Real Estate.  As of the Closing Date, Schedule 4.14 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) with respect to any real property of any Credit Party which provides for monthly rental payments after the date of this Agreement of more than $100,000 or is otherwise material to the business or operations of such Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.  Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and neither ResCap nor any of its Subsidiaries has knowledge of any default that has occurred and is continuing thereunder, and subject to an applicable order of the Bankruptcy Court, each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms.  ResCap and its Subsidiaries enjoy peaceful and undisturbed possession under all of their respective leases except where the failure to enjoy such peaceful and undisturbed possession, individually or in the aggregate, is not reasonably expected to have a Material Adverse Effect.

Section 4.15    Environmental Matters.  Except as set forth on Schedule 4.15 or to the extent, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:  (a) ResCap and each of its Subsidiaries has been and is in compliance with all applicable Environmental Laws, including any Governmental Authorizations issued pursuant thereto, and ResCap and each of its Subsidiaries will be capable of maintaining compliance with applicable Environmental Laws, including any reasonably foreseeable future requirements of existing Environmental Laws or regulations that have been formally proposed but have not yet been adopted; (b) neither ResCap nor any of its Subsidiaries nor any of their respective owned, leased, operated or used real property (including all buildings, fixtures or other improvements located thereon) or operations are subject either to (i) any Environmental Claim or (ii) any settlement agreement with any Person relating to any Environmental Claim, nor has ResCap or any of its Subsidiaries received written notice of any pending or threatened Environmental Claim; (c) neither ResCap nor any of its Subsidiaries has received, with respect to any owned, leased,

105

operated or used real property (including all buildings, fixtures or other improvements located thereon, any letter or written request for information under Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601, et seq.) or any comparable foreign, local, state or provincial law; (d) there are and have been no conditions, occurrences, or Hazardous Materials Activities that could reasonably be expected to form the basis of an Environmental Claim against ResCap or any of its Subsidiaries or that could require Remedial Action at any owned, leased, operated or used real property (including all buildings, fixtures or other improvements located thereon) or could require Remedial Action by ResCap or any of its Subsidiaries at any other location; or (e) neither ResCap nor any of its Subsidiaries nor, to the knowledge of any Credit Party, any predecessor of ResCap or its Subsidiaries, has been required to obtain a permit for the treatment, storage or disposal of hazardous waste for any of its owned, leased, operated or used real property (including all buildings, fixtures or other improvements located thereon) pursuant to the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et. seq. ("**RCRA**"), or any comparable state, local or provincial law, nor are any such Facilities regulated as "interim status" facilities required to undergo corrective action pursuant to RCRA or any comparable state, local or provincial law.

Section 4.16    No Defaults.  Neither ResCap nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations other than those defaults directly arising as a result of the commencement the Cases, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

Section 4.17    Material Contracts.  Schedule 4.17 contains a true, correct and complete list of all the Material Contracts (including all material amendments, supplements and modifications thereto), and except as described thereon, all such Material Contracts are in full force and effect and (except in respect of the Specified Permitted Indebtedness Documents other than the AFI DIP Loan (as defined in the AFI/Junior Secured Notes Order)) no default (for which any applicable grace periods have expired) by any Credit Party or, to the Credit Parties' knowledge, any other party thereto currently exist thereunder, except for any default (a) arising under any Material Contract that the applicable Credit Party has rejected under Section 365 of the Bankruptcy Code not in prohibition of this Agreement or (b) arising solely as a result of the commencement of the Cases.  No Credit Party has rejected any Material Contract under Section 365 of the Bankruptcy Code except (i) with respect to which ResCap has given ten (10) Business Days' prior written notice to Administrative Agent of its intention to reject or its Subsidiary's intention to reject and (ii) with respect to which Administrative Agent has not informed ResCap in writing within five (5) Business Days of receipt of the notice from ResCap referenced in clause (i) above that it objects to such rejection.

Section 4.18    Governmental Regulation.  Neither ResCap nor any of its Subsidiaries is subject to regulation under the Investment Company Act of 1940 or, subject to entry of the Interim Financing Order (or the Final Financing Order, when applicable), under any other federal, state or provincial statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.

Neither ResCap nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

Section 4.19   Margin Stock.   Neither ResCap nor any of its Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board.

Section 4.20   Employee Matters.   Neither ResCap nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against ResCap or any of its Subsidiaries, or to the knowledge of ResCap and its Subsidiaries, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against ResCap or any of its Subsidiaries or to the knowledge of ResCap and its Subsidiaries, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving ResCap or any of its Subsidiaries, and (c) to the knowledge of ResCap and Subsidiaries, no union representation question existing with respect to the employees of ResCap or any of its Subsidiaries and, to the knowledge of ResCap and its Subsidiaries, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

Section 4.21   Employee Benefit Plans.   ResCap and each of its Subsidiaries and each of their respective ERISA Affiliates are in substantial compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan in all material respects.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the IRS or ResCap or its Subsidiaries or ERISA Affiliates has submitted or shall submit an application to the IRS to receive such a letter, indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status.  No liability to the PBGC (other than required premium payments), the IRS, any Employee Benefit Plan or any trust established under Title IV of ERISA (other than any requirement under applicable law or the terms of any such Employee Benefit Plan or trust to make contributions to such any such Employee Benefit Plan or trust) has been or is expected to be incurred by ResCap, any of its Subsidiaries or any of their ERISA Affiliates in an amount, and with a priority, that could reasonably be expected, individually or in the aggregate, to exceed $5,000,000 or have a Material Adverse Effect.  No ERISA Event has occurred or is reasonably expected to occur that could result in an Event of Default.  Except to the extent required under Section 4980B of the Internal Revenue Code or similar state or provincial laws and except as set forth on Schedule 4.21, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates.  The present value of the aggregate

107

benefit liabilities under each Pension Plan sponsored, maintained or contributed to by ResCap, any of its Subsidiaries or any of their ERISA Affiliates (determined on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan) did not exceed the aggregate current value of the assets of such Pension Plan in an amount that could reasonably be expected, individually or in the aggregate, to exceed $75,000,000 or have a Material Adverse Effect.  Neither ResCap, nor any of its Subsidiaries, nor any ERISA Affiliates of ResCap or its Subsidiaries participates in a Multiemployer Plan or has participated in a Multiemployer Plan during the preceding five (5) years.

Section 4.22   Specified Permitted Indebtedness Documents and Underlying Documents.  ResCap and its Subsidiaries have delivered to Administrative Agent complete and correct copies of (a) each Specified Permitted Indebtedness Document, each Underlying Document, each Master Purchase Document, the MSFTA and of exhibits and schedules to the foregoing and (b) copies of any material amendment, restatement, supplement or other modification to or waiver or termination of each of the foregoing.

Section 4.23   Compliance with Statutes, Etc.  Each of ResCap and its Subsidiaries is in compliance in all material respects with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws, usury, unfair collection practice, equal credit opportunity, fair housing and regulations, real estate settlement procedures, all applicable predatory lending laws (including, for the avoidance of doubt, laws regarding the extension of credit without regard to the ability of a Mortgagor to repay and the extension of credit which has no apparent benefit to such Mortgagor), truth-in-lending and disclosure laws applicable to the solicitation, origination, collection, servicing and subservicing of any Collateral), except as set forth on Schedule 4.15.

Section 4.24   Accuracy of First Lien Collateral Schedules.  As of the Closing Date, Schedule 4.24 contains a true, accurate and complete (a) Eligible Receivables Schedule as of April 30, 2012, (b) Mortgage Schedule as of May 11, 2012, (c) list of any Eligible REO Property, (d) with respect to each Blocked Account, list of the related deposit account number, account name and depository institution and (e) schedule of any Capital Stock or other equity interests pledged as First Lien Collateral.  The Designated Servicing Agreement Schedule attached hereto as Schedule 1.01A contains a true, accurate and complete list of all Designated Servicing Agreements as of the Closing Date.  All Servicer's Tapes furnished to any Agent or the Custodian by any Credit Party prior to, on or after the Closing Date are true and correct in every material respect.

Section 4.25   Disclosure.  No information, exhibit, financial statement, document, book, record, or report or representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements furnished to the Lead Arranger, any Agent and/or the Lenders by or on behalf of ResCap or any of its Subsidiaries for use in connection with the transactions contemplated hereby or to the Bankruptcy Court in connection with the Credit Documents contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  Any projections (including the Projections) and pro forma financial information contained in such

108

materials are based upon good faith estimates and assumptions believed by ResCap or its Subsidiaries to be reasonable at the time made and delivered, it being recognized by Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.  There are no facts or other information known (or which should upon the reasonable exercise of diligence be known) to ResCap or its Subsidiaries (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to the Lead Arranger, any Agent and/or Lenders for use in connection with the transactions contemplated hereby.

Section 4.26    Patriot Act.  To the extent applicable, each Credit Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Department of the Treasury (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the Patriot Act.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

Section 4.27    Location of Books and Records.  Schedule 4.27 sets forth the chief executive office of each Credit Party and all locations where any books and records, including all electronic files and records relating to the Collateral that it owns or services, are kept, held or maintained.

Section 4.28    Accuracy of Borrowing Base and Collateral Amount.  At the time any Borrowing Base and Collateral Amount Certificate is delivered pursuant to this Agreement, each Eligible Asset included in the calculation of the Borrowing Base and the Collateral Amount satisfies all of the criteria stated herein to be an Eligible Asset.

Section 4.29    Post-Audit Asset Dispositions.  As of the Closing Date, the Credit Parties have not disposed of assets that are set forth in the valuations delivered pursuant to Section 3.01(j) except to the Borrowers, in accordance with the Interim Financing Order.

Section 4.30    Collateral Documents.

(a)    The Interim Financing Order (or the Final Financing Order, when applicable) is effective to create in favor of Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable security interest in and Lien on the Collateral and upon entry of the Interim Financing Order (or the Final Financing Order, when applicable), the Lien created by the applicable Order shall constitute a fully perfected First Priority Lien (except with respect to the Junior Lien Collateral, in which case it shall constitute a fully perfected Junior Priority Lien) on, and security interest in, all right, title and interest of the grantors thereunder in the Collateral, subject only to Permitted Collateral Liens.

109

(b)     In addition, each Collateral Document delivered on the Closing Date or pursuant to Section 5.11 or 5.12 will, upon execution and delivery thereof and upon entry into the Interim Financing Order (or the Final Financing Order, when applicable), be effective to create in favor of Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in and First Priority Lien (except with respect to the Junior Lien Collateral, in which case it shall constitute perfected Junior Priority Lien) on all of the Credit Parties' right, title and interest in and to the Collateral thereunder, and when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 4.30 and (ii) upon the taking of possession or control by Collateral Agent of the Collateral with respect to which a security interest may be perfected only by possession or control under the UCC (which possession or control shall be given to Collateral Agent to the extent possession or control by Collateral Agent is required hereunder or under the Collateral Documents), the Lien created by the Collateral Documents shall constitute under the UCC a fully perfected First Priority Lien (except with respect to the Junior Lien Collateral, in which case it shall constitute under the UCC a fully perfected Junior Priority Lien) on, and security interest in, all right, title and interest of the grantors thereunder in the Collateral, other than such Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction, in each case subject to no Liens other than Permitted Collateral Liens.

(c)     The Grantors are the legal and beneficial owners of the Collateral over which they have purported to grant a security interest under the Collateral Documents, and no Credit Party (other than the Grantors) has any right, title or interest in or to any of the Collateral.

Section 4.31    ResCap.  ResCap does not directly own any assets other than (a) Capital Stock of the certain Credit Parties and Non-Credit Parties, (b) Cash and Cash Equivalents and other immaterial assets in the ordinary course of business consistent with past practice, (c) assets that are subject to Liens as Collateral under the Collateral Documents and the Orders or subject to Specified Permitted Liens and (d) the Concentration Account.

Section 4.32    Borrowers.  Neither Borrower owns any assets other than assets that are subject to a First Priority Lien as First Lien Collateral under the Collateral Documents and the Orders.  Neither Borrower has incurred any Indebtedness or other liabilities other than under and as permitted by the Credit Documents to which it is a party.  Neither Borrower has (a) any Subsidiaries (other than such Borrower's REO Subsidiary and the Delaware statutory trust owned by such Borrower) or (b) any interests in any Joint Ventures.

Section 4.33    Adverse Actions.  Except to the extent as would be subject to the automatic stay under the Bankruptcy Code, no Credit Party has received from any Government Sponsored Entity or any other Governmental Authority any notice revoking or suspending, or indicating any intent to revoke or suspend or indicating any adverse fact or circumstance which could reasonably be expected to entitle such Governmental Authority, as the case may be, to revoke or suspend any approval relating to any Collateral.

Section 4.34    The Orders.  On the date of the making of the Term Loans,  the Interim Financing Order shall have been entered, shall be in full force and effect and shall not have been (a) vacated, reversed or stayed or (b) amended or modified except as agreed in writing

110

by Administrative Agent in its sole discretion.  On the date of the making of any Loan, the
Interim Financing Order (or the Final Financing Order, when applicable) shall have been entered,
shall be in full force and effect and shall not have been (a) vacated, reversed or stayed or (b)
amended or modified except as agreed in writing by Administrative Agent in its sole discretion.
At all times after entry thereof by the Bankruptcy Court, the Orders shall be in full force and
effect and shall not have been (a) vacated, reversed or stayed or (b) amended or modified except
as agreed in writing by Administrative Agent in its sole discretion.  Upon the maturity (whether
by the acceleration or otherwise) of any of the Obligations of the Credit Parties hereunder and
under the other Credit Documents, the Agents and Lenders shall, subject to the provisions of
Section 8.01 and the Orders, be entitled to immediate payment of such Obligations, and to
enforce the remedies provided for hereunder, without further application to or order by the
Bankruptcy Court.

Section 4.35    Cash Collateral and Other Orders.

(a)    On the Closing Date, each of the Cash Management Order, the
AFI/Junior Secured Notes Order, the EAF Order, the MSR Order and the Origination Order shall
have been entered, shall be in full force and effect and shall not have been (i) vacated, reversed
or stayed or (ii) amended or modified except as agreed in writing by Administrative Agent in its
sole discretion.  At all times after entry thereof by the Bankruptcy Court, each of the Cash
Management Order, the AFI/Junior Secured Notes Order, the EAF Order, the MSR Order and
the Origination Order shall be in full force and effect and shall not have been (i) vacated,
reversed or stayed or (ii) amended or modified except as agreed in writing by Administrative
Agent in its sole discretion.

(b)    The Sale Order, at all times after entry thereof by the Bankruptcy
Court, shall be in full force and effect and shall not have been (i) vacated, reversed or stayed or
(ii) amended or modified in any manner that would adversely affect the ability of any Borrower
to repay the Obligations in full in Cash with the sale proceeds upon consummation of the sale.

Section 4.36    Provision of Information.  Each Credit Party has provided to
Administrative Agent (whether pursuant to this Agreement or any other Credit Document) all
relevant information about any (a) material investigation by or otherwise involving a
Governmental Authority or Government Sponsored Entity relating to the Collateral and copies of
each notice or other correspondence received from the SEC Division of Enforcement (or
comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or
possible investigation by such agency regarding financial or other operational results of any
Credit Party or any Subsidiary thereof, (b) any event, change or condition adversely relating to
the servicer status under the Servicers' mortgage loan servicing and subservicing contracts
(including the Freddie Mac Contracts and the Fannie Mae Contracts) and (c) to the extent such
event, circumstance, change or condition could reasonably be expected to give rise to a Material
Adverse Effect, any other event, circumstance, change or condition involving a Governmental
Authority, a securitization trustee, or any other Person'.

Section 4.37    MERS.  GMACM and RFC are members of MERS in good
standing.

Section 4.38    GMACM Serviced /Specified Mortgage Loans.  All of the Eligible Mortgage Loans serviced by GMACM Servicer are GMACM Serviced Mortgage Loans and all Eligible Mortgage Loans serviced by a third-party servicer are Specified Mortgage Loans serviced by the Person as set forth on the most recently delivered Mortgage Schedule.

Section 4.39    Mortgage Loan Level Representations and Warranties.  Each of the representations and warranties set forth on Schedule 4.39 is true and correct with respect to each Eligible Mortgage Loan.

Section 4.40    Administrators' and Servicers' Additional Representation and Warranty.  Each Administrator and Servicer is or will be in compliance with the laws of each jurisdiction in which any Mortgaged Property underlying or securing any Serviced Loan is located to the extent necessary to ensure the enforceability of each Serviced Loan serviced under a Designated Servicing Agreement.

Section 4.41    Servicers and Subservicers.

(a)    Set forth on Schedule 4.41(a) is a true, complete and accurate list of all servicers and subservicers with respect to the Mortgage Loans (except as may otherwise be consented to pursuant to Section 6.18, which, if consented to, shall be deemed to automatically supplement and amend Schedule 4.41(a)).

(b)    Set forth on Schedule 4.41(b) is a true, complete and accurate list of all servicing and subservicing agreements (including all amendments thereto) with respect to the Specified Mortgage Loans (except such agreements and/or amendments as may otherwise be consented to pursuant to Section 6.18, which, if consented to, shall be deemed to automatically supplement and amend Schedule 4.41(b)) (all such servicing agreements, as the same may be amended, amended and restated, supplemented or modified from time to time on or after the Closing Date in accordance with the terms hereof and thereof, the "**Specified Servicing Agreements**").  The Credit Parties have delivered to Administrative Agent complete and correct copies of (i) all servicing and subservicing agreements with respect to the Specified Mortgage Loans and of exhibits and schedules to the foregoing and (ii) copies of any material amendment, restatement, supplement or other modification to or waiver or termination of each of the foregoing.

**ARTICLE V**

**AFFIRMATIVE COVENANTS**

Each Credit Party covenants and agrees that so long as any Commitment is in effect and until payment in full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Article V.

Section 5.01    Financial Statements and Other Reports.  The Credit Parties will deliver to Administrative Agent and Lenders:

(a)    Monthly Reports.

112

(i)      As soon as available, and in any event within thirty (30) days after the end of each month, the consolidated balance sheet of ResCap and its Subsidiaries as at the end of such month and the related consolidated statements of income of ResCap and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year (beginning in the case of such comparative analysis, with the monthly statements for April 2012), all in reasonable detail, together with the monthly operating reports required under the United States Trustee Guidelines, a Financial Officer Certification with respect to the foregoing and such other information as Administrative Agent may reasonably request, in each case in form and substance reasonably acceptable to Administrative Agent.

(ii)      As soon as available, and in any event within thirty (30) days after the end of each applicable four-week period, a four-week direct cash flow report of ResCap and its Subsidiaries (beginning with the first full four-week period after the Petition Date or such earlier date as may be agreed to between ResCap and the Administrative Agent), consistent with the monthly operating reports required under the United States Trustee Guidelines.

(b)      Quarterly Financial Statements.  As soon as available, and in any event within forty-five (45) days after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year, the consolidated balance sheets of ResCap and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income of ResCap and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case (beginning with the Fiscal Quarter ending June 30, 2012) in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and such other variance analysis as is consistent with the reports prepared for the audit committee of ResCap's Board of Directors, all in reasonable detail, together with a Financial Officer Certification and, to the extent prepared for the Board of Directors of ResCap, a Narrative Report with respect thereto; provided that to the extent any other financial statements for such Fiscal Quarter have been provided to ResCap's holders of the Prepetition Junior Secured Notes, the trustee under the Prepetition Junior Secured Indenture or other creditors, such financial statements shall be provided concurrently to Administrative Agent and the Lenders.

(c)      Annual Financial Statements.  As soon as available, and in any event within ninety (90) days after the end of each Fiscal Year, the consolidated balance sheets of ResCap and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income of ResCap and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and such other variance analysis as is consistent with the reports prepared for the audit committee of ResCap's Board of Directors, all in reasonable detail, together with a Financial Officer Certification and, to the extent prepared for the Board of Directors of ResCap, a Narrative Report with respect thereto; provided that to the extent audited annual consolidated financial statements of ResCap and its Subsidiaries are otherwise required or available, such audited annual financial statements shall be provided promptly following completion thereof.

(d)      Compliance Certificate.  Together with each delivery of consolidated financial statements of ResCap and its Subsidiaries pursuant to Sections 5.01(a) (beginning with delivery of the monthly statements for May 2012), 5.01(b) and 5.01(c), a duly executed and completed Compliance Certificate, including a statement of the aggregate net notional amount of positions under the MSFTA (meaning the sum of all long positions net of all short positions that have the same issuer, the same coupon and the same settlement date) as of the last Business Day of the most recently ended calendar month prior to the date of such Compliance Certificate.

(e)      2-Week Variance Report.  Beginning on June 11, 2012, and on every second Monday thereafter, as soon as available, but not later than 1:00 p.m. (New York City time) on the sixth (6th) Business Day following each two (2) week period ended six (6) Business Days prior to such date, a variance report setting forth the following: (i) for such two (2) week period ended six (6) Business Days prior to such date, actual results for each line item included in the Approved DIP Budget for such two (2) week period, noting therein aggregate variances (excluding servicing advances and advance reimbursements) from amounts set forth in each line item in the Approved DIP Budget in effect for such two (2) week period; and (ii) an explanation for all material variances (excluding servicing advances and advance reimbursements), certified by the Chief Financial Officer or Treasurer of each Primary Credit Party as being prepared in good faith and fairly presenting in all material respects the information set forth therein (the "**2-Week Variance Report**"); provided, however, that the initial 2-Week Variance Report delivered on June 11, 2012 shall cover the three (3) week period commencing on May 14, 2012 and ending on June 1, 2012; provided further, however, the Credit Parties shall not be required to provide a 2-Week Variance Report on any date on which the Credit Parties provide a 4-Week Variance Report.

(f)      Borrowing Base and Collateral Amount Certificates.  Borrowing Base and Collateral Amount Certificates, duly executed and delivered by the Chief Financial Officer or Treasurer of each Primary Credit Party, consistent with the reporting in the Projections and in form and substance reasonably acceptable to Administrative Agent, (i) on a weekly basis beginning on June 4, 2012, and on every Monday thereafter, as soon as available but not later than the sixth (6th) Business Day following the one-week period ended six (6) Business Days prior to such date (each, a "**Weekly Calculation Period**"), which certificates shall reflect the Borrowing Base and the Collateral Amount as of the last day of the applicable Weekly Calculation Period, and (ii) within three (3) Business Days of any time any Primary Credit Party becomes aware that the Borrowing Base or the Collateral Amount, assuming it were calculated at such time, is less than 85% of the Borrowing Base or the Collateral Amount, in any such case, calculated in the most recently delivered report or certificate.

(g)      Monthly Collateral Report; Eligible Receivables Schedule.  As soon as available, but no later than the fifteenth (15th) Business Day after the end of each calendar month, the Monthly Collateral Report for such calendar month, setting forth the Advance Ratio and the Advance to Pool Balance Ratio for each Eligible Receivable, an updated Schedule 4.41(a), and detailing the Eligible Assets, including the Book Value of all Eligible Receivables, the Market Value of all Eligible Mortgage Loans and the Appraised Value of all Eligible REO Property, in each case as determined as of the last day of such calendar month by the Valuation Agent, in accordance with customary market practices and in the form attached

114

hereto as Exhibit J or such form as is otherwise acceptable to the Agents in their sole discretion. Concurrently with the Monthly Collateral Report, the Administrators shall furnish to Collateral Agent an updated Eligible Receivables Schedule, in electronic form, and Collateral Agent shall maintain the most recent Eligible Receivables Schedule it receives, and send a copy to any Lender upon written request.

(h)    Net Outflows; AFI Payments and Receipts .  As soon as available, but no later than the fifteenth (15th) Business Day after the end of each calendar month, a monthly report detailing (i) Net Outflows during such calendar month, and (ii)  all payments made by any Credit Party to and receipts by any Credit Party from AFI during such calendar month.

(i)    Ally LOC Reports.  Promptly, all reports and notices (other than ministerial reports and notices) provided to or by AFI or any Credit Party under the Ally Line of Credit relating to the LOC Junior Lien Collateral, and in any case no less frequently than once per month, and every four (4) weeks, updated asset balance roll-forward projections consistent with those contained in the Projections.

(j)    Prepetition MSR Facility Reports.  Promptly, all reports and notices (other than ministerial reports and notices) provided to or by Citibank, N.A. or any Credit Party under the Prepetition MSR Facility relating to the MSR Junior Lien Collateral, and in any case no less frequently than once per month, and every four (4) weeks, updated asset balance roll-forward projections consistent with those contained in the Projections.

(k)    Mortgage Loan Reports.

(i)    With respect to Specified Mortgage Loans, within five (5) Business Days of receipt by any Primary Credit Party, a Mortgage Schedule and a Portfolio Remittance Report for such Specified Mortgage Loans.

(ii)    With respect to the GMACM Serviced Mortgage Loans, (A) not later than the fifth (5th) Business Day of each calendar month, the Servicer's Tape with respect to the GMACM Serviced Mortgage Loans and (B) not later than the eighth (8th) Business Day of each calendar month, a Mortgage Schedule and a Portfolio Remittance Report for such GMACM Serviced Mortgage Loans (the required reporting dates set forth in subclause (i) above and this subclause (ii), the "**Mortgage Loan Reporting Dates**").

(iii)    As soon as is available, and in any event, (A) with respect to Eligible Mortgage Loans that become Delinquent, within one-hundred and twenty (120) days of such Delinquency and (B) if requested by Administrative Agent, within seven (7) Business Days such request, copies of any appraisals, evaluation reports or Broker's Price Opinions obtained by any Primary Credit Party with respect to such Eligible Mortgage Loans in accordance with Accepted Servicing Practices.

(iv)    The Credit Parties shall use reasonable efforts to provide imaged copies of the documents comprising the Mortgage File for each Mortgage Loan

115

within twelve (12) Business Days after the reasonable request therefor by any Agent or the Custodian.

(l)    Notice of Default.  Prompt notice of (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given (other than by Administrative Agent) to ResCap or any of its Subsidiaries with respect thereto; (ii) that any Person has given any notice to ResCap or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.01(b); or (iii) of the occurrence of any event, circumstance, condition or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, together with a certificate of a Senior Officer of each Primary Credit Party specifying the nature and period of existence of such condition, event, circumstance or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event, circumstance, change or condition, and what action the Credit Parties have taken, are taking and propose to take with respect thereto.

(m)    Notice of Litigation.  Promptly upon any Senior Officer or member of Senior Management of ResCap or any other Credit Party obtaining knowledge of (i) the institution of, or non-frivolous written threat of, any Adverse Proceeding not previously disclosed in writing by ResCap or any other Credit Party to Administrative Agent and Lenders, or (ii) any material development in any Adverse Proceeding that, in the case of either (i) or (ii) if adversely determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to ResCap or any of its Subsidiaries to enable the Agents, Lenders and their respective counsel to evaluate such matters.

(n)    ERISA.  (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the IRS, the Department of Labor or the PBGC with respect thereto; (ii) promptly upon becoming aware of the receipt by ResCap or its Subsidiaries of any notice from the PBGC which could reasonably be interpreted as an indication of the intention of the PBGC to commence a process or take an action which could reasonably be expected to result in the termination of any Pension Plan or otherwise trigger accelerated funding obligations or termination liabilities for ResCap or any of its Subsidiaries with respect to any such plans, a written notice and description of such notice from the PBGC; (iii) promptly upon receipt, copies of all notices received by ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning the occurrence of or any event, circumstance, change or condition that could reasonably be expected to result in the occurrence of an ERISA Event; and (iv) with reasonable promptness after receipt of a written request from Administrative Agent, copies of (A) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates with the IRS with respect to each Pension Plan; and (B) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request.

116

(o)    <u>Insurance Report</u>.  Once per year, as soon as practicable and in any event by the last day of each Fiscal Year, a report in form and substance satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such report by or on behalf of ResCap and its Subsidiaries and all material insurance coverage planned to be maintained by or on behalf of ResCap and its Subsidiaries in the immediately succeeding Fiscal Year.  Within twenty (20) days after the expiration of any insurance policy identified on Schedule 4.11, one or more certificates of insurance evidencing the renewal of or replacement of such insurance policy.

(p)    <u>Notice of Change in Board of Directors and Senior Management</u>. As soon as practicable and in any event within three (3) Business Days after any Senior Officer or member of Senior Management of ResCap or any other Credit Party obtaining knowledge, written notice of any change in the Board of Directors or Senior Management of any Primary Credit Party.

(q)    <u>Notice Regarding Material Contracts</u>.  Together with the delivery of the financial statements pursuant to Section 5.01(b) and 5.01(c), notice of (i) any Material Contract by ResCap or any of its Subsidiaries that is terminated or amended in a manner that could reasonably be expected to have a Material Adverse Effect or (ii) any new Material Contract that is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Administrative Agent (to the extent such delivery is permitted by the terms of any such Material Contract, <u>provided</u>, no such prohibition on delivery shall be effective if it were bargained for by ResCap or its applicable Subsidiary with the intent of avoiding compliance with this Section 5.01(q)), and an explanation of any actions being taken with respect thereto.  Such notice, when properly delivered in accordance with the terms hereof, shall be deemed to automatically supplement and amend Schedule 4.17.

(r)    <u>Environmental Disclosure, Reports and Audits.</u>

(i)    Promptly upon ResCap's or any of its Subsidiaries' obtaining knowledge thereof, written notice describing in reasonable detail (A) any Release that could reasonably be expected to require a Remedial Action or give rise to Environmental Claims resulting in liability of ResCap or its Subsidiaries, (B) any Remedial Action taken by ResCap, its Subsidiaries or any other Person in response to any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims resulting in liability of ResCap or its Subsidiaries, and (C) any Environmental Claims (including any requests for information by a Governmental Authority), which, in any such case of (A), (B) or (C), individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(ii)    As soon as practicable following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by ResCap or any of its Subsidiaries or any of their respective predecessors or which relate to any environmental liabilities of ResCap or its Subsidiaries which in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

117

(iii)    To the extent not otherwise delivered pursuant to clauses (i) or (ii) above, promptly upon the reasonable request of Administrative Agent, copies of all material documents related to any pending or threatened Environmental Claims that are in ResCap's or its Subsidiaries' possession or control.

(s)    Senior Officer's Certificate Regarding Collateral.  Concurrently with any delivery of financial statements under Section 5.01(b) and thirty (30) days after the end of each calendar year, a certificate of a Senior Officer of each Primary Credit Party (i) setting forth any changes to the information required by the Perfection Certificate and any Perfection Certificate Supplements delivered after the Closing Date or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section 5.01(s).

(t)    Sale Process; Periodic Updates.

(i)    On a quarterly basis within two (2) Business Days after the delivery of the consolidated financial statements of ResCap and its Subsidiaries pursuant to Section 5.01(b), at times mutually agreed to by ResCap and Administrative Agent and reasonably acceptable to Requisite Lenders, the Credit Parties shall hold an update call among the Chief Financial Officer of the Primary Credit Parties (and, if requested by Administrative Agent in its discretion, an additional officer of the Primary Credit Parties senior to the Chief Financial Officer), the Agents and the Lenders and their respective representatives and advisors to discuss the state of the business of ResCap and its Subsidiaries, the Debtors' sale process, recent performance, cash and liquidity management, operations and restructuring activities, current business and market conditions and material performance changes.  The Credit Parties shall hold such additional update calls among such parties as may reasonably be requested from time to time by Administrative Agent (but in any event on no less than two (2) Business Days' notice from Administrative Agent).

(ii)    The Debtors shall consult with Administrative Agent on a timely basis concerning all acts, decisions or determinations that the Debtors make, or propose to make, pursuant to or in connection with the qualification of bidders and bids, the evaluation of bids or otherwise in connection with any auction.

(iii)    The Debtors shall provide copies all bids and expressions of interest promptly upon receipt thereof to Administrative Agent.

(u)    Notices from Governmental Authorities.  Promptly, copies of material notices from any Specified Governmental Authority, including any notices of circumstances, conditions, changes or events that could reasonably be expected to entitle any Specified Governmental Authority to revoke, suspend, impair or fail to renew consents, approvals or registrations relating to the Collateral and/or the servicing or subservicing thereof and notices of audits, examinations, evaluations, reviews and reports (including those prepared on a contract basis for any such Specified Governmental Authority).

(v)     <u>Servicing Activities</u>.  Promptly, notices of other events relating to servicing or subservicing arrangements or other activities that could reasonably be expected to have a Material Adverse Effect.

(w)     <u>Verification Agency Agreement</u>.  Promptly, copies of (i) any Change Order Request (as defined in the Verification Agency Agreement) or Change Order Response (as defined in the Verification Agency Agreement) or (ii) any other notice required to be delivered to Administrative Agent pursuant to the Verification Agency Agreement; <u>provided</u> that nothing in this Section 5.01(w) shall be deemed to override Section 6.14(c) or Section 11.03.

(x)     <u>Annual USAP Report</u>.  Each Servicer shall, on or before the last Business Day of the sixth month following the end of each of such Servicer's Fiscal Years (December 31), beginning with the Fiscal Year ended December 31, 2011, deliver to Administrative Agent (i) either (x) a copy of the results of any Uniform Single Attestation Program for Mortgage Bankers or similar review conducted on such Servicer by a firm of independent public accountants of recognized national standing, or (y) such Servicer's assessment of its compliance with the servicing criteria set forth in Section 1122(d) of Securities and Exchange Commission Regulation AB (17 C.F.R. Section 229.1122(d)), which assessment shall be attested to by a firm of independent public accountants of recognized national standing, and (ii) such other reports as such Servicer may prepare relating to its servicing functions as such Servicer.

(y)     <u>Agreed Upon Procedures Report</u>.  Not later than forty-five (45) days after the end of each calendar month, beginning with the month ending May 31, 2012, each Servicer shall cause the Verification Agent to furnish, at such Servicer's expense, a report with respect to the prior Fiscal Quarter to Administrative Agent, to the effect that such firm has applied certain procedures, agreed upon with the related Servicer and Administrative Agent, and substantially in the form of Exhibit S hereto or in a form mutually agreed upon by Administrative Agent and the Servicers (the "**Agreed Upon Procedures Report**").  A copy of such report will be sent by Administrative Agent to each Lender.

(z)     <u>Asset Sales</u>.  As promptly as possible, but in any event no later than three (3) Business Days after any Asset Sale of any First Lien Collateral permitted by Section 6.08, a complete description of such Asset Sale, and with respect to a single Asset Sale resulting in Net Asset Sale Proceeds greater than $2,000,000 or a series of related Asset Sales resulting in Net Asset Sale Proceeds greater than $5,000,000, in the aggregate, together with (i) the most recently delivered Borrowing Base and Collateral Amount Certificate delivered pursuant to Section 5.01(f) revised to give pro forma effect to such Asset Sale and (ii) any significant revisions to the Approved DIP Budget previously delivered pursuant to Section 5.02 as a result of such Asset Sale(s).

(aa)     <u>Termination of Sale Agreement</u>.  At least seven (7) days in advance of the termination of any Sale Agreement, written notice of the termination of such Sale Agreement.

(bb)     <u>Bankruptcy Court Filings and Notices</u>.  (i) As soon as practicable (and in any event at least two (2) Business Days) in advance of filing with the Bankruptcy Court

119

or delivering to any Committee or to the U.S. Trustee, as the case may be, the Final Financing Order and all other proposed orders and pleadings related to the Loans and the Credit Documents, any other financing or any use of cash collateral, any sale of Collateral or any Reorganization Plan and/or any disclosure statement related thereto, (ii) substantially simultaneously with the filing with the Bankruptcy Court, all other notices, filings, motions, pleadings or other information concerning the financial condition of ResCap or any of its Subsidiaries or other Indebtedness of the Credit Parties that may be filed with the Bankruptcy Court, and (iii) substantially simultaneously with delivering to any Committee or to the U.S. Trustee, as the case may be, all formal presentations and communications concerning the financial condition of ResCap or any of its Subsidiaries, the Loans and the Credit Documents, other Indebtedness of the Credit Parties, any Reorganization Plan or the sale of all or a substantial portion of the Collateral that may be delivered to any Committee or to the U.S. Trustee.

(cc)    Notice of Unmatured Defaults and Servicer Termination Events. Each Servicer shall provide written notice to Administrative Agent of any Unmatured Default or Servicer Termination Event immediately following the receipt by an Authorized Officer of such Servicer of notice, or the obtaining by an Authorized Officer of such Servicer of actual knowledge, of such Unmatured Default or Servicer Termination Event.

(dd)    Other Information.  (i) Promptly upon their becoming available, copies or notification of the electronic posting through any electronic system, including EDGAR or any other Internet or extranet-based site, of (x) all financial statements, reports, notices and proxy statements sent or made available generally by ResCap to its security holders acting in such capacity or by any Subsidiary of ResCap to its security holders other than ResCap or another Subsidiary of ResCap, (y) all regular and periodic reports and all registration statements and prospectuses, if any, filed by ResCap or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority and (z) all press releases and other statements made available generally by ResCap or any of its Subsidiaries to the public concerning material developments in the business of ResCap or any of its Subsidiaries, and (ii) such other information and data with respect to ResCap or any of its Subsidiaries as from time to time may be reasonably requested by any Agent or any Lender.

(ee)    Delivery of Information.  Documents required to be delivered pursuant to this Section 5.01 or Section 5.02 may be delivered electronically, and if so delivered, shall be deemed to have been delivered on the date (i) on which ResCap or any Borrower posts such documents or provides a link thereto on ResCap's or any Borrower's website on the Internet at the website address listed on Appendix B; or (ii) on which such documents are posted on ResCap or Borrowers' behalf on IntraLinks/IntraAgency or another relevant website or other information platform (the "**Platform**"), if any, to which each Lender and each Agent have access (whether a commercial, third-party website or whether sponsored by Administrative Agent); provided, however, that:  (x) ResCap and Borrowers shall deliver paper copies of such documents to Administrative Agent or any Lender that requests delivery of such paper copies until a written request to cease delivering paper copies is given by Administrative Agent or such Lender and (y) Borrowers shall notify (which may be by facsimile or electronic mail) Administrative Agent of the posting of any such documents and provide to Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents

referred to above, and in any event shall have no responsibility to monitor compliance by Borrowers or any other Credit Party with any such request for delivery and each Lender shall be solely responsible for requesting delivery to it, timely accessing posted documents or maintaining its copies of such documents.

(ff)    The delivery of each certificate and report or any other information delivered pursuant to this Section 5.01 or Section 5.02 shall constitute a representation and warranty by the Credit Parties that the statements and information contained therein are true and correct in all material respects on and as of such date.

Section 5.02    <u>Approved DIP Budget</u>.

(a)    Beginning on June 25, 2012, and on every fourth (4th) Monday thereafter, as soon as available, but not later than 1:00 p.m. (New York City time), on the sixth (6th) Business Day following each four (4) week period ended six (6) Business Days prior to such date, the Credit Parties shall deliver to Administrative Agent an updated Cash flow forecast on a line item basis, including each item set forth in the definition of Approved DIP Budget, for the immediately following twenty (20) week period (each, a "**Proposed DIP Budget**").  The initial Proposed DIP Budget delivered on June 25, 2012 shall cover the twenty (20) week period commencing on June 18, 2012.  Each such Proposed DIP Budget shall be accompanied by a variance report setting forth the following: (i) for the four (4) week period ended six (6) Business Days prior to such date (each, a "**4-Week Variance Period**"), actual results for each line item included in the Approved DIP Budget in effect for such 4-Week Variance Period, noting therein aggregate variances (excluding servicing advances and advance reimbursements) from amounts set forth in each line item in the Approved DIP Budget in effect for such 4-Week Variance Period; and (ii) an explanation for all material variances (excluding servicing advances and advance reimbursements), certified by the Chief Financial Officer or Treasurer of each Primary Credit Party as being prepared in good faith and fairly presenting in all material respects the information set forth therein (the "**4-Week Variance Report**"); <u>provided</u>, <u>however</u>, that the initial 4-Week Variance Report delivered on June 25, 2012 shall cover the five (5) week period commencing on May 14, 2012 and ending on June 15, 2012.  Each Proposed DIP Budget provided to Administrative Agent shall be of no force and effect unless and until it is approved by Administrative Agent, and, until such approval is given, the prior Approved DIP Budget shall remain in effect and each Credit Party shall comply (subject to Section 5.02(b)) with the prior Approved DIP Budget.  Administrative Agent shall approve or reject each Proposed DIP Budget within four (4) Business Days after delivery by the Primary Credit Parties to Administrative Agent as set forth above; <u>provided</u> that if Administrative Agent fails to approve or reject a Proposed DIP Budget within such four (4) Business Day period, such Proposed DIP Budget shall be deemed to be approved by Administrative Agent.  Any such Proposed DIP Budget, upon the approval or deemed approval thereof by Administrative Agent, shall become, as of the date of such approval and for the Current Period covered thereby, the Approved DIP Budget, and shall prospectively replace the prior Approved DIP Budget.  If Administrative Agent rejects the Proposed DIP Budget, the Primary Credit Parties shall deliver to Administrative Agent a revised Proposed DIP Budget as soon as practicable (and in any event within four (4) Business Days or such longer period agreed to by Administrative Agent in its sole discretion) thereafter, and Administrative Agent shall approve or reject such revised Proposed DIP Budget within four (4) Business Days after delivery thereof.

121

(b)    The Credit Parties shall comply at all times with the then existing Approved DIP Budget during the Current Period thereof on an aggregate basis, as to all Cash receipts and Cash disbursements, subject to the following permitted variances measured over each 4-Week Variance Period against the Approved DIP Budget in effect during such 4-Week Variance Period: (i) actual Cash receipts (excluding servicing advance reimbursements) received shall aggregate no less than eighty percent (80%) of aggregate Cash receipts (excluding servicing advance reimbursements) budgeted, and (ii) aggregate actual Cash disbursements (excluding servicing advances) made shall not exceed one hundred twenty percent (120%) of aggregate Cash disbursements (excluding servicing advances) budgeted.

Section 5.03    Existence.  Except as otherwise permitted under Section 6.08 or 6.09, each Credit Party will, and will cause each of its Subsidiaries to, at all times do or cause to be done all things necessary on its part to preserve and keep in full force and effect (a) its existence and (b) all rights, franchises, licenses, permits, approvals, registrations and qualifications in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such rights, franchises, licenses, permits, approvals, registrations or qualifications, except in the case of clause (b) to the extent that failure to do so, either in any case or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.04    Payment of Taxes.  Each Credit Party will, and will cause each of its Subsidiaries to, pay and discharge all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, in each of the foregoing cases, for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such Tax need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax.  No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than AFI, ResCap or any of their respective Subsidiaries).

Section 5.05    Maintenance of Properties.  Except as otherwise permitted under Section 6.08 or 6.09, each Credit Party will, and will cause each of its Subsidiaries to, maintain and preserve or cause to be maintained and preserved in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of ResCap and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof, all subject to and in accordance with its usual custom and practice; provided that nothing in this Section 5.05 shall be deemed to restrict any Credit Party or any of its Subsidiaries from carrying out alterations and improvements to, or changing the use of, any assets in the ordinary course.

Section 5.06    Insurance.

(a)    ResCap will maintain or cause to be maintained (including by AFI and its Subsidiaries), with financially sound and reputable insurers such public liability insurance,

third-party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of ResCap and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses (and, with respect to the Collateral, otherwise maintain all insurance coverage required under each applicable Collateral Document), in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.

(b)     Borrowers will maintain or cause to be maintained (including by AFI and its Subsidiaries), with financially sound and reputable insurers such public liability insurance, third-party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Borrowers and their respective Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses (and, with respect to the First Lien Collateral, otherwise maintain all insurance coverage required under each applicable Collateral Document), in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.

(c)     Without limiting the foregoing, each Primary Credit Party shall maintain, and shall ensure that each subservicer and successor Servicer, if any, maintains, with financially sound and reputable insurers, errors and omissions insurance with fidelity bond and/or mortgage impairment insurance and blanket bond coverage in an amount customarily required by Fannie Mae and Freddie Mac (as disclosed to Buyer in writing) and shall not reduce such coverage except in accordance with the Fannie Mae Guides or Freddie Mac Guides, as applicable.

Section 5.07    Maintaining Records; Access to Properties and Inspections; Lender Discussions.

(a)     Each Credit Party will maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate records evidencing the Receivables in the event of the destruction or loss of the originals thereof) consistent with market standards and in compliance in all material respects with the applicable Guidelines.  Each Credit Party will keep and maintain (i) proper books of record and account in which full, true and correct entries in conformity with GAAP and all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities are made of all dealings and transactions in relation to its business and activities and (ii) other information reasonably necessary or advisable for Collections (including, without limitation, records adequate to permit the daily identification of all collections with respect to, and adjustments of amounts payable under, the Collateral). Each Credit Party will keep and maintain proper records of intercompany accounts with full, true and correct entries reflecting all payments received and paid (including, without limitation, funds received by any Credit Party from swept deposit accounts of the other Credit Parties).

(b)     Each Credit Party will, and will cause each of its Subsidiaries to, permit any Agent or any of the Lenders or any agents or representatives thereof (including any

consultants, accountants, lawyers and appraisers retained by any Agent) to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to conduct evaluations, appraisals, assessments and ongoing maintenance and monitoring in connection with the Borrowers' computation of the Borrowing Base and the Collateral Amount and the assets included in the Borrowing Base and Collateral Amount and such other assets and properties of ResCap or its Subsidiaries as any Agent may reasonably require, to monitor the Collateral and all related systems, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested; provided that the Credit Parties shall have the right to be present at any discussions with independent public accountants. The Credit Parties shall have no obligation to disclose materials that are protected by attorney-client privilege and materials the disclosure of which would violate confidentiality obligations of such Credit Party.

(c)     The Credit Parties' management shall make themselves available for telephonic and in person meetings, on reasonable notice under the circumstances, to provide additional financial and restructuring information to the Agents.

Section 5.08   Compliance with Credit Documents.  Each Credit Party and each Subsidiary thereof shall comply with all provisions, covenants and other promises required to be observed by it under each of the Credit Documents to which it is a party (subject to all applicable grace periods as provided therein).

Section 5.09   Compliance with Laws.  Each Credit Party will comply, and shall cause each of its Subsidiaries to comply, in all material respects with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority applicable to such Person or its assets or properties (including all Environmental Laws, usury, unfair collection practice, equal credit opportunity, fair housing and regulations, real estate settlement procedures, all applicable predatory lending laws (including, for the avoidance of doubt, laws regarding the extension of credit without regard to the ability of a Mortgagor to repay and the extension of credit which has no apparent benefit to such Mortgagor), truth-in-lending and disclosure laws applicable to the solicitation, origination, collection, servicing and subservicing of any Collateral).

Section 5.10   Environmental.  Each Credit Party will (a) comply, and shall cause each of its Subsidiaries to comply, in all material respects with all applicable Environmental Laws, (b) obtain and renew all necessary Governmental Authorizations in connection with Environmental Laws for its operations and owned, leased, operated or used real property (including all buildings, fixtures or other improvements located thereon, and including any REO Property), and (c) conduct any investigation, study, sampling and testing, and promptly take, any reasonable actions necessary to (i) cure any violation of applicable Environmental Laws that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, in accordance with the requirements of any applicable Environmental Laws, (ii) make an appropriate response to any Environmental Claim against ResCap or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and

124

(iii) remedy the effect of any Release or other circumstance that could, in the reasonable judgment of ResCap, give rise to an Environmental Claim against ResCap or any of its Subsidiaries; provided, however, that neither ResCap nor any of its Subsidiaries shall be required to undertake any such remedial or curative action under this clause (c) to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 5.11    Subsidiaries.    In the event that any Person becomes a Domestic Subsidiary of ResCap after the Closing Date, ResCap shall (a) promptly cause such Domestic Subsidiary to become a Guarantor hereunder and, if such Person owns or has rights in any Collateral, a Grantor under the applicable Collateral Document by executing and delivering to Administrative Agent a Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Schedule 3.01 or as may be requested pursuant to Section 5.12.  With respect to each such Subsidiary, ResCap shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of ResCap, and (ii) all of the data required to be set forth on Schedules 4.01 and 4.02 with respect to all Subsidiaries of ResCap; provided, such written notice shall be deemed to supplement Schedule 4.01 and 4.02 for all purposes hereof.  In the event that any Credit Party or Subsidiary of any Credit Party, after the Closing Date, acquires any right, title or interest in any Collateral and such Person has not granted a Lien thereon pursuant to any Credit Document to secure the Obligations, ResCap shall (a) promptly cause such Person to become a Grantor under the applicable Collateral Document by executing and delivering to Collateral Agent a Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as may be requested pursuant to Section 5.12.

Section 5.12    Security Interests; Further Assurances.

(a)    Promptly, upon the reasonable request of any Agent, at Borrowers' expense, each Credit Party shall (i) execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Collateral Documents or otherwise deemed by any Agent reasonably necessary or desirable to carry out more effectively the purposes of the Credit Documents or for the continued validity, perfection and priority of the Liens on the Collateral covered thereby superior to and prior to the rights of all third Persons other than the holders of Permitted Collateral Liens and subject to no other Liens other than Permitted Collateral Liens; (ii) deliver or cause to be delivered to Administrative Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to Administrative Agent as any Agent shall reasonably deem necessary or desirable to perfect, preserve or maintain the Liens on the Collateral pursuant to the Collateral Documents or to obtain the full benefits of any such Liens; (iii) upon the exercise by any Agent or the Lenders of any power, right, privilege or remedy pursuant to any Credit Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, execute and deliver all applications, certifications, instruments and other documents and papers that any Agent or the Lenders may be so required to obtain; and (iv) take all other

125

actions necessary or advisable to preserve, defend, maintain and enforce such Credit Party's rights, title and interest in or to the Collateral.

(b)     Promptly upon the reasonable request by any Agent, or any Lender through Administrative Agent, correct, and cause each of the other Credit Parties promptly to correct (i) any material defect or error that may be jointly identified by Administrative Agent and the Borrowers in any Credit Document or (ii) in the execution, acknowledgment, filing or recordation of any Credit Document.

Section 5.13     Non-Consolidation.  ResCap will and will cause each of its Subsidiaries to:  (a) other than with respect to any Immaterial Subsidiary, maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity; (b) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity (other than such funds that may be commingled with each other in the ordinary course of their cash management system); and (c) provide that its Board of Directors (or similar governing body) will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities.

Section 5.14     Information Regarding Collateral.  Furnish to the Agents fifteen (15) days prior written notice (in the form of an officer's certificate), clearly describing any changes (a) in any Credit Party's legal name, "name" (within the meaning of Section 9-507(c) of any applicable enactment of the Uniform Commercial Code) or any trade name, fictitious name, assumed name or "doing business as" name used to identify it in the conduct of its business or in the ownership of its properties, (b) in the location of any Credit Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral having a value in excess of $250,000 owned by it is located (including the establishment of any such new office or facility), (c) in any Credit Party's identity or corporate structure, (d) in any Credit Party's Federal Taxpayer Identification Number or (e) in any Credit Party's type or jurisdiction of organization. Such notice shall specify any additional filing offices for purposes of Schedule 4.30 and, when delivered in accordance with the terms hereof, shall be deemed to automatically supplement and amend Schedules 4.01, 4.02, 4.27 and/or 4.30, as applicable, as of the effective date specified in such notice.  Each Credit Party agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest under the UCC in all the Collateral.  Each Credit Party agrees to provide to any Agent such other information in connection with such changes as such Agent may reasonably request.  Each Credit Party also agrees promptly to notify the Agents if any material portion of the Collateral is damaged or destroyed or taken by condemnation or other eminent domain proceeding.

Section 5.15     LOC Junior Lien Collateral.  The Credit Parties shall deposit all Net Asset Sale Proceeds received from any Asset Sales of LOC Junior Lien Collateral in an aggregate amount up to the lesser of (a) the aggregate outstanding Indebtedness under the Ally Line of Credit from time to time and (b) the Maximum Ally Line of Credit Amount into a cash collateral account that is an LOC Account for the benefit of AFI, solely in its capacity as lender, lender agent and secured party under the Ally Line of Credit, which Net Asset Sale Proceeds

shall be distributed only pursuant to an order of the Bankruptcy Court that does not conflict with the terms of the Intercreditor Provisions and is reasonably satisfactory to Administrative Agent. The Credit Parties shall apply all other Net Asset Sale Proceeds received from any Asset Sales of LOC Junior Lien Collateral as required by Section 2.14(d).

Section 5.16    <u>Credit Rating</u>.  Borrowers shall use commercially reasonable efforts to obtain a credit rating for the Revolving Facility and the Term Facilities from each of S&P and Moody's within sixty (60) days after the Petition Date.

Section 5.17    <u>Final Financing Order</u>.  Not later than the earlier of (a) the expiration of the Interim Financing Order and (b) forty-five (45) days after the entry of the Interim Financing Order, the Final Financing Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been (i) vacated, stayed or reversed or (ii) modified or amended except as otherwise agreed to in writing by Administrative Agent in its sole discretion.

Section 5.18    <u>Advisory Firm</u>.  The Credit Parties shall provide Administrative Agent with reasonable access to FTI Consulting and/or any additional, replacement or successor financial advisory firm retained by Borrowers or any of the other Credit Parties.

Section 5.19    <u>Servicing</u>.

(a)    Each Credit Party will ensure, and will direct its Subsidiaries to ensure, that any Collateral owned or serviced by it or its Subsidiaries (as applicable) (i) is serviced, subserviced and administered at all times in accordance with the procedures (including but not limited to collection and enforcement procedures) that each Borrower or other Credit Party (as the case may be) customarily employs and exercises (or requires to be employed or exercised by those servicing its other assets) in its good faith business judgment and which are normal and usual in the servicing of its other similar assets and (ii) in the case of any Mortgage Loan, REO Property, Serviced Loan and owned real property resulting from the foreclosure of a Serviced Loan, is conducted by it or its related servicer in accordance with Accepted Servicing Practices, and that all such servicing, subservicing and administration is conducted in the best interest of and for the benefit of the Secured Parties.

(b)    Each Credit Party and each of its Subsidiaries shall conduct quality control reviews of its servicing and subservicing operations in accordance with industry standards and past practice and shall report to the Agents quality control findings that could reasonably be expected to have a Material Adverse Effect as such reports are produced and upon reasonable request by any Agent.

(c)    If requested to do so by Administrative Agent, the Credit Parties will cooperate, to the fullest extent reasonably possible, with actions taken by any Agent or Lender under the Credit Documents that enable such Person to effect a transfer of servicing, legal title or other rights or benefits in an efficient and orderly manner upon exercise of remedies with respect to any Collateral maintained for the benefit of the Agents and the other Secured Parties.

127

Section 5.20    Receivables.  In accordance with the terms of the applicable Receivables Pooling and Purchase Agreement, each of GMACM and RFC shall sell and contribute all Additional Receivables it generates to GMACM Borrower and RFC Borrower, respectively.

Section 5.21    Obligations and Contractual Exercise of Rights and Remedies. Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a)    perform all of its obligations under, comply with the terms and conditions of, employ the procedures outlined in, and enforce the obligations of the parties to, the Underlying Documents, the Servicing Agreements and the Specified Servicing Agreements, except where failure to do so could not reasonably be expected to be materially adverse to the rights or remedies of any Agent or Lender;

(b)    take such actions to exercise and enforce the rights and remedies of ResCap or any of its Subsidiaries with respect to the Underlying Documents, the Servicing Agreements and the Specified Servicing Agreements in accordance with the terms thereof, except where failure to do so could not reasonably be expected to be materially adverse to the rights or remedies of any Agent or Lender;

(c)    promptly deliver to Administrative Agent all reports, notices and certificates required or delivered under any Underlying Document (other than ministerial reports, notices and certificates);

(d)    maintain all Underlying Documents, all Servicing Agreements and all Specified Servicing Agreements in full force and effect (except scheduled termination of such document in accordance with its terms for reasons other than cause);

(e)    promptly after any reasonable request by any Agent, make to the parties of any Underlying Document, Servicing Agreement or Specified Servicing Agreement such demands and requests for information and reports or for action to the extent such Credit Party or Subsidiary is entitled to make any such demand or request thereunder; and

(f)    except as permitted pursuant to Section 6.08 or 6.09, not take any action and shall use its best efforts not to permit any action to be taken by any other Person that would release any Person from any of such Person's covenants or obligations under any document, instrument or agreement included in or relating to the Collateral, or which would result in the amendment, modification, waiver, hypothecation, subordination, termination or discharge of (other than scheduled termination thereof in accordance with its terms for reasons other than cause), or impair the validity or effectiveness of, any such document, instrument or agreement, in any such case, if the effect thereof would be materially adverse to any Agent or Lender.

Section 5.22    Custodial Procedures.  The Borrowers shall have entered into and shall maintain the Custodial Agreement governing the custody of certain documentation for Collateral consisting of Mortgage Loans.  The Primary Credit Parties hereby agree to update the Agents on the Exception Report at any Agent's request.

Section 5.23    REO Property.

(a)    With respect to any Eligible REO Property, the Credit Parties will obtain and deliver to Collateral Agent a current Broker's Price Opinion every ninety (90) days.

(b)    GMACM Servicer shall service or subservice all REO Property resulting from the foreclosure of GMACM Serviced Mortgage Loans (except as may otherwise be consented to pursuant to Section 6.18) in accordance with Accepted Servicing Practices and GMACM Servicer's normal and customary business practices.

Section 5.24    Mortgage Loan Level Representations and Warranties.  Upon discovery by any Credit Party of a breach of any of the representations and warranties set forth on Schedule 4.39, the Credit Parties shall give prompt (but in any event within two (2) Business Days) written notice thereof to Collateral Agent.  In the event that it is discovered that the circumstances with respect to any Eligible Mortgage Loan are not accurately reflected in any of the applicable representations and warranties made by the Primary Credit Parties set forth on Schedule 4.39, notwithstanding the actual knowledge or lack of knowledge of any Primary Credit Party, and notwithstanding that such representation and warranty is made "to the best of the Primary Credit Parties' knowledge," then such representation and warranty shall be deemed to be breached and such Eligible Mortgage Loan shall cease to be an Eligible Mortgage Loan.

Section 5.25    MERS.  GMACM and RFC will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans for as long as such Mortgage Loans are registered with MERS.

Section 5.26    Servicing of GMACM Serviced Mortgage Loans.  GMACM Servicer shall service or subservice and administer the GMACM Serviced Mortgage Loans in accordance with Accepted Servicing Practices and GMACM Servicer's normal and customary business practices and shall (a) comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of such servicing, subservicing and administration (including compliance with all applicable usury, unfair collection practice, equal credit opportunity, fair housing and regulations, real estate settlement procedures, all applicable predatory lending laws (including, for the avoidance of doubt, laws regarding the extension of credit without regard to the ability of a mortgagor to repay and the extension of credit which has no apparent benefit to such mortgagor), truth-in-lending and disclosure laws applicable to the solicitation, origination, collection, servicing and subservicing of any mortgage loans), (b) maintain all state and federal licenses necessary for servicing and subservicing the GMACM Serviced Mortgage Loans, (c) not impair the rights of the Secured Parties in any GMACM Serviced Mortgage Loans or any payment thereunder and (d) service in accordance with any applicable Government Modification Program.  No Credit Party will modify or alter the terms of any Mortgage Loan or consent to the modification or alteration of the terms of any Mortgage Loan, other than with respect to modifications consistent with Accepted Servicing Practices, HAMP or other Government Modification Programs.  No later than the Mortgage Loan Reporting Dates, and from time to time reasonably promptly following Administrative Agent's request, GMACM Servicer shall deliver to Collateral Agent the Servicer's Tape with respect to the GMACM Serviced Mortgage Loans including those fields reasonably requested by Administrative Agent.

129

Section 5.27    Corporate Separateness of Borrowers; Related Matters and Covenants.  Each Borrower shall comply with its Organizational Documents (and GMACM and RFC, each in its capacity as the sole member of GMACM Borrower and RFC Borrower, respectively, shall cause each respective Borrower to comply therewith).  None of the Borrowers, ResCap or any its Subsidiaries shall take any action, or permit any of its respective Affiliates to take any action, inconsistent with this Section 5.27 or the Organizational Documents of any Borrower.

Section 5.28    Corporate Separateness of the Borrowers' REO Subsidiaries; Related Matters and Covenants.  Each Borrower's REO Subsidiary shall comply with its Organizational Documents (and GMACM Borrower and RFC Borrower, each in its capacity as the sole member of its Borrower's REO Subsidiary shall cause each respective Borrower's REO Subsidiary to comply therewith).  Neither any Borrower's REO Subsidiary, any Borrower, ResCap nor any its Subsidiaries shall take any action, or permit any of its respective Affiliates to take any action, inconsistent with this Section 5.28 or the Organizational Documents of any Borrower's REO Subsidiary.

Section 5.29    Amendments to Servicing Agreements.  The Administrator and each Servicer each hereby covenants and agrees not to amend any Designated Servicing Agreement, Specified Servicing Agreement or other master servicing, servicing or subservicing agreement except for such amendments that would have no adverse effect upon (a) the collectability of the Receivables or Mortgage Loans, (b) the amount or timing of payment of Advance Reimbursement Amounts or Collections or (c) the payment and performance of the Obligations under the Credit Documents or otherwise adversely affect the interests of the Lenders, without the prior written consent of Administrative Agent.  The Administrator shall, within five (5) Business Days following the effectiveness of such amendments, deliver to Administrative Agent copies of all such amendments.

Section 5.30    Notice of Security Interest in Receivables.  The Credit Parties shall use commercially reasonable efforts to ensure that any list of any Receivables relating to any Designated Servicing Agreement or related trial balance provided by any Credit Party provides notice that the Receivables identified therein are subject to a fully perfected First Priority Lien as First Lien Collateral under the Collateral Documents and the Orders in favor of Collateral Agent.

Section 5.31    Acquisition of Residual Interests.  Neither any Servicer nor any Affiliate of any Servicer shall acquire or own any Prohibited Interest in an MBS Trust without obtaining an opinion of tax counsel that the acquisition of such Prohibited Interest will not result in the imposition of United States withholding tax on any Advance Reimbursement Amounts received by the Borrowers.

Section 5.32    Compliance with Designated Servicing Agreements.  Neither Servicer shall fail to comply with its obligations as the Servicer under each of the related Designated Servicing Agreements, which failure would have a Material Adverse Effect on the interests of the Lenders under this Agreement.

Section 5.33    Payment of Fees and Administrative Expenses.  The Primary Credit Parties shall pay and be fully responsible for the fees of the Verification Agent.

Section 5.34    <u>Reimbursement of Non-Recoverable Advances</u>.  Each Servicer shall withdraw Advance Reimbursement Amounts from the appropriate MBS Trust Collection Account to reimburse any Advance that such Servicer shall have determined will not be recoverable from proceeds of the related Serviced Loan, promptly after making such determination of non-recoverability, to the extent permitted under the related Designated Servicing Agreement.

Section 5.35    <u>MBS Trust Collection Accounts</u>.  With respect to each Designated Servicing Agreement the related Servicer currently maintains, and shall continue to maintain, a segregated, non-commingled MBS Trust Collection Account for each MBS Trust in which the related Servicer shall remit all Advance Reimbursement Amounts for such Designated Servicing Agreement that are required in order for the Servicer to comply with its advancing obligations under such Designated Servicing Agreement.  Each Servicer shall adopt processes and procedures to ensure that a segregated MBS Trust Collection Account is maintained for each MBS Trust, and that no commingling occurs between amounts on deposit in any two MBS Trust Collection Accounts.

Section 5.36    <u>Verification Agent Duties with respect to MBS Trust Accounts</u>. Each Servicer shall cause the Verification Agency Agreement to provide for, among other things, confirmation at the times specified in the Verification Agency Agreement that to the extent that the Servicer utilizes Amounts Held for Future Distribution in making any Advances arising under any Designated Servicing Agreement in accordance with the terms of Section 9.03, such amounts are only used to make Advances for the related MBS Trust.

Section 5.37    <u>Broker's Price Opinions</u>.  Each Servicer agrees that (a) any Broker's Price Opinions required to be obtained or any other property valuation services utilized in connection with any Mortgaged Property or Eligible REO Property will be obtained from an independent third party and not from such Servicer or any of its respective Affiliates and (b) over any two consecutive Fiscal Quarters no single broker-price opinion vendor can provide more than 50% of the broker-price opinions to the Servicers in connection with the calculation of the Advance Ratio.

Section 5.38    <u>Senior Management</u>.  All members of Senior Management of each Primary Credit Party employed as of the Closing Date shall continue in employment, or a suitable and qualified replacement reasonably acceptable to Administrative Agent for any member of Senior Management of any Primary Credit Party not continuing in employment shall be duly appointed or elected, as applicable, as soon as practicable.

Section 5.39    <u>Obligations Regarding Sale Process</u>.  The Credit Parties (a) shall diligently prosecute the Sale Motion (and any other sale motion seeking approval of an Acceptable Alternative Sale Agreement) and take all commercially reasonable steps to obtain entry of the Sale Orders by the Sale Order Milestone and the Sale Procedures Order within the time frame contemplated in the Sale Motion and (b) shall not (i) withdraw the Sale Motion (except in connection with the filing of a new sale motion under Section 363 of the Bankruptcy Code seeking approval of a Replacement Sale Agreement within thirty (30) days of entering into any such Replacement Sale Agreement) or (ii) agree to, cause or permit any amendment, restatement, supplement or other modification to, or waiver of, any Sale Agreement, the Sale

131

Orders or the Sale Procedures Order that could reasonably be expected to be adverse to the Secured Parties (it being understood and agreed that any amendment, restatement, supplement or other modification to, or waiver of, any Sale Agreement, the Sale Orders or the Sale Procedures Order that (x) provides for a closing date for any sale transaction later than the Sale Closing Milestone or (y) changes the form of consideration for any assets being disposed of shall be considered adverse) without in each case obtaining the prior written consent of the Requisite Lenders and the Requisite Revolving Lenders to such amendment, restatement, supplement or other modification or waiver.

Section 5.40    <u>Servicer Acknowledgment and Instruction Letters</u>.  The Credit Parties shall use commercially reasonable efforts to obtain and deliver to Administrative Agent, within thirty (30) days following the Closing Date, copies of Servicer Acknowledgment and Instruction Letters for all of the Specified Mortgage Loans, each duly executed by the applicable servicer listed on Schedule 4.41(a).

Section 5.41    <u>Borrowing Base and Collateral Amount Certificate Variances</u>.  If at any time any Primary Credit Party shall obtain knowledge that any Borrowing Base and Collateral Amount Certificate delivered pursuant to Section 3.03(b) or Section 3.04(b) shall not have accurately reflected the amount of the Borrowing Base or the Collateral Amount as of the applicable date of determination as a result of estimates by any Primary Credit Party in calculating such Borrowing Base and Collateral Amount Certificate, and a negative variance of $2,500,000 or more exists in any such calculation, the Primary Credit Parties shall within one (1) Business Day deliver to Administrative Agent and Collateral Agent a corrected Borrowing Base and Collateral Amount Certificate remedying such inaccuracy.

Section 5.42    <u>Notification of MBS Trustees</u>.  Within fifteen (15) days following the Closing Date, each Servicer shall, by service of a copy of the Interim Financing Order, (a) notify the related MBS Trustees with respect to the Designated Servicing Agreements under which such Servicer is the servicer of the assignment, transfer of ownership and pledge of Receivables related to such Designated Servicing Agreements, including the related Advance Reimbursement Amounts, and that each related Receivable is subject to Collateral Agent's security interest under the Credit Documents and Orders, and (b) to the extent provided for in the applicable Designated Servicing Agreements, direct each MBS Trustee to cause payment of Advance Reimbursement Amounts to be made directly to the applicable Borrower.  No Credit Party shall rescind or modify any such notice relating to a particular Designated Servicing Agreement unless all related Receivables have been paid in full in Cash or have been released from the Lien of the Collateral Documents and Orders in accordance with the terms hereof and thereof.

Section 5.43    <u>Collections; Blocked Accounts</u>.  The Credit Parties and their Subsidiaries shall deposit and remit to the Borrower Accounts all Collections in compliance with the Cash Management Order and Section 9.01(a).  The Primary Credit Parties shall establish and maintain the Blocked Accounts in accordance with Article IX and no Credit Party shall permit any Collections to become subject to any Lien other than Liens described in clause (a) of the definition of "Permitted Collateral Liens."

Section 5.44    <u>Delaware Statutory Trusts</u>.  On or before ninety (90) days after the Closing Date, each Borrower shall (a) form and hold a one hundred percent (100%) interest in a Delaware statutory trust having a national banking association as trustee and (b) transfer the Designated Mortgage Loans owned by such Borrower to such statutory trust.  The trust agreement and trustee of each such statutory trust, and all documentation related thereto, shall be acceptable to Administrative Agent in its discretion.

# ARTICLE VI

# <u>NEGATIVE COVENANTS</u>

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Article VI.

Section 6.01    <u>Indebtedness</u>.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guarantee, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)    the Obligations;

(b)    (i) unsecured Indebtedness of any Credit Party (other than any Borrower or any Borrower's REO Subsidiary) to any other Credit Party (other than any Borrower or any Borrower's REO Subsidiary), in all the foregoing cases, to the extent approved in the Cash Management Order; <u>provided</u> that, all such Indebtedness of such Credit Parties shall be subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of Section 7.07; (ii) Indebtedness of ResCap to any Borrower in connection with the transfer of funds to the Concentration Account to the extent permitted under Section 9.01(b) and approved in the Cash Management Order; and (iii) unsecured Indebtedness of any Non-Credit Party to any other Non-Credit Party;

(c)    Indebtedness of ResCap and/or its Subsidiaries in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(d)    guaranties of ResCap and/or its Subsidiaries (other than any Borrower or any Borrower's REO Subsidiary) in the ordinary course of business of (i) the obligations owed to suppliers, customers, franchisees and licensees of ResCap and its Subsidiaries (other than any Borrower or any Borrower's REO Subsidiary) and (ii) the obligations with respect to workers' compensation liabilities of its Subsidiaries (other than any Borrower or any Borrower's REO Subsidiary);

(e)    Indebtedness (other than Indebtedness of any Borrower or any Borrower's REO Subsidiary) existing on the Closing Date and not otherwise permitted pursuant to Section 6.01(g) and set forth on Schedule 6.01;

(f)    obligations (other than obligations of any Borrower or any Borrower's REO Subsidiary) on account of non-current accounts payable which the applicable Credit Party is contesting in good faith and by appropriate proceedings diligently conducted and

133

with respect to which adequate reserves have been established and are being maintained in accordance with GAAP;

(g)        (i) Indebtedness of the LOC Grantors under the Ally Line of Credit in an aggregate principal amount not to exceed the Maximum Ally Line of Credit Amount, and (ii) Indebtedness of GMACM and ResCap under the Prepetition MSR Facility in an aggregate principal amount not to exceed the Maximum Prepetition MSR Facility Amount;

(h)        Indebtedness (i) under Permitted TBA Transactions or (ii) with the prior written consent of Administrative Agent, of ResCap or GMACM under any Hedge Agreements entered into with Ally Investment Management LLC and/or Ally Bank not for speculative purposes and entered into in the ordinary course of business for the purpose of hedging risks associated with the transactions contemplated by the Master Purchase Documents and otherwise authorized pursuant to the Origination Order;

(i)        Indebtedness of ResCap or GMACM under the Master Purchase Documents authorized pursuant to the Origination Order; provided that immediately after giving effect to the incurrence of such Indebtedness, the Credit Parties and their Subsidiaries shall be in compliance on a pro forma basis with all of the covenants set forth in Section 6.07; and

(j)        GSE Repurchase Obligations of GMACM and RFC.

Section 6.02    Liens.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of ResCap or any of its Subsidiaries, whether owned as of the Closing Date or thereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or province or under any similar recording or notice statute, except:

(a)        Liens in favor of any Agent for the benefit of Secured Parties granted pursuant to the Credit Documents and the Orders;

(b)        Liens for Taxes that are not yet required to be paid pursuant to Section 5.04;

(c)        (i) except with respect to property and assets of any Borrower (other than REO Property), statutory Liens of landlords, carriers, warehousemen, suppliers, mechanics, repairmen, workmen and materialmen, and (ii) other Liens imposed by law (other than any such Lien imposed pursuant to or in connection with Section 430(k) or 436 of the Internal Revenue Code or by ERISA), in each case of the foregoing subclauses (i) and (ii), incurred in the ordinary course of business (x) for amounts not yet overdue or (y) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

134

(d)      except with respect to property and assets of any Borrower or any Borrower's REO Subsidiary, Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(e)      easements, rights of way, restrictions, encroachments, licenses and other minor defects or irregularities in title to real property, in each case which, individually or in the aggregate, do not and will not interfere in any material respect with the ordinary conduct of the business of any Credit Party or any of its Subsidiaries;

(f)      except with respect to property and assets of any Borrower or any Borrower's REO Subsidiary, purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(g)      except with respect to property and assets of any Borrower or any Borrower's REO Subsidiary, licenses and sublicenses of patents, trademarks and other intellectual property rights granted by ResCap or any of its Subsidiaries in the ordinary course of business, not interfering in any respect with the ordinary conduct of the business of ResCap or such Subsidiary and that do not materially detract from the value of the business of ResCap or such Subsidiary;

(h)      Liens existing on the Closing Date:

(i)      on any assets or property of any Borrower or any Borrower's REO Subsidiary and described on Schedule 6.02(h)(i);

(ii)      not otherwise permitted pursuant to Section 6.02(k) on any assets or property constituting Junior Lien Collateral and described on Schedule 6.02(h)(ii) (other than with respect to any assets or property of any Borrower or any Borrower's REO Subsidiary); and

(iii)      on any assets or property that do not constitute Collateral (other than with respect to any assets or property of any Borrower or any Borrower's REO Subsidiary);

(i)      any attachment or judgment Lien not constituting an Event of Default under Section 8.01(u) so long as the enforcement of any such Lien on any Collateral is stayed by the time required by Section 8.01(u);

(j)      customary rights of set off, banker's liens, refund or charge back under deposit agreements, the UCC or common law of banks or other financial institutions where ResCap or any of its Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

135

(k)    except with respect to property and assets of any Borrower or any Borrower's REO Subsidiary:

(i)    Liens on LOC Junior Lien Collateral securing Indebtedness permitted pursuant to Section 6.01(g)(i) (including any adequate protection replacement Liens on the LOC Junior Lien Collateral granted under the AFI/Junior Secured Notes Order);

(ii)    Liens on MSR Junior Lien Collateral securing Indebtedness permitted pursuant to Section 6.01(g)(ii) (including any adequate protection replacement Liens on the MSR Junior Lien Collateral granted under the MSR Order);

(iii)    Liens on Prepetition Ally Revolver/Junior Secured Notes Collateral securing Indebtedness permitted pursuant to Section 6.01(e) under the Prepetition Ally Revolver and the Prepetition Junior Secured Notes as of the Petition Date (including any adequate protection replacement Liens on Prepetition Ally Revolver/Junior Secured Notes Collateral granted under the AFI/Junior Secured Notes Order); and

(iv)    Liens of Fannie Mae on the EAF Collateral securing Indebtedness permitted pursuant to Section 6.01(e) under the EAF Facility in an aggregate amount outstanding from time to time under the commitments under the EAF Facility as in effect at the Petition Date (including any adequate protection replacement Liens on EAF Collateral granted under the EAF Order);  and

(l)    Liens on Collateral (as defined in the Master Purchase Pipeline Security Agreement) pursuant to the Master Purchase Pipeline Security Agreement;

(m)    Liens on Cash of GMACM pursuant to the MSFTA and Permitted TBA Transactions; provided, however, that the aggregate initial margin amount for all transactions under the MSFTA shall not exceed $10,000,000; and

(n)    with the prior written consent of Administrative Agent, Liens on assets or property of ResCap or GMACM securing Indebtedness permitted by 6.01(h)(ii).

Section 6.03    No Further Negative Pledges.  No Credit Party or any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether owned as of the Closing Date or thereafter acquired.

Section 6.04    Restricted Junior Payments.  No Credit Party shall, nor shall it permit any of its Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment except that, so long as no Default or Event of Default shall have occurred and be continuing or shall be caused thereby, (a) Credit Parties (other than any Borrower) may make any Restricted Junior Payment (other than as described in clauses (d) and (e) of such definition) authorized by the Orders or any "first day" or "second day" order reasonably acceptable to Administrative Agent, (b) each Borrower's REO Subsidiary may make any Restricted Junior Payment to a Borrower, (c) each Borrower's

136

statutory trust may transfer Mortgage Loans and REO Property to such Borrower, and (d) GMACM may make any Restricted Junior Payment approved under the Origination Order; provided that immediately after giving effect to such Restricted Junior Payment, the Credit Parties and their Subsidiaries shall be in compliance on a pro forma basis with all of the covenants set forth in Section 6.07.

Section 6.05    Restrictions on Subsidiary Distributions.  Except as provided herein, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of ResCap to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by ResCap or any other Subsidiary of ResCap, (b) repay or prepay any Indebtedness owed by such Subsidiary to ResCap or any other Subsidiary of ResCap, (c) make loans or advances to ResCap or any other Subsidiary of ResCap, or (d) transfer any of its property or assets to ResCap or any other Subsidiary of ResCap, other than, in each of the foregoing cases, restrictions (i) existing under this Agreement, (ii) in agreements in existence on the Closing Date, and (iii) arising under applicable laws, rules, regulations or orders.

Section 6.06    Investments.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make, hold or own any Investment in any Person, including without limitation any Joint Venture, except:

(a)    Investments in Cash and Cash Equivalents and, in the case of any Non-Credit Party that is a Foreign Subsidiary, Foreign Cash Equivalents;

(b)    (i) Investments owned as of the Closing Date in any Subsidiary; (ii) Investments approved under the Cash Management Order and made by any Credit Party or any of its Subsidiaries (other than any Borrower or any Borrower's REO Subsidiary) after the Closing Date in any Wholly Owned Subsidiary that is a Credit Party, and (iii) Investments made by any Non-Credit Party in any other Non-Credit Party;

(c)    Investments consisting of the transfer of funds by any Borrower to the Concentration Account to the extent permitted under Section 9.01(b);

(d)    Investments by ResCap, GMACM or RFC, in accordance with the Approved DIP Budget, consisting of Advances, to the extent not otherwise prohibited pursuant to the terms of this Agreement;

(e)    Investments made by any Borrower in its Borrower's REO Subsidiary consisting of the transfer of REO Property to such Borrower's REO Subsidiary;

(f)    Investments by GMACM or RFC, in accordance with the Approved DIP Budget, consisting of capital contributions to a Borrower relating to transfers to such Borrower of Receivables or Mortgage Loans pursuant to and in accordance with the terms of the Receivables Pooling and Purchase Agreements, the Receivables Purchase Agreements and the Mortgage Loan Purchase and Contribution Agreements, as applicable, to the extent not otherwise prohibited pursuant to the terms of this Agreement;

137

(g)    Investments as of the Closing Date and described on Schedule 6.06;

(h)    Investments made by any Credit Party or any of its Subsidiaries (other than any Borrower or any Borrower's REO Subsidiary) consisting of extensions of credit to customers or advances, deposits and payments to or with suppliers, lessors or utilities or for workers' compensation, in each case, in the ordinary course of business that are recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of ResCap and its Subsidiaries prepared in accordance with GAAP;

(i)    transactions permitted by Section 6.04 to the extent constituting Investments;

(j)    Investments approved in the Cash Management Order, the AFI/Junior Secured Notes Order, the EAF Order or the MSR Order;

(k)    Investments by ResCap and GMACM under Hedge Agreements to the extent permitted under Section 6.01(e) or 6.01(h);

(l)    Investments by GMACM approved in the Origination Order; provided that immediately after giving effect to such Investment, the Credit Parties and their Subsidiaries shall be in compliance on a pro forma basis with all of the covenants set forth in Section 6.07;

(m)    Investments by GMACM or RFC in the ordinary course of business pursuant to and in satisfaction of any GSE Repurchase Obligations; provided that immediately after giving effect to such Investment, the Credit Parties and their Subsidiaries shall be in compliance on a pro forma basis with all of the covenants set forth in Section 6.07; and

(n)    Investments consisting of transfers, sales or contributions of Designated Mortgage Loans by either Borrower to one or more Delaware statutory trusts owned by such Borrower.

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment that results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.04.

Section 6.07    Financial Covenants.

(a)    Borrower Liquidity.  The Credit Parties shall not permit the aggregate amount of Cash and Cash Equivalents on deposit in the Borrower Accounts, the Collection Account and the Concentration Account to be less than $50,000,000 in the aggregate at any time.

(b)    Consolidated Liquidity.  The Credit Parties shall not permit the aggregate amount of Unrestricted Cash of ResCap and its Subsidiaries, determined on a consolidated basis, to be (i) less than $250,000,000 for any four (4) consecutive Business Days or (ii) less than $75,000,000 at any time.

(c)    Net Outflows.  The Credit Parties shall not permit Net Outflows at any time to exceed $75,000,000.

Section 6.08    Fundamental Changes; Disposition of Assets; Acquisitions.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sublease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any portion of the Collateral, whether real, personal or mixed and whether tangible or intangible, whether owned as of the Closing Date or thereafter acquired, or acquire by purchase or otherwise the business, or all or substantially all of the property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, nor shall any Credit Party enter into any agreement with respect to any of the foregoing, or permit any of its Subsidiaries to enter into any such agreement, except transactions or agreements providing for:

(a)    any Non-Credit Party (other than any Restricted Entity) may be merged with or into any Wholly Owned Subsidiary that is a Non-Credit Party (other than any Restricted Entity), or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions to any Wholly Owned Subsidiary that is a Non-Credit Party (other than any Restricted Entity);

(b)    (i) sales, leases, licenses or other dispositions of assets that do not constitute Asset Sales and (ii) sales or other dispositions (other than by any Borrower or any Borrower's REO Subsidiary) of (x) equipment that is obsolete, worn-out, condemned or no longer used or useful in the business of ResCap or any of its Subsidiaries and (y) other assets set forth on Schedule 6.08;

(c)    the sale transactions contemplated by any Sale Agreements; provided that (i) such sale transactions, collectively, contemplate payment in full in Cash of the Obligations at the closing of such sales and (ii) on the closing date of the sales contemplated by the Sale Agreements, sufficient Net Asset Sale Proceeds thereof are applied to repay the Obligations in full in Cash and the Commitments are terminated;

(d)    Asset Sales by ResCap or any of its Subsidiaries (other than a sale or disposition of any Capital Stock of any Borrower or any Borrower's REO Subsidiary); provided that (i) both immediately prior to and after giving effect to any such Asset Sale and any prepayments of the Obligations required to be made hereunder, no Default or Event of Default shall exist or result therefrom, (ii) the consideration received for such assets shall be in an amount at least equal to (A) if such assets constitute First Lien Collateral, the greater of (x) the fair market value thereof (determined in good faith by the applicable Credit Parties (or, with respect to any Asset Sale or related series of Asset Sales for which the proceeds and consideration are anticipated to be in excess of $5,000,000, in good faith by the Board of Directors (or similar governing body) of the applicable Credit Parties)) and (y) an amount determined based on the advance rate set forth in the definition of "Collateral Amount" applicable to such First Lien Collateral (calculated on an aggregate basis for the assets in each

139

transaction) hereunder, or (B) if such assets constitute Junior Lien Collateral, the fair market value thereof (determined in good faith by the applicable Credit Parties), (iii) 100% of the consideration shall be paid in Cash, (iv) the proceeds of all Asset Sales involving First Lien Collateral do not exceed $25,000,000 in the aggregate for all such Asset Sales from and after the Closing Date, (v) the Net Asset Sale Proceeds thereof are applied as required by Section 2.14 and (vi) if such assets constitute Junior Lien Collateral, any such Asset Sale is permitted pursuant to Section 6.19;

(e)        prior to receipt of notice from Administrative Agent given after the occurrence of an Event of Default, the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business consistent with past practice, other than First Lien Collateral; and

(f)        transfers, sales or contributions by either Borrower of Designated Mortgage Loans to one or more Delaware statutory trusts owned by such Borrower.

Section 6.09    Disposal Of Subsidiary Interests.    Except for any sale, assignment, transfer or disposition of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.08, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except by a Non-Credit Party to another Non-Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder) or to qualify directors if required by applicable law and except for (i) Specified Permitted Liens and (ii) Liens in favor of any Agent for the benefit of the Secured Parties granted pursuant to the Credit Documents and the Orders; provided that neither RFC nor GMACM may sell or dispose of any Capital Stock of any Borrower; provided further that neither Borrower may sell or dispose of any Capital Stock of any Borrower's REO Subsidiary.

Section 6.10    Mortgage Loan Servicing Fees.    No Credit Party shall pay, or cause to be paid, directly or indirectly, servicing and subservicing fees for Mortgage Loans in an amount exceeding 0.25% per annum of the outstanding principal balance of the Mortgage Loans; provided that, with respect to the Mortgage Loans identified on Schedule 6.10 as of the Closing Date, no Credit Party shall pay, or cause to be paid, directly or indirectly, servicing and subservicing fees for such Mortgage Loans in an amount exceeding the percentage per annum set forth opposite the applicable loan identification number for such Mortgage Loan on Schedule 6.10 as of the Closing Date.

Section 6.11    Transactions with Shareholders and Affiliates.    No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of ResCap or any of its Subsidiaries, on terms that are less favorable to ResCap or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided that the foregoing restriction shall not apply to (a) any transaction authorized by the Orders or any "first day" order reasonably acceptable to Administrative Agent; and (b) any transaction between or among any Non-Credit Parties.

140

Section 6.12    <u>Conduct of Business</u>.  No Guarantor shall, nor shall it permit or cause any of its Guarantor Subsidiaries or any of the Non-Credit Parties to, engage in any business other than a Permitted Business; <u>provided</u> that, no Borrower's REO Subsidiary shall, nor shall any other Credit Party permit or cause any Borrower's REO Subsidiary to, engage in any business other than as permitted under such Borrower's REO Subsidiary's Organizational Documents.  No Borrower shall, nor shall any other Credit Party permit or cause any Borrower to, engage in any business other than as permitted under such Borrower's Organizational Documents.

Section 6.13    <u>Permitted Activities of ResCap</u>.  ResCap shall not directly own any assets other than (a) Capital Stock of certain Credit Parties and Non-Credit Parties, (b) Cash and Cash Equivalents and other immaterial assets in the ordinary course of business consistent with past practice, (c) assets that are subject to Liens as Collateral under the Collateral Documents and the Orders or subject to Specified Permitted Liens and (d) the Concentration Account.

Section 6.14    <u>Amendments or Waivers of Certain Agreements</u>.

(a)    No Credit Party shall, nor shall it permit any of its Subsidiaries to, agree to, cause or permit any material amendment, restatement, supplement or other modification to, or waiver of, any of its material rights under any Organizational Documents of any Credit Party or its Subsidiaries or any Specified Permitted Indebtedness Document after the Closing Date if the effect of such amendment, restatement, supplement, modification or waiver would be adverse to any Credit Party or Lender without in each case obtaining the prior written consent of Requisite Lenders to such amendment, restatement, supplement or other modification or waiver; <u>provided</u> that the LOC Grantors, as debtors and debtors-in-possession, may enter into the Ally LOC DIP Amendment authorized by the AFI/Junior Secured Notes Order, in form and substance satisfactory to Administrative Agent in its sole discretion.  Without limiting the foregoing, neither Borrower shall, nor shall any Credit Party or any of its Subsidiaries cause any Borrower to, agree to, cause or permit any amendment, restatement, supplement or other modification to, or waiver of, any of its rights under the Organizational Documents of the Borrowers without the prior written consent of Administrative Agent.

(b)    No Credit Party shall, nor shall it permit any of its Subsidiaries to, agree to, cause or permit any material amendment, restatement, supplement or other modification to, or waiver of, any of its material rights under any Master Purchase Document, any Permitted TBA Transactions or, subject to Section 6.20, the MSFTA after the Closing Date without obtaining the prior written consent of Administrative Agent to such amendment, restatement, supplement or other modification or waiver.

(c)    No Credit Party shall, nor shall it permit any of its Subsidiaries to, agree to, request, cause or permit (i) any Service Changes, Change Order Request or any Change Order (each as defined in the Verification Agency Agreement), (ii) any amendment, restatement, supplement or other modification to, or waiver of, the provisions set forth in Exhibit A, Exhibit B or Sections 2, 5(b), 9, 11, 14, 16, 17, 18 19, 20(a), 23, 24 and 25 of Exhibit C to the Verification Agency Agreement, (iii) any other material amendment, restatement, supplement or other modification to, or waiver of, the Verification Agency Agreement after the Closing Date, or (iv) the termination or discharge of (other than scheduled termination thereof in accordance

141

with its terms for reasons other than cause), or impairment of the validity or effectiveness of, the Verification Agency Agreement, in each case without obtaining the prior written consent of Administrative Agent.

Section 6.15    <u>Fiscal Year</u>.  No Credit Party shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year end from December 31.

Section 6.16    <u>Use of Proceeds</u>.  No Credit Party shall, nor shall it permit any of its Subsidiaries to use the proceeds of the Credit Facilities other than in accordance with the terms of Section 2.06.

Section 6.17    <u>Other Superpriority Claims</u>.  No Credit Party shall nor shall it permit any of its Subsidiaries to, incur, create, assume, suffer to exist or permit any other Superpriority Claim which is pari passu with or senior to the claims of the Agents and the Lenders against the Credit Parties hereunder, except for the Carve Out and the Ally Superpriority Claim.

Section 6.18    <u>Servicing Practices</u>.

(a)    No Credit Party shall nor shall it permit any of its Subsidiaries to, agree to, cause or permit any material amendment, restatement, supplement or other modification to, or waiver of, any of its material rights under its servicing practices (other than as authorized in any "first day" or "second day" order reasonably acceptable to Administrative Agent); <u>provided</u> that any such changes that would adversely affect the rights of any Agent or any Lender shall be deemed material (other than as authorized in any "first day" or "second day" order reasonably acceptable to Administrative Agent).

(b)    No Credit Party shall appoint any subservicer with respect to GMACM Serviced Mortgage Loans without the prior written consent of Administrative Agent.

(c)    No Credit Party shall consent to any change in servicer or subservicer with respect to the Specified Mortgage Loans without the prior written consent of Administrative Agent and the concurrent delivery to Administrative Agent of a Servicer Acknowledgment and Instruction Letter duly executed by such successor servicer or subservicer.

(d)    No Credit Party shall assume or reject any Servicing Agreement, any Specified Servicing Agreement, or any other master servicing, servicing or subservicing contract relating to the Collateral pursuant to Section 365 of the Bankruptcy Code without the prior written consent of Administrative Agent.

(e)    Neither GMACM Servicer nor any Servicer will alter its servicing practices in any respect that could adversely affect the Lenders or the business or operations of any Credit Party or the value of the Collateral, except as required by any applicable law, rule or regulation or the applicable Designated Servicing Agreement.

Section 6.19    <u>Dispositions of LOC Junior Lien Collateral</u>.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, convey, sell, exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any portion of the LOC Junior Lien

142

Collateral, whether owned or existing as of the Closing Date or thereafter acquired except (a) in the ordinary course of business or (b) pursuant to a Sale Agreement.

Section 6.20    Amendment to MSFTA.  Within fifteen (15) days following the Closing Date, GMACM shall enter into an amended MSFTA with Ally Investment Management LLC that includes the following terms:  (i) the initial or independent margin shall be no more than $10,000,000 in the aggregate for all transactions, (ii) Ally Investment Management LLC shall hold any securities delivered to it under the MSFTA on a settlement date for the account of GMACM until they are delivered in settlement of Ally Investment Management LLC's related hedge transaction and return such securities to GMACM, net of any amounts that would have reduced the settlement payment under the MSFTA, by the end of the third (3rd) Business Day following such settlement date if such delivery has not occurred and (iii) such other terms reasonably acceptable to Administration Agent.

# ARTICLE VII

# GUARANTY

Section 7.01    Guaranty of the Obligations.  Subject to the provisions of Section 7.02, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (collectively, the "**Guaranteed Obligations**").  Notwithstanding the foregoing or any other provision of this Agreement to the contrary, if the obligations of any Guarantor under this Section 7.01 would, in any action or proceeding involving any state or provincial corporate law, or any state, provincial, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, otherwise be held or determined to be subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of a state, provincial or foreign law on account of the amount of its liability under this Section 7.01, then the amount of such liability shall, without further action by such Guarantor, or any Credit Party or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding.

Section 7.02    Contribution by Guarantors.  All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Obligations.  "**Fair Share Contribution Amount**" means, with respect to a Contributing

Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of a state, provincial or foreign law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 7.02, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (i) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 7.02), minus (ii) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.02.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.02 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 7.02.

Section 7.03    Payment by Guarantors.  Subject to Section 7.02, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof; that upon the failure of Borrowers to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest accruing during the pendency of the Cases, regardless of whether allowed or allowable in such proceedings) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

Section 7.04    Liability of Guarantors Absolute.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance that constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Borrowers and any Beneficiary with respect to the existence of such Event of Default;

144

(c)    the obligations of each Guarantor hereunder are independent of the obligations of Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrowers or any of such other guarantors and whether or not a Borrower is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security held as of the Closing Date or thereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sates, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Borrowers or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or

145

remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of; or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of ResCap or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

Section 7.05    <u>Waivers by Guarantors</u>.  Each Guarantor hereby waives, for the benefit of Beneficiaries:  (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrowers, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrowers, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of Borrowers or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrowers or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrowers or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence, or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or

146

Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrowers and notices of any of the matters referred to in Section 7.04 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

Section 7.06    Guarantors' Rights of Subrogation, Contribution, Etc.  Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor has or may have as of the Closing Date or thereafter against Borrowers or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor has or may have as of the Closing Date or thereafter against Borrowers with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary has or may have as of the Closing Date or thereafter against Borrowers, and (c) any benefit of, and any right to participate in, any collateral or security held as of the Closing Date or thereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including, without limitation, any such right of contribution as contemplated by Section 7.02. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrowers or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrowers, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

Section 7.07    Subordination of Other Obligations.  Any Indebtedness of Borrowers or any Guarantor held as of the Closing Date or thereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf

147

of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

Section 7.08    Continuing Guaranty.  This Guaranty is a continuing guaranty and shall (a) remain in effect until all of the Guaranteed Obligations shall have been paid in full and the Commitments shall have terminated, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agents and the Lenders and their successors, permitted transferees and permitted assigns.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

Section 7.09    Authority of Guarantors or Borrowers.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrowers or the officers, directors or any agents acting or purporting to act on behalf of any of them.

Section 7.10    Financial Condition of Borrowers.  Any Credit Extension may be made to Borrowers or continued from time to time, without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrowers at the time of any such grant or continuation.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrowers. Each Guarantor has adequate means to obtain information from Borrowers on a continuing basis concerning the financial condition of Borrowers and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrowers known as of the Closing Date or thereafter known by any Beneficiary.

Section 7.11    Discharge of Guaranty Upon Sale of Guarantor.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions of this Agreement, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

Section 7.12    Taxes.  The provisions of Section 2.20 shall apply, *mutatis mutandis*, to the Guarantors and payments thereby.

Section 7.13    Assignments.  Without limiting the generality of Section 7.08(c) above, each Guarantor acknowledges that any Agent or any Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, the Loans owing to it and any Note or Notes held by it), and such assignee, transferee or participant shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise, in each case as and to

148

the extent provided in Section 12.06.  No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders in accordance with Section 12.05(b)(vi).

Section 7.14  <u>Reinstatement</u>.  Each Guarantor agrees that, if (a) any payment made by the Borrowers or any other Person and applied to the Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or (b) the proceeds of Collateral are required to be returned by any Beneficiary to any Borrower or its estate, trustee, receiver or any other party, including any Guarantor or its estate, trustee, receiver, under any state or provincial corporate law, or any state, provincial, federal or foreign bankruptcy, insolvency, reorganization or other law or equitable cause affecting the rights of creditors generally, then, to the extent of such payment or repayment, any such Guarantor's liability hereunder (and any Lien or other Collateral securing such liability) shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, this Guaranty shall have been cancelled or surrendered (and if any Lien or other Collateral securing such Guarantor's liability hereunder shall have been released or terminated by virtue of such cancellation or surrender), this Guaranty (and such Lien or other Collateral) shall be reinstated in full force and effect, and such prior cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Guarantor in respect of the amount of such payment (or any Lien or other Collateral securing such obligation).

## ARTICLE VIII

## EVENTS OF DEFAULT

Section 8.01  <u>Events of Default</u>.  If any one or more of the following conditions or events shall occur:

(a)  failure by any Credit Party to pay (i) when due any principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (ii) any interest on any Loan within three (3) Business Days after the date due; or (iii) make any other payment, deposit or remittance to be made by any Credit Party under any Designated Servicing Agreement (subject to any cure periods provided therein) or any Credit Document within three (3) Business Days after the date due; or

(b)  (i) failure of any Credit Party or any of their respective Subsidiaries to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal of or premium or interest on or any other amount payable in respect of one or more items of post-petition Indebtedness (other than Indebtedness referred to in Section 8.01(a) but including under the Ally Line of Credit or any other debtor-in-possession financing facility provided to any Debtor) with an aggregate principal amount of $5,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party with respect to any other term of or the occurrence of any early amortization event, termination event, event of default or other similar event under (x) one or more items of post-petition Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (y) any loan agreement, mortgage, indenture or other agreement relating to such

149

item(s) of post-petition Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach, default or other event is to cause, or to permit the holders or beneficiaries of that Indebtedness (or a trustee or agent on behalf of such holders or beneficiaries), to cause, that Indebtedness to become or be declared due and payable (or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)     failure of any Credit Party to remedy any Borrowing Base Shortfall or Collateral Amount Shortfall within one (1) Business Day; or

(d)     (i) failure of any Credit Party to deliver a Borrowing Base and Collateral Amount Certificate when due pursuant to Section 5.01(f) and such failure shall not have been remedied, cured, reversed or waived within two (2) Business Days after such failure, or (ii) failure of any Credit Party to comply with any term or condition contained in Section 5.01 (other than Sections 5.01(f) and (l)), Section 5.07, Section 5.14 or Section 5.15 or to satisfy any notice requirements under any Collateral Document and, in any such case, such failure shall not have been remedied, cured, reversed or waived within five (5) Business Days after such failure; or

(e)     failure of any Credit Party to perform or comply with any term or condition contained in Section 2.06, 2.14, 5.01(l), 5.02, 5.03(a), 5.08, 5.17, 5.20, 5.21, 5.22, 5.26, 5.27, 5.28, 5.30, 5.31, 5.32, 5.34, 5.35, 5.39, 5.43, Article VI or Article IX; or

(f)     any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false or incorrect in any material respect as of the date made or deemed made (other than (i) the representations and warranties made in Section 4.39 with respect to any Eligible Mortgage Loan, the inaccuracy of which shall not constitute an Event of Default unless any Primary Credit Party shall have made such representations and warranties with knowledge that they were materially false or misleading at the time made, or any such representations or warranties have been determined by Administrative Agent or the Requisite Lenders in its or their discretion to be materially false or misleading on a regular basis after discovery of such inaccuracy by any Primary Credit Party or notice of such inaccuracy to Borrowers, notwithstanding the fact that any such representation and warranty shall have been made to the knowledge of the Primary Credit Parties, and (ii) the representation and warranty made in Section 4.01(d) with respect to the obtaining of necessary licenses, the inaccuracy of which shall not constitute an Event of Default unless such representation and warranty continues to be inaccurate for ninety (90) days after such representation and warranty was made or deemed made); or

(g)     any Credit Party shall default in the performance of or compliance with any term, covenant or agreement contained herein or any of the other Credit Documents, other than any such term referred to in any other subsection of this Section 8.01, and such default shall not have been remedied or waived within fifteen (15) days after such default; or

150

(h)    any material suspension by a Credit Party of operation of its business, other than pursuant to a transaction permitted by Section 6.08 or 6.09; or

(i)    any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or

(j)    a trustee (or comparable Person) under Chapter 7 or Chapter 11 of the Bankruptcy Code or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or

(k)    an order of the Bankruptcy Court shall be entered granting any Superpriority Claim (other than the Carve Out and the Ally Superpriority Claim) in any of the Cases which is pari passu with or senior to the claims of any Agent and the Lenders against Borrowers or any Credit Party under the Credit Documents or any Lien or security interest on any of the Collateral that is pari passu with or senior to the Liens and security interest securing the Obligations, in any case of the foregoing except (i) for the adequate protection replacement liens granted to AFI on account of the Ally Line of Credit on the collateral securing the Ally Line of Credit, which shall remain senior to the Liens permitted pursuant to Section 6.02(a) with respect to such collateral and (ii) for the adequate protection replacement liens granted to Citibank, N.A on account of the Prepetition MSR Facility on the collateral securing the Prepetition MSR Facility, which shall remain senior to the Liens permitted pursuant to Section 6.02(a) with respect to such collateral; or

(l)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest in or Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral of any of the Credit Parties with a value in excess of $5,000,000, either individually or in the aggregate; or

(m)    the Bankruptcy Court shall enter an order or orders permitting or authorizing any actions that could reasonably be expected to have a Material Adverse Effect, or a determination by a court of competent jurisdiction with respect to any motion, pleading or proceeding brought by another party that could reasonably be expected to have a Material Adverse Effect; or

(n)    any Order shall cease to be in full force and effect or an order of the Bankruptcy Court shall be entered reversing, staying, vacating or (except as otherwise agreed to in writing by Administrative Agent in its sole discretion) otherwise amending, supplementing or modifying the Interim Financing Order or the Final Financing Order; or

(o)    any Credit Party shall make any Prepetition Payment other than (i) as permitted by the Interim Financing Order or the Final Financing Order, (ii) as otherwise permitted by this Agreement or (iii) as authorized by the Bankruptcy Court in accordance with "first day" or "second day" orders entered on, before or after the Closing Date, which orders

151

permitting any such payment are in form and substance satisfactory to Administrative Agent, or other orders of the Bankruptcy Court entered with the written consent of (or non-objection by) Administrative Agent; or

(p)    any Credit Party shall not comply with any terms of (i) the Interim Financing Order or the Final Financing Order or (ii) any other order of the Bankruptcy Court (x) authorizing the use of cash collateral, (y) approving debtor-in-possession financing, or (z) granting adequate protection; or

(q)    (i) the Ally Sale Agreement and/or the Nationstar Sale Agreement shall be terminated, rescinded or revoked (in whole or in part) by any party thereto and is not replaced by a Replacement Sale Agreement, which Replacement Sale Agreement shall have been approved by the Bankruptcy Court within such sixty (60) day period; or (ii) any party to any Sale Agreement shall (x) admit in writing or state publicly its intent not to pursue the transactions contemplated by the Sale Agreement, or (y) act or fail to act in a manner that impairs such party's ability to perform its obligations under, or otherwise constitutes an anticipatory repudiation of, or a breach or default under (to the extent not cured within the applicable grace period), any Sale Agreement unless a Replacement Sale Agreement shall have been approved by the Bankruptcy Court within sixty (60) days from such act; or (iii) the denial (in whole or in part) by the Bankruptcy Court of any of the relief sought in the Sale Motion or in any motion seeking approval of a Replacement Sale Agreement unless the initial relief requested shall be approved by the Bankruptcy Court pursuant to a Sale Order within sixty (60) days of such denial; or

(r)    (i) the failure of the Sale Order, as entered by the Bankruptcy Court, to provide that the Obligations shall be repaid in full in Cash at the closing of the transactions approved by the Sale Order or (ii) the failure of the Obligations to be repaid in full in Cash at the closing of the transactions approved by the Sale Order; or

(s)    any Credit Party shall file a motion seeking or take any action supporting a motion seeking, or the Bankruptcy Court shall enter, an order authorizing a sale of First Lien Collateral which would violate Section 6.08(d) (unless such order requires and directs payment in full in Cash of the Obligations at the closing of such sale, whether pursuant to a Reorganization Plan or otherwise); or

(t)    a Reorganization Plan  that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases, or any of the Debtors shall propose any such plan; or

(u)    one or more post-petition money judgments, writs or warrants of attachment or similar process involving an amount in the aggregate in excess of $10,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) or one or more post-petition non-monetary judgments that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect shall be entered or filed against any Credit Party or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

(v)     any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days, other than pursuant to a transaction permitted by Section 6.08 or 6.09; or

(w)     an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to, individually or in the aggregate, (i) result in liabilities in excess of $5,000,000 in the aggregate or (ii) have a Material Adverse Effect; or

(x)     a Change of Control shall occur; or

(y)     any Lien purported to be created under any Collateral Document or any Order shall cease to be, or shall be asserted by any Credit Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Collateral Document, Interim Financing Order or Final Financing Order, except as expressly permitted hereunder or thereunder; or any Credit Party or any other Person contests in any manner the validity or enforceability of any provision of any Credit Document or any Lien granted under the Collateral Documents and the Orders; or any Credit Party denies that it has any or further liability or obligation under any Credit Document, or purports to revoke, terminate or rescind any provision of any Credit Document or any Lien granted under the Collateral Documents and the Orders; or

(z)     any Credit Document shall not be in full force and effect; or

(aa)     (i) any Credit Party or any of its Affiliates shall (x) seek to, or support or fail to oppose any other Person's motion or pleading to, disallow or subordinate the claims of any Lender under the Credit Documents or challenge the Liens held by Collateral Agent or (y) oppose a motion by any Lender or any Agent to confirm its claims or Liens, or (ii) in any case of the foregoing, the Bankruptcy Court enters a final order granting such relief; or

(bb)     any stipulation shall be entered into by any Credit Party or any order shall be entered by the Bankruptcy Court with respect to the provision of adequate protection to any Person or the use of cash collateral by any Credit Party, in each case that is not satisfactory in form and substance to Administrative Agent in its sole and absolute discretion; or

(cc)     the Bankruptcy Court shall enter an order or orders authorizing recovery from the Collateral for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than (i) as may be provided in the Orders, (ii) de minimus amounts or (iii) with the consent of Administrative Agent; or

(dd)     the occurrence of any adverse events or failures that could result in termination of servicing rights in any Designated Servicing Agreement; or

(ee)     any default that could not by its nature be cured within any applicable grace period, event of default, early amortization event, termination event or other similar event (other than as a result of those events that customarily occur leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the

153

Cases and the continuation and prosecution thereof) shall occur under any Underlying Document and such event could reasonably be expected to be materially adverse to the rights and interests of any Agent or the Lenders; or

(ff)     any Credit Party shall assume or reject any Servicing Agreement, any Specified Servicing Agreement or any other servicing or subservicing contract relating to the Collateral pursuant to Section 365 of the Bankruptcy Code in violation of Section 6.18(d); or

(gg)     any Credit Party or AFI or any of their respective Subsidiaries shall take any action (including, without limitation, filing a motion, seeking such relief or filing a pleading in support of such action or a pleading not opposing such action in good faith) in support of any matter set forth in Section 8.01(i), (j), (k), (l), (m), (n), (o), (t), (v), (aa), (bb), (cc) or (ff) above or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(hh)     one or more Sale Orders, approving one or more Sale Agreements, that individually or collectively provide sufficient net proceeds to repay the Obligations in full in Cash are not entered by the Bankruptcy Court by the Sale Order Milestone, or the simultaneous closing of such approved Sale Agreement transaction(s) has/have not occurred by the Sale Closing Milestone; or

(ii)     (i) any order of the Bankruptcy Court authorizing the use of the cash collateral of holders of Specified Permitted Indebtedness shall cease to be in full force and effect, (ii) an order or orders of the Bankruptcy Court shall be entered reversing, staying or vacating any such order, (iii) any cash collateral termination event specified in any such order shall have occurred or (iv) any holder of Specified Permitted Indebtedness shall file a motion or pleading seeking to terminate any such use of cash collateral;

THEN, if any Event of Default occurs and is continuing, Administrative Agent may, or, at the request of the Requisite Lenders shall, take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (provided that with respect to the enforcement of Liens or other remedies with respect to the Collateral under clause (iv) below, Administrative Agent shall provide the Borrowers with at least seven (7) days' written notice prior to taking the action contemplated thereby):

(i)     declare the Commitment of each Lender to make Loans to be terminated or reduced, whereupon such commitments and obligation shall be terminated or so reduced;

(ii)     declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Credit Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Credit Parties;

(iii)     direct Collateral Agent to (and Collateral Agent shall), without notice, exercise its remedies (including sending any Activation Notices) under

154

any Deposit Account Control Agreements to block withdrawals; <u>provided</u> that Collateral Agent shall provide seven (7) days' notice before application of any amounts in such accounts to the Obligations;

(iv)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, may (and at the direction of the Requisite Lenders, shall) proceed to protect, enforce and exercise all rights and remedies (including setoff or seizure of amounts in any bank accounts that are a part of the Collateral that are maintained with or under the control of Collateral Agent, Administrative Agent or any Lender) of the Agents and Lenders under this Agreement, any of the other Credit Documents or applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Credit Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Lenders;

(v)    give on behalf of any Credit Party or Subsidiary, or direct or cause any Credit Party or any of its Subsidiaries to give (or refrain from giving) (and the Credit Parties hereby covenant to so give or refrain from giving, or cause to be given or refrained from being given), any instructions permitted to be given by such Credit Party or Subsidiary under the Underlying Documents, the Servicing Agreements and the Specified Servicing Agreements;

(vi)    take such actions on behalf of any Credit Party or Subsidiary, or direct or cause any Credit Party or any of its Subsidiaries to take such actions (or refrain from taking) (and the Credit Parties hereby covenant to so take or refrain from taking, or cause to be taken or refrained from being taken), to exercise and enforce the rights and remedies of ResCap or any of its Subsidiaries with respect to the Underlying Documents, the Servicing Agreements and the Specified Servicing Agreements in accordance with the terms thereof; and

(vii)    subject to the rights of third parties to appoint or remove a servicer of any Collateral, at the direction of the Requisite Lenders, appoint a third-party servicer for any Collateral.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or existing as of the Closing Date or thereafter existing at law or in equity or by statute or any other provision of applicable law.

Section 8.02    <u>Application of Funds</u>.  After the exercise of remedies provided for in Section 8.01, any amounts received on account of the Obligations (it being understood and agreed that in the case of any proceeds from the Junior Lien Collateral, only to the extent not required to prepay any Indebtedness secured by Liens permitted under Section 6.02(k)) shall be applied by Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to Administrative Agent and Collateral Agent and amounts payable under Article II payable to Administrative Agent and Collateral Agent), each in its capacity as such, until paid in full;

*Second*, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Revolving Lenders, until paid in full, ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Protective Advances until paid in full;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal on the Protective Advances until paid in full;

*Fifth*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Revolving Loans and fees under the Revolving Facility, until paid in full, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause *Fifth* payable to them;

*Sixth*, to payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans, until paid in full, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause *Sixth* held by them;

*Seventh*, to payment of all other Obligations in respect of the Revolving Facility (including without limitation the cash collateralization of unliquidated indemnification obligations), until paid (or cash collateralized) in full, ratably among the Agents and the Revolving Lenders of the foregoing in proportion to the respective amounts described in this clause *Seventh* held by them;

*Eighth*, to payment of all Obligations arising from Banking Services, until paid in full, ratably in proportion to the respective amounts described in this clause *Eighth* held by them;

*Ninth*, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Term A-1 Lenders, until paid in full, ratably among them in proportion to the amounts described in this clause *Ninth* payable to them;

*Tenth*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term A-1 Loans and fees under the Term A-1 Facilities, until paid in full, ratably among the Term A-1 Lenders in proportion to the respective amounts described in this clause *Tenth* payable to them;

*Eleventh*, to payment of that portion of the Obligations constituting unpaid principal of the Term A-1 Loans, until paid in full, ratably among the Term A-1 Lenders in proportion to the respective amounts described in this clause *Eleventh* held by them;

156

*Twelfth*, to payment of all other Obligations in respect of the Term A-1 Facilities (including without limitation the cash collateralization of unliquidated indemnification obligations), until paid (or cash collateralized) in full, ratably among the Term A-1 Lenders of the foregoing in proportion to the respective amounts described in this clause *Twelfth* held by them;

*Thirteenth*, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Term A-2 Lenders, until paid in full, ratably among them in proportion to the amounts described in this clause *Thirteenth* payable to them;

*Fourteenth*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term A-2 Loans and fees under the Term A-2 Facility, until paid in full, ratably among the Term A-2 Lenders in proportion to the respective amounts described in this clause *Fourteenth* payable to them;

*Fifteenth*, to payment of that portion of the Obligations constituting unpaid principal of the Term A-2 Loans, until paid in full, ratably among the Term A-2 Lenders in proportion to the respective amounts described in this clause *Fifteenth* held by them;

*Sixteenth*, to payment of all other Obligations in respect of the Term A-2 Facility (including without limitation the cash collateralization of unliquidated indemnification obligations), until paid (or cash collateralized) in full, ratably among the Term A-2 Lenders of the foregoing in proportion to the respective amounts described in this clause *Sixteenth* held by them; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Credit Parties or as otherwise required by applicable law.

If any amount remains on deposit in any Blocked Account, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

## ARTICLE IX

## CASH MANAGEMENT; COLLECTIONS

Section 9.01    Accounts; Cash Management

(a)    Prior to the Closing Date, (i) GMACM Borrower shall establish and maintain, at its sole expense, one or more deposit accounts (collectively, the "**GMACM Borrower Accounts**") into which all Collections with respect to GMACM Borrower's Mortgage Loans, Receivables and REO Property will be deposited, and (ii) RFC Borrower shall establish and maintain, at its sole expense, one or more deposit accounts (collectively, the "**RFC Borrower Accounts**" and together with GMACM Borrower Accounts, the "**Borrower Accounts**") into which all Collections with respect to RFC Borrower's Mortgage Loans, Receivables and REO Property will be deposited.  The Borrower Accounts shall be established and maintained with JPMCB, or such other bank as is acceptable to Administrative Agent (the "**Borrower Account Bank**").

157

(b)    Funds on deposit in the Borrower Accounts may be swept from time to time (without any requirement to deliver any Withdrawal Notice or satisfy the conditions precedent in Section 3.04), except during an Activation Period, to a concentration account (the "**Concentration Account**") established and maintained by ResCap at JPMCB or another bank acceptable to Administrative Agent (the "**Concentration Account Bank**").  The Concentration Account will be a segregated account into which only funds swept from the Borrower Accounts will be deposited, and no other funds of the Credit Parties will be commingled with such funds. The Concentration Account will not be subject to any Lien other than Liens described in (i) clauses (a) and (b) of Section 6.02 and (ii) clause (j) of Section 6.02 to the extent that such Lien is permitted under the Deposit Account Control Agreement governing the Concentration Account and has not been waived by the Concentration Account Bank.  Subject to Sections 3.04. ResCap will be permitted to withdraw funds from the Concentration Account and the Borrowers will be permitted to withdraw funds from the Borrower Accounts (and, following the receipt of an Activation Notice but prior to the commencement of a Dominion Period, the Collection Account) solely for the following purposes (collectively, the "**Permitted Expenditures**"): (i) at any time other than during a Dominion Period, funding Advances under Eligible Servicing Agreements, (ii) at any time other than during a Dominion Period, transferring funds to a ResCap corporate account to be used for the payment of expenses in accordance with the Approved DIP Budget (inclusive of any permitted variances), (iii) on the Closing Date, for the transfer of an amount up to $40,000,000 to an account specified by the Borrowers, such funds to be used for general corporate purposes by ResCap and its Subsidiaries, and (iv) at any time other than during a Dominion Period, to reimburse GMACM or RFC, as applicable, for any Advances under Servicing Agreements initially funded out of ResCap's corporate accounts, in each of the foregoing cases, in accordance with the Approved DIP Budget, the Credit Documents, the Cash Management Order and the Orders.

(c)    As a condition to withdrawal of any funds from the Concentration Account or any Borrower Account (other than in connection with a sweep of funds to the Concentration Account pursuant to Section 9.01(b)), or, following the receipt of an Activation Notice but prior to the commencement of a Dominion Period, the Collection Account, the Primary Credit Parties shall deliver to Administrative Agent a fully executed Withdrawal Notice no later than 11:00 a.m. (New York City time) on the proposed Withdrawal Date, or such later time on the proposed Withdrawal Date agreed to by Administrative Agent in its sole discretion but in any event no later than 1:00 p.m. (New York City time), and all conditions precedent in Section 3.04 shall have been satisfied prior to any such withdrawal of funds on the applicable Withdrawal Date.

(i)    Upon the occurrence of an Activation Trigger Event that is continuing, Administrative Agent may, or, at the request of the Requisite Lenders shall, direct Collateral Agent to send, and Collateral Agent shall promptly send, a notice (an "**Activation Notice**") to the Borrower Account Bank and the Concentration Account Bank commencing a period of exclusive control by Collateral Agent.  After the delivery of an Activation Notice, the Borrowers shall not withdraw funds from the Borrower Accounts and ResCap shall not withdraw funds from the Concentration Account and all funds will be swept daily to the Collection Account as provided in Sections 9.01(e)(ii) and (iii).

158

(ii)    After the delivery of an Activation Notice, Administrative Agent shall determine, upon receipt of the Withdrawal Notice, whether the conditions precedent set forth in Section 3.04 have been satisfied and shall promptly either (x) deliver a Withdrawal Direction Letter to Collateral Agent directing Collateral Agent to instruct the Collection Account Bank to remit the funds from the Collection Account as requested pursuant to the Withdrawal Notice or (y) advise the Borrowers that the conditions precedent in Section 3.04 have not been satisfied and that the requested withdrawal shall not be permitted.

(d)    During a Dominion Period, the Primary Credit Parties agree that all payments made to the Borrower Accounts and funds on deposit therein and in the Concentration Account and the Collection Account and other funds received and collected by any Agent or any Lender, whether constituting Collections, other proceeds of First Lien Collateral or otherwise shall be treated as payments to Administrative Agent, Lenders and other Secured Parties in respect of the Obligations and therefore shall constitute the property of Administrative Agent, the Lenders and the other Secured Parties to the extent of the then outstanding Obligations.

(e)    Each Credit Party shall maintain a cash management system that is acceptable to Administrative Agent (the "**Cash Management System**"), it being understood and agreed that the existing cash management system maintained at JPMCB as of the Closing Date is acceptable to Administrative Agent.  The Cash Management System shall contain, among other things, the following:

(i)    The Borrowers shall establish and maintain the Borrower Accounts and ResCap shall establish and maintain the Concentration Account as set forth in Sections 9.01(a) and (b).  The Borrower Accounts and the Concentration Account will be subject to Deposit Account Control Agreements in favor of Collateral Agent, pursuant to which the applicable Account Bank shall agree that, from and after the receipt of an Activation Notice from Collateral Agent, at the direction of Administrative Agent (which Activation Notice may only be given in accordance with Section 9.01(c)(i) or 9.01(e)(iii)), such Account Bank shall comply exclusively with the directions and instructions of Collateral Agent with respect to the Deposit Accounts subject to such Deposit Account Control Agreement.

(ii)    Either GMACM Borrower or RFC Borrower, at its sole expense, shall establish and maintain a deposit account (the "**Collection Account**" and, collectively with the Borrower Accounts and the Concentration Account, the "**Blocked Accounts**") with JPMCB, or such other bank as is acceptable to Administrative Agent (the "**Collection Account Bank**").  All funds in the Borrower Accounts and the Concentration Account will be swept daily during an Activation Period to the Collection Account, and during a Dominion Period upon not less than seven (7) days' prior written notice to Borrowers from Collateral Agent (at the direction of Administrative Agent), applied to outstanding Obligations in accordance with Section 8.02.  The Collection Account will be subject to the sole dominion and control of Collateral Agent pursuant to a Deposit Account Control Agreement duly authorized, executed and delivered by the applicable Borrower and the Collection Account Bank.

159

(iii)    At any time after entry of the Final Financing Order, upon the occurrence of an Event of Default that is continuing, Administrative Agent may, or at the request of the Requisite Lenders shall, direct Collateral Agent to send, and Collateral Agent shall promptly send, an Activation Notice to the Borrower Account Bank and the Concentration Account Bank commencing a Dominion Period and further direct the Borrower Account Bank and the Concentration Account Bank to forward and sweep daily all amounts in the Borrower Accounts and the Concentration Account, respectively, to the Collection Account.

(iv)    Other than the Borrower Accounts and the Collection Account, Borrowers shall not establish any bank accounts, deposit accounts, checking accounts, money market funds, certificates of deposit or other similar accounts or financial instruments accounts after the Closing Date without the prior written consent of Administrative Agent. Any such account established by Borrowers with such consent shall be subject to a control agreement satisfactory to Administrative Agent and Collateral Agent, duly authorized, executed and delivered by such Borrower and by the bank where such account is maintained.

(f)    The Credit Parties and their respective directors, employees, agents and Affiliates shall, acting as trustee for Collateral Agent, for the benefit of the Secured Parties, receive, as the property of Collateral Agent, for the benefit of the Secured Parties, any monies, checks, notes, drafts or any other payments relating to and/or proceeds of First Lien Collateral which come into their possession or under their control and immediately upon receipt thereof, shall deposit or cause the same to be deposited in a Borrower Account. The Credit Parties agree to reimburse Collateral Agent on demand for any amounts owed or paid to any bank at which a Blocked Account is established or any other bank or Person involved in the transfer of funds to or from the Blocked Accounts arising out of Collateral Agent's payments to or indemnification of such bank or Person.

Section 9.02    <u>Daily Deposits of Receivables Proceeds</u>. Each Servicer shall remit to a GMACM Borrower Account or an RFC Borrower Account, as applicable, all Collections collected by such Servicer pursuant to any Designated Servicing Agreement, no later than two (2) Business Days after collection thereof by such Servicer; <u>provided</u>, <u>however</u>, that if a Designated Servicing Agreement requires the related Servicer to remit any such amounts constituting Receivables Proceeds that constitute Advance Reimbursement Amounts to an MBS Trust Collection Account, the Servicer shall deposit such Collections to such account no later than two (2) Business Days after collection thereof by the Servicer, and shall cause such amounts to be remitted directly from such MBS Trust Collection Account to the applicable Borrower Account no later than two (2) Business Days after such amounts are deposited into the MBS Trust Collection Account. Advance Reimbursement Amounts received in connection with the liquidation of any Serviced Loan shall be deemed to have been applied to reimburse all outstanding T&I Advances with respect to such Serviced Loan, before being applied to reimburse P&I Advances or Corporate Advances with respect to such Serviced Loan. Notwithstanding the foregoing, after a Servicer shall have remitted to the applicable Borrower Account Advance Reimbursement Amounts in respect of P&I Advances made under a Designated Servicing Agreement in an amount sufficient to reimburse all P&I Advances that were made under such Designated Servicing Agreement using funds other than Amounts Held

160

for Future Distribution, such Servicer may leave additional Advance Reimbursement Amounts collected with respect to such Designated Servicing Agreement in the related MBS Trust Collection Account and use such funds to reimburse Amounts Held for Future Distribution as required by Section 9.03 below.

Section 9.03    Restoration of Amounts Held for Future Distribution.  Pursuant to certain Designated Servicing Agreements, each Servicer may remit amounts held for distribution to the MBS Trustee in a future month ("**Amounts Held for Future Distribution**") on deposit in each MBS Trust Collection Account, to the related MBS Trustee as part of such Servicer's monthly P&I Advances required under the related Designated Servicing Agreement.  Each Servicer shall deposit the full amount of any Amount Held for Future Distribution with respect to each Designated Servicing Agreement that were so used by such Servicer, in any month, back into the related MBS Trust Collection Account, to the extent not restored already out of Advance Reimbursement Amounts, by no later than the date on which such Servicer is required to remit such amount to the related MBS Trustee under the related Designated Servicing Agreement.  If a Servicer fails to restore any such Amount Held for Future Distribution at the time when it is required to do so pursuant to this Section 9.03, and does not correct such failure within one (1) Business Day, then such Servicer covenants hereunder that it shall no longer use any Amounts Held for Future Distribution in making any of its P&I Advances at any time on or after such failure.

# ARTICLE X

# AGENTS

Section 10.01    Appointment and Authorization of Agents.  Each Lender hereby irrevocably appoints (subject to Section 10.07) Barclays to act on its behalf as Administrative Agent hereunder and under the other Credit Documents and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each Lender hereby irrevocably appoints (subject to Section 10.07) Barclays Bank PLC to act on its behalf as Collateral Agent hereunder and under the other Credit Documents and authorizes Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article X are solely for the benefit of the Agents and the Lenders, and the Borrowers shall not have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Credit Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Section 10.02    Rights as a Lender.  Any Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same rights and powers as though it were not an Agent hereunder, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person

serving as such Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, Borrowers or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

Section 10.03  Exculpatory Provisions.

(a)    No Agent shall have any duties or obligations except those expressly set forth herein and in the other Credit Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, no Agent shall: (i) be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing; (ii) have any duty to take any discretionary action or exercise any discretionary powers, except (in the case of Administrative Agent) discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that Administrative Agent is required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and (iii) except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by such Agent or any of its Affiliates in any capacity.

(b)    No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 12.05), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless and until such Agent shall have received written notice from a Lender or a Borrower (or in the case of any Agent other than Administrative Agent, written notice from Administrative Agent) referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."

(c)    No Agent or any of its Related Parties (collectively, "**Agent-Related Persons**") shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article III

162

or elsewhere herein, other than (in the case of Administrative Agent or Collateral Agent) to confirm receipt of items expressly required to be delivered to it.

Section 10.04  <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to any Credit Extension that by its terms shall be fulfilled to the satisfaction of a Lender, Agents may presume that such condition is satisfactory to such Lender unless Administrative Agent shall have received notice to the contrary from such Lender prior to any such Credit Extension.  Each Agent may consult with legal counsel (who may be counsel for the Borrowers and their Subsidiaries), independent accountants and other experts and professional advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts or professional advisors.

Section 10.05  <u>Delegation of Duties</u>.  Each Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article X shall apply to any such sub-agent and to the respective Related Parties of such Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Credit Facilities as well as activities as Administrative Agent, Collateral Agent or Syndication Agent, as applicable.  No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 10.06  <u>Indemnification of Agents</u>.  Whether or not the transactions contemplated hereby are consummated, each Lender shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of the Borrowers and without limiting the obligations of any Credit Party to do so) on a pro rata basis (determined as of the time that the applicable payment is sought based on each Lender's ratable share at such time) and hold harmless each Agent-Related Person against any and all Indemnified Liabilities incurred by it, including, without limitation, with respect to indemnities or other similar amounts payable by Administrative Agent or Collateral Agent to or on behalf of any other agent, sub-agent, appraiser or third party; <u>provided</u> that no Lender shall be liable for payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent determined in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from such Agent-Related Person's own gross negligence or willful misconduct (and no action taken in accordance with the directions of the Requisite Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 10.06).  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 10.06 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

Without limitation of the foregoing, each Lender shall reimburse Administrative Agent, Collateral Agent and Syndication Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by such Agent in connection with preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights and responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such costs or expenses by or on behalf of Borrowers.

To the extent required by any applicable law, Administrative Agent may withhold from any payment to any Lender an amount equivalent to any U.S. federal income Tax. If the IRS or any other Governmental Authority asserts a claim that Administrative Agent did not properly withhold U.S. federal income Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, U.S. federal income Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Tax or otherwise, including any penalties or interest and together with all reasonable costs and out-of-pocket expenses (including reasonable fees and expenses of counsel) incurred in connection therewith.

Section 10.07 <u>Resignation or Removal of Administrative Agent and Collateral Agent</u>.

(a)    Administrative Agent may resign as Administrative Agent upon thirty (30) days' notice to the Lenders and the Borrowers.  In addition, Administrative Agent may be removed at the written direction of the holders (other than Administrative Agent, in its capacity as a Lender) of 66 2/3% or more of the Aggregate Credit Exposure (excluding Administrative Agent's Credit Exposure, in its capacity as a Lender, if any).  Upon any such removal or upon receipt of any such notice of resignation, the Requisite Lenders shall appoint from among the Lenders a successor agent (which may be an Affiliate of a Lender), with the consent of the Borrowers at all times other than during the existence of an Event of Default (which consent shall not be unreasonably withheld or delayed).  If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment prior to the effective date of the removal or resignation of Administrative Agent, then Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on such effective date and such removal shall become effective on such effective date, where (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations under this Agreement and under the other Credit Documents and (ii) all payments, communications and determinations provided to be made by, to or through Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Requisite Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to

164

and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent, and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents.  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring or removed Administrative Agent's resignation or removal, as applicable, hereunder and under the other Credit Documents, the provisions of this Article X and Sections 12.02 and 12.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

(b)    Collateral Agent may resign as Collateral Agent upon thirty (30) days' notice to the Lenders and the Borrowers.  In addition, Collateral Agent may be removed at the written direction of the holders (other than Collateral Agent, in its capacity as a Lender) of 66 2/3% or more of the Aggregate Credit Exposure (excluding Collateral Agent's Credit Exposure, in its capacity as a Lender, if any).  Upon any such removal or receipt of any such notice of resignation, the Requisite Lenders shall have the right to appoint a successor collateral agent (which may be a Lender or an Affiliate of a Lender), with the consent of the Borrowers at all times other than during the existence of an Event of Default (which consent shall not be unreasonably withheld or delayed).  If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment prior to the effective date of the resignation or removal of Collateral Agent, then Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Collateral Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on such effective date and such removal shall become effective on such effective date, where (i) the retiring or removed Collateral Agent shall be discharged from its duties and obligations under this Agreement and under the other Credit Documents (except that in the case of any collateral security held by Collateral Agent on behalf of the Lenders under any of the Credit Documents, the retiring or removed Collateral Agent may (but shall not be obligated to) continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through Collateral Agent shall instead be made by or to each Lender directly, until such time, if any, as the Requisite Lenders appoint a successor Collateral Agent as provided for above.  Upon the acceptance of a successor's appointment as Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Collateral Agent, and the retiring or removed Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents.  The fees payable by Borrowers to a successor Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring or removed Collateral Agent's resignation or removal hereunder and under the other Credit Documents, the provisions of this Article X and Sections 12.02 and 12.03 shall continue in effect for the benefit of such retiring or removed Collateral Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Collateral Agent was acting as Collateral Agent.

Section 10.08  <u>Non-Reliance on Agents and Other Lenders</u>.  Each Lender acknowledges that it has, independently and without reliance upon any Agent-Related Person or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Credit Documents.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent-Related Person or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

Section 10.09  <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to the Credit Parties, including the Cases, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on any Credit Party) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, Administrative Agent and other Secured Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, Administrative Agent and other Secured Parties and their respective agents and counsel and all other amounts due to the Lenders, Administrative Agent and other Secured Parties under Sections 2.11, 12.02 and 12.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders or other Secured Parties, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Sections 2.11, 12.02 and 12.03.

Section 10.10  <u>Collateral Documents and Guaranty</u>.

(a)    <u>Agents under Collateral Documents and Guaranty</u>.  Each Secured Party hereby further authorizes Administrative Agent and Collateral Agent, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral and the Collateral Documents.  Subject to Section 12.05, without further written consent or authorization from any Secured Party, each of Administrative Agent and Collateral Agent may execute any documents or instruments necessary to (i) release

166

any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 12.05) have otherwise consented or (ii) release any Guarantor from the Guaranty pursuant to Section 7.11 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 12.05) have otherwise consented.

(b)    Right to Realize on Collateral and Enforce Guaranty.  Anything contained in any of the Credit Documents to the contrary notwithstanding, Borrowers, Administrative Agent, Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale.

## ARTICLE XI

## RECEIVABLES CUSTODIAN; VERIFICATION AGENT

Section 11.01  Receivable Files.

(a)    Administrators as Receivables Custodian.  To reduce administrative costs, Collateral Agent, on behalf of the Lenders, upon the execution and delivery of this Agreement, appoints the Administrators, and each Administrator accepts such appointment, to act as the agent (each such Person, acting in such capacity, a "**Receivables Custodian**" hereunder) of Collateral Agent as custodian for the benefit of the Lenders of the following documents (collectively referred to as the "**Receivable File**") relating to each Receivable attributable to such Person:

(i)    a copy of the related Designated Servicing Agreement and each amendment and modification thereto;

(ii)    any other documents received from or made available by the related MBS Trustee, Servicer, securities administrator or other similar party in respect of such Receivable; and

(iii)    any and all other documents that the Primary Credit Parties, as the case may be, shall keep on file, in accordance with their customary procedures, relating to such Receivable or the related MBS Trust.

167

In the event any of RFC or GMACM is terminated or resigns as the Servicer under any Designated Servicing Agreement, it will immediately upon such termination or resignation, as applicable, deliver all documents held by it hereunder to Collateral Agent or the successor Servicer.

(b)     Marking of Records.  The Administrator shall ensure that, from and after the time of sale and conveyance of Receivables originated under a Designated Servicing Agreement to a Borrower under a Receivables Purchase Agreement and the time of sale and/or contribution of Receivables to a Borrower under a Receivables Pooling and Purchase Agreement, and the pledge thereof to Collateral Agent pursuant to the Collateral Documents, any records (including any computer records and back-up archives) maintained by or on behalf of the related Servicer that refer to any Receivable indicate clearly the interest of the Borrowers and the security interest of Collateral Agent in such Receivable and that such Receivable is owned by the applicable Borrower and subject to Collateral Agent's security interest.  Indication of the applicable Borrower's ownership of a Receivable and the security interest of Collateral Agent shall be deleted from or modified on such records when, and only when, such Receivable has been paid in full, repurchased, or assigned by the applicable Borrower and released by Collateral Agent from its security interest.

Section 11.02   Duties of Receivables Custodian with Respect to the Receivables Files.

(a)     Safekeeping.  Each Person acting as a Receivables Custodian pursuant to Section 11.01, shall hold the portion of the Receivable Files, as applicable, that it is required to maintain under Section 11.01 in its possession from time to time for the use and benefit of the Lenders, and maintain such accurate and complete accounts, records and computer systems pertaining to each Receivable File as shall enable Collateral Agent and the Administrator to comply with this Agreement.  Each Receivables Custodian shall act with reasonable care, using that degree of skill and attention that it would exercise with respect to the receivable files for comparable receivables that such Receivables Custodian owns for itself (whether or not the Receivables Custodian shall then own such comparable receivables for itself). Each Receivables Custodian shall promptly report to Collateral Agent any failure on its part to hold the Receivable Files and maintain its accounts, records and computer systems as herein provided and promptly take appropriate action to remedy any such failure.

(b)     Maintenance of and Access to Records.  Each Receivables Custodian shall maintain the Receivable File that it is required to maintain under this Agreement at its offices at 1100 Virginia Drive, Fort Washington, PA 19034, or at such other office as shall be specified to Collateral Agent by thirty (30) days' prior written notice.  The Receivables Custodians shall make available to Collateral Agent, Administrative Agent, the Borrowers, the Administrator and any Lender or their duly authorized representatives, attorneys or auditors each Receivable File, as applicable, and the accounts, records and computer systems maintained with respect thereto upon not less than two (2) Business Days' prior written notice for examination during normal business hours and in a manner that does not unreasonably interfere with such Receivables Custodian's ordinary conduct of business.

Section 11.03   Removal and Replacement of Verification Agent.

(a)    Removal.  Administrative Agent may, in its discretion, direct the Primary Credit Parties to, and the Primary Credit Parties shall promptly upon being so directed, exercise their rights to terminate the Verification Agency Agreement in accordance with its terms.

(b)    Replacement.  Upon any termination of the Verification Agency Agreement, the Primary Credit Parties shall enter into an agreement with a successor Verification Agent selected by Administrative Agent in consultation with the Borrowers.

# ARTICLE XII

## MISCELLANEOUS

Section 12.01  Notices.

(a)    Notices Generally.  Unless otherwise expressly provided herein, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier to the applicable party hereto, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as provided in Appendix B.  Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in Section 12.01(b) below shall be effective as provided therein.

(b)    Electronic Communications.

(i)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified Administrative Agent that it is incapable of receiving, or is unwilling to receive, notices under Article II by electronic communication. Administrative Agent, Collateral Agent or the Borrowers may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by them; provided that approval of such procedures may be limited to particular notices or communications.

(ii)    Unless Administrative Agent otherwise prescribes, (x) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); and (y) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at

169

its e-mail address as described in clause (x) above, of notification that such notice or communication is available and identifying the website address therefor; provided that, in the case of clauses (x) and (y) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(iii)    Each of the Credit Parties and the Lenders understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(c)    Change of Address, etc.  Each Borrower, Administrative Agent and Collateral Agent may change its address, telecopier number, telephone number or electronic mail address for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier number, telephone number or electronic mail address for notices and other communications hereunder by notice to Borrowers and Administrative Agent.  In addition, each Lender agrees to notify Administrative Agent from time to time to ensure that Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire transfer instructions for such Lender.

(d)    Public Side Information Contacts.  The Credit Parties acknowledge that certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to any Credit Party or its Affiliates, or the respective securities of any of the foregoing.  Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including the U.S. federal and state securities laws, to make reference to materials and/or information provided by or on behalf of the Borrowers and their Related Parties ("**Borrower Materials**") that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to a Borrower or its securities for purposes of the U.S. federal or state securities laws.  In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrowers nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Credit Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use, such information.

(e)    Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT-RELATED PERSONS DO NOT WARRANT THE

ACCURACY OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE
PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN
THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED
OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF
MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT
OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE
DEFECTS, IS MADE BY ANY AGENT-RELATED PERSON IN CONNECTION WITH THE
BORROWER MATERIALS OR THE PLATFORM.  In no event shall any Agent-Related
Person have any liability to the Borrowers, any Lender or any other Person or entity for losses,
claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise)
arising out of the Borrowers' or Administrative Agent's transmission of Borrower Materials
through the Platform, except to the extent that such losses, claims, damages, liabilities or
expenses are determined by a court of competent jurisdiction by an final and nonappealable
judgment to have resulted from the gross negligence or willful misconduct of such Agent-
Related Person; provided that in no event shall any Agent-Related Person have any liability to
the Borrowers, any Lender or any other Person for indirect, special, incidental, consequential
damages or punitive damages (as opposed to direct or actual damages).  Each of the Credit
Parties, the Lenders and the Agents agree that Administrative Agent may, but shall not be
obligated to, store any Approved Electronic Communications on the Platform in accordance with
Administrative Agent's customary document retention procedures and policies.

(f)    Reliance by Administrative Agent, Collateral Agent and Lenders.
Administrative Agent, Collateral Agent and the Lenders shall be entitled to rely and act upon any
notices (including telephonic funding requests and other telephonic notices) purportedly given by
or on behalf of Borrowers even if (i) such notices were not made in a manner specified herein,
were incomplete or were not preceded or followed by any other form of notice specified herein
or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.
Borrowers shall indemnify Administrative Agent, Collateral Agent, each Lender and the Related
Parties of each of them for all losses, costs, expenses and liabilities resulting from the reliance of
such Person on each notice purportedly given by or on behalf of the Borrowers.  All telephonic
notices to and telephonic communications with any Agent may be recorded by such Agent, and
each of the parties hereby consents to such recording.

Section 12.02  Expenses.  Borrowers agree to promptly or reimburse (a) all the
reasonable out-of-pocket costs and expenses incurred by Administrative Agent and other Agents
in connection with the syndication of the Credit Facilities, the preparation, negotiation, execution,
delivery and administration of this Agreement and the other Credit Documents (including, for the
avoidance of doubt, fees and expenses payable by Administrative Agent or Collateral Agent to
any other agent, sub-agent, appraiser or other third party in connection therewith), or any
amendments, modifications or waivers of the provisions hereof or thereof (whether or not the
transactions contemplated hereby or thereby shall be consummated), including the reasonable
fees, charges and disbursements of counsel and (b) all out-of-pocket costs and expenses incurred
by Administrative Agent, the other Agents and each Lender (including the fees, charges and
disbursements of any counsel for Administrative Agent, the other Agents and any Lender) in
connection with the enforcement or protection of any rights and remedies under this Agreement
and the other Credit Documents, including all such costs and expenses incurred during any legal
proceeding, including the Cases and any other proceeding under any Debtor Relief Law, and

171

including in connection with any workout, restructuring or negotiations in respect of the Credit Extensions and the Credit Documents, including the reasonable fees, charges and disbursements of counsel.

Section 12.03  Indemnity.

(a)    Indemnification by Credit Parties.  Each Credit Party shall indemnify Administrative Agent (and any sub-agent thereof), each other Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims, demands, actions, judgments, suits, costs (including settlement costs and costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity or remedy any violation of Environmental Law and indemnities or other similar amounts payable by Administrative Agent or Collateral Agent to or on behalf of any other agent, sub-agent, appraiser or third party), disbursements and out-of-pocket fees and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee and indemnities or other similar amounts payable by Administrative Agent or Collateral Agent to or on behalf of any other agent, sub-agent, appraiser or third party) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted or awarded against any Indemnitee, whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, in each case other than Taxes, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any way relating to or arising out of or in connection with or by reason of (i) any actual or prospective claim, litigation, investigation or proceeding in any way relating to, arising out of, in connection with or by reason of any of the following, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation or proceeding): (x) the execution, delivery, enforcement, performance or administration of this Agreement, any other Credit Document or any other document delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby or (y) any Commitment, any Credit Extension or the use or proposed use thereof or of the proceeds thereof; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, fees and expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee; or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of ResCap, any of its Subsidiaries or any of their respective predecessors ((i) and (ii), collectively, the "**Indemnified Liabilities**"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of such Indemnitee and regardless of whether such Indemnitee is a party thereto, and whether or not any such claim, litigation, investigation or proceeding is brought by any Credit Party, its equity holders, Affiliates, creditors or any other Person.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 12.03 may be unenforceable in whole or in part because they are violative of any law or public

172

policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.  This Section 12.03(a) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(b)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, the Credit Parties shall not assert, and each Credit Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Credit Document or any other document contemplated thereby, the transactions contemplated thereby, any Commitment or any Credit Extension, the use thereof or of the proceeds thereof or such Indemnitee's activities in connection therewith (whether before or after the Closing Date); provided that such waiver of special, indirect, consequential or punitive damages shall not limit the indemnification obligations of the Credit Parties under this Section 12.03.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials obtained through any Platform or other information transmission systems in connection with the Credit Documents or the transactions contemplated thereby unless determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)    Payments.  All amounts due under this Section 12.03 shall be payable in full in Dollars, promptly after demand therefor by the relevant Person entitled thereto, without deduction for any variation in any Rate of Exchange.

(d)    Notification and Defense.  Promptly after any Indemnitee shall have been served with the summons or other first legal process or shall have received written notice of the threat of a claim in respect of which a claim for indemnity may be made against the Credit Parties under this Section 12.03, such Indemnitee shall notify Borrowers and Administrative Agent in writing of the service of such summons, other legal process or written notice, giving information therein as to the nature and basis of the claim, but failure so to notify such Persons shall not relieve any Credit Party from any liability which it may have hereunder or otherwise.  The applicable Credit Party or Credit Parties will be entitled, at its own expense, to participate in the defense of any such claim or action and, to the extent that it may wish, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnitee, and, after notice from any Credit Party to such Indemnitee that such Credit Party wishes to assume the defense of any such action, the Credit Parties will not be liable to such Indemnitee under this Section 12.03 for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense of any such action unless (1) the defendants in any such action include both such Indemnitee and any Credit Party, and such Indemnitee (upon the advice of counsel) shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to any Credit Party, or one or more Indemnitees, and which in the reasonable judgment of such counsel are sufficient to create a conflict of interest for the same counsel to represent both the Credit Parties and such Indemnitee, (2) the Credit Parties shall not have employed counsel reasonably satisfactory to such Indemnitee to represent such Indemnitee within a reasonable time after notice of commencement of the action,

173

or (3) the Credit Parties have authorized the employment of counsel for such Indemnitee at the expense of the Credit Parties, then, in any such event, such Indemnitee shall have the right to employ its own counsel in such action, and the reasonable fees and expenses of such counsel shall be borne by the Credit Parties; provided, however, that the Credit Parties shall not in connection with any such action or separate but substantially similar or related actions arising out of the same general allegations or circumstances, be liable for any fees and expenses of more than one firm of attorneys at any time for all Indemnitees. Each Indemnitee, as a condition of the indemnity agreement contained herein, shall use its commercially reasonable efforts to cooperate with the Credit Parties in the defense of any such action or claim. The Credit Parties shall not, without the prior written consent of any Indemnitee, effect any settlement of any pending or threatened proceeding in respect of which such Indemnitee is or could have been a party and indemnity could have been sought hereunder by such Indemnitee, unless such settlement includes an unconditional release of such Indemnitee from all liability on claims that are the subject matter of such proceeding or threatened proceeding.

(e)    Judgment Currency. The Credit Parties hereby agree to jointly and severally indemnify the Agents against any losses, damages, penalties, costs, expenses or disbursements of any kind or nature whatsoever, including, without limitation, attorney's fees and expenses, incurred by any Agent as a result of any judgment or order being given or made for the amount due hereunder and such judgment or order being expressed and paid in a currency (the "**Judgment Currency**") other than Dollars and as a result of any variation as between (i) the rate of exchange at which the dollar amount is converted into Judgment Currency for the purpose of such judgment or order, and (ii) the Rate of Exchange at which such Agent is then able to purchase Dollars with the amount of the Judgment Currency actually received by such Agent. The indemnity set forth in this Section 12.03(e) shall constitute a separate and independent obligation of the Credit Parties, shall continue in full force and effect notwithstanding any such judgment or order as aforesaid, and shall survive the termination or assignment of this Agreement and the resignation or removal of any Agent.

Section 12.04  Set Off.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency, but excluding any Blocked Accounts or funds on deposit therein) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender or any such Affiliate, to or for the credit or the account of Borrowers, but excluding any Blocked Accounts or funds on deposit therein, against any and all of the obligations of Borrowers existing as of the Closing Date or thereafter existing under this Agreement or any other Credit Document to such Lender or such Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Credit Document and although such obligations of Borrowers may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to Administrative Agent for further application in accordance with the provisions of Article II and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Administrative Agent, the Lenders and the other Secured Parties and (y) such

174

Defaulting Lender shall provide promptly to Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and their respective Affiliates under this Section 12.04 are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have; provided that if any Blocked Account is maintained with any Lender or any Affiliate of such Lender, such Lender hereby waives any right of setoff with respect to such Blocked Account, except to the extent otherwise provided in the applicable Deposit Account Control Agreement.  Each Lender agrees to notify Borrowers and Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.05  Amendments and Waivers.

(a)    No Waiver; Remedies Cumulative; Enforcement.  No failure or delay by any Agent or any Lender in exercising any right, remedy, power or privilege hereunder or under any other Credit Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such a right remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right remedy, power or privilege.  The rights, remedies remedy, powers and privileges of the Agents and the Lenders hereunder and under the Credit Documents are cumulative and are not exclusive of any rights, remedies, powers or privileges that any such Person would otherwise have.

Notwithstanding anything to the contrary contained herein or in any other Credit Document, the authority to enforce rights and remedies hereunder and under the other Credit Documents against Borrowers shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Administrative Agent in accordance with Section 8.01 for the benefit of all Lenders; provided that the foregoing shall not prohibit (i) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as such Agent) hereunder and under the other Credit Documents, (ii) any Lender from exercising setoff rights in accordance with Section 12.04 (subject to the terms of Article II), (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to Borrowers under any Debtor Relief Law or (iv) Collateral Agent from exercising all its powers, rights and remedies hereunder and under any other Credit Document to which it is a party; provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Credit Documents, then (x) the Requisite Lenders shall have the rights otherwise provided to Administrative Agent pursuant to Section 8.01 and (y) in addition to the matters set forth in clauses (ii) and (iii) of the preceding proviso and subject to Article II, any Lender may, with the consent of the Requisite Lenders, enforce any rights or remedies available to it and as authorized by the Requisite Lenders.

(b)    Amendments, Etc.  Except as otherwise expressly set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Credit Document, and no consent to any departure by Borrowers therefrom, shall be effective unless in writing executed by Borrowers and the Requisite Lenders, and acknowledged by Administrative Agent, or by Borrowers and Administrative Agent with the consent of the Requisite Lenders, and

175

each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no such amendment, waiver or consent shall:

(i)    extend or increase any Commitment of any Lender without the written consent of such Lender (other than any Sponsor Affiliated Lender); provided that Administrative Agent may make Protective Advances as set forth in Section 2.12 (it being understood that a waiver of any condition precedent set forth in Article III or the waiver of any Default or Event of Default shall not constitute an extension or increase of any Commitment of any Lender);

(ii)    reduce the principal of, rate of interest specified herein on, any Loan, or any fees or other amounts payable hereunder or under any other Credit Document, without the written consent of each Lender (other than any Sponsor Affiliated Lender) directly and adversely affected thereby (provided that only the consent of the Requisite Lenders shall be necessary to amend the definition of "Default Rate" or to waive the obligation of the Borrowers to pay interest at the Default Rate);

(iii)    postpone or extend any date (including, without limitation, the Termination Date) scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Credit Document, or reduce the amount of, waive or excuse any such payment, without the written consent of each Lender (other than any Sponsor Affiliated Lender) directly and adversely affected thereby;

(iv)    modify the definition of "Pro Rata Share" or pro rata sharing requirements of the Credit Documents, without the written consent of each Lender (other than any Sponsor Affiliated Lender);

(v)    permit any Credit Party to assign its rights under the Credit Facilities, without the written consent of each Lender (other than any Sponsor Affiliated Lender);

(vi)    release or limit the liability of any Guarantor, except as otherwise permitted in the Credit Documents, without the written consent of each Lender (other than any Sponsor Affiliated Lender);

(vii)    modify the payment priorities set forth in Section 2.13(a), Section 2.14, Section 2.15(a), Section 8.02 or Section 9.01, without the written consent of each Lender (other than any Sponsor Affiliated Lender);

(viii)    change any provision of this Section 12.05 or the percentage in the definition of "Requisite Lenders," "Requisite Revolving Lenders," "Requisite Term Lenders," "Supermajority Revolving Lenders," "Supermajority Term A-1 Lenders," "Supermajority Term A-2 Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender (other than any Sponsor Affiliated Lender);

176

(ix)    amend the financial covenants in Section 6.07 and any defined terms used therein, without the written consent of the Requisite Revolving Lenders and the Requisite Term Lenders;

(x)    directly or indirectly, whether by amendment, waiver or otherwise, increase the advance rates set forth in the definition of "Borrowing Base" or amend the definition of "A-1/Revolver Trigger Advance Rate" or any defined terms used in such definition, without the written consent of each Revolving Lender (other than any Sponsor Affiliated Lender) and each Term A-1 Lender (other than any Sponsor Affiliated Lender);

(xi)    make any other amendments to the definition of "Borrowing Base" or any other defined terms used in such definition or any amendments to Section 2.24, in a manner adverse to the interests of the Lenders or in a manner that would make more credit available to Borrowers, without the written consent of the Supermajority Revolving Lenders and the Supermajority Term A-1 Lenders;

(xii)    directly or indirectly, whether by amendment, waiver or otherwise, increase the advance rates set forth in the definition of "Collateral Amount" or amend the definition of "A-2 Trigger Advance Rate" or any defined terms used in such definition, without the written consent of each Term A-2 Lender (other than any Sponsor Affiliated Lender);

(xiii)    make any other amendments to the definition of "Collateral Amount" or any other defined terms used in such definition or any amendments to Section 2.24, in a manner adverse to the interests of the Lenders or in a manner that would make more credit available to Borrowers, without the written consent of the Supermajority Term A-2 Lenders;

(xiv)    with respect to any Revolving Loan made after the Closing Date or any withdrawal made on any Withdrawal Date, amend or waive any condition set forth in Section 3.02, 3.03 or 3.04, as applicable, without the written consent of each Revolving Lender (other than any Sponsor Affiliated Lender);

(xv)    amend any provisions related to asset sales or a sale process set forth in Sections 3.01(q), 4.35(b), 5.39, 6.08, 8.01(q) or 8.01(r), and in each case, any defined terms used therein, without the written consent of the Requisite Revolving Lenders and the Requisite Lenders;

(xvi)    release all or substantially all of the Collateral, without the written consent of each Lender (other than any Sponsor Affiliated Lender);

(xvii)    amend any provision of this Agreement or any other Credit Document (other than any such provision referred to in any other subsection of this Section 12.05(b)) such that the amendment by its terms would adversely affect the rights of any Class of Loans and/or Commitments in respect of payments under the Credit Documents in a manner different than such amendment affects other Classes, without the written consent of Lenders holding a majority of outstanding Loans and Commitments of

177

such Class (in any such case, less the aggregate Credit Exposure of such Class and unused Commitments of such Class held by any Sponsor Affiliated Lender at such time); or

(xviii)  with respect to any Delayed Draw Term A-1 Loan made after the Closing Date, amend or waive any condition set forth in Section 3.03 or 3.05 without the written consent of each Delayed Draw Term A-1 Lender (other than any Sponsor Affiliated Lender);

provided, further, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights or duties hereunder or under any other Credit Document of Administrative Agent, unless in writing executed by Administrative Agent, in each case in addition to Borrowers and the Lenders as required above; provided, further, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights or duties hereunder or under any other Credit Document of any other Agent, unless in writing executed by such Agent, in each case in addition to Administrative Agent, Borrowers and the Lenders as required above.

Notwithstanding anything herein to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that (x) the Commitment of any Defaulting Lender may not be increased or extended, or the maturity of any of its Loan may not be extended, the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, waiver or consent requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender.

In addition, notwithstanding anything in this Section 12.05 to the contrary, if Administrative Agent (or, in the case of any Collateral Documents, Collateral Agent) and the Borrowers shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Credit Documents, then Administrative Agent (or, in the case of any Collateral Documents, Collateral Agent) and Borrowers shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Credit Document if the same is not objected to in writing by the Requisite Lenders to Administrative Agent within ten (10) Business Days following receipt of notice thereof.

(c)      Sponsor Affiliated Lender.  Notwithstanding anything to the contrary contained in this Agreement or any other Credit Document, in no event shall any Sponsor Affiliated Lender be entitled:  (i) to consent to any amendment, modification, waiver, consent or other such action with respect to any of the terms of this Agreement or any other Credit Document, (ii) to require any Agent or other Lender to undertake any action (or refrain from taking any action) with respect to this Agreement or any other Credit Document, (iii) to otherwise vote on any matter related to this Agreement or any other Credit Document, (iv) to attend any meeting with any Agent or Lender or receive any information from any Agent or

178

Lender or (v) to make or bring any claim, in its capacity as Lender, against any Agent or any Lender with respect to the duties and obligations of such Agent or Lender under the Credit Documents; provided, however, no amendment, modifications or waiver shall deprive any Sponsor Affiliate Lender of its Pro Rata Share of any payments to which the Lenders are entitled to share on a pro rata basis hereunder without such Sponsor Affiliated Lender's consent.

Section 12.06  Successors and Assigns; Participations.

(a)    Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Credit Party (in any capacity), Administrator, or Servicer may assign or otherwise transfer any of its rights or obligations hereunder or under any other Credit Document without the prior written consent of Administrative Agent, Collateral Agent and each Lender.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 12.06(d) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Right to Assign.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans; provided that (in each case with respect to any Credit Facility) any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.  (A) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under any Credit Facility and the Loans at the time owing to it under such Credit Facility or in the case of an assignment to a Lender or an Affiliate of an Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned and (B) in any case not described in the foregoing subclause (A), the amount of the Commitment under any Credit Facility of the assigning Lender, or if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans under such Credit Facility of the assigning Lender, subject to each such assignment (determined as of the date the Assignment Agreement with respect to such assignment is delivered to Administrative Agent or, if "Trade Date" is specified in the Assignment Agreement, as of the Trade Date) shall not be less than (x) with respect to Term Commitments or Term Loans of any Class, $1,000,000 and (y) with respect to Revolving Commitments or Revolving Loans, $5,000,000, unless, in any such case, each of Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, Borrowers otherwise consent (each such consent not to be unreasonably withheld or delayed); provided, however, that contemporaneous assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining where such minimum amount has been met.

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and

179

obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Credit Facilities on a non-pro rata basis.

(iii)    Required Consents.  No consent shall be required for any assignment except to the extent required by Section 12.06(b)(i)(B) and, in addition:

(A)    the consent of Borrowers (such consent not to be unreasonably withheld or delayed) shall be required only for assignments in respect of the Revolving Facility unless (x) any Default or Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Administrative Agent within five Business Days after having received notice thereof; provided, further, that the Borrowers' consent shall not be required during the primary syndication of any Credit Facility; and

(B)    the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for any assignment in respect of any Credit Facility, unless, with respect to any Term Facility, such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund (provided that Administrative Agent shall acknowledge any such assignment).

(iv)    Assignment Agreement.  The parties to each assignment shall execute and deliver to Administrative Agent an Assignment Agreement (except as otherwise provided in Section 2.23), together with a processing and recordation fee of $3,500; provided that (x) Administrative Agent may, in its sole discretion, elect to waive such fee in the case of any assignment and (y) in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recording fee shall be payable for such assignments.  The assignee, if it is not a Lender, shall deliver to Administrative Agent an Administrative Questionnaire.

(v)    Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of Borrowers and Administrative Agent, the applicable ratable share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to Administrative Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full ratable share of all Loans; provided that, notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting

180

Lender hereunder shall become effective under applicable law without compliance with
the provisions of this clause (v), then the assignee of such interest shall be deemed to be a
Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(vi)    Effect of Assignment.  Subject to the terms and conditions
of this Section 12.06, and subject to acceptance and recording thereof by Administrative
Agent pursuant to Section 12.06(c), from and after the effective date specified in each
Assignment Agreement, (A) the Eligible Assignee thereunder shall be a party to this
Agreement and, to the extent of the interest assigned by such Assignment Agreement,
have the rights and obligations of a "Lender" under this Agreement to the extent of its
interest in the Loans and Commitments as reflected in the Register and shall thereafter be
a party hereto and a "Lender" for all purposes hereof, (B) the assigning Lender thereunder
shall, to the extent of the interest assigned by such Assignment Agreement, be released
from its obligations under this Agreement (and, in the case of an Assignment Agreement
covering all the assigning Lender's rights and obligations under this Agreement, such
Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of
Sections 2.18(c), 2.19, 2.20 and 12.03 with respect to facts and circumstances occurring
prior to the effective date of such assignment and any other rights which survive the
termination hereof under Section 12.08; (C) the Commitments shall be modified to reflect
the Commitment of such assignee and any Commitment of such assigning Lender, if any;
and (D) if any such assignment occurs after the issuance of any Note hereunder, the
assigning Lender shall, upon the effectiveness of such assignment or as promptly
thereafter as practicable, surrender its applicable Notes to Administrative Agent for
cancellation, and thereupon Borrowers shall issue and deliver new Notes, if so requested
by the assignee and/or assigning Lender, to such assignee and/or to such assigning
Lender, with appropriate insertions, to reflect the new Commitment and/or outstanding
Loans of the assignee and/or the assigning Lender; provided that, except to the extent
otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender
will constitute a waiver or release of any claim of any party hereunder arising from such
Lender having been a Defaulting Lender.  Any assignment or transfer by a Lender of
rights or obligations under this Agreement that does not comply with this clause (b) shall
be treated for purposes of this Agreement as a sale by such Lender of a participation in
such rights and obligations in accordance with Section 12.06(d).

(c)    Representations and Warranties of Assignee.  Each Lender, upon
execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans,
as the case may be, represents and warrants as of the Restatement Effective Date or as of the
effective date specified in the applicable Assignment Agreement that (i) it is an Eligible
Assignee; (ii) it has experience and expertise in the making of or investing in commitments or
loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or
invest in, as the case may be, its Commitments or Loans for its own account in the ordinary
course and without a view to distribution of such Commitments or Loans within the meaning of
the Securities Act or the Exchange Act or other federal securities laws (it being understood that,
subject to the provisions of this Section 12.06, the disposition of such Commitments, Loans or
any interests therein shall at all times remain within its exclusive control).

(d)    Participations; Participant Register.  Any Lender may at any time, without the consent of, or notice to, Borrowers or Administrative Agent, sell participations to any Person (other than a natural person, Borrowers or any of their Affiliates or Subsidiaries, or a Person that Administrative Agent has identified in a notice to the Lenders as a Defaulting Lender) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrowers, Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 10.06 with respect to any payments made by such Lender to its Participant(s).  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, waiver or consent in respect of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or consent described in the first proviso to Section 12.05(b) that directly affects such Participant.  Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 (subject to the requirements and limitations of such Sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.06(b); provided that (x) such Participant agrees to be subject to the provisions of Section 2.17 as if it were an assignee under Section 12.06(b) and (y) a Participant shall not be entitled to receive any greater payments under Section 2.19 or 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of such participation is made with the Borrowers' prior written consent.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.04 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.17 as though it were a Lender.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers (and such agency being solely for tax purposes), maintain a register in the United States on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Credit Extensions or other obligations under any Credit Document) except to the extent that such disclosure is necessary to establish that any such Commitment, Credit Extension or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(e)    Certain Other Assignments and Participations.  In addition to any other assignment or participation permitted pursuant to this Section 12.06, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this

182

Agreement to secure obligations of such Lender, including any pledge or assignment, to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto; and provided further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder, until such time as such Federal Reserve Bank, pledgee or trustee has complied with the provisions of this Section 12.06 regarding assignments.

Section 12.07  Independence of Covenants.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

Section 12.08  Survival of Representations, Warranties and Agreements.  All covenants, agreements, representations and warranties made by Borrowers herein and in any Credit Document or other documents delivered in connection herewith or therewith or pursuant hereto or thereto shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery hereof and thereof and the making of the Credit Extensions hereunder, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied and so long as the Commitments have not expired or been terminated.  Notwithstanding anything herein or implied by law to the contrary, the provisions of Sections 2.18(c), 2.19, 2.20, 12.02, 12.03, 12.04 and 12.26 and Article X shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the payment in full of the Obligations, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 12.09  No Waiver; Remedies Cumulative.  No failure or delay on the part of any Agent or any Lender in the exercise of any right, remedy, power or privilege hereunder or under any other Credit Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such a right, remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges of each Agent and each Lender hereunder and under the Credit Documents and are cumulative and are not exclusive of any rights, remedies, powers or privileges that any such Person would otherwise have.  Any forbearance or failure to exercise, and any delay in exercising, any right, remedy, power or privilege hereunder shall not impair any such right, remedy, power or privilege or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, remedy, power or privilege.

Section 12.10  Marshalling; Payments Set Aside.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any

payment by or on behalf of any Credit Party is made to any Agent or any Lender (or to any Agent, on behalf of the Lenders), or any Agent or any Lender enforces any security interests or exercises its right of setoff, and such payment or the proceeds of such enforcement or setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with the Cases or any other proceeding under any Debtor Relief Law, any other state, provincial or federal law, common law or any equitable cause or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred, and (b) each Lender severally agrees to pay to such Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

Section 12.11  Severability.  If any provision in or obligation under this Agreement or any other Credit Document is held to be illegal, invalid or unenforceable in any jurisdiction, (a) the legality, validity and enforceability of the remaining provisions in or obligations under this Agreement and the other Credit Documents, or of such provision in or obligation under this Agreement or any other Credit Document in any other jurisdiction, shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 12.11, if and to the extent that the enforceability of any provision of this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by Administrative Agent, then such provision shall be deemed to be in effect only to the extent not so limited.

Section 12.12  Obligations Several; Independent Nature of Lenders' Rights.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Revolving Commitment of any other Lender hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a Joint Venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and, subject to the final paragraph of Article VIII and Section 10.10(b) or as otherwise expressly provided in this Agreement, each Lender shall be entitled to protect and enforce its rights arising hereunder and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

Section 12.13  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.14  Applicable Law.  THIS AGREEMENT AND THE RIGHTS AND
OBLIGATIONS OF THE PARTIES HEREUNDER AND ANY CLAIMS, CONTROVERSY,
DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR
OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT
OR ANY OTHER CREDIT DOCUMENT (EXCEPT, AS TO ANY OTHER CREDIT
DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS
CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND
CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND
(TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

Section 12.15  Jurisdiction; Etc.

(a)      Jurisdiction.  EACH CREDIT PARTY IRREVOCABLY AND
UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION,
LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW
OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AGAINST ANY
AGENT, ANY LENDER OR ANY RELATED PARTY OF ANY OF THE FOREGOING, IN
ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT
OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN A FORUM OTHER
THAN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY COURT DOES NOT
HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW
YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT
COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE
COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY
AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND
AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR
PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE
COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH
FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL
JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE
CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE
JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS
AGREEMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT
THAT ANY AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY
ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER
CREDIT DOCUMENT AGAINST THE CREDIT PARTIES OR THEIR PROPERTIES IN THE
COURTS OF ANY JURISDICTION.

(b)      Waiver of Venue.  Each Credit Party irrevocably and
unconditionally waives, to the fullest extent permitted by applicable law, any objection that it
may have as of the Closing Date or thereafter to the laying of venue of any action or proceeding
arising out of or relating to this Agreement or any other Credit Document in any court referred to
in Section 12.15(a).  Each of the parties hereto hereby irrevocably waives, to the fullest extent
permitted by applicable law, the defense of an inconvenient forum to the maintenance of such
action or proceeding in any such court.

(c)    <u>Service of Process</u>.  Each party hereto irrevocably consents to
service of process in the manner provided for notices in Section 12.01.  Nothing in this
Agreement will affect the right of any party hereto to serve process in any other manner
permitted by applicable law.

Section 12.16  **<u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY
IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY
LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR
RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE
TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED
ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A)
CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY
OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH
OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO
ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND
THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS
AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER
THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 12.17  <u>Confidentiality</u>.  Each of the Agents and the Lenders agree to
maintain the confidentiality of the Information, except that Information may be disclosed (a) to
its Related Parties (it being understood that the Persons to whom such disclosure is made will be
informed of the confidential nature of such Information and instructed to keep such Information
confidential in accordance with customary practices); (b) to the extent required or requested by
any regulatory authority purporting to have jurisdiction over such Person or its Related Parties
(including any self-regulatory authority, such as the NAIC); (c) to the extent required by
applicable laws or regulations or by any subpoena or similar legal process; (d) to any other party
hereto; (e) in connection with the exercise of any remedies hereunder or under any other Credit
Document or any action or proceeding relating to this Agreement or any other Credit Document
or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing
provisions substantially the same (or at least as restrictive) as those of this Section 12.17 (or as
may otherwise be reasonably acceptable to the Borrowers), to (i) any assignee of or Participant in,
or any prospective assignee of or Participant in, any of its rights and obligations under this
Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative
other transaction under which payments are to be made by reference to the Borrowers and their
obligations, this Agreement or payments hereunder; (g) on a confidential basis to (i) any rating
agency in connection with rating the Borrowers or their Subsidiaries or the Credit Facilities or (ii)
the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring
of CUSIP numbers with respect to the Credit Facilities; (h) with the consent of the Borrowers; or
(i) to the extent that such Information (x) becomes publicly available other than as a result of a
breach of this Section 12.17, or (y) becomes available to any Agent, any Lender or any of their
respective Affiliates on a nonconfidential basis from a source other than the Borrowers.  For
purposes of this Section 12.17, "**Information**" means all information received from the
Borrowers or any of their Subsidiaries relating to the Borrowers or any of their Subsidiaries or
any of their respective businesses, other than any such information that is available to the any
Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrowers or any of

their Subsidiaries; provided that, in the case of information received from the Borrowers or any
of their Subsidiaries after the Closing Date, such information is clearly identified at the time of
delivery as confidential.  Any Person required to maintain the confidentiality of Information as
provided in this Section 12.17 shall be considered to have complied with its obligation to do so if
such Person has exercised the same degree of care to maintain the confidentiality of such
Information as such Person would accord to its own confidential information.  Notwithstanding
anything to the contrary herein, disclosures by Sponsor Affiliated Institutional Lenders shall be
limited to disclosures to Affiliates that are themselves Sponsor Affiliated Institutional Lenders
and their respective agents, trustees and advisors and with respect to Sponsor Affiliated
Institutional Lenders that are securitization vehicles, lenders to such securitization vehicles;
provided that such lenders shall be subject to similar confidentiality provisions as those
contained in this Section 12.17.

      Section 12.18  Usury Savings Clause.  Notwithstanding any other provision
herein, the aggregate interest rate charged with respect to any of the Obligations, including all
charges, fees or other amounts in connection therewith deemed in the nature of interest under
applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined
without regard to the preceding sentence) under this Agreement at any time exceeds the Highest
Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the
Highest Lawful Rate until the total amount of interest due hereunder equals the amount of
interest which would have been due hereunder if the stated rates of interest set forth in this
Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are
repaid in full the total interest due hereunder (taking into account the increase provided for above)
is less than the total amount of interest which would have been due hereunder if the stated rates
of interest set forth in this Agreement had at all times been in effect, then to the extent permitted
by law, Borrowers shall pay to Administrative Agent an amount equal to the difference between
the amount of interest paid and the amount of interest which would have been paid if the Highest
Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of
Lenders and Borrowers to conform strictly to any applicable usury laws.  Accordingly, if any
Lender contracts for, charges, or receives any consideration which constitutes interest in excess
of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if
previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans
made hereunder or be refunded to Borrowers.

      Section 12.19  Counterparts.  This Agreement may be executed in counterparts
(and by different parties hereto in different counterparts), each of which shall constitute an
original, but all of which when taken together shall constitute a single contract.  This Agreement
and the other Credit Documents, and any separate letter agreements with respect to fees and
expenses payable to the Agents and the Lenders (or any of them), constitute the entire contract
among the parties relating to the subject matter hereof and supersede any and all previous
agreements and understandings, oral or written, relating to the subject matter hereof.

      Section 12.20  Effectiveness.  Except as provided in Section 3.05, this Agreement
shall become effective when it shall have been executed by Administrative Agent and when
Administrative Agent shall have received counterparts hereof that, when taken together, bear the
signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature
page of this Agreement by telecopier or in electronic format (e.g., "pdf," "tif" or other lawful

1760935.07-New York Server 7A - MSW

comparable format) shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.21  Patriot Act.  Each Lender that is subject to the Patriot Act and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies such Credit Party, which information includes the name and address of such Credit Party and other information that will allow such Lender or Agent, as applicable, to identify the such Credit Party in accordance with the Patriot Act.  Each Credit Party shall, promptly following a request by any Agent or any Lender, provide all documentation and other information that such Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money-laundering rules and regulations, including the Patriot Act.

Section 12.22  Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment Agreement or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.23  No Fiduciary Duty.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), each Credit Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) no fiduciary, advisory or agency relationship between the such Credit Party and its Subsidiaries and any Agent or any Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Credit Documents, irrespective of whether any Agent or any Lender has advised or is advising such Credit Party or any Subsidiary on other matters, (ii) the arranging and other services regarding this Agreement provided by the Agents and the Lenders are arm's-length commercial transactions between the Credit Parties, on the one hand, and the Agents and the Lenders, on the other hand, (iii) such Credit Party has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate and (iv) such Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; and (b) (i) the Agents and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for such Credit Party or any of its Affiliates, or any other Person; (ii) none of the Agents and the Lenders has any obligation to such Credit Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; and (iii) the Agents and the Lenders and their respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of such Credit Party and its Affiliates, and none of the Agents and the Lenders has any obligation to disclose any of such

188

interests to the such Credit Party or its Affiliates.  To the fullest extent permitted by law, each Credit Party hereby waives and releases any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.24  Borrowers' Obligations.  Each Credit Party represents, warrants, covenants and agrees as follows:

(a)  Defenses.  The obligations pursuant to the Credit Documents shall not be affected by any of the following:  (i) the bankruptcy, disability, dissolution, incompetence, insolvency, liquidation, or reorganization of any Borrower; or (ii) the discharge, modification of the terms of, reduction in the amount of, or stay of enforcement of any or all Liens and encumbrances or any or all obligations pursuant to the Credit Documents in any bankruptcy, insolvency, reorganization, or other legal proceeding or by law, ordinance, regulation, or rule (federal, state, or local).

(b)  Rights of Administrative Agent and Collateral Agent.  Subject to receiving any required consents of the Requisite Lenders, such other number or percentage of the Lenders as shall be necessary or all of the Lenders, as may be required by applicable provisions of this Agreement and the other Credit Documents, Administrative Agent and/or Collateral Agent, on behalf of the Lenders, may do the following acts or omissions from time to time without notice to or consent of any Borrower and without receiving payment or other value, nor shall the following acts or omissions affect, delay or impair any or all Liens and encumbrances or any or all obligations pursuant to the Credit Documents:  (i) Administrative Agent and/or Collateral Agent may obtain collateral or additional collateral; (ii) Administrative Agent and/or Collateral Agent may substitute for any or all collateral regardless of whether the same type or greater or lesser value; (iii) Administrative Agent and/or Collateral Agent may release any or all collateral; (iv) Administrative Agent and/or Collateral Agent may compromise, delay enforcement, fail to enforce, release, settle or waive any rights or remedies of such Agent as to any or all collateral; (v) Administrative Agent and/or Collateral Agent may sell or otherwise dispose of any collateral in such manner or order as such Agent determines in accordance with the Credit Documents; (vi) Administrative Agent and/or Collateral Agent may fail to perfect, fail to protect the priority of, and fail to ensure any or all Liens or encumbrances; (vii) Administrative Agent and/or Collateral Agent may fail to inspect, insure, maintain, preserve or protect any or all collateral; (viii) Administrative Agent and/or Collateral Agent may obtain additional obligors for any or all obligations pursuant to the Credit Documents; (ix) Administrative Agent and/or Collateral Agent may increase or decrease any or all obligations or otherwise change terms of any or all obligations in accordance with the Credit Documents; (x) Administrative Agent and/or Collateral Agent (at the direction of Administrative Agent) may release any Borrower; (xi) Administrative Agent and/or Collateral Agent may compromise, delay enforcement, fail to enforce, release, settle or waive any obligations of any Borrower with the agreement of that Borrower; (xii) Administrative Agent and/or Collateral Agent may make advances, or grant other financial accommodations to any Borrower; (xiii) Administrative Agent and/or Collateral Agent may fail to file or pursue a claim in any bankruptcy, insolvency, reorganization or other proceeding as to any or all Liens and encumbrances or any or all obligations; (xiv) Administrative Agent and/or Collateral Agent may amend, modify, extend, renew, restate, supplement or terminate in whole or in part the obligation of any Borrower with

189

the agreement of that Borrower; (xv) Administrative Agent and/or Collateral Agent may take or fail to take any other action with respect to any Credit Document or any Borrower; and (xvi) Administrative Agent and/or Collateral Agent may do any other acts or make any other omissions that result in the extinguishment of the obligation of any Borrower, subject, in the case of clauses (ix) and (xiv) of this Section 12.24(b), to the consent of the Borrower(s) to the extent such Borrower's consent would be required by the applicable provisions of this Agreement and the other Credit Documents in such Borrower's capacity not as a surety but in its capacity as a primary obligor hereunder and under the other Credit Documents.

(c)      Suretyship Waivers.  Each Borrower waives any and all rights and benefits under any statutes or rules in effect as of the Closing Date or thereafter in effect and any other statutes or rules in effect as of the Closing Date or thereafter in effect that purport to confer specific rights upon or make specific defenses or procedures available to each Borrower.

(d)      Information.  Each Borrower represents and warrants to Administrative Agents, Lenders and other Secured Parties that such Borrower is currently informed of the financial condition of the Borrowers and of all other circumstances that a diligent inquiry would reveal, which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to the Agents, Lenders and other Secured Parties that such Borrower has read and understands the terms and conditions of the Credit Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of the Borrowers' financial condition, the financial condition of the other Credit Parties and other guarantors, if any, and of all other circumstances, which bear upon the risk of nonpayment or nonperformance of the Obligations.  Notwithstanding anything herein which may be construed to the contrary, no Agent shall have any obligation to provide to any Borrower any information concerning the performance of any other Borrower, the obligations pursuant to the Credit Documents, or the ability of any other Borrower to perform the obligations pursuant to the Credit Documents or any other matter, regardless of what information such Agent may from time to time have.

(e)      Waivers.  Each Borrower waives, until payment in full of the Obligations, any and all present and future claims, remedies and rights against any other Borrower, any collateral and any other property, interest in property or rights to property of any other Borrower (A) arising from any performance hereunder, (B) arising from any application of any collateral, or any other property, interest in property or rights to property of any Borrower, or (C) otherwise arising in respect of the Credit Documents, regardless of whether such claims, remedies and rights arise under any present or future agreement, document or instrument or are provided by any law, ordinance, regulation or rule (federal, state or local) (including, without limitation, any and all rights of contribution, exoneration, indemnity, reimbursement, and subrogation arising under the Credit Documents and any and all rights to participate in the rights and remedies of Lenders against any Borrower).

(f)      Joint and Several Liability of Borrowers.

(i)      Each of Borrowers is accepting joint and several liability hereunder and under the other Credit Documents in consideration of the financial accommodations to be provided by the Agents, the Lenders and the other Secured Parties

under this Agreement and the other Credit Documents, for the mutual benefit, directly and indirectly, of each of Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(ii)    Each of Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 12.24), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(iii)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(iv)    The Obligations of each Borrower under the provisions of this Section 12.24 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(v)    Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Loans issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement or any other Credit Document, notice of any action at any time taken or omitted by any Agent, any Lender or any other Secured Party under, or in respect of, any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement or any other Credit Document (except as otherwise provided in this Agreement or such other Credit Document).  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by any Agent, Lender or other Secured Party at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement or any other Credit Document, any and all other indulgences whatsoever by any Agent, any Lenders or any other Secured Party in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent, any Lender or any other Secured Party with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any

191

right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 12.24 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 12.24, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of such Borrower under this Section 12.24 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 12.24 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or any Agent, any Lender or any other Secured Party. The joint and several liability of each Borrower hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, constitution or place of formation of any of the Borrowers or any Agent, any Lender or any other Secured Party.

(vi)    The provisions of this Section 12.24 are made for the benefit of the Agents, the Lenders and the other Secured Parties and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of any Agent, any Lender or any other Secured Party or any of their respective successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 12.24 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by any Agent, any Lender or any other Secured Party upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 12.24 will forthwith be reinstated in effect, as though such payment had not been made.

(vii)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Credit Documents, any payments made by it to any Agent, any Lender or any other Secured Party with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in Cash. Any claim which any Borrower may have against the other Borrowers with respect to any payments to any Agent, any Lender or any other Secured Party hereunder or under any other Credit Documents are hereby expressly made subordinate and junior in right of payment, including without limitation, as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in Cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in Cash before any payment or distribution of any character, whether in Cash, securities or other property, shall be made to the other Borrowers therefor.

192

Section 12.25  <u>Inconsistency</u>.  In the event of any inconsistency between the provisions of this Agreement or any other Credit Document and the Interim Financing Order (and, when applicable, the Final Financing Order), the provisions of Interim Financing Order (and, when applicable, the Final Financing Order) shall govern.

Section 12.26  <u>Liability of Administrator; Indemnities</u>.

(a)  <u>Obligations</u>.  The Administrator shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Administrator under this Agreement and the other Credit Documents and shall have no other obligations or liabilities under this Agreement.  The Administrator and each Servicer shall indemnify, defend and hold harmless the each other Agent, each Lender, and each Related Party of any of the foregoing Persons, from and against any and all costs, expenses, losses, claims, damages and liabilities to the extent that such cost, expense, loss, claim, damage or liability arose out of, and was imposed upon, each other Agent, each Lender, and each Related Party of any of the foregoing Persons, through the violation of law, negligence, willful misfeasance or bad faith of the Administrator or either Servicer in the performance of their respective obligations under this Agreement and the other Credit Documents or as Servicer under the Designated Servicing Agreements, or by reason of the breach by the Administrator or either Servicer of any of its representations, warranties or covenants hereunder or under the Designated Servicing Agreements.

(b)  <u>Notification and Defense</u>.  Promptly after any party seeking indemnification hereunder (an "**Indemnified Party**") shall have been served with the summons or other first legal process or shall have received written notice of the threat of a claim in respect of which a claim for indemnity may be made against the Administrator or a Servicer under this Section 12.26, the Indemnified Party shall notify the Administrator and each Servicer in writing of the service of such summons, other legal process or written notice, giving information therein as to the nature and basis of the claim, but failure so to notify the Administrator and each Servicer shall not relieve the Administrator and each Servicer from any liability which it may have hereunder or otherwise, except to the extent that the Administrator or Servicer is prejudiced by such failure so to notify the Administrator. The Administrator and each Servicer will be entitled, at its own expense, to participate in the defense of any such claim or action and, to the extent that it may wish, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party, and, after notice from the Administrator and each Servicer to such Indemnified Party that the Administrator or Servicer wishes to assume the defense of any such action, the Administrator and Servicers will not be liable to such Indemnified Party under this Section 12.26 for any legal or other expenses subsequently incurred by such Indemnified Party in connection with the defense of any such action unless (1) the defendants in any such action include both the Indemnified Party and the Administrator or a Servicer, and the Indemnified Party (upon the advice of counsel) shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the Administrator or a Servicer, or one or more Indemnified Parties, and which in the reasonable judgment of such counsel are sufficient to create of interest for the same counsel to represent both the Administrator and each Servicer and such Indemnified Party, (2) the Administrator or a Servicer shall not have employed counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party within a reasonable time after notice of commencement of the action, or (3) the Administrator and each Servicer have authorized the

193

employment of counsel for the Indemnified Party at the expense of the Administrator or a Servicer; then, in any such event, such Indemnified Party shall have the right to employ its own counsel in such action, and the reasonable fees and expenses of such counsel shall be borne by the Administrator and each Servicer, jointly or severally; provided, however, that no Administrator or Servicer shall in connection with any such action or separate but substantially similar or related actions arising out of the same general allegations or circumstances, be liable for any fees and expenses of more than one firm of attorneys at any time for all Indemnified Parties. Each Indemnified Party, as a condition of the indemnity agreement contained herein, shall use its commercially reasonable efforts to cooperate with the Administrator and each Servicer in the defense of any such action or claim.  Neither the Administrator nor any Servicer shall, without the prior written consent of any Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such proceeding or threatened proceeding.

(c)      Expenses.  Indemnification under this Section 12.26 shall include, without limitation, reasonable fees and expenses of counsel and expenses of litigation.  If the Administrator or any Servicer has made any indemnity payments pursuant to this Section 12.26 and the recipient thereafter collects any of such amounts from others, the recipient shall promptly repay such amounts collected to the Administrator, without interest.

(d)      Survival.  The provisions of this Section 12.26 shall survive the resignation or removal of any Agent or either Servicer and the termination of this Agreement.

[Remainder of page intentionally left blank]

194

   IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWERS:**

**GMACM BORROWER LLC**

By: _____
  Name: James Whitlinger
  Title: Chief Financial Officer

**RFC BORROWER LLC**

By: _____
  Name: James Whitlinger
  Title: Chief Financial Officer

**GUARANTORS:**

**RESIDENTIAL CAPITAL, LLC**
**GMAC MORTGAGE, LLC**
**RESIDENTIAL FUNDING COMPANY, LLC**

By: _____
  Name: James Whitlinger
  Title: Chief Financial Officer

[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

**GUARANTORS:**

**DITECH, LLC**
**EPRE LLC**
**ETS OF VIRGINIA, INC.**
**ETS OF WASHINGTON, INC.**
**EXECUTIVE TRUSTEE SERVICES, LLC**
**GMAC MODEL HOME FINANCE I, LLC**
**GMAC MORTGAGE USA CORPORATION**
**GMAC RESIDENTIAL HOLDING COMPANY, LLC**
**GMACM REO, LLC**
**GMACR MORTGAGE PRODUCTS, LLC**
**GMAC-RFC HOLDING COMPANY, LLC**
**GMACRH SETTLEMENT SERVICES, LLC**
**HOME CONNECTS LENDING SERVICES, LLC**
**HOMECOMINGS FINANCIAL REAL ESTATE HOLDINGS, LLC**
**HOMECOMINGS FINANCIAL, LLC**
**PASSIVE ASSET TRANSACTIONS, LLC**
**PATI A, LLC**
**PATI B, LLC**
**PATI REAL ESTATE HOLDINGS, LLC**
**RAHI A, LLC**
**RAHI B, LLC**
**RAHI REAL ESTATE HOLDINGS, LLC**
**RESIDENTIAL ACCREDIT LOANS, INC.**
**RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.**
**RESIDENTIAL ASSET SECURITIES CORPORATION**
**RESIDENTIAL CONSUMER SERVICES OF ALABAMA, LLC**
**RESIDENTIAL CONSUMER SERVICES OF OHIO, LLC**
**RESIDENTIAL CONSUMER SERVICES OF TEXAS, LLC**
**RESIDENTIAL CONSUMER SERVICES, LLC**
**RESIDENTIAL FUNDING MORTGAGE EXCHANGE, LLC**
**RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.**
**RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.**
**RESIDENTIAL FUNDING REAL ESTATE HOLDINGS, LLC**
**RESIDENTIAL MORTGAGE REAL ESTATE HOLDINGS, LLC**
**RFC - GSAP SERVICER ADVANCE, LLC**
**RFC ASSET HOLDINGS II, LLC**
**RFC ASSET MANAGEMENT, LLC**
**RFC REO, LLC**


By: _____
    Name:  James Whitlinger
    Title:   Chief Financial Officer


[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

**GUARANTORS:**


**RCSFJV2004, LLC**
**RFC SFJV-2002, LLC**


By: **RFC ASSET MANAGEMENT, LLC,**
    **its Sole Member**


By: _____
        Name:  James Whitlinger
        Title:    Chief Financial Officer


**HFN REO SUB, LLC**


By: _____
        Name: James Whitlinger
        Title:   Manager


**LADUE ASSOCIATES, INC.**


By: _____
        Name: Joseph A. Pensabene
        Title:   President


**DOA HOLDING PROPERTIES, LLC**
**DOA PROPERTIES IX (LOTS-OTHER), LLC**
**EQUITY INVESTMENT I, LLC**
**RFC CONSTRUCTION FUNDING, LLC**


By: _____
        Name: William N. Tyson
        Title:   President


[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

**ADMINISTRATORS, ORIGINATORS, RECEIVABLES CUSTODIANS AND SERVICERS:**

**GMAC MORTGAGE, LLC**

By: _____
     Name:
     Title:

**RESIDENTIAL FUNDING COMPANY, LLC**

By: _____
     Name:
     Title:

**GMACM SERVICER:**

**GMAC MORTGAGE, LLC**

By: _____
     Name:
     Title:

[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

**BARCLAYS BANK PLC**,
as Administrative Agent


By: _____
     Name:  Craig J. Malloy
     Title:  Director

[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

**BARCLAYS BANK PLC**,
as Collateral Agent


By: _____
     Name:  Craig J. Malloy
     Title:  Director

[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

**BARCLAYS BANK PLC**,
as Syndication Agent


By: _____
     Name:  Craig J. Malloy
     Title:  Director

[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

**BARCLAYS BANK PLC**,
as Lender


By: _____
      Name:  Craig J. Malloy
      Title:  Director

[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

[Lender]

By: _____
    Name:
    Title:

If a second signature is required:

By: _____
    Name:
    Title:

[Signature Page to Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement]

**APPENDIX A-1**

## TO AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

**Commitments as of the Closing Date**
**(without giving effect to any Loans made on the Closing Date)**

| Lender | Initial Term A-1 Loan Commitment | Term A-2 Loan Commitment | Revolving Commitment |
|---|---|---|---|
| Barclays Bank PLC | $1,050,000,000 | $200,000,000 | $200,000,000 |
| **Total** | **$1,050,000,000** | **$200,000,000** | **$200,000,000** |

Appendix A-1

**APPENDIX A-2**

## TO AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION
## CREDIT AND GUARANTY AGREEMENT

**Commitments as of the Restatement Effective Date
(without giving effect to Delayed Draw Term A-1 Loans, if any,
made on the Restatement Effective Date)**

| Lender | Initial Term A-1 Loan Commitment | Delayed Draw Term A-1 Loan Commitment | Term A-2 Loan Commitment | Revolving Commitment |
|---|---|---|---|---|
| Barclays Bank PLC | $0 | $10,000,000 | $0 | $190,000,000 |
| **Total** | **$0** | **$10,000,000** | **$0** | **$190,000,000** |

**APPENDIX B**

## TO AMENDED AND RESTATED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

**Notice Addresses**

**Credit Parties:**

| | |
|---|---|
| Contact: | Tammy Hamzehpour |
| Institution Name: | Residential Capital LLC |
| Street Address: | 1100 Virginia Drive |
| City, State, Zip: | Fort Washington, PA 19034 |
| Phone: | 215-682-1307 |
| Fax Number: | |
| Email Address: | tammy.hamzehpour@ally.com |

**Administrative Agent and/or Collateral Agent (other than for a Funding Notice, a Withdrawal Notice, a Conversion/ Continuation Notice or a Notice of Payment/Commitment Termination):**

| | |
|---|---|
| Contact: | Alicia Borys / Patrick Kerner |
| Institution Name: | Barclays Bank PLC |
| Street Address: | 745 7th Avenue, 27th Floor |
| City, State, Zip Code: | New York, NY, 10119 |
| Phone: | 212-526-4291 / 212-526-1447 |
| Fax Number: | 212-526-5115 |
| Email Address: | alicia.borys@barclays.com / patrick.kerner@barclays.com |

With a copy to:

| | |
|---|---|
| Contact: | Joe Tricamo / May Wong |
| Institution Name: | Barclays Bank PLC |
| Street Address: | 1301 Sixth Avenue |
| City, State, Zip Code: | New York, NY 10019 |
| Phone: | 212-320-7564 / 212-320-7890 |
| Email Address: | xrausloanops5@barclays.com |

With a copy to:

| | |
|---|---|
| Contact: | Sarah M. Ward |
| Institution Name: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Street Address: | Four Times Square |

Appendix B-1

City, State, Zip Code: New York, NY 10036
Fax Number:          917-777-2126
Email Address:       sward@skadden.com

**Administrative Agent (solely in connection with a Funding Notice, a Withdrawal Notice, a Conversion/ Continuation Notice or a Notice of Payment/Commitment Termination):**

Contact:             Joe Tricamo /  May Wong
Institution Name:    Barclays Bank PLC
Street Address:      1301 Sixth Avenue
City, State, Zip Code: New York, NY 10019
Phone:               212-320-7564 / 212-320-7890
Email Address:       xrausloanops5@barclays.com


**Barclays Bank PLC, as Lender:**

Contact:             Alicia Borys / Patrick Kerner
Institution Name:    Barclays Bank PLC
Street Address:      745 7th Avenue, 27th Floor
City, State, Zip Code: New York, NY, 10119
Phone:               212-526-4291 / 212-526-1447
Fax Number:          212-526-5115
Email Address:       alicia.borys@barclays.com  /  patrick.kerner@barclays.com

With a copy to:

Contact:             Joe Tricamo /  May Wong
Institution Name:    Barclays Bank PLC
Street Address:      1301 Sixth Avenue
City, State, Zip Code: New York, NY 10019
Phone:               212-320-7564 / 212-320-7890
Email Address:       xrausloanops5@barclays.com

**Other Lenders**:  Initially, as provided in the applicable Lender's Administrative Questionnaire.

Appendix B-2

**SCHEDULE 3.05**

**RESTATEMENT EFFECTIVE DATE**
**CREDIT DOCUMENTS AND CERTAIN DELIVERABLES**

1.      Term A-1 Loan Note, by Borrowers in favor of Delayed Draw Term A-1 Lenders.

2.      Secretary's Certificate for each Credit Party confirming no changes to any Organizational Documents of such Credit Party and resolutions of the Board of Directors of such Credit Party.

Sched. 3.05

**SCHEDULE 4.39**

## REPRESENTATIONS AND WARRANTIES
## RELATING TO ELIGIBLE MORTGAGE LOANS

(a)    <u>Mortgage Schedule</u>.  The information set forth in each Mortgage Schedule delivered to Administrative Agent is true, complete and correct in all material respects;

(b)    <u>Document Delivery</u>.  For each Eligible Mortgage Loan, all documents required to be delivered under the Custodial Agreement pursuant to Section 2 of the Custodial Agreement for each Eligible Mortgage Loan have been delivered to Custodian. Borrowers or their agents are in possession of a true and materially accurate Note-Only Mortgage File or Complete Mortgage File in compliance with the Custodial Agreement, except for such documents the originals of which have been delivered to Custodian;

(c)    <u>Valid Lien</u>.  The Mortgage creates a first or second lien on an estate in fee simple or a leasehold interest in real property securing the related Mortgage Note, free and clear of all adverse claims, liens and encumbrances having priority over the lien of the Mortgage subject only to (i) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (ii) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording which are acceptable to mortgage lending institutions generally, (iii) with respect to each Mortgage Loan that is a second lien mortgage loan, the lien of the first mortgage on the Mortgaged Property and (iv) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property;

(d)    <u>Ownership</u>.  Each Eligible Mortgage Loan is a whole loan and not a participation interest in a mortgage loan.  Subject only to the Lien of Collateral Agent pursuant to the Collateral Documents and the Orders, the applicable Borrower has good title to, and is the sole owner of, each Eligible Mortgage Loan and has full right, power and authority to pledge and assign each of the Eligible Mortgage Loans to Collateral Agent free and clear of any and all pledges, liens, charges, security interests and/or other encumbrances.  To the best of the Primary Credit Parties' knowledge, each holder, originator and servicer of the Eligible Mortgage Loan was qualified and appropriately licensed (or was exempt from such qualification or license) to transact business in the jurisdiction in which the related Mortgaged Property is located at the time such entity had possession of the Mortgage Note except where the failure to be qualified or licensed would not reasonably be expected to have a Material Adverse Effect.  None of the Required Documents (as defined in the Custodial Agreement) restricts the Borrowers' right to pledge and assign the Eligible Mortgage Loan to Collateral Agent;

(e)    <u>No Outstanding Charges</u>.  There are no delinquent taxes which are due and payable, ground rents, assessments or other outstanding charges affecting the related Mortgaged Property;

(f)    <u>Original Terms Unmodified</u>.  The Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded or submitted for recording to the extent any such recordation is required by applicable law or is necessary to protect the interests of the Secured Parties, and which have been approved by the title insurer and the primary mortgage insurer, as applicable, and copies of which written instruments are included in the Mortgage File.  No other instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released by any Primary Credit Party, or to the best of the Primary Credit Parties' knowledge by any other Person, in whole or in part, from the terms thereof except in connection with an assumption agreement, which assumption agreement is part of the Mortgage File and the terms of which are reflected on the most recently delivered Mortgage Schedule;

(g)    <u>No Defenses</u>.  There is no valid offset, defense or counterclaim to any Mortgage Note or Mortgage, or to any obligation of the mortgagor to pay the unpaid principal of or interest on such Mortgage Note.  The Mortgage Note and the Mortgage are not subject to any right of rescission, recoupment, set off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage Note or Mortgage unenforceable, in whole or in part, or subject to any right of rescission, recoupment, set off, counterclaim or defense, including the defense of usury, and no such right of rescission, recoupment, set off, counterclaim or defense has been asserted with respect thereto;

(h)    <u>Payment Terms</u>.  Except as disclosed in the most recently delivered Mortgage Schedule, (i) with respect to each Adjustable Rate Mortgage Loan, on each adjustment date, the Mortgage Interest Rate will be adjusted to equal the index <u>plus</u> the margin, rounded to the nearest 0.125%, subject to the periodic rate cap, the maximum rate and the minimum rate and (ii) the related Mortgage Note is payable on the first day of each month in monthly installments of principal and/or interest, with interest payable in arrears;

(i)    <u>Hazard Insurance</u>.  The improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy that conforms in all respects to the requirements of Administrative Agent.  All individual insurance policies and flood policies referred to in clause (j) below contain a standard mortgagee clause naming Borrowers or the original mortgagee, and its successors in interest, as mortgagee, and no Primary Credit Party has received notice that any premiums due and payable thereon have not been paid; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance, including flood insurance (if required), at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor, except as may be limited or restricted by applicable law.  Where required by state law or regulation, the Mortgagor has been given an opportunity to choose the carrier of the required hazard insurance, <u>provided</u> that the policy is not a "master" or "blanket" hazard insurance policy covering a condominium, or any hazard insurance policy covering the common facilities of a planned unit development.  The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of Collateral Agent upon the consummation of the transactions contemplated by this Agreement.  No Primary Credit Party has engaged in, and has no knowledge of the Mortgagor's or any servicer's having engaged in, any

act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for herein, or the validity and binding effect of such policy, including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other Person or entity, and no such unlawful items have been received, retained or realized by any Primary Credit Party;

(j)    Flood Insurance.  If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property with a generally acceptable carrier and conforms in all respects to the Freddie Mac, Fannie Mae or Ginnie Mae requirements, as applicable;

(k)    Compliance with Laws.  Each Eligible Mortgage Loan as of the time of its origination complied in all material respects with all applicable local, state and federal laws, including, without limitation, usury, unfair collection practice, equal credit opportunity, fair housing and regulations, real estate settlement procedures, all applicable predatory lending laws (including, for the avoidance of doubt, laws regarding the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit which has no apparent benefit to the Mortgagor), truth-in-lending and disclosure laws applicable to the solicitation, origination, collection and servicing of such Eligible Mortgage Loan and any obligations of the holder of the Mortgage Note, Mortgage and other loan documents have been complied with in all material respects and the consummation of the transaction contemplated hereby will not involve the violation of any such laws or regulations, and Borrowers shall maintain in their possession, available for inspection of Administrative Agent or its designee, and shall deliver to Administrative Agent or its designee, upon reasonable request, such evidence of compliance with such requirements as are customary or otherwise required by applicable law;

(l)    No Satisfaction of Mortgage.  The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part nor has any instrument been executed that would effect any such satisfaction, release, cancellation, subordination or rescission;

(m)    Validity of Mortgage Loan Documents.  The Mortgage Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy, insolvency and other laws of general application affecting the rights of creditors. All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage and each Mortgagor is an individual or natural person.  The Mortgage Note and the Mortgage have been duly and properly executed by such parties.  The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading to the best of the Primary Credit Parties' knowledge;

Sched. 4.39-3

(n)    <u>Full Disbursements of Proceeds</u>.  Except in the case of a HELOC, the proceeds of each Eligible Mortgage Loan have been fully disbursed, there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with.  All costs, fees and expenses incurred in making, closing or recording the Eligible Mortgage Loans were paid and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(o)    <u>Transfer of Mortgage Loans/Recordation</u>.  Each Mortgage other than MERS Mortgage Loans was recorded and the assignment of mortgage is in recordable form and (other than with respect to the blank assignee and the lack of mortgage recordation) is acceptable for recording under the laws of the jurisdiction in which Mortgaged Property is located;

(p)    <u>Environmental Matters</u>.  To the best of the Primary Credit Parties' knowledge, the Mortgaged Property is in material compliance with all applicable environmental laws, and is free from any and all toxic or hazardous substances, other than those commonly used for homeowner repair and maintenance and/or household purposes, and there exists no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue;

(q)    <u>Title Insurance</u>.  Except with respect to Eligible Mortgage Loans secured by second liens with an original principal balance of less than $200,000, the Eligible Mortgage Loan is covered by an ALTA lender's title insurance policy or other generally acceptable form of policy of insurance, as the case may be, with all necessary endorsements, issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in clause (c) (i), (ii) and (iii) of this Schedule 4.39) the applicable Borrower, its successors and assigns, as to the first priority lien or second priority lien of the Mortgage, as applicable, in the original principal amount of the Eligible Mortgage Loan. Such title insurance policy affirmatively insures ingress and egress and against encroachments by or upon the Mortgaged Property or any interest therein.  In the case of Adjustable Rate Mortgage Loans, such title insurance policy also affirmatively insures against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment to the Mortgage Interest Rate.  The applicable Borrower is the sole insured of such lender's title insurance policy, such title insurance policy has been duly and validly endorsed to Collateral Agent or the assignment to Collateral Agent of such Borrower's interest therein does not require the consent of or notification to the insurer and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement.  No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage has done, by act or omission, anything that would impair the coverage of such lender's title insurance policy.  The underwriting standards with respect to the origination of each second lien Mortgage Loan did not require title insurance for second lien Mortgage Loans with an original principal balance of less than $200,000;

(r)    <u>No Default</u>.  To the best of the Primary Credit Parties' knowledge, except as disclosed in the most recently delivered Mortgage Schedule, there is no default, breach,

violation or event of acceleration existing under the Mortgage or the related Mortgage Note and, to the best of the Primary Credit Parties' knowledge, no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event permitting acceleration; and no Primary Credit Party nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration;

(s)    No Mechanic's Liens.  To the best of the Primary Credit Parties' knowledge, there are no mechanics, or similar liens or claims which have been filed for work, labor or material affecting the related Mortgaged Property which are or may be liens prior to or equal to the lien of the related Mortgage;

(t)    Mortgaged Property Undamaged.  To the best of the Primary Credit Parties' knowledge, the Mortgaged Property for each Eligible Mortgage Loan is free of material damage and is in good repair and condition and free of any structural deficiencies or deferred maintenance that would influence the originator's decision to originate any such Eligible Mortgage Loan or Administrative Agent's decision to accept such Eligible Mortgage Loan as collateral under the Credit Documents.  As of the date of its origination, there was no proceeding pending for the total or partial condemnation of any related Mortgaged Property that materially affects the value thereof.  All of the improvements which were included for the purpose of determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the Mortgaged Property, except those, if any, which are considered de minimis by the Fannie Mae Guides or are insured against by the title insurance policy referred to in (q) above;

(u)    Occupancy of the Mortgaged Property.  All inspections, licenses and certificates required in connection with the origination of the Eligible Mortgage Loans to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities and the Mortgaged Property is lawfully occupied under applicable law;

(v)    Location of Mortgaged Property.  The Eligible Mortgage Loan is not (i) secured by a lien other than a first lien on Mortgaged Property located in Minnesota unless the original principal balance thereof was greater than or equal to $100,000 or (ii) secured by a Mortgaged Property located in Puerto Rico, the Virgin Islands or Guam or any other jurisdiction for which GMACM Servicer does not have all licenses required to purchase, hold and sell such Eligible Mortgage Loan;

(w)    Due on Sale.  Except as disclosed in the most recently delivered Mortgage Schedule, the Eligible Mortgage Loan contains the usual and enforceable provisions of the originator at the time of origination for the acceleration of the payment of the unpaid principal amount if the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder;

(x)    Customary Provisions.  The related Mortgage contains enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the

realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.  Upon default by a Mortgagor on a Mortgage Loan and foreclosure on, or trustee's sale of, the Mortgaged Property pursuant to the proper procedures, the holder of the Mortgage Loan will be able to deliver good and marketable title to the Mortgaged Property.  To the best of the Primary Credit Parties' knowledge, there is no homestead or other exemption available to the Mortgagor that would materially interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage.  The Mortgagor has not notified any Primary Credit Party and Primary Credit Parties have no actual knowledge of any relief requested or allowed to the Mortgage under the Servicemembers Relief Act of 1940;

(y)    <u>Deeds of Trust</u>.  If the Mortgage constitutes a deed of trust, a trustee, duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by any Agent to the trustee under the deed of trust, except in connection with a trustee's sale or attempted sale after default by the Mortgagor;

(z)    <u>Location and Type of Mortgage Property</u>.  Each of the Mortgaged Properties consists of a single parcel of real property improved by a one-to-four-family residential dwelling, including condominium units and dwelling units in planned unit developments.  The Eligible Mortgage Loans are not secured by a manufactured home, co-op, mobile home, condotel, multifamily, mixed use or commercial structure.  None of the Eligible Mortgage Loans are on commercial, industrial, agricultural or undeveloped property, or on any property located anywhere except the continental United States, Alaska or Hawaii;

(aa)    <u>Origination and Collection Practices; Escrow Deposits</u>.  The origination, collection, servicing and subservicing practices with respect to each Mortgage Note and Mortgage have been in all material respects proper, reasonable and customary in the mortgage origination and servicing business.  With respect to escrow deposits and payments that any Primary Credit Party collects, all such payments are in the possession of, or under the control of, such Primary Credit Party, and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made.  No escrow deposits or other charges or payments due under the Mortgage Note have been capitalized under any Mortgage or the related Mortgage Note;

(bb)    <u>No Additional Security</u>.  There is no pledged account or other security other than real estate securing the Mortgagor's obligations;

(cc)    <u>Buydown Mortgage Loans</u>.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan (i) contains provisions pursuant to which monthly payments are (x) paid or partially paid with funds deposited in any separate account established by any Primary Credit Party, the mortgagor, or anyone on behalf of the mortgagor or (y) paid by any source other than the mortgagor or (ii) contains any other similar provisions which may constitute a "buydown" provision.  Except as disclosed in the Mortgage Schedule delivered to Administrative Agent on the Closing Date, no Eligible Mortgage Loan is a graduated payment mortgage loan and the Eligible Mortgage Loan does not have a shared appreciation or other contingent interest feature;

Sched. 4.39-6

(dd)     <u>No Reverse Mortgage Loan</u>.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan is a reverse mortgage loan;

(ee)     <u>No Additional Payments</u>.  There is no obligation on the part of any Primary Credit Party or any other party under the terms of the Mortgage or related Mortgage Note to make payments in addition to those made by the Mortgagor;

(ff)     <u>Consolidation of Advances</u>.  Any advances made prior to the Closing Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the related Mortgage Schedule.  The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first or second, as applicable, lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence reasonably acceptable to Administrative Agent.  The consolidated principal amount does not exceed the maximum principal amount of the Eligible Mortgage Loan;

(gg)     <u>No Error, Omission, Fraud etc</u>.  No material error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to an Eligible Mortgage Loan has taken place on the part of any Primary Credit Party, or to the best of the Primary Credit Parties' knowledge, on the part of any Person, including, without limitation, the related Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Eligible Mortgage Loan or in the application of any insurance in relation to such Eligible Mortgage Loan;

(hh)     <u>Leasehold Interests</u>.  If any of the Eligible Mortgage Loans are secured by a leasehold interest, with respect to each leasehold interest: (i) the lessor under the lease holds a fee simple interest in the land; (ii) the terms of such lease expressly permit the mortgaging of the leasehold estate, the assignment of the lease without the lessor's consent and the acquisition by the holder of the Mortgage of the rights of the lessee upon foreclosure or assignment in lieu of foreclosure or provide the holder of the Mortgage with substantially similar protections; (iii) the terms of such lease do not (A) allow the termination thereof upon the lessee's default without the holder of the Mortgage being entitled to receive written notice of, and opportunity to cure, such default, (B) allow the termination of the lease in the event of damage or destruction as long as the Mortgage is in existence, (C) prohibit the holder of the Mortgage from being insured (or receiving proceeds of insurance) under the hazard insurance policy or policies relating to the Mortgaged Property or (D) permit any increase in rent other than pre-established increases set forth in the lease; (iv) the residential property in such area consisting of leasehold estates is readily marketable; (v) the lease is recorded and is in full force and effect and is not subject to any prior lien or encumbrance by which the leasehold could be terminated or subject to any charge or penalty; and (vi) the remaining term of the lease does not terminate less than ten years after the maturity date of such Eligible Mortgage Loan;

(ii)     <u>No Bankruptcy Proceedings</u>.  The related Mortgagor was not subject to a proceeding under applicable bankruptcy laws at the time the Eligible Mortgage Loan was originated, except as disclosed in the most recently delivered Mortgage Schedule;

(jj)    HOEPA.  No Eligible Mortgage Loan is (i) subject to the provisions of the Homeownership and Equity Protection Act of 1994 as amended ("**HOEPA**"), or has an "annual percentage rate" or "total points and fees" payable by the borrower thereunder or with respect thereto (as each such term is defined under HOEPA) that equals or exceeds the applicable thresholds defined under HOEPA (Section 32 of Regulation Z, 12 C.F.R. Section 226.32(a)(1)(i) and (ii)), (ii) a "high cost" mortgage loan, "covered" mortgage loan, "high risk home" mortgage loan, or "predatory" mortgage loan or any other comparable term, or a similarly classified loan using different terminology under any federal, state or local law, (iii) subject to any comparable federal, state or local statutes or regulations, or any other statute or regulation providing for heightened regulatory scrutiny or assignee liability to holders of such mortgage loans, or (iv) a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the current Standard & Poor's LEVELS® Glossary Revised, Appendix E) (in the case of state or local law, as determined without giving effect to any available federal preemption, other than any exemptions specifically provided for in the relevant state or local law).  No Eligible Mortgage Loan is considered a "high-cost" or "covered" loan under the Georgia Fair Lending Act or the New York Banking Law, Section 6-1, or under any federal, state or local law, or if located in the state of New Jersey, the Eligible Mortgage Loans were not originated subsequent to November 26, 2003 and considered "high cost," "covered refinancings," "home improvement loans" or loans secured by manufactured housing, within the meaning of the New Jersey Home Ownership Security Act of 2002;

(kk)    Lost Note Mortgage Loan.  No Eligible Mortgage Loan is a Lost Note Mortgage Loan;

(ll)    Interest Only Mortgage Loan.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan is an interest only mortgage loan;

(mm)    No Credit Life Policies.  No borrower was required to purchase any single premium credit insurance policy (e.g., life, mortgage, disability, accident, unemployment or health insurance product) or debt cancellation agreement as a condition of obtaining the extension of credit.  No borrower obtained a prepaid single premium credit insurance policy (e.g., life, mortgage, disability, accident, unemployment or health insurance product) or debt cancellation agreement in connection with the origination of the Eligible Mortgage Loan.  No proceeds from any Eligible Mortgage Loan were used to purchase single premium credit insurance policies (e.g., life, mortgage, disability, accident, unemployment, or health insurance product) or debt cancellation agreements as part of the origination of, or as a condition to closing, such Eligible Mortgage Loan;

(nn)    MERS Mortgage Loans.  With respect to each Eligible Mortgage Loan that is a MERS Mortgage Loan, a Mortgage Identification Number has been assigned by MERS and such Mortgage Identification Number is accurately provided on the Mortgage Schedule.  The related assignment of mortgage (unless such loan was originated in the name of MERS) to MERS has been duly and properly recorded.  With respect to each MERS Mortgage Loan, no Mortgagor has received any notice of liens or legal actions with respect to such Eligible Mortgage Loan and no such notices have been electronically posted by MERS;

(oo)    No Proceedings; Adverse Effect.  There are no actions, suits or proceedings before any court, administrative agency or arbitrator concerning any Eligible Mortgage Loan, Mortgagor or related Mortgaged Property that could reasonably be expected to adversely affect title to the Mortgaged Property or the validity or enforceability of the related Mortgage or that could reasonably be expected to materially and adversely affect the value of the Mortgaged Property as security for the Eligible Mortgage Loan or the use for which the premises were intended;

(pp)    Prepayment Charges.  Except as disclosed in the most recently delivered Mortgage Schedule, no Mortgage Loan contains a provision permitting imposition of a penalty upon a prepayment prior to maturity;

(qq)    Credit Reporting.  The servicer for each Eligible Mortgage Loan has fully furnished accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis and in accordance with the Fair Credit Reporting Act and its implementing regulations;

(rr)    Eligible Products.  With respect to each Eligible Mortgage Loan, the borrower was not encouraged or required to select an Eligible Mortgage Loan product offered by the Eligible Mortgage Loan's originator which is a higher cost product designed for less creditworthy borrowers, taking into account such facts as, without limitation, the Eligible Mortgage Loan's requirements and the borrower's credit history, income, assets and liabilities. For a borrower who seeks financing through an Eligible Mortgage Loan originator's higher-priced subprime lending channel, the borrower should be directed towards or offered the Eligible Mortgage Loan originator's standard mortgage line if the borrower is able to qualify for one of the standard products;

(ss)    Underwriting Methodology.  The methodology used in underwriting the extension of credit for each Eligible Mortgage Loan did not rely solely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such extension of credit.  The methodology employed related objective criteria such as the borrower's income, assets, and liabilities to the proposed mortgage payment and, based on such methodology, the Eligible Mortgage Loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the Eligible Mortgage Loan;

(tt)    Points and Fees.  No borrower of an Eligible Mortgage Loan that is secured by the borrower's principal residence was charged "points and fees" in an amount greater than (i) $1,000 or (ii) 5% of the principal amount of such Eligible Mortgage Loan, whichever is greater.  For purposes of this representation, "points and fees" (x) include origination, underwriting, broker and finder's fees and charges that the lender imposed as a condition of making the Eligible Mortgage Loan, whether they are paid to the lender or a third party; and (y) exclude bona fide discount points, fees paid for actual services rendered in connection with the origination of the mortgage (such as attorneys' fees, notaries fees and fees paid for property appraisals, credit reports, surveys, title examinations and extracts, flood and tax certifications, and home inspections); the cost of mortgage insurance or credit-risk price adjustments; the costs

of title, hazard, and flood insurance policies; state and local transfer taxes or fees; escrow deposits for the future payment of taxes and insurance premiums; and other miscellaneous fees and charges, which miscellaneous fees and charges, in total, do not exceed 0.25 percent of the loan amount;

(uu)    <u>Truth in Lending Act</u>.  No Eligible Mortgage Loan that is a "residential mortgage transaction" within the meaning of the federal Truth in Lending Act, Regulation Z, 12 C.F.R. 226.2, has either an "annual percentage rate" or "total points and fees" payable by the borrower that exceeds the applicable thresholds under HOEPA;

(vv)    <u>No Negative Amortization Loans</u>.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan is a Negative Amortization Loan.  As used herein, "**Negative Amortization Loan**" means a Mortgage Loan that may be subject to Negative Amortization; "**Negative Amortization**" means that portion of interest accrued at the Mortgage Interest Rate in any month which exceeds the monthly payment on the related Mortgage Loan for such month and which, pursuant to the terms of the Mortgage Note, is added to the principal balance of the Mortgage Loan;

(ww)    <u>No Balloon Loans</u>.  Except as disclosed in the most recently delivered Mortgage Schedule, no Eligible Mortgage Loan is a balloon Mortgage Loan;

(xx)    <u>No Arbitration</u>.  Neither the related Mortgage nor the related Mortgage Note requires the Mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the Eligible Mortgage Loan; No Mortgagor agreed to submit to arbitration to resolve any dispute arising out of or relating in any way to the Eligible Mortgage Loan;

(yy)    <u>Fees and Charges</u>.  All fees and charges (including finance charges) and whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Eligible Mortgage Loan has been disclosed in writing to the borrower in accordance with applicable state and federal law and regulation;

(zz)    <u>Anti-Money Laundering</u>.  Each Primary Credit Party has complied with all applicable anti-money laundering laws and regulations, including without limitation the Patriot Act (collectively, the "**Anti-Money Laundering Laws**").  Each Primary Credit Party has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Eligible Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws; no Eligible Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the "**Executive Order**") or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury (the "**OFAC Regulations**") or in violation of the Executive Order or the OFAC Regulations, and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations;

Sched. 4.39-10

(aaa)    Compliance with Interagency Guidance.  Each Eligible Mortgage
Loan that is a "nontraditional mortgage loan" within the meaning of the Interagency Guidance on
Nontraditional Mortgage Product Risks, 71 FR 58609 (October 4, 2006), and that has a
residential loan application date on or after September 13, 2007 (or, if such date cannot be
determined, an origination date on or after October 1, 2007), complies in all respects with such
guidance, including any interpretations, applications or implementation plans with respect
thereto that have been communicated and/or agreed to by an institution's regulator, regardless of
whether the Eligible Mortgage Loan's originator or seller is subject to such guidance;

(bbb)    Compliance with Subprime Statement.  No Eligible Mortgage
Loan that is an Adjustable Rate Mortgage Loan and that has a residential loan application date on
or after September 13, 2007, is subject to the Interagency Statement on Subprime Mortgage
Lending, 72 FR 37569 (July 10, 2007) as defined by Fannie Mae in the Lender Letter 03-07
(August 15, 2007) or by Freddie Mac in Freddie Mac Single Family Advisory (September 7,
2007) and Freddie Mac Bulletin 2007-4);

(ccc)    Georgia.  No Mortgage Loan was originated in the state of Georgia
between October 1, 2002 and March 6, 2003;

(ddd)    [Reserved].

(eee)    No Defense to Insurance Coverage.  The Primary Credit Parties
have caused or will cause to be performed any and all acts required to preserve the rights and
remedies of Collateral Agent in any insurance policies applicable to the Mortgage Loans
including, without limitation, any necessary notifications of insurers, assignments of policies or
interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor
of Collateral Agent.  No action has been taken or failed to be taken, no event has occurred and no
state of facts exists or has existed on or prior to the Closing Date (whether or not known to the
Primary Credit Parties on or prior to such date) which has resulted or will result in an exclusion
from, denial of, or defense to coverage under any applicable, special hazard insurance policy,
primary mortgage guarantee insurance policy or bankruptcy bond (including, without limitation,
any exclusions, denials or defenses which would limit or reduce the availability of the timely
payment of the full amount of the loss otherwise due thereunder to the insured) whether arising
out of actions, representations, errors, omissions, negligence, or fraud of the Primary Credit
Parties, the related Mortgagor or any party involved in the application for such coverage,
including the appraisal, plans and specifications and other exhibits or documents submitted
therewith to the insurer under such insurance policy, or for any other reason under such coverage,
but not including the failure of such insurer to pay by reason of such insurer's breach of such
insurance policy or such insurer's financial inability to pay;

(fff)    Credit Information.  As to each consumer report (as defined in the
Fair Credit Reporting Act, Public Law 91-508) or other credit information furnished by the
Primary Credit Parties to Administrative Agent, that each Primary Credit Party has full right and
authority and is not precluded by law or contract from furnishing such information to the Agents
and the Agents are not precluded from furnishing the same to any Lender or any subsequent or
prospective purchaser of such Mortgage.  The Primary Credit Parties shall hold each Agent
harmless from any and all damages, losses, costs and expenses (including attorney's fees) arising

Sched. 4.39-11

from disclosure of credit information in connection with each Agent's secondary marketing operations and the purchase and sale of mortgages or Servicing Rights thereto;

(ggg)   <u>Tax Service Contract; Flood Certification Contract</u>.  Each Mortgage Loan is covered by a paid in full, life of loan, tax service contract and a paid in full, life of loan, flood certification contract and each of these contracts is assignable to Collateral Agent; and

(hhh)   <u>Regarding the Mortgagor</u>.  The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Fannie Mae guidelines for such trusts.