MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Anthony Princi

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**NOTICE OF FILING OF SUPPLEMENT TO DEBTORS' OBJECTION TO MOTION
OF BERKSHIRE HATHAWAY INC. FOR APPOINTMENT OF AN EXAMINER
PURSUANT TO 11 U.S.C. § 1104(c)**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On June 11, 2012, the debtors and debtors in possession (collectively, the "Debtors")

filed the *Debtors' Objection to Motion of Berkshire Hathaway Inc. for Appointment of an

Examiner Pursuant to 11 U.S.C. § 1104(c)* (the "Objection") [Docket 304]. The Objection

contained citations and references to transcripts and certain unreported decisions that were

inadvertently omitted as exhibits thereto.

Debtors hereby submit this supplement to the Objection and attach true and correct

copies of the following documents:

- Memorandum Decision and Order at 24, *In re Worldcom, Inc.*, Case No. 02-
  13533 (Bankr. S.D.N.Y. May 16, 2003) [Docket No. 5923] referenced in footnote

12 of the Objection, and attached hereto as <u>Exhibit A</u>;

- May 12, 2010 Hearing Transcript [Docket No. 3145], at 17:16-20, *In re Visteon Corp.* case, Case No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010), referenced in footnote 14 of the Objection and attached hereto as <u>Exhibit B</u>;

- October 31, 2007 Hearing Transcript [Docket No. 1997], at 76:11-12, *In re Am. Home Mortgage Holdings, Inc.* case, Case No. 07-11047 (KJC) (Bankr. D. Del. Oct. 31, 2007), referenced in footnote 14 of the Objection and attached hereto as <u>Exhibit C</u>;

- *In re Loral-Space and Commc'ns, Ltd.*, Case No. 04-08645, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004), referenced in footnote 15 of the Objection and attached hereto as <u>Exhibit D</u>; and

- Order Directing Appointment of Examiner Under 11 U.S.C. §§ 1104(c) and 1106 [Docket No. 7081] from the *In re Asarco, LLC*, Case No. 05-21207 (Bankr. S.D. Tex. Mar. 4, 2008), referenced in footnote 27 of the Objection and attached hereto as <u>Exhibit E</u>.

Dated: June 15, 2012
    New York, New York

*/s/*  Gary S. Lee              
Larren M. Nashelsky
Gary S. Lee
Anthony Princi
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

UNITED STATES BANKRUPTCY COURT                    UNPUBLISHED
SOUTHERN DISTRICT OF NEW YORK
_____

                                             :
                                             :
In re:                                       :        Chapter 11
                                             :
WORLDCOM, INC., *et al.*,                    :        Case No. 02-13533 (AJG)
                                             :
                        Debtors.             :        Jointly Administered
                                             :
_____:

### MEMORANDUM DECISION AND ORDER DENYING MOTIONS FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE AND EXAMINER

Before the Court are motions and various joinders for the appointment of a chapter 11 trustee

or examiner for MCI Corporation ("MCIC") and the MCIC subsidiaries (collectively, with MCIC,

"MCI") in the above-captioned cases of WorldCom, Inc., and certain of its direct and indirect

subsidiaries. For the reasons that follow, the Court denies the motions.

### I. Jurisdiction

The Court has subject matter jurisdiction of this matter under 28 U.S.C. §§ 1334(b) and

157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States

District Court, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding as that term is

defined by 28 U.S.C. § 157(b)(2).

### II. General Background

On July 21, 2002 and November 8, 2002, WorldCom, Inc., and certain of its direct and

indirect subsidiaries, including MCI (collectively, "WorldCom" or the "Debtor(s)"), commenced cases

under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By orders dated July

22, 2002 and November 12, 2002, the Debtors' chapter 11 cases have been consolidated for

procedural purposes only and are being jointly administered.  The Debtors continue to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.  On July 29, 2002, the United States Trustee for the Southern District of New

York (the "UST") appointed the statutory committee of unsecured creditors (the "Committee").

### III. Factual Background

*A. WorldCom, Inc., MCI and Intermedia*

WorldCom, Inc., one of the Debtors in the above captioned cases, together with direct and

indirect domestic subsidiaries and non-debtor foreign affiliates, is one of the world's largest global

communications companies providing a broad range of communication services in over 200 countries

on six continents.  WorldCom expanded as a result of numerous mergers and acquisitions.

In September 1998, WorldCom, Inc. acquired MCI for $40 billion pursuant to a merger of

MCIC with and into a wholly-owned subsidiary of WorldCom, Inc.  In 1998, when WorldCom, Inc.

acquired MCI, MCI was the fourth largest long distance telephone carrier in the United States, as well

as the third largest carrier of international voice traffic worldwide.  MCI enjoyed gross revenues of over

$18.5 billion and assets in excess of $20 billion.

In September 2000, WorldCom, Inc. purchased Intermedia Communications, Inc.

("Intermedia"), a provider of integrated data and voice communication services.  Thereafter, litigation

ensued involving the purchase and on July 1, 2001, WorldCom, Inc. ultimately consummated the

acquisition of Intermedia for approximately $5.8 billion, including the assumption of long-term debt

pursuant to the merger of a wholly-owned subsidiary of WorldCom, Inc., with and into Intermedia.

*B. Accounting Irregularities and Debtors' Response Thereto*

On June 25, 2002, the Debtors announced that an internal audit had revealed accounting irregularities. After the accounting announcement, WorldCom, Inc.'s board of directors formed a special committee (the "Special Committee") to conduct an independent investigation. The members of the Special Committee included a former United States Attorney General and a former head of enforcement at the United States Securities and Exchange Commission (the "SEC").

On June 26, 2002, in response to the Debtors' June 25, 2002 disclosures, the SEC commenced an enforcement action against WorldCom, Inc. for violations of various securities laws. The Debtors cooperated with this and other governmental investigations into their affairs. On June 28, 2002, the United States District Court for the Southern District of New York approved a stipulation and order providing for the appointment of a corporate monitor ("Corporate Monitor"). On July 3, 2002, the district court appointed Richard C. Breeden, a former chairman of the SEC, as Corporate Monitor with the consent of WorldCom, Inc. and the SEC. Pursuant to the June 28, 2002 order and subsequent orders entered by the district court, the Corporate Monitor is charged with, *inter alia*, overseeing the document retention policies of WorldCom, approving all compensation and similar payments to employees and any outside professionals or advisors, working with the Debtors regarding corporate governance to ensure the highest level of corporate integrity, and attending board meetings.

The Debtors filed the first bankruptcy petition electronically on Sunday, July 21, 2002. The following day, upon the request of the UST and with the consent of the Debtors, this Court directed the appointment of an examiner to investigate "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the arrangement of the affairs of any of the Debtors by

current or former management, including but not limited to issues of accounting irregularities." *See* Order Granting the Motion of the United States Trustee for the Appointment of an Examiner, dated July 22, 2002 (the "Examiner Order"). The Examiner Order further provided that in conducting its investigations, the examiner was to use best efforts to coordinate with and avoid unnecessary duplication of any investigations being conducted by the United States Department of Justice, the SEC, the Corporate Monitor or any other governmental agencies. On August 6, 2002, this Court approved the selection of Dick Thornburgh, former Attorney General of the United States and Governor of Pennsylvania, as the examiner (the "Examiner"). The Examiner issued his first interim report on November 4, 2002 and is expected to issue his next report in the near future.

On July 29, 2002, the UST appointed the Committee, which is currently comprised of 14 members representative of the broad spectrum of the Debtors' creditors, including bondholders and indenture trustees of WorldCom, Inc., MCIC, and Intermedia, as well as MCI trade creditors. The members of the Committee are as follows:

| Member | Interest |
|---|---|
| Metropolitan West Asset Management LLC | WorldCom, Inc. Bondholder |
| Cerberus Capital Management, L.P. | WorldCom, Inc. Bondholder |
| Blue River, LLC | WorldCom, Inc. Bondholder |
| ESL Investments | WorldCom, Inc. Bondholder |
| Wilmington Trust Company, as Indenture Trustee | WorldCom, Inc. Bonds |
| Deutsche Bank AG WorldCom Bank Lender | WorldCom, Inc. Bank Lender |
| ABN AMRO Bank N.V. | WorldCom, Inc. Bank Lender |

| Law Debenture Corporate Services, Inc., as Indenture Trustee | MCI Bonds |
|---|---|
| Metropolitan Life Insurance Company | MCI Bondholder |
| New York Life Investment Management LLC | MCI Bondholder |
| Elliot Management Corp. | MCI Bondholder |
| Electronic Data Systems Corporation | MCI Trade Creditor |
| AOL Time Warner, Inc. | MCI Trade Creditor |
| Sun Trust Bank, as Indenture Trustee | Intermedia Bonds |

At least six of the 14 members of the Committee are creditors of MCI. Thus, over 40% of the Committee in number is made up of MCI creditors.

In addition to the Committee, a number of informal committees have been active throughout the chapter 11 cases. These informal, or ad hoc committees, include an informal committee representing bondholders of MCIC (the "Ad Hoc MCI Committee"), an informal committee representing bondholders of WorldCom, Inc. (the "Ad Hoc WorldCom Committee"), and an informal committee representing bondholders of Intermedia Communications Inc. (the "Ad Hoc Intermedia Committee" and collectively with the Ad Hoc MCI Committee and the Ad Hoc WorldCom Committee, the "Ad Hoc Committees"). In addition, other creditors, including MatlinPatterson Global Opportunities Partners L.P., MatlinPatterson Phoenix SPV L.L.C., Silver Lake Phoenix LLC, and Bain Capital (collectively, the "MatlinPattersonGroup"), which hold significant claims against the Debtors, have actively participated in the chapter 11 cases.

On April 29, 2002, Bernard Ebbers resigned as the Debtors' chairman and chief executive officer ("CEO") and was replaced by John Sidgmore (the Debtors' then vice chairman) as interim

-5-

CEO.  On September 10, 2002, the Debtors announced that they were actively seeking a permanent

CEO to replace John Sidgmore.  The Debtors' decision to commence a search for a permanent CEO

was done, in part, at the urging of the Committee.  The Committee recognized a pressing need for

permanent leadership distinct from the Debtors' current and prior management to quell public

perception about the Debtors' financial incongruities, stability and ongoing businesses.  It was viewed

as critical to secure independent and new leadership to ensure the successful restructuring efforts of the

Debtors.  In September 2002, the Debtors retained the search firm SpencerStuart to assist the Debtors

(through the Search Committee of WorldCom, Inc.'s board of directors) in identifying a new CEO.

The Committee formed a Search Subcommittee which participated in the interview and selection

process.  The Search Subcommittee of the Committee was comprised of five members, and included

Elliot Management Corp., an MCIC bondholder, and Electronic Data Systems Corporation, an MCI

trade creditor.

      After an extensive screening process, the Debtors and the Search Subcommittee of the

Committee determined that Mr. Michael Capellas was the most qualified person to assume the role of

CEO.  On December 9, 2002, the Debtors filed a motion seeking authorization to employ Mr. Capellas

as CEO and Chairman of WorldCom, Inc.'s board of directors.  The motion was supported by the

Committee and approved by the district court and this Court on December 16, 2002.

      On October 15, 2002, this Court entered an order authorizing the Committee to retain a

forensic accountant to, among other things, (i) analyze and determine the appropriateness of the

Debtors' accounting journal entries and other record keeping methods relating to inter/intra company

transactions between their various legal entities, (ii) obtain and review the Debtors' intercompany

account balances and any reconciliations that may be required, (iii) analyze the Debtors' historical

financings and acquisitions and determine the appropriateness of those transactions on a legal entity-by-

entity basis, and (iv) review with the Debtors' management and gain an understanding of the Debtors'

operating practices and policies including the Debtors' cash management system and inter/intra

company transactions.

On November 26, 2002, the Debtors consented to the entry of a permanent injunction which

partially addressed the SEC litigation.  Pursuant to the partial settlement, the Debtors agreed (i) not to

violate securities laws in the future, (ii) to provide reasonable training and education to their senior

operational officers and financial reporting personnel to minimize the possibility of future violations, (iii)

to conduct a review of the effectiveness of its material internal accounting control structure and policies,

and (iv) that following consideration of the Special Committee's report, the Corporate Monitor would

submit recommendations concerning the Debtors' ongoing corporate governance and ethics policies.

On December 17, 2002, all of the members of the Debtors' board of directors serving prior to

the announcement of the accounting irregularities resigned.  All the members of the Debtors' current

board of directors were appointed subsequent to the aforementioned announcement.  On January 14,

2003, the Debtors, via web broadcast, announced the 100-Day Initiative.  Pursuant to the 100-Day

Initiative, the Debtors proposed to (i) launch new consumer and business products and services, (ii)

aggressively address the small-to medium-sized business market, (iii) implement cost reduction plans,

(iv) implement additional corporate integrity initiatives, including the establishment of a new corporate

leadership structure whereby the Debtors' business market and mass market sales, international

operations, strategy and marketing operations and technology, human resources, finance, accounting

-7-

and legal functions all report directly to the CEO, (v) prepare one-year and three-year business plans,

and (vi) file a plan of reorganization by April 14, 2003.  Due to the efforts of the Debtors' new

management team, the Debtors successfully completed the 100-Day Initiative.

*C. The Proposed Plan and Disclosure Statement and the Instant Motions*

On April 14, 2003, the Debtors filed a proposed plan of reorganization (the "Plan") and a

related disclosure statement (the "Disclosure Statement").  A hearing on the adequacy of the Disclosure

Statement currently is scheduled for May 19, 2003.  No hearing has been scheduled for confirmation of

the Plan.

The Plan substantively consolidates the estates of the WorldCom Debtors (which the Plan

defines as each of the chapter 11 debtors, other than the Intermedia Debtors) and the Intermedia

Debtors, respectively.  According to the Disclosure Statement, the Plan represents a compromise and

settlement of issues regarding substantive consolidation raised by the Ad Hoc Committee of MCIC

Senior Notes Holders and makes special provision in the treatment of the MCIC Senior Debt Claims

(as such term is defined in the Plan) to take into account the reliance of the holders of such claims in

extending credit to MCIC prior to its merger with WorldCom.  In addition, the Plan embodies a

compromise and settlement of certain issues with respect to the recharacterization of a certain

Intermedia intercompany note, an Intermedia fraudulent transfer claim, and an Intermedia preference

claim, which compromise and settlement affects the recovery of creditors of the Intermedia Debtors.

On April 17, 2003, the Ad Hoc MCI Trade Claims Committee (the "MCI Trade Committee")[1]

---

[1]The MCI Trade Committee consists of secondary purchasers of various trade claims of two
Debtor entities, MCI WorldCom Network Services, Inc. and MCI WorldCom Communications, Inc..

-8-

filed a Motion for the Appointment of a Chapter 11 Trustee for MCI Communications Corporation and

its Subsidiaries (the "MCI Trade Committee Motion").  On April 21, 2003, the Dissenting MCI

Bondholders (the "Dissenting MCI Bondholders" and, together with the MCI Trade Committee, the

"Movants" )[2] filed a Motion to Appoint a Limited Purpose Chapter 11 Trustee for MCI

Communications Corporation and its Subsidiaries (the "Dissenting MCI Bondholder Motion").

## IV.  Legal Standard

Section 1104(a) of the Bankruptcy Code provides that a chapter 11 trustee shall be appointed:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of
> the affairs of the debtor by current management either before or after the
> commencement of the case, or similar cause, . . .; or
> (2) if such appointment is in the interests of creditors, any equity security holders, and
> other interests of the estate.

11 U.S.C. § 1104(a).

The party seeking appointment of the trustee has the burden of showing, by clear and

convincing evidence, cause under section 1104(a)(1) or the need for a trustee under section

1104(a)(2).  *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998); *In re

Ionosphere*, 113 B.R.164, 168 (Bankr. S.D.N.Y. 1990).  The decision to appoint a trustee in a

chapter 11 proceeding is a factual determination left to the discretion of the bankruptcy judge.  *See

Schuster v. Dragone (In re Dragone)*, 266 B.R. 268, 271 (D. Conn. 2001).

The appointment of a chapter 11 trustee is recognized as an extraordinary remedy because

there is a strong presumption that the debtor should remain in possession.  *See Ionosphere*, 113 B.R.

---

[2]The Dissenting MCI Bondholder Committee primarily consists of holders of the preferred
stock instruments issued by MCI Capital I, a non-Debtor affiliate of MCIC.

-9-

at 167.  This presumption is premised upon the familiarity that the debtor in possession has with the

business it manages at the time of the filing, thereby making it the best party to conduct the debtor's

business during reorganization.  *Marvel*, 140 F.3d at 471.  The presumption is also premised on the

fiduciary duty owed to creditors, which presupposes that the debtor in possession will conduct the

affairs of the estate in a manner beneficial to creditors.  *Id.* at 471, 474.


Section 1104(a)(1) authorizes the appointment of a trustee "for cause, including fraud,

dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by *current* management

either before or after the commencement of the case, or similar cause . . . ."  11 U.S.C. § 1104(a)(1)

(emphasis added).  This provision of the Bankruptcy Code provides a non-exclusive list of what may

constitute cause.  *See* 11 U.S.C. § 102(3) (providing that the terms "includes" or "including" are not

limiting).  Each factor listed as "cause" to appoint a trustee "'cover[s] a wide range of conduct'" giving

the court discretion to determine if cause exists.  *Marvel*, 140 F.3d at 472.  It is generally recognized

that there is some degree of prepetition mismanagement and incompetence in every bankruptcy case.

Therefore, a showing of more than simple mismanagement or incompetence is required to appoint a

trustee.  *See, e.g., In re Evans*, 48 B.R. 46, 47 (Bankr. W.D. Tex. 1985).  As the text of the

Bankruptcy Code suggests, "the focus [under 1104(a)(1)] is on the debtor's current activities, not past

misconduct."  *In re Sletteland*, 260 B.R. 657, 671-72 (Bankr. S.D.N.Y. 2001).  Thus, it follows that

where current management is not implicated by a debtor's prior misdeeds, there may be no legal basis

for the imposition of a trustee under section 1104(a)(1).

Similarly, section 1104(a)(2) authorizes the appointment of a trustee if "such appointment is in

-10-

the interests of creditors, any equity security holders and other interests of the estate." 11 U.S.C. §

1104(a)(2). This provision envisions a flexible standard, *Marvel*, 140 F.3d at 474, necessitating that

the court resort to its broad equitable powers. *Dragone*, 266 B.R. at 272. In exercising equitable

powers, a court should avoid rigid absolutes and instead focus upon the practical aspects of a given

case. *See Dragone*, 266 B.R. at 272-73 ("In equity, courts eschew rigid absolutes and look to the

practical realities and necessities inescapably involved in reconciling competing interests. Moreover,

equitable remedies are a special blend of what is necessary, what is fair and what is workable.")

(internal quotation marks omitted). Under section 1104(a)(2), a creditor group, no matter how

dominant, cannot justify the appointment of a trustee simply by alleging that it would be in its interests.

*Sletteland*, 260 B.R. at 672. Indeed, as it has been noted:

> [I]t is important to remember that the "interests" standard requires a
> finding that appointment of a trustee would be in the interest of
> essentially all interested constituencies. . . . Use of the word "and" [in
> the text of section 1104(a)(2)] suggests that creditors cannot on their
> own obtain the appointment of a trustee under the provision in order to
> disenfranchise equity security holders or other interests. Instead,
> appointment of a trustee must be in the interest of the estate generally in
> order to satisfy the statutory "interest" standard.

7 Alan N. Resnick & Frank J. Sommer, *Collier on Bankruptcy* ¶ 1104.02 [3][d][i] (15th ed. rev.

2003). The traditional factors used to determine the propriety of a trustee under subsection (a)(2)

include:

> (i) the trustworthiness of the debtor;
> (ii) the debtor's past and present performance and prospects for rehabilitation;
> (iii) the confidence of the business community in the debtor; and
> (iv) whether the benefits of a trustee outweigh the costs.

*Ionosphere*, 113 B.R. at 168.

-11-

Although a full evidentiary hearing is not required, *Ionosphere*, 113 B.R. at 167, in this matter

the Court conducted a full evidentiary hearing on May 15, 2003.

## V. Discussion[3]

### A. *The Appointment of a Chapter 11 Trustee*

#### 1. *The Movants Argue that Cause Exists to Satisfy Section 1104(a)(1)*

The Movants' contentions can be distilled to the following arguments that allegedly justify the

appointment of a trustee under section 1104(a)(1):  (i) the proposal by the Debtors of a Plan that

provides for substantive consolidation and the concomitant elimination of intercompany claims; (ii) the

filing of consolidated schedules of assets; and (iii) the Debtors' negotiation of a consensual Plan.[4]  In

addition, the Joint Reply can be distilled to the following argument: that Debtors' alleged failure to

adequately investigate better economic terms for MCI creditors, as evidenced by the proposed terms

of the Plan, warrants the imposition of a chapter 11 trustee.

As a preliminary matter, the Court agrees with the Debtors' and Committee's assertions that

the majority of arguments raised by the Movants are more properly characterized as objections to

confirmation of the Plan.  But for the economic terms of the Plan that include substantive consolidation

---

[3]Although the Court has not addressed herein every argument raised by the parties, the Court has considered all such contentions and has determined that such are either irrelevant or immaterial to the ultimate decision of the Court.

[4] Initially, the Movants had relied on prepetition misconduct by former management as a justification for the appointment of a trustee.  However, at the hearing, the Movants focused only on the Debtors' postpetition conduct.  As previously discussed, in considering whether to appoint a trustee for cause under section 1104(a)(1), the focus is on evaluating the conduct of current management. Movants' arguments concerning current management will be addressed in connection with the economic terms of the Plan.

-12-

of the MCI and the Worldcom Debtors, the Court can see no reason for the timing of the issues raised

herein. Although Movants characterize their failure to act to preserve their rights until the eve of a

disclosure statement and a plan confirmation hearing as an honest "mistake," based upon the entire

record of this case, there is no basis for the Court to conclude that Movants "mistake" is anything but a

calculated risk. The fact that they may have relied upon the Ad Hoc MCI Committee to generally

protect their interests is of little consequence. At the outset of these cases, potentially conflicting issues

related to intercompany debt between Worldcom, Inc. and MCI entities were readily apparent from

the manner in which the businesses were conducted. The 100-day Initiative was well publicized and it

was quite clear that Mr. Capellas was committed to file a plan by mid-April 2003. Therefore, the filing

of a plan that addresses these issues should not have come as a surprise to the Movants, and hence

they should have been more diligent in protecting their interests.

> *i. Movants Have Failed to Establish that the Plan as
> Proposed by the Debtors Providing for Substantive
> Consolidation Constitutes Cause for the Appointment
> of a Trustee*

Movants contend that Debtors' failure to consider less harmful substantive consolidation

alternatives is cause for the appointment of a trustee. According to Movants, WorldCom should have

considered a three-entity substantive consolidation that would respect the alleged historic separateness

of the WorldCom, Inc. and MCI Debtors.

According to WorldCom, Inc., the Debtors recognized early in these chapter 11 cases that,

because they viewed their operations as integrated and because of the complex debt structure, the

question of the substantive consolidation of some or all of the Debtors would need to be analyzed and

-13-

decided.  Accordingly, the Debtors assert that they began to examine the facts and research the law of

substantive consolidation.  The Debtors contend that shortly after the chapter 11 filing, the Debtors and

their advisors discussed issues relating to substantive consolidation and the intercompany claims.  In

addition, the Debtors assert that their advisors addressed these issues with the Committee's

professionals.  The Debtors referenced its detailed time records evidencing activity through March

2003 by 34 attorneys who spent in excess of 1,150 hours analyzing the issues concerning substantive

consolidation and intercompany claims.

   The Debtors contend that during their investigation of the substantive consolidation issues, they

concluded that it was necessary to review the intercompany claims to determine whether the Debtors'

affairs could be disentangled.  The Debtors further contend that in an effort to avoid delay and

duplicative work, it was determined that the forensic accountants retained by the Committee would

take the lead role in compiling, analyzing, and reporting on intercompany claims and underlying data.

The Debtors maintain that this procedure was employed to enable the forensic accountants to

determine whether it would be possible for the Debtors to produce accurate, separate financial

statements for each of the Debtors' entities.  The Debtors assert that certain other prepetition advisors

worked with the forensic accountants in developing this information.  On November 13, 2002, January

8, 2003, and March 12, 2003, respectively, the forensic accountants produced reports detailing their

analyses of various legal entity and intercompany issues.   In these reports, the forensic accountants

indicated that the Debtors' accounting system does not contain all information that would enable the

Debtors to reliably track intercompany information on a legal entity basis.  In addition to the work

performed by the Committee's forensic accountants, the Debtors assert that financial advisors to the

-14-

Debtors and the Committee have analyzed the information from the Debtors' books and records in an

effort to determine what recoveries would be available to various creditor constituencies under a

number of assumptions.  The Debtors further assert that the financial advisors analyzed the results of the

forensic accountants' investigation as they relate to substantive consolidation and the impact of the

intercompany claims.

It appears that the Movants disagree with the conclusions drawn by the Debtors after the

Debtors' extensive investigation and analysis of the issues concerning substantive consolidation and

intercompany claims.  However, this disagreement is not the basis for the appointment of a trustee

where it appears the Debtors have appropriately discharged their fiduciary duty in evaluating and

analyzing these issues and have reached an informed conclusion.

The Movants argue that the Debtors did not fulfill their fiduciary duty because management did

not consider a three-party substantive consolidation model with the MCI entities separately

consolidated.  It appears undisputed that Mr. Capellas did not personally review the three-party

substantive consolidation model.  However, Mr. Capellas relied on the advice of various professionals

retained in these cases to reach his conclusions regarding substantive consolidation and other related

issues.  It is undisputed that some of these professionals considered the three-party substantive

consolidation model.  Whatever may be said about the three-party model and substantive

consolidation, it appears that the Movants disagree with the conclusions drawn by the Debtors after the

Debtors' investigation and analysis of the issues concerning substantive consolidation and intercompany

claims.  In this Court's view, this disagreement is not the basis for the appointment of a trustee where

the Debtors have expended great efforts in a forthright evaluation and analysis of these issues leading

-15-

the Debtors to ultimately reach an informed conclusion. The Movants opposition to the Debtors'

conclusion to promote a two-entity substantive consolidation is more appropriately addressed in the

context of considering confirmation of the Debtors' Plan.

### ii. Movants Failed to Establish that
### Debtors Abandoned their Duties in this Case

Movants argue that a trustee is required because WorldCom has abandoned its duties. As

support, Movants contrast WorldCom's alleged conduct to WorldCom's legal duties in these cases as

represented in the following chart:

| Code/Rule | WorldCom's Alleged Conduct That Justifies A Trustee |
|---|---|
| 1) Section 521(1) and Bankruptcy Rule 1007: Debtor/Trustee must file schedules. | WorldCom Debtors refuse to file schedules of assets for MCI. |
| 2) Section 704(5): Object to the allowance of any claim that is improper. | WorldCom Debtors refuse to examine claims against MCI and have no intention of objecting to claims against MCI that benefit WorldCom Debtors. |
| 3) Section 704(7): Furnish such information concerning the estate as is requested by a party in interest. | WorldCom Debtors refuse to divulge the basis for intercompany claims, or which subsidiaries allegedly own them. WorldCom Debtors also have not divulged any reason for treating them as valid claims. |

1) Movants' allege that WorldCom refuses to file schedules of assets for MCI. In response to

Movants' argument, the Debtors contend that they have filed schedules. On April 14, 2003, the

Debtors filed their schedule of assets, which primarily consist of an unaudited schedule of assets for all

of the Debtors other than Intermedia Communications, Inc. and its subsidiaries. On May 7, 2003, in

order to ensure compliance with section 521 of the Bankruptcy Code and to provide the most accurate

disclosure of assets possible, the Debtors filed amendments to their schedule of assets. The

amendments consist of approximately 46,500 pages detailing the real and personal property owned by

the consolidated Debtors. According to Debtors, they have filed the best, most accurate schedules that

they can file, given the realities of this case and the state of the books and records of the 222 Debtors.

The Debtors and the Committee believe that with the filing of the amendments to the schedule of assets,

the Debtors have made the proper disclosure of their assets as required under section 521 of the

Bankruptcy Code and the applicable Bankruptcy Rules.

The Court agrees with the Debtors and the Committee. The suggestion by the Movants that the

filing of consolidated schedules is a refusal to file schedules for MCI is misplaced. It was plainly evident

from the hearing that the Debtors' purported failure to file independent schedules of assets attributable

to MCI is not a dereliction of duty but simply a manifestation of the size and complexity of the issues in

these cases. Thus, Movants have failed to convince this Court that a trustee is needed to ameliorate the

situation.

2) Movants' allege that WorldCom refuses to examine claims against MCI and has no

intention of objecting to claims against MCI that benefit WorldCom itself. In response, Debtors point

to the numerous hours spent by professionals, including counsel for the Debtors, considering these

issues. For the same reasons outlined in section V.A.1.*i.* herein, the Court finds that Movants have

failed to meet its burden. Accordingly, there is no basis from which the Court can conclude that

Debtors have failed to fulfill its obligations under section 704(5) of the Bankruptcy Code.

3) Movants allege that WorldCom refused to furnish information concerning

-17-

the estate and the estate's administration as requested by Movants.[5]  Specifically, Movants charge that

Debtors did not divulge the basis for intercompany claims or which subsidiaries own them, or the

reasons for treating them as valid claims.  The Debtors respond that WorldCom spent thousands of

hours identifying and mapping these intercompany balances.  Beyond employing WorldCom's own

professionals, finance, tax and accounting personnel, the Debtors worked closely with the Committee's

forensic accountants to produce a matrix summarizing information to the extent possible at the time.  In

addition, the forensic accountants completed three reports which were shared with the Debtors and

major creditor constituents.

The Debtors noted that they faced considerable obstacles in assembling a reliable account of

intercompany claims.  WorldCom had never maintained their records on a legal entity basis, and had

therefore never summarized the intercompany balances among subsidiaries.  Furthermore, internal

controls for properly recording activity by separate legal entity had never been established, nor were

intercompany balances a focus of management review or control.  Additional difficulties stemmed from

the loss of institutional knowledge resulting from the termination of many of those in prepetition

management, and from the questionable veracity of accounting information dealing with prepetition

---

[5] The objection of the Debtors and the Committee to the admission of paragraphs 9-21 of the
Affidavit of Steven D. Pohl in support of the Ad Hoc MCI Trade Claims Committee's Motion for the
Appointment of a Chapter 11 Trustee for MCI Communications Corporation and its Subsidiaries (the
"Pohl Affidavit") is sustained and the Pohl Affidavit is not admitted into evidence.

The admission of the Pohl Affidavit would contradict the understanding that the parties to this
action arrived at concerning evidentiary procedures.  Given the eleventh hour introduction of the Pohl
Affidavit, neither the Debtors or the Committee was able to depose Pohl or to offer their own
responsive affidavit.

Moreover, the fact that Movants' counsel did not address the alleged discovery issues to the
Court prior to the submission of the Pohl Affidavit leads the Court to conclude that these issues are
immaterial and without merit.

activity.  Despite these shortcomings, the Debtors have argued that the intercompany matrix produced

by the forensic accountants is as accurate a report as possible under the circumstances.  The forensic

accountants' matrix ultimately formed the foundation for a "distribution model" built by the Committee's

financial advisors.

Movants have not established that WorldCom has failed to fulfill its duties pursuant to Section

704(7) of the Bankruptcy Code to furnish such information concerning the estate and the estate's

administration as required by the Movants.  The Court recognizes that significant obstacles exist in

accurately recreating a map of these complex intercompany claims.  However, the Court believes that,

given the circumstances, Movants had access to the most comprehensive information available.  The

Court does not believe that the appointment of a chapter 11 trustee is needed to ensure that Movants

continue to receive accurate information from the Debtors, or that the Debtors' disclosure to date is

insufficient, rendering necessary the appointment of a trustee.

*iii. Alleged Solicitation of Votes*

Movants allege that the Debtors have entered into an agreement with the MCIC Bondholders

that would accord the bondholders a substantial premium over the treatment they might otherwise

realize in a substantive consolidation of the Debtors.  Movants further allege that this treatment is only

available to MCI Bondholders if they agree to withdraw as members of the MCI Trade Committee and

agree that they will not contest the Plan in their capacity as holders of MCI trade claims or of MCIC

subordinated debt claims.  Movants argue that Debtors' alleged conduct amounts to improper

solicitation of acceptances to the Plan pursuant to section 1125(b) of the Bankruptcy Code.

Debtors respond that WorldCom did not solicit acceptances to the Plan in violation of section

-19-

1125(b).  Debtors claim that there is no written agreement among the Debtors and any constituency in

this case to support the Plan, and that discussion between the Debtors and any constituency on the Plan

occurred in the context of plan negotiations rather than acceptance solicitations.

Section 1125(b) provides that:

> An acceptance or rejection of a plan may not be solicited after the commencement of
> the case under this title from a holder of a claim or interest . . . unless, at the time of or
> before such solicitation, there is transmitted to such holder the plan or a summary of the
> plan, and a written disclosure statement approved, after notice and a hearing, by the
> court as containing adequate information . . . .

11 U.S.C. § 1125(b).

A majority of courts have adopted a narrow reading of "solicitation" for purposes of section

1125(b).  *In re Clamp-All Corp.*, 233 B.R. 198, 205 (Bankr. Mass. 1999); *Century Glove, Inc. v.

First American Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988) ("A broad reading of [section]

1125 can seriously inhibit free creditor negotiations."); *In re Snyder*, 51 B.R. 432, 437 (Bankr. D.

Utah 1985) ("The terms 'solicit' and 'solicitation,' as used in [section] 1125(b) of the [Bankruptcy]

Code, must be interpreted very narrowly to refer only to a specific request for an official vote either

accepting or rejecting a plan of reorganization."); *Snyder*, 51 B.R. at 437 ("The terms ['solicit' and

'solicitation'] do not encompass discussions, exchanges of information, negotiations, or tentative

arrangements that may be made . . . which may lead to the development of a disclosure statement or

plan of reorganization, or information to be included therein.  If these activities were prohibited by

[s]ection 1125(b), meaningful creditor participation would cease to exist.").

This Court agrees that, as a general principal, a narrow reading of the term "solicitation" in

relation to section 1125(b) is essential to promote a consensual reorganization process.  A narrow

reading "avoids a chill on debtors' postpetition negotiations with their creditors, one which otherwise

might prove devastating to the reorganization process." *In re Kellogg Square P'ship*, 160 B.R. 336,

340 (Bankr. D. Minn. 1993). Given the narrow reading generally applied to the term "solicitation" as

used in section 1125, and based upon the facts presented regarding the alleged solicitation of

acceptances by the Debtors, it is likely that the Debtors' actions would be deemed plan negotiations as

opposed to solicitations in this instance. However, the Court need not rule on this issue at this time.

The issue presently before the Court is whether Debtors' conduct is an element of cause warranting the

appointment of a chapter 11 trustee. The Court holds that Debtors' conduct does not support

Movants' motion to appoint a chapter 11 trustee.

 Even if this Court determined that the Debtors had improperly solicited acceptances to the

Plan, it is this Court's view that,

> a party in interest who seeks to obtain relief from an improper solicitation under the
> Bankruptcy Code must obtain such relief in accordance with the provisions of the
> [Bankruptcy] Code. Pursuant to 11 U.S.C. § 1126(e), the exclusive relief afforded
> under the [Bankruptcy] Code is to have such improperly solicited acceptance or
> rejection disregarded for purposes of computing the vote of the plan.

*In re Texaco*, 81 B.R. 813, 816 (Bankr. S.D.N.Y. 1988); *see also In re Allegheny International,*

*Inc.*, 118 B.R. 282, 293 (Bankr. W.D. Penn. 1990).

 Section 1126(e) states that:

> On request of a party in interest, and after notice and a hearing, the court may designate
> any entity whose acceptance or rejection of such plan was not in good faith, or was not
> solicited or procured in good faith or in accordance with the provisions of this title.

11 U.S.C. § 1126(e).

 Since the Bankruptcy Code provides an exclusive remedy for the improper solicitation of

acceptances to a plan, the appointment of a chapter 11 trustee would not be an appropriate remedy in the case at hand even if the Debtors had solicited improperly acceptances to the Plan.

*iv. Summary*

The Court concludes that the Movants have not established by clear and convincing evidence that cause exists to appoint a trustee pursuant to 11 U.S.C. § 1104(a)(1).

*2. Movants Are Unable To Satisfy Section 1104(a)(2) Standard*

For substantially the same reasons, the Court finds that Movants have failed to establish by clear and convincing evidence that a trustee is required under section 1104(a)(2).  There are simply too many interests with a stake in MCI that actually support the Debtors' efforts for the Court to find that the appointment of a chapter 11 trustee is in the interests of all creditors as the Bankruptcy Code requires.  Nevertheless, the Court will discuss the factors outlined in *Ionosphere*, 113 B.R. at 168.

*i. Trustworthiness*

 The Debtors' trustworthiness is no longer at issue.  Debtors have hired a new CEO and have replaced their board of directors.  Further, the Court is not aware of any criticism of the Debtors' business practices during postpetition period and the Debtors have worked diligently with creditors' constituencies in furtherance of their reorganizational goals.

*ii. Prospects*

The Debtors have made progress with respect to their business plan, are expanding their customer base and are moving toward a successful reorganization.

*iii. Confidence*

The appointment of a trustee to propose a plan for MCI would reduce, not enhance, creditor

and customer confidence in the Debtors and their businesses. In fact, an order of this Court appointing

a trustee in any of the Debtors' cases would constitute an event of default under the Debtors'

postpetition credit facility. Such an event of default would give the Debtors' postpetition lenders the

right to accelerate any outstanding balances and terminate the facility. With this knowledge, creditors

and suppliers would be reluctant to provide the Debtors with trade credit, critical goods, and services,

rendering the Debtors unable to properly serve their customers and without any ability to finance

working capital requirements. For many customers, WorldCom provides the backbone of their

business, and the Debtors' inability to serve such customers, including the United States government,

could prove devastating. The

unsettling effect of a trustee would be detrimental for the Debtors and all parties in interest, including the

Movants.

### iv. Cost-Benefit Analysis

The appointment of a trustee would be very costly to the Debtors and their estates, with no

apparent benefit. Given the size and complexity of the Debtors and their operations, the delay and

expense that would be caused by the trustee's (and new professionals') need to learn about the

Debtors' assets, liabilities, businesses, and chapter 11 cases would be substantial and would likely

seriously and adversely affect the prospects of rehabilitation. The appointment of a trustee would

severely impede the Debtors' ability to confirm a consensual chapter 11 plan of reorganization within

the next few months. As been stated previously in this decision, the issures raised by the Movants

throughout are most appropriately addressed in the context of the Plan confirmation process.

### v. Summary

The best interests of the WorldCom Debtors and the MCI Debtors taken either separately or combined are not served by the appointment of a trustee.

## C. *Appointment of an Examiner is Not Warranted*

The Court finds that the MCI Trade Committee's motion for appointment of an examiner is not warranted.  Section 1104(c) of the Bankruptcy Code does not require that the Court appoint another examiner where the mandatory prong of subsection (c)(2) of section 1104 has already been satisfied with the appointment of an examiner in the case.  The general provision of subsection (c) of section 1104 simply requires that the Court "order the appointment of an examiner to conduct such an investigation of the debtor *as is appropriate*" (emphasis added).  The Court finds that this language provides it with broad discretion to either expand the role of the Examiner to address issues raised during the proceeding or to appoint another examiner to address such issues.

The Court finds that expanding the scope of the Examiner's authority or appointing another examiner likely would cause the Debtors to incur substantial and unnecessary expenses detrimental to the interests of creditors and other parties in interest.  The Court also finds that since the confirmation process has already begun in this case, another appointment would cause undue delay of that process and thereby would likely have a negative impact on all of the Debtors in the marketplace.  Further, the Court finds that, at this juncture in the case, the issues that the MCI Trade Committee would like to have another examiner address are more appropriately raised in the context of the confirmation process.  Accordingly, the MCI Trade Committee's alternative relief seeking the appointment of an examiner is denied.

## VI. Conclusion

-24-

Upon consideration of all the arguments raised by the parties and the entire record of this case,

the motions and any joinders thereto are DENIED.

SO ORDERED.

Dated:  New York, New York
       May 16, 2003

                           /s/ Arthur J. Gonzalez
                           UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 09-11786-CSS

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


VISTEON CORPORATION, et al.



            Debtors.



- - - - - - - - - - - - - - - - - - - -x



            United States Bankruptcy Court

            824 North Market Street

            5th Floor

            Wilmington, Delaware


            May 12, 2010

            10:05 AM



B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  LESLIE MURIN

170

1          THE COURT:  Thank you.  Excuse me.  All right, the

2     issue, of course, before the Court, is whether to appoint an

3     examiner, pursuant to the motion in front of the Court.  And

4     the statute which is applicable, of course, is 1104(c).  "If

5     the Court does not order the appointment of a trustee," which I

6     have not, "then at any time before the confirmation ... on

7     request of a party in interest ... and after notice and a

8     hearing, the court shall order the appointment of an examiner

9     to conduct such an investigation of the debtor as is

10     appropriate, including" and then it goes on, "if such

11     appointment is in the interests of creditors" equity holders,

12     et cetera, "or the debtor's fixed, liquidated, unsecured debts

13     ... exceed $5,000,000."  It's a troubling -- well, troubling,

14     it's a somewhat ambiguous statute notwithstanding the fact that

15     it says "shall", because it immediately limits the scope of

16     that "shall".  I don't think it's true, and I think it would be

17     an absurd result to find that in every case where the financial

18     criteria is met and a party-in-interest asks, the Court must

19     appoint an examiner.  There has to be an appropriate

20     investigation that needs to be done.

21          Now, it's -- until someone does an investigation, of

22     course, you don't know whether an investigation really needed

23     to be done or not.  But at some point there has to be a level

24     of smoke, if you will -- not a lot but more than none, more

25     than just a whiff of smoke -- but some sort of indication, some

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .   Chapter 11
                                .
AMERICAN HOME MORTGAGE          .   Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware      .   (Jointly Administered)
corporation, *et al.*,          .
                                .   Oct. 31, 2007 (10:09 a.m.)
            Debtors.            .   (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    doesn't take a ton of time.  So - and I'm sensitive to this

2    issue and I know the Office of the United States Trustee is

3    sensitive, and I understand their position in connection with

4    shall meaning shall, and I think that's true, but I think in

5    order for - I would draw a bit of a distinction between what

6    Judge Walsh and Judge Balick have appeared to rule which is

7    simply that it's a best interest test.  I don't think that's

8    correct.  The best interest is in ©)(1).  It's not in ©)(2).

9    I think the financial criteria are important, and obviously,

10   they're met in this case, but that's only one piece of the

11   puzzle, and the other piece of the puzzle is that there has

12   to be an investigation to perform that's appropriate.  I

13   think the cases cited in the <u>Colliers</u> treatise discuss that.

14   I think that's a more nuance approach than sort of saying it

15   is what it is, and if you cry "examiner" in a crowded case,

16   you get one.  In this case, reading the motion carefully, I

17   really didn't see a request for any investigation.  There was

18   a complaint about practices.  A 2004 request for information

19   about individual loan files that we've already discussed, but

20   no real articulation of what it was that the movants wanted

21   to be investigated by an examiner, and even if one were to

22   sort of assume, okay, they want someone to examine the

23   debtors' practices in connection with loan origination and

24   servicing that may be violations of state or federal law, I

25   don't think that at this time giving someone sort of carte

**EXHIBIT D**

4

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 2979785 (S.D.N.Y.), 53 Collier Bankr.Cas.2d 555, 44 Bankr.Ct.Dec. 25
**(Cite as: 2004 WL 2979785 (S.D.N.Y.))**

H

United States District Court,
S.D. New York.
In re LORAL SPACE & COMMUNICATIONS,
LTD., et al. Debtors,
LORAL STOCKHOLDERS PROTECTIVE COM-
MITTEE, Appellant,
v.
LORAL SPACE & COMMUNICATIONS LTD., et
al., Appellees.

No. 04 Civ. 8645RPP.
Dec. 23, 2004.

Tony Christ, Falls Church, VA, Jeffrey M. Swarts,
Danville, Ohio, for Ad Hoc Loral Stockholders Pro-
tective Committee, pro se.

Weil, Gotshal & Manges LLP, New York, NY, By:
Stephen Karotkin, Rachel B. Ehrlich, for Loral Space
& Communications Ltd.

ORDER

PATTERSON, J.

(Jointly Administered)

**\*1** The Appellants, Loral Stockholders Protec-
tive Committee (the "LSPC"),[FN1] appeal *pro se*
the September 2, 2004 judgment of the United States
Bankruptcy Court for the Southern District of New
York (the "Bankruptcy Court"), denying their motion
for the appointment of an examiner under Sections
1104(c)(1) and (2) of the Bankruptcy Code, 11
U.S.C. § 101 *et seq.* In response to a December 7,
2004 letter from the LSPC requesting an expedited
hearing on this appeal and stating that it would rely
on the papers it had already filed, this Court issued an
Order on December 8, 2004 directing the Appellees
to file opposing briefs by December 15, 2004 di-
rected "at least in part to the issue of whether Judge
Drain was correct in determining that an independent
examiner should not be appointed for the limited
purpose of investigating whether the debtors' and the
creditors' committees' professionals had followed the
proper procedures in conducting their valuation
analyses of the going concern value of Loral Space &
Communications Ltd., including the orbital space

slots." The Court heard argument on this issue on
December 17, 2004. At the conclusion of the argu-
ment, the Court issued a ruling reversing the Bank-
ruptcy Court's denial of the LSPC's motion for the
appointment of an examiner.

> FN1. The Bankruptcy Court referred to the
> LSPC as the "Ad Hoc Committee." Accord-
> ing to the Bankruptcy Court, the LSPC
> represents approximately 8.4 percent of the
> outstanding common shares of Loral.

I. PROCEDURAL BACKGROUND

Based on the Bankruptcy Court's opinion, the
following is the procedural history of this proceeding.
Loral Space & Communications Ltd. ("Loral") and
its affiliated debtors and debtors in possession (with
Loral, the "Debtors") filed their Chapter 11 petitions
on July 15, 2003. The LSPC, which proceeds *pro se*
here as it did in all related proceedings in the Bank-
ruptcy Court, moved for the appointment of an offi-
cial shareholders' committee in September 2003, after
learning that the U.S. trustee did not intend to appoint
such a committee on its own. The Bankruptcy Court
denied this motion after a hearing on September 19,
2003. The LSPC moved again for the appointment of
an official shareholders' committee on October 27,
2003. Finding that the Debtors were hopelessly in-
solvent, the Bankruptcy Court denied the LSPC's
second motion at a December 2, 2003 hearing.

On May 2, 2004, after learning of the Debtors'
agreement with the Official Committee of Unsecured
Creditors (the "Creditors' Committee") that the Chap-
ter 11 plan would provide for no recovery by com-
mon shareholders,[FN2] the LSPC moved for a third
time for the appointment of an official shareholders'
committee. In support of its motion, the LSPC argued
that an official shareholders' committee could con-
duct a valuation of Loral that would support its view
that the Debtors and Creditors' Committee had valued
Loral at several hundreds of millions of dollars lower
than its true value.[FN3] After a hearing on May 21,
2004, the Bankruptcy Court denied the motion for the
appointment of an official shareholders' committee
by order dated May 28, 2004. The LSPC's appeal of
this order is pending.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2979785 (S.D.N.Y.), 53 Collier Bankr.Cas.2d 555, 44 Bankr.Ct.Dec. 25
**(Cite as: 2004 WL 2979785 (S.D.N.Y.))**

FN2. Under the terms of the plan, the equity of the post-bankruptcy corporation would be split between the corporation's managers and its creditors.

FN3. The LSPC also argued that an official shareholders' committee was necessary because the Debtors' management had engaged in numerous misrepresentations and self-dealing.

**\*2** On July 22, 2004, the Debtors announced their agreement with the Creditors' Committee on the terms of a Chapter 11 plan. Under this plan, Loral's preferred and common shareholders will not receive any distributions. On August 5, 2004, the LSPC moved for the appointment of an examiner under 11 U.S.C. §§ 1104(c)(1) and (2). The LSPC argued that an examiner was necessary "to provide a complete appraisal of the Debtor assets and liabilities in question." The Bankruptcy Court held a hearing on August 19, 2004, at which the LSPC made the same arguments in support of the examiner motion as it had previously made in support of its motion for the appointment of an official shareholders' committee: the LSPC argued (1) that the Debtors were undervaluing many of their most valuable assets; and (2) that the Debtors and Creditors' Committee were improperly colluding to depress the valuations of Loral. The Court rejected the LSPC's motion at the August 19, 2004 hearing and issued a memorandum decision on September 2, 2004. *In re Loral Space & Communications Ltd.*, 313 B.R. 577 (Bankr.S.D.N.Y.2004). The LSPC filed a Statement of Issues and Notice of Appeal of the denial of the motion for the appointment of an examiner on August 19, 2004, the same day the Bankruptcy Court issued its bench ruling denying the motion. This Court received the record on appeal from the Bankruptcy Court on November 19, 2004.

On November 18, 2004, the LSPC moved for a stay of the confirmation hearing scheduled for January 31, 2005; FN4 the LSPC amended the motion on November 30, 2004. On December 6, 2004, this Court heard argument on the LSPC's motion for a stay of the Bankruptcy Court's confirmation hearing pending determination of its appeal of the Bankruptcy Court's denial of its motion for an examiner. At the conclusion of the argument, the Court denied the LSPC's motion for a stay. The motion for the ap-

pointment of an examiner was not before the Court.

FN4. The Appellees stated at the December 17, 2004 hearing before this Court that the confirmation hearing will not be held in January and that a new date has not yet been scheduled.

On December 7, 2004, this Court received a letter from the LSPC requesting an expedited appeal of the Bankruptcy Court's denial of its motion to appoint an examiner pursuant to 11 U.S.C. § 1104(c)(2) and stating that it would rely on the papers it had already filed. This Court issued an Order the following day, December 8, 2004, that the Appellees file opposing briefs by December 15, 2004 directed "at least in part to the issue of whether Judge Drain was correct in determining that an independent examiner should not be appointed for the limited purpose of investigating whether the debtors' and the creditors' committees' professionals had followed the proper procedures in conducting their valuation analyses of the going concern value of Loral Space & Communications Ltd., including the orbital space slots." The Court heard argument on December 17, 2004. At the conclusion of the hearing, this Court reversed and remanded the Bankruptcy Court's decision to deny the LSPC's motion for the appointment of an examiner and ordered the Bankruptcy Court to appoint an examiner within ten (10) days.

**II. APPLICABLE LAW**

**\*3** Section 1104(c) of the Bankruptcy Code provides the following with regard to the appointment of an examiner:

(c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and hearing, the court shall order the appointment of an examiner to conduct such investigation of the debtor as is appropriate, including investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

(1) such appointment is in the interests of creditors, any equity security holders, and other inter-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2979785 (S.D.N.Y.), 53 Collier Bankr.Cas.2d 555, 44 Bankr.Ct.Dec. 25
**(Cite as: 2004 WL 2979785 (S.D.N.Y.))**

ests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c).[FN5]

> FN5. This section was formerly Section 1104(b) of the Bankruptcy Code and many of the cases cited in this Order reference it as such.

### III. DISCUSSION

Judge Drain recognized in his opinion, filed September 5, 2004, that the debtors fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000. He also acknowledged that Loral was a public company and that the legislative history of 11 U.S.C. § 1104(c)(2) indicates that the purpose of establishing the threshold figure of $5,000,000 was to protect equity holders of public companies. Judge Drain further recognized that the majority view of Section 1104(c)(2) requires appointment of an examiner if the $5,000,000 threshold is met. He then cited In re Revco D.S., Inc., 898 F.2d 498 (6th Cir.1990), which recognized that if the debt threshold is met, appointment of an examiner is mandatory. Judge Drain also noted that under In re Revco, the Bankruptcy Court has discretion to "prescribe the parameters of examiners' investigations as is appropriate." In re Loral, 313 B.R. at 586. The parties acknowledge that there is no Second Circuit opinion interpreting 11 U.S.C. § 1104(c)(2). Accordingly, In re Revco, which is cited with approval in Collier on Bankruptcy, is the only circuit court authority on this issue. See 7 Collier on Bankruptcy ¶ 1104.03[2][b] at 1104–38 (15th ed. rev.2004) (hereinafter "Collier" ) (stating that the Bankruptcy Court has no discretion to deny a motion to appoint an examiner under Section 1104(c)(2) when the debt threshold is met and the motion is made by a party in interest).

The Bankruptcy Court, however, departed from the "majority view" to state, without citation to any legal authority: "[I]t is not at all clear that the court should go the extra mile under section 1104(c)(2) to try to conceive of an appropriate investigation if the movant has sought a wholly inappropriate one." Id. at 587. Thus, the Bankruptcy Court decided not to pre-

scribe the parameters of the examiner's investigation, as allowed by Section 1104(c) and as permitted under the decision in In re Revco and the treatise Collier on Bankruptcy. Instead, Judge Drain argued that "[u]nless the court decides to appoint an examiner sua sponte, the statute requires that consideration of the appointment of an examiner be conducted only on request by a party in interest after notice and a hearing. 11 U.S.C. § 1104(c). If the only requested appointment [here, to conduct an appraisal or valuation for the Ad Hoc Committee] is wholly inappropriate, why should the court stretch to fashion a more appropriate job description for an examiner if none would justify sua sponte appointment?" Id. (footnote omitted). He cites no authority for this unspoken conclusion. Judge Drain concludes, "notwithstanding the legislative history of section 1104(c)(2) of the Bankruptcy Code, the appointment of an examiner pursuant to the terms of sections 1104(c)(1) and (c)(2) of the Bankruptcy Code to conduct a going concern valuation of the Debtors should be denied." Id. at 588.

**\*4** In his final footnote to the opinion, Judge Drain reveals that he had prescribed an investigatory role for the examiner at the hearing. Instead of appointing an examiner to conduct a going concern valuation as the Ad Hoc Committee had requested, he proposed at the hearing to appoint an examiner "to review whether the Debtors and the Creditors' Committee's professionals had followed proper procedures in conducting their valuation analyses." Id. at 577 n. 17. The footnote states that the Appellants responded affirmatively to the proposal, "but their response was qualified by concerns that the Ad Hoc Committee had not had enough time to think about the suggestion and that it would want to become comfortable with the adequacy of the budget and the description of the examiner's proposed duties." Id. Thus, the court did prescribe general parameters for an examiner as allowed by Section 1104(c)(2), but declined to take that step because the Appellants did not consent to the proposal without receipt of further elaboration, consent to which would have caused the order entered to be unappealable. The court then stated that "it was inequitable for the Debtors to have to defend against the Ad Hoc Committee's appeal of the denial of the appointment of an official shareholders' committee if—outside the appellate record—the Ad Hoc Committee obtained the appointment of an examiner to conduct the same valuation that the proposed official shareholders' committee would have under-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2979785 (S.D.N.Y.), 53 Collier Bankr.Cas.2d 555, 44 Bankr.Ct.Dec. 25
**(Cite as: 2004 WL 2979785 (S.D.N.Y.))**

taken." *Id.* In response to this suggestion that they withdraw their appeal, the Appellants equivocated, "stating that they would not want to relinquish their appeal until they were satisfied with the nature of the examiner's appointment and investigation." *Id.* Upon hearing this, the court decided it did not wish to negotiate and denied the Appellants' motion for an examiner.

The Bankruptcy Court's decision is reversed. On its face, Section 1104(c)(2) mandates the appointment of an examiner where a party in interest moves for an examiner and the debtor has $5,000,000 of qualifying debt. Furthermore, as Judge Drain noted prior to denying the LSPC's motion, "the legislative history of Section 1104(c)(2) reflects Congress's desire to provide extra protection to stockholders of public companies through the mechanism of an independent functionary." *In re Loral*, 313 B.R. at 585 (quoting *In re Gilman Servs., Inc.*, 46 B.R. 322, 327 (Bankr.D.Mass.1985)); *see also* 7 Collier ¶ 1104.03[2][b] at 1104–39 (reviewing legislative history of 11 U.S.C. § 1104(c)).

The Second Circuit has not yet considered whether this provision of the Bankruptcy Code is in fact mandatory. However, the Sixth Circuit, as well as a number of bankruptcy courts, has stated that it is. *See In re Revco D.S., Inc.*, 898 F.2d 498, 500–01 (6th Cir.1990) (holding that appointment of examiner is mandatory in view of the phrase "the court shall order"); *In re UAL Corp.*, 307 B.R. 80, 86 (Bankr.N.D.Ill.2004) (same); *In re Mechem Financial of Ohio, Inc.*, 92 B.R. 760 (Bankr.N.D.Ohio 1988) (same); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr.D.Mass., 1987) (same); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 685 n. 3 (Bankr.D.D.C.1980) (same); *In re Lenihan*, 4 B.R. 209, 211 (Bankr.D.R.I.1980) (same).[FN6] In *In re Revco*, the Sixth Circuit reviewed the two alternatives implied by Section 1104(c) and concluded that unless paragraph (c)(2) requires appointment of an examiner in cases exceeding the debt threshold, "it becomes indistinguishable" from paragraph (c)(1).[FN7] *In re Revco*, 898 F.2d at 501. As stated in *Collier on Bankruptcy*, "Section 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed, as long as the $5,000,000 threshold is met and a motion for appointment of an examiner is made by a party in interest," 7 *Collier* ¶ 1104.03[2][b] at 1104–38.

FN6. The Court has reviewed the cases relied on by the Appellees, many of which are interpretations of Section 1104(c)(1) and not (c)(2). *See In re Gliatech, Inc.*, 305 B.R. 832, 835 (Bankr.N.D.Ohio 2004); *In re Sletteland*, 260 B.R. 657, 671 (Bankr.S.D.N.Y.2001); *In re Gilman Servs., Inc.*, 46 B.R. 322, 327 n. 2 (Bankr.D.Mass.1985); *In re Bel Air Associates, Ltd.*, 4 B.R. 168, 172 (Bankr.W.D.Okla.1980). The cases relied on by the Appellees that do interpret Section 1104(c)(2) are distinguishable. *See In re Bradlees Stores, Inc.*, 209 B.R. 36, 39 (Bankr.S.D.N.Y.1997) (denying motion under Section 1104(c)(2) based on finding of laches); *In re Rutenberg*, 158 B.R. 230, 233 (Bankr.M.D.Fla.1993) (denying motion under Section 1104(c)(2) because debtor was an individual not a publicly held company). Although Judge Drain quotes the discussion in *Collier on Bankruptcy* of the exceptional circumstance of laches in his review of the applicable law, *see In re Loral*, 313 B.R. at 586, he does not set forth any facts supporting a claim of laches nor does he state that he relied on laches for his decision. Furthermore, on argument Mr. Swarts gave reasons why the LSPC was unable to move sooner than May or August of 2004 on the issue of valuations; he also showed that the LSPC, in light of its *pro se* status, acted promptly. This is *pro se* case and the Court should give the shareholders latitude.

FN7. A recent decision by the Bankruptcy Court for the Northern District of Illinois makes this conclusion clear when it observes: "[I]f paragraph (c)(2) were not mandatory, then § 1104(c) would have the following meaning: 'If specified debt is less than $5 million, it is in the court's discretion to appoint an examiner; and if specified debt is more than $5 million, it is in the court's discretion to appoint an examiner." ' *In re UAL Corp.*, 307 B.R. at 85 n. 2.

**\*5** "It is well established that when a statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2979785 (S.D.N.Y.), 53 Collier Bankr.Cas.2d 555, 44 Bankr.Ct.Dec. 25
**(Cite as: 2004 WL 2979785 (S.D.N.Y.))**

absurd—is to enforce it according to its terms." *Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (citations omitted). In light of the straightforward language and legislative history of 11 U.S.C. § 1104(c)(2), this Court holds that the Bankruptcy Court had no discretion to deny appointment of an examiner where, as here, the $5,000,000 debt threshold is met and shareholders of a public company have moved for appointment of an examiner. *See In re Revco,* 898 F.2d at 501.

The Bankruptcy Court accurately stated that it is "well established that the bankruptcy court has considerable discretion in designing an examiner's role." *In re Loral,* 313 B.R. at 585 (citations omitted). Indeed, it is that court's duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings. To that end, the Bankruptcy Court may exercise its discretion to limit the scope of the examiner's investigation and the compensation and expenses available to the examiner. *See In re Revco,* 898 F.2d at 501 (noting that "the bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration"); *see also* 7 Collier ¶ 1104.03[2][b] at 1104–39.

IV. CONCLUSION

For the foregoing reasons, the Bankruptcy Court's denial of the LSPC's motion to appoint an examiner is reversed and remanded to the Bankruptcy Court to appoint a qualified independent examiner. In this Court's view, the examiner should have an adequate budget and expertise to review whether appropriate procedures were followed in valuing Loral's assets, particularly the space-based assets. That appointment should take place within ten (10) days of this Order.

    IT IS SO ORDERED.

S.D.N.Y.,2004.
In re Loral Space & Communications, Ltd.
Not Reported in F.Supp.2d, 2004 WL 2979785 (S.D.N.Y.), 53 Collier Bankr.Cas.2d 555, 44 Bankr.Ct.Dec. 25

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT E**

### IN THE UNITED STATES BANKRUPTCY COURT
### OF THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

**ENTERED**
**03/04/2008**

| | | |
|---|---|---|
| In re: | § | Case No. 05-21207 |
| | § | |
| ASARCO   LLC, et al., | § | Chapter 11 |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

## ORDER DIRECTING APPOINTMENT OF EXAMINER
## UNDER 11 U.S.C. §§ 1104(c) AND 1106

The Court has considered the Motion of ASARCO Incorporated for an Order Appointing An Examiner and Granting Certain Related Relief (the "Examiner Motion") (Docket No. 6681) pursuant to 11 U.S.C. §§ 1104(c) and 1106, and it appearing to the Court that adequate notice has been given; and the Court having held a hearing on the Examiner Motion on February 8, 2008; and the Court, for reasons stated on the record at the hearing held on February 28, 2008, having determined that the legal and factual bases set forth in the Examiner Motion establish that the appointment of an examiner is mandatory; and the Court having further determined that the Court has discretion as to the scope of the duties of the examiner; and the Court having concluded that no current matter in the case warrants the attention of an examiner; it is hereby

**ORDERED** that the Examiner Motion is hereby granted; to the extent set forth herein; and it is further

ORDERED that an examiner (the "Examiner") shall be appointed in accordance with 11 U.S.C. § 1104(c)(2); and it is further

ORDERED that the scope of investigation proposed in the Examiner Motion is denied; and it is further

ORDERED that the Examiner shall not have any current duties; and it is further

ORDERED that any party has the right to ask the Court to assign specific duties to the Examiner at any time; and it is further

ORDERED that the Court shall retain jurisdiction over any matters arising from or relating to the implementation or interpretation of this Order.

SO ORDERED this ____4th____ day of ____March____, 2008.

_____
UNITED STATES BANKRUPTCY JUDGE

March 4, 2008