Richard M. Cieri
Ray C. Schrock
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>. | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF SUPPLEMENT
TO ALLY FINANCIAL INC.'S RESPONSE TO
OBJECTIONS TO THE ALLY CASH COLLATERAL AND DIP ORDER**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On June 14, 2012, Ally Financial Inc. filed *Ally Financial Inc.'s Omnibus Response to the Objections of the Committee, Certain Trustees for Residential Mortgage Backed Securities, and the United States of America to the Ally DIP and Cash Collateral Order* (the "***Response***") [Docket No. 356].  The Response contained citations and references to certain unreported decisions that were inadvertently omitted as exhibits thereto.  Ally Financial Inc. submits this supplement to the Response and attaches true and correct copies of the following documents:

- *Global Cable, Inc., v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),* No. 02-CIV-9770, 2006 WL 1559437 (S.D.N.Y. June 7, 2006), referenced in paragraphs 11 and 14 of the Response and attached hereto as <u>Exhibit A</u>.

- *In re Benedictine Hosp.*, No. 04-0962, 2007 WL 5830252 (N.Y. Sup. Ct. Jan. 10, 2007), referenced in paragraph 14 of the Response and attached hereto as <u>Exhibit B</u>.

- *In re WL Homes LLC*, No. 09-10571, 2012 WL 176659 (Bankr. D. Del. May 16, 2012), referenced in paragraph 10 of the Response and attached hereto as <u>Exhibit C</u>.

New York, New York
Dated: June 18, 2012

*/s/ Ray C. Schrock*

Richard M. Cieri
Ray C. Schrock
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

## EXHIBIT A

Not Reported in F.Supp.2d, 2006 WL 1559437 (S.D.N.Y.)
**(Cite as: 2006 WL 1559437 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re ADELPHIA COMMUNICATIONS CORP.,
Debtors.
GLOBAL CABLE, INC., Plaintiff-Appellant,
v.
ADELPHIA COMMUNICATIONS CORP. and
The Official Committee of Unsecured Creditors,
Defendant-Appellees.

No. 02 Civ. 9770(RCC).
June 7, 2006.

MEMORANDUM & ORDER

CASEY, J.

**\*1** Global Cable, Inc. ("Global") appeals, under 28 U.S.C. § 158(a)(1), from an order entered on August 6, 2002 by the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") denying Global's "Motion to Determine Right of Recoupment or Setoff and Relief From the Automatic Stay" ("Global's Motion"). Global argues on appeal that the Bankruptcy Court erred as a matter of law (1) by failing to grant Global relief from the automatic stay to exercise its right of recoupment or setoff; (2) in holding that Global is not entitled to a right of setoff or recoupment as against debtor Adelphia Communications Corp. ("Adelphia"); and (3) in failing to hold a full evidentiary hearing to determine Adelphia's liability to Global before ruling on Global's Motion. For the following reasons, the decision of the Bankruptcy Court is AFFIRMED.

I. BACKGROUND

Global is in the telecommunications-equipment business including buying cable-converter units (i.e., cable boxes that are typically rented to cable subscribers) from larger cable-system operators such as Adelphia to sell to smaller operators who seek to upgrade their cable systems. In November 2001, Adelphia entered into two contracts to provide Global with 400,000 digital cable converter boxes in exchange for payment ("November 2001 Contracts"). Global claims that Adelphia breached these contracts by failing to supply the converter boxes, causing $34.2 million in economic harm to Global. Adelphia disputes this claim.

On May 20, 2002, Global filed a complaint against Adelphia in the United States District Court for the Middle District of Pennsylvania (No. 3:CV-02-851), seeking specific performance on the November 2001 Contracts, $34.2 million in damages from Adelphia, and a temporary restraining order to prevent Adelphia from selling the converter boxes at issue to a third party ("TRO Motion"). Shortly thereafter, the parties settled the TRO Motion; the settlement agreement was entered as an order of the district court on May 24, 2002 ("TRO Order"). Under the TRO Order, Adelphia was bound to sell 50,000 converter boxes to Global in exchange for $2.5 million in payment to Adelphia from Global. Adelphia allegedly provided Global with approximately 49,000 converter boxes.

On June 25, 2002, before the $2.5-million payment date set forth in the TRO Order, Adelphia filed a bankruptcy petition, thereby staying the district-court action. On July 3, 2002, Global sought in Bankruptcy Court to be relieved from the stay so as to set off or recoup the approximately $2.5 million owed by Global to Adelphia under the TRO Order against the $34.2 million allegedly owed by Adelphia to Global for damages suffered by Adelphia's alleged breach of the November 2001 Contracts. *See In re Adelphia Communications Corp.,* No. 02-41729(REG) (Bankr.S.D.N.Y. July 31, 2002) (No. 112). On July 24, 2002, after Global's Motion was fully briefed by the parties, Bankruptcy Judge Robert E. Gerber held a hearing, at which he determined that Global failed to meet its initial burden of going forward to show cause for relief from the automatic stay. (Tr. of July 24, 2002 Hearing at 13-16.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559437 (S.D.N.Y.)
**(Cite as: 2006 WL 1559437 (S.D.N.Y.))**

**\*2** On July 31, 2002, the Bankruptcy Court is-
sued an order, entered on August 1, 2002, prohibit-
ing Global from setoff or recoupment of payment of
the $2.5 million owed to Adelphia against the $34.2
million in prepetition claims. *See In re Adelphia,*
No. 02-41729 (No. 277) ("Bankruptcy Court Or-
der"). Specifically, the Bankruptcy Court ordered
that Global was "prohibited from effectuating or
initiating a setoff or right of recoupment with re-
spect to a payment owed to the Debtors against a
disputed, prepetition claim it may have against
Debtors' estates" on the grounds that Global (1) had
"not shown cause as to why the automatic stay
should be lifted pursuant to 11 U.S.C. § 362" and
(2) lacked "a valid right of setoff under 11 U.S.C. §
553 or a common-law right of recoupment as its
claim against [Adelphia] is disputed and not a liab-
ility that is 'absolutely owed." ' *Id.* Global filed its
notice of appeal from the Bankruptcy Court Order
with the Bankruptcy Court on August 6, 2002. *Id.*
(No. 303).

## II. DISCUSSION

### A. Jurisdiction

Adelphia disputes the Court's appellate juris-
diction over this matter, alleging that the Bank-
ruptcy Court Order is not a final order and is there-
fore not appealable under 28 U.S.C. § 158(a)(1),
which provides district courts with jurisdiction to
hear appeals "from final judgments, orders, and de-
crees" of the bankruptcy courts. But the Second
Circuit has expressly stated that "the denial of relief
from an automatic stay in bankruptcy is equivalent
to a permanent injunction and is thus a final order"
subject to appellate review. *Sonnax Indus., Inc. v.
TriComponent Prod. Corp. (In re Sonnax Indus.,
Inc.),* 907 F.2d 1280, 1284 (2d Cir.1990) (citing *Di
Pierro v. Taddeo (In re Taddeo ),* 685 F.2d 24, 26
n. 4 (2d. Cir.1982)); *see also FDIC v. Niagra Mo-
hawk Power Corp. (In re Megan-Racine Assocs.),*
102 F.3d 671, 675 (2d Cir.1996)* ("In this circuit,
denial of relief from an automatic stay is a final or-
der."); *Banctexas Dallas, N.A. v. Chateaugay Corp.
(In re Chateaugay Corp.),* 880 F.2d 1509, 1513 (2d.

Cir.1989) (holding that a bankruptcy court's will-
ingness to later modify or revisit an order denying
relief from an automatic stay does not render the
order non-final). Further, the Bankruptcy Court Or-
der functions as an injunction against Global from
exercising its right of recoupment or setoff. *See id.*
Thus, the Bankruptcy Court Order is a final order
such that the Court has jurisdiction to hear this ap-
peal pursuant to 28 U.S.C. § 158(a)(1).

### B. Standard of Review

A bankruptcy court's conclusions of law are re-
viewed by a district court de novo, *Bank Brussels
Lambert v. Coan (In re AroChem ),* 176 F.3d 610,
620 (2d Cir.1999), and a bankruptcy court's factual
conclusions are examined for clear error, *Nat'l Uni-
on Fire Ins. Co. of Pittsburgh, PA v. Bonnanzio (In
re Bonnazio ),* 91 F.3d 296, 300 (2d Cir.1996). A
bankruptcy court's "decision to lift the automatic
stay to allow exercise of setoff rights is reviewed
for abuse of discretion." *Official Comm. Unsecured
Creditors v. Mfrs. & Traders Trust Co. (In re Ben-
nett Funding Group ),* 146 F.3d 136, 138 (2d
Cir.1998); *see also ABKCO Music, Inc. v. Stellar
Records, Inc.,* 96 F.3d 60, 64 (2d Cir.1996) (noting
that abuse of discretion "usually involves either the
application of an incorrect legal standard or reli-
ance on clearly erroneous findings of fact").

### C. The Bankruptcy Court Did Not Abuse its Discre-
tion by Denying Global Relief from the Automatic
Stay

**\*3** Under Section 362 of the Bankruptcy Code,
a bankruptcy petition "operates as a stay, applicable
to all entities" of the commencement or continu-
ation of judicial proceedings against the debtor. *See*
11 U.S.C. § 362(a)(1). A bankruptcy court shall
grant relief from the stay, however, "for cause, in-
cluding the lack of adequate protection of an in-
terest in property of such party in interest." *Id.* §
362(d)(1). Although "[t]he burden of proof on a
motion to life or modify the automatic stay is a
shifting one," Section 362(d)(1) "requires an initial
showing of cause by the movant." *In re Sonnax In-
dus.,* 907 F.2d at 1285. If such an initial showing of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559437 (S.D.N.Y.)

**(Cite as: 2006 WL 1559437 (S.D.N.Y.))**

cause is not made, "the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Id.*

The Bankruptcy Court exercised its discretion appropriately in declining to grant Global relief from the automatic stay on the ground that Global failed to make an initial showing of cause. Following *In re Sonnax Indus.,* 907 F.2d at 1285, the Bankruptcy Court noted that the "[f]actors that should be considered in determining whether to modify the automatic stay include balancing the harms due to modifying the stay." (Tr. of July 24, 2002 Hearing at 13.) After addressing the parties' arguments, the Bankruptcy Court expressly found that it did "not have a basis for granting relief from the stay at this time, based on this record," noting that not only would it be "highly detrimental to un-secured creditors" to elevate the unproven and unli-quidated claims asserted by Global to secured status, but that Global had failed to carry its burden to show cause. (*Id.* at 13, 17-18.) Global claimed that its company's business would be so damaged unless the stay was lifted that the company would be destroyed, yet failed to show any particularized injury that would have resulted from the continued application of the stay. (*See id.*) The Bankruptcy Court noted that economic ruin of the sort Global alluded to, if it had been articulated, would have been a factor to consider in balancing the harms created by an automatic stay (*id.* at 17-18), it did not abuse its discretion by denying Global relief from the automatic stay on the ground that Global failed to make an initial showing of cause, for mere "[c]onclusory statements that a continuance of the stay will cause irreparable harm or that injury will occur if relief is denied are insufficient to establish cause." *Lazard v. Texaco, Inc.* (*In re Texaco, Inc.*), 81 B.R. 820, 829 (Bankr.S.D.N.Y.1988).

**D. The Bankruptcy Court Did Not Abuse its Dis-cretion in Holding that Global is Not Entitled to a Right of Setoff or Recoupment**

Judge Gerber ruled that Global lacked a valid right of setoff or recoupment on the ground that

Global's claim "is disputed and not a liability that is 'absolutely owed.' " Global argues that this ruling runs counter to precedent. For the following reas-ons, the Court finds that the Bankruptcy Court did not abuse its discretion in holding that Global is not entitled to a right to setoff or recoupment.

1. Global is Not Entitled to a Right of Setoff

**\*4** An automatic stay, such as the one in effect in this case, applies to "the setoff of any debt owing to the debtor that arose before the commencement of the [bankruptcy] case ... against any claim against the debtor." 11 U.S.C. § 362(a)(7); *see also Mercy Hosp. of Watertown v. New York State Dep't of Social Servs.,* 171 B.R. 490, 494 (N.D.N.Y.1994) . A creditor may, however, "offset a *mutual debt* owing by such creditor to the debtor that arose be-fore the commencement of the [bankruptcy] case ... except to the extent that the claim of such creditor is disallowed ." 11 U.S.C. § 553(a) (emphasis ad-ded). It is undisputed that both the $2.5 million debt owed to Adelphia from Global and Global's $34.2 million claim against Adelphia arose before the commencement of the bankruptcy case. The parties dispute, however, whether these amounts represent "mutual debt[s]" within the meaning of Section 553(a) of the Bankruptcy Code.

A debt is "mutual" if it is due to and from the same party in the same capacity. *In re Bennett Funding Group,* 146 F.3d at 138 (defining mutual-ity as when "the creditor and the bankrupt debtor each incurred a debt to the other in the same right or capacity"). But "determining whether mutuality exists involves consideration of a range of circum-stances," *id.* at 140, and the decision to grant or deny setoff rests within "the sound discretion of the bankruptcy court," *In re Genuity Inc.,* 323 B.R. 79, 82 (Bankr.S.D.N.Y.2005)." Further, it is Global's burden to prove mutuality. *See Geron v. Schulman* ( *In re Manshul Constr. Corp.*), No. 97 Civ. 8851(JGK), No. 99 Civ. 2825(JGK), 2000 WL 1228866, at \*56 (S.D.N.Y. Aug. 30, 2000) ("A creditor bears the burden of proving its right of setoff and must establish ... [that] the debt and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559437 (S.D.N.Y.)
**(Cite as: 2006 WL 1559437 (S.D.N.Y.))**

claim [are] mutual.”).

The Bankruptcy Court's denial of setoff was based in part on the disputed and indefinite nature of the liability from the debtor to the creditor (i.e., Global's $34.2 million claim against Adelphia). ( *See* Tr. at 14-15 (holding that “ Section 553 provides in substance that ... there must be a mutual debt and the claim of claim of the creditor cannot be disallowed [but] ... [a]t this point we don't know whether or not this is the case”).) Because it was Global's burden to prove a symmetry or reciprocity of obligation in order to meet the mutuality requirement for setoff, the Court finds that the Bankruptcy Court did not abuse its discretion in ruling that Global has not satisfied this requirement for establishing a right to setoff under Section 553(a).

2. Global is Not Entitled to a Right of Recoupment

Although the right to a recoupment is not mentioned explicitly in the text of the Bankruptcy Code, it is still recognized as an equitable remedy at common law, and unlike the right to a setoff, the right of recoupment is not contingent on the lifting of an automatic stay. *See Mercy Hosp.,* 171 B.R. at 494. Recoupment, however, is limited to claims arising out of a single transaction. *See Malinowski v. New York State Dep't of Labor (In re Malinowski* ), 156 F.3d 131, 133 (2d Cir.1998) (holding that recoupment “should be limited in bankruptcy to cases in which ‘both debts ... arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations” ’ (*quoting In re Univ. Med. Ctr.,* 973 F.2d 1065, 1081 (3d Cir.1992)). The doctrine of recoupment “is a limited one and should be narrowly construed.” *New York State Elec. & Gas Corp. v. McMahon (In re McMahon* ), 129 F.3d 93, 97 (2d Cir.1997).

**\*5** Global wants to recoup its debt owed in accordance with the TRO Order from a debt it claims Adelphia owes from the November 2001 Contracts. Global contends that these claims arise from the same transaction because they both involve cable converter boxes at the same price. But the TRO Or-

der expressly separated itself from the legal duties arising out of any previous contracts. (*See* TRO Order ¶ 8 (“[T]his settlement is without prejudice to all claims or defenses which have been asserted or maybe asserted by any party to this action.”).) And an ongoing commercial relationship between parties does not satisfy the single-transaction requirement for equitable recoupment. *See Kings Terrace Nursing Home and Health Related Facility v. New York State Dep't of Soc. Servs.* (*In re Kings Terrace Nursing Home and Health Related Facility* ), No. 91 B. 14478, 1995 WL 65531, at \*11 (Bankr.S.D.N.Y. Jan. 27, 1995), *aff'd* 184 B.R. 200 (S.D.N.Y.1995). The claims at issue arise not from one transaction but rather from two. Equitable recoupment is therefore inappropriate.

E. The Bankruptcy Court Did Not Err by Failing to Hold a Full Evidentiary Hearing to Determine Adelphia's Liability to Global before Ruling on Global's Motion

Global contends the Bankruptcy Court denied it due process by refusing its request for a full evidentiary hearing prior to ruling on its motion for relief from the automatic stay. Although Section 263 of the Bankruptcy Code provides that the determination of a motion for relief shall be made “after notice and a hearing,” 11 U .S.C. § 362(d), the statute does not provide for any hearing beyond that which the Bankruptcy Court granted and held on July 24, 2002, and the requirements of due process were amply met by that hearing. Rather, a hearing associated with a motion to lift an automatic stay is meant to be quick and not a drawn-out adversarial affair. *See Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 31 (1st Cir.1994); *In re Virteous Steel Prods. Co.,* 911 F.2d 1223, 1232 (7th Cir.1990). In fact, a bankruptcy court is not required to hold any hearing-much less a full evidentiary hearing-on a motion for relief from an automatic stay. *See River Hills Assocs. v. Rover Hills Apartment Fund (In re River Hills Apartments Fund* ), 813 F.2d 702, 706 (5th Cir.1987) (“The words ‘after notice and a hearing’ in [ § 362(d) ] ... [are defined by the Bankruptcy Code as] ‘after such notice as is appropriate

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559437 (S.D.N.Y.)

**(Cite as: 2006 WL 1559437 (S.D.N.Y.))**

in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." ' (quoting 11 U.S.C. § 102(1)(A))); *see also* S.Rep. No. 95-989, at 27-28 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813 (the legislative history of 11 U.S.C. § 362(d), indicating that there are instances in which "after notice and a hearing" requires no hearing at all). Thus, the Bankruptcy Court did not err by not granting further evidentiary review beyond the July 24, 2002 hearing before ruling on Global's Motion.

III. CONCLUSION

**\*6** For the foregoing reasons, the decision of the Bankruptcy Court denying Global's Motion is AFFIRMED. The Clerk of the Court is directed to close this case and remove it from the Court's active docket.

So Ordered:

S.D.N.Y.,2006.
In re Adelphia Communications Corp.
Not Reported in F.Supp.2d, 2006 WL 1559437 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT B**

Slip Copy, 21 Misc.3d 1142(A), 2007 WL 5830252 (N.Y.Sup.), 2007 N.Y. Slip Op. 52581(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 2007 WL 5830252 (N.Y.Sup.))**

**C**

NOTE: THIS OPINION WILL NOT BE PUB-
LISHED IN A PRINTED VOLUME. THE DIS-
POSITION WILL APPEAR IN A REPORTER TA-
BLE.

Supreme Court, Ulster County, New York.
In the MATTER OF BENEDICTINE HOSPITAL,
as Receiver of the Hutton Nursing Home, to file a
final accounting.

No. 04–0962.
Jan. 10, 2007.

Daniels and Porco, LLP, (Michael G. Hayes, Esq.
of Counsel), Pawling, Attorneys for Petitioner.

Eliot Spitzer, Attorney General, (Lisa Ullman, As-
sistant Attorney General of Counsel), Albany, At-
torney for Commissioner Antonia C. Novello, M.D.

McNamee, Lochner, Titus & Williams, P.C. (Scott
C. Paton, Esq. of Counsel), Albany, Attorneys for
Charles Glessing, d/b/a The HuttonNursing Home.

Harter, Secrest & Emery LLP, (Thomas G. Smith,
Esq. of Counsel), Rochester, Proposed Intervenor,
Pro Se.

GEORGE B. CERESIA, J.

**\*1** The instant proceeding seeks a final ac-
counting to wind up the affairs of the Hutton Nurs-
ing Home, which closed in 2004. Pursuant to a con-
ference held by the prior Individual Assignment
System Justice, the parties were directed to make
submissions with respect to whether the sum of ap-
proximately $449,000, which represented the
amount of medicaid underpayments determined as a
result of a successful article 78 proceeding, could
be retained by the Department of Health to recoup
estimated medicaid overpayments and tax assess-
ments, or whether it should be paid to the current
receiver, Benedictine Hospital, or to Charles Gless-

ing, the former receiver and owner of the assets
comprising the Hutton Nursing Home. The attor-
neys for the Hutton Nursing Home in the successful
article 78 proceeding have moved to intervene to
establish their charging lien on the proceeds of that
litigation.

The relevant history of the Hutton Nursing
Home goes back more than two decades. Charles
Glessing was appointed receiver of the nursing
home in 1983 in conjunction with an agreement to
purchase the nursing home. While it appears that at
some time Mr. Glessing actually acquired the assets
of the home, he was never approved as the estab-
lished operator of the home by the Department of
Health. As such, he continued to operate the nurs-
ing home as a receiver. Petitioner Benedictine Hos-
pital was appointed successor receiver in conjunc-
tion with its agreement to purchase the nursing
home in 2001. Petitioner was not approved as the
established operator, and due to significant monet-
ary losses in operating the home, petitioner closed
the home in March, 2004.

In compliance with a judgment of Supreme
Court, Albany County, Benza, J. in 2003, which
was affirmed in *Matter of St. James Nursing Home
v. De Buono,* (12 AD3d 921 [Third Dept., 2004] ),
the Department of Health determined that the Hut-
ton Nursing Home was due approximately
$449,000 in additional medicaid reimbursement for
the years 1995 through 1997. However, the Depart-
ment of Health has refused to pay such sums to
either Benedictine Hospital or Mr. Glessing, claim-
ing a right to offset such sums against later debts. It
is noted that the Department of Health relies for the
most part upon estimates of claimed overpayments
and taxes due, claiming that approximately
$443,000 is due from the nursing home. No explan-
ation has been given as to why the additional
$6,000 has not been paid out to the current or
former receiver.

The    Department    of    Health    claims    that

Slip Copy, 21 Misc.3d 1142(A), 2007 WL 5830252 (N.Y.Sup.), 2007 N.Y. Slip Op. 52581(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 2007 WL 5830252 (N.Y.Sup.))**

$252,650.81, including interest and penalties, is due pursuant to the cash receipts assessment imposed by Public Health Law § 2807–d. It is noted that $97,239.64 of such sum is estimated rather than the product of a final determination. It is further noted that the estimated taxes are based upon estimated gross receipts for the last quarter of the home's operation which are approximately double the historical revenues of the facility as reflected in the final tax assessments for prior periods. However, the final accounting indicates that actual annualized revenues for the last quarter of the home's operation were significantly less than the revenues for the prior two years. The Department of Health has not offered any factual basis supporting the estimates.

**\*2** The Department of Health also claims that $190,475.90 is due for alleged medicaid overpayments for the period from 2002 until the home closed. Such claim is based primarily upon an estimate of the likely reduction in the medicaid reimbursement rate which will result from an audit of the nursing home's Patient Review Instruments, which reflect the level of care needed by the home's patient case mix. The patient case mix has a direct and significant impact upon the medicaid reimbursement rate. However, as above, the Department of Health has not offered any basis for its estimates nor does it appear that such estimates are based upon even a preliminary audit.

It is uncontroverted that the Department of Health has a general common law right to recoup past medicaid overpayments from current and future medicaid payments, which include the proceeds of the prior article 78 proceeding (*see e.g. Matter of Daleview Nursing Home v. Axelrod,* 62 N.Y.2d 30, 33 [1984] ). However, petitioner and Mr. Glessing object that there is no right of recoupment until there has been a final determination of the specific amount due and owing. None of the parties have cited any legal precedent directly on point. 18 NYCRR part 518 is generally applicable to recoupment of medicaid overpayments and requires a "final" administrative determination as to

the amount overpaid. Such determination is then subject to an administrative hearing and judicial review. Pursuant to 18 NYCRR § 518.8, the Department may not commence recoupment until at least 20 days after issuance of a final audit report or notice of agency action. However, it has been held that the regulations of the Department of Social Services at title 18 of the NYCRR are not applicable to audits of Patient Review Instruments (*see Matter of Blossom View Nursing Home v. Novello,* 4 NY3d 581, 591–596 [2005] ). Therefore, while not specifically applicable to the alleged overpayments involved herein, such regulations offer significant insight into acceptable methods of recoupment of overpayments.

The regulations which are applicable specifically provide "any rate of payment certified by the State Commissioner of Health * * * will be construed to represent a provisional rate until such audit is performed and completed, at which time such rate or adjusted rate will be construed to represent the audited rate." (10 NYCRR § 86–2 .7). Such regulation clearly indicates that the provisional rate continues until an audit is completed (*see State of New York v. Hollander,* 245 A.D.2d 625, 626 [Third Dept., 1997] ). Moreover, the general common law principles applicable to setoffs, which are equivalent to recoupment, require that the claim be "due and payable [as opposed to] contingent, possible and in futuro" ( *Matter of Northville Industries Corp. v. State of New York,* 14 AD3d 817, 818 [Third Dept., 2005] ). Mere assertion of a contingent or speculative claim will not support a setoff (id.). The Department of Health has not offered any authority, either statutory, regulatory or case law, indicating that it may recoup speculative pre-audit alleged overpayments from the amount due pursuant to the judgment in the prior article 78 proceeding. The Court therefore finds that the Department of Health may not presently recoup the asserted $190,475.90 from the $449,000 due to the Hutton Nursing Home.

**\*3** Because there has been no determination of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 21 Misc.3d 1142(A), 2007 WL 5830252 (N.Y.Sup.), 2007 N.Y. Slip Op. 52581(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 2007 WL 5830252 (N.Y.Sup.))**

the amount due, it appears that the Department of Health is actually attempting to withhold payment pending a final determination of the amount of overpayments. Withholding of payments for medicaid services is authorized by 18 NYCRR § 518.7 under very limited circumstances involving fraud or willful misrepresentation. The right to withhold payments is strictly circumscribed and requires compliance with numerous procedural protections which have not been followed herein. Moreover, the right to withhold is temporary and requires an agency determination within 90 days of commencement of the withholding. Such period expired long ago. The Court therefore finds that the Department of Health may not withhold the asserted $190,457.90 from the $449,000 due to the Hutton Nursing Home either.

The general principles discussed above are also applicable to the $252,650.81 in delinquent taxes claimed due pursuant to the cash receipts assessment imposed by Public Health Law § 2807–d. However, the statute specifically authorizes the commissioner to collect an estimate of the amount of taxes due if the estimated payments made by a hospital, which includes a nursing home, are less than a certain percentage of the amount which the commissioner has determined is due, based upon evidence of prior period moneys received or evidence of actual receipts for the relevant period (Public Health Law § 2807–d [6] ). It is uncontroverted that petitioner did not make any payments of the taxes due during the last quarter of its operation of the nursing home or for several months prior thereto. As such, the Department of Health would be authorized to withhold the estimated amount of taxes due upon compliance with the procedures dictated by the statute. Public Health Law § 2807–d (6)(d) requires the commissioner to provide a nursing home with notice of any estimate of an amount due at least three days prior to collection of such amount. The notice is required to contain the financial basis for the commissioner's estimate. The Department of Health gave petitioner notice that the payments were insufficient by filing a statement of

the amounts due as a claim in the final accounting proceeding. However, the notice does not provide any financial basis for the estimates, which, as noted above, appear grossly excessive. The only other evidence of notice by the Department of Health is an indication that a copy of a letter to the prior assigned Justice, which stated an intent to recoup the unpaid taxes, was sent to the attorneys for petitioner within the context of this proceeding. Such notice was not addressed to the nursing home and failed to set forth any financial basis for the estimated amounts claimed due. It is therefore determined that the Department of Health has failed to show that it is presently entitled to withhold the sum of $97,239.64 from the amount due to the Hutton Nursing Home pursuant to the prior article 78 proceeding.

**\*4** The Department of Health also seeks to withhold $155,411.17 from the payment. By memorandum of law, the Department of Health contends that such amount is based upon the nursing home's own assessment returns filed with the Department. However, no admissible factual basis for such representation has been submitted, nor does the claim submitted in the instant accounting proceeding state the source of or financial basis for the amounts set forth as due. As such, the claim for $155,411.17 also does not comply with the procedural requirements of Public Health Law § 2807–d (6)(d). It is therefore determined that the Department of Health has not shown any present legal right to recoup alleged medicaid overpayments or withhold payment of medicaid reimbursement due to the Hutton Nursing Home based upon the cash receipts assessment.

Such determination is based entirely upon procedural deficiencies on the part of the Department of Health in its attempts to recoup overpayments and withhold delinquent taxes. As such, the determination is without prejudice to the Department of Health providing proper notice as required by Public Health Law § 2807–d (6)(d) and/or issuing a determination of the amount of medicaid overpay-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 21 Misc.3d 1142(A), 2007 WL 5830252 (N.Y.Sup.), 2007 N.Y. Slip Op. 52581(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 2007 WL 5830252 (N.Y.Sup.))**

ments following an audit prior to the payment required herein.

The Court must determine to whom the medicaid reimbursement funds should be paid in the event that the Department of Health does not cure the procedural deficiencies before the period for making the required payment expires. Mr. Glessing has shown a strong equitable claim to the funds. The reimbursement funds are attributable to the period from 1995 to 1997. Had they been paid at that time, it does not appear that petitioner would have any right to such funds, as its status as a contract vendee and receiver did not arise until several years later. Moreover, pursuant to the purchase agreement and receiver agreement, Mr. Glessing remained liable for any medicaid underpayments for the period prior to petitioner's receivership. It is certainly compelling that Mr. Glessing should be entitled to the profits generated by the nursing home during that period of time if he is responsible for its losses.

However, Mr. Glessing's equities are tempered by the nature of the business which he attempted to sell to petitioner. A nursing home is subject to considerable regulation by the Department of Health. Its regulations, at 10 NYCRR § 600.9, prohibit anyone who has not received establishment approval from participating in the total gross income or net revenue of a nursing home. As noted above, Mr. Glessing never obtained establishment approval, despite operating the nursing home as a receiver for nearly 20 years. As such he could not lawfully receive the profits from the home. Consistent with such principle, the receiver agreement entered into between petitioner, Mr. Glessing and the Department of Health provided that the proceeds of all administrative appeals of medicaid reimbursement rates, regardless of whether they were for periods before or after commencement of petitioner's receivership, were to be retained by the new receiver and not distributed to Mr. Glessing until termination of the receivership. At that time, any remaining profit would be distributed to Mr. Glessing, subject

to approval of the Public Health Council.

**\*5** Such contractual provisions are not inconsistent with the purchase agreement, as argued by Mr. Glessing. While the purchase agreement gave Mr. Glessing the right to control challenges to earlier reimbursement rates, it was silent with respect to the distribution of the proceeds of such challenges. Certainly, if a distribution of income from earlier years was legal, the parties could have written the agreement to provide for the immediate distribution of the proceeds of rate appeals. They did not. As such, the Court finds that the proceeds from the prior article 78 proceeding should be paid to petitioner.

The law firm Harter Secrest & Emery, LLP has moved to intervene to enforce its charging lien on the proceeds of the prior article 78 proceeding. There being no opposition, intervention shall be granted. Such application stands on a different footing from the other claims against the receiver, which pursuant to the conference conducted by the prior IAS Justice, have been bifurcated to resolve issues of priority and amount of claims following determination of whether the proceeds of the prior article 78 proceeding should be paid to the receiver. Notwithstanding the above determination that the proceeds should be paid to the receiver, it is possible that the Department of Health may be able to complete audits and comply with the procedures of Public Health Law § 2807–d prior to the time set for making the payments. Under such circumstances, the issue of the priority of the attorneys' charging lien, which governs whether the lien takes precedence over the Department of Health's rights to recoup or withhold moneys, should be determined at this time.

An attorney's charging lien creates a security interest in the proceeds of successful litigation (*see Chadbourne & Parke, LLP v. AB Recur Finans, 18 AD3d 222, 223* [First Dept., 2005] ). Such interest takes priority over most other liens or claims, especially when the attorney's services created the fund in question (*see LMWT Realty Corp. v. Davis*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 21 Misc.3d 1142(A), 2007 WL 5830252 (N.Y.Sup.), 2007 N.Y. Slip Op. 52581(U)

**(Table, Text in WESTLAW), Unreported Disposition**

**(Cite as: 2007 WL 5830252 (N.Y.Sup.))**

*Agency,* 85 N.Y.2d 462, 468 [1995] ). Indeed, an attorney's charging lien is superior to the prior lien of a governmental entity asserted pursuant to a statute providing that the government's claim "shall ... be prior to all other liens and claims except the claim of a mortgagee of record named in such policy" ( General Municipal Law § 22(2); *LMWT Realty Corp. v. Davis Agency,* 85 N.Y.2d at 470). The charging lien also takes priority over rights to setoff the judgment against another judgment or debt where the setoff is not related to the fund recovered by the attorney (*cf. Banque Indosuez v. Sopwith Holdings Corp.,* 98 N.Y.2d 34, 43–44 [2002] ).

While the charging lien and at least some of the claims of the Department of Health arise out of medicaid reimbursement issues, the Court finds that the $449,000 proceeds from the judgment challenging 1995 through 1997 medicaid reimbursement rates are entirely separate and distinct from the Department's claims of medicaid reimbursement overpayments from 2002 through 2004. The proceeds are clearly entirely separate and distinct from the claims of delinquent cash receipts assessments. Moreover, the services of Harter Secrest & Emery created the fund from which the Department seeks to recoup the alleged overpayments and withhold unpaid taxes. Under such circumstances there would be no windfall to Harter Secrest & Emery if they were paid for services rendered. The only windfall would be to allow the Department to offset the entire judgment without payment for the attorney's services. It is therefore determined that the charging lien takes priority over all other claims to the $449,000 proceeds of the article 78 proceeding.

**\*6** The Department of Health also contends that the charging lien has been discharged or waived by stipulation entered into with respect to a claim for an award of attorney's fees brought pursuant to 42 USC § 1988 based upon alleged deprivations of civil rights. The parties agreed to settle such claim for $120,000. Nothing in the stipulation could be construed as determining that the sum of $120,000 was the value of all attorney's services

rendered to the petitioner nursing homes in the article 78 proceeding. Rather, it constituted an agreement with respect to the amount of the fees for which the Department would be directly liable due to its alleged violation of the law. The instant claim does not seek to recover attorneys fees from the assets of the Department of Health. Instead, the attorneys seek to enforce their right to be paid from funds of their client, the nursing home. As such, the stipulation does not discharge the charging lien.

It must, however, be considered in determining the amount of the lien which has priority over all other claims. In the absence of any contrary evidence, the full amount of the $120,000 payment must be deemed to have been paid toward the attorneys fees owed by the petitioners in the article 78 proceeding. As such, the amount of the lien will be reduced by the pro rata share attributable to the Hutton Nursing Home recovery. The intervenor has not offered any evidence from which the amount of the pro rata share could be determined. Therefore, the issue of the amount of the charging lien shall be determined within the context of the second phase of the final accounting proceeding.

Accordingly it is

**ORDERED** that the Department of Health shall pay the proceeds of the prior article 78 proceeding to petitioner within 30 days of service of a copy of the instant decision and order, together with notice of entry unless the Department of Health undertakes the procedures indicated herein for the recoupment of overpayments or collection of assessments prior to expiration of such period, and it is further

**ORDERED** that the intervenor Harter Secrest & Emery is determined to have a charging lien which has first priority on the proceeds of the prior article 78 proceeding. The amount of such lien shall be determined within the accounting proceeding.

This shall constitute the Decision and Order of the Court. All papers are returned to the attorneys

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 21 Misc.3d 1142(A), 2007 WL 5830252 (N.Y.Sup.), 2007 N.Y. Slip Op. 52581(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 2007 WL 5830252 (N.Y.Sup.))**

for petitioner, who are directed to enter this De-
cision/Order without notice and to serve all appear-
ing counsel with a copy of this Decision/Order with
notice of entry.

N.Y.Sup.,2007.
In re Benedictine Hosp.
Slip Copy, 21 Misc.3d 1142(A), 2007 WL 5830252
(N.Y.Sup.), 2007 N.Y. Slip Op. 52581(U)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT C**

**Westlaw.**

--- B.R. ----, 2012 WL 1766659 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1766659 (Bkrtcy.D.Del.))**

**H**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Delaware.
In re WL HOMES LLC, et al., Debtors.

No. 09–10571.
May 16, 2012.

Related to Docket Nos.: 1122, 1153, 1156, 1575,
1576, 1578, & 1584

**Background:** Insurance company moved for relief
from stay to exercise right of setoff.

**Holding:** The Bankruptcy Court, Brendan Linehan
Shannon, J., held that insurance company was not
entitled to relief from stay to allow it to set off,
against its $2.2 million obligation to debtor for re-
fund of premium overpayments, its own contingent
claim against debtor for reimbursement of defense
costs in event that it elected to advance defense
costs within the self-insured retention.

Motion denied.

West Headnotes

**[1] Set–Off and Counterclaim 352 ⟜0**

–Off and Counterclaim352 Set–Off and Counter-
claim
      In the simplest terms, setoff allows parties to
cancel mutual debts.

**[2] Bankruptcy 51 ⟜0**

51 Bankruptcy
      In bankruptcy context, setoff allows a party
holding property of the estate to keep that property
up to amount of its setoff right. 11 U.S.C.A. §
542(b).

**[3] Bankruptcy 51 ⟜0**

51 Bankruptcy

      Setoff provision of the Bankruptcy Code is per-
missive, rather than mandatory, and cannot be in-
voked in case in which general principles of setoff
would not justify it. 11 U.S.C.A. § 553.

**[4] Bankruptcy 51 ⟜0**

51 Bankruptcy
      Decision whether to allow exercise of setoff in
bankruptcy is left to sound discretion of bankruptcy
court. 11 U.S.C.A. § 553.

**[5] Bankruptcy 51 ⟜0**

51 Bankruptcy
      Creditors seeking to exercise right of setoff in
bankruptcy cannot do so unilaterally, without first
obtaining relief from automatic stay. 11 U.S.C.A.
§§ 362(d), 553.

**[6] Bankruptcy 51 ⟜0**

51 Bankruptcy
      To establish "cause" for relief from automatic
stay to allow it to exercise alleged right of setoff,
creditor first had to establish its right to setoff by
finding an independent right of setoff under non-
bankruptcy law, and then had to show that condi-
tions that the Bankruptcy Code placed on exercise
of setoff were satisfied. 11 U.S.C.A. §§ 362(d), 553
.

**[7] Bankruptcy 51 ⟜0**

51 Bankruptcy
      Insurance company was not entitled to relief
from stay to allow it to set off, against its $2.2 mil-
lion obligation to debtor for refund of premium
overpayments, its own contingent claim against
debtor for reimbursement of defense costs in event
that it elected to advance defense costs within the
self-insured retention, absent showing that Califor-
nia law allowed the setoff of such contingent
claims. 11 U.S.C.A. § 362(d)(1).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2012 WL 1766659 (Bkrtcy.D.Del.)

**(Cite as: 2012 WL 1766659 (Bkrtcy.D.Del.))**

**[8] Bankruptcy 51 ⊂⇒0**

51 Bankruptcy

Even assuming that California law provided for setoff of contingent claims, insurance company was not entitled to relief from stay to allow it to set off, against its $2.2 million obligation to debtor for refund of premium overpayments, its own contingent claim against debtor for reimbursement of defense costs in event that it elected to advance defense costs within the self-insured retention; because insurer had not yet made any such advances when petition was filed, and because decision whether to do so was entirely within insurer's control, reimbursement claim did not possess requisite mutuality with its prepetition obligation for premium overpayments, and requirements for exercise of right of setoff in bankruptcy were not satisfied. 11 U.S.C.A. §§ 362(d)(1), 553.

**[9] Bankruptcy 51 ⊂⇒0**

51 Bankruptcy

Question of when claim "arises" in bankruptcy is one of bankruptcy, and not state, law.

**[10] Bankruptcy 51 ⊂⇒0**

51 Bankruptcy

For setoff purposes, claims, even contingent ones, arise only when all transactions necessary for liability occur. 11 U.S.C.A. § 553.

**[11] Bankruptcy 51 ⊂⇒0**

51 Bankruptcy

Just because, for general bankruptcy purposes, a "claim" can exist under the Bankruptcy Code before right to payment exists does not mean that such a claim always provides basis for right of setoff; rather, setoff is permitted when, at the time bankruptcy petition is filed, debt is absolutely owing but is not presently due, or when a definite liability has accrued but is not yet liquidated. 11 U.S.C.A. §§ 101(5), 553.

**OPINION**[FN1]

BRENDAN LINEHAN SHANNON, United States Bankruptcy Judge.

**\*1** Before the Court is the Motion for Relief from the Automatic Stay filed by Zurich American Insurance Company. Zurich holds roughly $2 .2 million in insurance premium overpayments—called a "return premium"—that belong to the debtor, WL Homes, under a pre-bankruptcy insurance policy. At the same time, a number of homeowners have filed construction defect claims against WL Homes that, under the policy, Zurich may elect to defend. Zurich would like to setoff the return premium against a portion of its potential defense costs. To do that, it needs the Court to lift the automatic stay imposed by the Bankruptcy Code. But because Zurich has not established its right to setoff under either state law or § 553 of the Bankruptcy Code, there is no "cause" to lift the stay. The Motion is denied.

**I. BACKGROUND**

Before its 2009 bankruptcy filing, WL Homes was among the nation's largest and most-respected homebuilders, building everything from entry-level condos to multimillion dollar estates. In 2002 the company took out a Home Builders Protective Insurance Policy with Zurich. The policy was renewed four times between 2002 and 2009, with the final renewal occurring in May 2007 and running through May 2009.

During that final term the policy covered WL Homes for, among other things, damages and defense costs relating to construction defect claims. But the coverage only kicked-in after WL Homes itself paid a certain amount of those costs, defined as a "self insured retention." Specifically, Section IV.D. of the policy provides:

Except for any "defense costs" that [Zurich is] obligated to pay [in] excess of the "self insured retention," or that [Zurich] may elect to pay, [WL Homes] shall pay all such "defense costs" as they are incurred until [WL Homes] ha[s] paid "defense costs" and damages for the coverages

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2012 WL 1766659 (Bkrtcy.D.Del.)

**(Cite as: 2012 WL 1766659 (Bkrtcy.D.Del.))**

included in the policy equal to the applicable "self insured retention" amount. If any final judgment or settlement and "defense costs" is less than the "self insured retention" amount stated above, [Zurich] shall have no obligation to pay damages or "defense costs" under this policy.

(Homeowners' Resp. Ex. D. at ZUR00233.)

It turns out that some of the homes WL Homes built over the years contain flaws, leading homeowners to file construction defect claims against the company. Those claims are now pending before this Court and other courts around the country. Some of the claims are large enough to implicate Zurich's coverage obligations under the policy.

After WL Homes filed for bankruptcy, and in accordance with the policy, Zurich performed an audit and determined that WL Homes had overpaid its premium obligations for the 2007 to 2009 term by roughly $2.2 million. The policy entitles WL Homes to get that return premium back, but Zurich has yet to relinquish it. Instead, Zurich has asked this Court for relief from the automatic stay to apply the return premium towards any amounts it may "elect to pay" defending construction defect claims within the self insured retention.

**\*2** George L. Miller, the chapter 7 trustee administering WL Homes' bankruptcy estate, objected to the lift stay motion, as did the some of the homeowners. The objectors argue, among other things, that Zurich has not shown cause to lift the stay. After reviewing the parties' written submissions and hearing oral argument, the Court agrees with the objectors.

## II. LEGAL ANALYSIS

[1][2] In the simplest terms, "setoff" (or "offset") allows parties to cancel mutual debts. It has been called "a right grounded in concepts of fairness and equity," reflecting the absurdity of "making A pay B when B owes A." *United States v. Myers (In re Myers),* 362 F.3d 667, 672 (10th

Cir.2004). In the bankruptcy context, setoff allows a party holding property of the bankruptcy estate to keep the property up to the amount of the setoff right. 11 U.S.C. § 542(b).

[3][4] Since the Bankruptcy Code's enactment in 1978, § 553(a) FN2 has stated that, with some exceptions not applicable here, the Code does not affect any right of setoff that a creditor had before the bankruptcy. *Citizens Bank of Md. v. Strumpf,* 516 U.S. 16, 20, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). The Third Circuit has noted, however, that § 553 "is permissive rather than mandatory, and cannot be invoked in a case where the general principles of setoff would not justify it." *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 896 F.2d 54, 57 (3d Cir.1990). Thus, whether to allow setoff pursuant to § 553 is left to the sound discretion of the bankruptcy court. *In re HAL, Inc.,* 196 B.R. 159, 161 (B.A.P. 9th Cir.1996), *aff'd,* 122 F.3d 851 (9th Cir.1997).

[5][6] Though § 553 incorporates the right of setoff available outside of bankruptcy, creditors seeking to exercise that right inside a bankruptcy case cannot do so unilaterally, due to the automatic stay that arises the instant a bankruptcy petition is filed. *See* 11 U.S.C. § 362(a)(7). Creditors thus commonly ask courts to lift the stay. Such a request must be granted if the creditor shows "cause." 11 U.S.C. § 362(d)(1). Showing cause requires the creditor to first establish its right to setoff by finding an independent right of setoff under nonbankruptcy law. It then must show that the conditions § 553 places on setoff are satisfied.

### Zurich Has Not Established That Nonbankruptcy Law Permits It To Setoff Its Asserted Claim

[7] Zurich says it holds a "contingent claim" against the WL Homes bankruptcy estate "to the extent [Zurich] advances defense costs within the self insured retention." (Zurich Reply, 2, 17.) And it argues that California law permits it to setoff that claim against the return premium. Specifically, Zurich contends that "California law supports setoff rights even when they are subject to a number of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2012 WL 1766659 (Bkrtcy.D.Del.)

**(Cite as: 2012 WL 1766659 (Bkrtcy.D.Del.))**

contingencies." (*Id.* at 17; *see also* Zurich Motion ¶ 22 ("Under California law, parties are entitled to setoff claims even if such claims are unmatured, unliquidated, [or] contingent.")) But the only authority that Zurich cites for that key proposition— *In re Luz International Ltd.,* 219 B.R. 837 (B.A.P. 9th Cir.1998)—is not on point. *In re Luz* involved New York, not California law. And there, unlike here, no one "dispute[d] that New York law recognizes a creditor's setoff right." Rather, the issue in *In re Luz* was whether the party seeking setoff had satisfied § 553's requirements for setoff. While the court recognized that under the Bankruptcy Code, "a 'claim' is defined as 'a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured ...,' " the court said nothing about if and when California law permits the setoff of a contingent claim.

**\*3** In the absence of more compelling authority, the Court finds that Zurich's say-so is simply not enough to *establish* —as is Zurich's burden—that California law would permit this type of contingent claim to serve as the basis for setoff. Moreover, the Court's own research, though limited, revealed reasons to doubt that it would. *See* 16 Cal. Jur.3d., Counterclaim and Setoff, § 10 (2012) ("Ordinarily, when a liability is contingent, and not fixed, it is unavailable as a setoff without the consent of the plaintiff.... A claim urged as a setoff ... must be mature at the time when the judgment debtor seeks the setoff. Thus, a judgment debtor's right to receive payments from a judgment creditor on a note that is not yet due at the time when the setoff is sought does not constitute a proper subject for equitable set-off.").

### Zurich Has Not Met § 553's Requirements for Setoff

[8][9][10][11]  Even assuming that Zurich's claim could be the basis for setoff under California law, the Court would nonetheless refuse to lift the stay as a matter of bankruptcy law. Section 553(a) of the Bankruptcy Code says that to setoff a mutual debt and claim both must have arisen pre-petition. *See Anes v. Dehart (In re Anes),* 195 F.3d 177, 183 (3d Cir.1999). The question of when a claim "arises" in bankruptcy is one of bankruptcy law, not state law. *See Jeld–Wen, Inc. v. Van Brunt ( In re Grossman's Inc.),* 607 F.3d 114, 121 (3d Cir.2010). Courts interpreting § 553 have consistently held that, for setoff purposes, a claim—even a contingent one—arises when "all transactions necessary for liability occur." *United States v. Gerth,* 991 F.2d 1428, 1433 (8th Cir.1993); *In re Lehman Bros. Holdings Inc.,* 404 B.R. 752, 759 (Bankr.S.D.N.Y.2009). Just because a claim "can exist under the Code before a right to payment exists" for general bankruptcy purposes, *Grossman's,* 607 F.3d at 121, does not mean that such a claim always provides the basis for a right of setoff. Rather, setoff "is permitted when, at the time the bankruptcy petition is filed, the *debt is absolutely owing* but is not presently due, or when a *definite liability has accrued* but is not yet liquidated." *In re Young,* 144 B.R. 45, 46–47 (Bankr.N.D.Tex.1992) (emphasis added); *see also Global Cable, Inc., v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),* No. 02–CIV9770, 2006 WL 1559437, at *2 (S.D.N.Y. June 7, 2006) (upholding bankruptcy court's ruling that creditor lacked "a valid right of setoff under 11 U.S.C. § 553, ... as its claim against [the debtor] is ... not a liability that is 'absolutely owed.' "). Neither criterion is met here.

There is no evidence in the record that as of the petition date Zurich had elected to pay, or had in fact paid, any amounts within the self insured retention. And indeed Zurich does not argue that it did. FN3  Rather, Zurich's argument is that it may "elect" to fund the self insured retention post-petition, and that if it does it has the right to setoff that amount against the return premium. But if there is still an election *yet to be made* and money *yet to be paid*—both of which are decisions entirely within Zurich's control post-petition—then not "all transactions necessary" for a definite liability to accrue occurred as of the petition date. Indeed, Zurich

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2012 WL 1766659 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1766659 (Bkrtcy.D.Del.))**

itself emphasizes that "it has the *option, not the obligation* to defend and pay claims under the self insured retention." (Zurich Reply, at 20 (emphasis in original).) Zurich thus could choose not to defend or settle claims within the self insured retention, in which case WL Homes would never be liable to Zurich. To setoff under § 553 there can be no question that "liability has attached to the debt as of the petition date...." *Myers,* 362 F.3d at 673. Here there was, and still is, a question. Zurich has not established a right of setoff under § 553.

### III. CONCLUSION

**\*4** Today's decision is a narrow one. The only question before the Court is whether Zurich has shown cause to lift the automatic stay to exercise its alleged right to setoff. The Court holds that it has not. The Court makes no finding either way on the myriad other issues the parties raised in their briefs, including the validity, nature, or status of Zurich's claim. Nor has the Court ordered Zurich to surrender the return premium today, as that request has not yet been made.

The Motion is **DENIED.**

### ORDER

Upon consideration of Zurich American Insurance Company's Motion for Relief from the Automatic Stay [Docket No. 1122] and the various responses filed to it; and having held a hearing on the Motion; for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED,** that the Motion is **DENIED.**

FN1. The Court's jurisdiction over this contested matter is not in dispute. It exists under 28 U.S.C. §§ 157(a) and 1334. Venue is also proper here under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

FN2. 11 U.S.C. § 553(a) provides: "[T]his title does not affect any right of a creditor to offset a mutual debt owing by such cred-

itor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...."

FN3. Zurich does allege that "on the Petition Date, [it] was already *dealing with* construction defect claims under the policy totaling millions of dollars." (Zurich Reply, at 13 (emphasis added).) But that statement is both ambiguous and not supported by evidence.

Bkrtcy.D.Del.,2012.
In re WL Homes LLC
--- B.R. ----, 2012 WL 1766659 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.