MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**SUPPLEMENTAL DISCLOSURE BY GEORGE CROWLEY,
SENIOR HUMAN RESOURCES DIRECTOR, CONCERNING DEBTORS'
EMPLOYEE COMPENSATION PRACTICES**

I, George Crowley, being duly sworn, depose and say:

1.  I am a Senior Human Resources Director for Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"). I have held this position since 2010. I joined ResCap in 2005, and before becoming the Senior Human Resources Director, I served in a number of positions with ResCap, including Director of Human Resources and Manager of Workforce Administration. In my role as Senior Human Resources Director at ResCap, I am responsible for, along with the Senior Vice President and Chief Human Resources Officer, working with the business heads to develop and maintain compensation and benefit programs that will attract talented employees

ny-1045499

who can help the Debtors achieve their business goals. I am authorized to submit this supplemental declaration (the "Declaration") concerning certain of the Debtors' employee compensation practices.

2. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; information supplied or verified by personnel in the department that is within my control; my discussions with other members of the Debtors' management team; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' businesses. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

3. I am submitting this Declaration to make certain disclosures to the Court and parties in interest. I also submit this Declaration to apprise the Court and parties in interest of certain events that occurred postpetition as well as certain actions the Debtors intend to take in the near term to address such events.

4. The Debtors' businesses derive their value from the world-class service delivered by their employees. The employees are why ResCap is one of the leaders in government sponsored loan programs; they are what allow the Debtors to comply with the Federal Reserve Consent Order and the DOJ / AG settlement borrower relief program; and they are what will deliver billions of dollars in value to ResCap's creditors through the proposed asset sale to Nationstar.

5. The mortgage servicing industry is extremely competitive at this point in time. The Debtors have lost a number of key employees because of the uncertainties confronting the Debtors during the last few months. Our competitors are continuously trying to hire our employees away. Accordingly, it is extremely important to the Debtors that the employees do

not experience any personal hardship that an interruption in compensation or benefits would bring.

6. As a result of Ally Financial Inc. ("AFI") having received funds under the Troubled Asset Relief Program ("TARP"), the United States government has imposed limitations on the amount, form, and timing of compensation paid to certain Employees of AFI and its subsidiaries, including the Debtors and their top executives. During these Chapter 11 cases, the Debtors are required to continue to adhere to the compensation structures for their employees that were previously approved by the U.S. Department of the Treasury's Office of the Special Master (the "OSM"), which are consistent with TARP regulations.

7. For those individuals among the "Top 25" highest paid employees in the AFI organization (inclusive of the Debtors), the structure and amounts of their annual compensation are subject to the approval of the OSM. TARP regulations limit the amount of salary for the "Top 25" individuals that may be paid entirely in cash in a single year. As a result, alternate forms of compensation, such as deferred stock units ("DSUs," that are more commonly and appropriately referred to as "Salary Stock") are issued to these individuals and the value of such Salary Stock is set by the AFI Board of Directors. Thus, the "Top 25" employees receive compensation in two principal elements: (a) base salary in the form of cash and Salary Stock, and (b) incentive restricted stock units ("IRSUs" or "TARP Stock").

8. Salary Stock is denominated in cash, vested immediately upon issuance, and non-forfeitable. Salary Stock is then later redeemed in cash on a prescribed schedule over time. Further, due to TARP restrictions, Salary Stock redemption is by far the largest element of cash compensation for senior executives. For these reasons, Salary Stock is considered part of

base salary for purposes of TARP and would also be regarded as base salary in typical (i.e., non-TARP governed) corporate settings.[1]

9.  Once issued, Salary Stock is subject to a one-year holding period before any cash payments are made, although the ultimate payments of cash are unconditional. The payments that are made on account of Salary Stock depend on the year in which it was issued. Salary Stock that was issued before January 1, 2011 is paid out in cash as part of the bi-weekly payroll over a five-year period, beginning after the one-year holding period. The Salary Stock that was issued after January 1, 2011 is paid out in cash as part of the bi-weekly payroll over a three-year period, also beginning after the one-year holding period.[2]

10. TARP Stock awards are based on individual performance as recommended by managers to the AFI Chief Executive Officer, whose recommendations are then subject to the approval of the Compensation, Nominating and Governance Committee of the AFI Board of Directors, which are then considered and evaluated by the OSM. The TARP Stock awards generally cliff vest after a three-year period, and can be redeemed only after a portion of the funds received by the TARP recipient are repaid to the U.S. Treasury.

---

[1] *See* 31 CRF 30.1 ("*Example 4.* Employee is an employee of TARP recipient. For 2010, TARP recipient agrees to pay a salary of $15,000, payable monthly. At each salary payment date, Employee will receive a $10,000 payment in cash, and accrue a right to a contribution to an account equal to $5,000 divided by the fair market value of a share on the salary payment date. The account balance will be subject to notional gains and losses based on the investment return on TARP recipient common stock. The amount will be payable upon the last day of the second year immediately following the year the services are performed. The arrangement is for the payment of salary, and is not an incentive plan.")

[2] By way of example, a hypothetical ResCap employee might receive a compensation statement on January 1, 2011 that details his or her base salary in terms of cash payments and Salary Stock payments. If such an employee were to be issued $26,000 in Salary Stock on January 2, 2011, this dollar amount would be issued in the form of Salary Stock ratably over the normal 26 pay cycles during that year. Meaning that midway through the year, the employee would have received $13,000 worth of Salary Stock for which the employee would receive the cash payments on account of the Salary Stock at a future date. To be clear, in 2011, that employee would not receive any cash payments on account of the Salary Stock issued to them as a result of the one-year holding period. Beginning in 2012, the employee would receive 26 separate cash payments for the Salary Stock awarded in 2011 but only one-third of the total amount owed to them as a result of the Salary Stock. For instance, if $9,000 of Salary Stock was issued (and the value remains constant), the employee would receive a $3,000 cash payment in 2012 on account of that Salary Stock, a $3,000 cash payment in 2013, and a final $3,000 cash payment in 2014.

11. On June 8, 2012, the OSM issued a letter ruling (the "OSM Letter") to AFI that approved certain modifications to the amount and payment schedule for Salary Stock and the payment schedule for TARP Stock previously awarded to the "Top 25" employees within the AFI organization, a copy of which is attached as **Exhibit A**. The impact of the OSM Letter is that the Debtors' senior executives within the Top 25 are eligible to receive payment on previously-awarded Salary Stock and TARP Stock on an accelerated schedule in addition to receiving additional amounts of Salary Stock that will be granted over the remainder of the year (subject to the sole discretion of the AFI Chief Executive Officer).

12. As described in the first-day "employee wages" motion [Dkt. No. 43] (the "Wages Motion"), AFI processes the Debtors' payroll, funds it, and is subsequently reimbursed by ResCap for the amounts funded to the Debtors' employees. More specifically, on a bi-weekly basis and in chronological order: (a) AFI would pre-fund a payroll account on Wednesday; (b) AFI would submit an invoice to ResCap for ResCap-related wage and benefit costs on Thursday; (c) AFI would remit funds from the payroll account to both AFI's and ResCap employees on Friday; and (d) ResCap would remit payment to AFI in satisfaction of the payroll invoice on Friday. Before the Petition Date, these bi-weekly reimbursements included payments to the ResCap-badged senior executives in the AFI "Top 25" on account of their issued Salary Stock.

13. On June 15, 2012, this Court entered an order granting the Debtors' authority to continue their compensation and benefit programs consistent with their prepetition policies and practices (the "Wages Order") [Dkt. No. 386]. Pursuant to the terms of the Wages Order, the Debtors agreed to not make any payments under the AFI LTECIP and ResCap AIP (as

defined in the Wages Motion),[3] without further order of this Court, but did not obtain specific authority to continue to reimburse AFI for its payment of the Salary Stock.

14.    There are three ResCap employees who are in AFI's "Top 25" and are scheduled to continue to receive payment postpetition on account of previously-issued Salary Stock, as well as new Salary Stock to be issued within each bi-weekly pay period (and upon which payment will be due at a future date): ResCap's Chief Executive Officer, President and Chief Capital Markets Officer. The amounts collectively owed to these ResCap's employees for Salary Stock issued before the Petition Date is approximately $12.5 million.

15.    But for the TARP restrictions, the Debtors' employees in the "Top 25" would have received the monetary equivalent of the Salary Stock before the Petition Date as part of the regular payment of their base salary. After the Petition Date, the necessary modifications to the payroll processing system to prevent the reimbursement of prepetition amounts were not timely implemented, and as a result, during the Debtors' first two payroll cycles, the Debtors reimbursed AFI for Salary Stock issued before the Petition Date for which AFI paid the Debtors' employees. This is being addressed in connection with the funding of the next payroll cycle (which will be remitted to employees on June 22). Going forward, a control is in place so that the Debtors will withhold reimbursements to AFI related to the Salary Stock, and the Debtors will withhold additional reimbursement amounts to AFI in amounts equivalent to the Salary Stock reimbursements during the first two payroll cycles. The Debtors would prefer to continue with their prepetition reimbursement practices to AFI and not put at risk their senior executives' previously-earned and vested compensation; however, the Debtors recognize the need to first obtain permission from the Court.

---

[3]   The Wages Motion defines the AFI LTECIP as the "Ally Financial Inc. Long-Term Equity Compensation Plan" and the ResCap AIP as the "Residential Capital, LLC Annual Plan."

ny-1045499                                                            6

16. To obtain requisite Court authority for these Salary Stock-related practices, however, the Debtors are presently working with AFI and the official committee of unsecured creditors' (the "Creditors' Committee") to develop a proposed resolution, for which the Debtors will file a motion as soon as practicable. The Debtors will also engage with AFI and the Creditors' Committee to develop an acceptable reimbursement mechanism for the TARP Stock (for the "Top 25" executives) and restricted stock units[4] (for the "Next 75" executives) that vested both before and after the Petition Date, with the aim of safeguarding the interests of the Debtors' senior management.

17. These personnel are critical to the Debtors' ongoing reorganization efforts and should not be deprived of their previously-earned compensation, especially as these awards do not prejudice the Debtors' estates and its creditors and, subject to Court approval, are permissible under the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2012

                                                  */s/ George Crowley*
                                                  George Crowley
                                                  **Senior Human Resources Director for Residential Capital, LLC**

---

[4] For those individuals among the "Next 75" highest paid employees in the AFI organization (inclusive of the Debtors), the structure of their annual compensation are similarly subject to the approval of the OSM, and these employees receive compensation in the form of cash and restricted stock units ("RSUs").

**EXHIBIT A**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

June 8, 2012

Mr. James J. Duffy
Chief Human Resources Officer
Ally Financial Inc.
1177 Avenue of the Americas
New York, NY 10036

*Re:  Compensation Payments and Structure for Ally "Top 25" Employees*

Dear Mr. Duffy:

    Pursuant to the Department of the Treasury's Interim Final Rule on TARP Standards for Compensation and Corporate Governance (the "Rule"),[1] the Office of the Special Master issued a determination letter regarding 2012 compensation payments and structures for the senior executive officers and next 20 most highly compensated employees (the "top 25 employees") of Ally Financial Inc. ("Ally" or the "Company") on April 6, 2012 (the "top 25 letter"). 31 C.F.R. § 30.16(a)(3)(i).

    The top 25 letter noted that Ally might make new proposals with respect to top 25 compensation as it might deem appropriate in accordance with significant developments that might arise at the Company or its subsidiaries. On May 14, Ally's mortgage subsidiary Residential Capital, LLC filed for Chapter 11 bankruptcy, and Ally announced that it would launch a process to explore strategic alternatives, including a possible sale, for its international operations, which include auto finance, insurance, and banking and deposit operations in Canada, Mexico, Europe, the U.K., and South America. The May 14 press release issued by Ally stated in part, "Ally has paid approximately $5.5 billion to the U.S. Treasury, enabling the taxpayer to recover about one-third of the investment made into the company. Upon successful completion of the announced strategic initiatives, Ally expects to return at least another third of the total investment, thereby enabling the U.S. Treasury to recover at least two-thirds of its investment in Ally by year-end."

    The compensation structures previously proposed by Ally for 2012 and for previous years, as well as the compensation structures determined by the Office of the Special Master for 2012 and previous years to be consistent with the public interest, did not take into account the announcements on May 14. The Company has stated that, as a result of the substantial restructuring that will occur, its executives may be concerned about the future of their business units and their positions, and that management needs to make sure that they remain focused on implementing the announced steps as well as operating the ongoing businesses.

---

[1] The Interim Final Rule and all determination letters issued by the Office of the Special Master are available at www.financialstability.gov (click on "Executive Compensation").

Accordingly, Ally's compensation committee has re-examined the current compensation structure for its top 25 employees and has proposed modifications in the structure of the top 25 compensation payable for 2012, as well as with respect to compensation related to prior years that has not yet been paid, to ensure that Ally's compensation structure is aligned with returning value to shareholders.

The Rule requires that the Office of the Special Master determine whether 2012 compensation structures for the top 25 employees "will or may result in payments that are inconsistent with the purposes of Section 111 of EESA or TARP, or are otherwise contrary to the public interest." 31 C.F.R. § 30.16(a)(3)(ii) (the "Public Interest Standard"). The Rule also requires that the Office of the Special Master consider six principles when making these compensation determinations. Among the purposes of these principles are "maximization of overall returns to the taxpayers of the United States and providing stability and preventing disruptions to financial markets." Id. at § 30.16(b)(1). The principles, which are described in detail in the April 6 top 25 letter, include the principle of "taxpayer return": "The compensation structure, and amount payable . . . should reflect the need for the [company] to remain a competitive enterprise, to retain and recruit talented employees who will contribute to the [company's] future success, and ultimately to be able to repay TARP obligations". Id. at § 30.16(b)(1)(ii).

The Office of the Special Master has reviewed the Company's proposals and has determined that certain of the proposals are consistent with the Public Interest Standard, certain of the proposals are not consistent with the Public Interest Standard, and changes are required to certain of the proposals in order to meet the Public Interest Standard. Accordingly, the Office of the Special Master has concluded that the following determinations with respect to the compensation structure of the top 25 employees for 2009-2012[2], as applicable, are consistent with the Public Interest Standard:

a) The modifications will not apply to the Company's chief executive officer.

b) There will not be any increase in total direct compensation for any top 25 employee.

c) There will not be any increase in cash salary for any top 25 employee.

d) The balance of each employee's total direct compensation for 2012 will be payable in the form of stock salary. Stock salary earned in 2012 will be redeemable in three equal installments, the first on the final payroll date of the year, the second ratably over 2013 and the third ratably over 2014.

e) Stock salary earned in 2009 and 2010 and not yet paid will be redeemable in equal installments over the period ending on the third anniversary of the grant.

---

[2] For the avoidance of doubt, such changes are limited to top 25 compensation for such years for employees still employed by the Company on June 1, 2012.

2

f) Long-term restricted stock previously awarded for prior services will vest after two years of service. Even if vested, as required by the Interim Final Rule, these awards may be redeemed only in 25% installments as Ally repays its TARP obligations in 25% increments, and will otherwise be forfeited.

The approvals in this letter apply only to the employees referenced above and shall not be relied upon by anyone with respect to any other facts or circumstances. Such conclusion is limited to the authority vested in the Office of the Special Master by Section 30.16(a)(3) of the Rule, and shall not constitute, or be construed to constitute, the judgment of the Office of the Special Master or the Department of the Treasury with respect to the compliance of the proposed compensation payments or structure or any other compensation payments or structure for the subject employees with any other provision of the Rule. Moreover, my evaluation and conclusion with respect to these employees have relied upon, and are qualified in their entirety by, the accuracy of the materials submitted by Ally to the Office of the Special Master, and the absence of any material misstatement or omission in such materials.

Very truly yours,

Patricia Geoghegan
Office of the Special Master
for TARP Executive Compensation

cc:   Richard Strahota
      Drema M. Kalajian, Esq.

3