1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


                Debtors.


- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                June 12, 2012

                10:05 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

(CC: Doc no. 87, 57) Possible Final Hearing RE: (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac and Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief.

(CC: Doc# 91, 46) Final Hearing RE: Motion (I) Authorizing the Debtors to Continue in the Ordinary course of Business (A) Servicing Non-Governmental Association Loans, and (B) Sale Activities Related to Certain Loans in Foreclosure and Real Estate Owned Property, and (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-claims in Foreclosure and Eviction proceedings.

3

1   (CC: Doc# 82, 69, 16) Final Hearing RE: Motion Authorizing (1)

2   Continued Use of Cash Management Services and Practices, (II)

3   Continued use of Existing Bank Accounts, Checks, and Business

4   Forms, (IV) Interim Waiver of The Investment and Deposit

5   Requirements of Bankruptcy Code Section 345, (V) Debtors to

6   honor Specified Outstanding Prepetition Payment Obligations,

7   and (VI) Continuation of Intercompany Transactions, Including

8   Intercompany Transactions with Future Debtors. Granting

9   Administrative Expense Status to Intercompany Claims.

10

11  (CC: Doc# 92, 41) Final Hearing RE: Motion Authorizing

12  Residential Capital, LLC To Enter Into A Shared Services

13  Agreement With Ally Financial Inc. Nunc Pro Tunc To The

14  Petition Date For The Continued Receipt And Provision Of Shared

15  Services Necessary For The Operation Of The Debtors Businesses.

16

17  (CC: Doc# 181, 183) Hearing to consider the Debtors Motion for

18  Supplemental Order (1) Authorizing the Debtors to Continue

19  implementing Loss Mitigation Programs; (II) Approving

20  Procedures for Compromise and Settlement of Certain Claims,

21  Litigations and Causes of Action; (III) Granting Limited Stay

22  Relief to Permit Foreclosure and Eviction Proceedings, Borrower

23  Bankruptcy Cases, and Title Disputes to Proceed; and (IV)

24  Authorizing and Directing the Debtors to Pay Securitization

25  Trustee Fees and Expenses.

4

1

2  (CC: Doc# 93, 43) Final Hearing RE: Motion (I) Authorizing But

3  Not Directing Debtors To (A) Pay And Honor Prepetition Wages,

4  Compensation, Employee Expense And Employee Benefit

5  Obligations; And (B) Maintain and Continue Employee

6  Compensation And Benefit Programs; And (II) Directing Banks To

7  Honor Prepetition Checks And Transfer Requests For Payment Of

8  Prepetition Employee Obligations. (related document(s)43).

9

10  (CC: Doc# 94, 58) Final Hearing RE: Motion Authorizing the

11  Debtors to File Under Seal confidential Exhibit to the

12  Governmental Association Servicing Motion and (II) Limiting

13  Notice Thereof.

14

15  (CC: Doc# 108) Final Hearing Re: Motion Authorizing Payment of

16  Taxes and Regulatory Fees Under Bankruptcy Code Sections

17  105(a), 363, 506(a), 507(a)(8), 541 and 1129 and Bankruptcy

18  Rule 6003.

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

5

1

2    A P P E A R A N C E S :

3    MORRISON & FOERSTER LLP

4            Attorneys for Debtors

5            1290 Avenue of the Americas

6            New York, NY 10104

7

8    BY:   LARREN M. NASHELSKY, ESQ.

9            LORENZO MARINUZZI, ESQ.

10           NORMAN S. ROSENBAUM, ESQ.

11           TODD M. GOREN, ESQ.

12

13

14   UNITED STATES DEPARTMENT OF JUSTICE

15           Office of the U.S. Trustee

16           33 Whitehall Street

17           21st Floor

18           New York, NY 10004

19

20   BY:   BRIAN S. MASUMOTO, ESQ.

21

22

23

24

25

6

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

    Attorneys for Barclays Bank PLC DIP Administrative Agent

    Four Times Square

    New York, NY 10036


BY:   SUZANNE D.T. LOVETT, ESQ.



MCKOOL SMITH

    Attorneys for Freddie Mac

    600 Travis Street

    Suite 7000

    Houston, TX 77002


BY:   PAUL MOAK, ESQ.



MCKOOL SMITH

    Attorneys for Freddie Mac

    One Bryant Park

    47th Floor

    New York, NY 10036


BY:   MICHAEL R. CARNEY, ESQ.

7

1

2   WINSTON & STRAWN LLP

3        Attorneys for Fannie Mae

4        200 Park Avenue

5        New York, NY 10166

6

7   BY:   DAVID NEIER, ESQ.

8

9

10   KIRKLAND & ELLIS LLP

11        Attorneys for Ally Financial & Ally Bank

12        601 Lexington Avenue

13        New York, NY 10022

14

15   BY:   STEPHEN E. HESSLER, ESQ.

16        RAY C. SCHROCK, ESQ.

17

18

19   SHEARMAN & STERLING LLP

20        Attorneys for Citibank, N.A.

21        599 Lexington Avenue

22        New York, NY 10022

23

24   BY:   FREDRIC SOSNICK, ESQ.

25

**8**

1

2  KELLEY DRYE & WARREN LLP

3         Attorneys for U.S. Bank

4         101 Park Avenue

5         New York, NY 10178

6

7  BY:   BENJAMIN D. FEDER

8

9

10  WHITE & CASE LLP

11         Attorneys for Ad Hoc Group of Junior Secured Noteholders

12         1155 Avenue of the Americas

13         New York, NY 10036

14

15  BY:   GERARD UZZI, ESQ.

16         HARRISON DENMAN, ESQ.

17

18

19  KRAMER LEVIN NAFTALIS & FRANKEL LLP

20         Attorneys for Official Committee of Unsecured Creditors

21         1177 Avenue of the Americas

22         New York, NY 10036

23

24  BY:   KENNETH H. ECKSTEIN, ESQ.

25         DOUGLAS MANNAL, ESQ.

9

1

2  THE MICHAELSON LAW FIRM

3       11 Broadway

4       Suite 615

5       New York, NY 10004

6

7  BY:   ROBERT N. MICHAELSON, ESQ.

8

9

10  ALSTON & BIRD LLP

11       Attorneys for Wells Fargo Bank, N.A.

12       90 Park Avenue

13       New York, NY 10016

14

15  BY:   MARTIN G. BUNIN, ESQ.

16

17

18  STORCH AMINI & MUNVES PC

19       Attorneys for NACBA; Ed Boltz, William & Crystal Johnson

20       140 East 45th Street

21       25th Floor

22       New York, NY 10017

23

24  BY:   BIJAN AMINI, ESQ.

25

10

ACCESS LEGAL SERVICES

    Attorney for Wendy Nora and others similarly situated

    210 Second Street N.E.

    Minneapolis, MN 55413

BY:   WENDY A. NORA, ESQ. (TELEPHONICALLY)

RESIDENTIAL CAPITAL, LLC, ET AL.                    11
P R O C E E D I N G S

1
2        THE COURT:  All right, please be seated.  We're here

3   in Residential Capital, LLC, number 12-12020.

4        MR. NASHELSKY:  Good morning, Your Honor.  Larren

5   Nashelsky from Morrison & Foerster, proposed counsel to

6   Residential Capital and the other debtors before this Court.

7   We have eight matters on for this morning, Your Honor:  shared

8   services, employee wages, taxes and regulatory fees, cash

9   management, and four servicing-related motions.

10        Since the filing of these motions, the debtors have

11   worked very closely with a number of constituencies to resolve

12   issues.  We've had numerous calls and meetings with the

13   creditors' committee and its advisors, the Office of the United

14   States Trustee, Ally Financial, the trustees under a number of

15   our securitizations, Fannie Mae, Freddie Mac, Ginnie Mae, and

16   other parties.

17        I'm pleased to report that we've resolved all but four

18   objections to the motions on for today.  Of those objections,

19   two are omnibus objections where it is not entirely clear as to

20   which motions they pertain, but where we could ascertain, we

21   will respond.  One is the U.S. Trustee's objection on the 345

22   issue.  And the final one is from an association of consumer

23   bankruptcy attorneys and individuals on the supplemental

24   servicing.

25        There are a number of changes we made to the orders

1  filed with the initial motions, and we filed on the docket last

2  night the revised orders with the cumulative blackline.  I have

3  binders for Your Honor and your clerks of the marked pages from

4  the original to the versions that we are submitting.  And if

5  Your Honor would like, I could hand those up.

6          THE COURT:  Why don't you do that now?  Thank you.

7          MR. NASHELSKY:  Thank you.

8          THE COURT:  Thank you.

9          MR. NASHELSKY:  From the ones that we filed last

10  night, Your Honor, there were some changes -- minor changes to

11  the GA servicing, the supplemental servicing, cash management,

12  and an amended exhibit on the sealing motion, all of which

13  we'll discuss in detail.

14          In response to the objections, the debtors filed a

15  reply on June 8th with affidavits or declarations from George

16  Crowley, the senior human resources director; Jim Whitlinger,

17  the CFO; Yvette Gilmore of Freddie Mac; and Joe Pensabene, the

18  chief servicing officer; and Sowite Bagrijian (ph.), who is an

19  in-house counsel.  They're all in court today and available to

20  testify, if necessary, Your Honor.  As we go through each

21  motion, we'll move the admissions of the various affidavits, if

22  Your Honor would like.

23          THE COURT:  Okay.

24          MR. NASHELSKY:  Also with me today are two of my

25  partners who will be handling a couple of the motions, Lorenzo

1  Marinuzzi and Norm Rosenbaum.

2          So unless Your Honor would like to do something

3  different, I would start with the first motion.

4          THE COURT:  Let's do it.

5          MR. NASHELSKY:  Thank you.  Your Honor, the first

6  matter on the agenda is the debtors' motion requesting

7  authorization to pay outstanding pre-petition wages, reimburse

8  unpaid pre-petition business expenses, and continue certain

9  benefit programs.  Through the motions, the debtors are not

10 seeking to pay any amounts that would exceed the statutory cap

11 of 11,725 without committee consent.  All of the relief sought

12 complies with Section 503.  There are no payments to insiders

13 that would violate 503(c).  And finally, the debtors are not

14 seeking any relief with respect to assuming any contracts

15 between officers, directors of the debtors.  And interim order

16 on the motion was entered by Judge Peck on May 16th, docket

17 number 93.

18         There was only one response filed to the motion, and

19 that was by the creditors' committee.  And the two omnibus

20 objections I referred to earlier do not appear to address the

21 employee motion.

22         THE COURT:  Right.  And when I read the committee's

23 response, it indicated what -- you've worked out an agreement

24 with the committee?

25         MR. NASHELSKY:  Yes.  And then I will go through that.

1          THE COURT:  Okay.

2          MR. NASHELSKY:  I'm pleased to report that we have

3    resolved those committee's objection, and they were set forth

4    in the versions filed last night.  And I'll briefly go through

5    those.

6          The four changes we agreed with the committee, Your

7    Honor, were:  that to the extent any of the pre-petition

8    employee obligations would exceed the statutory cap, the

9    debtors have agreed not to make any such payment without prior

10   notice and consent of the creditors' committee.

11         Second, although the debtors' seek to continue their

12   discretionary variable pay plan and their annual incentive

13   plan, they have agreed with the committee not to make any

14   payments under those plans without first coming back to the

15   Court and requesting approval of any payments.  We don't

16   envision --

17         THE COURT:  Those payments wouldn't be due for some

18   time?

19         MR. NASHELSKY:  Until -- exactly.  The end of the year

20   or early next year.

21         And the debtors have also agreed with the committee to

22   provide them notice of any proposed changes, modifications or

23   additions to the compensation or benefit plans, which the

24   debtors do from time to time, and we will discuss and give the

25   committee notice.

RESIDENTIAL CAPITAL, LLC, ET AL.                    15

1        And finally, the debtors have agreed to give the

2   committee ten days' business notice prior to providing an

3   employee that is eligible to receive either a tier 2 severance

4   benefit, which is six to twelve months, or a severance payment

5   in excess of 50,000 dollars, with a termination letter, which

6   would commit the debtor to provide that severance over time.

7   And the debtors have agreed to notify the committee if

8   aggregate severance in any month exceeds half a million, or if

9   more than forty employees are terminated in any month.

10       With those changes, Your Honor, the committee has

11  signed off on the form of order that was filed last night.  And

12  unless Your Honor has specific questions, the debtors request

13  that this motion be approved.

14       THE COURT:  Let me hear from the committee.  Let me

15  hear from the committee first.

16       MR. MANNAL:  Your Honor, Doug Mannal from Kramer Levin

17  on behalf of the committee.  Your Honor, we worked closely with

18  the debtors to make these changes.  And with these changes,

19  Your Honor, the committee has no objection to entry of the

20  order.

21       THE COURT:  Thank you.  Mr. Masumoto?

22       MR. MASUMOTO:  Good morning, Your Honor.  Brian

23  Masumoto for the Office of the United States Trustee.  Your

24  Honor, we just ask the we see a copy of the order before it's

25  entered.  And we would also like to have a copy of the notices

1  that are being provided to the committee with respect to those

2  changes.

3         THE COURT:  All right.  Mr. Nashelsky, any problem

4  with that?

5         MR. NASHELSKY:  No, Your Honor.  Absolutely no problem

6  with either of those requests.  We will provide copies of the

7  order before we ask the Court to enter them.  And we will

8  provide them the same notice as we provide to the committee.

9         THE COURT:  All right.  Does anybody else wish to be

10  heard with respect to the employee wage motion?

11         All right.  Subject to the U.S. Trustee having an

12  opportunity to review the final order, that's granted.  Thank

13  you very much.

14         MR. NASHELSKY:  Thank you, Your Honor.  The next item

15  on the agenda is the debtors' motion for a final order under

16  Sections 105(a) and 363(b) of the Bankruptcy Code, authorizing

17  the debtors to enter into a shared services agreement with its

18  nondebtor parent, Ally Financial, Inc.  This agreement ensures

19  that ResCap continues to receive necessary services for the

20  continued operation of its business; and also the debtor

21  provides services.  The debtors are seeking authority to enter

22  into this agreement nunc pro tunc to the petition date.  An

23  interim order on this motion was entered by Judge Peck on May

24  16th, and it's docket number 92.

25         On June 8th the debtors filed with the court a

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1   supplemental affidavit of James Whitlinger in further support

2   which includes additional evidence in support of this motion.

3   Other than the omnibus objections to the first-day motions

4   filed by the two individuals, the debtors have not received any

5   objections to this motion.

6          As explained in more detail in Mr. Whitlinger's first-

7   day affidavit and the supplemental, this agreement was the

8   result of very extensive arm's-length negotiations between

9   ResCap and AFI over a number of months, including many meetings

10  with counsel and businesspeople, that resulted in the agreement

11  that is before the Court.

12         In the last few weeks, the debtors' advisors have

13  worked very closely with the committee, providing detailed

14  information, participating in numerous calls with the committee

15  and its advisors regarding among other things, the pricing of

16  the services, the significant negotiations that went into

17  development of the agreement, and the disruption and cost of

18  having to transition these services from AFI to a third party,

19  if this motion weren't approved.

20         THE COURT:  As I understand it, you negotiated some

21  changes with the committee.

22         MR. NASHELSKY:  Yes.  And I will go through those,

23  Your Honor.  There were three changes in the order requested by

24  the committee.  They were with respect to notice and a

25  reservation of rights on claims arising from pre-petition

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                18

1   services.

2           The notice that we agreed to with the committee was

3   providing five days' advance notice to the committee of any

4   assignment of the agreement and any material amendment or

5   modification to the agreement.  In addition, the debtors, the

6   committee, and any other party reserve any rights with respect

7   to pre-petition services between the debtors and Ally and any

8   claims that people may have arising from that.

9           Finally, Your Honor, as to the objections of Ms. Nora

10  and Mr. Papas, the omnibus objections I referred to, they

11  objected to shared services to the extent that it might

12  construe a preferential transfer to the parent or a release of

13  the parent's liabilities for the acts pre-petition or post-

14  petition with its subsidiaries.

15          We believe, with the change to paragraph 9 that we

16  agreed to with the creditors' committee, which reads,

17  "Notwithstanding anything herein, this order shall not waive or

18  foreclose and is without prejudice to any and all claims or

19  causes of action that may be made by the debtors or any party-

20  in-interest (including the committee) as a result of shared

21  services prior to the petition date."  We believe that should

22  address those omnibus objections.

23          And unless Your Honor has any questions, we would ask

24  that that motion also be approved.

25          THE COURT:  All right.  Does the committee want to be

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    19

1   heard?  Mr. Eckstein?

2          MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

3   Eckstein of Kramer Levin, proposed counsel for the official

4   creditors' committee.

5          Your Honor, this was an important motion to the

6   committee, because it obviously reflected a significant

7   business transaction between ResCap and its parent, Ally,

8   immediately prior to the petition date.  We actually spent a

9   significant amount of time, including with our financial

10  advisor, looking at the business aspects to satisfy ourselves

11  that, in fact, the proposed agreement was advantageous and not

12  detrimental.  We were satisfied, as a business matter, that it

13  made sense for the debtor to proceed.

14         As Mr. Nashelsky read into the record, we negotiated a

15  very specific reservation of rights.  As Your Honor is well

16  aware, the committee is in the process of undertaking an

17  investigation of pre-petition transactions and relationships

18  between the debtor and its parent.  And we've made clear in

19  paragraph 9, as Mr. Nashelsky said, that all rights, claims,

20  potential causes of action, are reserved, notwithstanding this

21  order.

22         THE COURT:  So if it should turn out later that the

23  rates or compensation being paid for shared services, if

24  someone is subsequently able to attack those, the committee has

25  reserved all of its rights to challenge those rates?

1    MR. ECKSTEIN:  I think, more specifically, Your Honor,

2    what we're reserving is that this order and this transaction

3    shall not in any way affect or be used adversely with respect

4    to any potential claims we might have.

5           THE COURT:  All right.  Thank you --

6           MR. ECKSTEIN:  And we're satisfied on that basis, Your

7    Honor.

8           THE COURT:  -- thank you, Mr. Eckstein.

9           Mr. Masumoto, do you want to be heard on this?

10          MR. MASUMOTO:  Yes, Your Honor.  Thank you.

11          MS. NORA:  Wendy Alison Nora, from Minneapolis, Your

12   Honor.

13          THE COURT:  Can you just -- can you please hold on,

14   please?  I'll give you an opportunity to speak.  But I want to

15   get the people in the courtroom first.

16          MS. NORA:  Thank you, Your Honor.

17          THE COURT:  Go ahead, Mr. Masumoto.

18          MR. MASUMOTO:  Good morning, Your Honor.  If I may, I

19   would like to ask for the same request that we did previously,

20   again, the ability to review the final order as submitted, and

21   that we get any notice that is provided to the committee.

22          THE COURT:  Absolutely.  And I think -- I assume

23   you'll be able to do that very promptly.  So --

24          MR. MASUMOTO:  Yes, Your Honor.

25          THE COURT:  -- you ought to have an opportunity to

1   look at any of these final orders today.  Because there were

2   changes made overnight, and I want to be sure that your office

3   has had an opportunity to see those.

4          MR. MASUMOTO:  Thank you, Your Honor.

5          THE COURT:  Thank you.  All right, anybody else in the

6   courtroom wish to be heard?

7          All right, anyone on the telephone?  Ms. Nora, did you

8   want to be heard?

9          MS. NORA:  Yes, thank you, Your Honor.  With respect

10  to the creditors' committee's agreements with the debtors, I

11  would simply like to review the proposed order and reserve all

12  of my rights to review that and to seek further relief, if

13  indeed, what I am concerned about is occurring, which is a

14  relationship between Ally and the debtors in which Ally is

15  using this bankruptcy to eliminate its liability for actions it

16  has taken.  That's my concern.

17         Also preferential transfers will be addressed at the

18  hearing on June 18th, where I will appear personally.

19         THE COURT:  Anybody else on the telephone wish to be

20  heard?

21         All right.  With respect to the motion on shared

22  services, first, the Court has reviewed the Nora objection

23  carefully.  To the extent it's not otherwise resolved, the

24  objection is overruled.  The Court is satisfied, subject to

25  reviewing -- itself reviewing the final order, that the last --

1  certainly the last version of the proposed order that I saw

2  satisfactorily dealt with any issues raised by Ms. Nora.  So

3  that objection is overruled.  The order will be subject to the

4  review by the U.S. Trustee before it's entered.

5           Mr. Nashelsky, next motion.

6           MR. NASHELSKY:  Thank you, Your Honor.  The next

7  motion is the debtors' motion for payment of taxes and

8  regulatory fees.  And I'm going to cede the podium to Mr.

9  Marinuzzi.

10          THE COURT:  Thank you.  Just bear with me for one

11 second, Mr. Marinuzzi.

12          MR. MARINUZZI:  Sure, Your Honor.

13          THE COURT:  Okay, go ahead.

14          MR. MARINUZZI:  Good morning, Your Honor.  For the

15 record, Lorenzo Marinuzzi, Morrison & Foerster.  Your Honor, as

16 Mr. Nashelsky stated, the next item on the agenda is the

17 debtors' motion for authority to pay pre-petition taxes and

18 regulatory fees.

19          In the ordinary course of the debtors' business, the

20 debtors pay taxes and licensing fees in many jurisdictions.

21 The payment of these fees and taxes is necessary for the

22 debtors and their employees to continue to originate loans,

23 undertake collection efforts, and otherwise operate their

24 business.

25          At the time of the commencement of the bankruptcy

1  case, the debtors believed that they were substantially current

2  on the payment of pre-petition regulatory fees.  The company

3  estimates currently that they will need to make direct payments

4  of pre-petition regulatory fees in the amount of approximately

5  200,000 dollars during the case.  The debtors currently

6  estimate that the amount of pre-petition taxes that will come

7  due and payable during these Chapter 11 cases is approximately

8  1.1 million dollars.  These estimates, which are current

9  estimates, are very close to the estimates contained in the

10  original motion.

11         THE COURT:  What are your regulatory fees?  Just give

12  me a sense.

13         MR. MARINUZZI:  Regulatory fees are the fees for

14  licenses, for brokerage licenses, to maintain offices in

15  jurisdictions, to be a debt collector.  In certain

16  jurisdictions you need a license, which costs money.  Those are

17  examples --

18         THE COURT:  Okay.

19         MR. MARINUZZI:  -- Your Honor.

20         THE COURT:  All right.

21         MR. MARINUZZI:  Now, there's an aspect of this motion

22  that's a little unusual.  And it relates to the fact that

23  ResCap employees who incur these fees or pay these fees use an

24  Ally Bank credit card.  It's --

25         THE COURT:  I've never heard of that before.

1       MR. MARINUZZI:  Okay.  Well, what we had sought in the

2   motion was the ability to pay or reimburse Ally for charges

3   incurred by Ally or the employee pre-petition, in particular,

4   ones that hadn't posted yet.  We haven't seen any such charges

5   at this point.  We don't believe that any pre-petition charges

6   will need to be paid on account of the credit card charges.

7   But we're going to reserve our right, under the order as

8   modified, to come back to court to the extent that these

9   charges arise and the debtors intend to seek to pay them.

10      During the hearing on the interim request back on May

11  15th, the U.S. Trustee expressed some concerns regarding

12  payments to Ally of amounts attributable to the pre-petition

13  period.  So we agreed, as part of that hearing, that we were

14  going to carve out reimbursement to Ally for any pre-petition

15  charges and revisit them at the time of the final hearing.  And

16  a day or so later, when the committee was formed, the committee

17  raised with us some concerns they had with respect to payments

18  to Ally --

19      THE COURT:  I take it there's a tax-sharing agreement

20  that's --

21      MR. MARINUZZI:  There is.

22      THE COURT:  -- been in place for some time?

23      MR. MARINUZZI:  There is a tax-sharing agreement

24  that's been in places, yes.

25      THE COURT:  Is that being modified now?

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1    MR. MARINUZZI:  It is not being modified now, Your

2    Honor.  But what we have agreed is that we will not be honoring

3    obligations under that pre-petition agreement to Ally, at this

4    point in time.  And should the debtors determine to do so,

5    we'll consult with the committee, try to obtain their consent,

6    and if we're unsuccessful at doing that, we'll come back to the

7    Court.

8            THE COURT:  So have the debtors been reporting losses?

9    Are there credits or deductions attributable to the debtors

10   that -- how are they being accounted for -- have they been

11   accounted for under the tax-sharing agreement?

12           MR. MARINUZZI:  Let me back up, Your Honor.  There are

13   a number of tax-sharing agreements.  But the one in particular

14   that we are discussing now is the tax-sharing agreement that

15   relates to federal income taxes.  And at one point --

16           THE COURT:  Are there separate agreements with respect

17   to state taxes, or are they all covered under the master

18   agreement?

19           MR. MARINUZZI:  They're separate agreements.  And I

20   believe they are separate agreements, Your Honor.  But it's

21   this tax-sharing agreement that is the one that is the lion's

22   share of the obligations.

23           The debtors, at one point, were a disregarded entity

24   for federal tax purposes.  So they incurred, as I understand

25   it, no direct liability to the federal government for taxes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    26

1  At some point in time, the debtors elected to become a

2  corporate taxpayer, which gave rise to direct obligations for

3  federal income taxes.

4          Subsequent to that election, the company became,

5  again, a disregarded entity for tax purposes.  And it was

6  something that, as we investigated further, looked at tax

7  returns, we realized something just didn't make sense.  And as

8  we dug a little deeper, we realized that there was a subsequent

9  election to make them a disregarded entity for taxpaying

10 purposes.  And with that assessment, in consultation with the

11 committee, it seemed to us that the liability that was a

12 concern to us for direct obligations to the federal government

13 for taxes, no longer existed.

14         Having said that, we're still assessing the impact of

15 the tax-sharing agreement on a whole host of issues, including

16 the transactions going forward.

17         THE COURT:  When was the last election made?

18         MR. MARINUZZI:  I understand it was around January of

19 2010.

20         THE COURT:  Are tax years prior to that still open?

21         MR. MARINUZZI:  I'll have to turn to -- no.  I'm

22 advised, no.  Okay?

23         So recognizing that this was no longer the same issue

24 we thought it was as of the petition date, as far as federal

25 tax liability, we've decided, in consultation with the

1   committee, that we weren't going to seek authority to make this

2   three and a half million dollar -- three million dollar pre-

3   petition payment that was coming due in June on account of our

4   obligations under the tax-sharing agreement.  And that's

5   reflected in the order.

6           Now, the proposed final order, Your Honor, reflects

7   the collective attempts of the debtors, the committee, and Ally

8   to address these concerns.  And I'm happy to walk through the

9   proposed order with the Court.  But what the order does is it

10  clarifies that the debtors are not making payments to Ally on

11  account of pre-petition obligations, without the consent of the

12  committee or further order of the Court, as I already stated.

13          The debtors have also agreed to give the committee --

14  and we'll do the same for the U.S. Trustee's Office -- notice

15  of all payments of pre-petition taxes and regulatory fees in

16  excess of 1.25 million dollars, which is the estimate that we

17  believe is still accurate.

18          Unless Your Honor has any questions, I'll walk through

19  the changes in the order or I'll cede the podium to the U.S.

20  Trustee or the committee.

21          THE COURT:  Let me hear from the committee next.  Mr.

22  Mannal?

23          MR. MANNAL:  Your Honor, Doug Mannal from Kramer

24  Levin, proposed counsel for the creditors' committee.

25          Your Honor, clearly this was a significant issue for

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    28

1   the creditors' committee.  And we're focused on the payment of

2   amounts to Ally under the tax-sharing agreement.  And with the

3   debtors' agreement that no such payments will be made, Your

4   Honor, the committee has no objection to the entry of this

5   order.

6           THE COURT:  Thank you.  Mr. Masumoto?

7           MR. MASUMOTO:  Your Honor, based upon the agreement to

8   provide us copies of the final order and the notice, we have no

9   objections.

10          THE COURT:  All right.  Anybody else in the courtroom

11  wish to be heard with respect to the tax motion?

12          Does anybody on the telephone wish to be heard with

13  respect to the tax motion?

14          All right.  The motion is granted, subject to review

15  of the final order.

16          MR. MARINUZZI:  Thank you, Your Honor.  Your Honor,

17  the next item on the agenda is the debtors' application for a

18  final order approving their cash management system and

19  requesting a waiver of Section 345(b).

20          As a servicer, the debtors are responsible for

21  managing and disbursing significant sums of money on a regular

22  basis, and often are required to make significant advances from

23  their own accounts to cover shortfalls in payments made by

24  borrowers, which include principal payments on their loans and

25  tax payments to local taxpaying authorities.

1        The debtors are asking the Court to allow them to

2   continue to use their existing cash management systems and be

3   permitted to implement certain modifications to that system

4   that have been requested and agreed to by the debtors and the

5   debtors' pre-petition secured creditors.

6        The debtors have numerous debt facilities in place

7   with distinct pools of collateral.  And in connection with the

8   commencement of these proceedings and discussions with the

9   debtors' DIP lender, Barclays, the debtors' DIP lender asked

10  that the debtors create a closed loop, effectively, for their

11  collateral, to isolate the flow of funds from intermingling

12  with the debtors' corporate accounts and also to keep them from

13  intermingling with the collateral of other secured parties.

14  The debtors created similar silos for each set of its lenders,

15  including cash collateral providers, and by this motion seek

16  the Court's permission to implement this modified structure.

17       As a fiduciary, the debtors believe that these systems

18  are appropriate to minimize risk to a secured lender's

19  collateral.

20       Now, through this cash management system, Your Honor,

21  the debtors will be able to track cash flows by secured credit

22  facility and ensure that expenses with respect to such facility

23  are allocated to that facility.  And so the relief that's being

24  requested in this motion, Your Honor, goes hand-in-hand with

25  the relief being requested next week in connection with the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    30

1  debtors' cash collateral and DIP financing motions.

2          Now, under this motion, the debtors propose to provide

3  their depository banks with the customary protections.  For

4  example, the banks are authorized to -- as part of their cash

5  management services to the debtors, to continue to make

6  deductions from accounts as appropriate.  The debtors (sic) are

7  restrained and prohibited from honoring pre-petition debits

8  unless certain conditions are met, including being authorized

9  by the debtors or directed by the debtors to make such payment

10  or that such payment's been authorized by an order of the

11  Court, and that the payment is supported by sufficient funds in

12  the relevant bank account.

13          Each bank that maintains one or more bank account will

14  implement customary handling procedures to effectuate the terms

15  of the proposed order.  And to the extent they comply with the

16  terms of the order in good faith or rely on direction given by

17  the debtors, they will not be held liable for any -- I guess,

18  any inadvertent payment of a pre-petition debit.  These are

19  typical provisions that are in these orders.

20          Now, the debtors are also asking, as part of the

21  motion, to be able to continue to use their stock of checks and

22  letterhead, until such time as they run out, in which case

23  they'll order new checks.  And I'm not sure how many checks

24  they're using.

25          THE COURT:  Are they stamping them?

1          MR. MARINUZZI:  I do not believe they are stamping

2    them, Your Honor.

3          No, they're not stamping them, Your Honor.  If Your

4    Honor wishes for us to stamp them, we will stamp them.

5          THE COURT:  I'll wait and hear --

6          MR. MARINUZZI:  Okay.

7          THE COURT:  -- from the U.S. Trustee on it.

8          MR. MARINUZZI:  We're not stamping them is the answer.

9          Now, the U.S. Trustee filed -- oh, I'm sorry.  One

10   other aspect of this that I wanted to highlight for the Court.

11   The debtors seek permission to continue their ordinary-course

12   practice of making interdebtor transfers.  And the debtors

13   propose to provide the transferor estate with an administrative

14   claim against the transferee estate, to provide protection for

15   the creditors for that estate.

16         Now, the U.S. Trustee filed an objection to the

17   motion.  And the objection was based on our request for a

18   waiver of Section 345(b).  And there was some confusion caused

19   by the papers using the word "custodial accounts", lowercase,

20   and "Custodial Accounts", uppercase.

21         And so when the motion talks about custodial accounts,

22   there are custodial accounts that are the debtors' custodial

23   accounts maintained by, for example, JPMorgan Chase, that has a

24   lockbox, into which mortgage payments are mailed.  That's a

25   custodial account, but it's our custodial account.

1      Then there are the thousands of T&I and P&I custodial

2   accounts that is not property of the debtors' estates.  And

3   those are the capital C, capital A Custodial Accounts that are

4   in the motion.  So we apologize for that confusion, and have

5   since spoken with the U.S. Trustee to make sure that the U.S.

6   Trustee understands that there's a difference, and to let the

7   Court know that we've had that discussion.

8       THE COURT:  Let me ask.  I'll let you finish, but has

9   this motion been resolved?  Have you reached an agreement with

10  the U.S. Trustee or not?

11      MR. MARINUZZI:  Your Honor, I believe we have.  And

12  we're asking the Court to find that the Custodial Accounts,

13  capital C, capital A, are not property of the debtors' estates,

14  and so 345 doesn't apply; no waiver is necessary.  So to the

15  extent --

16      THE COURT:  Well, let me ask you this question.  345

17  talks about money in the estate.  541 is property of the

18  estate.  Nobody has addressed whether those get the same or a

19  different interpretation.  But let's deal with 345.  Let's

20  assume that you had escrow accounts in your name.

21  Unquestionably, the property belongs to others.  You still have

22  legal title to the accounts.

23      I mean, 541, it's all legal or equitable interests in

24  property.  I guess my concern was, let's assume -- and I know

25  this is not the case here -- but let's assume --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    33

1          Whoever is on the phone, you're going to need to --

2  you ought to put your phone on mute, because we're picking up a

3  lot of noise in your room.  So if you don't want to be cut off

4  from the call, you better put your phone on mute.

5          All right.  Let's assume you have this escrow account,

6  and it happens to be the brother-in-law of one of your senior

7  executives who has this community bank that's not FDIC-assured.

8  And let's assume you're keeping twenty million dollars there.

9  Are you saying that 345 doesn't apply in that circumstance?  I

10  mean, it's -- if you lose -- if the money is gone tomorrow, the

11  debtor could very well be liable for that loss, for having

12  deposited the money in the account.  And it would have a direct

13  impact on the estate.  So you're saying 345 -- if the money in

14  the account ultimately belongs to somebody else, but you have

15  possession of it and it's deposited in an account in your name,

16  even though it's a custodial or escrow account, are you saying

17  345 doesn't apply?

18          MR. MARINUZZI:  Well, Your Honor, a couple of

19  responses.  I think if under the agreements pursuant to which

20  you or the debtors are given authority to put money in a

21  financial institution, the party entrusting the debtors to make

22  that deposit hasn't provided specific instructions on what to

23  do to protect the cash that is entrusted to them, then I would

24  argue they've allowed the debtors to make that determination.

25          THE COURT:  You said in paragraph 14 of the reply that

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                     34

1   "The funds in the Custodial Accounts," capital C, capital A,

2   "belong to third parties, not to the debtors.  In addition, the

3   debtors' disposition of the funds is governed by explicit terms

4   of pre-existing agreements, negotiated at arm's length, which

5   if breached, could threaten the debtors' ability to continue

6   its servicing business."

7           And the question I had was -- and this wasn't clear to

8   me -- do the agreements specify the banks in which the deposits

9   are to be held?  And do you need -- I mean, in reading the

10  reply, I couldn't tell whether you needed the consent of any

11  third parties to move the funds to a different depository.

12          MR. MARINUZZI:  You do, Your Honor.  Not all

13  agreements are the same.  Certain agreements require that the

14  cash be put in an institution that has a specific rating.

15  Certain agreements require that the cash be placed at a

16  specific bank.  Many agreements require that if you're closing

17  accounts that are holding this money in custody, you have to

18  get the consent of the party that's entrusted you --

19          THE COURT:  Let me ask.

20          MR. MARINUZZI:  -- with that responsibility.

21          THE COURT:  Do I need to make a decision that none of

22  these funds are property of the estate in order to grant the

23  relief you're seeking?  That's where I am.  It didn't seem to

24  me that I did.  It seemed to me that -- and I want to hear from

25  Mr. Masumoto about what agreement you reached with the U.S.

1  Trustee.  But on the showing you've made, I'm very reluctant

2  to, and I'm not going to, reach a decision as to whether the

3  funds in these accounts are money of the estate under 345,

4  property of the estate under 541.  It didn't seem to me you --

5  in your lead in, you said you're asking me to make that

6  finding.  And I'm resisting making that finding.

7          MR. MARINUZZI:  I see that, Your Honor.

8          THE COURT:  But I didn't think I needed --

9          MR. MARINUZZI:  I see the subtlety.

10          THE COURT:  -- to.  If I need to, explain to me why.

11          MR. MARINUZZI:  Well, Your Honor, we're asking for a

12  waiver of 345.  And --

13          THE COURT:  But that could be -- assuming that the

14  requisite showing has been made, and Service Merchandise is the

15  only case I'm familiar with -- you cited it in your reply --

16  where the Court dealt explicitly with a list of factors for a

17  court to consider in deciding whether cause has been

18  established for a waiver; that that waiver assumes that it's

19  money of the estate.

20          MR. MARINUZZI:  Your Honor, we're asking for a waiver.

21  If the Court is of the view that Your Honor can grant a waiver,

22  that we've shown cause based on the facts that we're putting

23  into the record, then that serves our purposes.  I understand

24  Your Honor's reluctance.

25          I will point out, though, Your Honor, in 345 -- and

RESIDENTIAL CAPITAL, LLC, ET AL.                                36

1    this doesn't answer the question definitively, obviously -- but

2    345 talks about money of the estate.  And so the estate is

3    defined by, in my view, 541 and what becomes property of the

4    estate.  We don't -- we may not need to address it, Your Honor.

5    Again, the point of the motion --

6         THE COURT:  541 provides that property of the estate

7    is anything you have that's has either legal or equitable --

8         MR. MARINUZZI:  Equitable.

9         THE COURT:  -- interest.

10        MR. MARINUZZI:  Understood.

11        THE COURT:  And you may not have an equitable interest

12   if the funds are held in custody for a third party.  But you

13   ordinarily would have a legal interest.  The account would be

14   in the name of whatever the ResCap entity is, either for the

15   benefit of or some other designation, to indicate that it was a

16   custodial account.  But you'd have legal title.  Am I wrong on

17   that?

18        MR. MARINUZZI:  Well, the account is in the name of

19   the debtor for the purpose of holding money for -- it's not the

20   account, necessarily; it's the cash that's in there, the money

21   that's in there, is earmarked property of third parties.

22        THE COURT:  Let me hear from Mr. Masumoto.  Maybe we

23   can short circuit this.  Because it's not clear to me that I

24   need to make a determination as to whether -- who the money

25   belongs to.  Mr. Masumoto?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    37

1    MR. MASUMOTO:  Good morning, Your Honor.  Your Honor,

2  as indicated, just at the outset, just to sort of set the

3  framework, our objection with respect to the Section 345 is

4  that we believe that the requirements should be maintained and

5  that the waiver should not be granted.

6          With respect to the waiver, specifically the objection

7  to the waiver aspect dealt with the thirty-six million dollars

8  that they identify that --

9          THE COURT:  That's in the Ally Bank.

10         MR. MASUMOTO:  That's at Ally Bank.  And that's what

11 they're seeking -- from our standpoint, that was the waiver.

12         The other aspect that you've been discussing with

13 debtors' counsel, from our perspective we identified as

14 essentially the custodial accounts, which are funds that

15 allegedly were by third -- borrower payments and that belong to

16 a third party.  From our standpoint, we did get clarification

17 from the debtor that contrary to what we saw in the motion,

18 where a custodial account, small c, included debtor funds, that

19 in fact, what they were seeking a determination by the Court,

20 were that these accounts were not subject to Section 345.

21         From our standpoint that's a distinction and different

22 from a 345 waiver, per se.  They're attempting to determine

23 that these capital C, Custodial Accounts were essentially not

24 monies of the estate.  From our standpoint, we did agree that

25 so far as they clarified that the amounts in these accounts did

RESIDENTIAL CAPITAL, LLC, ET AL.                            38

1  not include debtor funds or cash of the debtor, as we

2  interpreted the motion to say, that from our standpoint, we did

3  not wish to interfere with their processing of borrower

4  payments and the payments to the beneficial owners of those

5  amounts.

6         So we agreed that to the extent that they established

7  that there were no debtor cash in those accounts, and that they

8  met that burden with the Court, we would agree to take the

9  position that Section 345 and the requirements of posting

10  collateral or being at an authorized depository that's

11  collateralized at the Fed, would not be imposed on those

12  accounts.

13         THE COURT:  Were you ever able to satisfy yourself as

14  to the institutions where those funds are being held, as to

15  whether they're FDIC-insured or not?  I know there's a lot of

16  accounts.

17         MR. MASUMOTO:  Well, Your Honor, initially, during our

18  initial negotiations with the debtor, we did confirm, in fact,

19  that these custodial accounts -- and at that time, we didn't

20  make a distinction between the capital C and the small c --

21  that all these accounts were at authorized depositories.  But

22  as Your Honor indicated, the intent and the outcome of their

23  determination that it's not subject to 345 is, even if it is at

24  an authorized depository, these custodial accounts will not be

25  collateralized.  So they would not be protected in the event of

1  a bank failure.

2         But having said that, it's also our understanding that

3  these accounts are not protected by the FDIC insurance or by

4  any of the protections offered by the FDIC.  I mean, that's

5  based on what would seem commons sense, in that there are over

6  3,000 accounts.  Even if you multiply that by 250,000, that's

7  less than a billion dollars.  So they claim they have 4.6

8  billion dollars in these accounts.  So clearly, at least one or

9  more of the accounts have to be in excess of the FDIC

10  protection.

11         So we do understand that in many cases, many of the

12  accounts would not be fully protected under FDIC protections,

13  absent, I guess, one other qualification.  Currently the FDIC,

14  in addition to the 250,000 limit, does protect demand deposits,

15  essentially noninterest-bearing deposits.  So if, in fact,

16  these accounts are in noninterest-bearing deposits, arguably,

17  more of them would be protected under the FDIC.

18         THE COURT:  Let me ask.  Can you shed light on the

19  difference between 345 and 541, where 345 talks about money of

20  the estate and 541 is property of the estate?

21         MR. MASUMOTO:  Your --

22         THE COURT:  Nobody's addressed that in the briefs.

23  That's why my reluctance to decide on the basis of the record

24  before me that 345 does not apply.  The debtor has said it but

25  hasn't really given me any legal authority to support -- you

1  know, they attach Refco and they attach Enron, which were both

2  541 decisions and not 345 decisions.

3          MR. MASUMOTO:  Your Honor, we did not address that

4  with the debtor.  We took the position that they needed to

5  establish that they satisfied the requirements of 345.  We did

6  not take an official position with respect to the debtor as to

7  that distinction.  It was never raised.

8          THE COURT:  And what is your position as to the

9  thirty-six million dollars that's in Ally Bank?  And in the

10 reply they came back and said they're required to keep that --

11 that Reg W requires that Ally -- because of the money that Ally

12 has advanced, they're required to keep that as collateral.

13         MR. MASUMOTO:  Your Honor, as indicated, the position

14 of the program is that we believe that those funds should be

15 protected.  They're subject to 345, and accordingly, should be

16 accorded -- should comply with the requirements under Section

17 345.

18         THE COURT:  Have you made an analysis specifically

19 focused on the financial strength of Ally Bank?

20         MR. MASUMOTO:  No, Your Honor.  We don't do that,

21 because we -- normally, by asserting that the requirements do

22 apply, we eliminate that sort of individualized calculation

23 about various financial institutions.  If it is an authorized

24 depository, and they collateralize the funds as required by the

25 Code, the strength of the financial institution is not an

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    41

1    issue.

2            THE COURT:  Well, but if I apply Service Merchandise,

3    which is at 240 B.R. 894 (Bankr. M.D. Tenn. 1999), it's really

4    the only case I'm familiar with that deals with -- it

5    identifies ten factors for a court to consider in determining

6    whether to grant a waiver of 345.  And one of the factors that

7    specifically that Service Merchandise identifies, the fourth

8    factor, is the bank ratings; Moody's and Standard & Poor (sic)

9    of the financial institutions where debtor-in-possession funds

10   are held.  So applying Service Merchandise, that becomes a very

11   relevant factor:  what's the strength of Ally Bank, where the

12   funds are being held.

13           The other factors -- I won't go through each of

14   them -- I think many of the debtor -- and in the reply they

15   specifically cite to Service Merchandise.  So I don't think you

16   can get off quite so easily.  They've asked for the waiver.

17   The factors that have been identified, at least in the Service

18   Merchandise, the ten factors would include the strength of the

19   bank that's holding the funds.  Here they argue that they're

20   required to be held there because of Reg W.

21           MR. MASUMOTO:  Your Honor, as indicated, we normally

22   leave the question as to whether or not the debtors satisfy the

23   burden for cause to be excepted from 345 to the Court.  We do

24   not weigh in on that factor.  And I cannot speak to the issue

25   as to whether or not a debtor satisfies 345.  That is an

1    evidentiary matter that we leave to the Court.

2              THE COURT:  Thank you, Mr. Masumoto.

3              MR. MASUMOTO:  Thank you, Your Honor.

4              THE COURT:  Who else wants to be heard on this?  Mr.

5    Eckstein?

6              MR. ECKSTEIN:  Your Honor, we obviously understand the

7    U.S. Trustee has specific positions with respect to debtor

8    accounts.  Our view is that this is property of the estate.  I

9    would view 345 as being a subset of property of the estate.  So

10   we assumed it was property of the estate.

11             THE COURT:  You assumed the small C, custodial

12   accounts are prop -- even though --

13             MR. ECKSTEIN:  That's how we look at it.  But that's

14   just in response to that inquiry.

15             But nonetheless, we were satisfied from a business

16   standpoint that given the success Ally has had with ResCap

17   assets, we were comfortable --

18             THE COURT:  Well, that's true as to the thirty-six

19   million.  The 1.4 billion, or whatever that number is, is

20   spread around a lot of banks.

21             MR. ECKSTEIN:  Correct.

22             THE COURT:  Have you been provided a list of where the

23   funds are deposited?

24             MR. ECKSTEIN:  I don't believe we have seen a list, at

25   this point, of where all the funds are deposited.  We know that

1  they're not otherwise -- with the exception of this account --

2          Your Honor, I'm told, now, we do in fact, have the

3  list.  So --

4          THE COURT:  Okay.  Thank you.

5          MR. ECKSTEIN:  We were satisfied that this -- there

6  was a sufficient business reason for this exception.  And

7  subject to the U.S. Trustee's issue, the committee was

8  satisfied with that.

9          An alternative, Your Honor, if this can't be resolved

10  today, the servicing issue is going to be heard on the 18th.

11  And one alternative would be to revisit this issue in

12  connection with the motions that are on for the 18th.  Although

13  I don't want to clutter the calendar any further.  But that was

14  just an al --

15          THE COURT:  We'll deal with that issue later.

16          MR. ECKSTEIN:  We're otherwise, from a business

17  standpoint, satisfied with this exception.

18          THE COURT:  All right.  Anybody else wish to be heard?

19          All right, Mr. Marinuzzi?

20          MR. MARINUZZI:  Your Honor, I just wanted to clarify

21  something.  There are more than 3,200 "custodial accounts", and

22  they contain over four billion dollars in cash.  166 of those

23  more than 3,200 custodial accounts are at financial

24  institutions that are not on the U.S. Trustee SDNY-approved

25  list.  Of those 166, 162 are at Ally.  And those accounts

1  contain approximately -- and the amount fluctuates, and this is

2  in the declaration -- as of last week, the amount was 2.7

3  billion dollars.

4          Now, just a note about Ally.  Ally Bank is a federal

5  bank, insured by and subject to the regulations of the FDIC.

6  Ally Bank is owned by bank holding company Ally Financial,

7  Inc., which is subject to the regulations of the Federal

8  Reserve.  And of course, lest we forget, Ally Financial, Inc.

9  is approximately two-thirds owned by the United States

10  government.  So --

11          THE COURT:  I'm aware of that.

12          MR. MARINUZZI:  -- I would like to think that the cash

13  on deposit at Ally is safe.

14          And, Your Honor, we appreciate that the Court may not

15  be able to rule on whether these deposits are property of the

16  estate.  And frankly, we don't believe it's necessary for the

17  Court to rule, because we think we've made a showing under

18  Service Merchandise and the facts of this particular case, that

19  a 345 waiver for those custodial accounts that are not in SDNY-

20  approved locations, as well as the thirty-four million dollars

21  held in the Reg W account, warrant an exception from 345.

22          THE COURT:  All right.  Anybody else wish to be heard?

23          MR. ECKSTEIN:  Your Honor --

24          THE COURT:  Mr. Eckstein?

25          MR. ECKSTEIN:  -- just one more clarification.  I do

1  want to point out that paragraph 21 of the proposed order now

2  provides that nothing in the order shall authorize a setoff.

3  And that was provided specifically in the order, which was

4  obviously important --

5            THE COURT:  Thank you.

6            MR. ECKSTEIN:  -- reaching the conclusion.

7            THE COURT:  All right.  I'm going to grant the motion

8  to continue the cash management system.  On this issue -- the

9  only issue as to which the U.S. Trustee has raised an

10 objection -- the issue of waiver under Section 345(b), first

11 the Court makes no finding with respect to whether either small

12 c, custodial accounts or capital C, Custodial Accounts, whether

13 funds in deposit in either group of those accounts is property

14 of the estate or not.

15           Nevertheless, based on the showing made by the

16 debtors -- and I'll specifically refer to the supplemental

17 Whitlinger declaration in particular -- applying the Service

18 Merchandise standards -- and I cited the case previously; it's

19 the Bankruptcy Court of the Middle District of Tennessee --

20 it's the first decision after Columbia Gas Systems, the Third

21 Circuit case, that had said it wasn't discretionary.  Congress

22 revised the statute to allow a waiver for cause.

23           The Court has considered the factors identified in

24 Service Merchandise, and the overwhelmingly large number of

25 those ten factors support a waiver as to all of the accounts in

1 question here:  the sophistication of the debtors' business;

2 the size of the debtors' business operations.  It would be

3 extremely difficult, given the number of accounts, the number

4 of agreements that require funds be deposited in specific

5 accounts to alter that practice now.  The amount of the

6 investments involved -- it's very large.  It's very large.  I

7 think the clarification as to how much of it is in -- 2.7

8 approximately billion -- in Ally Bank it's obviously a very

9 large number.

10       I don't have any information on the bank ratings of

11 Ally Bank.  The complexity of the case certainly supports

12 granting the waiver here.  The safeguards in place within the

13 debtors' own business, I'm satisfied that careful accounting is

14 kept of where the deposits are and the flow of funds within

15 each of the accounts.

16       The seventh factor that Service Merchandise looked at

17 was the debtors' ability to reorganize in the face of a failure

18 of one or more of the financial institutions.  With the

19 exception of the amount that's on deposit at Ally Bank, while

20 the others may be large, they still pale in comparison.

21       The harm, if any to the estate.  If I were to turn

22 this motion down, it would add great complexity and uncertainty

23 in this case.

24       And the reasonableness of the debtors' request for

25 relief under 345(b) requirements in light of the overall

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    47

1  circumstances of the case; I would conclude that those

2  overwhelmingly support granting the waiver.

3          So it's on the basis of the waiver of 345(b) that I'm

4  approving the continuation of the deposits.  Let me just say,

5  if at any point in the case the U.S. Trustee wishes to revisit

6  the issue as to specific financial institutions in which funds

7  are deposited, I would entertain that.  I just want to make

8  that clear.  But I'm limiting it to that specific area, since

9  Mr. Eckstein has said, the committee has at least seen the list

10 of institutions where funds are deposited.  That ought to be --

11 that list ought to be shared with the U.S. Trustee's Office, if

12 it has not already had an opportunity to see that.

13         And if it wishes to raise specific issues as to

14 institutions included, a) you ought to, in the first instance,

15 see whether you can resolve the issue with the debtor, either

16 by the debtor agreeing to a transfer to another institution;

17 and the failsafe position is to come back to court.  But only

18 as to specific institutions, after you've had an opportunity to

19 review the list and if issues have arisen.  All right?

20         MR. MARINUZZI:  Your Honor, thank you very much.

21 We'll modify the order to reflect that there's no finding as to

22 whether the cash is property of the estate.

23         THE COURT:  Okay.

24         MR. MARINUZZI:  I would note also that an exhibit to

25 the motion is a 146-page list of bank accounts.  So it includes

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1  all the accounts.

2          THE COURT:  Okay.  Thank you, Mr. Marinuzzi.

3          MR. MARINUZZI:  Thank you.  I'm sorry, Your Honor.

4  I'll cede the podium to my partner, Norm Rosenbaum.

5          THE COURT:  Thank you.

6          MR. ROSENBAUM:  Good morning, Your Honor.  Norm

7  Rosenbaum for the debtors.  Your Honor, taking up the matters

8  as they're listed on the agenda, number 5, I think it would

9  make sense if I address that first.  And that, number 5, docket

10 number 58, relates to item number 7, which is docket number 57,

11 which is our motion to continue servicing government

12 association loans in the ordinary course.  So I can explain why

13 number 5 is relevant to --

14         THE COURT:  Just stay in -- this is that one document

15 that Judge Peck agreed to allow to be sealed pending the

16 hearing.

17         MR. ROSENBAUM:  Yes.

18         THE COURT:  And somebody handed me an envelope just

19 before the start of the hearing with that document in it, which

20 I left on my desk.  Everybody just stay in place; don't get up

21 when I come back in.

22     (Pause)

23         THE COURT:  Okay.  Go ahead.

24         MR. ROSENBAUM:  Thank you, Your Honor.  The exhibit

25 that Judge Peck directed and approved to be filed under seal is

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    49

1  a set of --

2          THE COURT:  I think he said he didn't really

3  understand what it was about or something to that effect.  But

4  he agreed to seal it pending today's hearing.

5          MR. ROSENBAUM:  He did, Your Honor.  The exhibit is

6  actually an exhibit to the GA servicing motion.  And what it

7  represents is a set of benchmarks that Freddie Mac has

8  established and negotiated with the debtors.  And these are

9  performance-based metrics on servicing.

10          And they were negotiated over a period of time.  And

11  what we, the debtors, agreed to as part of the servicing

12  motion, was that if the debtors failed to meet any one of these

13  benchmarks, Freddie Mac would have the right to come in and

14  remove servicing from the debtors.  So it's a significant

15  issue, and it was negotiated quite rigorously.

16          After filing the -- obtaining the order to file the

17  exhibit under seal, once the committee was appointed and

18  retained counsel, we did share that exhibit with the committee.

19  It's been reviewed by the Office of the United States Trustee

20  as well.

21          The committee -- and this was included in their

22  omnibus objection to the first day motions -- the committee did

23  raise a concern with the metrics, obviously not identifying

24  what was of concern to them.  Subsequent to that time, we had

25  discussions among the debtors, the committee, and Freddie Mac.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      50

1   And Freddie did agree -- Freddie Mac did agree to modify two of

2   the metrics to provide more cushion to the debtors in their

3   ability to meet those.  That was satisfactory to the debtors

4   and satisfactory to the committee.  So it would resolve one of

5   the committee's -- really, the only committee's objection to

6   the servicing.  And on that basis, Your Honor, that's the

7   genesis of the exhibit.

8           Freddie Mac feels very sensitive about the information

9   contained here.  It's servicer-specific.  They have expressed

10  that concern and requested that it be filed under seal.  The

11  debtors have concerns as well.  But we really defer to Freddie

12  Mac on this.

13          They did submit, in connection with the motion to

14  continue to keep it under seal, the declaration of Yvette

15  Gilmore, which is filed with the Court as docket number 260.

16          THE COURT:  I'm sorry, say that again.

17          MR. ROSENBAUM:  In support of the motion --

18          THE COURT:  Just give me the --

19          MR. ROSENBAUM:  Oh.

20          THE COURT:  -- ECF document number.

21          MR. ROSENBAUM:  260.

22          THE COURT:  Go ahead.  Anything else you want to say?

23          MR. ROSENBAUM:  On the seal, Your Honor, no.  We'd

24  request that Your Honor enter the order.

25          THE COURT:  Anybody else wish to be heard?  Mr.

1  Masumoto, do you want to be heard?  Your office usually has

2  strong views on sealing.

3          MR. MASUMOTO:  Your Honor, we believe that the sealing

4  order that has been narrowly tailored -- we saw what was

5  provided.  We would like to see a copy of the final order.  But

6  we have no further objections.

7          THE COURT:  All right.  Does the committee wish to be

8  heard?

9          MR. MANNAL:  We have no objection to the sealing, Your

10  Honor.

11          THE COURT:  I hadn't read the declaration.  Let me do

12  that now.

13          MS. NORA:  Your Honor, this is Wendy Alison Nora.  Did

14  I understand the Court to say that all of my objections to all

15  of these motions that are being heard today have been

16  overruled?

17          THE COURT:  No.  I overruled your objection to the one

18  motion that I heard earlier.

19          MS. NORA:  Thank you, Your Honor.  I did not object to

20  this particular motion.  I was objecting to the sealing of the

21  Barclays financing --

22          THE COURT:  Ms. Nora, Ms. Nora --

23          MS. NORA:  Yes.

24          THE COURT:  When it comes to a motion that you do

25  object to, I'll give you an opportunity to speak.  But I'm in

1  the --

2          MS. NORA:  Thank you.

3          THE COURT:  -- midst of reading something relating to

4  the matter currently before the Court.  So why don't you just

5  remain on the line and go answer the door.

6      (Pause)

7          THE COURT:  Is there anyone from Freddie Mac here?

8          MR. MOAK:  Your Honor, Paul Moak with McKool Smith on

9  behalf of Freddie Mac.

10          THE COURT:  So the question I have for you is I have a

11  published opinion in Borders, a memorandum opinion granting

12  debtors' motion to seal KOBO share purchase agreement.  I've

13  written three or four opinions on sealing.  The Borders opinion

14  was December 7th, 2011.  I don't have the Bankruptcy Reporter

15  citation.  But one of the things -- and Borders is not the only

16  one that I've done it in -- but there's a section in the

17  opinion called "Presumption favoring public access to court

18  records".  That's well-established.  There's another section on

19  "The redacted SPA properly protects the commercial

20  information".  And I think what I've held was that generally

21  redaction, rather than entire sealing is the appropriate way.

22          So why should this entire document be sealed as

23  opposed to redacted?

24          MR. MOAK:  Your Honor, candidly, our preference,

25  obviously, would be to have the entire sealed but --

1    THE COURT:  I know.  But so tell me why.  I'm sure

2  it's your preference.  But why isn't redaction a suitable

3  response?  And I'm not saying that it shouldn't be sealed.

4  It's only a single page.  And so tell me why the entire

5  document should be sealed as opposed to redacted.

6    MR. MOAK:  Your Honor, I guess our position would be

7  to protect the information that is the most sensitive to

8  Freddie Mac, we would have to redact it, I believe, in a way

9  that would render the rest of the exhibit, I would assume,

10  meaningless to people who had access to it.  So from our

11  perspective, we're not certain whether a redacted version

12  provides more transparency than filing the entire document

13  under seal.

14    But I guess, if you're asking us whether we can review

15  it and present to you a redacted version, I would have to

16  consult with Freddie Mac and give you a --

17    THE COURT:  I didn't ask you to do that yet.  But

18  look, I set out in an opinion a standard that applies to

19  sealing.  And I've said that the strong presumption is that

20  things should be redacted rather than sealed.  And I'm giving

21  you a chance to explain to me now why this document, the entire

22  document, should be sealed rather than having it redacted.

23    MR. MOAK:  Your Honor --

24    THE COURT:  I'm not trying to set you up.

25    MR. MOAK:  -- I hear you.

1    THE COURT:  What I'm trying to do is apply what I've

2    said the standard is.

3        MR. MOAK:  Your Honor, I understand what you're

4    saying.  I guess the answer, Your Honor, would be, the extent

5    to which redaction would be permitted -- I guess we could get

6    satisfied, depending upon what the Court would deem to be

7    satisfactory redaction of the document.  So if you'd like me to

8    consult with Freddie Mac and provide you with a redacted copy,

9    I believe we could do that.

10       THE COURT:  What's the relevance of this document to

11   the issue -- it relates to the subsequent motion, correct?

12       MR. MOAK:  That's right, Your Honor.  It's part of the

13   debtors' motion to approve the continuation of its servicing

14   with the -- I believe it terms us the governmental associations

15   or entities.

16       THE COURT:  Let me hear from debtors' counsel.  Why

17   does this have to be -- what's the relevance of this exhibit to

18   the servicing motion?  I guess what I'm trying to find out is

19   why do I need this at all?  Maybe I do.

20       MR. ROSENBAUM:  These performance benchmarks were

21   negotiated between the debtors and Freddie Mac, and they're --

22   a failure to meet any one of those benchmarks, pursuant to what

23   Judge Peck approved and what the agreement in between Freddie

24   Mac and the debtors is, Freddie Mac would have the right to

25   pull servicing of its loans, which are several hundred

1    thousand, billions of unpaid principal.  So I would say --

2            THE COURT:  I'm persuaded.  I'm persuaded about the

3    importance of it.

4            MR. ROSENBAUM:  It's sensitive data -- Mr. Moak will,

5    I'm sure interrupt me if I go too far -- it's sensitive data

6    specific to the debtor GMAC's performance as it relates to how

7    GMAC services the Freddie pool of loans.  It's specific to GMAC

8    in several respects.  And it's measured against other

9    benchmarks.  But the position of Freddie Mac, and the debtors

10   as well, as we agree with that and we're sensitive to this

11   issue as well, is this is specific in now Freddie Mac is

12   treating one servicer.  I think other servicers would be very

13   interested in seeing this data.  And it could have negative

14   impacts, I think, for the debtor, but more so to the way

15   Freddie Mac manages its other servicers.

16           THE COURT:  I mean, here is what I said in Borders.

17   "In cases where protection is required, however, the form of

18   protection that must be granted is not commanded by the

19   statute.  The Court has discretion when deciding how to protect

20   commercial information.  See Gitto, 422 F.3d at 9 ("It is true

21   that Section 107(b)(2) speaks of protection in general terms

22   rather than of wholesale sealing, and that courts must

23   therefore exercise some discretion in determining what form of

24   protection to grant.").  Redacting documents to remove only

25   protectable information is preferable to wholesale sealing.

1   The policy favoring public access supports making public as

2   much information as possible while still preserving

3   confidentiality of protectable information.  See, e.g., Nixon

4   v. Warner Communications, Inc., 435 U.S. 589, 597-98 (1978)."

5           And my law clerk has just handed me my Borders

6   decision is at 462 B.R. 42.

7           MR. ROSENBAUM:  Your Honor, I think I'd have concur

8   with Mr. Moak that it's -- to redact this would render it

9   meaningless.  One would not be able to glean what the

10  benchmarks were by what would have to be redacted.

11          THE COURT:  Well, let me -- is it fair to say that the

12  amended Freddie Mac servicing transfer metrics establish seven

13  specific metrics that the debtor must satisfy.  It sets forth

14  what each metric is; it provides a "logic" for the established

15  metric; it sets a benchmark, either in a number or a

16  percentage; and then it sets forth a time frame within which

17  the debtor must comply with a metric.  Is that a fair

18  statement?

19          MR. ROSENBAUM:  That's a fair statement, Your Honor.

20          THE COURT:  So tell me what happens if the debtor

21  fails to comply with any one metric?  Do you get notice?  Do

22  you get time to cure?  What happens?

23          MR. ROSENBAUM:  Based on the agreement which is part

24  of our motion and order which we're asking Your Honor to

25  approve on a final basis today, Freddie Mac has the right to

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                     57

1    remove all or some of the loans serviced in the Freddie Mac

2    pool, on notice --

3          THE COURT:  Without any further notice?

4          MR. ROSENBAUM:  With notice, but it's -- there is not

5    an opportunity, as per the agreement in the interim order, for

6    the debtors to challenge that.

7          MR. MOAK:  Your Honor, if I might?

8          THE COURT:  Go ahead.

9          MR. MOAK:  I've consulted with Freddie Mac, and we are

10   prepared to offer to the Court a redacted version of the

11   metrics.  I don't know the best way -- maybe to try to hand it

12   up at the end of the hearing and revisit this issue --

13         THE COURT:  Well, I don't need it today, but --

14         MR. MOAK:  Okay.  So we're willing to do that.

15         THE COURT:  See if you can work with -- let me ask you

16   this.  Work with the debtors' counsel, the committee, and the

17   U.S. Trustee, all of whom have seen the specific.  I recognize,

18   I think it would be difficult -- I can see where it would be

19   difficult to redact it in such a way as you're disclosing

20   meaningful information.

21         My concern is, you know, you set a bunch of metrics,

22   and when we get to the later motion, the consequences of

23   failing to comply with it can be quite serious.  Okay.  And the

24   issue for me -- and this where the transparency comes in -- are

25   creditors entitled to know what the risks that are being faced

1  as this case proceeds.  This is obviously potentially a

2  substantial risk.

3          I don't question that the precise benchmarks that you

4  set, particularly if they're specific as to ResCap, are

5  confidential.  They satisfy, under my Borders decision, or

6  Silicon Graphics, I wrote before that, would satisfy the 107(b)

7  standard for confidential information.  That I'm not disputing.

8          So we're going to keep this under seal, and I will see

9  what -- I'll give you a week to see if you can come to an

10 agreement on an acceptable redaction.  I'm not ruling as to

11 whether I would or would not seal it, as is.  I think it would

12 be preferable if you can come up with a redacted form that

13 reasonably discloses the information that creditors ought to

14 know.  Okay?

15         MR. MOAK:  We'll do that, Your Honor.

16         THE COURT:  I appreciate that.  Thank you very much.

17         And if you come up with an agreement, you'll submit

18 something and we won't have another hearing on it unless I

19 specifically ask for it.  Okay?

20         MR. MOAK:  That's good to hear, Your Honor.  Thank

21 you.

22         THE COURT:  Thank you very much.

23         MR. ROSENBAUM:  Your Honor, if I may, can we address

24 item number 7 on the agenda?

25         THE COURT:  You may as well, since we've been.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    59

1          MR. ROSENBAUM:   That's docket number 57.  And, Your

2   Honor, this is the debtors' motion to continue servicing

3   government association loans in the ordinary course of

4   business.  The motion was approved on an interim basis pursuant

5   to an order entered by Judge Peck on May 16th.

6          Your Honor, since the time of the initial hearing and

7   subsequent to the filing of the motion, we've continued to work

8   with all the major constituents to this that are affected by

9   this relief, including Fannie Mae, Freddie Mac, Ginnie Mae,

10  Ally, AFI, and of course the debtors, and tried to address

11  constructively all of the concerns.  There was a great deal of

12  information flow with the committee.  A large part of it, the

13  past couple days, dealt with the metrics we just reviewed and

14  modifying those metrics in a way that were acceptable to the

15  committee.

16         I don't believe that any of the omni objections that

17  were filed really are objections to the servicing motions and

18  this particular motion.  So at this time, it's a consensual

19  motion.  We've made some changes as requested to the initial

20  order in the final form of -- form of final order, as requested

21  by the committee and Ally Bank and AFI.  And some of those

22  affected or impacted what was in the interim order concerning

23  rights granted to Fannie Mae, Freddie Mac, and Ginnie Mae.  But

24  through the process of meeting and cooperation, all the parties

25  are satisfied with the form of the order that's been filed with

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    60

1  the Court.

2           THE COURT:  So one of the objections related to

3  providing preferential termination rights to Freddie Mac.  Have

4  you dealt with that?

5           MR. ROSENBAUM:  Well, we don't consider them

6  preferential.

7           THE COURT:  Well, that was the argument.  But what

8  did -- I'm not saying it is.  But I just --

9           MR. ROSENBAUM:  We believe that there's a strong

10 argument that Freddie Mac has that right to begin with.

11          THE COURT:  Okay.

12          MR. ROSENBAUM:  And we are asking, as part of this

13 bankruptcy, which in some respects is unprecedented what we're

14 trying to accomplish here, selling servicing rights as a going

15 concern, was very important, and we worked very hard for many

16 months to obtain the support of Fannie Mae, Freddie Mac, and

17 Ginnie Mae.

18          They expressed, understandably, the concerns of

19 working with the debtor.  And these were part of the

20 concessions to obtain their support.  We're hoping to continue

21 to have their support as we conclude this process through the

22 sale.  They are going to have to make important decisions in

23 support of the sale at that time.  And we felt this was a very

24 fair compromise, and it addresses their concerns.

25          THE COURT:  One of the objections seemed to be that

1  you had split the servicing motions into two or three parts,

2  when really it all should be raised together.

3           MR. ROSENBAUM:  I believe the reservation of rights

4  Your Honor is referring to is a reservation that the pooling

5  and servicing agreements or the origination of loans and the

6  servicing of loans, where they come up in agreements or

7  agreements that are integrated or agreements that relate to one

8  another should be considered one agreement, and that you cannot

9  segregate and divide the origination of loans from the

10  servicing of loans.  Your Honor, that's clearly not our

11  position.  I believe that's an issue for another day.  But

12  those were rights reserved at the interim hearing and I believe

13  is part of some of the reservation of rights.  I don't take

14  those as objections to these motions.

15           THE COURT:  Does anybody else wish to be heard with

16  respect to the government association servicing motion?  Mr.

17  Mannal?

18           MR. MANNAL:  Your Honor, Doug Mannal, Kramer Levin,

19  proposed counsel for the creditors' committee.

20           Your Honor, the reason you have an amended exhibit

21  under seal is because we discussed with the debtors and with

22  Freddie Mac what we thought were more appropriate metrics.  And

23  we worked with our financial advisor, Alex, to come up with

24  what we thought was appropriate in the circumstances.

25           Clearly we would rather there be no metrics, but the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    62

1   debtors, as they indicated, had negotiated pre-petition and --

2           THE COURT:  I'm sure it wasn't the debtors' choice to

3   arrive at those metrics.

4           MR. MANNAL:  I don't think it was either.  So, Your

5   Honor, with that, and with other modifications to the proposed

6   order, including putting a cap on certain critical servicing

7   payments of 19.6 million dollars, and certain reporting

8   requirements in connection with other payments and advances,

9   the committee has no objection.

10          THE COURT:  Thank you.  Anybody else?  The U.S. -- Mr.

11  Masumoto, did you want to be heard?

12          MR. MASUMOTO:  Your Honor, subject to the same request

13  previously, notice to the U.S. Trustee and review of the final

14  order, we have no objections.

15          THE COURT:  All right.  Anybody else want to be heard?

16          MR. AMINI:  Very briefly, Your Honor.  Bijan Amini on

17  behalf of National Association of Consumer Bankruptcy Attorneys

18  and a couple of the homeowners.

19          Our objections to 6, 7 and 8 are really to the

20  supplemental order, which is I think item 8.  I just don't want

21  to waive that --

22          THE COURT:  Okay.

23          MR. AMINI:  -- on this one.

24          THE COURT:  All right.  Anybody else wish to be heard?

25          Let me ask you, I wrote notes to myself relating to --

1  let me find it -- the nongovernment association servicing

2  motion.  But I want to -- it may apply here as well.  The

3  motions, I understand, permit ResCap to continue what you would

4  refer to as business as usual, right?

5              MR. ROSENBAUM:  Yes, Your Honor.

6              THE COURT:  And one of those things that's business as

7  usual is the right to sell loans --

8              MR. ROSENBAUM:  Real estate owned, Your Honor?

9              THE COURT:  I'm sorry?

10             MR. ROSENBAUM:  The real estate owned property or --

11             THE COURT:  Well, not -- real estate owned is after

12 foreclosure's successful.  So let's assume you've initiated

13 foreclosure and -- let me see.  With the government association

14 loans, are those loans subject to the HAMP program?

15             Somebody just clicked the light switch.  Thanks again.

16             MR. ROSENBAUM:  Your Honor, all of the loans are --

17 the debtors' obligations under HAMP apply to all of their

18 servicing.

19             THE COURT:  So here's --

20             MR. ROSENBAUM:  I don't believe -- the debtors have

21 some loans they hold for sale and hold for investment.  And

22 what we're seeking in that component of the motion was the

23 authority to do that.  I don't think there's any intention --

24             THE COURT:  Well, let me be --

25             MR. ROSENBAUM:  -- of doing that.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      64

1          THE COURT:  -- very specific.

2          MR. ROSENBAUM:  Sure.

3          THE COURT:  Are you able to provide me with any

4    statistics on the number of loans that ResCap has sold while

5    the borrowers were in a HAMP trial period?

6          MR. ROSENBAUM:  I don't have that.  I think we would

7    be able to provide that, Your Honor.

8          THE COURT:  Because, look, for two and a half years I

9    had the Chapter 13 calendar.  I don't any longer.  But I was

10   very active in creating the Southern District's Loss Mitigation

11   Program and follow even since I've given up the 13 calendar

12   that it still applies, loss mitigation applies in the other

13   chapters as well.

14          But one of the -- let me say, there are parties-in-

15   interest who allege that one of the abuses that has occurred in

16   the past, and I'm not making a judgment whether it is an abuse

17   or not, is when a borrower has been given a HAMP trial

18   modification that the loan gets sold and the buyer -- there may

19   be a month or two months into a trial period, have performed

20   perfectly, the loan gets sold and the buyer says, well, I don't

21   care, and you're forced to start all over, new documentation,

22   everything else.

23          And that's why I ask can you provide any statistics on

24   the number of loans sold while the borrowers were in a HAMP

25   trial period.  I mean, you characterize this as a business as

1   usual, and the problem is that business as usual may not be

2   good enough.  That's what, in part, led to various settlements,

3   and that's why I specifically want to know some information

4   about that.

5           MR. ROSENBAUM:  Your Honor, may I have a moment?

6           THE COURT:  Yes, you can.

7           MR. ROSENBAUM:  Your Honor, we conferred with one of

8   the debtors' officers, and they don't sell loans that are part

9   of the HAMP trial process.

10          THE COURT:  Okay.  Would you put that in the order?

11          MR. ROSENBAUM:  We can do that, Your Honor.

12          THE COURT:  Okay.  Because that is -- again, I don't

13  recall those instances occurring where ResCap or one of its

14  affiliates was involved, but this was more than an occasional

15  problem that occurs with respect to loan modifications.  It

16  drives borrowers nuts; it drives debtors in Chapter 13 nuts

17  when they perform -- they think they're performing well for an

18  extended period of time, and lo and behold, the loan gets sold

19  and they're back at square one.  So put in the order words to

20  the effect that you will not be selling loans that are in a

21  HAMP trial modification.

22          MR. ROSENBAUM:  We will do that, Your Honor.

23          THE COURT:  Okay.  Anybody else wish to be heard?

24          Okay, then the motion -- let me just make sure my

25  other questions are -- anybody on the phone want to be heard on

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    66

1   this?

2           All right.  The motion is granted.

3           MR. ROSENBAUM:  Your Honor, since you addressed your

4   concerns with the non --

5           MS. NORA:  Your Honor?

6           THE COURT:  Yes.

7           MS. NORA:  This is Wendy Alison Nora.  I don't think

8   you were able to hear me.

9           THE COURT:  I couldn't hear you.  Go ahead.  Do you

10  want to be heard?  Go ahead.

11          MS. NORA:  Yes, on 6, 7, and 8, Your Honor, the

12  concerns that I am trying to represent here are that the

13  homeowners that are in foreclosure, facing eviction, facing

14  foreclosures by advertisement, judicial states by action, that

15  there are forged documents being used by ResCap and its

16  affiliates in order to take these properties.

17          And that's why I have appeared here to get the Court's

18  supervision over more than just whether or not a HAMP loan is

19  sold in the process, but whether or not these foreclosures have

20  any legality at the core.  And without the filing of the

21  Schedules and Statements of Financial Affairs as to what they

22  claim to own by having taken properties in this manner, the

23  actions in which they are proceeding, which would appear on the

24  Statement of Financial Affairs, by the continuing claims that

25  they own loans when they are mere servicers.  For the sake of

1  the people who are suffering from the foreclosure holocaust, I

2  had just hoped that the Court would give us time to approach

3  the Court to use its equitable powers to supervise something

4  that we believe is an absolute scandal.  And it has not just

5  been settled, as asserted by the debtors; they are under

6  sanctions to stop the very actions I've just described to this

7  Court, and they are continuing to take homes, to appeal on the

8  basis of forged documents, to defend themselves on the basis of

9  these documents, and it's a very serious matter, Your Honor.

10            THE COURT:  Thank you.

11            Do you want to respond?  I'm not sure -- what is

12  the -- in the debtors' view, does this have a bearing on this

13  specific motion, number -- the Government Association servicing

14  motion?

15            MR. ROSENBAUM:  I don't believe it has much bearing on

16  either motion.  I would add, though, that as part of both the

17  Government Association motion and the non-Government

18  Association, we are very clear that we are committed to

19  continue to comply with the consent order and the DOJ/AG

20  settlement.  We are basically requiring, as part of the orders,

21  that we've been directed to do so and we have every intention

22  to do so.

23            In connection with the supplemental motion we haven't

24  heard yet, we've gone to great lengths to give borrowers, both

25  in foreclosure actions in judicial and nonjudicial states --

1        THE COURT:  Let's hold -- because I do have some

2   issues with the supplemental motion, so we'll hold that.  But

3   just focus on the two, the Governmental and non-Governmental

4   Association servicing motions.

5        MR. ROSENBAUM:  Your Honor, what we heard was clearly

6   not evidence; it's argument.  These are arguments that are made

7   in litigation around the country.  We defend that litigation.

8   As part of the servicing, we are conducting foreclosures and

9   participating in bankruptcies.  And it's our intention in this

10  bankruptcy case -- and not to go too far afield to the

11  supplemental, but I believe that that goes to the -- what I

12  heard was the core of the objection, that this is unfair

13  treatment.  And we fully intend to have proper --

14       THE COURT:  You don't question that using forged

15  documents in connection with foreclosure is unfair treatment?

16       MR. ROSENBAUM:  No, Your Honor, I don't.  And

17  that's -- but all we heard was an allegation, but --

18       THE COURT:  Well, you say an allegation, but there are

19  enough reported decisions that specifically deal with this

20  issue that -- they may not involve ResCap.  I've written some

21  opinions myself that have dealt with robo-signing of affidavits

22  in connection with foreclosure.

23       So I think you're straying if you're going to say

24  these are just allegations.  They're much more than

25  allegations.  They're taken very seriously.  But I'm not sure

1   what bearing it has on either the Governmental Association or

2   the non-Governmental Association servicing motion.  It may well

3   have a bearing on the supplemental servicing motion.

4          MR. ROSENBAUM:  I don't believe it was, Your Honor.  I

5   was trying to address the concern that was raised.

6          THE COURT:  Anybody else wish to be heard?  Okay.

7   Heard with respect to either the Governmental or the non-

8   Governmental servicing motions.  We'll take them both together.

9          All right.  Both of those motions are granted.  The

10  Nora objection is overruled.  The concerns that Ms. Nora raises

11  are very real concerns.  I don't think they have a bearing

12  specifically on either of those two motions, and for that

13  reason I'm overruling the objection.

14         Okay, next?

15         MR. ROSENBAUM:  Thank you, Your Honor.  Just bear with

16  me one second.

17         THE COURT:  Sure.

18         MR. ROSENBAUM:  Your Honor, this brings us to the last

19  matter on this morning's agenda.  This is docket number 181,

20  and this was number 8 on the agenda, and it's the debtors'

21  request for a supplemental order, primarily relating to

22  servicing.

23         Your Honor, in support of this motion, we've filed a

24  declaration of Sowite Bagrijian, the declaration of Joseph A.

25  Pensabene and the supplemental declaration of James Whitlinger.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    70

1    Your Honor, we received one limited objection to this

2    motion, which I'm happy to address.  This motion really arose

3    out of events which took place literally immediately upon the

4    filing, and the genesis of this motion is really an effort to

5    address issues relating to servicing of loans in the ordinary

6    course, and really is a supplement to the servicing relief Your

7    Honor just granted.  We're trying to address ordinary course

8    operations when it comes to loss mitigation, settlements,

9    foreclosures, and bankruptcies.

10    And we work very hard, again, with different

11    constituencies.  The debtors have a substantial expertise in

12    in-house counsel of managing both foreclosures and

13    bankruptcies.  They did also hear from literally hundreds of

14    external counsel they manage, as well as defense counsel.  And

15    we worked very hard to come up with procedures and processes

16    that'll govern foreclosures in all fifty states, in

17    bankruptcies in all fifty states, literally thousands, to come

18    up with a process that one would allow the debtors to continue

19    to meet their servicing obligation when it comes to foreclosing

20    on loans, engaging in loss mitigation, and protecting their

21    rights as servicer as well as owner in bankruptcies.

22    The objective was to have appropriate relief in

23    foreclosure actions that would allow borrowers to defend

24    themselves fully to the foreclosure and raise any claims or

25    objections and counter-claims that were necessary in order to

1  defend the action.

2          Where we've drawn the line, in terms of modifying the

3  relief from the stay, is to maintain the stay with claims and

4  counter-claims that clearly and only seek monetary relief.  And

5  we believe that --

6          THE COURT:  Let me ask you some specific questions.

7          MR. ROSENBAUM:  Sure.

8          THE COURT:  So if a borrower, in a state foreclosure

9  action or in a bankruptcy proceeding, files a TILA or a RESPA

10 claim on a loan that the debtors are seeking to foreclose, does

11 the relief under this motion permit the debtor to press the

12 TILA or RESPA claims?

13         MR. ROSENBAUM:  They would have the opportunity to

14 press the TILA or RESPA if it was a defense to the foreclosure.

15 My understanding is that, for the most part, those are not

16 defenses to foreclosures, but it may be state-specific as to

17 how they're applied.

18         THE COURT:  So what kind of claims is it that you're

19 permitting them to assert?

20         MR. ROSENBAUM:  In foreclosures, Your Honor?

21         THE COURT:  Yes.

22         MR. ROSENBAUM:  They can --

23         THE COURT:  What about robo-signed documents where

24 they --

25         MR. ROSENBAUM:  If that's --

1    THE COURT:  -- claim --

2    MR. ROSENBAUM:  If that's a defense to the -- that

3  would -- we would permit that, Your Honor.  That would be a

4  defense to the foreclosure.  If it's clearly seeking monetary

5  relief, the foreclosure's done, or it's not -- they're not

6  seeking to defend the foreclosure but they're just seeking

7  monetary --

8    THE COURT:  So if they assert a TILA claim, they

9  assert that the note is not enforceable because you violated

10 the Truth In Lending Act and therefore you can't successfully

11 foreclose on the property.  That's a permissible defense.

12   MR. ROSENBAUM:  Yes, Your Honor.

13   THE COURT:  What would the automatic stay continue to

14 bar if I grant this relief?

15   MR. ROSENBAUM:  The automatic stay would continue to

16 bar claims that are solely for monetary relief, both in

17 foreclosure actions and bankruptcy.  The automatic stay would

18 continue to bar any collective action or class action or

19 asserted class action.  And literally, Your Honor, that is

20 about the limit.  It would also continue to apply to set-offs.

21 There's not a --

22   THE COURT:  What if the --

23   MR. ROSENBAUM:  -- waiver of the set --

24   THE COURT:  What if the TILA claim is asserted as a

25 set-off to a foreclosure action?  And it may be state law

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                73

1   specific as to what defenses are permitted to be asserted, but

2   if someone claims that there's been a TILA or a RESPA violation

3   relating to the very specific loan that you're seeking to

4   foreclose on --

5           MR. ROSENBAUM:  Your Honor, if it's a defense to the

6   foreclosure, the way we structured this -- and again, we

7   believe it's fair to both sides -- they're allowed to proceed

8   with that.  They're allowed to proceed to a judgment.  They

9   wouldn't have the ability to set that off against any claims

10  that the debtors may have.  We believe that, as with all other

11  creditors, they should be similarly treated, and if they want

12  to assert set-off rights, you need to come to this Court.

13          We're trying to strike a balance between every other

14  creditor we have and the creditors or alleged creditors in

15  these actions.

16          THE COURT:  Well, do you get a judgment -- I guess it

17  may be state-specific, but if it's a recourse loan and you

18  foreclose and there's a deficiency, do you get a deficiency

19  judgment against the borrower?  You know, what about where they

20  claim, but I've got this TILA claim or RESPA claim that exceeds

21  that amount.  Why aren't they entitled to --

22          MR. ROSENBAUM:  Well, Your Honor, my understanding is

23  that, as a matter of practice, we're not pursuing those claims,

24  but to the extent we are, that would be, just under principles

25  of automatic stay, generally.  I don't think that's a category

1  addressed in our order.  It's something we could address.

2          THE COURT:  But I think --

3          MR. ROSENBAUM:  But we don't have the --

4          THE COURT:  Part of the objections is the uncertainty

5  that's created, that lawyers don't know what it is they're

6  permitted to do in defending a foreclosure action in any state.

7  Okay.  And it's the uncertainty, and I sympathize with them

8  about it.  If these questions about well, if it's a state that

9  if you have a recourse loan and, as in most foreclosures,

10 there's a deficiency, you get a judgment.  Can you enforce it?

11 Do they get to assert and set off a claim for TILA, RESPA,

12 state law fraud, you name it?  Why is that you get a judgment

13 and you say oh, but you can't set off your claim against it?

14          You only want to try it once.  If a state court's

15 going to try it and if it's going to result in a judgment

16 against a borrower, and their lawyer is saying but you're

17 keeping one or both hands tied behind my back because it's

18 going to result in a monetary judgment against my client, my

19 response to it is this very same loan has violated state law,

20 it has violated federal law.  Why aren't they entitled to set

21 off if you're going to get a judgment, as opposed -- just a

22 foreclosure judgment allowing you to foreclose on the property?

23          MR. ROSENBAUM:  Well, Your Honor, we have some concern

24 with waiving a fundamental bankruptcy right nationwide.  We

25 clearly have no -- and we wouldn't be prosecuting any action as

1  plaintiff, including deficiency actions.  Again, I don't

2  believe it's the policy to do so.  However, if we were to

3  pursue those actions then clearly the defendant would be able

4  to bring any claim they have in a defense.  And that, I think,

5  should be part -- the concern we have --

6          THE COURT:  How do you separate set-off from that?

7          MR. ROSENBAUM:  But the concern we have, Your Honor,

8  is we have to be cognizant and conscious of our claims

9  resolution process and where that's going to take place.  And

10 we've looked at these issues, and we see that as very unwieldy,

11 unworkable, and will have courts, state courts, federal courts,

12 bankruptcy courts literally 6 -- we have 60,000 bankruptcies

13 pending, 50 --

14         THE COURT:  Look, I'm not going to -- let me make it

15 clear before anybody else gets up here.  I'm not going to leave

16 it to judges, bankruptcy judges or state court judges to decide

17 whether the stay ought to be reinstated or not.  I mean, that's

18 all -- to the extent there's a stay, the only person who's

19 going to lift the stay is me.

20         MR. ROSENBAUM:  Thank you, Your Honor.  We have looked

21 and considered these issues and the precise issues Your Honor

22 is raising.  And the concern that the debtors have is we need

23 to maintain control over the claims resolution process.

24         THE COURT:  My biggest problem is an issue of clarity.

25 Is it clear what a borrower, whose home is being foreclosed or

1  against whom an eviction proceeding is being brought, can and

2  can't do.  Are they going to run the risk of contempt if their

3  lawyer takes an action in state court?

4         Have you tried to confer -- I know you did with the

5  committee and U.S. Trustee, but have you met with NACBA, for

6  example?  I'm not saying they have standing here or don't have

7  standing here.

8         MR. ROSENBAUM:  We --

9         THE COURT:  But have you attempted to --

10         MR. ROSENBAUM:  We did not --

11         THE COURT:  -- resolve this issue --

12         MR. ROSENBAUM:  We actually did not meet with NACBA,

13  but we have -- we did meet with the Association or had

14  discussions and communication with -- the name will escape me.

15  Your Honor's probably more familiar, but the Association of

16  Chapter 13 Trustees.  And they were --

17         THE COURT:  They're not usually the ones bringing

18  these claims.

19         MR. ROSENBAUM:  But they were -- they --

20         THE COURT:  I mean, they stand -- my experience where

21  the Chapter 13 Trustee stood by and watched the fight go on.

22         MR. ROSENBAUM:  Well, to finish my thought, they were

23  satisfied with the relief.

24         THE COURT:  Well, that doesn't --

25         MR. ROSENBAUM:  The other -- but the constituency we

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    77

1   did discuss with and deal with were the debtors' in-house

2   counsel that managed this litigation, and their communication

3   with external counsel, and what external counsel was hearing

4   from defense counsel and that we were hearing from defense

5   counsel.  So this was an iterative process to get where we are.

6   We do believe it's clear.

7          I don't believe it's possible to have an order that's

8   going to address every single counter-claim or claim that a

9   party could bring in a foreclosure action.  It will not be our

10  intent to waive the automatic stay and threaten contempt.  We

11  will educate our external counsel, through our in-house

12  counsel, that we have to work with borrowers in these actions.

13         If it's our position that it's a stay violation or

14  that it's subject to the automatic stay and is not covered by

15  the order, their recourse is to come to this Court, like any

16  other creditor, and get relief.  But we feel that we've gone

17  quite far in -- and again, I believe unprecedented in coming up

18  with a solution that protects the debtors, recognizes the

19  protection of the automatic stay to where it's applicable,

20  concern for the claims resolution process that we're going to

21  have to deal with in this case, but afford the fundamental

22  rights to both borrowers in foreclosures and bankruptcies.  I

23  don't know if we can go any farther than not have the stay at

24  all.  And I don't think that's appropriate and I don't think

25  that's warranted.

RESIDENTIAL CAPITAL, LLC, ET AL.                    78

1          THE COURT:  And I agree with that.  Let me ask you a

2    couple of other questions.  Does the automatic stay bar actions

3    for damages based on post-petition conduct by the debtor?

4          MR. ROSENBAUM:  No, it doesn't, Your Honor.

5          THE COURT:  Let me ask you specifically, the main

6    plaintiffs, who the matter is pending before the main Supreme

7    Court, I couldn't tell, have you been able to resolve that

8    issue?

9          MR. ROSENBAUM:  Your Honor, we spoke to counsel and

10   that was agreed that was simply a motion for relief from the

11   stay.  And --

12         THE COURT:  Well, come on, you're asking me to modify

13   the stay.  And the statute clearly -- I can do it on condition.

14   I don't want to have to do this twice.  I mean, can't you

15   resolve this issue about the main --

16         MR. ROSENBAUM:  May I -- just may I --

17         THE COURT:  There's a matter pending in the main

18   Supreme Court.

19         MR. ROSENBAUM:  I understand, Your Honor.

20         THE COURT:  It's fully briefed.  It's awaiting

21   decision.  Have you tried to resolve this issue?  Now don't

22   tell me that they have -- because they have filed a motion to

23   lift the stay now with respect to that.

24         MR. ROSENBAUM:  I'm happy to address that, Your Honor,

25   if --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    79

1          THE COURT:  Go ahead.

2          MR. ROSENBAUM:  -- you give me a chance.  Not an

3    excuse, but a lot of people in this room are very busy, and

4    we're very busy getting to this date.

5          THE COURT:  I am, too.

6          MR. ROSENBAUM:  And --

7          THE COURT:  And I read all these papers.

8          MR. ROSENBAUM:  I understand that, Your Honor.

9          THE COURT:  And I'm trying to resolve it now so that I

10   don't have to do it again.

11         MR. ROSENBAUM:  Just give me a chance.  What we told

12   counsel for the main plaintiffs is we'd appreciate it, we

13   believe it's an automatic stay motion, have it on for the July

14   10th hearing, which was, I think --

15         THE COURT:  Not July 10th; the 18th is the next

16   hearing.

17         MR. ROSENBAUM:  -- July 18th.  After today --

18   literally after today, this week we will look at the issue and

19   address it because it's not just the main plaintiffs, Your

20   Honor.  There's litigation throughout the country.  There's a

21   couple of appeals at the Fourth Circuit that are held up.  Our

22   position is that those courts -- at this point these are

23   substantive decisions that have been briefed but they don't

24   have the opportunity to issue them if -- and we had to take

25   that position.  If Your Honor's saying let's be clear, if

RESIDENTIAL CAPITAL, LLC, ET AL.                                    80

1  anything's been fully brief and pending, issue the decision --

2        THE COURT:  I'm not saying that.  The only thing I've

3  read about so far is the main action.

4        MR. ROSENBAUM:  But the reason that we're hesitating

5  on the main action and we need to think about it carefully is

6  it's not just the main action.  And if we need -- if we feel

7  after reviewing the main action there's other things, I'm sure,

8  percolating through the circuits -- I think the Fourth Circuit

9  decision, I think it was the Gilbert case is apparently a

10 minority view in one of the circuits.

11       We need to be careful and look at this in the context

12 of our bankruptcy as to where we're applying the automatic stay

13 and where we're not.  And to lift the automatic stay to allow a

14 circuit court to issue its opinion, reversing the lower court,

15 that puts us back into the -- ideally it would put us back into

16 the trial.  If that's -- again, we're waiving the protection of

17 the automatic stay.

18       THE COURT:  Look, I don't -- at some point those

19 issues are going to get resolved.  I don't -- and they're not

20 going to get resolved by me, okay?  If a matter has been fully

21 litigated, if it's on appeal and it's awaiting decision by an

22 appellate court, you're not really thinking you're going to get

23 me to say nope, I'm not going to allow the main Supreme Court

24 to decide the issue, I'm going to decide.  That isn't going to

25 happen --

1          MR. ROSENBAUM:  I understand that, Your Honor.

2          THE COURT:  -- and I think you know that.  Okay.  And

3     where it isn't a question of -- particularly in the main, it's

4     not a question of a judgment having been entered and it

5     isn't -- and even there, I mean, oftentimes bankruptcy judges

6     lift the stay to permit state court litigation to go forward

7     for everything other than execution of the judgment, and that

8     isn't even -- it isn't even that far.

9          Okay, let me hear from other counsel with respect

10    to --

11         MR. ROSENBAUM:  Your Honor, can I --

12         THE COURT:  You want to -- go ahead.

13         MR. ROSENBAUM:  Can I just -- the final point?

14         THE COURT:  Go ahead.

15         MR. ROSENBAUM:  Because really we are having these

16    discussions internally with our counsel, external counsel that

17    are handling those matters.  And we have other concerns here

18    about -- we have obligations under our DIP loan, we have

19    obligations under our asset purchase agreement about where we

20    consensually lift the stay for matters that affect servicing

21    that have nationwide consequences for other mortgage loan

22    servicers.

23         So it's a larger issue in the context of these cases.

24    What we have been discussing, and decisions haven't been made

25    yet, if it makes sense -- for example this Fourth Circuit

1    litigation --

2           THE COURT:  I don't know what the Fourth Circuit held,

3    but --

4           MR. ROSENBAUM:  I won't belabor the details, Your

5    Honor.  The point is if there's litigation out there, we're not

6    looking to come in and have fights about stay relief such as

7    the main.  If it makes sense to go forward and let that court

8    rule and the other side is amenable to stipulated relief from

9    the stay that's going to allow these courts to issue those

10   decisions, that's probably going to be acceptable to us.  As

11   you said, Your Honor, you're not going to rule; they have to

12   make -- these courts have to rule.  And in some instances they

13   may rule anyway because there's other -- they're consolidated

14   actions.

15          But the issue is are those plaintiffs or defendants in

16   those actions then going to be satisfied with just stipulated

17   stay relief or do they want, depending on the result of the

18   appeal, to come back into court and start litigating these

19   things, in which case we're losing the protection of the

20   automatic stay.  So we're trying to be systematic and careful

21   of how we review these things.

22          THE COURT:  All right.  Let me hear from other

23   counsel, first in the courtroom.

24          MR. AMINI:  Thank you, Your Honor.  Bijan Amini on

25   behalf of NACBA as well as one of -- the counsel in North

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                83

1  Carolina as well as two homeowners, William and Crystal

2  Johnson.

3          I think Your Honor is sensitive to -- there are two

4  issues; there's a substantive issue an then there's a

5  procedural issue.  And I heard Your Honor's questions about the

6  procedural issues.

7          This order -- the debtor wants to remain a debtor-in-

8  possession and operate in the ordinary course as a debtor-in-

9  possession but he doesn't want to --

10          THE COURT:  Well, look the debtor doesn't have to

11  agree to lift the automatic stay, and if they don't, I mean,

12  people can make motions to lift the automatic stay and I'll

13  rule upon them as they occur.

14          This case has already been unusual.  The debtor has

15  taken a lot of steps, it seems to me, to try and continue

16  business as usual, to give up the protection of the automatic

17  stay in certain defined areas.  It seems to me that they've

18  done a pretty good job in defining what they're proposing to

19  do.

20          The issue I'm really focusing on is -- some of it

21  raised in your objection and in others, and some based on my

22  own experience in other cases is does it appropriately deal

23  with the kinds of issues that come up.

24          MR. AMINI:  Well, you have --

25          THE COURT:  Are lawyers out in the field, have their

1   hands tied behind their back because they don't know what they

2   can do, what they can't do?

3           MR. AMINI:  Well, according to the debtors' papers

4   there are 51,000 of these cases in the bankruptcy courts

5   pending as we speak.  And --

6           THE COURT:  And the one thing I assure you is the 300

7   and some odd bankruptcy judges around the country are not going

8   to get to decide whether the automatic stay in this case

9   applies or doesn't.  Only I am going to do that.

10          MR. AMINI:  I understand that, but the order that --

11          THE COURT:  Because you asked just the opposite.

12          MR. AMINI:  I understand that, and I came with perhaps

13  a modified proposal to present to Your Honor on that issue,

14  understanding the concern that would arise because of that.

15  But even before we get to that issue, the order that you're

16  entering now is an order -- and I could go through it with you,

17  and in fact I'd be happy to go through it with you, but it's

18  subject to many different interpretations.

19          By way of just a simple example, you asked debtors'

20  counsel post-petition actions, are they subject to the

21  automatic stay?  Answer:  no.  The order, as written, cannot

22  bring, under any circumstances any action -- and they raise it

23  as direct claim, counter-claim, motion, adversary proceeding; I

24  don't know how they got that category of four things; I assume

25  in all our bankruptcy courts and state courts there are other

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    85

1  procedures too, but I guess we're precluded from using those --

2  but in any event, for monetary relief of any kind or any nature

3  against the debtor.  Debtor includes debtor-in-possession, by

4  definition.

5          So if the debtor-in-possession goes to one of these

6  courts, violates Rule 3000.21.  A state court rule on fee

7  assessments and when you have to tell the individual consumers

8  how much you're charging them in fees and how much time you

9  have for notice, and then if you charge them the fees anyway

10  you're entitled to attorney's fees.  Absolutely not.  It's

11  prohibited.  These guys are getting -- at this point the debtor

12  would get a special deal which no other service provider has

13  that says I get to drive the truck --

14          THE COURT:  To the contrary, because any other service

15  provider the automatic stay simply applies.  Good luck, you

16  know?

17          MR. AMINI:  The other service providers are not in

18  bankruptcy.  I'm talking about a non -- but anyway, basically

19  the debtor is saying I'm going to drive my trucks on the road

20  and if you catch me speeding, tough, you can't give me a

21  ticket.

22          THE COURT:  That's not a fair argument.

23          MR. AMINI:  But it is -- it is --

24          THE COURT:  It's not a fair argument.

25          MR. AMINI:  It is with respect to, for example --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    86

1        THE COURT:  Well, bankruptcy has an automatic stay and

2    it applies.  The question is the debtor has asked to lift it in

3    certain respects.  You think it should go further.

4        MR. AMINI:  Well, we made a proposal to them.  It was

5    a simple proposal, one that would require less parsing through

6    the order to try to fig -- Your Honor raised an interesting

7    question.  I mean, Your Honor understands how these work.  An

8    aggressive lawyer in Montana somewhere, pushing the case for

9    his client, comes up with some claim that he thinks might work

10   as a set-off to this.  You know, they're going to get a call

11   from the other side, you're in violation of the automatic stay,

12   I'm going to haul you before Judge Glenn in New York City and

13   you're going to be in a lot of trouble sitting out here in

14   Montana doing this.  I mean, this guy's getting paid what, 500

15   dollars to try to defend a family from losing their home and

16   now he's got to sit around and think, okay, I have all the

17   stuff that I know about here in Montana but I also have to sit

18   down, read this order and try to understand am I limited, for

19   example to the six different types of defenses I can raise --

20   methods of defending this claim that I can raise here.

21       I mean, it seems to me a much more simple of version

22   of this is, you know, you want to continue being a mortgage

23   service provider, you can go forward, subject to all of the

24   same rules, with the exception that, as Your Honor said, you

25   can't enforce a money judgment against them at this point.  No

1    court can.  That's the automatic stay.

2           To the extent that the debtor feels that some attorney

3    is getting beyond the bounds of what has been agreed to,

4    shouldn't it be the obligation, if they want to continue

5    business as usual, to come to you and ask for a stay in that

6    particular instance and perhaps give the consumer and their

7    counsel an opportunity to be heard remotely rather than calling

8    51,000 -- I doubt we'll have problems with 51,000, but if you

9    think about it, just a two percent problem rate will give you

10   1,000 cases in this court of people having to come from around

11   the country to argue about their specific individual cases.

12   And what are we telling the judges?  How are they going to

13   determine whether the people that filed them are violating your

14   order or not?  They're going to have to interpret your order as

15   well.

16          And I could -- as I say, if you go through --

17   paragraph 12 of the order is the one that we find problematic.

18   And if you go through it, just 12(a) defines the types of

19   things people can do --

20          THE COURT:  Okay.  Any other points you have?

21          Anybody else want to be heard?

22          Does anybody on the phone want to be heard?

23          MS. NORA:  Your Honor, Wendy Alison Nora.  I

24   essentially concur with NACBA --

25          THE COURT:  Anybody else want to be --

1       MR. AMINI:  -- and I did -- I appreciated the Court

2   pointing out RESPA and TILA, but there's also but there's also

3   Fair Debt Collections Practices Act; these are offsets, actual

4   treatises available.

5       What will happen is that with this stay being parsed

6   the way that it is, the homeowners are going to have more

7   difficulty getting lawyers, and lawyers are going to have more

8   difficulty pursuing their clients' defenses.

9       MR. AMINI:  May I add one thing only, Your Honor?

10      THE COURT:  Very quickly.

11      MR. AMINI:  We were very happy -- we were very

12  prepared to sit down.  I mean, there's been a lot -- there's

13  the time pressures --

14      THE COURT:  That I don't want to hear about because

15  I'm going to -- that's one thing you're going to get.  I'm not

16  ruling on the motion today.

17      MR. AMINI:  Prepared to sit with them.

18      THE COURT:  I'm going to direct that there be further

19  discussion.

20      Anybody else wish to be heard with respect to the

21  supplemental servicing motion?

22      All right.

23      MR. ROSENBAUM:  May I just respond --

24      THE COURT:  Go ahead, Mr. Eckstein.

25      MR. ROSENBAUM:  -- briefly?

1          THE COURT:  Mr. Eckstein.

2          MR. ECKSTEIN:  Sorry.  Your Honor, I just wanted to

3    raise one item that was really separate from what was being

4    discussed.  And with respect to what's being discussed, the

5    committee would also be certainly available and amenable to

6    participate in any discussions with respect to the precise

7    scope of the stay.  We think it's an important issue and we

8    think it does deserve careful attention and we endorse the

9    notion of continuing beyond today to come up with a proper

10   solution.

11          One item that I wanted to refer to Your Honor, which

12   was separate from the issue of modification of the stay, there

13   was a provision in this motion dealing with the ongoing

14   performance by the debtor of its obligations under various

15   agreements with the trusts.  And we have agreed with the debtor

16   that that issue will be reserved for further consideration on

17   July 10th, and the committee reserves its right to file a

18   supplemental pleading with respect to the issues raised in that

19   aspect of the motion in the proposed order.

20          THE COURT:  What's your view about how quickly this

21   supplemental servicing motion needs to get resolved?

22          MR. ECKSTEIN:  Your Honor, we believe that this could

23   be dealt with on July 10th.

24          MR. ROSENBAUM:  Your Honor, may I be heard?

25          THE COURT:  Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    90

1      MR. ROSENBAUM:  Just two points on the objection.

2  One, there's clearly no intent or desire on the part of the

3  debtors to start waving the threat of contempt against any

4  borrower when it comes to -- in a bankruptcy or foreclosure or

5  in any other action -- when it comes to try to figure out what

6  their rights are.  That's simply just not well taken.

7      Secondly, I think there also has to be some concern

8  here that we're now broadcasting to the debtors of the world

9  and parties in foreclosure that now you can -- you're

10  reinvigorated to bring --

11      THE COURT:  If you think that plaintiffs' lawyers

12  around the country haven't painted a big target on your back,

13  you're mistaken.  Okay?  That's the reality of it.

14      MR. ROSENBAUM:  Granted, Your Honor.  This is why we

15  have, also, some concerns with the formulation that NACBA is

16  raising, which is no stay relief whatsoever.

17      THE COURT:  Okay.  Let me make clear.  The NACBA

18  proposal isn't going to fly with the Court.  My concern is

19  this.  I think that the debtor, and to the extent the committee

20  was involved or the U.S. -- I don't know whether the U.S.

21  Trustee's been involved in this issue or not.  I mean, I think

22  in large measure what you've proposed is acceptable.  The

23  problem I have is when I started thinking it through, from my

24  own experience about the kinds of claims that I've seen

25  asserted by borrowers, it left question marks in my mind as to

1   what a lawyer could do and what he can't do.  Yes, a lawyer can

2   always come here and ask to have the stay lifted to proceed.  I

3   think you've largely tried to limit the instances where that

4   has to occur, and I commend you for that.  I think that it may

5   be 100 percent of what you've done will ultimately be

6   acceptable to the Court, and it may be that only ninety percent

7   of it will be.  But what I want, we're going to -- can this

8   matter -- will it wait till July 10th?

9         MR. ROSENBAUM:  Well, Your Honor, may I just address

10   what the other issue was with the committee?  Based on the

11   other components of this motion, not really specifically the

12   relief for the foreclosures and bankruptcies but the settlement

13   parameters, the committee requested that as to the committee

14   this be an interim order and Your Honor would hear it on a

15   final basis on the 10th.  It is very, very important that at

16   least this ninety percent relief be communicated really

17   yesterday, but today, because we've been telling counsel that

18   have these questions, not guaranteeing them that Your Honor's

19   entering this order, but this was teed up for today and we

20   would try to get clarity in bankruptcies.  And there is some

21   confusion in nonforeclosures --

22         THE COURT:  Let me just stop you because I thought

23   that the settlement portion of this motion -- and I haven't

24   heard any arguments -- any objections specifically to that,

25   seemed to me to be well taken.  So I have no problem -- and I

RESIDENTIAL CAPITAL, LLC, ET AL.                                          92

1   do want to see whether there are specific objections to the

2   settlement component.  I frankly, would think that plaintiffs

3   largely would be very happy to have that in place, to know that

4   they could go ahead and try and resolve these issues.  I have

5   no problem about trying to carve out that piece of it and

6   entering an order promptly with respect to that.

7           Are there other remarks?  And I'll ask whether there

8   are others to be heard specifically on that.  That wasn't the

9   part, obviously, where I focused --

10          MR. ROSENBAUM:  No, no --

11          THE COURT:  -- my attention --

12          MR. ROSENBAUM:  I --

13          THE COURT:  -- because I didn't have -- I thought that

14  that made a lot of sense.

15          MR. ROSENBAUM:  I was just trying to explain the

16  situation.  Our point is -- with respect to the relief we've

17  been discussing is, if anything, we'd like to get that on an

18  interim.  If we're going to -- it seems --

19          THE COURT:  You're talking about the settlement

20  procedure.

21          MR. ROSENBAUM:  -- that this will only get more

22  expanded.

23          THE COURT:  The settlement procedure on an interim

24  basis?

25          MR. ROSENBAUM:  No, the relief on the automatic stay,

1  at least on an interim basis, just because at this point it's

2  hard for us to -- since we don't have the express provisions

3  granting the relief in the bankruptcy cases, and really more to

4  the point, in the nonjudicial foreclosures, there's -- things

5  are slowing down, which isn't good for either side.

6          THE COURT:  Let me hear from other counsel about

7  whether this should be entered on an interim -- the whole order

8  should be entered on an interim basis, subject to being

9  revisited on July 10th.

10          Mr. Eckstein?

11          MR. ECKSTEIN:  Your Honor, the committee had made

12  certain modifications with respect to caps that were built into

13  the order, but with those modifications, we felt that it made

14  sense for the order to be entered on that basis.

15          THE COURT:  All right.

16          MR. ECKSTEIN:  And we thought that the relief on an

17  interim basis was appropriate and useful and that we could deal

18  with it on a final basis in July.

19          THE COURT:  Let me hear from NACBA's counsel.

20          MR. AMINI:  It's --

21          THE COURT:  I mean, I think we ought to try and keep

22  the trains moving.

23          MR. AMINI:  I don't have a problem with that.  But in

24  simple terms -- and I'll work quickly with them and get back to

25  you even faster than July 10th or 18th.  I have lost track of

RESIDENTIAL CAPITAL, LLC, ET AL.                                                94

1  which day it is that we're supposed to come back here.  But it

2  doesn't change the infirmities and the concerns you have and

3  that we have with respect to it --

4          THE COURT:  Well, it does to this extent:  I think in

5  the vast majority of cases the answers are going to be clear to

6  lawyers out in the field who are representing borrowers.  And

7  where it's not clear, that's where a final hearing -- which I

8  think will be on July 10th; the June 18th hearing is just too

9  full, I can't put anything else on for that.  And we're going

10  to want to talk about whether anything gets moved off of that.

11  But -- so the issue is whether you can -- whether everybody can

12  live with this order on an interim basis.  I'm making it clear.

13  There's no -- it's without prejudice to anybody's rights.  I'll

14  tell you right now, though, I think that -- I thought that

15  ninety percent of what's in there I had no problem with, on an

16  interim or a final basis.  It was at the margins where I

17  thought that there was uncertainty that might get resolved if

18  people actually sat down at the table and tried to do it.

19          MR. AMINI:  At least to the extent that you're going

20  to enter this order, and it appears that you are on --

21          THE COURT:  No.  Don't assume that yet.

22          MR. AMINI:  -- on an interim basis till July 10th --

23          THE COURT:  July 10th.

24          MR. AMINI:  -- I would ask that at least there be some

25  protection for the attorneys who are seeking to --

1      THE COURT:  Pay your money, take your chances.  I

2  can't --

3      MR. AMINI:  Yeah.  Yeah.

4      THE COURT:  The order is the order.  People have to

5  read the order and judge whether they think they're safe in

6  taking whatever action they can, or if they're going to come

7  back with a motion to lift the stay.  But I think if people

8  have waited this long, they can wait till July 10th.

9      MR. AMINI:  Well, then I think from that perspective

10  the infirmities are what they are.

11      THE COURT:  Okay.

12      MR. AMINI:  And we would object to entering it until

13  such time as it's been resolved.  Thank you.

14      THE COURT:  All right.  Anybody else want to be heard?

15      Why do you need more than the settlement portion of

16  this order now?

17      MR. ROSENBAUM:  So we can communicate -- the position

18  as set forth in this motion is this is critical relief to

19  foreclosures and bankruptcies nationwide.  The prior relief

20  clearly did not go far enough, and that's a big problem.  A

21  very big problem.  And it is slowing down -- in some cases,

22  cases probably aren't progressing really because of our concern

23  that we don't really -- the debtors don't have the authority to

24  continue these actions and are actually -- would be dragging

25  defense counsel into situations that would be unfair.

1   So there's a reluctance on our external counsel to do

2   what they are supposed to be doing as part of our servicing

3   obligations.  So I would say that the ninety percent for a

4   short period, because we can commit to work with whoever's

5   interested in this, to come up with more clarity between now

6   and July 10th, but I think it's only going to get more

7   expansive.  And the relief we have, I think, will go a very

8   long way to satisfying defense counsel as well as our external

9   counsel of what the parameters are and allow these actions to

10  go forward.

11          We can report to them or include as part of this

12  order, that comfort -- that it's an interim order; there may be

13  more clarity in a July 10th order.  And during that interval we

14  have no intention and will not seek sanctions against any

15  party.  We reserve our rights in those actions that we felt it

16  necessary, but we wouldn't take any type of action prior --

17          THE COURT:  You may get real mad, but you won't seek

18  sanctions yet.

19          MR. ROSENBAUM:  That's right.  Not until the 10th.

20          THE COURT:  Mr. Masumoto, does the U.S. Trustee have a

21  position on this?

22          MR. MASUMOTO:  We do not, Your Honor, at this time.

23          THE COURT:  All right.  I'm going to approve the order

24  on an interim basis with all parties reserving all rights.  I

25  direct that debtors' counsel, creditors' committee counsel --

1    and I really would ask the U.S. Trustee to participate on this.

2    I think you've got considerable experience that deals with

3    foreclosure crisis.  And obviously NACBA's counsel and other

4    counsel who want to do that.

5            I want any additional filings relating to this by 5

6    p.m. Friday, June 29th.  I don't want anybody spending Fourth

7    of July holiday dealing with this, so let's get it done before

8    then.  And it may be at the end of the day that this order is

9    going to be entered on a final basis; I'll decide that.  So no

10   one should assume from my comments that I'm not prepared to

11   enter this order on a final basis.  I thought that there are --

12   it could use some clarity in some areas, but it may not be the

13   clarity that NACBA wants because I will agree with at the end

14   of the day.

15           MR. ROSENBAUM:  Thank you, Your Honor.

16           THE COURT:  All right.  All right, is that it for our

17   agenda?

18           MR. NASHELSKY:  Yes, Your Honor.  That's everything

19   for the agenda for the 12th.

20           THE COURT:  Okay.  Now, let's just very briefly before

21   we adjourn.  I'm concerned about what's on the calendar for

22   June 18th.  Do you have a better handle at this point about

23   which of the motions that are on the 18th are going to require

24   evidentiary hearings?

25           MR. NASHELSKY:  I think, Your Honor, the sale

RESIDENTIAL CAPITAL, LLC, ET AL.                                    98

1  procedures -- clearly.

2           THE COURT:  You know, on 360 Bankruptcy this morning

3  I'm sure I read what everybody else read.  It sounds like

4  Berkshire Hathaway has come forward with a new offer for both

5  portions.  I don't know whether the debtors intend to actively

6  negotiate with Berkshire Hathaway, whether you're going forward

7  with the sale procedure motion and stalking horse contracts in

8  the face of potentially higher bids.  I'm sure the creditors'

9  committee is going to have something to say about it.

10          MR. NASHELSKY:  Yeah.  I think we're going to regroup

11  after today, Your Honor, sit down and figure out next steps.

12  Obviously, we'll be talking to Berkshire and we'll be talking

13  to our existing stalking horse bidders and the committee about

14  what are the right steps for Monday.

15          MR. ECKSTEIN:  If I may, Your Honor, just to add

16  confusion.  There was another bid by another entity; Lone Star

17  also submitted a bid for one of the groups of assets.  Just to

18  make sure we have the full complement.

19          THE COURT:  Okay.  Thank you.

20          MR. NASHELSKY:  Showing that our stalking horses did a

21  very nice job on their asset purchase agreements, since

22  everybody just signed up to them.

23          THE COURT:  Everybody would like that breakup fee,

24  too.  No, except for Berkshire Hathaway, which is willing to

25  take a lot less and no expense reimbursement.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    99

1      MR. NASHELSKY:  I think there are -- I think it is

2    critical that we move forward on the financing motions.  I

3    don't think there is a lot on those.  I think the issues are

4    pretty narrow.  That's the --

5          THE COURT:  Where do you see the issues -- factual

6    issues in the financing motion?

7          MR. NASHELSKY:  I'll let Mr. Goren, who's handling

8    those motions, just respond.

9          MR. GOREN:  Thank you, Your Honor.  Todd Goren,

10   Morrison & Foerster on behalf of the debtors.

11         I think the factual issues with respect to the

12   financing motions are fairly limited.  I think the committee

13   has raised an issue with respect to the fees and with respect

14   to certain amendments that they believe are needed.  I think

15   there will be some limited declarations that we'll probably put

16   in on those points.  I don't know if the committee feels it

17   necessary to actually engage in a cross-examination of Mr.

18   Puntus, who they deposed earlier last week on those points.

19         I'm very hopeful that we'll be able to resolve or

20   substantially narrow the issues that the committee and other

21   parties have raised by Monday.  But --

22         THE COURT:  So you think you're going to have one

23   witness in a declaration?

24         MR. GOREN:  Yeah.  I think we would probably be able

25   to limit ourselves to -- I mean, Mr. Whitlinger had some

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              100

1   previous testimony; I don't think there's anything he said in

2   his initial declaration that is really at issue.  I think to

3   the extent we had a witness it would be limited to Mr. Puntus.

4           THE COURT:  Mr. Eckstein?

5           MR. ECKSTEIN:  Your Honor, I'm trying to

6   prognosticate.  I'm being a little bit cautious, but I think I

7   can say today that the DIP and cash collateral motion has a

8   much higher likelihood of resolution or significant narrowing.

9   We have made good progress already with respect to that motion,

10  and I am guardedly optimistic that between now and Monday we

11  actually could resolve the issues or limit it to very, very few

12  open issues with respect to the DIP cash collateral.

13          Our intention is to file a declaration by the

14  committee's financial advisor in support of our objection.  I

15  don't know at this point that we'll need an evidentiary hearing

16  beyond the two declarations that will be on the file.

17          THE COURT:  When are you going to be filing the

18  declaration?

19          MR. ECKSTEIN:  That's being filed Wednesday, Your

20  Honor.  And so with respect to the DIP and cash collateral, to

21  the extent there is going to be an evidentiary hearing, I would

22  expect that it would be brief and narrow.  And as I said, we

23  may be able to avoid it.

24          THE COURT:  Are you going to take -- are you taking

25  any depositions on it?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    101

1        MR. ECKSTEIN:  We've taken the deposition already,

2   Your Honor.

3        THE COURT:  Taken.  Are they going to want to take a

4   deposition of your financial advisor?

5        MR. ECKSTEIN:  We've made our FA available this

6   Friday.

7        THE COURT:  Okay.

8        MR. ECKSTEIN:  With respect to the servicing motion, I

9   would agree with Mr. Nashelsky; right now that is extremely

10  fluid.

11       THE COURT:  I'm sorry, is what?

12       MR. ECKSTEIN:  That is extremely fluid.  A lot of -- a

13  lot of new material was filed at the end of the day yesterday.

14  And neither the debtor nor the committee, I believe, had

15  adequate opportunity to evaluate the implications and what

16  people are going to do about it.

17       THE COURT:  Just tell me which motion?

18       MR. ECKSTEIN:  The sale procedures, Your Honor.

19       THE COURT:  The sale procedures.

20       MR. ECKSTEIN:  I'm sorry.

21       THE COURT:  Yeah.  That's why I --

22       MR. ECKSTEIN:  I said servicing, I misspoke.  I

23  misspoke, I'm sorry.  The sale procedures.

24       A lot of new information, as Your Honor has noted, was

25  filed yesterday.  And I think that's going to take some

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    102

1  discussion.  I would expect that the committee and the debtor

2  will be consulting; we'll have to obviously consult with our

3  respective clients.  And we probably could be in a position to

4  give the Court an update by tomorrow or latest Thursday, I

5  would think, on how that's proceeding.  But I obviously would

6  need to hear from the debtor on what their intentions are.

7          THE COURT:  Any other motions that are going to

8  require an evidentiary hearing?

9          MR. ECKSTEIN:  I don't believe there are any other

10  motions that we would expect an evidentiary hearing for next

11  Monday.  I know there's -- excuse me, Your Honor.  If I may,

12  just one second.

13          THE COURT:  Go ahead.

14          MR. ECKSTEIN:  Your Honor, there's still -- with

15  respect to the origination motion and the Ally servicing motion

16  there are still some significant information requests that are

17  pending with the debtor, and we haven't yet gotten resolution

18  on that.  So I don't know where that will stand exactly, and

19  we'll need to assess tomorrow or the next day exactly where

20  that stands.  So I don't know exactly where we'll be with

21  respect to that motion.

22          THE COURT:  Refresh me whether -- is the time schedule

23  relating to the sale?  How is that linked to the DIP and cash

24  collateral motion?

25          MR. ECKSTEIN:  Your Honor, the DIP -- I believe, and

1   the debtor obviously can speak to it.  But I believe the debtor

2   is anxious to have the DIP order entered.  I don't recall what

3   the outside date is, but I believe that they've given

4   themselves a relatively tight timetable to get the order

5   entered promptly.

6         The sale has separate deadlines in the Nationstar

7   transaction to have a final order approved; I believe it's

8   shortly after the 18th.  I would imagine that that's going to

9   be something that has to get discussed with Nationstar, in

10   terms of whether or not there's any flexibility on the entry of

11   that order, and that discussion hasn't taken place.  And so one

12   of the important questions is whether there's going to be any

13   flexibility on the entry of a final order --

14         THE COURT:  Well, let me --

15         MR. ECKSTEIN:  -- with respect to the sale procedures.

16         THE COURT:  And I had a full plate for today and on

17   some other matters this week, so I haven't studied the DIP and

18   sale motions for next week.  I get very concerned, particularly

19   if there are disputed factual issues on any of those, about

20   timelines that have been built in, because this happened in

21   other cases where DIP loans -- or I think that the time

22   schedule was dictated by the debtor who wanted to do a sale

23   very quickly and it wasn't necessarily lender-driven that those

24   tight time schedules have been built in.  I don't know whether

25   that comment applies here or not.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    104

1    This is an important case.  These are important

2    issues.  I want to make sure they're fully vetted -- and I know

3    it's a moving target because there are different additional

4    offers that are coming in.  I don't want -- I want to make

5    clear -- this isn't directed at you, Mr. Eckstein.  I don't

6    want artificial deadlines driving these very important

7    decisions with huge economic impact on this case as a whole.

8    That isn't an accusation or a charge against anybody; it's just

9    an overall comment.  I'll decide things when they need to get

10   decided, but I'm concerned about the evidentiary hearing on

11   Monday.

12           Let me make clear to everybody.  For any matter that

13   requires an evidentiary hearing on Monday, this Friday at noon

14   is an absolute deadline for the parties to submit written

15   declarations.  If there are depositions and you're relying on

16   deposition designations, the designations and counter-

17   designations.  Exhibits pre-marked; they're the debtors'

18   motions so the debtors use the numbers; the objectors use

19   letters.  Everything -- we don't have a reporter who marks

20   things, so everything needs to be pre-marked.  You need to get

21   three copies of all exhibits delivered to chambers by Friday at

22   noon.  I want everything here if we're going forward with

23   evidentiary hearings.

24           I understand you're probably going to wind up spending

25   the weekend trying to resolve things, and I encourage you all

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    105

1  to do that.  But when I take the bench for this hearing on the

2  18th, I expect to be prepared.  Okay, I can't do that if I

3  don't have papers.  I know for today's hearing people asked for

4  some deadlines to be moved and I tried to be accommodating

5  about that, but I'm very protective of the Court's time to

6  review materials.  This is already much shorter than I like.

7         MR. ECKSTEIN:  Your Honor, I think -- at least,

8  speaking from the committee's standpoint, I'm sure the debtor

9  will speak -- that is understood.  And it seems eminently

10  reasonable in terms of --

11         THE COURT:  How many protagonists are there on the

12  sale procedure and financing motions?

13         MR. ECKSTEIN:  Your Honor, I believe as a practical

14  matter, the essential issues of the sale procedures are largely

15  the subject of the committee's objection and the debtors'

16  motion.

17         THE COURT:  Well, the U.S. Trustee's filed an

18  objection, too.

19         MR. ECKSTEIN:  The U.S. Trustee has filed, and a

20  pleading was filed yesterday also by the four trustees that

21  raised an issue that is very important, but I think somewhat

22  tangential to some of the basic elements of the sale

23  procedures.  There obviously are parties-in-interest who've now

24  filed significant pleadings that essentially reflect

25  alternative transactions or alternative proposals, so they're

1  important in that they've changed the landscape.

2          But I think that the sale procedures is a very

3  important motion, but the debtor and the committee are

4  dialoging pretty actively about that.  And I think we'll have

5  to make a judgment as to whether or not that does or does not

6  require evidence.  I would think right now -- I agree with Mr.

7  Nashelsky.  I would assume on that motion if it's not adjourned

8  that it's going to require evidence.

9          THE COURT:  Okay.

10          MR. ECKSTEIN:  The other motion I just wanted to speak

11  to, there is an examiner motion that is also on the calendar.

12          THE COURT:  Oh, yes.  I've been reading about that.

13  Yes.

14          MR. ECKSTEIN:  And that seems to also be on the

15  calendar for the 18th.

16          THE COURT:  It does.

17          MR. ECKSTEIN:  And --

18          THE COURT:  How can I forget?

19          MR. ECKSTEIN:  We are not assuming that there is an

20  evidentiary hearing on that.  And I don't know whether Your

21  Honor intends to really hear that on the 18th.

22          THE COURT:  I do.

23          MR. ECKSTEIN:  But that is on, and that is contested.

24          THE COURT:  Tell me what the -- I did sign the ex

25  parte order for the 2004 examination.  I did it; I knew that

1   the examiner motion had been filed.  I'll tell you my thinking

2   when I signed that is if there's an examiner, the examiner is

3   going to need all those documents.  So we may as well just go

4   forward with it, and let the committee set in motion getting

5   the documents.

6         I'm not previewing the examiner motion other than to

7   say if there is an examiner there aren't going to be two

8   unlimited budgets; namely, the examiner and the committee.  And

9   I know that the committee in support of its 2004 and the order

10  was worked out, we didn't have to have a hearing about it --

11  was intending a very broad investigation of pre-petition

12  transactions.  Those same arguments have been made in support

13  of the examiner motion.  I think when I hear the examiner

14  motion on Monday I'm going to be very interested in hearing how

15  duplication should be avoided, and therefore unnecessary

16  expense and everything else.  But I don't want to prejudge.

17        MR. ECKSTEIN:  I know that Your Honor has a very full

18  plate, and I have no doubt that Your Honor will ultimately have

19  the opportunity to read both the committee's response and the

20  debtors' response.  I think Your Honor will find them to be

21  very, very interesting and enlightening.

22        THE COURT:  Yeah, I know the debtors' response.  I

23  know a little bit about it already, so.

24        MR. ECKSTEIN:  And I trust Your Honor will read the

25  committee's response as well.

1          THE COURT:  I will.

2          MR. ECKSTEIN:  And I think Your Honor will note

3    that -- I'm not aware that there was any pleading filed in

4    support of the examiner motion, which is an interesting point

5    as well, but nonetheless that'll be heard, I assume, by

6    argument on the 18th.

7          THE COURT:  It will.  Let me just say that Monday's

8    calendar has nothing but ResCap, and if necessary, plan to be

9    here as late as necessary.  Okay.  I've got this -- it's just

10   it's a very full week.

11         MR. NASHELSKY:  We understand, Your Honor.  We will do

12   everything we can to limit the issues for Monday.  As Mr.

13   Eckstein said, we're in constant discussions on the cash

14   collateral and DIP, which we hope to narrow if not resolve.

15   Origination and subservicing we hope, again, to be able to

16   resolve with information and discussions.  Sale procedures,

17   there's a lot going on, so I don't want to preview that at all

18   because --

19         THE COURT:  Does it really need to -- well, we'll see

20   what happens on Monday.

21         MR. NASHELSKY:  When I talk to my client, we have to

22   decide what all this means and what we should be -- what you're

23   doing.  The examiner, we heard.  So we understand, and we

24   appreciate Your Honor being available.  And we will do our best

25   to limit the day's evidence as much as possible, and hopefully

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    109

1  resolve a bunch of these before.

2          Your Honor appeared popular with the wheel, which

3  was --

4          THE COURT:  I'm sorry?

5          MR. NASHELSKY:  Your Honor appeared popular with the

6  wheel, so it caused scheduling issues in terms of being very

7  busy.

8          THE COURT:  And the problem about -- I mean, we'll go

9  as late as necessary.  But if you all, in the exercise of your

10  judgment, conclude that in light of the events regarding the

11  sale motion, that it needs to be adjourned because of

12  continuing negotiations and that sort of thing, part of the

13  problem is, is that the following week I have a trial -- Monday

14  has got quite a full schedule, and then there's a trial

15  scheduled for the 26th, 27th and 28th, which I'm not -- I can't

16  adjourn.

17          MR. NASHELSKY:  Your Honor, your chambers had made us

18  aware of the limitation, which is why we have those things on

19  the 18th.  And we understand the limits in your schedule, and

20  we will try to get everything that needs to be done, done.  And

21  whatever can be resolved before, we will.

22          THE COURT:  Yeah.  You're on the calendar for July

23  10th, and there's nothing -- no other cases are scheduled on

24  that day, so.

25          MR. NASHELSKY:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    110

1          THE COURT:  You may want to consider if there's

2   anything that needs to get moved up because of ongoing

3   developments between now and Monday.  If, for example, the sale

4   hearing needs to be adjourned we ought to consider whether

5   either by moving -- there are things for the 10th, but maybe

6   they can be moved.  I don't mind having hearings more often.

7   You just hit a really --

8          MR. NASHELSKY:  We understand.

9          THE COURT:  -- busy period, okay?

10          MR. NASHELSKY:  Yeah.

11          THE COURT:  Keep my chambers informed, okay?

12          MR. NASHELSKY:  We will, Your Honor.

13          THE COURT:  Thank you very much.  We're adjourned.

14          MR. NASHELSKY:  Thank you, Your Honor.

15      (Whereupon these proceedings were concluded at 12:29 PM)

16

17

18

19

20

21

22

23

24

25

111

**I N D E X**

**RULINGS**

|  | Page | Line |
|---|---|---|
| Subject to UST review, debtors' final employee wage motion granted. | 16 | 9 |
| Subject to review by the UST, debtors motion authorizing a shared services agreement with Ally granted. | 22 | 1 |
| Subject to review of the order, debtors' final tax motion granted. | 28 | 12 |
| Debtors' final cash management motion granted. | 45 | 5 |
| Governmental Association motion granted | 66 | 2 |
| Non-Governmental Association motion granted | 69 | 9 |
| Supplemental servicing order granted on an interim basis. | 96 | 25 |

112

C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  June 13, 2012