| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | FOR PUBLICATION |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, *et al.*,<br><br>Debtors. | Case No. 12-12020 (MG)<br><br>Jointly Administered |

# MEMORANDUM OPINION AND ORDER GRANTING BERKSHIRE HATHAWAY'S MOTION TO APPOINT AN EXAMINER UNDER 11 U.S.C. § 1104(c)

*A P P E A R A N C E S:*

MUNGER, TOLLES & OLSON LLP
*Counsel for Berkshire Hathaway Inc.*
355 South Grant Avenue, 35th Floor
Los Angeles, California 90071
By:   Thomas B. Walper, Esq.
      Seth Goldman, Esq.
      Bradley R. Schneider, Esq.

MORRISON & FOERSTER LLP
*Proposed Counsel for the Debtors and Debtors in Possession*
1290 Avenue of the Americas
New York, New York 10104
By:   Larren M. Nashelsky, Esq.
      Gary S. Lee, Esq.
      Anthony Princi, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Proposed Counsel for the Official Committee of Unsecured Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:   Kenneth H. Eckstein, Esq.
      Barry H. Berke, Esq.

TRACY HOPE DAVIS
*United States Trustee for Region 2*
33 Whitehall Street, 21st Floor
New York, New York 10004
By:   Brian S. Masumoto, Esq.
      Michael Driscoll, Esq.

KIRKLAND & ELLIS LLP
*Counsel for Ally Financial Inc.*
601 Lexington Avenue
New York, New York 10022

-and-

655 15th Street, N.W. Ste. 1200
Washington, D.C. 20005
By:	Richard M. Cieri, Esq.
	Ray C. Schrock, Esq.
	Stephen E. Hessler, Esq.
	Jeffrey S. Powell, Esq.
	Daniel T. Donovan, Esq.

WHITE & CASE LLP
*Attorneys for the Ad Hoc Group of Junior Secured Noteholders*
1155 Avenue of the Americas
New York, New York 10036
By:	J. Christopher Shore, Esq.
	Harrison L. Denman, Esq.
	Gerard Uzzi, Esq.

LOWENSTEIN SANDLER PC
*Bankruptcy Counsel for The Union Central Life Insurance Co., Ameritas Life Insurance Corp. & Acacia Life Insurance Co. & New Jersey Carpenters Health Fund*
1251 Avenue of the Americas, 18th Floor
New York, New York 10020

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
By:	Michael S. Etkin, Esq.
	Ira M. Levee, Esq.
	Andrew Behlmann, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Counsel for Certain Unsecured Noteholders*
One Liberty Plaza
New York, New York 10006
By:	Thomas J. Moloney, Esq.
	Sean A. O'Neal, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Berkshire Hathaway Inc. ("Berkshire") moves for the appointment of an examiner to investigate and report on the actions of the debtor Residential Capital, LLC ("ResCap") and its affiliated debtors (collectively with ResCap, the "Debtors"), including, without limitation, the Debtors' prepetition transactions with non-debtor Ally Financial Inc. ("Ally" or "AFI"),[1] any claims that the Debtors may hold against their officers or directors, any claims the Debtors may hold against Ally's officers and directors, and any claims that the Debtors propose to release as part of their plan. ("Examiner Motion," ECF Doc. # 208.) The Official Committee of Unsecured Creditors ("Creditors Committee") opposes the motion. ("Creditors Committee Objection," ECF Doc. # 297.) The Debtors also oppose the motion. (ECF Doc. # 304.) The United States Trustee ("UST") filed a response to the Examiner Motion, arguing that the appointment of an examiner is mandatory.[2] ("UST Response," ECF Doc. # 406.) No party really disputes that an investigation and report should be done in this case; the only issue is whether the Creditors Committee should perform the investigation, or whether an examiner must be appointed to conduct the investigation pursuant to section 1104(c) of the Bankruptcy Code. For the reasons explained below, the Court concludes that section 1104(c) of the Bankruptcy

---

[1] AFI is the corporate parent of the intermediate non-debtor company that owns 100% of ResCap's equity, GMAC Mortgage Group, LLC. AFI has been partially owned by Cerberus Capital Management, L.P. since November 2006.

[2] Additional pleadings were filed in response to the Examiner Motion: Ally Financial Inc. Limited Objection to Berkshire Hathaway Inc.'s Motion for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c) (ECF Doc. # 289); Ad Hoc Group of Junior Secured Noteholders filed a Limited Statement of the Ad Hoc Group of Junior Secured Noteholders in Connection with the Motion of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c) (ECF Doc. # 295); Union Central Life Insurance Company, Ameritas Life Insurance Corp. and Acacia Life Insurance Company Joinder to Motion of Berkshire Hathaway, Inc. for the Appointment of an Examiner (ECF Doc. # 329); New Jersey Carpenters Health Fund Joinder to Motion of Berkshire Hathaway, Inc. for the Appointment of an Examiner (ECF Doc. # 330); Statement and Limited Joinder of Certain Unsecured Noteholders to the Debtors' Objection to Motion of Berkshire Hathaway Inc. for Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c) (ECF Doc. # 379).

3

Code requires appointment of an examiner in these cases. The scope, timing and budget for the investigation remain to be decided after the examiner is appointed and confers with other parties in interest.

## BACKGROUND

The Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on May 14, 2012, and the Court authorized joint administration of the cases. (ECF Doc. # 59.) On May 16, 2012, the UST appointed the Creditors Committee pursuant to section 1102(a) of the Bankruptcy Code. (ECF Doc. # 102.)

The Debtors' business operations include servicing mortgage loans for investors, including loans originated by the Debtors, non-debtor Ally Bank (f/k/a GMAC Bank), and other third parties. As of March 31, 2012, the Debtors were servicing over 2.4 million domestic residential mortgage loans with an aggregate unpaid principal balance of approximately $374 billion. (Affidavit of James Whitlinger in Support of Chapter 11 Petitions and First Day Pleadings ("Whitlinger Affidavit.") ¶ 6; ECF Doc. # 6.) The Debtors are collectively the fifth-largest servicer of residential mortgage loans in the United States. Whitlinger Aff. ¶ 9.

The Debtors' unaudited consolidated balance sheet reflects assets of $15,675,571,000 and liabilities of $15,276,228,000. Whitlinger Aff., Ex. 12, Schedule 4. As of April 30, 2012, the Debtors report aggregate fixed, liquidated unsecured debts to the Debtors' bondholders of $813,700,000. *Id.*, Ex. 3.

On June 1, 2012, the Creditors Committee filed a motion seeking an order for production of documents and testimony by the Debtors and others pursuant to Federal Rule of Bankruptcy Procedure 2004. ("2004 Motion," ECF Doc. # 192.) Through the 2004 Motion the Creditors Committee sought to launch a broad investigation of pre- and post-petition transactions by the

4

Debtors with Ally and the Debtors' secured creditors.[3]

Objections to the 2004 Motion were required to by filed by June 4, 2012. No objections were filed to the 2004 Motion, but on June 4, 2012, Berkshire filed the Examiner Motion, seeking the appointment of an examiner to conduct an investigation pursuant to 11 U.S.C. § 1104(c) of the same matters that the Creditors Committee sought to investigate through the 2004 Motion. Pursuant to the Case Management Order in this case, the Examiner Motion was calendared for June 18, 2012. On June 5, 2012, the Court entered an order granting the 2004

---

[3] The 2004 Motion stated:

> In addition to these proposed post-petition transactions—which apparently were structured to benefit Ally and the Debtors' secured creditors—from 2004 through the Petition Date, the Debtors and Ally, or Ally's corporate parent Cerberus, consummated a series of significant related party transactions involving the transfer of billions of dollars of assets and the provision of billions of dollars in financing. For example, in 2006 and 2008, ResCap effectively transferred its subsidiary federal savings bank, along with $1.2 billion in mortgage-related assets owned by that bank, to Ally and/or Ally Bank (formerly known as GMAC Bank) (the "GMAC Bank Transfer"); in 2007, Ally reportedly purchased ResCap's healthcare financing business for $900 million (the "Healthcare Financing Sale"); in 2008, Ally reportedly purchased for an apparently undisclosed amount ResCap's resort financing business valued at $1.5 billion (the "Resort Financing Sale"); and in 2008, Cerberus reportedly purchased ResCap's model home business, valued at $479 million, for $230 million and a junior preferred equity interest in Cerberus' newly formed acquisition vehicle (the "Model Home Business Sale"). There are many other similar pre-petition related party transactions. In addition, as of the Petition Date, Ally had extended $1.1 billion of secured indebtedness to certain of the Debtors.
>
> This complex constellation of pre- and post-petition transactions, involving billions of dollars of transfers and financings among *interested parties*, lies at the heart of these Chapter 11 cases. No plan of reorganization can be confirmed until the fairness of these transactions and the conduct of the interested parties is thoroughly examined. In particular, the Debtors' attempt to secure Non-Consensual Third Party Releases for Ally will require the overwhelming support of unsecured creditors holding such claims. However, other than the Committee, there is currently *no independent party* with the ability and authority to fully investigate and analyze these matters for the benefit of parties other than Ally and the Debtors' secured creditors.

2004 Mot. ¶¶ 4-5, at 3-4 (emphasis in original).

Motion. ("2004 Order," ECF Doc. # 217.) In signing the 2004 Order, the Court did so recognizing that an investigation should be conducted, either by the Creditors Committee or by an examiner if one is appointed. Because of the fast track on which this case is proceeding, the Court concluded that document production should proceed promptly; any documents produced to the Creditors Committee could be turned over to an examiner.[4]

## DISCUSSION

**A.    There is a Split of Authority Whether Section 1104(c)(2) Mandates the Appointment of an Examiner In Any Case in Which the Debtor's Fixed, Liquidated, Unsecured Debts, Other than Debts for Goods, Services, or Taxes, or Owing to an Insider, Exceed $5,000,000**

There is a split in authority whether appointment of an examiner is mandatory in cases in which a debtor's fixed debts exceed $5 million. *See* 7 COLLIER ON BANKRUPTCY ¶ 1104.03[2], at 1104-36 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2011) ("Notwithstanding the mandatory language of section 1104(c), some courts have denied the appointment of an examiner even when the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services or taxes, or debts owing to an insider, exceed $5,000,000."). Analysis of this issue begins, as it must, with the statutory text.

---

[4]    Approving the 2004 Motion did not preempt the Examiner Motion. While on a fast track, these cases are still at an early stage. There is no basis to argue that the filing of the Examiner Motion, three days after the 2004 Motion was filed, involved undue delay or that the 2004 Motion gives the Creditors Committee a priority over any examiner. In granting the Examiner Motion, the Court fully expects that a non-duplicative investigation will be conducted, with complete cooperation expected between the Debtors, the Creditors Committee, and all other parties. The scope, timing and budget for the examiner's investigation will be set by the Court after the examiner is appointed and confers with other parties in interest. In the first instance, the scope of the investigation established by the 2004 Order sets the appropriate scope parameter for the investigation, subject to later adjustment if necessary.

6

Section 1104(c) provides as follows:

> If the court does not order the appointment of a trustee under this section, then at any time before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct *such an investigation of the debtor as is appropriate*, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).[5]  Section 1104(c)(2) thus requires the satisfaction of at least three elements before a court must appoint an examiner upon request of a party in interest: (1) a chapter 11 trustee must not have been appointed; (2) a plan must not have been confirmed; and (3) the debtor must owe in excess of $5 million in fixed debt.  The issue before this Court is whether the requirement that a court "order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate" confers any discretion to deny an examiner motion when a debtor's fixed debts exceed $5 million.  *Id.*

Berkshire and the UST argue that section 1104(c)(2) plainly and unambiguously mandates that the court "shall" order the appointment of an examiner upon request by a party in interest or the UST where "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000," provided only that no trustee is appointed and no plan has been confirmed.  No party disputes that the Debtors' fixed

---

[5] Section 1104(c) was originally codified as section 1104(b) under the 1978 Bankruptcy Code; it was renumbered as section 1104(c) when the Bankruptcy Reform Act of 1994 added a new subsection (b), authorizing trustee elections in Chapter 11 cases.  *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394 (enacted October 22, 1994 and effective in cases filed after that date).

7

debts greatly exceed $5 million. The Debtors and the Creditors Committee argue that section 1104(c)(2) does not require appointment of an examiner; rather, they contend that the phrase "such an investigation of the debtor as is appropriate," preceding subsections (1) and (2), limits the circumstances under which an examiner must be appointed. They assert that because the Creditors Committee has already begun its investigation and is a more suitable party to conduct the investigation in this case, the motion to appoint an examiner should be denied. The Court concludes that appointment of an examiner is not mandatory in *all* cases satisfying subsection (c)(2) because the phrase "such an investigation of the debtor as is appropriate" provides a limitation on the requirement for appointment of an examiner under either subsections (1) or (2). Still, as explained below, the Court determines that limitation is inapplicable on the particular circumstances present here.

### 1. Cases Holding that Section 1104(c)(2) Mandates the Appointment of an Examiner

The UST argues that the use of the word "shall" in section 1104(c) makes appointment of an examiner mandatory:

> "Where the word 'shall' appears in a statutory directive, 'Congress could not have chosen stronger words to express its intent that [the specified action] be mandatory . . . .'" *Plaut v. Spendthrift Farm, Inc.*, 1 F.3d 1487, 1490 (6th Cir. 1993), *aff'd*, 514 U.S. 211 . . . (1995), quoting from *United States v. Monsanto*, 491 U.S. 600, 607 . . . (1989). *See also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S.Ct. 956, 962 (1998) ("the mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion") (citing *Anderson v. Yungkau*, 329 U.S. 482, 485 . . . (1947)); *Barbieri v. RAJ Acquisition Corp.* (*In re Barbieri*), 199 F.3d 616, 619 (2d Cir. 1999) ("The term 'shall,' . . . generally is mandatory and leaves no room for the exercise of discretion by the trial court"); *Hall [Fin. Grp.], Inc. v. DP Partners Ltd. [P'ship]* (*In re DP Partners Ltd. [P'ship]*), 106 F.3d 667, 670-71 (5th Cir.), *cert. denied*, 522 U.S. 815 . . . (1997) ("Use of the word 'shall' connotes a mandatory intent").

8

UST Resp. at 5.

The argument has some force and has been accepted by some courts as commanding the result sought by the UST—mandatory appointment of a trustee under section 1104(c)(2) when the fixed debts exceed $5 million.

This was the reasoning adopted by the Sixth Circuit in *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498 (6th Cir. 1990), the only circuit decision addressing the issue. The bankruptcy court denied the UST's motion to appoint an examiner in a case involving more than $5 million in fixed debts. The district court dismissed the appeal. The court of appeals reversed. The court stated that it was applying the plain meaning of the word "shall," *id.* at 500, which it viewed as mandating the appointment of an examiner. The court expressed concern that permitting discretion to deny an examiner in cases with fixed debt in excess of $5 million ignored the distinction drawn by Congress: "Unless § 1104[c](2) requires the appointment of an examiner in such a case [with more than $5 million in fixed debts], it becomes indistinguishable from § 1104[c](1)." *Id.* at 501. Subsection (c)(1) gives the court discretion to appoint an examiner in cases with less than $5 million in fixed debt, so long as "such appointment is in the interests of the estate . . . ." *Id.* The court only addressed the "as is appropriate" language somewhat elliptically:

> The debtors claim that such a construction of the statute invites abuse, and that the trustee or any other party in interest could needlessly prolong a case with last-minute demands for an examiner. That is not the case before us, of course, and we do not decide it except to note that the bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration. Section 1104[c] plainly states that the court shall appoint an examiner "to conduct such an investigation of the debtor as is appropriate." Furthermore, the U.S. trustee may be removed by the Attorney General if he abuses his office. *See* 28 U.S.C. § 581(b)(2).

*Id.* at 501.

9

The *Revco* court did not explain how the two subsections would be indistinguishable if separate force is given to the "as is appropriate" language—which applies to both subsections of section 1104(c). If the standard for the exercise of discretion accorded the bankruptcy court by the "as is appropriate" language applicable to both subsections is different than the discretion accorded by the "interests of creditors" language in subsection (1), then the two subsections remain distinguishable. Indeed, the court acknowledged that the bankruptcy court "retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration." *Id.* If the "as is appropriate" language provides such discretion with respect to the nature, extent and duration of the investigation, then why doesn't the same language provide the discretion to "just say no" to an examiner investigation where it may not be justified on the particular facts and circumstances of the case?[6]

Several district courts have reached the same conclusion as the Sixth Circuit in *Revco*. *See Walton v. Cornerstone Ministries Invs., Inc. (In re Cornerstone Ministries Invs., Inc.)*, 398 B.R. 77, 84 (N.D. Ga. 2008) (acknowledging the creditors committee's concerns that the appointment of an examiner would duplicate the efforts of the committee but concluding that "[n]onetheless, the statute is clear, and '[w]hile Congress may not have foreseen the problems that arise when discretion over an appointment of an examiner is missing, that is not sufficient grounds for refusing to give effect to the plain meaning of the statute'") (internal citation omitted); *Loral Stockholders Protective Comm. v. Loral Space & Commc'ns, Ltd. (In re Loral Space & Commc'ns, Ltd.)*, No. 04 CV 8645 RPP, 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004) (reversing the bankruptcy court and finding that section 1104(c)(2) mandates the

---

[6] For example, an examiner investigation might not be appropriate in cases where the SEC has completed a lengthy investigation and commenced an enforcement action laying out the specific misconduct of the debtor's prior management, or where the company or its senior managers were indicted, or where the creditors committee had already completed and reported on a lengthy investigation of its own.

10

appointment of an examiner where the debt threshold is met).

The UST points to other bankruptcy court decisions that have likewise reached the same conclusion. *In re Vision Dev. Grp. of Broward Cnty., LLC*, No. 07-17778-BKC-RBR, 2008 WL 2676827, at *3 (Bankr. S.D. Fla. June 30, 2008) (holding that appointment of an examiner is mandatory under section 1104(c)(2)); *In re Big Rivers Elec. Corp.*, 213 B.R. 962, 965-66 (Bankr. W.D. Ky. 1997) (holding that appointment of examiner was required as a matter of law); *In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988) (mandatory); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass. 1987) (holding that appointment of examiner is required if trustee is not appointed, but court appointed trustee); *In re 1243 20th St., Inc.*, 6 B.R. 683, 685 n.3 (Bankr. D.D.C. 1980) (mandatory); *In re Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980) (mandatory). *See also In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) (Wedoff, J.) ("Although the question is not free from doubt, the best reading of the statute differs from that proposed by either of the parties: appointment of an examiner is mandatory if the four conditions are met, but the court retains the discretion to determine the nature and scope of the examiner's investigation. That is the holding of the only circuit court decision to consider the question, it best reflects the plain meaning of the statutory language, and it is consistent with the legislative history of the statute.").

The UST recognizes, however, that while some courts have found the appointment mandatory, they have found the requirement waived even though the statutory language allows no such exceptions. *See In re Schepps Food Stores, Inc.*, 148 B.R. 27, 30 (S.D. Tex. 1992) (concluding that appointment is mandatory, but finding that creditor waived right to appointment of examiner by failing to make request until eve of confirmation hearing); *In re Bradlees Stores, Inc.*, 209 B.R. 36, 38 (Bankr. S.D.N.Y. 1997) (concluding that creditors waived right to

11

appointment of examiner to investigate claims arising from leveraged buyout by failing to make request until approximately two years after cases were filed and eight months after issuance of report on same matter by debtors' professionals following a thirteen-month investigation).

### 2. Other Recent Cases Have Concluded that the "As Is Appropriate" Language Provides Discretion to Refuse to Appoint an Examiner

The Creditors Committee Objection collects recent decisions rejecting the argument that appointment of an examiner is mandatory just because fixed debt exceeds $5 million. *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 128 (Bankr. D. Del. 2010) (rejecting mandatory interpretation of section 1104(c)(2) and denying a motion to appoint examiner pursuant to section 1104(c)(2) because the "as is appropriate" language afforded court discretion to deny appointment that would result in waste and delay); *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010), Hr'g Tr. at 170:16-20 (ECF Doc. # 3145) (denying appointment of examiner and finding "it would be an absurd result to find that in every case where the financial criteria is met and a party-in-interest asks, the Court must appoint an examiner. There has to be an appropriate investigation that needs to be done."); *In re Am. Home Mortg. Holdings, Inc.*, No. 07-11047 (CSS) (Bankr. D. Del. Oct. 31, 2007), Hr'g Tr. at 76:09-12 (ECF Doc. # 1997) (rejecting mandatory interpretation of section 1104(c)(2) because financial threshold was only one part of inquiry and "the other piece of the puzzle is that there has to be an investigation to perform that's appropriate," and denying a motion to appoint an examiner). *See also, e.g., In re Innkeepers USA Trust*, No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2012), Hr'g Tr. at 167:11-170:22 (ECF Doc. # 546) (finding it unnecessary to decide whether appointment was mandatory, but observing that a growing number of courts reject construction of section 1104(c)(2) that mandates appointment of examiner simply because $5 million threshold was exceeded if other facts do not make such appointment "appropriate," or have

appointed examiners with limited or no authority); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 24, 2007), Hr'g Tr. at 72:23-73:19 (ECF Doc. # 6467).[7]

In *In re Washington Mutual Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. May 5, 2010), Hr'g Tr. at 101:12 (ECF Doc. #3699 ), the court denied the motion of the committee of equity security holders ("Equity Committee") to appoint an examiner despite the fact that no trustee had been appointed, no plan had been confirmed, and the debtors clearly owed in excess of $5 million in fixed debt.[8]  The court held that it had the "discretion to determine what appropriate investigation of the debtor should occur and that, if the Court determines that there's no appropriate investigation that needs to be conducted, the Court has the discretion to deny the appointment of an examiner." *Id.* at  97:9-13.  The court in *Washington Mutual* pointed to three factors in determining whether an investigation would be inappropriate, including (1) whether the investigation has already been conducted by other parties; (2) whether the appointment of an examiner would increase costs and cause a delay with no corresponding benefit; and (3) the timing and underlying motives of the motion, *i.e.* whether it is a litigation tactic or an attempt to gain an advocate, or whether the motion comes after an undue delay. *Id.* at 97:14-24.

---

[7]     In *Calpine*, the court noted that it "appear[ed]" that the $5 million threshold had not been met. But even if it did meet the threshold, the court noted that the movant had "waived its right to request an examiner by waiting . . . almost two years after the petition date . . . and less than two months before the confirmation hearings." No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 24, 2007), Hr'g Tr. at 72:5-10 (ECF Doc. # 6467).

[8]     In *Washington Mutual*, the debtor filed a voluntary petition under chaper 11 of the Bankruptcy Code on September 26, 2008.  The Equity Committee was appointed on January 11, 2010. The Equity Committee requested the appointment of an examiner on April 26, 2010, over four months after it was formed and 19 months after the case was filed.  The motion was highly contested.  On May 5, 2010, the court denied the motion, expressly declining to rely on the length of time elapsed after the petition date and after the formation of the Equity Committee. *Wash. Mut.*, Hr'g Tr. at 100:22-23.  Rather, the Court found that the debtor had been "investigated to death," and that the cost would be very high high with little ascertainable benefit to parties in the case. *Id*. at 98:12-100:21.

On June 8, 2010, the Equity Committee renewed its motion to appoint an examiner.  The court granted the motion after all parties agreed to the appointment of an examiner.  *See In re Wash. Mut. Inc.*, No. 08-12229, Agreed Order Directing the Appointment of an Examiner (Bankr. D. Del. July 22, 2010) (ECF Doc. # 5120).

13

### 3. The "As Is Appropriate" Language Permits a Bankruptcy Court to Deny Appointment of an Examiner in Limited Circumstances Even if the Debtor Has $5 Million in Fixed Debts

Congress did not articulate what it meant by the "as is appropriate" limitation. While a court must apply the plain words of a statute when the language is clear, courts must look beyond the simple words when a single answer is not apparent. The legislative history of section 1104(c)—section 1104(b) at the time it was adopted—explains as follows:

> Subsection [(c)] permits the court, at any time after the commencement of the case and on request of a party in interest, to order the appointment of an examiner, if the court has not ordered the appointment of a trustee. The examiner would be appointed to conduct such an investigation of the debtor as is appropriate under the particular circumstances of the case, including an investigation of any allegations of fraud, dishonesty, or gross mismanagement of the debtor of or by current or former management of the debtor. The standards for the appointment of an examiner are the same as those for the appointment of a trustee; the protection must be needed, and the cost and expense must not be disproportionately high.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 402 (1977).

The legislative history points to the purpose of section 1104(c). An examiner shall be appointed to conduct an investigation "as appropriate under the particular circumstances of the case," but "the protection must be needed . . . ." *Id.* This legislative purpose is met when an examiner motion is denied in cases with fixed debts in excess of $5 million where the evidence establishes that the protection of an examiner is not needed under the facts and circumstances of the case. The appointment of an examiner would be inappropriate if the motion was filed for an improper purpose such as a litigation tactic to delay a case, or if there is no factual basis to conclude that an investigation needs to be conducted, or if an appropriate and thorough investigation has already been conducted (or is nearly complete) by a creditors committee or a governmental agency. *See, e.g., Wash. Mut. Inc.*, No. 08-12229 (MFW), Hr'g Tr. at 98:12-

14

100:21 (examiner motion denied where the debtor had been "investigated to death," and where the cost would be high with little ascertainable benefit to parties in the case). While section 1104(c) expresses a Congressional preference for appointment of an independent examiner to conduct a necessary investigation, the facts and circumstances of the case may permit a bankruptcy court to deny the request for appointment of an examiner even in cases with more than $5 million in fixed debts. Accordingly, section 1104(c)(2) requires that a court order the appointment of an examiner when (1) no plan has been confirmed; (2) no trustee has been appointed; (3) the debtor has in excess of $5 million in fixed debts; and (4) the facts and circumstances of a case do not render the appointment of an examiner inappropriate.

### B. The Protection of an Examiner is Required in this Case

Applying this standard rquires the appointment of an examiner to conduct an investigation in this case. No trustee has been appointed in this case, no plan has been confirmed, and it is undisputed that the Debtors owe in excess of $5 million in fixed debts. Further, no one disputes that an investigation of the Debtor's pre- and post-petition conduct is appropriate.

There is no evidence that the Examiner Motion was filed in bad faith or as a litigation tactic;[9] the motion was filed early in these cases; all parties agree that an investigation needs to be conducted; and while the Creditors Committee has *started* an investigation, it is far from complete. The only dispute is whether the Creditors Committee should be permitted to conduct an investigation without an examiner being appointed. The Creditors Committee is ably represented in these cases, and no party questions the Creditors Committee's professionals'

---

[9] The Creditors Committee Objection argues that Berkshire filed the Examiner Motion as a litigation tactic to delay the case. No competent evidence supports that contention. Other parties in interest also support granting the Motion.

15

ability to competently and expeditiously complete an investigation.  While Berkshire argues that some *members* of the Creditors Committee are conflicted because they agreed before these cases were filed to one or more plan support agreements that include support for third-party non-debtor releases in favor of Ally and others, the Court need not resolve whether any members of the Creditors Committee are conflicted; the Examiner Motion is not being decided on that basis.  Notwithstanding the ability of any other party to effectively and expeditiously investigate the Debtors, section 1104(c)(2) of the Bankruptcy Code requires that that an examiner should be appointed if no trustee has been appointed, a plan has not been confirmed, the debtors' fixed debts exceed $5 million and an investigation is appropriate.  All of those circumstances are present here.   Therefore, the Court concludes that an examiner must be appointed.

Because the Debtors hope to exit these cases quickly, with third-party non-debtor releases in favor of Ally and others,[10] it is important that the investigation be conducted expeditiously.  Until an independent evaluation has been completed of any potential claims that would be released under a proposed plan, the Court will be unable to conclude whether the Debtors will be permitted to solicit votes in support of such a plan.

---

[10]     Third-party non-debtor releases raise many difficult legal and factual issues.  *See, e.g., Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville)*, 600 F.3d 135 (2d Cir. 2010) (adhering to jurisdictional limitation for approving third-party non-debtor releases); *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville)*, 517 F.3d 52, 66 (2d Cir. 2008) (finding that a bankruptcy court "only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate"), *rev'd and remanded sub nom Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005) ("[A] nondebtor release is a device that lends itself to abuse.  By it, a nondebtor can shield itself from liability to third parties.  In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code.  The potential for abuse is heightened when releases afford blanket immunity."); *In re Dreier,* 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010) (finding that before a court can even decide if the "unusual circumstances" standard delineated in *Metromedia* is met, it must first determine whether it has subject matter jurisdiction under *Manville*); *see also In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 695-96 (Bankr. S.D.N.Y. 2010).

**CONCLUSION**

For the foregoing reasons, the Examiner Motion is **GRANTED**. The Court expects that the Debtors, the Creditors Committee, and all other parties in interest will cooperate with the examiner and the examiner's professionals once they are in place. The Court will schedule an early case management conference with the examiner and all other parties to consider the scope, timing and budget for the investigation.

**IT IS SO ORDERED.**

Dated:   June 20, 2012
         New York, New York

                                                     **/s/Martin Glenn**
                                                   MARTIN GLENN
                                            United States Bankruptcy Judge