1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


                Debtors.


- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                June 18, 2012

                10:18 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1

2   12-12020-mg Residential Capital, LLC Ch. 11  (Doc no. 61, 188)

3   Evidentiary Hearing RE: Debtors' Motion Pursuant to 11 U.S.C.

4   Sections 105, 363(b), (f), and (m), 365 and 1123 and Fed. R.

5   Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I)

6   Authorizing and Approving Sale Procedures, Including Break-Up

7   Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and

8   Sale Hearing; (III) Approving Form and Manner of Notice

9   Thereof; and (IV) Granting Related Relief and (B)(I)

10  Authorizing the Sale of Certain Assets Free and Clear of Liens,

11  Claims, Encumbrances, and Other Interests; (II) Authorizing and

12  Approving Asset Purchase Agreements Thereto; (III) Approving

13  the Assumption and Assignment of Certain Executory Contracts

14  and Unexpired Leases Related Thereto; and (IV) Granting Related

15  Relief filed by Lorenzo Marinuzzi on behalf of Residential

16  Capital, LLC

17

18  12-12020-mg (CC: Doc no. 208, 210) Motion of Berkshire

19  Hathaway, Inc. for the Appointment of an Examiner. (Related Doc

20  # 210)

21

22  Adversary proceeding: 12-01671-mg Residential Capital, LLC et

23  al. v. Allstate Insurance Company et al.

24  Doc# 4, 13 Initial Case Conference

25

3

1

2    12-12020-mg (Doc no. 80, 13) Final Hearing RE: Motion (I)

3    Authorizing Debtors (A) To Enter Into And Perform Under

4    Receivables Purchase Agreements And Mortgage Loan Purchase And

5    Contribution Agreements Relating To Initial Receivables And

6    Mortgage Loans And Receivables Pooling Agreements Relating To

7    Additional Receivables, And (B) to Obtain Postpetition

8    Financing On A Secured, Superpriority Basis

9

10    12-12020-mg Doc # 15, 79 Motion to Approve Use of Cash

11    Collateral / Debtors' Motion for Interim And Final Orders

12    Pursuant To Bankruptcy Code Sections 105, 361, 362, 363, And

13    507(b) And Bankruptcy Rule 4001(b): (I) Authorizing The Use Of

14    Cash Collateral And Related Relief, (II) Granting Adequate

15    Protection And (III) Scheduling A Final Hearing (Citibank, N.A.

16    Cash Collateral)

17

18    12-12020-mg Doc #81, 44 Final Hearing RE: Motion Authorizing

19    the Debtors to (I) Process And Where Applicable Fund

20    Prepetition Mortgage Loan Commitments, (II) Continue Brokerage,

21    Origination And Sale Activities Related To Loan Securitization,

22    (III) Continue To Perform, And Incur Postpetition Secured

23    Indebtedness, Under The Mortgage Loan Purchase And Sale

24    Agreement With Ally Bank And Related Agreements, (IV) Pay

25    Certain Prepetition Amounts Due To Critical Origination

**4**

1  Vendors, And (V) Continue Honoring Mortgage Loan Repurchase

2  Obligations Arising In Connection With Loan Sales And

3  Servicing, Each In The Ordinary Course Of Business

4

5  12-12020-mg (Doc #89, 42) Evidentiary Hearing RE: Final Hearing

6  RE: Motion (I) Authorizing the Debtors to Obtain Postpetition

7  Financing on a Secured Superpriority Basis, (II) Authorizing

8  the Debtors to Use Cash Collateral, (III) Granting Adequate

9  Protection to Adequate Protection Parties and (IV) Prescribing

10 the Form and Manner of Notice.

11

12

13

14

15

16

17

18

19 Transcribed by:  Penina Wolicki, Clara Rubin,

20

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

5

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4      Attorneys for Debtors

5      1290 Avenue of the Americas

6      New York, NY 10104

7

8  BY:   LARREN M. NASHELSKY, ESQ.

9      GARY S. LEE, ESQ.

10      NORMAN S. ROSENBAUM, ESQ.

11      TODD M. GOREN, ESQ.

12      STEFAN W. ENGELHARDT, ESQ.

13

14

15  MORRISON & FOERSTER LLP

16      Attorneys for Debtors

17      2000 Pennsylvania Avenue NW

18      Suite 5500

19      Washington, DC 20006

20

21  BY:   ALEXANDRA STEINBERG BARRAGE, ESQ.

22

23

24

25

6

1

2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3       Attorneys for Barclays Bank PLC, DIP Administrative Agent

4       Four Times Square

5       New York, NY 10036

6

7  BY:   KENNETH S. ZIMAN, ESQ.

8

9

10  MCKOOL SMITH

11       Attorneys for Freddie Mac

12       600 Travis Street

13       Suite 7000

14       Houston, TX 77002

15

16  BY:   PAUL MOAK, ESQ.

17

18

19  WINSTON & STRAWN LLP

20       Attorneys for Fannie Mae

21       200 Park Avenue

22       New York, NY 10166

23

24  BY:   DAVID NEIER, ESQ.

25

7

KIRKLAND & ELLIS LLP

     Attorneys for Ally Financial & Ally Bank

     655 Fifteenth Street, N.W.

     Washington, DC 20005

BY:   JUDSON D. BROWN, ESQ.


WHITE & CASE LLP

     Attorneys for Ad Hoc Group of Junior Secured Noteholders

     1155 Avenue of the Americas

     New York, NY 10036

BY:   GERARD UZZI, ESQ.

     HARRISON DENMAN, ESQ.

     J. CHRISTOPHER SHORE, ESQ.


ACCESS LEGAL SERVICES

     Attorney for Wendy Nora and others similarly situated

     210 Second Street N.E.

     Minneapolis, MN 55413

BY:   WENDY A. NORA, ESQ.

8

1

2  KRAMER LEVIN NAFTALIS & FRANKEL LLP

3        Attorneys for Official Committee of Unsecured Creditors

4        1177 Avenue of the Americas

5        New York, NY 10036

6

7  BY:   KENNETH H. ECKSTEIN, ESQ.

8        DOUGLAS MANNAL, ESQ.

9        STEPHEN D. ZIDE, ESQ.

10       RACHAEL L. RINGER, ESQ.

11

12

13  ALSTON & BIRD LLP

14       Attorneys for Wells Fargo Bank, N.A.

15       One Atlantic Center

16       1201 West Peachtree Street

17       Atlanta, GA 30309

18

19  BY:   KIT WEITNAUER, ESQ.

20

21

22

23

24

25

9

1

2  BARNES & THORNBURG LLP

3      Attorneys for USAA Federal Savings Bank

4      1000 North West Street

5      Suite 1200

6      Wilmington, DE 19801

7

8  BY:   DAVID M. POWLEN, ESQ.

9

10

11  U.S. DEPARTMENT OF JUSTICE

12      Attorneys for U.S. Attorney's Office

13      86 Chambers Street

14      3rd Floor

15      New York, NY 10007

16

17  BY:   JOSEPH N. CORDARO, AUSA

18

19

20  LOWENSTEIN SANDLER PC

21      Attorneys for Cambridge Place Investment Management

22      1251 Avenue of the Americas

23      New York, NY 10020

24

25  BY:   MICHAEL S. ETKIN, ESQ.

10

MORGAN, LEWIS & BOCKIUS LLP

     Attorneys for Deutsche Bank, et al.

     101 Park Avenue

     New York, NY 10178


BY:   ANDREW D. GOTTFRIED, ESQ.

     JAMES L. GARRITY, JR., ESQ.



CLEARY GOTTLIEB STEEN & HAMILTON LLP

     Attorneys for Ad Hoc Group of Unsecured Bondholders

     One Liberty Plaza

     New York, NY 10006


BY:   THOMAS J. MOLONEY, ESQ.

     SEAN A. O'NEAL, ESQ.



DECHERT LLP

     Attorneys for Bank of New York Mellon

     1095 Avenue of the Americas

     New York, NY 10036


BY:   GLENN E. SIEGEL, ESQ.

11

1

2  SEWARD & KISSEL LLP

3        Attorneys for U.S. Bank National Association

4          as Securitization Trustee

5        One Battery Park Plaza

6        New York, NY 10004

7

8  BY:   ARLENE R. ALVES, ESQ.

9

10

11 MUNGER, TOLLES & OLSON LLP

12        Attorneys for Berkshire Hathaway Inc.

13        355 South Grand Avenue

14        35th Floor

15        Los Angeles, CA 90071

16

17 BY:   SETH GOLDMAN, ESQ.

18        THOMAS B. WALPER, ESQ.

19        KEVIN S. ALLRED, ESQ.

20

21

22

23

24

25

12

1

2  JACKSON WALKER, L.L.P.

3        Attorneys for Frost Bank

4        100 Congress Avenue

5        Suite 1100

6        Austin, TX 78701

7

8  BY:   PATRICIA TOMASCO, ESQ.

9

10

11  SIDLEY AUSTIN LLP

12        Attorneys for Nationstar

13        One South Dearborn

14        Chicago, IL 60603

15

16  BY:   LARRY J. NYHAN, ESQ.

17

18

19  KING & SPALDING LLP

20        Attorneys for Lone Star U.S. Acquisitions, LLC

21        1180 Peachtree Street

22        Atlanta, GA 30309

23

24  BY:   PAUL K. FERDINANDS, ESQ.

25

```
 1
 2   ALLEN MATKINS LLP
 3         Attorneys for Digital Lewisville, LLC
 4         1900 Main Street
 5         5th Floor
 6         Irvine, CA 92614
 7
 8   BY:   MICHAEL S. GREGER, ESQ.
 9
10
11   WINSTON & STRAWN LLP
12         Attorneys for Wells Fargo, successor to Wachovia
13         200 Park Avenue
14         New York, NY 10166
15
16   BY:   JAMES DONNELL, ESQ.
17
18
19   KELLEY, DRYE & WARREN LLP
20         Attorneys for U.S. Bank, N.A., as indenture trustee
21         101 Park Avenue
22         New York, NY 10178
23
24   BY:   BENJAMIN D. FEDER, ESQ.
25
```

14

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3       Office of the United States Trustee

4       33 Whitehall Street

5       21st Floor

6       New York, NY 10004

7

8  BY:   BRIAN S. MASUMOTO, ESQ.

9       TRACY HOPE DAVIS, UST

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                        15

P R O C E E D I N G S

1

2      THE COURT:  All right, please be seated.  We're here

3  in Residential Capital, LLC, number 12-12020.

4      MR. NASHELSKY:  Good morning, Your Honor.  Larren

5  Nashelsky from Morrison & Foerster, proposed counsel for

6  Residential Capital and the other debtors which are before this

7  Court.

8      Your Honor, we have six matters and one status

9  conference on -- or initial case conference on for this

10  morning.  We have adjourned the Ally subservicing motion at the

11  request of the committee and with the consent of Ally, to give

12  the parties an opportunity to go through some of the concerns

13  of the committee and hopefully address them.

14      THE COURT:  Okay.

15      MR. NASHELSKY:  We would like to handle the status

16  conference first to allow any attorneys who here for that to

17  leave and to free up the courtroom.

18      THE COURT:  I agree.

19      MR. NASHELSKY:  Okay.  And then after that, we will go

20  through the motions.  So I will cede the podium to Mr. Lee, who

21  will handle the status.

22      THE COURT:  Thank you.

23      MR. LEE:  Good morning, Your Honor.  Gary Lee from

24  Morrison & Foerster, proposed counsel to the debtors.  Happy

25  belated Father's Day.

1    Your Honor, the first matter on the agenda is the

2    status conference on the debtors' motion to extend the

3    automatic stay, or for an injunction enjoining certain cases

4    filed against the debtors' officers, directors, and nondebtor

5    affiliates.  Our motion is made pursuant to Section 362 and

6    Section 105 of the Bankruptcy Code.

7        By way of background, Your Honor, the relief we're

8    seeking in our motion is to extend the automatic stay in

9    twenty-five cases in which both debtor and nondebtor affiliates

10   are named as defendants.  All of those cases are based on

11   claims related to the debtors' issuance of mortgage-backed

12   securities.  The twenty-five cases are comprised of eleven

13   brought by Monoline insurers, thirteen brought by investors in

14   the debtors' products, and one investor case brought by the

15   FHFA.  And although the cases are not based on the same legal

16   theories as each other, they all make allegations against the

17   debtors that are the same as those they make against the

18   nondebtors.  And the liability of the debtors is derivative of

19   that of the nondebtors.

20       Your Honor, before I turn to some discovery matters,

21   if I may, there are five issues that we wanted to highlight

22   that we think frame the motion and the relief that we're going

23   to be seeking from you next month.

24       First, we believe that the relief that we're seeking,

25   the extension of the stay, is within the jurisdiction of this

1  Court, as most recently recognized by the Second Circuit in

2  Quigley.

3          Second, Your Honor, the extension of the stay we're

4  looking for is temporally limited.  We're looking for an

5  extension through the end of the year, fundamentally.

6          THE COURT:  I looked at -- I did read all the papers.

7  Just for -- obviously the Quigley case is the most recent case

8  in the circuit on it.  I don't think you cited -- I had written

9  an opinion in a case called McHale v. Alvarez in the 1031 Tax

10  Group, where I granted a preliminary injunction against state

11  court litigation in Colorado, and again, it was temporally

12  limited.  So I didn't see it cited in papers.  People might

13  want to look at it, since I wrote that opinion.

14          MR. LEE:  Your Honor, my apologies.  I actually am

15  familiar with the case.  I have it in my bag, and we will

16  obviously address that.

17          THE COURT:  That's fine.  So in other -- I guess the

18  only thing I'm trying to communicate:  I've dealt with this

19  issue before.

20          MR. LEE:  Thank you, Your Honor.  The next point I

21  wanted to make, Your Honor, is that the twenty-five cases that

22  we're seeking to stay -- and there are a lot of other cases in

23  which both debtors and nondebtors are named; I think there may

24  be over sixty, and I think we're getting sort of one or two a

25  week more -- are really the ones that impose the greatest

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1   burden on the estate.  Just to sort of give you a sense of the

2   magnitude, they involve about 660,000 loans with original

3   principal balance of about 83 billion dollars.

4          Fourth, Your Honor, our view is that all of those

5   cases are at their early stages.  I think about fourteen or

6   fifteen of them were filed really just in the last two or three

7   months.  And staying them through confirmation, we do not

8   believe, will have any substantive impact on those cases.

9          The last point I wanted to mention, Your Honor, is

10  originally we --

11         THE COURT:  How do they affect the property of the

12  estate?

13         MR. LEE:  They affect the property of the estate in

14  four different ways, Your Honor.  The first is that there are

15  shared insurance policies between the debtors and nondebtors.

16  The second is that the operating agreement and indemnification

17  agreements effectively require us to continue to fund the

18  directors and officers.  The third way is that we're actually

19  receiving subpoenas and third-party discovery.  And there's an

20  issue as to the question of possession, custody and control of

21  documents.  And what we believe, Your Honor, is that if we

22  continue to comply with discovery in relation to any of those

23  cases, where the liability is derivative, we'll be spending

24  tens of millions of dollars of estate money to effectively fund

25  that.

RESIDENTIAL CAPITAL, LLC, ET AL.                          19

1           What I wanted to say, though, Your Honor, is that we

2    originally had twenty-seven cases that we were looking to

3    extend the stay to.  And in, I believe, two of those cases, the

4    parties have voluntarily dismissed the nondebtor affiliates,

5    and we'll be looking to remove them from the case.

6           The one issue I wanted to preview for the Court before

7    the evidentiary hearing next month is the scope of discovery.

8    We've received both formal and informal document requests from

9    some of the defendants in the adversary proceeding.  And some

10   of the requests are relevant and measured and we will respond

11   to them.

12          However, a number of the requests, Your Honor, really

13   have no relevance whatsoever to the motion.  They're aimed

14   at -- and I'll review this and preview this for the Court --

15   virtually every facet of these bankruptcy cases, including the

16   investigation that the official committee is undertaking, and

17   the merits of the underlying MBS cases themselves, in other

18   words, precisely the same discovery that we're trying to avoid

19   by making this motion.

20          One example is a formal discovery request that we

21   received from a group of MBS plaintiffs, New Jersey Carpenters

22   Fund, Union Central Life, Acacia Life, and Cambridge Place

23   Investment Management, all of whom are represented by the same

24   counsel.

25          THE COURT:  Where is the case pending?

1  MR. LEE:  The New Jersey Carpenter case is pending in

2  this district, Your Honor, Second Circuit.

3  THE COURT:  Before?  These are before Harold Baer?

4  MR. LEE:  I'm going to just turn to --

5  THE COURT:  I saw some of the cases are before Judge

6  Baer, but --

7  MR. LEE:  I can -- I'll check on that, Your Honor.

8  THE COURT:  Go ahead.

9  MR. LEE:  That's the case that went up to the Second

10  Circuit on class certification and class cert was denied.  So

11  fundamentally, discovery in that case is stayed, other than

12  limited discovery relating to class certification.

13  And those plaintiffs have asked for all documents and

14  communications relating to their underlying cases between the

15  debtors and nondebtors, all documents regarding third-party

16  injunctions and third-party releases, and documents regarding

17  the negotiation of a Chapter 11 plan, amongst other things.

18  THE COURT:  Who are the plaintiffs' counsel in the

19  case?

20  MR. LEE:  Your Honor, I'm going to have to --

21  MR. ETKIN:  Your Honor, I'm --

22  THE COURT:  We'll give you a chance to speak in a

23  minute.

24  MR. ETKIN:  Thank you, Your Honor.

25  THE COURT:  Okay.

1    MR. LEE:  So, Your Honor, our view is that the breadth

2  of what they're looking for is fairly staggering and not

3  relevant to the motion to stay their cases.  And we will, of

4  course, Your Honor, seek to resolve any discovery issues before

5  we come back to this Court.  But I just wanted to preview the

6  fact that we are receiving fairly significant discovery

7  requests that we don't think are relevant.

8    And we think that there are basically four principal

9  reasons why discovery, if it's necessary at all, should be very

10 limited.  And if I may, Your Honor, I could just run through

11 those briefly.

12    THE COURT:  Well, I'm not going to decide the

13 discovery issues right now.  Let me tell all of you how I

14 handle discovery disputes.  I don't permit discovery motions.

15 When a discovery dispute arises, I require, as our Local Rules

16 do, that counsel meet and confer in an effort to resolve the

17 dispute.  If they're not able to do so, the party seeking the

18 relief from the Court -- assistance from the Court,

19 schedules -- ordinarily it would be a telephone conference.

20 Given the number of cases that this involves, I'll come back to

21 that in a minute whether to do it by telephone or otherwise.

22    I will generally hear -- without even letters

23 describing what the nature of the discovery dispute is, I will

24 hear all counsel involved in the discovery dispute.  And in

25 almost all matters, I'm able to resolve that dispute without

RESIDENTIAL CAPITAL, LLC, ET AL.                    22

1   the necessity for briefing on anybody's part.  In some few

2   instances I've asked for limited letter briefs.  Typically I

3   have those conferences within either the same day or the next

4   day of when the request is made.

5           How many parties are you having a discovery dispute

6   with at the present time?

7           MR. LEE:  It hasn't yet risen to the level of a

8   dispute, Your Honor, because we haven't had a meet-and-confer.

9   So right now --

10          THE COURT:  That's the first step.

11          MR. LEE:  And, Your Honor, as I said, we will address

12  that before we come back to the Court with any unresolved

13  matters.  But I think it would be helpful, Your Honor, if the

14  defendants could actually coordinate amongst themselves so that

15  we end up with one set of discovery requests that are tailored

16  to the issues in the motion.  And to the extent to which the

17  defendants want to take depositions, you know, one party

18  leading that exercise and taking whatever depositions.

19          The problem we have, Your Honor, is even amongst the

20  informal requests we've had -- we've had one from the FHFA, and

21  they asked us what it would cost to produce the underlying loan

22  files in their cases.

23          THE COURT:  Well, look.  The issues on a motion to

24  extend the automatic stay, or to issue a preliminary injunction

25  with the same effect as an extension of the stay, in my view,

1  raises a fairly limited set of legal issues, and doesn't --

2  clearly does not encompass discovery relating to the merits of

3  the underlying actions.

4         The hearing is currently scheduled for July 10th, the

5  hearing on the extension of the stay; preliminary injunction is

6  scheduled for July 10th.  Responses or objections to the motion

7  are currently due at noon on July 2nd.  That does not leave a

8  lot of time.

9         Counsel involved in the case need -- are we all -- for

10  those who aren't aware of it, there's already quite a full

11  calendar for July 10th.  So the likelihood of having an

12  evidentiary hearing, if one is required, on July 10th in this

13  matter, I would have to say, is at best a long shot; possible,

14  but at best a long shot.  It depends on what the disputed

15  issues of fact are that would need to be resolved at that

16  hearing.

17         Counsel for the plaintiffs and defendants in the

18  adversary proceeding need to meet and confer by the end of this

19  Wednesday, by 5 p.m. on Wednesday.  They need to meet and

20  confer and see if they can agree on the pertinent issues,

21  factual disputes, as to which discovery will be required for

22  the motion to extend the automatic stay or preliminary

23  injunction.  They also should discuss whether they can agree on

24  a different schedule for going forward with an evidentiary

25  hearing, if one is required.

1      The Court's calendar is quite crowded.  Injunction

2  matters do take a priority.  It may be you'll be trying it at

3  night if necessary.  But the first step is to meet and confer

4  this week to see if you can agree on a discovery plan and

5  schedule, and agree on --

6      All right.  If anybody has a cell phone turned on, you

7  need to turn it off.  It's interfering with the transmission of

8  this to the overflow room.  So turn off your cell phones.

9      All right.  Back to the matter at hand.  So I expect

10  you to meet and confer by the end of the day Wednesday.  I want

11  to schedule a telephone status conference just in this

12  adversary proceeding.  Debtors' counsel can arrange a CourtCall

13  telephone number, post it in the adversary so there -- all

14  parties-in-interest have notice of it -- for 6 p.m. this

15  Wednesday.  I've got hearings going through all day, with the

16  last one scheduled for 4 p.m.  I don't know whether it's going

17  to go forward or not.  But so we're going to schedule it for 6

18  p.m.

19      And counsel can report then whether they are able to

20  agree with respect to what issues discovery will be taken, when

21  it'll be done, et cetera.  It's clear that expedited discovery,

22  to the extent appropriate -- okay, somebody just leaned against

23  the light switch which is against the wall there.  So you need

24  to stand off the wall.  Maybe you didn't hear.  Thank you.

25  Okay.

1    You can report -- and preferably -- I know there are a

2    lot of cases, so there are a lot of counsel representing the

3    plaintiffs in the underlying cases.  To the extent that you can

4    coordinate your positions and have one or two people speak for

5    your group, that will be helpful.  I will hear everybody if

6    necessary.  Each case is separate.  I don't know whether

7    there's overlap in counsel between the cases.  Counsel are

8    entitled to be heard.  They will be heard.  That's how we're

9    going to proceed for now.

10         Let me just tell you, if to the extent an evidentiary

11   hearing is required, whether it goes forward on July 10th or on

12   another date, all direct testimony needs to be submitted in

13   written declaration form.  The moving party, the debtors, will

14   mark their exhibits -- pre-mark their exhibits -- we don't have

15   a reporter to mark exhibits -- will pre-mark exhibits with

16   numbers.  Anybody objecting will use letters.  Because we have

17   so many underlying cases, use a name or initials for your case,

18   followed by letters A through whatever for your exhibits.

19         Okay.  So all exhibits need to be pre-marked.  They

20   will all -- we'll take this up in the call as to when they'll

21   be exchanged and provided to chambers.  All written direct --

22   all direct testimony needs to be in writing.  To the extent you

23   don't have control over a witness and there's a deposition, you

24   need to designate and have counterdesignations of deposition

25   transcripts as well.  I need to know in advance whatever

1  objections there are to testimony.  That will be the basics.

2          You ought to discuss, when you meet and confer, how

3  much time -- if there are disputed issues of fact, how much

4  time you anticipate will be needed for an evidentiary hearing.

5  On any longer hearings, I typically do them as timed trials.  I

6  allocate the time between the various parties.  And we'll hold

7  you to it; and you use the time any way you wish:  opening

8  statement; well, direct will be in writing; cross-examination;

9  rebuttal; et cetera.  Any declarant needs to be in court and

10  available for cross-examination in court.

11          That's how we're going to proceed with the adversary

12  proceeding.  Does anybody want to be heard very briefly for any

13  of the defendants in those cases?

14          MR. LEE:  Your Honor, can I just make --

15          THE COURT:  Go ahead, Mr. Lee.

16          MR. LEE:  -- one minor clarification.  My apologies.

17          THE COURT:  Why don't you come on up while he's

18  speaking.

19          MR. LEE:  The current schedule is that responses are

20  due on June the 21st and --

21          THE COURT:  Well, your amended notice, which I just

22  printed off a little while ago, second amended notice of

23  debtors' motion to extend the automatic stay, stated that

24  "Responses or objections to the motions shall be served, filed

25  and service is to be received no later than 4 p.m. on July 2."

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    27

1        MR. LEE:  Okay.  Thank you, Your Honor.

2        THE COURT:  So if there's something different -- I

3   mean, I just printed this out before I came on the bench.

4        MR. LEE:  Yes, I think, Your Honor, our objective was

5   to actually, if we were going to proceed on the 10th, which we

6   hoped to do, was to get you the papers in advance of Your

7   Honor's vacation.  So that we were planning on actually filing

8   a reply on the 2nd.  So --

9        THE COURT:  Okay.

10       MR. LEE:  -- it wouldn't --

11       THE COURT:  So let's talk about that on Wednesday as

12  well.

13       MR. LEE:  Okay.  Thank you, Your Honor.

14       THE COURT:  Any other points, Mr. Lee?

15       MR. LEE:  No, sir.

16       THE COURT:  All right, counsel, do you want to come up

17  and identify yourself for the record?

18       MR. ETKIN:  Yes, Your Honor, very briefly.  Michael

19  Etkin, Lowenstein Sandler, on behalf of three sets of

20  plaintiffs who are defendants in the adversary.

21       That was really one of the issues I wanted to address,

22  Your Honor, in terms of some of the things Mr. Lee had

23  mentioned to your scheduling-wise.  There are a lot of parties

24  to this.  It's a very serious motion.  I don't think that the

25  adversary complaint and summons was served -- probably served

RESIDENTIAL CAPITAL, LLC, ET AL.                                    28

1   for the first time approximately two weeks ago, maybe a little

2   less.

3           As we understand it, objections to the motion are due

4   this Thursday.  We have tried -- some of the defendants have

5   tried to coordinate.  It's not easy.  It takes some time to

6   pull together.  If we're going to try to have some

7   coordination, deal with these discovery issues informally,

8   because this is the first I've heard of a problem and obviously

9   I take a different position with respect to the discovery that

10  we served.  And we believe it's tailored, but we'll deal with

11  that and try to resolve anything with the debtors directly.

12          But with all of that, and I think from the debtors'

13  perspective, different than what Your Honor just read, they

14  believe that opposition is due this Thursday.

15          THE COURT:  Okay, I -- you know, like I say, I just

16  printed out the second amended notice.  If there's something

17  different --

18          MR. ETKIN:  And perhaps we can take it up --

19          THE COURT:  Let's take it up on Wednesday.

20          MR. ETKIN:  You have -- exactly, Your Honor.  You have

21  a full plate today.  So we'll take that up on Wednesday.  And I

22  won't get into any discussion of the merits of the argument

23  made by the debtor.  Obviously we take a very different view,

24  and we'll --

25          THE COURT:  No doubt.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    29

1      MR. ETKIN:  -- make the Court aware of that.

2      THE COURT:  I just -- once again, I'm not making any

3  decisions about the scope of discovery.  But having been

4  through several cases before, and the one where I wrote, but

5  others where I haven't, this adversary proceeding is not an

6  excuse or a basis for doing the merits discovery in the

7  underlying cases.  I don't view the decision I have to make to

8  be any determination whatsoever about the underlying cases.  So

9  make sure you're tailoring your discovery appropriately.  But

10 we'll take it up on Wednesday.  Okay?

11     MR. ETKIN:  Thank you, Your Honor.

12     THE COURT:  Thank you very much.  Okay.

13     What's the next matter on the agenda?

14     MR. NASHELSKY:  Your Honor, the debtors have five

15 motions, and then there's an examiner motion --

16     THE COURT:  Let me just say, anybody who's here in the

17 adversary and wants to be excused, feel free.

18     Okay.  Go ahead, Mr. Nashelsky.

19     MR. NASHELSKY:  As I said, we adjourned the Ally

20 subservicing motion, so Mr. Rosenbaum is going to handle the

21 origination motion.

22     THE COURT:  Okay.

23     MR. NASHELSKY:  And then we will get into the cash

24 collateral DIP motions.

25     THE COURT:  All right.  Thank you.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    30

1    MR. ROSENBAUM:  Good morning, Your Honor.  Norm

2 Rosenbaum, Morrison & Foerster, proposed counsel for the

3 debtors.  Your Honor, this is the debtors' origination motion,

4 as we refer to it.  It's docket number 44, and item number 3 on

5 today's agenda.

6    Your Honor, the motion was approved on an interim

7 basis on May 15th, docket number 81.  Your Honor, we've

8 received a limited objection from the creditors' committee,

9 that we've worked on over the past week and through this

10 weekend.  I don't believe we've received any other substantive

11 objections.  We received some reservation of rights to this

12 motion.  And if Your Honor would like, I could walk Your Honor

13 through the changes we've agreed upon with the creditors'

14 committee.

15    THE COURT:  Well, let me -- have you resolved the

16 matter with the creditors' committee?

17    MR. ROSENBAUM:  We have resolved substantially all the

18 matters with the creditors' committee.  There's two issues

19 we're discussing, which we believe we will reach conclusions

20 acceptable to both the committee and the debtors.  Part of it

21 is just sharing some additional information.

22    THE COURT:  All right.  Go ahead and describe it

23 briefly.

24    MR. ROSENBAUM:  The one issue that the committee

25 requested in our discussions was that the brokerage fees

1  payable to the debtors be locked.  We're going to continue to

2  discuss that with the committee.  We don't know if that's

3  feasible.  We will supply them with the information regarding

4  that.  And if not, then maybe we'll work on a notice provision.

5  If the rates changes (sic) and go lower, we will give them

6  notice.

7          The committee asked for a clarification that any

8  administrative expense to the Ally affiliate nondebtors be

9  limited to post-petition.  That was acceptable.  We limited

10  whole loan sales without committee consent to amounts in excess

11  of an unpaid balance of ten million.

12          The committee asked for a clarification that the

13  debtors are not paying any securitization fees on behalf of

14  Ally Bank.  We've limited the critical origination vendor

15  cap -- similar to what we had with servicing, we had a critical

16  vendor component to this motion -- to five million dollars.

17  That was acceptable to the committee.

18          The other issue that the committee raised in their

19  objection was the debtors' obligation to honor certain buy-

20  backs and make-wholes to the GSCs, that being Fannie, Freddie

21  and Ginnie Mae.  We had discussions back and forth.  And what

22  we've agreed to with the committee is in the event the debtors

23  exceed a cap of 8.64 -- 864,000 with paying buy-backs to

24  Freddie Mac, we would give the committee notice, and they would

25  have the opportunity to come into this Court and file a motion

1  to prohibit us from making further payment.  We made a similar

2  cap with Fannie Mae of 34.2 million.  And these were based on

3  projections in our DIP budget.  We also provide the committee

4  with periodic reporting on the payments of these make-wholes

5  and buy-backs.

6         In addition, we've agreed with the committee that the

7  debtors, absent further approval from the Court or committee

8  consent, will not be doing any buy-backs or make-wholes for

9  nongovernment securitization -- those are the private label

10  securitizations.  We're also -- the final point is, we're in

11  discussions with the committee over what would be an acceptable

12  cap for servicing error claims made on private label

13  securitizations.

14         The committee has also asked for certain reservation

15  of rights with respect to potential claims against Ally Bank

16  that would be included in the order.

17         What we'll need to do here, Your Honor, is continue to

18  work with the committee.  I believe we'll have an acceptable

19  order with the committee that will then need to be reviewed by

20  Fannie, Freddie, Ginnie Mae, the committee, the Office of the

21  United States Trustee, as well as Ally Bank.  But I believe we

22  can get to an acceptable order everyone will agree to, Your

23  Honor.

24         THE COURT:  All right.  Does the committee want to be

25  heard?  Mr. Mannal?

1    MR. MANNAL:   Good morning, Your Honor.   Doug Mannal,

2    proposed counsel for the unsecured creditors' committee.

3         Your Honor, clearly the committee was focused on the

4    economics -- and Your Honor, I'll be brief -- but focused on

5    the economics of this.   We didn't want to agree to something

6    today only to have it change tomorrow.   That's why we are

7    insisting on that language in the order.   I think the debtors

8    are amenable to working with us to address that.   And we have

9    worked extensively with the debtors, Your Honor, to ensure that

10   there are caps on critical vendor claims and payments to

11   Freddie, Fannie, and no payments on account of the non-GA.

12        We'll work with the debtors to draft an order, Your

13   Honor, that is acceptable to the committee.   If we're unable to

14   do so, obviously, we will be back before the Court and let the

15   Court know.   But we hope to work out something with the

16   debtors.

17        THE COURT:   All right.   Does the -- I didn't go back

18   to look at the interim orders.   Is the -- the interim order

19   isn't date-limited?   That'll remain in effect pending your

20   final resolution, hopefully final resolution of the issues,

21   correct?

22        MR. ROSENBAUM:   That's correct, Your Honor.   We do

23   have a fifty-day agreement on the affiliated transactions, the

24   transaction documents with Ally Bank.   But I believe that won't

25   be a problem.   One of my colleagues just pointed out to me that

RESIDENTIAL CAPITAL, LLC, ET AL.                                    34

1   one of the caps I mentioned on the Freddie Mac was 8.64

2   million.  I think I said 864,000.

3           THE COURT:  Okay.  Mr. Mannal, anything else?

4           MR. MANNAL:  No.  That's all, Your Honor.  Thanks.

5           THE COURT:  All right.  Does anybody else wish to be

6   heard with respect to the origination motion?  This was the

7   motion that was filed as ECF docket number 44.  Mr. Masumoto?

8           MR. MASUMOTO:  Good morning, Your Honor --

9           THE COURT:  Why don't you go up to the microphone.

10  We've got people in another room, and I want to be sure

11  everybody can hear.

12          MR. MASUMOTO:  Sorry, Your Honor.  Your Honor, subject

13  to the review of the U.S. Trustee to the final order, we have

14  no objections.

15          THE COURT:  All right.  I'll wait to see.  Hopefully

16  you'll be able to submit a consensual order, have the agreement

17  of the committee and satisfactory to the U.S. Trustee, and I'll

18  be looking for it.  Okay?

19          MR. ROSENBAUM:  Thank you, Your Honor.

20          THE COURT:  Thank you very much.

21          MR. ROSENBAUM:  I think I'm ceding the podium --

22          THE COURT:  So that the interim order remains in place

23  pending hopefully full agreement on the form of the final

24  order.

25          MR. ROSENBAUM:  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    35

1        THE COURT:  Thank you very much.

2        MR. ROSENBAUM:  I'm ceding the podium to Mr. Goren.

3        MR. GOREN:  Thank you, Your Honor.  Todd Goren,

4   Morrison & Foerster, on behalf of the debtors.  I'm here

5   presenting the debtors' three financing and cash collateral

6   motions.  This was originally designated as an evidentiary

7   hearing, but we have resolved or substantially resolved all of

8   the objections.  There might be a few minor issues still

9   outstanding.

10       THE COURT:  I always get worried when I hear you've

11  substantially resolved.  That suggests that you haven't

12  resolved everything.

13       MR. GOREN:  I think we've -- I'm sure somebody's going

14  to come up and correct me.  But I think pretty much all but one

15  objection has been resolved.

16       THE COURT:  Okay.  Go ahead, Mr. Goren.

17       MR. GOREN:  I'll start with Citi.  The Citibank cash

18  collateral motion was to approve the use of the debtors' cash

19  collateral and a 152 million dollar financing facility with

20  Citibank, secured by the debtors' mortgage servicing rights

21  with Fannie Mae and Freddie Mac.

22       I believe the only objection that went directly to the

23  Citi motion was by the committee.  Citi, the committee, and the

24  debtors have conferred and resolved that objection.  We filed

25  an amended form of order on Friday.  And miraculously, it has

1  not changed since then.  If Your Honor would like, I can go

2  through the resolutions with the committee, or -- if you think

3  that would be helpful, the resolutions agreed to.

4           THE COURT:  Why don't you just outline the resolution

5  with the committee?

6           MR. GOREN:  In general, what has been agreed to -- and

7  these are sort of the highlights -- is we've limited the

8  Section 552(b) waiver to a waiver of only the debtors' rights

9  to make such a claim.  We've made clear that Citi's adequate

10 protection liens and claims are limited to the aggregate

11 diminution in value of their collateral.  Citi has agreed to

12 use commercially reasonable efforts to realize on their

13 collateral, prior to seeking satisfaction of their

14 superpriority claim from unencumbered assets.

15          The debtors have agreed to provide Citi with the same

16 reporting -- to provide the committee with the same reporting

17 that they're providing Citi.  And we've extended the

18 committee's challenge period from 75 days from the petition

19 date, to 120 days from the final order.  So those would be the

20 key changes agreed to with Citi.

21          And then another thing I just want to make clear for

22 the record is Green Planet filed an omnibus objection to all of

23 the debtors' --

24          THE COURT:  Yes.  It's ECF docket number 293, is the

25 Green Planet objection.

RESIDENTIAL CAPITAL, LLC, ET AL.                                        37

1           MR. GOREN:  We've agreed with Green Planet on language

2      that will go into the AFI junior notes order and the Barclays

3      order.  But because of the limited nature of this collateral,

4      which doesn't involve anything to do with Green Planet, that

5      language was not in the Citi order.  And I believe, subject to

6      that clarification on the record, they were amenable to that.

7           THE COURT:  All right.  Committee?  Mr. Eckstein?

8           MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

9      Eckstein of Kramer Levin, proposed counsel for the unsecured

10     creditors' committee.

11          I think Mr. Goren actually understated what it might

12     have taken to get to these agreed orders.  I think it's

13     noteworthy that these were extremely complex transactions,

14     among many other transactions that Your Honor will hear today,

15     and getting to resolution took the work of a lot of parties.

16     So to that extent it was, I think, a good accomplishment all

17     around.

18          Mr. Goren has accurately described the highlights of

19     what's been agreed to.  The other point I want to just put on

20     the record, which I think is important to the case, is that

21     Citi -- and it's true for the other secured parties that are

22     going to be presented subsequently -- but Citi in this case, is

23     not receiving liens on the debtors' unencumbered assets.  The

24     debtor does have -- or it's represented that it has very

25     substantial unencumbered assets.  And it was very significant

1  to the committee, in resolving a variety of issues, that the

2  unencumbered assets, as of the petition date, are remaining

3  unencumbered, post-petition.

4          The other changes that Mr. Goren has described are

5  accurate.  And we were satisfied with the order that was

6  presented Friday.  And if that remains the order, then the

7  committee is agreeable to the relief being proposed.

8          THE COURT:  Thank you, Mr. Eckstein.  Does anybody

9  else -- this is the Citibank cash collateral motion.  It's ECF

10  docket number 15.  Does anybody else wish to be heard with

11  respect to this motion?  Mr. Masumoto?

12          MR. MASUMOTO:  Your Honor, if I may?  I did have an

13  agreement with the debtors' counsel that before any orders are

14  submitted, we would have an opportunity for a final review.  So

15  unless we have a separate objection, if Your Honor doesn't

16  mind, since I don't have to -- unless Your Honor wants me to

17  come up on each order -- we reserve the right to review the

18  final version of the order before it's submitted.

19          THE COURT:  Thank you.

20          MR. MASUMOTO:  Thank you, Your Honor.

21          THE COURT:  All right.  Mr. Goren, is the order still

22  in the form that Mr. Eckstein last saw?

23          MR. GOREN:  Yes.  Yes, Your Honor.  The order filed on

24  Friday is the final version of the order which will be

25  submitted to the Court.

RESIDENTIAL CAPITAL, LLC, ET AL.                                39

1       THE COURT:  All right.  So with respect to the

2   Citibank cash collateral motion on a final basis, does anybody

3   else wish to be heard?

4       All right.  That motion is approved on a final basis,

5   subject to Mr. Masumoto having an opportunity to look at the

6   order.  Okay?

7       MR. GOREN:  Okay.  Good.

8       THE COURT:  Thank you, Mr. Goren.

9       MR. GOREN:  Next on the agenda is the AFI DIP facility

10  and use of cash collateral under three different facilities.

11  The AFI DIP facility is a 200 million dollar facility, which

12  has the ability, subject to -- in Ally's sole discretion --

13      THE COURT:  Let me just stop you for a --

14      MR. GOREN:  Yes.

15      THE COURT:  -- hang on one second.  I just want to be

16  sure that I dealt with all pending objections.  There's the

17  Nora objection to most everything.  And when I've asked whether

18  anyone else wishes to be heard, Ms. Nora has not asked to

19  speak.  Can you -- did the objection lie as to the Citibank

20  cash collateral?  It's unclear.

21      MR. GOREN:  It was a little unclear to us, too.  It

22  didn't appear that it really went to that specific motion.  Ms.

23  Nora, I believe is in the --

24      THE COURT:  Well, she's there.  And therefore, when I

25  call on people to speak to it, unless I hear someone rise to

1    reiterate an objection, I will consider it either withdrawn or

2    overruled.  So you don't have to come up for this, but -- okay?

3    I just wanted to be sure that I dealt with the pending

4    objections as well.

5              MS. NORA:  Thank you, Your Honor.  I was very

6    satisfied with --

7              THE COURT:  Okay.  Thank you.  All right.  Mr. Goren,

8    I'm sorry to interrupt you.

9              MR. GOREN:  No problem, Your Honor.

10             THE COURT:  Go ahead.

11             MR. GOREN:  So then the next motion is the motion to

12   approve a debtor-in-possession financing facility with Ally

13   Financial.

14             THE COURT:  This is ECF docket number 42, was the --

15             MR. GOREN:  And which is a 200 million dollar facility

16   which can be increased to up to 220 million at Ally's sole

17   discretion.  The primary use of that facility is to fund buy-

18   backs of Ginnie Mae loans, which we're required to do under our

19   agreements with Ginnie Mae.  The motion also seeks the

20   consensual use of cash collateral under three different

21   facilities:  a line of credit with AFI, which had approximately

22   380 million outstanding as of the petition date.  The Ally DIP

23   is being funded under that facility.  It's an amendment to that

24   facility.  And the Ally DIP is secured by the Ginnie Mae loans

25   we're buying back and a priming lien on the Ally DIP facility.

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1    Another credit facility with Ally, which has about

2    approximately 750 million outstanding.  This credit facility is

3    often referred to as Ally revolver.  You'll see that referred

4    that way in various pleadings; so just so we have the

5    nomenclature down.

6         And then there's about 2.2 billion dollars in junior

7    secured notes, which are secured by a junior lien on the same

8    collateral that secures the Ally revolver.

9         The committee also had numerous concerns with this

10   order.  We've worked closely with the committee, Ally, counsel

11   for the junior notes, to resolve those objections.  I believe

12   we've resolved everything as of now.  I'm sure Ken or Steven

13   will correct me if that's not the case, but I believe we've

14   resolved all the committee's concerns.

15        Specifically we've -- as with Citi, we've limited the

16   552 waiver to waiver of the debtors' rights to bring such

17   claims.  AFI is required to exhaust recovery on their

18   collateral prior to seeking satisfaction of their superpriority

19   claims from unencumbered assets.  We've clarified that the

20   replacement lien given to AFI and the junior notes on the

21   equity in the DIP borrower is only to the extent that AFI and

22   the junior notes had a valid lien on the residual value of both

23   the BMMZ repo facility and the GSAP facility, which are the two

24   facilities that are taken out by the Barclays DIP and form the

25   primary collateral for the Barclays DIP.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    42

1     There's an agreement by the debtors to provide the

2     committee with the same reporting we're providing with AFI and

3     the junior notes.  We've removed the requirement that the

4     debtors have to comply with their obligations under the AFI

5     settlement as a condition to the use of cash collateral in the

6     DIP.  We've provided that the lenders can't stop the use of

7     cash collateral until they've given three business days'

8     notice.  We've limited certain of the cross-default-type

9     termination events.  We've provided a right of parties-in-

10    interest to seek to recharacterize the adequate protection

11    payments upon further order of the Court, if it's determined

12    that the lenders were undersecured.

13          The last sticking point, which I understand has now

14    been resolved is the challenge period for the junior notes,

15    which has been extended from seventy-five days from the

16    petition date to ninety days from the final order.  And then

17    we've also agreed to -- Ally has agreed to make several changes

18    to the AFI DIP agreement, to address the committee's concerns

19    about being able to stagger the sales or sell some form of

20    assets prior to the other.

21          With those changes, I believe the committee's

22    objections to the Ally DIP -- there might be a couple other I

23    haven't hit on, but I believe those are the primary ones -- the

24    committee's objection, I understand, has been resolved.  I

25    don't know if you want to go objection by objection, or if you

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1   want me to --

2          THE COURT:  Well, let me ask the committee; who wants

3   to speak on behalf of the committee?  Let's deal with this, and

4   then we'll go on with the other objections.

5          MR. GOREN:  Okay.

6          THE COURT:  Mr. Eckstein?

7          MR. ECKSTEIN:  Your Honor, again, Mr. Goren --

8          THE COURT:  You just need to identify yourself each

9   time you --

10          MR. ECKSTEIN:  Kenneth Eckstein of Kramer Levin,

11   proposed counsel for the unsecured creditors' committee.

12          Mr. Goren has accurately described the state of play.

13   I think on this motion, it's important to note, from the

14   committee's perspective, this was the DIP financing that

15   generated the most questions from the committee for reasons

16   that I think are probably apparent to the Court.

17          We had real concerns that a DIP from Ally was being

18   used to not only provide the debtor with some bridge financing

19   which ideally we would have preferred had come from a third

20   party, and the committee initially had some concerns that it

21   wasn't coming from Barclays or a third party, but also that the

22   DIP was being used to sort of preordain certain of the

23   agreements and plan-related items that the debtor had put into

24   place with Ally, pre-petition.

25          The most important change that we obtained and had

1  requested initially was that if this DIP was going to go

2  forward, that it be treated, really, as a standalone DIP, and

3  that any linkage to the plan process and to the agreements

4  between the debtor and Ally be eliminated from the DIP.  That

5  was ultimately agreed to with one minor exception.  But I did

6  want to point out that as part of the resolution, we have

7  allowed the DIP to include a default that is tied to obtaining

8  confirmation of a plan by December 15th of this year.

9         We've allowed that to stay in, not because we

10  necessarily believe that a plan will or will not be confirmed

11  by that date, but we were satisfied that the asset sale process

12  was one that hopefully will be able to pay the DIP in full by

13  that point in time, and that if we need to deal with that date,

14  we have ample time between now and then, we believe, to go back

15  and deal with the date, or find a replacement DIP, which the

16  committee believes is actually achievable if there's adequate

17  time.

18         So we were satisfied that is the only linkage in the

19  DIP to any of the other plan support agreement deadlines that

20  have been put in place.  And we considered that quite material.

21         There has been negotiation with Ally throughout the

22  weekend.  There have been further modifications to the order

23  that we were discussing this morning.  I do agree that as a

24  business matter, we seem to have an agreement.  And so I feel

25  confident that with a little more time, we'll be able to smooth

RESIDENTIAL CAPITAL, LLC, ET AL.                                    45

1  out whatever remaining language needs to be addressed in the

2  order, and we can actually submit an order that is subject to

3  the committee's agreement, the debtors' agreement and Ally's

4  agreement.  We're satisfied.

5            THE COURT:  Thank you, Mr. Eckstein.

6            All right.  There were -- Mr. Goren, why don't you

7  address the other objections and then I'll allow anyone who

8  wants to speak, with respect to the --

9            MR. GOREN:  Okay.  Next up was Green Planet.  The

10 resolution with Green Planet is -- it's slightly different than

11 Citi in that while I don't think there was any concern with the

12 specific matter raised in their objection, which is whether the

13 debtors are using the servicing funds which they define as,

14 sort of, principal and interest that we're holding on a

15 custodial basis as part of the cash collateral.

16           The servicing agreement itself, to the extent it's

17 still valid, is part of the collateral under the debtors' Ally

18 line of credit, which -- so it obviously is the subject, now,

19 of both the Ally DIP and the Barclays DIP.  So we've agreed to

20 insert language in the order simply clarifying that we're not

21 using their servicing -- their servicing funds do not

22 constitute cash collateral or collateral under the DIP.  And

23 that it will use those servicing funds only in accordance with

24 the applicable agreement with Green Planet.

25           THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    46

1       MR. GOREN:  The United States also filed an objection

2  to Ally requesting certain CERCLA-related language and with

3  respect to setoff rights.  That objection, I understand, has

4  also been resolved.  The CERCLA-related language has been added

5  to the order and there will be a provision added to the order

6  with respect to preserving the United States' setoff rights,

7  except as to collateral -- the exact language, I'll just read

8  it into the record so it's clear.  "As to the United States,

9  its agencies, departments or agents, nothing in this final

10 order shall discharge, release or otherwise preclude any valid

11 right of setoff our recoupment that any such entity may have

12 with respect to the collateral that is not, A, AFI DIP loan

13 collateral or, B, subject to adequate protection liens under

14 this final order."  So with that, I believe, the U.S.'s

15 objection has been resolved.

16      The other primary objection lodged against the DIP was

17 by certain MBS trustees asserting that they had certain setoff

18 and recoupment rights in the DIP loan -- in the debtors'

19 advanced receivables.  We have resolved this objection as well,

20 right before the hearing.  Basically the trustees will receive

21 adequate protection in the form of a superpriority claim only

22 to the extent it is subsequently determined that they had valid

23 setoff and/or recoupment rights against that collateral and to

24 the extent of any diminution in value.  And they will agree not

25 to exercise any such post-petition setoff or recoupment rights

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    47

1  until further order of the Court.

2          With respect to the stub period between the interim

3  and final order, all rights of all parties are reserved to

4  determine whether adequate protection during that stub period

5  was appropriate.

6          The last objection was -- I believe the last one

7  related to Wells Fargo, which was the debtors' former cash

8  management bank.  And I believe there might have been a mis --

9  the agenda might be a little messed up on this point and we

10  apologize, Your Honor.  Their objection was mistitled as an

11  objection to Barclays so it was accidentally listed there on

12  our amended agenda.  It is in fact an objection to the AFI cash

13  collateral motion; I apologize for that, Your Honor.

14          But Wells Fargo is the debtors' former cash management

15  bank.  We included certain reservation of rights language in

16  the interim order.  That language was removed in the final

17  order because in that period of time we've closed all of our

18  accounts with Wells Fargo.  All the funds in those accounts

19  have been moved to different bank accounts after, to my

20  understanding, Wells deducted whatever fees and costs it

21  believed it was owed and we're no longer doing business with

22  Wells Fargo in any capacity at this point.

23          So I'm a little bit confused as to exactly what it is

24  that they're looking for at this point but I assume they'll

25  come up and explain it and we can address it as appropriate.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    48

1          Other than that and the Nora objection --

2          THE COURT:  Well, you listed the Nora objection and

3    you also listed the Papas, which was not filed.

4          Well, Ms. Nora do you want to come up and be heard?

5          MS. NORA:  Thank you, Your Honor.

6          THE COURT:  You have to come up to the microphone to

7    speak.

8          MS. NORA:  As much as I appreciate the effort --

9          THE COURT:  Just identify yourself for the record,

10   okay?

11         MS. NORA:  Thank you.  Wendy Allison Nora, claimant

12   number 1 in these proceedings.

13         As much as I appreciate the efforts of the unsecured

14   creditors' committee to get up to speed and evaluate the

15   various dangers of the proposals being pressed by the debtors

16   in this matter, when we get to the core of all of these

17   requests for special orders before the schedules are filed in

18   this matter that would allow anyone evaluating this, outside of

19   the creditors' committee, to ascertain what the damage could be

20   to the estate for people with claims against the estate it gets

21   a little bit difficult.

22         But I do want to call the Court's attention to this

23   idea of superpriority claims with respect to Barclays

24   financing.  There is a case pending, Federal Housing Finance

25   Agency as administrator for FHLMC, which is Fannie Mae.

1  Barclays is a defendant in that case.

2          THE COURT:  The specific motion that we're discussing

3  right now is the Ally Financial DIP and cash collateral, not

4  Barclays.

5          MS. NORA:  Okay.  I just wanted to give a little bit

6  of background.  If we're referring to this proposed final order

7  with respect to Ally that I was handed this morning, there's a

8  grave misunderstanding by the debtors' counsel, I believe, as

9  to what its obligations with respect to its agreement with the

10  board of governors of the Federal Reserve on the April 13th,

11  2011 order and what its obligations are under the consent

12  judgment.  These are not "we're going to do better" situations.

13  These are, with respect to 12 CV 362 --

14          THE COURT:  What does this have to do with the DIP and

15  cash collateral motion?

16          MS. NORA:  Because there's a condition precedent to

17  the AFI DIP loan draws if the Court's going to sign this order

18  today.  It says, "Notwithstanding the terms of the AFI DIP loan

19  the AFI LOC borrowers shall not be permitted to draw under the

20  AFI DIP loan unless they meet all their obligations under the

21  consent decrees and the consent judgment."

22          THE COURT:  Do you disagree with that?

23          MS. NORA:  I do because Ally is obligated also, so

24  they are indicating to this Court that it is these subordinate

25  debtors who have to comply with this.  I just want to make it

RESIDENTIAL CAPITAL, LLC, ET AL.                                    50

1   clear to the Court that --

2          THE COURT:  I only enter orders with respect to what

3   these debtors do.

4          MS. NORA:  Okay.

5          THE COURT:  Whatever obligations the nondebtor Ally

6   has under the settlements that it has entered into, are beyond

7   my power or jurisdiction to deal with.  So focus your comments

8   specifically on how this impacts upon the debtors in these

9   cases.

10         MS. NORA:  What my feeling is, Your Honor, from

11  reading all of these documents, is that the debtors are being

12  used as a fall guy for the parent company.  I don't think

13  that's being completely examined here and that's my main

14  objection to giving adequate protection rights to Ally and to

15  co-conspirators such as Barclays, superpriority positions.  It

16  looks to me, Your Honor, on the big picture that these debtors

17  are being spun off into bankruptcy to defeat the claims of RMBS

18  investors and of homeowners who've had their homes stolen.  And

19  that's my --

20         THE COURT:  Who do you represent?

21         MS. NORA:  Myself.

22         THE COURT:  As a what?  In what capacity?

23         MS. NORA:  As a homeowner.

24         THE COURT:  You're not a holder of RMBS?

25         MS. NORA:  No, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                                       51

1        THE COURT:  And so focus solely on how you believe

2    you're impacted by this.

3        MS. NORA:  My hope was to pursue this fraud into a

4    litigation whereby there would be damages available to pay the

5    thousands of homeowners who have had their homes stolen with

6    forged documents.

7        The way that this is being structured, I'm afraid that

8    the unsecured creditors' committee is unable to see the harms

9    that could happen to that constituency because they have

10   indicated in their paperwork that they represent unsecured

11   creditors who are major financial institutions.

12       My position is on behalf of who really funds this

13   operation.  It is the assets of the homeowners which have not

14   been disclosed as to what these debtors have taken from the

15   homeowners under forged documents.  It's streams of income

16   produced by the homeowners paid to the servicer for

17   distribution to the RMBS.  This reminds me of Barbara Tuchman's

18   "A Distant Mirror," which is a book about the fourteenth

19   century where the people rose up against the knights because

20   the knights were getting lazy.  The knights killed all the

21   people and then the knights couldn't figure out why the fields

22   weren't getting planted, Your Honor.

23       THE COURT:  Okay.  Thank you, Ms. Nora.  Anything --

24   any last points you want to make?

25       MS. NORA:  Your Honor, I just have a standing

RESIDENTIAL CAPITAL, LLC, ET AL.                                   52

1   objection to all the preferential transfers going on in this

2   case.

3             THE COURT:  I don't know what that has to do with this

4   motion, but --

5             MS. NORA:  Thank you.

6             THE COURT:  Okay.  Anybody else wish to be heard with

7   respect to the Ally DIP and cash collateral?

8             MR. SIEGEL:  Your Honor, Glenn Siegel for Bank of New

9   York Mellon.  We're one of the larger RMBS trustees.

10            We listened to Mr. Goren and I must say that I think

11  we're all a little -- we know we reached a deal but the terms

12  of the deal seem to be a little bit confused so we're going to

13  have to take a little --

14            THE COURT:  Mr. Siegel, are the terms of the deal

15  reflected in an order?

16            MR. SIEGEL:  Not yet, which is why I'm advising you of

17  this.

18            THE COURT:  Okay.

19            MR. SIEGEL:  What I do want you to know is that we

20  understand what's going to happen going forward, and we are

21  going to reserve rights between the interim period and the

22  final period.  But what goes around -- what comes around with

23  that we will have to report to you on probably later today.

24            THE COURT:  Okay.  Anybody else who wants to be heard?

25            Just hold on for a second, okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1    Okay.  There are people in the courtroom who still

2    have cell phones turned on.  It is interfering -- or other

3    electronic devices, either cell phones, BlackBerrys, iPhones,

4    what have you.  It is interfering with the recording of the

5    proceedings.  It's essential that we have an accurate

6    transcript.  Everyone, please turn off your electronic devices.

7         Go ahead.  I'm sorry.  Your name is?

8         MR. GOTTFRIED:  Good morning, Your Honor.  Andrew

9    Gottfried, Morgan, Lewis & Bockius representing Deutsche Bank

10   National Trust Company and Deutsche Bank Trust Company

11   Americas, in both instances as trustee with various residential

12   mortgage-backed securitization facilities.

13        Your Honor, we, along with the other trustees in this

14   matter, thought we had a resolution last evening.  We were then

15   advised that that resolution was off the table.  This morning

16   we received a proposed order which comported with that advice

17   that the resolution we at least had agreed to was off the

18   table.  But what was being proposed sort of unilaterally in

19   that order was not necessarily objectionable.  This is a

20   confused situation, Your Honor.

21        We are now told by Mr. Goren that perhaps where we

22   were last evening is back on the table.  So this is going to

23   require, I think, a second call to see if we can reach a

24   resolution of our objections in this matter.

25        THE COURT:  Thank you.  Who else wants to be heard?

RESIDENTIAL CAPITAL, LLC, ET AL.                    54

1          MR. SHORE:  Good morning, Your Honor.  Chris Shore

2    from White & Case on behalf of the junior secured notes.

3          I just wanted to make one clarification for the record

4    because there have been a lot of drafts running around.  The

5    paragraph 28 in the order, which is the effect of the

6    stipulations on the parties, we've gone back and forth with the

7    creditors' committee on the period of time in which to bring a

8    challenge to the liens, with our main concern being that before

9    any plan is solicited in this case we have an understanding of

10   what they're going to do so that holders of the junior secured

11   notes can know how to vote.

12         What we have agreed to now is a ninety-day challenge

13   period from the final order with a hard stop.  There were

14   proposals going back and forth with extensions for cause or

15   anything else; ninety days with a hard stop.

16         Now, the case is moving quickly; we're in the process

17   of discussing timeline with the debtors.  We don't anticipate

18   that there's going to be a setting of a disclosure statement

19   hearing within ninety days from the final order but to the

20   extent that there is we'd have to come back to the Court and

21   address that.

22         THE COURT:  Thank you, Mr. Shore.

23         MR. SHORE:  You're welcome.

24         MS. ALVES:  Your Honor, Arlene Alves with Seward &

25   Kissel on behalf of U.S. Bank as securitization trustee.

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1    I would just like to note that we are also part of the

2    second call on the language with respect to the DIP order.  We

3    filed an objection with the other securitization trustees.

4         THE COURT:  I don't know what you mean by you're part

5    of the second call.

6         MS. ALVES:  We need to sit down with the debtors to go

7    over the language.  There have been some changes back and

8    forth.

9         THE COURT:  Thank you.

10        MS. ALVES:  Thank you, Your Honor.

11        THE COURT:  Is there anybody else who has not yet been

12   heard who wishes to be heard?  Please come on up to the podium.

13        Hold on, Mr. Goren.

14        MR. WEITNAUER:  Your Honor, Kit Weitnauer of Alston &

15   Bird on behalf of Wells Fargo in its capacity as a trustee as

16   well as master servicer.

17        We filed a joinder.  We're in the same confused

18   position as the other trustees.

19        THE COURT:  Okay.  Next?

20        MR. DONNELL:  Your Honor, Jim Donnell of Winston

21   Strawn appearing for Wells Fargo, successor to Wachovia in a

22   depository account situation where we have a deposit agreement

23   with both Ally Financial and the debtors.

24        I'll be very brief, Your Honor and you can rule on

25   this one.  We're just trying to preserve the rights, the

1    reservation of rights that we had embodied in the interim

2    order.  And if it --

3          THE COURT:  If your accounts are closed what rights

4    are you trying to preserve?

5          MR. DONNELL:  It's our rights versus Ally Financial,

6    the nondebtor.  We have contractual subordination rights.  We

7    may have claims in the future.  We concede the accounts are

8    closed; we are not aware of any claims as of today.

9          THE COURT:  What is it in the order that would affect

10   your rights with respect to Ally Financial?

11         MR. DONNELL:  The provision in the order that recites

12   that Ally Financial is not subject to any subordination on

13   account of even its pre-petition claims.  We have a contractual

14   subordination agreement that shouldn't be affected.  I

15   understand if they don't want an equitable subordination

16   complaint or something derivative of the debtor, but it

17   shouldn't affect their contractual subordination with third

18   parties.

19         We agree the DIP loan that they make, that's not

20   affected.  We'll limit the subordination to the pre-petition

21   claims just involving Ally Financial.

22         THE COURT:  And just tell me, what's your

23   understanding of the bid and ask with the debtor, they're

24   declining to put in the reservation of rights that you're

25   asking for?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    57

1      MR. DONNELL:  That's correct.  I found out Friday

2  night, when they filed it, that the entire thing was deleted.

3  So we had also asked for adequate protection from ResCap to

4  replace the collateral that we had.  We understand that's

5  totally in your discretion; if you're not going to do that,

6  you're not going to do it.  But we think, independent of that,

7  we do have --

8      THE COURT:  Adequate protection for what?

9      MR. DONNELL:  For whatever claims we have in the

10 future.

11     THE COURT:  For what claims?

12     MR. DONNELL:  We have -- we concede we can't identify

13 a present claim but we might get -- for example, if we had sued

14 for a preference, for fees.

15     THE COURT:  Are you a secured or unsecured creditor

16 with respect to potential claims?  What adequate protection --

17     MR. DONNELL:  We were secured.  On day one we had a

18 secured interest in the accounts.  We will concede, Your

19 Honor --

20     THE COURT:  On what accounts?  The accounts were

21 closed.  You don't have any accounts.

22     MR. DONNELL:  The bank accounts.

23     THE COURT:  Am I right?

24     MR. DONNELL:  Your Honor, I will limit my request to

25 simply the nondebtor, Ally Financial, just to preserve the

RESIDENTIAL CAPITAL, LLC, ET AL.                                           58

1   contractual subordination rights.

2           THE COURT:  Anybody else want to be heard?  Anybody on

3   the phone?  Mr. Eckstein?

4           MR. ECKSTEIN:  Your Honor, two items.  I don't want to

5   create confusion but my understanding is that the order does

6   not release Ally of any claims with respect to its pre-petition

7   debt; it's only with respect to its DIP loans that it's getting

8   the relief that's provided for in the order.  So that to the

9   extent this is a concern, my understanding was that the order

10  was not seeking to limit claims that related to pre-petition

11  loans.

12          Second is with respect to what Mr. Shore raised a

13  moment ago.  The ninety days was the agreement, but I do want

14  to make clear, because the order has not been finalized, that

15  it is subject to the committee filing a motion seeking standing

16  and that will be satisfactory to toll the ninety-day period, by

17  merely filing a motion.  And I want to make sure that that's

18  going to be included in the order.

19          THE COURT:  Mr. Shore, do you agree with that, Mr.

20  Eckstein's statement?

21          MR. SHORE:  Yes, Your Honor.

22          THE COURT:  Thank you, Mr. Shore.

23          MR. ECKSTEIN:  Okay.  And with respect to the RMBS

24  reservations, we'll need to see where that settles out as well,

25  so we'll discuss with the second call parties.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    59

1          THE COURT:  Thank you.  Anybody else wish to be heard

2    who has not been heard yet?

3          Mr. Goren?

4          MR. GOREN:  First of all Your Honor, I apologize for

5    the confusion with the MBS trustees.  We were trying to figure

6    out a deal; there were two different options on the table when

7    I sat down and Mr. Siegel whispered into my ear right

8    afterwards we had a deal and I misunderstood which of the two.

9    But my understanding, at least, is that either of the two

10   options were acceptable to the debtors and the lenders.  So

11   we'll work with the MBS trustees after this hearing and come

12   up -- I'm confident we'll be able to come up with agreed

13   language which we'll submit to all the applicable parties that

14   have asked for notice.

15         With respect to Wells, I agree with the committee.  I

16   don't believe there's anything in this order that releases Ally

17   of a pre-petition agreement.  So I don't think there's anything

18   in this order that impacts those obligations.

19         THE COURT:  Wells' counsel, just identify yourself

20   again.  I apologize.

21         MR. DONNELL:  Your Honor, Jim Donnell for Wells Fargo

22   again.

23         THE COURT:  Okay.

24         MR. DONNELL:  The paragraph we're concerned about is

25   27(g) that says that "The adequate protection payments shall

RESIDENTIAL CAPITAL, LLC, ET AL.                                    60

1   not be subject to subordination," among other things.

2            THE COURT:  Mr. Goren?

3            MR. GOREN:  That's limited to adequate protection

4   payments which in this case are payments of post-petition

5   interest which can be recharacterized as repayments of

6   principal, and I don't see how that provision at all impacts,

7   to the extent the bank has claims against Ally under a separate

8   agreement between the two of them, I don't see that provision

9   as being implicated.

10           THE COURT:  Okay.  Anybody else wish to be heard?

11           All right.  So with respect to the Ally Financing

12  motion, the Nora objection is overruled.  The Wells objection,

13  to the extent it's seeking adequate protection is overruled.

14  The accounts are closed.  I don't read the order and my

15  determination, I'm not approving a final order because I don't

16  have it, but the approval of the Court, if it's given, is on

17  the basis that Wells preserves all of its rights to any pre-

18  petition claims against Ally Financial that it has.  I didn't

19  read anything in the existing order to alter, waive or deviate

20  from or limit those rights.  So anything beyond that is

21  overruled.

22           Mr. Goren, when do you think you're going to be able

23  to come to closure with respect to --

24           MR. GOREN:  I guess that depends how long we go today.

25  Maybe during a break or at some other point we can sit down

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                     61

1  with the trustees and figure this out today.  I would hope no

2  later than tomorrow.

3           THE COURT:  Okay.

4           MR. GOREN:  I think, as with the origination order, we

5  can probably just circulate it to the committee, the U.S.

6  Trustee, the trustees, if there's anyone else that would like a

7  copy.

8           THE COURT:  All right.  So look, let's proceed on that

9  basis.  If you reach an impasse please advise my chambers and

10  we'll try and arrange a telephone hearing to resolve any

11  remaining issues.  Hopefully you'll be able to get them ironed

12  out, though.

13           MR. GOREN:  I believe we will, Your Honor.

14           THE COURT:  Thank you very much, Mr. Goren.

15           Next?

16           MR. GOREN:  Next, Your Honor, is the debtor-in-

17  possession -- the debtors' request to approve a debtor -- a

18  1.45 billion dollar debtor-in-possession financing facility led

19  by Barclays as administrative agent on behalf of a syndicate of

20  approximately eighty financial institutions.

21           The facility was initially to be comprised of a 1.05

22  billion dollar A1 term loan with an interest rate of LIBOR plus

23  400 and a 200 million dollar -- a two-term loan with an

24  interest rate of LIBOR plus 600 and a 200 million dollar

25  revolver with an interest rate of LIBOR plus 400.  The A1 and

RESIDENTIAL CAPITAL, LLC, ET AL.                                    62

1   A2 term loans both had a LIBOR floor of 1.25.

2           The syndication of the facility, however, was highly

3   successful and we actually reverse flexed on the interest rates

4   and the A1 and revolver interest rate dropped by a quarter of a

5   percentage point and the A2 interest rate dropped by fifty

6   basis points, half a percent.

7           The one aspect of syndication where there was a little

8   bit of trouble was syndicating the revolver.  As a result of

9   that the revolver was reduced to 190 million and the last ten

10  million was put in the A1 term loan.  And in order to induce

11  lender -- Barclays is the lender under about 133 million of the

12  revolver and in order to induce lenders to take up the other

13  fifty-seven million, the up-front fee on that -- on just that

14  fifty-seven million was increased by a half a percentage point.

15  So a total cost to the estate of about 280,000 but well

16  outweighed by the benefits of the reduced interest rates we've

17  achieved.

18          Again with Barclays, the committee raised a number of

19  concerns which we've agreed on changes to the order that will

20  resolve those concerns.  We've increased the portion of the

21  carve-out in Barclays collateral that can be used for an

22  investigation from 100,000 to 250,000 and increased the

23  investigation period to 120 days from entry of the final order.

24  Barclays has agreed that it will use good-faith efforts to seek

25  payment of the DIP obligations from its collateral before

RESIDENTIAL CAPITAL, LLC, ET AL.                                        63

1   looking to unencumbered property of the estate.

2           We've agreed that we'll provide the committee with the

3   same reporting we provide Barclays; including consultation

4   rights on the budget and that we'll give the committee at least

5   five business days' notice of any amendment to the facility.

6           To address the committee's concerns that -- as to the

7   fact that the Barclays' DIP requires the two sales to close

8   simultaneously, Barclays agreed to work with the committee and

9   the debtors to seek an amendment to the credit documents should

10  such an amendment become necessary.

11          Barclays also clarified that to the extent we seek to

12  replace a stalking horse bidder before we've moved on from that

13  process, that there would be sixty days to approve -- attain

14  approval of that stalking horse bid rather than sixty days to

15  approve -- attain approval of the sale itself, the language in

16  the creditor agreement was a bit unclear on that point.

17          THE COURT:  Could you just elaborate on that point

18  because we do have some issues to deal with on the sale

19  procedure motion.  So just elaborate on what you -- say it

20  again but explain it to me.

21          MR. GOREN:  Yeah.  So real world example, to the

22  extent we were to replace Nationstar or Ally's bid as a result

23  of today, that would not be a default under the DIP facility.

24  We would have sixty days from today to replace -- to obtain

25  approval of that stalking horse bid.  So approval of bid

RESIDENTIAL CAPITAL, LLC, ET AL.                                    64

1  procedures with that as the stalking horse would satisfy the

2  requirement under the Barclays' DIP facility.

3        THE COURT:  Okay.

4        MR. GOREN:  With that, I believe the committee's

5  concerns with the Barclays' DIP have been resolved.  The MBS

6  trustees raised a similar objection to the Barclays' DIP.  We

7  do have agreed-upon language with them that has been circulated

8  and agreed upon on this one and that will be inserted into the

9  order.  And I believe that was the only pending objections.

10        THE COURT:  Anybody else wish to be heard with respect

11  to the Barclays' DIP?

12        Mr. Eckstein?

13        MR. ECKSTEIN:  Kenneth Eckstein of Kramer Levin,

14  proposed counsel for the creditors' committee.

15        Your Honor, the Barclays' DIP was initially advertised

16  as an eighteen-month DIP.  In fact, when you look at the

17  milestones it, as a practical matter, is really an eleven-month

18  DIP because it requires that the sales close no later than

19  April 15th.  So as a practical matter the DIP must be paid off

20  by April 15th.

21        As Mr. Goren indicated, we were concerned that the

22  Barclays DIP additionally has a provision that says if any

23  asset greater than twenty-five million dollars is sold, that

24  triggers an obligation to repay the DIP in full.  And we did

25  not want to find that an eighteen-month DIP that really was an

1  eleven-month DIP became a DIP that could be due in

2  significantly less time, particularly given the fact that the

3  fees for this DIP were not insignificant.  They were, in fact,

4  very substantial.  And whenever you hear that the subscriptions

5  are wildly oversubscribed, it leads one to question whether or

6  not maybe the fees are in fact overly generous.

7        That said, we did get comfort with our concerns about

8  how we're going to deal with subsequent transactions.  First,

9  as Mr. Goren indicated, not only would there be no default if a

10  different stalking horse is entered today, but we clarified

11  that if for some reason a stalking horse, for either of the

12  transactions, disappears post-approval, that we'll have sixty

13  days to replace that stalking horse and continue with the

14  auction process.  And that was really the issue that we felt

15  was most important.  We didn't want to find that if for some

16  reason we lost a stalking horse a month from now, that we would

17  lose the ability to replace the stalking horse with one of the

18  other interested parties and continue with what we would hope

19  is going to be an active auction process.  So that has been

20  successfully clarified.

21        THE COURT:  Well let me ask this, when Mr. Goren

22  addressed it it sounded like it was language still to be agreed

23  upon, and that is if there's a sale of a pool of assets that

24  not the -- the first closed sale is not the mortgage servicing

25  rights, for whatever reason, and the price is less than the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    66

1   amount required to pay off the DIP in full, as at least in the

2   last version I saw, the DIP became due upon -- this was the

3   thing about requiring simultaneous closings, if the first sale

4   is sufficient to pay off the DIP, it doesn't become -- I guess

5   it's not really a big issue but if that first sale is not

6   sufficient, have you reached an agreement on it?

7          MR. ECKSTEIN:  Where we have come is as follows, and

8   that was precisely the issue that we were debating.  For

9   example, if the decision is that the whole loan assets can be

10  sold more quickly --

11         THE COURT:  With the 1.4 billion --

12         MR. ECKSTEIN:  That's correct.

13         THE COURT:  -- it wouldn't be enough to pay off the

14  DIP in full, what happens next.

15         MR. ECKSTEIN:  Exactly.  And the servicing assets may

16  take a much longer time to close.  What Barclays has agreed to

17  do is rather than amending it today, we've been persuaded that

18  trying to seek an amendment today before we knew exactly what

19  proceeds were likely to come in and what the debtors' ongoing

20  needs were going to be with respect to the revolver.  Barclays

21  has agreed to work with the debtors, in good faith, to amend

22  the DIP documents, to allow one of the asset sales to go

23  forward without triggering full repayment.

24         As a practical matter, we recognize that that will

25  entail going back to Barclays and obtaining their agreement to

1  an amendment.  But what has been represented to us as a

2  business matter is that that negotiation will take place and

3  that it will more likely be on a more advantageous basis for

4  the estate if it is done in advance of actually proceeding to

5  closure.

6          So we've agreed, essentially, to build that provision

7  into the order and if it turns out that we do need to close one

8  transaction separate from the other, we expect that we'll need

9  to have that discussion with Barclays and we are hopeful and

10 expect that they will work with the debtor appropriately.

11         THE COURT:  You contemplate -- I mean, have you agreed

12 on language to go into the order that contemplates a future

13 agreement to agree?

14         MR. ECKSTEIN:  Well, in fairness to Barclays, they

15 have not definitively agreed to agree.  They have agreed to

16 work with the debtor to negotiate an amendment.

17         THE COURT:  My concern, Mr. Eckstein, when I sign an

18 order, whatever the four corners of it provide, that's the

19 deal.  It makes me a little uncomfortable on this -- even

20 before this resolution was -- when I read your objection

21 initially, it was very clear to me what the potential problem

22 was from the debtors' standpoint and the committee's

23 standpoint.

24         MR. ECKSTEIN:  Your Honor, you are correct and I had

25 this discussion at length and maybe we're being -- maybe the

1    judgment is a pragmatic judgment but the feeling was that if in

2    fact there are proceeds that are available to come into the

3    estate earlier than expected to pay down a substantial portion

4    of the DIP, that if our choice is to essentially delay the

5    closing rather than obtain an earlier closing and earlier

6    paydown, we believe that we'll be in a position to be able to

7    persuade the DIP lender to find a way to accept the earlier

8    paydown.

9             THE COURT:  I'm not sure that it would help the cause

10   but has somebody tried to draft just some language that says in

11   the event of a closing that results in proceeds less than the

12   required amount, that Barclays agrees to negotiate in good

13   faith with the parties?

14            MR. ZIMAN:  Your Honor, may I?

15            THE COURT:  Yes.  Come up.

16            MR. ZIMAN:  Your Honor, Ken Ziman, Skadden Arps on

17   behalf of Barclays as DIP agent in this matter.

18            Paragraph 29, Your Honor, of the order that was

19   submitted Friday, I don't think the language has changed

20   between then and today, is exactly what you're focused on.  As

21   Mr. Eckstein alluded to, there was a lot of discussion around

22   this point and with an eighty-member syndicate, the ambiguity

23   that exists today in coming back for an amendment, in the

24   absence of information, I think, it was Barclays' judgment and

25   gave the debtor the advice and shared it with the committee as

1  well that that's a conversation better had in the context of

2  real, hard facts.  I mean, it may never be necessary.  It may

3  be necessary, it may be a positive, it may not be.  We'll see

4  what the --

5          THE COURT:  What's the language that you're pointing

6  to, Mr. Ziman?  I don't have it open in front of me.

7          MR. ZIMAN:  Oh.

8          THE COURT:  Just read it into the record.

9          MR. ZIMAN:  Now, I just lost my page.  One moment.

10 Paragraph 29.  Now, I need my glasses, Your Honor.

11         THE COURT:  Just louder because we've got an overflow

12 crowd.

13         MR. ZIMAN:  Sure.  So it says, and this is in

14 paragraph 29 of the proposed final DIP order, "Upon a written

15 request by the debtors, after consultation with by the debtors

16 with the creditors' committee, the administrative agent agrees

17 to work with the debtors and the creditors' committee to seek

18 one or more amendments to the DIP credit agreement that would

19 permit the debtors to consummate a sale of the portion of the

20 collateral that is either, A, the collateral that is subject of

21 the Ally sale agreement, defined term, or B, the collateral

22 that is the subject of the Nationstar sale agreement, also

23 defined term, without requiring that the DIP obligations be

24 paid in full upon consummation of such sale, provided that any

25 such amendment shall, one, be on terms and conditions

1  including, without limitation, arrangement amendment fees to be

2  agreed upon by the debtors, the administrative agent and the

3  requisite DIP lenders, and two, be subject to the consents,

4  approvals and documentations required by the DIP credit

5  agreement, and three, be subject to approval by further order

6  of this Court."

7          THE COURT:  Mr. Ziman, do you agree that work with

8  translates into negotiate in good faith?

9          MR. ZIMAN:  Yes, Your Honor.  The good faith language

10  actually appears in that language.

11          THE COURT:  All right.  Thank you.  Mr. Eckstein, is

12  there anything else you wanted to add?

13          MR. ECKSTEIN:  Your Honor, I'm pleased to hear Mr.

14  Ziman confirm that that implies good faith.  I don't believe

15  that the good faith language, at least I don't see it in the

16  paragraph, so that clarification is very useful and I'm happy

17  to rely on Mr. Ziman's representation as to how he understands

18  this provision to work.

19          I think the other modifications that have been made to

20  this DIP were satisfactory.  We were comfortable that the

21  milestones in this DIP, actually, we believe are sensible and

22  are helpful because it gives the debtor actually until February

23  15th of 2013 to obtain the sale orders, until April 15th to

24  close, which in fact are -- we don't know that we'll need to

25  use them but we don't think that that imposes undue pressure on

1  the estate and in fact to the contrary, were reasonable

2  timetables.  So to that extent we felt that having this kind of

3  a substantial financing facility to ensure the stability of the

4  assets and to allow the sale process to play itself out in

5  full, actually was quite beneficial.  And it was really on that

6  basis that the committee decided that with the modifications

7  that we've discussed, that we would allow the DIP -- the

8  economics of the DIP to go forward.  And therefore, with the

9  modifications that we've discussed, we are prepared to consent

10  to the entry of an order.

11          THE COURT:  Thank you very much.

12          All right.  Does anybody else wish to be heard with

13  respect to the Barclays DIP?

14          MR. GOTTFRIED:  Your Honor, Andrew Gottfried, Morgan

15  Lewis for Deutsche Bank National Trust Company and Deutsche

16  Bank Trust Company Americas.  And I believe in this instance I

17  speak on behalf of the other MBRS trustees.

18          We believe we have a resolution of our objection

19  dealing with setoff and recoupment rights, which is embodied in

20  paragraph 30 of the order.  Unfortunately, I think it is in the

21  rush of getting this order done, there are other provisions in

22  the order that undercut the resolution, and specifically I'm

23  referring to paragraphs 10(b), as in boy, and 10(d), as in

24  David, which have provisions which do not comport with

25  paragraph 30.  And if this was just a drafting matter and can

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

1   be fixed, then we would have no issue with regard to this

2   matter.

3              THE COURT:  There was so much paper that I asked my

4   law clerk to sit up here with me so he could find things more

5   easily than I could.  Let me just look.  You think which

6   paragraph --

7              MR. GOTTFRIED:  10(b), as in boy, Your Honor.

8              THE COURT:  What page is that on?

9              MR. GOTTFRIED:  That's on page 15.

10             MR. GOREN:  Your Honor, if I may approach?

11             THE COURT:  Mr. Goren?

12             MR. GOREN:  If I may approach?  This is the blackline

13   off of Friday's version, which has the new trustee language

14   that he's referring to.  So it might be --

15             THE COURT:  Thank you, Mr. Goren.

16             Go ahead, Mr. Gottfried.

17             MR. GOTTFRIED:  Our resolution appears in paragraph

18   30, Your Honor, which is on page 50 of the order.  And that's

19   the resolution that we reached with respect to setoff and

20   recoupment issues.  But I believe that that is undercut by the

21   language in paragraphs 10(b) and 10(d), which are not subject

22   to that resolution.  Both in 10(b) and 10(d) there is a cutoff

23   of setoff and recoupment rights, which was the basis of our

24   objection.

25             THE COURT:  Any other points you want to make?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    73

1          MR. GOTTFRIED:  Excuse me, Your Honor?

2          THE COURT:  Any other points you wish to make?

3          MR. GOTTFRIED:  No, Your Honor.

4          THE COURT:  All right.  Anybody else wish to be heard

5    with respect to the Barclays DIP?

6          MR. CORDARO:  Good morning, Your Honor.  Joseph

7    Cordaro, Assistant United States Attorney on behalf of the

8    United States.  And just for the sake of completeness, I did

9    not hear the debtors' counsel mention the United States'

10   limited objection on the setoff language; that, too, was

11   resolved.

12         THE COURT:  Thank you.

13         MR. CORDARO:  Thank you.

14         THE COURT:  Anybody else?  Ms. Nora, do you want to be

15   heard?

16         MS. NORA:  Yes.  Real briefly, Your Honor.

17         THE COURT:  Well, come up to the microphone because

18   we've got to make -- have a clear record.

19         MS. NORA:  I want to correct a misstatement I made on

20   the last item on the agenda, the previous one, and then I want

21   to explain to the Court why it's so important that we get

22   disclosures in the form of schedules.  What I think we're

23   talking about --

24         THE COURT:  Ms. Nora, I heard your point.  I've read

25   your papers.  I understand your point you want schedules.

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1   There's an order in place about when schedules will have to be

2   prepared.  Is there anything else you want to say specifically

3   with respect to the Barclays' DIP?

4           MS. NORA:  I think that if the Court understood what

5   this is, it's monetizing assets that the debtors don't have.  I

6   think that's what's going on here.

7           THE COURT:  Ms. Nora, don't tell me what you think the

8   Court ought to understand.  If you have an argument you wish to

9   make go ahead and make it.

10          MS. NORA:  I can't -- without having the schedules I

11  just want to reserve my objections, Your Honor.

12          THE COURT:  Well, your objection is overruled.

13          MS. NORA:  Thank you, Your Honor.

14          THE COURT:  So it's not reserved, it's overruled.

15          MS. NORA:  Subject to appeal.  Thank you, Your Honor.

16          THE COURT:  Mr. Ziman?

17          MR. ZIMAN:  Yeah.  Perhaps I can clear up the

18  confusion with Mr. Gottfried's comments.

19          THE COURT:  Just identify yourself again.

20          MR. ZIMAN:  I'm sorry.  Ken Ziman from Skadden Arps on

21  behalf of Barclays.

22          Your Honor, I think it's a drafting issue; I don't

23  think it's a substantive issue.  I think we can insert, subject

24  to paragraph 30 in each of those places, and that should clear

25  up the issue for the MBS trustees.

RESIDENTIAL CAPITAL, LLC, ET AL.                    75

1        THE COURT:  Mr. Gottfried?

2        MR. GOTTFRIED:  That would solve the problem, Your

3   Honor.

4        THE COURT:  Thank you.  All right.  Mr. Goren, do you

5   want to be heard again?

6        MR. GOREN:  I think that's it, Your Honor, actually.

7   It sounds like everything, other than the Nora objection --

8        THE COURT:  Okay.  And Mr. Masumoto has to have an

9   opportunity to review the final order as well.

10       MR. GOREN:  We will provide him with a copy of the

11   final order.

12       THE COURT:  Okay.  Does anybody else wish to be heard

13   with respect to the Barclays DIP?

14       All right.  Subject to the review of the proposed

15   final order, the motion is granted.

16       MR. GOREN:  Thank you, Your Honor.

17       THE COURT:  Thank you, Mr. Goren.

18       MR. GOREN:  I will now turn it over to my colleague,

19   Mr. Nashelsky, on the bid procedures.

20       MR. NASHELSKY:  So Your Honor, we have two matters

21   left.  One is the debtors' motion for sale procedures and the

22   other is Berkshire Hathaway's motion for an examiner.  We

23   understood you wanted to do the evidentiary hearing last.

24       THE COURT:  Yes, that's correct.

25       MR. NASHELSKY:  Okay.  So then I will cede the podium

1    to Mr. Walper, who is --

2         THE COURT:  All right.  Just so everybody understands

3    on schedule.  We'll proceed now with the examiner motion.  We

4    are going to take, wherever we are and if we finish with that

5    we'll move on to the start of the bidding procedures.  We will

6    take a recess at 12:25; I have a telephone hearing in another

7    matter at 12:30.  And let's see where we are when we take the

8    recess and we'll see how long the lunch break will be.

9         Okay.  Go ahead.

10        MR. WALPER:  Thank you, Your Honor.  Thomas Walper,

11   Munger Tolles & Olson on behalf of creditor Berkshire Hathaway.

12        We have filed a motion for the appointment of an

13   examiner.  I just wanted to confirm that the Court had an

14   opportunity to review all --

15        THE COURT:  I've read everything.

16        MR. WALPER:  Thank you, Your Honor.  And then I'll ask

17   the Court if it has any questions of Berkshire Hathaway and if

18   not we'll proceed with a very short presentation.

19        THE COURT:  Just proceed with your presentation.  If I

20   have questions I will interrupt.

21        MR. WALPER:  Thank you very much, Your Honor.

22        It's rare, Your Honor, that I feel that our position

23   is so strong and the matter before the Court is so meritorious

24   yet we don't seem to have many supporters.

25        THE COURT:  Well, you have the United States Trustee.

RESIDENTIAL CAPITAL, LLC, ET AL.                              77

1    MR. WALPER:  I think we have a few other creditors,

2    Your Honor.  But it's clear that all parties here agree that an

3    investigation is appropriate and that an expeditious

4    investigation is in the best interest of all the estates.

5        The relief sought is extraordinary in connection with

6    the agreements that are presented to the Court.  And we clearly

7    think that having an examiner appointed to review all of the

8    transactions -- and it could be in parallel with the committee.

9    And, Your Honor, I believe you said in court the other day that

10   duplication should be avoided and expense -- needless expense

11   should be avoided.  But I think there are ways to meld the two

12   such that an independent examiner can be appointed, yet at the

13   same time the creditors' committee can build whatever case it

14   believes its duties require it to make in conjunction with all

15   of the agreements, support agreements, the settlements and

16   everything before the Court.

17       Your Honor, 1104(c)(2) says that an examiner is

18   mandatory; we strongly believe that that is the case.

19       THE COURT:  But it doesn't say in those words that an

20   examiner is mandatory.

21       MR. WALPER:  That is correct.  It says "shall" and "as

22   appropriate".  But we think here that since all the parties

23   have agreed that an investigation is appropriate, that that's

24   covered.  And we believe there's certainly five million dollars

25   of outstanding --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    78

1        THE COURT:  No one's disputed that.

2        MR. WALPER:  Yes.  The committee alleges that this is

3   a mere litigation tactic.  I scratch my head, which is easy to

4   do, Your Honor.  And I don't find that there could be any

5   conceivable litigation tactic here.  In fact, my sense is that

6   the committee wants to hold the information dear so it can use

7   this as a strategy -- as a litigation tactic of its own.  But I

8   certainly wouldn't attribute that to them; this has not really

9   played out.  But I would say, Your Honor, that that is a

10  possibility.

11        I believe there are four very strong arguments for an

12  examiner in this case; one is the committee can perform its

13  investigation but it's going to do it -- it'll do it quickly

14  here, but it'll do it on its time, it's in control.  With an

15  examiner, this Court can say that the report shall be due

16  within a certain period of time.  And we have proposed that an

17  examiner report be due in ninety days, which is certainly

18  consistent with everything that the debtors have sought to

19  accomplish with respect to their near-term pleadings.  It'll

20  provide a report to the Court as opposed to a report to the

21  committee and its members, which is, frankly, a very diverse

22  group of creditors, some of whom may be subject to settlements

23  here, some of whom not.  But it is clearly, with the nine

24  members, quite a diverse group.

25        The next thing -- the next important point is that

1    there is independence.  And it is clear that the committee has

2    argued that everybody on the creditors' side is interested in

3    maximizing the value of the estate.  So in that respect, Your

4    Honor, I believe that the examination would really have the

5    same motive as the creditors' committee would have.  But what's

6    a little different here, and it does go to the efficiency, is

7    that an examiner can actually look at the various claims

8    between the estates and can also look at which --

9            THE COURT:  Explain what you mean by that.

10           MR. WALPER:  Well, to the extent that, in the most

11   simplest terms, if Ally is going to pay a 750 million dollar

12   settlement payment, the examiner can look at which estates

13   really have the strongest claims to whatever is made up of that

14   750 and can help the process along and move it toward

15   reorganization.  The creditors' committee -- it has the bonds

16   at the holding company, and so forth -- really can't do that

17   examination, because they believe that it's conflicted among

18   its members.  So an examiner can dig down between estates, say,

19   'This estate has this claim against Ally, this estate has this

20   claim,' and help to sort that all out, to bring the process to

21   a speedier, more rapid conclusion.

22           THE COURT:  In your view, Mr. Walper, if an examiner

23   is appointed, what professionals would the examiner need to

24   retain in order to conduct a meaningful investigation of the

25   pre-petition and post-petition transactions between the debtors

1    and Ally on the one hand, and with the secured creditors on the

2    other?  Your motion essentially -- you don't disagree -- if I

3    read everything correctly, you don't disagree with the scope of

4    the investigation that the creditors' committee was seeking to

5    undertake as evidenced in their 2004 motion; am I correct?

6           MR. WALPER:  That's absolutely correct, Your Honor.  I

7    believe that that is the case that Kramer Levin sat down with

8    the debtor's counsel and they sort of worked through that work

9    plan.  And it seems comprehensive and thorough, and --

10          THE COURT:  So what professionals would an examiner

11   need to retain in order to be able to conduct a competent

12   thorough examination of the issues that you all seem to agree

13   properly fall within the scope of an investigation?

14          MR. WALPER:  So I have not been party to that work

15   plan, but it seems to me very clear that an examiner would need

16   counsel; an examiner would need competent forensic accounting;

17   an examiner, in particular, may -- although this could be

18   something that could actually be shared, may need a financial

19   advisor to help value, for instance, the transfer of the bank

20   that occurred a couple of years ago.

21          THE COURT:  Well, that's what I was really -- where I

22   wanted to get to, because the issues that you and the

23   committee -- and the committee has its financial advisors.  The

24   transfers that you think should be examined, what you're

25   contending, that the debtors didn't receive adequate

RESIDENTIAL CAPITAL, LLC, ET AL.                                          81

1  consideration for the transfers of whatever assets were

2  transferred, correct?

3          MR. WALPER:  That's correct, Your Honor --

4          THE COURT:  All right.

5          MR. WALPER:  -- one of the issues.

6          THE COURT:  And what types of professionals do you

7  believe are required in order to be able to -- you use the term

8  "value"; I don't think that's a fair statement of what would

9  have to -- was the consideration that was transferred adequate

10 consideration or requires potentially a valuation of what was

11 given and what was received.

12         MR. WALPER:  Yeah, that would be the case, Your Honor,

13 and it would --

14         THE COURT:  Are you familiar with any cases where an

15 examiner has shared financial advisors with a committee or

16 others?  I mean, the committee has a very different charge than

17 an examiner would have.  They may not be willing to share.

18         MR. WALPER:  Right, but this committee has said that

19 it is willing to open its kimono, if you will.  And so --

20         THE COURT:  Well, it said if it does the

21 investigation, it is.  It hasn't said, if an examiner's

22 appointed, what they're prepared to do.

23         MR. WALPER:  Yeah, that is the case.  But I can see --

24 you know, if I were the examiner, I could see, Your Honor, a

25 situation where, for instance, an FTI comes in; they could

RESIDENTIAL CAPITAL, LLC, ET AL.                                      82

1   provide both sort of the accounting services, but also

2   valuation services.  That wasn't an add by -- in any respect,

3   Your Honor.  But you could see one additional financial

4   professional, but this analysis will be shared, and others can

5   work with that analysis.  But there's always a risk, Your

6   Honor -- and we're all looking toward efficiency, speed.

7   There's always a risk that this investigation that the

8   committee is performing sort of falls off the rails through

9   conflict or otherwise.  And an examiner, with that type

10  timetable, will actually encourage and help this process and,

11  hopefully, give us all an answer and conclusions that can be

12  used, if appropriate, to emerge on the timetable that's been

13  proposed.

14        And not to say that the committee would in any way

15  drag its heels with respect to pursuing the examination for

16  leverage or otherwise -- because speed is important here;

17  particularly with respect to the secured creditors, speed is

18  important here -- that having an examiner with that timetable

19  will help to expedite and ensure that, if it is appropriate to

20  emerge within the timetable proposed, that that actually

21  occurs.

22        A third advantage, Your Honor, is that it's a public

23  report.  And there's certainly been a lot of --

24        THE COURT:  The committee indicated it was prepared to

25  make its report a public report.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    83

1          MR. WALPER:  Well, but they -- I'm not sure they said

2     that, Your Honor.  What they said was, in connection with

3     supporting or objecting to a plan, necessarily there would be

4     argument, which would be adversarial, which would take the

5     position as to whether things that took place were right or

6     wrong.  That's not a public report, Your Honor; that's

7     advocacy.  And all of the issues may not see the light of day,

8     and I think that that's very important in this case in

9     particular.

10         The last important point is that the examiner can, by

11    order of this Court, have access to confidential privileged

12    communications.  And it's not exactly clear to me, but the

13    committee has said that the debtor has agreed that they will

14    give such access.  But I'm a little concerned about that,

15    because a member -- the members of the committee, in fact, have

16    disputed claims and have filed lawsuits against the company.

17    And access to attorney-client documents, well --

18         THE COURT:  Is the examiner's report to be public?  I

19    mean, I think there's been dispute whether it would be

20    redacted, whether it would contain meaningful information; if

21    the examiner had access to privileged information, what are the

22    limitations or restrictions on the examiner including that

23    information in his or her report.

24         MR. WALPER:  Yes, well, I -- that would not see the

25    light of day, Your Honor, but at the same time the committee --

RESIDENTIAL CAPITAL, LLC, ET AL.                              84

1    THE COURT:  How's that any different than what the

2    committee would do?

3        MR. WALPER:  The committee is sitting in a place where

4    it has several masters; it has an entire committee of interests

5    to align and merge.  And I guess I could anticipate, having

6    represented a number of committees, where there might be some

7    delays or haggling over who should be in, who should be out,

8    who should see what.  And the committee has clients.  An

9    examiner only reports to this Court, Your Honor.  And it's --

10       THE COURT:  I have your point.  Any other points to

11   the last point you want to make, Mr. Walper?

12       MR. WALPER:  Just in conclusion, and I think it is our

13   reply but it is something we have spoken to counsel about, and

14   that is, in terms of the issue of efficiency and cost, we would

15   propose that an examiner be appointed, that the examiner be --

16   meet and confer with the committee, and that they should

17   jointly provide a statement to the Court as to how it is that,

18   one, they will work together in doing an investigation where

19   the committee could obtain the information that it wants,

20   without double depositions and so forth; that, two, it'll

21   provide a work plan for the examiner and a budget for the

22   examiner, and that the report should be due to this Court

23   within ninety days.

24       THE COURT:  Thank you, Mr. Walper.

25       MR. WALPER:  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    85

1    THE COURT:  Who else wants to speak in support of the

2    motion for appointment of an examiner?  Mr. Masumoto?

3         MR. MASUMOTO:  Good afternoon, Your Honor.  Brian

4    Masumoto for the Office of the United States Trustee.  Your

5    Honor, thank you for the latitude in our filing our response on

6    Friday.  Part of our -- part of the response was prompted by

7    the objections that were filed to the original motion regarding

8    the appointment of examiner; specifically, the U.S. Trustee was

9    concerned about the interpretation of 1104(c)(2) where the U.S.

10   Trustee does take the position that the 1104(c)(2) provision,

11   based on the "shall" language, does require the mandatory

12   appointment.  I believe that many, if in fact not the majority,

13   of the courts have reached that same conclusion, and

14   specifically in the Southern District the one bankruptcy case

15   that took a different position was overruled by the district

16   court.

17        In addition, it seems that, with respect to the

18   "shall" provision, many of the courts have taken the position

19   that it is the court's -- within the court's discretion to

20   determine the nature and the scope of the retention.  So while

21   the "shall" language in the statute does require the

22   appointment, the Court can control either the duplication or

23   the potential duplication or the nature of the examination, so

24   as to avoid any unnecessary expense to the estate.

25        THE COURT:  Where do you derive -- where in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    86

1    statute do you derive the discretion of the Court to control

2    the scope, timing and budget for an examiner's investigation?

3          MR. MASUMOTO:  Your Honor, I don't believe there is

4    any specific language in the statute, but I think the

5    statute --

6          THE COURT:  Isn't the "as is appropriate" language,

7    which precedes subsections (1) and (2) -- isn't that the source

8    in the statute of discretion on the part of the Court, with

9    respect to controlling?  I would say, one, I think the issue --

10   does the "as is appropriate" language give the Court the

11   discretion to simply say, 'No, I'm not going to approve the

12   appointment of an examiner but, if I do,' as the Revco -- the

13   only circuit to rule on it basically gave scope, timing, budget

14   all within the discretion of the Court.  But -- so would you

15   agree that the discretion comes from the "as is appropriate",

16   those words, "as is appropriate", that does appear in 1104(c)?

17         MR. MASUMOTO:  Your Honor, I do believe the language

18   can extend to that position, but I do believe -- it's our

19   interpretation that the "as appropriate" language does not

20   eliminate the "shall" language which indicates that an examiner

21   should be appointed --

22         THE COURT:  Well, how so?  Because you argue that I am

23   required to give this statute its plain meaning and apply the

24   words of the statute only, which you conclude in your pleading

25   means that it's mandatory that an examiner be appointed when a

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      87

1   request is made by a party-in-interest or the trustee, U.S.

2   Trustee, in any case in which the fixed debt exceed five

3   million dollars.  Nobody disputes that the fixed debt exceeds

4   five million dollars.  You say it's mandatory.  You acknowledge

5   cases in your pleading in which courts, in cases in which fixed

6   debt exceeds five million dollars, have nevertheless said, 'No

7   examiner, because it's a litigation tactic; because an

8   investigation's been completed; because, even though within the

9   literal terms of the statute the request was made prior to

10  confirmation, it's two weeks before confirmation and it's

11  really intended to slow this down.'  You've acknowledged those

12  cases.  Do you agree those cases are correct?

13          MR. MASUMOTO:  No, Your Honor.  I mean we do believe

14  that the better rule is that the "shall" language does require

15  the appointment.  We believe that the "as if" language that

16  Your Honor refers to essentially --

17          THE COURT:  "As is appropriate" is the language.

18          MR. WALPER:  -- "as is appropriate" language refers to

19  the -- I guess it modifies the conduct of such investigation,

20  that the appointment is mandatory but that the judge -- that

21  the Court can tailor the scope and nature of the appointment,

22  or the investigation, as appropriate.  So, accordingly, we do

23  believe that the better interpretation is that an examiner

24  should be appointed but the Court does retain the discretion to

25  control that investigation for the best interests of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                   88

1    estate.

2         THE COURT:  Address the issue, if you would, about, if

3    there is an examiner appointed, what professionals would be

4    appropriate for an examiner to retain.  There's this problem

5    that the statute is silent about an examiner's retention of

6    professionals and, more importantly, compensating them.

7         MR. MASUMOTO:  Your Honor, we do believe that the

8    examiner should be independent.  I'm not aware of a case in

9    which an examiner has shared a professional with other

10   constituents; it's either debtor's professionals or the

11   committee's.  And the concern is, I believe, as was articulated

12   by the movant, that each constituency may have a slightly

13   different orientation, coupled with the problem of potential

14   confidentiality and privacy considerations that may or may not

15   be available or permitted with respect to an examiner's

16   investigation but are prohibited with respect to other

17   constituencies.

18        I know that there was some indication that the

19   committee will receive confidential information, but I'm still

20   not sure whether or not that access will be consistent with

21   what an examiner might be entitled to.  And so we do -- we are

22   concerned about the sharing of professionals.

23        THE COURT:  Do you agree that an examiner should be

24   able to retain both counsel and a financial advisor who would

25   be compensated from the estate, in connection with an

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    89

1  examiner's investigation?

2           MR. MASUMOTO:  Yes, I do, Your Honor.

3           THE COURT:  Anything else, Mr. Masumoto?

4           MR. MASUMOTO:  Nothing further, Your Honor.

5           THE COURT:  All right.  Anybody else wish to speak --

6           MR. MASUMOTO:  Thank you.

7           THE COURT:  -- in support of the motion for

8  appointment of an examiner?

9           All right, who wants to speak in opposition?  Mr. Lee?

10          MR. LEE:  Good afternoon, Your Honor.  Gary Lee from

11  Morrison & Foerster, proposed counsel to the debtors.  I've

12  known Mr. Walper for a long time and I get to say that there is

13  at least one thing that I do agree with him on, on this

14  occasion at least, which is that there really should be, and we

15  acknowledge, a complete, independent and very vigorous

16  investigation of any pre-petition transactions and agreements

17  between the debtors and AFI and the affiliates.

18          Given the billion dollar settlement -- I know it's

19  been referred to as 750,000, but --

20          THE COURT:  Million.

21          MR. LEE:  Yeah, 750 million.  Pardon me.  Yeah.  Maybe

22  for Berkshire, that matters a little less.  Given the billion

23  dollar settlement we reached with Ally and the nature of the

24  releases sought in exchange, I think we knew pretty well coming

25  into this case that there would be an investigation, and we

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    90

1   prepared one.  And in fact, I think it was not much more than

2   two or three hours after the formation of the committee, and

3   well in advance of the filing of the Rule 2004 examination,

4   that we began to have the first of several discussions on how

5   to implement a discovery process and an investigation.  And

6   those discussions culminated in the 2004 order Your Honor

7   entered; I think it was on June the 5th.

8           And I'd like to pause here.  I think it's very

9   significant that we, the committee and Ally were able to reach

10  agreement on a discovery process and investigation, for what is

11  a very complex and significant matter.  And I know, just as

12  Your Honor did, that the nature and scope of that discovery and

13  investigation has been widely endorsed by every party to this

14  case; and as Your Honor noted, that includes Berkshire Hathaway

15  who've adopted the process and the investigation, lock, stock

16  and barrel, just as it was entered in the order.

17          In the last three weeks alone, we've produced nearly

18  half a million pages of documents to the committee, and we have

19  spent literally hundreds of hours with committee counsel and

20  their advisors, of whom -- we can go through the list of who

21  those are -- since the inception of this case.  So we believe,

22  Your Honor, given that background, the question is whether or

23  not the Code mandates that the debtor's estates are required to

24  bear the costs of not just one but two identical investigations

25  in two exactly the same issues; there's no debate they're the

RESIDENTIAL CAPITAL, LLC, ET AL.                    91

1   same issues.  And that's going to be conducted by two different

2   parties.  And Your Honor's asked, 'Well, who will those parties

3   be, and what advisors will they require?'  You're looking at

4   investment bankers, you're looking at forensic accountants,

5   you're looking at lawyers.  We're going to end up with eight

6   different sets of very highly compensated advisors looking at

7   exactly the same thing.

8           THE COURT:  Well, I could -- I did sign the 2004

9   order, and I said in court at the last hearing that I signed

10  the order with full knowledge that, the day before I signed it,

11  the examiner motion was filed, and that I went forward and

12  signed it fully understanding that an investigation was going

13  to be conducted by someone, and that there was -- because of

14  the case management order, today was the first day that the

15  examiner motion would be heard, and there was no reason for

16  delay, 'So let's move forward with document production.'  I

17  signed the order and I said at the last hearing that if the

18  examiner motion is granted, I'd certainly contemplate that

19  whatever has been or would be otherwise produced to the

20  committee would be produced to the examiner, so that there was

21  no -- I wasn't resolving the examiner motion when I approved

22  the 2004 examination.

23          MR. LEE:  Yeah, I absolutely understand.  I think --

24          THE COURT:  Tell me this.

25          MR. LEE:  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                              92

1    THE COURT:  Here's -- look, the -- I think the real

2    issue's what does the Statute 1104(c) permit me to do, where

3    the U.S. Trustee and Mr. Walper argue that it's mandatory --

4    because fixed debt exceeds five million dollars, that it's

5    mandatory that an examiner be appointed?  Where in the language

6    of the statute do you see a bankruptcy court's power to say no,

7    that it's preferable that the creditors' committee conduct the

8    investigation?

9    MR. LEE:  So I think Berkshire's position and the U.S.

10   Trustee's position sort of follows what I think Judge Sontchi

11   suggested in the American Home was their thesis, which is if

12   you cry examiner in a crowded case, you get one.  But we

13   believe, Your Honor, that that thesis is actually flawed, and

14   there are a number of cases both in Delaware and increasingly

15   in this district that --

16   THE COURT:  But point to me where in the statute my

17   discretion resides, to turn down an examiner motion.

18   MR. LEE:  Your Honor, I believe that the discretion

19   comes by parsing the language.  I think that the thrust of the

20   argument that Berkshire and the U.S. Trustee have made is that

21   if you do have discretion, then you've effectively rendered

22   1104(c)(2) as superfluous.  And I think there's a way to parse

23   the language, and the way to parse the language --

24   THE COURT:  What Revco -- what the Sixth Circuit in

25   Revco said is, if it's not mandatory, subsections (1) and (2)

RESIDENTIAL CAPITAL, LLC, ET AL.                                    93

1   become indistinguishable, was the term used.

2           MR. LEE:  And I believe, Your Honor, there is a

3   distinction to be made, and I think that that is reflected both

4   in the cases and even in the references in Collier.  I think

5   the distinction is that (1) contemplates a situation where the

6   five million dollar threshold can't be demonstrated, and (2)

7   relates to cases where the five million dollar threshold is

8   met.  So it doesn't render five -- sorry, it does -- sorry,

9   that does not render --

10          THE COURT:  Well, Judge Lifland in Calpine -- there

11  was an issue whether the five million dollars was met.

12          MR. LEE:  Exactly.

13          THE COURT:  There's no dispute here the five million

14  dollars is met.

15          MR. LEE:  Right.  And I think that, because there is a

16  distinction between (1) and (2) whether the five million dollar

17  threshold is or isn't met, the key is that they are both

18  subject to -- because there is a different interpretation for

19  each, they're both subject to the requirements set forth in the

20  main text of 1104(c), which require the Court to determine that

21  an examiner investigation, quote, "is appropriate".

22          THE COURT:  "As is appropriate" is the precise terms

23  that are used.

24          MR. LEE:  Right.  And the issue therefore is, if Your

25  Honor doesn't have discretion, that means that an examiner will

1   be appointed even in cases where the investigation was ongoing

2   or complete.  If it was mandatory, you'd have to appoint one in

3   every case.  So we believe that (1) and (2) are, in effect,

4   subject to the requirements set forth in the main part of the

5   text.

6           THE COURT:  Well, even the courts that have accepted

7   that it's mandatory have found the power in the bankruptcy

8   court to find the right was waived because it came too late; a

9   variety of theories.

10          MR. LEE:  And the other places where courts have

11  focused on is not just on the delay in making the motion, but

12  really fundamentally more a question of waste in duplication,

13  and that's fundamentally the issue that the debtors are

14  confronted from.  And the Spansion court --

15          THE COURT:  Point to me a case of this magnitude where

16  the request for an examiner has come as early in the case as

17  this, where a court has turned it down because of the expense,

18  or waste is the term used.  Are there any cases that support --

19  I didn't find one.

20          MR. LEE:  I'm unaware of any cases, but I think that

21  the right analogy here, Your Honor, is there are no cases that

22  we're aware of in which there is uniformly no support

23  whatsoever from the constituents who really have their

24  interests at stake here, which are the unsecured creditors who

25  are in support of such a motion.

RESIDENTIAL CAPITAL, LLC, ET AL.                                   95

1          THE COURT:  1004 says that a relevant constituency --

2   and this is the United States Trustee and they've made their

3   position clear.

4          MR. LEE:  I understand, and we obviously disagree with

5   the way in which the U.S. Trustee argues Revco and the Raugh

6   (ph.) case.  Our view, again, is that you can give meaning to

7   both section 1 and section 2 by reference to the main text.

8   And our view here is that unsecured creditors, and obviously

9   Mr. Eckstein will speak to this issue, do not support the

10  appointment of an examiner, number one.  And I think there's

11  something very ironic here, Your Honor, which is that the same

12  creditors who purchased Berkshire Hathaway's bonds two days

13  after they sold them, two days after they filed the examiner

14  motion, have also come out in opposition to the appointment of

15  an examiner as well, Your Honor.  And I think that really

16  speaks volumes to where the unsecured creditors are:  They

17  believe the investigation should be conducted by the unsecured

18  creditors.

19         THE COURT:  So what limits -- if I accept your thesis,

20  what limits are there, if any, on a bankruptcy court's power to

21  say no in a case with fixed debts over five million dollars?

22         MR. LEE:  I believe that Your Honor has unfettered

23  discretion because of the use of the words "as is appropriate".

24  And if Your Honor concludes that it's not appropriate because

25  there is an appropriate investigation being undertaken, then

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    96

1  this Court can simply deny the motion.

2          THE COURT:  Okay.

3          MR. LEE:  Thank you, Your Honor.

4          THE COURT:  Who else wants to be heard in opposition?

5          MR. ECKSTEIN:  Your Honor, Kenneth Eckstein of Kramer

6  Levin, proposed counsel for the creditors' committee.  Let me

7  pick up on where Mr. Lee left off.  Your Honor obviously has

8  captured the legal question, which is whether it's mandatory.

9  And we respect the question.  It's a difficult question.  I

10 think I agree with Your Honor.  There is no clear answer in

11 this district --

12         THE COURT:  Well, let me hear -- Mr. Eckstein, let's

13 assume it's not mandatory, okay.  What I'm really struggling

14 with:  Even if I accept the premise of the objectors that it's

15 not mandatory, I don't think I have unbounded discretion to

16 turn down an examiner motion.  And I'm trying to understand

17 where the contours of that limit on my power reside.

18         MR. ECKSTEIN:  Your Honor, if the Court is satisfied

19 that it is not mandatory, that "as is appropriate" gives the

20 Court the discretion not to appoint an examiner, I believe the

21 Court, in that situation, does have the right to look at what

22 is appropriate in the circumstances of the case, and I think

23 the Court should look to whether or not in fact an

24 examination -- an investigation is being pursued, and whether

25 or not there is significant support or creditor support for the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    97

1  request for an examiner.  I believe that's a very important

2  issue.

3          And in this case, as Mr. Lee indicated, it is quite

4  significant that, number one, before Berkshire moved for an

5  examiner, the committee undertook to initiate the

6  investigation.  We did not require Berkshire's motion to then

7  stimulate the committee to step up and seek the investigation.

8  In fact, the committee knew what the dynamic was in this case.

9  We understand that there is a desire on the part of the debtor

10  and Ally and the junior secured bonds, to try to get this case

11  quickly through Chapter 11.  And while we have not yet endorsed

12  the schedule in this case, it was really with an eye toward

13  what the parties had proposed, recognizing that an

14  investigation was required, in this case, of the pre-petition

15  transactions; that immediately in the face of a great deal of

16  activity in this case, and Your Honor is well aware of the

17  schedule that we've been contending with, that immediately we

18  undertook to prepare a comprehensive outline for an

19  investigation; we put it into a motion, we put it into a

20  document request and a subpoena, filed it and, in fact,

21  obtained the consent of the adversaries in this case, which is

22  not an insignificant event.

23          And the fact that -- and I don't want to suggest that

24  there's agreement in the case.  What we have is we have an

25  agreement to a process among the parties.  And I don't think

RESIDENTIAL CAPITAL, LLC, ET AL.                              98

1    the Court should minimize how important it is that three, four

2    weeks into a case of this size and complexity, that the key

3    protagonists in this case have agreed how to proceed.

4         Berkshire is a very significant party-in-interest in

5    this case.  When Berkshire filed its motion, Berkshire

6    represented that it was the holder of approximately forty

7    percent of the junior secured bonds, the group that also has an

8    ad hoc committee that has entered into a plan support agreement

9    and that, based upon at least public disseminations, there is a

10   projection that, under the agreement that has been struck

11   currently with the debtor and with Ally, those bonds will be

12   paid in full under the plan that's contemplated.  Berkshire was

13   also a holder of a majority of the unsecured public bonds in

14   the case, represented by Wilmington Trust as trustee, which is

15   one of the members of the committee, and they clearly were a

16   significant stakeholder in this case.

17        As the declaration filed by Berkshire in this case,

18   the second declaration, indicated, after filing the examiner

19   motion, Berkshire disposed of its unsecured bonds, so today

20   Berkshire is merely a holder of --

21        THE COURT:  Merely?

22        MR. ECKSTEIN:  But -- when I say "merely", Your Honor,

23   they hold a very substantial position, but they are in the

24   secured bonds.  And it's important, not that they're not a

25   party-in-interest --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    99

1          THE COURT:  There's nothing in the statute -- it

2    doesn't limit the right to request an examiner, to unsecured

3    creditors.

4          MR. ECKSTEIN:  Absolutely correct, Your Honor.  What's

5    significant about that is merely the fact that they no longer

6    are looking at the motion from the standpoint of will the

7    unsecured creditors vigorously pursue the investigation.

8    They're now looking at it simply from the standpoint of a

9    secured creditor; and while that's important, while that's

10   important, it's a different significance in terms of is the

11   committee going to be vigorous.  I would respectfully submit

12   that Berkshire, by selling its bonds, no longer really has the

13   same standing to be concerned about whether unsecured

14   creditors --

15         THE COURT:  Well, you know they have standing.  You're

16   not really --

17         MR. ECKSTEIN:  I --

18         THE COURT:  -- contesting their standing?

19         MR. ECKSTEIN:  No, I'm not questioning standing.  I'm

20   simply -- maybe I misused the word, Your Honor.  They are not a

21   stakeholder in the unsecured debt, and that's important because

22   the unsecured debt in this case is represented by the

23   committee.  Now, obviously the U.S. Trustee appointed the

24   committee and determined how the committee should be composed.

25   But the committee has acted dynamically in this case.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    100

1   Notwithstanding the suggestion that there are conflicts, the

2   reality is, as in any large case, what we have here is

3   potential intercreditor issues.  Every large case that I'm

4   familiar with -- and I believe all the parties involved in this

5   case have also experienced that large complex cases have

6   intercreditor issues.

7           THE COURT:  Let me -- what I want to do, Mr. Eckstein,

8   is I want to draw you back to the issue that I'm focused on,

9   which is, if I accept the committee's theory -- and your brief

10  was very helpful; you did a good job.  I think the more recent

11  decisions which you captured were reflected in transcripts

12  rather than in published opinions; you attached them to your

13  objection; that was helpful to the Court.  I was aware of some

14  but not all of those.  But the issue that I'm struggling with

15  is, if I accept the starting point, namely that 1104(c)(2) is

16  not mandatory, not really mandatory, what are the limits on the

17  Court's exercise of discretion in refusing -- in denying a

18  motion to appoint an examiner?  You've talked about -- I mean,

19  the cases that you've called deal with requests that come late

20  in the process, or a committee's report is -- examination is

21  essentially complete, or some other equivalent to that.  Those

22  don't seem to apply here.

23          MR. ECKSTEIN:  Correct, Your Honor.  We have not

24  suggested that Berkshire has delayed; that is not the case.

25  The question that we focused on goes back to "as is

**RESIDENTIAL CAPITAL, LLC, ET AL.** 101

1  appropriate".  And, Your Honor, as a practical matter, I see

2  two --

3         THE COURT:  Wouldn't you agree that Congress expressed

4  a preference, at a minimum -- the U.S. Trustee would say, 'Not

5  just a preference.  It made it mandatory.'  But at a minimum,

6  Congress has expressed a preference that in larger cases --

7  five million is not very large anymore for fixed debt, but here

8  we've got huge numbers.  -- Congress has expressed a preference

9  that an examiner be appointed and conduct the investigation.

10  And the Revco decision, when it says the two subsections would

11  become indistinguishable, if it's discretionary, I'm not sure I

12  agree with that statement from the Revco opinion.  But at a

13  minimum, Congress has expressed a preference -- it's drawn a

14  distinction between smaller cases in which interests of

15  creditors and other constituents are clearly part of the

16  equation in deciding whether to approve it, and the five

17  million-plus fixed debt?

18         MR. ECKSTEIN:  Your Honor, I'm not sure I would

19  respectfully agree with that preference.  I think that when you

20  go back to what Congress really intended here, Congress was

21  coming off of the Bankruptcy Act where we had Chapter 10, where

22  there was a mandatory trustee.  And the examiner section that

23  was built into the Bankruptcy Code was really the transition

24  from Chapter 10 in large cases where there was a mandatory

25  trustee, to a debtor-in-possession structure where the process

RESIDENTIAL CAPITAL, LLC, ET AL.                                    102

1   that I believe was preferred by Congress was really the

2   adversarial process between the debtor and creditors'

3   committees --

4           THE COURT:  Well, it was leave management, and places

5   debtor-in-possession.  But if an investigation has to be done,

6   you have this way of doing it without -- by appointing an

7   examiner.

8           MR. ECKSTEIN:  So I believe you have the examiner

9   statute which was, I think, Congress sort of feeling its way.

10  And if you look at what the courts have said, I think the

11  courts have said, and that may not be a complete answer to what

12  the Court will do, but I think many of the courts in large

13  complex cases that have looked at this question have been

14  concerned that the language in 1104(c)(2) is not really what

15  Congress wanted to see happen in large cases where there was

16  active representation by the parties.  And that's why, when you

17  look at some of these cases, they bemoan the fact that the

18  statute is in fact less than clear.  And Your Honor may say,

19  'Well, maybe that requires an amendment by Congress,' and I

20  understand that.  But I don't know that I would share the view

21  that Congress intended for there to be an examiner in every

22  large case.  And in fact, as we have seen, that is not the way

23  every case has played out.  There have been some cases where

24  there have been examiners, some cases where there haven't been

25  examiners, and courts have looked for essentially reasons not

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    103

1  to appoint examiners in many cases.

2        THE COURT:  What I didn't see, Mr. Eckstein, are cases

3  early -- large cases early in the process; early in the

4  process.  I mean, this is quite a new case; we're really just

5  getting rolling here.  I know you got an aggressive schedule

6  that you have to live with, you want to extend it out, but

7  right now it's an aggressive schedule.  But I haven't found any

8  comparable cases, large cases, where a court has turned down an

9  examiner motion where it's been made early in the case.

10        MR. ECKSTEIN:  Your Honor, we haven't either, and

11  therefore, as we indicated, we think that this is an issue

12  where there's not a great deal of precedent, at the end of the

13  day, to look to.  Hence, I think -- as we look at it, I think

14  the Court has two choices.  We think the Court does have the

15  discretion and flexibility not to appoint an examiner in the

16  case, and I think the Court could conclude that a process

17  appears to exist in the case that could be the most efficient

18  and effective way to (a) conduct an examination.  We have

19  indicated in our brief how we will deal with some of the issues

20  that were raised by Berkshire that, while we don't think are

21  concerns, nonetheless I think we've addressed, including access

22  to privileged information, making sure that the committee's

23  investigation will become public and the like.  But I think,

24  more fundamentally, the Court can conclude that there's a

25  process in place that the parties-in-interest support, and the

1  Court could allow that process to proceed and not grant the

2  motion and could reserve and essentially conclude that the

3  motion could be denied without prejudice to being renewed.

4          THE COURT:  Assuming I grant the motion --

5          MR. ECKSTEIN:  That -- I was giving you option 1, Your

6  Honor.  That's option 1.  We believe option 2 -- and it's not

7  our preference, but we believe it to be practical; it's an

8  alternative.  There is a process in place, and we believe, at

9  the end of the day, the committee is conducting the

10 investigation, and we respectfully submit that the committee

11 should in fact conduct an investigation in this case.  We're

12 also respectful of the fact that there's concerns about

13 duplication.  Your Honor correctly points out that if an

14 examiner is appointed under what I would call the traditional

15 examiner order, which gives the examiner the control over the

16 process, we'll have to retain counsel, it will need a forensic

17 accountant and it will need a banker, because Your Honor

18 correctly points out the examiner will have to review all of

19 the pre-petition transactions and the relationships between the

20 parent and the sub; we'll have to conduct valuations, we'll

21 have to evaluate the appropriateness of transactions that took

22 place three, four years ago.  Those are complex undertakings

23 that --

24         THE COURT:  Whether that's done by the committee or an

25 examiner --

1    MR. ECKSTEIN:  Correct.

2        THE COURT:  -- those are complex undertakings.

3        MR. ECKSTEIN:  Correct.  But the examiner will need to

4    be fully geared up.  And so we're mindful of the duplication.

5        THE COURT:  Let me just -- let me stop you for a

6    second.

7        Go ahead, Mr. Eckstein.  My hearing is at 12:45, so we

8    still have a little time.

9        MR. ECKSTEIN:  By the way, I was just given a note

10   that one case where an examiner was denied early in a case, in

11   a case that was certainly as prominent and complex as this case

12   is, the WaMu case, where Judge Walrath did deny the examiner at

13   the outset.

14       THE COURT:  And then later on, she changed her mind.

15       MR. ECKSTEIN:  She subsequently did appoint an

16   examiner, but I did want to make that point clear, because that

17   was a case where early in the case Judge Walrath denied the

18   examiner, and I think that that is an important precedent for

19   Your Honor.

20       Well, if I may complete my suggestion.

21       THE COURT:  Go ahead, please.

22       MR. ECKSTEIN:  I think the practical alternative that

23   we have -- and we floated this, because we did discuss this

24   issue before the hearing today.  If the -- if Your Honor

25   believes that the Court is constrained to appoint an examiner,

1   we think that certainly the "as is appropriate" language in the

2   case law gives the Court the flexibility to fix scope and other

3   similar limitations and parameters on an examiner.  What we

4   think would be the sensible alternative to having the committee

5   simply proceed as it's proceeding, would be to appoint an

6   examiner, who would be an individual, who would essentially be

7   charged with monitoring the committee's investigation.  The

8   examiner could deal with the committee and could deal with

9   other parties-in-interest and supervise the examination that

10  the committee is performing.  This would address the concern

11  Mr. Walper indicated, which is somehow the committee is

12  burdened by conflicts.  We don't believe that's the case.  We

13  believe that the committee is focused on maximizing value.  And

14  whatever intercreditor issues could affect how you split up the

15  value, the committee is not burdened by conflicts with respect

16  to maximizing the estate.

17          Nonetheless, if it's useful in a case of this size to

18  have a third party who can monitor the committee's

19  investigation, make sure it's being done timely, make sure it

20  is being done consistent with the scope that has been proposed,

21  make sure that it is being done with a process that is

22  consistent with what the Court is looking for, we believe the

23  committee could certainly work with an appropriate individual,

24  and we believe that the appropriate individual does not need to

25  duplicate the investigation.  An individual can become apprised

RESIDENTIAL CAPITAL, LLC, ET AL.                                107

1    of what documents are being produced, can be apprised of what

2    depositions are being taken or what interviews are being

3    conducted, without doing it, in a sense, in a parallel or

4    duplicate fashion.

5            At the conclusion of the committee's investigation,

6    that examiner can render a report as to the appropriateness and

7    efficacy of the committee's investigation.  And obviously, if

8    problems arise, there is an individual who is onsite who can

9    deal with the committee, deal with other parties-in-interest

10   and the Court, to remedy the problem without delay.  That would

11   avoid the need for an entire duplication of professionals, and

12   it would at the same time ensure that a report will be issued

13   that can address whether in fact the committee has conducted

14   the appropriate report.

15           Now, what's the benefit of that?  The benefit is

16   obviously (a) there's an examiner and so we can avoid the

17   question of whether or not the Court does or doesn't have to

18   appoint an examiner, (b) we will have an independent party in

19   the case who will oversee what is taking place, (c) while we

20   don't think this is something that should be ordered today, we

21   may have a party who is knowledgeable about the case and, in

22   the event the Court determines down the road that in fact there

23   are issues in the case, intercreditor issues and the like,

24   where the benefit of a third party, not so much an examiner but

25   more a mediator is needed, that person could be in a position

RESIDENTIAL CAPITAL, LLC, ET AL.                                    108

1   to play the role quickly and in an informed fashion.  And

2   examiners have played that role in other cases.  And while I

3   don't think we need to go there today, it does have the benefit

4   of having a person essentially standing by.

5           And so in some respects, as we've thought about the

6   alternative, and our first choice is we don't think the motion

7   needs to be granted but, if Your Honor is looking for a

8   solution where an examiner is appointed, we think that scope is

9   precisely consistent with the "as is appropriate", and we think

10  it is consistent with what Your Honor has heard from all of the

11  parties-in-interest in this case, as to how we should proceed.

12          And the most important benefit:  At the end of the

13  day, what this case is going to require is it's going to

14  require maximizing the prospects of negotiating a consensual

15  plan.  And as I indicated a few weeks ago, this plan is

16  premised upon a nonconsensual third-party release.  And I

17  understand that that is going to be a tall order without

18  substantial consent from creditors in this case, and even with

19  substantial consent.

20          THE COURT:  Well, the -- we're a along way from having

21  to reach those issues.  But is the proposal for nonconsensual

22  releases -- it applies to stakeholders who might not even get

23  to vote on a plan.

24          MR. ECKSTEIN:  It applies to stakeholders who might

25  not get to vote, that is correct, Your Honor.  But it

1    clearly -- it involve --

2            THE COURT:  And how does the committee represent them?

3            MR. ECKSTEIN:  Your Honor, I'm not suggesting at the

4    moment that we can.  What I'm suggesting is that without a

5    negotiated plan of reorganization, I don't believe that it is

6    realistic to anticipate a successful reorganization in this

7    case, in the near term.  And we're submitting that the process

8    that's in place right now, certainly not ensuring a successful

9    plan in this case, but I think the sense of the parties is that

10   the process that's been put in place in this case is a process

11   that at least creates the context for potentially negotiating a

12   plan that, whether it reaches every party in this case, I don't

13   know, but it certainly has the best chance of reaching the

14   largest number of significant stakeholders.  And as Your Honor

15   obviously knows, if parties consent, it's a lot easier to

16   approve a release with respect to those parties.

17           And so I'm simply positing that this is a case where

18   the structure that is in place is the structure that has the

19   best chance of efficiently and promptly getting the parties to

20   a point where either they can reach an agreement or not.  And

21   if they're not going to reach an agreement, Your Honor will

22   deal with a nonconsensual plan.  But this process has the

23   chance of getting us the opportunity of getting to a successful

24   place.

25           So I've laid out what I think is an alternative.  And

1   we in fact have crafted an order that we think reflects that.

2   And while we're not urging the Court to adopt our option (b),

3   in anticipation of what I thought might be Your Honor's

4   concerns, I thought through an answer which hopefully is useful

5   to the Court.

6             THE COURT:  You obviously think it through, yes.

7             MR. ECKSTEIN:  So, hopefully that's useful to the

8   Court.  And I in fact have circulated that -- I've shown that

9   order to a couple of other people.  And we think that that is

10  an approach that Your Honor could take if you choose to go down

11  the road of actually appointing an examiner.

12            THE COURT:  Right.  Let me -- who else wants to be

13  heard in opposition to the motion?  I'm trying to get a sense

14  of how many people wish to be heard.

15            MR. BROWN:  Very briefly, Your Honor.

16            THE COURT:  Wait, Mr. Shore, you're going to be want

17  to be heard?

18            MR. SHORE:  Very briefly as well, Your Honor, yes.

19            THE COURT:  And you want to be brief.  All right, come

20  on up.

21            Mr. Shore, why don't you come on up now, because I do

22  have another hearing at 12:45, so --

23            MR. BROWN:  Your Honor, Judson Brown from Kirkland &

24  Ellis, on behalf of Ally Financial.  Your Honor, Ally

25  understands and welcomes an investigation into the pre-petition

1   transactions.

2               THE COURT:  You said you didn't care who did it.

3               MR. BROWN:  We don't, Your Honor.

4               THE COURT:  Okay.

5               MR. BROWN:  We expressed no preference.

6               THE COURT:  I got your position, then.

7               MR. BROWN:  And, Your Honor, we only filed a limited

8   objection to note two things, and that's -- there's no need for

9   duplicative investigations; and any investigation, whether it's

10  by an examiner or the committee here, Your Honor, should be

11  completed on a time frame to follow the debtor's proposed

12  schedule.  We've said all of that in our papers, and I have

13  nothing to add beyond those, Your Honor.  I only want to note a

14  few other points that we expressed in our papers, and that is,

15  if Your Honor's inclined to appoint an examiner in this case,

16  then we should focus closely on the proposed order by Berkshire

17  Hathaway in this case.  There are a couple of issues there that

18  at least Ally has with that proposed order; I want to flag two

19  of those for Your Honor.  First, Ally feels that it certainly

20  should receive a copy of whatever report an examiner issues in

21  this case, and that I think was just inadvertently omitted from

22  the proposed order.  Second and more importantly, though, Your

23  Honor, the proposed order, Berkshire's proposed order in this

24  case, is in our view overly broad.  There's a couple of

25  instances where Berkshire proposes an unfettered investigation

1   or unfettered access to documents and materials.  And from

2   Ally's perspective, Your Honor, that's problematic for the

3   following reason:  If Your Honor were to sign and approve in an

4   order an unfettered investigation or unfettered access, then

5   parties down the road may be limited in how they can deal with

6   discovery disputes.  We have no idea what discovery may be

7   coming down the road, Your Honor.  But to the extent that an

8   examiner serves discovery requests that Ally or any other party

9   wants to object to, they may feel, or the examiner may assert,

10  that they're in violation of a court order.

11          THE COURT:  Let me just -- let me stop you there.

12  Let's assume for the moment that I were to grant the examiner

13  motion.  In that sense, I don't view it any differently than

14  where the committee is undertaking its investigation.  I don't

15  intend to include, in any order I enter, limitations on the

16  ability of any party to object to a discovery request; that

17  would be true if the committee continues to go forward -- I

18  don't believe that the order I signed as to the committee

19  limits the rights of Ally or anybody else to object to

20  discovery that the committee is endeavoring to take.  I'll deal

21  with those discovery disputes as they arise.  There may be

22  different privilege issues or whatever, but I don't

23  contemplate -- the one thing that I must say from what Munger,

24  Tolles has submitted/Mr. Walper submitted, they wanted me to

25  basically write off anybody's rights to object on privilege or

1   any other grounds.  That isn't happening in any order I enter,

2   so that part you don't have to deal with.

3            MR. BROWN:  Perfectly, Your Honor, those --

4            THE COURT:  Okay, all right, let me hear --

5            MR. BROWN:  -- those were our only concerns.

6            THE COURT:  Who else wanted to be heard?  Mr. Shore,

7   you want to be heard?

8            MR. SHORE:  Briefly, Your Honor.  Chris Shore from

9   White & Case, on behalf of the junior secured notes.  Just want

10  to focus on one question you asked, which is how to exercise

11  your discretion here and what to do.

12           THE COURT:  If I have discretion.

13           MR. SHORE:  If you do.  And let me focus on what

14  Mr. Eckstein said as well.  What's coming out from

15  Mr. Eckstein, and I think from all of us, is that there's a

16  tension here between disclosure and the principles of

17  disclosure that are embedded in the Code, and consensus, which

18  is also to be fostered in 1104 and 1129, and the conflict

19  between those two.

20           We've been involved for months; we've had access to

21  the debtors; we've talked to the committee; we've had access to

22  Ally.  This case has made substantial progress, and we believe

23  that there's a real shot at peace.  As significant stakeholders

24  in this case, and pure-play secured creditors -- we're not

25  making a bid for the assets, like Berkshire has -- we have two

RESIDENTIAL CAPITAL, LLC, ET AL.                         114

1   concerns:  one, that if there's going to be an investigation,

2   whether by an examiner or by the committee, that it not

3   unnecessarily interfere with the settlement.  The problem with

4   an examiner motion is the examiner owes the duty to the Court

5   and to report to the Court good facts, bad facts.  That happens

6   irrespective of a settlement that's on the table.  We don't --

7           THE COURT:  I mean, all you have to look at is how

8   WaMu has progressed with respect to the settlement in that

9   case, and the complications that creates.  And at the end of

10  the day, Judge Walrath changed her mind about the examiner

11  issue.  So --

12          MR. SHORE:  So I think --

13          THE COURT:  -- careful what you ask for, you know.

14          MR. SHORE:  Right.  More facts are not necessarily

15  better and they're always bad for a deal with a settlement on

16  the table, because somebody's going to be either disappointed

17  or empowered by what an examiner says.

18          Second, we don't want the examiner to slow the process

19  down.  And we, as the junior secured notes group, have concerns

20  that the only party with an allowed claim coming forward to

21  seek an examiner is also a bidder in these cases.  We need to

22  make sure that the examiner process and the examiner's need for

23  additional time is a big distinction to the committee.  The

24  committee here owes a duty to the estate and can do what's in

25  the best interest of the estate as far as moving the process

RESIDENTIAL CAPITAL, LLC, ET AL.                    115

1   along and in not interfering with the settlement.  So whatever

2   may happen in another big case --

3        THE COURT:  Well, you keep talking about not

4   interfering with the settlement, but it's very important that

5   any investigation yield enough facts -- I mean, the 9019

6   standard for this Court to approve any settlement requires me

7   to have a fundamental understanding of the facts and the

8   arguments in support.  You don't try the issues in deciding

9   whether to approve a settlement.  But I need all that before

10  me.  And an examiner may be in a better position than the

11  parties to the settlement, to make sure I have all those facts.

12       So -- I mean, I have -- I understand your point,

13  Mr. Shore.

14       MR. SHORE:  Well, but you may or may not -- in the

15  context of a settlement embodied in the plan, you may or may

16  not need to address the 9019 issues, depending upon who's

17  coming forward and objecting.

18       THE COURT:  Mr. Shore, that's not my understanding of

19  the law, not as I've applied it in the past.  When a settlement

20  is included within a plan, I have to evaluate it, applying the

21  same standards that would apply in a 9019.  That is my

22  intention, unless someone absolutely persuades me that that's

23  inaccurate.  That's what I've always done, that's what I

24  understand the law to be, that's what's going to happen here.

25  If people disagree with that standard, they've got a burden of

RESIDENTIAL CAPITAL, LLC, ET AL.                                    116

1    persuasion.

2              MR. SHORE:  Just what I had said at the end was to the

3    extent the parties coming forward with an objection on it.  We

4    think that there's a great opportunity for a quick resolution

5    to this case and quick peace.  We just want to make sure that

6    whoever's doing the investigation is in the best position not

7    to interfere with that, and obviously provide Your Honor and

8    all parties-in-interest with the relevant information to assess

9    the settlement, which will be addressed both in the context of

10   a disclosure statement and then ultimately a confirmation.

11   What we don't to have happen here is have an examiner come out

12   with a report and throw the case into chaos.

13             So as far as exercising discretion, what Mr. Eckstein

14   said, and this is the first time we've heard it, of allowing

15   the examiner to shadow and come forward if there are problems,

16   that seems like a more workable solution than sending an

17   examiner off with counsel and an FA and all sort of other

18   advisors that are going to be necessary to assist in the

19   preparation of a report, holding up the process and then

20   ultimately leaving us all in a place we may not want to be

21   many, many months from now.

22             THE COURT:  All right, anybody else want to speak in

23   opposition?  Quickly.

24             MR. MOLONEY:  I'll be very brief, Your Honor.  Tom

25   Moloney, Cleary Gottlieb Steen & Hamilton, on behalf of a bunch

RESIDENTIAL CAPITAL, LLC, ET AL.                                117

1  of noteholders who are senior unsecured; you know, if I read

2  their names, it's going to take up the time.

3              THE COURT:  No, spare me that.

4              MR. MOLONEY:  But I want to answer the legal question

5  Your Honor raised, which is, how do you read the statute giving

6  yourself discretion?  The way I read the statute is that the

7  "as appropriate" language gives you some discretion.  Then

8  there are two provisions.  The two provisions below tell you

9  when it's appropriate; the first is it's appropriate when it's

10 in the interest of creditors, any equity security holders, and

11 other interests of the estates.  And then it creates a

12 presumption that it's going to always be appropriate for five

13 million dollars of debt.  I think that's a reasonable way to

14 read the statute, and --

15             THE COURT:  Well, that's your argument.  The U.S.

16 Trustee says there's no discretion built in on the five million

17 fixed debt.

18             MR. MOLONEY:  Well, I think it creates a presumption.

19 But if you find that it's not in the interest of creditors and

20 the equity security holders or any other interests, as I think

21 you could easily find on this record, since the creditors have

22 overwhelmingly said they're all in favor of the same

23 investigation, that no one's really criticized the UCC as being

24 a very good group to take that on.  They have the process in

25 place.

RESIDENTIAL CAPITAL, LLC, ET AL.                                          118

1      If you find that it's not in the interest of anyone

2   there, then I think the earlier language tells you it's not

3   appropriate.  And so that gives you at least a logical basis

4   for your opinion to say, 'Look, I have' -- 'I'm only required

5   to do one that's appropriate.  There is a presumption it's

6   appropriate if it's over five million dollars of debt.  But

7   that presumption is not irrebuttable.  And if I find it's not

8   in the interest of creditors, equity holders and securities or

9   anybody else, I can stop.'  That would explain all the cases,

10  Your Honor.

11          THE COURT:  Okay, I have your argument.

12          Does anybody else wish to be heard in opposition?

13          MR. MOLONEY:  Thank you, Your Honor.

14          THE COURT:  All right, we're going to take a recess

15  until 2 o'clock.  I don't need to hear rebuttal.  I expect

16  probably to rule on the examiner motion when we come back.

17  We'll start out first thing with that; we'll then move on to

18  the bidding -- the sale procedures motion.  We will go -- let

19  me ask you this:  How many live witnesses is it anticipated I'm

20  going to hear on the sale -- with respect to the bidding

21  procedures?

22          MR. NASHELSKY:  I think, Your Honor, we may have one

23  live witness to discuss -- to describe the board's

24  consideration of the new bids and its determination to move

25  forward that happened Friday evening; that wasn't in affidavits

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    119

1  before that, obviously.  Other than that, everything is by

2  affidavit, Your Honor.

3  THE COURT:  Let me just -- to get everybody focused on

4  what's on the Court's mind, in your reply you did cite my

5  Metaldyne decision, and it is in some ways analogous, although

6  there the late-to-the-party bidder had a higher bidder, all

7  cash, as opposed to the prior stalking horse bidder that had

8  expired, but theirs was subject to financing, et cetera.  So

9  here, if I understand the state of play, Berkshire Hathaway has

10  a higher bid, all cash, versus subject to financing; lower

11  breakup fee; lower -- no expense reimbursement.  And the legal

12  issue is exercise of -- it's a business judgment standard --

13  exercise of fiduciary duty by the debtor.  But there are not

14  many cases where the higher and better offer -- and there is a

15  signed APA.  Berkshire signed an APA, just marked up the one

16  that was previously signed, changed the terms.  And so focus on

17  how I become satisfied that the debtor has fulfilled its

18  fiduciary duties in deciding to go forward with a proposed

19  stalking horse that's not the highest value, that is, has a

20  higher breakup fee, has expense reimbursement, versus this all-

21  cash offer.  So that is -- at least from the papers, that's

22  been the principal focus.  I know this has been a moving target

23  with continued negotiations.

24  So the other point I would raise that is on the

25  Court's mind, in deciding to approve any breakup fee, the issue

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              120

1   is generally whether it will foster a process that will lead to

2   the highest and best offer.  Where cases arise where there's

3   active bidding before any stalking horse has been selected, I

4   don't -- you're going to have to persuade me why I should

5   approve any breakup fee, at least for one that isn't the

6   highest and best offer.  I just want to tell you right now

7   those are the things on my mind.  I'm open to hear whatever you

8   have to say.  I do want to hear the evidence.

9         How many -- will anybody else be calling any

10  witnesses?  Mr. Nashelsky said one witness -- one live witness.

11  Mr. Walper?

12        MR. WALPER:  Thank you, Your Honor.  We may have one

13  rebuttal witness, depending on the testimony, Your Honor.

14        THE COURT:  Okay, anybody else intending to call any

15  witnesses?

16        Okay.  So when we come back, we'll finish on the

17  examiner.  We'll start on the bidding procedures.  I gather --

18  and I don't know the details of it.  I don't know whether I've

19  seen the latest in play.  I want to hear -- before we start to

20  hear the evidence, I want to understand, Mr. Nashelsky, what

21  is -- what's the deal I'm supposed to be looking at.  I

22  understand you've reached some agreement with the committee

23  that they've perhaps withdrawn their objection?  I don't know

24  if they've withdrawn -- so I just want -- we'll start -- when

25  we get to this, just lay out what the state of play is, and

RESIDENTIAL CAPITAL, LLC, ET AL.                    121

1  then we'll move into the evidence and I'll hear argument.  And

2  we'll stay as long as we need to tonight to finish this.

3            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

4            THE COURT:  All right, we're in recess.

5            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

6        (Recess from 12:48 p.m. until 2:05 p.m.)

7            THE COURT:  Can you hear now?  Now it's working.

8            Okay, as I indicated, I intend to rule now with

9  respect to the examiner motion.  I intend to issue a written

10 opinion, hopefully within the next few days, but an order will

11 be entered before then.  The motion by Berkshire Hathaway Inc.

12 for the appointment of an examiner, it's ECF docket number 208,

13 the motion is granted.  Briefly, while I disagree with the U.S.

14 Trustee that appointment of an examiner is mandatory in all

15 cases in which the debtor has fixed debts in excess of five

16 million dollars, I believe the "as is appropriate" language in

17 the introduction to 1104(c) provides the court with some

18 discretion, constrained discretion.  And under the facts and

19 circumstances of this case, the Court concludes that

20 appointment of an examiner is required and is appropriate.

21           The parties appear to agree, in the first instance, to

22 what the proper scope of the investigation should be, and at

23 least at this stage the Court will leave that intact.  But with

24 respect to scope generally, timing and budget, the Court is

25 going to defer determination of those issues as soon as an

1    examiner is appointed.  The Court directs that the examiner, as

2    soon as he or she has identified professionals that he or she

3    intends to retain, will meet and confer with a representative

4    of the other constituencies, certainly the major

5    constituencies -- the debtor's counsel; the creditors'

6    committee's counsel; Berkshire, who is the moving party on the

7    examiner motion in the first instance; the U.S. Trustee -- and

8    will confer regarding the issues of scope, timing, budget.  The

9    Court agrees that the investigation and report need to be

10   completed expeditiously.  I'm not setting a ninety-day time

11   limit on that now; that may be aspirational, it may be wholly

12   appropriate, but it's premature for the Court to mandate that

13   time until the examiner is in place and he or she confers with

14   the other constituencies.

15         With respect to Mr. Eckstein's argument that an

16   examiner should have a monitoring role and supervise the

17   committee's investigation, I decline to follow that guidance.

18   I think that close cooperation between the examiner and the

19   committee is required.  Duplication of effort is certainly to

20   be avoided.  There needs to be, to the fullest extent possible,

21   agreement or ground rules worked out ahead of time so that the

22   first time I'm seeing or hearing about it isn't when I get a

23   fee application from the committee.

24         There may be some areas where the same subjects will

25   be examined by the committee and by an examiner.  Communication

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      123

1   between the committee's professionals and the examiner will

2   hopefully limit that.  The U.S. Trustee obviously monitors fee

3   applications closely, and they will have -- may well have

4   something to say about it.  But I will assume, with the very

5   able professionals involved, that they'll be able to work out

6   satisfactory ground rules.  To the extent necessary, the Court

7   will have case management conferences that can address issues

8   as they arise, but I'm not hamstringing the examiner in what he

9   or she does.

10          So that will be the Court's ruling.  With respect to

11  the issue that Mr. Walper raised on privilege, I'm not deciding

12  any privilege issues or any objections.  If the examiner serves

13  subpoenas on parties, if they're not able to satisfactorily

14  work it out, those can be raised in the ordinary fashion with

15  me and I'll resolve discovery dispute as they arise.  But you

16  all ought to confer about the precise form of the order that

17  will be entered.

18          I assume, Ms. Davis, that you'll -- even before the

19  order is in place, that you'll move forward expeditiously to

20  select an examiner.

21          MS. DAVIS:  I will, Your Honor.

22          THE COURT:  Thank you very much.

23          Okay, let's move forward with the sales procedure

24  motion, Mr. Nashelsky.

25          MR. NASHELSKY:  Thank you, Your Honor.  Larren

RESIDENTIAL CAPITAL, LLC, ET AL.                    124

1  Nashelsky from Morrison & Foerster, on account of -- on behalf

2  of the debtors.

3          Your Honor, Your Honor posed a couple questions before

4  we took a break, and I will come back to those.  But I thought

5  it'd be helpful to just start with a little bit of background

6  and level-set where we are, and I think that will help the

7  Court understand.  By way of background, we believe that these

8  sales are the cornerstone of these Chapter 11 cases; they

9  represent the debtor's best, and maybe only, viable means of

10 preserving and maximizing value.  They're the product of

11 significant discussions with various governmental entities,

12 many of whom are here today, many of whom gave input on the

13 process and on how we should move forward.  They're also the

14 product of a careful marketing process and a stalking horse

15 arrangement that we negotiated with Nationstar as to the

16 platform and AFI as to the --

17         THE COURT:  You know, but sometimes people come late

18 to the party.  When I read your reply and the supplemental

19 Greene declaration, it was -- I'll tell you quite honestly, I

20 saw this sort of this grudging that you think that Berkshire,

21 because they weren't willing to play your game -- the debtor's

22 game at the outset in the pre-petition marketing, that you

23 don't want to let them under the tent now, even though they may

24 have a higher bid.  And that seemed rather odd to me, frankly.

25         MR. NASHELSKY:  So, Your Honor, I think process

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    125

1  matters.  I don't believe what we ran was a game.  I believe we

2  ran a process.  I believe we looked at quantitative and

3  qualitative factors in selecting a stalking horse.  I don't

4  think a breakup fee alone is a factor that should control

5  whether the sound business judgment of the debtors determine to

6  go with one stalking horse or another.

7          THE COURT:  Do you agree that Berkshire has the higher

8  dollar bid --

9          MR. NASHELSKY:  No, I --

10          THE COURT:  -- at the present time?

11          MR. NASHELSKY:  No, I do not, Your Honor --

12          THE COURT:  Okay.

13          MR. NASHELSKY:  -- at this time.  And I think, Your

14  Honor, there were two points; let me jump to them now, because

15  you're asking.  There is no financing contingency in the

16  Nationstar bid.  They have arranged financing, but there are

17  two public compan --

18          THE COURT:  Well, they got a highly confident letter.

19          MR. NASHELSKY:  No, no, they have financing.  They

20  have two public companies who are on the hook for the entire

21  purchase price.  There's no out if the financing doesn't come

22  through.  The two public companies have to come through with

23  the entire financing if their financing doesn't come through.

24  It's not a situation like Metaldyne or others where there are

25  outs here in comparison.  Berkshire may have all cash, but it's

1  the same purchase price with the same outs that Nationstar --

2  they signed the same APA.  So I just want to be clear, there

3  isn't a financing contingency.

4         You know, one of the things as we came into this case,

5  and I just think it's really important, Your Honor, is, without

6  a stalking horse, we would not have been able to get the DIP

7  financing we got, we would not have been able to get parties

8  supportive of the process, including the GSEs, certain trustees

9  and the junior secured bonds and Ally, to go forward with us

10 with a filing.  We would have ended up getting, if any DIP

11 financing, very poor DIP financing, and it would have led to a

12 quick liquidation.  The DIP financing was critical to give us

13 time.  And as you heard in the DIP financing discussions, the

14 DIP financer required there be a sale that would be the basis

15 of repayment of the DIP.

16        So with that we embarked on a process.  We understand

17 that -- we're not holding a grudge that Berkshire arrives here

18 late.  In fact, we want them here, and we want them to be an

19 active part of the process.  However, we ran a stalking horse

20 process; it created value in setting up the framework of the

21 deal.  We had no framework.  We had a bunch of assets.  We

22 spent a lot of time, with Nationstar, coming up with what will

23 the assets look like, how will we structure them, what will be

24 the issues.  We went down to the GSEs with them in Washington

25 and said, will you be comfortable if we file for bankruptcy and

1   we sell assets?  And they said maybe.  And we said -- they said

2   it depends on who the buyer is.  We spent time with them in

3   Nationstar.  Now, I'm not here to tell you that they say,

4   "We're signed off on Nationstar.  They're good.  They're the

5   only one we'll take."  Not at all, Your Honor.  What I say is

6   that Nationstar spent a lot of time doing diligence, they spent

7   a lot of time with the company, they got comfortable with the

8   assets, they understand the business, and they understand the

9   subtleties and complexities.  There are outs in the APA, like

10  there are outs in any APA.  We need GSE consent.  We need other

11  things to happen.  Those exist no matter who the buyer is.  And

12  the debtor spent time to get comfortable that Nationstar would

13  close, that these outs were understood by Nationstar, they

14  understood the risks that went along with them, and they were

15  willing to go forward.

16          THE COURT:  Just -- highest price is not -- clearly

17  not determinative.

18          MR. NASHELSKY:  Um-hum.

19          THE COURT:  But answer me this question:  From the

20  papers I read, it appeared that as of this weekend the higher

21  price was the Berkshire price.  Is that correct or not?

22          MR. NASHELSKY:  No, that's not correct, Your Honor.

23  The bids were identical.  The only --

24          THE COURT:  I thought there was a fifty million dollar

25  difference.

RESIDENTIAL CAPITAL, LLC, ET AL.                    128

1    MR. NASHELSKY:  Not as of -- I want to be clear

2    because things are moving fast, and that's why process is

3    important, Your Honor, and that's why we're struggling here.

4    As of Friday when we met with the committee and Nationstar, and

5    we got some concessions for them on breakup fee, expense

6    reimbursement and timing, as of that Friday, purchase price was

7    identical, Berkshire was at twenty-four million dollar breakup

8    fee, Nationstar was at seventy-two million.  Nationstar came

9    down thirty million dollars to forty-two million; they dropped

10   their expense reimbursement in half from ten to five, and they

11   gave an additional thirty days for the process, which was

12   important to the creditors' committee and other constituents.

13   Price was identical.

14        We received at 12:15 this morning an e-mail from

15   Berkshire's counsel with a new proposal.  Wasn't the proposal

16   that they put in their papers last Monday when deadline hit.

17   It was a new proposal.  That proposal now has a bid that is

18   fifty million dollars higher than their original bid.  But that

19   only came up early this morning.  And so at the time that we

20   made --

21        THE COURT:  On all other terms being the same?  In

22   other words, all other terms proposed by Berkshire, they've

23   raised the proposed purchase price by fifty million dollars

24   above where Nationstar was, correct?

25        MR. NASHELSKY:  That is correct, and they clarified --

1  because it wasn't clear, at least as we understood it, they

2  clarified that the overbid would be five million dollars for

3  overbids after the first bid.  So purchase price -- breakup

4  fee, expense reimbursement, not overbid.

5          So that's what came in at 12:15 or so this morning.

6  It's really hard to run a process when, at the last minute,

7  bids come in after the board's met.  Let me --

8          THE COURT:  You know, sometimes some of my colleagues

9  have wound up having auctions in their courtroom for the right

10  to be the stalking horse bidder, because you've accomplished --

11  it may be that Nationstar has facilitated a very lucrative --

12  you know, a very good process, because before there's been a

13  stalking horse approved by this Court and bidding procedures

14  approved by the Court, you've had very active bidding, which is

15  what raises the question in my mind about why am I going to

16  approve a breakup fee while this auction for the right to be

17  the stalking horse is going on?

18          MR. NASHELSKY:  Well, it's interesting you say that,

19  Your Honor, but the standards for a breakup fee are that the

20  breakup fee enhance, not hamper, bidding.  So now we have a

21  breakup fee.

22          THE COURT:  You don't yet.

23          MR. NASHELSKY:  We have a breakup fee in place that

24  people are bidding against, right?  It's not that people didn't

25  show up to bid.  We have somebody bidding, even with the

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1   structure we have in place.  And what we worry about is, if you

2   end up running a mini-auction today, right, it is possible, and

3   we're very concerned about it, that you will harm the future

4   auction's process, because parties will say one of two things:

5   We might not have people show up; people may say, it's an

6   auction but, after that, if I want to show up later in court

7   and bid more, I can do that because that was what was allowed

8   earlier.

9           So we worry that process does matter.  And the board

10  really deliberated on the stalking horse that they spent many

11  months with.  We had another board meeting on Friday after we

12  had the discussion with the creditors' committee and Nationstar

13  and got the revised bid, and we walked through, and looking at

14  the qualitative and quantitative factors of the stalking horse

15  bid by Nationstar, which includes things -- like Berkshire's

16  not done -- as far as we know and as far as they've told us,

17  they've done no due diligence.  They've not met with

18  management.  They've not with the GSEs.  They've not spent any

19  time to get us comfortable that they understand what they're

20  getting into, they understand the subtleties of it and they

21  give us comfort.  Berkshire can close, Your Honor.  There's no

22  question, from a dollar amount, they can close.  No one's

23  questioning that.  But the point is it does say something to

24  us, and we've run a process, that they've spent no time.  They

25  never called us.  They didn't call us before the bid last

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    131

1    Monday.  They didn't call us before the bid this morning.  They

2    didn't spend any time with us to try to help our board get

3    comfortable with qualitative factors as well as the

4    quantitative.  They relied solely on quantitative factors and

5    really solely on the breakup fee.  We don't think that --

6              THE COURT:  Not solely.  They -- I mean, price.

7              MR. NASHELSKY:  Well, that as of this morning, but

8    there is -- the problem is we're jumping into what they filed

9    this morning as -- sorry, what they sent by e-mail this

10   morning, as opposed to the process and why we selected what we

11   did.  We can defend we selected what we did.  And there is --

12   we have a new proposal in response to the 12:15 proposal of

13   Nationstar.  But --

14             THE COURT:  Wait, I'm confused.  I thought --

15             MR. NASHELSKY:  Sorry.

16             THE COURT:  -- at 12:15 a.m. you got the Berkshire --

17             MR. NASHELSKY:  Berkshire.  Sorry.  We have a new

18   Nationstar proposal in response to the 12:15 Berkshire.  But

19   it's important to the debtors that process matters.  And we are

20   worried about having a mini-auction here, because we feel, if

21   we do have a mini-auction here and we do ignore the process and

22   ignore what's been done, that this may be the last bidding we

23   have, and that's the last thing we want.

24             So let me give you the new offer, because I think it's

25   important.  Nationstar's proposal --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    132

1          THE COURT:  This was as of what time?

2          MR. NASHELSKY:  This would have been during the break,

3     Your Honor.  So --

4          THE COURT:  And has the board met to consider this

5     one?

6          MR. NASHELSKY:  The board has not met to consider this

7     one, but we have three of the board members here with us.

8          THE COURT:  Okay, let me hear it.

9          MR. NASHELSKY:  It is a fifty million dollar higher

10    purchase price, matching Berkshire Hathaway's purchase price;

11    it's a twenty-four million dollar breakup fee, matching

12    Berkshire Hathaway's breakup fee; zero expense reimbursement,

13    matching Berkshire's expense reimbursement; and a five million

14    dollar overbid, matching Berkshire Hathaway's overbid from

15    their 12:15 e-mail.

16          Now, Your Honor, the board believed that the

17    qualitative and quantitative factors made it clear that

18    Nationstar should be the stalking horse.  That still holds true

19    as from the bid they looked at on Friday.  This is actually

20    better from the debtor's perspective, because Friday the

21    breakup had an eighteen million dollar difference and there was

22    five million expense reimbursement.  So those two pieces, the

23    board felt, weren't enough to warrant Berkshire getting the

24    stalking horse bid, given all the qualitative factors.  Now

25    those are off the table and the debtors believe that the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      133

1  Nationstar bid is equal to but is the better bid, highest --

2  don't want to use economics, but it is the higher and better

3  bid for qualitative reasons.

4          I think, Your Honor, that the evidence will show that

5  we ran a robust process.  We spent a lot of time getting to a

6  point where we felt comfortable that we had a stalking horse

7  who understood the business and who would be in a position to

8  get GSE approval.  Berkshire Hathaway may well get GSE

9  approval, Your Honor; no one's sitting here saying they can't.

10 What we're sitting here saying is we haven't had one discussion

11 with them and, as far as we know, they haven't had one

12 discussion with the GSEs about that approval, and that scares

13 us, because it's important, and that's why we ran a process.

14         We may have been the first mortgage company ever to go

15 to the GSEs months before we filed, risking them pulling our

16 servicing by telling them -- by saying to them, we need you to

17 work with us in this process.

18         THE COURT:  Let me see -- who owns seventy percent of

19 your parent, and who owns the GSEs?

20         MR. NASHELSKY:  Ah, fair point, Your Honor, but you

21 know -- you've worked with government entities before.  You

22 make that comment as if they all work together.  They don't

23 always work together, we can assure you.

24         But part of it was they wanted to get comfortable with

25 who would be servicing their loans.  And we spent a lot of time

RESIDENTIAL CAPITAL, LLC, ET AL.                                    134

1    to do that.  And if Berkshire had been in the process, we

2    probably could have done that with them as well and gotten

3    comfortable; they chose not to, and we'd like them to show up

4    starting tomorrow morning at the -- you know, during the

5    process and at the auction, and bid this thing for as high as

6    it can go.  But we think it's important for the process, and as

7    we sit here today with the bids we have, to go forward with the

8    stalking horse that the board decided in its sound business

9    judgment was the higher and better offer.

10           THE COURT:  Just talk briefly about the legacy

11   portfolio --

12           MR. NASHELSKY:  Sure.

13           THE COURT:  -- and the LI bid.

14           MR. NASHELSKY:  The legacy portfolio, Your Honor, just

15   to step back, originally Nationstar was bidding on both the

16   platform and the legacy portfolio.  They had a 1.6 million

17   dollar bid --

18           THE COURT:  Billion.

19           MR. NASHELSKY:  -- on the -- sorry.  Thank you.  --

20   1.6 billion dollar bid on the legacy portfolio, but it required

21   stretch financing.  We went to AFI and said, would you provide

22   it?  It's below market, and they said no.  We went back to

23   Nationstar and said, what would you pay without stretch

24   financing?  They said 1.4 breakup fee on bid protections.

25           We -- in further discussions with Ally, we said, would

1  you be interested in buying these?  And they said, well, under

2  a plan, we'd buy it for a billion-six, but they didn't really

3  want to bid in the 363.  And we said, well, that doesn't do us

4  any good.  We need certainty.  We need a 363 bid.  So they came

5  back and said, okay, we'll give you a billion-four under a 363.

6          Nationstar was happy to have that bifurcated and have

7  someone else buying the whole loan portfolio.  Part of what got

8  them to bid on it in the first place is the debtor saying, "You

9  got to take everything.  We're not going to be left with odds

10  and ends that may cause us to have lower prices.  You're here;

11  buy everything," and they were willing to.

12          So AFI, being an insider, no breakup up, no expense

13  reimbursement, no protections whatsoever, they set a floor.

14  They set what we consider a free floor, because anybody who

15  bids over -- so we have -- Lone Star and Berkshire Hathaway

16  show up; they each are willing to bid different numbers.  Lone

17  Star plays around with the APA a little bit; Berkshire Hathaway

18  doesn't.  But they both have breakup fees.  And from our

19  perspective, we have a free floor; no reason to pay a breakup

20  fee if people are going to bid, because it's just going to come

21  off the backend.

22          So it was the -- it's the debtor's view that we should

23  stay with the bid from AFI.  We got rid of any connection to a

24  plan, any linkage to the 1.6.  Anything that confused people or

25  anything that people were concerned about, we got rid of.  We

RESIDENTIAL CAPITAL, LLC, ET AL.                                    136

1   start at 1.4 in a 363 sale, and the next bid over it will be

2   whatever the bidding increment is; I believe it's five million

3   dollars or maybe less, Your Honor.

4        And so we believe that that is the highest and best

5   offer.  And to not have a stalking horse -- sorry, not have a

6   breakup fee is a luxury, because they were --

7        THE COURT:  I don't see everybody pounding the table

8   about the LI legacy loan portfolio bid, let's put it this way.

9        MR. NASHELSKY:  So, Your Honor, a couple other points

10  I just want to make.  I mean, I think that we have provided

11  substantial evidence through the declarations that Your Honor

12  has seen, and other evidence that we will put in today that's

13  already been provided to the Court, that this was a sound

14  business decision by these debtors to do this.  This was not --

15  we didn't exclude anybody.  We invited Berkshire; they chose

16  not to.  I'm not holding it against them; it's just showing up

17  at the --

18       THE COURT:  I'm not sure you're not holding it against

19  them, but it is what it is.

20       MR. NASHELSKY:  Your Honor, we would love their money

21  and we'd love it tomorrow, and -- because tomorrow we can spend

22  time with them and get through the qualitative factors; we can

23  get through an understanding.  They can meet management.  They

24  can spend time with the GSEs.  They can understand -- they've

25  done no diligence.  It doesn't give you comfort that just

1   because they have a lot of money, that they understand what

2   they're getting into.  And this is a complicated business.  And

3   Nationstar spent a lot of time.  Other bidders will spend a lot

4   of time, and we will hope Berkshire will spend a lot of time.

5          When it comes to the breakup fee, we believe the

6   reduced breakup fee now that is being proposed, you know, I

7   think it seems to me that this easily meets the Integrated

8   Resources three-part test.  The relationship is not tainted,

9   there was no --

10          THE COURT:  So, just hypothetically --

11          MR. NASHELSKY:  Yeah?

12          THE COURT:  -- if Berkshire's lawyer stands up there

13   and says we'll go fifty million and higher, what then?

14          MR. NASHELSKY:  The debtors' position, Your Honor, is,

15   first and foremost, process matters.  It has to matter.

16   Otherwise, we don't believe we're going to have an auction

17   later.  And if -- and a little bit of bankruptcy policy because

18   I think it's important.  If courts start allowing people to

19   show up and take out not just a situation where there's been a

20   stalking horse for an hour or someone throws in a bid, but

21   where months of planning has gone in, there's been a thorough

22   process, there has been diligence done to get the debtors

23   comfortable that there can be a deal that's going to be closed

24   and there is a determination and a sound business judgment that

25   the party can close, there are no outs in the contract on

RESIDENTIAL CAPITAL, LLC, ET AL.                    138

1   financing, on diligence, that that should hold a lot of weight

2   with the court and that if other people want to bid, there's

3   nothing wrong with showing up in an auction.

4           The party that's not selected as the stalking horse,

5   it's not the end of the game; it's just the start.  And if the

6   breakup fee is reasonable then there really is no impediment to

7   them being a bidder here.  And so we would say that the process

8   matters.  And we would ask the Court to continue to approve

9   Nationstar under these revised terms as the stalking horse

10  because, Your Honor, in theory, it never ends then.  And

11  running a mini auction before your auction sounds great because

12  it sounds like you might have two auctions.  Our theory is you

13  may only have one.  And you may only have one with two parties

14  without the benefit of other parties because we don't know how

15  parties will react to a stalking horse bid of a party that

16  didn't do any diligence and hasn't engaged at all with the

17  debtors.  And we want a robust process.  We want parties to

18  engage.  We want parties to get information.  We want parties

19  to talk to the GSEs and talk to other counterparties.  And we

20  believe that a process is important for that and the sanctity

21  of the process matters.  We've run it very carefully.  We've

22  involved parties all along the way.  And we think at the

23  eleventh hour there was an objection deadline.  They filed a --

24          THE COURT:  Objection deadline doesn't stop somebody

25  from bringing in a higher bid.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    139

1    MR. NASHELSKY:  It doesn't, Your Honor, but there

2    needs to be a process as well.  Otherwise, if they come in with

3    a higher bid and we then have to go back to Nationstar, then we

4    have to go back to our board.  And this process could never

5    end.

6            THE COURT:  Do you have to go back to your board now?

7            MR. NASHELSKY:  We don't believe we do, Your Honor,

8    because --

9            THE COURT:  Why not?

10           MR. NASHELSKY:  -- we belie -- because they approved

11   the Nationstar bid when the bidding increment was eighteen

12   million -- sorry -- the breakup fee was eighteen million higher

13   and the expense reimbursement was five and the dollars were

14   matching.  We're at the same point with the dollars matching

15   now; those two are matching.  We have three of the board

16   members here and we're comfortable that this is within what the

17   board would approve.

18           Your Honor, we just believe that this process has been

19   run.  It's been thorough.  Nationstar has done everything you

20   want a stalking horse to do and --

21           THE COURT:  I'm not questioning that.

22           MR. NASHELSKY:  No, I understand.  But to then say

23   you're going to take a higher bid at the last minute from

24   someone else is going to discourage people from --

25           THE COURT:  Well, I start with -- and I said this.  I

1    don't read the law as saying that you have to take the highest

2    dollar bid.  But that is not the answer -- that's not the final

3    answer.  Okay.  There's more that is required than that.

4              MR. NASHELSKY:  And we think the evidence will show

5    that there's qualitative factors that the debtors took into

6    consideration and that are very relevant here and weigh heavily

7    in the favor of Nationstar.

8              THE COURT:  Thank you.  So let me --

9              MR. NASHELSKY:  Sure.

10             THE COURT:  Before we get on with the testimony, let

11   me briefly hear from the committee, the U.S. trustee and very

12   briefly from Berkshire as well.  Does anybody from the

13   committee want to speak to this?  The number keeps coming up,

14   Mr. Eckstein.

15             MR. ECKSTEIN:  Your Honor, I'm inclined to defer to

16   Mr. Walper because I see he wants to get up and to speak.

17             THE COURT:  Well --

18             MR. ECKSTEIN:  But I'm happy -- if you'd like, I'll

19   speak first, if you prefer.

20             THE COURT:  Do you want to speak last?  I don't

21   really -- go ahead.  Come on.  Let me hear from you.

22             MR. ECKSTEIN:  Your Honor, just to provide a little

23   more color to the dynamics here, this has been an extremely

24   complicated and dynamic set of transactions over the last

25   several weeks as Your Honor has seen from the pleadings that

1  have come in.

2          The committee initially filed an objection to the

3  bidding procedures at a time when we had no other bids.  We had

4  Nationstar.  And the committee was concerned not so much about

5  the process, although we did take a deposition of the debtors'

6  financial advisor in connection with the auction process.  And

7  one could always question whether or not all the parties were

8  identified.

9          But the biggest concern was that the transaction ended

10  up with a combination of break fee, expense reimbursement and

11  bidding increments that was approximately 105 million dollars.

12  And it contemplated a ninety-day process for two separate

13  assets that had to be run together and we had the additional

14  complexity that the HFS assets were linked directly to the plan

15  process and the plan support agreements and had this toggle bid

16  from AFI that we felt was confusing and was likely to

17  discourage rather than encourage bidding.

18          So we saw many problems with a process and were

19  concerned that assets that we thought had significant upside

20  value were not going to be subject to meaningful bidding

21  because of the various hurdles in place.  And we did file that

22  objection.  And as is often the case in complex cases,

23  committees file objections, want better terms and oftentimes,

24  the court looks at the committee at the hearing and says, do

25  you have an alternative.  And very often, the committee does

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    142

 1 | not have an alternative.

 2 |         THE COURT:  Now you do.

 3 |         MR. ECKSTEIN:  And in those cases, it's not clear what

 4 | happens.  Today we do.

 5 |         THE COURT:  But now you have an alternative.

 6 |         MR. ECKSTEIN:  That's correct.  As Mr. Nashelsky said,

 7 | on Friday, when the bids were equal except for the break fee,

 8 | we did meet with Nationstar and Nationstar made very

 9 | significant modifications.  And the committee met and was

10 | prepared to support the modified Nationstar transaction based

11 | upon considering a variety of factors including the debtors'

12 | position that it wanted to go forward with Nationstar and was

13 | willing to essentially go forward with Nationstar despite the

14 | fact that the Berkshire bid was financially more attractive

15 | even Friday, but not in terms of price.  It was just a

16 | differential in terms of break fee and expense reimbursement.

17 | The committee felt that we had made significant improvements

18 | and including extending out the time period and we had made

19 | significant modifications with AFI to, in our view, eliminate

20 | any tilt to that bid because the indications we had from

21 | various parties, including two parties who had submitted bids

22 | or indications of serious interest, that there is going to be

23 | interest in the HFS assets.

24 |         As Mr. Nashelsky indicated, over the weekend, there

25 | has been very significant modifications and a fifty million

RESIDENTIAL CAPITAL, LLC, ET AL.                                143

1   dollar increase from Berkshire, in the committee's view, was a

2   material change.  And it was so material that it did cause the

3   committee this morning to have a call because we did get the

4   information last night.  We had a call this morning and the

5   committee seriously discussed the -- essentially jettisoning

6   what was agreed to on Friday.

7          Over the lunch period, as Mr. Nashelsky indicated,

8   Nationstar has now indicated that they are prepared to increase

9   their price and reduce their break fee and reduce their

10  expenses which, in our view, obviously is much better.  This is

11  a materially better dynamic whether we go with Berkshire or

12  Nationstar.  But the committee does agree with the debtor that

13  process is important.  The committee has participated in this

14  process.  The committee has put its credibility on the table in

15  terms of seeking and obtaining improvements.  And we've

16  indicated to Nationstar -- and I haven't spoken to Berkshire

17  because we, frankly, like both of them as bidders -- but we've

18  indicated to Nationstar that we view their improvement as

19  material and the committee would be comfortable supporting the

20  Nationstar proposal as modified and shares the debtors' view

21  that there is a value in the process.

22         We also questioned what is going to happen if Mr.

23  Walper stands up and submits a materially improved bid.

24         THE COURT:  Let's see if he does before I have to --

25         MR. ECKSTEIN:  And that'll be the next shoe.

RESIDENTIAL CAPITAL, LLC, ET AL.                    144

1   THE COURT:  -- before you have to answer that

2   question.

3        MR. ECKSTEIN:  But right now, Your Honor, knowing what

4   we know right now, we are comfortable supporting the

5   modified -- the improved Nationstar transaction.  I'll come

6   back to the HFS assets possibly later, if you want me to,

7   because we have separate views on those.

8        THE COURT:  All right.  Thank you.

9        MR. NEIER:  Good afternoon, Your Honor.  David Neier

10  on behalf of Fannie Mae, also owned by the government.  Your

11  Honor, with Mr. Walper's permission, I thought I'd address the

12  Court before he did and just let you know that as far as Fannie

13  Mae is concerned, it's not too late.  If we were to say the

14  opposite, there would be no need for an auction since we only

15  met with Nationstar and no other bidder.  So obviously, the

16  better way to go is just say it's not too late.  We don't think

17  that that's a qualitative difference that should be a part of

18  the Court's decision.

19       THE COURT:  I don't understand what you mean it's not

20  too late.

21       MR. NEIER:  It's not too late for other bidders to get

22  in the game.  We're looking forward to a robust auction.

23       THE COURT:  That's what an auction is about.

24       MR. NEIER:  Yes.

25       THE COURT:  The question for today is do I --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    145

1          MR. NEIER:  It's not too late for somebody to get

2    Fannie Mae approval to be a servicer, a qualified servicer in

3    this case.

4          THE COURT:  Do you have a position with respect to the

5    now further revised Nationstar offer?

6          MR. NEIER:  You know, as high as it can go, whenever

7    it goes, is great for us and is great for all creditors in

8    these cases.  The point we're trying to make is that we're not

9    precluding anyone from bidding on the assets at any particular

10   time whether it's now before bidding procedures are approved or

11   at a robust auction which is what we want to see and which I

12   think a lot of creditors here would be interested in seeing.

13   So we don't think the qualitative differences that were alluded

14   to really matter much because we think we can go through our

15   process.  We think we can go through our process quickly to

16   reach the decision that somebody is a qualified servicer.

17          We think that what the people are bidding on here is

18   essentially a turnkey operation.  They're bidding lock, stock

19   and barrel and all the employees.  And obviously, the debtors

20   are a qualified servicer.  So we think the combination of

21   somebody who can originate the service loans with the same

22   employees and the same platform in mind and then going forward

23   with the full faith and credit of a qualified buyer behind

24   that, that's what you need to bid on this case.

25          THE COURT:  Thank you.

RESIDENTIAL CAPITAL, LLC, ET AL.                                146

1      MR. NEIER:  Thank you, Your Honor.

2      MR. WALPER:   Your Honor, Thomas Walper, Munger Tolles

3  & Olson, on behalf of Berkshire Hathaway.  Just a couple of

4  quick statements and then what everybody might be interested

5  in.

6      One, Your Honor, you've heard from the government just

7  then about how this step up or this lead with obtaining

8  approval is not really relevant at this time.

9      THE COURT:  That's not what he said, but go ahead.

10      MR. WALPER:  I didn't mean to mischaracterize what he

11  said.  But with respect to due diligence, which counsel argued

12  about, I think it's ironic actually.  Usually, when you're

13  negotiating deals, you're trying to find somebody to say

14  there's no due diligence, there's no due diligence, there's no

15  out.  Here's a case where you have a highly creditworthy

16  company that's agreed to pursue and close a transaction without

17  due diligence and a company whose reputation is so sterling

18  that the ramifications of walking away from a transaction would

19  have far greater ramifications --

20      THE COURT:  Well, this transaction -- I mean, the

21  highest price is not the only basis for a board deciding what

22  deal to approve even if it was a final offer, even if it was

23  the auction -- at the end of the auction.  Qualitative factors

24  do matter and they do count.  And the, what, 2.4 million

25  mortgages that are being serviced, the ability of whoever buys

RESIDENTIAL CAPITAL, LLC, ET AL.                    147

1  the assets to be able to service those mortgages, I think, is

2  relevant.  It's a factor.  It's not a deciding factor but Mr.

3  Nashelsky -- and we'll hear this -- I'll hear testimony about

4  it -- the debtor has explored Nationstar's ability to purchase

5  the assets, professionally run the business, service the loans.

6  Got to be a major concern to the GSEs whether whoever winds up

7  buying this servicing platform can, in fact, do what it's

8  supposed to do.  And so when your client hasn't been at the

9  party and hasn't explored, hasn't done the due diligence and

10 perhaps demonstrated its own capabilities, why isn't that

11 relevant to a decision by the Court today on which offer to

12 approve as the stalking horse bidder or, rather, not for me but

13 for the board of the debtor to exercise its business judgment

14 and decide we think, qualitatively, the right decision today is

15 to approve the Nationstar bid as the stalking horse?

16       MR. WALPER:  I appreciate that, Your Honor.  But as

17 Mr. Neier did say and what Berkshire Hathaway intends to do is

18 to take over the existing platform --

19       THE COURT:  The one that found its way into a Chapter

20 11 proceeding.

21       MR. WALPER:  Well, we could say all sorts of things on

22 why it found its way into Chapter 11 including its relationship

23 with its parent.  But that said, it is the case that they would

24 take over the existing qualified, with all the licenses,

25 platform.  And so it is anticipated that they shouldn't run

RESIDENTIAL CAPITAL, LLC, ET AL.                           148

1   into any issues with respect to getting an approval.

2         The debtor had said and the creditors' committee, as

3   well, had said that the last day to object was Thursday or

4   Friday and this has come late.  We did reach out to the company

5   and talked to the company last week.  And they said that they

6   weren't interested in moving.  They weren't interested in our

7   bid.  Then we talked to the creditors' committee who we've had

8   a consistent dialogue with, spoke to them late yesterday --

9         THE COURT:  My personal view is that objections to the

10  pending motion have a deadline that was operative.  Somebody

11  else wants to come in and put more money on the table, I don't

12  view the objection --

13        MR. WALPER:  And that's what we're willing to do.

14        THE COURT:  -- deadline as a bar to doing --

15        MR. WALPER:  And that's what we're willing to do.  We

16  did it late last night, Pacific time -- that would have been

17  9:15 but 12:15.  And you could see the dramatic change in the

18  Nationstar bid.  They matched where we went.  And we're

19  prepared to both increase the purchase price and reduce the

20  breakup fee, Your Honor.

21        And what is the most manageable way to try to move

22  this quickly because, at some point, there should be an order,

23  of course.  And perhaps the right thing to do is to repair to

24  some conference rooms and work with the debtor to improve this

25  bid to the point where it is the best and finest with respect

1  to those parties that are there now.

2          With respect to the whole loans, I'm not sure what was

3  stated on --

4          THE COURT:  This is the Ally --

5          MR. WALPER:  Yes.

6          THE COURT:  -- legacy portfolio?

7          MR. WALPER:  Legacy portfolio, Your Honor.  I think

8  that -- there wasn't a lot of time spent on that but I'm not

9  sure it was absolutely clear as to what Berkshire Hathaway is

10 willing to do.  Last night, in connection with the offer with

11 respect to the origination and servicing platform, we did

12 increase our offer.  And we increased it by fifty million

13 dollars.  And we also agreed to reduce the breakup fee to ten

14 million dollars -- I think it was a three percent breakup fee

15 in our original bid -- and reduced the bid increments to five

16 million dollars as well.  So --

17         THE COURT:  Let me ask you this.  We'll come to the

18 Ally -- the legacy loan portfolio.  You're not -- since there's

19 no breakup fee, no expense reimbursement provision in the Ally

20 offer, you're not in any way prejudiced or disadvantaged if

21 Ally is approved as the stalking horse for the legacy

22 portfolio.  Do you agree with that?

23         MR. WALPER:  Well --

24         THE COURT:  You can come in and --

25         MR. WALPER:  -- Your Honor, as a --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    150

1    THE COURT:  -- keep bidding.

2    MR. WALPER:  -- bidder, probably not.  But what we are

3  is an option to these companies to have somebody who's truly

4  independent that's a bidder rather than --

5    THE COURT:  Yeah.  But you can -- the committee and

6  the debtors, they would love you to keep bidding with a higher

7  price.  As long as there's no -- this may not be the only

8  circumstance, but if there's no breakup fee and there's no

9  expense reimbursement, what Ally has done is locked in a floor

10  for that pool of assets.  Anybody can come in and as long as

11  you go above the bid increment -- it sounds like you've already

12  done that, right?

13    MR. WALPER:  Yeah.

14    THE COURT:  You said you've increased it by fifty

15  million dollars which was well above what the bid increment

16  would be if Ally is the stalking horse, correct?

17    MR. WALPER:  Yeah.  That's correct.

18    THE COURT:  Okay.  All right.  Thank you very much,

19  Mr. Walper.

20    MR. WALPER:  Thank you, Your Honor.

21    THE COURT:   Who else wants to be heard briefly?

22    MR. MOAK:  Your Honor, Paul Moak with McKool Smith on

23  behalf of Freddie Mac.  I just wanted to note for the record an

24  issue that you pointed out.  From our perspective, whoever

25  presents the highest bid is not necessarily the best.  We are

1   very much concerned, as Your Honor pointed out, with the

2   qualitative aspects of it right here today to pass on whether

3   Berkshire or Nationstar is the better servicer.  But candidly,

4   Freddie Mac looks at that issue as almost primary importance

5   and in our limited objection, which I don't know if we need to

6   get into right now, Your Honor, we wanted to make clear that

7   our due diligence process is not one that maybe can be run as

8   quickly as Fannie's counsel indicated that they can run theirs.

9   It's extremely involved and, to date, we have not had

10  meaningful interaction with either bidder.

11          So our process was going to start, I think, tomorrow

12  or maybe whenever this gets resolved.  And I want to make clear

13  for the record, the quality --

14          THE COURT:  You know, it's always an issue whoever the

15  stalking horse is.  If there's an auction and there's a higher

16  bidder and there are consents that are required --

17          MR. MOAK:  That's right.

18          THE COURT:  -- until you know who the successful

19  bidder is, you never -- it's --

20          MR. MOAK:  That's exactly right, Your Honor.

21          THE COURT:  You never know the answer.

22          MR. MOAK:  That's exactly right.  And I wanted to

23  point out one other issue.  There was a suggestion by the

24  debtors in their papers, well, Freddie Mac can start the day

25  after the stalking horse bidder is approved and do its due

RESIDENTIAL CAPITAL, LLC, ET AL.                                    152

1   diligence on all bidders.  Well, there may be dozens of

2   bidders.  That's really not a workable solution.  So we have an

3   issue with regard to timing, post-auction, pre-sale hearing

4   date that I'll address later if I need to.  But for purposes of

5   the current discussion, I just want to make clear that

6   qualitative issues are of extreme importance to Freddie Mac.

7           THE COURT:  Thank you.

8           MR. MOAK:  Thank you, Your Honor.

9           THE COURT:   Go ahead.  Brief response.

10          MR. FERDINANDS:  Good afternoon, Your Honor.  Paul

11  Ferdinands with King & Spalding.  I represent Lone Star U.S.

12  Acquisitions, LLC.  Your Honor, Lone Star is an investment firm

13  based in Dallas.  We previously purchased the CIT origination

14  and servicing platform.  We purchased over twelve billion

15  dollars of UPB whole loans in the last couple years.  We are

16  very interested in taking a look at these assets and being a

17  bidder.

18          We filed a response to the motion to approve bid

19  procedures because we were very concerned about the original

20  structure of the transaction with respect to the whole loan

21  pool.  And two things mainly:  one, the linkage between the

22  sale of the whole loans and the possible Ally release or

23  settlement; and second, confusion as to whether the sale is

24  going to be done under a plan or a 363 sale.  We've talked to

25  both the debtors and the committee.  We understand that the

RESIDENTIAL CAPITAL, LLC, ET AL.                                        153

1   whole loans are now going to be sold in a conventional 363

2   process and that the debtors have eliminated the possibility of

3   selling the whole loans under a plan for 1.6.  And based on

4   that, one of the things we had done is we had also offered to

5   serve as the stalking horse for the whole loan pool, but based

6   on the changes that have been made, we're comfortable

7   participating in the process with Ally as the stalking horse

8   bidder under the theory that we now have, we believe, a level

9   playing field.

10         But I would say that if the Court is inclined to

11  entertain, if you will, further bidding to become the stalking

12  horse for that loan pool, we have not had an opportunity to do

13  any due diligence.  And we were bidding without the benefit of

14  any due diligence.  There's an information imbalance.  I would

15  suggest to the Court that if we're going to go down that road

16  with respect to the whole loan pool, we be afforded a limited

17  period of time, maybe a week even --

18         THE COURT:  You agree that Lone Star would not be

19  prejudiced by having the Court approve Ally as the stalking

20  horse bidder for the legacy loan portfolio because there is no

21  breakup fee or expense reimbursement, correct?

22         MR. FERDINANDS:  That's correct.  And more

23  importantly, from our perspective, it's the structural changes

24  that have been agreed to.

25         THE COURT:  Yes.  I understand.  It's been separated.

RESIDENTIAL CAPITAL, LLC, ET AL.                                      154

1          MR. FERDINANDS:  Exactly.  And so, we're comfortable
2  now --
3          THE COURT:  All right.
4          MR. FERDINANDS:  -- proceeding.
5          THE COURT:  I think that's the sufficient answer.
6          MR. FERDINANDS:  Thank you, Your Honor.
7          MS. TOMASCO:  Your Honor, Patty Tomasco, Jackson
8  Walker, on behalf of Frost Bank.  I wasn't clear from your
9  announcement if you wanted to hear objections from
10 counterparties as to the cure provisions --
11         THE COURT:  Look.  I --
12         MS. TOMASCO:  -- at this point or if you wanted to
13 move forward on the actual bidding.
14         THE COURT:  I want to do --
15         MS. TOMASCO:  I do think the two are related.
16         THE COURT:  You do?
17         MS. TOMASCO:  I do.  Well --
18         THE COURT:  Look, in every other 363 bidding
19 procedures, cure amounts, cure procedures is the tail wagging
20 the dog because until you know who the successful bidder is and
21 which contracts they are going to assume, you don't -- I mean,
22 in every other case, all the cure stuff gets deferred until
23 later.  Do you disagree with that?
24         MS. TOMASCO:  I disagree because the debtor has,
25 frankly, overreached in the terms of its order.  And I've done

RESIDENTIAL CAPITAL, LLC, ET AL.                              155

1    a lot -- I mean, you don't me.  I'm from Texas.  But I've done

2    a lot of these myself.

3         If I could turn the Court's attention to page 13 of

4    the --

5         THE COURT:  Let's deal with the cure issues later on.

6    Okay?

7         MS. TOMASCO:  Your Honor, the bidders are bidding

8    against a proposal that purports to cut off future claims for

9    indemnity based on acts of the debtor.  That's a significant

10   risk shifting to the contract counterparties.

11        THE COURT:  I'll let you do final argument.  But right

12   now, I don't want to hear about the cure.  Okay?

13        MS. TOMASCO:  Thank you.

14        THE COURT:  Mr. Masumoto, the U.S. Trustee has filed

15   objections to the original bidding procedures motion.  The

16   landscape has changed fairly dramatically since then.

17        MR. MASUMOTO:  Yes, Your Honor.  Brian Masumoto from

18   the Office of the United States Trustee.  Your Honor has

19   indicated given the change in the landscape, with respect to

20   our objection regarding the breakup fee and the minimum bid

21   increments, obviously, I think that has been entirely laid to

22   rest.  And with respect to that aspect of our objection, we no

23   longer have a problem.

24        I don't know if Your Honor wants us to address the

25   other aspects raised in our objection.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    156

1      THE COURT:  Go ahead.  Just briefly now.  I'll give

2   you another chance later.

3      MR. MASUMOTO:  Briefly, Your Honor, I would like to

4   say that based upon conversations with the debtor, our

5   objections regarding the successor liability in Section 363(o),

6   I believe, has been resolved.  There's been proposed language.

7   We have some negotiations on that but I think that's been

8   addressed.

9      What does remain outstanding is our objection

10   regarding whether or not the consumer protection issues have

11   been adequately addressed regarding PII.  I believe the debtor

12   is prepared to provide some additional evidence to indicate why

13   an ombudsman is not necessary.  Frankly, from the position of

14   the U.S. Trustee, given the magnitude of the number of, as you

15   mentioned, 2.4 million homeowners and the magnitude of the

16   investments for most of these homeowners and the large part of

17   the personal information that's involved, it is our preference

18   that an ombudsman be appointed in this case.  But I'll leave

19   the debtor to its burden of proof on establishing why one is

20   not necessary in this case.

21      THE COURT:  Thank you, Mr. Masumoto.

22      Mr. Nashelsky, let's call a witness.

23      MR. NASHELSKY:  Yes, Your Honor.  I'll cede the podium

24   to my partner, Mr. Engelhardt, who will put the evidence on.

25      MR. ENGELHARDT:  Good afternoon, Your Honor.  Stefan

1  Engelhardt from Morrison & Foerster, proposed counsel for the

2  debtors.

3          For the debtors' case-in-chief on the sales procedure

4  motion, we would first offer the affidavit of James Whitlinger,

5  chief financial officer of Residential Capital LLC, in support

6  of Chapter 11 petitions and first day pleadings.  The

7  particular paragraphs within --

8          THE COURT:  Why don't you first -- I need to know the

9  ECF document number as well.

10          MR. ENGELHARDT:  That is ECF docket number 6, Your

11  Honor.

12          THE COURT:  Okay.

13          MR. ENGELHARDT:  The particular paragraphs, for the

14  Court's convenience, within that declaration that relate to the

15  sales procedure motion would be, if you will, the background

16  sections about the company in paragraphs 1 through 113.  And

17  then there were particular paragraphs directed towards the

18  sales procedure motion which are paragraphs 214 through 227.

19          THE COURT:  Okay.  Are there any objections to the

20  Court admitting in evidence for purposes of the sales procedure

21  motion the Whitlinger declaration, which is ECF document number

22  6, paragraphs 1 through 113 and paragraphs 214 through 227?

23          Hearing no objection, those are admitted into evidence

24  for purposes of this hearing.

25  (Declaration of James Whitlinger, paragraphs 1-113 and 214-227,

RESIDENTIAL CAPITAL, LLC, ET AL.                                     158

1   was hereby received into evidence, as of this date.)

2          MR. ENGELHARDT:  Your Honor, the debtors would next

3   offer the declaration of Samuel M. Greene in support of the

4   proposed sale of the debtors' assets and the entirety of that

5   declaration would be relevant.  That is ECF docket number 63.

6          THE COURT:  Are there any objections to the Greene

7   declaration which is ECF number 63?

8          Hearing no objection, it is admitted into evidence.

9   (Declaration of Samuel Greene was hereby received into

10  evidence, as of this date.)

11         MR. ENGELHARDT:  The next declaration that we would

12  offer, Your Honor, would be the supplemental declaration of

13  Samuel M. Greene in further support of the proposed sale of

14  debtors' assets.  Again, the entirety of that declaration would

15  be relevant to this motion.  And that is located, ECF docket

16  number 375.

17         THE COURT:  Are there any objections to admitting in

18  evidence the supplemental Greene declaration which is ECF

19  docket number 375?

20         Hearing no objections, that is admitted into evidence

21  as well.

22  (Supplemental declaration of Samuel Greene was hereby received

23  into evidence as of this date.)

24         MR. ENGELHARDT:  The next declaration that we would

25  offer in the debtors' case-in-chief on the motion, Your Honor,

RESIDENTIAL CAPITAL, LLC, ET AL.                                159

1  would be the amended declaration of Peter Giamporcaro in

2  support of the sale of the Nationstar purchased assets without

3  a privacy ombudsman.  Again, it would be the entirety of that

4  declaration that is relevant to this motion.  And it is ECF

5  docket number 189.

6          THE COURT:  Are there any objections to admitting the

7  amended declaration of Mr. Giamporcaro which is ECF docket

8  number 189?

9          All right.  It is admitted in evidence as well.

10 (Amended declaration of Peter Giamporcaro was hereby received

11 into evidence, as of this date.)

12         MR. ENGELHARDT:  Next, Your Honor, the debtors would

13 offer into evidence various documentary exhibits which appear

14 on our exhibit list.  I believe it will be helpful for the

15 Court to have in the record as a baseline to establish where

16 all these supplemental biddings are taking off from -- would be

17 Debtors' Exhibit number 1.

18         THE COURT:  Well, let me see if we can short circuit.

19 I have a binder that is debtors' sale exhibits marked as

20 Exhibits 1 through 8.  Is it your intention to offer all of

21 those?

22         MR. ENGELHARDT:  Your Honor, most of them.  I think it

23 would be easier to tell you the ones that I don't think need to

24 go in evidence.  For example, the amended order, I do not think

25 need to be in the evidentiary record.

RESIDENTIAL CAPITAL, LLC, ET AL.                    160

1        THE COURT:  That's Exhibit number 3.

2        MR. ENGELHARDT:  Exhibit number 3.  And I believe

3    number 7, the excerpts of the GLBA rules and regulations from,

4    I believe, the CFR, I don't -- as a matter of evidence, I don't

5    think they need to be in the evidentiary record.

6        THE COURT:  All right.  So you'd offer --

7        MR. ENGELHARDT:  Well, I would offer --

8        THE COURT:  -- 1, 2, 4, 5, 6 and 8.

9        MR. ENGELHARDT:  That is correct, Your Honor.

10        THE COURT:  All right.  And the debtor filed its

11    exhibit list as ECF document number 382.  So the description of

12    each of these exhibits has been set out in the exhibit list.

13    Are there any objections to admitting in evidence Debtors'

14    Exhibits 1, 2, 4, 5, 6 and 8?

15        All right.  Exhibits 1, 2, 4, 5, 6 and 8 are admitted

16    in evidence.

17    (Asset purchase agreement between Nationstar Mortgage LLC and

18    Residential Capital, LLC, et al., dated as of May 13, 2012 was

19    hereby received into evidence as Debtors' Exhibit 1, as of this

20    date.)

21    (Asset Purchase Agreement between Ally Financial Inc. and BMMZ

22    Holdings LLC and Residential Capital, LLC, et al., dated as of

23    May 13, 2012 was hereby received into evidence as Debtors'

24    Exhibit 2, as of this date.)

25    (Sale procedures was hereby received into evidence as Debtors'

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              161

1  Exhibit 4 as of this date.)

2  (May 3, 2012 Berkshire letter was hereby received into evidence

3  as Debtors' Exhibit 5, as of this date.)

4  (Privacy notices were hereby received into evidence as Debtors'

5  Exhibit 6, as of this date.)

6  (Chapter 11 breakup fee analysis was hereby received into

7  evidence as Debtors' Exhibit 8, as of this date.)

8          MR. ENGELHARDT:  That would be the extent of the

9  documentary presentation --

10          THE COURT:  Okay.

11          MR. ENGELHARDT:  -- on the debtors' direct case.  With

12  Your Honor's permission, given the recent movement and there is

13  gaps in the record, with Your Honor's permission, the debtors

14  would like to call Mr. Samuel Greene to the stand.

15          THE COURT:  All right.  I just want to -- each of the

16  declarants needs to be made available for cross-examination.

17          MR. ENGELHARDT:  If Your Honor would prefer that they

18  be made available for cross-examination before --

19          THE COURT:  I'm -- on this one, I'm actually agnostic

20  as to whether we proceed first with Mr. -- I think let's

21  proceed with Mr. Greene's testimony.  Then we've already

22  admitted into evidence the Greene declaration, ECF number 63.

23  So any cross-examination can encompass that as well.

24          MR. ENGELHARDT:  Okay.

25          THE COURT:  Okay?

RESIDENTIAL CAPITAL, LLC, ET AL.                    162

1   MR. ENGELHARDT:  Thank you, Your Honor.  The debtors

2   call to the stand Mr. Samuel Greene.

3        THE COURT:  Okay.  Could you raise your right hand?

4   (Witness sworn)

5        THE COURT:  All right.  Please have a seat, Mr.

6   Greene.

7        MR. ENGELHARDT:  May I proceed, Your Honor?

8        THE COURT:  Yes.  Please do.

9   DIRECT EXAMINATION

10  BY MR. ENGELHARDT:

11  Q.   Good afternoon, Mr. Greene.

12  A.   Good afternoon.

13  Q.   You are aware, sir, that you have filed two declarations

14  in this matter in support of the debtors' sales motion?

15  A.   I am.

16  Q.   And in that affidavit, you have set forth your background

17  and your qualifications, correct?

18  A.   I did.

19  Q.   Just for brief introduction so people aren't doing this

20  cold, by whom are you currently employed?

21  A.   Centerview Partners.

22  Q.   And what is your position at Centerview?

23  A.   I'm a partner and co-head of the financial restructuring

24  group.

25  Q.   Okay.  And in that position, Mr. Greene, what are your

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                     163

1  general job responsibilities?

2  A.    To manage the group along with my co-head, to generate

3  business, and to execute on transactions.

4  Q.    Okay.  Do you recall, sir, that in your declaration you

5  listed a variety of restructurings on which you have worked?

6  A.    I do.

7            MR. ENGELHARDT:   And that would be in paragraph 5 for

8  the Court's convenience.

9  Q.    I'd just like to ask you, sir, have any of those

10  restructurings involved cases in Chapter 11?

11  A.    Yes, they have.

12  Q.    Approximately how many such cases have you worked on?

13  A.    I'd have to look at the list, but I think the vast

14  majority.  So probably in the neighborhood of twenty.

15  Q.    In those Chapter 11 cases on which you provided financial

16  advice, have any of those cases involved proceedings where

17  there were auctions?

18  A.    Yes.

19  Q.    And how many such auctions have you provided advice upon?

20  A.    I think there were three separate transactions but one

21  transaction in particular, Calpine, contained six or seven

22  individual auctions, so probably all-in number of auctions is,

23  you know, ten to fifteen.

24  Q.    You mentioned the Calpine transaction and two others.

25  What were the other two?

RESIDENTIAL CAPITAL, LLC, ET AL.                          164

1   A.     Oakwood Homes and Extended Stay.

2   Q.     Okay.  Now, sir, did there come a point in time when

3   Centerview was retained by the debtors in this case?

4   A.     Yes.

5   Q.     And when did that occur?

6   A.     In October of 2011.

7   Q.     What was Centerview retained to do in October of 2011?

8   A.     We were retained by the ResCap entity to provide financial

9   advice regarding potential restructuring of the ResCap

10  subsidiary.

11  Q.     Okay.  Did there come a point in time when your assignment

12  focused upon a potential sale of ResCap's assets through a

13  bankruptcy proceeding?

14  A.     Yes.  I think when we first came on board, obviously, we

15  spent a lot of time familiarizing ourself (sic) with the

16  business, diligencing it, working with the management team,

17  counsel, the independent members of the board to develop a plan

18  of action.  The first part of that plan of action, which really

19  extended through the end of 2011, was an examination of whether

20  or not it was possible to sell the business or otherwise

21  restructure the business without use of the Chapter 11 process.

22  And we came to the conclusion towards the end of the year,

23  around Christmas time, that that was not possible for a number

24  of reasons.

25         And at that point, we transitioned to an exploration of

RESIDENTIAL CAPITAL, LLC, ET AL.                                            165

1   the possibility of a sale of all or substantially all of the

2   critical pieces of the debtors' businesses through a Chapter 11

3   process.  And obviously, that also involved raising the

4   requisite amount of debtor-in-possession financing to support

5   the business through the Chapter 11 process.

6   Q.   What did you do in your exploration of a potential sale of

7   the ResCap assets?

8   A.   Well, we did a lot of work with regard to which assets we

9   thought would be most easily saleable.  We did a lot of work

10  examining prior sale processes that the company and/or Ally,

11  the parent, had ran.  And we devised a process in conjunction

12  with management and Morrison & Foerster and the board to run a

13  sale process that was constrained by the real -- the facts and

14  circumstances on the ground, most specifically the liquidity

15  position of the company and the maturity of certain debt

16  facilities.

17  Q.   Did the marketing process involve seeking out potential

18  stalking horse bidders?

19  A.   Yes.  We -- I believe we contacted five or six companies

20  and/or funds who might be interested -- who we thought might be

21  interested in participating in that process.

22  Q.   And was one of those potential bidders Nationstar?

23  A.   Yes.

24  Q.   Was one of those potential bidders Berkshire?

25  A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                                166

1  Q.    Did Berkshire respond?

2  A.    I had a conversation with someone at Berkshire in -- you

3  know, probably actually before I had spoken to anybody else

4  because we were very cognizant of the size of that -- excuse

5  me -- the amount of debt that Berkshire owned and sort of their

6  presence in the case.  So we made, you know, we really went out

7  of our way to reach out to them first almost in advance of

8  anybody else.  And I was told that there was no interest in

9  participating in a process at that time.

10 Q.    Did they explain to you why?

11 A.    No.

12 Q.    After that initial solicitation process was done, did

13 there come a point in time where negotiations became exclusive

14 with Nationstar?

15 A.    Yes.  Of the five or six original people that we

16 contacted, three submitted bids.  One of those bids was for

17 only a portion of the assets.  Two of those bids were for

18 multiple pieces of the company, effectively substantially the

19 platform and the whole loan business.  And we worked with those

20 two people to clarify their bids and ultimately came to the

21 conclusion -- or I should say the board came to the conclusion

22 that moving forward with Nationstar on an exclusive basis made

23 the most sense due to, again, the time constraints that we were

24 working under, the complexity of the business itself, the need

25 to interact with multiple government organizations, whether it

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    167

1   was U.S. Treasury, Fannie, Freddie, Ginnie, FHFA, HUD, you

2   know, et cetera.  There was a fairly long list of people that

3   we needed to interact with and it just didn't seem possible to

4   do that with more than one person under the time constraints

5   that we were working under.

6              THE COURT:  Were you dealing with a subcommittee of

7   the board or the entire board?

8              THE WITNESS:  Well, the board actually wasn't that

9   large, Your Honor.  So we met with the full board.  It was

10  comprised of some of the management team and, correct me if I'm

11  wrong, maybe four or five independent directors.  So they were

12  all very active and very present in those discussions.  So it

13  wasn't like a board of fifteen where we only had to deal with

14  four or five.

15             THE COURT:  Has that been true throughout that you've

16  dealt with the entire board?

17             THE WITNESS:  Yes.

18             THE COURT:  Go ahead.

19  Q.   How long did the negotiations with Nationstar last?

20  A.   I think we went, you know, effectively, exclusive with

21  them on or around the end of February.  And that really lasted

22  up until the filing on May 14th, I believe.

23  Q.   Could you describe for the Court what was involved in

24  those negotiations with Nationstar?

25  A.   Well, I mean, we were starting from a blank piece of paper

RESIDENTIAL CAPITAL, LLC, ET AL.                                    168

1   from an APA perspective.  So, you know, we had a lot of wood to

2   chop, again, on a very complicated business:  a lot of

3   management presentations, an extreme amount of diligence.  I

4   think the Nationstar guys actually worked, you know, very

5   quickly because they had the benefit of being in the business

6   so they understood the concepts.  They actually didn't have to

7   rely a lot on outside advisors.  They were able to bring their

8   senior management team, you know, to bear in a lot of these

9   complicated discussions.  There was onsite visits at the

10  various servicing centers.  There was obviously the APA

11  negotiation.  There was a negotiation of the transition

12  servicing agreement.  There was a negotiation of a subservicing

13  agreement with the parent who also stood up and supported the

14  process and the business.  So there were probably, you know, a

15  dozen or so critical items that we really needed to get through

16  all of which, on their own, were sort of complicated tasks.

17  Q.   We've heard mention in argument -- you were in court for

18  those -- regarding GSEs or government associations.  Are you

19  familiar with those, sir?

20  A.   I am.

21  Q.   Okay.  During this negotiation process with Nationstar,

22  are you aware as to whether or not Nationstar had the

23  opportunity to meet with any of the GSEs?

24  A.   Yes.  I was present at a number of different meetings with

25  three of the, you know, most important institutions, Fannie,

1   Freddie, Ginnie.  I will remark that I was sort of surprised to

2   hear Freddie's counsel or Fannie's counsel's --

3            THE COURT:  Let's just stick to the questions.  Okay?

4   A.   But our takeaway was those were very difficult

5   discussions.

6   Q.   Why do you characterize them as difficult?

7   A.   Well, I think that those agencies aren't used to dealing

8   with businesses that -- on an ongoing basis that are planning

9   to file for bankruptcy.  They have a very long history of not

10  dealing with those businesses but, in fact, pulling their

11  business away from those businesses and effectively causing

12  them to liquidate and moving those servicing rights over to

13  other servicers in the business.

14  Q.   Now, there came a point in time when ultimately an initial

15  asset purchase agreement, stalking horse agreement, was signed

16  with Nationstar, correct?

17  A.   Yes.

18  Q.   And do you recall the terms of that?  We've heard them in

19  court.  Do you recall what they are?

20  A.   Yes, I do.

21  Q.   Okay.  Just for setting up a baseline for the movement of

22  the bids, do you recall what the initial purchase price was?

23  Let's start with the Nationstar --

24  A.   Sure.

25  Q.   -- platform --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              170

1   A.   Yeah.  I think --

2   Q.   -- deal.

3   A.   -- depending upon the -- the number I have in my head is

4   2.3 billion.  I think it's slightly different.  It might be

5   2.36 billion or something like that.  But I use 2.3 as a round

6   number.  There was a seventy-two million dollar deposit.  There

7   was a seventy-two million dollar breakup fee.  There was an

8   overbid increment of one percent or twenty-three million

9   dollars.  And then there was expense reimbursement up to ten

10  million dollars.

11  Q.   Okay.  And how about with respect to the Ally stalking

12  horse bid?  Do you recall the terms of that?

13  A.   Yes.  It was 1.6 billion dollars to the extent that it was

14  sold pursuant to a plan with no expense reimbursement and no

15  breakup fee and 1.4 billion to the extent that it was sold

16  through a 363 process.

17  Q.   Now, as of the time that the breakup fee was a seventy-two

18  million dollar breakup fee, did you, as the financial advisor

19  to the debtors, conduct any analysis regarding the

20  reasonableness of that breakup fee?

21  A.   Yes, we did.

22  Q.   Okay.  And what did that analysis show?

23  A.   It showed that at three percent, which is, effectively,

24  where seventy-two million dollars came in versus the total

25  purchase price, that that was within the range of the comps

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    171

1  that we looked at.

2  Q.   Now, since that initial bid, you are aware that there has

3  been movement --

4  A.   I am very aware.

5  Q.   -- in the target.

6  A.   Yes.

7  Q.   You are aware that as of last Friday, Berkshire submitted

8  a proposal to replace Nationstar as the stalking horse bid.

9  A.   I'm aware.

10  Q.   Are you aware of the terms that Berkshire proposed?

11  A.   Yes.

12  Q.   What is your awareness of those terms?

13  A.   I believe they kept the price the same.  The headline

14  price for the assets was the same.  They dropped the breakup

15  fee to twenty-four million dollars.  And I can't recall -- it's

16  either zero or five million on expenses.  I can't recall.

17  Q.   Okay.  I believe it was zero.

18  A.   Okay.

19  Q.   And are you aware, then, that Nationstar responded --

20  A.   Yes.

21  Q.   -- with another proposal?

22  A.   Yes.

23  Q.   And what is that proposal to your understanding?

24  A.   Again, the price didn't change.  They dropped their

25  breakup fee, I believe to forty-two million dollars from

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    172

1   seventy-two million dollars.  And they reduced their expense

2   reimbursement from ten -- up to ten million to up to five

3   million.  And they reduced the initial overbid, I believe, to

4   seven and a half million dollars.

5   Q.    Okay.

6   A.    They also agreed to extend the process by thirty days.

7   Q.    Did Berkshire respond again?

8   A.    Yes, although not to me or my client.

9   Q.    Do you have awareness of that response?

10  A.    Yes.

11  Q.    And what is your awareness?

12  A.    My awareness is that we received an e-mail late last night

13  or early this morning to the debtors' counsel referencing

14  conversations that Berkshire had with the committee over the

15  course of the weekend and that they were prepared to revise

16  their bid again.  This time, they would be raising the purchase

17  price by fifty million dollars and, I believe, all of the other

18  points remain the same.  Actually, I believe they also

19  increased the time for an additional thirty days in the

20  process.  But the economic points -- other economic points

21  remained the same.

22  Q.    Since the receipt of that proposal early this morning, to

23  your understanding, has Nationstar increased its proposed

24  stalking horse bid?

25  A.    Yes.  I was present here when Mr. Nashelsky recited the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              173

1  revised terms of the Nationstar --

2  Q.   Just so we have that --

3  A.   -- proposal.

4  Q.   -- as a matter of -- on the evidentiary record, can you

5  tell me your understanding of what the terms are of --

6  A.   Yeah.  I --

7  Q.   -- new revised Nationstar bid?

8  A.   Sure.  Excuse me.  I think, effectively, they just matched

9  exactly what Berkshire's last proposal was.

10 Q.   Now, have you had an opportunity to present to the board

11 since your presentation on Friday?

12 A.   We had a board presentation on Friday.  Since that

13 presentation, we have not had another one.

14 Q.   Okay.  As Residential Capital's financial advisor,

15 focusing on Friday with respect to the state of play at that

16 time --

17 A.   Right.

18 Q.   -- did you provide advice to the board of directors

19 concerning the relative merits of the various proposed stalking

20 horse agreements that had been put forward?

21 A.   Yes, we did.

22 Q.   And what was that advice?

23 A.   We felt that there were a number of --

24         THE COURT:  You say "we" but does this mean you?

25         THE WITNESS:  Centerview.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    174

1          THE COURT:  Yes.  But --

2          THE WITNESS:  Did I personally --

3          THE COURT:  -- were you the one delivering --

4          THE WITNESS:  I didn't.  I was in transit.  So I was

5     listening.  My partner recited it.

6          THE COURT:  Who did the presentation?

7          THE WITNESS:  Marc Puntus.

8          THE COURT:  And you were listening?

9          THE WITNESS:  Yes.

10          THE COURT:  Go ahead.

11          THE WITNESS:  And I also worked on the presentation

12    materials that --

13          THE COURT:  Okay.

14          THE WITNESS:  -- were presented.

15    Q.   What is your understanding -- what advice was provided to

16    the board?

17    A.   We simply laid out a bunch of issues that we thought was

18    important for the board to consider.  Obviously, we laid out

19    the economics as well on a side -- what we call a side-by-side

20    basis so they could see the difference in the economic impact

21    of the bids which, at that point in time, was just a

22    difference, effectively, in the breakup fee.  The price -- the

23    top line price of the deal had not changed.  And some of the

24    issues that we felt were important to discuss with the board

25    were, number one, the fact that Berkshire hadn't done any due

RESIDENTIAL CAPITAL, LLC, ET AL.                    175

1   diligence on the company which gave us some pause based on the

2   complicated nature of the APA and, you know, their ability to

3   sort of execute on the things that they were signing up for.

4        Number two, we were concerned about the fact that, as far

5   as we were aware, Berkshire wasn't currently in this business

6   and therefore did not have any relationship with the GSEs and

7   would not have been in front of the GSEs on any other

8   businesses that they own.  I think they are in some similar

9   lines of business but not businesses that are necessarily

10  regulated by Fannie, Freddie or Ginnie.

11       And lastly, we were concerned about licensing issues.

12  It's our understanding that Berkshire is not currently

13  licensed, you know, in this business which is not a small fact.

14            THE COURT:  What licenses are required?

15            THE WITNESS:  I believe you need a license in every

16  state to participate in Fannie, Freddie and Ginnie

17  securitizations.  And I don't believe -- I think someone said

18  earlier I don't believe those licenses are transferrable.  I

19  don't think you can buy those licenses.  I think you have to

20  reapply.

21  A.   So without an entity that is currently controlled by

22  Berkshire that is licensed, there is certainly an open question

23  or an amount of time that we would like to discuss with

24  Berkshire about how they plan to go about doing that.

25  Q.   You mentioned that one of the concerns that you

1  articulated to the board was with respect to Berkshire's lack

2  of due diligence.  Did I understand that correctly?

3  A.    Yes.

4  Q.    Why did you view that as a concern?

5  A.    Again, I think, you know, there are various -- the APA is

6  a complicated document.  We are very comfortable in

7  understanding what our expectations are with our current bidder

8  as we negotiated that document with them.  You know, there are

9  some very sort of particular issues that may change the price

10 one way or the other or allow other either positive or negative

11 things to happen.  And not having had the opportunity to

12 discuss any of those with Berkshire, it was very difficult to

13 formulate an opinion as to how they would, you know, react or

14 respond to those provisions as they continued presumably the

15 diligence process that they wanted to do.  Understanding there

16 is no diligence out in the deal but there are -- there's no

17 such thing really as a hundred percent ironclad APA.  There are

18 issues and soft spots that we would certainly like to

19 understand what Berkshire's perspective is on.

20 Q.    You also stated that Berkshire was not in the business and

21 had no relations with the GSEs.  Did I understand that

22 correctly, Mr. Greene?

23 A.    That is -- yes.  That is -- I said that, yes.

24 Q.    Okay.  Why is that a concern?

25 A.    Well, again, I think you're talking about a highly

1   regulated business, a business, in fact, that can't exist

2   without the support of certain governmental agencies.  And I

3   think having a track record in the business, notwithstanding

4   Berkshire's excellent reputation, clearly, and their success in

5   other endeavors and other businesses that they've purchased,

6   this is not a simple manufacturing business.  This is a very

7   complex business that's governed by a lot of regulations and

8   agencies.  And in our meetings with the GSEs, in particular,

9   each one of them individually was very interested in

10  understanding who the prospective purchaser might be and was

11  very interested and asked to meet that management team and was

12  very interested and sort of commenting on the relationships

13  that they had with those individuals.  And I think it's

14  important to say that we're not standing here saying Berkshire

15  can't do that.  They may well be able to.  We just haven't had

16  the opportunity to understand that issue.

17          THE COURT:  What happens at the end of the auction

18  process?  Let's assume that Nationstar is the stalking horse

19  but at the end of the process, another entity is the highest

20  bidder.  What happens then about satisfying the GSEs --

21          THE WITNESS:  It's a --

22          THE COURT:  -- or dealing with licensing requirements?

23          THE WITNESS:  Yeah, it's a great question and I think

24  it goes to the qualitative factors that we would have to

25  consider when we're looking and comparing one bidder against

RESIDENTIAL CAPITAL, LLC, ET AL.                                    178

1    another.  I would say, Your Honor, all things being equal, if

2    the price is, you know, very, very close, I think having

3    licenses and being in the business is an important and

4    distinguishing factor.

5            THE COURT:  Why aren't the existing licenses -- why

6    don't they carry forward?  If the buyer intends to carry on the

7    business with existing personnel, why aren't the existing

8    licenses all that is required?

9            THE WITNESS:  That's just my understanding of how the

10   contracts work.  I'd have to defer to the lawyers.

11           THE COURT:  You don't know one way or the other?  So

12   when you say they need new licenses, you don't really know?

13           THE WITNESS:  No.  I do know.  I've been advised by

14   Morrison & Foerster that they need new licenses.

15           THE COURT:  Go ahead.

16           MR. ENGELHARDT:  Okay.

17   BY MR. ENGELHARDT:

18   Q.   Do you have any understanding as to the ramifications as

19   to what would happen if the GSEs could not get comfortable with

20   the proposed bidder?

21   A.   Yeah.  I think that the business would -- well, at least

22   the platform, as we call it, meaning the servicing and

23   origination business and related servicing assets, would

24   effectively liquidate.

25   Q.   Are there any outs to the deal with respect to GSE

1  support?

2  A.    The deal is subject to the consent of the GSEs.

3  Q.    You've spoken about the qualitative aspects of the

4  Nationstar bid and the potential Berkshire bid.  Have you had

5  an opportunity as financial advisor to assess the qualitative

6  aspects of the bid as it concerns Berkshire?

7  A.    Are you asking if I've had a chance to assess Ber -- the

8  qualitative aspects of Berkshire's proposal?

9  Q.    Yes.

10  A.    Only to the extent of flagging the issues that I

11  previously discussed.  We've had no interaction with Berkshire

12  with regard to specific issues.  In fact, I think if we did, we

13  may have violated the Nationstar agreement by doing so.

14          THE COURT:  Why is that?

15          THE WITNESS:  We had a nonsolicit period so we didn't

16  want to jeopardize the contract that we had.

17  Q.    Mr. Greene --

18          THE COURT:  Berkshire came forward with a proposal and

19  you're saying that talking to Berkshire would violate the

20  nonsolicitation procedures?

21          THE WITNESS:  We cannot negotiate another deal right

22  now pursuant to the contract that we have --

23          THE COURT:  Did you go back to the board and ask them

24  whether you could negotiate with Berkshire?

25          THE WITNESS:  I don't know if we asked that question

1   in particular.  I believe we just --

2          THE COURT:  Were you advised that you couldn't?

3          THE WITNESS:  We were advised that it's a potential

4   issue.

5          THE COURT:  Go ahead.

6   Q.   Mr. Greene, given your experience as a financial advisor

7   and one that's been involved in this process, do you have any

8   concerns regarding the replacement of Nationstar as a stalking

9   horse at this stage in the proceedings?

10  A.   Look, I think we're here to create the most value that we

11  can for the stakeholders of ResCap.  I think that is our number

12  one duty.  I also think that -- I'm concerned about replacing

13  them at this point in time and having sort of a second auction

14  before the third auction because I'm concerned about what

15  happens, you know, after we picked the stalking horse and would

16  anyone show up in that context.  I think we might be leaving

17  money on the table today --

18         THE COURT:  Why are you concerned whether anybody

19  would show up if Berkshire were the stalking horse after today?

20         THE WITNESS:  Well, I think because we've sort of

21  upended the process.  I think --

22         THE COURT:  Why is that?

23         THE WITNESS:  Well, because we ran a process.  We

24  reached out to people.

25         THE COURT:  Process is I have to approve who the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              181

1  stalking horse is.

2         THE WITNESS:  Correct.

3         THE COURT:  Are you concerned that if I select anybody

4  other than Nationstar that no one will come and bid?

5         THE WITNESS:  No.  Well, my -- well, first, let me

6  clarify.  The process I was talking about was the pre-petition

7  process.  So I understand that the post-petition process needs

8  the approval of this Court.  But my reference was that we ran a

9  pre-petition process that I think was fairly clear, that was

10 fairly run, that was open and transparent.  And I think it's

11 difficult to attract people to invest their time and their

12 capital should the applecart get upturned on the eve of or the

13 morning of, if you will, the hearing after someone's invested a

14 material amount of time.  And I think there is a carryover

15 effect, potentially, into the auction itself saying that why am

16 I going to participate in the auction --

17        THE COURT:  You're saying the Court should never

18 approve a higher bid that comes in at the time of a stalking

19 horse --

20        THE WITNESS:  No.  I think --

21        THE COURT:  -- hearing on bidding procedures?

22        THE WITNESS:  Excuse me, Your Honor.  I think that

23 there are probably times where it does make sense where the

24 process that was run to pick the stalking horse was

25 insufficient or not transparent enough, if you will, or that

RESIDENTIAL CAPITAL, LLC, ET AL.                    182

1  there were material flaws with the APA such as a due diligence

2  out or a financing out.

3          THE COURT:  Other than those circumstances, you don't

4  think that the proposed stalking horse should ever be replaced

5  because there's a higher and better offer at the time of the

6  hearing?

7          THE WITNESS:  I think it creates a very difficult

8  dynamic to do so.

9          THE COURT:  Go ahead.

10  BY MR. ENGELHARDT:

11  Q.    In your role as financial advisor during these

12  transactions, do you perceive any benefit that Fortress' and

13  Nationstar's participation in the process has brought to bear?

14  A.    I'm sorry.  Could you repeat the question?

15  Q.    Sure.  In your role as being involved as a financial

16  advisor in the pre-petition process, do you perceive any

17  benefit that Nationstar brought to bear on the value of the

18  estates or the process in general?

19  A.    Yeah, absolutely.  I think they served as a stalking horse

20  quite well.  The evidence before us demonstrates that.  And I

21  think that we would never have gotten to this point, frankly,

22  based on where we were in the process and the other bids that

23  we received.  We wouldn't be here today, I think, you know,

24  without Fortress or Nationstar's support.  Without their bid,

25  again, I think, as previously discussed, the number one factor

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    183

1   here would have been -- we wouldn't have been able to get a

2   DIP.  And I think what would have ultimately happened was we

3   would have been pushed into the arms of the parent and we would

4   have received a very unfavorable contract to buy the business

5   or to finance the business.  That would be to the great

6   detriment of the unsecureds and junior secured bondholders.

7          MR. ENGELHARDT:  Your Honor, I have no further

8   questions and make the witness available for cross-examination.

9          THE COURT:  All right.  We can take a ten-minute

10  recess and then we'll resume.  Who else intends to cross-

11  examine the witness?

12         MR. ALLRED:  Your Honor, Kevin Allred with Munger

13  Tolles & Olson for Berkshire Hathaway.

14         THE COURT:  All right.  Anybody else?  Okay.  I have

15  two.  Anybody else?  All right.  We'll take a ten-minute recess

16  and then we'll resume with cross-examination.

17      (Recess from 3:33 p.m. until 3:52 p.m.)

18         THE COURT:  All right.  Please be seated.

19         All right.  We have cross-examination of Mr. Greene.

20  Mr. Greene, you know you're still under oath.  Thank you very

21  much.

22         MR. ALLRED:  Good afternoon, Your Honor.  Kevin

23  Allred, Munger, Tolles & Olson, for Berkshire Hathaway.

24  CROSS-EXAMINATION

25  BY MR. ALLRED:

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              184

1   Q.   Good afternoon, Mr. Greene.

2   A.   Good afternoon.

3   Q.   Is it fair to say that you may naturally feel personally

4   invested in the results of the structure and process you put

5   together here?

6   A.   No, I don't think so.

7   Q.   Isn't it at least possible that professional pride and all

8   the work you've done could cause you unconsciously to put a

9   little thumb on the scale in favor of the results of your

10  process?

11          MR. ENGELHARDT:  Objection, Your Honor.

12          THE COURT:  Sustained.

13  Q.   Is it fair to say that by not observing the nuts and bolts

14  of your proposed process, Berkshire Hathaway has already

15  improved the stalking horse bid by well over one hundred

16  million dollars?

17  A.   I'm sorry.  Could you repeat the question?

18  Q.   Fair to say that by not following the nuts and bolts of

19  the process you've laid out, Berkshire Hathaway already, as of

20  this moment, has improved the stalking horse bid in value by

21  well over one hundred million dollars?

22  A.   Yeah.  On a numerical basis, I would say that's correct.

23  Q.   And it's -- a Nationstar bid is now over one hundred

24  million dollars better as a result.  There's no qualitative

25  difference in the Nationstar bid, is there?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    185

1  A.   There's no qualitative difference, no.  Just the numbers.

2  Q.   All right, now, let's start with the procedures that you

3  put in place.  In your original declaration, at paragraph 39,

4  you stated that the proposed sales procedures would allow the

5  "maximum recovery" for creditors, is that correct?

6          MR. ENGELHARDT:  Your Honor, if I may --

7          THE COURT:  Overruled.

8  A.   Can I see the exhibit?

9  Q.   Sure.  I'll give you a copy of your declaration if you'd

10 like it.

11         MR. ALLRED:  May I approach the witness, Your Honor?

12         THE COURT:  Yes, please.  Go ahead.

13         THE WITNESS:  Thank you.

14 A.   39?

15 Q.   Yes.

16         THE COURT:  What paragraph are you referring to?

17         MR. ALLRED:  In the original declaration, Your Honor,

18 paragraph 39.

19         THE COURT:  Okay.  I have it.  Do you have it, Mr.

20 Greene?

21         THE WITNESS:  Yes.

22 Q.   And you described the sales procedures there as allowing

23 the "maximum recovery" for creditors, correct?

24 A.   Yes.

25 Q.   Now, since that time, the procedures under the Nationstar

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      186

1   proposal are proposed to be adjusted to reduce the bid

2   increment requirement, correct?

3   A.   Since then -- I'm sorry.  The procedures -- can you

4   repeat?

5   Q.   Let me take it step by step.  In the procedures that you

6   were talking about in your declaration at paragraph 39, what

7   were the required bid increments?

8   A.   I believe it was twenty-five million.

9   Q.   All right.  And Nationstar has now agreed to different bid

10  increments, correct?

11  A.   Yes.

12  Q.   And what are those?  Five million dollars each?

13  A.   It was 7.5 and then I believe they dropped it to 5.

14  Q.   So now it's five million instead of twenty-five million on

15  each of the asset sets, correct?

16  A.   Correct.

17  Q.   And you didn't advise your client that that was reducing

18  the anticipated recovery by reducing the bid increments, did

19  you?

20  A.   No.

21  Q.   To the contrary, reducing the bid increments enhances

22  potentially the maximum recovery, correct?

23  A.   Correct.

24  Q.   In your original declaration, at paragraph 40 -- if you'll

25  turn to that, please.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    187

1  A.    Yep.

2  Q.    You offer the opinion that the May 13 APA breakup fee is

3  "necessary" to induce Nationstar to serve as the stalking horse

4  bidder, correct?

5  A.    Correct.

6  Q.    And the capitalized term there, "Break-Up Fee", refers to

7  a seventy-two million dollar breakup fee, right?

8  A.    Correct.

9  Q.    But as of today, Nationstar has proposed to serve as a

10  stalking horse bidder with a dramatically smaller fee, correct?

11  A.    Correct, but that was a statement made at the time that we

12  entered into the negotiation.  And that was the required amount

13  that Nationstar required to sign the APA.  So there's a timing

14  difference.

15  Q.    Okay.  But don't the developments as of today suggest very

16  strongly that Nationstar was and is willing to be a stalking

17  horse bidder for less than seventy-two million dollars' breakup

18  fee?

19          MR. ENGELHARDT:  Objection, Your Honor.

20          THE COURT:  Sustained.

21  Q.    Have you in any way altered your opinion as of today that

22  a seventy-two million dollar breakup fee is necessary to induce

23  Nationstar to act as a stalking horse bidder?

24  A.    Again, I think as of the time that we entered into the

25  contract, the only contract that was available to us at the

RESIDENTIAL CAPITAL, LLC, ET AL.                    188

1  price, seventy-two million was the cost of doing business with

2  Nationstar.  Today, based on, you know, a confluence of events

3  that we're all aware of, that number has come down.

4  Q.   Fair to say that confluence of events may shed some light

5  on whether or not the seventy-two million was really necessary

6  in the first place?

7          MR. ENGELHARDT:  Objection, Your Honor.

8          THE COURT:  Sustained.

9  Q.   Now, you understand that Berkshire Hathaway has also

10 proposed to act as a stalking horse for that mortgage business

11 purchased for only twenty-four million dollars, correct --

12 twenty-four million breakup fee.

13 A.   Correct.

14 Q.   So it's not necessary, in your understanding, to induce

15 Berkshire to act as stalking horse to have a larger breakup

16 fee, correct?

17 A.   I guess Berkshire does not require one, no.

18 Q.   If you'll turn to the supplemental declaration, your

19 declaration that came in shortly after Berkshire's

20 opposition -- do you have that in front of you?

21 A.   Yes, I do.

22 Q.   If you'll turn to paragraph 21.

23 A.   Sorry.  What page was that?  Page 9?

24 Q.   I believe so.  Yes.  You opined there that the "Break-Up

25 Fee" -- and that's capitalized -- "and the Expense

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    189

1  Reimbursement" -- again, capitalized -- "reflect the best

2  outcome that is possible for the Debtors and the Debtors'

3  [entities] under the circumstances."  Do you see that?

4  A.   I do.

5  Q.   And the breakup fee referenced in that opinion is to

6  seventy-two million that was in the May 13 APA, correct?

7  A.   I believe so.

8  Q.   And the expense reimbursement referenced there is the ten

9  million dollars that was in the APA, correct?

10  A.   Yes.

11  Q.   And it was your opinion that that was the best possible

12  outcome, is that correct?

13  A.   Yes.

14  Q.   You're aware that Berkshire has offered to serve as a

15  stalking horse with no expense reimbursement, correct?

16  A.   I am now aware, yes.

17  Q.   And as we just noted, has been willing to offer a breakup

18  fee of only twenty-four million, correct?

19  A.   Yes.

20  Q.   So when you said that the Nationstar agreements fee and

21  reimbursement were the best possible outcome, was it your

22  opinion then that it's not possible for this Court to select

23  Berkshire rather than Nationstar as the stalking horse?

24          MR. ENGELHARDT:  Objection, Your Honor.

25          THE COURT:  Sustained.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    190

1   Q.   When you say "best possible outcome", does that involve

2   any legal advice from Morrison & Foerster?

3           MR. ENGELHARDT:  Objection, Your Honor.

4           THE COURT:  No.  It's in his declaration.  I'll permit

5   it.

6   A.   I don't think so.

7   Q.   So it's just a factual matter that factually it's not

8   possible to have done better than seventy-two million breakup

9   fee and ten million expense reimbursement?

10  A.   Based on the process that we ran on the information that

11  we had at the time that I made this declaration, that was the

12  conclusion.

13  Q.   All right.

14  A.   We can't see the fu -- I couldn't see the future of what

15  was going to come.

16  Q.   But it was your opinion then that there was no other

17  possible process?  That you had followed the only possible

18  process because this was the only -- the best possible outcome?

19  A.   We followed what we thought was a well-run, a well-

20  constructed and transparent process where we contacted a select

21  number of bidders who could potentially be able to put

22  themselves in a position to consummate a transaction in a

23  somewhat limited period of time under difficult circumstances.

24  And we constructed that transaction in a way that it was open

25  to higher and better bidders through an auction process once

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    191

1  this Court selected the stalking horse bidder.  So, yes, I'm

2  satisfied that that was the best process that we could have

3  run.

4  Q.    My question is not if it's the best process.  My question

5  is -- I'm exploring your opinion that that was the best outcome

6  possible.  It's turned out, in short order, that it's possible

7  from at least two sources to get a combined breakup fee and

8  expense reimbursement terms that are at least fifty-eight

9  million dollars better than that, correct?

10  A.    Who -- sorry.  Who are the two sources?

11  Q.    Berkshire Hathaway and Nationstar.

12  A.    Yes.  The -- again, at the time, that was the best process

13  that we reflect -- and we thought that was the best outcome

14  that was possible to attain.  There were other people who were

15  invited to the process that didn't participate.  It's very

16  difficult to foresee the future and think that they're going to

17  show up at the last minute and change things.

18  Q.    I'd like to go through -- I wasn't sure we were entirely

19  on the same page as to what your understanding is of the

20  enhancements that have come about over the past week.  Is it

21  your understanding that, basically, as of this moment, the

22  economic terms proposed by Berkshire and Nationstar are

23  essentially the same?

24  A.    Yes.

25  Q.    And what are the changes that you understand in economic

RESIDENTIAL CAPITAL, LLC, ET AL.                                    192

1   terms that have come about since your declaration?

2            THE COURT:  Which declaration?

3            MR. ALLRED:  Since the supplemental declaration that

4   said that this was the best possible outcome.

5            THE COURT:  That's his June 14th declaration.

6            THE WITNESS:  Yeah.

7   A.   I think that the -- again, it's easier for me, if the

8   Court is okay, to kind of start and walk through the sequences.

9   It's hard to kind of start in the middle.

10  Q.   Well, maybe you think I'm asking a more complex question

11  than I am.  There's about four different elements of monetary

12  economics that have changed --

13  A.   Correct.

14  Q.   -- from the APA as it existed then to where we stand

15  today.  Are you able to just check them off and say --

16  A.   I can tell you where we are today.  If you want to walk

17  through them sequentially, I can walk through them

18  sequentially.

19  Q.   It will get confusing if we try to go through all the

20  back-channel bidding that's gone on.  So I think it's going to

21  be easier if we just --

22            THE COURT:  Just ask the question.

23            MR. ALLRED:  Yeah.

24  Q.   What's the change in the purchase price from the time you

25  said that what you had was the best possible outcome to where

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                193

1  we are today?

2  A.   I believe it increased by fifty million dollars.

3  Q.   What's the change in the breakup fee since the time that

4  you said the best possible outcome was the APA?

5  A.   We're now at twenty-four million dollars.  At the time of

6  my declaration, I believe we were still at seventy-two.

7  Q.   And what's the change in the expense reimbursement since

8  that time?

9  A.   I believe Nationstar was at up to ten million and now

10 we're at zero.

11 Q.   And what's the change in the bidding increment?

12 A.   It went from one percent of the aggregate consideration,

13 or about twenty-three million dollars and I believe we're at

14 five million dollars today.

15 Q.   And what's the positive effect, if any, of reducing the

16 bid increment by roughly twenty million dollars?

17 A.   It just lowers the hurdle for the next bid.

18 Q.   Makes it easier for somebody to overbid, right?

19 A.   Yeah.  It lowers the hurdle.

20 Q.   All right.  Now, let's turn, similarly, to the loan

21 portfolio purchase.  That's also been enhanced since the

22 original declaration, correct?

23 A.   Yes.

24 Q.   Again, I'd ask you to take us through what are the changes

25 since the original declaration.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    194

1  A.    I believe that -- Lone Star also put in a proposal.  So

2  you're asking for the Lone Star comparison?  The Berkshire

3  comparison?

4  Q.    Today we have a Nationstar proposal and -- excuse me.

5        MR. ALLRED:  Strike that.

6  Q.    Today we have a Berkshire proposal and the original Ally

7  proposal?

8  A.    Right.

9  Q.    All right.  What is the --

10 A.    We also have a Lone Star proposal.

11 Q.    Fair enough.  Let's just do the Berkshire proposal to keep

12 it simple.

13 A.    Surprise.

14 Q.    Yeah.  Starting with the purchase price, what's the

15 difference between the pending Berkshire proposal and the

16 proposal that existed in the stalking horse APA that you were

17 talking about in your declaration?

18 A.    The exact number escapes me.  I believe the purchase price

19 increased in the neighborhood of forty or fifty million

20 dollars.

21 Q.    Fifty million seem right?

22 A.    Yes.

23 Q.    Yeah.  And the bid increments have been reduced to five

24 million dollars?

25 A.    Yes.  There's also a breakup fee.

1   Q.    Yes.   And the breakup fee is ten million dollars?

2   A.    Yes.   It was something higher.

3   Q.    Let's talk for a moment about the qualitative points that

4   you were saying leaned you one direction as opposed to the

5   other.   It's correct, is it not, that Nationstar does not

6   currently have any of the requisite GSE approvals, right?

7           MR. ENGELHARDT:   Objection.

8           THE COURT:   Overruled.

9   A.    Correct.   They have not officially received approval.

10  Q.    And you have not provided the Court with any statement,

11  sworn or otherwise, from anybody representing the GSEs that

12  such approvals are imminent or forthcoming, correct?

13  A.    Correct, but we spent a lot of time with them.

14  Q.    Okay.   You only spoke -- you and Nationwide (sic) only

15  began --

16  A.    Nationstar.

17  Q.    -- that process with the -- excuse me -- Nationstar only

18  began that process with the GSEs after Nationstar became your

19  exclusive target, correct?

20  A.    No.

21  Q.    Isn't it a fact that you did not have those comparable

22  meetings with the other four of the five potential bidders that

23  you talked about?

24  A.    I'm sorry.   Could you say that again?

25  Q.    You described in your testimony attending meetings with

**RESIDENTIAL CAPITAL, LLC, ET AL.**                     196

1  the GSE representatives and Nationstar, correct?

2  A.    I do.  But I also attended meetings well in advance of the

3  selection of any bidder to understand what the GSEs were

4  looking for in a potential stalking horse bid.

5  Q.    Okay.  But in terms of the bidders themselves getting

6  involved in a process with the GSEs, it's only Nationstar

7  that's participated with you in that?

8  A.    No.  I think there was -- Nationstar may have been the

9  only one who traveled with us to DC to see the various

10  governmental agencies.  But we certainly talked to the

11  governmental agencies about other of the potential bidders.

12  Q.    Did you receive any opinions that any of them were

13  unacceptable to the GSEs?

14  A.    No.

15  Q.    Did any of the GSEs suggest to you that there will be any

16  difficulty in Berkshire Hathaway becoming a successful bidder?

17  A.    They didn't express an opinion at all because they weren't

18  aware of your interest.

19  Q.    It's your belief that parties other than Nationstar will,

20  in fact, be able to qualify with GSEs within the confines of

21  the procedures you're asking the Court to adopt, correct?

22  A.    That's certainly our hope.

23  Q.    All right.  And you have no reason to believe that

24  Berkshire Hathaway would be unsuccessful in that respect,

25  correct?

1  A.    Again, I think I said earlier we have a lot of respect for

2  Berkshire as an institution and their history in closing

3  transactions.  I would say an area of risk for us the fact that

4  they are not in the business today and they're not currently

5  licensed.

6  Q.    If Berkshire Hathaway were to keep the same management

7  team in place that's currently servicing these mortgages using

8  the same platform that is currently approved but backed by

9  Berkshire Hathaway's balance sheet, isn't it reasonable to

10  expect that it's likely to be viewed favorably by those GSEs?

11          MR. ENGELHARDT:  Objection.

12          THE COURT:  Overruled.

13  A.    I --

14          THE COURT:  He's given opinion testimony.  All this --

15  A.    I mean, it's a very difficult question to answer.  I don't

16  know if the management team is going to stay or not stay.  I

17  think it's an open question as to what the GSEs would or

18  wouldn't do.

19  Q.    You, on your direct testimony, expressed concern that

20  Berkshire has not done due diligence, correct?

21  A.    I did.

22  Q.    Notwithstanding the fact that, as you noted, Berkshire has

23  expressly not imposed any due diligence condition on closing

24  this deal, right?

25  A.    That is my -- that is -- yes.  That is correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    198

1   Q.   And usually, as a seller, you're pushing to avoid due

2   diligence conditions, not asking for more due diligence, aren't

3   you?

4   A.   I don't think we were asking for more due diligence in

5   trying to create an out, if you will, that didn't previously

6   exist as much as we were expressing the opinion, if you will,

7   that having no contact with the company whatsoever, not one

8   meeting, not one conversation between the company and

9   Berkshire, between the management team and Berkshire, zero

10  understanding of how these businesses would come together, and

11  the complex nature of this business and the fact that Berkshire

12  isn't currently in the business today gave us some pause.

13  Q.   So your opinion is premised on a belief or understanding

14  that Berkshire doesn't have a very sophisticated understanding

15  of the business you're selling; is that correct?

16  A.   I didn't say that.

17  Q.   It sounded like it.  You're saying that --

18  A.   No.

19       THE COURT:  It didn't sound that way to me.  Ask you

20  next question.

21       MR. ALLRED:  All right.  Yes, Your Honor.

22  Q.   Now, you noted that the Nationstar bid, you did not view

23  it as having a financing contingency, correct?

24  A.   Nationstar does not have a financing contingency.

25  Q.   But it does, in fact, rely on financing in order to make

RESIDENTIAL CAPITAL, LLC, ET AL.                              199

1  the payment required under the purchase, correct?

2  A.   Correct, but that doesn't mean it has a financing

3  contingency.

4  Q.   It has a risk of closing if the financing didn't come

5  through, correct?

6  A.   Well, then we can go after the two publicly traded

7  entities who signed the letter and sue them for damages.

8  Q.   In terms of those financing commitments, is it fair to say

9  that if there were a 2008-like capital markets event, there are

10 outs in those financings?

11          MR. ENGELHARDT:  Objection.

12          THE COURT:  Overruled.

13 A.   It's a huge speculation.  I have no idea what can happen,

14 you know, between now and the time of closing.

15 Q.   And on the other side, you're not disputing that Berkshire

16 has adequate cash on the balance sheet to simply close on its

17 own with no financing, are you?

18 A.   No.  I have -- it's very clear that they have the ability

19 to do so.

20 Q.   All right.  And no issue with Berkshire's credit rating,

21 is there?

22 A.   No.

23 Q.   All right.  And you've referred earlier to Berkshire's

24 history in terms of reliability in closing transactions; that's

25 something you're comfortable with, correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                                200

1   A.    Yes, it is.

2   Q.    Your supplemental declaration says that Berkshire Hathaway

3   "expressed no interest in participating in a process".  That

4   was your testimony?

5   A.    Could you just point me to the paragraph?

6   Q.    Sure.

7   A.    It might be the bottom of 22; is that what you're looking

8   at?

9   Q.    Paragraph 22, the sixth and seventh line.

10  A.    Yes, that's true.

11  Q.    All right.  Were you made aware in mid-April of

12  communications between Berkshire and Ally in which Berkshire

13  urged that the better course was a transaction that would keep

14  residential capital out of bankruptcy and operated as a going

15  concern paying its debts in the due course?

16  A.    I was aware that a letter was written from Berkshire to

17  Ally, not to ResCap, expressing that view.

18  Q.    And were you aware -- so is that a reference to the

19  follow-up letter of May 3 from Berkshire?

20  A.    There were quite a number of letters, I believe, all of

21  which were addressed to Ally, not to ResCap.

22  Q.    And those letters were copied to the ResCap board of

23  directors, were they not?

24  A.    Yes, they were.

25  Q.    All right.  And the essence of those letters was that

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    201

1   Berkshire was strongly pushing that a better course was not the

2   bankruptcy solution with an asset sale but rather an equity

3   purchase solution, keeping them as a going concern and paying

4   debts in due course, correct?

5   A.    Yes.

6   Q.    And Berkshire was proposing to be the buyer in such a

7   transaction, correct?

8   A.    Yes.

9   Q.    And Ally responded, basically saying give us a definitive

10  proposal -- on a Friday, saying give us a definitive proposal

11  by Sunday with your terms, correct?

12  A.    I can't recall.

13  Q.    Were you involved in reviewing that response?

14  A.    No.  It was prepared by Ally.

15  Q.    And are you aware that Berkshire, that same day, sent a

16  letter with such a definitive proposal?

17  A.    Again, there was a lot of correspondence; none of it was

18  directed towards my client.  So I believe all those

19  negotiations were between the parent, Ally, and Berkshire.

20  Q.    And are you aware that Ally rejected Berkshire's proposals

21  in that early May time frame?

22  A.    Yes, I'm aware.

23  Q.    So it's fair to say that it's not that Berkshire was

24  uninterested in participating or in purchasing these operations

25  but rather it was quite interested, but it disagreed with the

RESIDENTIAL CAPITAL, LLC, ET AL.                                202

1  path ResCap was pursuing?

2          MR. ENGELHARDT:  Objection.

3          THE COURT:  Overruled.

4  A.   Again, I don't know what Berkshire's intent was or wasn't.

5  I know that we contacted them; they declined to participate.  I

6  know that the auction -- or pre-bankruptcy auction, if you

7  will, that we tried so hard to keep confidential was widely

8  reported in the news.  I have no idea whether or not they

9  agreed or disagreed with the process that we went through.

10 Apparently, at the eleventh hour, they registered their

11 interest with the parent to buy the equity of the sub which was

12 slightly out of the purview of what we were doing and the work

13 we were doing with ResCap, and it was really an issue that

14 resided more with the parent.

15 Q.   If you'll turn to your original declaration at paragraph

16 14, you state -- you describe efforts to explore potential

17 equity purchases there, correct?

18 A.   Yes.  That was managed, I believe, by the parent.

19 Q.   But it was, in essence, within the purview of what you

20 were looking at then, wasn't it?

21 A.   Well, that was a process that was run almost two years

22 before we were hired by somebody else.

23 Q.   All right.  Well, in paragraph 14, you say that equity

24 buyers required that AFI provide complete indemnity for

25 litigation liabilities.  Do you see that?

**RESIDENTIAL CAPITAL, LLC, ET AL.** 203

1  A.    Yes.

2  Q.    And that's something -- you're saying that's not part of

3  anything you were doing but two years earlier?

4  A.    Correct.

5  Q.    And in fact, the Berkshire proposals at the beginning of

6  May did not have any such requirement in them, did they?

7  A.    I'm sorry; could you repeat the question?

8  Q.    The Berkshire proposed equity purchase that -- the

9  multiple proposals; none of them required that AFI provide

10  complete indemnity for litigation liabilities, did they?

11  A.    No.  I believe you suggested that they purchase an

12  insurance policy.

13  Q.    There was a suggestion that there would be an insurance

14  policy, which is far, far different from complete indemnity,

15  isn't it?

16  A.    Yeah, I guess, but you get to the same place.

17        THE COURT:  Mr. Greene, who drafted paragraph 14 of

18  your declaration?

19        THE WITNESS:  I did.

20        THE COURT:  Where did you get the information on which

21  you based it?

22        THE WITNESS:  A Goldman Sachs' presentation.

23        THE COURT:  When?

24        THE WITNESS:  When was the presentation?

25        THE COURT:  Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                          204

1          THE WITNESS:  It was in 2009.

2          THE COURT:  At a point when you had not been retained

3    by --

4          THE WITNESS:  No, no.  We had been retained.  We

5    reviewed some of Goldman Sachs' work from the prior process in

6    order to expedite the process that we were running.  It had a

7    list of people who they had contacted and some of the issues

8    that they had run into in their process.

9          THE COURT:  Go ahead.

10         MR. ALLRED:  Thank you, Your Honor.

11   Q.   Now, I want to go back to your direct testimony that you

12   said you reached out to Berkshire Hathaway in January to

13   participate in a particular process that you wanted to run.  Do

14   you recall that?

15   A.   Yeah, I think I said December or January, I couldn't

16   recall.

17   Q.   All right.  And your declaration does say December or

18   January; the brief that cites your declaration says a

19   particular date of January 23; is that your best estimate?

20   A.   No.

21   Q.   No?  You --

22   A.   I think that was a drafting error.

23   Q.   Oh, okay.  In that time frame, and I won't pick a date

24   since I think there's some ambiguity there, your testimony is

25   that you identified a targeted list of five potential bidders

1  to contact; is that correct?

2  A.    Yes.

3  Q.    And that you limited it to five rather than a broader list

4  of twenty-four because of the concerns about confidentiality

5  and speed; is that right?

6  A.    Confidentiality was one issue.  I think the major issue

7  was we were looking at a March 31 potential filing, so I think

8  we had to go with the best list that we could come up with

9  people who could move quickly and, you know, be able to

10 consummate a transaction.

11 Q.    Okay.  And your testimony was that you negotiated a

12 nondisclosure agreement, an NDA, with each of those five people

13 you reached out to, correct?

14 A.    Yes.

15 Q.    All right.  And now, there is no NDA with Berkshire

16 Hathaway, correct?

17 A.    Not that I'm aware of.

18 Q.    Okay.

19 A.    There might be one between them and the parent because

20 there have been discussions but not between ResCap and

21 Berkshire Hathaway.

22 Q.    And to clarify, you're not aware of such an NDA?

23 A.    I'm not.

24 Q.    All right.  Shifting subjects.  If Berkshire Hathaway is

25 not approved as the stalking horse bidder, do you know for a

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    206

1   fact whether Berkshire Hathaway will bid at all in your

2   subsequent auction process?

3          MR. ENGELHARDT:  Objection.

4          THE COURT:  Overruled.

5   A.   No, I don't know.

6   Q.   All right.

7   A.   Nor do I know if Nationstar will.

8   Q.   Have you had any discussions with your client about how

9   they should respond if there are further overbids to where we

10  stand at this moment?

11  A.   You mean since this morning?

12  Q.   Yes.

13  A.   No, I don't think we have a concrete process put in place

14  to the extent that there are further overbids.

15  Q.   Independent of process, is it fair to say it's your view

16  that there should be a strong bias in favor of the existing

17  stalking horse you've selected, even if there is an overbid?

18         MR. ENGELHARDT:  Objection.

19         THE COURT:  Overruled.

20  A.   No, there is no strong bias.  I think Nationstar came and

21  performed its duties admirably, and we wouldn't be here without

22  them.  And I think we've talked a lot about the sanctity of the

23  process, and I think that's important, and would be a factor in

24  our consideration, but in absence of another bid to consider, I

25  can't sit here and say that we would definitely choose one over

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                                207

1  the other.  But I think that for the reasons that I've

2  previously enumerated, all things being equal, I think

3  Nationstar deserves to be the stalking horse at this current

4  moment in time at 4:21.  What happens at 4:30, I don't know.

5  Q.   All right.  We'll see.

6          MR. ALLRED:  No further questions, Your Honor.

7          THE COURT:  Other cross-examination?

8          MS. TOMASCO:  Your Honor, Patty Tomasco, Jackson

9  Walker, representing Frost Bank.

10 CROSS-EXAMINATION

11 BY MS. TOMASCO:

12 Q.   Good afternoon.

13 A.   Good afternoon.

14 Q.   Do you have an exhibit book in front of you?

15 A.   No.

16         MS. TOMASCO:  May I ask the debtor to provide the

17 witness with its exhibit book?

18         THE COURT:  What exhibits are you asking for?

19         MS. TOMASCO:  The debtor's exhibits.

20         THE COURT:  Okay.

21         MR. ENGELHARDT:  May I approach the witness, Your

22 Honor?

23         THE COURT:  Yes, please, go ahead.

24         MR. ENGELHARDT:  Thanks.

25         THE COURT:  Thank you very much.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                           208

1    MS. TOMASCO:  I'm trying to think of the best order to

2 do this in, Your Honor.  I guess I'm going to start with the

3 language that is in the sales procedures order on page 13 which

4 is the Debtor's Exhibit 3.

5 A.   Page 13 of this exhibit?

6 Q.   Page 13 of Exhibit 3.  Did you review any part of the

7 sales procedures order as part of your duties?

8 A.   I didn't focus on the order, no.

9 Q.   Were you aware that the proposed APA purports to cut off

10 for assumed contracts any liability attributable to the actions

11 of the debtor?

12    MR. ENGELHARDT:  Your Honor, objection.

13    THE COURT:  What's your objection?

14    MR. ENGELHARDT:  I believe it's beyond the scope of

15 the direct and the declaration as submitted and also the direct

16 I elicited on the testimony.

17    MS. TOMASCO:  I can go back to --

18    THE COURT:  I'm going to overrule it.

19    MS. TOMASCO:  Thank you, Your Honor.

20 Q.   You --

21    THE COURT:  Otherwise, she's just going to recall your

22 witness as part of her -- let's just move on with it, okay?

23    MR. ENGELHARDT:  Thank you, Your Honor.

24    THE COURT:  This is not a jury.

25 Q.   You testified in your declaration filed with the

1  procedures motion, Mr. Greene, that you participated in the

2  negotiation of the APA with Nationstar; is that correct?

3  A.   Yes, I did.

4  Q.   And you did so in that -- that product is what is Debtor's

5  Exhibit 1; is that correct?

6  A.   Yes, it looks to be like the APA.

7  Q.   Would you agree with me that the asset purchase agreement

8  purports to terminate, with respect to any assumed contract,

9  any liability attributable to actions of the debtor?

10        MR. ENGELHARDT:  Objection.

11        THE COURT:  Point him to a specific paragraph,

12  counsel.  He's not giving a legal opinion if he --

13        Did you review the order?

14        THE WITNESS:  I did not.

15        THE COURT:  Objection sustained.

16  Q.   You did review the APA, did you not?

17  A.   I've seen the APA; I did not read every page of the APA,

18  no.

19  Q.   Can you look at the definition of "assumed liabilities" on

20  page 4 of Exhibit 1?

21  A.   Assumed liabilities?

22  Q.   Yes.

23  A.   Yes.

24  Q.   "The assumed liabilities include liabilities arising under

25  any assumed contract to the extent such liabilities arise on

1  and after the closing date."  Do you see that?

2  A.    Yes.

3  Q.    All right.  And that was an essential term of the asset

4  purchase agreement that you assisted the debtor in negotiating

5  with Nationstar?

6            MR. ENGELHARDT:  Objection.

7            THE COURT:  Sustained.

8  Q.    Are you familiar with that language?

9  A.    I'm familiar now that I've read it, but I was not involved

10  in negotiating that direct provision.

11  Q.    Let's turn to page 24 of the asset purchase agreement.  Do

12  you see where "amongst the retained liabilities to be retained

13  by the debtor include any act or omission of any originator,

14  holder, servicer of mortgage loans occurring prior to the" --

15  A.    No, sorry.

16  Q.    -- "closing date"?

17  A.    Where are you?

18  Q.    On subpart G, right before the definition of RFC,

19  continuing the definition of retained liabilities.

20  A.    I see that, but it's a subpart to something else that I

21  should probably read, right?  I mean, I see the subsection; I

22  don't know what it relates to unless you want me to read back

23  and find out.

24            THE COURT:  This is back on page 22 under retained

25  liabilities.  Were you involved in drafting this?

1    THE WITNESS:  No.

2         MS. TOMASCO:  His declaration -- Your Honor, his

3    declaration --

4         THE COURT:  Just ask your question.  I don't want to

5    hear any argument.

6         MS. TOMASCO:  All right.

7    Q.   You said in your declaration that you assisted in the

8    negotiation of the APA, correct?

9    A.   Right.  Usually, the financial advisor's role is to assist

10   in the negotiation of the APA on the major business points, and

11   the attorneys draft a lot of the definitions and other language

12   that ends up in the document itself.

13   Q.   In your declaration, paragraph 39 --

14   A.   Which one?

15   Q.   The one that is docket number 63.

16   A.   I'm sorry; which paragraph?

17   Q.   Paragraph 39.

18   A.   Yup.

19   Q.   All right.  And did you mean the sales procedures as it

20   pertains to the bidding process or as to the cure amount

21   process?

22   A.   The sale procedures, in my mind, are the bidding process.

23   Q.   All right.  Did you have any role at all in assisting the

24   debtors with developing the cure process?

25   A.   No.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    212

1   Q.   Now, in working with the debtors, did you become familiar

2   with the servicing business, the mortgage servicing business?

3   A.   Sure.

4   Q.   All right.  And does the 2.3 million mortgages that the

5   debtor serviced, do many of them -- they're serviced by the

6   debtors pursuant to pooling and servicing agreements?

7   A.   Yes, they are pursuant to PSAs.

8   Q.   All right.  Now, when purchasers are looking at the

9   debtor's business for purposes of determining what those PSAs

10  are worth, what are the components of that value?

11          MR. ENGELHARDT:  Objection.

12  A.   I didn't review the PSAs, PSA by PSA, so I can't answer

13  that.

14  Q.   No.  I'm saying as a generic -- the servicing rights, how

15  were those valued?

16          THE COURT:  Are you, as the financial advisor able to

17  answer this question?

18          THE WITNESS:  I don't understand the question so --

19  Q.   So are purchase -- or pooling and servicing agreements,

20  are they valued primarily because they create an income stream

21  that's fairly certain over time?

22  A.   Pooling and service -- yeah, at a high level, yes, that is

23  how they work, but we have many different types of pooling and

24  servicing agreements.  I think we have dozens, if not more, so

25  I'm sure that they're all a little bit different.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                213

1  Q.   So like all assets that are valued in this sense, you have

2  an income stream and you also have potential liabilities; is

3  that correct?

4  A.   I don't know how to answer the question.

5  Q.   If you have an income stream, what are some of the factors

6  that can detract from the value of that income stream?

7        MR. ENGELHARDT:  Objection.

8        THE COURT:  Overruled.

9  A.   I think you might be referring to things like nonpayment

10 and other things that -- and then the company has to post

11 effectively advances for those assets.

12 Q.   What kind have you -- have you become familiar enough with

13 the debtor's business to know what kind of liabilities can

14 occur for a servicer in the process of servicing mortgages?

15 A.   I think I just answered that question.  They have an

16 obligation to make payments of taxes, insurance, et cetera.

17 Q.   Do they also incur liability to the mortgagor?

18 A.   I'm not sure of the -- at that technical level.

19 Q.   All right.  Are you aware that servicers sometimes

20 misapply escrow payments?

21 A.   I'm not sure.

22 Q.   That they sometimes mistakenly impose force placed

23 insurance?

24        MR. ENGELHARDT:  Objection.

25        THE COURT:  Sustained.

RESIDENTIAL CAPITAL, LLC, ET AL.                    214

1   Q.   Are you aware that servicers sometimes violate fair debt

2   collection procedures?

3              MR. ENGELHARDT:  Objection.

4              THE COURT:  Sustained.

5   Q.   With respect to the owners of the mortgage file, do they

6   have physical possession of the servicing file?

7   A.   I have no idea.

8   Q.   So, for instance, the trustees of any particular PSA don't

9   have day-to-day contact with the servicing arrangements?

10             MR. ENGELHARDT:  Objection.

11             THE COURT:  If he has knowledge, he can answer it; if

12  not, just ask --

13  A.   I don't; I don't know.

14  Q.   So as a trustee with the -- trustee of a certain -- of a

15  pooling and servicing agreement or another owner of a mortgage

16  who actually advanced the funds to purchase the home, would

17  they have knowledge if the servicer had actually violated any

18  of its servicing obligations?

19             MR. ENGELHARDT:  Objection.

20             THE COURT:  Sustained.

21  Q.   Would you agree that most pooling and servicing

22  agreements, as a result of the division of ownership and

23  servicing, have broad indemnity provisions?

24  A.   I'm not --

25             THE COURT:  Do you have any knowledge about that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    215

1    THE WITNESS:  I'm not sure.

2    Q.   As part of your negotiations of the asset purchase

3    agreement, were indemnities under the PSAs ever a point of

4    negotiation?

5    A.   I believe they were, but I wasn't involved.

6    Q.   And what makes you believe that they were?

7    A.   I just had heard the concept being discussed amongst

8    counsel.

9    Q.   And what was the discussion?

10   A.   I can't recall.

11        MR. ENGELHARDT:  Objection.

12        THE COURT:  Sustain -- oh, he can't recall.  Makes it

13   easy.

14        MS. TOMASCO:  I beg your pardon?

15   A.   I can't recall.

16        THE COURT:  He can't recall, so it makes it easy; I

17   don't have to rule on an objection.

18        MS. TOMASCO:  Okay.

19        That's all I have, Your Honor.

20        THE COURT:  Thank you.

21        Any other cross-examination?

22        Redirect.

23        MR. ENGELHARDT:  Stefan Engelhardt, Morrison &

24   Foerster, proposed counsel for the debtors.  May I proceed,

25   Your Honor?

RESIDENTIAL CAPITAL, LLC, ET AL.                              216

1       THE COURT:  Yes, go ahead.

2       MR. ENGELHARDT:  Thank you.

3   REDIRECT EXAMINATION

4   BY MR. ENGELHARDT:

5   Q.   Mr. Greene, just a brief few questions.  Do you recall

6   under examination by Berkshire's counsel there was some

7   testimony regarding the seventy-two million dollar break-up

8   fee?  Do you recall that testimony?

9   A.   Yes, I recall being asked questions about the break-up

10  fee.

11  Q.   And do you recall you were questioned about the statements

12  in your declaration as to whether that break-up fee was

13  reasonable, generally.  Do you recall that testimony?

14  A.   Yes.

15  Q.   When was that seventy-two million dollar break-up fee

16  negotiated?

17  A.   It was negotiated over a fairly lengthy period of time,

18  embedded in dozens, if in the more, issues in the APA right up

19  until the time we filed.

20  Q.   When was final agreement reached on that particular break-

21  up fee?

22  A.   I think was about the day before we filed.

23  Q.   Okay.  Was the debtors -- were the debtors facing any

24  exigencies at that point in time?

25  A.   Yes.  We had to file by the next day.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    217

1   Q.   Okay.  In your view as the financial advisor for the

2   debtor, did those exigencies limit the leverage that the

3   debtors had to further negotiate that fee?

4   A.   Sure.  I think that was apparent, but we did our best to

5   strike the best deal for the company, but it's inevitable in

6   those types of situations that sometimes buyers have more

7   leverage.

8   Q.   Did the debtors make any efforts to get that break-up fee

9   lowered?

10  A.   Yes.  We negotiated -- our opening position was one

11  percent, so we were working very hard to do that.  And we got

12  other concessions along the way that -- again, that were rolled

13  up into the entire APA in general.  And we weren't successful

14  in reducing the seventy-two million at that time.

15          MR. ENGELHARDT:  I have nothing further, Your Honor.

16          THE COURT:  Thank you very much.

17          Any recross?

18          MR. ALLRED:  No, Your Honor.

19          THE COURT:  You're excused.  Thank you.

20          THE WITNESS:  Thanks.

21          THE COURT:  Mr. Engelhardt, any additional witnesses?

22          MR. ENGELHARDT:  Your Honor, we have no additional

23  witnesses to present live before the Court.  We do make

24  available our declarants for cross-examination.

25          THE COURT:  All right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                  218

1      Do you wish to cross-examine?

2             MR. ALLRED:  No, Your Honor, but we have a witness.

3             THE COURT:  I know, but we'll get to that.

4             Does anybody wish to cross-examine any of the

5      declarants for whom the Court admitted in evidence their

6      declarations?

7             MS. TOMASCO:  Your Honor, just so we can get to more

8      personal knowledge --

9             THE COURT:  Just tell me who you want to cross-

10     examine.

11            MS. TOMASCO:  James Whitlinger.

12            THE COURT:  Okay.  Would you come on up to the witness

13     stand, okay?  Thank you very much.

14            If you would, raise your right hand and be sworn.

15       (Witness sworn)

16            THE COURT:  All right.  Please have a seat.

17     CROSS-EXAMINATION

18     BY MS. TOMASCO:

19     Q.   Is it Whitlinger?

20     A.   Yes, Whitlinger.

21     Q.   Mr. Whitlinger --

22            THE COURT:  If you're going to cross-examine him about

23     his declaration, do you want to put a copy in front of him now?

24     Somebody put a copy -- is that what's your intention to do?

25            MS. TOMASCO:  Essentially, I'm going to ask the same

1   questions I was not able to get answered from the prior

2   witness.

3         THE COURT:  Are you going to ask him any questions

4   from his declarations?

5         MS. TOMASCO:  I don't have a copy of his declaration,

6   Your Honor.

7         THE COURT:  Go ahead and ask your questions then.

8   Makes it easy.

9   Q.   Mr. Whitlinger, what is your role with the debtors?

10  A.   Chief financial officer.

11  Q.   All right.  Are you familiar with the servicing business?

12  A.   I am familiar with the servicing business.

13  Q.   How, generally, are pooling and servicing agreements

14  structures?

15        MR. ENGELHARDT:  Your Honor, I have to object on the

16  relevance of this.

17        THE COURT:  Could you make that question a little --

18  I'm going to sustain the objection to the question.  I'm not

19  closing off this area, but you're going to have to be more

20  focused in your question.

21  Q.   Does GMAC Mortgage service loans for other owners?

22  A.   GMAC Mortgage services multiple loans for multiple

23  investors?

24  Q.   Correct.

25        THE COURT:  Why don't you pull the microphone a little

**RESIDENTIAL CAPITAL, LLC, ET AL.**                 220

1  closer?  You won't have to lean over as much, okay?  Thank you.

2          Go ahead.

3  Q.   Are those investors the counterparties to the pooling and

4  servicing agreements?

5  A.   Yes.

6  Q.   Do they rely on GMAC Mortgage to service those loans in a

7  particular way?

8          THE COURT:  Sustained.

9  A.   Yeah, they service --

10         THE COURT:  No, no, no.  I'm sustain -- there's was

11  going to -- I beat him to the punch.  He was standing to

12  object, and I sustained the objection because he was asked --

13  the question was about what somebody else relies on.

14  Q.   What is your understanding of GMAC Mortgage's duties with

15  respect to servicing the loans under its care?

16  A.   The servicing business services the loans in accordance

17  with the servicing guides.

18  Q.   All right.  What are some of the kinds of mistakes that a

19  servicer can make with respect to servicing a loan?

20         MR. ENGELHARDT:  Objection.

21         THE COURT:  Sustained.

22         MS. TOMASCO:  I'm sorry, Your Honor.  What's the basis

23  of the objection?

24         THE COURT:  Well, I sustained the objection, so ask

25  another question, okay?

RESIDENTIAL CAPITAL, LLC, ET AL.                221

1    MS. TOMASCO:  Well, I would -- okay.

2   Q.   Do servicers sometimes misapply escrow payments?

3        MR. ENGELHARDT:  Objection.

4        THE COURT:  Overruled.

5   A.   Yes.

6   Q.   Do servicers sometimes mistakenly impose force placed

7   insurance?

8   A.   I don't know.

9   Q.   Do servicers sometimes engage in conduct that relate --

10  that causes liability to be asserted by the mortgagor?

11       MR. ENGELHARDT:  Objection.

12       THE COURT:  Sustained.

13  Q.   Who has possession and control of the servicing file vis-

14  a-vis the relationship between GMAC and the parties for whom it

15  does servicing?

16       THE COURT:  I don't understand your question, so

17  before I hear the objection, you're going to have to reframe

18  your question.  I didn't understand it.

19  Q.   Do you know who a servicing file is?

20  A.   I think I know what a servicing file is.

21  Q.   The servicing file contains all of the information about

22  the payments made and how they're applied with respect to any

23  particular mortgage, correct?

24  A.   That's not what I was going to say a servicing file is.

25  Q.   In your mind, what is a servicing file?

**RESIDENTIAL CAPITAL, LLC, ET AL.**          222

1  A.    A servicing file would contain documents that the borrower

2  had signed at time origination, and some of the related

3  information about the loan, if it was transferred, et cetera.

4  Q.    All right.  The relationship between the servicer and the

5  borrower, is there also information about payments made by the

6  borrower to the servicer?

7  A.    The servicing system contains information about payments

8  from the borrower to the servicer.

9  Q.    All right.  Do the owners of the mortgage, the trustees of

10 the PSAs or the owners of the mortgage, such as my client, do

11 they have access to the servicing system?

12          MR. ENGELHARDT:  Objection.

13          THE COURT:  Do you know?

14          THE WITNESS:  I don't know.

15 Q.    Do trustees routinely access your servicing system to

16 verify whether or not loans are being serviced properly?

17          THE COURT:  Do you know?

18          THE WITNESS:  I don't know.

19 Q.    When do the trustees of a PSA or the owner of a mortgage

20 find out when or if there has been an error in servicing?

21          MR. ENGELHARDT:  Objection.

22          THE COURT:  Sustained.

23 Q.    What is GMAC's position with respect to reporting mortgage

24 servicing errors to the trustees of PSAs?

25 A.    I am not the head of servicing; I don't know the answer.

RESIDENTIAL CAPITAL, LLC, ET AL.                                223

1   Q.    Are you aware of the structure of most pooling and

2   servicing agreements?

3   A.    I am not.

4   Q.    Are you aware of how servicing rights are valued?

5   A.    Yes.

6   Q.    And how are they valued?

7   A.    Servicing rights are valued based on what the company

8   determines expected life of the loan to -- how much the

9   servicing fee is, what ancillary income that will be collected,

10  what projected pre-payment speeds, delinquencies, and costs to

11  service the loan will be as a discounted cash flow.

12  Q.    Would liability for servicing errors be one of the things

13  that detracted from the value of a servicing contract?

14          MR. ENGELHARDT:  Objection.

15          THE COURT:  Overruled.

16  A.    The company separately establishes a liability for

17  potential rep and warranty repurchases outside of its MSR

18  evaluation.

19  Q.    And how does GMAC or ResCap account for -- is it a

20  reserve?

21  A.    Yes, it's a reserve.

22  Q.    All right.  Under the contemplated APA, what happens to

23  that reserve once those contracts are assigned to the

24  purchaser?

25  A.    The servicing rights would be transferred to the new owner

RESIDENTIAL CAPITAL, LLC, ET AL.                    224

1   without the rep and warranty.

2            THE COURT:  Without the reserve for the rep?

3            THE WITNESS:  Without the reserve for the rep and

4   warranty.

5   Q.   And why is that?

6   A.   That's the structure that's been contemplated.

7   Q.   Does that structure depend on the language in the APA that

8   retains liabilities at the debtor for past servicing errors?

9            MR. ENGELHARDT:  Objection, Your Honor.

10           THE COURT:  Do you know the answer to this?

11           THE WITNESS:  I don't know the answer.

12  Q.   Did you negotiate the APA?

13  A.   I was part of the team that negotiated the APA.

14  Q.   Are you aware of the definition of assumed liabilities?

15  A.   I don't -- I don't remember.

16  Q.   Do you have the exhibit book in front of you?

17  A.   I do not.

18           MR. ENGELHARDT:  May I approach the witness, Your

19  Honor?

20           THE COURT:  Yes, please go ahead.

21           Are you referring to page 4?

22           MS. TOMASCO:  Yes, I am, Your Honor.

23           THE COURT:  Okay.  So we're looking at Exhibit 1 --

24  Debtor's Exhibit 1 at page 4, the definition of assumed

25  liabilities.

1  Q.    Do you see on romanette iii, Mr. Whitlinger?

2  A.    Yes.

3  Q.    That liabilities arising under any assumed contract, to

4  your understanding, that includes servicing agreements?

5  A.    I don't know.

6  Q.    Do you know what contracts are being assumed under this

7  APA with Nationstar?

8  A.    There's a lot of contracts being assumed.

9  Q.    All right.  Would servicing contracts be amongst those?

10 A.    Yes.

11 Q.    So under the APA, it purports to cut off under any assumed

12 contract liabilities that occurred prior to the closing date,

13 correct?

14         MR. ENGELHARDT:  Objection.

15         THE COURT:  Sustained.

16 Q.    Do you understand what the language of romanette iii means

17 on assumed liabilities?

18 A.    Yes.  It's stating that liabilities arising under the

19 assumed contract, that they arise on or after the closing.

20 Q.    And with respect to liabilities under a servicing

21 contract, is it possible that there are liabilities that have

22 occurred under assumed contract prior to the closing?

23         MR. ENGELHARDT:  Objection.

24         THE COURT:  Sustained.

25 Q.    Do you have knowledge of what happens to liabilities

RESIDENTIAL CAPITAL, LLC, ET AL.                          226

1  occurring under the servicing agreements under this APA that

2  occur prior to the closing?

3          THE COURT:  Do you know?

4          THE WITNESS:  I believe --

5          THE COURT:  What's your understanding?

6          THE WITNESS:  My understanding is that those

7  liabilities would remain with the estate.

8  Q.   Do you know why that was negotiated that way?

9          MR. ENGELHARDT:  Objection.

10          MS. TOMASCO:  He said he was participating --

11          THE COURT:  Just don't get into an argument.  If I

12  want to hear from you, I will.

13          Can you answer that question?

14          The objection is overruled.

15  A.   Yeah.  I mean, the servicing assets in the marketplace

16  haven't been trading because of these types of liabilities, so

17  it would be difficult to put a value on what potential

18  liability for rep and warranty-type obligations are, and so a

19  buyer wouldn't want to take on that obligation.

20  Q.   When you say "rep and warranty claims", you're talking

21  about rep and warranty claims that originated when the

22  securitization was first formed, correct?

23  A.   That, for sure.

24  Q.   All right.  What about liabilities for actual servicing

25  activities as opposed to rep and warranty liabilities?

RESIDENTIAL CAPITAL, LLC, ET AL.                    227

1       THE COURT:  Is that something you considered?  I don't

2   want you speculating.

3       THE WITNESS:  Yeah, I don't --

4       THE COURT:  If it's something you considered, you can

5   go ahead and answer it.

6       THE WITNESS:  Yeah.  I don't know for sure.

7   Q.   Well, when you said that the market was viewing the

8   servicing assets disfavorably as a result of rep and warranty

9   liabilities emanating from the origination of the loan and the

10  securitization; is that correct?

11  A.   Yes.

12  Q.   Are liabilities associated solely with servicing

13  activities among the factors that, in your view, have caused

14  these assets to be viewed negatively in the market?

15       MR. ENGELHARDT:  Objection.

16       THE COURT:  Overruled.

17  A.   Clearly, I would say with some of the concerns about the

18  servicing that's been performed with the DOJ, the AGs for

19  closure activities, that that has been a concern.

20  Q.   A trustee or an owner of a mortgage, after the closing, as

21  you understand the asset purchase agreement, if liability is

22  asserted against them as a result of the activities of the

23  debtors in servicing the mortgage, can they look to the

24  purchaser or not?

25       MR. ENGELHARDT:  Objection.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    228

1      THE COURT:  Sustained.

2   Q.    Do you know if the schedules have been filed in this case?

3   A.    I don't understand the question.

4   Q.    Have the schedules and statements of financial --

5           THE COURT:  They haven't.  Ask your next question.

6   Q.    Are there counterparties to servicing contracts that have

7   not yet been notified of the pendency of this case?

8           THE COURT:  Do you know?

9           THE WITNESS:  I don't know.

10          MS. TOMASCO:  That's all I have, Your Honor.

11          THE COURT:  All right.  Any other cross-examination?

12          Any redirect?

13          MR. ENGELHARDT:  No, Your Honor.

14          THE COURT:  All right.  You're excused.  Thank you

15   very much.

16          Are there any of the other declarants that anyone

17   wishes to cross-examine?

18          All right.  Do the debtors rest?

19          MR. ENGELHARDT:  Your Honor, the debtors rest.

20          THE COURT:  Thank you very much.

21          All right.  Do the objectors -- any of the objectors

22   intend to call any witnesses?

23          MR. ALLRED:  Yes, Your Honor.  Berkshire would call

24   one witness.

25          THE COURT:  All right.  Call them, Mr. Allred.

RESIDENTIAL CAPITAL, LLC, ET AL.                                              229

1          MR. ALLRED:  We call Mr. Ted Weschler, please.

2          THE COURT:  If you'd raise your right hand.

3     (Witness sworn)

4          THE COURT:  All right.  Please have a seat.  Thank you

5  very much.

6          Mr. Allred, go ahead with direct.

7          MR. ALLRED:  Thank you, Your Honor.

8          Just to expedite, may I approach the bench and give

9  the Court some exhibits?

10          THE COURT:  Please do.  These are things I don't have

11  is what you're saying?

12          MR. ALLRED:  Some of them.

13          THE COURT:  Okay.  Does the witness have a set in

14  front?

15          MR. ALLRED:  The witness has a set in front of him.

16          THE COURT:  Okay.  Do other counsel have copies?

17          MR. ENGELHARDT:  I do, Your Honor.

18          MR. ALLRED:  These two tables do, Your Honor.

19          THE COURT:  Thank you.

20          MR. ALLRED:  I don't have this many copies.

21          THE COURT:  Okay.

22          Go ahead, Mr. Allred.

23          MR. ALLRED:  Thank you.

24  DIRECT EXAMINATION

25  BY MR. ALLRED:

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                230

1  Q.   Mr. Weschler, we won't go through all the background

2  that's been provided in the declaration, but could you just

3  introduce yourself to the Court in terms of your position

4  currently?

5  A.   Sure.  I work as an investment manager at Berkshire

6  Hathaway.  I've worked in that position since January of this

7  year.

8  Q.   All right.  And do you play any role at Berkshire that's

9  relevant to this proceeding?

10  A.   Yes.  Subsequent to my beginning of employment at

11  Berkshire, I was charged with getting up to speed on the ResCap

12  situation and have been the key point since probably -- key

13  point man at Berkshire on the transaction probably since the

14  late March, early April time frame.

15          THE COURT:  What did you do before joining Berkshire?

16          THE WITNESS:  I ran an investment partnership called

17  Peninsula Partners for twelve years, and then I was in private

18  equity for ten years before that.

19          THE COURT:  Go ahead, Mr. Allred.

20          MR. ALLRED:  Thank you, Your Honor.

21  Q.   You've probably heard while you were in the courtroom

22  today some testimony about Berkshire not participating in the

23  pre-petition process that was run by Centerview.  Did you hear

24  that testimony?

25  A.   I did.

RESIDENTIAL CAPITAL, LLC, ET AL.                    231

1  Q.   Do you have any understanding as to why Berkshire may not

2  have been eager to participate in pre-bankruptcy asset sale

3  proceedings?

4          MR. ENGELHARDT:  Objection.

5          THE COURT:  Sustained.

6  Q.   Was Berkshire interested in participating in pre-

7  bankruptcy asset sale proceedings?

8          MR. ENGELHARDT:  Objection.

9          THE COURT:  You haven't established a foundation for

10 this other than hearsay.  I mean, he just joined Berkshire.

11 Q.   Let's focus on the time period since January 2012.  You

12 joined at the beginning of the year?

13 A.   End of January.

14 Q.   End of January.  And subsequent to your joining, did you

15 become aware of what Berkshire's position was as to the optimal

16 approach to be taken with respect to its ResCap investments?

17 A.   Yes.

18 Q.   And how did you learn that?

19 A.   I was invited into a dialog between Mr. Michael Carpenter,

20 the CEO of Ally, and Warren Buffett, my boss.  Mr. Carpenter

21 came to Omaha, and I was invited to participate in that

22 meeting.

23 Q.   And based on that, did you come to have an understanding

24 as to whether Berkshire was eager in participating in --

25          THE COURT:  Well, whether he's eager or not, just tell

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    232

1  me what happened?

2  Q.   What was your understanding as to Berkshire's view about a

3  pre-bankruptcy asset sale process?

4         THE COURT:  Tell me what was said at the meeting.  I

5  don't want to know about pre-bankruptcy, you came on late in

6  the day, but tell me what was said in the meeting with Ally.

7         THE WITNESS:  Well, the meeting was -- at the time,

8  there were a lot of rumors in the press that Ally and ResCap

9  were potentially thinking about ResCap going into bankruptcy.

10 We had no basis to know whether that was the case or not.  Mr.

11 Carpenter came out to Omaha to, I think, test the waters to see

12 what our appetite would be if a bankruptcy --

13        THE COURT:  Tell me what he said.  Whether he was

14 testing the waters or not, we'll leave to him if we have to

15 hear him.

16        THE WITNESS:  He simply talked about hypothetical

17 scenarios that they were looking at including bankruptcy.

18        THE COURT:  Go ahead, Mr. Allred.

19        MR. ALLRED:  Thank you, Your Honor.

20 Q.   And did you or Mr. Buffett respond to his suggestions

21 about where they might be headed?

22 A.   We didn't like the idea of bankruptcy.

23 Q.   And why was that?

24        THE COURT:  Did you say that?

25        THE WITNESS:  Yes.  It was -- we didn't think it was

1   the best path for ResCap to take, and as a bondholder, we

2   thought it would have a negative effect on our overall

3   position.

4   Q.    All right.  And why did you think that?

5   A.    Well, our analysis was that it would likely have the

6   effect of accelerating and bringing to the fore the broad body

7   of litigation referred to as reps and warranties litigation,

8   potentially make that litigation effectively senior to some of

9   the bonds that we owned.

10  Q.    All right.  And based on that, did you reach a view as to

11  whether or not you wanted to be part of a pre-bankruptcy asset

12  sale process?

13  A.    We felt we would prefer to buy the company outright and --

14          THE COURT:  Did you say that at the meeting?

15          THE WITNESS:  Yes.

16          THE COURT:  Go ahead.  I interrupted you.  Had you

17  finished your answer?

18          THE WITNESS:  Yes.

19  Q.    All right.  And since bankruptcy filing, obviously we all

20  know that you have now -- you Berkshire have now come forward

21  with a proposal for an asset purchase.  Why now when you

22  weren't willing to before?

23  A.    Well, there are two aspects.  One is we were strongly

24  against the bankruptcy filing, and we said that at the meeting.

25  We said that in follow-up communication with Mr. Carpenter; we

1   said that in follow-up offers to buy ResCap directly.  We

2   thought that was a better tack.  And secondly, we are not

3   subject to an NDA with either Ally or ResCap.  It was a

4   situation where we thought it was in our best interest to not

5   be restricted, and we made it very clear to anybody that was

6   talking to us that we did not want to be exposed to material

7   nonpublic information.  We gather most of the information that

8   we use in our business from public filings that anybody else

9   can have access to.

10  Q.   All right.  Before we move on to the next subject, I want

11  to --

12          MR. ALLRED:  Your Honor, if I may approach with --

13          THE COURT:  Go ahead.

14          MR. ALLRED:  -- with two more exhibits.

15          THE COURT:  Sure.

16  (Letters were hereby marked for identification as Berkshire's

17  Exhibits I and J, as of this date.)

18          THE COURT:  Just so the record is clear, I had

19  previously been handed what's been marked for identification as

20  Berkshire Exhibit A, Berkshire Exhibit F, Berkshire Exhibit G,

21  and now I've just been handed what's marked for identification

22  as Berkshire Exhibits I and J.

23          MR. ALLRED:  Your Honor, if I may offer a friendly

24  amendment, that top document you have is actually Exhibits A

25  through E, and there's a one-page Exhibit H that's on the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    235

1    bottom that probably got stuck to your Exhibit G.

2              THE COURT:  Okay.  All true.

3              MR. ALLRED:  Thank you, Your Honor.

4    Q.   Mr. Weschler, earlier on -- in the earlier testimony,

5    there was a reference to a May 3 letter proposal that you sent

6    to Ally's chairman.  Do you recall that?

7    A.   Ally's CEO, correct.

8    Q.   CEO, thank you.

9              MR. ALLRED:  And Your Honor, just for your

10   information, that was part of debtor's exhibit, so it's already

11   in evidence, but these are the follow-up correspondents I

12   wanted to bring in.

13   Q.   If you could now look at what has been marked as Exhibit I

14   in front of you.

15   A.   Um-hum.

16   Q.   Can you identify what Exhibit I is?

17   A.   Yes.  It's a letter from me to Mike Carpenter, the chief

18   executive officer of Ally, dated May 4, 2012, expressing

19   interest in acquiring ResCap.

20   Q.   All right.  And could you look next at Exhibit J, please?

21   A.   Yep.

22   Q.   And what is Exhibit J?

23   A.   It's a response to the response of my May 4th letter.  My

24   May 4th letter was -- my May 4th offer was fairly quickly

25   rejected, and I followed up with a further approach, in effect,

RESIDENTIAL CAPITAL, LLC, ET AL.                          236

1   asking what can we do to make a transaction work here.

2   Q.   And did Mr. Carpenter respond to that?

3   A.   Either verbally or in an e-mail the next day or on Monday

4   just saying that they couldn't see clear to negotiate.

5              MR. ALLRED:  Your Honor, we'd move Exhibits I and J

6   into evidence.

7              MR. ENGELHARDT:  No objection, Your Honor.

8              THE COURT:  All right.  Berkshire Exhibits I and J are

9   admitted into evidence.

10  (Letter from Mike Carpenter, dated May 4, 2012 was hereby

11  received into evidence as Berkshire's Exhibit I, as of this

12  date.)

13  (Response to letter from Mike Carpenter was hereby received

14  into evidence as Berkshire's Exhibit J, as of this date.)

15  Q.   I want to change subjects now to due diligence.

16  A.   Um-hum.

17  Q.   You heard the testimony of Mr. Greene earlier today that

18  he had some concern about the lack of due diligence that he

19  felt Berkshire had done.  Did you hear that testimony?

20  A.   Yes, I did.

21  Q.   How would you characterize the knowledge that Berkshire

22  has about ResCap?

23  A.   Enough to put their proposals on the table that we've put

24  on the table and feel comfortable that we were paying a price

25  that was fair and in the best interest of Berkshire

RESIDENTIAL CAPITAL, LLC, ET AL.                    237

1  shareholders.

2  Q.   And what are the sources or some of the sources that you

3  know of, of that knowledge?

4  A.   It would be filings with the SEC, 10Ks, 10Qs.  In the case

5  of ResCap, they stopped filing with the SEC, I think, three

6  years ago, but they still do make available to their

7  bondholders on an exclusive site quarterly financial

8  statements, and we get those regularly.

9  Q.   All right.  And what level of interest did Berkshire have

10 in the nature of ResCap's operations?

11 A.   Quite high.  Mr. Buffett has followed the mortgage

12 industry and housing industry for many, many years.  In the

13 ResCap situation specifically, I think the position was first

14 put on maybe four, maybe five years ago, was when we first

15 bought some of these loans.

16 Q.   And so as of around the beginning of the year, roughly how

17 large was Berkshire's position?

18 A.   It was face value, somewhere around one-and-a-half billion

19 dollars.

20 Q.   All right.  And do you foresee any reasonable possibility

21 that if Berkshire is selected as stalking horse, it would fail

22 to close based on some further due diligence?

23        MR. ENGELHARDT:  Objection.

24 A.   No --

25        THE COURT:  Just a second; just a second.

RESIDENTIAL CAPITAL, LLC, ET AL.                    238

1      THE WITNESS:  Oh.

2      THE COURT:  Overruled.

3      Go ahead.

4      THE WITNESS:  I'm sorry.

5  A.   No.  I mean, we submitted the bid knowing that we had less

6  than perfect information, but we also knew that these were

7  unusual circumstances, and we had opted out of the process up

8  front because we didn't want to be tainted by the process.  And

9  so we --

10     THE COURT:  What do you mean "tainted by the process"?

11     THE WITNESS:  Well, in effect, brought into material

12 nonpublic information.  And because of that, we needed to have

13 comfort that we had enough information and the purchase price

14 was attractive enough that we'd be doing a transaction that,

15 again, was in the best interest of our shareholders.

16 Q.   All right.  And did you have -- do you have that

17 confidence?

18 A.   Yes.

19 Q.   All right.  Let's move to the GS -- excuse me -- GSEs.

20 You heard that testimony?

21 A.   Yes.

22 Q.   Have you given any consideration to the ability of

23 Berkshire Hathaway to get any necessary GSE approvals?

24 A.   Very much so.  It's an important part of this process.

25 Q.   And what have you concluded?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                           239

1  A.   Well, we'll do our absolute best to get those approvals.

2  Q.   And what do you foresee at the likelihood of that?

3  A.   Well --

4       MR. ENGELHARDT:  Objection.

5       MR. ALLRED:  Your Honor, I'll withdraw it and ask a

6  series of questions.

7       THE COURT:  Go ahead.

8  Q.   Does Berkshire have any experience in getting regulatory

9  approvals?

10 A.   I think it's fair to say extensive.  We run a number of

11 insurance operations; each one have their own licensure and

12 rules and the like in the states and countries that we're in.

13 Likewise, we run a regulated utility -- actually utilities, and

14 again, those are subject to regulation.  A lot of the

15 businesses we have have licensing and regulatory rules

16 associated with them.

17 Q.   And what has been Berkshire's experience in terms of its

18 ability to get those licenses and approvals?

19 A.   Pretty good.

20      THE COURT:  What does that mean?

21      THE WITNESS:  Well, I can't think of a case where we

22 didn't get it, but my experience there is relatively limited,

23 Judge.

24 Q.   Does Berkshire have any experience with any of the GSEs

25 that are involved here?

RESIDENTIAL CAPITAL, LLC, ET AL.                    240

1          MR. ENGELHARDT:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          I'll let you go into the subject, but ask some

4  specific questions.

5  Q.   Are any of Berkshire's currently owned or invested-in

6  entities regulated by or approved by any of the GSEs?

7  A.   I can't say for sure.

8  Q.   All right.  Do you have experience with comparable

9  approvals -- comparable approvals, you meaning Berkshire, not

10  you personally.

11          MR. ENGELHARDT:  Objection

12          THE COURT:  Sustained.

13  Q.   All right.

14          THE COURT:  Do you know what approvals you need from

15  the GSEs?  Do you know what approvals you would need to obtain

16  from the GSEs?

17          THE WITNESS:  Broadly speaking, they need to be

18  supportive of us being in the position as servicer.

19          THE COURT:  Well, do you know specifically what

20  approvals you would require from the GSEs?

21          THE WITNESS:  I do not.

22          THE COURT:  Go ahead.  Next question.

23  Q.   There was some testimony early today about state licenses.

24  Is it correct, in your understanding that all states have to

25  approve this or is it something different from that?

1       MR. ENGELHARDT:  Objection.

2       THE COURT:  Sustained.

3       Do you know what state licenses you would need to

4  obtain if you acquire the assets of ResCap?

5       THE WITNESS:  I don't.

6  Q.   Have you received any information that would lead you to

7  think that Berkshire is unlikely to get GSE approval for a

8  transaction with ResCap?

9       MR. ENGELHARDT:  Objection.

10       THE COURT:  Sustained.

11       If you want to lay a foundation for it, go ahead,

12  because so far he's established the foundation he doesn't know

13  what he needs.

14       MR. ALLRED:  All right.

15  Q.   In general --

16       MR. ALLRED:  Well, strike that.  Let me focus it a

17  different way.

18  Q.   What is Berkshire's contemplated approach, if it succeeds

19  in acquiring the ResCap servicing operations in terms of going

20  forward with that business?

21  A.   Yeah.  We'd view it as a stand-alone operation, and our

22  strategy would be to create, in effect, a new wholly subsidiary

23  of Berkshire that would own the assets and the things that go

24  into the origination servicing business.  We'd do it in a way

25  that would -- our goal would be to keep the existing business

**RESIDENTIAL CAPITAL, LLC, ET AL.**                           242

1  as similar as possible to what it is right now, and that would

2  be the same people, the same procedures, and the view being, as

3  I understand it, it's been acceptable to the GSEs up to now,

4  and we'd want to make the process as similar to it's been

5  before, but under Berkshire's ownership with a little bit

6  stronger balance sheet behind it.

7          MR. ENGELHARDT:  Your Honor, if I may, I'd move to

8  strike his references to acceptability of the GSEs on a lack of

9  foundation.

10         THE COURT:  That's overruled.

11 Q.   And you mentioned a little bit better balance sheet.  I

12 assume that was intended as understatement?

13         THE COURT:  I think he was being euphemistic.

14         MR. ALLRED:  Yeah.

15 Q.   I want to now bring the Court up to date on the so-called

16 bidding process that we've been undergoing recently.

17 A.   Um-hum.

18 Q.   You submitted a declaration in opposition to the sale

19 motion; is that correct?

20 A.   That's correct.

21 Q.   And do you have that in front of you?

22         THE COURT:  Is this what you handed me as Exhibit A

23 through --

24         MR. ALLRED:  A with the exhibits thereto as B, C, D,

25 and E?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    243

1            THE COURT:  Right.

2   A.   Yeah.  So that will be A; is that right?

3   Q.   A and the accompanying exhibits.

4   A.   Yes.

5   Q.   All right.  And is that your testimony in this matter?

6   A.   That is.

7   Q.   And what are the exhibits -- what were the exhibits, I

8   should say, since it's past tense at this point.

9   A.   Yeah.  They were essentially the asset purchase agreements

10  for the two transactions that were proposed to be stalking

11  horse transactions, one of those black-lined to highlight the

12  changes that Berkshire was making to the documents that were

13  submitted by the other buyers, Nationstar and Ally, as

14  potential stalking horse bidders.  And then, in addition to the

15  blacklined versions, the two different blacklined versions, we

16  attached a fully executed version signed by Berkshire.

17            MR. ALLRED:  Your Honor, we'd move Exhibits A through

18  E into evidence.

19            THE COURT:  Any objections?

20            MR. ENGELHARDT:  No objection, Your Honor.

21            THE COURT:  All right.  Berkshire Exhibits A through E

22  are admitted in evidence.

23  (Various documents were hereby admitted into evidence as

24  Berkshire's Exhibits A through E, as of this date.)

25  Q.   Since submitting that declaration, have you had

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              244

1  discussions with the debtor or creditor committee

2  representatives about possible improvements to that stalking

3  horse proposal?

4  A.   Yes.

5  Q.   All right.  And let me have you turn to Exhibit H, please;

6  it's the one-page e-mail.

7  A.   Yes.

8  Q.   And is Exhibit H an e-mail that you directed be sent last

9  night?

10  A.   Yes, it is.

11  Q.   And can you summarize for us what it is?

12  A.   It was basically amendments to the key financial terms and

13  bidding terms of the previously submitted and executed

14  Berkshire asset purchase agreements.

15  Q.   All right.  Now, if you'll turn to Exhibits F and G, in

16  turn -- let's start with F.  What is Exhibit F?

17  A.   Exhibit F is a new, executed by Berkshire, asset purchase

18  agreement relating to the origination and servicing business.

19  Q.   And if we could just highlight for the Court the way --

20  the places in which it's different other than the cover page.

21  The cover page is now dated as of today, correct?

22  A.   Correct.

23  Q.   And would you point the Court to the other places in which

24  this differs from the exhibits to your declaration?

25  A.   Sure.  On page 40, section 3.1(a), we simply added a

1  little (ii), which is simply taking what our purchase price was

2  before and saying plus fifty million dollars; we increased the

3  purchase price by fifty million dollars.

4  Q.   All right.  And on page 83, was there an additional

5  change?

6  A.   On page 83, we extended the time of the -- the time line

7  associated with the sales procedure order from ninety days to

8  120 days.

9  Q.   All right.  Now, if you'll turn to Exhibit G, what is

10 that?

11 A.   Okay.  This would be the asset purchase agreement executed

12 as of today by Berkshire Hathaway for the loan portfolio.

13 Q.   And other than the change to date, the cover is today,

14 could you point the Court to any other change from your

15 declaration exhibit?

16 A.   Sure.  On page 43, we had previously -- and this is the

17 top of the page.  We had previously had a breakup fee that I

18 believe was three percent of the purchase price, which would

19 have been, I think, 42.5 million dollars and we changed that to

20 a 10 million dollar breakup fee.  And then on page 48, parallel

21 change to the other asset purchase agreement, we extended the

22 bidding procedures by another 30 days from 90 days to 120 days.

23 Q.   Now with respect to both of these purchase agreements

24 there's separate procedures as reflected in Exhibit H was --

25 did you agree to some change in the procedures applicable to

12-12020-mg   Doc 472   Filed 06/20/12   Entered 06/20/12 15:35:46   Main Document
Pg 246 of 342

246

1  these proposed stalking horse --

2  A.    Sure.  In both of these we -- in both of the asset

3  purchase agreements we agreed that minimum bid increments would

4  be changed to five million dollars in each agreement.

5          MR. ALLRED:  Your Honor, we move Exhibits F, G and H.

6          THE COURT:  Any objections?

7          MR. ENGELHARDT:  No objections.

8          THE COURT:  All right, Exhibits F, G and H are

9  admitted in evidence.

10  (Document was hereby received into evidence as Defendant's

11  Exhibit F, as of this date.)

12  (Document was hereby received into evidence as Defendant's

13  Exhibit G, as of this date.)

14  (Document was hereby received into evidence as Defendant's

15  Exhibit H, as of this date.)

16  Q.    That brings us now to this afternoon.  As you've heard,

17  Nationstar has, since receiving the proposal, I guess, of last

18  night, has adjusted it's -- as you heard today.  Do you have

19  any response that Berkshire's prepared to make?

20  A.    We'd be willing to better our offer.

21  Q.    In what way?

22  A.    Well, for the servicing and origination platform we'd

23  increase the what was a fifty million dollar adder in the

24  agreement from this morning to a sixty million dollar adder.

25  So add ten million dollars to that.  And further we'd reduce

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1   our breakup fee from twenty-four million dollars to twelve

2   million dollars.

3   Q.   And with respect to the other agreement, is there any

4   change?

5   A.   There would be no change in the other agreement.

6   Q.   And other than those two changes that you just mentioned,

7   the other aspects of your proposal such as no due diligence

8   contingency, no financing contingency, et cetera all remain in

9   place, is that correct?

10   A.   They do.

11   Q.   No further questions.

12        THE COURT:  Let me ask you this, Mr. Weschler.

13        THE WITNESS:  Sure.

14        THE COURT:  Did you communicate what you've now just

15   told us in the testimony about your increased offering price

16   for the serving business in one portfolio -- did you

17   communicate that before you just testified to it on the stand?

18   Did you tell the debtors or the committee --

19        THE WITNESS:  No.  No.

20        THE COURT:  No.  Okay, so they're hearing it for the

21   first time?

22        THE WITNESS:  Yes, they are.

23        MR. ALLRED:  No further questions, Your Honor.

24        THE COURT:  All right.  We're going to take a ten-

25   minute recess and then we'll resume with cross-examination.

248

1     (Recess from 5:13 p.m. until 5:35 p.m.)

2         THE COURT:  All right, be seated please.  Mr.

3    Weschler, you know you're still under oath?

4         THE WITNESS:  Excuse me?

5         THE COURT:  You're still under oath.

6         THE WITNESS:  Yes.

7         THE COURT:  Cross-examination.

8         MR. ENGELHARDT:  Thank you, Your Honor.  Stefan

9    Engelhardt, Morrison & Foerster, proposed counsel for the

10   debtors.  May I proceed?

11        THE COURT:  Please go ahead.

12   CROSS-EXAMINATION

13   BY MR. ENGELHARDT:

14   Q.   Hello again, Mr. Weschler.

15   A.    Hello.

16   Q.   Now, if I understood your testimony correctly, you joined

17   Berkshire Hathaway in late January 2012, correct?

18   A.   That is correct.

19   Q.   You have no personal knowledge of any licenses that

20   Berkshire Hathaway acquired in advance of January 2012, is that

21   correct?

22   A.   I wouldn't say no knowledge.  I mean, having been there

23   four months, I've gotten to see a lot of the -- a lot of our

24   licenses in regulated businesses.

25   Q.   Prior to January 2012 you have no first hand knowledge as

249

1  how Berkshire Hathaway went about acquiring those licenses,

2  correct?

3  A.    That's correct.

4  Q.    Now, there came a point in time, did there not, when we

5  heard in your initial testimony that there was a meeting

6  between Berkshire Hathaway representatives and Ally

7  representatives, correct?

8  A.    Correct.

9  Q.    And that occurred in roughly mid-April?

10 A.    Yeah, that sounds right.

11 Q.    And that resulted in certain proposals that Berkshire

12 Hathaway made to Ally, is that correct?

13 A.    That's correct.

14 Q.    And that proposal is embodied in Berkshire Hathaway

15 Exhibit I, which you have before you.  Is that correct?

16 A.    That is correct.  And there is also one of, I think, May

17 3rd as well.  Correct.

18        MR. ENGELHARDT:  Your Honor, may I approach the

19 witness?

20        THE COURT:  Yes, please.  For everybody's benefit, my

21 courtroom rules are you can approach the witness without asking

22 permission if you're approaching to ask about a specific

23 document.  So you don't need to have to ask each time you go

24 up, okay?

25        IN UNISON:  Thank you, Your Honor.

250

1        THE COURT:  Thank you.

2        MR. ENGELHARDT:  Your Honor, I have placed in front of

3   Mr. Weschler Debtor's Sale Exhibit 5, which is moved in

4   evidence.

5   Q.   Mr. Weschler, you testified regarding a May 3rd letter in

6   your previous answer.  Is that the letter to which you were

7   referring?

8   A.   Yes, this is it.

9   Q.   Focusing on Weschler Exhibit I, that was a proposal made

10  to Ally, correct?

11  A.   That is correct.

12  Q.   It was not a proposal directed towards ResCap?

13  A.   It's correct.  We wrestled back and forth how we should

14  present it, but since we were offering to buy the ResCap stock,

15  that was owned by Ally, so we choose to approach it through

16  Ally.

17  Q.   Correct, it -- this is not a proposal for the purchase of

18  assets from ResCap?

19  A.   Correct, it's the purchase of ResCap.

20  Q.   Yes, you did not direct your inquiry to ResCap at all,

21  correct?

22  A.   Well, I copied the board.

23  Q.   The inquiry was directed to Mr. Michael Carpenter of Ally

24  Financial, correct?

25  A.   Correct.

251

1  Q.   And that was for the purchase of the equity interest, am I

2  right?

3  A.   That is correct.

4  Q.   And you offered to purchase those equity interests for one

5  dollar?

6  A.   That's correct.

7  Q.   Now your offer also involved a contribution to ResCap by

8  Ally.  Is that right?

9  A.   Contribution -- say that again?

10  Q.   Your offer --

11  A.   Yes.

12  Q.   -- involved Ally making a 850 million dollar contribution

13  to ResCap, correct?

14  A.   That's correct.

15  Q.   And that's embodied in point number three in Berkshire

16  Exhibit I, is it not?

17  A.   That is correct.

18  Q.   Okay.  And additionally, your offer also involved, if you

19  will, an insurance policy, correct?

20  A.   Yes.

21  Q.   And that's an insurance policy with a fairly big

22  deductible, is it not?

23  A.   Yes.

24  Q.   In fact, your -- Berkshire's proposal involves Ally

25  retaining the first billion dollars in liability, is that

252

1  correct?

2  A.   That is correct.

3  Q.   Now sir, at the time you made this proposal, Berkshire

4  Hathaway owned unsecured bonds of residential capital.  Is that

5  correct?

6  A.   That is correct.

7  Q.   In fact, you were a major bondholder at that time.  When I

8  mean you, I mean Berkshire Hathaway.

9  A.   How do you define major?  I mean --

10 Q.   You own --

11 A.   I think we're the biggest.

12        THE COURT:  You were a major bondholder, yes.

13 Q.   Now, the only due diligence that you undertook prior to

14 making the proposal that's embodied in Exhibit I was roughly a

15 review of public filings.  Is that correct?

16 A.   That would be the extent of the due diligence, yes.

17 Q.   Okay.  And you were aware, Sir, are you not, that on

18 June -- I believe June 14th, I might be off on the date -- you

19 submitted your declaration in this case which attached an

20 opponent of stalking horse proposal.  Am I correct?

21 A.   This would be the A, B, C, D and E Exhibits?

22 Q.   It was the one attached to your declaration, A, B, C, D --

23 A.   Yes.

24 Q.   -- which I believe you have in front of you.

25 A.   Yeah.

253

1   Q.   Now, before you made that particular proposal Berkshire

2   Hathaway conducted no further due diligence other than perhaps

3   reviewing some more publicly available information, correct?

4   A.   Sure, some incremental information came out on the docket

5   on the business that was marginally beneficial to our

6   understanding.

7   Q.   Okay.  And it was all publicly available information,

8   correct?

9   A.   Yes.

10  Q.   In fact, you testified that you didn't want to execute a

11  nondisclosure agreement with either Ally or ResCap, correct?

12  A.   That is -- we chose not to, correct.

13  Q.   I believe because you didn't want access to nonpublic

14  material information, is that correct?

15  A.   Generally that was the case and also we didn't want to

16  encourage the bankruptcy process.

17  Q.   So it's correct, is it not, that up until this point in

18  time Berkshire hasn't had any access to Residential Capital's

19  confidential business information, correct?

20  A.   That's correct but that's not unusual.

21  Q.   I'm not asking if it's unusual, Sir.  Berkshire Hathaway

22  has not had access to Residential Capital's confidential

23  business information?

24  A.   Correct.

25  Q.   Generally speaking, you don't have access to the nuts and

254

1   bolts of how the business works, correct?

2   A.   I'd say we have a fairly good understanding of how the

3   business works.  Maybe not the nuts and bolts, but public

4   filings do include a fair amount of information.

5   Q.   But again, you've had no access to, for example, a data

6   room, correct?

7   A.   Correct.

8   Q.   Now, prior to making your proposal that's attached to your

9   declaration, Berkshire Hathaway never approached the debtors or

10  its advisors, correct?

11  A.   I believe we did speak to the advisors very briefly on an

12  introductory call at one point.

13  Q.   Did you speak to them about that particular proposal?

14  A.   No.  No.

15  Q.   In fact the first time that the debtors learned about that

16  proposal was through its filing, correct?

17  A.   That's correct.

18  Q.   So you never spoke to management about how the business

19  operates, am I right?

20  A.   That's correct.

21  Q.   I believe you testified, sir, that you don't know what

22  licenses are required to run this business, correct?  And when

23  I mean this business, I mean Residential Capital Servicing

24  Business.

25  A.   That's correct.

255

1   Q.   Okay.  You don't know what steps need to be taken to

2   obtain those licenses?

3   A.   That's correct.

4   Q.   And to this day, nobody from Berkshire Hathaway has had

5   any discussions with any of the GSEs -- GSAs --

6          THE COURT:  Es.

7          MR. ALLRED:  GSEs, thank you, Your Honor, I confuse

8   GAs with GSEs.

9   Q.   -- GSEs regarding Berkshire's potential purchase of the

10  platform?

11  A.   No direct communication, correct.  We have spoken to

12  counsel for two of the GSEs.

13  Q.   And Sir, you were not aware that Berkshire Hathaway had

14  previously declined to participate in the initial stalking

15  horse process in late 2011 early 2012, correct?

16  A.   Quite honestly, it was unclear internally whether we were

17  invited into that process or not.

18  Q.   You never had any discussions with anyone regarding a call

19  Mr. Greene had with anyone at Berkshire Hathaway?  Is that

20  correct?

21  A.   I actually followed up on that a couple days ago when I

22  first heard about that.

23  Q.   A couple days ago?

24  A.   Yeah.

25  Q.   But not at the time?

256

1    A.    Correct.

2    Q.    Okay.  Your Honor, I have no further questions.

3          THE COURT:  Thank you.  Anyone else wish to cross-

4    examine?

5          MR. ECKSTEIN:  Your Honor, can I ask a few questions?

6          THE COURT:  Absolutely.

7    CROSS-EXAMINATION

8    BY MR. ECKSTEIN:

9    Q.    Mr. Weschler, good afternoon.  Good evening.  We've met

10   before.  I'm Kenneth Eckstein representing proposed counsel for

11   the unsecured creditors' committee.  Can I ask you just to turn

12   your attention to Exhibit I, which was the May 4th letter.

13   A.    Sure.

14   Q.    That was a letter that you delivered to Michael Carpenter

15   who was the CEO of Ally Financial.  Is that correct?

16   A.    That is right.

17   Q.    And you copied Thomas Marano who is the chief executive

18   officer of ResCap, is that right?

19   A.    That is right.

20   Q.    I just would like to walk through the letter to make sure

21   I understand more specifically what was the nature of the

22   proposal you were making on May 4th.

23   A.    Certainly.

24   Q.    Now do I understand correctly that this was a pre-

25   bankruptcy proposal to acquire one hundred percent of the

257

1   equity in ResCap?  Am I right?

2   A.    That is correct.

3   Q.    And if this transaction were implemented, was the business

4   expectation that as a result of the acquisition Berkshire would

5   own all of the assets at that time owned by ResCap?  Am I

6   correct?

7   A.    Yes.

8   Q.    That would have --

9   A.    It would have been a stock acquisition.

10  Q.    So that would include the servicing assets, the whole loan

11  assets and the miscellaneous assets that are currently owned by

12  ResCap?

13  A.    Correct.

14  Q.    And am I correct that point two of this letter

15  contemplated that in order for you to proceed with this

16  transaction, ResCap would have to agree not to proceed with the

17  sale of the servicing transaction with Nationstar?

18  A.    That is correct.

19  Q.    Now, point three contemplated that in connection with your

20  purchase of the equity Ally would make in it an affirmative

21  contribution to ResCap of 850 million dollars?

22  A.    That is correct?

23  Q.    And was this essentially intended for Ally to essentially

24  pre-fund potential liabilities that you were willing to assume

25  in connection with the purchase of the equity?

258

1  A.    To some extent, yes.

2  Q.    And so as part of this transaction do I understand

3  correctly that Berkshire was willing to buy the existing assets

4  subject to whatever existing litigation was pending against

5  ResCap and its assets.  Am I correct?

6  A.    That's correct.

7  Q.    And do I understand point four to mean that Berkshire was

8  proposing that Ally make an additional payment of 500 million

9  dollars to -- directly to Berkshire in connection with this

10 transaction?

11 A.    That is correct?

12 Q.    And was that considered an additional payment in respect

13 of liabilities?

14 A.    It was -- we offered in as a -- under an insurance

15 construct that it was a way to further mitigate a perceived

16 exposure at Ally to various liabilities that they thought they

17 might have with ResCap.

18 Q.    So this was effectively -- the 850 million plus 500

19 million -- so effectively it would be an initial payment of

20 1.35 billion dollars by Ally in connection with this

21 transaction?  Would you agree?

22 A.    Well, 850 would go into ResCap and 500 would go to

23 Berkshire and that's an important distinction.

24 Q.    Okay.  Now can you explain what else was contemplated by

25 point four?  Basically, can you explain what you intended with

1    respect to how Berkshire and Ally would be responsible for any

2    remaining liabilities under this --

3    A.    Sure.   In return for a 500 million dollar payment to

4    Berkshire we'd have an agreement that to the extent there was,

5    you know, perspective liability that flowed to Ally from their

6    ownership of ResCap, they'd be on the hook for the first one

7    billion dollars of those liabilities.   Once it got to one

8    billion, I think of that as a deductible, per se.   Once it got

9    to that level we would share fifty-fifty in any exposure.   And

10   in that sharing in that exposure would be capped at an overall

11   level of three billion of exposure.   So in effect, if the total

12   exposure was 3 billion dollars -- or, you know, if the total

13   liability is 3 billion dollars, Berkshire would have gotten a

14   payment of 500 million dollars day one but would have paid out

15   1 billion dollars over the time frame up to the point that they

16   got to the 3 billion exposure level.

17   Q.    So under your -- under your example it had to have been a

18   total of three billion dollars of liability Ally would have

19   paid two billion dollars of the three billion and Berkshire

20   would have paid one billion dollars?   Is that correct?

21   A.    Yes.

22   Q.    And do I understand that Ally under this construct would

23   have paid the two billion dollars into ResCap in contrast to

24   paying it to Berkshire?

25   A.    No.   I don't think -- I think that's -- the mechanics of

260

1   that are unspoken in the letter.

2   Q.   So that was still left a bit unclear you say?

3   A.   Yes.

4   Q.   Okay.

5   A.   I think the liability would ripen and they'd simply write

6   the check.  Where that check would get written, who knows?

7   Q.   Okay, I understand.  Now point five, this contemplated --

8   am I correct that this contemplated that Berkshire was offering

9   in connection with the acquisition of the equity to repay all

10  of the Ally credit facilities?

11  A.   Yes, that's right.

12  Q.   And do I understand that that was approximately 1.3

13  billion dollars of credit facilities that were outstanding?

14  A.   Yeah, I remember 1.4 billion, but we're in the ballpark.

15  Q.   1.4 billion dollars?

16  A.   Yeah.

17  Q.   So Ally would have received 1.4 billion dollars, would

18  have paid essentially 1.35 billion to a combination of ResCap

19  and Berkshire and would have had contingent liabilities for up

20  to an additional 2 billion dollars?

21  A.   It could be a lot more than that.

22  Q.   I'm sorry.

23  A.   Because once you beyond three billion -- yeah.

24  Q.   Yeah, the sharing would have been anything above --

25  anything above the three billion dollars would have continued

261

1   to be Ally's responsibility?

2   A.    Correct.

3   Q.    Okay.  Did you receive a response to this proposal?

4   A.    Yes.

5   Q.    And what was the response to this proposal?

6   A.    They didn't want to engage in real dialog on it.  It was

7   dismissed above the offer.

8   Q.    And do you know why this was not something they wanted to

9   engage in?

10  A.    I think they had already made their decision that --

11        THE COURT:  Did they tell you what the reasons were?

12  I don't want your speculation, did they tell you why?

13  A.    No.

14  Q.    Do you know why they declined to proceed with this

15  transaction?

16  A.    I'd be speculating.

17        MR. ECKSTEIN:  Okay, no further questions.

18        THE COURT:  Thank you.  Any further cross-examination?

19  Any redirect?

20        MR. ALLRED:  Very briefly, Your Honor.

21  REDIRECT EXAMINATION

22  BY MR. ALLRED:

23  Q.    During discussion about Berkshire not having access to

24  nonconfidential information about ResCap, is it uncommon for

25  Berkshire to make very large acquisitions based on only public

262

1   information?

2           MR. ENGELHARDT:  Objection.

3           THE COURT:  Overruled.

4   A.    Not at all.  I mean, any public security in effect that we

5   buy, we buy on that basis.  And we've done whole company

6   acquisitions on that basis.

7           MR. ALLRED:  No other questions, Your Honor.

8           THE COURT:  Thank you.  Any further cross?  You're

9   excused.  Thank you very much.  Do the objectors wish to call

10  any additional witnesses?

11          MR. ALLRED:  No, Your Honor.

12          THE COURT:  Do the objectors rest?

13          THE COURT:  We rest, Your Honor.  Thank you.

14          THE COURT:  Does the debtor wish to call any witnesses

15  in rebuttal?

16          MR. ENGELHARDT:  No, Your Honor.

17          THE COURT:  All right, you rest?

18          MR. ENGELHARDT:  We rest, Your Honor.

19          THE COURT:  Okay.  I'll hear argument.

20          MS. NASHELSKY:  Your Honor, we've had a long day here.

21  And I think the debtors view is that the evidence shows that

22  the debtors' decision to enter into the sales transactions

23  originally and to continue with Nationstar and AFI as their

24  stalking horse were done exercising sound business judgment.

25  The debtors -- the evidence shows -- Mr. Greene testified that

263

the debtors considered many factors, qualitative and
quantitative, and that the debtors believed that the Nationstar
bid and AFI bid were appropriate stalking horse bids and at the
time they approved the various breakup fees that those breakup
fees at the time were appropriate, understanding that
circumstances change.

I think the evidence also shows through Mr. Weschler's
testimony that, as he testified, they -- Berkshire can't say
for sure what GSE approvals are needed.  Mr. Weschler testified
that he doesn't know what licenses he needs to obtain and he
doesn't know what steps are necessary.  And that the due
diligence they did was only on public information.  These are
the types of qualitative factors that the debtors were
concerned about when Berkshire appeared out of the blue with
this bid.  They are the -- they are part of the reasons the
debtors continued to stay with the Nationstar bid, engaging in
discussions to try to improve those bids all along the way,
last Friday and up and through this hearing and continuing.
But the debtors believe that in the exercise of their sound
business judgment, selecting and staying with the Nationstar
bid at the current levels is appropriate.

THE COURT:  Well the board has not -- I mean this has
been a moving target.  I'm not faulting anybody for this, but a
few minutes ago we heard an additional ten million dollars put
on the table.  The board has not considered it because they

264

1  didn't know about it.  I don't know whether any board members

2  are here but they didn't know about it.  So the board has not

3  considered and -- the latest offer and made a decision in the

4  face of that to proceed with Nationstar.

5          MS. NASHELSKY:  Your Honor that is correct.  However,

6  three of the board members are here.

7          THE COURT:  How many members of the board?

8          MS. NASHELSKY:  There are seven all together.

9          THE COURT:  So you have -- all right --

10          MS. NASHELSKY:  We have --

11          THE COURT:  You don't have a majority of the board

12  members.

13          MS. NASHELSKY:  We're reaching out to the majority,

14  but I think importantly on Friday when the debtors' board

15  approved staying with Nationstar, with the bids at the time,

16  there was a gap of twenty-three million dollars.  Eighteen

17  million dollars in a breakup fee and five million on expense

18  reimbursement.  Twenty-three in total that they determined was

19  not enough to warrant going with the Berkshire bid.  As we are

20  right now, and there may be another development, Your Honor,

21  but as we are right now, there's a twenty-two million dollar

22  difference.  One million less than where the board was on

23  Friday.

24          THE COURT:  How big does the difference have to be

25  before the board has to reconsider, in your view?

265

1    MS. NASHELSKY:  Well, I think it has to be bigger than

2 their last decision, Your Honor.  How big, I'm not sure and

3 that's where, you know, you'll --

4    THE COURT:  I mean, the cross-examination correctly

5 elicited that the price for the servicing business is increased

6 by 100 and now 110 million dollars since you filed your motion.

7 That's real money to me.

8    MS. NASHELSKY:  Absolutely, and that's money that we

9 hope continues at an auction but there's a process, Your Honor.

10 And, you know, I -- we can turn to Nationstar and see if

11 they'll increase their bid yet again, but it doesn't get us

12 finality in the process at any point.

13    THE COURT:  Well, look, there's going to be finality

14 in the process.  The question is whether the finality comes a

15 little after 6 p.m. or whether it comes tomorrow morning or

16 just when.

17    MS. NASHELSKY:  Sorry, I've just been reported that

18 two further board members have been reached and continue to

19 support the Nationstar bid.

20    THE COURT:  Look, it's not a board meeting.

21    MS. NASHELSKY:  No.

22    THE COURT:  Let's do this right, okay?  I'm not saying

23 you're not -- that this isn't going to be approved.  But it

24 isn't going to be done that way.

25    MS. NASHELSKY:  But, so Your Honor, is the -- the

266

1  problem the debtors have is where's -- where does the process -
2  - and we have Berkshire shows up on direct testimony for the
3  first time elicits yet a further bid.  Nationstar may bid
4  again.  There needs to be some type of process, Your Honor,
5  that we can move this forward.  Otherwise I feel like this
6  keeps going.

7         THE COURT:  Well, it isn't going to keep going for
8  very long.  Okay.  That's not in the cards.

9         MS. NASHELSKY:  Can I have a moment, Your Honor?

10         THE COURT:  Yes.

11         MR. NYHAN:  Your Honor, if I may?  Larry Nyhan from
12  Sidley Austin representing Nationstar.  We two would like to
13  bring this some closure, Your Honor.  We're not prepared to
14  move on our breakup fee but we are prepared to increase the
15  value of our --

16         THE COURT:  Well, here's -- I don't want to hear what
17  you're ready to do.

18         MR. NYHAN:  Good.

19         THE COURT:  Okay?  At this stage.  Much as auctions
20  can be fun, that's not what I'm aiming for.

21         MR. NYHAN:  Well, Your Honor, just on that point, we
22  just want to make certain that to the extent the court
23  determines that the bid that was articulated on the stand needs
24  to be responded to as opposed to deferring to the debtors'
25  business judgment on this, we'd like an opportunity to be

267

1  heard.

2          THE COURT:  Okay.  Right now -- I understand that.

3          MR. NYHAN:  Thank you very much.

4          MS. NASHELSKY:  And that was the quandary I was in,

5  Your Honor, as I stood here, which was, you know, I don't

6  know -- you know, we had a process, we were in a process so now

7  we need to figure out at what point do we no longer take bids,

8  at what point can we convene a board meeting and come before

9  Your Honor and other than saying, you know, as soon as

10 possible, it's critical, you know, I don't have anything other

11 than that.  I think, you know, we feel that right now there is

12 a difference but not a difference that would change the board's

13 vote.  But obviously not all the information is yet in.

14         THE COURT:  Okay.  We'll hear from the committee.

15         MR. ECKSTEIN:  As Your Honor can appreciate, we also

16 have not had an opportunity to consult with the committee on

17 the very significant developments.  So, I'm not at a position

18 to give a final here.  We obviously are appreciative on one

19 level of the significant improvements that have been

20 accomplished.  And those are advantageous.  We also feel very

21 strongly that we'd like to wind up with a process that will

22 maximize the ability to encourage an ongoing auction as we

23 think that that is realistic.  And toward that end, obviously,

24 the lower the break fee, the more likely people are to come in

25 to participate in the process and we think the combination of

268

1   lowering the break, the additional time quite advantageous.

2   And needless to say, if the price -- the base price is

3   increased it gives us greater protection in the event nobody

4   better ultimately appears.  That said, we would endorse

5   creating a mechanism to achieve finality from both --

6   THE COURT:  Well let me just put it out on the table

7   so that there's no surprise where I'm coming from.  And I

8   haven't made up my mind for sure on this but I was going to set

9   an 8 p.m. deadline tonight for highest and best offers to act

10  as stalking horse bidder with a board meeting to occur tonight

11  or tomorrow morning and for parties to return tomorrow.  I've

12  got a very full calendar, so it's either going to be --

13  probably at noon.  And 8 p.m. is it.  It's not going to be this

14  back -- there's got to be finality to it.  I don't question

15  that.  And it does seem to me that in an orderly process, the

16  board is the one that exercises the business judgment to decide

17  how it wants to proceed.

18  I asked questions about this process.  I don't

19  question that, as designed, the process seemed fundamentally

20  sound.  I'm not questioning that.  It's not totally uncommon to

21  have active bidding after a bidding procedures motion has been

22  filed and a stalking-horse contract assigned.  I don't think

23  I've ever seen the price go up by 110 million in this

24  relatively short time, but that's what's happened here.

25  So that's really the question in my mind.  If I set an

269

1   8 p.m. time, people are available by phone, people with

2   authority can put whatever proposals they're authorized to do

3   on the table.  The committee can consult and meet; the board

4   can meet and decide; and no further bidding thereafter for this

5   stalking horse would go forward from there.

6           I am mindful of the fact, and I am concerned about the

7   fact that -- look, one only has to read the press to know the

8   size of the transactions that Berkshire does.  The testimony is

9   they do it based on public information.  I'll accept that as an

10  accurate statement.  I do have concerns that the process going

11  forward with the GSEs is not going to be a simple one.  I think

12  that the qualitative factors that the board takes into account

13  are important, but so is the price.

14          At some point, the amount of the breakup --

15  particularly since the bid increments have been reduced, the

16  amount of the breakup fee was much more -- a much bigger factor

17  when it was seventy-two million, when it was reduced below that

18  so substantially in increments.  So, those are all issues.

19          But really Mr. Eckstein, the question is do you want

20  to be able to consult with your committee one more time?  Do

21  you think the debtors' board should reconvene?  That's really

22  why I didn't want to hear from Nationstar, another offer put on

23  the table now.  I think that really what has to happen is there

24  does have to be finality.  There does have to be an orderly

25  process.  Nationstar and Berkshire Hathaway can both give the

270

1  debtor their highest and best proposals on all of these

2  elements:  price, breakup fee, expense reimbursement, whether

3  there are others.  And then the relevant decision makers, the

4  board, in the case of debtors, the committee, which has an

5  important role to play, can advise the Court of its position.

6  I mean that's kind of what I am mulling.  I don't know what

7  your view of that is, Mr. Eckstein.

8          MR. ECKSTEIN:  Your Honor, that's essentially what I

9  was going to endorse.  I think at this point, it does make

10  sense to let both of the parties submit to the debtor -- we

11  would ask for the committee to receive the submission, I think

12  it should be in writing.  8 p.m. is fine.  We will convene a

13  committee conference call and we would like the ability to

14  consult with the debtor so that we could all have the ability

15  of exchanging our views and I think coming back and reporting

16  on the decision.  Then Your Honor will make a decision.  I

17  don't know that we need to prejudge what the decision is going

18  to be.  I think we've all heard a lot of information.

19          The GSE issue was important, but I think from our

20  perspective, we have a high level of confidence that we have

21  two -- right now, we have two bidders, both of whom you would

22  expect --

23          THE COURT:  And hopefully you'll have these two

24  bidders after there's a stalking horse --

25          MR. ECKSTEIN:  Hopefully.

271

1    THE COURT:  -- whichever one of these two is

2  successful.

3    MR. ECKSTEIN:  Our hope is both of these bidders are

4  the types of bidders who will ultimately receive a positive

5  endorsement.  It sounds like they're both seeking to buy the

6  full platform, and they're both going to provide substantial

7  financial support to this enterprise.  It would seem as if

8  there's a desire for this business to continue.  These are the

9  types of bidders that will ultimately get favorable GSE

10  approval.

11    THE COURT:  Just speak briefly as to the legacy loan

12  portfolio.  What is your view on that?

13    MR. ECKSTEIN:  Your Honor, thank you for asking.  We

14  obviously are very comfortable with the fact that a bid without

15  a break fee is an easy bid.  The question that we're still

16  grappling with is, what we have right now is a bid from Ally

17  that is divorced from the plan process and the PSA process, and

18  divorced of the toggle of 1.4.  We received a bid from

19  Berkshire of 1.45 with a 10 million dollar break fee.  We also

20  had a bid from Lone Star, I believe it was for 1.4, also with a

21  10 million dollar break fee, but there were certain

22  modifications to the contract that, in the absence of due

23  diligence, Lone Star wasn't able to make any further

24  modifications and raised some concerns.  Berkshire was prepared

25  to sign the contract and Ally is prepared to sign.

272

1          So, the business question that we have been

2   considering is, is it worth locking in an additional fifty

3   million dollars in exchange for ten million dollars?

4          THE COURT:  Go ahead.  Finish.

5          MR. ECKSTEIN:  And while I would not say it is a

6   clear-cut conclusion, I think the committee was inclined to

7   take the additional fifty million dollars in exchange for the

8   ten million dollars.

9          THE COURT:  There's no testimony on this and I didn't

10  read the documents carefully enough to know whether there's

11  anything in there, and that is whether there are any consents

12  that are required in connection with the purchase of the legacy

13  loan portfolio.

14         MR. ECKSTEIN:  We're not aware of any consents.  And

15  in fact, the education we've gotten is that these are the types

16  of assets that once the due diligence is open, these can be

17  diligenced, and bids can actually be forthcoming, potentially

18  very quickly.  And a judgment is going to need to be made

19  depending upon the interest level, how quickly the debtor wants

20  to proceed.

21         THE COURT:  And what I was focusing on:  were there

22  any of these qualitative factors that come into play in

23  evaluating competing offers with respect to the loan portfolio?

24         MR. ECKSTEIN:  I am not aware that there are any.  I

25  believe this is essentially really a simple financial

1   transaction.

2           THE COURT:  Okay.  Thank you, Mr. Eckstein.

3           Mr. Nashelsky, with respect to the loan portfolio, are

4   there any consents that are required?

5           MR. NASHELSKY:  I'm told no, that there are no

6   qualitative factors.

7           THE COURT:  Are you still standing by the Ally

8   stalking horse?

9           MR. NASHELSKY:  Look, we --

10          THE COURT:  You've added fifty million and even with a

11  ten million dollar breakup fee, you're still coming out way

12  ahead.  So you're going to have to --

13          MR. NASHELSKY:  Yes, let us talk to the board tonight.

14  It is --

15          THE COURT:  So, I take my suggestion of best and final

16  offers at this stage by 8 p.m., your board to meet tonight, is

17  an acceptable resolution for you for tonight?

18          MR. NASHELSKY:  One moment, Your Honor.

19          MR. ECKSTEIN:  While he is consulting, I am assuming

20  Your Honor is sort of evolving to we may as well get best and

21  final on both assets?

22          THE COURT:  We should, yes.

23          MR. ECKSTEIN:  I think that would be useful.

24          MR. NASHELSKY:  Yes.  So, Your Honor, we just need

25  some clarification when we get those, that Berkshire is

274

1   interested in buying either/or and they're not tied together,

2   so that we obviously know that if we choose to select them on

3   one or not the other, that we don't swirl into --

4           THE COURT:  That's what their proposal was in the

5   past; right?

6           MR. ECKSTEIN:  And it remains that way.

7           THE COURT:  And it remains that way.

8           MR. NASHELSKY:  With that, Your Honor, we're fine with

9   receiving final and best.

10          THE COURT:  Okay.  Does anyone else want to be heard

11  briefly at this time?

12          MR. MASUMOTO:  Your Honor?

13          THE COURT:  Go ahead.  Come up to the microphone.

14          MR. MASUMOTO:  Brian Masumoto for the Office of the

15  United States Trustee.  Your Honor, I didn't know whether or

16  not you wanted arguments relating to the nonsale aspect.

17          THE COURT:  Go ahead.  Let me hear it now.

18          MR. MASUMOTO:  Your Honor, we just wanted to -- with

19  respect to the issue that remained outstanding with respect to

20  our objection --

21          THE COURT:  Consumer privacy ombudsman.

22          MR. MASUMOTO:  That's correct, Your Honor.  I believe

23  that the amended declaration, docket number 189, that was

24  submitted, from our standpoint, did not completely satisfy the

25  requirements of the Code as to whether or not these policies of

275

1    the debtor are consistent with the transfer of that

2    information.  I believe if you look at the attachments, the

3    reference was to sharing agreements, which we again raised in

4    our pleading, and there seems to have been no subsequent

5    evidence to indicate that a sale and a transfer in the course

6    of a sale to a third party was consistent with their policy.

7         THE COURT:  Let me ask you this.  Is that an issue

8    that needs to be decided?  Is there something in these bidding

9    procedures that precludes the Court requiring the appointment

10   of a consumer privacy ombudsman?

11        MR. MASUMOTO:  Not to our understanding, Your Honor.

12   I believe Section 332, in fact, says that it can be appointed

13   seven days prior to the hearing on the sale.  It's just that

14   since it was folded into the bid procedures, we did not want to

15   waive our objections to that provision.  But we're happy to

16   have it addressed.

17        THE COURT:  I read the materials with respect to the

18   consumer privacy ombudsman and I certainly read the debtors'

19   reply with respect to why they didn't believe it was required.

20   Quite honestly, with everything that was on the plate for

21   today, I just wasn't able to come to a firm conclusion.  As you

22   know, Mr. Masumoto, your office has been active on this in

23   Borders.  A consumer privacy ombudsman was appointed and I

24   think in some other cases.  It can't be approved a couple of

25   days before the hearing because in a big case, it turns out to

276

1   be a very complicated process, I learned.

2        MR. MASUMOTO:  I understand, Your Honor.

3        THE COURT:  But it didn't seem to me -- I'll ask Mr.

4   Nashelsky and Mr. Eckstein -- it didn't seem to me that had to

5   be resolved today or tomorrow.  You can reserve your rights.  I

6   didn't read anything in the order that would preclude this

7   issue coming before the Court for a decision on another day.

8        MR. MASUMOTO:  And that will be fine with us, Your

9   Honor.

10       THE COURT:  Mr. Nashelsky?

11       MR. NASHELSKY:  Your Honor, I think our view is that

12  it's pretty clear, the statute's pretty clear.  You follow your

13  privacy policies.  If they allow it, you can do it.  We think

14  the evidence is clear on that.

15       We put this forward today for the concern Your Honor

16  had.  It's a big case, and we didn't want to find out later

17  that somebody wanted one.  So we wanted to address the issue up

18  front.  Obviously --

19       THE COURT:  How do you know they want one?

20       MR. NASHELSKY:  Right, but the statute's clear.  The

21  statute isn't if it's a big case, you get one.

22       THE COURT:  Just answer this.  Do I need to decide

23  this now?

24       MR. NASHELSKY:  No, Your Honor.  If Your Honor decides

25  it enough in advance, an ombudsman can do their job.  We're

277

1  fine.

2          THE COURT:  Oh, it isn't going to get pushed very far.

3  But with everything that was on the docket for today --

4          MR. NASHELSKY:  Understood, Your Honor.

5          THE COURT:  -- I'm just not comfortable that I am

6  ready to make a decision on it.

7          MR. NASHELSKY:  That's fine, Your Honor.

8          THE COURT:  Okay.  Mr. Eckstein, did you want to be

9  heard on that?

10         MR. ECKSTEIN:  Your Honor, I was just going to make

11 the observation, I actually had the experience in St. Vincent's

12 of a consumer privacy ombudsman.  I don't think there's any

13 requirement that it be done today, but it probably would make

14 sense to do it within the next -- certainly meaningfully in

15 advance of the sale hearing.

16         THE COURT:  Okay.

17         MR. ECKSTEIN:  We're not looking for anything at this

18 point.  I think it's really relevant to the servicing motion,

19 and I don't think we're looking at anything happening in the

20 very near term, given the 120-day auction process.

21         THE COURT:  Thank you.  We have someone else who

22 wanted to be heard.  Thank you.

23         MS. TOMASCO:  Your Honor, I believe that we --

24         THE COURT:  Just make your appearance again.

25         MS. TOMASCO:  I'm sorry, Patty Tomasco with Jackson

278

1    Walker on behalf of Frost Bank.  I believe that we've made an

2    agreement with something in the sales order that resolves the

3    objection that cannot be deferred until the sale hearing.

4    Specifically, Frost's objection and that of some other

5    securitization trustees was to the language on page 13 of the

6    proposed sale order that essentially says that any contract

7    counterparty is barred from asserting any claim that arose

8    prior to the assumption date, which essentially, in my view,

9    violates 365.  It turns 365 into a 363(f) sale and it just --

10   it can't be done.

11         Rather than argue that, the debtor has proposed

12   language with respect to the securitization trustees who also

13   filed a similar objection, that essentially says that we all

14   agree to the procedures, but as to my client only, as to the

15   nonassumption of pre-sale liabilities, that issue is preserved

16   as stated in our objection until the sale hearing.  I will

17   note, Your Honor, that the debtors' proposal is to keep that

18   language in there, that any contract counterparty who, for

19   whatever reason, isn't here today to preserve this, will be cut

20   off from asserting any pre-assumption liability against the

21   assuming party in contravention to 365.

22         THE COURT:  All right.  Others want to be heard --

23         MS. TOMASCO:  And I would like the debtors' counsel to

24   affirm that that's their understanding with respect to the

25   language in the order.

279

1        THE COURT:  Mr. Nashelsky or someone on behalf of the

2   debtors, can you confirm Ms. Tomasco's statement?

3        MR. NASHELSKY:  Yes, we can confirm that.

4        THE COURT:  All right.  Thank you.  Mr. Siegel?

5        MR. NASHELSKY:  So, Your Honor, they -- there were a

6   bunch of provisions that we've agreed to with a variety of

7   people that -- a few provisions we agreed to with a variety of

8   people that resolved objections and that we were going to read

9   in.  Mr. Siegel's client is one of them.  The hearing shall

10  drown.  If you'd like me to do that, I can do that and then --

11       MR. SIEGEL:  The only reason I am up here --

12       THE COURT:  Go ahead.  Just identify yourself, Mr.

13  Siegel.

14       MR. SIEGEL:  Glenn Siegel, Bank of New York Mellon.

15  I'm one of the RMBS trustees, but I am speaking on behalf of

16  all of us right now.  The trustees negotiated a carve-out in

17  this order in connection with the assumption and the assignment

18  of the servicing agreements.  While we did not objection to the

19  sales procedures, what we've agreed is we're going to figure

20  out how to resolve many of the thorny issues associated with

21  this; and they are very complicated.  And while it may not

22  impact upon the sales procedures, it certainly may impact on

23  purchase price adjustments.

24       The reason I am talking about this is our view is that

25  there is nothing with respect to the assumption and assignment

280

1  of these contracts that has been resolved with respect to this

2  order.  What we will be doing is we will be putting together

3  procedures that allow Your Honor to make decisions about that

4  in the event we can't resolve this.  Thank you.

5         THE COURT:  Okay.  Thank you, Mr. Siegel.  Let me hear

6  from others before --

7         MR. MOAK:  If I might?  Your Honor, Paul Moak and

8  McKool Smith on behalf of Freddie Mac.  As I mentioned earlier,

9  we didn't come here prepared today to address which party

10  should be the stalking horse bidder.  We don't necessarily have

11  a view on that, other than as I mentioned earlier, we do

12  believe that qualitative considerations are of significant

13  importance to us.  We did file a limited objection that

14  addresses some of the timing issues and I don't know if you

15  want to hear that now or hold that until tomorrow.

16        THE COURT:  Let's hear it now.

17        MR. MOAK:  Okay.

18        THE COURT:  I don't anticipate hearing arguments

19  tomorrow.  Really, when you come back in, the issue I am

20  focusing on is the terms -- the economic terms.  So now is the

21  time to do it.

22        MR. MOAK:  That's what I thought, Your Honor.  The

23  issue is really irrelevant as to which party is the stalking

24  horse bidder.  As the procedures, as I understand them at

25  least, and they may have changed, originally were to establish

281

1  an auction on September 25th, then have a sale hearing on

2  October 15th, I believe was what was requested; essentially a

3  three-week period.  Also, the bid deadline, as I believe it

4  still stands, is a week before the auction, so September 18.

5          As I mentioned earlier, Freddie Mac's approval process

6  is significant.  It is extremely involved.  We're talking about

7  the transfer of servicing related to 400,000 loans.  It

8  involves not only an assessment of the operational expertise of

9  the potential bidders but the financial wherewithal also.  It

10  also will likely involve negotiation of terms of business going

11  forward.  There are just a litany of concerns that need to be

12  resolved.

13          And from our perspective, although before we learned

14  about Berkshire's bid, we were content to move forward to the

15  best we could with Nationstar leading up to the auction, and I

16  think Freddie Mac will do that with regard to whichever bidder

17  is the stalking horse bidder; it's clear that we won't know for

18  certain until September 18th, how many bidders there are going

19  to be.  And it's impossible, frankly, or it may be impossible

20  for Freddie Mac to effectively work on a parallel track with

21  other bidders.  So, we could be at an auction where someone who

22  is not here today is the highest and best bidder or deemed to

23  be by the parties, and we're simply starting from square one in

24  terms of our due diligence.  If that's the case and our consent

25  is a condition to closing, I think it's fairly clear, at least

282

1   from what I understand, that a three-week period to do that due

2   diligence between the auction and the sale hearing is simply

3   insufficient with regard to any potential new bidder.  It may

4   be insufficient with regard to the stalking horse bidder.

5        So, we filed a limited objection really to put folks

6   on notice, because they said our consent is necessary.  We

7   believe our consent is necessary and we want to let everybody

8   know that the way the structure is right now, it's very

9   possible and maybe likely, that Freddie Mac will not be in a

10  position to consent by a sale hearing, if that's to occur three

11  weeks after the auction.

12       We have proposed in our order -- excuse me, in our

13  objection, that to the extent the stalking horse bidder is the

14  ultimate highest and best bidder, that the sale hearing not

15  occur prior to October 31st.  That's five weeks from what we

16  think is going to be the auction date and we thought that was

17  sufficient if the stalking horse bidder is a prevailing party.

18  If the stalking horse bidder is not the prevailing party, we

19  think that the sale hearing should not occur prior to the end

20  of November, November 30th, because we think it will take that

21  additional time for us to get the consents and to do the due

22  diligence that we think is necessary.  Thank you, Your Honor.

23       THE COURT:  Has Fannie Mae spoken to this issue?  I

24  mean, I assume you've got more loans than Freddie does.

25       MR. NEIER:  Yes, Your Honor.  David Neier on behalf of

283

1  Fannie Mae.  We have approximately 160 billion of loans and

2  unpaid principal balance.  So yes, it's about three times the

3  size of Freddie Mac's portfolio.

4        It is a substantial issue.  I was hoping that we could

5  work it out over time, if you will.  I don't want to scare off

6  bidders.  I don't want to prejudge the process.  We were hoping

7  that we could sit down with the parties and try and work as

8  best as possible and fast as possible and then report back to

9  the various parties as to how quickly it's going to take,

10 rather than setting dates today.

11       THE COURT:  Thank you.

12       MR. NEIER:  Thank you, Your Honor.

13       MR. GREGER:  Your Honor, Michael Greger of Allen

14 Matkins on behalf of Digital Lewisville, LLC.  Your Honor, I

15 have a pro hac vice application pending.  To my knowledge --

16       THE COURT:  Just go ahead.

17       MR. GREGER:  Thank you, Your Honor.  Two quick points;

18 Digital Lewisville is the landlord of the debtor -- of one of

19 the debtors.  It shares in the objection on the basis of the

20 purported bid procedures bifurcating between pre- and post-

21 closing liability.  Digital Lewisville believes that any

22 assumption of the contract has to be with all benefits and

23 burdens or cum honore.  The effort to bifurcate between pre and

24 post-closing liabilities cannot be allowed.

25       THE COURT:  Well, anybody who is going to assume is

284

1  going to have to -- it's going to have to cure.  So which

2  entity is paying which share of it?  If you don't get the cure,

3  they don't get to assume.  So what's your problem?

4      MR. GREGER:  Well, it's more than just a cure, Your

5  Honor.  There are -- a cure is only of outstanding defaults.

6  There may be issues that arise under the contract that aren't a

7  default as of the closing date but mature into obligations

8  post-closing.

9      THE COURT:  Such as?

10     MR. GREGER:  For example, indemnity obligations, CAM

11 reconciliations in connection with prior years, property tax

12 reconciliations.  There's a whole host of issues that can come

13 up.

14     THE COURT:  Yes, but I've never had a problem with any

15 of these --

16     MR. GREGER:  Well --

17     THE COURT:  -- in any 363 sales.

18     MR. GREGER:  Unfortunately, the proposed bid

19 procedures order expressly provides that the respective

20 assumption notice party shall be forever barred from asserting

21 against the buyer any such pre-closing liabilities essentially.

22 That's my paraphrasing.  And then the notice that is attached

23 for the proposed notice of assumed contracts, expressly

24 provides that Nationstar is not assuming and the parties will

25 be enjoined from asserting against Nationstar, any claims or

285

1    obligations relating to the pre-closing period.  And that

2    creates a problem, Your Honor.

3              We cannot always anticipate in connection with the

4    cure process, what issues may be outstanding.  And again,

5    examples are indemnity or otherwise.  And the assumption -- the

6    bid procedures should be amended, or alternatively, this issue

7    concerning whether or not the debtors have the ability to

8    assume and assign parts of the contract should --

9              THE COURT:  Well it can't assume and assign parts of

10   the contract --

11             MR. GREGER:  -- should be carried over.

12             THE COURT:  -- not without consent.

13             MR. GREGER:  And then the final issue is --

14             THE COURT:  Have you conferred with debtors' counsel

15   on this issue?

16             MR. GREGER:  I have, Your Honor.  We filed an

17   objection.  I have not heard any response as to how to resolve

18   this particular objection.

19             Then the other issue is procedural due process, Your

20   Honor.  Obviously in the assumption context, if there is a

21   party that is assuming, that their contract's being assigned,

22   we're entitled to adequate assurance of future performance.

23             THE COURT:  Sure, but we never know until we know the

24   successful bidder.  You never know this.

25             MR. GREGER:  I understand, Your Honor.  However, the

286

1   debtors' proposal is to resolve it at the sale hearing.  We

2   have no prior notice pursuant to the bid procedures --

3         THE COURT:  It's not going to get resolved at the sale

4   hearing.  So that needs to change.  It just can't.

5         MR. GREGER:  Thank you, Your Honor.

6         THE COURT:  Because you can't -- the contract

7   counterparties can't evaluate the need for adequate assurance

8   until they know who the successful bidder is or are able to do

9   some investigation and get some information.  So, Mr.

10   Nashelsky, that part doesn't fly.

11         MR. NASHELSKY:  So, let me -- maybe I'll take these in

12   reverse order.  Digital Lewisville, this -- you know, look, we

13   will get them information.  They're one landlord.  They'll know

14   what their contract is and they'll be able to file a cure.  If

15   we do change, then we'll come up with a procedure where they

16   have an opportunity.

17         THE COURT:  Talk to them.

18         MR. NASHELSKY:  Yes, we will.

19         THE COURT:  See if you can work this out.  I can't --

20         MR. NASHELSKY:  On the timing for Freddie and Fannie,

21   I think Fannie's suggestion was a good one, Your Honor.  We

22   don't anticipate there's going to be -- we would love for it to

23   be but we don't anticipate there's going to be a huge number of

24   bidders for the platform, and we suspect that the bidders that

25   we have, the serious ones, we will actually spend time with

287

1   them and Fannie and Freddie and Ginnie to get them comfortable.

2   So, it won't be like they're starting from scratch post-

3   auction.  They'll have already spent time with them, gotten

4   financials and gotten a sense of these people.  They may need

5   some time, but it's a closing condition to get their consent,

6   so we think the timing works.  On the other --

7           THE COURT:  You realize you have a problem if they say

8   we just don't have enough time and we can't give you consent or

9   we're not going to.

10          MR. NASHELSKY:  We understand that that's -- it's a

11  double-edged sword and we understand it.  But we can't force

12  their consent; but we understand and that's why we're trying to

13  do it very far in advance.

14          The other point I just wanted to note, Your Honor,

15  part of --

16          THE COURT:  I would just say that -- I'm not

17  suggesting this is what ought to happen here -- this is much

18  bigger than the cases where this has been applied -- is I've

19  had some cases, several now, with transition services

20  agreements.

21          MR. NASHELSKY:  Which we have here -- which we have a

22  couple here, Your Honor.  You know, there will be transition

23  services, a couple of different directions here.  We understand

24  that.

25          There were a couple of other changes in things we

288

1   agreed to with various objectors.  On the bid deadline, as you

2   heard, Nationstar and Berkshire both agreed to a thirty-day

3   extension, so the bid deadline would go from September 18th to

4   October 18th, giving another thirty days of diligence.  That

5   would have the auction move out from approximately September

6   25th to approximately October 23re.

7          And then the sale hearing would move from what is now

8   thought to be somewhere around the middle of October to the

9   beginning of November.  And then the deadline to object would

10  be at the end of October.  So those dates have been moved to

11  give more time for diligence.  It also gives us more time to

12  resolve some of the issues that Mr. Siegel and others have said

13  in terms of how we deal with the assumption and assignment.

14         In addition, Your Honor, there's one other, U.S. Bank,

15  who is the indenture trustee for the junior bonds.  We have

16  sought to have credit bidding waived as part of it.  They have

17  come to us and said look, we don't have direction --

18         THE COURT:  They didn't have direction from their --

19         MR. NASHELSKY:  -- we need more time.  And we said we

20  understand, that makes sense.  So, we put proposed language in

21  the order that by the 31st, they either have to get a direction

22  and act on it or say they don't have a direction, in which

23  case, if they aren't giving us clarity that they're not going

24  to credit bid, we can come back before Your Honor and show

25  cause that it should be waived.  Again, that issue may be

289

1  mooted depending on who the bidder is --

2           THE COURT:  Okay.

3           MR. NASHELSKY:  -- sorry, stalking horse.

4           THE COURT:  I see Mr. Feder, you wanted to be heard?

5           MR. FEDER:  Thank you.  Thank you, Your Honor.  Very

6  quickly, given the hour --

7           THE COURT:  Just make your appearance.

8           MR. FEDER:  Benjamin Feder, Kelley, Drye & Warren on

9  behalf of U.S. Bank National Association as the indenture

10 trustee for the 9.625 percent junior secured guarantee notes

11 due 2015, commonly referred to in this case as the junior

12 secured notes.  As has been set forth in declarations and

13 testimony, approximately forty percent of these notes are owned

14 by the ad hoc group represented by White & Case; approximately

15 forty percent by Berkshire.  And so, yes, given the fact that

16 we have not yet received a direction, we felt it important to

17 make sure that the rights of credit bidding are preserved.

18          THE COURT:  You're satisfied with Mr. Nashelsky's

19 explanation of --

20          MR. FEDER:  Based on the language that I saw this

21 morning in the proposed order, that would resolve the issue.

22 So, subject to seeing the final order, yes.  Thank you very

23 much.

24          THE COURT:  Anybody else want to be heard now?  Mr.

25 Eckstein?

290

1          MR. ECKSTEIN:  Your Honor, I apologize for the

2    multiple comments, but since I think Your Honor wants to take

3    all the comments today, let me just mention two or three what I

4    would call minor clarifications.

5          First of all, the agreement to extend the bidding

6    deadline by thirty days was actually an important item.  Number

7    one, our hope is that we'll be able to work with the debtor and

8    with the GSEs to try to put a process in place early on to

9    identify the parties who we believe are going to be serious

10   potential bidders.  And one of the goals was to use the

11   additional time period to give the GSEs more time to get closer

12   to pre-clearance of not only the stalking horse bidder but

13   other potential alternatives, so that we're in a position to

14   hopefully make an apples-to-apples judgment.

15         Toward that end, the debtor has agreed with us that

16   120 days was going to begin when the data room is up and the

17   data is ready for distribution.  We have been assured that

18   that, in fact, is the case today.  I think it would --

19         THE COURT:  It's up.  It's running.  It's --

20         MR. ECKSTEIN:  We're told -- I would like to just

21   confirm that on the record, so that all bidders or potential

22   bidders have the comfort to know that once they sign a

23   confidentiality agreement, that there's not going to be a delay

24   in getting access to very extensive information.  So that's a

25   clarification that I am assuming Mr. Nashelsky can make.

291

1          Number two, we've also agreed that with respect to the

2    HFS assets, it is possible that there will be multiple parties

3    bidding essentially as a consortium; and subject obviously to

4    the absence of collusion in the bidding process, we've agreed

5    that those will be considered an acceptable bid.  And parties

6    should understand that that's an option available, as well.

7    I'd appreciate that being clarified.

8          Number three, we ought to confirm on the record that

9    in the event separate bids for the platform and the HFS assets

10   are received through the auctions, which sounds like that is

11   becoming almost a foregone conclusion, that there is no

12   requirement that the auction proceed on a contemporaneous

13   basis.  This really goes back to what we talked about early

14   this morning with the DIP.  And again, I think for purposes of

15   potential bidders, we'd like the record to be clear that

16   bidders are not going to be locked in to assets that they may

17   not be bidding on.

18         Finally, I just want to confirm on the record that the

19   new timeline that Mr. Nashelsky described is consistent with

20   what we discussed.  However, in the event it turns out that the

21   auction takes longer than expected -- and what we saw today,

22   for example, is an indication of how complicated this can be --

23   that the expectation is that we may need to extend the sale

24   objection deadline and adjourn the hearing to approve the sales

25   potentially for a few days to accommodate a potential

292

1  protracted auction.  Again, I don't think we need to anticipate

2  that today, but I wanted to make that point clear on the

3  record.

4          THE COURT:  Mr. Nashelsky?

5          MR. NASHELSKY:  Your Honor --

6          THE COURT:  Can you confirm that the data room is up

7  and running?

8          MR. NASHELSKY:  Yes, I can confirm that the data room

9  is up and running.  The information's in there and it's ready

10 as soon as a stalking horse bidder is approved.  We are

11 perfectly fine with multiple bids, obviously, as long as there

12 are no collusion.  We have no problem with that.

13          As to the auctions not occurring together, right now

14 they're on the same timeline.  If facts change and the bidders

15 want something, we will obviously work with the committee and

16 try to take any action that will maximize it.  And obviously,

17 if the auction takes a lot longer than anticipated, everything

18 else will have to move, so that everybody has the same

19 reasonable amount of time in the original schedule.  We

20 understand that.  And in some respects we hope that's the case

21 that there's such robust bidding that it pushes for more than a

22 day.

23          THE COURT:  Okay.

24          MR. NASHELSKY:  Thank you.

25          THE COURT:  Anybody else want to be heard briefly?

293

1        MR. NASHELSKY:  Sorry.  Your Honor, just to confirm

2  that what counsel from Frost stated earlier was the agreement

3  among the parties is in fact the agreement on the debtors.

4        MR. WALPER:  Thank you, Your Honor.  Thomas Walper on

5  behalf of Berkshire Hathaway.  Just a couple of things about an

6  8 o'clock, 12 o'clock --

7        THE COURT:  Well, it's now going to move to 8:30.  I

8  want to give everybody two hours, at least.

9        MR. WALPER:  I appreciate that, Your Honor.  Just two

10  issues --

11        THE COURT:  It's early in Omaha -- earlier than it is

12  here.

13        MR. WALPER:  Well, it's certainly very early in Los

14  Angeles.  One, that the last and final offer, whatever the time

15  deadline is, that that not be shared with the other bidders,

16  such that it's just last and final.

17        THE COURT:  Yeah, it's not going to go back and forth.

18  I want you to put your best and final in front of the debtors

19  and the committee and that's it.

20        MR. WALPER:  And that neither the debtor nor the

21  committee should share it with the other bidder; correct?

22        THE COURT:  Correct.

23        MR. WALPER:  Yes.

24        THE COURT:  Anybody disagree with that?

25        MR. ECKSTEIN:  That's fine, Your Honor.

294

1      MR. WALPER:  And --

2      THE COURT:  Mr. Nashelsky, do you agree with that?

3      MR. NASHELSKY:  Absolutely, Your Honor.

4      MR. WALPER:  Thank you, Your Honor.  And that because

5   of the agreement that currently exists with the debtor, we have

6   not spoken to anyone at the debtor about the transaction.  They

7   have been bound to Nationstar.  And I'm wondering whether we

8   could have access to management if they're available.

9      THE COURT:  In the next two hours?

10      MR. WALPER:  If they're available.  And that's not an

11   order but if they're available to talk to us.  And it would

12   not -- the earlier agreement would not be binding to provide

13   that we could not do that if they were available.

14      THE COURT:  I think the earlier agreement is the

15   stalking horse, you believe precludes --

16      MR. WALPER:  Well, that has been the testimony, Your

17   Honor.

18      THE COURT:  Well, I was pretty skeptical about that

19   nonsolicitation testimony, I am not making any determination.

20   Nonsolicitation in responding to offers that are made by other

21   parties seem to me to be entirely two different things.  Mr.

22   Nashelsky, do you agree or disagree?

23      MR. NASHELSKY:  We agree, Your Honor.

24      THE COURT:  Is there any preclusion --

25      MR. NASHELSKY:  We agree, Your Honor.  And obviously

295

1  Nationstar is here and can comment, but if management has time

2  and can still stand in the next two hours or sit, I have no

3  problem with them having that opportunity and I don't think it

4  violates any agreement we have.

5          UNIDENTIFIED SPEAKER:  Well, that's debatable but we

6  have no objection to that.

7          THE COURT:  Okay.  That resolved that.

8          MR. WALPER:  Thank you very much, Your Honor.

9          THE COURT:  Anything else?  Okay.  So I will extend

10  the deadline for best and final to 8:40, two hours.  And then

11  the committee, you can try and get your committee organized to

12  meet and the board can do the same.  Tomorrow, again, I don't

13  envision more than reports to the Court and a decision from the

14  board on how to proceed.  I guess we still don't know what's

15  happening at 10:00.  11:30; I have a 10 o'clock hearing.  I

16  don't know how many of you all plan to show up tomorrow but

17  we'll do it at 11:30.  I have a 2 o'clock calendar.

18          We're adjourned.  Thank you very much.

19      (Whereupon these proceedings were concluded at 6:39 PM)

20

21

22

23

24

25

1

2                          I N D E X

3

4    WITNESS              EXAMINATION BY            PAGE

5    Samuel M. Greene     Mr. Engelhardt           162

6    Samuel M. Greene     Mr. Allred               183

7    Samuel M. Greene     Ms. Tomasco              207

8    Samuel M. Greene     Mr. Engelhardt           216

9    James Whitlinger     Ms. Tomasco              218

10   R. Ted Weschler      Mr. Allred               229

11   R. Ted Weschler      Mr. Engelhardt           248

12   R. Ted Weschler      Mr. Eckstein             256

13   R. Ted Weschler      Mr. Allred               261

14

15                        E X H I B I T S

16                      DESCRIPTION                PAGE

17   ---        Affidavit of James Whitlinger,     157

18              paragraphs 1-113 and 214-227

19   ---        Declaration of Samuel Greene       158

20   ---        Supplemental declaration of        158

21              Samuel Greene

22   ---        Amended declaration of Peter       159

23              Giamporcaro in support of the sale

24              of the Nationstar purchased assets

25              without a privacy ombudsman

297

```
 1   1              Asset Purchase Agreement       160
 2                  between Nationstar Mortgage
 3                  LLC and Residential Capital, LLC,
 4                  et al., dated 5/13/12
 5   2              Asset Purchase Agreement       160
 6                  between Ally Financial Inc.
 7                  and BMMZ Holdings LLC and
 8                  Residential Capital, LLC, et al.,
 9                  dated 5/13/12
10   4              Sale procedures                160
11   5              May 3, 2012 Berkshire letter   161
12   6              Privacy notices                161
13   8              Chapter 11 breakup fee analysis 161
14   Berkshire F    Document
15   Berkshire G    Document
16   Berkshire H    Document
17   Berkshire I    Letter from Mike Carpenter,    236
18                  Dated May 4, 2012
19   Berkshire J    Response to letter from Mike   236
20                  Carpenter
21   Berkshire      Various Exhibits               243
22   A through E
23
24
25
```

298

RULINGS

|                                                                      | Page | Line |
|----------------------------------------------------------------------|------|------|
| Citibank cash collateral order is approved on a final basis, subject to UST review. | 39 | 4 |
| Barclays' DIP order, granted subject to review of final order | 75 | 15 |
| Motion of Berkshire Hathaway, Inc, for the appointment of an examiner, granted. | 121 | 13 |

299

C E R T I F I C A T I O N

We, Penina Wolicki and Clara Rubin, certify that the foregoing

transcript is a true and accurate record of the proceedings.

_____

PENINA WOLICKI, CET**D-569

CLARA RUBIN, CET**D-491

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  June 19, 2012

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

**#**

**#607 (1)**
4:22
**#89 (1)**
4:5

**[**

**[entities] (1)**
189:3

**A**

**A1 (4)**
61:22,25;62:4,10
**A2 (2)**
62:1,5
**ability (13)**
39:12;65:17;
112:16;146:25;
147:4;175:2;199:18;
238:22;239:18;
267:22;270:13,14;
285:7
**able (36)**
21:17,25;24:19;
34:16;42:19;44:12,
25;59:12;60:22;
61:11;68:6;80:11;
81:7;88:24;90:9;
123:5,5,13;126:6,7;
147:1;168:7;177:15;
183:1;190:21;
192:15;196:20;
205:9;212:16;219:1;
269:20;271:23;
275:21;286:8,14;
290:7
**above (6)**
128:24;150:11,15;
260:24,25;261:7
**absence (4)**
68:24;206:24;
271:22;291:4
**absent (1)**
32:7
**absolute (1)**
239:1
**absolutely (9)**
80:6;91:23;99:4;
115:22;149:9;
182:19;256:6;265:8;
294:3
**Acacia (1)**
19:22
**accelerating (1)**
233:6
**accept (6)**
68:7;95:19;96:14;
100:9,15;269:9
**acceptability (1)**

**242:8**
**acceptable (11)**
30:20;31:9,17;
32:11,18,22;33:13;
59:10;242:3;273:17;
291:5
**accepted (1)**
94:6
**ACCESS (22)**
7:20;83:11,14,17,
21;88:20;103:21;
112:1,4;113:20,21;
222:11,15;234:9;
253:13,18,22,25;
254:5;261:23;
290:24;294:8
**accidentally (1)**
47:11
**accommodate (1)**
291:25
**accompanying (1)**
243:3
**accomplish (1)**
78:19
**accomplished (2)**
129:10;267:20
**accomplishment (1)**
37:16
**accordance (2)**
45:23;220:16
**accordingly (1)**
87:22
**account (6)**
33:11;55:22;56:13;
124:1;223:19;269:12
**accountant (1)**
104:17
**accountants (1)**
91:4
**accounting (2)**
80:16;82:1
**accounts (11)**
47:18,18,19;56:3,
7;57:18,20,20,21,22;
60:14
**accurate (3)**
38:5;53:5;269:10
**accurately (2)**
37:18;43:12
**achievable (1)**
44:16
**achieve (1)**
268:5
**achieved (1)**
62:17
**acknowledge (2)**
87:4;89:15
**acknowledged (1)**
87:11
**acquire (2)**
241:4;256:25
**acquired (1)**
248:20

**acquiring (3)**
235:19;241:19;
249:1
**acquisition (3)**
257:4,9;260:9
**Acquisitions (4)**
12:20;152:12;
261:25;262:6
**Act (7)**
101:21;187:23;
188:10,15;210:13;
268:9;288:22
**acted (1)**
99:25
**action (3)**
164:18,18;292:16
**actions (3)**
23:3;208:10;209:9
**active (8)**
65:19;102:16;
120:3;126:19;
129:14;167:12;
268:21;275:22
**activities (4)**
226:25;227:13,19,
22
**activity (1)**
97:16
**acts (1)**
155:9
**actual (2)**
154:13;226:24
**actually (38)**
17:14;18:18;22:14;
27:5,7;37:11;44:16;
45:2;62:3;67:4;
70:10,21,22;71:5;
75:6;79:7;80:18;
82:10,20;92:13;
110:11;132:19;
146:12;161:19;
166:3;167:8;168:4,6;
172:18;214:16,17;
234:24;239:13;
255:21;272:17;
277:11;286:25;290:6
**Ad (4)**
7:11;10:12;98:8;
289:14
**add (4)**
70:12;82:2;111:13;
246:25
**added (4)**
46:4,5;244:25;
273:10
**adder (2)**
246:23,24
**addition (4)**
32:6;85:17;243:14;
288:14
**additional (20)**
30:21;82:3;114:23;
128:11;141:13;

**156:12;172:19;**
**217:21,22;245:4;**
**258:8,12;260:20;**
**262:10;263:24;**
**268:1;272:2,7;**
**282:21;290:11**
**additionally (2)**
64:22;251:18
**address (20)**
15:13;17:16;22:11;
27:21;33:8;42:18;
45:7;47:25;54:21;
63:6;88:2;106:10;
107:13;115:16;
123:7;144:11;152:4;
155:24;276:17;280:9
**addressed (8)**
45:1;65:22;103:21;
116:9;156:8,11;
200:21;275:16
**addresses (1)**
280:14
**Adequate (20)**
4:8,9;36:9;42:10;
44:16;46:13,21;47:4;
50:14;57:3,8,16;
59:25;60:3,13;80:25;
81:9;199:16;285:22;
286:7
**adequately (1)**
156:11
**adjourn (1)**
291:24
**adjourned (3)**
15:10;29:19;
295:18
**adjusted (2)**
186:1;246:18
**adjustments (1)**
279:23
**Administrative (5)**
6:3;31:8;61:19;
69:16;70:2
**administrator (1)**
48:25
**admirably (1)**
206:21
**admitted (11)**
157:23;158:8,20;
159:9;160:15;
161:22;218:5;236:9;
243:22,23;246:9
**admitting (4)**
157:20;158:17;
159:6;160:13
**adopt (2)**
110:2;196:21
**adopted (1)**
90:15
**advance (10)**
25:25;27:6;67:4;
90:3;166:7;196:2;
248:20;276:25;

**277:15;287:13**
**advanced (2)**
46:19;214:16
**advances (1)**
213:11
**advantage (1)**
82:22
**advantageous (3)**
67:3;267:20;268:1
**adversarial (2)**
83:4;102:2
**adversaries (1)**
97:21
**adversary (9)**
19:9;23:18;24:12,
13;26:11;27:20,25;
29:5,17
**advertised (1)**
64:15
**advice (9)**
53:16;68:25;
163:16,19;164:9;
173:18,22;174:15;
190:2
**advise (3)**
61:9;186:17;270:5
**advised (4)**
53:15;178:13;
180:2,3
**advising (1)**
52:16
**advisor (11)**
80:19;88:24;141:6;
170:18;173:14;
179:5;180:6;182:11,
16;212:16;217:1
**advisors (9)**
80:23;81:15;90:20;
91:3,6;116:18;168:7;
254:10,11
**advisor's (1)**
211:9
**advocacy (1)**
83:7
**affect (5)**
18:11,13;56:9,17;
106:14
**affected (2)**
56:14,20
**affidavit (3)**
119:2;157:4;
162:16
**affidavits (1)**
118:25
**affiliate (1)**
31:8
**affiliated (1)**
33:23
**affiliates (4)**
16:5,9;19:4;89:17
**affirm (1)**
278:24
**affirmative (1)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 301 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

257:20
**afforded (1)**
153:16
**AFI (27)**
37:2;39:9,11;
40:21;41:17,20,21;
42:2,4,18;46:12;
47:12;49:17,18,19,
20;89:17;124:16;
134:21;135:12,23;
141:16;142:19;
202:24;203:9;
262:23;263:3
**afraid (1)**
51:7
**afternoon (14)**
85:3;89:10;144:9;
152:10;156:25;
162:11,12;183:22;
184:1,2;207:12,13;
246:16;256:9
**afterwards (1)**
59:8
**again (44)**
17:11;29:2;43:7;
59:20,22;62:18;
63:20;74:19;75:5;
95:6;158:14;159:3;
166:23;168:2;
171:24;172:7,16;
176:5,25;182:25;
187:24;189:1;
191:12;192:7;
193:24;195:24;
197:1;201:17;202:4;
217:12;238:15;
239:14;248:14;
251:9;254:5;265:11;
266:4;275:3;277:24;
285:4;288:25;
291:14;292:1;295:12
**against (26)**
16:4,16,17;17:10;
24:22,23;32:15;
46:16,23;48:20;
51:19;60:7,18;79:19;
83:16;129:24;
136:16,18;155:8;
177:25;227:22;
233:24;258:4;
278:20;284:21,25
**agencies (6)**
46:9;169:7;177:2,
8;196:10,11
**Agency (1)**
48:25
**agenda (7)**
16:1;29:13;30:5;
39:9;47:9,12;73:20
**Agent (5)**
6:3;61:19;68:17;
69:16;70:2
**agents (1)**

46:9
**aggregate (2)**
36:10;193:12
**aggressive (2)**
103:5,7
**agnostic (1)**
161:19
**ago (11)**
26:22;28:1;58:13;
80:20;104:22;
108:15;237:6,14;
255:21,23;263:24
**agree (41)**
15:18;23:20,23;
24:4,5,20;32:22;
33:5;44:23;46:24;
56:19;58:19;59:15;
67:13,15;70:7;77:2;
80:12;86:15;87:12;
88:23;89:13;96:10;
101:3,12,19;121:21;
125:7;143:12;
149:22;153:18;
209:7;214:21;
245:25;257:16;
258:21;278:14;
294:2,22,23,25
**agreeable (1)**
38:7
**agreed (50)**
30:13;31:22;32:6;
36:3,6,11,15,20;37:1,
12,19;42:17,17;44:5;
45:19;53:17;54:12;
59:12;62:19,24;63:2,
8;64:8;65:22;66:16,
21;67:6,11,15,15;
70:2;77:23;83:13;
98:3;143:6;146:16;
149:13;153:24;
172:6;186:9;202:9;
246:3;279:6,7,19;
288:1,2;290:15;
291:1,4
**agreed-upon (1)**
64:7
**agreement (70)**
18:16;33:23;34:16,
23;38:13;42:1,18;
44:19,24;45:3,3,4,16,
24;49:9;55:22;56:14;
58:13;59:17;60:8;
63:16;66:6,25;67:13;
69:18,21,22;70:5;
90:10;97:24,25;98:8,
10;109:20,21;
120:22;122:21;
160:17,21;168:12,13;
169:15,15;179:13;
205:12;209:7;210:4,
11;214:15;215:3;
216:20;227:21;
244:18;245:11,21;

246:4,24;247:3,5;
253:11;259:4;278:2;
290:5,23;293:2,3;
294:5,12,14;295:4
**agreements (27)**
18:17;40:19;43:23;
44:3;77:6,15,15;
89:16;141:15;
173:20;189:20;
212:6,19,24;214:22;
219:13;220:4;223:2;
225:4;226:1;243:9;
244:14;245:23;
246:3;275:3;279:18;
287:20
**agrees (3)**
68:12;69:16;122:9
**AGs (1)**
227:18
**Ah (1)**
133:20
**ahead (47)**
20:8;26:15;29:18;
30:22;35:16;40:10;
53:7;72:16;74:9;
76:9;105:7,21;
122:21;140:21;
146:9;152:9;156:1;
167:18;174:10;
178:15;180:5;182:9;
185:12;204:9;
207:23;216:1;219:7;
220:2;224:20;227:5;
229:6,22;230:19;
232:18;233:16;
234:13;238:3;239:7;
240:22;241:11;
248:11;272:4;
273:12;274:13,17;
279:12;283:16
**aimed (1)**
19:13
**aiming (1)**
266:20
**al (3)**
10:3;160:18,22
**align (1)**
84:5
**all- (1)**
119:20
**allegations (1)**
16:16
**alleges (1)**
78:2
**ALLEN (2)**
13:2;283:13
**all-in (1)**
163:22
**Allison (1)**
48:11
**allocate (1)**
26:6
**allow (11)**

15:16;45:7;48:18;
66:22;71:4,7;104:1;
176:10;185:4;
276:13;280:3
**allowed (5)**
44:7,9;114:20;
130:7;283:24
**allowing (3)**
116:14;137:18;
185:22
**ALLRED (51)**
11:19;183:12,12,
22,23,25;185:11,17;
192:3,23;194:5;
198:21;204:10;
207:6;217:18;218:2;
228:23,25;229:1,6,7,
12,15,18,20,22,23,25;
230:19,20;232:18,19;
234:12,14,23;235:3,
9;236:5;239:5;
241:14,16;242:14,24;
243:17;246:5;
247:23;255:7;
261:20,22;262:7,11
**alluded (2)**
68:21;145:13
**Ally (112)**
7:3,3;15:10,11;
29:19;31:8,14;32:15,
21;33:24;40:12,22,
24,25;41:1,3,8,10;
42:17,22;43:17,24;
44:4,21;45:17,19;
46:2;49:3,7,23;50:5,
14;52:7;55:23;56:5,
10,12,21;57:25;58:6;
59:16;60:7,11,18;
69:21;79:11,19;80:1;
89:23;90:9;97:10;
98:11;110:24,24;
111:18,19;112:8,19;
113:22;126:9;
134:25;149:4,18,19,
21;150:9,16;152:22;
153:7,19;160:21;
165:10;170:11;
194:6;200:12,17,21;
201:9,14,19,20;
231:20;232:6,8;
234:3;235:18;
243:13;249:6,12;
250:10,15,16,23;
251:8,12,24;253:11;
256:15;257:20,23;
258:8,16,20;259:1,5,
18,22;260:10,17;
271:16,25;273:7
**Ally's (8)**
39:12;40:16;45:3;
63:22;112:2;235:6,7;
261:1
**almost (5)**

21:25;151:4;166:7;
202:21;291:11
**alone (2)**
90:17;125:4
**along (9)**
53:13;79:14;
108:20;115:1;
127:14;138:22;
163:2;217:12;263:17
**ALSTON (2)**
8:13;55:14
**alter (1)**
60:19
**altered (1)**
187:21
**alternative (8)**
104:8;105:22;
106:4;108:6;109:25;
141:25;142:1,5
**alternatively (1)**
285:6
**alternatives (1)**
290:13
**although (6)**
16:15;80:17;119:5;
141:5;172:8;281:13
**Alvarez (1)**
17:9
**ALVES (5)**
11:8;54:24,24;
242:16,20,21
**always (10)**
35:10;82:5,7;
114:15;115:23;
117:12;133:23;
141:7;151:14;285:3
**ambiguity (2)**
68:22;204:24
**amenable (2)**
33:8;37:6
**amend (1)**
66:21
**amended (11)**
26:21,22;28:16;
35:25;47:12;159:1,7,
10,24;274:23;285:6
**amending (1)**
66:17
**amendment (12)**
40:23;63:5,9,10;
66:18;67:1,16;68:23;
69:25;70:1;102:19;
234:24
**amendments (2)**
69:18;244:12
**American (1)**
92:11
**Americas (6)**
7:12;8:4;9:22;
10:22;53:11;71:16
**among (3)**
37:14;60:1;79:17;
97:25;227:13;293:3

12-12020-mg     Doc 472     Filed 06/20/12     Entered 06/20/12 15:35:46     Main Document
Pg 302 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

**amongst (6)**
20:17;22:14,19;
210:12;215:7;225:9

**amount (14)**
66:1;68:12;130:22;
165:4;166:5;168:3;
175:23;181:14;
187:12;211:20;
254:4;269:14,16;
292:19

**amounts (2)**
31:10;154:19

**ample (1)**
44:14

**analogous (1)**
119:5

**analogy (1)**
94:21

**analysis (6)**
82:4,5;161:6;
170:19,22;233:5

**ancillary (1)**
223:9

**and/or (3)**
46:23;165:10,20

**ANDREW (3)**
10:7;53:8;71:14

**Angeles (2)**
11:15;293:14

**announcement (1)**
154:9

**answered (2)**
213:15;219:1

**anticipate (9)**
26:4;54:17;84:5;
109:6;280:18;285:3;
286:22,23;292:1

**anticipated (4)**
118:19;147:25;
186:18;292:17

**anticipation (1)**
110:3

**anymore (1)**
101:7

**APA (36)**
119:15,15;126:2;
127:9,10;135:17;
168:1,10;175:2;
176:5,17;182:1;
187:2,13;189:6,9;
192:14;193:4;
194:16;208:9;209:2,
6,16,17,17;211:8,10;
216:18;217:13;
223:22;224:7,12,13;
225:7,11;226:1

**apologies (2)**
17:14;26:16

**apologize (5)**
47:10,13;59:4,20;
290:1

**apparent (2)**
43:16;217:4

**Apparently (1)**
202:10

**appeal (1)**
74:15

**appear (4)**
39:22;86:16;
121:21;159:13

**appearance (1)**
277:24;289:7

**appeared (2)**
127:20;263:14

**appearing (1)**
55:21

**appears (4)**
70:10;72:17;
103:17;268:4

**appetite (1)**
232:12

**applecart (1)**
181:12

**apples-to-apples (1)**
290:14

**applicable (3)**
45:24;59:13;
245:25

**application (2)**
122:23;283:15

**applications (1)**
123:3

**applied (3)**
115:19;221:22;
287:18

**applies (2)**
108:22,24

**apply (3)**
86:23;100:22;
115:21

**applying (1)**
115:20

**appoint (10)**
94:2;96:20;100:18;
103:1,15;105:15,25;
106:5;107:18;111:15

**appointed (19)**
77:7,12;79:23;
81:22;84:15;86:21,
25;87:24;88:3;92:5;
94:1;99:23;101:9;
104:14;108:8;122:1;
156:18;275:12,23

**appointing (2)**
102:6;110:11

**appointment (16)**
76:12;85:2,8,12,
22;86:12;87:15,20,
21;89:8;95:10,14;
121:12,14,20;275:9

**appreciate (6)**
48:8,13;147:16;
267:15;291:7;293:9

**appreciative (1)**
267:18

**apprised (2)**

106:25;107:1

**approach (14)**
72:10,12;110:10;
185:11;207:21;
224:18;229:8;
231:16;234:12;
235:25;241:18;
249:18,21;250:15

**approached (1)**
254:9

**approaching (1)**
249:22

**appropriate (43)**
24:22;47:5,25;
77:3,22,23;82:12,19;
86:6,10,15,16,19;
87:17,18,22;88:4;
93:21,22;95:23,24,
25;96:19,22;101:1;
106:1,23,24;107:14;
108:9;117:7,9,9,12;
118:3,5,6;121:16,20;
122:12;263:3,5,21

**appropriately (2)**
29:9;67:10

**appropriateness (2)**
104:21;107:6

**approval (18)**
32:7;60:16;63:14,
15,25,25;70:5;133:8,
9,12;145:2;146:8;
148:1;181:8;195:9;
241:7;271:10;281:5

**approvals (13)**
70:4;195:6,12;
238:23;239:1,9,18;
240:9,9,14,15,20;
263:9

**approve (25)**
35:18;40:12;61:17;
63:13,15;86:11;
101:16;109:16;
112:3;115:6,9;
119:25;120:5;
129:16;138:8;
139:17;146:22;
147:12,15;152:18;
153:19;180:25;
181:18;240:25;
291:24

**approved (17)**
30:6;39:4;91:21;
129:13,14;139:10;
145:10;149:21;
151:25;197:8;
205:25;240:6;263:4;
264:15;265:23;
275:24;292:10

**approving (1)**
60:15

**approximately (13)**
28:1;40:21;41:2;
61:20;98:6;141:11;

163:12;260:12;
283:1;288:5,6;
289:13,14

**April (5)**
49:10;64:19,20;
70:23;230:14

**area (2)**
197:3;219:19

**areas (1)**
122:24

**argue (3)**
86:22;92:3;278:11

**argued (2)**
79:2;146:11

**argues (1)**
95:5

**argument (13)**
28:22;74:8;83:4;
92:20;117:15;
118:11;121:1;
122:15;155:11;
168:17;211:5;
226:11;262:19

**arguments (4)**
78:11;115:8;
274:16;280:18

**arise (8)**
107:8;112:21;
120:2;123:8,15;
209:25;225:19;284:6

**arises (1)**
21:15

**Arising (4)**
4:2;209:24;225:3,
18

**ARLENE (2)**
11:8;54:24

**arms (1)**
183:3

**arose (1)**
278:7

**around (11)**
37:17;52:22,22;
54:4;68:21;135:17;
164:23;167:21;
237:16,18;288:8

**ARPS (3)**
6:2;68:16;74:20

**arrange (2)**
24:12;61:10

**arranged (1)**
125:16

**arrangement (2)**
70:1;124:15

**arrangements (1)**
214:9

**arrives (1)**
126:17

**articulated (3)**
88:11;176:1;
266:23

**ascertain (1)**
48:19

**aspect (3)**
62:7;155:22;
274:16

**aspects (7)**
151:2;155:25;
179:3,6,8;233:23;
247:7

**aspirational (1)**
122:11

**assert (1)**
112:9

**asserted (2)**
221:10;227:22

**asserting (5)**
46:17;278:7,20;
284:20,25

**assess (3)**
116:8;179:5,7

**assessment (1)**
281:8

**asset (2)**
44:11;64:23;66:22;
160:17,21;169:15;
186:15;201:2;209:7;
210:3,11;215:2;
227:21;231:2,7;
232:3;233:11,21;
243:9;244:14,17;
245:11,21;246:2

**assets (56)**
36:14;37:23,25;
38:2;41:19;42:20;
51:13;65:23;66:9,15;
71:4;74:5;81:1;
113:25;126:21,23;
127:1,8;141:13,14,
19;142:23;144:6;
145:9;147:1,5;
150:10;152:16;
158:4,14;159:2;
164:12;165:7,8;
166:17;171:14;
178:23;213:1,11;
226:15;227:8,14;
241:4,23;250:18;
257:5,10,11,11;
258:3,5;272:16;
273:21;291:2,9,16

**assign (2)**
285:8,9

**assigned (3)**
223:23;268:22;
285:21

**assignment (4)**
164:11;279:17,25;
288:13

**assist (2)**
116:18;211:9

**assistance (1)**
21:18

**Assistant (1)**
73:7

**assisted (2)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Pg 303 of 342

Case No. 12-12020(MG)
June 18, 2012

210:4;211:7
**assisting (1)**
    211:23
**associated (4)**
    227:12;239:16;
    245:7;279:20
**Association (2)**
    11:3;289:9
**associations (1)**
    168:18
**assume (14)**
    47:24;96:13;
    112:12;123:4,18;
    154:21;177:18;
    242:12;257:24;
    282:24;283:25;
    284:3;285:8,9
**assumed (16)**
    208:10;209:8,19,
    21,24,25;224:14,24;
    225:3,6,8,11,17,19,
    22;284:23
**Assuming (6)**
    104:4;273:19;
    278:21;284:24;
    285:21;290:25
**assumption (8)**
    278:8;279:17,25;
    283:22;284:20;
    285:5,20;288:13
**assurance (2)**
    285:22;286:7
**assure (1)**
    133:23
**assured (1)**
    290:17
**Atlanta (2)**
    8:17;12:22
**Atlantic (1)**
    8:15
**attached (6)**
    100:12;243:16;
    252:19,22;254:8;
    284:22
**attachments (1)**
    275:2
**attain (3)**
    63:13,15;191:14
**attended (1)**
    196:2
**attending (1)**
    195:25
**attention (3)**
    48:22;155:3;
    256:12
**Attorney (2)**
    7:21;73:7
**attorney-client (1)**
    83:17
**Attorneys (23)**
    6:3,11,20;7:3,11;
    8:3,14;9:3,12,21;
    10:3,12,21;11:3,12;

12:3,12,20;13:3,12,
20;15:16;211:11
**Attorney's (1)**
    9:12
**attract (1)**
    181:11
**attractive (2)**
    142:14;238:14
**attributable (1)**
    208:10;209:9
**attribute (1)**
    78:8
**auction (42)**
    65:14,19;129:16;
    130:6;134:5;137:16;
    138:3,11,11;141:6;
    144:14,22,23;145:11;
    146:23,23;151:15;
    177:17;180:13,14;
    181:15,16;190:25;
    202:6,6;206:2;265:9;
    267:22;277:20;
    281:1,4,15,21;282:2,
    11,16;287:3;288:5;
    291:12,21;292:1,17
**auctions (9)**
    129:9;138:12;
    163:17,19,22,22;
    266:19;291:10;
    292:13
**auction's (1)**
    130:4
**AUSA (1)**
    9:17
**Austin (3)**
    12:6,11;266:12
**authority (1)**
    269:2
**authorized (1)**
    269:2
**Authorizing (2)**
    4:6,7
**automatic (5)**
    16:3,8;22:24;
    23:22;26:23
**available (18)**
    26:10;51:4;68:2;
    88:15;161:16,18;
    183:8;187:25;
    217:24;237:6;253:3,
    7;269:1;291:6;294:8,
    10,11,13
**Avenue (10)**
    6:21;7:12;8:4;
    9:22;10:4,22;11:13;
    12:4;13:13,21
**a-vis (1)**
    221:14
**avoid (5)**
    19:18;85:24;
    107:11,16;198:1
**avoided (3)**
    77:10,11;122:20

**aware (39)**
    23:10;29:1;56:8;
    88:8;94:22;97:16;
    100:13;162:13;
    168:22;171:2,4,7,9,
    10,19;175:5;188:3;
    189:14,16;196:18;
    200:11,16,18;201:15,
    20,22;205:17,22;
    208:9;213:19;214:1;
    223:1,4;224:14;
    231:15;252:17;
    255:13;272:14,24
**awareness (4)**
    171:12;172:9,11,
    12
**away (2)**
    146:18;169:11

### B

**back (42)**
    21:5,20;22:12;
    24:9;31:21;33:14,17;
    40:25;44:14;53:22;
    54:6,14,20;55:7;
    66:25;68:23;100:8,
    25;101:20;118:16;
    120:16;124:4;
    134:15,22;135:5;
    139:3,4,6;144:6;
    179:23;204:11;
    208:17;210:22,24;
    250:13;268:14;
    270:15;280:19;
    283:8;288:24;
    291:13;293:17
**back-channel (1)**
    192:20
**backed (1)**
    197:8
**backend (1)**
    135:21
**background (8)**
    16:7;49:6;90:22;
    124:5,7;157:15;
    162:16;230:1
**backs (2)**
    31:20;40:18
**bad (2)**
    114:5,15
**Baer (2)**
    20:3,6
**bag (1)**
    17:15
**balance (7)**
    18:3;31:11;197:9;
    199:16;242:6,11;
    283:2
**ballpark (1)**
    260:14
**Bank (31)**
    6:3;7:3;8:14;9:3;

10:3,21;11:3;12:3;
13:20;31:14;32:15,
21;33:24;47:8,15,19;
52:8;53:9,10;54:25;
57:22;60:7;71:15,16;
80:19;154:8;207:9;
278:1;279:14;
288:14;289:9
**banker (1)**
    104:17
**bankers (1)**
    91:4
**Bankruptcy (24)**
    16:6;19:15;50:17;
    85:14;92:6;94:7;
    95:20;101:21,23;
    126:25;137:17;
    164:13;169:9;
    200:14;201:2;231:7;
    232:9,12,17,22;
    233:19,24;253:16;
    256:25
**bar (1)**
    148:14
**Barbara (1)**
    51:17
**Barclays (31)**
    6:3;37:2;41:24,25;
    43:21;45:19;47:11;
    48:23;49:1,4;50:15;
    61:19;62:11,18,21,
    24;63:3,8,11;64:22;
    66:16,20,25;67:9,14;
    68:12,17;71:13;73:5;
    74:21;75:13
**Barclays' (8)**
    63:7;64:2,5,6,11,
    15;68:24;74:3
**BARNES (1)**
    9:2
**barred (1)**
    278:7;284:20
**barrel (2)**
    90:16;145:19
**base (1)**
    268:2
**based (23)**
    16:10,15;32:2;
    85:11;98:9;142:10;
    152:13;153:3,5;
    155:9;156:4;175:1;
    182:22;188:2;
    223:7;231:23;
    233:10;237:22;
    261:25;269:9;289:20
**baseline (1)**
    159:15;169:21
**basically (8)**
    21:8;46:20;86:13;
    112:25;191:21;
    201:9;244:12;258:25
**basics (1)**

26:1
**Basis (25)**
    4:7;29:6;30:7;39:2,
    4;45:15;60:17;61:9;
    62:6;67:3;71:6;
    72:23;118:3;126:14;
    146:21;166:22;
    169:8;174:20;
    184:22;220:22;
    232:10;262:5,6;
    283:19;291:13
**Battery (1)**
    11:5
**bear (4)**
    90:24;168:8;
    182:13,17
**beat (1)**
    220:11
**became (4)**
    65:1;66:2;166:13;
    195:18
**become (11)**
    63:10;66:4;93:1;
    101:11;103:23;
    106:25;119:17;
    153:11;212:1;
    213:12;231:15
**becoming (2)**
    196:16;291:11
**beg (1)**
    215:14
**began (3)**
    90:4;195:15,18
**begin (1)**
    290:16
**beginning (5)**
    203:5;230:10;
    231:12;237:16;288:9
**behalf (30)**
    27:19;31:13;35:4;
    43:3;51:12;54:2,25;
    55:15;61:19;68:17;
    71:17;73:7;74:21;
    76:11;110:24;113:9;
    116:25;124:1;
    144:10;146:3;
    150:23;154:8;278:1;
    279:1,15;280:8;
    282:25;283:14;
    289:9;293:5
**behind (2)**
    145:23;242:6
**belated (1)**
    15:25
**belie (1)**
    139:10
**belief (2)**
    196:19;198:13
**believes (2)**
    44:16;77:14;
    105:25;283:21
**below (3)**
    117:8;134:22;

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

269:17
**bemoan (1)**
102:17
**bench (2)**
27:3;229:8
**beneficial (2)**
71:5;253:5
**benefit (11)**
107:15,15,24;
108:3,12;138:14;
153:13;168:5;
182:12,17;249:20
**benefits (2)**
62:16;283:22
**BENJAMIN (2)**
13:24;289:8
**Ber (1)**
179:7
**Berkshire (200)**
11:12;75:22;76:11,
17;89:22;90:14;
92:20;95:12;97:4;
98:4,5,5,12,17,19,20;
99:12;100:24;
103:20;111:16,25;
113:25;119:9,15;
121:11;122:6;
124:20;125:7,25;
126:17;127:21;
128:7,22;130:21;
131:16,17,18;132:10,
12,14,23;133:8;
134:1;135:15,17;
136:15;137:4;
140:12;142:14;
143:1,11,16;146:3;
147:17;149:9;151:3;
161:2;165:24;166:1,
2,5;171:7,10;172:7,
14;174:25;175:5,12,
22,24;176:12,20;
177:14;179:4,6,11,
18,19,24;180:19;
183:13,23;184:14,19;
188:9,15,17;189:14,
23;191:11,22;194:2,
6,11,15;196:16,24;
197:2,6,9,20,22;
198:9,9,11,14;
199:15;200:2,12,12,
16,19;201:1,6,15,19,
23;203:5,8;204:12;
205:15,21,24;206:1;
228:23;230:5,8,11,
13,15,22;231:1,6,10,
24;233:20;234:20,20,
20,22;236:8,19,21,
25;237:9,21;238:23;
239:8,24;240:9;
241:7,23;243:12,16,
21;244:14,17;
245:12;248:17,20;
249:1,6,11,14;

251:15;252:3,8;
253:1,18,21;254:9;
255:4,13,19;257:4;
258:3,7,9,23;259:1,4,
13,19,24;260:8,19;
261:23,25;263:8,14;
264:19;266:2;269:8,
25;271:19,24;
273:25;288:2;
289:15;293:5
**Berkshire's (33)**
92:9;97:6;111:23;
128:15;130:15;
132:13;137:12;
173:9;176:1,19;
177:4;179:8;188:19;
199:20,23;201:20;
202:4;216:6;231:15;
232:2;234:16;
236:11,14;237:17;
239:17;240:5;
241:18;242:5;
243:24;246:19;
251:24;255:9;281:14
**best (48)**
23:13,14;77:4;
87:25;109:13,19;
114:25;116:6;120:2,
6;124:9;136:4;
148:25;150:25;
189:1,11,21;190:1,
18;191:2,4,5,12,13;
192:4,25;193:4;
204:19;205:8;208:1;
217:4,5;233:1;234:4;
236:25;238:15;
239:1;268:9;270:1;
273:15,20;274:9;
281:15,22;282:14;
283:8;293:18;295:10
**better (27)**
49:12;69:1;87:14,
23;114:15;115:10;
119:14;132:20;
133:1,2;134:9;
141:23;143:10,11;
144:16;151:3;182:5;
184:24;190:8,25;
191:9;200:13;201:1;
234:2;242:11;
246:20;268:4
**beyond (5)**
50:6;60:20;111:13;
208:14;260:23
**bias (2)**
206:16,20
**bid (120)**
56:23;63:14,22,25,
25;75:19;113:25;
119:10;124:24;
125:8,16;128:17,18;
129:3,25;130:7,13,
15,25;131:1;132:19,

24;133:1,1,3;134:5,
13,17,20,24;135:3,4,
8,16,20,23;136:1,8;
137:20;138:2,15,25;
139:3,11,23;140:2;
141:15;142:14,20;
143:23;145:24;
147:15;148:7,18,25;
149:15,15;150:11,15,
25;152:18;155:20;
170:12;171:2,8;
172:16,24;173:7;
179:4,4,6;181:4,18;
182:24;184:15,20,23,
25;186:1,7,9,18,21;
193:16,17;194:23;
196:4;198:22;206:1,
24;238:5;246:3;
263:3,3,15,16,21;
264:19;265:11,19;
266:3,3,23;269:15;
271:14,15,16,18,20;
275:14;281:3,14;
283:20;284:18;
285:6;286:2;288:1,3,
24;291:5
**bidder (49)**
63:12;114:21;
119:6,6,7;129:10;
138:7;144:15;
147:12;150:2,4;
151:10,16,19,25;
152:17;153:8,20;
154:20;176:7;
177:20,25;178:20;
187:4,10,17,23;
191:1;196:3,16;
205:25;268:10;
280:10,24;281:16,17,
22;282:3,4,13,14,17,
18;285:24;286:8;
289:1;290:12;
292:10;293:21
**bidders (34)**
137:3;143:17;
144:21;152:1,2;
155:7;165:18,22,24;
190:21,25;195:22;
196:5,11;204:25;
243:14;270:21,24;
271:3,4,9;281:9,18,
21;283:6;286:24,24;
290:10,21,22;291:15,
16;292:14;293:15
**bidding (49)**
76:5;118:18,20;
120:3,17;129:13,14,
20,24,25;131:22;
134:15;136:2;
139:11;141:3,11,17,
20;145:9,10,17,18;
150:1,6;151:3,11,13;
154:13,18;155:7,15;

181:21;192:20;
193:11;211:20,22;
242:16;244:13;
245:22;268:21,21;
269:4;275:8;288:16;
289:17;290:5;291:3,
4,17;292:21
**biddings (1)**
159:16
**bids (22)**
118:24;127:23;
129:7;134:7;135:15;
141:3;142:7,21;
166:16,16,17,20;
169:22;174:21;
182:22;263:3,17;
264:15;267:7;
272:17;291:9;292:11
**bifurcate (1)**
283:23
**bifurcated (1)**
135:6
**bifurcating (1)**
283:20
**big (10)**
50:16;66:5;114:23;
115:2;251:21;
264:24;265:2;
275:25;276:16,21
**bigger (3)**
265:1;269:16;
287:18
**biggest (2)**
141:9;252:11
**billion (38)**
18:3;41:6;61:18,
22;66:11;89:18,22;
134:18,20;152:14;
170:4,5,13,15;
237:18;251:25;
258:20;259:7,8,11,
12,13,15,16,18,19,19,
20,23;260:13,14,15,
17,18,20,23,25;283:1
**billion-four (1)**
135:5
**billion-six (1)**
135:2
**binder (1)**
159:19
**binding (1)**
294:12
**BIRD (2)**
8:13;55:15
**bit (13)**
47:23;48:21;49:5;
52:12;62:8;63:16;
124:5;135:17;
137:17;22:25;
242:5,11;260:2
**BlackBerrys (1)**
53:3
**blackline (1)**

72:12
**blacklined (2)**
243:15,15
**black-lined (1)**
243:11
**blank (1)**
167:25
**blue (1)**
263:14
**BMMZ (2)**
41:23;160:21
**board (59)**
49:10;130:9,11;
131:2;132:4,6,7,16,
23;134:8;139:4,6,15,
17;146:21;147:13;
164:14,17;165:12;
166:21;167:7,7,8,9,
13,16;173:10,12,18;
174:16,18,24;176:1;
179:23;200:22;
250:22;263:22,25;
264:1,2,6,7,11,14,22,
25;265:18,20;267:8;
268:10,16;269:3,12,
21;270:4;273:13,16;
295:12,14
**board's (3)**
118:23;129:7;
267:12
**BOCKIUS (2)**
10:2;53:9
**body (1)**
233:6
**bolts (4)**
184:13,18;254:1,3
**bondholder (3)**
233:1;252:7,12
**Bondholders (3)**
10:12;183:6;237:7
**bonds (13)**
79:15;95:12;97:10;
98:7,11,13,19,24;
99:12;126:9;233:9;
252:4;288:15
**book (4)**
51:18;207:14,17;
224:16
**Borders (1)**
275:23
**borrower (5)**
41:21;222:1,5,6,8
**borrowers (1)**
49:19
**boss (1)**
231:20
**both (35)**
16:9;17:23;19:8;
30:20;41:22;45:19;
53:11;55:23;62:1;
72:22;82:1;88:24;
92:14;93:3,17,19;
95:7;116:9;134:15;

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

135:18;143:17;
148:19;152:25;
245:23;246:2,2;
268:5;269:25;
270:10,21;271:3,5,6;
273:21;288:2
**bottom (2)**
200:7;235:1
**bought (1)**
237:15
**bound (1)**
294:7
**boy (2)**
71:23;72:7
**breadth (1)**
21:1
**break (13)**
60:25;76:8;124:4;
132:2;141:10;142:7,
16;143:9;267:24;
268:1;271:15,19,21
**break- (1)**
216:20
**breakup (66)**
119:11,20,25;
120:5;125:4;128:5,7;
129:3,16,19,20,21,
23;131:5;132:11,12,
21;134:24;135:12,18,
19;136:6;137:5,6;
138:6;139:12;
148:20;149:13,14,19;
150:8;153:21;
155:20;161:6;170:7,
15,17,18,20;171:14,
25;174:22;187:2,7,
17,22;188:12,15;
189:5,17;190:8;
191:7;193:3;194:25;
195:1;245:17,20;
247:1;263:4,4;
264:17;266:14;
269:14,16;270:2;
273:11
**Break-Up (7)**
187:6;188:24;
216:7,9,12,15;217:8
**BRIAN (4)**
14:8;85:3;155:17;
274:14
**bridge (1)**
43:18
**brief (10)**
33:4;55:24;100:9;
103:19;110:19;
116:24;152:9;
162:19;204:18;216:5
**briefing (1)**
22:1
**briefly (20)**
21:11;26:12;27:18;
30:23;73:16;110:15,
18;113:8;121:13;

134:10;140:11,12;
150:21;156:1,3;
254:11;261:20;
271:11;274:11;
292:25
**briefs (1)**
22:2
**bring (7)**
41:16;54:7;79:20;
168:7;235:12;
242:15;266:13
**bringing (2)**
138:25;233:6
**brings (1)**
246:16
**broad (3)**
111:24;214:23;
233:6
**broader (1)**
205:3
**Broadly (1)**
240:17
**brokerage (1)**
30:25
**brought (6)**
16:13,13,14;
182:13,17;238:11
**BROWN (9)**
7:7;110:15,23,23;
111:3,5,7;113:3,5
**budget (7)**
32:3;63:4;84:21;
86:2,13;121:24;
122:8
**Buffett (3)**
231:20;232:20;
237:11
**build (2)**
67:6;77:13
**built (2)**
101:23;117:16
**bunch (4)**
116:25;126:21;
174:17;279:6
**burden (3)**
18:1;115:25;
156:19
**burdened (2)**
106:12,15
**burdens (1)**
283:23
**Business (81)**
4:3;42:7;44:24;
47:21;63:5;67:2;
119:12;125:5;127:8;
133:7;134:8;136:14;
137:2,24;147:5,13;
163:3;164:16,20,21;
165:5;166:19,24;
168:2,5,14;169:11,
13;175:5,9,13;
176:20;177:1,1,3,6,7;
178:3,7,21,23;183:4,

5;188:1,10;197:4;
198:11,12,15;211:10;
212:2,2,9;213:13;
219:11,12;220:16;
234:8;241:20,24,25;
244:18;247:16;
253:5,19,23;254:1,3,
18,22,23,24;257:3;
262:24;263:20;
265:5;266:25;
268:16;271:8;272:1;
281:10
**businesses (10)**
165:2;169:8,10,11;
175:8,9;177:5;
198:10;239:15;
248:24
**buy (12)**
135:2,11;175:19;
183:4;202:11;
233:13;234:1;
250:14;258:3;262:5,
5;271:5
**buy- (2)**
31:19;40:17
**buy-backs (1)**
31:23;32:5,8
**buyer (7)**
127:2,11;145:23;
178:6;201:6;226:19;
284:21
**buyers (3)**
202:24;217:6;
243:13
**buying (5)**
40:25;135:1,7;
147:7;274:1
**buys (1)**
146:25

---

# C

**CA (2)**
11:15;13:6
**calendar (4)**
23:11;24:1;268:12;
295:17
**call (28)**
25:20;39:25;48:22;
53:23;55:2,5;58:25;
104:14;120:14;
130:25;131:1;143:3,
4;156:22;161:14;
162:2;174:19;
178:22;228:22,23,25;
229:1;254:12;
255:18;262:9,14;
270:13;290:4
**called (4)**
17:9;100:19;
130:25;230:16
**calling (1)**
120:9

**Calpine (3)**
93:10;163:21,24
**CAM (1)**
284:10
**Cambridge (2)**
9:21;19:22
**came (21)**
27:3;94:8;126:4;
128:8,19;129:5;
135:4;164:14,22;
166:20,21;169:14;
170:24;179:18;
188:19;206:20;
231:21;232:5,11;
249:4;253:4
**can (150)**
20:7;23:20,23;
24:4,12,19;25:1,3;
26:14;28:18;32:22;
34:11;36:1;39:19;
40:16;45:2;47:25;
53:23;54:11;55:24;
60:5,25;61:5;62:21;
66:9;71:25;74:17,23;
77:12,13;78:6,12,15;
79:7,8,12,14,18;
81:23;82:4,11;83:10;
85:22;86:18;87:21;
90:20;95:6;96:1;
103:24;106:18,25;
107:1,6,8,13,16;
109:4,20;112:5;
114:24;118:9;121:7;
123:7,14;130:7,21,
22;131:11;133:23;
134:6;136:21,22,23,
24,24;137:23,25;
145:6,14,15,21;
147:7;149:24;150:5,
10;151:7,8,24;
159:18;161:23;
173:4;175:19;
180:11;183:9;185:8;
186:3;192:16,17;
199:6,13;208:17;
209:19;213:6,13;
214:11;218:7;
220:19;226:13;
227:4,23;234:9;
235:16;236:1;
244:11;249:21;
256:5,11;258:24,25;
265:10;266:5,9,20;
267:8,15;269:2,3,4,
25;270:5;272:16,17;
275:12;276:5,13,25;
279:2,3,10;284:12;
286:19;288:24;
290:25;291:22;
292:6,8;295:1,2,11,
12
**candidly (1)**
151:3

**cap (4)**
31:15,23;32:2,12
**capabilities (1)**
147:10
**capacity (3)**
47:22;50:22;55:15
**Capital (10)**
15:3,6;157:5;
160:18,22;181:12;
199:9;200:14;252:4;
254:23
**capitalized (3)**
187:6;188:25;
189:1
**Capital's (3)**
173:14;253:18,22
**capped (1)**
259:10
**caps (2)**
33:10;34:1
**captured (2)**
96:8;100:11
**cards (1)**
266:8
**care (2)**
111:2;220:15
**careful (2)**
114:13;124:14
**carefully (2)**
138:21;272:10
**Carpenter (11)**
20:1;231:19,20;
232:11;233:25;
235:17;236:2,10,13;
250:23;256:14
**Carpenters (1)**
19:21
**carried (1)**
285:11
**carry (2)**
178:6,6
**carryover (1)**
181:14
**carve-out (2)**
62:21;279:16
**CASE (137)**
7:10;15:9;16:14;
17:7,7,9,15;19:5,25;
20:1,9,11,19;23:9;
25:6,17;37:20,22;
41:13;48:24;49:1;
52:2;54:2,9,16;60:4;
77:13,18;78:12;80:7;
81:12,23;83:8;85:14;
87:2;88:8;89:25;
90:14,21;91:14;
92:12;94:3,15,16;
95:6,21;96:22;97:3,8,
10,12,14,16,21,24;
98:2,3,5,14,16,17;
99:22,25;100:2,3,5,
24;102:22,23;103:4,
9,16,17;104:11;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 306 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

105:10,10,11,11,12,
17,17;106:2,12,17;
107:19,21,23;108:11,
13,18;109:7,9,10,12,
17;111:15,17,21,24;
113:9,22,24;114:9;
115:2;116:5,12;
121:19;123:7;126:4;
141:22;145:3,24;
146:15;147:23;
154:22;156:18,20;
161:11;164:3;166:6;
228:2,7;232:10;
237:4;239:21;
252:19;253:15;
270:4;275:25;
276:16,21;281:24;
288:23;289:11,14;
290:18;292:20
case-in-chief (2)
157:3;158:25
cases (72)
16:3,9,10,12,15;
17:21,22;18:5,8,23;
19:2,3,15,17;20:5,14;
21:3,20;22:22;25:2,3,
7,17;26:13;29:4,7,8;
50:9;81:14;87:5,5,12,
12;92:14;93:4,7;
94:1,18,20,21;100:5,
19;101:6,14,24;
102:13,15,17,23,24;
103:1,2,3,8,8;108:2;
114:21;118:9;
119:14;120:2;
121:15;124:8;
141:22;142:3;145:8;
163:10,12,15,16;
275:24;287:18,19
Cash (26)
4:8;29:23;35:5,17,
18;38:9;39:2,10,20;
40:20;42:5,7;45:15,
22;47:7,12,14;49:3,
15;52:7;119:7,10,21;
125:25;199:16;
223:11
cause (6)
54:14;68:9;135:10;
143:2;184:8;288:25
caused (1)
227:13
causes (1)
221:10
causing (1)
169:11
cede (3)
15:20;75:25;
156:23
ceding (2)
34:21;35:2
cell (4)
24:6,8;53:2,3

Center (1)
8:15
centers (1)
168:10
Centerview (6)
162:21,22;164:3,7;
173:25;230:23
Central (1)
19:22
century (1)
51:19
CEO (4)
231:20;235:7,8;
256:15
CERCLA-related (2)
46:2,4
cert (1)
20:10
certain (19)
16:3;31:19;32:14;
42:8;43:22;46:2,17,
17;47:15;78:16;
126:8;165:15;177:2;
212:21;214:14;
249:11;266:22;
271:21;281:18
certainly (22)
77:24;78:8,17;
82:23;91:18;105:11;
106:1,23;109:8,13;
111:19;122:4,19;
175:22;176:18;
196:10,22;256:23;
275:18;277:14;
279:22;293:13
certainty (1)
135:4
certification (2)
20:10,12
cetera (7)
24:21;26:9;119:8;
167:2;213:16;222:3;
247:8
CFR (1)
160:4
chairman (1)
235:6
challenge (4)
36:18;42:14;54:8,
12
Chambers (3)
9:13;25:21;61:9
chance (6)
20:22;109:13,19,
23;156:2;179:7
change (25)
33:6;43:25;143:2;
148:17;155:19;
171:24;176:9;
191:17;192:24;
193:3,7,11;236:15;
245:5,13,14,21,25;
247:4,5;263:6;

267:12;286:4,15;
292:14
changed (11)
36:1;68:19;105:14;
114:10;119:16;
155:16;174:23;
192:12;245:19;
246:4;280:25
changes (15)
30:13;31:5;36:20;
38:4;42:17,21;55:7;
62:19;153:6,23;
191:25;193:24;
243:12;247:6;287:25
chaos (1)
116:12
Chapter (14)
20:17;97:11;
101:21,24;124:8;
147:19,22;157:6;
161:6;163:10,15;
164:21;165:2,5
characterize (2)
169:6;236:21
charge (1)
81:16
charged (2)
106:7;230:11
check (4)
20:7;192:15;260:6,
6
Chicago (1)
12:14
chief (4)
157:5;219:10;
235:17;256:17
choice (2)
68:4;108:6
choices (1)
103:14
choose (4)
110:10;206:25;
250:15;274:2
chop (1)
168:2
chose (3)
134:3;136:15;
253:12
Chris (2)
54:1;113:8
Christmas (1)
164:23
CHRISTOPHER (1)
7:17
Circuit (7)
17:1,8;20:2,10;
86:13;92:24;159:18
circulate (1)
61:5
circulated (2)
64:7;110:8
circumstance (1)
150:8

circumstances (8)
96:22;121:19;
165:14;182:3;189:3;
190:23;238:7;263:6
CIT (1)
152:13
cite (1)
119:4
cited (2)
17:8,12
cites (1)
204:18
Citi (12)
35:17,23,23;36:11,
15,17,20;37:5,21,22;
41:15;45:11
Citibank (5)
35:17,20;38:9;
39:2,19
Citi's (1)
36:9
claim (7)
36:9,14;46:21;
57:13;79:19;114:20;
278:7
claim' (1)
79:20
claimant (1)
48:11
claims (28)
16:11;32:12,15;
33:10;36:10;41:17,
19;48:20,23;50:17;
56:7,8,13,21;57:9,11,
16;58:6,10;60:7,18;
79:7,1,3;83:16;155:8;
226:20,21;284:25
Clara (1)
4:19
clarification (8)
26:16;31:7,12;
37:6;54:3;70:16;
273:25;290:25
clarifications (1)
290:4
clarified (7)
41:19;63:11;65:10,
20;128:25;129:2;
291:7
clarify (3)
166:20;181:6;
205:22
clarifying (1)
45:20
clarity (1)
288:23
class (3)
20:10,10,12
clear (41)
24:21;36:9,21;
46:8;50:1;58:14;
67:21;73:18;74:17,
24;77:2;79:1;80:15;

83:12;95:3;96:10;
102:18;105:16;
126:2;128:1;129:1;
132:17;142:3;149:9;
151:6,12;152:5;
154:8;181:9;199:18;
234:5,18;236:4;
276:12,12,14,20;
281:17,25;291:15;
292:2
clear-cut (1)
272:6
clearly (10)
23:2;33:3;77:6;
78:23;98:15;101:15;
109:1;127:16;177:4;
227:17
CLEARY (2)
10:11;116:25
clerk (1)
72:4
client (8)
147:8;172:8;
186:17;201:18;
206:8;222:10;
278:14;279:9
clients (1)
84:8
close (14)
63:7;64:18;66:16;
67:7;70:24;128:12;18;
127:13;130:21,22;
137:25;146:16;
178:2;199:16;237:22
closed (7)
47:17;56:3,8;
57:21;60:14;65:24;
137:23
closely (1)
41:10;111:16;
123:3
closer (2)
220:1;290:11
closing (20)
68:5,5,11;197:2,
23;199:4,14,24;
210:1,16;219:19;
225:12,19,22;226:2;
227:20;281:25;
283:21;284:7;287:5
closings (1)
66:3
closure (1)
60:23;67:5;227:19;
266:13
co-conspirators (1)
50:15
Code (5)
16:6;90:23;101:23;
113:17;274:25
cognizant (1)
166:4
co-head (2)

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.    Pg 307 of 342    Case No. 12-12020(MG)
June 18, 2012

162:23;163:2

**cold (1)**
162:20
**Collateral (36)**
4:8;29:24;35:5,18,
19;36:11,13;37:3;
38:9;39:2,10,20;
40:20;41:8,18,25;
42:5,7;45:15,17,22,
22;46:7,12,13,23;
47:13;49:3,15;52:7;
57:4;62:21,25;69:20,
20,21
**colleague (1)**
75:18
**colleagues (2)**
33:25;129:8
**collected (1)**
223:9
**collection (1)**
214:2
**Collier (1)**
93:4
**collusion (2)**
291:4;292:12
**color (1)**
140:23
**Colorado (1)**
17:11
**combination (4)**
141:10;145:20;
260:18;267:25
**combined (1)**
191:7
**comfort (5)**
65:7;130:21;
136:25;238:13;
290:22
**comfortable (22)**
70:20;126:25;
127:7,12;130:19;
131:3;133:6,24;
134:3;137:23;
139:16;143:19;
144:4;153:6;154:1;
176:6;178:19;
199:25;236:24;
271:14;277:5;287:1
**coming (15)**
43:21;68:23;89:24;
101:21;112:7;
113:14;114:20;
115:17;116:3;
126:22;140:13;
268:7;270:15;
273:11;276:7
**comment (2)**
133:22;295:1
**commenting (1)**
177:12
**comments (4)**
50:7;74:18;290:2,3
**commercially (1)**

36:12
**commitments (1)**
199:8
**Committee (174)**
8:3;15:11,13;
19:16;30:8,14,16,18,
20,24;31:2,7,10,12,
17,18,22,24;32:3,6,7,
11,14,18,19,20,24;
33:2,3,13;34:17;
35:23,23;36:2,5,16;
37:7,10;38:1,7;41:9,
10;42:2;43:2,3,11,15,
20;44:16;48:14,19;
51:8;54:7;58:15;
59:15;61:5;62:18;
63:2,4,8;64:14;
68:25;69:16,17;71:6;
77:8,13;78:2,6,12,21;
81:15,16,18;82:8,14,
24;83:13,15,25;84:2,
3,4,8,16,19;88:19;
90:2,9,18,19;91:20;
92:7;96:6;97:5,7,8;
98:8,15;99:11,23,24,
24,25;104:9,10,24;
106:4,8,10,11,13,15,
23;107:9,13;109:2;
111:10;112:14,17,18,
20;113:21;114:2,23,
24;120:22;122:19,23,
25;128:4,12;130:12;
140:11,13;141:2,4,
24,25;142:9,17;
143:3,5,12,13,14,19;
148:2,7;150:5;
152:25;172:14;
244:1;247:18;
256:11;267:14,16;
269:3,20;270:4,11,
13;272:6;292:15;
293:19,21;295:11,11
**committees (3)**
84:6;102:3;141:23
**committee's (22)**
36:18;41:14;42:18,
21,24;43:14;45:3;
63:6;64:4;67:22;
88:11;100:9,20;
103:22;106:7,18;
107:5,7;122:6,17;
123:1;143:1
**commonly (1)**
289:11
**communicate (3)**
17:18;247:14,17
**Communication (3)**
122:25;233:25;
255:11
**communications (3)**
20:14;83:12;
200:12

**compan (1)**
125:17
**companies (4)**
125:20,22;150:3;
165:19
**company (26)**
50:12;53:10,10;
71:15,16;79:16;
83:16;127:7;133:14;
146:16,17;148:4,5;
157:16;165:10,15;
166:18;175:1;198:7,
8;213:10;217:5;
223:7,16;233:13;
262:5
**comparable (4)**
103:8;195:21;
240:8,9
**comparing (1)**
177:25
**comparison (3)**
125:25;194:2,3
**compensated (2)**
88:25;91:6
**compensating (1)**
88:6
**competent (2)**
80:11,16
**competing (1)**
272:23
**complaint (2)**
27:25;56:16
**complete (8)**
89:15;94:2;100:21;
102:11;105:20;
202:24;203:10,14
**completed (2)**
87:8;111:11;
122:10
**completely (2)**
50:13;274:24
**completeness (1)**
73:8
**complex (11)**
37:13;90:11;100:5;
102:13;104:22;
105:2,11;141:22;
177:7;192:10;198:11
**complexities (1)**
127:9
**complexity (3)**
98:2;141:14;
166:24
**complicated (10)**
137:2;140:24;
168:2,9,16;175:2;
176:6;276:1;279:21;
291:22
**complications (1)**
114:9
**comply (3)**
18:22;42:4;49:25
**component (1)**

31:16
**components (1)**
212:10
**comport (1)**
71:24
**comported (1)**
53:16
**composed (1)**
99:24
**comprehensive (2)**
80:9;97:18
**comprised (3)**
16:12;61:21;
167:10
**comps (1)**
170:25
**concede (3)**
56:7;57:12,18
**conceivable (1)**
78:5
**concept (1)**
215:7
**concepts (1)**
168:6
**concern (16)**
45:11;54:8;58:9;
67:17;88:11;106:10;
141:9;147:6;176:4,
24;197:19;200:15;
201:3;227:19;
236:18;276:15
**concerned (22)**
59:24;64:21;83:14;
85:9;88:22;99:13;
102:14;130:3;
135:25;141:4,19;
144:13;151:1;
152:19;175:4,11;
180:12,14,18;181:3;
263:14;269:6
**concerning (2)**
173:19;285:7
**concerns (25)**
15:12;41:9,14;
42:18;43:17,20;
62:19,20;63:6;64:5;
65:7;103:21;104:12;
110:4;113:5;114:1,
19;175:25;179:6;
180:8;205:4;227:17;
269:10;271:24;
281:11
**concessions (2)**
128:5;217:12
**conclude (4)**
86:24;103:16,24;
104:2
**concluded (2)**
238:25;295:19
**concludes (2)**
95:24;121:19
**conclusion (11)**
79:21;84:12;85:13;

107:5;164:22;
166:21,21;190:12;
272:6;275:21;291:11
**conclusions (2)**
30:19;82:11
**concrete (1)**
206:13
**condition (5)**
42:5;49:16;197:23;
281:25;287:5
**conditions (2)**
69:25;198:2
**conduct (10)**
79:24;80:11;87:19;
92:7;101:9;103:18;
104:11,20;170:19;
221:9
**conducted (6)**
91:1,13;95:17;
107:3,13;253:2
**conducting (1)**
104:9
**confer (10)**
21:16;23:18,20;
24:3,10;26:2;84:16;
122:3,8;123:16
**conference (8)**
15:9,9,16;16:2;
21:19;24:11;148:24;
270:13
**conferences (2)**
22:3;123:7
**conferred (2)**
35:24;285:14
**confers (1)**
122:13
**confidence (2)**
238:17;270:20
**confident (3)**
44:25;59:12;
125:18
**confidential (5)**
83:11;88:19;202:7;
253:19,22
**confidentiality (4)**
88:14;205:4,6;
290:23
**confines (1)**
196:20
**confirm (10)**
70:14;76:13;279:2,
3;290:21;291:8,18;
292:6,8;293:1
**confirmation (5)**
18:7;44:8;87:10,
10;116:10
**confirmed (1)**
44:10
**conflict (2)**
82:9;113:18
**conflicted (1)**
79:17
**conflicts (3)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 308 of 342
Case No. 12-12020(MG)
June 18, 2012

100:1;106:12,15
**confluence (2)**
188:2,4
**confronted (1)**
94:14
**confuse (1)**
255:7
**confused (6)**
47:23;52:12;53:20;
55:17;131:14;135:24
**confusing (2)**
141:16;192:19
**confusion (4)**
58:5;59:5;74:18;
152:23
**Congress (11)**
12:4;101:3,6,8,13,
20,20;102:1,9,15,21
**Congress' (1)**
102:19
**conjunction (2)**
77:14;165:11
**Connection (16)**
4:2;77:5;83:2;
88:25;135:23;141:6;
149:10;257:19,25;
258:9,20;260:9;
272:12;279:17;
284:11;285:3
**consensual (3)**
34:16;40:20;
108:14
**consensus (1)**
113:17
**consent (21)**
15:11;31:10;32:8;
49:11,21,21;71:9;
97:21;108:18,19;
109:15;127:10;
179:2;281:24;282:6,
7,10;285:12;287:5,8,
12
**consents (6)**
70:3;151:16;
272:11,14;273:4;
282:21
**consider (7)**
40:1;132:4,6;
135:14;174:18;
177:25;206:24
**consideration (8)**
81:1,9,10;118:24;
140:6;193:12;
206:24;238:22
**considerations (2)**
88:14;280:12
**considered (8)**
44:20;227:1,4;
258:12;263:1,25;
264:3;291:5
**considering (2)**
142:11;272:2
**consistent (10)**

78:18;88:20;
106:20,22;108:9,10;
148:8;275:1,6;
291:19
**consortium (1)**
291:3
**constituencies (4)**
88:17;122:4,5,14
**constituency (3)**
51:9;88:12;95:1
**constituents (4)**
88:10;94:23;
101:15;128:12
**constitute (1)**
45:22
**constrained (3)**
105:25;121:18;
165:13
**constraints (2)**
166:23;167:4
**construct (2)**
258:15;259:22
**constructed (2)**
190:20,24
**consult (4)**
267:16;269:3,20;
270:14
**consultation (2)**
63:3;69:15
**consulting (1)**
273:19
**consumer (6)**
156:10;274:21;
275:10,18,23;277:12
**consummate (3)**
69:19;190:22;
205:10
**consummation (1)**
69:24
**contact (3)**
198:7;205:1;214:9
**contacted (5)**
165:19;166:16;
190:20;202:5;204:7
**contain (2)**
83:20;222:1
**contained (1)**
163:21
**contains (2)**
221:21;222:7
**contemplate (3)**
67:11;91:18;
112:23
**contemplated (10)**
98:12;141:12;
223:22;224:6;
241:18;257:15,19;
258:24;260:7,8
**contemplates (2)**
67:12;93:5
**contemporaneous (1)**
291:12
**contending (2)**

80:25;97:17
**content (1)**
281:14
**contesting (1)**
99:18
**context (6)**
69:1;109:11;
115:15;116:9;
180:16;285:20
**contingency (7)**
125:15;126:3;
198:23,24;199:3;
247:8,8
**contingent (1)**
260:19
**Continue (11)**
4:1;18:17,22;31:1;
32:17;65:13,18;
138:8;262:23;
265:18;271:8
**continued (4)**
119:23;176:14;
260:25;263:16
**continues (2)**
112:17;265:9
**continuing (2)**
210:19;263:18
**contours (1)**
96:17
**contract (26)**
137:25;155:10;
179:16,22;183:4;
187:25,25;209:8,25;
223:13;225:3,12,19,
21,22;268:22;271:22,
25;278:6,18;283:22;
284:6;285:8,10;
286:6,14
**contracts (10)**
154:21;178:10;
208:10;223:23;
225:6,8,9;228:6;
280:1;284:23
**contract's (1)**
285:21
**contractual (4)**
56:6,13,17;58:1
**contrary (2)**
71:1;186:21
**contrast (1)**
259:23
**contravention (1)**
278:21
**contribution (4)**
251:7,9,12;257:21
**control (9)**
18:20;25:23;78:14;
85:22;86:1;87:25;
104:15;125:4;221:13
**controlled (1)**
175:21
**controlling (1)**
86:9

**convene (2)**
267:8;270:12
**convenience (2)**
157:14;163:8
**conventional (1)**
153:1
**conversation (3)**
69:1;166:2;198:8
**conversations (2)**
156:4;172:14
**cooperation (1)**
122:18
**coordinate (3)**
22:14;25:4;28:5
**coordination (1)**
28:7
**copied (3)**
200:22;250:22;
256:17
**copies (2)**
229:16,20
**copy (7)**
61:7;75:10;111:20;
185:9;218:23,24;
219:5
**CORDARO (4)**
9:17;73:6,7,13
**core (1)**
48:16
**corners (1)**
67:18
**cornerstone (1)**
124:8
**correctly (9)**
80:3;104:13,18;
176:2,22;248:16;
256:24;258:3;265:4
**correspondence (1)**
201:17
**correspondents (1)**
235:11
**cost (4)**
22:21;62:15;84:14;
188:1
**costs (3)**
47:20;90:24;
223:10
**counsel (53)**
15:5,24;19:24;
20:18;21:16,24;23:9,
17;24:12,19;25:2,7,7;
27:16;30:2;33:2;
37:9;38:13;41:10;
43:11;49:8;59:19;
64:14;73:9;80:8,16;
84:13;88:24;89:11;
90:19;96:6;104:16;
116:17;122:5,6;
128:15;146:11;
151:8;157:1;164:17;
169:2;172:13;
209:12;215:8,24;
216:6;229:16;248:9;

255:12;256:10;
278:23;285:14;293:2
**counsel's (1)**
169:2
**count (1)**
146:24
**counterdesignations (1)**
25:24
**counterparties (6)**
138:19;154:10;
155:10;220:3;228:6;
286:7
**counterparty (2)**
278:7,18
**countries (1)**
239:12
**couple (16)**
42:22;80:20;110:9;
111:17,24;124:3;
136:9;146:3;152:15;
255:21,23;275:24;
287:22,23,25;293:5
**coupled (1)**
88:13
**Course (9)**
4:3;21:4;148:23;
172:15;200:13,15;
201:1,4;275:5
**COURT (737)**
15:2,7,14,18,22;
17:1,6,11,17;18:11;
19:6,14,25;20:3,5,8,
18,22,25;21:5,12,18,
18;22:10,12,23;26:9,
10,15,17,21;27:2,9,
11,14,16;28:15,19,
25;29:1,2,12,16,22,
25;30:15,22;31:25;
32:7,24;33:14,15,17;
34:3,5,9,15,20,22;
35:1,10,16;36:4,24;
37:7;38:8,19,21,25;
39:1,8,13,15,24;40:7,
10,14;42:11;43:2,6,8,
16;45:5,25;47:1;
48:2,6,9;49:2,14,22,
24;50:1,2,5,20,22,24;
51:1,23;52:3,6,14,18,
24;53:25;54:20,22;
55:4,9,11,19;56:3,9,
22;57:8,11,15,20,23;
58:2,19,22;59:1,19,
23;60:2,10,16;61:3,8,
14;63:17;64:3,10;
65:21;66:11,13;
67:11,17;68:9,15;
69:5,8,11;70:6,7,11;
71:11;72:3,8,11,15,
25;73:2,4,12,14,17,
21,24;74:4,7,8,12,14,
16,19;75:1,4,8,12,17,
24;76:2,13,15,17,19,
23,25;77:6,9,16,19;

12-12020-mg   Doc 472   Filed 06/20/12   Entered 06/20/12 15:35:46   Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 309 of 342
Case No. 12-12020(MG)
June 18, 2012

78:1,15,20;79:9,22;
80:10,21;81:4,6,14,
20;82:24;83:11,18;
84:1,9,10,17,22,24;
85:1,16,22,25;86:1,6,
8,10,14,22;87:17,21,
24;88:2,23;89:3,5,7,
20;91:8,9,24;92:1,16,
24;93:10,13,20,22;
94:6,8,14,15,17;95:1,
19;96:1,2,4,12,18,20,
21,23;98:1,21;99:1,
15,18;100:7,13;
101:3;102:4,12;
103:2,8,14,14,16,24;
104:1,4,24;105:2,5,
14,21,25;106:2,22;
107:10,17,22;108:20;
109:2;110:2,5,6,8,12,
16,19;111:2,4,6;
112:10,11;113:4,6,
12;114:4,5,7,13;
115:3,6,18;116:22;
117:3,15;118:11,14;
119:3;120:14;121:4,
7,17,19,23,24;122:1,
9,12;123:6,22;124:7,
17;125:7,10,12,18;
127:16,19,24;128:21;
129:8,13,14,22;
130:6;131:6,14,16;
132:1,4,8;133:18;
134:10,13,18;136:7,
13,18;137:10,12;
138:2,8,24;139:6,9,
21,25;140:8,10,17,
20;141:24;142:2,5;
143:24;144:1,8,12,
19,23,25;145:4,25;
146:9,20;147:11,19;
148:9,14;149:4,6,17,
24;150:1,5,14,18,21;
151:14,18,21;152:7,
9;153:10,15,18,19,
25;154:3,5,11,14,16,
18;155:5,11,14;
156:1,21;157:8,12,
19,20;158:6,17;
159:6,15,18;160:1,6,
8,10;161:10,15,19,
25;162:3,5,8;167:6,
15,18,23;168:17;
169:3,19;173:24;
174:1,3,6,8,10,13;
175:14;177:17,22;
178:5,11,15;179:14,
18,23;180:2,5,18,22,
25;181:3,8,17,17,21;
182:3,9;183:9,14,18;
184:12;185:7,12,16,
19;187:20;188:8;
189:22,25;190:4;
191:1;192:2,5,8,22;

195:8,10;196:21;
197:12,14;198:19;
199:12;202:3;
203:17,20,23,25;
204:2,9;206:4,19;
207:7,18,20,23,25;
208:13,18,21,24;
209:11,15;210:7,24;
211:4;212:16;213:8,
25;214:4,11,20,25;
215:12,16,20;216:1;
217:16,19,21,23,25;
218:3,5,9,12,16,22;
219:3,7,17,25;220:8,
10,21,24;221:4,12,
16;222:13,17,22;
223:15;224:2,10,20,
23;225:15,24;226:3,
5,11;227:1,4,16;
228:1,5,8,11,14,20,
25;229:2,4,9,10,13,
16,19,21;230:3,15,
19;231:5,9,25;232:4,
13,18,24;233:14,16;
234:13,15,18;235:2;
236:8;237:25;238:2,
10;239:7,20;240:2,
12,14,19,22;241:2,
10;242:10,13,15,22;
243:1,19,21;244:19,
23;245:14;246:6,8;
247:12,14,20,24;
248:2,5,7,11;249:20;
250:1;252:12;255:6;
256:3,6;261:11,18;
262:3,8,12,13,14,17,
19;263:22;264:7,9,
11,24;265:4,13,20,
22;266:7,10,16,19,
22;267:2,14;268:6;
270:5,23;271:1,11;
272:4,9,21;273:2,7,
10,15,22;274:4,7,10,
13,17,21;275:7,9,17;
276:3,7,10,19,22;
277:2,5,8,16,21,24;
278:22;279:1,4,12;
280:5,16,18;282:23;
283:11,16,25;284:9,
14,17;285:9,12,14,
23;286:3,6,17,19;
287:7,16;288:18;
289:2,4,7,18,24;
290:19;292:4,6,23,
25;293:7,11,17,22,
24;294:2,9,14,18,24;
295:7,9,13

**CourtCall (1)**
24:12
**courtroom (5)**
15:17;53:1;129:9;
230:21;249:21
**courts (10)**

85:13,18;87:5;
94:6,10;102:10,11,
12,25;137:18
**Court's (15)**
24:1;48:22;49:17;
85:19,19;92:6;95:20;
100:17;119:4,25;
123:10;144:18;
155:3;157:14;163:8
**cover (3)**
244:20,21;245:13
**covered (1)**
77:24
**crafted (1)**
110:1
**create (5)**
58:5;180:10;198:5;
212:20;241:22
**created (1)**
126:20
**creates (6)**
109:11;114:9;
117:11,18;182:7;
285:2
**creating (1)**
268:5
**credibility (1)**
143:14
**credit (14)**
40:21;41:1,2;
45:18;63:9;69:18;
70:4;145:23;199:20;
260:10,13;288:16,24;
289:17
**creditor (6)**
57:15;63:16;76:11;
96:25;99:9;244:1
**Creditors (25)**
8:3;51:11;77:1;
78:22;80:1;82:17;
94:24;95:8,12,16,18;
99:3,7,14;101:15;
108:18;113:24;
117:10,19,21;118:8;
145:7,12;185:5,23
**creditors' (28)**
30:8,13,16,18;
33:2;37:10;43:11;
48:14,19;51:8;54:7;
64:14;69:16,17;
77:13;79:2,5,15;
80:4;92:7;96:6;
102:2;122:5;128:12;
130:12;148:2,7;
256:11
**creditworthy (1)**
146:15
**critical (7)**
31:14,15;33:10;
126:12;165:2;
168:15;267:10
**criticized (1)**
117:23

**cross (1)**
262:8
**cross- (3)**
183:10;218:9;
256:3
**cross-default-type (1)**
42:8
**cross-examination (21)**
26:8,10;161:16,18,
23;183:8,16,19,24;
207:7,10;215:21;
217:24;218:17;
228:11;247:25;
248:7,12;256:7;
261:18;265:4
**cross-examine (4)**
218:1,4,22;228:17
**crowd (1)**
69:12
**crowded (2)**
24:1;92:12
**cry (1)**
92:12
**culminated (1)**
90:6
**cum (1)**
283:23
**cure (14)**
154:10,19,19,22;
155:5,12;211:20,24;
284:1,2,4,5;285:4;
286:14
**current (5)**
26:19;152:5;176:7;
207:3;263:21
**currently (16)**
23:4,7;98:11;
162:20;175:5,12,21;
195:6;197:4,7,8;
198:12;230:4;240:5;
257:11;294:5
**custodial (1)**
45:15
**custody (1)**
18:20
**cut (4)**
155:8;208:9;
225:11;278:19
**cutoff (1)**
72:22
**CV (1)**
49:13

---

# D

**Dallas (1)**
152:13
**damage (1)**
48:19
**damages (2)**
51:4;199:7
**dangers (1)**
48:15

**data (5)**
254:5;290:16,17;
292:6,8
**date (38)**
25:12;36:19;38:2;
40:22;42:16;44:11,
13,15;151:9;152:4;
158:1,10,23;159:11;
160:20,24;161:1,3,5,
7;204:19,23;210:1,
16;225:12;234:17;
236:12,14;242:15;
243:24;245:13;
246:11,13,15;252:18;
278:8;282:16;284:7
**dated (5)**
160:18,22;235:18;
236:10;244:21
**date-limited (1)**
33:19
**dates (2)**
283:10;288:10
**DAVID (5)**
6:24;9:8;71:24;
144:9;282:25
**DAVIS (3)**
14:9;123:18,21
**Day (28)**
15:25;22:3,4;
24:10,15;57:17;77:9;
83:7,25;91:10,14;
103:13;104:9;
108:13;114:10;
148:3;151:24;157:6;
201:15;216:22,25;
232:6;236:3;255:4;
259:14;262:20;
276:7;292:22
**days (33)**
36:18,19;42:15,16;
54:15,19;58:13;
62:23;63:13,14,24;
65:13;78:17;84:23;
95:12,13;121:10;
128:11;172:6,19;
245:7,8,22,22,22;
255:21,23;275:13,25;
288:4;290:6,16;
291:25
**days' (2)**
42:7;63:5
**day-to-day (1)**
214:9
**DC (2)**
7:5;196:9
**DE (1)**
9:6
**deadline (14)**
128:16;138:23,24;
148:10,14;268:9;
281:3;288:1,3,9;
290:6;291:24;
293:15;295:10

12-12020-mg   Doc 472   Filed 06/20/12   Entered 06/20/12 15:35:46   Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 310 of 342
Case No. 12-12020(MG)
June 18, 2012

**deadlines (1)**
44:19
**deal (42)**
28:7,10;43:3;
44:13,15;50:7;52:11,
12,14;59:6,8;63:18;
65:8;67:19;97:15;
100:19;103:12,19;
106:8,8;107:9,9;
109:22;112:5,20;
113:2;114:15;
120:21;126:21;
137:23;146:22;
155:5;167:13;170:2;
174:23;176:16;
178:25;179:2,21;
197:24;217:5;288:13
**dealing (5)**
71:19;167:6;169:7,
10;177:22
**deals (1)**
146:13
**dealt (4)**
17:18;39:16;40:3;
167:16
**dear (1)**
78:6
**Dearborn (1)**
12:13
**debatable (1)**
295:5
**debate (1)**
90:25
**debating (1)**
66:8
**debt (15)**
58:7;87:2,3,6;92:4;
99:21,22;101:7,17;
117:13,17;118:6;
165:15;166:5;214:1
**debtor (55)**
16:9;28:23;37:24;
43:18,23;44:4;56:16,
23;61:17;67:10,16;
68:25;70:22;83:13;
97:9;98:11;102:2;
119:13,17;121:15;
127:12;135:8;
143:12;147:4,13;
148:2,24;154:24;
155:9;156:4,11,19;
160:10;207:16;
208:11;209:9;210:4,
13;212:5;217:2;
224:8;244:1;262:14;
270:1,10,14;272:19;
275:1;278:11;
283:18;290:7,15;
293:20;294:5,6
**debtor-in- (1)**
61:16
**debtor-in-possession (5)**
40:12;61:18;

101:25;102:5;165:4
**Debtors (105)**
4:6,8;15:6,24;
16:17,18;17:23;
18:15;20:15;25:13;
28:11;29:14;30:3,20;
31:1,13,22;32:7;33:7,
9,12,16;35:4,24;
36:15;42:1,4;45:13;
48:15;49:25;50:3,8,
11,16;51:14;54:17;
55:6,23;59:10;63:9;
66:21;69:15,15,17,
19;70:2;74:5;78:18;
79:25;80:25;89:11,
17;94:13;113:21;
124:2;125:5;131:19;
132:25;136:14;
137:22;138:17;
140:5;145:19;150:6;
151:24;152:25;
153:2;157:2;158:2;
159:12;161:13;
162:1;164:3;170:19;
189:2;211:24;212:1,
6;215:24;216:23,23;
217:3,8;219:9;
227:23;228:18,19;
247:18;248:10;
254:9,15;262:21,25;
263:1,2,13,16,19;
266:1;270:4;279:2;
283:19;285:7;293:3,
18
**debtors' (59)**
16:2,4,11,14;
24:12;26:23;28:12;
30:3;31:19;35:5,18,
20;36:8,23;37:23;
38:13;41:16;45:3,17;
46:18;47:7,14;49:8;
61:17;66:19;67:22;
73:9;75:21;137:14;
141:5;142:11;
143:20;157:3;158:4,
14,25;159:17,19;
160:13,19,23,25;
161:3,4,7,11;162:14;
165:2;172:13;189:2;
262:22;264:14;
266:24;269:21;
275:18;278:17,23;
285:14;286:1
**debtor's (17)**
80:8;88:10;90:23;
111:11;122:5;124:9,
21;132:20;135:22;
207:19;208:4;209:4;
212:9;213:13;
224:24;235:10;250:3
**debts (4)**
95:21;121:15;
200:15;201:4

**December (3)**
44:8;204:15,17
**DECHERT (1)**
10:20
**decide (5)**
21:12;147:14;
268:16;269:4;276:22
**decided (3)**
71:6;134:8;275:8
**decides (1)**
276:24
**deciding (7)**
101:16;115:8;
119:18,25;123:11;
146:21;147:2
**decision (20)**
29:7;66:9;101:10;
119:5;136:14;
144:18;145:16;
147:11,14;261:10;
262:22;264:3;265:2;
270:3,16,16,17;
276:7;277:6;295:13
**decisions (3)**
29:3;100:11;280:3
**declarant (1)**
26:9
**declarants (4)**
161:16;217:24;
218:5;228:16
**declaration (63)**
25:13;98:17,18;
124:19;157:14,21,25;
158:3,5,7,9,11,12,14,
18,22,24;159:1,4,7,
10;161:22;163:4;
185:3,9,17;186:6,24;
188:18,19;190:4,11;
192:1,2,3,5;193:6,22,
25;194:17;200:2;
202:15;203:18;
204:17,18;208:15,25;
211:2,3,7,13;216:12;
218:23;219:5;230:2;
242:18;243:25;
244:24;245:15;
252:19,22;254:9;
274:23
**declarations (5)**
136:11;162:13;
218:6;219:4;289:12
**decline (1)**
122:17
**declined (3)**
202:5;255:14;
261:14
**declining (1)**
56:24
**decrees (1)**
49:21
**deducted (1)**
47:20
**deductible (2)**

251:22;259:8
**deemed (1)**
281:22
**default (4)**
44:7;63:23;65:9;
284:7
**defaults (1)**
284:5
**defeat (1)**
50:17
**defend (1)**
131:11
**defendant (1)**
49:1
**defendants (8)**
16:10;19:9;22:14,
17;23:17;26:13;
27:20;28:4
**Defendant's (3)**
246:10,12,14
**defer (3)**
121:25;140:15;
178:10
**deferred (2)**
154:22;278:3
**deferring (1)**
266:24
**define (2)**
45:13;252:9
**defined (2)**
69:21,23
**definitely (1)**
206:25
**definition (5)**
209:19;210:18,19;
224:14,24
**definitions (1)**
211:11
**definitive (3)**
201:9,10,16
**definitively (1)**
67:15
**Delaware (1)**
92:14
**delay (5)**
68:4;91:16;94:11;
107:10;290:23
**delayed (1)**
100:24
**delays (1)**
84:7
**deleted (1)**
57:2
**deliberated (1)**
130:10
**delinquencies (1)**
223:10
**delivered (1)**
256:14
**delivering (1)**
174:3
**demonstrated (2)**
93:6;147:10

**demonstrates (1)**
182:20
**denied (4)**
20:10;104:3;
105:10,17
**DENMAN (1)**
7:16
**deny (2)**
96:1;105:12
**denying (1)**
100:17
**DEPARTMENT (2)**
9:11;14:2
**departments (1)**
46:9
**depend (1)**
224:7
**depending (5)**
115:16;120:13;
170:3;272:19;289:1
**depends (3)**
23:14;60:24;127:2
**deposit (2)**
55:22;170:6
**deposition (3)**
25:23,24;141:5
**depositions (4)**
22:17,18;84:20;
107:2
**depository (1)**
55:22
**derivative (3)**
16:18;18:23;56:16
**derive (2)**
85:25;86:1
**describe (4)**
30:22;118:23;
167:23;202:16
**described (6)**
37:18;38:4;43:12;
185:22;195:25;
291:19
**describing (1)**
21:23
**description (1)**
160:11
**deserves (1)**
207:3
**designate (1)**
25:24
**designated (1)**
35:6
**designed (1)**
268:19
**desire (2)**
97:9;271:8
**despite (1)**
142:13
**details (1)**
120:18
**determination (6)**
29:8;60:15;118:24;
121:25;137:24;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 311 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

294:19
**determinative (1)**
127:17
**determine (4)**
47:4;85:20;93:20;
125:5
**determined (4)**
42:11;46:22;99:24;
264:18
**determines (3)**
107:22;223:8;
266:23
**determining (1)**
212:9
**detract (1)**
213:6
**detracted (1)**
223:13
**detriment (1)**
183:6
**Deutsche (5)**
10:3;53:9,10;
71:15,15
**develop (1)**
164:17
**developing (1)**
211:24
**development (1)**
264:20
**developments (2)**
187:15;267:17
**deviate (1)**
60:19
**devices (2)**
53:3,6
**devised (1)**
165:11
**dialog (2)**
231:19;261:6
**dialogue (1)**
148:8
**difference (13)**
127:25;132:21;
144:17;174:20,22;
184:25;185:1;
187:14;194:15;
264:22,24;267:12,12
**differences (1)**
145:13
**different (37)**
18:14;23:24;27:2;
28:9,13,17,23;39:10;
40:20;45:10;47:19;
59:6;65:10;79:6;
81:16;84:1;85:15;
88:13;91:1,6;93:18;
99:10;112:22;
135:16;168:24;
170:4;186:9;192:11;
203:14;212:23,25;
240:25;241:17;
243:15;244:20;
287:23;294:21

**differential (1)**
142:16
**differently (1)**
112:13
**differs (1)**
244:24
**difficult (11)**
48:21;96:9;169:4,
6;176:12;181:11;
182:7;190:23;
191:16;197:15;
226:17
**difficulty (1)**
196:16
**dig (1)**
79:18
**Digital (5)**
13:3;283:14,18,21;
286:12
**diligence (41)**
127:6;130:17;
136:25;137:22;
138:1,16;146:11,14,
14,17;147:9;151:7;
152:1;153:13,14;
168:3;175:1;176:2,
15,16;183:1;197:20,
23;198:2,2,4;236:15,
18;237:22;247:7;
252:13,16;253:2;
263:12;271:23;
272:16;281:24;
282:2,22;288:4,11
**diligenced (1)**
272:17
**diligencing (1)**
164:16
**diminution (2)**
36:11;46:24
**DIP (86)**
6:3;29:24;32:3;
39:9,11;40:22,24,25;
41:21,24,25;42:6,18,
22;43:14,17,22;44:1,
2,4,7,12,15,19;45:19,
19,22;46:12,16,18;
49:3,14,17,18,20;
52:7;55:2;56:19;
58:7;62:25;63:7,23;
64:2,5,6,11,15,16,18,
19,22,24,25;65:1,1,3;
66:1,2,4,14,22;68:4,
7,17;69:14,18,23;
70:3,4,20,21;71:7,8,
13;73:5;74:3;75:13;
126:6,10,11,12,13,14,
15;183:2;291:14
**direct (16)**
25:12,21,22;26:8;
161:11;162:9;
197:19;204:11;
208:15,15;210:10;
229:6,24;250:20;

255:11;266:2
**directed (5)**
157:17;201:18;
244:8;250:12,23
**direction (6)**
195:4;288:17,18,
21,22;289:16
**directions (1)**
287:23
**directly (5)**
28:11;35:22;
141:14;234:1;258:9
**directors (5)**
16:4;18:18;167:11;
173:18;200:23
**directs (1)**
122:1
**disadvantaged (1)**
149:20
**disagree (10)**
49:22;80:2,3;95:4;
115:25;121:13;
154:23,24;293:24;
294:22
**disagreed (2)**
201:25;202:9
**disappears (1)**
65:12
**disappointed (1)**
114:16
**discharge (1)**
46:10
**disclosed (1)**
51:14
**disclosure (4)**
54:18;113:16,17;
116:10
**disclosures (1)**
73:22
**discounted (1)**
223:11
**discourage (2)**
139:24;141:17
**discovery (39)**
16:20;18:19,22;
19:7,18,20;20:11,12;
21:4,6,9,13,14,14,15,
23,24,22;5,15;23:2,
21;24:4,20,21;28:7,9;
29:3,6,9;90:5,10,12;
112:6,6,8,16,20,21;
123:15
**discretion (27)**
39:12;40:17;57:5;
85:19;86:1,8,11,14,
15;87:24;92:17,18,
21;93:25;95:23;
96:15,20;100:17;
103:15;113:11,12;
116:13;117:6,7,16;
121:18,18
**discretionary (1)**
101:11

**discuss (9)**
23:23;26:2;31:2;
58:25;105:23;
118:23;174:24;
175:23;176:12
**discussed (7)**
71:7,9;143:5;
179:11;182:25;
215:7;291:20
**discussing (4)**
30:19;44:23;49:2;
54:17
**discussion (10)**
28:22;67:9,25;
68:21;130:12;
133:10,12;152:5;
215:9;261:23
**discussions (17)**
30:25;31:21;32:11;
90:4,6;124:11;
126:13;134:25;
167:12;168:9;169:5;
205:20;206:8;244:1;
255:5,18;263:17
**disfavorably (1)**
227:8
**dismissed (2)**
19:4;261:7
**disposed (1)**
98:19
**dispute (10)**
21:15,17,23,24,25;
22:5,8;83:19;93:13;
123:15
**disputed (4)**
23:14;26:3;78:1;
83:16
**disputes (5)**
21:14;23:21;87:3;
112:6,21
**disputing (1)**
199:15
**disseminations (1)**
98:9
**Distant (1)**
51:18
**distinction (6)**
93:3,5,16;101:14;
114:23;258:23
**distinguishing (1)**
178:4
**distribution (2)**
51:17;290:17
**district (5)**
20:2;85:14,15;
92:15;96:11
**diverse (2)**
78:21,24
**division (1)**
214:22
**divorced (2)**
271:17,18
**do' (1)**

86:12
**Doc (1)**
4:5
**docket (17)**
30:4,7;34:7;36:24;
38:10;40:14;121:12;
157:10;158:5,15,19;
159:5,7;211:15;
253:4;274:23;277:3
**document (14)**
19:8;91:16;97:20;
157:9,21;160:11;
176:6,8;211:12;
234:24;246:10,12,14;
249:23
**documentary (2)**
159:13;161:9
**documentations (1)**
70:4
**documents (18)**
18:21;20:13,15,16;
33:24;50:11;51:6,15;
63:9;66:22;83:17;
90:18;107:1;112:1;
222:1;243:12,23;
272:10
**dog (1)**
154:20
**DOJ (1)**
227:18
**dollar (42)**
35:19;39:11;40:15;
61:18,22,23,24;
79:11;89:18,23;93:6,
7,16;125:8;127:24;
128:7;130:22;132:9,
11,14,21;134:17,20;
140:2;143:1;170:6,7,
18;187:7,22;216:7,
15;245:20;246:23,
24;251:5,12;259:3;
264:21;271:19,21;
273:11
**dollars (87)**
18:3,24;31:16;
41:6;64:23;77:24;
87:3,4,6;92:4;93:11,
14;95:21;117:13;
118:6;121:16;128:9,
18,23;129:2;136:3;
139:13,14;141:11;
149:13,14,16;150:15;
152:15;170:9,10,13,
24;171:15,25;172:1,
4,17;184:16,21,24;
186:12;188:11;
189:9;191:9;193:2,5,
13,14,16;194:20,24;
195:1;237:19;245:2,
3,19;246:4,25;247:1,
2;251:25;257:21;
258:9,20;259:7,12,
13,14,15,18,19,20,23;

12-12020-mg   Doc 472   Filed 06/20/12   Entered 06/20/12 15:35:46   Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Pg 312 of 342

Case No. 12-12020(MG)
June 18, 2012

260:13,15,17,20,25;
263:24;264:16,17;
265:6;272:3,3,7,8
**dollars' (1)**
187:17
**done (34)**
24:21;67:4;71:21;
102:5;104:24;
106:19,20,21;115:23;
130:16,17;131:22;
134:2;136:25;
137:22;139:19;
147:9;150:9,12;
152:24;153:4;
154:25;155:1;
166:12;174:25;
184:8;190:8;197:20;
236:19;262:5,24;
265:24;277:13;
278:10
**DONNELL (14)**
13:16;55:20,20;
56:5,11;57:1,9,12,17,
22,24;59:21,21,24
**double (1)**
84:20
**double-edged (1)**
287:11
**doubt (1)**
28:25
**Doug (1)**
33:1
**DOUGLAS (1)**
8:8
**down (21)**
41:5;55:6;59:7;
60:25;68:3;79:18;
80:7;92:17;94:17;
96:16;103:8;107:22;
110:10;112:5,7;
114:19;126:24;
128:9;153:15;188:3;
283:7
**down' (1)**
87:11
**dozen (1)**
168:15
**dozens (3)**
152:1;212:24;
216:18
**draft (3)**
33:12;68:10;
211:11
**drafted (1)**
203:17
**drafting (4)**
71:25;74:22;
204:22;210:25
**drafts (1)**
54:4
**drag (1)**
82:15
**dramatic (1)**

148:17
**dramatically (2)**
155:16;187:10
**draw (2)**
49:19;100:8
**drawn (1)**
101:13
**draws (1)**
49:17
**dropped (6)**
62:4,5;128:9;
171:14,24;186:13
**drown (1)**
279:10
**DRYE (2)**
13:19;289:8
**due (45)**
23:7;26:20;28:3,
14;65:1;66:2;78:15,
17;84:22;130:17;
146:11,14,14,17;
147:9;151:7,25;
153:13,14;166:23;
174:25;176:2;182:1;
197:20,23;198:1,2,4;
200:15;201:4;
236:15,18;237:22;
247:7;252:13,16;
253:2;263:11;
271:22;272:16;
281:24;282:1,21;
285:19;289:11
**duplicate (2)**
106:25;107:4
**duplication (8)**
77:10;85:22,23;
94:12;104:13;105:4;
107:11;122:19
**duplicative (1)**
111:9
**during (4)**
47:4;60:25;132:2;
134:4;168:21;
182:11;261:23
**duties (5)**
77:14;119:18;
206:21;208:7;220:14
**duty (4)**
114:4,24;119:13;
180:12
**dynamic (4)**
97:8;140:24;
143:11;182:8
**dynamically (1)**
99:25
**dynamics (1)**
140:23

**E**

**eager (3)**
231:2,24,25
**ear (1)**

59:7
**earlier (20)**
68:3,5,5,7;118:2;
130:8;175:18;197:1;
199:23;203:3;235:4,
4;236:17;280:8,11;
281:5;293:2,11;
294:12,14
**early (19)**
18:5;94:16;103:3,
3,3,9;105:10,17;
128:19;172:13,22;
201:21;230:14;
240:23;255:15;
290:8;291:13;
293:11,13
**easier (5)**
109:15;159:23;
192:7,21;193:18
**easily (4)**
72:5;117:21;137:7;
165:9
**easy (6)**
28:5;78:3;215:13,
16;219:8;271:15
**ECF (16)**
34:7;36:24;38:9;
40:14;121:12;157:9,
10,21;158:5,7,15,18;
159:4,7;160:11;
161:22
**ECKSTEIN (88)**
8:7;37:7,8,9;38:8,
22;43:6,7,10,10;45:5;
58:3,4,23;64:12,13,
13;66:7,12,15;67:14,
17,24;68:21;70:11,
13;95:9;96:5,5,12,18;
98:22;99:4,17,19;
100:7,23;101:18;
102:8;103:2,10;
104:5;105:1,3,7,9,15,
22;108:24;109:3;
110:7;113:14,15;
116:13;140:14,15,18,
22;142:3,6;143:25;
144:3;256:5,8,10;
261:17;267:15;
269:19;270:7,8,25;
271:3,13;272:5,14,
24;273:2,19,23;
274:6;276:4;277:8,
10,17;289:25;290:1,
20;293:25
**Eckstein's (2)**
58:20;122:15
**economic (6)**
172:20,20;174:20;
191:22,25;280:20
**economics (6)**
33:4,5;71:8;133:2;
174:19;192:12
**education (1)**

272:15
**effect (13)**
22:25;33:19;54:5;
94:3;181:15;193:15;
233:2,6;235:25;
238:11;241:22;
259:11;262:4
**effective (1)**
103:18
**effectively (15)**
18:17,24;92:21;
166:18;167:20;
169:11;170:23;
173:8;174:22;
178:24;213:11;
233:8;258:18,19;
281:20
**efficacy (1)**
107:7
**efficiency (3)**
79:6;82:6;84:14
**efficient (1)**
103:17
**efficiently (1)**
109:19
**effort (4)**
21:16;48:8;122:19;
283:23
**efforts (5)**
36:12;48:13;62:24;
202:16;217:8
**eight (1)**
91:5
**eighteen (4)**
132:21;139:11,12;
264:16
**eighteen-month (2)**
64:16,25
**eighty (1)**
61:20
**eighty-member (1)**
68:22
**either (19)**
22:3;40:1;53:3;
59:9;65:11;69:20;
85:22;88:10;103:10;
109:20;114:16;
151:10;171:16;
176:10;234:3;236:3;
253:11;268:12;
288:21
**either/or (1)**
274:1
**elaborate (2)**
63:17,19
**electronic (2)**
53:3,6
**elements (2)**
192:11;270:2
**eleven (1)**
16:12
**eleven-month (2)**
64:17;65:1

**eleventh (1)**
138:23;202:10
**elicited (2)**
208:16;265:5
**elicits (1)**
266:3
**eliminate (2)**
86:20;142:19
**eliminated (2)**
44:4;153:2
**ELLIS (2)**
7:2;110:24
**else (55)**
34:3,5;38:9,10;
39:3,18;52:6,24;
53:25;54:15;55:11;
58:2;59:1;60:10;
61:6;64:10;70:12;
71:12;73:4,14;74:2;
75:12;85:1;89:3,5;
96:4;110:12;112:19;
113:6;116:22;118:9,
12;120:9,14;135:7;
139:24;148:11;
150:21;166:3,8;
183:10,14,15;202:22;
210:20;203:13;
234:8;256:3;258:24;
274:10;277:21;
289:24;292:18,25;
295:9
**e-mail (7)**
128:14;131:9;
132:15;172:12;
236:3;244:6,8
**emanating (1)**
227:9
**embarked (1)**
126:16
**embedded (2)**
113:17;216:18
**embodied (6)**
56:1;71:19;115:15;
249:14;251:15;
252:14
**emerge (2)**
82:12,20
**employed (1)**
162:20
**employees (2)**
145:19,22
**employment (1)**
230:10
**empowered (1)**
114:17
**encompass (2)**
23:2;161:23
**encourage (4)**
82:10;141:17;
253:16;267:22
**end (25)**
17:5;22:15;23:18;
24:10;91:5;103:12;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:                                          Pg 313 of 342                                          Case No. 12-12020(MG)
RESIDENTIAL CAPITAL, LLC, et al.                                                                                      June 18, 2012

104:9;108:12;114:9;
116:2;130:2;138:5;
139:5;146:23;
164:19,22;167:21;
177:17,19;231:13,14;
267:23;282:19;
288:10;290:15
**endeavoring (1)**
112:20
**endeavors (1)**
177:5
**ended (2)**
126:10;141:9
**endorse (2)**
268:4;270:9
**endorsed (2)**
90:13;97:11
**endorsement (1)**
271:5
**ends (3)**
135:10;138:10;
211:12
**engage (4)**
138:18;221:9;
261:6,9
**engaged (1)**
138:16
**engaging (1)**
263:16
**Engelhardt (95)**
156:24,25;157:1,
10,13;158:2,11,24;
159:12,22;160:2,7,9;
161:8,11,17,24;
162:1,7,10;163:7;
178:16,17;182:10;
183:7;184:11;185:6;
187:19;188:7;
189:24;190:3;195:7;
197:11;199:11;
202:2;206:3,18;
207:21,24;208:12,14,
23;209:10;210:6;
212:11;213:7,24;
214:3,10,19;215:11,
23,23;216:2,4;
217:15,21,22;219:15;
220:20;221:3,11;
222:12,21;223:14;
224:9,18;225:14,23;
226:9;227:15,25;
228:13,19;229:17;
231:4,8;236:7;
237:23;239:4;240:1,
11;241:1,9;242:7;
243:20;246:7;248:8,
9,13;249:18;250:2;
262:2,16,18
**enhance (1)**
129:20
**enhanced (1)**
193:21
**enhancements (1)**

191:20
**enhances (1)**
186:21
**enjoined (1)**
284:25
**enjoining (1)**
16:3
**enough (13)**
66:13;115:5;
132:23;181:25;
194:11;213:12;
236:23;238:13,14;
264:19;272:10;
276:25;287:8
**ensure (4)**
33:9;71:3;82:19;
107:12
**ensuring (1)**
109:8
**entail (1)**
66:25
**enter (4)**
50:2;112:15;113:1;
262:22
**entered (9)**
50:6;65:10;90:7,
16;98:8;121:11;
123:17;187:12,24
**enterprise (1)**
271:7
**entertain (1)**
153:11
**entire (8)**
57:2;84:4;107:11;
125:20,23;167:7,16;
217:13
**entirely (3)**
155:21;191:18;
294:21
**entirety (3)**
158:4,14;159:3
**entities (4)**
124:11;133:21;
199:7;240:6
**entitled (3)**
25:8;88:21;285:22
**entity (5)**
46:11;164:8;
175:21;177:19;284:2
**entry (2)**
62:23;71:10
**enumerated (1)**
207:2
**envision (1)**
295:13
**equal (4)**
133:1;142:7;178:1;
207:2
**equation (1)**
101:16
**equitable (1)**
56:15
**equity (16)**

41:21;117:10,20;
118:8;201:2;202:11,
17,23;203:8;230:18;
251:1,4;257:1,20,25;
260:9
**equivalent (1)**
100:21
**error (3)**
32:12;204:22;
222:20
**errors (3)**
222:24;223:12;
224:8
**Es (1)**
255:6
**escapes (1)**
194:18
**eScribers (1)**
4:21
**escrow (2)**
213:20;221:2
**ESQ (31)**
6:7,16,24;7:7,15,
16,17,25;8:7,8,9,10,
19;9:8,25;10:7,8,16,
17,25;11:8,17,18,19;
12:8,16,24;13:8,16,
24;14:8
**essence (2)**
200:25;202:19
**essential (2)**
53:5;210:3
**essentially (26)**
67:6;68:4;80:2;
87:16;100:21;
102:25;104:2;106:6;
108:4;142:13;143:5;
145:18;191:23;
218:25;243:9;
257:23,23;260:18;
270:8;272:25;278:6,
8,13;281:2;284:21;
291:3
**establish (2)**
159:15;280:25
**established (2)**
231:9;241:12
**establishes (1)**
223:16
**establishing (1)**
156:19
**estate (21)**
18:1,12,13,24;
48:20,20;62:15;63:1;
67:4;68:3;71:1;79:3,
19;19;85:24;88:1,25;
106:16;114:24,25;
226:7
**estates (7)**
77:4;79:8,12,18;
90:23;117:11;182:18
**estimate (1)**
204:19

**et (10)**
10:3;24:21;26:9;
119:8;160:18,22;
167:2;213:16;222:3;
247:8
**ETKIN (9)**
9:25;20:21,24;
27:18,19;28:18,20;
29:1,11
**euphemistic (1)**
242:13
**evaluate (4)**
48:14;104:21;
115:20;286:7
**evaluating (2)**
48:18;272:23
**evaluation (1)**
223:18
**eve (1)**
181:12
**even (20)**
21:22;22:19;56:13;
67:19;87:8;93:4;
94:1,6;96:14;108:18,
22;123:18;124:23;
129:25;142:15;
146:22,22;153:17;
206:17;273:10
**evening (4)**
53:14,22;118:25;
256:9
**event (9)**
31:22;68:11;97:22;
107:22;199:9;268:3;
280:4;291:9,20
**events (3)**
42:9;188:2,4
**everybody (10)**
25:5;34:11;76:2;
79:2;119:3;136:7;
146:4;282:7;292:18;
293:8
**everybody's (1)**
249:20
**everyone (2)**
32:22;53:6
**evidence (51)**
120:8,20;121:1;
133:4;136:11,12;
140:4;156:12,24;
157:20,23;158:1,8,
10,18,20,23;159:9,
11,13,24;160:4,13,
16,19,23,25;161:2,4,
7,22;182:20;218:5;
235:11;236:6,9,11,
14;243:18,22,23;
246:9,10,12,14;
250:4;262:21,25;
263:7;275:5;276:14
**evidenced (1)**
80:5
**Evidentiary (11)**

4:5;19:7;23:12,24;
25:10;26:4;35:6;
75:23;159:25;160:5;
173:4
**evolving (1)**
273:20
**exact (2)**
46:7;194:18
**exactly (13)**
28:20;47:23;66:15,
18;68:20;83:12;
90:25;91:7;93:12;
151:20,22;154:1;
173:9
**examination (17)**
79:4,17;80:12;
82:15;85:23;90:3;
91:22;96:24;100:20;
103:18;106:9;162:9;
164:19;216:3,6;
234:24;261:21
**examine (3)**
183:11;218:10;
256:4
**examined (3)**
50:13;80:24;
122:25
**examiner (130)**
29:15;75:22;76:3,
13;77:7,12,17,20;
78:12,15,17;79:7,12,
18,22,23;80:10,15,
16,17;81:15,17,24;
82:9,18;83:10,21,22;
84:9,15,15,21,22;
85:2,8;86:12,20,25;
87:7,23;88:3,4,8,9,
21,23;89:8;91:11,15,
18,20,21;92:5,12,17;
93:21,25;94:16;
95:10,13,15;96:16,
20;97:1,5;98:18;
99:2;100:18;101:9,
22;102:7,8,21;103:9,
15;104:14,15,15,18,
25;105:3,10,12,16,
18,25;106:3,6,8;
107:6,16,18,24;
108:8;110:11;
111:10,15,20;112:8,
9,12;114:2,4,4,10,17,
18,21,22;115:10;
116:11,15,17;118:16;
120:17;121:9,12,14,
20;122:1,1,7,13,16,
18,25;123:1,8,12,20
**examiners (4)**
102:24,25;103:1;
108:2
**examiner's (7)**
81:21;83:18;86:2;
88:5,15;89:1;114:22
**examining (1)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:                              Pg 314 of 342                          Case No. 12-12020(MG)
RESIDENTIAL CAPITAL, LLC, et al.                                                      June 18, 2012

165:10

**example (9)**
19:20;57:13;63:21;
66:9;159:24;254:5;
259:17;284:10;
291:22

**examples (1)**
285:5

**exceed (2)**
31:23;87:2

**exceeds (3)**
87:3,6;92:4

**excellent (1)**
177:4

**except (2)**
46:7;142:7

**exception (1)**
44:5

**excerpts (1)**
160:3

**excess (2)**
31:10;121:15

**exchange (3)**
89:24;272:3,7

**exchanged (1)**
25:21

**exchanging (1)**
270:15

**exclude (1)**
136:15

**exclusive (5)**
166:13,22;167:20;
195:19;237:7

**excuse (10)**
29:6;73:1;166:4;
173:8;181:22;194:4;
195:17;238:19;
248:4;282:12

**excused (4)**
29:17;217:19;
228:14;262:9

**execute (3)**
163:3;175:3;
253:10

**executed (4)**
243:16;244:13,17;
245:11

**executive (2)**
235:18;256:17

**exercise (8)**
22:18;46:25;
100:17;113:10;
119:12,13;147:13;
263:19

**exercises (1)**
268:16

**exercising (2)**
116:13;262:24

**exhaust (1)**
41:17

**exhibit (52)**
159:14,17;160:1,2,
11,12,19,24;161:1,3,

5,7;185:8;207:14,17;
208:4,5,6;209:5,20;
224:16,23,24;234:20,
20,20,25;235:1,10,
13,16,20,22;236:11,
14;242:22;244:5,8,
16,17;245:9,15,24;
246:11,13,15;249:15;
250:3,9;251:16;
252:14;256:12

**exhibits (33)**
25:14,14,15,15,18,
19;159:13,19,20;
160:12,14,15;207:18,
19;229:9;234:14,17,
22,24;236:5,8;
242:24;243:3,7,7,17,
21,24;244:15,24;
246:5,8;252:21

**exigencies (2)**
216:24;217:2

**exist (4)**
103:17;127:11;
177:1;198:6

**existed (2)**
192:14;194:16

**existing (10)**
60:19;147:18,24;
178:5,7,7;206:16;
241:25;258:3,4

**exists (2)**
68:23;294:5

**expect (6)**
24:9;67:8,10;
118:15;197:10;
270:22

**expectation (2)**
257:4;291:23

**expectations (1)**
176:7

**expected (3)**
68:3;223:8;291:21

**expedite (3)**
82:19;204:6;229:8

**expedited (1)**
24:21

**expeditious (1)**
77:3

**expeditiously (2)**
122:10;123:19

**expense (31)**
31:8;77:10,10;
85:24;94:17;119:11,
20;128:5,10;129:4;
132:12,13,22;135:12;
139:13;141:10;
142:16;149:19;
150:9;153:21;170:9,
14;172:1;188:25;
189:8,15;190:9;
191:8;193:7;264:17;
270:2

**expenses (2)**

143:10;171:16

**experience (7)**
180:6;239:8,17,22,
24;240:8;277:11

**experienced (1)**
100:5

**expertise (1)**
281:8

**expired (1)**
119:8

**explain (8)**
47:25;63:20;73:21;
79:9;118:9;166:10;
258:24,25

**explanation (1)**
289:19

**exploration (2)**
164:25;165:6

**explore (1)**
202:16

**explored (2)**
147:4,9

**exploring (1)**
191:5

**exposed (1)**
234:6

**exposure (6)**
258:16;259:9,10,
11,12,16

**express (1)**
196:17

**expressed (8)**
101:3,6,8,13;111:5,
14;197:19;200:3

**expressing (3)**
198:6;200:17;
235:18

**expressly (3)**
197:23;284:19,23

**extend (12)**
16:2,8;19:3;22:24;
23:22;26:23;86:18;
103:6;172:6;290:5;
291:23;295:9

**extended (6)**
36:17;42:15;164:1,
19;245:6,21

**extending (1)**
142:18

**extension (6)**
16:25;17:3,5;
22:25;23:5;288:3

**extensions (1)**
54:14

**extensive (2)**
239:10;290:24

**extensively (1)**
33:9

**extent (33)**
22:16;24:22;25:3,
10,22;37:16;41:21;
45:16;46:22,24;
54:20;58:9;60:7,13;

63:11,22;71:2;79:10;
112:7;116:3;122:20;
123:6;161:8;170:13,
15;179:10;206:14;
209:25;252:16;
258:1;259:4;266:22;
282:13

**extraordinary (1)**
77:5

**extreme (2)**
152:6;168:3

**extremely (4)**
37:13;140:23;
151:9;281:6

**eye (1)**
97:12

---

# F

**FA (1)**
116:17

**face (3)**
97:15;237:18;
264:4

**facet (1)**
19:15

**facilitated (1)**
129:11

**facilities (7)**
39:10;40:21;41:24;
53:12;165:16;
260:10,13

**facility (21)**
35:19;39:9,11,11;
40:12,15,17,23,24,
25;41:1,2,23,23;
61:18,21;62:2;63:5,
23;64:2;71:3

**facing (1)**
216:23

**fact (59)**
21:6;23:15;26:3;
47:12;63:7;64:16;
65:2,3,6;68:2;70:24;
71:1;78:5;83:15;
85:12;90:1;96:23;
97:8,20,23;99:5;
102:17,18,22;104:11,
12;107:13,22;110:1,
8;126:18;142:14;
147:7;169:10;
174:25;175:4,13;
177:1;179:12;
195:21;196:20;
197:3,22;198:11,25;
203:5;206:1;251:24;
252:7;253:10;
254:15;269:6,7;
271:14;272:15;
275:12;289:15;
290:18;293:3

**factor (7)**
125:4;147:2,2;

178:4;182:25;
206:23;269:16

**factors (18)**
125:3;130:14;
131:3,4;132:17,24;
136:22;140:5;
142:11;146:23;
177:24;213:5;
227:13;263:1,13;
269:12;272:22;273:6

**facts (10)**
69:2;114:5,5,14;
115:5,7,11;121:18;
165:13;292:14

**factual (2)**
23:21;190:7

**factually (1)**
190:7

**fail (1)**
237:21

**fair (14)**
81:8;133:20;184:3,
13,18;188:4;194:11;
199:8;201:23;
206:15;214:1;
236:25;239:10;254:4

**fairly (13)**
21:2,6;23:1;
155:16;167:2;181:9,
10;212:21;216:17;
235:24;251:21;
254:2;281:25

**fairness (1)**
67:14

**faith (7)**
66:21;68:13;70:8,
9,14,15;145:23

**fall (2)**
50:12;80:13

**falls (1)**
82:8

**familiar (10)**
17:15;81:14;100:4;
168:19;210:8,9;
212:1;213:12;
219:11,12

**familiarizing (1)**
164:15

**Fannie (18)**
6:20;31:20;32:2,
20;33:11;35:21;
48:25;144:10,12;
145:2;167:1;168:25;
175:10,16;282:23;
283:1;286:20;287:1

**Fannie's (3)**
151:8;169:2;
286:21

**far (13)**
114:25;116:13;
130:16,16;133:11;
144:12;146:19;
175:4;203:14,14;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 315 of 342
Case No. 12-12020(MG)
June 18, 2012

241:12;277:2;287:13
**Fargo (9)**
8:14;13:12;47:7,
14,18,22;55:15,21;
59:21
**fashion (3)**
107:4;108:1;
123:14
**fast (2)**
128:2;283:8
**Father's (1)**
15:25
**faulting (1)**
263:23
**favor (4)**
117:22;140:7;
184:9;206:16
**favorable (1)**
271:9
**favorably (1)**
197:10
**feasible (1)**
31:3
**February (2)**
70:22;167:21
**FEDER (6)**
13:24;289:4,5,8,8,
20
**Federal (3)**
9:3;48:24;49:10
**fee (83)**
62:13;119:11,20,
25;120:5;122:23;
123:2;125:4;128:5,8;
129:4,16,19,20,21,
23;131:5;132:11,12;
134:24;135:20;
136:6;137:5,6;138:6;
139:12;141:10;
142:7,16;143:9;
148:20;149:13,14,19;
150:8;153:21;
155:20;161:6;170:7,
15,17,18,20;171:15,
25;174:22;187:2,6,7,
10,18,22;188:12,16,
25;189:5,18,20;
190:9;191:7;193:3;
194:25;195:1;216:8,
10,12,15,21;217:3,8;
223:9;245:17,20;
247:1;264:17;
266:14;267:24;
269:16;270:2;
271:15,19,21;273:11
**feel (10)**
29:17;44:24;76:22;
112:9;131:20;184:3;
236:24;266:5;
267:11,20
**feeling (3)**
50:10;68:1;102:9
**feels (1)**
111:19
**fees (10)**
30:25;31:13;47:20;
57:14;65:3,6;70:1;
135:18;263:4,5
**felt (11)**
65:14;71:2;132:23;
133:6;141:16;
142:17;173:23;
174:24;233:13;
236:19;289:16
**FERDINANDS (7)**
12:24;152:10,11;
153:22;154:1,4,6
**few (11)**
22:1;35:8;77:1;
108:15;111:14;
121:10;216:5;256:5;
263:24;279:7;291:25
**FHFA (3)**
16:15;22:20;167:1
**FHLMC (1)**
48:25
**fiduciary (2)**
119:13,18
**field (1)**
153:9
**fields (1)**
51:21
**fifteen (3)**
18:6;163:23;
167:13
**Fifteenth (1)**
7:4
**fifty (19)**
62:5;127:24;
128:18,23;132:9;
137:13;142:25;
149:12;150:14;
172:17;193:2;
194:19,21;245:2,3;
246:23;272:2,7;
273:10
**fifty-day (1)**
33:23
**fifty-eight (1)**
191:8
**fifty-fifty (1)**
259:9
**fifty-seven (2)**
62:13,14
**figure (5)**
51:21;59:5;61:1;
267:7;279:19
**file (17)**
31:25;126:25;
141:21,23;169:9;
214:5,6;216:25;
221:13,19,20,21,24,
25;222:1;280:13;
286:14
**filed (39)**
16:4;18:6;26:24;
34:7;35:24;36:22;
38:23;46:1;48:3,17;
55:3,17;57:2;76:12;
83:16;85:7;91:11;
95:13;97:20;98:5,17;
111:7;131:8;133:15;
138:23;141:2;
152:18;155:14;
160:10;162:13;
208:25;216:19,22;
228:2;265:6;268:22;
278:13;282:5;285:16
**files (1)**
22:22
**filing (13)**
27:7;58:15,17;
85:5;90:3;98:18;
126:10;167:22;
205:7;233:19,24;
237:5;254:16
**filings (4)**
234:8;237:4;
252:15;254:4
**Final (41)**
4:5;32:10;33:20,
20;34:13,23;36:19;
38:14,18,24;39:2,4;
42:16;46:9,14;47:3,
16;49:6;52:22;54:13,
19;60:15;62:23;
69:14;75:9,11,15;
140:2;146:22;
155:11;216:20;
267:18;273:15,21;
274:9;285:13;
289:22;293:14,16,18;
295:10
**finality (6)**
265:12,13,14;
268:5,14;269:24
**finalized (1)**
58:14
**Finally (1)**
291:18
**Finance (2)**
48:24;183:5
**financer (1)**
126:14
**Financial (42)**
7:3;40:13;49:3;
51:11;55:23;56:5,10,
12,21;57:25;60:18;
61:20;80:18,23;
81:15;82:3;88:24;
110:24;141:6;157:5;
160:21;162:23;
163:15;164:8;
170:18;173:14;
179:5;180:6;182:11,
15;211:9;212:16;
217:1;219:10;228:4;
237:7;244:12;
250:24;256:15;
271:7;272:25;281:9
**financially (1)**
142:14
**financials (1)**
287:4
**Financing (37)**
4:7;35:5,19;40:12;
43:14,18;48:24;
60:11;61:18;71:3;
119:8,10;125:15,16,
19,21,23,23;126:3,7,
11,11,12,13;134:21,
24;138:1;165:4;
182:2;198:23,24,25;
199:2,4,8,17;247:8
**financings (1)**
199:10
**find (16)**
44:15;64:25;65:15;
68:7;72:4;78:4;94:8,
19;117:19,21;118:1,
7;146:13;210:23;
222:20;276:16
**fine (8)**
17:17;270:12;
274:8;276:8;277:1,7;
292:11;293:25
**finest (1)**
148:25
**finish (4)**
76:4;120:16;121:2;
272:4
**finished (1)**
233:17
**firm (2)**
152:12;275:21
**first (48)**
15:16;16:1,24;
18:14;22:10;24:3;
28:1,8;59:4;65:8,24;
66:3,5;90:4;91:14;
108:6;111:19;
116:14;117:9;
118:17;121:21;
122:7,22;129:3;
133:14;135:8;
137:15;140:19;
157:4,6,8;161:20;
164:14,18;166:7;
181:5;188:6;226:22;
237:13,14;247:21;
248:25;251:25;
254:15;255:22;
259:6;266:3;290:5
**five (48)**
16:21;29:14;31:16;
63:5;77:24;87:2,4,6;
92:4;93:6,7,8,11,13,
16;95:21;101:7,16;
117:12,16;118:6;
121:15;128:10;
129:2;132:13,22;
136:2;139:13;
149:15;165:19;
166:15;167:11,14;
171:16;172:2;
186:12,14;193:14;
194:23;195:22;
204:25;205:3,12;
237:14;246:4;260:7;
264:17;282:15
**fix (1)**
106:2
**fixed (10)**
72:1;87:2,3,5;92:4;
95:21;101:7,17;
117:17;121:15
**flag (1)**
111:18
**flagging (1)**
179:10
**flawed (1)**
92:13
**flaws (1)**
182:1
**flexed (1)**
62:3
**flexibility (2)**
103:15;106:2
**floated (1)**
105:23
**FLOM (1)**
6:2
**Floor (9)**
9:14;11:14;13:5;
14:5;62:1;135:13,14,
19;150:9
**flow (1)**
223:11
**flowed (1)**
259:5
**fly (1)**
286:10
**focus (10)**
50:7;51:1;111:16;
113:10,13;119:16,22;
208:8;231:11;241:16
**focused (10)**
33:3,4;68:20;
94:11;100:8,25;
106:13;119:3;
164:12;219:20
**focusing (4)**
173:15;250:9;
272:21;280:20
**Foerster (12)**
15:5,24;30:2;35:4;
89:11;124:1;157:1;
165:12;178:14;
190:2;215:24;248:9
**folded (1)**
275:14
**folks (1)**
282:5
**follow (3)**
111:11;122:17;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 316 of 342
Case No. 12-12020(MG)
June 18, 2012

276:12
**followed (6)**
25:18;190:17,19;
235:25;237:11;
255:21
**following (2)**
112:3;184:18
**follows (2)**
66:7;92:10
**follow-up (4)**
200:19;233:25;
234:1;235:11
**force (3)**
213:22;221:6;
287:11
**fore (1)**
233:6
**foregone (1)**
291:11
**foremost (1)**
137:15
**forensic (3)**
80:16;91:4;104:16
**foresee (3)**
191:16;237:20;
239:2
**forever (1)**
284:20
**forged (2)**
51:6,15
**Form (10)**
4:10;25:13;34:23;
35:25;38:22;41:24;
42:19;46:21;73:22;
123:16
**formal (2)**
19:8,20
**formation (1)**
90:2
**formed (1)**
226:22
**former (2)**
47:7,14
**formulate (1)**
176:13
**forth (12)**
31:21;54:6,14;
55:8;79:16;84:20;
93:19;94:4;162:16;
250:13;289:12;
293:17
**forthcoming (2)**
195:12;272:17
**Fortress (1)**
182:24
**Fortress' (1)**
182:12
**forty (4)**
98:6;194:19;
289:13,15
**forty-two (2)**
128:9;171:25
**forward (39)**

23:24;24:17;25:11;
44:2;52:20;66:23;
71:8;91:11,16;
112:17;114:20;
115:17;116:3,15;
118:25;119:18;
123:19,23;124:13;
126:9;127:15;134:7;
142:12,13;144:22;
145:22;154:13;
166:22;173:20;
178:6;179:18;
233:20;241:20;
266:5;269:5,11;
276:15;281:11,14
**foster (1)**
120:1
**fostered (1)**
113:18
**found (5)**
57:1;94:7;103:7;
147:19,22
**foundation (4)**
231:9;241:11,12;
242:9
**Four (8)**
6:4;18:14;21:8;
67:18;78:11;98:1;
104:22;167:11,14;
192:11;195:22;
237:14;248:23;
258:7,25
**fourteen (1)**
18:5
**fourteenth (1)**
51:18
**Fourth (1)**
18:4
**frame (6)**
16:22;111:11;
201:21;204:23;
230:14;259:15
**framework (2)**
126:20,21
**FRANKEL (1)**
8:2
**frankly (7)**
78:21;124:24;
143:17;154:25;
156:13;182:21;
281:19
**fraud (1)**
51:3
**Freddie (24)**
6:11;31:20,24;
32:20;33:11;34:1;
35:21;150:23;151:4,
24;152:6;167:1;
169:1;175:10,16;
280:8;281:5,16,20;
282:9,24;283:3;
286:20;287:1
**Freddie's (1)**

169:2
**free (4)**
15:17;29:17;
135:14,19
**Friday (24)**
35:25;38:6,24;
57:1;68:19;85:6;
118:25;128:4,6;
130:11;132:19,20;
142:7,15;143:6;
148:4;171:7;173:11,
12,15;201:10;
263:18;264:14,23
**Friday's (1)**
72:13
**friendly (1)**
234:23
**front (15)**
69:6;175:7;188:20;
207:14;218:23;
224:16;229:14,15;
235:14;238:8;
242:21;250:2;
252:24;276:18;
293:18
**Frost (5)**
12:3;154:8;207:9;
278:1;293:2
**Frost's (1)**
278:4
**FTI (1)**
81:25
**fu (1)**
190:14
**fulfilled (1)**
119:17
**full (16)**
23:10;28:21;34:23;
44:12;64:24;66:1,14,
23;69:24;71:5;91:10;
98:12;145:23;167:9;
268:12;271:6
**fullest (1)**
122:20
**fully (3)**
91:12;105:4;
243:16
**fun (1)**
266:20
**fund (4)**
18:17,24;19:22;
40:17
**fundamental (1)**
115:7
**fundamentally (6)**
17:5;20:11;94:12,
13;103:24;268:19
**funded (1)**
40:23
**funds (7)**
45:13,21,23;47:18;
51:12;165:20;214:16
**further (32)**

32:1,7;42:11;
44:22;47:1;70:5;
89:4;134:25;145:5;
153:11;158:13;
183:7;206:9,14;
207:6;217:3,15;
235:25;237:22;
246:25;247:11,23;
253:2;256:2;258:15;
261:17,18;262:8;
265:18;266:3;269:4;
271:23
**future (8)**
56:7;57:10;67:12;
130:3;155:8;190:14;
191:16;285:22

## G

**GA (2)**
8:17;12:22
**game (5)**
124:21,22;125:1;
138:5;144:22
**gap (1)**
264:16
**gaps (1)**
161:13
**GARRITY (1)**
10:8
**Gary (2)**
15:23;89:10
**GAs (1)**
255:8
**gather (2)**
120:17;234:7
**gave (6)**
68:25;86:13;
124:12;128:11;
175:1;198:12
**geared (1)**
105:4
**general (5)**
36:6;163:1;182:18;
217:13;241:15
**generally (7)**
21:22;120:1;
121:24;216:13;
219:13;253:15,25
**generate (1)**
163:2
**generated (1)**
43:15
**generic (1)**
212:14
**generous (1)**
65:6
**GERARD (1)**
7:15
**gets (3)**
48:20;151:12;
154:22
**Giamporcaro (3)**

159:1,7,10
**Ginnie (10)**
31:21;32:20;40:18,
19,24;167:1;169:1;
175:10,16;287:1
**Given (20)**
21:20;41:20;42:7;
60:16;65:23;81:11;
89:18,22;90:22;
105:9;132:24;
155:19;156:14;
161:12;180:6;
197:14;238:22;
277:20;289:6,15
**gives (8)**
70:22;96:19;
104:15;106:2;117:7;
118:3;268:3;288:11
**giving (6)**
50:14;104:5;117:5;
209:12;288:4,23
**glasses (1)**
69:10
**GLBA (1)**
160:3
**GLENN (3)**
10:25;52:8;279:14
**GMAC (6)**
219:21,22;220:6,
14;221:14;223:19
**GMAC's (1)**
222:23
**goal (1)**
241:25
**goals (1)**
290:10
**goes (6)**
25:11;52:22;
100:25;145:7;
177:24;291:13
**GOLDMAN (3)**
11:17;203:22;
204:5
**Good (41)**
15:4,23;30:1;33:1;
34:8;37:8,16;39:7;
53:8;54:1;66:21;
68:12;70:8,9,14,15;
73:6;85:3;89:10;
100:10;114:5;
117:24;127:4;
129:12;135:4;144:9;
152:10;156:25;
162:11,12;183:22;
184:1,2;207:12,13;
239:19;254:2;256:9,
9;266:18;286:21
**good-faith (1)**
62:24
**Goren (56)**
35:2,3,3,13,16,17;
36:6;37:1,11,18;38:4,
21,23;39:7,8,9,14,21;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 317 of 342
Case No. 12-12020(MG)
June 18, 2012

40:7,9,11,15;43:5,7,
12;45:6,9;46:1;
52:10;53:21;55:13;
59:3,4;60:2,3,22,24;
61:4,13,14,16;63:21;
64:4,21;65:9,21;
72:10,11,12,15;75:4,
6,10,16,17,18
**GOTTFRIED (13)**
10:7;53:8,9;71:14,
14;72:7,9,16,17;73:1,
3;75:1,2
**Gottfried's (1)**
74:18
**GOTTLIEB (2)**
10:11;116:25
**governed (1)**
177:7
**government (5)**
133:21;144:10;
146:6;166:25;168:18
**governmental (4)**
124:11;177:2;
196:10,11
**governors (1)**
49:10
**Grand (1)**
11:13
**grant (3)**
104:1,4;112:12
**granted (5)**
17:10;75:15;91:18;
108:7;121:13
**Granting (1)**
4:8
**grappling (1)**
271:16
**grave (1)**
49:8
**great (8)**
97:15;103:12;
116:4;138:11;145:7,
7;177:23;183:5
**greater (3)**
64:23;146:19;
268:3
**greatest (1)**
17:25
**Green (7)**
36:22,25;37:1,4;
45:9,10,24
**Greene (26)**
124:19;158:3,6,9,
13,18,22;161:14,22;
162:2,6,11,25;
176:22;179:17;
180:6;183:19,20;
184:1;185:20;
203:17;209:1;216:5;
236:17;255:19;
262:25
**Greene's (1)**
161:21

**GREGER (13)**
13:8;283:13,13,17;
284:4,10,16,18;
285:11,13,16,25;
286:5
**ground (3)**
122:21;123:6;
165:14
**grounds (1)**
113:1
**Group (13)**
7:11;10:12;17:10;
19:21;25:5;78:22,24;
98:7;114:19;117:24;
162:24;163:2;289:14
**grudge (1)**
126:17
**grudging (1)**
124:20
**GS (1)**
238:19
**GSAP (1)**
41:23
**GSAs (1)**
255:5
**GSCs (1)**
31:20
**GSE (11)**
127:10;133:8,8;
178:25;195:6;196:1;
238:23;241:7;263:9;
270:19;271:9
**GSEs (43)**
126:8,24;130:18;
133:12,15,19;136:24;
138:19;147:6;
168:18,23;175:6,7;
176:21;177:8,20;
178:19;179:2;
195:11,18;196:3,6,
13,15,20;197:10,17;
238:19;239:24;
240:6,15,16,20;
242:3,8;255:5,7,8,9,
12;269:11;290:8,11
**guarantee (1)**
289:10
**guess (10)**
17:17;60:24;66:4;
84:5;87:19;188:17;
203:16;208:2;
246:17;295:14
**guidance (1)**
122:17
**guides (1)**
220:17
**guy (1)**
50:12
**guys (1)**
168:4

**H**

**hac (1)**
283:15
**haggling (1)**
84:7
**half (5)**
62:6,14;90:18;
128:10;172:4
**HAMILTON (2)**
10:11;116:25
**hamper (1)**
129:20
**hamstringing (1)**
123:8
**hand (6)**
24:9;80:1;162:3;
218:14;229:2;248:25
**handed (4)**
49:7;234:19,21;
242:22
**handle (4)**
15:15,21;21:14;
29:20
**hang (1)**
39:15
**happen (13)**
51:9;52:20;102:15;
115:2,24;116:11;
127:11;143:22;
176:11;178:19;
199:13;269:23;
287:17
**happened (4)**
118:25;183:2;
232:1;268:24
**happening (3)**
113:1;277:19;
295:15
**happens (9)**
66:14;114:5;142:4;
177:17,20;180:15;
207:4;223:22;225:25
**Happy (5)**
15:24;70:16;135:6;
140:18;275:15
**hard (7)**
54:13,15;69:2;
129:6;192:9;202:7;
217:11
**harm (1)**
130:3
**harms (1)**
51:8
**Harold (1)**
20:3
**HARRISON (1)**
7:16
**Hathaway (47)**
11:12;76:11,17;
90:14;111:17;119:9;
121:11;133:8;
135:15,17;146:3;
147:17;149:9;
183:13,23;184:14,19;

188:9;191:11;
196:16,24;197:6;
200:2;204:12;
205:16,21,24;206:1;
230:6;238:23;
245:12;248:17,20;
249:1,6,12,14;252:4,
8;253:2,21;254:9;
255:4,13,19;269:25;
293:5
**Hathaway's (6)**
75:22;95:12;
132:10,12,14;197:9
**have' (1)**
118:4
**head (3)**
78:3;170:3;222:25
**headed (1)**
232:21
**headline (1)**
171:13
**hear (43)**
21:22,24;24:24;
25:5;34:11;35:10;
37:14;39:25;65:4;
70:13;73:9;96:12;
113:4;118:15,20;
120:7,8,19,20;121:1,
7;132:8;140:11,21;
147:3,3;154:9;
155:12;169:2;211:5;
221:17;226:12;
230:23;232:15;
236:19;262:19;
266:16;267:14;
269:22;274:17;
280:5,15,16
**heard (61)**
25:8,8;26:12;28:8;
32:25;34:6;38:10;
39:3,18;48:4;52:6,
24;53:25;55:12,12;
58:2;59:1,2;60:10;
64:10;71:12;73:4,15,
24;75:5,12;91:15;
96:4;108:10;110:13,
14,17;113:6,7;
116:14;118:12;
126:13;146:6;
150:21;168:17;
169:18;215:7;
230:21;236:17;
238:20;246:16,18;
249:5;255:22;
263:24;267:1;
270:18;274:10;
277:9,22;278:22;
285:17;288:2;289:4,
24;292:25
**Hearing (51)**
4:5,5;19:7;23:4,5,
12,16,25;25:11;26:4;
35:7;46:20;54:19;

59:11;61:10;75:23;
76:6;91:9,17;105:7,
24;110:22;122:22;
141:24;152:3;
157:23,24;158:8,20;
181:13,21;182:6;
247:20;263:18;
275:13,25;277:15;
278:3,16;279:9;
280:18;281:1;282:2,
10,14,19;286:1,4;
288:7;291:24;295:15
**hearings (2)**
24:15;26:5
**hearsay (1)**
231:10
**heavily (1)**
140:6
**heels (1)**
82:15
**Hello (2)**
248:14,15
**help (8)**
68:9;79:14,20;
80:19;82:10,19;
124:6;131:2
**helpful (8)**
22:13;25:5;36:3;
70:22;100:10,13;
124:5;159:14
**Hence (1)**
103:13
**hereby (17)**
158:1,9,22;159:10;
160:19,23,25;161:2,
4,6;234:16;236:10,
13;243:23;246:10,12,
14
**Here's (3)**
92:1;146:15;
266:16
**HFS (5)**
141:14;142:23;
144:6;291:2,9
**high (5)**
134:5;145:6;
212:22;237:11;
270:20
**higher (22)**
119:6,10,14,20;
124:24;125:7;
127:20;128:18;
132:9;133:2;134:9;
137:13;138:25;
139:3,12,23;150:6;
151:15;181:18;
182:5;190:25;195:2
**highest (14)**
119:19;120:2,6;
127:16;133:1;136:4;
140:1;146:21;
150:25;177:19;
268:9;270:1;281:22;

12-12020-mg   Doc 472   Filed 06/20/12   Entered 06/20/12 15:35:46   Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 318 of 342
Case No. 12-12020(MG)
June 18, 2012

282:14

**highlight (3)**
16:21;243:11;
244:19

**highlights (2)**
36:7;37:18

**highly (5)**
62:2;91:6;125:18;
146:15;176:25

**hired (1)**
202:22

**history (3)**
169:9;197:2;
199:24

**hit (2)**
42:23;128:16

**Hoc (4)**
7:11;10:12;98:8;
289:14

**hold (7)**
26:6;52:25;55:13;
78:6;98:23;138:1;
280:15

**holder (5)**
50:24;98:6,13,20;
210:14

**holders (4)**
54:10;117:10,20;
118:8

**holding (6)**
45:14;79:16;
116:19;126:17;
136:16,18

**Holdings (1)**
160:22

**holds (1)**
132:18

**Home (2)**
92:11;214:16

**homeowner (1)**
50:23

**homeowners (7)**
50:18;51:5,13,15,
16;156:15,16

**homes (3)**
50:18;51:5;164:1

**honestly (3)**
124:19;255:16;
275:20

**Honor (430)**
15:4,8,23;16:1,7,
20;17:3,14,20,21;
18:4,9,14,21;19:1,12;
20:2,7,20,21,24;21:1,
4,10;22:8,11,13,19;
26:14;27:1,4,13,18,
22;28:13,20;29:11,
14;30:1,3,6,7,12,12;
31:19;32:17,23;33:1,
3,4,9,13,22;34:4,8,12,
12,19,25;35:3;36:1;
37:8,14;38:12,15,16,
20,23;40:5,9;43:7;

47:10,13;48:5;50:10,
16,25;51:22,25;52:8;
53:8,13,20;54:1,24;
55:10,14,20,24;
57:19,24;58:4,21;
59:4,21;61:13,16;
64:15;67:24;68:14,
16,18;69:10;70:9,13;
71:14;72:7,10,18;
73:1,3,6,16;74:11,13,
15,22;75:3,6,16,20;
76:10,16,21,22;77:2,
9,17;78:4,9;79:4;
80:6;81:3,12,24;82:3,
6,22;83:2,6,25;84:9,
25;85:3,5;86:3,17;
87:13,16;88:7;89:2,4,
10;90:6,12,14,22;
92:13,18;93:2,25;
94:21;95:11,15,22,
24;96:3,5,7,10,18;
97:16;98:22;99:4,20;
100:23;101:1,18;
102:18;103:10;
104:6,13,17;105:19,
24;108:7,10,25;
109:3,14,21;110:10,
15,18,23,24;111:3,7,
10,13,19,23;112:2,3,
7;113:3,8;116:7,24;
117:5;118:10,13,22;
119:2;120:12,13;
121:3,5;123:21,25;
124:3,3,25;125:11,
14;126:5;127:5,22;
128:3;129:19;
130:21;132:3,16;
133:4,9,20;134:14;
136:3,9,11,20;
137:14;138:10;
139:1,7,18;140:15,
22,25;144:3,9,11;
146:1,2,6;147:16;
148:20;149:7,25;
150:20,22;151:1,6,
20;152:8,10,12;
154:6,7;155:7,17,18,
24;156:3,23,25;
157:11;158:2,12,25;
159:12,22;160:9;
161:17;162:1,7;
167:9;178:1;181:22;
183:7,12,22;184:11;
185:6,11,17;187:19;
188:7;189:24;190:3;
198:21;204:10;
207:6,8,22;208:2,12,
19,23;211:2;215:19,
25;217:15,18,22;
218:2,7;219:6,15;
220:22;224:9,19,22;
228:10,13,19,23;
229:7,17,18;230:20;

232:19;234:12,23;
235:3,9;236:5,7;
239:5;240:1;242:7;
243:17,20;246:5;
247:23;248:8;
249:18,25;250:2;
255:7;256:2,5;
261:20;262:7,11,13,
16,18,20;264:5,20;
265:2,9,25;266:4,9,
11,13,21;267:5,9,15;
270:8,16;271:13;
273:18,20,24;274:8,
12,15,18,22;275:11;
276:2,9,11,15,24,24;
277:4,7,10,23;
278:17;279:5;280:3,
7,22;282:22,25;
283:12,13,14,17;
284:5;285:2,16,20,
25;286:5,21;287:14,
22;288:14,24;289:5;
290:1,2;292:5;293:1,
4,9,25;294:3,4,17,23,
25;295:8

**honore (1)**
283:23

**Honoring (1)**
4:1

**Honor's (6)**
27:7;91:2;110:3;
111:15;161:12,13

**hook (2)**
125:20;259:6

**HOPE (11)**
14:9;33:15;51:3;
61:1;65:18;137:4;
196:22;265:9;271:3;
290:7;292:20

**hoped (1)**
27:6

**hopeful (1)**
67:9

**hopefully (14)**
15:13;33:20;34:15,
23;44:12;61:11;
82:11;110:4,7;
121:10;123:2;
270:23,25;290:14

**hoping (2)**
283:4,6

**horse (97)**
63:12,14,25;64:1;
65:10,11,13,16,17;
119:7,19;120:3;
124:14;125:3,6;
126:6,19;129:10,13,
17;130:10,14;132:18,
24;133:6;134:8;
136:5;137:20;138:4,
9,15;139:20;147:12,
15;149:21;150:16;
151:15,25;153:5,7,

12,20;165:18;
169:15;170:12;
171:8;172:24;
173:20;177:18;
180:9,15,19;181:1,
19,24;182:4,19;
184:15,20;187:3,10,
17,23;188:10,15;
189:15,23;191:1;
194:16;196:4;
205:25;206:17;
207:3;237:21;
243:11,14;244:3;
246:1;252:20;
255:15;262:24;
263:3;268:10;269:5;
270:24;273:8;
280:10,24;281:17;
282:4,13,17,18;
289:3;290:12;
292:10;294:15

**host (1)**
284:12

**hour (4)**
137:20;138:23;
202:10;289:6

**hours (6)**
90:2,19;293:8;
294:9;295:2,10

**Housing (2)**
48:24;237:12

**Houston (1)**
6:14

**How's (1)**
84:1

**HUD (1)**
167:1

**huge (3)**
101:8;199:13;
286:23

**hundred (5)**
176:17;184:15,21,
23;256:25

**hundreds (1)**
90:19

**hurdle (2)**
193:17,19

**hurdles (1)**
141:21

**hypothetical (1)**
232:16

**hypothetically (1)**
137:10

---

## I

**idea (6)**
48:23;112:6;
199:13;202:8;214:7;
232:22

**ideally (1)**
43:19

**identical (4)**

12,20;165:18;
169:15;170:12;
171:8;172:24;
173:20;177:18;
180:9,15,19;181:1,
19,24;182:4,19;
184:15,20;187:3,10,
17,23;188:10,15;
189:15,23;191:1;
194:16;196:4;
205:25;206:17;
207:3;237:21;
243:11,14;244:3;
246:1;252:20;
255:15;262:24;
263:3;268:10;269:5;
270:24;273:8;
280:10,24;281:17;
282:4,13,17,18;
289:3;290:12;
292:10;294:15

**identification (3)**
234:16,19,21

**identified (3)**
122:2;141:8;
204:25

**identify (9)**
27:17;43:8;48:9;
57:12;59:19;74:19;
235:16;279:12;290:9

**ignore (2)**
131:21,22

**II (2)**
4:7;245:1

**III (3)**
4:8;225:1,16

**IL (1)**
12:14

**imbalance (1)**
153:14

**immediately (2)**
97:15,17

**imminent (1)**
195:12

**impact (4)**
18:8;174:20;
279:22,22

**impacted (1)**
51:2

**impacts (3)**
50:8;59:18;60:6

**impasse (1)**
61:9

**impediment (1)**
138:6

**implement (1)**
90:5

**implemented (1)**
257:3

**implicated (1)**
60:9

**implies (1)**
70:14

**importance (3)**
151:4;152:6;
280:13

**important (42)**
37:20;43:13,25;
65:15;73:21;78:25;
82:16,18;83:8,10;
97:1;98:1,24;99:9,10,
21;105:18;108:12;
115:4;126:5;128:3,
12;131:19,25;
133:13;134:16;
137:18;138:20;
143:13;168:25;
174:18,24;177:14;
178:3;206:23;
238:24;258:23;
269:13;270:5,19;
289:16;290:6

90:24;127:23;
128:7,13

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 319 of 342
Case No. 12-12020(MG)
June 18, 2012

**importantly (4)**
88:6;111:22;
153:23;264:14
**impose (3)**
17:25;213:22;
221:6
**imposed (1)**
197:23
**imposes (1)**
70:25
**impossible (2)**
281:19,19
**improve (2)**
148:24;263:17
**improved (4)**
143:23;144:5;
184:15,20
**improvement (1)**
143:18
**improvements (4)**
142:17;143:15;
244:2;267:19
**inaccurate (1)**
115:23
**inadvertently (1)**
111:21
**Inc (3)**
11:12;121:11;
160:21
**inception (1)**
90:21
**inclined (4)**
111:15;140:15;
153:10;272:6
**include (6)**
44:7;112:15;
209:24;210:13;
254:4;257:10
**included (4)**
32:16;47:15;58:18;
115:20
**includes (3)**
90:14;130:15;
225:4
**including (11)**
19:15;63:3;70:1;
83:22;103:21;126:8;
142:11,18,21;147:22;
232:17
**income (6)**
51:15;212:20;
213:2,5,6;223:9
**increase (7)**
143:1,8;148:19;
149:12;246:23;
265:11;266:14
**increased (14)**
40:16;62:14,20,22;
149:12;150:14;
172:19,23;193:2;
194:19;245:2;
247:15;265:5;268:3
**increasingly (1)**

92:14
**increment (8)**
136:2;139:11;
150:11,15;170:8;
186:2;193:11,16
**incremental (1)**
253:4
**increments (11)**
141:11;149:15;
155:21;186:7,10,18,
21;194:23;246:3;
269:15,18
**incur (1)**
213:17
**indemnification (1)**
18:16
**indemnities (1)**
215:3
**indemnity (7)**
155:9;202:24;
203:10,14;214:23;
284:10;285:5
**indenture (3)**
13:20;288:15;
289:9
**independence (1)**
79:1
**independent (9)**
57:6;77:12;88:8;
89:15;107:18;150:4;
164:17;167:11;
206:15
**indicate (2)**
156:12;275:5
**indicated (18)**
51:10;64:21;65:9;
82:24;97:3;98:18;
103:11,19;106:11;
108:15;121:8;
142:24;143:7,8,16,
18;151:8;155:19
**indicates (1)**
86:20
**indicating (1)**
49:24
**indication (2)**
88:18;291:22
**indications (2)**
142:20,22
**indistinguishable (2)**
93:1;101:11
**individual (6)**
106:6,23,24,25;
107:8;163:22
**individually (1)**
177:9
**individuals (1)**
177:13
**induce (5)**
62:10,12;187:3,22;
188:14
**industry (2)**
237:12,12

**inevitable (1)**
217:5
**informal (2)**
19:8;22:20
**informally (1)**
28:7
**information (45)**
30:21;31:3;68:24;
78:6;83:20,21,23;
84:19;88:19;103:22;
116:8;138:18;143:4;
153:14;156:17;
190:10;203:20;
221:21;222:3,5,7;
234:7,7;235:10;
238:6,12,13;241:6;
253:3,4,7,14,19,23;
254:4;261:24;262:1;
263:12;267:13;
269:9;270:18;275:2;
286:9,13;290:24
**information's (1)**
292:9
**informed (1)**
108:1
**initial (9)**
15:9;166:12;
169:14,22;171:2;
172:3;249:5;255:14;
258:19
**initially (6)**
43:20;44:1;61:21;
64:15;67:21;141:2
**initials (1)**
25:17
**initiate (1)**
97:5
**injunction (6)**
16:3;17:10;22:24;
23:5,23;24:1
**injunctions (1)**
20:16
**input (1)**
124:12
**inquiry (2)**
250:20,23
**insert (2)**
45:20;74:23
**inserted (1)**
64:8
**insider (1)**
135:12
**insignificant (2)**
65:3;97:22
**insisting (1)**
33:7
**instance (6)**
71:16;80:19;81:25;
121:21;122:7;214:8
**instances (3)**
22:2;53:11;111:25
**instead (1)**
186:14

**institution (1)**
197:2
**institutions (3)**
51:11;61:20;
168:25
**insufficient (3)**
181:25;282:3,4
**insurance (10)**
18:15;203:12,13;
213:16,23;221:7;
239:11;251:19,21;
258:14
**insurers (1)**
16:13
**intact (1)**
121:23
**Integrated (1)**
137:7
**intend (4)**
112:15;121:8,9;
228:22
**intended (6)**
87:11;101:20;
102:21;242:12;
257:23;258:25
**intending (1)**
120:14
**intends (4)**
122:3;147:17;
178:6;183:10
**intent (1)**
202:4
**intention (3)**
115:22;159:20;
218:24
**interact (2)**
166:25;167:3
**interaction (2)**
151:10;179:11
**intercreditor (4)**
100:3,6;106:14;
107:23
**interest (30)**
42:10;45:14;57:18;
60:5;61:22,24,25;
62:3,4,5,16;77:4;
114:25;117:10,19;
118:1,8;142:22,23;
166:8;196:18;200:3;
202:11;234:4;
235:19;236:25;
237:9;238:15;251:1;
272:19
**interested (16)**
65:18;79:2;135:1;
145:12;146:4;148:6,
6;152:16;165:20,21;
177:9,11,12;201:25;
231:6;274:1
**interesting (1)**
129:18
**interests (7)**
84:4;87:25;94:24;

**institution (1)** 101:14;117:11,20;
251:4
**interfere (2)**
114:3;116:7
**interfering (5)**
24:7;53:2,4;115:1,
4
**interim (8)**
30:6;33:18,18;
34:22;47:2,16;52:21;
56:1
**internally (1)**
255:16
**interpretation (4)**
85:9;86:19;87:23;
93:18
**interrupt (1)**
40:8;76:20
**interrupted (1)**
233:16
**interviews (1)**
107:2
**into (80)**
28:22;29:23;31:25;
37:2;43:23;46:8;
50:6,17;51:3;59:7;
64:8;67:7,12;68:2;
69:8;70:8;89:25;
97:19,19;98:2,8;
101:23;110:25;
116:12;121:1;126:4;
130:20;131:8;137:2;
140:5;147:19,22;
148:1;151:6;157:23;
158:1,8,9,20,23;
159:11,13;160:19,23,
25;161:2,4,6,22;
181:15;183:3;
187:12,24;204:8;
217:13;226:11;
231:19;232:9;236:6,
9,11,14;238:11;
240:3;241:24;
243:18,23;246:10,12,
14;255:17;258:22;
259:23;262:22;
269:12;272:22;
274:3;275:14;278:9;
284:7
**introduce (1)**
230:3
**introduction (2)**
121:17;162:19
**introductory (1)**
254:12
**invest (1)**
181:11
**invested (2)**
181:13;184:4
**invested-in (1)**
240:5
**investigation (60)**
19:16;62:22,23;

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

77:3,4,23;78:13;
79:24;80:4,13;81:21;
82:7;84:18;86:2;
87:19,22,25;88:16;
89:1,16,25;90:5,10,
13,15;91:12;92:8;
93:21;94:1;95:17,25;
96:24;97:6,7,14,19;
99:7;101:9;102:5;
103:23;104:10,11;
106:7,19,25;107:5,7;
110:25;111:9,25;
112:4,14;114:1;
115:5;116:6;117:23;
121:22;122:9,17;
286:9

**investigations (2)**
90:24;111:9

**investigation's (1)**
87:8

**Investment (6)**
9:21;19:23;91:4;
152:12;230:5,16

**investments (2)**
156:16;231:16

**investor (1)**
16:14

**investors (4)**
16:13;50:18;
219:23;220:3

**invited (5)**
136:15;191:15;
231:19,21;255:17

**involve (6)**
18:2;37:4;109:1;
165:17;190:1;281:10

**involved (24)**
21:24;23:9;100:4;
113:20;123:5;
138:22;151:9;
156:17;163:10,16;
165:3;167:23;180:7;
182:15;196:6;
201:13;210:9,25;
215:5;239:25;251:7,
12,18;281:6

**involves (3)**
21:20;251:24;
281:8

**involving (1)**
56:21

**iPhones (1)**
53:3

**ironclad (1)**
176:17

**ironed (1)**
61:11

**ironic (2)**
95:11;146:12

**irrebuttable (1)**
118:7

**irrelevant (1)**
280:23

**irrespective (1)**
114:6

**Irvine (1)**
13:6

**issuance (1)**
16:11

**issue (57)**
17:19;18:20;19:6;
22:24;30:24;31:18;
65:14;66:5,8;72:1;
74:22,23,25;84:14;
86:9;88:2;93:11,24;
94:13;95:9;97:2;
100:8,14;103:11;
105:24;114:11;
119:12,25;121:9;
123:11;150:24;
151:4,14,23;152:3;
177:16;180:4;
199:20;202:13;
205:6,6;270:19;
274:19;275:7;276:7,
17;278:15;280:19,
23;282:23;283:4;
285:6,13,15,19;
288:25;289:21

**issued (1)**
107:12

**issues (63)**
16:21;21:4,13;
22:16,23;23:1,15,20;
24:20;26:3;27:21;
28:7;30:18;33:20;
35:8;38:1;61:11;
63:18;72:20;80:12,
22;81:5;83:7;90:25;
91:1;100:3,6;103:19;
106:14;107:23,23;
108:21;111:17,20;
112:22;115:8,16;
121:25;122:8;123:7,
12;126:24;148:1;
152:6;155:5;156:10;
174:17,24;175:11;
176:9,18;179:10,12;
204:7;216:18;
269:18;279:20;
280:14;284:6,12;
285:4;288:12;293:10

**issue's (1)**
92:2

**item (3)**
30:4;73:20;290:6

**items (3)**
43:23;58:4;168:15

**IV (1)**
4:9

## J

**JACKSON (4)**
12:2;154:7;207:8;
277:25

**JAMES (5)**
10:8;13:16;157:4,
25;218:11

**January (11)**
204:12,15,18,19;
230:6;231:11,13,14;
248:17,20,25

**jeopardize (1)**
179:16

**Jersey (2)**
19:21;20:1

**jettisoning (1)**
143:5

**Jim (2)**
55:20;59:21

**job (3)**
100:10;163:1;
276:25

**joinder (1)**
55:17

**joined (3)**
231:10,12;248:16

**joining (2)**
230:15;231:14

**jointly (1)**
84:17

**JOSEPH (2)**
9:17;73:6

**JR (1)**
10:8

**Judge (8)**
20:5;87:20;92:10;
93:10;105:12,17;
114:10;239:23

**judgment (16)**
49:12,21;68:1,1,
24;119:12;125:5;
134:9;137:24;
147:13;262:24;
263:20;266:25;
268:16;272:18;
290:14

**JUDSON (2)**
7:7;110:23

**July (7)**
23:4,6,7,11,12;
25:11;26:25

**jump (1)**
125:14

**jumping (1)**
131:8

**June (5)**
26:20;90:7;192:5;
252:18,18

**Junior (20)**
7:11;37:2;41:6,7,
11,20,22;42:3,14;
54:2,10;97:10;98:7;
113:9;114:19;126:9;
183:6;288:15;
289:10,11

**jurisdiction (2)**
16:25;50:7

**jury (1)**
208:24

**JUSTICE (2)**
9:11;14:2

## K

**keep (10)**
115:3;150:1,6;
194:11;197:6;
200:13;202:7;
241:25;266:7;278:17

**keeping (1)**
201:3

**keeps (2)**
140:13;266:6

**KELLEY (2)**
13:19;289:8

**Ken (3)**
41:12;68:16;74:20

**KENNETH (7)**
6:7;8:7;37:8;
43:10;64:13;96:5;
256:10

**kept (1)**
171:13

**KEVIN (3)**
11:19;183:12,22

**key (6)**
36:20;93:17;98:2;
230:12,12;244:12

**killed (1)**
51:20

**kimono (1)**
81:19

**kind (6)**
71:2;192:8,9;
213:12,13;270:6

**kinds (1)**
220:18

**KING (2)**
12:19;152:11

**KIRKLAND (2)**
7:2;110:23

**KISSEL (2)**
11:2;54:25

**KIT (2)**
8:19;55:14

**knew (4)**
66:18;89:24;97:8;
238:6

**knights (4)**
51:19,20,20,21

**knowing (2)**
144:3;238:5

**knowledge (12)**
91:10;214:11,17,
25;218:8;225:25;
236:21;237:3;
248:19,22,25;283:15

**knowledgeable (1)**
107:21

**known (1)**

89:12

**knows (2)**
109:15;260:6

**KRAMER (6)**
8:2;37:9;43:10;
64:13;80:7;96:5

## L

**label (2)**
32:9,12

**lack (3)**
176:1;236:18;
242:8

**laid (5)**
109:25;155:21;
174:17,18;184:19

**landlord (2)**
283:18;286:13

**landscape (2)**
155:16,19

**language (59)**
33:7;37:1,5;45:1,
20;46:2,4,7;47:15,16;
55:2,7;59:13;63:15;
64:7;65:22;67:12;
68:10,19;69:5;70:9,
10,15;72:13,21;
73:10;85:11,21;86:4,
6,10,17,19,20;87:14,
15,17,18;92:5,19,23,
23;102:14;106:1;
117:7;118:2;121:16;
156:6;208:3;210:8;
211:11;224:7;
225:16;278:5,12,18,
25;288:20;289:20

**large (14)**
100:2,3,5;101:7,
24;102:12,15,22;
103:3,8;156:16;
167:9;237:17;261:25

**larger (3)**
52:9;101:6;188:15

**largest (1)**
109:14

**Larren (2)**
15:4;123:25

**LARRY (2)**
12:16;266:11

**last (44)**
18:6;9:24:16;
38:22;42:13;47:6,6,
51:24;53:14,22;62:9;
66:2;73:20;75:23;
83:10;84:11;90:17;
91:9,17;128:16;
129:6;130:25;
131:22,23;139:23;
140:20,24;143:4;
148:3,5,16;149:10;
152:15;167:19;
171:7;172:12;173:9;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 321 of 342
Case No. 12-12020(MG)
June 18, 2012

191:17;244:8;
246:17;263:18;
265:2;293:14,16
**lasted (1)**
167:21
**lastly (1)**
175:11
**late (17)**
94:8;100:19;
124:17;126:18;
144:13,16,20,21;
145:1;148:4,8,16;
172:12;230:14;
232:5;248:17;255:15
**later (13)**
26:25;52:23;61:2;
64:18;105:14;130:6;
137:17;144:6;152:4;
154:23;155:5;156:2;
276:16
**latest (2)**
120:19;264:3
**late-to-the-party (1)**
119:6
**latitude (1)**
85:5
**law (5)**
72:4;106:2;115:19,
24;140:1
**lawsuits (1)**
83:16
**lawyer (1)**
137:12
**lawyers (2)**
91:5;178:10
**lay (2)**
120:25;241:11
**lazy (1)**
51:20
**lead (3)**
120:1;146:7;241:6
**leading (2)**
22:18;281:15
**leads (1)**
65:5
**lean (1)**
220:1
**leaned (2)**
24:22;195:4
**learn (1)**
231:18
**learned (3)**
254:15;276:1;
281:13
**least (22)**
53:17;59:9;63:4;
66:1;70:15;89:13,14;
98:9;109:11;111:18;
118:3;119:21;120:5;
121:23;129:1;
178:21;184:7;191:7,
8;280:25;281:25;
293:8

**leave (6)**
15:17;23:7;102:4;
121:23;156:18;
232:14
**leaving (2)**
116:20;180:16
**led (2)**
61:18;126:11
**Lee (44)**
15:20,23,23;17:14,
20;18:13;20:1,4,7,9,
20;21:1;22:7,11;
26:14,15,16,19;27:1,
4,10,13,14,15,22;
89:9,10,10,21;91:23,
25;92:9,18;93:2,12,
15,24;94:10,20;95:4,
22;96:3,7;97:3
**left (4)**
75:21;96:7;135:9;
260:2
**legacy (12)**
134:10,14,16,20;
136:8;149:6,7,18,21;
153:20;271:11;
272:12
**LEGAL (8)**
7:20;16:15;23:1;
96:8;117:4;119:11;
190:2;209:12
**lender (3)**
62:11,11;68:7
**lenders (5)**
42:6,12;59:10;
62:12;70:3
**length (1)**
67:25
**lengthy (1)**
216:17
**less (10)**
28:2;65:2,25;
68:11;89:22;102:18;
136:3;187:17;238:5;
264:22
**letter (20)**
22:2;125:18;161:2;
199:7;200:16,19;
201:16;235:5,17,23,
24;236:10,13;250:5,
6;256:12,14,20;
257:14;260:1
**letters (7)**
21:22;25:16,18;
200:20,22,25;234:16
**level (11)**
22:7;153:8;212:22;
213:18;237:9;259:9,
11,16;267:19;
270:20;272:19
**levels (1)**
263:21
**level-set (1)**
124:6

**leverage (3)**
82:16;217:2,7
**LEVIN (6)**
8:2;37:9;43:10;
64:13;80:7;96:6
**likelihood (2)**
23:11;239:2
**likely (8)**
66:19;67:3;141:16;
197:10;233:5;
267:24;281:10;282:9
**Likewise (1)**
239:13
**limit (9)**
56:20;57:24;58:10;
60:20;96:17;99:2;
122:11;123:2;217:2
**limitation (1)**
70:1
**limitations (3)**
83:22;106:3;
112:15
**limited (26)**
17:4,12;20:12;
21:10;22:2;23:1;
30:8;31:9,9,14;36:7,
10;37:3;41:15;42:8;
60:3;73:10;111:7;
112:5;151:5;153:16;
190:23;205:3;
239:22;280:13;282:5
**limits (4)**
95:19,20;100:16;
112:19
**line (5)**
40:21;45:18;
174:23;200:9;245:6
**lines (1)**
175:9
**linkage (4)**
44:3,18;135:24;
152:21
**linked (1)**
141:14
**liquidate (2)**
169:12;178:24
**liquidation (1)**
126:12
**liquidity (1)**
165:14
**list (10)**
90:20;159:14;
160:11,12;163:13;
167:2;204:7,25;
205:3,8
**listed (4)**
47:11;48:2,3;163:5
**listened (1)**
52:10
**listening (2)**
174:5,8
**litany (1)**
281:11
**literal (1)**
87:9
**literally (1)**

**LEWIS (3)**
10:2;53:9;71:15
**Lewisville (5)**
13:3;283:14,18,21;
286:12
**LI (2)**
134:13;136:8
**liabilities (37)**
202:25;203:10;
209:19,21,24,24,25;
210:12,19,25;213:2,
13;224:8,14,25;
225:3,12,17,18,20,21,
25;226:7,16,24,25;
227:9,12;257:24;
258:13,16;259:2,7;
260:19;278:15;
283:24;284:21
**liability (18)**
16:18;18:23;156:5;
208:10;209:9;
213:17;221:10;
223:12,16;226:18;
227:21;251:25;
259:5,13,18;260:5;
278:20;283:21
**Liberty (1)**
10:13
**LIBOR (4)**
61:22,24,25;62:1
**license (1)**
175:15
**licensed (3)**
175:13,22;197:5
**licenses (18)**
147:24;175:14,18,
19;178:3,5,8,12,14;
239:18;240:23;
241:3;248:19,24;
249:1;254:22;255:2;
263:10
**licensing (3)**
175:11;177:22;
239:15
**licensure (1)**
239:11
**lie (1)**
39:19
**lien (4)**
40:25;41:7,20,22
**liens (4)**
36:10;37:23;46:13;
54:8
**Life (3)**
19:22,22;223:8
**Lifland (1)**
93:10
**light (4)**

24:23;83:7,25;
188:4

90:19
**litigation (12)**
17:11;51:4;78:3,5,
7;87:7;202:25;
203:10;233:7,7,8;
258:4
**little (29)**
26:22;28:1;39:21;
44:25;47:9,23;48:21;
49:5;52:11,12,13;
62:7;67:19;79:6;
83:14;89:22;105:8;
124:5;135:17;
137:17;140:22;
184:9;212:25;
219:17,25;242:5,11;
245:1;265:15
**live (5)**
103:6;118:19,23;
120:10;217:23
**LLC (11)**
4:21;12:20;13:3;
15:3;152:12;157:5;
160:17,18,22,22;
283:14
**LLP (18)**
6:2,19;7:2,10;8:2,
13;9:2;10:2,11,20;
11:2,11;12:2,11,19;
13:2,11,19
**Loan (35)**
4:1,2;22:21;31:10;
46:12,18;49:17,18,
20;56:19;61:22,23;
62:10;66:9;135:7;
136:8;149:18;
152:20;153:5,12,16,
20;166:19;193:20;
220:19;222:3;223:8,
11;227:9;245:12;
257:10;271:11;
272:13,23;273:3
**loans (25)**
18:2;40:18,24;
58:7,11;62:1;133:25;
145:21;147:5;149:2;
152:15,22;153:1,3;
210:14;219:21,22;
220:6,15,16;222:16;
237:15;281:7;
282:24;283:1
**LOC (1)**
49:19
**Local (1)**
21:15
**located (1)**
158:15
**lock (2)**
90:15;145:18
**locked (3)**
31:1;150:9;291:16
**locking (1)**
272:2

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:                    Pg 322 of 342                    Case No. 12-12020(MG)
RESIDENTIAL CAPITAL, LLC, et al.                                      June 18, 2012

**lodged (1)**
46:16
**logical (1)**
118:3
**Lone (11)**
12:20;135:15,16;
152:11,12;153:18;
194:1,2,10;271:20,23
**long (14)**
23:13,14;60:24;
76:8;89:12;121:2;
150:7,10;167:2,19;
169:9;262:20;266:8;
292:11
**longer (9)**
26:5;47:21;66:16;
99:5,12;155:23;
267:7;291:21;292:17
**look (36)**
17:13;22:23;33:18;
39:5;61:8;64:16;
72:5;79:7,8,12;92:1;
96:21,23;102:10,17;
103:13,13;114:7;
118:4;126:23;
152:16;154:11,18;
163:13;180:10;
209:19;227:23;
235:13,20;265:13,20;
269:7;273:9;275:2;
286:12;288:17
**looked (6)**
17:6;102:13,25;
152:2;132:19;171:1
**looking (30)**
17:4,4;19:2,5;21:2;
34:18;47:24;63:1;
82:6;91:3,4,5,6;99:6,
8;106:22;108:7;
120:21;130:13;
144:22;177:25;
196:4;200:7;202:20;
205:7;212:8;224:23;
232:17;277:17,19
**looks (4)**
50:16;141:24;
151:4;209:6
**Los (2)**
11:15;293:13
**lose (1)**
65:17
**lost (2)**
65:16;69:9
**lot (45)**
17:22;23:8;25:2,2;
27:23;37:15;54:4;
68:21;82:23;109:15;
126:22;127:6,7;
133:5,25;137:1,3,3,4;
138:1;145:12;149:8;
155:1,2;164:15;
165:8,9;168:1,2,7,8;
177:7;195:13;197:1;

201:17;206:22;
211:11;225:8;232:8;
239:14;248:23,23;
260:21;270:18;
292:17
**louder (1)**
69:11
**love (4)**
136:20,21;150:6;
286:22
**LOWENSTEIN (2)**
9:20;27:19
**lower (5)**
31:5;119:10,11;
135:10;267:24
**lowered (1)**
217:9
**lowering (1)**
268:1
**lowers (2)**
193:17,19
**lucrative (1)**
129:11
**lunch (2)**
76:8;143:7
**luxury (1)**
136:6

## M

**Mac (12)**
6:11;31:24;34:1;
35:21;150:23;151:4,
24;152:6;280:8;
281:16,20;282:9
**Mac's (2)**
281:5;283:3
**Mae (14)**
6:20;31:21;32:2,
20;35:21;40:18,19,
24;48:25;144:10,13;
145:2;282:23;283:1
**magnitude (4)**
18:2;94:15;156:14,
15
**Main (6)**
13:4;50:13;54:8;
93:20;94:4;95:7
**mainly (1)**
152:21
**major (8)**
51:11;122:4;147:6;
205:6;211:10;252:7,
9,12
**majority (5)**
85:12;98:13;
163:14;264:11,13
**makers (1)**
270:3
**makes (7)**
67:19;193:18;
215:6,12,16;219:8;
288:20

**make-wholes (3)**
31:20;32:4,8
**making (12)**
19:19;29:2;32:1;
94:11;103:22;
113:25;243:12;
251:12;252:14;
254:8;256:22;294:19
**man (1)**
230:13
**manage (1)**
163:2
**manageable (1)**
148:21
**managed (1)**
202:18
**Management (21)**
9:21;19:23;47:8,
14;91:14;102:4;
123:7;130:18;
136:23;164:16;
165:12;167:10;
168:3,8;177:11;
197:6,16;198:9;
254:18;294:8;295:1
**manager (1)**
230:5
**mandate (1)**
122:12
**mandates (1)**
90:23
**mandatory (20)**
77:18,20;85:11;
86:25;87:4,20;92:3,5,
25;94:2,7;96:8,13,15,
19;100:16,16;101:22,
24;121:14
**mandatory' (1)**
101:5
**MANNAL (6)**
8:8;32:25;33:1,1;
34:3,4
**Manner (1)**
4:10
**manufacturing (1)**
177:6
**many (30)**
22:5;25:17;37:14;
76:24;85:12,18;
102:12;103:1;
110:14;116:21,21;
118:19;119:14;
120:9;124:12,12;
130:10;141:18;
163:12,19;212:5,23;
229:20;237:12,12;
263:1;264:7;279:20;
281:18;295:16
**Marano (1)**
256:17
**Marc (1)**
174:7
**March (2)**

205:7;230:14
**marginally (1)**
253:5
**mark (2)**
25:14,15
**marked (6)**
119:15;159:19;
234:16,19,21;235:13
**market (3)**
134:22;227:7,14
**marketing (3)**
124:14,22;165:17
**marketplace (1)**
226:15
**markets (1)**
199:9
**master (1)**
55:16
**masters (1)**
84:4
**MASUMOTO (34)**
14:8;34:7,8,12;
38:11,12,20;39:5;
75:8;85:2,3,4;86:3,
17;87:13;88:7;89:2,
3,4,6;155:14,17,17;
156:3,21;274:12,14,
14,18,22;275:11,22;
276:2,8
**matched (2)**
148:18;173:8
**matching (7)**
132:10,11,13,14;
139:14,14,15
**material (9)**
44:20;143:2,2,19;
181:14;182:1;234:6;
238:11;253:14
**materially (2)**
143:11,23
**materials (3)**
112:1;174:12;
275:17
**MATKINS (2)**
13:2;283:14
**matter (32)**
16:1;23:13;24:9;
29:13;30:16;44:24;
45:12;48:16,18;
53:14,24;64:17,19;
66:24;67:2;68:17;
71:25;72:2;76:7,23;
90:11;101:1;127:11;
130:9;137:15;
145:14;146:24;
160:4;162:14;173:4;
190:7;243:5
**matters (13)**
15:8;16:20;21:25;
22:13;24:2;30:18;
75:20;89:22;125:1;
131:19;137:15;
138:8,21

205:7;230:14
**mature (1)**
284:7
**maturity (1)**
165:15
**maximize (2)**
267:22;292:16
**maximizing (5)**
79:3;106:13,16;
108:14;124:10
**maximum (3)**
185:5,23;186:22
**may (112)**
16:21;17:23;21:10;
24:2;30:7;38:12;
46:11;56:7;66:15;
68:14;69:2,2,3,3;
72:10,12;78:22;
80:17,18;81:17;83:7;
88:12,14,14;102:11,
18;105:20;107:21;
112:5,6,9,9,21;115:2,
10,14,14,15,15;
116:20;118:22;
120:12;122:11,11,24;
123:3;124:23;
125:25;129:11;
130:5;131:22;133:8,
14;135:10;138:13,
13;150:7;152:1;
160:18,23;161:2;
162:7;167:22;176:9;
177:15;179:13;
184:3;185:6,11;
187:2;188:4;189:6;
196:8;200:19;
201:21;203:6;
207:16,21;215:24;
224:18;229:8;231:1;
234:12,23;235:5,18,
23,24,24;236:10;
242:7;248:10;
249:16,18;250:5;
256:12,22;264:20;
266:3,11;273:20;
279:21,22;280:25;
281:19;282:3;284:6;
285:4;287:4;288:25;
291:16,23
**Maybe (23)**
24:24;28:1;31:4;
60:25;65:6;67:25,25;
89:21;99:20;102:19;
124:9;127:1;136:3;
151:7,12;153:17;
167:11;192:10;
237:14,14;254:3;
282:9;286:11
**MBRS (1)**
71:17
**MBS (7)**
19:17,21;46:17;
59:5,11,64:5;74:25
**McHale (1)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 323 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

17:9
**MCKOOL (3)**
6:10;150:22;280:8
**MEAGHER (1)**
6:2
**mean (44)**
27:3;55:4;67:11;
69:2;79:9;81:16;
83:19;87:13;100:18;
103:4;114:7;115:5,
12;131:6;136:10;
144:19;146:10,20;
154:21;155:1;
167:25;173:24;
197:15;199:2;
206:11;210:21;
211:19;226:15;
231:10;238:5,10;
239:20;248:22;
252:8,8,9;254:23,23;
258:7;262:4;263:22;
265:4;270:6;282:24
**meaning (4)**
86:23;95:6;178:22;
240:9
**meaningful (4)**
79:24;83:20;
141:20;151:10
**meaningfully (1)**
277:14
**means (4)**
86:25;93:25;124:9;
225:16
**measured (1)**
19:10
**mechanics (1)**
259:25
**mechanism (1)**
268:5
**mediator (1)**
107:25
**meet (17)**
21:16;23:18,19;
24:3,10;26:2;49:20;
84:16;122:3;136:23;
142:8;168:23;
177:11;269:3,4;
273:16;295:12
**meet-and-confer (1)**
22:8
**meeting (12)**
130:11;198:8;
231:22;232:4,6,7;
233:14,24;249:5;
265:20;267:8;268:10
**meetings (5)**
168:24;177:8;
195:22,25;196:2
**meets (1)**
137:7
**meld (1)**
77:11
**Mellon (3)**

10:21;52:9;279:14
**member (1)**
83:15
**members (13)**
78:21,24;79:18;
83:15;98:15;132:7;
139:16;164:17;
264:1,6,7,12;265:18
**mention (4)**
18:9;73:9;168:17;
290:3
**mentioned (10)**
27:23;34:1;156:15;
163:24;175:25;
242:11;247:6;280:8,
11;281:5
**mere (1)**
78:3
**merely (5)**
58:17;98:20,21,22;
99:5
**merge (1)**
84:5
**meritorious (1)**
76:23
**merits (5)**
19:17;23:2;28:22;
29:6;173:19
**messed (1)**
47:9
**met (13)**
93:8,11,14,17;
128:4;129:7;130:17;
132:4,6;142:9;
144:15;167:9;256:9
**Metaldyne (2)**
119:5;125:24
**MICHAEL (7)**
9:25;13:8;27:18;
231:19;250:23;
256:14;283:13
**microphone (5)**
34:9;48:6;73:17;
219:25;274:13
**mid-April (2)**
200:11;249:9
**middle (2)**
192:9;288:8
**might (28)**
17:12;35:8;37:11;
42:22;47:8,9;57:13;
72:14;84:6;88:21;
108:22,24;110:3;
130:5;138:12;146:4;
165:20,20;170:4;
177:10;180:16;
200:7;205:19;213:9;
232:21;252:18;
258:17;280:7
**Mike (3)**
235:17;236:10,13
**milestones (2)**
64:17;70:21

**million (146)**
31:11,16;32:2;
34:2;35:19;39:11;
40:15,16,22;41:2;
61:23,24;62:9,10,11,
13,14;64:23;77:24;
79:11;87:3,4,6;89:20,
21;90:18;92:4;93:6,
7,11,13,16;95:21;
101:7;117:13,16;
118:6;121:16;
127:24;128:7,8,9,9,
18,23;129:2;132:9,
11,13,21,22;134:16;
136:2;137:13;
139:12,12;141:11;
142:25;146:24;
149:12,14,16;150:15;
156:15;170:6,7,8,10,
18,24;171:15,16,25;
172:1,2,3,4,17;
184:16,21,24;186:8,
12,14,14;187:7,17,
22;188:1,5,11,12;
189:6,9,18;190:8,9;
191:9;193:2,5,9,13,
14,16;194:19,21,24;
195:1;212:4;216:7,
15;217:14;245:2,3,
19,20;246:4,23,24,
25;247:1,2;251:12;
257:21;258:8,18,19;
259:3,14;263:24;
264:16,17,17,21,22;
265:6;268:23;
269:17;271:19,21;
272:3,3,7,8;273:10,
11
**million-plus (1)**
101:17
**millions (1)**
18:24
**mind (12)**
38:16;105:14;
114:10;119:4,25;
120:7;129:15;
145:22;211:22;
221:25;268:8,25
**mindful (1)**
105:4;269:6
**mini (1)**
138:11
**mini-auction (3)**
130:2;131:20,21
**minimize (1)**
98:1
**minimum (5)**
101:4,5,13;155:20;
246:3
**Minneapolis (1)**
7:23
**minor (4)**
26:16;35:8;44:5;

290:4
**minute (6)**
20:23;21:21;129:6;
139:23;191:17;
247:25
**minutes (1)**
263:24
**miraculously (1)**
35:25
**Mirror (1)**
51:18
**mis (1)**
47:8
**misapply (2)**
213:20;221:2
**miscellaneous (1)**
257:11
**mischaracterize (1)**
146:10
**misstatement (1)**
73:19
**mistakenly (2)**
213:22;221:6
**mistakes (1)**
220:18
**mistitled (1)**
47:10
**misunderstanding (1)**
49:8
**misunderstood (1)**
59:8
**misused (1)**
99:20
**mitigate (1)**
258:15
**MN (1)**
7:23
**MOAK (11)**
6:16;150:22,22;
151:17,20,22;152:8;
280:7,7,17,22
**modifications (9)**
44:22;70:19;71:6,
9;142:9,19,25;
271:22,24
**modified (3)**
142:10;143:20;
144:5
**modifies (1)**
87:19
**MOLONEY (6)**
10:16;116:24,25;
117:4,18;118:13
**moment (11)**
58:13;69:9;109:4;
112:12;184:20;
191:21;195:3;
206:10;207:4;266:9;
273:18
**Monday (3)**
128:16;131:1;
236:3
**monetary (1)**

192:11
**monetizing (1)**
74:5
**money (7)**
18:24;136:20;
137:1;148:11;
180:17;265:7,8
**monitor (1)**
106:18
**monitoring (2)**
106:7;122:16
**monitors (1)**
123:2
**Monoline (1)**
16:13
**month (3)**
16:23;19:7;65:16
**months (7)**
18:7;113:20;
116:21;130:11;
133:15;137:21;
248:23
**mooted (1)**
289:1
**more (48)**
17:25;44:25;66:10;
67:3,3;69:18;72:4;
79:21;88:6;90:1;
94:12;100:10;
103:24;107:25;
111:22;114:14;
116:16;130:7;140:3,
23;142:14;148:11;
153:22;167:4;
192:10;198:2,4;
202:14;212:24;
216:18;217:6;218:7;
219:19;234:14;
253:3;256:21;
260:21;267:24;
269:16,20;282:24;
284:4;288:11,11,19;
290:11;292:21;
295:13
**MORGAN (3)**
10:2;53:9;71:14
**morning (32)**
15:4,10,23;30:1;
33:1;34:8;37:8;
44:23;49:7;53:8,15;
54:1;73:6;128:14,19;
129:5;131:1,7,9,10;
134:4;143:3,4;
172:13,22;181:13;
206:11;246:24;
265:15;268:11;
289:21;291:14
**Morrison (12)**
15:5,24;30:2;35:4;
89:11;124:1;157:1;
165:12;178:14;
190:2;215:23;248:9
**Mortgage (21)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 324 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

4:1;35:20;65:24;
133:14;160:17;
188:10;210:14;
212:2;214:5,15;
219:21,22;220:6;
221:23;222:9,10,19,
23;227:20,23;237:11
**mortgage-backed (2)**
16:11;53:12
**mortgages (5)**
146:25;147:1;
197:7;212:4;213:14
**Mortgage's (1)**
220:14
**mortgagor (2)**
213:17;221:10
**most (20)**
17:1,7;39:17;
43:15,25;65:15;
79:10;103:17;
108:12;148:21;
156:16;159:22;
165:9,14;166:23;
168:25;180:10;
214:21;223:1;234:7
**Motion (102)**
4:6;15:10;16:2,5,8,
22;19:13,19;21:3;
22:16,23;23:6,22;
26:23;27:24;28:3;
29:15,20,21;30:3,6,
12;31:16,25;34:6,7;
35:18,23;38:9,11;
39:2,4,22;40:11,11,
19;43:13;47:13;49:2,
15;52:4;58:15,17;
60:12;63:19;75:15,
21,22;76:3,12;80:2,5;
85:2,7;89:7;91:11,15,
18,21;92:17;94:11,
25;95:14;96:1,16;
97:6,19;98:5,19;
99:6;100:18;103:9;
104:2,3,4;108:6;
110:13;112:13;
114:4;118:16,18;
121:9,11,13;122:7;
123:24;148:10;
152:18;155:15;
157:4,15,18,21;
158:15,25;159:4;
162:14;209:1;
242:19;265:6;
268:21;277:18
**motions (6)**
15:20;21:14;26:24;
29:15,24;35:6
**motive (1)**
79:5
**movant (1)**
88:12
**move (26)**
76:5;79:14;91:16;

118:17,24;121:1;
123:19,23;124:13;
148:21;154:13;
205:9;208:22;
234:10;236:5;
238:19;242:7;
243:17;246:5;266:5,
14;281:14;288:5,7;
292:18;293:7
**moved (5)**
47:19;63:12;97:4;
250:3;288:10
**movement (3)**
161:12;169:21;
171:3
**moving (10)**
25:13;54:16;
114:25;119:22;
122:6;128:2;148:6;
166:22;169:12;
263:23
**MSR (1)**
223:17
**much (41)**
26:3,3;29:12;
34:20;35:1,14;48:8,
13;61:14;66:16;
71:11;72:3;76:21;
90:1;107:24;123:22;
141:4;143:10;
145:14;150:18;
151:1;183:21;198:6;
207:25;217:16;
218:13;220:1;223:8;
228:15,20;229:5;
238:24;262:9;
266:19;267:3;
269:16,16;287:17;
289:23;295:8,18
**mulling (1)**
270:6
**multiple (8)**
166:18,25;203:9;
219:22,22;290:2;
291:2;292:11
**MUNGER (6)**
11:11;76:11;
112:23;146:2;
183:12,23
**must (3)**
52:10;64:19;
112:23
**Myself (2)**
50:21;155:2

## N

**NA (2)**
8:14;13:20
**NAFTALIS (1)**
8:2
**name (2)**
25:17;53:7

**named (2)**
16:10;17:23
**namely (1)**
100:15
**names (1)**
117:2
**NASHELSKY (104)**
15:4,5,15,19;29:14,
18,19,23;75:19,20,
25;118:22;120:10,
20;123:24,25;124:1,
25;125:9,11,13,19;
127:18,22;128:1,25;
129:18,23;131:7,15,
17;132:2,6,9;133:20;
134:12,14,19;136:9,
20;137:11,14;139:1,
7,10,22;140:4,9;
142:6,24;143:7;
147:3;156:22,23;
172:25;262:20;
264:5,8,10,13;265:1,
8,17,21,25;266:9;
267:4;273:3,5,9,13,
18,24;274:8;276:4,
10,11,20,24;277:4,7;
279:1,3,5;286:10,11,
18,20;287:10,21;
288:19;289:3;
290:25;291:19;
292:4,5,8,24;293:1;
294:2,3,22,23,25
**Nashelsky's (1)**
289:18
**National (4)**
11:3;53:10;71:15;
289:9
**Nationstar (125)**
12:12;63:22;69:22;
124:15;125:16;
126:1,22;127:3,4,6,
12,13;128:4,8,8,24;
129:11;130:12,15;
131:13,18;132:18;
133:1;134:15,23;
135:6;137:3;138:9;
139:3,11,19;140:7;
141:4;142:8,8,10,12,
13;143:8,12,16,18,
20;144:5,15;145:5;
147:15;148:18;
151:3;159:2;160:17;
165:22;166:14,22;
167:19,24;168:4,21,
22;169:16,23;171:8,
19;172:23;173:1,7;
177:18;179:4,13;
180:8;181:4;182:17;
184:23,25;185:25;
186:9;187:3,9,13,16,
23;188:2;189:20,23;
191:11,22;193:9;
194:4;195:5,16,17,

18;196:1,6,8,19;
198:22,24;206:7,20;
207:3;209:2;210:5;
225:7;243:13;
246:17;257:17;
262:23;263:2,16,20;
264:4,15;265:10,19;
266:3,12;269:22,25;
281:15;284:24,25;
288:2;294:7;295:1
**Nationstar's (4)**
131:25;147:4;
182:13,24
**Nationwide (1)**
195:14
**naturally (1)**
184:3
**nature (11)**
21:23;37:3;85:20,
23;87:21;89:23;
90:12;175:2;198:11;
237:10;256:21
**NDA (4)**
205:12,15,22;
234:3
**NE (1)**
7:22
**near (2)**
109:7;277:20
**nearly (1)**
90:17
**near-term (1)**
78:19
**necessarily (7)**
44:10;53:19;83:3;
114:14;150:25;
175:9;280:10
**necessary (19)**
21:9;24:3;25:6;
63:10;69:2,3;116:18;
123:6;156:13,20;
187:3,22;188:5,14;
238:23;263:11;
282:6,7,22
**necessity (1)**
22:1
**need (72)**
23:9,15,18,19;24:7,
23;25:19,24,25;
32:17,19;43:8;44:13;
55:6;58:24;67:7,8;
69:10;70:24;79:23;
80:11,15,16,18;
104:16,17;105:3;
106:24;107:11;
108:3;111:8;114:21,
22;115:9,16;118:15;
121:2;122:9;127:10,
10;133:16;135:4,4;
144:14;145:24;
151:5;152:4;157:8;
159:23,25;160:5;
166:24;175:15;

178:12,14;240:14,15,
17;241:3;249:23;
255:1;267:7;270:17;
272:18;273:24;
276:22;281:11;
286:7;287:4;288:19;
291:23;292:1
**needed (6)**
26:4;107:25;167:3;
168:15;238:12;263:9
**needless (2)**
77:10;268:2
**needs (16)**
25:12,22;26:9;
45:1;66:20;108:7;
122:20;139:2;
161:16;181:7;
241:13;263:10;
266:4,23;275:8;
286:4
**negative (2)**
176:10;233:2
**negatively (1)**
227:14
**negotiate (8)**
67:16;68:12;70:8;
179:21,24;217:3;
224:12;236:4
**negotiated (10)**
109:5;124:15;
176:8;205:11;
216:16,17;217:10;
224:13;226:8;279:16
**negotiating (5)**
108:14;109:11;
146:13;210:4,10
**negotiation (13)**
20:17;44:21;67:2;
168:11,11,12,21;
187:12;209:2;211:8,
10;215:4;281:10
**negotiations (7)**
119:23;156:7;
166:13;167:19,24;
201:19;215:2
**NEIER (11)**
6:24;144:9,9,21,
24;145:1,6;146:1;
147:17;282:25,25;
283:12
**neighborhood (2)**
163:14;194:19
**neither (1)**
293:20
**nevertheless (1)**
87:6
**New (35)**
4:23;6:5,22;7:13;
8:5;9:15,23;10:5,14,
21,23;11:6;13:14,22;
14:6;19:21;20:1;
52:8;72:13;103:4;
118:24;128:15,17;

**Min-U-Script®**
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
**(25) mortgage-backed - New**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 325 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

131:12,17,24;173:7;
178:12,14;223:25;
241:22;244:17;
279:14;282:3;291:19
**news (1)**
202:8
**next (32)**
16:23;17:20;19:7;
22:3;29:13;39:9;
40:11;45:9;55:19;
61:15,16;66:14;
78:25,25;121:10;
136:1;143:25;158:2,
11,24;159:12;
193:17;198:20;
216:25;228:5;
234:10;235:20;
236:3;240:22;
277:14;294:9;295:2
**night (8)**
24:3;57:2;143:4;
148:16;149:10;
172:12;244:9;246:18
**nine (1)**
78:23
**ninety (7)**
42:16;54:15,19;
58:13;78:17;84:23;
245:7
**ninety-day (4)**
54:12;58:16;
122:10;141:12
**Nobody (3)**
87:3;255:4;268:3
**nomenclature (1)**
41:5
**nonassumption (1)**
278:15
**nonconfidential (1)**
261:24
**nonconsensual (3)**
108:16,21;109:22
**nondebtor (6)**
16:4,9;19:4;50:5;
56:6;57:25
**nondebtors (6)**
16:18,19;17:23;
18:15;20:15;31:8
**nondisclosure (2)**
205:12;253:11
**none (2)**
201:17;203:9
**nonetheless (2)**
103:21;106:17
**non-GA (1)**
33:11
**nongovernment (1)**
32:9
**nonpayment (1)**
213:9
**nonpublic (3)**
234:7;238:12;
253:13

**nonsale (1)**
274:16
**nonsolicit (1)**
179:15
**nonsolicitation (3)**
179:20;294:19,20
**noon (2)**
23:7;268:13
**Nor (2)**
206:7;293:20
**Nora (36)**
7:21,25;39:17,18,
23;40:5;48:1,2,4,5,8,
11,11;49:5,16,23;
50:4,10,21,23,25;
51:3,23,25;52:5;
60:12;73:14,16,19,
24;74:4,7,10,13,15;
75:7
**Norm (1)**
30:1
**North (1)**
9:4
**note (8)**
43:13;55:1;105:9;
111:8,13;150:23;
278:17;287:14
**noted (4)**
90:14;189:17;
197:22;198:22
**Noteholders (2)**
7:11;117:1
**notes (14)**
37:2;41:7,11,20,
22;42:3,14;54:2,11;
113:9;114:19;
289:10,12,13
**noteworthy (1)**
37:13
**Notice (16)**
4:10;24:14;26:21,
22;28:16;31:4,6,24;
42:8;59:14;63:5;
282:6;284:20,22,23;
286:2
**notices (1)**
161:4
**notified (1)**
228:7
**Notwithstanding (4)**
49:18;100:1;177:3;
197:22
**November (3)**
282:20,20;288:9
**number (58)**
15:3;19:12;21:20;
24:13;30:4,4,7;34:7;
36:24;38:10;40:14;
48:12;62:18;84:6;
92:14;95:10;97:4;
109:14;121:12;
140:13;156:14;
157:9,10,21;158:5,7,

16,19;159:5,8,17;
160:1,2,3,11;161:22;
163:22;164:23;
168:24;170:3,6;
173:23;174:25;
175:4;180:11;
182:25;188:3;
190:21;194:18;
200:20;211:15;
239:10;251:15;
274:23;286:23;
290:6;291:1,8
**numbers (4)**
25:16;101:8;
135:16;185:1
**numerical (1)**
184:22
**numerous (1)**
41:9
**nuts (4)**
184:13,18;253:25;
254:3
**NW (1)**
7:4
**NY (14)**
4:23;6:5,22;7:13;
8:5;9:15,23;10:5,14,
23;11:6;13:14,22;
14:6
**NYHAN (6)**
12:16;266:11,11,
18,21;267:3

---

# O

**Oakwood (1)**
164:1
**oath (3)**
183:20;248:3,5
**object (8)**
112:9,16,19,25;
148:3;219:15;
220:12;288:9
**objecting (3)**
25:16;83:3;115:17
**objection (121)**
30:8;31:19;35:15,
22,24;36:22,25;
38:15;39:17,19;40:1;
42:24,25,25;45:12;
46:1,3,15,16,19;47:6,
10,11,12;48:1,2;
50:14;52:1;55:3;
60:12,12;64:6;67:20;
71:18;72:24;73:10;
74:12;75:7;100:13;
111:8;116:3;120:23;
138:23,24;141:2,22;
148:12;151:5;
155:20,22,25;156:9;
157:23;158:8;
184:11;187:19;
188:7;189:24;190:3;

195:7;197:11;
199:11;202:2;206:3,
18;208:12,13;209:10,
15;210:6;212:11;
213:7,24;214:3,10,
19;215:11,17;
219:18;220:12,20,23,
24;221:3,11,17;
222:12,21;223:14;
224:9;225:14,23;
226:9,14;227:15,25;
231:4,8;236:7;
237:23;239:4;240:1,
11;241:1,9;243:20;
262:2;274:20;278:3,
4,13,16;279:18;
280:13;282:5,13;
283:19;285:17,18;
291:24;295:6
**objectionable (1)**
53:19
**objections (34)**
23:6;26:1,24;28:3;
30:11;34:14;35:8;
39:16;40:4;41:11;
42:22;43:4;45:7;
53:24;64:9;74:11;
85:7;123:12;141:23;
148:9;154:9;155:15;
156:5;157:19;158:6,
17,20;159:6;160:13;
243:19;246:6,7;
275:15;279:8
**objective (1)**
27:4
**objectors (6)**
96:14;228:21,21;
262:9,12;288:1
**obligated (1)**
49:23
**obligation (4)**
31:19;64:24;
213:16;226:19
**Obligations (14)**
4:2;42:4;49:9,11,
20;50:5;59:18;62:25;
69:23;214:18;
226:18;284:7,10;
285:1
**observation (1)**
277:11
**observing (1)**
184:13
**Obtain (9)**
4:6;63:24;68:5;
70:23;84:19;240:15;
241:4;255:2;263:10
**obtained (2)**
43:25;97:21
**obtaining (4)**
44:7;66:25;143:15;
146:7
**obviously (38)**

17:7,16;28:8,23;
33:14;45:18;95:4,8;
96:7;99:23;107:7,16;
109:15;110:6;116:7;
119:1;123:2;143:10;
144:15;145:19;
155:21;164:14;
165:3;168:10;
174:18;233:19;
267:13,18,23;271:14;
274:2;276:18;
285:20;291:3;
292:11,15,16;294:25
**occasion (1)**
89:14
**occur (7)**
164:5;213:14;
226:2;268:10;
282:10,15,19
**occurred (4)**
80:20;225:12,22;
249:9
**occurring (3)**
210:14;226:1;
292:13
**occurs (1)**
82:21
**o'clock (5)**
118:15;293:6,6;
295:15,17
**October (8)**
164:6,7;281:2;
282:15;288:4,6,8,10
**odd (1)**
124:24
**odds (1)**
135:9
**off (30)**
24:7,8,24;26:22;
50:17;53:6,15,17;
64:19;66:1,4,13;
72:13;82:8;96:7;
101:21;112:25;
116:17;127:4;
132:25;135:21;
155:8;159:16;
192:15;208:9;
219:19;225:11;
252:18;278:20;283:5
**offer (34)**
119:14,21;120:2,6;
131:24;134:9;136:5;
145:5;146:22;
147:11;149:10,12,20;
157:4;158:3,12,25;
159:13,20;160:6,7;
182:5;187:2;189:17;
234:23;235:24;
246:20;251:7,10,18;
261:7;264:3;269:22;
283:5
**offered (4)**
153:4;189:14;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 326 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

251:4;258:14
**offering (3)**
  247:15;250:14;
  260:8
**offers (5)**
  234:1;268:9;
  272:23;273:16;
  294:20
**Office (7)**
  9:12;14:3;32:20;
  85:4;155:18;274:14;
  275:22
**officer (4)**
  157:5;219:10;
  235:18;256:18
**officers (2)**
  16:4;18:18
**Official (2)**
  8:3;19:16
**officially (1)**
  195:9
**often (3)**
  41:3;141:22,25
**oftentimes (1)**
  141:23
**OLSON (5)**
  11:11;76:11;146:3;
  183:13,23
**Omaha (3)**
  231:21;232:11;
  293:11
**ombudsman (9)**
  156:13,18;159:3;
  274:21;275:10,18,23;
  276:25;277:12
**omission (1)**
  210:13
**omitted (1)**
  111:21
**omnibus (1)**
  36:22
**once (8)**
  29:2;190:25;
  223:23;259:7,8;
  260:23;272:16;
  290:22
**One (158)**
  8:15;10:13;11:5;
  12:13;15:8;16:14;
  17:24;19:6,20;22:15,
  17,20;23:12,25;
  24:16;25:4;26:16;
  27:21;29:4;30:24;
  33:25;34:1;35:14;
  39:15;44:5,12;47:6;
  52:9;54:3;55:25;
  57:17;62:7;64:8;
  65:5,17;66:22;67:7;
  69:9,18,25;73:20;
  75:21;78:12;80:1;
  81:5;82:3;84:18;
  85:14;86:9;89:13;
  90:1,24;92:12;94:2,

19;95:10;97:4;98:15;
105:10;112:23;
113:10;114:1;118:5,
22;119:15;120:5,10,
10,12;125:6;126:4;
127:5;130:4;132:5,7;
133:10,11;138:13,13;
141:7;146:6;147:19;
151:7,23;152:21;
153:4;156:19;
161:19;163:20;
165:22,24;166:16;
167:4;170:8;173:13;
174:3,25;175:25;
176:10;177:9,25;
178:11;180:7,12;
181:4;182:25;
184:15,21,23;188:17;
193:12;195:4;196:9;
198:7,8;205:6,19;
206:25;211:14,15;
217:10;223:12;
228:24;233:23;
239:11;243:11;
247:16;249:16;
251:4;252:22;
254:12;256:25;
259:6,7,14,20;
264:22;267:18;
268:16;269:7,11,20;
271:1;273:18;274:3;
276:17,19,21;279:9,
15;281:23;283:18;
286:13,21;288:14;
290:7,10;293:14
**O'NEAL (1)**
  10:17
**one-and-a-half (1)**
  237:18
**one-page (2)**
  234:25;244:6
**ones (4)**
  17:25;42:23;
  159:23;286:25
**one's (4)**
  78:1;117:23;
  130:22;133:9
**ongoing (4)**
  66:19;94:1;169:8;
  267:22
**only (52)**
  17:18;33:6;35:22;
  36:8;41:21;43:18;
  44:18;45:23;46:21;
  50:2;58:7;64:9;65:9;
  84:9;86:13,24;111:7,
  13;113:5;114:20;
  118:4;124:9;127:5,
  23;128:19;138:13,
  13;144:14;146:21;
  150:7;166:17;
  167:13;179:10;
  187:25;188:11;

189:18;190:17,18;
195:14,14,17;196:6,
9;252:13;261:25;
263:12;269:7;
278:14;279:11;
281:8;284:5;290:12
**onsite (2)**
  107:8;168:9
**open (8)**
  69:6;81:19;120:7;
  175:22;181:10;
  190:24;197:17;
  272:16
**opening (2)**
  26:7;217:10
**operated (1)**
  200:14
**operates (1)**
  254:19
**operating (1)**
  18:16
**operation (3)**
  51:13;145:18;
  241:21
**operational (1)**
  281:8
**operations (4)**
  201:24;237:10;
  239:11;241:19
**operations@escribersnet (1)**
  4:25
**operative (1)**
  148:10
**opined (1)**
  188:24
**opinion (18)**
  17:9,13;101:12;
  118:4;121:10;
  176:13;187:2,21;
  189:5,11,22;190:16;
  191:5;196:17;
  197:14;198:6,13;
  209:12
**opinions (2)**
  100:12;196:12
**opponent (1)**
  252:20
**opportunity (18)**
  15:12;31:25;38:14;
  39:5;75:9;76:14;
  109:23;116:4;
  153:12;168:23;
  173:10;176:11;
  177:16;179:5;
  266:25;267:16;
  286:16;295:3
**opposed (6)**
  78:20;119:7;
  131:10;195:4;
  226:25;266:24
**opposite (1)**
  144:14
**opposition (9)**

28:14;89:9;95:14;
96:4;110:13;116:23;
118:12;188:20;
242:18
**opted (1)**
  238:7
**optimal (1)**
  231:15
**option (6)**
  104:5,6,6;110:2;
  150:3;291:6
**options (2)**
  59:6,10
**order (135)**
  32:16,19,22;33:7,
  12,18;34:13,16,22,
  24;35:25;36:19;37:2,
  3,5;38:5,6,17,18,21,
  23,24;39:6;41:10;
  42:11,16;44:22;45:2,
  2,20;46:5,5,10,14;
  47:1,3,16,17;49:6,11,
  17;52:15;53:16,19;
  54:5,13,19;55:2;56:2,
  9,11;58:5,8,9,14,18;
  59:16,18;60:14,15,
  19;61:4;62:10,12,19,
  23;64:9;67:7,12,18;
  68:18;69:14;70:5;
  71:10,20,21,22;
  72:18;74:1;75:9,11,
  15;79:24;80:11;81:7;
  83:11;90:6,16;91:9,
  10,14,17;104:15;
  108:17;110:1,9;
  111:16,18,22,23,23;
  112:4,10,15,18;
  113:1;121:10;
  123:16,19;148:22;
  154:25;159:24;
  191:6;198:25;204:6;
  208:1,3,7,8;209:13;
  245:7;257:15;276:6;
  278:2,6,25;279:17;
  280:2;282:12;
  284:19;286:12;
  288:21;289:21,22;
  294:11
**ordered (1)**
  107:20
**orderly (2)**
  268:15;269:24
**orders (6)**
  33:18;37:12;38:13;
  48:17;50:2;70:23
**ordinarily (1)**
  21:19
**Ordinary (2)**
  4:3;123:14
**organizations (1)**
  166:25
**organized (1)**
  295:11

**orientation (1)**
  88:13
**original (15)**
  18:2;85:7;128:18;
  149:15;152:19;
  155:15;166:15;
  185:3,17;186:24;
  193:22,25;194:6;
  202:15;292:19
**originally (6)**
  18:10;19:2;35:6;
  134:15;262:23;
  280:25
**originate (1)**
  145:21
**originated (1)**
  226:21
**origination (13)**
  29:21;30:3;31:14;
  34:6;61:4;149:11;
  152:13;178:23;
  222:2;227:9;241:24;
  244:18;246:22
**originator (1)**
  210:13
**others (10)**
  7:21;29:5;81:16;
  82:4;125:24;163:24;
  270:3;278:22;280:6;
  288:12
**otherwise (12)**
  21:21;46:10;82:9,
  16;91:19;137:16;
  139:2;164:20;
  195:11;208:21;
  266:5;285:5
**ought (5)**
  26:2;74:8;123:16;
  287:17;291:8
**ourself (1)**
  164:15
**out (74)**
  27:3;28:16;33:15,
  25;41:24;44:6;45:1;
  51:21;57:1;58:24;
  59:6;61:1;12;67:7;
  71:4;78:9;79:20;
  84:7;95:14;102:23;
  103:6;104:13,18;
  109:25;113:14;
  116:11;118:17;
  120:25;122:21;
  123:5,14;125:21;
  137:19;142:18;
  146:15;148:4;
  150:24;151:1,23;
  160:12;165:17;
  166:6,7;174:17,18;
  176:16;180:24;
  182:2,2;184:19;
  191:6;198:5;200:14;
  202:12;204:12;
  205:13;210:23;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:                                                                Case No. 12-12020(MG)
RESIDENTIAL CAPITAL, LLC, et al.                                                 June 18, 2012
                                Pg 327 of 342

222:20;232:11;
238:7;253:4;259:14;
263:14;264:13;
267:7;268:6;273:11;
275:25;276:16;
279:20;283:5;
286:19;288:5;291:20
**outcome (10)**
189:2,12,21;190:1,
18;191:5,13;192:4,
25;193:4
**outline (2)**
36:4;97:18
**outright (1)**
233:13
**outs (5)**
125:25;126:1;
127:9,10,13;137:25;
178:25;199:10
**outset (2)**
105:13;124:22
**outside (3)**
48:18;168:7;
223:17
**outstanding (9)**
35:9;40:22;41:2;
77:25;156:9;260:13;
274:19;284:5;285:4
**outweighed (1)**
62:16
**over (31)**
17:24;25:23;30:9;
32:11;55:7;75:18;
84:7;95:21;104:15;
118:6;135:15;136:1;
140:24;142:24;
143:7;147:18,24;
152:14;169:12;
172:14;184:15,21,23;
191:20;206:25;
212:21;216:17;
220:1;259:15;283:5;
285:11
**overall (2)**
233:2;259:10
**overbid (8)**
129:2,4;132:14,14;
170:8;172:3;193:18;
206:17
**overbids (3)**
129:3;206:9,14
**overflow (2)**
24:8;69:11
**overlap (1)**
25:7
**overly (2)**
65:6;111:24
**overreached (1)**
154:25
**overrule (1)**
208:18
**overruled (22)**
40:2;60:12,13,21;

74:12,14;85:15;
185:7;195:8;197:12;
199:12;202:3;206:4,
19;213:8;221:4;
223:15;226:14;
227:16;238:2;
242:10;262:3
**oversee (1)**
107:19
**oversubscribed (1)**
65:5
**overwhelmingly (1)**
117:22
**owed (1)**
47:21
**owes (2)**
114:4,24
**own (9)**
78:7;147:10;
168:16;175:8;
199:17;239:11;
241:23;252:10;257:5
**owned (9)**
144:10;166:5;
233:9;240:5;250:15;
252:4;257:5,11;
289:13
**owner (4)**
214:15;222:19;
223:25;227:20
**owners (4)**
214:5;219:21;
222:9,10
**ownership (3)**
214:22;242:5;
259:6
**owns (2)**
133:18,19

## P

**Pacific (1)**
148:16
**page (26)**
69:9;72:8,9,18;
155:3;188:23,23;
191:19;208:3,5,6;
209:17,20;210:11,24;
224:21,24;244:20,21,
25;245:4,6,16,17,20;
278:5
**pages (1)**
90:18
**paid (6)**
51:16;64:19;69:24;
98:12;259:14,19,20,
23;260:18
**Papas (1)**
48:3
**paper (2)**
72:3;167:25
**papers (10)**
17:6,12;27:6;

73:25;111:12,14;
119:21;127:20;
128:16;151:24
**paperwork (1)**
51:10
**paragraph (27)**
54:5;59:24;68:18;
69:10,14;70:16;
71:20,25;72:6,17;
74:24;163:7;185:3,
16,18;186:6,24;
188:22;200:5,9;
202:15,23;203:17;
209:11;211:13,16,17
**paragraphs (10)**
71:23;72:21;157:7,
13,16,17,18,22,22,25
**parallel (4)**
77:8;107:3;245:20;
281:20
**parameters (1)**
106:3
**paraphrasing (1)**
284:22
**Pardon (2)**
89:21;215:14
**parent (12)**
50:12;104:20;
133:19;147:23;
165:11;168:13;
183:3;201:19;
202:11,14,18;205:19
**Park (5)**
6:21;10:4;11:5;
13:13,21
**parse (2)**
92:22,23
**parsing (1)**
92:19
**part (34)**
22:1;30:20;44:6;
45:15,17;55:1,4;85:6,
6;86:8;94:4;97:9;
101:15;113:2;
126:19;133:24;
135:7;144:17;
156:16;164:18;
203:2;208:6,7,22;
215:2;224:13;
233:11;235:10;
238:24;258:2;
263:15;286:10;
287:15;288:16
**participate (9)**
175:16;181:16;
191:15;202:5;
204:13;231:2,21;
255:14;267:25
**participated (3)**
143:13;196:7;
209:1
**participating (9)**
153:7;165:21;

166:9;200:3;201:24;
226:10;230:22;
231:6,24
**participation (1)**
182:13
**particular (19)**
80:17;83:9;145:9;
157:7,13,17;163:21;
176:9;177:8;180:1;
204:13,19;214:8;
216:20;220:7;
221:23;253:1;
254:13;285:18
**particularly (3)**
65:2;82:17;269:15
**Parties (58)**
4:9;15:12;19:4;
22:5;26:6;27:23;
37:15,21;47:3;54:6;
56:18;58:25;59:13;
65:18;68:13;77:2,22;
91:2,2;97:13,25;
100:4;102:16;109:9,
15,16,19;112:5;
115:11;116:3;
121:21;123:13;
126:7;130:4;138:13,
14,15,17,18,18,22;
141:7;142:21,21;
149:1;196:19;
221:14;268:11;
270:10;281:23;
283:7,9;284:24;
290:9;291:2,5;293:3;
294:21
**parties-in- (1)**
42:9
**parties-in-interest (6)**
24:14;103:25;
106:9;107:9;108:11;
116:8
**partner (3)**
156:24;162:23;
174:5
**Partners (2)**
162:21;230:17
**partnership (1)**
230:16
**parts (2)**
285:8,9
**party (29)**
21:17;22:17;25:13;
43:20,21;80:14;
90:13;106:18;
107:18,21,24;109:12;
112:8,16;114:20;
122:6;124:18;
137:25;138:4,15;
147:9;275:6;278:21;
280:9,23;282:17,18;
284:20;285:21
**party-in-interest (3)**
87:1;98:4,25

166:9;200:3;201:24;
**pass (1)**
151:2
**past (6)**
30:9;115:19;
191:20;224:8;243:8;
274:5
**path (2)**
202:1;233:1
**PATRICIA (1)**
12:8
**Patty (3)**
154:7;207:8;
277:25
**PAUL (5)**
6:16;12:24;150:22;
152:10;280:7
**pause (3)**
90:8;175:1;198:12
**pay (9)**
44:12;51:4;66:1,4,
13;68:3;79:11;
134:23;135:19
**payable (1)**
31:1
**paydown (2)**
68:6,8
**paying (7)**
31:13,23;200:15;
201:3;236:24;
259:24;284:2
**payment (9)**
32:1;62:25;79:12;
199:1;258:8,12,19;
259:3,14
**payments (13)**
32:4;33:10,11;
42:11;59:25;60:4,4,
213:16,20;221:2,22;
222:5,7
**PC (1)**
9:20
**peace (2)**
113:23;116:5
**Peachtree (2)**
8:16;12:21
**pendency (1)**
228:7
**pending (12)**
19:25;20:1;33:19;
34:23;39:16;40:3;
48:24;64:9;148:10;
194:15;258:4;283:15
**Penina (1)**
4:19
**Peninsula (1)**
230:17
**People (40)**
17:12;25:4;34:10;
39:25;48:20;51:19,
21;53:1;110:9,14;
115:25;124:17;
129:24,24;130:5,5;
135:20,24,25;137:18;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:                                   Pg 328 of 342                              Case No. 12-12020(MG)
RESIDENTIAL CAPITAL, LLC, et al.                                                                    June 18, 2012

138:2;139:24;
145:17;162:19;
166:15,20;167:2;
180:24;181:11;
191:14;204:7;205:9,
12;242:2;267:24;
269:1,1;279:7,8;
287:4
**per (1)**
259:8
**perceive (2)**
182:12,16
**perceived (1)**
258:15
**percent (14)**
62:6;98:7;133:18;
149:14;170:8,23;
176:17;193:12;
217:11;245:18;
256:25;289:10,13,15
**percentage (2)**
62:5,14
**perfect (1)**
238:6
**Perfectly (2)**
113:3;292:11
**perform (1)**
78:12
**performance (1)**
285:22
**performed (2)**
206:21;227:18
**performing (2)**
82:8;106:10
**perhaps (7)**
28:18;53:21;74:17;
120:23;147:10;
148:23;253:2
**period (23)**
36:18;42:14;47:2,
4,17;52:21,22;54:7,
13;58:16;62:23;
78:16;142:18;143:7;
153:17;179:15;
190:23;216:17;
231:11;281:3;282:1;
285:1;290:11
**periodic (1)**
32:4
**permission (4)**
144:11;161:12,13;
249:22
**permit (4)**
21:14;69:19;92:2;
190:4
**permitted (2)**
49:19;88:15
**person (3)**
107:25;108:4;
167:4
**personal (4)**
148:9;156:17;
218:8;248:19

**personally (3)**
174:2;184:3;
240:10
**personnel (1)**
178:7
**perspective (12)**
28:13;43:14;112:2;
132:20;135:19;
150:24;153:23;
168:1;176:19;259:5;
270:20;281:13
**persuade (2)**
68:7;120:4
**persuaded (1)**
66:17
**persuades (1)**
115:22
**persuasion (1)**
116:1
**pertains (1)**
211:20
**pertinent (1)**
23:20
**Peter (2)**
159:1,10
**petition (5)**
36:18;38:2;40:22;
42:16;60:18
**petitions (1)**
157:6
**ph (1)**
95:6
**phone (3)**
24:6;58:3;269:1
**phones (3)**
24:8;53:2,3
**physical (1)**
214:6
**pick (3)**
96:7;181:24;
204:23
**picked (1)**
180:15
**picture (1)**
50:16
**piece (1)**
167:25
**pieces (3)**
132:22;165:2;
166:18
**PII (1)**
156:11
**Place (32)**
9:21;19:22;34:22;
43:24;44:20;67:2;
74:1;83:5;84:3;
103:25;104:8,22;
107:19;109:8,10,18,
24;116:20;117:25;
122:13;123:19;
129:23;130:1;135:8;
141:21;185:3;188:6;
197:7;203:16;

206:13;247:9;290:8
**placed (3)**
213:22;221:6;
250:2
**places (5)**
74:24;94:10;102:4;
244:20,23
**plain (1)**
86:23
**plaintiffs (5)**
19:21;20:13;23:17;
25:3;27:20
**plaintiffs' (1)**
20:18
**plan (34)**
20:17;24:4;44:3,8,
10,19;54:9;80:9,15;
83:3;84:21;98:8,12;
108:15,15,23;109:5,
9,12,22;115:15,20;
135:2,24;141:14,15;
152:24;153:3;
164:17,18;170:14;
175:24;271:17;
295:16
**Planet (7)**
36:22,25;37:1,4;
45:9,10,24
**planning (3)**
27:7;137:21;169:8
**plan-related (1)**
43:23
**planted (1)**
51:22
**plate (2)**
28:21;275:20
**platform (17)**
124:16;134:16;
145:22;147:7,18,25;
149:11;152:14;
166:19;169:25;
178:22;197:8;
246:22;255:10;
271:6;286:24;291:9
**play (11)**
43:12;71:4;108:1;
119:9;120:19,25;
124:21;173:15;
230:8;270:5;272:22
**played (3)**
78:9;102:23;108:2
**playing (1)**
153:9
**plays (1)**
135:17
**Plaza (2)**
10:13;11:5
**PLC (1)**
6:3
**pleading (3)**
86:24;87:5;275:4
**pleadings (4)**
41:4;78:19;140:25;

157:6
**please (21)**
15:2;53:6;55:12;
61:9;105:21;162:5,8;
183:18;185:12;
186:25;207:23;
218:16;224:20;
229:1,4,10;235:20;
244:5;248:2,11;
249:20
**pleased (1)**
70:13
**plus (5)**
61:22,24,25;245:2;
258:18
**pm (18)**
23:19;24:14,16,18;
26:25;121:6,6;
183:17,17;248:1,1;
265:15;268:9,13;
269:1;270:12;
273:16;295:19
**podium (6)**
15:20;34:21;35:2;
55:12;75:25;156:23
**point (75)**
17:20;18:9;32:10;
37:19;42:13;44:6,13;
47:9,22,24;60:25;
62:5,14;63:16,17;
68:22;73:24,25;
78:25;83:10;84:10,
11;92:16;94:15;
100:15;105:16;
109:20;115:12;
119:24;130:23;
133:6,20;139:14;
145:8;148:22,25;
151:23;154:12;
164:2,11,25;166:13;
169:14;174:21;
180:13;182:21;
200:5;204:2;209:11;
215:3;216:24;
230:12,13;243:8;
244:23;245:14;
249:4;251:15;
253:17;254:12;
257:14,19;258:7,25;
259:15;260:7;
265:12;266:21;
267:7,8;269:14;
270:9;277:18;
287:14;292:2
**pointed (3)**
33:25;150:24;
151:1
**pointing (1)**
69:5
**points (17)**
27:14;51:24;62:6;
72:25;73:2;84:10;
104:13,18;111:14;

125:14;136:9;
172:18,20,20;195:3;
211:10;283:17
**policies (3)**
18:15;274:25;
276:13
**policy (6)**
137:17;203:12,14;
251:19,21;275:6
**pool (6)**
65:23;150:10;
152:21;153:5,12,16
**pooling (9)**
212:6,19,22,23;
214:15,21;219:13;
220:3;223:1
**poor (1)**
126:11
**portfolio (19)**
134:11,14,16,20;
135:7;136:8;149:6,7,
18,22;153:20;
193:21;245:12;
247:16;271:12;
272:13,23;273:3;
283:3
**portion (4)**
62:20;68:3;69:19;
166:17
**posed (1)**
124:3
**positing (1)**
109:17
**position (40)**
28:9;51:12;55:18;
68:6;76:22;83:5;
85:10,15,18;86:18;
92:9,10;95:3;98:23;
107:25;111:6;
115:10;116:6;133:7;
137:14;142:12;
145:4;156:13;
162:22,25;165:15;
190:22;217:10;
222:23;230:3,6;
231:15;233:3;
237:13,17;240:18;
267:17;270:5;
282:10;290:13
**positions (2)**
25:4;50:15
**positive (4)**
69:3;176:10;
193:15;271:4
**possession (4)**
18:20;61:17;214:6;
221:13
**possibility (4)**
78:10;153:2;165:1;
237:20
**possible (31)**
23:13;122:20;
130:2;152:22;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 329 of 342
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020(MG)
June 18, 2012

164:20,23;167:3;
184:7;189:2,11,21,
22;190:1,8,17,17,18;
191:6,6,14;192:4,25;
193:4;225:21;242:1;
244:2;267:10;282:9;
283:8,8;291:2
**possibly (1)**
144:6
**post (2)**
24:13;213:10
**post- (2)**
283:20;287:2
**post-approval (1)**
65:12
**post-auction (1)**
152:3
**post-closing (2)**
283:24;284:8
**Postpetition (1)**
4:6
**post-petition (6)**
31:9;38:3;46:25;
60:4;79:25;181:7
**potential (33)**
32:15;57:16;67:21;
85:23;88:13;100:3;
164:9,12;165:6,17,
22,24;179:4;180:3;
195:22;196:4,11;
202:16;204:25;
205:7;213:2;223:17;
226:17;243:14;
255:9;257:24;281:9;
282:3;290:10,13,21;
291:15,25
**potentially (9)**
81:10;109:11;
181:15;186:22;
190:21;232:9;233:8;
272:17;291:25
**pounding (1)**
136:7
**power (5)**
50:7;92:6;94:7;
95:20;96:17
**POWLEN (1)**
9:8
**practical (6)**
64:17,19;66:24;
101:1;104:7;105:22
**pragmatic (1)**
68:1
**pre (1)**
283:23
**pre- (4)**
60:17;231:6;
256:24;283:20
**pre-assumption (1)**
278:20
**pre-bankruptcy (5)**
202:6;231:2;232:3,
5;233:11

**precedent (3)**
49:16;103:12;
105:18
**precedes (1)**
86:7
**precise (2)**
93:22;123:16
**precisely (1)**
19:18;66:8;108:9
**pre-clearance (1)**
290:12
**pre-closing (2)**
284:21;285:1
**preclude (2)**
46:10;276:6
**precludes (1)**
275:9;294:15
**precluding (1)**
145:9
**preclusion (1)**
294:24
**prefer (3)**
140:19;161:17;
233:13
**preferable (1)**
92:7
**preferably (1)**
25:1
**preference (10)**
57:14;101:4,5,6,8,
13,19;104:7;111:5;
156:17
**preferential (1)**
52:1
**preferred (2)**
43:19;102:1
**pre-fund (1)**
257:24
**prejudge (2)**
270:17;283:6
**prejudice (1)**
104:3
**prejudiced (2)**
149:20;153:19
**preliminary (4)**
17:10;22:24;23:5,
22
**pre-mark (2)**
25:14,15
**pre-marked (1)**
25:19
**premature (1)**
122:12
**premise (1)**
96:14
**premised (2)**
108:16;198:13
**preordain (1)**
43:22
**preparation (1)**
116:19
**prepare (1)**
97:18

**prepared (17)**
71:9;74:2;81:22;
82:24;90:1;142:10;
143:8;148:19;
156:12;172:15;
201:14;246:19;
266:13,14;271:24,25;
280:9
**pre-payment (1)**
223:10
**pre-petition (16)**
43:24;56:13,20;
58:6,10;59:17;79:25;
89:16;97:14;104:19;
110:25;124:22;
181:6,9;182:16;
230:23
**pre-sale (2)**
152:3;278:15
**Prescribing (1)**
4:9
**presence (1)**
166:6
**present (9)**
22:6;57:13;125:10;
167:12;168:24;
172:25;173:10;
217:23;250:14
**presentation (10)**
76:18,19;161:9;
173:11,12,13;174:6,
11;203:22,24
**presentations (1)**
168:3
**presented (4)**
37:22;38:6;77:6;
174:14
**presenting (1)**
35:5
**presents (1)**
150:25
**preserve (4)**
55:25;56:4;57:25;
278:19
**preserved (2)**
278:15;289:17
**preserves (1)**
60:17
**preserving (2)**
46:6;124:10
**press (2)**
232:8;269:7
**pressed (1)**
48:15
**pressure (1)**
70:25
**presumably (1)**
176:14
**presumption (4)**
117:12,18;118:5,7
**pretty (6)**
35:14;89:24;
239:19;276:12,12;

294:18
**prevailing (2)**
282:17,18
**preview (3)**
19:6,14;21:5
**previous (2)**
73:20;250:6
**previously (11)**
119:16;152:13;
179:11;182:25;
198:5;207:2;234:19;
244:13;245:16,17;
255:14
**price (45)**
65:25;125:21;
126:1;127:16,21,21;
128:6,13,23;129:3;
131:6;132:10,10;
142:15;143:9;
146:21;148:19;
150:7;169:22;
170:25;171:13,14,24;
172:17;174:22,23;
176:9;178:2;188:1;
192:24;194:14,18;
236:24;238:13;
245:1,3,18;247:15;
265:5;268:2,2,23;
269:13;270:2;279:23
**prices (1)**
135:10
**pride (1)**
184:7
**primarily (1)**
212:20
**primary (5)**
40:17;41:25;42:23;
46:16;151:4
**priming (1)**
40:25
**principal (6)**
18:3;21:8;45:14;
60:6;119:22;283:2
**principles (1)**
113:16
**printed (3)**
26:22;27:3;28:16
**prior (21)**
36:13;41:18;42:20;
87:9;119:7;165:10;
204:5;210:14;219:1;
225:12,22;226:2;
248:25;252:13;
254:8;275:13;278:8;
282:15,19;284:11;
286:2
**priority (1)**
24:2
**privacy (9)**
88:14;159:3;161:4;
274:21;275:10,18,23;
276:13;277:12
**private (3)**

32:9,12;230:17
**privilege (4)**
112:22,25;123:11,
12
**privileged (3)**
83:11,21;103:22
**pro (1)**
283:15
**probably (19)**
27:25;43:16;52:23;
61:5;118:16;134:2;
150:2;163:14,22;
166:3;168:14;
181:23;210:21;
230:12,13,21;235:1;
268:13;277:13
**problem (19)**
22:19;28:8;33:25;
40:9;67:21;75:2;
88:4,13;107:10;
114:3;131:8;155:23;
266:1;284:3,14;
285:2;287:7;292:12;
295:3
**problematic (1)**
112:2
**problems (3)**
107:8;116:15;
141:18
**procedural (1)**
285:19
**procedure (8)**
63:19;123:23;
157:3,15,18,20;
245:7;286:15
**procedures (46)**
64:1;75:19,21;
76:5;118:18,21;
120:17;129:13;
141:3;145:10;
152:19;154:19,19;
155:15;160:25;
179:20;181:21;
185:2,4,22,25;186:3,
5;196:21;208:3,7;
209:1;211:19,22;
214:2;242:2;245:22,
24,25;268:21;275:9,
14;278:14;279:19,
22;280:3,24;283:20;
284:19;285:6;286:2
**proceed (24)**
25:9;26:11;27:5;
61:8;76:3,18,19;
98:3;104:1;106:5;
108:11;161:20,21;
162:7;215:24;
248:10;257:15,16;
261:14;264:4;
268:17;272:20;
291:12;295:14
**proceeding (11)**
19:9;23:18;24:12;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 330 of 342

Case No. 12-12020(MG)
June 18, 2012

26:12;29:5;67:4;
106:5;147:20;154:4;
164:13;230:9
**proceedings (7)**
48:12;53:5;163:16;
180:9;231:3,7;
295:19
**proceeds (3)**
66:19;68:2,11
**process (180)**
44:3,11;54:16;
63:13;65:14,19;71:4;
79:14,20;82:10;90:5,
10,15;97:25;100:20;
101:25;102:2;103:3,
4,16,25;104:1,8,16;
106:21;109:7,10,10,
22;114:18,22,25;
116:19;117:24;
120:1;124:13,14,25;
125:2;126:8,16,19,
20;128:2,11;129:6,
12;130:4,9,24;
131:10,19,21;133:5,
13,17;134:1,5,6;
137:15,22;138:7,17,
20,21;139:2,4,18;
141:5,6,12,15,18;
143:13,14,21;145:15,
15;151:7,11;153:2,7;
164:21;165:3,5,11,
13,17,21;166:9,12;
168:14,21;170:16;
172:6,20;176:15;
177:18,19;180:7,21,
23,25;181:6,7,7,9,24;
182:13,16,18,22;
184:4,10,14,19;
190:10,17,18,20,25;
191:2,4,12,15;
195:17,18;196:6;
200:3;202:9,21;
204:5,6,8,13;206:2,
13,15,23;211:20,21,
22,24;213:14;
230:23;232:3;
233:12;238:7,8,10,
24;242:4,16;253:16;
255:15,17;265:9,12,
14;266:1,4;267:6,6,
21,25;268:15,18,19;
269:10,25;271:17,17;
276:1;277:20;281:5;
283:6;285:4,19;
290:8;291:4
**processes (1)**
165:10
**produce (1)**
22:21
**produced (5)**
51:16;90:17;91:19,
20;107:1
**product (3)**

124:10,14;209:4
**production' (1)**
91:16
**products (1)**
16:14
**professional (3)**
82:4;88:9;184:7
**professionally (1)**
147:5
**professionals (11)**
79:23;80:10;81:6;
88:3,6,10,22;107:11;
122:2;123:1,5
**progress (1)**
113:22
**progressed (1)**
114:8
**prohibit (1)**
32:1
**prohibited (1)**
88:16
**projected (1)**
223:10
**projection (1)**
98:10
**projections (1)**
32:3
**prominent (1)**
105:11
**prompted (1)**
85:6
**promptly (1)**
109:19
**proof (1)**
156:19
**proper (1)**
121:22
**properly (2)**
80:13;222:16
**property (4)**
18:11,13;63:1;
284:11
**proposal (55)**
108:21;128:15,15,
17,17;131:12,12,18,
25;143:20;155:8;
171:8,21,23;172:22;
173:3,9;179:8,18;
186:1;194:1,4,6,7,10,
11,15,16;201:10,10,
16;233:21;235:5;
244:3;246:17;247:7;
249:14;250:9,12,17;
251:24;252:3,14,20;
253:1;254:8,13,16;
256:22,25;261:3,5;
274:4;278:17;286:1
**proposals (9)**
48:15;54:14;
201:20;203:5,9;
236:23;249:11;
269:2;270:1
**propose (1)**

84:15
**proposed (59)**
15:5,24;30:2;33:2;
37:9;38:7;43:11;
49:6;53:16,18;64:14;
69:14;75:14;78:16;
82:13,20;89:11;96:6;
97:13;106:20;
111:11,16,18,22,23,
23;119:18;128:22,
23;137:6;156:6;
157:1;158:4,13;
171:10;172:23;
173:19;178:20;
182:4;184:14;185:4;
186:1;187:9;188:10;
191:22;203:8;208:9;
215:24;243:10;
246:1;248:9;256:10;
278:6,11;282:12;
284:18,23;288:20;
289:21
**proposes (1)**
111:25
**proposing (2)**
201:6;258:8
**prospective (1)**
177:10
**prospects (1)**
108:14
**protagonists (1)**
98:3
**Protection (16)**
4:9,9;36:10;42:10;
46:13,21;47:4;50:14;
57:3,8,16;59:25;60:3,
13;156:10;268:3
**protections (2)**
134:24;135:13
**protracted (1)**
292:1
**provide (24)**
32:3;36:15,16;
42:1;43:18;63:2,3;
67:18;75:10;78:20;
82:1;84:17,21;116:7;
134:21;140:22;
156:12;164:8;
188:18;202:24;
203:9;207:16;271:6;
294:12
**provided (12)**
25:21;42:6,9;58:8;
69:24;136:10,13;
163:15,19;174:15;
195:10;230:2
**provides (3)**
121:17;284:19,24
**providing (2)**
36:17;42:2
**provision (13)**
31:4;46:5;56:11;
60:6,8;64:22;67:6;

70:18;85:10,18;
149:19;210:10;
275:15
**provisions (9)**
71:21,24;117:8,8;
154:10;176:14;
214:23;279:6,7
**PSA (5)**
212:12,12;214:8;
222:19;271:17
**PSAs (6)**
212:7,9,12;215:3;
222:10,24
**public (17)**
82:22,25;83:6,18;
98:9,13;103:23;
125:17,20,22;234:8;
252:15;254:3;
261:25;262:4;
263:12;269:9
**publicly (3)**
199:6;253:3,7
**published (1)**
100:12
**pull (2)**
28:6;219:25
**pulling (2)**
133:15;169:10
**punch (1)**
220:11
**Puntus (7)**
174:7
**purchase (51)**
125:21;126:1;
128:6,23;129:3;
132:10,10;147:4;
148:19;160:17,21;
169:15,22;170:25;
172:16;192:24;
193:21;194:14,18;
199:1;201:3;203:8,
11;209:7;210:4,11;
212:19;214:16;
215:2;227:21;
233:21;238:13;
243:9;244:14,17;
245:1,3,11,18,21,23;
246:3;250:17,19;
251:1,4;255:9;
257:20,25;272:12;
279:23
**purchased (6)**
95:12;152:13,14;
159:2;177:5;188:11
**purchaser (3)**
177:10;223:24;
227:24
**purchasers (1)**
212:8
**purchases (1)**
202:17
**purchasing (1)**
201:24

**pure-play (1)**
113:24
**purported (1)**
283:20
**purports (4)**
155:8;208:9;209:8;
225:11
**purposes (5)**
152:4;157:20,24;
212:9;291:14
**pursuant (6)**
16:5;170:14;
179:22;212:6,7;
286:2
**pursue (3)**
51:3;99:7;146:16
**pursued (1)**
96:24
**pursuing (2)**
82:15;202:1
**purview (2)**
202:12,19
**pushed (2)**
183:3;277:2
**pushes (1)**
292:21
**pushing (2)**
198:1;201:1
**put (36)**
37:19;43:23;44:20;
56:24;62:10;97:19,
19;109:10;128:16;
136:8,12;143:14;
148:11;156:24;
173:20;184:4,8;
185:3;190:21;194:1;
206:13;218:23,24;
226:17;236:23,23;
237:14;263:24;
268:6;269:2,22;
276:15;282:5;
288:20;290:8;293:18
**putting (1)**
280:2

## Q

**qualifications (1)**
162:17
**qualified (5)**
145:2,16,20,23;
147:24
**qualify (1)**
196:20
**qualitative (26)**
125:3;130:14;
131:3;132:17,24;
133:3;136:22;140:5;
144:17;145:13;
146:23;151:2;152:6;
177:24;179:3,5,8;
184:24;185:1;195:3;
263:1,13;269:12;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.    Pg 331 of 342    Case No. 12-12020(MG)
June 18, 2012

272:22;273:6;280:12
**qualitatively (1)**
147:14
**quality (1)**
151:13
**quandary (1)**
267:4
**quantitative (6)**
125:2;130:14;
131:4,4;132:17;
263:2
**quarter (1)**
62:4
**quarterly (1)**
237:7
**quick (5)**
116:4,5;126:12;
146:4;283:17
**quickly (16)**
54:16;66:10;78:13;
97:11;108:1;116:23;
145:15;148:22;
151:8;168:5;205:9;
235:24;272:18,19;
283:9;289:6
**Quigley (2)**
17:2,7
**quite (15)**
23:10;24:1;44:20;
71:5;78:24;97:3;
103:4;124:19;
182:20;200:20;
201:25;237:11;
255:16;268:1;275:20
**quote (1)**
93:21

**R**

**RACHAEL (1)**
8:10
**rails (1)**
82:8
**raise (4)**
119:24;162:3;
218:14;229:2
**raised (13)**
31:18;45:12;58:12;
62:18;64:6;103:20;
117:5;123:11,14;
128:23;155:25;
271:24;275:3
**raises (2)**
23:1;129:15
**raising (2)**
165:3;172:16
**ramifications (3)**
146:18,19;178:18
**ran (10)**
125:1,2;126:19;
133:5,13;165:11;
180:23;181:8;
190:10;230:16

**range (1)**
170:25
**rapid (1)**
79:21
**rare (1)**
76:22
**rate (5)**
61:22,24,25;62:4,5
**rates (3)**
31:5;62:3,16
**rather (14)**
63:14;66:17;68:5;
100:12;124:24;
141:17;147:12;
150:4;189:23;201:2,
25;205:3;278:11;
283:10
**rating (1)**
199:20
**Raugh (1)**
95:5
**RE (2)**
4:5,6
**reach (11)**
30:19;53:23;61:9;
90:9;108:21;109:20,
21;145:16;148:4;
166:7;233:10
**reached (11)**
52:11;66:6;72:19;
85:13;89:23;120:22;
180:24;204:12;
205:13;216:20;
265:18
**reaches (1)**
109:12
**reaching (2)**
109:13;264:13
**react (2)**
138:15;176:13
**read (27)**
17:6;28:13;46:7;
60:14,19;67:20;69:8;
73:24;76:15;80:3;
117:1,5,6,14;124:18;
127:20;140:1;
209:17;210:9,21,22;
269:7;272:10;
275:17,18;276:6;
279:8
**reading (1)**
50:11
**ready (4)**
266:17;277:6;
290:17;292:9
**real (9)**
43:17;63:21;69:2;
73:16;92:1;113:23;
165:13;261:6;265:7
**realistic (2)**
109:6;267:23
**reality (1)**
100:2

**realize (2)**
36:12;287:7
**really (61)**
17:25;18:6;19:12;
27:21;39:22;44:2;
51:12;64:17,25;
65:14;66:5;71:5;
78:8;79:4,13,16;
80:21;87:11;89:14;
94:12,23;95:15;
96:13;97:12;99:12,
16;100:16;101:20,
23;102:1,14;103:4;
117:23;126:5;129:6;
130:10;131:5;135:2;
138:6;140:21;
145:14;146:8;152:2;
164:18;166:6;
167:21;168:15;
176:17;178:12;
188:5;202:13;
268:25;269:19,21,23;
272:25;277:18;
280:19,23;282:5;
291:13
**reapply (1)**
175:20
**reason (10)**
65:11,16,25;91:15;
112:3;135:19;
196:23;278:19;
279:11,24
**reasonable (8)**
36:12;71:1;117:13;
138:6;197:9;216:13;
237:20;292:19
**reasonableness (1)**
170:20
**reasons (8)**
21:9;43:15;102:25;
133:3;164:24;207:1;
261:11;263:15
**rebuttal (4)**
26:9;118:15;
120:13;262:15
**recall (21)**
163:4;169:18,19,
22;170:12;171:15,
16;201:12;204:14,
16;208:21;215:10,12,
15,16;216:5,8,9,11,
13;235:6
**receipt (1)**
172:22
**receivables (1)**
46:19
**receive (8)**
46:20;80:25;88:19;
111:20;196:12;
261:3;270:11;271:4
**received (33)**
19:8,21;26:25;
30:8,10,11;53:16;

81:11;128:14;158:1,
9,22;159:10;160:19,
23,25;161:2,4,6;
172:12;182:23;
183:4;195:9;236:11,
13;241:6;246:10,12,
14;260:17;271:18;
289:16;291:10
**receiving (5)**
18:19;21:6;37:23;
246:17;274:9
**recent (3)**
17:7;100:10;
161:12
**recently (2)**
17:1;242:16
**recess (10)**
76:6,8;118:14;
121:4,6;183:10,15,
17;247:25;248:1
**recharacterize (1)**
42:10
**recharacterized (1)**
60:5
**recited (2)**
172:25;174:5
**recites (1)**
56:11
**recognize (1)**
66:24
**recognized (1)**
17:1
**recognizing (1)**
97:13
**reconciliations (2)**
284:11,12
**reconsider (1)**
264:25
**reconvene (1)**
269:21
**record (24)**
27:17;36:22;37:6,
20;46:8;48:9;54:3;
69:8;73:18;117:21;
150:23;151:13;
159:15,25;160:5;
161:13;173:4;177:3;
234:18;290:21;
291:8,15,18;292:3
**recording (1)**
53:4
**recoupment (7)**
46:11,18,23,25;
71:19;72:20,23
**recovery (5)**
41:17;185:5,23;
186:18,22
**recross (1)**
217:17
**redacted (1)**
83:20
**Redirect (5)**
215:22;216:3;

228:12;261:19,21
**reduce (6)**
143:9,9;148:19;
149:13;186:1;246:25
**reduced (9)**
62:9,16;137:6;
149:15;172:1,3;
194:23;269:15,17
**reducing (5)**
186:17,18,21;
193:15;217:14
**refer (1)**
30:4
**reference (5)**
95:7;181:8;200:18;
235:5;275:3
**referenced (2)**
189:5,8
**references (2)**
93:4;242:8
**referencing (1)**
172:13
**referred (5)**
41:3,3;89:19;
199:23;233:7;289:11
**referring (7)**
49:6;71:23;72:14;
185:16;213:9;
224:21;250:7
**refers (3)**
87:16,18;187:6
**reflect (2)**
189:1;191:13
**reflected (4)**
52:15;93:3;100:11;
245:24
**reflects (1)**
110:1
**reframe (1)**
221:17
**refusing (1)**
100:17
**regard (5)**
72:1;152:3;165:8;
179:12;281:16;
282:3,4
**regarding (17)**
20:15,16;31:3;
85:7;122:8;155:20;
156:5,10,11;164:9;
168:18;170:19;
180:8;216:7;250:5;
255:9,18
**registered (1)**
202:10
**regularly (1)**
237:8
**regulated (5)**
175:10;177:1;
239:13;240:6;248:24
**regulation (1)**
239:14
**regulations (2)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 332 of 342
Case No. 12-12020(MG)
June 18, 2012

160:3;177:7
**regulatory (2)**
239:8,15
**reimbursement (27)**
119:11,20;128:6,
10;129:4;132:12,13,
22;135:13;139:13;
141:10;142:16;
149:19;150:9;
153:21;170:9,14;
172:2;189:1,8,15,21;
190:9;191:8;193:7;
264:18;270:2
**reiterate (1)**
40:1
**rejected (2)**
201:20;235:25
**relate (2)**
157:14;221:9
**related (7)**
16:11;47:7;58:10;
154:15;178:23;
222:2;281:7
**relates (2)**
93:7;210:22
**relating (6)**
20:12,14;23:2;
244:18;274:16;285:1
**relation (1)**
18:22
**relations (1)**
176:21
**relationship (5)**
137:8;147:22;
175:6;221:14;222:4
**relationships (2)**
104:19;177:12
**relative (1)**
173:19
**relatively (2)**
239:22;268:24
**release (5)**
46:10;58:6;108:16;
109:16;152:22
**releases (4)**
20:16;59:16;89:24;
108:22
**relevance (2)**
19:13;219:16
**relevant (15)**
19:10;21:3,7;95:1;
116:8;140:6;146:8;
147:2,11;158:5,15;
159:4;230:9;270:3;
277:18
**reliability (1)**
199:24
**relied (1)**
131:4
**relief (7)**
16:7,22,24;21:18;
38:7;58:8;77:5
**relies (1)**

220:13
**rely (4)**
70:17;168:7;
198:25;220:6
**remain (5)**
33:19;156:9;
172:18;226:7;247:8
**remained (2)**
172:21;274:19
**remaining (4)**
38:2;45:1;61:11;
259:2
**remains (4)**
34:22;38:6;274:6,7
**remark (1)**
169:1
**remedy (1)**
107:10
**remember (2)**
224:15;260:14
**reminds (1)**
51:17
**remove (1)**
19:5
**removed (2)**
42:3;47:16
**render (3)**
93:8,9;107:6
**rendered (1)**
92:21
**renewed (1)**
104:3
**reorganization (3)**
79:15;109:5,6
**rep (9)**
223:17;224:1,2,3;
226:18,20,21,25;
227:8
**repair (1)**
148:23
**repay (2)**
64:24;260:9
**repayment (2)**
66:23;126:15
**repayments (1)**
66:23;126:15
**repeat (4)**
182:14;184:17;
186:4;203:7
**replace (7)**
57:4;63:12,22,24;
65:13,17;171:8
**replaced (1)**
182:4
**replacement (3)**
41:20;44:15;180:8
**replacing (1)**
180:12
**reply (5)**
27:8;84:13;119:4;
124:18;275:19
**repo (1)**
41:23

**report (24)**
24:19;25:1;52:23;
78:15,17,20,20;
82:23,25,25;83:6,18,
23;84:22;100:20;
107:6,12,14;111:20;
114:5;116:12,19;
122:9;283:8
**reported (2)**
202:8;265:17
**reporter (1)**
25:15
**reporting (7)**
32:4;36:16,16;
42:2;63:3;222:23;
270:15
**reports (2)**
84:9;295:13
**represent (5)**
50:20;51:10;109:2;
124:9;152:11
**representation (2)**
70:17;102:16
**representative (1)**
122:3
**representatives (4)**
196:1;244:2;249:6,
7
**represented (8)**
19:23;37:24;67:1;
84:6;98:6,14;99:22;
289:14
**representing (6)**
25:2;53:9;195:11;
207:9;256:10;266:12
**reps (1)**
233:7
**Repurchase (1)**
4:1
**repurchases (1)**
223:17
**reputation (2)**
146:17;177:4
**request (13)**
15:11;19:20;22:4;
57:24;61:17;69:15;
87:1;9;94:16;97:1,
20;99:2;112:16
**requested (3)**
30:25;44:1;281:2
**requesting (1)**
46:2
**requests (9)**
19:8,10,12;21:7;
22:15,20;48:17;
100:19;112:8
**require (13)**
18:17;21:15;53:23;
77:14;85:11,21;
87:14;93:20;97:6;
108:13,14;188:17;
240:20
**require' (1)**

91:3
**required (32)**
23:12,21,25;25:11;
40:18;41:17;66:1;
68:12;70:4;81:7;
86:23;90:23;97:14;
118:4;121:20;
122:19;126:14;
134:20;140:3;
151:16;175:14;
178:8;186:7;187:12,
13;199:1;202:24;
203:9;254:22;
272:12;273:4;275:19
**requirement (6)**
42:3;64:2;186:2;
203:6;277:13;291:12
**requirements (4)**
93:19;94:4;177:22;
274:25
**requires (5)**
63:7;64:18;81:10;
102:19;115:6
**requiring (3)**
66:3;69:23;275:9
**requisite (3)**
70:3;165:4;195:6
**ResCap (47)**
57:3;164:8,9;
165:7;180:11;
200:17,21,22;202:1,
13;205:20;223:19;
230:11;231:16;
232:8,9;233:1;234:1,
3;235:19;236:22;
237:5,13;241:4,8,19;
250:12,14,18,19,20;
251:7,13;253:11;
256:18;257:1,5,12,
16,21;258:5,17,22;
259:6,23;260:18;
261:24
**ResCap's (2)**
164:12;237:10
**reservation (5)**
30:11;32:14;47:15;
56:1,24
**reservations (1)**
58:24
**reserve (11)**
38:17;49:10;52:21;
74:11;104:2;223:20,
21,23;224:2,3;276:5
**reserved (2)**
47:3;74:14
**reside (1)**
96:17
**resided (1)**
202:14
**Residential (12)**
15:3,6;53:11;
157:5;160:18,22;
173:14;200:14;

252:4;253:18,22;
254:23
**resides (1)**
92:17
**residual (1)**
41:22
**resolution (18)**
33:20,20;36:4;
37:15;44:6;45:10;
53:14,15,17,24;
67:20;71:18,22;
72:17,19,22;116:4;
273:17
**resolutions (2)**
36:2,3
**resolve (14)**
21:4,16,25;28:11;
41:11;61:10;62:20;
123:15;279:20;
280:4;285:17;286:1;
288:12;289:21
**resolved (26)**
23:15;30:15,17;
35:7,7,11,12,15,24;
41:12,14;42:14,24;
46:4,15,19;64:5;
73:11;151:12;156:6;
276:5;279:8;280:1;
281:12;286:3;295:7
**resolves (1)**
278:2
**resolving (2)**
38:1;91:21
**Resources (1)**
137:8
**respect (91)**
24:20;29:8;32:15;
34:6;38:11;39:1;
45:8;46:3,6,12;47:2;
48:23;49:7,9,13;
50:2;52:7;55:2;
56:10;57:16;58:6,7,
12,23;59:15;60:11,
23;64:10;66:20;
71:13;72:19;73:5;
74:3;75:13;78:19;
79:3;82:2,15,17;
85:17;86:9;88:15,16;
96:9;106:15;109:16;
114:8;118:20;121:9,
24;122:15;123:10;
145:4;146:11;148:1,
25;149:2,11;152:20;
153:16;155:19,22;
170:11;173:15;
176:1;178:25;
196:24;197:1;209:8;
214:5;220:15,19;
221:22;222:23;
225:20;231:16;
245:23;247:3;
258:12;259:1;
272:23;273:3;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 333 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

274:19,19;275:17,19;
278:12,24;279:25;
280:1;291:1
**respectful (1)**
104:12
**respectfully (3)**
99:11;101:19;
104:10
**respective (1)**
284:19
**respects (2)**
108:5;292:20
**respond (7)**
19:10;166:1;172:7;
176:14;206:9;
232:20;236:2
**responded (3)**
171:19;201:9;
266:24
**responding (1)**
294:20
**response (15)**
85:5,6;131:12,18;
152:9,18;172:9;
201:13;235:23,23;
236:13;246:19;
261:3,5;285:17
**Responses (3)**
23:6;26:19,24
**responsibilities (1)**
163:1
**responsibility (1)**
261:1
**responsible (1)**
259:1
**rest (7)**
155:22;228:18,19;
262:12,13,17,18
**restricted (1)**
234:5
**restrictions (1)**
83:22
**restructure (1)**
164:21
**restructuring (2)**
162:23;164:9
**restructurings (2)**
163:5,10
**result (7)**
62:8;63:22;184:24;
214:22;227:8,22;
257:4
**resulted (1)**
249:11
**results (3)**
68:11;184:4,9
**resume (3)**
183:10,16;247:25
**retain (7)**
79:24;80:11;87:24;
88:4,24;104:16;
122:3
**retained (9)**

164:3,7,8;204:2,4;
210:12,12,19,24
**retaining (1)**
251:25
**retains (1)**
224:8
**retention (2)**
85:20;88:5
**return (2)**
259:3;268:11
**Revco (6)**
86:12;92:24,25;
95:5;101:10,12
**reverse (1)**
62:3;286:12
**review (14)**
19:14;34:13;38:14,
17;75:9,14;76:14;
77:7;104:18;208:6;
209:13,16;212:12;
252:15
**reviewed (2)**
32:19;204:5
**reviewing (2)**
201:13;253:3
**revise (1)**
172:15
**revised (5)**
130:13;138:9;
145:5;173:1,7
**revolver (8)**
41:3,8;61:25;62:4,
8,9,12;66:20
**RFC (1)**
210:18
**rid (2)**
135:23,25
**right (189)**
15:2;21:13;22:9;
24:6,9;27:16;29:25;
30:22;32:24;33:17;
34:5,15;37:7;38:17,
21;39:1,4;40:7;42:9;
45:6;46:11;20;49:3;
57:23;59:7;60:11;
61:8;70:11;71:12;
73:4;75:4,14;76:2;
81:4,18;83:5;89:5,9;
93:15,24;94:8,21;
96:21;99:2;103:7;
109:8;110:12,19;
113:4;114:14;
116:22;118:14;
120:6;121:4;129:9,
16,24;130:2;144:3,4,
8;147:14;148:23;
150:12,18;151:2,6,
17,20,22;154:3;
155:11;159:9;160:6,
10,15;161:15;162:3,
5;173:17;179:21;
183:9,14,15,18,19;
185:2;186:9;187:7;

190:13;193:18,20;
194:8,9,21;195:6;
196:23;197:24;
198:21;199:20,23;
200:11,25;202:23;
204:17;205:5,15,24;
206:6;207:5;210:3,
18,21;211:6,9,19,23;
212:4,8;213:19;
216:18;217:25;
218:14,16;219:11;
220:18;222:4,9;
223:22;225:9;
226:24;228:11,14,18,
21,25;229:2,4;230:8;
233:4,10,19;234:10;
235:20;236:8;237:9,
20;238:16,19;240:8,
13;241:14;242:1;
243:1,2,5,21;244:5,
15;245:4,9;246:8;
247:24;248:2;
249:10;251:2,8;
254:19;256:16,18,19;
257:1;260:11;
262:17;264:9,20,21;
265:22;267:2,11;
270:21;271:16;
274:5;276:20;
278:22;279:4,16;
282:8;292:13
**rights (37)**
30:11;32:15;35:20;
36:8;41:16;46:3,6,18,
23,25;47:3,15;50:14;
52:21;55:25;56:1,3,5,
6,10,24;58:1;60:17,
20;63:4;65:25;71:19;
72:23;112:19,25;
169:12;212:14;
223:4,7,25;276:5;
289:17
**RINGER (1)**
8:10
**ripen (1)**
260:5
**rise (1)**
39:25
**risen (1)**
22:7
**risk (5)**
82:5,7;155:10;
197:3;199:4
**risking (1)**
133:15
**risks (1)**
127:14
**RMBS (6)**
50:17,24;51:17;
52:9;58:23;279:15
**road (5)**
107:22;110:11;
112:5,7;153:15

**robust (5)**
133:5;138:17;
144:22;145:11;
292:21
**role (10)**
108:1,2;122:16;
182:11,15;211:9,23;
219:9;230:8;270:5
**rolled (1)**
217:12
**rolling (1)**
103:5
**romanette (2)**
225:1,16
**room (6)**
24:8;34:10;254:6;
290:16;292:6,8
**rooms (1)**
148:24
**rose (1)**
51:19
**Rosenbaum (10)**
29:20;30:1,2,17,
24;33:22;34:19,21,
25;35:2
**roughly (4)**
193:16;237:16;
249:9;252:14
**round (1)**
170:5
**routinely (1)**
222:15
**Rubin (1)**
4:19
**rule (7)**
55:24;86:13;87:14;
90:3;118:16;121:8;
215:17
**Rules (7)**
21:15;122:21;
123:6;160:3;239:12,
15;249:21
**ruling (1)**
123:10
**rumors (1)**
232:8
**run (21)**
21:10;129:6;
130:24;138:21;
139:19;141:13;
147:5,25;151:7,8;
165:12;181:10,24;
191:3;202:21;204:8,
13;230:23;239:10,
13;254:22
**running (7)**
54:4;130:2;138:11;
204:6;290:19;292:7,
9
**rush (1)**
71:21

**S**

**Sachs' (2)**
203:22;204:5
**sake (1)**
73:8
**sale (57)**
44:11;63:15,18;
65:23,24;66:3,5;
69:19,21,22,24;
70:23;71:4;75:21;
118:18,20;126:14;
136:1;152:22,23,24;
158:4,13;159:2,19;
160:25;164:12;
165:1,6,10,13;201:2;
211:22;231:2,7;
232:3;233:12;
242:18;250:3;
257:17;275:5,6,13;
277:15;278:3,6,9,16;
281:1;282:2,10,14,
19;286:1,3;288:7;
291:23
**saleable (1)**
165:9
**Sales (25)**
4:2;31:10;42:19;
63:7;64:18;66:22;
123:23;124:8;157:3,
15,18,20;162:14;
185:4,22;208:3,7;
211:19;245:7;
262:22;278:2;
279:19,22;284:17;
291:24
**same (48)**
16:15;17:19:18,23;
22:3,25;36:15,16;
41:7;42:2;55:17;
63:3;77:13;79:5;
83:25;85:13;90:25;
91:1,7;95:11;99:13;
107:12;115:21;
117:22;122:24;
126:1,1,2;128:21;
139:14;145:21,22;
171:13,14;172:18,21;
191:19,23;197:6,8;
201:15;203:16;
218:25;242:2,2;
292:14,18;295:12
**Samuel (6)**
158:3,9,13,22;
161:14;162:2
**sanctity (2)**
138:20;206:22
**SANDLER (2)**
9:20;27:19
**sat (2)**
59:7;80:7
**satisfaction (2)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 334 of 342

Case No. 12-12020(MG)
June 18, 2012

36:13;41:18
**satisfactorily (1)**
　123:13
**satisfactory (4)**
　34:17;58:16;70:20;
　123:6
**satisfied (9)**
　38:5;40:6;44:11,
　18;45:4;96:18;
　119:17;191:2;289:18
**satisfy (2)**
　64:1;274:24
**satisfying (1)**
　177:20
**Savings (1)**
　9:3
**saw (7)**
　20:5;38:22;66:2;
　124:20;141:18;
　289:20;291:21
**saying (20)**
　133:9,10,16;135:8;
　140:1;177:14;
　179:19;181:15,17;
　195:4;198:17;201:9,
　10;203:2;212:14;
　229:11;236:4;245:2;
　265:22;267:9
**scale (1)**
　184:9
**scare (1)**
　283:5
**scares (1)**
　133:12
**scenarios (1)**
　232:17
**schedule (12)**
　23:24;24:5,11,17;
　26:19;76:3;97:12,17;
　103:5,7;111:12;
　292:19
**scheduled (3)**
　23:4,6;24:16
**schedules (8)**
　21:19;48:17;73:22,
　25;74:1,10;228:2,4
**scheduling-wise (1)**
　27:23
**scope (16)**
　19:7;29:3;80:3,13;
　85:20;86:2,13;87:21;
　90:12;106:2,20;
　108:8;121:22,24;
　122:8;208:14
**scratch (2)**
　78:3;287:2
**se (1)**
　259:8
**SEAN (1)**
　10:17
**seat (3)**
　162:5;218:16;
　229:4

**seated (3)**
　15:2;183:18;248:2
**SEC (2)**
　237:4,5
**Second (23)**
　7:22;17:1,3;18:16;
　20:2,9;26:22;28:16;
　39:15;52:25;53:23;
　55:2,5;58:12,25;
　98:18;105:6;111:22;
　114:18;152:23;
　180:13;237:25,25
**secondly (1)**
　234:2
**Section (9)**
　16:5,6,36:8;95:7,7;
　101:22;156:5;
　244:25;275:12
**sections (1)**
　157:16
**Secured (25)**
　4:7;7:11;35:20;
　37:21;40:24;41:7,7;
　54:2,10;57:15,17,18;
　80:1;82:17;97:10;
　98:7,24;99:19,13,
　24;114:19;126:9;
　183:6;289:10,12
**secures (1)**
　41:8
**securities (2)**
　16:12;118:8
**Securitization (10)**
　11:4;31:13;32:9;
　53:12;54:25;55:3;
　226:22;227:10;
　278:5,12
**securitizations (3)**
　32:10,13;175:17
**security (3)**
　117:10,20;262:4
**seeing (3)**
　122:22;145:12;
　289:22
**seek (9)**
　21:4;42:10;62:24;
　63:9,11;66:18;69:17;
　97:7;114:21
**seeking (14)**
　16:8,23,24;17:22;
　21:17;36:13;41:18;
　58:10,15;60:13;80:4;
　143:15;165:17;271:5
**seeks (1)**
　40:19
**seem (12)**
　44:24;52:12;76:24;
　80:12;100:22;167:3;
　194:21;268:15;
　271:7;276:3,4;
　294:21
**seemed (2)**
　124:24;268:19

**seems (6)**
　80:9,15;85:17;
　116:16;137:7;275:4
**select (5)**
　123:20;181:3;
　189:22;190:20;274:2
**selected (7)**
　120:3;131:10,11;
　138:4;191:1;206:17;
　237:21
**selecting (2)**
　125:3;263:20
**selection (1)**
　196:3
**sell (3)**
　42:19;127:1;
　164:20
**seller (1)**
　198:1
**selling (3)**
　99:12;153:3;
　198:15
**sending (1)**
　116:16
**senior (3)**
　117:1;168:8;233:8
**sense (13)**
　18:1;78:5;107:3;
　109:9;110:13;
　112:13;166:23;
　181:23;213:1;
　270:10;277:14;
　287:4;288:20
**sensible (2)**
　70:21;106:4
**sent (4)**
　131:9;201:15;
　235:5;244:8
**separate (7)**
　25:6;38:15;60:7;
　67:8;141:12;144:7;
　163:20;245:24;291:9
**separated (1)**
　153:25
**separately (1)**
　223:16
**September (5)**
　281:1,4,18;288:3,5
**sequences (1)**
　192:8
**sequentially (2)**
　192:17,18
**series (1)**
　239:6
**serious (4)**
　27:24;142:22;
　286:25;290:9
**seriously (1)**
　143:5
**serve (4)**
　153:5;187:3,9;
　189:14
**served (5)**

26:24;27:25,25;
28:10;182:19
**serves (2)**
　112:8;123:12
**service (9)**
　26:25;145:21;
　147:1,5;212:22;
　219:21;220:6,9;
　223:11
**serviced (4)**
　146:25;212:5,5;
　222:16
**servicer (15)**
　51:16;55:16;145:2,
　2,16,20;151:3;
　210:14;213:14;
　214:17;220:19;
　222:4,6,8;240:18
**servicers (6)**
　169:13;213:19;
　214:1;221:2,6,9
**SERVICES (7)**
　7:20;82:1,2;
　219:22;220:16;
　287:19,23
**Servicing (87)**
　4:3;31:15;32:12;
　35:20;45:13,16,21,
　21,23;65:24;66:15;
　133:16,25;147:7;
　149:11;152:14;
　168:10,12;169:12;
　178:22,23;197:7;
　212:2,2,6,14,19,24;
　213:14;214:6,9,15,
　18,21,23;219:11,12,
　13;220:4,15,16,17,
　19;221:13,15,19,20,
　21,24,25;222:1,7,11,
　15,20,24,25;223:2,4,
　7,9,12,13,25;224:8;
　225:4,9,20;226:1,15,
　24;227:8,12,18,23;
　228:6;241:19,24;
　244:18;246:22;
　254:23;257:10,17;
　265:5;277:18;
　279:18;281:7
**serving (1)**
　247:16
**set (14)**
　22:15;23:1;93:19;
　94:4;135:13,14;
　140:24;160:12;
　162:16;229:13,15;
　268:8,25;289:12
**SETH (1)**
　11:17
**setoff (10)**
　46:3,6,11,17,23,25;
　71:19;72:19,23;
　73:10
**sets (3)**

27:19;91:6;186:15
**setting (5)**
　54:18;122:10;
　126:20;169:21;
　283:10
**settlement (17)**
　42:5;79:12;89:18,
　23;114:3,6,8,15;
　115:1,4,6,9,11,15,19;
　116:9;152:23
**settlements (3)**
　50:6;77:15;78:22
**settles (1)**
　58:24
**seven (4)**
　163:21;172:4;
　264:8;275:13
**seventh (1)**
　200:9
**seventy (1)**
　133:18
**seventy-five (1)**
　42:15
**seventy-two (18)**
　128:8;170:6,7,17,
　24;172:1;187:7,17,
　22;188:1,5;189:6;
　190:8;193:6;216:7,
　15;217:14;269:17
**several (6)**
　29:4;42:17;84:4;
　90:4;140:25;287:19
**SEWARD (2)**
　1:2;54:24
**shadow (1)**
　116:15
**shall (14)**
　26:24;46:10;49:19;
　59:25;69:25;77:21;
　78:15;85:11,18,21;
　86:20;87:14;279:9;
　284:20
**share (5)**
　81:17;102:20;
　259:9;284:2;293:21
**shared (2)**
　18:15;68:25;80:18;
　81:15;82:4;88:9;
　293:15
**shareholders (2)**
　237:1;238:15
**shares (2)**
　143:20;283:19
**sharing (5)**
　30:21;88:22;
　259:10;260:24;275:3
**shed (1)**
　188:4
**sheet (4)**
　197:9;199:16;
　242:6,11
**shifting (1)**
　155:10;205:24

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 335 of 342
Case No. 12-12020(MG)
June 18, 2012

**shoe (1)**
143:25
**SHORE (22)**
7:17;54:1,1,22,23;
58:12,19,21,22;
110:16,18,21;113:6,
8,8,13;114:12,14;
115:13,14,18;116:2
**short (4)**
76:18;159:18;
191:6;268:24
**shortly (1)**
188:19
**shot (3)**
23:13,14;113:23
**show (14)**
129:25;130:5,6;
133:4;134:3;135:16;
137:19;140:4;
170:22;180:16,19;
191:17;288:24;
295:16
**showed (1)**
170:23
**showing (2)**
136:16;138:3
**shown (1)**
110:8
**shows (4)**
262:21,25;263:7;
266:2
**sic (3)**
31:5;164:15;
195:14
**side (3)**
79:2;174:19;
199:15
**side-by-side (1)**
174:19
**SIDLEY (2)**
12:11;266:12
**SIEGEL (14)**
10:25;52:8,8,14,16,
19;59:7;279:4,11,13,
14,14;280:5;288:12
**Siegel's (1)**
279:9
**sign (8)**
49:17;67:17;91:8;
112:3;187:13;
271:25,25;290:22
**signed (14)**
91:9,10,12,17;
112:18;119:15,15,16;
126:2;127:4;169:15;
199:7;222:2;243:16
**significance (1)**
99:10
**significant (22)**
21:6;37:25;90:9,
11;96:25;97:4;98:4,
16;99:5;109:14;
113:23;124:11;

141:19;142:9,17,19,
25;155:9;267:17,19;
280:12;281:6
**significantly (1)**
65:2
**signing (1)**
175:3
**silent (1)**
88:5
**similar (8)**
31:15;32:1;64:6;
106:3;175:8;242:1,4;
278:13
**similarly (2)**
7:21;193:20
**simple (4)**
177:6;194:12;
269:11;272:25
**simplest (1)**
79:11
**simply (16)**
45:20;57:25;86:11;
96:1;99:8,20;106:5;
109:17;174:17;
199:16;232:16;
244:25;245:1;260:5;
281:23;282:2
**simultaneous (1)**
66:3
**simultaneously (1)**
63:8
**sit (7)**
55:6;60:25;72:4;
134:7;206:25;283:7;
295:2
**site (1)**
237:7
**sitting (3)**
84:3;133:9,10
**situated (1)**
7:21
**situation (10)**
53:20;55:22;81:25;
93:5;96:21;125:24;
137:19;230:12;
234:4;237:13
**situations (2)**
49:12;217:6
**six (4)**
15:8;163:21;
165:19;166:15
**Sixth (2)**
92:24;200:9
**sixty (6)**
17:24;63:13,14,24;
65:12;246:24
**size (5)**
98:2;106:17;166:4;
269:8;283:3
**SKADDEN (3)**
6:2;68:16;74:20
**skeptical (1)**
294:18

**SLATE (1)**
6:2
**slightly (4)**
45:10;88:12;170:4;
202:12
**slow (2)**
87:11;114:18
**small (1)**
175:13
**smaller (2)**
101:14;187:10
**SMITH (3)**
6:10;150:22;280:8
**smooth (1)**
44:25
**so-called (1)**
242:15
**soft (1)**
176:18
**sold (6)**
64:23;66:10;95:13;
153:1;170:14,15
**sole (2)**
39:12;40:16
**solely (5)**
51:1;131:4,5,6;
227:12
**solicitation (1)**
166:12
**solicited (1)**
54:9
**solution (5)**
108:8;116:16;
152:2;201:2,3
**solve (1)**
75:2
**somebody (15)**
24:22;68:10;
129:25;138:24;
145:1,16,21;146:13;
148:10;150:3;
193:18;202:22;
218:24;220:13;
276:17
**somebody's (2)**
35:13;114:16
**somehow (1)**
106:11
**someone (11)**
39:25;91:13;
115:22;135:7;
137:20;139:24;
166:2;175:17;
277:21;279:1;281:21
**someone's (1)**
181:13
**sometimes (9)**
124:17;129:8;
213:19,22;214:1;
217:6;221:2,6,9
**somewhat (1)**
190:23
**somewhere (2)**

237:18;288:8
**Sontchi (1)**
92:10
**soon (4)**
121:25;122:2;
267:9;292:10
**sophisticated (1)**
198:14
**Sorry (28)**
34:12;40:8;53:7;
74:20;93:8,8;131:9,
15,17;134:19;136:5;
139:12;182:14;
184:17;186:3;
188:23;191:10;
195:24;203:7;
210:15;211:16;
220:22;238:4;
260:22;265:17;
277:25;289:3;293:1
**sort (3)**
17:24;18:1;36:7;
43:22;45:14;53:18;
79:20;80:8;82:1,8;
92:10;102:9;116:17;
124:20;166:5;
168:16;169:1;175:3;
176:9;177:12;
180:13,20;273:20
**sorts (1)**
147:21
**sought (4)**
77:5;78:18;89:24;
288:16
**sound (8)**
125:5;134:8;
136:13;137:24;
198:19;262:24;
263:19;268:20
**sounded (2)**
65:22;198:17
**sounds (7)**
75:7;138:11,12;
150:11;249:10;
271:5;291:10
**source (1)**
86:7
**sources (4)**
191:7,10;237:2,2
**South (2)**
11:13;12:13
**Southern (1)**
85:14
**SPALDING (2)**
12:19;152:11
**Spansion (1)**
94:14
**spare (1)**
117:3
**speak (20)**
20:22;25:4;39:19,
25;43:3;45:8;48:7;
71:17;85:1;89:5,9;

95:9;116:22;140:13,
16,19,20;254:11,13;
271:11
**SPEAKER (3)**
121:3,5;295:5
**speaking (4)**
26:18;240:17;
253:25;279:15
**speaks (1)**
95:16
**special (1)**
48:17
**specific (8)**
39:22;45:12;49:2;
86:4;179:12;209:11;
240:4;249:22
**Specifically (11)**
41:15;50:8;71:22;
74:2;85:8,14;165:14;
237:13;240:19;
256:21;278:4
**speculating (2)**
227:2;261:16
**speculation (2)**
199:13;261:12
**speed (6)**
48:14;82:6,16,17;
205:5;230:11
**speedier (1)**
79:21
**speeds (1)**
223:10
**spend (2)**
131:2;136:21,24;
137:3,4;286:25
**spending (1)**
18:23
**spent (16)**
90:19;126:22;
127:2,6,6,12;130:10,
18,24;133:5,25;
137:3;149:8;164:15;
195:13;287:3
**split (1)**
106:14
**spoke (3)**
148:8;195:14;
254:18
**spoken (7)**
84:13;143:16;
166:3;179:3;255:11;
282:23;294:6
**spots (1)**
176:18
**spun (1)**
50:17
**Square (2)**
6:4;281:23
**St (1)**
277:11
**stability (1)**
71:3
**stage (4)**

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

121:23;180:9;
266:19;273:16
**stages (1)**
18:5
**stagger (1)**
42:19
**staggering (1)**
21:2
**stake (1)**
94:24
**stakeholder (2)**
98:16;99:21
**stakeholders (5)**
108:22,24;109:14;
113:23;180:11
**stalking (97)**
63:12,14,25;64:1;
65:10,11,13,16,17;
119:7,19;120:3;
124:14;125:3,6;
126:6,19;129:10,13,
17;130:10,14;132:18,
24;133:6;134:8;
136:5;137:20;138:4,
9,15;139:20;147:12,
15;149:21;150:16;
151:15,25;153:5,7,
11,19;165:18;
169:15;170:11;
171:8;172:24;
173:19;177:18;
180:8,15,19;181:1,
18,24;182:4,19;
184:15,20;187:3,10,
16,23;188:10,15;
189:15,23;191:1;
194:16;196:4;
205:25;206:17;
207:3;237:21;
243:10,14;244:2;
246:1;252:20;
255:14;262:24;
263:3;268:10;269:5;
270:24;273:8;
280:10,23;281:17;
282:4,13,17,18;
289:3;290:12;
292:10;294:15
**stalking-horse (1)**
268:22
**stand (9)**
24:24;161:14;
162:2;192:14;
206:10;218:13;
247:17;266:23;295:2
**standalone (1)**
44:2
**stand-alone (1)**
241:21
**standard (3)**
115:6,25;119:12
**standards (2)**
115:21;129:19

**standing (10)**
51:25;58:15;99:13,
15,18,19;108:4;
177:14;220:11;273:7
**standpoint (5)**
67:22,23;99:6,8;
274:24
**stands (3)**
137:12;143:23;
281:4
**Star (11)**
12:20;135:15,17;
152:11,12;153:18;
194:1,2,10;271:20,23
**start (19)**
35:17;76:5;118:17;
120:17,19,24;124:5;
136:1;137:18;138:5;
139:25;151:11,24;
169:23;185:2;192:8,
9;208:2;244:16
**starting (6)**
100:15;134:4;
167:25;194:14;
281:23;287:2
**state (9)**
17:10;43:12;119:9;
120:25;173:15;
175:16;202:16;
240:23;241:3
**stated (6)**
26:23;149:3;
176:20;185:4;
278:16;293:2
**statement (11)**
26:8;54:18;58:20;
81:8;84:17;101:12;
116:10;187:11;
195:10;269:10;279:2
**statements (4)**
146:4;216:11;
228:4;237:8
**STATES (14)**
14:2,3;32:21;46:1,
8;73:7,8;76:25;85:4;
95:2;155:18;239:12;
240:24;274:15
**States' (2)**
46:6;73:9
**stating (1)**
225:18
**status (5)**
15:8,15,21;16:2;
24:11
**statute (19)**
85:21;86:1,4,5,8,
23,24;87:9;88:5;
92:2,6,16;99:1;102:9,
18;117:5,6,14;276:21
**statute's (2)**
276:12,20
**stay (19)**
16:3,8,25;17:3,22;

19:3;21:3;22:24,25;
23:5,22;26:23;44:9;
121:2;135:23;164:1;
197:16,16;263:16
**stayed (1)**
20:11
**staying (3)**
18:7;263:20;
264:15
**STEEN (2)**
10:11;116:25
**Stefan (3)**
156:25;215:23;
248:8
**step (7)**
22:10;24:3;97:7;
134:15;146:7;186:5,
5
**STEPHEN (1)**
8:9
**steps (2)**
255:1;263:11
**sterling (1)**
146:17
**Steven (1)**
41:12
**stick (1)**
169:3
**sticking (1)**
42:13
**still (20)**
35:8;38:21;45:17;
53:1;65:22;88:19;
105:8;132:18;
183:20;193:6;237:6;
248:3,5;260:2;
271:15;273:7,11;
281:4;295:2,14
**stimulate (1)**
97:7
**stipulations (1)**
54:6
**stock (4)**
90:15;145:18;
250:14;257:9
**stolen (2)**
50:18;51:5
**stood (2)**
168:13;267:5
**stop (7)**
39:13;42:6;54:13,
15;105:5;112:11;
138:24
**stop' (1)**
118:9
**stopped (1)**
237:5
**strategy (2)**
78:7;241:22
**STRAWN (3)**
6:19;13:11;55:21
**stream (4)**
212:20;213:2,5,6

**streams (1)**
51:15
**Street (10)**
4:22;6:12;7:4,22;
8:16;9:4,13;12:21;
13:4;14:4
**stretch (2)**
134:21,23
**Strike (4)**
194:5;217:5;
241:16;242:8
**strong (4)**
76:23;78:11;
206:16,20
**stronger (1)**
242:6
**strongest (1)**
79:13
**strongly (5)**
77:18;187:16;
201:1;233:23;267:21
**struck (1)**
98:10
**structural (1)**
153:23
**structure (11)**
101:25;109:18,18;
126:23;130:1;
152:20;184:4;223:1;
224:6,7;282:8
**structured (1)**
51:7
**structures (1)**
219:14
**struggling (3)**
96:13;100:14;
128:3
**stub (2)**
47:2,4
**stuck (1)**
235:1
**stuff (1)**
154:22
**sub (2)**
104:20;202:11
**subcommittee (1)**
167:6
**subject (33)**
34:12;37:5;39:5,
12;45:2,18;46:13;
56:12;58:15;60:1;
69:20,22;70:3,5;
72:21;74:15,23;
75:14;78:22;93:18,
19;94:4;119:8,10;
141:20;179:2;234:3,
10;239:14;240:3;
258:4;289:22;291:3
**subjects (3)**
122:24;205:24;
236:15
**submission (1)**
270:11

**submit (6)**
34:16;45:2;59:13;
99:11;104:10;270:10
**submits (1)**
143:23
**submitted (16)**
25:12;38:14,18,25;
68:19;112:24;
142:21;166:16;
171:7;208:15;238:5;
242:18;243:13;
244:13;252:19;
274:24
**submitted/Mr (1)**
112:24
**submitting (2)**
109:7;243:25
**subordinate (1)**
49:24
**subordination (8)**
56:6,12,14,15,17,
20;58:1;60:1
**subpart (2)**
210:18,20
**subpoena (1)**
97:20
**subpoenas (2)**
18:19;123:13
**subscriptions (1)**
65:4
**subsection (1)**
210:21
**subsections (3)**
86:7;92:25;101:10
**subsequent (5)**
65:8;206:2;230:10;
231:14;275:4
**subsequently (3)**
37:22;46:22;
105:15
**subservicing (3)**
15:10;29:20;
168:12
**subsidiary (2)**
164:10;241:22
**substantial (11)**
37:25;65:4;68:3;
71:3;98:23;108:18,
19;113:22;136:11;
271:6;283:4
**substantially (6)**
30:17;35:7,11;
165:1;166:18;269:18
**substantive (3)**
18:8;30:10;74:23
**subtleties (2)**
127:9;130:20
**succeeds (1)**
241:18
**success (1)**
177:4
**successful (11)**
62:3;109:6,8,23;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 337 of 342

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
June 18, 2012

151:18;154:20;
196:16;217:13;
271:2;285:24;286:8
**successfully (1)**
65:20
**successor (3)**
13:12;55:21;156:5
**sue (1)**
199:7
**sued (1)**
57:13
**sufficient (4)**
66:4,6;154:5;
282:17
**suggest (4)**
97:23;153:15;
187:15;196:15
**suggested (3)**
92:11;100:24;
203:11
**suggesting (3)**
109:3,4;287:17
**suggestion (6)**
100:1;105:20;
151:23;203:13;
273:15;286:21
**suggestions (1)**
232:20
**suggests (1)**
35:11
**Suite (4)**
4:22;6:13;9:5;12:5
**summarize (1)**
244:11
**summons (1)**
27:25
**Sunday (1)**
201:11
**superfluous (1)**
92:22
**Superpriority (6)**
4:7;36:14;41:18;
46:21;48:23;50:15
**supervise (2)**
106:9;122:16
**supplemental (8)**
124:18;158:12,18,
22;159:16;188:18;
192:3;200:2
**supply (1)**
31:3
**support (26)**
44:19;77:15;85:1;
89:7;94:18,22,25;
95:9;96:25,25;98:8;
103:25;115:8;
141:15;142:10;
157:5;158:3,13;
159:2;162:14;165:4;
177:2;179:1;182:24;
265:19;271:7
**supported (1)**
168:13

**supporters (1)**
76:24
**supporting (3)**
83:3;143:19;144:4
**supportive (2)**
126:8;240:18
**supposed (2)**
120:21;147:8
**sure (55)**
29:9;34:10;35:13;
39:16;40:3;41:12;
58:17;68:9;69:13;
83:1;88:20;101:11,
18;103:22;106:19,19,
21;114:22;115:11;
116:5;134:12;
136:18;140:9;149:2,
9;169:24;173:8;
182:15;185:9;
191:18;200:6;212:3,
25;213:18,21;215:1;
217:4;226:23;227:6;
230:5;234:15;240:7;
244:25;245:16;
246:2;247:13;253:4;
256:13,20;259:3;
263:9;265:2;268:8;
285:23;289:17
**Surprise (2)**
194:13;268:7
**surprised (1)**
169:1
**suspect (1)**
286:24
**Sustain (3)**
215:12;219:18;
220:10
**Sustained (23)**
184:12;187:20;
188:8;189:25;
209:15;210:7;
213:25;214:4,20;
220:8,12,21,24;
221:12;222:22;
225:15,24;228:1;
231:5;240:2,12;
241:2,10
**swirl (1)**
274:3
**switch (1)**
24:23
**sword (1)**
287:11
**sworn (5)**
162:4;195:11;
218:14,15;229:3
**syndicate (2)**
61:19;68:22
**syndicating (1)**
62:8
**syndication (2)**
62:2,7
**system (3)**

222:7,11,15

**T**

**table (17)**
53:15,18,22;59:6;
114:6,16;132:25;
136:7;143:14;
148:11;180:17;
236:23,24;263:25;
268:6;269:3,23
**tables (1)**
229:18
**tack (1)**
234:2
**tactic (4)**
78:3,5,7;87:7
**tail (1)**
154:19
**tailor (1)**
87:21
**tailored (2)**
22:15;28:10
**tailoring (1)**
29:9
**tainted (3)**
137:8;238:8,10
**takeaway (1)**
169:4
**talk (8)**
27:11;134:10;
138:19,19;195:3;
273:13;286:17;
294:11
**talked (10)**
100:18;113:21;
148:5,7;152:24;
195:23;196:10;
206:22;232:16;
291:13
**talking (11)**
73:23;115:3;
176:25;179:19;
181:6;186:6;194:17;
226:20;234:6;
279:24;281:6
**tall (1)**
108:17
**target (4)**
119:22;171:5;
195:19;263:23
**targeted (1)**
204:25
**tasks (1)**
168:16
**Tax (2)**
17:9;284:11
**taxes (1)**
213:16
**team (8)**
164:16;167:10;
168:8;177:11;197:7,
16;198:9;224:13

**technical (1)**
213:18
**Ted (1)**
229:1
**telephone (6)**
21:19,21;24:11,13;
61:10;76:6
**telling (1)**
133:16
**tells (1)**
118:2
**temporally (2)**
17:4,11
**ten (18)**
31:11;62:9;128:10;
149:13;163:23;
170:9;172:2,2;189:8;
190:9;193:9;195:1;
230:18;246:25;
263:24;272:3,8;
273:11
**ten- (1)**
247:24
**ten-minute (2)**
183:9,15
**tens (1)**
18:24
**tense (1)**
243:8
**tension (1)**
113:16
**tent (1)**
124:23
**term (12)**
61:22;62:1,10;
69:21,23;81:7;93:1;
94:18;109:7;187:6;
210:3;277:20
**terminate (1)**
209:8
**termination (1)**
42:9
**terms (42)**
27:22;49:18;52:11,
14;69:25;79:11;
84:14;87:9;93:22;
99:10;119:16;
128:21,22;138:9;
141:23;142:15,16;
143:15;154:25;
169:18;170:12;
171:10,12;173:1,5;
191:8,22;192:1;
196:5;199:8,24;
201:11;230:3;
239:17;241:19;
244:12,13;280:20,20;
281:10,24;288:13
**test (2)**
137:8;232:11
**testified (4)**
208:25;247:17;
250:5;253:10;

254:21;262:25;
263:8,9
**testimony (36)**
25:12,22;26:1;
120:13;140:10;
147:3;161:21;
195:25;197:14,19;
200:4;204:11,24;
205:11;208:16;
216:7,8,13;230:22,
24;235:4;236:17,19;
238:20;240:23;
243:5;247:15;
248:16;249:5;263:8;
266:2;269:8;272:9;
289:13;294:16,19
**testing (1)**
232:14
**Texas (1)**
155:1
**Thanks (3)**
34:4;207:24;
217:20
**That'll (2)**
33:19;143:25
**theirs (2)**
119:8;151:8
**theories (2)**
16:16;94:9
**theory (4)**
100:9;138:10,12;
153:8
**thereafter (1)**
269:4
**therefore (5)**
39:24;71:8;93:24;
103:11;175:6
**thereto (1)**
242:24
**thesis (3)**
92:11,13;95:19
**thinking (1)**
232:9
**third (9)**
18:18;43:19,21;
56:17;82:22;106:18;
107:24;180:14;275:6
**third-party (4)**
18:19;20:15,16;
108:16
**thirteen (1)**
16:13
**thirty (6)**
128:9,11;172:6,19;
288:4;290:6
**thirty-day (1)**
288:2
**THOMAS (6)**
10:16;11:18;76:10;
146:2;256:17;293:4
**THORNBURG (1)**
9:2
**thorny (1)**

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 338 of 342
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020(MG)
June 18, 2012

279:20
**thorough (4)**
80:9,12;137:21;
139:19
**though (5)**
19:1;61:12;87:8;
111:22;124:23
**thought (21)**
53:14;108:5;110:3,
4;124:4;127:24;
131:14;141:19;
144:11;165:9,20;
174:17;190:19;
191:13;233:2;234:2,
4;258:16;280:22;
282:16;288:8
**thousands (1)**
51:5
**three (32)**
18:6;27:19;35:5;
39:10;40:20;42:7;
70:5;90:2,17;98:1;
104:22;132:7;
139:15;149:14;
163:20;166:16;
168:25;170:23;
237:5;245:18;
251:15;257:19;
259:11,18,19;260:23,
25;264:6;282:10;
283:2;290:3;291:8
**three-part (1)**
137:8
**three-week (2)**
281:3;282:1
**threshold (3)**
93:6,7,17
**throughout (2)**
44:21;167:15
**throw (1)**
116:12
**throws (1)**
137:20
**thrust (1)**
92:19
**thumb (1)**
184:9
**Thursday (3)**
28:4,14;148:3
**tied (2)**
44:7;274:1
**tilt (1)**
142:20
**timed (1)**
26:5
**timeline (3)**
54:17;291:19;
292:14
**timely (1)**
106:19
**Times (3)**
6:4;181:23;283:2
**timetable (4)**

82:10,12,18,20
**timetables (1)**
71:2
**timing (10)**
86:2,13;121:24;
122:8;128:6;152:3;
187:13;280:14;
286:20;287:6
**today (64)**
28:21;33:6;37:14;
49:18;52:23;56:8;
60:24;61:1;63:23,24;
65:10;66:17,18;
68:20,23;91:14;
98:19;105:24;
107:20;108:3;
124:12;130:2;134:7;
136:12;142:4;
144:25;147:11,14;
151:2;180:17,19;
182:23;187:9,15,21;
188:2;192:15,16;
193:1,14;194:4,6;
197:4;198:12;
230:22;236:17;
240:23;244:21;
245:12,13;246:18;
275:21;276:5,15;
277:3,13;278:19;
280:9;281:22;
283:10;290:3,18;
291:21;292:2
**today's (1)**
30:5
**Todd (1)**
35:3
**together (11)**
28:6;84:18;133:22,
23;141:13;184:5;
198:10;264:8;274:1;
280:2;292:13
**toggle (2)**
141:15;271:18
**told (6)**
53:21;130:16;
166:8;247:15;273:5;
290:20
**toll (1)**
58:16
**TOLLES (6)**
11:11;76:11;
112:24;146:2;
183:13,23
**Tom (1)**
116:24
**TOMASCO (35)**
12:8;154:7,7,12,15,
17,24;155:7,13;
207:8,8,11,16,19;
208:1,17,19;211:2,6;
215:14,18;218:7,11,
18,25;219:5;220:22;
221:1;224:22;

226:10;228:10;
277:23,25,25;278:23
**Tomasco's (1)**
279:2
**tomorrow (14)**
33:6;61:2;134:4;
136:21,21;151:11;
265:15;268:11,11;
276:5;280:15,19;
295:12,16
**tonight (6)**
121:2;268:9,10;
273:13,16,17
**took (6)**
37:15;83:5;85:15;
104:21;124:4;140:5
**top (3)**
174:23;234:24;
245:17
**total (6)**
62:15;170:24;
259:11,12,18;264:18
**totally (2)**
57:5;268:20
**toward (5)**
79:14;82:6;97:12;
267:23;290:15
**towards (4)**
157:17;164:22;
201:18;250:12
**track (2)**
177:3;281:20
**TRACY (1)**
14:9
**traded (1)**
199:6
**trading (1)**
226:16
**traditional (1)**
104:14
**transaction (29)**
33:24;67:8;141:9;
142:10;144:5;
146:16,18,20;152:20;
163:21,24;190:22,24;
200:13;201:7;
205:10;230:13;
236:1;238:14;241:8;
257:3,16,17;258:2,
10,21;261:15;273:1;
294:6
**transactions (22)**
33:23;37:13,14;
65:8,12;77:8;79:25;
89:16;97:15;104:19,
21;111:1;140:24;
163:3,20;182:12;
197:3;199:24;
243:10,11;262:22;
269:8
**Transcribed (1)**
4:19
**transcript (1)**

53:6
**transcripts (2)**
25:25;100:11
**transfer (4)**
80:19;275:1,5;
281:7
**transferrable (1)**
175:18
**transferred (4)**
81:2,9;222:3;
223:25
**transfers (3)**
52:1;80:24;81:1
**transit (1)**
174:4
**transition (4)**
101:23;168:11;
287:19,22
**transitioned (1)**
164:25
**translates (1)**
70:8
**transmission (1)**
24:7
**transparent (3)**
181:10,25;190:20
**traveled (1)**
196:9
**Travis (1)**
6:12
**Treasury (1)**
167:1
**treated (1)**
44:2
**trials (1)**
26:5
**tried (4)**
28:4,5;68:10;202:7
**triggering (1)**
66:23
**triggers (1)**
64:24
**trouble (1)**
62:8
**true (6)**
37:21;112:17;
132:18;167:15;
200:10;235:2
**truly (1)**
150:3
**Trust (5)**
53:10,10;71:15,16;
98:14
**Trustee (40)**
11:4;13:20;14:3;
32:21;34:13,17;
53:11;54:25;55:15;
61:6;72:13;76:25;
85:4,8,10;87:1,2;
92:3,20;95:2,5;
98:14;99:23;101:4,
22,25;117:16;
121:14;122:7;123:2;

140:11;155:14,18;
156:14;214:14,14;
227:20;274:15;
288:15;289:10
**trustees (23)**
46:17,20;52:9;
53:13;55:3,18;59:5,
11;61:1,6;64:6;
71:17;74:25;126:8;
214:8;222:9,15,19,
24;278:5,12;279:15,
16
**Trustee's (1)**
92:10
**try (13)**
28:6,11;61:10;
97:10;115:8;131:2;
148:21;192:19;
263:17;283:7;290:8;
292:16;295:11
**trying (14)**
17:18;19:18;24:2;
55:25;56:4;59:5;
66:18;96:16;110:13;
145:8;146:13;198:5;
208:1;287:12
**Tuchman's (1)**
51:17
**turn (21)**
16:20;20:4;24:7,8;
53:6;75:18;92:17;
96:16;155:3;186:25;
188:18,22;193:20;
202:15;210:11;
244:5,15,16;245:9;
256:11;265:10
**turned (5)**
24:6;53:2;94:17;
103:8;191:6
**turnkey (1)**
145:18
**turns (4)**
67:7;275:25;278:9;
291:20
**twelve (3)**
152:14;230:17;
247:1
**twenty (2)**
163:14;193:16
**twenty-five (6)**
16:9;12;17:21;
64:23;186:8,14
**twenty-four (9)**
128:7;132:11;
171:15;188:11,12;
189:18;193:5;205:4;
247:1
**twenty-seven (1)**
19:2
**twenty-three (4)**
170:8;193:13;
264:16,18
**twenty-two (1)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(39) thorough - twenty-two

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Pg 339 of 342

Case No. 12-12020(MG)
June 18, 2012

264:21

**two (83)**
17:24;18:6;19:3;
25:4;28:1;30:18;
41:23;58:4;59:6,8,9;
60:8;63:7;70:3;
75:20;77:11;84:20;
87:10;90:2,24,25;
91:1;95:12,13;101:2,
10;103:14;111:8,18;
113:19,25;117:8,8;
125:14,17,20,22;
130:4;132:22;
138:12,13;139:15;
141:12;142:21;
152:21;154:15;
162:13;163:24,25;
166:17,20;175:4;
183:15;191:7,10;
199:6;202:21;203:3;
229:18;233:23;
234:14;243:10,15;
247:6;255:12;
257:14;259:19,23;
265:18;266:12;
270:21,21,23;271:1;
283:17;290:3;291:1;
293:8,9;294:9,21;
295:2,10

**two-term (1)**
61:23

**TX (2)**
6:14;12:6

**type (2)**
82:9;266:4

**types (8)**
81:6;212:23;217:6;
226:16;263:13;
271:4,9;272:15

**Typically (2)**
22:2;26:5

## U

**UCC (1)**
117:23

**ultimate (1)**
282:14

**ultimately (9)**
44:5;116:10,20;
166:20;169:14;
183:2;268:4;271:4,9

**Um-hum (4)**
127:18;235:15;
236:16;242:17

**unable (2)**
33:13;51:8

**unacceptable (1)**
196:13

**unaware (1)**
94:20

**unbounded (1)**
96:15

**unclear (5)**
39:20,21;63:16;
255:16;260:2

**uncomfortable (1)**
67:19

**uncommon (2)**
261:24;268:20

**unconsciously (1)**
184:8

**under (60)**
39:10;40:18,20,23;
42:4;45:17,22;46:13;
49:11,19,20;50:6;
51:15;60:7;62:11;
63:23;64:2;98:10,12;
104:14;121:18;
124:23;135:1,5;
138:9;152:24;153:3,
8;166:24;167:4,5;
183:20;185:25;
189:3;190:23;199:1;
209:24;210:24;
215:3;216:6;220:15;
223:22;225:3,6,11,
11,18,20,22;226:1,1;
242:5;248:3,5;
258:14;259:2,17,17,
22;284:6

**undercut (1)**
71:22;72:20

**undergoing (1)**
242:16

**underlying (8)**
19:17;20:14;22:21;
23:3;25:3,17;29:7,8

**undersecured (1)**
42:12

**understands (3)**
70:17;76:2;110:25

**understated (1)**
37:11

**understatement (1)**
242:12

**understood (9)**
74:4;75:23;127:13,
14;129:1;133:7;
168:6;248:16;277:4

**undertake (1)**
80:5

**undertaken (1)**
95:25

**undertaking (2)**
19:16;112:14

**undertakings (2)**
104:22;105:2

**undertook (3)**
97:5,18;252:13

**undue (1)**
70:25

**unencumbered (7)**
36:14;37:23,25;
38:2,3;41:19;63:1

**unfavorable (1)**

183:4

**unfettered (5)**
95:22;111:25;
112:1,4,4

**Unfortunately (2)**
71:20;284:18

**UNIDENTIFIED (3)**
121:3,5;295:5

**uniformly (1)**
94:22

**unilaterally (1)**
53:18

**uninterested (1)**
201:24

**Union (1)**
19:22

**UNISON (1)**
249:25

**UNITED (14)**
14:2,3;32:21;46:1,
6,8;73:7,8,9;76:25;
85:4;95:2;155:18;
274:15

**unless (6)**
38:15,16;39:25;
49:20;115:22;210:22

**unlikely (1)**
241:7

**unnecessarily (1)**
114:3

**unnecessary (1)**
85:24

**unpaid (3)**
31:11;283:2

**unresolved (1)**
22:12

**Unsecured (23)**
8:3;10:12;33:2;
37:9;43:11;48:13;
51:8,10;57:15;94:24;
95:8,16,17;98:13,19;
99:2,7,13,21,22;
117:1;252:4;256:11

**unsecureds (1)**
183:6

**unspoken (1)**
260:1

**unsuccessful (1)**
196:24

**unusual (3)**
238:7;253:20,21

**up (107)**
15:17;20:9;22:15;
25:20;26:17;27:16;
28:18,19,21;29:10;
34:9;35:14;38:17;
40:2,16;45:9;47:9,
25;48:4,6,14;51:19;
55:12;59:12,12;
62:12;68:15;72:4;
73:17;74:17,25;
79:13;91:5;96:7;
97:7;105:4;106:14;

110:20,21;116:19;
117:2;119:15;
126:10,20,22;128:19;
129:9,25;130:2,5,6;
134:3;135:12,16;
136:16;137:12,19;
138:3;140:13,16;
141:10;143:23;
146:7;147:6;167:22;
168:13;169:21;
170:9;172:2,2;175:3;
180:16,19;191:17;
193:9;205:8;211:12;
216:18,21;217:13;
218:12;230:11;
235:25;238:7;242:3,
15;249:24;253:17;
255:21;259:15;
260:19;263:18;
266:2;267:21;268:8,
23;274:13;276:17;
279:11;281:15;
284:13;286:15;
290:16,19;292:6,9;
295:16

**UPB (1)**
152:15

**upended (1)**
180:21

**up-front (1)**
62:13

**upon (19)**
30:13;42:11;50:8;
64:8;65:23;66:2;
69:14,24;70:2;98:9;
108:16;115:16;
142:11;156:4;
163:19;164:12;
170:3;272:19;279:22

**upside (1)**
141:19

**upturned (1)**
181:12

**urged (1)**
200:13

**urging (1)**
110:2

**USAA (1)**
9:3

**Use (22)**
4:8;25:16,17;26:7;
35:18;36:12;39:10;
40:17,20;42:5,6;
45:23;62:24;70:25;
78:6;81:7;95:23;
133:2;164:21;170:5;
234:8;290:10

**used (9)**
43:18,22;50:12;
62:21;82:12;93:1,23;
94:18;169:7

**useful (5)**
70:16;106:17;

110:4,7;273:23

**using (3)**
45:13,21;197:7

**US's (1)**
46:14

**UST (1)**
14:9

**Usually (3)**
146:12;198:1;
211:9

**utilities (1)**
239:13

**utility (1)**
239:13

**UZZI (1)**
7:15

## V

**vacation (1)**
27:7

**valid (4)**
41:22;45:17;46:10,
22

**valuation (2)**
81:10;82:2

**valuations (1)**
104:20

**value (22)**
36:11;41:22;46:24;
79:3;80:19;81:8;
106:13,15;119:19;
124:10;126:20;
141:20;143:21;
180:10;182:17;
184:20;212:10;
213:6;223:13;
226:17;237:18;
266:15

**valued (6)**
212:15,20;213:1;
223:4,6,7

**variety (6)**
38:1;94:9;142:11;
163:5;279:6,7

**various (18)**
26:6;41:4;48:15;
53:11;79:7;124:11;
141:21;142:21;
159:13;168:10;
173:19;176:5;196:9;
243:23;258:16;
263:4;283:9;288:1

**vast (1)**
163:13

**vendor (3)**
31:14,16;33:10

**Vendors (1)**
4:1

**verbally (1)**
236:3

**verify (1)**
222:16

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Pg 340 of 342

Case No. 12-12020(MG)
June 18, 2012

**version (5)**
38:18,24;66:2;
72:13;243:16
**versions (2)**
243:15,15
**versus (4)**
56:5;119:10,20;
170:24
**viable (1)**
124:9
**vice (1)**
283:15
**view (37)**
18:4;21:1;22:25;
28:23;29:7;79:22;
95:6,8;102:20;
111:24;112:13;
135:22;142:19;
143:1,10,18,20;
148:9,12;176:4;
198:22;200:17;
206:15;217:1;
227:13;232:2;
233:10;241:21;
242:2;262:21;
264:25;270:7;
271:12;276:11;
278:8;279:24;280:11
**viewed (2)**
197:10;227:14
**viewing (1)**
227:7
**views (2)**
144:7;270:15
**vigorous (2)**
89:15;99:11
**vigorously (1)**
99:7
**Vincent's (1)**
277:11
**violate (2)**
179:19;214:1
**violated (2)**
179:13;214:17
**violates (2)**
278:9;295:4
**violation (1)**
112:10
**virtually (1)**
19:15
**vis- (1)**
221:13
**visits (1)**
168:9
**volumes (1)**
95:16
**voluntarily (1)**
19:4
**vote (4)**
54:11;108:23,25;
267:13

**W**

**Wachovia (2)**
13:12;55:21
**wagging (1)**
154:19
**wait (3)**
34:15;110:16;
131:14
**waive (2)**
60:19;275:15
**waived (3)**
94:8;288:16,25
**waiver (4)**
36:8,8;41:16,16
**walk (5)**
30:12;192:8,16,17;
256:20
**walked (1)**
130:13
**WALKER (4)**
12:2;154:8;207:9;
278:1
**walking (1)**
146:18
**wall (2)**
24:23,24
**WALPER (62)**
11:18;76:1,10,10,
16,21;77:1,21;78:2;
79:10,22;80:6,14;
81:3,5,12,18,23;83:1,
24;84:3,11,12,24,25;
87:18;89:12;92:3;
106:11;112:24;
120:11,12;123:11;
140:16;143:23;
146:2,2,10;147:16,
21;148:13,15;149:5,
7,23,25;150:2,13,17,
19,20;293:4,4,9,13,
20,23;294:1,4,10,16;
295:8
**Walper's (1)**
144:11
**Walrath (3)**
105:12,17;114:10
**WaMu (2)**
105:12;114:8
**wants (20)**
29:17;38:16;43:2;
45:8;52:24;53:25;
78:6;84:19;85:1;
89:9;96:4;110:12;
112:9;140:16;
148:11;150:21;
155:24;268:17;
272:19;290:2
**warrant (2)**
132:23;264:19
**warranties (1)**
233:7

**warranty (7)**
223:17;224:1,4;
226:20,21,25;227:8
**warranty-type (1)**
226:18
**WARREN (3)**
13:19;231:20;
289:8
**Washington (2)**
7:5;126:24
**waste (2)**
94:12,18
**waters (2)**
232:11,14
**way (46)**
16:7;18:18;26:7;
41:4;51:7;68:7;
82:14;92:22,23;95:5;
102:6,9,22;103:18;
105:9;108:20;117:6,
13;124:7;136:8;
138:22;144:16;
147:19,22;148:21;
149:20;166:7;
176:10;178:11;
187:21;190:24;
198:19;217:12;
220:7;226:8;241:17,
24;244:19;246:21;
258:15;263:17;
265:24;273:11;
274:6,7;282:8
**ways (3)**
18:14;77:11;119:5
**Wednesday (8)**
23:19,19;24:10,15;
27:11;28:19,21;
29:10
**week (7)**
17:25;24:4;30:9;
148:5;153:17;
191:20;281:4
**weekend (5)**
30:10;44:22;
127:20;142:24;
172:15
**weeks (8)**
28:1;87:10;90:17;
98:2;108:15;140:25;
282:11,15
**weigh (1)**
140:6
**weight (1)**
138:1
**WEITNAUER (3)**
8:19;55:14,14
**welcome (1)**
54:23
**welcomes (1)**
110:25
**well- (1)**
190:19
**well-run (1)**

**190:19
Wells (13)**
8:14;13:12;47:7,
14,18,20,22;55:15,
21;59:15,21;60:12,17
**Wells' (1)**
59:19
**Wendy (3)**
7:21,25;48:11
**weren't (8)**
51:22;124:21;
132:23;148:6,6;
196:17;217:13;
233:22
**Weschler (11)**
229:1;230:1;235:4;
247:12;248:3,14;
250:3,5,9;256:9;
263:9
**Weschler's (1)**
263:7
**West (3)**
4:22;8:16;9:4
**What's (30)**
29:13;37:19;52:20;
56:22;69:5;74:6;
79:5;99:4;107:15;
113:14;114:24;
115:24;119:4;
120:21;131:22;
192:24;193:3,7,11,
15;194:14;208:13;
218:24;220:22;
226:5;234:19,21;
268:24;284:3;295:14
**whatsoever (5)**
19:13;29:8;94:23;
135:13;198:7
**whenever (3)**
65:4;145:6;151:12
**whereby (1)**
51:4
**where's (1)**
266:1
**Whereupon (1)**
295:19
**wherever (1)**
76:4
**wherewithal (1)**
281:9
**whichever (2)**
271:1;281:16
**whispered (1)**
59:7
**WHITE (4)**
7:10;54:2;113:9;
289:14
**Whitehall (1)**
14:4
**Whitlinger (9)**
157:4,21,25;
218:11,19,20,21;
219:9;225:1

**190:19
whoever's (1)**
116:6
**whole (5)**
31:10;66:9;135:7;
149:2;152:15,20,22;
153:1,3,5,16;166:19;
257:10;262:5;284:12
**wholly (2)**
122:11;241:22
**who's (3)**
29:16;115:16;
150:3
**whose (1)**
146:17
**who've (2)**
50:18;90:15
**widely (2)**
90:13;202:7
**wildly (1)**
65:5
**willing (16)**
81:17,19;124:21;
127:15;135:11,16;
142:13;148:13,15;
149:10;187:16;
189:17;233:22;
246:20;257:24;258:3
**Wilmington (2)**
9:6;98:14
**wind (1)**
267:21
**winds (1)**
147:6
**WINSTON (3)**
6:19;13:11;55:20
**wish (21)**
26:7;34:5;38:10;
39:3;52:6;59:1;
60:10;64:10;71:12;
73:2,4;74:8;75:12;
89:5;110:14;118:12;
218:1,4;256:3;262:9,
14
**wishes (3)**
39:18;55:12;
228:17
**withdraw (1)**
239:5
**withdrawn (3)**
40:1;120:23,24
**within (19)**
16:25;22:3;54:19;
78:16;80:13;82:20;
84:23;85:19;86:14;
87:8;115:20;121:10;
139:16;157:7,14;
170:25;196:20;
202:19;277:14
**without (32)**
21:22,25;31:10;
66:23;69:23;70:1;
74:10;84:20;102:6;
104:3;107:3,10;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.                Pg 341 of 342
Case No. 12-12020(MG)
June 18, 2012

108:17;109:4;126:5;
134:23;138:14;
146:16;153:13;
159:2;164:21;
175:21;177:2;
182:24,24;206:21;
224:1,2,3;249:21;
271:14;285:12
**witness (89)**
25:23;118:23;
120:10,10,13;156:22;
162:4;167:8,17;
173:25;174:2,4,7,9,
11,14;175:15;177:21,
23;178:9,13;179:15,
21,25;180:3,20,23;
181:2,5,20,22;182:7;
183:8,11;185:11,13,
21;192:6;203:19,22,
24;204:1,4;207:17,
21;208:22;209:14;
211:1;212:18;215:1;
217:20;218:2,12,15;
219:2;222:14,18;
224:3,11,18;226:4,6;
227:3,6;228:9,24;
229:3,13,15;230:16;
232:7,16,25;233:15,
18;238:1,4,11;
239:21;240:17,21;
241:5;247:13,19,22;
248:4,6;249:19,21
**witnesses (8)**
118:19;120:10,15;
217:21,23;228:22;
262:10,14
**Wolicki (1)**
4:19
**wondering (1)**
294:7
**wood (1)**
168:1
**word (1)**
99:20
**words (6)**
19:18;77:19;86:16,
24;95:23;128:22
**work (40)**
31:4;32:18;33:12,
15;37:15;59:11;63:8;
66:21;67:10,16;
69:17;70:7,18;80:8,
14;82:5;84:18,21;
106:23;123:5,14;
133:17,22,23;148:24;
165:8,9;178:10;
184:8;202:12;204:5;
212:23;230:5;236:1;
281:20;283:5,7;
286:19;290:7;292:15
**workable (2)**
116:16;152:2
**worked (12)**

30:9;33:9;41:10;
80:8;122:21;133:21;
163:5,12;166:19;
168:4;174:11;230:6
**working (7)**
33:8;121:7;164:16;
166:24;167:5;212:1;
217:11
**works (3)**
254:1,3;287:6
**world (1)**
63:21
**worried (2)**
35:10;131:20
**worry (2)**
130:1,9
**worth (2)**
212:10;272:2
**wound (1)**
129:9
**wrestled (1)**
250:13
**write (2)**
112:25;260:5
**writing (3)**
25:22;26:8;270:12
**written (7)**
17:8;25:13,21;
69:14;121:9;200:16;
260:6
**wrong (3)**
83:6;138:3;167:11
**wrote (2)**
17:13;29:4

## Y

**year (6)**
17:5;44:8;164:22;
230:7;231:12;237:16
**years (11)**
80:20;104:22;
152:15;202:21;
203:3;230:17,18;
237:6,12,14;284:11
**Yep (2)**
187:1;235:21
**yesterday (1)**
148:8
**yield (1)**
115:5
**York (17)**
4:23;6:5,22;7:13;
8:5;9:15,23;10:5,14,
21,23;11:6;13:14,22;
14:6;52:9;279:14
**Yup (1)**
211:18

## Z

**zero (5)**
132:12;171:16,17;

193:10;198:9
**ZIDE (1)**
8:9
**ZIMAN (15)**
6:7;68:14,16,16;
69:6,7,9,13;70:7,9,
14;74:16,17,20,20
**Ziman's (1)**
70:17

## 1

**1 (22)**
48:12;86:7;92:25;
93:5,16;94:3;95:7;
104:5,6;157:16,22;
159:17,20;160:8,14,
15,19;209:5,20;
224:23,24;259:15
**1.05 (1)**
61:21
**1.25 (1)**
62:1
**1.3 (1)**
260:12
**1.35 (2)**
258:20;260:18
**1.4 (9)**
66:11;134:24;
136:1;170:15;
260:14,15,17;271:18,
20
**1.45 (2)**
61:18;271:19
**1.6 (5)**
134:16,20;135:24;
153:3;170:13
**10 (6)**
101:21,24;245:20;
271:19,21;295:15
**10:00 (1)**
295:15
**100 (2)**
12:4;265:6
**100,000 (1)**
62:22
**1000 (1)**
9:4
**10004 (2)**
11:6;14:6
**10006 (1)**
10:14
**10007 (1)**
9:15
**10020 (1)**
9:23
**10036 (4)**
6:5;7:13;8:5;10:23
**1004 (1)**
95:1
**10040 (1)**
4:23
**101 (2)**

10:4;13:21
**10166 (2)**
6:22;13:14
**10178 (2)**
10:5;13:22
**1031 (1)**
17:9
**105 (2)**
16:6;141:11
**1095 (1)**
10:22
**10b (4)**
71:23;72:7,21,22
**10d (3)**
71:23;72:21,22
**10Ks (1)**
237:4
**10Qs (1)**
237:4
**10th (6)**
23:4,6,11,12;
25:11;27:5
**11 (12)**
20:17;97:11;124:8;
147:20,22;157:6;
161:6;163:10,15;
164:21;165:2,5
**11:30 (2)**
295:15,17
**110 (2)**
265:6;268:23
**1100 (1)**
12:5
**1104 (1)**
113:18
**1104c (4)**
86:16;92:2;93:20;
121:17
**1104c2 (6)**
77:17;85:9,10;
92:22;100:15;102:14
**1-113 (1)**
157:25
**1129 (1)**
113:18
**113 (2)**
157:16,22
**1155 (1)**
7:12
**1177 (1)**
8:4
**1180 (1)**
12:21
**12 (2)**
49:13;293:6
**12:15 (7)**
128:14;129:5;
131:12,16,18;132:15;
148:17
**12:25 (1)**
76:6
**12:30 (1)**
76:7

**12:45 (2)**
105:7;110:22
**12:48 (1)**
121:6
**120 (5)**
36:19;62:23;245:8,
22;290:16
**1200 (1)**
9:5
**1201 (1)**
8:16
**120-day (1)**
277:20
**12-12020 (1)**
15:3
**12-12020-mg (1)**
4:5
**1251 (1)**
9:22
**13 (9)**
155:3;160:18,23;
187:2;189:6;208:3,5,
6;278:5
**133 (1)**
62:11
**13th (1)**
49:10
**14 (3)**
202:16,23;203:17
**14th (3)**
167:22;192:5;
252:18
**15 (2)**
38:10;72:9
**152 (1)**
35:19
**15th (7)**
30:7;44:8;64:19,
20;70:23,23;281:2
**160 (1)**
283:1
**18 (1)**
281:4
**189 (3)**
159:5,8;274:23
**18th (3)**
281:18;288:3,4
**190 (1)**
62:9
**1900 (1)**
13:4
**192nd (1)**
4:22
**19801 (1)**
9:6

## 2

**2 (15)**
26:25;86:7;92:25;
93:6,16;94:3;95:7;
104:6;118:15;160:8,
14,15,24;260:20;

12-12020-mg    Doc 472    Filed 06/20/12    Entered 06/20/12 15:35:46    Main Document
Pg 342 of 342
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020(MG)
June 18, 2012

295:17
**2.2 (1)**
41:6
**2.3 (3)**
170:4,5;212:4
**2.36 (1)**
170:5
**2.4 (2)**
146:24;156:15
**2:05 (1)**
121:6
**200 (6)**
6:21;13:13;39:11;
40:15;61:23,24
**20005 (1)**
7:5
**2004 (5)**
80:5;90:3,6;91:8,
22
**2008-like (1)**
199:9
**2009 (1)**
204:1
**2011 (5)**
49:11;164:6,7,19;
255:15
**2012 (10)**
160:18,23;161:2;
231:11;235:18;
236:10;248:17,20,25;
255:15
**2013 (1)**
70:23
**2015 (1)**
289:11
**208 (1)**
121:12
**21 (1)**
188:22
**210 (1)**
7:22
**214 (2)**
157:18,22
**214-227 (1)**
157:25
**21st (2)**
14:5;26:20
**22 (3)**
200:7,9;210:24
**220 (1)**
40:16
**227 (2)**
157:18,22
**23 (1)**
204:19
**23re (1)**
288:6
**24 (1)**
210:11
**250,000 (1)**
62:22
**25th (2)**
281:1;288:6

**27g (1)**
59:25
**28 (1)**
54:5
**280,000 (1)**
62:15
**29 (3)**
68:18;69:10,14
**293 (1)**
36:24
**2nd (2)**
23:7;27:8

**3**

**3 (11)**
30:4;160:1,2;
161:2;200:19;208:4,
6;235:5;259:12,13,16
**3.1a (1)**
244:25
**3:33 (1)**
183:17
**3:52 (1)**
183:17
**30 (5)**
71:20,25;72:18;
74:24;245:22
**30309 (2)**
8:17;12:22
**30th (1)**
282:20
**31 (1)**
205:7
**31st (2)**
282:15;288:21
**33 (1)**
14:4
**332 (1)**
275:12
**34.2 (1)**
32:2
**355 (1)**
11:13
**35th (1)**
11:14
**362 (2)**
16:5;49:13
**363 (9)**
135:3,4,5;136:1;
152:24;153:1;
154:18;170:16;
284:17
**363f (1)**
278:9
**363o (1)**
156:5
**365 (3)**
278:9,9,21
**375 (2)**
158:16,19
**380 (1)**
40:22

**382 (1)**
160:11
**39 (6)**
185:3,14,18;186:6;
211:13,17
**3rd (3)**
9:14;249:17;250:5

**4**

**4 (11)**
24:16;26:25;160:8,
14,15;161:1;209:20;
224:21,24;235:18;
236:10
**4:21 (1)**
207:4
**4:30 (1)**
207:4
**40 (2)**
186:24;244:25
**400 (2)**
61:23,25
**400,000 (1)**
281:7
**42 (2)**
4:5;40:14
**42.5 (1)**
245:19
**43 (1)**
245:16
**44 (2)**
30:4;34:7
**48 (1)**
245:20
**4th (5)**
235:23,24,24;
256:12,22

**5**

**5 (8)**
23:19;160:8,14,15;
161:3;163:7;186:13;
250:3
**5:13 (1)**
248:1
**5:35 (1)**
248:1
**50 (1)**
72:18
**500 (5)**
258:8,18,22;259:3,
14
**552 (1)**
41:16
**552b (1)**
36:8
**55413 (1)**
7:23
**5th (2)**
13:5;90:7

**6**

**6 (9)**
24:14,17;157:10,
22;160:8,14,15;
161:5;265:15
**6:39 (1)**
295:19
**600 (2)**
6:12;61:24
**60603 (1)**
12:14
**63 (4)**
158:5,7;161:22;
211:15
**655 (1)**
7:4
**660,000 (1)**
18:2

**7**

**7 (1)**
160:3
**7.5 (1)**
186:13
**700 (1)**
4:22
**7000 (1)**
6:13
**75 (1)**
36:18
**750 (4)**
41:2;79:11,14;
89:21
**750,000 (1)**
89:19
**77002 (1)**
6:14
**78701 (1)**
12:6

**8**

**8 (11)**
159:20;160:8,14,
15;161:7;268:9,13;
269:1;270:12;
273:16;293:6
**8.64 (2)**
31:23;34:1
**8:30 (1)**
293:7
**8:40 (1)**
295:10
**81 (1)**
30:7
**83 (3)**
18:3;245:4,6
**850 (4)**
251:1;257:21;
258:18,22

**86 (1)**
9:13
**864,000 (2)**
31:23;34:2

**9**

**9 (1)**
188:23
**9.625 (1)**
289:10
**9:15 (1)**
148:17
**90 (1)**
245:22
**90071 (1)**
11:15
**9019 (3)**
115:5,16,21
**92614 (1)**
13:6
**973406-2250 (1)**
4:24