Hearing Date: July 10, 2012 at 10:00 a.m. (ET)

MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500
John G. Moon
Charles R. Jacob III
Claire L. Huene

*Attorneys for Triaxx Prime CDO 2006-1, LLC,
Triaxx Prime CDO 2006-2, LLC and
Triaxx Prime CDO 2007-1, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*,

                  Debtors.

Case No. 12-12020 (MG)

Chapter 11

### OBJECTION TO DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS

        1.        The Debtors seek approval of two settlements (collectively, the "Proposed Settlement") [Docket No. 320, Exs. 2 and 4] of claims that could be asserted by up to 392 residential mortgage-backed securitization ("RMBS") trusts (the "Trusts").

        2.        Triaxx Prime CDO 2006-1, LLC, Triaxx Prime 2006-2, LLC, and Triaxx Prime CDO 2007-1, LLC (collectively "Triaxx") hold 24 classes of certificates issued by 20 of the Trusts covered by the Settlement. As of May 31, 2012, Triaxx held an aggregate notional amount of $637 million of such certificates. Triaxx's holdings in 23 classes of these certificates constitute greater than 25% of such class.

## The Trusts' Potential Claims

3. Triaxx has analyzed 356 of the 392 Trusts. The Trusts analyzed by Triaxx have realized losses to date of approximately $27.1 billion. Based on the delinquent loans still held by the Trusts and other factors, Triaxx estimates that the total losses will ultimately be approximately $48 billion for the Trusts it analyzed. The total losses for all 392 Trusts would be greater.

4. As described in Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements (the "Motion") [Docket No. 320], Residential Funding Company, LLC ("RFC") and/or GMAC Mortgage LLC ("GMAC") originated or acquired residential mortgage loans ("Loans"), and sold them to the Trusts. Motion, at 7.

5. "One or more of the Debtors provided contractual representations and warranties" regarding the underwriting and quality of the Loans. *Id.* The "one or more of the Debtors" making such representations and warranties included RFC and GMAC. The Debtors admit that the Trusts have "tens of billions of dollars" in claims against the "Debtors' estates," including those of RFC and GMAC, for breach of these representations and warranties ("R&W Claims"). *Id.*, at 2.

6. RFC or GMAC also acted as master servicer of the Loans for the Trusts. Although the Motion does not mention servicing claims, on information and belief the Trusts also have sizeable claims for faulty servicing of the Loans ("Servicing Claims").

7. In addition to claims against the Debtors, the Trusts could potentially assert claims against non-Debtor Ally Financial, Inc. ("AFI"), the Debtors' parent and a secured creditor in the Debtors' estates. Certain monoline insurance companies have commenced actions

2

asserting, *inter alia*, that AFI is liable on the R&W claims. *See Financial Guaranty Insurance Co. v Ally Financial, Inc. et al.*, No. 12 Civ. 1860 (S.D.N.Y.) and *Assured Guaranty Municipal Corp. v. Ally Financial et al.*, No. 12 Civ. 3776 (S.D.N.Y.). AFI has "taken reserves in the billions of dollars" with respect to those claims. Motion, at 2 n.4.

### The Proposed Settlement

8. The Proposed Settlement is nominally among Residential Capital, LLC ("ResCap") "and its direct and indirect subsidiaries," and certain holders of certificates issued by the Trusts, referred to as the "Institutional Investors" and the "Talcott Franklin Group." *Id.* at 1 & n. 1. The "direct and indirect subsidiaries" are not identified. The only ResCap signatory to the Proposed Settlement is ResCap itself, signing "for itself and its direct and indirect subsidiaries." Motion, Ex. 2 at 13; Ex. 4 at 14.

9. In exchange for a full release of *inter alia*, the R&W Claims and the Servicing Claims, the Debtors would provide an allowed claim of up to $8.7 billion (the "Allowed Claim"). *See* Motion, Ex. 2 and Ex. 4 at § 5.01. It is unclear under the Settlement Agreement against which Debtors the Allowed Claim would be permitted. The Proposed Settlement states that "ResCap will provide a general unsecured claim" (*id.*), but ResCap is defined collectively to include its "direct and indirect subsidiaries." *Id.* at 1.

10. The Allowed Claim would be allocated among the Trusts participating in the Settlement according to the amount of losses incurred (the "Allocation Formula"). The Trusts that have incurred more losses would receive a greater share of the Allowed Claim.

11. The Proposed Settlement provides for the Debtors to pay "legal fees" to the law firms ("Attorney Compensation") who negotiated the Settlement on behalf of the Institutional Investors and the Talcott Franklin Group of up to approximately 5% ($400 million)

of the Allowed Claim. It further provides that the Debtors "may pay" such law firms an amount they later "respectively agree is equal to the cash value of their respective portions of the Allowed Claim, and in any such event, no estate retention application, fee application or further order of the Bankruptcy Court shall be required as a condition of the Debtors making such agreed payment." Motion, Ex. 2 and Ex. 4 at § 6.02(a).

## Objections

### A. The Proposed Settlement Is Inequitable to Triaxx and Other Certificateholders That Invested Prudently

12. As it does not address Servicing losses, the Proposed Settlement implicates two general types of risks associated with the Loans. The first is the credit risk: the risk that a borrower will default on a Loan. The second is the security risk: the risk that the security for a Loan (the borrower's property) is inadequate to repay the Loan.

13. The Trusts are not the same with respect to these risks. *Id.* at 25 (there are "many different loan types involved" in the Trusts). Some hold first-lien, thirty-year fixed Loans. Some hold adjustable-rate Loans ("ARMs"). Others hold subprime Loans, and others hold second lien Loans. Overall, the Trusts are generally of five types: (a) prime, which hold 30-year fixed-rate Loans; (b) fixed-rate alt-A, which also holds 30-year fixed-rate Loans;[1] (c) subprime, which hold subprime Loans; (d) alt-A POA, which hold alt-A pay-option ARMs; and (e) second lien, which hold Loans in a second lien position on the property. *See* Exhibit 1 hereto (showing breakdown of the 356 Trusts reviewed by Triaxx).

14. The level of credit risk and security risk differ depending on the type of loans. The credit risk embraced by the prime and fixed-rate alt-A Trusts is less than the credit

---

[1] "Alt" refers to "alternative" documentation during underwriting. For example, where a borrower is self-employed and does not have a W-2 form to prove income, an alternative document would be used. Alt-A fixed-rate Loans are still "A" or prime quality.

4

risk for subprime of alt-A POA Trusts, as there is a greater risk that a subprime borrowers or a borrowers with an adjustable-rate mortgages will default. There is far greater security risk with second mortgages, because properties with two mortgages may have had little equity at origination, so that if the property value decreases by any significant amount, the second mortgage may be insufficiently collateralized (i.e. be "underwater").

15. Indeed, the riskier subprime, alt-A POA, and second lien Trusts have incurred greater losses than the safer prime and fixed-rate alt-A Trusts. *See* Exhibit 1 hereto.

16. Triaxx invested only in prime and fixed-rate alt-A Trusts. It did not invest in subprime, alt-A POA or second lien Trusts.

17. The Allocation Formula treats all Trusts as the same and merely allocates according to "losses" across all the Trusts. Thus, the Proposed Settlement assumes that the Trusts' losses are equally deserving of a share of the Allowed Amount, as if the Trusts all had equally strong R&W Claims or other claims and as if the Trusts all had equal credit and security risk. However, that a Trust has incurred a loss with respect to a particular Loan does not automatically mean that the Trust has a valid R&W Claim or other claim against one of the Debtors or AFI. There is no rational basis for the Proposed Settlement's assumption that the greater losses in the subprime, alt-A POA or second lien Trusts mean that there were more representation and warranty breaches in those Trusts. To the contrary, the riskier Trusts would have been expected to have greater losses than prime or fixed-rate alt-A Trusts due to the greater risks associated with subprime, alt-A POA and second lien Loans, even <u>absent</u> any representation and warranty violations.

18. Because of the increased risk, the potential yield on investments in the riskier Trusts was higher than the yield on investments in the safer Trusts. The certificateholders

5

that chose to invest in riskier Trusts bargained to receive a high yield. By contrast, Triaxx and other certificateholders in the safer Trusts accepted a lower yield, in exchange for reduced risk.

19. The Allocation Formula's assumption that the losses in the riskier Trusts are equally likely to have been caused by representation and warranty breaches as the losses in the safer Trusts ignores economic reality. The Proposed Settlement is inequitable and disproportionately favors investors in the riskier Trusts.

**B.    The Proposed Settlement Fails to Differentiate Among "Debtors"**

20. These proceedings have not been substantively consolidated.

21. The Proposed Settlement and the Motion refer collectively to the Debtors collectively and fail to differentiate among them.

22. Some Debtors have more assets than others. Notably, the Debtors that made representations and warranties to the Trusts include RFC and GMAC, operating subsidiaries of ResCap, a holding company. The Trusts' Servicing Claims also lie against RFC and GMAC.

23. ResCap issued secured debt to investors. Absent substantive consolidation, unsecured RFC and GMAC creditors, such as the Trusts, have claims to the assets of those operating subsidiaries that must be satisfied before RFC or GMAC assets could be used to satisfy claims of secured creditors of ResCap.

24. The Proposed Settlement does not set forth against which Debtors the Allowed Claim would be allowed under the Proposed Settlement. If the Proposed Settlement contemplates an "Allowed Claims" against ResCap or against all the Debtors collectively, as it appears to suggest, this would improperly effect substantive consolidation without any basis or

6

proper procedure therefore, and prejudice the Trusts, who are creditors of GMAC and RFC, among other Debtors.

25.     In addition, the Proposed Settlement does not set forth which Debtor or Debtors would pay the Attorney Compensation, nor the source of such funds. The Attorney Compensation collectively could exceed $400 million, and it is unclear what portion of that would actually be paid.

C.   **Insufficient Information Is Provided about the Circumstances of the Proposed Settlement**

26.     The circumstances of the Proposed Settlement are questionable.

27.     Contemporaneously with the Proposed Settlement, AFI entered into a settlement (the "AFI Settlement") with ResCap in which AFI agreed to contribute $750 million to the "Debtors" estates to fund the settlement of claims, including the claims of the Trusts, and to secure third-party releases that would release AFI from liability for such claims, whether the Trusts opt-in to the Proposed Settlement or not. [Docket No. 6, Ex. 8]. Thus, the Proposed Settlement appears to be part and parcel of a deal to release non-Debtor AFI from liability for the Trusts' claims.

28.     In addition, the Attorney Compensation raises questions. This is the second settlement of this type that the Institutional Investors and their counsel, Gibbs & Bruns, have orchestrated. The first was the RMBS settlement between Bank of New York Mellon and Bank of America, which also inequitably allocates the settlement amount to trusts according to losses only.[2] In neither case have the Institutional Investors disclosed information to guard

---

[2] The Bank of New York Mellon settlement, for $8.5 billion, would release Countrywide and Bank of America from claims by more than 500 RMBS trusts that could exceed $100 billion. Bank of America agreed to pay the Institutional Investors' counsel, Gibbs & Bruns, $85 million. That RMBS settlement is being questioned by approximately thirty other certificateholders, including Triaxx, and the Attorneys General of New York and Delaware.

against the possibility that they bought certificates in the riskier Trusts at distressed rates, and then brokered a proposed settlement that, by allocating the settlement amount according to "losses," unfairly provides them a windfall. Here, AFI appears to be seeking to protect itself by causing the Debtors to enter into the Proposed Settlement to satisfy activist certificateholders, the Institutional Investors and the Talcott Franklin Group, at the expense of other certificateholders, particularly those in the less risky Trusts.

D.     **The Attorney Compensation Is Unjustifiable**

29.    The Proposed Settlement is vague as to the amount of the Attorney Compensation, which could exceed $400 million, that would actually be paid to the law firms. However, for the Debtors to pay any percentage of the Attorney Compensation, diminishing the assets available to be distributed to creditors, falls outside the "range of reasonableness," because such an amount is antithetical to the paramount interests of creditors. *Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). Further, that the Debtors agreed to pay such amounts to opposing counsel calls into question whether the Proposed Settlement was "the product of arm's-length bargaining." *Id.* No Debtors' assets should be used to pay any portion of the Attorney Compensation. The Institutional Investors and the Talcott Franklin Group should pay their own attorneys.

E.     **Notice of the Motion Was Inadequate for Certificateholders**

30.    Debtors filed the Motion on June 11, 2012, but did not serve it on the trustees (the "Trustees") of the Trusts by overnight courier until June 12 [Docket No. 344], so that it would have been received by the Trustees on June 13. The objection deadline specified is nine days later, on June 21.

31.    Upon information and belief, the Trustees have not had sufficient time to inform all the certificateholders. As of the date hereof, Triaxx had received no notice from the

Trustees of its Trusts. Instead, it found out about the Proposed Settlement through the news media.

32. The certificateholders have a beneficial interest in the Proposed Settlement, and they should be given proper notice and opportunity to be heard.

### Conclusion

33. The Proposed Settlement is unfair, vague, not based upon a sufficient factual record or adequate notice to interested parties. For these reasons, the Proposed Settlement does not meet the standards of Rule 9019(a) and cases thereunder.

34. On June 18, 2012, the Court granted the motion of Berkshire Hathaway [Docket No. 208] for an Examiner to investigate the AFI Settlement, among other things. The Examiner should also investigate the Proposed Settlement at the same time.

Dated: June 21, 2012

                                            MILLER & WRUBEL P.C.

                                  By:  /s/ John G. Moon
                                            John G. Moon
                                            Charles R. Jacob III
                                            Claire L. Huene
                                            570 Lexington Avenue
                                            New York, New York 10022
                                            212-336-3500

                                            *Attorneys for Triaxx*