**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al.,[1] | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

# FINAL ORDER
## UNDER SECTIONS 105, 361, 362, 363, AND 364
## OF THE BANKRUPTCY CODE AND BANKRUPTCY
## RULES 2002, 4001, 6004, AND 9014 (I) AUTHORIZING
## THE DEBTORS TO OBTAIN POSTPETITION FINANCING ON
## A SECURED SUPERPRIORITY BASIS, (II) AUTHORIZING THE
## DEBTORS TO USE CASH COLLATERAL, AND (III) GRANTING
## ADEQUATE PROTECTION TO ADEQUATE PROTECTION PARTIES

Upon the motion (as amended, revised or supplemented prior to the date hereof, the

"***Motion***")[2], dated May 14, 2012, of the above-captioned debtors and debtors in possession

(collectively, the "***Debtors***") filed in these chapter 11 cases (the "***Chapter 11 Cases***") for entry of

the interim order entered May 16, 2012 [Docket No. 89] (the "***Interim Order***") and this final

order (this "***Final Order***") under sections 105, 361, 362, 363(c), and 364 of title 11 of the United

---

[1]    The Debtors are:  Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Motion.

States Code (the "***Bankruptcy Code***"), and Rules 2002, 4001, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), seeking:

(I)　　authorization for

(a) GMAC Mortgage, LLC and Residential Funding Company, LLC

(collectively, the "***Borrowers***") to use Cash Collateral and all other Prepetition

Collateral (each as defined below) pursuant to sections 361, 362 and 363 of the

Bankruptcy Code, as set forth herein;

(b) the Debtors to provide adequate protection to Ally Financial Inc.

("***AFI***"):

(i) as lender under the Amended and Restated Loan Agreement,

dated as of December 30, 2009 (as amended, supplemented or otherwise

modified, the "***AFI Revolver Loan***"), among the Borrowers, Residential

Capital, LLC, GMAC Residential Holding Company, LLC,  GMAC-RFC

Holding Company, LLC, and Homecomings Financial, LLC (together

with certain other affiliates of the Borrowers as guarantors or obligors,

collectively, the "***AFI Revolver Guarantors***"), AFI as initial lender (the

"***AFI Revolver Lender***") and agent for the AFI Revolver Lender, and

Wells Fargo Bank, N.A., as first priority collateral agent, and

(ii) as secured party under the Amended and Restated First Priority

Pledge and Security Agreement and Irrevocable Proxy dated as of

December 30, 2009 and the Real Estate Subsidiary Pledge and Security

Agreement and Irrevocable Proxy dated as of December 30, 2009 among

certain affiliates of Residential Capital, LLC, as grantors, Wells Fargo

2

Bank, N.A., as collateral agent, AFI (f/k/a GMAC Inc.), as lender agent, U.S. Bank National Association, as trustee under the 2010 indenture, and U.S. Bank National Association, as trustee under the 2015 indenture (all of the foregoing security agreements, as amended, supplemented, or otherwise modified, and together with any other security documents executed in connection with the AFI Revolver Loan, collectively, the "*AFI Revolver Security Agreements*", and together with the AFI Revolver Loan, collectively, the "*AFI Revolver*"),

(c) the Debtors to provide adequate protection to AFI:

(i) as lender under the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as amended, supplemented or otherwise modified, the "*AFI LOC Loan*"), by and among GMAC Mortgage, LLC and Residential Funding Company, LLC, as borrowers (in such capacity, the "*AFI LOC Borrowers*"), Residential Capital, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, and Equity Investment I, LLC as guarantors (the "*AFI LOC Guarantors*"), AFI as lender (the "*AFI LOC Lender*" and, together with the AFI Revolver Lender, collectively, the "*AFI Lender*") and agent for the AFI LOC Lender, and

(ii) as a secured party under the Amended and Restated Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009, among the Borrowers and certain of the AFI LOC Guarantors, as

grantors, and the AFI LOC Lender, Ally Investment Management LLC (f/k/a GMAC Investment Management, LLC), as secured parties, and the Amended and Restated Pledge and Security Agreement and Irrevocable Proxy dated as of December 30, 2009 among RFC Assets Holdings II, LLC, Equity Investment I, LLC, Passive Asset Transactions, LLC, Residential Capital, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, and certain of their affiliates from time to time parties hereto, as grantors, and AFI (f/k/a GMAC Inc.), as a secured party (all of the foregoing security agreements, as amended, supplemented or otherwise modified, and together with any other security documents executed in connection with the AFI LOC Loan, collectively the "*AFI LOC Security Agreements*," and together with the AFI LOC Loan, collectively, the "*AFI LOC*"); and

(d) the Debtors to provide adequate protection to:  (i) the holders (the "*Junior Secured Noteholders*") of the 9.625% Junior Secured Guaranteed Notes due 2015 (the "*Junior Secured Notes*") issued under that certain Indenture (the "*Indenture*" and, together with the Junior Secured Notes, the Security Documents (as defined in the Indenture) and all other documents executed in connection therewith, the "*Junior Secured Notes Documents*") dated as of June 6, 2008, among Residential Capital, LLC, as issuer, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, GMAC Mortgage, LLC, Residential Funding Company, LLC, and Homecoming Financial, LLC as guarantors (the "*Junior Secured Notes Guarantors*" and, together with the AFI

Revolver Guarantors and the AFI LOC Guarantors, the "***Guarantors***"), and U.S. Bank National Association, as trustee (the "***Trustee***") for the benefit of the Junior Secured Noteholders; (ii) the Trustee, as trustee under the Indenture; and (iii) Wells Fargo Bank, N.A., as collateral agent (the "***Collateral Agent***" and, together with the Junior Secured Noteholders and the Trustee, the "***Junior Secured Parties***") under the Junior Secured Note Documents.  All obligations of the Debtors arising under the Junior Secured Notes Documents shall collectively be referred to herein as the "***Junior Secured Notes Obligations***";

(II)    authorization for the Debtors' waiver and release of any right to surcharge against the Prepetition Collateral (hereinafter defined) and the AFI DIP Loan Collateral (hereinafter defined) pursuant to section 506(c) of the Bankruptcy Code, as set forth herein;

(III)    authorization for the Debtors' waiver and release of any right to seek a court order invalidating or otherwise voiding AFI Lender's and the Junior Secured Parties' security interests in their respective collateral pursuant to section 552(b)(1) of the Bankruptcy Code, as set forth herein;

(IV)    authorization for the AFI LOC Borrowers to request postpetition draws under the AFI LOC in an aggregate principal amount not to exceed $220 million (the "***AFI DIP Loan***"), no more than $85 million of which was made available upon the entry of the Interim Order and the balance of which will be available upon the entry of this Final Order subject to the terms of the Ally DIP Amendment to the AFI LOC dated as of May 25, 2012 and filed as **Exhibit C** [Docket No. 174] to the Motion (the "***AFI LOC Amendment***") and this Final Order, *provided* that the aggregate amount of AFI LOC prepetition and postpetition draws (plus any

unpaid interest, expenses, or other costs payable thereunder) authorized under this Final Order may not exceed $600 million;

(V)     authorization for the AFI LOC Borrowers to execute the AFI LOC Amendment, and perform such other and further acts as may be required in connection with the AFI LOC Amendment and the AFI LOC; and

(VI)     the grant of superpriority administrative expense claims to the AFI Lender in its capacity as the lender under the AFI DIP Loan (in such capacity, the "*AFI DIP Lender*");

**WHEREAS,** on May 16, 2012, the United States Bankruptcy Court for the Southern District of New York (the "*Court*") entered the Interim Order authorizing the Borrowers to (a) use Cash Collateral and granting adequate protection to AFI Lender and the Junior Secured Parties (collectively, as applicable, the "*Adequate Protection Parties*"), and (b) to obtain postpetition secured superpriority financing under the AFI DIP Loan to fund in a manner consistent with past practices, the repurchase of whole loans from Ginnie Mae pools in order to (i) avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (ii) effect foreclosures, conveyances or other normal course loss mitigation activities with respect to the related properties in connection with the submission of HUD Claims (as hereinafter defined), and (iii) allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified, in each case, pursuant to the terms of the Interim Order and the Final Order;

**WHEREAS**, the Court scheduled, pursuant to Bankruptcy Rule 4001, a final hearing (the "*Final Hearing*") for the Court to consider entry of the Final Order authorizing the Borrowers on a final basis to use Cash Collateral and obtain the AFI DIP Loan, and providing such additional relief on a final basis as set forth in the Motion;

**WHEREAS**, the Debtors have filed a notice of the Proposed Final Order (the "*Supplemental Notice*"), dated June 15, 2012; and

**WHEREAS**, the Final Hearing was held by the Court on June 18, 2012 at 10:00 a.m.

**NOW THEREFORE**, upon the record established at the Interim and Final Hearings, and all objections to the entry of the Interim Order and this Final Order having been withdrawn, resolved or overruled by the Court, and after due deliberation and consideration, and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Petition Date.*  On May 14, 2012 (the "*Petition Date*"), each of the Debtors filed separate voluntary petitions under chapter 11 of the Bankruptcy Code in the Court commencing the Chapter 11 Cases.

2.      *Debtors-in-Possession.* The Debtors have continued in the management and operation of their businesses and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee has been appointed in these cases.  On May 16, 2012, the United States Trustee appointed the Creditors' Committee in these Cases.

3.      *Jurisdiction.*  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      *Notice.*  Notice of the Motion, the relief requested therein and the Final Hearing was given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the

Securities and Exchange Commission; (g) Barclays Bank PLC ("***Barclays***"), as the administrative agent, collateral agent, syndication agent, documentation agent, bookrunner and lead arranger for the Barclays DIP Facility[3] and counsel to Barclays; (h) The Bank of New York Mellon, as indenture trustee under the Pre-Petition GSAP Facility; (i) Barclays Bank PLC, as administrative agent under the Pre-Petition GSAP Facility; (j) Ally Financial Inc. and its counsel, Kirkland & Ellis LLP; (k) Ally Bank and its counsel, Kirkland & Ellis LLP; (l) Citibank, N.A., as secured lender under the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified, including pursuant to Amendment Number Ten, dated March 30, 2012 ( the "***Citibank MSR Facility***"); (m) U.S. Bank National Association, as Trustee for the Junior Secured Notes, and its counsel, Kelley Drye & Warren LLP; (n) Wells Fargo Bank, N.A., as collateral agent for the Prepetition Junior Secured Notes, as collateral agent for the AFI Revolver, and as collateral control agent under the Intercreditor Agreement, dated as June 6, 2008; (o) Fannie Mae; (p) Freddie Mac; (q) Ginnie Mae; (r) servicers and sub-servicers under the Designated Servicing Agreements and the Specified Servicing Agreements (each term as defined in the Barclays DIP Facility); (s) the MBS Trustees (as defined in the Barclays DIP Facility); (t) Nationstar Mortgage LLC and its counsel; (u) counsel for the official committee of unsecured creditors of the Debtors (the "***Creditors' Committee***"); and (v) the parties included on the Debtors' list of fifty (50) largest unsecured creditors (collectively, the "***Notice Parties***").  The Court finds that, in view of the facts and circumstances, such notice, together with the Supplemental Notice, is sufficient and no other or further notice need be provided.

---

[3]    The "***Barclays DIP Facility***" shall mean the DIP Facilities (as defined in the Barclays DIP Order).

5.      *Debtors' Stipulations.*  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraph 28 below), the Debtors admit, stipulate and agree that:

(a)      the Debtors' intend to propose a chapter 11 plan (the "***Plan***") that incorporates the settlement between AFI and the Debtors of all claims held by AFI and Ally Bank (together with their subsidiaries and affiliates, excluding Residential Capital, LLC and its subsidiaries, "***Ally***") against the Debtors, and of all claims held by the Debtors against Ally, including claims, defenses, or causes of action against the AFI LOC Lender and the AFI Revolver Lender with respect to the AFI LOC or the AFI Revolver (such claims related to the AFI LOC or AFI Revolver, the "***Ally Debt Claims***"), as set forth in the Settlement and Plan Sponsor Agreement dated as of May 14, 2012 (the "***Ally Settlement Agreement***"), and, as provided in the Ally Settlement Agreement, the Debtors have agreed to use commercially reasonable efforts to seek the Court's approval of the Plan (and the Ally Settlement Agreement, whether under the Plan or otherwise);

(b)      As of the Petition Date, the aggregate principal amount outstanding (i) under the AFI Revolver was at least $747,000,000, (ii) under the AFI LOC was at least $380,000,000, and (iii) under the Junior Secured Notes Documents was at least $2,120,452,000, in each case plus accrued and unpaid interest thereon, reimbursement obligations in respect thereof and additional fees and expenses and other amounts now or hereafter due, including under the Junior Secured Notes Documents (including any fees and expenses of the Junior Secured Parties' attorneys and financial advisors that are chargeable or reimbursable under the Junior Secured Notes Documents) and other obligations incurred in connection therewith (collectively, the "***Prepetition Obligations***");

(c)      the Junior Secured Notes Obligations constitute legal, valid and binding obligations of  Residential Capital LLC and the Junior Secured Notes Guarantors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);

(d)      no portion of the Junior Secured Notes Obligations is subject to avoidance, recharacterization, recovery, subordination, setoff, or counterclaim pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(e)      the Debtors have granted liens and security interests to the AFI Lender pursuant to and in connection with the AFI LOC, including the liens and security interests in the following:

(i)      certain of the accounts described in the *Final Order (A) Authorizing, But Not Directing, the Debtors to Continue Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Continued Investment of Excess Funds in Investment Accounts and (D) Authorizing Continued Intercompany Arrangements and Historical Practices*, which was entered by the Court on June 12, 2012 [Docket No. 309] (the "**Final Cash Management Order**"), including account number 796682920 established with JPMorgan Chase Bank, N.A. (the "**Ally DIP Account**"); and

(ii)      other personal and real property constituting "Collateral" under, and as defined in, the AFI LOC (the "**AFI LOC Collateral**"), and such liens and security interests are presently subject and subordinate only to (A) the Carve Out, as defined in paragraph 16(g), (B) certain liens and security interests granted to

10

secure the Adequate Protection Obligations (as defined in paragraph 16 below), and (C) certain liens and security interests granted to secure the AFI DIP Loan;

(f)        the Debtors have granted liens and security interests to secure the AFI Lender pursuant to and in connection with the AFI Revolver, including the liens and security interests in certain of the accounts described in the Final Cash Management Order, and in the other personal and real property constituting "Collateral" under, and as defined in, the AFI Revolver (the "*AFI Revolver Collateral*," and together with the AFI LOC Collateral, collectively, the "*AFI Lender Collateral*"), and such liens and security interests are presently subject and subordinate only to (A) the Carve Out, as defined in paragraph 16(g), and (B) certain liens and security interests granted to secure the Adequate Protection Obligations (as defined in paragraph 16 below);

(g)        the liens and security interests granted to secure the Junior Secured Parties pursuant to the Junior Secured Notes Documents and in connection with Junior Secured Notes (the "*Junior Secured Notes Liens*") are valid, binding, perfected, and enforceable first priority liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the Junior Secured Notes Documents (together with the AFI Lender Collateral, the "*Prepetition Collateral*") and (i) were granted to, or for the benefit of, the Junior Secured Parties for fair consideration and reasonably equivalent value; (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iii) are subject and subordinate only to (A) the liens and security interests granted to the AFI Lender under the AFI Revolver, all subject to the terms and conditions of the Intercreditor Agreement, dated as of June 6, 2008 (as amended, the "*Intercreditor Agreement*" and, together with the instruments and agreement evidencing or

11

providing for the issuance of the Prepetition Obligations, the "***Existing Agreements***"), (B) the

Carve Out, and (C) the liens and security interests granted to secure the Adequate Protection

Obligations (as defined in paragraph 16 below);

(h)      the collateral securing the Junior Secured Notes Obligations includes,

among others, the Pre-Petition Ally Repo Facility (as defined in the Barclays DIP Order) or any

residual value therefrom and the residual value of the Initial Purchased Assets securing the Pre-

Petition GSAP Facility (as defined in the Barclays DIP Order) through valid liens on the equity

interests of the entities owning the equity interests of the owners of such Initial Purchased

Assets, and the categories of assets under the columns labeled "Ally Revolver" and "Blanket" set

forth on **Exhibit A** to this Final Order;

(i)      no setoffs, recoupments, offsets, defenses or counterclaims to any of the

Junior Secured Notes Obligations exist, and no portion of the Junior Secured Notes Obligations

or any payments made to any or all of the Junior Secured Parties are subject to avoidance,

recharacterization, recovery, subordination, attach, recoupment, offset, counterclaim, defense, or

"claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or

applicable non-bankruptcy law, except for the priming contemplated herein;

(j)      there are no claims, defenses, or causes of action against the Junior

Secured Parties with respect to the Junior Secured Notes Documents (the "***Junior Secured***

***Parties Claims***");

(k)      subject to the reservation of rights set forth in paragraph 27 below, each

Debtor and its estate shall be deemed to have forever waived, discharged and released each of

the Junior Secured Parties in their respective capacities as such and their respective affiliates,

members, managers, equity security holders, agents, attorneys, financial advisors, consultants,

officers, directors, and employees of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment, or other offset rights, whether arising at law or in equity, relating to and/or otherwise in connection with the Junior Secured Notes Obligations and the Junior Secured Notes Liens, or the debtor creditor relationship between the Junior Secured Parties and the Debtors, including, without limitation, (x) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law, and (y) any right or basis to challenge or object to the amount, validity or enforceability of the Junior Secured Notes Obligations, or the validity, enforceability, priority or non-avoidability of the Junior Secured Notes Liens securing the Junior Secured Notes Obligations;

(l)    the Adequate Protection Parties retain, and have not waived or otherwise prejudiced, any of their rights, claims, defenses or counterclaims at law or in equity with respect to the Debtors or any other Person or Governmental Unit (each such term as defined in the Bankruptcy Code); and

(m)    prior to the Petition Date, the AFI LOC Borrowers funded the repurchase of whole loans (the "*Repurchased Loans*") from Ginnie Mae pools in order (i) to avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (ii) to effect foreclosures, conveyances or other normal course loss mitigation activities of the related properties in connection with the submission of HUD Claims (as defined below), and (iii) to allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified (collectively, the "*GNMA Buyouts*"), and for additional reasons determined at the Debtors' discretion.  Following the GNMA Buyouts, the

AFI LOC Borrowers submit a claim to the Secretary of the U.S. Department of Housing and Urban Development (such a claim, a "**HUD Claim**") for payments of amounts related to the Repurchased Loans insured by the Federal Housing Administration (the "**FHA**") or guaranteed by the U.S. Department of Veterans Affairs ("**VA**"), as applicable.  Following a period of review and processing of a HUD Claim, it is typically converted to cash that is remitted to the AFI LOC Borrowers.  The AFI LOC Borrowers will continue to fund GNMA Buyouts with the proceeds of the AFI DIP Loan on a postpetition basis and with Cash Collateral under the AFI Revolver Loan and submit HUD Claims in the ordinary course of business.

      6.    *Certain Findings Regarding the Use of Cash Collateral and the AFI DIP Loan*.

      (a)    Good cause has been shown for entry of this Final Order.  The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the use of Cash Collateral.  The use of Cash Collateral, will, therefore, help preserve the going concern value of the Debtors and their estates and will enhance the prospects for successful Chapter 11 Cases.

      (b)    The Debtors need to obtain the full amount of the financing available under the AFI DIP Loan in order to permit the orderly continuation of the operation of their businesses, including the continued funding of the GNMA Buyouts to ensure their compliance with the Ginnie Mae Guide and maintain their current issuer status.  The Debtors' access to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

      (c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the AFI DIP Lender under the AFI DIP Loan.  The Debtors are also unable to

obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the AFI DIP Lender, subject to the Carve Out (as defined below) as provided for herein, the AFI DIP Liens (as defined below) and the AFI Superpriority Claims (as defined below) upon the terms and conditions set forth in this Final Order and in the AFI DIP Loan.

(d)     Based on the record established in the Court at the Interim and Final Hearings, the terms of the AFI DIP Loan are fair and reasonable, and reflect the Debtors' and their respective managers' and directors' exercise of prudent business judgment consistent with their fiduciary duties.  Entry of this Final Order is in the best interests of the Debtors' estates and creditors.

(e)     The AFI DIP Loan has been negotiated in good faith and at arm's length among the Debtors and the AFI DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the AFI DIP Loan as well as the rights granted in the Interim Order, including (i) all future draws remitted to the AFI LOC Borrowers pursuant to the AFI DIP Loan, and (ii) any other obligations under the AFI DIP Loan (clauses (i) and (ii) collectively, the "*AFI DIP Obligations*"), shall be deemed to have been extended by the AFI DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     Based on the record established in the Court at the Interim and Final Hearings, the terms of the Debtors' use of Cash Collateral appear to be fair and reasonable, and reflect the Debtors' and their respective managers' and directors' exercise of prudent business

judgment consistent with their fiduciary duties.  Entry of this Final Order is in the best interests of the Debtors' estates and creditors.

(g)     The terms of the use of the Cash Collateral have been the subject of extensive negotiations conducted in good faith and at arm's-length among the Debtors and the Adequate Protection Parties, and the Adequate Protection Parties are found to have acted in "good faith" in connection with the negotiation and entry of this Final Order, and are entitled to the protections provided to good faith lenders under section 364(e) of the Bankruptcy Code.

(h)     The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Absent granting the relief set forth in this Final Order, the Debtors' estates will be irreparably harmed.  Consummation of the AFI DIP Loan in accordance with this Final Order is therefore in the best interest of the Debtors' estates.

7.     *Authorization for the AFI LOC Amendment and for Continued Borrowings Under the AFI LOC*.

(a)     The Debtors are hereby authorized and directed to continue to perform under the AFI LOC.  Further, the AFI LOC Borrowers and AFI LOC Guarantors are hereby authorized to execute and perform under the AFI LOC Amendment.  Each of the AFI LOC Borrowers is hereby authorized to borrow money pursuant to the AFI DIP Loan, and the AFI LOC Guarantors (as defined in the AFI LOC Amendment) are hereby authorized to unconditionally guaranty (on a joint and several basis) such borrowings and the AFI LOC Borrowers' joint and several obligations with respect to such borrowings up to an aggregate principal or face amount not to exceed $220 million; *provided* that the aggregate amount of AFI LOC prepetition and postpetition draws (plus any unpaid interest, expenses, or other costs payable thereunder) authorized under this Final Order may not exceed $600 million; *provided*

*further* that notwithstanding any provision in the AFI LOC Amendment to the contrary, the amount available under the AFI DIP Loan shall be $200 million, and any additional borrowings in excess of $200 million shall be made at the sole discretion of the AFI DIP Lender, all borrowings of which are at the same interest rate as provided for in the AFI LOC Amendment.

(b)    In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including the execution or recordation of security agreements, mortgages and financing statements), and to accrue all fees, payment of which shall be waived subject to consummation of the Plan pursuant to the terms of the Ally Settlement Agreement, that may be reasonably required or necessary for the Debtors' performance of their obligations under the AFI DIP Loan, including:

(i)    the execution, delivery, and performance of the AFI LOC Amendment;

(ii)    the performance of all other acts required under or in connection with the AFI DIP Loan pursuant to the AFI LOC, as amended by the AFI LOC Amendment (including the indemnity provisions contained therein).

(c)    The AFI LOC Amendment has been duly executed and delivered and the AFI LOC Amendment and the AFI DIP Loan constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms and this Final Order.  No obligation, payment, transfer, or grant of security under the AFI DIP Loan or this Final Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

8.      *AFI DIP Loan Liens*.   As security for the AFI DIP Obligations, effective and perfected upon the date of this Final Order and without the necessity of the execution, recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the AFI DIP Lender, the following security interests and liens are hereby granted to the AFI DIP Lender (all tangible and intangible property, whether real or personal, identified in clauses (a), (b), and (c) below being collectively referred to as the "**AFI DIP Loan Collateral**"); all such liens and security interests granted to the AFI DIP Lender pursuant to this Final Order (the "**AFI DIP Liens**"), subject and subordinate only to the payment of the Carve Out:

(a)      Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien upon all right, title and interest in all Repurchased Loans (including the related mortgage notes, mortgage, or any assignments of mortgage) and HUD Claims funded with the proceeds of the AFI DIP Loan, together with all proceeds, products, and supporting obligations with respect thereto;

(b)      Pursuant to section 364(d) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, whether tangible or intangible, whether real or personal, together with all proceeds and products thereof, that constitutes the AFI LOC Collateral (other than the property described in (a) of this paragraph); and

(c)      Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority security interest in the Ally DIP Account.

9.      *Superpriority Claims.*

(a)      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the AFI DIP
Obligations shall constitute allowed claims against each of the Debtors (without the need to file a
proof of claim) with priority over any and all administrative expenses, and all other claims
against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all
administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy
Code, and over any and all administrative expenses or other claims arising under section 105,
326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy
Code, including any superpriority claims granted as adequate protection in favor of the Debtors'
pre-petition secured lenders or other secured parties in the Cases, but not including the proceeds
of Chapter 5 avoidance actions (the "***Superpriority Claims***"), whether or not such expenses or
claims may become secured by a judgment lien or other non-consensual lien, levy or attachment,
which Superpriority Claims shall be subject only to the Carve Out to the extent specifically
provided for herein and shall be junior to the "Superpriority Claims" granted in respect of the
obligations under the Barclays DIP Facility (as defined hereinafter) pursuant to section 364(c)(1)
of the Bankruptcy Code (the "***Barclays 364(c)(1) Claims***") as provided in paragraph 13 of the
Barclays DIP Order;[4] *provided*, that the Barclays 364(c)(1) Claims are junior to the AFI Lender's
rights in the AFI DIP Loan Collateral and all proceeds and other consideration received upon the
sale, exchange, transfer, or other disposition thereof.

---

[4]    The "***Barclays DIP Order***" means the *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing Debtors (A) to Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) to Obtain Post-Petition Financing on a Secured Superpriority Basis, and (II) Granting Related Relief.*

10.    *Perfection of the AFI DIP Liens.*

(a)    The AFI DIP Lender is hereby authorized, but not required, to file or record financing statements, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the AFI DIP Lender shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of the Interim Order.

(b)    A certified copy of this Final Order may, in the discretion of the AFI DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Final Order for filing and recording.  For the avoidance of doubt, the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the AFI Lender, and the Secured Parties to take all actions, as applicable, referenced in this paragraph 10.

11.    *Use of AFI DIP Loan Proceeds.*[5]    The proceeds of the AFI DIP Loan shall be used solely to fund GNMA Buyouts to the extent necessary in order to (a) avoid Debtor GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (b) effect foreclosures, conveyances or other normal course loss mitigation activities of the related properties in connection with the submission of HUD Claims, and

---

[5]    In the event of any inconsistencies between the use restrictions contained in the AFI LOC Amendment and this Final Order, the terms of this Final Order shall govern.

(c) allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified. For the avoidance of doubt, no proceeds of the AFI DIP Loan may be used to fund the purchase of whole loans for any other purpose, including for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects, or for any other purpose other than as identified in the first sentence of this paragraph; *provided* that up to $50 million of the proceeds of the AFI DIP Loan million may be used for general corporate purposes; *provided further* that the use of any borrowings in excess of $200 million shall be at the sole discretion of the AFI DIP Lender.

12.      *Conditions Precedent to AFI DIP Loan Draws.* Notwithstanding the terms of the AFI DIP Loan, the AFI LOC Borrowers shall not be permitted to draw under the AFI DIP Loan unless the following conditions are satisfied:

(a)      the Debtors shall have performed and shall be current on all of their obligations required under (i) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (ii) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, and (iii) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012 (collectively, the "***Consent Obligations***");

(b)      the Court shall have entered the Final Cash Management Order in form and substance reasonably satisfactory to the AFI Lender;

(c)      the Debtors shall use good faith efforts to comply with all requirements attendant to their position as subsidiaries of a bank holding company; and

(d)    no Termination Event (as hereinafter defined) shall have occurred and be continuing.

13.    *Cash Collateral.*    The Debtors' cash and cash equivalents on deposit or maintained in any account or accounts by the Debtors that is subject to a perfected security interest in favor of the AFI Lender or the Junior Secured Parties and cash and cash equivalents generated by the collection of accounts receivable, sale of inventory, or other disposition of the Prepetition Collateral constitutes proceeds of the Prepetition Collateral and, therefore, are and shall be deemed to be cash collateral of the Adequate Protection Parties within the meaning of section 363(a) of the Bankruptcy Code for the purposes hereof and under the terms hereof (collectively, and together with all cash and cash equivalents otherwise constituting Prepetition Collateral and the AFI DIP Loan Collateral, the "***Cash Collateral***").

14.    *Reporting.*    The Debtors have delivered to the Adequate Protection Parties a 20-week forecast of anticipated cash receipts and disbursements for such period (the "***Initial 20-Week Forecast***"), a copy of which is attached as **Exhibit B** to the Motion and to this Final Order. In lieu of the reporting requirements set forth in the documents underlying the Prepetition Obligations, the Debtors shall deliver to the Adequate Protection Parties and the Creditors' Committee: (i) beginning on the first Monday immediately following five (5) weeks after the Petition Date (or if the Petition Date is a Monday, beginning five (5) weeks after the Closing Date), as soon as available, but not later than 1:00 p.m. (New York City time) on the sixth (6th) business day following each four-week period ended six (6) business days prior to such date, an updated 20-week forecast (an "***Updated Forecast***") for the following 20-week period (each such subsequent forecast delivered after the Initial 20-Week Forecast shall be, for the period of its applicability, referred to herein as the "***Forecast***") that is in form satisfactory to the AFI Lender;

(ii) beginning on the first Monday immediately following three (3) weeks after the Petition Date (or if the Petition Date is a Monday, beginning three (3) weeks after the Petition Date), as soon as available, but not later than 1:00 p.m. (New York City time) on the sixth (6th) business day following the two-week period ended six (6) business days prior to such date, a bi-weekly variance report for each prior two (2) week period setting forth, for such two-week period (x) actual results noting therein aggregate variances from amounts set forth for the two-week period in the relevant Forecast, (y) with respect to the AFI LOC, a report, in form and detail satisfactory to the AFI Lender, of all deposits into and withdrawals from the concentration account established and maintained pursuant to the AFI LOC, and (z) with respect to the AFI Revolver, a report, in form and detail satisfactory to the AFI Lender, of all deposits into and withdrawals from the concentration account established and maintained pursuant to the AFI Revolver; *provided* that on any date on which an Updated Forecast is provided, the variance report shall set forth actual results against the amounts projected in the relevant Forecast for the prior four-week period; and (iii) no later than the fifteenth (15) business day of each calendar month, a collateral report that reflects updated values as of the end of the prior calendar month (each such revised report, for the period of its applicability, to be referred to herein as the "**Collateral Report**"). Thereafter, promptly following request by the AFI Lender, the Creditors' Committee, or the Trustee, the Debtors shall make themselves reasonably available to discuss such Forecast and the details thereof.

15.    *Authorization of Use of Cash Collateral.*  Subject to the terms hereof, including all reservations of rights herein, the Borrowers are authorized to use Cash Collateral during the period from the Petition Date through and including the Termination Date (as defined in paragraph 20 below) solely for the purposes detailed within the Initial 20-Week Forecast and

each subsequent Forecast and, in the case of Cash Collateral of the AFI Revolver (the "**AFI Revolver Cash Collateral**"), to fund GNMA Buyouts, subject to the restriction on the use thereof for such purpose set forth in the first sentence of paragraph 11. Each Forecast will be subject to the written approval of the AFI Lender, and the AFI Lender shall use reasonable efforts to deliver its approval, or non-approval, as the case may be, to the Debtors within two business days of the receipt of the Forecast. The Debtors shall not use Cash Collateral and other Prepetition Collateral at any time, except as set forth in this Final Order.

16.     *Adequate Protection.*     Subject to the provisions of paragraph 28 hereof, the Adequate Protection Parties are entitled, pursuant to sections 362, 363(c)(2), and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Collateral to the extent of their interests therein, including any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of any Prepetition Collateral, including Cash Collateral, the priming of the AFI Lenders' liens on the AFI LOC Collateral by the Carve Out and AFI DIP Loan, and the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, if any, the "**Adequate Protection Obligations**"). As adequate protection, the Adequate Protection Parties are granted the following:

(a)     The AFI Lender, in its capacity as AFI LOC Lender, shall receive:

(i)     as security for the Adequate Protection Obligations, effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the AFI Lender of any collateral,

additional and replacement continuing, valid, binding, enforceable, non-avoidable and automatically perfected security interests and liens (the "***Adequate Protection Liens***") on all of the collateral securing the AFI LOC and any additional collateral purchased, funded, or financed through the use of Cash Collateral of the AFI LOC. The Adequate Protection Liens shall not be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code. The Adequate Protection Liens shall be (i) senior to the (A) existing liens granted to the AFI Lender under the AFI LOC, (B) junior liens in the AFI LOC Collateral granted under paragraph 14 of the Barclays DIP Order to secure the obligations under the Barclays DIP Facility, (C) Adequate Protection Liens granted to the AFI Lender in its capacity as AFI Revolver Lender, and (D) Adequate Protection Liens granted to the Junior Secured Parties, and (ii) junior to the Carve Out and the AFI DIP Liens;

(ii)     superpriority administrative expense claims as and to the extent provided in section 507(b) of the Bankruptcy Code with priority in payment over any and all unsecured claims and administrative expense claims, now existing or after arising, of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including sections 326, 328, 330, 331, 503(b), 506(c) and 726 of the Bankruptcy Code   (a "***507(b) Claim***"), which 507(b) Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or

any subsequent proceedings under the Bankruptcy Code subject and subordinate only to the Carve Out and that shall be (x) senior to the 507(b) Claims granted to the Junior Secured Parties, and (y) *pari passu* with the 507(b) Claims granted to Citibank, N.A. and the AFI Lender on account of the AFI Revolver; *provided* that notwithstanding any other provision of this Final Order, no 507(b) Claim shall be payable to the AFI Lender from (1) unencumbered property until the Adequate Protection Parties have exhausted recoveries from their collateral and (2) the proceeds of actions brought under chapter 5 of the Bankruptcy Code with respect to the AFI LOC or the AFI Revolver; *provided further* that the AFI Lender may seek Court approval of its rights to have the 507(b) Claims payable from the Debtors' unencumbered property upon a Termination Event; and

(iii)    adequate protection payments ("***Adequate Protection Payments***") consisting of accrued and unpaid prepetition interest as well as current postpetition payments of interest at the non-default rate set forth in the AFI LOC (the foregoing to include all unpaid prepetition interest);

(b)    the AFI Lender, in its capacity as the AFI Revolver Lender, shall receive:

(i)    Adequate Protection Liens on all of the collateral securing the AFI Revolver and any additional collateral purchased, funded, or financed through the use of AFI Revolver Cash Collateral, including the Repurchased Loans and related HUD Claims, which shall be (x) junior only to the existing liens granted to the AFI Revolver Lender under the AFI Revolver, and (y) senior to (A) the existing liens granted to the Junior Secured Parties, and (B) Adequate Protection Liens granted to the Junior Secured Parties;

(ii)    additional Adequate Protection Liens on all of the collateral securing the AFI LOC, which shall be (x) junior to the (A) existing liens granted to the AFI Lender under the AFI LOC, (B) Adequate Protection Liens granted to the AFI LOC Lender, (C) the liens granted under paragraph 14 of the Barclays DIP Order to secure the obligations under the Barclays DIP Facility (the "*Barclays DIP Liens*") and (D) the AFI DIP Liens, and (y) senior to the Adequate Protection Liens granted to the Junior Secured Parties on the collateral securing the AFI LOC as set forth below;

(iii)    507(b) Claims that are (x) senior to the 507(b) Claims granted to the Junior Secured Parties and (y) *pari passu* with the 507(b) Claims granted to Citibank, N.A. and the AFI Lender on account of the AFI LOC (but senior to the claims referred to in this clause (y) to the extent relating to Cash Collateral that is used to fund GNMA Buyouts);

(iv)    Additional Adequate Protection Liens on all of the equity of GMACM Borrower and RFC Borrower (each as defined in the Barclays DIP Facility and collectively referred to herein as the "*Barclays DIP Borrowers*"), which shall be senior to the Adequate Protection Liens granted to the Junior Secured Parties on the equity of the Barclays DIP Borrowers; *provided* that the Adequate Protection Liens on the equity of the Barclays DIP Borrowers shall only be to the extent that the Adequate Protection Parties were secured by valid liens on (a) the Pre-Petition Ally Repo Facility (as defined in the Barclays DIP Order) or any residual value therefrom and/or (b) the residual value of the Initial Purchased Assets securing the Pre-Petition GSAP Facility (as defined in the

Barclays DIP Order) through valid liens on the equity interests of the entities

owning the equity interests of the owners of such Initial Purchased Assets; and

(v)    Adequate Protection Payments consisting of accrued and unpaid

prepetition interest as well as current postpetition payments of interest at the non-

default rate set forth in the AFI Revolver (the foregoing to include all unpaid

prepetition interest) calculated based on the AFI Revolver balance of $400

million; *provided* that if that certain Plan Support Agreement between AFI,

certain Junior Secured Noteholders, and the Debtors dated as of May 13, 2012

and attached as **Exhibit 9** to the Whitlinger Affidavit [Docket No. 6] (the "***Junior***

***Notes PSA***") is terminated pursuant to its terms, the AFI Lenders shall be entitled

to payment of interest on the full amount outstanding under the AFI Revolver,

including all accrued and unpaid interest thereon; and

(c)    the Junior Secured Parties shall receive:

(i)    Adequate Protection Liens on all of the collateral securing the AFI

Revolver, which shall be junior to the (x) existing liens granted to the AFI Lender

under the AFI Revolver, (y) Adequate Protection Liens granted to the AFI Lender

in its capacity as AFI Revolver Lender and (z) existing liens granted to the Junior

Secured Parties, *provided* that the enforcement of the Adequate Protection Liens

shall be subject to, in all respects, the Intercreditor Agreement and paragraph 23

below;

(ii)    additional Adequate Protection Liens on all of the collateral

securing the AFI LOC, which shall be junior to (x) all existing liens and Adequate

Protection Liens granted to the AFI Lender (on both the AFI LOC and the AFI
Revolver), (y) the Barclays DIP Liens and (z) the AFI DIP Liens;

     (iii)    additional Adequate Protection Liens on all of the equity interests
of the Barclays DIP Borrowers, which shall be junior to the Adequate Protection
Liens granted to the AFI Revolver Lender on the equity of the Barclays DIP
Borrowers; *provided* that such Adequate Protection Liens on the equity of the
Barclays DIP Borrowers shall only be to the extent that the Junior Secured Parties
were secured by valid liens on (a) the Pre-Petition Ally Repo Facility (as defined
in the Barclays DIP Order) or any residual value therefrom and/or (b) the residual
value of the Initial Purchased Assets Securing the Pre-Petition GSAP Facility (as
defined in the Barclays DIP Order) through valid liens on the equity interests of
the entities owning the equity interests of the owners of such Initial Purchased
Assets.

     (iv)    to the extent the Adequate Protection Liens are insufficient to
provide adequate protection, 507(b) Claims against each Debtor that are junior to
the 507(b) Claims granted to the lenders under the Barclays DIP Facility and all
507(b) Claims granted to the AFI Lender but *pari passu* with any and all other
507(b) Claims; *provided* that notwithstanding any other provision of this Final
Order, no 507(b) Claim shall be payable to the Junior Secured Parties from
(1) unencumbered property until the Adequate Protection Parties have exhausted
recoveries from their collateral and (2) the proceeds of actions brought under
chapter 5 of the Bankruptcy Code with respect to the Junior Secured Notes
Documents; *provided further* that the Junior Secured Parties may seek Court

approval of its rights to have the 507(b) Claims payable from the Debtors' unencumbered property upon a Termination Event; and

(v)    The Debtors shall promptly pay the reasonable fees and expenses, whether accrued prepetition or postpetition, (i) of the Trustee (including the reasonable fees and expenses of Kelley Drye & Warren LLP), and (ii) of that certain Ad Hoc Committee of Holders of Junior Secured Notes represented by White & Case LLP (including the reasonable fees and expenses of White & Case LLP and Houlihan Lokey); *provided* that none of such fees and expenses as Adequate Protection Payments hereunder shall be subject to further approval by the Court or the United States Trustee Guidelines, but such professionals shall provide copies of summary invoices and statements (subject in all respects to applicable privilege or work product doctrines) to the Debtors, Creditors' Committee, and the U.S. Trustee, and the Debtors shall promptly pay all reasonable fees and expenses not subject to objection of the U.S. Trustee or the Creditors' Committee on the eleventh business day after the receipt of such invoices.  No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, however, that the Court shall have jurisdiction to determine any dispute concerning such invoices, *provided*, *further*, however, that nothing shall prejudice the rights of any party to seek to recharacterize any such payments, upon motion and further order of the Court, as payments of principal under the Junior Secured Notes.

(d)    Notwithstanding anything to the contrary in this Final Order, the sum of the obligations under the (x) AFI DIP Loan plus (y) the AFI LOC Loan plus (z) the Adequate

Protection Obligations, including any unpaid interest, expenses, or other costs payable with respect to such obligations in (x), (y) and (z), in respect of the AFI LOC Loan that shall be senior to the Barclays DIP Liens in the AFI LOC Collateral granted in paragraph 14 of the Barclays DIP Order shall not exceed $600,000,000.

(e)    All 507(b) Claims granted herein are junior and subordinate to all administrative expense claims granted priority under section 364(c)(1) of the Bankruptcy Code whether under this order, the Barclays DIP Order, or otherwise.

(f)    All reasonable, documented fees, and expenses incurred or accrued by the AFI Lender, including reasonable documented fees and expenses of counsel, shall accrue during the Chapter 11 Cases and be waived by AFI Lender subject to confirmation of the Plan that is in accordance with the terms of the Ally Settlement Agreement.    In the event that the Plan incorporating the Ally Settlement Agreement in accordance with the terms thereof is not confirmed, the Debtors shall pay all of such AFI Lender's fees and expenses.

(g)    For purposes hereof, the "*Carve Out*"[6] shall mean the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, and (ii) at any time after the first business day after the occurrence and during the continuance of a Termination Event hereunder, and delivery of notice thereof to the U.S. Trustee and each of the lead counsel for the Debtors (the "*Carve Out Notice*"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid fees and

---

[6]    The Carve Out is intended to mirror the Barclays' Carve Out (and not be in addition to).  Allocation of the $25 million Carve Out monies between the Barclays' DIP collateral and Collateral of AFI shall be pro rata based on amounts outstanding under the (a) Barclays DIP, and  (b) the aggregate amount of the AFI LOC, AFI Revolver, and AFI DIP Loan.  For the avoidance of doubt, any limitations on the use of the Carve Out as provided in this Final Order shall only apply to that portion of the Carve-Out allocable to the collateral of AFI.

expenses incurred by the professionals retained in the Chapter 11 Cases and reimbursement of out-of-pocket expenses of the members of any official committee appointed in the Chapter 11 Cases, including the Creditors' Committee (collectively, the "*Professional Fees*") incurred by persons or firms whose retention is approved pursuant to sections 327 and 1103 of the Bankruptcy Code after the Business Day following delivery of the Carve Out Notice and allowed by the Court, in an aggregate amount not exceeding $25 million (the "*Carve Out Cap*") (plus all unpaid Professional Fees allowed by the Court at any time that were incurred on or prior to the Business Day following delivery of the Carve Out Notice, whether paid or unpaid); provided further that (A) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Adequate Protection Parties, (B) so long as no event of default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (C) nothing in this Final Order shall impair the right of any party to object to any such fees or expenses to be paid by the Debtors' estates.

17.    *Replacement Liens*.  Pursuant to section 363(e) and (f) of the Bankruptcy Code or otherwise, the AFI Revolver Lender shall receive first priority replacement liens and the Junior Secured Parties shall receive second priority replacement liens (collectively, the "*Replacement Liens*"), junior only to the Replacement Liens granted to the AFI Revolver Lender, on all of the equity of the Barclays DIP Borrowers as adequate protection for the transfer of the Initial Purchased Assets (as defined in the Barclays DIP Order); *provided* that the Replacement Liens on the equity of the Barclays DIP Borrowers shall only be to the extent that the AFI Revolver Lender and the Junior Secured Parties were secured by valid liens on (a) the Pre-Petition Ally

Repo Facility (as defined in the Barclays DIP Order) or any residual value therefrom and/or (b)

the residual value of the Initial Purchased Assets securing the Pre-Petition GSAP Facility (as

defined in the Barclays DIP Order) through valid liens on the equity interests of the entities

owning the equity interests of the owners of such Initial Purchased Assets.

18.    *Additional Adequate Protection.*

(a)    <u>Covenants</u>:  As additional adequate protection:

(i)    the Debtors shall maintain (x) their cash management system and

(y) the treatment of any and all claims on account of postpetition distributions and

transfers by the Borrowers to any Affiliated Debtor (the "***Priority Intercompany***

***Claim***"), in each case, in a manner consistent with such arrangements and

treatment described in the Final Cash Management Order, without further

modification thereto;

(ii)    the Debtors shall use good faith efforts to be in compliance with all

requirements attendant to their position as subsidiaries of a bank holding

company;

(iii)    the Debtors shall continue to perform and remain current with, and

require that all of the Debtors continue to perform and remain current with, all of

their obligations under the Consent Obligations;

(iv)    the Debtors shall comply with the terms of the Amended and

Restated Servicing Agreement by and between Ally Bank, as Owner, and GMAC

Mortgage, LLC, as Servicer, dated as of May 11, 2012;

(v)    the Debtors shall comply with the terms of the *Interim Order*

*Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the*

*Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business* or *Final Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business*, as applicable;

(vi)    the Debtors shall have closed all accounts with Wells Fargo Bank, N.A., and its subsidiaries and affiliates, by June 12, 2012; *provided* that GMAC Mortgage LLC account number 2000042898689 shall have been closed by June 15, 2012;

(vii)    the Debtors shall gain approval by the Court for the *Final Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business* in form and substance satisfactory to the AFI Lender by July 13, 2012;

(viii)    the Debtors shall use the AFI DIP Loan proceeds in accordance with the use restrictions contained in this Final Order; and

(ix)    the effective date of the Plan that, for the avoidance of doubt, incorporates the terms of the Ally Settlement Agreement shall occur by December 15, 2012.

(b)    Reporting:  As further adequate protection hereunder, the Debtors shall comply with the reporting requirements set forth in paragraph 14 (the "***Reporting Requirements***").    Further, the Adequate Protection Parties and the Creditors' Committee shall receive copies of all reports provided to the lenders pursuant to the Barclays DIP Facility and the Barclays DIP order.

(c)      Section 552 Waiver.  The "equities of the case" exception contained in section 552(b) of the Bankruptcy Code is hereby waived by the Debtors with respect to the Prepetition Collateral.

19.    *Exercise of Rights and Remedies against Deposit Accounts*.  Notwithstanding anything to the contrary contained in any instrument or agreement to which the Borrowers, or any Debtor, are party or subject, or in any order entered by the Court, no Person (as defined by the Bankruptcy Code) that holds or has lien or other security interest on any demand deposit or other accounts of a Debtor may exercise any rights or remedies against any such account (including by way of set off), whether pursuant to an account control agreement or otherwise, without first providing seven days written notice (by facsimile electronic mail, overnight mail or hand delivery) to the U.S. Trustee, counsel to the Debtors, counsel to the Creditors' Committee, counsel for the AFI Lender, counsel to the Junior Secured Notes, counsel for Citibank, N.A. and counsel for Barclays (the "*Account Notice Parties*").  The AFI Lender hereby acknowledges and stipulates that its liens on any demand deposit or other account, whether such lien arises under a prepetition control agreement or under this Final Order, attach only to the proceeds of its collateral, and such liens do not attach to amounts on deposit in any such account to the extent such amount constitutes the proceeds of any other Person's collateral or property that was unencumbered prior to its being deposited in such an account.  In the event any Person asserts the occurrence and continuance of a default or an event of default and the right to exercise remedies with respect to such an account, the Debtors within three days will prepare and serve on the Account Notice Parties a detailed accounting of each Person's interest in the amounts on deposit in such account.  All parties rights to review and object to such accounting are hereby preserved.  Each Account Notice Party shall serve on the others a notice of objections with

respect to such accounting within 5 days following service thereof. Any unresolved disputes with the Debtors' accounting shall be determined by the Court at a hearing to be held on not less than 15 days written notice to the Account Notice Parties.  All amounts in dispute shall remain on deposit in such account pending Court order.  No commingling of amounts on deposit in any such account shall in any way adversely affect, detract from, or otherwise impair the perfection of any Person's lien on such proceeds.

20.    *Termination.*  The Borrowers' right to use Prepetition Collateral, including Cash Collateral, and the AFI DIP Loan, pursuant to this Final Order shall automatically terminate (the date of any such termination, the "***Termination Date***") without further notice or order of the Court (x) on the effective date of a Plan for any Debtor or (y) upon written notice (the "***Termination Notice***") by the AFI Lender (or, if the AFI Revolver has been paid in full, by the Junior Secured Parties) to the Borrowers (with a copy to counsel to the Creditors' Committee, the Administrative Agent and the Collateral Agent under the Barclays DIP Facility, and the United States Trustee) after the occurrence and during the continuance of any of the following events (unless waived by the Adequate Protection Parties, "***Termination Events***") beyond any applicable grace period set forth below:

(a)    the occurrence and continuance of an event of default under the Barclays DIP Facility;

(b)    the occurrence and continuance of an event of default under the AFI DIP Loan;

(c)    the Debtors seek to reject under section 365 of the Bankruptcy Code, or otherwise, either the Master Servicing Agreement (1st Lien Mortgages Servicing Released) dated as of April 16, 2006 and amended as of June 1, 2007 between Residential Funding Company,

LLC (f/k/a Residential Funding Corporation) and Ally Bank (f/k/a GMAC Bank) or the Master

Servicing Agreement (1st Lien Mortgages Servicing Retained) dated as of August 15, 2005 and

amended as of March 31, 2006 between Residential Funding Company, LLC (f/k/a Residential

Funding Corporation) and Ally Bank (f/k/a GMAC Bank);

(d)    failure to perform or remain current on all of the Consent Obligations;

(e)    failure to obtain entry of the *Final Order Pursuant to Sections 105(A)and

*363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank

Servicing Agreement in the Ordinary Course of Business* in form and substance satisfactory to

the AFI Lender on or before July 13, 2012;

(f)    failure to satisfy the Reporting Requirements that continues unremedied

for a period of five (5) business days after the date of such failure;

(g)    failure of the Borrowers to comply with any other covenant or agreement

specified in this Final Order that continues unremedied for a period of five (5) business days

after the date of such failure;

(h)    any default, event of default, early amortization event, or termination

event (other than as a result of the commencement of the Chapter 11 Cases) shall occur under

any material document or agreement that relates to the Prepetition Collateral and such event

could reasonably be expected to be materially adverse to the rights and interests of the Adequate

Protection Parties, as applicable;

(i)    any of the material Chapter 11 Cases shall be dismissed or converted to a

chapter 7 case; or a chapter 11 trustee with plenary powers, a responsible officer or an examiner

with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond

those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the material Chapter 11 Cases;

(j)     appointment of a trustee (or comparable person) or a responsible officer or examiner with expanded powers in any of the material Chapter 11 Cases (or any of the Debtors or their affiliates seeking or supporting such appointment);

(k)     the Court shall enter an order granting relief from the automatic stay as to any Prepetition Collateral which has an aggregate value in excess of $25 million and such order shall not, at any time, be subject to stay pending appeal;

(l)     a court shall enter an order amending, supplementing, staying, vacating or otherwise modifying this Final Order except as otherwise agreed to in writing by the Adequate Protection Parties, or this Final Order shall cease to be in full force and effect; provided that no event of default shall occur to the extent that any such amendment, supplement or other modification is made in compliance with this Final Order and is not adverse, in the reasonable judgment of the Adequate Protection Parties, as applicable;

(m)     entry of a Bankruptcy Court order granting any superpriority claim (or claim of equivalent status) that is senior to or *pari passu* with the claims of the Adequate Protection Parties or any lien or security interest that is senior to or *pari passu* with the liens and security interests securing the AFI DIP Loan, AFI Revolver, the AFI LOC, or the Junior Secured Notes, except as provided herein;

(n)     entry of an order authorizing recovery from Prepetition Collateral, including Cash Collateral, for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than as may be provided in this Final Order, or certain *de minimis* amounts as may be agreed to by the Adequate Protection Parties;

(o)      any judgment in excess of $10 million as to any postpetition obligation not covered by insurance shall be rendered against the Debtors and the enforcement thereof shall not effectively be stayed at all times; or there shall be rendered against the Debtors a non-monetary judgment with respect to a postpetition event which has or could reasonably be expected to have a material adverse effect on the property, business or condition (financial or otherwise) of the Debtors taken as a whole or the ability of the Debtors to perform their obligations under this Final Order; or

(p)      any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables (including reclamation claims) other than payments authorized by the Court.

The Borrowers shall, within two business days of an occurrence of a Termination Event, provide the corresponding Termination Notice to the parties set forth above.

21.    *Remedies After Termination Event.*

(a)      The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit

(i)      the Adequate Protection Parties to, immediately upon the occurrence and during the continuation of a Termination Event, and issuance of a the Termination Notice, terminate the right of the Borrowers to use Prepetition Collateral, including Cash Collateral;

(ii)      In no event shall the Adequate Protection Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral.  The delay or failure of the Adequate Protection Parties to

exercise rights and remedies under the Prepetition Obligations or this Final Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the Prepetition Obligations; and

(iii)   the AFI DIP Lender to exercise all rights and remedies under the AFI DIP Loan, and, to the extent provided for in the AFI DIP Loan, to take any or all of the following actions without further order of or application to the Court: (a) cease to make any extensions of credit or loans or advances to the Debtors; (b) declare all AFI DIP Obligations to be immediately due and payable without presentment, demand, protest or notice; (c) the AFI DIP Lender shall exercise any and all remedies available to it under the AFI DIP Loan; (d) take any other actions or exercise any other rights or remedies permitted under this Order, the AFI DIP Loan, or applicable law to realize upon the AFI DIP Loan Collateral and/or effect the repayment and satisfaction of the DIP Obligations.

(b)   The rights of the AFI DIP Lender to exercise the remedies in paragraph 21(a)(iii) above are subject to the AFI DIP Lender providing seven (7) days written notice (by facsimile, telecopy, electronic mail or otherwise) to the U.S. Trustee, counsel to the Debtors, counsel to the Junior Secured Parties, counsel to any Committee and counsel to the Administrative Agent and Collateral Agent under the Barclays DIP Facility (collectively, the "**_Termination Notice Parties_**"), prior to exercising any enforcement rights or remedies in respect of the Collateral (other than the rights described in clauses 21(a)(iii)(a) and (b) above (to the extent they might be deemed remedies in respect of the Collateral) and other than with respect to the placement of administrative holds on any other deposit accounts or securities accounts).  All

rights of the AFI DIP Lender and Adequate Protection Parties are subject to paragraphs 16 (e)-(h) of the Barclays DIP Order.  In any hearing regarding any exercise of rights or remedies by the AFI Lender, the only issue that may be raised by the Debtors and any party in interest shall be whether, in fact, a Termination Event has occurred and is continuing, and neither the Debtors nor any party in interest shall be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the AFI DIP Lender set forth in this Order or the AFI DIP Loan.  In no event shall the AFI DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the AFI DIP Loan Collateral.  The Adequate Protection Parties may exercise the remedies in paragraph 21(a)(i) three (3) business days after giving the Termination Notice to the Borrowers with a copy to the Termination Notice Parties; *provided* that the Debtors and the Creditors' Committee shall be entitled to an emergency hearing before this Court within seven (7) days after the Termination Notice has been given to the Borrowers.  If the Debtors or the Creditors' Committee do not contest the Termination Event with such seven (7) day period, or if the Debtors or the Creditors' Committee do timely contest the occurrence of a Termination Event and the Court after notice and hearing (within such seven (7) day period) declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes of the automatic stay.  Nothing herein shall preclude the Adequate Protection Parties from seeking an order of the Court upon written notice (electronically, including via facsimile, in a manner that generates a receipt for delivery, or via overnight mail) to the Borrowers and Termination Notice Parties authorizing the Adequate Protection Parties to exercise any enforcement rights or remedies with respect to the Prepetition Collateral on less than seven (7) days' notice, or the Debtors' right to contest such relief.

(c)      Subject to the provisions of the Junior Notes PSA or further order of the Court, following the occurrence of an event of default under the Prepetition Obligations, the Junior Secured Parties may not exercise any rights or remedies under the Junior Secured Notes Documents or this Final Order unless and until all the indebtedness of the AFI Lender attributable to the AFI Revolver, including the Adequate Protection Liens, 507(b) Claims, and Adequate Protection Payments granted to the AFI Lender on account the AFI Revolver pursuant to the terms of this Final Order (collectively, the "*AFI Revolver Payable*"), has been paid in full in cash and all commitments under the AFI Revolver and AFI Revolver Payable have been terminated or an amount sufficient to satisfy the AFI Revolver Payable has been escrowed by the Debtors (calculated in accordance with the Junior Notes PSA to the extent then in effect).  If, prior to the payment in full in cash of all of the AFI Revolver Payable and all commitments under the AFI Revolver and AFI Revolver Payable having been terminated, the Junior Secured Parties or any other party holding a claim junior to the AFI Revolver Payable receive(s) any Prepetition Collateral or proceeds thereof, such Prepetition Collateral or proceeds thereof shall be considered to be held in trust for the benefit of the AFI Revolver Lender and shall be immediately payable to the AFI Revolver Lender.  For the avoidance of doubt, other than the use of the Carve Out in accordance with the terms of this Final Order, and as set forth in paragraph 30, the Borrowers may not use the Prepetition Collateral or Cash Collateral to challenge in any manner the claims and liens of the Adequate Protection Parties.

22.      *Limitation on Charging Expenses Against Prepetition Collateral and AFI DIP Loan Collateral.*  Except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or

recovered from the Prepetition Collateral and AFI DIP Loan Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Adequate Protection Parties or AFI DIP Lender, as applicable and no such consent shall be implied from any other action, inaction, or acquiescence by the Adequate Protection Parties or AFI DIP Lender, as applicable.

23.    *Reservation of Rights of The Adequate Protection Parties.*    The adequate protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties.  Notwithstanding any other provision hereof, the grant of adequate protection to the Adequate Protection Parties pursuant hereto is without prejudice to the right of the Adequate Protection Parties to seek modification of the grant of adequate protection provided hereby so as to provide different or additional Adequate Protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.  Nothing herein shall be deemed to waive, modify or otherwise impair the rights of the Adequate Protection Parties under the Existing Agreements, and the Adequate Protection Parties expressly reserve all rights and remedies that the Adequate Protection Parties now or may in the future have under the Existing Agreements and/or applicable law in connection with all defaults and events of default.  Except as expressly provided herein, nothing contained in this Final Order (including the authorization to use any Prepetition Collateral, including Cash Collateral) shall have the effect of, or shall be construed as having the effect of, amending or waiving any covenant, term or provision of the Existing Agreements, or any rights or remedies of the Adequate Protection Parties thereunder, including any right to argue that failure to strictly comply with any such covenant, term or provision during the course of the Chapter 11 Cases or that any use of Prepetition Collateral, including Cash Collateral, permitted or contemplated

hereby constitutes a default or event of default that is not subject to cure under section 1124 of the Bankruptcy Code or otherwise despite any consent or agreement contained herein.

24.    *Reservation of Rights of The Debtors.*    The foregoing adequate protection provisions contained in this Final Order shall be without prejudice to the rights of the Debtors or the Creditors' Committee to object to the Adequate Protection Parties' request for any other, further or additional Adequate Protection.  Nothing in this Final Order shall be deemed to waive, modify or otherwise impair the respective rights of the Debtors under the Existing Agreements, and the Debtors expressly reserve all rights and remedies that each has now or may in the future have under the Existing Agreements and/or applicable law (subject to paragraphs 5 and 27).

25.    *Reservation of Rights of the Junior Secured Parties*.  The Junior Secured Parties hereby reserve their rights to assert arguments that the adequate protection provided hereunder is insufficient on account of diminution in value of the AFI Revolver Collateral resulting from the Barclays DIP Loan; *provided*, that the Junior Secured Parties shall not assert any such arguments, if at all, prior to January 1, 2013, with such date subject to extension solely at the discretion of the Junior Secured Parties, and that the assertion of such arguments may in no way adversely affect Ally.

26.    *Perfection of Adequate Protection Liens.*  The Adequate Protection Parties are authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over or take any other action in order to validate and perfect the liens and security interests granted to it hereunder.  Whether or not the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over or otherwise confirm

perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the Petition Date.

27.    *Preservation of Rights Granted Under the Final Order.*

(a)    Except as permitted in this Final Order, no claim or lien having a priority senior to or *pari passu* with those granted by the Interim Order to the Adequate Protection Parties shall be granted or allowed while any portion of the Adequate Protection Obligations remain outstanding, and Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Borrowers' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Except as otherwise provided for herein, no claim or lien having a priority superior to or *pari passu* with those granted by this Final Order to the AFI DIP Lender shall be granted or allowed while any portion of the AFI DIP Loan or the commitments thereunder or the DIP Obligations remain outstanding, and the AFI DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise (other than the Carve Out and as expressly provided in this Final Order).

(c)    Unless all AFI DIP Obligations shall have been indefeasibly paid in full, the Debtors shall not seek (i) any modifications or extensions of this Final Order without the prior written consent of the AFI DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the AFI DIP Lender, or (ii) an order converting or dismissing

any of the Chapter 11 Cases. If an order dismissing any of the Chapter 11 Cases under section 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims and AFI DIP Liens granted to the AFI DIP Lender pursuant to this Final Order shall continue in full force and effect, shall maintain their priorities as provided in this Final Order and shall, notwithstanding such dismissal, remain binding on all parties in interest until all AFI DIP Obligations shall have been indefeasibly paid in full in cash and the commitments under the AFI DIP Loan have been terminated in accordance with the AFI DIP Loan and (ii) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claims and AFI DIP Liens.

(d)     If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the 507(b) Claims, the other administrative claims granted pursuant to this Final Order and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Adequate Protection Obligations shall have been paid and satisfied in full (and that such 507(b) Claims, the other administrative claims granted pursuant to this Final Order and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) above.

(e)     If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the

actual receipt of written notice by the Adequate Protection Parties of the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of Prepetition Collateral, including Cash Collateral, or any Adequate Protection Obligations incurred by the Borrowers hereunder, as the case may be, prior to the actual receipt of written notice by the Adequate Protection Parties of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Final Order, and the Adequate Protection Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in this Final Order with respect to all uses of Prepetition Collateral, including Cash Collateral, and all Adequate Protection Obligations.

(f) If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt by the AFI Lender of written notice of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of the AFI DIP Liens and Superpriority Claims authorized or created hereby or pursuant to the AFI DIP Loan with respect to any DIP Obligations. Notwithstanding any such reversal, stay, modification or vacation, the DIP Obligations incurred by the Debtors pursuant to the AFI DIP Loan, prior to the actual receipt by the AFI DIP Lender of written notice of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Final Order, and the AFI DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order and pursuant to the AFI DIP Loan.

(g)        Except as provided in this paragraph 27(g), the Adequate Protections

Payments shall not be subject to counterclaim, setoff, subordination, recharacterization, defense,

or avoidance in the Chapter 11 Cases or any subsequent chapter 7 case, *provided* that if the

Adequate Protection Parties' respective Prepetition Obligations are determined by this Court to

be undersecured, any party in interest may seek, subject to further order entered by this Court, to

recharacterize and recredit to the principal balance of such Prepetition Obligations, any interest

payments or payment of fees to the applicable Adequate Protection Parties permitted hereunder

as Adequate Protection Payments.

(h)        Except as expressly provided in this Final Order or in the Prepetition

Obligations, the Adequate Protection Obligations, the 507(b) Claims and all other rights and

remedies of the Adequate Protection Parties granted by the provisions of this Final Order and the

Prepetition Obligations shall survive, and shall not be modified, impaired or discharged by (i) the

entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the

Bankruptcy Code, dismissing any of the Chapter 11 Cases or by any other act or omission, or

(ii) the entry of an order confirming a Plan in any of the Chapter 11 Cases and, pursuant to

section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any

remaining Adequate Protection Obligations.  The terms and provisions of this Final Order and

the Prepetition Obligations shall continue in the Chapter 11 Cases, in any successor cases, or in

any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens,

the 507(b) Claims, the other administrative claims granted pursuant to this Final Order, and all

other rights and remedies of the Adequate Protection Parties granted by the provisions of this

Final Order and the Prepetition Obligations shall continue in full force and effect until all

Adequate Protection Obligations are indefeasibly paid in full in cash.  Notwithstanding anything

contained in this paragraph, nothing in this Final Order shall (i) limit the Debtors' rights, if any, with respect to unimpairment of the Debtors' prepetition debt or (ii) be deemed to modify the Prepetition Obligations.

(i)      Except as expressly provided in this Final Order or in the AFI DIP Loan, the AFI DIP Liens, the Superpriority Claims of the AFI DIP Lender and all other rights and remedies of the AFI DIP Lender granted by the provisions of this Final Order and the AFI DIP Loan shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Final Order and the AFI DIP Loan shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the AFI DIP Liens, the Superpriority Claims of the AFI DIP Lender and all other rights and remedies of the AFI DIP Lender granted by the provisions of this Final Order and the AFI DIP Loan shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

28.     *Effect of Stipulations on Third Parties.*  The stipulations, admissions, and releases contained in paragraph 5(b)-5(k) of this Final Order, shall be binding on the Debtors upon entry of this Final Order.  The stipulations, admissions, and releases contained in paragraph 5(b)-5(k) of this Order, shall be binding on all parties in interest, including the Creditors' Committee, unless, and solely to the extent that, any party in interest files an objection to this Final Order

challenging such stipulations, admissions, releases, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against the Junior Secured Parties (an "***Objection***"), in each case no later than the later of ninety (90) days after entry of this Final Order (the "***Challenge Deadline***"); *provided* that if the Creditors' Committee files a motion seeking standing to bring causes of action against the Junior Secured Parties prior to the Challenge Deadline, the Challenge Deadline shall be tolled until adjudication of such motion, which will be heard at the next omnibus hearing following the filing of the motion or as determined by the Court. If no such Objection is timely filed then, without further order of the Court, all of the stipulations, admissions and releases set forth in paragraph 5 shall be binding on all parties in interest in the Chapter 11 Cases and shall not be subject to challenge or modification in any respect. If such an Objection is timely filed, the stipulations, admissions and releases shall nonetheless remain binding on all parties in interest and shall be preclusive except to the extent that any such stipulations, admissions and releases are expressly challenged pursuant to such timely filed Objection, and there is an order sustaining such Objection. Notwithstanding anything to the contrary, if the Junior Notes PSA is terminated, the stipulation contained in paragraph 5(g)(iii)(A) or this Final Order shall not be binding on the Junior Secured Notes. For the avoidance of doubt, the Challenge Deadline shall only apply to the Junior Secured Notes.

29. *Reservation of Rights.* Notwithstanding anything herein to the contrary, this Final Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, the Consent Obligations. As to the United States, its agencies, departments or agents, nothing in this Final Order shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have with respect to collateral that is not (a) the AFI DIP Loan Collateral or (b) subject to Adequate Protection Liens under this Final Order.

30.     *Limitation on Use of Prepetition Collateral and Proceeds of AFI DIP Loan.*  The
Borrowers shall use the proceeds of the Prepetition Collateral, including Cash Collateral, and the
proceeds of the AFI DIP Loan solely as provided in this Final Order.  Notwithstanding anything
herein or in any other order of the Court to the contrary, no AFI DIP Loan Collateral or
Prepetition Collateral, including Cash Collateral, or the proceeds thereof, or the proceeds of the
AFI DIP Loan, or the Carve Out may be used to (a) object, contest or raise any defense to, the
validity, perfection, priority, extent or enforceability of any amount due under the Prepetition
Obligations, or to any of the liens or claims granted under this Final Order or the Prepetition
Obligations, (b) assert any claims and defenses or any other causes of action against the AFI
Lender or their respective agents, affiliates, subsidiaries, directors, officers, representatives,
attorneys or advisors, (c) prevent, hinder or otherwise delay the AFI Lender's assertion,
enforcement or realization on the Prepetition Collateral in accordance with the Prepetition
Obligations or this Final Order, (d) seek to modify any of the rights granted to the AFI Lender
hereunder or under the Prepetition Obligations, in the case of each of the foregoing clauses (a)
through (d), without such party's prior written consent or (e) pay any amount on account of any
claims arising prior to the Petition Date unless such payments are (i) approved by an order of the
Court and (ii) permitted hereunder; *provided*, that without duplication of the limitations on the
use of the Carve Out, up to $125,000 in the aggregate of such proceeds may be used to pay
allowed fees and expenses of professionals to the Creditors' Committee to investigate (but not
initiate or prosecute any claims with respect to) any Ally Debt Claims or Junior Secured Parties
Claims; *provided further* that notwithstanding anything else herein, the limitations on the use of
AFI DIP Loan Collateral and Prepetition Collateral, including Cash Collateral, or the proceeds
thereof, or the proceeds of the AFI DIP Loan as set forth in this order shall not apply to any other

assets of the Debtors in which the AFI DIP Lender and AFI Lender does not have a lien, including the Debtors' unencumbered assets, nor prohibit the payment of allowed Professional Fees incurred in connection with the initiation and prosecution of any claims, causes of action, adversary proceeding, or other litigation against the Adequate Protection Parties from such other assets in accordance with sections 330 and 331 of the Bankruptcy Code and any interim compensation order to be entered in these cases (understanding that all parties' rights to review and object to such fees and expenses are expressly reserved in accordance with sections 330 and 331 of the Bankruptcy Code).

31.    *Proofs of Claim.*  The Junior Secured Parties, the AFI Lender, and the AFI DIP Lender shall not be required to file proofs of claim in any of the Chapter 11 Cases for any claim allowed herein.  The Debtors' stipulations contained in paragraph 5 of this Final Order with respect to the Junior Secured Parties and the AFI Lender, and paragraph 7 with respect to the AFI DIP Lender, shall be deemed to constitute a timely filed proof of claim for the Junior Secured Parties, the AFI Lender, and the AFI DIP Lender, and, upon approval of this Final Order, the Junior Secured Parties, the AFI Lender, and the AFI DIP Lender shall be treated under section 502(a) of the Bankruptcy Code as if they have filed a proof of claim.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases to the contrary, the Trustee, for the benefit of itself and the Junior Secured Noteholders, the AFI Lender, and the AFI DIP Lender are hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases for any claim allowed herein with respect to the Junior Secured Parties, the AFI Lender, and the AFI DIP Lender.

32.     *Modifications and Amendments to Provisions to AFI LOC Amendment*.   This

Final Order hereby modifies and amends certain event of default provisions of the AFI LOC

Amendment.  Specifically, Section 2.6 of the AFI LOC Amendment is modified as follows:

(a)     Section 8.03(q) is hereby deleted in its entirety; and

(b)     Section 8.03(r) is hereby deleted in its entirety and replaced with the

following text:  "(i) the failure of an order of the Bankruptcy Court, which approves a sale of

assets pursuant to a Sale Agreement, to direct that the proceeds of such sale shall be used to

repay the secured parties whose collateral was sold or (ii) the failure by the Debtors at the

closing of the transactions approved by the order of the Bankruptcy Court referenced in the

foregoing paragraph 8.03(r)(i) to repay the secured parties whose collateral was sold pursuant to

such a sale; or".

33.     *Notice to MBS Trustees Regarding Advance Facility and Debtors' Status as an*

*Advancing Person/Advancing Counterparty*.   Service by the Debtors of the Interim Order and a

notice of the Final Hearing constituted notice and payment direction by the Debtors as the master

servicer and servicer to each MBS trustee or other person for which it is servicing mortgage

loans (other than the GSEs) to pay, or cause to be paid, all collections with respect to, and all

other proceeds of, receivables to the applicable Debtor, as the party to whom the master

servicer's or servicer's advance reimbursement rights, servicing fees, or servicing rights  have

been sold, assigned and/or pledged, and each MBS trustee shall pay, or cause to be paid, all

collections with respect to, and all other proceeds of, receivables to the applicable Debtor, as the

party to whom the master servicer's or servicer's advance reimbursement rights have been sold,

assigned and/or pledged (as such party may be otherwise defined) as so provided.

34.     *Waiver of Claims and Causes of Action.*  Without prejudice to the rights of any

other party, the Debtors waive any and all claims and causes of action against the AFI Lender

and its respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or

advisors related to this Final Order or the negotiation of the terms thereof.

35.     *Reservation of Rights.* Notwithstanding anything herein to the contrary, this Final

Order shall not modify or affect the terms and provisions of, nor the rights and obligations under,

(a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011,

by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the

Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent

judgment entered April 5, 2012 by the District Court for the District of Columbia, dated

February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent

Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all

related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

Notwithstanding anything herein to the contrary, all rights of the Objecting MBS Trustees (as

defined in the Barclays DIP Order) to challenge the effect of paragraph 30 of the Interim Order,

including whether such provision was binding and effective upon the Objecting MBS Trustees,

are fully preserved.

36.     *Binding Effect; Successors and Assigns.*  Subject to paragraph 28, the provisions

of this Final Order, including all findings herein, shall be binding upon all parties in interest in

the Chapter 11 Cases, including the Adequate Protection Parties, the Creditors' Committee and

the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11

trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner

appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a

legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Adequate Protection Parties and the Debtors and their respective successors and assigns, *provided*, that, except to the extent expressly set forth in this Final Order, the Adequate Protection Parties shall have no obligation to permit the use of Prepetition Collateral, including Cash Collateral, or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  Further, nothing in this Final Order providing for the release of non-Debtors or injunction of actions against non-Debtors shall apply to (a) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies and liabilities of the United States and any agency thereof, (b) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities of any State or any agency of any State, under state or federal environmental laws, or (c) any criminal liability under the laws of the United States.

37.    *Limitation of Liability.*    Solely in connection with permitting the use of Prepetition Collateral, including Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Final Order or the Prepetition Obligations, the Adequate Protection Parties shall not be deemed, from and after the Petition Date, to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors so long as the Adequate Protection Parties' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute). Nothing in this Final Order or the AFI DIP Loan shall permit the Debtors to violate 28 U.S.C. § 959(b). Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon the Adequate Protection Parties any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code). None of the Green Planet Servicing Funds (as defined in the Green Planet Objection [Docket No. 293]) constitute property of the Debtors' estate, nor shall the Green Planet Servicing Funds in the constitute Cash Collateral. On a going-forward basis, the Green Planet Servicing Funds shall be used by the Debtors only in accordance with the terms and conditions of the servicing agreement with Green Planet Servicing, LLC (the "*Green Planet Servicing Agreement*") and the Debtors shall utilize the Green Planet Servicing Funds in accordance with the Green Planet Servicing Agreement.

38. *No Impact on Certain Contracts/ Transactions.* No rights of any entity under sections 555, 556, 559, 560 and 561 of the Bankruptcy Code shall be affected by the entry of this Final Order as to any contract or transaction of the kind listed in such sections of the Bankruptcy Code.

39. *Effectiveness.* This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

40.    *The Interim Order.*  Except as specifically amended, supplemented or otherwise modified hereby, all of the provisions of the Interim order shall remain in effect and are hereby ratified by this Final Order.  In the event of any inconsistency between the terms of this Final Order and the terms of the Interim Order, the terms of this Final Order shall govern.

41.    *Objections Overruled.*  Any objection that has not been withdrawn or resolved is, to the extent not resolved, hereby overruled.

Dated:   June 25, 2012
        New York, New York

_____**/s/Martin Glenn**_____
MARTIN GLENN
United States Bankruptcy Judge

# EXHIBIT A

($ in millions)

| | Ally Revolver | Blanket | Ally LOC | Citi MSR | DIP — GSAP | DIP — BMMZ Repo | Fannie EAF | Unpledged | Subtotal | International — Mexico | International — Canada | International — Other Int'l | CapRe | Exclude | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | | | |
| 1 **Cash and Cash Equivalents** | $69 | $174 | $ - | $ - | $91 | $ - | $ - | $252 | $586 | $88 | $22 | $10 | $0 | $ - | $706 |
| 2 | | | | | | | | | | | | | | | |
| 3 **Mortgage Loans Held For Sale** | | | | | | | | | | | | | | | |
| 4 Pipeline | - | 15 | 22 | - | - | - | - | - | 37 | - | - | - | | | 37 |
| 5 1st Lien | 107 | 31 | 397 | - | - | 225 | - | - | 760 | - | - | - | | | 760 |
| 6 2nd Lien | 225 | 5 | 109 | - | - | 157 | - | - | 497 | - | - | - | | | 497 |
| 7 HELOCs | - | 90 | 142 | - | - | - | - | - | 232 | - | - | - | | | 232 |
| 8 Reverse Mortgages/ Silent 2nds | 11 | - | 0 | - | - | - | - | - | 11 | - | - | - | | | 11 |
| 9 Contingent Repurchase Option | - | 0 | - | - | - | - | - | - | 0 | - | - | - | | | 0 |
| 10 GNMA Loans | 36 | 124 | 189 | - | - | - | - | - | 350 | - | - | - | | | 350 |
| 11 Foreign | 42 | 0 | - | - | - | - | - | - | 42 | 5 | 0 | - | | | 47 |
| 12 | | | | | | | | | | | | | | | |
| 13 Repo and foreclosed assets | 5 | 15 | 11 | - | - | - | - | - | 32 | 3 | - | 0 | | | 35 |
| 14 | | | | | | | | | | | | | | | |
| 15 **Finance Receivables & Lns Net** | - | (0) | - | - | - | - | - | - | (0) | 27 | 1 | (0) | | | 28 |
| 16 | | | | | | | | | | | | | | | |
| 17 **Mortgage Servicing Rights** | | | | | | | | | | | | | | | |
| 18 FNMA MSR | - | - | - | 422 | - | - | - | - | 422 | - | - | - | | | 422 |
| 19 FLHMC MSR | - | - | - | 180 | - | - | - | - | 180 | - | - | - | | | 180 |
| 20 GNMA MSR | - | - | - | - | - | - | 393 | - | 393 | - | - | - | | | 393 |
| 21 PLS MSR | - | 1 | 178 | - | - | - | - | - | 179 | - | - | - | | | 179 |
| 22 Master Servicing MSR | - | - | 28 | - | - | - | - | - | 28 | - | - | - | | | 28 |
| 23 | | | | | | | | | | | | | | | |
| 24 **Servicer Advance** | | | | | | | | | | | | | | | |
| 25 FNMA SA | 6 | 10 | - | - | - | - | 144 | - | 161 | - | - | - | | | 161 |
| 26 FLHMC SA | 2 | 1 | 79 | - | - | - | - | - | 83 | - | - | - | | | 83 |
| 27 GNMA SA | - | - | - | - | - | - | - | 108 | 108 | - | - | - | | | 108 |
| 28 PLS SA | 612 | 0 | - | - | 792 | - | - | - | 1,403 | - | - | - | | | 1,403 |
| 29 Master Servicing SA | 31 | (0) | - | - | 178 | - | - | - | 208 | - | - | - | | | 208 |
| 30 Other SA | 120 | - | - | - | - | - | - | - | 120 | - | 0 | - | | | 120 |
| 31 | | | | | | | | | | | | | | | |
| 32 **Accounts Receivable** | | | | | | | | | | | | | | | |
| 33 Govt Claims | 29 | 329 | 466 | - | - | - | - | - | 824 | - | - | - | | | 824 |
| 34 Other | 3 | 31 | 36 | 36 | - | 4 | - | 19 | 129 | 0 | 0 | - | 3 | 30 | 162 |
| 35 | | | | | | | | | | | | | | | |
| 36 **Other** | | | | | | | | | | | | | | | |
| 37 Trading Securities | 29 | 25 | 42 | - | - | - | - | - | 96 | - | - | - | | | 96 |
| 38 Oth Assts-Rstrctd cash & Eqv(1) | - | 211 | - | - | - | - | - | - | 211 | 0 | 0 | - | 123 | - | 334 |
| 39 Other Assets(2) | - | 62 | - | - | - | - | - | - | 62 | 5 | 1 | 0 | 0 | - | 68 |
| 40 **Total Assets** | **1,329** | **1,126** | **1,699** | **638** | **1,060** | **387** | **144** | **772** | **7,154** | **128** | **25** | **10** | **126** | **30** | **7,474** |
| 41 **Other Excluded** | | | | | | | | | | | | | | | |
| 42 Derivative Assets | - | - | - | | - | - | | - | | - | | - | | 3,967 | 3,967 |
| 43 Derivative collateral placed | - | - | - | | - | - | | - | | - | | - | | 1,163 | 1,163 |
| 44 Intercompany Loans Rec | - | - | 2 | | - | - | | - | 2 | - | | - | | 3,457 | 3,459 |
| 45 Subsidiary Inv | - | - | - | | - | - | | - | | - | | - | | - | - |
| 46 Receivables from Affiliates | - | - | - | | - | - | | - | | - | | - | | - | - |
| 47 | | | | | | | | | | | | | | | |
| 48 **Total Assets with Excluded Assets** | **1,329** | **1,126** | **1,701** | **638** | **1,060** | **387** | **144** | **772** | **7,156** | **128** | **25** | **10** | **126** | **8,617** | **16,063** |

(1) Of the $211MM in restricted cash, approximately $75M was subsequently returned to the company, and the LOC was paid down by the same amount.

(2) Includes $45M of PP&E, $8.7M of pre-paids, $5M of non derivative collateral posted, and $3.5M of unamortized debt issuance cost.

**EXHIBIT B**

**Weekly Cash Flow Projections - Ally Line of Credit**

| ($ millions) | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALLY LINE OF CREDIT CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | |
| 1  GNMA Net Repurchases | $ 9.7 | $ (0.5) | $ (2.1) | $ (2.5) | $ 0.4 | $ 24.0 | $ (2.5) | $ (6.3) | $ 0.8 | $ 22.6 | $ 2.5 | $ (44.8) | $ 1.2 | $ (2.1) | $ 27.6 | $ (2.1) | $ (44.0) | $ 1.3 | $ 22.8 | $ 3.0 | $ 8.8 |
| 2  Net Servicer Advances | (8.8) | 1.4 | 1.2 | 1.7 | 1.7 | (8.4) | 1.7 | 2.8 | 3.4 | (8.7) | 3.4 | 1.9 | 0.9 | (9.2) | 0.9 | 3.4 | 4.3 | 3.5 | (5.3) | 4.7 | (6.0) |
| 3  P&I / Residual / REO / HELOC Collections | 2.5 | 6.6 | 3.5 | 4.3 | 3.7 | 1.9 | 8.2 | 5.4 | 3.5 | 3.0 | 7.3 | 6.0 | 3.8 | 3.6 | 6.8 | 2.7 | 6.3 | 3.5 | 2.8 | 8.1 | 93.4 |
| 4  Servicing / Ancillary Fees | 4.8 | 3.2 | 6.5 | 10.1 | 5.8 | 3.3 | 4.8 | 12.1 | 4.6 | 4.7 | 3.1 | 13.4 | 4.6 | 4.8 | 2.8 | 3.5 | 11.8 | 4.5 | 4.7 | 5.1 | 118.3 |
| 5  Interest | - | - | (1.0) | - | - | - | - | (1.2) | - | - | - | (1.5) | - | - | - | - | (1.7) | - | - | - | (5.4) |
| 6  Operating Expenses / Professional Fees | (3.4) | (6.9) | (2.6) | (7.2) | (6.1) | (7.2) | (3.5) | (6.5) | (3.3) | (13.6) | (3.3) | (7.0) | (3.2) | (14.4) | (3.2) | (7.0) | (3.0) | (15.8) | (3.8) | (7.6) | (128.8) |
| 7  **Net Cash Flow** | **4.7** | **3.7** | **5.5** | **6.3** | **5.5** | **13.6** | **8.7** | **6.2** | **9.0** | **8.0** | **13.0** | **(32.0)** | **7.2** | **(17.4)** | **34.9** | **(2.0)** | **(27.2)** | **(2.1)** | **21.2** | **13.3** | **80.2** |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | |
| 8  Beginning Cash Balance | - | 4.7 | 8.5 | 14.0 | 20.3 | 25.8 | 39.4 | 48.1 | 54.3 | 63.3 | 71.3 | 84.3 | 52.2 | 59.5 | 42.1 | 77.0 | 75.1 | 47.9 | 45.8 | 66.9 | - |
| 9  Net Cash Flow | 4.7 | 3.7 | 5.5 | 6.3 | 5.5 | 13.6 | 8.7 | 6.2 | 9.0 | 8.0 | 13.0 | (32.0) | 7.2 | (17.4) | 34.9 | (2.0) | (27.2) | (2.1) | 21.2 | 13.3 | 80.2 |
| 10  **Ending Cash Balance** | **4.7** | **8.5** | **14.0** | **20.3** | **25.8** | **39.4** | **48.1** | **54.3** | **63.3** | **71.3** | **84.3** | **52.2** | **59.5** | **42.1** | **77.0** | **75.1** | **47.9** | **45.8** | **66.9** | **80.2** | **80.2** |

**Weekly Cash Flow Projections - Ally Revolver**

| ($ millions) | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALLY REVOLVER CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | |
| 1  Origination Activity | $ 87.7 | $ 1.2 | $ - | $ 9.8 | $ 25.7 | $ 6.7 | $ - | $ 12.9 | $ 0.7 | $ 5.6 | $ 1.1 | $ 12.4 | $ - | $ - | $ - | $ - | $ 17.1 | $ - | $ - | $ - | $ 181.0 |
| 2  GNMA Net Repurchases | 9.7 | (0.5) | (2.1) | (2.5) | 0.4 | 24.0 | (2.5) | (19.0) | 0.8 | 22.6 | 2.5 | (40.5) | 1.2 | (2.1) | 27.6 | (2.1) | (41.8) | 1.4 | 22.8 | 3.0 | 2.8 |
| 3  Net Servicer Advances | (95.3) | (35.1) | 32.8 | 44.2 | (91.0) | (30.8) | 44.2 | 39.0 | 48.8 | (161.4) | 48.8 | 41.3 | 36.3 | (98.9) | (38.7) | 36.3 | 46.2 | 57.8 | (124.9) | 60.1 | (140.7) |
| 4  P&I / Residual / REO / HELOC Collections | 2.2 | 3.9 | 3.0 | 3.5 | 3.4 | 2.0 | 5.5 | 4.4 | 2.9 | 2.6 | 4.6 | 4.9 | 3.2 | 3.1 | 4.2 | 2.4 | 4.9 | 3.0 | 2.4 | 5.2 | 71.2 |
| 5  Interest | - | - | (2.0) | - | - | - | - | (2.0) | - | - | - | (2.0) | - | - | - | - | (2.1) | - | - | (10.1) | (8.1) |
| 6  Operating Expenses / Professional Fees | (4.8) | (9.7) | (3.6) | (9.8) | (8.3) | (9.8) | (4.7) | (8.6) | (4.4) | (17.9) | (4.4) | (9.4) | (4.3) | (19.3) | (4.3) | (9.4) | (4.0) | (20.9) | (5.0) | (10.1) | (172.6) |
| 7  **Net Cash Flow** | **(0.6)** | **(40.1)** | **28.0** | **45.1** | **(69.8)** | **(7.9)** | **42.5** | **26.7** | **48.9** | **(148.6)** | **52.5** | **6.6** | **36.4** | **(117.2)** | **(11.2)** | **27.2** | **20.4** | **41.2** | **(104.7)** | **58.3** | **(66.4)** |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | |
| 8  Beginning Cash Balance | 206.5 | 206.0 | 165.9 | 193.9 | 239.0 | 169.2 | 161.3 | 203.8 | 230.5 | 279.3 | 130.7 | 183.3 | 189.8 | 226.2 | 109.0 | 97.8 | 125.0 | 145.3 | 186.5 | 81.8 | 206.5 |
| 9  Net Cash Flow | (0.6) | (40.1) | 28.0 | 45.1 | (69.8) | (7.9) | 42.5 | 26.7 | 48.9 | (148.6) | 52.5 | 6.6 | 36.4 | (117.2) | (11.2) | 27.2 | 20.4 | 41.2 | (104.7) | 58.3 | (66.4) |
| 10  **Ending Cash Balance** | **206.0** | **165.9** | **193.9** | **239.0** | **169.2** | **161.3** | **203.8** | **230.5** | **279.3** | **130.7** | **183.3** | **189.8** | **226.2** | **109.0** | **97.8** | **125.0** | **145.3** | **186.5** | **81.8** | **140.1** | **140.1** |

**Weekly Cash Flow Projections - Ally DIP**

| ($ millions) | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALLY DIP CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | |
| 1    GNMA Net Repurchases | $ - | $ - | $ - | $ (84.7) | $ 0.2 | 0.2 | 0.2 | $ (63.3) | 0.4 | $ 0.4 | 0.4 | $ (3.8) | 0.5 | 0.5 | 0.5 | 0.5 | $ (1.7) | 0.5 | 0.5 | 0.5 | $ (148.1) |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | |
| 2    Beginning Cash Balance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 3    Net Cash Flow | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4    **Ending Cash Balance** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **ALLY DIP FACILITY ACTIVITY** | | | | | | | | | | | | | | | | | | | | | |
| 5    Beginning DIP Balance | - | - | - | - | 84.7 | 84.5 | 84.2 | 84.0 | 147.3 | 146.9 | 146.5 | 146.0 | 149.8 | 149.4 | 148.9 | 148.4 | 148.0 | 149.7 | 149.1 | 148.6 | - |
| 6    Net Cash Flow | - | - | - | 84.7 | (0.2) | (0.2) | (0.2) | 63.3 | (0.4) | (0.4) | (0.4) | 3.8 | (0.5) | (0.5) | (0.5) | (0.5) | 1.7 | (0.5) | (0.5) | (0.5) | 148.1 |
| 7    **Ending DIP Balance** | **-** | **-** | **-** | **84.7** | **84.5** | **84.2** | **84.0** | **147.3** | **146.9** | **146.5** | **146.0** | **149.8** | **149.4** | **148.9** | **148.4** | **148.0** | **149.7** | **149.1** | **148.6** | **148.1** | **148.1** |

**EXHIBIT C**

*Execution Copy*

DEBTOR-IN-POSSESSION FINANCING AMENDMENT
The Eighth Amendment to the Amended and Restated Loan Agreement
(Line of Credit Agreement)

Dated as of May 25, 2012

by and among

RESIDENTIAL FUNDING COMPANY, LLC,
as Borrower,

GMAC MORTGAGE, LLC,
as Borrower,

RESIDENTIAL CAPITAL, LLC,
AND CERTAIN OTHER AFFILIATES OF THE BORROWERS
as Guarantors,

ALLY FINANCIAL INC. (f/k/a GMAC Inc.),
as Initial Lender and as Lender Agent

and

Certain Other Financial Institutions and Persons from
time to time party hereto as Lenders

*Eighth Amendment
to A&R LOC Loan Agreement*

This DEBTOR-IN-POSSESSION FINANCING AMENDMENT (this "Agreement"), dated as of May 25, 2012, is by and among GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage"), Residential Funding Company, LLC, a Delaware limited liability company ("RFC" and, together with GMAC Mortgage, each a "Borrower" and collectively, the "Borrowers"), Residential Capital, LLC, a Delaware limited liability company ("ResCap"), and the various other parties signatory hereto as Guarantors (together with ResCap, each a "Guarantor" and collectively, the "Guarantors"), Ally Financial Inc. (f/k/a GMAC Inc.), a Delaware corporation ("Ally Financial"), as the initial lender (in such capacity, the "Initial Lender"), the financial institutions and other Persons that are or may from time to time become parties hereto as Lenders (together with the Initial Lender and their respective successors and assigns, each a "Lender" and collectively, the "Lenders"), and Ally Financial, as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Lender Agent").

Reference is hereby made to the Amended and Restated Loan Agreement (Line of Credit Agreement), dated as of December 30, 2009, among the Borrowers, the Guarantors, the Lenders and the Lender Agent (as amended and modified through the date hereof, the "LOC Loan Agreement"). The LOC Loan Agreement includes seven prior amendments, with this Agreement constituting the eighth amendment thereto as of the date first written above.

RECITALS

1.    Each of the parties hereto is a party to the LOC Loan Agreement.

2.    On May 14, 2012 (the "Petition Date"), the Borrowers and each of the Guarantors and certain of their respective Affiliates filed voluntary petitions with the Bankruptcy Court commencing their respective cases under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.    GMAC Mortgage has requested that the Lenders provide Loans under the LOC Loan Agreement after the Petition Date, and the Lenders are willing to do so on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein contained and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

ARTICLE I
DEFINED TERMS

SECTION 1.1 Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the LOC Loan Agreement.

ARTICLE II
AMENDMENTS TO THE LOC LOAN AGREEMENT

SECTION 2.1   Amendments to Article II of the LOC Loan Agreement.

(a)      Section 2.08 of the LOC Loan Agreement is hereby amended by inserting the following paragraph (f):

"(f)     Notwithstanding the terms and provisions of this Section 2.08, following the PPL Closing Date, all payments made by or on behalf the Credit Parties to the Lender Agent for the benefit of the Lenders shall be applied in the following order: (i) first, to pay due and unpaid interest on the Post-Petition Loans, until fully paid; (ii) second, to reduce the aggregate principal amount of the Post-Petition Loans until fully paid; and (iii) third, to pay the other Obligations of the Credit Parties and in accordance with this Agreement and the other Facility Documents."

(b)      Article II of the LOC Loan Agreement shall be amended by adding the following Section 2.11:

"Section 2.11.   Post-Petition Loans.

(a)      Post-Petition Loan Commitment; Use of Proceeds.   On and subject to the terms and conditions of this Agreement, each of the Lenders, severally and for itself alone, agrees to make loans to GMACM on a non-revolving basis ("Post-Petition Loans") on and after the PPL Closing Date until the Termination Date in such Lender's Pro Rata Share of such aggregate amounts as GMACM may request from said Lenders; provided, however, that the PPL Outstandings shall not at any time exceed the lesser of the amount permitted under the Financing Orders (as then in effect) and the Buyout Commitment Amount.   Within the foregoing limits, the proceeds of any such Post-Petition Loans shall only be used, consistent with past practices, solely to fund the repurchase of whole loans from Ginnie Mae pools in order to (A) avoid GMACM being in violation of delinquency triggers applicable to GMACM under Chapter 18 of the Ginnie Mae Guide, (B) effect foreclosures, conveyances or other normal course loss mitigation activities of the related mortgaged properties in connection with the submission of HUD Claims, and (C) allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified (collectively, "GNMA Repurchases").   For the avoidance of doubt, no Post-Petition Loan may be used to fund the purchase of whole loans for any other purpose, including for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects, or for any other purpose other than as identified in the immediately preceding sentence.   The limitation on the use of funds set forth in the preceding sentences is referred to herein as the "Use Restriction".   The aggregate outstanding amount of PPL Obligations shall be due and payable on the Termination Date.

*Eighth Amendment to*
*A&R LOC Loan Agreement*

701735197 08048307

(b)    Post-Petition Loan Requests.   GMACM shall give written notice or telephonic notice (followed immediately by written confirmation thereof) to the Lender Agent of each proposed borrowing not later than 5:00 p.m. (New York City time), on the Business Day prior to any date of proposed borrowing of Post-Petition Loans. Each such notice shall be effective upon receipt by the Lender Agent, shall be irrevocable, and shall specify the date and amount of the proposed borrowing. Promptly upon receipt of such notice, the Lender Agent shall advise each Lender thereof. Not later than 1:00 p.m. (New York City time), on the date of a proposed borrowing, each Lender shall provide the Lender Agent at the office specified by the Lender Agent with immediately available funds covering such Lender's Pro Rata Share of such borrowing and, so long as the Lender Agent has not received written notice that the conditions precedent set forth in Section 5.03 with respect to such borrowing have not been satisfied, the Lender Agent shall pay over the funds received by the Lender Agent to GMACM on the requested borrowing date. The proceeds of all borrowings shall be credited to the applicable account nominated by GMACM from time to time in accordance with the Financing Orders.

(c)    Security Interest; Collateral.   Pursuant to the Financing Orders, as security for the full and timely payment and performance of all PPL Obligations hereunder, whether now existing or hereafter arising, Lender Agent, for the benefit of the Lender Agent and the Lenders, shall have (a) pursuant to Section 364(d) of the Bankruptcy Code, a valid, binding, enforceable, duly perfected security interest and priming lien upon all right, title and interest in the Repurchased Loans (including the related mortgage notes, mortgages, or any assignments of mortgages) and HUD Claims funded with Post-Petition Loans and any cash collateral thereof as permitted in the Financing Orders, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, whether tangible or intangible, whether real or personal, together with all proceeds, products, and supporting obligations with respect thereto; and (b) pursuant to Section 364(d) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected priming lien and security interest in all property of the Credit Parties, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, whether tangible or intangible, whether real or personal, together with all proceeds and products thereof, that constitutes Collateral. In addition to the foregoing, the repayment of the Post-Petition Loans and all other obligations of GMACM and the other Credit Parties arising under this Agreement shall, pursuant to Section 364(c)(1) of the Bankruptcy Code be Superpriority Claims. The execution and delivery of the DIP Financing Amendment shall not be construed as an acknowledgment by the Lender Agent or any Lender that such party is adequately protected with respect to its interests in any Collateral granted to secure Pre-Petition Indebtedness.

(d)    Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral.   Upon the PPL Closing Date, and on behalf of themselves and their estates, and for so long any PPL Obligations of the Credit Parties hereunder shall be outstanding, each Credit Party, on behalf of itself and its Subsidiaries, hereby

3

*Eighth Amendment to*
*A&R LOC Loan Agreement*

irrevocably waives (i) any right, pursuant to Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the PPL Obligations of the Credit Parties hereunder, or to approve a claim of equal or greater priority than the PPL Obligations of the Credit Parties hereunder, except as permitted under the (x) the Interim Financing Order and Final Financing Order and (y) the order of the Bankruptcy Court approving the Barclays DIP Facility, and (ii) any right, pursuant to Section 363 of the Bankruptcy Code or otherwise, to use Post-Petition Collateral proceeds or any other Cash Collateral in any manner not permitted by the Financing Orders or otherwise without the consent of the Lender Agent and the Lenders.

(e)      Interest on Post-Petition Loans; Interest Payment Dates.  Interest shall accrue on the unpaid principal amount of each Post-Petition Loan for the period commencing on the date of such Post-Petition Loan until such Post-Petition Loan is paid in full at a rate equal to the LIBOR Rate plus 4% per annum, with a LIBOR Rate floor of 1.25% (the "Post-Petition Interest Rate"); provided that at any time an Event of Default exists under Section 8.03 hereof, the interest rate shall accrue on the Post-Petition Loans at a rate equal to the Post-Petition Interest Rate plus 2% per annum.  Accrued interest on each Post-Petition Loan shall be payable in arrears on the last day of each calendar month."

SECTION 2.2 Amendment to Article IV of the LOC Loan Agreement. Article IV of the LOC Loan Agreement shall be amended by adding the following Section 4.06:

"Section 4.06.  LOC DIP Account.

(a)      GMACM has established Account Number 796682920 with JPMorgan Chase Bank, N.A. (the "LOC DIP Account") for the sole purpose of holding and utilizing proceeds from Post-Petition Loans in accordance with the Use Restriction.

(b)      Pursuant to the Orders, as security for the full and timely payment and performance of all PPL Obligations hereunder, whether now existing or hereafter arising, GMACM hereby grants a continuing security interest to the Lender Agent (for the benefit of the Lender Agent and the Lenders) in all of GMACM's right, title and interest, in and to the LOC DIP Account and all funds deposited or carried therein, together with all proceeds and distributions on, and rights arising out of, such LOC DIP Account and all funds deposited or carried therein.  In furtherance of the security interest granted hereunder, GMACM shall deliver to the Lender Agent a Blocked Account Control Agreement in form and substance satisfactory to the Lender Agent executed by GMACM, JPMorgan Chase Bank, N.A. and Ally Financial, as Lender Agent (for the benefit of the Lender Agent and the Lenders), with delivery of such Blocked Account Control Agreement to occur prior to utilization of the LOC DIP Account as set forth in Section 4.06(c), below.  The LOC DIP Account shall be deemed a Collection Account under this Agreement, and the Lender Agent shall have all rights with respect to the LOC DIP Account as if pledged pursuant to the Security Documents.

*Eighth Amendment to*
*A&R LOC Loan Agreement*

(c)     Each of the Debtors covenant and agree to refrain from all use of the LOC DIP Account prior to the Bankruptcy Court approving the use thereof and acknowledging the first priority perfected security interest of the Lender Agent therein under the Final Financing Order and the Cash Management Order.  Utilization of the LOC DIP Account prior to satisfaction of each condition set forth in the immediately preceding sentence shall constitute a PPL Event of Default as set forth in Section 8.03(z).

(d)     Each of the Debtors covenant and agree to refrain from all use of the LOC DIP Account other than for purposes of (x) depositing collections and proceeds arising from, or in any way related to, Repurchased Loans and HUD Claims and (y) making withdrawals in compliance with the Use Restriction.  Any amounts to be deposited in the LOC DIP Account under the immediately preceding clause (x) shall be made within five (5) Business Days of receipt thereof by the applicable Debtor.

(e)     For avoidance of doubt, GMACM shall be permitted to obtain Post-Petition Loans following the PPL Closing Date and prior to authorized use of the LOC DIP Account as set forth in Section 4.06(c), above, so long as all proceeds, collections and other amounts related to such Post-Petition Loans are deposited in, and related withdrawals (subject to the Use Restriction) are made through, the LOC Concentration Account (as such term is defined in the Cash Management Order)."

SECTION 2.3 Amendment to Article V of the LOC Loan Agreement.  Article V of the LOC Loan Agreement shall be amended by adding the following Section 5.03:

"Section 5.03.  Conditions Precedent to Post-Petition Loans.

(a)     PPL Closing Date.  The Buyout Funding Commitment, and each Lender's obligation to make Post-Petition Loans thereunder, shall not be in effect until the date (the "PPL Closing Date") on which all of the following shall have occurred to the satisfaction of the Lender Agent or waived by the Lender Agent in writing:

(i)      the Bankruptcy Court shall have entered the Interim Financing Order, which order shall not have been (a) stayed, vacated or reversed, or (b) amended or modified except as otherwise agreed to in writing by the Lender Agent in its sole discretion;

(ii)     no trustee or examiner with expanded powers pursuant to section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Credit Party or their respective business, properties or assets;

(iii)    all of the "first day" orders entered by the Bankruptcy Court at the time of the commencement of the Cases (and if any such orders shall not have been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) shall be in form and substance reasonably satisfactory to the Lender Agent;

(iv)    (a) operational changes to track and allocate expenses relating to the Specified Prepetition Facilities, the Master Purchase Documents, the MSFTA and the First Lien Collateral (as such terms are defined in the Barclays DIP Facility as of the

*Eighth Amendment to*
*A&R LOC Loan Agreement*

date hereof) by asset type and facility shall have been implemented and cash management systems satisfactory to the Lender Agent (including with respect to cash dominion) shall have been established by the Credit Parties and (b) one or more orders, in form and substance satisfactory to the Lender Agent in its sole discretion, approving such cash management systems and arrangements (the "Cash Management Order") shall have been entered by the Bankruptcy Court (it being understood and agreed that the interim order entered by the Bankruptcy Court on May 15, 2012 under docket number 82 is acceptable to the Lender Agent and a final order in the form of such interim order shall also be deemed acceptable to the Lender Agent), which Cash Management Order shall not have been (1) stayed, vacated or reversed, or (2) amended or modified except as otherwise agreed to in writing by the Lender Agent in its sole discretion;

(v)     the Credit Parties and the other parties hereto shall have duly executed and delivered the DIP Financing Amendment;

(vi)    the Lenders and the Lender Agent shall have received all fees required to be paid and all expenses for which invoices have been presented;

(vii)   (a) all governmental and third party approvals necessary in connection with the transactions contemplated by the DIP Financing Amendment and (b) all material governmental and third party approvals necessary in connection with the continuing operations of the Debtors in all the foregoing cases, shall have been obtained on satisfactory terms and shall be in full force and effect (including shareholder approvals, if any);

(viii)  the Lender Agent shall have received copies of the Initial 20-Week Forecast as defined in the Interim Financing Order and provided under the Barclays DIP Facility; and

(ix)    each Credit Party shall have complied with the Financing Orders and satisfied the requirements specified therein as of the Credit Date (as such term is defined below).

(b)     Conditions to Each Post-Petition Loan.  The obligation of any Lender to provide any Post-Petition Loan, including on the PPL Closing Date and from time to time thereafter and prior to the Termination Date (each, a "Credit Date"), is subject to satisfaction, or waiver by the Lender Agent, of the following conditions precedent:

(i)     Lender Agent shall have received a fully executed and delivered borrowing request in accordance with the applicable requirements set forth in Section 2.11(b), together with certification from an officer of GMACM that the proceeds of such Post-Petition Loan shall be utilized in compliance with (x) the Use Restriction and the requirements set forth in the Financing Orders, and (y) that the unpaid principal balance of the mortgage loans being repurchased from Ginnie Mae pools with the proceeds of such borrowing shall not represent an amount less than the Post-Petition Loan being requested in connection therewith;

6

*Eighth Amendment to
A&R LOC Loan Agreement*

(ii)     after giving effect to such Post-Petition Loan and use of proceeds, the aggregate amount of Post-Petition Loans outstanding shall not exceed the Buyout Commitment Amount;

(iii)    both prior to and after giving effect to the requested Post-Petition Loan, the PPL Outstandings shall be in compliance with the Interim Financing Order or the Final Financing Order, as applicable;

(iv)    the Credit Parties shall be in compliance with, and there shall not have been any material amendment to, the Orders;

(v)     the Credit Parties shall be in compliance with the requirements set forth in Section 5.02 (as modified pursuant to the DIP Financing Amendment), Section 6.02 and Section 7.04 of this Agreement;

(vi)    as of such Credit Date, the representations and warranties contained herein and in each other Facility Document shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects subject to such qualification;

(vii)   as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Post-Petition Loan and application of the proceeds thereof that would constitute a PPL Event of Default, or after giving effect to clauses (c) and (d) below, an Event of Default or a Default;

(viii)  GMACM shall be an approved issuer by Ginnie Mae, and shall not have received written notice from Ginnie Mae indicating an intention to limit or withdraw such status;

(ix)    not later than forty-five (45) days after the entry of the Interim Financing Order, the Bankruptcy Court shall have entered the Final Financing Order in form and substance satisfactory to the Lender Agent in its sole discretion; and

(x)     the Interim Financing Order or the Final Financing Order, as the case may be, shall be in full force and effect, and shall not have been (a) vacated, reversed, or stayed, or (b) amended or modified except as otherwise agreed to in writing by Lender Agent in its sole discretion.

(c)     Conflict.  To the extent any representation or warranty set forth in Article VI, any covenant set forth in Article VII, or Event of Default set forth in Article VIII, has been breached or occurred solely as a result of the commencement or pendency of the Cases, or has been superseded by the terms of the Orders, a breach thereof shall be of no effect

7

*Eighth Amendment to
A&R LOC Loan Agreement*

to the extent the same would otherwise permit the Lenders not make the Post-Petition Loans <u>so long as</u>, and subject to, each Credit Party remaining in compliance with the Orders.  For the avoidance of doubt, nothing contained in this <u>Section 5.03(c)</u> shall be construed as a waiver of Events of Default or Defaults arising on or before the Petition Date.

(d)    <u>Application of Certain Provisions to Post-Petition Loans</u>.   The following provisions in this Agreement shall not be applicable to Post-Petition Loans: <u>Section 2.01(b)</u>, <u>Section 2.01(c)</u>, <u>Section 2.08</u>, <u>Section 3.01(f)</u>, <u>Schedule 5.02(a)-(c)</u>; <u>Schedule 5.02(f)-(j)</u>, <u>Section 7.01(u)</u>, <u>Section 8.01(d)</u>, <u>Section 8.01(e)</u>, <u>Section 8.01(f)</u>, <u>Section 8.01(n)</u> and <u>Section 8.01(p)</u>."

SECTION 2.4   <u>Amendment to Article VI of the LOC Loan Agreement</u>.

(a)    Section 6.01(h) of the LOC Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(h)    <u>Fraudulent Conveyance</u>.  The amount of consideration being received by an Credit Party upon its pledge or provision of any Collateral to the Lender Agent constitutes reasonably equivalent value and fair consideration for such Collateral.  No Credit Party is pledging or providing any Collateral with any intent to hinder, delay, or defraud any of its creditors."

(b)    Section 6.01(k) of the LOC Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(k)    <u>No Default</u>.  No PPL Event of Default has occurred and is continuing and, after giving effect to <u>Section 5.03(c)-(d)</u>, no Default has occurred and is continuing."

(c)    Article VI of the LOC Loan Agreement shall be amended by adding the following Section 6.02:

"Section 6.02.   <u>Representations and Warranties Related to Post-Petition Loans</u>.  Each Credit Party represents and warrants to each Lender Party that throughout the term of this Agreement:

(a)    <u>Use of Proceeds</u>.  The proceeds of each Post-Petition Loan shall be solely used in accordance with the Use Restriction.

(b)    <u>Compliance with Orders</u>.  Each Credit Party is in compliance with each applicable requirement set forth in the Orders."

SECTION 2.5   <u>Amendment to Article VII of the LOC Loan Agreement</u>. Article VII of the LOC Loan Agreement shall be amended by adding the following Section 7.04:

"Section 7.04.   <u>Post-Petition Loan Covenants</u>.  Each Credit Party covenants and agrees with the Lender Parties that, until all Post-Petition Loans and all other PPL Obligations

*Eighth Amendment to*
*A&R LOC Loan Agreement*

have been paid in full in cash and the Buyout Funding Commitment has been terminated or expired:

(a)    Use of Proceeds.  The proceeds of any Post-Petition Loan shall not be utilized for any purpose other than those complying with the Use Restriction.

(b)    Compliance with Orders.  Each Credit Party shall comply with each applicable requirement set forth in the Orders.

(c)    Post-Petition Collateral.  The proceeds of any Repurchased Loans and HUD Claims funded with Post-Petition Loans, and cash collateral thereof as permitted in the Financing Orders shall be solely used in accordance with the Use Restriction.  Each Obligor shall promptly mark its books and records to indicate that all such Repurchased Loans and HUD Claims have been pledged to the Lender Agent for so long as such Repurchased Loans and HUD Claims constitute Post-Petition Collateral.  Each Obligor further covenants and agrees to deliver the Mortgage File (as defined in the applicable Custody Agreement) with respect to each Repurchased Loan to one of the custodians pursuant to the Custody Agreements.

(e)    Reporting Requirements.  The Credit Parties shall deliver reports relating to the matters referred to on Schedule 7.04 attached hereto, such reports to be in such form and substance as agreed between the Credit Parties and the Lender Agent acting reasonably.  Additionally, each Credit Party shall provide; (a) the reporting provided for in the Financing Orders; (b) concurrent with delivery to the Administrative Agent under (and as such term is defined in) the Barclays DIP Facility, a copy of each document delivered pursuant to the following sections contained therein: (i) Section 5.01(a), (b) and (c); and (ii) such other documents delivered to the Administrative Agent as may be requested by the Lender Agent in writing; and (c) immediately upon receipt thereof, written notice to the Lender Agent of any notice of default, proposed waiver, amendment or forbearance or similar document provided to such Credit Party by the Administrative Agent pursuant to the terms set forth in the Barclays DIP Facility."

SECTION 2.6    Amendment to Article VIII of the LOC Loan Agreement. Article VIII of the LOC Loan Agreement shall be amended by adding the following Section 8.03:

"Section 8.03.  Post-Petition Loan Events of Default.  The following events shall be "PPL Events of Default":

(a)    failure by any Credit Party to pay (i) when due any principal of any Post-Petition Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Post-Petition Loan within three (3) Business Days after the date due; or

(b)    any Event of Default under (and as such term is defined in) the Barclays DIP Facility shall occur and continue after giving effect to any applicable notice and grace period set forth therein and to any waiver by the Barclays Lenders with respect thereto; or

9

*Eighth Amendment to*
*A&R LOC Loan Agreement*

(c)     the proceeds of any Post-Petition Loan shall be utilized for any purpose other than as expressly permitted by the Use Restriction; or

(d)     any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or

(e)     a trustee (or comparable Person) under Chapter 7 or Chapter 11 of the Bankruptcy Code or a responsible officer or an examiner with expanded powers shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or

(f)     an order of the Bankruptcy Court shall be entered granting (i) any Lien or security interest that is pari passu with or senior to the Liens and security interest of the Lender Agent and the Lenders in the Repurchased Loans, the HUD Claims or the other Post-Petition Collateral securing the Post-Petition Loan, or (ii) a Superpriority Claim in any of the Cases which is senior to the claims of Lender Agent and the Lenders against any Credit Party under this Agreement or the Barclays DIP Facility; or

(g)     the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest in or Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Post-Petition Collateral of any of the Credit Parties with a value in excess of $5,000,000, either individually or in the aggregate; or

(h)     the Bankruptcy Court shall enter an order or orders permitting or authorizing any actions that could reasonably be expected to have a Material Adverse Effect (as defined in the Barclays DIP Facility), or a determination by a court of competent jurisdiction with respect to any motion, pleading or proceeding brought by another party that could reasonably be expected to have a Material Adverse Effect (as defined in the Barclays DIP Facility); or

(i)     any Financing Order shall cease to be in full force and effect or an order of the Bankruptcy Court shall be entered reversing, staying, vacating or (except as otherwise agreed to in writing by Lender Agent in its sole discretion) otherwise amending, supplementing or modifying the Interim Financing Order or the Final Financing Order; or

(j)     any Credit Party shall make any Prepetition Payment other than (i) as permitted by the Interim Financing Order or the Final Financing Order, (ii) as otherwise permitted by this Agreement or (iii) as authorized by the Bankruptcy Court in accordance with orders entered on, before or after the PPL Closing Date, which orders permitting any such payment are in form and substance satisfactory to the Lender Agent, or other orders of the

*Eighth Amendment to*
*A&R LOC Loan Agreement*

Bankruptcy Court entered with the written consent of (or non-objection by) Lender Agent; or

(k)     any Credit Party shall not comply with any terms of the Interim Financing Order or the Final Financing Order or a termination event is declared with respect to any other order authorizing the use of Cash Collateral; or

(l)     any Credit Party shall file a motion seeking or take any action supporting a motion seeking, or the Bankruptcy Court shall enter, an order authorizing a sale of Post-Petition Collateral which would violate Section 7.04(c) (unless such order requires and directs payment in full in cash of the PPL Obligations at the closing of such sale, whether pursuant to a Confirmation Order or otherwise); or

(m)     any Credit Party or any of its Affiliates shall (x) seek to, or support or fail to oppose any other Person's motion or pleading to, disallow or subordinate the PPL Obligations or challenge the Liens held by the Lender Agent with respect thereto, or (y) oppose a motion by any Lender or Lender Agent to confirm its claims or Liens with respect to the PPL Obligations, or (ii) in any case of the foregoing, the Bankruptcy Court enters a final order granting such relief; or

(n)     any stipulation shall be entered into by any Credit Party or any order shall be entered by the Bankruptcy Court with respect to the provision of adequate protection to any Person or the use of Cash Collateral by any Credit Party, in each case that is not satisfactory in form and substance to Lender Agent in its sole and absolute discretion; or

(o)     the Bankruptcy Court shall enter an order or orders authorizing recovery from the Post-Petition Collateral for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than (i) as may be provided in the Financing Orders, (ii) de minimus amounts or (iii) with the consent of the Lender Agent; or

(p)     any material suspension by a Credit Party of operation of its business, other than pursuant to a transaction permitted under this Agreement; or

(q)     (i) the Ally Sale Agreement and/or the Nationstar Sale Agreement shall be terminated, rescinded or revoked (in whole or in part) by any party thereto and is not replaced by a Replacement Sale Agreement, which Replacement Sale Agreement shall have been approved by the Bankruptcy Court within such sixty (60) day period; or (ii) any party to any Sale Agreement shall (x) admit in writing or state publicly its intent not to pursue the transactions contemplated by the Sale Agreement, or (y) act or fail to act in a manner that impairs such party's ability to perform its obligations under, or otherwise constitutes an anticipatory repudiation of, or a breach or default under (to the extent not cured within the applicable

11

*Eighth Amendment to*
*A&R LOC Loan Agreement*

grace period), any Sale Agreement unless a Replacement Sale Agreement shall have been approved by the Bankruptcy Court within sixty (60) days from such act; or (iii) the denial (in whole or in part) by the Bankruptcy Court of any of the relief sought in the Sale Motion or in any motion seeking approval of a Replacement Sale Agreement unless the initial relief requested shall be approved by the Bankruptcy Court pursuant to a Sale Order within sixty (60) days of such denial; or

(r)    (i) the failure of the Sale Order, as entered by the Bankruptcy Court, to provide that the PPL Obligations shall be repaid in full in Cash at the closing of the transactions approved by the Sale Order or (ii) the failure of the PPL Obligations to be repaid in full in cash at the closing of the transactions approved by the Sale Order; or

(s)    one or more post-petition money judgments, writs or warrants of attachment or similar process involving an amount in the aggregate in excess of $10,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) or one or more post-petition non-monetary judgments that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect shall be entered or filed against any Credit Party or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

(t)    any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days, other than pursuant to a transaction permitted under this Agreement; or

(u)    an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to, individually or in the aggregate, (i) result in liabilities in excess of $5,000,000 in the aggregate or (ii) have a Material Adverse Effect; or

(v)    a Change of Control shall occur; or

(w)    a Reorganization Plan that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases, or any of the Debtors shall propose any such plan; or

(x)    any Lien purported to be created under any Security Document or any Order shall cease to be, or shall be asserted by any Credit Party not to be, a valid and perfected Lien on any material portion of the Collateral or the Post-Petition Collateral, with the priority required by the Interim

12

*Eighth Amendment to*
*A&R LOC Loan Agreement*

Financing Order or Final Financing Order, except as expressly permitted hereunder or thereunder; or any Credit Party seeks to disallow its obligations under any Facility Document or to revoke, terminate or rescind any provision of any Facility Document or any Lien granted under the Security Documents and the Orders; or

(y)    termination of the Settlement and Plan Sponsor Agreement among ResCap for itself and its Debtor subsidiaries, and Ally Financial, for itself and certain of its subsidiaries and affiliates other than the Debtors dated May 14, 2012, pursuant to Section 3.2(c) thereof; or

(z)    the Debtors utilize the LOC DIP Account in a manner inconsistent with Section 4.06;

THEN, if any PPL Event of Default occurs and is continuing, Lender Agent (x) shall declare the Buyout Funding Commitment of each Lender and the obligation of each Lender to make Post-Petition Loans to be automatically terminated, and (y) may, at the request of the Required Lenders shall, take any or all of the following actions, at the same or different times, in each case without further order or application of the Bankruptcy Court (provided that with respect to the enforcement of Liens or other remedies with respect to the Collateral under clause (iii) below, Lender Agent shall provide the Borrowers with at least seven (7) days' written notice prior to taking the action contemplated thereby); in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, a PPL Event of Default has occurred and is continuing:

(i)    declare all or any portion of the unpaid principal amount of all outstanding Post-Petition Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under this Agreement to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Credit Parties;

(ii)   exercise any other remedies that are provided for in the Financing Orders; and/or

(iii)  exercise any of the rights and remedies otherwise available to it following an Event of Default, whether pursuant to this Agreement, or otherwise.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of applicable law."

SECTION 2.7 Amendments to Exhibits and Schedules:

(a)    The definition of "Loan" in Schedule 1.01 to the LOC Loan Agreement is hereby amended and restated in full to read as follows:

701735197 08048307

""Loan" means, collectively (x) "Loans" as defined in <u>Section 2.01(a)</u> and (y) Post-Petition Loans, except to the extent specific terms and conditions in this Agreement relate specifically to such Post-Petition Loans."

(b)    The definition of "Repayment Date" in Schedule 1.01 to the LOC Loan Agreement is hereby amended by adding the following at the end of the existing definition:

", and <u>further</u> <u>provided</u> that, solely with respect to the Post-Petition Loans, the "Repayment Date" shall mean the earliest of (i) the closing of a sale of all or a substantial part of the assets of the Debtors approved under Section 363 of the Bankruptcy Code or under a Chapter 11 plan, (ii) the Termination Date, and (iii) the occurrence of a PPL Event of Default, provided further that, notwithstanding the foregoing, all PPL Obligations shall be due and payable concurrently with the repayment of the Barclays DIP Facility."

(c)    The following definitions shall be added to Schedule 1.01 of the LOC Loan Agreement in appropriate alphabetical order:

"<u>Acceptable Alternative Sale Agreement</u>" means a Replacement Sale Agreement that is acceptable under the Barclays DIP Facility and satisfies each of the requirements listed below and shall otherwise, in form and substance, be acceptable to the Lender Agent in its reasonable discretion:

(i)     the agreement shall not be subject to any diligence or financing conditions and the proposed purchaser shall have obtained all requisite corporate/organizational approvals, and has obtained, or is reasonably likely to obtain all necessary governmental and third-party consents, within a time frame such that the contemplated sale is capable of being consummated by April 15, 2013 (the "<u>Sale Closing Milestone</u>").

(ii)    The proposed purchaser(s) is/are capable of consummating the sale by the Sale Closing Milestone, after taking into account all relevant legal, regulatory and business considerations.

(iii)   The agreement, and in the event there is more than one Replacement Sale Agreement, such Replacement Sale Agreements collectively, shall provide for payment in full in cash of the PPL Obligations and termination of the Buyout Funding Commitment.

"<u>Acceptable Reorganization Plan</u>" means a Reorganization Plan that (i) authorizes and implements the sale transactions contemplated under the Sale Agreements, (ii) provides for the termination of the Buyout Funding Commitment and the payment in full in cash of the PPL Obligations (other than contingent indemnification obligations not yet due and payable) on the effective date of such Reorganization Plan and (iii) provides for (x) releases and exculpations of the Lenders and Lender Agent in their capacities as such with respect to the Buyout Funding Commitment and the PPL Obligations, reasonably acceptable to the

*Eighth Amendment to*
*A&R LOC Loan Agreement*

Lender Agent and (y) that the PPL Obligations shall not be discharged pursuant to the terms of such Reorganization Plan or the Confirmation Order.

"Ally Sale Agreement" means the asset purchase agreement between ResCap, GMACM and RFC and Ally Financial and BMMZ Holdings LLC, in the form attached to the Sale Motion, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith.

"Bankruptcy Code" means title 11 of the United States Code entitled "Bankruptcy" as now and hereafter in effect (or any similar or equivalent legislation as in effect in any applicable jurisdiction), or any successor statutes.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Barclays DIP Facility" means the $1,450,000,000 Secured Debtor-in-Possession Credit Agreement, dated as of the PPL Closing Date, with Barclays Bank PLC as agent for various lenders party thereto (the "Barclays DIP Lenders"), provided to certain Credit Parties in connection with the Cases.

"Buyout Commitment Amount" means $150,000,000, subject to the terms of the Financing Orders.

"Buyout Funding Commitment" means the obligation of the Lenders to provide Post-Petition Loans to GMACM subject to the terms of this Agreement in an aggregate amount not to exceed the Buyout Commitment Amount.

"Cases" means collectively, each and all of the cases under chapter 11 of the Bankruptcy Code with respect to which one of the (x) Borrowers is the debtor and the debtor-in-possession and (y) the Guarantors is the debtor and the debtor-in-possession.

"Cash Collateral" shall have the meaning provided in Section 363(a) of the Bankruptcy Code.

"Cash Management Order" has the meaning specified in Section 5.03(a).

"Confirmation Order" means an order of the Bankruptcy Court confirming a chapter 11 plan or plans in any of the Cases.

"Debtors" means ResCap and each of its Subsidiaries that have filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code.

"DIP Financing Amendment" means the Debtor-In-Possession Financing Amendment to this Agreement dated as of the PPL Closing Date and providing for the availability of Post-Petition Loans hereunder.

15

*Eighth Amendment to
A&R LOC Loan Agreement*

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or was sponsored, maintained or contributed to by, or required to be contributed by, ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates.

"ERISA Affiliate" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (c) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member. Any former ERISA Affiliate of ResCap or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of ResCap or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of ResCap or such Subsidiary and with respect to liabilities arising after such period for which ResCap or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"ERISA Event" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding the reportable event under Section 4043(c)(10) of ERISA coincident to the commencement of the Cases and those for which the provision for 30 day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code or Section 302 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA), the application for a minimum funding waiver with respect to a Pension Plan under Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA or the failure to make any required contribution to a Multiemployer Plan; (c) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA); (e) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (f) the withdrawal by ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to ResCap, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (g) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the imposition of liability on ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section

16

*Eighth Amendment to*
*A&R LOC Loan Agreement*

4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (i) the withdrawal of ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, that it has been determined to be in "endangered" or "critical" status within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (j) the occurrence of an act or omission which could give rise to the imposition on ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (k) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against ResCap, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; or (l) receipt from the IRS of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code.

"<u>Final Financing Order</u>" means a final order approving the DIP Financing Amendment that is in substantially the form of the Interim Financing Order with only such changes from the Interim Financing Order as are satisfactory in form and substance to the Lender Agent in its sole discretion.

"<u>Financing Orders</u>" means, collectively, the Interim Financing Order and the Final Financing Order.

"<u>GNMA Repurchases</u>" has the meaning set forth in <u>Section 2.11(a)</u>.

"<u>HUD Claims</u>" has the meaning set forth on the Financing Orders.

"<u>Initial Approved DIP Budget</u>" has the meaning set forth in <u>Section 5.03(a)</u>.

"<u>Interim Financing Order</u>" shall mean the order of the Bankruptcy Court entered on May 16, 2012 under docket number 89.

"<u>LOC DIP Account</u>" has the meaning specified in <u>Section 4.06</u>.

"<u>Nationstar Sale Agreement</u>" means the asset purchase agreement between certain of the Debtors and Nationstar Mortgage LLC, in the form  attached  to  the  Sale Motion,  collectively  with  all  schedules  and  exhibits  thereto  and  all  other

17

agreements, documents and instruments related thereto and executed and/or delivered in connection therewith.

"Orders" means, collectively, the Financing Orders and the Cash Management Order.

"Original Sale Agreements" means, collectively, the Ally Sale Agreement and the Nationstar Sale Agreement.

"Petition Date" means May 14, 2012.

"Post-Petition Collateral" means (v) the LOC DIP Account, (w) the Collateral, (x) the Repurchased Loans and HUD Claims, (y) the Cash Collateral and (z) a Superpriority Claim, together with any additions thereto and proceeds therefrom.

"Post-Petition Interest Rate" has the meaning set forth in Section 2.11(e).

"Post-Petition Loans" has the meaning set forth in Section 2.11(a).

"PPL Closing Date" has the meaning set forth in Section 5.03(a).

"PPL Event of Default" has the meaning set forth in Section 8.03.

"PPL Obligations" means all Obligations arising from, or in any way related to, the Post-Petition Loans.

"PPL Outstandings" means, at any time, the aggregate principal amount of all outstanding Post-Petition Loans.

"Pre-Petition Indebtedness" means any and all Indebtedness incurred by any Credit Party prior to the Petition Date.

"Prepetition Payment" means a payment (by way of adequate protection or otherwise) of principal, interest, fees or otherwise on account of (a) Pre-Petition Indebtedness or (b) trade payables (including, without limitation, in respect of reclamation claims) or other prepetition claims against any Credit Party.

"Reorganization Plan" means a chapter 11 plan or plans filed in any or all of the Cases.

"Repurchased Loans" has the meaning set forth in the Financing Orders.

"Replacement Sale Agreement" means one or more sale agreements entered into within sixty (60) days following the termination, rescission or revocation of an Original Sale Agreement, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, which Replacement Sale Agreement is an Acceptable Alternative Sale Agreement.

18

*Eighth Amendment to*
*A&R LOC Loan Agreement*

"Sale Agreement" means an Original Sale Agreement or a Replacement Sale Agreement.

"Sale Motion" means the motion filed with the bankruptcy court on May 14, 2012 under docket number 61, as amended from time to time.

"Sale Order" means (a) an order or orders of the Bankruptcy Court approving: (i) the Ally Sale Agreement; (ii) the Nationstar Sale Agreement; and/or (iii) an Acceptable Alternative Sale Agreement, and in each case, directing the repayment in full in cash of the PPL Obligations and the termination of the Buyout Funding Commitment upon the closing of the transactions collectively contemplated by the applicable agreement(s) and containing terms consistent, in the reasonable judgment of the Lender Agent, with the Financing Orders and the rights of the Lender Agent and the Initial Lender as lender under the Buyout Funding Commitment, and/or (b) a Confirmation Order.

"Specified Prepetition Facilities" means, collectively, (a) this Agreement, (b) the Senior Debt Facility, (c) the 9.625% Junior Secured Guaranteed Notes due 2015 issued by ResCap pursuant to the Prepetition Junior Secured Indenture, in an initial aggregate face amount of $4,010,280,000 (as amended or supplemented prior to the date hereof), (d) the financing facility under the Amended and Restated Addendum to the Fannie Mae Contracts, dated as of July 11, 2011, between Fannie Mae and GMACM (as amended or supplemented prior to the date hereof) and (e) the credit facility under (i) the Amended and Restated Loan and Security Agreement, dated as of June [30], 2010, among GMACM, ResCap and Citibank, N.A., as amended by Amendment Number One, dated as of August 19, 2010, as amended by Amendment Number Two, dated as of September 15, 2010, as amended by Amendment Number Three, dated as of September 30, 2010, as amended by Amendment Number Four, dated as of November 30, 2010, as amended by Amendment Number Five, dated as of January 18, 2011, as amended by Amendment Number Six, dated as of March 15, 2011, as amended by Amendment Number Seven, dated as of April 1, 2011, as amended by Amendment Number Eight, dated as of April 11, 2011, as amended by Amendment Number Nine, dated as of February 1, 2012, and as amended by Amendment Number Ten, dated as of March 30, 2012 (as further amended or supplemented prior to the date hereof, the "Prepetition MSR Loan Agreement") and (ii) the other Facility Documents (as defined in the Prepetition MSR Loan Agreement).

"Superpriority Claim" means a claim against any Credit Party in any of the Cases that is a superpriority administrative expense claim having the priority set forth in the Financing Orders.

"Termination Date" means the earliest to occur of (a) the stated maturity date of the Barclays DIP Facility as in effect on the PPL Closing Date, (b) the date that is forty-five (45) days after entry of the Interim Financing Order if the Final Financing Order has not been entered by the Bankruptcy Court prior to the

19

*Eighth Amendment to*
*A&R LOC Loan Agreement*

expiration of such 45-day period, (c) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date thereof) of a reorganization plan for any Credit Party that is confirmed pursuant to an order entered by the Bankruptcy Court, and (d) the date on which maturity of the Post-Petition Loans is accelerated and the commitments therefor are terminated pursuant to Section 8.03.

"Use Restriction" has the meaning set forth in Section 2.11(a). For avoidance of doubt, proceeds from Post-Petition Loans shall not be used to repurchase whole loans for any purpose other than as contemplated by the Use Restriction, including without limitation for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects.

## ARTICLE III
## CONDITIONS TO EFFECTIVENESS

SECTION 3.1 Amendment Effectiveness. The provisions of this Agreement shall become effective on the date hereof.

SECTION 3.2 Undertaking. Each Credit Party shall utilize best efforts to prepare and submit all necessary documentation to the Bankruptcy Court in order to obtain entry of the Final Financing Order no later than forty-five (45) days after the date of entry of the Interim Financing Order.

## ARTICLE IV
## NOTICES, CONFIRMATION AND ACKNOWLEDGMENTS

SECTION 4.1 Notice. Each party hereto hereby acknowledges timely notice of the execution of this Agreement and of the transactions and amendments contemplated hereby. Each party hereto hereby waives any notice requirement contained in the LOC Loan Agreement or the other Facility Documents with respect to the execution of this Agreement.

SECTION 4.2 Reservation of Rights. The Credit Parties each hereby acknowledge and agree that none of this Agreement, the making of any loan under the LOC Loan Agreement (including without limitation the Post-Petition Loans) by any Lender and any Lender's or the Lender Agent's consent thereto either before or after the date hereof shall constitute (w) an approval of the accuracy of all or any portion of any Borrower funding request or any certification delivered pursuant to the Facility Documents, (x) a waiver or forbearance by any Lender or the Lender Agent under any of the Facility Documents, (y) the acceptance by any Lender or the Lender Agent of any course of conduct by any Credit Party or any other Person or (z) an agreement by any Lender or the Lender Agent to amend any of the Facility Documents without all required approvals or related certifications. The Credit Parties each hereby further acknowledge and agree that the Lenders and the Lender Agent reserve all rights, remedies and options under the Facility Documents, including to require the Borrowers to satisfy in all respects the conditions relating to the making of any loan under the Facility Documents and the right to require each Credit Party to perform all of its obligations under the Facility Documents which are then due and owing or are susceptible of performance, as the case may be.

20

*Eighth Amendment to
A&R LOC Loan Agreement*

SECTION 4.3 <u>Confirmation of the Facility Documents</u>.  The Credit Parties each hereby acknowledge and agree that the LOC Loan Agreement and each other Facility Document (each as amended as of the date hereof) are each ratified and confirmed in all respects and shall remain in full force and effect in accordance with their respective terms.  Without limiting the foregoing, each Credit Party reaffirms its grant of a security interest in all the Collateral pledged by it, and agrees that such security interest secures all Obligations.  As of the date hereof, each reference in the LOC Loan Agreement to "this Agreement" or in any other Facility Document to the "Loan Agreement" shall mean the LOC Loan Agreement as amended by this Agreement, and as hereinafter amended, restated or modified.

SECTION 4.4 <u>Non-waiver of Events of Default</u>.  The Credit Parties each hereby acknowledge and agree that Events of Default have occurred and are continuing with respect to all Loans (other than the Post-Petition Loans) under the LOC Loan Agreement, and as condition to the effectiveness of this Agreement expressly acknowledge that nothing contained herein shall be deemed a waiver by the Lender Agent or Lenders of such Events of Default.

ARTICLE V<br>MISCELLANEOUS

SECTION 5.1 **GOVERNING LAW.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).**

SECTION 5.2 <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents) and all of which when taken together shall constitute one and the same agreement.

SECTION 5.3 **WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

SECTION 5.4 <u>Entire Agreement</u>.  This Agreement, the Orders, the LOC Loan Agreement and the other Facility Documents embody the entire agreement and understanding of the parties hereto and supersede any and all prior agreements, arrangements and understanding relating to the matters provided for herein.

SECTION 5.5 <u>Captions</u>.  The various captions in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

21

701735197 08048307

SECTION 5.6 <u>Severability</u>.   If any provision of this Agreement, or the application thereof to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason (in any jurisdiction), the remaining terms of this Agreement, modified by the deletion of the unenforceable invalid or illegal portion (in any relevant jurisdiction), will continue in full force and effect, and such unenforceability, invalidity or illegality will not otherwise affect the enforceability, validity or legality of the remaining terms of this Agreement so long as this Agreement, as so modified, continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the deletion of such portion of this Agreement will not substantially impair the respective expectations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.

SECTION 5.7 **SUBMISSION TO JURISDICTION.   EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.   EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES.   THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.**

[signature pages follow]

22

701735197 08048307

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

RESIDENTIAL FUNDING COMPANY, LLC
GMAC MORTGAGE, LLC
as Borrowers

By: _____
Name: Joseph Ruhlin
Title:   Treasurer and Treasury Executive


RESIDENTIAL CAPITAL, LLC,
as Guarantor

By: _____
Name: Joseph Ruhlin
Title:   Treasury Executive


HOMECOMINGS FINANCIAL, LLC,
as Guarantor

By: _____
Name: Joseph Ruhlin
Title:   Treasurer and Treasury Executive


RFC ASSET HOLDINGS II, LLC
PASSIVE ASSET TRANSACTIONS, LLC
GMAC RESIDENTIAL HOLDING COMPANY, LLC and
GMAC-RFC HOLDING COMPANY, LLC,
as Guarantors

By: _____
Name: Joseph Ruhlin
Title:   Treasurer and Treasury Executive

701735197 08048307                       S-1                       *Eighth Amendment to*
                                                                   *A&R LOC Loan Agreement*

EQUITY INVESTMENT I, LLC,
as Guarantor

By:_____
Name: Heather Anderson
Title:   Assistant Treasurer

*Eighth Amendment to*
*A&R LOC Loan Agreement*

ALLY FINANCIAL INC.
(f/k/a GMAC Inc.),
as Lender Agent and Initial Lender
By:
Name: Christopher A. Halmy
Title: Corporate Treasurer

SCHEDULE 7.04

POST-PETITION ADMINISTRATIVE AND REPORTING REQUIREMENTS

1.    Deliver its daily cash tracking report to the Lender Agent.

2.    Cash collections from domestic operations are moved into the LOC Concentration account or LOC DIP Account, as applicable, within 5 Business Days of receipt for amounts greater than $2 million, unless waived by Lender Agent. All other amounts moved as soon as administratively possible. These collections shall include advance collections, servicing fees, borrower payments and bond payments.

3.    Borrowing Base is delivered monthly, with pledged Repurchased Loans and HUD Claims added, at the same time as reports are delivered under the Financing Orders.  Borrower shall continue to deliver an Officer's certificate with respect to the Borrowing Base in form and substance similar to the certificate required under the LOC Loan Agreement.

4.    Post-Petition Loans will be made to fund GNMA Repurchases on one Business Day's notice, but repurchases will be funded with corporate cash before Post-Petition Loan is made.

5.    Any other pre-petition cash moves for collections or sales proceeds which simply moved cash into and out of a LOC bank account would cease as new collection process is implemented.

6.    Interest calculation and accrued interest.