1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, ET AL.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              June 25, 2012

19              11:17 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   Initial Case Conference RE:  Assumption of Plan Support

3   Agreement Motions.  Marked up Documents: 318, 319, 320, 390,

4   473

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

```
 1
 2  A P P E A R A N C E S :
 3  MORRISON & FOERSTER LLP
 4        Attorneys for Debtors
 5        1290 Avenue of the Americas
 6        New York, NY 10104
 7
 8  BY:   ANTHONY PRINCI, ESQ.
 9
10
11  ALSTON & BIRD
12        Attorneys for wells Fargo as Trustee
13        1201 West Peachtree Street
14        Atlanta, GA 30309
15
16  BY:   JOHN C. WEITNAUER, ESQ.
17
18
19  CADWALADER, WICKERSHAM & TAFT LLP
20        Attorneys for MBIA Insurance Co.
21        700 Sixth Street, N.W.
22        Washington, DC 20001
23
24  BY:   MARK C. ELLENBERG, ESQ.
25
```

4

1

2   CLEARY GOTTLIEB STEEN & HAMILTON LLP

3        Attorneys for certain holders of the unsecured bonds at

4             ResCap Management LLC

5        One Liberty Plaza

6        New York, NY 10006

7

8   BY:   SEAN A. O'NEAL, ESQ.

9

10

11  DECHERT LLP

12       Attorneys for Bank of New York Mellon

13       1095 Avenue of the Americas

14       New York, NY 10036

15

16  BY:   MAURICIO A. ESPANA, ESQ.

17       GLENN E. SIEGEL, ESQ.

18

19

20

21

22

23

24

25

1

2   KRAMER LEVIN NAFTALIS & FRANKEL LLP

3          Proposed Counsel to Creditors' Committee

4          1177 Avenue of the Americas

5          New York, NY 10036

6

7   BY:   KENNETH H. ECKSTEIN, ESQ.

8          DOUGLAS MANNAL, ESQ.

9          RACHAEL L. RINGER, ESQ.

10

11

12   MORGAN LEWIS & BICKLUS LLP

13          Attorneys for Deutsche Bank Trust Company Americas

14          101 Park Avenue

15          New York, NY 10178

16

17   BY:   JAMES L. GARRITY, JR., ESQ.

18

19

20   ROPES & GRAY LLP

21          Attorneys for RMBS Certificate Holders

22          1211 Avenue of the Americas

23          New York, NY 10036

24

25   BY:   KEITH H. WOFFORD, ESQ.

```
 1
 2   SEWARD & KISSEL LLP
 3         Attorneys for U.S. Bank
 4         One Battery Park Plaza
 5         New York, NY 10004
 6
 7   BY:   RONALD L. COHEN, ESQ.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                      P R O C E E D I N G S

2           THE COURT:  Please be seated.  We're here on

3    Residential Capital, LLC.  It's case number 12-12020.

4           MR. PRINCI:  Good morning, Your Honor.  Anthony Princi

5    of Morrison & Foerster on behalf of the debtors.

6           THE COURT:  Good morning.

7           MR. PRINCI:  Your Honor, I believe this is a status

8    conference on two motions that we've calendared with the Court.

9    One is a 9019 motion respecting certain settlement agreements

10   we have with certain institutional investors, and the second is

11   motions to assume certain plan support agreements that we have

12   with those same institutional investors.

13          There have been a number of discussions that we've had

14   with a number of the main parties in this case respecting the

15   time table for those motions.  And having heard the concerns by

16   those parties, we are going to propose to the Court that at the

17   end of the day -- I'll give you sort of the punch line and then

18   work backwards -- we're going to propose to the Court that we

19   continue to have discussions with those parties to try to come

20   up with a specific new proposed hearing date, of course subject

21   to the Court's calendar.

22          But we do have, I think, Your Honor, progress with

23   respect to when those motions perhaps should be heard.  And

24   what I'd like to do, Judge, before I get into the weeds on

25   that, is first take a step back and just give Your Honor a

1  little bit of a summary about what is involved in each of those

2  motions, what those agreements pertain to and what their impact

3  on the estate is, if I may.

4        THE COURT:  You can.  I read the three motions but not

5  all of the exhibits to them.  I've read what I think is the

6  only objection to be filed so far, the Triaxx objection.  I

7  didn't -- looking quickly at the docket, I didn't see other

8  objections having been filed yet, but I know that the deadline

9  for objections was already extended once, and I suppose,

10  depending on what the schedule is -- we'll see what the new

11  schedule is, but those are the papers I've read so far.

12        MR. PRINCI:  I think you've got the main ones, then,

13  Judge.

14        So Judge, let me start by first addressing what the

15  9019 motions pertain to and why they're so important to the

16  progress and ultimately the outcome of this case.

17        As the Court is aware, the debtors have both been

18  originators and servicers of a large number of residential

19  mortgage-backed trusts.  The settlement agreement, Judge, that

20  has been reached -- and I should say, Judge -- let me take a

21  step back.  From 2004 to 2007, which are the period of time for

22  which those trusts are the subject of tremendous amount of

23  litigation or potential litigation claims respecting alleged

24  breach of representation and warranty claims, and there are

25  approximately 392 trusts all together in that period of time.

1   Those 392 trusts have face amount 221 billion of original issue

2   balance, and they consist of 1.6 billion mortgage loans.

3           And to understand the impact of those numbers, Judge,

4   the debtors take the position that with respect to any claim

5   that an institutional investor in those trusts, or the

6   trustees, more specifically, Judge, who would have the

7   standing, could make to allege any breach of representation or

8   warranty, those breaches, to the extent they exist, would be on

9   a loan-level basis.  So you would have to, we take the

10  position, examine the particulars of the loans for which the

11  alleged breaches pertain to.  And again, we have 1.6 billion in

12  loans that comprise those 392 trusts.

13          Prior to the commencement of this case, Judge, we knew

14  from our existing experience with the institutional investors,

15  a number of whom had alerted us to the fact that they believed

16  they had a breach of rep and warranty claims, and in fact the

17  number of lawsuits we already faced, that in this case, for us

18  to succeed and to succeed in some sort of a reasonable time

19  frame, we were going to have to get to the bottom of what is

20  the amount -- the liquidated amount that should be accepted by

21  the Court, ultimately, but hopefully consensually with the

22  parties, as the amount for those alleged breaches.

23          And not only did we, from our own experience with the

24  claims we were facing, realize that this would be an enormous

25  task, but we looked, Judge, at a case like Lehman where it's

 1  taken literally years in that case in this court for the

 2  parties to come to grip with what is the biggest single claim

 3  constituent, and that is the RMBS holders' claims.

 4        So we set about, Judge, before the petition date, to

 5  try to see if we could set up a process whereby we could start

 6  to consensually resolve this.  And we were fortunate, Judge, in

 7  that we had two parties, and one in particular, who were

 8  organized and who represented a large number of the actual real

 9  parties-in-interest.

10        And as the Court is aware, you have the trusts and

11  they have the technical claim against the estate, but there's

12  trustees who manage those trusts, and those trustees are

13  fiduciaries for, fundamentally, financial institutions around

14  the globe who own the RMBS paper.  And these are some of the --

15        THE COURT:  So the one thing that, I guess, surprised

16  me in what I've read is you argue that twenty-five percent of

17  the holders of the securitization trust can direct the trustee

18  as to what the trustee is supposed to do.  And you allege that

19  as to the number of trusts with whom you've reached a proposed

20  settlement that these two groups that you negotiated with hold

21  or control more than twenty-five percent.  And then I read the

22  Triaxx objection, they say they have more than twenty-five

23  percent.  So what's the trustee supposed to do when the trustee

24  receives conflicting direction from holders of claims or

25  securities with more than twenty-five percent?

1          MR. PRINCI:  That's a good question.

2          THE COURT:  Mr. Siegel, you can have a seat and you'll

3    get your chance.

4          MR. PRINCI:  That's a good question, Judge, and of

5    course I won't speak for, obviously, the trustees.  But, Your

6    Honor, it's our understanding that the trustees are subject to

7    a prudent man standard -- a prudent person standard.  They have

8    to look at this the way a reasonable, prudent investor would

9    look at it and make a determination as to what's in the best

10   interest of the ultimate beneficiaries for whom they are

11   fiduciaries.

12         Let's put aside for a second, Judge, the settlements

13   we've reached and for which we've made the 9019 motion, and

14   let's just look at this and see what would happen in the

15   absence of any involvement and the way in which now we are

16   bringing all the claims together, hopefully, through this

17   settlement.

18         So the trustees presumably would file a proof of

19   claim.  And then the trustees would either bring that to a

20   judgment at a claims hearing or they would settle.  Whether

21   they bring it to litigation and seek a judgment or whether they

22   settle, either way they're going to have to make a prudent

23   judgment as to what is in the best interests of the

24   beneficiaries to whom they owe a fiduciary duty.

25         What we have done here, Judge, is we have negotiated

1   directly with their ultimate beneficiaries.  And the numbers

2   are like this, Judge.  Out of the 392 trusts, the two settling

3   groups -- we refer to one as the Patrick group and the other

4   one as the Talcott group.  Collectively, they own twenty-five

5   percent or more of 331 of the 392 trusts.  And I mentioned

6   before that you're looking at approximately 221 billion face,

7   the original issue balance; they hold 184 billion of that

8   amount, so approximately eighty-four percent.

9           The way in which the settlement agreement works is by

10  virtue of the settlement agreement we have agreed upon what the

11  allowed amount should be for their claim, and we've agreed that

12  it should be 8.7 billion.  That is for all the trusts.

13          THE COURT:  So it'll be reduced -- if less than all

14  the trusts participate -- if the trustees for less than all the

15  trusts elect to participate, then the 8.7 -- the actual amount

16  of the allowed claim would be reduced proportional to the --

17          MR. PRINCI:  That's correct, and that's laid out in

18  the settlement agreement.  And for the institutional investors,

19  Judge -- and I know this because I was involved in the

20  negotiations with them, what they don't want, and it's

21  understandable, is to end up in another Chapter 11 proceeding

22  like Lehman where they're just mired, where it just goes

23  nowhere.

24          So we have now an agreement with them and they have a

25  professional belief and obviously they were -- this will all

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1   come out, Judge, at the hearing, but obviously they're

2   represented by sophisticated professionals.  They came to a

3   judgment that this amount was fair.

4          The agreement requires them to direct the trustees to

5   accept this settlement, but the trustees, Judge, as I

6   mentioned, are going to apply their own prudent investment

7   standard and then they will make a decision.  The way we have

8   the --

9          THE COURT:  Let me ask you this.  If the trustees and

10  the investors -- let's say the investors holding more than

11  twenty-five percent of a particular trust direct the trustee to

12  agree to move forward with the settlement and the trustee

13  declines to do so because twenty-five percent of the holders

14  instructed not to, is that an inter-creditor dispute that has

15  to be resolved in a state court or in a federal district court

16  as opposed to in the bankruptcy court?

17         I'll give you an example.  This issue arose in

18  Chrysler and it also arose in a case that I wrote in, In re

19  Metaldyne.  There the indenture provided that fifty percent, a

20  majority, could direct the indenture trustee what to do.  In

21  Metaldyne, a minority holder, I think five million out of, I

22  don't remember how many, some very large amount, objected to

23  the agent agreeing to credit bid the full amount.  And I didn't

24  definitively resolve it, but relying on the Chrysler decision,

25  I said that really was a matter for another court to decide;

1    that would be an inter-creditor dispute.

2            Does this settlement contemplate -- what happens if

3    the trustee receives conflicting directions and you don't like

4    the decision the trustee made.  Who gets to resolve that?

5            MR. PRINCI:  The settlement agreement, Judge, does not

6    require or impose any restrictions or obligations on the part

7    of the institutional investors in that situation, so they're

8    free to enforce their rights vis-a-vis the trustee in whatever

9    way they see appropriate.  So the debtor hasn't sought, for

10   example, to insist that if there is such an inter-creditor

11   agreement that they'd bring that as a related proceeding in the

12   bankruptcy case.

13           So Your Honor, we have a mechanism whereby we have

14   allowed for a certain amount of time, which was a negotiated

15   period of time with the Patrick and Talcott groups, for when

16   the trustees need to make a determination as to whether they

17   want to do this or they don't want to do this.  That time

18   period has created consternation amongst a number of parties,

19   the creditors' committee and the trustees themselves.  And

20   their fundamental point is that they want more time and they

21   want a considerable amount more time.  We hear them.  We don't

22   want to lose the settlement agreement.  And I heard Your Honor

23   to say first-day and we're all familiar with these dynamics

24   that you don't want -- the Court obviously doesn't want to have

25   parties putting unnecessary pressure in an already complicated

1   case with arbitrary deadlines.  That wasn't the intention of

2   the Patrick or Talcott groups.  I understand from their

3   experiences, their clients' experiences in other cases --

4         THE COURT:  I'm more inclined to believe the debtor

5   imposed that time limit because it wants to push all of this

6   through, but that's --

7         MR. PRINCI:  Well, I think -- Judge, to be honest with

8   you, I think it was mutual.  I mean, I think we both want a

9   system in place where this case doesn't get derailed and we

10   have parochial interests creating chaos.  There's got to be a

11   reasonably systematic way to bring resolution to the variety of

12   major claims, and we think we've set up a sound one, but we

13   hear people when people tell us that's not workable for them.

14   So both we, the debtor, and the Patrick and Talcott groups are

15   amenable to putting off that so-called opt-in period for a

16   considerable period of time.

17         We believe, Your Honor, that the deadline, however,

18   has to be concomitant with the hearing on the Nationstar sale

19   proceeding, because at the end of the day if we do have the

20   trustees agreeing to a settlement and we have peace in the

21   valley, then we're going to have peace in the valley with

22   respect to the Nationstar sale, at least vis-a-vis the

23   trustees -- at least vis-a-vis the trustees, which are, as I

24   mentioned earlier, obviously an enormous constituent in this

25   case.  On the other hand, if they're going to take the position

1   that they don't want to settle and they'd rather fight, then

2   their first fight will be in connection, presumably, with

3   Nationstar.

4         So we're going to need to know by that date.  That, I

5   believe, Judge, and I can't -- you know, I can't say this with

6   absolute certainty -- I believe that hearing is scheduled for

7   the first week in November, or at least if it's not -- if we

8   don't have a hearing date yet, the agreement contemplates that

9   there be a hearing by that date.  So we believe, Judge, having

10   listened to the concerns that that should be enough time, more

11   than enough time.  And we're talking also, Judge, about not

12   only to allow the trustees to look into that but all the other

13   parties as well.

14         Consistent with that concept, let me move to the plan

15   support agreement and the timing for that, and then I'll circle

16   back, Judge, to the 9019.

17         For the same reasons that the trustees and the

18   creditors' committee had urged us to extend the time line for

19   that opt-in period, so too did they inform us that they

20   believed that more time, and considerably more time, was

21   necessary for them to consider the ramifications of the plan

22   support agreement.

23         And we, once again, understand where the trustees are

24   coming from in that regard, and so we are prepared, Judge, to

25   put the hearing on the motion to assume the plan support

1  agreements off concomitantly with a date that would be

2  consistent with the other plan support agreement that we're

3  seeking to assume, and that is with the junior secured

4  bondholder group, so that's a number of months out.

5          THE COURT:  So the plan support agreements make

6  approval of the RMBS settlement a condition to the

7  effectiveness of the plan support agreements, is that correct?

8          MR. PRINCI:  Judge, can you repeat the question?  I'm

9  sorry.

10          THE COURT:  I looked quickly.  Am I correct that the

11  plan support agreements have as a condition precedent to the

12  effectiveness of the plan support agreements the approval and

13  entry of an order approving the RMBS settlements?  I may have

14  gotten it wrong.  I didn't spend an enormous --

15          MR. PRINCI:  Judge --

16          THE COURT:  -- amount of time on this.

17          MR. PRINCI:  -- I apologize, I'd have to go back

18  and --

19          THE COURT:  Can somebody tell me?

20          MR. PRINCI:  -- review the --

21          THE COURT:  I mean, I saw these as inextricably linked

22  together.

23          MR. PRINCI:  I'm being told yes, Your Honor.

24          THE COURT:  Yeah, I mean, when I read them over it

25  looked like this was really all inextricably linked.

1        MR. PRINCI:  I think there's a certain amount of

2   linkage, but they're not inextricably linked, Judge.  And in

3   fact, once you take the opt-out provision, Judge, and you move

4   it, what remains in the 9019 motion has really no linkage

5   whatsoever.  Let me address that because with respect to --

6        THE COURT:  No, but the other way it did.

7        MR. PRINCI:  You're correct.

8        THE COURT:  I could approve the 9019 on the RMBS.

9   That could stand alone.  But the plan support agreement, I

10  could approve it, but it wouldn't be effective unless the RMBS

11  settlement was approved.

12       MR. PRINCI:  Judge, and we heard in so many words that

13  issue being raised by the creditors' committee and by the

14  trustees.  And so that's why, Judge, the Patrick group and we

15  are amenable to separating those two, extending out the time

16  line for the trustees to consider both the opt-in feature in

17  the settlement agreement and the PSAs.

18       With respect to what remains then, Judge, of our 9019

19  motion, in terms of timing, okay, is presently it's scheduled

20  for July 24th; we have a hearing date July 24th.  The

21  creditors' committee, in particular, has indicated that it

22  believes it needs more time to consider the matter before it

23  can take a position.  We're sensitive to their time needs,

24  Judge.  So we're prepared to move that back as well.  Again,

25  we're prepared to do that, Judge, because people need the

1    amount of time they need, within reason, to consider that, but

2    not because it's linked, Judge, to the terms of the plan,

3    because it's not.

4            The PSA, of course, is linked to the terms of the plan

5    directly, but that settlement agreement is not.  That

6    settlement agreement, Judge, is a big, big first step in this

7    case, we hope, to start to liquidate the amount of the claims

8    here and get this case to take some meaningful shape and form

9    going forward.

10           So do I have a proposed date for you and the Court?  I

11   do not.  And the reason I don't, Judge, is I'd like to have an

12   opportunity to talk further with Mr. Eckstein, and he needs

13   some more time to talk to his creditors' committee.  And we

14   also, Judge, as you know from the last hearing, we're still

15   working out things with the counsel for the trustees.  We have

16   until July 10 to work out any further issues they have with

17   respect to the sales hearing.

18           So I would propose, Judge, that we'll finish these

19   discussions on timing and hopefully we'll get back to the Court

20   with a new proposed date for the 9019 motion.  I've already

21   informed creditors' committee's counsel of this, not attempting

22   to impose anything on anybody, but just to give everybody a

23   heads up, you know, the way we see this, Judge, we would think

24   by the end of August.  That should be enough time for the

25   parties here to do the work necessary.

1           And Judge, we say this having had to do this

2    ourselves, so we have a sense of what's involved.  But we think

3    that should give the creditors' committee and any other party

4    who has an interest in looking at this settlement, between

5    these institutional investors on the one hand, and the debtor

6    on the other.  And I tried to make a demonstrative showing,

7    Judge, because any other party reserves their right.  I mean,

8    if they don't like the deal -- if you have another investor --

9    and by the way, this is expressly laid out in the settlement

10   agreement, if there's another investor and they don't like the

11   deal, they're not being imposed upon, if you will, by that

12   settlement.

13           THE COURT:  Let me make sure I understand that,

14   because I read it differently.

15           MR. PRINCI:  Okay.

16           THE COURT:  I saw where your negotiation counter-

17   parties in the two groups you negotiated with in the

18   settlement, that those lead parties had to agree that they

19   would continue to hold more than twenty-five percent.

20           MR. PRINCI:  That's correct --

21           THE COURT:  And --

22           MR. PRINCI:  -- of a certain number of trusts.  I

23   think the floor is 235 of the 331.

24           THE COURT:  And other investors could trade away or

25   not.  But you are relying on the trustees of these trusts

1  following the directions of twenty-five percent of the holders

2  of each trust.

3          MR. PRINCI:  We are --

4          THE COURT:  And if you get that and if the Court

5  approves it, that trust is bound, whether minority inve -- and

6  I say minority because it may not be -- I mean, in theory, you

7  could have another investor who owned just as much, but if the

8  trustees followed the direction to enter the settlement --

9  participate in the settlement, the other seventy-five percent,

10  tough, they're bound.

11          MR. PRINCI:  Your Honor's comment is exactly right.

12  But Your Honor, the binding --

13          THE COURT:  I'm not saying there's anything wrong with

14  that, but that --

15          MR. PRINCI:  No, no, no, understood.

16          THE COURT:  -- if I understand the consequences --

17          MR. PRINCI:  Understood.  But Your Honor, the binding

18  effect would not come from this Court's grant of the 9019

19  motion.  The binding effect would come from the trustee's

20  independent decision, made over the course of a lot of time

21  with a lot of information to decide to settle on those terms.

22  And as I said earlier, that is a decision they would have to

23  make in this case, whether we had the settlement agreement with

24  the Patrick group or not.  So that is just the way the trusts

25  work.  People bought those instruments knowing full well that

1    the trustees would have that power.

2            THE COURT:  We'll see how many trustees decide to

3    resign before they have to make a decision.  I'm not joking.

4            MR. PRINCI:  Well, Judge, I will say on that front,

5    one of the reasons that we came back to the Court with respect

6    to the servicing agreements is we certainly want to make sure

7    that the trustees can fulfill their obligations, can do all the

8    work necessary.  They've all got terrifically sophisticated

9    lawyers.  They either have retained or in the process of

10   retaining a financial advisor.  So in my experience, Judge,

11   with trustees, and so far in my experience with them in this

12   case, I think they have evidenced the kind of good faith that

13   investors should be happy about, regardless of what they choose

14   to do.

15           THE COURT:  Let me ask you a few more questions

16   about --

17           MR. PRINCI:  Sure.

18           THE COURT:  -- the effect of the settlement, if it's

19   approved.  There obviously has been an enormous amount of

20   litigation.  There was a lot against ResCap.  There were a lot

21   against -- your papers talk about Bank of America.  You talked

22   about the other cases.  What claims, either against ResCap or

23   in similar litigation, have investors -- and I know there are

24   securities claims and I know you say you're going to apply 510

25   into that, you're not seeking to get a release of those claims,

1    but what claims have investors asserted where they say those

2    are direct claims of mine, those are not claims as to which a

3    trustee can exercise control and decide to settle that -- you

4    know, I approved entering into a settlement that will release

5    all of those claims.  Does that issue come up in these cases?

6            MR. PRINCI:  Certainly obviously in the securities

7    fraud cases, Judge.  May I confer for a moment?

8            THE COURT:  Yes, please, go ahead.

9            So Judge, I think the answer is that we are not aware

10   of the investors ever having brought or attempted to bring a

11   claim of breach in warranty in their own stead.  The monolines,

12   Judge -- and you know how that works -- they have brought

13   actions against us directly.  So Judge --

14           THE COURT:  And how does the settlement affect the

15   monoline claims?

16           MR. PRINCI:  Well, the monoline claimants have a right

17   to, if you will, opt in.  So the time period when I refer to

18   the opt-in period, that period will be extended for everyone,

19   including the monolines.  And at the end of the day they too,

20   right, will make their own decision as they would have to have

21   made even if we didn't set up this system whereby we're moving

22   the case along hopefully to consensual resolution rather than

23   litigation, but we can't stop people if they want to litigate

24   with us.

25           THE COURT:  I mean, I just -- in principle, the notion

1    of settling these claims with an allowed claim and a formula

2    makes perfect sense.  That isn't to say that this is going to

3    get approved or disapproved.  For those who, in all likelihood,

4    would otherwise face years of litigation whether it's in the

5    claims allowance process or whatever, settlement is favored in

6    bankruptcy, favored outside of bankruptcy too.  So I'm not --

7    you know, in principle, what you're trying to accomplish is --

8    I don't have any problem with it.  The devil is in the details.

9              MR. PRINCI:  Understood.

10             THE COURT:  And we'll see what happens.  Let me shift

11   to some questions --

12             MR. PRINCI:  Sure.

13             THE COURT:  -- about the plan support agreements,

14   okay?

15             MR. PRINCI:  Sure.

16             THE COURT:  What happens to the obligations of the

17   parties to the plan support agreement -- support agreements,

18   plural, if the Court were to determine that some aspect of the

19   plan -- plans that the parties have agreed to support are

20   unconfirmable as a matter of law?

21             MR. PRINCI:  The counter-party -- that would be a

22   termination event, which would give the counter-party a right

23   to terminate.  We have a procedure whereby they've got to give

24   us a certain amount of notice, and it's obviously contemplated,

25   which is why we put --

 1              THE COURT:  Okay.  So let me interrupt.

 2              MR. PRINCI:  Sure.

 3              THE COURT:  Okay?  So let's assume I approve the RMBS

 4      settlement, the 9019, and assume I approve the plan support

 5      agreements but I subsequently determine that elements of the

 6      plan are not confirmable as a matter of law; we don't even get

 7      to the confirmation hearing, I just decide that -- or at

 8      confirmation I decide that some aspect of the plan is

 9      unconfirmable as a matter of law, I saw the termination event,

10      I saw that language, but what happens to the RMBS settlement at

11      that point?

12              MR. PRINCI:  That remains untouched.  That's what I

13      was saying earlier, Judge.  The RMBS settlement really is

14      completely detached from the PSA and the plan.

15              THE COURT:  Those trustees were also agreeing that

16      they would support the plan, right?

17              MR. PRINCI:  I think -- yes, that's what they.  That

18      would be -- that would be -- I'm sorry.  So  what --

19              THE COURT:  You know, Mr. Siegel, I will give you a

20      chance, so sit there and restrain yourself.

21              MR. PRINCI:  So, Judge, at the end of the day, the

22      plan support agreement calls for the institutional investors to

23      direct the trustees to vote for the plan.  So you have two

24      distinct sets of directions under each of these two very

25      distinct agreements.  Under the settlement agreement, the

 1  institutional investors are directing the trustees to accept

 2  the allowed claim amount of 8.7 billion.  Under the plan

 3  support agreement, the institutional investors are directing

 4  the trustees to vote for the plan.

 5          At the end of the day, Judge, the trustees, we

 6  believe, as a matter of law, are going to be required, under a

 7  prudent investment standard, to make both those determinations.

 8  Would they be affected by the views taken by that large a

 9  portion of their ultimate beneficiaries? Presumably.  But they

10  will take their own counsel in that.  They're set up to --

11  right now, to go forward and make the analysis they need to

12  make.  And they'll make ultimately their determination and do

13  what they think is the prudent thing to do.

14          Should the plan not be confirmed, fundamentally, it

15  just blows up, because you don't get the settlement proceeds

16  from Ally.  And the rest of the pieces just sort of --

17          THE COURT:  Well, what does that mean?  That's what

18  I'm trying to understand.  So the plan may blow up, but what

19  happens to --

20          MR. PRINCI:  The allowed claim stays.  The allowed

21  claim stays for all those who have opted in.  So we believe,

22  Judge, that regardless of what the plan looks like, we

23  separately have to deal with the allowance of claims.  So if

24  we're not fortunate enough to have the plan that we're working

25  on confirmed, separately, however, at least we will have made

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1    definitive progress in defining what the allowed claims are

2    against the estate, regardless of where a plan stands.

3            THE COURT:  Am I right, there was only the one

4    objection so far, that was filed?

5            MR. PRINCI:  That's right, Judge.  And just, Judge, I

6    want to bring one thing to a head.  So just with respect to

7    timing and scheduling, as I said, we're going to have further

8    discussions.  Hopefully you'll hear from us that the creditors'

9    committee and we and hopefully other parties will agree on a

10   certain proposed date, subject to the Court's calendar, for a

11   hearing, as I've said, just to give everybody a heads up.  I

12   think -- we believe the end of August should be sufficient,

13   but --

14           THE COURT:  Well, let me tell you --

15           MR. PRINCI:  Yes.

16           THE COURT:  -- before -- don't schedule it for the end

17   of August, okay?

18           MR. PRINCI:  Okay.

19           THE COURT:  I want to be clear.  My first new clerk

20   shows up July 30th, but she will not be here continuously

21   through -- she moved up her start date as an accommodation to

22   me, but has a vacation scheduled for August.  My second new

23   clerk, I believe, will be starting the Tuesday after Labor Day.

24   So with essentially brand new law clerks on board, don't expect

25   that you're going to get a hearing at the end of August or the

RESIDENTIAL CAPITAL, LLC, ET AL.                    28

1   first week in September.  You're just not.  It's not going to

2   happen.

3           MR. PRINCI:  Okay.

4           THE COURT:  I read everything myself, but I think like

5   many of my colleagues, rely very heavily on my law clerks.  So

6   that's a very practical reality --

7           MR. PRINCI:  We will take that into account.

8           THE COURT:  -- in scheduling, you better take into

9   account.

10          MR. PRINCI:  We will absolutely take that into

11  account.  Heard very clearly.

12          THE COURT:  Second point.  You haven't mentioned the

13  word "discovery".  And I don't know -- if this becomes a

14  contested matter, you have the one objection so far.  I've read

15  it.  I think I understand what they are objecting about.  I

16  don't know what discovery any parties-in-interest are going to

17  want to take.  I'm assuming there are additional objections to

18  the 9019.  And even that one, the gist of what I read was, they

19  object that that same twenty percent loss rate is applying

20  across the board as to all securitization trusts, no matter

21  what the type or category of loan that went into the trust.

22  And there are different risks and rewards with each.  And

23  essentially they're arguing, the same formula shouldn't apply.

24  I understood the basics of it.

25          I don't know what discovery they're going to want to

1   take and what the debtors' position is going to be with respect

2   to discovery.  So any schedule that is going to be agreed upon

3   needs to contemplate a reasonable time period for discovery.

4   I'll rule on objections to discovery as I always do, without

5   discovery motions.  But you need to build in, not just an

6   objection deadline, if this is going to be a contested hearing.

7   You've already submitted some affidavits and some declarations

8   in support of the settlement.  There may be more you're going

9   to want to put in, depending on what the objections are, no

10  doubt.

11          But if we're going to have an evidentiary hearing in a

12  contested matter, I'm going to impose -- and it's premature to

13  do that now -- so you're going to need to have the lay of the

14  land about what are the issues that are going to have to be

15  resolved by the Court.

16          On the 9019, for example, when I read Judge Walrath's

17  decision in WaMu, that was the most extensive analysis of

18  evidence I've seen in any decision about approving a

19  settlement.  I'm not saying I am going to do that or I'm not

20  going to do that.  But I certainly took note of it.  And there

21  are, no doubt, serious issues that have to be evaluated.

22          You lay out the basic standards for approval of 9019.

23  I didn't disagree with what I read.  It's when you apply --

24  when you get down to the nitty-gritty and the details, how it

25  applies in the circumstances of the particular settlement

1    agreement, where I think -- so you're going to have -- I don't

2    know that you're going to be able to sit down with the

3    creditors' committee, and assuming you get their agreement to

4    support, that that's the end of the discussion.  You already

5    have at least one group of objectors with a substantial

6    interest in some of the trusts; and you may well have

7    additional ones.

8            MR. PRINCI:  We hear you, Judge.  So we have informed

9    the parties who have sought discovery from us, either formally

10   or informally, that we're ready to provide any and all

11   reasonable discovery.  To the extent that we can't work out any

12   difference of opinion we have and what constitutes reasonable

13   discovery under the circumstances, we will seek to have a

14   conference with the Court.  We understand the way Your Honor

15   deals with it, think that's very helpful, in fact.

16           Right now, Judge, I can only report on having such an

17   issue with one party, that's MBIA.  If MBIA would like to have

18   that dealt with today, we're prepared to address the area where

19   we do not have agreement with MBIA on the scope of their

20   discovery.  We're otherwise going forward with MBIA and

21   prepared to produce information that they don't have.  Tough to

22   find information that they don't have, because they've been

23   litigating with us for a long time.  They've taken over eighty

24   days of depositions --

25           THE COURT:  I read that in your papers.

1        MR. PRINCI:  -- they've had millions of papers of

2    documents have been produced.  I mean, MBIA probably knows as

3    much about us as anybody.  So but that having been said,

4    they're entitled to make their requests.  And if they don't

5    have information we'll give it to them.

6        There are certain areas that I think are just patently

7    prolix, and we're not prepared to let people who have parochial

8    interests in maybe wanting to have what we've set up, get off

9    the rails.  That we're not prepared to do.  But --

10       THE COURT:  Let me -- I have a couple other just very

11   specific questions.  So in your memorandum in support of the

12   9019, you talk about a defined term "loss share rate", the

13   twenty percent, and you describe how that was negotiated.  And

14   then you talk about -- this is in paragraph -- so, for example,

15   in paragraph 39 of the brief, you talk about the loss share

16   rate.  And then in paragraph 40, you talk about in the Bank of

17   America litigation, you talk about a breach rate and agree

18   rate.  How does the breach rate and agree rate differ from the

19   loss share rate?  I just -- is it an apples-to-apples

20   comparison, or is it a totally different analysis?

21       MR. PRINCI:  Excuse me, Judge.  May I confer for one

22   moment, please?

23       Your Honor, there's somebody who has greater

24   familiarity with this than I do.  I've just been informed

25   that --

1        UNIDENTIFIED SPEAKER:  Use the mic.

2        MR. PRINCI:  I've just been informed that the loss

3   share rate is the product of the breach rate and -- just -- and

4   the agreed rate.

5        THE COURT:  I'm not sure what that means, but I don't

6   need to know today.  But I just -- you know, when I read it --

7        MR. PRINCI:  Yes.  I'm only slightly ahead of you --

8        THE COURT:  -- you gave this comparison:  we reached a

9   twenty percent on the loss share rate, but then I'm reading

10  about a different range in the Bank of America/Countrywide

11  litigation, but for two different metrics.

12       MR. PRINCI:  I think, Judge, so that you know, all of

13  this will be brought out in appropriate, clear detail, through

14  our expert at the time of the 9019 motion.

15       THE COURT:  Okay.

16       MR. PRINCI:  It's complicated.  And we understand that

17  people can argue for different methodologies, and some people

18  will.

19       So Judge, we hear you on the need to take into account

20  discovery, which we will, in connection with any proposed

21  hearing date that we bring you.  We'll do that, Judge, in

22  coordination with the committee, taking into account what we

23  hear from the objecting parties.

24       THE COURT:  Here's what I would -- I'm going to hear

25  others who are here.  But I'd like an update on the status of

 1  this at the July 10th hearing, to see what progress you've made

 2  about a schedule.  And I don't -- you may have informally heard

 3  about more objections than the one that's been filed.  And

 4  we've got enough on the plate on July 10th already.  We won't

 5  take an enormous amount of time with this, but I do want an

 6  update at that point.

 7           MR. PRINCI:  Okay.

 8           THE COURT:  Okay?

 9           MR. PRINCI:  Thank you, Judge.  And that's also

10  consistent with the date that we chose with the trustees from

11  the sales procedure motion to try to resolve their open issues.

12           THE COURT:  Okay.

13           MR. PRINCI:  So that makes perfect sense.

14           THE COURT:  Thank you, Mr. Princi.

15           MR. PRINCI:  Thank you, Judge.

16           THE COURT:  All right.  Who else wants to be heard?

17  Mr. Eckstein?

18           MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

19  Eckstein of Kramer Levin, proposed counsel for the unsecured

20  creditors' committee.  I'd like to make a couple of

21  observations on a preliminary basis on these motions.

22           As Your Honor observed, the committee has not yet

23  filed a response to the motions.  And my understanding, our

24  response date was not set for several days, so hence we didn't

25  feel it was necessary or appropriate to prematurely file one.

1  And I know that the trustees' counsels are going to speak about

2  their issues.  I don't intend to speak about their issues

3  specifically, but I will make a couple of observations.

4           I think, Your Honor, just as the punch-line, probably

5  has come out at the place we would have recommended, so I feel

6  that Your Honor has come out to the right conclusion in terms

7  of how to approach this.  But there are details.

8           THE COURT:  We're either both wrong, Mr. Eckstein,

9  or --

10           MR. ECKSTEIN:  That's true.  But I think Your Honor

11  made the comment, that particularly with these motions, the

12  devil is very much in the details.  These are complicated

13  motions that go to the heart of this case.

14           As Your Honor knows, we spent a fair amount of time

15  the last several weeks, as I view it, sort of setting the table

16  for this case with DIP financing and with sale procedures

17  motions and with an investigation, and now an examiner.

18  There's been a lot of activity, all of which was, in many

19  respects, designed to put the case on a path moving forward.

20  And I think the case is moving forward at a brisk, and I think,

21  pretty well-organized manner.

22           These motions really go to the punch-line of the case.

23  I mean, in many respects, the motion with respect to the 9019

24  is seeking to resolve and fix the overwhelming claims in the

25  case.  And as Your Honor correctly pointed out, the three

1  motions:  the motions to approve the plan support agreements

2  and the motion for the 9019, collectively fix the claims and

3  were intended to cause the claimants and ultimately the

4  trustees, who are in fact the parties who hold the put-back

5  claims, to support a plan which embodied an agreement between

6  ResCap and Ally for Ally to make a contribution to the plan in

7  exchange for a release.

8           So in many respects, what we were looking at when we

9  read these motions, it seemed to me, on first glance, to

10 essentially be the plan.  And I asked myself, and I'm still

11 asking myself whether or not it's reasonable and appropriate to

12 go forward with these motions outside of a plan.  And we

13 haven't made a decision on that.  And --

14          THE COURT:  That was one of the -- I didn't say this

15 before, but when I thought about it, if the PSAs provide that

16 the trustees -- I'll use "should", but maybe that's the wrong

17 term -- but if the trustee gets a direction from twenty-five

18 percent of the holders -- investors -- whether it should,

19 could, would follow the direction and vote in favor of the

20 plan.  I started thinking, that's interesting, because that's

21 not the vote that's required for confirmation of a plan for

22 classes of creditors.  This is the biggest group of claims.  I

23 have recognized that in my own thinking.

24          I may be wrong.  We'll see how this unfolds; but

25 that's a very substantial bulk of the claims.  And has suddenly

1   the requirement of a vote been altered by the fact that twenty-

2   five percent can direct trustees how to vote -- anyway, that's

3   just -- I may be looking at it the wrong way.

4           MR. ECKSTEIN:  That's one of the questions we would

5   like to think more about and we'd like to discuss that with the

6   debtor and with other parties in the case, which is whether or

7   not these should or should not be done separate from a plan or

8   released until a plan has had an opportunity to potentially

9   take some more shape.

10          The second threshold question that we are still

11  grappling with is whether or not it is even ripe for the Court

12  to hear a 9019 motion with respect to the claims, even if the

13  PSAs are put aside and even if the obligation to support the

14  plan is delinked from the 9019, which is what I understand Mr.

15  Princi is suggesting, so that we simply look at the claim

16  amount.

17          We're in the process of trying to understand exactly

18  what the direction really means and what the holdings really

19  mean.  As we understand it, and as we've now looked at the

20  documents that have been made available to us, the direction is

21  not what we would typically understand a direction to mean in a

22  traditional indenture, for example, where a requisite majority

23  can actually direct the trustee.

24          In this case, it appears that the direction really is

25  a submission to the trustees of a request that they support or

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1    endorse a certain outcome.  Typically those directions or

2    instructions or requests need to be accompanied by an

3    indemnification.  And in this case, it's pretty clear from the

4    documents that no indemnifications are being provided; which I

5    understand, at least for the trustees, is a fundamental

6    omission.

7         We also understand that there's a lot of complexity

8    surrounding what do the holdings mean.  As we understand it, in

9    order to direct the trustees, a group of claimants needs to

10   hold twenty-five percent of a tranche within a trust.  Now, my

11   understanding is that that's the representation with respect to

12   approximately three-quarters of the trusts.  But when one looks

13   at the overall claims, our understanding is that the group of

14   investors that are the parties to the 9019, in fact, hold

15   substantially less than twenty-five percent of the overall

16   claims.

17        We don't know right now what percentage they hold.

18   But it may be that they hold ten percent of the overall claims.

19   And it leads to the question:  what about the other ninety

20   percent?  And what's going to happen if there are two

21   directions or three directions or four directions?

22        It leads us to believe, at least preliminarily, that

23   it would be ideal -- and by the way, sitting here today, we

24   don't have a quarrel with the idea of the settlement, and we

25   don't have a quarrel with the amount of the settlement.  We

1   don't have a view on that right now.  But I think as Your Honor

2   indicated, the notion of a settlement, particularly in what I

3   sort of compare this case to, which is really a mass tort

4   litigation case, the notion of an early settlement can be very

5   attractive for a mass tort case.

6            I've been in many mass tort cases and they have lasted

7   four, five years, because there was an inability to resolve the

8   disputed claims.  And if there is an ability to resolve the

9   claims in a consensual manner, that is a very, very favorable

10  goal to try to reach.

11           However, we're a month into the case.  And I know that

12  the key parties in this case who were not at the settlement

13  table don't know anything close to what they need to know in

14  order to make an informed evaluation of whether or not this

15  settlement is reasonable and appropriate.  And you're going to

16  have parties who think the settlement is too high and parties

17  who think the settlement is too low.  And there are also many

18  details surrounding the settlement that need to be understood.

19  And that's separate and apart from the negotiation of the

20  settlement, just the merits of the claims, needs to be

21  evaluated.

22           Sitting here today, and as Mr. Princi suggested,

23  because we don't have firm dates, we're trying to get an

24  assessment of how long it will reasonably take for the

25  creditors' committee, the trustees, maybe other parties in this

1    case, to promptly evaluate the merits of the claims, to do a

2    sampling, to understand issues around the claims.

3            THE COURT:  Well, I was going to ask about that.

4    Because you raised the issue about the mass tort cases, and

5    when I saw this loss share rate and read what I read, there was

6    nothing about what the methodology was in arriving at it.  So

7    in mass tort cases, there may be trials of some sampling of

8    cases or some further evaluation of a sampling of cases to find

9    out what likely -- what the ranges of recoveries are.

10           To say that -- I mean, if this loss share rate should

11   apply across the board as to all categories of securitization

12   trust, fine.  I'm not -- I certainly don't have enough basis to

13   know that now.

14           MR. ECKSTEIN:  So --

15           THE COURT:  That's fine.  But how it was arrived at, I

16   mean, other than saying it was at the negotiating table, it

17   doesn't tell me a lot.

18           MR. ECKSTEIN:  So what seemed to me, essentially

19   picking up on, I think, what Your Honor was suggesting, is I

20   think that a variety of parties in this case, including the

21   creditors' committee, including the trustees, and potentially

22   others, should determine what a reasonable amount of time is to

23   evaluate these claims.  And I don't know the answer yet,

24   although I think by July 10th, that's probably a reasonable

25   time to try to make an assessment of how long it will take.

1    We would anticipate, in our case, probably needing an

2  expert who can help us evaluate these claims.  And my sense is,

3  it's going to take a few months.  I don't know whether that's

4  two, or three or four months yet.  I don't want to prejudge it.

5  But I think the debtor and the Patrick Group, I think, would

6  like the parties to move quickly.  And that's reasonable.

7    It seems we should try to do that quickly.  And I

8  would agree with Your Honor, that is not what I would view

9  traditional discovery relating to litigation.  That is an

10  evaluation of the claims.  And it probably would be useful to

11  have a status conference out toward the end of the summer,

12  subject to everybody's availability -- or early September -- to

13  see whether or not, in fact, parties have made sufficient

14  progress in evaluating the underlying merits of the claim; have

15  they done a reasonable sampling; have they seen different types

16  of claims; can they understand, if a claim is allowed, how

17  would it be allocated among claimants.  Is it allocated pro

18  rata?  Is it allocated differently?  Because there are more

19  severe and less severe types of claims.

20    So there's a lot of issues that have to be understood.

21  And I think before we embark on traditional discovery with

22  respect to the claims, it would be, I think, useful to see

23  whether, in fact, there is a building consensus around the

24  settlement.

25    It may turn out that after people review the

1    settlement, it may turn out people like the settlement.  And I

2    would encourage the parties to let the trustees, let the

3    committee, let others do that work and see whether or not there

4    is or is not going to be some consensus around the resolution

5    of the claims in and of themselves, separate from the plan.

6          And if there is a resolution, obviously, it's one type

7    of hearing.  If there is not a resolution, then it's a

8    different type of hearing.  And I would imagine it's a more

9    complex hearing where certainly there's going to need to be a

10   discovery schedule and briefing, and this is going to need to

11   be set down for an extensive hearing.

12         THE COURT:  You know, if this is going to turn into a

13   battle of experts as to -- right now I'm just focusing on this

14   loss share rate, because it's a big metric that everything

15   rises and falls from -- but there are undoubtedly other

16   issues -- some of my colleagues have selected court-appointed

17   experts where -- because I can see this gap between where each

18   respective parties' experts are.

19         So what you ought to be -- yes, you need to try and

20   see whether you can develop a consensus without having to go to

21   a full-blown contested hearing over this.  If the parties can't

22   agree on the numbers or sufficiently narrow their differences,

23   the two things that come to mind either are a mediator, which

24   I'm not sure -- may or may not make sense -- or a court-

25   appointed expert to deal with it as well.

1        But all that's premature.  But I could just -- when I

2   read this I thought, this is just the tip of the iceberg of the

3   issues that are going to unfold here.

4        MR. ECKSTEIN:  That's how we saw it as well, Your

5   Honor.  I think those ideas -- we would agree with those ideas.

6   We also need to understand clearly which debtors are involved

7   in the settlement.  What does it mean to settle these claims is

8   a significant question in the context of the case.

9        THE COURT:  Let me ask you another question, because

10  this issue has come up at several hearings that I keep focusing

11  on:  the issue about the third-party nondebtor releases.  Here,

12  I think the settlements, if they get approved, if the trustees

13  support it, would provide that they're agreeing to vote for a

14  plan that includes for third-party nondebtor releases.  Does

15  that make it a consensual release at that point?  At least as

16  to these --

17        MR. ECKSTEIN:  Your Honor, as I understand it, if the

18  trustees were to agree to vote in favor of that plan, I think

19  with respect to the RMBS put-back claimants, my understanding

20  is the trustees control the vote.  And right now, the trustees

21  are not a party to a plan support agreement.  And the trustee

22  is not party to an agreement.

23        So that is -- as we saw it, that is a major issue.

24  And that's why we didn't think it was appropriate to

25  prematurely push the settlements, because the settlements,

1   right now, were linked to the plan.  And as I said, Mr. Princi

2   offered that they're going to delink it.  But I think that's

3   easier said than done.  I think these were done together.  And

4   I'm not sure that given the motion papers we have right now,

5   I'd be comfortable in simply saying they're delinked.

6          I think that one can propose a settlement of a claim

7   as a standalone matter.  And if we can reach a conclusion as to

8   who should be bringing that -- who should be the parties to

9   that settlement, I think a settlement can be presented and

10  approved without linking it to how parties vote in a plan.  And

11  I think there's movement there.  And maybe over the next two

12  weeks a little more shape will be brought there.

13         THE COURT:  Okay.  All right.  Thank you.

14         MR. ECKSTEIN:  But that's how we would proceed.

15         THE COURT:  Who else wants to be heard?  Mr. Siegel,

16  you've been chomping at the bit.

17         MR. SIEGEL:  Your Honor, I apologize for my earlier

18  ardor.  I will try and restrain myself a little bit.

19         THE COURT:  Just make your appearance -- note your

20  appearance, please.

21         MR. SIEGEL:  Glenn Siegel on behalf of the Bank of New

22  York Mellon, as one of the larger RMBS trustees.  Your Honor

23  should be aware that the RMBS trustees have been working

24  closely together.  We consult with each other on these things.

25  And as I'm sure my colleagues will correct me if I say

1  something that they don't agree with, you should generally

2  believe this reflects the view of the group collectively.

3          Your Honor, let's start with first principles.  As a

4  first principle, the trustees very much agree with the idea

5  that a consensual settlement of these thorny issues would be

6  the best possible outcome.  And indeed, we have been giving a

7  great deal of thought to many of the very complex issues that

8  would be involved in approving a settlement, assuming for the

9  moment, the trustees exercise their independent judgment,

10  reviewed all of the material they have over an appropriate

11  period of time, and determined that this was in the best

12  interests of the certificate holders.

13          Now, when we talk about the best interests of the

14  certificate holders, we're very much aware of what Your Honor

15  has been saying about the twenty-five percent issue.  From our

16  perspective, there are hundreds of trusts involved here.  And

17  accepting the representations of the settling group, this is

18  twenty-five percent of a subgroup of the trusts.  And I do not

19  believe that we will be able to get comfortable settling some

20  portion of this, because the duty we have to all the

21  certificate holders is the identical duty.  And since we are

22  the ones making the decision, if we decide that this is a good

23  deal for that subgroup, we're going to want that deal to be the

24  deal for all of the groups.  Now --

25          THE COURT:  As I read it, others would have the right

1  to opt in to the settlement.

2          MR. SIEGEL:  Well, that's true, except we are the

3  settling party.  So -- and we are their trustees under the

4  applicable documents.  And maybe I should just mention one

5  technical point that I think is very important.  The way these

6  obligations were created, as I'm sure Your Honor is aware,

7  under a structured deal, a large group of loans were sold into

8  trusts.  Those trusts issued certificates.  Facing the debtors

9  here are the trusts as the obligors; and the trusts have

10  obligations to their certificate holders.

11          Whether it's twenty-five percent or any other

12  percentage, vis-a-vis the estate, there is only one creditor.

13  And that would be the trust --

14          THE COURT:  So what happens if in a particular

15  securitization trust or a small group of securitization trusts,

16  you get an instruction from investors holding seventy-five

17  percent of the certificates, but you're the trustee of a lot of

18  other trusts where you get twenty-five percent direction?

19          MR. SIEGEL:  Your Honor, if there is --

20          THE COURT:  Because you're saying that you've got to

21  take into account -- you can't really tell me that you're going

22  to -- that your fiduciary duty -- what if you got a hundred

23  percent of a securitization trust, and you've got others -- are

24  you simply going to disregard --

25          MR. SIEGEL:  Your Honor, I would -- there's actually

1  compound issues in there, and I want to take them one at a

2  time.

3          Your Honor, first of all -- and I understand the use

4  of the word fiduciary here -- but trustees have contractual

5  duties under their documents.

6          THE COURT:  Yes, I know.  They disclaim any fiduciary

7  duties.  I've read those documents.

8          MR. SIEGEL:  And --

9          THE COURT:  I've read them.

10          MR. SIEGEL:  -- the duties we have exist under the

11  agreements.

12          THE COURT:  Yes.

13          MR. SIEGEL:  Having said that, Your Honor, if we got a

14  valid direction under an appropriate document, with an

15  indemnification, and we determined it was not prejudicial to

16  any other holders, subject to other legal standards that are

17  too numerous to talk about now, we would follow a valid

18  direction.

19          In this situation -- and by the way, Your Honor, my

20  firm represents Bank of New York in connection with the Bank of

21  America/Countrywide settlement.  And in that settlement, we

22  have never received such a direction.

23          THE COURT:  So what's the sta -- tell me what the

24  status of that is.  You can finish what you're doing.  But I do

25  want you to come back and tell me what the status of Bank of

1  America is.

2          MR. SIEGEL:  Your Honor, I'm going to tell you a great

3  deal about the procedure that's going on in another court now,

4  because I think it would be helpful to you.  And I planned on

5  doing that at the end of this discussion.

6          THE COURT:  Okay.  I'll wait till the end.

7          MR. SIEGEL:  So at least from our perspective, it's

8  very important, in the absence of valid directions that we

9  believe we must follow, to do this collectively, because we

10  don't think our judgment is going to be appreciably different

11  with respect to each individual trust.

12          And by the way, again, this is just a variation on the

13  same thing:  there's no aggregation here.  You know, if you get

14  a critical mass, we still have to do this on a trust-by-trust

15  basis.  And we think we need to do this, again, all at once.

16          Now, the Triaxx pleading is illustrative of the

17  challenges that face the trustee.  I think Triaxx threw out a

18  number like twenty-two billion dollars of what the appropriate

19  number is.  And, by the way, we have no opinion; 8.7 billion

20  might be the right number; 22 billion might be the right

21  number.  I don't know.  But what the trustees do know is that

22  if they entered into a settlement on their own on this without

23  any sort of protection, it's conceivable they could get sued

24  for the difference between the two numbers.  And that's not

25  very appealing to them.

1        THE COURT:  So I only half in jest said that trustees

2   seem to like to resign when they get in this situation because

3   it's --

4        MR. SIEGEL:  Well, Your Honor --

5        THE COURT:  -- not uncommon.

6        MR. SIEGEL:  -- we think we have a better alternative

7   to trustees resigning and never finding another trustee.  And

8   we do want to talk about --

9        THE COURT:  I hope so.

10        MR. SIEGEL:  -- the Article 77 proceeding that's

11   pending in New York Supreme.

12        Now, what we -- and Your Honor actually touched upon

13   this earlier, because we are working very hard to figure out

14   how to give -- assuming that after we do our diligence, we

15   believe that entering into the settlement is the appropriate

16   thing to do, we need to find a mechanism to make that work.

17   And all the timing issues we've discussed previously are very

18   real to us.  We need a reasonable period of time to go through

19   this and conclude whether this is the right thing to do.  And

20   we need our certificate holders to have an opportunity to

21   disagree with us.

22        The Article 77 proceeding in New York State Supreme

23   Court right now, is the other half of this.  And this is what

24   the trustee -- or at least what Bank of New York Mellon has

25   been doing --

1           THE COURT:  This the BofA/Countrywide?

2           MR. SIEGEL:  That's exactly what this is.  And Your

3    Honor, basically that proceeding as proceeding -- Article 77 of

4    the C.P.L.R. allows trustees under express trusts to get a

5    ruling from a court of competent jurisdiction that they have

6    discharged their duties under that trust.

7           So what those pleadings say -- and Your Honor, if you

8    would like us to, we will provide you with all the public

9    pleadings on this, if you're so inclined.

10          THE COURT:  How voluminous are they?

11          MR. SIEGEL:  Oh, they are very voluminous.  By the

12   way, just so you know, many of, if not all of the settling

13   holders, are the same parties that are involved in this case.

14          And in that proceeding, the bank ultimately determined

15   to support the settlement that was reached by a similar group

16   of consulting holders.  Although in that situation, the

17   negotiations and the consultation was going on simultaneously,

18   over an extended period of time.  So the bank was able to get

19   up to speed during the process.

20          What is going on now and has been going on for twelve

21   months, is there's a proceeding where there have been a whole

22   series of objections filed by certificate holders who don't

23   support this and other parties, and they're fighting it out.

24   And it continues until now.

25          THE COURT:  Who's the case before?

 1          UNIDENTIFIED SPEAKER:  It's Justice Barbara Kapnick.

 2          MR. SIEGEL:  Thank you.  And it continues till now.

 3  But at the conclusion of the process --

 4          THE COURT:  Just, I'm not sure whether the record

 5  picked --

 6          MR. SIEGEL:  Justice Barbara Kapnick.

 7          THE COURT:  Thank you.  Go ahead.

 8          MR. SIEGEL:  At the conclusion of that proceeding, one

 9  of two things will happen.  Well, many things will happen.  But

10  either the judge will determine that the trustees -- or the

11  trustee, in this case, has exercised its judgment appropriately

12  and tell the trustee it may go forward with the settlement, or

13  it will find that this settlement's not appropriate under the

14  circumstances, and the bank will have closure one way or the

15  other.

16          Obviously, we support the settlement and we'd like it

17  to be approved.  But that's that procedure.  I mention this --

18          THE COURT:  That's been going on for how long?

19          MR. SIEGEL:  At this point, a year.

20          Your Honor, what we think is a sensible process here,

21  because we recognize that a year or some other period of time,

22  may not be the appropriate period of time, is we are struggling

23  with a way to have these things happen simultaneously, and

24  perhaps even in front of this --

25          THE COURT:  Is it your view that the bankruptcy court

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1    doesn't have jurisdiction to resolve those issues?

2          MR. SIEGEL:  We are looking very hard at the law to

3    make sure that we advise this Court in an appropriate manner

4    about whether this Court or a district court would have

5    jurisdiction to make that kind of a ruling.

6          It would be our goal, though, assuming that we could

7    reach an appropriate settlement, to have that heard in front of

8    the same judge, because virtually the same identical issues

9    would be considered by the court.  And also the timing would be

10   controlled by that court as well.

11         THE COURT:  Is it under submission before Justice

12   Kapnick, at this point?

13         MR. SIEGEL:  No, I think it's just --

14         It's in discovery.

15         THE COURT:  Go ahead.

16         MR. SIEGEL:  Okay.  So nonetheless, while the

17   procedure or something like that procedure is something that

18   would be very important to the trustees, the trustees do not

19   control the timing in New York --

20         THE COURT:  This case will be in complete meltdown if

21   you're talking about several years to reach a decision.

22         MR. SIEGEL:  Your Honor, and we recognize that.  And

23   of course, that decision is not the decision the trustee made

24   in that case, but it's the time under New York State Supreme

25   Court procedure that's required.  We're not married to that

1    procedure.  We would like something to go forward that makes

2    sense where we can both discharge our duties to the certificate

3    holders and get comfort that if someone disagrees with us, that

4    there will not be litigation against us for that.

5            And we have been working very hard to come up with a

6    process that we think will allow that to happen.  Your Honor,

7    in order for us to do that, of course, we do have to exercise

8    our independent judgment and reach an independent conclusion

9    with respect to the appropriateness of the proposed settlement

10   or some variation of it.  We would very much -- we need that

11   process.

12           But Your Honor, to be clear, at least from the

13   standpoint of the trustees, we think this needs to happen with

14   respect to all of the trusts, in the absence of an individual

15   opt-out by a valid directing group.  And by the way, we don't

16   think that's insurmountable.  We actually think that's a very

17   efficient, sensible way to go forward.

18           THE COURT:  You've indicated who your client is.  But

19   Mr. Princi, can you tell me how many trustees are involved?

20   How many, Mr. Siegel?

21           MR. SIEGEL:  Four.

22           THE COURT:  Four.

23           MR. SIEGEL:  They're in the courtroom.  At the risk

24   of --

25           MR. COHEN:  Your Honor, on behalf of U.S. Bank, Ron

1    Cohen, Seward & Kissel.

2            THE COURT:  Okay.

3            MR. WEITNAUER:  Your Honor, Kip Weitnauer, Alston &

4    Bird, on behalf of Wells Fargo as trustee.

5            MR. GARRITY:  And Jim Garrity from Morgan Lewis on

6    behalf of Deutsche Bank.

7            THE COURT:  Thank you.

8            MR. SIEGEL:  And as I said, Your Honor, we've been

9    coordinating.

10           THE COURT:  Those -- it's the four.

11           MR. SIEGEL:  To our knowledge, we are the four.

12           THE COURT:  Okay.

13           MR. SIEGEL:  So in any event, Your Honor, this is

14   mostly to advise you of the other half of the equation and to

15   let you know that, again, we believe the preferred outcome here

16   is --

17           THE COURT:  Gee, this isn't as simple as --

18           MR. SIEGEL:  -- a settlement.

19           THE COURT:  -- the pleading would make it sound.  Is

20   that what you're suggesting?

21           MR. SIEGEL:  You know, it never is, is it?

22           THE COURT:  Why did I expect that was going to be -- I

23   wouldn't have needed a courtroom full of people for a status

24   conference if it was.  Go ahead, Mr. Siegel.

25           MR. SIEGEL:  Well, at least now you know why I've been

 1  chomping at the bit.

 2          THE COURT:  You're getting your say.

 3          MR. SIEGEL:  No, I know.

 4          THE COURT:  You just had to be patient and wait.

 5          MR. SIEGEL:  No, I understand.  I understand.

 6          But in any event, I think that what we need to do, and

 7  I take the suggestion of committee counsel, is to hunker down

 8  and come up with a process that works to explain to you how

 9  that might get approved and come up with a procedure that would

10  work for that.

11          We have already begun a great deal of work on that, as

12  Your Honor might appreciate.  The trustees have been very busy

13  dealing with the sale and the DIP order and other things.  But

14  we think we've made some progress.  And I think that you at

15  least should have some sense of what we have in mind based on

16  this discussion.

17          THE COURT:  Well, let me just say, I think that trying

18  to come up with a set of procedures that will accommodate the

19  main interests of all of these various constituencies, the

20  trustees among them, really seems to me to be the first order

21  of business that you have to devote yourself to.

22          You all will figure out or not -- I mean, I'll decide

23  what I can decide -- but I think Justice Kapnick is a fine

24  judge.  Nothing I'm saying is really in any way to reflect

25  adversely on her or the challenges that she faces in the cases

1  before her and the huge docket that she has beside that.  But

2  if the answer that you're going to come up with is we've got to

3  go off to New York Supreme Court, and whether it's Justice

4  Kapnick or somebody else, I mean, come on.  This case is going

5  to be in meltdown.

6        MR. SIEGEL:  Your Honor, that is not our preferred

7  resolution, which is why, as I said to you earlier, it's our

8  goal to find one court to hear this that would probably have to

9  be a federal court.  Which federal court, we still are working

10 very hard on to figure out.

11       THE COURT:  Let me ask you this.  I've read Judge

12 Cote's May decision in the UBS case.  That was just on

13 securities cases.  Am I correct on that?  Do you know that

14 case?

15       MR. SIEGEL:  That's my recollection.  You know, to

16 make a -- to at least clarify one point you made earlier.  The

17 trusts hold what are generically referred to as the put-back

18 claims and the servicing claims.  Those are trust claims.  What

19 the trusts do not hold is individual securities-law types of

20 claims that holders might have had from the purchase and sale

21 of the certificates.

22       THE COURT:  Well, understand the debtor's going to

23 argue 510.  They're not seeking a release of any of those

24 claims.  They're going to seek subordination under 510 of the

25 securities claims.  That I understand.

1          MR. SIEGEL:  Understood.  But those are not our

2  claims.

3          THE COURT:  Right.

4          MR. SIEGEL:  That's really the only point that we're

5  trying to make.

6          Your Honor, I think I've had my say, and I thank you

7  for that.

8          THE COURT:  Thank you.  Who else wants to be heard?

9          Just before you start.  Anybody else who wants to be

10  heard, why don't you -- if you're in the back, come on up and

11  be ready to speak.  Go ahead.

12          MR. ELLENBERG:  If the Court please, Mark Ellenberg;

13  Cadwalader, Wickersham & Taft; on behalf of MBIA.  As

14  previously mentioned, Your Honor, MBIA is a monoline insurer.

15  They insured four trusts that were formed by the debtors here.

16          In those trusts, we have paid out to the Patrick, and

17  Talcott and other clients, 1.7 billion dollars in actual

18  losses.  And we're not done yet, because the trusts are still

19  running.

20          In the voluminous discovery that's been talked about

21  in that case, which is actually pretty far down the road, we've

22  been able to --

23          THE COURT:  Who is that before?

24          MR. ELLENBERG:  It is before Justice Bransten --

25  Justice Fried, excuse me, Your Honor.

1        THE COURT:  He's leaving soon.  July 13th or something

2   like that.  Is Justice Bransten going to inherit them from

3   Justice Fried?  Is that what's happening?  Does somebody know?

4        MR. ELLENBERG:  Not sure, Your Honor.

5        THE COURT:  So Justice Bransten does not have the

6   case?

7        MR. ELLENBERG:  She recently issued a decision in the

8   case, so --

9        THE COURT:  Maybe she has the case, maybe not.  I know

10  Justice Fried, and I know he's going to JAMS in the middle of

11  July.  I don't remember the exact date.

12       MR. ELLENBERG:  In any event, Your Honor, obviously

13  that case is stayed as we speak.

14       THE COURT:  Yes, I understand.

15       MR. ELLENBERG:  But what we've determined is that --

16  from our own sampling of the claims and expert analysis, is

17  that in our view, over eighty percent of the loans had material

18  breaches.  And what we've asserted in that case, are claims not

19  only for breach of rep and warrantee, which we can assert both

20  by subrogation, because when we pay claims we subrogate to the

21  rights of the investors; but also directly, because our

22  insurance agreement incorporates the same rep and warrantees

23  that were in the pooling and servicing agreement.

24       We have also asserted a claim for fraudulent

25  inducement into the insurance agreement.  And we have a

1   decision in the case that that claim can go forward, and that

2   we do not need to prove loss causation with respect to that --

3           THE COURT:  That's the decision by Justice Fried?

4           MR. ELLENBERG:  That's Justice Bransten, actually.

5           THE COURT:  That's Justice Bransten, okay.

6           MR. ELLENBERG:  That we do not need to prove loss

7   causation with respect to those claims.  And so we were pretty

8   confident that but for the intervention of this case, that we

9   were well on our way to a two-billion-dollar-plus judgment

10  there.

11          Now, that brings us to today and the motions before

12  the Court.  I think if you're -- I think for the reasons stated

13  by Mr. Eckstein and Mr. Siegel, it's pretty clear that the

14  twenty-five percent assemblage here is really a red herring,

15  because whatever communication they have given the trustees is

16  not a binding direction.  At a minimum, because there's no

17  indemnification associated with --

18          THE COURT:  It's not going to be a red hearing if the

19  trustees decide that they're going to take that instruction,

20  exercise their fiduciary duty, and decide to enter into the

21  support -- approve the settlement, enter into a plan support

22  agreement.

23          MR. ELLENBERG:  I totally agree with that, Your Honor.

24  I totally agree with that.  But that is the point, is that it's

25  the trustees' independent decision that has yet to be made.

1  And I think if you listened to Mr. Princi carefully and if you

2  read the motion carefully, it actually says that.

3           THE COURT:  I understood that.

4           MR. ELLENBERG:  There is no binding direction --

5           THE COURT:  Okay, I --

6           MR. ELLENBERG:  -- here.

7           THE COURT:  -- understood that.

8           MR. ELLENBERG:  There is no binding direction here.

9  And so --

10          THE COURT:  Mr. Ellenberg, I understood that.  Go

11 ahead.

12          MR. ELLENBERG:  Okay.  And so what we have is a

13 settlement entered into with people who don't have the

14 authority to settle the claims.

15          THE COURT:  That's not true.  That's not true.

16          MR. ELLENBERG:  Well --

17          THE COURT:  Show me something that says they don't

18 have the authority to do it.  If they decide -- if they get a

19 direction and they decide to follow the direction, are you

20 telling me they don't have the authority to enter into any

21 settlements?

22          MR. ELLENBERG:  The trustees, absolutely have the

23 authority to settle the claims.

24          THE COURT:  Okay.

25          MR. ELLENBERG:  Except perhaps for our claims.  Not

1    perhaps, but --

2              THE COURT:  Then don't tell me they don't have the

3    authority.

4              MR. ELLENBERG:  No, the trustees have the authority,

5    but the people who entered into a settlement agreement don't.

6              THE COURT:  No.  Okay, fine.  I understand that.

7              MR. ELLENBERG:  Okay, but, Your Honor -- and the

8    people who sign the plan support agreements don't have

9    authority to vote on the plan.  And yet, this is being put on

10   the schedule and pushed forward.

11             THE COURT:  I think you're overstating your position.

12   Why don't you restrict yourself to the MBIA issues.

13             MR. ELLENBERG:  The MBIA issues, Your Honor, is that

14   notwithstanding the great deal of knowledge we have about our

15   own claims, what we don't understand is the settlement.

16             THE COURT:  Is what?

17             MR. ELLENBERG:  Is the settlement.  We don't

18   understand the extent to which it affects claims that we're

19   asserting either directly or by way of subrogation.

20             THE COURT:  What discovery do you need to figure that

21   out?

22             MR. ELLENBERG:  Well, Your Honor, we've read the

23   agreement, and it's quite opaque.  It's quite opaque on any

24   number of points.

25             THE COURT:  Have you sat down with the debtors'

1    counsel to --

2             MR. ELLENBERG:  Yes.

3             THE COURT:  -- see whether you can gain the

4    understanding you need or figure out exactly what your issues

5    are?

6             MR. ELLENBERG:  We've tried that, Your Honor.  And we

7    were directed to Ms. Patrick.  Ms. Patrick canceled the

8    meeting.  That was all before these motions were filed.

9             THE COURT:  But the motions are filed now.

10            MR. ELLENBERG:  And the motions are filed now.  And

11   we've tried again; and we've not been able to get further

12   insight into --

13            THE COURT:  What do you mean you've --

14            MR. ELLENBERG:  -- as Your Honor said, the devil is in

15   the details.

16            THE COURT:  -- "tried again and haven't gotten the

17   insight"?  Have you met and conferred with the debtors' --

18            MR. ELLENBERG:  Yes.

19            THE COURT:  -- counsel?

20            MR. ELLENBERG:  We did.

21            THE COURT:  When was the last time you did that?

22            MR. ELLENBERG:  Last week.

23            THE COURT:  And did you set another meeting?

24            MR. ELLENBERG:  We didn't, Your Honor.  We were told

25   that --

1          THE COURT:  When would you like to meet again?

2          MR. ELLENBERG:  We'll meet tomorrow.  We'll meet this

3    afternoon.

4          THE COURT:  Mr. Princi, when are you prepared to sit

5    down with MBIA and meet?

6          MR. PRINCI:  We're prepared to meet tomorrow, Judge.

7          THE COURT:  Okay.  You're going to meet tomorrow.

8          MR. ELLENBERG:  Okay.  In addition, Your Honor, with

9    respect to the discovery requests that we --

10         THE COURT:  I'm not going to deal with your discovery

11   requests until you've met and conferred and you have -- I mean,

12   what I'm hearing from you is pretty nebulous.  I don't

13   understand -- you're saying you don't understand the

14   settlement.  I'm telling you you're going to sit down with Mr.

15   Princi or his colleagues -- they've agreed tomorrow.  You said

16   you're available tomorrow; he's available tomorrow.

17         You're going to sit down and you're going to try and

18   understand what the purported impact of this settlement, if

19   it's approved, will be on MBIA.  That's the first order of

20   business.

21         MR. ELLENBERG:  That's correct, Your Honor.

22         THE COURT:  You can't even begin to talk about

23   discovery until you at least understand what the impact will

24   be.  Then you can talk about discovery.

25         MR. ELLENBERG:  Your Honor, that would be -- that

1    would be ideal.  And that was our objective.

2              THE COURT:  Well, you're going to do that.  And you're

3    going to come back on July 10th.  And you can file a status

4    report with the Court on the status -- I don't want to know the

5    details -- you know, I'm not going to get in the midst of

6    settlement between -- if that's the direction it goes --

7    between MBIA and the debtors.  But certainly, the first step is

8    for you to understand what the purported impact of the

9    settlement will be on MBIA.

10             And if your objection is, they told us, but the

11   document doesn't say that, that's one category of issues you're

12   raising.  Then you can move on and talk about, in light of

13   those issues, and what you think your objections are, what

14   discovery you're entitled to.  Okay?  You've been in discovery

15   for how long, in state court?

16             MR. ELLENBERG:  Your Honor, we've been in discovery in

17   the state court about our claims, not about the settlement.

18             THE COURT:  I understand that.  You -- how long have

19   you been in discovery?

20             MR. ELLENBERG:  Two years.

21             THE COURT:  Okay.

22             MR. ELLENBERG:  And we are not seeking any further

23   discovery about our claims or about the loans in these pools.

24   The discovery --

25             THE COURT:  Okay.  So here is what I --

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1              MR. ELLENBERG:  -- we have served is --

2              THE COURT:  -- here is what I want --

3              MR. ELLENBERG:  -- completely about settlement.

4              THE COURT:  -- you can begin meeting and conferring

5      tomorrow.  I expect more than one meeting is going to be

6      required.  I expect you to continue to meet and confer.

7              Mr. Princi, I don't expect you to say it's going to be

8      three weeks before I can sit down again.  And I want a written

9      status report by Friday July 6th at 5 o'clock with respect to

10     any discovery disputes.  I don't want briefs.  I just want you

11     to outline what your differences are, if there are any

12     differences, at that point.

13             And we'll take them up on the 10th at the hearing on

14     the 10th.  And if that schedule winds up so full, it'll happen

15     very promptly thereafter.  But that's how we're going to

16     proceed.

17             MR. ELLENBERG:  Your Honor, does that apply to Ms.

18     Patrick as well?

19             THE COURT:  Sure.  They're a party to the settlement,

20     right?

21             Mr. Princi?

22             MR. PRINCI:  I think what he's saying, Judge, is I

23     believe MBIA has served third-party discovery requests of Ms.

24     Patrick.  I'm taking from the comment that they must have

25     issues.  And so I think the question to the Court is does that

1  include any --

2          THE COURT:  It does.  I want to know about all of the

3  discovery issues.  So the first order of business is sit down

4  and figure out what you think the effect of this is going to be

5  on MBIA, if any.

6          MR. ELLENBERG:  We've been very diligently trying to

7  do that, Your Honor.

8          THE COURT:  And I understand that.  And now you've

9  gotten an agreement that you're going to meet tomorrow.

10          MR. ELLENBERG:  Just one further point, Your Honor.

11  We had a meet-and-confer with Ms. Patrick.  Her position was

12  that our discovery was improper, because we had not yet filed

13  an objection and therefore there was no contested matter.  If

14  that is the rule, that's fine.  But the schedule has to reflect

15  that.  I would hope that's not the rule --

16          THE COURT:  Well, the schedule right now reflects that

17  you're going to meet and confer regarding this proposed

18  settlement to understand what the effect is on MBIA.  And

19  you're going to meet and confer about discovery.  And you're

20  going to file a status report by July 6th.  And we're going to

21  take this issue up on the 10th.

22          MR. ELLENBERG:  Thank you, Your Honor.

23          THE COURT:  Okay.  Anybody else wish to be heard?

24          MR. WOFFORD:  Your Honor, Keith Wofford from the firm

25  of Ropes & Gray, co-counsel on behalf of the RMBS institutional

1  certificate holders.  Very briefly, Your Honor.

2         With respect to the nature of the 9019, we do believe

3  the 9019 and PSA re delinked.  In fact, it was intended fully

4  in the documents that the 9019 was a standalone resolution of a

5  very complicated issue of the number on the rep and warrantee

6  claims, and that the PSA is a separate issue, as the debtors

7  have intoned.

8         Second point, Your Honor, is that we believe it's

9  important that while there is time for the parties-in-interest

10 to undertake their analysis, that that 9019 is analyzed, those

11 who seek to object, object; and that there is a schedule for a

12 decision on that motion.  We realize that the creditors'

13 committee is still weighing its reservations or thoughts about

14 that process, but that was a fundamental part of the

15 negotiation that that would go forward, and that we wanted to

16 make sure from our client's perspective that this issue got

17 resolved in a timely fashion and was not part of a WaMu-style

18 endless series of experts and mediations.  I mean, that's part

19 of the fundamental benefit that we and the debtors believe we

20 mutually negotiated.  So that's all on that point.

21        With respect to the trustees and the various

22 statements that have been made.  In fact, I assure Your Honor

23 that our clients are not phantoms.  And although they are not a

24 hundred percent of the claimants in all of the trusts, and

25 although we recognize, from the trustees' perspective, that the

1   positioning here is not bulletproof in terms of the typical,

2   full, global insulation in terms of indemnification and

3   exculpation from liability, the fact of the matter is, our

4   clients, with billions of dollars of claims, have said that

5   there is a number that they would like to put this situation in

6   ResCap behind them, analogous to the attempts to put it behind

7   them in other cases.

8        The fact of the matter is, from the trustees'

9   perspective, there will be people who may and come and say it's

10  too high.  We would suggest that if claimants are saying to the

11  trustees that the number is too high, that that is not an issue

12  for the Court in a 9019 motion.  Because presumably, the relief

13  would not be to raise the number.  In fact, they should be

14  happy if they think that 8.7 is -- or pardon me -- that 8.7 is

15  too low for the claims, and that it could have been a higher

16  number.

17       If there are claimants who say that the number is too

18  high, that is, that if claimants say the claim shouldn't be

19  8.7, it should be some lower number; from the perspective that

20  it is the trustees' constituents that are saying that, I would

21  think the trustees would then say, well, gee, maybe this is a

22  wonderful deal and they should hurriedly accept it.

23       In any event, there will be differences, perhaps,

24  among the trusts and who supports.  Our clients do

25  wholeheartedly support this deal.  And we believe that given

RESIDENTIAL CAPITAL, LLC, ET AL.                    68

1  the trustees do acknowledge that they have an independent duty

2  to judge the settlement, that they will undertake that duty

3  properly.  But that duty is not to prolong the process

4  unnecessarily or to create mechanisms that do not permit for a

5  timing of a decision, but in fact, to go forward with that

6  decision, both in terms of getting the 9019 approved or not,

7  and allowing the trustees then to commensurately opt in or out.

8          THE COURT:  Thank you.  Who else wants to be heard?

9          MR. O'NEAL:  Your Honor, Sean O'Neal, Cleary Gottlieb,

10 on behalf of certain holders of the unsecured bonds at ResCap

11 Management, LLC.

12         I just wanted to stand up briefly and endorse Mr.

13 Eckstein's comments.  He had mentioned that other parties may

14 have an interest in participating in the 9019 motion

15 discussions and related issues.  We certainly are among that

16 group.  We are interested in participating in any discussions

17 concerning timing and procedures and perhaps also conducting

18 our own discovery.  We have reached out to the debtors, and

19 we've had very constructive discussions, and we anticipate that

20 we'll be in a position to meet with them soon to understand the

21 impact of this 9019 motion on our position.

22         THE COURT:  Thank you, Mr. O'Neal.  Anybody else wish

23 to be heard?

24         Mr. Princi, briefly.

25         MR. PRINCI:  Sure.  Judge, just real quickly.  Without

1    having -- wasting the Court's time in trying to pinpoint who

2    said what, I just want to be real clear.  And I think it was

3    probably mostly from Mr. Siegel's remarks, though.  But it's

4    important that the Court understand that the 9019 motion does

5    not limit the trustees' rights to make the determination that

6    Mr. Siegel says is theirs and theirs alone to make, which we

7    don't disagree with.

8            Your Honor, I can hear from your comments, does

9    understand, and because of your experience in trying to move

10   cases along, appreciates that what we are trying to do with a

11   major this-is-their-money constituency, is try to get

12   resolution instead of litigation.

13           We will meet tomorrow, Judge -- and by the way, the

14   Article 77 proceeding, not only for the reasons that the Court

15   said, isn't going to work, but it goes to the trustees'

16   concerns about getting sued, not an unreasonable concern if

17   you're them.  But on the other hand, Judge, you know what?

18   These are big institutions that took on this engagement and

19   they have to deal with this the way they have to deal with

20   this, at this point.  To have this case not go forward because

21   they're concerned about getting sued, is just -- that's the

22   tail wagging the dog.

23           THE COURT:  Well, all I can say is look, about seven

24   years ago, when I was still in practice, I remember

25   representing a group of security holders -- debt security

1   holders who tried to get a trustee to do something.  And the

2   trustee was frozen.  It just wouldn't do anything, because it

3   was afraid whatever it would do, it wound up resigning, because

4   it didn't -- okay.

5           So I've seen firsthand what can happen.  That's not a

6   great solution for anybody.  So I didn't read this proposed

7   settlement as requiring a trustee to do something.  But if they

8   don't this settlement's going to fall flat on its face.

9           MR. PRINCI:  And then they'll have to be stuck in here

10  figuring out what they do anyway, which is the bottom line

11  point.

12          Judge, just with respect to MBIA, obviously we're

13  going to meet with them tomorrow.  But I just have to clear up

14  a few things on the record, Judge, very briefly.  We did have a

15  phone call last week to discuss --

16          THE COURT:  I don't want to get into the back-and

17  forth.

18          MR. PRINCI:  Okay.

19          THE COURT:  I really don't.

20          MR. PRINCI:  Okay.

21          THE COURT:  Just you're going to meet tomorrow --

22          MR. PRINCI:  Okay.

23          THE COURT:  -- and you'll have further meetings to the

24  extent necessary.

25          MR. PRINCI:  Okay, unless --

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1          THE COURT:  July 6th, I expect to get a status report.

2          MR. PRINCI:  Fair enough.  No back and forth, Judge.

3     It is difficult, though, for the debtor to understand how a

4     party can come before the Court and say that the motion before

5     the Court fundamentally is a red herring and then say --

6          THE COURT:  Spare me.

7          MR. PRINCI:  -- that --

8          THE COURT:  Mr. Princi --

9          MR. PRINCI:  Fair enough.

10          THE COURT:  I don't need to hear that.

11          MR. PRINCI:  Fair enough.

12          THE COURT:  Okay?

13          MR. PRINCI:  All right, Judge.  We will report back in

14     accordance with the Court's directions today.  And we

15     appreciate the amount of time the Court has given us --

16          THE COURT:  Okay.

17          MR. PRINCI:  -- to try to start to work this out with

18     people.

19          THE COURT:  All right.  Anybody else want to be heard?

20     We're adjourned --

21          MR. ECKSTEIN:  Your Honor?

22          THE COURT:  -- Mr. Eckstein, very briefly.

23          MR. ECKSTEIN:  I just want to clarify procedurally.

24     My understanding where we're leaving thing is, the motions

25     right now are adjourned sine ADA --

1          THE COURT:  They are.

2          MR. ECKSTEIN:  -- and I'm assuming response deadlines

3    are not fixed right now.

4          THE COURT:  That's correct.  But I expect that we're

5    going to get -- you know, you're going to work on working out a

6    schedule that takes into account all the things we talked about

7    today.

8          MR. ECKSTEIN:  Correct.  That's the idea.

9          THE COURT:  Okay?

10         MR. ECKSTEIN:  Okay.

11         THE COURT:  All right.  Thank you very much.  We're

12   adjourned.

13      (Whereupon these proceedings were concluded at 12:50 PM)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    **I N D E X**

3

4                                    RULINGS

5                                                        Page      Line

6  Debtors' motion to approve bidding procedures   24          4

7  is granted as revised based on the record.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   SHARONA SHAPIRO

11   AAERT Certified Electronic Transcriber CET**D-492

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  June 26, 2012

18

19

20

21

22

23

24

25