# EXHIBIT 1

**SERVICING AGREEMENT**

SERVICING AGREEMENT
by and between


GREEN PLANET SERVICING, LLC
Owner


and


GMAC MORTGAGE, LLC
Servicer


Dated as of October 1, 2011

# TABLE OF CONTENTS

ARTICLE I. .................................................................................................................. 1

DEFINITIONS .............................................................................................................. 1

    SECTION 1.01.   DEFINITIONS ................................................................................. 1

ARTICLE II. ................................................................................................................ 13

SERVICING ................................................................................................................ 13

    SECTION 2.01.   SERVICER TO ACT AS SERVICER ................................................. 13
    SECTION 2.02.   LIQUIDATION OF MORTGAGE LOANS ......................................... 17
    SECTION 2.03.   COLLECTION OF MORTGAGE LOAN PAYMENTS .......................... 19
    SECTION 2.04.   ESTABLISHMENT OF AND DEPOSITS TO CUSTODIAL ACCOUNTS ... 19
    SECTION 2.05.   PERMITTED WITHDRAWALS FROM CUSTODIAL ACCOUNTS ......... 21
    SECTION 2.06.   ESTABLISHMENT OF AND DEPOSITS TO ESCROW ACCOUNTS ...... 22
    SECTION 2.07.   PERMITTED WITHDRAWALS FROM ESCROW ACCOUNTS .............. 23
    SECTION 2.08.   PAYMENT OF ESCROW ITEMS AND OTHER CHARGES .................. 23
    SECTION 2.09.   PROTECTION OF ACCOUNTS ....................................................... 24
    SECTION 2.10.   MAINTENANCE OF HAZARD AND FLOOD INSURANCE .................. 25
    SECTION 2.11.   MAINTENANCE OF BLANKET HAZARD INSURANCE COVERAGE ..... 26
    SECTION 2.12.   MAINTENANCE OF PMI POLICIES ............................................... 26
    SECTION 2.13.   MAINTENANCE OF FIDELITY BOND AND ERRORS AND OMISSIONS INSURANCE .... 27
    SECTION 2.14.   INSPECTIONS ............................................................................. 28
    SECTION 2.15.   RESTORATION OF MORTGAGED PROPERTY ................................. 28
    SECTION 2.16.   TITLE, MANAGEMENT AND DISPOSITION OF REO PROPERTY ...... 28
    SECTION 2.17.   NOTIFICATION OF ADJUSTMENTS ............................................... 28
    SECTION 2.18.   NON-RECOVERABLE ADVANCES ................................................. 29
    SECTION 2.19.   SERVICING CHANGES ................................................................ 29
    SECTION 2.20.   PREPAYMENT CHARGES ............................................................ 30
    SECTION 2.21.   CREDIT REPORTING .................................................................. 30
    SECTION 2.22.   SAFEGUARDING CUSTOMER INFORMATION ............................... 30

ARTICLE III. .............................................................................................................. 31

REMITTANCES AND STATEMENTS ...................................................................... 31

    SECTION 3.01.   REMITTANCES FOR PORTFOLIO LOANS THAT ARE NOT HELOC LOANS .... 31
    SECTION 3.02.   REMITTANCES FOR HELOC LOANS ............................................ 31
    SECTION 3.03.   REMITTANCE FOR AGENCY LOANS ............................................ 32
    SECTION 3.04.   RECONCILIATION OF SERVICING ADVANCES .............................. 32
    SECTION 3.05.   STATEMENTS TO OWNER ........................................................... 32
    SECTION 3.06.   INTERNAL REVENUE SERVICE REPORTS ................................... 33
    SECTION 3.07.   NO PRINCIPAL & INTEREST ADVANCES ..................................... 34
    SECTION 3.08.   ODD DUE DATES ....................................................................... 34

ARTICLE IV. .............................................................................................................. 35

ADDITIONAL SERVICING PROCEDURES ............................................................. 35

    SECTION 4.01.   TRANSFERS OF MORTGAGED PROPERTY ................................... 35
    SECTION 4.02.   SATISFACTION OF MORTGAGES UPON PAYMENT IN FULL ......... 35
    SECTION 4.03.   SERVICING COMPENSATION AND OWNER EXPENSES .................. 36
    SECTION 4.04.   POSSESSION OF MORTGAGE FILES ............................................ 36
    SECTION 4.05.   RIGHT TO EXAMINE SERVICER RECORDS ................................... 37

SECTION 4.06.    LOSSES AND EXPENSES ................................................................. 37
SECTION 4.07.    REPURCHASE REQUESTS ............................................................. 38

ARTICLE V. ........................................................................................................ 40

COMPLIANCE AND CONFIDENTIALITY ................................................. 40

SECTION 5.01.    ANNUAL STATEMENT AS TO COMPLIANCE ................................. 40
SECTION 5.02.    ANNUAL INDEPENDENT PUBLIC ACCOUNTANTS' SERVICING REPORT .. 40
SECTION 5.03.    COMPLIANCE WITH GRAMM-LEACH-BLILEY ACT OF 1999 ............. 40
SECTION 5.04.    CONFIDENTIALITY OF INFORMATION .......................................... 41

ARTICLE VI. ...................................................................................................... 43

REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER ........... 43

SECTION 6.01.    ORGANIZATION AND GOOD STANDING ....................................... 43
SECTION 6.02.    ORDINARY COURSE OF BUSINESS ............................................... 43
SECTION 6.03.    NO VIOLATIONS ........................................................................ 43
SECTION 6.04.    ABILITY TO PERFORM ............................................................... 43
SECTION 6.05.    LITIGATION ............................................................................. 43
SECTION 6.06.    NO CONSENT REQUIRED ............................................................ 44
SECTION 6.07.    OWNERSHIP ............................................................................ 44
SECTION 6.08.    ACCURACY ............................................................................. 44
SECTION 6.09.    ELIGIBILITY CRITERIA .............................................................. 44

ARTICLE VII. ..................................................................................................... 45

REPRESENTATIONS, WARRANTIES AND COVENANTS OF SERVICER ...... 45

SECTION 7.01.    ORGANIZATION AND GOOD STANDING ....................................... 45
SECTION 7.02.    ORDINARY COURSE OF BUSINESS ............................................... 45
SECTION 7.03.    NO VIOLATION ......................................................................... 45
SECTION 7.04.    ABILITY TO PERFORM ............................................................... 45
SECTION 7.05.    ABILITY TO SERVICE ................................................................. 45
SECTION 7.06.    LITIGATION ............................................................................. 46
SECTION 7.07.    NO CONSENT REQUIRED ............................................................ 46

ARTICLE VIII. .................................................................................................... 47

OWNER DEFAULT .......................................................................................... 47

SECTION 8.01.    OWNER EVENTS OF DEFAULT .................................................... 47

ARTICLE IX. ...................................................................................................... 49

SERVICER DEFAULT ...................................................................................... 49

SECTION 9.01.    SERVICER EVENTS OF DEFAULT ................................................. 49

ARTICLE X. ........................................................................................................ 51

INDEMNIFICATION AND ASSIGNMENT ...................................................... 51

SECTION 10.01.    INDEMNIFICATION .................................................................. 51
SECTION 10.02.    LIMITATION ON LIABILITY OF SERVICER AND OTHERS ............... 54
SECTION 10.03.    OPERATION OF INDEMNITIES .................................................... 55
SECTION 10.04.    ASSIGNMENT ......................................................................... 55
SECTION 10.05.    MERGER OR CONSOLIDATION OF THE SERVICER ......................... 56
SECTION 10.06.    COOPERATION OF SERVICER WITH AN AGENCY TRANSFER ........... 56

ARTICLE XI. ...................................................................................................... 58

TERMINATION ............................................................................ 58
    SECTION 11.01.    TERMINATION ................................................. 58
    SECTION 11.02.    TRANSFER PROCEDURES ........................... 58

ARTICLE XII. ............................................................................. 61

MISCELLANEOUS PROVISIONS ............................................. 61
    SECTION 12.01.    NOTICES .......................................................... 61
    SECTION 12.02.    WAIVERS ........................................................ 62
    SECTION 12.03.    ENTIRE AGREEMENT; AMENDMENT ........ 62
    SECTION 12.04.    COUNTERPARTS; BINDING EFFECT .......... 62
    SECTION 12.05.    NO-HIRE .......................................................... 62
    SECTION 12.06.    HEADINGS ...................................................... 62
    SECTION 12.07.    GOVERNING LAW .......................................... 63
    SECTION 12.08.    RELATIONSHIP OF PARTIES ....................... 63
    SECTION 12.09.    SEVERABILITY OF PROVISIONS ............... 63
    SECTION 12.10.    RECORDATION OF ASSIGNMENTS OF MORTGAGE ... 63
    SECTION 12.11.    EXHIBITS ......................................................... 63
    SECTION 12.12.    OWNER'S FINANCIALS ................................ 63
    SECTION 12.13.    NO SOLICITATION .......................................... 64
    SECTION 12.14.    FORCE MAJEURE .......................................... 64
    SECTION 12.15.    WAIVER OF TRIAL BY JURY ...................... 64
    SECTION 12.16.    LIMITATION OF DAMAGES ......................... 64
    SECTION 12.17.    SURVIVAL ....................................................... 65

## EXHIBITS

EXHIBIT I        PRICING EXHIBIT
EXHIBIT II       MORTGAGE LOAN DOCUMENTS
EXHIBIT III      ELIGIBILITY CRITERIA
EXHIBIT IV       APPROVAL MATRIX
EXHIBIT V        FORM OF LIMITED POWER OF ATTORNEY
EXHIBIT VI       FORM OF TRANSFER INSTRUCTIONS
EXHIBIT VII      FORM OF AGENCY TRANSFER ACKNOWLEDGMENT AGREEMENT
EXHIBIT VIII     FORM OF ADDITIONAL CUSTODIAL ACCOUNT REQUEST
EXHIBIT IX       FORM OF SALES, DELIVERY, TRANSFER FILE

## SERVICING AGREEMENT

This Servicing Agreement ("Agreement") is entered into as of September 1, 2011, by and among GMAC MORTGAGE, LLC, a Delaware limited liability company (the "Servicer") and GREEN PLANET SERVICING, LLC, a Delaware limited liability company (the "Owner"). The Servicer and the Owner may be referred to herein as a "Party" or collectively as the "Parties".

WHEREAS, the Owner has purchased or originated and expects in the future to purchase or originate residential, first lien mortgage loans, closed-end subordinate lien mortgage loans and home equity lines of credit and/or the related servicing rights; and

WHEREAS, the Servicer regularly services such mortgage loans and lines and has agreed to service the mortgage loans that become subject to this Agreement and the Parties desire to provide the terms and conditions of such servicing by the Servicer.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

# ARTICLE I.
## DEFINITIONS

Section 1.01.  Definitions

The following terms are defined as follows:

Accepted Servicing Practices:  With respect to any Portfolio Loan or REO Property, (i) the Fannie Mae Guides, (ii) any applicable mortgage insurer guides, (iii) the VA Regulations applicable for any VA Mortgage Loan and FHA regulations applicable for any FHA Mortgage Loans, and (iv) to the extent not inconsistent therewith, those mortgage servicing practices of mortgage lending institutions which service mortgage loans of the same type as such Portfolio Loan or REO Property in the jurisdiction where the related Mortgaged Property is located, exercising a reasonable standard of care in performing those practices.  With respect to any Agency Loan, (i) the applicable Agency Guide including the VA Regulations applicable for any VA Mortgage Loan and FHA regulations applicable for any FHA Mortgage Loans, (ii) any applicable mortgage insurer guides and (iii) to the extent not inconsistent therewith , those mortgage servicing practices of mortgage lending institutions which service mortgage loans of the same type as such Agency Loan in the jurisdiction where the related Mortgaged Property is located, exercising a reasonable standard of care in performing those practices.

Adjustable Rate Mortgage Loan:  Any Mortgage Loan with respect to which the related Mortgage Note contains a provision whereby the Mortgage Interest Rate is subject to change from time to time in accordance with the terms of such Mortgage Note.

Advances:  In connection with any Agency Loan, the Monthly Payment (or portion thereof) required to be remitted to an Agency according to the Agency Guide.

Affiliate:  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agency:  Any of Fannie Mae, Freddie Mac or Ginnie Mae.

Agency Guide:  The respective Fannie Mae Guide, Freddie Mac Guide or Ginnie Mae Guide, as they may be modified from time to time.

Agency Loan:  Any Mortgage Loan sold to an Agency.

Agency Loan Remittance Date:  The remittance date specified in the applicable Agency Guide.

Agency Transfer:  The sale or transfer by Owner of some or all of the Portfolio Loans to Fannie Mae under its Cash Purchase Program (Special Servicing Option) or its MBS Swap Program (Special Servicing Option) or to Freddie Mac under its Freddie Mac Cash Program or Gold PC Program, or to Ginnie Mae, in each case retaining the Servicer as "servicer" thereunder.

Agency Transfer Acknowledgment Agreement:  An acknowledgment agreement substantially in the form of Exhibit 7 hereto to be executed by the Parties prior to each Agency Transfer with respect to the servicing of a pool of Agency Loans identified as part of such acknowledgment agreement.

Ancillary Income:  All income derived from the Mortgage Loans and REO Properties that the Servicer may collect in connection with servicing the Mortgage Loans and REO properties, including, but not limited to (a) interest or other benefits earned in connection with funds on deposit in the Custodial Accounts and Escrow Account less the interest on escrowed funds required by Applicable Law to be paid to the Mortgagor, (b) fees payable in connection with the Home Affordable Modification Program, (c) Agency incentive and loss mitigation fees, (d) late charges, (e) customer prepayment fees and line termination fees, and (f) non-sufficient funds fees, ACH fees, assumption fees, amounts associated with marketing special products to the Mortgagors,  and all other incidental fees and charges with respect to a Mortgage Loan or REO Property.

Applicable Law: All federal, state or local laws or regulations applicable to any Mortgage Loan, Mortgaged Property, or any REO Property, or the Servicer's activities under this Agreement as if Servicer were servicing the Mortgage Loans for its own account.

Approval Matrix: The approval matrix attached as Exhibit 4 and applicable only to the Portfolio Loans and REO Properties to the extent not inconsistent with the requirements of any applicable mortgage insurer or guarantor.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer or sale of the Mortgage.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions are authorized to be closed for business in the States of California, Iowa or Texas, or the Commonwealth of Pennsylvania.

Condemnation Proceeds: All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Confidential Information: Shall have the meaning set forth in Section 5.04 hereof.

CPI: The Consumer Price Index for All Urban Consumers (CPI U), United States City Average, All Items (1982 84=100) (the CPI Index), published monthly by the Bureau of Labor Statistics of the US Department of Labor.

Credit Line Increase: An increase in the maximum available principal balance with respect to a HELOC Loan.

Custodial Account: The separate account or accounts created and maintained pursuant to Section 2.04(a) or Section 2.04(b).

Custodian: The custodian of the Mortgage Loan Documents as specified under any related custodial agreement between the Owner and their custodian.

Daily HELOC Report: The daily report to be provided by Servicer to Owner in connection with the HELOC Loans, as described in Section 3.05.

Deboarding Fee: With respect to each Mortgage Loan and REO Property, the deboarding fees set forth in the Pricing Exhibit.

**Default**: The status of a Mortgage Loan when one Monthly Payment is due and unpaid as of the last day of the calendar month in which the monthly payment was due.

**Determination Date**: With respect to Portfolio Loans, the last Business Day of the month prior to the related Portfolio Loan Remittance Date. With respect to Agency Loans, the date specified in the applicable Agency Guide.

**Due Date**: The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

**Eligibility Criteria**: The eligibility criteria for residential mortgage loans and home equity lines of credit to be delivered by Owner and serviced by Servicer under this Agreement attached as Exhibit 3.

**Eligible Investments**: Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than one day prior to the Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable, in each month (or such other date as permitted under this Agreement):

    (i)    direct obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America ("Direct Obligations");

    (ii)    federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company (including U.S. subsidiaries of foreign depositories) incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal or state banking authorities, so long as at the time of such investment or the contractual commitment providing for such investment the commercial paper or other short term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the commercial paper or other short term debt or deposit obligations of such holding company or deposit institution, as the case may be) have been rated by each Rating Agency in its highest short-term rating category or one of its two highest long-term rating categories;

    (iii)    repurchase agreements collateralized by Direct Obligations or securities guaranteed by Fannie Mae or Freddie Mac with any registered broker/dealer subject to Securities Investors' Protection Corporation jurisdiction or any commercial bank insured by the Federal Deposit

Insurance Corporation, if such broker/dealer or bank has an uninsured, unsecured and un-guaranteed obligation rated by each Rating Agency in its highest short-term rating category;

(iv)    securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof which have a credit rating from each Rating Agency, at the time of investment or the contractual commitment providing for such investment, at least equal to one of the two highest long term credit rating categories of each Rating Agency; provided, however, that securities issued by any particular corporation will not be Eligible Investments to the extent that investment therein will cause the then outstanding principal amount of securities issued by such corporation to exceed 20% of the aggregate principal amount of all Eligible Investments in the Custodial Accounts and the Escrow Accounts; provided, further, that such securities will not be Eligible Investments if they are published as being under review with negative implications from either Rating Agency;

(v)    commercial paper (including both non-interest-bearing discount obligations and interest bearing obligations payable on demand or on a specified date not more than 180 days after the date of issuance thereof) rated by each Rating Agency in its highest short-term rating category;

(vi)    certificates or receipts representing direct ownership interests in future interest or principal payments on obligations of the United States of America or its agencies or instrumentalities (which obligations are backed by the full faith and credit of the United States of America) held by a custodian in safekeeping on behalf of the holders of such receipts; and

(vii)    any other demand, money market, common trust fund or time deposit or obligation, or interest bearing or other security or investment rated in the highest rating category by each Rating Agency; provided, however, that (a) any such instrument shall be acceptable to the Rating Agencies, and (b) no such instrument shall be an Eligible Investment if such instrument evidences either (i) a right to receive only interest payments with respect to the obligations underlying such instrument, or (ii) both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying obligations.

Environmental Liability:  Shall have the meaning set forth in Section 10.01 hereof.

**Escrow Account:** The separate account or accounts created and maintained pursuant to Section 2.06(a) or Section 2.06(b).

**Escrow Payment:** With respect to any Mortgage Loan, the amounts constituting real estate taxes, mortgage insurance premiums, fire and hazard insurance premiums, and any other payments required to be escrowed by the Mortgagor with the mortgagee or Servicer pursuant to the Mortgage Loan Documents.

**Extension Term:** Shall have the meaning set forth in Section 11.01 hereof.

**Fannie Mae:** Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

**Fannie Mae Guides:** The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto.

**FHA:** The Federal Housing Administration of HUD, or any successor thereto.

**Fitch:** Fitch, Inc., or any successor thereto.

**Flood Act:** The Flood Disaster Protection Act of 1973, as amended.

**Forbearance:** Shall have the meaning set forth in Section 2.01(i) hereof.

**Freddie Mac:** The Federal Home Loan Mortgage Corporation, or any successor thereto.

**Freddie Mac Guide:** The Single-Family Seller/Servicer Guide.

**Ginnie Mae:** The Government National Mortgage Association or any successor thereto.

**Ginnie Mae Guide:** The Ginnie Mae MBS Guide.

**Home Affordable Modification Program (HAMP):** A federal program established to assist eligible Mortgagors modify their Mortgage Loans to be more affordable for such Mortgagor

**HELOC Draw:** With respect to any HELOC Loan, a borrowing by the Mortgagor under the related Mortgage Note.

**HELOC Loan:** Any revolving line of credit, secured by a lien on a one to four family residential real property, whether or not said line of credit has a loan balance.

HOEPA Loan: A Mortgage Loan subject to the Home Ownership and Equity Protection Act of 1994 ("HOEPA").

HUD: shall mean the United States Department of Housing and Urban Development or any successor thereto.

Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interest Rate Adjustment Date:  With respect to each Adjustable Rate Mortgage Loan, the date specified in the related Mortgage Note and the New Loan Data File, on which the Mortgage Interest Rate is adjusted.

Liability:  Shall have the meaning set forth in Section 10.01 hereof.

LIBOR Rate:  The three month London Inter-Bank Offered Rate as published in the Wall Street Journal (northeast edition).

Liquidation Proceeds:  Cash received by the Servicer in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

LPMI Policy:  A policy of primary mortgage guaranty insurance issued by an insurer pursuant to which the related premium is either (a) to be paid by the servicer of the related Mortgage Loan from payments of interest made by the Mortgagor in an amount as is set forth in the related New Loan Data File, or (b) to be paid by the Owner.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the state of Delaware, or any successor thereto.

Monthly Advice:  The monthly report to be provided by Servicer to Owner in connection with each remittance.

Monthly Payment:  The monthly payment of principal and interest due on a Mortgage Loan under the applicable Mortgage Loan Documents.

Moody's:  Moody's Investors Service, Inc., and any successor thereto.

Mortgage:  The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first or subordinate lien, as applicable, on an unsubordinated estate in fee simple in real property securing the Mortgage Note; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the mortgage, deed of trust

or other instrument securing the Mortgage Note may secure and create a first or subordinate lien, as applicable, upon a leasehold estate of the Mortgagor.

Mortgage File: The documents pertaining to a particular Mortgage Loan or REO Property referred to as the Mortgage File, listed in Exhibit 2 annexed hereto to the extent received by the Servicer from the Owner, prior servicer, sub-servicer or originator, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate: The annual rate of interest borne on a Mortgage Note with respect to each Mortgage Loan including any changes resulting from any amendment, modification, forbearance, application of the Servicemembers Civil Relief Act of 2003 or any court order.

Mortgage Loan: An individual mortgage loan conforming to the Eligibility Criteria and which is subject to this Agreement, consisting of any Agency Loans and the Portfolio Loans.

Mortgage Loan Documents: The documents pertaining to a particular Mortgage Loan or REO Property referred to as the Mortgage File in Exhibit 2 attached hereto.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property: The real property (or leasehold estate, if applicable) located in one of the fifty states or the District of Columbia, securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor: The obligor on a Mortgage Note.

Mortgagor Check: A check intended to be used by a Mortgagor as a means for drawing down funds on a HELOC Loan.

New Loan Data File: With respect to each Mortgage Loan delivered, or caused to be delivered, hereunder, the data file produced by Owner or the prior servicer pursuant to the Transfer Instructions, which is used to enable Servicer to set up each Mortgage Loan on its loan servicing system.

Non-recoverable Advance: Any Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property which, in the good faith judgment of the Servicer, will not or, in the case of a proposed advance, may not, be ultimately recoverable from related Insurance Proceeds, Liquidation Proceeds or otherwise from such Mortgage Loan or REO Property. The determination by the Servicer that it has made a Non-recoverable Advance shall be evidenced by an officer's certificate delivered to the Owner.

Original Term: Shall have the meaning set forth in Section 11.01 hereof.

Owner Event of Default: Any one of the conditions or circumstances enumerated in Section 8.01.

Owner Expense: "Out-of-pocket" costs to third parties incurred by the Servicer in servicing the Mortgage Loans and REO Properties that are generally not reimbursable by the Mortgagor or from Liquidation Proceeds and that are customarily paid by the Owner. Owner Expenses may include, but are not limited to the cost of (a) Mortgagor counseling fees payable to a third party, (b) any Mortgage Loan assignment, recording, trustee, endorsement or release fee including recordation of powers of attorney and any MERS charges, which fees are not reimbursable to Servicer by any other party, (c) tax penalties as a result of a prior servicer or originator not paying taxes, (d) flood tracking contracts, (e) tax service contracts (f) tax certifications performed to research past due tax amounts, (g) LPMI premiums, (h) attorneys' fees and costs not chargeable to the Mortgagor, (i) funds to repurchase Agency Loans from the applicable Agency, (j) funds to buyout a superior lien, (k) environmental clean up costs, (l) costs from the sale of charged-off assets, or (m) any other fees or amounts contained in this Agreement, required to be processed by Servicer and not otherwise reimbursed. All such expenses are subject to change from time-to-time.

Owner Income: That portion of Ancillary Income which is payable to the Owner pursuant to the Pricing Exhibit.

Owner Indemnified Parties: Shall have the meaning set forth in Section 10.01(b) hereof.

Person: Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

PMI Policy: A policy of primary mortgage guaranty insurance issued by an insurer in connection with any Mortgage Loan.

Portfolio Loan: Any Mortgage Loan that is not an Agency Loan. The Portfolio Loans shall include the HELOC Loans.

Portfolio Loan Remittance Date: The 7th Business Day of the month following the Determination Date.

Pricing Exhibit: The pricing exhibit attached hereto as Exhibit 1.

Principal Prepayment: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date (including any charge or premium thereon) and which is not accompanied by an amount of interest

representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Program Form: Any form of worksheet, checklist, summary, log, transmittal, request, order, report or other written form and any written document, instrument, statement, notice, request, authorization or communication, including, without limitation, customer billing forms and customer correspondence, utilized in connection with the servicing of the Mortgage Loans.

Qualified Depository: For Portfolio Loans and REO Properties, a depository the accounts of which are insured by the Federal Deposit Insurance Corporation, or any successor thereto. For Agency Loans, a depository which meets the requirements of the applicable Agency Guide.

Rating Agency: Any of Fitch, Moody's or Standard & Poor's.

Recourse Obligation: means, with respect to any Mortgage Loan, any obligation or liability (actual or contingent), as applicable, for loss of principal incurred in connection with the foreclosure or other disposition of, or other realization or attempt to realize upon the collateral securing such Mortgage Loan, or any repurchase obligation in connection with a Mortgage Loan.

REO Property: A Mortgaged Property that secured a Portfolio Loan acquired by the Servicer on behalf of the Owner through foreclosure or by deed in lieu of foreclosure.

Repurchase Request: A request to repurchase a Mortgage Loan.

Servicer Employees: Shall have the meaning set forth in Section 2.13 hereof.

Servicer Event of Default: Any one of the conditions or circumstances enumerated in Section 9.01 hereof.

Servicer Indemnified Parties: Shall have the meaning set forth in Section 10.01(a) hereof.

Servicer Recovery Costs: The costs of any necessary (a) Mortgagor credit reports, (b) asset searches or bankruptcy searches, (c) asset valuations, or (d) Mortgagor skip tracing, which costs shall be borne by the Servicer.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred (a) in the performance by the Servicer of its servicing obligations pursuant to this Agreement including, but not limited to, the cost relating to (i) the preservation, restoration and protection of the Mortgaged Property, (ii) any enforcement or judicial

proceedings, including, but not limited to proof of claim charges, (iii) foreclosure actions, (iv) property inspections, (v) property valuations including broker price opinions, appraisals, or automated values, (vi) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage (vii) taxes, assessments, water rates, sewer rents and other charges which are or may become a lien upon the Mortgaged Property, (viii) insurance premiums including PMI insurance premiums,  or (b) by a prior servicer prior to the applicable Transfer Date.

Servicing Change:  Shall have the meaning set forth in Section 2.19 hereof.

Servicing Change Proposal:  Shall have the meaning set forth in Section 2.19 hereof.

Servicing Compensation:  With respect to each Mortgage Loan and REO Property, the amounts Owner shall pay to the Servicer, (a) as set forth on the Pricing Exhibit, or (b) for any specially requested services by Owner.

Servicing Rights:  Any and all of the following: (a) any and all rights to service and administer, or direct the servicing or administration, of the Mortgage Loans; (b) any payments to or monies received by the Servicer for servicing the Mortgage Loans; (c) any Ancillary Income associated with the Mortgage Loans; (d) all agreements or documents creating, defining or evidencing any such servicing rights and all rights of the Servicer thereunder; (e) any and all rights to and in the Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected by the Servicer with respect thereto; (f) all accounts and other rights to payment related to any of the property described in this paragraph; and (g) any and all servicing files, servicing documents, servicing records, or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans.

Standard & Poor's:  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies Inc., and any successor thereto.

Termination Date:  Shall have the meaning set forth in Section 11.02 hereof.

Termination Fee:  With respect to each Mortgage Loan and REO Property, the termination fees set forth in the Pricing Exhibit, which is calculated as of the date of notice.

Third Party Claim:  Shall have the meaning set forth in Section 10.01(c) hereof.

Transfer Date:  With respect to each Mortgage Loan and REO Property, the date Servicer physically assumes its obligations of servicing pursuant to this Agreement.

Transfer Instructions:  The form of transfer instructions used by the Servicer and provided to Owner or any prior servicer in connection with any given transfer of Mortgage Loans or REO Properties for servicing under this Agreement, as modified by Servicer from time to time. The current form of the Mortgage Loan (excluding HELOC Loan) Transfer Instructions is attached hereto as Exhibit 6A, the current form of the HELOC Loan Transfer Instructions is attached hereto as Exhibit 6B, the current form of recovery Transfer Instructions is attached hereto as Exhibit 6C, and the current form of REO Property Transfer Instructions is attached hereto as Exhibit 6D

VA:  The United States Department of Veterans Affairs, or any successor thereto.

VA No-Bid Instruction:  An instruction given by the VA that the VA will not accept conveyance of the REO Property resulting from the foreclosure of a VA guaranteed Mortgage Loan or when the VA pays all or part of the difference between the net sale proceeds and the total indebtedness on a VA guaranteed loan following the private sale of the property where the proceeds are insufficient to fully payoff the existing Mortgage.

VA Regulations:  Any and all regulations promulgated by the VA under the Servicemen's Readjustment Act of 1944, as amended.

## ARTICLE II.

### SERVICING

Section 2.01.  Servicer to Act as Servicer

(a)    From and after the date of this Agreement and the applicable Transfer
Date (provided that all information required hereunder from Owner or any prior servicer
has been provided to Servicer by such Transfer Date), the Servicer, as an independent
contractor, shall service and administer each Mortgage Loan and REO Property and shall
have full power and authority, acting alone, to do any and all things in connection with
such servicing and administration which the Servicer may deem necessary or desirable,
consistent with the terms of this Agreement, Accepted Servicing Practices, Agency
Guidelines, and the Approval Matrix. The Owner shall not interfere with or itself attempt
to perform the duties and activities of the Servicer hereunder, and Owner shall refer to
Servicer any Mortgagor inquiries or correspondence, payments or payoff funds, or
similar matters within the Servicer's responsibilities hereunder that Owner may receive.
All Mortgage Loans and REO Properties transferred to Servicer hereunder shall conform
to the Eligibility Criteria and shall be documented on those Mortgage Loan Documents
that have been approved by Servicer. If Owner wishes the Servicer to assume the
servicing of Mortgage Loans or REO Properties that do not meet the Eligibility Criteria
or that are not documented on approved Mortgage Loan Documents, such request shall be
subject to the Servicer's consent and the Parties' agreement on a new Pricing Exhibit
covering such loans and properties.

(b)    If the Owner has performed a due diligence review of the Mortgage Loans
and REO Properties, (i) Owner shall inform the Servicer of such review and (ii) upon
Servicer's reasonable request, Owner shall provide to the Servicer information obtained
in such review.

(c)    Owner shall provide or cause to be provided by the prior servicer(s), in
accordance with the Transfer Instructions, the New Loan Data File and any related
Mortgage Loan documentation for each Mortgage Loan and REO Property to be serviced
by the Servicer under this Agreement. For newly originated Mortgage Loans being
transferred prior to the first payment due date of the Mortgage Loan, the Servicer must
receive this information no later than five (5) Business Days before Servicer is to begin
servicing such Mortgage Loan. For Mortgage Loans being transferred after the first
payment due date, Owner agrees (i) to provide Servicer this information no later than two
(2) Business Days following the Transfer Date, (ii) to provide Servicer notice of any
incoming transfers no less than thirty (30) days prior to the Transfer Date, and (iii) to
notify Servicer, in writing, within two (2) Business Days of Servicer's receipt of the New
Loan Data File of any changes in the information contained therein. For all Mortgage
Loans, Owner agrees to provide Servicer, within two (2) Business Days after Servicer's
request, copies of the Mortgage Note, the Mortgage or any other documents with respect
to a Mortgage Loan or REO Property that Servicer (i) deems reasonably necessary in
connection with its performance of the servicing of such loan, or (ii) that Servicer
requires in order to respond to or comply with any audit, examination or other review

conducted by any state or federal agency, department or regulator with jurisdiction over Servicer or any affiliate of Servicer. Owner agrees to, and shall use commercially reasonable efforts to cause any prior servicer to, comply with the Transfer Instructions. Owner is responsible for ensuring that all advances made by any prior servicer are communicated to Servicer within three (3) Business Days following the Transfer Date so as to enable Servicer to meet Mortgagor notification requirements of Applicable Law; if the foregoing timeframe is not met Servicer shall have no obligation to board or collect any such prior servicer advances. Owner is responsible for reconciling and funding all prior servicer advances directly with the prior servicer; Servicer will reasonably cooperate and assist in the reconciliation process but Servicer will not advance any of its own funds to reimburse the prior servicer or Owner for such amounts.

Owner hereby agrees that the Servicer shall net the costs or expenses incurred to transfer tax service contracts and flood service contracts or to obtain contracts that are not existing or transferable to the Servicer, in the amounts indicated on the Pricing Exhibit, which amounts can change from time to time, from amounts payable to the Owner.

Owner acknowledges that Servicer's obligations to pay taxes and insurance pursuant to Section 2.08 and this Section 2.01 are contingent upon the existence of life of loan tax and flood service contracts on a per Mortgage Loan or REO Property basis. To the extent Servicer has not received evidence of the existence of contracts that are acceptable to Servicer, as specified below, the Servicer shall obtain such contracts. Owner acknowledges that Servicer will accept life of loan service contracts from the following vendors: (i) for tax service contracts, (x) First American Real Estate Tax Services and (y) for Mortgage Loans more than one (1) year aged (based on the first payment due date of such Mortgage Loan) and provided the tax identification numbers for each Mortgaged Property are guaranteed, LSI, ZC Sterling and LandAmerica Tax & Flood Services, and (ii) for flood service contracts, First American Flood Data Services and LPS National Flood.

For newly originated Mortgage Loans being transferred prior to the first due date of the Mortgage Loan, Owner is responsible to ensure that any items included in Escrow Payments that are due within sixty (60) days following the closing date of the Mortgage Loan, are paid. For all other Mortgage Loans, Owner is responsible to ensure that any items included in Escrow Payments that are due within thirty (30) days following the Transfer Date are paid prior to transfer to Servicer. Owner is responsible for any loss of discount, tax penalties or lapses in hazard or flood coverage due to non-payment of such amounts prior to the Transfer Date.

(d)    In servicing and administering the Mortgage Loans and REO Properties, the Servicer shall comply in all material respects with Applicable Law and employ Accepted Servicing Practices except and to the extent that such practices conflict with the requirements of this Agreement. The Servicer shall retain adequate personnel to service and administer the Mortgage Loans and REO Properties.

(e)      In connection with any subordinate lien Portfolio Loan that succeeds to a superior lien position as a result of payment in full of the related superior lien mortgage loan, the Servicer may subordinate such subordinate lien Portfolio Loan in accordance with the Approval Matrix and Accepted Servicing Practices.

(f)      In connection with the HELOC Loans, the Servicer will, upon Owner's request, provide Mortgagor Checks to the Mortgagors and shall be reimbursed by Owner for all out of pocket expenses associated with providing such checks. The Servicer will verify the availability of funds prior to authorizing payment of Mortgagor Checks. The Mortgagor will also be able to access available funds by calling Servicer, via a toll free number. For each request made by a Mortgagor via the toll free number, such Mortgagor will be sent a wire request form and given instructions on where the form is to be sent once completed. Servicer will review the form and verify funds availability and funds will be wire transferred to the account designated by such Mortgagor requesting funds. Servicer will not issue payment of a Mortgagor Check and will not wire funds in response to a wire request form if Servicer has knowledge that the Mortgagor is not eligible to make a HELOC Draw from his or her HELOC Loan because HELOC Draw privileges have been suspended or terminated. If Servicer pays a Mortgagor Check or wires funds to a Mortgagor when Servicer had knowledge that the Mortgagor was not eligible to make a HELOC Draw from his or her HELOC Loan, Servicer shall be responsible for such payment or wire of funds.

(g)      The Servicer will process all Credit Line Increase requests received on a HELOC Loan in compliance with the Mortgage Loan Documents and Accepted Servicing Practices. The Servicer will obtain approvals in accordance with the Approval Matrix.

(h)      The Servicer's computer system shall clearly reflect (i) the Owner's ownership of (a) each Portfolio Loan and REO Property and (b) the Servicing Rights associated with the Mortgage Loans and REO Properties and (ii) the applicable Agency's ownership of each Agency Loan. The Servicer shall release from its custody the contents of any Mortgage File retained by it only in accordance with this Agreement.

(i)      In the event that any Mortgage Loan is in Default or, in the judgment of the Servicer, such a Default is reasonably foreseeable, the Servicer, consistent with Accepted Servicing Practices and Applicable Law, may waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Interest Rate, forgive the payment of principal or interest, or waive, in whole or in part, a prepayment charge), accept payment from the related Mortgagor of an amount less than the principal balance in final satisfaction of such Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor (any and all such waivers, modifications, payment plans, variances, forgiveness of principal or interest, postponements, or indulgences collectively referred to herein as "Forbearance"). Any approvals required in connection with such Forbearance shall be obtained in accordance with the Approval Matrix and Agency Guidelines. The Servicer's analysis supporting any Forbearance and the conclusion that any Forbearance

meets the standards of this section, shall be appropriately reflected in the Servicer's records.

(j)      The Servicer shall, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Owner, all instruments and documents necessary to carry out its servicing and administrative duties under this Agreement including but not limited to instruments in connection with foreclosures; satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Owner shall furnish the Servicer with a power of attorney in the form of Exhibit 5 appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement. If reasonably required by the Servicer, the Owner shall furnish the Servicer with any powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

With respect to the performance of any service to be performed by the Servicer hereunder, including, without limitation, the obtaining of credit report data, the provision of field or other inspections, the provision of title-related services, and the sale or management of REO Properties, the Servicer may obtain such services from an Affiliate in accordance with Accepted Servicing Practices.

(k)      With respect to any Portfolio Loan in Default, if the Servicer determines that (i) no significant net recovery is possible through foreclosure proceedings or other liquidation of the related Mortgaged Property or (ii) the potential net recoveries are anticipated to be an amount, determined by the Servicer in its reasonable discretion, that is insufficient to warrant proceeding through foreclosure or other liquidation of the related Mortgaged Property, the Servicer may, at its discretion, forego foreclosing and treat such Portfolio Loan as a charge off. The Servicer will provide Owner with written notice of such charge offs and will seek the approval of the Owner where required under the Approval Matrix.  Servicer has no obligation to foreclose upon a charged off Portfolio Loan; however, Servicer shall continue to attempt to collect the Portfolio Loan as set forth below.

Servicer shall use all reasonable methods to collect the amounts due under each charged off Portfolio Loan. The Owner recognizes that not all amounts due under each charged off Portfolio Loan may be collectable, due to inadequate collateral value, Mortgagor inability or unwillingness to pay, or otherwise. Servicer shall use such methods, consistent with this Agreement, which in Servicer's reasonable judgment will maximize the recovery under the charged off Portfolio Loan. The Servicer shall pay all items constituting Servicer Recovery Costs, without reimbursement therefore from Owner. The Servicer shall be under no obligation to make any Servicing Advance in connection with a charged off Portfolio Loan, including advances to protect the lien status of such Portfolio Loan, but to the extent Servicer does so it shall be reimbursed as provided herein. The Servicer shall have no obligation to attempt to collect on any charged off Portfolio Loan via institution of litigation against the Mortgagor, whether via suit on the Mortgage Note or otherwise.

In the event the Servicer is unable to collect in full or in part from the Mortgagor on a charged off Portfolio Loan within a reasonable period of time following the date of charge off (determined by Servicer in its reasonable discretion), Servicer may, on behalf of Owner, sell such charged off Portfolio Loan or the Mortgage Note servicing released to a third party, either individually or as part of a bulk package of charged off mortgage loans. In furtherance of any such sale, Owner agrees and hereby authorizes Servicer to disclose information related to the charged off Portfolio Loans and make available for inspection the Mortgage Loan Documents (to the extent those documents are in Servicer's possession) to prospective purchasers of the charged off Portfolio Loans conducting a due diligence examination. Servicer shall obtain a non-disclosure agreement from any such prospective purchaser prior to releasing any information. Any such sale shall be evidenced by a purchase and sale agreement which shall be entered into between Servicer (on behalf of Owner) and the purchaser of such assets. Servicer shall negotiate such agreement on behalf of Owner and Owner agrees to cooperate in such negotiation and, if necessary, execute such agreement in a timely manner to accomplish such sale. Proceeds from any such sale shall be treated as a recovery on the Portfolio Loan(s), subject to Servicer's right to receive the fee specified in the Pricing Exhibit and recover any Servicing Advances as contemplated in this Agreement.

At the expiration of six months from the date of charge off, unless (i) the charged off Portfolio Loan is in a paying status or negotiations with the Mortgagor are pending to resolve the delinquency, or (ii) the charged off Portfolio Loan is in the process of being sold servicing released to a third party, Servicer shall cease active collections efforts and either (i) at Owner's request, transfer such Portfolio Loan servicing released to Owner or its designee pursuant to Section 11.02, or (ii) if Owner does not request such transfer or timely respond to Servicer's transfer request, satisfy the lien securing such Portfolio Loan and remove such Portfolio Loan from Servicer's servicing system. The Servicer shall have no further obligation to service such Portfolio Loan.

The Servicer, as permitted by Applicable Law, will continue to service a Portfolio Loan in recovery regarding which the Mortgagor files bankruptcy. Upon notice of a bankruptcy filing, the Owner agrees to pay the Servicer for any out of pocket costs incurred by Servicer. In addition, the Owner agrees to pay the Servicer a monthly fee as shown on the Pricing Exhibit while the Portfolio Loan remains in bankruptcy.

(l)    For all Agency Loans, the Servicer shall service, report and remit in compliance with the applicable Agency Guide as allowed or required by its role as "subservicer" on behalf of Owner; Owner retains the role and responsibility as "Issuer" and "Servicer" as defined by the Ginnie Mae Guide and as "Seller" and "Servicer" as defined by the Fannie Mae Guide or Freddie Mac Guide, as applicable.

Section 2.02.    Liquidation of Mortgage Loans

In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 2.01 is not paid when the same becomes due and payable,

or in the event the Mortgagor fails to perform any other covenant or obligation under the
Mortgage Loan and such failure continues beyond any applicable grace period, the
Servicer shall take such action as is consistent with Applicable Law and Accepted
Servicing Practices. In the event that any payment due under any Mortgage Loan is not
postponed pursuant to Section 2.01 and remains delinquent for a period of 90 days or any
other default continues for a period of 90 days and provided that foreclosure is allowed
by Applicable Law in the jurisdiction where the related Mortgaged Property is located
and as allowed by Accepted Servicing Practices, and further provided that such Mortgage
Loan has not been charged off pursuant to Section 2.01(k), the Servicer shall refer the
Mortgage Loan for foreclosure unless otherwise defined within the Approval Matrix. In
connection with any such foreclosure, the Servicer shall make all necessary and proper
Servicing Advances, provided, however, that the Servicer shall not be required to expend
any funds in connection with any foreclosure or towards the restoration or preservation of
any Mortgaged Property, unless it shall determine that such expense is beneficial to the
Owner or will be recoverable by Servicer on behalf of Owner either through Liquidation
Proceeds (respecting which Servicer shall have priority for purposes of withdrawals from
the Custodial Account pursuant to Section 2.05) or through Condemnation Proceeds or
Insurance Proceeds (respecting which Servicer shall have similar priority).

In connection with a foreclosure, in the event the Servicer has reasonable
cause to believe that a Mortgaged Property is contaminated by hazardous or toxic
substances or wastes, the Servicer shall cause the Mortgaged Property to be inspected by
a qualified environmental inspector at the Owner's expense. Upon completion of the
inspection, the Servicer shall promptly provide the Owner with a written report of the
environmental inspection.

Notwithstanding anything to the contrary contained herein, after reviewing
the environmental inspection report, the Owner shall determine how the Servicer shall
proceed with respect to the Mortgaged Property; provided, that Servicer may determine
in its sole discretion that it will not proceed with a foreclosure or acceptance of a deed in
lieu of foreclosure with respect to a Mortgaged Property that has been determined to be
contaminated by hazardous or toxic substances or wastes and with respect to which
Servicer would be expected to take title in its own name. In the event (a) the
environmental inspection report indicates that the Mortgaged Property is contaminated by
hazardous or toxic substances or wastes and (b) the Owner directs the Servicer to proceed
with foreclosure or acceptance of a deed in lieu of foreclosure, the Owner shall be
responsible for all reasonable costs associated with any related environmental clean up.
The Servicer shall calculate such costs and Owner shall wire transfer the amount to the
Servicer within one (1) Business Days of the Servicer's request.

In the event the Owner directs the Servicer not to proceed with foreclosure
or acceptance of a deed in lieu of foreclosure, or the Servicer is otherwise not proceeding
to liquidation as a result of environmental contamination, the Servicer shall transfer the
servicing of such Mortgage Loan or REO Property within fifteen (15) days of such
determination following the procedures in Section 11.02 and Servicer will have no
further obligation with regard to such Mortgage Loan or REO Property.

SERVICING AGREEMENT BY AND BETWEEN
GREEN PLANET SERVICING, LLC and GMAC MORTGAGE, LLC

OCTOBER 1ST, 2011

### Section 2.03.  Collection of Mortgage Loan Payments

The Servicer shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take reasonable care in ascertaining and estimating Escrow Payments, to the extent applicable, and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the extent that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.  In connection with any Mortgage Loan that is in Default or regarding which the Servicer believes Default is reasonably foreseeable, the Servicer may, in accordance with Accepted Servicing Practices, recommend or counsel the Mortgagor to refinance their Mortgage Loan with the Servicer, an Affiliate of Servicer or with any third party lender. Notwithstanding the confidentiality provisions of this Agreement, the Servicer may (with any required Mortgagor consent) share Confidential Information relative to the Mortgagor's Mortgage Loan in connection with any such refinance.

### Section 2.04.  Establishment of and Deposits to Custodial Accounts

(a)    The Servicer shall segregate and hold all funds collected and received pursuant to the Portfolio Loans and REO Properties separate and apart from any of its own funds and general assets and shall establish one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "GMAC Mortgage, LLC, in trust for Green Planet Servicing, LLC  re: Fixed and Adjustable Rate Residential Mortgage Loans" (the "non-HELOC Custodial Account") and "GMAC Mortgage, LLC, in trust for Green Planet Servicing, LLC re: Home Equity Lines of Credit" (the "HELOC Custodial Account"), or such other title as is mutually agreed upon and directed in writing by Owner in accordance with Exhibit 8.  The Custodial Accounts shall be established with a Qualified Depository which Qualified Depository may be an Affiliate of Servicer.  Any funds deposited in the Custodial Accounts shall at all times be fully insured to the full extent permitted under Applicable Law.

The Servicer shall deposit in the corresponding Custodial Account no more than two (2) Business Days following receipt thereof (unless otherwise noted), the following collections received by the Servicer or payments to be made by the Servicer, in connection with the Portfolio Loans and REO Properties, after the applicable Transfer Date:

(i)    all collections of principal, including all Principal Prepayments;

(ii)    all collections of interest;

(iii)    all Liquidation Proceeds (which shall be deposited as soon as practical after the expenses of such sale are paid and the Servicer has reimbursed itself for any related un-reimbursed Servicing Advances, unpaid Servicing Compensation, and unpaid Owner Expenses);

19

(iv)    net cash flow, if any, from the REO Property, which shall equal the revenues from such REO Property net of expenses and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses;

(v)    all Insurance Proceeds, required to be deposited pursuant to Section 2.10, other than proceeds to be held in a suspense account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vi)    all Condemnation Proceeds which are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vii)    any amount required to be deposited in the Custodial Account pursuant to Section 2.09 (losses on Eligible Investments), or Section 3.01(interest on late remittances);

(viii)    any amounts required to be deposited by the Servicer pursuant to Section 2.11 in connection with the deductible clause in any blanket hazard insurance policy;

(ix)    any amounts received by the Servicer under a PMI Policy or an LPMI Policy (which shall be deposited as soon as practical after Servicer has reimbursed itself for any related un-reimbursed Servicing Advances, unpaid Servicing Compensation, and unpaid Owner Expenses); and

(x)    any other amount specifically required to be deposited in the Custodial Account pursuant to this Agreement.

The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, unless otherwise provided herein, payments consisting of Servicing Compensation, Owner Expenses, or Ancillary Income due the Servicer pursuant to the Pricing Exhibit need not be deposited by the Servicer into the Custodial Account.

(b)    The Servicer shall segregate and hold all funds collected and received in connection with the Agency Loans separate and apart from any of its own funds and general assets and shall establish Custodial Accounts in accordance with the applicable Agency Guide. The Servicer shall deposit in the corresponding Agency Custodial Accounts no more than two (2) Business Days following receipt thereof, the applicable collections received by the Servicer in accordance with the Agency Guide. The Owner shall ensure the Agency Custodial Account shall be sufficiently funded to pay any Advances due by Owner to the applicable Agency.

(c)    Any interest paid on funds deposited in the Custodial Accounts by the depository institution or any other non-interest benefits shall accrue to the benefit of the Parties set forth in the Pricing Exhibit.

Section 2.05.    Permitted Withdrawals from Custodial Accounts

(a)    The Servicer shall be entitled to withdraw funds from the Custodial Accounts for the following purposes; provided, however, no such withdrawal from the Custodial Accounts relating to the Agency Loans shall be made if prohibited by the applicable Agency Guide:

(i)    to make payments to the Owner in the amounts and in the manner provided in Section 3.01 and Section 3.02;

(ii)    to pay to itself Servicing Compensation and Owner Expenses (to the extent the Servicer has not retained the Servicing Compensation and Owner Expenses);

(iii)    to reimburse itself for un-reimbursed Servicing Advances (except to the extent already reimbursed pursuant to any other provision of this Agreement), any accrued but unpaid Servicing Compensation, and unpaid Owner Expenses. The Servicer's right to reimbursement pursuant to this section shall be prior to the rights of the Owner;

(iv)    to reimburse itself for any un-reimbursed Non-recoverable Advances made by the Servicer in accordance with this Agreement;

(v)    to invest funds in Eligible Investments in accordance with Section 2.09;

(vi)    to withdraw funds deposited in error;

(vii)    to withdraw funds necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance and the fees of any managing agent acting on behalf of the Servicer.;

(viii)    to pay itself any interest earned on funds deposited in the Custodial Account as set forth in the Pricing Exhibit (all such interest to be withdrawn no later than each Portfolio Loan Remittance Date);

(ix)    to pay itself any amounts that are owed by Owner under this Agreement and that remain unpaid;

(x)    to pay for any LPMI Policy premiums;

(xi)    to transfer funds to another Qualified Depository in accordance with Section 2.09 hereof;  and

(xii)    to clear and terminate the Custodial Account upon the termination of this Agreement.

Section 2.06.    Establishment of and Deposits to Escrow Accounts

(a)    The Servicer shall segregate and hold all funds collected and received pursuant to a Portfolio Loan constituting Escrow Payments separate and apart from any of its own funds and general assets in one or more Escrow Accounts, in the form of time deposit or demand accounts, titled, "GMAC Mortgage, LLC, in trust for Owners of Residential Fixed and Adjustable Rate Mortgage Loans, and various Mortgagors" , or such other title as is mutually agreed upon and directed in writing by Owner in accordance with Exhibit 8. The Escrow Account shall be established with a Qualified Depository, in a manner which shall provide the maximum available insurance thereunder.

The Servicer shall deposit in the Escrow Account or Accounts no more than two (2) Business Days following receipt thereof the following amounts received in connection with the Portfolio Loans:

(i)    all Escrow Payments collected for the purpose of effecting timely payment of any such items as required under the terms of this Agreement along with any refunds received in connection with Escrow Payment items;

(ii)    all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property; and

(iii)    buydown funds and other amounts held is suspense prior to application to the Mortgage Loan or REO Property.

(b)    The Servicer shall segregate and hold all funds collected and received pursuant to the Agency Loans separate and apart from any of its own funds and general assets and shall establish Escrow Accounts in accordance with the applicable Agency Guides. The Servicer shall deposit in the corresponding Agency Escrow Accounts no more than two (2) Business Days following receipt thereof, the applicable collections received by the Servicer in accordance with the applicable Agency Guide

(c)    Any benefit related to the funds held in the Escrow Accounts and any obligation to pay interest on such funds to the related Mortgagor shall be allocated between the Servicer and Owner as set forth in the Pricing Exhibit.

Section 2.07.   Permitted Withdrawals from Escrow Accounts

(a)      The Servicer shall be entitled to withdrawal funds from the Escrow
Accounts for the following purposes; provided, however, no such withdrawal from the
Escrow Accounts relating to the Agency Loans shall be made if prohibited by the
applicable Agency Guide:

(i)      to effect timely payments of real estate taxes, assessments,
mortgage insurance premiums, fire and hazard insurance premiums or
other items constituting Escrow Payments for the related Portfolio Loan;

(ii)      to reimburse itself for any Servicing Advance constituting Escrow
Payments made by the Servicer pursuant to this Agreement with respect to
a related Portfolio Loan (except to the extent already reimbursed pursuant
to any other provision of this Agreement), but only from amounts received
on the related Portfolio Loan which represent late collections of Escrow
Payments thereunder;

(iii)      to refund to any Mortgagor any funds found to be in excess of the
amounts required under the terms of the related Portfolio Loan or
Applicable Law;

(iv)      to transfer funds to the Custodial Account for application to reduce
the principal balance of the Portfolio Loan in accordance with the terms of
the related Mortgage and Mortgage Note;

(v)      to pay to itself, or any Mortgagor to the extent required by
Applicable Law, any interest paid on the funds deposited in the Escrow
Account;

(vi)      to restore or repair the Mortgaged Property in accordance with
Section 2.15 ;

(vii)      to withdraw funds deposited in error; and

(viii)      to clear and terminate the Escrow Account on the termination of
this Agreement.

Section 2.08.   Payment of Escrow Items and Other Charges

With respect to each first lien Mortgage Loan that provides for Escrow
Payments, the Servicer shall maintain accurate records reflecting the status of real estate
taxes and other charges which are or may become a lien upon the Mortgaged Property,
and the status of hazard and flood insurance coverage, and shall obtain, from time to
time, all bills for the payment of such charges that are part of Escrow Payments

(including renewal premiums) and shall effect payment thereof prior to the applicable loss of discount, penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage. The Servicer assumes full responsibility for the timely payment of all such bills and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments.

With respect to each first lien Mortgage Loan that does not provide for Escrow Payments, the Servicer shall monitor to ensure that any such payments are made by the Mortgagor. The Servicer shall make Servicing Advances to effect such payments, as commercially reasonable, within the time period required to avoid additional penalties and interest, and no later than the time required to avoid the loss of the related Mortgaged Property by foreclosure from a tax or other lien. Servicer will charge the Mortgagor for such penalties and interest associated with such past due amounts paid by Servicer in connection with the Mortgaged Property. Servicer may, at Servicer's discretion and in accordance with Applicable Law and Accepted Servicing Practices, establish an Escrow Account for any Mortgagor that fails to pay real estate taxes, flood or hazard insurance on the Mortgaged property in a timely manner.

With respect to each second lien Mortgage Loan, the Servicer shall not be required to collect any Escrow Payments and shall not be responsible for monitoring or paying any taxes, flood or hazard insurance, or other amounts constituting Escrow Payments.

Section 2.09. Protection of Accounts

The Custodial Accounts and Escrow Accounts for the Mortgage Loans and REO Properties will be held by the Servicer at a Qualified Depository. The Servicer may transfer the Custodial Accounts or the Escrow Accounts to a different Qualified Depository from time to time. Such transfer shall be made only upon reasonable advance notice to the Owner.

Amounts on deposit in the Custodial Accounts may at the option of the Servicer be invested in Eligible Investments. Any such Eligible Investment shall mature no later than one day prior to the Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable, in each month; provided, however, that if such Eligible Investment is an obligation of a Qualified Depository (other than the Servicer) that maintains the Custodial Account, then such Eligible Investment may mature on the related Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable. Any losses incurred in respect of any such investment shall be deposited in the Custodial Account, by the Servicer out of its own funds prior to the next Portfolio Loan Remittance Date or Agency Loan Remittance Date, as applicable.

All suspense and clearing accounts in which funds relating to the Mortgage Loans and REO Properties are deposited shall be established with a Qualified Depository, in a manner which shall provide maximum available insurance thereunder.

Section 2.10.  Maintenance of Hazard and Flood Insurance

The Servicer shall cause to be maintained (a) for each first lien Portfolio Loan, hazard insurance such that all buildings upon the Mortgaged Property are insured by a generally acceptable insurer acceptable under the Fannie Mae Guides against loss by fire, hazards of extended coverage and such other hazards as are required to be insured pursuant to the Fannie Mae Guides, in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such first lien Mortgage Loan or (ii) the outstanding principal balance of the first lien Mortgage Loan provided that such amount represents at least 80% of the insurable value of the Mortgaged Property and (b) for each Agency Loan, hazard insurance coverage as required under the terms of the applicable Agency Guide.  If a Mortgaged Property is not covered by hazard insurance or is covered in an amount less than the amount required, the Servicer shall notify the related Mortgagor in accordance with Accepted Servicing Practices that the Mortgagor must obtain such insurance coverage, and if said Mortgagor fails to obtain the required insurance coverage after such notification, the Servicer shall force place insurance on the Mortgagor's behalf within the time permitted by Applicable Law and Accepted Servicing Practices.

The Servicer shall cause to be maintained  (a) for each first lien Portfolio Loan secured by a Mortgaged Property located in a special flood hazard area (where flood insurance is available, and where the originator or prior servicer maintained, such flood insurance), a flood insurance policy with an insurance carrier acceptable under the Fannie Mae Guides in an amount representing coverage not less than the lesser of (i) the aggregate unpaid principal balance of the Mortgage Loan, (ii) maximum amount of insurance which is available under the Flood Act , and (iii) the full replacement value of the improvements which are part of such Mortgaged Property and (b) for each Agency Loan secured by a Mortgaged Property located in a special flood hazard area (where flood insurance is available, and where the originator or prior servicer maintained, such flood insurance), flood insurance coverage as required under the terms of the applicable Agency Guide.  If a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Act, the Servicer shall notify the related Mortgagor in accordance with Accepted Servicing Practices that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage after such notification, the Servicer shall force place flood insurance on the Mortgagor's behalf within the time permitted by Applicable Law and Accepted Servicing Practices.

All policies required hereunder shall name the Servicer and its successors and assigns as a mortgagee and loss payee and shall be endorsed with non contributory standard or New York mortgagee clauses which shall provide for at least 30 days prior written notice of any cancellation, reduction in amount or material change in coverage.

The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting a insurance carrier or agent, provided, however, that the Servicer shall not accept any insurance policies from insurance companies unless such companies are acceptable (a) for Portfolio Loans, in accordance with the Fannie Mae Guides or (b) for Agency Loans, in accordance with the applicable Agency Guide. The Servicer shall determine that such policies provide sufficient coverage in amounts as required pursuant to the applicable guide.

Any amounts collected by the Servicer under any such policies (other than amounts to be deposited in a suspense account and applied to the restoration or repair of the related Mortgaged Property, or to be released to the Mortgagor, in accordance with the Servicer's normal servicing procedures as specified in Section 2.15) shall be deposited in the Custodial Account pursuant to Section 2.04, subject to withdrawal pursuant to Section 2.05.

With respect to each subordinate lien Mortgage Loan, including HELOC Loans, the Servicer shall obtain and maintain the blanket hazard insurance and flood policy described in Section 2.11.

Section 2.11.    Maintenance of Blanket Hazard Insurance Coverage

In the event that the Servicer shall obtain and maintain a blanket policy insuring against losses arising from fire, hazards and flood covered under extended coverage on all of the Mortgage Loans, then, to the extent such policy complies with all of the requirements of Section 2.10 relating to hazard insurance, the Servicer shall conclusively be deemed to have satisfied its obligations as set forth in Section 2.10 to maintain such hazard and flood insurance. Any amounts collected by the Servicer under any such blanket policy relating to a Mortgage Loan shall be deposited in the applicable Custodial Account as provided in Section 2.04, subject to withdrawal as provided in Section 2.05. Such policy may contain a deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property an individual policy complying with Section 2.10, and there shall have been a loss which would have been covered by such individual policy, the Servicer shall deposit in the applicable Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause, such amount to be deposited from the Servicer's funds, without reimbursement therefore.

Section 2.12.    Maintenance of PMI Policies

With respect to each Mortgage Loan subject to a PMI Policy or LPMI Policy on the related Transfer Date, the Servicer shall maintain or cause the Mortgagor to maintain (to the extent that the Mortgage Loan Documents require the Mortgagor to maintain such insurance) in full force and effect such PMI Policy or LMPI Policy, and shall pay or shall cause the Mortgagor to pay their Escrow Payments relating thereto, on a timely basis. In connection with any assumption or substitution agreements entered into

or to be entered into with respect to a Mortgage Loan, the Servicer shall promptly notify the insurer under the related PMI Policy or LPMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such PMI Policy or LPMI Policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under such PMI Policy or LPMI Policy.

The Servicer shall comply with all provisions of Applicable Law relating to the cancellation of, or collection of premiums with respect to, PMI Policies, including, but not limited to, the provisions of the Homeowners Protection Act of 1998, and all regulations promulgated thereunder, as amended from time to time. The Servicer shall be obligated to make premium payments with respect to PMI Policies required to be maintained by the Mortgagor, if the Mortgagor is required but fails to pay any Escrow Payments, which shall be paid from the Escrow Account.

With respect to each Mortgage Loan covered by a PMI Policy or LPMI Policy, the Servicer shall take all such actions on behalf of the Owner as are necessary to service, maintain and administer the related Mortgage Loan in accordance with such policy and to enforce the rights under such policy. Except as expressly set forth herein, the Servicer shall have full authority on behalf of the Owner to do anything it deems appropriate or desirable in connection with the servicing, maintenance and administration of such policy; provided that the Servicer shall not take any action with respect to such Mortgage Loan which would result in non-coverage under such LPMI Policy or PMI Policy of any loss which, but for actions of the Servicer, would have been covered thereunder. The Servicer shall cooperate with the PMI Policy or LPMI Policy insurers and shall furnish all reasonable evidence and information in the possession of the Servicer to which the Servicer has access with respect to the related Mortgage Loan.

The Servicer agrees to prepare and present, on behalf of itself and the Owner, claims to the insurer under any PMI Policy or LPMI Policy in a timely fashion in accordance with the terms of such PMI Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any PMI Policy or LPMI Policy respecting a defaulted Mortgage Loan.

Section 2.13.   Maintenance of Fidelity Bond and Errors and Omissions Insurance

The Servicer shall maintain, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds, money, documents or papers relating to the Mortgage Loans and REO Properties ("Servicer Employees"). Any such fidelity bond and errors and omissions insurance policy shall be in the form of the mortgage banker's blanket bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Servicer Employees. No provision of this Section 2.13 requiring such fidelity bond and errors and omissions insurance policy shall relieve the Servicer from its duties and obligations as set forth in this Agreement. The Servicer shall maintain minimum coverage amounts under any such fidelity bond and

errors and omissions insurance policy as acceptable to the Agency. The Servicer shall
provide proof of such coverage upon written request by Owner.

Section 2.14.  Inspections

Regarding Mortgage Loans in a first lien position, the Servicer shall
perform inspections of the Mortgaged Property as required by Accepted Servicing
Practices. Regarding subordinate lien Mortgage Loans, the Servicer shall have no
obligation to perform inspections.

Section 2.15.  Restoration of Mortgaged Property

The Servicer shall release to the Mortgagor any Insurance Proceeds to be
applied to the restoration or repair of the Mortgaged Property or any Condemnation
Proceeds in accordance with (a) for Portfolio Loans and REO properties, the Fannie Mae
Guide and (b) for Agency Loans, the applicable Agency Guide.

Section 2.16.  Title, Management and Disposition of REO Property

(a)     In the event that title to any Mortgaged Property securing a Portfolio Loan
is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale
shall be taken in the name of the Owner.

The Servicer, either itself or through an agent selected by the Servicer,
shall manage, protect and market for sale each REO Property for the Owner for the
purpose of securing its prompt disposition and sale. The disposition of REO Property
shall be carried out by the Servicer in accordance with the terms of the Approval Matrix.

The Servicer shall use commercially reasonable efforts to dispose of each
REO Property as soon as possible and shall sell such REO Property in any event within
one year after title has been taken to such REO Property, unless the Servicer determines
that a longer period is necessary for the orderly liquidation of such REO Property.

The Servicer shall maintain on each REO Property fire and hazard
insurance with extended coverage in an amount which is at least equal to the maximum
insurable value of the improvements which are a part of such property, liability insurance
and, to the extent required and available under the Flood Act, flood insurance.

(b)     In the event that title to any Mortgaged Property securing an Agency Loan
is acquired in foreclosure or by deed in lieu of foreclosure, the Servicer shall take title
and manage such property in accordance with the applicable Agency Guide.

Section 2.17.  Notification of Adjustments

With respect to each Adjustable Rate Mortgage Loan, the Servicer shall
adjust the Mortgage Interest Rate on the related Interest Rate Adjustment Date in

compliance with the requirements of the related Mortgage Note and Applicable Law.
The Servicer shall deliver any and all notices required under Applicable Law and the
terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate
and the Monthly Payment adjustments. The Servicer shall promptly upon written request
thereof, deliver to the Owner any applicable data regarding such adjustments and the
methods used to calculate and implement such adjustments. In connection with any
Forbearance entered into pursuant to Section 2.01(i), the Servicer may waive any
Mortgage Interest Rate or Monthly Payment adjustments provided such waiver
corresponds with the attached Approval Matrix.

Section 2.18.    Non-Recoverable Advances

Notwithstanding anything to the contrary in this Agreement, if the
Servicer determines a Servicing Advance may be a Non-recoverable Advance, the
Servicer shall have no obligation to make such Servicing Advance.

Section 2.19.    Servicing Changes

If, following the date of this Agreement, Owner shall propose to (a)
amend, supplement, discontinue or introduce any Program Form; and/or (b) alter, amend
or supplement the servicing activities (any such amendment, supplement, discontinuation,
introduction or other alteration being herein referred to as a "Servicing Change"), the
Owner shall provide written notice of each such proposed Servicing Change to the
Servicer by providing (i) a specimen of each Program Form proposed to be amended,
supplemented or introduced, in the form in which it is proposed to be amended,
supplemented or introduced; and/or (ii) a written description of each proposed
amendment, supplement or other alteration to the servicing activities, which description
shall in each case be sufficiently clear, comprehensive and detailed to provide a
reasonable basis for the training of individuals who would be required to follow the
procedures described thereby (such written notice, as accompanied by the items described
in clauses (i) and (ii), is referred to herein as a "Servicing Change Proposal").

Upon receipt of a Servicing Change Proposal, the Servicer shall deliver a
written response either (a) accepting such Servicing Change Proposal, in which case the
Servicing Change shall become effective on the date that Servicer, in its reasonable
discretion, is able to implement the Servicing Change, or (b) reject such Servicing
Change Proposal, which rejection shall include the reasons for such rejection set forth in
reasonable detail.   No Servicing Change shall become effective unless and until all
terms, including the cost thereof, are agreed upon in writing by both Parties.

If, following the date of this Agreement, a change in Applicable Law or
investor requirements, including Fannie Mae, Freddie Mac or Ginnie Mae requirements,
increases the Servicer's cost to service or otherwise negatively affects the Servicer's
economics from that contained on the Pricing Exhibit, in each case determined by
Servicer in its reasonable discretion, the Servicer may increase the pricing payable by
Owner hereunder in an amount reasonably necessary to address such change in