Hearing Date: July 24, 2012 at 10:00 a.m. (ET)
Objection Deadline Date: July 17, 2012 at 4:00 p.m. (ET)

NICHOLS KASTER, PLLP
Kai H. Richter (admitted *pro hac vice*)
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870
E-Mail:  krichter@nka.com

NICHOLS KASTER, LLP
Robert L. Schug (*pro hac vice* pending)
One Embarcadero Center
Suite 720
San Francisco, CA 94111
Telephone: (415) 277-7235
Fax: (415) 277-7238
E-Mail: rschug@nka.com

*Bankruptcy Counsel for Christina Ulbrich
and the Putative Class Members*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------X

| | |
|---|---|
| **In re:** | : |
| | : **Chapter 11** |
| **Residential Capital, LLC, *et al*.,** | : |
| | : **Case No. 12-12020 (MG)** |
| **Debtors.** | : |
| | : **Jointly Administered** |

--------------------------------------------------------X

**MEMORANDUM IN SUPPORT OF MOTION OF CHRISTINA ULBRICH FOR
<u>RELIEF FROM AUTOMATIC STAY AS TO GMAC MORTGAGE, LLC</u>**

# TABLE OF CONTENTS

**INTRODUCTION**........................................................................................................................1
**FACTUAL AND PROCEDURAL BACKGROUND** ...............................................................1
   I.   PLAINTIFFS' CLAIMS.................................................................................................1
         A.  Origination of Plaintiff's Mortgage Loan ...............................................................2
         B.  GMAC Repeatedly Purchases Backdated Insurance for Plaintiff's Property ...........2
              1.  Backdated (and Duplicative) Hazard Insurance ..........................................2
              2.  Backdated Wind Insurance...........................................................................3
              3.  Backdated (and Duplicative) Flood Insurance ............................................6
         C.  Grudging Cancellation of Certain Policies in Response to Persistent Complaints ...7
   II.   CASE STATUS ..............................................................................................................8
         A.  The Ulbrich Standstill Agreement...........................................................................8
         B.  Motion Practice .......................................................................................................8
         C.  The Automatic Stay.................................................................................................9
         D.  Discovery.................................................................................................................9
**ARGUMENT**..............................................................................................................................10
   I.   LEGAL STANDARD...................................................................................................10
   II.   THE RELEVANT CIRCUMSTANCES WEIGH IN FAVOR OF LIFTING THE
       AUTOMATIC STAY ..................................................................................................11
         A.  No Interference with the Bankruptcy Case............................................................11
         B.  The Impact of the Stay and Balancing of Harms Weighs in Favor of Relief from the
             Stay .......................................................................................................................12
         C.  Judicial Economy; Judge Scola Has Experience with Similar Cases ....................12
**CONCLUSION** ........................................................................................................................13

# TABLE OF AUTHORITIES

**CASES**

*In re Keene Corp.*, 171 B.R. 180 (Bankr. S.D.N.Y. 1994) ............................................................. 11

*In re Sonnax Indus., Inc.*, 907 F.2d 1280 (2d Cir. 1990) ......................................................... 10, 11

*In re Taub*, 413 B.R. 55 (Bankr. E.D.N.Y. 2009) ......................................................................... 11

*In re The SCO Group, Inc.*, 395 B.R. 852 (Bankr. D. Del. 2007) .......................................... 10, 13

*In re Touloumis*, 170 B.R. 825 (Bankr. S.D.N.Y. 1994) .............................................................. 11

*In re Wiley*, 288 B.R. 818 (8th Cir. 2003) .................................................................................... 11

*Williams v. Wells Fargo Bank., N.A.*, 2012 WL 566067 (S.D. Fla. Feb. 21, 2012) ...................... 12

**STATUTES**

11 U.S.C. § 362(a)(1) .................................................................................................................... 10

11 U.S.C. § 362(d)(1) .................................................................................................................... 10

11 U.S.C. § 362(g)(2) .................................................................................................................... 10

**OTHER SECONDARY SOURCES**

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ......................................................................... 10

U.S. Code Cong. & Admin. News 1978 ....................................................................................... 10

# INTRODUCTION

Plaintiff Christina Ulbrich ("Plaintiff") seeks relief from the automatic stay to pursue her claims and the claims of the putative classes in the case captioned *Ulbrich v. GMAC Mortgage, LLC et al.*, Civ. No. 11-cv-62424-RNS, currently pending in the United States District Court for the Southern District of Florida. Allowing Plaintiff to liquidate her claims in the Southern District will have no significant prejudicial impact on GMAC or this bankruptcy case. On the other hand, taking away Plaintiff's ability to pursue her case in her chosen forum would risk irreparable harm to numerous borrowers who may be, or already have been, threatened with foreclosure by GMAC and its affiliates. Lifting the stay also would serve judicial economy in light of the fact that the presiding judge in the matter, the Honorable Robert N. Scola, has gained expertise on the issues presented by Plaintiff's case through his work on a similar matter pending in the Southern District of Florida. Considering all of the relevant factors and the particular factual circumstances of Plaintiff's case, Plaintiff's motion should be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.     PLAINTIFFS' CLAIMS**

On November 14, 2011, Plaintiff Christina Ulbrich filed a putative class action lawsuit against Defendants GMAC Mortgage, LLC ("GMAC") and Balboa Insurance Services, Inc. ("Balboa") in the United States District Court for the Southern District of Florida. Plaintiffs' claims arise out of GMAC's unlawful practice of purchasing backdated force-placed insurance coverage for Plaintiff and other customers for periods that already have expired, and arranging for kickbacks or commissions from the insurance company that issued the policies. (*See generally* Richter Decl., Ex. A (Compl.).) Plaintiff's claims are brought on behalf of herself and the members of several putative classes for (1) breach of contract/breach of the covenant of good

1

faith and fair dealing; (2) unjust enrichment; (3) breach of fiduciary duty in connection with Plaintiff's escrow account; and (4) violation of the Florida Deceptive and Unfair Trade Practices Act. (*Id.*) A summary of Plaintiffs' allegations is set forth below.

### A.     Origination of Plaintiff's Mortgage Loan

On August 4, 2003, Plaintiff obtained a loan from GMAC Mortgage Corporation in the amount of $201,000, which was secured by a mortgage on her residential property in Fort Lauderdale, Florida. (*Id.* ¶ 1.) GMAC Mortgage, LLC is the successor-in-interest to GMAC Mortgage Corporation, and services the mortgage loan. (*Id.*) Paragraph 5 of the mortgage states that Plaintiff is obligated keep the improvements on the property insured against loss by fire and other hazards "for which Lender requires insurance[.]" (*Id.* ¶ 2.) It further states that "[i]f borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense." (*Id.*) However, it does ***not*** state that GMAC may purchase backdated insurance coverage, and does not state that GMAC may arrange for commissions for itself or its affiliates in connection with lender-placed coverage. (*Id.*)

### B.     GMAC Repeatedly Purchases Backdated Insurance for Plaintiff's Property

#### 1.     Backdated (and Duplicative) Hazard Insurance

As of July 6, 2010, Plaintiff maintained $254,800 worth of hazard insurance coverage on her property through Nationwide Insurance, which was effective through July 6, 2011. (*Id.* ¶ 3.) GMAC was listed as a beneficiary under this policy, and received a copy of the policy declarations page. (*Id.*)

In spite of this hazard insurance coverage, GMAC sent Plaintiff a form letter ("Initial Hazard Insurance Letter") on or about January 3, 2011, falsely claiming that there was "no evidence of current hazard insurance coverage" on the Property. (*Id.* ¶ 4.) This Initial Hazard

2

Insurance Letter further stated: "In order to prevent us from purchasing lender-placed hazard insurance coverage on your property, we must be provided with evidence of insurance coverage with an effective date of 07/06/2010." (*Id.*)

On around February 17, 2011, GMAC sent Plaintiff a second form letter ("Second Hazard Insurance Letter"), falsely reasserting that there was "no evidence of a hazard insurance policy in effect for the above property[.]" (*Id.* ¶ 5.) In this Second Hazard Insurance Letter, GMAC further stated:

> Since we have not received evidence of hazard coverage, we will secure hazard insurance coverage, also known as lender-placed hazard insurance. This coverage will provide protection to us for loss to your dwelling up to a limit of $254,800.00 with a deductible of $1,000.
> * * *
> The effective date of this coverage will be 07/06/2010. You are responsible for reimbursing us for the cost of this coverage in the amount of $12,786.64[.]

(*Id.*) The amount demanded by GMAC for this force-paced coverage ($12,786.64) was ***more than 14 times the premium*** for Plaintiff's existing hazard insurance policy ($892.41). (*Id.*)

### 2. **Backdated Wind Insurance**

Plaintiff's Mortgage does not require her to carry wind insurance, and GMAC did not require her to carry wind insurance when she entered into her Mortgage. (*Id.* ¶ 7.) In fact, shortly before Plaintiff refinanced with GMAC and entered into this Mortgage, a GMAC representative explicitly stated that Plaintiff did not have to carry wind coverage. (*Id.*)

More than seven years later, however, GMAC suddenly claimed that Plaintiff was required to maintain wind insurance on her Property. (*Id.* ¶ 8.) On or about December 19, 2010, GMAC sent Plaintiff a form letter ("Initial Windstorm Letter"), which stated:

3

> This notice is to advise you that your hazard policy[1] furnished to us does not include windstorm (hurricane) and hail coverage. Insurance coverage against the perils of "windstorm and hail" is a requirement under the terms of your mortgage/deed of trust.

(*Id.* ¶ 9.) This Initial Windstorm Letter further informed Plaintiff that if she did not provide "proof of acceptable insurance coverage," GMAC would purchase $277,871 worth of wind insurance coverage for her at a premium cost of $9,708.12. (*Id.*)

On or about February 2, 2011, GMAC sent Plaintiff a second form letter relating to wind insurance ("Second Windstorm Letter"). (*Id.* ¶ 10.) This Second Windstorm Letter reasserted that Plaintiff was required to obtain windstorm insurance for her Property, and renewed GMAC's threat to force-place windstorm coverage on her Property if she did not obtain such coverage on her own. (*Id.*)

On March 23, 2011, GMAC sent Plaintiff a third form letter, entitled "Notice of Windstorm Coverage Placement." (*Id.* ¶ 11.) In the Notice of Windstorm Coverage Placement, GMAC informed Plaintiff that it had purchased $277,871 worth of windstorm coverage through Balboa at a premium cost of $9,708.12. (*Id.*) ***This force-placed windstorm coverage was backdated more than 17 months*** to reflect an effective policy period of October 1, 2009 through October 1, 2010. (*Id.*) As a result, ***the windstorm policy had fully expired nearly five months before GMAC purchased it***. (*Id.*) GMAC and/or its affiliates received a kickback or commission from Balboa on this force-placed policy.[2] (*Id.* ¶ 12.)

---

[1] GMAC's reference to Plaintiff's hazard policy in the Initial Windstorm Letter belies its statement in the Initial Hazard Letter (just two weeks later) that "we have no evidence of current hazard insurance coverage on your property."

[2] The commission arrangements between major banks and insurance companies that issue force-placed coverage (including Balboa) have been reported in an award-winning investigative article. *See* Jeff Horwitz, Ties to Insurers Could Land Mortgage Servicers in More Trouble, AMERICAN BANKER, Nov. 10, 2010, *available at*

4

On the very same day that GMAC sent Plaintiff the Notice of Windstorm Coverage Placement (March 23, 2011), it sent her a "Windstorm Insurance Renewal Notice." (*Id.* ¶ 13.) In the Windstorm Insurance Renewal Notice, GMAC stated that "the windstorm insurance coverage we placed on your account has expired." (*Id.*) GMAC further stated that "the windstorm coverage will be renewed if a replacement windstorm policy is not received."[3] (*Id.*)

Approximately one month later, on April 27, 2011, GMAC sent Plaintiff a second Notice of Windstorm Coverage Placement ("Second Notice of Windstorm Coverage Placement"). (*Id.* ¶ 14.) This Second Notice of Windstorm Coverage Placement informed Plaintiff that GMAC had force-placed a second windstorm policy through Balboa, which provided $276,889 worth of coverage at a premium cost of $9,673.80. (*Id.*) This coverage was ***backdated more than six months***, showing an effective policy period of October 1, 2010, through October 1, 2011. (*Id.*) Notably, the effective date of this policy predates GMAC's first letter to Plaintiff alleging her wind coverage was insufficient by more than two months. (*Id.*) GMAC and/or its affiliates also received a kickback or commission from Balboa on this lender-placed policy. (*Id.* ¶ 15.)

The premiums for these backdated windstorm policies were charged to Plaintiff's mortgage escrow account on March 22, 2011 and April 26, 2011. (*Id.* ¶ 16.) Prior to this time, Plaintiff's monthly mortgage payment was $1,227.52 (including $1,141.26 in principal and interest and $86.26 in escrows). (*Id.*) However, after these charges for force-placed windstorm insurance posted to her account, her monthly payment more than doubled to $2,695.59 (still

---

http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?nopagination=1&zkPrintable=1.

[3] According to this Windstorm Insurance Renewal Notice, there are many "disadvantages" to such force-placed insurance coverage, including the fact that such coverage is "substantially more expensive" than typical policies.

5

reflecting $1,141.26 in principal and interest, but now reflecting $1,554.33 in monthly escrow charges).[4] (*Id.*)

This severe increase in Plaintiff's monthly mortgage payments has placed a crushing financial burden on her. (*Id.* ¶ 17.) As of Plaintiff's February 2011 statement, she was current on her mortgage and capable of meeting her monthly payment obligation. (*Id.*) However, after these charges posted to her account, she was unable to meet the increased payment amount, and GMAC refused to accept payments from her for less than the full payment amount.[5] (*Id.*) GMAC then threatened to foreclose on her Property.[6] (*Id.*)

### 3. Backdated (and Duplicative) Flood Insurance

Shortly after GMAC force-placed this backdated windstorm insurance on Plaintiff's Property, it also purchased backdated flood insurance for Plaintiff's property, even though she already had flood insurance coverage. (*Id.* ¶ 18.) As of April 28, 2011, Plaintiff had $250,000 worth of flood insurance coverage on her property. (*Id.* ¶ 19.) This is the maximum amount of coverage available under the National Flood Insurance program for single family homes such as Plaintiff's residence. (*Id.*) GMAC was listed as a beneficiary under this flood insurance policy, and received a copy of the policy declarations page. (*Id.* ¶ 20.)

---

[4] In order to avoid further charges for force-placed windstorm insurance, Plaintiff has now purchased her own windstorm insurance policy for her Property, even though this coverage was not required when she took out her mortgage.

[5] Plaintiff increased her mortgage payment from $1,227.52 to $1,957.45 in May of 2011 (the amount demanded by GMAC after the charge for the first windstorm policy posted to her account). However, she was unable to increase her mortgage payment to $2,695.59 after the charge for the second windstorm policy posted to her account. Although she attempted to pay her normal mortgage payment, GMAC rejected her payment because it did not include the additional escrow amount.

[6] As set forth in more detail herein, Plaintiff and GMAC have since agreed to a standstill, temporarily resolving the foreclosure issue.

6

In spite of this flood coverage, GMAC sent Plaintiff a form letter ("Initial Flood Insurance Letter") on or about May 11, 2011, falsely claiming that "[o]ur loan file does not contain evidence of flood insurance in force on your property." (*Id.* ¶ 21.) In this Initial Flood Insurance Letter, GMAC threatened to purchase a lender-placed flood insurance policy for Plaintiff if she did not provide "evidence that a flood insurance policy is in effect[.]" (*Id.*)

The following month, on June 30, 2011, GMAC sent Plaintiff a "Notice of Flood Insurance Placement," indicating that GMAC had purchased $250,000 worth of flood insurance coverage through Southwest Business Corporation at a premium cost of $4,274.50. (*Id.* ¶ 22.) This duplicative coverage was backdated to April 28, 2011 (the effective date of Plaintiff's already-existing flood insurance policy). (*Id.*) The amount demanded by GMAC for this force-paced coverage ($4,274.50) was **more than 7 times the premium** for Plaintiff's existing flood insurance policy ($577.00). (*Id.*) GMAC and/or its affiliates also received a kickback or commission on this force-placed flood insurance policy. (*Id.* ¶ 23.)

Plaintiff's escrow account was charged $4,274.50 for this force-placed flood insurance. (*Id.* ¶ 24.) As a result, GMAC increased Plaintiff's mortgage payment, in August 2011, to $4,780.45 per month (still reflecting $1,141.26 in principal and interest, but now reflecting $3,639.19 in monthly escrow charges).[7] (*Id.*) This payment amount is approximately **three times** the amount that Plaintiff was required to pay in February 2011, and the escrow portion of the payment ($3,639.19) is **more than 40 times** the previous escrow amount. (*Id.*)

C.     **Grudging Cancellation of Certain Policies in Response to Persistent Complaints**

Plaintiff attempted to address this situation herself by contacting GMAC on numerous occasions. (*Id.* ¶ 25.) However, her concerns fell on deaf ears. On September 8, 2011, a

---

[7] On the same statement, GMAC claimed an alleged escrow shortage of -$22,926.49.

7

representative from Plaintiff's insurance agency (The Sena Group) also contacted GMAC in an effort to address the situation. (*Id.* ¶ 26.) In response, a GMAC representative claimed that lender-placed insurance had been purchased for Plaintiff's Property because she refinanced her mortgage in December 2010. (*Id.*) This representation was false. (*Id.*) Plaintiff did not refinance her mortgage in December 2010, and has not refinanced since she entered into her Mortgage with GMAC in August 2003. (*Id.*)

The following day, on September 9, 2011, The Sena Group wrote a letter to GMAC in another attempt to "help get the insurance records corrected at GMAC." (*Id.* ¶ 27.) Shortly thereafter, GMAC cancelled the force-placed flood insurance policy on September 15, 2011, and cancelled the first force-placed windstorm policy on September 22, 2011. (*Id.*) However, it still has not refunded any portion of the second backdated windstorm policy.

## II.    CASE STATUS

### A.    The Ulbrich Standstill Agreement

In early 2012, Plaintiff and GMAC entered into a Standstill Agreement to address the servicing of Plaintiff's mortgage loan during the pendency of her lawsuit. (Richter Decl., Ex. B (Agreement).) The agreement provides, among other things, that GMAC will not treat Plaintiff's loan as being in default, and will not take any action to foreclose on Plaintiff's property while the action is pending. (*Id.*) To counsel's knowledge, GMAC has not entered into a standstill agreement with regard to the mortgage loans of the members of the putative classes.

### B.    Motion Practice

On January 13, 2012, GMAC filed a motion to compel arbitration and for a stay or, in the alternative, to dismiss the Complaint and otherwise strike the jury demand. (Richter Decl. ¶ 4.) Balboa also filed a motion to dismiss. (*Id.*) On April 2, 2012, GMAC filed a motion to stay

8

discovery pending the district court's rulings. (*Id.*) All outstanding motions have been briefed. (*Id.*) However, as of the date of this motion, no decisions have been issued by the court. (*Id.*)

### C. The Automatic Stay

On May 17, 2012, GMAC filed a Notice of Bankruptcy and Effect of Automatic Stay. (*Id.* ¶ 7.) On May 18, 2012, the district court issued an order staying the case as it pertains to GMAC. (*Id.*) The court ordered the remaining parties to confer and inform the court of their positions as to whether the case should proceed against Balboa despite the stay as to GMAC, or whether the matter should be stayed in its entirety. (*Id.*) On May 23, 2012, Plaintiff and Balboa jointly advised the court that the case could proceed against Balboa, despite the stay as to GMAC. (*Id.*) However, in the joint submission, Balboa noted its view that it would be more costly and less efficient to continue the litigation without GMAC. (*Id.*)

### D. Discovery

In early 2012, Plaintiff conferred with GMAC and Balboa pursuant to Fed. R. Civ. P. 26(f), and submitted a Joint Discovery Plan and Conference Report. (Richter Decl. ¶ 5.) The district court issued a scheduling order on March 9, 2012. (*Id.*) Fact discovery is scheduled to be completed by November 14, 2012, and dispositive motions are to be filed by November 29, 2012. (*Id.*) The case is set for a two-week trial period beginning March 25, 2013. (*Id.*) Plaintiff has served discovery on GMAC and Balboa, and Balboa has responded. (*Id.*) Plaintiff has not been able to make further progress with discovery as to GMAC because of the imposition of the bankruptcy stay.

# ARGUMENT

## I. LEGAL STANDARD

The automatic stay set forth in § 362(a) of the Bankruptcy Code stays the continuation of actions against the debtor that were, or could have been, brought before the commencement of the bankruptcy proceedings. 11 U.S.C. § 362(a)(1). However, as Congress has stated:

> It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from duties that may be handled elsewhere.

*In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess., 341 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6297). After notice and a hearing, a party in interest may obtain relief from the stay "for cause." 11 U.S.C. § 362(d)(1). "The burden of proof on a motion to lift or modify the automatic stay is a shifting one." *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990). The initial burden is on the movant. *Id.* The burden then shifts to the debtor for all other issues. 11 U.S.C. § 362(g)(2). The decision of whether to lift the stay is within the discretion of the bankruptcy judge, and may be overturned only for an abuse of discretion. *In re Sonnax*, 907 F.2d at 1286.

In *In re Sonnax*, the Second Circuit set forth twelve factors to be weighed in deciding whether litigation can continue despite the automatic stay.[8] *Id.* Only the relevant factors need to

---

[8] The factors are: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other

be considered, and all factors need not be assigned equal weight. *In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994). In deciding whether to lift a stay and allow a creditor to continue litigation in another forum, the bankruptcy court should consider the "particular circumstances" of the case, and ascertain what is just to the claimants, the debtor, and the estate. *In re Touloumis*, 170 B.R. 825, 828 (Bankr. S.D.N.Y. 1994).

## II.     THE RELEVANT CIRCUMSTANCES WEIGH IN FAVOR OF LIFTING THE AUTOMATIC STAY

The circumstances of this case weigh in favor of lifting the automatic bankruptcy stay to allow Plaintiff to pursue her claims, and the claims of the putative classes, in district court in the Southern District of Florida. Accordingly, Plaintiff's motion should be granted.

### A.     No Interference with the Bankruptcy Case

First, allowing Plaintiff to proceed in her home forum to liquidate her claims will not significantly prejudice GMAC, or interfere with the bankruptcy proceedings. *See In re Wiley*, 288 B.R. 818, 823 (8th Cir. 2003) ("The mere cost of defense . . . is ordinarily considered an insufficient basis for denying relief from the stay."). On the contrary, if Plaintiff is allowed to proceed as proposed, the resolution of the amount owed to Plaintiff and the classes will remove an obstacle to GMAC's pursuit of the confirmation of a Chapter 11 bankruptcy plan. *See e.g.*, *In re Taub*, 413 B.R. 55, 62-63 (Bankr. E.D.N.Y. 2009) ("This would resolve significant open issues in the Debtor's bankruptcy case, and would assist the Debtor in pursuing the confirmation of a Chapter 11 plan.").

---

proceeding; and (12) impact of the stay on the parties and the balance of harms. *In re Sonnax Indus.,* 907 F.2d at 1286.

### B. The Impact of the Stay and Balancing of Harms Weighs in Favor of Relief from the Stay

Second, any potential interference with the bankruptcy case is far outweighed by the potential for harm to Plaintiff and members of the putative classes she seeks to represent. As explained above, Plaintiff's monthly mortgage payments were severely increased due to GMAC's actions and the conduct alleged in the Complaint. (Richter Decl., Ex. A ¶ 17.) This placed a significant financial burden on her. (*Id.* ¶ 17.) Indeed, she was eventually unable to meet her increased payment amount, and GMAC threatened to foreclose. (*Id.*) Although Plaintiff has individually negotiated a standstill agreement under which GMAC will not take any action to foreclose on Plaintiff's property while the action is pending, (Richter Decl., Ex. B), the members of the putative classes have not had this opportunity. There are likely many other individuals who are being threatened with foreclosure by GMAC due to the conduct that Plaintiff seeks to correct. Thus, the stay should be lifted in order to allow for the immediate remedy of the potential harm that has been, and continues to be, caused by GMAC's conduct.

### C. Judicial Economy; Judge Scola Has Experience with Another Similar Case

Third, lifting the stay would further judicial economy. Plaintiff's case is assigned to the Honorable Robert N. Scola in the Southern District of Florida. (*See* Richter Decl., Ex. A) Judge Scola is currently assigned to another force-placed insurance case, *Williams v. Wells Fargo Bank, N.A. et al.*, Civ. No. 11-21233-RNS (S.D. Fla.). That case involves factual and legal issues that are similar, in some respects, to the issues raised in Plaintiff's case.

In *Williams*, the plaintiff filed a class action complaint asserting that the defendants "colluded in a scheme to artificially inflate the premiums charged to homeowners for force-placed insurance on property, after the homeowners self-placed insurance policies had lapsed." *Williams v. Wells Fargo Bank., N.A.*, 2012 WL 566067, at *1 (S.D. Fla. Feb. 21, 2012). The

12

plaintiff brought claims of unjust enrichment and breach of the covenant of good faith and fair-dealing, challenging "the alleged manipulation of the force-placed insurance process in general, the payment arrangement between Wells Fargo Bank and the other Defendants, and Wells Fargo Bank's participation in the overall scheme intended to provide illegal kickbacks and commissions to the entities involved." *Id.* The *Williams* litigation has advanced significantly—on February 21, 2012, Judge Scola granted the plaintiff's motion for class certification. *See id.*

Just as in the *Williams* case, Plaintiff here has filed a lawsuit in the Southern District of Florida challenging GMAC and Balboa's abuse of the force-placed insurance process, as well as the improper kickbacks at issue. Given the similarity between these two actions assigned to Judge Scola, it makes sense to lift the stay as to GMAC and allow Plaintiff to pursue her claims in the Southern District on behalf of herself and the classes of individuals that she seeks to represent. *See, e.g.*, *In re SCO Group, Inc.*, 395 B.R. 852, 860 (Bankr. D. Del. 2007) ("Debtors concede that it is unreasonable to expect this Court to spend a significant amount of time learning and resolving the Liability Issues when the District Court already has the knowledge required to adjudicate the Liability Issues. Moreover, to do so would be economically inefficient and unnecessarily time consuming.").

## CONCLUSION

For all of the reasons set forth herein, Plaintiff respectfully requests that this Court grant Plaintiff relief from the automatic stay to liquidate her claims and the claims of the putative classes in the case captioned *Ulbrich v. GMAC Mortgage, LLC et al.*, Civ. No. 11-cv-62424-RNS, in the United States District Court for the Southern District of Florida.

Dated:  July 3, 2012
Minneapolis, Minnesota

                        Respectfully Submitted,

                        **NICHOLS KASTER, LLP**

                        /s/ Kai Richter
                        Kai Richter, MN Bar No. 0296545*
                          *(admitted *pro hac vice*)
                        4600 IDS Center
                        80 South Eighth Street
                        Minneapolis, MN 55402
                        Telephone: (612) 256-3200
                        Fax: (612) 215-6870
                        E-Mail: krichter@nka.com

                        *Bankruptcy Counsel for Christina Ulbrich*
                        *and the Putative Class Members*