

AlaFile E-Notice

57-CV-2008-000362.00

Judge: ALBERT L JOHNSON

To:  WOOTEN NICHOLAS HEATH
nhwooten@gmail.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL
57-CV-2008-000362.00

The following matter was FILED on 1/13/2011 5:42:27 PM

**C001 HORACE PHYLLIS**
MOTION FOR OTHER
[Attorney: DICKSON NATHAN ANDREW II]

Notice Date:     1/13/2011 5:42:27 PM

KATHY S. COULTER
CIRCUIT COURT CLERK
RUSSELL COUNTY, ALABAMA
RUSSELL COUNTY JUDICIAL CENTER
PHENIX CITY, AL 36867

334-298-0516
kathy.coulter@alacourt.gov

**STATE OF ALABAMA**
Unified Judicial System

Revised 3/5/08

Cas...

ELECTRONICALLY FILED

57-RUSSELL

☐ District Court   ☑ Circuit Court

CV20...

CIRCUIT COURT OF
RUSSELL COUNTY, ALABAMA
KATHY S. COULTER, CLERK

---

PHYLLIS HORACE  VS.  LASALLE BANK
NATIONAL ASSOCIATION, ET AL

**CIVIL MOTION COVER SHEET**

Name of Filing Party: C001 - HORACE PHYLLIS

---

Name, Address, and Telephone No. of Attorney or Party. If Not Represented.

NATHAN A. DICKSON

POST OFFICE BOX 350
UNION SPRINGS, AL 36089

Attorney Bar No.:  DIC031

☐ Oral Arguments Requested

---

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative Summary Judgment($50.00) | ☐ Continue |
| | ☐ Deposition |
| ☐ Renewed Dispositive Motion(Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Designate a Mediator |
| | ☐ Judgment as a Matter of Law (during Trial) |
| | ☐ Disburse Funds |
| ☐ Summary Judgment pursuant to Rule 56($50.00) | ☐ Extension of Time |
| | ☐ In Limine |
| ☐ Motion to Intervene ($297.00) | ☐ Joinder |
| | ☐ More Definite Statement |
| ☑ Other    Summary Judgment | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| pursuant to Rule  56           ($50.00) | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| _____ | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| ☐ Local Court Costs $ | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| | ☐ Other _____ |
| | pursuant to Rule            (Subject to Filing Fee) |

---

| Check here if you have filed  or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees)  ☐ | Date:  1/13/2011 5:41:48 PM | Signature of Attorney or Party:  /s NATHAN A. DICKSON |

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

ELECTRONICALLY FILED
PM
CV-2008-000362.00
CIRCUIT COURT OF
RUSSELL COUNTY, ALABAMA
KATHY S. COULTER, CLERK

## IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

| | |
|---|---|
| PHYLLIS HORACE, ) | |
| ) | |
|        Plaintiff, ) | |
| ) | |
| vs. ) | **CASE NUMBER:** |
| ) | **CV-08-362** |
| LASALLE BANK NATIONAL ) | |
| ASSOCIATION, AS TRUSTEE FOR ) | |
| CERTIFICATE HOLDERS OF BEAR ) | |
| STEARNS ASSET BACKED SECURITIES ) | |
| I LLC, ASSET BACKED CERTIFICATES, ) | |
| SERIES 2006-EC2; BEAR STEARNS ) | |
| ASSET BACKED SECURITIES I LLC, ) | |
| ASSET BACKED CERTIFICATES, SERIES ) | |
| 2006-EC2; MORTGAGE ELECTRONIC ) | |
| REGISTRATION SYSTEMS, INC.; ENCORE ) | |
| CREDIT CORPORATION; EMC MORTGAGE) | |
| COMPANY; BANK OF AMERICA, et al., ) | |
| ) | |
|        Defendants. ) | |

## PLAINTIFF PHYLLIS HORACE'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE ALABAMA RULES OF CIVIL PROCEDURE AND RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes now Phyllis Horace and moves this Honorable Court for an Order granting summary judgment in her favor as set forth in her motion and supporting brief as follows:

### SUMMARY JUDGMENT IS APPROPRIATE IN THIS CASE

The plaintiff moves pursuant to Rule 56 for summary judgment in this matter on her claims of wrongful foreclosure against the Defendant Trust designated as "LaSalle Bank National Association, as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2". The Plaintiff asserts that Summary Judgment is proper under the law and facts and prays that after

consideration of her motion, her evidentiary submissions and her brief that the Court will enter a Summary Judgment in her favor finding that the Defendant trust has no interest in her promissory note and no ability to foreclose and further finding that the Trust's institution of foreclosure against her was wrongful and further enjoining the Trust from prosecuting a foreclosure against her in this case. The Plaintiff feels it important to note that her claims and her motion do not seek to obviate the underlying promissory note but is in the nature of a claim against a stranger to her mortgage loan who seeks to foreclose upon her property under false and fraudulent pretenses. Under the Plaintiff's theory of the case it is clear that the Trust is a stranger to her mortgage loan and that success upon her claim against the Trust will not defeat the right of a holder in due course to enforce the promissory note executed in conjunction with her home mortgage loan. In effect the Plaintiff asserts that there is a proper payee of her mortgage promissory note but it is not the defendant Trust or its agents who are involved in the foreclosure upon which she sued in the present case.

## STATEMENT OF FACTS

1.      On or about November 11, 2005 Phyllis Horace ("Mrs. Horace") executed a mortgage to facilitate the purchase of her home for her family in Russell County, Alabama.

2.      At the time the funds were borrowed, the nation was in the midst of the expanding housing bubble.

3.      The Defendant Encore Credit Corp, a mortgage lender, offered Mrs. Horace a loan that is commonly referred to as a 2/28 ARM. This loan involved an initial two year teaser rate period during which Mrs. Horace was required to make only interest

payments at a low teaser rate. At the expiration of the teaser period, the loan recast to a
substantially higher monthly payment based on the terms of the note and mortgage.

4.      Mrs. Horace and her husband (who is not a signatory and thus not bound
to the mortgage) (together the "Horace's") enjoyed income from regular employment,
which was used to make their monthly mortgage payments.

5.      After the loan recast at the end of the teaser period, the Horace's income
was not sufficient to cover the fully indexed payment, a fact which was known to the
Defendants at the time of originating this loan.

6.      Despite the predatory and unfair origination of the Horace loan, the loan's
origination is not the subject of the summary judgment motion. The Horace's have
reserved those issues for trial. The Horace's provide this information to the Court as
background to explain the original claimed default which led to this litigation.

7.      This motion and the crux of this case is about the validity of the transfers
of mortgage promissory notes in the Wall Street financing process known as
"securitization" and the resulting issues regarding the ability of the securitization trust in
this case to foreclose. Ultimately, much of the outcome of this case hinges upon the
Court's ruling regarding the validity or not of the Trust's assertions that it is the owner of
the Horace Promissory note.

8.      Securitization is the practice of pooling and selling contractual debt
obligations ("receivables") such as residential mortgages, commercial mortgages, auto
loans or credit card debt, to a specially-created entity, typically a trust. The trust pays for
the receivables by issuing debt securities (variously referred to as bonds, pass-through
securities, or Collateralized mortgage obligation (CMOs)) to investors. The trust collects

payment of principal and interest on the receivables which it then uses to make regular

payments to investors on their debt securities. Securitization thus ___ ___ and

commercial borrowers with financing from securities markets.

9.    There are numerous reasons why **financial institutions engage in**

**securitization,** including the **management** of **credit** and **interest rate risk,** relief from

regulatory ___ requirements, and **liquidity enhancement.** Securitization began to be

used as a **financing technique with mortgages** in 1970. "For decades before that, banks

**were essentially portfolio lenders; they held loans** until they matured or were **paid off.**

These loans were **funded principally by deposits** and sometimes **by debt, which was a**

___ ___ of the bank (rather than a claim on specific assets). But after **World War**

**II, depository institutions** simply could not keep pace with the rising demand for housing

credit. Banks as well as other financial intermediaries sensing a **market opportunity,**

sought ways of increasing the sources of **mortgage funding.** To attract investors,

investment bankers eventually developed an investment vehicle that isolated **defined**

**mortgage pools,** segmented the credit risk, and **structured** the **cash flows** from the

underlying **loans."**

10.    **Banks** use a variety of strategies for securitization trusts depending on the

type of asset **being securitized,** but all securitization structures are designed to serve two

overriding concerns. First, is ensuring favorable **tax treatment** of the bank, the

securitization trust, and the investors, ideally through the securitization **trust having**

"pass-thru" tax status, meaning that the securitization trust is not taxed on its own income

[1] Steven L. Schwarcz, Alan Kreutzer, The Alchemy of Securitization, September 1993 (Oxford Univ. Press, ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___
Last ___ ___

when it is paid on the receivables.[3]  Second, and perhaps more critical, is ensuring that

the trust's assets are "bankruptcy remote," meaning that they are insulated from the

claims of the *bank's* creditors.  This involves ensuring that the transfer of the receivables

to the trust is a "true sale" and not a financing transaction.

11.    Bankruptcy remoteness is critical for making the economics of

securitization work.  By insulating the receivables placed in the trust from the claims of

the bank's creditors, securitization enables investors to invest based solely on the quality

of the receivables and not have to worry about the bank's other business activities. To

accomplish this, the bank conveys receivables to a trust for the benefit of certificate

holders.

12.    Applying these industry standards to the transaction at issue, Horace

points out that the Defendant is a securitization trust identified as "LaSalle Bank National

Association as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I,

LLC, Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates, and Series

2006-EC2" (hereinafter the "Trust").[4]

13.    The Trust was formed on February 1, 2006 by the execution of the trust

agreement, which is known in the industry as a Pooling and Servicing Agreement

(hereinafter "PSA").[5] The Trust's closing date was February 28, 2006.[6]

14.    The Trust is a common law trust created pursuant to the laws of the State

of New York, and its existence and actions are governed and controlled by New York

law.

---

[3]*See id.*
[4]*See* PSA for Defendant Trust page 5 of 397
[5]*See* PSA page 5 of 397
[6]*See* PSA page 25 of 397

15.    New York trust law is ancient and well-settled with respect to the determination of whether an asset is trust property.

16.    Under New York law, the analysis of whether an asset is trust property is determined under the law of gifts.[7] In order to have a valid inter vivos gift, there must be a delivery of the gift (either by a physical delivery of the subject of the gift) or a constructive or symbolic delivery (such as by an instrument of gift) sufficient to divest the donor of dominion and control over the property[8]and "what is sufficient to constitute delivery 'must be tailored to suit the circumstances of the case.'"[9] The delivery rule requires that "'[the] delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit.'"[10]

17.    New York law is also settled that (1) "Until the delivery to the trustee is performed by the settlor, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise".[11] (2) The delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit; there must be a change of dominion

---

[7]*See, e.g.,In re* Becker, 2004 N.Y. Slip Op. 51773U, 4 (N.Y. Sur. Ct. 2004) ("In the case of a trust where there is a trustee other than the grantor, transfer will be governed by the existing rules as to intent and delivery (the elements of a gift).").

[8]    (see, Matter of Szabo, 10 N.Y.2d 94, 98-99, supra; Speelman v. Pascal, 10 N.Y.2d 313, 318-320, supra; Beaver v Beaver, 117 NY 421, 428-429, supra; Matter of Cohn, 187 App. Div. 392, 395) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56 (N.Y. 1986).

[9](Matter of *Szabo*, supra, at p. 98).

[10]    (id.; Vincent v. Rix, 248 N.Y. 76, 83; Matter of Van Alstyne, supra, at p 309; see, Beaver v. Beaver, supra, at p 428) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56-57 (N.Y. 1986).

[11]    (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc. 30, aff'd 190 App. Div. 907, supra; Marx v. Marx, 5 Misc. 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).

and ownership; intention or mere words cannot supply the place of an actual surrender of control and authority over the thing intended to be given.[12]

18.     Lastly, "under New York law there are four essential elements of a valid trust of personal property: (1) A designated beneficiary; (2) a designated trustee, who must not be the beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) the actual delivery of the fund or other property, or of a legal assignment thereof to the trustee, with the intention of passing legal title thereto to him as trustee."[13] There is no trust under the common law until there is a valid delivery of the asset in question to the trust.[14] Furthermore, when the trust fails to acquire the property, then *there is no trust over that property that may be enforced.*[15]

19.     When New York trust law is applied to the Trust and the facts of this case, it is apparent that there was never a valid delivery of Mrs. Horace's mortgage note to the Trust, so the *Trust* may not enforce the mortgage note.

20.     According to the terms of the PSA, all promissory notes transferred to the Trust are required to have a complete chain of endorsements from the original payee thereof to either "Blank" or to the Trustee for the specific Trust. This means that each promissory note must have the following complete chain of endorsements in order to

---

[12]Vincent v. Putnam, 248 N.Y. 76, 82-84 (N.Y. 1928).

[13]Brown v. Spohr, 180 N.Y. 201, 209-210 (N.Y. 1904).

[14]  Until the delivery to the trustee is performed by the settlor, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc 30, affd 190 App Div 907, supra; Marx v Marx, 5 Misc 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).

[15]  In an action against the individual defendant as trustee, based on the theory of breach of fiduciary obligation, the complaint was properly dismissed on the ground that he had acquired no title or separate control of the goods and, hence, there was no actual trust over the property to breach. Kermani v. Liberty Mut. Ins. Co., 4 A.D.2d 603 (N.Y. App. Div. 3d Dep't 1957).

comply with the Trust's documents and thus fit within the authorization of the Trust's

activities:

From Encore Credit Corporation to

↓

EMC Mortgage Corporation; who endorsed to

↓

Bear Stearns Asset Backed Securities I, LLC, as the Depositor; who
endorsed either in blank or specifically to

↓

LaSalle Bank National association as trustee for Certificate holders of Bear
Stearns Asset Backed Securities I, LLC, Bear Stearns Asset Backed
Securities I LLC Asset Backed Certificates, and Series 2006-EC2

21.    The PSA requires this complete chain of endorsements to be in place by

the Trust's closing date or under no circumstances later than 90 days after the Trust's

closing date. Therefore the last possible day to transfer to the Trust within the terms of

the Trust agreement was May 29, 2006.

22.    During the litigation of this case, the Defendants produced a collateral file

that included the original, wet-ink, signed note in this case. *This note contained a single*

*endorsement in blank by the Encore Credit Corporation and no other.* Accordingly, the

endorsement chain presented by the Defendant Trust does not comply with that required

by the PSA. This means that under New York trust law, there is no effective transfer of

the Horace mortgage note to the Defendant Trust, so the Trust cannot enforce the note.

23.    There is no evidence that Mrs. Horace's mortgage promissory note has

been securitized, and there is no effective conveyance of Mrs. Horace's mortgage

promissory note to the Defendant Trust, which has claimed ownership and sought to foreclose. [16]

24.    In the case before the Court there is no good faith basis for the defendant Trust to assert or otherwise claim that the Horace promissory note is Trust property.

25.    Mrs. Horace requests that the Court enter a summary judgment in her favor that the Trust is not the owner of her promissory note and that the Trust has no right to foreclose upon her real property.

26.    Mrs. Horace also requests that the Court enter any appropriate Orders to effectuate this Judgment.

27.    Mrs. Horace also requests that the Court direct liability in her favor on her claims against the Trust and the parties acting on the Trust's behalf with respect to her claims regarding the foreclosure action instituted by these parties and that the Court seat a jury for the sole purpose of determining what damages should be awarded against these parties for their wrongful conduct.

## PLAINTIFF'S EVIDENTIARY SUBMISSIONS IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

The Plaintiff submits the following list of exhibits in support of her motion for summary judgment in this case:

28.    Attached as exhibit 1 to this motion is the PSA consisting of all exhibits including the form custody agreement and the mortgage loan purchase agreement pulled from the SEC's website and consisting of 397 pages. This exhibit does not include the mortgage loan schedule submitted by the defendant's in this case.

---

[16] A fact noted in the opinions and testimony of Horace's securitization expert, Thomas J. Adams who opines that the promissory note is not an asset of the Defendant trust in his deposition at 140:4-8.

29.     Attached as exhibit 2 to this motion is the affidavit of Thomas J. Adams previously provided to the Defendant's in this case.

30.     Attached as exhibit 3 to this motion is the deposition of Thomas J. Adams taken by counsel for the defendants, Shaun Ramey.

31.     Attached as exhibit 4 to this motion is the complete collateral file produced by the defendants in this case which consists of 62 pages as produced by the Defendants.

32.     Attached as exhibit 5 to this motion is an exhibit which shows the transfers required by the Trust instrument as a recapitulation of the voluminous document.

33.     Attached as exhibit 6 to this motion is an exhibit which demonstrates the transfers of the mortgage promissory note revealed by the contents of the mortgage collateral file.

34.     Attached as exhibit 7 is Horace 391 which is a single document from the PSA which sets forth the required documents for the collateral files of loans properly transferred to the Defendant trust.

35.     Additionally, other documents are attached to this motion which are referenced in this motion or in brief by their Bates Stamp number which include, at least, Bates Stamped documents numbered 2 & 29.

## CONCLUSION

The plaintiff requests that the Court consider her motion, her evidentiary submissions and her brief in support of her motion for summary judgment and upon consideration of the same, enter summary judgment as prayed for herein against the

**Multiple Injuries**    #50    **E.D. Physician Record**

53176690  396009
JACKSON , CORLA
06/25/1961  46 B F  03/13/08
018996    BENJAMIN, REGINA M.  MD
E/R



Burns
covered
and
dressed -

5cm

Deep
laceration

1° Burns    1° Burns

Repeat exam at:  N30- twkgeses
Findings:    improved

**Diagnostic Considerations:** circle potential diagnoses

Smoke inhalation    Ft Bmns contw

**X-ray:** (Read by ___ E ___ Rad)
1- □ CxR                    2- □ Lhip/Rn  nl
3- □ L FA                   4- □ pelvis      nl
5- □ R FA                   6- □ ___        nl
Reviewed / discussed with Radiologist:

**Treatment / Course:**
**Medications / Orders**                        Response
□ O2  1n weplock
L Tetanus:  TT / dT / TIG
__ Pain meds:                          Morphine IV
__ immobilization:  static    dynamic    2⁰ Glan IV
    Applied by: ___ E.P. ___ other
__ compression dressing ___ crutches
__ NPO
other procedures / meds:            A+A  neb q ?
LIVS 1000 ml

Recheck Mco: Still wheee
Procedure:                          A+A repeated
    (__ see addendum)
Course:  same / better / worse    Solumed'd 125m IV
Critical Care: ___ minutes / hour(s)

**Clinical Impression:**
JS Smoke inhalation    1 contusion
2 5cm laceration (L) forearm    Buttock
3 4cm laceration (L) forearm    5 1° Burn
                                B/L E

**Medical Decis. Making:** L1: straightforward; L2,3: low/complex, L4: mod, L5: hi
Slash box if ordered ☑, check normals ⟨circle⟩ and note abnormals

**Lab:**
□ CBC: __ nl __ nl except:        □ Other data reviewed:
Hct ___ Hgb ___ Plts ___        □ ETOH    □ Drug screen
WBC ___                          □ PT, PTT, INR __  □ T & G x ___ units RBC
Neut % ___ Lymph % ___
Monos % ___ Eos % ___
Baso% ___
□ BMP: __ nl __ nl except:        □ ABG: on __ RA/O2: ___ % / L
□ CMP: __ nl __ nl except:        pH: ___ PO2 ___
NA __ K __ Glu __ Cl __           PCO2 ___ HCO3 ___
CO2 __ Anion gap __ BUN __
Creat. __ CO2 Ratio __ Calcium __   □ P. Ox __ %: on __ RA/O2: ___ % / L
Alk Pitase ___ SGPT (ALT) ___        nl / hypoxic
SGOT (AST) __ T. Bili __ T. Prot __
Albumin __ Globulin __ A/G Ratio __
□ U/A: __ dip neg __ dip neg except:   □ EKG __ Nl study
                                    __ NSR __ nl intervals
Micro neg ___ neg except ___       __ nl QRS __ nl ST-T waves
__ Qual hCG: □Blood □Urine Neg / Pos   Compared to:
__ sand quantitative               __ unchanged / changed
                                    Read by: __ E.P.
                                    □ Cardiac monitor: ___ NSR

**Wound Repair:**

| Location | Length / Depth | Repair |
|---|---|---|
| 1 R F.A. | 3 cm | SNOQ    Dermabond / staples |
| superfic (30)YM | | Running    # of 3 -0 Vicryl Sutures |
| 2 L FA | 4 cm | # of 3 -0 Nylone    Dermabond / staples |
| superfic (90)YM | | Skin-Simple    # of ___ -0 |

**Comments:**
____ intact ___ intact    L FA Subq Simple running
Level of contamination: __ clean / min / mod / severe  Skin mattres
Anesthesia: local / digital block ___ mL of  1 plidc   2 epi/HCO3
__ prep    Suture removal instruct:  10 days   over inj
__ Explored: __ no F.B. __ no tendon inj./ F.B. identified / tendon injury
__ irrigat. __ debrided __ undermined __ revised  F.B. removed
(for above: min = 1, mod = 2, extensive = 3)

**Consultation:**
Consulted Dr. ___
Suggests: admit. / discharge / will see: ___ / Transfer to ___
Case discussed with: patient / family / other:

**Disposition:**
__ Transfer to: ___ Accepting Physician: ___
__ Admit: __ IP / __ OP __ ICU / Tele / Med-Surg    __ EMTALA form completed
Admitting Physician ___              Covering Physician ___
Orders written in ED ___
__ Discharged. Condition: ✓ improved __ unchanged  thu PMD-5 d
Instructions given: ✓ written ___ mini. / RTW form ___ school excuse
    __ off work / school or __ lmtd work / school / gym thru ___
Discharge Rx: albterol  5d pred  lotab
Certified Emergency? □ Yes    □ No
Sig: ___                          date 3/13/08  Attend / Resid. / PA / NP
___                               date 3/13/8  Attend. / Resid. / PA / NP
See: __ Addendum __ Attending note    □ dictated
Copies to:                          □ chart completed

Copyright © 2008, EvolveMed, ERG

## Multiple Injuries

**PROVIDENCE HOSPITAL EMERGENCY DEPARTMENT, MOBILE, AL (334) 633-1**

53176690  396009
JACKSON , CORLA
06/25/1961  46 B F 03/13/08
018996    BENJAMIN, REGINA M.  MD
E/R

*Check (✓) for normals, circle positives, slash negatives, note findings*

Date: 5/13/08   E.P. time: ___   Age: ___   Wt: ___   Sex: M / F
P: 111   BP: 186/70   RR: 18   Temp: 99.1

**Chief Complaint:** Multiple Injuries   House Fire – fell

Referred by: *self / clinic / PMD / family / EMS*
Historian: *patient / family / friend / EMS*

Arrived by: *EMS / walk-in / wheelchair* ___
Hx limited by: *Altered LOC / acuity / intoxication* ___

### HPI:

**Onset:** undetermined
**Occurred:** 0830   time ___ date ___
___ mins / hrs / days PTA

**Location:** home / work
Other: ___

**Activity during injury:** ___ unknown
putting fire out
fell 8 ft off ladder

**Mechanism of injury:** ___ unknown
fell

**Location (anatomic):**
Burns legs, smoke inhalation
lacs

**Injury description (qualify):**
deformity / dislocation / sprain / strain /
contusion / laceration / puncture / stab / abrasion /
GSW / F.B. / burn
**Pain:** ___ none / at rest / ō wt bearing / ō use
**Pain quality:** sharp / dull / aching / throbbing

Pt was trying to put
fire out – she
has smoke inhalation
burns to legs – lac's
to burns, injury to hip

**Last ate:** ___

**Modifying factors:** ___ none
witnessed / unwitnessed
Ambulatory at scene: ___ yes / no
Contributing factors: ETOH / drugs /
seizure / syncope / suicide attempt
Other: ___

**Assoc. sxs:** ___ none
no complaints / "just stiff and sore"
wounds / bony deformity / swelling
**Pain:** head / face / neck / chest / abd /
back / pelvis / RUE / LUE / RLE / LLE
**LOC:** unknown / dazed / + LOC
**Duration:** ___ see / mins / hrs
Remembers: incident / coming to hospital
GCS: 15 / 15

**Prior Rx:** ___ none
EMS: spinal immobilization
Other: ___

### Past, Family, Social History:

Reviewed ___ RN note ___ Old Records ___ NH records ___ EMS note
**PMH:** ___ none ___ unknown   **Surgical Hx:** none ___ unknown
peptic ulcer / GI bleed   (HTN)   Prior trauma: ___
arthritis / CAD / DDM / RDDM   Other: ___
thrombophlebitis / clotting probs   **Family Hx:** none ___ unknown ___ N/A
CHF / HTN   DM / CAD
   clotting probs
**Meds:** ___ none ___ reviewed RN note   **Social Hx:** ___ unknown
ASA / NSAIDs / Coumadin / Plavix   Tobacco: current / no ___ yes
insulin / steroids   quit ___ years ago; hx of ___ pack years
antihistamines / narcotics / sedatives   ETOH: yes ___ drinks / wk
   Recent? ___
**Allergies:** ___ reviewed RN note   Drugs: ___
Diphtheria tetanus current: ___ no ___   Occupation: ___
   ___ yes / year ___   Home situation: ☐ lives alone ☐ w/spouse
   ☐ w/family ☐ N.H.   ☐ CBRF

### Physical Exam:

___ Exam limited by: urgency of condition / pt. uncooperative
**Gen:** Anxious: no / mild / mod / severe   Distress: no / mild / mod / severe
VS nl   Orthostat. VS: O- : ___
**Nutritional status:** nl / obese   **Hydration:** nl / dehydrated
Longboard / cervical immob. ( ED / EMS )  IV / intubation / splint
☐ color, tone   **Skin / Nail:**   nose
   nl appearance ø cyanosis
☐ pale, alert, appropriate   ☐ pale, nl capillary refill
☐ diaphoretic   ☐ hydrated, warm & dry   sooty
☐ cyanotic   exudate
**Head / Neck (MSK):**   **Neuro:** patent
☐ head ō trauma, skin nl   ☐ alert & oriented x 3
☐ neck ō tend, ROM full   ☐ motor sensory nl
**Eyes:**   ☐ face intact, symmetrical   burns
☐ nl, conj. nl   ☐ nl gait, cerebellar function   both
☐ PERRL, EOM's full   ☐ cranial nerves intact   legs
cornea, chambers, disc nl
**ENT:**   **Psych:**
☐ nose nl   ☐ affect, mood nl
ext. ears, canals, TM's nl   ☐ judgment, memory nl
mucosa, teeth, oropharynx nl
**CV:**   (R) / (L) upper ext.   pl arm
☐ nl rate, rhythm   D/R   (mark nl as R, L or B):
☐ heart sounds nl   ____   ___ appearance nl, nontender
☐ pulses = neck & all 4 ext.   ☐ ROM full ō pain:   ☐ devi? pt
**Resp, Chest:**   ☐ stable:   twigs
☐ no resp distress   ☐ nl strength and tone nl
☐ breath sounds nl, clear, equal   (R) / (L) lower ext.
☐ chest inspect., palpat. nl   (mark nl as R, L or B):
**Spine / pelvis / ribs (MSK):**   ___ appearance nl, nontender   pl mic
☐ thorac., lumbar inspect., palpat. nl   ☐ ROM full ō pain:   wheeze
☐ pelvis stable, inspect., palpat. nl   ☐ stable:
   ☐ strength and tone nl
**GI / Abdomen / Flank:**
☐ soft appearance, BS nl   **Glasgow Coma Score** 15
☐ soft, nontender   Eyes open: 4-spontaneous 3-to command
☐ flank nl appearance, nontender   2-to pain 1-none
☐ rectal nl, heme neg.   Verbal: 5-nl 4-confused 3-inappropriate
**MSK:**   2-incoherent sounds 1-none
☐ nl   Motor: 6-normal 5-localizes pain
☐ toes, nails nl   4-withdraws 3-decorticate (flex.)
   2-decerebrate (ext.) 1-none

(L) hip/buttock tender – large lac ___
→ buttock

### Review of Systems: ___

All systems reviewed: ___ negative ___ negative except as marked
___ Constit: weak / faint / fever / chills / diaphoresis
___ Eyes: F.B. sensat. / vision probs
___ ENT: ear, nose or throat s/o's / hearing probs / hoarseness
___ CV: chest discomfort / palpitations
___ Resp: SOB / breathing probs / cough / wheezing
___ GI: N / V
___ GU: urinary probs / kidney probs / genitalia pain   LMP: ___ nl / abnl
___ MS: other painful areas: nl p
___ Skin: skin probs
___ Neuro: numbness / tingling / focal deficits / paralysis / dizzy / change in behavior /
   incontinence / seizures
___ Psych: psych probs / anxiety / depression
___ Hemat / Lymph: bruising / bleeding
___ Endo: polyuria / polydipsia
___ Immun / Allerg: HIV / AIDS / splenectomy

Copyright © 2008, EvolveMed, EMG   Photocopying without permission is prohibited   E.D. PHYSICIAN RECORD   AAEM Template   http://www.aaem.org   Page 1 of 2

# GE Money
# Home Loans
PO BOX 25142
Santa Ana, CA 92799-0905

February 8, 2006

**Address**

RE: Account No.          : 0835002124
     Property Address     : 13230 Tom Gaston Rd  Mobile, AL 36695-0000
     File No.             : CRTN
     Date of Loss         : LDT

Dear Corla Jackson

We realize how difficult a loss to your home can be, and we want to process your claim as quickly and efficiently as possible. To assist in the claim- handling process, please submit the following items to our office:

1. The insurance claim check(s) (SIGNED/ENDORSED BY ALL PARTIES LISTED ON THE CHECKS».
2. The enclosed *Homeowner's Statement* completed and signed by you.
3. A copy of the insurance adjuster's detailed report or your contractor's detailed damage estimate for repairs.
4. A copy of the signed contract between you and your contractor doing the repairs.
5. The enclosed *Contractor Affidavit/Statement* needs to be completed and returned to our office once ALL REPAIRS HAVE BEEN COMPLETED.

Upon receipt of the fully endorsed insurance claim check and above required information, we will release a portion of the claim funds within 4-5 business days after receipt.  If all required items are not received, we are unable to proceed with a  disbursement of the claim funds until the missing items are submitted.

Due to the amount of loss, partial funds will be released at various stages. After the first release of insurance funds, periodic property inspections will be needed to confirm repair progress. Please contact our office seven to ten business days prior to needing additional funds to allow time for the property inspection.

If I may be of additional assistance, please call me at 1-866-354-7281.

Sincerely,

Insurance Claims Center
**FAX: (866)336-3811**
Same Phone Number (#)
**GE TPA 13**
**HAZ6-NWCLMDP**
**Enclosures**
**BRB**

*Plaintiff Was Supose To Be Given Fund In Full To Gutt out or Rebuilt Without Dedection or Depreciations*

# GMAC Mortgage

P.O. Box 25144
Santa Ana, CA 92799-5144

February 14, 2007

Corla Jackson
13230 Tom Gaston Rd
Mobile, AL 36695-0000

RE:  Property Address    : 13230 Tom Gaston Rd  Mobile, AL 36695-0000
     Tracking No         : 732379
     Date of Loss        : 08/24/2005
     Account No          : 0835002124

Dear Corla Jackson :

Our office was previously notified of damage sustained to the above- referenced property. At that time, you were provided with the required forms to be completed and returned to our office with the endorsed claim check.

We are currently reviewing our files and request an update on the status of your claim. Please check the appropriate information below:

☒    Send me information again.

☐    The endorsed insurance claim check, *Homeowner's Statement*, and detailed damage estimate will be sent to your office by _____.

☐    Repairs have been completed. Please contact me at _____ to set up an inspection of the property.

Please return any documentation in the enclosed self-addressed envelope.

Your prompt attention to this matter is greatly appreciated.

If Iwe may be of further assistance, please contact our office at 1-866-354-7281.

**Insurance Claims Center**
**FAX: (866)336-3811**

** BRE **

*Property Cannot Be Signed off On By County Chief Building Inspector... see Attached Letters*

① *Property Has Been Distroyed By Major Water Damge Which Contaminated Rain Water Debris, Wood Framing, Insulation Ect*

② *Property Has Been Distroyed By Toxic Mold*

③ *Please Turn In your (Policy) for Complete Pay off by Farmers Insurance Group...*

*Corla Jackson*

# **GMAC Mortgage**

P.O. Box 52052
Phoenix, AZ  85072

April 2, 2008

Corla Jackson
13230 Tom Gaston Rd
Mobile, AL 36695-0000

RE:  Property Address     : 13230 Tom Gaston Rd  Mobile, AL 36695-0000
      Account No.             : 0835002124
      Tracking No.            : 902022
      Date of Loss            : 3/13/2008

Dear Corla Jackson:

We realize how difficult a loss to your home can be, and we want to process your claim as quickly and efficiently as possible. Due to the status of your loan and investor requirements, we have the responsibility to ensure the damage is repaired. To assist in the claim-handling process, please submit the following items to our office:

1.   The insurance claim check(s) (SIGNED/ENDORSED BY ALL PARTIES LISTED ON THE CHECK(S).

2.   The enclosed *Homeowner's Statement* completed and signed by you.

3.   A copy of the insurance adjuster's detailed report or your contractor's detailed damage estimate for repairs.

4.   A copy of the signed contract between you and your contractor doing the repairs.

5.   The enclosed *Contractor Affidavit/Statement* needs to be completed and returned to our office once ALL REPAIRS HAVE BEEN COMPLETED.

Upon receipt of the fully endorsed insurance claim check and above required information, we will release a portion of the claim funds within 4-5 business days after receipt.  If all required items are not received, we are unable to proceed with a disbursement of the claim funds until the missing items are submitted.

Due to the amount of loss, partial funds will be released at various stages. After the first release of insurance funds, periodic property inspections will be needed to confirm repair progress.  **FLORIDA PROPERTIES: Please contact our office 10 to 14 business days prior to needing additional funds to allow time for the property inspection.**
NON-FLORIDA PROPERTIES: please contact our office 7-10 business days prior to needing additional funds.

If I may be of further assistance, please contact me at 1-866-354-7281.

Sincerely,
Insurance Claims Center
**FAX: (866)336-3811**

GMAC TPA 13 (a)
HAZ6-NWCLMDQ

Enclosures
**\*\* BRE \*\***

 Research and
Engineering, Inc.

5815 I-10 Industrial Parkway
Theodore, Alabama 36582
(251) 653-9009
Fax: (251) 653-5803
E-mail: AL@LAREC2.com
www.LAREC2.com

August 23, 2007

**GMAC** Mortgage
P.O. Box 25144
Santa Anna, CA 92799-5144

Re: Structural Inspection of Jackson Residence, 13230 Tom Gaston Rd., Mobile, AL
File No.       : GMC002124
Date of Loss  : 08/24/2005

Dear Sir or Madam:

This letter is to further comment on the findings of an Engineering Inspection to the subject residence at the above address performed in April, 2006. This dwelling is insured by Farmers Insurance Policy # 92649-56-20 and was under repair from damage sustained in Hurricane Katrina in August, 2005 at the time of that inspection. The claim number for those repairs is 1007093144-1-1. As stated in my report:

The subject structure is located in a high wind area and in accordance with the International Building Code is required to be constructed to withstand a Basic Wind Speed (3 second gust) of 140 miles per hour. The dwelling is located in an area that is defined as Exposure C in accordance with the aforementioned code.

The damage caused by Hurricane Katrina included structural damage to the roof structure as well as considerable interior damage due to water incursion from the loss of the integrity of the roof cover. Although much of the damage was a direct result of the wind load of the hurricane, the damage was augmented by the substandard construction of the roof structure.

The aforementioned report was based upon a visual inspection of the structure at that time. Since a large portion of the roof was destroyed and there was considerable interior damage, I would consider the structure unlivable as a result of my observations. In order to complete the repairs from the point of that inspection it would be very difficult for a contractor to perform the necessary work with the residence occupied.

Since my inspection was limited to a visual inspection, it was impossible to determine damage to the structure beyond the roof structural damage. There was evidence of water incursion which undoubtedly caused interior damage to the walls and ceilings. Also, based upon the observed quality of the framing and workmanship in the roof structure, I would expect other deficiencies in the framing of the walls.

251-653-5803                    p.3

Letter Re: Jackson, August 23, 2007, page 2.

Based upon the observed level of damage to the structure and the construction
deficiencies previously reported, my recommendation is that the repairs required will be
extensive enough in accordance with the Mobile County Building Code to make it
necessary for the structure to meet current code requirements. This is particularly
important since the structure is located in an Exposure C environment and in the 140 mph
wind load area.

If there are any further questions, please feel free to contact me.

Thank you for the opportunity to be of service to you.

Sincerely,

J. Albert McEachern, Jr., P.E.
Consulting Engineer

CC: Ms. Jackson



AOL | Mail | Toolbar

Location: Mobile, AL 36695 | Search History | Advanced Search | Settings

Web   Images | Videos | Maps | News | Shopping | more »

**What does it mean when a Hurricanes leave sags and dips**

Web Results 1 - 10 of about 2,660

[PDF] **SAFE REHABILITATION OF HURRICANE-DAMAGED HOMES**
Roofs that **sag** in the middle or at the ends due to load-bearing walls that have shifted. ... a **dip** in the **roof** and sill beam. ribbon board, cracked floor joist .... However if there is a lot of **water damage**, and/or mold growth ... In adults , lead poisoning may **cause** high blood pressure, fertility ...
hud.gov/offices/lead/library/misc/HUD_CSS_Booklet.pdf - Similar

[PDF] **Response to Floods and Water Damage** for Libraries, ...
Jun 14, 2008 ... Go onto the **roof** if rising water makes it necessary as long as no thunderstorm is in progress. ... highway **dips**, where water may pool and pose threats. ... Emergency Drying Procedures for **Water Damaged** Collections. ... Pools of cool standing water (which can **cause** hypothermia if the water is less ...
www.loc.gov/preserv/emergprep/floodcomp.pdf - Similar

Roofing: How dry **does** the deck need to be?, asphalt shingles, ...
Apr 30, 2009 ... Anything that might soak up **water**, like insulation must be ripped out as it can ... Several interior rooms beneath the **damaged roof** show obvious signs of warped ... one could SEE an extreme bow or **sag**, but are there degrees of tolerance in what ... Look for isolated humps or **dips** between rafters. ...
en.allexperts.com/q/Roofing-1598/2009/4/dry-deck-need... - Similar

**Hurricane** Survival Tips - **Hurricane** Mitigation & Survival
The two huge masses of **water** do **leave** the land in much the same way, .... When **water** kills or **does damage**, the wind put it up to it. .... and with **major hurricanes**, it ain't over until the National Guard arrives. .... Invest in a **hurricane roof** as the main hole you want to avoid is a big one with a view of Heaven. ...
www.hurricane-man.com/survival-tips.html - Similar

General information | RAGBRAI
This may **cause** your group to be ineligible for the lottery. .... RAGBRAI is a **major** economic boost to every church, Boy Scout or Girl .... Your wristband also will give you priority to **sag** wagons, bicycle shop repairs and many other services. ... If you race ahead, lag behind or **leave** the official bicycle route, ...
ragbrai.com/index.php/about/general-information/ - Similar

Antigua - Local Reports (Caribbean **Hurricane** Network)
that it **does** not necessarily **mean** that the case brought by ABITPC against govern - .... it was badly **damaged** by the 1990s **hurricanes** kept visiting Antigua.. . ...... Whatever will **cause** this **dip** could occur earlier? I certainly hope not! ..... WHAT a way to start a week... with a 140 mph **major hurricane** on your ...
stormcarib.com/reports/2003/antigua.shtml - Similar

Using Technology to Reduce Risk and Improve Worker Safety | ...
The root **cause** of this unwanted connection is often a result of insulation breakdown. ... equipment **damage** and present a fire and explosion risk to personnel (see photo 1). .... 5) To reduce the momentary line-voltage **dip** occasioned by the occurrence and ..... Utility Deregulation, **What Does it Mean** to Inspectors? ...
www.iaei.org/magazine/?p=2449 - Similar

Pain in Maine, but they can measure **rain** « Climate Audit
But all the data sufficient to predict **hurricanes** is OK? ..... (Heck, if it's like my house, the whole electrical system voltage **sags** whenever a big ..... that CO2 is not a **major** factor in **causing** the earth to warm: You are a denier. ...... **Does this mean** that it's OK to shade the truth about AGW so that someone, ...
www.climateaudit.org/?p=1816 - Similar

40

**Potential Health Effects Associated with Inhalation Exposure to Molds and Mycotoxins**

- Allergic Reactions (e.g., rhinitis and dermatitis or skin rash)
- Asthma
- Hypersensitivity Pneumonitis
- Other Immunologic Effects

Research on mold and health effects is ongoing. This list is not intended to be all-inclusive.

The health effects listed above are well documented in humans. Evidence for other health effects in humans is less substantial and is primarily based on case reports or occupational studies.

All molds have the potential to cause health effects. Molds produce allergens, irritants, and in some cases, toxins that may cause reactions in humans. The types and severity of symptoms depend, in part, on the types of mold present, the extent of an individual's exposure, the ages of the individuals, and their existing sensitivities or allergies. Specific reactions to mold growth can include the following:

Allergic Reactions: Inhaling or touching mold or mold spores may cause allergic reactions in sensitive individuals. Allergic reactions to mold are common – these reactions can be immediate or delayed. Allergic responses include hay fever-type symptoms, such as sneezing, runny nose, red eyes, and skin rash (dermatitis). Mold spores and fragments can produce allergic reactions in sensitive individuals regardless of whether the mold is dead or alive. Repeated or single exposure to mold or mold spores may cause previously non-sensitive individuals to become sensitive. Repeated exposure has the potential to increase sensitivity.

Asthma: Molds can trigger asthma attacks in persons who are allergic (sensitized) to molds. The irritants produced by molds may also worsen asthma in non-allergic (non-sensitized) people.

Hypersensitivity Pneumonitis: Hypersensitivity pneumonitis may develop following either short-term (acute) or long-term (chronic) exposure to molds. The disease resembles bacterial pneumonia and is uncommon.

Irritant Effects: Mold exposure can cause irritation of the eyes, skin, nose, throat, and lungs, and sometimes can create a burning sensation in these areas.

Opportunistic Infections: People with weakened immune systems (i.e. immune-compromised or immune-suppressed individuals) may be more vulnerable to infections by molds (as well as more vulnerable than healthy persons to mold toxins). Aspergillus fumigatus, for example, has been known to infect the lungs of immune-compromised individuals. These individuals inhale the mold spores which then start growing in their lungs. Trichoderma has also been known to infect immune-compromised children.

Healthy individuals are usually not vulnerable to opportunistic infections from airborne mold exposure. However, molds can cause common diseases, such as athlete's foot, as well as other infections such as yeast infections.

Mold Toxins (Mycotoxins)

Molds can produce toxic substances called mycotoxins. Some mycotoxins cling to the surface of mold spores; others may be found within spores. More than 200 mycotoxins have been identified from common molds, and many more remain to be identified. Some of the molds that are known to produce mycotoxins are commonly found in moisture-damaged buildings. Exposure pathways for mycotoxins can include inhalation, ingestion, or skin contact. Although some mycotoxins are well known to affect humans and have been shown to be responsible for human health effects, for many mycotoxins, little information is available.

Aflatoxin B, is perhaps the most well known and studied mycotoxin. It can be produced by the molds Aspergillus flavus and Aspergillus parasiticus and is one of the most potent carcinogens known. Ingestion of aflatoxin B, can cause liver cancer. There is also some evidence that inhalation of aflatoxin B, can cause lung cancer. Aflatoxin B, has been found on contaminated grains, peanuts, and other human and animal foodstuffs. However, Aspergillus flavus and Aspergillus parasiticus are not commonly found on building materials or in indoor environments.

41



**Research and**

**Engineering, Inc.**

5815 I-10 Industrial Parkway
Theodore, Alabama 36582

(251) 653-9009
Fax: (251) 653-5803
E-mail: amce2000@aol.com

April 7, 2006

**Subject:** Hurricane Ivan-Hurricane Katrina
Farmers Insurance Policy #: 92649-56-20

**Re:** Structural Engineer Inspection Report (Residence - Dwellings)
Ms. Corla Jackson & GMAC Mortgage
13230 Tom Gaston Road
Mobile, Alabama 36695

To Whom It May Concern:

This letter is to report the findings of an Engineering Inspection to the subject residence at the above address.  This dwelling is insured by Farmers Insurance Policy # 92649-56-20 and is currently under repair from damage sustained in Hurricane Ivan (September 2004) and Hurricane Katrina (August 2005).  The claim numbers for both Hurricanes are (2C-118138) and (1007093144-1-1).  This policy includes a clause insuring against code violations, and therefore the repairs being performed include modifications to meet the Building Code.

In accordance with the International Building Code 2000, the current applicable code to Mobile County, this residence is required to be constructed to withstand a Basic Wind Speed (3 second gust) of 140 miles per hour.  The subject structure is located in a high wind area and is in an open field, with no trees or other structures to slow down or block southerly winds from the Gulf of Mexico.  Therefore, the dwelling is located in an area that is defined as Exposure (C) in accordance with the aforementioned code.

The damage caused by Hurricane Ivan and Hurricane Katrina included structural damage to the roof structure as well as considerable interior damage due to water incursion from the loss of the integrity of the roof cover including lifting of the sheathing and roofing materials and loss of ridge and power vents. Hurricane Ivan & Hurricane Katrina perils forced in rain via ridge caps, ridge vents, hooded powered vents, and vents, lifted shingles, lifted decking, windows and soffit.

Although much of the damage was a direct result of the wind load of the hurricane, because the house was not built in compliance with Mobile County Building Codes, the damages were augmented by the substandard construction of the roof structure. Specifically:

- Roof structure is a hip style, high slope, design with fiberglass reinforced architectural shingles on 24/16 7/16" OSB.  In many locations the maximum 24" on centers spacing of the 2 x 6 rafters was exceeded.
- The maximum hip and ridge rafter spans were also exceeded.
- Although there were rat runs in some locations to support the mid span of the 2 x 6 rafters, the maximum spans for the rafters were exceeded in many locations.
- The rat run supports were not adequate in size or support.  In one case only two 2 x 4 supports were used to hold a 2 x 4 rat run over 8 rafters.
- There was no cross bracing of any of the rafters.

- The workmanship of the carpentry was substandard.
- Recommended nailing schedules were not adhered to and in some cases the OSB panels were barely attached to the rafters.
- Minimum nailing requirements for the architectural shingles was not met. In some cases as few as 2 nails were used to attach a strip of roofing.
- The rafter materials used included many finger-joint splices, some less than 2 feet apart. Although the code allows use of finger-joint splices, the required grade markings were not apparent.
- The use of 7/16" OSB for roof sheathing with 24" on centers rafters is minimal in most locations, but is not recommended for high wind loads with Exposure C.
- The Dryer Vent was improperly installed and discharged into the attic space.
- Window seals were improperly sealed allowing water to be forced in.

This inspection was a visual only inspection. Based upon the observed code deficiencies, it is recommended that a more detailed study be made of this Structure and a plan for completing the repairs be made that incorporates reinforcing the structure to meet current codes to avoid additional losses due to future storms

If you have any further questions, please call me at, (251) 653-9009.

Thank you for the opportunity to be of service to you.

Sincerely,

J. Albert McEachern, Jr., P.E.
Consulting Engineer
Ph: (251) 653-9009
Fax: (251) 653- 5803

Photos



Photo1



Photo 2

Photos



Photo 3
Note lack of braces and mid span supports



Photo 4
Note OSB has been replaced on slope to right

Photos



Photo 5



Photo 6



Photo 7





**Farmers did Deceptive Practices**
**Breached Contract**
**Bad Faith**
**Committing Fraud**

To prevent from covering all the Hurricane Ivan & Hurricane Katrina covered losses
On This Structural Damages Roof In Full
And the Entire Dwellings Inside
Also on the Other Structures & Personal Property, to date!