

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 18 of 58

AlaFile E-Notice

57-CV-2008-000362.00

Judge: ALBERT L JOHNSON

To: WOOTEN NICHOLAS HEATH
nhwooten@gmail.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL
57-CV-2008-000362.00

The following matter was FILED on 1/13/2011 5:43:39 PM

**C001 HORACE PHYLLIS**
MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT
[Attorney: DICKSON NATHAN ANDREW II]

Notice Date: 1/13/2011 5:43:39 PM

KATHY S. COULTER
CIRCUIT COURT CLERK
RUSSELL COUNTY, ALABAMA
RUSSELL COUNTY JUDICIAL CENTER
PHENIX CITY, AL 36867

334-298-0516
kathy.coulter@alacourt.gov

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 19 of 84

ELECTRONICALLY FILED 1/13/2011 5:43 PM CV-2008-000062.00 CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA KATHY S. COULTER, CLERK

STATE OF ALABAMA Revised 3/5/08
Unified Judicial System
57-RUSSELL ☐ District Court ☑ Circuit Court

Case
CV20

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL

# CIVIL MOTION COVER SHEET

Name of Filing Party: C001 - HORACE PHYLLIS

Name, Address, and Telephone No. of Attorney or Party. If Not Represented.
NATHAN A. DICKSON
POST OFFICE BOX 350
UNION SPRINGS, AL 36089

Attorney Bar No.: DIC031

☐ Oral Arguments Requested

## TYPE OF MOTION

**Motions Requiring Fee**

- ☐ Default Judgment ($50.00)
- ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00)
- ☐ Judgment on the Pleadings ($50.00)
- ☐ Motion to Dismiss, or in the Alternative Summary Judgment($50.00)
- ☐ Renewed Dispositive Motion(Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00)
- ☐ Summary Judgment pursuant to Rule 56($50.00)
- ☐ Motion to Intervene ($297.00)
- ☐ Other ______ pursuant to Rule ______ ($50.00)

*Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees.

☐ Local Court Costs $ ______

**Motions Not Requiring Fee**

- ☐ Add Party
- ☐ Amend
- ☐ Change of Venue/Transfer
- ☐ Compel
- ☐ Consolidation
- ☐ Continue
- ☐ Deposition
- ☐ Designate a Mediator
- ☐ Judgment as a Matter of Law (during Trial)
- ☐ Disburse Funds
- ☐ Extension of Time
- ☐ In Limine
- ☐ Joinder
- ☐ More Definite Statement
- ☐ Motion to Dismiss pursuant to Rule 12(b)
- ☐ New Trial
- ☐ Objection of Exemptions Claimed
- ☐ Pendente Lite
- ☐ Plaintiff's Motion to Dismiss
- ☐ Preliminary Injunction
- ☐ Protective Order
- ☐ Quash
- ☐ Release from Stay of Execution
- ☐ Sanctions
- ☐ Sever
- ☐ Special Practice in Alabama
- ☐ Stay
- ☐ Strike
- ☐ Supplement to Pending Motion
- ☐ Vacate or Modify
- ☐ Withdraw
- ☑ Other Memorandum in support of summary judgment pursuant to Rule none (Subject to Filing Fee)

| Check here if you have filed or are filing contemoraneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) ☐ | Date: 1/13/2011 5:43:16 PM | Signature of Attorney or Party: /s NATHAN A. DICKSON |
|---|---|---|

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 20 of 88

ELECTRONICALLY FILED
KATHY S. COULTER, CLERK

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE,

PLAINTIFF,

VS.

LASALLE BANK NATIONALASSOCIATION as Trustee for Certificate Holders of BEAR STEARNS ASSET BACKED SECURITIES I, LLC asset backed certificates, series 2006-EC2; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ENCORE CREDIT CORP., EMC MORTGAGE CO., and BANK OF AMERICA, As successor-in-interest to Lasalle Bank National Assn.,

DEFENDANTS.

CASE NUMBER:

CV-2008-362

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Phyllis Horace, through counsel, submits this memorandum of law in support of her motion for summary judgment on the issue of standing as to Defendant LaSalle Bank National Association ("LaSalle"). Plaintiff's Complaint claims that LaSalle did not have possession of the mortgage note when it notified her that foreclosure was forthcoming. Namely, LaSalle had no — and cannot have any — authority to institute foreclosure proceedings because LaSalle is not entitled to the money secured by the promissory note.

**INTRODUCTION**

On November 11, 2005, Plaintiff borrowed $283,500.00 for the purchase of property at 3745 Knowles Road in Phenix City, Alabama. The loan was secured by a mortgage to the lender

Encore Credit Corp ("Encore"). The mortgage was recorded in the office of the probate judge on August 11, 2006.At some unknown time after the signing of the mortgage documents, Encore executed a blank endorsement.[1] No other assignments or endorsements are present in the record provided to the Plaintiff.[2]

On October 16, 2008, LaSalle sent a "Notice of Acceleration of Promissory Note and Mortgage" to Plaintiff. Plaintiff then filed the instant cause. The court enjoined the foreclosure by order entered on November 20, 2008. Plaintiff currently lives in the subject property. Plaintiff comes before the court today requesting a judgment that the foreclosure proceeding be permanently enjoined as to the defendant Trustee LaSalle acting for its beneficiary trust (and Bank of America as the successor-in-interest), the only entity to give notice of foreclosure and for summary judgment on her claims related to the wrongful foreclosure of this real property.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."ALA. R. CIV. PROC. 56(c)(3), *Young v. La Quinta Inns, Inc.*, 682 So.2d 402 (Ala.1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, *Hurst v. Alabama Power Co.*, 675 So.2d 397 (Ala.1996), *Fuqua v. Ingersoll-Rand Co.*, 591 So.2d 486 (Ala. 1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, *Fuqua, supra, Aldridge v. Valley Steel Constr., Inc.*, 603 So.2d 981 (Ala. 1992); and will resolve all reasonable doubts against the moving party. *Ex parte Brislin*, 719 So.2d 185 (Ala.1998).

1 Bates #: Horace v. LaSalle 29.
2 Bates #: Horace v. LaSalle 2.

# III. ARGUMENTS

## A. THE DEFENDANT TRUST HAS NO STANDING TO FORECLOSE BECAUSE THERE HAS BEEN NO VALID ENFORCEABLE ASSIGNMENT TO THE TRUSTEE OF THE TRUST

### A-1.The Defendant Trust Is A New York Common Law Trust Governed By New York Law Based On Its Trust Agreement

The October 16, 2008 Notice sent to Plaintiff was on behalf of the legal entity,"LaSalle Bank National Association, as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2" (hereafter the "Trust"). LaSalle is not the originator of the mortgage, the servicer, or even a bank. Instead, this entity is a New York common law trust created by an agreement known as "Pooling and Service Agreement." Allegedly, the Plaintiff's loan, along with other loans, were pooled into a trust and converted into mortgage-backed securities ("MBS") that can be bought and sold by investors — a process known as securitization. The underlying promissory notes of each and every mortgage held by the Trust serve as generate a potential income stream for investors.

The Trust allegedly holding the Plaintiff's note was created on or about February 1, 2006, and is identified as "LaSalle Bank National Association, as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2."The Trust, by its terms, set a "closing date" of February 28, 2006.The terms of the Trust are contained in the Pooling and Servicing Agreement ("PSA" or the "Trust agreement"), which is an approximately 400-page document that creates the Trust and defines the rights, duties and

Case 1:12-cv-00121-KD-B Document 1-2 Filed 02/23/12 Page 23 of 38

obligations of the parties to the Trust Agreement.[3] The PSA is filed under oath with the Securities and Exchange Commission and is attached to LaSalle's motion for summary judgment as Exhibit 1. The PSA also incorporates by reference a separate document called the Mortgage Loan Purchase Agreement ("MLPA"). These various documents, and hence the acquisition of the mortgage assets for the Trust, are governed under the law of the State of New York pursuant to section 11.03 of the PSA (found at page 133 of 397 of the PSA).

The Trust, being sued through its trustee, is a New York Corporate Trust formed to act as a "REMIC" trust (defined below) pursuant to the U.S. Internal Revenue Code ("IRC"). Pursuant to the terms of the Trust and the applicable Internal Revenue Service ("IRS") regulations adopted and incorporated into the terms of the Trust, the "closing date" of the Trust (February 28, 2006) is also the "Startup Day" for the Trust under the REMIC provisions of the IRC. The Startup Day is significant because the IRC ties the limitations upon which a REMIC trust may be receive its assets to this date. The relevant portion of the IRC addressing the definition of a REMIC is:

> (a) General rule. For purposes of this title, the terms 'real estate mortgage investment conduit'and 'REMIC' mean any entity—
> (1) to which an election to be treated as a REMIC applies for the taxable year and all prior taxable years,
> (2) all of the interests in which are regular interests or residual interests,
> (3) which has 1 (and only 1) class of residual interests (and all distributions, if any, with respect to such interests are pro rata),
> (4) ***as of the close of the 3rd month beginning after the startup day***and at all times thereafter, substantially all of the assets of which consist of qualified mortgages and permitted investments.

26 U.S.C.S. § 860D(emphasis added).

3It is settled that the duties and powers of a trustee are defined by the terms of the trust agreement and are tempered only by the fiduciary obligation of loyalty to the beneficiaries (see, United States Trust Co. v First Nat'l City Bank, 57 A.D.2d 285, 295-296, aff'd 45 NY2d 869; Restatement [Second] of Trusts § 186, comments a, d). *See In re* IBJ Schroder Bank & Trust Co., 271 A.D.2d 322 (N.Y. App. Div. 1st Dep't 2000)

The IRC also provides definitions of prohibited transactions and prohibited contributions which are relevant to this case as well. In the context of this case, the relevant statute is the definition of *prohibited contributions* which is as follows:

> 26 U.S.C. 860G(d)(1) states:
>
> Except as provided in section 860G(d)(2), "if any amount is contributed to a REMIC after the startup day, there is hereby imposed a tax for the taxable year of the REMIC in which the contribution is received equal to 100 percent of the amount of such contribution."
>
> 26 U.S.C. 860G(d)(2) states:
> (2) Exceptions. Paragraph (1) shall not apply to any contribution which is made in cash and is described in any of the following subparagraphs:
> (A) Any contribution to facilitate a clean-up call (as defined in regulations) or a qualified liquidation.
> (B) Any payment in the nature of a guarantee.
> (C) Any contribution during the 3-month period beginning on the startup day.
> (D) Any contribution to a qualified reserve fund by any holder of a residual interest in the REMIC.
> (E) Any other contribution permitted in regulations.

The PSA (primarily in section 9.12) addresses these sections of the IRC by obliging the parties to the Trust to avoid any action which might jeopardize the tax status of any REMIC and/or impose any tax upon the Trust for prohibited contributions or prohibited transactions. These PSA provisions are important to the court's analysis of the facts in this case because of the interplay between the New York trust law, the IRC's REMIC provisions, and the PSA's incorporation of the IRC REMIC provisions.

**A-2.The Trust Instrument/PSA Sets Forth A Specific Time, Method And Manner Of Funding The Trust**

The Trust seeking to foreclose on the Plaintiff has included in the terms of its Trust agreement (the PSA) a specific time, method and manner of funding the Trust with its assets.

The *most critical* time is the Trust's closing date, February 28, 2006.[4] According to the terms of the PSA, all of the assets of the Trust were to be transferred to the Trust on or before the closing date.5 This requirement is to ensure that the Trust will receive REMIC status and thus be exempt from federal income taxation. Section 2.02(a) of the PSA provides for a window of 90 days after the Trust closing date in which the Trust may complete any missing paperwork or finalize any documents necessary to complete the transfers of assets from the depositor to the Trust.6 Thus, for an asset to become an asset of the Trust it *must* have been transferred to the Trust within the time set forth in the PSA. The additional 90 days in the timeline requirement is incorporated from the REMIC provisions of the IRC to provide a "clean-up period" for a REMIC to complete the documents associated with the transfers of assets to a REMIC after the startup day (which is also the Trust closing date). Therefore, according to the plain terms of the Trust agreement in this case, the closing date/startup date was February 28, 2006 and the last day for transfer of assets into the Trust was May 29, 2006.

## B. THE TRUST AGREEMENT PROVIDES THE ONLY MANNER IN WHICH ASSETS MAY BE PROPERLY TRANSFERRED TO THE TRUST AND ANY ACT IN CONTRAVENTION OF THE TRUST AGREEMENT IS VOID

### B-1. Transfer of Assets to the Trust Pursuant to the Trust Instrument/PSA

As a generic matter, there are several methods by which the underlying assets of the Trust, specifically the individual promissory notes, might be transferred or conveyed. A trust's ability to transact is restricted to the actions authorized by its trust documents. In this case, the Trust documents permit only one specific method of transfer to the Trust. That method is set forth in Section 2.01 of the PSA:

---

4http://sec.gov/Archives/edgar/data/1352655/000088237706000801/d431341.htm(last viewed 1/7/10) **This date is defined in the Trust instrument at page 25 of 397 in exhibit 1.**

5 This requirement is found at Section 2.01 on page 56 of 397.

6 This requirement is found at page 58 of 397.

Case 1:12-cv-00121-KD-B Document 1-2 Filed 02/23/12 Page 26 of 38

> Pursuant to the Mortgage Loan Purchase Agreement, each Seller sold, transferred, assigned, set over and otherwise conveyed to the Depositor, without recourse, all the right, title and interest of such Seller in and to the assets sold by it in the Trust Fund....
>
> In connection with such sale, the Depositor has delivered to, and deposited with, the Trustee or the Custodian, as its agent, the following documents or instruments with respect to each Mortgage Loan so assigned: (i) the original Mortgage Note, including any riders thereto, endorsed without recourse (A) in blank or to the order of *"LaSalle Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2,"* or (B) in the case of a loan registered on the MERS system, in blank, and in each case showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee,

The analysis of this transfer language requires the court to consider each part. In the second paragraph of the language in the Trust Agreement, the first statement is one of transfer, stating ***"the Depositor has delivered to and deposited with the Trustee or the Custodian the following documents"***. The key document is the original mortgage note, which requires mandatory endorsements found in this language: ***"the original mortgage note....endorsed without recourse"*** followed by two alternatives which are phrased in the either/or format. The first labeled "A" states ***"in blank or to the order of "LaSalle Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC ,Asset-Backed Certificates, Series 2006-EC2."*** The second possibility stated in "B" provides as the "or" proposition for transfer the following statement ***"in the case of a loan registered on the MERS system, in blank..."*** In each case, the affirmative language of the Trust agreement places a burden on the depositor to make a valid legal transfer in the terms required by the Trust instrument. The key language in the entire paragraph is the final statement trailing the "either/or" language of A & B which reads: ***"and in each case showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee"***.

Stacked upon the top of this requirement of an unbroken chain of endorsements is the requirement of certification of the final contents of the collateral file for the benefit of the Trust. This requirement is found at Exhibit 1 to the MLPA (Mortgage Loan Purchase Agreement), which is an attachment to and incorporated as a part of the PSA in Section 2.01. This Document is found at Horace 391 and states as follows:

> With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser or its designee, and which shall be delivered to the Purchaser or its designee pursuant to the terms of this Agreement.
>
> (a) The original Mortgage Note, including any riders thereto, endorsed without recourse to the order of *"LaSalle Bank National Association, as Trustee for certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2,"* and showing to the extent available to the related Mortgage Loan Seller an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee;

The foregoing requirement demonstrates clearly that while the parties to the securitization made provisions whereby promissory notes for this Trust might be delivered in blank to the Trustee, there were two requirements that were *mandatory*. First, all notes sold to the Trust were required to have an unbroken chain of endorsements from the original payee to the person endorsing it to the Trustee. This requirement stems from a particular business concern in securitization, namely to evidence that there was in fact a "true sale" of the securitized assets and that they are in no way still property of the originator, sponsor, or depositor, and thus not subject to the claims of creditors of the originator, sponsor, or depositor. A fact testified to by the Plaintiff's securitization expert, Thomas J. Adams, who explained under examination by Counsel for the Trust as follows:

> Page 83
> Q So what then I guess with respect to
> notes is -- what's the purpose then of having a
> chain of endorsements, if what I'm concerned

about is who currently owns it?
A My understanding is that it helps establish how you came to possess it.
Q Okay. And why does that matter?
Page 84
A From an investor perspective in a mortgage backed securities governed by a pooling and servicing agreement, you want confidence that the collateral for the file is properly conveyed to it, that -- that the -- that they will have the right to establish their ownership as investors in that collateral.

Second, there was a requirement that ultimately, within 90 days of the Trust closing date, the actual promissory note must be endorsed over to the trustee for the specific trust to effectively transfer the asset into the trust and therefore make the Horace promissory note Trust property. This requirement finds support in logic and law and is, in fact, the ancient and settled law of New York on this issue.

**<u>B-2. New York Law Governs The Mandatory Requirements To Effectively Transfer An Asset To A Trust</u>**

It is not contested that securitization trusts, such as the defendant, are subject to the common law of New York.[7] New York's trust law is ancient and settled. There are a few principles of New York Trust law that are particularly important to the analysis of whether any particular asset is an asset of a given trust. Under New York law, the analysis of whether an asset is trust property is determined under the law of gifts.[8] In order to have a valid inter vivos gift, there must be a delivery of the gift (either by a

[7] As early as 1935, in <u>Burgoyne v. James, 282 N.Y.S. 18, 21 (1935)</u>, the New York Supreme Court recognized that business trusts, also known as ""Massachusetts trusts","are deemed to be common law trusts. *See also In re Estate of Plotkin*, 290 N.Y.S.2d 46, 49 (N.Y. Sur. 1968) (characterizing common stock trust funds as ""common law trust[s]""). Other jurisdictions are in accord. *See, e.g., Mayfield v. First 'Nat'l Bank of Chattanooga*, 137 F.2d 1013 (6th Cir. 1943) (applying common law trust principles to a pool of mortgage participation certificate holders).
[8] ""In the case of a trust where there is a trustee other than the grantor, transfer will be governed by the existing rules as to intent and delivery (the elements of a gift)""*In re* Becker, 2004 N.Y. Slip Op. 51773U, 4 (N.Y. Sur. Ct. 2004).

physical delivery of the subject of the gift) or a constructive or symbolic delivery (such as by an instrument of gift) sufficient to divest the donor of dominion and control over the property[9] and "what is sufficient to constitute delivery 'must be tailored to suit the circumstances of the case'".[10] The delivery rule requires that "'[the] delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit.'"[11]

"Under New York law there are four essential elements of a valid trust of personal property: (1) A designated beneficiary; (2) a designated trustee, who must not be the beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) the actual delivery of the fund or other property, or of a legal assignment thereof to the trustee, with the intention of passing legal title thereto to him as trustee."[12] There is no trust under the common law until there is a valid delivery of the asset in question to the Trust.[13] If the trust fails to acquire the

---

9 (see, Matter of Szabo, 10 N.Y.2d 94, 98-99, *supra*; Speelman v Pascal, 10 N.Y.2d 313, 318-320, supra; Beaver v. Beaver, 117 N.Y. 421, 428-429, supra; Matter of Cohn, 187 App. Div. 392, 395) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56 (N.Y. 1986).

10 (Matter of *Szabo*, supra, at p. 98).

11 (id.; Vincent v Rix, 248 N.Y. 76, 83; Matter of Van Alstyne, supra, at p 309; see, Beaver v. Beaver, supra, at p 428) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56-57 (N.Y. 1986).

12 Brown v. Spohr, 180 N.Y. 201, 209-210 (N.Y. 1904).

13 Until the delivery to the trustee is performed by the settlor, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc 30, aff'd 190 App. Div. 907, supra; Marx v. Marx, 5 Misc 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).

property,then there is *no trust* over that property which may be enforced.[14] An attempt to convey to a trust will fail if there is no designated beneficiary in the conveyance.[15]

In the context of mortgage-backed securitization, it is clear that registration of the notes and mortgages in the name of the trustee for the trust is necessary for effective transfer to the trust. Within the Statutes of New York governing Trusts, Estates Powers and Trusts Law (EPTL) section 7-2.1(c) authorizes investment trusts to acquire real or personal property "in the name of the trust as such name is designated in the instrument creating said trust." Further, the actual contracts of the parties, which include the custodial agreements, the mortgage loan purchase agreements, and the trust instrument known as the "pooling and servicing agreement," prescribe a very specific method of transfer of the notes and mortgages to the Trust. Because the method of transfer is set forth in the Trust instrument, it is not subject to any variance or exception.[16] The Trust documents require that the promissory notes and mortgages be transferred to the Trustee, which under New York trust law requires valid delivery. The question then arises — "What constitutes valid delivery to the Trustee?"

---

14 In an action against the individual defendant as trustee, based on the theory of breach of fiduciary obligation, the complaint was properly dismissed on the ground that he had acquired no title or separate control of the goods and, hence, there was no actual trust over the property to breach. Kermani v. Liberty Mut. Ins. Co., 4 A.D.2d 603 (N.Y. App. Div. 3d Dep't 1957).

[15] Wells Fargo Bank v. Farmer, 2008 N.Y. Misc Lexis 3248.

[16] Courts may neither ignore the actual provisions of transaction documents nor create contractual remedies that were omitted from the governing contracts by the contracting parties. *See* Schmidt v. Magnetic Head Corp., 468 N.Y.S.2d 649, 654 (N.Y. App.Div. 1983) (""It is fundamental that courts enforce contracts and do not rewrite them . . . An obligation undertaken by one of the parties that is intended as a promise . . . should be expressed as such, and not left to implication."" (citations omitted)); *Morlee Sales Corp. v. Manufacturers Trust Co.*, 172 N.E.2d 280, 282 (N.Y. 1961) (""[T]he courts may not by construction add or excise terms . . . and thereby 'make a new contract for the parties under the guise of interpret[ation].'"" (quoting *Heller v. Pope*, 250 N.E. 881, 882 (N.Y. 1928))

When the requirements of transfer to the trustee are viewed in the context of the corporate or business trust indenture, more information about compliance with these requirements becomes apparent. One must first understand that

> "[t]he corporate trustee has very little in common with the ordinary trustee . . . . The trustee under a corporate indenture . . . has his [or her] rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement. His [or her] status is more that of a stakeholder than one of a trustee."[17]

Indeed, "[a]n indenture trustee is unlike the ordinary trustee. In contrast with the latter, some cases have confined the duties of the indenture trustee to those set forth in the indenture."[18] The indenture trustee, it has been said, resembles a stakeholder whose obligations are defined by the terms of the indenture agreement.[19] Moreover,"[i]t is settled that the duties and powers of a trustee are defined by the terms of the trust agreement and are tempered only by the fiduciary obligation of loyalty to the beneficiaries".[20]

The clear import of these cases and statutes is that the delivery of an asset to a trustee under the terms of a corporate indenture requires strict compliance with the mandatory transfer terms of the trust indenture. Thus the Trustee in this case can only take delivery in strict compliance with the terms of the PSA/Trust document. Further, given that New York Estates Powers and Trusts Law section 7-2.1(c) authorizes a trustee to acquire property "in the name of the trust as such name is designated in the

---

[17] AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co., 2008 N.Y. Slip Op. 5766, 7 (N.Y. 2008)
[18] Green v. Title Guarantee & Trust Co., 223 A.D. 12, 227 N.Y.S. 252 (1st Dept.), aff'd, 248 N.Y. 627 (1928); Hazzard v. Chase National Bank, 159 Misc. 57, 287 N.Y.S. 541 (Sup. Ct. 1936), aff'd, 257 A.D. 950, 14 N.Y.S.2d 147 (1st Dept.), aff'd, 282 N.Y. 652, cert. denied, 311 U.S. 708 (1940).
[19] See Meckel v. Continental Resources, 758 F.2d 811, 816 (2d Cir. 1985) as cited in Ambac Indem. Corp. v. Bankers Trust Co., 151 Misc. 2d 334, 336 (N.Y. Sup. Ct. 1991).
[20] see, United States Trust Co. v First Nat'l City Bank, 57 A.D.2d 285, 295-296, aff'd 45 NY2d 869; Restatement [Second] of Trusts § 186, comments a, d) as cited in *In re* IBJ Schroder Bank & Trust Co., 271 A.D.2d 322 (N.Y. App. Div. 1st Dep't 2000).

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 32 of 38

instrument creating said trust property," there should be little doubt that for transfer to an trustee to be effective, the property must be registered in the name of the trustee *for the particular trust.* Trust property cannot be, as the Defendant argues, held with incomplete endorsements and assignments that do not indicate that the property is held in trust by a trustee for a specific beneficiary trust. In fact, it is clear in the law of New York that an attempt to transfer to a trust which fails to specify both a trustee and a beneficiary is ineffective as a conveyance to the Trust. ***"The failure to name a beneficiary for the Trustee renders the assignment without merit."21***

This position is further supported logically in the common law of New York by the following propositions:

(1) "Until the delivery to the trustee is performed by the settlor, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise".[22]

(2) The delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit; there must be a change of dominion and ownership; intention or mere words cannot supply the place of an actual surrender of control and authority over the thing intended to be given.[23] It is the consummation of the donor's intent to give that completes the transaction. Intention alone, no matter how fully established, is of no avail

---

21 Wells Fargo Bank, N.A. v. Farmer, 2008 NY Slip Op 51133U, 6 (N.Y. Sup. Ct. 2008)

[22](cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc. 30, aff'd 190 App. Div. 907, supra; Marx v. Marx, 5 Misc 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).

[23]Vincent v. Putnam, 248 N.Y. 76, 82-84 (N.Y. 1928).

without the consummated act of delivery.[24] How could one logically argue that delivering a promissory note endorsed in blank (making it bearer paper) into a trustee's vault is "delivery beyond the authority and control of the donor" when the vault is managed by the agent of the donor? If the donor were to claim that the promissory note were its property, not the trustee's, there would be no evidentiary basis for the trustee to claim ownership. Accordingly, New York law expressly requires that for property to be validly delivered to a trust, the property must pass completely out of the control of the donor (and its agents):

> "If the donor delivers the property to the third person simply for the purpose of his delivering it to the donee as the agent of the donor, the gift is not complete until the property has actually been delivered to the donee. Such a delivery is not absolute, for the ordinary principle of agency applies, by which the donor can revoke the authority of the agent, and resume possession of the property, at any time before the authority is executed.""[25]

Another case addressing this issue holds that "In order that delivery to a third person shall be effective, he must be the agent of the donee. Delivery to an agent of the donor is ineffective, as the agency could be terminated before delivery to the intended donee."[26]

Trustees for securitizations often occupy many roles simultaneously and conflictingly both as document custodians and trustees for myriad thousands of securitizations as well as for various parties who are active in the securitization process including originators, servicers, sponsors and depositors. Accordingly, it is inconceivable that anything other than registration into "the name of the trust as such

---

[24] Phillippsen v. Emigrant Indus.Sav. Bank, 86 N.Y.S.2d 133, 137-138 (N.Y. Sup. Ct. 1948). (*Beaver v. Beaver, supra,* 117 N.Y. 421, 428, 22 N.E. 940, 941, 6 L.R.A. 403, 15 Am.St.Rep. 531).

[25] (See, also, Grant Trust & Savings Co. v. Tucker, 49 Ind. App. 345; Furenes v. Eide, 109 Ia. 511; Dickeschied v. Exchange Bank, 28 W. Va. 340; Love v. Francis, 63 Mich. 181; [**428] Merchant v. Building Co. [***15] , 17 Ohio Circuit Ct. 190.)

[26] In re Nat'l Commer. Bank & Trust Co., 257 A.D. 868, 869-870 (N.Y. App. Div. 3d Dep't 1939) citing Vincent v. Rix, supra v. Rix, supra; Bump v. Pratt, 84 Hun, 201.

name is designated in the instrument creating said trust property"27 could ever qualify as delivery to any particular securitization trust. Absent such registration, there would be nothing that would indicate which of thousands of trusts in the care of a trustee a particular promissory note might belong to or if it were the personal property of the trustee itself. Absent such registration, a promissory note would simply be bearer paper, and thus the property of anyone who obtained possession of it. Further, if anything less constituted delivery, why are our courts overwhelmed with robo-signed mortgage assignments and affidavits expressing legally-impossible transfers into the specific trusts long *after* the trusts have closed for funding?

This point was recently slammed home to the public consciousness in a watershed decision out of the State of Massachusetts. On January 7, 2011, the Supreme Judicial Court of Massachusetts—the highest court in that state—rendered a unanimous verdict in a case captioned *U.S. Natl. Bank Assn., Trustee, v. Ibanez, For ABFC 2005-OPT 1 Trust, ABFC Asset Backed Certificates, Series 2005-OPT 1*, No. SJC-10694, (Mass. Jan. 7, 2011). While that ruling is of course not binding upon this court, it is very much contrary to the mortgage securitization industry's position in cases involving the foreclosure of mortgage loans which have allegedly been securitized. The facts of the case in Massachusetts and the facts of this instant case are similar. Both the Massachusetts and the Horace cases concern an entity seeking to foreclose on the mortgagor when the foreclosing entities did not possess the underlying promissory note at the time of the foreclosure (or attempted foreclosure in the Horace situation). The case was a ruling on two consolidated cases – both cases were filed by banks (as trustees for

27 EPTL 7-2.1(c)

two separate trusts) to quiet title on properties they had foreclosed and purchased at the foreclosure sale to satisfy the mortgagor's debt. The Massachusetts Supreme Judicial Court held that neither bank proved that its trust owned the mortgages when they foreclosed on the homes; therefore, neither had title to the foreclosed properties and that their foreclosures were void. Effectively, this put the borrowers back into the place they were before the foreclosure. The Massachusetts Supreme Judicial Court did not tell the homeowners they are allowed to shirk their obligation to pay their mortgages, which are still outstanding, valid obligations. The Massachusetts Supreme Judicial Court did, however, sharply instruct the banks that they must have the proper documentation which demonstrates a valid right to foreclose before a foreclosure can be carried out. It is well worth noting the conclusion of the Massachusetts *Ibanez* opinion. The Massachusetts Supreme Judicial Court noted that "The legal principles and requirements we set forth are well established in our case law and our statutes. All that has changed is the [banks'] apparent failure to abide by those principles and requirements in the rush to sell mortgage-backed securities." Just as the principles and requirements of Massachusetts law are well-founded, so too are those of New York law, and they should be upheld even if adherence to the law is inconvenient for banks rushing to sell mortgage-backed securities.

**B-3 THE INTENT TO TRANSFER AN ASSET TO THE TRUST *IS NOT A TRANSFER TO THE TRUST***

The contents of these statutes, cases and contracts lead to one inescapable conclusion: the intent of the parties and the requirements of the contracts were that the assets be conveyed to the Trusts by the Trust closing dates. For a transfer to any

particular trust to be effective, there should have been a registration of the assets into "the name of the trust as such name is designated in the instrument creating said trust property"—this is the only method by which these assets could have been "divested from the possession and title" of the donors.

In response to the lucidity of the controlling law on this issue, the mortgage foreclosure industry has chosen to argue that it is clear that it was the parties'"intent" to transfer these assets and therefore "no court" would ever declare that these assets were not transferred to these trusts. The controlling law is overwhelmingly against the industry in this position. The failure to deliver the notes and mortgages to these trusts as required by the trust instruments is a default under the terms of every agreement that these parties executed, including their agreements for payment guarantees with the monoline bond insurers. The securitization industry chose to create its securitization trusts under New York law precisely because the law was ancient and settled. Now that the actions of the foreclosure industry contradicts that law, parties such as the defendant trust are left to argue hope against precedent. The well-settled New York trust law provides that "A mere intention to make a gift which has not been carried into effect, confers no right upon the intended beneficiary. There must be also delivery beyond the power of further control and dominion."[28] Equity will not help out an incomplete delivery. If the agent of the donor has failed to make the delivery expected equity will

[28](Vincent v. Rix, 248 N.Y. 76, 85 v. Rix, 248 N.Y. 76, 85; Matter of Green, 247 App. Div. 540; McCarthy v. Pieret, 281 N.Y. 407, 409.) as cited by In re FIRST TRUST & DEPOSIT CO., 264 A.D. 940, 941 (N.Y. App. Div. 4th Dep't 1942)

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 37 of 58

not declare him a trustee for the donee.[29] "Thus, Thornton on Gifts and Advancements (§140) notes:

> "In determining whether there has been a valid delivery, the situation of the subject of the gift must be considered. Thus if it is actually present, and capable of delivery without serious effort, it is not too much to say that there must be an actual delivery, although the donor need not in person or by agent hand the article to the donee, if the latter assumes the possession."

There was absolutely nothing in the physical nature of the papers to be delivered in this case, or in the physical condition or the surroundings of the donor, that made a symbolical delivery necessary."[30] It is true that the old rule requiring an actual delivery of the thing given has been very largely relaxed, but a symbolical delivery is sufficient only when the conditions are so adverse to actual delivery as to make a symbolical delivery as nearly perfect and complete as the circumstances will allow.[31]

Further, the failure to convey to a trust per the controlling trust document is not a matter that may be cured by the breaching party. New York law is unflinchingly clear that a trustee has only the authority granted by the instrument under which he holds, either deed or will. This fundamental rule has existed from the beginning and is still law.[32] An indenture trustee is unlike the ordinary trustee. In contrast with the latter, some cases have confined the duties of the indenture trustee to those set forth in the indenture.[33] From this context springs the seminal rule of law that effectively causes the parties to the Trust agreement and the Trust to be "gored by their own bull". New

[29] Vincent v. Putnam, 248 N.Y. 76, 82-84 (N.Y. 1928)
[30] In re Van Alstyne, 207 N.Y. 298, 309-310 (N.Y. 1913).
[31] In re Van Alstyne, 207 N.Y. 298, 309-310 (N.Y. 1913).
[32] Allison & Ver Valen Co. v. McNee, 170 Misc. 144, 146 (N.Y. Sup. Ct. 1939).
[33] Ambac Indem. Corp. v. Bankers Trust Co., 151 Misc. 2d 334, 336 (N.Y. Sup. Ct. 1991).

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 38 of 58

York's law is so well-settled regarding the limitations of a trustee's power to act that New York's Estates Powers and Trust Law Section 7-2.4 states:

> § 7-2.4 Act of trustee in contravention of trust
>
> If the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized by this article and by any other provision of law, is void.

Therefore, the trustees for these trusts may only acquire assets in the manner set forth in the trust instrument and may not acquire assets in violation of the trust instrument. To the extent that any assets were not conveyed to these trusts as required and when required by the trust instrument, they are not assets of the trusts and the trustee cannot correct this deficiency now since the funding period provided in the Trust instruments passed many years ago. The attempt to acquire assets by these trusts which violate the terms of the Trust instrument are void. Therefore, late assignments, improper chains of title, late endorsements, improper chains of title in the endorsements and the attempt to transfer to the trusts by foreclosure deed are just a number of the many examples of actions which are *void* if taken by a party to the indenture who is attempting to transfer property to the Trustee for the Trust in violation of the trust instrument.

## C. THE TRUST NEVER PROPERLY ACQUIRED THE MORTGAGE NOTE AND THE TRUST CANNOT CURE ITS FATAL STANDING DEFECT

Under New York law there is no trust over property that has not been properly transferred to a trust. The Defendant Trust stated to the U.S. Securities and Exchange Commission in filings under oath that it has assets in excess of $400 million.[34] To acquire assets, the Trust must be

34http://sec.gov/Archives/edgar/data/1352655/000088237706000801/d431341.htm(last viewed 1/7/10)

funded in accordance with the requirements of the PSA/Trust documents. The pertinent terms of the agreement are found at §2.01 (Conveyance of Trust Fund) of the PSA.[35] This section details how the mortgage notes in the instant case were transferred from Encore Credit Corp. (as Originator) to EMC Mortgage Corp. (as the Sponsor and Master Servicer) to Bear Stearns Asset Backed Securities I LLC (the Depositor) to LaSalle Bank National Association (the Trustee). Bear Stearns as the Depositor was required to deliver to LaSalle the original mortgage note showing an unbroken chain of endorsements from the original payee to the person endorsing it to the Trustee. The person endorsing to the Trustee was the Bear Stearns entity.[36]

In the discovery provided to the Plaintiff, the only endorsement to the Horace mortgage note is a blank endorsement "pay to the order of ______ without recourse Encore Credit Corp, A California Corporation," signed by an unreadable name with an unreadable title.[37] The last assignment of the mortgage was a blank endorsement with a stamp by Encore — nothing has been submitted by the Trust to the Court indicating that Encore ever assigned the mortgage to any other entity. Thus, based on the documents in this case, Encore, not LaSalle, is the mortgage holder. LaSalle does not have the authority to foreclose the mortgage.

No later than May 29, 2006 there should have been — at a minimum — endorsements from Encore Credit Corp. to EMC Mortgage Corp., then EMC Mortgage Corp. to Bear Stearns, then Bear Stearns to LaSalle.[38] And yet, there is no "showing" of an unbroken chain of endorsements in the documents provided to the Plaintiff. The affidavit of Thomas J. Adams, expert for the Plaintiff, testified to this:

---

35 Bates #: Lasalle/Horace 0067.

[36] *See* Bates #: LaSalle/Horace 0067-0068: ""(A) in blank or to the order of ""LaSalle Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2,"" or (B) in the case of a loan registered on the MERS system, in blank, and in each case showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee, . . .""

[37] Bates #: Horace v. LaSalle 29.

[38] Plaintiff states ""at a minimum"" because there may have been more transfers.

> "According to the requirements set forth in the Trust Agreement I would expect to see a series of endorsements of the promissory note reflective of each party who had an interest in the promissory note reflective of each party who had an ownership interest in the promissory note culminating with a blank endorsement from the depositor at the very minimum."[39]

The Trust never possessed the mortgage note per the terms of the PSA (Pooling and Service Agreement). Further, in the PSA's exhibits, Exhibit One sets forth the contents of the collateral file for each mortgage loan that is trust property and further includes a final specific endorsement to the Trustee for the specific trust in this case to effect a final transfer to the Trust and to make the Horace promissory note trust property.

Any attempt by LaSalle, or Bank of America, to transfer the promissory note to the Trust at this late date would fail for numerous reasons, not the least of which is that the closing date of February 28, 2006 passed nearly 5 years ago. By the terms of the Trust and the applicable provision of the Internal Revenue Code incorporated into and a part of the Trust agreement, the promissory note cannot be transferred to the Trust.[40] Because the uncontradicted evidence in the case is that the Horace loan has never been conveyed to the Trust and a conveyance to the Trust at this time would be void as violating the terms of the PSA the Court is left with one clear and inescapable proposition: ***The Trust has never owned the Horace promissory note and the Trust can never own the Horace promissory note.***

## D. THE TRUST IS NOT ENTITLED TO THE MONEY SECURED BY THE HORACE MORTGAGE AND CANNOT FORECLOSE

Per Ala. Code §35-10-12, the power to sell lands is held by the person who " . . . by assignment or otherwise, becomes entitled to the money thus secured." As outlined above, the

[39] Affidavit and Testimony of Thomas J. Adams, ¶ 12.
[40] Affidavit and Testimony of Thomas J. Adams, ¶17.

Trust has not provided documentation to show that it was or is entitled to the money secured by the mortgage of Horace's property. "The defendant Trust [LaSalle] has offered no proof of ownership and the collateral file offered by the defendant Trust clearly demonstrates that this loan was not securitized nor was it transferred to this Trust."[41]

## CONCLUSION

Based on the law, the terms of the Pooling and Service Agreement, the failure to show the proper chain of endorsements, and the arguments contained herein, Plaintiff moves this Court to permanently enjoin LaSalle Bank National Association (and Bank of America as its successor-in-interest) from foreclosing on the property at 3745 Knowles Road, Phenix City because they have failed to make the required showing that they are or ever were or ever could be the holder of the mortgage promissory note.

RESPECTFULLY SUBMITTED,

/s/ Nicholas H. Wooten
Nicholas H. Wooten – Ala. Bar No. Woo084
(Attorney for Plaintiff)
P.O. Box 3889
Auburn, AL 36831-3389
Tel. (334) 887-3000
Fax (334) 821-7720

**OF COUNSEL:**

Mr. Nick Wooten
**WOOTEN LAW FIRM, P.C.**
P.O. Box 3389
Auburn, Al. 36831
(334) 887-3000

41 Affidavit and Testimony of Thomas J. Adams, ¶14 and deposition testimony page 140, lines 4-8.

**JINKS, CROW, & DICKSON, P.C.**
PO Box 350
219 Prairie Street North
Union Springs, AL 36089

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Defendants by providing an electronic copy on this the 13th day of January 2011.

All counsel of Record

/s/ Nick Wooten

OF COUNSEL

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 43 of 58

Defendant Trust and its agents declaring that the Trust has no interest in her promissory note and may not pursue foreclosure against her and preserving for trial the issue of damages against the Defendant trust and its agents.

RESPECTFULLY SUBMITTED,

/s/ Nicholas H. Wooten
Nicholas H. Wooten – Ala. Bar No. Woo084
(Attorney for Plaintiff)
P.O. Box 3889
Auburn, AL 36831-3389
Tel. (334) 887-3000
Fax (334) 821-7720

**OF COUNSEL:**

Mr. Nick Wooten
**WOOTEN LAW FIRM, P.C.**
P.O. Box 3389
Auburn, Al. 36831
(334) 887-3000

**JINKS, CROW, & DICKSON, P.C.**
PO Box 350
219 Prairie Street North
Union Springs, AL 36089

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Defendants by providing an electronic copy on this the 13th day of January 2011.

All counsel of Record

/s/ Nick Wooten
OF COUNSEL



Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 44 of 58

AlaFile E-Notice

57-CV-2008-000362.00

Judge: ALBERT L JOHNSON

To: WOOTEN NICHOLAS HEATH
nhwooten@gmail.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL
57-CV-2008-000362.00

The following matter was FILED on 3/30/2011 2:12:06 PM

Notice Date: 3/30/2011 2:12:06 PM

KATHY S. COULTER
CIRCUIT COURT CLERK
RUSSELL COUNTY, ALABAMA
RUSSELL COUNTY JUDICIAL CENTER
PHENIX CITY, AL 36867

334-298-0516
kathy.coulter@alacourt.gov

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 45 of 58

ELECTRONICALLY FILED
PM
CIRCUIT COURT
RUSSELL COUNTY, ALABAMA
KATHY S. COULTER, CLERK

| | | |
|---|---|---|
| PHYLLIS HORACE, | ) | IN THE CIRCUIT COURT OF |
| Plaintiff, | ) | RUSSELL COUNTY, ALABAMA |
| VS. | ) | CASE NO. CV 08-362 |
| LASALLE BANK NATIONAL ASSOCIATION, et al., | ) | |
| Defendants, | ) | |

ORDER

This cause comes before the court for hearing on March 21, 2011.

It is hereby

ORDERED, ADJUDGED, AND DECREED:

Following hearing and review of all submissions from the parties the Court has come to two conclusions necessary for the disposition of this case:

First, the Court is surprised to the point of astonishment that the defendant trust (LaSalle Bank National Association) did not comply with the terms of its own Pooling and Servicing Agreement and further did not comply with New York Law in attempting to obtain assignment of plaintiff Horace's note and mortgage.

Second, plaintiff Horace is a third party beneficiary of the Pooling and Servicing Agreement created by the defendant trust (LaSalle Bank National Association). Indeed without such Pooling and Servicing Agreements, plaintiff Horace and other mortgagors similarly situated would never have been able to obtain financing.

Consequently, plaintiff's motion for summary judgment is granted to the extent that

defendant trust (LaSalle Bank National Association) is permanently enjoined from foreclosing on the property at 3745 Knowles Road in Phenix City, Alabama.

Further, the Court is of the opinion there is no reason for further delay as to the entry of final judgment concerning the issue of foreclosure by the trust (LaSalle Bank National Association).

That notice shall issue to the parties.

DONE this the 25th day of March, 2011.

ALBERT L. JOHNSON, CIRCUIT JUDGE

2011 MAR 30 PM



AlaFile E-Notice

57-CV-2008-000362.00

Judge: ALBERT L JOHNSON

To: WOOTEN NICHOLAS HEATH
nhwooten@gmail.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL
57-CV-2008-000362.00

The following matter was FILED on 1/13/2011 5:42:27 PM

**C001 HORACE PHYLLIS**

MOTION FOR OTHER

[Attorney: DICKSON NATHAN ANDREW II]

Notice Date: 1/13/2011 5:42:27 PM

KATHY S. COULTER
CIRCUIT COURT CLERK
RUSSELL COUNTY, ALABAMA
RUSSELL COUNTY JUDICIAL CENTER
PHENIX CITY, AL 36867

334-298-0516
kathy.coulter@alacourt.gov

ELECTRONICALLY FILED
CIRCUIT COURT OF
RUSSELL COUNTY, ALABAMA
KATHY S. COULTER, CLERK

STATE OF ALABAMA
Unified Judicial System
Revised 3/5/08

57-RUSSELL

☐ District Court ☑ Circuit Court

Case
CV20

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL

CIVIL MOTION COVER SHEET

Name of Filing Party: C001 - HORACE PHYLLIS

Name, Address, and Telephone No. of Attorney or Party. If Not Represented.
NATHAN A. DICKSON
POST OFFICE BOX 350
UNION SPRINGS, AL 36089

Attorney Bar No.: DIC031

☐ Oral Arguments Requested

TYPE OF MOTION

**Motions Requiring Fee**

- ☐ Default Judgment ($50.00)
- ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00)
- ☐ Judgment on the Pleadings ($50.00)
- ☐ Motion to Dismiss, or in the Alternative Summary Judgment($50.00)
- ☐ Renewed Dispositive Motion(Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00)
- ☐ Summary Judgment pursuant to Rule 56($50.00)
- ☐ Motion to Intervene ($297.00)
- ☑ Other Summary Judgment pursuant to Rule 56 ($50.00)

*Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees.

☐ Local Court Costs $

**Motions Not Requiring Fee**

- ☐ Add Party
- ☐ Amend
- ☐ Change of Venue/Transfer
- ☐ Compel
- ☐ Consolidation
- ☐ Continue
- ☐ Deposition
- ☐ Designate a Mediator
- ☐ Judgment as a Matter of Law (during Trial)
- ☐ Disburse Funds
- ☐ Extension of Time
- ☐ In Limine
- ☐ Joinder
- ☐ More Definite Statement
- ☐ Motion to Dismiss pursuant to Rule 12(b)
- ☐ New Trial
- ☐ Objection of Exemptions Claimed
- ☐ Pendente Lite
- ☐ Plaintiff's Motion to Dismiss
- ☐ Preliminary Injunction
- ☐ Protective Order
- ☐ Quash
- ☐ Release from Stay of Execution
- ☐ Sanctions
- ☐ Sever
- ☐ Special Practice in Alabama
- ☐ Stay
- ☐ Strike
- ☐ Supplement to Pending Motion
- ☐ Vacate or Modify
- ☐ Withdraw
- ☐ Other pursuant to Rule (Subject to Filing Fee)

| Check here if you have filed or are filing contemoraneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) ☐ | Date: 1/13/2011 5:41:48 PM | Signature of Attorney or Party: /s NATHAN A. DICKSON |
|---|---|---|

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 49 of 58

ELECTRONICALLY FILED
PM
CV-2008-000362.00
CIRCUIT COURT OF
RUSSELL COUNTY, ALABAMA
KATHY S. COULTER, CLERK

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE,

Plaintiff,

vs.

CASE NUMBER: CV-08-362

LASALLE BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR CERTIFICATE HOLDERS OF BEAR STEARNS ASSET BACKED SECURITIES I LLC, ASSET BACKED CERTIFICATES, SERIES 2006-EC2; BEAR STEARNS ASSET BACKED SECURITIES I LLC, ASSET BACKED CERTIFICATES, SERIES 2006-EC2; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; ENCORE CREDIT CORPORATION; EMC MORTGAGE COMPANY; BANK OF AMERICA, et al.,

Defendants.

**PLAINTIFF PHYLLIS HORACE'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE ALABAMA RULES OF CIVIL PROCEDURE AND RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Comes now Phyllis Horace and moves this Honorable Court for an Order granting summary judgment in her favor as set forth in her motion and supporting brief as follows:

SUMMARY JUDGMENT IS APPROPRIATE IN THIS CASE

The plaintiff moves pursuant to Rule 56 for summary judgment in this matter on her claims of wrongful foreclosure against the Defendant Trust designated as "LaSalle Bank National Association, as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2". The Plaintiff asserts that Summary Judgment is proper under the law and facts and prays that after

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 50 of 58

consideration of her motion, her evidentiary submissions and her brief that the Court will enter a Summary Judgment in her favor finding that the Defendant trust has no interest in her promissory note and no ability to foreclose and further finding that the Trust's institution of foreclosure against her was wrongful and further enjoining the Trust from prosecuting a foreclosure against her in this case. The Plaintiff feels it important to note that her claims and her motion do not seek to obviate the underlying promissory note but is in the nature of a claim against a stranger to her mortgage loan who seeks to foreclose upon her property under false and fraudulent pretenses. Under the Plaintiff's theory of the case it is clear that the Trust is a stranger to her mortgage loan and that success upon her claim against the Trust will not defeat the right of a holder in due course to enforce the promissory note executed in conjunction with her home mortgage loan. In effect the Plaintiff asserts that there is a proper payee of her mortgage promissory note but it is not the defendant Trust or its agents who are involved in the foreclosure upon which she sued in the present case.

STATEMENT OF FACTS

1. On or about November 11, 2005 Phyllis Horace ("Mrs. Horace") executed a mortgage to facilitate the purchase of her home for her family in Russell County, Alabama.

2. At the time the funds were borrowed, the nation was in the midst of the expanding housing bubble.

3. The Defendant Encore Credit Corp, a mortgage lender, offered Mrs. Horace a loan that is commonly referred to as a 2/28 ARM. This loan involved an initial two year teaser rate period during which Mrs. Horace was required to make only interest

payments at a low teaser rate. At the expiration of the teaser period, the loan recast to a substantially higher monthly payment based on the terms of the note and mortgage.

4.      Mrs. Horace and her husband (who is not a signatory and thus not bound to the mortgage) (together the "Horace's") enjoyed income from regular employment, which was used to make their monthly mortgage payments.

5.      After the loan recast at the end of the teaser period, the Horace's income was not sufficient to cover the fully indexed payment, a fact which was known to the Defendants at the time of originating this loan.

6.      Despite the predatory and unfair origination of the Horace loan, the loan's origination is not the subject of the summary judgment motion. The Horace's have reserved those issues for trial. The Horace's provide this information to the Court as background to explain the original claimed default which led to this litigation.

7.      This motion and the crux of this case is about the validity of the transfers of mortgage promissory notes in the Wall Street financing process known as "securitization" and the resulting issues regarding the ability of the securitization trust in this case to foreclose. Ultimately, much of the outcome of this case hinges upon the Court's ruling regarding the validity or not of the Trust's assertions that it is the owner of the Horace Promissory note.

8.      Securitization is the practice of pooling and selling contractual debt obligations ("receivables") such as residential mortgages, commercial mortgages, auto loans or credit card debt, to a specially-created entity, typically a trust. The trust pays for the receivables by issuing debt securities (variously referred to as bonds, pass-through securities, or Collateralized mortgage obligation (CMOs)) to investors. The trust collects

payments of principal and interest on the receivables, which it then uses to make regular payments to investors on their debt securities.[1] Securitization thus [illegible] and commercial borrowers with financing from securities markets.

9. There are numerous reasons why financial institutions engage in securitization, including the management of credit and interest rate risk, relief from regulatory capital requirements, and liquidity enhancement. Securitization began to be used as a financing technique with mortgages in [illegible]. "For decades before that, banks were essentially portfolio lenders; they held loans until they matured or were paid off. These loans were funded principally by deposits, and sometimes by debt, which was a direct obligation of the bank (rather than a claim on specific assets). But after World War II, depository institutions simply could not keep pace with the rising demand for housing credit. Banks, as well as other financial intermediaries sensing a market opportunity, sought ways of increasing the sources of mortgage funding. To attract investors, investment bankers eventually developed an investment vehicle that isolated defined mortgage pools, segmented the credit risk, and structured the cash flows from the underlying loans."[2]

10. Banks use a variety of [illegible] securitization trusts depending on the type of asset being securitized, but all securitization structures [illegible] overriding concerns. First, is ensuring favorable tax treatment of the bank, the securitization trust, and the investors, ideally through the securitization trust having "pass-thru" tax status, meaning that the securitization trust [illegible] on its own income

---

[1] [illegible] Structured Securities 103 (Oxford Univ. Press,

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 53 of 58

when it is paid on the receivables.[3] Second, and perhaps more critical, is ensuring that the trust's assets are "bankruptcy remote," meaning that they are insulated from the claims of the *bank's* creditors. This involves ensuring that the transfer of the receivables to the trust is a "true sale" and not a financing transaction.

11. Bankruptcy remoteness is critical for making the economics of securitization work. By insulating the receivables placed in the trust from the claims of the bank's creditors, securitization enables investors to invest based solely on the quality of the receivables and not have to worry about the bank's other business activities. To accomplish this, the bank conveys receivables to a trust for the benefit of certificate holders.

12. Applying these industry standards to the transaction at issue, Horace points out that the Defendant is a securitization trust identified as "LaSalle Bank National Association as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I, LLC, Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates, and Series 2006-EC2" (hereinafter the "Trust").[4]

13. The Trust was formed on February 1, 2006 by the execution of the trust agreement, which is known in the industry as a Pooling and Servicing Agreement (hereinafter "PSA").[5] The Trust's closing date was February 28, 2006.[6]

14. The Trust is a common law trust created pursuant to the laws of the State of New York, and its existence and actions are governed and controlled by New York law.

---

[3] *See id.*
[4] *See* PSA for Defendant Trust page 5 of 397
[5] *See* PSA page 5 of 397
[6] *See* PSA page 25 of 397

15. New York trust law is ancient and well-settled with respect to the determination of whether an asset is trust property.

16. Under New York law, the analysis of whether an asset is trust property is determined under the law of gifts.[7] In order to have a valid inter vivos gift, there must be a delivery of the gift (either by a physical delivery of the subject of the gift) or a constructive or symbolic delivery (such as by an instrument of gift) sufficient to divest the donor of dominion and control over the property[8] and "what is sufficient to constitute delivery 'must be tailored to suit the circumstances of the case.'"[9] The delivery rule requires that "'[the] delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit.'"[10]

17. New York law is also settled that (1) "Until the delivery to the trustee is performed by the settlor, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise".[11] (2) The delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit; there must be a change of dominion

---

[7] *See, e.g.,In re* Becker, 2004 N.Y. Slip Op. 51773U, 4 (N.Y. Sur. Ct. 2004) ("In the case of a trust where there is a trustee other than the grantor, transfer will be governed by the existing rules as to intent and delivery (the elements of a gift).").

[8] (see, Matter of Szabo, 10 N.Y.2d 94, 98-99, supra; Speelman v. Pascal, 10 N.Y.2d 313, 318-320, supra; Beaver v Beaver, 117 NY 421, 428-429, supra; Matter of Cohn, 187 App. Div. 392, 395) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56 (N.Y. 1986).

[9](Matter of *Szabo*, supra, at p. 98).

[10] (id.; Vincent v. Rix, 248 N.Y. 76, 83; Matter of Van Alstyne, supra, at p 309; see, Beaver v. Beaver, supra, at p 428) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56-57 (N.Y. 1986).

[11] (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc. 30, aff'd 190 App. Div. 907, supra; Marx v. Marx, 5 Misc. 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 55 of 68

and ownership; intention or mere words cannot supply the place of an actual surrender of control and authority over the thing intended to be given.[12]

18. Lastly, "under New York law there are four essential elements of a valid trust of personal property: (1) A designated beneficiary; (2) a designated trustee, who must not be the beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) the actual delivery of the fund or other property, or of a legal assignment thereof to the trustee, with the intention of passing legal title thereto to him as trustee."[13] There is no trust under the common law until there is a valid delivery of the asset in question to the trust.[14] Furthermore, when the trust fails to acquire the property, then *there is no trust over that property that may be enforced.*[15]

19. When New York trust law is applied to the Trust and the facts of this case, it is apparent that there was never a valid delivery of Mrs. Horace's mortgage note to the Trust, so the *Trust* may not enforce the mortgage note.

20. According to the terms of the PSA, all promissory notes transferred to the Trust are required to have a complete chain of endorsements from the original payee thereof to either "Blank" or to the Trustee for the specific Trust. This means that each promissory note must have the following complete chain of endorsements in order to

---

[12] Vincent v. Putnam, 248 N.Y. 76, 82-84 (N.Y. 1928).
[13] Brown v. Spohr, 180 N.Y. 201, 209-210 (N.Y. 1904).
[14] Until the delivery to the trustee is performed by the settlor, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc 30, affd 190 App Div 907, supra; Marx v Marx, 5 Misc 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).
[15] In an action against the individual defendant as trustee, based on the theory of breach of fiduciary obligation, the complaint was properly dismissed on the ground that he had acquired no title or separate control of the goods and, hence, there was no actual trust over the property to breach. Kermani v. Liberty Mut. Ins. Co., 4 A.D.2d 603 (N.Y. App. Div. 3d Dep't 1957).

comply with the Trust's documents and thus fit within the authorization of the Trust's
activities:

From Encore Credit Corporation to

↓

EMC Mortgage Corporation; who endorsed to

↓

Bear Stearns Asset Backed Securities I, LLC, as the Depositor; who
endorsed either in blank or specifically to

↓

LaSalle Bank National association as trustee for Certificate holders of Bear
Stearns Asset Backed Securities I, LLC, Bear Stearns Asset Backed
Securities I LLC Asset Backed Certificates, and Series 2006-EC2

21.     The PSA requires this complete chain of endorsements to be in place by
the Trust's closing date or under no circumstances later than 90 days after the Trust's
closing date. Therefore the last possible day to transfer to the Trust within the terms of
the Trust agreement was May 29, 2006.

22.     During the litigation of this case, the Defendants produced a collateral file
that included the original, wet-ink, signed note in this case. *This note contained a single
endorsement in blank by the Encore Credit Corporation and no other.* Accordingly, the
endorsement chain presented by the Defendant Trust does not comply with that required
by the PSA. This means that under New York trust law, there is no effective transfer of
the Horace mortgage note to the Defendant Trust, so the Trust cannot enforce the note.

23.     There is no evidence that Mrs. Horace's mortgage promissory note has
been securitized, and there is no effective conveyance of Mrs. Horace's mortgage

promissory note to the Defendant Trust, which has claimed ownership and sought to foreclose.[16]

24. In the case before the Court there is no good faith basis for the defendant Trust to assert or otherwise claim that the Horace promissory note is Trust property.

25. Mrs. Horace requests that the Court enter a summary judgment in her favor that the Trust is not the owner of her promissory note and that the Trust has no right to foreclose upon her real property.

26. Mrs. Horace also requests that the Court enter any appropriate Orders to effectuate this Judgment.

27. Mrs. Horace also requests that the Court direct liability in her favor on her claims against the Trust and the parties acting on the Trust's behalf with respect to her claims regarding the foreclosure action instituted by these parties and that the Court seat a jury for the sole purpose of determining what damages should be awarded against these parties for their wrongful conduct.

**PLAINTIFF'S EVIDENTIARY SUBMISSIONS IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

The Plaintiff submits the following list of exhibits in support of her motion for summary judgment in this case:

28. Attached as exhibit 1 to this motion is the PSA consisting of all exhibits including the form custody agreement and the mortgage loan purchase agreement pulled from the SEC's website and consisting of 397 pages. This exhibit does not include the mortgage loan schedule submitted by the defendant's in this case.

---

[16] A fact noted in the opinions and testimony of Horace's securitization expert, Thomas J. Adams who opines that the promissory note is not an asset of the Defendant trust in his deposition at 140:4-8.

29.     Attached as exhibit 2 to this motion is the affidavit of Thomas J. Adams previously provided to the Defendant's in this case.

30.     Attached as exhibit 3 to this motion is the deposition of Thomas J. Adams taken by counsel for the defendants, Shaun Ramey.

31.     Attached as exhibit 4 to this motion is the complete collateral file produced by the defendants in this case which consists of 62 pages as produced by the Defendants.

32.     Attached as exhibit 5 to this motion is an exhibit which shows the transfers required by the Trust instrument as a recapitulation of the voluminous document.

33.     Attached as exhibit 6 to this motion is an exhibit which demonstrates the transfers of the mortgage promissory note revealed by the contents of the mortgage collateral file.

34.     Attached as exhibit 7 is Horace 391 which is a single document from the PSA which sets forth the required documents for the collateral files of loans properly transferred to the Defendant trust.

35.     Additionally, other documents are attached to this motion which are referenced in this motion or in brief by their Bates Stamp number which include, at least, Bates Stamped documents numbered 2 & 29.

## CONCLUSION

The plaintiff requests that the Court consider her motion, her evidentiary submissions and her brief in support of her motion for summary judgment and upon consideration of the same, enter summary judgment as prayed for herein against the

Multiple Injuries #50 E.D. Physician Record

396009
JACKSON, CORLA
46 B F
018996 BENJAMIN, REGINA M. MD
E/R

5cm deep laceration
4 cm deep lac
1° Burns
1° Burns
Burns cleaned and dressed

Repeat exam at: 1430 - Ewheezes
Findings: improved

**Diagnostic Considerations:** circle potential diagnoses
Smoke inhalation, FA Burns cantly

**X-ray:** (Read by: __ EP __ Rad)
1—CXR ✓ nl
2—(L) hip/knee ✓ nl
3—(L) FA ✓ nl
4—pelvis nl
5—(R) FA __ nl
6— __ nl
Reviewed / discussed with Radiologist:

**Treatment / Course:**
Medications / Orders | Response
__ O2 — 1 1/2 heplock
✓ Tetanus: TT / dT / TIG
__ Pain meds: Morphine IV, Zofran IV
__ Immobilization: static dynamic
Applied by: __ E.P. __ other
__ compression dressing __ crutches
__ NPO
other procedures / meds: IVNS 1000 mL
ABA neb q 2

Recheck NCO: still wheezing

Procedure:
(__ see addendum)
Course: same / better / worse — ABA repeated
Critical Care: ______ minutes / hour(s)
Solumedrol 125mg IV

**Clinical Impression:**
(1) Smoke inhalation
(2) 5cm laceration (R) forearm
(3) 4cm laceration (L) forearm
(4) Contusion Buttock
(5) 1° Burn B/LE

**Medical Decis. Making:** L1: straightforward; L2/3: low complex; L4: mod; L5: hi
Slash box if ordered ☑, check normals ✓, circle and note abnormals

**Lab:**
☐ CBC: __ nl __ nl except:
Hct ____ Hgb ____ Plts ____
WBC ____
Neut % ____ Lymph % ____
Monos % ____ Eos % ____
Baso% ____
☐ BMP: __ nl __ nl except:
☐ CMP: __ nl __ nl except:
NA ____ K ____ Glu ____ Cl ____
CO2 ____ Anion gap ____ BUN ____
Creat. ____ B/C Ratio ____ Calcium ____
Alk Phase ____ SGPT (ALT) ____
SGOT (AST) ____ T. Bili ____ T. Prot ____
Albumin ____ Globulin ____ A/G Ratio ____
☐ UA: __ dip neg __ dip neg except:
Micro neg ____ neg except ____
__ Qual hCG: ☐Blood ☐Urine Neg / Pos
__ send quantitative

☐ Other data reviewed:
☐ ETOH ☐ Drug screen
☐ PT, PTT, INR ☐ T & C x __ units RBC
☐ ABG: on __ RA / O2: ____ % / L
pH: ____ PO2 ____
PCO2 ____ HCO3 ____
☐ P. Ox __ %: on __ RA / O2: __ % / L
__ nl / hypoxic
☐ **EKG** __ Nl study
__ NSR __ nl intervals
__ nl QRS __ nl ST-T waves
Compared to: ______
__ unchanged / changed
Read by: __ E.P.
☐ Cardiac monitor: __ NSR

**Wound Repair:**

| Location | Length / Depth | Repair |
|---|---|---|
| (1) (R) F.A. | 5 cm superfic / SQ / M | SubQ running sutures; Dermabond / staples; # of 3-0 Vicryl; # of 3-0 Prolene |
| (2) (L) FA | 4 cm superfic / SQ / M | Skin: Simple interrupted; Dermabond / staples; # of __ -0; # of __ -0 |

(2) (L) FA SubQ Simple running, Skin: Mattress

**Comments:**
__ Sensat. intact __ Vasc. intact
Level of contamination: __ clean / min / mod / severe
Anesthesia: local / digital block ____ mL of 1% Lid c̄ epi / HCO3
✓ prep
Suture removal instruct: 10 days
✓ Explored: __ no F.B. ✓ no tendon inj. / F.B. identified / tendon injury
__ Irrigat. __ débrided __ undermined __ revised ✓ F.B. removed
(for above: min = 1, mod = 2, extensive = 3)
Steri strips

**Consultation:**
Consulted Dr. ______ (time) ____
Suggests: admit / discharge / will see: ______ / Transfer to ______
Case discussed with: patient / family / other:

**Disposition:**
__ Transfer to: __ Accepting Physician: __ EMTALA form completed
__ Admit: __ IP / __ OP ICU / Tele / Med-Surg
Admitting physician ______ Covering Physician:
Orders written in ED __
✓ Discharged. Condition: ✓ improved __ unchanged — Stu PMD 3-5 d
Instructions given: ✓ written—refer to: __ WMH form __ RTW form __ school excuse
(__ off work / school or __ lmtd work / school / gym thru ____)
Discharge Rx: albuterol, Sdpred, Lortab
Certified Emergency? ☑ Yes ☐ No
**Sig:** ______ date 3/13/08 Attend. / Resid. / PA / NP
______ date 3/13/08 Attend. / Resid. / PA / NP
See: __ Addendum __ Attending note ☐ dictated
Copies to:

396009
JACKSON, CORLA
46 B F
018996 BENJAMIN, REGINA M. MD
E/R

## Multiple Injuries

PROVIDENCE HOSPITAL EMERGENCY DEPARTMENT, MOBILE, AL (334) 633-10

Check (✓) for normals, circle (positives) slash negatives, note findings

Date: 3/13/05 E.P. time: ______ Age: ______ Wt: ______ Sex: M / F

P: 111 BP: 186/70 RR: 18 Temp: 99.1

Chief Complaint: Multiple injuries House Fire - fell

Referred by: self / clinic / PMD / family / EMS
Historian: patient / family / friend / EMS

Arrived by: EMS / walk-in / wheelchair
Hx limited by: Altered LOC / acuity / intoxication

### HPI

**Onset:** ___ undetermined
Occurred: 0330 time ______ date
______ mins / hrs / days PTA

**Location:** (home) work
Other:

**Activity during injury:** ___ unknown
putting fire out fell 8 ft off ladder

**Mechanism of injury:** ___ unknown
fell

**Location (anatomic):**
Burns legs, smoke inhalation lacs

**Injury description (quality):**
deformity / dislocation / sprain / strain / contusion / laceration / puncture / stab / abrasion / GSW / F.B. / burn

Pain: ___ none / at rest / ō wt bearing / ō use
Pain quality: sharp / dull / aching / throbbing

**Modifying factors:** ___ none
witnessed / unwitnessed
Ambulatory at scene: yes / no
Contributing factors: ETOH / drugs / seizure / syncope / suicide attempt
Other:

**Assoc. sxs:** ___ none
no complaints / "just stiff and sore"
wounds / bony deformity / swelling
Pain: head / face / neck / chest / abd / back / pelvis / RUE / LUE / RLE / LLE
(LOC): unknown / dazed / + LOC
Duration: ____ secs / mins / hrs
Remembers: incident / coming to hospital
GCS: 15/15

**Prior Rx:** ___ none
EMS: spinal immobilization
Other:

Pt was trying to put fire out — she has smoke inhalation burns to legs - lac's to arms, injury to hip

Last eta: ______

### Past, Family, Social History

Reviewed: ___ RN note ___ Old Records ___ NH records ___ EMS note

**PMH:** ___ none ___ unknown
peptic ulcer / GI bleed (HTN)
arthritis / CAD / IDDM / NIDDM
thrombophlebitis / clotting probs
asthma

**Surgical Hx:** (none) ___ unknown
Prior trauma:
Other:

**Family Hx:** (none) ___ unknown
DM / CAD
clotting probs

**Meds:** ___ none reviewed RN note
ASA / NSAIDs / Coumadin / Plavix
insulin / steroids
antihistamines / narcotics / sedatives

**Social Hx:** ___ unknown
Tobacco: current ___ no ___ yes
quit ___ years ago; hx of ___ pack years
ETOH: (Social) drinks / wk
Recent? ______
Drugs:
Occupation:
Home situation: ☐ lives alone ☐ w/spouse ☐ w/family ☐ N.H. ☐ CBRF

Allergies: ___ reviewed RN note
Diphtheria tetanus current: (no) ___ yes; year ___

### Physical Exam

___ Exam limited by: urgency of condition / pt. uncooperative

Gen: Anxious: ___ (no) mild / mod / severe  Distress: ___ no (mild) mod / severe
✓ VS nl  Orthostat. VS: O→:
Nutritional status: (nl) obese  Hydration: (nl) dehydrated
Longboard / cervical immob. (ED / EMS) / IV / intubation / splint

___ nl color, tone
✓ awake, alert, appropriate
___ diaphoretic
___ cyanotic

patent airway

Head / Neck (MSK):
✓ head ō trauma, skin nl
___ neck ō tend, ROM full

Eyes:
✓ lids, conj. nl
✓ PERRL, EOM's full
___ cornea, chambers, discs nl

Burns right legs

ENT:
___ nose nl
___ ext. ears, canals, TM's nl
___ mouth, teeth, oropharynx nl

CV:
✓ reg rate, rhythm (L) ↑ R
___ heart sounds nl Pacer/AS
___ pulses = neck & all 4 ext.

Resp, Chest: lacerations
___ no resp distress
___ breath sounds nl, clear, equal
___ chest inspect., palpat. nl

Spine / pelvis / ribs (MSK):
✓ thorac., lumbar inspect., palpat. nl
___ pelvis stable, inspect., palpat. nl

GI / Abdomen / Flank:
✓ abd nl appearance, BS nl
✓ soft, nontender
✓ flank nl appearance, nontender
___ rectal nl, heme neg.

MSK:
✓ gait nl
✓ toes, nails nl

Skin / Nails: nose
✓ nl appearance ō cyanosis
✓ color, nl capillary refill
✓ hydrated, warm & dry. Sooty exudate

Neuro:
✓ alert & oriented x 3
___ motor, sensory nl
___ reflexes intact, symmetrical
___ nl gait, cerebellar function
___ cranial nerves intact

Plor

Psych:
___ affect, mood nl
___ judgment, memory nl

(R) / (L) upper ext. (mark nl as R, L or B):
___ appearance nl, nontender
___ ROM full ō pain
___ stable
___ strength and tone nl

(R) / (L) lower ext. (mark nl as R, L or B):
___ appearance nl, nontender
___ ROM full ō pain
___ stable
___ strength and tone nl

↓ hoarse
↓ Deviy
Lungs
(+) mi
wheez

Glasgow Coma Score 15
Eyes open: 4-spontaneous 3-to command 2-to pain 1-none.
Verbal: 5-nl 4-confused 3-inappropriate 2-incoherent sounds 1-none
Motor: 6-normal 5-localizes pain 4-withdrawn 3-decorticate (flex.) 2-decerebrate (ext.) 1-none

(L) hip/buttock tender - large hem buttock

### ROS

All systems reviewed: ___ negative ___ negative except as marked

___ Constit: weak / faint / fever / chills / diaphoresis
___ Eyes: F.B. sensat. / vision probs
___ ENT: ear, nose or throat s/s's / hearing probs / hoarseness
___ CV: chest discomfort / palpitations
✓ Resp: (SOB / breathing probs / cough / wheezing)
___ GI: N / V
___ GU: urinary probs / kidney probs / genitalia pain  LMP: ______ nl / abnl
✓ MS: other painful areas: hip
___ Skin: skin probs
___ Neuro: numbness / tingling / focal deficits / paralysis / dizzy / change in behavior / incontinence / seizures
___ Psych: psych probs / anxiety / depression
___ Hemat / Lymph: bruising / bleeding
___ Endo: polyuria / polydipsia
___ Immun / Allerg: HIV / AIDS / splenectomy

HP1109

GE Money
Home Loans
PO BOX 25142
Santa Ana, CA 92799-0005

February 8, 2006

**Address**

RE: Account No. : [redacted]2124
Property Address : 13230 Tom Gaston Rd Mobile, AL 36695-0000
File No. : CRTN
Date of Loss : LDT

Dear Corla Jackson

We realize how difficult a loss to your home can be, and we want to process your claim as quickly and efficiently as possible. To assist in the claim- handling process, please submit the following items to our office:

1. The insurance claim check(s) (SIGNED/ENDORSED BY ALL PARTIES LISTED ON THE CHECKS).
2. The enclosed *Homeowner's Statement* completed and signed by you.
3. A copy of the insurance adjuster's detailed report or your contractor's detailed damage estimate for repairs.
4. A copy of the signed contract between you and your contractor doing the repairs.
5. The enclosed *Contractor Affidavit/Statement* needs to be completed and returned to our office once ALL REPAIRS HAVE BE[EN] COMPLETED.

Upon receipt of the fully endorsed insurance claim check and above required information, we will release a portion of the claim fu[nds] within 4-5 business days after receipt. If all required items are not received, we are unable to proceed with a disbursement of the claim funds until the missing items are submitted.

Due to the amount of loss, partial funds will be released at various stages. After the first release of insurance funds, periodic prope[rty] inspections will be needed to confirm repair progress. Please contact our office seven to ten business days prior to needing additio[nal] funds to allow time for the property inspection.

If I may be of additional assistance, please call me at 1-866-354-7281.

Sincerely,

Insurance Claims Center
FAX: (866)336-3811
Same Phone Number (#)
GE TPA 13
HAZ6-NWCLMDP
Enclosures
BRE

Plaintiff Was Suppose To Be Given Fund for Full
To Gutt out or Rebuilt
Without Deduction or Depreciations

**GMAC Mortgage**

P.O. Box 25144
Santa Ana, CA 92799-5144

February 14, 2007

Corla Jackson
13230 Tom Gaston Rd
Mobile, AL 36695-0000

RE: Property Address : 13230 Tom Gaston Rd Mobile, AL 36695-0000
Tracking No : 732379
Date of Loss : 08/24/2005
Account No : [redacted]2124

Dear Corla Jackson :

Our office was previously notified of damage sustained to the above- referenced property. At that time, you were provided with the required forms to be completed and returned to our office with the endorsed claim check.

We are currently reviewing our files and request an update on the status of your claim. Please check the appropriate information below:

☒ Send me information again.

☐ The endorsed insurance claim check, *Homeowner's Statement*, and detailed damage estimate will be sent to your office by ______________________.

☐ Repairs have been completed. Please contact me at ______________________ to set up an inspection of the property.

Please return any documentation in the enclosed self-addressed envelope.

Your prompt attention to this matter is greatly appreciated.

If Iwe may be of further assistance, please contact our office at 1-866-354-7281.

Insurance Claims Center
FAX: (866)336-3811

** BRE **

Property Cannot Be Signed off On By County Chief Building Inspector: .. see Attached Letters
(1) Property Has Been Distroyed By Major Water Dam; Which Contaminated Rain Water Debris, Wood Framing, Insu[illegible] Dry[illegible] Etc
(2) Property Has Been (Destroyed) By Toxic Mold
(3) Please Turn In your (Policy) For Complete Pay off by Farmers Insurance Group.. .
Corla Jackson



Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 63 of 68

P.O. Box 52052
Phoenix, AZ 85072

April 2, 2008

Corla Jackson
13230 Tom Gaston Rd
Mobile, AL 36695-0000

| RE: Property Address | : 13230 Tom Gaston Rd Mobile, AL 36695-0000 |
|---|---|
| Account No. | :[redacted]2124 |
| Tracking No. | : 902022 |
| Date of Loss | : 3/13/2008 |

Dear Corla Jackson:

We realize how difficult a loss to your home can be, and we want to process your claim as quickly and efficiently as possible. Due to the status of your loan and investor requirements, we have the responsibility to ensure the damage is repaired. To assist in the claim-handling process, please submit the following items to our office:

1. The insurance claim check(s) (SIGNED/ENDORSED BY ALL PARTIES LISTED ON THE CHECK(S).
2. The enclosed *Homeowner's Statement* completed and signed by you.
3. A copy of the insurance adjuster's detailed report or your contractor's detailed damage estimate for repairs.
4. A copy of the signed contract between you and your contractor doing the repairs.
5. The enclosed *Contractor Affidavit/Statement* needs to be completed and returned to our office once ALL REPAIRS HAVE BEEN COMPLETED.

Upon receipt of the fully endorsed insurance claim check and above required information, we will release a portion of the claim funds within 4-5 business days after receipt. If all required items are not received, we are unable to proceed with a disbursement of the claim funds until the missing items are submitted.

Due to the amount of loss, partial funds will be released at various stages. After the first release of insurance funds, periodic property inspections will be needed to confirm repair progress. **FLORIDA PROPERTIES: Please contact our office 10 to 14 business days prior to needing additional funds to allow time for the property inspection.**
NON-FLORIDA PROPERTIES: please contact our office 7-10 business days prior to needing additional funds.

If I may be of further assistance, please contact me at 1-866-354-7281.

Sincerely,
Insurance Claims Center
FAX: (866)336-3811

GMAC TPA 13 (a)
HAZ6-NWCLMDQ

Enclosures
** BRE **

 Research and Engineering, Inc.

5815 I-10 Industrial Parkway
Theodore, Alabama 36582
(251) 653-9009
Fax: (251) 653-5803
E-mail: AL@LAREC2.com
www.LAREC2.com

August 23, 2007

GMAC Mortgage
P.O. Box 25144
Santa Anna, CA 92799-5144

Re: Structural Inspection of Jackson Residence, 13230 Tom Gaston Rd., Mobile, AL
File No. : GMC002124
Date of Loss : 08/24/2005

Dear Sir or Madam:

This letter is to further comment on the findings of an Engineering Inspection to the subject residence at the above address performed in April, 2006. This dwelling is insured by Farmers Insurance Policy # 92649-56-20 and was under repair from damage sustained in Hurricane Katrina in August, 2005 at the time of that inspection. The claim number for those repairs is 1007093144-1-1. As stated in my report:

The subject structure is located in a high wind area and in accordance with the International Building Code is required to be constructed to withstand a Basic Wind Speed (3 second gust) of 140 miles per hour. The dwelling is located in an area that is defined as Exposure C in accordance with the aforementioned code.

The damage caused by Hurricane Katrina included structural damage to the roof structure as well as considerable interior damage due to water incursion from the loss of the integrity of the roof cover. Although much of the damage was a direct result of the wind load of the hurricane, the damage was augmented by the substandard construction of the roof structure.

The aforementioned report was based upon a visual inspection of the structure at that time. Since a large portion of the roof was destroyed and there was considerable interior damage, I would consider the structure unlivable as a result of my observations. In order to complete the repairs from the point of that inspection it would be very difficult for a contractor to perform the necessary work with the residence occupied.

Since my inspection was limited to a visual inspection, it was impossible to determine damage to the structure beyond the roof structural damage. There was evidence of water incursion which undoubtedly caused interior damage to the walls and ceilings. Also, based upon the observed quality of the framing and workmanship in the roof structure, I would expect other deficiencies in the framing of the walls.

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 65 of 68

Letter Re: Jackson, August 23, 2007, page 2.

Based upon the observed level of damage to the structure and the construction deficiencies previously reported, my recommendation is that the repairs required will be extensive enough in accordance with the Mobile County Building Code to make it necessary for the structure to meet current code requirements. This is particularly important since the structure is located in an Exposure C environment and in the 140 mph wind load area.

If there are any further questions, please feel free to contact me.

Thank you for the opportunity to be of service to you.

Sincerely,

J. Albert McEachern, Jr., P.E.
Consulting Engineer

ALABAMA REGISTERED No. 15480 PROFESSIONAL ENGINEER J. ALBERT McEACHERN, JR. P.E.

CC: Ms. Jackson



AOL | Mail | Toolbar

Location: Mobile, AL 36695 | Search History | Advanced Search | Settings

Web Images | Videos | Maps | News | Shopping | more »

**What does it mean when a Hurricanes leave sags and dips**

Web Results 1 - 10 of about 2,660

[PDF] SAFE REHABILITATION OF HURRICANE-DAMAGED HOMES
Roofs that sag in the middle or at the ends due to load-bearing walls that have shifted. ... a dip in the roof and sill beam. ribbon board, cracked floor joist .... However if there is a lot of water damage, and/or mold growth ... In adults , lead poisoning may cause high blood pressure, fertility ...
hud.gov/offices/lead/library/misc/HUD_CSS_Booklet.pdf - Similar

[PDF] Response to Floods and Water Damage for Libraries, ...
Jun 14, 2008 ... Go onto the roof if rising water makes it necessary as long as no thunderstorm is in progress. ... highway dips, where water may pool and pose threats. ... Emergency Drying Procedures for Water Damaged Collections. ... Pools of cool standing water (which can cause hypothermia if the water is less ...
www.loc.gov/preserv/emergprep/floodcomp.pdf - Similar

Roofing: How dry does the deck need to be?, asphalt shingles, ...
Apr 30, 2009 ... Anything that might soak up water, like insulation must be ripped out as it can ... Several interior rooms beneath the damaged roof show obvious signs of warped ... one could SEE an extreme bow or sag, but are there degrees of tolerance in what ... Look for isolated humps or dips between rafters. ...
en.allexperts.com/q/Roofing-1598/2009/4/dry-deck-need... - Similar

Hurricane Survival Tips - Hurricane Mitigation & Survival
The two huge masses of water do leave the land in much the same way. .... When water kills or does damage, the wind put it up to it. .... and with major hurricanes, it ain't over until the National Guard arrives. .... Invest in a hurricane roof as the main hole you want to avoid is a big one with a view of Heaven. ...
www.hurricane-man.com/survival-tips.html - Similar

General information | RAGBRAI
This may cause your group to be ineligible for the lottery. .... RAGBRAI is a major economic boost to every church, Boy Scout or Girl .... Your wristband also will give you priority to sag wagons, bicycle shop repairs and many other services. ... If you race ahead, lag behind or leave the official bicycle route, ...
ragbrai.com/index.php/about/general-information/ - Similar

Antigua - Local Reports (Caribbean Hurricane Network)
that it does not necessarily mean that the case brought by ABITPC against govern - .... It was badly damaged by the 1990s hurricanes that kept visiting Antigua.. . ...... Whatever will cause this dip could occur earlier? I certainly hope not! ..... WHAT a way to start a week... with a 140 mph major hurricane on your ...
stormcarib.com/reports/2003/antigua.shtml - Similar

Using Technology to Reduce Risk and Improve Worker Safety | ...
The root cause of this unwanted connection is often a result of insulation breakdown. ... equipment damage and present a fire and explosion risk to personnel (see photo 1). .... 5) To reduce the momentary line-voltage dip occasioned by the occurrence and ..... Utility Deregulation, What Does It Mean to Inspectors? ...
www.iaei.org/magazine/?p=2449 - Similar

Pain in Maine, but they can measure rain « Climate Audit
But all the data sufficient to predict hurricanes is OK? ..... (Heck, if it's like my house, the whole electrical system voltage sags whenever a big ..... that CO2 is not a major factor in causing the earth to warm: You are a denier. ...... Does this mean that it's OK to shade the truth about AGW so that someone, ...
www.climateaudit.org/?p=1816 - Similar

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 67 of 68

**Potential Health Effects Associated with Inhalation Exposure to Molds and Mycotoxins**

- **Allergic Reactions (e.g., rhinitis and dermatitis or skin rash)**
- **Asthma**
- **Hypersensitivity Pneumonitis**
- **Other Immunologic Effects**

**Research on mold and health effects is ongoing. This list is not intended to be all-inclusive.**

**The health effects listed above are well documented in humans. Evidence for other health effects in humans is less substantial and is primarily based on case reports or occupational studies.**

**All molds have the potential to cause health effects. Molds produce allergens, irritants, and in some cases, toxins that may cause reactions in humans. The types and severity of symptoms depend, in part, on the types of mold present, the extent of an individual's exposure, the ages of the individuals, and their existing sensitivities or allergies. Specific reactions to mold growth can include the following:**

**Allergic Reactions: Inhaling or touching mold or mold spores may cause allergic reactions in sensitive individuals. Allergic reactions to mold are common – these reactions can be immediate** or delayed. Allergic responses include hay fever-type **symptoms, such as sneezing, runny nose, red eyes, and skin rash (dermatitis). Mold spores and fragments can produce allergic reactions in sensitive individuals regardless of whether the mold is dead or alive. Repeated or single exposure to mold or mold spores may cause previously non-sensitive individuals to become sensitive. Repeated exposure has the potential to increase sensitivity.**

**Asthma: Molds can trigger asthma** attacks in persons who are allergic (sensitized) **to molds. The irritants produced by molds may also worsen asthma in non-allergic (non-sensitized) people.**

**Hypersensitivity Pneumonitis:** Hypersensitivity pneumonitis may develop following either short-term (acute) or long-term (chronic) exposure to molds. The disease resembles bacterial pneumonia and is uncommon.

**Irritant Effects: Mold exposure can cause irritation of the eyes, skin, nose, throat, and lungs, and sometimes can create a burning sensation in these areas.**

**Opportunistic Infections:** People with weakened immune systems (i.e., immune-compromised or immune-suppressed individuals) may be more vulnerable to infections by molds (as well as more vulnerable than healthy persons to mold toxins). *Aspergillus fumigatus*, for example, has been known to infect the lungs of immune-compromised individuals. These individuals inhale the mold spores which then start growing in their lungs. *Trichoderma* has also been known to infect immune-compromised children.

Healthy individuals are usually not vulnerable to opportunistic infections from airborne mold exposure. However, molds can cause common skin diseases, such as athlete's foot, as well as other infections such as yeast infections.

## Mold Toxins (Mycotoxins)

Molds can produce toxic substances called mycotoxins. Some mycotoxins cling to the surface of mold spores; others may be found within spores. More than 200 mycotoxins have been identified from common molds, and many more remain to be identified. Some of the molds that are known to produce mycotoxins are commonly found in moisture-damaged buildings. Exposure pathways for mycotoxins can include inhalation, ingestion, or skin contact. Although some mycotoxins are well known to affect humans and have been shown to be responsible for human health effects, for many mycotoxins, little information is available.

Aflatoxin $B_1$ is perhaps the most well known and studied mycotoxin. It can be produced by the molds *Aspergillus flavus* and *Aspergillus parasiticus* and is one of the most potent carcinogens known. Ingestion of aflatoxin $B_1$ can cause liver cancer. There is also some evidence that inhalation of aflatoxin $B_1$ can cause lung cancer. Aflatoxin $B_1$ has been found on contaminated grains, peanuts, and other human and animal foodstuffs. However, *Aspergillus flavus* and *Aspergillus parasiticus* are *not* commonly found on building materials or in indoor environments.

 Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 68 of 68

Research and
Engineering, Inc.

5815 I-10 Industrial Parkway
Theodore, Alabama 36582

(251) 653-9009
Fax: (251) 653-5803
E-mail: amce2000@aol.com

April 7, 2006

**Subject:** Hurricane Ivan-Hurricane Katrina
Farmers Insurance Policy #: 92649-56-20

Re: Structural Engineer Inspection Report (Residence - Dwellings)
Ms. Corla Jackson & GMAC Mortgage
13230 Tom Gaston Road
Mobile, Alabama 36695

To Whom It May Concern:

This letter is to report the findings of an Engineering Inspection to the subject residence at the above address. This dwelling is insured by Farmers Insurance Policy # 92649-56-20 and is currently under repair from damage sustained in Hurricane Ivan (September 2004) and Hurricane Katrina (August 2005). The claim numbers for both Hurricanes are (2C-118138) and (1007093144-1-1). This policy includes a clause insuring against code violations, and therefore the repairs being performed include modifications to meet the Building Code.

In accordance with the International Building Code 2000, the current applicable code to Mobile County, this residence is required to be constructed to withstand a Basic Wind Speed (3 second gust) of 140 miles per hour. The subject structure is located in a high wind area and is in an open field, with no trees or other structures to slow down or block southerly winds from the Gulf of Mexico. Therefore, the dwelling is located in an area that is defined as Exposure (C) in accordance with the aforementioned code.

The damage caused by Hurricane Ivan and Hurricane Katrina included structural damage to the roof structure as well as considerable interior damage due to water incursion from the loss of the integrity of the roof cover including lifting of the sheathing and roofing materials and loss of ridge and power vents. Hurricane Ivan & Hurricane Katrina perils forced in rain via ridge caps, ridge vents, hooded powered vents, and vents, lifted shingles, lifted decking, windows and soffit.

Although much of the damage was a direct result of the wind load of the hurricane, because the house was not built in compliance with Mobile County Building Codes, the damages were augmented by the substandard construction of the roof structure. Specifically:

- Roof structure is a hip style, high slope, design with fiberglass reinforced architectural shingles on 24/16 7/16" OSB. In many locations the maximum 24" on centers spacing of the 2 x 6 rafters was exceeded.
- The maximum hip and ridge rafter spans were also exceeded.
- Although there were rat runs in some locations to support the mid span of the 2 x 6 rafters, the maximum spans for the rafters were exceeded in many locations.
- The rat run supports were not adequate in size or support. In one case only two 2 x 4 supports were used to hold a 2 x 4 rat run over 8 rafters.
- There was no cross bracing of any of the rafters.