Wendy Alison Nora                                    Hearing Date: July 10, 2012
ACCESS LEGAL SERVICE                                 Hearing Time: 10:00 a.m.
210 Second Street NE
Minneapolis, Minnesota 55413
Telephone: (612) 333-4144
Facsimile: (612) 886-2444

Robert N. Michaelson
The Michaelson Law Firm
11 Broadway, Suite 615
New York, New York 10004
Telephone: 212.604.0685
Facsimile: 800.364.1291

*Counsel to Wendy Alison Nora*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re

Residential Capital, LLC *et al.,*                   Chapter 11

                                                     Case No. 12-12020 (MG)

.

                                     Debtors.        Administratively Consolidated


-----------------------------------------------------------------X
**REPLY TO RESPONSE OF DEBTORS TO**
**AMENDED OBJECTION TO ENTRY OF FINAL SUPPLEMENTAL ORDER UNDER**
**BANKRUPTCY CODE SECTIONS 105(A), 362, 363, 502, 1107(A) AND 1108 AND**
**BANKRUPTCY RULE 9019 (I) AUTHORIZING THE DEBTORS TO CONTINUE**
**IMPLEMENTING LOSS MITIGATION PROGRAMS; (II) APPROVING**
**PROCEDURES FOR COMPROMISE AND SETTLEMENT OF CERTAIN CLAIMS,**
**LITIGATIONS AND CAUSES OF ACTION; (III) GRANTING LIMITED STAY RELIEF**
**TO PERMIT FORECLOSURE AND EVICTION PROCEEDINGS, BORROWER**
**BANKRUPTCY CASES, AND TITLE DISPUTES TO PROCEED; AND (IV)**
**AUTHORIZING AND DIRECTING THE DEBTORS TO PAY SECURITIZATION**
**TRUSTEE FEES AND EXPENSES [DOCKET NO. 544] FINAL ORDERS WHICH**
**AUTHORIZE THE CONTINUATION OF THE OPERATIONS OF A RACKETEERING**
**ENTERPRISE**

        Wendy Alison Nora ("Claimant"), a contingent claimant in litigation, and replies to the

response of the Debtors to her continuing objection to the harm being imposed on the public by

the Interim Order allowing the Debtors to pursue litigation throughout the nation at their

discretion while blocking their opponents from proceeding against it for the damages they cause

by pursuing their litigation claims with forged and fabricated documents.    Objector will first

reply to the assertions of the Debtors in their Response to her Objection in specific paragraph

order as set forth in Debtors' Response.  She will provide the additional grounds for her

Objection, which was required to be filed on June 29, 2012,  which were discovered since that

date,  upon the subsequent filing of the Debtors' Schedules and Statements in these proceedings

on June 30, 2012, in consecutively numbered paragraphs.

*REPLY TO DEBTORS' RESPONSE TO CLAIMANTS' OBJECTION:*

1.  Claimant was prevented from basing her objection on full facts and evidence in the

record at the time that her Objection was due because, coincidentally, the date which appears to

have been imposed by the Debtors for the filing of Objections was one day before critical

evidence was made available by the Debtors: to wit, the Schedules and Statements of Financial

Affairs in the 51 consolidated cases.

Some **evidence** which is necessary to prove Claimant's Objection has now been made

available by the Debtors, on June 30, 2012 as amended on July 3, 2012 and notes that the

Debtors have  moved for a further extension of time to file their Schedules and Statements,

alleging "cause" only for the extension of time to complete paragraphs 3b and 3c (payments to

creditors and payments to creditors who are *insiders*.) fn1   Evidence now exists that did not exist

---

[1]  This Court appointed an Examiner to investigate, among other issues, the pre-petition
and post-petition transactions between the Debtors and insiders at the request of Berkshire
Hathaway on June 25, 2012.   Retired Chief Judge of the Bankruptcy Court for the Southern

2

prior to the deadline for filing the Objection to the Final Order to the extent that the Affidavit of

James Whitlinger (Docket Entry 6) and the Schedules filed as Docket Entries 548-599  and

signed by James Whitlinger under penalty of perjury combine to create sufficient evidence upon

which Claimant may argue her objection.

Claimant can specifically testify and will testify to the facts applicable to her own case:

that on the Schedules of the Residential Funding Company, LLC (RFC, LLC) bankruptcy (Case

No. 12-12019, Docket Entry 548) her home appears as an asset of the estate which the estate

claims to "own."   It is impossible to determine, from the Schedules (Docket Entry 548)  and the

plain reading of the Affidavit of James Whitlinger (Docket Entry 6) whether Claimant's home is

"owned" by RFC, LLC or an undisclosed entity for which RFC, LLC is the "servicer."  Whether

RFC, LLC is claiming to own her home or it is claiming the right to sell her home on behalf of

some undisclosed principal, it has failed to disclose that the matter is pending on appeal to the

Wisconsin Court of Appeals, in Case No. 11-AP-879 and res judicata had not attached to the

disputed issue of ownership.   The listing of Claimant's home among the assets of the

consolidated Debtors, under Schedule A of  the RFC, LLC filing is a fraud upon this Court.

Specifically, James Whitlinger claims that it must sell REO properties, among which

assets the home of the Claimant appears, should be sold in the "ordinary course of business."  He

states, under oath at the Whitlinger Affidavit (Docket Entry 6) at page 73, paragraph 168:

With respect to the Non-GA REO, the Debtors currently hold approximately 4,180
housing units that have been foreclosed upon and are ready to be sold, with an aggregate unpaid
principal balance of $523 million. The Debtors estimate that there are approximately 1,100

_____

District of New York, Arthur J. Gonzalez, has been selected and appointed as the examiner.
There is still no disclosure of pre-petition payments to creditors and to creditors who are
insiders.

3

contracts pending for the sale of Non-GA REO, with approximately 1,000 sales scheduled to
close on or before June 30, 2012. The Debtors estimate that sale proceeds from Non-GA REOs
during May and June 2012 will be approximately $130 million. I believe it is important that the
Debtors be authorized to continue to conduct servicing and foreclosure activities with respect to
foreclosed loans and REO, and to sell foreclosed Non-GA Loans and REO in the ordinary course
of business.

Claimant urges the Court to find that the request to sell approximately 1,000 housing

units, including her home, in the "ordinary course of business" is nothing short of a request to

have this Court approve the sale of stolen property advanced in this Court by a criminal

enterprise.   Claimant's case is not unique.  In the REO inventory of all Debtors before this

Court, upon proper examination, it will be clear that most, if not all, the real estate assets were

generally taken using forged and fabricated documents and evidence.  Despite that fact which

ought to be known to the Debtors and which Claimant specifically expressed on the record of

these proceedings, Debtors seek to go forward to sell real estate which has been stolen from

homeowner, such as your Claimant.   A careful examination of the REO real estate portfolio is

necessary to avoid a miscarriage of justice by which this Court's powers would allow the sale of

property taken by forgery and fraud.

Claimant's evidence is her own testimony,  the Schedules and Statement of Financial

Affairs filed by the Debtors and the Affidavit of James Whitlinger (Docket 6) in these

proceedings.

Debtors cannot claim that there is no evidence in support of Claimant's objection to the

entry of a Final Order which would give it license to sell the stolen property which is her home

when it did not disclose that it claimed her home as an asset until the day after the deadline for

filing her objection to the entry of the Final Order by which her home might be sold under the

authority of this Court's order, while her appeal rights are still pending and have been stayed by

4

the filing of these bankruptcy proceedings.  She now has the evidence which she needed to prove

the direct harm to her interests and the falsity of the Schedules and Statement of Financial

Affairs which RFC, LLC filed before this Court.

Evidence does exist.  The essential evidence was in the control of the Debtors and not

made available to the Claimant until after her Objection was due to be filed, lest her Objection

be deemed untimely.  Paragraph 1 of Debtors' Response to Claimant's Objection is false.

2.    Debtors have not addressed the concerns of the Claimant in its response to her

Interim Objection nor has the Court overruled her Objection to the Motion now pending before

this Court which by which these Debtors wide-ranging power to sell stolen real estate assets  and

to continue to engage in litigation using forged and fabricated documents transmitted by wire

and mail (racketeering) while shielded from the consequences of awards of monetary damages.

Final hearing on the objectionable Order is scheduled for July 10, 2012.  The record will show

that NO objections to the entry of the Order at Docket Entry 544 were overruled on June 18,

2012 because the Interim Order was allowed to stay in place by Order of the Court at the hearing

on June 10, 2012, not June 18, 2012.  A Second Interim Order on the continuation of litigation

throughout the nation to allow the Debtors to attempt to take title to homes by foreclosure in

state court proceedings was entered on June 15, 2012 and provided, in relevant part:

**ORDERED, ADJUDGED, AND DECREED THAT:**
1. The Motion is GRANTED on an interim basis, as set forth herein, and the NACBA
Objection and any other objections to the Motion are hereby overruled; [Docket Entry 391]

Claimant's Objection to the entry of the Second Interim Order was overruled, but that is

equally true of the Objection of the National Association of Consumer Bankruptcy Attorneys

(hereinafter "NACBA") with whom the Debtors claim that they subsequently negotiated to

5

arrive at the terms of the proposed Final Order to which Claimant continues to object.  The Court

overruled the Objections of the Unsecured Creditors Committee and NACBA, as well as

Claimant,  for purposes of entering the Interim Order, not for purposes of the Final Order.   No

evidence was introduced at the hearing on June 10, 2012 and the Court had not made a final

decision on the basis of the arguments and the offers of proof on the record.

Either the Debtors are moving too fast for conditions and their counsel cannot recall

which date certain matters were heard by the Court or the outcome of those matters, even when

reduced to writing by an Interim Order dated June 15, 2012, which is a full three days before

counsel asserts that the Claimant's Objection was overruled or they are deliberately misleading

the Court.   While Claimant is willing to believe that Debtors' own counsel cannot track the

proceedings as they hastily seek to design the relief which the Debtors desire to enable their

continuing forgery operations, their statement that Claimant's Objection as it pertains to the

Final Order is objectively false in fact.   Objections to the entry of the Interim Order were

overruled by the terms of the Interim Order entered on June 15, 2012, but a FINAL hearing was

set on the Objections to the entry of the Final Order.   Claimant was not barred from being heard

on her Objection to the entry of the Final Order any more than NACBA was barred from being

heard at the final hearing now set for July 10, 2012.

Among the responses to Claimant's Omnibus Objection to Interim Orders, which

includes her Objection to the Final Order by which Debtors would continue to litigate against

homeowners on a completely unequal playing field in which the Debtors can sue, counterclaims

can be brought but only the Debtors can "win" because no money damages can be awarded

against the Debtors outside these proceedings, was Debtors' admission that "Finally, to the

6

extent that Debtors' may have engaged in any objectionable practices in the past, as a result of the April 13, 2011 Consent Order, the Debtors have made numerous improvements to various aspects of their business. . . Further, on February 9, 2012, . . . certain of the Debtors reached an agreement in principle with the federal government, 49 state attorneys general, and 48 state banking departments with respect to potential claims of the government parties arising out of the origination and servicing activities and foreclosure matters (the ' <u>DOJ/AG Settlement</u>'.)  The Debtors intend to comply with all of their obligations under the Consent Order and the DOJ/AG Settlement."

The Court is asked to take judicial notice of the National Mortgage Settlement, which is designated the DOJ/AG Settlement by the Debtors.  First of all, the United States District Court for the District of Columbia entered an Order approving the settlement on February 4, 2012 in Case No. 12-cv-361, which has been negotiated, signed and filed before that date.   The release from <u>civil penalties</u> which might have been imposed by the government agencies involved in the settlement resolved the issue of state and federal civil penalties only for their conduct between January 1, 2009 and February 8, 2012.  Therefore, effective February 9, 2012, the Debtors are operating without a release from civil penalties which may be imposed by state and federal agencies.   The Debtors were never released from criminal sanctions nor were they released from any homeowner claims.  Respectfully, it appears that they have come to this Court in an effort to conceal their crimes and to extinguish the homeowner claims for that period of their crime spree which is still raging in state court litigation on the Interim Order entered by this Court on June 15, 2012 (Docket Entry 391.)

This Court was not deceived by the Debtors' effort to call the Claimant's statement that

7

real estate assets are being taken by forged documents when Debtors' counsel called her

statement "allegations."  Rather, this Court took judicial notice of its own rulings, cf. In re

Lippold (NYSB 11-12300-MG)  and In re Mims (NYSB 10-14030), in which Judge Glenn had

seen examples of the very practices which he identified as robo-signing and stopped the

wrongful taking of Chapter 13 Debtors' homes and stated, as a fact, that robo-signed does exist.

Claimant asserts that the Court made a finding of fact that "robo-signing" is not a mere

allegation.

Claimant  requests that her testimony be heard at a full and fair hearing on the issue of

the criminal conduct whereby the major Debtors in these proceedings have engage in crimes to

take her  home, which they now seek permission to sell under the pending Final Order,  having

perjuriously listed her home as RFC, LLC's REO asset in these proceedings and having

perjuriously stated that the foreclosure litigation is "closed" as opposed to "on appeal."

Claimant respectfully shows that Court that she can prove through her own testimony and

judicially noticeable facts that not only are the Debtors not following the requirements of the

National Mortgage Settlement, they are hiding behind it, as if all they have to do is agree in

principle to stop committing crimes and go forward to continue to profit from their crimes by

selling the assets they seized by criminal conduct.  Claimant further respectfully shows the Court

that she would have been able to point to the specific evidence in the record as it pertains to her

own home had the Schedules and Statements been filed prior to the deadline for her Objection to

the Final Order whereby the Debtors seek this Court's permission to proceed to sell stolen assets

obtained by forgery and fraud on courts and trustees throughout the nation had the Schedules and

Statements been filed prior to the request for relief and prior to the deadline for Objections.  This

8

Reply is timely, because her Objection is not time-barred nor was her Objection overruled on the record of the proceedings on June 10, 2012 nor was she barred from proceeding to hearing on the Final Order under the terms of the June 15, 2012 Interim Order of this Court.

Debtors assertion in paragraph 2 of their Response to Claimant's Objection is false in that it states that her Objection to the Interim Order was overruled on June 18, 2012, when, in fact, the matter was not heard on June 18, 2012 and was heard and determined as set forth above.

3.  Far from being moot because the Debtors filed their Schedules and some of their Statements of Financial Affairs on June 30, 2012 (the day after the Claimant's Objection was due to be filed) it is now clear that the Schedules and Statements of Financial Affairs (not including the payments to creditors and payments to insiders) are available evidence of the crime being committed against the Claimant and, within a reasonable period of time with notice to all homeowners whose real estate appears as REOs on the Schedules A many more stolen properties can be shown to be claimed as assets of the Debtors' estates.   Claimant knows of her own knowledge of several other cases in which the Debtors or the entities for which they as servicers to proceed in litigation to take control and possession of homes without standing and in reliance on forged documents and she knows that thousand of homes have been taken by the Debtors using the same modus operandi, all of which are being claimed to be owned by the Debtors in these proceedings and which they seek Court permission to sell under the proposed Final Order.  The Debtors themselves admit that they take title to homes for undisclosed parties and have perjuriously failed to list a single REO property being held for the securitization trusts for which they claim to be the servicers.  (See for example, Attachment 14 to the RFC, LLC Statement of Financial Affairs.)

9

The filing of the Schedules and Statements of Financial Affairs on June 30, 2012 and the amendments of July 3, 2012 are perjurious, but to the extent that they have been filed and make certain statements and list real estate assets, they are probative in support of the Claimant's request that this Court deny the entry of the Final Order to the extent that it would allow stolen property to be sold and to the extent that it allows state court foreclosure litigation to continue to seek to seize more real estate assets based on forged documents.

It is noteworthy that  absent from the Schedules and Statement of Financial Affairs which Claimant has reviewed is any mention of the Debtors' over-collateralized derivative position, which is stated to be valued  $19,100,000.00 (19.1 million USD) with a liability of $5,600,000.00 (5.6 million USD) with a net asset value of $13,600,000.00 ($13.6 million USD) set forth in the Whitlinger Affidavit at Docket Entry 6, page 31, paragraph 73.   At paragraph 74 of the Whitlinger Affidavit, the Debtors represent to the Court that "most" the over-collateralized derivative positions are expected to be "unwound" with the filing of these Chapter 11 cases.  No derivative assets are disclosed in the Debtors' Schedules.   There is no mention of what collateral has been pledged for the derivatives.   It is possible that the homes which Debtors are seeking to sell are pledged as collateral for the derivatives.    The testimony of James Whitlinger should be compelled on that issue.   Claimant was unable to find the derivatives are not listed as an asset on any of the Schedules she has reviewed to date and she has not been able to find derivative liabilities listed on the Schedules D and F which she has reviewed.

Not only do the filing of the Schedules and Statements of Financial Affairs not render Claimant's Objection to the proposed Final Order "substantially moot," the filings prove the very reason for all of her objections to relief being granted before the Schedules and Statements

10

were filed.   The Schedules and Statements of Financial Affairs, both as to what is included in

them and what ought to be included but is not,  are particularly compelling in support of

Claimant's Objection to the entry of any further Final Orders allowing the Debtors to continue to

foreclose on homes and sell REO properties  in the "ordinary course of business."

4.   The foregoing provable facts, combined with the concealment of the true ownership

of assets and the status of cases in litigation, along with the concealment of the very existence of

the derivative assets,  is prima facie evidence of  the bad faith filing of these Chapter 11 cases.

Nevertheless, Claimant has not yet filed her Motion to Dismiss or Convert Proceedings to

Chapter 7 proceedings because it has only been 7 days since the substantial evidence of bad faith

has come into her possession through the filing of the Schedules and Statements of Financial

Affairs in these proceedings, the information contained therein is vast (the Schedules and

Statements of GMAC Mortgage, LLC, for example, are over 1000 pages long and there are 51

entities involved in these proceedings, many of which are merely shells with no assets or

liabilities and have been consolidated herein for the apparent purpose of creating confusion) and

detailed research on individual REO properties and case status are required, along with cross-

referencing among the 51 entities to assure that the most thorough presentation of the perjuries in

the Schedules and Statements will be presented, within the limited resources of the Claimant's

time and technological support.

A Motion to Dismiss or Convert these Proceedings is being discussed among injured

homeowners who are direct and indirect victims of the Debtors' racketeering enterprise.   The

issue of bad faith is raised with respect to the Final Order designated by counsel for the Debtors

as the "Supplemental Servicing" Order because parties acting in bad faith are not entitled to the

11

protection of courts of equity.    Debtors have boldly stated their intention to foreclose on

properties without standing to do so and to sell REO property that they do not own.  The only

way to stop them from doing so is to deny the Final Order to the extent that it allows them to

continue to foreclose without standing to do so or to sell properties which they do not own.

5.    Debtors have strongly objected to the factual allegation that the Chapter 11

proceedings were filing in bad faith.  They have joined issue on the application of the principles

of equity as a matter of fact.  A full, evidentiary hearing must be held to resolve this issue.

Claimant cannot be expected to proceed to a full evidentiary hearing July 10, 2012 because issue

was joined for the first time on July 6, 2012.   She is able to give considerable testimony

telephonically on July 10, 2012 and make offers of proof.   Claimant doubts that Debtors are able

to proceed to a full evidentiary hearing on the issue of bad faith on July 10, 2012 either.  A final

evidentiary hearing should be scheduled and the automatic stay should not be modified to allow

these Debtors to sell Claimant's home or any other REO property,  nor should they be allowed to

continue any efforts in to foreclose on any homeowner in judicial or non-judicial foreclosure

states in any further proceedings involving  the Claimant or any other homeowner against whom

they have and are proceeding with forged documents.

The Debtors claim that the orderly sale of the assets they claim conducted under the

protection of Chapter 11 are the best way to: (a) maximize the value of the Debtors' assets for

the benefit of creditors; (b) preserve the Debtors' servicing business on a going concern basis for

sale (in whole or in part), thus preserving jobs, providing the best possible outcome for the more

than 2.4 million consumers whose loans are serviced by the Debtors and for the investors,

including pension fund  and money fund managers and insurance companies, in securitization

12

pools that own loans serviced by the Debtors; (c) avoid disruption in the fragile housing market recovery; and (d) provide a vehicle for distributing the proceeds of the asset sales to creditors pursuant to the priority scheme under the Bankruptcy Code. Whitlinger Affidavit ¶ 13. As described at length in the Whitlinger Affidavit, the Debtors have compelling reasons for filing these Chapter 11 cases and the Objector's assertion that they were filed in bad faith is baseless.

To these assertions Claimant responds:

(a) Chapter 11 proceedings are the best way that the Debtors have devised to extinguish their liability to homeowners for crimes they have committed against them in the use of forged documents to give the appearance of standing in the effort to seize this nation's homes for their own benefit, the benefit of their co-conspirators (many of whom are listed as bank creditors in these proceedings) and their parent companies.

(b) The preservation of a criminal enterprise as an ongoing concern is an unprecedented request which must, in due course and on a proper motion, be denied by dismissal of these proceedings or conversion of these proceedings to Chapter 7 for the protection of the public. Debtors provide not one fact to show how their continuing operations will benefit the homeowners (from whom the Debtors seek protection from paying legitimate claims for serious harm  and who could simply send their payments to the real party in interest on the loans if the Debtors were not operating to conceal the true identities of those parties) or the investors (who have been suing the Debtors for breaches of warranties and representations in numerous cases) in securitization pools (to which the Debtors never transferred the loan documents, which is the primary cause of "robo-signing," " robo-stamping," and other document forgeries including forged mortgage assignments) all of whom are unsecured creditors and are likely to lose any

13

hope of recovery of damages if the Debtors barely concealed scheme to pay their "secured" co-conspirators succeeds.

( c ) The end to the Debtors' racketeering enterprise, which this Court has the power to stop, will assist in the recovery of the housing market and the recovery of losses to investors because this Court has the power to force the disclosure of the real parties in interest who are entitled to receive the homeowners' payments, who are the investors.  Most homeowners would be pleased to have the opportunity to enter into an accord and satisfaction with the real parties in interest, at the current market value of their properties and at market interest.   The housing market can begin to recover only when the fraud is driven out of the market.  Denying the purveyors of fraud the relief they are seeking in this case is the first best step to ending the fraud which caused the investors' losses, destroyed the housing market, created massive unemployment and created the foreclosure crisis.  Claimant offers to prove that the platitudinous recitations that the Debtors make any contribution to the stabilization of the housing market are complete falsehoods.   The Claimant offers to prove that the securitization trusts are empty,  that the Debtors have gone on a foreclosure binge to seize hard assets (the homes) for defaults which have been created for the purpose of making false claims against the United States Treasury for payments under 12 USC sec. 5212 and which payments would have more than satisfied the investors' claims on a present market value basis.

(d) The priority scheme is just that: a scheme.  It is a scheme to pay the co-conspirators in the racketeering enterprise from the assets of the homeowners and the investors.  It also appears to be a full-employment plan for the largest law firms in this nation, all of whom want their share of the proceeds of the sale of homes for a claim of debt which has already been

14

paid in full by the United States Treasury under 12 USC sec. 5212.  Where the funds for the

payments (homeowners' payments, mortgage insurance payments, payments by the investors,

the government agency guarantees  and payments by the United States Treasury)  have actually

been hidden is a question which should be investigated by the Examiner.   It is recommended

that the books and records of Ally Bank, Ally Financial, Inc., Cerberus Capital Management, LP

(along with more than 100 Cerberus entities registered with the Delaware Secretary of State) and

the private bank accounts of the officers and directors of the Debtors, their parent companies, the

non-governmental shareholders of the parent companies, Deutsche Bank, AG, Barclays Bank,

Citibank, JP Morgan Chase Bank and every other putative secured bank and hedge fund

creditors should be investigated to locate the funds which have been taken at every stage of the

securitization fraud process in which the Debtors admit they are major participants.

        6.  As to tracking this case, the website maintained by KCC, LLC does not allow public

user access.   Finally, on June 29, 2012, Claimant was connected to the Court's CM/ECF site.

KCC, LLC was a complete failure as a noticing agent and Claimant would have objected to it

being approved for payment had she received proper notice of the motions/applications for

approval of the administrative priority claimants, including Debtors' counsel, conflicts counsel,

securitization counsel, counsel for the Committee of Unsecured Creditors and every other

conceivable administrative claimant to seek a priority share of the proceeds of liquidating these

Debtors.  Unfortunately, those motions/applications were filed on June 28, 2012 and were never

provided to her by KCC, LLC.  KCC, LLC is so incompetent that it even sent Claimant a post

card informing her that her claim had been filed with this Court as Claim Number 2, when she

knew very well that her claim was the first filed claim and is Claim Number 1 in these

proceedings. (There had only been 3 claims filed in these proceeding as of the date the Claimant received notice that her claim had been assigned Claim Number 2, so KCC, LLC was at least 33% in error in its notices of assignments of Claim numbers.)

This case has been so mismanaged by KCC, LLC that this Claimant intends to bring a new claim in these proceedings under the indemnification agreement which Debtors made with their choice of noticing agent for any and all losses she may experience as a result of KCC, LLC's failure to give her notice of the motions/applications for approval of their administrative priority claim for services and that of all the other law firms and organizations which are now poised to take millions of dollars in fees as administrative priority claims from a consolidated bankruptcy estate which is funded by the broken dreams of American homeowners whose homes have been taken and whose payments have been sent to off-shore banks by these racketeers and their co-conspirators.

7.   As to the Debtors' denial of the obvious fact that they are seeking a one-sided relief from stay by their specious proposal to continue to foreclose against homes and sell the REO properties while allowing the "counterparties" to assert "**many** claims and defenses against the Debtors" in connection with foreclosure actions and borrower bankruptcy cases, several obvious statements must be made:

a.    Homeowners are not "counterparties"fn2 with the Debtors when they are acting  as servicers of  the mortgage loans.

Counterparty is a legal and financial term. It means a party to a contract or a the other party to a financial transaction. A counterparty is usually the entity with whom one negotiates on a given agreement, and the term can refer to either party or both, depending on context. Any

---

2

legal entity can be counterparty. Usually, to say that there are counterparties to an arrangement means that there is some potential for conflict between them. Well-drafted contracts usually attempt to spell out in explicit detail what each counterparty's rights and obligations are in every conceivable circumstance, though there are of course limits. There are general provisions for how counterparties are treated under the law, and there are many legal precedents that shape the common law. The Counterparty is also called Contraparty.

Prior to March 14, 2008, American homeowners did not know that their mortgage loans were being securitized.  They did not have the opportunity to accept or reject securitization funding.   They did not negotiate with the servicers.  The servicers, and specifically these Debtors, were not a party to the original loan agreement.   The very fact that counsel for these Debtors would attempt to cast the homeowners are counterparties demonstrates the underlying fraud in the origination of securitized loans.

Debtors, as servicers, did not loan the homeowners any money.  Mortgage servicers are agents of the "lender."   It would be the rare case in which the Debtors were the source of funding of the mortgage loan.   The Debtors are not counterparties with the homeowners.  As servicers they operated to cause the homeowners who are or have been in the foreclosure process to go into default though a variety of devices, such as failure to credit timely payments, applying payments to late fees rather than to principal and interest as required by law, force-placing insurance,  drive by inspections, default servicing fees, failure to apply modifications payments, encouraging homeowners to default for a period of 3 months in order to qualify for a loan modification, refusing to work out disputes or taking advantage of homeowners' temporary distress (such as the death of a spouse, an illness or unemployment) and other predatory servicing techniques.   The homeowners cannot be in default to a servicer with which they have never negotiated for contract terms and from which they never received any loan funds.

Debtors' counsel obviously does not know what a counterparty in these transactions is.

17

Counterparties are those who have negotiated for and accepted the allocation of risk for an obligation under certain terms and conditions.  Debtors did not enter into counterparty relationships with the homeowners.   In their capacity as servicers, they have no contractual relationship with the homeowners at all and are merely agents of what are frequently undisclosed principals.

(b) By allowing the Debtors to proceed to foreclose on homeowners while preventing the homeowners from receiving monetary compensation from the Debtors by recoupment, setoff of cash payments, when all the Debtors' assets are protected in by the automatic stay, the detriment to the homeowners is obvious.   They are allowed to bring claims against the Debtors without the opportunity to recover for their liquidated claims by a monetary award, including awards of attorneys' fees and costs,  recoupment or setoff against the Debtors in state court judgments or in settlements in excess of $100,000.00.  Although post-petition claims against the Debtors should not be stayed under bankruptcy law, the fact that the Debtors' pre-petition assets are all protected in the bankruptcy estate renders the "permitted" litigation against them an exercise in futility.  It is beyond disingenuous for the Debtors to claim that it is not detrimental to homeowners to be put in a position where their successful claims will not be paid, even by offset or recoupment, and are not collectible from the Debtors' assets.  This is akin to fighting a battle over territory when only one party can gain any territory.  One party stands to lose everything and the other cannot lose at all.   As designed by the proposed Final Order, the litigation of the homeowners' claims against these Debtors becomes an  exercises in futility.

Every lawyer knows that the prior to commencing litigation, one assesses the

18

collectibility of the party to be sued.  Insolvent fn3 or not (and Debtors are far from insolvent,

have claimed title to millions of dollars in US real estate without having loaned any money to

homeowners  and are concealing over $13.6 million in derivatives while the contracts are

"unwound" ) they are using the automatic stay to make themselves uncollectible.   The detriment

of the Debtors' self-designed litigation model is self-evident.

( c) It is worth noting here that, although the Debtors claim to have "worked closely with

the National Association of Consumer Bankruptcy Attorneys (NACBA)  and the Unsecured

Creditors' Committee to "craft relief which would strike an appropriate balance between

preserving Debtors statutory protections under the Bankruptcy Code and providing a clear and

efficient mechanism for resolving ongoing litigation affecting borrowers nationwide."   Debtors

did not work with homeowners with litigation claims, to which they have filed the Omnibus

Response to those homeowners'  Objections to their requests and the requests of their counsel

for relief in these proceedings.  (Docket Entry 682 filed on July 3, 2012) They did not work with

Claimant in crafting their request for relief.

The Unsecured Creditors Committee does not and cannot represent the interests of

homeowners whose homes have been taken in foreclosure by the Debtors and which the Debtors

seek to sell as REO property.   There is no representation on the Unsecured Creditors Committee

---

[3]The original standards for bankruptcy eligibility were insolvency or inability to make
payments when payments are due.  From the Affidavit of James Whitlinger (Docket Entry 6) it is
clear that the Debtors are asserting that they cannot make payments when they are due on claims
arising from litigation and because their parent company has decided to stop funding their
activities.   Debtors should then cease and desist their litigation practices and conserve the estate
for the parties who already have matured claims against the Debtors.  What they seek is akin to
the asbestos manufacturers going into bankruptcy court and getting permission to keep installing
asbestos while they empty their estate of all assets from which damages for asbestos injuries
could be paid.

for class of  the thousands of former homeowners whose homes were taken without the Debtors

having standing to do so and for which they forged evidence purporting to give them standing to

do so.  The interests of these former homeowners are not represented by NACBA because they

are not involved in ongoing bankruptcy proceedings.

 This is  specific situation in which the Claimant finds herself individually: she is a

homeowner who was proceeding on appeal from a void judgment taken on forged documents

when the Debtors filed for bankruptcy and she discovered within the last seven days that her

home is listed as an REO property as an asset of one of these Debtors, RFC, LLC when the

Debtors filed their Schedules.

 As a bankruptcy lawyer as well as a foreclosure defense litigator herself, she was unable

to even advise the Wisconsin Court of Appeals whether the automatic stay applied to her appeal

or not, based on the ambiguities in the Interim Orders now designated as the Interim

"Supplemental Servicing Order" by the Debtors and which Claimant designates as the Interim

Order Modifying the Automatic Stay for purposes of accuracy.  Arguably, the automatic stay

might not have applied to her appeal initially,  because there is a suggestion in the both versions

of the Interim Orders that some appeals apparently may be pursued, but awards of appeal costs

might not be allowed.  But if she had gone forward to communicate with the Wisconsin Court of

Appeals on any matter other than the fact that the Respondent-Appellee RFC, LLC (Case No.

12-12019 consolidated in Case No. 12-12020) she would have been subject to contempt of this

Court's Interim Orders on the modification of the automatic stay because her judgment of

foreclosure could be determined to have been void and her home would then be returned to her,

while RFC, LLC is claiming her home to be an REO asset in its bankruptcy.  In the meantime,

20

her home could be sold under the Interim Order Modifying the Automatic Stay while her appeal is pending.

She has clients in similar ambiguous positions where the automatic stay which has been modified on an interim basis is concerned. GMAC Mortgage, LLC (Case No. 12-12032 consolidated in Case No. 12-12020) is reportedly the servicer for a Wisconsin home for which Deutsche Bank National Trust Company, N.A. is purportedly the Trustee of an undisclosed securitization trust and she cannot sue on her clients' behalf for offset or damages for ongoing violations of the Fair Debt Collection Practices Act (FDCPA) at 15 USC sec. 1692, et seq to obtain attorneys' fees for the costs of defending the home against fraudulent foreclosure on forged documents, leaving her clients to pay her fees out of pocket or for her to proceed without compensation to defend her clients' home. A fraudulent attempt to confirm the void Sheriff's sale in that case was reinitiated on July 3, 2012 as an unfair debt collection practice by a law firm who is being paid from this bankruptcy estate under the Interim Order Modifying the Automatic Stay.

On June 14, 2012, in another of her clients' cases, a lawyer from that same law firm which is being paid by these Debtors under an executory contract which appears to be approved by the "Interim Supplemental Servicing Order" told a Wisconsin bankruptcy judge that he had "no reason to believe" that her clients' home was involved in these bankruptcy proceedings despite the fact that the Debtors are in the process of settling a securitization trust claim of Maiden Lane, LLC, in which there is substantial evidence to show that a credit default swap monetized in that portolio of assets  is based on the trust into which her clients' loan was purportedly transferred. Maiden Lane, LLC is or has been serviced by one of the Debtors and

21

may be subject to repurchase rights against Debtors and in favor of Maiden Lane, LLC.

Documents have been forged to make it appear her clients' loan was had been transferred into the Wells Fargo Home Equity Trust 2005-2 after the trust had already failed and its assets were purportedly transferred to the Federal Reserve Bank of New York as subrogation for the payout on the credit default swap, presumably under 12 USC 5212. The Federal Reserve Bank of New York subsequently transferred the purportedly credit default swap and its subrogation rights to Maiden Lane, LLC . Claimant was in the process of preparing an adversary proceeding for racketeering and other claims against numerous parties, including Maiden Lane, LLC, when she became aware through filings in these proceedings that one of these Debtors is or was the servicer for certain Maiden Lane, LLC assets. One of the Debtors could be liable for her clients' damages under the repurchase agreement with Maiden Lane, LLC if Claimant sued Maiden Lane, LLC and, having heard Judge Glenn's strong admonition that no other bankruptcy judge could interpret the nature, scope and intent of the Interim Order modifying the automatic stay, Claimant advised her clients that Maiden Lane, LLC could not yet be joined in the Wisconsin adversary proceeding which was due to be filed on June 14, 2012 and the entire pleading had to be re-written to remove the references to Maiden Lane, LLC and its servicer, which may well be one of the Debtors in this case. The racketeering case could not then be pleaded due to the inability to join a necessary party.

A California homeowner has contacted Claimant to seek relief in this Court because one of the Debtors used the automatic stay in these proceedings as a shield against his claims in an injunction proceeding against the non-judicial foreclosure of his home. Paul Pappas of Arizona is seeking relief from the automatic stay but may choose to bring his claims before this Court. A

22

Michigan homeowner is prevented from pursuing his claims for racketeering consisting of document forgery transmitted by mail and wire and foreclosure fraud against the RFC, LLC by joining in Claimant's Wisconsin action due to the automatic stay and must bring his claim to this Court.   The same is true of a South Dakota homeowner.   Debtors designed their modification of the  automatic stay to prevent Third Parties from intervening in cases to claim damages against them,  but in cases in both Texas and Florida, they are actively intervening in cases brought by other foreclosing entities to claim rights to collect disputed debts through foreclosure, despite the use of the automatic stay as a shield against intervention in cases in which they are subject to claims for damages.  And, again, any successful prosecution of the Debtors for damages in any state will lead the homeowner back to this Court to collect their damages from what Debtors are urgently trying to distribute all their assets according to the priority scheme laid out in the Whitlinger Affidavit.

The very nature of the relief sought by modification of the automatic stay is further evidence of the Debtors' bad faith in filing these proceedings.  It is clear that they want to pick and choose how they will litigate and what litigation risk they will accept.  They are using the awesome power of the automatic stay to manage not only their litigation risk but the litigation risk of their parent companies, including seeking to give Ally Financial, Inc. the benefit of the automatic stay against discovery where they are co-Defendants with their parent company. Without discovery, Ally Financial, Inc. cannot be successfully sued, so Ally Financial, Inc. Is using these proceedings to obtain the benefit of the automatic stay without filing for bankruptcy relief.  But all claims can be brought before this Court and commenced as adversary proceedings.

23

8.  It is respectfully submitted that soon this Court will hear and consider Motions to

Dismiss or Convert these Proceedings to Chapter 7 proceedings for bad faith filing and

continuing criminal conduct of the Debtors.   In the meantime, it Debtors are not entitled to craft

their own desire relief from the automatic stay to control how litigation which results from their

foreclosure operations.   Criminal conduct is not entitled to any remedy at law or equity.

Debtors are functionally insolvent because they need the protection of the automatic stay

in these proceedings to protect them from their illegal foreclosure and real estate seizure scheme.

They must be prevented from incurring any further liabilities by engaging in illegal foreclosure

practices in which they cannot afford to fund the damages they cause.  They must be prevented

from selling REO properties obtained by forgery and fraud.  In short, the modification of the

automatic stay which they have designed for risk management purposes as their final hedge

against the consequences of their criminal conduct must be denied.  The automatic stay must be

reinstated to prevent the Debtors from creating more victims fn4 with damages claims they

cannot afford to pay.  They must be prevented from illegally seizing any more homes.  If this

puts them out of business, the homeowners, investors and the housing market will benefit.  The

secured creditors are not entitled to benefit from the crimes of these Debtors and should be

investigated for their probable collusion in the racketeering enterprise of the Debtors.

**WHEREFORE**, the undersigned makes this objection in good faith, for the

protection of the public and the integrity of the Court and seeks to be heard at the hearing now

set for July 10,  2012 or any continued or adjourned date or dates of any hearings on the attempts

---

4 Such as the Claimant's clients whose lives are being put on hold by these Debtors who
want to dictate the terms upon which they may be held liable for damages and as exemplified by
the suffering of the courageous Valerie Ann Greene. (Docket Entry 663)

24

of the Debtors modify the automatic stay to allow it to  continue to illegally foreclose and sell

homes it has illegally foreclosed as  its "ordinary course of business."

Dated: July 8,  2012

     Minneapolis, Minnesota.

                            ACCESS LEGAL SERVICES

                            */s/ Wendy Alison Nora*

                            Wendy Alison Nora, pro hac vice
                            210 Second Street NE
                            Minneapolis, Minnesota 55413
                            Telephone (612) 333-4144
                            Facsimile (612) 886-2444

                            *Counsel to Wendy Alison Nora*

25