**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

|   |   |
|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------------

**NOTICE OF FILING OF CORRECTED EXHIBIT 2 TO**
**DEBTORS' APPLICATION FOR AN ORDER AUTHORIZING THE**
**EMPLOYMENT AND RETENTION OF MERCER (US) INC. AS COMPENSATION**
<u>**CONSULTANT TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**</u>

**PLEASE TAKE NOTICE THAT** on June 26, 2012, the above-captioned debtors and

debtors in possession (collectively, the "Debtors") filed the *Debtors' Application for an Order*

*Authorizing the Employment and Retention of Mercer (US) Inc. as Compensation Consultant to*

*the Debtors Nunc Pro Tunc to the Petition Date* (the "Application") [Docket 511].

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby submit a complete

copy of the Engagement Letter,[1] which appears as <u>Exhibit 2</u> to the Application, and is attached

hereto as <u>Exhibit 1</u>.

Dated:  July 9, 2012
        New York, New York

                                        /s/ Larren M. Nashelsky
                                        Larren M. Nashelsky
                                        Gary S. Lee
                                        Lorenzo Marinuzzi
                                        MORRISON & FOERSTER LLP
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        Telephone: (212) 468-8000
                                        Facsimile: (212) 468-7900

                                        *Proposed Counsel for the Debtors and
                                        Debtors in Possession*

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application.

## EXHIBIT 1

**John Dempsey**

155 North Wacker Drive, Suite 1500
Chicago, IL 60606
+1 312 917 0609
john.dempsey@mercer.com
www.mercer.com

 MERCER

Chairman of the Compensation Committee
Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attn: Tammy Hamzehpour
May 14, 2012

**Subject: Compensation Expert Services**

Dear Sirs:

Thank you for your inquiry regarding retention of Mercer (US) Inc. ("Mercer" or "we") by Residential Capital, LLC and its affiliated entities ("ResCap", "you" or the "Company") to perform expert services (the "Services") in connection with compensation services for ResCap and its Compensation Committee (the "Committee") as more specifically described in the statement of work ("SOW") attached hereto. In particular, we have been retained to provide expert services with regard to the assessment of a proposed Key Employee Incentive Plan ("KEIP") and Key Employee Retention Plan ("KERP") with the expectation of providing testimony in bankruptcy court regarding the market competitiveness of the programs and their reasonableness in the ResCap context.

**STATEMENT OF WORK**

### Background
ResCap filed for bankruptcy under Chapter 11 of the US bankruptcy code on May 14, 2012 (the "Petition Date"). It is anticipated that a substantial portion of its operating assets will be sold. FTI Consulting has been advising the Company on the development of a compensation program. The KEIP will cover insiders and the KERP will cover non-insiders. In addition there is expected to be a program for individuals remaining with ResCap following the sale to resolve the bankruptcy process.

### Why Mercer

Mercer has extensive experience advising financial and real estate organizations on retention challenges while planning for recapitalizations. Among financial and real estate organizations, Mercer has worked with CIT Group, Centro Properties Group and Capmark Financial Group. Mercer is presently advising other organizations as they explore alternate capital structures.

Mercer has extensive experience advising organizations going through Chapter 11 restructurings. Recent clients include Borders, Blockbuster, Nortel, and Tribune. John Dempsey is the leader of team of compensation consultants for organizations in financial



Page 2
May 14, 2012
Chairman of the Compensation Committee
Residential Capital, LLC

distance. He has extensive experience testifying at deposition and in bankruptcy court
hearings, should that be required here.  His abridged professional biography is attached as
<u>Exhibit 1</u>.  Mercer maintains an extensive database of compensation programs for
organizations going through restructurings including out-of-court, prepackaged and
traditional bankruptcy restructurings.

### *Workplan*

Mercer shall be responsible for providing our expert opinion ("the Services") in connection
with the above-referenced matter as requested orally or in writing by Morrison & Foerster.
Mercer will review the KEIP and KERP plan design in the context of overall compensation
and compare the programs to market practice.  The analysis will include comparisons of the
total cost of the programs to programs at similar cases.  In addition Mercer will assess the
total compensation opportunities to market pay levels at comparable organizations with
similar roles.  To the extent, Mercer requires information from the Company or its
consultants, Mercer will request such information for Morrison & Foerster, who will work with
the Company to gather necessary information, including compensation and benefits data
and the scope of the relevant jobs.
If asked, Mercer will prepare and provide an expert report suitable for filing with court
documents, which summarizes our assessment of the KEIP and KERP in the context of
overall compensation programs.  Mercer would be available to provide a deposition and/or
court testimony if requested.
Mercer's work under this Statement of Work (and together with the attached terms and
conditions, this "Agreement") is done at ResCap's request, and all work performed by
Mercer under this agreement including, but not limited to, all non-public communications,
whether written or oral, between Mercer and any attorney or employees of ResCap or
members of its Committee, are intended to be confidential and privileged communications
that the parties to this Agreement will not reveal to any other person, except as
contemplated by this Agreement or authorized by the disclosing party or required by law.  In
this regard, Mercer agrees to inform each of its employees or agents performing services
under this agreement of the confidentiality obligations set forth herein.

### *Fee Estimate*

John Dempsey's billing rate is $748 per hour, subject to periodic adjustment at Mercer's sole
discretion, which is approximately $6,000 per day.



Page 3
May 14, 2012
Chairman of the Compensation Committee
Residential Capital, LLC

We typically charge on a time and expenses basis for our services, which include negotiations with creditors, court approval and related processes. Our standard hourly rates are as follows:

| Skill Sets | Hourly Rate Range |
|---|---|
| Research | $50 to $150 |
| Analyst | $150 to $300 |
| Associate | $250 to $400 |
| Sr. Associate | $350 to $550 |
| Principal | $500 to $700 |
| Partner | $700 to $950 |

Mercer records time in quarter hour increments. In addition to such compensation, we also bill for necessary travel and other expenses related to the services requested, including legal fees associated with our retention, subsequent fee application with the US bankruptcy court if required and any requested participation in contested matters or litigation, such as depositions, responding to subpoenas or discovery requests, and court testimony.

Period of time over which work will be performed: The SOW will be effective through the later of 3/30/2013 or the completion of a recapitalization of ResCap's balance sheet.

 **MERCER**

Page 4
May 14, 2012
Chairman of the Compensation Committee
Residential Capital, LLC

### *Staffing*

John Dempsey will be responsible for the work to be completed. John will be assisted by an experienced team of Mercer consultants.  Neither Mercer nor John Dempsey is aware of any occasion when a court disqualified Mr. Dempsey from serving as an expert.

**MERCER**

Page 5
May 14, 2012
Chairman of the Compensation Committee
Residential Capital, LLC

\* \* \*

We are very interested in working as an expert with for ResCap on this matter. We trust this proposal reflects our discussion and enthusiasm for the project. Upon execution, this agreement will be effective as of May 14, 2012.

**Mercer (US) Inc.**

By: _John Dempsey_

Name: __John Dempsey__          Date: __06/25/2012__
      (Please Print)

Title: __Partner__

ACCEPTED AND AGREED

Residential Capital, LLC

By: _Tammy Hamzehpour_

Name: __Tammy Hamzehpour__          Date: __06/25/12__
      (Please Print)

Title: __General Counsel__

ny-1047195

*EXHIBIT 1*

 MERCER

### John Dempsey Credentials

**PRESENT RESPONSIBILITIES**
John is a Partner based in Mercer's Chicago office. He has had extensive experience advising organizations undergoing major financial transitions including bankruptcies, IPOs, LBOs, and acquisitions on compensation issues. John designs annual and multi-year incentive programs, change in control arrangements, and employment agreements.

**EXPERIENCE**
John's recent bankruptcy related clients include Nortel Networks, Tribune Company, Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion, Dana, Owens Corning, Kaiser Aluminum, Solutia, Oglebay Norton, Citation, Intermet, Venture Holding, Alterra, EaglePicher, Allied Holding, Mesaba Aviation, and FLAG Telecom. In addition, John has worked with numerous clients seeking to avoid bankruptcy. He has also worked on restructuring issues with Georgia Gulf, ABN AMRO, US Foodservice, Barrick Gold, Manulife, CareMark Rx, Archipelago, and Sky Financial.

John published an article entitled Bankruptcy Blues: Retaining Key Employees During a Financial Crisis with Michael Siebenhaar in the February 2002 issue of Workspan, and an update The New Challenge of Chapter 11 with Elizabeth Stephens in August 2008. He is frequently quoted on issues relating to effective transitional compensation practices in such publications as HR Magazine, Cox News, and Atlanta Journal Constitution. In addition, he has been quoted in the Dallas Morning News, the Chicago Tribune, and the Milwaukee Journal Sentinel.

He has presented at the National Meeting of the Conference Board, the National Association of Stock Plan Professionals, and the National Center for Employee Ownership.

John has testified as an expert in connection with a renewal of the KERP of Owens Corning on 2004, the approval of Citation KERP on 2004, the approval of Intermet KERP in 2004, the approval of Venture Industries' KERP in 2005, the approval of Allied Holding KERP in 2005, Nortel Networks KEIP & KERP in 2009 and Tribune in connection with their Management Incentive Plan in 2009

In addition, John's testimony was proffered and accepted in connection with the approval of EaglePicher's KERP, the approval of Dana's director compensation program in 2006, the approval the continuation of Mesaba's Incentive and Severance plans in 2006, and the approval of Olgebay Norton's KERP in 2004. In 2010, John's testimony was proffered and accepted in connection with the approval of Nortel's "Special Incentive Plan". In 2011, John's testimony was proffered and accepted in connection with the approval of Tribune's Management Incentive Plan and Plan of Reorganization and in connection with the approval of Borders Key Employee Incentive Plan and Key Employee Retention Plan.

**EDUCATION**
John joined Mercer in 1985 following his graduation from Yale University and has worked out of the firm's offices in Chicago, Cleveland and London. He was awarded an MBA in 1992 from The Ohio State University, where he earned academic and leadership honors.

*EXHIBIT 2*

**Terms and Conditions Governing Engagement**
*Our performance of the Services are subject to the following terms:*

1. Payment Terms.
    A. We perform Services in consideration of ResCap paying, or causing to be paid, our compensation. Our compensation for Services, such as professional fees, commissions or other amounts payable to us ("Compensation") is set forth in the Exhibit 2 ("Applicable SOW or SOW") or as otherwise agreed. In addition to our Compensation, we also bill monthly for our reasonable expenses ("Expenses"). Mercer's Expenses include reimbursement for reasonable attorneys' fees incurred relating to its requested or required participation in contested matters or litigation (such as depositions, responding to subpoenas or discovery requests, and court testimony). Further, in the event Company files for relief under title 11 of the United States Code (the "Bankruptcy Code") and Company is required, or elects, to seek court approval for the retention of Mercer as a professional (a "Professional") (whether under section 327 of the Bankruptcy Code, as an ordinary course professional, or otherwise), Mercer's Expenses include reimbursement for reasonable attorneys' fees incurred relating to seeking approval in the applicable United States Bankruptcy Court (the "Bankruptcy Court") for the retention of, and compensation for, Mercer. You are responsible for any sales, value added taxes or similar taxes related to the performance or receipt of the Services, including those taxes assessed by authorities subsequent to payment for the Services.

    B. In light of the anticipated considerable benefit to the Company under SOW, the Company will be responsible for timely payment of all Compensation and Expenses in accordance with subparagraph C below.

    C. For Services performed and Expenses incurred after the Petition Date, invoices are due and payable within thirty (30) days of the date of the invoice, unless otherwise prohibited under the Bankruptcy Code or applicable orders of the Bankruptcy Court. If any invoice is not timely paid, we may exercise our right to claim interest for late payment as permitted by applicable law. If any invoice remains unpaid for longer than ninety (90) days from the date of the invoice, we may either suspend the provision of the Services until payment is received, or terminate this Agreement and/or any SOW with immediate effect.

    D. If we become involved (whether or not as a party) in a dispute (including audits or investigations) between you or the Company, on the one hand, and a third party (including a governmental entity), on the other hand, or if we are asked to preserve records relating to the Services or this Agreement, including where Mercer is requested to preserve documents, electronically stored information, back-up tapes, or other media beyond its standard recycling or retention protocol, beyond the scope of Services described in the applicable SOW, these additional services will be documented in a SOW. If no SOW or other agreement is reached on these additional services, you agree to pay us at our then current standard rates for all our time spent, and will reimburse us for all reasonable

expenses incurred by us, in connection with such dispute or such documentation preservation request. We will reimburse such payments in the event and to the extent such dispute is finally determined by a court to have resulted primarily from our negligence, conduct in bad faith or fraud.

## 2.  Global Business Standards; Relationships with Committee and Management.

We have adopted Global Business Standards for executive remuneration assignments, a copy of which is attached as Exhibit 3.

Mercer is being retained by ResCap and the Committee to provide an expert opinion to  as specified in this Agreement and in any SOW for the benefit of the Committee as well as the Company. In our capacity as an expert, we will report directly Morrison & Foerster LLP ("Morrison & Foerster") and the Committee will approve the scope of our work and our fees.

In order for Mercer to provide effective expert advice to the Committee as described above, we intend work under the direction of Morrison and Foerster and in consultation with FTI Consulting. To the extent, Mercer requires information from the Company's management or employees, we will request such information from Morrison and Foerster who will work with the Company, FTI and Mercer to gather necessary information, including compensation and benefits data and the scope of the relevant jobs.  With approval of the Committee chair and Morrison & Foerster, we will check our factual and data analyses with management to ensure that they are accurate.  We will review our draft expert report with the Committee chair and Morrison & Foerster and such management team members as you direct. This enables each of us to surface any issues and identify any areas where further research or analysis may be needed to finalize the report.

In order to complete an expert report we will need compensation and benefits data on the covered employees. We will forward an electronic data request under separate cover to Morrison & Foerster to obtain this information.

## 3.  Instructions; Provision of Information and Assistance.

You or your counsel will provide, or cause us to be provided, all necessary and reasonably requested information, direction and cooperation to enable us to provide the Services, and any direction (whether verbal or written) shall be effective if contained expressly in the applicable SOW or if received (whether verbally or in writing) from a person known to us or reasonably believed by us to be authorized to act on your or the Company's behalf. You agree that we shall use all information and data supplied by you or on your behalf without independently verifying the accuracy, completeness or timeliness of it. We will not be responsible for any delays or liability arising from missing, delayed, incomplete, inaccurate or outdated information and data, or if you do not provide adequate access to members of the Committee or cause to be provided adequate access to employees of the Company and other persons (including third parties such as advisors), agents or other representatives necessary for us to perform the Services. We will be entitled to charge you in respect of any additional work carried out as a result.

Without limiting the generality of this Section 3, you will inform us at the commencement of our work under each SOW (and thereafter in the event of any change) as to whether or not you or any

of your Affiliates are subject to any restrictions or obligations directly relevant to the Services as a result of or in connection with having received any federal financial assistance in connection with any federal law or program, including, but not limited to, the American Recovery and Reinvestment Act of 2009 and the Emergency Economic Stabilization Act of 2008, including the Troubled Assets Relief Program.  In the event that you or your Affiliates are subject to such restrictions or obligations, you will also promptly describe such restrictions and obligations to us in writing in reasonable detail and make an expert (including internal or external counsel) available to us for additional clarification that we reasonably request regarding the analysis or interpretation of any such restrictions or obligations.  You agree that we will be entitled to rely on, and have no liability for, the accuracy and completeness of the information, analysis or interpretation that is provided to us in connection with the foregoing.

4.  **Confidential Information; Data.**

    A.  Each of us is likely to disclose information ("Disclosing Party") to the other ("Receiving Party") from time to time in the course of the provision of the Services, which is marked or designated as confidential or proprietary at or prior to disclosure or which would appear to a reasonably prudent person to be confidential and/or proprietary in nature ("Confidential Information"). The Receiving Party will not disclose such Confidential Information to any person other than in connection with the provision of the Services or as otherwise provided for in this Agreement. This restriction does not apply to information that (i) the Receiving Party must disclose by law or legal process, (ii) is either already in the public domain or enters the public domain through no fault of the Receiving Party, (iii) is available to the Receiving Party from a third party who, to the Receiving Party's knowledge, is not under any non-disclosure obligation to the Disclosing Party, or (iv) is independently developed by or for the Receiving Party without reference to any Confidential Information of the Disclosing Party.

    B.  Notwithstanding Section 4(A), you agree that we will be entitled to disclose information, including Confidential Information, relating to the Services, the Committee or the Company to regulators having jurisdiction over our business. You also agree that, notwithstanding any other provision in this Agreement, we may include the identities of those persons who are identified by you as contact persons for you and information about the terms of this Agreement, the Services and the Compensation in our internal client management, financial and conflict checking databases.

    C.  You and the Company hereby grant us a perpetual, non-exclusive, royalty-free license to copy, modify and use any information and data supplied by you or on your behalf so that we may create analytical trend data (in anonymous form) and in order to improve the quality of our advice to our clients. We will not disclose any information in a manner that allows particular clients or individuals to be identified. Notwithstanding the foregoing, you and the Company agree that the Company's name may appear in a list of participating organizations for reports containing such analytical trend data.

    D.  Our respective obligations under Section 4(A) shall survive for a period of five (5) years from the date of termination of this Agreement or for such longer period as is required by law, except that any trade secrets disclosed to the Receiving Party shall be maintained in

confidence in perpetuity or until such time as they are no longer reasonably considered to be trade secrets by the Disclosing Party.

E. Notwithstanding anything to the contrary in this Agreement, but subject to the terms and conditions of Section 4, we may (i) retain copies of Confidential Information that is required to be retained by law or regulation, (ii) retain copies of our work product that contain Confidential Information for archival purposes or to defend our work product and (iii) in accordance with legal, disaster recovery and records retention requirements, store such copies and derivative works in an archival format (e.g. tape backups), which may not be returned or destroyed. We may retain your or the Company's information in paper or imaged format and we may destroy paper copies if we retain digital images thereof.

## 5. Personal Information.

Each of us and our respective Affiliates (as defined below) will comply with our respective obligations arising from data protection and privacy laws in effect from time to time to the extent applicable to this Agreement and the Services. This includes, without limitation, (i) the obligation, if any, of the Committee, the Company or any of its Affiliates, to obtain any required consent(s) in respect of the transfer of information to us by you, the Company, any of its Affiliates or any third party relating to an identified or identifiable individual that is subject to applicable data protection, privacy or other similar laws ("Personal Information"), (ii) any obligation with respect to the creation or collection of additional Personal Information by us, and (iii) any obligation with respect to the use, disclosure and transfer by us of Personal Information as necessary to perform the Services or as expressly permitted under this Agreement. Subject to Section 4(C), any use or processing by us of Personal Information supplied by or on your behalf in connection with the Services shall be done solely on your behalf. We shall handle such Personal Information in accordance with your reasonable instructions as may be provided from time to time in the applicable SOW or as reasonably necessary for the purpose of providing the Services and shall not handle such Personal Information in a manner inconsistent with the terms of this Agreement. We also confirm that we have taken appropriate technical and organizational measures intended to prevent the unauthorized or unlawful processing of Personal Information and the accidental loss or destruction of, or damage to, Personal Information. For purposes of this Agreement, "Affiliates" means, with respect to either Party, any entity directly or indirectly controlling, controlled by or under common control with such Party.

## 6. Disclosure in Governmental Filings.

To the extent that you, the Company or any of its Affiliates disclose any information in a governmental or regulatory filing about us relating to our provision of advice and counsel regarding the Services or executive remuneration matters, including in order to satisfy any legal requirements to disclose our identity, the particulars of the mandate for which we have been retained, or any other work that we performed for you, the Company or any of its Affiliates, you and the Company agree that our identification and any description of our mandate or our work for you or the Company will be subject to our prior review and you and the Company shall ensure that our reasonably requested modifications are made to such identification and/or description.

## 7. Potential Conflicts of Interest.

In engaging Mercer as an expert for the Committee, the Committee and the Company agree that Mercer (and its Affiliates) shall not be restricted in any respect from providing advice or other services or products to the Company or to other clients in the same business sector as the Company, which could potentially lead to a conflict of interest.

Mercer shall disclose to the Committee any services it provides in the U.S. and the fees received for those services and, upon request, shall provide information regarding services provided by Mercer outside the United States as well as services provided by its Affiliates.

During the year ended December 31, 2011, Mercer has not identified any consulting activity for ResCap. Mercer provides benefits consulting services to Ally Financial. Upon request, we will provide you with information regarding the nature of services provided by Mercer to Ally and services provided by other MMC companies.

**8. Ownership and Use of Work; Intellectual Property.**

    A. All materials prepared by us specifically and exclusively for you pursuant to this Agreement (the "Work") shall be owned exclusively by you or the Company. Notwithstanding anything to the contrary set forth in this Agreement, we will retain all copyright, patent and other intellectual property rights in the methodologies, methods of analysis, ideas, concepts, know-how, models, tools, techniques, skills, knowledge and experience owned or possessed by us before the commencement of, or developed or acquired by us during or after, the performance of the Services, including without limitation, all systems, software, specifications, documentation and other materials created, owned or licensed and used by us or our Affiliates or subcontractors in the course of providing the Services (the "Intellectual Property"), and we shall not be restricted in any way with respect thereto. To the extent any Work incorporates any Intellectual Property, we hereby grant you and the Company a non-exclusive, non-transferable right to use such Intellectual Property solely for purposes of utilizing the Work internally in accordance with the terms of this Agreement.

    B. Unless we provide our prior written consent, neither you nor the Company will use, in a manner other than as mutually contemplated when we were first retained by you to perform the applicable Services, or disclose to any third party, other than your attorneys, accountants or financial advisors with a need to know and who are bound by confidentiality obligations at least as restrictive as those contained in this Agreement, any Work or Intellectual Property or other material supplied by us under this Agreement, and you and the Company shall be responsible for, and we shall have no liability with respect to, modifications made by any person other than us to the Work, Intellectual Property or other work product provided to you by us. You and the Company will indemnify, defend and hold us and our Affiliates harmless in respect of any Loss (as defined in Section 10) incurred by us as a result of your or the Company's breach of this obligation or any modifications made by any person other than us to the Work, Intellectual Property or other work product provided to you by us.

**9. Dispute Resolution.**

    A. Before commencing any action or proceeding with respect to any dispute between us arising out of or relating to any of our Services, the Parties shall first attempt to settle the dispute through consultation and negotiation in good faith and in a spirit of mutual

cooperation. If the dispute is not resolved within five (5) business days, either of us may elect to escalate the resolution of such dispute by submitting the dispute in writing to a panel of one senior executive of Mercer and one member of the Committee, who will promptly meet and confer in an effort to resolve the dispute. Each Party will identify such senior executive or member of the Committee, as applicable, by notice to the other Party, and each party may change its senior executive or member of the Committee, as applicable, at any time thereafter by notice. Any mutually agreed decisions of the panel will be final and binding on both Parties. In the event the panel is unable to resolve any dispute within thirty (30) days after submission to them, either Party may then refer such dispute to mediation by a mutually acceptable mediator to be chosen by both Parties within forty-five (45) days after written notice by either Party demanding mediation. Neither Party may unreasonably withhold, delay or condition consent to the selection of a mediator. All communications and discussions in furtherance of this paragraph shall be treated as confidential settlement negotiations that are not subject to disclosure to any third party. The costs of the mediator shall be shared equally, but each Party shall pay its own attorney's fees.

B. Any dispute that is not resolved within six (6) months of the date of the initial demand for mediation by one of the Parties may then be submitted to a court of competent jurisdiction in accordance with the provisions of Section 13 (J). Nothing in this Section 9 will prevent either of us from resorting to judicial proceedings at any time if interim equitable relief from a court is necessary to prevent serious and irreparable injury or damage to that Party.

C. ANY CLAIM, ACTION OR PROCEEDING IN ANY FORUM AGAINST A PARTY OR ANY OF ITS AFFILIATES WILL BE BARRED UNLESS THE OTHER PARTY INITIATES THE DISPUTE RESOLUTION PROCEDURES SET FORTH IN THIS SECTION 9 WITHIN ONE YEAR OF THE DATE UPON WHICH THAT PARTY (i) FIRST DISCOVERED, OR (ii) UPON THE EXERCISE OF REASONABLE DILIGENCE COULD HAVE DISCOVERED THE ACT, ERROR OR OMISSION THAT IS THE BASIS FOR SUCH CLAIM, WHICHEVER DATE IS SOONER.

## 10. Limitation of Liability.

A. The aggregate liability of Mercer, our Affiliates and any officer, director or employee of ours and our Affiliates ("Mercer Parties") to you, your Affiliates, your officers, directors or employees or those of your Affiliates and any third party (including any benefit plan, its fiduciaries or any plan sponsor) for any and all Losses arising out of or relating to the provision of any Services at any time  by any of the Mercer Parties shall not exceed the greater of one times the Compensation for the Services giving rise to such Loss and $100,000. Mercer shall have no liability for the acts or omissions of any third party (other than our subcontractors).

B. In no event shall either Party or its Affiliates be liable in connection with this Agreement or the Services to the other Party, its Affiliates or any third party for any loss of profit or incidental, consequential, special, indirect, punitive or similar damages. The provisions of this Section 10 shall apply to the fullest extent permitted by law. Nothing in this Section 10 limiting the liability of a Party shall apply to any liability that has been finally determined by a court to have been caused by the fraud of such Party.

C. For purposes of this Agreement "Loss" means damages, claims, liabilities, losses, awards, judgments, penalties, third party claims, interest, costs and expenses, including reasonable attorneys' fees, whether arising under any legal theory including, but not limited to claims sounding in tort (such as for negligence, misrepresentation or otherwise), contract (whether express or implied), by statute, or otherwise, claims seeking any kind of damages and claims seeking to apply any standard of liability such as negligence, statutory violation or otherwise. For the avoidance of doubt, multiple claims arising out of or based upon the same act, error or omission, or series of continuous, interrelated or repeated acts, errors or omissions shall be considered a single Loss.

D. Each of the Parties acknowledges that the Compensation for the Services to be provided under this Agreement and the applicable SOW reflects the allocation of risk set forth in this Section 10.

**11. Unforeseen Events.**
Neither Party shall be liable for delays or failures in performance of obligations under this Agreement, other than failure to make payments hereunder when due, resulting from events beyond its reasonable control, including without limitation "acts of God," fire, flood, riots, new laws which prevent the carrying out of the Services, the results of terrorist activity, failures of third party suppliers, and electronic and other power failures.

**12. Duration and Termination of this Agreement.**
This Agreement will continue until terminated as provided in this Section, except as provided otherwise in a SOW. This Agreement and any SOW may be terminated (i) by either Party upon ninety (90) days' prior written notice to the other Party, (ii) by either Party upon material breach by the other Party, which breach is not cured within thirty (30) days after receipt of written notice thereof, or (iii) immediately by us for non-payment of invoices by you as provided under Section 1. After the termination of this Agreement, Sections 4, 5, 6, 8, 9, 10, 12 and 13 will survive in full force and effect. Any termination of this Agreement shall not relieve you, the Company or its Affiliates of their obligations to pay for Services rendered and expenses incurred by us or our Affiliates up to and including the effective date of such termination, and such termination may require you to pay termination fees to the extent provided in a SOW. Notwithstanding the foregoing, to the extent that the Parties agree that Mercer shall continue to provide Services after the effective date of termination of this Agreement or any SOW, the terms and conditions of this Agreement and the applicable SOW shall survive until such Services are completed or the Parties agree that the Services shall no longer be provided.

**13. Additional Terms**
A. *Terms Incorporated by Reference* - The provision of Services (whether or not under any SOW) shall be considered to be provided under and subject to the terms of this Agreement and the terms set forth in any SOW shall be deemed incorporated by reference into this Agreement for purposes of that SOW.

B. **Notices** - Any notice that is to be given by one Party to the other under this Agreement will be given in writing and delivered to John Dempsey, 155 North Wacker Drive Suite 1500 Chicago IL 60606 with a copy to the Legal Department, Mercer, 1166 Avenue of the Americas, New York, New York 10036 if to Mercer or Residential Capital, LLC c/o Jordan

A. Wishnew or Jamie A Levitt Morrison & Foerster 1290 Avenue of the Americas New York, NY 10104-0050 if to Committee, or any other address specified by notice subsequently by one party to the other. A notice will be effective upon receipt.

C. **No Third Party Beneficiaries -** Neither this Agreement nor the provision of the Services is intended to confer any right or benefit on any third party, other than the Affiliates of each Party that execute a SOW, and, in such event, solely as set forth in such SOW and this Agreement. The provision of Services under this Agreement cannot reasonably be relied upon by any third party.

D. **No Publicity -** You and the Company agree not to refer to us or attribute any information to us in the press (including for the purposes of advertising or promotion, or for the purpose of informing or influencing any other party, including the investment community), without our prior written consent. We agree not to refer to you and the Company in the press or for promotional purposes without your prior written consent, provided that we may include your and the Company's name in our representative client listing and as provided in Section 4(C).

E. **Waiver -** The failure by either Party to insist upon strict performance of any provision of this Agreement shall in no way constitute a waiver of rights under this Agreement, at law or in equity.

F. **WAIVER OF JURY TRIAL -** EACH PARTY, ON BEHALF OF ITSELF AND ITS AFFILIATES, TO THE FULLEST EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY SERVICES PROVIDED BY MERCER OR ITS AFFILIATES. THE WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY AGREES NOT TO INCLUDE ANY EMPLOYEE, OFFICER, DIRECTOR OR TRUSTEE OF THE OTHER AS A PARTY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM RELATING TO SUCH DISPUTE.

G. **Warranties of Mercer -** Except as expressly set forth in this Agreement, we expressly disclaim any warranty, express or implied, including but not limited to any implied warranty of merchantability and fitness for a particular purpose.

H. **Entire Agreement -** This Agreement is the complete, entire and fully integrated agreement between the Parties with respect to executive remunerations related services provided on or after the Petition Date. This Agreement (including any SOW and any schedules or exhibits attached hereunder) supersedes, revokes, cancels, extinguishes and replaces all prior or contemporaneous understandings, agreements, undertakings, negotiations and discussions, whether oral or written, between the Parties with respect to executive remunerations related services contemplated herein that are rendered on or after the Petition Date. The Parties agree that, except for the obligations under this Agreement, they have no obligations to one another for actions arising or services rendered on or after the Petition Date and have not relied upon any promises, representations, warranties, agreements, covenants or undertakings, other than those expressly set forth in this Agreement. Because the Parties are of equal commercial sophistication in negotiating contracts and have negotiated this Agreement at arms length, it shall not be construed for

Page 16

or against any Party.  Each Party is entering into this Agreement voluntarily, has read and understands all provisions of this Agreement and has had the opportunity to seek and obtain the advice of counsel on its rights and responsibilities under, and the terms and conditions of, this Agreement.

I.  ***Amendment, Assignment, Subcontracting*** - Except with respect to a change in address for notices, this Agreement shall not be amended except by a written document executed by both of us. In the event of any inconsistency between the terms of a SOW and those in the Agreement, the provisions contained in this Agreement shall prevail unless the SOW specifically amends a term contained herein. Neither of us may assign this Agreement without the prior written consent of the other, except that we may assign this Agreement to an Affiliate with reasonable prior written notice to you. We may subcontract with any of our Affiliates upon reasonable prior written notice to you, and we may subcontract with third parties with your prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

J.  ***Governing Law and Jurisdiction*** - Any and all actions or proceedings arising out of, or relating to this Agreement, any Services provided up to this date or any and all SOWs will be governed by, and interpreted in accordance with, the law of the State of New York and will be subject to the exclusive jurisdiction of the courts located in the State of New York; provided, however, that in the event Company files for relief under the Bankruptcy Code, such actions or proceedings will be governed by the Bankruptcy Code and will be subject to the exclusive jurisdiction of the Bankruptcy Court.  Each Party agrees that service of process in any such action or proceeding may be properly made by first class mail in accordance with the notice provisions in Section 13(B) above.

K.  ***Severability*** - It is the intent of the Parties that the provisions of this Agreement shall be enforced to the fullest extent permitted by applicable law. To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified, deleted or interpreted in such a manner so as to afford the Party for whose benefit it was intended the fullest benefit commensurate with making this Agreement as modified, enforceable and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

L.  ***Advice on Legal Matters*** - We are not engaged in the practice of law and the Services provided hereunder, which may include commenting on legal issues or drafting documents, do not constitute and are not a substitute for legal advice. Accordingly, we recommend that you secure the advice of competent legal counsel with respect to any legal matters related to the Services or otherwise.

M.  ***Counterparts*** - This Agreement may be executed and delivered (including by facsimile or a scanned PDF version) in one or more counterparts, each of which when executed shall be deemed an original, but all of which taken together shall constitute one and the same agreement.

N.  ***Authority*** - The Parties hereby represent and warrant that their respective signatories below have full legal authority to enter into this Agreement and each of its terms on their behalf.

**Exhibit 3**

# MERCER



## Executive Remuneration Solutions
## Global Business Standards

Mercer is committed to providing objective advice to all of our clients. Ensuring the objectivity of consulting advice on executive remuneration is a corporate governance issue around the globe and is critical to our role as a trusted advisor to our clients. Accordingly, Mercer has adopted these Global Business Standards for its Executive Remuneration Solutions to manage potential conflicts of interest and to preserve the integrity of our advice. Our Executive Remuneration Solutions encompass all forms of remuneration (cash, equity, benefits and perquisites) for executives as well as for members of organizations' governing boards. The Global Business Standards address how we (i) manage the executive remuneration consulting relationship, (ii) ensure the quality of executive remuneration consulting services and (iii) structure our business to manage potential conflicts of interest.

### Managing the relationship
A clearly defined client relationship provides the foundation for ensuring the objectivity and integrity of our advice. At the beginning of each engagement, our consultants establish with clients a clear mutual understanding of our role and client reporting relationship, premised on our commitment to providing objective advice.

An engagement letter documents the key elements of the assignment and relationship: roles, responsibilities, scope of services, fees, timeframe and client reporting relationships including how and to whom information and recommendations are communicated. The engagement letter also sets out the parties' expectations regarding certain disclosures, such as information about other services provided by Mercer to the client.

### Ensuring the quality of our advice
Mercer is committed to providing the highest quality advice to our clients. To ensure that our professional standards are upheld, executive remuneration consulting services are performed only under the direction of a human capital business principal. All consulting advice is peer reviewed pursuant to Mercer's global professional standards before it is rendered. In addition, the structure of ongoing executive remuneration consulting relationships is subject to annual review to ensure that it continues to best serve the interests of the client and properly preserves the objectivity of our advice.

### Structuring our business
The structure of our business not only facilitates the seamless exchange of our best thinking but also demonstrates to employees and clients the integrity of our advice. Our human capital business is accountable for all of Mercer's executive remuneration consultants. Our human capital business leaders – not client relationship managers – evaluate performance and determine remuneration for all executive remuneration consultants. Consultants are not compensated based upon client revenue from other lines of business or other MMC companies other than to the extent that all employees of MMC benefit from the overall success of MMC and its subsidiaries.

Mercer's human capital business leadership requires our consultants to seek guidance from them whenever there is any question that our objectivity or integrity is at risk of being compromised. Consultants may discontinue executive remuneration consulting relationships where apparent or actual conflicts that would impact the quality or objectivity of our advice cannot be resolved to both our clients' and our satisfaction.

00062-HC

Consulting, Outsourcing, Investments,