MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum
Todd M. Goren

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF THOMAS MARANO, CHIEF EXECUTIVE OFFICER OF
RESIDENTIAL CAPITAL, LLC, IN FURTHER SUPPORT OF DEBTORS'
ALLY SERVICING MOTION**

I, Thomas Marano, under penalty of perjury, declare as follows:

1.  I am the Chief Executive Officer of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"). I have held this position since July of 2008. From May 2009 through May 13, 2012, I also served as Chief Capital Markets Officer and Chief Mortgage Officer of Ally Financial Inc. ("AFI"), a non-Debtor affiliate. Prior to joining ResCap, I served as Managing Director for Cerberus Capital Management, L.P. in its Residential and Commercial Capital Markets Division from March 2008 to April 2009. Before my engagement at Cerberus, I

spent 25 years at The Bear Stearns Companies, Inc., where I held numerous positions, most recently, as Senior Managing Director and Global Head of Mortgage and Asset Backed Securities responsible for mortgage sales, trading, and origination. In my role as Chief Executive Officer of ResCap, I am responsible for overall leadership and management of the Debtors and their non-debtor subsidiaries. I am authorized to submit this declaration (the "Declaration") in further support of Debtors' Ally Servicing Motion[1] (the "Motion").[2]

2.  In my capacity as Chief Executive Officer, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records. Except as otherwise indicated, all statements in this Declaration are based upon: my personal knowledge; information supplied or verified by personnel in departments within the Debtors' various business units; my review of the Debtors' books and records as well as other relevant documents; my discussions with other members of the Debtors' management team; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' operations, financial condition and history. In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees or consultants, I have relied upon these employees and consultants to accurately record, prepare, collect, and/or verify any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

---

[1] The "Ally Servicing Motion" refers to the *Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business* [Docket No. 47].

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

ny-1047825                                2

A. **Approval of the Servicing Agreement Is Critical to the Debtors' Chapter 11 Cases**

3. As an initial matter, I believe that the approval of the Servicing Agreement between GMAC Mortgage and Ally Bank is critical to the success of these Chapter 11 cases, which are premised on the sale of the Debtors' mortgage loan origination and servicing activities as live operational platforms. The Debtors' continuation of their origination and servicing functions during bankruptcy is unprecedented, as is the ongoing support of various governmental institutions and other stakeholders. As I describe in more detail below, the ability of the Debtors to maintain such support relies on the confidence of key constituencies that the Debtors can and will continue to perform their obligations at comparable quality and volumes pending the proposed asset sale. The Debtors have been successful in those efforts thus far; however, the failure to obtain approval of the Servicing Agreement may change that.

4. For the reasons set forth below, I believe that approval of the Servicing Agreement is necessary to protect the value of the Debtors' estates, both in the near term and as a going concern, and to ensure that recoveries for creditors are maximized.

B. **The Debtors' Indemnification Obligations**

5. Pursuant to Section 10.01(e) of the Servicing Agreement, a copy of which was attached to the Motion, the Debtors are obligated to indemnify Ally Bank for any losses incurred by Ally Bank through modifications to Ally Bank loans made by the Debtors under the Servicing Agreement as a result of the Debtors' obligations under the DOJ/AG Settlement (the "Indemnification Obligations"). I submit this declaration in order to further clarify the Debtors' view as to the nature and extent of the Indemnification Obligations and how such obligations impact the economics of the Servicing Agreement.

6. The Debtors' continued compliance with the DOJ/AG Settlement is a cornerstone of these chapter 11 cases, and is contemplated under each of the orders that have been entered by the Court to date. I believe that the continued support and cooperation of the various governmental entities involved in these cases is contingent on the Debtors continuing to honor their obligations under the DOJ/AG Settlement. In light of the prominent role of Fannie Mae, Freddie Mac, and Ginnie Mae in the Debtors' business model, as well as the highly regulated nature of the Debtors' businesses generally, such support is a prerequisite to a going-concern sale of the Debtors' servicing and origination platforms. As a result, in my view, the failure to comply with the DOJ/AG Settlement would jeopardize the Debtors' ability to successfully close such a sale, to the detriment of the estates and their creditors.

7. Pursuant to Exhibit I to the DOJ/AG Settlement (the "DOJ/AG Addendum"), a copy of which is annexed hereto as Exhibit 1, the Debtors are obligated to solicit all borrowers in the owned loan portfolios of the Debtors, AFI and its affiliates (including Ally Bank)[3] for potential borrower relief with respect to such loans. *See* DOJ/AG Addendum at ¶ 4(a). Such borrower relief can take many forms, but generally either entails a refinancing of the borrower into a lower interest rate or a principal reduction to the loan.

8. The DOJ/AG Addendum requires the Debtors to obtain at least $200 million in borrower relief credits through the above process (the "Soft Dollar Credits"). *See* DOJ/AG Addendum at ¶ 3. To the extent the Debtors fail to perform such obligations, AFI is jointly responsible. *Id.* As noted in the Motion, the DOJ/AG Addendum also required the Debtors to fund a direct settlement payment of approximately $110 million in cash. *See* DOJ/AG Addendum at ¶ 1.

---

[3] There is a small subset of Ally Bank loans (known as the "CMG" loans) that are not required to be solicited or modified under the DOJ/AG Addendum.

9. In anticipation of the DOJ/AG Settlement and to maintain tangible net worth covenants in loan documents and servicing agreements, the Debtors and AFI entered into a letter agreement on January 30, 2012 (the "January 30th Letter") detailing how the DOJ/AG Settlement would be funded and ongoing obligations effectuated as between the Debtors, AFI and Ally Bank. A copy of the January 30th Letter is annexed hereto as Exhibit 2. As set forth in the January 30th Letter, AFI agreed to forgive approximately $197 million in debt under the AFI LOC (as defined in the *Affidavit Of James Whitlinger, Chief Financial Officer Of Residential Capital, LLC, In Support Of Chapter 11 Petitions And First Day Pleadings* [Docket No. 6]) in order to permit the Debtors to make the $110 million cash payment required by the DOJ/AG Settlement and satisfy other obligations related to the DOJ/AG Settlement, including anticipated reimbursements to Ally Bank for modifications of their loans.

10. The January 30th Letter provided that GMAC Mortgage would negotiate in good faith with Ally Bank for a new subservicing agreement that would permit the Debtors to "implement the modifications and other loss mitigation activities and earn soft dollar credits in accordance with the requirements of the DOJ/AG Settlement in respect of mortgage loans owned by Ally Bank that GMACM is servicing for Ally Bank." *See* January 30th Letter at ¶ 7. The January 30th Letter also provided that any new agreement would contain the Indemnification Obligations ultimately embodied in the Servicing Agreement. *See* January 30th Letter, Exhibit C.[4] Importantly, however, the Debtors were of the view that the January 30th Letter capped the Debtors' reimbursement obligations to AFI and Ally Bank once the Debtors had

---

[4] The January 30th Letter and the Servicing Agreement also contain provisions that provide that GMACM would not perform modifications or other loss mitigation activities with respect to the Ally Bank portfolio once indemnification payments to Ally Bank exceeded $75 million in the aggregate (but that any loans solicited prior to that time would remain eligible for modification). *See* Servicing Agreement at § 10.01(f); January 30th Letter, Exhibit C.

ny-1047825                                    5

made the $110 million cash payment and earned $200 million in Soft Dollar Credits (the "<u>Reimbursement Cap</u>").  *See* January 30th Letter at ¶ 5.[5]

11.    The Debtors began soliciting borrowers in their own portfolio and the Ally Bank portfolio on or about March 30, 2012.  The DOJ/AG Settlement incentivizes early completion of the borrower relief requirements by providing a 25% crediting of Soft Dollar Credits for loan modifications achieved during the first year.  In order to achieve this incentive, at the outset of the solicitation process, the Debtors focused on the most likely candidates for relief, without regard to whether such borrowers' loans were owned by the Debtors or Ally Bank.  Absent performing modifications to the Ally Bank loan portfolio, the Debtors likely would have been unable to obtain the $200 million in Soft Dollar Credits required by the DOJ/AG Addendum solely by modifying their own book, which reduces the value of the Debtors' assets, but does not result in a direct cash cost to the estates (although it can result in a reduction of the purchase price for such assets depending on the nature of the modification).  Thus, utilizing the Ally Bank loan portfolio in order to reach $200 million in Soft Dollar Credits provided a concrete benefit to the estates, borrowers, and the governmental entities that are parties to the DOJ/AG Settlement by permitting the Debtors to satisfy their DOJ/AG Settlement obligations within the time frames required by the DOJ/AG Settlement without incurring any fines for failure to perform under the settlement and in a manner calculated to reduce their overall liability under the settlement through the 25% crediting for early completion, while preserving the value of the Debtors' assets for sale.

12.    Furthermore, the DOJ/AG Settlement requires the Debtors to solicit borrowers in Ally Bank's portfolio, and the failure to do so would result in the imposition of

---

[5]    As described in paragraph 19 below, I understand that AFI and Ally Bank disagree with this position.

ny-1047825                                6

additional penalties. Accordingly, at least to the extent necessary to reach the required $200 million in Soft Dollar Credits under the DOJ/AG Settlement, the Debtors have always considered the Indemnification Obligations to be part of the cost of complying with the DOJ/AG Settlement. I believe this view is generally consistent with industry practice, as any standard subservicing agreement will require a subservicer to reimburse the client for modification programs that are implemented by the subservicer in the absence of, or that exceed, the client's authorization. In fact, Ally Bank has taken the position that the Prior Servicing Agreement between GMACM and Ally Bank, a copy of which is annexed hereto as Exhibit 3, contained a similar requirement. *See* Prior Servicing Agreement at § 7.3, Exhibit A. It is also worth noting that Ally Bank is not a party to the DOJ/AG Settlement and, as a result, the Debtors' failure to comply with the DOJ/AG Settlement would expose the Debtors—not Ally Bank—to penalties.

13.   Prior to the Petition Date, the Debtors reimbursed Ally Bank approximately $48 million for modifications performed prior to the Petition Date. This payment was funded through a draw on the AFI LOC. The Debtors did not believe we had adequate liquidity to fund any required post-petition future Indemnification Obligations. As a result, the Debtors negotiated with AFI to increase the amount of funding availability under the debtor-in-possession financing facility provided by AFI (the "AFI DIP"). Originally, the AFI DIP was to be a $150 million facility used only to repurchase loans from Ginnie Mae as required by the Debtors' servicing agreements with Ginnie Mae. Ultimately, in early June, AFI agreed to increase the total amount available under the AFI DIP to $200 million and to permit the use of up to $50 million in proceeds of the AFI DIP to fund general corporate expenses, including any required future Indemnification Obligations. This increase in the AFI DIP was designed to facilitate the reimbursement to Ally Bank for losses in connection with the modification of its

ny-1047825                                    7

loans pursuant to the DOJ/AG Settlement. I understand that AFI and Ally Bank took the position that any obligations of the Debtors under the DOJ/AG Settlement, including the indemnification claims payable under the Servicing Agreement, were payable from the Debtors' general resources as necessary expenses to administer the estates. As an accommodation to the Debtors, however, AFI was willing to agree to the Debtors' requested increase in the AFI DIP for general corporate purposes to the extent that the Debtors needed additional liquidity.

14. Following AFI's agreement to provide the liquidity necessary to fund the Indemnification Obligations, on June 13, 2012, the Debtors paid Ally Bank $19.9 million on account of outstanding Indemnification Obligations as of May 31, 2012 out of cash on hand. The $19.9 million payment included approximately $12.9 million for reimbursement payments relating to modifications performed prior to the Petition Date. The Debtors made the $19.9 million payment because we had not yet reached the Reimbursement Cap and the interim order approving the Motion authorized and directed the Debtors to comply with their obligations under the Servicing Agreement.

15. As referenced in the Motion, the Debtors requested (and obtained) authority to take such actions and make such disbursements required in order to comply with the DOJ/AG Settlement pursuant to the GA Servicing Motion[6] and Non-GA Servicing Motion.[7] *See*

---

[6] The term "GA Servicing Motion" refers to the *Debtors' Motion For Interim And Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), And 1108 Of The Bankruptcy Code (I) Authorizing The Debtors To Continue In The Ordinary Course Of Business (A) Servicing Governmental Association Loans And (B) Foreclosure Activities Related To Certain Real Estate Owned By Fannie Mae, Freddie Mac, And Ginnie Mae; (II) Authorizing The Debtors To Pay Certain Prepetition Amounts Due To Critical Servicing Vendors And Foreclosure Professionals; (III) Granting Limited Stay Relief To Enable Borrowers To Assert Related Counter-Claims In Foreclosure Proceedings; (IV) Authorizing The Debtors To Use Cash Collateral Under the Fannie Mae EAF Facility And (V) Granting Related Relief* [Docket No. 57].

[7] The term "Non-GA Servicing Motion" refers to the *Debtors' Motion For Interim And Final Orders Under Sections 105(a), 362, 363, 1107(a), And 1108 Of The Bankruptcy Code (I) Authorizing The Debtors To Continue In The Ordinary Course Of Business (A) Servicing Non-GA Loans And (B) Sale Activities Related To Certain Loans In Foreclosure And Real Estate Owned Property; And (II) Granting Limited Stay Relief To*

Motion at ¶ 21, n. 9.  Interim orders granting the motions and conferring authority on the Debtors to "use estate assets and take such actions as, in their reasonable business judgment, are necessary to comply with and adhere to the terms of the Consent Order and the DOJ/AG Settlement" were entered by the Court on May 15, 2012 [Docket No. 87] and May 16, 2012 [Docket No. 91], respectively.

16. Because the payment of the $19.9 million made on June 13, 2012 was necessary to reach the Reimbursement Cap, the Debtors believe that such payments were necessary and appropriate under the circumstances, regardless of whether the payment was on account of prepetition or post-petition modifications.  Even if such payments were not made, additional post-petition payments in a corresponding amount would be required to reach the Reimbursement Cap and comply with the Debtors' obligations under the Servicing Agreement and the DOJ/AG Settlement.

17. Upon approval of the AFI DIP, the Debtors drew on the facility and refunded the estates for the cash used to make the $19.9 million payment.  Thereafter, as a result of the approximately $68.3 million paid to Ally Bank both prior to and following the Petition Date, the Debtors determined that we had reached the Reimbursement Cap.  An analysis detailing the calculation with respect to the Reimbursement Cap is annexed as Exhibit 4.

18. At the time the $19.9 million payment was made, the Debtors believed that we had only earned approximately $180 million in Soft Dollar Credits, and continued solicitations on the Ally Bank portfolio.  Thereafter, the Debtors learned that we would also receive Soft Dollar Credits on account of approximately $20 million in deficiency waivers granted to borrowers.  As a result of the determination that we had reached the Reimbursement

---

*Enable Borrowers To Assert Related Counter-Claims In Foreclosure And Eviction Proceedings* [Docket No. 46].

Cap, on June 18, 2012, the Debtors suspended all further solicitations of Ally Bank loans. Absent the Reimbursement Cap, based on the anticipated "pull through" rates (i.e., the borrower rate of acceptance of the proposed modification) with respect to the outstanding solicitations, the Debtors believe that outstanding Indemnification Obligations to Ally Bank would total approximately a further $35 million beyond what has already been paid.[8]  An analysis detailing the Indemnification Obligation amounts paid and potentially outstanding is annexed as Exhibit 5.

19.  On June 18, 2012, the Debtors informed AFI that we had reached the Reimbursement Cap and did not believe any further indemnification payments were required under the January 30th Letter and the Servicing Agreement.  It is my understanding that AFI and Ally Bank dispute this interpretation of the documents.  A letter from counsel for AFI, dated July 7, 2012, setting forth their interpretation of the documents is annexed as Exhibit 6; a reply letter from proposed counsel for the Debtors, dated July 9, 2012, setting forth their own interpretation is annexed as Exhibit 7.  As set forth in the July 9th reply letter, the Debtors argued that the January 30th Letter effectively caps the Debtors' Indemnification Obligations under the Servicing Agreement, and that AFI should make all further indemnification payments to Ally Bank.  Accordingly, absent further order of the Court, the Debtors will not make any payments on account of any potential additional Indemnification Obligations.

20.  In light of the importance of the Servicing Agreement, the Debtors, AFI, and Ally Bank engaged in good faith negotiations to resolve the dispute.  As a result of those negotiations, on July 12, 2012, the Debtors and AFI agreed as follows in conjunction with the Servicing Agreement:  (a) the Debtors will pay up to $75 million in aggregate payments on account of the Indemnification Obligations (which is approximately $7 million in additional

---

[8] If a 100% pull through rate was achieved, then approximately $60 million would be outstanding.

payments over what has already been paid, and consistent with the $75 million threshold for solicitations of the Ally Bank portfolio contemplated under the Servicing Agreement); and (b) AFI and the Debtors will each pay 50% of any Indemnification Obligations with respect to outstanding solicitations incurred in excess of $75 million; <u>provided</u>, that the Debtors will make no further indemnity payments without final Court approval.  The Debtors, while in chapter 11, will not solicit the balance of the "eligible population" of loans in the Ally Bank portfolio, a limitation that is consistent with section 10.01(f) of the Servicing Agreement.  Based on this agreement, it is expected that the Debtors will need to make approximately $21 million in additional indemnity payments to Ally Bank.

### C. Approval Of The Servicing Agreement Is In The Best Interest Of The Estates

21.     Notwithstanding the Indemnification Obligations, the Debtors strongly believe that entry into the Servicing Agreement is in the best interest of the Debtors' estates.  The Ally Bank loan portfolio represents approximately 30% of the loans serviced by the Debtors and accounts for approximately 10% of all servicing related income.  As a result, the Debtors project that, putting aside any Indemnification Obligations, we will earn <u>profits</u> of approximately $25 million under the Servicing Agreement.[9]  In contrast, if the Servicing Agreement is not approved by the Court and the Debtors were forced to revert to the Prior Servicing Agreement, which had been in place since August 2001,[10] the Debtors project that we would sustain <u>losses</u> of approximately $2 million.  An analysis detailing the projected profits and losses set forth above

---

[9]   The $25 million in profits assume performance under the Servicing Agreement from June through December 2012.

[10]  As set forth in the Motion, the Servicing Agreement was entered into immediately prior to the Petition Date, and the effectiveness of such agreement is conditioned on an order acceptable to Ally Bank approving the Servicing Agreement.  Thus, if the proposed Final Order is not entered by the Court, the Servicing Agreement will cease to be effective, and the relationship between the Debtors and Ally Bank will revert to the Prior Servicing Agreement, which was terminated by Ally Bank on April 19, 2012 and therefore expires by its terms on August 21, 2012.

is annexed as <u>Exhibit 8</u>.  The $2 million in losses that would be sustained under the Prior Servicing Agreement does not include any indemnification payments, including the $19.9 million already paid on account of Indemnification Obligations or any other payments relating to post-petition modifications performed on the Ally Bank portfolio.

    22. Taking into account expected Indemnification Obligations, the Servicing Agreement results in approximately a $15 million loss to the estates.  However, as discussed in more detail below, the Debtors generate approximately $15 million in origination-related profits directly from solicitations of the Ally Bank portfolio, which activities the Debtors are entitled to conduct pursuant to the Servicing Agreement.  If the Debtors were to lose the Servicing Agreement, they would also lose these profits, even if they were able to maintain their other origination activities, which, for the reasons set forth below, is far from certain.  As a result, it is my belief that, even with Indemnification Obligations on the terms agreed to with AFI and Ally Bank, the Servicing Agreement is essentially a break-even proposition for the estate.

    23. Further, failure to obtain approval of the Servicing Agreement would also result in various qualitative detriments to the Debtors' estates.  First, it is my view that discontinuation of the Servicing Agreement would harm the Debtors' servicing platform and make the platform less desirable in the pending sale process. While the current sale agreement to Nationstar (the "<u>Sale Agreement</u>") does not currently contemplate that the Servicing Agreement will be assigned to Nationstar on a long term basis, it is my view that Nationstar and other potential purchasers believe that they will ultimately be able to work out an arrangement to continue servicing the Ally Bank loans.  Since such loans represent such a substantial portion of the Debtors' servicing business, the Servicing Agreement provides the Debtors' servicing

platform with critical economies of scale and makes the platform more desirable to potential purchasers.

24. Second, in order to achieve even the $2 million in losses noted above if the Debtors are forced to revert to the Prior Servicing Agreement, the Debtors would be required to terminate approximately 207 employees upon the expiration of such agreement in August. It is my understanding that any large reduction in workforce such as this would need to be discussed with Nationstar under the Sale Agreement. Such a change in the Debtors' workforce also would likely be viewed negatively by the Governmental Associations and by the Debtors' other employees.

25. Third, in the event the Debtors were not permitted to continue performance under the Servicing Agreement and Ally Bank elected to transfer the servicing of its loans upon the expiration of the Prior Servicing Agreement, such transfer would result in tremendous distractions, and potentially cost, to the estates. Specifically, transferring the approximately 700,000 Ally Bank loans currently serviced by the Debtors would be among the largest transfers of servicing ever in the industry that I am aware of, and would require significant time and manpower on the part of the Debtors' employees. Further, the Prior Servicing Agreement does not contain any termination fees or similar provisions that require Ally Bank to reimburse the Debtors for their costs associated with transferring the servicing.[11] Thus, absent a further agreement with AFI or Ally Bank to compensate the Debtors for the costs of transfer, the Debtors could also be forced to bear significant costs related to the transfer. Such costs would be in addition to the $2 million loss that would be sustained as a result of reverting to the Prior Servicing Agreement. Moreover, the Debtors may not simply refuse to transfer the

---

[11] The new Servicing Agreement does contain such fees upon termination of that agreement. *See* Servicing Agreement § 11.01.

loans unless Ally Bank pays for the transfer costs because the Ally Bank portfolio consists entirely of Fannie Mae and Freddie Mac loans. As a result, the Debtors would likely endanger their relationships with those entities if they took any action—or refused to take any action—that would potentially harm Fannie Mae or Freddie Mac's interests.

26. Fourth, the Debtors' performance under the Servicing Agreement is a requirement of the AFI DIP and under the Settlement and Plan Sponsor Agreement with AFI (the "Settlement Agreement"). In the event the Debtors fail to perform under the Servicing Agreement, AFI would be entitled to terminate the AFI DIP as well as the Debtors' use of AFI's cash collateral. Without the AFI DIP, the Debtors would be unable to fund their required Ginnie Mae buyback obligations, which would likely result in Ginnie Mae seeking to terminate the Debtors as a servicer, and the loss in value to the estate from the sale of such assets to Nationstar.[12] In addition, Ginnie Mae may attempt to seize the $98 million deposit it currently holds, and the Department of Housing and Urban Development, the federal agency that governs Ginnie Mae, may refuse to honor insurance claims submitted to it by the Debtors. Loss of the use of AFI's cash collateral under their prepetition financing facilities would also be nothing short of catastrophic to the Debtors. The Debtors would almost certainly be unable to fund their operations and would also be in default of the Barclays DIP, further constraining any available liquidity.[13] Further, while the Settlement Agreement has not yet been approved by the Court (and will only be approved as part of a Plan of Reorganization), pursuant to the Settlement

---

[12] The Ginnie Mae servicing rights and advances are being purchased for approximately $245 million (based on February 29, 2012 balances) under the Sale Agreement. Because the Ginnie Mae assets are not encumbered by any of the Debtors' secured facilities, all such value inures directly to the benefit of unsecured creditors.

[13] I do not believe the Debtors can obtain third-party DIP financing to replace the Ally DIP on similar terms, the most important of which is the advance rate of 100%. Even if the Debtors were able to obtain such a third-party DIP, it would result in additional fees to be paid by the estates, would likely have a higher interest rate, and would have a lower advance rate, thus requiring the estates to fund the "equity portion" of the Ginnie Mae repurchases. The estates do not have excess liquidity to fund that expense.

Agreement, AFI is obligated to provide the Debtors with various support throughout these Chapter 11 cases. That support includes, among other things, AFI's agreement to support the Debtors' origination activities. The Debtors expect to generate approximately $100 million in profits through their origination activities prior to the closing of the Platform Sale. As noted above, approximately one-sixth of the Debtors' origination income is derived from refinancing loans held in Ally Bank's portfolio. Even if failure to approve the Servicing Agreement does not affect the Settlement Agreement, the Debtors' ability to refinance Ally Bank loans will be lost if the Debtors are no longer performing servicing for Ally Bank, resulting in additional losses of approximately $15 million.

27. Fifth, because the Debtors were required to solicit and, as appropriate, subsequently modify loans held in Ally Bank's portfolio to satisfy their obligations under the DOJ/AG Settlement, the loss of the Debtors' ability to take such actions could be viewed as affecting the Debtors' ability to comply with the DOJ/AG Settlement and could subject the Debtors to penalties under the DOJ/AG Settlement.

28. Finally, even if the transfer of the Ally Bank portfolio were to occur in an orderly manner, the Governmental Associations might become concerned by the perceived lack of stability in the Debtors' operations and seek to terminate their servicing agreements with the Debtors in order to effect a transfer of servicing rights to third party servicers. The loss of those servicing rights would further erode the value of the Debtors' servicing platform and result in the loss in value to the estate from the sale of such assets to Nationstar.

29. In summary, I believe that the issue of the Indemnification Obligations should not detract from the principle point—the Servicing Agreement must be approved by August 11, 2012, which is the extended deadline for entry of a final order approving the Motion

under the AFI DIP. If the Servicing Agreement is not approved, the Debtors' servicing of Ally Bank loans will revert to the Prior Servicing Agreement, which is far less beneficial to the Debtors. Indeed, for the reasons set forth above, the losses that would be suffered as a result are likely to far exceed the amount of Indemnification Obligations the Debtors expect to make post-petition. Furthermore, as explained in the Motion, the Prior Servicing Agreement will terminate in August 2012. As set forth above, if Ally Bank transfers its servicing, and some or all of the various adverse consequences set forth above are also triggered, then the Debtors risk becoming just another failed mortgage company, losing the opportunity to accomplish the first transfer by a mortgage servicing company of a live servicing and origination platform in bankruptcy, and the corresponding value of those assets, as reflected in the Nationstar bid.

30. For all of the foregoing reasons, I believe that entry into and performance under the Servicing Agreement is a reasonable exercise of the Debtors' business judgment and in the best interest of the Debtors' estate.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 16, 2012

                                               /s/ Thomas Marano
                                               Thomas Marano
                                               Chief Executive Officer of
                                               Residential Capital, LLC