**<u>EXHIBIT 1</u>**

# EXHIBIT I

Confidential

## Addendum to Federal and State Settlement Agreements

The Federal Parties, the State Parties, Residential Capital LLC ("ResCap"), GMAC Mortgage, LLC ("GMACM"), Residential Funding Company, LLC ("Residential Funding" and, together with ResCap and GMACM, the "ResCap Parties"), and Ally Financial, Inc. ("AFI") have agreed to enter into the Consent Judgment.  Capitalized terms used herein but not defined herein have the meanings assigned to them in the relevant portion or exhibit of the Consent Judgment.

In recognition of the financial situation of the ResCap Parties, the agreements of AFI with respect to the payment of settlement funds in the event the ResCap Parties do not perform certain obligations, and the agreement of the ResCap Parties to establish the ResCap Settlement Loan Modification Programs set forth below, in addition to the terms agreed elsewhere in the Consent Judgment, the Parties agree to the following:

1.      Pursuant to Paragraph 3 of the Consent Judgment, the ResCap Parties shall pay a Direct Payment Settlement Amount of $109,628,425, by electronic funds transfer no later than seven days after the Effective Date of the Consent Judgment, in accordance with written instructions to be provided by the United States Department of Justice and, in furtherance of such payment, AFI has undertaken the obligations specified in Paragraph 8 of this Addendum, including, without limitation, entering into the Earmark and Indemnification Agreement.

2.      In addition, the ResCap Parties and AFI agree that the United States shall not be responsible for attorney's fees for the relator in United States ex rel. Szymoniak v. [SEALED], Civ No. 0:10-cv-01465 (D.S.C.) or in United States ex rel. Szymoniak v. [SEALED], Civ No. 3:10-cv-575 (W.D.N.C.) in connection with the settlement of those matters.

3.      The ResCap Parties (and to the extent the ResCap Parties do not perform such obligations, AFI) shall be responsible for $200,000,000 in consumer relief as set forth in the Consumer Relief Requirements, credited pursuant to the terms therein and this Addendum.

     a.    Notwithstanding anything to the contrary in the Consent Judgment or the Exhibits thereto, the ResCap Parties and AFI, jointly and severally, will be obligated to make the payments specified in Paragraph 10.d of Exhibit D to the Consent Judgment (Consumer Relief Requirements), Exhibit H (SCRA), and Paragraph 7 of this Addendum in the event and to the extent that the ResCap Parties, AFI, or their successors in interest do not complete the Consumer Relief Activities set forth in Exhibit D to the Consent Judgment; provided, however, that any successor or purchaser of all or a substantial portion of the assets of the ResCap Parties shall not be obligated to pay any of the amounts owed by the ResCap Parties or AFI under the Consent Judgment or the Exhibits thereto.

     b.    Notwithstanding the terms of Exhibit D of the Consent Judgment (Consumer Relief Requirements), the ResCap Parties shall receive credit toward their Consumer Relief commitment, up to a total of $1.6 million, for the ResCap Parties' out of pocket costs of contributions to a national borrower portal and partnering with third parties for

document delivery as contemplated by the servicing standards in Exhibit A of the Consent Judgment.

    c.   The releases contained in Exhibits F and G of the Consent Judgment shall become effective upon payment of the Direct Payment Settlement Amount by Defendant. The United States and any State Party may withdraw from the Consent Judgment and declare it null and void with respect to that party and all released entities if the Consumer Relief Payments (as that term is defined in Exhibit F (Federal Release)) required under this Consent Judgment are not completed within the time specified and any payment required under Paragraph 10.d of Exhibit D to the Consent Judgment is not cured within thirty days of written notice by the party.

4.    The ResCap Parties shall establish the following ResCap Settlement Loan Modification Programs:  The ResCap Parties and AFI shall conduct nationwide modification programs to be offered to underwater borrowers with economic hardship on first-lien and second-lien loans ("ResCap Settlement Loan Modification Programs").

    a.   The ResCap Parties shall solicit, in accordance with the ResCap Settlement Loan Modification Program Solicitation Requirements, all borrowers in the owned loan portfolios of the ResCap Parties, AFI and its affiliates with the exception of Ally Bank-owned CMG loans as of March 1, 2012 or loans included in asset sales in the normal course of business where the primary servicer is a ResCap Party (the "Loan Portfolio") who meet the Eligibility Criteria for any of the Program ("Eligible Borrowers"), as set forth in more detail below.

    b.   From the date of Entry of the Consent Judgment by the Court until completion of the Solicitation Requirements or proper denial of the borrower for relief under this agreement, whichever is earlier, the ResCap Parties will defer any foreclosure sales on any Eligible Borrower.

    c.   The ResCap Parties will extend offers of relief under the ResCap Settlement Loan Modification Programs to all Eligible Borrowers in the Loan Portfolio who meet the Eligibility Criteria for any of the Programs as set forth below.

5.    The ResCap Settlement Loan Modification Programs shall include the following:

    a.   Rate Reduction Refinancing Program ("RRRP"): the Rate Reduction Refinancing Program will offer a restructured mortgage to current borrowers who would benefit from a refinancing but are currently precluded from refinancing due to a negative equity position on their property.

        i.   The ResCap Parties will offer a Rate Reduction Refinancing to all borrowers in the Loan Portfolio who meet the RRRP Eligibility Criteria.
        ii.  Eligibility Criteria.  The Eligibility Criteria for the RRRP are the following:
           1)  The loan was originated prior to January 1, 2009;

I-2

Confidential

2) The borrower is current on his or her first lien and has only been delinquent 30 days once during the past 12 months;

3) The borrower's current interest rate is greater than or equal to 5.25% (including, but not limited to mortgage loans that are interest-only and non-interest only); and

4) The borrower's LTV is greater than 100% or the borrower's LTV is greater than 80% and the borrowers FICO score is less than 660.

   iii. Offer of Relief. Borrowers meeting the Eligibility Criteria will be offered a modification that includes:

1) modification to a new fixed rate mortgage at current conforming rates (Primary Mortgage Market Survey Rate as of March 1st, 2012);

2) minimum payment relief of at least $100/month; and

3) no future interest rate increases, changes in term, or additional costs to the borrower.

   iv. Credit. Credit for the RRRP against the ResCap Parties obligation to provide Consumer Relief shall be consistent with the crediting set forth in the Consumer Relief Requirements in Exhibit D to the Consent Judgment.

b. Principal Reduction Modification Program ("PRMP"): the PRMP program will offer Eligible Borrowers a HAMP PRA or a Proprietary PRA modification programs, as follows[1]:

   i. The ResCap Parties will offer a Principal Reduction Modification to all borrowers in the Loan Portfolio who meet the PRMP Eligibility Criteria.

1) For all PRMP Programs, payment relief through the reduction in principal balance will be the first step in the waterfall.

2) All borrowers shall have their 1st liens reduced to an LTV of 105% or lower, as set forth below.

   ii. The PRMP Programs are fourfold:

1) Underwater with Credit Degradation.

    a. Eligibility Criteria. The Eligibility Criteria for the Underwater with Credit Degradation Program are the following:

      i. Must not be an interest Only Loan; and

      ii. The borrower is current and has been 30 days delinquent at least twice in the past year or 60 days delinquent at least once in the past year; or the borrower's FICO score is less than 675; or the borrower's FICO has reduced more than 10% since origination of the loan; and

      iii. The loan was originated prior to January 1, 2009; and

      iv. The borrower's LTV is greater than 100%.

      v. Borrowers for this program will not need to have underwriting based on income.

---

[1] An existing HAMP modification shall not receive principal reduction if such principal reduction would result in that modification losing good standing under HAMP.

I-3

Confidential

b. Offer of Relief.  The ResCap Parties shall offer a loan modification to all such Eligible Borrowers that includes:
   i. Payment relief through the reduction in principal balance being the first step in the waterfall; and
   ii. Minimum payment reduction of at least 10%; and
   iii. Reduction of principal balance to no more than 100% LTV.

c. Credit.  Credit for this Program against the ResCap Parties obligation to provide Consumer Relief shall be consistent with the crediting set forth in the Consumer Relief Requirements in Exhibit D, except that the ResCap parties will receive (1) credit for principal reduction that results in an LTV below 100% and (2) credit will be effective 90 days after the implementation of the modification provided that the borrower is still current at that time, or, in the event that borrower liquidates the property prior to the expiration of the 90 days, credit shall be calculated as provided in Section 4.ii of Table 1 to Exhibit D (Consumer Relief Requirements).

2) Payment Shock Relief.
   a. Eligibility Criteria.  The Eligibility Criteria for the Payment Shock Relief Program are:
      i. The borrower is current; and
      ii. The loan was originated prior to January 1, 2009; and
      iii. The borrower's LTV is greater than 100%; and
      iv. The loan is an interest only loan or other high-risk mortgage product that will reset, resulting in a payment shock to the borrower (such borrowers shall be deemed to be in imminent risk of default consistent with Paragraph 1.c of the Consumer Relief Requirements).
      v. Borrowers for this program will not need to have underwriting based on income.
   b. Offer of Relief.  For all such Eligible Borrowers, the ResCap parties shall offer a loan modification that includes:
      i. Reduction of principal balance to a maximum of 100% LTV;
      ii. Conversion to a fully amortizing fixed rate mortgage;
      iii. A monthly payment that is no higher than the borrower's current payment, achieved through reduction of principal balance.
   c. Credit.  Credit for this Program against the ResCap Parties obligation to provide Consumer Relief shall be consistent with the crediting set forth in the Consumer Relief Requirements in Exhibit D, except that the ResCap Parties will receive (1) credit for principal reduction that results in an LTV below 100% and (2) credit will be effective 90 days after the implementation of the modification, provided that the borrower is still current at that time, or, in the event that borrower liquidates the property prior to the expiration of the 90 days, credit shall be calculated as provided in Section 4.ii of Table 1 to Exhibit D (Consumer Relief Requirements).

3) Principal Reduction for Delinquent Borrowers

I-4

    a.   Eligibility Criteria.  The Eligibility Criteria for the Principal Reduction for Delinquent Borrowers Program are:

        i.   The borrower is at least 30 days delinquent or otherwise qualifies as being at imminent risk of default due to the borrower's financial situation; and

        ii.   The borrower's LTV is greater than 100%.

    b.   Offer of Relief.  For all such Eligible Borrowers, the ResCap Parties shall provide a modification that includes:

        i.   Reduction of principal to between 85% LTV and 105% LTV;

        ii.   If the borrower is in an adjustable rate mortgage, conversion into a fully amortizing fixed rate mortgage;

        iii.   Reduction in monthly payment of no less than 30%; and

        iv.   Reduction of monthly payment to no more than 31% DTI.

        v.   Borrowers for this program will need to have underwriting based on HAMP guidelines.

    c.   Credit.  Credit for this Program against the ResCap Parties obligation to provide Consumer Relief shall be consistent with the crediting set forth in the Consumer Relief Requirements in Exhibit D, except that the ResCap Parties will receive (1) credit for principal reduction that results in an LTV below 100% and (2) credit will be effective 90 days after the implementation of the modification, provided that the borrower is still current at that time, or, in the event that borrower liquidates the property prior to the expiration of the 90 days, credit shall be calculated as provided in Section 4.ii of Table 1 to Exhibit D (Consumer Relief Requirements).

4)  Second Lien Reduction Program

    a.   Eligibility Criteria.  The Eligibility Criteria for the Second Lien Reduction Program are the following:

        i.   The borrower's first lien is modified in accordance with Section 2 of the Consumer Relief Requirements  or

        ii.    The borrower is 30 or more days delinquent on the second lien regardless of whether the first lien is delinquent or has been modified; and

        iii.   The borrower's CLTV is greater than 115%.

    b.   Offer of Relief.  For all such Eligible Borrowers, the ResCap Parties shall provide a second lien modification that includes:

        i.   Reduction of the borrower's CLTV to maximum of 115%;

        ii.   Reduction of principal on the second lien at the top of the waterfall, followed by rate reduction and term extension; and

        iii.   Reduction of monthly payment consistent with the methodology used in the 2MP program.

    c.   Credit.  Credit for this Program against the ResCap Parties obligation to provide Consumer Relief shall be consistent with the crediting set forth in Section 2.c of the Consumer Relief Requirements in Exhibit D.

Confidential

c. Borrowers eligible for both the RRRP and the PRMP will be proactively solicited for the RRRP. In order to put Eligible Borrowers in a sustainable mortgage, such Eligible Borrowers will be asked to provide financial information per HAMP guidelines in order to be evaluated under the PRMP if the borrower indicates the RRRP payment is not sustainable.

d. Notwithstanding the success or failure of the RRRP and the PRMP in putting borrowers in sustainable mortgages, the ResCap Parties shall be obligated to satisfy the commitment set forth in Paragraph 3 above; failure to satisfy the commitment set forth in Paragraph 3 shall result in an additional payment as set forth in Paragraph 10 of the Consumer Relief Requirements contained in Exhibit D.

e. In the event that the implementation of the RRRP and PRMP programs results in the RespCap Parties completing more Consumer Relief than the commitment set forth in Paragraph 3, as credited pursuant to the Consumer Relief Requirements and subject to the requirements set forth therein, the ResCap Parties shall nonetheless be obligated to comply with Paragraph 6 (including continuing to make offers to Eligible Borrowers during the solicitation period) and satisfy any RRRP and the PRMP offers that are accepted, including continuing to provide modifications or refinancing consistent with those programs to all borrowers meeting the Eligibility and solicitation period Criteria as contemplated herein.

6. Borrower Solicitation Requirements. The ResCap Parties will solicit all borrowers in the Loan Portfolio who meet the Eligibility Criteria for the RRRP or the PRMP as of March 1, 2012 as follows:

a. General Loan Modification Program Solicitation Requirements.
   i. Such solicitation shall commence as soon as reasonably practicable following the entry of the Consent Judgment and solicitations shall be sent to all Eligible Borrowers in accordance with the timeline set forth in the ResCap work plan. Any borrower who accepts a modification offer made under the RRRP or PRMP within 3 months from the date the solicitation commences (which shall be the first calendar day of the month following the date written communication is first sent pursuant to b.i or c.i below) shall receive the modification. Further, any borrower who accepts a modification offer made under the RRRP or PRMP within 180 days of the offer being made shall, unless the ResCap Parties have, as of the date of the offer, exceeded their obligations under Paragraph 3 by $50,000,000, receive the modification. The minimum solicitation period for a modification offer made under the RRRP or PRMP shall be 3 months from the date the solicitation commences (which shall be the first calendar day of the month following the date written communication is first sent pursuant to b.i or c.i below). Upon commencement of this solicitation of any individual Eligible Borrower, ResCap Parties shall complete all of the solicitation requirements described below until the earlier of the following occurs: (a) exhaustion of relevant solicitation steps (such as attempted Right Party Contact) described in 6.b or 6.c below, without success, or (b) proper acceptance or denial of an

I-6

Confidential

Eligible Borrower for the RRRP and/or PRMP (the "Borrower Solicitation Period").

ii.    After the completion of the Borrower Solicitation Period the ResCap Parties may, but shall not be required to, make further solicitations of an Eligible Borrower in respect of the RRRP, the PRMP and other modification programs and the obligation to defer foreclosure sales shall terminate, except that the ResCap Parties will continue to include any loss mitigation or modification information in notices to such borrowers as required by the Servicing Standards.

iii.    The Borrower Solicitation Requirements shall not apply to solicitations for modification programs other than RRRP or PRMP (which may be conducted contemporaneously) or to solicitations to a particular Eligible Borrower for the RRRP or PRMP that occur after that particular Eligible Borrower has been previously solicited, in compliance with this agreement, through the termination of the Borrower Solicitation Period.

iv.    For the avoidance of doubt, loans that are prohibited by law or government agency insurance programs from receiving principal reduction payments are excluded from all solicitation requirements.

b.    The ResCap Loan Modification Program Solicitation Requirements for delinquent borrowers under the PRMP shall include:

i.    Written communication clearly describing or offering programs specific to the Settlement Loan Modification Programs shall be mailed to each Eligible Borrower (the "Solicitation Package"). The Solicitation Package may also identify other options potentially available to help the borrower cure any delinquency and retain homeownership.

ii.    Unless Right Party Contact is achieved in fewer calls, The ResCap Parties shall make a minimum of 4 telephone calls over a period of at least thirty days, at different times of the day following the mailing of the first Solicitation Package.

iii.    If no Right Party Contact, as defined in Chapter II of the MHA Handbook, is established with the borrower 30 days after mailing of the first Solicitation Package, the ResCap Parties shall send a second Solicitation Package and shall make a minimum of 4 telephone calls (unless Right Party Contact is achieved in fewer calls) over a period of at least thirty days, at different times of the day following the mailing of the second Solicitation Package.[2]

iv.    If no Right Party Contact, is established with the borrower 30 days after mailing of the second Solicitation Package, the ResCap Parties shall send a third Solicitation Package and shall make a minimum of 4 telephone calls (unless Right Party Contact is achieved in fewer calls) over a period of at least thirty days, at different times of the day following the mailing of the third Solicitation Package.

v.    Any contact with borrowers, whether by telephone, mail or otherwise, shall (1) advise borrowers that they may be eligible for the Settlement Loan Modification

---

[2] Solicitation Packages shall be sent to the last address of record and at least one of the first two Solicitation Packages shall be sent via certified/express mail or via overnight delivery service (such as UPS) with return receipt/delivery confirmation.

Confidential

Programs; (2) clearly describe the Required Documentation required to be submitted by the borrower and state what other information the servicer needs to complete the modification analysis; and (3) provide a toll-free telephone number through which the borrower can reach a Single Point of Contact for any follow up questions.  All contact attempts must be documented in the servicing file.

vi.    If Right Party Contact is established over the phone and the borrower expresses interest in the Settlement Loan Modification Programs, the ResCap Parties shall send one reactive package with a fifteen-day response period.  If the borrower does not respond by submitting the Required Documentation, the ResCap Parties shall send another reactive package with a fifteen-day response period.

vii.   If Right Party Contact is established and the borrower expresses an interest in the Settlement Loan Modification Programs, the ResCap Parties must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package required to be submitted by the borrower to request a HAMP modification. The communication should: Describe the income evidence required to be evaluated for the Settlement Loan Modification Program; provide a financial information form substantially similar in content to the HAMP RMA and, if necessary, a Hardship Affidavit; and include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

viii.  The post-Right Party Contact communication should also state that during the Settlement Loan Modification Program evaluation the home will not: (1) be referred to foreclosure; or (2) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication. Electronic mail for this purpose may only be sent to an email address provided by the borrower when right party contact was made. Such email address must be documented in the servicing file.

ix.    If Right Party Contact is established but the borrower does not submit an Initial Package, the ResCap Parties must resend the Initial Package communication. Again, the ResCap Parties must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication. If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the ResCap Parties may determine the borrower to be ineligible for the Settlement Loan Modification Program.

x.     If Right Party Contact is established but the borrower submits an incomplete Initial Package within the required time period, the ResCap Parties must comply with the notice requirements set forth in the Settlement's Servicing Standards. If the borrower does not respond to the notice of incomplete information by providing a complete Initial Package within the required time period, the ResCap Parties may determine the borrower to be ineligible for the Settlement Loan Modification Program.

I-8

xi.   ResCap Parties are not required to send an Initial Package if, as a result of discussions with the borrower, ResCap Parties reasonably determine that the borrower does not meet the basic eligibility criteria for the Settlement Loan Modification Programs, or the ResCap Parties determine that the borrower's monthly mortgage obligation (including principal interest, taxes, insurance and Supplemental) is substantially less than 25% of the borrower's gross monthly income.  Such decision must be documented in the applicable servicing files.

xii.  In addition to meeting these solicitation requirements, ResCap Parties shall seek input from state attorneys general and NGOs (e.g. housing counseling agencies) regarding best practices for borrower solicitation, and shall partner with those state attorneys general or NGO's to establish adequate response rates to meet ResCap Parties' solicitation obligations.

c.   The ResCap Loan Modification Program Solicitation Requirements for borrowers eligible for (1) RRRP, (2) Under Water with Credit Degradation under PRMP or (3) Payment Shock Relief under PRMP (i.e., borrowers who are not delinquent) shall include:

i.    The ResCap Parties shall issue a Solicitation Package that includes a pre-approved modification agreements for payment reductions and/or principal reductions which the borrower can execute without the ResCap Parties requiring any further due diligence except in cases where the Rescap Parties are required to assess borrowers' financial distress due to potentially adverse credit issues in order to determine proper accounting treatment related to Trouble Debt Restructuring or where borrowers' consent is required to mail pre-approved modification agreements.

ii.   The Solicitation Package shall clearly describe the Settlement Loan Modification Programs and the pre-approved modification agreement. The solicitation may also identify other options potentially available to help the borrower cure any delinquency and retain homeownership.  Eligible Borrowers may submit a modification package for review if they want to evaluate alternative programs that may be available.

iii.  If no Right Party Contact, as defined in Chapter II of the MHA Handbook, is established with the borrower 30 days after mailing of the first Solicitation Package, the ResCap Parties shall send a second Solicitation Package and shall make a minimum of 4 telephone calls (unless Right Party Contact is achieved in fewer calls) over a period of at least thirty days, at different times of the day following the mailing of the second Solicitation Package.[3]

iv.   If no Right Party Contact, is established with the borrower 30 days after mailing of the second Solicitation Package, the ResCap Parties shall send a third Solicitation Package and shall make a minimum of 4 telephone calls (unless Right Party Contact is achieved in fewer calls) over a period of at least thirty

---

[3] Solicitation Packages shall be sent to the last address of record and at least one of the first two Solicitation Packages shall be sent via certified/express mail or via overnight delivery service (such as UPS) with return receipt/delivery confirmation

Confidential

days, at different times of the day following the mailing of the third Solicitation Package.

v.  Any contact with borrowers, whether by telephone, mail or otherwise, shall (1) advise borrowers that they may be eligible for the Settlement Loan Modification Programs; and (2) clearly describe the Required Documentation required to be submitted by the borrower and state what other information, if any, the ResCap Parties need to complete the modification analysis.

7.  Role of the Monitor

a.  Following entry of the Consent Judgment, the Monitor shall annually review the ResCap Parties' compliance with this Addendum, specifically paragraphs 3, 4, 5, and 6, to ensure compliance with the Borrower Solicitation requirements and the commitments made in the ResCap Borrower Relief programs.   It shall be the responsibility of the Monitor to verify that the conditions set forth herein have been satisfied, using methods consistent with Exhibit E of the Consent Judgment (Enforcement Provisions).  The Monitor and the ResCap Parties shall work together in good faith to resolve any disagreements or discrepancies.  In the event that a dispute cannot be resolved, the ResCap Parties may petition the Court for resolution in accordance with Section G of Exhibit E of the Consent Judgment (Enforcement Provisions).

b.  If the Monitor determines that the ResCap Parties have failed to substantially comply with the material terms set forth herein, he or she shall issue a Notice of Non-Compliance to the ResCap Parties detailing those areas of non-compliance.  For example, if the ResCap Parties fail to conduct the Borrower Solicitation activities set forth in the Borrower Solicitation requirements in all material respects or fail to give offers of principal reduction or refinancing to borrowers consistent with the terms of the programs set forth herein such that the Monitor determines that the ResCap Parties have failed to substantially comply with the material terms of paragraphs 3, 4, 5 and 6 of this Addendum, the Monitor shall detail such failings in a Notice of Non-Compliance.

c.  Notices of Non-Compliance shall have the following consequences:

i.  If the Monitor issues a Notice of Non-Compliance at the end of the first year of the Consent Judgment or the second year of the Consent Judgment (provided no prior uncured Notice of Non-Compliance has been issued with regard to paragraphs 3, 4, 5, and 6 of the Addendum), the ResCap Parties shall have an opportunity to cure such non-compliance within 90 days of issuance of the Notice.

1)  Following issuance of such Notice, the ResCap Parties shall submit a report detailing the steps taken to cure the non-compliance within 120 days of the issuance of such Notice.

2)  It shall be the responsibility of the Monitor to verify that the ResCap Parties have cured issues identified in the Notice, using methods consistent with Exhibit E of the Consent Judgment (Enforcement Provisions).  The Monitor and the ResCap parties shall work together in good faith to resolve any disagreements or discrepancies.  In the event that

Confidential

a dispute cannot be resolved, the ResCap parties may petition the Court for resolution in accordance with Section G of Exhibit E of the Consent Judgment (Enforcement Provisions).

3)   In the event that the ResCap Parties fail to cure such material non-compliance, the Monitor may impose an assessment of up to $15 million, to be paid in accordance with instructions from the United States Department of Justice.  In setting the size of such an assessment, the Monitor shall take account of the effort made by the ResCap Parties to comply, the level of non-compliance and the impact of the non-compliance on borrowers.

ii.   If the Monitor issues a Notice of Non-Compliance at the end of the second year of the Consent Judgment and the ResCap Parties have not cured a prior Notice of Non-Compliance with regard to paragraphs 3, 4, 5 and 6, the steps set forth in subparagraph i.1-3 shall be followed except that the Monitor may impose an assessment that in combination with the prior assessment(s), if any, aggregates to up to $25 million.  In setting the size of such an assessment, the Monitor shall take account of the effort made by the ResCap Parties to comply, the level of non-compliance and the impact of the non-compliance on borrowers.

iii.   If, at the end of the third year of the Consent Judgment, the Monitor issues a Notice of Non-Compliance, there shall be no opportunity to cure and the Monitor may impose an assessment of up to $25 million.  In setting the size of such an assessment, the Monitor shall take account of the effort made by the ResCap Parties to comply, the level of non-compliance and the impact of the non-compliance on borrowers.

8.   Representations and Warranties

a.  The ResCap Parties agree that, in the event of a transformative transaction involving the ResCap Parties, including, without limitation, a change of control transaction, a sale of all or substantially all of their assets (or assets that together are material to the performance of the obligations of the ResCap Parties under the Consent Judgment) or a reorganization or similar transaction (including in connection with any legal or regulatory proceeding) (a "Transformative Transaction"), the ResCap Parties will ensure the continued performance of their obligations under the Consent Judgment, including requiring any successor or purchaser of substantially all the assets (or assets that together are material to the performance of the obligations of the ResCap Parties under the Consent Judgment) of a ResCap Party to honor and perform the obligations (in the case of a purchase or other acquisition of assets, to honor and perform the obligations with respect to those assets) under the Consent Judgment.

b.  AFI has entered into, with the United States, an Earmark and Indemnification Agreement.  The executed Earmark and Indemnification Agreement will be accompanied by an AFI board of directors' resolution authorizing AFI to enter into the Earmark and Indemnification Agreement.

c.  The ResCap Parties and AFI represent and agree that the ResCap Parties have agreed with AFI that they will not enter into a Transformative Transaction without the consent of AFI; and AFI represents and agrees that AFI will not consent to any such

Confidential

Transformative Transaction (or provide financial support in connection with any such transaction) unless the ResCap Parties (including any successor to or purchaser of the assets from a ResCap Party) agree to ensure the continued performance of the obligations under the Consent Judgment, including, without limitation, the Consumer Relief Activities (in the case of a purchase or other acquisition of assets, to honor and perform the obligations with respect to those assets) and the obligations under this Addendum; provided, however, that any successor or purchaser of all or a substantial portion of the assets of the ResCap Parties shall not be obligated to pay any of the amounts owed by the ResCap Parties or AFI under the Consent Judgment or the Exhibits thereto.

9.   Other Matters.

Menu Items.  With respect to Table 1 "Credit Towards Settlement," the following modification and amendments shall apply:

   i.   For first lien mortgage modifications with principal reduction credit will be effective 90 days after the implementation of the modification, provided that the borrower is still current at that time, or, in the event that borrower liquidates the property prior to the expiration of the 90 days, credit shall be calculated as provided in Section 4.ii of Table 1 to Exhibit D (Consumer Relief Requirements).

10.   State Release.

a.   With respect to the State Release in the Settlement Agreement, the following paragraph is deemed to be included and applies to the ResCap Parties and AFI:

**V. Cooperation**

Residential Capital LLC ("ResCap"), GMAC Mortgage, LLC ("GMACM"), Residential Funding Company, LLC ("Residential Funding" and, together with ResCap and GMAC Mortgage, the "ResCap Parties"),agree that in the event of a transformative transaction involving the ResCap Parties, including, without limitation, a change of control transaction, a sale of all or substantially all of their assets (or assets that together are material to the performance of the obligations of the ResCap Parties under the Consent Judgment) or a reorganization or similar transaction (including in connection with any legal or regulatory proceeding) (a "Transformative Transaction"), the ResCap Parties will ensure the continued performance of their obligations under the Consent Judgment, including requiring any successor or purchaser of substantially all the assets (or assets that together are material to the performance of the obligations of the ResCap Parties under the Consent Judgment) of a ResCap Party to honor and perform the obligations (in the case of a purchase or other acquisition of assets, to honor and perform the obligations with respect to those assets) under the Consent Judgment; provided, however, that any successor or purchaser of all or a substantial portion of the assets of the ResCap Parties shall not be obligated to pay any of the amounts owed by the ResCap Parties or AFI under the Consent Judgment or the Exhibits thereto.  In addition, the ResCap Parties have agreed with AFI that they will not enter into a Transformative Transaction without the consent of AFI; and AFI

I-12

Confidential

represents and agrees that AFI will not consent to any such Transformative Transaction (or provide financial support in connection with any such transaction) unless the ResCap Parties (including any successor to or purchaser of substantially all the assets from a ResCap Party) agree to ensure the continued performance of the obligations under the Consent Judgment, including, without limitation, the Consumer Relief Activities (in the case of a purchase or other acquisition of assets, to honor and perform the obligations with respect to those assets); provided, however, that any successor or purchaser of all or a substantial portion of the assets of the ResCap Parties shall not be obligated to pay any of the amounts owed by the ResCap Parties or AFI under the Consent Judgment or the Exhibits thereto.

Subject to compliance by the ResCap Parties, their Successors and AFI with the foregoing, in the event of a Transformative Transaction, the State Mortgage Regulators agree that it is in the public's best interest to expedite new licenses for the Successors in a Transformative Transaction. Accordingly, State Mortgage Regulators agree that, subject to applicable state law, they will expeditiously process applications for change of control and/or new licenses for any such successors of the ResCap Parties and for individual mortgage loan originators to be employed by any such successors in order to complete a Transformative Transaction.

Furthermore, subject to applicable state law, the State Mortgage Regulators shall make all efforts to enable ResCap Parties to continue to operate under the licenses active at the time of the transaction pending the completion of the Transformative Transaction.

The ResCap Parties and Successors shall use their best efforts to comply with all applicable requirements of licensure in each state. The State Mortgage Regulators agree that neither the Res Cap Parties' entry into the Settlement Agreements nor any alleged or admitted conduct by the ResCap Parties that is described in or forms a basis of the Settlement Agreements shall be a basis for denying, delaying or imposing non-standard conditions upon a change of control or new license application necessary to complete a Transformative Transaction. The covered conduct subject to this Agreement shall not unduly prejudice ResCap Parties and successors or otherwise limit access to licensure by the State Mortgage Regulators.

--

Confidential

## EXHIBIT 2

January 30, 2012

Residential Capital, LLC
8400 Normandale Lake Blvd., Suite 350
Minneapolis, MN  55437

GMAC Mortgage, LLC
8400 Normandale Lake Blvd., Suite 350
Minneapolis, MN  55437

Re:  Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement

Ladies and Gentlemen:

This letter agreement describes the terms and conditions pursuant to which Ally Financial Inc. ("AFI") is willing to provide capital support to Residential Capital, LLC ("ResCap") and any applicable ResCap subsidiaries so that ResCap can meet its obligations under a possible Order of Assessment of a Civil Money Penalty or similar requirement issued by the Federal Reserve Board (the "FRB Order") or a possible settlement (a "DOJ/State AG Settlement") by ResCap with the Department of Justice (the "DOJ") and the Attorneys General of certain States (the "AGs").

1.      AFI agrees to provide capital support by forgiving indebtedness in the amount of $196,500,000 under that certain Amended and Restated Loan Agreement (Line of Credit Agreement) (as amended through the date hereof, the "LOC Loan Agreement"), dated as of December 30, 2009, among Residential Funding Company, LLC and GMAC Mortgage, LLC ("GMACM"), as borrowers (each, a "Borrower" and collectively, the "Borrowers"), ResCap, Passive Asset Transactions, LLC, RFC Asset Holdings II, LLC and certain other affiliates of the Borrowers, as guarantors (each, a "Guarantor" and collectively, the "Guarantors") (together with the Borrowers, each an "Obligor" and collectively, the "Obligors"), and AFI, as lender agent (in such capacity, the "Lender Agent"), and as initial lender (in such capacity, the "Initial Lender"). This debt forgiveness will occur through execution of a letter agreement in the form attached as Exhibit A hereto.

2.      AFI agrees, and agrees to cause it subsidiary BMMZ Holdings LLC, to waive any breach of or default under the consolidated tangible net worth covenants in those credit facilities described in the letter agreements attached as Exhibit B hereto, where the breach or default results from any amounts recorded in the financial statements of ResCap and its subsidiaries with respect to a potential FRB Order or DOJ/State AG Settlement as of and for the period ended December 31, 2011.  These waivers will occur through execution of letter agreements in the forms attached as Exhibit B hereto.

3.      Without AFI's prior written consent, ResCap and its relevant subsidiaries (including without limitation, GMACM) shall not agree to, finalize, execute or commit to

1

execute a DOJ/State AG Settlement. Each of ResCap and GMACM acknowledge that in no case will AFI consent to any DOJ/State AG Settlement that does not contain, at a minimum, a release of AFI and its affiliates acceptable in form and substance to AFI. ResCap and its relevant subsidiaries (including without limitation, GMACM) shall execute and comply with the terms set forth in any FRB Order only if, and to the extent that, AFI has provided its prior written consent to the execution of such FRB Order.

4.      ResCap and GMACM covenant and agree to pay, and to cause their relevant subsidiaries to pay, to the applicable governmental authorities any and all cash payments with respect to amounts owed directly to such governmental authorities ("hard dollar payments") (currently expected to be approximately $100,000,000), whether immediately due and payable or payable in the future, pursuant to a DOJ/State AG Settlement or FRB Order, within two business days of the date on which such amounts are agreed in principle in writing with the DOJ, AGs and/or Federal Reserve Board.

5.      ResCap and GMACM, respectively, covenant and agree, and covenant and agree to cause their relevant subsidiaries, to promptly perform all of their obligations under a DOJ/State AG Settlement or FRB Order in accordance with the terms thereof. ResCap and GMACM each acknowledges and agrees to fully reimburse AFI and Ally Bank for any and all amounts expended by AFI or Ally Bank in connection with AFI's or Ally Bank's performance or satisfaction of obligations under any DOJ/State AG Settlement or FRB Order and for any fines, penalties or other amounts levied against AFI or Ally Bank, in each case, as a result of the failure of ResCap, GMACM or their subsidiaries to perform their obligations under any DOJ/State AG Settlement or FRB Order ("Settlement Costs"). Any such reimbursement pursuant to this Paragraph 5 shall be made within one (1) business day of AFI's or Ally Bank's request for such reimbursement of such Settlement Costs. ResCap and GMACM shall not have any further obligation to reimburse AFI or Ally Bank for Settlement Costs pursuant to this Paragraph 5 from and after the time ResCap and GMACM have effected the hard dollar payments pursuant to Paragraph 4 above and have earned $200,000,000 of funds paid or credited as a result of mitigation, remediation or other financial accommodation to mortgage loan borrowers or other third parties ("soft dollar credits") pursuant to the DOJ/State AG Settlement.

6.      ResCap and GMACM acknowledge and agree that (a) to the extent that AFI or any of its non-ResCap affiliates provides debtor-in-possession financing for ResCap and its subsidiaries ("DIP Financing") if ResCap commences chapter 11 cases, one of the conditions of such DIP Financing shall be that ResCap, GMACM and their subsidiaries continue to fulfill their obligations under any DOJ/AG Settlement Agreement and/or FRB Order before and during the pendency of its chapter 11 case, and (b) to the extent that AFI or one of its non-ResCap affiliates provides financing to one or more purchasers of ResCap's assets ("Sale Financing"), one of the conditions of such Sale Financing shall be that such purchaser shall assume all outstanding obligations of ResCap, GMACM or their subsidiaries under any DOJ/AG Settlement Agreement or FRB Order.

7.      In anticipation of entering into the DOJ/State AG Settlement, and as partial consideration for this letter agreement, GMACM agrees to negotiate in good faith an amendment (the "Modification Amendment") to the Servicing Agreement, dated August 21, 2001, between Ally Bank and GMACM (as amended through the date hereof, the "Servicing Agreement") to

2

permit GMACM to implement modifications and other loss mitigation activities and earn soft dollar credits in accordance with the requirements of the DOJ/State AG Settlement in respect of mortgage loans owned by Ally Bank that GMACM is servicing for Ally Bank.    This Modification Amendment shall contain the terms set forth on Exhibit C hereto.    GMACM acknowledges and agrees that: (a) any breach or repudiation of any DOJ/AG Settlement Agreement or FRB Order by ResCap, GMACM or their subsidiaries shall constitute an event of default under the Servicing Agreement that shall entitle Ally Bank to immediately terminate the Servicing Agreement upon written notice to GMACM, provided that GMACM shall have 30 days from the date of a breach or repudiation to cure any such breach or repudiation capable of being cured or remediated; (b) the foregoing event of default is deemed incorporated into and made a part of the Servicing Agreement; and (c) any new servicing agreement between Ally Bank and GMACM shall contain a similar provision.

8.    In order to address Ally Bank's concerns about ResCap or GMACM as a counterparty, ResCap and GMACM shall negotiate in good faith to execute such documents as are necessary or reasonably desired by Ally Bank or AFI to terminate that certain Amended and Restated ISDA Master Agreement, dated as of April 1, 2011, between GMACM and Ally Bank and related credit support annex and confirmations and to enter into new derivative documentation on the same economic terms with Ally Investment Management LLC.

9.    The parties hereto agree that Ally Bank is a third party beneficiary of this letter agreement and is entitled to enforce the provisions of this letter agreement against ResCap and the Borrowers.    Ally Bank's rights as a third party beneficiary vest immediately upon signing of this letter agreement by the parties and may not be modified or diminished without Ally Bank's and AFI's prior written consent.    Nothing in this letter agreement, express or implied, shall give to any person or entity, other than the parties to this letter agreement and Ally Bank, any benefit of any legal or equitable right, power, remedy or claim under this letter agreement.

10.    As further consideration for the agreements provided in this letter agreement, and in accordance with, and subject to, the authorization of the Board of Directors of AFI, AFI commits to contribute capital to ResCap in an amount necessary for ResCap to exceed its TNW Covenants (as defined below) by $25 million for the month of January, 2012, as determined through the closing process, if and to the extent necessary for ResCap to exceed the TNW Covenants by $25 million for the month of January 2012; provided that such capital contribution is required as a result of operating losses in the ordinary course of business and shall not exceed $100 million.

Any such contribution will take the form of debt forgiveness under the LOC Loan Agreement (as defined below) and/or the Senior Debt Loan Agreement or otherwise, as determined by AFI in its sole discretion.    Any such debt forgiveness will occur through execution of a letter agreement substantially in the form attached as Exhibit A hereto.

"TNW Covenants" means covenants of ResCap under various funding agreements requiring a consolidated tangible net worth of greater than or equal to $250,000,000.

"Senior Debt Loan Agreement" means that certain Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended,

3

supplemented, restated or otherwise modified from time to time) by and among Residential Funding Company, LLC and GMACM, as borrowers, ResCap and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, AFI, as the initial lender, the financial institutions and other persons that are or may from time to time become parties thereto as lenders, AFI, as agent for the lenders, and Wells Fargo Bank, N.A., as first priority collateral agent.

11.     This letter agreement is confidential and subject to Federal Rule of Evidence 408 and all applicable State law equivalents.

12.     The terms and conditions memorialized in this letter agreement have been the subject of lengthy arm's length negotiations amount AFI, Ally Bank, ResCap, GMACM and each of their respective professionals.

13.     **THIS LETTER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS LETTER AGREEMENT).  THIS LETTER AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO ITS SUBJECT MATTER.**

*[Signature Pages Follow]*

4

This letter agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed is deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original) and all of which when taken together constitute one and the same agreement.

Very truly yours,

ALLY FINANCIAL INC.

By: _____
Name: JEFFREY J. BROWN
Title: SR. EXECUTIVE VP

Acknowledged and Agreed as of the
date first written above:

RESIDENTIAL CAPITAL, LLC

By: _____
Name:
Title:

GMAC MORTGAGE, LLC

By: _____
Name:
Title:

*Signature Page to Terms of Support for DOJ/State AG Settlement*

This letter agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed is deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original) and all of which when taken together constitute one and the same agreement.

Very truly yours,

ALLY FINANCIAL INC.

By:_____
Name:
Title:


Acknowledged and Agreed as of the
date first written above:

RESIDENTIAL CAPITAL, LLC

By: _____
Name:
Title:


GMAC MORTGAGE, LLC

By: _____
Name:    JAMES WHIRINGER
Title:    CFO, GMAC Mortgage

**EXHIBIT A**
**FORM OF DEBT FORGIVENESS LETTER**

January 30, 2012


Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attn: Tammy Hamzehpour

Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 350,
Minneapolis, MN  55437
Attn:  Jerry Lombardo

GMAC Mortgage, LLC
c/o Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 350,
Minneapolis, MN  55437
Attn: Jerry Lombardo


            Re:  Forgiveness of Certain Indebtedness under LOC Loan Agreement

Ladies and Gentlemen:

        Reference is hereby made to that certain Amended and Restated Loan Agreement (Line of Credit Agreement) (as amended through the date hereof, the "LOC Loan Agreement") dated as of December 30, 2009 among Residential Funding Company, LLC and GMAC Mortgage, LLC as borrowers (each, a "Borrower" and collectively, the "Borrowers"), Residential Capital, LLC ("ResCap"), Passive Asset Transactions, LLC, RFC Asset Holdings II, LLC and certain other affiliates of the Borrowers, as guarantors (each, a "Guarantor" and collectively, the "Guarantors") (together with the Borrowers, each an "Obligor" and collectively, the "Obligors"), and Ally Financial Inc. (f/k/a as GMAC Inc.) ("AFI"), as lender agent (in such capacity, the "Lender Agent"), and as initial lender (in such capacity, the "Initial Lender"). Capitalized terms used herein and not otherwise defined in this letter agreement (this "Letter Agreement") shall have the meaning set forth in the LOC Loan Agreement.

        The Initial Lender hereby forgives, effective as of the close of business on January 30, 2012,  Loans under the LOC Loan Agreement in a principal amount equal to $196,500,000 (such forgiveness, the "Debt Forgiveness").  Each Obligor hereby acknowledges and agrees that, after giving effect to the Debt Forgiveness, the Outstanding Aggregate Loan Amount as of the close of business on January 30, 2012 was $311,500,000.

        By its signature hereto, each Borrower and Obligor hereby represents and warrants that, before and after giving effect to this Letter Agreement, the representations and warranties set forth in the Facility Documents are true and correct as if made on the date hereof, except to the extent they expressly relate to an earlier date, and no Default or Event of Default has occurred and is continuing.  The Obligors each hereby acknowledge and agree that this Letter Agreement shall not constitute (x) a waiver of any past, present or future Default or Event of Default

*Debt Forgiveness Letter – DOJ / AG Settlement*

(whether known to any Lender or the Lender Agent) or any right, power or remedy of the Lenders or the Lender Agent or forbearance by any Lender or the Lender Agent under any of the Facility Documents, (y) the acceptance by any Lender or the Lender Agent of any course of conduct by any Obligor or any other Person or (z) an agreement by any Lender or the Lender Agent to amend any of the Facility Documents.  The Obligors each hereby further acknowledge and agree that the Lenders and the Lender Agent reserve all rights, remedies and options under the Facility Documents, including the right to require each Obligor to perform all of its obligations under the Facility Documents.  The Obligors each hereby acknowledge and agree that the LOC Loan Agreement and each other Facility Document are each ratified and confirmed in all respects and shall remain in full force and effect in accordance with their respective terms.  Without limiting the foregoing, each Obligor reaffirms its grant of a security interest in all the Collateral pledged by it, and agrees that such security interest secures all Obligations as of the date originally granted.

**THIS LETTER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS LETTER AGREEMENT).  IF ANY PART OF THIS LETTER AGREEMENT IS HELD INVALID OR UNENFORCEABLE, THE REMAINDER REMAINS VALID AND ENFORCEABLE.  THIS LETTER AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO ITS SUBJECT MATTER.**

[signature pages follow]

This Letter Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original) and all of which when taken together shall constitute one and the same agreement.

Very truly yours,

ALLY FINANCIAL INC.
(f/k/a GMAC Inc.),
as Lender Agent and as Initial Lender

By:
Name:    JEFFREY J. BROWN
Title:    SR. EXECUTIVE VP

Acknowledged and Agreed the
date first written above:

GMAC MORTGAGE, LLC
as Borrower
RESIDENTIAL FUNDING COMPANY, LLC
as Borrower and Guarantor

By: _____
Name: ~~Timothy Pacitto~~    Randall Newman
Title:   Senior Treasury Services Officer

RESIDENTIAL CAPITAL, LLC,
as Guarantor

By: _____
Name: ~~Timothy Pacitto~~    Randall Newman
Title:   Assistant Treasurer

HOMECOMINGS FINANCIAL, LLC,
as Guarantor

By: _____
Name: ~~Timothy Pacitto~~    Randall Newman
Title:   Senior Treasury Services Officer

RFC ASSET HOLDINGS II, LLC
PASSIVE ASSET TRANSACTIONS, LLC
EQUITY INVESTMENT I, LLC
GMAC RESIDENTIAL HOLDING COMPANY,
LLC and
GMAC-RFC HOLDING COMPANY, LLC,
as Guarantor

By: _____
Name: ~~Timothy Pacitto~~    Randall Newman
Title:   Senior Treasury Services Officer

**EXHIBIT B**
**FORMS OF WAIVER LETTERS**

701047861 08048307

January 30, 2012

Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 350,
Minneapolis, MN  55437
Attn:  Jerry Lombardo

GMAC Mortgage, LLC
c/o Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 350,
Minneapolis, MN  55437
Attn: Jerry Lombardo

        Re:      Waiver of Default under Master Repurchase Agreement

Ladies and Gentlemen:

        Reference is hereby made to that certain Master Repurchase Agreement dated as of December 21, 2011 (as amended, supplemented, restated or otherwise modified from time to time, "Repo Agreement") among GMAC Mortgage, LLC (the "Servicer") and Residential Funding Company, LLC as sellers (each, a "Seller" and collectively, the "Sellers"), Residential Capital, LLC as guarantor (the "Guarantor", and together with the Sellers and the Servicer, each a "Seller Party" and collectively, the "Seller Parties"), and BMMZ Holdings LLC as buyer (the "Buyer").  Capitalized terms used but not defined herein shall have the meanings given to such terms in the Repo Agreement.

        The Seller Parties have notified the Buyer that Guarantor failed to maintain Consolidated Tangible Net Worth in an amount greater than $250,000,000 as of December 31, 2011 (the "Net Worth Breach").  As a result of a charge in the amount of $196,500,000 taken as of such date, Consolidated Tangible Net Worth was $103,500,000.    Ally Financial Inc. has forgiven indebtedness of the Sellers under the LOC Agreement in an amount equal to $196,500,000 on the date hereof.  At the request of the Seller Parties, the Buyer hereby waives the Events of Default arising from the Net Worth Breach.

        Each of the Seller Parties hereby represents and warrants that no Default or Event of Default (other than those described herein) has occurred and is continuing.  Each Seller Party hereby acknowledge and agrees that this letter shall not constitute (w) a waiver of any other past, present or future Default or Event of Default (whether known or unknown by Buyer) or any right, power or remedy of the Buyer or forbearance by the Buyer under any of the Program Agreements, (x) the acceptance by Buyer of any course of conduct or dealing by any Seller Party or any other Person, (y) an agreement by Buyer to amend any of the Program Agreements or (z) an agreement or understanding that a waiver of the occurrence of any other Default or Event of

1

Default will be granted in the future.  Each Seller Party hereby further acknowledges and agrees that the Buyer reserves all rights, remedies and options under the Program Agreements, including the right to require each Seller Party to perform all of its obligations under the Program Agreements.  Each Seller Party hereby acknowledges and agrees that the Repo Agreement and each other Program Agreement are ratified and confirmed in all respects and shall remain in full force and effect in accordance with their respective terms.

**THIS LETTER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).  IF ANY PART OF THIS LETTER AGREEMENT IS HELD INVALID OR UNENFORCEABLE, THE REMAINDER REMAINS VALID AND ENFORCEABLE.  THIS LETTER AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO ITS SUBJECT MATTER.**

[signature pages follow]

2

This letter agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original) and all of which when taken together shall constitute one and the same agreement.

Very truly yours,

BMMZ HOLDINGS LLC,
as Buyer

By: _____

Name: Bradley J. Brown


ACKNOWLEDGED AND AGREED
AS OF THE DATE FIRST WRITTEN ABOVE:


RESIDENTIAL FUNDING COMPANY, LLC,
as Seller
GMAC MORTGAGE, LLC,
as Seller

By: _____
Name:


RESIDENTIAL CAPITAL, LLC,
as Guarantor

By: _____
Name:
Title:

701008214 08048307

*Repurchase Agreement TNW Wavier Letter*

This letter agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original) and all of which when taken together shall constitute one and the same agreement.

Very truly yours,

BMMZ HOLDINGS LLC,
as Buyer

By:_____
Name:

ACKNOWLEDGED AND AGREED
AS OF THE DATE FIRST WRITTEN ABOVE:

RESIDENTIAL FUNDING COMPANY, LLC,
as Seller
GMAC MORTGAGE, LLC,
as Seller

By: _____
Name: Randall T. Newman
Chief Treasury Management Officer

RESIDENTIAL CAPITAL, LLC,
as Guarantor

By: _____
Name: Randall T. Newman
Title: Assistant Treasurer

3

701008214 08048307

*Repurchase Agreement TNW Wavier Letter*

January 30, 2012

Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attn: Tammy Hamzehpour

Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 350,
Minneapolis, MN 55437
Attn: Jerry Lombardo

GMAC Mortgage, LLC
c/o Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 350,
Minneapolis, MN 55437
Attn: Jerry Lombardo

      Re:     Waiver of Default under LOC Loan Agreement

Ladies and Gentlemen:

      Reference is hereby made to that certain Amended and Restated Loan Agreement (Line of Credit Agreement) dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time, "LOC Loan Agreement") among Residential Funding Company, LLC and GMAC Mortgage, LLC as borrowers (each, a "Borrower" and collectively, the "Borrowers"), Residential Capital, LLC and various other parties signatory thereto as guarantors (each, a "Guarantor" and collectively, the "Guarantors", and together with the Borrowers, each an "Obligor" and collectively, the "Obligors"), and Ally Financial Inc. (f/k/a GMAC Inc.) as lender agent (in such capacity, the "Lender Agent") and as initial lender (in such capacity, the "Initial Lender"). Capitalized terms used but not defined herein shall have the meanings given to such terms in the LOC Loan Agreement.

      The Obligors have notified the Lender Agent that ResCap failed to maintain Consolidated Tangible Net Worth in an amount greater than $250,000,000 as of December 31, 2011 (the "Net Worth Breach"). As a result of a charge in the amount of $196,500,000 taken as of such date, Consolidated Tangible Net Worth was $103,500,000. The Initial Lender has forgiven indebtedness of the Borrowers under the LOC Loan Agreement in an amount equal to $196,500,000 on the date hereof. At the request of the Obligors, the Lender Agent and the Lenders hereby waive the Events of Default arising from the Net Worth Breach.

      Each of the Obligors hereby represents and warrants that no Default or Event of Default (other than those described herein) has occurred and is continuing. The Obligors each hereby

      1      *LOC Loan Agreement TNW Waiver Letter*

acknowledge and agree that this letter shall not constitute (w) a waiver of any other past, present or future Default or Event of Default (whether known to any Lender or the Lender Agent) or any right, power or remedy of the Lenders or the Lender Agent or forbearance by any Lender or the Lender Agent under any of the Facility Documents, (x) the acceptance by any Lender or the Lender Agent of any course of conduct or dealing by any Obligor or any other Person, (y) an agreement by any Lender or the Lender Agent to amend any of the Facility Documents or (z) an agreement or understanding that a waiver of the occurrence of any other Default or Event of Default will be granted in the future.  The Obligors each hereby further acknowledge and agree that the Lenders and the Lender Agent reserve all rights, remedies and options under the Facility Documents, including the right to require each Obligor to perform all of its obligations under the Facility Documents.  The Obligors each hereby acknowledge and agree that the LOC Loan Agreement and each other Facility Document are each ratified and confirmed in all respects and shall remain in full force and effect in accordance with their respective terms.  Without limiting the foregoing, each Obligor reaffirms its grant of a security interest in all the Collateral pledged by it, and agrees that such security interest secures all Obligations.

**THIS LETTER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).  IF ANY PART OF THIS LETTER AGREEMENT IS HELD INVALID OR UNENFORCEABLE, THE REMAINDER REMAINS VALID AND ENFORCEABLE.  THIS LETTER AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO ITS SUBJECT MATTER.**

[signature pages follow]

*LOC Loan Agreement TNW Waiver Letter*

Jan 30 12 10:11p   Jeff and Sara Brown   7045529653                              p.4
12-12020-mg    Doc 793-1    Filed 07/16/12    Entered 07/16/12 18:20:20    Exhibits 1
through 8    Pg 35 of 111

This letter agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original) and all of which when taken together shall constitute one and the same agreement.

Very truly yours,

ALLY FINANCIAL INC. (f/k/a GMAC Inc.), as Lender Agent and as Initial Lender

By: _____

Name: _____  JEFFREY J. BROWN

Title: _____  SR. EXECUTIVE VP

701008107 08048307

*LOC Loan Agreement TNW Waiver Letter*

Acknowledged and Agreed
the date first written above

RESIDENTIAL FUNDING COMPANY, LLC
GMAC MORTGAGE, LLC
as Borrowers

By: _____
Name: Randall Newman
Title:   Chief Treasury Management Officer


RESIDENTIAL CAPITAL, LLC,
as Obligor


By: _____
Name: James Whitlinger
Title:   Chief Financial Officer


HOMECOMINGS FINANCIAL, LLC,
as Obligor

By: _____
Name: Randall Newman
Title:   Chief Treasury Management Officer


RFC ASSET HOLDINGS II, LLC
PASSIVE ASSET TRANSACTIONS, LLC
EQUITY INVESTMENT I, LLC
GMAC RESIDENTIAL HOLDING COMPANY,
LLC and
GMAC-RFC HOLDING COMPANY, LLC,
as Obligors

By: _____
Name: Randall Newman
Title:   Senior Treasury Management Officer

4

*LOC Loan Agreement TNW Waiver Letter*

Acknowledged and Agreed
the date first written above

RESIDENTIAL FUNDING COMPANY, LLC
GMAC MORTGAGE, LLC
as Borrowers

By:_____
Name: Randall Newman
Title:   Chief Treasury Management Officer


RESIDENTIAL CAPITAL, LLC,
as Obligor

By:_____
Name: James Whitlinger
Title:   Chief Financial Officer


HOMECOMINGS FINANCIAL, LLC,
as Obligor

By:_____
Name: Randall Newman
Title:   Chief Treasury Management Officer


RFC ASSET HOLDINGS II, LLC
PASSIVE ASSET TRANSACTIONS, LLC
EQUITY INVESTMENT I, LLC
GMAC RESIDENTIAL HOLDING COMPANY,
LLC and
GMAC-RFC HOLDING COMPANY, LLC,
as Obligors

By:_____
Name: Randall Newman
Title:   Senior Treasury Management Officer

701008107 08048307                                    *LOC Loan Agreement TNW Waiver Letter*

January 30, 2012

Residential Funding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attention: Jerry Lombardo

GMAC Mortgage, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attention: Jerry Lombardo

     Re:    Waiver of Default under Senior Debt Loan Agreement

Ladies and Gentlemen:

    Reference is hereby made to that certain Amended and Restated Loan Agreement (Senior Debt Loan Agreement) dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time, "Senior Debt Loan Agreement") among Residential Funding Company, LLC and GMAC Mortgage, LLC as borrowers (each, a "Borrower" and collectively, the "Borrowers"), Residential Capital, LLC and various other parties signatory thereto as guarantors (each, a "Guarantor" and collectively, the "Guarantors", and together with the Borrowers, each an "Obligor" and collectively, the "Obligors"), and Ally Financial Inc. (f/k/a GMAC Inc.) as lender agent (in such capacity, the "Lender Agent") and as initial lender (in such capacity, the "Initial Lender"), and Wells Fargo Bank, N.A., as first priority collateral agent. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Senior Debt Loan Agreement.

    The Obligors have notified the Lender Agent that ResCap failed to maintain Consolidated Tangible Net Worth in an amount greater than $250,000,000 as of December 31, 2011 (the "Net Worth Breach"). As a result of a charge in the amount of $196,500,000 taken as of such date, Consolidated Tangible Net Worth was $103,500,000. Ally Financial Inc. has forgiven indebtedness of the Borrowers under the Line of Credit Agreement in an amount equal to $196,500,000 on the date hereof. At the request of the Obligors, the Lender Agent and the Lenders hereby waive the Events of Default arising from the Net Worth Breach.

    Each of the Obligors hereby represents and warrants that no Default or Event of Default (other than those described herein) has occurred and is continuing. The Obligors each hereby acknowledge and agree that this letter shall not constitute (w) a waiver of any other past, present or future Default or Event of Default (whether known to any Lender or the Lender Agent) or any right, power or remedy of the Lenders or the Lender Agent or forbearance by any Lender or the

          1     *Senior Debt Loan Agreement TNW Waiver Letter*

Lender Agent under any of the Facility Documents, (x) the acceptance by any Lender or the Lender Agent of any course of conduct or dealing by any Obligor or any other Person, (y) an agreement by any Lender or the Lender Agent to amend any of the Facility Documents or (z) an agreement or understanding that a waiver of the occurrence of any other Default or Event of Default will be granted in the future.  The Obligors each hereby further acknowledge and agree that the Lenders and the Lender Agent reserve all rights, remedies and options under the Facility Documents, including the right to require each Obligor to perform all of its obligations under the Facility Documents.  The Obligors each hereby acknowledge and agree that the Senior Debt Loan Agreement and each other Facility Document are each ratified and confirmed in all respects and shall remain in full force and effect in accordance with their respective terms.  Without limiting the foregoing, each Obligor reaffirms its grant of a security interest in all the Collateral pledged by it, and agrees that such security interest secures all Obligations.

**THIS LETTER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).  IF ANY PART OF THIS LETTER AGREEMENT IS HELD INVALID OR UNENFORCEABLE, THE REMAINDER REMAINS VALID AND ENFORCEABLE.  THIS LETTER AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO ITS SUBJECT MATTER.**

[signature pages follow]

701007903 08048307                                    *Senior Debt Loan Agreement TNW Waiver Letter*

This letter agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original) and all of which when taken together shall constitute one and the same agreement.

Very truly yours,

Ally Financial Inc., as Lender Agent
and Initial Lender

By: _____

Name: _JEFFREY J. BROWN_

Title: _SR. EXECUTIVE VP_

3

Acknowledged and Agreed
as of the date first written above

RESIDENTIAL FUNDING COMPANY, LLC
as Borrower
GMAC MORTGAGE, LLC
as Borrower
GMAC RESIDENTIAL HOLDING COMPANY,
LLC, as Guarantor
GMAC-RFC HOLDING COMPANY, LLC
as Guarantor
HOMECOMINGS FINANCIAL, LLC
as Guarantor
RESIDENTIAL MORTGAGE REAL ESTATE
HOLDINGS, LLC, as Obligor
RESIDENTIAL FUNDING REAL ESTATE
HOLDINGS, LLC, as Obligor
HOMECOMINGS FINANCIAL REAL ESTATE
HOLDINGS, LLC, as Obligor
EQUITY INVESTMENT I, LLC, as Obligor
RFC ASSET HOLDINGS II, LLC
as Obligor
PASSIVE ASSET TRANSACTIONS, LLC
as Obligor
HOME CONNECTS LENDING SERVICES, LLC
as Obligor
GMACR MORTGAGE PRODUCTS, LLC
as Obligor
DITECH, LLC
as Obligor
RESIDENTIAL CONSUMER SERVICES, LLC
as Obligor
GMAC MORTGAGE USA CORPORATION
as Obligor
RESIDENTIAL FUNDING MORTGAGE
SECURITIES I, INC.
as Obligor
RFC ASSET MANAGEMENT, LLC
as Obligor

701007903 08048307                                    *Senior Debt Loan Agreement TNW Waiver Letter*

RFC SFJV-2002, LLC
as Obligor
 By: RFC ASSET MANAGEMENT, LLC
 its sole member

RCSFJV2004, LLC
as Obligor
 By: RFC ASSET MANAGEMENT, LLC
 its sole member

By: _____

Name:  ~~Timothy Pacitto~~  Randall Newman

Title:    Senior Treasury Services Officer

5

*Senior Debt Loan Agreement TNW Waiver Letter*

RESIDENTIAL CAPITAL, LLC
as Guarantor
DOA HOLDING PROPERTIES, LLC
as Obligor
GMAC MODEL HOME FINANCE I, LLC
as Obligor
RFC CONSTRUCTION FUNDING, LLC
as Obligor
DOA PROPERTIES IX (LOTS-OTHER), LLC
as Obligor
By: _____
Name:   Timothy Pacitto
Title:    Assistant Treasurer

6

**EXHIBIT C**
**MODIFICATION AMENDMENT TERMS**

- The mortgage loans owned by Ally Bank that GMACM is servicing for Ally Bank that shall be subject to the Modification Amendment shall be limited to such mortgage loans that are held by Ally Bank for investment and that qualify for soft dollar credit pursuant to a DOJ/State AG Settlement (the "Subject Loans"). Any such Modification Amendment shall provide GMACM with the right, but not the obligation, to offer modifications in accordance with a DOJ/State AG Settlement to the borrowers under such Subject Loans.

- GMACM may continue to implement modifications that are currently permitted under the Servicing Agreement. Ally Bank and GMACM shall develop new matrices and processes related to the implementation of modifications and loss mitigation activities applicable to the Subject Loans and qualifying for soft dollar credit under the DOJ/State AG Settlement. GMACM shall implement the modification and other loss mitigation activities pursuant to the Modification Amendment using the same skill and care that GMACM uses in connection with the performance of similar modifications on mortgage loans that GMACM and its affiliates own and in accordance with all applicable laws and regulations, the terms of the Servicing Agreement and the Bank Servicing Guide (to the extent not inconsistent with the Modification Amendment) and the terms of any DOJ/State AG Settlement and any FRB Order, and shall be liable to Ally Bank for any breaches of the foregoing.

- GMACM shall indemnify Ally Bank for any loss suffered by Ally Bank with respect to any Subject Loan as a result of any modification or loss mitigation in accordance with the Modification Amendment; provided that GMACM shall not be required to indemnify Ally Bank for any losses in connection with any modification or loss mitigation activities of any Subject Loans that are currently permitted under the terms of the Servicing Agreement and the delegations under which Ally Bank and GMACM are operating as of the date hereof. GMACM shall make such required indemnification payments promptly (but in no event later than two business days) after the last day of each calendar month for all Subject Loans that were modified or for which other loss mitigation activities were undertaken in such calendar month.

- GMACM may take up to 90 days from the date of the Modification Amendment to revise its policies, procedures and systems in order to implement the Modification Plan.

- To the extent required by applicable banking law or regulations, GMACM will collateralize the forgoing indemnification obligations with security satisfactory to Ally Bank.

- GMACM and Ally Bank shall agree upon a monitoring and reporting process for such modifications and other loss mitigation activities.

- If a modification or other loss mitigation alternative is extended to a customer of Ally

C-1

Bank, then GMACM, as servicer, must complete such modification or other loss mitigation activity if such customer provides the necessary data.

- In no case shall GMACM perform modifications or other loss mitigation activities once indemnification payments to Ally Bank pursuant to the Modification Amendment exceed $75,000,000 in the aggregate. If GMACM desires to perform modifications or other loss mitigation activities resulting in indemnification payments to Ally Bank pursuant to the Modification Amendment in excess of an aggregate amount of $75,000,000, then Ally Bank and GMACM agree to discuss the terms on which such additional loss mitigation activities could proceed.

701047861 08048307

**<u>EXHIBIT 3</u>**

## SERVICING AGREEMENT

THIS AGREEMENT is made as of the 21st_day of August 2001, by and between GMAC MORTGAGE CORPORATION, a Pennsylvania corporation with offices at 100 Witmer Road, Horsham, Pennsylvania 19044 (hereinafter referred to as "GMACM") and GMAC BANK, a federal savings bank with its principal office at 3710 Kennett Pike, Greenville, Delaware 19807 ("the Bank").

### Explanatory Statement

A.    GMACM is in the business of servicing residential mortgages including home equity loans and lines of credit, and providing other related services.

B.    The Bank is an affiliate of GMACM and a federal savings bank.

C.    The Bank and GMACM desire to enter into a formal arrangement for the servicing by GMACM of certain residential mortgages, home equity loans and lines of credit (the "Loans") held by the Bank, as may be designated from time to time, upon the terms and conditions set forth below.

D.    It is the intent of the Bank and GMACM that this Agreement comply with requirements of Sections 23A and 23B of the Federal Reserve Act and with the applicable provisions of the Home Owners Loan Act (Section 11) and the implementing OTS regulations.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

Whenever used in this Agreement, the following capitalized terms, whether in the singular or plural, shall have the following meanings:

Affiliate:    With respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or under common control with, such Person. "Control" means the power to direct the management and policies of a Person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise; and "controlling" and "controlled" shall have meanings correlative to the foregoing.

Agreement:    This Servicing Agreement, as the same may be amended, modified or supplemented from time to time pursuant to the applicable provisions hereof.

Annual Fee:    The annual fee, if any, to be charged to a Borrower for a Loan as required by the Bank.

Bank Funding Report:    This term shall have the meaning assigned to it in Section 4.2.

Bank Servicing Guide(s): The GMAC Bank Servicing Guide(s) attached hereto as EXHIBIT D, as may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

Banking Day:   Any day other than a Saturday or Sunday or any other day on which the Bank if officially closed or which national banks in Delaware or Pennsylvania are authorized or obligated to remain closed.

Base Fee:    The applicable amount designated on EXHIBIT A as the Base Fee.

Borrower:    An individual or entity having an outstanding Loan.

Borrower Agreement:  With respect to each Loan, the agreement between the Borrower and the originator of the Loan setting forth the terms of that Loan.

Borrower Check: A draft drawn on the clearing account maintained at the Clearing Bank and used by a Borrower as a means for drawing down funds on a Loan.

Borrower Statement:   A periodic account statement to be provided to a Borrower in accordance with the Borrower Agreement containing such information concerning the Loan as is provided to a Borrower pursuant to the Bank Servicing Guide.

Borrowing Limit: The maximum amount that may be drawn down under a Loan.

Bulk Purchase:  A group of 200 or more Loans purchased by Bank from a single Vendor and submitted for servicing to GMACM on a single day.

Clearing Bank: This term shall have the meaning assigned to it in Section 2.4.

Closed Loan Data File:  With respect to each Loan, an electronic data file produced by Bank pursuant to Section 6.2 which is used to enable GMACM to set up each Loan on the Computer System.

Commencement Date:  The date first set forth above as being the date of this Agreement.

Computer System: The computer system, comprising both computer hardware and software, utilized by GMACM in connection with the services performed by GMACM.

Credit Card:  Any card, plate or other credit device that may be used from time to time by a Borrower as a means of drawing down funds on a revolving line of credit Loan.

Credit Card Addendum:  This term shall have the meaning assigned to it in Section 2.4.

Credit Line Decrease: A decrease in the Borrowing Limit with respect to a revolving line of credit Loan.

Credit Line Increase: An increase in the Borrowing Limit with respect to a revolving line of credit Loan.

Credit Line Increase Fee: This term shall have the meaning assigned to it in Section 2.16.

Credit Line Increase Request: A written request received from a Borrower for Credit Line Increase.

Default:   A circumstance described in Article 8.

Early Termination:  This term shall have the meaning assigned to it in Section 9.2

Expense Statement: This term shall have the meaning assigned to it in Section 3.4 and 3.6.

Expenses:    This term shall have the meaning assigned to it in Section 3.5.

Financial Review: This term shall have the meaning assigned to it in Section 2.4.

Foreclosure Fees: With respect to each Loan to which GMACM initiates a foreclosure proceeding hereunder (which shall not include merely sending a notice of intent to foreclose without actually initiating a foreclosure proceeding), the fee GMACM shall be entitled to receive pursuant to Section 3.5.

Hazard Insurance Policy: A casualty insurance policy insuring a Mortgaged Property.

Implementation Fee: The Fee GMACM will be paid to cause development of equipment, software, conversion and operational systems to support Bank's home equity as set forth in Section 3.1 and EXHIBIT A.

Initial Collection Period: This term shall have the meaning assigned to it in Section 2.8.

Issuing Bank: The Bank that will issue credit card as an access device for HELOC's.

Late Fees: With respect to any Loan, all late fees that the Borrower is obligated to pay under the Borrower Agreement on account of delinquent payments thereunder.

Loan: Any revolving line of credit or closed end loan, secured by a lien on a one-to-four family residential real property, purchased or originated by the Bank and serviced by GMACM pursuant to this Agreement, whether or not in the case of a home equity line of credit, money has been drawn down.

Mortgage: The Mortgage, deed of trust or other security instrument which creates lien on a Mortgaged Property to secure the repayment of a Loan.

Mortgage Release: A document evidencing full release of a Mortgage.

Mortgaged Property:  The one-to-four family residential real property, including land and the improvements thereon, which is subject to the lien of a Mortgage.

Note:    The promissory Note, Loan agreement, credit line agreement or other instrument which evidences the indebtedness of a Borrower under a Loan.

Partial Calendar Month: This term shall have the meaning assigned to it in Section 3.3.

Partial Mortgage Release: A document evidencing release of a Mortgage with respect to a portion of the Mortgaged Property.

Partial Mortgage Release Request: A written request received by GMACM from a Borrower for a Partial Mortgage Release.

Person: Any individual, partnership, corporation, trust, association, joint venture, joint stock company, non-incorporated organization, government or any department or agency thereof, or any other entity.

Program Form: Any form of worksheet, checklist, summary, log, transmittal, request, order, report or other written form and any written document, instrument, statement, notice, request, authorization or communication, including, without limitation, customer billing forms and customer correspondence, utilized in connection with the Servicing Activities and all other aspects of the Loans; provided, however, that the Borrower Agreement shall not constitute a Program Form.

Satisfaction Request: A written request received by GMACM from a Borrower for a Mortgage Release.

Security Protection Expenses: Out-of-pocket expenses incurred in connection with the preservation or protection of a Mortgage Property and not of a type that would generally be considered overhead, including (i) Hazard Insurance Policy premiums, (ii) real estate taxes and property repair, replacement, protection and preservation expenses, (iii) expenses to cure or prevent any default with respect to a Senior Loan, and (iv) similar expenses to preserve or protect the security value of a Mortgage.

Senior Loan: A Mortgage Loan secured by a lien on a Mortgage Property superior to the lien of a Mortgage.

Servicing Activities: Those servicing, administrative and related functions in connection with the Loans as are delegated to GMACM pursuant to this Agreement.

Servicing Change: This term shall have the meaning assigned to it in Section 2.3.

Servicing Change Proposal: This term shall have the meaning assigned to it in Section 2.3.

Servicing Compensation: This term shall have the meaning assigned to it in Section 3.3.

Servicing Compensation Statement: This term shall have the meaning assigned to it in Section 3.3.

Servicing File: With respect to each Loan, the file, diskette or other storage device containing the Closed Loan Report and all other information that GMACM is required to maintain with respect to that Loan pursuant to Section 6.1.

Stated Rate: As of any date, the lesser of (i) the "prime rate" published by The Wall Street Journal for such date, or if such date is a date on which The Wall Street Journal is not published, the "prime rate" published in the most recent edition of The Wall Street Journal, and (ii) the highest rate of interest permitted by applicable law. If The Wall Street Journal ceases to publish a "prime rate", the "prime rate" referred to in clause (i) shall be the "prime rate" published by The New York Times or such other rate as determined by the Bank.

Stated Termination Date: This term shall have the meaning assigned to it in Section 9.1.

Subordination Request: Any request received by GMACM from a Borrower for subordination of a Mortgage.

Termination Fee: This term shall have the meaning assigned to it in Section 9.3.

Termination Without Cause: This term shall have the meaning assigned to it in Section 9.2.

Vendor: Entity from which the Bank purchases Loans.

Vendor Contracts: A contract between the Bank and each Vendor, as may be amended, supplemented or otherwise modified from time to time.

## ARTICLE 2
## ADMINISTRATION AND SERVICING

2.1    Responsibility and Authority. The Bank or, as appropriate, its successors or assigns, shall be in all respects the owner of the Loans and the servicing rights with respect thereto, and shall bear all credit risks associated with the Loans. GMACM acknowledges and agrees that all collections GMACM receives on the Loans shall be for the account of the Bank and its successors and assigns.

2.2    General Servicing. (a) Subject to the provisions of Section 6.2, GMACM shall accept from the Bank the Closed Loan Data File. Except as otherwise specified in Section 2.16 with respect to Credit Line Increases, GMACM shall assume servicing responsibilities hereunder with respect to each Loan for which a Closed Loan Data File is delivered to it immediately upon receipt of that Closed Loan Data File from the Bank. In performing the Servicing Activities, GMACM shall be entitled to rely upon information contained in the Closed Loan Data File unless otherwise notified by the Bank.

(b) GMACM shall service the Loans in accordance with all applicable laws and regulations, the terms of this Agreement, and the terms of the Bank Servicing Guides, which is incorporated herein by reference as if set forth herein in its entirety, except as specifically modified by any Servicing Changes. Servicing Activities shall include all operational servicing functions with respect to the Loans and GMACM shall be responsible for assuring that all Servicing Activities are carried out in full compliance with all applicable laws or regulations; provided, however, that to the extent certain Servicing Activities are not governed by law or regulations or by any specific provision of this Agreement (including, without limitation, the Bank Servicing Guide(s)), GMACM shall exercise the same standard of care in performing these activities for the Bank as it exercises in its own operations.

2.3    <u>Servicing Changes</u>.  If, following the date of this Agreement, the Bank shall propose to (i) amend, supplement, discontinue or introduce any Program Form; (ii) amend or supplement the Servicing Activities; (iii) amend its Home Equity program such that the servicing requirements are different from those required by the Bank on the Commencement Date; and/or (iv) otherwise alter any aspect of the Servicing Activities (any such amendment, supplement, discontinuation, introduction or other alteration being herein referred to as a "Servicing Change"), the Bank shall give GMACM written notice of each such proposed Servicing Change accompanied, as applicable, by (A) a specimen of each Program Form proposed to be amended, supplemented or introduced, in the form in which it is proposed to be amended, supplemented or introduced; and /or (B) a written description of each proposed amendment, supplement or other alteration to the Servicing Activities, which description shall in each case be sufficiently clear, comprehensive and detailed to provide a reasonable basis for the training of individuals who would be required to follow the procedures described thereby (such written notice, as accompanied by the items described in clauses (A) and (B), is referred to herein as "Servicing Change Proposal").

Within twenty (20) Banking Days following GMACM's receipt of a Servicing Change Proposal, GMACM shall either (i) accept such Servicing Change Proposal by delivering to the Bank a written notice of acceptance, in which case the Servicing Change shall become effective on the date specified in the Servicing Change Proposal, or (ii) deliver a written notice of non-acceptance to the Bank stating that (a) the performance of services hereunder by GMACM in accordance with such proposed Servicing Change would result in an increase in the cost to and burden upon GMACM of performing services hereunder; and/or (b) such proposed Servicing Change cannot be practicably implemented.  Any such notice shall contain a description of the increased cost or burden or, as appropriate, the reason for such impracticality.  In the event GMACM delivers to the Bank any such notice of non-acceptance in response to a Servicing Change Proposal, such proposed Servicing Change shall not become effective unless and until agreed upon in writing by both parties.

2.4    <u>Checks and Clearing Bank</u>.  Borrowers may draw upon the revolving line of credit Loans solely through the use of Borrower Checks as permitted by state law which shall be provided to Borrowers by GMACM within seven (7) Banking Days after receipt by GMACM of the Closed Loan Data File.

GMACM shall, prior to the Commencement Date, enter into such arrangements as GMACM deems necessary to perform its obligations to service Loans under this Agreement with one or more Financial Institutions in order to provide draft clearing, lockbox and Credit Card services (such bank(s) being herein referred to as the "Clearing Bank").  At a minimum the arrangements shall provide for: (i) creation of an account in GMACM's name, at the Clearing Bank for the payment of Borrower Check drafts; (ii) the clearing and payment of Borrower Check drafts by the Clearing Bank on; and (iii) recordkeeping and reporting of activities in connection with the account as are necessary to enable GMACM to carry out its duties hereunder.

The Bank agrees to pay for all Loans all reasonable charges assessed by the Clearing Bank, or other banks on account of standard processing charges for clearing items, lockbox administration fees, and special handling of account overdrafts and NSF checks:

In connection with its performing all clearing functions with respect to Borrower Checks, the Clearing Bank shall rely on information provided by GMACM to determine: (i) whether there is sufficient available credit under the relevant revolving line of credit Loan to cover the amount of the Borrower Check; (ii) whether a freeze has been placed on the relevant Loan; (iii)

whether a stop payment order has been issued with respect to the relevant Borrower Check (the "Financial Review").

2.5    Liability with Respect to Forged or Altered Borrower Checks.    As between the Bank and GMACM, the Bank shall be responsible for all losses resulting from forged or altered Borrower Check chargebacks except that GMACM shall be responsible for any such losses resulting from the gross negligence or willful misconduct on the part of GMACM.

2.6    Servicer Records; Bank Access.    GMACM shall maintain such records in connection with the Loans as are required to be kept under the Bank's Servicing Guide(s). During the term of this Agreement, GMACM shall give the Bank authorized representatives reasonable access upon two (2) Banking Days' notice to all documents, files, books, records, accounts, offices and other facilities of GMACM related to the Loans and the servicing thereof, and permit the Bank to make such inspections thereof as the Bank may reasonably request during normal business hours.

2.7    Borrower Statements.    GMACM shall prepare and mail periodic Borrower Statements to Borrowers in accordance with the terms of the Borrower Agreement in a manner consistent with the Bank Servicing Guide(s).  Borrower Statements shall indicate that payments due under the Loans should be mailed to the Clearing Bank arranged by GMACM.

2.8    Collection Activities.    For a period of ninety (90) consecutive days commencing on the day immediately following the day on which a payment under a Loan becomes due but is not paid (the "Initial Collection Period"), GMACM shall follow the Bank Servicing Guide(s) in attempting to collect such payment.  Unless the Bank notifies GMACM in writing to the contrary, GMACM shall also be responsible for performing all collection and other servicing functions with respect to any delinquent Loan after the Initial Collection Period with respect thereto in accordance with the Servicing Procedures.

2.9    Casualty Loss, Condemnation and Insurance.    GMACM will rely upon the information provided by the Bank to establish the presence of both hazard and flood insurance policies.  GMACM will act only on cancellation notices and loss claims it may receive in accordance with the Bank's Servicing Guide.  GMACM will use permitted remedies allowed in the Mortgage documents in cases of policy cancellation to protect the Bank's interest.  GMACM will not force-order hazard and/or flood insurance.  GMACM will not be responsible for insurance renewal processing or insurance renewal premium payment.

2.10    Notices to the Bank of Loan Defaults.    GMACM shall notify the Bank by the last day of each calendar month of all Loans which have outstanding payments which, as of the date of such notice, are more than thirty (30) days past due as of the last day of the preceding calendar month.  GMACM shall also notify the Bank at that time of any other event in connection with a Loan, of which GMACM gains knowledge, which constitutes a default under such Loan giving the owner of the Loan a right of acceleration of the Loan.

2.11    Security Protection Expenses.    GMACM shall notify the Bank promptly, and in any event within five (5) Banking Days, of any situation, of which GMACM gains knowledge, which, in GMACM's judgment, shall require an advance of Security Protection Expenses.  Upon obtaining the Bank's prior consent, GMACM shall advance any such Security Protection Expenses and the Bank shall reimburse GMACM for such Security Protection Expenses in accordance with the provisions of Section 3.5.

2.12    Communications with Borrowers.    GMACM shall be permitted to communicate with Borrowers as necessary in connection with performance of its obligations under this Agreement provided that all such communications shall be made by GMACM in its own name acting in its capacity as servicer of the applicable Loan.  GMACM shall not send any statement inserts to Borrowers without having obtained the Bank's prior approval of each such insert.  GMACM agrees upon the request of the Bank to insert with the monthly Borrower Statements any customer satisfaction surveys or any other inserts developed by the Bank for distribution to all of its revolving line of credit Loan customers or any inserts developed by the Bank and supplied to GMACM; provided, however, that the Bank shall be responsible for all costs associated with the development, mailing and production of any such inserts developed by the Bank and shall give GMACM at least sixty (60) days' advance notice of any such inserts, and any increased costs of mailing due to increased postage or envelope size due to such inserts.

2.13    Freezing of Loan Advances; Stopping of Checks:    GMACM shall follow the Bank Servicing Guide(s) with respect to freezing of Loan advances for revolving line of credit Loans and stopping checks and communicate such information to the Clearing Bank.

2.14    Satisfaction Requests.    GMACM shall follow the Bank's Servicing Guide(s) in responding to Satisfaction Requests or pay-off requests.

2.15    Subordination Request; Partial Release Requests. GMACM shall follow the Bank Servicing Guide(s) in responding to Subordination Requests and Partial Mortgage Requests.

2.16    Credit Line Increase Requests.    GMACM shall follow the Bank Servicing Guides(s) for processing Credit Line Increase Requests. GMACM shall be entitled to receive the Credit Line Increase Fee as specified in EXHIBIT A (the "Credit Line Increase Fee"), in addition to recovering from the Bank of any third party expenses incurred in processing and recording the documents used for the Credit Line Increase as specified in EXHIBIT A..

2.17    Credit Line Decrease Requests.    GMACM shall follow the Bank Servicing Guide(s) for processing Credit Line Decrease requests.

2.18    Borrower Transfers of Mortgaged Properties.    In any case in which GMACM gains actual knowledge that a Mortgaged Property or any interest therein has been or is about to be conveyed by a Borrower, GMACM shall notify the Bank promptly, and in any event within five (5) Banking Days, of such conveyance or prospective conveyance.

2.19    GMACM Personnel.    GMACM employees performing Servicing Activities shall be employees of GMACM for all purposes hereunder and under applicable law, and GMACM shall be solely responsible for hiring, classification, compensation (including fringe benefits), supervision, safety, training, transfer, promotion and discharge of such employees. In addition, GMACM shall pay all workers' compensation premiums, and shall make all payroll withholdings and deductions required by applicable law in respect of such employees, and shall be solely responsible for any and all fines or penalties imposed by reason of any failure to make such payroll withholdings or deductions, or to make any payment in respect thereof.

## ARTICLE 3
## IMPLEMENTATION, SERVICING CHANGE COMPENSATION AND REIMBURSEMENT OF EXPENSES

3.1    Implementation Fee. In consideration of GMACM's provision of the services necessary to develop equipment, software and operational systems to support Bank's home equity loan program, Bank will pay GMACM an Implementation/Conversion Fee as provided in Exhibit A hereto.

3.2    Implementation Date. The "Implementation Date" shall be the date on which GMACM has completed the development and implementation of equipment, software and operational systems to support Bank's home equity program and has delivered written confirmation of the fact to Bank.

3.3    Servicing Compensation. As compensation for the services to be performed hereunder in any full calendar month during the term of this Agreement or, if the term of this Agreement begins on other than the first day of the calendar month or ends on other than the last day of a calendar month, for that portion of such first or last calendar month of the term of this Agreement during which this Agreement is in force and effect (a "Partial Calendar Month"), GMACM shall earn an amount (together with the fees described in the immediately succeeding sentence, the "Servicing Compensation") the total Base Fees for any Loan(s) in existence on the last day of the calendar month. In addition, GMACM shall receive all additional fees specified in EXHIBIT A to extent applicable. All fees due GMACM shall be set forth on the Servicing Compensation Statement. In no event shall the Servicing Compensation for any month be less than fifteen thousand dollars ($15,000.00).

3.4 _Payment of Servicing Change Compensation_.  GMACM shall forward to the Bank, on or before the second (2nd) business day of each calendar month, the Servicing Compensation Statement setting forth the Servicing Compensation earned for the immediately preceding calendar month in accordance with Section 3.3 and broken down by fee types and in the formats specified on EXHIBIT A.  The Bank shall pay to GMACM the amount of the Servicing Compensation each month through check or wire transfer.

3.5 _Expenses_.  In addition, to the fees set forth on the Servicing Compensation Statement the Bank shall reimburse GMACM for the following expenses ("Expenses"):

(i) any out-of-pocket expense GMACM incurs with the prior approval of the Bank in connection with its servicing and administrative obligations set forth in this Agreement to the extent such expense is not ordinary to the servicing function (but not including salaries, rent and other general operating expenses of GMACM normally classified as overhead);

(ii) expenses the Bank has expressly agreed to pay or be liable for hereunder;

(iii) expenses incurred in connection with the performance by GMACM at the request of the Bank of any activity which is not specifically required to be performed by GMACM under this Agreement and is not reasonably ancillary to any specific requirements of GMACM under this Agreement;

(iv) Out-of-pocket collection Expenses incurred by GMACM and billed by third parties and which include but are not limited to Expenses associated with the following: appraisals (pre- and post-foreclosure and other), title work, attorney fees (foreclosure, bankruptcy and other), legal filing fees, recording fees and taxes, inspection fees (interviews, drive-by, clean out and  inspections after the premises securing the Loan have been vacated, professional services such as property surveys, repair inspections, Environmental Protection Agency inspections, etc.) property maintenance (utilities, lawn care, snow removal, securing costs, repairs, winterization, removal of debris, clean-up after the premises securing the Loan have been vacated), condominium expenses (condo fees, association fees, etc.) insurance (premiums and deductibles), taxes (property, estate, assessments), photographs, and travel (transportation, meals, lodging, rental cars);

(v) Any out-of-pocket Expenses that GMACM incurs with the Bank's prior approval in connection with the conversion of servicing; provided, further, that the Bank will use its best efforts to arrange a servicing tape exchange in the event that a Vendor shall transfer Loans in a Bulk Purchase;

(vi) Any out-of-pocket expenses associated with the lien satisfaction or subordination process including recording fees; and

(vii) Any out-of-pocket expenses incurred in the ordering, production and mailing of checkbooks and credit cards to the Bank's Customers.

3.6 _Reimbursement of Expenses_.  GMACM shall forward to the Bank, on or before the fifteenth (15th)  business day of any calendar month, a statement in substantially the form of EXHIBIT B hereto (the "Expense Statement") showing the aggregate amount of Expenses (including Security Protection Expenses) incurred by GMACM during the immediately preceding calendar month, grouped by type of Expense.  Bank shall reimburse GMACM for the Expenses set forth in any Expenses incurred during the immediately preceding month for which GMACM has not yet received a bill shall be submitted in the next month after which GMACM actually receives the invoice or billing statement.

Except as otherwise expressly provided in this Article or the Agreement, each party shall pay its own expenses incurred in connection with the preparation of and performance under this Agreement, including, without limitation, its own legal fees and expenses of preparing and delivering the notices, documents, reports, accountings and any other information required of it hereunder.

## ARTICLE 4
## FUNDING OF LOANS; REMITTANCES

4.1     Loan Funding.    GMACM shall advance money to fund draws on the Loans and the Bank shall reimburse GMACM for such advances in accordance with the procedures described in Section 4.3.

4.2     Accounting.    On or before 12:00 p.m. Eastern time on each Banking Day, GMACM shall deliver a report (the "Bank Funding Report") to the Bank showing on an aggregate basis all draws on Loans funded and all Loan payments received on the immediately preceding Banking Day.

4.3     Remittances and Reimbursement of Borrower Advances.        With respect to advances and principal and interest repayments on each revolving line of credit Loan, GMACM shall on a daily basis determine all amounts representing principal and interest payments received on account of the Loans on the preceding Banking Day as well as the aggregate amount of advances made by GMACM and posted to the revolving line of credit Loans on that Banking Day.  To the extent that the aggregate principal and interest payments exceed the aggregate advances, GMACM shall remit such difference to the Bank by wire transfer of immediately available funds by 1:00 p.m. Eastern time on the Banking Day immediately following the day such payments and advances were received and made.  To the extent that the aggregate amount of advances exceeds the aggregate amount of principal and interest payments, (i) GMACM shall notify the Bank of such difference in the Bank Funding Report and (ii) the Bank shall remit to GMACM such difference by 1:00 p.m. Eastern time every Banking Day in accordance with standard intercompany transfer procedures.

## ARTICLE 5
## REPORTS

Section 5.1     Reports to the Bank.    GMACM shall provide the Bank with such management reports and electronic data in connection with administration of the Loans as are detailed in EXHIBIT C.  The frequency and timing of delivery of these reports will also be as described in EXHIBIT C.

## ARTICLE 6
## SERVICING DOCUMENTS AND FILES

6.1     Maintenance of Servicing Files.    GMACM shall maintain a Servicing File as to each Loan on film or hard copy containing the Closed Loan File and all correspondence, records and other documents received or generated by or on behalf of GMACM with respect to that Loan. If the Closed Loan Data Files are electronically transmitted to GMACM, hard copy files will be created only for Loans having other items such as correspondence and reports.

6.2     Submission of Closed Loan Data File and Other Loan Documents.  the Bank, shall provide the Closed Loan Data File for each Loan to GMACM promptly upon purchase or origination of the Loan by the Bank, and in no event later than five (5) days before the first periodic statement is due under the Borrower Agreement.  Information contained in the Closed Loan Data File shall be utilized by GMACM in the performance of the Servicing Activities and GMACM shall be entitled to rely on information contained in the Closed Loan Data File in performing its duties hereunder.  The Bank shall notify GMACM within two (2) Banking Days, in writing, of any changes in the in the information contained in the Closed Loan Data File, including, without limitation, any change in a Borrower's Borrowing Limit.  The Bank agrees to provide or instruct its custodian to provide GMACM, within two (2) Banking Days after GMACM's request, copies of the Note, the Mortgage or any other documents the Bank has with respect to a Loan that GMACM deems reasonably necessary in connection with its performance of the servicing of that Loan.

### ARTICLE 7
### GENERAL MATTERS

7.1     Liability for Origination or Servicing by Others. Anything herein to the contrary notwithstanding GMACM shall not be liable for any acts or omissions that take place in connection with the purchase or origination of any Loan or the servicing of any Loan at any time other than the period during which it is serviced by GMACM hereunder.

7.2     Agreement to Provide Information.   GMACM will use its best efforts to cooperate fully with the Bank and to accommodate any reasonable request made by the Bank in connection with any sale, securitization or other disposition of any of the Bank's right, title or interest in any of the Loans. Without limiting the generality of the foregoing, GMACM will use its best efforts to provide complete and accurate information with respect to GMACM as a business enterprise and any particular aspects of its servicing or other operations to the extent that any such information may be reasonably requested by the Bank in connection with such sale, securitization or other disposition of any Loans.  Any such information may be included as disclosures in any security offering documents.  In addition, GMACM will use its best efforts to cooperate fully to the extent reasonably necessary to accommodate any diligence of third parties in connection with any transaction involving the sale, securitization, pledge or other disposition of any of the Bank's right, title or interest in or to any of the Loans, including, without limitation, any security underwriter, bond insurer, purchaser of Loans, pledgee of Loans, or rating agency. Bank shall reimburse GMACM for any out-of-pocket expenses incurred by GMACM in connection with providing any such information or otherwise cooperating with any such third party diligence.

7.3     Indemnification: Third Party Claims.     (a) Subject to Section 7.1, GMACM agrees to indemnify and hold harmless the Bank, any Affiliate of the Bank other than GMACM, and their respective successors, assigns, officers, directors, agents and employees from and against any and all claims, liabilities, damages, losses, penalties, fines forfeitures, legal fees and costs, judgments, and any other costs, fees and expenses that the Bank or any such indemnified Person may sustain as a result of the occurrence of an Event of Default by GMACM.  Provided, however, that if the Bank or any such indemnified Person is entitled to retain an indemnification payment from any other Person with respect to any such loss, damage, or expense, the Bank or such indemnified Person, as the case may be, shall not be entitled to claim the same amount under this Section 7.3; provided, further, that neither the Bank nor any other indemnified Person shall have any obligation to pursue any such payment from any Person.  GMACM's obligations under this Section 7.3 are contingent upon its receipt of timely notice of any such third party

claim, an opportunity to defend such claim with counsel of its choice and full cooperation of the Bank and any such indemnified Person in the defense of such claim.

(b) The Bank agrees to indemnify and hold harmless GMACM and its Affiliates other than the Bank, and their respective successors, assigns, officers, directors, agents and employees, from and against any and all claims, liabilities, damages, losses, penalties, fines, forfeitures, legal fees and costs, judgments, and any other costs, fees and expenses that GMACM or any such indemnified Person may sustain as a result of the occurrence of an Event of Default by the Bank, provided, however, that if GMACM or any such indemnified Person actually receives and is entitled to retain an indemnification payment from any other Person with respect to any such loss, damage or expense, GMACM or such indemnified Person, as the case may be, shall not be entitled to claim the same amount under this Section 7.3; provided, further, that neither GMACM nor any other indemnified Person shall have any obligation to pursue any such payment from any Person. The obligations of the Bank under this Section 7.3 are contingent upon the Bank's receipt of timely notice of any such third party claim, an opportunity to defend such claim with counsel of its choice and the full cooperation of GMACM and any such indemnified Person in the defense of such claim.

The provisions of this Section 7.3 shall survive any termination of this Agreement.

7.4     Assignment of Servicing Obligations.    GMACM shall have the right to assign all or any part of its rights, responsibilities, duties or obligations under this Agreement to any successor to GMACM with the prior written consent of the Bank, which consent shall not be unreasonably withheld or delayed. Upon any assignee's assumption of such of GMACM's rights, responsibilities, duties or liabilities as were assigned in accordance with this Section 7.4, GMACM shall be released from any liability therefor arising from the actions or inaction of such assignee from and after the effective date of such assumption.

7.5     Assignment by the Bank.    Bank shall have the right at any time and from time to time to assign all or any part of its rights, responsibilities, duties or obligations under this Agreement to any successor to the Bank or to any other party providing GMACM with sixty (60) days prior notice of such assignment.

7.6     Payments.    Except as otherwise provided by Section 4.3, the Bank and GMACM shall each make each payment due hereunder in immediately available funds prior 11:00 a.m. Eastern Time, on the date due, unless the scheduled due date shall not be a Banking Day, in which case the Bank or, as appropriate, GMACM, shall make such payment on the next succeeding Banking Day. Any amount owed by the Bank or GMACM (including, without limitation, any amount owed under Article 3 and Section 4.3) and not paid when due shall bear interest at the Stated Rate from the date such payment was due to an including the date of payment. Such interest shall be payable on demand or if no demand is made then on the date of payment of the amount on which such interest accrued.

7.7     Non-Exclusive Right to Service Loans.    The parties understand and agree that the Bank has the right, but not the obligation, to have GMACM service pursuant to this Agreement any particular Loan it owns and that the Bank retains the right to service, or employ any other Person to service, any such Loan, or to sell such servicing rights to any Person, all in the exercise of its sole discretion. Nothing in this Section 7.7 shall be deemed to affect in any way the provisions of Article 9 of this Agreement pertaining to the termination by the Bank of GMACM's subservicing of any Loan being subserviced by it hereunder.

7.8    Representations and Warranties of GMACM.  GMACM represents and warrants to, and covenants with, the Bank that as of each date during the term of this Agreement:

(i)    GMACM is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania, and is qualified to transact business in, and is in good standing under, the laws of each state where the performance of the Servicing Activities may from time to time require that it be qualified and in good standing;

(ii)    GMACM has the corporate power and authority and legal right to enter into and perform its obligations under this Agreement;

(iii)    the execution, delivery and performance of this Agreement have been duly authorized by corporate resolution and all necessary corporate actions on the part of GMACM and such authorizations are maintained with copies of this Agreement in GMACM's permanent corporate records;

(iv)    this Agreement has been duly executed and delivered by, and constitutes the legal, valid and binding obligation of GMACM, enforceable against GMACM in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally;

(v)    the execution, delivery and performance of this Agreement by GMACM, its compliance with the terms hereof and consummation of the transactions contemplated hereby will not violate, conflict with, result in a breach of, constitute a default under, be prohibited by or require any additional approval under its charter, by-laws or any material agreement or other instrument to which GMACM is a party or by which it or any material portion of its property is bound, or any federal, state or local statute, regulation or ordinance applicable to GMACM, or any order of any federal or state court or regulatory agency applicable to GMACM; and

vi)    no Event of Default by GMACM under and as defined in this Agreement has occurred and is continuing and no event or condition that with the passage of time, the giving of notice or both will become an Event of Default by GMACM exists or has occurred and is continuing; and

(vii) the terms of this Agreement are no less favorable to the Bank than those that would be offered by GMACM to, or would apply to, a third party that is not affiliated with GMACM.

7.9    Representations and Warranties of the Bank.   The Bank represents and warrants to, and covenants with, GMACM that:

(i)    the Bank is a federal savings bank duly organized, validly existing and in good standing under the laws of the United States of America;

(ii)    the Bank has all requisite power and authority and legal right to enter into and perform its obligations under this Agreement;

(iii)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of the Bank;

(iv) this Agreement has been duly executed and delivered by, and constitutes the legal, valid and binding obligation of the Bank, enforceable against the Bank in accordance with its

terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally;

(v)    the execution, delivery and performance of this Agreement by the Bank, its compliance with the terms hereof and consummation of the transactions contemplated hereby will not violate, conflict with, result in a breach of, constitute a default under, be prohibited by or require any additional approval under its charter, by-laws or any material agreement or other instrument to which the Bank is a party or by which it or any material portion of its property is bound, or any federal, state or local statute, regulation or ordinance applicable to the Bank, or any order of any federal or state court or regulatory agency applicable to the Bank;

(vi)    no Event of Default by the Bank under and as defined in this Agreement has occurred and is continuing and no event or condition that with the passage of time, the giving of notice or both will become an Event of Default by the Bank exists or has occurred and is continuing;

(vii)    the Bank has received all federal, state and local governmental and regulatory licenses and other authorizations that are required in order for it to originate and/or acquire the Loans from Vendors pursuant to the Vendor Contracts; and

(viii)    all Loans to be serviced pursuant to this Agreement were originated in compliance with all applicable state and federal laws and regulations except to the extent that the failure to so comply would not have a material effect on the servicing of any such Loans.

Sections 7.8 and 7.9 shall survive any termination of this Agreement.


## ARTICLE 8
## DEFAULT; REMEDIES

8.1    Default by GMACM.    The occasion of any one or more of the following circumstances shall constitute an Event of Default by GMACM:

(i)    the failure of GMACM to make any payment required to be made under the terms of this Agreement within two (2) Banking Days following the Bank's delivery of written notice of such failure;

(ii)    the material failure of GMACM to perform any of its obligations under this Agreement within sixty (60) days following its receipt of a written notice from the Bank specifying the nature of such failure;

(iii)    any material representation or warranty made by GMACM herein shall prove to be incorrect in any respect;

(iv)    there shall be a decree or order of a court or agency or supervisory authority having jurisdiction or supervisory authority over GMACM for the appointment of a conservator or receiver or liquidator for GMACM; or there shall be initiated any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings involving GMACM or there shall be initiated proceedings for the winding up or liquidation of the affairs of GMACM;

(v)  GMACM shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceeding of or relating to GMACM or relating to all or substantially all of the property belonging to GMACM; or

(vi)  the admission by GMACM in writing of its inability to pay its debts generally as they become due, the filing of a petition to take advantage of any applicable insolvency or reorganization statute, the making of any assignment for the benefit of its creditors or the voluntary suspension of payment of its obligations.

In case one or more of such Events of Default shall occur and be continuing, the Bank may at its option (i) by written notice to GMACM, terminate this Agreement, in which event, on the thirtieth (30th) day following delivery of such notice, or immediately without notice or other action of any kind in the case of any Event of Default of the type described in clauses (iv), (v) and (vi) above, this Agreement shall terminate, (ii) enforce this Agreement in accordance with its terms, and/or (iii) pursue such other rights and remedies as may be provided by law.  It is understood and agreed that (a) the remedies set forth in this Section 8.1 shall be cumulative and not alternative, and shall be in addition to any and all other rights and remedies provided by law, and (b) the provisions of this Section shall not be construed to discharge GMACM from any liability it may otherwise possess under this Agreement.

8.2    Limitation of Liability.    Anything to the contrary not-withstanding, GMACM's maximum liability under this Agreement shall in no event exceed the Servicing Compensation paid by the Bank to GMACM within the twelve month period prior to a demand for payment made by the Bank to GMACM, resulting from GMACM's liability under this Agreement.

8.3    Default by the Bank.    The occasion of any one or more of the following circumstances shall constitute an Event of Default by the Bank:

(i)  the failure of the Bank to make any payment required to be made under the terms of this Agreement within two (2) Banking Days following GMACM's delivery of written notice of such failure;

(ii)  any representation or warranty made by the Bank herein shall prove to be incorrect in any respect;

(iii)  the material failure of the Bank to perform any of its other obligations under this Agreement within sixty (60) days following written notice from GMACM specifying the nature of such failure;

(iv)    proceedings in bankruptcy, or for reorganization of the Bank, or for the readjustment of any debts, under the Bankruptcy Code, as amended, or any part thereof, or under any state or federal receivership or other insolvency laws for the relief of debtors, now or hereafter existing, shall be commenced against or by the Bank, and, with respect to any such proceedings commenced against the Bank, such proceedings shall not be dismissed or discharged within sixty (60) days of their commencement;

(v) the Bank shall consent to the appointment of a conservator or receiver or liquidate in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Bank or relating to all or substantially all the property belonging to the Bank; or

(vi) the Bank shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations.

In case one or more of such Events of Default shall occur and be continuing, GMACM may at its option (i) by written notice to the Bank, terminate this Agreement, in which event, on the thirtieth (30th) day following delivery of such notice, or immediately without notice or other action of any kind in the case of any Event of Default of the type described in clauses (iv), (v) and (vi) above, this Agreement shall terminate, (ii) enforce this Agreement in accordance with its terms, and/or (iii) pursue such other rights and remedies as may be provided by law. It is understood and agreed that (a) remedies set forth in this Section 8.3 shall be cumulative and not alternative, and shall be in addition to any and all other rights and remedies provided by law, and (b) the provisions of this Section 8.3 shall not be construed to discharge the Bank from any liability it may otherwise possess under this Agreement.

Anything to the contrary notwithstanding, GMACM's total liability under this Agreement shall in no event exceed the maximum of 1 years service fee from the implementation date of this Agreement.

## ARTICLE 9
## TERM AND VOLUNTARY TERMINATION

9.1    Term.    The term of this Agreement shall start on the Commencement Date and continue until the earlier of: (i) August 21, 2004 or (ii) the date, if any, that this Agreement is terminated under the provision of Section 8.1, 8.3, 9.2 or 11.13. The earlier of such dates is herein referred to as the "Stated Termination Date." Neither party shall have any obligation to extend this Agreement beyond the Stated Termination Date, but if this Agreement has not been terminated earlier, each party agrees to give the other party at least one hundred and twenty (120) days' advance written notice of its intent not to extend the term of this Agreement. If not terminated, this Agreement shall automatically be extended for an additional one (1) year period on the same terms as are then in effect, and shall thereafter continue to be automatically so extended for one (1) year terms until one party gives the other party notice at least one hundred and twenty (120) days prior to any such automatic renewal date of its election not to so extend this Agreement.

9.2    Voluntary Termination.    After the Commencement Date and upon one hundred and twenty (120) calendar days' notice to GMACM, the Bank may terminate without cause GMACM's right and obligation to subservice any Loan pursuant to this Agreement as of the date specified in that notice (any such termination being herein referred to as an "Early Termination"). If the Office of Thrift Supervision requires the Bank to terminate its obligations under this Agreement, then this Agreement shall terminate as of the effective date of such termination. In addition, the Bank may terminate this Agreement with respect to all Loans then being subserviced by GMACM without cause at any time upon one hundred twenty (120) calendar days' prior written notice to GMACM (any such termination date being herein referred to as a "Termination Without Cause").

9.3    Termination Fees. Upon any Early Termination which becomes effective prior to the Stated Termination Date, the Bank shall pay to GMACM a Termination Fee equal to the greater of (a) the average of the two months service fee (prior to the termination notification)

multiplied by the number of months remaining in the initial or renewal term  or (b) the sum of Fifty Thousand Dollars ($50,000).

9.4    Transfer of Files.    Upon termination of this Agreement GMACM's receipt of all amounts due GMACM hereunder, GMACM shall forward all documents and other information stored in any format in GMACM's possession (or in any of its subcontractor's, agent's or assignee's possession) pertaining to any Loan to such location as is specified by the Bank. As to any Loan with respect to which any payment is thirty (30) or more days delinquent, all such documents and other information shall be transmitted to the Bank within five (5) days and as to any other Loan, all data concerning the current status of that Loan shall be transmitted as directed by the Bank within ten (10) days and any actual physical files (if any) with respect to such Loans shall be transmitted as directed by the Bank within thirty (30) days. All out-of-pocket Expenses incurred by GMACM in connection with any such transfer shall in all events be borne by the Bank.

9.5    Transfer of Servicing.    In the event that GMACM shall cease to service any Loans previously serviced by it pursuant to this Agreement, GMACM agrees that it will take all such action as the Bank at the expense of the Bank shall designate in order to facilitate the transfer of the servicing with respect to that Loan, including, without limitation, transferring the Servicing Files in accordance with the Bank's instructions.

In the event that the Bank enters into an agreement with a third party to transfer the servicing rights with respect to a package of Loans either in bulk or in periodic installments, the Bank shall take all such action as GMACM shall reasonably request in order to assist with the transfer and minimize the amount of costs and expenses incurred by GMACM in connection with that transfer.

## ARTICLE 10
## REVIEW OF THIS AGREEMENT

10.1    The parties agree that prior to December 31, 2001 they will review the terms of this Agreement and in good faith make any changes or modifications that are necessary or desirable.

10.2    If, at any time during the term of this Agreement, GMACM or the Bank, (as applicable the "Asserting Party") believes that the compensation terms provided in this Agreement are less favorable to the Asserting Party than it could obtain from an independent third party or parties, the Asserting Party may give written notice thereof (a "Compensation Notice") to the other party, and GMACM and the Bank shall promptly enter into good faith negotiations for the purpose of establishing a mutually agreeable adjustment to the compensation to be paid by the Bank to GMACM for the Services provided by GMACM hereunder and for the Bank's use of the Facilities. Any such Compensation Notice by the Asserting Party shall be accompanied by information which supports its belief that the then-current compensation terms are less favorable to it than could be obtained from a third party or parties. In the event that GMACM and the Bank are unable to mutually agree upon the adjustment, if any, which should be made to the compensation provided for in this Agreement on or prior to the date (the "Adjustment Cut-Off Date") which is ninety (90) days after the Asserting Party gives the Compensation Notice, then the Asserting Party may thereafter terminate this Agreement, without penalty, by giving written notice thereof to the other party within ten (10) days after the Adjustment Cut-Off Date, which termination shall become effective sixty (60) days after the Adjustment Cut-Off Date.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

11.1    <u>Relationship of Parties</u>.    The parties hereto do not intend to create hereby a partnership or joint venture between them, and nothing herein contained shall be construed to create such a partnership or joint venture.  The services rendered by GMACM hereunder are rendered by GMACM as an independent contractor and shall be so construed for all purposes.

11.2    <u>Assignment</u>.    Except as otherwise expressly provided in this Agreement, this Agreement shall not be assignable by either party without the prior written consent of the other parties.

11.3    <u>Entire Agreement</u>.    The terms and provisions of this Agreement (including the Bank Servicing Guide(s) incorporated herein by reference) supersede all prior negotiations and oral and/or written agreements or understandings between the Bank and GMACM with respect to the transactions contemplated hereby (including, without limitation, the Prior Agreement).  The Exhibits to this Agreement (including, without limitation, the Bank Servicing Guide(s)) are incorporated into and made a part of this Agreement as if fully set forth herein.

11.4    <u>Counterparts; Effectiveness</u>.    This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed shall be an original, but all such counterparts shall together constitute but one and the same fully executed instrument.  This Agreement shall be of no force or effect unless and until it has been executed and delivered by both the Bank and GMACM.

11.5    <u>Headings</u>.    The headings of the various Articles and Sections of this Agreement are for convenience of reference only and shall not modify, define, expand or limit any of the terms or provisions hereof.

11.6    <u>Successors and Assigns</u>.    This Agreement, including all covenants, representations and warranties, shall be binding upon and inure to the benefit of GMACM, the Bank and their respective successors and permitted assigns.

11.7    <u>Notices</u>.    Unless otherwise required or permitted hereby, all demands, notices and communications required or permitted hereunder shall be in writing, shall be addressed as described below and shall be Personally delivered or sent by facsimile followed by telephone confirmation of receipt, U.S. mail or overnight courier.  Any such demand, notice or communication shall be deemed to be given for purposes of this Agreement on the day that such writing is Personally delivered or transmitted by facsimile, on the first Banking Day following its delivery to any such courier, or on the fifth day following the date of deposit in the United States mail.  Unless otherwise specified in a notice delivered or sent in accordance with the provisions of this Section 11.7, demands, notices and communications shall be given to or made upon the parties hereto at their respective addresses indicated below:

| If to the Bank: | GMAC Bank | 3710 Kennett Pike |
| | | Wilmington, DE  19807 |
| | | Attn:  Chief Financial Officer |
| With a copy to: | GMAC Bank | |
| | | 100 Witmer Road |
| | | Horsham, PA  19044 |
| | | Attn:  General Counsel |
| | | Facsimile No.: 215-682-1467 |

If to GMACM:            GMAC Mortgage Corporation
                        100 Witmer Road
                        Horsham, PA 19044
                        Attention: Chief Operating Officer
                        Facsimile No: 215-682-1460


With a copy to:         GMAC Mortgage Corporation
                        100 Witmer Road
                        Horsham Pa 19044
                        Attention: General Counsel
                        Facsimile No: 215-682-1467

11.8    Governing Law.    This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware(disregarding any conflicts of law rule which might result in the application of the laws of any other jurisdiction), and all matters pertaining to the construction, validity and performance of this Agreement shall be determined in accordance with such laws.

11.9    Severability.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereto or affecting the validity or enforceability of such provisions in any other jurisdiction.

11.10    Amendment.    Neither this Agreement nor any term hereof may be altered, amended, supplements, waived or modified in any matter except by written instrument signed by the partied hereto.

11.11    Certain Matters of Construction; Incorporation of Exhibits.    When used in this Agreement, "herein", and other words of similar import refer to this Agreement as a whole, and not to any particular Article or Section. References in this Agreement to Articles, Sections and Exhibits are to Articles, Sections and Exhibits in this Agreement unless otherwise indicated.

All of the Exhibits attached to this Agreement [and the Credit Card Addendum] are incorporated herein by reference and made a part of this Agreement.

11.12    Confidentiality; Non-Solicitation.    GMACM agrees to keep all information pertaining to the Loans, including, without limitation, the identity of the Borrowers, confidential. GMACM further agrees not to solicit Borrowers directly for refinancing any of the Loans and not to use, or permit any other Person to use, the Borrower list for any purpose other than as expressly contemplated by this Agreement, including, without limitation, attempting to sell Borrowers any financial services or other products or services. The parties understand and agree that the prohibition against refinancing solicitations set forth above shall not be deemed to prohibit general advertising that is directed to the public at large and the prohibition shall only apply to communication directed exclusively at Borrowers whose Loans are being serviced subject to this Agreement. The provisions of this Section 11.12 shall survive any termination of this Agreement.

11.13    Force Majeure.    If circumstances beyond the control of a party shall temporarily make it impossible for it perform its duties under this Agreement, then the principles of force majeure will apply and the rights and obligations of that party will be temporarily suspended during the force majeure period to the extent that such performance is reasonably affected thereby.    If a party anticipates a delay or failure pursuant to this Section 11.13, that party, by written notice, shall inform the other party of the anticipated effect of such delay as soon as possible, and, in any event, shall give written notice within ten (10) days.    The written notice shall include the steps that the party is taking to alleviate the problem.

If an excusable delay or failure to perform by a party exceeds thirty (30) days, the other party shall have the right to terminate this Agreement without liability.

11.14    Accounting and Financial Reporting.    GMACM limits its reporting responsibility to accounting information as detailed in this Agreement.    GMACM will adhere to generally accepted accounting principles unless specifically directed otherwise by the Bank. GMACM shall not be held responsible or liable for any litigation, adverse financial impact, or changes in tax effects (or tax laws and regulations) arising from differences in accounting procedures as requested by the Bank.

11.15    Attorneys' Fees.    If any action of law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees from the other party.    Such fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose.    Such fees shall be in addition to any other relief that may be awarded.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE CORPORATION

By:
Name:  Barry Bier
Title:  Chief Operating Officer


GMAC BANK

By:
Name:  Jeff Johnson
Title:    President

## LIST OF EXHIBITS

**EXHIBIT A**          Monthly Servicing Fee Schedule

**EXHIBIT B**          Form of Expense Statement

**EXHIBIT C**          Summary of Management Reports

**EXHIBIT D**          GMAC Bank Servicing Guide

# EXHIBIT A

## Monthly Servicing Fee Schedule

The Greater of $15,000 per month Minimum Service Fee or the aggregate of the following Base Fees as applicable:

| Product | Base Fee |
|---|---|
| Home Equity Loans/Lines | $8.25 per loan |
| | |
| | |
| | |

| Additional Fees per Loan | Fee Rate |
|---|---|
| Default and Collections (charged on all loans in a defaulted status) 30+ days delinquent | $30.00 |
| Cost Evaluation | $75.00 |
| Bankruptcy Processing | $200.00 |
| Foreclosure Processing | $225.00 |
| Loss Mitigation Processing | $300.00 |
| Subordination Processing | $180.00 |
| Credit Line Increases | $100.00 |
| Lien Transfer | $1,000.00 |

| Pass Through / Conversion Fees | |
|---|---|
| Satisfaction Processing, Recording and/or Custodial fees | Pass Through |
| Default management fees include but are not limited to fees for property inspections, attorney work for foreclosure processing, breach letters, appraisals, credit reports, property preservation and other third party fees related to default management. | Pass Through |
| Implementation/Conversion Fees per portfolio not to exceed. | $50,000.00 |
| Travel, Lodging, Meal and Other Expenses related to Implementation/Conversion. | Pass Through |
| REO maintenance and service. | Pass Through |

| Ancillary Income | |
|---|---|
| None | |
| | |

**Monthly Servicing Fee Schedule - First Mortgage Product**

***CONFIDENTIAL***

## Bank Price List

| "A" Credit Loan Product | FNMA/FHLMC Base Service Fee | GNMA Base Service Fee | |
|---|---|---|---|
| Servicer Retention % of Late Chg/Ancillary/Float(P&I and Escrow) | 100% | 100% | |
| Fixed Rate Loans | 0.25% | 0.44% | |
| ARM Loans | 0.375% | 0.50% | |
| | | | |
| REO Processing/Marketing (and execution of REO agreement) | $300/mo/asset | $300/mo/asset | Minimum - $2000.00 |

## Additional Pricing Considerations:

Government servicing: Servicer bears all normal losses (2 mos interest, re-conveyance cost & non-reimbursable foreclosure costs).

All loan mitigation activities are reimbursed per FNMA guidelines.

Prices include standard investor reporting & default report package

Prices do not include any 'non-standard' reporting

Non-Standard reports will be priced upon request ( generally priced at $125.00/hr to create)

## EXHIBIT B

### Reimbursement of Expenses (Sample)

January
2001
**Expense Reimbusement Due from GMAC Bank**

| Date | Vendor # | Additional Description | Notes | Amount | Journal |
|---|---|---|---|---|---|
| **In Transit Item:** | | | | | |
| 11/14/00 | 0000609985 09031634 | | to be reclassed | 0.95 | 00111416320593PACTA1 |
| 1/22/01 | 0001043831 IN000006934 81400160464452001 | | Wrong Amount Pd.by A/P | 200.00 | 0112213342458PACTA1 |
| 11/30/00 | | | | 200.95 | |
| **January Detail:** | | | | | |
| 1/5/01 | 0000973564 6907668 | | id | 1.91 | 011519071245PACTA1 |
| 1/5/01 | 0000973564 7901225 | | id | 2.07 | 011519113881PACTA1 |
| 1/5/01 | 0000973564 6901611 | | id | 9.24 | 011519080843PACTA1 |
| 1/5/01 | 0000973564 6908694 | | id | 16.54 | 011519110768PACTA1 |
| 1/5/01 | 0000973564 6908694 | | id | 24.11 | 011519120716PACTA1 |
| 1/8/01 | 0000594623 8502 | | id | 46.50 | 011814174313PACTA1 |
| 1/5/01 | 0000981333 B864248 81200156737362001 | | id | 100.00 | 00121819053627PACTA1 |
| 1/25/01 | 0000981333 B821944 81200155948582001 | | | 150.00 | 0112508232065PACTA1 |
| 1/25/01 | 0000981333 B871227 | | | 150.00 | 0112508455802PACTA1 |
| 1/25/01 | 0000981333 B870269 81200149075072001 | | | 150.00 | 0112508541014PACTA3 |
| 1/31/01 | | | | 31,991.70 | |

| | | |
|---|---|---|
| **Total Due:** | 32,192.65 | |
| **GL Balance:** | 32,192.65 | **Balance as of 2/6** |
| | | - |

Submitted by:          Date:
Approved by:          Date:

DEFAULT

| Aging: | 1-30 Days | | 31-60 Days | | | 61-90 Days | |
|---|---|---|---|---|---|---|---|
| | # | $ | # | $ | | # | $ |
| All Items | 2 | 32,191.70 | 0 | | - | 1 | 0.95 |

| | Over 90 Days | | | Total | |
|---|---|---|---|---|---|
| | # | $ | | # | $ |
| | 0 | | - | 3 | 32,192.65 |

## EXHIBIT C

### Sample Summary of Management Reports

Managed Portfolio Information
- Portfolio volumes
- New Loans Added
- Utilization by Branch
- Credit Card Concertrations
- Credit Card Activity
- Portfolio by State
- Payments Processed by Day
- Payoffs by Month
- Satisfactions Outstanding
- Subordinations Summary
- Line Changes
- Phone Statistics
- Escalated Issues

Bank Reconciliation
- BCA Reconciliation
- Remittance Schedule

Default Information
- Delinquency by Month – All Branches
- Delinquency by Month Branch Detail
- Delinquency by Credit Score
- Vintage Delinquency Report
- Portfolio by Recovery Code
- Over Line Summary

## ADDENDUM TO SERVICING AGREEMENT

This Addendum dated as of July 1, 2004 (the "Addendum") is made to the Servicing Agreement dated as of August, 2001 (the "Agreement") by and between GMAC Mortgage Corporation ("GMACM" or "Servicer"), a Pennsylvania corporation with its principal office at 100 Witmer Road, Horsham, Pennsylvania 19044-0963 and GMAC Bank (the "Bank"), a federal savings bank with its principal office at 3710 Kennett Pike, Greenville, Delaware 19807.

### Explanatory Statement

1.      GMACM and the Bank have entered into the Agreement, whereby GMACM will service certain residential mortgage loans and lines of credits originated or acquired by the Bank.

2.      GMACM and the Bank wish to amend Exhibit A to the Agreement as it applies to Servicing Compensation payable to GMACM for its Servicing Activities.

3.      It is the intent of the Bank and GMACM that this Addendum comply with the requirements of Sections 23A and 23B of the Federal Reserve Act, the applicable provisions of the Home Owners Loan Act, and the implementing OTS regulations.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      The capitalized terms used herein, unless otherwise defined, shall have the meanings set forth in the Agreement.

2.      Section 11.12 of the Agreement is hereby amended and restated in its entirety as follows:

### 11.12. Confidentiality; Non-Solicitation.

(i)      Servicer shall maintain the confidentiality of the terms of this Agreement and of information relating to the Loans and the Borrowers, (including without limitation Confidential Information as that term is defined in Exhibit E hereto) using the same care and discretion to avoid disclosure of such information as it uses to protect its own information that it does not want disclosed. Notwithstanding the foregoing, Servicer further agrees that, with respect to Confidential Information, the requirements set forth in Exhibit E to the Agreement, Confidentiality, Non-Disclosure and Security Requirements, attached hereto and incorporated herewith, shall apply.

(ii)     Servicer further agrees to not solicit Borrowers directly for refinancing of any of the Loans held in the Bank's Mortgage Investment Portfolio. Notwithstanding anything to the contrary contained in this Agreement, the parties understand and agree that the prohibition against refinancing solicitations set forth above shall not be deemed to prohibit (A) general advertising that is directed to the public at large, (B) general solicitations of Servicer's servicing portfolio that are not targeted exclusively at the Borrowers or the Loans, or (C) incidental messages relating to refinance opportunities that are transmitted via Servicer's voice response systems or monthly account statements. The provisions of this Section 11.12 shall survive any termination of this Agreement.

3.      Exhibit A to the Agreement is hereby amended and replaced in its entirety by the Servicing Fee Schedule attached as Exhibit A hereto.

4.    The Agreement is hereby amended and supplemented by the addition of Exhibit E hereto.

5.    Any conflict between the provisions of this Addendum and those of the Agreement shall be resolved in favor of the provisions of this Addendum. Except as expressly set forth in this Addendum, no modification of the Agreement is made or intended to be made by this Addendum, and the Agreement, as amended by this Addendum, is confirmed and reaffirmed by GMACM and the Bank and shall be and remain in full force and effect.

IN WITNESS WHEREOF, each of the undersigned parties to this Addendum has caused this Addendum to be duly executed in its corporate name by one of its duly authorized officers, all as of the date first above written.

ATTEST:

GMAC MORTGAGE CORPORATION

By: _____

Kenneth R. Perkins

Its:    Senior Vice President

ATTEST:

GMAC BANK

By: _____

Brian P. Kuelbs

Its:    Executive Vice President and
Chief Financial Officer

## Exhibit A

### Servicing Fee Schedule

Pricing          GMACB has chosen not to use the Private Label service offered by NLA, consequently the following
                 prices are for servicing with GMACM branding. GMACB will be charged on a pass-thru basis for certain
                 Firsts and on a sub-servicing invoice basis for certain Firsts, HELs and HELOCs

Sub-servicing Program Set-up          No Charge
Charge

**Set Up Fee Per
Loan/Line**
From GMACM          No Charge
From Other Parties          Actual out-of-pocket expenses passed through to GMACB plus reasonable GMACM personnel
                            costs on a case-by-case basis.

**Borrower Web Access**          No Charge

**Service Fee Per Loan/Line**          Monthly service fee per product

1) For first mortgage loans funded prior to July 1, 2004, classified as HFI and serviced under Investor # 50230
   Block # 10003, and for first mortgages classified as HFS; there is no change from the practice of passing
   through net interest after deducting the applicable servicing fee (25.0 or 37.5 basis points per annum depending
   on the loan type) on the outstanding unpaid principal balance.

2) For HEL – 16.18 basis points and HELOC – 23.43 basis points based on the daily average outstanding balance
   for the month, to be invoiced monthly effective July 1, 2004.

3) For first mortgage loans funded subsequent to June 30, 2004, classified as HFI and serviced under newly
   established blocks (These will be communicated with the effective date announcement): 1.62 basis points per
   annum on the daily average outstanding balance for the month, to be invoiced monthly effective when
   announced on a date to be determined.

Daily average outstanding balances will be obtained from the servicing system for the affected investor/blocks.
GMACM NLA will prepare the invoice and forward to GMAC Bank Accounting for approval by noon on the second
business day of each month for information regarding the prior month.

| Firsts (new) | HEL | HELOC |
|---|---|---|
| | | |
| 1.62 bps/annum | 16.18 bps/annum | 23.43 bps/annum |

**Ancillary Income**

| | |
|---|---|
| Line Fees and Late Charges | For account of GMACB |
| Principal and Interest Float | For account of GMACB (P&I receipts are passed to GMACB on an actual basis as received) |
| Escrow and Interest Float | For account of GMACM (T&I value is given to GMACM) |
| Servicing Activity Fees | For account of GMACM (e.g. payoff statements, fax fees) if paid by the Borrower. |
| **Optional Products** | Revenue of non-banking products retained by GMACM |
| **Customer Prepayment Fees** | For account of GMACB |
| **De-Boarding Fee Per Loan for HIF assets sold to a third party** | Actual out-of-pocket expenses passed through to GMACB plus reasonable GMACM personnel costs |

## Exhibit E

## Confidentiality, Non-Disclosure and Security Requirements

The Gramm-Leach-Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1138), as amended from time to time (the "GLB Act") and the regulations promulgated thereunder impose certain obligations on financial institutions with respect to the confidentiality and security of the customer data of such financial institutions. This Exhibit E to the Servicing Agreement sets forth the Confidentiality, Non-Disclosure and Security requirements for confidential information related to customers, including without limitation any "nonpublic personal information" as defined under the GLB Act and regulations promulgated thereunder.

1.    **Confidential Information.**

For the purposes of this Agreement, "Confidential Information" shall mean all information related to customers, including without limitation any "nonpublic personal information" as defined under the GLB Act and regulations promulgated thereunder in oral, demonstrative, written, graphic or machine-readable form, whether or not owned or developed by the Bank.

2.    **Disclosure and Protection of Confidential Information.**

(a)    The Bank warrants that its disclosure of Confidential Information to GMACM is in accordance with applicable state and federal laws and the Bank's own privacy policy.

(b)    Servicer agrees not to use Confidential Information for any purpose other than the fulfillment of Servicer's obligations to the Bank. Servicer shall not disclose, publish, release, transfer or otherwise make available Confidential Information in any form to, or for the use or benefit of, any third party without Bank's prior written consent. Servicer shall, however, be permitted to disclose relevant aspects of the Confidential Information to its employees, agents and subcontractors to the extent that such disclosure is reasonably necessary for the performance of its functions and/or contractual duties and provided that such disclosure is not prohibited by the GLB Act, and the regulations promulgated thereunder or other applicable law. Servicer agrees that it will not use non-public personal information about Bank's customers in any manner prohibited by the Gramm-Leach-Bliley Act. Servicer agrees that it shall remain fully responsible for any disclosure as set forth in the preceding sentence. Servicer further agrees to advise Bank promptly in writing of any misappropriation, or unauthorized disclosure or use of Confidential Information which may come to the attention of Servicer, and to take all steps reasonably requested by Bank to limit, stop or otherwise remedy such misappropriation, or unauthorized disclosure or use. If the GLB Act or other applicable law now or hereafter in effect imposes a higher standard of confidentiality and/or protection to the Confidential Information, then such standard shall take precedence over the provisions of this Section.

(c)    Servicer will make no more copies of the Confidential Information than is necessary for Servicer's use. All copies made, in any medium whatsoever, shall be covered by the terms and conditions of this Agreement.

(d)    Each party shall develop, implement and maintain a comprehensive information security program (the "Security Program") to protect Confidential Information that includes administrative, technical and/or physical safeguards appropriate to such party's size and complexity and the nature and scope of its activities in compliance with the GLB Act and regulations promulgated thereunder. The objective of each such Security Program shall be to insure the security and confidentiality of Confidential Information, protect against any anticipated threats or hazards to the security or integrity of Confidential Information that could result in substantial harm or inconvenience to any customer.

(e)    Servicer will ensure that any third party to whom it transfers Confidential Information enters into an agreement to protect the confidentiality and security of Confidential Information in a manner no less stringent than required by this Agreement.

(f)    Upon request, a party shall provide to the other party information such as audits or summaries of test results demonstrating the effectiveness of its Security Program.

(g)    <u>California Personal Information Statute</u>.    Servicer acknowledges that Bank Confidential Information may include personal information pertaining to California residents.  Servicer shall ensure that its system and/or the networks comply with the requirements of California Civil Code §1798.82 et. seq.; or any similar federal or state statute that may enacted (the "California Statute"), including the encryption of all personally-identifiable Bank Confidential Information.  If Servicer believes that personally-identifiable Bank Confidential Information has been accessed without proper authorization, or there has been an unsuccessful attempt to access such Confidential Information, Servicer shall provide written notice to Bank within twenty-four (24) hours.  If Bank determines that actions must be taken to comply with the California Statute, Servicer shall fully cooperate with Bank to achieve such compliance.  Nothing contained herein shall be deemed to release Servicer from its indemnification obligations as set forth in the Agreement.

3.    **Return of Materials.**

(a)    All Confidential Information, including copies thereof, shall be promptly returned to Bank upon request, except that copies may be retained, if required, for legal or financial compliance purposes.

(b)    Upon termination or expiration of the business relationship and/or Agreement, all Confidential Information, including copies thereof, shall be promptly returned to such party or destroyed, except that copies may be retained, if required, for legal or financial compliance purposes.

## SECOND ADDENDUM TO SERVICING AGREEMENT

This Second Addendum dated as of April 1, 2005 (the "Addendum") is made to the Servicing Agreement dated as of August 21, 2001 and amended as of July 1, 2004 (the "Agreement") by and between GMAC Mortgage Corporation ("GMACM" or "Servicer"), a Pennsylvania corporation with its principal office at 100 Witmer Road, Horsham, Pennsylvania 19044-0963 and GMAC Bank (the "Bank"), a federal savings bank with its principal office at 3710 Kennett Pike, Greenville, Delaware 19807.

### Explanatory Statement

1.    GMACM and the Bank have entered into the Agreement, whereby GMACM will service certain residential mortgage loans and lines of credits originated or acquired by the Bank.

2.    GMACM and the Bank wish to amend Exhibit A to the Agreement as it applies to Servicing Compensation payable to GMACM for its Servicing Activities with respect to loans held for investment.

3.    It is the intent of the Bank and GMACM that this Addendum comply with the requirements of Sections 23A and 23B of the Federal Reserve Act, the applicable provisions of the Home Owners Loan Act, and the implementing OTS regulations.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    The capitalized terms used herein, unless otherwise defined, shall have the meanings set forth in the Agreement.

2.    Exhibit A to the Agreement is hereby amended and replaced in its entirety by the Servicing Fee Schedule for Held for Investment Loans attached as Exhibit A hereto.

3.    Any conflict between the provisions of this Addendum and those of the Agreement shall be resolved in favor of the provisions of this Addendum. Except as expressly set forth in this Addendum, no modification of the Agreement is made or intended to be made by this Addendum, and the Agreement, as amended by this Addendum, is confirmed and reaffirmed by GMACM and the Bank and shall be and remain in full force and effect.

IN WITNESS WHEREOF, each of the undersigned parties to this Addendum has caused
this Addendum to be duly executed in its corporate name by one of its duly authorized officers, all
as of the date first above written.

ATTEST:                                          GMAC MORTGAGE CORPORATION

_____                          By: _____
                                                     William Maguire
                                                 Its: Senior Vice President

ATTEST:                                          GMAC BANK

                                                 By: _____
                                                     Peter A. Simon
                                                 Its: Senior Vice President

---

1. As defined in the GMACM service level template attached hereto.

## Exhibit A

### Servicing Fee Schedule for Held for Investment (HFI) Loans

**Pricing**    GMACB has chosen not to use the Private Label service offered by NLA, and consequently, the following prices are for servicing with GMACM branding. GMACB will be charged on a pass-thru basis for certain Firsts and on a sub-servicing invoice basis for certain HFI Firsts, HELs and HELOCs

**Sub-servicing Program Set-up Charge**    No Charge

**Set Up Fee Per Loan/Line**

From GMACM    No Charge

From Other Parties    Actual out-of-pocket expenses passed through to GMACB plus reasonable GMACM personnel costs on a case-by-case basis.

**Borrower Web Access**    No Charge

**Service Fee Per Loan/Line**    Monthly service fee per product

1) For first mortgage loans funded prior to July 1, 2004, classified as HFI and serviced under Investor # 50230 Block # 10003, and for first mortgages classified as HFS; there is no change from the practice of passing through net interest after deducting the applicable servicing fee (25.0 or 37.5 basis points per annum depending on the loan type) on the outstanding unpaid principal balance.

2) For HEL – 16.18 basis points and HELOC – 23.43 basis points based on the daily average outstanding balance for the month, to be invoiced monthly effective July 1, 2004. All HEL and HELOC loans will be serviced using the "consumer/HELOC" service level process.[1]

3) For first mortgage "Prime" loans funded subsequent to June 30, 2004, classified as HFI and serviced under newly established blocks (These will be communicated with the effective date announcement): 1.62 basis points per annum on the daily average outstanding balance for the month, to be invoiced monthly effective when announced on a date to be determined. All "Prime" loans will be serviced using the "Prime/Base" service level process.[1]

4) For first mortgage "Alt-A" loans funded subsequent to March 1, 2005, classified as HFI and serviced under newly established blocks (these will be communicated with the effective date of the announcement): 2.00 basis points per annum on the daily average outstanding balance for the month, to be invoiced monthly effective when announced on a date to be determined. All "Alt-A" loans will be serviced using the "Alt-A/Enhanced" service level process.[1]

Daily average outstanding balances will be obtained from the servicing system for the affected investor/blocks. GMACM NLA will prepare the invoice and forward to GMAC Bank Accounting for approval by noon on the second business day of each month for information regarding the prior month.

| Firsts (Prime) | Firsts (Alt-A) | HEL | HELOC |
|---|---|---|---|
| | | | |
| 1.62 bps/annum | 2.00 bps/annum | 16.18 bps/annum | 23.43 bps/annum |

**Ancillary Income**

Line Fees and Late Charges    For account of GMACB

Principal and Interest Float    For account of GMACB (P&I receipts are passed to GMACB on an actual basis as received)

Escrow and Interest Float    For account of GMACM (T&I value is given to GMACM)

1. As defined in the GMACM service level template attached hereto.

| | |
|---|---|
| Servicing Activity Fees | For account of GMACM (e.g. payoff statements, fax fees) if paid by the Borrower. |
| **Optional Products** | Revenue of non-banking products retained by GMACM |
| **Customer Prepayment Fees** | For account of GMACB |
| **De-Boarding Fee Per Loan for HFI assets sold to a third party** | Actual out-of-pocket expenses passed through to GMACB plus reasonable GMACM personnel costs |

**Service Level Template For HFI Loans**

| # | Service Level Name | Specific Measure Definition | Prime Borr Commitment | Alt-A Enhanced Commitment | Sub Prime Commitment | Consumer/HELOC Commitment | Sp Serv/Aggressive Commitment | Comments |
|---|---|---|---|---|---|---|---|---|
| 1 | Boarding Default Data | Data Entry | Data loaded within x days of data delivery, available. % made within # of days | 100% in 7 business days | 100% in 7 business days | 100% within 10 days (post boarding) | Not Applicable | 100% within 7 business days |
| 2 | Collections | Welcome Call | | Not Applicable | Not Applicable | Day 5 | Day 2 | 100% within 10 days upon receipt of data |
| 3 | Collections | Outbound Call Starts | First delinquency day for contact | Per Freddie Mac Early Indicator Score, Day 17 | Per Freddie Mac Early Indicator Score, Day 8 | Day 5 | Day 2 | Day 2 | If scoring model driven |
| 4 | Collections | Outbound Call Attempts | # of attempts in 30 day delinquency cycle | 4 attempts, 30 days | 4 attempts, 30 days | 4 attempts, 30 days | 10 attempts, 20 days | Daily | Prime, Alt-A, sub-prime are EI driven, Consumer are HELOC driven |
| 6 | Collections | Outbound Penetration Rate | % of loans with attempted contact from eligible date | 95% within 30 days of eligibility date | 95% within 30 days of eligibility date | 95% within 5 days of eligibility date | 95% within 5 days of eligibility date | 95% daily | score, campaigns can start between day 2 and day 31 |
| 7 | Collections | Failed Promise of Payment Reconnect Date | # of days between fail date and reconnect attempt date | not to exceed 10 days | not to exceed 10 days | Daily | Daily | Daily | Promises to pay and repayment plans |
| 8 | Correspondence | Late Charge Notices Sent | % notified of late charge assessed per month | 95% per month | 95% per month | 95% per month | | 95% per month |
| 9 | Correspondence | Intent to Foreclose / Breach Letter | % notified by x day of delinquency | 95% by 63rd day of delinquency | 95% by 32nd day of delinquency | 95% by 32nd day of delinquency | 95% by 63rd day of delinquency | 95% by 32nd day of delinquency |
| 10 | Correspondence | Breach Letter Expiration Notice | % sent by x day of delinquency | 95% by 95th day of delinquency | 95% by 95th day of delinquency | 95% sent 30 days after breach expiration | Not Applicable | 95% sent 30 days after breach expiration |
| 11 | Property Inspection | Initial Inspection | % completed by x day of delinquency | 95% by 45th day of delinquency | 95% by 45th day of delinquency | 95% by 45th day of delinquency | | 95% by 45th day of delinquency |
| 12 | Property Inspections | Subsequent Inspections | % completed monthly until resolution | Per FNMA Guides | Per FNMA Guides | | | 95% per month |
| 13 | Property Valuations | Initial BPO ordered | % ordered by x day of delinquency | 95% by 65th day of delinquency | 95% by 65th day of delinquency | 95% by 65th day of delinquency | | 95% by 65th day of delinquency |
| 14 | Property Valuations | Subsequent BPOs | % ordered every 6 months | 95% once every 6 months | 95% once every 6 months | | | 95% once every 6 months |
| 15 | Foreclosure | Referral to Attorney | % completed within x days of breach expiration | 95% within 15 days | 95% within 15 days | 95% within 15 days | | 95% within 15 days |
| 16 | Foreclosure | Timeline Guidelines | % completed within Freddie Mac or Investor guidelines | 90% | 90% | 90% | | 90% |
| 17 | Foreclosure | Title Delay Resolution | % of delays resolved within x days unless documentation for delay written | 95% in 60 days | 95% in 60 days | 95% in 60 days | | 95% in 60 days |
| 18 | Foreclosure | Assignment Delays Resolution | % of delays resolved within x days unless documentation for delay written | 95% in 60 days | 95% in 60 days | 95% in 60 days | | 95% in 60 days |
| 19 | Bankruptcy | Loading new Bankruptcies | % loaded within x days of detection | 95% in 2 business days | 95% in 2 business days | 95% in 2 business days | | 95% in 2 business days |
| 20 | Bankruptcy | Proof of Claim Referral | % referred to attorney | 95% referred in 15 business days of detection | 95% referred in 15 business days of detection | 95% referred in 15 business days of detection | | 95% referred in 15 business days of detection |
| 21 | Bankruptcy | Chapter 7 Motion for Relief | % referred to attorney | 95% referred in 15 business days of assignment to bankruptcy processor | 95% referred in 15 business days of assignment to bankruptcy processor | 95% referred in 15 business days of assignment to bankruptcy processor | | 95% referred in 15 business days of assignment to bankruptcy processor |
| 22 | Bankruptcy | Chapter 13 Motion for Relief | % referred to attorney | 95% at earliest date, not to exceed 90 days past post petition due date | 95% at earliest date, not to exceed 90 days past post petition due date | 95% at earliest date, not to exceed 90 days past post petition due date | | 95% at earliest date, not to exceed 90 days past post petition due date |
| 23 | Bankruptcy | Referral for Next Appropriate Action (Foreclosure, Collection, Loss Mitigation) | % referred for next action | 95% in 3 business days | 95% in 3 business days | 95% in 3 business days | | 95% in 3 business days |
| 24 | Bankruptcy | Receipt of Chapter 13 Proposed Plans | % reviewed/objected to by confirmation date | 95% | 95% | 95% | | 95% |
| 25 | Loss Mitigation | Solicitation Attempts | # of solicitation attempts per month, commencing X | 2 calling attempts per month after foreclosure referral, solicitation card mailed at Day-60 | 2 calling attempts per month after foreclosure referral, solicitation card mailed at Day-60 | 2 calling attempts per month after foreclosure referral, solicitation card mailed at Day-60 | 2 calling attempts per month after Day-120 | 2 calling attempts per month after foreclosure referral, solicitation card mailed at Day-60 |
| 26 | Loss Mitigation | Follow-up Packages Sent | % called within a business days | 95% within 15 business days | 95% within 10 business days | 95% within 10 business days | 95% within 10 business days | 95% within 10 business days |
| 27 | Loss Mitigation | Follow-up on Repayment Plans | % follow-ed up x days prior to plan due date | 95% within 10 days of plan due date | 95% within 10 days of plan due date | 95% within 10 days of plan due date | 95% within 10 days of plan due date | 95% within 10 days of plan due date |
| 28 | Loss Mitigation | Equity Evaluation | # of completed evaluations by Day 120 | Not Applicable | Not Applicable | 90% by the 120th day of default | 90% by the 120th day of default | 90% by the 120th day of default |
| 29 | REO | Marketing, Available for Sale to List | | 30 days/95% rolling average | 30 days/95% rolling average | | | 20 days/95% rolling average |
| 30 | REO | Marketing- List Date to Sale | | 120 days/95% rolling average | 120 days/95% rolling average | | | 120 days/95% rolling average |
| 31 | REO | Marketing- Executed contract to close date | % within x days of disposition | 45 days/95% rolling average | 45 days/95% rolling average | | | 45 days/95% rolling average |
| 32 | REO | Cash Proceeds- Sales Price to Market Value | | 97% average | 97% average | | | 97% average |
| 33 | REO | Loss Closing Costs and Concessions to Market Value | | 87% average | 87% average | | | 87% average |
| 34 | Post Sale | Claim to Insurer | % within x days of disposition | 95% within 30 days | 95% within 30 days | | | 95% within 30 days |
| 35 | Post Sale | Claim to Investor | % within x days of disposition | 95% within 30 days | 95% within 30 days | | | 95% within 30 days |
| 36 | Post Sale | Liquidation Reports | % within x days of disposition | 95% within 5 days | 95% within 5 days | | | 95% within 5 days |
| 37 | Cash Posting | Posting of Funds (Forbearance and Bankruptcy plans) | % within x business days | 95% in 2 business days | 95% in 2 business days | | | 95% in 2 business days |
| 38 | Lien Release and Subordinations | Subordinations | % completed in a business days | 95% within 15 business days | 95% within 15 business days | | | 95% within 15 business days |

## THIRD ADDENDUM TO SERVICING AGREEMENT

This Third Addendum dated and effective as of June 1, 2007 (the "Addendum") is made to the Servicing Agreement dated as August 21, 2001 and amended as of July 1, 2004 and April 1, 2005 (the "Agreement") by and between GMAC Mortgage, LLC (the "Affiliate"), a Delaware limited liability company [formerly known as GMAC Mortgage Corporation,] and GMAC Bank (the "Bank" or "GMACB"), a Utah industrial bank.

### Explanatory Statement

1.      The Agreement was assumed by the Bank pursuant to the terms and conditions of the Purchase and Assumption Agreement dated as of November 20, 2006.

2.      The Affiliate and the Bank wish to amend the Agreement to provide additional terms and conditions governing the Affiliate's performance of Servicing on behalf of the Bank.

3.      It is the intent of the Bank and the Affiliate that this Addendum comply with the requirements of Sections 23A and 23B of the Federal Reserve Act and the Federal Reserve Board's Regulation W.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      The capitalized terms used herein, unless otherwise defined, shall have the meanings set forth in the Agreement.

2.      Article 1 of the Agreement is hereby amended to include the following definitions:

**Applicable Requirements**. Applicable Requirements means (a) all federal, state and local legal and regulatory requirements (including statutes, rules, regulations and ordinances) applicable to the Bank, (b) all other requirements and guidelines of FDIC, the Utah Department of Financial Institutions, and any other governmental body or officer having jurisdiction over the Bank, (c) all judicial and administrative judgments, orders, stipulations, awards, writs, and injunctions applicable to the Bank, (d) the Bank's Affiliate Transaction Policy, as it may be amended from time to time.

3.      Article 5 of the Agreement is hereby amended to include Section 5.2 as follows:

5.2      **Information and Reports; Cooperation in Audits, Reviews and Inspections**. The Affiliate shall prepare and deliver to the Bank, regularly and on a timely basis, such information and reports as the Bank shall reasonably request or require from time to time regarding any and all aspects of the Services. The Affiliate shall cooperate with the Bank and its accountants, auditors, fidelity and deposit insurance underwriters, and federal and state regulators and other similar parties in conducting such audits, reviews and inspections of the Services as the Bank and such parties shall reasonably require from time to time. Such cooperation shall include providing access upon reasonable notice to books, records, management, and physical locations of the Affiliate that pertain to the implementation of this Agreement.

4.      Article 11 of the Agreement is hereby amended and supplemented by the insertion of the following Section 11.3a:

11.3a   **Incorporation of Exhibits;** Exhibits attached hereto shall be incorporated herein and shall be understood to be a part hereof as though included in the body of this Agreement.

5.      Exhibit E to the Agreement is hereby deleted.

6.      Any conflict between the provisions of this Addendum and those of the Agreement shall be resolved in favor of the provisions of this Addendum. Except as expressly set forth in this Addendum, no modification of the Agreement is made or intended to be made by this Addendum, and the Agreement, as amended by this Addendum, is confirmed and reaffirmed by the Affiliate and the Bank and shall be and remain in full force and effect.

IN WITNESS WHEREOF, each of the undersigned parties to this Addendum has caused this Addendum to be duly executed in its name by one of its duly authorized officers or members, all as of the date first above written.

ATTEST:

_____

GMAC Mortgage, LLC

By: _____

Its: CFO

ATTEST:

_____

GMAC BANK

By: _____
Robert E. Groody
Its: Chief Mortgage Accountant

2

## FOURTH ADDENDUM TO SERVICING AGREEMENT

This Fourth Addendum dated and effective as of September 1, 2007 (the "Addendum") is made to the Servicing Agreement dated as August 21, 2001 and amended as of July 1, 2004 and April 1, 2005 (the "Agreement") by and between GMAC Mortgage, LLC (the "Affiliate"), a Delaware limited liability company [formerly known as GMAC Mortgage Corporation,] and GMAC Bank (the "Bank" or "GMACB"), a Utah industrial bank.

### Explanatory Statement

1.    The Agreement was assumed by the Bank pursuant to the terms and conditions of the Purchase and Assumption Agreement dated as of November 20, 2006.

2.    The Affiliate and the Bank wish to amend the Agreement to provide additional terms and conditions governing the Affiliate's performance of Servicing on behalf of the Bank.

3.    It is the intent of the Bank and the Affiliate that this Addendum comply with the requirements of Sections 23A and 23B of the Federal Reserve Act and the Federal Reserve Board's Regulation W.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    Exhibit A-1 is added to the Agreement.

2.    Any conflict between the provisions of this Addendum and those of the Agreement shall be resolved in favor of the provisions of this Addendum. Except as expressly set forth in this Addendum, no modification of the Agreement is made or intended to be made by this Addendum, and the Agreement, as amended by this Addendum, is confirmed and reaffirmed by the Affiliate and the Bank and shall be and remain in full force and effect.

IN WITNESS WHEREOF, each of the undersigned parties to this Addendum has caused this Addendum to be duly executed in its name by one of its duly authorized officers or members, all as of the date first above written.

ATTEST:

_____

ATTEST:

_____

GMAC Mortgage, LLC

By: _____
    James Young
Its: Chief Financial Officer

GMAC BANK

By: _____
    Robert Groody
Its: Chief Mortgage Accountant

## Exhibit A-1

### Servicing Fee Schedule – Mortgage Servicing Rights

**Pricing**

The following pricing will apply to servicing of loans for which GMAC Bank ("Bank") owns the related
mortgage servicing rights ("MSRs")

**Service fee per loan**          $46 per annum payable monthly per loan serviced [1]

**MSR program set up charge**          No charge

**Set up fee per loan**          No charge

**Ancillary income**

| | |
|---|---|
| Late charge income | For account of Bank |
| Float income (P&I, T&I) | For account of Bank |
| Optional products | For account of Bank |
| Servicing activity fees | For account of Bank |
| Customer prepayment fees | For account of Bank |

[1] $46 per annum will adjust quarterly based on GMACM actual cost to service



# SUBSERVICING

| Approval Matrix | | | | | |
|---|---|---|---|---|---|
| **Loss Mitigation** | | | | | |
| **Item** | **Product** | **Parameter for GMAC Delegated Approval** | **Parameter for Client Approval Required** | **Documentation Required for Client Approval** | **Client Contact for Approval** |
| Repayment Plans | First Second | Repays up to 18 months with a minimum of 1 contractual payment down. | Repays for 19-24 months duration **or** repays with less than 1 contractual payment down. | Asset Plan (which includes all loan details, current value, reason for default & our recommendation) | |
| Modifications | All | Any modification which does not reduce the interest rate more than 2% or extend the maturity beyond 480 months or where capitalization of delinquent interest, escrow, and/or servicing advances does not exceed $20,000.00 over the original unpaid principal balance, and the modified UPB does not exceed 115% of original value.  Borrower's verbal financial information acceptable for modifications. HELOC will be converted to a closed end second mortgage. | Any modification that is outside delegated approval. | Asset Plan | |

GMAC Mortgage Subservicing                                                                    Approval Matrix

| Short Sales | First | Approval to accept sales price at 88% of interior value or MI requirement | Approval required on 87% or less of interior value. | Asset Plan | |
|---|---|---|---|---|---|
| Short Sales | Second Liens | Approval to accept the greater of proceeds from sale at 88% of interior value or $3,000.00 | Approval required on sales price less than 87% if proceeds are less than $3,000.00 | Asset Plan | |
| Note Sales (Individual or Bulk) | First | Approval to accept down to 90% of Estimated Recovery Value (ERV) after REO on an individual note or on an aggregate basis in a bulk sale. ERV is defined as the most recent valuation of the property (must be less than 6 months old) less all amounts due for senior items (liens, taxes, HOA's or other encumbrances) less anticipated costs of recovery (foreclosure fees and costs, REO disposition, etc) | Approval required to accept < 90% of Estimated Recovery Value (ERV) after REO on an individual or aggregate basis. | Asset Plan | |
| Deed in Lieu | First | N/A | Client to approve all Deeds in Lieu. | Asset Plan | |
| Charge off | All | GMAC to follow standard methodology | N/A | N/A | N/A |
| Stop P&I Advances when remittance is scheduled | All | GMAC to follow standard methodology | N/A | N/A | N/A |
| Trial Modifications | First | 3-6 month repayment plan with 1 contractual payment down to be converted to a | Any trial outside delegated authority. | Asset Plan | |

GMAC Mortgage Subservicing                                                                                    Approval Matrix

| | | permanent modification at end of trial period.  No financials or contact with the borrower required. | | | |
|---|---|---|---|---|---|
| **Foreclosure and Bankruptcy** | | | | | |
| **Item** | **Product** | ***Parameter for GMAC Delegated Approval*** | ***Parameter for Client Approval Required*** | ***Documentation Required for Client Approval*** | ***Client Contact for Approval*** |
| Bidding Instructions | First | Bidding is determined by the lesser of the total debt versus value banding (BPO value of property multiplied by the percent of BPO value).  BPO Value ranges are:<br>$0 – $20,000        65%<br>$20,001 – $35,500      70%<br>$35,501 – $50,000      75%<br>$50,001 – $75,000      80%<br>$75,001 – $200,000    85%<br>$200,000 and over      90% | Any foreclosure bids outside delegated authority | • Total Debt<br>• BPO Value<br>• Recommendation | |
| Bidding Instructions (Senior Lien Buyout) | Second HELOC | If combined total debt of the first & second liens is less than percentage of the BPO value in the Loan Equity (HEAT) table (less carrying costs), bid total debt of the 2nd lien only.  If total debt of both exceeds, bid up to the adjusted BPO amount after the HEAT table is applied to the value (less carrying costs) and deduct the senior lien total debt. | Any foreclosure bids outside delegated authority | • Total Debt<br>• BPO Value<br>• Recommendation | |

GMAC Mortgage Subservicing                                                                                      Approval Matrix

| Bidding Instructions (Junior lien buyout) | Second or HELOC at a senior mortgage sale | If combined total debt of the first & second liens is less than percentage of the BPO value in the Loan Equity (HEAT) table (less carrying costs), bid up to the combined total debt of both liens if the recovery amount is greater than the applicable branch code. If total debt of both exceeds, bid up to the adjusted BPO amount after the HEAT table is applied to the value (less carrying costs) | Any foreclosure bids outside delegated authority | • Total Debt<br>• BPO Value<br>• Recommendation | |
| Cure or Payoff of senior mortgage lien | Second HELOC | N/A | Client to approve. | • Bid/cost Evaluation Form<br>• BPO Value<br>• Recommendation | |
| Additional Fee Requests | All | GMACM will approve over allowable for 8 hours @ $175 per hour. Client to approve any additional amount(s). GMACM will email Client contact with amount and reason. | YES - if over 8 hours @ 175 per hour. Response is requested within 48 hours of request. | Attorney Summary of Fees | |

| **REO** | | | | | |
|---|---|---|---|---|---|
| **Item** | **Product** | **Parameter for GMAC Delegated Approval** | **Parameter for Client Approval Required** | **Documentation Required for Client Approval** | **Client Contact for Approval** |
| Marketing Strategy | All | GMAC will list at a minimum of 105% of reconciled REO Fair Market Value (FMV). FMV is defined as the | N/A | | |

GMAC Mortgage Subservicing

Approval Matrix

| | | anticipated sale price based on review and reconciliation of BPO and appraisal reports. It is a benchmark for the REO asset management staff in setting list prices and negotiating offers. | | | |
|---|---|---|---|---|---|
| Negotiation of Offers | All | GMAC will review offer on a case by case basis (market data, listing history, net sale amount, etc.) to determine counter offer or acceptance. | N/A | | |
| Cash for Keys | All | GMAC determines Cash for Keys amount on a case by case basis. | N/A | | |
| Price Reductions | All | GMAC may review and reduce list prices every 14 to 30 days. | N/A | | |
| Initial Repairs | All | GMAC may make all initial repairs at their discretion | N/A | N/A | N/A |
| Accepted Offer Renegotiations | All | GMAC may make offer amendments after contract execution on a case by case basis | N/A | N/A | N/A |
| Emergency Repairs | All | GMAC may make all necessary emergency repairs at their discretion | | | |
| **RECOVERY** | | | | | |
| **Item** | **Product** | ***Parameter for GMAC Delegated Approval*** | ***Parameter for Client Approval Required*** | ***Documentation Required for Client Approval*** | ***Client Contact for Approval*** |
| Settlements | All | GMACM determines recoverability on a case by | N/A | N/A | |

GMAC Mortgage Subservicing                                                                    Approval Matrix

| | | case basis. | | | |
|---|---|---|---|---|---|
| Liquidations/ Write off's | All | GMACM determines recoverability on a case by case basis. | N/A | N/A | |
| Note Sales | All | GMACM determines recoverability on a case by case basis. | N/A | N/A | |
| Short Sales | All | GMACM determines recoverability on a case by case basis. | N/A | N/A | |

| **PROPERTY PRESERVATION** | | | | | |
|---|---|---|---|---|---|
| **Item** | **Product** | **Parameter for GMAC Delegated Approval** | **Parameter for Client Approval Required** | **Documentation Required for Client Approval** | **Client Contact for Approval** |
| Maintenance or Repairs | All | GMACM determines action needed on a case by case basis up to $5000 in costs. | Investor approval requested if over $5000 | • Current UPB<br>• Date/Amt of BPO<br>• Total amount spent on repairs to date | |
| Winterization or Required Emergency Repairs | All | GMACM determines action needed on a case by case basis. | N/A | N/A | |
| Loss Drafts/Hazard Claims | All | GMACM determines on a case by case basis, using FNMA guidelines. | N/A | N/A | |

| **OTHER** | | | | | |
|---|---|---|---|---|---|
| **Item** | **Product** | **Parameter for GMAC Delegated Approval** | **Parameter for Client Approval Required** | **Documentation Required for Client Approval** | **Client Contact for Approval** |

GMAC Mortgage Subservicing                                                                      Approval Matrix

| Subordinations | Second HELOC | Customer current for past 12 months, no intervening liens, current LTV (CLTV) doesn't change or decreases from the initial CLTV, and does not put customer into alternative pricing threshold. | Customer is not current for past 12 months or intervening liens, or current LTV (CLTV) increases, or CLTV puts customer into alternative pricing threshold. | Subordination Worksheet | |
|---|---|---|---|---|---|
| Line Increases | HELOC | N/A | Client to approve all line increase requests. | Completed line increase package. | |
| Escrow Waivers – Primary & Secondary Homes | First | Original LTV > 80%. Current LTV must be 80% or less and 0 payments 30 days or more late for 24 prior months. Original LTV < 80% - 0 payments 30 days or more late for 24 prior months. | N/A | N/A | |
| Escrow Waivers – Investment Properties | First | Original LTV > 70% - Current LTV less than 70% and 0 payments 30 days or more late for prior 24 months. Original LTV < 70% - 0 payments 30 days or more late for prior 24 months | N/A | N/A | |
| Assumptions | First | Assumptions can be considered if the loan documents allow for it or when a transfer is protected under federal regulation. Buyer must qualify for the loan using Fannie Mae Desktop Underwriter and final approval is given by a delegated GMACM underwriter. | N/A | N/A | |
| Assumptions | Second, | Not assumable | N/A | N/A | |

GMAC Mortgage Subservicing                                                                 Approval Matrix

| | HELOC | | | | |
|---|---|---|---|---|---|
| Partial Releases | All | Follow Fannie Mae Servicing guide | N/A | N/A | |

**NOTES:**

- Client must respond within two business days of request for approval.  No response will be taken as approval.

- Some calculations may be updated from time to time to keep in alignment with current business practices or economic conditions.

- Loan Equity (HEAT) Tables contain market level summary of proceeds received from REO sale after closing costs and broker expenses are deducted.  The net execution percentage is established from the last twelve month REO portfolio history within a state and property value band. (GMACM proprietary data based on historical trends.)

**EXHIBIT 4**

# ResCap AG Consumer Relief Solicitation and Credit Summary

- The analysis reflects accrued soft dollar credits as of June 15, 2012 and is not audited and certified by the Internal Review Group (IRG). Modification credits are dependent upon performance of the borrower remaining current on payment at day 90 after modification execution.

*Dollars in Millions*

| | Eligible Population | Solicited Loan Count | % Solicited of Eligible | Executed Transactions count | Effective Pull Through | Executed Estimated Credit | Adjusted Estimated Credit[4] | Ally Bank | GMACM |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Solicitation and Estimated Credit[1]** | | | | | |
| Refinance Program | 2,018 | 1,703 | 84% | 133 | 8% | 6.3 | 7.8 | 61% | 39% |
| PRA Modification[2] | 9,829 | 4,715 | 48% | 1,765 | 37% | 106.8 | 133.5 | 71% | 29% |
| Forgiveness of Forbearance[3] | 477 | 49 | 10% | 9 | 18% | 0.2 | 0.2 | 38% | 62% |
| **Total Refinance and Modification** | **12,324** | **6,467** | **52%** | **1,907** | 29% | 113.3 | 141.6 | 70% | 30% |
| Deficiency Waiver[5] | | | | 4,144 | | 23.5 | 20.0 | | |
| Short Sale and DIL | | | | 2,492 | | 67.7 | 45.0 | | |
| **Total Non-Modification Activities** | | | | **6,636** | | 91.2 | 65.0 | | |
| **Total Modification and Non-Modification Activities** | | | | | | **204.5** | **206.6** | | |

**Footnotes:**

1 *Executed transaction activity includes all transactions meeting the AG credit eligibility criteria regardless of solicitation*

2 *Modification credit is dependent upon the borrower remaining current at day 90 after modification*

3 *Most of the loans with forbearance balance also qualify for refi and PRA modification and forbearance is forgiven as part of modification process*

4 *Adjusted credit includes 25% servicer bonus and applicable menu cap limits. This credit has not been submitted to and approved by the AG Monitor*

5 *Deficiency Amounts should be capped at $20MM; the cap has not been applied at the Entity level between Ally, GMAC, and Non-Balance Sheet*

## **EXHIBIT 5**

## ResCap AG Consumer Relief Activity and Bank Reimbursement Estimate (June 15, 2012)

■ The Company has made $68.3M in loan modification payments through June 15, 2012.  Based on outstanding solicitations, there could be an additional $35.3M to $60.3M in modifications based on assumed pull through rates.

| AG Consumer Relief Activity and Bank Reimbursement Estimate at 6/15/12 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dollars in Millions | Loan Count | UPB | Paid | Projected / Due | | Total Paid & Projected | |
| | | | | Baseline | Max | Baseline | Max |
| **Reimbursement Paid:** | | | | | | | |
| Total Reimbursement Paid Thru 5/31 | 723 | 241.1 | 68.3 | - | - | 68.3 | 68.3 |
| | | | | | | | |
| **Amounts Due:** | | | | | | | |
| May True Up Reimbursement | 9 | 2.6 | - | 1.0 | 1.0 | 1.0 | 1.0 |
| June Activity (Thru 6/15) | 20 | 6.2 | - | 1.7 | 1.7 | 1.7 | 1.7 |
| Subtotal | 29 | 8.8 | - | 2.7 | 2.7 | 2.7 | 2.7 |
| | | | | | | | |
| **Outstanding Solicitation** | 2,429 | 176.4 | - | 32.6 | 57.6 | 32.6 | 57.6 |
| | | | | | | | |
| Total | | | | | | **103.6** | **128.7** |

Notes:

*Bank solicitation has been suspended as of 6/18/2012. Suspended solicitation represents 40% of the total $1.5b eligible population*

*Outstanding solicitation represents solicitation prior to 6/18/2012. Over 75% of this solicitation is 2nd lien charge off and refinance program where reimbursement requirement is minimal*

## **EXHIBIT 6**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, New York 10022

| | | |
|---|---|---|
| Ray C. Schrock<br>To Call Writer Directly:<br>(212) 446-4828<br>ray.schrock@kirkland.com | (212) 446-4800<br><br>www.kirkland.com | Facsimile:<br>(212) 446-4900 |

July 2, 2012

**By E-mail (lnashelsky@mofo.com)**

**CONFIDENTIAL
SETTLEMENT COMMUNICATION
SUBJECT TO FRE 408**

Larren M. Nashelsky, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104

Re:    Reimbursement of Ally Bank for DOJ/AG Solicitation Activity

Dear Larren:

I write on behalf of Ally Financial Inc. ("***AFI***") and Ally Bank to follow up on our June 27, 2012 telephone conversation concerning GMAC Mortgage LLC's ("***GMACM***") obligation under the amended and restated subservicing Agreement between Ally Bank and GMACM dated as of May 11, 2012 (the "***Servicing Agreement***") to reimburse Ally Bank for losses from loan modifications being performed in accordance with the DOJ/State AG settlement (the "***DOJ/AG Settlement***").  This letter also serves as AFI's and Ally Bank's combined response to the June 20, 2012 letters that were sent by Mr. Thomas Marano of Residential Capital, LLC ("***ResCap***") and Mr. Joseph Pensabene of GMACM on the same subject.

Based upon our conversation, I understand that, despite the clear statement to the contrary in Mr. Pensabene's June 20 letter to Ally Bank and the unambiguous terms of the Servicing Agreement, ResCap and GMACM are now both taking the position that GMACM will no longer issue *any* further reimbursements to Ally Bank under the Servicing Agreement for loan modifications (including with respect to loans that have already been solicited) based upon the January 30, 2012 support letter among AFI, GMACM and ResCap (the "***Support Letter***") and ResCap's and GMACM's assertion that they have earned more than $200 million in "soft dollar credits" under the DOJ/AG Settlement.  This position is wholly inconsistent with the unambiguous terms of the Servicing Agreement and business discussions, and jeopardizes several other key agreements among the parties as well as the Debtors' sale and reorganization efforts.

GMACM's obligation to reimburse Ally Bank for loan modifications is clearly set forth in Section 10.01(e) of the Servicing Agreement, which states that "[GMACM] shall indemnify [Ally Bank] for losses suffered by [Ally Bank] as a result of any action taken in accordance with

# KIRKLAND & ELLIS LLP

Larren M. Nashelsky, Esq.
July 2, 2012
Page 2

the AG Menu Items attached hereto as Exhibit 4-B; provided, that [GMACM] shall not be required to indemnify [Ally Bank] for any losses in connection with any such action that also would have been permitted under the terms of the Standard Matrix." The Servicing Agreement does not contain any limitation on GMACM's indemnity obligation relating to "soft dollar credits" earned under the DOJ/AG Settlement and is the "entire agreement" between the parties as set forth in Section 12.03 of the Servicing Agreement. Therefore, GMACM is obligated to reimburse Ally Bank under the Servicing Agreement notwithstanding that ResCap and GMACM may have earned $200 million in "soft dollar credits" under the DOJ/AG Settlement. *See Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467-68 (2d Cir. 2010) ("[A] written agreement that is complete, clear and unambiguous on its face must be interpreted according to the plain meaning of its terms, without the aid of extrinsic evidence") (internal citations omitted).[1]

Further, arguments founded on the terms of the Support Agreement are misleading and not relevant. The Support Agreement was executed on January 30, 2012 to provide tangible net worth covenant support to ResCap. The terms relevant to the DOJ/AG Settlement were based on an understanding *at that time* of the expected terms of the DOJ/AG Settlement. ResCap then finalized the terms of the DOJ/AG Settlement and it was executed on February 9, 2012. During the period between the execution of the Support Agreement and the DOJ/AG Settlement, several terms of the DOJ/AG Settlement were materially revised by ResCap, including the population for which the solicitations were to occur. Of course, the terms of the Servicing Agreement and the ResCap/Ally settlement agreement were negotiated in good-faith and at arm's-length among AFI, GMACM, and ResCap. Notably, these negotiations occurred following the execution of the DOJ/AG Settlement.

Section 10.01(f) of the Servicing Agreement does provide that GMACM shall cease soliciting Ally Bank loans for modification in the month after it has paid $75,000,000 in reimbursements until GMACM and Ally Bank can agree upon terms on which additional loss mitigation

---

[1] Even though the terms of the Servicing Agreement are clear, I note that the reimbursement obligation of GMACM under the Servicing Agreement is consistent with the Support Letter. Specifically, the limitation on reimbursements to AFI and Ally Bank contained in paragraph 5 of the Support Letter once ResCap and GMACM have effected the required hard dollar payments and have earned $200,000,000 in "soft dollar credits" applies *only* to the obligation under paragraph 5 of the Support Letter to reimburse AFI and Ally Bank for costs arising from the failure of ResCap and GMACM to perform their obligations under the DOJ/AG Settlement. *See* Support Letter ¶5. GMACM's obligations to reimburse Ally Bank for its use of Ally Bank's loans to obtain the "soft dollar credits" in connection with the DOJ/AG Settlement was contemplated in paragraph 7 of the Support Letter, which contains no dollar limit. That paragraph provides that ResCap and GMACM agreed to negotiate a servicing amendment containing the terms set forth on **Exhibit C** to the Support Letter. Those negotiations led to GMACM's and Ally Bank's entry into the Servicing Agreement.

# KIRKLAND & ELLIS LLP

Larren M. Nashelsky, Esq.
July 2, 2012
Page 3

activities can proceed. AFI and Ally Bank acknowledge the notification provided in ResCap's and GMACM's June 20 letters that the $75,000,000 threshold may be crossed in the month of June, but note that the cessation of further solicitations does not relieve GMACM from its reimbursement obligation for solicitations that have already occurred. In fact, Section 10.01(f) of the Servicing Agreement explicitly requires that "any loans that have been solicited for such AG Menu Items prior to such month [the month following the month in which indemnification payments to the Bank exceed $75,000,000] shall be eligible for the AG Menu Items."

We recognize that the Creditors' Committee has raised some questions concerning the Servicing Agreement and the reimbursement obligation to Ally Bank set forth therein. As you are aware, we have engaged in discussions with ResCap, GMACM and the Creditors' Committee to address these questions and are willing to continue such discussions. We remind you that the Servicing Agreement is just one of many integrated pieces of support that AFI and Ally Bank have agreed to provide to ResCap and GMACM in connection with their chapter 11 cases to facilitate their efforts to a going-concern sale of ResCap's assets and pursuit of the chapter 11 plan. AFI and Ally Bank do not intend to renegotiate the individual pieces of their support.

As yet another gesture of good faith, however, AFI and Ally Bank have agreed to extend the date for entering the final order approving the Servicing Agreement to July 27th. All rights are expressly reserved. We also remind you that GMACM is required to continue to perform its obligations under the Servicing Agreement pursuant to the interim order approving the Servicing Agreement and the final AFI DIP and cash collateral order. Any failure of GMACM to perform its obligations under the Servicing Agreement, including a failure to perform obligations under the DOJ/AG Settlement or a failure to reimburse Ally Bank for loan modifications, would constitute a breach of agreements and Court orders, including the AFI DIP and cash collateral order, and, in turn, other key agreements between the parties. To avoid any such result, we suggest an in-person meeting with ResCap and GMACM on July 5, 2012 at Kirkland's offices to try to resolve the disputes concerning the Servicing Agreement.

Sincerely,

*/s/ Ray C. Schrock*

Ray C. Schrock

RCS/rcs

cc:    Michael A. Carpenter

**EXHIBIT 7**

MORRISON | FOERSTER

1290 AVENUE OF THE AMERICAS
NEW YORK, NY 10104-0050

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

July 9, 2012

Writer's Direct Contact
212.506.7365
LNashelsky@mofo.com

**By E-mail (ray.schrock@kirkland.com)**

**Confidential**
**For Settlement Purposes Only**
**Subject to FRE 408**

Ray C. Schrock, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

Re:    Reimbursement of Ally Bank for DOJ/AG Solicitation Activity

Dear Ray:

I write on behalf of Residential Capital, LLC ("**ResCap**") and certain of its direct and indirect subsidiaries, including GMAC Mortgage LLC ("**GMACM**" and, collectively, the "**Debtors**"), each of which are debtors in the chapter 11 cases that are currently being jointly administered under case number 12-12020 (MG) in the United States Bankruptcy Court for the Southern District of New York. This letter serves as the Debtors' response to your letter dated July 2, 2012 regarding the scope of GMACM's obligation under the amended and restated subservicing agreement between Ally Bank and GMACM dated as of May 11, 2012 (the "**Servicing Agreement**") to reimburse Ally Bank for losses from loan modifications being performed in accordance with the DOJ/AG Settlement. Specifically, this letter is intended to clarify the Debtors' interpretation of Section 10.01(e) of the Servicing Agreement, pursuant to which the Debtors are obligated to indemnify Ally Bank for certain losses incurred by Ally Bank through modifications to Ally Bank loans made by the Debtors under the Servicing Agreement as a result of the Debtors' obligations under the DOJ/AG Settlement (the "**Indemnification Obligations**").

As indicated during our June 27, 2012 telephone conversation, GMACM disagrees with your statement that ResCap and GMACM are obligated to make further payments under the Servicing Agreement. The DOJ/AG Settlement requires the Debtors to obtain at least $200 million in borrower relief credits (the "**Soft Dollar Credits**"), and, to the extent the Debtors fail to perform such obligations, provides that AFI is responsible. The DOJ/AG Settlement also required the Debtors to fund a direct settlement payment of approximately $110 million in cash.

ny-1048398

**MORRISON** | **FOERSTER**

Ray C. Schrock, Esq.
July 9, 2012
Page Two

In anticipation of the DOJ/AG Settlement and to maintain tangible net worth covenants in loan documents and servicing agreements, the Debtors and AFI entered into a letter agreement on January 30, 2012 (the "**Support Letter**") detailing how the DOJ/AG Settlement would be funded and ongoing obligations effectuated as between the Debtors, AFI and Ally Bank. The Support Letter capped the Debtors' reimbursement obligations to AFI <u>and</u> Ally Bank once the Debtors had made the $110 million cash payment and earned $200 million in Soft Dollar Credits (the "**Reimbursement Cap**").

The Support Letter provided that GMACM would negotiate in good faith with Ally Bank with respect to a new subservicing agreement that would permit the Debtors to "implement the modifications and other loss mitigation activities and earn soft dollar credits in accordance with the requirements of the DOJ/AG Settlement in respect of mortgage loans owned by Ally Bank that GMACM is servicing for Ally Bank." *See* Support Letter at ¶ 7. The Support Letter further provided that any new agreement would contain the Indemnification Obligations ultimately embodied in the Servicing Agreement.

The Support Letter specifically contemplated entry into the Servicing Agreement (including the Indemnification Obligations). As a result, and contrary to your suggestion that referring to the Support Letter constitutes improper reliance on extrinsic evidence, the Support Letter and the Servicing Agreement cannot be interpreted independently of each other. Importantly, nothing in Servicing Agreement between the Debtors and Ally Bank modifies or eliminates the Reimbursement Cap contemplated under the Support Letter, which is only between the Debtors and AFI. Consistent with the Support Letter, the Debtors' and AFI's obligations under the DOJ/AG Settlement, and the course of dealing between the Debtors on the one hand, and AFI and Ally Bank on the other, ResCap's position is that no further payments on account of Indemnification Obligations were required to be paid by ResCap to Ally Bank once the Reimbursement Cap was reached.

GMACM also disagrees with your suggestion that the Reimbursement Cap only applies to direct costs incurred under the DOJ/AG Settlement paid by AFI or Ally Bank, and thus not the Indemnification Obligations. As between AFI and Ally Bank, only AFI is liable for the direct costs of the DOJ/AG Settlement. Ally Bank would never have been liable for such costs, and, as a result, applying the Reimbursement Cap solely to those amounts makes no sense. Particularly in light of the fact that the Reimbursement Cap is measured with reference to the Soft Dollar Credits earned by the Debtors, it is clear that the reference to the Reimbursement Cap in paragraph 5 of the Support Letter was intended to apply not just to direct settlement costs but also to the Indemnification Obligations.

We also note that, pursuant to a letter agreement between AFI and Ally Bank dated October 5, 2010, as amended on April 1, 2011 (the "**AFI Guarantee Letter**"), AFI agreed to indemnify Ally Bank for any losses arising out of violations by GMACM of, among other things, any applicable law or regulation or the prior servicing agreement between Ally Bank

MORRISON | FOERSTER

Ray C. Schrock, Esq.
July 9, 2012
Page Three

and GMACM, dated August 21, 2001. As all parties are aware, the DOJ/AG Settlement and the obligations thereunder were agreed to by the Debtors and AFI in order to settle the U.S. government's allegations of violations of law and regulation in connection with the Debtors' mortgage servicing practices. Even if the Servicing Agreement could be construed as creating an unlimited obligation on the part of GMACM to reimburse Ally Bank for the loan modifications in question (which, as set forth above, it cannot), based on the AFI Guarantee Letter and AFI's agreement in the Support Letter to limit ResCap's reimbursement obligations, it is clear that if any party is obligated to make further reimbursement/indemnification payments to Ally Bank, that party is AFI. As bankruptcy estates, ResCap and GMACM cannot make payments to Ally Bank that the Debtors' solvent parent, AFI, is obligated to make.

Additionally, we note that the Servicing Agreement did not become effective until entry of the interim order. On June 13, 2012, the Debtors paid Ally Bank $19.9 million on account of Indemnification Obligations outstanding as of May 31, 2012, which, we recently learned, included $12.9 million for reimbursement payments relating to modifications performed prior to the petition date. Because the Servicing Agreement did not become effective until after the bankruptcy filing, it is unclear under what agreement the obligation to reimburse Ally Bank with respect to such modifications arose. At a minimum, nothing in the motion or interim order contemplated or authorized payments under the Servicing Agreement relating to modifications performed prior to the petition date. Thus, it appears that the Debtors may have improperly paid Ally Bank approximately $12.9 million on account of a pre-petition general unsecured claim without Bankruptcy Court authorization.

Although the Debtors are not seeking disgorgement of that $12.9 million payment at this time (but reserve all rights to do so), in order to avoid having made an unauthorized payment to Ally Bank, we believe the payment on account of the pre-petition modifications must be deemed a prepayment of future post-petition obligations (including any payments for the May "true-up" or for June loan modifications). Accordingly, as a result of the application of such payment to pre-petition Indemnification Obligations, even if GMACM is liable for additional reimbursements to Ally Bank and fails to remit additional payments for such reimbursements, GMACM is nonetheless currently in compliance with the Servicing Agreement.

Finally, as a reminder, under the order approving the Servicing Agreement on an interim basis, the Servicing Agreement is a pre-petition contract and subject to the automatic stay pursuant to Section 362 of the Bankruptcy Code. Any attempt by AFI or Ally Bank to terminate the Servicing Agreement or modify the Debtors' rights thereunder would therefore be a violation of the automatic stay.

ny-1048398

MORRISON | FOERSTER

Ray C. Schrock, Esq.
July 9, 2012
Page Four

I believe our discussions to date on this issue (as well as most other issues in the cases) have been cooperative and constructive. In order to allow progress to continue while we work to resolve the disputes regarding the Servicing Agreement, the Debtors would suggest that AFI make the indemnification payments to Ally Bank pursuant to its obligations under the AFI Guarantee Letter and reserve its rights to assert claims against the Debtors' estates related to such payments.

Further, ResCap is willing to continue to assist in completing the solicitation of the Ally Bank portfolio, pursuant to the DOJ/AG Settlement, provided that AFI acknowledges its obligation to reimburse Ally Bank for indemnification payments. Finally, as their own gesture of good faith, the Debtors are willing to consider reducing the availability under the Ally DIP facility to approximately $170 million—an amount that will provide sufficient liquidity to cover $150 million in GNMA repurchase obligations and the $19.9 million of indemnification payments already made.

We are amenable to holding an in-person meeting at a mutually convenient time to try to resolve these issues, and will follow up with you separately regarding scheduling.

Sincerely,

Larren M. Nashelsky

cc: Mr. Thomas Marano

## EXHIBIT 8

## ResCap Subservice P&L – Ally Bank Portfolio

- The Company has entered into a new pricing arrangement as sub-servicer for Ally loans.  Based on the current forecast, the Company forecasts approximately $25M in income due to the current subservicing arrangement

  - MSR swap was a key part of the profitability for subservicing prior to May 14, 2012.  The swap was terminated as of April 30, 2012 (the economics of the swap are <u>not</u> included in the analysis below)

  - Based on the new pricing arrangement, subservice fee revenue per loan is approximately $112 per year and the CTS per loan is approximately $66 per year

| *Dollars in Millions* | Actuals - Old Agreement | | | | Actuals - Combined* | Forecast - New Agreement | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan Y2012 | Feb Y2012 | Mar Y2012 | Apr Y2012 | May Y2012 | Jun Y2012 | Jul Y2012 | Aug Y2012 | Sep Y2012 | Oct Y2012 | Nov Y2012 | Dec Y2012 |
| **Subservice Fee Paid to ResCap** | | | | | | | | | | | | |
| Bank MSR | 3.6 | 3.6 | 3.6 | 2.5 | 5.8 | 5.7 | 5.6 | 5.4 | 5.3 | 5.2 | 5.1 | 5.0 |
| Bank On Balance Sheet | 0.4 | 0.4 | 0.4 | 0.3 | 0.2 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.6 | 0.6 |
| **Total** | **3.9** | **3.9** | **3.9** | **2.9** | **5.9** | **6.4** | **6.2** | **6.1** | **5.9** | **5.8** | **5.7** | **5.5** |
| **Cost to Service** | (3.5) | (4.0) | (3.8) | (3.8) | (3.7) | (3.7) | (3.7) | (3.6) | (3.5) | (3.4) | (3.3) | (3.2) |
| Ancillary Income | - | - | - | - | - | 1.3 | 1.1 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Total P&L** | **0.5** | **(0.1)** | **0.1** | **(0.9)** | **2.2** | **3.9** | **3.7** | **3.6** | **3.5** | **3.4** | **3.4** | **3.3** |
| **Loan Count** | 705,291 | 701,194 | 700,191 | 693,347 | 693,038 | 683,344 | 669,062 | 654,097 | 635,725 | 621,374 | 607,031 | 594,480 |
| **Subservice Fee Revenue** | | | | | | | | | | | | |
| **Dollar per loan (annualized)** | **67** | **67** | **67** | **50** | **103** | **112** | **112** | **112** | **112** | **112** | **112** | **112** |
| Dollar per loan (per month) | 5.5 | 5.6 | 5.6 | 4.2 | 8.6 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 |
| <u>**Cost to Service ("CTS")**</u> | | | | | | | | | | | | |
| **Dollar per loan (annualized)** | **59** | **68** | **66** | **66** | **66** | **66** | **66** | **66** | **66** | **66** | **66** | **66** |
| Dollar per loan (per month) | 4.9 | 5.7 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 |

*\* May 2012 includes both old and new subservicing agreement cash flows*

## ResCap Subservice P&L – Adjusted P&L Based on Reductions

- **The summary below assumes the discontinuation of the Ally Subservicing contract starting in September 2012**

  - Due to the assumption that the new subservicing agreement would not be accepted, this analysis assumes that revenue from July 11, 2012 through August 31, 2012 is based on the old pricing agreement

  - Subservicing fees and related ancillary income are no longer realized in September, assuming the cessation begins at the end of August*

  - The Company has estimated cost savings of approximately $2M / month, which begin to be realized beginning in September.  This is partially offset by severance costs of $1.8M which would be paid at the end of August 2012**

| *Dollars in Millions* | Actuals - Old Agreement | | | | Actuals - Combined* | Forecast - Subservicing Discontinuation | | | | | | | Jan - May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan Y2012 | Feb Y2012 | Mar Y2012 | Apr Y2012 | May Y2012 | Jun Y2012 | Jul Y2012 | Aug Y2012 | Sep Y2012 | Oct Y2012 | Nov Y2012 | Dec Y2012 | Y2013 |
| **Subservice Fee Paid to ResCap** | | | | | | | | | | | | | |
| Bank MSR | 3.6 | 3.6 | 3.6 | 2.5 | 5.8 | 5.7 | 4.1 | 3.4 | - | - | - | - | - |
| Bank On Balance Sheet | 0.4 | 0.4 | 0.4 | 0.3 | 0.2 | 0.7 | 0.5 | 0.4 | - | - | - | - | - |
| **Total** | **3.9** | **3.9** | **3.9** | **2.9** | **5.9** | **6.4** | **4.6** | **3.7** | **-** | **-** | **-** | **-** | **-** |
| **Cost to Service** | (3.5) | (4.0) | (3.8) | (3.8) | (3.7) | (3.7) | (3.7) | (3.6) | (3.5) | (3.4) | (3.3) | (3.2) | (16.2) |
| **Severance Costs** | - | - | - | - | - | - | - | (1.8) | - | - | - | - | - |
| **Subservicing Elimination Cost Saving** | - | - | - | - | - | - | - | - | 2.0 | 2.0 | 2.0 | 2.0 | 9.8 |
| **Ancillary Income** | - | - | - | - | - | 1.3 | 1.1 | - | - | - | - | - | - |
| **Total P&L** | **0.5** | **(0.1)** | **0.1** | **(0.9)** | **2.2** | **3.9** | **2.1** | **(1.6)** | **(1.5)** | **(1.4)** | **(1.4)** | **(1.3)** | **(6.4)** |
| | | | | | | | | | | | | | |
| **Loan Count (Adjusted)** | 705,291 | 701,194 | 700,191 | 693,347 | 693,038 | 683,344 | 669,062 | - | - | - | - | - | - |
| **Subservice Fee Revenue** | | | | | | | | | | | | | |
| Dollar per loan (annualized) | 67 | 67 | 67 | 50 | 103 | 112 | 112 | N/A | N/A | N/A | N/A | N/A | N/A |
| Dollar per loan (per month) | 5.5 | 5.6 | 5.6 | 4.2 | 8.6 | 9.3 | 9.3 | N/A | N/A | N/A | N/A | N/A | N/A |
| **Cost to Service ("CTS")** | | | | | | | | | | | | | |
| Dollar per loan (annualized) | 59 | 68 | 66 | 66 | 66 | 66 | 66 | N/A | N/A | N/A | N/A | N/A | N/A |
| Dollar per loan (per month) | 4.9 | 5.7 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | N/A | N/A | N/A | N/A | N/A | N/A |

*   Scenario assumes loans transfer off the ResCap platform in September, however in reality it is likely that transfer will take place over the course of several months
**  Assumes no costs to transfer loans back to Ally