MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Norman S. Rosenbaum

*Counsel for the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------ )
In re:                                                    )        Case No. 12-12020 (MG)
                                                          )
RESIDENTIAL CAPITAL, LLC, et al.,                         )        Chapter 11
                                                          )
                                        Debtors.          )        Jointly Administered
                                                          )
------------------------------------------------------------------------------ )

## DEBTORS' OBJECTION TO MOTION OF AURORA BANK, FSB FOR ORDER PURSUANT TO BANKRUPTCY CODE 362(d), BANKRUPTCY RULE 4001 AND LOCAL BANKRUPTCY RULE 4001-1 MODIFYING <u>AUTOMATIC STAY TO ALLOW CONTINUATION OF PRE-PETITION LITIGATION</u>

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 3

OBJECTION .......................................................................................................................... 5

I.     THE AUTOMATIC STAY IS FUNDAMENTAL TO THE CHAPTER 11
      PROCESS ....................................................................................................................... 5

     A.     The Policies Underlying the Automatic Stay Weigh in Favor of Denying
             the Relief Requested by the Movant ..................................................................... 5

     B.     Movant Has Failed to Establish Cause for Relief from the Automatic Stay ......... 8

            (i)     Whether Relief Would Result in a Partial or Complete Resolution
                    of the Issues (Sonnax Factor No. 1) ...................................................... 10

            (ii)     The Lifting of the Automatic Stay Is Connected to and Will
                    Interfere with the Debtors' Chapter 11 Cases (Sonnax Factor
                    Nos. 2) and Litigation of the Actions in Another Forum Would
                    Prejudice the Interests of Other Creditors (Sonnax Factor No. 7) ........... 11

            (iii)     No Specialized Tribunal Has Been Established to Hear the Actions
                    (Sonnax Factor No. 4) ........................................................................... 14

            (iv)     No Insurer Has Assumed Responsibility for Any of the Actions
                      (Sonnax Factor No. 5) ........................................................................... 15

            (v)     The Actions do not Primarily Involve Third Parties (Sonnax Factor
                    No. 6) ................................................................................................... 16

            (vi)     The Interests of Judicial Economy and Economical Resolution of
                    the Actions Are Best Served by Maintaining the Automatic Stay
                    and None of the Actions is Ready for Trial (Sonnax Factor Nos ............ 16

            (vii)     The Balance of Harms Favors Maintaining the Automatic Stay
                      (Sonnax Factor No. 12) ......................................................................... 18

CONCLUSION ...................................................................................................................... 20

Exhibits:

Exhibit 1:     Scoliard Declaration
Exhibit 2:     Appendix

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Capital Comm. Fed. Credit Union v. Boodrow (In re Boodrow),
    126 F.3d 43 (2d Cir. 1997)........................................................................................9

City Ins. Co. v. Mego Int'l Inc. (In re Mego Int'l Inc.),
    28 B.R. 324 (Bankr. S.D.N.Y. 1983)...................................................................16

In re Bally Total Fitness of Greater N.Y., Inc.,
    402 B.R. 616 (Bankr. S.D.N.Y. 2009).....................................................15, 18, 19

In re Cuyahoga Equip. Corp.,
    980 F.2d 110 (2d Cir. 1992)..................................................................................13

In re Leibowitz,
    147 B.R. 341 (Bankr. S.D.N.Y. 1992)...................................................................9

In re Motors Liquidation Co.,
    Case. No. 10 Civ. 36 (RJH), 2010 WL 4966018 (S.D.N.Y. Nov. 17, 2010)...........9

In re Northwest Airlines Corp.,
    No. 05-17930, 2006 WL 694727 (Bankr. S.D.N.Y. Mar. 3, 2006).......................19

In re Pioneer Commercial Funding Corp.,
    114 B.R. 45 (Bankr. S.D.N.Y. 1990)..............................................................6, 13

In re Ionosphere Clubs, Inc., 922 F.2d 984 (2d Cir. 1990)..........................................19

Mazzeo v. Lenhart (In re Mazzeo),
    167 F.3d 139 (2d Cir. 1999)...............................................................................8,9

Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection,
    474 U.S. 494 (1986)...............................................................................................6

Morgan Guar.Trust Co. v. Hellenic Lines, Ltd.,
    38 B.R. 987 (S.D.N.Y. 1984).................................................................................9

SEC v. Brennan,
    230 F.3d 65 (2d Cir. 2000).....................................................................................6

Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.),
    907 F.2d 1280 (2d Cir. 1990)........................................................................ passim

**STATUTES**

11 U.S.C. § 362(a)(1)..................................................................................................................6

11 U.S.C. § 362(d) ....................................................................................................................8

**OTHER AUTHORITIES**

Collier on Bankruptcy ¶ 362.03 (16th ed. rev. 2012) ...................................................................6

ny-1049415

Residential Capital, LLC and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "***Debtors***") hereby submit this objection (the "***Objection***") to the *Motion of Aurora Bank, FSB for Order Pursuant to Section 362(d) of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-1 Modifying the Automatic Stay to Allow Continuation of Pre-Petition Litigation*, dated June 19, 2012 [Docket No. 451] (the "***Motion***").[1]   In support of hereof, the Debtors submit the Declaration of Jennifer Scoliard, dated July 17, 2012 (the "***Scoliard Declaration***"), attached hereto as <u>Exhibit 1</u>, and respectfully represent:

### PRELIMINARY STATEMENT

1.      Aurora Bank, FSB ("***Movant***") seeks relief from the automatic stay to proceed with prepetition claims for damages pending against Debtors GMAC Mortgage, LLC ("***GMACM***") and Executive Trustee Services ("***ETS***" and, together with GMACM, the "***Debtor Defendants***") in two separate actions pending in California state courts (the "***California Actions***").  Movant cannot satisfy its burden of establishing cause sufficient to truncate the statutorily imposed breathing spell to which the Debtors are entitled under section 362 of title 11 of the United States Code (the "***Bankruptcy Code***").

2.      Moreover, the California Actions are just two of a substantial number of lawsuits and proceedings for prepetition claims currently pending against the Debtors that are being managed by the Debtors' Legal Department (as defined below) across the country. (Scoliard Decl. ¶ 3.)  The Debtors, by way of direct claims and counter-claims, are defendants in

---

[1] In addition to the Motion, motions for relief from the automatic stay filed by Mary Gardner, date June 18, 2012 [Docket No. 462] (the "***Gardner Motion***") and Rex T. Gilbert, Jr. and Daniela L. Gilbert, dated June 11, 2012 [Docket No. 275] (the "***Gilbert Motion***") were originally scheduled to be heard on July 10, 2012.  On June 3, 2012, the Debtors filed an omnibus objection to several motions for relief from the automatic stay, including the Gardner Motion and the Gilbert Motion (the "***July 3 Omnibus Objection***").  The Gardner Motion and the Gilbert Motion were adjourned until July 24, 2012.

1

over 1,900 lawsuits involving a wide range of causes of action asserted against them, including

in their capacities as loan servicers and originators of mortgage loans, as well as causes of action

against third parties for which the Debtors are contractually obligated to defend.[2]  By virtue of

the Supplemental Servicing Order,[3] the Debtors have voluntarily relinquished a significant

amount of the protection that would ordinarily be afforded to them pursuant to the automatic

stay.  (Scoliard Decl. ¶ 3.)  The practical effect of the Supplemental Servicing Order is that two-

thirds of the cases currently being handled by the Legal Department are, either in whole or in

part, permitted to proceed.  Notwithstanding the impact of the Supplemental Servicing Order,

there are still a substantial number of cases – one-third of approximately 1,900 (approximately

690) – that are stayed by the automatic stay, including the California Actions.  (Scoliard Decl.

¶ 3.)  Movant, however, has not articulated any special facts or circumstances warranting relief

from the stay to permit them to proceed with the California Actions.

3.      As a policy matter, the Debtors submit that it is simply too early in the

Debtors' highly complex bankruptcy cases (the "***Chapter 11 Cases***") for the Court to grant relief

from the automatic stay for claimants to proceed with actions and lawsuits against the Debtors.

The Chapter 11 Cases are a little more than two months old.  Granting such relief at this juncture

would undoubtedly invite countless other lift stay motions from the Debtors' myriad other

prepetition claimants, opening the "floodgates" to litigation which would impose a burden on the

Debtors and their estates at a time when their remaining resources should be devoted to

---

[2] This figure does not include the tens of thousands of foreclosure, eviction, and bankruptcy-related proceedings which are not managed by the Legal Department that the Debtors are a party to in connection with their mortgage servicing obligations.

[3] On July 13, 2012, the Court entered the *Final Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 774] (the "***Supplemental Servicing Order***").

ny-1049415

maximizing the value of their assets through the contemplated asset sales and proceeding with the Chapter 11 claims process.  Forcing the Debtors to address motions for relief from stay arising from and potentially litigate even a fraction of the suits in which they are named as defendants (including as a consequence of counterclaims) would deprive them of the "breathing spell" the automatic stay is designed to provide and distract them from addressing the critical tasks necessary to achieve a successful resolution of the Chapter 11 Cases.  (Scoliard Decl. ¶ 9.) The Bankruptcy Code provides an orderly and centralized claims process meant to prevent a debtor from being forced to litigate claims in a piecemeal, ad hoc manner.  Granting relief from the stay at this early stage would in effect require the Debtors to conduct the claims resolution process in hundreds of forums across the country.

4.    The burden imposed on the Debtors in terms of the time, financial resources, and attention necessary to defend themselves in the California Actions far outweighs any prejudice to the Movant in preserving the automatic stay as to the Debtors.   The Debtors therefore must oppose the Motion so that their estates – and thousands of other creditors[4] – are not burdened and prejudiced by prepetition litigation proceeding against the Debtors.

5.    For the above reasons, and as more fully set forth below, the Debtors respectfully request that this Court deny the Motion.

## **BACKGROUND**

6.    On the Petition Date, each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The Debtors are managing and operating their businesses as debtors in possession pursuant to

---

[4] See Whitlinger Aff. ¶¶ 116; 118.

ny-1049415

Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered

pursuant to Bankruptcy Rule 1015(b).  No trustee has been appointed in the Chapter 11 Cases.[5]

7.      On May 16, 2012, the United States Trustee for the Southern District of

New York (the "*U.S. Trustee*") appointed a nine member official committee of unsecured

creditors (the "*Creditors' Committee*").

8.      On July 3, 2012, the U.S. Trustee appointed the Honorable Arthur T.

Gonzalez, former Chief Judge of this Court, as examiner (the "*Examiner*").

9.      As of the Petition Date, the California Actions were pending in California

Superior Court in El Dorado County (the "*Rogers Action*") and in Orange County (the "*Joint*

*Action*").  (See Mot. ¶¶ 5, 7; Scoliard Decl. ¶ 14.)  In the Rogers Action, Movant asserts a

counterclaim against the Debtor Defendants for money damages in excess of $332,800 arising

from the Debtor Defendant's allegedly wrongful reconveyance of a deed of trust being serviced

by Movant.  (See Mot. ¶¶ 1, 5.)  In July of 2011, Movant and the Debtor Defendants agreed to

(i) attend mediation to attempt to settle the disputes and (ii) suspend all deadlines pending

mediation.  (Scoliard Decl. ¶ 18.)  On September 23, 2011, the Debtor Defendants and Movant

attended mediation, but ultimately the parties were unable to reach a settlement.  (See Mot. ¶ 6;

Scoliard Dec. ¶ 14.)  To date, limited discovery has occurred, no dispositive briefing or motions

have been filed, and no trial date has been set.  (Scoliard Decl. ¶ 14.)

10.      Movant also alleges damages arising from similar claims against the

Debtor Defendants in three other matters (collectively, the "*King, Thomas, and Tozier*

---

[5] The Debtors are a leading residential real estate finance company indirectly owned by Ally Financial Inc. ("*AFI*"), which is not a Debtor.  The Debtors and their non-debtor affiliates operate the fifth largest mortgage servicing business and the tenth largest mortgage origination business in the United States.  A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6] (the "*Whitlinger Affidavit*").

*Matters*"). On or about January 24, 2012, Movant filed the Joint Action against the Debtor

Defendants alleging damages from wrongful reconveyance of deeds of trust being serviced by

Movant with respect to the King, Thomas and Tozier Matters. (See Mot. ¶ 7.) As of the Petition

Date, no initial case management conference has been held, the Debtor Defendants have not filed

an answer to Movant's complaint, there is no set discovery schedule and no discovery has taken

place, no motions for dispositive relief have been filed, and no trial date has been set in the Joint

Action. (Scoliard Decl. ¶ 15); see also Docket Sheet for Joint Action as of June 11, 2012.)[6]

        11.    Although the parties attempted to schedule a second round of mediation to

address Movant's claims in the California Actions, they were unable to do so due to mutual

scheduling conflicts. (Scoliard Decl. ¶ 18.) In aggregate, Movant asserts claims against the

Debtor Defendants in the Rogers Action and the Joint Action in excess of $1.4 million. (See

Mot. ¶ 3.)

        12.    On June 19, 2012, Movant filed the Motion.

## OBJECTION

### I.    The Automatic Stay is Fundamental to the Chapter 11 Process

#### A.    The Policies Underlying the Automatic Stay Weigh in Favor of Denying the Relief Requested by the Movant

        13.    Section 362(a)(1) of the Bankruptcy Code provides, in pertinent part, that

the filing of a bankruptcy petition:

> operates as a stay, applicable to all entities, of –

> > (1) the commencement or continuation, including the issuance of employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title,

---

[6] Court documents cited herein are included in the index annexed hereto as Exhibit 2.

or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).

14.     The automatic stay affords "one of the fundamental debtor protections provided by the bankruptcy laws." Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection, 474 U.S. 494, 503 (1986).  The automatic stay is of considerable importance in cases such as this, where the Debtors seek to sell all or substantially all of their assets.  It maintains the status quo to protect the debtor's ability to control the sale or other disposition of property of the estate.  Collier on Bankruptcy ¶ 362.03 (16th ed. rev. 2012).  The automatic stay prevents the state-law "race to the courthouse," and is intended to "allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas."  SEC v. Brennan, 230 F.3d 65, 71 (2d Cir. 2000) (internal quotation omitted).  In this regard, the automatic stay "promot[es] equal creditor treatment and giv[es] the debtor a breathing spell."  In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).

15.     One of the primary objectives of the Chapter 11 Cases is the preservation of the Debtors' going concern value through the sale of their servicing platform and legacy assets through which the Debtors hope to maximize creditor recoveries.[7]  The automatic stay is critical to the Debtors' ability to achieve this objective because it will permit the Debtors' management and employees, including the Debtors' in-house legal department (the "*Legal Department*"), to focus on the tasks critical to achieve a successful resolution of these cases, including, but not limited to, the following:  (i) a myriad of due diligence and other issues with respect to the

---

[7] In tandem with this effort, the Debtors have entered into plan support agreements with key constituents including AFI, certain holders of their junior secured notes, and certain investors in mortgage-backed securitizations sponsored by the Debtors.

proposed sales of the Debtors' servicing operations and legacy loan portfolios, (ii) the

negotiation and drafting of and solicitation of votes on a Chapter 11 plan and the drafting of a

related disclosure statement, (iii) producing documents and responding to requests for

information in connection with investigations by the Creditors' Committee and the Examiner,

and (iv) obtaining approval for settlement agreements regarding potential claims to be asserted

by or against the Debtors' estates – all of which the Debtors' seek to accomplish on an

accelerated time frame before the end of the year.

16.    Performing just these tasks in isolation is in and of itself an enormous

burden given that the objective of these Chapter 11 Cases are somewhat unprecedented (i.e., the

sale of a mortgage loan servicing and origination platform as a going concern); in addition, the

Debtors must address the concerns of multiple constituencies, including United States

government entities and governmental associations in the context of a Chapter 11 case (e.g.,

FNMA; Federal Home Loan Mortgage Corporation; Governmental National Mortgage

Association; Department of Housing and Urban Development; and the U.S. Department of

Justice (the "**DOJ**") (in connection with a joint settlement among the Debtors, the DOJ, and State

Attorneys General from 49 states); and the Board of Governors of the Federal Reserve System

(in connection with that certain Consent Order, dated April 13, 2011)).

17.    At the same time, the Debtors' personnel continue to operate the Debtors'

businesses; itself a full time endeavor made all the more demanding by the pendency of the

Chapter 11 Cases.  These, and many other tasks related to the restructuring, have and will

continue to require the utmost attention from all of the Debtors' employees.  Continuation of the

breathing spell created by the automatic stay, therefore, is essential to the Debtors' restructuring

at this juncture, because it allows the Debtors to focus on steps critical to achieving a successful

resolution to these cases, including the continued operation of the Debtors' business and

consummation of the sales.  (See Scoliard Decl. at ¶¶ 4-9.)

**B.      Movant Has Failed to Establish Cause for Relief from the Automatic
            Stay**

18.      Section 362(d) of the Bankruptcy Code provides that the Court shall grant

relief from the automatic stay "for cause."  11 U.S.C. § 362(d).  The Bankruptcy Code does not,

however, define the phrase "for cause."  In the context of stayed prepetition litigation, though,

the Second Circuit has outlined a 12-factor test (the "***Sonnax Factors***") to determine whether

"cause" exists to lift the stay to allow the litigation to proceed:

> (1) whether relief would result in a partial or complete resolution
> of the issues, (2) the lack of any connection with or interference
> with the bankruptcy case, (3) whether the other proceeding
> involves the debtor as a fiduciary, (4) whether a specialized
> tribunal with the necessary expertise has been established to hear
> the cause of action, (5) whether the debtor's insurer has assumed
> full responsibility for defending the action, (6) whether the action
> primarily involves third parties, (7) whether litigation in another
> forum would prejudice the interests of other creditors, (8) whether
> the judgment claim arising from the other action is subject to
> equitable subordination, (9) whether movant's success in the other
> proceeding would result in a judicial lien avoidable by the debtor,
> (10) the interests of judicial economy and the expeditious and
> economical resolution of litigation, (11) whether the parties are
> ready for trial in the other proceeding and (12) the impact of the
> stay on the parties and the balance of harms.

Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280,

1285-1287 (2d Cir. 1990); see also Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d

Cir. 1999) (vacating a district court order granting stay relief where the bankruptcy court had not

applied the Sonnax Factors, made only sparse factual findings and ultimately did not provide the

appellate court "with sufficient information to determine what facts and circumstances specific to

the present case the court believed made relief from the automatic stay appropriate.").  Courts

have recognized that not all of the Sonnax Factors will be applicable to every case, and the Court

may disregard irrelevant factors.  See In re Mazzeo, 167 F.3d at 143.

19.    In a request for stay relief, the moving party bears the initial burden to

demonstrate that cause exists for lifting the stay, using the Sonnax Factors, and the court may

deny the motion if the movant fails to make an initial showing of cause.  See Sonnax, 907 F.2d at

1285; Capital Comm. Fed. Credit Union v. Boodrow (In re Boodrow), 126 F.3d 43, 48 (2d Cir.

1997) ("We have emphasized that a bankruptcy court should deny relief from the stay if the

movant fails to make an initial showing of cause.") (quotation omitted).  Further, the cause

demonstrated must be "good cause."  Morgan Guar.Trust Co. v. Hellenic Lines, Ltd., 38 B.R.

987, 998 (S.D.N.Y. 1984).

20.    The movant's burden is especially heavy if it is an unsecured creditor.

"[T]he general rule is that claims that are not viewed as secured in the context of § 362(d)(1)

should not be granted relief from the stay unless extraordinary circumstances are established to

justify such relief."  In re Leibowitz, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992); see also In re

Motors Liquidation Co., Case. No. 10 Civ. 36 (RJH), 2010 WL 4966018 (S.D.N.Y. Nov. 17,

2010).

21.    Movant claims that the facts of these cases and the law mandate

modification of the stay.  (Mot. ¶ 15.)  Nowhere in the Motion, however, does Movant provide

any evidentiary support for its assertions.  Without such support, Movant fails to (and cannot)

meet its burden of establishing good cause for lifting the automatic stay under the Sonnax

analysis.  Moreover, Movant is wrong on its application of the law.  The application of the

Sonnax Factors clearly indicates that granting relief from the automatic stay would be inappropriate.[8]  Thus, the Motion should be denied.

> (i)    *Whether Relief Would Result in a Partial or Complete Resolution of the Issues (Sonnax Factor No. 1)*

22.    The first Sonnax Factor does not support relief from the stay because lifting the stay would not result in resolution of the issues.  If the stay were lifted, the California Actions would still have to be litigated against the Debtor Defendants.  Both the Rogers Action and the Joint Action are in their initial stages.  (See Scoliard Decl. ¶ 10.)  Only limited discovery has occurred with respect to Movant's counterclaim against the Debtor Defendants in the Rogers Action, which was stayed pending the outcome of the initial mediation, and no discovery has taken place in the Joint Action.  (Scoliard Decl. ¶ 10.)  Litigating the California Actions to completion would require the Debtor Defendants to draft an answer and potentially motions for dismissal and/or summary judgment, present oral arguments and, if summary judgment is not granted, conduct written discovery, depositions, possibly engage expert witnesses and prepare for and conduct a trial.  (See Scoliard Decl. ¶ 12.)  Even if judgments were ultimately rendered against the Debtor Defendants in the California Actions, such judgments would merely entitle Movant to general unsecured claims to be paid proportionally with thousands of other similar claims in accordance with the terms of a confirmed chapter 11 plan.  (See Scoliard Decl. ¶ 13.)  There is no reason Movant must liquidate their general unsecured claims ahead of the thousands of similarly-situated creditors.

---

[8] Sonnax Factors numbers 3 and 9 are not applicable to the facts here.  The Debtors do not address Sonnax Factor 8 in their objection, but reserve all right with regard thereto.

      (ii)     *The Lifting of the Automatic Stay Is Connected to and Will Interfere with the Debtors' Chapter 11 Cases (Sonnax Factor Nos. 2) and Litigation of the Actions in Another Forum Would Prejudice the Interests of Other Creditors (Sonnax Factor No. 7)*

23.      The second and seventh <u>Sonnax</u> Factors militate against providing the Movant with relief from the automatic stay because allowing the California Actions to proceed against the Debtor Defendants at this juncture in the Chapter 11 Cases would not only deplete estate resources, thereby prejudicing other creditors, but would also expose the Debtors to have to defend countless other lift stay motions.  To grant a general unsecured creditor, such as Movant, relief from the automatic stay to liquidate its claims where there is no (i) articulated need to immediately liquidate such creditor's general unsecured claim or (ii) compelling reason why the processing of its claims should be treated any differently than other general unsecured creditors of the Debtors would set a precedent that could result in additional motions for such relief by creditors in the nearly 700 actions that are currently stayed.  To allow creditors such as Movant to proceed with liquidating its claims would reduce the critical protection under the automatic stay that remains after the entry of the Supplemental Servicing Order and narrow the breathing spell for the Debtors.  This would impose a heavy burden on the Debtors' valuable time and scarce resources and would result in a wholly unnecessary distraction to the Debtors' focus on achieving the objectives of the Chapter 11 Cases – the maximization of value for creditors.

24.      The Legal Department is tasked with managing litigation in which the Debtors are defendants or respondents in state and federal court, including bankruptcy courts, as well as managing litigation for third parties for which the Debtors have a contractual obligation to defend.  The Legal Department plays a very active role in analyzing and strategizing on active litigation matters, working with various departments within the Debtors' various regional offices,

collecting all documents and information necessary to analyze each case, including, but not limited to, the following: (i) reviewing documents and information related to discovery, (ii) reviewing all draft pleadings and discovery responses, (iii) witness preparation of deposition and trial witnesses, (iv) directing settlement negotiations, (v) coordinating discussion with internal business personnel, (vi) maintaining the Legal Staff database, (vii) coordinating with local litigation counsel and ResCap bankruptcy counsel, (viii) attending mediations and settlement conferences and (ix) preparing for trial.  The Legal Department has been the primary group tasked with assisting in the development and implementation of the Supplemental Servicing Order.  (Scoliard Decl. at ¶ 5.)  The overwhelming task of managing hundreds of outside counsel and assisting them with automatic stay and application of the Supplemental Servicing Order will continue to consume the time and resources of the Legal Department.  (Scoliard Decl. at ¶ 6-7.)

25.    On top of these duties, the Legal Department has also spent the better part of the last month assisting in the preparation of the Debtors' schedules of assets and liabilities, statements of financial affairs, ordinary course professionals and special counsel retention applications and other pleadings, as well as performing related tasks in support of the administration of the Chapter 11 Cases.  (Scoliard Decl., at ¶ 8.)  As the Chapter 11 Cases proceed, the Legal Department will be required to assist in the preparation of monthly operating reports on an ongoing basis, address information requests related to the preparation of the Debtors' plan and disclosure statement, the proposed sales of the servicing platform and legacy assets, the Creditors' Committee and Examiner investigations, and various other proposed settlements.  Adding to these responsibilities by permitting legal actions to continue would divert the Legal Department's and other critical employees' attention from the critical tasks of running the Debtors' businesses and would contravene the policies behind the automatic stay.  See In re

<u>Pioneer Commercial Funding Corp.</u>, 114 B.R. at 48 (noting that the automatic stay is intended to provide the Debtors with a "breathing spell" to address the immediate concerns related to the restructuring of the Debtors' businesses).

26.     Movant's argument that, because these matters <u>could</u> be resolved in mediation, permitting them to proceed will not require participation of any member of the Debtors' senior management and therefore will not materially impact the Debtors' ability to carry on its financial affairs and administer the Chapter 11 Cases is pure conjuncture.  (Mot. ¶¶ 15, 19.)  As discussed below, it is unclear whether these matters will be resolved in mediation and therefore it is too early to forecast whether any members of the Debtors' management team may be called to testify at trial.  (Scoliard Decl. ¶ 18.)  At least one of the Debtors' in-house attorneys, Ms. Scoliard, would be required to devote substantial time analyzing and preparing the California Actions for mediation and potentially trial, given the detailed management by the Legal Department of its cases.  (Scoliard Decl., at ¶ 19.)  Further, the preparation of the California Actions for mediation and/or litigation would require the time and resources of the Debtors' other departments and employees.  (Scoliard Decl. ¶ 19.)    Finally, as Ms. Scoliard is based in the Debtors' Fort Washington, Pennsylvania office, the Debtors would be required to incur the expense for her travel.  (Scoliard Decl. ¶ 19.)

27.     Moreover, permitting the California Actions to proceed would prejudice other creditors.  Likely, each of the litigants in stayed actions would prefer to liquidate their claims through their pending lawsuits.  However, liquidation of these claims can and should be done in this Court as part of an organized claims resolution process absent special circumstances which do not exist here.  Requiring the Debtors to defend the California Actions in other forums would upend the "strong bankruptcy code policy that favors centralized and efficient

administration of all claims in the bankruptcy court," In re Cuyahoga Equip. Corp., 980 F.2d

110, 117 (2d Cir. 1992).  A successful case is in the interests of all of the Debtors' creditors and

diverting the attention of the Debtors' employees, including the Legal Department, could have a

detrimental effect on the Debtors' restructuring efforts.  As a result, the seventh Sonnax Factor

also weighs in favor of denying relief from the automatic stay.

28.    Therefore, for the above reasons, the second and seventh Sonnax

Factors weigh heavily against lifting the stay.

(iii)    *No Specialized Tribunal Has Been Established to Hear the Actions
(Sonnax Factor No. 4).*

29.    The fourth Sonnax Factor does not support relief from the stay.  Movant

provides no evidence for its argument that their claims should be resolved in California courts.

The California courts where the California Actions are pending do not have any particularized

expertise that this Court does not have.  While the California courts may be more familiar with

the facts and procedural history in the California Actions, the same could be said for the courts in

which every prepetition case pending against the Debtors was originally filed.[9]  Notwithstanding

this reality, the Bankruptcy Code specifically contemplates resolving prepetition claims against

the Debtors via a centralized claims resolution process shepherded by the bankruptcy courts.

Indeed, as Judge Gerber noted in In re General Motors Corp., "[b]ankruptcy litigation is typically

as efficient or more efficient than litigation in the district courts in connection with plenary

litigation."[10]  Movant's argument that the stay should be lifted because (i) resolution of the

California Actions requires determination of complex issues of California state law and (ii) this

---

[9] In fact, the state court in which the Joint Action was filed may no more familiar than this Court with the facts and
procedural history of the Joint Action given that the only activity in that case to date has been the filing of a first
amended complaint, and the state court has not yet held an initial case management conference.

[10] Hr'g Tr. 41:18 – 20 (Nov. 5, 2009), In re Motors Liquidation Company f/k/a General Motors Corp., Chapter 11
Case No. 09-50026 (REG) (denying motion to lift stay because Sonnax Factors weight against lifting the stay).

court cannot render a judgment binding on all parties in the California Actions rings hollow.

This Court has recognized that it can interpret and apply state law in resolving claims through the

bankruptcy process.  See, e.g., In re Bally Total Fitness of Greater N.Y., Inc., 402 B.R. 616, 624

(Bankr. S.D.N.Y. 2009) ("[t]his Court has significant experience in applying state law ….").

Movant's claims are no exception – this Court has the authority to adjudicate and render

judgment on such claims.  Accordingly, the fourth Sonnax Factor weighs in favor of denying

relief from the automatic stay.

> (iv)    *No Insurer Has Assumed Responsibility for Any of the Actions*
> *(Sonnax Factor No. 5).*

30.    The Movant's unsupported belief that the Debtors have insurance

coverage for most if not all of any judgment against them is simply inaccurate.  (See Mot. ¶ 15.)

While the Debtors have customary errors and omissions insurance coverage ("E&O Insurance")

that may potentially provide coverage for the claims Movant asserts against the Debtors, that

E&O Insurance policy provides for a deductible that is orders of magnitude higher than the

amount of damages sought by Movant; any amounts awarded, therefore, to Movant as a

judgment against the Debtors will be born directly by the Debtors' estates.  (Scoliard Decl. ¶ 15.)

31.    In addition, in the vast majority of the cases, including the California

Actions, the Debtors pay their legal defense fees and costs out-of-pocket.  As a result, requiring

the Debtors to defend the California Actions will result in increased out-of-pocket defense costs,

which based upon the Debtors' records for the year prior to the Petition Date averaged

approximately $5.7 million per month.[11]  (Scoliard Decl. ¶ 16.)

---

[11]  In Ms. Scoliard's  prior declaration, dated July 3, 2012 [Docket No. 682], based on the Debtors' records and in
consultation with other members of the Legal Department, Ms. Scoliard stated that the Debtors' average out-of-
pocket defense costs for the 12 months prior to the Petition Date is approximately $14.8 million per month.  While
this straight average is accurate, upon subsequent review of the Debtors' records, the out-of-pocket defense costs for
the months of December 2011 and April 2012 appeared to be unusually high and may have skewed the straight 12-
month average.  Eliminating these outlier months from the calculation, the Debtors' monthly out-of-pocket defense

32.     For the foregoing reasons the fifth <u>Sonnax</u> Factor weighs against granting relief from the automatic stay.

> (v)    *The Actions do not Primarily Involve Third Parties (Sonnax Factor No. 6).*

33.     The sixth Sonnax Factor does not support the relief sought in the Motion. The only named defendants in the Joint Action are Debtor Defendants and Movant's counterclaim is only against the Debtors Defendants in the Rogers Action.[12] As a result, in the California Actions, the Debtors are required to actively participate in the California Actions in order to avoid facing adverse judgments and, accordingly, the fourth <u>Sonnax</u> Factor weighs against granting relief from the automatic stay. <u>See</u> <u>City Ins. Co. v. Mego Int'l Inc. (In re Mego Int'l Inc.)</u>, 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying motion to lift the automatic stay where the debtor was more than a mere conduit for the flow of proceeds and the action impacted the "property and administration of [the debtor's] estate, suggesting that continuance of the stay was proper.").

> (vi)   *The Interests of Judicial Economy and Economical Resolution of the Actions Are Best Served by Maintaining the Automatic Stay and None of the Actions is Ready for Trial (Sonnax Factor Nos. 10 and 11).*

34.     Movant makes several baseless assertions in support of its argument that permitting the California Actions to proceed would serve judicial economy, including that (i) the facts of the California Action are largely not in dispute and only legal issues remain, and (ii) further mediation did not occur due to the Debtors' undue delay.  (<u>See</u> Mot. ¶¶ 14, 15 and

---

costs averaged approximately $5.7 million for the 12 months prior to the Petition Date, reflecting a more conservative view of their average monthly legal costs.

[12] <u>See</u> <u>Complaint of Aurora Bank, FSB v. GMAC Mortgage</u>, LLC, Case No. 30-2012-00539541, dated April 26, 2012; <u>First Amended Counterclaim in Intervention for Damages for Negligent Reconveyance of First Deed of Trust</u>, Case No. PC20090603, dated August 4, 2012.

19.)  Each of these allegations is unsupported by the facts.  *First*, if a judgment were awarded in favor of Movant in either of the California Actions, a determination of the amount of damages to which Movant would be entitled will mandate a fact-intensive inquiry that would require potentially costly discovery, expert witness testimony, briefing, and oral argument.  (Scoliard Decl. ¶ 16.)  *Second*, the fact that the parties have already gone through one round of unsuccessful mediation in the Rogers Action undercuts Movant's assertions that the matters could be settled through mediation.  (See Mot. ¶ 6.).  It is therefore unclear that further mediation would resolve the issues.  (Scoliard Decl. ¶ 19.)  *Third*, while the parties attempted to schedule a second mediation, there was no binding agreement between the parties to do so.  (Scoliard Decl. ¶ 13.)  *Lastly*, Movant's spurious allegation that the Debtor Defendants unreasonably delayed the scheduling of mediation is patently false.  The Debtor Defendants did not engage in any dilatory tactics to delay setting a date for further meditation; rather they attempted in good faith to schedule another mediation date.  Beginning in February 2012, counsel for the Debtor Defendants had numerous communications with counsel for Movant to attempt to set a date for further mediation, but the parties were ultimately unable to come to agreement due to mutual scheduling conflicts.  (Scoliard Decl. ¶ 18.)

35.     Moreover, neither of the California Actions is ready for trial.  As set forth above, these cases are each in their early stages.  (Scoliard Decl. ¶ 10-12.)  There has been no scheduling conference, discovery, dispositive motions, or other activity in the Joint Action.  (Scoliard Decl. ¶ 11.)  Moreover, only limited discovery has occurred with respect to Movant's counterclaim against the Debtors in the Rogers Action, which was stayed pending the outcome of the initial mediation.  (Scoliard Decl. ¶ 10.)  Accordingly, the courts in which the California Actions are pending have not expended significant judicial resources and have not even entered

orders setting a discovery schedule or a trial date.  See Bally, 402 B.R. at 624 (denying stay relief

where the parties had not started conducting extensive discovery and were not ready for trial).

36.    To the contrary, the interests of judicial economy and the economical

resolution of litigation would best be served by resolving Movant's claims against the Debtors

through the uniform bankruptcy claims process, particularly in large, complex Chapter 11 cases

where a debtor has thousands of potential claimants and hundreds of pending actions against it.

As Judge Gerber stated in General Motors, "[t]he economical way of doing [prepetition

litigation] is dealing with [prepetition litigation] by the claims allowance process, as all of the

other thousands of claims against this estate are."[13]  Accordingly, the tenth and eleventh Sonnax

Factors weigh in favor of denying the stay relief in each case.

> (vii)    *The Balance of Harms Favors Maintaining the Automatic Stay*
> *(Sonnax Factor No. 12)*

37.    The final Sonnax Factor, the balance of the harms, weighs heavily in favor

of maintaining the stay because the burden imposed on the Debtors in terms of the time, financial

resources, and attention necessary to defend itself in the California Actions far outweighs any

potential gain to Movant in proceeding with the California Actions against the Debtor

Defendants.  The Movant does not provide any evidence that they will suffer any prejudice if the

stay is not immediately lifted.  In contrast, the cost to the Debtors of lifting the automatic stay at

this early stage of the Chapter 11 Cases is substantial, as is the potential detriment to other

creditors as discussed above.  Establishing a precedent for lifting the automatic stay at this point

would inevitably lead to additional relief from stay motions seeking to proceed with prepetition

litigation.  With the Debtors' named as defendants or respondents in over 1,900 prepetition

---

[13] H'rg Tr. 44:20–25, (Nov. 5, 2009) (finding Sonnax Factor 10, the interests of judicial economy and economical
resolution of litigation, weighed in favor of denial of lifting the stay).

actions and in addition, party to several thousand foreclosure, eviction and borrower bankruptcy proceedings nationwide, relief from stay motions filed by plaintiffs in even a relatively small percentage of the Debtors' outstanding litigation would unnecessarily distract the Debtors' management, professionals and, more importantly, the Legal Department from the primary task at hand of a successful rehabilitation of the Debtors' estates.  See, e.g., In re Northwest Airlines Corp., No. 05-17930, 2006 WL 694727, at *2 (Bankr. S.D.N.Y. Mar. 3, 2006) (stating that "[t]o allow the automatic stay to be lifted with respect to this action at this time would prompt similar motions and . . . [t]he distraction and expense of defending such litigation would interfere with judicial economy and the Debtors' process of reorganization.") (citing In re Ionosphere Clubs, Inc., 922 F.2d 984, 989 (2d Cir. 1990)); Bally, 402 B.R. at 623 ("allowing the actions to proceed would distract the Debtors' management from the bankruptcy proceeding . . . thereby affecting the interests of other creditors.").  During the pendency of the Debtors' Chapter 11 Cases, the limited resources of the Debtors' estates are much better spent on the Debtors' restructuring efforts, rather than litigating lawsuits spread throughout the country.  Forcing the Debtors to litigate the California Actions, as discussed above, would distract the Debtors from and hinder their reorganization efforts and negate the important "breathing spell" necessary to allow them to restructure and preserve the value of their assets for the benefit of all creditors.

38.    Permitting the Movant to liquidate its claims in state courts in other parts of the country would undoubtedly lead to numerous additional stay relief motions, which would unnecessarily drain the Debtors' resources and distract them from restructuring at this important early stage in the cases.  See Bally, 402 B.R. at 624 (holding that the overall balance of harms weighed in favor of denying stay relief because forcing the debtors to litigate would distract them from reorganizing, threaten to open the "floodgates" to other lift stay motions, resources

19

were better spent stabilizing operations and cash flows and no great hardship had been

demonstrated).  As Judge Gerber succinctly framed this concern in General Motors:

> [I]f I were ever to allow relief from the stay on a garden variety
> claim of this type there would indeed be the risk, if not the
> certainty, that every other party who thinks he or she has a good
> claim against the estate pending in another jurisdiction would be
> asking me to defend -- to provide relief from the stay and require
> the debtors to be litigating claims of this character all over the
> country. The floodgates concern that the estate articulated is indeed
> a very serious one.[14]

This concern is also real in the Chapter 11 Cases; since the first motion seeking relief from stay

was filed, approximately 16 additional motions seeking relief from the automatic stay have been

filed and the Debtors and their counsel have received several additional informal requests for

such relief.  The balance of the harms clearly favors maintaining the automatic stay with respect

to the California Actions.

## CONCLUSION

39.     Based on the weight of settled authority and its application to the Motion

as described above, the Debtors respectfully submit that the Movant has failed to meet its

burden.  Substantially all of the applicable Sonnax Factors weigh heavily in favor of maintaining

the automatic stay.  As such, the Court should deny the Motion.

---

[14] H'rg Tr. 45:2–45:10 (Nov. 5, 2009).

ny-1049415

WHEREFORE, for the foregoing reasons, the Debtors request that the Court enter an

Order denying the Motion and grant such other relief as the Court deems proper.


New York, New York                          /s/ Larren M. Nashelsky
Dated: July 17, 2012                        Larren M. Nashelsky
                                            Gary S. Lee
                                            Norman S. Rosenbaum
                                            MORRISON & FOERSTER LLP
                                            1290 Avenue of the Americas
                                            New York, New York 10104
                                            Telephone: (212) 468-8000
                                            Facsimile: (212) 468-7900

                                            *Counsel to the Debtors and
                                            Debtors in Possession*

21