**EXHIBIT 2**

**Appendix**

i

**Appendix**

1.      Docket Sheet for Joint Action as of June 11, 2012

2.      Transcript of Hearing at 41:18–20; 44:20–25; 45:2–45:10, In re Motors Liquidation Company f/k/a General Motors Corp., Chapter 11 Case No. 09-50026 (REG) (Nov. 5, 2009)

3.      Complaint of Aurora Bank, FSB v. GMAC Mortgage, LLC, Case No. 30-2012-00539541, dated April 26, 2012

4.      First Amended Counterclaim in Intervention for Damages for Negligent Reconveyance of First Deed of Trust, Case No. PC20090603, dated August 4, 2012

5.      In re Motors Liquidation Co., Case. No. 10 Civ. 36 (RJH), 2010 WL 4966018 (S.D.N.Y. Nov. 17, 2010)

**1**

Case Summary:

| Case Id: | 30-2012-00539541-CU-OR-CJC |
| Case Title: | AURORA BANK, FSB VS. GMAC MORTGAGE, LLC |
| Case Type: | OTHER REAL PROPERTY |
| Filing Date: | 01/24/2012 |
| Category: | CIVIL - UNLIMITED |

Register Of Actions:

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 1 | COMPLAINT FILED BY AURORA BANK, FSB ON 01/24/2012 | 01/24/2012 | | 9 pages | |
| 2 | SUMMONS ISSUED AND FILED FILED BY AURORA BANK, FSB ON 01/24/2012 | 01/24/2012 | | 1 pages | |
| 3 | CIVIL CASE COVER SHEET FILED BY AURORA BANK, FSB ON 01/24/2012 | 01/24/2012 | | 2 pages | |
| 4 | CASE ASSIGNED TO JUDICIAL OFFICER FIRMAT, FRANCISCO ON 01/24/2012. | 01/24/2012 | | 1 pages | |
| 5 | PAYMENT RECEIVED BY FOR 166 - COMPLAINT OR OTHER 1ST PAPER IN THE AMOUNT OF 395.00, TRANSACTION NUMBER 11070365 AND RECEIPT NUMBER 10894257. | 01/24/2012 | | 1 pages | |
| 6 | AMENDED COMPLAINT (FIRST) FILED BY AURORA BANK, FSB ON 04/26/2012 | 04/26/2012 | | 20 pages | |
| 7 | SUMMONS ISSUED AND FILED FILED BY AURORA BANK, FSB ON 04/26/2012 | 04/26/2012 | | 1 pages | |
| 8 | CASE MANAGEMENT CONFERENCE SCHEDULED FOR 08/24/2012 AT 09:00:00 AM IN C15 AT CENTRAL JUSTICE CENTER. | 05/10/2012 | | 2 pages | |
| 9 | NOTICE - OTHER (OF BANKRUPTCY AND EFFECT OF AUTOMATIC STAY) FILED BY GMAC MORTGAGE, LLC; EXECUTIVE TRUSTEE SERVICES, LLC ON 06/01/2012 | 06/01/2012 | | 9 pages | |
| 10 | PAYMENT RECEIVED BY FOR 167 - ANSWER OR OTHER 1ST PAPER, 167 - ANSWER OR OTHER 1ST PAPER IN THE AMOUNT OF 790.00, TRANSACTION NUMBER 11156396 AND RECEIPT NUMBER 10980288. | 06/01/2012 | | 1 pages | |

Participants:

| Name | Type | Assoc | Start Date | End Date |
|---|---|---|---|---|
| AURORA BANK, FSB | PLAINTIFF | | 01/24/2012 | |
| EXECUTIVE TRUSTEE SERVICES, LLC | DEFENDANT | | 01/24/2012 | |
| GMAC MORTGAGE, LLC | DEFENDANT | | 01/24/2012 | |

Hearings:

| Description | Date | Time | Department | Judge |
|---|---|---|---|---|
| CASE MANAGEMENT CONFERENCE | 08/24/2012 | 09:00 | C15 | FIRMAT |

Print this page

**2**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, ET AL.,

        f/k/a General Motors Corp, et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                November 5, 2009

                9:50 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

41

1    is to permit his claim to be liquidated in another forum.  But

2    it has the consequences of requiring the estate to defend the

3    claim in an inefficient fashion.

4         In my experience, impact of the stay on the parties

5    and the balance of harms, factor number 12, is one of the most

6    important.  Here nobody is going to be depriving Mr. Lawrence

7    of his day in court.  The issue, rather, is which court will

8    decide the issues.

9         As we've now established I have subject matter

10   jurisdiction to decide a routine matter of claims allowance and

11   to address all of Mr. Lawrence's needs and concerns insofar as

12   he's looking for relief from this debtor.  Frankly, based upon

13   my understanding of the nonbankruptcy law, if and to the extent

14   he has claims, they're more likely to exist against the

15   separate defendant, the trust, rather than this debtor but I'll

16   give him a fair day in court to decide these issues if he

17   wishes to proceed with them in the claims context.

18        Bankruptcy litigation is typically as efficient or

19   more efficient than litigation in the district courts in

20   connection with plenary litigation.  And the very reason that

21   we have a claims allowance process is to deal with these

22   matters, subject to rights of appeal of course, in the most

23   economical way possible.

24        Conversely, if the estate has to go through the burden

25   of litigation elsewhere and the estate is paying full

1      whether you have the option, which is plainly present here, of

2      allowing the litigation to proceed against the third parties,

3      against whom it's primarily asserted.  And it's no big deal to

4      allow the debtor to be severed and to allow the litigation to

5      proceed in the other forum against the remaining parties.

6            Here I still think that having the debtor participate

7      would have the burdens that I articulated previously.  And the

8      second way of looking at it favors opposition to the

9      debtor's -- excuse me -- Mr. Lawrence's motion.  His principal

10     target should be, if it's anybody, the trust.  But if he wants

11     to proceed against the debtor, that's his right.  But what he

12     should do is simply continue his litigation against the trust

13     and if he wishes to proceed with his claim here.

14           Whether the judgment claim arising from the other

15     section is subject to equitable subordination is factor 8, it's

16     simply inapplicable here.

17           Factor 9, whether movant's success in other proceeding

18     would result in a judicial lien avoidable by the debtor isn't

19     applicable here.

20           Factor 10, the interest of judicial economy and the

21     expeditious and economical resolution of litigation warrants

22     and weighs in favor of denial of the motion Mr. Lawrence

23     brought here.  The economical way of doing it is dealing with

24     it by the claims allowance process, as all of the other

25     thousands of claims against this estate are.  And in this

45

1    connection, in connection with several of the factors, I do

2    have to note that if I were ever to allow relief from the stay

3    on a garden variety claim of this type there would indeed be

4    the risk, if not the certainty, that every other party who

5    thinks he or she has a good claim against the estate pending in

6    another jurisdiction would be asking me to defend -- to provide

7    relief from the stay and require the debtors to be litigating

8    claims of this character all over the country.  The floodgates

9    concern that the estate articulated is indeed a very serious

10   one.

11           So for the foregoing reasons the motion is denied.

12   The debtors are to settle an order in accordance with the

13   foregoing.  The order should not attempt to encapsulate

14   everything I said in this lengthy, dictated decision.  It

15   should merely provide that for the reasons set forth in this

16   decision the motion is denied.

17           Not by way of reargument, do we have anything that I

18   failed to address?  Mr. Lawrence?

19           MR. LAWRENCE:  Yes, Your Honor.

20           THE COURT:  I can't allow you to reargue the motion or

21   to debate my decision except by taking it up on appeal, but I

22   will allow you to tell me if you think I have any business that

23   I didn't address today.

24           MR. LAWRENCE:  Any what, sir?

25           THE COURT:  Business.

**3**



# Notice of Service of Process

**AZF / ALL**
**Transmittal Number: 9915962**
**Date Processed: 05/16/2012**

**Primary Contact:**
Sheryl Mlaker
GMAC/Residential Funding
8400 Normandale Lake Blvd
Suite 350
Bloomington, MN 55437

| | |
|---|---|
| **Entity:** | GMAC Mortgage, LLC |
| | Entity ID Number  2455042 |
| **Entity Served:** | GMAC Mortgage, LLC |
| **Title of Action:** | Aurora Bank, FSB vs. GMAC Mortgage, LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Property |
| **Court/Agency:** | Orange County Superior Court, California |
| **Case/Reference No:** | 30-2012-00539541 |
| **Jurisdiction Served:** | Alaska |
| **Date Served on CSC:** | 05/15/2012 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | Valerie J. Schratz |
| | 714-918-7000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

**SUMMONS** ON FIRST AMENDED COMPLAINT
*(CITACION JUDICIAL)* ·

**SUM-100**

| | FOR COURT USE ONLY
| | *(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:** GMAC MORTGAGE, LLC, a Delaware
*(AVISO AL DEMANDADO):* limited liability company;
EXECUTIVE TRUSTEE SERVICES, LLC, a Pennsylvania
limited liability company; and DOES 1 through 25,
inclusive

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

APR 26 2012

ALAN CARLSON, Clerk of the Court

**YOU ARE BEING SUED BY PLAINTIFF:** AURORA BANK, FSB
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (*www.sucorte.ca.gov*), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (*www.lawhelpcalifornia.org*), en el Centro de Ayuda de las Cortes de California, (*www.sucorte.ca.gov*) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is: | CASE NUMBER: |
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* |

Superior Court
Orange County
700 Civic Center Drive West
Santa Ana, California 92701

CASE NUMBER: 2012 - 00539541

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Howard D. Hall, Esq. (145024)       (714) 918-7000   (714) 918-6996
Valerie J. Schratz, Esq. (272418)
Green & Hall, APC
1851 East First Street, 10th Floor, Santa Ana, California 92705   R. LUCEY

| DATE: | APR 26 2012 ALAN CARLSON | Clerk, by | | , Deputy |
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* GMAC Mortgage, LLC.
   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

1 | GREEN & HALL, A PROFESSIONAL CORPORATION
Howard D. Hall, Esq. (State Bar No. 145024)
2 | Valerie J. Schratz, Esq. (State Bar No. 272418)
1851 East First Street, 10th Floor
3 | Santa Ana, California 92705-4052
Telephone: (714) 918-7000
4 | Facsimile: (714) 918-6996

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

APR 26 2012

ALAN CARLSON, Clerk of the Court

5 | Attorneys for Plaintiff
AURORA BANK, FSB

6

7

8 | ## SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | ## COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11 | AURORA BANK, FSB,                                    ) Case No. 30-2012-00539541
                                                        )
12 |              Plaintiff,                             ) JUDGE:   Hon. Francisco F. Firmat
                                                        ) DEPT:    C15
13 | vs.                                                 )
                                                        ) **FIRST AMENDED COMPLAINT**
14 | GMAC MORTGAGE, LLC, a Delaware                      ) **FOR:**
limited liability company; EXECUTIVE                    ) **(1) DECLARATORY RELIEF**
15 | TRUSTEE SERVICES, LLC, a Pennsylvania               ) **(2) SLANDER OF TITLE (KING)**
limited liability company; and DOES 1                   ) **(3) SLANDER OF TITLE (THOMAS)**
16 | through 25, inclusive,                              ) **(4) SLANDER OF TITLE (TOZIER)**
                                                        ) **(5) CANCELLATION OF CLOUD ON**
17 |              Defendants.                            ) **TITLE**
                                                        ) **(6) NEGLIGENT RECONVEYANCE**
18 |                                                     ) **OF DEED OF TRUST**
                                                        ) **(7) UNFAIR BUSINESS PRACTICES**
19 |                                                     ) **(B&P 17000)**
                                                        )
20 |                                                     ) Action Filed:  January 24, 2012
                                                        ) Trial Date:    None Set
21 |

22 |        COMES NOW Plaintiff AURORA BANK, FSB and for causes of action alleges as

23 | follows:

24 |        1.    Plaintiff AURORA BANK, FSB ("Plaintiff" or "Aurora") is a federal

25 | savings bank, and at all times relevant herein was registered to do business in and was

26 | conducting business in the State of California.

27 |        2.    Plaintiff is informed and believes and, based thereon, alleges that Defendant

28 | GMAC MORTGAGE, LLC, formerly known as GMAC MORTGAGE CORPORATION

---

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

1  ("GMAC"), is a Delaware limited liability company, and at all times relevant herein

2  conducted business in the State of California.

3      3.   Plaintiff is informed and believes and, based thereon, alleges that Defendant

4  EXECUTIVE TRUSTEE SERVICES, LLC, formerly known as EXECUTIVE TRUSTEE

5  SERVICES, INC. ("Executive Trustee"), is a Pennsylvania limited liability company, and

6  at all times relevant herein conducted business in the State of California.

7      4.   The true names and capacities, whether individual, corporate, associate or

8  otherwise, of Defendants herein designated by the fictitious names DOES 1 through 25,

9  inclusive are unknown to Plaintiff, who therefore sue Defendants by such fictitious names.

10  When the true names and capacities of Defendants have been ascertained, Plaintiff will

11  amend this pleading accordingly. Plaintiff is informed and believes and, based thereon,

12  alleges that each of the Defendants are in some manner responsible for the acts, omissions

13  and/or occurrences hereinafter alleged and actually and proximately caused and/or

14  contributed to the various injuries and damages set forth below.

15      5.   At all times relevant hereto, each of the Defendants was acting as the agent,

16  partner, co-developer, joint venturer, servant and/or subcontractor of each of the remaining

17  Defendants, and was acting within the course and scope of said agency and employment.

18  **KING DEED OF TRUST**

19      6.   On or about May 5, 2005, Richard King ("Mr. King") obtained a home loan

20  from Plaza Home Mortgage, Inc. for $340,000.00 ("King Loan"). The King Loan was

21  secured by a deed of trust ("King Deed of Trust") recorded against Mr. King's real property

22  located at 1175 Phillips St., Vista, California 92083 ("King Property"). The King Deed of

23  Trust was recorded on May 9, 2005, in the San Diego County Recorder's Office as

24  document number 2005-0391137.

25      7.   Plaintiff is the current servicer of the King Loan and represents the interests

26  of the current owner of the King Loan. Plaintiff, as servicer, has the authority, through

27  relevant servicing agreements, to enforce the terms of the King Loan and the King Deed of

28  Trust and therefore has standing to bring this lawsuit.

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

1        8.    On or about November 25, 2005, GMAC, through its agent, Executive

2  Trustee, executed a Full Reconveyance of the King Deed of Trust.  This Full Reconveyance

3  was recorded in the San Diego County Recorder's Office on December 2, 2005, as

4  document number 2005-1039076.

5        9.    Neither GMAC nor Executive Trustee was given any authority by Plaintiff

6  or any other person related to the King Deed of Trust to execute the Full Reconveyance.  In

7  fact, the King Deed of Trust was to be reconveyed only upon full satisfaction of the

8  $340,000.00 loan made to Mr. King, and the King Loan has never been satisfied.

9  Furthermore, at no time was GMAC or Executive Trustee a servicer of the King Loan or

10  the King Deed of Trust.  Plaintiff is informed and believes and, based thereon, alleges that

11  GMAC was the servicer for another loan related to the King Property, and meant to

12  reconvey the deed of trust related to that other loan; but inadvertently reconveyed the King

13  Deed of Trust instead.

14        10.   Plaintiff is informed and believes and, based thereon, alleges that on or about

15  October 9, 2006, Mr. King obtained a home equity loan from Washington Mutual Bank, FA

16  ("WAMU") in the amount of $413,000.00 ("WAMU Loan"), secured by a deed of trust

17  against the King Property ("WAMU Deed of Trust").  The WAMU Deed of Trust was

18  recorded in the San Diego County Recorder's Office as document number 2006-0716372

19  on October 9, 2006.

20        11.   Plaintiff is informed and believes and, based thereon, alleges that Mr. King

21  subsequently defaulted upon the WAMU Loan, and WAMU sold the King Property at a

22  foreclosure sale on or about June 4, 2008.  Specifically, a Trustee's Deed Upon Sale was

23  recorded in the San Diego County Recorder's Office as document number 2008-0311820

24  on June 10, 2008, which purports to transfer ownership of the King Property to WAMU.

25  Plaintiff is informed and believes and, based thereon, alleges that, at the time of its

26  foreclosure sale, WAMU believed that all senior Deeds of Trust recorded against the King

27  Property had been reconveyed.  Plaintiff is further informed and believes and, based

28  thereon, alleges that WAMU (now owned by JP Morgan Chase Bank, NA) subsequently

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

GREEN & HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

1   sold the King Property to Timothy and Leah Lyall (the "Lyalls") on or about December 2,

2   2009.

3       12. The King Loan is currently in default. Plaintiff is informed and believes

4   and, based thereon, alleges that the Lyalls claim exclusive title and possession of the King

5   Property, subject only to a subsequently recorded deed of trust in favor of Sterns Lending

6   Inc. and/or its successor or assigns. Plaintiff is informed and believes and, based thereon,

7   alleges that the Lyalls have not and do not intend to pay the outstanding balance owed on

8   the King Loan.

9       13. Because of the aforementioned actions of GMAC and Executive Trustee,

10  Plaintiff has been unable to foreclose upon the King Property under the terms of the King

11  Deed of Trust or otherwise enforce its security interest in the King Property, and has

12  suffered damages in an amount to be proven at trial.

13                          **THOMAS DEED OF TRUST**

14      14. On or about February 18, 2005, Jo Ann Thomas ("Ms. Thomas") obtained a

15  home loan from National Bank for $304,000.00 ("Thomas Loan"). This home loan was

16  secured by a deed of trust ("Thomas Deed of Trust") against Ms. Thomas' real property

17  located at 1428 West 93rd Street, Los Angeles, California 90047 ("Thomas Property"). The

18  Thomas Deed of Trust was recorded on February 28, 2005, in the Los Angeles County

19  Recorder's Office as document number 2005-0441107.

20      15. Plaintiff is the current servicer of the Thomas Loan and represents the

21  interests of the current owner of the Thomas Loan. Plaintiff, as servicer, has the authority,

22  through relevant servicing agreements, to enforce the terms of the Thomas Loan and the

23  Thomas Deed of Trust and therefore has standing to bring this lawsuit.

24      16. On or about November 17, 2005, GMAC, through its agent, Executive

25  Trustee, executed a Substitution of Trustee naming Executive Trustee as trustee under the

26  Thomas Deed of Trust. This Substitution of Trustee was recorded in the Los Angeles

27  County Recorder's Office on November 28, 2005, as document number 2005-2885686.

28  ///

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

GREEN & HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

1    17. On or about November 17, 2005, GMAC, through its agent, Executive

2    Trustee, executed a Full Reconveyance of the Thomas Deed of Trust. This Full

3    Reconveyance was recorded in the Los Angeles County Recorder's Office on November

4    28, 2005, as document number 2005-2885687.

5    18. Neither GMAC nor Executive Trustee was given any authority by Plaintiff

6    or any other person related to the Thomas Deed of Trust to execute either the Substitution

7    of Trustee or the Full Reconveyance. In fact, the Thomas Deed of Trust was to be

8    reconveyed only upon full satisfaction of the $304,000.00 loan made to Ms. Thomas, and

9    such loan has never been satisfied. Furthermore, at no time was GMAC or Executive

10   Trustee a servicer of the loan secured by the Thomas Deed of Trust. Plaintiff is informed

11   and believes and, based thereon, alleges that GMAC was the servicer for another loan

12   related to the Thomas Property, and meant to reconvey the deed of trust related to that other

13   loan; but instead executed a Full Reconveyance for the Thomas Deed of Trust.

14   19. Plaintiff is informed and believes and, based thereon, alleges that in 2007,

15   Ms. Thomas deeded the Thomas Property to PRG Investments, Inc., who later deeded the

16   property to Fannie Dutton ("Dutton"). Plaintiff is informed and believes and, based

17   thereon, alleges that on or about October 10, 2007, Dutton obtained a loan in the amount of

18   $373,500.00, which was secured by a deed of trust against the Thomas Property, recorded

19   on October 16, 2007, in the Los Angeles County Recorder's Office as document number

20   2007-2356818 ("Dutton Deed of Trust").

21   20. Plaintiff is informed and believes and, based thereon, alleges that on January

22   31, 2008, GMAC recorded a Notice of Rescission of Full Reconveyance, document number

23   2008-0184534, in the Los Angeles County Recorder's Office. Plaintiff is further informed

24   and believes and, based thereon, alleges that GMAC made multiple representations to

25   Plaintiff that this Notice of Rescission re-established the priority of the Thomas Deed of

26   Trust.

27   21. The Thomas Loan is currently in default. Plaintiff is informed and believes

28   and, based thereon, alleges that Dutton claims exclusive title and possession of the Thomas

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

GREEN & HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

1  Property, subject only to the Dutton Deed of Trust. Plaintiff is informed and believes and,

2  based thereon, alleges that Dutton has not and does not intend to pay the outstanding

3  balance owed on the Thomas Loan.

4      22.  Because of the aforementioned actions of GMAC and/or Executive Trustee,

5  Plaintiff has been unable to foreclose upon the Thomas Property under the terms of the

6  Thomas Deed of Trust or otherwise enforce its security interest in the Thomas Property,

7  and has suffered damages in an amount to be proven at trial.

8                              **TOZIER DEED OF TRUST**

9      23.  On or about April 4, 2005, Mark Tozier ("Mr. Tozier") obtained a home loan

10  from California Empire Financial Group, Inc. for $429,856.00 ("Tozier Loan"). This home

11  loan was secured by a deed of trust ("Tozier Deed of Trust") against Mr. Tozier's real

12  property located at 33914 Tuscan Creek Way, Temecula, California 92592 ("Tozier

13  Property"). The Tozier Deed of Trust was recorded on April 4, 2005, in the Riverside

14  County Recorder's Office as document number 2005-0261680.

15      24.  Plaintiff is the current servicer of the Tozier Loan and represents the

16  interests of the current owner of the Tozier Loan. Plaintiff, as servicer, has the authority,

17  through relevant servicing agreements, to enforce the terms of the Tozier Loan and the

18  Tozier Deed of Trust and therefore has standing to bring this lawsuit.

19      25.  On or about November 29, 2005, GMAC, through its agent, Executive

20  Trustee, executed a Substitution of Trustee naming Executive Trustee as trustee under the

21  Tozier Deed of Trust. This Substitution of Trustee was recorded in the Riverside County

22  Recorder's Office on November 29, 2005, as document number 2005-0984448.

23      26.  On or about November 29, 2005, GMAC, through its agent, Executive

24  Trustee, executed a Full Reconveyance of the Tozier Deed of Trust. This Full

25  Reconveyance was recorded in the Riverside County Recorder's Office on November 29,

26  2005, as document number 2005-0984449.

27      27.  Neither GMAC nor Executive Trustee was given any authority by Plaintiff

28  or any other person related to the Tozier Deed of Trust to execute either the Substitution of

GREEN&HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

6

1  Trustee or the Full Reconveyance. In fact, the Tozier Deed of Trust was to be reconveyed

2  only upon full satisfaction of the $429,856.00 loan made to Mr. Tozier, and such loan has

3  never been satisfied. Furthermore, at no time was GMAC or Executive Trustee a servicer

4  of the loan secured by the Tozier Deed of Trust. Plaintiff is informed and believes and,

5  based thereon, alleges that GMAC was the servicer for another loan related to the Tozier

6  Property, and meant to reconvey the deed of trust related to that other loan; but instead

7  executed a Full Reconveyance for the Tozier Deed of Trust.

8        28.  Plaintiff is informed and believes and, based thereon, alleges that on or about

9  April 30, 2008, Bank of America ("BofA") foreclosed upon a junior home equity line of

10  credit Deed of Trust and purchased the Tozier Property at the foreclosure sale for $160,776

11  (Trustee's Deed Upon Sale recorded as document no. 2008-0222317). Plaintiff is further

12  informed and believes and, based thereon, alleges that BofA believed that all senior Deeds

13  of Trust against the Tozier Property had been reconveyed at the time of BofA's foreclosure

14  sale. Plaintiff is further informed and believes and, based thereon, alleges that on June 10,

15  2008, BofA entered into a written contract with Jason and Jennifer Schermerhorn to

16  purchase the Tozier Property.

17        29.  Plaintiff is informed and believes and, based thereon, alleges that on June

18  17, 2008, GMAC recorded a document entitled "Rescission: A Notice of Void

19  Reconveyance," document number 2008-0329369 in the Riverside County Recorder's

20  Office. Plaintiff is informed and believes and, based thereon, alleges that GMAC

21  repeatedly represented to Plaintiff that recording this document would re-establish the

22  priority of the Tozier Deed of Trust.

23        30.  Plaintiff is informed and believes and, based thereon, alleges that on March

24  29, 2007, Tozier filed for bankruptcy and listed the Tozier Loan as a fully secured

25  encumbrance against the Tozier Property. Based upon Tozier's Bankruptcy, Plaintiff is

26  informed and believes and, based thereon, alleges that Plaintiff cannot seek recovery of the

27  Tozier Loan from Tozier but must look solely to its security interest under the Tozier Deed

28  of Trust to obtain recovery in the event Tozier fails to pay the Tozier Loan.

GREEN & HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

7

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

1    31. Plaintiff is informed and believes and, based thereon, alleges that on or about

2    July 11, 2008, escrow closed for the sale of the Tozier Property from BofA to the

3    Schermerhorns. Plaintiff is further informed and believes and, based thereon, alleges that

4    on or about April 9, 2009, the Schermerhorns obtained a loan from National Bank of

5    Kansas City for $335,637.00 secured by a Deed of Trust recorded against the Tozier

6    Property as document number 2009-0174200 in the Riverside County Recorder's Office

7    ("Schermerhorn Deed of Trust"). Plaintiff is informed and believes and, based thereon,

8    alleges that National Bank of Kansas City subsequently assigned its interest in the

9    Schermerhorn loan and Deed of Trust to Wells Fargo Bank, N.A.

10    32. The Tozier Loan is currently in default. Plaintiff is informed and believes

11    and, based thereon, alleges that the Shermerhorns claim exclusive title and possession of

12    the Tozier Property, subject only to the Shermerhorn Deed of Trust. Plaintiff is informed

13    and believes and, based thereon, alleges that the Schermerhorns have not and do not intend

14    to pay the outstanding balance owed on the Tozier Loan. Furthermore, Plaintiff is informed

15    and believes and, based thereon, alleges that Wells Fargo Bank, N.A. asserts that the

16    Schermerhorn Deed of Trust is in a first lien priority position and not subordinate to the

17    Tozier Deed of Trust.

18    33. Plaintiff is informed and believes and, based thereon, alleges that on or about

19    December 1, 2009, GMAC filed an action in the Riverside County Superior Court entitled

20    *GMAC Mortgage, LLC v. Tozier,* Case No. RIC541193 ("Tozier Lawsuit"), and represented

21    to Plaintiff that this lawsuit would re-establish the priority of the Tozier Deed of Trust.

22    34. Plaintiff is informed and believes and, based thereon, alleges that on or about

23    February 1, 2012, judgment was entered in the Tozier Lawsuit declaring that Plaintiff's

24    Tozier Deed of Trust was unenforceable.

25    35. Because of the aforementioned actions of GMAC and/or Executive Trustee,

26    Plaintiff has been unable to foreclose upon the Tozier Property under the terms of the

27    Tozier Deed of Trust or otherwise enforce its security interest in the Tozier Property, and

28    has suffered damages in an amount to be proven at trial.

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

## **FIRST CAUSE OF ACTION**

### **(Declaratory Relief against all Defendants)**

36. Plaintiff incorporates, by reference, each and every paragraph of this Complaint as though fully set forth herein.

37. Plaintiff is informed and believes and, based thereon, alleges that because of the actions of Defendants that resulted in the erroneous reconveyances of the King, Thomas, and Tozier Deeds of Trust, Plaintiff has lost its security interest in those Properties, is unable to enforce its Deeds of Trust and is now unable to foreclose upon the King, Thomas and Tozier Properties. Plaintiff is further informed and believes and, based thereon, alleges that due to the circumstances more fully described above, Plaintiff has been and will continue to be unable to recover any of the unpaid loan balances of the King, Thomas and Tozier Loans.

38. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that Defendants are liable to Plaintiff for the full amount of the unpaid balances on the King, Thomas and Tozier Loans, whereas Plaintiff is informed and believes and, based thereon, alleges that Defendants dispute these contentions and contend that they are not liable to Plaintiff.

39. Plaintiff desires a judicial determination and a declaration as to the rights, duties and obligations of Defendants in regards to their erroneous reconveyances of the King, Thomas and Tozier Deeds of Trust and their resulting liability for the unpaid balances of the King, Thomas and Tozier Loans.

40. Plaintiff is informed and believes and, based thereon, alleges that Plaintiff has previously demanded that Defendants take corrective actions in regards to their erroneous reconveyances of the King, Thomas and Tozier Deeds of Trust; but Defendants failed to reinstate the first lien priority position of the King, Thomas and Tozier Deeds of Trust and refuse to acknowledge any liability for the losses sustained or to be sustained by Plaintiff due to Defendants' actions and/or failures to act.

9

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

GREEN & HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

1   41.  A judicial declaration is necessary and appropriate at this time under the

2   circumstances in order that Plaintiff and Defendants may ascertain whether Defendants'

3   actions have caused Plaintiff a complete loss of security under the King, Thomas and

4   Tozier Deeds of Trust and whether Defendants are liable to Plaintiff for the full amount of

5   the unpaid balances of the King, Thomas and Tozier Loans.

6   ## SECOND CAUSE OF ACTION

7   ### (Slander of Title (King) against all Defendants)

8   42.  Plaintiff incorporates, by reference, each and every paragraph of this

9   Complaint as though fully set forth herein.

10   43.  Plaintiff is informed and believes and, based thereon, alleges that on or about

11   November 28, 2005, Defendants willfully, wrongfully, without justification, and without

12   privilege caused to be recorded a Full Reconveyance of the King Deed of Trust.

13   44.  Plaintiff is informed and believes and, based thereon, alleges that the Full

14   Reconveyance of the King Deed of Trust was false and caused doubt to be cast on

15   Plaintiff's legal interest in the King Property.  Because of the execution and recording of

16   the Full Reconveyance of the King Deed of Trust, Plaintiff has been unable to foreclose

17   upon the King Property under the terms of the King Deed of Trust or otherwise enforce its

18   security interest in the King Property, and has suffered damages in an amount to be proven

19   at trial.

20   45.  Plaintiff is informed and believes and, based thereon, alleges that Defendants

21   represented to Plaintiff on multiple occasions that Defendants' actions would restore the

22   King, Thomas and Tozier Deeds of Trust to enforceable first lien priority positions.

23   Plaintiff is further informed and believes and, based thereon, alleges that at the time

24   Defendants made these representations, Defendants knew these representations were false;

25   but Defendants made these representations to induce Plaintiff to avoid seeking other

26   remedies against Defendants.  Plaintiff reasonably relied on these representations.  Plaintiff

27   filed this action immediately after learning that the above-mentioned representations were

28   false.  Plaintiff is informed and believes, and based thereon alleges, that Defendants have

GREEN & HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

10

1   suffered no prejudice from any delay in bringing this action. Based upon the foregoing, all

2   relevant statutes of limitation have been equitably tolled and/or Defendants are equitably

3   estopped from asserting any defense due to any statute of limitations.

4        46. The recording of the Full Reconveyance of the King Deed of Trust made it

5   necessary for Plaintiff to retain attorneys and to bring this action. Therefore, Plaintiff is

6   entitled to recover attorney's fees and costs incurred in this action. The exact amount of

7   such damages is not known to Plaintiff at this time, and Plaintiff will move to amend this

8   complaint to state such amount when the same becomes known, or on proof thereof.

9   **THIRD CAUSE OF ACTION**

10  **(Slander of Title (Thomas) against all Defendants)**

11       47. Plaintiff is informed and believes and, based thereon, alleges that on or about

12  November 17, 2005, Defendants willfully, wrongfully, without justification, and without

13  privilege caused to be recorded a Full Reconveyance of the Thomas Deed of Trust.

14       48. Plaintiff is informed and believes and, based thereon, alleges that the Full

15  Reconveyance of the Thomas Deed of Trust was false and caused doubt to be cast on

16  Plaintiff's interest in title to the Thomas Property. Because of the execution and recording

17  of the Full Reconveyance of the Thomas Deed of Trust, Plaintiff has been unable to

18  foreclose upon the Thomas Property under the terms of the Thomas Deed of Trust or

19  otherwise enforce its security interest in the Thomas Property, and has suffered damages in

20  an amount to be proven at trial.

21       49. Plaintiff is informed and believes and, based thereon, alleges that Defendants

22  represented to Plaintiff on multiple occasions that Defendants' actions would restore the

23  King, Thomas and Tozier Deeds of Trust to enforceable first lien priority positions.

24  Plaintiff is further informed and believes and, based thereon, alleges that at the time

25  Defendants made these representations, Defendants knew these representations were false;

26  but Defendants made these representations to induce Plaintiff to avoid seeking other

27  remedies against Defendants. Plaintiff reasonably relied on these representations. Plaintiff

28  filed this action immediately after learning that the above-mentioned representations were

GREEN&HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

11

1  false. Plaintiff is informed and believes, and based thereon alleges, that Defendants have

2  suffered no prejudice from any delay in bringing this action. Based upon the foregoing, all

3  relevant statutes of limitation have been equitably tolled and/or Defendants are equitably

4  estopped from asserting any defense due to any statute of limitations.

5      50. The recording of the Full Reconveyance of the Thomas Deed of Trust made

6  it necessary for Plaintiff to retain attorneys and to bring this action. Therefore, Plaintiff is

7  entitled to recover attorney's fees and costs incurred in this action. The exact amount of

8  such damages is not known to Plaintiff at this time, and Plaintiff will move to amend this

9  complaint to state such amount when the same becomes known, or on proof thereof.

10                **FOURTH CAUSE OF ACTION**

11          **(Slander of Title (Tozier) against all Defendants)**

12      51. Plaintiff is informed and believes and, based thereon, alleges that on or about

13  November 29, 2005, Defendants willfully, wrongfully, without justification, and without

14  privilege caused to be recorded a Full Reconveyance of the Tozier Deed of Trust.

15      52. Plaintiff is informed and believes and, based thereon, alleges that the Full

16  Reconveyance of the Tozier Deed of Trust was false and caused doubt to be cast on

17  Plaintiff's interest in title to the Tozier Property. Because of the execution and recording of

18  the Full Reconveyance of the Tozier Deed of Trust, Plaintiff has been unable to foreclose

19  upon the Tozier Property under the terms of the Tozier Deed of Trust or otherwise enforce

20  its security interest in the Tozier Property, and has suffered damages in an amount to be

21  proven at trial.

22      53. Plaintiff is informed and believes and, based thereon, alleges that Defendants

23  represented to Plaintiff on multiple occasions that Defendants' actions would restore the

24  King, Thomas and Tozier Deeds of Trust to enforceable first lien priority positions.

25  Plaintiff is further informed and believes and, based thereon, alleges that at the time

26  Defendants made these representations, Defendants knew these representations were false;

27  but Defendants made these representations to induce Plaintiff to avoid seeking other

28  remedies against Defendants. Plaintiff reasonably relied on these representations. Plaintiff

GREEN&HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

12

1    filed this action immediately after learning that the above-mentioned representations were

2    false. Plaintiff is informed and believes, and based thereon alleges, that Defendants have

3    suffered no prejudice from any delay in bringing this action. Based upon the foregoing, all

4    relevant statutes of limitation have been equitably tolled and/or Defendants are equitably

5    estopped from asserting any defense due to any statute of limitations.

6        54. The recording of the Full Reconveyance Tozier Deed of Trust made it

7    necessary for Plaintiff to retain attorneys and to bring this action. Therefore, Plaintiff is

8    entitled to recover attorney's fees and costs incurred in this action. The exact amount of

9    such damages is not known to Plaintiff at this time, and Plaintiff will move to amend this

10   complaint to state such amount when the same becomes known, or on proof thereof.

11                        **FIFTH CAUSE OF ACTION**

12            **(Cancellation of Cloud on Title against all Defendants)**

13       55. Plaintiff incorporates, by reference, each and every paragraph of this

14   Complaint as though fully set forth herein.

15       56. Plaintiff is informed and believes and, based thereon, alleges that the Lyalls

16   and others claim and assert interests in the King Property which are adverse to Plaintiff's

17   interest. These adverse interests are based on a Full Reconveyance of the King Deed of

18   Trust which was recorded on or about December 2, 2005, in the San Diego County

19   Recorder's Office as document number 2005-1039076.

20       57. The Full Reconveyance of the King Deed of Trust is invalid and void

21   because it is false and was executed without proper authority.

22       58. Because of the execution and recording of the Full Reconveyance of the

23   King Deed of Trust, Plaintiff has been unable to foreclose upon the King Property under the

24   terms of the King Deed of Trust or otherwise enforce its security interest in the King

25   Property, and has suffered damages in an amount to be proven at trial.

26       59. Plaintiff is informed and believes and, based thereon, alleges that Dutton and

27   others claim and assert interests in the Thomas Property which are adverse to Plaintiff's

28   interest. These adverse interests are based on a Full Reconveyance of the Thomas Deed of

GREEN&HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

13

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

1   Trust which was recorded on or about November 28, 2005, in the Los Angeles County

2   Recorder's Office as document number 2005-2885687.

3         60.   The Full Reconveyance of the Thomas Deed of Trust is invalid and void

4   because it is false and was executed without proper authority.

5         61.   Because of the execution and recording of the Full Reconveyance of the

6   Thomas Deed of Trust, Plaintiff has been unable to foreclose upon the Thomas Property

7   under the terms of the Thomas Deed of Trust or otherwise enforce its security interest in the

8   Thomas Property, and has suffered damages in an amount to be proven at trial.

9         62.   Plaintiff is informed and believes and, based thereon, alleges that the

10  Schermerhorns and others claim and assert interests in the Tozier Property which are

11  adverse to Plaintiff's interest.  These adverse interests are based on a Full Reconveyance of

12  the Tozier Deed of Trust which was recorded on or about November 29, 2005, in the

13  Riverside County Recorder's Office as document number 2005-0984449.

14        63.   The Full Reconveyance of the Tozier Deed of Trust is invalid and void

15  because it is false and was executed without proper authority.

16        64.   Because of the execution and recording of the Full Reconveyance of the

17  Tozier Deed of Trust, Plaintiff has been unable to foreclose upon the Tozier Property under

18  the terms of the Tozier Deed of Trust or otherwise enforce its security interest in the Tozier

19  Property, and has suffered damages in an amount to be proven at trial.

20        65.   Based upon the foregoing, Plaintiff requests that the erroneous documents

21  recorded by Defendants be delivered to the clerk of the court for cancellation and that they

22  be declared void, that Plaintiffs be awarded damages caused by the inconvenience and time

23  suffered by Plaintiff in removing the cloud(s) on title and all attorney's fees and costs

24  incurred in removing the cloud(s) on title.

25                          **SIXTH CAUSE OF ACTION**

26        **(Negligent Reconveyance of Deed of Trust against all Defendants)**

27        66.   Plaintiff incorporates, by reference, each and every paragraph of this

28  Complaint as though fully set forth herein.

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

1      67. Plaintiff is informed and believes and, based thereon, alleges that in

2 performing its duties as a mortgage servicer and recording public documents in County

3 Recorder's Offices in Southern California, Defendants owed a duty to the public to execute

4 and record only those documents for which they are properly authorized to execute and

5 record, and to ensure that all documentation recorded is accurate. Furthermore, if a trustee

6 reconveys a secured interest in property without proper authorization, it must immediately

7 and effectively correct its mistake. Further, a trustee is liable for the damages caused by an

8 improper or erroneous reconveyance.

9      68. When executing and recording the Full Reconveyance of the King Deed of

10 Trust, Defendants negligently failed to ensure that they were properly authorized to

11 reconvey the King Deed of Trust and/or negligently failed to ensure that the deed of trust

12 information and document numbers listed on the Full Reconveyance matched those

13 Defendants actually intended to reconvey.

14      69. As a result of Defendants' negligence in regards to the Full Reconveyance of

15 the King Deed of Trust, Plaintiff has incurred and will incur substantial damages in an

16 amount presently unknown.

17      70. When executing and recording the Full Reconveyance of the Thomas Deed

18 of Trust, Defendants negligently failed to ensure that they were properly authorized to

19 reconvey the Thomas Deed of Trust and/or negligently failed to ensure that the deed of trust

20 information and document numbers listed on the Full Reconveyance matched those

21 Defendants actually intended to reconvey.

22      71. As a result of Defendants' negligence in regards to the Full Reconveyance of

23 the Thomas Deed of Trust, Plaintiff has incurred and will incur substantial damages in an

24 amount presently unknown.

25      72. When executing and recording the Full Reconveyance of the Tozier Deed of

26 Trust, Defendants negligently failed to ensure that they were properly authorized to

27 reconvey the Tozier Deed of Trust and/or negligently failed to ensure that the deed of trust

28

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

GREEN&HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

1  information and document numbers listed on the Full Reconveyance matched those

2  Defendants actually intended to reconvey.

3       73.  As a result of Defendants' negligence in regards to the Full Reconveyance of

4  the Tozier Deed of Trust, Plaintiff has incurred and will incur substantial damages in an

5  amount presently unknown.

6  **SEVENTH CAUSE OF ACTION**

7  **(Unfair Business Practices, B&P § 17200 et seq., against all Defendants)**

8       74.  Plaintiff incorporates, by reference, each and every paragraph of this

9  Complaint as though fully set forth herein.

10       75.  Plaintiff is informed and believes and, based thereon, alleges that Defendants

11  failed to check available records in order to confirm that Defendants were authorized to

12  execute the above-described Substitutions of Trustee and Full Reconveyances.  Plaintiff is

13  informed and believes and, based thereon, alleges that Defendants also failed to check the

14  recording information for trust deeds for which they were loan servicers prior to executing

15  and recording the above-described Substitutions of Trustee and Full Reconveyances and/or

16  instructing their agents to execute and record the above-described Substitutions of Trustee

17  and Full Reconveyances.

18       76.  Plaintiff is informed and believes and, based thereon, alleges that had

19  Defendants checked the appropriate records, which would have taken a minimal amount of

20  time, Defendants would have discovered that they were not the servicers or the holders of

21  the King, Thomas, or Tozier Deeds of Trust and did not have the authority to substitute the

22  trustee or cause a reconveyance of the King, Thomas, or Tozier Deeds of Trust to be issued

23  or recorded.  Plaintiff is informed and believes and, based thereon, alleges that had

24  Defendants appropriately checked the available records, Defendants would not have issued

25  and recorded documents referencing the King, Thomas, or Tozier Deeds of Trust, and the

26  security interests of these deeds of trust would have been preserved and Aurora would have

27  been able to complete foreclosure proceedings upon the King, Thomas and Tozier

28

16

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

GREEN&HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

1  Properties. Instead, as a direct result of Defendants' actions and inactions, Plaintiff lost its

2  security interest and power of sale under the King, Thomas, and Tozier Deeds of Trust.

3      77.  Plaintiff is informed and believes and, based thereon, alleges that Defendants

4  knew in 2005 when GMAC instructed ETS to issue the Full Reconveyances of the King,

5  Thomas and Tozier Deeds of Trust that if Defendants recorded the Full Reconveyances in

6  the county recorder's office that the public record would reflect that the security interests

7  held by the holder of the King, Thomas and Tozier Deeds of Trust would be eliminated and

8  subject to injury because any third party relying on the current status of title, including but

9  not limited to any transferee, lender, bankruptcy trustee or title insurer, would be entitled to

10  rely upon the state of record title showing that the King, Thomas and Tozier Deeds of Trust

11  no longer existed, thus causing a complete loss of security for the holders of the King,

12  Thomas and Tozier Deeds of Trust.

13      78.  Plaintiff is informed and believes and, based thereon, alleges that Defendants

14  knew that if they reconveyed the wrong deed of trust at the time they were in the process of

15  doing so, that mistake would not be discovered by either Plaintiff or the holder so long as

16  the borrowers continued to make payments on the obligations secured by the King, Thomas

17  and Tozier Deeds of Trust.  Plaintiff is informed and believes and, based thereon, alleges

18  that Defendants also knew that if Defendants did not take the few minutes necessary to

19  verify the recording information on the substitution of trustee and full reconveyance

20  documents they were executing that their actions would cause direct injury to Plaintiff and

21  the holders of the notes secured by the King, Thomas and Tozier Deeds of Trust.

22      79.  Plaintiff is informed and believes and, based thereon, alleges that Defendants

23  execute thousands of substitutions of trustees and reconveyances of deeds of trust each year

24  as part of their ordinary business operations.  As such, Defendants could reasonably foresee

25  that their actions would have a devastating impact upon Plaintiff's and the holders' abilities

26  to protect themselves from harm and preserve the security and priority of the King, Thomas

27  and Tozier Deeds of Trust if they were wrongfully reconveyed.

28  ///

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

GREEN & HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

80.  Plaintiff is informed and believes and, based thereon, alleges that in and around 2005, Defendants were aware that approximately 1% of the reconveyances they were executing and recording in Southern California county recorders' offices listed the incorrect Deed of Trust information; but Defendants continued their current practices regardless of this information and the harm it would surely cause.

81.  Plaintiff is informed and believes and, based thereon, alleges that the recording of the Substitutions of Trustee and Full Reconveyances by Defendants has caused serious injury to Plaintiff, the holders of the King, Thomas and Tozier Deeds of Trust, and numerous financial institutions throughout the United States.  Such injury was a direct, proximate and foreseeable result of Defendants' wrongful conduct, as alleged above.

82.  Defendants' acts hereinabove alleged are acts of unfair business practices. Plaintiff is informed and believes and, based thereon, alleges that, unless restrained, Defendants will continue the above-described wrongful conduct.

**WHEREFORE, Plaintiff prays for judgment as follows:**

### On the First Cause of Action

1.  For a judicial determination that Defendants erroneously reconveyed the King, Thomas and Tozier Deeds of Trust; and that Defendants are liable to Plaintiff for the full unpaid balance of the King, Thomas and Tozier Loans.

### On the Second, Third and Fourth Causes of Action

2.  For compensatory damages as alleged herein and to be determined according to proof at the time of trial; and

3.  For attorney's fees and costs incurred herein.

### On the Fifth Cause of Action

4.  For the Full Reconveyance of the King Deed of Trust to be delivered to the clerk of the court for cancellation and that it be declared void;

///

18

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

GREEN & HALL
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

5.    For the Full Reconveyance of the Thomas Deed of Trust to be delivered to the clerk of the court for cancellation and that it be declared void;

6.    For the Full Reconveyance of the Tozier Deed of Trust to be delivered to the clerk of the court for cancellation and that it be declared void;

7.    For damages caused Plaintiff by the inconvenience and time suffered by Plaintiff in removing the cloud(s) on title;

8.    For attorney's fees and costs incurred in removing the cloud(s) on title according to proof; and

9.    For costs of suit incurred herein.

### On the Sixth Cause of Action

10.    For compensatory damages as alleged herein and to be determined according to proof at the time of trial.

### On the Seventh Cause of Action

11.    For compensatory damages as alleged herein and to be determined according to proof at the time of trial.

12.    For treble damages as alleged herein and to be determined according to proof at the time of trial;

13.    For a permanent injunction enjoining Defendants and Defendants' agents, servants and employees, and all persons acting under or in concert with them, to cease and desist from the following:

a.    Executing and/or recording documents related to deeds of trust for which they have not properly been authorized; and

b.    Executing and/or recording documents related to deeds of trust without first comparing the information on the document to available records and ensuring that the information on the document matches the deed of trust information for which the document is intended to affect; and

14.    For attorney's fees and costs incurred herein pursuant *California Business & Professions Code* § 17082.

19

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

S:\Aurora.GMAC(Thomas)\Pleadings\FAC.doc

**As to All Causes of Action**

15.  For such other and further damages according to proof; and

16.  For such other and further relief as this Court may deem just and proper.

Dated:  April 25, 2012

GREEN & HALL, A PROFESSIONAL
CORPORATION

By: _____

Howard D. Hall, Esq.
Valerie J. Schratz, Esq.
Attorneys for Plaintiff
AURORA BANK, FSB

20

FIRST AMENDED COMPLAINT FOR:
(1) DECLARATORY RELIEF

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Howard D. Hall, Esq. (145024)
Valerie J. Schratz, Esq. (272418)
Green & Hall, APC
1851 East First Street, 10th Floor
Santa Ana, California 92705

TELEPHONE NO: (714) 918-7000   FAX NO: (714) 918-6996
ATTORNEY FOR (Name): Aurora Bank FSB

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: Orange County
MAILING ADDRESS: 700 Civic Center Drive West
CITY AND ZIP CODE: Santa Ana, California 92701
BRANCH NAME: Central Justice Center

CASE NAME: Aurora Bank FSB vs. GMAC Mortgage, LLC, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | |
|---|---|---|
| [x] Unlimited  [ ] Limited | [ ] Counter  [ ] Joinder | |
| (Amount demanded exceeds $25,000) | (Amount demanded is $25,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) |

FOR COURT USE ONLY

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**JAN 24 2012**

At AN CARLSON, Clerk of the Court

BY  n MITCHELL  , DEPUTY

CASE NUMBER:
30-2012

JUDGE 00539541

JUDGE FRANCISCO F. FIRMAT
DEPT. C15

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [x] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (*not specified above*) (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (*check all that apply*): a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive

4. Number of causes of action (*specify*): 3

5. This case [ ] is [x] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: January 24, 2012

Valerie J. Schratz
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

---

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal
Solutions
Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
  Contract/Warranty Breach—Seller Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment (*non-domestic relations*)
  Sister State Judgment
  Administrative Agency Award (*not unpaid taxes*)
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-harassment*)
  Mechanics Lien
  Other Commercial Complaint Case (*non-tort/non-complex*)
  Other Civil Complaint (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF ORANGE

# ALTERNATIVE DISPUTE RESOLUTION (ADR)
# INFORMATION PACKAGE

**NOTICE TO PLAINTIFF(S) AND/OR CROSS-COMPLAINANT(S):**

**Rule 3.221(c) of the California Rules of Court requires you to serve a copy of the ADR Information Package along with the complaint and/or cross-complaint.**

California Rules of Court – Rule 3.221
Information about Alternative Dispute Resolution (ADR)

(a) Each court shall make available to the plaintiff, at the time of filing of the complaint, an ADR Information Package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes.

(2) Information about the ADR programs available in that court, including citations to any applicable local court rules and directions for contacting any court staff responsible for providing parties with assistance regarding ADR.

(3) Information about the availability of local dispute resolution programs funded under the Dispute Resolutions Program Act (DRPA), in counties that are participating in the DRPA. This information may take the form of a list of the applicable programs or directions for contacting the county's DRPA coordinator.

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) A court may make the ADR Information Package available on its Web site as long as paper copies are also made available in the clerk's office.

(c) The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action along with the cross-complaint.

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ORANGE

## ADR Information

**Introduction.**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts and others offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. ADR is usually less formal, less expensive, and less time-consuming than a trial. ADR can also give people more opportunity to determine when and how their dispute will be resolved.

## BENEFITS OF ADR.

Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case. Some potential benefits of ADR are summarized below.

**Save Time.** A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

**Save Money.** When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

**Increase Control Over the Process and the Outcome.** In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

**Preserve Relationships.** ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction.** In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

**Improve Attorney-Client Relationships.** Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

## DISADVANTAGES OF ADR.

ADR may not be suitable for every dispute.

**Loss of protections.** If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

**Less discovery.** There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

**Additional costs.** The neutral may charge a fee for his or her services. If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

**Effect of delays If the dispute Is not resolved.** Lawsuits must be brought within specified periods of time, known as statues of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## TYPES OF ADR IN CIVIL CASES.

The most commonly used ADR processes are arbitration, mediation, neutral evaluation and settlement conferences.

**Arbitration.** In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

    **Cases for Which Arbitration May Be Appropriate.** Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

    **Cases for Which Arbitration May Not Be Appropriate.** If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Mediation.** In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

    **Cases for Which Mediation May Be Appropriate.** Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

    **Cases for Which Mediation May Not Be Appropriate.** Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Neutral Evaluation.** In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is

often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate.** Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May <u>Not</u> Be Appropriate.** Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences.** Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

**ADDITIONAL INFORMATION.**

In addition to mediation, arbitration, neutral evaluation, and settlement conferences, there are other types of ADR, including conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

To locate a dispute resolution program or neutral in your community:
- Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, 1-800-852-5210
- Contact the Orange County Bar Association at (949) 440-6700
- Look in the Yellow Pages under "Arbitrators" or "Mediators"

Free mediation services are provided under the Orange County Dispute Resolution Program Act (DRPA) For information regarding DRPA, contact:
- Community Service Programs, Inc. (949) 851-3168
- Orange County Human Relations (714) 834-7198

For information on the Superior Court of California, County of Orange court ordered arbitration program, refer to Local Rule 360.

The Orange County Superior Court offers programs for Civil Mediation and Early Neutral Evaluation (ENE). For the Civil Mediation program, mediators on the Court's panel have agreed to accept a fee of $300 for up to the first two hours of a mediation session. For the ENE program, members of the Court's panel have agreed to accept a fee of $300 for up to three hours of an ENE session. Additional information on the Orange County Superior Court Civil Mediation and Early Neutral Evaluation (ENE) pilot programs is available on the Court's website at www.occourts.org.

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name & Address)*: | FOR COURT USE ONLY |
|---|---|
| Telephone No.:                    Fax No. (Optional): <br> E-Mail Address (Optional): <br> ATTORNEY FOR *(Name)*:                    Bar No: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
JUSTICE CENTER:
☐ Central - 700 Civic Center Dr. West, Santa Ana. CA 92701-4045
☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512
☐ Harbor-Laguna Hills Facility – 23141 Moulton Pkwy., Laguna Hills, CA 92653-1251
☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595
☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500
☐ West – 8141 13ᵗʰ Street, Westminster. CA 92683-0500

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION** | CASE NUMBER: |
|---|---|

Plaintiff(s)/Petitioner(s),_____

and defendant(s)/respondent(s), _____

_____

agree to the following dispute resolution process:

☐  Mediation

☐  Arbitration (must specify code)
            ☐ Under section 1141.11 of the Code of Civil Procedure
            ☐ Under section 1280 of the Code of Civil Procedure

☐  Neutral Case Evaluation

The ADR process must be completed no later than 90 days after the date of this Stipulation or the date the case was referred, whichever is sooner.

☐  I have an *Order on Court Fee Waiver* (FW-003) on file, and the selected ADR Neutral(s) are eligible to provide pro bono services.

☐  The ADR Neutral Selection and Party List is attached to this Stipulation.

We understand that there may be a charge for services provided by neutrals.  We understand that participating in an ADR process does not extend the time periods specified in California Rules of Court rule 3.720 et seq.

Date: _____     _____     _____
                          (SIGNATURE OF PLAINTIFF OR ATTORNEY)     (SIGNATURE OF PLAINTIFF OR ATTORNEY)

Date: _____     _____     _____
                          (SIGNATURE OF DEFENDANT OR ATTORNEY)     (SIGNATURE OF DEFENDANT OR ATTORNEY)

**ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION**

Approved for Optional Use
L1270 (Rev. January 2010)                                California Rules of Court, rule 3.221

| | FOR COURT USE ONLY |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**<br>JUSTICE CENTER:<br>☑ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045<br>☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512<br>☐ Harbor-Laguna Hills Facility – 23141 Moulton Pkwy., Laguna Hills, CA 92653-1251<br>☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595<br>☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500<br>☐ West – 8141 13ᵗʰ Street, Westminster, CA 92683-0500 | |
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |
| **ALTERNATIVE DISPUTE RESOLUTION (ADR) NEUTRAL SELECTION AND PARTY LIST**<br><br>☐Arbitration  ☐Mediation  ☐Neutral Evaluation | CASE NUMBER: |

**(ATTACH THIS FORM TO FORM L-1270, ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION, AND FILE IT WITH THE COURT.)**

## ADR NEUTRAL SELECTION

For Arbitration, parties may select a Neutral and Alternate or may have a Neutral randomly assigned from the Court's Panel. For Mediation and Neutral Evaluation, parties must select a Neutral and an Alternate below.

☐ For Arbitration, please check this box to have an arbitrator assigned at random.

The parties select the following Neutral and Alternate from the Court ADR Panel:

Neutral: _____

Alternate:_____

The above named Neutral will be notified by a Notice of Assignment of ADR Neutral that he or she has been selected as the neutral in this proceeding. In the event the neutral does not accept the assignment, a new Notice of Assignment of ADR Neutral will be sent to the above named Alternate. The assignment of the Alternate to serve as the Neutral does not extend the time to complete the ADR process.

**ALTERNATIVE DISPUTE RESOLUTION (ADR) NEUTRAL SELECTION AND PARTY LIST**

| Short Title: | Case Number: |
|---|---|

**PARTY LIST**
**(Including Affiliates)**

The parties agree that the ADR Session may be conducted on one of the following dates:

1._____  2._____  3._____  4._____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____Fax_____

Attorney for:_____

This Party List must also include the full names, addresses, and phone numbers of corporate parties' parent and subsidiary corporations, and of all insurance carriers. Counsel must immediately notify the neutral upon discovery if any attorney or self-represented party is not listed on this Party List Form.

☐ Attach additional copies of this page if necessary to include additional parties, affiliated entities or insurance carriers.

**ALTERNATIVE DISPUTE RESOLUTION (ADR)**
**NEUTRAL SELECTION AND PARTY LIST**

Adopted for Mandatory Use
L2748 (New February 2008)                                    www.occourts.org



7004 2890 0002 2030 6498

| FROM | Rafia Aleem |
| --- | --- |
| | Paralegal Manager |

GREEN & HALL
ATTORNEYS AT LAW

A PROFESSIONAL CORPORATION

1851 EAST FIRST STREET, 10TH FLOOR
SANTA ANA, CALIFORNIA 92705-4052

**TO**

Corporation Service company
9360 Glacier Hwy., Suite 202
Juneau, AK  99801

**4**

1   Martin T. McGuinn (SBN 82530)
    Elaine L. Chan (SBN 79211)
2   **KIRBY & McGUINN, A P.C.**
    707 Broadway, Suite 1750
3   San Diego, California 92101
    Telephone: (619) 685-4000
4   Facsimile: (619) 685-4004

5   Attorneys for Real Party in Interest Aurora Loan Services, LLC

6

7

8                  **IN THE SUPERIOR COURT STATE OF CALIFORNIA**

9                        **FOR THE COUNTY OF EL DORADO**

10

11  GMAC MORTGAGE, LLC, fka GMAC          **CASE NO. PC20090603**
    MORTGAGE CORPORATION, and
12  EXECUTIVE TRUSTEE SERVICES, LLC fka   **FIRST AMENDED COUNTERCLAIM IN**
13  EXECUTIVE TRUSTEE SERVICES, INC.,     **INTERVENTION**
                                          **FOR DAMAGES FOR NEGLIGENT**
14                 Plaintiffs,            **RECONVEYANCE OF FIRST DEED OF**
                                          **TRUST**
15  v.
                                          Dept.:  9
16  STEVEN SCOTT RODGERS, et al.,         Judge:  Nelson Keith Brooks

17                 Defendants.            Complaint Filed:            September 25, 2009
                                          Complaint-in-Intervention:  February 17, 2011
18  AURORA LOAN SERVICES, LLC, a Delaware
    Corporation,
19
                   Plaintiff in Intervention,
20
    v.
21
    GMAC MORTGAGE, LLC, fka GMAC
22  MORTGAGE CORPORATION, and
    EXECUTIVE TRUSTEE SERVICES, LLC fka
23  EXECUTIVE TRUSTEE SERVICES, INC., et
    al.,
24
                   Defendants in Intervention
25

26

27       Plaintiff in Intervention AURORA LOAN SERVICES, LLC, a Delaware limited liability

28  company ("ALS") alleges as follows:

                                          1

    FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT
                   RECONVEYANCE OF FIRST DEED OF TRUST

## JURISDICTION AND VENUE

1.    Venue is properly in the Superior Court for the county of El Dorado as the real property which is the subject of this action and the actions which give rise to the claims alleged herein occurred in County of El Dorado, State of California.

2.    On or about August 6, 2009, Steven Rogers ("Debtor" or "Rodgers") filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code and was assigned case number 09-36650-A-7.

3.    On or about February 17, 2011, the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, remanded this case to the Superior Court for the County of El Dorado pursuant to a stipulation of the parties.

## THE PARTIES

4.    ALS is a limited liability company, duly organized, and existing under the laws of the State of Delaware with its principal place of business in Littleton, Colorado.

5.    ALS is a wholly-owned subsidiary of Aurora Bank FSB, which is a wholly owned subsidiary of Lehman Brothers Bancorp Inc., a Delaware corporation, which is a wholly owned direct subsidiary of Lehman Brothers Holdings Inc., a Delaware corporation.

6.    Defendant in Intervention GMAC Mortgage, LLC, fka GMAC Mortgage Corporation ("GMACM") is a limited liability company, duly organized, and existing under the laws of the State of Delaware with its principal place of business in Horsham, Pennsylvania.

7.    Defendant in Intervention Executive Trustee Services, LLC, formerly known as Executive Trustee Services, Inc. ("ETS") is a limited liability company, duly organized, and existing under the laws of the State of Pennsylvania with its principal place of business in Horsham, Pennsylvania.

8.    Mortgage Electronic Registration Systems, Inc. ("MERS") is a corporation organized and existing under the laws of Delaware.

9.    ALS is informed and believes and thereupon alleges: Aegis Wholesale Corporation ("Aegis") is a Delaware corporation formerly licensed to do business in the State of California.

2

FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT
RECONVEYANCE OF FIRST DEED OF TRUST

10.    ALS is informed and believes and thereupon alleges: Commonwealth Land Title Company ("CLTC") is a corporation duly organized and existing under the laws of the State of Nebraska and licensed and authorized to do business by the State of California as a title insurer.

11.    ALS is informed and believes and thereupon alleges: At all relevant times, each counter-defendant was the agent, partner, joint venturer, co-conspirator, servant and employee of each other counter-defendant, who, while acting, omitting to act, representing, misrepresenting, concealing and conspiring was acting both for his, her or its individual benefit and advantage as well as acting, omitting to act, representing, misrepresenting, concealing and conspiring for the benefit of some or all of the other counter-defendants, within the scope of said employment, agency, joint venture, partnership, and conspiracy and with the knowledge, consent, approval, permission and ratification of the other counter-defendants and each of them and that each counter-defendant is liable for the damages suffered by ALS proximately caused by the erroneous reconveyance of the First Deed of Trust described below.

## STANDING

12.    ALS is authorized to bring this action on behalf of the current owner of the loan that is the subject of this action (the "Loan"). The Loan's owner is Federal National Mortgage Association, a Federal Corporation ("FNMA").

13.    The Loan was originated by Aegis Mortgage Corporation ("Aegis"). It was thereafter sold to Lehman Brothers Bank FSB, and Lehman Brothers Holdings, Inc., which ultimately sold the Loan to FNMA.

14.    ALS serviced the Loan as of May 1, 2005. As the Loan's servicer, at all relevant times ALS was responsible for all daily servicing operations, including but not limited to collections, foreclosures and litigation and bankruptcy proceedings.

15.    FNMA's Seller Servicer Guidelines, which are available to the public on FNMA's website, state specifically the applicable actions which take place when a FNMA owned loan is required to be the subject of litigation. Attached hereto as Exhibit 1 and made a part hereof by reference is Section 202.07.02 of the FNMA Seller Servicer Guide, which states in pertinent part:

3

FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT RECONVEYANCE OF FIRST DEED OF TRUST

1  "In order to ensure that a servicer is able to perform  the services and duties incident to the

2  servicing of the mortgage loan, Fannie Mae temporarily gives the servicer possession of the

3  mortgage note whenever the servicer, acting in its own name, represents the interests of Fannie

4  Mae in foreclosure actions, bankruptcy cases, probate proceedings, or other legal proceedings."

5  The FNMA Seller Servicing Guidelines also specifically permit possession of the Note to pass to

6  the servicer in order to permit the servicer (ALS) to bring the litigation in the name of the servicer.

7       16.    ALS last obtained physical possession of the subject original Note on January 5,

8  2011.  The Note remains in Aurora's vault.

9       17.    The Counter-claim of ALS relates to certain residential real property located at

10 2832 Knollwood Drive, Cameron Park, California 95682 (the "Property") and legally described as

11 follows:  Lot 1412, as shown on that certain Map entitled "Cameron Park North Unit No. 3, filed

12 in the Office of the County Recorder of El Dorado County, State of California, on October 15,

13 1963 in Map Book D, at page 13.  APN-082-283-06.

14      18.    Prior to October 22, 2010 (the "Sale Date"), when it was sold pursuant to Orders of

15 the United States Bankruptcy Court as referenced below, the Property was owned at all relevant

16 times by Steven Scott Rodgers and Stephanie Rodgers, husband and wife ("Borrowers" or

17 "Debtors"), or by their bankruptcy Trustees (Trustee John Roberts 50% as successor to Stephanie

18 Rodgers, and Trustee Geoffrey Richards 50%, as successor to Steven Rodgers).

19

20                          **THE OBLIGATIONS**

21      19.    Aegis was the original lender and beneficiary in connection with the two Deeds of

22 Trust dated March 17, 2005, and recorded March 23, 2005, as Instrument Nos. 2005-0023129-00

23 (hereafter the "First Deed of Trust") and 2005-0023130-00 (defined below as the "HELOC Junior

24 Deed of Trust") in the Office of the County Recorder for the County of El Dorado, State of

25 California (the "El Dorado County Recorder"). The First Deed of Trust secured a promissory note

26 in the original principal sum of $332,800.00, and the HELOC Junior Deed of Trust secured a

27 promissory note in the original principal sum of $27,500.00.  True and correct copies of the First

28

---
4

FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT
RECONVEYANCE OF FIRST DEED OF TRUST

1  Deed of Trust and the HELOC Junior Deed of Trust are attached hereto as Exhibits 2 and 3 and are

2  incorporated herein by reference.

3      20.    The borrowers, Steven Rodgers and Stephanie Rodgers (Borrowers) also executed a

4  promissory note (Note) in the sum of $332,800 which was secured by the First Deed of Trust. A

5  copy of the Note is attached hereto as Exhibit 4 and made a part hereof by reference. Aegis

6  initially assigned its interest in the Note and First Deed of Trust to Aurora Bank. Thereafter,

7  Aurora Bank assigned its interest in the Note to Lehman Holdings. Thereafter Lehman Holdings

8  endorsed the Note in blank and now FNMA holds the Note. A copy of the Allonge to Note by

9  Aegis to Aurora Bank and from Aurora Bank to Lehman Holdings and in blank by Lehman

10  Holdings is attached hereto as Exhibit 5 and made a part hereof by reference.

11      21.    CLTC was the originally named Trustee, in connection with the First Deed of Trust

12  and the HELOC Junior Deed of Trust.

13      22.    MERS is a separate corporation that is acting solely as nominee for the Lender and

14  the Lender's successors and assigns as defined in the First Deed of Trust. MERS is the beneficiary

15  of the First Deed of Trust and was the beneficiary of the HELOC Junior Deed of Trust.

16      23.    GMACM is a mortgage lender and/or servicer who at all times alleged herein is a

17  registered member with MERS. ALS is informed and believes and thereon alleges GMACM was

18  either the servicer or the holder under the HELOC Junior Deed of Trust.

19      24.    GMACM never serviced the loan secured by the First Deed of Trust nor was

20  GMACM at any time the beneficiary or holder of the First Deed of Trust.

21      25.    ETS was substituted in as the Trustee under the First Deed of Trust and the HELOC

22  Junior Deed of Trust by GMACM, on or about October 17, 2005, even though GMACM held no

23  interest in the First Deed of Trust as the servicer or the holder of the Note which was secured by

24  the First Deed of Trust at the time the substitution of trustee was executed. Specifically, at the

25  time that GMACM substituted ETS as trustee and purported to sign the substitution of trustee on

26  behalf of MERS, GMACM did not have the right or authority from MERS, FNMA, Aurora Bank,

27  Plaintiff or Lehman to execute the substitution of trustee because GMACM was neither the

28  servicer, the lender nor the holder of the obligation secured by the First Deed of Trust.

5

FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT
RECONVEYANCE OF FIRST DEED OF TRUST

26.    Counterclaimant is informed and believes and thereon alleges that GMACM failed to check the records of MERS in order to confirm that it was authorized to execute the substitution of trustee for the First Deed of Trust as either the servicer or the holder for the Note.  GMACM also failed to check the recording information for the trust deed for which it was the loan servicer prior to issuing the substitution of trustee and instructing ETS to issue a reconveyance of the First Deed of Trust.  Both of these two simple tasks would have taken less than three minutes time.

27.    Had GMACM checked the electronic records maintained by MERS and available at all times to GMACM to which it had on line access at the time GMACM executed the substitution of trustee on behalf of MERS, it would have discovered that it was not the servicer or the holder of the First Deed of Trust and did not have the authority to substitute the trustee or cause a reconveyance of the First Deed of Trust to be recorded.  Had GMACM checked the MERS records for the MIN number and discovered it was not the loan servicer or sub-servicer or holder for the loan it was intending to instruct ETS to reconvey, then the security interest of the First Deed Trust would have been preserved and the bankruptcy trustees of the Borrowers would not have been able to sell the Property without paying off the First Trust Deed.  Instead, as a direct result of GMACM's and ETS's actions and inactions, ALS lost the security interest and the power of sale under the First Deed of Trust.

28.    GMACM and ETS knew in October 2005 when GMACM instructed ETS to issue the full reconveyance of the First Deed of Trust that if GMACM was instructing ETS to record a full reconveyance of the First Deed of Trust and was executing the Substitution of Trustee pursuant to GMACM's signing authority granted to it by MERS that the records in the Office of the El Dorado County office would reflect that the security interest held by the holder of the First Deed of Trust would be eliminated and subject to injury because any third party relying on the current status of title, including but not limited to any transferee, lender, bankruptcy trustee or title insurer  would be entitled to rely upon the state of record title showing that the First Deed of Trust no longer existed, thus causing a complete loss of security for the holder of the First Deed of Trust.

29.    GMACM and ETS knew that if they reconveyed the wrong deed of trust at the time they were in the process of doing so that the mistake would not be discovered by either ALS or the

6

1    holder so long as the borrowers continued to make payments on the obligation secured by the First

2    Deed of Trust.   GMACM and ETS also knew that if GMACM and ETS did not take the few

3    minutes necessary to verify the recording information on the substitution of trustee and full

4    reconveyance documents they were executing that their actions would cause direct injury to ALS

5    and the holder of the Note secured by the First Deed of Trust.

6            30.    GMACM and ETS execute tens of thousands of substitutions of trustees and

7    reconveyances of deeds of trust each year and if either entity executed such documents, GMACM

8    and ETS could reasonably foresee that their actions would have a devastating impact on ALS and

9    the holder's ability to protect themselves from harm and preserve the security and priority of the

10   First Deed of Trust if it was wrongfully reconveyed.

11           31.    ALS became the servicer of the obligation secured by the First Deed of Trust on or

12   about April 12, 2005.

13           32.    On or about October 25, 2005, written instruments were recorded as Instrument

14   Nos. 2005-0089457-00 ("Full Reconveyance") and 2005-0089456-00 ("Substitution of Trustee"),

15   respectively, with the El Dorado County Recorder by GMACM, ETS and/or other individuals

16   and/or entities on their  behalf for the purported purpose and with the intention of releasing the

17   HELOC Junior Deed of Trust, serviced or previously serviced or held by GMACM as servicer and

18   agent, in connection with the alleged repayment of the HELOC Note and/or origination or

19   refinancing of another junior trust deed.   True and correct copies of the Full Reconveyance and the

20   Substitution of Trustee are attached hereto as Exhibits 6 and 7 and are incorporated by reference

21   herein.

22           33.    The Full Reconveyance and Substitution of Trustee negligently referred to and

23   identified the First Deed of Trust instead of the HELOC Junior Deed of Trust as the lien being

24   released.  GMACM was not authorized to release the First Deed of Trust.  The First Deed of Trust

25   was superior to and had priority over the HELOC Junior Deed of Trust and any other recorded

26   deeds of trust encumbering Property.

27           34.    ALS did not become aware of the erroneous reconveyance of the First Deed of

28   Trust by GMACM, ETS and their agents and employees until it attempted to commence

7

1  nonjudicial foreclosure proceedings for the First Deed of Trust in April of 2009. When ALS tried

2  to initiate a non judicial foreclosure of the Property, it was advised by the title insurer that the First

3  Trust Deed had been reconveyed.

4      35.    On September 25, 2009, GMACM filed a complaint with the Superior Court of

5  California, for the County of El Dorado, entitled *GMAC Mortgage, LLC, et al. vs. Steven Scott*

6  *Rodgers, et al.,* as case number PC 20090603 (the "State Court Action"), seeking (1) declaratory

7  relief, and (2) cancellation of instruments.

8      36.    GMACM and ETS admit in the Complaint filed September 25, 2009 that the Full

9  Reconveyance and Substitution of Trustee recorded in October 2005 mistakenly referred to the

10  wrong deed of trust, that the recording information in the documents was mistakenly identified,

11  that GMACM was not authorized to cause the release of the First Deed of Trust and that their

12  actions occurred through inadvertence, error and mistake.

13      37.    Further, GMACM and ETS admitted in the Complaint filed on September 25, 2009

14  that the mistaken documents they recorded would cause a reasonable apprehension that said

15  written instruments may cause serious injury because the First Deed of Trust appeared to have

16  been released from the public records and third party purchasers and encumbrancers for value may

17  acquire an interest in the Property without knowing the Substitution of Trustee and Full

18  Reconveyance were mistakenly recorded.

19      38.    The recording of the documents aforementioned did cause serious injury.

20      39.    On August 6, 2009 (the "Steven Rodgers Bankruptcy Petition Date"), and *prior* to

21  the commencement of the State Court Action, Debtor Steven Rodgers filed a voluntary petition for

22  relief under Chapter 7 of the United States Bankruptcy Code (the "Steven Rodgers Bankruptcy

23  Case") as Case No. 09-36650-A-7 with the Bankruptcy Court for the Eastern District of California,

24  Sacramento Division (the "Bankruptcy Court"), and Geoffrey Richards ("Trustee Richards") was

25  appointed Chapter 7 Trustee and became, by operation of 11 U.S.C. §§541 and 704, the successor

26  in-interest to Debtor Steven Rodger for purposes of defending the State Court Action and the real

27  property interests which are the subject thereof.

28

FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT
RECONVEYANCE OF FIRST DEED OF TRUST

40.     Thereafter, on August 31, 2009, and again prior to the commencement of the State Court Action, Debtor Steven Rodger's ex-wife, Stephanie Rodgers ("Debtor Stephanie Rodgers") filed with the Bankruptcy Court a separate voluntary Chapter 7 bankruptcy case (the "Stephanie Rodgers Bankruptcy Case") as Case No. 09-38705-C-7, and John Roberts ("Trustee Roberts") was appointed Chapter 7 Trustee and became the successor-in-interest to Debtor Stephanie Rodgers for purposes of defending the State Court Action and the real property interests which are the subject thereof. Both Debtor Steven Rodgers and Debtor Stephanie Rodgers identified as property of their respective bankruptcy estates, a non-exempt interest in the subject Property.

41.     On June 8, 2010, Trustee Richards and Trustee Roberts (collectively "the Trustees") filed a Notice of Removal, which served to remove the State Court Action to the United States Bankruptcy Court for the Eastern District of California as Adversary Proceeding No. 10-02323.

42.     On June 29, 2010, the Trustees answered the removed Complaint, denying that GMACM is entitled to the relief sought by way of the Complaint and filed a Counterclaim against GMACM and a Cross-Claim against all others for Avoidance of Equitable Liens Relating to Removed Complaint for (1) Declaratory Relief; and (2) Cancellation of Instruments in Adversary Proceeding No. 10-02323 ("Counterclaim").

43.     ALS is informed and believes and thereupon alleges: A search of the public land records maintained by and at the El Dorado County Recorder on August 6, 2009 (the instant prior to the filing of Steven Rodgers' Chapter 7 bankruptcy case) by a prudent purchaser would have reflected the following:

        i.      A document entitled Deed of Trust dated March 17, 2005, bearing the duly notarized signatures of Steven Scott Rodgers and Stephanie Rodgers as borrowers, in favor of Mortgage Electronic Registration Systems, Inc. as beneficiary, and which was recorded March 31, 2005 as Instrument No: 2005-0023129. This is the erroneously reconveyed First Deed of Trust.

        ii.     A document entitled Deed of Trust dated March 17, 2005, bearing the duly notarized signatures of Steven Scott Rodgers and Stephanie Rodgers as borrowers, in favor of Mortgage Electronic Registration Systems, Inc. as beneficiary, and which was recorded March 23, 2005 as Instrument No: 2005-0023130.

9

iii.    A document recorded on October 25, 2005, as Instrument No. 2005-0089457, entitled Substitution of Trustee, referencing the Property by address in the top left hand corner which purports to substitute ETS as the Trustee under the First Deed of Trust.

iv.    A document recorded on October 25, 2005 as Instrument No. 2005-0089457, entitled Full Reconveyance, which references to the Property by address in the top left hand corner, and bears the duly notarized signature of Mary Ann Hilmer, Assistant Secretary to ETS, as Trustee, purporting to reconvey to the person or persons legally entitled thereto, without warranty, all of the estate, title and interest acquired by Trustee under the First Deed of Trust.

44.    ALS is informed and believes and thereupon alleges:    A prudent purchaser reviewing the title of the Property as of August 6, 2009, the instant prior to the filing of the bankruptcy of Steven Rodgers, would not have been on either actual or constructive notice of any interest or claim of Aegis, MERS, Aurora Bank, Lehman, FNMA or ALS in the Property.  As a proximate result thereof, the Trustees qualified as hypothetical bona fide purchasers under 11 U.S.C. §544(a) (3) and became entitled to avoid any right, title, claim or interest of ALS or its successors in interest, as against the Property, arising from and/or related to the First Deed of Trust, Instrument No. 2005-0023129, erroneously reconveyed by GMACM, ETS and their agents and employees in the Full Reconveyance.

45.    On or about October 22, 2010, the sale of the Property pursuant to the Bankruptcy Court's Orders in both bankruptcy cases closed escrow.  Previously, in September and October of 2010, the Bankruptcy Court in each Borrower's case entered Orders Granting Trustee's Joint Motion for Authority to (1) Sell Real Property Free and Clear of Liens and (2) Compensate Broker from Proceeds Thereof was entered by the United States Bankruptcy Court for the Eastern District of California in Case Nos. 09-36650 and 09-38705 ("Orders").

46.    The Orders authorized and allowed Trustee Richards and Trustee Roberts to sell the Property free and clear of the lien of the First Deed of Trust proximately causing monetary damages to be suffered by ALS.

/ / /

/ / /

FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT RECONVEYANCE OF FIRST DEED OF TRUST

## FIRST CLAIM FOR RELIEF

### (Negligence against all Defendants in Intervention)

47.     ALS re-alleges paragraphs 1 through 46 inclusive and incorporates the same herein by reference.

48.     ALS is informed and believes and thereupon alleges: GMACM and ETS, regularly as part of their services act and are familiar with the role of a trustee under a deed of trust in the state of California. GMACM and ETS are aware that a trustee under a deed of trust has two functions: to foreclose when instructed by the beneficiary that the obligation secured by the deed of trust is in default and to reconvey the deed of trust which secures the obligation when the underlying obligation has been paid.

49.     ALS is informed and believes and thereupon alleges: GMACM and ETS are well aware of the necessity in making sure and verifying that the deed of trust which is being reconveyed has been paid in full prior to executing and recording a full reconveyance. GMACM and ETS breached a duty of care to ALS by failing to verify that the above referenced Full Reconveyance and Substitution of Trustee correctly referred to and identified the HELOC Junior Deed of Trust instead of the unsatisfied First Deed of Trust. ALS is informed and believes and thereon alleges that the electronic check with MERS to determine whether GMACM was authorized to reconvey the First Deed of Trust could have accomplished in a few minutes time.

50.     ALS is informed and believes and thereupon alleges: employees or agents of GMACM and ETS prepared the Substitution of Trustee and the Full Reconveyance. ALS is informed and believes that the employees or agents of GMACM and ETS failed to properly prepare the Full Reconveyance by inserting in the Full Reconveyance the recorded Document No. 2005-0023129 for the First Deed of Trust instead of Document No. 2005-0023130 which was the correct recording information for the HELOC Junior Deed of Trust.

51.     As a result of the negligence of GMACM and ETS, which both GMACM and ETS admit in their complaint filed on September 25, 2009 in this case, ALS has lost its security interest for the loan secured by the First Deed of Trust in the Property in relation to Trustee Richards and Trustee Roberts. Due to the loss of its security interest caused by the negligent actions of

11

FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT RECONVEYANCE OF FIRST DEED OF TRUST

1  GMACM and ETS, ALS has sustained monetary damages in an amount which is not less than

2  $332,800.00, plus lost accrued interest, attorney fees and costs the total amount of which is

3  unknown at this time.  ALS will amend this Counterclaim to state such amount when the same

4  becomes known to ALS.

5      52.  ETS was instructed by GMACM to reconvey the wrong deed of trust.  ETS

6  breached the standard of care to ALS and the holder of the First Trust Deed by not following the

7  written requirements of the First Deed of Trust in order to issue a reconveyance.  Specifically, ETS

8  was required to receive the Original Note prior to issuing a reconveyance.  Counterclaimant is

9  informed and believes and thereon alleges that ETS was never presented with the Original Note or

10  a copy thereof prior to issuing the Full Reconveyance.

11      53.  GMACM and ETS are aware that in servicing loans held by FNMA the servicer or

12  sub-servicer is required to make FNMA whole on all loans held by FNMA where a servicing

13  problem develops.  Therefore, the loss to ALS will be the full amount of the loan balance, plus

14  interest less any sums received from the bankruptcy sales.

15      54.  Therefore, ALS has damaged in a sum which is not fully known at this time but this

16  complaint will be amended or the amount of damages will be proven at trial in the matter.

17      WHEREFORE, ALS prays for judgment as follows:

18      1.  For monetary damages against GMACM and ETS in the amount of not less than

19  $332,800.00, plus lost interest, attorney fees and costs incurred by reason of the negligent

20  recordation of the Full Reconveyance of the First Deed of Trust recorded on October 25, 2005, as

21  Instrument No. 2005-0089457 in the Official Records of the El Dorado County Recorder.

22      2.  For reasonable attorneys' fees.

23      3.  For all costs of suit incurred herein.

24      4.  For such other relief as the Court deems just and proper.

25  DATED:  August 4, 2011                KIRBY & McGUINN, A P.C.

26

27                        By: _____

28                        Martin T. McGuinn
                      Attorneys for Plaintiff in Intervention
                      Aurora Loan Services, LLC

12

FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR NEGLIGENT
RECONVEYANCE OF FIRST DEED OF TRUST

# EXHIBIT "1"

**Lender Relationships**

Contractual Relationship

Section 202                                                                                      June 10, 2011

document custodian, the document custodian has custody of the note for Fannie Mae's exclusive use and benefit.

**Section 202.07.02
Temporary Possession
by the Servicer
(05/23/08)**

In order to ensure that a servicer is able to perform the services and duties incident to the servicing of the mortgage loan, Fannie Mae temporarily gives the servicer possession of the mortgage note whenever the servicer, acting in its own name, represents the interests of Fannie Mae in foreclosure actions, bankruptcy cases, probate proceedings, or other legal proceedings.

This temporary transfer of possession occurs automatically and immediately upon the commencement of the servicer's representation, in its name, of Fannie Mae's interests in the foreclosure, bankruptcy, probate, or other legal proceeding.

When Fannie Mae transfers possession, the servicer becomes the holder of the note as follows:

- If a note is held at Fannie Mae's DDC, Fannie Mae has possession of the note on behalf of the servicer so that the servicer has constructive possession of the note and the servicer shall be the holder of the note and is authorized and entitled to enforce the note in the name of the servicer for Fannie Mae's benefit.

- If the note is held by a document custodian on Fannie Mae's behalf, the custodian also has possession of the note on behalf of the servicer so that the servicer has constructive possession of the note and the servicer shall be the holder of the note and is authorized and entitled to enforce the note in the name of the servicer for Fannie Mae's benefit.

**Section 202.07.03
Physical Possession of
the Note by the Servicer
(05/23/08)**

In most cases, a servicer will have a copy of the mortgage note. If a servicer determines that it needs physical possession of the original note to represent the interests of Fannie Mae in a foreclosure, bankruptcy, probate, or other legal proceeding, the servicer may obtain physical possession of the original note.

If Fannie Mae's possession of the original note is direct because the custodial documents are at its DDC, the servicer should submit a request to obtain the original note and any other custodial documents that are

# EXHIBIT "2"

*Recording Requested By:*
PLACER-TITLE-COMPANY.

Return to.
A E G I S    W H O L E S A L E
CORPORATION
ATTENTION   LOAN SHIPPING
3250 BRIARPARK DRIVE, #400
HOUSTON, TX  77042-4204

El Dorado, County Recorder
William Schultz Co Recorder Office

**DOC- 2005-0023129-00**

Acct  6-PLACER TITLE CO
Wednesday, MAR 23, 2005 14:30:00
Ttl Pd    $72.00       Nbr-0000703834
CLC/C1/1-22

PTC 20257841-WD

Loan No·  3000728283                                    [Space Above This Line For Recording Data]
Borrower.  STEVEN SCOTT RODGERS                                              Data ID  308

## DEED OF TRUST

MIN 100053030007282834

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21   Certain rules regarding the usage of words used in this document are also provided in Section 16

(A) "Security Instrument" means this document, which is dated March 17, 2005, together with all Riders to this document

(B) "Borrower" is STEVEN SCOTT RODGERS AND  STEPHANIE RODGERS , HUSBAND AND WIFE   Borrower is the trustor under this Security Instrument

(C) "Lender" is AEGIS WHOLESALE CORPORATION.  Lender is A CORPORATION organized and existing under the laws of the State of DELAWARE.  Lender's address is 3250 BRIARPARK DRIVE, SUITE 400, HOUSTON, TEXAS  77042.

(D) "Trustee" is COMMONWEALTH LAND TITLE

(E) "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of PO  Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3005   1/01          *(Page 1 of 16 Pages)*



30007282830130

EXHIBIT 2

02312

(F) **"Note"** means the promissory note signed by Borrower and dated March 17, 2005  The Note states that Borrower owes Lender **THREE HUNDRED THIRTY-TWO THOUSAND EIGHT HUNDRED and NO/100-----Dollars (U.S. $ 332,800.00)** plus interest  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than April 1, 2035

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property "

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]

☒ Adjustable Rate Rider   ☐ Condominium Rider   ☐ Second Home Rider
☐ Balloon Rider   ☐ Planned Unit Development Rider
☐ 1-4 Family Rider   ☐ Biweekly Payment Rider
☒ Other(s) [specify]   Prepayment Rider and Interest-Only Addendum to Rider

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U S C  §2601 et seq ) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3005   1/01   *(Page 2 of 16 Pages)*

EXHIBIT 2

023129

Loan No 3000728283

Data ID: 308

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of EL DORADO.

LOT 1412, AS SHOWN ON THAT CERTAIN MAP ENTITLED "CAMERON PARK NORTH UNIT NO 3", FILED IN THE OFFICE OF THE COUNTY RECORDER OF EL DORADO COUNTY, STATE OF CALIFORNIA, ON OCTOBER 15, 1963 IN MAP BOOK D, AT PAGE 13.

which currently has the address of 2832    KNOLLWOOD DRIVE,
                                              [Street]
CAMERON PARK, CALIFORNIA                                    95682          ("Property Address")
[City]                                                     [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right. to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                    Form 3005    1/01    (Page 3 of 16 Pages)

EXHIBIT 2

023129

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3005   1/01         *(Page 4 of 16 Pages)*

EXHIBIT 2

023129

Loan No. 3000728283

Data ID: 308

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any, (c) premiums for any and all insurance required by Lender under Section 5, and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time  Any such waiver may only be in writing  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Form 3005   1/01          *(Page 5 of 16 Pages)*

EXHIBIT 2

023121

4.   **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower  (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement, (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5  **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably  Lender may require Borrower to pay, in connection with this Loan, either. (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3005   1/01      *(Page 6 of 16 Pages)*

EXHIBIT 2

0231?

Loan No: 3000728283

Data ID  308

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance  Lender shall have the right to hold the policies and renewal certificates  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3005   1/01      *(Page 7 of 16 Pages)*

EXHIBIT 2



023129

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.    If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration

Lender or its agent may make reasonable entries upon and inspections of the Property  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property  Lender's actions can include, but are not limited to, (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                    Form 3005   1/01          *(Page 8 of 16 Pages)*

EXHIBIT 2

023129

Loan No  3000728283                                    Data ID  308

10.  **Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums)

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance"  Further

(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)  Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                    Form 3005   1/01              *(Page 9 of 16 Pages)*

EXHIBIT 2

023129

11  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby
assigned to and shall be paid to Lender

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair
of the Property, if the restoration or repair is economically feasible and Lender's security is not
lessened  During such repair and restoration period, Lender shall have the right to hold such
Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the
work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken
promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of
progress payments as the work is completed.  Unless an agreement is made in writing or Applicable
Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay
Borrower any interest or earnings on such Miscellaneous Proceeds  If the restoration or repair is not
economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be
applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if
any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in
Section 2

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous
Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due,
with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair
market value of the Property immediately before the partial taking, destruction, or loss in value is equal
to or greater than the amount of the sums secured by this Security Instrument immediately before the
partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the
sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds
multiplied by the following fraction· (a) the total amount of the sums secured immediately before the
partial taking, destruction, or loss in value divided by (b) the fair market value of the Property
immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to
Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair
market value of the Property immediately before the partial taking, destruction, or loss in value is less
than the amount of the sums secured immediately before the partial taking, destruction, or loss in
value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be
applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the
Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages,
Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is
authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the
Property or to the sums secured by this Security Instrument, whether or not then due  "Opposing
Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom
Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that,
in Lender's judgment, could result in forfeiture of the Property or other material impairment of
Lender's interest in the Property or rights under this Security Instrument  Borrower can cure such a
default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or
proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property
or other material impairment of Lender's interest in the Property or rights under this Security
Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment
of Lender's interest in the Property are hereby assigned and shall be paid to Lender

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be
applied in the order provided for in Section 2

EXHIBIT 2

023129

Loan No  3000728283

Data ID  308

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy

**13  Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer") (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.  Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note)  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3005  1/01    *(Page 11 of 16 Pages)*

EXHIBIT 2

023129



15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing   Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means   Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise   The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender   Borrower shall promptly notify Lender of Borrower's change of address   If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure   There may be only one designated notice address under this Security Instrument at any one time   Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower   Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.   If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.**   This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located   All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.   Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract   In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision

As used in this Security Instrument   (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action

17. **Borrower's Copy.**   Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.**   As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument   However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law

If Lender exercises this option, Lender shall give Borrower notice of acceleration.   The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument   If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3005   1/01                    *(Page 12 of 16 Pages)*

**EXHIBIT 2**

023129

Loan No  3000728283

Data ID  308

19.  **Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.  **Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Form 3005    1/01    *(Page 13 of 16 Pages)*

EXHIBIT 2



023129

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials, (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law Nothing herein shall create any obligation on Lender for an Environmental Cleanup

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise) The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3005   1/01          *(Page 14 of 16 Pages)*

EXHIBIT 2

J129

Loan No· 3000728283

Data ID· 308

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees, (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Form 3005  1/01      (Page 15 of 16 Pages)

EXHIBIT 2

02312

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it

_____ (Seal)
STEVEN SCOTT RODGERS —Borrower

_____ (Seal)
STEPHANIE RODGERS —Borrower

_____ [Space Below This Line For Acknowledgment] _____

State of  CALIFORNIA                               §
County of  EL DORADO                           §

On _3·18_ _____, 20_05_, before me, _L.Wilson_ _____, a Notary Public, personally appeared
STEVEN SCOTT RODGERS AND STEPHANIE RODGERS
☐ personally known to me
OR
☑ proved to me on the basis of satisfactory evidence

to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument

WITNESS my hand and official seal

_____
Notary Public

L.Wilson

[Seal]

My commission expires _4·23·06_ _____       (Printed Name)

---

**ILLEGIBLE NOTARY DECLARATION**
I certify under penalty that the notary seal on the document
To which this statement is attached reads as follows
Name of Notary _L. Wilson_
Date commission expires _Apr. 23, 2006_
Notary Identification number _1353183_
(For notaries commissioned after 1-1-1992)
Manufacturer/Vendor identification number _TG-T1_
(For notaries commissioned after 1-1-1992)
Place of execution of Declaration _Placerville CA_
Dated _3-21-05_
Signed Placer Title Co. By: _M Hoyg_

L. WILSON
COMM. #1353183
NOTARY PUBLIC · CALIFORNIA
EL DORADO COUNTY
My Comm. Expires Apr. 23, 2006

---

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Form 3005    1/01         _(Page 16 of 16 Pages)_

**EXHIBIT 2**

023129 

Loan No    3000728283
Borrower    STEVEN SCOTT RODGERS

Data ID  308

# ADJUSTABLE RATE RIDER
### (LIBOR Six-Month Index (As Published In The Wall Street Journal)—Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 17th day of March, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to AEGIS WHOLESALE CORPORATION ("Lender") of the same date and covering the property described in the Security Instrument and located at:

2832   KNOLLWOOD DRIVE
CAMERON PARK, CALIFORNIA  95682
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT.   THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows·
A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of 5.875 %.  The Note provides for changes in the interest rate and the monthly payments, as follows.
4.    INTEREST RATE AND PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of April, 2010, and on that day every 6th month thereafter  Each date on which my interest rate could change is called a "Change Date"·
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index  The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal  The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information  The Note Holder will give me notice of this choice
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO and ONE/FOURTH percentage points ( 2.250 %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0 125%)  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)-
Single Family Fannie Mae UNIFORM INSTRUMENT
Modified by Middleberg, Riddle & Gianna

Form 3138  1/01    (Page 1 of 2 Pages)


3000728283

EXHIBIT 2

02312

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.8750 % or less than 2.2500 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points (2.00 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 11.8750 %

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider

_____ . . ............ (Seal)
STEVEN SCOTT RODGERS —Borrower

_____ . . (Seal)
STEPHANIE RODGERS —Borrower

MULTISTATE ADJUSTABLE RATE RIDER–LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)–
Single Family Fannie Mae UNIFORM INSTRUMENT
Modified by Middleberg, Riddle & Gianna                Form 3138  1/01      (Page 2 of 2 Pages)

EXHIBIT 2

Loan No    3000728283
Borrower    STEVEN SCOTT RODGERS

Data ID    308

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

THIS ADDENDUM is made this 17th day of March, 2005, and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as this Addendum executed by the undersigned and payable to **AEGIS WHOLESALE CORPORATION** (the "Lender") and covering the property described in the Security Instrument and located at

2832   KNOLLWOOD DRIVE
CAMERON PARK, CALIFORNIA  95682

THIS ADDENDUM supersedes Section 4(C) of the Rider.  None of the other provisions of the Note are changed by this Addendum

4    INTEREST RATE AND MONTHLY PAYMENT CHANGES
(C)  Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO and ONE/FOURTH percentage points ( 2.250 %) to the Current Index for such Change Date.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0 125%)  Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date
During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest  This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period  If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance  At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note  The result of this calculation will be the new amount of my monthly payment  After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments

Form 603F

1/01    *(Page 1 of 2 Pages)*



30007282830000

**EXHIBIT 2**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Interest-Only Addendum

_____ (Seal)
STEVEN SCOTT RODGERS —Borrower

_____ (Seal)
STEPHANIE RODGERS —Borrower

Form 603F                                    1/01        (Page 2 of 2 Pages)

EXHIBIT 2

023129

Loan No   3000728283
Borrower   STEVEN SCOTT RODGERS

Data ID· 308

## PREPAYMENT RIDER
### (Multi-state)

This Prepayment Rider is made this 17th day of March, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to AEGIS WHOLESALE CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at: 2832   KNOLLWOOD DRIVE, CAMERON PARK, CALIFORNIA 95682 (the "Property").

Additional Covenants.  Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  A "Full Prepayment" is the prepayment of the entire unpaid Principal due under the Note. A payment of only part of the unpaid Principal is known as a "Partial Prepayment."

If, within the 3-year period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a Full Prepayment, or Partial Prepayment in any twelve (12)-month period that exceeds 20% of the original Principal loan amount, Borrower will pay a Prepayment charge as consideration for the Note Holder's acceptance of such Prepayment. The Prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original Principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of Prepayment, unless otherwise prohibited by applicable law or regulation. No Prepayment charge will be assessed for any Prepayment occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first (0) year(s) of the term of the Note, no Prepayment penalty will be assessed.  In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

603B2-Multi-state Rider    11/15/99

*(Page 1 of 2 Pages)*



30007282830000

EXHIBIT 2

0231

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants
contained in this Prepayment Rider

Date _____3|18|05_____

_____ . (Seal)
STEVEN SCOTT RODGERS —Borrower

_____ . . . (Seal)
STEPHANIE RODGERS —Borrower

603B2-Multi-state Rider        11/15/89                                    (Page 2 of 2 Pages)

03/23/2005,20050023129

EXHIBIT 2

# EXHIBIT "3"

*Recording Requested By:*

PLACER TITLE COMPANY

WHEN RECORDED MAIL TO
AEGIS WHOLESALE
CORPORATION
ATTENTION: LOAN SHIPPING
3250 BRIARPARK DRIVE, #400
HOUSTON, TX 77042-4204

El Dorado, County Recorder
William Schultz Co Recorder Office

**DOC- 2005-0023130-00**

Acct 6-PLACER TITLE CO
Wednesday, MAR 23, 2005 14:30:00
Ttl Pd    $27.00    Nbr-0000703336
                                    CLC/C1/1-7

PTC 20257841-LW

Loan No 3000728276
Borrower  STEVEN SCOTT RODGERS

[Space Above This Line For Recording Data]

Data ID  335

# DEED OF TRUST

MIN: 100053030007282768

THIS DEED OF TRUST is made this 17th day of March, 2005, among the Trustor, STEVEN SCOTT RODGERS AND STEPHANIE RODGERS , HUSBAND AND WIFE
(herein "Borrower"),

COMMONWEALTH LAND TITLE
(herein "Trustee"), and

AEGIS WHOLESALE CORPORATION, A CORPORATION, organized and existing under the laws of the State of DELAWARE, whose address is 3250 BRIARPARK DRIVE, SUITE 400, HOUSTON, TEXAS  77042
(herein "Lender")

WHEREAS, this Security Instrument is given to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), as beneficiary, which is acting solely as nominee for Lender (as hereinabove defined) and Lender's successors and assigns  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of PO Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS

BORROWER, in consideration of the indebtedness herein recited and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of EL DORADO, State of California.

LOT 1412, AS SHOWN ON THAT CERTAIN MAP ENTITLED "CAMERON PARK NORTH UNIT NO 3", FILED IN THE OFFICE OF THE COUNTY RECORDER OF EL DORADO COUNTY, STATE OF CALIFORNIA, ON OCTOBER 15, 1963 IN MAP BOOK D, AT PAGE 13.

THIS DEED OF TRUST IS SECOND AND SUBORDINATE
TO THAT CERTAIN DEED OF TRUST IN FAVOR OF
*Aegis Wholesale*
IN THE AMOUNT OF $ 332,800.00 RECORDED
CONCURRENTLY HEREWITH

which has the address of 2832  KNOLLWOOD DRIVE,                CAMERON PARK,
                                                    [Street]                                              [City]
California          95682                                          ("Property Address"),
                    [Zip Code]

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents (subject however to the rights and authorities given herein to Lender to collect and apply such rents), all of which shall be deemed to be and remain a part of the property covered by this Deed of Trust, and all of the foregoing, together with said property (or the leasehold estate if this Deed of Trust is on a leasehold) are hereinafter referred to as the "Property"; Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument

**CALIFORNIA** - SECOND MORTGAGE - 1/80 FNMA/FHLMC UNIFORM INSTRUMENT
Modified by Middleberg, Riddle & Gianna

Form 3805    5/93    (Page 1 of 6 Pages)

30007282760130

EXHIBIT 3

023130

TO SECURE to Lender the repayment of the indebtedness evidenced by Borrower's note dated March 17, 2005, and extensions and renewals thereof (herein "Note"), in the principal sum of U.S. $ 27,500.00, with interest thereon, providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on April 1, 2020, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Deed of Trust; and the performance of the covenants and agreements of Borrower herein contained

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property, and that the Property is unencumbered except for encumbrances of record  Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record

UNIFORM COVENANTS  Borrower and Lender covenant and agree as follows:

**1.  Payment of Principal and Interest.**  Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note

**2.  Funds for Taxes and Insurance.**  Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Deed of Trust, and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof  Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution)  Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents  Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge.  Borrower and Lender may agree in writing at the time of execution of this Deed of Trust that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made  The Funds are pledged as additional security for the sums secured by this Deed of Trust

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds  If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may  require

Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Borrower any Funds held by Lender  If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Deed of Trust

**3.  Application of Payments.**  Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note

**4.  Prior Mortgages and Deeds of Trust; Charges; Liens.**  Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust, including Borrower's covenants to make payments when due  Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Deed of Trust, and leasehold payments or ground rents, if any

Form 3805    5/93    *(Page 2 of 6 Pages)*

EXHIBIT 3

02313

Loan No  3000728276

Data ID  335

5  **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender, provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Deed of Trust.

6.  **Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Deed of Trust is on a leasehold  If this Deed of Trust is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents

7.  **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Deed of Trust, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest  If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Deed of Trust. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder

8.  **Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property

9.  **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has a priority over this Deed of Trust.

10.  **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Deed of Trust granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest  Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Deed of Trust by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy

Form 3805    5/93    (Page 3 of 6 Pages)

EXHIBIT 3

02313

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof All covenants and agreements of Borrower shall be joint and several Any Borrower who co-signs this Deed of Trust, but does not execute the Note, (a) is co-signing this Deed of Trust only to grant and convey that Borrower's interest in the Property to Trustee under the terms of this Deed of Trust, (b) is not personally liable on the Note or under this Deed of Trust, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Deed of Trust or the Note without that Borrower's consent and without releasing that Borrower or modifying this Deed of Trust as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Deed of Trust shall be deemed to have been given to Borrower or Lender when given in the manner designated herein

**13. Governing Law; Severability.** The state and local laws applicable to this Deed of Trust shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Deed of Trust. In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Deed of Trust and the Note are declared to be severable As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein

**14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and this Deed of Trust at the time of execution or after recordation hereof

**15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Deed of Trust However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Deed of Trust

If Lender exercises this option, Lender shall give Borrower notice of acceleration The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Deed of Trust If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower

**NON-UNIFORM COVENANTS** Borrower and Lender further covenant and agree as follows

**17. Acceleration; Remedies.** Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Deed of Trust, including the covenants to pay when due any sums secured by this Deed of Trust, Lender, prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Deed of Trust and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option may declare all of the sums secured by this Deed of Trust to be immediately due and payable without further demand and may invoke the power of sale and any other remedies permitted by applicable law Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies provided in this paragraph 17, including, but not limited to, reasonable attorneys' fees.

Form 3805    5/93    (Page 4 of 6 Pages)

EXHIBIT 3

0231

Loan No 3000728276                                                              Data ID 335

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which the Property or some part thereof is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the lapse of such time as may be required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property so sold without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all reasonable costs and expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled thereto

18. **Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Deed of Trust due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Deed of Trust discontinued at any time prior to five days before sale of the Property pursuant to the power of sale contained in this Deed of Trust or at any time prior to entry of a judgment enforcing this Deed of Trust if (a) Borrower pays Lender all sums which would be then due under this Deed of Trust and the Note had no acceleration occurred, (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Deed of Trust, (c) Borrower pays all reasonable expenses incurred by Lender and Trustee in enforcing the covenants and agreements of Borrower contained in this Deed of Trust, and in enforcing Lender's and Trustee's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Deed of Trust, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Deed of Trust shall continue unimpaired. Upon such payment and cure by Borrower, this Deed of Trust and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19. **Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Deed of Trust Lender and the receiver shall be liable to account only for those rents actually received.

20. **Reconveyance.** Upon payment of all sums secured by this Deed of Trust, Lender shall request Trustee to reconvey the Property and shall surrender this Deed of Trust and all notes evidencing indebtedness secured by this Deed of Trust to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled thereto Such person or persons shall pay all costs of recordation, if any.

21. **Substitute Trustee.** Lender, at Lender's option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county where the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this instrument is recorded and the name and address of the successor trustee. The successor trustee shall, without conveyance of the Property, succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. The procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution

Form 3805   5/93   (Page 5 of 6 Pages)

EXHIBIT 3

023

**22. Statement of Obligation.** Lender may collect a fee not to exceed $60.00 for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Balloon Rider attached hereto

IN WITNESS WHEREOF, Borrower has executed this Deed of Trust

STEVEN SCOTT RODGERS —Borrower                    (Seal)

STEPHANIE RODGERS —Borrower                    (Seal)

_____ [Space Below This Line For Acknowledgment] _____

State of  CALIFORNIA                    §
County of  EL DORADO                    §

On _March 18_____, 20_05_, before me, _L. Wilson_____, a Notary Public, personally appeared
STEVEN SCOTT RODGERS AND STEPHANIE RODGERS
☐ personally known to me
**OR**
☑ proved to me on the basis of satisfactory evidence

to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument

WITNESS my hand and official seal.

_L. Wilson_
                    Notary Public

L. Wilson
                    (Printed Name)

[Seal]

My commission expires: _4·23·06_____

(This area for official notarial seal)

⌐‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾⌐
        **ILLEGIBLE NOTARY DECLARATION**
    I certify under penalty that the notary seal on the document
To which this statement is attached reads as follows:
Name of Notary _L. Wilson_
Date commission expires _Apr 23, 2006_
Notary identification number _1353183_
(For notaries commissioned after 1-1-1992)
Manufacturer/Vendor identification number _TGJI_
(For notaries commissioned after 1-1-1992)
Place of execution of Declaration _Placerville CA_
Dated _3-21-05_
Signed Placer Title Co. By: _M Hogg_
∟_____∟

L. WILSON
COMM. #1353183
NOTARY PUBLIC · CALIFORNIA
EL DORADO COUNTY
My Comm. Expires Apr. 23, 2006

Form 3805    5/93        (Page 6 of 8 Pages)

**EXHIBIT 3**



Loan No    3000728276
Borrower   STEVEN SCOTT RODGERS                          Data ID   335

# BALLOON RIDER
## SECOND MORTGAGE

This Balloon Rider is made this 17th day of March, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to AEGIS WHOLESALE CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at 2832 KNOLLWOOD DRIVE, CAMERON PARK, CALIFORNIA 95682 (the "Property").

Additional Covenants. Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows.

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Balloon Rider

Date    3/18/05



STEVEN SCOTT RODGERS —Borrower                          (Seal)

STEPHANIE RODGERS —Borrower                             (Seal)

Form 851    5/1/01

30007282760000

03/23/2005 20050023130

# EXHIBIT 3

# EXHIBIT "4"

Borrower: STEVEN SCOTT RO... ...F

Data ID: ...

## ADJUSTABLE RATE NOTE

MIN: 100053030007282834

**(LIBOR Six-Month Index (As Published In The Wall Street Journal)—Rate Caps)**

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

March 17, 2005                CAMERON PARK                    CALIFORNIA
                                  [City]                        [State]

2832  KNOLLWOOD DRIVE
CAMERON PARK, CALIFORNIA  95682
[Property Address]

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 332,800.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **AEGIS WHOLESALE CORPORATION**. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.  PAYMENTS**

(A)  **Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **May 1, 2005**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **April 1, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 422030, HOUSTON, TX 77242-4239, or at a different place if required by the Note Holder.

MULTISTATE ADJUSTABLE RATE NOTE-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)-
Single Family-Fannie Mae UNIFORM INSTRUMENT
Modified by Middleberg, Riddle & Gianna                    Form 3520  1/01        (Page 1 of 5 Pages)



30007282830940

INITIALS: _____

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,968.64.  This amount may change.

**(C)  Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)  Change Dates**

The interest rate I will pay may change on the first day of **April, 2010**, and on that day every 6th month thereafter.  Each date on which my interest rate could change is called a "Change Date."

**(B)  The Index**

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal.  The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO and ONE/FOURTH** percentage points ( **2.250** %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.8750** % or less than **2.2500** %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO**  percentage points (**2.00** %) from the rate of interest I have been paying for the preceding 6 months.  My interest rate will never be greater than **11.8750** %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

MULTISTATE ADJUSTABLE RATE NOTE-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)-
Single Family-**Fannie Mae** UNIFORM INSTRUMENT
Modified by **Middleberg, Riddle & Gianna**                                   Form 3520  1/01      *(Page 2 of 5 Pages)*

INITIALS: _____

Loan No. 3060728283                                                    Data ID: 308

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

MULTISTATE ADJUSTABLE RATE NOTE-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)-
Single Family-Fannie Mae UNIFORM INSTRUMENT
Modified by Middleberg, Riddle & Gianna          Form 3520  1/01     (Page 3 of 5 Pages)

INITIALS: _mc_

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE NOTE-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)-
Single Family-Fannie Mae UNIFORM INSTRUMENT
Modified by Middleberg, Riddle & Gianna                    Form 3520  1/01    (Page 4 of 5 Pages)

INITIALS: _____  _____

Loan No: 3601728283                                                  Data ID: 308

Six. Prepayment & Interest-Only Note Addendum attached hereto.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
STEVEN SCOTT RODGERS --Borrower

_____ (Seal)
STEPHANIE RODGERS —Borrower

[Sign Original Only]

**MULTISTATE ADJUSTABLE RATE NOTE-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)-**
Single family-**Fannie Mae UNIFORM INSTRUMENT**
Modified by Middleberg, Riddle & Gianna                    Form 3520  1/01    *(Page 5 of 5 Pages)*

Loan No. 3000728283
Borrower: STEVEN SCOTT RODGERS

Data ID: 309

# ALLONGE TO NOTE

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of the Note.

Note Date:              March 17, 2005

Loan Amount:            332,800.00

Borrower:               STEVEN SCOTT RODGERS AND STEPHANIE RODGERS

Property Address:       2832   KNOLLWOOD DRIVE, CAMERON PARK, CALIFORNIA 95682

PAY TO THE ORDER OF
AEGIS MORTGAGE CORPORATION
WITHOUT RECOURSE

AEGIS WHOLESALE CORPORATION

By: _____

Its: ____Debbie Romano_____
        VP & Asst. Secretary  (Printed Name and Title)

PAY TO THE ORDER OF
        Lehman Brothers Bank, FSB

WITHOUT RECOURSE

AEGIS MORTGAGE CORPORATION

By: _____
        Debbie Romano
Its: ____VP & Asst. Secretary_____
                        (Printed Name and Title)



30007282830000

Loan No   3000728283
Borrower   STEVEN SCOTT RODGERS

Data ID   308

# ADJUSTABLE RATE RIDER

(LIBOR Six-Month Index (As Published In The Wall Street Journal)—Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 17th day of March, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to AEGIS WHOLESALE CORPORATION ("Lender") of the same date and covering the property described in the Security Instrument and located at:

2832   KNOLLWOOD DRIVE
CAMERON PARK, CALIFORNIA   95682
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS   In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of 5.875 %. The Note provides for changes in the interest rate and the monthly payments, as follows.

4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of April, 2010, and on that day every 6th month thereafter   Each date on which my interest rate could change is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index   The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal   The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information   The Note Holder will give me notice of this choice

(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO and ONE/FOURTH percentage points ( 2.250 %) to the Current Index.   The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0 125%)   Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)-
Single Family Fannie Mae UNIFORM INSTRUMENT
Modified by Middleberg, Riddle & Gianna

Form 3138  1/01     (Page 1 of 2 Pages)



3000728283

0231

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.8750 % or less than 2.2500 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points (2.00 %) from the rate of interest I have been paying for the preceding 6 months   My interest rate will never be greater than 11.8750 %

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date.   I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change   The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider

.......................... (Seal)
STEVEN SCOTT RODGERS —Borrower

.. (Seal)
STEPHANIE RODGERS —Borrower

O   I 2 9

Loan No   3000728283
Borrower   STEVEN SCOTT RODGERS

Data ID   308

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

THIS ADDENDUM is made this 17th day of March, 2005, and is incorporated into and intended to form
a part of the Adjustable Rate Rider (the "Rider") dated the same date as this Addendum executed by the
undersigned and payable to AEGIS WHOLESALE CORPORATION (the "Lender") and covering the
property described in the Security Instrument and located at

2832   KNOLLWOOD DRIVE
CAMERON PARK, CALIFORNIA  95682

THIS ADDENDUM supersedes Section 4(C) of the Rider.  None of the other provisions of the Note are
changed by this Addendum

4      INTEREST RATE AND MONTHLY PAYMENT CHANGES
       (C)  Calculation of Changes
       Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO
and ONE/FOURTH percentage points ( 2.250 %) to the Current Index for such Change Date. The
Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point
(0 125%)  Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate
until the next Change Date
       During the Interest-Only Period, the Note Holder will then determine the amount of the monthly
payment that would be sufficient to repay accrued interest  This will be the amount of my monthly
payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make
a voluntary prepayment of principal during such period  If I make a voluntary prepayment of principal
during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the
amount necessary to pay interest at the then current interest rate on the lower principal balance  At the
end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the
amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am
expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly
payments over the remaining term of the Note  The result of this calculation will be the new amount
of my monthly payment  After the end of the Interest-Only Period, my payment amount will not be
reduced due to voluntary prepayments



30007282830000

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Interest-Only Addendum

............................................................ (Seal)
STEVEN SCOTT RODGERS —Borrower

............................................................ (Seal)
STEPHANIE RODGERS —Borrower

Form 603F                                              1/01        *(Page 2 of 2 Pages)*

Loan No     3000728283                                          Data ID· 308
Borrower   STEVEN SCOTT RODGERS

# PREPAYMENT RIDER
## (Multi-state)

This Prepayment Rider is made this 17th day of March, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to AEGIS WHOLESALE CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at: 2832  KNOLLWOOD DRIVE, CAMERON PARK, CALIFORNIA 95682 (the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  A "Full Prepayment" is the prepayment of the entire unpaid Principal due under the Note.  A payment of only part of the unpaid Principal is known as a "Partial Prepayment."

**If, within the 3-year period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a Full Prepayment, or Partial Prepayment in any twelve (12)-month period that exceeds 20% of the original Principal loan amount, Borrower will pay a Prepayment charge as consideration for the Note Holder's acceptance of such Prepayment.  The Prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original Principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of Prepayment, unless otherwise prohibited by applicable law or regulation.  No Prepayment charge will be assessed for any Prepayment occurring after the Penalty Period.**

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first (0) year(s) of the term of the Note, no Prepayment penalty will be assessed.  In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

603B2-Multi-state Rider      11/15/99                          *(Page 1 of 2 Pages)*



30007282830000

023

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants
contained in this Prepayment Rider

Date _____3/18/05_____

.........................................  (Seal)
STEVEN SCOTT RODGERS —Borrower

.........................................  (Seal)
STEPHANIE RODGERS —Borrower

603B2-Multi-state Rider        11/15/99                    (Page 2 of 2 Pages)

03/23/2005,20050023129

# EXHIBIT "5"

Loan No   3000728283
Borrower   STEVEN SCOTT RODGERS

# ALLONGE TO NOTE

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of the Note

Note Date              March 17, 2005

Loan Amount            332,800 00

Borrower               STEVEN SCOTT RODGERS AND STEPHANIE RODGERS

Property Address       2832   KNOLLWOOD DRIVE, CAMERON PARK, CALIFORNIA 95682

---

PAY TO THE ORDER OF
AEGIS MORTGAGE CORPORATION
WITHOUT RECOURSE

AEGIS WHOLESALE CORPORATION

By _____

Its _____ Debbie Romano _____
VP & Asst  Secretary  (Printed Name and Title)

Pay To The Order Of
Lehman Brothers Holdings Inc
Without Recourse
Lehman Brothers Bank, FSB

By _____
Rick W Skogg
Vice President

PAY TO THE ORDER OF
Lehman Brothers Bank, FSB

WITHOUT RECOURSE

AEGIS MORTGAGE CORPORATION

By _____

Its _____ Debbie Romano _____
VP & Asst  Secretary  (Printed Name and Title)

Pay To The Order Of

_____
Without Recourse
Lehman Brothers Holdings Inc

By _____
Denise E  Elwell
Senior Vice President

||||||||||||||||||||||||||||||||||||||||||||||||||||||||
30007282830000

# EXHIBIT "6"



El Dorado, County Recorder
William Schultz Co Recorder Office
**DOC- 2005-0089457-00**

Check Number  30946832
Tuesday, OCT 25, 2005 09:39:18
Ttl Pd    $9.00        Nbr-0000791281
                            LJP/C1/1-1

Recording Requested By
GMAC MORTGAGE CORPORATION

When Recorded Return To.
Current Trustor
STEVEN S RODGERS
2832 KNOLLWOOD DR
CAMERON PARK, CA  95882.

---

### FULL RECONVEYANCE

GMAC MORTGAGE CORPORATION #0307624597 "RODGERS"  Lender ID 41300/30454912  El Dorado, California PIF, 10/05/2005

MERS # 10005303007282788 VRU #: 1-888-679-6377

EXECUTIVE TRUSTEE SERVICES, INC as present Trustee for the Deed of Trust executed by STEVEN SCOTT RODGERS AND STEPHANIE RODGERS as Trustor(s), Dated. 03/17/2005 Recorded: 03/23/2005 as Instrument No . 2005-0023129 of official Records in the office of the County Recorder of El Dorado, California having been requested in writing, by the holder of the obligations secured by said Deed of Trust, to reconvey the estate granted to trustee under said Deed of Trust, does hereby reconvey to the person or persons legally entitled thereto, without warranty, all the estate, title and interest acquired by Trustee under said Deed of Trust.

IN WITNESS WHEREOF, EXECUTIVE TRUSTEE SERVICES, INC as the Trustee has caused its corporate name to be affixed by a duly authorized officer on the date shown in the acknowledgment certificate below:

On October 17th, 2005
By. EXECUTIVE TRUSTEE SERVICES, INC  as Trustee


MARY ANN HILMER , ASSISTANT SECRETARY


STATE OF Iowa
COUNTY OF Black Hawk

On October 17th, 2005, before me, M CLARK, a Notary Public in and for Black Hawk in the State of Iowa, personally appeared MARY ANN HILMER , ASSISTANT SECRETARY, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument

WITNESS my hand and official seal,

M CLARK
Notary Expires 05/17/2007  #728505

```
M CLARK
NOTARIAL SEAL - STATE OF IOWA
COMMISSION NUMBER 728505
MY COMMISSION EXPIRES MAY 17, 2007
```

(This area for notarial seal)

Prepared By:  Gina Herman;  GMAC MORTGAGE CORPORATION 3451 HAMMOND AVENUE, PO BOX 780, WATERLOO, IA 50704-0780 319-236-5400

"GCH"GCHGMAC"10/17/2005 07 17 28 PM" GMAC01GMAC00000000000000000808073" CAEL DO" 0307624597 CASTATE_TRUST_REL "GCH"GCHGMAC"

10/25/2005 ,20050089457

# EXHIBIT "7"

El Dorado, County Recorder
William Schultz Co Recorder Office
**DOC- 2005-0089456-00**
Check Number 30948832
Tuesday, OCT 25, 2005 09:39:18
Ttl Pd    $7.00    Nbr-0000791280
LJP/C1/1-1

Recording Requested By·
GMAC MORTGAGE CORPORATION

When Recorded Return To·
Current Trustor
STEVEN S RODGERS
2832 KNOLLWOOD DR
CAMERON PARK, CA 95682

## SUBSTITUTION OF TRUSTEE

GMAC MORTGAGE CORPORATION #.0307624597 "RODGERS" Lender ID 41300/30454912  El Dorado, California PIF, 10/05/2005

MERS #· 100053030007282768 | VRU #· 1-888-679-6377

WHEREAS, the undersigned is the present Beneficiary under the Deed of Trust described below as follows
  Original Trustor  STEVEN SCOTT RODGERS AND STEPHANIE RODGERS Original Beneficiary· MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC ("MERS") Dated· 03/17/2005 Recorded· 03/23/2005 as Instrument No  2005-0023129 in the County of El Dorado and State of  California

AND WHEREAS , the undersigned desires to substitute a different Trustee for the purpose of reconveying said Deed of TRUST, NOW THEREFORE the undersigned hereby substitutes EXECUTIVE TRUSTEE SERVICES, INC. as Trustee under said Deed of Trust.

On October 17th, 2005
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC  ("MERS")

_____
JANICE BURT, Assistant Secretary

STATE OF Iowa
COUNTY OF Black Hawk

On October 17th, 2005, before me, M CLARK, a Notary Public in and for Black Hawk in the State of Iowa, personally appeared JANICE BURT, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within Instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument

WITNESS my hand and official seal,

_____
M CLARK
Notary Expires 05/17/2007 #728505

┌─────────────────────────────────┐
│         M CLARK                 │
│  NOTARIAL SEAL - STATE OF IOWA  │
│    COMMISSION NUMBER 728505     │
│  MY COMMISSION EXPIRES MAY 17, 2007 │
└─────────────────────────────────┘

(This area for notarial seal)

Prepared By   Gina Herman, GMAC MORTGAGE CORPORATION 3451 HAMMOND AVENUE, PO BOX 780, WATERLOO, IA 50704-0780 319-236-5400

"GCH"GCHGMAC"10/17/2005 07 17 25 PM" GMAC01GMAC00000000000000000808073" CAEL DO" 0307624597 CASTATE_TRUST_SUB "GCH"GCHGMAC"

10/25/2005, 20050089456

1    Martin T. McGuinn (SBN 82530)
    James F. Lewin (SBN 140268)
2    **KIRBY & McGUINN, A P.C.**
    707 Broadway, Suite 1750
3    San Diego, California 92101
    Telephone: (619) 685-4000
4    Facsimile: (619) 685-4004

5    Attorneys for Real Party in Interest
    Aurora Loan Services, LLC

6

7

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                **COUNTY OF EL DORADO**

10              **CAMERON PARK BRANCH**

11    GMAC MORTGAGE, LLC, fka GMAC      CASE NO. PC20090603
    MORTGAGE CORPORATION, and
12    EXECUTIVE TRUSTEE SERVICES, LLC fka    **PROOF OF SERVICE**
    EXECUTIVE TRUSTEE SERVICES, INC.,

13

14            Plaintiff,

     v.
15

16    STEVEN SCOTT ROGERS, et al. ,

          Defendants.
17

18

19       I, the undersigned, declare under penalty of perjury that the following facts are true and

20 correct:

21       I am a resident of the State of California and over the age of 18 years and not a party to or

22 interested in the above-entitled matter. I am an employee of Kirby & McGuinn, A P.C., and my

23 business address is 707 Broadway, Suite 1750, San Diego, California 92101. On August 4, 2011, I

24 served the following document(s):

25       **FIRST AMENDED COUNTERCLAIM IN INTERVENTION FOR DAMAGES FOR
NEGLIGENT RECONVEYANCE OF FIRST DEED OF TRUST**
26
by:
27

28       ■     MAIL: by placing a true copy(ies) thereof in a sealed envelope(s) in the outgoing
              mail in my office for deposit in the United States mail, with postage fully prepaid,
              addressed as shown below. I am readily familiar with the business practice at my

1    place of business for collection and processing of outgoing mail with the U.S. Postal
     Service that same day in the ordinary course of business.

2

3    ☐   OVERNIGHT DELIVERY: by enclosing, a true copy(ies) in a sealed FedEx
         envelope(s) addressed as shown below.

4    ☐   PERSONAL SERVICE: by personally serving by hand delivery in an envelope(s)
         addressed as shown below:

5

6    ☐   VIA FACSIMILE: by transmitting via facsimile to the number(s) shown below:

7    Said document(s) was/were served on the following persons:

8        Alan Feld, Esq.
         Stephanie M. Seidl, Esq.
         Sheppard Mullin Richter & Hampton LLP
9        333 S. Hope St., 43rd Fl.
         Los Angeles, CA 90071-1422
10       Telephone:  (213) 620-1780
         Facsimile:  (213) 620-1398
11       *Attorney for GMAC Mortgage, LLC*

12

13   I declare under penalty of perjury under the laws of the United States that the foregoing is
     true and correct.

14

15   Executed on August 4, 2011, at San Diego, California.

16

17   Roxann R. Jaggi

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

**5**

ny-1050266



Not Reported in F.Supp.2d, 2010 WL 4966018 (S.D.N.Y.)
**(Cite as: 2010 WL 4966018 (S.D.N.Y.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re MOTORS LIQUIDATION COMPANY, et al.,
Debtors.
Walter J. Lawrence, Appellant,
v.
Motors Liquidation Company, Appellee.

Nos. 09–50026 (REG), 10 Civ. 36(RJH).
Nov. 17, 2010.

### MEMORANDUM OPINION AND ORDER
RICHARD J. HOLWELL, District Judge.

*1 Appellant Walter J. Lawrence, appearing *pro se*, appeals from a judgment of the United States Bankruptcy Court for the Southern District of New York denying his motion for relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code. Appellant seeks relief to proceed with an action he filed against General Motors ("GM"), the predecessor in interest to Appellee Motors Liquidation Company ("MLC"). Appellant contends that the Bankruptcy Court lacked subject matter jurisdiction over his motion and that the Bankruptcy Court erred in denying him relief. For the reasons stated below, the Court finds that the Bankruptcy Court had jurisdiction to consider Appellant's motion to lift the stay and did not abuse its discretion in denying that motion.[FN1]

> FN1. On September 21, 2010, Appellant also filed a "Motion for the Court to Rule on Appellant's Pending Appeal from the United States Bankruptcy Court." (Docket No. 8.) The Court's disposition of Appellant's appeal in this order vitiates Appellant's motion, and that motion is hereby dismissed as moot.

### BACKGROUND

The following facts are taken from Appellant's motion for relief from the automatic stay filed in the bankruptcy court. *See In re Motors Liquidation Co.*, Ch. 11 Case No. 09–50026 (Bankr.S.D.N.Y.) (Docket No. 4202) ("App.Mot."). Appellant was an employee

of GM until he retired on March 1, 1993. (*See* App. Mot. at 2–3.) As such, Appellant was a beneficiary of the General Motors Hourly–Rate Employees Pension Plan ("the Pension Plan") which was governed by the General Motors/United Auto Workers Pension Plan Agreement ("the Agreement"). (*See* App. Mot. at 2–3.)

On May 14, 2007, the Pension Plan wrote to Appellant informing him that Appellant had received $32,985.00 in overpayments and that Appellant was required to remit such overpayments to the Pension Plan. (*See* App. Mot. at 24.) The Pension Plan sent Appellant a second notice in September 2007, but Appellant refused to remit the overpayments. The Pension Plan then began reducing Appellant's ongoing payments to satisfy the outstanding overpayments. (*See* App. Mot. at 24–25.)

Appellant brought suit against the Pension Plan and GM in the United States District Court for the Middle District of Florida on October 9, 2007 alleging that GM and the Pension Plan had violated the Employee Retirement Income Security Act ("ERISA") by wrongfully reducing his pension payments and diverting some of those payments to the IRS to satisfy a tax levy against Appellant. (*See Walter J. Lawrence v. General Motors Hourly–Rate Employee Pension Plan,* 5:07–CV–408 OC (M.D.Fla.) (Docket No. 1) ("the ERISA suit").) Appellant amended his complaint in February 2008 and the parties subsequently filed cross motions for summary judgment, which remain pending. (*See* App. Br. at 11; App. Mot. at 25–26, 31.)[FN2]

> FN2. Appellant also seems to have filed a series of other motions in his ERISA suit, including motions to strike affirmative defenses, various discovery motions, and a motion for recusal. (*See* App. Mot. at 31–33.) Thereafter, the United States District Court for the Middle District of Florida entered an order enjoining Appellant from filing any other documents with that court pending disposition of the parties' motions for summary judgment. (*See* App. Mot. at 33 .)

On June 1, 2009, MLC—an entity formed in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4966018 (S.D.N.Y.)
**(Cite as: 2010 WL 4966018 (S.D.N.Y.))**

conjunction with the United States Treasury to reorganize GM—filed a Title 11 bankruptcy petition in the bankruptcy court in this district. Pursuant to 11 U.S.C. § 362(a), the bankruptcy petition triggered the so-called "automatic stay" of all pre-petition litigation against GM which, in MLC's case, included the ERISA suit. Appellant filed a motion in the bankruptcy court for this district seeking relief from the automatic stay to allow the ERISA suit to proceed. (*See* App. Mot .; App. Br. at 7.) In an opinion from the bench after a hearing on November 6, 2009, Bankruptcy Judge Gerber denied Appellant's motion and later entered an order to that effect on November 24, 2009. (*See id.; see also* Tr. of Hr'g, Nov. 6, 2009, *In re Motors Liquidation Co.,* 09–50026 (Bank.S.D.N.Y.) (Docket No. 4416) ("Hr'g Tr.").) On December 3, 2009, Appellant filed a notice of appeal of that order to this court.

**STANDARD OF REVIEW**

*2 "Pursuant to Bankruptcy Rule 8013, a District Court reviews a bankruptcy court's conclusions of law de novo and reviews findings of fact for clear error." *In re Cavalry Const., Inc.,* 428 B.R. 25, 29 (S.D.N.Y.2010); *see also In re Bayshore Wire Prods. Corp.,* 209 F.3d 100, 103 (2d Cir.2000) ( "Like the District Court, we review the Bankruptcy Court's findings of fact for clear error, [and] its conclusions of law de novo ...." (internal citations omitted). A district court reviews a bankruptcy court's denial of a motion for relief from the automatic stay for abuse of discretion. *See In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 91 (2d Cir.2003) ("The decision to lift an automatic stay is left to the discretion of the bankruptcy court...."); *In re Sonnax Indus., Inc.,* 907 F.2d 1280, 1286 (2d Cir.1990). In such a review, the district court considers not whether it would have made the same decision, but only whether the decision was reasonable. *See In re Jamesway Corp.,* 179 B.R. 33, 39 (S.D.N.Y.1995).

**DISCUSSION**

**A. Subject Matter Jurisdiction**

Despite having moved the bankruptcy court to grant relief from the automatic stay, Appellant now contends that the bankruptcy court did not have jurisdiction over that motion. Appellant argues that, because the terms of the Agreement prohibited GM from transferring beneficial interests in the Pension Plan, the pension benefits at issue in the ERISA suit are not part of the bankruptcy estate.

Appellant's arguments are misplaced. Section 1334 of title 28 of the United States Code provides that the federal "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Under 28 U.S.C. § 157(a), a "district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). "In this district, by standing order under 28 U.S.C. § 157(a), the district court refers all cases 'arising under,' 'arising in,' or 'related to' Title 11 proceedings to the bankruptcy court." *In re 131 Liquidating Corp.,* 222 B.R. 209, 211 (S.D.N.Y.1998) (citing Order of Acting Chief Judge Robert J. Ward, July 10, 1984). Accordingly, the bankruptcy court had jurisdiction if Appellant's motion concerned a proceeding "arising under title 11, or arising in or related to cases under title 11."

Appellant's motion was plainly a proceeding "arising under title 11." Not only does the provision governing the automatic stay from which Appellant seeks relief appear in 11 U.S.C. § 362, but Title 11 also defines "motions to terminate, annul, or modify the automatic stay" as "core proceedings" which reside "at the heart of federal bankruptcy power." *Norkin v. DLA Piper Rudnick Gray Cary, LLP,* No. 05 Civ. 9137, 2006 WL 839079, at *3 (S.D.N.Y. Mar. 31, 2006). Accordingly, courts in this Circuit have consistently held that bankruptcy courts have jurisdiction over motions for relief from the automatic stay. *See, e.g., Contemporary Mortg. Bankers, Inc. v. High Peaks Base Camp, Inc.,* 156 B.R. 890, 891 n. 2 (N.D.N.Y.1993) ("A motion to terminate, annul, or modify the automatic stay is a core proceeding within the meaning of 28 U.S.C. § 157(2)(G) and is, therefore, a proceeding properly referred to a bankruptcy judge under 28 U.S.C. § 157."); *In re Gibson & Cushman Dredging Corp.,* 100 B.R. 634, 637 (E.D.N.Y.1989) ("[A] motion to modify the automatic stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G). As such, the Bankruptcy Court was empowered to enter judgment on that branch of the motion.") The same was true of the bankruptcy court here.

**B. Relief from the Automatic Stay**

*3 Motions for relief from the automatic stay are

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4966018 (S.D.N.Y.)
**(Cite as: 2010 WL 4966018 (S.D.N.Y.))**

governed by 11 U.S.C. § 362(d), which provides in relevant part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

> (2) with respect to a stay of an act against property under subsection (a) of this section, if—

> (A) the debtor does not have an equity in such property; and

> (B) such property is not necessary to an effective reorganization;

> 11 U.S.C. § 362(d).

Apparently challenging the substance of the bankruptcy court's denial of relief, Appellant argues that he "met his burden of proof under 11 U.S.C. § 362 ... because Debtor has no equity in the property that is excluded from the estate as a result of debtor's agreement with the UAW to include within the term of the GM/UAW ERISA and IRC supplemental pension plan the anti-alienation and anti-assignment clause." (App. Br. at 2.) That is, Appellant appears to argue that the provisions of the Agreement prohibiting GM from transferring beneficial interests in the Pension Plan deprived MLC of any equity in the property for purposes of Section 362(d)(2).

This argument is directed at the wrong section of Section 362. "The legislative history makes clear that § 362(d)(2) is aimed at protecting a creditor's right to foreclose, *not* a creditor's right to pursue any form of litigation against the debtor in another court." *In re Northwest Airlines Corp.,* No. 05–17930, 2006 WL 2583647, at *3 n. 2 (Bankr.S.D.N.Y. Aug. 28, 2006) (emphasis added); *see also* S.Rep. No. 95–589, at 5 (1978) ("In cases where the single asset of the debtor is *real property,* the court shall grant relief from the stay if the debtor has no equity in the collateral, thereby allowing the creditor to proceed with his

foreclosure.") (emphasis added). Since Appellant's ERISA action is not an action to enforce a secured interest in real property, Section 362(d)(2) does not apply and his motion for relief from the stay can only be granted for "cause" under Section 362(d)(1). *See Sonnax,* 907 F.2d at 1285 ("Because the instant case concerns a stay of a judicial proceeding, only Section 362(d)(1) is applicable.")

In considering whether "cause" exists to grant relief from the automatic stay under Section 362(d)(1), courts in this Circuit apply a multifactor test pursuant to the Second Circuit's decision in *In re Sonnax Industries, Inc.,* 907 F.2d 1280 (2d Cir.1990). In *Sonnax,* the Second Circuit identified twelve factors relevant to a "cause" determination:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

**\*4** *Id.* at 1286. The bankruptcy court here concluded that the *Sonnax* factors weighed strongly against granting Appellant relief from the automatic stay. That decision was not an abuse of discretion.

Focusing on the second, seventh, and twelfth *Sonnax* factors, the bankruptcy court found that the *Sonnax* factors weighed against relief because, regardless of whether beneficial interests in the Pension Plan were property of the MLC estate, allowing Appellant to proceed with the ERISA suit would force MLC to expend estate resources to defend that action. Hence the bankruptcy court found that relief "would

Not Reported in F.Supp.2d, 2010 WL 4966018 (S.D.N.Y.)
**(Cite as: 2010 WL 4966018 (S.D.N.Y.))**

prejudice the interests of other creditors" and that there was no "lack of any connection with or interference with the bankruptcy case." (*See* Hr'g Tr. at 39:25–41:3.) By the same token, in assessing the "impact of the stay on the parties and the balance of harms," the bankruptcy court noted that denying Appellant relief would conserve the resources of the MLC estate without prejudicing Appellant because the ERISA suit against MLC could and would be adjudicated as part of the claims allowance process under Title 11. (*See* Hr'g Tr. at 41:4–42:4.) Far from an abuse of discretion, that reasoning accorded with the general rule that, "[g]enerally, unsecured claims should not be granted relief from the stay because to do so would result in a violation of one of the fundamental concepts of bankruptcy law[:] that there should be an equality of distribution among creditors. An unsecured claimant should not be entitled to obtain a distributive advantage over other unsecured claimants who are similarly enjoined from seeking distribution by any method other than in accordance with the distributive scheme under the Bankruptcy Code." *In re Leibowitz,* 147 B.R. 341, 345 (Bankr.S.D.N.Y.1992).

The bankruptcy court also found that the first *Sonnax* factor, "whether relief would result in a partial or complete resolution of the issues", weighed against relief because allowing the ERISA suit to proceed would merely enable the United States District Court for the Middle District of Florida to resolve the pending cross motions for summary judgment. (Hr'g Tr. at 42:5–19.) The outcome of those motions is at best uncertain, and it seems unlikely that the Florida court will grant a *plaintiff's* motion for summary judgment. *Cf. Norden v. Samper,* 503 F.Supp.2d 130, 136 (D.D.C.2007) ("This is that rare case in which a plaintiff wins on summary judgment."). Hence the bankruptcy court reasonably found that granting Appellant relief from the stay would more likely expose MLC to protracted litigation rather than speedily resolve the ERISA suit.

For much the same reason, the bankruptcy court found that the parties were not ready for trial in the ERISA action and that the eleventh *Sonnax* factor weighed against relief. (*See* Hr'g Tr. at 46:19–23.) That analysis, too, was far from an abuse of discretion. Appellant contends that he has completed discovery and that the "the district judge is right on the doorstep of resolving this case" (Hr'g Tr. at 25:7–8), but the dispositive motions filed in the ERISA suit were

pending for over a year before the automatic stay came into effect, hardly an indication that the case was ready for trial.

**\*5** The bankruptcy court also found that the United States District Court for the Middle District of Florida was not a "specialized tribunal" with any unique expertise in adjudicating ERISA actions. (*See* Hr'g Tr. at 43:9–14.) That decision was more than reasonable, for this Court has found bankruptcy courts well-equipped to adjudicate statutory actions involving employee benefits. *See, e.g., See In re Bally Total Fitness of Greater New York, Inc.,* 411 B.R. 142, 1471–148 (S.D.N.Y.2009) (finding no need for a specialized tribunal in wage and hour class action). *Cf. In re White Motor Corp.,* 42 B.R. 693, 705–706 (N.D.Ohio 1984) (finding no need for bankruptcy court to withdraw under Section 157 from suit involving ERISA and tax issues).

In addition, the bankruptcy court found that the presence of the Pension Plan as a defendant in Appellant's ERISA suit weighed against relief because the automatic stay would not apply to a suit against the Pension Plan alone. (Hr'g Tr. at 43:22–44:13.) *Cf. Buchanan v. Golden Castin Corp. Hourly Health Benefit Plan,* No. No. 4:03–CV–151, 2003 WL 22951936, at \*3 (S.D.Ind. Oct. 10, 2003) (holding that "a stay of claims against the employer does not stay claims against the employee benefit plan") (citing *Brengettys v. LTV Steel Hourly Pension Plan,* 241 F.3d 609, 609 n. 1 (7th Cir.2001)). Accordingly, Appellant could vitiate the effect of the automatic stay by severing the ERISA suit into two actions, one against the Pension Plan alone in the Middle District of Florida and another against MLC in the bankruptcy court. The fact that Appellant has the power to move his ERISA suit forward weighs strongly in favor of denying him relief.

Finally, the bankruptcy court found that "the interests of judicial economy and the expeditious and economical resolution of litigation" weighed against relief because allowing Appellant to proceed with his classic pre-petition action would open the "floodgates" to thousands of other litigants with garden variety claims against the MLC estate. (*See* Hr'g Tr. at 44:20–45:10.) That would usher in the very state of affairs the automatic stay was enacted to prevent. *See In re Ionosphere Clubs, Inc.,* 922 F .2d 984, 989 (2d Cir.1990) ("[T]he automatic stay allows the bank-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4966018 (S.D.N.Y.)
**(Cite as: 2010 WL 4966018 (S.D.N.Y.))**

ruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.").

In making these findings, the bankruptcy court clearly did not abuse its discretion. "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." S.Rep. No. 95–989, at 54–55 (1978). The only reason related to the *Sonnax* factors that Appellant has advanced as to why MLC should be stripped of the fundamental debtor protection embodied in the stay is that doing so would prevent the bankruptcy court from being "further burdened by more motions for pro hac vice attorneys to come in here and try to hear issues ... that have already been heard by the district court judge in Ocala, Florida...." (Hr'g Tr. at 23:9–24:13.) However, the minimal benefit, if any, of freeing the bankruptcy court of such routine motions is dwarfed by the burden on MLC of defending the ERISA suit outside the established claims process. Under *Sonnax,* that conclusion strongly militates against relief, particularly where Appellant could vitiate any burden to any party by severing his suit. In reaching the same conclusion, the bankruptcy court did not abuse its discretion.

## CONCLUSION

**\*6** For the foregoing reasons, the bankruptcy court's denial of Appellant's motion for relief from the automatic stay is AFFIRMED, Appellant's appeal [1] is DISMISSED, and Appellant's motion [8] to decide this appeal is DISMISSED as moot. The Clerk is directed to close this case.

SO ORDERED.

S.D.N.Y.,2010.
In re Motors Liquidation Co.
Not Reported in F.Supp.2d, 2010 WL 4966018 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.