Hearing Date and Time: August 8, 2012 at 2:00 p.m. (prevailing Eastern Time)
Objection Deadline: August 1, 2012 at 4:00 p.m. (prevailing Eastern Time)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Jamie A. Levitt
Jordan A. Wishnew

*Counsel for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------
|  | ) |  |
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
-------------------------------------------------------------------

**NOTICE OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS**
**363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING**
**(I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR**
**CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR**
**CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS**
<u>**ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**</u>

**PLEASE TAKE NOTICE** that on July 17, 2012, the Debtors and Debtors in

possession in the above-captioned cases (collectively, the "Debtors") filed the attached Debtors'

Motion for an Order Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code

Authorizing (I) Implementation of (A) Key Employee Retention Plan for Certain Non-Insiders

and (B) A Key Employee Incentive Plan for Certain Insiders and (II) Payment of Any

Obligations Arising Thereunder as Administrative Expenses (the "Motion") with the United

States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  A

hearing to consider the Motion is scheduled for **August 8, 2012 at 2:00 p.m. (prevailing**

**Eastern Time)** before the Honorable Martin Glenn, United States Bankruptcy Judge, in

Courtroom 501 at the Bankruptcy Court, One Bowling Green, New York, New York 10004.

                    **PLEASE TAKE FURTHER NOTICE** that any objection to the Motion must be

in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules

for the Southern District of New York, and the Notice, Case Management, and Administrative

Procedures approved by the Bankruptcy Court [Docket No. 141], be filed electronically by

registered users of the Bankruptcy Court's electronic case filing system, and be served, so as to

be received no later than **August 1, 2012 at 4:00 p.m. (prevailing Eastern Time)**, upon (a)

counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York,

NY 10104 (Attn: Larren M. Nashelsky, Gary S. Lee and Lorenzo Marinuzzi); (b) the Office of

the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor,

New York, NY 10004 (Attn: Tracy Hope Davis, Linda A. Riffkin and Brian S. Masumoto);

(c) the Office of the United States Attorney General, U.S. Department of Justice, 950

Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attn: US Attorney General, Eric H.

Holder, Jr.); (d)  Office of the New York State Attorney General, The Capitol, Albany, NY

12224-0341 (Attn: Nancy Lord, Esq. and Neal Mann, Esq.); (e) Office of the U.S. Attorney for

the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attn: Joseph

N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street,

New York, NY 10022 (Attn: Richard M. Cieri); (g) counsel to Barclays Bank PLC, as

administrative agent for the DIP lenders, Skadden, Arps, Slate, Meagher & Flom LLP, Four

Times Square, New York, New York 10036 (Attn: Ken Ziman & Jonathan H. Hofer); (h)

counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177

Avenue of the Americas, New York, NY 10036 (Attn: Kenneth Eckstein & Greg Horowitz); (i)

counsel for Nationstar Mortgage LLC, Sidley Austin LLP, One South Dearborn, Chicago,

Illinois 60603 (Attn: Jessica C.K. Boelter); (j) Internal Revenue Service, P.O. Box 7346,

Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133,

Philadelphia, PA 19104-5016); and (k) Securities and Exchange Commission, New York

Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attn: George

S. Canellos, Regional Director).

   **PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not

timely filed and served, the Bankruptcy Court may enter an order granting the relief requested in

the Motion without further notice or opportunity to be heard afforded to any party.

Dated:  July 17, 2012
   New York, New York


      */s/* Larren M. Nashelsky
      Larren M. Nashelsky
      Gary S. Lee
      Jamie A. Levitt
      Jordan A. Wishnew
      MORRISON & FOERSTER LLP
      1290 Avenue of the Americas
      New York, New York 10104
      Telephone: (212) 468-8000
      Facsimile: (212) 468-7900

      *Counsel for the Debtors and*
      *Debtors in Possession*

Hearing Date: **August 8, 2012 at 2:00 p.m. (ET)**
Objection Deadline: **August 1, 2012 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Jamie A. Levitt
Jordan A. Wishnew

*Counsel for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- )
                                                                      )
In re:                                                                )     Case No. 12-12020 (MG)
                                                                      )
RESIDENTIAL CAPITAL, LLC, et al.,                                     )     Chapter 11
                                                                      )
                                            Debtors.                  )     Jointly Administered
                                                                      )
--------------------------------------------------------------------- )

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363(b)(1) AND**
**503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF**
**(A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND**
**(B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND**
**(II) PAYMENT OF ANY OBLIGATIONS**
**ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 2

BACKGROUND ...................................................................................................... 5

    A.    Employees ............................................................................................ 6

    B.    Employees' Compensation ................................................................... 7

    C.    The KEIP ............................................................................................. 8

            i.    KEIP Participants' Compensation ................................................ 8

            ii.    Structure Of The KEIP.................................................................. 10

    D.    The KERP ........................................................................................... 12

RELIEF REQUESTED.............................................................................................. 13

BASIS FOR THE RELIEF REQUESTED .................................................................. 13

I.      THE KEIP SHOULD BE AUTHORIZED PURSUANT TO Bankruptcy Code SECTION 503(3) BECAUSE IT HAS A SOUND BUSINESS PURPOSE .................. 13

    A.    The KEIP Incentivizes the KEIP Participants to Effectuate a Value-Maximizing Sale of the Debtors' Businesses for the Benefit of All Stakeholders ...................................................................................... 14

    B.    The KEIP Should be Approved under Bankruptcy Code Section 503(c)(3) ....... 16

II.    The KERP Should be Approved under Bankruptcy Code Section 503(c)(3)................. 20

    A.    The KERP Participants are Not Insiders Under the Bankruptcy Code............... 20

    B.    The KERP is Justified by the Facts and Circumstances of the Case .................. 22

III.    The KEIP and KERP Represent an Exercise of the Debtors' Sound Business Judgment and Should be Approved under Section 363(b)(1) of the Bankruptcy Code ............................................................................................................... 24

CONCLUSION......................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Aerovox, Inc.,*
    269 B.R. 74 (Bankr. D. Mass. 2001) ......................................................................25

*In re Allen Family Foods, Inc.,*
    No. 11-11764 (KJC) (Bankr. D. Del. July 13, 2011) ..............................................18

*In re Borders Group, Inc.,*
    453 B.R. 459 (Bankr. S.D.N.Y. 2011) .............................................................. passim

*In re Dana Corp.*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) ...................................................14, 17, 22

*In re Diamond Glass, Inc.,*
    No. 08-10601 (CSS) (Bankr. D. Del. June 6, 2008) ..............................................17

*In re Diamond Glass, Inc.,*
    No. 08-10601 (CSS) (Bankr. D. Del. May 8, 2008) ..............................................16

*In re Global Grossing Ltd.,*
    295 B.R. 726 (Bankr. S.D.N.Y. 2003) ....................................................................25

*In re Mesa Air Group,*
    Case No. 10-10018 (MG), 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010) ............13, 17

*In re Metaldyne Corp.*, 409 B.R. 661 (Bankr. S.D.N.Y. 2009) ....................................................25

*In re New Century TRS Holdings, Inc.,*
    Case No. 07-10416 (Bankr. D. Del. Apr. 24, 2007) ...............................................22

*In re New Century TRS Holdings Inc.,*
    No. 07-10416 (KJC) (Bankr. D. Del. May 29, 2007) ............................................18

*In re New Century TRS Holdings Inc.,*
    No. 07-10416 (KJC) (Bankr. D. Del. May 7, 2007) ........................................15, 16

*In re Quigley Co.,*
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ....................................................................25

*In re Velo Holdings, Inc.,*
    Case No. 12-11384 (MG) slip op. (Bankr. S.D.N.Y. June 6, 2012) ...............14, 16, 17, 20, 21

*Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay),*
    973 F.2d 141 (2d Cir. 1992)...................................................................................24

i

<u>Official Comm. of Subordinated Bondholders v. Integrate Res., Inc. (In re Integrated
Res., Inc.)</u>,
147 B.R. 650 (S.D.N.Y. 1992)...........................................................................................24, 25

<u>Smith v. Van Gorkom</u>, 488 A.2d 858 (Del. 1985)........................................................................24


**STATUTES**

11 U.S.C. § 101(31) .............................................................................................13, 20, 21

11 U.S.C. § 363..................................................................................................... passim

11 U.S.C. § 503(c) ................................................................................................ passim


**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY 1193 (7th ed.1999) ...................................................................21

ii

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[1] hereby move for entry of an order, pursuant to sections 363(b)(1) and 503(c)(3) of title 11 of the United States Code  (the "Bankruptcy Code"), authorizing (i) implementation of (a) a key employee incentive plan for certain key executives ("Key Employee Incentive Plan" or "KEIP") and (b) a key employee retention plan for certain non-insiders ("Key Employee Retention Plan" or "KERP"), and (ii) payment of any obligations arising thereunder as administrative expenses (the "Motion").  In support of the Motion, the Debtors rely upon and incorporate by reference (i) the Declaration of Ronald Greenspan (the "Greenspan Decl.", (ii) the Declaration of John Dempsey (the "Dempsey Decl.") and the accompanying Report, attached thereto as Exhibit 1 (the "Report"), and (iii) the Declaration of Anne Janiczek (the "Janiczek Decl.," together with the Greenspan Decl. and the Dempsey Decl. the "Supporting Declarations"), each of which is being filed concurrently herewith.  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.       This Court has jurisdiction over this Motion under 28 U.S.C. sections 157 and 1334.  Venue is proper under 28 U.S.C. sections 1408 and 1409.  This is a core proceeding as defined in 28 U.S.C. section 157(b)(2).  The statutory predicates for the relief requested herein are sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

---

[1]      The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Motions (the "Whitlinger Affidavit") [Docket No. 6].

ny-1019062

## INTRODUCTION

2.      The Debtors' primary and most valuable business operations consist of servicing

mortgage loans for investors, including loans originated by the Debtors, the Debtors' non-debtor

affiliate, Ally Bank, and other third parties.  As of March 31, 2012, the Debtors were the fifth

largest servicer of residential mortgage loans in the United States, servicing over 2.4 million

domestic mortgage loans with an aggregate unpaid principal balance of approximately $374.2

billion.  In addition, prior to the Petition Date (defined below), the Debtors and their non-debtor

affiliates, including Ally Bank, were collectively the tenth largest originator of residential

mortgage loans in the United States, producing approximately $56.3 billion and $8.6 billion in

loan origination volume during the year ended December 31, 2011 and the three months ended

March 31, 2012, respectively.

3.      At this time, the Debtors have two separate asset purchase agreements

(collectively, the "APAs") for the sale of substantially all of their assets.  Nationstar Mortgage

LLC ("Nationstar") is the stalking horse bidder for the sale of the Debtors' mortgage loan

origination and servicing businesses (the "Platform Sale"), and Berkshire Hathaway Inc.

("Berkshire," together with Nationstar, the "Purchasers") is the proposed stalking horse bidder

for the sale of the Debtors' "legacy" portfolio consisting mainly of mortgage loans and other

residual financial assets (the "Legacy Sale," together with the Platform Sale, the "Asset Sales").

4.      As set forth in greater detail in the Whitlinger Affidavit, over the past several

years, the Debtors attempted going-concern sales of their businesses on several occasions, but

the sales did not come to fruition.  Whitlinger Affidavit ¶ 75.  That makes the Asset Sales

presently before the Court all the more critical to consummate.  The Debtors must not only

ensure that their businesses continue to operate in bankruptcy, but the Debtors' management

needs to ensure that upon closing of the Asset Sales, the Purchasers will be able to seamlessly

ny-1019062

take over the businesses without interruption of customer service. To that end, the Debtors must ensure that its employees work towards the collective goal of preserving and maximizing the value of the estates for the benefit of creditors.

5.        As a service-driven business, the Debtors' value is directly related to their employees collectively providing first-class service to their customers, and that same level of outstanding customer service will undoubtedly be maintained during this bankruptcy. However, throughout this year, in addition to continuing to manage the day-to-day operations, the Debtors' management team and key employees have taken on the additional task of simultaneously working with the Debtors' professionals to market and consummate the Asset Sales that are expected to generate nearly $4 billion of value for Debtors' estates. As a result, the restructuring and sale-related responsibilities borne by the Debtors' management team and Key Employees (as defined herein) requires them to undertake significant additional tasks beyond the scope of their regular daily obligations.

6.        In the months leading up to the Petition Date, the Debtors instituted a Business Continuity Incentive Plan ("BCIP"), to ensure that their employees remained incentivized and focused throughout uncertain times and to manage the degree of employee attrition, especially in light of the additional tasks being asked of them during a time of substantial uncertainty. As the Debtors entered bankruptcy, they concluded that continuing the BCIP would be critical to maintaining employee morale and incentivizing employees in the face of additional responsibilities and uncertainty. The BCIP has been adapted to comply with the Bankruptcy Code and now takes the form of the plans described herein. The structure of the plan might appear different to the employee; however, the Debtors intend to deliver substantially similar economic benefits to its employees.

3

7.      The KEIP provides 17 senior executives (the "KEIP Participants") [2] with financial incentives to compensate them for the extraordinary efforts being asked of them in these Chapter 11 cases.  The incentives are tied to both the sale of the Debtors' businesses and the achievement of certain financial and operational goals.  The KEIP Participants consist of the senior management team[3] who are collectively responsible for making the decisions that govern how the Debtors' businesses are run on a daily basis.  The financial and operational metrics are tailored to ensure that the KEIP Participants do not lose sight of the need to continue managing all of the components of the Debtors' businesses, including those that are not being acquired by Nationstar or Berkshire under the APAs.  The KEIP encourages these individuals to strive to improve the efficiency in the Debtors' operations, meet financial goals, maintain and/or enhance the value of the Debtors' businesses, and thereby preserve, and potentially enhance, the sale price for the benefit of all stakeholders.  Without the proper incentives to motivate the KEIP Participants to take on the innumerable additional restructuring and sale-related duties, the Debtors' businesses face a substantial risk of diminution in value.

8.      The KERP is intended to provide a financial incentive to approximately 174 of the Debtors' more than 3,625 current employees (the "Key Employees").  The Key Employees have been identified by the Debtors' senior management as necessary to execute the Debtors' business plan, maintain operational stability throughout the sale processes, and transition the Debtors' businesses as a going concern.  The Key Employees provide critical services in areas such as finance, legal, origination, servicing, operations and technology, and they possess irreplaceable knowledge of the Debtors' operations, their customers and the key functions

---

[2]     A list of the KEIP Participants and their respective titles will be provided to the Court, Office of the U.S. Trustee for the Southern District of New York ("UST") and the Creditors' Committee (as defined herein).

[3]     The KEIP Participants do not include the Debtors' Chief Executive Officer, President and Chief Capital Markets Officer.

ny-1019062

necessary to effectively operate the businesses up to and through the closing of the respective Asset Sales.  As with the KEIP Participants, the Debtors stand to lose a significant amount of value if the Key Employees were to resign their positions.

9.      As discussed in greater detail herein, the Debtors propose to make target payments of $4.1 million under the KEIP and $10.8 million under the KERP.[4]  The total potential award payouts represent a reasonable amount, especially when compared with the combined stalking horse bids of nearly $4.0 billion.  Accordingly, the Debtors submit that the KEIP and the KERP are justified by the facts and circumstances of these Chapter 11 cases and are in the best interests of the Debtors, their estates, and their creditors and should be approved by the Court.

## BACKGROUND

10.      On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No trustee has been appointed in these Chapter 11 cases.

11.      On May 16, 2012, the United States Trustee for the Southern District of New York appointed a nine member official committee of unsecured creditors (the "Creditors' Committee").

---

[4]      The target payments total $14.9 million; however, as noted herein, should new participants need to be added to the KEIP or KERP because of interim changes in the employee population, then the target payments would not exceed $15.9 million, which would be anticipated to be allocated $4.6 million to the KEIP and $11.3 million to the KERP.  Janiczek Decl. ¶ fn. 5.

12.     On June 20, 2012, the Court directed that an examiner be appointed [Docket No. 454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner [Docket No. 674].

13.     On the Petition Date, the Debtors filed the Sale Motion[5], and on June 28, 2012, the Court entered an order approving the sale and bid procedures for the Asset Sales [Docket No. 62].

### A.     Employees

14.     As of the Petition Date, the Debtors employed approximately 3,625 employees (the "Employees"), of whom approximately 3,575 are full-time employees and approximately 50 are part-time employees.  Janiczek Decl. ¶ 4.  The Debtors also employ approximately 250 employees who earn wages primarily in the form of commissions and utilize the services of approximately 375 contract workers.  Janiczek Decl. ¶ 4.

15.     Potential bidders are in the process of conducting significant amount of due diligence on both the Platform Sale and the Legacy Sale, for which Berkshire was only recently designated as the stalking horse bidder.  See Greenspan Decl. ¶ 23.  In addition to fulfilling their day-to-day operational obligations, the Key Employees and the KEIP Participants have been and will continue to be asked to simultaneously undertake the significant project of coordinating and responding to due diligence requests related to the Asset Sales.  Greenspan Decl. ¶ 23.  Further, the KEIP Participants and the Key Employees are continuing to assist the Debtors' professionals in administering these Chapter 11 cases, including responding to numerous information requests

---

[5]     *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m), 365 and 1123 and Fed R. Bank. P. 2002, 6004, 6006 and 9014 for Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Hearing and Sale Deadline; (III) Approving Form and Manner of Notice Thereof and (IV) Granting Related Relief and (B)(I)  Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion") [Docket No. 61].

ny-1019062

while also continuing to operate the Debtors' businesses to maximize value for the Asset Sales.
See Greenspan Decl. ¶ 24.

**B.    Employees' Compensation**

16.    Prior to the Petition Date, the vast majority of the employees received a portion of their annual compensation in the form of variable pay awarded based on company, unit and individual performance targets established by management and approved by the compensation committee of the Debtors' boards of directors (the "Discretionary Variable Pay").  Janiczek Decl. ¶ 5.  Discretionary Variable Pay is generally paid in cash; however, as noted herein, certain Employees are required to receive less cash and have a portion of their Discretionary Variable Pay remitted in restricted AFI stock.  Janiczek Decl. ¶ 7.  Certain Employees receive Discretionary Variable Pay through participation in the Ally Financial Inc. Long-Term Equity Compensation Plan (the "AFI LTECIP") and the Residential Capital, LLC ("ResCap") Annual Incentive Plan (the "ResCap AIP"). [6]  Janiczek Decl. ¶ 7.

17.    Tying a portion of employees' salaries to discretionary pay plans is typical in the financial services industry and, therefore, the Debtors' Employees generally view these programs as part of their base compensation and expect that they will receive some portion of incentive compensation.  Janiczek Decl. ¶ 5.  However, as described further below, because of the uncertainties associated with the bankruptcy and the sales of the businesses, and because the value of awards under the AFI LTECIP is tied to AFI's value, uncertainty exists as to the amount of Discretionary Variable Pay that Employees will ultimately realize.

18.    In an effort to combat the uncertainty regarding the Debtors and their businesses since the beginning of 2012, and to stem any resulting attrition, the Debtors took a proactive approach and implemented the BCIP during the first quarter of 2012.  Janiczek Decl. ¶ 11.  At

---

[6]    Approximately 76 of the Debtors' Employees are current participants in the AFI LTECIP.  Janiczek Decl. ¶ 7.

ny-1019062

that point, it was still unclear whether the restructuring / sale of the Debtors would occur in

Chapter 11.  In formulating a restructuring strategy, employee and management stability was

paramount.  Janiczek Decl. ¶ 11.  The Debtors are not seeking approval for the continuation of

the BCIP within these cases; rather, the Debtors propose to replace the BCIP with the KEIP and

KERP.  Janiczek Decl. ¶ 12.  The KEIP Participants and Key Employees are substantially similar

to the participants under the BCIP.  Janiczek Decl. ¶ 12.

19.    As part of this Motion, the Debtors seek authority to have the necessary flexibility

to add new participants to the KEIP and KERP and adjust payments to Key Employees to reflect

changes in job responsibility and employment terms.  In the event the Debtors determine that the

addition of a new participant is appropriate, they will provide the U.S. Trustee and the Creditors'

Committee the name and title of the proposed Key Employee.  The addition of new participants

is not anticipated to result in either the KEIP or KERP exceeding the current estimated costs.

C.    **The KEIP**

i.    **KEIP Participants' Compensation**

20.    On average, Discretionary Variable Pay historically comprised more than 50

percent of the KEIP Participants' total annual compensation.   Janiczek Decl. ¶ 5.  As a result of

AFI having received support under the federal government's troubled asset relief program

("TARP"), the Debtors (as indirect wholly-owned subsidiaries) have been required to adhere to

specific compensation rules administered by the special paymaster appointed by the United

States Treasury (the "Special Paymaster").   Janiczek Decl. ¶ 6.  Since 2009, the compensation

for those Employees that fall within AFI's "next 75"[7] most highly-compensated employees must

---

[7]    Under TARP, the Special Paymaster oversees the compensation structure for employees of a company that
previously received TARP funds but has not yet repaid such funds.  The "Next 75" refers to employees whose
total compensation ranks them amongst the 26-100 highest-paid employees at Ally Financial Inc. an its
subsidiaries, including the Debtors.

have their compensation structure reviewed and approved by the Special Paymaster.[8]   Janiczek

Decl. ¶ 6.  The pay structure approved by the Special Paymaster requires 50 percent of

Discretionary Variable Pay to be in the form of equity that must be deferred for three years.

Janiczek Decl. ¶ 6.  Furthermore, of the 50 percent of Discretionary Variable Pay that is payable

in cash, fifty percent must be deferred for one year (i.e., twenty-five percent of overall

Discretionary Variable Pay). Janiczek Decl. ¶ 6.  Therefore, over the past few years, the TARP

restrictions have not allowed the KEIP Participants to immediately receive the full amount of

their annual compensation.

21.     In addition to having to defer a significant portion of the prior years'

compensation, 50 percent or more of each KEIP Participants' potential total annual

compensation is at risk as a result of the Debtors' filing for bankruptcy protection because the

Discretionary Variable Pay Plans are just that, discretionary.  The Debtors do not control awards

that AFI grants under the AFI LTECIP, and it is uncertain if AFI will continue to make AFI

LTECIP awards postpetition.   Janiczek Decl. ¶ 10.  Furthermore, the Debtors can not pay any

Discretionary Variable Pay to the Employees without further order of the Bankruptcy Court.[9]

Therefore, it is difficult to assure the KEIP Participants of the amount of their Discretionary

Variable Pay for 2012.

22.     Consequently, the only guaranteed compensation for the KEIP Participants is

their base salary, which is approximately 50 percent of their compensation.  Yet, the KEIP

Participants are being asked to take on additional responsibilities with significant time

---

[8]    Nine of the Debtors' employees fall within AFI's 75 next most highly-compensated employees.

[9]    See Final Order Under *Bankruptcy Code Sections* 105(a), 363(b), 507(a), 1107 and 1108 and *Bankruptcy Rule*
6003 (I) Authorizing But Not Directing Debtors to (A) Pay and Honor Prepetition Wages, Compensation,
Employee Expenses and Employee Benefit Obligations; and (B) Maintain and Continue Employee
Compensation and Benefit Programs; and (II) Directing Banks to Honor Prepetition Checks and Transfer
Requests for Payment of Prepetition Employee Obligations entered by Judge Glenn on June 15, 2012 [Docket
No. 386 at ¶ 4].

commitments in order to consummate the Asset Sales and assist in the administration of the

Chapter 11 proceedings.  Thus, approving the KEIP is extremely important to ensuring the KEIP

Participants remain motivated to commit the extraordinary time and effort required during these

Chapter 11 cases.

### ii.    Structure Of The KEIP

23.    The Debtors seek authorization to implement the KEIP for 17 key executives who

are critical to the Debtors' ability to (a) manage the Debtors' businesses during the pendency of

the bankruptcy cases, (b) support an auction process to ensure the Debtors maximize the value of

their businesses, (c) close the Asset Sales, (d) assist with the administration of the bankruptcy

proceedings to achieve a successful restructuring and (e) transition the business over to the

eventual Purchasers.  The KEIP provides for performance-based incentive payments based on

five separate milestones.

24.    The size of a KEIP award is based on each KEIP Participant's achievement of the

following milestones (the "KEIP Milestones").  As described further below, target Sales Awards

(defined below) are intended to provide KEIP Participants with compensation consistent with

market practice.  See Dempsey Decl. ¶ 29.  Certain payments are based upon achievement of the

Asset Sales (the "Sales Milestone").

> **Sales Milestone (70%)**[10]
> - The Sales Milestone is deemed "achieved," and a KEIP Participant will
>   earn up to a total of 70% of the KEIP award, with the KEIP Participant
>   vesting in 42% of the award upon closing of the Platform Sale and 28%
>   upon closing of the Legacy Sale at the negotiated stalking horse sale
>   prices, or higher and better offers approved by the court.[11]
> - 90% of the Sales Milestone (the "Threshold Sales Award") will be earned
>   upon closing of each sale; and

---

[10]    The Asset Sales, and the vesting of the awards, predicated on such sales, are intended to be treated separately.

[11]    In the event that the Platform Sale closing occurs prior to the closing of the Legacy Sale, KEIP Participants will
still be eligible to earn the Legacy Sale award if they accept employment with the buyer in the Platform Sale
and leave the Debtors' employ prior to the closing of the Legacy Sale.  Greenspan Decl. ¶ fn. 3.

ny-1019062

- 10% of the Sales Milestone (the "Target Sales Award") will be earned upon an auction of the Debtors' assets that results in the closing of a sale with a higher and better offer than the stalking horse purchase price.
- KEIP Participants can achieve up to an additional 100% of the Target Award if the sale proceeds realized through the auction process exceeds the relevant stalking horse bid by 3%.  The award level will be proportionate to the percentage of the potential 3% sale price increase actually achieved.

    **Financial/Operational Performance Milestone (30%)**
- Barclays DIP Covenant (10%)
    The DIP Covenant Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided the Debtors maintain compliance without being in default of the 20% Cash Flow Variance covenant (as such term is defined in the Barclays DIP financing agreement) through the earlier of (i) closing of the Platform Sale or (ii) payoff of the Barclays DIP.
- GSE Adherence (10%)
    The GSE Adherence Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided the Debtors maintain a year-to-date top 3 Fannie Mae service ranking, measured as of the earlier of (i) closing of the Platform Sale or (ii) December 31, 2012.
- Performance Rating (10%)
    The Performance Rating Milestone is "achieved" and a KEIP Participant will earn 10% of his/her target award provided such participant achieves an "Effective" rating based on his/her overall individual performance for all goals, as determined by the Debtors' compensation committee, measured as of the earlier of (i) closing of the Platform Sale or (ii) December 31, 2012.

Greenspan Decl. ¶ 34.

25.    KEIP awards will vest upon the achievement of each KEIP Milestone and payments will be made upon the earlier of (i) an Asset Sale closing and (ii) termination of the KEIP Participant's employment.[12]  Greenspan Decl. ¶ 35.  However, payment of 40% of the rested KEIP Awards will be deferred until the effective date of a confirmed plan of reorganization, or its equivalent.  In addition, if a KEIP Participant:

---

[12]    Through this structure, the Debtors seek to ensure that the Debtors' funds are actually available to compensate the KEIP Participants for their efforts and that the Debtors' estates do not unnecessarily incur an administrative expense.

ny-1019062

(i)      is terminated for cause, the KEIP Participant will forfeit all vested and unvested awards;

(ii)     is terminated without cause, the KEIP Participant will receive all vested awards, but forfeit any unvested awards; or

(iii)    resigns, the KEIP Participant will receive any vested awards but will forfeit all unvested awards.

26.     The resulting total expected amount for all KEIP awards is approximately $4.1 million, with a potential payout of $7.0 million if the final sale proceeds exceeds anticipated sale proceeds by three percent or greater.  Greenspan Decl. ¶ 34.

### D.    The KERP

27.     The Debtors also seek authorization to implement the KERP for 174 non-insider Key Employees who are critical to the Debtors' operations and their ability to support (a) the Debtors' operations during these Chapter 11 cases, (b) the closing of the sale of the Debtors' businesses and (c) the transition of the business over to the eventual buyers.  See Greenspan Decl. ¶ 38.  The KERP retention awards are intended to provide the Key Employees with a financial incentive to forgo seeking alternative employment during the Debtors' bankruptcy proceeding.

28.     The Debtors' senior management have determined that each of the Key Employees provide critical services in areas such as finance, legal, sales, operations and technology.  Each of the Key Employees have been assigned to one of three tiers, based upon their business unit, job function and the roles they have been tasked with for the sale and transition of certain of the Debtors' businesses as a going concern.

29.     The KERP awards in the estimated aggregate amount of $10.8 million will vest (i) 40% upon closing of the Legacy Sale and (ii) 60% upon closing of the Platform Sale, with payment made only after both closings have occurred.  Greenspan Decl. ¶ 42.

30. Forfeiture of KERP awards will occur in the following manner, with Key

Employees (i) forfeiting all vested and unvested awards if terminated for cause, (ii) forfeiting no

awards if terminated without cause and (iii) forfeiting only unvested awards if they resign.

Greenspan Decl. ¶ 42.

## RELIEF REQUESTED

31. By this Motion, the Debtors seek entry of an order under Bankruptcy Code

section 503(c)(3) and, to the extent applicable, section 363(b)(1) of the Bankruptcy Code,

authorizing (i) implementation of (a) the KERP and the KEIP, and (ii) payment of any

obligations arising thereunder as administrative expenses.

## BASIS FOR THE RELIEF REQUESTED

## I.    THE KEIP SHOULD BE AUTHORIZED PURSUANT TO BANKRUPTCY CODE SECTION 503(3) BECAUSE IT HAS A SOUND BUSINESS PURPOSE

32. The Debtors respectfully submit that the KEIP is governed by, and meets the

standards for approval under, section 503(c)(3) of the Bankruptcy Code.  Key employee plans

outside of the ordinary course and not governed by Bankruptcy Code section 363 must be

analyzed under Bankruptcy Code section 503(c).[13]  See In re Borders Group, Inc., 453 B.R. 459,

470-71 (Bankr. S.D.N.Y. 2011); In re Mesa Air Group, Case No. 10-10018 (MG), 2010 WL

3810899 (Bankr. S.D.N.Y. Sept. 24, 2010).[14]  Bankruptcy Code section 503(c) restricts a

debtor's ability to treat certain payments to "insiders" as administrative expenses.  Although the

Debtors recognize that the KEIP Participants may be "insiders," as defined in section 101(31) of

the Bankruptcy Code, section 503(c) of the Bankruptcy Code does not bar approval of the KEIP.

---

[13]    The Debtors do not contend that the KEIP or KERP are ordinary course plans governed by Bankruptcy Code section 363.

[14]    Due to the volume of the unreported orders cited herein, such orders are not annexed to the Motion.  Copies of these orders (and, where cited material comes from motions and/or transcripts associated with the orders, copies of the relevant motions and/or transcripts) are being delivered to Chambers with copies of this Motion and will be made available to other parties in interest upon request to Debtors' counsel.

ny-1019062

33.    Bankruptcy Code section 503(c)(1) restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business" – i.e. those insider plans that are essentially "pay to stay" plans.  In re Velo Holdings, Inc., Case No. 12-11384 (MG) slip op. at 12-13 (Bankr. S.D.N.Y. June 6, 2012) (Docket No. 227); In re Borders Group, Inc., 453 B.R. at 471 (quoting In re Dana Corp., 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) ("Dana II")). [15]  However, section 503(c) is not intended to "foreclose a Chapter 11 debtor from reasonably compensating employees, including 'insiders,' for their contribution to the debtors' reorganization."  In re Velo Holdings, Inc., slip op. at 12 (citing Dana II, 358 B.R. at 575).  Instead, Debtors may implement incentive plans covering insiders that meet the requirements of Bankruptcy Code section 503(c)(3).  See In re Borders Group, Inc., 453 B.R. at 471.

34.    The Debtors' businesses are highly people-intensive service businesses that derive a substantial portion of their value from their employees.  The KEIP is necessary to ensure that the Debtors' employees remain motivated in these difficult and taxing times.  Accordingly, the Debtors respectfully submit that the KEIP should be evaluated under Bankruptcy Code section 503(c)(3) and is "justified by the facts and circumstances of the case."

**A.    The KEIP Incentivizes the KEIP Participants to Effectuate a Value-Maximizing Sale of the Debtors' Businesses for the Benefit of All Stakeholders**

35.    The KEIP was carefully crafted to align the interests of the KEIP Participants with the interests of the Debtors' stakeholders, by incentivizing the KEIP Participants to close the value-maximizing Asset Sales.  Greenspan Decl. ¶19.  A substantial portion of the KEIP Participants' incentive payment i.e., 63% is contingent upon closing of the Asset Sales, with an

---

[15]    Section 503(c)(2) also restricts payments of severance to insiders.  Because the KEIP does not propose to make any payments to insiders arising from termination of their employment with the Debtors, section 503(c)(2) is inapplicable.

additional payout in the event the Asset Sales produce an auction process i.e., 7%.  Greenspan

Decl. ¶ 34.  In sum, 70% of the overall KEIP award is tied to the disposition of the Asset Sales,

and the KEIP Participants have the opportunity to achieve a higher award payment if the sale

price improves.

36.     Tying the KEIP Participants' incentive pay to closing the Asset Sales will

encourage them to continue addressing the copious due diligence requests while also continuing

to perform their day-to-day duties and all of the other restructuring related duties now being

asked of them.  Greenspan Decl. ¶ 42.  At the same time, providing the KEIP Participants with

the ability to share, in any increase in the purchase price received in the Asset Sales, will align

the Debtors' interest in achieving the highest and best offer for their assets with the creditors'

interest in maximizing the value of estate assets available for distribution to creditors.  See

Greenspan Decl. ¶ 42.

37.     Likewise, the KEIP has been crafted to ensure that the KEIP Participants remain

incentivized to meet the types of financial and operational performance goals that they have

historically strived to meet, which will ultimately benefit creditors through a further increased

sale price, by tying 30% of the KEIP awards to the achievement of the Financial and Operations

Milestones.  Greenspan Decl. ¶ 34.

38.     Courts have recognized the value of incentivizing a debtor's senior-most

executives to address due diligence requests from a stalking horse and perform sale related

activities that would not otherwise be within their normal job description.  See Transcript of

Hearing at 260, In re New Century TRS Holdings Inc., No. 07-10416 (KJC) (Bankr. D. Del. May

7, 2007) (Docket No. 1318) (court found it necessary to incentivize employees to perform

activities that would not otherwise be within their normal job descriptions in order to perform

15

functions necessary to close a sale to the stalking horse bidder and produce the most value for the estate.); see also In re Borders Group, Inc., 453 B.R. at 472.

39.     The KEIP may have the incidental effect of encouraging the KEIP Participants to remain with the Debtors; however, this does not change the analysis.  See In re Velo Holdings Inc., slip. op. at 12-13 (explaining that the fact that a plan has same retentive effect does not mean that the plan, overall is retentive rather than incentivizing); In re Borders Group Inc., 453 B.R. at 471.  Although the KEIP proposes to make payments upon a sale to the stalking horse bidder, this, in and of itself does not render the KEIP primarily retentive. See, e.g., Transcript of Hearing at 88-89, In re Diamond Glass, Inc., No. 08-10601 (CSS) (Bankr. D. Del. May 8, 2008) (Docket No. 255) (refusing to conclude that getting to a closing by a stalking horse bidder in and of itself was retentive.); Transcript of Hearing at 261, In re New Century TRS Holdings Inc. (explained that the timing of the request for relief and development of the sales, including putting a stalking horse in place prior to seeking approval of the plan was not reason alone to deny the relief and in fact was "off the mark" and "wrong").

40.     In sum, the KEIP was carefully crafted to ensure that the KEIP Participants are incentivized to work toward several objectively verifiable goals intended to maximize the value of the Debtors' estates for all creditors.  As a result, the KEIP is an incentive plan and Bankruptcy Code section 503(c)(1) does not apply.

**B.     The KEIP Should be Approved under Bankruptcy Code Section 503(c)(3)**

41.     Bankruptcy Code section 503(c)(3) governs incentive compensation plans like the KEIP.  In re Borders Group, Inc., 453 B.R. at 471 (concluding that a proposed KEIP was an incentive plan, thus "alleviating the need for a section 503(c)(1) analysis," and instead analyzing the KEIP under section 503(c)(3)).  Bankruptcy Code section 503(c)(3) precludes "transfers or obligations that are outside of the ordinary course of business and not justified by the facts and

16

circumstances of the case. . ." 11 U.S.C. § 503(c)(3). The "facts and circumstances of the case,"

test in section 503(c)(3) is "no different than the business judgment standard under section

363(b)." In re Borders Group, Inc., 453 B.R. at 473; see also In re Velo Holdings Inc., slip. op.

at 17; In re Mesa Air Group, Inc., 2010 WL 3810899, at **3 (Bankr. S.D.N.Y. Sept. 24, 2010).

In determining whether a compensation proposal meets the requirements of Bankruptcy Code

section 503(c)(3), courts consider several factors, including:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

Dana II, 358 B.R. at 576-77 (emphasis in original); see also In re Borders Group, Inc., 453 B.R.

at 474-77 (applying Dana II factors). The KEIP satisfies each of these requirements and should

be approved pursuant to Bankruptcy Code section 503(c)(3).

42.    Courts in this and other districts regularly approve incentive plans with features

similar to the KEIP. See, e.g., In re Velo Holdings, Inc., Case No. 12-11384 (MG) (June 6,

2012) (Docket No. 232) (approving sale related incentive plan based upon DIP budget goals); In

re Borders Group, Inc., 453 B.R. at 465 (approving a key employee incentive plan covering

fifteen key executives and their achievement of transactional and financial goals); In re Diamond

Glass, Inc., No. 08-10601 (CSS) (Bankr. D. Del. June 6, 2008) (Docket No. 312) (approving sale

incentive plan for twenty-one employees, including insiders, portion of plan pool funding upon

consummation of a sale to the stalking horse prepetition lender); In re Allen Family Foods, Inc.,

No. 11-11764 (KJC) (Bankr. D. Del. July 13, 2011) (Docket No. 173) (same); In re New Century

TRS Holdings Inc., No. 07-10416 (KJC) (Bankr. D. Del. May 29, 2007) (Docket No. 896)

(approving a sale incentive plan payable for consummating a sale to a stalking-horse bidder at

the stalking horse bid).

43.     First, the KEIP is calculated to align the interests of the KEIP Participants and the

Debtors' stakeholders.  Greenspan Decl. ¶ 17.  As described above, the Debtors believe that

including both (i) objective Asset Sale related and (ii) financial and operations milestones in the

KEIP strikes the proper balance between encouraging the KEIP Participants to expeditiously

work toward a sale and also providing the KEIP Participants with an incentive to seek to obtain

higher and better offers to maximize the value of the estates for the benefit of all creditors.

Moreover, the KEIP is critical to keeping the KEIP Participants motivated and maintaining

morale by providing them with the opportunity to replace the prepetition BCIP plan.

44.     Second, the cost of the KEIP is reasonable and consistent with (or even below)

industry standards, particularly when compared with the Debtors' revenues and the aggregate of

the stalking horse bids for the Asset Sales.  In total, the Debtors propose to pay a maximum of $7

million under the KEIP, or 0.18% of expected proceeds from the Asset Sales, which is well

below the 0.68% cost/proceeds average for comparable programs.  Report at 4.  Indeed, the total

potential KEIP award, as a percentage of sales proceeds, falls well below the 25th percentile of

KEIP plans in comparable bankruptcy cases.  See Dempsey Decl. ¶ 19; Report at 4.

Additionally, Target Sales Awards are reasonable as compared to comparable KEIP plans.  They

18

range from 52% to 117% of base salary, with an average target award of $241,353.  Greenspan

Decl. ¶ 34.

47.    45.    In sum, the Debtors believe that despite the limited precedent for transactions of

the size and complexity presented here, they have designed a compensation structure that is

reasonable and well within market standards for the industry and companies in Chapter 11.

46.    <u>Third</u>, the scope of the KEIP is fair and reasonable, as it applies to the 17 senior

executives (excluding the CEO, President and Chief Capital Markets Officer) out of an employee

population of over 3,600.  The Debtors have identified these individuals as the primary decision-

makers whose decisions affect the direction of the Debtors' businesses and that are therefore,

critical to achieving the objective of closing the Asset Sales.   Greenspan Decl. ¶ 17.  The KEIP

Participants represent only 0.4% of the prepetition employee population, and are critical to

keeping the staff motivated and engaged.   Janiczek Decl. ¶ 13.  Additionally, Purchasers of the

Debtors' assets have expressed their opinion that they are impressed by the Debtors'

management team.  Greenspan Decl. ¶ 20.  As a result, losing these critical senior employees

could result in bidders negatively adjusting their purchase prices.  Dempsey Decl. ¶ 7.

47.    <u>Fourth</u>, the KEIP was devised after extensive due diligence.  FTI assisted the

Debtors in devising the KEIP after carefully reviewing incentive plans instituted by comparable

companies in Chapter 11 and compensation plans of executives both in and out of bankruptcy.

The Debtors and their professionals also conducted extensive analyses of incentive-based plans

in complex Chapter 11 cases. Ultimately, after reviewing the results of the due diligence

produced by FTI and Mercer, the compensation committee of the Debtors' board of directors

determined that the KEIP was appropriate, reasonable in cost and scope, and reasonably

calculated to achieve the Debtors' goals.

19

48.    <u>Finally</u>, in addition to consulting with FTI and Mercer, the Debtors engaged

counsel in discussions regarding the need for the KEIP, its scope, and its terms and tapped into

counsel's experience in negotiating and devising incentive plans on behalf of both debtors and

official creditors committees.

49.    In sum, the KEIP is necessary to encourage each of the KEIP Participants to work

toward the Debtors' ultimate goal – maximizing the estates' value for the benefit of the Debtors'

stakeholders through a sale of the Debtors' businesses as a going concern.  Accordingly, the

KEIP is "justified by the facts and circumstances" of these Chapter 11 cases and should be

approved under section 503(c)(3).

## II.    THE KERP SHOULD BE APPROVED UNDER BANKRUPTCY CODE SECTION 503(C)(3)

50.    The KERP is a pay-to-stay retention program structured to retain the Key

Employees through the closing of the going concern Asset Sales.  This Court has recognized

that, "as an initial matter, the Court must determine whether each eligible key employee under a

key employee plan is an 'insider' within the meaning of section 101(31)."  <u>In re Borders Group,</u>

<u>Inc.</u>, 453 B.R. at 467.  Should a court determine that an employee is an insider, the employee

may be prevented from participating in a retention plan such as the KERP.  <u>See</u> <u>id.</u>  However, to

the extent that a key employee plan applies only to non-insiders, courts analyze the propriety of

the plan under Bankruptcy Code section 503(c)(3).  <u>Id.</u> at 473.

### A.    The KERP Participants are Not Insiders Under the Bankruptcy Code

51.    The term "insider" is defined in Bankruptcy Code section 101(31)(B) to include,

among others: officers, directors, and persons in control of a corporate debtor.  However,

"insider status can also be determined on a case-by-case basis from the totality of the

circumstances, including the degree of an individual's involvement in a debtor's affairs."  <u>In re</u>

20

<u>Velo Holdings</u>, slip op. at 10.  In such cases, insiders must have "at least a controlling interest in the debtor or . . . exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."  <u>Id.</u> (citation omitted)

52.     Neither "officer" nor "director" is defined in the Bankruptcy Code.  However, this Court has concluded that "with respect to Bankruptcy Code section 101(31)(b)(i) 'director' means an individual who sits on the board of directors of a corporation."  <u>In re Borders Group, Inc.</u>, 453 B.R. at 468.  The term "officer" in Bankruptcy Code section 101(31) includes those persons "elected or appointed by the board of directors to manage the daily operations of a corporation, such as the CEO, president, secretary, or treasurer."  <u>Id.</u> (quoting BLACK'S LAW DICTIONARY 1193 (7th ed.1999)).  However, "an individual's title, by itself, is insufficient to establish that an individual is a director or officer."  <u>In re Borders Group, Inc.</u>, 453 B.R. at 468-69.  Instead, courts must look at the role of the employees on a case-by-case basis to determine if, for instance, the employee has the authority to implement company policy or whether the employee reports directly to a company's board of directors.  <u>See</u> <u>Id</u>. at 469.

53.     While developing the KEIP and KERP, the Debtors extensively reviewed their critical employees to determine who would constitute "insiders" under the Bankruptcy Code and excluded those employees from the KERP.  As described further in the Janiczek Declaration, the Debtors' analysis concluded that although a number of Key Employees held "officer" titles for client-facing purposes, the Key Employees' functional title was a more accurate reflection of their overall responsibilities within the mortgage operations business segment.  Janiczek Decl. ¶ 18.  For example, many loan officers have the title of Vice President or higher in order to compete for business, but do not, in fact, possess any management or business policy-making authority.  Janiczek Decl. ¶ 18.  Likewise, these individuals have little, if any, ability to dictate

ny-1019062

overall company policy.  Janiczek Decl. ¶ 18.  Accordingly, the Debtors submit that none of the

Key Employees is an "insider" within the meaning of Bankruptcy Code section 101(31).  See In

re Borders Group, Inc., 453 B.R. at 469 (noting that "companies often give employees the title

'director' or 'director-level,' but do not give them decision-making authority akin to an

executive" and concluding that certain "director-level" employees in that case were not insiders);

Transcript of Hearing at 67-68, In re New Century TRS Holdings, Inc., Case No. 07-10416

(Bankr. D. Del. Apr. 24, 2007) (acknowledging the debtors' argument, in the bankruptcy of

another mortgage servicer, that "every bank has enumerable Assistant Vice Presidents, Vice

Presidents who have very limited authority" and concluding that these employees were not

insiders).  Under this analysis, the Key Employees are not insiders.

### B.    The KERP is Justified by the Facts and Circumstances of the Case

54.    Because none of the Key Employees is an "insider" under the Bankruptcy Code,

the Bankruptcy Court need only determine whether the KERP satisfies section 503(c)(3) of the

Bankruptcy Code.  See In re Borders Group, Inc., 453 B.R. at 473.  For the same reasons set

forth above regarding the KEIP, as well as those described below, the KERP satisfies each of the

Dana II factors, and the Debtors therefore submit that the facts and circumstances of the case

justify that the KERP be approved.

55.    The Key Employees represent a critical sub-set of the employee population who

are each necessary to ensure an efficient bankruptcy sale process and transition phase to the new

operating entity.  Janiczek Decl. ¶ 14.  The KERP provides for the Key Employees retention

payments based upon closing of the Asset Sales, with awards vesting as they are earned – upon a

closing of the respective Asset Sale.  As such, the KERP awards provide an essential motivation

to the Key Employees to refrain from seeking alternative employment prior to the completion of

the Asset Sales.

22

56.     The Debtors' workforce has already been reduced by almost two-thirds over the past four years. Janiczek Decl. ¶ 11. The Key Employees are critical to the Debtors' ability to maintain stable operations throughout the sale and transition of the business. The Key Employees have unique and vital knowledge of the Debtors' business operations that are critical to the businesses' long-term success. Janiczek Decl. ¶ 14. The Debtors' business operates in a highly competitive market. If the Key Employees were to resign, the loss of their experience during this critical time would result in an overall diminution in value of the Debtors' businesses. Dempsey Decl. ¶ 7. Moreover, at least two factors will almost certainly render replacing the Key Employees exceedingly difficult, including: (i) the degree of training necessary to process loan files in accordance with regulatory frameworks in place and (ii) increased hiring by competitors to staff for (a) record loan production volume resulting from low interests and (b) loan file reviews required under governmental settlements. Janiczek Decl. ¶ 14. Accordingly, the KERP will assist the Debtors in achieving their overarching goal of preventing the Key Employees from seeking alternative employment options, which could result in the loss of valuable institutional knowledge and thereby place additional hurdles in the Debtors' ability to execute the Asset Sales.

57.     Additionally, the KERP is reasonable in cost and in relation to market, particularly when compared with the Debtors' revenues and sale price. In total, the Debtors propose to pay approximately $10.8 million under the KERP,[16] or 0.28% of expected sales proceeds, which is below the median of 0.67% cost/proceeds average for comparable programs (when normalized for size). Report at 5. As with the KEIP, the total cost of the KERP falls well below the 25th percentile of KERP plans in comparable bankruptcy cases. Dempsey Decl. ¶ 22.

---

[16]    Notwithstanding the results of this analysis, the Debtors have requested authority to add participants to the extent employees resign.

58.     In addition, the scope of the KERP is also fair and reasonable.  It applies to only

174 of 3,625 employees, which falls within the range of market practice, especially given the

large size of the Debtors' operations and the wide range of business functions served by the Key

Employees. Report at 5.

59.     Finally, the Debtors utilized and performed the same careful and thorough

analysis, with the same assistance and counsel of their professionals, in developing the KERP as

they did with the KEIP.  See Greenspan Decl. ¶ 13.

60.     Accordingly, the Debtors respectfully submit that the KERP is justified by the

facts and circumstances of the Debtors' Chapter 11 cases, and that implementation of the KERP

is in the best interests of the Debtors, their estates, creditors, and all other stakeholders.

## III.    THE KEIP AND KERP REPRESENT AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT AND SHOULD BE APPROVED UNDER SECTION 363(B)(1) OF THE BANKRUPTCY CODE

61.     To the extent applicable, the KEIP and the KERP should also be approved under

Bankruptcy Code section 363(b)(1).  Bankruptcy Code section 363(b)(1) provides that a debtor-

in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate. . ." 11 U.S.C. § 363(b)(1).  Use of estate property

outside the ordinary course of business is entrusted to the sound business judgment of a debtor.

See e.g.  Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay), 973 F.2d

141, 143 (2d Cir. 1992); In re Borders Group, Inc., 453 B.R. at 473.  The business judgment rule

"is a presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action was in the best interests of

the company."  Official Comm. of Subordinated Bondholders v. Integrate Res., Inc. (In re

Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488

A.2d 858, 872 (Del. 1985)).

62.     The business judgment rule applies in Chapter 11 cases and shields a debtor's

management from judicial second-guessing.  See Integrated Res., 147 B.R. at 656; see also, e.g.,

In re Quigley Co., 437 B.R. 102, 157 (Bankr. S.D.N.Y. 2010) (citing In re Metaldyne Corp., 409

B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009).  Indeed "courts are loath to interfere with corporate

decisions absent a showing of bad faith, self-interest, or gross negligence."  In re Quigley Co.,

437 B.R. at 157 (quoting In re Integrated Res., Inc., 147 B.R. at 656).  Consequently, a debtor's

business decision "should be approved by the court unless it is shown to be so manifestly

unreasonable that it could not be based upon sound business judgment, but only on bad faith, or

whim or caprice."  In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal

quotations omitted); cf. In re Global Grossing Ltd., 295 B.R. 726, 742 (Bankr. S.D.N.Y. 2003)

(citing Aerovox with approval).  Moreover, "parties opposing the proposed exercise of a debtor's

business judgment have the burden of rebutting the presumption of validity."  In re Integrated

Res., Inc., 147 B.R. at 656.

63.     As set forth above, the Debtors' decision to implement the KEIP and KERP is a

valid exercise of their business judgment.  The scope of the KEIP and KERP is fair, reasonable,

and narrowly tailored to include only those employees most critical to achieving a closing of the

Asset Sales and administration of these Chapter 11 proceedings.  The Key Employees and KEIP

Participants have been working in a difficult environment with uncertainty surrounding the

Debtors' future prospects and will continue to do so during the Debtors' Chapter 11 cases.

Additionally, the KEIP is specifically designed to encourage the KEIP Participants to continue

their day-to-day responsibilities while making a substantial additional time commitment to

maximizing the value received in the Asset Sales for the benefit of the Debtors' estates.

64.     Accordingly, the Debtors have determined, in their business judgment, that the

KEIP and KERP are necessary, appropriate, and reasonable in terms of both scope and cost.

## NOTICE

65.     The Motion is being served in a manner consistent with the Court's Case

Management Procedures Order [Docket No. 141].

## NO PRIOR MOTION

66.     No previous motion requesting the relief sought herein has been made to this or

any other Court.

## CONCLUSION

The Debtors respectfully submit that the KEIP and KERP are justified by the facts and

circumstances of these cases, represent a valid exercise of their business judgment, and are

necessary and in the best interest of the Debtors, their creditors, and their estates.  Accordingly,

the KEIP and KERP should be approved, along with any obligations arising thereunder, pursuant

to section 503(c)(3) of the Bankruptcy Code and, to the extent applicable, Bankruptcy Code

section 363(b).

Dated:   July 17, 2012
            New York, New York

*/s/* Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Jamie A. Levitt
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and*
*Debtors in Possession*

26

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------

)

In re:                                                    )          Case No. 12-12020 (MG)

)

RESIDENTIAL CAPITAL, LLC, et al.,      )          Chapter 11

)

Debtors.         )          Jointly Administered

-------------------------------------------------------------------------    )

## ORDER (I) APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES

Upon consideration of the Debtors' motion (the "**Motion**")[1] for entry of an order

approving the implementation of a key employee retention plan for certain non-insiders (the

"**KERP**"), a key employee incentive plan for certain insiders (the "**KEIP**") and the treatment of

the payment of any obligations arising thereunder as administrative expenses; and jurisdiction

existing for the Court to consider the motion; and after due deliberation thereon; and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that notice of

the Motion was adequate and proper under the circumstances of these cases and that no further or

other notice need be given; and the Court having found that good and sufficient cause exists for

granting the Motion; and upon consideration of the Janiczek Declaration, the Greenspan

Declaration and the Dempsey Declaration; and upon the files and records in these cases; and

upon the arguments and statements in support of the Motion presented at the hearing before the

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Court; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; it is hereby:

**ORDERED** that the Motion is granted; and it is further

**ORDERED** that, pursuant to Bankruptcy Code sections 363(b)(1) and 503(c)(3), the KERP and the KEIP are approved in their entirety and the Debtors are authorized to implement the KERP and the KEIP upon the terms described in the Motion and to make payments contemplated thereunder; and it is further

**ORDERED** that the authorization granted hereunder to make payments to the KEIP Participants under the KEIP and the Key Employees under the KERP shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to make payments under the KEIP or the KERP unless the KEIP Participants and the Key Employees meet the necessary milestones as described in the Motion; and it is further

**ORDERED** that the Debtors are authorized to change the KERP to adjust individual budgeted awards and to add/remove employees due to attrition or otherwise; provided, however, that the Debtors shall provide reasonable notice to the Office of the U.S. Trustee and the Creditors' Committee of the identity of any employees added to or removed from the KERP; and is further

**ORDERED** that the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion; and it is further

**ORDERED** that the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order; and it is further

**ORDERED** that notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

Ally Financial Inc., Ally Bank, Residential Capital LLC, GMAC Mortgage, LLC, the Board of

Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b)

the consent judgment entered April 5, 2012, by the District Court for the District of Columbia,

dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon

Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012,

and (d) all related agreements with Ally Financial Inc. and Ally Bank and their respective

subsidiaries and affiliates; and it is further

      **ORDERED** that this Court shall retain jurisdiction over all matters arising from or

related to the interpretation and implementation of this Order.


Dated: August __, 2012
New York, New York

                                       _____
                                       THE HONORABLE MARTIN GLENN
                                       UNITED STATES BANKRUPTCY JUDGE

ny-1050136