**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---------------------------------------------------------------

**DECLARATION OF JOHN DEMPSEY IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, John Dempsey, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.       I am a Partner at Mercer (US) Inc. ("Mercer").  My business address is 155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606.  Mercer is a global professional compensation services firm that was engaged by the above-captioned debtors and debtors in possession (the "Debtors").

2.       I respectfully submit this declaration (the "Declaration") in support of the *Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders and (B) a Key Employee Incentive Plan for Certain Insiders and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses*, filed contemporaneously herewith.

A.    **Background Information and Qualifications**

3.     I joined Mercer following my graduation from Yale University, and have worked in the firm's Chicago, Cleveland and London offices.  I received an MBA in 1992 from the Ohio State University.  I have been a Principal or Partner at Mercer for approximately 12 years.

4.     I have extensive experience advising organizations undergoing major financial transitions (including bankruptcies, IPOs, LBOs, and acquisitions) regarding compensation issues, and also have extensive experience with designing annual and multi-year incentive programs, change in control arrangements, and employment agreements.  My recent bankruptcy-related engagements include Borders Group, Nortel Networks, Tribune Company, Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion, Dana, Owens Corning, Kaiser Aluminum, Solutia, Oglebay Norton, Citation, Intermet, Venture Holdings, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation, and FLAG Telecom.  I have also worked on restructuring issues with Georgia Gulf, ABN AMRO, US Foodservice, Barrick Gold, Manulife, CareMark Rx, Archipelago, and Sky Financial.

5.     Additionally, I published an article entitled *Bankruptcy Blues: Retaining Key Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of Workspan, and an update, *The New Challenge of Chapter 11*, with Elizabeth Stephens in August 2008.  I have been frequently quoted on issues relating to effective transitional compensation practices in such publications as HR Magazine, Cox News, and the Atlanta Journal Constitution. In addition, I have been quoted in the Dallas Morning News, the Chicago Tribune, and the Milwaukee Journal Sentinel.  I have also presented at the National Meeting of the Conference Board, the National Association of Stock Plan Professionals, and the National Center for Employee Ownership.

2

6.      I testified as an expert in connection with (i) a renewal of the KERP of Owens
Corning on September 8, 2004, (ii) the approval of Citation Corporation's KERP on
November 4, 2004, (iii) the approval of Intermet Corporation's KERP on December 22, 2004,
(iv) the approval of Venture Industries' KERP on March 10, 2005, (v) the approval of Allied
Holdings' KERP on October 11, 2005, and (vi) Nortel Networks' KERP on February 5, 2009.  In
addition, my testimony was proffered, or submitted by declaration, and accepted in connection
with (i) the approval of Olgebay Norton's KERP in 2004; (ii) the approval of EaglePicher's
KERP on August 9, 2005, (iii) the approval of Dana's director compensation program in 2006,
(iv) the approval of the continuation of Mesaba's Incentive and Severance plans in 2006, and
(v) the approval of the Borders Group KEIP and KERP in 2011.  In 2010, my testimony was
proffered and accepted in connection with the approval of Nortel's "Special Incentive Plan" and
Tribune's 2010 Management Incentive Plan.  On March 11, 2011, my testimony was proffered
and accepted during Tribune's confirmation hearing.

**B.**      **Overview of the Plans**

7.      As a result of the ongoing bankruptcy proceedings and the financial uncertainty of
Residential Capital, LLC and its debtor subsidiaries (the "Debtors" or the "Company") both
before and during the bankruptcy process, employees of the Debtors have assumed
responsibilities above their normal duties, as well as have been subjected to extraordinary stress,
pressure, and uncertainty as to the security of their jobs.  These factors are above and beyond the
normal scope of these employees' positions with the Company and have resulted in employees of
all levels leaving the Company for other opportunities.  Given the importance of the Company's
workforce to the success and value of the Company, retaining and motivating these employees
has surfaced as a paramount concern of the Debtors.  A loss of key talent would not only
jeopardize the ability of the Company to function effectively and succeed, but it would also have

ny-1018038

a tangible negative impact on the value of the Company being assumed by interested parties in the sale process and thus the value the Company is able to deliver to the creditors. Furthermore, given the company's current status and the uncertainty surrounding its future, it would be near impossible to recruit a similar caliber of talent to replace any lost employees. In light of this important issue, the Debtors have, in coordination with counsel and an outside professional consulting firm, designed and propose to put in place two key employee plans aimed at retaining and incentivizing the key members of the Company. The first of these plans is the Key Employee Incentive Plan (the "KEIP"), which is an incentive-based plan for 17 insiders of the company <u>excluding</u> the Chief Executive Officer, President and Chief Capital Markets Officer. The second of these plans is the Key Employee Retention Plan (the "KERP"), which is a retention-based plan for 174 employees across all key functions of the Company. It is my belief that these plans as currently designed will effectively serve the purpose of retaining and motivating the key talent upon which the Company relies, and thus preserve the value of the Company for the benefit of the creditors.

8.    The possible payouts under the KEIP and the KERP are below, as expressed as a percentage of the applicable employees' base salaries. For the purposes of determining plan eligibility, participating employees were classified into four "tiers" based on level in the organization and criticality to the organization. Tier I employees are included in the KEIP, while Tier II – IV employees are included in the KERP.

| Tier | Plan | Number of Executives | KEIP/KERP Target (average % of base salary) |
|------|------|----------------------|---------------------------------------------|
| I | KEIP | 17 | 80% |
| II | KERP | 68 | 54% |
| III | KERP | 96 | 39% |
| IV | KERP | 10 | 13% |
| **Total** | **-** | **191** | **52%** |

ny-1018038

C.    **The KEIP**

9.       The KEIP provides potential performance incentives for seventeen (17) of the

Debtors' key executives (collectively, the "KEIP Participants"), in the event they achieve

specific financial/operational and sale-related goals.  It is noteworthy that the Debtors' Chief

Executive Officer, President and Chief Capital Markets Officer are not among the KEIP

Participants.  Mercer reviewed the cost and terms of the Debtors' proposed KEIP in aggregate

and by participant in the context of the anticipated performance to ensure conformity with the

market.

10.       The KEIP includes potential awards (the "KEIP Awards") in connection with five

milestones, generally falling within two categories.  The first two, accounting for 70% of each

KEIP Participant's target award, is the Sales Milestone.  The 70% Sales Milestone is divided

among the two simultaneous sales of the Debtors' assets, in proportion to their respective sizes:

42% to the Nationstar Sale Metric and 28% to the Berkshire Sale Metric.  For each of the Sales

Milestones, each KEIP Participant will receive the greater of (i) 90% of the target Sales

Milestone KEIP Award upon a closing of a sale of substantially all of the Debtors' assets (the

"Closing"), (ii) 100% of the target Sales Milestone KEIP Award upon a Closing after an auction,

and (iii) 200% of the target Sales Milestone KEIP Award upon a Closing in which the sale

proceeds realized through the auction process exceed the Purchase Price by up to three percent

(3%).

11.       The second category of milestones includes Financial and Operational

Performance Milestones.  The KEIP provides awards amounting to 10% of each KEIP

Participant's target award for meeting each of three Financial and Operational Performance

Milestones, including: (i) a DIP Covenant Milestone achieved by maintaining compliance with

the 20% cash flow variance covenant described in section 5.02(b) of the DIP Agreement attached as <u>Exhibit B</u> to the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (i) Authorizing the Debtors to (A) Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (ii) Schedule a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) and (iii) Granting Related Relief* [D.I. 13] through the date of a Closing; (ii) achieving a year-to-date "Top 3" Fannie Mae servicer ranking, measured as of the earlier of (a) a Closing or (b) December 31, 2012, and (iii) achievement of an "Effective" performance rating for all applicable organizational goals in the period leading up to a Closing, with such goals and performance approved and assessed by the compensation committee of the Debtors' Board of Directors.

12.      Assuming target performance, the KEIP will cost approximately $4.1 million, with a maximum cost of approximately $7 million.  The amount of the KEIP Awards would be determined upon the date that each milestone is achieved and vests.  The KEIP Awards would be paid upon the earlier of (i) a Closing and (ii) a KEIP Participant's termination.  Notwithstanding the preceding provisions, payment of 40% of the vested awards will be deferred until the Effective Date of the Plan of Reorganization, or its equivalent.

13.      However, the KEIP Awards are subject to several limiting conditions if the KEIP Participant leaves prior to a Closing.  First, KEIP Participants terminated for cause will not receive a KEIP Award.  Next, KEIP Participants terminated without cause will receive any

vested KEIP Award, and will forfeit any unvested portions of the KEIP Award. Finally, KEIP Participants resigning prior to the Closing will receive any vested KEIP Award but will forfeit any unvested portion.

**D.    The KERP**

14.    The KERP provides retention incentives for approximately one-hundred seventy four (174) employees who are critical to the Debtors' reorganization and to ongoing business (the "Key Employees"), and who are of high talent and would be difficult, if not impossible, to re-recruit in the current market, given the Debtors' current circumstances. The Key Employees consist of (i) approximately 68 critical manager and director level employees across all key functions of mortgage operations ("Tier II Employees"), (ii) 96 critical employees supporting key functions throughout the organization ("Tier III Employees") and (iii) 10 critical employees supporting key processes or systems throughout the organization ("Tier IV Employees").

15.    The Debtors estimate that the total maximum aggregate payout under the KERP will be approximately $10.8 million, consisting of approximately $6.3 million for the Tier II Employees, $4.4 million for the Tier III Employees and $0.1 million for the Tier IV Employees. The Key Employees have been broken down into three tiers with pre-determined proposed individual award ranges as follows:

  o   Tier II- between 20% and 93% of base salary,

  o   Tier III- between 12% and 86% of base salary, and

  o   Tier IV- between 12% and 14% of base salary

16.    The Debtors have informed me that the KERP is intended to incentivize the Key Employees to remain with the Debtors and to achieve a successful sale of the Debtors' businesses in these Chapter 11 cases. To that end, the Debtors developed a KERP that provides for the vesting of payments (the "KERP Awards") only upon the closing of a sale of substantially

all of the Debtors' assets.  The payments would be made upon the earlier of (i) the Closing or

(ii) termination of the Key Employee's employment with the Debtors. However, Key Employees

terminated or resigning prior to a Closing will be subject to the same restrictions as KEIP

Participants who are terminated or resign prior to a Closing.

E.    **Mercer's Analysis of the KEIP and the KERP**

17.    The Debtors engaged Mercer to analyze the KEIP and KERP programs and advise

them on how the plan compares to the market.  In accordance therewith, Mercer participated in

multiple meetings and discussions with the Debtors' management team and restructuring

advisors, FTI Consulting, Inc., regarding the Debtors' businesses, operational history,

restructuring goals, existing base salaries, and incentive compensation programs.  This enabled

Mercer to evaluate the KEIP and KERP with appropriate consideration of the Debtors' specific

and reasonable goals and objectives.

18.    In assessing the reasonableness of the KEIP and KERP, Mercer conducted a

market study that compared the KEIP and KERP to market practice in terms of design features

(*e.g.* eligibility, metrics and payout timing), payout levels and total cost.  Additionally, Mercer

performed a benchmarking analysis, considering the current compensation of the KEIP

Participants and Key Employees relative to market compensation.  Exhibit 1, attached hereto,

contains Mercer's analysis of the KEIP and the KERP.

19.    To assess the reasonableness of the KEIP and KERP in the context of market

practice, the proposed plans were compared to the retention and incentive plans implemented by

twenty one (21) companies that filed for bankruptcy after January 1, 2009, underwent a section

363 sale of their asset base and implemented an incentive plan which incentivized key employees

based on this asset transaction.  Eight of these companies also implemented a non-insider key

employee retention plan.  To assess the reasonableness of the proposed plans in the context of

8

market practice, Mercer compared the aggregate cost of the KEIP and KERP to the cost of

programs implemented by the 21 comparator companies.  To assess competitiveness, the

Debtors' plans are compared to the market percentiles[1]. The results of our KEIP and KERP

analyses can be found in **Tables 1 and 2**, below.  As **Table 1** outlines, although the dollar

amount of the maximum payout of the KEIP is relatively large ($7 million, compared with a

market 75th percentile of approximately $3.4 million), as expressed as a percentage of the

expected asset sale proceeds it falls well below the 25th percentile of companies analyzed**.**  The

total maximum cost of a plan is one of the most commonly used metrics to assess the

reasonableness and impact of the plan, and is most appropriate in a sale situation such as this,

where the cost of these plans must be justified in the context of the value generated in the sales.

Expressing the plan costs as a percentage of expected sale proceeds takes into account the size

and complexity of the transaction and the increased workload, manpower and diligence

necessary to successfully execute the transaction to the benefit of creditors.

*Table 1: KEIP Compared to Market*

|  | Max Cost of KEIP | % Sale Proceeds |
|---|---|---|
|  |  |  |
| **Proposed KEIP** | **$7,000,000** | **0.18%** |
|  | *Market Data:* |  |
| **75th Percentile** | $3,444,000 | 2.28% |
| **50th Percentile** | $1,404,000 | 1.04% |
| **25th Percentile** | $852,688 | 0.68% |

20.    Mercer also analyzed the cost of the KEIP in comparison to the cost of KEIPs of

the four companies in the database with sale proceeds greater than $500 million (the "Large

---

[1]    The 25th percentile is defined as, given a set of numbers, the number which is greater than 25% of the numbers
in the set; the median (50th percentile) is greater than 50% of the numbers; the 75th percentile is greater than
75% of the numbers

ny-1018038

Companies"[2]).  In dollar terms, the KEIP fell in the middle of this subset of Large Companies

(larger than two and smaller than two).  However, as a percentage of sale proceeds, the KEIP is

positioned smaller than all four of these Large Companies.

21.    Furthermore, Mercer also analyzed the KEIP in the context of plan design, payout

metrics, and payout timing.  From its market study, Mercer found that market practice for KEIPs

is to base plan payouts on either deal completion / timing (completing a deal by a certain date) or

sale proceeds (triggered by achieving certain proceeds targets).  Mercer also found that KEIP

payouts are either a fixed pool (with 57% prevalence) or are variable based on sale proceeds

(52% prevalence).  Thus, the proposed KEIP is consistent with market practice since plan

payouts are earned based in large part on deal completion and maximum payouts are based on

deal price appreciation.  It is noteworthy that if the contemplated deals are not consummated,

participants will lose the opportunity to earn 80% of their target awards.  Mercer also found that

95% of companies analyzed for this review paid KEIP payments immediately after deal

completion, which includes effective date and closing of the sale transaction, which is consistent

with the proposed KEIP design.  Given the Debtors' large size and the complexity of the

bankruptcy process, we find this reasonable in the context of market practice.

22.    As **Table 2** (below) outlines, similar to the KEIP, although the maximum cost of

the proposed KERP is above the 75th percentile of companies analyzed in Mercer's study, the

proposed KERP falls below the 25th percentile as a percentage of sale proceeds.

---

[2]    These companies are: Nortel Networks, TerreStar Networks, Borders Group and BearingPoint

ny-1018038

*Table 2: KERP Compared to Market*

| | Max Cost of KERP | % Sale Proceeds |
|---|---|---|
| | | |
| **Proposed KERP** | **$10,800,000** | **0.28%** |
| | *Market Data:* | |
| **75th Percentile** | $7,543,750 | 1.19 % |
| **50th Percentile** | $1,195,375 | 0.67% |
| **25th Percentile** | $549,877 | 0.38% |

23.    Mercer also analyzed the cost of the KERP in comparison to the cost of KERPs of the Large Companies.  Three out of the four companies implemented a KERP in addition to a KEIP.  In dollar terms, the KERP is smaller than two of the Large Companies and larger than one.  As a percentage of sale proceeds, the KERP is positioned in the middle of these companies (smaller than one, larger than one, and roughly equal to one).

24.    Consistent with the methodology used to assess the KEIP in the context of market practice, Mercer also analyzed the reasonableness of the KERP in terms of plan design, metrics, and payout timing.  From this study, Mercer found that market practice for KERPs in this bankruptcy context is to base KERP payouts solely on continued employment through certain time-based milestones (for example, through deal close or for 6 months or 1 year after deal close).  No companies analyzed as part of this review included performance contingencies in KERP payouts.  Thus, Mercer found the proposed KERP is consistent with market practice by making fixed payouts based on retention of key talent through pre-specified milestones.  Mercer also found that market practice for KERPs is to make plan payments upon time-based milestones

ny-1018038

in the bankruptcy process (for example, upon auction, sale closing, plan confirmation, 1 year after deal closing). Therefore, the proposed KERP is consistent with market practice by calibrating payments to pre-specified bankruptcy milestones.

25.      Lastly, Mercer compared the combined total cost of the KEIP and KERP with the combined total cost of incentive and retention plans implemented by the 21 comparator companies. The result of this analysis can be found in **Table 3** below. Consistent with the proposed KEIP and KERP, the maximum cost of these plans is above the 75th percentile of the maximum cost of combined KEIPs and KERPs in Mercer's analysis; however, taking the size of the transaction into account and expressing the cost as a percentage of sale proceeds, the combined maximum cost of the KEIP and KERP are well below the market 25th percentile.

*Table 3: Total Cost Compared to Market*

| | Max Cost of KEIP + KERP | % Sale Proceeds |
|---|---|---|
| **Proposed Plans** | **$17,800,000** | **0.46%** |
| *Market Data:* | | |
| 75th **Percentile** | $3,750,000 | 2.62 % |
| 50th **Percentile** | $1,445,177 | 1.31 % |
| 25th **Percentile** | $855,375 | 0.73% |

26.      Mercer also analyzed the aggregate cost of the KEIP and KERP in comparison to the cost of KEIPs and KERPs of the Large Companies. Three out of the four Large Companies implemented a KERP in addition to a KEIP. In dollar terms, the aggregate cost of the KEIP and KERP is smaller than two of the Large Companies and larger than two. However, as a

percentage of sale proceeds, the aggregate cost of the KEIP and  KERP is smaller than all four of

the Large Companies.

27.     Concurrent to the analysis of the KEIP and KERP in the context of current market

practice, Mercer also conducted a compensation benchmarking analysis of several key

employees included in the KEIP and KERP.  Mercer analyzed the current compensation and

target KEIP or KERP amounts for thirty seven (37) positions at the Debtors by comparing them

to market compensation levels.  This includes the 17 KEIP participants, with the remainder of

the individuals included in the study being included in the KERP.  Mercer was also given access

to benchmarking analyses previously performed by the Debtors, which were reviewed by

Mercer; including these positions Mercer can comment on the competitiveness of a total of one

hundred fifteen (115) positions.

28.     To conduct Mercer's analysis, incumbents' positions at the Debtors were first

matched to the appropriate survey benchmark position which takes into account the position's

roles, responsibilities, reporting relationship, and organizational importance.  Next, the

benchmark positions were scoped by industry (Finance & Banking) and asset size (using a target

asset size of $15 billion) to reflect the market for talent of the positions; where available,

mortgage servicing-specific survey data was used.  This analysis results in competitive market

compensation ranges (represented by market percentiles) for each of the benchmark positions;

these percentiles represent the range of compensation for a particular position in a particular

industry, and is what the incumbents would expect to be paid if they took the same position in

another company similar to the Debtors.  This data is compared with current compensation to

assess competitiveness to market.  The results of our benchmarking analysis and those performed

by the Debtors can be found below in **Table 4.**  This table displays the variance (percent

difference) between the aggregate compensation of the Debtors (base salary and KEIP/KERP

target compensation), by tier, and aggregate market total compensation.  A positive variance

implies that compensation is above a particular percentile, and a negative variance implies

compensation is below the applicable percentile; for instance, a variance of 5% at the 75th

percentile means that the incumbent compensation is 5% above the market 75th percentile.

Overall, Mercer found compensation was positioned above the median and below the 75th

percentile, which I consider to be reasonable and competitive given the increased responsibilities

assumed in the bankruptcy process as well as the increased importance of retention for these key

employees.

*Table 4: Benchmarking Results*

| Tier | Variance from Compensation Target[3] |
|:---:|:---:|
| I | -39.3% |
| II | -23.3% |
| III | 7.3% |
| IV | *n/a* [4] |
| **Aggregate** | **-21.4%** |

29.     Based upon my analysis, knowledge, and experience, I believe that the design and

structure of the KEIP and the KERP, and proposed payouts to be made thereunder, are generally

in line with market standards and practice.

30.     Based upon my analysis, knowledge, and experience, I believe that the KEIP and

the KERP would serve to align the interests of the Debtors, their key employees and their

---

[3]     The market 75th percentile is shown as the compensation target since this has been the Debtors' historical target
pay positioning.

[4]     Mercer did not perform nor was made available to benchmarking analyses for incumbents in Tier IV therefore
cannot comment on market competitiveness.

financial stakeholders, in order to best achieve the Debtors' specific restructuring-related goal, achieving an expeditious and value maximizing Closing.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on the 17th day of July, 2012.

/s/ John Dempsey
John Dempsey

# EXHIBIT 1



CONSULTING. OUTSOURCING. INVESTMENTS.



# Project Bounce
## KEIP/KERP Assessment
July 17, 2012

**John Dempsey**
(312) 917-0609
john.dempsey@mercer.com



# Background & Context

- Mercer was retained as an expert to assist with the evaluation of the proposed KEIP and "NewCo" KERP (collectively referred to as the "proposed plans")

- To assess the appropriateness and competitiveness of the proposed plans, Mercer conducted a market study of companies that have implemented a 363 sale-oriented KEIP and other post-petition bankruptcy plans since 1/1/2009

  - The proposed plan designs were compared to market practice in terms of design features (eligibility, metrics, payout timing, etc.), payout levels and total cost

- The following pages outline the results of this analysis, and contain Mercer's assessment and commentary of the proposed plans in the context of market practice

# Executive Summary of Proposed Plans

| Plan | Participants | Maximum Cost | Payout Determination | Commentary |
|---|---|---|---|---|
| KEIP | Insiders, excluding President , CEO and Chief Capital Markets Officer (17) | $7.0MM | Metric-based: 70% based on sale completion/proceeds, 30% based on financial/operational objectives | Incentivizes key employees to optimize deal value and quality, while rewarding for work above and beyond normal duties |
| "NewCo" KERP | Key employees subject to stalking horse sale (174) | $10.8MM | Based on retention through approval of sale and closing date | Retains employees essential to the operation and value retention of the company through the bankruptcy process |
| TOTAL | 191 *(5.5% total employee population)* | $17.8MM *(0.46% expected sale proceeds)* | | |

> **Overall Mercer agrees with the necessity of these plans and finds them reasonable in the context of market practice for companies going through a sale process**

## Cost of All Bankruptcy Plans vs. Sale Size
### The total cost of the plans is appropriate in the context of ResCap's size

- The chart below shows the relationship between the maximum cost of the bankruptcy plans (KEIP, KERP)
  and the actual sale proceeds of companies analyzed:



MERCER

# KEIP Comparison to Market Practice
## Proposed KEIP is large in terms of dollar value and participants, which is appropriate given ResCap's size and complexity

| Element | Current Proposed | Market Practice | Commentary |
|---|---|---|---|
| **Eligibility** | 17 Insiders, exc'l the President, CEO and Chief Capital Mkts. Officer (approx. 0.49% of pre-petition employee population) | **Total # Eligible EEs / % of Pre-Petition EE Population** — 75th Percentile: 17 / 1.33%; 50th Percentile: 8 / 0.46%; 25th Percentile: 5 / 0.17% | Participation is at the market 75th percentile based on the number of employees, and slightly above the median as % of all employees |
| **Total Cost** | Maximum total payout of ~$7.0MM (0.18% of expected sale proceeds) | **Max Cost of KEIP / % Actual Sale Proceeds** — 75th Percentile: $3,444,000 / 2.28%; 50th Percentile: $1,404,000 / 1.04%; 25th Percentile: $852,688 / 0.68% | • The cost in $ terms is above the 75th percentile; however, <br> • As a percentage of sale proceeds (which normalizes for size), ResCap is positioned well below the 25th percentile |
| **Metrics** | 70% Sale (Target/Threshold based on sale closing and auction occurrence, Max based on proceeds), 30% Financial/Operational Performance | • Plans pay out based on either deal completion / timing (completing a deal by certain date) or sale proceeds (achieving certain proceeds targets) <br> • Payout amount is either a fixed pool (57% prevalence) or variable based on proceeds (52% prevalence) | • Weighing on sale metrics consistent with market practice <br> • Target and maximum metrics incentivize sale proceeds maximization, which is consistent with market practice of basing payouts on deal completion and proceeds |
| **Payout Timing** | Made upon earlier of (i) sale closing or (ii) participant's termination | 95% of companies paid KEIP payments immediately after deal completion which includes effective date and closing of sale transaction | Aligned with market practice |

# NewCo KERP Assessment
## Proposed KERP is reasonable and necessary to retain value of the sale entities

| Element | Current Proposed | Market Practice | Commentary |
|---|---|---|---|
| **Eligibility** | 174 total (4.97% pre-petition employee population) | For companies that implemented a sale-oriented KEIP and a KERP, eligible employees range from 880 – 6 employees | ResCap falls within the range of market practice, especially given its large size |
| **Total Cost** | ~$10.8MM (0.28% of expected sale proceeds) | | •The cost in $ terms is above the 75th percentile; however, •As a percentage of sale proceeds (which normalizes for size), ResCap is positioned below the 25th percentile |
| **Payout Determination** | Fixed-amount awards vest 100% upon closing of sale transaction (later of Platform and Whole Loan sale closings) | Payouts determined based on continued employment through applicable time-based milestones. No companies analyzed used performance metrics | ResCap is consistent with market practice by making fixed payouts based on retention |
| **Payout Timing** | Paid upon applicable vesting event | Market practice is to make plan payouts upon milestones in the bankruptcy process (i.e. upon auction, sale closing, plan confirmation) | ResCap is consistent with market practice by calibrating payments to bankruptcy milestones |

Inset table (Total Cost row):

|  | Max Cost of KERP | % Actual Sale Proceeds |
|---|---|---|
| 75th Percentile | $7,543,750 | 1.19% |
| 50th Percentile | $1,195,375 | 0.67% |
| 25th Percentile | $549,877 | 0.38% |



# Market Study Overview

- To conduct the market study used for benchmarking the Proposed Plans, Mercer relied on its proprietary bankruptcy databases to analyze companies that fit the following criteria:
  - Filed for bankruptcy since 1/1/2009
  - Went through a 363 sale of most or substantially all assets
  - Implemented a KEIP which rewarded participants based on the 363 sale
- This resulted in a comparator group of 21 companies, as outlined to the right
- To account for the differences in transaction sizes and complexities (which impact the size and payouts of the KEIP), Mercer also analyzed the actual sale proceeds from these transactions. The statistics below detail the sale proceeds of these companies:

| Company | Filing Date | Pre-Petition Assets |
|---|---|---|
| Nortel Networks, Inc. | 1/14/2009 | $9,000,000,000 |
| TerreStar Networks Inc. | 10/19/2010 | $1,401,602,000 |
| Evergreen Solar, Inc. | 8/15/2011 | $424,470,000 |
| Trident Microsystems, Inc. | 1/4/2012 | $370,941,000 |
| Real Mex Restaurants, Inc. | 10/4/2011 | $281,445,000 |
| Point Blank Solutions, Inc. | 4/14/2010 | $125,375,000 |
| BearingPoint, Inc. | 2/18/2009 | $1,981,404,000 |
| Crusader Energy Group Inc. | 3/30/2009 | $749,978,331 |
| Proliance International, Inc. | 7/2/2009 | $187,205,000 |
| Nanogen, Inc. | 5/13/2009 | $98,351,000 |
| Reader's Digest Association, Inc. | 8/24/2009 | $3,966,100,000 |
| Borders Group, Inc. | 2/16/2011 | $1,425,200,000 |
| Pacific Energy Resources Ltd. | 3/8/2009 | $721,973,894 |
| Movie Gallery, Inc. | 2/2/2010 | $663,325,000 |
| Fleetwood Enterprises, Inc. | 3/10/2009 | $625,571,000 |
| Eddie Bauer Holdings, Inc. | 6/17/2009 | $596,920,000 |
| Palm Harbor Homes, Inc. | 11/29/2010 | $357,753,000 |
| Gottschalks Inc. | 1/14/2009 | $331,994,000 |
| Spheris Inc. | 2/3/2010 | $275,078,000 |
| Magic Brands | 4/21/2010 | $77,654,926 |
| Seahawk Drilling Inc | 2/11/2011 | $625,336,000 |

| Statistic | Actual Sale Proceeds |
|---|---|
| 75th Percentile | $286,000,000 |
| Median | $106,820,000 |
| 25th Percentile | $63,450,000 |

## KEIP Cost vs. Sale Size
The cost of the KEIP is appropriate given ResCap's size

- The chart below shows the relationship between the max cost of KEIPs to the actual asset sale proceeds of companies:



MERCER

