**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------
                                                                    )
In re:                                                              )   Case No. 12-12020 (MG)
                                                                    )
RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al</u>.,                     )   Chapter 11
                                                                    )
                                                          Debtors.  )   Jointly Administered
                                                                    )
---------------------------------------------------------------------

**DECLARATION OF RONALD GREENSPAN IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, Ronald Greenspan, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a senior managing director in the Corporate Finance/Restructuring practice of FTI Consulting, Inc. ("FTI")[1]. My business address is 633 West 5th Street, Suite 1600, Los Angeles, CA 90071-2027.

2. I respectfully submit this declaration (the "Declaration") in support of the *Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders and (B) a Key Employee Incentive Plan for Certain Insiders and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses*. The Debtors have duly authorized me to do so.

---

[1] On June 27, 2012, the above-captioned debtors and debtors in possession (collectively, the "Debtors") submitted an application to the Court seeking an order authorizing the engagement of FTI as financial advisor to the Debtors [Docket No. 526].

ny-1021502

A. **<u>Background Information and Qualifications</u>**

3. I earned my B.A degree in economics summa cum laude from University of California, Los Angeles and my J.D magna cum laude from Harvard Law School. FTI is the successor to the Corporate Finance and Restructuring Practice of PricewaterhouseCoopers LLP ("PwC"), which I joined in 1991 and since then have led its Global Real Estate and Real Estate-Secured Debt Restructuring Practice. Prior to that, I held senior management positions at several real estate and financial services companies: I was the chief operating officer of Los Angeles Land Companies, the executive vice president of Brookside Savings & Loan Association and the executive vice president of The Heritage Group.

4. In my over twenty years at FTI and its predecessor PwC, I have provided consulting services regarding compensation issues to a number of debtors in possession and creditors of debtors in possession in the mortgage, housing and financial services industries; including, in several cases, incentive and retention plans similar to those proposed by the Debtors. In particular, FTI provided compensation-related consulting in the bankruptcies of ResMae Mortgage Corp.; American Home Mortgage Corp.; Mortgage Lenders Network USA; Capmark Financial Group, Inc.; People's Choice Home Loan Inc.; Credit-Based Asset Servicing & Securitization LLC; Fairfield Residential LLC; and Orleans Homes, amongst others.

5. I have also provided such services in significant bankruptcies outside of the real estate and mortgage industries, too, including US Airways and Peregrine Systems Inc. I provided expert testimony regarding the chapter 11 employee incentive plans in Peregrine Systems, Inc., and the employee emergence compensation plans in US Airways.

6. I co-authored an article entitled *KERP's Are Out, But Incentives Are In* with Matthew Pakkala, published shortly after the adoption of BAPCPA in the August 2006 issue of

2

ny-1021502

the Turnaround Management Association's Journal of Corporate Renewal. In addition, I have authored numerous articles and given dozens of speeches regarding issues related to the real estate, banking and financial services industries.

7.  I am a Certified Insolvency and Restructuring Advisor, Fellow of the American College of Bankruptcy and past-President and Member of the Board of Directors of the Los Angeles Bankruptcy Forum.

**B.  FTI's Engagement as Financial Advisor**

8.  FTI has provided financial advice regarding numerous aspects of the Debtors' businesses as it pertains to the preparation of filing for chapter 11. Throughout its engagement, FTI developed a comprehensive understanding of the Debtors' businesses through our assistance in the preparation of the first day motions and such key analyses, amongst others, as the following: bottoms-up cash flow projections; profitability of business lines; assessment of key contractual relationships; evaluation and negotiation of shared services and transition services arrangements with affiliates; development of communication plans for customers, vendors and employees; general assistance in connection with the sale process (the "Sale Process") and in securing debtor-in-possession financing. Such projects spanned the year leading up to these chapter 11 proceedings, which has resulted in FTI possessing substantial institutional knowledge regarding the specific facts and circumstances surrounding these cases.

9.  As discussed in further detail below, the Debtors concluded that it was necessary to enlist FTI, in coordination with Mercer (US) Inc. as compensation consultant, to advise on the creation of (i) a Key Employee Incentive Plan (the "KEIP") to ensure that certain insider-level employees (the "KEIP Participants") are incentivized to work toward an expeditious, value maximizing sale of the Debtors' businesses and (ii) a Key Employee Retention Plan (the

3

ny-1021502

"KERP", together with the KEIP, the "Plans") in an effort to ensure that non-insider employees critical to the Sale Process (the "Key Employees") remain with the company through the conclusion of the Sale Process.

10. **As of the Petition Date, the Debtors employed approximately 3,625 employees, of whom approxi**mately 3,575 are full-time employees and approximately 50 are part-time employees. The Debtors also employ approximately 250 employees who earn wages primarily in the form of commissions and utilize the services of approximately 375 contract workers.

C. **Need for the KEIP and the KERP**

11. The Debtors enter the auctions with an offer to purchase their businesses as a going concern for approximately $2.45 billion (the "Nationstar Bid" or the "Platform Sale") in addition to the sale of other assets for approximately $1.44 billion (the "Berkshire Bid" or the "Legacy Sale") (collectively, the "Stalking Horse Bids").[2] The Debtors require the continued services of some of their most critical employees in order to continue driving and supporting the sale efforts, with the possibility of increasing value beyond the Stalking Horse Bids, and efficiently achieving closings for the sale of substantially all of the Debtors' assets (the "Closings"). Furthermore, a hearing approving the sales will not be scheduled before early November 2012 with the Closings likely not to occur before December 2012.

12. Firms in the financial service industry, including the Debtors, derive much of their value from their employees. It is my experience that losing their most valuable employees could reduce the value of the Debtors' businesses and endanger the Debtors' sale and reorganization efforts. Beginning in early calendar year 2012, retaining and incentivizing some of the Debtors' most valuable employees became increasingly difficult. The need to retain and incentivize their

---

[2] Amounts are based on figures in the Debtors' February 29, 2012 Balance Sheet.

employees is particularly acute in light of the well-known fate of many mortgage industry businesses that filed for bankruptcy in recent years. In many of those cases, the debtors were forced to sell their businesses piecemeal in Chapter 11 or forced into Chapter 7 (or 11) liquidation cases, resulting in lay-offs of thousands of employees.

13. In connection with FTI's role in advising the Debtors regarding the KEIP and the KERP, FTI engaged in numerous discussions with the Debtors' management regarding its needs and objectives in implementing the Plans. It is my understanding that the KEIP Participants and Key Employees are critical to maintaining the Debtors' customer base and business relationships and continuing to adhere to government-sponsored-entity standards, all despite the uncertainty of continued employment.

14. The KEIP and KERP are necessary in order to: (i) ensure that critical employees are properly incentivized to assist in maximizing value during the greater than seven month long Sale Process, (ii) reward employees for the significant additional responsibilities they have undertaken in the past several months, both because of the disentangling of the businesses of the Debtors and their parent, Ally Financial Inc. ("AFI"), and the immense amount of ongoing work required to market and sell the Debtors' assets to multiple bidders while keeping the business operating as a going concern, and (iii) reduce potential employee attrition that would otherwise result from the uncertainty created by the bankruptcy and sale process and cessation of the pre-bankruptcy employee retention program.

15. In addition, I understand that, on average, Discretionary Variable Pay historically comprised more than 50% of the KEIP Participants' total annual compensation. In addition to having to defer a significant portion of prior years' compensation, this 50% (and sometimes more) of each KEIP Participants' potential total annual compensation is at risk as a result of the

Debtors' filing for bankruptcy protection because the Discretionary Variable Pay Plans are just that, discretionary. Awards for the 2012 award year may not be determined until after the closing of a sale transaction.

16. Consequently, the only guaranteed compensation for the KEIP Participants is their base salary. Yet, the Debtors are asking them to take on additional responsibilities with significant time commitments in order to consummate the sale of the Debtors' businesses with virtually no upside in return for their efforts. Thus, approving the KEIP is extremely important to ensuring the KEIP Participants remain motivated to commit the extraordinary time and effort required to close the sale and achieve the maximum potential value for the benefit of the Debtors' estates and their creditor constituencies.

> i. <u>The KEIP and KERP are Necessary to Properly Incentivize Critical Employees</u>

17. The design of the KEIP and KERP payment opportunities appropriately align the interests of key stakeholders with the KEIP Participants and Key Employees. The efforts of the KEIP Participants and Key Employees through the Closing are essential to maximize sale value for the benefit of key stakeholders (i.e., secured and unsecured creditors, employees, equity holders). Such efforts have been undertaken, and will continue to be, without any certainty with regard to the KEIP Participants' and Key Employees' roles, or employment, once the assets have been sold to third parties.

18. The Nationstar Bid provides for the assumption of certain employee obligations to the extent such employees are hired by Nationstar. There is clearly no guarantee on which employees would be hired to the extent the Nationstar Bid is ultimately deemed to be the highest and best bid. Additionally, if the highest and best bid is not Nationstar, there is certainly no guarantee that the winning bid will include provisions to hire employees or provide for the

6

assumption of certain employee-related obligations.  The Berkshire Bid does not contain any provisions with respect to hiring employees or assuming employee related obligations as part of that sale.

19.  Due to the uncertainty regarding their continued employment, as well as the Debtors' request that the KEIP Participants take on a significant number of additional roles and responsibilities as further described below, the KEIP is necessary to align the interests of the KEIP Participants with key stakeholders and to incentivize the KEIP Participants to work towards closing value-maximizing sales of the Debtors' businesses.

20.  The Key Employees also face uncertainty regarding their compensation and continued employment.  The Key Employees serve important roles that are critical to the achievement of a smooth sale process and transition of the Debtors' businesses to a buyer or buyers.  They possess significant talent and organizational knowledge that would be difficult, if not impossible, to re-recruit in the current market, given the Debtors' current circumstances and tightness in the industry's talent pool.  Additionally, I understand that the potential Purchasers of the Debtors' assets have expressed their opinion that they are impressed by the Debtors' management team.  Accordingly, it is critical to retain these employees and management designed the KERP in furtherance of this goal.

21.  Finally, with respect to the Nationstar Bid, the ultimate consent of the sale to be provided by the government-sponsored-entities will hinge not only on the wherewithal and capabilities of the buyer, but also on the continuity of the employees charged with operating the platform.  The Plans are critical to ensuring this continuity is maintained through the Closings.

    ii.    <u>Employees' Enhanced Daily Responsibilities</u>

22.  Historically, the Debtors have operated, with their affiliates, as an integrated organization under the supervision and oversight of AFI.  Recently, the Debtors began to

ny-1021502

separate their businesses from those of AFI and its other affiliates. Such separation positions the Debtors' businesses as stand-alone operations, which is a key aspect of maximizing value for the estate pursuant to the Sale Process. As a result of the separation, which is ongoing, certain employees are taking on responsibility for functions that had previously been the responsibility of AFI employees, *inter alia*, treasury, audit, the accounting of certain significant activities; IT systems infrastructure; communications; compliance activities; and certain human resource management functions.

23. In addition to the augmented responsibilities imposed upon management and other employees as a result of the separation of the ResCap and AFI entities, the Debtors' employees have also borne the heavy burden of carrying on a marketing and Sale Process in an attempt to effectuate the sale of substantially all of the Debtors' assets as well as to maintain the necessary financing to support an effective marketing and sale process. Additional responsibilities include, but are not limited to, preparing for and participating in diligence sessions with interested parties; researching and responding to diligence requests from interested parties; participating in asset purchase agreement negotiations; participating in discussions with key constituents such as the government-sponsored-entities, creditors, key investors and other regulatory agencies; participating in negotiations and driving analyses in an effort to secure debtor-in-possession financing; and, with respect to the Berkshire Bid, having completed approximately $200 million of soft credit modifications on the whole loan portfolio as a condition precedent to the Closing.

24. Finally, the Debtors' employees' daily work responsibilities have been further burdened by the additional workload brought on by the chapter 11 filing, including: assisting in drafting and preparation of motions, applications and declarations; preparing for and

participating in testimony and depositions; participating in negotiations with key stakeholders regarding provisions of certain motions; preparing required court reporting (e.g., statements of assets and liabilities, schedules of financial affairs, monthly operating reports); and responding to various chapter 11 specific data requests.

25.     Accordingly, it is necessary to compensate the Debtors' critical employees for taking on significant additional responsibilities beyond what has been asked of them in the ordinary course.

### iii.    Employee Attrition

26.     Since the beginning of calendar year 2012, the Debtors have faced many questions from their employees regarding the future of their businesses and the press coverage about a potential bankruptcy filing.  In an effort to combat this uncertainty and stem any resulting attrition, the Debtors took a proactive approach and implemented the Business Continuity Incentive Program (the "BCIP") during the first quarter of 2012 when it was unclear whether the restructuring / sale of the Debtors would occur within chapter 11.  The BCIP was intended to provide a supplemental monetary award to the employees for their efforts in effectuating the Debtors' out-of-court restructuring efforts in 2012.  The Debtors are not seeking to assume the BCIP within these cases; rather, the KEIP and KERP replace and supersede the BCIP and provide an alternate structure through which to deliver substantially similar economic benefits to the employees. The KEIP Participants and Key Employees are substantially identical to the actual or intended participants under the BCIP.

27.     As shown in the tables below, in the past few months, despite considerable turmoil and uncertainty surrounding the Debtors, there has been relatively modest variation from the prior year in turnover rates, a fact management largely attributes to the timely implementation of the BCIP.

9

28.     However, even with the BCIP, the Debtors have suffered an uptick in resignations within the Global Functions group. This group is vitally important given its role in supporting the Sale Process and heightened uncertainty with respect to post-sale employment on account of potential redundancies of their positions within a buyer's organization.  Additionally, employees within the Global Functions group may be targeted by competitors not involved in the Sale Process given their experience in developing certain aspects of the Debtors' servicing platforms and the market demand for such skill sets.  As such, the Plans are very inclusive of employees within the Global Functions group.

29.     Furthermore, I understand the industry is experiencing tightness in its talent pool given the high production volumes under the low interest rate environment, degree of training / human capital investment necessary for building out loan files with minimal government-sponsored entity put-back risk, and increased hiring efforts by the government-sponsored entities. These factors make it all the more critical for the Debtors to retain their key talent.

| 2011 ResCap Anualized Voluntary Turnover % | | | | | |
|---|---|---|---|---|---|
|  | Jan | Feb | Mar | Apr | May |
| Capital Markets | 0.0% | 0.0% | 7.7% | 11.6% | 9.3% |
| Consumer Lending | 24.3% | 25.5% | 21.3% | 24.6% | 24.7% |
| Global Function | 7.9% | 5.9% | 6.6% | 7.4% | 7.1% |
| O & S Administration | 0.0% | 0.0% | 0.0% | 6.7% | 5.1% |
| Servicing | 14.6% | 13.5% | 12.2% | 12.4% | 12.4% |

| 2012 ResCap Annualized Voluntary Turnover % | | | | | |
|---|---|---|---|---|---|
|  | Jan | Feb | Mar | Apr | May |
| Capital Markets | 0.0% | 0.0% | 15.2% | 16.8% | 20.0% |
| Consumer Lending | 14.3% | 20.9% | 18.8% | 19.8% | 22.0% |
| Global Function | 7.1% | 6.2% | 7.2% | 7.6% | 9.3% |
| O & S Administration | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Servicing | 9.7% | 9.1% | 11.4% | 11.6% | 12.6% |

| 2012 vs. 2011 ResCap Annualized Voluntary Turnover [favorable/(unfavorable)] | | | | | | |
|---|---|---|---|---|---|---|
|  | Headcount May 2012 | Jan | Feb | Mar | Apr | May |
| Capital Markets | 113 | 0.0% | 0.0% | (7.4)% | (5.2)% | (10.7)% |
| Consumer Lending | 610 | 10.0% | 4.6% | 2.4% | 4.8% | 2.7% |
| Global Function | 641 | 0.9% | (0.3)% | (0.6)% | (0.2)% | (2.2)% |
| Origination & Servicing A | 108 | 0.0% | 0.0% | 0.0% | 6.7% | 5.1% |
| Servicing | 2,164 | 4.9% | 4.4% | 0.9% | 0.9% | (0.2)% |

*Note: Variances above are calculated as the absolute % change in the underlying statistic*

**D.     Development of the Plans**

30.     In assisting the Debtors with the development of the KEIP and KERP, FTI relied upon its extensive industry expertise and its review of the structure of employee incentive plans implemented and approved in other chapter 11 sale scenarios.  Specifically, FTI reviewed court-approved plans implemented in cases that announced the launching of a sale process between January 1, 2010 and May 22, 2012 within the Southern District of New York and Delaware for "Bankruptcy Auctions" in excess of $25 million as reported by the Deal Pipeline (www.thedealpipeline.com).  Based on this criterion, and after removing certain instances that would not be comparable (e.g., single asset real estate transactions, non-profit organizations, banking institutions taken over by the FDIC), over 50 cases were identified, of which 20 implemented employee incentive and retention plans.

11

ny-1021502

31. The Debtors' selection process for determining the Key Employees and KEIP Participants was narrowly focused on those employees that are critical in leading, or supporting, key functions, processes or systems throughout the organization. Participants were selected based on feedback from each functional business unit leader and through discussions with the senior human resources team. A particular focus was placed on those employees within Global Functions given their necessary interaction with, and support of, each of the Debtors' businesses. Furthermore, leaders of functional groups were targeted for inclusion in the Plans to maintain continuity of such groups and mitigate the risk of attrition by employees excluded from the Plans. The list of employees identified to participate in the Plans was then reviewed and approved by the CEO, the President, and the Debtors' Board Compensation Committee.

E.  **The KEIP**

32. The KEIP provides potential performance incentives for 17 KEIP Participants, in the event they achieve specific sale and financial / operational performance goals. The KEIP Participants include several members of the senior leadership team across each of the following critical functional areas: Compliance / Risk, Consumer Lending, Treasury / Finance, Human Resources, IT, Legal, Origination and Servicing Administration, Primary Servicing, and Global Capital Markets.

33. However, the Debtors' CEO, President, and Chief Capital Markets Officer are not among the KEIP Participants because of restrictions under the TARP regulations prohibiting their involvement in such a program.

34. Assuming target-level performance, the payments under the KEIP (the "KEIP Awards") will total approximately $4.1 million, with the maximum cost of approximately $7.0 million, assuming sale value increases beyond the Stalking Horse Bids. The KEIP Awards range

from 52% to 117% of base salary, with an average target award of $241,353.  Target awards are payable contingent upon achievement of five result-driven metrics (the "KEIP Metrics"), which are broken into two categories ─ "Sale Metrics" and "Financial and Operational Performance Metrics," as follows:

    **a.**    Platform Sale Metric (42% of Target Award )

- 90% of the Platform Sale Metric (or 37.8% of the Target Award) is achieved upon the Platform Sale Closing at the negotiated stalking horse price;

- 100% of the Platform Sale Metric (or 42% of the Target Award) is achieved upon an auction being held in connection with the Sale Process, followed by the Platform Sale Closing at a higher and better offer approved by the Court; and

- Up to 200% of the Platform Sale Metric (or 84% of the Target Award) can be achieved if the sale value increases 3% above the stalking horse bid.  To the extent sale value increases less than 3% above the stalking horse bid, the payout to KEIP Participants will be determined through interpolation (i.e., award level will be proportionate to the percentage of the potential 3% sale price increase actually achieved).

    **b.**    Legacy Sale Metric (28% of Target Award )[3]

- 90% of the Legacy Sale Metric (or 25.2% of the Target Award) is achieved upon the Legacy Sale Closing at the negotiated stalking horse price;

- 100% of the Legacy Sale Metric (or 28% of the Target Award) is achieved upon an auction being held in connection with the Sale Process, followed by the Legacy Sale Closing at a higher and better offer approved by the Court; and

- Up to 200% of the Legacy Sale Metric (or 56% of the Target Award) can be achieved if the sale value increases 3% above the stalking horse bid.  To the extent sale value increases less than 3% above the stalking horse bid, the payout to KEIP Participants will be determined through interpolation (i.e., award level will be

---

[3] In the event that the Platform Sale closing occurs prior to the closing of the Legacy Sale, KEIP Participants will still be eligible to earn the Legacy Sale award if they accept employment with the buyer in the Platform Sale and leave the Debtors' employ prior to the closing of the Legacy Sale.

> proportionate to the percentage of the potential 3% sale price increase actually achieved).

  **c.** Financial and Operational Performance Metrics (30% of Target Award)

- <u>Barclays DIP Covenant (10%)</u>

  The Barclays DIP Covenant Milestone is "achieved" and a KEIP Participant will earn 10% of his/her Target Award provided the Debtors meet the 20% Cash Flow Variance covenant as such term is defined in section 5.02 of the Barclays DIP Agreement attached as Exhibit B to the DIP Financing Motion[4], as measured through the earlier of (i) the Platform Sale Closing or (ii) Barclays DIP payoff.

- <u>GSE Adherence (10%)</u>

  The GSE Adherence Milestone is "achieved" and a KEIP Participant will earn 10% of his/her Target Award provided the Debtors achieve a year-to-date "Top 3" Fannie Mae servicer ranking, as measured as of the earlier of (i) the Platform Sale Closing or (ii) December 31, 2012.

- <u>Performance Rating (10%)</u>

  The Performance Rating Milestone is "achieved" and a KEIP Participant will earn 10% of his/her Target Award provided such participant achieves an "Effective" performance rating for all applicable organizational goals as determined by the compensation committee of the Debtors' board of directors through consultation with each Participant's supervisor. The Performance Rating Milestone will be measured as of the earlier of (i) the Platform Sale Closing or (ii) December 31, 2012.

35. KEIP awards will vest upon the achievement of each KEIP Milestone and payments will be made upon the earlier of (i) a sale closing and (ii) termination of the KEIP Participant's employment. Namely, KEIP Participants terminated for cause will not receive any

---

[4] Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (i) Authorizing the Debtors to (A) Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (ii) Schedule a Final Hearing Pursuant to Bankruptcy Rules 4001(b)( and 4001(c) and (iii) Granting Related Relief [D.I. 13]

KEIP Award and KEIP Participants who resign or are terminated without cause will receive only their vested KEIP Awards, forfeiting any unvested portion. Notwithstanding the preceding provisions, payment of 40% of the vested awards (the "KEIP Holdback") will be deferred until the Effective Date of the Plan of Reorganization, or its equivalent.

36. For example, assuming the following: (i) target KEIP Award of $100,000; (ii) all five KEIP Metrics vest at target levels; (iii) Legacy Sale Closing date of 11/30/12; (iv) Platform Sale Closing date of 12/31/12; and (v) Effective Date of Plan of Reorganization of 4/30/13, KEIP Award payments would be made as follows: (i) on or about 11/30/12, the payment of the Legacy Sale Metric of $16,800 (60% * 28% * $100,000) would be made; (ii) on or about, 12/31/12 the payments of the (1) Platform Sale Metric of $25,200 (60% * 42% * $100,000), (2) the Barclays DIP Covenant metric of $6,000 (60% * 10% * $100,000), (3) the GSE Adherence metric of $6,000 (60% * 10% * $100,000), and (4) the Performance Rating metric of $6,000 (60% * 10% * $100,000) would be made; and (iii) on or about 4/30/13 the payment of the KEIP Holdback of $40,000 (40% * $100,000) would be made.

37. Further, in order to illustrate the interpolation calculation to the extent sale value is higher than the Stalking Horse Bids, see the following example: (i) assume the Platform Sale closes at 1.5% higher than the Nationstar Bid for illustrative purposes, (ii) assume a target KEIP Award of $100,000, (iii) the vested Platform Sale Metric award would be $63,000 [((1.5% / 3.0%) * (200% - 100%) + 100%) * 42% * $100,000].

**F.    The KERP**

38. The KERP provides performance and retention incentives for 174 of the Debtors' non-insider employees. Among the Key Employees are 68 critical manager and director level employees across all key functions of the Debtors' operations (the "Tier II Employees").

15

ny-1021502

Additionally, there are 96 key employees supporting key functions throughout the organization (the "Tier III Employees") and 10 employees supporting key processes or systems throughout the organization (the "Tier IV Employees").

39. The Tier II[5] Employees include 68 non-insider directors and managers. Although certain of these managers are provided with the title of Director, these employees are non-executive managers that provide critical supervisory and professional support services for the Debtors but, as described below, do not possess the decision-making authority to implement company policies or strategies to render them insiders. Tier II KERP awards range from 20% to 93% of a Key Employee's base salary with an average award of $93,273.

40. The Tier III Employees include 96 non-insider supervisory and professional support employees that perform critical functions that are key to maintaining client satisfaction during these cases as well as ensuring a smooth transaction to a buyer of the Debtors' businesses. Tier III KERP awards range from 12% to 86% of a Key Employee's base salary with an average award of $45,972.

41. The Tier IV Employees include 10 mortgage origination operations support staff in Consumer Lending Operations to ensure that the Debtors retain certain mortgage origination and operational capabilities that are critical to maintaining enterprise value for the benefit of any new owner. Tier IV KERP awards range from 12% to 14% of a Key Employee's base salary with an average award of $6,054.

42. The total aggregate maximum payout under the KERP will be approximately $10.8 million, consisting of approximately $6.3 million, $4.4 million and $61 thousand for the Tier II, Tier III and Tier IV Employees, respectively, if all remain with the Debtors through the vesting date. The KERP is designed to provide incentives to the Key Employees to remain with

---

[5] The KEIP Participants are designated as Tier I employees under the Debtors' categorization scheme.

16

ny-1021502

the Debtors to effectuate successful Closings.  Accordingly, the payments under the KERP (the "KERP Awards") will vest upon the closing of the Stalking Horse Bids:  (i) 60% vesting upon closing the Nationstar Bid and (ii) 40% vesting upon closing of the Berkshire Bid.  The KERP Awards will be paid upon the earlier of (i) a Closing (the later of the Platform or Legacy Closings) or (ii) the Key Employee's termination, subject to the following conditions: (a) Key Employees terminated for cause will not receive any KERP Award; (b) Key Employees terminated without cause will receive any vested and unvested KERP Awards, and (c) Key Employees resigning prior to the Closings will receive any vested KERP Award but will forfeit any unvested portion.

### G.    The Reasonableness of the Plans

43.    Based on FTI's research and my experience, the structure of these programs is consistent with those adopted under similar sale scenarios and properly incentivizes the KEIP Participants and Key Employees to maximize value. Furthermore, it is my belief that the KEIP and the KERP proposed by the Debtors are reasonable in light of their goals of preventing attrition and incentivizing employees to effectuate a value-maximizing Closing, while continuing to carry the heavy burden of additional responsibilities associated with the Debtors' separation from AFI and bankruptcy-related workloads.

44.    The KEIP was carefully crafted to motivate the KEIP Participants and ensure that the Debtors' businesses continue to operate as efficiently as possible, while also working toward a value maximizing Closing.  The Financial and Operational Performance Metrics are intended to ensure that the KEIP Participants promote the efficient operation of the Debtors' businesses while maintaining the necessary regulatory compliance and support to ensure that a purchaser will be provided with a turn-key operation upon Closing.  Simultaneously, the Sale Metric

17

motivates the KEIP Participants to not only complete a sale of their businesses, but also bring additional bidders to the table and obtain the best possible price for the businesses by permitting them a small share in any overbid.

45. The KEIP Participants are critical to the Sale Process and the success of the Debtors' businesses after a Closing as a result of their relationships with governmental regulators and familiarity with the relevant regulatory schemes.  Should any member of this team choose to leave, it would be extremely difficult, if not impossible, to replace him/her during the bankruptcy cases, leaving significant functional leadership and talent gaps.

46. Likewise, the services of each of the Key Employees are necessary to ensure that the Debtors' businesses continue to run smoothly and retain their value through a Closing.  The KERP attempts to achieve this goal by providing the Key Employees with retention payments vesting in two tranches, with the majority payable only upon achievement of the ultimate goal ─ a Closing.

47. Without the KEIP and the KERP, employee morale would likely continue to suffer, particularly in light of the discontinuation of the pre-petition BCIP, and could lead to a further loss of the Debtors' most critical employees, endangering the Company's ability to maximize value for its key stakeholders and ultimately, consummate a reorganization plan.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on the 17th day of July, 2012.

                                                /s/ Ronald F. Greenspan
                                                  Ronald F. Greenspan