**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF ANNE JANICZEK IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) A KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, Anne Janiczek, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am the Chief Human Resources Officer for the Mortgage Division at Debtor[1] Residential Capital LLC and its affiliates ("ResCap"). I submit this Declaration in support of the Debtors' Motion for an Order Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (i) Implementation of (a) a Key Employee Retention Plan for Certain Non-Insiders and (b) a Key Employee Incentive Plan for Certain Insiders and (ii) Payment of Obligations Arising Thereunder as Administrative Expenses (the "Motion").[2]

2. I have been at ResCap for 13 years, the last 4 in my current position. In my current position, I am responsible for leading and managing a team that supports the business in all aspects of human resources, including: management and executive development; investing

---

[1] Capitalized terms not otherwise defined herein shall have the definitions ascribed to them in the Motion.

[2] I am a proposed recipient under the KEIP.

ny-1049719

and preserving critical talent acquisition; learning and development; employee relations; performance management, planning and appraisal; oversight of incentive, long-term and executive compensation plans; diversity; organizational design and effectiveness; and succession planning.  Except as otherwise indicated, all statements in this Declaration are based upon: my personal knowledge; information supplied or verified by personnel in departments within the Debtors' various business units; my review of the Debtors' books and records as well as other relevant documents; my discussions with other members of the Debtors' management team; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' operations, financial condition and history. In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees or consultants, I have relied upon these employees and consultants to accurately record, prepare, collect, and/or verify any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

3. Since ResCap began making plans for a possible restructuring, I have been involved with the full human capital strategy for the transition process.  In that role, I have worked with ResCap leadership to strategically design or enhance key functions to support an independent organizational structure. As part of my responsibilities, I manage critical tasks including organizational design, function responsibilities, staffing models, compensation design, such as the Business Continuity Incentive Plan (the "BCIP"), assigning individuals to their roles during the transition period, making sure that our human resources are properly allocated, and overseeing the design of the KEIP and KERP on behalf of the Debtors.  I have also become

aware of the roles that ResCap employees play in the transition process and in maintaining the value of the assets and business of the Debtors' estate.

### A. The Debtors' Variable Pay Plans

4. As of the Petition Date, the Debtors employed approximately 3,625 employees, of whom approximately 3,575 are full-time employees and approximately 50 are part-time employees. The Debtors also employ approximately 250 employees who earn wages primarily in the form of commissions and utilize the services of approximately 375 contract workers.

5. Prior to the Petition Date, the vast majority of the Debtors' employees (the "Employees") received a portion of their annual compensation in the form of variable pay awarded based on company, unit and individual performance targets established by management and approved by the compensation committee (the "Compensation Committee") of the Debtors' board of directors (the "Discretionary Variable Pay"). On average, Discretionary Variable Pay historically comprised more than 50 percent of the KEIP Participants' total annual compensation. Tying a portion of the Employees' salaries to discretionary pay plans is typical in the financial services industry and, therefore, the Employees generally view these programs as part of their base compensation and expect that they will receive some portion of incentive compensation.

6. As a result of AFI having received support under the federal government's troubled asset relief program ("TARP"), the Debtors (as indirect wholly-owned subsidiaries) have been required to adhere to specific compensation rules administered by the special paymaster appointed by the United States Treasury (the "Special Paymaster"). Since 2009, the compensation for those Employees that fall within AFI's "next 75"[3] most highly-compensated

---

[3] Under TARP, the Special Paymaster oversees the compensation structure for employees of a company that previously received TARP funds but has not yet repaid such funds. The "Next 75" refers to employees whose total compensation ranks them amongst the 26-100 highest-paid employees at Ally Financial Inc. an its subsidiaries, including the Debtors.

ny-1049719           3

employees must have their compensation structure reviewed and approved by the Special Paymaster.[4]  The pay structure approved by the Special Paymaster requires 50 percent of Discretionary Variable Pay to be in the form of equity that must be deferred for three years. Furthermore, of the 50 percent of Discretionary Variable Pay that is payable in cash, fifty percent is typically deferred for one year (i.e., twenty-five percent of overall Discretionary Variable Pay).  Over the past few years, the TARP restrictions have not allowed the KEIP Participants to immediately receive the full amount of their annual compensation.

7. When paid, Discretionary Variable Pay is generally paid in cash, with certain Employees receiving a portion of Discretionary Variable Pay in restricted AFI stock.  Certain Employees receive a portion of their Discretionary Variable Pay through participation in the Ally Financial Inc. Long-Term Equity Compensation Plan (the "AFI LTECIP") and the Residential Capital, LLC ("ResCap") Annual Incentive Plan (the "ResCap AIP"). Approximately 76 of the Debtors' Employees are current participants in the AFI LTECIP.

8. AIP.  Historically, the Debtors participated in the Ally Financial Inc. Annual Incentive Plan (the "AFI AIP").  As of March 8, 2012, ResCap adopted the ResCap AIP effective from and after January 1, 2012, which reflects substantially all of the terms of the AFI AIP.  Approximately 2,800 Employees participate in the ResCap AIP.

9. The ResCap AIP ties a portion of an employees' compensation to annual performance benchmarks established by management and company performance benchmarks as approved by the Compensation Committee.  The total size of the ResCap AIP award pools are subject to approval by the Debtors' Compensation Committee, together with AFI Compensation Committee.  If awarded by management, ResCap AIP award payments are paid during the first

---

[4] Nine of the Debtors' employees fall within AFI's 75 next most highly-compensated employees.

ny-1049719                                                4

quarter of each year based on performance for the prior year and considered on a corporate, business unit, function and individual bases.

10. **AFI LTECIP**. Additionally, certain of the Debtors' employees receive a portion of their variable pay under the AFI LTECIP because their compensation exceeds a predetermined monetary threshold. The AFI LTECIP awards are in the form of restricted stock grants in AFI common stock generally awarded by AFI in the first quarter of each year. The value of the award is based on the appraised value of AFI common stock at the time of payment. All payments to participants are made in cash and are generally paid in the first quarter of each year. However, the Debtors do not control the awards that AFI grants under the AFI LTECIP.

### B.   Managing Employee Attrition

11. Over the past four years, the Debtors' workforce has already been reduced by almost two-thirds, in large part, because as part of the Debtors' ongoing restructuring efforts, specific business lines have closed and there has been a corresponding reduction in force. Since the beginning of calendar year 2012, the Debtors have faced many questions from their employees regarding the future of their businesses and the press coverage about a potential bankruptcy filing. In an effort to combat this uncertainty and stem any resulting attrition, the Debtors took a proactive approach and implemented the BCIP during the first quarter of 2012 when it was unclear whether the restructuring / sale of the Debtors would occur within Chapter 11. In formulating a restructuring strategy, employee and management stability was paramount. The BCIP provides a supplemental monetary award to the employee for their efforts in effectuating the Debtors' out-of-court restructuring efforts in 2012.

12. The Debtors are not seeking to assume the BCIP within these cases; rather, the KEIP and KERP[5] replace and supersede the BCIP and provide an alternate structure through which to deliver substantially similar economic benefits to the employee. The KEIP Participants and Key Employees are substantially similar to the actual or intended participants under the BCIP.

13. I firmly believe that the Debtors' employees are their most valuable assets. The KEIP Participants are primary decision-makers whose decisions affect the direction of the Debtors' businesses and are critical to achieving the objective of selling the Debtors' businesses as a going concern. The KEIP Participants represent only 0.4% of the prepetition employee population, and are critical to keeping the staff motivated and engaged. The KEIP is needed to motivate the KEIP Participants and ensure that the Debtors can effectively work toward their collective goal of effectuating the Asset Sales. The incentive the Debtors propose are designed to motivate the KEIP Participants by tying incentive payments to the sale price achieved in the Asset Sales and certain financial and operational goals. Based on my experience in the human resources sector, it is my belief that without the proper incentives to motivate the KEIP Participants to perform their innumerable additional restructuring related tasks in addition to addressing their day-to-day obligations, the Debtors face a substantial risk that they could lose one or more of the KEIP Participants, to the detriment of the Debtors' businesses.

14. With respect to the KERP, the Key Employees are critical to the Debtors' ability to maintain stable operations throughout the sale and transition of the business. The Key Employees represent a critical sub-set of the employee population who are each necessary to

---

[5] The target payments total $14.9 million; however, as noted herein, should new participants need to be added to the KEIP or KERP because of interim changes in the employee population, then the target payments would not exceed $15.9 million, which would be anticipated to be allocated $4.6 million to the KEIP and $11.3 million to the KERP.

ensure an efficient bankruptcy sale process and transition phase to the new operating entity. The Key Employees have unique and vital knowledge of the Debtors' business operations that are critical to the businesses' long-term success. If the Key Employees were to resign, the Debtors fear that the loss of their experience during this critical time would result in an overall diminution in value of the Debtors' businesses. Moreover, at least two factors will almost certainly render replacing the Key Employees exceedingly difficult, including: (i) the degree of training necessary to process loan files in accordance with regulatory frameworks in place and (ii) increased hiring by competitors to staff for (a) record loan production volume resulting from low interests and (b) loan file reviews required under governmental settlements. The KERP will assist the Debtors' in achieving their overarching goal of preventing the Key Employees from seeking alternative employment options, which could result in the loss of valuable institutional knowledge and thereby place additional hurdles in the Debtors' path to executing the Asset Sales.

      **C.**     **Identification of Insiders**

15. In order to ensure that the KERP did not include insiders (as that term is defined in section 101(31) of the Bankruptcy Code), the Debtors undertook an analysis to identify the Debtors' "officers". The Debtors' human resources personnel, with guidance from its legal and financial advisors, conducted a thorough review of the Debtors' businesses and each Key Employee's job function.

16. It is my understanding that the Debtors identified which officers are statutory insiders by using the following criteria: (a) they reviewed the functional job titles of employees, the reporting structure for each business unit and operational area, the process for making important business and legal decisions and identified those persons who were responsible for reporting to the Debtors' senior executive leadership that have the authority to approve

significant business decisions, (b) they identified the persons who oversee important aspects of the Debtors' businesses, (c) they considered whether the employee is entitled an officer under bylaws, and/or appointed or elected by the board of directors, and (d) they reviewed the processes for reviews and compensation within the business units and the operational areas and identified the persons responsible for each process. Based on this analysis, the Debtors identified 20 insiders, including myself, and placed those individuals into the KEIP (excluding the three senior executives who are not eligible because of TARP restrictions).

17. The Key Employees who are a part of the KERP run the Debtors' day-to-day operations, but they do not possess the decision-making authority to implement company policies or strategy. None of the Key Employees is appointed or elected by the board of directors. The Key Employees are tiered in the KERP in a manner consistent with the manner in which the Debtors ordinarily rank their employees. As a matter of practice, the Debtors' employees are assigned a "grade," which is driven by the employee's seniority and degree of responsibility within the organization.

18. Moreover, to the extent that an employee may have "director" in his or her title or have an officer-like title, it is my understanding that it is the Debtors' ordinary business practice to provide certain individuals with such titles in order to enable them to sign documents on the company's behalf, which is common in the mortgage industry; however, such titles do not equate to the level of authority given to that person. The analysis concluded that although a number of Key Employees held "officer" titles for customer-facing purposes, the Key Employees' functional title was a more accurate reflection of their overall responsibilities within the servicing segment. For example, several servicing employees have the title of Director or higher (e.g., Vice President, Senior Vice President, Senior Director, Executive Director) in order to

compete for business, but do not, in fact, possess any ability to dictate overall company policy or strategy. Additionally, the Key Employees do not report directly to ResCap's boards of directors, but instead report to an officer or other employees who report up to the Debtors' officers.

19. For the foregoing reasons, and in order to ensure that the Debtors' continue to operate smoothly pending sales of the Debtors' businesses, the Debtors, in their business judgment determined that the KEIP and KERP are reasonable, appropriate and in the best interests of the Debtors, their estates, and their stakeholders.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Executed on July 17, 2012, at Fort Washington, Pennsylvania.

/s/ Anne Janiczek
Anne Janiczek
