MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------
In re:

RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,

                       Debtors.
-------------------------------------------------------------------

)
)
)
)
)
)
)
)

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

**DEBTORS' APPLICATION PURSUANT TO 11 U.S.C. § 327(A)**
**AND FED. R. BANKR. P. 2014 FOR AUTHORIZATION TO EMPLOY**
**AND RETAIN KPMG LLP AS TAX COMPLIANCE**
**PROFESSIONALS  AND INFORMATION TECHNOLOGY**
**ADVISORS *NUNC PRO TUNC* TO THE PETITION DATE**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

        The debtors and debtors in possession in the above-captioned cases (the

"Debtors")[1] hereby move this Court (the "Application")[2] for entry of an order, substantially in

the form annexed hereto as <u>Exhibit 1</u> (the "Order"), under section 327(a) of title 11 of the United

States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on <u>Exhibit 1</u> to the Whitlinger Affidavit (defined below).

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

(the "Bankruptcy Rules") and Local Rule 2014-1 of the Local Bankruptcy Rules of the Southern

District of New York (the "Local Rules") authorizing the Debtors to employ and retain KPMG

LLP (the "KPMG") as tax compliance professionals and information technology advisors *nunc*

*pro tunc* to the Petition Date (as defined herein).  In support of the Application, the Debtors rely

upon and incorporate by reference the Declaration of James W. McAveeney (the "McAveeney

Declaration"), attached hereto as Exhibit 2.  In further support of the Application, the Debtors,

by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b).Venue is proper

pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein

are Bankruptcy Code section 327(a), Bankruptcy Rule 2014 and Local Rule 2014-1.

## BACKGROUND

2.      On May 14, 2012 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors

are managing and operating their businesses as debtors in possession pursuant to Bankruptcy

Code sections 1107(a) and 1108.   These cases are being jointly administered pursuant to

Bankruptcy Rule 1015(b).

3.      On May 16, 2012, the United States Trustee for the Southern District of

New York (the "U.S. Trustee") appointed a nine member official committee of unsecured

creditors (the "Creditors' Committee").

4.      On June 20, 2012, the Court directed that an examiner be appointed [Docket No. 454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner [Docket No. 674].

5.      The Debtors are a leading residential real estate finance company indirectly owned by Ally Financial Inc. ("AFI"), which is not a Debtor.  The Debtors and their non-debtor affiliates operate the fifth largest mortgage servicing business and the tenth largest mortgage origination business in the United States.  A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of the Chapter 11 Petitions and First Day Pleadings, filed with the Court on the Petition Date (the "Whitlinger Affidavit") [Docket No. 6].

**RELIEF REQUESTED**

6.      By this Application, the Debtors respectfully request entry of an Order, pursuant to sections 327(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1, authorizing the employment and retention of KPMG as tax compliance professionals and information technology advisors for the Debtors in these Chapter 11 cases, pursuant to the terms of (i) the Master Services Agreement, dated November 15, 2010, between AFI[3] and KPMG (the "2010 MSA") and the following statements of work issued thereunder (a) the statement of work, entered into as of March 14, 2012, between AFI[4] and KPMG, entered into as of March 14, 2012,

---

[3]    Section 2.2 of the 2010 MSA provides that, to the extent an affiliate of AFI contracts directly with KPMG through a statement of work subject to the terms and conditions of the 2010 MSA, "(i) all references to 'Ally' in the [2010 MSA] shall mean the Affiliate which executes the Statement of Work; and (ii) in all events, the sole contracting parties for all purposes related to the Statement of Work shall be [KPMG] and the Affiliate which executes the Statement of Work and [KPMG's] obligations under such Statement of Work run solely to the Affiliate with executes the State of Work."

[4]    The services provided pursuant to this IT Phase 2 SOW were authorized by and for the benefit of GMAC Mortgage, LLC ("GMAC Mortgage"), a debtor herein.  GMAC Mortgage either paid KPMG directly pursuant to the terms of the IT Phase 2 SOW and the 2010 MSA or reimbursed AFI in connection therewith.

for the provision of certain information technology ("IT") services in connection with the preliminary phase of the development of a records management system to assist the Debtors in managing their loan documents and records (the "IT Phase 2 SOW") and (c) the statement of work, entered into as of July 10, 2012, between GMAC Mortgage and KPMG, for the provision of certain IT services in connection with the Plan and Define phase of the development of the records management system (including but not limited to such tasks as the development of future business process, functional and technical design, and planning for the Construct, Test and Deploy phase) (the "IT Phase 3 SOW"); and (ii) the Master Professional Services Agreement, dated as of July 1, 2008, between GMAC LLC (k/n/a AFI)[5] and KPMG (the "2008 MSA," together with the 2010 MSA, the "MSAs") and the statement of work issued thereunder between KPMG and Residential Funding Company, LLC (a debtor) dated July 16, 2012 and effective as of the Petition Date, tax compliance and tax consulting services (the "REMIC SOW," together with the IT Phase 2 SOW and the IT Phase 3 SOW, the "SOWs"; the SOWs, together with the MSAs, the "Agreements"). Copies of the Agreements are annexed hereto as <u>Exhibit 3</u>.

## BASIS FOR RELIEF

7.      Title 11 U.S.C. § 327(a) provides that a debtor, subject to Court approval:

[M]ay employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under this title.

11 U.S.C. § 327(a).

---

[5]    Similar to the 2010 MSA, Section 1.A. of the 2008 MSA provides: "References to 'Client' within this Agreement shall refer to the entity that engages [KPMG] to perform Services, which will be either GMAC or a GMAC Subsidiary . . . Statements of Work shall reference this Agreement, . . . and shall form a part of this Agreement." GMAC Mortgage reaffirms its obligations under the 2008 MSA as if it were a signatory thereto.

8.      Bankruptcy Rule 2014(a) requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, and proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014.

9.      In light the complexity of the Debtors' businesses, the Debtors submit that the appointment of KPMG as tax compliance professionals and information technology advisors is both necessary and in the best interests of the Debtors, their estates and other parties in interest.

10.      KPMG is one of the country's leading independent public accounting firms as defined under the Code of Professional Conduct of the American Institute of Certified Public Accountants.  The Debtors have selected KPMG as their tax compliance professionals and information technology advisors because of the firm's diverse experience and extensive knowledge in the fields of accounting, taxation, and operational controls for large sophisticated companies, both in and outside of bankruptcy.

11.      The Debtors have employed KPMG since 2000.  By virtue of its prior engagements, KPMG is familiar with the books, records, financial information and other data maintained by the Debtors and is qualified to continue to provide tax compliance, tax consulting and information technology advisory services to the Debtors.  As such, retaining KPMG is an efficient and cost effective manner in which the Debtors may obtain the requisite services.

12.      Prior to the Petition Date, the Debtors utilized KPMG to provide tax services related to the Debtors' obligations as tax administrator under its Master Servicing agreements in connection with certain REMIC and other mortgage or asset-backed structures.

The Debtors may maintain REMICs and similar residual interests on their own balance sheet.

KPMG assists the Debtors in forecasting any income related to such interests that are reported in

the Debtors' financial statements and to AFI.  In addition, in their capacity as master servicer, the

Debtors serve as the tax administrator for third party investors and are thus required to

administer these assets.  As master servicer, the Debtors do not have individual tax liabilities

related to the REMICs, but the Debtors do use KPMG to prepare information tax returns that are

distributed to and utilized by the individual investors to determine their respective tax liabilities

(*see* ¶15(A)).   In each instance, the Debtors require KPMG's services to assist in the tax

administration of these assets, which include calculating and reporting the tax attributes of the

REMIC investment to the individual investors in order to facilitate the investor's assessment of

their individual tax liabilities.  As master servicer, part of the Debtors' master servicing fee is

allocated to cover the costs of third party professionals, such as KPMG.

13.     The Debtors also used KPMG's IT services to assist them with the

preliminary phases of the development of the records management system referred to in

paragraph 6 above.  The tasks performed by KPMG in these preliminary phases included, but

were not limited to, conducting a current state assessment, developing a high-level design of the

future environment, developing a project roadmap, performing program management and

assisting with the selection of an IT solution.

14.     The Debtors submit that utilizing KPMG to provide the services provided

for in the Agreements will provide the most cost-effective and efficient administrative service for

these Chapter 11 cases.  The Debtors chose KPMG based on its experience, reputation and the

competitiveness of its fees.  Accordingly, the Debtors believe that KPMG is well qualified to

serve in the capacity of tax compliance professionals and information technology advisors, and

that KPMG's retention in such capacity is in the best interests of the Debtors' estates and their

creditors.

## PROPOSED SERVICES

15.     As discussed more fully in the McAveeney Declaration, the Debtors seek

to retain KPMG to provide, among other things, the following services (collectively, the

"Services"):

A)  <u>Tax Compliance Services</u>

i.  In connection with Real Estate Mortgage Investment Conduits ("REMIC"), the
following services:

1.     Preparation of Federal tax returns and supporting schedules, and elections
as required;

2.     Preparation of work papers to support the tax basis income statement, and
balance sheets;

3.     Completion of a REMIC election for the initial tax return(s);

4.     Preparation of Form 8811, Information Return for REMICS;

5.     Preparation of Form SS-4, if requested;

6.     Preparation of Quarterly Schedule Q for residual holders representing
prorata share of REMIC income and expense;

a.     Preparation of residual holder Income Summary;

b.     Determination of reportable mortgage interest income  of backing
REMIC tranches;

c.     Determination of reportable bond premium income;

d.     Aggregation of allowable total REMIC expenses;

e.     Calculation of deductible REMIC expenses including original issue
discount; and

f.     Preparation of Section 212 expense statements.

7.     Preparation of quarterly and annual Information Reporting (OID Factor
Reports) for all regular interests;

7

      a.     Monthly calculations of reportable original issue discount;

      b.     Preparation of quarterly and annual supplemental information statements as required by IRS code Section 6049; and

8.     Computation of REMIC Taxes;

9.     Calculation of Quarterly Projected Excess Inclusion Income and Preparation of Reports; and

10.     Calculation of Annual (actual) Excess Inclusion Income and Preparation of Reports.

ii.  In connection with PFIC (non-revolving), the following services:

1.     Provision of accompanying Form 5471 (if requested);

2.     Preparation of Passive Foreign Investment Company (PFIC) Statement and supporting schedules;

3.     Preparation of work papers to support the tax basis income statement and balance sheet;

      a.     Preparation of Equity Holder Income Summary;

      b.     Calculation of reportable discount on the loan pool;

      c.     Determination of reportable interest income of backing assets;

      d.     Determination of reportable bond premium income;

      e.     Aggregation of allowable expenses; and

      f.     Calculation of deductible expenses including original issue discount.

4.     Preparation of quarterly and annual Information Reporting (OID Factors) for all debt interests:

      a.     Monthly calculations of reportable  original issue discount; and

      b.     Preparation of quarterly and annual supplemental information statements as required by IRS Code Section 6049.

iii.  In connection with Grantor and Owner Trusts, the following services:

     5.     Prepare and assist GMAC Mortgage with filing tax returns and supporting schedules, elections and information reporting as required.[6]

B)  <u>Information Technology ("IT") Advisory Services</u>

The document management project for which KPMG was retained by the Debtors was intended to optimize the Debtors' management of its loan origination and servicing files.

<u>IT Phase 2 SOW</u>

In connection with the IT Phase 2 SOW, KPMG provided the following services to the Debtors to establish the necessary framework for facilitating the future phases of the document management infrastructure project: (i) program and planning support; (ii) solution selection via a RFP process; and (iii) document management governance.  The services provided under the IT Phase 2 SOW began in March 2012 and were completed postpetition at the end of June.  A more detailed description of the services provided are set forth in the IT Phase 2 SOW annexed hereto as part of Exhibit 2 and incorporated herein by reference.

<u>IT Phase 3 SOW</u>

The scope of the IT Phase 3 SOW is Recovery, Curative, Collateral Transfer and Document Tracking functions for Record Services, including performing the following services:

    i.   Scoping and Mobilization;

    ii.   Develop the Future State Business Process Definition;

    iii.   Develop the Functional Design for the Records Case Management System;

    iv.   Develop the Technical Design for the Records Case Management System; and

    v.   Develop the Implementation Plan for the Construct, Test and Deploy phase.

---

[6]    The REMIC SOW also covers tax consulting matters that may arise for which the Debtors may seek KPMG's advice that are not covered by a separate statement of work.

16.     In addition to the foregoing, KPMG will provide such other consulting, advice, research, planning, and analysis regarding tax compliance, tax consulting and IT advisory services as may be necessary, desirable or requested from time to time.

## PROFESSIONAL COMPENSATION

17.     KPMG intends to apply to the Court for allowances of compensation and reimbursement of out-of-pocket expenses incurred after the Petition Date in connection with the performance of the Services in these Chapter 11 cases, subject to Court approval and in accordance with the Amended Guidelines for Fees and Disbursements for Professionals in the Southern District of New York, dated November 25, 2009, and the United States Trustee Fee Guidelines, the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable provisions of the Bankruptcy Code, Bankruptcy Rules, the Local Rules, and any applicable orders of the Court[7].  The professional time required to prepare detailed applications in accordance with the Bankruptcy Code, applicable rules and guidelines differs from KPMG's normal billing procedures and, as a result, requires significant effort by KPMG to comply therewith.   As a result, subject to Bankruptcy Court approval, KPMG shall be reimbursed for such professional time incurred.

18.     Subject to paragraphs 19 and 20, KPMG's requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate.  In the normal course of KPMG's business, the hourly rates are subject to periodic increase.  To the extent such hourly rates are increased, the Debtors request that, with respect to the work to be performed after such

---

[7]    On July 17, 2012, the Court entered an order [Docket No. 797] approving the *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 513].

increase, the rates listed below be amended to reflect the increase. If KPMG increases the rates for its services, KPMG will file a supplemental declaration with the Court and provide ten days' notice to the Debtors, the United States Trustee and the Official Committee of Unsecured Creditors appointed in these cases. The supplemental declaration will state the basis for the requested rate increases and whether the Debtors have consented to the rate increase.

19.    REMIC SOW.    The hourly rates for tax compliance services to be rendered by KPMG and applicable herein, which reflect a 40% discount from KPMG's standard hourly rates for such services, are as follows[8]:

| Tax Compliance Services | Billing Rates |
|---|---|
| Partners/Managing Directors | $510 |
| Directors | $435 |
| Managers | $345 |
| Senior Associates | $240 |
| Associates | $195 |

Pursuant to the REMIC SOW, KPMG is entitled to the lesser of (i) actual time incurred to complete the services at the hourly rates set forth above or (ii) (a) for REMIC, the sum of certain fixed monthly costs and one time fees, (b) for Grantor Trust-Owner Trusts, a maximum of $4,200 per trust per year, and (c) for PFIC (non-revolving), a maximum annual service fee of $8,240 per trust plus additional amounts. With respect to taxable income and excess inclusion income estimates under the REMIC SOW, KPMG is also entitled to the lesser of (i) actual time

---

[8]    If in connection with any subsequent statements of work, KPMG is retained to perform additional services at different rates, such rates will be disclosed in connection with the relevant statements of work. As stated above, KPMG and the Debtors do not intend to seek separate retention orders with regard to any such statements of work.

incurred to complete the services at the hourly rates set forth above or (ii) a one time maximum initial set up fee of $600 and a maximum quarterly fee of $257.50, for each REMIC Trusts where such services are provided.

20.    <u>IT Phase 2 SOW & IT Phase 3 SOW</u>.  The following table represents KPMG's hourly billing rates for IT advisory services to be rendered by KPMG:

| IT Advisory Services | Billing Rates |
|---|---|
| Partners/Principals | $330 |
| Directors/Senior Managers | $260 |
| Managers | $215 |
| Senior Associates | $195 |
| Associates | $160 |

The majority of fees to be charged for IT advisory services reflect a reduction of approximately 55% - 65% from KPMG's standard rates, depending on the types of services to be rendered. KPMG has agreed with the Debtors that the fees (exclusive of expenses) to be charged for services rendered will not exceed $586,000.

21.    KPMG also will seek reimbursement for reasonable necessary expenses incurred, which shall include meals, lodging, travel, photocopying, delivery service, postage, vendor charges and other out-of-pocket expenses incurred in providing professional services.

22.    Under the 2010 MSA and the 2008 MSA, KPMG and the Debtors agreed to indemnify each other in connection with certain claims.  The Debtors believe that such provisions are customary and reasonable for tax and IT professionals in chapter 11 cases.

23.     The fee and expense agreement is consistent with compensation arrangements (or reflects discounts) entered into by KPMG and other comparable firms in connection with rendering similar services under similar circumstances.  The Debtors believe that the fee and expense agreement is reasonable, market-based and designed to fairly compensate KPMG for its work and to cover out-of-pocket expenses.

## KPMG'S DISINTERESTEDNESS

24.     To the best of the Debtors' knowledge, information, and belief, and except as disclosed in the McAveeney Declaration, KPMG has represented that it neither holds nor represents any interest adverse to the Debtors' estates in connection with any matter on which it would be employed and that it is a "disinterested person," as referenced in Bankruptcy Code § 327(a) and as defined in Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b).  KPMG will supplement its disclosure to the Court if any facts or circumstances are discovered that would require disclosure.

## NOTICE

25.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for the Debtors' outstanding notes issuances; (i) Ally Financial Inc. and its counsel; (j) counsel for Barclays Bank PLC, as tax compliance, tax consultants and information technology advisors for the lenders under the debtor in possession financing facility; (k) Nationstar Mortgage LLC and its counsel; (l) counsel for the

Committee; and (m) all entities which have filed a written request for notice with the Court pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter an Order substantially in the form attached hereto as <u>Exhibit 1</u> granting the relief requested in the Motion; and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: July 25, 2012
      New York, New York

                        RESIDENTIAL CAPITAL, LLC,
                        on behalf of itself and each of its Debtor
                        subsidiaries

                        By: <u>*/s/ James Whitlinger*</u>
                        Name:  James Whitlinger
                        Title: Chief Financial Officer

**EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------

|                                              |     |                          |
| -------------------------------------------- | --- | ------------------------ |
|                                              | )   |                          |
| In re:                                       | )   | Case No. 12-12020 (MG)   |
|                                              | )   |                          |
| RESIDENTIAL CAPITAL, LLC, et al.,            | )   | Chapter 11               |
|                                              | )   |                          |
|                          Debtors.            | )   | Jointly Administered     |
|                                              | )   |                          |

-----------------------------------------------------------------------

### ORDER PURSUANT TO 11 U.S.C. § 327(A) AND FED. R. BANKR. P. 2014 AUTHORIZING THE EMPLOYMENT AND RETENTION OF KPMG LLP AS TAX COMPLIANCE AND INFORMATION TECHNOLOGY ADVISORS, *NUNC PRO TUNC* TO THE PETITION DATE

Upon the application (the "Application")[1] of the above-captioned debtors and debtors in possession (the "Debtors") for entry of an order (the "Order") pursuant to sections 327(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Bankruptcy Rules of the Southern District of New York (the "Local Rules") authorizing the retention of KPMG LLP ("KPMG") as tax compliance professionals and information technology advisors in the Debtors' Chapter 11 cases *nunc pro tunc* to the Petition Date on the terms and conditions set forth in the Agreements as described more fully in the Application; and upon the Declaration of James W. McAveeney, a principal of KPMG, submitted in support of the Application (the "McAveeney Declaration"); and the Court being satisfied that KPMG does not hold an interest adverse to the Debtors or their estates respecting matters upon which it is to be engaged; and it appearing that the Court has jurisdiction to consider the Application; and it appearing that venue is proper in this district pursuant to 28 U.S.C. § 1408; and it appearing that

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Application.

ny-1046046

KPMG is disinterested and eligible for retention pursuant to sections 101(14) and 327(a) of the Bankruptcy Code and that the terms of the Agreements, as modified by the terms of this Order and as applicable, are reasonable and appropriate; and good and sufficient notice of the Application having been given and no other or further notice being required; and it appearing that the employment of KPMG is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby

### ORDERED, ADJUDGED AND DECREED THAT:

1.      The Application is granted to the extent provided herein.

2.      The Debtors are authorized pursuant to section 327(a) of the Bankruptcy Code to retain and employ KPMG, *nunc pro tunc* to the Petition Date, as tax compliance professionals and information technology advisors subject to the terms of the Application and the Agreements, and to perform the services specifically listed in the Application subject to the terms of this Order.

3.      With respect to all services described more fully in the Application and Agreements, KPMG shall be compensated in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, this Order and any other applicable orders of this Court.

4.      The terms and conditions of the Agreements, as modified by this Order, are approved.

5.      To the extent the Debtors and KPMG enter into any additional statements of work for tax consulting, tax compliance or information technology advisory services, the Debtors will file such statement(s) of work with the Bankruptcy Court and serve such

ny-1046046

statement(s) of work upon the United States Trustee and counsel to the Official Committee of Unsecured Creditors.  To the extent any of such parties object, within 10 days of such new statement(s) of work being served, to the additional services to be provided by KPMG, the Debtors will promptly schedule a hearing before the Court.  All additional services will be subject to the provisions of this Order.

6.    KPMG is authorized to take such other action to comply with all duties set forth in the Application.

7.    KPMG shall apply to the Court for allowances of compensation and reimbursement of out-of-pocket expenses incurred in this case after the Petition Date in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, General Order M-412, the guidelines established by the U.S. Trustee, and further orders of this Court.

8.    Prior to any increases in KPMG's rates, KPMG will file a supplemental declaration with the Court and provide ten days' notice to the Debtors, the United States Trustee and the Official Committee of Unsecured Creditors appointed in these cases.  The supplemental declaration should state the basis for the requested rate increases and whether the Debtors have consented to the rate increase.  All parties rights in connection with such increase are reserved.

9.    Notwithstanding anything to the contrary in the MSAS, the indemnification provisions are hereby modified and restated as follows:

> (a) All requests of KPMG for payment of indemnity pursuant to the Agreements shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that such indemnity conforms to the terms of the Agreements, and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought, *provided*, however, that in no event shall KPMG be indemnified in the case of its own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

ny-1046046

(b) In the event that KPMG seeks reimbursement from the Debtors for reasonable attorneys' fees in connection with a request by KPMG for payment of indemnity pursuant to the Agreements, as modified by this Order, the invoices and supporting time records from such attorneys shall be included in KPMG's own application (both interim and final) and such invoices and time records shall be subject to the guidelines established by the United States Trustee for Region 2 and the approval of the Court under the standards of sections 330 and 331 of the Bankruptcy Code without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code; and

(c) In no event shall KPMG be indemnified if the Debtors or representatives of the estates assert a claim for, and a court determines by final order that such claim arose out of, KPMG's own bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct.

10.    To the extent that the Application or the Agreements are inconsistent with this Order, the terms of the Order shall govern.

11.    The Debtors and KPMG are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

12.    The terms and conditions of this Order are immediately effective and enforceable upon its entry.

13.    Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

ny-1046046

14.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Date: _____, 2012

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

7

## Exhibit 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Residential Capital, LLC, et al., | ) | Case No. 12-12020 (MG) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF JAMES W. MCAVEENEY IN SUPPORT OF THE DEBTORS' APPLICATION TO RETAIN AND EMPLOY KPMG LLP AS TAX COMPLIANCE PROFESSIONALS AND INFORMATION TECHNOLOGY ADVISORS *NUNC PRO TUNC* TO THE PETITION DATE

I, James W. McAveeney, being duly sworn, deposes and says:

1.      I am a principal of KPMG LLP, a professional services firm ("KPMG"). KPMG is the United States member firm of KPMG International, a Swiss cooperative. I submit this declaration on behalf of KPMG in support of the application (the "Application")[1] of the above-captioned debtors and debtors in possession (the "Debtors"), for entry of an order, pursuant to sections 327(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), authorizing the Debtors to retain and employ KPMG as tax compliance professionals and information technology advisors to the Debtors *nunc pro tunc* to the Petition Date. I have personal knowledge of the matters set forth herein.[2]

---

[1]    Capitalized terms used herein but not otherwise defined shall have those meanings set forth in the Application.

[2]    Certain of the disclosures herein relate to matters within the knowledge of other professionals at KPMG.

## QUALIFICATIONS OF PROFESSIONALS

2.      KPMG is a firm of independent public accountants as defined under the Code of

Professional Conduct of the American Institute of Certified Public Accountants.

3.      The Debtors have selected KPMG as their tax compliance professionals and

information technology advisors because of the firm's diverse experience and extensive

knowledge in the fields of accounting, taxation, mortgage business processes, technology and

operational controls for large sophisticated companies both in and outside Chapter 11.

4.      The Debtors have employed KPMG since 2000. By virtue of its prior

engagements, KPMG is familiar with the books, records, financial information and other data

maintained by the Debtors and is qualified to continue to provide tax compliance and

information technology advisory services to the Debtors. As such, retaining KPMG is an

efficient and cost effective manner in which the Debtors may obtain the requisite services.

## SERVICES TO BE RENDERED

5.      Subject to approval of the Application, pursuant to (i) the Master Services

Agreement, dated November 15, 2010, between AFI[3] and KPMG (the "2010 MSA") and the

following statements of work issued thereunder (a) the statement of work, entered into as of

March 14, 2012, between AFI[4] and KPMG for the provision of certain information technology

("IT") services in connection with the preliminary phase of the development of a records

management system to assist the Debtors in managing their loan documents and records (the "IT

---

[3]    Section 2.2 of the 2010 MSA provides that, to the extent an affiliate of AFI contracts directly with KPMG
through a statement of work subject to the terms and conditions of the 2010 MSA, "(i) all references to 'Ally' in
the [2010 MSA] shall mean the Affiliate which executes the Statement of Work; and (ii) in all events, the sole
contracting parties for all purposes related to the Statement of Work shall be [KPMG] and the Affiliate which
executes the Statement of Work and [KPMG's] obligations under such Statement of Work run solely to the
Affiliate with executes the State of Work."

[4]    The services provided pursuant to the IT Phase 2 SOW were authorized by and for the benefit of GMAC
Mortgage, LLC ("GMAC Mortgage"), a debtor herein. GMAC Mortgage either paid KPMG directly pursuant
to the terms of the IT Phase 2 SOW and the 2010 MSA or reimbursed AFI in connection therewith.

2

Phase 2 SOW") and (b) the statement of work, entered into as July 10, 2012, between GMAC

Mortgage and KPMG, for the provision of certain IT services in connection with the Plan and

Define phase of the development of the records case management system (including but not

limited to such tasks as the development of future business process, functional and technical

design, and planning for the Construct, Test and Deploy phase) (the "IT Phase 3 SOW"); and (ii)

the Master Professional Services Agreement, dated as of July 1, 2008, between GMAC LLC

(k/n/a AFI)[5] and KPMG (the "2008 MSA," together with the 2010 MSA, the "MSAs") and the

statement of work issued thereunder between KPMG and Residential Funding Company, LLC (a

debtor) dated September 2, 2008, as amended, for the provision of tax compliance services (the

"REMIC SOW," together with the IT Phase 2 SOW and the IT Phase 3 SOW, the "SOWs"; the

SOWs, together with the MSAs, the "Agreements"), KPMG will provide tax compliance and

information technology advisory services as KPMG and the Debtors shall deem appropriate and

feasible in order to advise the Debtors in the course of these cases, including, but not limited to

the following.

**Tax Compliance Services**

**Real Estate Mortgage Investment Conduits ("REMIC"):**

    i.    Preparation of Federal tax returns and supporting schedules, and elections as required;

    ii.    Preparation of work papers to support the tax basis income statement, and balance sheets;

    iii.    Completion of a REMIC election for the initial tax return(s);

    iv.    Preparation of Form 8811, Information Return for REMICS;

---

[5]    Similar to the 2010 MSA, Section 1.A. of the 2008 MSA provides: "References to 'Client' within this Agreement shall refer to the entity that engages [KPMG] to perform Services, which will be either GMAC or a GMAC Subsidiary . . . Statements of Work shall reference this Agreement, . . . and shall form a part of this Agreement." GMAC Mortgage reaffirms its obligations under the 2008 MSA as if it were a signatory thereto.

    v.    Preparation of Form SS-4, if requested;

    vi.    Preparation of Quarterly Schedule Q for residual holders representing prorata share of REMIC income and expense;

        a.    Preparation of residual holder Income Summary;

        b.    Determination of reportable mortgage interest income of backing REMIC tranches;

        c.    Determination of reportable bond premium income;

        d.    Aggregation of allowable total REMIC expenses;

        e.    Calculation of deductible REMIC expenses including original issue discount; and

        f.    Preparation of Section 212 expense statements.

    vii.    Preparation of quarterly and annual Information Reporting (OID Factor Reports) for all regular interests;

        a.    Monthly calculations of reportable original issue discount;

        b.    Preparation of quarterly and annual supplemental information statements as required by IRS code Section 6049;

    viii.    Computation of REMIC Taxes;

    ix.    Calculation of Quarterly Projected Excess Inclusion Income and Preparation of Reports; and

    x.    Calculation of Annual (actual) Excess Inclusion Income and Preparation of Reports.

ii. In connection with PFIC (non-revolving), the following services:

    xi.    Provision of accompanying Form 5471 (if requested);

    xii.    Preparation of Passive Foreign Investment Company (PFIC) Statement and supporting schedules;

    xiii.    Preparation of work papers to support the tax basis income statement and balance sheet;

        a.    Preparation of Equity Holder Income Summary;

        b.    Calculation of reportable discount on the loan pool;

    c.      Determination of reportable interest income of backing assets;

    d.      Determination of reportable bond premium income;

    e.      Aggregation of allowable expenses; and

    f.      Calculation of deductible expenses including original issue discount.

xiv.    Preparation of quarterly and annual Information Reporting (OID Factors) for all debt interests

    a.      Monthly calculations of reportable original issue discount; and

    b.      Preparation of quarterly and annual supplemental information statements as required by IRS Code Section 6049.

iv.  In connection with Grantor and Owner Trusts, the following services:

    a.      Prepare and assist GMAC Mortgage with filing tax returns and supporting schedules, elections and information reporting as required.[6]

**Information Technology ("IT") Advisory Services**

**IT Phase 2 SOW**

In connection with the IT Phase 2 SOW, KPMG provided information technology services related to: (i) program and planning support; (ii) solution selection via a RFP process; and (iii) document management governance. The services provided under the IT Phase 2 SOW began in March 2012 and were completed postpetition at the end of June. A more detailed description of the services provided are set forth in the IT Phase 2 SOW annexed hereto as part of Exhibit 2 and incorporated herein by reference.

---

[6]    The REMIC SOW also covers tax consulting matters that may arise for which the Debtors may seek KPMG's advice that are not covered by a separate statement of work.

**IT Phase 3 SOW**

The scope of the IT Phase 3 SOW includes information technology services related to recovery, curative, collateral transfer and document tracking functions for record services, including performing the following services:

    i.    Scoping and Mobilization;

    ii.    Develop the Future State Business Process Definition;

    iii.    Develop the Functional Design for the Records Case Management System;

    iv.    Develop the Technical Design for the Records Case Management System; and

    v.    Develop the Implementation Plan for the Construct, Test and Deploy phase.

    6.    In addition to the foregoing, KPMG will provide such other consulting, advice, research, planning, and analysis regarding tax compliance and IT advisory services as may be necessary, desirable or requested from time to time.[7]

## DISINTERESTEDNESS OF PROFESSIONALS

    7.    Based upon information supplied by Debtors' counsel, KPMG searched its client database from May 2, 2005 and forward to identify any connection or relationship with any creditors and parties-in-interest as of the Petition Date, as set forth on Schedule 1 attached hereto.

---

[7]    Although, by this Application, the Debtors are seeking to retain KPMG to provide such other consulting, advice, research, planning, and analysis regarding tax compliance, tax consulting and information technology services as may be necessary, desirable or requested from time to time, internal KPMG procedures require that KPMG enter into additional statements of work for additional work under certain circumstances. To the extent the Debtors request additional services not covered by the Agreements, KPMG and the Debtors may enter into additional statements of work, as is necessary, and file, for disclosure purposes, such additional statements of work with the Court. Unless required by the Court, the Debtors and KPMG do not intend to seek separate retention orders with regard to any additional statements of work. Instead, any additional statements of work will be filed with the Court and served on the applicable notice parties, absent any objections filed within ten (10) days after the filing and service of such supplemental declarations or affidavits, KPMG's employment shall continue as authorized pursuant to the Proposed Order.

8.      KPMG's review consisted of queries of an internal computer database containing names of individuals and entities that are present or recent and former clients of KPMG in order to identify potential relationships.[8]  This database includes engagement activity or potential engagement activity from May 2, 2005 forward.  A summary of those current potential relationships that KPMG was able to identify using its reasonable efforts is reflected on Schedule 2 attached hereto.[9]  On an ongoing basis, KPMG will conduct further reviews of its professional contacts as it becomes aware of new parties of interest, as is stated below.  To the best of my knowledge and based upon the results of the relationship search described above and disclosed herein, KPMG neither holds nor represents an interest adverse to the Debtors' estates that would impair KPMG's ability to objectively perform professional services for the Debtors, in accordance with section 327 of the Bankruptcy Code.

9.      Upon Bankruptcy Court approval of the Application, to the best of my knowledge, KPMG will be a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that, KPMG:

> i)  will not be a creditor, an equity security holder, or an insider of the Debtors;
>
> ii)  is not and was not, within two years before the date of filing of these chapter 11 cases, a director, officer, or employee of the Debtors; and
>
> iii)  does not have an interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders, by reason of any

---

[8]  As set forth in paragraph 14, KPMG is the United States member firm of KPMG International, a Swiss cooperative of independent member firms.  While KPMG is a separate and distinct legal entity from all other member firms of KPMG International, in an attempt to identify conflicts among or between KPMG International member firms, KPMG International has a global conflict internal computer database related to the engagement activity or potential engagement activity of a majority of such member firms since May 2, 2005 that allows KPMG International member firms to identify potential conflicts between other KPMG International member firms.  Financial information pertaining to engagement activity is the proprietary and confidential information of each individual member firm and KPMG does not have any legal right to access, or if accessed, disclose, such information relating to other KPMG International member firms.

[9]  Schedule 2 contains a list of the relationships or potential relationships of all KPMG International member firms (as opposed to solely KPMG) and one or more of the parties set forth on the conflicts checklist.

direct or indirect relationship to, connection with, or interest in, the Debtors or for any other reason.

10.     To the extent the Application is granted, KPMG has agreed to waive amounts owed for professional services rendered prior to the Petition Date, and thus, will not be, as of the effective date of its retention, a "creditor" of the Debtors within the meaning of section 101(10) of the Bankruptcy Code.

11.     To the best of my knowledge, except as set forth herein and on Schedule 2, (a) KPMG has no connections with the creditors, any other party-in-interest, or their respective attorneys and accountants; and (b) the KPMG professionals working on this matter are not relatives of and have no known connection with the United States Trustee of the Southern District of New York or of any known employee in the office thereof, or any United States Bankruptcy Judge of the Southern District of New York.

12.     KPMG currently provides a variety of services to Ally Financial Inc. and various of its affiliates who are not debtors (collectively, "AFI"), some of which are related to these chapter 11 cases. For example, KPMG has been retained by AFI to perform tax consulting services related to these chapter 11 cases. In addition, prior to the Petition Date, under certain statements of work, including, but not limited to, certain of the SOWs, AFI paid KPMG directly for services rendered by KPMG and the applicable Debtor then reimbursed AFI. In addition, KPMG understands that certain services it provides to AFI may be reimbursed by one or more of the Debtors through the shared services agreement between the Debtors and AFI, and possibly, the Debtors may pay KPMG directly for services that may be reimbursed by AFI under such shared services agreement. As set forth in paragraph 23 below, with respect to the SOWs (i.e., the statements of work directly between one or more Debtors and KPMG) and any other statements of work that may be entered into between KPMG and one or more Debtors during the

8

course of these chapter 11 cases, KPMG will apply to the Court for the allowance of

compensation for professional services rendered and reimbursement of expenses incurred in

accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the

Local Rules and orders of this Court. Except with respect to the foregoing, KPMG has not

provided, and will not provide, any professional services to any of the creditors, other parties-in-

interest, or their respective attorneys and accountants with regard to any matter related to these

Chapter 11 cases.

13.    Subject to the foregoing paragraph 12, KPMG has in the past been retained by,

and presently provides and likely in the future will provide services for, certain creditors of the

Debtors, other parties-in-interest and their respective attorneys and accountants in matters

unrelated to such parties' claims against the Debtors or interests in these Chapter 11 cases.

KPMG currently performs, has previously performed or may have performed such services for

the entities listed on Schedule 2, however, except as disclosed herein, such services, to the extent

performed by KPMG, are unrelated to the Debtors or their Chapter 11 cases.

14.    KPMG is the United States member firm of KPMG International, a Swiss

cooperative of member firms, each a separate legal entity, located worldwide. Only KPMG is

being retained in this matter. KPMG cannot assure that an engagement will not be accepted by a

foreign member firm of KPMG International for another party that may bear upon KPMG's

engagement by the Debtors. However, to the extent KPMG is aware of such engagement and

believes such engagement may bear upon KPMG's engagement by the Debtors, KPMG will file

a supplemental declaration with the Bankruptcy Court.

15.    As part of its practice, KPMG appears in many cases, proceedings, and

transactions involving many different law firms, financial consultants, and investment bankers in

9

matters unrelated to these bankruptcy cases.  KPMG has not identified any material relationships

or connections with any law firm, financial consultant or investment banker involved in these

Chapter 11 cases that would cause it to be adverse to the Debtors, the Debtors' estates, any

creditor or any other party-in-interest.  If and when additional information becomes available

with respect to any other relationships which may exist between KPMG, foreign member firms

of KPMG International, or their partners and professionals and the Debtors, creditors, or any

other parties in interest which may affect these cases, supplemental declarations describing such

information shall be filed with this Court.

## PROFESSIONAL COMPENSATION[10]

16.    Subject to paragraphs 18 and 20, KPMG's requested compensation for

professional services rendered to the Debtors will be based upon the hours actually expended by

each assigned staff member at each staff member's hourly billing rate.  In the normal course of

KPMG's business, the hourly rates are subject to periodic increase.  To the extent such hourly

rates are increased, KPMG requests that, with respect to the work to be performed after such

increase, the rates listed below be amended to reflect the increase.  The Debtors have agreed to

compensate KPMG for professional services rendered at its normal and customary hourly rates,

subject to the reductions discussed below.

17.    If KPMG increases the rates for its services, KPMG will file a supplemental

affidavit with the Court and provide ten business days' notice to the Debtors, the United States

Trustee and the Official Committee of Unsecured Creditors appointed in these cases.  The

supplemental declaration will state the basis for the requested rate increases and whether the

Debtors have consented to the rate increase.

---

[10]    Certain SOWs contain estimated fees to be charged for the applicable services.  Any such amount is an estimate
and may be subject to increase or decrease depending upon the Debtors' circumstances.

18.    REMIC SOW.  The hourly rates for tax compliance services to be rendered by KPMG and applicable herein, which reflect a 40% discount from KPMG's standard hourly rates for such services, are as follows[11]:

| Tax Compliance Services | Billing Rates |
|---|---|
| Partners/Managing Directors | $510 |
| Directors | $435 |
| Managers | $345 |
| Senior Associates | $240 |
| Associates | $195 |

Pursuant to the REMIC SOW, KPMG is entitled to the lesser of (i) actual time incurred to complete the services at the hourly rates set forth above or (ii) (a) for REMIC, the sum of certain fixed monthly costs and one time fees, (b) for Grantor Trust-Owner Trusts, a maximum of $4,200 per trust per year, and (c) for PFIC (non-revolving), a maximum annual service fee of $8,240 per trust plus additional amounts.  With respect to taxable income and excess inclusion income estimates under the REMIC SOW, KPMG is also entitled to the lesser of (i) actual time incurred to complete the services at the hourly rates set forth above or (ii) a one time maximum initial set up fee of $600 and a maximum quarterly fee of $257.50, for each REMIC Trusts where such services are provided.

19.    IT Phase 2 SOW & IT Phase 3 SOW.  The following table represents KPMG's hourly billing rates for IT advisory services to be rendered by KPMG:

---

[11]    If in connection with any subsequent statements of work, KPMG is retained to perform additional services at different rates, such rates will be disclosed in connection with the relevant statements of work.  As stated above, KPMG and the Debtors do not intend to seek separate retention orders with regard to any such statements of work.

11

| IT Advisory Services | Billing Rates |
|---|---|
| Partners/Principals | $330 |
| Directors/Senior Managers | $260 |
| Managers | $215 |
| Senior Associates | $195 |
| Associates | $160 |

The majority of fees to be charged for IT advisory services reflect a reduction of approximately 55% - 65% from KPMG's standard rates, depending on the types of services to be rendered. KPMG has agreed with the Debtors that the fees (exclusive of expenses) to be charged for services rendered will not exceed $586,000.

20.    KPMG also will seek reimbursement for reasonable necessary expenses incurred, which shall include meals, lodging, travel, photocopying, delivery service, postage, vendor charges and other out-of-pocket expenses incurred in providing professional services.

21.    The fee and expense agreement is consistent with compensation arrangements (or reflects discounts) entered into by KPMG and other comparable firms in connection with rendering similar services under similar circumstances.

22.    KPMG intends to apply to the Court for the allowance of compensation for professional services rendered and reimbursement of expenses incurred in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of this Court.  KPMG has agreed to accept as compensation such sums as may be allowed by the Court and understands that interim and final fee awards are subject to approval by the Court. The professional time required to prepare detailed applications in accordance with the

12

Bankruptcy Code, applicable rules and guidelines differs from KPMG's normal billing procedures and, as a result, requires significant effort by KPMG to comply therewith. As a result, subject to Bankruptcy Court approval, KPMG shall be reimbursed for such professional time incurred.

23.    According to KPMG's books and records, during the 90-day period prior to the Petition Date, KPMG received $699,261 from the Debtors for professional services performed and expenses incurred. A schedule showing the payments that KPMG received during this period is attached as Schedule 3.

24.    Under the 2010 MSA and the 2008 MSA, KPMG and the Debtors agreed to indemnify each other in connection with certain claims. KPMG believes that such provisions are customary and reasonable for tax and IT professionals in chapter 11 cases. Notwithstanding the foregoing, during the pendency of these cases, KPMG has agreed to modify the indemnity terms of the MSAs to the extent set forth in the proposed order granting the Application.

25.    Except as disclosed herein, to the best of my knowledge no commitments have been made or received by KPMG with respect to compensation or payment in connection with these cases other than in accordance with the provisions of the Bankruptcy Code, and there is no agreement or understanding between KPMG and any other entity, other than a professional of KPMG, for the sharing of compensation received or to be received for services rendered in connection with these proceedings.

13

26.     This declaration is provided in accordance with section 327 of the Bankruptcy

Code, Bankruptcy Rule 2014 and Local Rule 2014-1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of July, 2012

_____
James W. McAveeney
Principal
KPMG LLP
303 E. Wacker Drive
Chicago, Illinois 60601-5255

14

# SCHEDULE 1
## RESIDENTIAL CAPITAL, LLC ET AL

## MASTER CONFLICT LIST

**Debtors and Subsidiaries**
ditech, LLC
DOA Holding Properties, LLC
DOA Properties IX (Lots-Other), LLC
EPRE LLC
Equity Investment I, LLC
ETS of Virginia, Inc.
ETS of Washington, Inc.
Executive Trustee Services LLC
GMAC – RFC Holding Company, LLC
GMAC Model Home Finance I, LLC
GMAC Mortgage USA Corporation
GMAC Mortgage, LLC
GMAC Residential Holding Company, LLC
GMAC RH Settlement Service, LLC
GMACM Borrower LLC
GMACM REO LLC
GMACR Mortgage Products, LLC
HFN REO SUB II, LLC
Home Connects Lending Services, LLC
Homecomings Financial Real Estate Holdings, LLC
Homecomings Financial, LLC
Ladue Associates, Inc.
Passive Asset Transactions, LLC
PATI A, LLC
PATI B, LLC
PATI Real Estate Holdings, LLC
RAHI A, LLC
RAHI B, LLC
RAHI Real Estate Holdings, LLC
RCSFJV2004, LLC
Residential Accredit Loans, Inc.
Residential Asset Mortgage Products, Inc.
Residential Asset Securities Corporation
Residential Capital, LLC
Residential Consumer Services of Alabama, LLC
Residential Consumer Services of Ohio, LLC
Residential Consumer Services of Texas, LLC
Residential Consumer Services, LLC
Residential Funding Company, LLC
Residential Funding Mortgage Exchange, LLC
Residential Funding Mortgage Securities I, Inc.
Residential Funding Mortgage Securities II, Inc.
Residential Funding Real Estate Holdings, LLC
Residential Mortgage Real Estate Holdings, LLC
RFC – GSAP Servicer Advance, LLC
RFC Asset Holdings II, LLC
RFC Asset Management, LLC
RFC Borrower LLC
RFC Construction Funding, LLC
RFC REO LLC
RFC SFJV-2002, LLC

**Foreign Subsidiaries**
Canada Mortgage Acceptance Corporation

Foreign Obligation Exchange, Inc. 2003-H12
Foreign Obligation Exchange, Inc. 2003-H14
Foreign Obligation Exchange, Inc. 2004-H11
Foreign Obligation Export, Inc.
GMAC Financiera S.A. de C.V. Sociedad
    Financiera de Objecto Multiple
GMAC Residential Funding of Canada Limited
GMAC-RFC (No. 2) Limited
GMAC-RFC Auritec, S.A.
GMAC-RFC Direct Limited
GMAC-RFC Espana Hipotecas SL
GMAC-RFC Europe Limited
GMAC-RFC Holdings Limited
GMAC-RFC Property Finance Limited
High Street Home Loans Limited
MCA Finance Limited
National Guarantee plc
Private Label Group Limited
Private Label Mortgage Services Limited

**Officers and Directors**
Abreu, Steven M.
Aretakis, James
Dondzila, Catherine M.
Fleming, Patrick
Hamzehpour, Tammy
Harney, Anthony J.
Hills, Garry
Horner, Jill M.
III, Edward F. Smith,
Ilany, Jonathan
Mack, John E.
Marano, Thomas
Meyer, Darsi
Nees, Louis A.
Pensabene, Joseph A.
Riddle, Mindy
Strauss, Thomas M.
Tyson, William N.
West, Pamela E.
Whitlinger, James
Wilkinson, Winston Carlos

**Parties to Funding Agreements**
Ally Financial Inc (f/k/a GMAC Inc.)
Barclays Bank PLC
Citibank, N.A.
Wells Fargo Bank, N.A.
BMMZ Holdings LLC
US Bank National Association
Deutsche Bank Trust Company Americas

**Bondholders**
AllianceBernstein Advisors

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

American Enterprise Investment Services Inc.
Appaloosa Management L.P.
Bank of New York Mellon, (The)/Barclays Capital - London
Bank of Nova Scotia/CDS
BARC/FIXED
Barclays Capital Inc. /LE
Berkshire Hathaway Inc.
BlackRock Global Investors
Charles Schwab & Co., Inc.
CITIBK/GRP
Citigroup Global Markets Inc.
Citigroup Global Markets Inc. /Salomon Brothers
Credit Suisse Securities (USA) LLC
David Lerner Associates, Inc.
Deutsche Bank Securities, Inc.
E*Trade Clearing LLC
Edward D. Jones & Co.
First Clearing, LLC
First Southwest Company
Goldman Sachs International
Goldman, Sachs & Co.
Interactive Brokers Retail Equity Clearing
J.P. Morgan Clearing Corp.
J.P. Morgan Securities LLC
Janney Montgomery Scott Inc.
Loomis Sayles & Company
LPL Financial Corporation
Merrill Lynch Safekeeping
Morgan Stanley & Co. LLC
Morgan Stanley Smith Barney LLC
National Financial Services LLC
Oppenheimer & Co. Inc.
OptionXpress, Inc
P. Schoenfeld Asset Management
Paulson & Co. Inc.
Penson Financial Services, Inc./Ridge.
Pershing LLC
Pentwater Capital Management
Putnam Investment Management
Raymond, James & Associates, Inc.
RBC Capital Markets, LLC
Scottrade, Inc.
Security Investors LLC
Silver Point Capital, L.P.
Stifel, Nicolaus & Company Incorporated
Taconic Capital Advisors, L.P.
TD Ameritrade Clearing, Inc.
Timber Hill LLC
UBS Financial Services LLC
UBS Securities LLC
Vanguard Marketing Corporation
Western Asset Management Company

**Landlords and Tenants**
2155 Northpark Lane LLC
2255 Partners, L.P. c/o M. David Paul Development

LLC
Avenel Realty Company d / b / a Avenel at Montgomery Square
Brandywine Cityplace LP
BREOF Convergence LP c/o Brookfield Real Estate Opportunity Fund
Business Suites (Texas) LTD
Center Township of Marion County
Del Amo Financial Center, LP
DRA CLP Esplanade LP c/o Colonial Properties Services Ltd Partnership
Euclid Plaza Associates, LLC
GBM Properties, LLC
Homeowners Alliance
Liberty Property Limited Partnership
National Default Servicing, LLC
New Towne Center Inc.
PBC San Jose, LLC
PBC Walnut Creek, LLC
Realty World - Graham/Grubbs and Associates
Regus Management Group LLC
Teachers Insurance and Annuity Association of America c/o Northmarq RES
The Irvine Company LLC
The Office Annex, Inc.
Veridian Credit Union f/k/a John Deere Community Credit Union
W.E.G., Jr., Inc. d / b / a Highland-March Beverly Suites

**Parties to Litigation**
Acacia Life Insurance Company
Allstate Bank (f/k/a Allstate Federal Savings Bank)
Allstate Insurance Company
Allstate Life Insurance Company
Allstate Life Insurance Company of New York, Allstate Retirement Plan
Allstate New Jersey Insurance Company
American Heritage Life Insurance Company
Ameritas Life Insurance Corp.
Boilermaker Blacksmith National Pension Trust
Brown County, Ohio
Cambridge Place Investment Management Inc.
Church-Dellinger, Victoria Jean
Columbus Life Insurance Company
Deutsche Zentral-genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York Branch
DG Holding Trust
Federal Home Loan Bank of Boston
Federal Home Loan Bank of Chicago
Federal Home Loan Bank of Indianapolis
Federal Home Loan Mortgage Corporation
Federal Housing Finance Agency
Financial Guaranty Insurance Company
First Colonial Insurance Company
Fort Washington Active Fixed Income LLC
Fort Washington Investment Advisors, Inc.

2

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

HSH Nordbank AG
HSH Nordbank AG, Luxembourg Branch
HSH Nordbank AG, New York Branch
HSH Nordbank Securities S.A.
Huntington Bancshares Inc.
IKB Deutche Industriebank AG
IKB International S.A. (in Liquidation)
Integrity Life Insurance Company
Kennett Capital, Inc.
Kral, Kenneth L.
Laster, Marteal
Massachusetts Mutual Life Insurance Company
MBIA Insurance Corporation
Mitchell, Ruth
Mitchell, Steven
National Credit Union Administration Board
National Integrity Life Insurance Company
New Jersey Carpenters Health Fund
New Jersey Carpenters Vacation Fund
Rio Debt Holdings (Ireland) Limited
Sall, Mohammed A.
Sealink Funding Ltd.
State of Ohio
Stichting Pensioenfonds ABP
The Charles Schwab Corporation
The Union Central Life Insurance Company
The Western and Southern Life Insurance Company
Thrivent Balanced Fund
Thrivent Balanced Portfolio
Thrivent Bond Index Portfolio
Thrivent Core Bond Fund
Thrivent Financial Defined Benefits Plan Trust
Thrivent Financial for Lutherans
Thrivent Income Fund
Thrivent Limited Maturity Bond Fund
Thrivent Limited Maturity Bond Portfolio
U.S. Central Federal Credit Union
West Virginia Investment Management Board
Western Corporate Federal Credit Union
Western-Southern Life Assurance Company

### U.S. Trustee's Office (Region 2 Trial Attorneys)
Davis, Tracy Hope
Driscoll, Michael
Gasparini, Elisabetta
Golden, Susan
Khodorovsky, Nazar
Masumoto, Brian S.
Morrissey, Richard C.
Nakano, Serene
Riffkin, Linda A.
Schwartz, Andrea B.
Schwartzberg, Paul K.
Velez-Rivera, Andy
Zipes, Greg M.

### Bankruptcy Judges (New York)
Bernstein, Stuart M.
Chapman, Shelley C.
Drain, Robert
Gerber, Robert E.
Glenn, Martin
Gonzalez, Arthur J.
Gropper, Allan L.
Lane, Sean H.
Lifland, Burton R.
Morris, Cecelia G.
Peck, James M.

### District Court Judges (New York)
Baer, Harold
Batts, Deborah A.
Berman, Richard M.
Briccetti, Vincent L.
Buchwald, Naomi Reice
Carter, Andrew L.
Castel, P. Kevin
Cedarbaum, Miriam Goldman
Cote, Denise L.
Crotty, Paul A.
Daniels, George B.
Duffy, Kevin T.
Engelmayer, Paul A.
Forrest, Katherine B.
Gardephe, Paul G.
Griesa, Thomas P.
Haight, Charles S.
Hellerstein, Alvin K.
Jones, Barbara S.
Kaplan, Lewis A.
Karas, Kenneth M.
Koeltl, John G.
Marrero, Victor
McKenna, Lawrence M.
McMahon, Colleen
Nathan, Alison J.
Oetken, J. Paul
Owen, Richard
Patterson, Robert P.
Pauley, William H.
Preska, Loretta A.
Rakoff, Jed S.
Ramos, Edgardo
Sand, Leonard B.
Scheindlin, Shira A.
Seibel, Cathy
Stanton, Louis L.
Stein, Sidney H.
Sullivan, Richard J.
Swain, Laura Taylor
Sweet, Robert W.
Wood, Kimba M.

3

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

**Depositing Banks**
Ally Bank
Bank of America, N.A.
Bank of New York Mellon
Citibank, N.A.
Deutsche Bank Trust Company Americas
JPMorgan Chase Bank, N.A.
M&T Bank
State Street Bank and Trust Company
U.S. Bank National Association
Wachovia Bank, National Association

**Consultants & Professionals**
Barclays Bank PLC
Centerview Partners LLC
Deloitte & Touche
Evercore
Fortress Investment Group, LLC
FTI Consulting, Inc.
Kirkland & Ellis LLP
Kurtzman Carson Consultants LLC
Mayer Brown LLP
Mercer
Nationstar Mortgage, LLC
PricewaterhouseCoopers
Rubenstein Associates, Inc.
Sidley Austin LLP
Skadden, Arps, Slate, Meagher & Flom LLP

**HELOC Investors**
5th 3rd bank
Aurora Loan Services LLC
Bank One, Texas N.A.
Deutsche Bank National Trust Co.
Everbank
JP Morgan Chase
Macquarie Mortgages USA Inc
Suntrust
The Bank of New York Mellon
Treasury Bank, N.A.
Us Bank, N.A.
Wachovia Bank Na
Wells Fargo Bank, N.A.

**Servicing Counterparties**

**Government Entities and GSEs**
Federal Home Loan Mortgage Corporation (Freddie Mac)
Federal Housing Administration (FHA)
Federal National Mortgage Association (Fannie Mae)
Government National Mortgage Association (Ginnie Mae)

**Housing and Local Agencies**
California Housing Finance Agency

CitiMortgage, Inc., as administrator for Texas Veterans Land Board
Connecticut Housing Finance Authority
Delaware Housing Authority
Hawaii Housing (Hula Mae)
Housing Opportunities Commission of Montgomery County, Maryland
Mississippi Home Corporation
Neighborhood Housing Services of America and Philadelphia N.H.S.
Oregon Housing and Community Services Department
Redevelopment Authority of the County of Berks
Rural Housing
The Housing and Redevelopment Authority in and for the City of Minneapolis
The Industrial Commission of North Dakota

**Mortgage and Monoline Insurers**
The ACE Group
Ambac
Assured Guaranty Corp.
Cuna Mutual Group Mortgage Insurance Company
FGIC
Financial Security Assurance Inc
Federal Insurance Group (a subsidiary of the Chubb Group of Insurance Companies)
General Electric Mortgage Insurance Corporation
Genworth Mortgage Insurance Corporation
MBIA
Mortgage Guaranty Insurance Corp.
PMI Mortgage Insurance Co.
Radian Asset Assurance Inc.
Radian Guaranty Inc.
Republic Mortgage Insurance Company
Triad Guaranty Insurance Corporation
United Guaranty Residential Insurance Company

**Trustees**
Bank One, National Association
BNY Midwest Trust Company
Chase Bank of Texas, N.A.
Citibank, N.A.
Deutsche Bank National Trust Company
Deutsche Bank Trust Company Americas
HSBC Bank USA, National Association
JPMorgan Chase Bank, N.A.
LaSalle Bank National Association
Security Pacific National Company
The Bank of New York Mellon
U.S. Bank National Association
US National Association
Wells Fargo Bank Minnesota, N.A.
Wells Fargo Bank, National Association
Wilmington Trust Company

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

**Other Counterparties to Servicing Agreements**
50 BY 50, LLC
ABN AMRO Mortgage Croup, Inc.
Access National Mortgage Corporation
Ace Home Equity Loan Trust, Series 2007-SL3
ACE Securities Corp.
ACT Mortgage Capital
Advantage Bank
Aegis Mortgage Corporation
Aegon USA Realty Advisors
Alliance Bancorp
Alliance Securities Corp.
Ally Bank
Ally Financial Inc.
Ally Investment Management LLC
Alternative Finance Corporation
Amalgamated Bank of New York
American Equity Mortgage, Inc.
American Home Mortgage
American Home Mortgage Acceptance, Inc.
American Home Mortgage Investment Trust 2005-2
American Home Mortgage Investment Trust 2005-4A
American Home Mortgage Investment Trust 2006-2
American Home Mortgage Investment Trust 2007-A
American Home Mortgage Servicing, Inc.
American Home Mortgage Trust 2004-4
American Home Mortgage Trust 2005-1
American Home Mortgage Trust 2005-2
American Home Mortgage Trust 2005-4A
American Residential Equities XXVII, LLC
American Residential Equities, LLC
Ameriquest Mortgage Company
Andover Bank
Arbor Commercial Mortgage, LLC
Asset Management Holding of South Florida, LLC
Assured Guaranty Municipal Corp
Atlantic Financial Federal
Audobon Savings Bank
Aurora Loan Services Inc.
Aurora Loan Services LLC
Banc of America Funding 2005-3 Trust
Banc of America Funding 2005-8 Trust
Banc of America Funding 2006-1 Trust
Banc of America Funding 2006-4 Trust
Banc of America Funding Corporation
Banc of America Mortgage Capital Corporation
Bancap
Banco Mortgage Company
Banco Popular North America
Bank of America, National Association
Bank of Hawaii
Bank One, Texas, N.A.
Bank Rhode Island
Bank United, FSB
Bankatlantic, A Federal Savings Bank

Bankers Saving
Bankers Trust Company
Banknorth Mortgage
Bay Atlantic Federal Credit Union
Bay Financial Savings Bank, FSB
Bayrock Mortgage Corporation
Bayview Acquisitions, LLC
Bayview Financial Asset Trust
Bayview Financial Property Trust
Bayview Financial Securities Company, LLC
Bayview Financial Trading Group, L.P.
Bayview Financial, L.P.
Bear Stearns Asset Backed Securities I, LLC
Bear Stearns Mortgage Capital Corporation
Bear Stearns Second Lien Trust 2007-1
Bear Stearns Second Lien Trust 2007-SV1
Bell Federal Savings and Loan Association
BellaVista Funding Corporation
Belvedere Trust Finance Corporation
Bluebonnet Savings Bank FSB
BMMZ Holdings LLC
Broadway Federal Bank, FSB
Brothers Bank, FSB
Butte Savings and Loan Association
Caliber Funding, LLC
California Banking Association
California Federal Bank, FSB
California Public Employees' Retirement System
Cambridge Place Collateral Management LLC
Canada Mortgage Acceptance Corporation
Capital Crossing Bank
Capitol Federal Savings and Loan Association
Capstead Mortgage Corporation
CDC Mortgage Capital Inc. (Natixis)
Cenfed Bank, a Federal Savings Bank
Cenlar FSB
CenterState Bank of Florida, N.A.
Central Bank of Jefferson County, Inc.
Century Bank, FSB
CFX Bank
Charter One Bank, FSB
Charter One Bank, N.A.
Chase Manhattan Mortgage Corporation
Chemical Mortgage Company
Citi Financial Mortgage Co., Inc
Citibank (West), FSB
Citigroup Global Markets Realty Corp.
Citigroup Mortgage Loan Trust Inc.
CitiMortgage, Inc.
Citizens Bank of Connecticut
Citizens Bank of Massachusetts
Citizens Bank of New Hampshire
Citizens Bank of Pennsylvania
Citizens Bank, N.A.
Citizens Federal Bank, FSB
Clayton Fixed Income Services Inc.
Clayton National, Inc.

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

CMC Investment Partnership
Coastal Banc Capital Corporation
Coastal Banc SSB
Coastal States Mortgage Corporation
Collective Federal Savings Bank
Colonial Mortgage Service Company
Comerica Bank
Community Lending, Incorporated
Communityone Bank, N.A.
ComUnity Lending, Incorporated
Copperfield
Core, Cap Inc.
Corona Asset Management III, LLC
Countrywide Bank, N.A.
Countrywide Home Loans Servicing, LP
Countrywide Home Loans, Inc.
Credit Suisse First Boston Mortgage Securities
   Corp.
CSX
CTCE Federal Credit Union
CTX Mortgage Company, LLC
DB Structured Products, Inc.
Deutsche Alt-A Securities, Inc.
Deutsche Bank AG New York Branch
Deutsche Mortgage Securities, Inc.
DLJ Mortgage Acceptance Corp.
DLJ Mortgage Capital, Inc.
Dollar Bank, FSB
Drawbridge Consumer Funding Ltd
Dynex Securities Corporation
E*Trade Bank
E*Trade Mortgage
E*Trade Wholesale Lending Corp.
EAB Mortgage Company, Inc.
EMC Mortgage Corporation
Empire Mortgage X, Inc.
Encore Bank and National Association
Encore Savings Bank
Erie Savings Bank
Eurekabank
EverBank
Fairbanks Capital Corp.
Fairfax Savings Bank
Family Bank, FSB
Family Lending Services, Inc.
FBS Mortgage Corporation
Federal Home Loan Bank of Atlanta
Federal Trust Bank, FSB
Fidelity Federal Bank
Fidelity Savings and Loan
Fifth Third Bank
Financial Asset Securities Corp.
First Bank Incorporated
First Bank, Inc.
First Cap Holdings, Inc.
First Citizens Bank and Trust Company
First Citizens Mortgage Company

First Community Bank N.A.
First Federal of Michigan
First Federal Savings and Loan Association of
   Storm Lake
First Guaranty Mortgage Corporation
First Horizon Home Loan Corporation
First Indiana Bank
First Internet Bank of Indiana
First Massachusetts Bank, N.A.
First National Bank and Trust Company
First National Bank of Arizona
First National Bank of El Dorado
First Nationwide Mortgage Corporation
First NLC
First Rate Capital Corporation
First Savings Mortgage Corporation
First Tennessee Bank National Association
First Tennessee Capital Assets Corporation
First Trust Savings Bank
First Union National Bank
First-Citizens Bank & Trust Company
Firstrust Bank
Fleet National Bank
Flex Point Funding Corporation
Flick Mortgage Investors, Inc.
FNBA
Fortress Credit Corp.
FPA Corporation
Franklin Bank, SSB
Franklin Credit
Franklin Credit Management Corporation
Gateway Credit Union
Gateway Funding Diversified Mortgage Services,
   LP
GE Capital Consumer Card Co.
GE Mortgage Services, LLC
Geneva Mortgage Corporation
Germantown Savings Bank
Gibraltar Savings Association
Ginn Financial Services, LLC
Goldman Sachs Mortgage Company
Gonzalo Residential Asset Trust
Great American First Savings Bank
Great American Savings Bank
Green Planet Servicing, LLC
Green Tree Servicing LLC
GreenPoint Mortgage Funding Trust 2005-HE4
GreenPoint Mortgage Funding Trust 2006-HE1
GreenPoint Mortgage Funding, Inc.
Greenwich Capital Acceptance, Inc.
Greenwich Capital Financial Products, Inc.
Greenwich Universal Portfolio
GS Mortgage Securities Corp.
GSAA Home Equity Trust 2005-9
GSMPS Mortgage Loan Trust 2005-LT1
GSR Mortgage Loan Trust 2006-AR2
GSR Trust 2007-HEL1

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

Guardian Savings Bank
Hanover Capital Mortgage Holdings, Inc.
HarborView Mortgage Loan trust 2004-10
Healthcare Employees Federal Credit Union
Home Equity Loan Trust 2005-HS2
Home Equity Loan Trust 2006-HSA2
Home Equity Loan Trust 2006-HSA3
Home Equity Loan Trust 2006-HSA5
Home Equity Loan Trust 2007-HSA1
Home Equity Loan Trust 2007-HSA3
Home Federal Savings & Loan Association of
    Rome, Ga.
Home Loan Corporation
Home Loan Series 09-2028
HomeBanc Mortgage
HomEq Servicing Corporation
Horsham Funding Inc.
HSI Asset Securitization Corporation
Hudson & Keyse, LLC
Hudson City Savings Bank
Huntington Federal Savings & Loan Association
Hyperion Capital Group LLC
IMPAC CMB Trust Series 2005-6
IMPAC Funding Companies
IMPAC Funding Corporation
IMPAC Mortgage Holdings, Inc.
IMPAC Secured Assets Corp.
Imperial Credit Industries, Inc.
Independent Bank East Michigan
IndyMac Bank, FSB (now OneWest Bank, FSB)
IndyMac MBS, Inc.
IndyMac Mortgage Holdings, Inc.
ING Bank, FSB
Investment Capital Group
Irwin Union Bank and Trust Company
Ixis Real Estate Capital Inc
Jackson Federal Bank
Just Mortgage, Inc.
Kaiser Federal Bank
Keystone Nazareth Bank & Trust Company
Kidder Peabody Mortgage Capital Corporation
Lacera
Lebank
Lehman Brothers Bank, FSB
Lehman Brothers Holdings Inc.
Lehman Capital, a division of Lehman Brothers
    Holdings Inc.
Liberty Home Lending, Inc.
Liberty Savings Bank, FSB
Linden Assemblers Federal Credit Union
Litton Loan Servicing, LP
LNV Corporation
Loan Center of California
Loan Link Financial Services
Local #38 and Associates Credit Union
Lomas Mortgage USA, Inc.
Los Angeles County Employees Retirement

Association
Los Angeles Federal Savings
LPP Mortgage Ltd.
Luminent Mortgage Capital, Inc.
Lydian Private Bank
Macquarie Mortgage Funding Trust 2007-1
Macquarie Mortgages USA, Inc.
MAIA Mortgage Finance Statutory Trust
Marine Bank
Market Street Mortgage Corporation
Massachusetts Mutual Life Insurance Co.
Matrix Capital Bank
MB Financial Bank N.A.
Medway Savings Bank
Mellon Bank
Mellon/McMahon Real Estate Advisors Inc.
Merck Sharp & Dohme Federal Credit Union
Mercury Mortgage Finance Statutory Trust
Meridian Mortgage Corporation
Merrill Lynch Bank & Co.
Merrill Lynch Hunton Paige
Merrill Lynch Mortgage Capital Inc.
Merrill Lynch Mortgage Holdings, Inc.
Merrill Lynch Mortgage Investors, Inc.
Merrill Lynch Mortgage Lending, Inc.
Metlife Bank, N.A.
Metrocities Mortgage Corp., LLC
Metropolitan Life Insurance Company
Mid America Bank, FSB
MidFirst Bank
Midland Financial Savings and Loan Association
Mint I, LLC
Mint II, LLC
Money Bank Investment Corporation
Monterey I Holdings
Morgan Stanley Capital I Inc.
Morgan Stanley Mortgage Capital Inc.
Morgan Stanley Mortgage Loan Trust 2005-3AR
Mortgage Asset Securitization Transactions, Inc.
Mortgage Asset Securitization Trust
Mortgage Interest Networking Trust II
Mortgage Investors Corporation
MortgageIT Holdings Inc.
MortgageIT Securities Corp.
MortgageIT Trust 2005-4
MortgageIT, Inc
MRF 3 LLC
Mrit Securities Corporation
Mutual Savings & Loan Association of Charlotte,
    N.C.
Mutual Savings Bank
National Bank of Commerce
NETBANK
Network Funding L.P.
Neuwest Equity Partners
New Century Mortgage Securities, Inc.
New Cumberland Federal Credit Union

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

New Penn Financial, LLC
New York Life Insurance and Annuity Corporation
New York Life Insurance Company
Nomura Asset Acceptance Corporation
Nomura Credit & Capital, Inc.
Nomura Home Equity Loan, Inc.
North Jersey Federal Credit Union, Inc.
Northwest Funding, Inc.
Northwestern National Bank of Minneapolis
Norwest Bank Minnesota, National Association
Norwest Mortgage, Inc.
Ocwen Federal Bank FSB
Ocwen Loan Servicing, LLC
Ohio Savings Bank
Opteum Financial Services, LLC
Option One Mortgage Corporation
Paine Webber Real Estate Securities Inc.
Parkside Lending, LLC
Parkvale Savings Bank
Paul Financial, LLC
People Savings Bank, Inc., SSB
Peoples Heritage Savings Bank
PHH Mortgage
Philadelphia Federal Credit Union
Pinnacle Capital Mortgage Corporation
Pinnacle Financial Corporation
Plaza Home Mortgage, Inc.
PMC Bancorp
PNC Bank, N.A.
PNC Mortgage Securities Corp.
Pomona First Federal Bank and Trust
Principal Asset Markets, Inc.
Principal Bank
Principal Mutual Life Insurance Company
Private Capital Group
Quaker City Bank
Quicken Loans Inc.
RBS Citizens, National Association
Real Time Resolutions, Inc.
Real Time Solutions
Realty Mortgage Corporation
Redlands Federal Bank, FSB
Redwood Trust, Inc.
Reliance Federal Credit Union
Residential Mortgage Assistance Enterprise, LLC
Resolution Capital Advisors, LLC
Ridgewood Savings Bank
Riggs Bank N.A.
Rochester Community Savings Bank
Roosevelt Management Company, LLC
RWT Holdings, Inc.
Ryland Acceptance Corporation Four
SACO I Trust 2005-GP1
SACO I Trust 2006-8
Salomon Brothers Realty Corp.
Saxon Mortgage Funding Corporation
Sea Breeze Financial Services, Inc.

Sebring Capital
Secured Bankers Mortgage Company
Security National
Security Pacific National Bank
Select Portfolio Servicing Inc.
Sequoia Funding Trust
Sequoia Residential Funding, Inc.
Shearson Lehman Government Securities, Inc.
Shellpoint Mortgage LLC
Sierra Pacific Mortgage, Inc
Silver State Financial Services, Inc.
Silvergate Bank
Skyline Financial Corp.
SMFC Funding Corporation
SN Servicing Corporation
SNBOA, LLC
Southbank
Southern Pacific Thrift and Loan Association
SouthStar Funding, LLC
Southwest Savings and Loan Association
Sovereign Bank, FSB
Specialized Loan Servicing LLC
St. Paul Federal Bank for Savings
Stanwich Mortgage Acquisition Company, LLC
Sterling Savings Bank
Steward Financial, Inc.
Stonebridge Bank
Structured Asset Mortgage Investments II Inc.
Structured Asset Mortgage Investments, Inc.
Structured Asset Securities Corporation
Structured Mortgage Investments II Inc.
Summit Savings & Loan Association
Suntrust Asset Funding, LLC
Superior Bank
Susquehanna Bank
Syncora Guarantee Inc.
Taylor, Bean Whitaker
TCF National Bank
TCIF, LLC
TeleBank
Terwin Advisors LLC
Terwin Mortgage Trust 2006-6
Terwin Securitization LLC
The Canada Trust Company
The Chase Manhattan Bank
The First Boston Corporation
The First National Bank of Glens Falls
The Frost National Bank
The Mortgage Store Financial, Inc.
The New York Mortgage Company, LLC
The Travelers Indemnity Company
The Winter Group
Treasury Bank, N.A.
Tri Counties Bank
Tri Country Area Federal Credit Union
Truman Capital Securitization LLC
UBS Real Estate Securities Inc.

8

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

UBS Warburg Real Estate Securities Inc.
UBS Warburg, LLC
United Capital Mortgage, LLC
United Federal Savings Bank
United Financial Mortgage Corporation
United Savings Association of Texas, FSB
Unity Bank
Universal Master Servicing, LLC
US Bank Home Mortgage
USAA Federal Savings Bank
Valley Independent Bank
Vermont Mortgage Group, Inc.
Wachovia Bank, National Association
Wachovia Mortgage Corporation
Walter Mortgage Company
Washington Mutual Bank
Washington Mutual Mortgage Securities Corp.
Webster Bank
Western Financial Savings Bank, FSB
WestStar Mortgage, Inc.
Wilshire Credit Corporation
Winter Group
Witmer Funding LLC
WMCC Clayton / Washington Mutual Bank
WMD Capital Markets, LLC

**Utilities**
Abovenet Communications Inc.
AT&T
AT&T Mobility
Center Point Energy
CenturyLink
Cisco Systems Capital Corporation
City of Eden Prairie
Comcast
Dish Network
Genesys Conferencing
Global Capacity Group Inc.
IEX Corporation
Inova Solutions
Intercall
Intervoice Inc.
Level 3 Communications LLC
MediaCom
Micro-Tel Center
MidAmerican Energy
Sprint
Time Warner Cable
Time Warner Telecom
Verizon
Verizon Business
Verizon California
Verizon Wireless
Waste Management
Waterloo Water Works
Xcel Energy

**Consolidated Top 50 Creditors**
Aegis Usa Inc.
Alan Gardner
Allstate Insurance
Ambac Assurance Corp
Assured Guaranty Corp.
BNYMellon
Boilermaker Blacksmith National Pension Trust
Brian Kessler, et al
Cambridge Place Investment Management Inc.
Credstar
Deutsche Bank AG, New York
Deutsche Bank Trust Company Americas
Don E. Diane M. Patterson
Donna Moore
Emortgage Logic
Federal Home Loan Bank of Boston
Federal Home Loan Bank of Chicago
Federal Home Loan Bank of Indianapolis
Federal Housing Finance Agency
Financial Guaranty Insurance Co.
Huntington Bancshares Inc.
Indecomm Global Services
Iowa Public Employees Retirement System
Lehman Brothers Holdings, Inc.
Loan Value Group
Massachusetts Mutual Life Insurance Company
MBIA, Inc.
Midwest Operating Engineers Pension Trust Fund
National Credit Union Administration Board
New Jersey Carpenters Health Fund
New Jersey Carpenters Vacation Fund
Orange County Employees Retirement System
Police and Fire Retirement System of the City of
    Detroit
Sealink Funding Limited
Steven And Ruth Mitchell
Stichting Pensioenfonds ABP
The Charles Schwab Corporation
The Union Central Life Insurance Company
Thrivent Financial for Lutherans
Tiffany Smith
US Bank
Wells Fargo & Company
Wells Fargo Bank N.A
West Virginia Investment Management Board
Western & Southern

**Members of the Creditors' Committee**
Allstate Life Insurance Company
AIG Asset Management (U.S.), LLC
The Bank of New York Mellon Trust Company,
    N.A.
Deutsche Bank Trust Company Americas
Drennen, Rowena L.
Financial Guaranty Insurance Company
MBIA Insurance Corporation

9

## SCHEDULE 1
### RESIDENTIAL CAPITAL, LLC ET AL

U.S. Bank National Association
Wilmington Trust, N.A.

**Parties connected to Creditors' Committee R.**
**2004 motion**
AlixPartners
Cerberus Capital Management, L.P.
Cerberus FIM Investors LLC
Cerberus FIM, LLC
FIM Holdings LLC
General Motors Company
Gibbs & Bruns, LLP
GMAC Bank
GMAC Commercial Finance, LLC
GMAC LLC
GMAC Mortgage Group, LLC
Houlihan Lokey
IB Finance Holding Company, LLC
Kelly Drye & Warren LLP
Kramer Levin et al
Moelis & Company
Morrison & Foerster LLP
Morrison Cohen LLP
National Motors Bank FSB
Ropes & Gray LLP
White & Case

**SCHEDULE 2**
**RESIDENTIAL CAPITAL, LLC ET AL**

**KPMG RELATIONSHIPS**

**Debtors and Subsidiaries**
  GMAC – RFC Holding Company, LLC
  GMAC Mortgage, LLC
  Home Connects Lending Services, LLC
  Residential Accredit Loans, Inc.
  Residential Asset Mortgage Products, Inc.
  Residential Asset Securities Corporation
  Residential Capital, LLC
  Residential Funding Mortgage Securities I, Inc.
  Residential Funding Mortgage Securities II, Inc.
  RFC Construction Funding, LLC

**Foreign Subsidiaries**
  Canada Mortgage Acceptance Corporation
  GMAC Residential Funding of Canada Limited
  GMAC-RFC (No. 2) Limited
  GMAC-RFC Auritec, S.A.
  GMAC-RFC Direct Limited
  GMAC-RFC Espana Hipotecas SL
  GMAC-RFC Europe Limited
  GMAC-RFC Holdings Limited
  GMAC-RFC Property Finance Limited
  High Street Home Loans Limited
  Private Label Group Limited
  Private Label Mortgage Services Limited

**Officers and Directors**
  Fleming, Patrick
  Ilany, Jonathan
  Mack, John E.
  Marano, Thomas
  Strauss, Thomas M.

**Parties to Funding Agreements**
Ally Financial Inc (f/k/a GMAC Inc.)
Barclays Bank PLC
Citibank, N.A.
Wells Fargo Bank, N.A.
US Bank National Association
Deutsche Bank Trust Company Americas

**Bondholders**
  AllianceBernstein Advisors
  American Enterprise Investment Services Inc.
  Appaloosa Management L.P.
  Bank of New York Mellon, (The)/Barclays Capital -
  London
  Bank of Nova Scotia/CDS
  Barclays Capital Inc. /LE
  Berkshire Hathaway Inc.

BlackRock Global Investors
Charles Schwab & Co., Inc.
CITIBK/GRP
Citigroup Global Markets Inc.
Citigroup Global Markets Inc. /Salomon Brothers
Credit Suisse Securities (USA) LLC
Deutsche Bank Securities, Inc.
E*Trade Clearing LLC
Edward D. Jones & Co.
First Clearing, LLC
First Southwest Company
Goldman Sachs International
Goldman, Sachs & Co.
J.P. Morgan Clearing Corp.
J.P. Morgan Securities LLC
Janney Montgomery Scott Inc.
Loomis Sayles & Company
Merrill Lynch Safekeeping
Morgan Stanley & Co. LLC
Morgan Stanley Smith Barney LLC
National Financial Services LLC
Oppenheimer & Co. Inc.
P. Schoenfeld Asset Management
Paulson & Co. Inc.
Penson Financial Services, Inc./Ridge.
Pershing LLC
Pentwater Capital Management
Putnam Investment Management
Raymond, James & Associates, Inc.
RBC Capital Markets, LLC
Scottrade, Inc.
Security Investors LLC
Silver Point Capital, L.P.
Stifel, Nicolaus & Company Incorporated
Taconic Capital Advisors, L.P.
TD Ameritrade Clearing, Inc.
Timber Hill LLC
UBS Financial Services LLC
UBS Securities LLC
Vanguard Marketing Corporation
Western Asset Management Company

**Landlords and Tenants**
Brandywine Cityplace LP
BREOF Convergence LP c/o Brookfield Real Estate Opportunity Fur
Center Township of Marion County
DRA CLP Esplanade LP c/o Colonial Properties Services Ltd Partner
Liberty Property Limited Partnership
Regus Management Group LLC

1

## SCHEDULE 2
## RESIDENTIAL CAPITAL, LLC ET AL

Teachers Insurance and Annuity Association of America c/o Northern Core Bond Fund
RES
The Irvine Company LLC

**Parties to Litigation**
  Acacia Life Insurance Company
  Allstate Bank (f/k/a Allstate Federal Savings Bank)
  Allstate Insurance Company
  Allstate Life Insurance Company
  Allstate Life Insurance Company of New York, Allstate Retirement Plan
  Allstate New Jersey Insurance Company
  American Heritage Life Insurance Company
  Ameritas Life Insurance Corp.
  Boilermaker Blacksmith National Pension Trust
  Brown County, Ohio
  Cambridge Place Investment Management Inc.
  Columbus Life Insurance Company
  Deutsche Zentral-genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York Branch
  DG Holding Trust
  Federal Home Loan Bank of Boston
  Federal Home Loan Bank of Chicago
  Federal Home Loan Bank of Indianapolis
  Federal Home Loan Mortgage Corporation
  Federal Housing Finance Agency
  Financial Guaranty Insurance Company
  First Colonial Insurance Company
  Fort Washington Active Fixed Income LLC
  Fort Washington Investment Advisors, Inc.
  HSH Nordbank AG
  HSH Nordbank AG, Luxembourg Branch
  HSH Nordbank AG, New York Branch
  HSH Nordbank Securities S.A.
  Huntington Bancshares Inc.
  IKB Deutche Industriebank AG
  IKB International S.A. (in Liquidation)
  Integrity Life Insurance Company
  Kennett Capital, Inc.
  Massachusetts Mutual Life Insurance Company
  MBIA Insurance Corporation
  Mitchell, Ruth
  Mitchell, Steven
  National Credit Union Administration Board
  National Integrity Life Insurance Company
  Sealink Funding Ltd.
  State of Ohio
  Stichting Pensioenfonds ABP
  The Charles Schwab Corporation
  The Union Central Life Insurance Company
  The Western and Southern Life Insurance Company
  Thrivent Balanced Portfolio
  Thrivent Bond Index Portfolio

Thrivent Financial Defined Benefits Plan Trust
Thrivent Financial for Lutherans
Thrivent Income Fund
Thrivent Limited Maturity Bond Fund
Thrivent Limited Maturity Bond Portfolio
U.S. Central Federal Credit Union
Western Corporate Federal Credit Union
Western-Southern Life Assurance Company

**U.S. Trustee's Office (Region 2 Trial Attorneys)**
None

**Bankruptcy Judges (New York)**
None

**District Court Judges (New York)**
None

**Depositing Banks**
Ally Bank
Bank of America, N.A.
Bank of New York Mellon
Citibank, N.A.
Deutsche Bank Trust Company Americas
JPMorgan Chase Bank, N.A.
M&T Bank
State Street Bank and Trust Company
U.S. Bank National Association
Wachovia Bank, National Association

**Consultants & Professionals**
Barclays Bank PLC
Centerview Partners LLC
Deloitte & Touche
Evercore
Fortress Investment Group, LLC
FTI Consulting, Inc.
Kirkland & Ellis LLP
Kurtzman Carson Consultants LLC
Mayer Brown LLP
Mercer
Nationstar Mortgage, LLC
PricewaterhouseCoopers
Sidley Austin LLP
Skadden, Arps, Slate, Meagher & Flom LLP

**HELOC Investors**
5th 3rd bank
Aurora Loan Services LLC
Bank One, Texas N.A.
Deutsche Bank National Trust Co.
Everbank
JP Morgan Chase
Macquarie Mortgages USA Inc
Suntrust

2

## SCHEDULE 2
### RESIDENTIAL CAPITAL, LLC ET AL

The Bank of New York Mellon
Treasury Bank, N.A.
Us Bank, N.A.
Wachovia Bank Na
Wells Fargo Bank, N.A.

**Servicing Counterparties**

**Government Entities and GSEs**
Federal Home Loan Mortgage Corporation (Freddie Mac)
Federal Housing Administration (FHA)
Federal National Mortgage Association (Fannie Mae)
Government National Mortgage Association (Ginnie Mae)

**Housing and Local Agencies**
California Housing Finance Agency
CitiMortgage, Inc., as administrator for Texas Veterans Land Board
Connecticut Housing Finance Authority
Delaware Housing Authority
Hawaii Housing (Hula Mae)
Housing Opportunities Commission of Montgomery County, Maryland
Mississippi Home Corporation
Oregon Housing and Community Services Department
The Housing and Redevelopment Authority in and for the City of Minneapolis
The Industrial Commission of North Dakota

**Mortgage and Monoline Insurers**
Ambac
The ACE Group
Assured Guaranty Corp.
Cuna Mutual Group Mortgage Insurance Company
FGIC
Federal Insurance Group
Financial Security Assurance Inc
General Electric Mortgage Insurance Corporation
Genworth Mortgage Insurance Corporation
MBIA
Mortgage Guaranty Insurance Corp.
PMI Mortgage Insurance Co.
Radian Asset Assurance Inc.
Radian Guaranty Inc.
Republic Mortgage Insurance Company
Triad Guaranty Insurance Corporation
United Guaranty Residential Insurance Company

**Trustees**
Bank One, National Association
BNY Midwest Trust Company
Chase Bank of Texas, N.A.
Citibank, N.A.

Deutsche Bank National Trust Company
Deutsche Bank Trust Company Americas
HSBC Bank USA, National Association
JPMorgan Chase Bank, N.A.
LaSalle Bank National Association
Security Pacific National Company
The Bank of New York Mellon
U.S. Bank National Association
US National Association
Wells Fargo Bank Minnesota, N.A.
Wells Fargo Bank, National Association
Wilmington Trust Company

**Other Counterparties to Servicing Agreements**
50 BY 50, LLC
ABN AMRO Mortgage Croup, Inc.
Access National Mortgage Corporation
Ace Home Equity Loan Trust, Series 2007-SL3
ACE Securities Corp.
Advantage Bank
Aegis Mortgage Corporation
Aegon USA Realty Advisors
Alliance Bancorp
Alliance Securities Corp.
Ally Bank
Ally Financial Inc.
Ally Investment Management LLC
Amalgamated Bank of New York
American Home Mortgage
American Home Mortgage Acceptance, Inc.
American Home Mortgage Investment Trust 2005-2
American Home Mortgage Investment Trust 2005-4A
American Home Mortgage Investment Trust 2006-2
American Home Mortgage Investment Trust 2007-A
American Home Mortgage Servicing, Inc.
American Home Mortgage Trust 2004-4
American Home Mortgage Trust 2005-1
American Home Mortgage Trust 2005-2
American Home Mortgage Trust 2005-4A
American Residential Equities XXVII, LLC
American Residential Equities, LLC
Ameriquest Mortgage Company
Andover Bank
Asset Management Holding of South Florida, LLC
Assured Guaranty Municipal Corp
Aurora Loan Services Inc.
Aurora Loan Services LLC
Banc of America Funding 2005-3 Trust
Banc of America Funding 2005-8 Trust
Banc of America Funding 2006-1 Trust
Banc of America Funding 2006-4 Trust
Banc of America Funding Corporation
Banc of America Mortgage Capital Corporation

3

## SCHEDULE 2
### RESIDENTIAL CAPITAL, LLC ET AL

Banco Popular North America
Bank of America, National Association
Bank of Hawaii
Bank One, Texas, N.A.
Bank Rhode Island
Bank United, FSB
Bankers Trust Company
Bayview Acquisitions, LLC
Bayview Financial Asset Trust
Bayview Financial Property Trust
Bayview Financial Securities Company, LLC
Bayview Financial Trading Group, L.P.
Bayview Financial, L.P.
Bear Stearns Asset Backed Securities I, LLC
Bear Stearns Mortgage Capital Corporation
Bear Stearns Second Lien Trust 2007-1
Bear Stearns Second Lien Trust 2007-SV1
Broadway Federal Bank, FSB
Caliber Funding, LLC
California Banking Association
California Federal Bank, FSB
California Public Employees' Retirement System
Canada Mortgage Acceptance Corporation
Capital Crossing Bank
Capstead Mortgage Corporation
CDC Mortgage Capital Inc. (Natixis)
Cenlar FSB
CenterState Bank of Florida, N.A.
Century Bank, FSB
CFX Bank
Charter One Bank, FSB
Charter One Bank, N.A.
Chase Manhattan Mortgage Corporation
Citi Financial Mortgage Co., Inc
Citibank (West), FSB
Citigroup Global Markets Realty Corp.
Citigroup Mortgage Loan Trust Inc.
CitiMortgage, Inc.
Citizens Bank of Connecticut
Citizens Bank of Massachusetts
Citizens Bank of New Hampshire
Citizens Bank of Pennsylvania
Citizens Bank, N.A.
Clayton Fixed Income Services Inc.
Comerica Bank
Copperfield
Countrywide Bank, N.A.
Countrywide Home Loans Servicing, LP
Countrywide Home Loans, Inc.
Credit Suisse First Boston Mortgage Securities Corp.
CSX

CTX Mortgage Company, LLC
DB Structured Products, Inc.
Deutsche Alt-A Securities, Inc.
Deutsche Bank AG New York Branch
Deutsche Mortgage Securities, Inc.
DLJ Mortgage Acceptance Corp.
DLJ Mortgage Capital, Inc.
Dollar Bank, FSB
Drawbridge Consumer Funding Ltd
E*Trade Bank
E*Trade Mortgage
E*Trade Wholesale Lending Corp.
EAB Mortgage Company, Inc.
EMC Mortgage Corporation
Encore Bank and National Association
EverBank
Fairbanks Capital Corp.
Federal Home Loan Bank of Atlanta
Federal Trust Bank, FSB
Fidelity Federal Bank
Fidelity Savings and Loan
Fifth Third Bank
Financial Asset Securities Corp.
First Bank Incorporated
First Bank, Inc.
First Cap Holdings, Inc.
First Citizens Bank and Trust Company
First Citizens Mortgage Company
First Community Bank N.A.
First Horizon Home Loan Corporation
First Indiana Bank
First Internet Bank of Indiana
First National Bank and Trust Company
First National Bank of Arizona
First Nationwide Mortgage Corporation
First NLC
First Tennessee Bank National Association
First Union National Bank
First-Citizens Bank & Trust Company
Firstrust Bank
Fleet National Bank
FNBA
Fortress Credit Corp.
FPA Corporation
Franklin Bank, SSB
Franklin Credit
Franklin Credit Management Corporation
Gateway Credit Union
Gateway Funding Diversified Mortgage Services, LP
GE Capital Consumer Card Co.
GE Mortgage Services, LLC

4

## SCHEDULE 2
### RESIDENTIAL CAPITAL, LLC ET AL

Goldman Sachs Mortgage Company
Gonzalo Residential Asset Trust
Green Tree Servicing LLC
GreenPoint Mortgage Funding Trust 2005-HE4
GreenPoint Mortgage Funding Trust 2006-HE1
GreenPoint Mortgage Funding, Inc.
Greenwich Capital Acceptance, Inc.
Greenwich Capital Financial Products, Inc.
Greenwich Universal Portfolio
GS Mortgage Securities Corp.
Hanover Capital Mortgage Holdings, Inc.
Home Equity Loan Trust 2005-HS2
Home Equity Loan Trust 2006-HSA2
Home Equity Loan Trust 2006-HSA3
Home Equity Loan Trust 2006-HSA5
Home Equity Loan Trust 2007-HSA1
Home Equity Loan Trust 2007-HSA3
HomeBanc Mortgage
HomEq Servicing Corporation
HSI Asset Securitization Corporation
Hudson City Savings Bank
IMPAC CMB Trust Series 2005-6
IMPAC Funding Companies
IMPAC Funding Corporation
IMPAC Mortgage Holdings, Inc.
IMPAC Secured Assets Corp.
Imperial Credit Industries, Inc.
Independent Bank East Michigan
IndyMac Bank, FSB (now OneWest Bank, FSB)
IndyMac MBS, Inc.
IndyMac Mortgage Holdings, Inc.
ING Bank, FSB
Investment Capital Group
Irwin Union Bank and Trust Company
Ixis Real Estate Capital Inc
Jackson Federal Bank
Kidder Peabody Mortgage Capital Corporation
Lacera
Lehman Brothers Bank, FSB
Lehman Brothers Holdings Inc.
Lehman Capital, a division of Lehman Brothers Holdings Inc.
Liberty Savings Bank, FSB
Litton Loan Servicing, LP
Los Angeles County Employees Retirement Association
Luminent Mortgage Capital, Inc.
Macquarie Mortgage Funding Trust 2007-1
Macquarie Mortgages USA, Inc.
MAIA Mortgage Finance Statutory Trust
Marine Bank
Market Street Mortgage Corporation

Massachusetts Mutual Life Insurance Co.
Matrix Capital Bank
MB Financial Bank N.A.
Mellon Bank
Mellon/McMahon Real Estate Advisors Inc.
Merck Sharp & Dohme Federal Credit Union
Mercury Mortgage Finance Statutory Trust
Meridian Mortgage Corporation
Merrill Lynch Bank & Co.
Merrill Lynch Hunton Paige
Merrill Lynch Mortgage Capital Inc.
Merrill Lynch Mortgage Holdings, Inc.
Merrill Lynch Mortgage Investors, Inc.
Merrill Lynch Mortgage Lending, Inc.
Metlife Bank, N.A.
Metrocities Mortgage Corp., LLC
Metropolitan Life Insurance Company
Mid America Bank, FSB
MidFirst Bank
Morgan Stanley Capital I Inc.
Morgan Stanley Mortgage Capital Inc.
Morgan Stanley Mortgage Loan Trust 2005-3AR
Mortgage Asset Securitization Transactions, Inc.
Mortgage Interest Networking Trust II
Mortgage Investors Corporation
MortgageIT Holdings Inc.
MortgageIT Securities Corp.
MortgageIT Trust 2005-4
MortgageIT, Inc
Mutual Savings Bank
National Bank of Commerce
NETBANK
New Century Mortgage Securities, Inc.
New York Life Insurance and Annuity Corporation
New York Life Insurance Company
Nomura Credit & Capital, Inc.
Nomura Home Equity Loan, Inc.
Ocwen Loan Servicing, LLC
Ohio Savings Bank
Opteum Financial Services, LLC
Option One Mortgage Corporation
Paine Webber Real Estate Securities Inc.
Paul Financial, LLC
PHH Mortgage
PNC Bank, N.A.
PNC Mortgage Securities Corp.
Pomona First Federal Bank and Trust
Principal Bank
Private Capital Group
Quaker City Bank
Quicken Loans Inc.

5

## SCHEDULE 2
### RESIDENTIAL CAPITAL, LLC ET AL

RBS Citizens, National Association
Real Time Resolutions, Inc.
Redwood Trust, Inc.
Riggs Bank N.A.
Roosevelt Management Company, LLC
Ryland Acceptance Corporation Four
Salomon Brothers Realty Corp.
Sebring Capital
Security Pacific National Bank
Select Portfolio Servicing Inc.
Sequoia Residential Funding, Inc.
Shearson Lehman Government Securities, Inc.
Southwest Savings and Loan Association
Sovereign Bank, FSB
Specialized Loan Servicing LLC
Stanwich Mortgage Acquisition Company, LLC
Sterling Savings Bank
Stonebridge Bank
Structured Asset Mortgage Investments II Inc.
Structured Asset Mortgage Investments, Inc.
Structured Asset Securities Corporation
Suntrust Asset Funding, LLC
Superior Bank
Susquehanna Bank
Syncora Guarantee Inc.
Taylor, Bean Whitaker
TCF National Bank
TeleBank
Terwin Mortgage Trust 2006-6
The Canada Trust Company
The Chase Manhattan Bank
The First Boston Corporation
The Frost National Bank
The Travelers Indemnity Company
Treasury Bank, N.A.
Tri Counties Bank
UBS Real Estate Securities Inc.
UBS Warburg Real Estate Securities Inc.
UBS Warburg, LLC
United Savings Association of Texas, FSB
Unity Bank
Universal Master Servicing, LLC
US Bank Home Mortgage
USAA Federal Savings Bank
Valley Independent Bank
Wachovia Bank, National Association
Wachovia Mortgage Corporation
Walter Mortgage Company
Washington Mutual Bank
Washington Mutual Mortgage Securities Corp.
Webster Bank

WestStar Mortgage, Inc.
Wilshire Credit Corporation
WMCC Clayton / Washington Mutual Bank
WMD Capital Markets, LLC

**Utilities**
Abovenet Communications Inc.
AT&T
AT&T Mobility
Center Point Energy
CenturyLink
Cisco Systems Capital Corporation
Comcast
Dish Network
Genesys Conferencing
IEX Corporation
Intercall
Intervoice Inc.
Level 3 Communications LLC
MediaCom
MidAmerican Energy
Sprint
Time Warner Cable
Time Warner Telecom
Verizon
Verizon Business
Verizon California
Verizon Wireless
Waste Management
Xcel Energy

**Consolidated Top 50 Creditors**
Aegis Usa Inc.
Alan Gardner
Allstate Insurance
Ambac Assurance Corp
Assured Guaranty Corp.
BNYMellon
Boilermaker Blacksmith National Pension Trust
Brian Kessler, et al
Cambridge Place Investment Management Inc.
Deutsche Bank AG, New York
Deutsche Bank Trust Company Americas
Don E. Diane M. Patterson
Donna Moore
Federal Home Loan Bank of Boston
Federal Home Loan Bank of Chicago
Federal Home Loan Bank of Indianapolis
Federal Housing Finance Agency
Financial Guaranty Insurance Co.
Huntington Bancshares Inc.
Indecomm Global Services

6

## SCHEDULE 2
### RESIDENTIAL CAPITAL, LLC ET AL

Iowa Public Employees Retirement System
Lehman Brothers Holdings, Inc.
Loan Value Group
Massachusetts Mutual Life Insurance Company
MBIA, Inc.
National Credit Union Administration Board
Orange County Employees Retirement System
Police and Fire Retirement System of the City of
Detroit
Sealink Funding Limited
Stichting Pensioenfonds ABP
The Charles Schwab Corporation
The Union Central Life Insurance Company
Thrivent Financial for Lutherans
US Bank
Wells Fargo & Company
Wells Fargo Bank N.A

**Members of the Creditors' Committee**
Allstate Life Insurance Company
AIG Asset Management (U.S.), LLC
The Bank of New York Mellon Trust Company,
N.A.
Deutsche Bank Trust Company Americas
Financial Guaranty Insurance Company
MBIA Insurance Corporation
U.S. Bank National Association
Wilmington Trust, N.A.

**Parties connected to Creditors' Committee R.
2004 motion**
AlixPartners
Cerberus Capital Management, L.P.
Cerberus FIM Investors LLC
Cerberus FIM, LLC
FIM Holdings LLC
General Motors Company
Gibbs & Bruns, LLP
GMAC Bank
GMAC Commercial Finance, LLC
GMAC LLC
GMAC Mortgage Group, LLC
Houlihan Lokey
IB Finance Holding Company, LLC
Kelly Drye & Warren LLP
Kramer Levin et al
Moelis & Company
Morrison & Foerster LLP
Morrison Cohen LLP
National Motors Bank FSB
Ropes & Gray LLP
White & Case

7

**SCHEDULE 3**

**KPMG LLP**
**In re: Residential Capital, LLC, et al.**
**PAYMENT HISTORY FOR THE 90 DAYS PRIOR TO FILING BANKRUPTCY**

| Invoice Number | Invoice Date | Amount Billed | Date Invoice Paid | Amount Paid |
|---|---|---|---|---|
| 44243965 | 12/15/2011 | $70,000 | 3/9/2012 | $70,000 |
| 44251536 | 12/21/2011 | $130,000 | 3/9/2012 | $130,000 |
| 44288937 | 2/8/2012 | $75,000 | 3/9/2012 | $75,000 |
| 44302663 | 2/22/2012 | $45,502 | 3/12/2012 | $45,502 |
| 44322329 | 3/12/2012 | $75,000 | 3/19/2012 | $75,000 |
| 44305565 | 2/24/2012 | $62,250 | 3/23/2012 | $62,250 |
| 44361566 | 4/12/2012 | $86,000 | 4/20/2012 | $86,000 |
| 44361547 | 4/12/2012 | $75,000 | 4/20/2012 | $75,000 |
| 44360848 | 4/12/2012 | $62,250 | 5/4/2012 | $62,250 |
| 44375379 | 4/24/2012 | $18,259 | 5/4/2012 | $18,259 |
| TOTAL | | | | $699,261 |

Exhibit 3

## MASTER SERVICES AGREEMENT
### CW1947760

This Master Services Agreement dated November 15, 2010 (the "Effective Date"), is between **KPMG LLP**, a Delaware registered limited liability partnership ("Supplier") with offices at 345 Park Avenue, New York, New York, 10154, which is the United States member firm of KPMG International Cooperative ("KPMG International"), a Swiss entity and **Ally Financial Inc.**, a Delaware corporation ("Ally"), with offices located at 1100 Virginia Drive, Fort Washington, Pennsylvania, 19034.

### RECITALS

**WHEREAS**, Ally wishes to engage Supplier to provide certain Services, as defined below, upon the terms and conditions specified herein, for the benefit of Ally and its direct and indirect subsidiaries.

**WHEREAS**, it is the intention of the Parties to establish this Agreement to govern the respective rights, duties and obligations of the Parties.

**THEREFORE**, in consideration of the mutual covenants, agreements, warranties, and representations made and contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows.

Services will be performed in accordance with the attached terms and conditions, Statement(s) of Work and all other documentation referred to herein and attached hereto.

**This Agreement is for the provision of consulting services only, including tax and advisory and shall not be used for (i) the provision of expert testimony on behalf of Ally or (ii) any service that would require Supplier to maintain independence from Ally in accordance with then current applicable Law, rule or regulation of any governmental entity or professional organization.**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date.

| Ally Financial Inc. | KPMG LLP |
|---|---|
| By: | By: |
| Printed Name: Calvin Rose | Printed Name: Michael J. Conover |
| Title: Senior Strategic Sourcing Manager | Title Principal |

*Digitally signed by QZ75LN
DN: cn=QZ75LN, sn=Rose, givenName=Calvin, c=US, ou=GMAC Corporate Services, email=Calvin.Rose@gjmacfs.com
Date: 2010.12.16 11:22:06 -05'00'*

Address for legal notice:

Ally Financial Inc.
1100 Virginia Drive
Fort Washington, PA 19034
ATTN:   Chief Procurement Officer / MC: 190-FTW-M96
CC:     Legal Staff / MC: 190-FTW-L95

KPMG LLP
345 Park Avenue
New York, New York 10154
ATTN: General Counsel

1 of 19

*Version: MSA 04-06-10*

## TERMS AND CONDITIONS

## FOR THE MASTER SERVICES AGREEMENT

1. **Definitions.** The following definitions apply to this Agreement:

    1.1. **"Affiliate(s)"** are any company in which Ally owns (directly or indirectly) at least fifty (50%) of the voting interest, and Ally Bank.

    1.2. **"Agreement"** is this Master Services Agreement, and any and all Exhibits and Statements of Work attached hereto and any documents that are incorporated herein by reference.

    1.3. **"Ally Agents"** means Ally's employees, consultants, subcontractors, Affiliates, agents and representatives.

    1.4. **"Ally Data"** is all data and information that Ally submits to Supplier, and includes Ally Confidential Information and Consumer Information.

    1.5. **"Ally Systems"** means any Ally computers, equipment, systems, applications, or the Ally computer network.

    1.6. **"Charges"** are the charges, prices and fees set forth in the applicable Statement of Work.

    1.7. **"Claim"** is any civil, criminal, administrative, or investigative action or proceeding.

    1.8. **"Confidential Information"** means any information of a confidential or proprietary nature received by a Recipient, directly or indirectly, from the Discloser, or acquired or developed pursuant to the provision of the Services, including, but not limited to, business affairs, data, designs, manuals, training materials and documentation, formulas, ideas, inventions, knowledge of financial, insurance or mortgage processes, mask-works, methods, prices, financial and accounting data, products and product specifications, Software, systems, technical information, but excluding Consumer Information (all of the foregoing collectively referred to as "Confidential Information").

    1.9. **"Consumer Information"** means customer information as set forth in 16 C.F.R. §314.2(b) (2003) as well as any information that identifies a customer or consumer (as such terms are defined by the Gramm-Leach-Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338), as amended from time to time) and information from which a customer's or consumer's identity can be ascertained, either from the information itself or by combining the information with information from other sources. Consumer Information also includes any information Ally (including any Affiliate) may directly or indirectly disclose to Supplier or to which Supplier may collect or otherwise have access due to Supplier's relationship with Ally or an Affiliate that relates to an individual. This includes, but is not limited to, financial information; medical or health related information; credit history; income; financial benefits; application, loan or claim information; names or lists of individuals derived from nonpublic personally identifiable information or otherwise derived from Ally or an Affiliate; and the identification of an individual as a Ally customer or as an individual Ally claimant. Consumer Information will be protected in accordance with this Agreement.

    1.10. **"Developed Software"** means any and all Technology that Supplier (or Supplier's Agents) solely or with Ally, may develop in the process of performing Services pursuant to the Agreement or a Statement of Work and which is designated as Work Product under a Statement of Work, not including any and all Ally Technology, Ally Confidential Information, and Supplier Technology.

    1.11. **"Direct Damages Cap"** means direct damages related to a Party's acts and omissions under the Agreement which is an amount equal to three (3) times the Charges paid or owing under the applicable Statement of Work for the twelve (12) month period prior to the act or omission giving rise to a Claim by a Party.

    1.12. **"Discloser"** is the Party disclosing Confidential Information.

    1.13. **"Force Majeure Event"** is any failure or delay by Ally or Supplier in performing its obligations under the Agreement provided that such failure or delay could not have been prevented by reasonable precautions and cannot reasonably be avoided by the non-performing Party through the use of alternate sources, work-around plans or other means including but not limited to Supplier's obligations to meet its business continuity and disaster recovery plans, to the extent the failure or delay is caused by fire, flood, earthquake, elements of nature or acts of God, public utility or electrical failure, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, strikes, lockouts, or labor difficulties, court order, third party nonperformance (except for non-performance by a Party's employees, labor unions, subcontractors, suppliers, consultants, agents and/or representatives) or any other similar cause beyond the reasonable control of such Party and without the fault or negligence of the Party.

*Version: MSA 04-06-10*

1.14. **"Illicit Code"** is any program containing malicious or detrimental hidden files, any virus, malware or any other malicious computer program, any hardware-limiting, Software-limiting or Services-limiting function not part of standard configuration (including any key, node lock, time-out or other similar functions) or containing any automatically replicating, transmitting or activating computer program not part of normal function of the program.

1.15. **"Indirect Damages"** means any indirect, incidental, special, consequential, punitive or exemplary damages or amounts for loss of income, profits or savings relating to a Party's performance or failure to perform under the Agreement.

1.16. **"Intellectual Property Rights"** are all patents, patent applications, inventions, designs, mask works, processes, methodologies, copyrights and copyrightable works, trade secrets including Confidential Information, data, designs, manuals, training materials and documentations, formulas, knowledge of manufacturing processes, methods, prices, financial and accounting data, products and product specifications and all other intellectual property rights as these terms are understood under United States Law, including any modifications, adaptations, adjustments, enhancements, updates, improvements, alterations and error corrections thereto and other derivative works thereof.

1.17. **"Key Employees(s)"** are the employees of Supplier and Supplier Agents who Ally and Supplier designate under a Statement of Work as fundamental to the Services under such Statement of Work.

1.18. **"Law"** is any directive, legislative enactment, order, ordinance, regulation, rule or other binding restriction of or by any governmental body.

1.19. **"Parties"** are both Ally and Supplier, and Ally and Supplier may be individually referred to as a "Party".

1.20. **"Recipient"** is the Party receiving Confidential Information.

1.21. **"Services"** are the advisory and Tax services provided by Supplier to Ally as more fully set forth in the applicable Statement of Work.

1.22. **"Software"** is the source code and object code versions of any programs, operating system software, computer software languages, utilities and other computer programs (i.e., any set of statements or instructions to be used in a computer to obtain a result), and related documentation and supporting materials, in any form or media, used to provide the Services, including the tangible media upon which the programs, operating system software, computer software languages, utilities and other computer programs, and documentation and supporting materials are recorded or printed, together with all corrections, improvements, updates and releases.

1.23. **"Statement(s) of Work"** mean the description of Services for a particular project, associated Work Product, Supplier's compensation and other specifications, schedules, milestones, payments, or any other terms and conditions mutually agreed upon by the Parties. Statement(s) of Work issued hereunder will be executed by the Parties and incorporated into and subject to all of the terms and conditions of this Agreement.

1.24. **"Supplier Agents"** means Supplier's employees, consultants, subcontractors, agents and representatives that are performing on behalf of Supplier under this Agreement, including Supplier Parties.

1.24a. **"Supplier Parties"** means Supplier, any member firm of KPMG International Cooperative, and their respective partners, principals, employees, agents or affiliates.

1.25. **"Supplier Property"** means all ideas, concepts, know-how, techniques, tools, models, methodologies and processes of a general nature, that are discovered, invented, created, conceived, made or reduced to practice by Supplier (a) prior to performing Services; or (b) during, on or after performance of the Services, provided that (i) such Supplier Property is not Work Product under this Agreement and was not developed specifically for Ally; and (ii) such Supplier Property is not based on or derived from Ally Confidential Information.

1.26. **"Taxes"** are any value-added, country or local sales, use or similar taxes assessed by any taxing authority, and any telecommunications excise taxes, except taxes on net income of a Party.

1.27. **"Technology"** means algorithms, concepts, data, designs, developments, documentation, discoveries, HTML, XML and other codes, interfaces, inventions, methods, multimedia files (including audio, graphic, photographic, and video files), object code, procedures, programs, source code, text, documentation, web pages and any other item generally recognized as technology in Supplier's or Ally's industry.

1.28. **"Term"** of this Agreement will commence on the Effective Date as stated above and will remain in force through the Seventh (7th) anniversary of the Effective Date, unless terminated in accordance with provisions of the Agreement.

*Version: MSA 04-06-10*

1.29. **"Termination Assistance Period"** is defined as the period of up to twelve (12) months as set forth in the applicable Statement of Work, for the orderly transition of the Services to Ally or another supplier of Ally, beginning upon the expiration or termination of the Services under such Statement of Work.

1.30. **"Termination Assistance Plan"** is the plan set forth in a Statement of Work that Supplier will use to deliver Termination Assistance Services during the Termination Assistance Period.

1.31. **"Termination Assistance Services"** are any previous Services which were provided by Supplier and any new services that Ally may require and that Supplier agrees to provide to transfer the affected Services to Ally or an Affiliate.

1.32. **"Third Party Service Provider(s)"** means those third parties that require access to or use of the Services and/or Software in order to provide services and/or products to Ally and Affiliates.

1.33. **"Work Product"** is all documents, designs, Developed Software, copyrightable material and other tangible materials authored or prepared by Supplier for Ally and the Intellectual Property Rights appurtenant thereto as the work product required by a Statement of Work, except for any Supplier Property included therein.

2. **Services.** During the Term, Ally or Supplier may identify Services that Supplier can provide to either Ally or its Affiliates domiciled in the United States for its benefit. These Services may include provisions of Services and/or delivery of Work Product, which will be described, along with any terms and conditions that are additional to the terms and conditions of this Agreement, in a Statement of Work. The terms and conditions of this Agreement will be applicable to each Statement of Work. Unless expressly set forth in a Statement of Work with respect to Tax Services, the Services do not include representing Ally in the event of a challenge by the United States Internal Revenue Service (the "IRS") or other Tax or revenue authorities. It is understood and agreed that Supplier's services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Ally. Supplier will not perform management functions or make management decisions for Ally. Subsequent to the completion of the Services under a Statement of Work, Supplier will not update its advice, recommendations or Work Product for changes or modification to the Law and regulations, or to the judicial and administrative interpretations thereof, or for subsequent events or transactions, unless Ally separately engages Supplier to do so in writing after such changes or modifications, interpretations, events or transactions.

2.1. **Non-Exclusivity:** Despite anything stated to the contrary in the Agreement, Supplier agrees that (a) this is not a requirements contract and Ally will not be required to obtain its requirements for any of the Services from Supplier; (b) Supplier is not the exclusive provider to Ally for Services and Ally may at any time, itself, and/or through a third party(ies), provide and/or obtain any services; and (c) Ally is not obligated to obtain Services from Supplier for Ally or any Affiliates. Additionally, Supplier is not obligated to provide any Services under this Agreement (other than as set forth in any Statements of Work issued hereunder) and may provide the same or similar services to others without restriction.

2.2. **Use by and for Affiliates:** Affiliates domiciled in the United States may contract directly with Supplier for Services by executing a Statement of Work subject to the terms and conditions of this Agreement, except that (i) all references to "Ally" in the Agreement shall mean the Affiliate which executes the Statement of Work; and (ii) in all events, the sole contracting parties for all purposes related to the Statement of Work shall be Supplier and the Affiliate which executes the Statement of Work and Supplier's obligations under such Statement of Work run solely to the Affiliate which executes the Statement of Work. In the event of a conflict between the terms and conditions of the Agreement and the Statement of Work, the terms and conditions of the Statement of Work shall govern, solely to the extent of the conflict.

2.3. **Access by Third Party Service Providers:** Ally acknowledges and agrees that any advice, recommendations, information or Work Product provided to Ally by Supplier in connection with the Services is intended for use by Ally only and may not be relied upon by any third party. Ally agrees that if it makes such advice, recommendations, information or Work Product available to any third party other than as expressly permitted by the applicable Statement of Work, the provisions of <u>Section 13.3</u> shall apply unless Ally provides the written notice to the third party in substantially the form of <u>Exhibit A</u> hereto (the "Notice"), which Notice shall be acknowledged in writing by such third party and returned to Ally. Upon request, Ally shall provide Supplier with a copy of the foregoing Notice and acknowledgement and any notice and acknowledgement sent to Ally by such third party as contemplated by the Notice. Notwithstanding the foregoing, (i) in the event of a disclosure made by Ally that is required by law, that is made to a regulatory authority having jurisdiction over Ally or that is made pursuant to <u>Section 16.3(e)</u> below, no acknowledgement of the Notice shall be required and (ii) no Notice or acknowledgement shall be required with respect to

4 of 19

disclosures expressly authorized by the terms of the applicable Statement of Work.

3. **Payment.**

    3.1. **Charges:** Charges and discounts, if any, for Services will be determined as set forth in each Statement of Work. Any increase in a Charge will (i) not occur unless a minimum of twelve (12) months has elapsed since the effective date of the previously established Charge, and (ii) not exceed the lower of the increase in the All Items Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average, 1982-84 = 100 CPI or five percent (5%) of such previously established Charge.

    3.2. **Invoices:** Invoices will be paid for Services upon the second (2nd) day of the second (2nd) month after the submission of a correct invoice. Discounts for prompt payments, if any, will be reflected in the Statement of Work. Any payment by Ally is without prejudice to its right to contest the accuracy of any Charges.

    3.3. **Ariba Invoicing:**

        (a) **Purchase Orders:**

            (i) Throughout the Term of this Agreement, Supplier agrees to utilize the technology of Ally's choice (currently Ariba Buyer) via the Ariba Services Network ("ASN") to facilitate payment and invoicing issues. Supplier will adopt and adhere to the technical specifications, standards, formats, and definitions of the ASN. Supplier shall be responsible for all implementation costs associated with preparing to transact via the ASN and any membership charges Ariba may charge Supplier. Supplier should choose the most cost effective method for connecting to the ASN given Supplier's environment while at the same time providing the Services detailed in this Agreement with regards to the ASN. Any additional costs associated with Supplier's participation and use of the ASN during the Term of this Agreement will be allocated in good faith following a mutually agreed upon method by all Parties involved. Supplier understands that the ASN platform will be used for requisitioning, ordering, receiving, and invoice processing.

            (ii) Supplier must accept purchase orders via the ASN as well as via facsimile, telephone, or written purchase orders. For purchase orders received by the Supplier outside of the ASN, Supplier must confirm in writing to Ally that the purchase order was received and in a readable format so as to allow process of said purchase order. Supplier will be responsible for ensuring that all purchase orders originated outside of the ASN are entered into the ASN within three (3) business days.

            (iii) At any time during the Term of this Agreement, Ally may, in its discretion, elect to utilize the ASN for settlement/payment of its supplier invoices. Upon receipt of written notice of such election, Supplier agrees to promptly undertake reasonable efforts to be able to accept such payments.

        (b) **Invoices:** Invoices shall be submitted via the ASN and contain the following information: purchase order number, item number(s), serial number(s) of items purchased, description of items, quantities, unit prices, and amount(s).

    3.4. **Expenses:** Except for expenses for travel or as otherwise set forth in a Statement of Work, all expenses relating to the Services are included in the Charges and will not be reimbursed by Ally unless otherwise agreed to by Ally in writing. Supplier will comply with Ally's travel guidelines. To the extent that Ally approves reimbursement to Supplier of any out-of-pocket expenditures, the actual costs at the time incurred will be passed through to Ally with no markup. Supplier shall bill Ally at agreed intervals as set forth in the applicable Statement of Work. Where Supplier is reimbursed for expenses, it is Supplier's policy to bill clients the amount incurred at the time the good or service is purchased. If Supplier subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, Supplier does not credit such payment to Ally. Instead, Supplier applies such payments to reduce its overhead costs, which costs are taken into account in determining Supplier's standard billing rates and certain transaction charges that may be charged to clients.

    3.5. **Charges Disputes:** If Ally disputes in good faith all or any portion of an invoice submitted by Supplier, Ally may withhold payment of the disputed amount; provided, however, that: (i) Ally continues to pay any undisputed amounts consistent with the Agreement; and (ii) Supplier will continue to provide all of the Services and otherwise perform its obligations under the Agreement. Charges that are in dispute will not be considered a basis for default or termination under the Agreement.

    3.6. **Taxes:** Except for those Taxes noted herein, no extra charges of any kind, including, without limitation, transportation charges, will be allowed unless agreed to in writing by Ally prior to the performance of the

*Version: MSA 04-06-10*

Services. Ally will pay all sales, excise, use, value added or other applicable Taxes, tariffs or duties due on the transactions hereunder or provide Supplier customary proof that the transactions are exempt from sales Taxes. Invoices will separately identify any Tax and will include either Supplier's sales Tax or use Tax permit number. Supplier will pay any other Taxes and charges, including, without limitation, Taxes on net income of Supplier such as a franchise, gross receipts, capital, or a similar Tax that is based or assessed on net profit or loss, assessments or fines arising from Supplier's performance of the Services under the Agreement, or penalties or fees imposed due to failure to file or pay collected sales or use Taxes, failure to verify taxability of a purchase, or failure to calculate or remit Taxes in a timely manner.

4.  **Term and Termination.**

    4.1.  **Term:** The Term of this Agreement will expire on the seventh (7th) anniversary of the Effective Date. In the event Ally desires to renew the Agreement beyond the Term, Ally will provide written notice to Supplier of its desire to renew the Agreement at least thirty (30) days prior to the expiration of the Term of the Agreement; provided, however, that such extension shall not exceed an additional three (3) year term. Supplier may then agree to such renewal by return written notice to Ally within ten (10) days of its receipt of Ally's renewal notice. If a Statement of Work has a term that exceeds the Term of this Agreement, then the Agreement shall remain in effect solely with respect to such Statement of Work until the Statement of Work is completed or is otherwise independently terminated at which time the Agreement shall terminate.

    4.2.  **Termination for Convenience:** At any time that there is no uncompleted Statement of Work outstanding, either Ally or Supplier may terminate the Agreement without cause, by providing at least thirty (30) days written notice of such termination to the other Party. In addition, Ally may terminate any Statement of Work without cause, by providing at least thirty (30) days written notice of such termination to Supplier. Supplier also may resign from performing all or any portion of the Services and terminate this Agreement and/or any Statement of Work immediately upon written notice in the event that circumstances arise that would make continuation of all or any portion of the Services by Supplier in conflict with any independence or other professional regulations, standards or guidelines or any applicable law, rule or regulation to which Supplier conforms or complies. Upon such termination by Ally of a Statement of Work, Supplier will recover, as its sole remedy, (i) payment for Services completed and not previously paid; and (ii) any incurred non-billed costs previously specified in any Statement of Work (which has not expired or terminated on the termination date for convenience) as being agreed to be reimbursed by Ally in the event of such termination for convenience. Supplier hereby waives and forfeits all other Claims for payment including without limitation, anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

    4.3.  **Termination for Default:** (a) Either Party may terminate this Agreement for cause upon a material default by the other Party (including any default for which specific remedies are provided herein), which default remains uncured thirty (30) days after written notice thereof is given to the defaulting Party. (b) If either Party becomes or is declared insolvent or bankrupt, is the subject of any proceedings relating to its liquidation or insolvency or for the appointment of a receiver for it, makes an assignment for the benefit of all or substantially all of its creditors, or enters into an agreement for the composition, extension, or readjustment of all or substantially all of its obligations, then the other Party may, by giving written notice thereof to such Party, terminate this Agreement as of a date specified in such notice of termination. (c) If Supplier or its employees appear on or are members of any organization that appears on any governmental watch list, including, but not limited to, the Control List prepared by the Office of Foreign Assets Control of the Department of the Treasury, then Ally may take all measures authorized under applicable Law and may, by giving written notice thereof to Supplier, terminate this Agreement upon the date specified in the notice, which date may be the date of the notice. Notwithstanding the foregoing, Supplier shall have the right to cure any violation of this Section 4.3.(c) by terminating its relationship with the employee at issue within five (5) business days of Supplier discovering such employee is included on the list. Ally shall not have the right to terminate this Agreement for default pursuant to this Section 4.3.(c) during Supplier's cure period.

    4.4.  **Termination Assistance:** In connection with the termination or expiration of a Statement of Work for any reason, and notwithstanding any dispute between the Parties, Supplier will provide to Ally Termination Assistance Services for the Termination Assistance Period or as otherwise agreed upon between Ally and Supplier as follows: (a) Development of Termination Assistance Plan. If requested by Ally, at Supplier's expense, Supplier will assist Ally and its designated Third Party Service Provider in developing a Termination Assistance Plan; (b) Comparable Prices. Supplier will provide the Termination Assistance Services during the Termination Assistance Period, including prices no worse to Ally than those for comparable Services prior to termination; and (c) Post-Termination Assistance Period. For up to three (3) months after the Termination Assistance Period, Supplier will answer all reasonable and pertinent verbal or written questions from Ally

regarding the Services on an "as needed" basis as agreed to by Ally and Supplier, and deliver to Ally any remaining Ally-owned reports and documentation still in Supplier's possession subject to Supplier's right to retain copies of such reports and documentation.

5. **Future Acquisitions.** If during the Term of the Agreement, Ally acquires control of an entity ("Acquired Entity") under an existing contract with Supplier covering or relating to the subject matter of the Agreement, Ally, at its option, may (a) keep the Acquired Entity's existing contract in effect until the date of termination of the existing contract, after which, such Acquired Entity may receive the benefits of the Agreement to which it may be entitled by the terms hereof; or (b) immediately cancel such existing contract after which, such Acquired Entity may receive the benefits of the Agreement to which it may be entitled by the terms hereof.

6. **Representations and Warranties.**

   6.1. Supplier and Ally each represent and warrant to the other that the execution, delivery and performance of this Agreement by such Party (a) has been duly authorized by all necessary corporate action; (b) does not conflict with, or result in a material breach of, the articles of incorporation or by-laws of such Party, and any material agreement by which such Party is bound, or any Law, regulation, rule, judgment or decree of any governmental instrumentality or court having jurisdiction over such Party; and (c) constitutes a valid and legally binding obligation of such Party enforceable in accordance with its terms.

   6.2. Supplier represents and warrants that: (a) the Services will be performed in a diligent and workmanlike manner in accordance with good industry practices, by individuals of suitable training and skill; (b) the Services and all Work Product provided under this Agreement will comply with and function in accordance with the requirements, if any, set forth in this Agreement and the Statement of Work; (c) its performance of Services and Ally's use of the Work Product does not and will not violate any Intellectual Property Rights of any third party; (d) its actions and performance of the Services are and will be in full compliance with all applicable Law; (e) no Illicit Code has been coded or introduced into the Software, hardware, tools, equipment or any similar item; and (f) it has, and will maintain throughout the Term of this Agreement, all licenses, franchises, permits, authorizations and approvals materially necessary for the lawful conduct of its business.

   6.3. EXCEPT AS STATED ABOVE, NEITHER Ally NOR SUPPLIER MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES REGARDING THE SERVICES, THE SOFTWARE OR WORK PRODUCT AND EACH EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE FOR THE SERVICES.

7. **Security and Use of Ally Systems.** When Supplier is performing Services on Ally's premises, Supplier will comply with Ally's security, safety, and fire protection procedures of which it has been advised. If Supplier is given a key, code, combination or other access device to Ally's premises, Supplier will: (a) safeguard it with the same degree of care as Supplier safeguards keys to its own premises, but in no event with less than reasonable care; (b) account for all keys and access devices whenever requested to do so by Ally; and (c) return all such keys and access devices immediately upon request by Ally. Ally will have the right to inspect the contents of all containers or packages being brought into or removed from Ally's locations. While at any Ally location or if Supplier or Supplier Agents are given access to any Ally Systems, Supplier and Supplier's Agents will follow all reasonable directions and instructions given by Ally and use of Ally Systems will be only to the extent necessary to perform the Services hereunder. For Supplier Agents that have access to Ally Systems, such Supplier Agents shall read and confirm his/her compliance with Ally's Acceptable Use Policy pursuant to Ally's affirmation requirements. Ally may monitor such use of the Ally Systems. In the event Ally, in its sole discretion, determines that Supplier failed to comply with this provision, Ally may immediately terminate this Agreement or take such action as it deems appropriate, and Ally's sole liability will be for payment of Services already rendered.

8. **Performance and Personnel.**

   8.1. **Key Employees:** Ally and Supplier will designate Key Employees under a Statement of Work who will primarily be responsible for Supplier's performance of the Services under such Statement of Work. Supplier will not reassign or replace any Key Employee (a) for twelve (12) months after being designated as a Key Employee unless the Services under the applicable Statement of Work terminate sooner; or (b) during the Termination Assistance Period;, except for: (i) replacement or reassignment of a Key Employee with Ally's written consent; (ii) Key Employee's voluntary resignation from Supplier; (iii) dismissal of Key Employee by Supplier , as determined by Supplier; or (iv) inability of Key Employee to work due to sickness or disability, or any relevant labor or employment legislation, or following the termination or expiration of any Statement of Work.

*Version: MSA 04-06-10*

8.2. **Personnel:** Supplier will provide Ally with a resume for each Supplier personnel proposed for assignment to Services under a Statement or Work. Ally may reject the assignment of any such Supplier personnel. Upon the request of Ally for Supplier to reassign or otherwise arrange so that a particular Supplier Agent does not work at any Ally location or perform Services hereunder, Supplier will use commercially reasonable efforts to find a suitable qualified replacement for such Supplier Agent. If Supplier notifies Ally that Supplier ios unable to find a suitable replacement, Ally shall either withdraw its request or terminate the applicable Statement of Work for convenience. Supplier will take appropriate measures to select, supervise and monitor the Supplier Agents performing Services. Supplier will maintain current employment eligibility verification records, including necessary certification and documentation and insurance for all Supplier Agents performing Services hereunder. Supplier will not conduct disciplinary actions with respect to Supplier Agents while on Ally's premises, including, but not limited to, terminating employment of Supplier Agents. All Supplier Agents assigned to perform any Services under a Statement of Work have been or will be subject to Supplier's hiring criteria, including background checks. Supplier represents that all such background checks were or will be conducted with the knowledge and consent of the Supplier Agents involved, and in compliance with all applicable state and federal Laws and regulations.

8.3. **Independent Contractor Status:** The Services of Supplier are to be rendered as an independent contractor. Supplier and Supplier Agents will not be, or represent themselves to be, officers, employees, agents or representatives of Ally and will not bind, or attempt to bind, Ally to any agreement, liability or obligation of any nature. Supplier Agents will not be considered employees of Ally within the meaning or application of any federal, state, or local Laws or regulations. Supplier will be responsible for the payment of wages, salaries, and other amounts due to Supplier Agents in connection with the Services performed hereunder, and will be responsible for all payroll reports and obligations, including, but not limited to, withholding, social security, unemployment insurance, workers' compensation, immigration and naturalization, and similar items.

9. **Change Orders.** Both Parties acknowledge that the scope of work for the Services to be provided by Supplier under a Statement of Work may change over the course of the term of the Statement of Work. If Ally requests Supplier to provide additional Services, then Supplier may, as mutually agreed upon by the Parties, respond to such requests from Ally as a change in order ("Change Order"), provided however, that all Change Orders must be agreed upon in writing and signed by an authorized representative of both Parties prior to commencing such additional Services. Such Change Orders will be amendments to the then-current Statement of Work.

10. **Rejection of Services.** Ally shall have the right to reject Work Product based upon Supplier's non-compliance with any applicable specifications set forth in the applicable Statement of Work or any term of this Agreement, including, without limitation, a breach of any of the representations and warranties set forth herein. This remedy will be cumulative of and is in addition to any other remedies provided herein or existing at Law or in equity.

11. **Ownership.**

11.1. **Work for Hire:** Ally has all right, title and interest, including ownership of all Intellectual Property Rights, in, to and under Work Product. All Work Product will be "Works Made for Hire" under Title 17 of the United States Code as it may be revised and amended from time to time and will be solely and exclusively owned by Ally. Supplier hereby irrevocably assigns and will cause Supplier Agents to irrevocably assign to Ally, without further consideration, all rights and titles to the Work Product. Supplier acknowledges that Ally and the assigns of Ally will have the right to obtain and hold in their own name the Work Product and Supplier agrees to execute any documents or take any other reasonable actions necessary to perfect Ally's ownership in the Work Product. Supplier represents and warrants to Supplier that any Work Product will not be subject to any liens created by or result from actions of Supplier. Supplier will not embed any third party software or property in the Work Product without Ally's consent. Supplier reserves the right to retain copies of the Work Product for its records.

11.2. **License to Supplier Property:** Supplier Property is excluded from the Work Product. As part of the consideration tendered by Ally to Supplier for any Statement of Work, Supplier grants to Ally a fully-paid, royalty-free, irrevocable, perpetual, non-exclusive license to use the Supplier Property in connection with Ally's use of the Work Product and Services provided hereunder. Except as set forth herein, all right, title and interest in Supplier Property remains with Supplier.

11.3. **Assistance in Enforcement:** Supplier agrees to provide all assistance reasonably requested by Ally at Ally's sole cost and expense in the establishment, preservation and enforcement of Ally's copyright, trademark, trade secret, and any other proprietary interests in the Work Product, including executing documents, testifying, and all similar activity.

8 of 19

**12. Damages Relating to Claims between Parties.**

12.1. A Party will be liable to the other Party for all direct damages relating to its performance, or failure to perform, under the Agreement; provided that the liability of a Party to the other, whether based in an action or Claim in contract, equity, negligence, tort or otherwise for any act or omission, will not exceed the Direct Damages Cap.  Neither Party, however, will be liable for, nor will the measure of damages include any Indirect Damages.

12.2. The limitation on the amount of direct damages and the exclusion of Indirect Damages set forth in <u>Section 12.1</u> will not apply to (i) liability resulting from the gross negligence or willful misconduct of a Party or its employees, consultants, subcontractors, agents and/or representatives; (ii) breach of confidentiality, data protection and security obligations; and (iii) indemnification obligations.

12.3. The following are direct damages and Supplier will not assert that they are Indirect Damages if they result from the breach of any terms of this Agreement:

    (a) costs and expenses of recreating or reloading any of Ally's lost, stolen or damaged information;

    (b) costs and expenses of implementing a work-around for Supplier's or Supplier Agents' failure to provide all or a portion of the Services or any part of the Services;

    (c) costs and expenses of replacing lost, stolen or damaged hardware, Software, and materials;

    (d) costs and expenses incurred by Ally to correct errors in Software, Software maintenance and enhancements to the Software; and

    (e) fines, penalties, or other charges resulting from any of the above or any failure of the above.

**13. Indemnification.**

13.1. **Cross-Indemnity Claims:** Ally and Supplier (each an "Indemnifying Party") will indemnify, defend and hold harmless the other Party, its directors, officers, employees, affiliates and agents ("Indemnified Party(ies)") from all Claims, damages, liabilities, costs and expenses, including actual, out-of-pocket reasonable attorneys' fees and expenses, relating to:

    (a) the death or personal injury of third parties, including invitees or employees of the Indemnified Party, in any way resulting from the negligent or willful acts or omissions of the Indemnifying Party or any of its employees, consultants, subcontractors, agents and/or representatives;

    (b) the damage or destruction of real or tangible personal property of the Indemnified Party or third parties, including invitees or employees of the Indemnified Party, in any way resulting from the negligent or willful acts or omissions of the Indemnifying Party or its employees, consultants, subcontractors, agents and/or representatives;

    (c) Services, Software, data or any other items provided by the Indemnifying Party to the Indemnified Party under the Agreement infringing upon or misappropriating the proprietary rights of any third party (except as may have been caused by a change by the Indemnified Party or its employees, consultants, subcontractors, agents and/or representatives in the operation or use of such Services, Software, data or programs without authorization or consent of the Indemnifying Party);

    (d) Claims asserted by any employee or former employee of a Party, attributable to any period while the employee was employed by the Party and arising out of the employer Party's employment of the employee, including Claims for (a) a violation of Law for persons of a protected class by the employer Party, including unlawful discrimination, (b) any work-related injury or death caused by the employer Party, except if the Claim can be covered by workers compensation coverage, (c) accrued employee benefits not expressly provided for by the other Party, (d) any representations, oral or written, made by the employer Party to the other Party's employees, and (e) any other aspect of the employees' employment relationship with the employer Party or the termination of the employment relationship (including Claims for breach of an employment contract).

13.2. **Supplier Indemnity:** Supplier will indemnify, defend and hold harmless Ally, its directors, officers, employees, affiliates and agents from all Claims, damages, liabilities, costs and expenses, including actual, out-of-pocket reasonable attorneys' fees and expenses, relating to (i) any liability of Ally arising out of Supplier's failure to comply with any relevant data protection or privacy Laws and regulations in any jurisdiction where Services are being provided or which data is being transported/transmitted or Ally's failure to comply to the extent that such failure was caused by Supplier's negligent acts or omissions; (ii) Supplier's

Version: MSA 04-06-10

failure to implement physical or data security controls imposed by the Agreement; and (iii) Supplier's failure to comply with the obligations set forth in Section 11, Ownership.

13.3. In accordance with Section 2.3 above, Ally agrees to indemnify, defend and hold harmless the Supplier Parties from and against any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") incurred or suffered by or asserted against any of the Supplier Parties in connection with a third party claim to the extent resulting from such party's reliance upon Supplier's advice, recommendations, information or work product as a result of Ally's disclosure of such advice, recommendations, information or work product without adhering to the notice requirements of Section 2.3 above. The foregoing indemnification obligation shall apply regardless of whether the third party claim alleges a breach of contract or tort (including, without limitation. negligence) by Supplier.

13.4. **Indemnification Procedures:**

(a) If a Claim is commenced against an Indemnified Party under this Agreement, written notice will be provided to Indemnifying Party as promptly as practicable by the Indemnified Party. After notice, the Indemnifying Party will be entitled, but not obligated, at its discretion, to immediately take control of the defense and investigation of the Claim and employ attorneys of its sole choice to handle the Claim, at the Indemnifying Party's sole expense. The Indemnified Party will cooperate with the Indemnifying Party and its attorneys in the investigation and defense of the Claim and any potential appeal; provided, however, that the Indemnified Party may, at its own expense, participate in the investigation and defense of the Claim and any potential appeal. No settlement of a Claim that involves a remedy other than the payment of money by the Indemnifying Party will be entered into without the written consent of the Indemnified Party. After notice by the Indemnifying Party to the Indemnified Party of its intent to assume full control of the defense of the Claim, the Indemnifying Party will not be liable to the Indemnified Party for any legal expenses incurred directly by the Indemnified Party.

(b) If the Indemnifying Party does not assume full control over the Claim as described in this Agreement, the Indemnifying Party may participate in the defense, at its sole expense, and the Indemnified Party may defend the Claim in an appropriate manner, at the expense of the Indemnifying Party.

14. **Infringement.** If any Claim of infringement or misappropriation occurs, or if in Ally's and Supplier's jointly agreed opinion, any Deliverable(s) is likely to become the subject of an infringement Claim, then Ally will do either of the following:

14.1. **Right to Continue Use (Ally):** Ally will, at Supplier's request, attempt to continue to use the Deliverable(s) on reasonable commercial terms, with the terms to be agreed to by Supplier. If the right to continue use of the Deliverable(s) is obtained, then Supplier will reimburse Ally for the costs associated with obtaining the continued right to use the Deliverable(s).

14.2. **Right to Continue Use (Supplier), Modification or Substitution:** If Section 14.1 does not apply either due to Ally's failure to obtain the right to continue to use the Deliverable(s) after reasonably diligent efforts or Supplier's reasonable failure to agree to the terms of continued use, then Supplier will (in its discretion): (a) obtain the right for Ally to continue to use the Deliverable(s) and any other items provided by Supplier rendered unusable; (b) modify the Deliverable(s) so that it does not infringe but remains equivalent; (c) substitute equivalent, non-infringing items for the Deliverable(s), or substitute non-infringing items for the Deliverable(s) without material loss of functionality; or (d) if Supplier is unable to perform any of the foregoing, Ally shall return the infringing Deliverable(s) and any other items provided by Supplier rendered unusable to Supplier in exchange for a refund of the amounts paid to Supplier for such infringing item. The rights under this Section 14.2. shall be in addition to the indemnification obligations under Section 13, and shall not limit Ally's recourse under Section 13.

15. **Insurance.** For and during the Term of this Agreement, Supplier will secure and maintain at its own expense insurance of the type and in the amounts set forth below:

15.1. Workers' Compensation Insurance in accordance with all federal and state statutory requirements and Employer's Liability Insurance in an amount of not less than $500,000 per accident for bodily injury by accident and $500,000 per employee/aggregate for bodily injury by disease. Supplier and its underwriter will waive subrogation against Ally.

15.2. Commercial General Liability Insurance in an amount of not less than $1,000,000 per occurrence, subject to a $2,000,000 aggregate limit covering bodily injury (including death), personal injury, property damage including, without limitation, all contractual liability for such injury or damage assumed by Supplier under this

Version: MSA 04-06-10

Agreement. This policy will cover liability arising from premises and operations, independent contractors, products/completed operations, personal and advertising injury, and blanket contractual liability.

15.3. Commercial Automobile Liability Insurance in an amount of not less than $5,000,000 combined single limit covering bodily injury (including death) and property damage for all owned, hired and non-owned vehicles used by Supplier, including all statutory coverage for all jurisdictions of operation.

15.4. Umbrella Liability Insurance with respect to Workers' Compensation, Commercial General Liability, and Commercial Automobile Liability in an amount of not less than $5,000,000 combined single limit.

15.5. Blanket Crime Coverage including employee dishonesty covering liability against direct and verifiable losses of money, securities, products, equipment, material and other property of Ally caused by theft or forgery by identifiable employees of Supplier acting alone or in collusion with others, in an amount of not less than $1,000,000.

15.6. Professional Errors and Omissions Liability Insurance appropriate to Supplier's profession. Coverage should be for a professional error, act or omission arising out of the scope of Services set forth in this Agreement, in an amount not less than $1,000,000 per occurrence.

15.7. Ally, its directors, officers, employees, agents, subsidiaries and affiliates will be named as additional insureds on the Commercial General Liability and Commercial Automobile Liability policies. All of the foregoing policies will be issued by insurance companies having an "A" rating by A.M. Best Supplier. These insurance provisions set forth the minimum amounts and scopes of coverage to be maintained by Supplier and are not to be construed in any way as a limitation or release of Supplier's liability under this Agreement or as a representation that coverage and limits will necessarily be adequate to protect Supplier. Supplier will not self-insure any of its obligations under this Agreement without full disclosure to Ally of its intention to self-insure and without obtaining Ally's prior written consent. Any and all deductibles specified in the above-referenced insurance policies will be assumed by, for the account of, and at the sole risk of Supplier. All policies of insurance procured by Supplier will be written as primary policies, not contributing with, nor in excess of coverage carried by Ally.

15.8. Upon request from Ally, Supplier will furnish Certificates of Insurance evidencing all of the foregoing insurance coverage. All of the above-described policies will provide that no less than thirty (30) days prior written notice of cancellation, material modification, reduction in coverage or non-renewal will be provided to Ally. Supplier will provide Ally with written notice if any of the insurance coverage or policies required to be maintained by Supplier under this Section is terminated, lapses or for any reason does not remain in full force and effect. In the event that any Services under this Agreement are to be rendered by persons other than the Supplier's own employees, Supplier will arrange for such persons to forward to Ally prior to commencement of Services by them, Certificates of Insurance evidencing such amounts, in such form, and with such insurance companies as are satisfactory to Ally.

16. **Data Protection and Security.**

16.1. **Protection of Ally Data:** Ally Data will remain the property of Ally. Supplier acknowledges that Ally maintains control over Ally Data and will follow Ally's instructions on the creation, processing, amendment and deletion of Ally Data. Ally Data will not be: (i) used by Supplier other than in providing the Services; (ii) sold, assigned, or otherwise provided to third parties by Supplier; or (iii) commercially exploited by or on behalf of Supplier. In addition to the obligations otherwise stated in the Agreement, Supplier will protect and cause all Supplier Agents to protect Consumer Information. Supplier will not provide Consumer Information in any form to any third party (including any Supplier Agent) without Ally's prior written consent (which consent may be set forth in the applicable Statement of Work) and Supplier will remain fully responsible for any such disclosure.

16.2. **Data Security:**

(a) **Safeguards:** Supplier will maintain safeguards and take technical, physical and organizational precautions to ensure Ally Data against destruction, loss, alteration, unauthorized access by or disclosure to third parties while in the possession or under the control of Supplier and Supplier Agents. The objective of each such precaution will be to (i) ensure the security and confidentiality of Consumer Information, (ii) protect against any anticipated threats or hazards to the security or integrity of Consumer Information, and (iii) protect against unauthorized access to or use of Consumer Information that could result in substantial harm or inconvenience to any customer. These precautions will be consistent with Ally's corporate security practices, including the Information Security Policy and Standards, as updated

11 of 19

from time to time. Supplier agrees to provide training in key Laws and regulations to all Supplier Agents whose duties pursuant to this Agreement and/or a Statement of Work could bring them in contact with Consumer Information. Supplier will provide training records, on a periodic basis, that confirm to Ally that such Supplier Agents have been adequately trained in the subject Laws and regulations.

(b) **Unauthorized Access to Ally Data:**

    (i) **Detection and Response to Security Breaches:** Supplier will maintain sufficient procedures to detect and respond to any unauthorized possession, disclosure, use, or other security breaches involving Ally Data.

    (ii) **Notification of Unauthorized Access:** Supplier will, as soon as reasonably practicable, notify Ally of any unauthorized or attempted possession, disclosure, use or knowledge of Ally Data when it becomes aware of it, including any material breach or potential material breach of security, on a system, LAN or telecommunications network which contains or processes Ally Data.

    (iii) **Furnishing Details of Unauthorized Access:** Supplier will, as soon as reasonably practicable, furnish to Ally full details of the unauthorized or attempted possession, disclosure, use or knowledge, and use reasonable efforts to assist Ally in investigating or preventing the recurrence of any unauthorized or attempted possession, use or knowledge, of Ally Data.

    (iv) **Cooperation:** Supplier will cooperate with Ally to correct any unauthorized possession, disclosure, use, or other security breaches, and in any litigation and investigation deemed necessary by Ally to protect Ally's proprietary rights.

    (v) **Recurrence:** Supplier will use all reasonable efforts to prevent a recurrence of any unauthorized possession, use or knowledge of Ally Data.

(c) **Sites:** In conjunction with Ally audit rights set forth in Section 17, Ally Agents can access any Supplier site consistent with reasonable security provisions of Supplier and the following: (i) access to Supplier sites by Ally or Ally Agents may only be permitted with reasonable prior notice (specifying details of personnel who require access) during normal business hours and only to those Supplier sites where Services are being provided; (ii) Supplier can deny access to Ally Agents (but not Ally), where in Supplier's opinion, Ally Agent is a competitor of Supplier; and (iii) access by Ally or Ally Agents must not adversely affect Supplier's performance of the Services or Supplier's services to its other customers. Supplier will maintain data and physical security standards and procedures at each of the sites in which Services are performed consistent with the Agreement.

16.3 **Confidentiality:**

(a) **Standard of Care:** Each Party will protect all Confidential Information of the other Party with the same degree of care as it uses to avoid unauthorized use, disclosure, publication or dissemination of its own confidential information of a similar nature, but in no event, less than a reasonable degree of care. Further, Supplier agrees that it will protect Consumer Information in accordance with the requirements of this Agreement.

(b) **Restricted Disclosure:** Except as otherwise set forth in the applicable Statement of Work, each Party will not disclose, release, or otherwise make available to any third party, any Confidential Information of the other Party without the other Party's prior written consent other than to fulfill professional obligations and standards (including quality and peer review) or to submit and process an insurance claim. Further, Supplier agrees that it will not disclose, release, or otherwise make available to any third party, any Consumer Information without Ally's prior written consent. Ally and Supplier may disclose Confidential Information and Consumer Information of the other to Ally Agents and Supplier Agents, and each Party's accountants, attorneys, other agents, and its affiliates or subsidiaries (respectively, each Party's "Third Party Recipients") if reasonably necessary in performing its duties under the Agreement or, for Ally, its use and enjoyment of the Services and the hardware and Software used to perform Services, provided, however, that Supplier and Ally are each responsible for any violation of these confidentiality obligations by its Third Party Recipients and will ensure that these individuals or entities are aware of these confidentiality obligations.

(c) **Confidential Information Exclusions:** The obligations in this Section 16 will not restrict any disclosure of Confidential Information by the Recipient from the Discloser where the Recipient can demonstrate that such Confidential Information is exempt from the obligations set forth in this Agreement based upon the

Version: MSA 04-06-10

following.   The burden of proof that Confidential Information falls into any one of the following exemptions will be borne by the Party claiming such exemption:

(i) the Confidential Information was independently developed by the Recipient without violating its obligations or any of the Discloser's proprietary rights;

(ii) the Confidential Information becomes publicly known (other than through unauthorized disclosure by the Recipient or its employees, consultants, subcontractors, agents or representatives, but this exclusion does not apply to Consumer Information);

(iii) the Confidential Information was already known to the Recipient prior to receiving it without any obligation of confidentiality;

(iv) the Confidential Information is rightfully received by the Recipient from a third party without any obligation of confidentiality;

(v) the Recipient is required to do so under an order from a court, administrative agency, or governmental body; by subpoena or other legal process; by Law or by applicable regulatory or professional standard (provided that the Recipient provides reasonable prior written notice to the Discloser); or by demand of auditors, examiners or regulators; or

(vi) the Confidential Information is disclosed by Recipient in any judicial or other proceeding involving Discloser and Recipient or any partners, principals or employees of Recipient (regardless of whether the proceeding involved any third parties) relating to Services that Recipient provides under the Agreement if the disclosure is reasonably necessary.

(d) **Non-proprietary Know-How:** Neither Ally nor Supplier will be prevented from using know-how experience gained of a non-proprietary and non-confidential nature.

(e) **Permission to Disclose:** Notwithstanding anything to the contrary set forth herein, no provision in this Agreement or a Statement of Work is or is intended to be construed as a condition of confidentiality within the meaning of IRC sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the Laws of a state or other jurisdiction.  In particular, Ally (and each employee, representative, or other agent of Ally) may disclose to any and all persons, without limitation of any kind, the Tax treatment and Tax structure of any transaction within the scope of the Services under a Statement of Work and all materials of any kind (including opinions and other Tax analyses) that are provided to Ally relating to such Tax treatment and Tax structure.  Ally also agrees to use commercially reasonable efforts to inform Supplier of any conditions of confidentiality imposed by third party advisors with respect to any transaction on which Supplier advice is requested.  Such notification must occur prior to Supplier providing any advice with respect to the transaction.

(f) **Reportable Transactions:** Treasury regulations under IRC section 6011 require taxpayers to disclose to the IRS their participation in reportable transactions and IRC section 6707A imposes strict penalties for noncompliance.  Ally agrees to use commercially reasonable efforts to inform Supplier if Ally is required to disclose any transaction covered by the Services provided under a Statement of Work as a reportable transaction to the IRS or to any state or other jurisdiction adopting similar or analogous provisions. IRC section 6111 requires a material advisor with respect to a reportable transaction to disclose information on the transaction to the IRS by a prescribed date, and IRC section 6112 requires the material advisor to maintain, and make available to the IRS upon request, a list of persons and other information with respect to the transaction. Supplier will use commercially reasonable efforts to inform Ally if Supplier provides Ally's identifying information to the IRS under IRC section 6111 or 6112, or to any state or other jurisdiction adopting similar or analogous provisions.

16.4 **Return of Confidential Information:** When the Agreement expires or terminates, each Party will return to the other Party all Confidential Information of the other Party disclosed and all copies, or at the other Party's option, destroy the Confidential Information and provide to the other Party certificates evidencing the return or destruction. Despite anything else stated in the Agreement, each Party (i) may retain one (1) copy of the other Party's Confidential Information solely for archival, audit, disaster recovery, legal and/or regulatory purposes and  (ii) will not be required to search archived electronic back-up files of its computer systems for the other Party's Confidential Information in order to purge such Confidential Information from its archived files; provided, however, that each Party must (i) maintain its  confidentiality under the Agreement as if it were still in effect, and (ii) not use the retained other Party's Confidential Information for any other purpose.

16.5 **Survival:** The provisions of this Section 16 will survive the termination or expiration of this Agreement.

Version: MSA 04-06-10

17. **Access and Audit Procedure.** Supplier shall maintain written records of the fees and expenses charged to Ally with respect to the Services under each Statement of Work. Supplier shall retain such records for six (6) years after the completion or termination of the Services to which they pertain and shall make such records available to Ally during normal business hours upon reasonable advance written notice. Supplier shall cooperate in any audit of such records that Ally may undertake; provided, however, that: (i) any such audit shall be at Ally's sole expense; (ii) no such audit may occur more than once in any twelve (12) month period; and (iii) Supplier shall have the right to approve the auditor used for any such audit, with such approval not to be unreasonably withheld. Supplier will maintain a system of internal controls designed to identify, monitor and mitigate risks to which its information and Ally's information is exposed. The system reflects the nature of services Supplier provides to its clients and is consistent with Supplier's obligations to protect information under professional standards and applicable laws and regulations. Key aspects of the system include:

1. Documented policies, procedures manual and technical controls, modeled after industry-accepted controls frameworks
2. Senior management level individuals overseeing the implementation and maintenance of the controls
3. Training and awareness programs
4. On-going monitoring of risks with appropriate adjustment to controls
5. Monitoring of program effectiveness by internal audit

Upon request, Supplier will provide Ally with a completed SIG questionnaire (under the program published by BITS (www.bitsinfo.org)). Moreover, upon reasonable notice and during business hours, Ally may perform an on-site review of Supplier's data center. Supplier will make available appropriate senior-level managers responsible for overseeing IT operations, who can discuss with Ally how control activities are performed. Ally will also be provided the opportunity to review relevant documentation. Supplier reserves the right to limit such inquiries if they judge that providing requested information for would put at risk its own or its other clients' confidential information.

18. **Disputes.**

18.1    All disputes relating to the Agreement will initially be referred by either Party to Ally and Supplier project managers. If the project managers are unable to resolve the dispute within five (5) business day(s) (or any other agreed upon timeframe), the Parties will notify their respective senior management of the dispute. Senior management may, if both Parties agree, meet to resolve the dispute, but if they are unable to resolve the dispute then (regardless of whether a meeting occurs) within ten (10) business days of referral (or such other period as the Parties may agree), the Parties may pursue the resolution procedures set forth in this Section 18.

18.2    **Mediation:** There will be a single mediator. If the Parties cannot agree upon an acceptable mediator within ten (10) days of termination of the negotiations under Section 18.1, each Party will select one (1) mediator from a list of not less than five (5) mediators provided by the other Party. These two (2) mediators will select a third (3rd) mediator who will serve as the sole mediator. Subject to the availability of the mediator, the mediation will occur not more than thirty (30) days after the request for mediation. The mediation process will continue until the dispute (or any part thereof) is resolved or until such time as the mediator makes a finding that there is no possibility of resolution short of referring the Parties to final and binding arbitration. The mediation will be held in Detroit, Michigan, unless the mediator, on his/her own initiative, wishes to conduct any mediation proceeding by telephone, facsimile transmission or other means of communication. The cost of mediation, including the mediator's fees and expenses, will be shared equally by the Parties. Each Party will have the right to be represented by attorneys of their own choosing to advise them before and during the mediation process and their attorneys may review any settlement agreement, or other agreement, which the Parties have reached through mediation, prior to the execution of such agreement. The Parties agree that the mediator is acting in a neutral capacity and is not serving as an attorney, advocate, representative or fiduciary for either or both of them. Each Party will pay its own attorney's fees and costs. In connection with the mediation process, the mediator may meet in confidential "caucus" sessions separately with each Party. The mediator will be obligated to treat as confidential and refrain from disclosing to the other Party or its counsel any information conveyed to the mediator during the caucus sessions unless the Party conveying such information authorized the mediator to disclose it to the other Party.

18.3    **Binding Arbitration:** Should any dispute (or part thereof) remain between the Parties after completion of the mediation process described in Section 18.2, such dispute will be submitted to final and binding arbitration in Detroit, Michigan under the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), except to the extent that the AAA Rules are contrary to the specific terms of this Section 18.3. There will be three (3) arbitrators. Each Party will select one (1) arbitrator. The two (2) arbitrators selected by the Parties will select a third (3rd) arbitrator. At least one (1) of the arbitrators will have at least five (5) years of relevant

experience. Each Party may be represented by an attorney selected by the Party. The costs of the arbitration, including the arbitrators' fees and expenses, will be shared equally by the Parties. Each Party will pay its own attorney's fees and costs; provided that, if the arbitrators find either Party has acted in bad faith, the arbitrators will have discretion to award attorneys' fees to the other Party. No Party may raise new Claims against the other Party in the arbitration not raised during mediation. The arbitrators will have the power to resolve all disputes between the Parties. The arbitrators will apply the Law of the state of Michigan. The arbitrators will only interpret and apply the terms and provisions of the Agreement and will not change any such terms or provisions or deprive either Party of any right or remedy expressly or impliedly provided for in the Agreement. The arbitrators will not have the power to award damages other than those described in the Agreement. The determination of a majority of the arbitrators will be conclusive upon the Parties and will be non-appealable. At least thirty (30) days before the arbitration is scheduled to commence, the Parties will exchange lists of witnesses and copies of all exhibits intended to be used in arbitration. The Parties will be entitled to limited discovery. A stenographic record of the proceedings will be kept, unless waived by both Parties, at the equal expense of the Parties. The arbitration will be intended to be completed within one hundred twenty (120) days of the selection of the third (3rd) arbitrator. The arbitrators will render a written decision, which contains findings of fact and conclusions of Law, within thirty (30) days of the conclusion of the arbitration and will specify a time within which the award will be performed. Judgment upon the award, including specific enforcement of the decision, will be entered in any court of proper jurisdiction. The Parties have knowingly chosen arbitration as an alternative to proceedings in court and they specifically waive their rights to proceed by any means before a court otherwise having jurisdiction of any dispute between them, except to the extent necessary for injunctive relief or other equitable relief. A single arbitration may be used to resolve one (1) or more disputes pending between the Parties at the time of the arbitration proceeding. The pendency of arbitration will not extend the Term of the Agreement or affect any termination provided for under the Agreement. The Agreement to arbitrate will be specifically enforceable under the Laws of the state of Michigan.

19. **Force Majeure.** Upon a Force Majeure Event, Ally may deploy its own resources or contract for other assistance as necessary to cover for Supplier's failure, and Ally may reduce or eliminate Supplier's remaining work obligations in any manner. The occurrence of a Force Majeure Event does not limit Supplier's obligation to provide either normal recovery procedures or any disaster recovery services as defined in the Agreement to the extent practicable. The Party delayed by a Force Majeure Event will, as soon as practicable, notify the other Party by telephone (to be confirmed in a written notice within five (5) days of the inception of delay as a result of the Force Majeure Event) of the occurrence of a Force Majeure Event and describe in reasonable detail the nature of the Force Majeure Event. If any Force Majeure Event results in a failure to perform Services which lasts for more than seven (7) days, Ally may, upon notice to Supplier cease payment of the Charges for the affected Services (other than those already accrued and due under the Agreement) until the recovery from the Force Majeure Event has been completed and procure the affected Services from an alternate source; or terminate the affected portion of the Services as of a date specified by Ally.

20. **Subcontracts and Assignment.** Neither Ally nor Supplier will assign, in whole or part, any of its obligations under this Agreement without written consent of the other Party. Supplier will not subcontract any portion of its performance obligations under this Agreement without Ally's prior written approval, which approval may be set forth in the applicable Statement of Work. Ally's approval with respect to any subcontracting will not relieve Supplier of its responsibility for the performance of its obligations under the Agreement, including, but not limited to, representations and warranties, indemnification, data protection and security, and confidentiality obligations. Supplier is responsible for all payments to, and Claims by, Supplier subcontractors relating to performance or nonperformance under the Agreement and Supplier will ensure that Supplier subcontractors comply with the Agreement.

21. **Business Continuity and Disaster Recovery.** In addition to what is otherwise in the Agreement, Supplier is responsible for the following minimum requirements for which Supplier will not charge Ally any additional charges. Supplier will (i) develop and update Supplier's business continuity and disaster recovery plans as Supplier deems appropriate; (ii) participate in discussions of Supplier's business continuity or disaster recovery plans then in effect at Ally's request but not more often than once every twelve (12) months during the Term; (iii) as soon as practicable following the occurrence of a business interruption or a disaster affecting the Services, provide Ally with written notice and implement Supplier's business continuity or disaster recovery plan, as applicable; (iv) use commercially reasonable efforts to reinstate the Services as soon as practicable but in any event within any period of time set out in any Agreement and (v) upon Ally's request, certify that its business continuity and disaster recovery plans are in effect.

22. **Governing Law.** This Agreement will be governed by, and construed and enforced in accordance with, the Laws of the state of Michigan, without regard to its conflicts of Law rules.

23. **Miscellaneous.**

*Version: MSA 04-06-10*

23.1 **Remedies:** No remedy herein conferred is intended to be exclusive of any other remedy, and each and every such remedy will be cumulative and will be in addition to every other remedy given hereunder or now or hereafter existing at Law or in equity or by statute or otherwise.

23.2 **No Waiver:** No delay or omission by either Party to exercise any right or power it has under this Agreement will impair or be construed as a waiver of such right or power. A waiver by any Party of any breach or covenant will not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be signed by the Party waiving the rights.

23.3 **Amendments/Modifications:** No amendment to, or change, waiver or discharge of, any provision of this Agreement will be valid unless in writing and signed by an authorized representative of each of the Parties.

23.4 **Headings:** The headings in this Agreement are for convenience of reference only and in no way define or limit any of the provisions hereof or otherwise affect their construction or effect.

23.5 **Survival:** Termination or expiration of this Agreement will not release either Party from its respective obligations hereunder with regard to (a) confidentiality, data protection and security, (b) indemnification, and (c) Services already delivered or performed, including, without limitation, obligations of payment, warranty, and representations.

23.6 **Severability:** If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to Law, then the remaining provisions of this Agreement, if capable of substantial performance, will remain in full force and effect.

23.7 **Use of Name:** In accordance with Ally's current guidelines, Supplier will not use Ally's or its Affiliates' names, trademarks and/or logos for advertising or any other similar purpose including, but not limited to, brochures, advertisements, press releases, testimonials, websites, client reference lists or other implied or expressed endorsements, without the prior written approval of Ally, which can be withheld and withdrawn in Ally's sole discretion. Supplier will not represent directly or indirectly that the Services or Work Product provided by Supplier to Ally have been approved by or endorsed by Ally. Supplier acknowledges that this Section 23.7 is a material provision to Ally and further acknowledges that remedies at Law may be inadequate to protect Ally against breach of this provision. Supplier hereby agrees in advance that Ally will be entitled to the granting of injunctive relief in its favor without proof of actual damages in the event of breach of this provision by Supplier. Such remedy will not be deemed to be the exclusive remedy for any breach of this Agreement, but will be in addition to all other remedies at Law or in equity available to Ally. Except as permitted by Law, Ally does not acquire hereunder any right to use the name or logo of either Supplier or KPMG International Cooperative or any part thereof for advertising or any other similar purpose including, but not limited to, brochures, advertisements, press releases, testimonials, websites, client reference lists or other implied or expressed endorsements. Any such use shall require the express written consent of Supplier.

23.8 **No Third Party Beneficiary:** This Agreement is made and entered into for the sole protection and benefit of the Parties and the entities named in this Agreement and is not intended to convey any rights or benefits to any other third party other than Affiliates and Third Party Service Providers, nor will this Agreement be interpreted to convey any rights or benefits to any person except as provided in this Agreement.

23.9 **Representation of Counsel; Mutual Negotiation:** The language of this Agreement will in all cases be construed simply, as a whole and in accordance with its fair meaning and not strictly for or against any Party. The Parties agree that this Agreement has been prepared jointly and has been the subject of arm's length and careful negotiation. Each Party has been given the opportunity to independently review this Agreement with legal counsel and other consultants, and each Party has the requisite experience and sophistication to understand, interpret and agree to the particular language of the provisions. Accordingly, in the event of an ambiguity in or dispute regarding the interpretation of this Agreement, the drafting of the language of this Agreement will not be attributed to either Party.

23.10 **Notices:** Any notices required or permitted hereunder will be in writing and sent to a Party at the address on the signature page of this Agreement (or to such other address of which either Party may notify the other in a notice that complies with the provision of this Section). Notices will be effective upon receipt and will be sent (i) by private carrier or reputable overnight carrier with package tracing capability; or (ii) by personal service; or (iii) by registered or certified mail, postage prepaid, return receipt requested.

23.11 **International Use:** If and to the extent Ally desires to use the Services and/or Software outside of the United States, the Ally and the appropriate Supplier Parties will negotiate mutually-agreeable terms and conditions pursuant to a local country participation agreement which will become an Exhibit to this Agreement.

*Version: MSA 04-06-10*

23.12 **Cooperation between the Parties.**  Supplier agrees to provide all information necessary and reasonably available to Supplier to support Ally's supplier management processes during the Term of this Agreement.  Ally agrees to cooperate with Supplier in the performance of the Services and shall provide or arrange to provide Supplier with timely access to and use of the personnel, facilities, equipment, data and information to the extent necessary for Supplier to perform the Services.  Statements of Work may set forth additional details regarding Supplier's access to and use of personnel, facilities, equipment, data and information.  To the extent applicable to the Services, a Statement of Work shall set forth the obligations of Ally in connection with such Services.  Ally agrees to perform such obligations in accordance with, and subject to, such Statement of Work.  Ally acknowledges that its failure to meet such obligations could adversely affect Supplier's ability to provide the Services in accordance with the terms of this Agreement and the applicable Statement of Work.  Ally acknowledges and agrees that Supplier will, in performing the Services, base its conclusions on the facts and assumptions that Ally furnishes and that Supplier may use data, material, and other information furnished by or at the request or direction of Ally without any independent investigation or verification and that Supplier shall be entitled to rely upon the accuracy and completeness of such data, material and other information.  Inaccuracy or incompleteness of such data, material and other information furnished to Supplier could have a material effect on Supplier's conclusions. In rendering Tax advice, Supplier may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and the Employee Retirement Income Security Act of 1973, each as amended, and the relevant state and foreign statutes, the regulations thereunder, income Tax treaties, and judicial and administrative interpretations, thereof.  These authorities are subject to change, retroactively or prospectively, and any such changes could affect the validity of Supplier's advice.

23.13 **Order of Precedence; Exclusion of Other Terms and Conditions:**  This Agreement constitutes the entire and exclusive statement of the agreement between the Parties and supersedes all prior representations, understandings or agreements between the Parties with respect to such subject matter.  The documents referred to herein and the Exhibits attached hereto will be read together with this Agreement to determine the Parties' intent.  If there is a conflict between or among such documents, this Agreement will be the final expression of the Parties' intent and will prevail over any inconsistent terms set forth in any Exhibits.  Any other terms or conditions included in any click-wrap license agreements, shrink wrap license agreements, quotes, invoices, acknowledgements, purchase orders, bills of lading or other forms utilized or exchanged by the Parties will not be incorporated in this Agreement or be binding upon the Parties unless the Parties expressly agree in writing or unless otherwise provided in this Agreement.

23.14 **Sarbanes-Oxley.**  Except as set forth in the applicable Statement of Work, Ally acknowledges that acceptance of Work Product will not constitute a basis for Ally's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act").  The Services under any Statement of Work issued hereunder shall not be construed to support Ally's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

23.15 **Electronic Communications**.  Supplier and Ally may communicate with one another by electronic mail or otherwise transmit documents in electronic form during the course of Services under this Agreement[open] . Ally

23.16 **California Accountancy Act.**  For Statements of Work where Services will be provided by Supplier through offices located in California, Ally acknowledges that certain of Supplier's personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide Services in connection with a particular Statement of Work, may not be licensed as certified public accountants under the laws of any of the various states.

23.17 **Privileged Communications.**  Information relating to advice Supplier provides to Ally, including communications between Supplier and Ally and material Supplier creates in the course of providing advice, may be privileged and protected from disclosure to the IRS or other governmental authority in certain circumstances.  As Supplier is not able to assert the privilege on Ally's behalf with respect to any communications for which privilege has been waived, Ally agrees to notify Supplier of any such waivers, whether resulting from communications with Supplier or third parties in the same or a related matter.  Ally agrees that Supplier will not assert on Ally's behalf any claim of privilege unless Ally specifically instructs Supplier in writing to do so after discussing the specific request and the grounds on which such privilege claim would be made.  Notwithstanding the foregoing, Ally acknowledges that in no event will Supplier assert any claim of privilege that Supplier concludes, after exercising reasonable judgment, is not valid.

Version: MSA 04-06-10

23.18 **Active Spreadsheets and Electronic Files** Supplier may use models, electronic files and spreadsheets with embedded macros created by Supplier to assist Supplier in providing the Services under a Statement of Work. If Ally requests a working copy of any such model, electronic file or spreadsheet, Supplier may, at its discretion, make such item available to Ally for its internal use only and such item shall be considered Work Product hereunder; provided that Ally is responsible for obtaining the right to use any third party products necessary to use or operate such item.

23.19 **Use of Member Firms, Affiliates and Third Party Service Providers.** To the extent any of the Services under a Statement of Work will be performed in or relate to a jurisdiction outside of the United States, Ally acknowledges and agrees that such Services, including any applicable Tax advice, may be performed by the member firm of KPMG International practicing in such jurisdiction. Ally understands that KPMG International and each such member firm is a separate, distinct and independent legal entity and is not a partner, principal, agent or affiliate of Supplier and Supplier is not a partner, principal, agent or affiliate of KPMG International or any such member firm. Ally further acknowledges that in connection with the performance of Services under a Statement of Work, such Statement of Work may indicate that Supplier will utilize the services of affiliates and third party service providers within and without the United States to complete the Services under the Statement of Work. Accordingly, Ally consents to Supplier's disclosure to a member firm, affiliate or third party service provider and such member firm's, affiliate's and third party service provider's use of data and information, including but not limited to Confidential Information and "tax return information" within the meaning of Treasury Regulations section 301.7216-1(b)(3) (or a successor provision), received from or at the request or direction of Ally for the purposes set forth in Paragraphs 12(a) and 12(b) above. Any Services performed by a member firm, affiliate or third party service provider shall satisfy the terms of this Agreement and the applicable Statement of Work and Supplier shall remain responsible to Ally for the performance of such Services. Ally agrees that any claim relating to the Services may only be made against Supplier and not any other member firm, affiliate or third party service provider referred to above.

**END OF TERMS AND CONDITIONS**

*Version: MSA 04-06-10*

## Exhibit A

### [FORM OF NOTICE AND ACKNOWLEDGEMENT]

[Name of Third Party]
Address
Attention:

The advice, recommendations and information in the document included with this notice were prepared for the sole benefit of [Name of Client], based on the specific facts and circumstances of [Name of Client], and its use is limited to the scope of KPMG's engagement for [Name of Client]. It has been provided to you for informational purposes only and you are not authorized by KPMG to rely upon it and any such reliance by you or any one else shall be at your or their own risk. You acknowledge and agree that KPMG accepts no responsibility or liability in respect of the advice, recommendations or other information in such document to any person or organization other than [Name of Client]. You shall have no right to disclose the advice, recommendations or other information in such document to anyone else without including a copy of this notice and, unless disclosure is required by law or to fulfill a professional obligation required under applicable professional standards, obtaining a signed acknowledgement of this notice from the party to whom disclosure is made and you provide a copy thereof to [Name of Client]. You acknowledge and agree that you will be responsible for any damages suffered by KPMG as a result of your failure to comply with the terms of this notice.

Please acknowledge your acceptance of the foregoing by signing and returning to us a copy of this letter.*

Very truly yours,

[Name of Client]

By: _____
    Name:
    Title:

**Accepted and Agreed to on this ___ day of ___ , 20__ by:***

[Name of Third Party]

By: _____
    Name:
    Title:

*Remove in the event of a disclosure made by Client that is required by law, that is made to a regulatory authority having jurisdiction over Client or that is made pursuant to Paragraph 16.3(e) of the Agreement in which case an acknowledgement is not required by the terms of Paragraph 2.3.

*Version: MSA 04-06-10*

Confidential – GMAC Mortgage

## STATEMENT OF WORK

### I.  INTRODUCTION

This Statement of Work ("SOW"), is entered into as of March 14, 2012 by and between Ally Financial Inc. ("Client") and KPMG LLP ("KPMG") and is issued pursuant to and in accordance with the terms and conditions set forth in the Master Services Agreement by and between Ally Financial Inc. and KPMG LLP dated November 15, 2010 (the "Agreement"). This SOW reflects the final pricing and requirements for the Services, except as may be subsequently modified by the parties upon written agreement. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

### II.  DESCRIPTION OF SERVICES

We are pleased to continue to assist Ally Financial Inc. ("GMAC Mortgage") with the planning activities based on the Document Management Roadmap strategy that was just completed.

**Project Objectives**
The objective of this initiative is to assist GMAC Mortgage with program planning and foundational activities to establish the program infrastructure required to execute against the projects identified within the Discovery phase of the Document Management Program.

**Scope**
The scope of this engagement will include Program planning assistance, and support for document management foundation activities including selection of the solution via an RFP process and setup of the Document Management Governance program.  In particular, KPMG will assist with the following:

- Develop and setup the program management infrastructure that includes a master plan, resource plan, program dashboard and reporting, risk and issues management, and program success metrics definition for execution of the upcoming projects.
- Continue to support GMAC Mortgage with socializing the roadmap and business case with required stakeholders and through the tollgate process to attain funding
- Support GMAC Mortgage with the solution selection including the development of the RFP package, evaluation, recommendation of the  preferred solution, and development of the associated high-level solution / logical architecture
- Establish a document management specific governance organization that includes developing the governance program charter and defining applicable roles and responsibilities across the mortgage lines of business

**Project Approach**
We will work collaboratively with GMAC Mortgage's project team for this engagement.  Our approach for this engagement consists of three work-streams:  (i) Program Planning and Support (ii) Solution Selection via an RFP process (iii) Document Management Governance.  We expect to complete this work as described below:



SOW – GMAC Mortgage Document Management Program Planning Project
Page 1

Confidential – GMAC Mortgage

| Project Scoping and Mobilization | | |
|---|---|---|
| **Work Step** | **Key Activities** | **Key Outputs** |
| Objectives: The objective of this step is to align KPMG and GMAC Mortgage's project objectives, determine scope and strategic direction, initiate project activities and mobilize a joint project team. | | |
| | • Confirm project objectives, scope and deliverables with project sponsor<br>• Confirm Steering Committee / Client team participation, roles and responsibilities<br>• Finalize high-level work plan and timing<br>• Identify key stakeholders, other key management and resources for project | • Work Plan / Project Calendar |

| Work-stream 1: Program Planning and Support | | |
|---|---|---|
| **Work Step** | **Key Activities** | **Key Outputs** |
| Objectives:  The objective of this activity is to support GMAC Mortgage to setup the Program Management infrastructure – program planning and support activities and socialization of the Document Management Roadmap and Business Case | | |
| | • Jointly develop and refine a master project and resource plan which identifies:<br>  o  Work stream team members and required stakeholders<br>  o  Indicates key milestones / delivery points / interdependencies<br>  o  Resource requirements and on-boarding timing<br>• Jointly develop and design appropriate program acceptance and success measures including establishing a baseline and a mechanism to measure performance against baseline for the 2012 projects as defined in the Roadmap<br>• Support the development of a program-level dashboard that should be used to provide Steering Committee Members with a monthly (or as applicable) update of financial and adoption status, progress against milestones and program success metrics performance<br>• Support the development of a baseline communication plan defining communication events, objectives by stakeholder, key messages, vehicle of communication and communication responsibilities<br>• Support the development of program risks, actions, issues and decisions logs on both a program and work-stream level to communicate and share critical information on a weekly (or as appropriate) basis<br>• Support GMAC Mortgage with document management program related activities including but not limited to:<br>  o  Socializing the roadmap and business case with required stakeholders<br>  o  Assist with tollgate process including the preparation of materials and funding requirements to attain program funding (e.g., Business Case, APEX Sizing Tool)<br>  o  Pre-planning discussions for identified projects (e.g., Imaging Pilot with ACS / Xerox/ Kofax) | • Program Master Plan (tactical and strategic projects)<br>• Program Resource Plan (tactical and strategic projects)<br>• Program Toll-Gate Materials / Funding Requirements (e.g., Business Case, APEX Sizing Tool)<br>• Program-level Dashboard and Reporting<br>• Program Risks, Actions, Issues and Decisions Logs (RAID)<br>• Program Acceptance / Success Measures |

Confidential – GMAC Mortgage

| Work-stream 2: Solution Selection - RFP Support | | |
|---|---|---|
| **Work Step** | **Key Activities** | **Key Outputs** |
| **Objectives:** The objective of this activity is to develop use cases that will be part of the RFP package and will be shared with vendors for a customized product demo during the RFP process. | | |
| Step 2a: Develop Product Demo Use Cases | • Meet with Project Stakeholders to select appropriate Use Cases that will be provided to vendors for a customized Product Demo | • Use Cases for Product Demo |
| | • Identify business and technology stakeholders to define use cases objectives and business scenarios | |
| | • Collect and review any additional key materials and technical artifacts (e.g., process documentation / flows, integration with other systems) | |
| | • Review and identify applicable functional requirements from the process/system requirements collected during the Discovery Phase | |
| | • Prepare for and conduct interviews with key business and technology stakeholders to better understand the functional and technical requirements for the use cases | |
| | • Develop Use Cases that provide the high-level scope, triggers, actors, high level process flow, data elements and flow of events | |
| | • Review and finalize the use-cases with project sponsor and appropriate stakeholders | |
| **Objectives:** The objective of this activity is to develop the RFP package that will be shared with the Vendors. | | |
| Step 2b: Develop RFP and refine solution selection criteria | • Leverage KPMG's solution selection toolkit, functional and technical requirements developed during the Discovery phase, and Use Cases to jointly develop the vendor RFP | • RFP Package |
| | • Jointly review, revise and finalize RFP and timeline with key business and technology stakeholders | • Vendor Evaluation Criteria / Score-card |
| | • Refine evaluation criteria and develop weightings for the score-card and use as parameters for RFP development to evaluate the functional and technical requirements | |
| | • Leverage Evaluation of Solution Options / Scorecard deliverable from the Discovery Phase to identify solutions capable of providing adequate RFP responses (i.e. vendor short list) | |
| **Objectives:** The objective of this activity is to jointly evaluate vendor solutions based on the RFP responses / demos. | | |
| Step 2c: Conduct Demos and Evaluate Solutions | • Jointly issue RFP to Client-determined vendor short-list | • Solution Evaluation - Score-card results and "Fit/Gap" Analysis |
| | • Jointly review / score RFP responses, contact available references and coordinate with vendor contacts for missing / incomplete data | |
| | • Jointly prepare for and coordinate vendor demos (e.g., Proof of Concept / Use Cases Demo) and debrief with business and technology stakeholders | |
| | • Jointly develop side-by-side comparison of each of the solutions, highlighting areas of alignment and key functional and technical gaps (e.g., "Fit / Gap" analysis) for current capabilities and future needs / requirements, pricing and Total Cost of Ownership (TCO) | |
| | • Jointly review "fit/gap" analysis with key business and technology stakeholders to refine and finalize vendor scoring | |
| **Objectives:** The objective of this activity is to jointly develop the findings and recommendations for the preferred solution | | |

Confidential – GMAC Mortgage

| Step 2d: Recommend Preferred Solution | • Jointly document recommendations to close key gaps for each short list vendor solution and prioritize based on importance to the future state conceptual architecture and alignment with the preferred implementation option | • Executive Summary / Solution Recommendation (includes a High-Level Solution/Logical Architecture) |
|---|---|---|
| | • Jointly review and finalize economic and business impact / benefits with key stakeholders | |
| | • Jointly determine trade-offs and potential "workarounds" based on economic and business impacts/benefits of each short list solution | |
| | • Jointly brainstorm implementation options and select preferred option | |
| | • Jointly develop high-level implementation approach, key assumptions, fully loaded implementation costs and key risks | |
| | • Jointly develop the high-level solution / logical architecture based on the preferred solution | |
| | • Jointly update the Toll-Gate business case that considers the implementation costs, future enhancements and ongoing maintenance and development for each solution | |
| | • Jointly develop executive summary of findings and highlight preferred document management solution | |

## Work-stream 3: Develop Integrated Document Management Governance

| Work Step | Key Activities | Key Outputs |
|---|---|---|
| **Objectives:** The objectives of this activity is to develop the Governance project charter that defines the scope, approach, timeline and core team/participants | | |
| Step 3a: Develop Project Charter | • Meet with Project Stakeholders to identify the Business / Technology Leads for Document Management Governance | • Project Charter |
| | Note: Document Management Governance should span across the originations channels, record services, servicing, legal, compliance, credit risk, and IT to provide a sustainable environment for managing and maintaining the document life-cycle for the long term. Consequently, participation in this initiate should include representatives from each group. | |
| | • Conduct interviews with the business and technology leads to define objectives, scope and stakeholders that should be involved in the setup of the Governance program | |
| | • Develop the project charter that defines scope, objectives, approach, timeline and core team / participants for this work-stream | |
| | • Review and finalize the charter with project sponsor and appropriate stakeholders | |
| **Objectives:** The objectives of this activity is to develop the integrated Document Management Governance organization with the appropriate roles and responsibilities | | |
| Step 3b: Develop Roles and Responsibilites | • Collect and review the existing governance program organization structure, processes, policies and procedures. | • Governance organization with Roles and Responsibilities (RACI) |
| | • Prepare for and conduct working sessions with business and technology governance stakeholders to develop the appropriate document management governance organization structure. | |
| | • Define the functional roles and responsibilities (RACI) and integration / linkages of the document management governance structure to the enterprise information governance organization. | |
| | • Review and finalize the governance organization structure and functional roles and responsibilities with project sponsor and | |

Confidential – GMAC Mortgage

| | appropriate stakeholders | |
|---|---|---|

## III.    DELIVERABLES

Draft deliverables will be provided to GMAC Mortgage for review and comment prior to final delivery.  The deliverables presented as part of this engagement are for the internal use of GMAC Mortgage management, the Audit Committee and Board of Directors.  If GMAC Mortgage elects to share the deliverables with third parties, section 13.3 of the Agreement shall apply.  Deliverables for this project will be developed based on our project approach and will include the following:

**Scoping and Mobilization**

**Work Plan / Project Calendar** - A project work-plan will be developed that will have key dates, working session schedule activities and milestones.

**Program Planning and Support** – the deliverables listed in this section will be used for managing the projects identified within the Roadmap during the Program Execution Phase.

**Program Master Plan** – integrates and aggregates individual work-stream plans, timeline and resource needs to help manage the integrated view and the broader impact to departments and individual resources.  Program Steering Committee Meetings, Funding Checkpoints (if applicable) and program level communication and adoption activities will be layered on top of integrated work-stream efforts.  The master plan will be updated weekly (or as appropriate) throughout the life of the program.  The master plan will also conform to any appropriate GMAC Mortgage standards and be in MS Project.

**Program Resource Plan** – summarizes resource loads and is used in the "leveling" of resource commitments to appropriate levels given intended allocations and roles. The resource plan is highly dependent on the master plan and once baseline is set will be updated in tandem.  The resource plan will also conform to any appropriate GMAC Mortgage standards and be in MS Project

**Program Toll-Gate Materials / Funding Requirements (e.g., Business Case, APEX Sizing Tool)** – includes the refinement of program one-time and operating costs, benefits (qualitative and quantitative) as well as anticipated execution risks.  This will be socialized with the appropriate IT, Business and Finance stakeholders prior to finalization.

**Program-level Dashboard and Reporting** – program dashboard that will be produced monthly for Steering Committee members and Executive stakeholders.  This deliverable will summarize the program financial status, progress against milestones and program success metrics performance (as metrics and baseline data is available).

**Program Risks, Actions, Issues and Decisions Logs (RAID)** – logs will reflect both project/work-stream and program level risks and be distributed weekly (or as appropriate) as an important communication tool to share critical information such as decisions and action items as well as managing risks and issues across the program.

**Program Acceptance/Success Measures** – design and collection of success metrics including both a plan and development of mechanisms to baseline and measure longer-term performance improvement (based on planned frequency) for the 2012 projects as defined in the Roadmap.

**Solution Selection - RFP Support**

**Use Cases for Product Demo** - defines the use cases that will be shared with the vendors for the product demos as part of the RFP process. This deliverable includes the business scenarios (3-5) for the selected document management functions (e.g. recovery, curative) and includes the high-level scope, triggers, actors, high level process flow, data elements and flow of events.

Confidential – GMAC Mortgage

**RFP Package** – includes the Use Cases for product demos, high-level requirements and questionnaire for the RFP response to have a better understanding of each vendor's solution - system functionality, customization - design vs. development, and system integration capabilities.

**Vendor Evaluation Criteria/Score-Card** – includes the solution selection criteria based on pricing, TCO, the high-level requirements, product demonstration, alignment with conceptual architecture and product functionality to develop and manage the document management solutions.

**Vendor Evaluation** - this deliverable compiles the results of the solution evaluations, score-card and fit/gap analysis based on the RFP responses and product demonstrations.

**Executive Summary / Solution Recommendation** – includes the final recommendations of the preferred solution with high level implementation approach, key assumptions, implementation costs, key risks and a high-level solution/logical architecture.

### Track 2: Develop Integrated Document Management Governance

**Project Charter** – this deliverable will define the scope, objectives, approach, timeline and participants for the document management governance work-stream. Known interdependencies to the other project / work-streams will also be identified.

**Roles and Responsibilities (RACI)** – this deliverable establishes the governance organization for the document management program and includes the roles and responsibilities with decision rights, membership, guiding principles and reporting line of sight. Interdependencies and connection points to enterprise governance efforts will also be outlined as part of this deliverable.

### Time Schedule

KPMG Advisory staff will work at GMAC Mortgage's designated Fort Washington, PA facilities Monday through Thursday, with limited time at the Waterloo, IA facilities as required, and continue project work from their KPMG home offices on Friday. We have estimated the project duration of 11 weeks on-task time for this initiative and the anticipated timeline is illustrated below.

Confidential – GMAC Mortgage



| Work stream | March | | | | April | | | | May | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | WK 1 3/12/2012 | WK 2 3/19/2012 | WK 3 3/26/2012 | WK 4 4/2/2012 | WK 5 4/9/2012 | WK 6 4/16/2012 | WK 7 4/23/2012 | WK 8 4/30/2012 | WK 9 5/7/2012 | WK 10 5/14/2012 | WK 11 5/21/2012 |
| Scoping and Mobilization | | | | | | | | | | | |
| 1 - Program Planning and Support | | | | | | | | | | | |
| 2 - Solution Selection - RFP Support | | | | | | | | | | | |
| 2a - Develop Product Demo Use Case | | | | | | | | | | | |
| 2b - Develop RFP and Refine Vendor Solution Evaluation Criteria | | | | | | | | | | | |
| 2c - Conduct Demos and Evaluate Solutions | | | | | | | | | | | |
| 2d - Recommend Preferred Solution | | | | | | | | | | | |
| 3 - Document Management Governance | | | | | | | | | | | |
| 3a - Develop Project Charter | | | | | | | | | | | |
| 3b - Develop Roles and Responsibilities | | | | | | | | | | | |

1 Work Plan / Project Calendar
2 Program Master Plan
3 Program Resource Plan
4 Program Toll-Gate Business Case
5 Program Dashboard
6 Program Risks, Actions, Issues and Decisions Logs (RAID)
7 Program Acceptance/Success Measures
8 Use Cases for Product Demo
9 RFP Package
10 Vendor Evaluation Criteria / Scorecard
11 Vendor Evaluation
12 Executive Summary / Solution Recommendation
13 Project Charter
14 Roles and Responsibilities (RACI)
⭐April Tollgate - Revisit and Request Funding for the Recovery / Curative and Collateral Transfer - Plan & Define

## IV. PROJECT ORGANIZATION

KPMG Team will be comprised of both functional and technical resources to support GMAC Mortgage in this initiative. The project team will be supported as required by subject matter professionals, bringing specific skills to augment the core team.

**Lead Partner:** Jim McAveeney (Principal, KPMG Midwest Advisory - Financial Services) will be responsible for the overall quality of service that GMAC Mortgage receives during the conduct of this engagement.

**Project Leadership:** Chetan Nair (Director, KPMG Midwest Advisory - Financial Services) will be the primary resource for coordinating our services including all client work and deliverables and act as the Engagement Leader and Senior Application Architect.

**Engagement Management:** Pedro Calado (Manager, KPMG Midwest Advisory – Financial Services) will manage daily project activities and provide subject matter experience of GMAC's business process and systems.

**Engagement Staff:** Paul Rho (Senior Associate, KPMG Advisory) will be the primary resources supporting the analysis and development of all client work and deliverables.

Confidential – GMAC Mortgage



Key project contacts for this engagement include the following:

| Resource Name | Location | Office Phone | Cell Phone |
|---|---|---|---|
| James McAveeney | Chicago, IL | 312-665-2188 | 630-639-9728 |
| Chetan Nair | Columbus, OH | 614-249-2338 | 614-638-7048 |

## V.    CLIENT RESPONSIBILITIES

During the development of this engagement letter, we have been guided by certain assumptions about the project scope, and level of GMAC Mortgage's involvement and support.

**GMAC Mortgage Support.** We will require the support of GMAC Mortgage personnel in order to achieve timely completion of the project. Support includes, but is not limited to, the collection of all relevant documents (paper or electronic) and the scheduling of interviews and coordination of meetings. In-case of project delays due to availability and scheduling of GMAC Mortgage stakeholders and key resources for interviews and work sessions; we will work in good faith and discuss options with GMAC's project sponsor towards a mutually agreed solution.

In addition, we will require adequate work space in which to conduct interviews, hold working sessions with large groups of individuals, and hold team meetings. Finally, we will need access to the facilities in scope for the engagement as well as a dedicated project team workstation with access to internal calendars for scheduling purposes and an ability to print working and final documents.

**Project Management.** GMAC Mortgage will be responsible for all management functions and decisions relating to this engagement including all decisions regarding potential out-sourcing or other document management strategies, potential vendor selection process, evaluations and judgments as to vendors' relative strengths and weaknesses in

Confidential – GMAC Mortgage

meeting the evaluation criteria and the ultimate solution selection. KPMG will not recommend a specific out-source provider or vendor.

GMAC Mortgage has identified the short-list of potential vendors for the RFP process for the document management solution. KPMG LLP in the US and one or more other member Firms of KPMG International have provided audit, tax and advisory services to International Business Machines Corporation, Autonomy Corporation Plc, Fiserv Solutions Inc, ACS Image Solutions, Inc. and EMC Corporation. A member Firm of KPMG International has provided advisory services to Kofax Plc. KPMG agrees that during the term of this engagement none of the personnel providing services to GMAC Mortgage pursuant to this engagement will provide services to the vendors listed without your written consent.

GMAC Mortgage agrees that KPMG's relationship with the listed vendors shall not constitute a conflict of interest for KPMG relative to the services KPMG has agreed to provide to GMAC Mortgage under the Engagement Letter. Should you later determine that you wish KPMG to cease performance of the work set forth in our Engagement Letter as a result of the existence of these relationships, we will do so until an appropriate course of action is agreed upon. As a result of KPMG's relationship with listed vendors identified above, KPMG may be in possession of confidential information concerning the potential vendors that may be relevant to the procedures KPMG will perform for GMAC Mortgage and GMAC Mortgage understands that such information will not be made available to the vendor selection process and GMAC Mortgage or to the engagement team serving you unless the potential vendors provide such information directly to GMAC Mortgage or to the KPMG engagement team.

GMAC Mortgage will designate a management level individual with appropriate background and knowledge, who is capable of making the decisions necessary to complete the vendor selection process to oversee the conduct of this project, including coordination of GMAC Mortgage resources needed and review of draft deliverables. GMAC Mortgage personnel assigned to the project will review draft deliverables on a timely basis.

**Recovery / Curative and Collateral Transfer - Plan & Define.** Funding and Resource deployment for this project which is projected to be kicked-off April 16, 2012 will be revisited and requested during the April Tollgate.

**Project Duration.** The project duration of 11 weeks and associated professional fees are predicated on Vendors responding to the RFP and holding product demo within two and a half (2 ½) weeks. Should Vendors not be able to meet this schedule, we will work with GMAC Mortgage to determine a mutually agreeable solution.

GMAC Mortgage agrees that KPMG may list the company as a customer in its marketing materials. In addition, GMAC Mortgage gives KPMG the right to use the GMAC Mortgage logo on documents prepared for GMAC Mortgage internally (e.g., internal presentations, etc.).

VI.    **CHANGE ORDERS**

Change Orders will be addressed as per the Agreement in place at the time of the signing of this Statement of Work.

VII.    **ACCEPTANCE CRITERIA AND PROCEDURES**

Deliverables specified for each step of the engagement will be presented upon the completion of that step to GMAC Project Leadership for approval. Acceptance will be based upon the completion of the deliverable within the scope of the engagement and at a level of specificity commensurate with the constraints placed upon it. Upon the completion of all engagement work, the body of work consisting of all deliverables will be submitted to the GMAC Project Sponsor for final approval.

VIII.    **PAYMENT and INVOICING**

We are prepared to begin work upon receipt of a signed copy of this engagement letter and at a time mutually determined by GMAC Mortgage and KPMG.

Confidential – GMAC Mortgage

Our professional fees for this engagement are estimated based upon the skill and experience level of the individuals assigned and the amount of time and material required to complete the engagement. Based on the size and parameters of the engagement, and our desire to maintain a long-term working relationship with you, our rates reflect an additional discount over and above our current discounted GMAC Mortgage rates. The estimate is based on the complexity of the issues and the time required of the KPMG professionals who will be performing these services. The following table represents our rates by level, discounted for GMAC Mortgage:

| Resource level | Billing Rate |
|----------------|--------------|
| Partner | $330 |
| Sr. Manager | $260 |
| Manager | $215 |
| Sr. Associate | $195 |
| Associate | $160 |

KPMG will bill for its services for this engagement on a fixed fee basis and the professional fees is estimated at: $311,000. The following table represents the resources required, the estimated time and estimated cost to complete the engagement.

| Resource Role | Resource Level | Estimated Hours | Estimated Cost |
|---------------|----------------|-----------------|----------------|
| Jim McAveeney, Engagement Partner | Partner | 44 | $14,300 |
| Chetan Nair, Engagement Leader | Director | 360 | $93,600 |
| Pedro Calado, Engagement Manager | Manager | 495 | $106,500 |
| Paul Rho, Engagement Staff | Senior Associate | 495 | $96,600 |

In addition to professional fees, KPMG will be reimbursed for out-of-pocket expenses. Out-of-pocket expenses will be billed in addition to the fees quoted above and are estimated at 20% of professional fees. If out-of-pocket expenses are to exceed the 20% target, we will make the project sponsor aware and work to manage expenses appropriately. KPMG's out-of-pocket expenses will be added to and reported as a separate line item on each bill and will include, but are not limited to, travel, meals, accommodations and report printing. Expense reimbursement will be in compliance with GMAC Mortgage's accounts payable policies.

The following schedule will be used to submit invoices for professional fees and will be billed to GMAC ResCap/Resi, P.O. Box 25163, Lehigh Valley, PA 18002. Out-of-pocket expenses will be billed as incurred as a separate line item on the invoices. Additional payment terms are dictated by the KPMG/Ally Financial Inc. - Master Professional Services Agreement.

| | |
|---|---|
| At Engagement Letter Signing | $86,000 |
| Progress Billing at end of Month – March 31 | $75,000 plus expenses |
| Progress Billing at end of Month – April 30 | $75,000 plus expenses |
| At Engagement Completion | $75,000 plus expenses |

Circumstances encountered during the engagement or scope changes may warrant additional time and expense. We will notify you of such circumstances as they arise and we will obtain your approval before proceeding.

Confidential – GMAC Mortgage

KPMG will provide our services in accordance with the terms and conditions of this letter. Such services are not intended to be an audit, examination, attestation, special report or agreed-upon procedures engagement as those services are defined in American Institute of Certified Public Accountants (AICPA) literature applicable to such engagements conducted by independent auditors. Accordingly, these services will not result in the issuance of a written communication to third parties by KPMG directly reporting on financial data or internal control or expressing a conclusion or any other form of assurance.

Circumstances encountered during the engagement or scope changes may warrant additional time and expense. We will notify you of such circumstances as they arise and we will obtain your approval before proceeding.

## IX.    ESTIMATED PROJECT TIMETABLE

| | | |
|---|---|---|
| Start date | March 12, 2012 | |
| Project Mobilization | March, 14 2012 | Project Mobilization Deliverables due |
| Step 1 Program Planning and Support | May 25, 2012 | Step 1 Deliverables due |
| Step 2 Solution Selection – RFP Support | May 25, 2012 | Step 2 Deliverables due |
| Step 3 Document Management Governance | May 25, 2012 | Step 3 Deliverables due |

Please refer to the Deliverables (section III) that provides the timetable and milestones for each of the project deliverables.

Confidential – GMAC Mortgage

**IN WITNESS WHEREOF**, the parties hereto have executed this Statement of Work as of the day and year first written above.

| Ally Financial Inc. (GMAC Mortgage) | KPMG |
|---|---|
| By: | By: |
| Printed Name: _Michael J. Lynst_ | Printed Name: _James W. McAveeney_ |
| Title: _Contract Mgr_ | Title: _Partner_ |
| Date: 3/19/2012 | Date: _3/14/2012_ |

Confidential – GMAC Mortgage

## STATEMENT OF WORK

### I.    INTRODUCTION

This Statement of Work ("SOW") is entered into as of July 10, 2012 by and between GMAC Mortgage, LLC ("GMAC Mortgage") and KPMG LLP ("KPMG") and is issued pursuant to and in accordance with the terms and conditions set forth in the Master Services Agreement by and between Ally Financial Inc. ("Ally") and KPMG dated as of November 15, 2010 (the "Agreement"). This SOW reflects the final pricing and requirements for the Services, except as may be subsequently modified by the parties upon written agreement. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

### II.    DESCRIPTION OF SERVICES

We are pleased to assist GMAC Mortgage with the Records Case Management Project - Plan and Define phase based on the Document Management Roadmap.

**Project Objectives**
The objective of this initiative is to assist GMAC Mortgage with the Records Case Management – Plan and Define phase to establish the future state business process, functional and technical design and an implementation plan for the next phase – Construct, Test and Deploy.

**Scope**
The scope of this SOW will be Recovery, Curative, Collateral Transfer and Document Tracking functions for Record Services. In particular, KPMG will perform the following activities based on input from GMAC Mortgage and subject to review and approval by GMAC Mortgage:

- Develop the Future State Business Process Definition
    - Define future state business processes (Level 2 and Level 3) that includes an end-to-end process map of recovery, curative, collateral transfer and document tracking
- Develop the Functional Design for the Records Case Management System that includes:
    - Develop the Use Cases that define the business scenarios and functional design for the system (15 -18 Use Cases have been estimated for this project)
    - Develop the Functional Requirements and Non-Functional Requirements
    - Develop the User-Interface ("UI") Specifications that supplements the Use Cases and provides the structure of the UI screens and layouts
    - Develop the Traceability Matrix that maps the Functional Requirements to the Use Cases
- Develop the Technical Design for the Records Case Management System that includes:
    - Develop the Solution Architecture that includes content management, process management, rules, application interaction, data and security design
    - Develop the Systems Interface Design that includes the integration to the FileNet Imaging Repository (Images), DocTrac (Imaging custom database) and Reporting Data-Marts for data enrichment and validation (3 – 4 System Interfaces have been estimated for this project)
- Develop the Implementation Plan for the Construct, Test and Deploy phase that includes a high-level project plan, resources and costs

**Project Approach**
We will work collaboratively with GMAC Mortgage's project team for this SOW and will complete this work by utilizing the five step approach described below.



Confidential – GMAC Mortgage

| Work Step | Key Activities | Key Outputs |
|---|---|---|
| **Objectives:** The objective of this step is to align KPMG and GMAC Mortgage's project objectives, determine scope and strategic direction, initiate project activities and mobilize a joint project team. | | |
| **Step 1:** Scoping and Mobilization | • Confirm project objectives, scope and deliverables with project sponsor<br><br>• Confirm Steering Committee / Client team participation, roles and responsibilities<br><br>• Finalize project charter, high-level work plan and timing<br><br>• Identify key stakeholders, other key management and resources for interviews and working sessions<br><br>• Start scheduling interviews and work sessions<br><br>• Prepare for and conduct project kickoff | • Work Plan / Project Calendar<br><br>• Project Charter |
| **Objectives:** The objective of this step is to identify and map future state business processes that include an end-to-end process map for recovery, curative, collateral transfer and document tracking. | | |
| **Step 2:** Develop Future State Business Process Definition | • Develop and agree upon guiding/design principles for future state business definitions and functional design (e.g., use of document management business web services within the enterprise via switch to integrate with FileNet's Image Repository) leveraging already collected criteria<br><br>• Develop a rough draft of the process maps for recovery, curative, collateral transfer and document tracking leveraging the process maps completed during the assessment/roadmap phase as well as interview/work session outputs from both the assessment/roadmap and program planning phases<br><br>• Prepare for and conduct challenge/review sessions with selected Line of Business (LOB) stakeholders to validate and refine future state process maps, as follows:<br><br>   - Business processes for recovery, curative, collateral transfer and document tracking processes<br>   - Timing and frequency<br>   - Roles and accountabilities<br>   - Key inputs, outputs and assumptions for processes<br><br>• Refine process maps for recovery, curative, collateral transfer and document tracking based on challenge/review sessions<br><br>• Finalize and obtain sign-off on processes from LOB | • Future State Process Maps (Level 2 and Level 3) |

Confidential – GMAC Mortgage

| Objectives: The objective of this step is to develop the functional design of the Records Case Management System. | | |
|---|---|---|
| **Step 3:**<br>Develop<br>Functional Design | • Identify appropriate Use Cases based on the developed business process maps (approximately 15-18 Use Cases)<br><br>• Develop a rough draft for each identified Use Case leveraging content already created during the program planning phase documenting the following:<br><br>  – High-level scope, triggers, actors, high level process maps, data elements and flow of events<br><br>  – User-Interface ("UI") specifications<br><br>• Prepare for and conduct iterative challenge/review sessions with key business and technology stakeholders to validate and refine Use Cases and UI specifications<br><br>• Review and finalize the Use Cases and UI specifications with project sponsor and appropriate stakeholders<br><br>• Review functional and non-functional requirements developed during the assessment/roadmap phase and extract applicable requirements for the Records Case Management project<br><br>• Elaborate and expand on functional and non-functional requirements leveraging the developed Use Cases<br><br>• Prepare for and conduct challenge/review session with applicable stakeholders to validate and refine functional and non-functional requirements<br><br>• Review and finalize functional and non-functional requirements with project sponsor and appropriate stakeholders<br><br>• Develop a traceability matrix validating that each functional requirement is mapped to a Use Case making adjustments to Use Cases where necessary<br><br>• Prepare for and conduct challenge/review session with applicable stakeholders to validate and refine traceability matrix<br><br>• Review and finalize traceability matrix with project sponsor and appropriate stakeholders | • Use Cases<br><br>• Functional and Non-Functional Requirements<br><br>• User-Interface Specifications<br><br>• Traceability Matrix |
| Objectives: The objective of this step is to develop the Technical Design for the Records Case Management System. | | |
| **Step 4:**<br>Develop Technical Design | • Develop the Content Management solution architecture including the definition of the:<br><br>  – Class structure and classifications for files / documents<br><br>  – Metadata for Final Documents<br><br>  – Events to trigger and clear exceptions<br><br>  – Events to update document location<br><br>• Define the base workflow and sub-workflows architecture / design for:<br><br>  – Recovery<br><br>  – Curative<br><br>  – Collateral Transfer<br><br>  – Document Tracking<br><br>• Define the user interface architecture / design leveraging the UI specifications<br><br>• Define architecture and technical design for required reports and | • Architecture Design Document<br><br>• Interface Specifications |

Confidential – GMAC Mortgage

| | | |
|---|---|---|
| | management dashboards | |
| | • Prepare for and conduct challenge/review sessions to confirm and refine the proposed solution architecture (i.e., content management, workflow, user interface, reports, and dashboards) | |
| | • Review and finalize solution architecture with project sponsor and appropriate stakeholders | |
| | • Conduct discovery sessions with appropriate stakeholders to gain understanding of required integration with the following systems: | |
| |     - FileNet Imaging Repository | |
| |     - DocTrac Database | |
| |     - Reporting DataMart | |
| | • Develop interface specifications based on discovery sessions | |
| | • Prepare for and conduct a challenge/review sessions to validate and refine interface specifications | |
| | • Review and finalize interface specifications | |
| | **Note:** Solution architecture for each component (i.e., Content Management, Workflow, Reporting) will be tailored based on the selected solution and functional design | |
| **Objectives:** The objective of this step is to develop the implementation plan for the Construct, Test and Deploy Phase. | | |
| **Step 5:** Develop Implementation Plan | • Develop the construct, test, and deploy estimate based on the functional and technical design<br>• Develop the implementation plan (project plan, resources, and cost) leveraging the completed estimate / work effort<br>• Prepare for and conduct a challenge/review session to validate and refine the implementation plan<br>• Review and finalize the implementation plan<br>• Continue to support GMAC Mortgage with document management program related activities including but not limited to:<br>    - Socializing and reprioritizing roadmap and business case with required stakeholders (e.g., Consumer Lending)<br>    - Assist with tollgate process including the preparation of materials and funding requirements to attain Tollgate 2 funding (e.g., Business Case, APEX Sizing Tool) | • Implementation Plan - project plan, resources and costs<br>• Tollgate Materials / Funding Requirements (e.g., Business Case, APEX Sizing Tool) for Tollgate 2 |

III.   **DELIVERABLES**

Draft deliverables will be provided to GMAC Mortgage for review and comment prior to final delivery. The deliverables delivered pursuant to this SOW constitute Work Product as defined in the Agreement. KPMG will provide the final deliverables in an editable Word format, as well as PDF.

Deliverables will not be prepared on KPMG letterhead or contain the KPMG logo or other references to KPMG. KPMG may attach a transmittal letter to each deliverable, or provide a periodic transmittal letter referring to the deliverables that have been provided previously.

Deliverables for this project will be developed based on our project approach and will include the following:

**Step 1: Scoping and Mobilization**

> **Work Plan / Project Calendar** – KPMG will develop a project work-plan and project calendar that will have key dates, working session schedule activities and milestones.

Confidential – GMAC Mortgage

**Project Charter** – KPMG will assist GMAC Mortgage to draft the project charter including identifying key stakeholders, enabling team structure, project objectives, scope and deliverables.

**Step 2: Develop Future State Business Process Definition**

**Future State Process Maps (Level 2 and Level 3)** – defines the future state business process and includes process maps (Level 2 and Level 3) for Record Services business functions - recovery, curative, collateral transfer and document tracking.

**Step 3: Develop Functional Design**

**Use Cases** – includes the business scenarios for the Record Services functions – recovery, curative, collateral transfer and document tracking and includes the high-level scope, triggers, actors, process maps, data elements and flow of events. (15 -18 Use Cases have been estimated for this project)

**Functional and Non-Functional Requirements** – includes the functional / process requirements for Records Case Management system and non-functional requirements - scalability, availability, performance, usability, security and auditing requirements for the Document Management platform.

**User-Interface Specifications** – supplements the Use Cases and defines the structure and layout of the user-interface screens and will be developed for each of the Use Cases.

**Traceability Matrix** – maps the functional requirements to Use Cases to track and confirm that the business / functional requirements will be addressed as part of the Records Case Management system.

**Step 4: Develop Technical Design**

**Architecture Design Document** - defines the solution architecture that includes the logical and physical / deployment views and will include the technical design of content / document management, process management (workflow), rules, reporting, data and security design.

**Interface Specifications** - defines the system interfaces for the Records Case Management system and will include the technical design to integrate with FileNet Imaging Repository, DocTrac (Imaging custom database) and Reporting data-marts for data-enrichment and validation of loans. (3 - 4 System Interfaces have been estimated for this project)

**Step 5: Develop Implementation Plan**

**Implementation Plan** – defines the implementation plan for the Construct, Test and Deploy phase of the Records Case Management System and includes the resource needs and costs. The implementation plan will also conform to any appropriate GMAC Mortgage standards and be in MS Project.

**Tollgate Materials / Funding Requirements (e.g., Business Case, APEX Sizing Tool) for Tollgate 2** – includes the refinement of the program one-time and operating costs, benefits (qualitative and quantitative) as well as anticipated execution risks for the Records Case Management system. This will be socialized with the appropriate IT, Business and Finance stakeholders prior to finalization.

**Time Schedule**

KPMG personnel will work at GMAC Mortgage's designated Fort Washington, PA facilities Monday through Thursday, with limited time at the Waterloo, IA facilities as required, and continue project work from their KPMG home offices on Friday. We have estimated the project duration of 14 weeks on-task time for this initiative and the anticipated timeline is illustrated below.

Confidential – GMAC Mortgage



1 Work Plan / Project Calendar
2 Project Charter
3 Process Maps
4 Use Cases
5 Functional and Non-Functional Requirements
6 User-Interface Specifications
7 Traceability Matrix
8 Architecture Design Document
9 Interface Specifications
10 Implementation Plan
11 Tollgate Materials

## IV. **PROJECT ORGANIZATION**

KPMG Team will be comprised of both functional and technical resources to support GMAC Mortgage in this initiative. The project team will be supported as required by subject matter professionals, bringing specific skills to augment the core team.

**Lead Partner:** Jim McAveeney (Principal, KPMG Midwest Advisory - Financial Services) will be responsible for the overall quality of service that GMAC Mortgage receives in connection with this SOW.

**Project Leadership:** Chetan Nair (Director, KPMG Midwest Advisory - Financial Services) will be the primary resource for coordinating our Services including all client work and deliverables and act as the Engagement Leader and Senior Application Architect.

**Engagement Management:** Pedro Calado (Manager, KPMG Midwest Advisory – Financial Services) will manage daily project activities and provide subject matter experience of GMAC Mortgage's business processes and systems.

**Solution Architect** – TBD (KPMG Midwest Advisory – Financial Services) will manage the technical design and provide subject matter experience in Systems Architecture and Enterprise Content Management (ECM) / Business Process Management (BPM).

**Engagement Staff:** Paul Rho (Senior Associate, KPMG Advisory) and TBD (Associate, KPMG Advisory) will be the primary resources supporting the analysis and development of all client work and deliverables.

Confidential – GMAC Mortgage



Key project contacts for this SOW include the following:

| Resource Name | Location | Office Phone |
|---|---|---|
| James McAveeney | Chicago, IL | 312-665-2188 |
| Chetan Nair | Columbus, OH | 614-249-2338 |
| Pedro Calado | Detroit, MI | 313-230-3062 |

## V.    CLIENT RESPONSIBILITIES

During the development of this SOW, we have been guided by certain assumptions about the project scope, and level of GMAC Mortgage's involvement and support.

**GMAC Mortgage Support.** We will require the support of GMAC Mortgage personnel in order to achieve timely completion of the project. Support includes, but is not limited to, the collection of all relevant documents (paper or electronic) and the scheduling of interviews and coordination of meetings. In-case of project delays due to availability and scheduling of GMAC Mortgage stakeholders and key resources for interviews and work sessions; we will work in good faith and discuss options with GMAC Mortgage's project sponsor towards a mutually agreed solution.

In addition, we will require adequate work space in which to conduct interviews, hold working sessions with groups of individuals, and hold team meetings. Finally, we will need access to a project team workstation with an ability to print working and final documents.

**Project Management.** GMAC Mortgage will be responsible for all management functions and decisions relating to this SOW. GMAC Mortgage will designate a management level individual with appropriate background and knowledge, who is capable of making the decisions necessary to oversee the conduct of this project, including

Confidential – GMAC Mortgage

coordination of GMAC Mortgage resources needed and review of draft deliverables. GMAC Mortgage personnel assigned to the project will review draft deliverables on a timely basis.

GMAC Mortgage will provide KPMG with their Project Management - APEX Plan and Define project templates that will be leveraged for developing the deliverables for this SOW. GMAC Mortgage gives KPMG the right to use the GMAC Mortgage logo on GMAC Mortgage provided templates (e.g., APEX templates) and presentations required to brief internal GMAC Mortgage stakeholders.

## VI.    CHANGE ORDERS

Change Orders will be addressed in accordance with Section 9 of the Agreement including changes required as a result of GMAC Mortgage templates being substantially different than the scope defined and agreed upon in the engagement.

## VII.    ACCEPTANCE CRITERIA AND PROCEDURES

Deliverables specified for each step of the SOW will be presented upon the completion of that step to GMAC Project Leadership – Robert Keeton for approval. Acceptance will be based upon the completion of the deliverable within the scope of the SOW and at a level of specificity commensurate with the constraints placed upon it. Upon the completion of all Services and deliverables, the body of work consisting of all deliverables will be submitted to the GMAC Project Leadership for final approval.

## VIII.    PAYMENT and INVOICING

We are prepared to begin work upon receipt of a mutually executed signed copy of this SOW and at a time mutually determined by GMAC Mortgage and KPMG. The following table represents our rates by level, discounted for GMAC Mortgage:

| Resource level | Billing Rate |
|---|---|
| Principal | $330 |
| Director / Sr. Manager | $260 |
| Manager | $215 |
| Sr. Associate | $195 |
| Associate | $160 |

KPMG will bill for the Services for this SOW on a Time & Material basis with the professional fees not to exceed: $586,000. The following table represents the resources required, the estimated time and estimated cost to complete the Services.

| Resource Role | Resource Level | Estimated Hours | Estimated Cost |
|---|---|---|---|
| Jim McAveeney, Engagement Principal | Principal | 56 | $18,480 |
| Chetan Nair, Engagement Leader | Director | 504 | $131,020 |
| Pedro Calado, Engagement Manager | Manager | 630 | $135,450 |
| Solution Architect, Technical Manager | Manager | 360 | $77,400 |
| Paul Rho, Engagement Staff | Senior Associate | 630 | $122,850 |
| TBD, Engagement Staff | Associate | 630 | $100,800 |

Confidential – GMAC Mortgage

In addition to the professional fees of $586,000 quoted above, KPMG will be reimbursed for actual out-of-pocket expenses not to exceed 18% of professional fees.

If out-of-pocket expenses are to exceed 18% of the professional fees, KPMG will make the GMAC Mortgage project leader aware and work to manage expenses appropriately. KPMG's out-of-pocket expenses will be added to and reported as separate line items on each bill and will include, but are not limited to, travel, meals, and accommodations in accordance with GMAC Mortgage's travel policy. KPMG will bill on a monthly basis for actual hours performed and the invoice will include the out-of-pocket expenses.

The Services provided hereunder are not intended to be an audit, examination, attestation, special report or agreed-upon procedures engagement as those services are defined in American Institute of Certified Public Accountants (AICPA) literature applicable to such engagements conducted by independent auditors. Accordingly, these Services will not result in the issuance of a written communication to third parties by KPMG directly reporting on financial data or internal control or expressing a conclusion or any other form of assurance.

## IX.    ESTIMATED PROJECT TIMETABLE

| | | |
|---|---|---|
| Start date | July 16, 2012 | |
| Project Mobilization | July 20, 2012 | Deliverables due |
| Develop Future State Business Process Definition | August 15, 2012 | Deliverables due |
| Develop Functional Design | October 3, 2012 | Deliverables due |
| Develop Technical Design | October 12, 2012 | Deliverables due |
| Develop Implementation Plan | October 19, 2012 | Deliverables due |

Please refer to the Deliverables (section III) that provides the timetable and milestones for each of the project deliverables.

Confidential – GMAC Mortgage

**IN WITNESS WHEREOF**, the parties hereto have executed this Statement of Work as of the day and year first written above.

| GMAC Mortgage, LLC | KPMG LLP |
|---|---|
| By: | By: |
| Printed Name: _JOSEL DOMINGUEZ_ | Printed Name:  James W. McAveeney |
| Title: _SOURCING DIRECTOR_ | Title:  Principal |
| Date:  7/13/12 | Date:  July 10, 2012 |



## MASTER PROFESSIONAL SERVICES AGREEMENT
### Multiple Engagement

THIS MASTER PROFESSIONAL SERVICES AGREEMENT ("Agreement"), dated as of July 1, 2008 (the "Effective Date"), is between **GMAC LLC**, a Delaware limited liability company having its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265 ("Client"), and **KPMG LLP**, a Delaware registered limited liability partnership with an office at 150 West Jefferson, Detroit, Michigan 48226 ("Contractor") (Client and Contractor are each, a "Party", and collectively, the "Parties").

### Recitals

A.    **WHEREAS,** GMAC or any GMAC Subsidiary (as defined herein) may from time to time to engage Contractor to perform certain professional non-audit services; and

B.    **WHEREAS,** Contractor desires to perform such professional services for GMAC or any GMAC Subsidiary.

C.    **NOW THEREFORE,** in consideration of the foregoing premises and the mutual covenants and agreements set forth herein, the Parties hereto agree as follows:

### Agreement

### 1. Scope and Performance of Services.

A.    GMAC agrees to retain Contractor to perform professional services for GMAC or any company domiciled in the United States in which GMAC holds a majority interest ( a "GMAC Subsidiary") on a task-by-task basis (the "Services") and Contractor agrees to furnish the Services on the terms and subject to the conditions set forth in this Agreement. References to "Client" within this Agreement shall refer to the entity that engages Contractor to perform Services, which will be either GMAC or a GMAC Subsidiary. During the term of this Agreement, Client and Contractor will develop and agree upon statements of work defining the Services and work product to be provided by Contractor, Contractor's compensation, deadlines, if any, additional terms and conditions applicable to specific engagements, if any, and such other details as the parties deem appropriate (each a "Statement of Work"). Statements of Work shall reference this Agreement, shall be executed by the parties and shall form a part of this Agreement. In the event of a conflict between the provisions of this Agreement and the specific provisions in a Statement of Work, the provisions in the Statement of Work shall control if they expressly reference the provisions of this Agreement with which they are inconsistent. Notwithstanding anything herein to the contrary, the Services shall not include (i) the provision of expert testimony on behalf of Client or (ii) any service that would require Contractor to maintain independence from Client in accordance with then current applicable law, rule or regulation of any governmental entity or professional organization.

Unless expressly set forth in a Statement of Work with respect to tax services, the Services do not include representing Client in the event of a challenge by the United States Internal Revenue Service (the "IRS") or other tax or revenue authorities.

**B.**    Contractor represents and warrants that it shall provide sufficient qualified personnel to perform the Services required by each Statement of Work and shall perform such Services in a competent and workmanlike manner in accordance with American Institute of Certified Public Accountants ("AICPA") and other professional standards applicable to Contractor's performance of the Services and in accordance with the terms of the applicable Statement of Work and this Agreement. Contractor's personnel performing the Services on Client's premises shall comply with Client's rules and regulations pertaining to security of and access to Client's premises and facilities of which Contractor has been informed in writing.

**C.**    Client agrees to cooperate with Contractor in the performance of the Services and shall provide or arrange to provide Contractor with timely access to and use of the personnel, facilities, equipment, data and information to the extent necessary for Contractor to perform the Services. Statements of Work may set forth additional details regarding Contractor's access to and use of personnel, facilities, equipment, data and information. If Contractor is given a key, code, combination or other access device to Client's premises, Contractor shall: (a) safeguard it with the same degree of care as Contractor safeguards keys to its own premises, but in no event with less than reasonable care; (b) account for all keys and access devices whenever requested to do so by Client; and (c) return all such keys and access devices immediately upon request by Client.   Client shall have the right to inspect the contents of all containers or packages being brought into or removed from Client's locations.   Contractor's and its employees, agents and subcontractors use of Client's computers, equipment and systems ("Client Systems") shall be only to the extent necessary to perform the Services hereunder.   Client may monitor such use of the Client Systems.   In the event Client, in its sole discretion, determines that Contractor failed to comply with this provision, Client may immediately terminate this Agreement or take such action as it deems appropriate, and Client's sole liability shall be for payment of Services already rendered.

**D.**     Client may request changes that affect the scope or duration of the Services relating to any Statement of Work and Contractor may notify Client that it has encountered issues or circumstances related to the Services that are beyond the scope of Services under a Statement of Work. If Client requests such a change or if Contractor notifies Client of issues or circumstances beyond the applicable scope of Services, then Contractor promptly shall notify Client if Contractor believes that an adjustment in the scope of Services, fees to be paid to Contractor with respect to the applicable Statement of Work or applicable deadlines is required and the parties shall negotiate in good faith a reasonable and equitable adjustment in the applicable scope, fees or deadlines. Unless Client directs Contractor to stop work pending acceptance of such change, Contractor shall continue work pursuant to the existing Statement of Work, and shall not be bound by any change requested by Client, until Contractor has accepted such change in writing.

**E.**     To the extent applicable to the Services, a Statement of Work shall set forth the obligations of Client in connection with such Services. Client agrees to perform such obligations in accordance with, and subject to, such Statement of Work. Client acknowledges that its failure to meet such obligations could adversely affect Contractor's ability to provide the Services in accordance with the terms of this Agreement and the applicable Statement of Work.

**F.**     Client acknowledges and agrees that Contractor will, in performing the Services, base its conclusions on the facts and assumptions that Client furnishes and that Contractor may use data, material, and other information furnished by or at the request or direction of Client without any independent investigation or verification and that Contractor shall be entitled to rely upon the accuracy and completeness of such data, material and other information. Inaccuracy or incompleteness of such data, material and other information furnished to Contractor could have a material effect on Contractor's conclusions.

**G.**     It is understood and agreed that Contractor's services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client. Contractor will not perform management functions or make management decisions for Client. In connection with Contractor's provision of Services under a Statement of Work, Client agrees that Client, and not Contractor, shall perform the following functions: (i) make all management decisions and perform all management functions; (ii) designate an individual who possesses suitable skill, knowledge and experience, to oversee such services, and to evaluate the adequacy and results of such services; (iii) accept responsibility for the results of such services; and (iv) establish and maintain internal controls over the processes with which such services are concerned, including monitoring on-going activities.

**H.**     Subsequent to the completion of the Services under a Statement of Work, Contractor will not update its advice, recommendations or work product for changes or modification to the law and regulations, or to the judicial and administrative interpretations thereof, or for

- 3 -

subsequent events or transactions, unless Client separately engages Contractor to do so in writing after such changes or modifications, interpretations, events or transactions.

## 2. Term.

The term of this Agreement shall begin on the date hereof and shall continue until terminated by either Party pursuant to Paragraph 6 hereof.

## 3. Contractor's Compensation.

A.      During the term of this Agreement, Client agrees to compensate Contractor as set forth in the applicable Statement of Work. Contractor may be compensated on a time and materials or fixed price or other basis. In addition, Client shall reimburse Contractor its actual out-of-pocket expenses as reasonably incurred by Contractor in connection with its performance of the Services in accordance with Client's current travel and expense reimbursement policies.

B.      Contractor shall bill Client at agreed intervals as set forth in the applicable Statement of Work. Contractor shall mail invoices to Client at the address set forth in the applicable Statement of Work. Client shall pay properly submitted invoices on the second day of the second month following receipt of the invoice.

C.      All fees, charges and other amounts payable to Contractor hereunder do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties that become payable as a result of Services, payment of which shall be the sole responsibility of Client (excluding any applicable taxes based on Contractor's net income, taxes arising from the employment or independent contractor relationship between Contractor and its personnel, or other taxes that are payable by Contractor in the ordinary course of its business). In the event that such taxes, tariffs or duties are assessed against Contractor, Client shall reimburse Contractor for any such amounts paid by Contractor or provide Contractor with valid tax exemption certificates with respect thereto.

D.      Contractor shall maintain written records of the fees and expenses charged to Client with respect to the Services under each Statement of Work. Contractor shall retain such records for two years after the completion or termination of the Services to which they pertain and shall make such records available to Client during normal business hours upon reasonable advance written notice. Contractor shall cooperate in any audit of such records that Client may undertake; provided, however, that: (i) any such audit shall be at Client's sole expense; (ii) no such audit may occur more than once in any twelve (12) month period and (iii) Contractor shall have the right to approve the auditor used for any such audit with such approval not to be unreasonably withheld. .

## 4. Ownership and Use of Materials Related to Services.

A.      The Parties agree that all documents, designs, copyrightable material and other tangible materials authored or prepared by Contractor for Client as the work product required by a Statement of Work (collectively, the "Works") are the sole and exclusive property of Client and shall be considered works made for hire. In the event any such Works do not fall within the specifically enumerated works that constitute works made for hire under the United States copyright laws, Contractor hereby agrees to assign and, upon their authorship or

creation, expressly and automatically assigns all copyrights, proprietary rights, trade secrets, and other right, title and interest in and to the Works to Client. Contractor agrees to render to Client, at Client's sole cost and expense, all reasonably required assistance to protect the rights herein above described.

B.    Client acknowledges that Contractor provides professional services to other clients, and agrees that nothing in this Agreement shall be deemed or construed to prevent Contractor from carrying on such business. In particular, Client agrees that, notwithstanding anything in this Agreement to the contrary: (i) Contractor shall have the right to retain a copy of each of the Works for its records; and (ii) Contractor's administrative communications, records, files and working papers relating to the Services and the intellectual property rights associated with any know how, tools models, methodologies and techniques utilized or developed by Contractor prior to the Effective Date or during the course of this Agreement and, (a) to the extent included in the Works, the general elements of style, design, art work and graphics, and (b) content of general applicability not specific to Client (including Client Confidential Information) or the Services under a Statement of Work (collectively, "Contractor's Property") are not deemed to be Works and belong to Contractor. To the extent that any of Contractor's Property is contained in any of the Works, Contractor hereby grants Client, upon full and final payment of all amounts due Contractor under the applicable Statement of Work, a royalty-free paid-up, non-exclusive license to use Contractor's Property in connection with Client's use of the Works.

C.    Client acknowledges and agrees that any advice, recommendations, information or work product provided to Client by Contractor in connection with the Services is for the sole use of Client and may not be relied upon by any third party. Client agrees that if it makes such advice, recommendations, information or work product available to any third party other than as expressly permitted by the applicable Statement of Work the provisions of Paragraph 8(d) shall apply unless Client provides the written notice to the third party in substantially the form of Exhibit B hereto (the "Notice"), which Notice shall be acknowledged in writing by such third party and returned to Client. Upon request, Client shall provide Contractor with a copy of the foregoing Notice and acknowledgement and any notice and acknowledgement sent to Client by such third party as contemplated by the Notice. Notwithstanding the foregoing, (i) in the event of a disclosure made by Client that is required by law, that is made to a regulatory authority having jurisdiction over Client or that is made pursuant to Paragraph 16(a) below, no acknowledgement of the Notice shall be required and (ii) no Notice or acknowledgement shall be required with respect to disclosures expressly authorized by the terms of the applicable Statement of Work.

5.    **Contractor's Limited Warranties and Warranty Disclaimer.**    In addition to the warranties set forth in Section 1:

A.    Contractor represents and warrants to Client that Contractor's performance of the Services called for by this Agreement do not violate any applicable law, rule, or regulation.

B.    Contractor represents and warrants to Client that Contractor has full authority and sufficient rights, except for rights respecting programs, data and materials provided by Client or identified by Contractor as furnished to Client by third-party vendors, to grant and convey

the rights granted to Client under Paragraph 4 hereof. Contractor further represents and warrants to Client that any rights granted to Client under Paragraph 4 will not infringe the rights of any third-party.

C.      Except as set forth in this Agreement, Contractor disclaims all other warranties, either express or implied.

## 6. Termination.

A.      At any time that there is no uncompleted Statement of Work outstanding, either Party may terminate this Agreement for any or no reason upon thirty (30) days advance written notice to the other.

B.      In addition, (i) either Party may terminate this Agreement or any outstanding Statement of Work upon thirty (30) days written notice to the other Party, in the event such other Party breaches a material term of this Agreement or any Statement of Work and such breach remains uncured at the end of such thirty (30) day period and (ii) either Party may terminate any outstanding Statement of Work for any or no reason upon thirty (30) days advance written notice to the other.

## 7. Liabilities and Remedies for Infringement.

A.      Contractor hereby agrees to indemnify, hold harmless and defend Client from and against any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by any third party against Client to the extent such Liabilities result from the infringement by the Works (including any Contractor Property included therein) of the rights of any third party's patents issued as of the date of the applicable Statement of Work, trade secrets, copyrights or other intellectual property rights. The foregoing provisions shall not apply to any infringement arising out of: (i) use of the Works other than for the permitted purposes as set forth in the Statement of Work or this Agreement or in accordance with applicable documentation and instructions supplied by Contractor in writing or for other than Client's internal purposes; (ii) any alteration, modification or revision of the Works not expressly authorized in writing by Contractor; or (iii) the combination of the Works with materials not supplied by Contractor.

B.      In case any of the Works or any portion thereof is held, or in Contractor's reasonable opinion is likely to be held, in any such suit to constitute infringement, Contractor may within a reasonable time, at its option, either: (i) secure for Client the right to continue the use of such infringing item; or (ii) replace, at Contractor's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing. In the event Contractor is, in Contractor's reasonable discretion, unable to either procure the right to continued use of the allegedly infringing item or replace the allegedly infringing item as provided in clauses (i) and (ii) of the immediately preceding sentence, the allegedly infringing item shall be returned to Contractor, and Contractor's sole liability shall be to refund to Client the amount paid to Contractor for such item; provided that the foregoing shall not be construed to limit Contractor's indemnification obligation set forth in Paragraph 7(a) above.

C.    The provisions of this Paragraph 7 state Contractor's entire liability and Client's sole and exclusive remedies with respect to any infringement or claim of infringement.

## 8. Limitations of Liability; Indemnification.

A.    EACH PARTY'S MAXIMUM LIABILITY TO THE OTHER ARISING FOR ANY REASON RELATING TO THE SERVICES PROVIDED UNDER A STATEMENT OF WORK SHALL BE LIMITED TO THE GREATER OF THREE TIMES THE AMOUNT OF THE FEES PAID OR OWING TO CONTRACTOR FOR THE PERFORMANCE OF SUCH SERVICES OR TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00).

B.    NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER FOR ANY LOST PROFITS OR SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

C.1    **Exclusions**.  The limitations or exculpations of liability set forth in Sections 8(A) and 8(B) above shall not apply to (a) either party's liability (i) for indemnification obligation set forth herein , (ii) resulting from its gross negligence (as defined below) or intentional misconduct;  and (iii) for a breach of its obligations under Section 9 (Confidential Information).  For purposes of these terms and conditions, the term "gross negligence" is defined to mean a lack of slight diligence or care, or a conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to the other party.

C.2    Each Party agrees to indemnify, hold harmless and defend the other Party from and against any and all Liabilities for physical injury to, illness or death of, any person or persons regardless of status, and damage to or destruction of any tangible property which the other Party may sustain or incur to the extent such Liabilities result from the negligence or willful misconduct of the indemnifying Party.

D.    In accordance with Paragraph 4(c), Client will indemnify, defend and hold harmless Contractor from and against any and all Liabilities incurred or suffered by or asserted against Contractor in connection with a third party claim to the extent resulting from such third party's use or possession of or reliance upon Contractor's advice, recommendations, information or work product as a result of Client's disclosure of such advice, recommendations, information or work product without adhering to the notice requirements of Paragraph 4(c) above.

E.    The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification hereunder and the Indemnifying Party shall have the exclusive right and authority to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense and the Indemnified Party shall cooperate with the Indemnifying Party in connection therewith. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified

Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages.

## 9. Confidential Information.

A.      "Confidential Information" means any information of a confidential or proprietary nature received by a party ("Receiving Party"), directly or indirectly, from the other party ("Disclosing Party"), or acquired or developed pursuant to the provision of the Services, including, but not limited to, business affairs, data, designs, manuals, training materials and documentation, formulas, ideas, inventions, knowledge of financial, insurance or mortgage processes, mask-works, methods, prices, financial and accounting data, products and product specifications, systems, technical information, and the terms of the Agreement (all of the foregoing collectively referred to as "Confidential Information"). Notwithstanding the foregoing, Confidential Information does not include information which: (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is independently developed by the Receiving Party without knowledge of or the benefit of the Disclosing Party's Confidential Information; (iv) relates to the tax treatment or tax structure of any transaction; (v) the Receiving Party determines is required to be maintained or disclosed by the Receiving Party under sections 6011, 6111 and 6112 of the Internal Revenue Code ("IRC") and the regulations thereunder or similar or analogous provisions of a state or other jurisdiction or (vi) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality.

B.      The Receiving Party will deliver to the Disclosing Party all Confidential Information of the Disclosing Party and all copies thereof when the Disclosing Party requests the same, except for one copy thereof that the Receiving Party may retain for its records. Notwithstanding anything to the contrary, the Receiving Party shall not be obligated to erase Confidential Information that is contained in an archive computer system backup that was made in accordance with the Receiving Party's archive systems procedures or security and/or disaster recovery procedures. The Receiving Party shall not use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's prior written permission; provided, however, that notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is required to be disclosed pursuant to a statutory or regulatory provision or court order or to fulfill professional obligations and standards.

C.      Each party shall be deemed to have met its nondisclosure obligations under this Paragraph 9 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

D.      If the Receiving Party receives a subpoena or other validly issued administrative or judicial demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall provide prompt written notice to the Disclosing Party of such demand in order to permit it to seek a protective order. So long as the Receiving Party gives notice as

provided herein, the Receiving Party shall be entitled to comply with such demand to the extent permitted by law, subject to any protective order or the like that may have been entered in the matter.

### E.  Data Protection and Security

**Consumer Information.**  In addition to the obligations otherwise stated in the Agreement, Contractor will protect Consumer Information.  Except to the extent required by law, Contractor will not provide Consumer Information in any form to any third party without Client's prior written consent.  "**Consumer Information**" means customer information as set forth in 16 C.F.R. §314.2(b) (2003) as well as any information that identifies a customer or consumer (as such terms as defined by the Gramm-Leach-Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1138), as amended from time to time) and information from which a customer's or consumer's identity can be ascertained, either from the information itself or by combining the information with information with other sources.  Consumer Information also includes any information Client (including any Affiliate) may directly or indirectly disclose to Contractor or to which Contractor may have access due to Contractor's relationship with Client or an Affiliate that relates to an individual.  This includes, but is not limited to, financial information, medical or health related information that may include such information as credit history; income; financial benefits; application, loan or claim information; health information; medical records; names or lists of individuals derived from nonpublic personally identifiable information or otherwise derived from Client or an Affiliate; and the identification of an individual as a Client or as an individual claimant.

**Data Security.**  Contractor will maintain safeguards and take technical and organizational precautions designed to ensure Consumer Information against destruction, loss, alteration, unauthorized access or disclosure by third parties while in the possession or under the control of Contractor.

### 10.  Independent Contractor.

Contractor is performing the Services as an independent contractor and not as an employee of Client and none of Contractor's personnel shall be entitled to receive any compensation, benefits or other incidents of employment from Client. Subject to Paragraph 3(c), Contractor shall be responsible for all taxes and other expenses arising from the employment or independent contractor relationship between Contractor and its personnel and the rendition of Services hereunder by such personnel to Client. Nothing in this Agreement shall be deemed to constitute a partnership or joint venture between Client and Contractor, nor shall anything in this Agreement be deemed to constitute Contractor or Client the agent of the other. Neither Contractor nor Client shall be or become liable or bound by any representation, act or omission whatsoever of the other.

### 11.  Assignment; Use of Member Firms.

Neither party shall assign, transfer, delegate or subcontract this Agreement or any of its obligations hereunder or under a Statement of Work without the other party's prior written consent, such consent not to be unreasonably withheld. Notwithstanding the foregoing, to the extent any of the Services will be performed in or relate to a jurisdiction outside of the United

States, Client acknowledges and agrees that such Services, including any applicable tax advice, may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Client consents to Contractor's disclosure to a member firm and such member firm's use of data and information, including tax return information, received from or at the request or direction of Client for the purpose of completing the Services under the applicable Statement of Work; provided, however, that Contractor shall remain liable for such member firm.

**12. Notices.**

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given upon personal delivery, five (5) days after being mailed by registered or certified mail, return receipt requested, or one (1) business day after being sent by nationally recognized overnight courier. Notices shall be addressed as follows:

| | |
|---|---|
| If to Client: | GMAC LLC<br>200 Renaissance Center<br>P.O. Box 200<br>Detroit, Michigan 48265-2000<br>Attention: Mr. Mark Weintraub, General Auditor |
| With a copy to: | GMAC LLC<br>LEGAL STAFF<br>200 Renaissance Center<br>P.O. Box 200<br>Mail Code: 482-B09-B11<br>Detroit, Michigan 48265-2000<br>Attention: Jeffrey A. Belisle |
| If to Contractor: | KPMG LLP<br>150 West Jefferson, Suite 1200<br>Detroit, Michigan 48226<br>Attention: Mr. Jeffrey Dobbs, Office Managing Partner |
| With a copy to: | KPMG LLP<br>Office of General Counsel<br>757 Third Avenue<br>New York, New York 10017<br>Attention: General Counsel<br>Fax Number: 212-909-5485 |

### 13. Severability; Governing Law.

In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, impaired or invalidated, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. This Agreement and the Statements of Work entered into hereunder shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws provisions thereof.

### 14. Integration.

This Agreement, including any Statements of Work entered into pursuant hereto, constitutes the entire agreement of the parties hereto with respect to its subject matter and supersedes all prior and contemporaneous representations, proposals, discussions, and communications, whether oral or in writing. This Agreement may be modified only in writing and shall be enforceable in accordance with its terms when signed by each of the parties hereto.

### 15. Insurance.

Throughout the term of this Agreement, Contractor shall maintain workers compensation insurance in the amount required by statute, comprehensive general liability insurance with coverage of at least one million dollars ($1,000,000) and professional errors and omissions insurance with coverage of at least one million dollars ($1,000,000), in connection with the provision of Services by Contractor pursuant to the terms of this Agreement. At Client's request, Contractor shall provide Client with certificates or other acceptable evidence of insurance or self-insurance evidencing the above coverage and shall provide Client with prompt written notice of any material change.

### 16. Additional Terms for Engagements Involving Tax Services.

A.      Notwithstanding anything to the contrary set forth herein, no provision in this Agreement or a Statement of Work is or is intended to be construed as a condition of confidentiality within the meaning of IRC sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. In particular, Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of the Services under a Statement of Work and all materials of any kind (including opinions and other tax analyses) that are provided to Client relating to such tax treatment and tax structure. Client also agrees to use commercially reasonable efforts to inform Contractor of any conditions of confidentiality imposed by third party advisors with respect to any transaction on which Contractor advice is requested. Such notification must occur prior to Contractor providing any advice with respect to the transaction.

B.      Information relating to advice Contractor provides to Client, including communications between Contractor and Client and material Contractor creates in the course of providing advice, may be privileged and protected from disclosure to the IRS or other governmental authority in certain circumstances. As Contractor is not able to assert the privilege on Client's behalf with respect to any communications for which privilege has been waived, Client agrees to notify Contractor of any such waivers, whether resulting from

communications with Contractor or third parties in the same or a related matter. Client also understands that privilege may not be available for communications with an audit client and that Contractor personnel providing audit and non-audit services will discuss matters that may affect the audit to the extent required by applicable professional standards. Client agrees that Contractor will not assert on Client's behalf any claim of privilege unless Client specifically instructs Contractor in writing to do so after discussing the specific request and the grounds on which such privilege claim would be made. Notwithstanding the foregoing, Client acknowledges that in no event will Contractor assert any claim of privilege that Contractor concludes, after exercising reasonable judgment, is not valid.

C.      Treasury regulations under IRC section 6011 require taxpayers to disclose to the IRS their participation in reportable transactions and IRC section 6707A imposes strict penalties for noncompliance. Client agrees to use commercially reasonable efforts to inform Contractor if Client is required to disclose any transaction covered by the Services provided under a Statement of Work as a reportable transaction to the IRS or to any state or other jurisdiction adopting similar or analogous provisions. IRC section 6111 requires a material advisor with respect to a reportable transaction to disclose information on the transaction to the IRS by a prescribed date, and IRC section 6112 requires the material advisor to maintain, and make available to the IRS upon request, a list of persons and other information with respect to the transaction. Contractor will use commercially reasonable efforts to inform Client if Contractor provides Client's identifying information to the IRS under IRC section 6111 or 6112, or to any state or other jurisdiction adopting similar or analogous provisions.

D.      In rendering tax advice, Contractor may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and the Employee Retirement Income Security Act of 1973, each as amended, and the relevant state and foreign statutes, the regulations thereunder, income tax treaties, and judicial and administrative interpretations, thereof. These authorities are subject to change, retroactively or prospectively, and any such changes could affect the validity of Contractor's advice.

E.      Client acknowledges that in connection with any tax compliance services provided by Contractor under a Statement of Work, Contractor may utilize the services of affiliates and third party service providers within and without the United States to organize and input data, operate the software used to generate tax returns for Client or its personnel and perform other related tasks. Client hereby consents to Contractor's use of such affiliates and third party service providers and the disclosure to such affiliates and third party service providers and their use of tax return information, received from Client or its personnel for the purpose of preparing, assisting in preparing, or obtaining or providing services in connection with preparing, any tax return required in connection with the Services rendered under a Statement of Work.

**17. Miscellaneous.**

A.      Except as otherwise set forh in the applicable Statement of Work, Client acknowledges that completion of the Services under a Statement of Work or acceptance of the Works thereunder will not constitute a basis for Client's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with

its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). The Services under a Statement of Work shall not be construed to support Client's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

**B.**    Each party may communicate by electronic mail or otherwise transmit documents in electronic form during the course of any Services under this Agreement. Each party accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices) and agrees that it may rely only upon a final hardcopy version of a document or other communication that is transmitted unless no such hardcopy is submitted.

**C.**    Client acknowledges that certain of Contractor's personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide Services under a Statement of Work may not be licensed as certified public accountants under the laws of any of the various states.

**D.**    Where Contractor is reimbursed for expenses, it is Contractor's policy to bill clients the amount incurred at the time the good or service is purchased. If Contractor subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, Contractor does not credit such payment to Client. Instead, Contractor applies such payments to reduce its overhead costs, which costs are taken into account in determining Contractor's standard billing rates and certain transaction charges that may be charged to clients.

## 18. Alternative Dispute Resolution.

**A.**    Any dispute or claim arising out of or relating to the this Agreement or the services under a Statement of Work shall be submitted first to non-binding mediation (unless either party elects to forego mediation by initiating a written request for arbitration) and if mediation is not successful within 90 days after the issuance by one of the parties of a request for mediation then to binding arbitration in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution ("CPR Arbitration Rules"). By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction.

**B.**    Mediation, if selected, may take place at a location to be designated by the parties using the Mediation Procedures of the International Institute for Conflict Prevention and Resolution, with the exception of paragraph 2 (Selecting the Mediator).

**C.**    Arbitration shall take place in New York, New York. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort except as provided in CPR Rule 13 (Interim Measures of Protection). Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages shall be unavailable in arbitration or any other forum. In no

event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

**D.**     Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

**E.**     Notwithstanding the agreement to such procedures, either party may seek equitable relief to enforce its rights in any court of competent jurisdiction.

## 19. Additional Terms for Due Diligence Assistance Engagements.

**A.**     The procedures Contractor will perform are limited to those referred to in the applicable Statement of Work and are limited in nature and extent to those that Client has determined meets its needs and, as such, will not necessarily disclose all significant matters about the subject company ("Target") or reveal errors in the underlying information, instances of fraud, or illegal acts, if any. Contractor will provide no assurance and make no representation regarding the sufficiency of the procedures either for the purpose for which Contractor has been engaged or for any other purpose. Contractor will express no opinion and will provide no other form of assurance on Target's historical or prospective financial information or Target's internal controls over financial reporting under any audit or other attestation standards such as those issued by the Public Company Accounting Oversight Board and the AICPA.

**B.**     Contractor's estimates of fees and expenses depends upon a variety of factors outside Contractor's control, including but not limited to, the availability of information, the degree of cooperation Contractor receives from Client's and Target's personnel and advisors, and the timeliness and completeness of the responses by Client's and Target's personnel and advisors to Contractor's requests for information.

**C.**     Contractor may potentially be engaged by other parties in connection with the transaction involving Target that is the subject of The Services under a Statement of Work. If the Contractor engagement team providing the Services to Client becomes aware that a separate Contractor team has been so engaged by another party, Contractor will notify Client that Contractor has been so engaged (subject to any confidentiality restrictions) and will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of information between the Contractor team serving Client and the engagement team serving any other party. Unless Client elects to exercise Client's right to terminate the applicable Statement of Work, Client agrees that Contractor may be so engaged by other parties and Client waives any potential conflict.

**D.**     If Client is a potential purchaser of or investor in Target and Contractor serves as independent auditors of Target, or provides any other services to Target, Contractor will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of confidential information between the Contractor engagement team serving Client and the Contractor engagement team serving Target. However, Client hereby acknowledges and

agrees that Contractor may be in possession of confidential information concerning Target that may be relevant to Client's due diligence procedures and that such information will not be disclosed to Client unless Target provides written consent to such disclosure in advance. Contractor's professional responsibilities may require that Contractor inform the engagement team serving Target about information coming to Contractor's attention during the performance of the Services under the applicable Statement of Work that could affect Contractor's engagements with Target. Client acknowledges that Contractor's relationship with Target may represent an actual or potential conflict of interest for Contractor in light of the services Contractor has agreed to provide to Client hereunder. Client hereby agrees that Contractor's relationship shall not constitute a conflict of interest for purposes of Contractor's performance of the Services under the applicable Statement of Work and Client expressly waives its right to assert any such conflict against Contractor. Client hereby acknowledges that Contractor's agreement to provide the Services under the applicable Statement of Work is based upon and subject to the foregoing waiver and, in the event that Client revokes such waiver, Contractor's Services under the applicable Statement of Work will automatically terminate.

**E.**    Client agrees to review reports prepared by Contractor ("Reports") promptly and to advise Contractor on a timely basis of any additional procedures Client would like Contractor to perform or areas to address. Unless specifically requested by Client, Contractor is not obligated to provide copies of Reports to Target for the purpose of confirming Target's representations concerning the accuracy of the factual information presented in Reports. Contractor's findings will not constitute recommendations to Client as to whether or not Client should proceed with any proposed transaction.

**F.**    Because of the special nature of the Services under the applicable Statement of Work, Contractor's Reports are not suited for any purpose other than to assist Client in Client's evaluation of the potential transaction, and Client agrees Reports will be used for that purpose only. Reports will be provided by Contractor for Client's information only, and except as provided in paragraph 4(c), Client agrees that the Reports may not be copied, quoted or referred to, in whole or in part, by Client without Contractor's prior written consent. For purposes of Paragraph 4(c), the Client's board of directors, management and other employees, Client's independent audit firm, and attorneys acting as Client's counsel in the contemplated transaction are not considered to be third parties, provided that each of the foregoing is subject to a binding obligation (through a written agreement or professional obligation) to maintain the confidentiality of the Reports.

**G.**    The provisions of Paragraphs 1(f) and 9 shall apply to information about Target provided to Contractor in the course of performing the Services under the applicable Statement of Work. Client agrees to use all reasonable efforts to arrange for Contractor's access to Target's personnel and advisors, business offices and financial information as required for Contractor to perform the Services contemplated by the applicable Statement of Work.

**20. Survival.**
Paragraphs 1(h), 3(d), 4, 5, 7, 8, 9, 12, 13, 16, 17, 18 and 19 shall survive any expiration or termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

GMAC LLC

By: _____

Name: Mark Weintraub
Title: General Auditor
Date: _____6/24/08_____

KPMG LLP

By: _____

Name: Michael J. Conover
Title: Partner
Date: _____6/30/08_____

**Enclosures**:
Exhibit B

## Exhibit B

### [FORM OF NOTICE AND ACKNOWLEDGEMENT]

[Name of Third Party]
Address

The advice, recommendations and information in the document included with this notice were prepared for the sole benefit of [Name of Client], based on the specific facts and circumstances of [Name of Client], and its use is limited to the scope of KPMG's engagement for [Name of Client]. It has been provided to you for informational purposes only and may not be relied upon by you or any other person or organization. You acknowledge and agree that KPMG accepts no responsibility or liability in respect of the advice, recommendations or other information in such document to any person or organization other than [Name of Client]. You shall have no right to disclose the advice, recommendations or other information in such document to anyone else without including a copy of this notice and obtaining a signed acknowledgement of this notice from the party to whom disclosure is made and you provide a copy thereof to [Name of Client]. You acknowledge and agree that you will be responsible for any damages suffered by KPMG as a result of your failure to comply with the terms of this notice.

*Please acknowledge your acceptance of the foregoing by signing and returning to us a copy of this letter.

Very truly yours,

[Name of Client]

By: _____
    Name:
    Title:

**\*Accepted and Agreed to on this ___ day of ____, 20__ by:**

[Name of Third Party]

By: _____
    Name:
    Title:
* Remove if a signed acknowledgement is not required by the terms of Paragraph 4(c).



September 2, 2008

**PRIVATE**

Ms Darsi Meyer
GMAC Financial Services LLC
2255 North Ontario Street,
Suite 400
Burbank, CA 91504-3120

**RE: Statement of Work 9/2/08**

Dear Ms. Meyer:

This Statement of Work #9/2/08 ("SOW") is entered into pursuant to and in accordance with the terms of the Master Professional Service Agreement ("Agreement") between KPMG LLP ("KPMG") and Residential Funding Company, LLC ("GMAC"), dated July 1, 2008.

We are pleased that you have engaged KPMG to provide tax return compliance, preparation of GMAC's taxable Income and basis roll forward schedule, preparation of REMIC taxable income and excess inclusion income estimates and tax consulting services (collectively referred to in this SOW as the "Services") to the trusts listed on Appendix A on behalf of GMAC Residential Capital Company, LLC ("GMAC-RESCAP"), a subsidiary of GMAC. This SOW # 9/2/08 confirms the scope, and related terms of your engagement of KPMG.

The Services described below will be provided for the list of Asset Backed Securities ("MBS") contained in Appendix A for the 2008 to 2012 tax years. GMAC may add or remove transactions from Appendix A from time to time as further discussed below by giving KPMG written notice. An email will be considered written notice for this purpose.

GMAC's Designated Representative for this engagement is:

> **Tim Witten, GMAC – Residential Funding Company.**
> Address: 2255 North Ontario Street, Suite 400, Burbank, CA 91504-3120

**1   Executive Overview:**

GMAC issues asset-backed securities using Real Estate Mortgage Investment Conduits ("REMIC"), Partnerships, Grantor Trusts ("GT"), Owner Trusts, and Passive Foreign Investment Company ("PFIC") as the issuing entity through one or more of GMAC's subsidiaries. After these securities are issued, GMAC assigns responsibilities to its subsidiary GMAC-RESCAP, this assignment includes the monthly calculation of payments to securities holders and the filing of quarterly and/or yearly tax returns and OID information (Tax Reporting). KPMG is being engaged to provide the Tax Reporting services for the issued securities to GMAC's RESCAP Bond Administration Department

## 2   Description of Services/Project Scope:

<u>Objective</u>

The purpose of this engagement is to perform quarterly and/or annual tax return compliance services, and taxable income and excess inclusion estimates for the list of tax entities assigned by GMAC to KPMG

<u>Procedures</u>

KPMG will perform tax return compliance services as specified below for the issuances listed on Attachment A, and also perform taxable income and excess inclusion estimates for tax entities listed on Attachment B. New tax entities may be added or deleted from Attachments A and B from time to time by GMAC.  KPMG will notify GMAC within 90 days of a tax entity being added to Attachment A or B for which we will be unable to provide services under this SOW.

Please note that throughout this SOW, our references to Original Issue Discount (OID) are intended to also include Premium amounts. Although we make no specific reference to lower tier vs. upper tier REMIC trusts in this discussion, in those instances where multiple tiers of REMICs exist, the tax returns and supporting information will be prepared simultaneously for all REMIC tax tiers within the entity.

<u>**Tax Return Compliance Services**</u>

GMAC has issued securitizations through various types of tax entities.  The tax entities listed below are inclusive of existing and anticipated GMAC entities.  Any tax reporting services beyond the scope of these standard mortgage backed securities issuances will require an additional SOW.

The services described below are restricted to entities created/issued by GMAC and its subsidiaries.

We will perform the following Services, (as applicable):

**REMICs:**

- Preparation of Federal tax returns and supporting schedules and elections as required.
- Preparation of work papers to support the tax basis income statement and balance sheet.
- Complete a REMIC election for the initial tax return(s).
- Preparation of Form 8811, Information Return for Real Estate Mortgage Investment Conduits (REMICS) and Issuers of Collateralized Debt Obligations.
- Preparation of Form SS-4, Application for Employer Identification Number, if requested.
- Preparation of quarterly Schedule Q for the residual holder(s) representing their pro-rata share of all income and expense of the REMIC.  This will include, if applicable:
  - Preparation of a Residual Holder Income Summary.
  - Calculation of reportable discount on the loan pool, including processing of servicer's loan-by-loan or sub-pool data, as required.
  - Determination of reportable mortgage interest income of the backing REMIC tranches.
  - Determination of reportable bond premium income.

2

- ♦ Aggregation of allowable REMIC expenses including servicing, custodial, trustee and "other" expenses.
- ♦ Calculation of REMIC deductible expenses including original issue discount.
- ♦ Preparation of Section 212 expense statement as necessary.
- Preparation of quarterly and annual information reporting for all regular interests. This will include:
  - ♦ Monthly calculations of reportable original issue discount. Calculation considerations include accrual periods, adjusted issue prices, and collateral prepayment accelerations/decelerations.
  - ♦ Preparation of quarterly and annual supplemental information statements within the meaning of Code Section 6049.
- Computation of REMIC taxes.


**Partnerships:**

- Prepare and assist GMAC with filing federal tax returns and supporting schedules and elections as required.
- Preparation of work papers to support the tax basis income statement and balance sheet.
- Preparation of elections for the initial tax return(s).
- Preparation of required reporting representing the partnership's pro-rata share of all income and expense of the trust. This will include:
  - ♦ Preparation of Equity Holder Income Summary.
  - ♦ Calculation of reportable loan pool discounts, including processing of servicer's loan-by-loan or sub-pool data, as required.
  - ♦ Determination of reportable interest income of the backing assets.
  - ♦ Determination of reportable bond premium income.
  - ♦ Aggregation of allowable expenses including servicing, custodial, trustee, and "other" expenses.
  - ♦ Calculation of deductible expenses including original issue discount.

- Preparation of quarterly and annual Information Returns (OID Factor Reports) for all debt interests. This will include:
  - ♦ Monthly calculations of reportable original issue discount. Calculation considerations include accrual periods, adjusted issue prices, and collateral prepayment accelerations/decelerations.
  - ♦ Preparation of quarterly and annual supplemental information statements within the meaning of Code Section 6049.

**PFIC (non-revolving):**

- Provision of accompanying Form 5471 (if requested)
- Preparation of Passive Foreign Investment Company (PFIC) statement and supporting schedules.
- Preparation of work papers to support the tax basis income statement and balance sheet.
  - ♦ Preparation of an Equity Holder Income Summary.
  - ♦ Calculation of reportable discount on the loan pool, including processing of servicer's loan-by-loan or sub-pool data, as required.
  - ♦ Determination of reportable interest income of the backing assets.
  - ♦ Determination of reportable bond premium income.

3

- ♦ Aggregation of allowable expenses including servicing, custodial, trustee and "other" expenses.
- ♦ Calculation of deductible expenses including original issue discount.

- Preparation of quarterly and annual Information Returns (OID factor reports) for all regular interest certificate holders. This will include:
  - ♦ Monthly calculations of reportable original issue discount. Calculation considerations include accrual periods, adjusted issue prices, and collateral prepayment accelerations/decelerations.
  - ♦ Preparation of quarterly and annual supplemental information statements within the meaning of Code Section 6049.

### GT and GT-Owner Trusts:

Prepare and assist GMAC with filing tax returns and supporting schedules, elections and information reporting as required.

### Debt Deal - Domestic Net Interest Margin Notes ("NIMs"):

- Preparation of work papers to support the tax basis income statement and balance sheet.
- Preparation and provision of quarterly and annual Information Returns (OID Factor Reports) for all regular interests no later than forty (40) business days after we receive the applicable data. This will include:
  - ♦ Monthly calculations of reportable original issue discount. Calculation considerations include accrual periods, adjusted issue prices, and collateral prepayment accelerations/decelerations.
  - ♦ Preparation of quarterly and annual supplemental information statements within the meaning of Code Section 6049.3.

We will prepare these returns based on the information provided by you and, or the Trust's designated Trustee. We will not audit or independently verify such data provided to us however, we may ask for clarification of some of the information. Our engagement cannot be relied on to uncover errors in the underlying information incorporated in the tax return should any exist. However, we will inform you of any such matters that may come to our attention. GMAC's management or designated trustee will be responsible for the final review and approval of the reports and tax returns produced. Because management is responsible for the tax return(s), please have the appropriate trust official review the return before an officer signs and files the return(s).

### KPMG as Paid Preparer:

KPMG will sign each REMIC trust, Grantor trust or Partnership return in its capacity as "paid preparer", provided that, in our best judgment, signing the return(s) would be consistent with applicable laws and professional standards.

Published guidelines allow for the use of facsimile signatures. In most cases tax returns will be signed by KPMG using a facsimile signature. Each group of returns sent to the IRS will be accompanied by a letter signed by the person authorized to sign the returns declaring that the facsimile signature appearing on each return is the signature adopted by that person and that the signature was affixed to the returns at that person's direction. The letter will list each return by name and EIN of the REMIC trust. KPMG will prepare the letter and list for signature by the appropriate trust official. Returns will be printed on IRS-approved forms. KPMG will provide GMAC with copies of the returns.

4

KPMG will mail the required reports and tax returns to each trustee for signature and filing as approved by GMAC.

**OID Factors Website and Responses to Investor Questions and Requests:**

As part of our engagement and to assist you in meeting your obligations, KPMG will make available certain information to nominees, corporations and other specified persons as defined in Treasury Regulation section 1.6049-7(e)(4) and, if required, by Treasury Regulation 1.671-5 ("Investors") through its OID Factors website. KPMG will notify you in writing (email will be considered written notification) once this information has been posted and you agree to promptly access the website and verify that the information conforms as to accuracy and completeness to the information in your records. KPMG shall not be responsible for any inaccurate or incomplete information posted on the OID Factors website. You will also note that information accessible through the website will generally be available to all persons who agree to the terms and conditions for accessing the website and who possess the appropriate CUSIP or deal name/class for the underlying securities regardless of whether they are an actual Investor.

KPMG will also maintain telephone and E-mail "hotlines" to respond to inquiries related to information available on the OID Factors website. The information provided to Investors will be limited to information required to be provided to such entities by the REMIC pursuant to Treasury Regulation section 1.6049-7(e)(2) including bondholder requests for SIS's, residual holders' (or their nominees') requests for reporting yields and adjusted issue prices, and requests to explain reporting methodologies. In addition, for grantor trusts treated as widely held fixed investment trusts, the information provided to Investors will be limited to the information required to be supplied to Investors pursuant to Treasury Regulation section 1.671-5. KPMG disclaims any liability associated with responding to these inquiries including if the information provided by KPMG to an Investor is inaccurate or incomplete.

Information provided by KPMG on behalf of the REMIC and/or grantor trust through the website, in whatever format, IS NOT INTENDED TO BE TAX ADVICE to the Investors and Investors will be advised to seek their own tax counsel.

All of our information is produced in electronic form. KPMG will answer most Investor requests by electronic means; including E-mail or via our OID Factors Web site. Alternatively, KPMG has the capability to print the information and deliver it by fax or standard mail.

**Quality Control:**

KPMG will conduct computerized and manual reviews of all REMIC tax information.

Our variance analyses and tests include evaluation of the following:

- Change in OID or Premium amortization from period to period versus a benchmark range;
- Identification of OID or Premium that has been reduced to zero;
- Identification of bond and collateral pay offs;
- Projection of future OID or Premium amortization, to identify situations in which the OID or Premium does not completely amortize;
- Identification of when a bond receives its first principal payment;
- Identification of any balance sheet variance;

5

- Identification of quarterly income changes beyond a "normal range" from the prior quarter.

KPMG will conduct the validation checks described below on the cash flow files provided to it by GMAC, and provide a variance report to GMAC:

(i)    Validate that the ending balances reported for all bonds, and collaterals equal the respective beginning balance less principal payments, and (principal) losses.

(ii)    Validate that the ending balances reported for all bonds, and collaterals equal the sum of projected principal payments.

(iii)    Validate that all projected interest payments to the bonds (except O/C, and Accrual bonds) are based on the pricing pass through rates.

(iv)    Validate that the cash inflows to the collateral equals the cash outflows to the bonds for the current and all projected periods.

**Preparation of GMAC's taxable Income and basis roll forward schedule:**

Within 30 business days of the completion of each quarter's REMIC tax processing, KPMG will provide to GMAC's corporate tax department a "Taxable Basis Income Report". This report will include rolling forward GMAC's corporate tax REMIC residual federal tax basis from the prior quarter and comparing and reconciling the result to the capital account basis reported on the Schedule Qs. This report will be both at the individual REMIC residual level as well as on an aggregated basis.

The purpose of the report is to identify and track Net Operating Losses carry forward amounts by each REMIC tier. This report will also track REMIC residual federal tax basis differences generated by individual REMICs once their basis is less than zero. KPMG will prepare and provide this report on a quarterly basis.

**Preparation of REMIC taxable income and excess inclusion income estimates:**

KPMG will compute taxable income and excess inclusion income estimates for the REMICs listed in Attachment B, based upon prepayment and loss assumptions provided by GMAC ("a shock scenario"). GMAC's master servicing group will initially be responsible for providing the prepayment and loss assumptions 45 days prior to the due dates stated below. To the extent that the provider of the prepayment and loss assumption changes, GMAC will notify KPMG within 30 days.

The estimated taxable income and excess inclusion estimates will be calculated using the most recent historical payment information provided to KPMG by GMAC . These computations will be performed 5 times per year, quarterly and once for year-end extension. The taxable income and excess inclusion income estimate reports will be prepared based on the schedule described in Attachment D.

**Tax Consulting Services**

This SOW also covers tax consulting matters that may arise for which you seek our advice, both written and oral, and that are not the subject of a separate engagement letter or SOW. The advice will be issued at the elevated standards described in the "Tax Return Standards" section of this letter. However, we will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction".

6

3    **GMAC's Responsibilities:**

GMAC will designate a person in management with the responsibility to oversee the adequacy of the procedures performed and to address any individual issues that may arise.

The following is a description of the information that KPMG will need from GMAC to provide the services described above:

**Monthly Data Requirements**

- GMAC will supply KPMG with electronically accessible cash flow data files for each "cashflow" REMIC deal no later than one (1) business days prior to the related distribution date. This file should contain current distributions and projected comprehensive cash flows for all regular and residual interest bonds, based on the pricing prepayment assumptions. GMAC will also provide an electronically accessible collateral data file to KPMG for those REMIC issuances for which projected cash flow files are not provided.

- GMAC will provide the current month Certificate Payment Reports to KPMG in electronic format no later than one (1) business day prior to the distribution date. KPMG anticipates that we will be supplied numerous updated Certificate Payment Reports, and an updated cash flow data file whenever there is revision to the original report provided.

- GMAC will also provide any other additional data required to complete the tax calculation process to KPMG in a manner and format agreeable to both parties.

- GMAC will research and correct cash flow errors that are reported on the variance reports provided by KPMG. KPMG's role in researching and correcting such errors would be limited to providing GMAC with variance reports, and a reasonable explanation of the variances reports.

**Inception or Yearly Data Requirements**

- Initial bond prices (First Prices Out):

  GMAC will provide the price at which the majority of each class was issued to the public on the first day of trading. This is referred to as the First Price Out (FPO). The FPOs will be forwarded to KPMG no later than one month after the Closing Date.

- Fair Market Values ("FMVs")

  GMAC will provide fair market values for any new issuances with cap agreements, yield maintenance agreements, forward contracts or any other derivatives that have a value for tax purposes. FMV will be reported for each bond impacted by such derivatives. The values may be reported as either proceeds or percentages of original OID prices allocable to regular interests and derivative interests. GMAC will provide these values no later than one month after the Closing Date for each issuance with derivative values.

7

- Initial documents and data

  GMAC will designate an individual responsible for providing documents and data at the inception of each deal that includes the following:

  - o  Final version of the Prospectus Supplement.
  - o  Final version of the Pooling and Servicing Agreement.
  - o  Signed Form 2848 for each trust designating KPMG to act on behalf of the trustee for tax matters.

- Initial residual holder and residual holder transfer information:

  - o  GMAC's designated trustees will provide KPMG with this information for each new REMIC issue. This report identifies the initial owner(s) of residual interests. The trustees provide this report in their capacity as transfer agent for each REMIC. KPMG will utilize these reports to determine the new owner's name, address, EIN number, percentage of holding and entity status (corporate, individual, etc.).

  - o  GMAC's designated trustees will provide a residual holder transfer list information to KPMG on a monthly basis. This report details all trade activity of residual interests. The trustees provide this report in their capacity as transfer agent for each REMIC. KPMG will utilize these reports to properly allocate income between the buyers and sellers of residual interests and to determine the new owner's name, address, EIN number, percentage of holding and entity status. The allocation of income between - buyers and sellers will be done through the KPMG **FAST** system based on the transfer date.

  - o  Year end bond holder history

  - o  GMAC's designated trustees will provide comprehensive histories of bond holders of record for each Grantor Trust and Partnership. KPMG will utilize this information to complete the annual information reporting requirements.

4    **KPMG's Responsibilities:**

KPMG will act as a contractor in providing the services set out in this SOW and does not undertake to perform the obligations of GMAC, whether regulatory or contractual.

In carrying out these services:

- KPMG will not act in the capacity equivalent to a member of management or as an employee of GMAC.
- KPMG will not form part of the client's internal review structure relating to the preparation of information or reports.
- KPMG will not be responsible for GMACs' Back-Up Procedures and Recovery Systems.
- KPMG will establish and maintain its systems back-up procedures. KPMG will also establish and maintain disaster recovery systems and procedures with respect to the services to be performed under this SOW. KPMG will determine a back-up location of its choosing. GMAC will have the option to request that KPMG establish additional back-up locations; in such event, GMAC will reimburse KPMG for the cost of equipment and software to the extent such equipment and software are redundant with existing back-up facilities.

8

5      **Deliverables:**

- For each REMIC trust – KPMG will deliver the following Tax Reporting Information:
    - o   Quarterly Schedule Qs.
    - o   Quarterly OID Supplement Information Statements (OID Factor Reports).
    - o   Quarterly Tax Type and Tax Factor Files.
    - o   Quarterly Taxable Basis Reports for the portions of the trusts for which GMAC is the residual holder.
    - o   Yearly IRS Form 1066.
    - o   Yearly IRS Form 7004, if needed.
    - o   Yearly 1099s, if required.
    - o   IRS Form 2848 at trust inception.
    - o   IRS Form 8811 at trust inception.

- For each Grantor trust – KPMG will deliver the following Tax Reporting Information:
    - o   Yearly information reporting as required

- For each PFIC – KPMG will the following Tax Reporting Information:
    - o   Form 5471, if requested
    - o   PFIC statement and supporting schedules

- KPMG will deliver work papers to support the tax basis income statement and balance sheet
    - o   Quarterly and yearly Information Returns (OID Factor Statements) for all regular interests

- For each NIM – KPMG will deliver the following Tax Reporting Information:
    - o   Work papers to support the tax Basis income statement and balance sheet.

6      **Fees and Charges:**

**Tax Return Compliance Services**

KPMG fees for the services described above will be the <u>lesser</u> of

1) Actual time incurred to complete the services detailed above at 100% of our standard hourly rates for the individuals involved in providing the services; or

2) the total fees calculated in accordance with the following schedule:

   <u>REMIC:</u>

   KPMG's monthly service fee for the REMIC issuance section of this SOW will be the sum of items (a), (d) and (e) below, plus (b) and (c) whenever applicable: Multiple tiers that are issued as part of one issuance will be considered one "REMIC issuance" for the purpose of calculating this fee.

   (a).There will be a maximum monthly service fee of $34,778.59 for REMIC tax calculations.

9

(b).There will be a one time maximum modeling fee of $3,600 per REMIC issuance for Trusts where KPMG is required to generate cash flows in its WINFAST system to provide REMIC Tax Services.

(c).There will be a one time maximum tax set up fee of $600 per new REMIC issuance.

(d).There will be a maximum monthly cash flow generation and tax processing fee of $184.94 for Trust issuances that uses the KPMG WINFAST generated cash flow for tax calculations.

(e).There will be a maximum monthly tax processing fee of $92.47 for Trust issuances that use cash flow generated and provided by GMAC for tax calculations.

(f). There will be a maximum monthly tax processing fee of $92.47 for all other (spreadsheet) Trust issuances that do not require cash flows.

Partnership:

KPMG's monthly fees for where we provide Partnership Tax Services will be a maximum fee of $600 per trust per month

PFIC (non-revolving):

KPMG's monthly service fees for the PFIC (non-revolving) will be a maximum fee of $700 per trust per month per Trust.

Preparation of first Form 5471 for each trust will result in an additional maximum yearly fee of $3,500, then each additional Form 5471 that needs to be prepared for the same trust, a maximum fee yearly $2,000 will be charged.

Grantor Trust and Grantor Trust-Owner Trusts:

KPMG's monthly fees for trust where we provide Grantor Trust or Grantor Trust-Owner Trust Tax Service will be a maximum fee of $350 per trust per month.

Debt Deal - Domestic Net Interest Margin Notes ("NIMs"):

KPMG's monthly fees for trust where we provide Debt Deal- Domestic Net Interest Margin Notes ("NIMs") Trusts tax services will be a $500 per trust per month.


**Taxable income and excess inclusion income estimates**

KPMG fees for the services described above will be the lesser of

1) Actual time incurred to complete the services detailed above at 100% of our standard hourly rates for the individuals involved in providing the services; or
2) For each: KPMG will charge a one time maximum initial set up fee of $600, and a maximum quarterly fee of $257.50 for each REMIC Trusts where we provide taxable income and excess inclusion income estimate services.

10

**Plus**

We will bill for out-of-pocket expenses, which should not exceed 20% of the total estimated fees. These expenses may include such items as travel, lodging, meals, etc.  GMAC agrees to pay for only those direct out-of-pocket expenses for which receipts are summarized and submitted in accordance with GMAC's corporate expense and reimbursement guidelines, "Consultants/Contractor Travel" section which is attached hereto as Appendix C.

The fees and expenses will be billed on a monthly basis equal to the monthly per deal fee quoted above or annually as applicable.  In addition, expenses are billed for reimbursements as set forth in the Agreement.

KPMG will adjust the last monthly billing under this SOW to account for any required adjustment of the fee as a result of the actual time incurred to complete the services detailed above at 100% of our standard hourly rates for the individuals involved in providing the services if it is less than the maximum fees under this SOW.

Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver the services within the above fee estimates.  We will endeavor to notify you of any such circumstances as they are assessed.  If such matters exceed the scope of this engagement letter, we will issue an addendum or a separate SOW to confirm the scope and related terms of any additional engagements.

It is understood that neither our fees nor the payment thereof will be contingent upon the results of our engagement.  A fee will be quoted to you under a separate SOW for any procedures which are deemed to be beyond the scope of this SOW.

This fee arrangement contemplates a pre-established maximum/variable fee schedule without regard to the complexity of the deals. Generally, it is anticipated that this arrangement would be applied to all new deals regardless of structural innovations, unless the Tax Reporting implications imposed by such innovations require a significant additional effort or infrastructure change.  In such event, KPMG and GMAC will separately negotiate the payment verification and tax reporting fees for those deals.

The maximum fees will increase annually by the greater of  4% or Consumer Price Index (CPI-U) starting from February 2009. The applicable CPI-U will be the "un-adjusted 12 months" all items CPI-U for the 12 calendar months ended in November of the preceding year, published by the Bureau of Labor and Statistics of the U.S. Department of Labor. A sample copy of the CPI-U published for 12 calendar months ending in November 2007 is attached herewith.

### Tax Consulting Services

Our fees for any tax consulting services related to the Tax Return Compliance, Preparation of GMAC's taxable Income and basis roll forward Schedule,  Preparation of REMIC taxable income and excess inclusion income estimates provided under this SOW will be based upon the "Specialty Practices" fee schedule immediately below (these rates include an administrative recovery fee equal to 11.5% of our standard hourly rates for the time incurred in completing this engagement).  These Tax Consulting Services will be invoiced based on the actual time required by the individuals who will be performing the services.

Specialty Tax Practices (M&A, ICS,EVS, TCS, SFG)

| | |
|---|---|
| Partner | 800.00 |
| Director | 755.00 |
| Senior Manager | 700.00 |
| Manager | 570.00 |
| Senior Staff | 340.00 |
| Staff | 250.00 |

**7      Staffing:**

Douglas L. Williams will be the overall engagement partner responsible for the performance of the services detailed above.  Arno Izuagie, Senior Manager, will manage the day-to-day responsibilities detailed above.

**8      Warranties and Terms & Conditions:**

The warranties and terms and conditions are defined in the Agreement as modified below:

For purposes of this SOW, Paragraph 8A. of the Agreement is hereby amended and restated to read as follows:

> EACH PARTY'S MAXIMUM LIABILITY TO THE OTHER ARISING FOR ANY REASON RELATING TO THE SERVICES PROVIDED UNDER A STATEMENT OF WORK SHALL BE LIMITED TO THE GREATER OF THREE TIMES THE AMOUNT OF FEES PAID OR OWING TO CONTRACTOR FOR THE PERFORMANC OF SUCH SERVICES FOR THE APPLICABLE TAX YEAR OR TWO HUNDRED AND FIFTY THOUGHSAND DOLLARS ($250,000.00).

**9      Billing Schedule:**

KPMG will issue an invoice on a monthly basis. GMAC shall pay KPMG invoices for Services rendered in accordance with the Agreement and this applicable Statement of Work within thirty (30) days after receipt of the invoice.

Changes to the SOW that result in a change in fee or schedule will be submitted in writing by the business sponsor requesting the change. Changes to the scope of the project will require a two (2) week notice prior to the change affecting scheduled project activities.

**10      Other Provisions:**

**Tax Return Standards and Circular 230**

KPMG applies elevated standards in preparing tax returns.  Under these standards, we must be able to determine that (1) an undisclosed return position is at least "more likely than not" to be upheld (i.e., has a greater than 50 percent likelihood of success if challenged by the IRS) and (2) a disclosed return position has at least a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by the IRS) if the position does not involve a "listed transaction" or a "principal purpose transaction".

If a return position involves a transaction designated by the IRS or a state as a "listed transaction," or a transaction with the principal purpose of avoiding or evading tax, we must

12

arrive at a "should" confidence level (i.e., approximately a 70 percent or greater likelihood of success if challenged by the taxing authorities) with respect to the position. In determining whether a return position meets the appropriate standard, we will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. We will inform you as soon as possible if, during our preparation, we determine circumstances exist that prevent us from completing the tax return under these standards.

We do not anticipate that any written tax advice provided under this engagement will be a Covered Opinion as defined in §10.35 of Circular 230 (Covered Opinion). Therefore, all the written tax advice provided under this engagement letter will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if our services will rise to the level of a Covered Opinion, we will issue a separate engagement letter for the issuance of a Covered Opinion.

13

## Proposed Transactions

To be of greatest assistance to GMAC, we should be advised **in advance** of proposed transactions. If such matters exceed the scope of this engagement letter, we will issue separate engagement letters to confirm the scope and related terms of any additional engagements. Furthermore, if the fees for any item of tax consulting are expected to exceed $50,000 we will issue a separate engagement letter.

## Taxable Presence of Trusts

Please note that if the trusts listed on Attachments A had a taxable presence (e.g., an employee within the state or any tangible property owned or rented within the state), it may be subject to state income or franchise tax in that state, depending upon the particular facts. It is GMAC's obligation to notify KPMG if assistance is needed to determine whether the trusts listed on the Attachments are liable for state income or franchise tax.

## Examination by Taxing Authorities

All returns are subject to examination by the taxing authorities. In the event of an examination, GMAC may be requested to produce documents, records, or other evidence to substantiate the items of income and deduction shown on the tax return(s). In preparing your return(s), we rely on the trust representations that you understand and have complied with applicable documentation requirements for trust's expenses, deductions, and credits. If an examination of a trust occurs, and if you engage KPMG to assist or represent the trust, any such additional services and the fees would be set forth in a separate engagement letter.

## Voluntary Consent to Share Tax Information

Separate and subsequent to your agreement to the terms of this engagement letter, KPMG also requests that you provide voluntary consent to authorize KPMG to share certain tax information for purposes of implementing this engagement. Pursuant to various authority governing the sharing of tax returns and tax return information ("Tax Information"), certain jurisdictions require tax return preparers, such as KPMG, to obtain consent from clients before making certain uses and disclosures of a client's Tax Information (for U.S. taxpayers this authority is found in 26 U.S.C. Section 7216 and its accompanying regulations, and similar federal, state, or local authority.)

Accordingly, GMAC

**HEREBY SEPARATELY CONSENTS TO, AGREES TO, AND APPROVES THE DISCLOSURE OF ALL SUCH TAX INFORMATION** to or by any member firm of the KPMG International network, its affiliates, or agents as necessary for the purpose of providing tax preparation or other tax consulting services as contemplated by this engagement letter, as well as to such disclosure that may occur through, by, or in connection with generation or dissemination of work product, reports, or other means resulting from the tax compliance or tax consulting services contemplated by this engagement letter. This consent to disclosure may result in the Tax Information being disclosed to a tax return preparer outside the United States. The Tax Information shall not be disclosed for any purpose other than as identified in this consent.

14

**AND HEREBY SEPARATELY CONSENTS TO, AGREES TO, AND APPROVES THE USE OF ALL SUCH TAX INFORMATION** to or by any member firm of the KPMG International network, its affiliates, or agents as necessary for the purpose of providing tax preparation or other tax consulting services as contemplated by this engagement letter. This consent to use may result in the Tax Information being used by a tax return preparer outside the United States. The Tax Information shall not be used for any purpose other than as identified in this consent.

By signing below the enclosed copy of this letter and returning it to me within 30 days, you indicate (a) your agreement with the terms of this engagement letter and in the attachments to this letter and (b) your consent to KPMG's disclosure and use of Tax Information for the purposes described above. If you have any questions about KPMG's disclosure or use of Tax Information or your rights to consent, please contact Doug Williams at 703-286-8380.

11      **Term of Engagement**

        **This engagement will be for the** Tax Years 2008 – 2012.

12      **Invoice Address:**
        **Attn: Securities Administration**
        Residential Funding Company, LLC.,
        2255 North Ontario Street, Suite 400
        Burbank, CA 91504-3120

13      **Notices Address:**
        KPMG LLP
        1660 International Drive
        McLean, Virginia 22102
        ATTN: Mr. Douglas L. Williams, Partner

14      **Approvals:**

        The obligations and responsibilities of each party are acknowledged and accepted by each authorized representative whose signature appears below. Signature affirms authority to commit each party to this SOW. Each party agrees that the complete agreement consists of the SOW and the Agreement including the attached Standard Terms and Conditions for Advisory and Tax Services, as modified in the Agreement.

Please sign the enclosed copy of this SOW to confirm our agreement both to the terms of the engagement and your separate consent to KPMG's disclosure and use of Tax Information for the purposes described above and return it to us. If you have any questions, please call me.

Very truly yours,

KPMG LLP

Douglas L. Williams
*Partner*

15

*Enclosures:*
Appendix A – Listing of Asset Backed Securities for Tax Return Compliance Service
Appendix B – Listing of Asset Backed Securities for REMIC Taxable Income and Excess Inclusion Income Estimation Services
Appendix C – GMAC's Travel and Expense Reimbursement Guidelines.
Appendix D –Taxable Income and Excess Inclusion Income Estimate Reports Schedule


cc:    Dina Shaprio – GMAC – New York
       John Demro – GMAC - Minneapolis
       Michael Conover – KPMG New York
       Todd Voss – KPMG Detroit


ACCEPTED

Residential Funding Company, LLC

By:

Title :

Date:

*William J. Maguire*

William J. Maguire

Managing Director

10/8/08

16

## Appendix D

## Taxable Income and Excess Inclusion Income Estimate Reports Schedule

The prior year estimated taxable income for extension purposes will completed by February 1st. It is anticipated that quarter 3 of the prior year and all prior quarters will be based on actual collateral payments and subsequent quarters will be estimated based on projected cashflows. For year-end 2004, for example, all quarters through 3rd quarter 2004 will be based upon the actual collateral payments and subsequent quarters will be estimated.

1st Quarter estimated taxable income calculations will be completed by March 1st. We anticipate that quarter 3 of the prior year and all prior quarters will be based on actual collateral payments. Subsequent quarters, including all the quarters of the current year, will be estimated based on projected cashflows. For 1st quarter 2005, for example, all quarters through 3rd quarter 2004 will be based upon the actual collateral payments and subsequent quarters will be estimated.

2nd Quarter estimated taxable income calculations will be completed by May 1st. It is anticipated that 4th quarter of the prior year and all prior quarters will be based on actual collateral payments and that subsequent quarters, including all the quarters of the current year, will be estimated based upon projected cashflows. For 2nd quarter 2005, for instance, all quarters through 4th quarter 2004 will be based upon the actual collateral payments and all subsequent quarters will be estimated.

3rd Quarter estimated taxable income calculations will be completed by August 1st. It is expected that 1st quarter of the current year and all prior quarters will be based on actual collateral payments and subsequent quarters (including the 2nd, 3rd and 4th quarters of the current year) will be estimated based upon projected cashflows. For example, for 3rd quarter 2005, all quarters through 1st quarter 2005 will be based upon the actual collateral payments and subsequent quarters will be estimated.

4th Quarter estimated taxable income calculations will be completed by November 1. We anticipate that quarter 2 of the current year and all prior quarters will be based on actual collateral payments and all subsequent quarters (including the 3rd and 4th quarters of the current year) will be estimated based upon projected cashflows. For example, for 4th quarter 2005, all quarters through 2nd quarter 2005 will be based upon the actual collateral payments and subsequent quarters will be estimated.

## Reports

The estimated taxable income, and the excess inclusion reports will be provided at both a summary and individual deal level. The reports will also incorporate appropriate allowances for loss carryover and basis limitation in determining the estimated taxable income and excess inclusion income. The reports' format will be substantially similar to the current "REMIC basis roll forward report" by legal entity and by deal that KPMG provides to GMAC as part of its REMIC reporting engagement.

17

### Amendment No. 1

This Amendment No.1 ("Amendment") to the Statement of Work 09/02/2008 ("Agreement") for the provision of tax return compliance, preparation of GMAC's taxable Income and basis roll forward schedule, preparation of REMIC taxable income and excess inclusion income estimates and tax consulting services (collectively referred to in this SOW as the "Services") to GMAC Residential Capital Company, LLC ("GMAC-RESCAP") is made and entered into as of January 1, 2011 ("Amendment Effective Date") by Residential Funding Company, LLC ("GMAC"), with an office located at 2255 North Ontario Street, Suite 400, Burbank, CA 91504-3120 and KPMG LLP located at 345 Park Avenue, New York, NY 10017 ("KPMG").

     **WHEREAS,** GMAC and KPMG have entered into the Agreement, and

     **WHEREAS,** GMAC and KPMG now wish to amend the Agreement as set forth herein

     **NOW, THEREFORE,** in consideration of the foregoing premises and the promises, terms and conditions set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows.

1.  To amend the Agreement as follows:

6. **"Fees and Charges" - Tax Return Compliance Services** section is hereby deleted in its entirety and replaced with the following:

KPMG fees for the services provided under the Statement of Work of 09/02/2008 will be the lesser of:

1)  Actual time incurred to complete the services detailed above at 100% of our standard hourly rates for the individuals involved in providing the services; or

2)  the total fees calculated in accordance with the following schedule:

    REMIC:

    KPMG's monthly service fee for the REMIC issuance section of the SOW will be the sum of items (a), (d) and (e) below, plus (b) and (c) whenever applicable: Multiple tiers that are issued as part of one issuance will be considered one "REMIC issuance" for the purpose of calculating this fee.

    (a).There will be a maximum monthly service fee of **$40,000.00** for REMIC tax calculations.

    (b).There will be a one time maximum modeling fee of $3,600 per REMIC issuance for Trusts where KPMG is required to generate cash flows in its WINFAST system to provide REMIC Tax Services.

    (c).There will be a one time maximum tax set up fee of $600 per new REMIC issuance.

    (d).There will be a maximum monthly cash flow generation and tax processing fee of $184.94 for Trust issuances that uses the KPMG WINFAST generated cash flow for tax calculations.

(e). There will be a maximum monthly tax processing fee of $50 for Trust issuances that use cash flow generated and provided by GMAC for tax calculations.

(f). There will be a maximum monthly tax processing fee of $50 for all other (spreadsheet) Trust issuances that do not require cash flows.

Partnership:

KPMG's monthly fees for where we provide Partnership Tax Services will be a maximum fee of $600 per trust per month

PFIC (non-revolving):

KPMG's monthly service fees for the PFIC (non-revolving) will be a maximum fee of $700 per trust per month per Trust.

Preparation of first Form 5471 for each trust will result in an additional maximum yearly fee of $3,500, then each additional Form 5471 that needs to be prepared for the same trust, a maximum fee yearly $2,000 will be charged.

Grantor Trust and Grantor Trust-Owner Trusts:

KPMG's monthly fees for trust where we provide Grantor Trust or Grantor Trust-Owner Trust Tax Service will be a maximum fee of $350 per trust per month.

Debt Deal - Domestic Net Interest Margin Notes ("NIMs"):
    KPMG's monthly fees for trust where we provide Debt Deal- Domestic Net Interest Margin Notes ("NIMs") Trusts tax services will be a $500 per trust per month. :

**\*These amendments will be effective beginning February 1, 2011 through 12/31/2012**

2.  Except as expressly amended herein, the Agreement remains in full force and effect.

3.  Terms not defined herein shall be as defined in Agreement.

4.  By executing this Amendment, the parties hereto ratify and confirm the terms of the Agreement, as modified by the terms of this Amendment.

5.  This Amendment may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.

6.  If there shall be any conflict in the terms and conditions of the Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control and be binding.

7.  All references in this Agreement in and/or to "this Agreement" and words of a like nature shall be deemed to refer to the agreement, as amended and supplemented by this Amendment.

**IN WITNESS WHEREOF**, GMAC and KPMG have caused duly authorized representatives of their respective companies to execute this Amendment as of the Amendment Effective Date.

Residential Funding Company, LLC

By: _____

Printed Name: _Tim  WITTEN_

Title: _VP MASTER SERVICING_

Date: _1/3/2011_

KPMG LLP

By: _____

Printed Name: _Douglas Lane_

Title: _Partner_

Date: _2/15/2011_

## Amendment No. 2 to the Statement of Work 09/02/2008

This Amendment No. 2 (the "Second Amendment") to the Statement of Work 09/02/2008 (as previously amended, the "Statement of Work") is made as of July 16, 2012 (the "Effective Date") by and between Residential Funding Company, LLC ("Client") and KPMG LLP ("KPMG").

### RECITALS

**WHEREAS**, KPMG and Client desire to amend the Statement of Work upon the terms and conditions noted below.

**THEREFORE**, in consideration of the mutual covenants, agreements, warranties, and representations made and contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows.

### AMENDED TERMS

1.  The parties hereby agree that the Statement of Work will be governed by the terms and conditions of the Master Services Agreement dated November 15, 2010 by and between Ally Financial Inc. and KPMG, which superseded and replaced the Master Professional Service Agreement dated July 1, 2008 by and between Ally Financial Inc. and KPMG.

2.  Section 6, Fees and Charges of the Statement of Work is hereby deleted in its entirety and replaced with the following:

6     Fees and Charges:

**Tax Return Compliance Services**

KPMG fees for the services described above will be the lesser of

1)  Actual time incurred to complete the services detailed above at the hourly rates for the individuals involved in providing the services as set forth below in the Tax Consulting Services section; or

2)  the sum of the total fees calculated in accordance with the schedule/s below:

**REMIC Trusts:**

KPMG's annual service fee for the REMIC issuance/s in the section of this SOW will be the sum of items (a), (b), and (c) whenever applicable. Multiple tiers that are issued as part of one issuance will be considered one "REMIC issuance" for the purpose of calculating this fee.

(a)  There will be a maximum annual fixed service fee of $480,000.00 for REMIC tax calculations.

(b)  There will be a maximum annual tax processing fee of $600.00 for each REMIC Trust issuance that uses cash flow generated and provided by ResCap for tax calculations currently listed on Appendix A.

(c)  There will be a one time maximum tax set up fee of $1,200.00 per new REMIC issuance added to Appendix A, in addition to a prorated tax processing fee described in (b) above.

The total annual service fee for the REMIC issuance/s under this SOW, currently listed on Appendix A, will be $744,000.00.

**This total annual service fee will be billed on a time and materials basis monthly until such time that the maximum total annual service fee is reached for the REMIC issuances under this SOW.**

<u>Grantor Trust-Owner Trusts:</u>

KPMG's fees for trusts where we provide Grantor Trust-Owner Trust Tax Service will be a maximum fee of $4,200.00 per trust per year.

The total annual service fee for the Owner Trust issuance/s under this SOW currently listed on Appendix A will be $29,400.

**This total annual service fee will be billed on a time and materials basis monthly until such time that the maximum total annual service fee is reached for the Owner Trust issuances under this SOW.**

<u>PFIC (non-revolving):</u>

KPMG's annual service fee for the PFIC (non-revolving) will be a maximum fee of $8,240.00 per trust, per year

Preparation of the first Form 5471 for each trust will result in an additional maximum yearly fee of $3,500. For each additional Form 5471 that needs to be prepared for the same trust a maximum yearly fee of $2,000 will be charged.

The total annual service fee for the PFIC issuance/s under this SOW currently listed on Appendix A will be $8,240.00.

**This total annual service fee will be billed on a time and materials basis monthly until such time that the maximum total annual service fee is reached for the PFIC issuances under this SOW.**

<u>Taxable Income and Excess Inclusion Income Estimates</u>

KPMG fees for the services described above will be the <u>lesser</u> of

1) Actual time incurred to complete the services detailed above at the hourly rates set forth below in the Tax Consulting Services section for the individuals involved in providing the services; or

2) KPMG's annual service fee for the REMIC issuance section of this SOW will be the sum of items (a) and (b) whenever applicable. Multiple tiers that are issued as part of one issuance will be considered one "REMIC issuance" for the purpose of calculating this fee.

    (a) There will be a maximum annual processing fee of $1,030.00 for each REMIC Trust (listed on Appendix B) where we provide taxable income and excess inclusion income estimate services.

    (b) KPMG will charge a one time maximum initial set up fee of $600, in addition to a prorated processing fee described in (a) above.

The total annual service fee for the REMIC Trusts under this SOW currently listed on Appendix B will be $66,950.00.

**This total annual service fee will be billed on a time and materials basis monthly until such time that the maximum total annual service fee is reached for the taxable income and excess inclusion income estimates under this SOW.**

Expenses and Other Matters

We will bill for out-of-pocket expenses, which should not exceed 20% of the total estimated fees. These expenses may include, but are not limited to, such items as travel, lodging, and meals. ResCap agrees to pay for only those

direct out-of-pocket expenses for which receipts are summarized and submitted in accordance with ResCap's corporate expense and reimbursement guidelines, "Consultants/Contractor Travel" section, attached hereto as Appendix D.

Expenses will be billed on a monthly basis. KPMG will adjust the last installment billing under this SOW to account for any required adjustment of the fee as a result of the actual time incurred to complete the services detailed above at the hourly rates set forth below in the Tax Consulting Services section for the individuals involved in providing the services if it is less than the maximum fees under this SOW.

Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver the services within the above fee estimates. We will endeavor to notify you of any such circumstances as they are assessed. If such matters exceed the scope of this engagement letter, we will issue an addendum or a separate SOW to confirm the scope and related terms of any additional engagements.

It is understood that neither our fees nor the payment thereof will be contingent upon the results of our engagement. A fee will be quoted to you under a separate SOW for any procedures that are deemed to be beyond the scope of this SOW.

This fee arrangement contemplates a pre-established maximum/variable fee schedule without regard to the complexity of the deals. Generally, it is anticipated that this arrangement would be applied to all new deals regardless of structural innovations, unless the Tax Reporting implications imposed by such innovations require a significant additional effort or infrastructure change. In such event, KPMG and ResCap will separately negotiate the payment verification and tax reporting fees for those deals.

### Tax Consulting Services

Our fees for any tax consulting services related to Tax Return Compliance, Preparation of ResCap's taxable Income and basis roll forward Schedule, and/or Preparation of REMIC taxable income and excess inclusion income estimates provided under this SOW will be based upon the "Specialty Practices" fee schedule immediately below. These Tax Consulting Services will be invoiced based on the actual time required by the individuals who will be performing the services.

| Specialty Tax Practices | |
| --- | --- |
| Partner | $510.00 |
| Managing Director | $510.00 |
| Director | $435.00 |
| Manager | $345.00 |
| Senior Associate | $240.00 |
| Associate | $195.00 |

3.  Section 11, Term of Engagement of the Statement of Work is hereby deleted in its entirety and replaced with the following:

    **11  Term of Engagement:**

    **This engagement will be for Tax Year 2012 for Services provided on and after May 14, 2012.**

4.  Except as provided herein, all other terms, conditions and provisions of the Statement of Work shall remain in full force and effect. This Second Amendment and the Statement of Work, including all documents referred to herein and attached hereto, constitute the entire agreement of the parties on the subject matter hereof and supersede all prior representations, understandings and agreements between the parties with respect to such subject matter. The documents referred to herein and attached hereto shall be read together with this Second Amendment and the Statement of Work to determine the parties' intent. If there is a conflict between or among this Second Amendment, the Statement of Work, and such documents, first this Second Amendment, and then the Statement of Work, shall control.

Sep 21 08 07:40a                                          7032438038              p.4

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the day and year first written above.

| KPMG LLP | Residential Funding Company, LLC |
|---|---|
| By: _~ul lli~_ | By: _____ |
| Printed Name _Douglas L. Cullican_ | Printed Name  Calvin Rose |
| Title _Partner_ | Title  Sr. Strategic Sourcing Manager |